James I. Stang, Esq. (SBN 94435)
Shirley S. Cho, Esq. (SBN 192616)
Werner Disse, Esq. (SBN 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: jstang@pszjlaw.com
       scho@pszjlaw.com
       wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV  89101
Telephone:  702/382.1170
Facsimile:  702/382.1169
Email: zlarson@lslawnv.com

E-Filed:  April 1, 2009

[Proposed] Attorneys for Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

| In re: | Case No. 09-14778-LBR |
|---|---|
| HERITAGE LAND COMPANY, LLC, a Nevada limited liability company, et al.,[1] | (Jointly Administered) |
| Debtors. | Chapter 11 |
| Affects: | **MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 105(a), 363(c), 1107(a), 1108 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO HONOR PREPETITION OBLIGATIONS TO CUSTOMERS AND TO OTHERWISE CONTINUE CUSTOMER PRACTICES AND PROGRAMS IN THE ORDINARY COURSE OF BUSINESS** |
| ☒ All Debtors ☐ Affects the following Debtor(s): | |

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

73203-001\DOCS_LA:198787.3

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this Court (this "Motion") for entry of an order authorizing the Debtors to honor prepetition obligations to customers and to otherwise continue customer practices and programs in the ordinary course of business. In support of this Motion, the Debtors respectfully state as follows:

## I.

## JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are sections 105(a), 363, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

## II.

## BACKGROUND

3. On March 31, 2009, the above-captioned Debtors (the "Primary Filers") except Tuscany Golf Country Club, LLC, Pinnacle Grading, LLC, and Rhodes Homes Arizona, LLC (the "Secondary Filers") filed voluntary petitions for relief under chapter 11 of title 11, United States Bankruptcy Code (the "Bankruptcy Code"). On April 1, 2009, the Secondary Filers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. All references to Petition Date herein shall mean March 31, 2009 for the Primary Filers or April 1, 2009 for the Secondary Filers, as applicable. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. The factual background relating to the Debtors' commencement of these Chapter 11 Cases is set forth in detail in the *Declaration of James M. Rhodes in Support of First Day Motions* (the "Rhodes Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## III.

## **RELIEF REQUESTED**

5.      Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace.  These practices include, but are not limited to, customer service obligations (the "Customer Care Programs"), sales incentive programs provided to induce customers to enter into sales contracts for the construction of homes ("Sales Incentive Programs"), and programs to pay, in whole or in part, the homeowners association fees of existing customers (the "HOA Fee Payment Programs" and, together with the Customer Care Programs and Sales Incentive Program, the "Customer Programs").  Approval of the Debtors' request to honor the Customer Programs will permit the Debtors to meet certain prepetition and postpetition obligations to their customers, enhance customer satisfaction and protect the Debtors' reputation for outstanding customer service and its overall brand.

6.      The types of Customer Programs offered by the Debtors are on par with homebuilders similar to the Debtors.  The Debtors have developed a strong reputation in the marketplace for customer service that sets the Debtors apart from their competitors and adds great value to the Debtors' brand name.  The Customer Programs are a cornerstone of the Debtors' businesses, and the Debtors must continue to offer their customers the same exceptional service if they wish to thrive in their remaining core areas.  The common goals of the Customer Programs have been to meet competitive pressures, ensure customer satisfaction, and protect the Debtors' reputation in the marketplace, thereby satisfying current customers, attracting new ones, and ultimately enhancing net revenue.

7.      These Customer Program obligations are often, but not necessarily, incorporated in the sale contracts to construct homes with customers.  The importance of such Customer Programs to maintain customer satisfaction and enhance the Debtors' brand name is of paramount importance in the current home sale market.  The Debtors have developed and maintain a strong reputation with their customers and throughout the market for quality home construction and superior customer service programs.  Because these chapter 11 cases may create apprehension for homebuyers

presently under contract, and may substantially impair future sales of homes in the absence of a "business as usual" atmosphere, the Debtors seek to continue to honor existing Customer Programs and continue to offer the same or similar Customer Programs related to new sale contracts on a going forward basis in their core markets.  Without a clear commitment by the Debtors to continue to deliver the Customer Programs, the Debtors' reputation will suffer to the detriment to their estates and creditors.

8. The Customer Programs, as implemented and modified from time to time in the ordinary course of business, range in scope from short-term incentive plans, such as advertised discounts or financing incentives, to warranties for customers who purchase homes.  The Customer Programs vary depending on the strength of the housing markets and the varying levels of competition in a particular locality.

9. In addition to the Customer Programs associated with sale of homes, the Debtors operate a pro golf store associated with their golf course at their master-planned community at Tuscany.

10. In essence, during the postpetition period the Debtors need to continue those Customer Programs that have been cost-effective and beneficial to their businesses.  Such relief is necessary to preserve their critical business relationships and goodwill for the benefit of their estates.  For the reasons set forth herein, it is in the best interests of the Debtors, their estates and creditors, to honor, in the Debtors' discretion, their prepetition obligations in connection with the Customer Programs, and to continue the Customer Programs in the ordinary course of business.

