James I. Stang, Esq. (SBN 94435)
Shirley S. Cho, Esq. (SBN 192616)
Werner Disse, Esq. (SBN 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: jstang@pszjlaw.com
       scho@pszjlaw.com
       wdisse@pszjlaw.com

E-Filed:  April 1, 2009

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV  89101
Telephone:  702/382.1170
Facsimile:  702/382.1169
Email: zlarson@lslawnv.com

[Proposed] Attorneys for Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

| | |
|---|---|
| In re<br><br>HERITAGE LAND COMPANY, LLC, a Nevada limited liability company, et al.,[1]<br><br>          Debtors.<br><br>Affects:<br><br>☒ All Debtors<br>☐ Affects the following Debtor(s) | Case No. 09-14778-LBR<br>   (Jointly Administered)<br><br>Chapter 11<br><br>**DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 363, 503(b), 1107 AND 1108 AUTHORIZING (I) MAINTENANCE OF CERTAIN EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (IV) PROVIDING ADMINISTRATIVE PRIORITY STATUS TO** |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

**POSTPETITION INTERCOMPANY CLAIMS, AND (V) WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS; MEMORANDUM OF POINTS AND AUTHORITIES**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this Court for entry of an order authorizing the Debtors (1) to maintain certain existing bank accounts, and to pay any prepetition routine banking fees imposed by the financial institutions of these bank accounts, (2) to continue to use existing business forms, (3) to continue to use their existing cash management system, (4) to provide administrative priority to postpetition intercompany claims, and (5) for a limited waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code (the "Motion").

The Debtors' postpetition cash management system (the "Cash Management System") consists of twenty-two bank accounts that facilitate the timely and efficient collection, management and disbursement of funds used in the Debtors' business. Because of the nature of the Debtors' business and the disruption to the business that would result if it were forced to close these accounts, it is critical that the existing Cash Management System remain in place. Accordingly, through the Motion, the Debtors seek authority to retain certain accounts which form the core of its existing cash management system and to maintain the use of business forms.

This Motion is made and based upon these moving papers, the following Memorandum of Points and Authorities, the accompanying *Declaration of James M. Rhodes in Support of First Day Motions*, the record in these cases, including the pleadings and documents filed on behalf of the parties, the arguments and representations of counsel, and any oral or documentary evidence presented at or prior to the time of the hearing.

WHEREFORE, the Debtors respectfully request that this Court grant the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:   April 1, 2009                    LARSON & STEPHENS

*/s/Zachariah Larson*
Zachariah Larson, Esq. (NV Bar No. 7787)
810 S. Casino Center Blvd., Ste. 104
Las Vegas, Nevada  89101

[Proposed] Counsel for Debtors and
Debtors in Possession

## I.

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.   General Background**

On March 31, 2009, the above-captioned Debtors (the "Primary Filers") except Tuscany Golf Country Club, LLC, Pinnacle Grading, LLC, and Rhodes Homes Arizona, LLC (the "Secondary Filers") filed voluntary petitions for relief under chapter 11 of title 11, United States Bankruptcy Code (the "Bankruptcy Code").  On April 1, 2009, the Secondary Filers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  All references to Petition Date herein shall mean March 31, 2009 for the Primary Filers or April 1, 2009 for the Secondary Filers, as applicable.  The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The factual background relating to the Debtors' commencement of these Cases is set forth in detail in the *Declaration of James M. Rhodes in Support of First Day Motions* filed contemporaneously with this Motion or shortly thereafter and incorporated herein by reference.

Simultaneously with the filing of this Motion, the Debtors have filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) seeking joint administration of the Debtors' estates.

**B.   Background Related to the Cash Management System**

73203-001\DOCS_LA:198454.7

3

The Debtors' cash management system (the "Cash Management System") consists of bank accounts that facilitate the timely and efficient collection, management and disbursement of funds used in the Debtors' business. Because of the nature of the Debtors' business and the disruption to the business that would result if it were forced to close these accounts, it is critical that the existing Cash Management System remain in place.

Prior to the Petition Date, the Cash Management System consisted of 46 bank accounts (the "Bank Accounts"), 26 of which are maintained at Mutual of Omaha Bank ("Mutual of Omaha"), 12 of which are maintained at Community Bank of Nevada ("Community Bank"), 4 of which are maintained at Wells Fargo Bank ("Wells Fargo"), 2 of which are maintained at Mission Bank and 2 of which are maintained at Merrill Lynch.

In order to streamline the Cash Management System, the Debtors are closing 24 dormant or rarely used Bank Accounts (the "Closed Accounts") on the Petition Date. Through this Motion the Debtors are requesting to maintain the remaining core 22 Bank Accounts (the "Core Accounts").

