James I. Stang, Esq. (SBN 94435)
Shirley S. Cho, Esq. (SBN 192616)
Werner Disse, Esq. (SBN 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: jstang@pszjlaw.com
       scho@pszjlaw.com
       wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV  89101
Telephone:  702/382.1170
Facsimile:  702/382.1169
Email: zlarson@lslawnv.com

E-Filed: April 1, 2009

[Proposed] Attorneys for Debtors and Debtors in Possession

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

| | |
|---|---|
| In re:<br><br>HERITAGE LAND COMPANY, LLC, a Nevada limited liability company, et al.,[1]<br><br>    Debtors.<br><br>_____<br>Affects:<br><br>☒ All Debtors<br>☐ Affects the following Debtor(s) | Case No.: 09-14778-LBR<br>(Jointly Administered)<br><br>Chapter 11<br><br>**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE (A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL, (B) GRANTING** |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

ADEQUATE PROTECTION TO THE DEBTORS' PREPETITION SECURED PARTIES AND (C) SCHEDULING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this Motion (the "Motion") for entry of interim and final orders, pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), (a) authorizing the Debtors to use cash collateral, (b) granting adequate protection to the Debtors' prepetition secured creditors, and (c) scheduling a final hearing on the Motion pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

As all of the Debtors' cash is Cash Collateral (as defined in the Memorandum of Points and Authorities below), the use of Cash Collateral is required to fund day-to-day business operations, including payments to employees, and generally to sustain the Debtors' business operations. Unless the Court authorizes use of the Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to continue their business operations, pay their employees and maximize the value of the Debtors' estates. Indeed, absent sufficient funds to support the Debtors' business operations, the Debtors' reorganization prospects would be imperiled. Therefore, authorization to use Cash Collateral pending the Final Hearing is in the best interests of the Debtors' estates and creditors.

This Motion is made and based upon these moving papers, the following Memorandum of Points and Authorities, the accompanying *Declaration of James M. Rhodes in Support of First Day Motions*, the accompanying *Declaration of Paul David Huygens in Support of (A) Debtors' Motion to Use Cash Collateral, and (B) Debtors' Motion to Use Cash Management System*, the record in these cases, including the pleadings and documents filed on behalf of the parties, the arguments and representations of counsel, and any oral or documentary evidence presented at or prior to the time of the hearing.

73203-001\DOCS_LA:198808.6

2

WHEREFORE, the Debtors respectfully request that the Court enter an order approving the relief set forth above and granting such other relief as is just and proper.

Dated:   March 31, 2009             LARSON & STEPHENS

*/s/Zachariah Larson*
Zachariah Larson, Esq. (NV Bar No. 7787)
810 S. Casino Center Blvd., Ste. 104
Las Vegas, Nevada  89101

[Proposed] Counsel for Debtors and
Debtors in Possession

I.

**MEMORANDUM OF POINTS AND AUTHORITIES**

A.      **General Background**

On March 31, 2009, the above-captioned Debtors (the "Primary Filers") except Tuscany Golf Country Club, LLC, Pinnacle Grading, LLC, and Rhodes Homes Arizona, LLC (the "Secondary Filers") filed voluntary petitions for relief under chapter 11 of title 11, United States Bankruptcy Code (the "Bankruptcy Code").  On April 1, 2009, the Secondary Filers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  All references to Petition Date herein shall mean March 31, 2009 for the Primary Filers or April 1, 2009 for the Secondary Filers, as applicable.  The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The factual background relating to the Debtors' commencement of these Cases is set forth in detail in the *Declaration of James M. Rhodes in Support of First Day Motions* ("Rhodes Declaration") filed contemporaneously with this Motion or shortly thereafter and incorporated herein by reference.

Simultaneously with the filing of this Motion, the Debtors have filed a motion with this Court pursuant to Bankruptcy Rule 1015(b) seeking joint administration of the Debtors' estates.

B.      **Bankruptcy rule 4001 and Concise Statement of Relief**

1.      Relief Requested

The Debtors request the entry of an interim order and final order authorizing the Debtors to, among other things: (i) use cash collateral to pay those amounts for those expenses set forth in the 13 week budget (the "13 Week Budget") and this Motion, subject to a variance of 20% per line item on an interim basis; and (ii) after payment of the foregoing from cash collateral, authorizing the Debtors to use the excess, to fund the costs and expenses of this chapter 11, including the cost and expenses

of Debtors who do not generate revenue or generate insufficient income to pay for their costs of operation in full; and (iii) finding that adequate protection is provided through the adequate protection proposal made by the Debtors at Section E below. A copy of the proposed Order for interim use of cash collateral (the "Interim Order") is attached hereto as <u>Exhibit A</u>. A copy of the 13 Week Budget is attached hereto as <u>Exhibit B</u>.

