UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

LAS VEGAS, NEVADA

In re:  HERITAGE LAND COMPANY,   )  E-Filed:  04/15/09
LLC,                             )
                  Debtor.        )  Case No.
                                 )  BK-S-09-14778-LBR
_____)  Chapter 11

TRANSCRIPT OF PROCEEDINGS
OF
ORDER SHORTENING TIME
RE: MOTION FOR JOINT ADMINISTRATION
WITH LEAD CASE HERITAGE LAND COMPANY, LLC,
OF RELATED CHAPTER 11 CASES
AND SETTING SINGLE BAR DATE AND MEETING OF CREDITORS
AND PROPOSED ORDER, NO. 39
AND
ORDER SHORTENING TIME RE: APPLICATION
PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 363, AND 507(A)
FOR AN ORDER AUTHORIZING THE DEBTORS TO,
(1), PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS,
AND OTHER COMPENSATION;
(2), REMIT WITHHOLDING OBLIGATIONS;
(3), MAINTAIN EMPLOYEE COMPENSATION AND BENEFIT PROGRAMS
AND PAY RELATED ADMINISTRATIVE OBLIGATIONS;
AND, (4), HAVE APPLICABLE BANKS AND OTHER FINANCIAL
INSTITUTIONS RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS
PRESENTED FOR PAYMENT AND HONOR CERTAIN FUND TRANSFER BENEFITS;
AND MEMORANDUM OF POINTS AND AUTHORITIES, NO. 40
AND
ORDER SHORTENING TIME
RE: MOTION TO EXTEND TIME
TO FILE SCHEDULES OF ASSETS AND LIABILITIES
AND STATEMENT OF FINANCIAL AFFAIRS, NO. 41
AND
ORDER SHORTENING TIME
RE: APPLICATION FOR AN ENTRY OF AN ORDER
PURSUANT TO SECTIONS 105(A), 363(C), 1107(A), AND 1108
OF THE BANKRUPTCY CODE
AUTHORIZING THE DEBTORS TO HONOR PREPETITION OBLIGATIONS
TO CUSTOMERS
AND TO OTHERWISE CONTINUE CUSTOMER PRACTICES AND PROGRAMS
IN THE ORDINARY COURSE OF BUSINESS, NO. 43

ORDER SHORTENING TIME
RE: APPLICATION FOR ORDER
UNDER 11, USC, 105, 363, 503(B), 1107, 1108 AUTHORIZING,
(1), MAINTENANCE OF CERTAIN EXISTING BANK ACCOUNTS;
(2), CONTINUED USE OF EXISTING BUSINESS FORMS;
(3), CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM;
(4), PROVIDING ADMINISTRATIVE PRIORITY STATUS
TO POSTPETITION INTERCOMPANY CLAIMS,
AND, (5), WAIVER OF SECTION 345(B) DEPOSIT
AND INVESTMENT REQUIREMENTS;
MEMORANDUM OF POINTS AND AUTHORITIES, NO. 44
AND
ORDER SHORTENING TIME
RE: APPLICATION FOR ENTRY OF ORDER,
(1), AUTHORIZING THE DEBTORS TO SELL HOMES FREE AND CLEAR
OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS;
(2), ESTABLISHING PROCEDURES FOR THE RESOLUTION AND PAYMENT
OF LIENS AND CLAIMS,
AND, (3), AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR
ALL OBLIGATIONS RELATED THERETO, NO. 45
AND
ORDER SHORTENING TIME
RE: MOTION TO USE CASH COLLATERAL
FOR INTERIM AND FINAL ORDERS
PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364
OF DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
PURSUANT TO 105, 361, 362, 363, AND 364
OF THE BANKRUPTCY CODE,
(A), AUTHORIZING DEBTORS TO USE CASH COLLATERAL;
(B), GRANTING ADEQUATE PROTECTION TO THE DEBTOR'S
PREPETITION SECURED PARTIES;
AND, (C), SCHEDULING A FINAL HEARING;
MEMORANDUM OF POINTS AND AUTHORITIES, NO. 47
VOLUME 1
BEFORE THE HONORABLE LINDA B. RIEGLE
UNITED STATES BANKRUPTCY JUDGE

Tuesday, April 7, 2009

1:30 p.m.

Court Recorder:        Helen C. Smith

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

```
 1    APPEARANCES:

 2    For the Debtor:          ZACHARIAH LARSON, ESQ.
                               Larson & Stephens, LLC
 3                             810 South Casino Center Boulevard
                               Suite 104
 4                             Las Vegas, Nevada 89101

 5                             JAMES I. STANG, ESQ.
                               ALAN J. KORNFELD, ESQ.
 6                             SHIRLEY S. CHO, ESQ.
                               Pachulski, Stang, Ziehl & Jones, LLP
 7                             10100 Santa Monica Boulevard
                               Eleventh Floor
 8                             Los Angeles, California 90067

 9    For James Rhodes         BRETT A. AXELROD, ESQ.
      and Sagebrush            Greenberg Traurig, LLP
10    Enterprises, Inc.:       3773 Howard Hughes Parkway
                               Suite 500-N
11                             Las Vegas, Nevada 89169

12    For the Steering         TIMOTHY P. THOMAS, ESQ.
      Committee for            Kolesar & Leatham, Chtd.
13    Senior Secured           3320 West Sahara Avenue
      Lenders:                 Suite 380
14                             Las Vegas, Nevada 89102

15                             PHILIP C. DUBLIN, ESQ.
                               ABID QURESHI, ESQ.
16                             Akin, Gump, Strauss, Hauer & Feld, LLP
                               One Bryant Park
17                             New York, New York 10036

18    For Credit Suisse,       RODNEY M. JEAN, ESQ.
      Cayman Islands Branch:   Lionel, Sawyer & Collins
19                             300 South Fourth Street
                               Suite 1700
20                             Las Vegas, Nevada 89101

21                             RAMON M. NAGUIAT, ESQ.
                               Skadden, Arps, Slate, Meagher
22                               & Flom, LLP, and Affiliates
                               300 South Grand Avenue
23                             Suite 3400
                               Los Angeles, California 90071

24

25
```

4

1    APPEARANCES (Cont.):

2

     For the United States    AUGUST B. LANDIS, ESQ.
3    Trustee:                 Office of the United States Trustee
                              300 Las Vegas Boulevard South
4                             Suite 4300
                              Las Vegas, Nevada 89101
5
     For Wells Fargo:         DON S. DeAMICIS, ESQ.
6                             Ropes & Gray, LLP
                              One International Place
7                             Boston, Massachusetts 02110
                              (Telephonic)
8
     Also Present:            ROBERT BERGER
9                             President and Owner
                              Omni Management Group, LLC
10                            16501 Ventura Boulevard
                              Suite 440
11                            Encino, California 91436

12                            PAUL HUYGENS
                              Consultant
13                            Heritage Land Company, LLC

14

15

16

17

18

19

20

21

22

23

24

25

1          (Court convened at 01:37:58 p.m.)

2              THE CLERK:  Bankruptcy court is now in session.

3      (Colloquy not on the record.)

4              THE COURT:  Excuse me.  Be seated.

5      (Colloquy not on the record.)

6              THE COURT:  Okay.  Heritage Land Company.

7          Appearances, please.

8              MR. LARSON:  Good afternoon, your Honor.  Zach Larson

9      on behalf of the Heritage Land companies and related entities.

10     I'm local counsel for this matter.

11             MS. AXELROD:  Good afternoon, your Honor.

12     Brett Axelrod, Greenberg Traurig, for James Rhodes and

13     Sagebrush Holding Corporation.

14             MR. THOMAS:  Your Honor, Tim Thomas on behalf of the

15     Steering Committee for the Senior Secured Lenders.  Phil Dublin

16     and Abid Qureshi from Akin, Gump, Strauss, Hauer & Feld are

17     also here.

18             THE COURT:  Okay.

19         (Colloquy not on the record.)

20             MR. JEAN:  Rodney Jean of Lionel, Sawyer & Collins

21     and Ramon Naguiat of Skadden, Arps for Credit Suisse.

22             THE COURT:  Okay.

23             MR. STANG:  Good afternoon, your Honor.  James Stang,

24     S-t-a-n-g, Alan Kornfeld, and Shirley Cho appearing for the

25     debtors.

6

1          MR. LANDIS:  Good afternoon, Judge.  Augie Landis,

2     Assistant United States Trustee.

3          THE COURT:  Okay.  And on the telephone.

4          MR. BERGER:  Robert Berger of Omni Management Group.

5          MR. DeAMICIS:  Don DeAmicis at Ropes & Gray.  We

6     represent Wells Fargo.  That is the prospective administrative

7     agent and collateral agent for the second-lien lenders.

8       (Colloquy not on the record.)

9          THE COURT:  Okay.

10          THE CLERK:  That's it, your Honor.

11          THE COURT:  Okay.  All right.  Before we start, I

12     have a number of preliminary problems in this case.

13       (Colloquy not on the record.)

14          THE COURT:  And what I want to do is indicate what

15     those problems are, indicate what I think should happen next,

16     and then give the parties a chance to talk about where we go

17     next unless you're telling me there's some agreement that was

18     made between now and the last pleading.

19          MR. STANG:  If you're talking about cash collateral,

20     your Honor, or any of the others they objected to, no --

21          THE COURT:  Okay.

22          MR. STANG:  -- there has not been any progress.

23          THE COURT:  All right.  My preliminary problems are

24     this.  We don't even have a list of creditors in any of the

25     cases.  All we have is the consolidated list of some of the top

1   25 creditors.  Was a list of creditors filed in any of these

2   cases?

