1

1        UNITED STATES BANKRUPTCY COURT

2              DISTRICT OF NEVADA

3              LAS VEGAS, NEVADA

4   In re:  HERITAGE LAND COMPANY,  )  E-Filed:  04/15/09
    LLC,                            )
5                                   )
            Debtor.                 )  Case No.
6                                   )  BK-S-09-14778-LBR
    _____ )  Chapter 11
7

8              TRANSCRIPT OF PROCEEDINGS
                         OF
9             MOTION FOR JOINT ADMINISTRATION
       WITH LEAD CASE HERITAGE LAND COMPANY, LLC,
10              OF RELATED CHAPTER 11 CASES
       AND SETTING SINGLE BAR DATE AND MEETING OF CREDITORS
11             AND PROPOSED ORDER, NO. 94
                        AND
12        APPLICATION PURSUANT TO BANKRUPTCY CODE
            SECTIONS 105(A), 363, AND 507(A)
13        FOR AN ORDER AUTHORIZING THE DEBTORS TO,
    (1), PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS,
14                AND OTHER COMPENSATION;
            (2), REMIT WITHHOLDING OBLIGATIONS;
15    (3), MAINTAIN EMPLOYEE COMPENSATION AND BENEFIT PROGRAMS
            AND PAY RELATED ADMINISTRATIVE OBLIGATIONS;
16      AND, (4), HAVE APPLICABLE BANKS AND OTHER FINANCIAL
    INSTITUTIONS RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS
17  PRESENTED FOR PAYMENT AND HONOR CERTAIN FUND TRANSFER BENEFITS;
       AND MEMORANDUM OF POINTS AND AUTHORITIES, NO. 95
18                      AND
              MOTION TO EXTEND TIME
19      TO FILE SCHEDULES OF ASSETS AND LIABILITIES
         AND STATEMENT OF FINANCIAL AFFAIRS, NO. 96
20                      AND
         APPLICATION FOR ENTRY OF ORDER,
21    (1), AUTHORIZING THE DEBTORS TO SELL HOMES FREE AND CLEAR
       OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS;
22    (2), ESTABLISHING PROCEDURES FOR THE RESOLUTION AND PAYMENT
                   OF LIENS AND CLAIMS,
23    AND, (3), AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR
         ALL OBLIGATIONS RELATED THERETO, NO. 100
24                      AND

25

1       MOTION TO USE CASH COLLATERAL
       FOR INTERIM AND FINAL ORDERS
2   PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364
    OF DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
3     PURSUANT TO 105, 361, 362, 363, AND 364
       OF THE BANKRUPTCY CODE,
4    (A), AUTHORIZING DEBTORS TO USE CASH COLLATERAL;
    (B), GRANTING ADEQUATE PROTECTION TO THE DEBTOR'S
5       PREPETITION SECURED PARTIES;
     AND, (C), SCHEDULING A FINAL HEARING;
6   MEMORANDUM OF POINTS AND AUTHORITIES, NO. 101
         AND
7    APPLICATION FOR AN ENTRY OF AN ORDER
  PURSUANT TO SECTIONS 105(A), 363(C), 1107(A), AND 1108
8      OF THE BANKRUPTCY CODE
 AUTHORIZING THE DEBTORS TO HONOR PREPETITION OBLIGATIONS
9        TO CUSTOMERS
 AND TO OTHERWISE CONTINUE CUSTOMER PRACTICES AND PROGRAMS
10   IN THE ORDINARY COURSE OF BUSINESS, NO. 99
         AND
11      APPLICATION FOR ORDER
 UNDER 11, USC, 105, 363, 503(B), 1107, 1108 AUTHORIZING,
12  (1), MAINTENANCE OF CERTAIN EXISTING BANK ACCOUNTS;
   (2), CONTINUED USE OF EXISTING BUSINESS FORMS;
13 (3), CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM;
  (4), PROVIDING ADMINISTRATIVE PRIORITY STATUS
14    TO POSTPETITION INTERCOMPANY CLAIMS,
   AND, (5), WAIVER OF SECTION 345(B) DEPOSIT
15    AND INVESTMENT REQUIREMENTS;
   MEMORANDUM OR POINTS AND AUTHORITIES, NO. 99
16       VOLUME 1
   BEFORE THE HONORABLE LINDA B. RIEGLE
17    UNITED STATES BANKRUPTCY JUDGE

18     Wednesday, April 8, 2009

19       3:00 p.m.

20

21

22

23 Court Recorder:   Helen C. Smith

24

25 Proceedings recorded by electronic sound recording;
 transcript produced by transcription service.

3

```
 1    APPEARANCES:

 2    For the Debtor:          ZACHARIAH LARSON, ESQ.
                               Larson & Stephens, LLC
 3                             810 South Casino Center Boulevard
                               Suite 104
 4                             Las Vegas, Nevada 89101

 5                             JAMES I. STANG, ESQ.
                               ALAN J. KORNFELD, ESQ.
 6                             SHIRLEY S. CHO, ESQ.
                               Pachulski, Stang, Ziehl & Jones, LLP
 7                             10100 Santa Monica Boulevard
                               Eleventh Floor
 8                             Los Angeles, California 90067
                               (Telephonic)
 9
      For James Rhodes         BRETT A. AXELROD, ESQ.
10    and Sagebrush            Greenberg Traurig, LLP
      Enterprises, Inc.:       3773 Howard Hughes Parkway
11                             Suite 500-N
                               Las Vegas, Nevada 89169
12
      For the Steering         TIMOTHY P. THOMAS, ESQ.
13    Committee for            Kolesar & Leatham, Chtd.
      Senior Secured           3320 West Sahara Avenue
14    Lenders:                 Suite 380
                               Las Vegas, Nevada 89102
15
                               PHILIP C. DUBLIN, ESQ.
16                             ABID QURESHI, ESQ.
                               Akin, Gump, Strauss, Hauer & Feld, LLP
17                             One Bryant Park
                               New York, New York 10036
18                             (Telephonic)

19    For the United States    AUGUST B. LANDIS, ESQ.
      Trustee:                 Office of the United States Trustee
20                             300 Las Vegas Boulevard South
                               Suite 4300
21                             Las Vegas, Nevada 89101

22    For Credit Suisse,       RAMON M. NAGUIAT, ESQ.
      Cayman Islands Branch:   Skadden, Arps, Slate, Meagher
23                                & Flom, LLP, and Affiliates
                               300 South Grand Avenue
24                             Suite 3400
                               Los Angeles, California 90071
25                             (Telephonic)
```

1    APPEARANCES (Cont.):

2    For Wells Fargo:        DON S. DeAMICIS, ESQ.
                             Ropes & Gray, LLP
3                            One International Place
                             Boston, Massachusetts 02110
4                            (Telephonic)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          (Court convened at 03:04:20 p.m.)

2               THE CLERK:  Bankruptcy court is now in session.

3          (Colloquy not on the record.)

4               THE COURT:  Be seated.  Heritage Land Company.

5          Appearances in the courtroom first, please.

6               MR. LARSON:  Good afternoon, your Honor.  Zach Larson

7     on behalf of Heritage Land Company, local counsel.

8               MS. AXELROD:  Good afternoon, your Honor.

9     Brett Axelrod for James Rhodes and Sagebrush Enterprises.

10              MR. THOMAS:  Your Honor, Tim Thomas on behalf of the

11    Steering Committee for the First Secured Lienholders.

12              MR. LANDIS:  Good afternoon, Judge.  Augie Landis,

13    Assistant United States Trustee.

14              THE COURT:  Okay.  And on the telephone.

15              MR. STANG:  Good afternoon, your Honor.  James Stang,

16    S-t-a-n-g, appearing for the debtors.

17              MR. KORNFELD:  Good afternoon, your Honor.

18    Alan Kornfeld also for the debtors.

19              MR. DUBLIN:  Good afternoon, your Honor.  Phil Dublin

20    and Abid Qureshi from Akin, Gump for the First Lien

21    Steering Committee.

22              MR. NAGUIAT:  Good afternoon, your Honor.

23    Ramon Naguiat of Skadden, Arps on behalf of Credit Suisse as

24    the agent under the first-lien credit agreement.

25              THE COURT:  Okay.  All right.  So I --

1        MR. DeAMICIS:  Good afternoon, your Honor.

2   Don DeAmicis --

3        THE COURT:  Sorry.

4        MR. DeAMICIS:  -- of Ropes & Gray.

5        THE COURT:  Sorry.  I couldn't hear you.

6        MR. DeAMICIS:  Don DeAmicis of Ropes & Gray

7   representing the agent on the second lien (indiscernible)

8   Wells Fargo.

9        THE COURT:  Okay.  Did you catch that name?

10        THE CLERK:  (Indiscernible).

11        THE COURT RECORDER:  Yes, your Honor.

12        THE COURT:  Okay.  Thank you.

13        MR. DeAMICIS:  Thank you.

14        THE COURT:  All right.  So why don't you -- I mean, I

15   have a proposed order.

16     Is there any other appearances?  Did I cut anyone off?

17        MS. CHO:  Your Honor, Shirley Cho from the Pachulski

18   firm.  I'm also on the phone for debtors.

19        THE COURT:  Okay.  All right.  I have a proposed

20   order in front of me, but why don't someone go through this and

21   explain where we are and what your intention is vis-a-vis the

22   coming hearings.

23        MR. STANG:  Thank you, your Honor.  This is

24   Mr. Stang.  If I could take a shot at this?  Your Honor, you

25   have in front of you a stipulated interim cash-collateral order

1    that would allow use of cash collateral pursuant to a budget

2    that was given to you yesterday and updated as to one line item

3    which we'll talk about as we get through the order, and it

4    allows for use of cash collateral through April 17th.

5        The parties understand that there are other -- obviously,

6    as we discussed yesterday, there are other matters pending

7    coming up on the 17th.

8        And the parties will during the next ten days be engaged

9    in an exchange of information and due diligence by the first

10   lienholders and the agent and, perhaps, can reach an agreement

11   on further use of cash collateral if the Court's calendar is

12   otherwise taken up with the trustee matters.

13       The cash-collateral order has what some people might call

14   standard provisions of adequate protection to the lenders.  It

15   does provide for concessions by the debtor in connection with

16   the validation of the first lienholders' and agents' positions,

17   but with reservation of rights for a creditors committee to be

18   appointed we hope in the near future.

19       There is also a provision --

20           THE COURT:  Let --

21           MR. STANG:  -- for a budget--

22           THE COURT:  Let me interrupt you --

23           MR. STANG:  Yes, ma'am.

24           THE COURT:  -- as I go along, and maybe that's not --

25           MR. STANG:  I --

1          THE COURT:  -- the best way to do it, but it will

2     help me remember as I go.

3          I don't know why -- and I'm asking the lien creditors to

4     reply to this.  I understand that you're opening it up to other

5     entities to object, but this is cash collateral for ten days

6     for heaven sakes.  Why in the world does that provision have to

7     be in there for a cash-collateral order for this first period?

8          MR. DUBLIN:  Good afternoon, your Honor.  This is

9     Phil Dublin for the first-lien lenders.  Your Honor, as part of

10    the negotiation with the debtors on the interim use of cash

11    collateral, this is one of the requests that the lenders made.

