Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
TIMOTHY P. THOMAS, ESQ.
Nevada Bar No. 005148
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:    nleatham@klnevada.com

*E- FILED*

April 7, 2009

Ira S. Dizengoff (NY Bar No. 2565687)
Philip C. Dublin (NY Bar No, 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002

E-Mail:    idizengoff@akingump.com
           pdublin@akingump.com
           aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HERITAGE LAND** | § | **Case No. 09-14778-LBR** |
| **COMPANY, LLC,** *et al.,* | § | **Joint Administration Pending** |
| | § | |
| **Debtors.**[1] | § | |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited

| | |
|---|---|
| | § **Hearing Date:** |
| | § **Hearing Time:** |
| **Affects:** | § |
| ☒ **All Debtors** | § **MOTION ON SHORTENED NOTICE OF THE** |
| ☐ **Affects the following** | § **FIRST LIEN STEERING COMMITTEE FOR AN** |
| **Debtor(s)** | § **ORDER DIRECTING THE APPOINTMENT OF A** |
| | § **TRUSTEE PURSUANT TO 11 U.S.C. § 1104(A) OR,** |
| | § **IN THE ALTERNATIVE, DISMISSING THE** |
| | § **DEBTORS' CHAPTER 11 CASES PURSUANT TO** |
| | § **11 U.S.C. § 1112(b)** |

The First Lien Steering Committee (the "First Lien Steering Committee"), consisting

of certain unaffiliated lenders under the Credit Agreement dated as of November 21, 2005

(as may have been amended from time to time, the "First Lien Credit Agreement") among

Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General

Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders (the "First Lien

Lenders"), and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral

Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger (the "Agent"), by and

through its undersigned counsel, hereby files this motion (the "Motion") for entry of an

order directing the appointment of a chapter 11 trustee pursuant to section 1104 of title 11 of

the United States Code (the "Bankruptcy Code") and Rule 2007.1 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"). In support of this Motion, the First Lien

Steering Committee respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1.      The immediate appointment of a chapter 11 trustee is necessary to prevent the

continued mismanagement of the above-captioned debtors (collectively, the "Debtors") by

---

Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897);
Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

[2] The First Lien Steering Committee reserves the right to supplement this Motion and the facts
contained herein with additional information received through discovery or otherwise.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

the Debtors' CEO, President and sole director, James Rhodes. Mr. Rhodes has violated, and continues to violate, his fiduciary duties to creditors of these estates, has overseen the misappropriation of the Debtors' funds and has engaged in other inappropriate activities that, to date, have destroyed millions of dollars of value that would otherwise be available to satisfy the Debtors' prepetition secured debt.

2. The First Lien Steering Committee was formed in early March 2009, when it became apparent that the Borrowers would be unable to make scheduled interest and amortization payments due under the First Lien Credit Agreement on March 31, 2009. From the time of its formation up until the Petition Date (as defined below), the First Lien Steering Committee was engaged in what it believed to be good-faith discussions with Mr. Rhodes, on behalf of the Debtors, regarding the terms of a forbearance agreement and other documentation that would have provided the Debtors additional time to review and analyze restructuring alternatives in order to avoid the free fall chapter 11 filings that occurred on the Petition Date. Indeed, over a 2-½ week period leading up to the commencement of these chapter 11 cases, the First Lien Steering Committee, its members and its professionals held numerous telephonic conferences and at least one in-person meeting with Mr. Rhodes, Jeff Barcy (a consultant for the Debtors) and/or Debtors' counsel in order to achieve a consensual, constructive agreement to ensure that the value of the Debtors' assets and businesses could be maximized for the benefit of creditors.

3. Despite not having been permitted to conduct any independent diligence, on no less than two occasions, the First Lien Steering Committee believed it had reached an agreement in principle with the Debtors on the terms of a forbearance agreement and, on at least one occasion, the terms upon which Mr. Rhodes would consensually leave the Debtors'

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

3

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1  employ and put control of the Debtors' operations in the hands of an independent third-party

2  fiduciary.  Unfortunately, each time the First Lien Steering Committee believed that it had

3  reached an agreement with the Debtors, Mr. Rhodes reneged in order to attempt to obtain

4  additional consideration or compensation solely for his own benefit, at the expense of the

5  Debtors and their creditors.  In fact, as late as March 31, 2009, the First Lien Steering

6  Committee's professionals continued to request a response from Debtors' counsel on the

7  status of their review of the latest draft of the forbearance agreement.  Even subsequent to

8  the Petition Date, the First Lien Steering Committee's professionals have inquired of

9  Debtors' counsel as to whether the Debtors would engage the First Lien Steering Committee

10  in negotiations over the terms of a consensual cash collateral order.  These offers have been

11  rebuffed, however, as the Debtors have refused to discuss any resolution that would provide

12  for the imposition of a chief restructuring officer or other fiduciary that would put the

13  Debtors' operations, books and records in the control of a person other than Jim Rhodes.

14      4.      After determining that his self-dealing tactics were not going to prevail, Mr.

15  Rhodes forced the Debtors to commence these chapter 11 cases.  Acting to enhance his own

16  pecuniary interests at the expenses of others, however, is nothing new to Mr. Rhodes.   Upon

17  information and belief, Mr. Rhodes has historically used the Debtors' cash, assets and

18  employees for his own personal agenda, including for business interests in direct

19  competition with the Debtors, to the detriment of the Debtors' businesses and their creditors.

20      5.      The First Lien Steering Committee engaged in good faith discussions with

21  Mr. Rhodes notwithstanding having received a copy of a report prepared by AlixPartners on

22  behalf of the Agent (the "Report") that described repeated allegations of potentially

23  fraudulent conduct, mismanagement and misappropriation of the Debtors' assets committed

by Mr. Rhodes and members of his immediate family.  The Report, a copy of which is

attached hereto at Exhibit A, disclosed, among other things, that:

- Mr. Rhodes' brother (who was reportedly terminated on the eve of the Petition Date) was an employee of the Borrowers, and received a salary of approximately $600,000 in 2008 and 2007 for services that "appear to be limited in responsibility." Report at 8.

- Mr. Rhodes' wife, Glynda Rhodes, who was also reportedly terminated on the eve of the Petition Date, was also an employee of the Borrowers, and received a salary of $98,800 in 2008 and 2007 for services that were similarly limited. Report at 8.

- Until recently, the Debtors had been paying for Glynda Rhodes' nanny.  Report at 14.

