James I. Stang, Esq. (CA Bar No. 94435)
Shirley S. Cho, Esq. (CA Bar No. 192616)
Werner Disse, Esq. (CA Bar No. 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
Email: jstang@pszjlaw.com
       scho@pszjlaw.com
       wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV 89101
Telephone: 702/382.1170
Facsimile: 702/382.1169
Email: zlarson@lslawnv.com
[Proposed] Attorneys for Debtors and
Debtors in Possession

E-Filed: May 11, 2009

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,[1]

Debtors.

Affects:

☒ All Debtors
☐ Affects the following Debtor(s)

Case No.: BK-S-09-14814-LBR
(Jointly Administered)

Chapter 11

DATE: June 5, 2009
TIME: 1:30 p.m.
PLACE: Courtroom 1

---

[1] The Debtors in these cases, along with their case numbers are: Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No.

**DECLARATION OF JEFF BARCY IN SUPPORT OF APPLICATION FOR ORDER UNDER SECTION 327(a) OF THE BANKRUPTCY CODE AUTHORIZING THE LIMITED EMPLOYMENT AND RETENTION OF JEFF BARCY AS FINANCIAL CONSULTANT TO THE DEBTORS AND DEBTORS IN POSSESSION *NUNC PRO TUNC* TO THE PETITION DATE**

I, Jeff Barcy, declare as follows:

1. This Declaration is submitted in support of the *Application For Order Under Section 327(a) Of The Bankruptcy Code Authorizing The Limited Employment And Retention Of Jeff Barcy As Financial Consultant To The Debtors And Debtors In Possession Nunc Pro Tunc To The Petition Date* (the "Application"), which is being submitted concurrently herewith.

2. I am the founder and Chief Executive Officer of Ridgeback Partners, a real estate firm created in 2007 that provides turnaround advisory and consulting services to help distressed homebuilders, banks and institutional investors work through their problems. Before founding Ridgeback Partners, I was Chief Executive Officer, Chief Strategic Officer and Executive Vice President for Hearthstone, a leading institutional investor in for-sale residential real estate, with approximately $4 billion in equity commitments from investors. Prior to joining Hearthstone, I spent over 12 years at Credit Suisse First Boston, most recently as a Director in the West Coast real estate investment banking practice, where I worked on over $15 billion of financings for all types of real estate companies, including homebuilders, developers, multi-family REITs and hotel companies. I am a graduate of Harvard College and have an MBA from the Harvard Business School.

3. I was personally employed by the Debtors pursuant to an engagement letter (the "Engagement Letter") dated December 8, 2009, a copy of which is attached hereto as Exhibit 1.

4. I was employed by the Debtors beginning December 8, 2009 as an outside consultant at the agreed upon salary of $250,000 per year plus a bonus of $250,000 per year, which bonus was payable monthly. During this prepetition work period, I developed a significant level of knowledge relating to the Debtors' operations and finances. I helped create the Debtors' 13 week budget that was attached to the cash collateral motion. My last day of work with the Debtors was April 10, 2009.

---

09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

5. I do not, insofar as I have been able to ascertain, have any connection with the above-captioned debtors (collectively, the "Debtors"), their creditors, equity security holders, or any other parties in interest, or their respective attorneys, in any matter relating to the Debtors or their estates, except as set forth below.

6. I spent over 12 years working as an investment banker at Credit Suisse First Boston, which is one of the Debtors' secured lenders and also the Administrative Agent to the lending group for the $430,000,000 Senior Secured Credit Facility (First Lien) and the $70,000,000 Second Secured Credit Facility (Second Lien) (collectively, the "Secured Loans"). I helped negotiate the Secured Loans on behalf of Credit Suisse First Boston, though I no longer worked for Credit Suisse First Boston at the time the Secured Loans were closed.