### IV.

### CUSTOMER PROGRAMS

11. The following describe the Debtors' Customer Programs:

**A.    One Year Limited Warranty**

12. The Debtors provide all of their homebuyers with a one year limited warranty (the "Warranty Program").  During the time period in which a home is under warranty, the Debtors are obligated to repair or replace any part of the new home that is materially defective due to the Debtors' workmanship or materials.

13. Customer warranty claims under the Warranty Program (the "Warranty Claims") are submitted in writing directly to the Debtors from homebuyers via the Internet. The Debtors pay such Warranty Claims from two separate sources of funds. First, as protection against large, catastrophic losses related to the Warranty Program, the Debtors are the insured under a home builders protective policy (the "Policy") with Lloyd's of London ("Lloyd's"). The Policy, which provides in relevant part coverage for any home constructed by the Debtors during the current policy period (10/1/2007 through 10/1/2010), has a per occurrence coverage limit of $2 million, an aggregate limit of $27 million for all occurrences, and a self-insured retention of $500,000 per claim. Due to the large amount of this self-insured retention, only the largest of Warranty Claims will have insurance available as a source of funding.

14. For Warranty Claims with a cost of under $500,000, the Debtors fund the repair or resolution of their Warranty Claims. As of March 20, 2009, there are 347 homes that are eligible for the Warranty Program. The Debtors have budgeted $1,200 per home on account of Warranty Claims for the one-year coverage period.

15. The Debtors seek authority, in the exercise of their business judgment and in their discretion, to honor prepetition obligations related to the Warranty Program and to continue to honor postpetition obligations related to the Warranty Program for any Warranty Claims received. The Debtors also request the authority, in the exercise of their business judgment and their discretion, to incur new, postpetition obligations under the Warranty Program, or other similar program. In order to attract new customers and maximize the going concern value of the Debtors' business, the Debtors request the authority to continue its existing Warranty Program and offer the Warranty Program to its potential new customers.

**B.    Sales Incentive Programs**

16. Sales Incentives vary from time to time and may include (a) discounts on price of home and/or design options, (b) financing incentives, and (c) promotional incentives. Examples include some combination of the following: discounts on base prices of individual home or all homes in a community, offering certain free options and/or upgrades, lot premium waivers, buydowns of interest rates and payment of closing costs.

17. Currently, the Debtors have offered six buyers that have canceled home sales contracts with a coupon towards a purchase of a Rhodes Home within six months from the cancellation date. The coupons are worth a total of $60,000. As of the Petition Date, the Debtors do not have any other active Sales Incentive Programs, but reserve their right to implement such a program in the future.

18. Programs such as the Sales Incentive Program are common in the marketplace, and are an essential component of the Debtors' marketing strategy. Customer confidence and goodwill, and the Debtors' ability to remain competitive, will be severely harmed and the Debtors' revenues will decline if the Debtors are prevented from developing and implementing an appropriate Sales Incentive Program after the Petition Date.

**C.     HOA Fee Payment Program**

19. In the ordinary course of business, the Debtors pay homeowner association dues ("HOA Fees") under two circumstances. First, in those partially-completed developments where the Debtors own homes that have not yet been sold, the Debtors may pay HOA Fees for those homes. Second, the Debtors may subsidize HOA Fees for current development homeowners until such time that the development is fully sold, at which time the HOA Fees will be shared equally by all homeowners in the development. On a monthly basis, the Debtors pay approximately $28,000 in HOA Fees. The Debtors seek authority, in their sole discretion, to pay any HOA Fees that may have accrued during the pre-petition period.

**D.     Tuscany Golf Pro Shop**

20. The Debtors own and operate a golf pro shop at their golf course at Tuscany. At the pro shop, customers purchase golf-related merchandise and can rent golf equipment for use at the Debtor's 18-hole golf course. The Debtors request the authority to continue operating Customer Programs at the pro shop in the ordinary course of business, including honoring approximately $4,800 in outstanding gift cards and accepting any return or exchange of unused merchandise pursuant to store policy.

21. The Debtors also pay credit card processing fees to credit card companies so that customers can make purchases of goods with credit cards. The amount of fees paid to the credit card

company is determined by a percentage of sales ranging from 1 to 3% depending on the credit card company, which is deducted directly from receipts in the case of American Express or monthly based on total credit card sales in the case of Visa, Mastercard, or Discover.  On a monthly basis, the Debtors pay approximately $5,000 on account of credit card processing fees to credit card companies, which they seek authority to pay in the ordinary course of business including any prepetition amounts that may be outstanding to the credit card companies.

## V.

## BASIS FOR RELIEF

22. Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in possession to continue to operate its business.  Section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to use property of the estate in the ordinary course of business without notice or a hearing.  The Debtors respectfully submit that their continuing, renewing, replacing, initiating and terminating their Customer Programs is in the ordinary course of their business and is permitted by sections 363(c), 1107(a) and 1108 of the Bankruptcy Code, without further application to the Court.  However out of an abundance of caution, the Debtors request the relief stated herein.