Of the Core Accounts, twenty-one are maintained at Mutual of Omaha and one is maintained at Wells Fargo. The Closed Accounts include all Bank Accounts at Merrill Lynch, Mission Bank and Community Bank; accordingly, after the Petition Date the Debtors will no longer have any Bank Accounts open at these three financial institutions. There are also Closed Accounts at Mutual of Omaha and Wells Fargo.

A diagram showing the role of each Core Account in the Cash Management System is attached hereto as <u>Exhibit A</u>. A description of all of the Debtors' Bank Accounts appears in <u>Exhibit B</u>, attached hereto, which provides both a list of the Core Accounts and a list of the Closed Accounts. The Cash Management System is described in detail below.

The basic format of the Cash Management System is that all incoming funds from revenues are deposited into the relevant Debtor's operating account (the "Operating Account"). Funds from the Operating Accounts are swept daily, subject to any minimum balance requirements, into an interest-bearing custody account (the "Custody Account"), which is the central account in the Cash Management System. The Custody Account funds the Operating Accounts on an "as needed" basis.

The Debtors' disbursements for vendor payments, payroll and other operating expenses (collectively, the "Operating Expenses") are made either from the Operating Accounts or from special-purpose zero balance accounts that are funded by the Operating Accounts.

The Debtors will have 10 postpetition Operating Accounts:

(i) The Rhodes Companies, LLC operating account (Account No. ending in 2186) (the "Rhodes Companies Operating Account");

(ii) the Pinnacle Grading, LLC operating account (Account No. ending in 2062) (the "Pinnacle Operating Account");

(iii) the Rhodes Ranch GP operating account (Account No. ending in 2178) (the "Rhodes Ranch GP Operating Account");

(iv) the Rhodes Ranch Golf & Country Club, LLC operating account (Account No. ending in 1940) (the "RRGC Operating Account");

(v) the Tribes Holdings, LLC operating account (Account No. ending in 0706) (the "Tribes Operating Account");

(vi) the Tuscany Golf Country Club, LLC operating account (Account No. ending in 2089) (the "Tuscany Operating Account");

(vii) the Rhodes Homes Arizona, LLC operating account (Account No. ending in 4541) (the "Rhodes Homes Arizona Operating Account");

(viii) the Rhodes Arizona Properties, LLC operating account (Account No. ending in 4533) (the "Rhodes Arizona Operating Account");

(ix) the H. Heritage Land Company, LLC operating account (Account No. ending in 2151) (the "Heritage Operating Account"); and

(x) the Apache Framing LLC operating account (Account No. ending in 0714) (the "Apache Framing Operating Account").

One of the functions of the Operating Accounts is to act as disbursement accounts to pay Operating Expenses for the relevant Debtor. In addition, certain of the Debtors also have special purpose zero balance accounts and low balance accounts (the "Zero Balance Accounts"), whereby funds are placed into the Zero Balance Accounts only to the extent necessary to pay specific Operating Expenses. The Zero Balance Accounts are funded by the Operating Accounts, with the exception of the Rhodes Realty Commissions Account, as defined below, which is funded by the proceeds from the sale of homes. The Zero Balance Accounts are summarized as follows:

(a) Rhodes Design and Development Corp. has a payroll account (Account No. ending in 1038) (the "RDD Payroll Account"), a flex spending account (Account No. ending in 1354) (the "RDD Flex Account") and a second flex spending account (Account No. ending in 1963)

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

(the "Second RDD Flex Account"), all three of which are funded by the Rhodes Companies Operating Account;

(b)  C&J Holdings, Inc. has a payroll account (Account No. ending in 1054) (the "C&J Payroll Account"), which is funded by the Rhodes Companies Operating Account;

(c)  Rhodes Realty, Inc. has a payroll account (Account No. ending in 1003) (the "Rhodes Realty Payroll Account"), which is funded by the Rhodes Companies Operating Account, and a commissions account (Account No. ending in 0996) (the "Rhodes Realty Commissions Account"), which is funded by the proceeds from the sale of homes;

(d)  The Tuscany Golf Country Club, LLC has a payroll account (Account No. ending in 2097) (the "Tuscany Payroll Account"), which is funded by the Tuscany Operating Account;

(e)  Pinnacle Grading, LLC has a payroll account (Account No. ending in 2070) and a petty cash account (Account No. ending in 4517), both of which are funded by the Pinnacle Operating Account; and

(f)  Rhodes Homes Arizona, LLC has a payroll account (Account No. ending in 2054) and a petty cash account (Account No. ending in 2046), both of which are funded by the Rhodes Homes Arizona Operating Account.

The average amount held in the Custody Account over the past 30 days was approximately $8,000,000.