2. <u>Purpose of Use and Use of Cash Collateral</u>

The Debtors propose to use "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") to pay those expenses and in those amounts set forth in the 13 Week Budget and this Motion on an interim and final basis. These expenses include, but are not limited to payroll, utilities, property costs, insurance, repairs and maintenance, professional fees and expenses and similar charges and expenses.

3. <u>Duration of Use of Cash Collateral</u>

The Debtors propose to use Cash Collateral first, to and through the date fixed by the Court for the conduct of the final cash collateral hearing and, in that connection, seek on a final basis to use cash collateral through July 1, 2009, subject to further extension, if appropriate, after a notice and a hearing.

4. <u>Bankruptcy Rule 4001(b)</u>

Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 15-day period following the filing of a motion requesting authorization to use cash collateral, "only ... as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 400I(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g.*, *In re Simasko Production Co.*, 47 B.R. 444,449 (D. Co. 1985), 47 B.R. at 449; *see also In re Ames Dep't Stores Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990). After the 15-day

73203-001\DOCS_LA:198808.6

5

period, the request for use of cash collateral is not limited to those amounts necessary to prevent immediate and irreparable harm to the debtor's business. Rather, a debtor is entitled to use cash collateral that it believes prudent in the operation of its business. *See*, *e.g.*, *Simasko*, 47 B.R. at 449; *Ames Dep't Stores*, 115 B.R. at 36.

The Debtors further respectfully request that, pursuant to Bankruptcy Rule 4001(b)(2), this Court set a date and time for the Final Hearing to consider the entry of a Final Order approving the relief sought in the Motion.

    5.    <u>Adequate Protection to be Provided to Each Entity Claiming an Interest in Cash Collateral</u>

The Debtors propose as and for adequate protection for their use of cash collateral that: (i) the use of cash collateral will first fund the expenses of preserving, maintaining and operating the real properties subject to a claim of cash collateral for the benefit of Cash Collateral Creditors, as defined below; (ii) the use of cash collateral is subject to the Operating Projections and thus the Cash Collateral Creditors, as defined below, are provided adequate protection in knowing the purpose and amount of the cash collateral's use; and (iii) it appears to the Debtors that the value of the secured creditors' interest in cash collateral will not be diminished by such use, or through the passage of time.

**C.**    **Background Related to Cash Collateral**

    1.    <u>Corporate Structure</u>

The Debtors' organizational chart is attached to the Rhodes Declaration as <u>Exhibit A</u>. In addition to the Debtor entities below, the Debtors are affiliated with several other companies that are not Debtors in these proceedings. However, the Cash Collateral will not be used to pay any of the expenses of the non-Debtor affiliates.

Rhodes Ranch GP is the primary holder of land associated with the Rhodes Ranch master-planned community and also owns some commercial properties outside of the Rhodes Ranch master-planned community. The Rhodes Ranch master-planned community consists of several

developments, including developments built by non-Debtor affiliated developers. Rhodes Design and Development Corp. holds the Debtors' contractor's license in Nevada along with holding some land. Previously, Rhodes Ranch Golf and Country Club was the owner and operator of the golf course and club house in the Rhodes Ranch development, but on December 22, 2008, as required by the Debtors' secured lenders, its assets were sold to non-debtor Rhodes Ranch Golf, Inc. The Rhodes Companies, LLC is a real estate development holding company.

The following Debtors hold parcels of land associated with the Tuscany development: Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC; Tuscany Acquisitions III, LLC; and Tuscany Acquisitions IV, LLC. Tuscany Golf Country Club, LLC owns and operates the golf club located at the Tuscany development.

The following Debtors own land in Arizona: Rhodes Homes Arizona, LLC; Rhodes Arizona Properties, LLC and Elkhorn Investments, Inc. Rhodes Homes Arizona, LLC also holds the Debtors' Arizona contractor's license.