3             MR. STANG:  Your Honor, I --

4        (Colloquy not on the record.)

5             MR. STANG:  I apologize, your Honor.  I --

6        (Colloquy not on the record.)

7             MR. LARSON:  Your Honor, we could upload that

8   mass-mailing matrix today, this afternoon.

9             THE COURT:  Well, it's got to be a debtor by debtor.

10  I'm not going to have some list that's just a list of people.

11       This is not -- you only asked for joint administration and

12  rightfully so.  I'm not even sure to what extent I'm going to

13  grant that, but you can't do it as if these were substantively

14  consolidated which is what you're trying to do with some

15  mass-mailing list.  You can't do that.

16       It's got to be credit debtor by debtor.  We don't even

17  have that, yet.  All we have is a consolidated list of the top

18  25 creditors, and we don't even know from that list which

19  debtor allegedly owes which creditor that amount of money.

20       Secondly, the only motion for joint administration was

21  filed in the Heritage case.  It wasn't filed in any of the

22  other cases at all nor were any of the other pleadings filed in

23  the other cases.

24       Now, arguably, I suppose once you file the motion for

25  joint administration people know to look for the other matters,

1    but we also have a problem -- and it's not necessarily your

2    problem -- is that creditors of The Rhodes Companies would have

3    no way of finding anything.

4            MR. STANG:  Your Honor, we will correct that, and we

5    will change the -- if you grant the -- well, regardless of what

6    you grant vis-a-vis joint administration, if you want the -- if

7    we create a caption that becomes the lead caption, we will make

8    it whichever of the debtor --

9            THE COURT:  Okay.

10           MR. STANG:  -- (indiscernible) requests.

11           THE COURT:  The problem is since -- I guess the name

12   is The Rhodes Companies.  When you pull it up on our system,

13   you can't find it because you have to -- if you type in

14   Rhodes Companies --

15           MR. STANG:  Um-h'm.

16           THE COURT:  -- you have to know the name is

17   The Rhodes Companies.  As I'm saying, that isn't necessarily

18   your fault because of our system.

19           MR. STANG:  The --

20           THE COURT:  But for somebody who wanted to read about

21   this case, and they thought their debtor was Rhodes Companies,

22   they type that in, and it says no match.

23           MR. STANG:  Well, the only thing I could suggest

24   there is that there are some --

25           THE COURT:  File an a.k.a.

1        MR. STANG:  Well, I guess we could do that.

2        THE COURT:  If you did it as a.k.a.

3        MR. STANG:  I was also going to say that there are

4   some debtors whose names begin with Rhodes.

5        THE COURT:  Right.

6        MR. STANG:  And --

7        THE COURT:  But --

8        MR. STANG:  But that's not quite the same.

9        THE COURT:  That's right.  The problem is --

10        MR. STANG:  It will make --

11        THE COURT:  -- if somebody thinks that

12   Rhodes Companies --

13        MR. STANG:  Right.

14        THE COURT:  -- LLC, is their debtor, you can't find

15   it.  Now, again, that part is necessarily your fault.  We need

16   to fix that, but I would ask you to amend The Rhodes Companies

17   case to say a.k.a. Rhodes Companies.

18        MR. STANG:  And it will then pick up on PACER?

19        THE COURT:  Then it will pick up on PACER.

20        MR. STANG:  Okay.

21        THE COURT:  And I agree if we do joint administration

22   the lead case should be, probably, Rhodes Companies, LLC, but

23   that's a separate matter.

24     Let me next indicate some problems I have which could be

25   solved today, arguably, by listening, but, really, it's

1    something that needs to be fleshed out.

2        The chart -- well, let me tell about before I talk about

3    the chart because that's something I'm going to want for the

4    next hearing, and we're going to have to continue this hearing.

5        Because of the procedural problems where creditors weren't

6    necessarily noticed of these matters and, more importantly,

7    because of the objections raised by the secured lenders and the

8    U.S. Trustee as well as the motion to appoint a trustee, this

9    is going to require an evidentiary hearing.

10        First of all, vis-a-vis cash collateral, I don't have any

11    good evidence that would support today a motion to support use

12    of cash collateral.  I mean, I think it clearly requires an

13    evidentiary hearing, and I can give you April 17th what we had

14    already scheduled for the utility motion all day.

15        Now, the point is what do we do in the meantime, and let

16    me point out some of my concerns among the issues.

17        I think we should also continue the motion for joint

18    administration until the 17th, and I'll tell you why.  It's

19    sort of a knee-jerk reaction when we have 32 debtors that are

20    affiliated.  Let's file a motion for joint administration, and

21    I have done it in other cases, and it may well need to be done

22    in this case.

23        But if you really do have, for example, 10,000

24    creditors -- well, I have no way of knowing because none of

25    those creditors are on any matrix anyplace -- they're probably

1    people who bought a house at some point in time that may allege

2    they have a construction defect whether or not or they do.

3        And it doesn't make any sense to put them on a mailing

4    matrix where these people are getting noticed of everything in

5    the case if we do a limited notice.

6        It may make sense that we group these entities by

7    development.  It may make sense that we have one case jointly

8    administered for Heritage.  It may make sense we have one case

9    jointly administered for something else.  I don't know.

10       Part of the problem is the description of each of these

11    debtors isn't sufficient enough for me to understand what's

12    happening in the case.

13          MR. STANG:  By the way, your Honor, that is why the

14    list is so long.  It's homeowners who within the statutory

15    Statute of Limitations period might be able to come forward --

16          THE COURT:  Okay.

17          MR. STANG:  -- and allege a claim.

18          THE COURT:  So it seems to me, then, much better than

19    a knee-jerk reaction let's do a motion for joint administration

20    that notices all them and everything might be to segregate out

21    the cases.  It may not be because of the debt structure, but,

22    again, I can't tell, and that brings me to the information that

23    I need.

24       First of all, I don't understand this chart.  The chart --

25          MR. STANG:  Are --

```
1              THE COURT:  -- isn't --

2              MR. STANG:  Are you referring to --

3              THE COURT:  -- in any --

4              MR. STANG:  Are you referring to the corporate chart,

5    your Honor?

6              THE COURT:  Organizational chart.

7              MR. STANG:  Yes, ma'am.

8              THE COURT:  But that doesn't flow in any manner I've

9    ever seen.  It looks as if these entities own 100 percent of

10   some other company.  It just doesn't make any sense to me.

11             MR. STANG:  Well, you're seeing, well --

12             THE COURT:  I mean, let's go to the chart, for

13   example.

14             MR. STANG:  Well, okay.

15             THE COURT:  Pull it up.

16             MR. STANG:  This is Exhibit A to Mr. Rhodes'

17   declaration?

18             THE COURT:  Right.

19             MR. STANG:  Thank you.

20             THE COURT:  This looks as if you've got the arrow

21   going from, for example, Rhodes, CJ (sic), Rhodes Design

22   & Development, and with a number of other entities.

23             MR. STANG:  Right.

24             THE COURT:  And all of the arrows are pointed out --

25             MR. STANG:  Right.
```

1          THE COURT:  -- as if they own 100 percent of Tuscany,

2     for example, and that's not what you mean, is it?

3          MR. STANG:  No.  You follow the line.  Let's see.

4          THE COURT:  But you've got all the arrows --

5          MR. STANG:  Rhodes Development Design (sic) --

6          THE COURT:  -- going out.

7          MR. STANG:  -- has a -- C&J Holdings, Inc., goes out

8     to a line that goes up to Rhodes Design & Development.

9          THE COURT:  So, what, does Rhodes Design

10    & Development do what, own the CJ Holdings (sic)?

11         MR. STANG:  Your Honor, the gentleman approaching the

12    podium is Paul Huygens.  Mr. Huygens is a consultant to the

13    company and for a number of years had been the CFO of the

14    company.

15         THE COURT:  Okay.

16         MR. STANG:  I apologize, but I think for getting the

17    right answers to you as efficiently as possible, perhaps, he

18    can --

19         THE COURT:  Okay.

20         MR. STANG:  -- be of assistance here.

21         MR. HUYGENS:  Okay.  So --

22         THE COURT RECORDER:  And will you state your name --

23         MR. HUYGENS:  I'm going --

24         THE COURT RECORDER:  -- so that we have that --

25         MR. HUYGENS:  -- to spell it.

```
 1              THE COURT RECORDER:  -- in the record.

 2              MR. HUYGENS:  Paul Huygens.  The last name is

 3     H-u-y-g-e-n-s.

 4              THE COURT RECORDER:  Thank you.

 5              THE COURT:  So, for example, you've got

 6     Rhodes Companies.  The arrow goes up to Rhodes Companies.

 7              MR. HUYGENS:  Which means they're owned by The Rhodes

 8     Companies.  That's the way the diagram --

 9              THE COURT:  Shouldn't it be the opposite?  Isn't the

10     standard procedure something that's owned shows the diagram

11     down to show what they own?

12              MR. HUYGENS:  That's just not how we've done it

13     internally.

14              THE COURT RECORDER:  And I'm sorry, Counsel (sic).

15     Could you move the microphone towards you --

16              MR. HUYGENS:  I'm sorry.

17              THE COURT RECORDER:  Thank you.

18              MR. HUYGENS:  That's just not how we've done it

19     internally in the past.  This was the internal organizational

20     chart with the ownership interest going up.

21         So The Rhodes Companies owns Tuscany Acquisitions down to

22     Parcel 20, LLC.  It owns Rhodes Design & Development down to

23     Wazoo Design.

24              THE COURT:  Wait a minute.  So if you go down,

25     The Rhodes Companies, LLC, owns 100 percent of
```

1    Tuscany Acquisitions, LLC, Tuscany Acquisitions II, III, IV,

2    and Parcel 20?