12         And we don't want to find ourselves in the position where

13    we're permitting the debtors to use the lenders' cash

14    collateral, and then the debtors themselves challenge the

15    claims of the first-lien lenders.

16         It is opened up for again a committee, any type of

17    committee to the extent appointed, or any third party pursuant

18    to the terms of paragraph 10 of the proposed order.

19         THE COURT:  But just 'til June 15th.

20         MR. DUBLIN:  But 90 -- I'm sorry.  Today is

21    April 8th.  It's in excess of a 60-day period for the

22    committee.  We can modify that to be 60 days from the

23    appointment of a committee as opposed to a finite date,

24    your Honor.

25         THE COURT:  Well, I don't think these kinds of

9

1    language belong in interim orders.  You know they're always

2    problematic in final orders.

3        But I don't think they belong in interim orders especially

4    since the secured creditor's not exactly giving up much, and

5    you're getting all that money back for your attorneys fees, and

6    you're going to cost this estate a lot of money, and, right,

7    I'm not saying it's wrong.

8        But there's going to be a lot of cost and expense to this

9    estate in all the discovery that's going to be going on in the

10   two weeks.

11       So I am not inclined to allow those provisions as

12   admissions for the first ten days because wouldn't these also

13   be binding on the trustee?

14               MR. DUBLIN:  Yes, your Honor.

15               THE COURT:  Well, and you're moving for a trustee,

16   right?

17               MR. DUBLIN:  Yes.

18               THE COURT:  Well, then you tell me why I should do

19   that especially when the fact that nobody's been noticed of

20   this.

21               MR. DUBLIN:  I understand your concerns, your Honor.

22   Would it be possible that if we take out those provisions that

23   we at least have a stipulation that during this interim period

24   the debtors would not challenge the claims?

25               THE COURT:  That would be acceptable.  So in other

```
1    words, I would accept as an interim provision that you assert
2    they have a first lien they have not challenged as yet, and
3    they will not challenge up to the cash-collateral date.
4              MR. DUBLIN:  Okay.  Thank you, your Honor.
5              THE COURT:  All right.  Go on, Mr. Stang.
6              MR. STANG:  Thank you, your Honor.  And we could do a
7    page turn on this.  I was just trying to give you the
8    highlights if you will.
9              THE COURT:  And I appreciate that.
10             MR. STANG:  It --
11             THE COURT:  And I --
12             MR. STANG:  It --
13             THE COURT:  I appreciate that.
14        Thank you.
15             MR. STANG:  Okay.
16             THE COURT:  So it was --
17             MR. STANG:  So it --
18             THE COURT:  -- just one --
19             MR. STANG:  It talked --
20             THE COURT:  It was one of the things --
21             MR. STANG:  It --
22             THE COURT:  -- I wanted covered.
23             MR. STANG:  I'm sorry?
24             THE COURT:  That was just one of the things I wanted
25    to make sure I covered --
```

1          MR. STANG:  Okay.

2          THE COURT:  -- before I forgot, so --

3          MR. STANG:  It ties to the budget.  Your Honor, the

4     budget has items on it that fall within the first three weeks,

5     and, remember, there was this weekend date, and column 3 is

6     April 17th.

7          There are items in the cash flow which show money going

8     out.  But by virtue of the rules on professional compensation,

9     it would not go out.

10          So, for example, there is a line item for ordinary-course

11     professionals.  It was really left in there even with my

12     knowledge to really kind of give people a sense of what we

13     thought was happening operationally during the case.

14          But this approval of the cash-collateral order is not

15     meant to supercede any of the other rules regarding any

16     professional compensation.

17          You also made a comment yesterday, your Honor, about --

18     and I'm just -- we'll get to the budget, specifically, but,

19     once again, a high level.

20          You made a comment about, well, if the funds aren't used

21     for warranty work does it go to some kind of slush fund.  Under

22     the company's cash management, if line items are not expended,

23     they're not being created for reserves.

24          There's no separate account being created just because it

25     says $5,000, for example, for warranty repairs, and that money

```
1     leaves the concentration account to go to a separate account.
2         This is really if the money's not being actually spent,
3     then it stays in the debtor's accounts in the concentration
4     accounts.  It doesn't get spun off to places underneath the
5     carpet.  I think it makes sense to go through the order --
6               THE COURT:  Okay.
7               MR. STANG:  -- and give you kind of what happens on
8     each page.
9               THE COURT:  Yes.
10              MR. STANG:  The first page is a recital of the
11    petition dates and the jurisdiction.
12        Page 2 which starts with paragraph 3 is where the debtor
13    acknowledged, admitted, and confirmed, and I would
14    interlineate.
15        I would not change the subparagraphs, but I would
16    interlineate that for the period or for the cash-collateral
17    period the debtors shall not commence any challenge.  We'll
18    pick up the terminology that's used later.  I think we should
19    still have these factual recitals --
20              THE COURT:  I have no objection --
21              MR. STANG:  -- so that --
22              THE COURT:  -- if you recite.
23              MR. STANG:  Two or three of them.
24              THE COURT:  I --
25              MR. STANG:  Okay.
```

1              THE COURT:  But I think --

2              MR. STANG:  So --

3              THE COURT:  I just don't know if this is the right

4    time pending assessment of what investigation you've done for

5    you to admit as opposed to acknowledge that this is their

6    contention.

7              MR. STANG:  I think that the way it should be done is

8    that the debtors acknowledge that the first-lien creditors and

9    agent allege the following --

10             THE COURT:  Yes.

11             MR. STANG:  -- as of the petition date.

12             THE COURT:  Yes.

13             MR. STANG:  And that way, you know, we recognize what

14   they're saying.

15        So what you've got in the subsections is a recital of the

16   existence of the agreement, a recital of the amount of

17   indebtednesses.  That is at subpoint 2.

18        We turn to page 3.  There is a recital regarding the scope

19   of the liens that are provided to the first lienholders.

20             THE COURT:  Now, you're going to --

21             MR. STANG:  There is --

22             THE COURT:  Excuse me.  You're going to need --

23             MR. STANG:  I'm sorry, ma'am.

24             THE COURT:  -- to refer to paragraph letters --

25             MR. STANG:  Okay.

```
 1              THE COURT:  -- because --
 2              MR. STANG:  Will do.
 3              THE COURT:  -- I have the version uploaded as an
 4      order, so my page numbers don't match yours.
 5              MR. STANG:  Okay.  I apologize.  At C-3 --
 6              THE COURT:  Okay.
 7              MR. STANG:  -- there is a recital regarding the scope
 8      of their liens.  There --
 9              THE COURT:  Okay.
10              MR. STANG:  There is a recital to Section 552 as
11      extending to proceeds.
12          At C-4, there is a validation if you will, again, but
13      we're going to make this into allegations.
14              THE COURT:  Correct.
15              MR. STANG:  So it will allege that they're valid and
16      binding, and that extends into C-5 as well.
17          And then D is --
18              THE COURT:  Well --
19              MR. STANG:  -- a recital of --
20              THE COURT:  -- I'm sorry.  You're --
21              MR. STANG:  I'm sorry.
22              THE COURT:  It's going to be changed to say they
23      contend that the --
24              THE COURT:  The secured creditor --
25              MR. STANG:  Yeah.  We're going to have a --
```

1          THE COURT:  -- contends.

2          MR. STANG:  We will have a lead-in sentence to all of

3     these subdivisions --

4          THE COURT:  All right.

5          MR. STANG:  -- that will condition the content of the

6     subdivisions.

7          THE COURT:  Okay.  Thank you.

8          MR. STANG:  But rather than doing it in each

9     paragraph, we'll have a lead-in --

10          THE COURT:  That makes sense.

11          MR. STANG:  -- conditioning.

12      Then at subpoint D there is the recital of the debtor's

13     request to use the cash collateral.

14      At subpoint E, it constitutes a finding of good faith for

15     the negotiation and the motivation behind the use of the cash

16     collateral.

17      Subpoint F or subparagraph F recites the consent for the

18     cash-collateral period on the terms and conditions of the

19     order.

20      Subpoint G recites that the emergency motion or interim

21     motion was served on the 2nd, and the recitals here were

22     reflected in Certificates of Service that were filed with the

23     court.

24      We then turn to the numbered paragraphs which is where the

25     order actually starts.

```
 1              THE COURT:  Now, on the notice, I would add just to
 2     clarify that no -- let's see.  "Notice of the interim hearing
 3     to approve the motion."  It makes it sound like it's the whole
 4     motion, so I guess --
 5              MR. STANG:  The motion is defined at --
 6              THE COURT:  Right.  It's --
 7              MR. STANG:  -- the top as the motion for interim and
 8     final.
 9              THE COURT:  Yeah.  See, that's the problem.
10              MR. STANG:  But the motion --
11              THE COURT:  So I think --
12              MR. STANG:  The motion --
13              THE COURT:  -- these --
14              MR. STANG:  Oh.
15              THE COURT:  If you just add --
16              MR. STANG:  Well, your Honor, the motion --
17              THE COURT:  -- the word --
18              MR. STANG:  I'm sorry.  I apologize.
19              THE COURT:  No, no, no.
20              MR. STANG:  It's hard, yes.
21              THE COURT:  It's just --
22              MR. STANG:  Yes.
23              THE COURT:  It's just hard.  That's why I say these
24     telephonics are so hard.
25              MR. STANG:  Yes.
```

```
 1              THE COURT:  What if we say and no further notice of

 2    the motion for interim relief is necessary?

 3              MR. STANG:  Okay.

 4         (Colloquy not on the record.)

 5              MR. STANG:  Got it.

 6              THE COURT:  Now, go --

 7              MR. STANG:  Wait.  We should still -- I think we

 8    should still recite -- but it's actually in there at the end,

 9    but okay, so we've got that.

10        And then we turn to the substantive provisions of the

11    order starting at paragraph 1 which is that it's granted only

12    on an interim basis.  And to the extent there were objections,

13    that they have been resolved again only for the interim.

14              THE COURT:  Correct.

15              MR. STANG:  Paragraph 2 is the budget, and I'm

16    prepared if you want, your Honor, to go through the budget and

17    explain it to you.

18        The paragraph here does provide for a 15-percent line-item

19    variance, but it does require, of course, that it's only for

20    the three-week period.

21              THE COURT:  Okay.  I think --

22              MR. STANG:  As to --

23              THE COURT:  -- I need you to go through the budget

24    because as we know we can't have a final hearing until the

25    15 days have passed, and the interim order must only be to
```

1     prevent immediate and irreparable harm.

2         So I think you need to make some sort of record why this

3     budget relates just to those matters which are to prevent

4     immediate and irreparable harm.

5              MR. STANG:  Okay.  First of all, your Honor, I would

6     refer and rely on the declaration of James Rhodes who is the

7     principal of the debtors and has decades, decades-long

8     experience in building and selling homes, and this is a little

9     editorial.

10        While there is obviously a lot going on between the debtor

11    and the first-lien lenders regarding what they consider to be

12    cause for the appointment of a trustee, I think what everyone

13    agrees on is that Mr. Rhodes knows how to build a house, and

14    that Mr. Rhodes knows how to sell houses.