- The Debtors made substantial payments totaling approximately $1.75M to Glynda Rhodes' interior design business in 2007 and 2008.  Report at 8.

- Approximately $2.375 million, in the aggregate, was paid over the last two years to Mr. Rhodes' ex-wife, Deborah Rhodes, out of the accounts of a non-debtor affiliate.  According to an employee of the Debtors, these payments were part of a divorce settlement.  The Report provides that the cash for these payments may have come from the Borrowers.  Report at 15.

- Mr. Rhodes received a $75,000 bonus on December 31, 2008 in addition to his $400,000 annual salary.  This bonus was approved at a board meeting on April 30, 2008 at which Mr. Rhodes was the only attendee.  Report at 15.

- Among the assets listed on the Borrowers' books are (i) a Bentley (with a book cost of approximately $76,000) and (ii) two Mercedes Benz (with book values of $98,000 and $67,000, respectively).  Report at 11.

- The Borrowers continued to pay automobile insurance for vehicles they did not own.  Report at 11.

- The Borrowers made disbursements in excess of $7 million to non-debtor companies owned by or affiliated with Mr. Rhodes in 2007.  Report at 10.

- Large amounts of funding were expended on property in Pravada, Arizona that had "a damaged flood channel and no grading permit." Report at 15.

- Former employees interviewed by AlixPartners believe that resources have been diverted from the Debtor entities to Harmony Homes, a direct competitor of Rhodes Homes also operated by Mr. Rhodes allegedly through a trust in his children's names.  Report at 8.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

- Certain of the Borrowers' employees performed work for other non-debtor businesses affiliated with Mr. Rhodes (including Harmony Homes), but were compensated solely by the Borrowers. Specifically, the Borrowers' former CFO identified approximately $2.8 million in overhead costs incurred by the Borrowers that should have been billed to companies outside of the First Lien Credit Agreement. Report at 6-7.

In addition, upon information and belief, Harmony Homes is currently bidding on Kimball Hill Homes' Las Vegas real estate assets in an apparent attempt to increase its presence in the Las Vegas housing market. Also upon information and belief, both the diligence performed by Harmony Homes and the preparation of its bid for the Kimball Hill Homes' assets were undertaken by Debtor employees.

6.      Questionable activity continued in the weeks leading up to the chapter 11 filings. Indeed, upon information and belief, in the beginning of March 2009, the Debtors had approximately $8 million in cash on their balance sheet. As of the Petition Date, the Debtors had approximately $1.8 million in cash on their balance sheet. While no accounting or information has been disclosed by the Debtors regarding this rapid decline in the Debtors' cash balances, upon information and belief, in the days prior to the Petition Date, while the Debtors were preparing to commence these cases, substantial funds were spent by the Debtors to satisfy debts for which Mr. Rhodes was personally liable.

7.      Diligence performed by the First Lien Steering Committee also reveals that Mr. Rhodes' self-dealing and illegal conduct extend to many facets of his life. Indeed, public reports indicate that Mr. Rhodes "has admitted to illegally using his money to aid powerful politicians in Nevada, [has] repeatedly and successfully been sued over allegations of fraud, theft and self-dealing by his investment partners and others he has done business with, and ... has a long history of complaints for shoddy workmanship and construction defects from people who bought his homes." Mark Flatten, New land baron has checkered

6

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

past, Tribune, East Valley Scottsdale, Apr. 15, 2007. Mr. Rhodes' personal and professional misconduct have branded him one of Las Vegas' most controversial home builders:

- In 1999, Rhodes' Homes' license was suspended for six months based on 19 complaints filed by Rhodes Homes customers. Hubble Smith, Rhodes fights to prevent suspension, Las Vegas Review-Journal, Feb. 9, 1999.

- Litigation initiated against Rhodes Homes in the 1990s alleging various construction defects settled in 2000 for $16.2 million, which was at the time the largest residential construction defect settlement in Nevada history. Mark Flatten, E.V. developer locked in litigation, Tribune, East Valley Scottsdale, Apr. 16, 2007.

- Mr. Rhodes allegedly promised generous campaign contributions to a county commissioner in exchange for the commissioner's support of Mr. Rhodes' high-density residential development plans in 2003. Frank Geary, Developer accused of attempt to sway commissioner's vote, Las Vegas Review-Journal, Apr. 17, 2003.

- In 2006, Mr. Rhodes admitted to making illegal contributions to two democratic candidates and paid nearly $150,000 in fines. Molly Ball, Rhodes settles federal case, Las Vegas Review-Journal, Mar. 10, 2006.

- Mr. Rhodes was implicated in the 2007 federal investigation of former county commissioner Erin Kenny, who had until the time of the investigation been on Mr. Rhodes' payroll. Ms. Kenny later admitted to receiving approximately $400,000 in bribes. Mark Flatten, New land baron has checkered past, Tribune, East Valley Scottsdale, Apr. 15, 2007.

- In August 2007, a superior court found that Mr. Rhodes had breach a land purchase agreement and required Mr. Rhodes to proceed with the $5.35 million sale. Dave Hawkins, Nevada developer ordered to complete land deal, Las Vegas Review-Journal, Aug. 9, 2007.

8.    Given the widespread fraudulent and potentially criminal activity conducted prepetition by Mr. Rhodes, the First Lien Steering Committee has no confidence in Mr. Rhodes' ability to rehabilitate the Debtors' businesses and formulate a viable plan of reorganization. Moreover, as the Debtors require the use of the First Lien Lenders' collateral (including cash collateral) but cannot adequately protect the First Lien Lenders' interests, the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Debtors require the consent of the First Lien Lenders to operate their businesses.  The First Lien Steering Committee will not grant this consent, however, unless, among other things, an independent fiduciary is appointed to manage the Debtors' businesses for the benefit of the Debtors' creditors.  Indeed, as set forth in the First Lien Steering Committee's objection to the Debtors' motion to use cash collateral, the First Lien Steering Committee intends to condition the use of their collateral on, among other things, the removal of current management from any control over the Debtors' day-to-day operations.