7. I am a "disinterested person" as that term is defined in section 101(14) of title 11 of the United States Code (the "Bankruptcy Code") in that I:

   a. am not a creditor, equity security holder or insider of the Debtors;

   b. am not and was not, within 2 years before the date of the filing of the petitions, a director, officer or employee of the Debtors; and

   c. do not have an interest materially adverse to the interest of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.

8. I may have in the past represented, and may currently represent and may in the future represent creditors of the Debtors in connection with matters unrelated to the Debtors and these cases. At this time, I am not aware of such representations.

9. I am not aware of any relationship as a "relative" with any U.S. Bankruptcy Judge in this District or with the United States Trustee for Region 17 that would be subject to the requirements of Bankruptcy Rule 5002(b).

10. I intend to apply for compensation for professional services rendered in connection with these chapter 11 cases, subject to the Court's approval and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States

1. Bankruptcy Court for the District of Nevada and this Court's Orders, based upon its normal and usual billing rates. I charged the Debtors rates consistent with the rates I charge other clients.

11. I will receive reimbursement of my post-petition expenses, including travel, lodging, cell phone service, photocopying, witness fees, long distance telephone calls, postage, express mail and messenger charges, expenses for working meals and telecopier charges. I charge the Debtors for these expenses in a manner and at rates consistent with those I generally charge my other clients; provided, however, I will comply with the guidelines for charging bankruptcy estates for such expenses that are applicable in this District.

12. Prior to the Petition Date, I received a retainer (the "Retainer") in these cases in the amount of $30,000. During the twelve months prior to the Petition Date, I received $206,236.29 in the aggregate from the Debtors, including the Retainer and reimbursed expenses. The Debtors do not owe me any monies as of the Petition Date. I am currently holding a Retainer in the amount of $30,000, which I will apply against the fees and expenses I am awarded pursuant to my first and final fee application when approved by this Court, with the remainder to be returned to the Debtors.

LARSON & STEVENS
810 S. CASINO CENTER BLVD., SUITE 104
LAS VEGAS, NEVADA 89101

13. If the Application is approved, I will submit a first and final fee application. I understand that my compensation in these cases is subject to the prior approval of this Court. No compensation will be paid except upon application to and approval by this Court after notice and a hearing in accordance with sections 330 and 331 of the Bankruptcy Code and Bankruptcy Rule 2016.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed this ___ day of May, 2009, in San Francisco, California.

Jeff Barcy

Exhibit "1"

CONFIDENTIAL

## RHODES / BARCY CONSULTING AGREEMENT

Rhodes Design and Development Corporation, a Nevada corporation (the "Company") and Ridgeback Partners, a Delaware Corporation ("Consultant") (collectively, the "Parties"), make this RHODES/BARCY CONSULTING AGREEMENT ("Agreement") as of ~~November 19,~~ 2008 ("Commencement Date").   Dec. 8

### RECITALS

The Company wishes to retain Consultant, and specifically the services of Consultant's employee, Mr. Jeff Barcy, a natural person and resident of the State of California, as a Chief Investment Advisor and Consultant desires to be retained by Company in this position. The Company and Consultant wish to enter into this Consulting Agreement to outline the terms and conditions of Consultant's rendition of services for Company.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Company and Consultant agree as follows:

1. Consulting Duties.

    (a) Term. The Term of this Agreement shall begin as of the Commencement Date and shall continue unless sooner terminated as hereinafter provided (referred to as the "Term.").