23. As to honoring prepetition claims, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).  A bankruptcy court's use of equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Under 11 U.S.C. §105, a court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, Inc., 98 B.R. at 177).  The Debtors strongly believe that continuation of the Customer Programs is imperative to the ongoing operations and viability of the Debtors.  Conversely, the Debtors submit that the Debtors' failure to honor their obligations under the Customer Programs would have a disastrous impact upon customer loyalty and goodwill as well as the Debtors' brand name in the homebuilder market.

24. The protection of Debtors' reputation and name in the marketplace is critical to the Debtors' goal of maximizing the value of their estates. Where protecting the Debtors' reputation is critical to the ongoing operations of a debtor for the benefit of its estates and creditors, courts in this and other districts have granted relief similar to that requested here. See, e.g., In re Lake at Las Vegas Joint Venture, LLC, et al., Case No. BK-S-08-17814-LBR (Bankr. D. Nev. July 24, 2008); In re WL Homes, LLC, et al., Case No. 09-10571 (BLS) (D. Del. February 20, 2009); In re Woodside Group, LLC, Case No. 08-20682 (PC) (C.D. CA Sept. 22, 2008).

25. Moreover, section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor's decisions to use, sell or lease assets outside of the ordinary course of business must be based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996), citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991). See In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application). See also In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is "good business reason").

26. The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). In a bankruptcy case, the decision must be "reasonable in light of the circumstances surrounding the Debtors' bankruptcy." In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (D. Del. 1999). In fact "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct." <u>In re Johns-Manville Corp.</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts have consistently and appropriately been loathe to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and will uphold a board's decisions as long as they are attributable to any "rational business purpose." <u>In re Integrated Res., Inc.</u>, 147 B.R. at 656.

27. The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment and is justified under section 363(b), as well as under section 105(a) of the Bankruptcy Code. If the Debtors are prohibited from honoring their prepetition customer program obligations and maintaining those Customer Programs consistent with their past business practices, both existing homeowners and potential customers will likely lose confidence in the Debtors, thereby impeding the Debtors' ability to maintain and enhance their business operations for the benefit of their creditors. The Debtors' failure to honor the Customer Programs would significantly disadvantage the Debtors in the highly competitive marketplace in which such programs are commonplace, and there is no reason to think that the Debtors' loyal customers would stay loyal if the Debtors did not honor or continue their Customer Program obligations. Ultimately, the damage from refusing to honor these obligations or continue these programs far exceeds the cost associated with honoring prepetition obligations and continuing the Customer Programs. At this critical early state, the Debtors simply cannot risk any loss of customer confidence in the marketplace as a result of the Debtors' failure to honor prepetition obligations to customers or discontinuing their Customer Programs. The relief requested herein will protect the Debtors' goodwill during this critical time and enhance the Debtors' ability to generate revenue. Consequently, the Debtors' estates and creditors will benefit if the requested relief is granted.

28. Maintenance of these Customer Programs is critical to the Debtors' business. They distinguish the Debtors from competitors, help maintain high levels of customer service and satisfaction and generally allow the Debtors to remain competitive in the homebuilding industry. The Debtors believe that the maintenance of their Customer Programs on a going-forward basis (including modifying existing programs and introducing new programs that are similar in scope and expense to existing programs) is well within the ordinary scope of their business operations.

Nevertheless, because the Debtors anticipate that these chapter 11 cases may create some apprehension with new homebuyers as to the scope of the Debtors' authority to continue the Customer Programs, the Debtors seek specific authority to continue the Customer Programs in the Debtors' discretion and in the ordinary course of business.

29. Any delay in the relief sought indeed, even being forced to advise customers that further judicial relief is necessary, could result in the Debtors' losing a substantial portion of their potential customer base, diminish the value of their assets, and severely harm their prospects for a successful reorganization.

30. Nothing herein is intended or should be construed as an admission as to the validity of any claim against any of the Debtors, a waiver of any of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of any of the Debtors' rights to subsequently dispute such claim and recover such payments.

## VI.

### THE DEBTORS HAVE MET THE REQUIREMENTS OF RULE 6003

31. Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described herein and as supported by the Sharp Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## VII.

### NOTICE

32. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee; (ii) the administrative agents for the Debtors' prepetition secured lenders and their respective counsel to the extent known, (iii) the Debtors' top 25

unsecured creditors on a consolidated basis as disclosed in their petitions; and (iv) all parties in interest requesting notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

WHEREFORE, the Debtors respectively request that the Court (i) enter an order in the form attached hereto and (ii) grant such other and further relief as this Court may deem just and proper.

Dated:    April 1, 2009              LARSON & STEPHENS

*/s/Zachariah Larson*
Zachariah Larson, Esq. (NV Bar No. 7787)
810 S. Casino Center Blvd., Ste. 104
Las Vegas, Nevada  89101

[Proposed] Counsel for Debtors and
Debtors in Possession

73203-001\DOCS_LA:198787.3