The approximate average amount held in the Operating Accounts over the past 30 days was:

(i)    the Rhodes Companies Operating Account - $750,000;

(ii)   the Pinnacle Operating Account - $13,000;

(iii)  the Rhodes Ranch GP Operating Account - $100,000;

(iv)   the RRGC Operating Account - $300,000;

(v)    the Tribes Operating Account - $30,000;

(vi)   the Tuscany Operating Account - $500,000;

(vii)  the Rhodes Homes Arizona Operating Account - $500,000;

(viii) the Rhodes Arizona Operating Account - $200,000; and

(ix)   the Heritage Operating Account - $100,000.

The Zero Balance Accounts all end each day with a zero balance.

**C.    The Court Should Authorize the Debtors to Maintain Existing Bank Accounts**

The United States Trustee for the District of Nevada has established certain operating guidelines for debtors in possession. One such provision requires a chapter 11 debtor in possession

to open new bank accounts and close all existing accounts. The United States Trustee Guidelines also require that the new bank accounts only be opened in certain financial institutions designated as authorized depositories by the United States Trustee. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

The Debtors seek a waiver of the United States Trustee's requirement that all Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in this case, the United States Trustee's requirement would disrupt the Debtors' activities and would impair the Debtors' ability to operate under chapter 11.

Maintenance of the Core Accounts will greatly facilitate the Debtors' operations in chapter 11. As noted above, all payments from the Debtors' customers are deposited into the eight Operating Accounts and the Rhodes Realty Commissions Account. If the Core Accounts were closed, the Debtors would have to open new accounts and then attempt to coordinate alternative arrangements with its customers and vendors, which could well disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred postpetition. Such a disruption would severely impact and could irreparably harm the Debtors' ability to operate their business.

To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain their existing Core Accounts and, if necessary, to open new accounts or close unnecessary existing accounts.

To guard against improper transfers resulting from the postpetition honoring of prepetition checks, banks may not honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of the Core Accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

If the relief requested herein is granted, the Debtors will not pay, and the banks will be instructed not to pay, any debts incurred before the Petition Date other than as specifically

authorized by this Court.

**D.     The Court Should Authorize the Debtors to Continue their Existing Cash Management System**

The Debtors hereby seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor in possession financing facility and/or cash collateral usage and related order of this Court.

For the reasons set forth above, the Debtors' Cash Management System constitutes an essential business practice that was created and implemented by the management of the Debtors in the exercise of their business judgment.  The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) ensure cash availability; (c) control and monitor corporate funds; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information.  In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

Bankruptcy courts routinely grant chapter 11 debtors authority to continue utilizing existing cash management systems and treat requests for such authority as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R.  321, 327 (Bankr. S.D. Ohio 1987).  This is particularly true where, as here, the chapter 11 case involves affiliated entities with complex financial affairs.  In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example, the bankruptcy court entered an order authorizing the debtor and forty-three (43) of its subsidiaries "to continue to consolidate the management of its cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." *Id*. at 620.  The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtor to utilize its prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code.  *Id*. at 621.

73203-001\DOCS_LA:198454.7

Likewise, in another context, the bankruptcy court in the *Columbia Gas* chapter 11 case explained that a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S. Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court. *Medical Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2nd Cir. 1997). Included within the purview of section 363(c) is a Debtors' ability to continue the "routine transactions" necessitated by a Debtors' cash management system. *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Accordingly, the Debtors seeks authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement of cash pursuant to its Cash Management System described above.

Additionally the Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Debtors' Cash Management System without interruption is vital to the success of these Cases. The Cash Management System is a mechanism whereby the Debtors are able to transfer their revenues toward the payment of their obligations and without which the Debtors' organization

would fail.

**E.     Payment of Outstanding Routine Prepetition Expenses Relating to the Operation of the Cash Management System**

In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System described above. The Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees owed to any banks.

**F.     The Court Should Allow the Debtors to Continue Certain Intercompany Arrangements and Accord Administrative Expense Priority to Intercompany Claims after the Petition Date**

As described above, under the Cash Management System, transfers are made between and among the Debtors (the "Intercompany Transfers") as part of their consolidated Cash Management System. For example, the Rhodes Companies Operating Account funds the RDD Payroll Account, the RDD Flex Account, the Second RDD Flex Account, the C&J Payroll Account and the Rhodes Realty Payroll Account. Discontinuing Intercompany Transfers could impact the Debtors' ability to fund payroll accounts and make timely payments to vendors. Intercompany transfers are tracked by means of a monthly reconciliation of bank statements, which permits the easy accounting of transfers to and from each Debtor. Accordingly, the Debtors respectfully submit that the continuation of the Intercompany Transfers in the ordinary course is in the best interest of the Debtors' estates and, therefore, the Debtors should be permitted to continue such Intercompany Transfers. To be clear, however, the Debtors do not hereby request authority to make any transfers to entities other than the Debtors, or to pay any Intercompany Claims that arose prior to the Petition Date.