Heritage Land Company, LLC is the land management company for its subsidiaries and does not hold any real estate directly. The following Debtors are subsidiaries of Heritage Land Company, LLC and hold various parcels of land primarily located in Nevada: Tick, LP; Glynda, LP; Chalkline, LP; Batcave, LP; Jacknife, LP; Wallboard, LP; Overflow LP; and Jarupa LLC.

The Company is also involved in land acquisition, development, and some utility and design work. Exterior and interior design is provided by Rhodes Design & Development Corporation, which was named as one of the top 10 builders by the Meyers Group in 2003. Rhodes Realty, Inc. is the Debtor that provides sales and marketing services for the Debtors. C & J Holdings, Inc. is the homeowners association management company for Rhodes Ranch, Tuscany, and three other smaller communities.

Pinnacle Grading, LLC provides grading and excavation services to the Debtors. Previously, the following Debtors also provided specific services to the Debtors, but have ceased operations within the past year: Bravo Inc.; Gung-Ho Concrete, LLC; Geronimo Plumbing, LLC; Arapahoe Cleaning, LLC; Apache Framing, LLC; Six Feathers LLC; and Tribes Holding LLC.

Elkhorn Investments, Inc. is a holding company for Elkhorn Partners, LP. Elkhorn Partners, LP is a limited partnership that was formed for the purchase of one home that is currently on the market relating to construction defect litigation.

2. The Debtors' Prepetition Debt Structure

Pursuant to that certain *Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders, and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger*, as amended from time to time (the "$430,000,000 Senior Secured Credit Facility (First Lien)"), three of the Debtors as named therein are directly obligated to a syndicate of 29 lenders in the approximate amount of $302 million as of the Petition Date. The remainder of the filing Debtors have executed guaranties under the same facility. Other than the guarantees of the other filing Debtors, the $430,000,000 Senior Secured Credit Facility (First Lien) is not guaranteed. The Lenders under the $430,000,000 Senior Secured Credit Facility (First Lien), assert a blanket first lien and security interest on substantially all of the Debtors' property.

Pursuant to that certain *Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein, as the Lenders, and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger*, as amended from time to time (the "$70,000,000 Second Secured Credit Facility (Second Lien)"), three of the Debtors as named therein are obligated to a syndicate of approximately 21 lenders in the approximate amount of $70.7 million as of the Petition Date. Other than the

guarantees of the other filing Debtors, the $70,000,000 Second Secured Credit Facility (Second Lien) is not guaranteed. The Lenders under the $70,000,000 Second Secured Credit Facility (Second Lien) assert a blanket second lien and security interest on substantially all of the Debtors' property (the "Second Lien Lender Collateral" which together with the First Lien Lender Collateral shall be referred to as the "Prepetition Lender Collateral" or the "Cash Collateral Properties").

The Debtors are obligated to approximately 9 equipment lenders who hold a purchase money security interests in various office equipment and equipment used in the Debtors' operations. As of the Petition Date, the Debtors estimate that they are obligated to these equipment lenders in the approximate amount of $2.5 million. Jim Rhodes has personally guaranteed some of these secured claims.

In the ordinary course of business, the Debtors are required to post bonds, either on an unsecured or partially secured basis backed by collateral, as support for the Debtors' completion of certain performance and/or payment obligations for the benefit of various third party beneficiaries, generally governmental entities, agencies, jurisdictions or homeowners associations with which they conduct business. The Debtors rely on bonding companies to post the bonds and have issued indemnities in favor of the bonding companies in the event that the bonds come due. Jim Rhodes personally indemnified some, if not all, of these bonds. The Debtors estimate that they have approximately $30.2 million in outstanding bonds, none of which amounts have been called as of the Petition Date.

As of the Petition Date, the Debtors estimate that they are obligated to various service and goods providers for over $2.5 million on an unsecured basis. Jim Rhodes has a personal claim of approximately $11 million.

As set forth above, the amounts owing on the Petition Date (the "Prepetition Indebtedness") under the $430,000,000 Senior Secured Credit Facility (First Lien) and the $70,000,000 Second Secured Credit Facility (Second Lien) (collectively, the "Prepetition Credit Agreements") are secured by liens (collectively, the "Prepetition Liens") on substantially all of the Debtors' assets, including the Debtors' "cash collateral" as such term is defined in section 363 of the Bankruptcy

Code (the "Cash Collateral"). Thus, the Debtors do not have any unencumbered cash with which to operate their businesses. To date, the Debtors have not yet obtained the consent of the First Lien Lenders and the Second Lien Lenders (collectively, the "Cash Collateral Creditors") to use the Cash Collateral, though the Debtors will attempt to obtain such consent after the filing of this Motion.

**D.    The Debtors' Proposed Use of Cash Collateral and Requested Relief**

The Debtors require the immediate use of Cash Collateral to pay the operating expenses for its properties and also the Debtors' operating expenses. Absent the use of Cash Collateral, the Debtors cannot effectuate their reorganization, nor even sell their properties in an orderly fashion for the benefit of creditors. The Debtors have prepared the 13 Week Budget, which shows, *inter alia*, the Debtors' forecasted receipts and disbursements from the Petition Date through July 1, 2009.[2] The 13 Week Budget is attached hereto as Exhibit B.

Without the use of their Cash Collateral, the Debtors will likely be forced to cease operations, lay off their employees and liquidate their assets in a very short timeframe. The proposed use of Cash Collateral is no different than the use the Debtors have made of the income streams for many months before the filing of their Cases. More specifically, the Debtors respectfully request that the Court enter the Interim Order in the form attached hereto as Exhibit A authorizing the Debtors to use Cash Collateral to pay those April expenses set forth in the 13 Week Budget on an interim basis pending a final hearing. The salient points of the Order are that the Debtors also seek Court authority to exceed the total budgeted sums (both individually and in the aggregate) by as much as 20% per line item. This variance is requested to enable the Debtors to avoid having to rush back into Court if the Debtors' actual expenses exceed the Debtors' budgeted expenses by a negligible amount.

---

[2]    The Debtors' estimated financing needs after the Petition Date are based on assumptions that the Debtors believe are reasonable, but that may change materially. Accordingly, the Debtors reserve their right to seek additional relief in advance of the Final Hearing to the extent necessary to avoid immediate and irreparable harm to their business.

73203-001\DOCS_LA:198808.6

10

The reasons underlying the Debtors' need to use Cash Collateral during the course of the Cases are compelling. As all of the Debtors' cash is Cash Collateral, the use of Cash Collateral is required to fund day-to-day business operations, including payments to employees, and generally to sustain the Debtors' business operations. Unless the Court authorizes use of the Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to continue their business operations, pay their employees and maintain the value of the Debtors' estates. Indeed, absent sufficient funds to support the Debtors' business operations, the Debtors' reorganization prospects would be imperiled. Therefore, authorization to use Cash Collateral pending the Final Hearing is in the best interests of the Debtors' estates and creditors.

**E.  The Debtors Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve the Properties and to Fund Their Costs of Operation**

1. <u>Overview of Statutory Framework for the Use of Cash Collateral</u>

The Debtors' use of property of the estate is governed by Section 363 of the Bankruptcy Code. *See*, 11 U.S.C. §§ 363(c)(1), 1107(a) and 1108.

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest ..." 11 U.S.C. § 363(a). Section 363(c)(2) establishes a special requirement under the Bankruptcy Code with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U S.C. §363(c)(2)(A) and (B).

One of the provisions of "this section" referred to above, is Section 363(e), which section provides in pertinent part:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or

> condition such use, sale or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

The Debtors bring this Motion to obtain the requisite permission to use cash collateral for the operation of their properties and business. Further, in contemplation that the Cash Collateral Creditors would demand the provision of adequate protection under section 363(e), the Debtors have provided a comprehensive proposal for the provision of adequate protections, that in the Debtors' view provides ample protection against any diminution in the Cash Collateral Creditor's respective interests in their Cash Collateral.

Adequate protection is described in section 361:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503 (b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

Section 361 provides three non-exclusive means of providing adequate protection, where the same is required, in that adequate protection may take many forms. 3 *Collier on Bankruptcy*, (15th Ed. 2008), section 361.03, p. 361-9. Among other things, the term "indubitable equivalent" has been interpreted liberally. *In re Mocco*, 176 B. R. 355 (Bankr. D.NJ. 1995) citing to *United Savings Association v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 378 (1988), 108 S. Ct. 626, L.Ed. 2d 740. The use of cash collateral involves balancing the interests of the debtor and the secured creditor and the equities must thus be balanced in each case. *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982). It is recognized that "the purpose of Chapter 11 is to rehabilitate debtors and generally, access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D. N.H. 1993), quoting *In re Stein*, *supra*, 19 B.R. at 459. In order to encourage

reorganization, a flexible approach should be used in the application of adequate protection. *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (citing to *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The debtor's use of cash collateral during case administration must be considered in light of the quest of a successful reorganization. *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987). Adequate protection is not intended nor need it stand as an absolute guarantee to the secured creditor that it will receive the value of its interest in the collateral; the cash collateral. *In re McCombs Properties VI, Ltd.*, *supra*; *In re Elliott Lease Cars, Inc.*, 20 B.R. 893 (Bankr. D.R.I. 1982).

The Debtors submit, as shown below, that the facts and circumstances of these Cases justify the use of Cash Collateral as proposed by the Debtors and the adequate protection to be provided to the Cash Collateral Creditors is more than adequate.

2. <u>Use of Cash Collateral for Operating Expenses is Permitted</u>

It is well settled that the use of cash collateral for the preservation of the value of a secured creditor's lien is in and of itself sufficient to provide adequate protection to a secured creditor for use of those funds. *Federal Natl. Mortgage v. Dacon Bollingsbrook Associates Limited Partnership*, 153 B.R. 204; 214 (N.D. Ill. 1993); *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988); *In re Stein*, *supra*; *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981). In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs*, *supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations, and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral. The ordinary and customary costs of maintenance, operation and preservation of property are expenses that preserve and enhance the value of the secured creditor's interest in cash collateral. Such expenses are the same expenses a lender or the lender's receiver would have to pay to preserve and protect the property, and thus, there should be no

dispute of the appropriateness of payment of such expenses for their collateral properties by the Cash Collateral Creditors holding liens against the Cash Collateral Properties. *See*, *In re Princeton Square Associates, L.P.*, 201 B.R. 90, 96 (Bankr. S.D.N.Y. 1996). The Debtors' use of Cash Collateral will preserve and increase the value of the Cash Collateral Properties, not diminish the value.

The Debtors respectfully submit that they have satisfied the standards applicable for the use of Cash Collateral. As described above, it is vital to the success of the Debtors' reorganization efforts that they immediately obtain access to Cash Collateral. The preservation of the Debtors' business and the Debtors' ability to reorganize successfully depend heavily upon the expeditious approval of the use of Cash Collateral. Absent this Court's approval of the interim relief sought herein, the Debtors face a substantial risk of severe disruption to their business operations, irreparable damage to their relationships with their vendors and customers, and the inability to maintain the value of their assets.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, and granting such other and further relief as is just and proper under the circumstances.

Dated:    April 1, 2009              LARSON & STEPHENS

                                             */s/Zachariah Larson*
                                             Zachariah Larson, Esq. (NV Bar No. 7787)
                                             810 S. Casino Center Blvd., Ste. 104
                                             Las Vegas, Nevada  89101

                                             [Proposed] Counsel for Debtors and
                                             Debtors in Possession

# EXHIBIT A

**Rhodes Homes 13 Week Cash Flow Forecast**
**Prepared 4/1/2009**

| Starting Cash on 4/1/2009 | $ 1,863,563 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending (1) | 1<br>4/3/2009 | 2<br>4/10/2009 | 3<br>4/17/2009 | 4<br>4/24/2009 | 5<br>5/1/2009 | 6<br>5/8/2009 | 7<br>5/15/2009 | 8<br>5/22/2009 | 9<br>5/29/2009 | 10<br>6/5/2009 | 11<br>6/12/2009 | 12<br>6/19/2009 | 13<br>6/26/2009 | Totals |
| Units Closed - Standing Inventory (Sold) | 0 | 0 | 6 | 1 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| Units Closed - Under Construction (Sold) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 7 | 0 | 3 | 13 |
| Units Closed - Standing Inventory (Projected) | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 2 | 3 | 4 | 0 | 0 | 0 | 13 |
| Net Revenues - Standing Inventory (Sold) | $ - | $ - | $ 968,582 | $ 315,491 | $ 2,301,128 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 3,585,201 |
| Net Revenues - Under Construction (Sold) | | | | | | | | | | 737,783 | 1,419,389 | | 919,496 | 3,076,667 |
| Net Revenues - Standing Inventory (Projected) | | | | | | | 950,950 | 596,050 | 971,425 | 1,319,500 | | | | 3,837,925 |
| Revenues - Park Construction | | | | 1,342,000 | 315,000 | | | 415,000 | | | | | | 2,072,000 |
| Tuscany Golf Course Revenues | 21,000 | 85,000 | 70,200 | 68,000 | 68,000 | 65,000 | 62,000 | 73,000 | 65,000 | 60,000 | 50,000 | 51,000 | 54,000 | 792,200 |
| Pinnacle Grading Revenues | | | | 1,198,403 | | | | 1,438,315 | | | | | 2,009,103 | 4,645,821 |
| **Total Cash Receipts** | **21,000** | **85,000** | **1,038,782** | **2,923,894** | **2,684,128** | **65,000** | **1,012,950** | **2,522,365** | **1,036,425** | **2,117,283** | **1,469,389** | **51,000** | **2,982,599** | **18,009,814** |
| Insurance Financing | | | 2,038 | | 22,288 | | | | | 24,326 | | | | 48,651 |
| IT Services / Equip. (2) | | | 21,791 | | 8,591 | | | | | 8,591 | | | | 38,972 |
| Storage | | | 1,635 | | 1,635 | | | | | 1,635 | | | | 4,905 |
| Rent | | 29,878 | | | 29,878 | | | | | 29,878 | | | | 89,634 |
| Brokerage License | | 1,000 | | | 1,000 | | | | | 1,000 | | | | 3,000 |
| HOA Fees (3) | | | | | 2,808 | | | | | 2,808 | | | | 8,424 |
| Model Home Leases (4) | | 30,014 | | | 30,014 | | | | | 30,014 | | | | 90,041 |
| **Total 1st of Month Payments** | **-** | **60,892** | **28,271** | **-** | **96,213** | **-** | **-** | **-** | **-** | **98,251** | **-** | **-** | **-** | **283,627** |
| Rhodes Homes Payroll | | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 73,864 | 886,374 |
| Rhodes Homes Ordinary Course Professionals (5) | | 12,625 | 12,625 | 32,625 | 12,625 | 12,625 | 12,625 | 12,625 | 12,625 | 12,625 | 12,625 | 12,625 | 12,625 | 171,500 |
| Rhodes Homes AZ Payroll | | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 3,057 | 36,679 |
| Pinnacle Payroll | | 38,053 | 38,053 | 8,332 | 8,332 | 8,332 | 8,332 | 8,332 | 8,332 | 8,332 | 8,332 | 8,332 | 8,332 | 159,427 |
| **Total Payroll and Benefits** | **-** | **127,600** | **127,600** | **117,878** | **97,878** | **97,878** | **97,878** | **97,878** | **97,878** | **97,878** | **97,878** | **97,878** | **97,878** | **1,253,980** |
| Pinnacle (Job Cost) (6) | | 53,894 | 29,990 | 1,254,546 | 6,208 | 10,055 | 13,767 | 1,453,599 | 10,055 | 10,055 | 10,055 | 13,767 | 1,306,658 | 4,172,645 |
| Pinnacle (Equipment Notes Payments) | | | | 93,000 | | | | 93,000 | | | | | 93,000 | 279,001 |
| Rhodes Homes Vertical Costs (Cost to Complete) | | | 449,230 | 68,637 | 196,924 | 23,640 | 458,326 | 104,569 | 196,924 | 11,793 | 16,415 | 14,573 | 30,728 | 1,571,759 |
| Rhodes Homes Vert. Costs - Projected Dirt Lot Sales (7) | | | | | 58,347 | 116,694 | 116,694 | 233,387 | 116,694 | 233,387 | 116,694 | 233,387 | 116,694 | 1,341,978 |
| Rhodes Homes Land Dev. (Cost to Complete) (8) | | | | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 21,000 | 29,000 | 15,000 | 21,000 | 161,000 |
| Rhodes Ranch Park (Job Cost) (9) | | | 59,234 | 59,234 | 59,234 | 59,234 | 59,234 | 59,234 | 59,234 | 59,234 | | | | 473,873 |
| Rhodes Homes Warranty Repairs (Job Cost) | | 30,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 195,000 |
| Rhodes Homes Vertical Costs - A/P (10) | | | | | | | | 213,632 | | | | | | 213,632 |
| Rhodes Homes Land Dev. - A/P (10) | | | | | | | | 239,156 | | | | | | 239,156 |
| Rhodes Homes Land Dev. - Spirit Underground A/P (10) | | | | | | | | 288,773 | | | | | | 288,773 |
| Rhodes Homes Land Dev. - Park A/P (10) | | | | | | | | 514,377 | | | | | | 514,377 |
| **Total Job Cost** | **-** | **83,894** | **553,454** | **1,490,417** | **350,713** | **239,623** | **678,021** | **3,229,728** | **412,906** | **350,469** | **187,163** | **291,727** | **1,583,080** | **9,451,194** |
| Sales / Marketing | | 24,005 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 12,002 | 156,030 |
| G & A | | 34,657 | 17,328 | 17,328 | 27,478 | 17,328 | 20,928 | 17,328 | 17,328 | 17,328 | 17,328 | 17,328 | 17,328 | 239,020 |
| Builder Subsidies to Tuscany HOA | | | | | 47,298 | | | | | | | | | 68,697 |
| Sales and Use Tax (11) | | | | | 47,408 | | | | | 21,399 | | | | 47,408 |
| Debtor's Restructuring Professionals | | | | | 40,000 | | | | | | | | | 40,000 |
| Committee's Restructuring Professionals | | | | | | | | | | | | | | 300,000 |
| Employee & Consultant Housing and Travel Expenses | | 4,500 | 2,000 | 2,000 | 4,500 | 1,000 | 1,000 | 1,000 | 1,000 | 3,500 | 1,000 | 150,000 | 1,000 | 23,500 |
| **G&A Expenditures** | **-** | **63,162** | **31,331** | **31,331** | **178,687** | **30,331** | **33,931** | **180,331** | **30,331** | **54,230** | **30,331** | **180,331** | **30,331** | **874,656** |
| **Tuscany Golf Course Costs (12)** | **-** | **-** | **143,159** | **20,000** | **132,010** | **13,000** | **82,759** | **20,000** | **62,560** | **111,450** | **56,660** | **38,199** | **56,660** | **736,457** |
| Starting Cash Position | 1,863,563 | 1,884,563 | 1,634,017 | 1,788,984 | 3,053,251 | 4,881,879 | 4,566,047 | 4,686,409 | 3,680,836 | 4,113,586 | 5,518,592 | 6,615,949 | 6,058,814 | 1,863,563 |
| Projected Net Revenue | 21,000 | 85,000 | 1,038,782 | 2,923,894 | 2,684,128 | 65,000 | 1,012,950 | 2,522,365 | 1,036,425 | 2,117,283 | 1,469,389 | 51,000 | 2,982,599 | 18,009,814 |
| Disbursement for Week | | 335,547 | 883,815 | 1,659,626 | 855,501 | 380,832 | 892,589 | 3,527,937 | 603,675 | 712,277 | 372,032 | 608,135 | 1,767,949 | 12,599,914 |
| **Ending Cash Position** | **$ 1,884,563** | **$ 1,634,017** | **$ 1,788,984** | **$ 3,053,251** | **$ 4,881,879** | **$ 4,566,047** | **$ 4,686,409** | **$ 3,680,836** | **$ 4,113,586** | **$ 5,518,592** | **$ 6,615,949** | **$ 6,058,814** | **$ 7,273,464** | **$ 7,273,464** |

**Notes:**
(1) Week 1 is a stub week starting April 1, 2009.
(2) IT Services / Equip. payment in week 3 includes $13,200 of software license renewal payments (Timberline / Builder MT).
(3) HOA fees paid for completed communities in which the Company continues to own lots / property (Spanish Hills and Elkhorn).
(4) Lease payments paid to owners of model homes (11 units) which are representative of product that continues to be sold in Tuscany and in Rhodes Ranch.
(5) Ordinary course professionals include tax and legal counsel; tax counsel (Bob Evans) to be paid on April 24.
(6) Pinnacle job cost in Week 2 includes costs that would have been incurred in Week 1.
(7) Vertical construction costs incurred related to prospective, ongoing sales of product that is at the dirt lot phase of construction; based on last three months' sales rate.
(8) Land development work includes improvement work required under development agreement; $135,000 estimated expenditure (spread ratably over nine weeks). $45,000 return of cash (cash bond posted) expected 30-45 days after completion.
(9) Rhodes Ranch Park remaining job costs assumed to be spread ratably over 8 weeks.
(10) Prepetition accounts payable owed to critical vendors assumed to be paid in Week 8 in order to maintain existing and future business relationships.
(11) Sales and Use Tax paid quarterly in arrears.
(12) See attached schedule A for golf course expense details.

# EXHIBIT B

James I. Stang, Esq. (SBN 94435)
Shirley S. Cho, Esq. (SBN 192616)
Werner Disse, Esq. (SBN 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: jstang@pszjlaw.com
           scho@pszjlaw.com
           wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV  89101
Telephone:  702/382.1170
Facsimile:  702/382.1169
Email: zlarson@lslawnv.com

[Proposed] Attorneys for Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

SOUTHERN DIVISION

| | |
|---|---|
| In re: | Case No.: 09-14778-LBR |
| HERITAGE LAND COMPANY, LLC, a Nevada limited liability company, et al.,[1] | (Jointly Administered) |
| | Chapter 11 |
| Debtors. | **ORDER AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL ON AN INTERIM BASIS** |
| Affects: | |
| ☒ All Debtors | |
| ☐ Affects the following Debtor(s) | |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

1    Upon the motion (the "Motion")[2] of the debtors and debtors in possession in the above-
2    captioned cases (the "Debtors"), for entry of interim and final orders, pursuant to sections 105, 361,
3    362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, (a) authorizing the
4    Debtors to use cash collateral, (b) granting adequate protection to the Debtors' prepetition secured
5    creditors, and (c) scheduling a final hearing on the Motion pursuant to Rule 4001(b) of the Federal
6    Rules of Bankruptcy Procedure; upon the *Declaration of James M. Rhodes in Support of First Day*
7    *Motions* ("Rhodes Declaration") and the *Declaration of Paul David Huygens in Support of the*
8    *Motion*; upon the other pleadings and documents filed in these cases; and upon the arguments made
9    by counsel at the hearing, and the Court having jurisdiction to consider the Motion and the relief
10   requested therein in accordance with 28 U.S.C. § 1334; and it appearing that the relief requested by
11   the Motion is necessary and in the best interests of the Debtors, their estates, and their creditors; and
12   due notice of the Motion having been served upon (a) the Office of the United States Trustee, (b) the
13   secured creditors holding consensual liens on properties of the Debtors, and (c) the consolidated 25
14   largest unsecured creditors of the Debtors (the "25 Largest Unsecured Creditors"), and it appearing
15   that no other or further notice need be given; and sufficient cause appearing therefore, it is

**ORDERED**

17       1.    The Motion is GRANTED on an interim basis pending a final hearing, which
18   final hearing shall be held on April _, 2009 at _:__..m, before this Court (the "Final Hearing").
19       2.    The Debtors are hereby authorized to use the Cash Collateral to and through
20   the date set for the Final Hearing on the Motion, pursuant to the terms of the Motion and in the
21   amounts and for the expenses set forth in the 13 Week Budget attached to the Motion as Exhibit B.
22   In that connection, it is further ordered that the Debtor shall not deviate by more than 20% on any
23   line item in the 13 Week Budget.
24       3.    After the payment of the expenses of preserving, maintaining and operating
25   the Cash Collateral Properties, any excess income may be utilized by any other Debtor to pay its
26   ordinary costs and expenses of preserving, maintaining and operating its property. Further, such
27   excess income or receipts from any Cash Collateral Property shall be available to the Debtors to pay

---

[2] All capitalized terms not otherwise defined herein are defined in accordance with their usage in the Motion.

73203-001\DOCS_LA:199809.1

2

the fees and costs of the professionals of the Debtors' estates, as such fees and costs may be awarded by the Court after appropriate notice and a hearing.

      4.      Any opposition to the Motion must be filed with the Court and served on the United States Trustee, the Cash Collateral Creditors, parties requesting special notice, counsel for any official unsecured creditors committee appointed in these cases, or until such time as counsel is named, the 25 Largest Unsecured Creditors, or upon any such Committee of Creditors Holding Unsecured Claims, if one is appointed, and counsel to the Debtor, by no later than 4:00 p.m. on April __, 2009.

      5.      Any reply to opposition to the Motion must be filed with the Court, with a conformed copy delivered to chambers and a copy served on the United States Trustee, the Cash Collateral Creditors, counsel for any official unsecured creditors committee appointed in this case, or until such time as counsel is named, the 25 Largest Unsecured Creditors, and parties requesting special notice, by no later than 4:00 p.m. on April __,2009.

      6.      Upon entry of this Order, counsel for the Debtors shall forward written notice thereof to the creditors and interested parties described in paragraph 5 above.

      7.      The Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.

Dated: _____, 2009

                                      _____
                                      UNITED STATES BANKRUPTCY JUDGE

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

73203-001\DOCS_LA:199809.1