3              MR. HUYGENS:  Correct.

4              THE COURT:  Okay.  Now, going to the other side, does

5    it own 100 percent of these other entities?

6              MR. HUYGENS:  Yes.

7              THE COURT:  Now, where you've got Tribes Holdings,

8    LLC, do mean that these other, Bravo, Gung-Ho, Geronimo,

9    Arapaho, and Apache own 100 percent of Tribes or vice versa?

10             MR. HUYGENS:  No.  Tribes owns 100 percent of those

11   entities.

12             THE COURT:  Okay.  And does Rhodes Homes own

13   100 percent of Pinnacle?

14             MR. HUYGENS:  Yes.

15             THE COURT:  And Elkhorn Investments, Inc., owns

16   50 percent of Elkhorn Partners?

17             MR. HUYGENS:  Correct.

18             THE COURT:  Who owns the other part of -- who's the

19   other partner of Elkhorn Partners?

20             MR. HUYGENS:  I believe that company is called

21   Jericho Trust.  It's a third party.

22             THE COURT:  Okay.

23             MR. HUYGENS:  This is an entity that hasn't developed

24   a house for -- I don't know -- ten years.  It's got one house

25   in it.  That's it.

```
 1              THE COURT:  So Rhodes Companies, LLC, owns one
 2     percent, then, of --
 3          (Colloquy not on the record.)
 4              THE COURT:  I don't understand.  What does this mean
 5     on the left-hand side?
 6              MR. HUYGENS:  It --
 7              THE COURT:  Why don't you --
 8              MR. HUYGENS:  Rhodes --
 9              THE COURT:  -- put that chart up.  Do you have a copy
10     of that chart, an extra copy?
11              MR. STANG:  I am sorry.
12              THE COURT:  No?
13              MR. HUYGENS:  How do I do it?
14              THE COURT:  You don't have an extra copy?
15              MR. HUYGENS:  Do I put it right here?
16              THE COURT:  Yeah.
17          (Colloquy not on the record.)
18              THE COURT:  There we go.  Okay.  So on the left-hand
19     side there, you've got Rhodes Ranch I guess GP.
20              MR. HUYGENS:  Yeah.
21              THE COURT:  What --
22              MR. HUYGENS:  Yes.
23              THE COURT:  It is owned 94.36 percent by
24     Rhodes Companies, LLC?
25              MR. HUYGENS:  That's correct.
```

1          THE COURT:  Who owns the rest?

2          MR. HUYGENS:  A company called Rhodes Ranch, LLC --

3          THE COURT:  Which is not a debtor?

4          MR. HUYGENS:  -- which is not a debtor.

5          THE COURT:  And then so Rhodes Ranch GP doesn't own

6  anything --

7          MR. HUYGENS:  No.

8          THE COURT:  -- I mean any -- it's not a holding

9  company.

10          MR. HUYGENS:  Correct.

11          THE COURT:  Then Rhodes Companies, LLC, owns one

12  percent?

13          MR. HUYGENS:  That's correct of those entities off

14  the left-hand side.

15          THE COURT:  Well, who owns the other 99 percent?

16          MR. HUYGENS:  Trusts that were set up for the benefit

17  of Jim Rhodes' heirs.

18          THE COURT:  So that should certainly be on that.  It

19  doesn't seen show --

20      (Colloquy not on the record.)

21          THE COURT:  Where does it show who owns that

22  99 percent?

23          MR. HUYGENS:  Yeah.  I'm sorry.  Heritage Land

24  Company owns 99 percent of the entities beneath it.

25  Heritage Land Company is owned 99 percent by trusts that were

```
1    set up --

2              THE COURT:  Oh.

3              MR. HUYGENS:  -- for Jim's heirs.

4         (Colloquy not on the record.)

5              MR. HUYGENS:  They --

6              THE COURT:  So --

7              MR. HUYGENS:  They run through a holding company.

8              THE COURT:  So Rhodes Companies, LLC, owns one

9    percent.  99 percent is owned by Heritage --

10             MR. HUYGENS:  That's correct.

11             THE COURT:  -- of these LPs.

12             MR. HUYGENS:  That's correct.

13             THE COURT:  Okay.  Now, what's the ownership of

14   The Rhodes Companies, LLC?

15             MR. HUYGENS:  It's owned 100 percent by

16   Sagebrush Enterprises.

17             THE COURT:  And that's owned by --

18             MR. HUYGENS:  100 percent by Jim Rhodes.

19             THE COURT:  Okay.  And okay.  So your new chart, I'm

20   going to have you do a new chart before the next hearing at

21   least if nothing else for joint administration.  I want to know

22   with respect to each debtor.

23        And when I say a chart, there's two parts, a chart that

24   visually shows the ownership relationships and the appropriate

25   designations.  I mean, I really don't think this is the
```

1    standard format.

2        And, also, when you do it, I want you to use a different

3    icon for each corporate structure or business structure --

4    excuse me -- in other words, for example, a diamond for a

5    partnership, a square for an LLC, a circle for a corporation.

6        I want to know in a chart -- or excuse me -- in a summary

7    fashion by debtor the business of each debtor, the status of

8    that business that would include operating or not operating, a

9    summary of assets.  And by that, I mean, for example, raw land

10   in Arizona, 200 acres of raw land in Arizona --

11            MR. HUYGENS:  Understood.

12            THE COURT:  -- whether or not, and then how much of

13   that's unencumbered, and then I want a summary of debts,

14   secured, how much of that is loans -- and in that, I would like

15   to know what's cross collateralized -- and then lien claims,

16   summary of debts, trade, contingent kind in number, insider,

17   and then other unsecured which would include guarantees, and

18   then I also want with respect to each debtor a summary of

19   income versus expenses on a stand-alone basis.

20       Now, I recognize that this is just going to be estimates,

21   and I recognize this is just going to be, you know, subject to

22   the final, you know, statements of schedules and affairs, but

23   we have to get a sense of where each of those debtors stand and

24   what the relationship is and what their needs are.

25           (Colloquy not on the record.)

1              THE COURT:  And then I also want to know by

2    development, and I appreciate some of this information may

3    already be before me, and I appreciate this fact this may not

4    make sense to you the way I want it organized, but it's just

5    going to be very helpful to me by development as well.

6         So, for example, we've got Rhodes Ranch.  I want to know

7    each debtor that's involved in Rhodes Ranch, what's the status

8    of that project.  That is how many homes in escrow, how many

9    homes that are needing completion.

10             MR. HUYGENS:  Um-h'm.

11             THE COURT:  And then I want you to list each debtor,

12   a nondebtor affiliate, and nondebtor affiliates that are

13   working on that project.  So, for example --

14             MR. HUYGENS:  Okay.

15             THE COURT:  -- if one of the debtor paving companies

16   is working on that project, I need to know that.

17             MR. HUYGENS:  Okay.

18             THE COURT:  I want the same thing done for Tuscany

19   thing, the same thing for Pravda (phonetic), the same thing for

20   Spanish Hills.

21        And I understand that you say the development has stopped.

22   This is the last three, but I think it's the only way you're

23   going to associate which debtors are related to each project --

24             MR. HUYGENS:  Um-h'm.

25             THE COURT:  -- because, again, this will help me

1    assess whether or not we should have joint administration for

2    the whole case or whether we subdivide this case out.

3              MR. STANG:  Your Honor, is it Pravda, Tuscany,

4    Spanish Hills, and --

5              THE COURT:  Tuscany and Rhodes Ranch.  Now, if I

6    missed a development, be sure to include it.

7              MR. STANG:  Yes, ma'am.

8              THE COURT:  I now know there's that one house at

9    Elkhorn, but you'll have that described in the other part.

10        And then, also, I want to know for joint-administration

11   purposes how you intend to divide the professional

12   compensation, including not only Chapter 11, but, also, the

13   normal overhead and management which may have been occurring in

14   the past.

15        Now, there are some other -- vis-a-vis the case, in

16   general, I don't want to forget this now because I'm going to

17   bring you back because it is apparent to me we have got to have

18   a hearing on your motion for cash collateral.

19        And I will grant their motion for appointment of a trustee

20   because that's something that needs to be heard sooner, rather

21   than later, so we could have those both heard on the 17th.

22   They jive together.  It will be the same kinds of allegations

23   going back and forth.

24        And that's not to say that I may continue it.  I may say,

25   all right, you've got enough of the cash collateral.  We'll

1    continue the trustee aspect.

2         Just as kind of a side case-management issue, I'm going to

3    enter a case-management order in this case which I know many of

4    you are familiar with which will set omnibus dates in this

5    case.

6         I'll probably just set one omnibus date today until we see

7    where this case goes, and that order will contain rules for

8    setting hearings, the standard.

9         If it's on 25-days' notice, you just pick the date.  If

10   you want an order shortening time, you have to present an order

11   shortening time, but it's on that omnibus date.

12        Courtesy copies, everybody has to give us courtesy copies

13   of all pleadings.  And Court Call, Court Call will be

14   available.

15        You need not get permission to be on Court Call if you

16   listen only.  But if you intend to argue, you must appear.  I

17   made an exception for today because it is an order shortening

18   time.

19        Local counsel, I'll waive the requirement of local counsel

20   for anyone.  Having said that, local counsel is often quite

21   valuable and quite helpful to the Court because we can get

22   things quickly.  We can go to them, so they can be a valuable

23   resource, but I understand cost and expenses, so I'll waive

24   that requirement if necessary.

25        Now, I know I sort of took the wind out of your sails, but

what I wanted to do is save as much time as possible for the

parties to -- since you know where I'm headed, I want you to go

out and talk, so we can figure out what we do in the ten days

between now and that next hearing because, obviously, I'm going

to make sure that the project doesn't die because somebody

didn't blink in time or everybody blinked at once.

It's obvious this project -- something has to be

continued.  We obviously have to deal with cash-management

issues.  We have to deal with selling the homes.  We have to

deal with customer issues.  We have to deal with deposits.

Those things I obviously can find solutions to, but it

makes more sense.  The parties know the issues better than I

do.

So I would suggest you spend, you know, as long as you

want.  Of course, I'd like to leave before 5:00 -- but if we

can't, we can't -- working out that issues.

I know Mr. Berger's on the phone.

Let me skip ahead one moment to the claims-agent issue.

Obviously, we can't send out -- it's kind of irrelevant now

because we don't have a list of creditors.  But when the time

comes, I'm going to enter an order, yeah, assuming I approve

the claim agent.

But in any event, proofs of claims will be filed in each

debtor's case.  I'm not going to have it filed just in

whichever is the lead case.  Each debtor should file the claim

1    in this debtor's case.  And if a creditor believes it has

2    claims against different debtors, then it has to file it.

3        Having been through this and having dealt with cases in

4    which, you know, you have to sort out later who's a creditor

5    and who's not, I think that makes more sense.

6        Regardless of joint administration, there will be one 341

7    date, the same bar date for all the debtors, and I certainly

8    don't mean to suggest that that would be any different.

9        It must be held 30 days after the order for relief.  It

10   can't be held before 20.  It's got to have 20-days' notice, so

11   we get a few more days on that flexibility there.

12       With respect to claim agent, Mr. Berger, I believe you're

13   familiar with our guidelines for a claim agent?

14              MR. BERGER:  Yes, your Honor.

15              THE COURT:  And is your company willing to abide by

16   those guidelines or is there any problems with any of those?

17              MR. BERGER:  No problems whatsoever, your Honor.

18              THE COURT:  Okay.  So does anyone have any objection

19   to having the Omni Group regardless of what happens in this

20   case from now as the claims agent?  All right.

21       I don't hear any, so we'll authorize you as a claim agent.

22   I will indicate, though, that you have agreed to those terms

23   and conditions, and we'll attach those guidelines to the order

24   as well --

25              MR. BERGER:  Yes, your Honor.

1        THE COURT:  -- or I'll have Mr. Stang attach those

2    guidelines to the order.  Okay.

3        Thank you.  All right.  Mr. --

4            MR. STANG:  Can --

5            THE COURT:  So we'll take --

6            MR. STANG:  Can Mr. Berger --

7            THE COURT:  -- a --

8            MR. STANG:  Can Mr. Berger hang up --

9            THE COURT:  Yes.

10           MR. STANG:  -- then?

11           THE COURT:  Mr. Berger, you're certainly free to go.

12           MR. BERGER:  Thank you, your Honor.

13           THE COURT:  Thank you very much.

14    (Robert Berger was excused from the proceedings

15        at 02:01:54 p.m.)

16           THE COURT:  Well, we'll take a recess, and I want you

17    all to decide where you want to go from here, and then, of

18    course, I'll hear any arguments we need to hear to what extent

19    you can't agree on things.  And, of course, I will hear

20    arguments on use of cash collateral for the next ten days.

21        But even as an interim, I didn't see sufficient evidence

22    to warrant, you know, cash collateral without their assent

23    without an evidentiary hearing except in very minor degrees.

24           MR. STANG:  Your Honor, can we stay with that for

25    just a moment, so that we have some guidance for our

1    discussions?  Can you indicate are there any particular

2    deficiencies --

3              THE COURT:  Well, yeah.

4              MR. STANG:  -- that you observed?

5              THE COURT:  I can't tell exactly.  I don't know what

6    you're really using it for.  I don't know what houses are

7    actually needing completion.  I can't tell which debtor wants

8    to use it.  I can't tell how much is being used in salaries.

9         I don't have sufficient evidence of how these projections

10   will show that, indeed, the creditor will be adequately

11   protected.

12        And I think you need to give me some evidence that --

13   well, I don't know if you're going to use the money to actually

14   complete the homes, and what's the sale process.

15        So I just don't have sufficient evidence.  I mean,

16   basically, it's their opposition that pointed out the defects,

17   so I think I need some evidence on that.

18             MR. STANG:  Okay.

19             THE COURT:  All right.  Well, we'll take a recess.

20   Let me know when you're ready.

21        Again, obviously, you need to come up with some solution

22   at least to get you through the 17th or I'll rule, and you can

23   bet that I'll let them, you know, do whatever's necessary to

24   protect the public as well as keep the property at least in a

25   mode that we don't kill the patient before we have the surgery,

1    so all right.

2        Thank you.

3            MR. STANG:  Thank you, your Honor.

4            THE CLERK:  All rise.

5        (Recess at 02:03:59 p.m.)

6        (Thereupon, Michele Phelps concluded as transcriber,

7        and Lisa L. Cline commenced as transcriber

8        at 05:11:32 p.m.)

9          (Court reconvened at 05:11:32 p.m.)

10           THE CLERK:  Bankruptcy court is now in session.

11           THE COURT:  Be seated.

12       (Colloquy not on the record.)

13           THE COURT:  All right.  Where are we?

14           MR. STANG:  Your Honor, thank you for your patience,

15   and your staff and courtroom deputy and reporters have been

16   very helpful during the break, and thank you for that.

17       Our focus has been on reaching a consensual

18   cash-collateral order.  Both sides -- I think I can speak for

19   both sides -- that we made very substantial progress.

20       And there are a few things that we just haven't reviewed

21   with each other's redlines, yet, but I don't think they're

22   going to be material in terms of preventing us from reaching a

23   consensual order.

24       And so we would like to have the hearing reconvened at

25   your convenience.  We understand 2:30 tomorrow may be

```
1    available.

2              THE COURT:  Um-h'm.

3              MR. STANG:  It was proposed that no one appear in

4    court, and that we all do it by phone if that's okay, and I

5    believe at that time with a consensual cash-collateral order

6    the other objections to the other motions will on an interim or

7    a final basis fall by the wayside.

8         (Interference in recording at 05:12:45 p.m.)

9              MR. STANG:  And we can focus on the things you asked

10   of us in connection with the joint-administration order and

11   get --

12             THE COURT RECORDER:  I'm sorry.  Is your cell

13   phone --

14             MR. STANG:  No.  I actually turned it --

15             THE COURT RECORDER:  -- (indiscernible)?

16             MR. STANG:  I turned it off.

17             THE COURT:  It's --

18             MR. STANG:  And it's --

19             THE COURT:  It's got to be off vibrate, too --

20             MR. STANG:  It's --

21             THE COURT:  -- because it --

22             MR. STANG:  It's totally off.

23             THE COURT:  Okay.

24             MR. STANG:  It's dead.  Right.  Yeah.

25        That the other matters will fall into place.  We have
```

1    reviewed several of the orders with the U.S. Trustee's Office.

2    And but for the extension of the schedules deadline, I think we

3    are in agreement on the various comments the U.S. Trustee has

4    to the different orders, so that's where we are.

5            THE COURT:  Okay.  That sounds fine, and I guess the

6    point is if I have concerns, and you can't reach an agreement

7    you're just going to have to come back here on Thursday or

8    Friday I guess --

9            MR. STANG:  I --

10            THE COURT:  -- if we --

11            MR. STANG:  I guess so.

12            THE COURT:  Well, and I assume that there's consent

13    to use -- well, part of the thing I don't understand in this

14    order is I don't -- you're going to need to supply in your

15    cash-collateral motion exactly how much money you're going to

16    use in this short period of time first in the interim order.

17        And, of course, if you do reach this agreement, well,

18    you're going to have to comply with 4001, and I recognize that

19    motions that are in settlement of a cash-collateral motion I

20    can waive it.  But because of all of the defects and anybody

21    finding out about this, I'd be hesitant to do that, so --

22            MR. STANG:  And the other --

23            THE COURT:  For the short term, we'll come back

24    tomorrow at 2:30 on a telephonic.  Now, let's assume you reach

25    this agreement.

1          MR. STANG:  Yes.

2          THE COURT:  What happens next is you'll have to turn

3    that as far as I'm concerned into a motion under 4001 that

4    complies with 4001.  We can have an initial hearing.  It

5    wouldn't be the final hearing because it wouldn't be 15 days

6    after the motion.

7          MR. STANG:  The motion was filed --

8          THE COURT:  Well --

9          MR. STANG:  -- either the 1st or the 2nd.

10         THE COURT:  -- right.

11     (Colloquy not on the record.)

12         MR. STANG:  And we're just contemplating coming back

13    on the 17th.

14         THE COURT:  Right.  But the rule says that you have

15    to have 15 days to be able to object to a cash-collateral

16    motion.

17         MR. STANG:  They've been given notice.  Well, they

18    haven't been told --

19         THE COURT:  And you didn't notice your lien

20    creditors, right?

21         MR. STANG:  No, we did not, well, except to the

22    extent they're on the 25.

23         THE COURT:  Excuse me.

24         MR. STANG:  Right.

25         THE COURT:  The mechanic's-lien creditors.

1          MR. STANG:  Except to the extent they were on the

2     list of 25.

3          THE COURT:  And they can't be --

4          MR. STANG:  Well --

5          THE COURT:  -- because that's unsecured.

6          MR. STANG:  Well, yes.  But some of them may not have

7     recorded liens, yet, but I understand what you're saying.

8          THE COURT:  Okay.  So I don't think we can hold our

9     final hearing on the 17th.

10         MR. STANG:  Okay.

11         THE COURT:  We can talk about that tomorrow.

12         MR. STANG:  Okay.

13         THE COURT:  But I don't think we can hold our final

14    hearing on the 17th.  I'm not available, then, 'til the 27th,

15    so we could have the final hearing on the 27th.

16         MR. STANG:  Okay.

17         THE COURT:  So I just tell you these things --

18         MR. STANG:  No.  I --

19         THE COURT:  -- so that --

20         MR. STANG:  I --

21         THE COURT:  -- you could put it --

22         MR. STANG:  I got --

23         THE COURT:  -- in your negotiations --

24         MR. STANG:  Thank you, your Honor.

25         THE COURT:  -- now.

1         MR. STANG:  I appreciate that.

2         THE COURT:  We'd still go ahead and have the utility

3    motion on the 17th because you need to do that.  That has to be

4    within the first 20 days.

5         MR. STANG:  Right.

6         THE COURT:  So we'd still have that, and we could

7    have the -- I certainly --

8         MR. STANG:  By the way, your Honor, I'm sorry to

9    interrupt you.  This does not take off the trustee motion.

10        THE COURT:  Oh, I understand from the stipulation it

11   did.

12        MR. STANG:  No.

13        THE COURT:  Well, now, the stipulation said that --

14        MR. STANG:  I --

15        THE COURT:  -- if you did --

16        MR. STANG:  I'm not sure --

17        THE COURT:  -- these things that they wouldn't file a

18   trustee motion.

19        MR. STANG:  Your Honor, I will yield the podium, but

20   they very much intend to pursue their rights on the trustee

21   motion.

22        THE COURT:  Okay.

23        MR. STANG:  And --

24     (Colloquy not on the record.)

25        MR. DUBLIN:  Good afternoon, your Honor.

Cline Transcription Services, Inc.  (702) 644-1123

1  Phil Dublin, Akin, Gump, on behalf of the First Lien

2  Steering Committee.

3      The negotiations that we've been having out in the hall

4  this afternoon have been to just abridge us from today to the

5  17th to allow the company to use cash collateral for that short

6  period of time.

7              THE COURT:  Okay.  But when this says, "The

8  First Lien Steering Committee shall not file a motion for the

9  appoint of a Chapter 11 Trustee prior to the cash-collateral

10  termination date" --

11              MR. DUBLIN:  And --

12              THE COURT:  -- then you can't possibly have a hearing

13  on the same date the cash-collateral --

14              MR. DUBLIN:  I --

15              THE COURT:  -- termination stops.

16              MR. DUBLIN:  I'm not sure what document you're

17  looking at, your Honor.

18              THE COURT:  I'm looking at the redline that you

19  provided me.

20              MR. STANG:  Oh.

21              MR. DUBLIN:  I'm sorry.  I did not.  I didn't

22  provide.

23      Did you?

24              MR. STANG:  Your Honor, oh, well, I didn't realize

25  that you were getting that.  I --

1          THE COURT:  Oh.

2          MR. STANG:  I --

3          THE COURT:  Well, then why did you give it to the

4     deputy?

5          MR. STANG:  She was very nice to have printed it out

6     for us because we didn't have a printer capacity --

7          THE COURT:  Oh, I thought --

8          MR. STANG:  -- here.

9          THE COURT:  All right.  Well, then we can't have this

10    by telephone tomorrow because I won't have had a chance to

11    unless you get to me something tonight.

12          MR. STANG:  We're expecting that it will be the first

13    thing in the morning.

14          THE COURT:  Well, then how could we even continue

15    today's hearing to (indiscernible)?

16          MR. STANG:  I'm sorry?

17          THE COURT:  Well, I guess if you wanted to have this

18    hearing when did you expect we're going to finish it, then?

19          MR. STANG:  I was hoping that we could finish it

20    tomorrow with the submission of a consensual cash-collateral

21    order to you in the morning.

22          THE COURT:  But what were you going to do if you

23    couldn't do it telephonic?  I mean --

24          MR. STANG:  Well, we --

25          THE COURT:  -- what did you intend to do?

```
 1              MR. STANG:  Well, someone came out and told us that
 2      you were available at 2:30 --
 3              THE COURT:  I understand.
 4              MR. STANG:  -- tomorrow.
 5              THE COURT:  But if it's not done tonight, when did
 6      you expect to have it done?
 7              MR. STANG:  We were told that you were coming back
 8      out on the bench.  That we needed to get back into the
 9      courtroom.  We were almost finished.
10              THE COURT:  Oh, so you're almost done now --
11              MR. STANG:  Yeah.  We're --
12              THE COURT:  -- totally --
13              MR. STANG:  We --
14              THE COURT:  -- done.
15              MR. STANG:  Well, no.  I said almost finished.
16      Probably, well, your Honor --
17              THE COURT:  How many hours do you need?
18              MR. STANG:  I --
19              THE COURT:  Tell me.
20              MR. STANG:  You know, your Honor, you're right.
21      You're absolutely right.  We feel exactly the same way as you
22      do.  This is for ten days to keep some employees in place, to
23      get some homes finished, so we can close them.  I agree with
24      you.
25              THE COURT:  And why can't people stay until tomorrow,
```

Cline Transcription Services, Inc.  (702) 644-1123

1    A, to negotiate and, B, to appear in court?

2            MR. STANG:  Well, your Honor, it is Passover

3    tomorrow.

4            THE COURT:  Oh --

5            MR. STANG:  That's --

6            THE COURT:  -- I'm sorry.

7            MR. STANG:  That's a problem for me, personally.

8            THE COURT:  All right.  Well, then come back

9    Thursday.

10           MR. STANG:  Well --

11           THE COURT:  Is Thursday --

12       (Colloquy not on the record.)

13           THE COURT:  Thursday's not the holiday, is it?

14           MR. STANG:  I don't celebrate the second night of

15   Passover.  But for some people, it might be.  I can stay a

16   little while longer.  So at least, we can report back to

17   whether or not --

18           THE COURT:  I don't want --

19           MR. STANG:  -- we have finished it.

20           THE COURT:  -- a report.  I want to know.  I mean, I

21   want a stipulation or I don't want a stipulation.

22           MR. STANG:  Well, I meant to report back to you that

23   we have one.  The flights are -- you know, we still have a

24   little time.  We were close to having finished going through

25   it, but we --

```
1              THE COURT:  I mean, I --
2              MR. STANG:  We got --
3              THE COURT:  I mean, I don't have a problem, but
4    you --
5              MR. STANG:  -- to --
6              THE COURT:  -- I mean, if you would tell me you're
7    going to have it done tomorrow, but, apparently, you're not.
8              MR. STANG:  I think we will, but, you know,
9    your Honor, you're asking me to make an absolute commitment to
10   you.
11             THE COURT:  Okay.
12             MR. STANG:  And I don't want to come back in here and
13   say --
14             THE COURT:  Well --
15             MR. STANG:  -- what you're saying you --
16             THE COURT:  -- I am not going to have a trustee
17   motion on the 17th, then, if you're not going to file a motion,
18   and the motion's been filed, but the stipulation doesn't have
19   that in it, then I won't have it.
20        You either reach a deal or you don't reach a deal.  If you
21   don't reach a deal -- I mean, I'll set a trustee motion, but
22   not on the 17th, then.
23             MR. DUBLIN:  I'm sorry, your Honor.
24             THE COURT:  If you've reached a deal, then I'm not
25   going to put this trustee motion on.
```

1          (Interference in the recording at 05:19:58 p.m.)

2          MR. DUBLIN:  To the extent -- I'm sorry.  Let me just

3     make sure I'm off.  I am off.  Your Honor, the arrangement that

4     we were trying to reach is to bridge us to a hearing on the

5     17th for both the trustee motion.

6          But what we expect if we can't reach a longer-term

7     agreement during the period between today and the 17th a

8     contested cash-collateral hearing.

9          We did not envision that permitting the use of cash

10    collateral on an interim basis between today and April 17th

11    would alleviate the need for or going forward with the trustee

12    motion.

13          THE COURT:  Okay.  Well, just how hard can this be to

14    work on a -- I mean, I'll enter one now.  I mean, it's just not

15    that hard to take you 'til the 17th.

16          It's really not that hard to figure out what you need to

17    build some houses between now and then if you'd stop putting on

18    all these other things that you want for each other.

19          MR. DUBLIN:  No.  We understand.  Again, your Honor,

20    we are very close, and I think we have --

21          THE COURT:  All right.

22          MR. DUBLIN:  -- just a few minor changes to the

23    order --

24          THE COURT:  You've got --

25          MR. DUBLIN:  -- that we're working through.

```
 1              THE COURT:  -- 20 minutes.  It's not fair to keep my
 2     staff here when you guys don't -- did you even get together for
 3     this morning?
 4              MR. STANG:  Yes --
 5              MR. DUBLIN:  We (indiscernible) --
 6              MR. STANG:  -- your Honor.
 7              MR. DUBLIN:  -- yesterday.
 8              THE COURT:  What time did you get together?
 9              MR. STANG:  Mr. Dublin sent me an order at 12:30 in
10     the morning.  I was up at 6:30 reading it, and we had a phone
11     call at 8:30.
12              THE COURT:  Okay.
13              MR. STANG:  There was a demand made.  We rejected it.
14              THE COURT:  Okay.
15              MR. STANG:  And we got ready for the hearing today.
16              THE COURT:  All right.  Well, then when because of
17     the holidays is the next time everybody can come back that I'm
18     talking about the people who actually celebrate the religious
19     holidays?  I don't care if somebody else may --
20              MR. DUBLIN:  And --
21              THE COURT:  I want to know of counsel who are
22     participating.
23              MR. DUBLIN:  What did you say?  I'm sorry.
24              THE COURT:  When's the next time we can come back if
25     we don't reach a deal tonight?  And I'll bring you back.  I
```

```
1    guess you're telling me you can't do it the 9th, and you can't

2    do it the 10th.  You can't do it the 9th.

3         (Colloquy not on the record.)

4              MR. DUBLIN:  We can come back Friday, your Honor.

5              THE COURT:  Okay.  By Friday.

6              MR. STANG:  Well --

7              THE COURT:  Well, I also have my two other megacases

8    that day as well.

9              MR. STANG:  Well, that's -- yeah.  Okay.  Let's

10   not --

11             THE COURT:  I mean, I can do that, and I'll put you

12   in-between the two cases, but you've got between 10:30 and 1:30

13   and then 2:30 and 5:00.

14             MR. STANG:  Your Honor, it may not be me, but someone

15   senior from my office will be here, and it's for medical

16   reasons.

17             THE COURT:  Okay.  All right.  Well, go tell them all

18   what you want to do.  I don't want to have to keep -- and I'll

19   stay to whenever, but I don't want to keep the staff here.

20   They've been here 12 hours, already, today, so --

21             MR. DUBLIN:  We understand, your Honor.  We will.

22             THE COURT:  Okay.  All right.

23             MR. STANG:  Okay.

24             THE COURT:  Thank you.

25             MR. STANG:  Thank you.
```

1          So do we get our 20 minutes?

2                THE COURT:  Yep.

3                MR. STANG:  Okay.  That's it.

4                THE COURT:  Take 20 minutes.

5                MR. STANG:  That's it.

6          (Colloquy not on the record.)

7                THE CLERK:  All rise.

8          (Recess at 05:22:31 p.m.)

9          (Court reconvened at 05:29:53 p.m.)

10               THE CLERK:  All rise.

11         (Colloquy not on the record.)

12               THE CLERK:  Bankruptcy court is now in session.

13               THE COURT:  Be seated.

14               MR. STANG:  Your Honor, I think we have created a bad

15    or a good precedent.  Subject to Mr. Dublin sending me his

16    chicken scrolls that I can incorporate in tomorrow morning, we

17    have a consensual order that will take us through the 17th.

18               THE COURT:  Okay.

19               MR. STANG:  And as I said, we are going to finalize

20    with him the comments that the U.S. Trustee has provided to us

21    on the other orders.

22         We have a stipulated order on the sale of the homes during

23    the ten-day period because we have about seven closings we hope

24    to accomplish.

25         And, you know, obviously, subject always to your questions

1    and concerns about these things, we have an agreement on the

2    matters that were the subject of objections.

3              THE COURT:  Okay.  So I'm just concerned about the

4    timing on the 17th for the final hearing on the stip for cash

5    collateral.

6              MR. STANG:  Oh, I don't, frankly, know what's going

7    to happen, but one of the things that this order incorporates

8    -- and maybe you did get through it, so you know this now -- is

9    this access issue that was, frankly, a large stumbling block.

10        Can I dare say that I keep my fingers crossed that there

11   will be some confidence building on both sides, and that we

12   might see this further extended or at least trail the trustee

13   hearing if that starts on the 17th?  But, honestly --

14             THE COURT:  Okay.

15             MR. STANG:  -- I'm not sure what's going --

16             THE COURT:  Okay.

17             MR. STANG:  -- to happen.

18             THE COURT:  So just let me tell you this, though,

19   timing wise.  If you think you want the trustee motion for the

20   17th, you only have that whole day.  You won't have another day

21   until the 27th.

22             MR. STANG:  Okay.

23             THE COURT:  Arguably, I could give you the 16th in

24   advance, but that requires me to have to -- I'm supposed to be

25   speaking at the district conference, and --

1           MR. STANG:  It's their motion, and, obviously,

2    Mr. Kornfeld, my partner, can speak to what we think some of

3    the general matters might be in terms of how many witnesses --

4           THE COURT:  Okay.

5           MR. STANG:  -- and that sort of thing.

6           MR. KORNFELD:  Good afternoon, your Honor.

7    Alan Kornfeld, Pachulski, Stang, Ziehl & Jones.  I have had the

8    opportunity to talk to counsel for the First Lien

9    Steering Committee about the litigation of the trustee motion.

10   Let me just give you a brief idea of what that litigation

11   involves.

12          There will be 13 to 15 depositions between now and the

13   17th.  They will obviously be double-tracked depositions.  We

14   will try to be efficient and get them done quickly, but we need

15   to get 13 to 15 depositions done.

16          I don't see us being able to lose one day, and it's not

17   me.  I don't see us being able to lose a day and start on the

18   16th.

19          Now, given the 13 to 15 witnesses and exchange of

20   documents that we're all agreed that we're going to do

21   expeditiously, our view is is this could easily be a

22   more-than-one-day hearing.  It could easily be a two-day

23   hearing.  It's possible it would be a three-day hearing, so

24   that's where we are.

25          (Colloquy not on the record.)

1    MR. KORNFELD:  I don't think we should make the

2    hearing on the trustee motion any earlier.  Certainly, counsel

3    for the First Lien Steering Committee does not agree to make

4    the hearing any later even though we suggested that might be

5    one solution to the pressure of having all these depositions in

6    a very short time, but that's where we're at.

7         THE COURT:  Okay.

8    (Colloquy not on the record.)

9         MR. QURESHI:  Your Honor, if I may briefly be heard

10   on that issue?  Again, Abid Qureshi, Akin, Gump, Strauss, Hauer

11   & Feld, on behalf of the First Lien Steering Committee.

12        Your Honor, while Mr. Kornfeld is certainly correct with

13   respect to the number of depositions that need to get done, we

14   are hopeful that we can get this hearing done in one day.

15        It is certainly not my anticipation that all of the

16   witnesses that are deposed would come and testify in person.  I

17   would hope that we will be able to agree upon submissions of

18   deposition testimony in lieu of live testimony.

19        And, certainly, our expectation and hope would be that we

20   could limit the number of live witnesses to three or four or

21   something in that range and try to get it done on the 17th.

22        THE COURT:  Okay.

23        MR. QURESHI:  Thank you.

24        THE COURT:  So just let me let everybody know,

25   though.  To the extent that you're pushing for a trustee early,

1    so that everybody has to spend lots of times in litigation and

2    to the extent you seek fees later from collateral, I'm likely

3    not to approve those fees because when you push hard for

4    something early on that's kind of a waste of estate assets

5    because you're all running around like chickens with your heads

6    cut off, quite frankly, when you could be doing more productive

7    things, so just keep those things in mind.

8         Now, of course, if a trustee's appointed, and there's

9    enough cash collateral at the end, you might come out fine, but

10   just because you spend your time 20 hours a day on this case

11   doesn't mean this case deserves compensation for 20 hours a day

12   by ten attorneys --

13             MR. QURESHI:  Understood, your Honor.

14             THE COURT:  -- because we've got lien-collateral

15   creditors to take care of in this case.  You're not the only

16   lien claimants in this case.  You're not the only creditors,

17   and you don't run the case.

18             MR. DUBLIN:  We understand, your Honor.

19             THE COURT:  Okay.  I do think, though -- let me give

20   you the only three available dates you could have if you don't

21   want it the 17th, and, tomorrow, you can let me know what's

22   more likely.

23        You can have the 17th, from 10:30 on the 27th -- I can

24   kick a hearing off -- and the 28th, and May 1st, and I have

25   other dates after that, but I know you wanted to stay within

1   that two-week timeframe.  Okay.

2       I'll hear, too, tomorrow on -- well, we'll have to see the

3   extent of that cash-collateral order.  Now, unfortunately, I'm

4   not going to have much time to read it.  I've got 200 motions

5   on calendar before my 2:30 calendar, so make sure you get it to

6   me, so I can read it over the lunch hour.

7       We may not be able to have the cash-collateral, a final

8   cash-collateral hearing, on the 17th.  It depends on I need to

9   know -- and, also, on your budget, I have no idea how much

10  money you're spending in 10 days --

11              MR. STANG:  It's --

12              THE COURT:  -- or 15 days.

13              MR. STANG:  It's on the budget, your Honor.

14              THE COURT:  On the 15 days?

15              MR. STANG:  Well, it's a week.  It's a week -- I'm

16  sorry.

17              THE COURT:  Was it a week?

18              MR. STANG:  I apologize, your Honor.

19          Do you have it (indiscernible)?

20              UNIDENTIFIED SPEAKER:  Yes.

21              THE COURT:  Oh, this budget --

22              MR. STANG:  Yeah.

23          (Colloquy not on the record.)

24              THE COURT:  -- the one that was just given to me

25  today.

```
 1          (Colloquy not on the record.)

 2              MR. STANG:  Yes.

 3              THE COURT:  No.  This was attached.  You're right.

 4              MR. STANG:  Right.  And it's a week-ending budget,

 5      and it shows how much.

 6              THE COURT:  Okay.

 7              MR. STANG:  I --

 8              THE COURT:  So --

 9              MR. STANG:  I can't read --

10              THE COURT:  -- what --

11              MR. STANG:  -- without --

12              THE COURT:  Okay.

13              MR. STANG:  -- my glasses.

14              THE COURT:  You're right.

15              MR. STANG:  But --

16              THE COURT:  So that's a week ending.

17              MR. STANG:  Yes.

18              THE COURT:  So we're only talking about between now

19      and the 17th?

20              MR. STANG:  Yes.  Week three.

21              THE COURT:  How much total of --

22              MR. STANG:  Let's see.  We've got an ending-cash

23      position of 2, well --

24          (Colloquy not on the record.)

25              THE COURT:  Look, if you can't tell me, and you wrote
```

1    it --

2              MR. STANG:  No.  Well, no.  I mean, your Honor, I'm

3    half blind without these things.  I have to add up -- let's

4    see -- 49 --

5         (Colloquy not on the record.)

6              MR. KORNFELD:  It's about --

7              MR. STANG:  There it is --

8              MR. KORNFELD:  -- a million-three --

9              MR. STANG:  -- your Honor.

10             MR. KORNFELD:  -- your Honor.

11             MR. STANG:  If you look at the second line --

12             THE COURT:  Okay.

13             MR. STANG:  -- and you see the gray line?  You've got

14   three disbursements for the week?

15             THE COURT:  Um-h'm.

16             MR. STANG:  That's showing you 352,066 for the week

17   ending the 10th and then 987,652 for the week ending the 3rd,

18   so it's about a million-three.

19             THE COURT:  Okay.

20             MR. STANG:  There's a very substantial amount of

21   supporting documentation for this, your Honor.  It's --

22             THE COURT:  Okay.

23             MR. STANG:  I don't want you to think that

24   Mr. Kornfeld wasn't ready to spend --

25             THE COURT:  Okay.

```
 1              MR. STANG:  -- the three hours --
 2              THE COURT:  Well --
 3              MR. STANG:  -- doing that.
 4              THE COURT:  -- since it is so high, then I'd be very
 5    reticent especially since those lien claimants haven't been
 6    given any notice of this of approving a final one on less than
 7    15-days' notice.
 8              MR. STANG:  Understood, your Honor.  Well, I think
 9    we're all hearing the message that given the trustee motion
10    that we better be looking at taking the cash collateral
11    potentially past that if you either deny the trustee motion
12    that day or continue it further.
13              THE COURT:  Right.  Also, just a side note getting
14    back to those earlier issues, make sure you have -- if you get
15    your order approving a claims agent in tomorrow, then we can
16    have that put on the 341 notices to give everyone directions to
17    do that.
18         Next, make sure you get your creditors' notices in, list
19    of creditors in each case in by Friday.  If you do that, then
20    the Court through BNC can do the noticing, and the estate --
21              MR. STANG:  Okay.
22              THE COURT:  -- won't have to do --
23              MR. STANG:  All right.  If --
24              THE COURT:  -- the --
25              MR. STANG:  Well, your Honor, everyone has tight
```

1    pressures.  We have the list.  What we were hoping for was to

2    avoid sending the same list of 11,000 out to multiple people,

3    but you know what?  We'll --

4              THE COURT:  Well --

5              MR. STANG:  We --

6              THE COURT:  -- wait, wait, wait.  I'm confused.  How

7    in the world is somebody who bought a home at Rhodes Ranch a

8    creditor of Overflow, LP.

9              MR. STANG:  Probably isn't.

10             THE COURT:  So why should I have the estate -- why

11   should I allow fees for you at the end of the case when you're

12   trying to pay moneys in Overflow, Inc., object to claims filed?

13   How do we sort that out --

14             MR. STANG:  Well, you know what?

15             THE COURT:  -- at the end?

16             MR. STANG:  I gotcha.  I mean, we will have some

17   overlap in duplication --

18             THE COURT:  Sure.

19             MR. STANG:  -- because --

20             THE COURT:  Of course, you will.

21             MR. STANG:  -- of the contractor, the seller.  And so

22   instead of it being 32 times 11,000, it might be 4 times --

23             THE COURT:  Well --

24             MR. STANG:  -- 11,000.

25             THE COURT:  -- why is that even the case?

```
 1              MR. STANG:  Well --

 2              THE COURT:  How is that even possible?

 3              MR. STANG:  -- because you had a general contractor.

 4              THE COURT:  Okay.

 5              MR. STANG:  You had the entity that sold the

 6    property.  Maybe there's a design firm that -- so it's possible

 7    there could be as many as three.  Maybe I stretched it a little

 8    bit when I said four, but there's probably at least three for

 9    some of it if not all --

10              THE COURT:  Hey, if BNC --

11              MR. STANG:  -- of it.

12              THE COURT:  As I understand it, BNC would send out

13    10,000 notices; is that right?

14         And the clerk's nodding yes.

15              MR. STANG:  Bless them.  Okay.  Yeah.

16              THE COURT:  But don't just do it willy-nilly.

17              MR. STANG:  No, no, no.

18              THE COURT:  I mean --

19              MR. STANG:  I'm not going to.  As a taxpayer, I

20    respect the need --

21              THE COURT:  Well --

22              MR. STANG:  -- to be efficient.

23              THE COURT:  -- it's even that.  The point is why do

24    we want to go through here.  I'm a homeowner at Rhodes Ranch,

25    and I file my proof of claim, and we get a plan.
```

1     And let's assume the plan filters out each company, and

2   now somebody has to decide why I, Ms. Creditor, don't have a

3   claim in Parcel 20.

4         MR. STANG:  And it's not fair to that person to send

5   them 32 notices.  Maybe it's fair to send them three, and

6   they're going to call us and say why did I get three.

7     And we'll have our staff, obviously, within the limits of

8   what we can say explain to them why we have three or four, and

9   it's an absolutely-fair approach.  I am not complaining about

10  it.

11    But we are hoping -- but we weren't successful -- that

12  there could be some joint stuff done today, but we didn't get

13  it, and we'll take care of --

14         THE COURT:  I don't see --

15         MR. STANG:  -- the mailing list.

16         THE COURT:  -- any way we can do it.

17    Do you, Mr. Landis?

18    I mean, I guess you could do the four together, but I

19  don't see any good.

20         MR. STANG:  I -- okay.

21         MR. LANDIS:  Augie Landis, Assistant United States

22  Trustee.  I think that the better practice, of course, is to

23  notice the appropriate parties in the cases that they file

24  unless they want to substantively --

25         THE COURT:  Yeah.

```
 1              MR. LANDIS:  -- consolidate --

 2              THE COURT:  What are you going --

 3              MR. LANDIS:  -- these matters.

 4              THE COURT:  -- to do on your schedules?  You're going

 5    to have to --

 6              MR. LANDIS:  The --

 7              MR. STANG:  I --

 8              THE COURT:  -- your schedules.

 9              MR. STANG:  I have told them that.  I have told them

10    that, and, you know, I was thinking -- well, you know what?

11    What I was thinking doesn't matter.

12              THE COURT:  Okay.

13              MR. STANG:  We'll just leave it alone.

14              THE COURT:  All right.  So get those lists of

15    creditors in by Friday.

16              MR. STANG:  Okay.

17              THE COURT:  And, you know, if you're overinclusive,

18    fine.

19              MR. STANG:  Okay.

20              THE COURT:  But --

21              MR. LANDIS:  Judge, can I be heard on one of the

22    motions --

23              THE COURT:  Yes.

24              MR. LANDIS:  -- that's pending --

25              THE COURT:  I'm sorry.
```

1          MR. LANDIS:  -- just very briefly?

2          THE COURT:  Um-h'm.

3          MR. LANDIS:  And it may be that you can resolve it

4     for us right now, and it might be helpful going forward.  One

5     of the motions that's on file is a motion to extend the time to

6     45 days to file the schedules and statements.  That takes us

7     beyond the 341 hearing date that you're talking about noticing

8     right now.

9          I have opposed that.  I don't have any problem with an

10    extension, but the opposition said -- my opposition suggested

11    that if they could have the schedules on file ten days in

12    advance of the 341 meeting we can do a good job.

13         Certainly, we can continue it.  But at least, that gives

14    us an outside chance of concluding at the same day we do it.

15    And if we can save that time and money, we will.

16         I understand counsels to say that they're not willing to

17    agree to that far in advance, either.  If we can get a little

18    bit of guidance from you as to when the schedules might be in

19    place, that could, perhaps, be some benefit in terms of how we

20    get notices out if not in this particular instance going

21    forward because it appears to me that we may have some

22    additional notices that are required at a minimum in connection

23    with the final hearing on cash collateral.  If you can give us

24    some guidance now, that may be helpful.

25         MR. STANG:  Your Honor --

1          THE COURT:  Okay.

2          MR. STANG:  -- under no circumstances should the

3   341 meeting be concluded without a full opportunity to review

4   completed schedules.

5          We're contemplating that we are going to have the kind of

6   litigation that we're facing, and it's taxing some resources,

7   and it is a lot of cases, anyway.

8          (Colloquy not on the record.)

9          MR. STANG:  And so what I had said to counsel was

10  we'll make our best efforts, but there will probably be a lot

11  to ask us at the 341 even if you didn't have schedules.

12         But if it could be continued so that it's not concluded

13  before there's an opportunity to review them, we'd still like

14  the extension.

15         I know that some people think we'll get the first one in

16  when you get it finished, and there's a certain amount of

17  integration of some of these companies.  I'm not trying to

18  argue a consolidation motion today.

19         And I'm just concerned that we send it one, and then we

20  end up having to make amendments because when we do No. 8 it's

21  going to trigger some changes, but I absolutely agree and

22  respect the fact that we cannot have a completed 341 before the

23  schedules are done.

24         MR. LANDIS:  And just the other part of that is, of

25  course, you know, here we are now.  We're asking for a

1    million-three for two weeks in cases we don't even have

2    schedules on.

3        And now we're asking to have the schedules to go beyond

4    the meeting of creditors.  And if we have the schedules on file

5    in a timely fashion, it will eliminate a lot of the question

6    regarding noticing.

7        The bottom line is just simply this.  There is a

8    quid pro quo, isn't there?  I mean, you can get the relief.

9    You get the stay.

10       Everybody has to stand still while you're doing this.

11   They have the benefit of a million-three for use of cash during

12   the next two weeks.

13       (Colloquy not on the record.)

14           MR. LANDIS:  At a minimum, they ought to be telling

15   us who belongs in each of the estates and who should receive

16   notices in these cases going forward.

17       All I'm looking for in this context, though,

18   Judge, is just a date by which they ought to file the

19   schedules.

20           MR. STANG:  Your Honor, I'd love to say kick out the

21   trustee motion for six weeks, so we can get this done, instead,

22   but, you know, we face the pressures we face.

23           THE COURT:  Okay.  Well, I think it's probably

24   appropriate to extend it because of the trustee motion, but

25   I'll continue it for at least 15 days beyond when they're due,

```
 1    and then we'll discuss it further at our final cash-collateral
 2    hearing which will either be --
 3              MR. LANDIS:  The 17th --
 4              THE COURT:  -- the 17th --
 5              MR. LANDIS:  -- or --
 6              THE COURT:  -- or --
 7              MR. LANDIS: -- the 27th.
 8              THE COURT:  -- some other day.
 9              MR. STANG:  Okay.
10              THE COURT:  Again, there are hearings on the 17th
11    with the utility motion.
12              MR. STANG:  Right.
13              THE COURT:  So that will be a hearing date.
14              MR. STANG:  Okay.  Okay.  So --
15         (Colloquy not on the record.)
16              THE COURT:  When you do your interim order for cash
17    collateral, I want to know, for example, who the rent's payable
18    to.  Let's see.  On the 17th, we've got --
19              MR. STANG:  There are no --
20              THE COURT:  And homeowners fees --
21              MR. STANG:  -- insider relationships.
22              THE COURT:  -- you've explained.
23              MR. STANG:  Sure.
24              THE COURT:  Model-home leases, I need to know --
25              MR. STANG:  That those aren't from insiders?
```

```
 1              THE COURT:  -- that aren't from insiders.

 2              MR. STANG:  Right.  I don't think they are, but

 3    we'll --

 4              THE COURT:  Payroll --

 5              MR. STANG:  -- leave it to your (indiscernible).

 6              THE COURT:  -- we've had all those concerns.  We've

 7    got ordinary-course professionals.  I don't know why they'd

 8    have to be paid on the 12th.

 9              MR. STANG:  Okay.

10              THE COURT:  Pinnacle, I want to know what's that --

11              MR. STANG:  Okay.

12              THE COURT:  -- and why they have to be paid.

13    Home-warranty repairs, why those -- I could seemingly

14    understand, but I want to know that those are actually being

15    done as opposed to you're either putting it into, you know, a

16    slush fund.

17              MR. STANG:  Right.  Right.

18              THE COURT:  Again, 1,000,000 for ten days, you'd

19    better -- before a final hearing, I'm going to be rather

20    reluctant, so you've got to give me some good reasons why you

21    need that much money.

22              MR. STANG:  Okay.

23              THE COURT:  Especially, again, now that you've got

24    the senior liens happy, that's fine, but we've got those

25    mechanic liens.  And, again, since I don't know about all these
```

1    debtors, I don't know if there are any.  I don't know what the

2    extent is.

3              MR. STANG:  I understand.

4              THE COURT:  So I want you to make sure by next Monday

5    -- well, by next Wednesday to provide to me that chart as

6    well --

7              MR. STANG:  The --

8              THE COURT:  -- that --

9              MR. STANG:  That --

10              THE COURT:  -- I had discussed before.

11              MR. STANG:  Do an admin chart we were talking about?

12              THE COURT:  Right.

13              MR. STANG:  Yes.

14              THE COURT:  Also, don't forget that explained -- let

15    me just go over it again.  It's been a long time.  List each

16    debtor, business of each debtor, status of that business,

17    summary of assets, how much of that's unencumbered, summary of

18    debts by secureds, by the lien creditors -- excuse me -- by

19    debt --

20              MR. STANG:  The debt.

21              THE COURT:  -- yeah --

22              MR. STANG:  Right.

23              THE COURT:  -- voluntary debt, and then by lien

24    claims, trade debt contingent with kind in number, and I just

25    mean it's kind in number, not who, just a class.

```
 1              MR. STANG:  An 11,000 homeowner claims --

 2              THE COURT:  Yeah.

 3              MR. STANG:  -- okay --

 4              THE COURT:  Exactly.  That's the --

 5              MR. STANG:  -- or a home-mortgage claims.

 6              THE COURT:  -- kind of thing.  Insider, and then

 7   guarantees, and then a summary of income versus expenses on a

 8   stand-alone basis.

 9         And then I need to know if you're going to use -- for the

10   cash collateral, I need to know how that fits in, what entities

11   are using it, the status of the project, et cetera --

12              MR. STANG:  Yeah.  I understand --

13              THE COURT:  -- and, also --

14              MR. STANG:  -- your Honor.

15              THE COURT:  -- is any of these moneys, the

16   cash-collateral moneys, being used, apparently, from one debtor

17   to pay another because there was that motion for administrative

18   priority from one to the other.

19              MR. STANG:  Right.  One of the things that counsel

20   for the U.S. Trustee said was that we needed to eliminate that

21   and not try to characterize that up-front, and we said okay.

22              THE COURT:  Okay.

23              MR. STANG:  So we're working on that.

24              MR. LANDIS:  And, Judge, I --

25              THE COURT:  All right.
```

1          MR. LANDIS:  I'd like to sit down, so I'm just simply

2    going to just add one thing, and then I'll go away, so you can

3    finish.

4        And that is what's been said regarding a discussion

5    between debtor's counsel and our office is, in fact, true.  We

6    did have those conversations.  I believe we've got matters

7    worked out.  We're working on an order language.

8        Until there's a resolution, of course, we reserve the

9    rights raised by our objection, but I do believe --

10              THE COURT:  Sure.

11              MR. LANDIS:  -- that we'll have a resolution --

12              THE COURT:  Okay.  Good.

13              MR. LANDIS:  -- for you shortly.

14              THE COURT:  Thank you.

15        And I recognize there's a lot to do, and I recognize

16    you've been working on it, but, you know --

17              MR. STANG:  Our goal is to make you feel fully

18    informed, your Honor.

19              THE COURT:  Okay.  All right.  All right.  So we'll

20    let -- and let me see if that (indiscernible) is tomorrow.

21        I could probably fix you by making you wait on the phone

22    for an hour at 2:30.  Let's see.

23        (Colloquy not on the record.)

24              THE COURT:  It doesn't look very promising --

25        (Colloquy not on the record.)

```
 1              THE COURT:  -- that it will be -- it looks like I
 2    won't be done 'til 3:00.
 3              MR. STANG:  Okay.
 4              THE COURT:  That's safer --
 5              MR. STANG:  All right.
 6              THE COURT:  -- so that you're not all waiting around
 7    on the phone.
 8              MR. STANG:  3:00 o'clock.
 9              THE COURT:  Yeah.
10              MR. STANG:  Thank you.
11              THE COURT:  That's a safer time, and it would be very
12    helpful if there is somebody from your office that could stay.
13    It's just easier to question back and forth when you've got a
14    live person.  If you can't, you can't, but it's a lot easier.
15              MR. STANG:  Yeah.
16              THE COURT:  Okay.
17              MR. STANG:  Okay.  Thank you, your Honor.
18              THE COURT:  All right.  Thank you, and we'll talk to
19    you all tomorrow, then, and, obviously, the debtor's authorized
20    to use cash collateral to the extent necessary between now and
21    tomorrow.
22              MR. STANG:  Thank you.
23              THE CLERK:  All rise.
24         (Court concluded at 05:49:23 p.m.)
25
```

1    I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Michele Phelps                    04/10/09

7    _____           _____
     Michele Phelps, Transcriptionist         Date

8

9

10   /s/ Lisa L. Cline                     04/10/09

11   _____           _____
     Lisa L. Cline, Transcriptionist          Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25