15        And in his declaration, he talks about the background of

16    how he has risen in the ranks if you will of homebuilders not

17    just because those ranks are being thinned out, but, also,

18    because that would naturally make you become higher up on the

19    list of the largest, but, also, because he is good at what he

20    does in a very difficult financial environment.

21        We would also rely on the declaration of Paul Huygens who

22    is a consultant to the company and was formerly the company's

23    CFO.

24        So, your Honor, in lines 1 through 10, you have the total

25    receipts.  And the way the company looks at its revenue, you've

1    got standing inventory which is a house.  You could walk into

2    that house, and you could buy it and live in it the next day.

3    That's what we called the standing inventory.

4        And then you've got homes not started.  This would be

5    where we have a finished lot, and we're ready to sell the lot.

6    Well, we've sold the lot, and we're ready to start building the

7    house for the person who bought the lot.

8        Now, we don't have to be the builder, but these are

9    projections for those instances where we will be the

10   builder.

11       And then you have a standing inventory projected which is

12   well beyond the three-week period, so maybe we shouldn't just

13   spend a lot of time on that --

14            THE COURT:  Okay.

15            MR. STANG:  -- since we're not expending any money --

16            THE COURT:  Right.  Let's just talk about --

17            MR. STANG:  -- during the three weeks.

18            THE COURT:  -- this interim for the moment --

19            MR. STANG:  Right.  We also --

20            THE COURT:  -- since that's our --

21            MR. STANG:  We also operate a golf course associated

22   with one of the projects, so that's the Tuscany Golf Course

23   revenues coming in at line 8, and so that's basically the

24   revenues.

25       On the expenditures, we first start off with insurance

1   financing which we think it speaks for itself as to being

2   critical to protect the estate.

3       IT services which are renewals of software licenses.

4   We've got storage and rent expenses which we're required to pay

5   under 365 on a timely basis.

6               THE COURT:  And those IT --

7               MR. STANG:  A --

8               THE COURT:  And, again, looking just for the ten days

9   because we're talking about an interim order, those IT expenses

10  need to be paid at this level as opposed to, for example,

11  outside the 17th.

12              MR. STANG:  Well, we always could push things out,

13  and I don't know that the software codes disappear.  I honestly

14  don't know if that happens electronically somehow.

15      That might be a violation of the stay.  But when it's

16  done, it's hard to get it back.  These are payments that are

17  due as scheduled, and the IT is critical to the company's --

18              THE COURT:  Okay.

19              MR. STANG:  -- accounting staff and operations --

20              THE COURT:  Okay.  So these are --

21              MR. STANG:  -- on --

22              THE COURT:  When you talk about these payments, these

23  are payments due as scheduled on those dates --

24              MR. STANG:  Yes, ma'am.

25              THE COURT:  -- on whatever category.

1          MR. STANG:  Yes.  Under these --

2          THE COURT:  Okay.

3          MR. STANG:  There are some instances here where we

4    are considering prepaying some vendors because it's hard to get

5    a project started and tell someone, essentially, put me on a

6    COD basis, and I'm only going to operate for ten days.

7          So in certain instances, we are looking at some vendor

8    prepays in the hopes of getting them started to even undertake

9    the work, but these particular ones are as scheduled as due --

10          THE COURT:  Okay.

11          MR. STANG:  -- on the dates we're showing.

12          HOA fees -- so we've got some rent payments which are

13    required to be made.  We can't defer those per the code.

14          THE COURT:  And they're third --

15          MR. STANG:  Brokerage --

16          THE COURT:  They're rent to third parties?

17          MR. STANG:  Yes, ma'am.  The rent on lines, the 13

18    and 14, are not insider leases, though.  The --

19          THE COURT:  Okay.

20          MR. STANG:  You've got a brokerage license which is a

21    nominal amount --

22          THE COURT:  Um-h'm.

23          MR. STANG:  -- for the realty license.

24          HOA fees, we own homes in these projects because we

25    haven't sold them, yet.  The HOA fees are due.  This is

1   important to us because if we start having problems with the

2   homeowners it's bad reputationally, too.

3        When someone wants to buy the house, they go around, and

4   they talk to their neighbors, you know, how's the swimming

5   pool, how's the golf course.

6        We are projecting that we will have seven house closings

7   during this interim period, and we don't want to give people an

8   excuse to bail out of the closings which are reflected on

9   line 4 and projecting revenues of approximately a

10  million-one-thirty.

11           THE COURT:  Okay.

12           MR. STANG:  Model-home leases, these are model homes

13  that have been sold to third parties.  They are not insiders.

14  They are not related by blood or marriage to Mr. Rhodes.

15       And they lease the homes back to the debtor, so that they

16  can be shown as models.  It has to be paid per the code.  We

17  filed on the 1st.  There's no stub issue here, and that's --

18           THE COURT:  Okay.

19           MR. STANG:  That's why that's there.

20       The line 19 is our payroll.  It says Rhodes Homes payroll.

21  That is a consolidated payroll.  And in our wages motion, we do

22  break it out debtor by debtor as to how many employees are on

23  each.

24       This does not include any compensation for Mr. Rhodes.

25  That will be subject to an insider motion.  And although

1    Mrs. Rhodes and Mr. Rhodes' brother were employees of the

2    company prepetition, they are not drawing any compensation

3    direct or indirect postpetition, and they're not included in

4    these numbers.

5                THE COURT:  Okay.

6                MR. STANG:  And line 20, the ordinary-course

7    professionals, are as I said before while scheduled will not be

8    paid absent procedures pursuant to a court order.

9        And then we've got other payrolls both at Pinnacle which

10   is, you know, a debtor, but it does grading work,

11   g-r-a-d-i-n-g, grading work for both the companies, the debtor

12   companies, but, also, for third parties, and those are

13   postpetition.

14       Pinnacle, those are postpetition payrolls.  I'm sorry,

15   your Honor.  That's not correct.  The Pinnacle payroll and the

16   AZ payroll reflect approximately three days of prepetition

17   wages and salaries again not to insiders.

18                THE COURT:  Okay.

19                MR. STANG:  We do have a wages motion.  I don't know

20   if your practice is to let that roll in through the cash

21   collateral, but we do have a separate wages motion that has

22   been uploaded --

23                THE COURT:  Okay.

24                MR. STANG:  -- all of them within the priority

25   amount.  Let's see.

1           Pinnacle job, line 25, the debtor, the Pinnacle debtor, is

2      engaged in grading operations for nondebtors under Public Works

3      projects in Arizona.  One is a city-jail project, and the other

4      one is Public Works.  I'm not sure exactly what the nature of

5      it is.

6           The reason that we feel the need to go forward with this

7      during the emergency period is, A, it brings in some revenue,

8      but that -- hello?

9                THE COURT:  Yes.

10               MR. STANG:  Yeah.  I'm sorry.  The line lost a little

11     static sound, and I thought I had gotten cut off.

12               THE COURT:  No.  I think --

13               MR. STANG:  The most --

14               THE COURT:  -- it was just --

15               MR. STANG:  The most important aspect of this is that

16     these are all bonded projects.  And if we don't do the work in

17     accordance with the Public Works project time lines, it could

18     trigger the bonds, and the claims in this case are going to

19     become much, much greater.

20               THE COURT:  Okay.

21               MR. STANG:  We are on the verge of completing this

22     job.  There's a substantial retention that will come into the

23     estates if it's completed.

24           And so we think it's necessary, A, to generate the

25     revenue, but, more importantly, to prevent further complication

25

1    in this case by virtue of the bonding companies getting

2    involved.

3              THE COURT:  Okay.

4              MR. STANG:  I should tell you just for, you know,

5    absolutely frankness Mr. Rhodes is an indemnitor or a guarantor

6    of those Public Works bonds.

7         And so he has, certainly, an interest in having this work

8    done, but I think the case has an interest in seeing this work

9    get done as well.

10        Then there are various vertical costs which is putting the

11   house up, grading costs relating to the lots, and I'm really

12   working through lines 25 through 29 here.

13             THE COURT:  Right.

14             MR. STANG:  And we think it's necessary to keep these

15   projects going because it's hard to pull people off and then

16   get them to come back.

17        And I can't tell you that it will -- what the nature --

18   what the extent of the damage is in a monetary sense.  But,

19   certainly, in a continuity sense of telling people to leave and

20   then telling them we'll call you back on the 18th, it's just

21   not the way to operate a business.

22        We have gone through these numbers with Westchester

23   (phonetic) in very great detail on Monday night and Monday and

24   Monday night.

25        And it is a budget that at least the agents who have been

1    very conservative with us about what to do during the next

2    ten days have agreed to.

3        The warranty repairs on line 31 as I said is not a

4    reserve, but this is our estimate of what it would cost.  The

5    CFO has asked me to let you know that no warranties are being

6    approved without his specific approval and with specific backup

7    as to each check that he's being asked to sign.

8        We are in the process by the way of changing the signature

9    cards as I may have mentioned yesterday in court.  Even before

10   those are changed, however, no checks will go out the door

11   without the CFO's specific approval.

12       So at the moment -- you know, maybe by tonight he will be.

13   But at the moment, he is not a signatory.  The items don't have

14   expenditures.

15       Going into lines 37, we have sales and marketing.  We are

16   still trying to sell homes that are part of our standing

17   inventory.

18       GNA (phonetic), there is a formula that we use, and I

19   believe it is five percent, but it might be as high as

20   eight percent.

21       Of every construction dollar expended by any of the debtor

22   entities -- I'm going to use five percent in this

23   presentation -- five percent of that construction cost is

24   assessed if you will as a GNA expense and driven up into I

25   think it Rhodes Design & Development, and that's how the GNA is

1    funded from the various debtors.

2        It's a straightforward formula.  There's no put your

3    finger up in the air and see which way the wind's blowing on

4    how busy each entity is.  It's the way it's been done

5    throughout Mr. Rhodes' career as a developer.  Let's see.

6        The other things, the debtor's restructuring

7    professionals, again, subject as I said to the employment

8    issues.

9        Lenders' professionals, your Honor -- we're at

10   line 44 -- this is being paid over as part of the adequate

11   protection.

12       The order specifically states that it is subject to

13   recharacterization under Section 506 because we don't have

14   valuation of the assets, yet, and we're not in a position to

15   agree that they're entitled to attorneys fees.

16       At line 45, the company has at least two consulting firms.

17   One is Mr. Huygens' firm which is going to be the subject of an

18   employment application.

19       The other one is a firm that the principal who's providing

20   services to the debtor now is a Mr. Jeff Barsey (phonetic).

21   Mr. Barsey at one time worked for Credit Suisse, but, actually,

22   worked on the due diligence and funding of this particular

23   credit.

24       He left I think over a year ago, maybe longer than that,

25   and we're going to do an employment application.  I don't know

1    if the lenders are going to object to that or not, but we

2    certainly talked about it with them.

3         But in connection with these expenditures, your Honor,

4    these folks live out of town, and the company decided that it

5    would provide rental housing to them in lieu of them charging

6    hotel-room rates.

7         They lease a home.  The company reimburses them for a

8    housing cost.  They rent a home.  I think they rent it as

9    opposed to the company renting it, but the company pays the

10   rent on a home owned by Mrs. Rhodes.

11        It is a 3,000-square-foot house.  They pay approximately

12   $2500 a month in rent.  It is used by three gentlemen who are

13   there during the week.

14        And that is an expense that comes back if you will to an

15   insider.  That has been in effect for at least a couple of

16   months, and I wanted you to know that.

17              THE COURT:  Okay.

18              MR. STANG:  So that is --

19              THE COURT:  And I think --

20              MR. STANG:  -- the totality --

21              THE COURT:  -- maybe the --

22              MR. STANG:  -- of the budget.

23              THE COURT:  The point with that last thing is -- and

24   it's sort of like I hear what you're saying, and, probably,

25   that expense is an appropriate expense.

1        It remains to be seen whether it ultimately is an

2    appropriate -- to whom it's to be paid, but it makes sense that

3    you're going to have this expense in the budget at least in the

4    future for your consultants if that's part of the package.

5        Is it appropriate in the ten days?  I don't know.  But at

6    least, it's, you know, arguably to be put in the budget and

7    dealt with.

8            MR. STANG:  Your Honor, because it's a real estate

9    lease, we budgeted -- I mean, we talked about this, and I'm

10   very sensitive to the insider issues in any case, but this one,

11   you know, seems to be one where it's really a hot button.

12       Because it's a real estate lease, I told them they had to

13   show it being funded, you know, as required by the lease, and

14   that's why it's in there; otherwise, we would have tried to

15   have pushed it out.

16       I don't have Mrs. Rhodes' consent to push it out.

17   Mr. Rhodes shuddered when I talked to him about the idea of

18   deferring it, but that's what that is.

19       And we do think it is less in total for a month than what

20   they would charge for their weekday hotel accommodations even

21   if they were staying at, you know --

22           THE COURT:  Well, I think --

23           MR. STANG:  -- not at one --

24           THE COURT:  -- it's probably appropriate --

25           MR. STANG:  -- of the glitzier hotels.

1          THE COURT:  -- to budget that amount.  You can put it

2    in your trust account.  But for heaven sakes, we can wait 'til

3    the 17th because, you know --

4          MR. STANG:  Okay.

5          THE COURT:  -- you'd probably pay it on the 1st,

6    anyway, and see what happens.

7          MR. STANG:  All right.  So we'll disburse it into my

8    firm's trust account and hold it pending the 17th?

9          THE COURT:  Yes.

10          MR. STANG:  Is that what --

11          THE COURT:  And then --

12          MR. STANG:  -- you'd like?  Okay.

13          THE COURT:  And --

14          MR. STANG:  That's what we'll do.

15          THE COURT:  And then that leaves other people the

16    chance to discuss it, you know, weigh the cost benefit --

17          MR. STANG:  Right.

18          THE COURT:  -- market rents, et cetera.

19          MR. STANG:  Maybe Mr. Dix (phonetic) will take some

20    time and go look at the house.

21      So, your Honor, if we go back to the order now, that is

22    paragraph 3.

23          THE COURT:  All right.

24          MR. STANG:  There is a --

25          MR. NAGUIAT:  Excuse me, your Honor.

1          Excuse me, Jim.

2                MR. STANG:  Yes.  Go ahead.

3                MR. NAGUIAT:  Your Honor, if I may?  It's

4     Ramon Naguiat on behalf of Credit Suisse.  Just one bit of

5     clarification with respect to the line item for the lenders'

6     professionals.

7          As I'm sure Mr. Stang will get to later, I just wanted to

8     clarify that the lenders' professionals line item deals only

9     with the Steering Committee's professionals which the parties

10    were able to agree to under the proposed interim

11    cash-collateral order.

12         The first -- excuse me.  The first-lien-agent professional

13    fees are not covered in there, and we have reserved our rights

14    as set forth in the order.

15         But I did just want to make that clarification that at

16    this time we couldn't reach an agreement with respect to

17    payment of the first-lien agent's fees.  I apologize for

18    interrupting.

19                THE COURT:  Okay.  No.  I appreciate it.

20         Now, tell me, though, how does that fit within the idea of

21    immediate and irreparable harm that they're paid within these

22    ten days?

23                MR. STANG:  Your Honor, I didn't want my arm broken

24    (indiscernible).  Personally, I'm going to -- you know what?

25    I'm going to let Mr. Dublin speak to that.  I am not going to

1    try.

2            MR. DUBLIN:  And, your Honor, the lenders require --

3    I'm sorry.  Phil Dublin.  I apologize for not announcing my

4    name at beginning of speaking.

5        The lenders obviously have a significant amount of work

6    that needs to be done over the next ten days leading up to a

7    trustee hearing, a cash-collateral hearing, on the 17th and

8    require the professionals to assist them.

9        The professionals have also been working extensively

10    for the lenders leading up to the filing and since the

11    filing.

12        And with no other allocation for a provision of

13    compensation, we thought it was appropriate as part of an

14    adequate-protection package that the professionals for the

15    lenders for the First Lien Steering Committee lenders be

16    compensated.

17        Again, as Mr. Stang mentioned, there is a provision that

18    provides for the potential recharacterization of those amounts

19    for the reduction of principal to the extent it is determined

20    at a later date that those payments should not have been paid

21    under Section 506.

22            MR. NAGUIAT:  And --

23            THE COURT:  And I guess --

24            MR. NAGUIAT:  -- your Honor --

25            THE COURT:  -- I'm a little --

1           MR. NAGUIAT:  -- if I may?

2           THE COURT:  Um-h'm.

3           MR. NAGUIAT:  I'm sorry.

4           THE COURT:  Go ahead.

5           MR. NAGUIAT:  It's Ramon Naguiat again on behalf of

6    Credit Suisse.  Your Honor, I did not in any way mean to

7    intimate that we had any problem with the payment of those fees

8    and just wanted to go on the record as saying we do believe

9    that the work that the Steering Committee is doing is valuable,

10   and I did not mean to intimate otherwise.

11      Thank you.

12          THE COURT:  I understand.  I understand why the

13   lender wants it.  I understand why the debtor doesn't oppose

14   it, but the test is immediate and irreparable harm.

15      So I'm just not quite sure how that -- I mean, let's

16   assume you had all walked in here the first day hand in hand.

17   I couldn't have approved the payment of those fees pending the

18   final hearing, could I?

19          MR. DUBLIN:  And I believe you -- Phil Dublin again,

20   your Honor.  I believe you can as part of an

21   adequate-protection package.

22          THE COURT:  Within the first 15 days --

23          MR. DUBLIN:  Yes.

24          THE COURT:  -- immediate and irreparable harm?

25          MR. DUBLIN:  Yes.  To the lenders, your Honor,

1    absolutely.  And to the extent that the Court is not going to

2    authorize the payment of the fees as contemplated by the

3    agreed-upon cash-collateral budget in the budget and the

4    proposed cash-collateral order, I would have to go back to my

5    firm -- and I believe the others would as well -- to determine

6    if we would continue in the engagement based on the risk.

7         We are in a situation where the debtor's professionals

8    received prepetition retainers, hundreds of thousands of

9    dollars if not more, so in a position where they are not

10   necessarily at the same risk as the other professionals --

11             THE COURT:  Well --

12             MR. DUBLIN:  -- that are involved --

13             THE COURT:  Well, I have to deal --

14             MR. DUBLIN:  -- in this --

15             THE COURT:  -- with silly things --

16             MR. DUBLIN:  -- (indiscernible).

17             THE COURT:  -- like rules.  I know that doesn't mean

18   a lot to you, but let's look at the code.  4001, agreement,

19   hearing.  Let's see.  (Indiscernible).  Let's see.  Cash

20   collateral.  (Indiscernible) and not on 20 days

21   (indiscernible).

22        Well, arguably, Mr. Landis, what's your thoughts?

23        I guess it doesn't come within 6003.  We're now dealing

24   with an agreement.

25             MR. LANDIS:  I think that the issue, Judge --

```
 1    Augie Landis, Assistant United States Trustee.  It probably

 2    does come outside of the scope of Rule 6003(b) because of the

 3    exception for motions that fall within Rule 4001 --

 4              THE COURT:  1.

 5              MR. LANDIS:  -- which takes you back I think to

 6    Rule 4001.

 7         And with respect to this issue to the extent that you're

 8    talking about the motion, you're probably looking at use of

 9    cash collateral --

10              THE COURT:  Right.

11              MR. LANDIS:  -- (b)(2), talking about the hearing,

12    and it says, "The Court may authorize the use of only that

13    amount of cash collateral as necessary to avoid immediate and

14    irreparable harm to the estate pending a final hearing."

15    That's what I think you were referring to.

16              THE COURT:  Right.  Now --

17              MR. LANDIS:  That would --

18              THE COURT:  Right.  And now we have an agreement.

19              MR. LANDIS:  Which --

20              THE COURT:  So that provision --

21              MR. LANDIS:  Which takes us to D, right?

22              THE COURT:  Right.  And that provision isn't

23    specifically in there, is it?

24              MR. LANDIS:  It isn't, but, again, the Court may

25    direct that the procedures prescribed in paragraphs 1, 2, and 3
```

1    of the subdivision shall not apply.

2            THE COURT:  Right.

3            MR. LANDIS:  And the agreement may be approved

4    without further notice if a motion was sufficient to afford

5    reasonable motives of the material provisions in the agreement

6    an opportunity for a hearing, so, really, what you're talking

7    about in the context of an agreement is due-process concerns.

8            THE COURT:  So I don't have immediate and irreparable

9    which I would have if we started out -- sorry to work my way

10   through this.

11       We started out with the use of cash collateral.  So if

12   they had offered that, it's only so much as immediate and

13   irreparable harm.

14       Now we have an agreement, and we don't have that provision

15   which says that the final hearing --

16           MR. LANDIS:  Again, Judge, I think what you're really

17   focused on now that there is an agreement is --

18           THE COURT:  Now there's an agreement.  I --

19           MR. LANDIS:  -- the due-process component.

20           THE COURT:  That's right.  Now I've got to give -- I

21   can't approve the agreement until after 15 days or I could.  I

22   don't think it's appropriate in this case.

23       (Colloquy not on the record.)

24           THE COURT:  Objections may be filed 15 days -- all

25   right.  You're right, so it can be allowed.  I don't have the

1  same -- and, of course, the reason is because since you've

2  agreed on the budget, and it's your ox that's getting gored,

3  that's the relevance, so all right, so that's appropriate.

4      Now, we don't -- are there any junior lien -- voluntary

5  lien creditors that we haven't heard from?

6          MR. STANG:  Your Honor, the agent for the second is

7  on.  This is Mr. Stang.  The agent for the second is on the

8  phone.

9          THE COURT:  Okay.  And there aren't any other --

10          MR. DeAMICIS:  Yeah.  And, your Honor, this is

11  Don DeAmicis again representing the agent for the seconds.

12      You know, we expect to -- well, the agent was a successor

13  agent that just got appointed sort of late yesterday, and we

14  expect to review everything, get up to speed --

15          THE COURT:  Okay.

16          MR. DeAMICIS:  -- and decide what we're going to

17  do --

18          THE COURT:  Okay.

19          MR. DeAMICIS:  -- by --

20          THE COURT:  Okay.

21          MR. DeAMICIS:  -- the final hearing.

22          THE COURT:  All right.  So for an interim matter -- I

23  mean, again, since -- as an interim matter subject to any

24  further objections, I'm willing to allow the moneys to be paid

25  subject to recharacterization to the Steering Committee

1    professionals as set forth --

2              MR. STANG:  Okay.

3              THE COURT:  -- in the budget.

4              MR. STANG:  So, your Honor, to get back to the order,

5    that was paragraph -- essentially, we're at paragraph 3.  And

6    at 3-B, there are some reporting requirements that are within

7    the company's ability to perform on variances from week to week

8    versus the ten days, but I hope this is a template for the

9    future.  We will only engage in ordinary-course business

10   transactions during the ten-day period.

11       And then at paragraph 5 we lead into what their adequate

12   protection is.

13             THE COURT:  Okay.

14             MR. STANG:  And their adequate protection is

15   replacement liens on all property of the estate except

16   avoidance actions.  That has been taken out.  It is that except

17   if you will is about five lines up from the bottom --

18             THE COURT:  Yes.

19             MR. STANG:  -- of paragraph --

20             THE COURT:  I saw that.

21             MR. STANG:  Oh, (indiscernible), and it's only for a

22   diminution in value.

23       And then at subpoint B they get the administrative

24   priority claim, the superpriority administrative priority

25   claim, that if you will parallels that diminution in value.

1     I should point out there was a bit of a carve-out here on

2   their -- not on their lien, replacement lien, but on their

3   superpriority claim, and that carve-out is the sentence

4   following the straight cite of code sections.

5     And, basically, what it says is that they don't have a

6   superpriority as to admin claims incurred by the debtor under

7   the cash flow, under the budget, because what I said to the

8   lenders was we can't tell people --

9          THE COURT:  Right.

10         MR. STANG:  It's one thing to say we can't pay the

11  cash, but to ask them to work and then tell them that they're

12  subordinated was just a bit too much.

13    I also, frankly, you know, looked out for people who got

14  prepetition retainers because it doesn't extend to the

15  administrative claims for those professionals.

16    And it also anticipates a carve-out for a

17  Creditors Committee, though it doesn't have a dollar amount

18  because the lenders didn't have anyone to talk to, yet.

19         THE COURT:  Okay.

20         MR. STANG:  There is a provision that limit --

21  Mr. Rhodes has a minority interest though it is 49 percent in a

22  company called Spirit Underground which lays underground cable

23  and electrical conduit and that sort of thing.

24    It is actually one of the largest in Nevada, and so that

25  company does some work for the debtors, but it's limited to

1    $30,000 per the order, and that's about two sentences up from

2    the end of Subsection B.

3         Subsection C provides for the fees that we just talked

4    about.  After you see the recitals as to the amounts, there is

5    a sentence that says subject to recharacterization --

6              THE COURT:  Right.

7              MR. STANG:  -- under 506(b).

8         Subsection D is more reporting.  There is a requirement

9    that if we know of an event that constitutes a default that we

10   tell the lenders and not keep it a secret.

11        There is a provision for giving information to the

12   Steering Committee which was negotiated the day before the

13   hearing during some depositions.

14        Subpoint E is the check-signing authority we talked about.

15        Paragraph 6 says you don't have to go file your perfection

16   documents for your replacement lien.

17        Subpoint 7 is a 506(c) waiver, and, perhaps, we need to

18   address that in the context of -- well, it does say except as

19   set forth herein, and so there is the contemplation of a

20   reasonable carve-out for the committee.  We don't know that

21   dollar amount, yet.

22        But in the context of having said there will be a

23   reasonable carve-out for the committee, I think the 506(c)

24   waiver is appropriate.

25        I don't know if you want to put the time collar on this

1   like we did earlier, but this is where the 506(c) issue comes

2   up.

3           THE COURT:  Okay.

4           MR. STANG:  In my mind, your Honor, 506(c) waivers

5   are quid pro quos for carve-outs and in their retainers, large

6   retainers, and my firm got a large retainer in this case.

7       And so, you know, because we don't have that

8   quid pro quo going, yet, I wanted to really bring it to your

9   attention.

10          THE COURT:  Okay.  So --

11          MR. STANG:  But --

12          THE COURT:  -- for an interim --

13          MR. STANG:  But --

14          THE COURT:  In other words, should we limit this

15  provision until we have a final order?

16          MR. DUBLIN:  Your Honor --

17          MR. STANG:  I --

18          MR. DUBLIN:  -- Phil Dublin for the First Lien

19  Steering Committee.  This, the provision, is only for the

20  period for which there is consensual use of the cash

21  collateral.

22          THE COURT:  Okay.  All right.

23          MR. STANG:  Okay.  You know what?  I'm sorry,

24  Mr. Dublin.  You're right.  I --

25          THE COURT:  That's right.

```
1                MR. STANG:  I apologize --

2                THE COURT:  That's right.

3                MR. STANG:  -- for going on --

4                THE COURT:  Oh --

5                MR. STANG:  -- about that.

6                THE COURT:  -- okay.  Thank you.

7          And then paragraph 8 or going on, rather.

8                MR. STANG:  Yeah.  Paragraph 8 is that they have a

9     superpriority claim to the extent provided for in the order for

10    their diminution.

11         Paragraph 9 is they get to reserve rights including the

12    right to seek relief from the stay to foreclose on their

13    collateral, to request a dismissal, conversion, appointment of

14    a trustee which, of course, they've done, propose their own

15    plan when exclusivity is no longer in force, and to always ask

16    for more adequate protection as appropriate.

17               THE COURT:  I need to go back.  I'm pretty sure this

18    is the case, but I just need confirmation.  All these adequate

19    protection, by administrative priority, by additional liens

20    only goes to the extent of diminution of value.  It doesn't

21    attempt to wrap any prior debt, correct?

22               MR. STANG:  Yeah.  Mr. Stang.  From the debtor, that

23    is our understanding.

24               THE COURT:  Okay.

25               MR. DUBLIN:  This is Phil Dublin.  That's correct,
```

1    your Honor.

2            THE COURT:  All right.  Thank you.

3            MR. STANG:  Paragraph 10 is the challenge period, and

4    this is an area where I think we need to in light of your

5    comments, your Honor, about recitals of acknowledging what is

6    alleged we did that recital C.  We need to go back and either

7    eliminate this entirely or somehow address what's going on

8    here.

9            THE COURT:  In other words, I --

10           MR. STANG:  Basically --

11           THE COURT:  It may be appropriate in a final order.

12   I don't think it's appropriate in an interim order the same as

13   before.

14           MR. DUBLIN:  Your Honor, this is Phil Dublin.  We can

15   just take out paragraph 10.

16           THE COURT:  All right.  And then when you make --

17           MR. STANG:  I --

18           THE COURT:  When you file your motion, you're going

19   to need to make sure that you have the final draft of the

20   agreement in there.

21       And, of course, when you do your final motion, you're

22   going to have to comply with the 4001 provision, so that will

23   be brought to everyone's attention.

24           MR. STANG:  Okay.

25           THE COURT:  Okay.

1          MR. STANG:  Well, that cut down the order a bit.

2      We're on to paragraph 11, then, your Honor.

3          THE COURT:  All right.

4          MR. STANG:  And these are termination events.  This

5  is on its own.  It expires on its own on the 17th, and then

6  there are other termination events which include noncompliance,

7  a material adverse change.

8      We can't enter into any transaction.  You know, we have to

9  actually do ordinary course.  We can't try to prime them and if

10  there's a conversion or a dismissal.  Those are all cash.

11      And so I have just raced through Roman Numeral V.  It's a

12  page turn for me.

13      6, no priming.

14      7, we have to make the payments to them by the end of the

15  day.

16      By the way, we don't have -- I don't think we have the

17  wiring instructions for the Winchester Group, but we do for the

18  other two lender professionals.

19          MR. DUBLIN:  I will --

20          MR. STANG:  So --

21          MR. DUBLIN:  I will forward that to you.  I

22  apologize.

23          MR. STANG:  Okay.  We have the document production

24  that we agreed to.  We're going to give access to people.

25  We're going to look at that a little more in a moment.

1          We're now at No. 9, and that's basically it.

2          At subpoint B, your Honor -- and believe it or not, this

3    was why we were out of the room for at least part of the time

4    yesterday -- we are going to have the Winchester Group which

5    are financial advisors for the first lienholders come into the

6    debtor's offices and camp out for a couple of days.

7          They're going to get their document production which is

8    Exhibit C.  They get to ask for follow-up documents, and we'll

9    try as best we can.  We'll make a good-faith effort to get that

10   to them.

11         But, most importantly, we are giving them -- let's see --

12   one, two, three, four, four-and-a- -- three-and-a- -- oh, sorry

13   -- one, two, three-and-a-half days of interviews with company

14   employees, and we think that's a very significant due-diligence

15   opportunity for the first-lien creditors.

16              THE COURT:  Okay.

17              MR. STANG:  Just to point out, they are going to be

18   hosted by a company employee during those interviews, but

19   Mr. Rhodes will not be that company employee.

20              THE COURT:  All right.

21              MR. STANG:  Let's see.  Upon a cash-collateral

22   termination event and two-days' notice, they -- I'm sorry.

23   They provide two-days' notice to the debtors of a termination

24   event, and we get to come in during that two-day period and

25   tell you why a termination event has not occurred.

1        There is no relief from stay for them to foreclose on

2   their collateral as the result of a cash-collateral termination

3   event.  It's simply the cessation of the use of cash

4   collateral.

5            THE COURT:  All right.

6            MR. STANG:  Let's see.  Roman Numeral II is fairly

7   standard.  That they don't waive anything by having failed to

8   seek it.

9        Paragraph 12, we don't grant liens on the prepetition

10  collateral.

11       13 is the successor to the signed provision regarding the

12  order.  You pointed that out just a few minutes ago about it

13  being binding on the trustee.

14       14, no discharge of the obligations under this order under

15  Section 1141 until all obligations under the order are paid.

16       No modification provision in 15.

17       16, no right of setoff.

18       17, no delay on the effectiveness of the order.  Oh, let's

19  see.

20       Chapter 7 conversion doesn't affect the provisions of the

21  order or anything granted under it.

22       And then, finally, paragraph 19 is the scheduling of the

23  final hearing.  We are contemplating that we could get out

24  notice of the final hearing in today's mail to the parties

25  indicated.

```
1              THE COURT:  Okay.
2              MR. DUBLIN:  Your Honor, Phil Dublin.  One more
3    comment for Mr. Stang is that based on the changes to
4    paragraph C and the removal of paragraph 10 the proviso in
5    paragraph 20 should be removed.
6              THE COURT:  And what you could do if you want --
7              MR. STANG:  Yes.
8              THE COURT:  -- to send it out today is --
9              MR. STANG:  Thank you.
10             THE COURT:  Oh, that's right.  You're ready to go on
11   the final motion.  That's right.  We're just changing the
12   interim order.
13             MR. STANG:  Right.
14             THE COURT:  Correct.
15             MR. STANG:  Right.
16             THE COURT:  I would like you to also serve any entity
17   that purports to hold a mechanic lien.
18             MR. STANG:  Your Honor, let me tell you.  I talked to
19   Mr. Rhodes about this after the hearing because of --
20             THE COURT:  Uh-huh.
21             MR. STANG:  -- your comments.  What he said to me was
22   -- first of all, just so you know -- and I'm not trying to
23   change any service requirement -- the company tends to focus
24   much, much, much of its work on about 25 to 30
25   subcontractors.
```

```
1              THE COURT:  Um-h'm.

2              MR. STANG:  And so we don't have a numerosity problem

3   in terms of getting out this kind of notice.  He said he's not

4   aware, and we'll obviously double-check.

5         But that he's not aware of anyone who has actually

6   perfected a mechanic's lien on the property, but, obviously,

7   people do their preliminary notices as a means of, you know,

8   protecting themselves.

9         So I think what we'll just do is we'll end up serving, you

10  know, probably everybody, I mean, not the homeowners.

11             THE COURT:  Right.

12             MR. STANG:  But we're going to end up -- I think we

13  should just serve all the vendors and cover ourselves that way.

14             THE COURT:  Okay.

15             MR. DeAMICIS:  Your Honor?

16             THE COURT:  Yes.

17             MR. DeAMICIS:  Your Honor, it's Don DeAmicis

18  representing the second lienholders.  A request, perhaps, to

19  Mr. Stang, if I may?

20        And that is to the extent that documents are being

21  provided to the first lienholders we have liens that, you know,

22  cover the same collateral.  We would also like to have the

23  benefit of that documentary production.

24             MR. STANG:  Your Honor, I guess two thoughts.

25  Number one, if the second agent is consenting or is not
```

1    objecting I should say to the relief sought, you know, if

2    that's a nice quid pro quo.

3         The second thing is there is a -- I'm not sure how we're

4    delivering these documents.  I'm not sure that they're all

5    going to be electronically scanned.  It may be because Mr. Dix

6    of Westchester is sitting in our offices.  We're going to just

7    drop them on his table.

8         I can't guarantee that we can get them to the second agent

9    in the same time frame because it will require some

10   transmission if they're not electronically produced.

11        But we have no problem giving the second agent the

12   documents.  I just don't know that it will be by 5:00 p.m. this

13   Friday.

14             THE COURT:  Okay.

15             MR. STANG:  But I'll work with counsel, so that they

16   get this stuff as quickly as possible after or as we have

17   produced it to the first.

18             THE COURT:  Okay.  And one other on noticing -- I

19   think you're going to cover it -- I'm a little confused about

20   Pinnacle.

21        But since it looks like Pinnacle is -- the assets are

22   being used and given in Pinnacle, and there might be some --

23   I'm not quite sure how it's funding through.  Make sure that

24   all the creditors of Pinnacle receive notice.

25             MR. STANG:  Pinnacle is a debtor, your Honor.

```
1              THE COURT:  I know.

2              MR. STANG:  Okay.

3              THE COURT:  All the creditors --

4              MR. STANG:  Okay.

5              THE COURT:  -- of Pinnacle --

6              MR. STANG:  Okay.

7              THE COURT:  -- unless they're --

8              MR. STANG:  Got it.

9              THE COURT:  I assume they're not that many.

10             MR. STANG:  I don't know, your Honor.  Your Honor,

11   Ms. Cho who is on the line and who is going to hunt me down at

12   the end of this hearing has sent me an E-mail saying we have

13   300 pages of UCC-1 holders.

14             THE COURT:  Oh.

15             MR. STANG:  I'm not sure how much that is of kind of

16   repeated the same names.  I guess my question to you is could

17   we provide that we give out notice by end of tomorrow as

18   opposed to end of today because it --

19             THE COURT:  Certainly.

20             MR. STANG:  Okay.  Thank you.

21             THE COURT:  Mr. Landis.

22             MR. LANDIS:  I just want to make sure, Judge.  In

23   order to make certain this thing doesn't come back and bite us

24   from a service perspective, 4001(d), Subsection C talks about

25   service, and it talks about a committee -- and, of course, we
```

1    don't have one of those -- if it's a reorganization case and no

2    committee has been formed on the creditors included on the list

3    under Rule 1007(d) and then, two, on any other entity that the

4    Court directs.

5        I just want to make sure that we're absolutely clear that

6    in addition to any other parties we've talked about that at a

7    minimum the consolidated list of the 20-largest unsecureds gets

8    it --

9            THE COURT:  Right.

10           MR. LANDIS:  -- as well.

11           THE COURT:  I had presumed that as a given.  These

12   were like additionals, but I think you're absolutely right for

13   making that clear, so it's that consolidated list you had plus

14   the Pinnacle creditors.

15       Obviously, if you want to serve all the creditors except

16   the homeowners, that's fine.  I would only direct that it be

17   anyone who could claim an interest in the collateral --

18           MR. STANG:  Right.

19           THE COURT:  -- and then the Pinnacle creditors and

20   then the top 25.

21           MR. STANG:  Okay.

22           THE COURT:  And you're right.  It may be easier just

23   to send it out than trying to sort through.

24           MR. STANG:  Yeah.  I think it may be based on the

25   statements to me by Mr. Rhodes that they don't have a lot of

1    suppliers, but I think by having tomorrow to sort through some

2    of this stuff will be sufficient.

3            THE COURT:  All right.  Fine.  And make sure your

4    motion -- you know, you're going to have comply with 4001(d) on

5    the copy of the agreement and a proposed form of order.  Let's

6    see.  I'll --

7            MR. STANG:  Yeah.  If we're just going forward on

8    the --

9            THE COURT:  Why don't we just do a summary.  I'll

10   allow you to -- make sure you file your motion and the proposed

11   form of order, and then I'll allow you to do the motion just

12   due to the concise summary.

13           MR. STANG:  Okay.

14           THE COURT:  And I'm not going to -- I won't require

15   you to mail a copy of the agreement, but with directions where

16   they can find it, what document number they can find it on

17   PACER.

18           MR. STANG:  Okay.

19           THE COURT:  And are you going to do a Web site?

20           MR. STANG:  We have one.  I just have to remember the

21   extent to which Omni is providing us that kind of facility.

22           MS. CHO:  It --

23           MR. STANG:  I'm not sure they're running a pleading

24   Web site for us.

25           THE COURT:  Okay.

1            MS. CHO:  And (indiscernible) --

2            MR. STANG:  And I'll make --

3            THE COURT:  And I signed --

4            MR. STANG:  -- a reference --

5            THE COURT:  -- that order today by the way.  Oh, I

6    added to the order as an aside that they have to keep a claims

7    register for each debtor, and that they agree to abide by the

8    guidelines of this court.

9            MR. STANG:  But you wanted the guidelines attached.

10           THE COURT:  Well, they weren't.

11           MR. STANG:  Right.

12           THE COURT:  But I just added it by text.

13           MR. STANG:  Oh, okay.

14           THE COURT:  So I've solved that problem.  All right.

15   And then we'll have the hearing on that on the 17th.

16   Objections must be filed by the 16th at 3:00 p.m. Pacific

17   Daylight Time.  I know that doesn't give you --

18           MR. STANG:  Okay.

19           THE COURT:  -- much time to respond.  But at least,

20   it gives you a little head start.

21           MR. STANG:  Yeah.  I think we'll be talking with the

22   people who are most likely --

23           THE COURT:  I think that's right.

24           MR. STANG:  -- to have objections.

25           THE COURT:  Now --

1          MR. STANG:  Okay.

2          THE COURT:  We need to go back over to these other

3    motions.

4          MR. STANG:  Yes.

5          THE COURT:  Now, the good news is partly because my

6    staff was ready to shoot me I'm prepared to go ahead and enter

7    an order of joint administration as long as we do several

8    things.

9        One -- and then we discussed this yesterday -- the notice

10   of the 341 meeting will go out for each debtor and the proof of

11   claims.  The creditors will be directed -- in other words, the

12   mailing matrix for each creditor, and the creditor is to file

13   the claim in that --

14         MR. STANG:  Right.

15         THE COURT:  -- in the appropriate debtor's case.

16         MR. STANG:  We're going to give you a master mailing

17   list for each separate debtor.

18         THE COURT:  Correct.

19         MR. STANG:  Right.  Got it.

20         THE COURT:  And then it will be the same date and

21   time.  I mean, it will be the same date and time.  It will be

22   held together.

23         MR. STANG:  Your Honor, I have to admit to being a

24   little unaware of exactly how these dates get automatically

25   generated, but is it clear that that, in fact, is what those

1    notices that are generated by BNC are going to say?

2            THE COURT:  It's my understanding talking to our

3    Clerk of Court that's what they're going to do, but I would ask

4    -- I know Mr. Larson's been working with our staff very

5    closely.

6        Make sure they -- Mr. Larson, if I could impose on you --

7    and I'll certainly suggest it to them, but I'm likely to

8    forget -- before they send it out to have me eyeball it, you

9    eyeball it, so that you make sure it covers the things that you

10   want covered in there.

11           MR. LARSON:  Absolutely.  Absolutely, your Honor.

12           THE COURT:  Okay.  And then they'll be doing that

13   mailing, and I think they'll be able to do it Friday if you get

14   those uploaded.

15           MR. DUBLIN:  Your Honor, it's --

16           THE COURT:  So I'm prepared --

17           MR. DUBLIN:  It's Phil Dublin speaking, but I

18   apologize for interrupting.  It's --

19           THE COURT:  That's all right.

20           MR. DUBLIN:  It's 7:00 o'clock here in New York, and

21   I am already late for my Seder.  It is the first night of

22   Passover.  I was hoping to be excused.

23       I just wanted to note that we had provided and commented

24   on a number of the other orders that Mr. Stang has uploaded and

25   is going to present.  They are all consensual from the

1    First Lien Steering Committee's perspective.

2         And to the extent that your Honor has any issues with the

3    agreed-upon terms, I'm sure that we would be able work those

4    out.  But if I don't get to my Seder soon, I'm afraid that my

5    wife will want to divorce me.

6              THE COURT:  Okay.  All right.  So that's fine.

7    You're excused, and so I gather, then, that the

8    First Lien Committee has withdrawn its objections to all those

9    other motions at least on an interim basis on the bank

10   accounts, et cetera?

11             MR. DUBLIN:  That's correct, your Honor.  On an

12   interim basis, we are consenting to the entry of those

13   orders --

14             THE COURT:  Okay.

15             MR. DUBLIN:  -- as modified.

16             THE COURT:  Okay.  Fine.

17        Thank you.

18             MR. DUBLIN:  Thank you, your Honor.

19             THE COURT:  Yes.  You're excused.

20        (Philip C. Dublin, Esq., was excused from the proceedings

21        at 04:00:29 p.m.)

22             THE COURT:  So you can --

23        (Colloquy not on the record.)

24             THE COURT:  And the other thing in the motion for

25   joint administration is that you, the professionals, all

1    professionals, that anticipate filing applications for fees

2    have to to the best of their ability segregate their work

3    vis-a-vis the debtors.

4              MR. STANG:  Your Honor, may I --

5              THE COURT:  So --

6              MR. STANG:  Your Honor, may I comment --

7              THE COURT:  Yeah.

8              MR. STANG:  -- on that --

9              THE COURT:  Yeah.

10             MR. STANG:  -- because I just went through this --

11             THE COURT RECORDER:  Your Honor --

12             MR. STANG:  -- before Judge Jury in Riverside --

13             THE COURT RECORDER:  -- (indiscernible) --

14             THE COURT:  Wait, wait.

15             THE COURT RECORDER:  -- (indiscernible).

16             MR. STANG:  -- on a case --

17             THE COURT:  Wait.  Wait.

18             MR. STANG:  -- that --

19             THE COURT:  Please, hold on.  Wait.

20             THE COURT RECORDER:  Off --

21             MR. STANG:  Oh.

22             THE COURT RECORDER:  Off record.

23             MR. STANG:  Oh, I --

24        (Off the record at 04:00:58 p.m.)

25        (On the record at 04:01:07 p.m.)

```
 1              THE COURT RECORDER:  Okay.  We're back on,
 2    your Honor.
 3              THE COURT:  All right.  We're back on.
 4         Sorry.
 5              MR. STANG:  Okay.  Judge Jury and I just went through
 6    this in a case called Empire Land out in Riverside, and what we
 7    had done in that case was we created what in this case I guess
 8    I would call a Rhodes' general account, and we would bill to
 9    that account matters that we thought were of common interest,
10    for example --
11              THE COURT:  Okay.
12              MR. STANG:  -- this hearing.  If there was an item
13    that was specifically related to Pinnacle, I would have a
14    separate Pinnacle-matter number.
15              THE COURT:  Yes.
16              MR. STANG:  And I would bill just to that.
17              THE COURT:  That's fine.
18              MR. STANG:  And then at the end of the day, you know,
19    maybe if someone says, well, we have to allocate it between the
20    bankruptcy estates we'll figure out a way of doing that, but
21    that's how I would -- you know, I'm not saying that should
22    necessarily be in the order.
23         But I'm going to -- what I'll write down is that
24    professionals doing fee apps have to record their time in a
25    manner that enables it to be allocated to specific estates.
```

```
 1              THE COURT:  Right.  And I think Mr. Landis has some
 2     magic language he likes to use, so --
 3              MR. STANG:  Oh, okay.  Well, I would welcome that
 4     from him, then.
 5              THE COURT:  So yeah.
 6              MR. LANDIS:  We --
 7              THE COURT:  And because the whole point is now I
 8     don't want to surprise you later.  You know, in other words --
 9              MR. STANG:  No, no, no.  And --
10              THE COURT:  So --
11              MR. STANG:  -- in this case like --
12              THE COURT:  And I think that --
13              MR. STANG:  In a case like -- I'm sorry.
14              THE COURT:  No.  Go ahead.
15              MR. STANG:  I was going to say in a case like this
16     even a couple of days can become a horrific task of trying to
17     sort it back out later.
18              THE COURT:  Yeah.
19              MR. STANG:  So earlier is definitely best.
20              THE COURT:  Okay.  And the lead case should be not
21     Heritage Land, but The Rhodes Companies, LLC.  Also, please
22     amend the petition in The Rhodes Companies to put a/k/a
23     Rhodes Companies, LLC, because I've told you --
24              MR. STANG:  Yes.
25              THE COURT:  As I've told you -- it's not your
```

1    fault -- our system didn't pick it up because it was not "The".

2              MR. STANG:  We have discussed that.  Ms. Cho and I

3    have discussed that, and we're in the process of preparing the

4    amended petition.

5              THE COURT:  And then when things settle down

6    Mr. Larson's office can work with our staff on how we get

7    everything that was filed in Heritage over to the Rhodes cases

8    whether it's by a docket entry or whatever, so that people can

9    follow.

10        But from now on -- after you get this order, from now on,

11    file it -- and that's the lead case.  The lead case will be --

12    I don't have that number, but you know which one that is.

13              MR. STANG:  Right.  So, your Honor, as I understand

14    it, what we should do is file -- you know, apparently, we can't

15    just file an order in a case.  We have to tie it to a motion,

16    and so we --

17              THE COURT:  Right.

18              MR. STANG:  -- would file the joint admin motion in

19    each of the 32 cases.  We would file the joint admin order in

20    each of the 32 cases.

21        And that joint admin order will, in effect, serve as a

22    notice to anyone looking saying look at case No. 1 for all

23    subsequent pleadings.

24              THE COURT:  I think -- yes.  That's right.

25              MR. STANG:  Yeah.  Okay.

1          THE COURT:  And, again, the clerk has I think a form

2     order that they work with you on that.  The form order you

3     provided was fine but for the fact that I want it to be in --

4     so that people know where to find the case.

5          MR. STANG:  Got it.  Okay.

6          THE COURT:  And, well, it's just the problem of how

7     do we now transfer it over.  It can be done.  It's just a

8     mechanical kind of thing.

9          And, you know, it may well just be for a docket entry we

10    do it by saying for prior to this date check docket number such

11    and such.  Check the docket in Heritage Company for matters

12    after that.  It's after that, so it --

13         MR. STANG:  Right.

14         THE COURT:  That's just a procedural issue.  All

15    right.

16         MR. LARSON:  And I think we have --

17         MR. STANG:  Okay.

18         MR. LARSON:  -- that scheduled to fix the first thing

19    next week, your Honor.

20         THE COURT:  Okay.  Great.  Then the next thing we had

21    was -- I'm sorry.  I've lost the calendar.  You have now a form

22    order on your prepetition wages, et cetera?

23         MR. STANG:  Yes.  That has been consented to I

24    believe by all parties, including the U.S. Trustee's Office.

25         THE COURT:  All right.  I'm prepared to approve that,

1    and we did this.  The extension of time is granted 'til -- did

2    I say 15 days after or what did I say?

3              MR. STANG:  You said 15 days yesterday.

4              MR. LANDIS:  Yes.

5              THE COURT:  Okay.

6              MR. LANDIS:  And the order billed --

7              MR. STANG:  Right.

8              MR. LANDIS:  -- (indiscernible) April 30th, Judge,

9    that's a full week in advance of the 341 meeting.  We have no

10   further opposition based on that date.

11             THE COURT:  Okay.

12             MR. DeAMICIS:  Right.  And, your Honor, Don DeAmicis,

13   the second-lien lenders.  Just so the record reflects, we've

14   been in very late.  We haven't consented to anything at this

15   point.

16             THE COURT:  But you have no opposition to the

17   motion --

18             MR. DeAMICIS:  We --

19             THE COURT:  -- I --

20             MR. DeAMICIS:  We're not registering an objection.

21             THE COURT:  Okay.  Thank you.

22      No. 4, debtors to sell homes free and clear, the

23   procedures.

24             MR. STANG:  Everyone signed off, including the

25   U.S. Trustee, your Honor.

```
 1              THE COURT:  All right.  So that's granted, and

 2     there's no objection filed by the second, so that's granted.

 3         No. 5 was the cash collateral which we've dealt with.

 4         No. 6 is the prepetition obligations, and any objection to

 5     a form order on that one?

 6              MR. STANG:  I think we were awaiting the

 7     U.S. Trustee's response, your Honor.

 8              THE COURT:  Okay.

 9              MR. LANDIS:  That's not accurate, Judge.  We've

10     already agreed --

11              MR. STANG:  Oh.

12              MR. LANDIS:  -- to that.

13              THE COURT:  You've agreed to that?

14              MR. LANDIS:  Yeah.

15              THE COURT:  All right.  So that will --

16              MR. STANG:  Sorry.

17              MR. LANDIS:  That --

18              THE COURT:  That will be granted.

19              MR. LANDIS:  That's okay.

20              THE COURT:  That's all right.

21              MR. STANG:  Sorry, Mr. Landis.

22              THE COURT:  Things move.

23              MR. LANDIS:  Trying to help.

24              THE COURT:  And then No. 7, and I had a concern about

25     the administrative priority for postpetition intercompany
```

1    claims.  I assume you're deferring that issue and have reached

2    an agreement as to the rest or do you have an agreement?

3              MR. STANG:  I think we've put it off 'til the 17th,

4    your Honor.

5              THE COURT:  Okay.  Good.

6              MR. LANDIS:  That's accurate, Judge.

7              MR. STANG:  Yeah.

8              MR. LANDIS:  We reserved that one, specifically.

9              THE COURT:  Okay.  So the whole motion is reserved

10   for the 17th or just that part 4?

11             MR. STANG:  We're granting the --

12             THE COURT:  And then --

13             MR. STANG:  We are seeking approval only on an

14   interim basis.  And as to the administrative priority, that's

15   not included in the interim approval.

16             THE COURT:  Okay.  So interim, we're -- are we

17   approving, Mr. -- I'm sorry.

18        Mr. Landis, do you have any objection to the existing bank

19   accounts, the existing cash management, on an interim basis?

20             MR. LANDIS:  Not on an interim basis, Judge.  What it

21   does is it pushes the issues back to the 17th to allow us to

22   work them out.

23             THE COURT:  Okay.

24             MR. LANDIS:  I think that's good.  And in that order,

25   too, because it also -- there are two orders that talk about

1    intercompany claims being accorded, you know, administrative

2    priority.  All I did in the proposed order was reserve that

3    issue back to the 17th --

4              THE COURT:  Okay.

5              MR. LANDIS:  -- your Honor.

6              THE COURT:  Good.  All right.  So that's continued to

7    the 17th, so the only motions we have continued to the 17th are

8    the motion -- it will be an amended motion for approval.  Well,

9    really, it's a new motion.

10        It's a motion -- how do you want to do that, the motion to

11   approve cash collateral, the agreement?  I guess it's really a

12   new motion, isn't it?

13             MR. STANG:  I guess, well, we --

14             THE COURT:  Why don't you call it an amended motion

15   and indicate it's with consent now.  That way that gets us in

16   our time frame, and --

17             MR. STANG:  Well, your Honor, it only goes through

18   the 17th, and so I don't know what their position's going to be

19   when I talk to them tomorrow about getting past the 17th.

20             THE COURT:  Okay.  So we need to continue your motion

21   which is --

22             MR. STANG:  Yes.

23             THE COURT:  -- Docket No. 5.  You also will be filing

24   a motion for approval of agreement for I guess for --

25             MR. STANG:  Yes.

1          THE COURT:  -- cash collateral to be heard on the

2     17th.

3          MR. NAGUIAT:  Excuse me --

4          THE COURT:  It may make --

5          MR. NAGUIAT:  -- your Honor.  It's Ramon Naguiat on

6     behalf of Credit Suisse.  Is this motion going to deal with the

7     interim agreement?  It's just to get approval of that?  Is that

8     what's contemplated --

9          THE COURT:  Oh, that's right --

10         MR. NAGUIAT:  -- because --

11         THE COURT:  -- because you're only interim, aren't

12    you?

13         MR. NAGUIAT:  Yeah.  Right.

14         THE COURT:  We don't have --

15         MR. NAGUIAT:  Right now, we're only on an interim, so

16    there is no real motion to approve this agreement to the extent

17    your Honor is -- I think your Honor's approving that today.

18       So it's really I think a motion for, you know, further

19    interim use of cash collateral past the 17th and then final use

20    of cash collateral, and maybe I'm misunderstanding or I missed

21    something, but --

22         MR. STANG:  Yeah.  I think he may be right,

23    your Honor.  We are looking for approval of use of cash

24    collateral after the 17th, and we don't have any agreement on

25    that at the moment.

1          THE COURT:  That's right.  My original concern was

2    all this language that granted all of that to the creditors --

3          MR. STANG:  Yeah.  Right.

4          THE COURT:  -- on an interim basis, but we have

5    excised out most of the offending language.  Well, I still

6    think the creditors have to have the right to object, so they

7    could say, I'm sorry --

8          MR. STANG:  Okay.

9          THE COURT:  -- you shouldn't have approved it on an

10   interim basis, so I think we are having a hearing on that

11   interim hearing on the 17th.  I mean, you run the risk that a

12   creditor says you should never have done it, but, hey, that's

13   due process.

14         MR. STANG:  Right.  All right.  So we'll have two

15   things related to cash collateral.  One will be our noticed

16   motion for approval of use of cash collateral post-17th and

17   then a motion for approval of the agreement that's being

18   entered today on an interim basis.

19         THE COURT:  Correct.  And that will make it --

20         MR. STANG:  Okay.

21         THE COURT:  -- much easier, too, in case you agree to

22   something final just to continue that out.

23         MR. STANG:  Right.  Right.

24         THE COURT:  And then --

25         MR. STANG:  Okay.

1        THE COURT:  -- we also have -- Docket No. 7 will be

2   continued, and then I will sign the order shortening time for a

3   motion to appoint a trustee for the 17th.

4        MR. STANG:  Your Honor, before we go past the trustee

5   scheduling, Mr. Kornfeld who's been on the line asked me if we

6   could get some deadlines for briefing.

7        Or, Mr. Kornfeld, maybe you should just address it

8   directly.

9        MR. KORNFELD:  Your Honor, the question really is

10  when will the Court want our response to be due for that

11  briefing.

12       And just for reference, we envision the depositions will

13  be taking place, probably, on the 14th and 15th at a minimum,

14  perhaps, even on the 13th.

15       THE COURT:  Quite frank --

16       MR. KORNFELD:  So if --

17       THE COURT:  I'm sorry.

18       MR. KORNFELD:  So --

19       THE COURT:  What --

20       MR. KORNFELD:  So if our response date could be on

21  the 16th at 3:00 p.m. like the cash-collateral response, then

22  that would be helpful.  And if not, we'll do, of course,

23  whatever the Court wants.

24       THE COURT:  Well, quite frankly -- and you'll be glad

25  to hear this -- you know, I think briefing is of little use in

1    a case like this.  We all know what the statute says.  It's the

2    evidence that makes the difference.

3        I think for just the sake of preserving the record, you

4    file an opposition, and then we'll have the evidence, and then

5    if there is, you know, legal issues involved I could have

6    postbriefing, but, you know, we know what the standards are.

7        I mean, the standard's in the code, and I know there's

8    cases that the Court acts as appointed trustee because of this,

9    and Court Y has or hasn't.  That's all very well and good.

10       But that's just some Court that said that, so it's just

11   whatever the -- you know, I have to apply the facts to the law,

12   and the law is spelled out pretty clear in 1112.

13               MR. KORNFELD:  Okay.  So would the Court want us to

14   file an opposition that says for, you know, the reasons that

15   will be presented at the hearing we hereby oppose or does the

16   Court want more --

17               THE COURT:  I'm --

18               MR. KORNFELD:  -- detailed briefing?

19               THE COURT:  I'm satisfied with that.

20               MR. KORNFELD:  Okay.

21               THE COURT:  I wouldn't --

22               MR. KORNFELD:  We --

23               THE COURT:  I wouldn't object to that.

24               MR. KORNFELD:  Your Honor, we can do that.

25               THE COURT:  And I --

1           MR. STANG:  Oh.

2           THE COURT:  And remind me when I yell at you later

3    for saying what kind of a brief is this that I said so.

4           MR. KORNFELD:  I will do so gently.

5           THE COURT:  Okay.  Thank you.

6      I assume that the movant doesn't disagree with that

7    analysis?  I mean, you know, what kind of cases do you need to

8    see from them?

9           MR. THOMAS:  Well, I think Phil -- I'm sorry.  I'm

10   sorry, your Honor.

11          MR. STANG:  Your Honor --

12          MR. THOMAS:  Tim --

13          MR. STANG:  -- I believe Mr. Dublin dropped off.

14          MR. THOMAS:  Right.

15          THE COURT:  Okay.

16          MR. THOMAS:  Tim Thomas, the local counsel.  I'm sure

17   that that's fine, your Honor.

18          THE COURT:  Okay.  And that, of course, means you

19   don't need to do a reply brief, either.  Now, to make it go as

20   fast as possible, declarations are fine, depositions are fine,

21   but keep in mind if you've -- you've got to, of course, make

22   your witnesses available for cross-examination if you use

23   declarations.  Keep in mind if you use a deposition that I've

24   got to have time to read them.

25      I don't expect you to read the depositions in the record

1  here.  That takes too long, but it would be helpful I guess if

2  you have -- if you have specific testimony, you know, lay it

3  all out.

4      So with the extent you talk about briefs, if you're later

5  talking about summations of evidence, that's appropriate, you

6  know.  I mean, have that available.

7      If you have summations of the evidence that's I can look

8  at after the conclusion of the evidence, that will be very

9  helpful.

10         MR. KORNFELD:  Something in the nature of findings of

11  fact.

12         THE COURT:  Sure.  Yeah.  The point being the --

13  yeah.  You know, who said what and what they said.

14         MR. KORNFELD:  Okay.  Then we can definitely do that,

15  your Honor, and that would be at a posttrial schedule I guess

16  for all parties that you'll tell us when you want that.

17         THE COURT:  Right.  If I can't make a decision that

18  day, then that's what we'll have to do, and I think you're all

19  aware I am unavailable the next week, so I could not bring you

20  back until the 27th or 28th.

21      Do you want to reserve a time now just so that everybody's

22  got their schedule clear and my calendar doesn't filled?

23         MR. KORNFELD:  Your Honor, I think that would

24  definitely be helpful.

25         THE COURT:  All right.  Let's reserve the 28th for

1   you, then, or would you rather have May 1st?

2           MR. KORNFELD:  From our standpoint, any of those

3   dates work, your Honor.

4           THE COURT:  Mr. Stang, any preference?

5           MR. STANG:  No, your Honor.

6           THE COURT:  Okay.  Well, let's say --

7           MR. THOMAS:  And, your Honor, from the

8   Lien Steering Committee, I don't know what Mr. Dublin's

9   schedule is, but I think within that short period of time any

10  of those dates is fine.

11          THE COURT:  Okay.  Well, let's say May 1st.  The

12  point is that would then give you two full weeks if we needed

13  it to, you know, get a transcript, pull the evidence together,

14  et cetera.

15          MR. KORNFELD:  Okay.

16          THE COURT:  And if you change your mind, just let me

17  know the -- just let me know.

18          MR. THOMAS:  Thank you, your Honor.  I'll --

19          THE COURT:  Well, I'll tell you what we'll do.  Right

20  now, we'll reserve both days for you.  The worst-case basis is

21  it goes off, and I don't have anything to do.  That's the worst

22  thing that could happen to me.

23          THE CLERK:  Your Honor, are we having it at 9:30?

24          THE COURT:  Yeah.  What's a good time for counsel

25  because you all travel, 9:30, 10:00, earlier, later?

1          MR. STANG:  10:00 o'clock would be a good start time

2     for us, your Honor.

3          THE COURT:  Okay.  All right.

4          MR. KORNFELD:  Yes.

5          THE COURT:  10:00 o'clock on the 28th and

6     10:00 o'clock on the 1st we'll reserve for you.

7          MR. THOMAS:  And should we contact the Court if

8     there's going to be a scheduling issue with either of those

9     or --

10          THE COURT:  Sure.

11          MR. THOMAS:  All right.  Thank you, your Honor.

12          MR. KORNFELD:  And, your Honor, the start time -- and

13     the Court may have said this, and I may have missed it -- on

14     the 17th for that day's hearing, is that 10:00 o'clock, also?

15          THE COURT:  Right now, we have them at 9:30.  It was

16     the utility motion was noticed out at 9:30.  If you want to

17     make the other motions 10:00 o'clock, that's fine.  Just notice

18     them out for that time.

19          MR. KORNFELD:  Okay.

20          THE COURT:  So we'll continue those other motions

21     'til 10:00, then.

22          THE CLERK:  Okay.

23          THE COURT:  The utility motion will be on at 9:30.

24     Just so you know, we've set May 15th as an omnibus day for this

25     case.  We've had so many other things to do.

1      How should we go about that form-scheduling order?  I

2  think I have one.

3      Shall I just give it to Mr. Larson and have you upload it

4  in this case.

5           MR. LARSON:  That would be great.

6           THE COURT:  I think we talked about it.  I'm just

7  going to use the same format we used in Lake At Las Vegas

8  Joint Ventures.

9      You all can work with the clerk in getting additional

10  omnibus hearing days, and let's get that entered just so people

11  know to do the courtesy copies, Court Call procedures,

12  et cetera, so we'll use that same form order.

13      I have no problem if the parties think of additional

14  things that should be in a case-management order to include

15  them.  All right.

16      Thank you very much.

17           MR. STANG:  Your Honor --

18           THE COURT:  Uh-huh.

19           MR. STANG:  -- before you go off?

20           THE COURT:  Sure.

21           MR. STANG:  One never wants to press one's luck I

22  guess.  Do you still want the chart that you talked to us about

23  yesterday?

24           THE COURT:  Oh, I -- yes, I do.

25           MR. STANG:  Okay.  All right.

1          THE COURT:  I'll tell you why.  Because

2    notwithstanding the fact in the joint venture, it's going to

3    help all of us understand all the relationships of all the

4    parties in this case, so that I'm not the only one that's in

5    the dark.

6          MR. STANG:  Oh, I'd like to think you weren't the

7    only one.

8          THE COURT:  So --

9          MR. STANG:  We're working on it --

10          THE COURT:  I can --

11          MR. STANG:  -- your Honor.

12          THE COURT:  I understand with your time pressures

13    that it may be later, rather than sooner.  Certainly, it would

14    helpful to have it for the trustee hearing because that, you

15    know, to the extent you could stipulate facts.  That will be a

16    good way --

17          MR. STANG:  Right.

18          THE COURT:  -- to stipulate your facts on the chart

19    of what all these entities are.

20          MR. STANG:  We're working through it.

21          THE COURT:  Okay.

22          MR. STANG:  Your Honor, I'd just like to say one

23    other thing.  You've been very patient with all of us,

24    including the timing of getting you the orders today.

25          You asked me yesterday, you know, when did I start working

1    on this.  Mr. Dublin and I and other people started the first

2    thing our respective mornings.

3         And I'm sure it was somewhat frustrating for you to be

4    waiting for us, but I appreciate the way you've approached us

5    today in today's hearing.

6                   THE COURT:  Okay.  Well, thank you very much.

7                   MR. STANG:  All right.

8                   THE COURT:  All right.

9                   MR. STANG:  All right.

10                  THE COURT:  Thank you.

11                  MR. STANG:  Thank you.

12                  THE COURT:  Um-h'm.

13                  MR. STANG:  Bye.

14                  THE CLERK:  All rise.

15        (Court concluded at 04:18:15 p.m.)

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                        04/13/09

7    _____         _____
     Lisa L. Cline, Transcriptionist         Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25