9.      Based on the foregoing and as further discussed below, a chapter 11 trustee must be appointed immediately to prevent the Debtors and their management from continuing to violate their fiduciary duties to creditors and provide the Debtors with an opportunity to restructure.  The First Lien Steering Committee believes that the appointment of a trustee will prevent the further destruction of value during the pendency of these cases and will (together with the support of the First Lien Steering Committee) result in a viable opportunity for the Debtors to emerge from chapter 11 successfully.  In the alternative, the First Lien Steering Committee requests that this Court dismiss the chapter 11 cases and allow the First Lien Lenders to exercise available remedies under state law.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this proceeding and Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are section 1104 of the Bankruptcy Code and Bankruptcy Rule 2007.1(b).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## BACKGROUND

11.    On either March 31, 2009 or April, 1, 2009 (collectively, the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

12.    Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are currently authorized to operate their businesses and manage their properties as debtors in possession.

13.    As set forth in the Declaration of James M. Rhodes in Support of First Day Motions (Docket No. 34) (the "Rhodes Declaration"), the Debtors' principal debt obligations are as follows.  First, the Debtors are party to the First Lien Credit Agreement.  Each of the Debtors is either a borrower or guarantor under the First Lien Credit Agreement.  The First Lien Credit Agreement is secured by a blanket first lien on substantially all of the Debtors' property.  As of the Petition Date, approximately $302 million was outstanding under the First Lien Credit Agreement.

14.    Second, the Debtors are party to that Credit Agreement Dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein, as the Lenders, and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger (as may have been amended from time to time, the "Second Lien Credit Agreement").  As with the First Lien Credit Agreement, each of the Debtors is either a borrower or guarantor under the Second Lien Credit Agreement.  The Second Lien Credit Agreement is secured by a blanket second

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

lien on substantially all of the Debtors' property.  As of the Petition Date, approximately $70.7 million was outstanding under the Second Lien Credit Agreement.

15.     Third, the Debtors (i) are obligated to nine equipment lenders who hold purchase money security interests of approximately $2.5 million, (ii) have approximately $30.2 million in outstanding surety bonds, and (iii) are obligated to various third party service and goods providers for over $2.5 million on an unsecured basis.[3]

16.     In February 2009, the Agent retained AlixPartners to investigate the Debtors' account balances and accounting procedures.  AlixPartners disclosed its findings in the Report, dated as of March 3, 2009 and attached hereto as <u>Exhibit A</u>.[4]

## **REQUESTED RELIEF**

17.     The First Lien Steering Committee requests that the Court immediately appoint a chapter 11 trustee for the Debtors pursuant to Bankruptcy Code section 1104 and Bankruptcy Rule 2007.1(b) to (i) prevent the continued mismanagement of the Debtors' businesses and misappropriation of estate assets by Mr. Rhodes, and (ii) work collaboratively with the Debtors' creditor constituencies towards a consensual and successful reorganization of the Debtors and their estates.  In the alternative, the First Lien Steering Committee requests that the Court dismiss the chapter 11 cases to allow the First Lien Lenders to exercise their remedies under applicable state law.

---

[3] In addition, Mr. Rhodes asserts in the Rhodes Declaration that he has an $11 million claim against the Debtors, although no detail has been provided to support such a claim.  The First Lien Steering Committee reserves its rights to object to any claims asserted against the Debtors by Jim Rhodes, his family or his affiliates.

[4] The Agent has authorized the First Lien Steering Committee to use the Report in connection with the relief requested herein and in connection with its opposition to the Debtors' use of the First Lien Lenders' cash collateral.

**BASIS FOR RELIEF**

**I.    The Appointment of a Chapter 11 Trustee is Warranted**

18.    Bankruptcy Code section 1104 governs the appointment of a chapter 11 trustee.[5]  The facts here compel the appointment of a trustee (i) "for cause" under the objective test set forth in Bankruptcy Code section 1104(a)(1), and (ii) as being in the "best interests of creditors" under the subjective test set forth in Bankruptcy Code section 1104(a)(2).

**A.    Appointment of a Chapter 11 Trustee Pursuant to Section 1104(a)(1)**

19.    Bankruptcy Code section 1104(a)(1) mandates the appointment of a trustee where "fraud, dishonesty, incompetence or gross mismanagement" or a similar "cause" is established.  11 U.S.C. §1104(a)(1).  Although no specific conduct is required to establish fraud, dishonesty or gross mismanagement under section 1104(a)(1), activities found to satisfy the statutory standard include, (i) where company managers were indicted for participating in illegal loans and engaging in practices designed to mislead the public, (ii) where assets of the company were mysteriously melting away through methods other than ordinary attrition, (iii) where management was operating the company for their own benefit

---

[5] Section 1104 provides, in pertinent part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

    (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, … ; or

    (2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

and not the benefit of the companies over which they had control, and (iv) where papers were discovered indicating that management was siphoning money out of the company by means of a kickback scheme.  In re Bibo, Inc., 76 F.3d 256 (9th Cir. 1995); In re American Resources, Ltd., 54 B.R. 245 (Bankr. D. Haw. 1985).

20.    Where cause has been shown, the courts are without discretion and must appoint a trustee.  In re AG Serv. Ctrs L.C., 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999) ("if the Court determines that there is cause, which it has in this case, the appointment of a trustee is mandatory"); In re Colorado-UTE Elec. Ass'n, Inc., 120 B.R. 164, 174 (Bankr. D. Colo. 1990) ("[i]f the Court finds that cause for the appointment of a trustee exists, the Court has no discretion, but must appoint a trustee"); accord, In re Nat'l Staffing Serv., LLC, 338 B.R. 31, 33 (Bankr. N.D. Ohio 2005) (noting that, unlike section 1104(a)(2), 1104(a)(1) provides for mandatory appointment of a trustee); In re SunCruz Casinos, LLC, 298 B.R. 821, 828-29 (Bankr. S.D. Fla. 2003) ("Once the court finds that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed.").  However, "[t]he examples of cause enumerated in §1104(a)(1) are not exhaustive; the Court may find that cause exists for a reason not specifically set forth in the statute." In re Cardinal Indus., Inc., 109 B.R. 755, 765 (Bankr. S.D. Ohio 1990).

21.    A debtor in possession owes a fiduciary duty to maximize the value of its estate for the benefit of creditors.  See In re Anchorage Nautical Tours Inc., 145 B.R. 637, 643 (B.A.P. 9th. Cir. 1992) (holding that directors, officers and majority shareholders of chapter 11 debtor corporations owe fiduciary duties to creditors so long as the corporation remains under chapter 11); In re Ball, No. 03-14674, 2006 WL 2038641 (Bankr. D. Ariz., Apr. 5, 2006) ("when serving as the estate representative, debtors in possession and trustees

owe a fiduciary duty to creditors and the estate to conserve assets and maximize creditor

recoveries") (citing <u>Kalyna v. Swaine</u> (<u>In re Accomazzo</u>), 226 B.R. 426, 429 (D. Ariz.

1998)); <u>In re Products Int'l Co.</u>, 395 B.R.101, 111 (Bankr. D. Ariz., 2008) ("a debtor in

possession owes a fiduciary duty to its creditors").

22. "Cause" to appoint a trustee exists where a board of directors or management

breaches its fiduciary duties to creditors. <u>See</u> <u>In re Hawaiian Airlines, Inc.</u>, 03-00817, 2003

WL 22945906 (Bankr. D. Haw. May 16, 2003) ("A debtor that cannot be trusted to carry out

its fiduciary duties to creditors must not be left in possession"); <u>Official Comm. of Asbestos</u>

<u>Pers. Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)</u>, 285 B.R. 148, 158

(Bankr. D. Del. 2002) (noting that "cause" under 1104(a)(1) would include a breach of a

fiduciary duty owed by the debtor to creditors); <u>In re Paolino</u>, 53 B.R. 399, 401 (Bankr. E.D.

Pa. 1985) (finding that the debtor's failure to satisfy their fiduciary obligations constituted

sufficient cause to justify appointment of a trustee); <u>In re G&G Transp., Inc.</u>, No. 98-30860,

1998 Bankr. LEXIS 1634 (Bankr. E.D. Pa. Dec. 22, 1998) (holding that appointment of a

trustee was appropriate where the debtor in possession failed to fulfill its fiduciary duties);

<u>In re Holly's, Inc.</u>, 140 B.R. 643, 685 (Bankr. W.D. Mich. 1992) ("appointment of a trustee

is appropriate when the debtor in possession fails to protect and conserve property of the

estate for the benefit of its creditors").

23. "Cause" to appoint a trustee further exists where creditors have lost

confidence in the debtor's management. <u>In re Cardinal Indus., Inc.</u>, 109 B.R. at 765-66

(holding that a collective loss of confidence in the debtor's management required the court to

appoint a trustee); <u>In re Ionosphere Clubs, Inc.</u>, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)

(one of the factors in determining whether to order appointment of a trustee is "the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

confidence – or lack thereof – of the business community and of creditors in present management"); and where there are conflicts of interest involving debtor's management. See, e.g., In re Colorado-UTE Elec., 120 B.R. at 174-75.

24.    Mr. Rhodes' prepetition behavior with respect to the businesses constitutes every form of "cause" contemplated by Bankruptcy Code section 1104. As stated above, section 1104 requires a court to appoint a chapter 11 trustee for cause, where cause is defined as including "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor…" 11 U.S.C. § 1104(a)(1). As reported by AlixPartners, Mr. Rhodes used corporate funds to compensate immediate family members for performing services described as limited in responsibility. Mr. Rhodes authorized substantial payments to Glynda Rhodes' interior design business. Mr. Rhodes deployed the Debtors' employees to perform services for companies wholly owned by or affiliated with Mr. Rhodes, for which the Debtor companies received no compensation. Mr. Rhodes disbursed cash to non-debtor entities, to the direct detriment of the Debtors and their creditors. Mr. Rhodes continues to operate an unrelated entity that is in direct competition with the Debtors. Moreover, as noted above, Mr. Rhodes has been found guilty of illegal activities unrelated to the Debtors. The activities listed above and those further elaborated upon in the Preliminary Statement of this Motion, either individually or taken together, establish cause under section 1104 and mandate the appointment of a chapter 11 trustee.

**B.    Appointment of a Chapter 11 Trustee in the Best Interests of Creditors under Section 1104(a)(2)**

25.    While the First Lien Steering Committee believes that there is ample evidence to appoint a chapter 11 trustee for cause, the Court may also order the appointment of a trustee under section 1104(a)(2) if the interests of creditors and other interests of the

estate would be served thereby.  In re Sonicblue Inc., No. 03-51775, 2007 WL 926871

(Bankr. N.D. Cal. Mar. 26, 2007) ("Section 1104(a)(2) of the Bankruptcy Code creates a

flexible standard for appointing a trustee when it is in "the interests of the creditors, equity

security holders, and other interests of the estate.") (citing In re Sharon Steel Corp., 871 F.2d

1217, 1226 (3d Cir.1989)); In re Cardinal Indus., Inc., 109 B.R. at 766 ("The Court believes

the interests of all parties to these cases will be served by the presence of an independent

trustee."); see also, In re Microwave Prods. of America, Inc., 102 B.R. 666, 675 (Bankr.

N.D. Tenn. 1989) ("11 U.S.C. § 1104(a)(2) provides a flexible standard for the appointment

of a trustee.").

26.    Under this less stringent standard, *the moving party need not show wrongful
behavior on the part of management,* as long as a meaningful benefit from the appointment

of a trustee is shown and the benefit outweighs the burdens and expenses. See, e.g.,

Cardinal Indus., 109 B.R. at 766; In re Microwave Prods., Inc., 102 B.R. at 675; Collier on

Bankruptcy, ¶1104.02[3][d][I] (15th ed. 2008).  The First Lien Steering Committee has

clearly satisfied this standard for the reasons set forth above.

C.    **Appointment of a Chapter 11 Trustee is Warranted Under Both Section
1104(a)(1) and Section 1104(a)(2)**

27.    Many of the cases employing the "best interests" of the estates test to appoint

a  trustee consider the same factors as those considered for a finding of "cause". See, e.g., In

re North, 212 Fed. Appx. 626, 626-27 (9th Cir. 2006) (approving the bankruptcy court's

order appointing a trustee both for cause and in the best interests of creditors); In re

Lowenschuss, 171 F.3d 673, 685 (9th Cir. 1999) (finding that the bankruptcy court did not

abuse its discretion in appointing a trustee under section 1104(a)(1) and 1104(a)(2)); In re

Marvel Entertainment, 104 F.3d 463, 474 (3rd Cir. 1998) (appointment of trustee under

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

section 1104(a) for cause *and* in the best interests of the creditors and the estate); In re Sharon Steel Corp., 871 F.2d at 1220 (appointment of trustee under section 1104(a) for cause *and* in the best interests of the creditors and the estate); In re Holly's, Inc., 140 B.R. at 684 (stating that a debtor in possession's fiduciary obligation includes refraining from conduct that would hamper the reorganization process and finding that where a debtor was unable to carry out these duties, the appointment of a chapter 11 trustee was appropriate); In re Microwave Prods., 102 B.R. at 671 (same); In re Ionosphere Clubs, Inc., 113 B.R. at 168 (stating that a debtor in possession's fiduciary obligation includes refraining from conduct that would hamper the reorganization process and finding that where a debtor was unable to carry out these duties, the appointment of a chapter 11 trustee was appropriate).

28.    The First Lien Steering Committee simply cannot trust Mr. Rhodes to acquit his fiduciary duties and maximize the value of these estates.  Mr. Rhodes' fraudulent behavior, misappropriation of funds and self-dealing have led to the destruction of the Debtors' businesses and jeopardized the ability of the Debtors to continue as a going concern.  As a result, the benefits of the appointment of a trustee clearly outweigh any burdens and expenses associated with such an appointment as any costs associated with the appointment of a trustee would be dwarfed by the economic savings that would be achieved by preserving the continued viability of these businesses and implementing a plan of reorganization.   Moreover, as there is insufficient value in the estates to satisfy the First Lien Lenders' claims in full, the First Lien Lenders will bear the costs associated with the chapter 11 trustee and are prepared to incur such costs at the expense of their recoveries in these cases.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

**II.    If No Trustee is Appointed, the Court Should Dismiss These Chapter 11 Cases**

29.    In the event a trustee is not appointed under Bankruptcy Code section 1104, the First Lien Steering Committee respectfully requests that the Court dismiss the Debtors' chapter 11 cases pursuant to Bankruptcy Code section 1112(b).  As explained in greater detail below, cause exists for these cases to be dismissed so that the First Lien Lenders can enforce their rights under applicable state law and the First Lien Credit Agreement.

**A.    Standards Under Bankruptcy Code Section 1112(b)**

30.    Bankruptcy Code section 1112(b) provides authority for this Court to dismiss the Debtors' chapter 11 cases for cause, including a non-exhaustive list of factors set forth in sections 1112(b)(4)(A)-(P).[6]  See Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994 ("[t]he bankruptcy court may dismiss a chapter 11 case "for cause" pursuant to 11

---

[6] In relevant part, section 1112(b)(4) provides: "For purposes of this subsection, the term 'cause' includes--
(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
(B) gross mismanagement of the estate;
(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
(E) failure to comply with an order of the court;
(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title   or by any rule applicable to a case under this chapter;
(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
(K) failure to pay any fees or charges required under chapter 123 of title 28;
(L) revocation of an order of confirmation under section 1144;
(M) inability to effectuate substantial consummation of a confirmed plan;
(N) material default by the debtor with respect to a confirmed plan;
(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

U.S.C. § 1112(b)"); In re Prods. Int'l Co., 395 B.R. at 109 ("A list of what constitutes 'cause' is found in § 1112(b)(4). Generally, such lists are viewed as illustrative rather than exhaustive . . . ."). In addition to these factors, courts should examine the circumstances of the case and employ their equitable powers to reach the appropriate result. 395 B.R. at 109. Courts have broad discretion in deciding what constitutes "cause" for dismissal. Id.

31.     As discussed herein, the First Lien Steering Committee can demonstrate by a preponderance of the evidence that cause exists to dismiss the chapter 11 cases under Bankruptcy Code section 1112(b). See Collier on Bankruptcy at ¶ 1112.04[8] (15th ed. 2008) ("As a general rule, the burden of proof under section 1112(b) rests with the party requesting the relief. Thus, where the matter is contested, the party seeking . . . dismissal must demonstrate the existence of cause by a fair preponderance of the evidence"); see also, In re the V Cos., 274 B.R. 721, 726 (Bankr. N.D. Ohio 2002) ("The party requesting relief [under section 1112(b)] bears the burden of proving that cause exists by a preponderance of the evidence"); In re Muskogee Envtl. Conservation Co., 236 B.R. 57, 59 (Bankr. N.D. Okla. 1999) (granting motion to dismiss based on preponderance of the evidence standard).

**B.     Cause Exists to Dismiss the Chapter 11 Cases if no Trustee is Appointed**

32.     Under Bankruptcy Code section 1112(b)(4)(B), cause exists to dismiss a chapter 11 case if the debtor in possession has engaged in gross mismanagement of the estate. Gross mismanagement may be found when the debtor in possession has failed to maintain an effective management team. In re Prods. Int'l Co., 395 B.R. at 111 (finding that the lack of a focused management team constituted cause for dismissal of the debtor's chapter 11 case); In re Gateway Access Solutions, Inc., 374 B.R. 556 (Bankr. M.D. Pa. 2007) (finding that the debtor lacked an effective management team and dismissing the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

debtor's case for cause); In re Broad Creek Edgewater L.P., 371 B.R. 752 (Bankr. D. S.C.

2007) (noting that the debtor effectively had no management). As discussed at length, Mr.

Rhodes' leadership of these companies is neither focused nor effective. The Debtors cannot

be found to have "maintained an effective management" team in light of Mr. Rhodes'

prepetition behavior and, accordingly, these cases should be dismissed for cause under

section 1112(b)(4)(B).

33.    In addition, chapter 11 was designed to differentiate between debtors that

warrant the time and effort required to complete chapter 11 cases and those debtors that do

not. See Collier on Bankruptcy at ¶ 1112.04[2] (15th ed. 2008) ("In order to avoid the

costs…in cases in which they are not justified, section 1112(b) was designed to provide the

court with a powerful tool to weed out inappropriate…cases at the earliest possible stage.").

Moreover, courts have recognized that dismissal is an appropriate remedy in cases where the

risk to secured creditors of going forward with a chapter 11 reorganization outweighs the

benefit to the debtor. See, e.g., Humble Place Joint Venture v. Fory (In re Humble Place

Joint Venture), 936 F.2d 814, 818 (5th Cir. 1991) (approving the bankruptcy court's

dismissal of a chapter 11 cases where the bankruptcy court implicitly found that the risk to

secured creditors of a continuing chapter 11 case outweighed the benefit to the debtor).

34.    If the Court does not find that the appointment of a chapter 11 trustee is

warranted on the facts set forth herein, the First Lien Steering Committee requests that the

Court dismiss these chapter 11 cases for the reasons set forth above and because the First

Lien Steering Committee will be irreparably harmed by the continuation of the Debtors'

cases absent the relief requested herein. The First Lien Steering Committee therefore

submits that cause exists to dismiss the Debtors' cases and allow the First Lien Steering

Committee to proceed expeditiously to exercise its rights under the First Lien Credit

Agreement and under applicable state law.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the First Lien Steering Committee

respectfully requests the Court (i) appoint a chapter 11 trustee or, in the alternative, dismiss

the Debtors' chapter 11 cases and (ii) grant the First Lien Steering Committee such other

and further relief as is just and proper under the circumstances.

Signed this 7th day of April, 2009.

By: _____

Nile Leatham (NV Bar No. 002838)
TIMOTHY P. THOMAS, ESQ.
Nevada Bar No. 005148
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
(702) 979-2357 (Telephone)
(702) 362-9472 (Facsimile)
Nleatham@klnevada.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff (NY Bar No. 2565687)
Philip C. Dublin (NY Bar No, 2959344)
Abid Qureshi (NY Bar No. 2684637)
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
idizengoff@akingump.com
pdublin@akingump.com
aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**EXHIBIT A**



**RHODES** HOMES

Report of Findings
March 3, 2009
Attorney Work Product
Privileged and Confidential



Chicago  Dallas  Detroit  Düsseldorf  London  Los Angeles  Milan  Munich  New York  Paris  San Francisco  Shanghai  Tokyo



**AlixPartners**
*When it really matters.*

**CREDIT SUISSE**



**AlixPartners**

*When it really matters.*

Chicago  Dalllas  Detroit  Düsseldorf  London  Los Angeles  Milan  Munich  New York  Paris  San Francisco  Shanghai  Tokyo



# Presentation Contents

▶ Objectives and Tasks Undertaken During the Inspection

▶ Steps Taken in the Review Process Pursuant to the Inspection

▶ Findings

Attorney Work Product - Privileged and Confidential

# Objectives and Tasks Undertaken During the Inspection

▶ Review the Borrowers' expenditures during the period of January 2008 through December 2008 to determine whether funds have been used for the benefit of affiliated companies.

▶ To assist in the review and evaluation of the current financial condition of the Borrowers.

▶ Gather and review financial and other information as necessary to gain an understanding of the Borrowers' operations and financial position.

▶ Review the Borrowers' cash management system and procedures.

▶ Meet with senior management to gain an understanding of the business operations and current initiatives.

AlixPartners

3

Attorney Work Product - Privileged and Confidential

# Steps Taken in the Review Process Pursuant to the Inspection

▸ **In the two weeks spent on-site at Rhodes Homes in Las Vegas, the following steps were performed:**

- Met with company personnel responsible for:
  - ‣ Accounting, Sales, Finance, Land Development, Human Resources, Payroll and Legal
- Reviewed books and records and support for transactions
- Extracted data to evaluate the financial information provided
- Obtained and reviewed D&B reports on the Borrowers and several related companies

▸ **We met off company premises and had conversations with three former employees who left the company within the previous year.**

- The employees expect to remain anonymous throughout this process.
- We made inquiries as to their knowledge of certain aspects of our findings.
- We took additional information that they shared and used it to focus our inquiries and ask more direct and probing questions of company personnel.
- Two of the former employees were of the belief that Jim Rhodes was using resources obtained through companies that were party to the Credit Agreement for the benefit of entities outside of the Credit Agreement.

AlixPartners

4

Attorney Work Product - Privileged and Confidential

# Steps taken in the Review Process Pursuant to the Inspection

▸ **We visited several properties under development, including**

– The Rhodes Ranch and Tuscany master planned communities

  ▸ For the tour of these gated properties, we were escorted by employees of Rhodes Homes

– Harmony Heights at Hualapai Way and Farm Street in northwest Las Vegas

  ▸ This site visit was made independently to examine the property and to determine whether it was readily apparent that resources of Rhodes Homes were being used on the property

AlixPartners

5

# Findings

▶ **There is evidence that Rhodes Homes employees were used by other businesses (e.g., Harmony Homes) without reimbursement to the Borrowers.**

– The former CFO, Gary Fuchs, prepared a schedule which detailed $2.8 million (net) of overhead incurred from 2006 – 2009 related to salaries of Rhodes Homes employees and other costs booked and paid for by the Borrowers which he believed should have been allocated and billed to other companies outside of the Credit Agreement (the "Allocation Schedule").

– The former CFO resigned his position the week we started our field work.  According to Jim Rhodes, he left the company due to both health reasons and the fact that he discovered that the company was actively searching for a new CFO.  We spoke to Gary Fuchs and asked him whether there were any operational or accounting reporting issues that he took exception to.  He informed us that he is party to a confidentiality agreement with Rhodes Homes and that he could not respond to this inquiry.

– The amounts included on the Allocation Schedule include:

  ▸ Expenses paid mostly in 2007 and 2008, but also includes some amounts going as far back as 2004 and some paid in January 2009.

  ▸ Overhead allocations representing the portion of salaries paid to employees of the Borrowers which, based upon their own estimations of time spent on projects outside of the Credit Agreement, should have been reimbursed to the Borrowers.

   – For January 2008 – July 2008, employees filled out forms detailing their estimates of time spent on companies outside of the Credit Agreement.  For this time period, this analysis resulted in a total of $510,000 which should have been allocated to companies outside of the Credit Agreement.

   – An extrapolation was made for August – January 2009 which resulted in an additional allocation of $305,000.

AlixPartners

6

Attorney Work Product - Privileged and Confidential

# Findings

‣ **There is evidence that Rhodes Homes employees were used by other businesses (e.g., Harmony Homes) without reimbursement to the Borrowers.** (continued)

– The amounts included on the Allocation Schedule include: (continued)

▸ The above amounts include $217,000 specifically identified as being related to time spent working on Harmony Homes.

▸ Although the Payroll Administrator indicated in our meeting with her that she had very limited responsibility for Harmony Homes, the HR Director contradicted this assertion, indicating that the Payroll Administrator actually spent a majority of her time working for that entity.

▸ Our sense from observation is that the HR Director's account is more credible.

▸ Additionally, Jim Rhodes indicated that his time was spent 100% on Rhodes Homes (with regard to the salary paid to him by the Borrowers).

– The schedule prepared by the former CFO also includes two large amounts related to Rhodes operations in Arizona:

▸ $1.0 million for expenditures of Rhodes Homes Arizona (debtor company) on property owned by South Dakota Conservancy, a company outside of the Credit Agreement. According to the former CFO's notes on the schedule, the land was supposed to be sold to Rhodes Arizona Property (debtor company) but the transaction did not occur because the 1st amendment to the Credit Agreement prohibited the purchase of land by Rhodes Arizona Property.

▸ $2.1 million in leased equipment costs paid by Pinnacle Grading (debtor company) for equipment used on the Pravada property in Arizona. The former CFO included this amount on his schedule due to his understanding that the equipment was not needed after the work on the Pravada property was stopped in mid-2007. Further, it appears that the recipient of the lease payments is a non-debtor company.

**AlixPartners**

Attorney Work Product - Privileged and Confidential

# Findings

- **There is a high level of salaries and payments made to family members of Jim Rhodes without, what appears to be, commensurate value.**

  - John Rhodes (brother) – received a salary of $600,000 in 2008 and 2007. This amount represents 4% of total General & Administrative expenses in 2008 for services that appear to be limited in responsibility.

  - Glynda Rhodes (wife) – receives payments in multiple forms from the Borrowers
    - A 2008 and 2007 salary of $98,800 without a large time commitment to the company;
    - Payments to her company, id Interior Design, for work performed for Rhodes Homes in the amount of $174K in 2008 and $1.57MM in 2007; and
    - Additional payments to Glynda Rhodes from the Rhodes Companies made through Accounts Payable totaling $76,128 in 2008 and 2007.

- **Aside from authorizing what appear to be excessive payments to his brother and wife, there is evidence that resources held as collateral under the Credit Agreement were used to promote the interests of Harmony Homes.**

  - Harmony Homes is a home-building operation run by Jim Rhodes in which he claims to have no legal economic interest (i.e., an alleged trust whose ownership is for the benefit of Jim Rhodes' children); however, his family's legal ownership implies a personal economic interest.

  - Two former employees indicated that resources (labor and assets) had been diverted from the Borrowers' operations to Harmony Homes.

AlixPartners

8

# Findings

▶ **Aside from authorizing what appear to be excessive payments to his brother and wife, there is evidence that resources held as collateral under the Credit Agreement were used to promote the interests of Harmony Homes.** (continued)

– Upon our visit to the Harmony Heights site in northwest Las Vegas, we noted that there were homes in varying stages of completion, including some that appeared to be lived in.

– Although it was not evident where the Harmony Homes property started and ended, we noted one backhoe on the unfinished property adjacent to the Harmony Homes sales office.

– There was a sharp decline in the activity of White Mountain Framers, a subsidiary of one of the Borrowers, from 2007 to 2008 as less homes were being built and framed internally in 2008. White Mountain Framers is non-operational as of December 2008, although there was a spike in activity for the company in the summer of 2008.

– White Mountain Framers does not appear on the organization chart provided by Credit Suisse.

– Examination of the 2008 invoices of White Mountain Framers shows activity at home sites in Rhodes Ranch and Tuscany (e.g., 124 Tall Ruff Drive, 1041 Viale Placenza).

– Certain vendor files needed to complete our analysis were not made available to us.

  ▸ Vendor files for White Mountain Framers were located at a separate office site which had recently been closed and all documentation, even that as recent as 2008, had been shipped to a storage facility.



White Mountain Framers Operational Data

—— Number of Employees    —— $ Revenue

AlixPartners

9

# Findings

▶ **There were indications of misreporting in the time reporting and payroll of White Mountain Framers.**

- An email exchange memorialized in a payroll file indicates that there were at least two instances in which laborers worked on Harmony Homes sites but charged time to Rhodes Homes sites.

- Signatures endorsing payroll checks to pieceworkers sometimes did not appear to match the corresponding employee's signature on file. In fact, we noted instances wherein the same penmanship appeared to be used for multiple checks, which were deposited in sequential order at the same financial institution.

▶ **The Borrowers have had significant dealings with non-debtor companies owned by Jim Rhodes and/or his family members.**

- Spirit Underground is an underground construction operator which is 50% owned by Sagebrush, one of Jim Rhodes' companies.

  ▸ Disbursements to Spirit Underground by the Borrowers under the Credit Agreement were $572,000 in 2008 and $6.6 million in 2007.

  ▸ Two former employees indicated that while there was no direct evidence of inflated prices in the contract terms with Spirit Underground, they felt that it was possible.

  ▸ The company's current Director, Land Development & Acquisition, who oversees the bidding of contracts, has been with the company since September 2008. Although there is an official bidding process for all such contracts in place at the present, he could not speak to the propriety of contracts and the bidding process prior to his employment.

AlixPartners    10

# Findings

▸ **The Borrowers have had significant dealings with non-debtor companies owned by Jim Rhodes and/or his family members. (continued)**

– id Interior Design is a company owned and operated by Glynda Rhodes started in 2005.

▸ The Rhodes companies paid id Interior Design $174,000 in 2008 and $1.57 million in 2007.

▸ Payments rendered are for interior design services and materials in model homes and homes built and sold to customers.

▸ **There were 68 trucks and other vehicles in the fixed asset ledger at the beginning of 2008, 38 of which were written off in 2008.**

– According to the Corporate Controller, in June of 2008 the Borrowers sold a large group of vehicles that were not being used in the operations at a bulk auction.

– This sale took place a few days before the Corporate Controller started, so she was not aware of the details nor the results of the sale. She also stated that the person who coordinated the sale was no longer with the company.

– One of the former employees of the company stated that when he was with the company, he undertook an exercise to clean up the books for vehicles for which the company was still paying insurance, but no longer owned.

– He also stated that it was his belief that many of these vehicles had been taken or given away to employees and/or related parties.

– Remaining on the books are a Bentley (book cost of $76,000) and two Mercedes Benz (book costs of $98,000 and $67,000).

AlixPartners    11

Attorney Work Product – Privileged and Confidential

# Findings

- **Further consideration of certain following sections of the Credit Agreement may be warranted in light of the findings outlined in this report**

  - **§1.2   Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement**

    - "Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrowers to the Lenders pursuant to clauses (i), (ii) and (x) of subsection 5.3 shall be prepared in accordance with GAAP (except, with respect to interim financial statements, for the absence of normal year-end audit adjustments and explanatory footnotes) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 5.3(iv))."

    - As described on slide 6, the allocation of certain costs paid by the Borrowers but related to companies outside of the Credit Agreement was not booked.

  - **§6.9   Asset Sales**

    - The Credit Agreement indicates a number of terms related to asset sales.

    - The bulk sale of Vehicles in June 2008 (slide 11) may potentially be considered a Major Collateral Asset Sale as defined in the Credit Agreement.

  - **§6.10  Transactions with Shareholders and Affiliates**

    - "The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction … on terms that are less favorable to the Borrowers or the Subsidiaries, as the case may be, than those that might be obtained reasonably at the time from Persons who are not such a holder or Affiliate…"

    - Transactions with related parties, such as Spirit Underground and id Interior Design, may not have been made at arm's length- further investigation would be required.

Attorney Work Product - Privileged and Confidential

AlixPartners

12

# Findings

▶ **The company has certain operational issues which inhibit its ability to function efficiently and in a cost-effective manner.**

– There is a high level of turnover at the management level.

| Employee | Title | Start date | Left company |
|---|---|---|---|
| Joseph Whatley | President | 5/23/2008 | August 2008 |
| Chris Stephens | Executive Vice President | 6/12/2006 | June 2008 |
| Gary Fuchs | Chief Financial Officer | 9/10/2007 | February 2009 |
| David Rau | Chief Accounting Officer | 9/29/2008 | December 2008 |
| Rosario Romano | Corporate Controller | 8/4/2008 | December 2008 |
| Alan Yue | Corporate Controller | 3/17/2008 | July 2008 |

– High turnover has resulted in a disorganized accounting function and has resulted in the loss of some historical information, including:

  ▸ Certain records from as recent as 2008, such as vendor files for White Mountain Framers, could not be located on a timely basis.

  ▸ Detail of balances presented in the financial statements for certain accounts (e.g. Inventory, General & Administrative Expenses) was difficult to obtain.

  ▸ The support and explanations for certain entries booked, such as the write-off of fixed asset balances after the vehicles were disposed of.

AlixPartners    13

Attorney Work Product - Privileged and Confidential

# Findings

▶ **The company has certain operational issues which inhibit its ability to function efficiently and in a cost-effective manner. (continued)**

  – Accounts Payable

  ‣ The company routinely pays individuals out of Accounts Payable instead of payroll. According to management, this is Jim Rhodes' preferred method of paying consultants. This could create certain tax issues if the company and the employees do not report such payments as income. Approximately 25 people received monthly or weekly payments in 2008 totaling $575,000.

  ‣ Upon examination of the accrued expenses detail, there are line items with the description "Held checks" ($480,000 at 12/31/08).

  ‣ According to the Corporate Controller, although this artificially increases the cash balance at the reporting date, she felt that it was not inappropriate.

  ‣ According to a former employee, there was a common practice at the company to cut checks and hold on to them for a period of time before distributing them due to inadequate balances in the cash accounts and/or the inability to get the proper approvals on the checks once they had been cut.

  ‣ Additionally, Glynda Rhodes' salary (through payroll) increases from $98,800 to $159,300 on 7/25/08 and returns to $98,800 on 8/29/08.

  ‣ According to a former employee, when he inquired about this increase he was told that it had been determined that Rhodes Homes could no longer pay for Glynda's nanny, so her compensation was increased to make up for the difference. In response to his questions regarding this arrangement, her salary was reduced to its previous level.

AlixPartners    14

Attorney Work Product - Privileged and Confidential

# Findings

- **The company has certain operational issues which inhibit its ability to function efficiently and in a cost-effective manner.** (continued)

  – Several former employees indicated that certain strategic decisions undertaken by the company were not good business decisions.

    ▸ Two of the former employees that we had conversations with stressed that the management of the company, and Jim Rhodes' management style in particular, was one of intimidation and micromanagement, causing poor business decisions and high employee turnover.

    ▸ One former employee indicated that a large amount of funds was put into the property in Pravada, Arizona, but the property had "a damaged flood channel and no grading permit."

    ▸ Another former employee stated that his experience in building led him to believe that the process in which the Rhodes Homes properties were constructed led to poorly built homes.

  – The closings reported for 2008 include certain sales which may be considered non-recurring

    ▸ Sales of the Greens properties at Rhodes Ranch totaled 43 units, all in the fourth quarter at an average selling price of $218,000.

    ▸ A bulk sale of 37 properties in a community called X-it occurred on September 26, 2008 at an average selling price of $141,000.

    ▸ Jim Rhodes received a bonus of $75,000 on December 31, 2008 upon the realization of 375 closings in 2008. This bonus was approved at a Board meeting on April 30, 2008 in which he was the only attendee.

- **Potential uses of Borrowers' transfers to non-debtor companies**

  – We noted that Deborah Rhodes (ex-wife of Jim Rhodes) was paid 875,000 in 2008 and $1.5 million in 2007 out of the accounts of Sagebrush Enterprises, which is a non-debtor company. According to the Corporate Controller, these payments are "a part of the divorce settlement."

AlixPartners

15

Attorney Work Product - Privileged and Confidential

# AlixPartners – Global Offices



AlixPartners is a global business advisory firm offering comprehensive services to improve corporate performance, execute corporate turnarounds, and provide litigation consulting and forensic accounting services. The firm's specialty is urgent, high-impact situations when results really matter.

**CHICAGO**
181 W. Madison Street
Suite 4700
Chicago, IL 60602
312.346.2500

**MUNICH**
Mauerkircherstr. 1 a
81679 Munchen
Germany
+49.89.20.30.40.00

**DALLAS**
2100 McKinney Ave.
Suite 800
Dallas, TX 75201
214.647.7500

**NEW YORK**
9 West 57th Street
Suite 3420
New York, NY 10019
212.490.2500

**DETROIT**
2000 Town Center
Suite 2400
Southfield, MI 48075
248. 358.4420

**PARIS**
49/51 Avenue George V
75008 Paris
France
+33.1.76.74.72.00

**DÜSSELDORF**
Königsallee 59 a
40215 Düsseldorf
Germany
+49.211.97.55.10.00

**SAN FRANCISCO**
4 Embarcadero Center
Suite 3110
San Francisco, CA 94111
415.848.0283

**LONDON**
20 North Audley Street
London W1K 6WE
United Kingdom
+44.20.7098.7400

**SHANGHAI**
Suite D, 15F
Plaza 66 Building II
1366 Nan Jing West Road
Shanghai, 200040 China
+8621.6137.6111

**LOS ANGELES**
515 S. Flower Street
Suite 3050
Los Angeles, CA 90071
213.437.7100

**TOKYO**
Marunouchi Building 24F
2-4-1 Marunouchi
Chiyoda-ku
Tokyo 100-6324  Japan
+81.3.3533.4800

**MILAN**
Corso Matteotti 9
20121 Milan
Italy
+39.02.360.12000

## AlixPartners

16

Attorney Work Product - Privileged and Confidential