    (b) Duties and Responsibilities. Consultant, specifically Mr. Jeff Barcy, shall perform and discharge those duties which are normally and customarily vested in a senior investment advisor operating in the same business as Company, as well as those duties and goals set forth in "Exhibit A", attached hereto, and will work over the near term to help the Company in resolving issues related to the Credit Facility. Consultant shall perform his duties in Las Vegas, Nevada, flying in on Monday morning of each week and leaving for his current home in San Francisco on Friday (and staying in Company's office until at least 5:00 p.m. on each Friday). Consultant shall devote one hundred percent (100%) of his working time to the Company's business and shall work a sixty (60) hour workweek except that Consultant shall be permitted to modify such a schedule for illness, vacation, holidays, *etc.*, subject to mutual agreement between the parties. In addition to those duties and goals outlined in "Exhibit A", Consultant shall have the following specific duties and responsibilities:

    (i) Consultant shall bear primary responsibility for investor relations and shall use his best efforts to resolve the issues related to the current credit facility with CSFB;

    (ii) Consultant shall explore all desirable or potentially desirable sources of capital for the Company's operations including the creation of joint ventures or private placements. As the senior investment advisor, Consultant shall function as the team leader with respect to capital raising activities. Prior to finalizing any arrangement for new capital, Ridgeback Partners and the Company agree to enter into a mutually acceptable

arrangement to compensate the Consultant for new capital raised, based on a percentage of profits to be determined.

(iii) Consultant shall take responsibility for formulating and adhering to the Company's business plan;

(iv) Consultant shall prepare pro forma budgets and reconcile actual results to the budgeted amounts as well as financial statements. To the extent material discrepancies exist in the budgeted amounts, Consultant shall determine the cause of such discrepancies and either initiate or recommend steps to eliminate problems and inefficiencies going forward (to the extent they are present) or adjust budgets to reflect the Company's modified experience. Using this process, Consultant shall develop a body of knowledge the Company and Consultant can and shall use in evaluating new projects and the viability of the same; and

(v) Consultant shall perform a monthly "drill down" review of the Company's balance sheet and statement of cash flow with the Company's financial officers and executives. In this meeting, problems should be identified and steps should be outlined to deal with any issues and investigate the root cause of any problems.

2. Compensation.

(a) Fees. Consultant shall be paid fees ("Fees") during the Term in the amount of two hundred and fifty thousand dollars ($250,000.00) per year, which shall be payable on a weekly basis.

(b) Consulting Bonus. Consultant shall be entitled to receive a guaranteed minimum consulting bonus of two hundred and fifty thousand dollars ($250,000.00) ("Consulting Bonus") in his first year of performance of services for the Company. Such Consulting Bonus shall be payable monthly in the amount of twenty thousand eight hundred thirty three dollars ($20,833). Concurrently with the signing of this contract, the Company will pay Consultant for prior work (including fees and pro rata Consulting Bonus) and travel expenses. The monthly Consulting Bonus payment shall be paid and due to Consultant, in equal installments, at the end of each month of the Term.

(c) Status as a Consultant/Independent Contractor. This Agreement calls for the performance of the services of Consultant as an independent contractor. The Company will issue Consultant an IRS Tax Form 1099 for all payments under this Agreement. Notwithstanding anything herein to the contrary, the parties understand and agree that the Consultant shall not be treated as an employee of the Company with respect to the duties to be performed pursuant to this Agreement for purposes of Workers' Compensation benefits, the Federal Insurance Contributions Act, the Social Security Act, the Federal Unemployment Tax Act, income tax withholding, or any employee benefit provision of the Internal Revenue Code of 1986, as amended, or any other purposes. The Consultant accepts as the Consultant's sole responsibility all duties and responsibilities to pay federal self-employment and income taxes. The Consultant further acknowledges and agrees that such treatment is proper, and the Consultant represents and

warrants to the Company that the Consultant has paid (or shall pay for the current year and all future years) all federal and state income taxes and self employment taxes required of the Consultant consistent with such treatment. Without limiting the generality of the foregoing, the Consultant expressly releases the Company, its officers, directors, managers, owners, and affiliates from any and all liability in connection with such taxes, and the Consultant agrees to hold harmless and indemnify the Company, their officers, directors, managers, owners, and affiliates from and against any payments, claims, losses, or costs, excluding attorneys' fees, which the Company, their officers, directors, managers, owners, and affiliates may suffer or be required to make in connection with such taxes.

3.  Other Consulting Benefits.

(a) Travel Expenses While Commuting. During the Commuting Period (as hereinafter defined), The Company agrees to reimburse Consultant, on a weekly basis, for the cost of traveling between California and Nevada in order to perform his duties pursuant to the terms of the Agreement. Such costs shall be reimbursed based on coach class airfare, and shall include airport parking and other reasonable costs relevant to such travel. Consultant shall take advantage of advance booking travel discounts whenever possible to minimize the costs to the Company. The Company agrees that it will provide Consultant with a residence and a car to utilize when performing Consultant's duties in Las Vegas. Consultant shall be responsible for up to $200 per month for utilities on the residence (including homeowners association dues), and the Company shall be responsible for all amounts in excess of $200. After three months from the Commencment Date of this Agreement Consultant shall put the utilities to the residence in his name and be reimbursed by the Company for $200 per month for utilities on the residence. Consultant shall be responsible for providing gas for the car. Should Company be insolvent, or otherwise unable to provide reimbursement for such expenses, reimbursement of such expenses will be provided by Heritage Land Co, LLC, Rhodes Companies, LLC and Rhodes Ranch GP.

(b) Other Business Expenses. In addition to the Travel Expenses set forth above, upon submission of expense statements to the Company, Consultant shall be entitled to reimbursement for other reasonable business and coach class travel expenses duly incurred by Consultant in the performance of his duties under this Agreement.

4.  Termination of the Term of this Agreement.

(a) The Company or the Consultant can terminate this agreement at any time for any reason and without prior notice by delivering a written termination notice to the other party.

(b) Intentionally left blank

(c) Payments Upon Termination. If the Term is terminated by the Company or the Consultant, the Company shall promptly pay or provide to the Consultant, or his estate, (i) the Consultant's earned but unpaid Fees accrued through such date of termination, (ii) the Consultants earned but unpaid pro rata portion of the Consulting Bonus through the date of termination; and (iii) reimbursement of any business expenses incurred by the Consultant prior to the date of termination that are reimbursable under Paragraphs 3(a) and 3(b) above or 6 (i) below

(subsections (i) to (iii), above, are referred to together as the "Accrued Obligations"). If Consultant is terminated for any reason by the Consultant or the Company, Consultant shall receive the Accrued Obligations, payable within one week of the termination. If the Accrued Obligations are not paid within one week of the termination, any amounts due will earn interest at an annual rate of 18%.

5. Covenants of Consultant.

(a) Works For Hire. Consultant recognizes and acknowledges that as a result of his services for the Company, Consultant may have access to, be involved in the development of, and have knowledge of certain "Works", which term is defined to include all programs, ideas, processes, inventions, trade secrets, techniques, technology, code and operating ideas, all Confidential Information (as defined in subpart (b) below), and materials, whether or not published, patented, copyrighted, registered, or suitable therefor, and all intellectual property rights therein, that are made, developed, written, conceived, or first reduced to practice by Consultant, in part or in whole, whether alone or with others, during the term of this Agreement, to the extent they relate to the Company's past, present, future, or anticipated business, research, development, or trade, or are developed using the Company's time, equipment, or materials. Consultant agrees to promptly disclose the existence, use, and manner of operation of any Works to the Company. Consultant expressly agrees that all Works he creates, writes, or develops in the course of providing the services to the Company to the extent they relate to the Company's business (including future or anticipated business) or are developed during the time of Consultant's services for the Company or using the Company's time, equipment, or materials shall be "works made for hire" as defined by U.S. copyright law and, accordingly, the property of the Company. To the extent such "works made for hire" doctrine may be legally inapplicable for any reason, Consultant hereby assigns to the Company all right, title, and interest in the above Works, including all rights of patent, trademark, copyright and other intellectual property rights, and agrees to execute at the Company's request a subsequent document as further evidence of this assignment. Consultant acknowledges and expressly agrees that all Works are and shall be the sole and exclusive property of the Company, and hereby assigns to the Company any rights, copyrights, patent rights, trade secrets, and other intellectual property that Consultant may have therein. Consultant agrees to take all actions reasonably requested by the Company, both during and after the term of this Agreement, to assign to the Company and to establish (including, without limitation, assisting in obtaining or registering copyrights, patents, trademarks, or similar property rights and executing assignments to the Company), perfect, exercise, or protect the Company's rights in any Works or title thereto. If the Company is unable, because of Consultant's mental or physical incapacity, geographic distance or for any other reason, to obtain Consultant's approval or signature on any document it deems necessary or useful to claim, secure, extend, protect, or enforce any right in intellectual property to which the Company has a reasonable claim, then Consultant hereby appoints the Company and its duly authorized officers as Consultant's Consultant and attorney-in-fact to act for Consultant and in Consultant's place and stead for the purpose of accomplishing such act with the same legal force and effect as if executed by Consultant.

(b) Confidential Information. Consultant agrees that the Confidential Information of the Company and its affiliates is and shall remain the property and asset of the Company and its affiliates. Except as specifically authorized, Consultant shall treat as

confidential and proprietary and shall not use, disclose, or otherwise make available any Confidential Information of the Company and its affiliates to any person, other than employees, representatives, and consultants of the Company authorized by the Company to receive such information. Upon termination of Term and upon the request of the Company, Consultant shall return to the Company all Confidential Information, regardless of whether it is in written, electronic, photographic, or any other form, including all copies reproductions, summaries, and extracts therefrom, in whatever form, of such information that is in Consultant's possession, custody, or control.

For purposes of this Agreement, "Confidential Information" means information or knowledge that:

(i) is used or is developed to be used in the Company's business, or results from the Company's business or development activities or the Consultant's efforts on the Company's behalf under this Agreement,

(ii) is private or confidential in that it is not generally known or available to the public, and

(iii) is knowledge that would give a competitor, lender or other creditor an advantage to use against the Company, and

(iv) gives the Company or any of its customers an opportunity to obtain an advantage over their respective competitors who do not know or use such information or the knowledge of which would give a competitor an advantage relative to the Company.

Examples of the categories of Confidential Information include (but are not limited to): financial and business information, processes, marketing information, methods, and strategies, including marketing data, market research, sales techniques, compiled customers and potential customer information, distributor information, purchasing methods and sources, including the compiled information of vendors and suppliers; cost and price lists, product and potential product information, intellectual property, trade secrets, know how, ideas, inventions, discoveries, plans, strategies, technology, computer programs (whether owned by the Company, its affiliates, or any third party or used under license), source code, object code, designs, patents, trademarks, research, methods, processes, procedures, systems, formulae, formulations, recipes, compositions, devices, processes, and records.

(c) <u>No Solicitation; Non Competition</u>. During the term of this Agreement, the Consultant agrees that the Consultant shall not directly or indirectly employ or engage, or attempt to employ or engage, any consultant or employee of the Company, or in any other manner interfere with or disturb the relationship of the Company with any of the Company's employees, clients, vendors, referrals, other Consultants or, or induce or attempt to induce any third party to terminate, curtail, or cancel its business or relationship with the Company or in any manner modify or fail to enter into any actual or potential business relationship with the Company. For purposes hereof, the term "other Consultants or employees" shall mean any person or persons who have received, are receiving, or will receive remuneration for services

rendered to the Company on the date of termination of the Term or at any time twelve (12) months previously thereto. During the Term Consultant agrees that the Consultant shall not directly or indirectly within the Restricted Area (as hereinafter defined) compete or attempt to compete with the Company or work for a competitor of the Company operating in the Restricted Area. The term "Restricted Area" shall mean the states of Nevada, Arizona or any other state in which the Company is operating or owns property for development as of the date of termination of the Term. During the Term, and for a period of six (6) months thereafter, the Consultant agrees that the Consultant shall not directly or indirectly employ, engage or interfere, or attempt to employ engage or interfere, with any consultant, employee or customer of the Company, or in any other manner interfere with or disturb the relationship of the Company with any of the Company's employees, consultants or customers. These covenants on the part of the Consultant shall be construed as an agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of the Consultant against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this covenant. If, in any judicial proceeding, a court of competent jurisdiction shall refuse to enforce any of the separate covenants deemed included in this paragraph, then the unenforceable covenants shall be deemed eliminated from these provisions for the purpose of those proceedings to the extent necessary to permit the remaining separate covenants to be enforced.

(d) Consultant's covenants and obligations under this Section 5 shall survive any termination of this Agreement for any reason as long as the Consultant is paid current with any earned but unpaid Fees and Consulting Bonus, and reimbursed for all prior travel and business expenses reimbursable under paragraph 3 (a) and 3 (b) above.

6. Miscellaneous

(a) Governing Law; Jurisdiction, Attorneys' Fees. This Agreement shall be governed by and construed in accordance with the laws of Nevada without regard to conflict of law principles. The parties agree that any suit or other proceeding related in any way to the terms of this Agreement must be submitted only to the state or federal courts located in Clark County, Nevada. The prevailing party in any such action or proceeding (as well as any appeal, supplemental proceeding, or attempt to collect any judgment) shall be entitled to its reasonable attorneys' fees and costs.

(b) Insurance/Indemnification. The Company agrees to secure insurance in reasonable amounts based on its line of business, to the extent it already does not have such insurance, which shall cover Consultant should any costs, claims or actions arise as a result of the performance of his services for the Company (including, without limitation, listing consultant on any insurance policies applicable to the senior individuals of the Company). The Company agrees to provide proof of such insurance to Consultant upon request by Consultant. Consultant shall also obtain a primary coverage E&O Insurance covering Consultant should any costs, claims or actions arise as a result of the performance of his services for the Company. Company shall indemnify Consultant from any costs, claims or actions which are related to the Consultant's performance of duties for the Company and are not the result of Consultant's gross negligence or criminal conduct, and which are not covered by any applicable insurance. Should Company be insolvent, or otherwise unable to provide funds for such indemnification to

Consultant, through insurance or otherwise, such indemnification will be provided by Heritage Land Co, LLC, Rhodes Companies, LLC and Rhodes Ranch General Partnership.

(c) <u>Amendment</u>. This Agreement may be amended only by a writing signed by Consultant and by Jim Rhodes if living, or, if not living by a duly authorized representative of the Company (other than Consultant).

(d) <u>Severability</u>. If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect, provided however, that any such provision found invalid, unenforceable or void shall be deemed amended only to the extent necessary and shall preserve the intent of the parties hereto.

(e) <u>Nonwaiver</u>. No failure or neglect of either party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance.

(f) <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument.

(g) <u>Copies of this Agreement</u>. A fully executed photocopy, facsimile or "pdf" of this Agreement, including any signatures thereto, shall be considered as effective and valid as the original.

(h) <u>Entire Agreement</u>. This Agreement and the documents referenced herein and executed herewith contain the entire agreement and understanding between the parties hereto and supersedes any prior or contemporaneous written or oral agreements, representations and warranties between them respecting the subject matter hereof.

(i) <u>Legal Fees</u>. The Company and Consultant agree to share equally the cost of Consultant's legal fees related to the preparation of this Agreement.

(j) <u>Authority to Bind</u>. Company's signatory, as indicated below, represents that it is signing on behalf, and has the authority to bind, Heritage Land Co., LLC, Rhodes Companies, LLC and Rhodes Ranch General Partnership, with respect to the obligations of the aforementioned companies, as set forth herein.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date set forth above.


Rhodes Design and Development
Corporation ("Company")