To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of an affiliated entity, the Debtors respectfully request that all Intercompany Claims arising from such transfers on and after the Relief Date be accorded administrative expense priority under section 503(b) of the Bankruptcy Code. If Intercompany Claims are given administrative expense priority, each entity that utilizes funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

Administrative expense treatment for Intercompany Claims, like that requested here, has been granted in numerous other large chapter 11 cases and is similarly appropriate in these Cases. *See, e.g.*, *In re TOUSA, Inc., et al.*, No. 08-10928 (JKO) (Bankr. S.D. Fla. June 21, 2008); *In re Kimball Hill, Inc., et al.*, No. 08-10095 (SPS) (Bankr. N.D. Ill. May 13, 2008); *In re UAL Corp.*, No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002).

### G.  The Court Should Grant the Debtors Authority To Use Existing Business Forms

The Debtors also request authority to continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders, invoices, marketing materials, customer care booklets, etc.) without reference to their "debtor in possession" status. Parties doing business with the Debtors undoubtedly will be aware, as a result of the notice that will be sent of the filing of the Cases and the publicity of the filing, of each of the Debtor's status as a chapter 11 debtor in possession. Changing correspondence and business forms would be unnecessary and burdensome to the estates, as well as expensive and disruptive to the Debtors' reorganization efforts. For this reason, the Debtors request that they be authorized to use business forms without placing the label "debtor in possession" on each such form; provided that the Debtors shall add such designation to any new business forms that they order.

Bankruptcy courts routinely grant authority to continue using existing business instruments in chapter 11 cases. *See, e.g., In re Johnson*, 106 B.R. 623, 624 (Bankr. D. Neb. 1989) (debtors not required to obtain new checks imprinted with "Debtor in Possession" legend). The reason that such authority is routinely granted is fundamental – there is simply no reason to force a complex business enterprise to incur the expense of reprinting myriad business forms, or to hamper administration of the Debtors' Cases to the further economic detriment of their creditors while the new forms are being printed. Accordingly, the Court should authorize the Debtors' continued use of existing business forms as set forth above.

### H.  Cause Exists to Waive Bankruptcy Code § 345(b) Requirements

Section 345 of the Bankruptcy Code authorizes deposits or investments of money of the estates, such as Debtors' cash, only in a manner that will yield the maximum reasonable net return on such funds, taking into account the safety of each deposit or investment. If deposits or

investments are not insured or guaranteed by the United States or backed by the full faith and credit of the United States, section 345(b) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the estate must require the entity with which the money is deposited or invested to obtain a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety. It is within the Court's discretion to extend or waive the investment guidelines requirement of section 345(b) of the Bankruptcy Code "for cause." *See* 11 U.S.C. § 345(b); *see also* 140 Cong. Rec. H10752-01 (October 4, 1994).

Cause exists to grant the limited waiver requested in these Cases. Twenty-one of the Core Accounts are maintained at Mutual of Omaha, which is an approved depository in Region 13. The Debtors have asked Mutual of Omaha to become an approved depository in Region 17 (an "Approved Depository"). Pursuant to the terms and conditions specified by the U.S. Trustee's Approved Depository and Collateralization Agreement, once Mutual of Omaha becomes an Approved Depository, Mutual of Omaha will be pledging (the "Collateralization") government securities it owns in the amount of 115% of the difference between a) the amount of the Debtors' funds Mutual of Omaha is holding, and b) the guarantee limit of the Federal Deposit Insurance Corporation (the "FDIC"). As a result, all of the Debtors' funds held at Mutual of Omaha will be guaranteed either through the Collateralization or the FDIC. The remaining Core Account, the Second RDD Flex Account, is a zero balance account that is funded only to the extent necessary to make payments and is maintained at Wells Fargo, an Authorized Depository. Accordingly, the Debtors submit that cause exists to waive the requirements of section 345 of the Bankruptcy Code.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto (i) authorizing the Debtors to maintain the Core Accounts, subject to the Debtors' ability, in its discretion, to close any unnecessary Core Accounts throughout the chapter 11 Cases; (ii) authorizing the Debtors to continue to use existing business forms without reference to the debtor-in-possession status; (iii) authorizing the Debtors to continue to employ their existing Cash Management System; (iv) authorizing the Debtors to provide administrative priority to postpetition intercompany claims, (v) granting a limited waiver of the investment and deposit guidelines set forth in Bankruptcy Code Section 345(b); and (vi) granting such other and further

relief as the Court deems appropriate.

Dated:   April 1, 2009              LARSON & STEPHENS

*/s/Zachariah Larson*
Zachariah Larson, Esq. (NV Bar No. 7787)
810 S. Casino Center Blvd., Ste. 104
Las Vegas, Nevada  89101

[Proposed] Counsel for Debtors and
Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA