1

```
 1              UNITED STATES BANKRUPTCY COURT

 2                   DISTRICT OF NEVADA

 3                   LAS VEGAS, NEVADA

 4   In re:  HERITAGE LAND COMPANY,   )  E-Filed:  05/18/09
     LLC,                            )
 5                                    )
            Debtor.                  )  Case No.
 6                                    )  BK-S-09-14778-LBR
     _____)  Chapter 11
 7   THE RHODES COMPANIES, LLC,      )
                                     )
 8          Debtor.                  )  Case No.
                                     )  BK-S-09-14814-LBR
 9   _____)  Chapter 11

10

11                TRANSCRIPT OF PROCEEDINGS
                           OF
12                 (09-14778) FINAL HEARING
     RE: MOTION TO USE CASH COLLATERAL FOR INTERIM AND FINAL ORDERS
13          PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364
             OF DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
14              PURSUANT TO 105, 361, 362, 363, AND 364
                   OF THE BANKRUPTCY CODE,
15       (A), AUTHORIZING DEBTORS TO USE CASH COLLATERAL,
               (B), GRANTING ADEQUATE PROTECTION
16         TO THE DEBTOR'S PREPETITION SECURED PARTIES,
             AND, (C), SCHEDULING A FINAL HEARING;
17       MEMORANDUM OF POINTS AND AUTHORITIES, NO. 119
                           AND
18                 (09-14814) FINAL HEARING
     RE: (COPY) DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
19          PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364
             OF DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
20          PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364
                   OF THE BANKRUPTCY CODE,
21       (A), AUTHORIZING DEBTORS TO USE CASH COLLATERAL,
               (B), GRANTING ADEQUATE PROTECTION
22         TO THE DEBTOR'S PREPETITION SECURED PARTIES,
             AND, (C), SCHEDULING A FINAL HEARING;
23       MEMORANDUM OF POINTS AND AUTHORITIES, NO. 16
                           AND

24

25
```

2

```
 1              (09-14778) ORDER SHORTENING TIME
                  RE: APPLICATION FOR AN ORDER
 2            UNDER SECTION 366 OF THE BANKRUPTCY CODE,
                 (A), PROHIBITING UTILITY PROVIDERS
 3        FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE,
                (B), DEEMING UTILITIES ADEQUATELY ASSURED
 4                     OF FUTURE PERFORMANCE,
                 AND, (C), ESTABLISHING PROCEDURES
 5         FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT;
             MEMORANDUM OF POINTS AND AUTHORITIES, NO. 58
 6                            AND
            (09-14814) (COPY) DEBTOR'S MOTION FOR AN ORDER
 7            UNDER SECTION 366 OF THE BANKRUPTCY CODE,
                 (A), PROHIBITING UTILITY PROVIDERS
 8        FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE,
                (B), DEEMING UTILITIES ADEQUATELY ASSURED
 9                     OF FUTURE PERFORMANCE,
                 AND, (C), ESTABLISHING PROCEDURES
10         FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT, NO. 16
                              AND
11         (COPY) DEBTOR'S MOTION PURSUANT TO BANKRUPTCY CODE
                  SECTIONS 105(A), 363, AND 507(A)
12             FOR AN ORDER AUTHORIZING THE DEBTORS TO,
        (I), PAY PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS,
13                    AND OTHER COMPENSATION;
                (II), REMIT WITHHOLDING OBLIGATIONS;
14            AND, (III), MAINTAIN EMPLOYEE, NO. 8
                              AND
15              (COPY) MOTION FOR ENTRY OF AN ORDER
         PURSUANT TO SECTIONS 105(A), 363(C), 1107(A), AND 1108
16                   OF THE BANKRUPTCY CODE
        AUTHORIZING THE DEBTORS TO HONOR PREPETITION OBLIGATIONS
17                        TO CUSTOMERS
        AND TO OTHERWISE CONTINUE CUSTOMER PRACTICES AND PROGRAMS
18          IN THE ORDINARY COURSE OF BUSINESS, NO. 16
                              AND
19                 (COPY) DEBTOR'S MOTION
               FOR UNDER 11, USC, 105, 363, 503(B),
20              1107, AND 1108 AUTHORIZING,
         (I), MAINTENANCE OF CERTAIN EXISTING BANK ACCOUNTS,
21          (II), CONTINUED USE OF EXISTING BUSINESS FORMS,
        (III), CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM,
22      AND, (IV), PROVIDING ADMINISTRATIVE PRIORITY STATUS, NO. 16
                              AND
23                 (COPY) MOTION FOR ENTRY OF ORDER,
        (I), AUTHORIZING THE DEBTORS TO SELL HOMES FREE AND CLEAR
24         OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
        (II), ESTABLISHING PROCEDURES FOR THE RESOLUTION AND PAYMENT
25                 OF LIENS AND CLAIMS, NO. 16
```

1               (09-14778) ORDER SHORTENING TIME
                 RE: MOTION TO APPOINT TRUSTEE
2                   OR, IN THE ALTERNATIVE,
          DISMISSING THE DEBTOR'S CHAPTER 11 CASES, NO. 121
3                           AND
                 (09-14814) ORDER SHORTENING TIME
4           RE: MOTION TO STRIKE INADMISSIBLE HEARSAY
          IN OBJECTION OF THE FIRST LIEN STEERING COMMITTEE
5       TO THE DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
          PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364
6                    OF THE BANKRUPTCY CODE,
          (A), AUTHORIZING DEBTORS TO USE CASH COLLATERAL,
7                (B), GRANTING ADEQUATE PROTECTION
           TO THE DEBTOR'S PREPETITION SECURED PARTIES,
8          AND, (C), SCHEDULING A FINAL HEARING, NO. 55
                            AND
9                   ORDER SHORTENING TIME
        RE: (COPY) MOTION BY THE FIRST LIEN STEERING COMMITTEE
10       FOR AN ORDER DIRECTING THE APPOINTMENT OF A TRUSTEE
                  PURSUANT TO 11, USC, 1104(A)
11                  OR, IN THE ALTERNATIVE,
           DISMISSING THE DEBTOR'S CHAPTER 11 CASES
12            PURSUANT TO 11, USC, 1112(B), NO. 69
                         VOLUME 1
13          BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
14
                   Friday, April 17, 2009
15
                       9:30 a.m.
16

17

18

19

20

21

22

23   Court Recorder:        Helen C. Smith

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

4

```
1    APPEARANCES:

2    For the Rhodes          ZACHARIAH LARSON, ESQ.
     Entities:               Larson & Stephens, LLC
3                            810 South Casino Center Boulevard
                             Suite 104
4                            Las Vegas, Nevada 89101

5                            JAMES I. STANG, ESQ.
                             SHIRLEY S. CHO, ESQ.
6                            ALAN J. KORNFELD, ESQ.
                             Pachulski, Stang, Ziehl & Jones, LLP
7                            10100 Santa Monica Boulevard
                             Eleventh Floor
8                            Los Angeles, California 90067

9    For James Rhodes        BRETT A. AXELROD, ESQ.
     and Sagebrush           Greenberg Traurig, LLP
10   Enterprises, Inc.:      3773 Howard Hughes Parkway
                             Suite 500-N
11                           Las Vegas, Nevada 89169

12   For the First           TIMOTHY P. THOMAS, ESQ.
     Lienholders Steering    Kolesar & Leatham, Chtd.
13   Committee:              3320 West Sahara Avenue
                             Suite 380
14                           Las Vegas, Nevada 89102

15                           PHILIP C. DUBLIN, ESQ.
                             ABID QURESHI, ESQ.
16                           Akin, Gump, Strauss, Hauer & Feld, LLP
                             One Bryant Park
17                           New York, New York 10036

18   For Credit Suisse,      RAMON M. NAGUIAT, ESQ.
     Cayman Islands Branch:  Skadden, Arps, Slate, Meagher
19                            & Flom, LLP, and Affiliates
                             300 South Grand Avenue
20                           Suite 3400
                             Los Angeles, California 90071
21
     For the United States   AUGUST B. LANDIS, ESQ.
22   Trustee:                Office of the United States Trustee
                             300 Las Vegas Boulevard South
23                           Suite 4300
                             Las Vegas, Nevada 89101
24

25
```

```
 1    APPEARANCES (Cont.):

 2    For NV Energy:          KIRBY C. GRUCHOW, JR., ESQ.
                              Leach, Johnson, Song & Gruchow
 3                            5495 South Rainbow Boulevard
                              Suite 202
 4                            Las Vegas, Nevada 89118

 5    For Wells Fargo Bank,   DON S. DeAMICIS, ESQ.
      N.A.:                   Ropes & Gray, LLP
 6                            One International Place
                              Boston, Massachusetts 02110
 7
      Also Present:           PAUL HUYGENS
 8                            Consultant
                              Heritage Land Company, LLC
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Court convened at 09:37:05 a.m.)

2              THE CLERK:  Bankruptcy court is now in session.

3              THE COURT:  Be seated.  Okay.

4          (Colloquy not on the record.)

5              THE COURT:  Darla, I left that beautiful chart on my

6      desk.  Do you want Susan to get it or do you want to take

7      appearances first?

8              UNIDENTIFIED SPEAKER:  I have a spare one --

9              THE COURT:  Be seated.

10             UNIDENTIFIED SPEAKER:  -- your Honor.

11             THE COURT:  Oh, okay.  We got a spare one.  Thanks.

12         Be seated.  Sorry.

13             UNIDENTIFIED SPEAKER:  May I approach, your Honor?

14             THE COURT:  I was just so taken aback by it that I

15     immediately sent it out for framing, and --

16         (Colloquy not on the record.)

17             THE COURT:  All right.  Rhodes Companies.

18         Appearances, please.

19         MR. LARSON:  Good morning, your Honor.  Zach Larson,

20     local counsel, for the Rhodes entities.

21         MR. STANG:  Good morning, your Honor.  James Stang,

22     Shirley Cho, and Alan Kornfeld, Pachulski, Stang, Ziehl

23     & Jones, for the debtor.

24         MS. AXELROD:  Good morning, your Honor.

25     Brett Axelrod, Greenberg Traurig, for James Rhodes and

1    Sagebrush Enterprises.

2            MR. THOMAS:  Good morning, your Honor.  Tim Thomas,

3    local counsel for the First Lienholders Steering Committee and

4    also Philip Dublin and Abid Qureshi from Akin, Gump.

5            MR. NAGUIAT:  Good morning, your Honor.  Ray Naguiat

6    from Skadden, Arps on behalf of Credit Suisse.

7            MR. LANDIS:  Good morning, Judge.  Augie Landis,

8    Assistant United States Trustee.

9            THE COURT:  All right.  Excuse me.  It's the change

10   in weather.

11        Since we've got this lovely chart, why don't we start with

12   just a status report, and I think I understand things now, but

13   I think it will be helpful before we start everything, and then

14   I'll have you give me a status report on where we are or are

15   not today.

16            MR. STANG:  Well, your Honor, James Stang for the

17   debtors.  I'm not sure love is exactly breaking out all over.

18        (Colloquy not on the record.)

19            MR. STANG:  But we certainly are making a lot of

20   progress towards not just a final cash-collateral order.  We

21   hadn't submitted a second interim, but, also, discussions have

22   started in detail with the First Lien Steering Committee on

23   plans of reorganization for all the debtors.

24        We have been working now not just with the Steering

25   Committee, but with the first agent, the second agent,

1   obviously, Sagebrush through Ms. Axelrod with the U.S. Trustee,

2   and we are starting to get a little more in sync on getting

3   orders reviewed and signed off by him and that office.

4       And so we are very optimistic that the case is getting on

5   the right track, and that we are moving quickly towards a plan

6   term sheet that will enable us to quickly move towards a plan

7   and confirmation.

8       There are a lot of moving parts as much, frankly, on the

9   lenders' side as the business side.  We've got a

10   Steering Committee.  It has a certain percentage of the

11   first-lien people on it.  There's a lot of overlap between the

12   first lien and the second liens.

13       So with so many cats which includes us having to be

14   herded, we're very optimistic that we're moving the case

15   forward.

16       THE COURT:  Okay.  And where are we on appointing an

17   Unsecured Creditors Committee?  I know it's early, and you just

18   got the information, but --

19       MR. LANDIS:  Augie Landis, Assistant United States

20   Trustee.  I knew you would ask, so I actually prepared.

21       We have solicited the combined list of unsecured creditors

22   that was provided by the debtors at the inception of the case.

23   We did that immediately after the cases were filed.

24       We allowed a response time which just expired a couple of

25   days ago earlier this week.  Here's the summary of where that

1    is at.

2         Seven creditor responses were received.  Four were not

3    willing to serve.  Three are willing to serve, but one of those

4    is a mechanic's lienholder, so they really weren't an unsecured

5    creditor, and they're probably not qualified to serve.

6         At this point, we don't have sufficient creditor interest

7    to form.  I don't think that will stay the case, but I don't

8    know who else to call or write --

9              THE COURT:  Sure.

10             MR. LANDIS:  -- or solicit.

11        Once we have schedules or if we have supplemental

12   information from the debtors with respect to who might be

13   interested or qualified, we can pursue the matter further, but

14   we will continue to do that.

15        And I'm mindful of the fact that once we know who the

16   whole body of unsecured creditors are there will be other

17   people that we can tap.

18        We've done what we can at this juncture.  We're not able

19   to appoint a committee right now.

20             THE COURT:  Okay.  Okay.  All right.

21             MR. STANG:  In addition, your Honor, the debtors are

22   having their initial debtor interview with the U.S. Trustee's

23   Office this afternoon.

24             THE COURT:  Okay.  Now, I haven't had a chance to

25   digest the pros version of the organizational chart if you

1    will, so why don't we spend a few minutes.  If you'd fill me in

2    on the businesses of each of these just starting at left to

3    right.

4         The Rhodes Companies --

5              MR. STANG:  Well --

6              THE COURT:  -- is a holding.  Why don't you just go

7    through and explain.  I understand now which are the holding

8    companies, and then when you get to the operating entities what

9    is the business of those operating entities.

10             MR. STANG:  Okay.  Well, your Honor, you have a group

11   of what we call the nonoperating and the wind-down, and those

12   are -- I'm a little color blind, actually, but those are kind

13   of the bluish ones, and some of them haven't operated for a

14   while, frankly.

15        And then you've got the holding and investment which are

16   relative dormant as well, and then the operating entities.  And

17   while I'm generally familiar with these, I am going to have to

18   do a page turn --

19             THE COURT:  Sure.

20             MR. STANG:  -- through the specific ones, so let's

21   see.

22        If we use the chart that's got the spreadsheet-type

23   approach, we start with Elkhorn Partners which is -- well,

24   maybe we should start.

25        The Rhodes Companies, LLC, and Heritage Land are holding

1    companies.  You've got then Rhodes Ranch GP, so let me just --

2             THE COURT:  And Rhodes Ranch GP owns

3    Rhodes Ranch Golf & Country Club, LLC.

4             MR. STANG:  Yes.

5             THE COURT:  So while we're at that one --

6             MR. STANG:  Well, and --

7             THE COURT:  -- what does Rhodes Ranch --

8             MR. STANG:  Well --

9             THE COURT:  Rhodes Ranch Golf & Country Club, LLC,

10   what's its business?

11            MR. STANG:  Well, that property, the golf-course

12   property --

13        (Colloquy not on the record.)

14            MR. STANG:  I'll try.

15            THE COURT:  He's got to learn it --

16            MR. STANG:  Well, yeah, I do.

17            THE COURT:  -- sometimes.

18            MR. STANG:  You got to start at the disclosure

19   statement, yeah.  Actually, your Honor, I could do this, but it

20   might be, frankly, a little more fluid and comprehensible if

21   Mr. Huygens came up --

22            THE COURT:  That's fine.

23            MR. STANG:  -- and did it.  Okay.

24        (Colloquy not on the record.)

25            MR. STANG:  He didn't get to be deposed yesterday

1    because we reached a stipulation, so he's dying to speak in

2    front of a microphone.

3              MR. HUYGENS:  I couldn't be more thrilled.

4              THE COURT:  State your name again, please.

5              THE COURT RECORDER:  (Indiscernible) your name,

6    please?

7              MR. HUYGENS:  Paul Huygens.

8              THE COURT:  Okay.

9              MR. HUYGENS:  That's H-u-y-g-e-n-s.  Perfect.  Okay.

10   So starting on the left, the Rhodes Companies, LLC, that's a

11   holding company for the operating entities --

12             THE COURT:  Okay.

13             MR. HUYGENS:  -- generally what we call the operating

14   entities.  Over on the right, Heritage Land Company on that,

15   and I'll work from top to bottom.

16             THE COURT:  Great.

17             MR. HUYGENS:  That's a holding company for

18   nonoperating companies, landholding companies, companies that

19   don't do any development work, just hold land.

20             THE COURT:  Okay.  So, for example, if it's going

21   down to the entities that it owns 99 percent of, Tick,

22   Jackknife, Batcave, Overflow, Wallboard, Chalkline, they own

23   real property on their own?

24             MR. HUYGENS:  That's correct, and that's actually

25   where the bulk of the value of the estate is.

```
1                THE COURT:  And is it like just a lot or is it acres

2      or --

3                MR. HUYGENS:  Acres, yeah.

4                THE COURT:  Acres.

5                MR. HUYGENS:  And it depends on the entity, but it

6      could be 20 acres to 50 acres --

7                THE COURT:  Okay.

8                MR. HUYGENS:  -- to tavern sites, you know --

9                THE COURT:  Unimproved --

10               MR. HUYGENS:  -- things of that nature.

11               THE COURT:  -- acres or --

12               MR. HUYGENS:  Well, superpadded acres, so that they

13     were --

14               THE COURT:  Oh, superpadded.  Okay.

15               MR. HUYGENS:  Correct.  But no --

16               THE COURT:  Now --

17               MR. HUYGENS:  -- on-site development would be done in

18     those holding companies, Tick through Chalkline.

19               THE COURT:  Okay.  And Glynda, it says nonoperating

20     wind-down.  Does it still own this acreage?

21               MR. HUYGENS:  No.  It sold the acreage to a company

22     called Parcel 20, LLC, which is one of the operating entities

23     on the far right in the green.

24               THE COURT:  Oh, okay.

25               MR. HUYGENS:  That's in the middle of the page.
```

1          THE COURT:  Okay.

2          MR. HUYGENS:  So, essentially, what happens is when

3    the company is ready to develop a piece of property it moves

4    from a nonoperating company to an operating company, and the

5    operating companies typically hold one development or an

6    accumulation of subdivisions that are discrete.  So to the

7    extent that there were issues within that company, it wouldn't

8    spill into the broader group.

9          THE COURT:  Okay.  So then going back up, then, we've

10   got Heritage which owns 99 percent of those entities that hold

11   the land.

12         MR. HUYGENS:  Um-h'm.

13         THE COURT:  And then one percent is held by the

14   Rhodes Companies?

15         MR. HUYGENS:  That's correct.

16         THE COURT:  I thought you had indicated it was a

17   private trust before or you just -- the last time, I thought it

18   said it was owned by a private trust.

19         MR. HUYGENS:  Well, Heritage Land Company is

20   ultimately owned 94 percent by Sedora Holdings which is then

21   owned by a private trust.

22         THE COURT:  Okay.

23         MR. HUYGENS:  The one-percent interest --

24         THE COURT:  But --

25         MR. HUYGENS:  -- is a general-partnership interest --

1          THE COURT:  Okay.

2          MR. HUYGENS:  -- to the Rhodes Companies.

3          THE COURT:  Okay.  All right.  So then going back in

4    the middle I guess Rhodes Ranch General Partnership which is

5    owned partly by a nondebtor and the rest by Rhodes Companies?

6          MR. HUYGENS:  That's correct.

7          THE COURT:  Okay.  And what's the business of

8    Rhodes Ranch General Partnership?  Oh, it just holds the

9    interest of Rhodes Ranch Golf & Country Club?

10          MR. HUYGENS:  Well, no.  Rhodes Ranch

11    General Partnership holds the interest in Rhodes Ranch

12    Golf & Country Club -- or excuse me.  It used to.  It sold that

13    interest in December of 2008.

14      But it also is a developer of real property as well, so

15    there are remnant subdivisions in Rhodes Ranch, both active and

16    inactive remnant subdivisions in Rhodes Ranch

17    General Partnership, within the Rhodes Ranch master

18    development.

19          THE COURT:  Okay.  But Rhodes Ranch Golf & Country --

20    did you say Rhodes Ranch General Partnership sold its interest

21    in Rhodes Ranch Golf & Country Club, LLC --

22          MR. HUYGENS:  At --

23          THE COURT:  -- or Rhodes Ranch Golf & Country Club

24    sold what it owned?

25          MR. HUYGENS:  Yeah.  The latter.

```
1              THE COURT:  Okay.  So Rhodes Ranch --

2              MR. HUYGENS:  It was an asset sale.

3              THE COURT:  -- doesn't own anything, anymore.

4              MR. HUYGENS:  It has some wind-down miscellaneous --

5              THE COURT:  Okay.

6              MR. HUYGENS:  -- very small cash balances and

7       payables.

8              THE COURT:  Okay.

9              MR. HUYGENS:  I think it's maybe 50,000 or so.

10             THE COURT:  Okay.  Okay.

11             MR. HUYGENS:  So then moving down into I guess the

12      middle of the table working from left to right,

13      Elkhorn Investments primarily is a holding company for

14      Elkhorn Partners.

15         Elkhorn Partners developed a series of subdivisions in the

16      northern part of the valley many years ago.  At this point, it

17      has one house left in it.

18             THE COURT:  Um-h'm.

19             MR. HUYGENS:  And I know this is confusing, but

20      Elkhorn Investments also has a few pieces of property in

21      Arizona as well just to make it more interesting.

22             THE COURT:  And that's Investments holds the interest

23      in Partners, and Partners owns the house and the property; is

24      that correct?

25             MR. HUYGENS:  No.  Partners owns the one house.
```

```
 1              THE COURT:  Okay.

 2              MR. HUYGENS:  And then Investments own a few pieces

 3      of real property --

 4              THE COURT:  Oh, okay.

 5              MR. HUYGENS:  -- value wise fairly inconsequential

 6      relative to the rest of the organization.

 7              THE COURT:  Okay.

 8              MR. HUYGENS:  Six Feathers Holding was never used.

 9              THE COURT:  Okay.

10              MR. HUYGENS:  So it should have been shut down.  Then

11      Tribes Holdings --

12              THE COURT:  Um-h'm.

13              MR. HUYGENS:  -- they used to be a holding company

14      for a series of subcontractor entities.

15              THE COURT:  Um-h'm.

16              MR. HUYGENS:  And they're all appropriately labelled.

17      Well, Bravo, Inc., was a framing company.  The operations of

18      Bravo, Inc., were wound down in 2006.

19              THE COURT:  Okay.

20              MR. HUYGENS:  And those operations were moved to

21      Apache Framing which was wound down in 2008.

22              THE COURT:  Okay.

23              MR. HUYGENS:  And then Gung-Ho Concrete and

24      Geronimo Plumbing were wound down either late of '07 or early

25      of '08.
```

```
 1              THE COURT:  And when you say wound down, do you mean
 2    it -- maybe I'm asking for a legal opinion.  Do you mean wound
 3    down in the corporate legalistic sense or wound down in the
 4    sense of you just ceased doing operations?
 5              MR. HUYGENS:  Correct.  We've finished the jobs, the
 6    subcontracting jobs, that were either with the Rhodes affiliate
 7    entities, you know, part of this chart or with third parties.
 8         The staff were laid off or absorbed in other parts of the
 9    business.  The equipment has been sold for the most part.
10    There are, you know, miscellaneous items left.
11              THE COURT:  Okay.
12              MR. HUYGENS:  That we got out of the leases, you
13    know, those sorts of things, but there are still again
14    small-dollar items that have to be incurred to just finish --
15              THE COURT:  Okay.
16              MR. HUYGENS:  -- the job.
17              THE COURT:  Okay.
18              MR. HUYGENS:  Then moving across also in the middle
19    to Jarupa, LLC --
20              THE COURT:  And Tribes owned nothing except its
21    interest in those companies that have been wound down?
22              MR. HUYGENS:  That's correct.
23              THE COURT:  Okay.
24              MR. HUYGENS:  And when you get an opportunity to go
25    through the by-entity summary pages --
```

1          THE COURT:  Um-h'm.

2          MR. HUYGENS:  -- we didn't even break these entities

3    out separately.  We rolled them into Tribes, consolidated,

4    because the numbers are --

5          THE COURT:  Okay.

6          MR. HUYGENS:  -- really pretty inconsequential.

7    Jarupa, LLC, was set up to be the development entity for the

8    property that's held by Chalkline --

9          THE COURT:  Um-h'm.

10          MR. HUYGENS:  -- but it was never used.  The product

11   that was designed when the market fell apart was no longer

12   appropriate.

13      And so there was some abandonment costs for the incurred

14   engineering and design costs in Jarupa, LLC.  Those were

15   written off in 2008, and now it's just a shell and will go

16   away, no payables or anything of that nature.

17      Moving to the right, C&J Holdings, that's a d/b/a,

18   Neighborhood Association Group, and that's an association

19   management company.

20          THE COURT:  And does it manage a homeowner

21   association besides Rhodes Ranch ones or --

22          MR. HUYGENS:  Yeah.  It manages Rhodes Ranch.

23          THE COURT:  Uh-huh.

24          MR. HUYGENS:  It manages Tuscany, Shailon (phonetic)

25   which is a small 45-unit subdivision, Exit (phonetic), and --

1              THE COURT:  What I mean, it doesn't limit its

2      management to developments that were either developed or still

3      owned by Rhodes.

4              MR. HUYGENS:  It does limit --

5              THE COURT:  It does.

6              MR. HUYGENS:  -- its management.

7              THE COURT:  Okay.

8              MR. HUYGENS:  Yes.

9              THE COURT:  Thank you.  And when I say Rhodes, I'm

10     talking about the ecliptic, obviously.

11             MR. HUYGENS:  Correct.  Rhodes Design & Development,

12     it's sort of the hub of the wagon wheel.  It's the corporate

13     entity.  It employs the staff for the Nevada development

14     business.

15         It holds the general-contractor's license, and so it's a

16     signator on all of the subcontractor contracts along with the

17     entity that's developing it which may be Tuscany Acquisitions.

18             THE COURT:  Okay.

19             MR. HUYGENS:  It may be Rhodes Ranch

20     General Partnership, that kind of a thing, and then its

21     incurred overhead is allocated out based upon costs incurred

22     throughout the rest of the development business.  And so in a

23     normal market, it would be a break-even corporate enterprise.

24             THE COURT:  Okay.

25             MR. HUYGENS:  But that's where you're going to find

1    the majority of the payables.  Rhodes Realty is a brokerage

2    business.

3        It's a sales-and-marketing arm of the overall company for

4    the Nevada developments, so it employs the sales staff.  It

5    pays for all the marketing and advertising and pays for the

6    external brokerage commissions that are involved in a home

7    sale.

8            THE COURT:  As opposed to design and development, the

9    marketing people are separated out into Rhodes Realty as

10    opposed to design and development.

11            MR. HUYGENS:  That's correct.

12            THE COURT:  Okay.

13            MR. HUYGENS:  That's just a mechanism to hold the

14    sales manager accountable for his own profit-and-loss

15    statement.

16            THE COURT:  And this goes towards any of the

17    developments by Rhodes Companies in any of the states.

18            MR. HUYGENS:  No.  Just for the state of Nevada.

19            THE COURT:  Just Nevada.

20            MR. HUYGENS:  Yeah.

21            THE COURT:  Okay.

22            MR. HUYGENS:  And then Rhodes Arizona Properties,

23    LLC --

24            THE COURT:  Um-h'm.

25            MR. HUYGENS:  -- is similar to Rhodes Realty --

22

1          THE COURT:  Okay.

2          MR. HUYGENS:  -- but for Arizona --

3          THE COURT:  Okay.

4          MR. HUYGENS:  -- sales and marketing.

5          THE COURT:  Okay.

6          MR. HUYGENS:  Rhodes Homes Arizona is the development

7   company for the Pravada master plan which is just outside of

8   Kingman, Arizona.

9          THE COURT:  And where is that -- no.  I don't mean --

10  I know outside Kingman.  What progress wise?  What's the status

11  of that project?

12         MR. HUYGENS:  There have been several-thousand lots

13  that have been graded.  The golf course has been graded.

14      The majority of the off-site water infrastructure has been

15  completed, wells drilled and pipes run, and things of that

16  nature.

17      Planning has been done around drainage and things of that

18  nature, but we've put down no asphalt, curb, gutter, sidewalks,

19  streetlights, that kind of a thing.

20         THE COURT:  So do we have any homeowners who have

21  made deposits on any of these properties, yet?

22         MR. HUYGENS:  Yes, we do.  Well, reservations --

23         THE COURT:  Okay.

24         MR. HUYGENS:  -- on deposits.

25         THE COURT:  Okay.

1           MR. HUYGENS:  The state of Arizona requires those

2    deposits to be held in a trust account with an escrow company,

3    and I don't recall how many of them there are left.

4        At the peak of the market, there were 2500 reservations or

5    somewhere thereabouts.  I think there's several hundred now

6    between 1,000 and $2,000 apiece, but, again, held in a trust

7    account segregated.

8           THE COURT:  Okay.

9           MR. HUYGENS:  And, you know, it would be our

10   intention to continue to develop that project and deliver those

11   homes.

12       Pinnacle Grading is a grading and excavation company.  It

13   was set up to do the grading and excavation work initially for

14   the Pravada master plan.

15       During 2005, '6, and '7, it was difficult if not

16   impossible to get that company, a grading and excavation

17   company, to come down to Kingman and do work, and so we set up

18   our own.

19       When the grading work was complete at Pravada, they

20   started doing other work, Public Works projects and things of

21   that nature, in the state of Arizona.

22       And they have two projects that are ongoing now, and one

23   is the City of Flagstaff Redevelopment Project, and it's

24   roughly a $20,000,000 project, and then the other is a

25   detention center in Kingman, but we're talking about just the

1    horizontal work, not the vertical construction.

2              THE COURT:  Right.

3              MR. HUYGENS:  Tuscany Golf & Country Club is just

4    that, a golf and country club.

5              THE COURT:  Is that in Nevada?

6              MR. HUYGENS:  Yeah.  Correct.  That's the centerpiece

7    of the Tuscany master plan in Henderson.

8              THE COURT:  And that's completed?

9              MR. HUYGENS:  Correct.  Yeah.  It's been open since I

10   want to say about 2004 maybe.

11             THE COURT:  And it has, what, dues?  How does it

12   maintain its operation?

13             MR. HUYGENS:  It's a public course.

14             THE COURT:  Oh, it's a public course.

15             MR. HUYGENS:  Yeah.  So it's in a gated community --

16             THE COURT:  I haven't been to Henderson --

17             MR. HUYGENS:  -- but it's open to the public.

18             THE COURT:  -- in years.  That's how parochial we are

19   here.

20             MR. HUYGENS:  Tuscany Acquisitions, LLC, through

21   Tuscany Acquisitions IV, LLC, the master developer for Tuscany

22   was a company called Commerce Associates.

23        In 2003 I believe it was, Rhodes negotiated a rolling

24   land-option agreement with Commerce, and that was executed I

25   want to say it was early 2004.  It might have been late '03.

1    I'm not sure.

2        In any event, as those options were taken down or

3    exercised, they were put into single-purpose entities for each

4    takedown, and then many of the lots as part of those takedowns

5    have been developed, and there are homeowners living in homes.

6            THE COURT:  So they're, what, custom houses is what

7    you're saying?

8            MR. HUYGENS:  No.  There were -- I'm guessing a

9    little bit -- but, roughly, 1,000 lots that were purchased over

10    the course of three years, and 6- or 700 of those had been sold

11    to homebuyers, built homes, sold to homebuyers, not sold as

12    lots.

13            THE COURT:  Okay.

14            MR. HUYGENS:  So the land was purchased in a superpad

15    condition.  The land-development work was completed.  Homes

16    were built in partnership with Rhodes Design & Development as

17    the general contractor.

18        And Rhodes Realty is the sales company, and the

19    Neighborhood Association Group is the management company to

20    build and sell houses --

21            THE COURT:  Okay.

22            MR. HUYGENS:  -- of which there were 650 or somewhere

23    thereabouts --

24            THE COURT:  Okay.

25            MR. HUYGENS:  -- now.

1          THE COURT:  Okay.  And then we have Acquisitions II?

2          MR. HUYGENS:  Well, that's --

3          THE COURT:  So each of these was a special-purpose

4    vehicles you were talking about.

5          MR. HUYGENS:  That's correct.

6          THE COURT:  Okay.

7          MR. HUYGENS:  And each one has, you know, between 200

8    and 250 lots.  That seemed to be about the size of each

9    takedown.

10         THE COURT:  And so how many do each have left?  About

11   that many left now?

12         MR. HUYGENS:  Let's see.  We would have I would say

13   5- to 600 lots left --

14         THE COURT:  Total.

15         MR. HUYGENS:  -- total --

16         THE COURT:  Okay.

17         MR. HUYGENS:  -- in those four entities.

18         THE COURT:  Okay.  And then Parcel --

19         MR. HUYGENS:  And --

20         THE COURT:  Oh, sorry.

21         MR. HUYGENS:  I'm sorry.  It may be 700.  I'm

22   guessing a little bit there.

23         THE COURT:  Okay.  And they're in the condition where

24   they're pads.  All the infrastructure's done around, but the

25   house itself has not been commenced.

1          MR. HUYGENS:  Well, it's a mix.  In some cases, the

2    streets, curb, gutter, sidewalk, streetlights, those kind of

3    things are in, and the lots are in a finished condition ready

4    for vertical construction.

5      And in some cases, the land option was exercised, but no

6    on-site development work was done to put the on-site streets

7    and sidewalks --

8          THE COURT:  Okay.

9          MR. HUYGENS:  -- and things of that nature.

10          THE COURT:  Okay.

11          MR. HUYGENS:  So it's a mix.  It just depends on

12    which parcel, and there are many.  There were ten or so

13    separate parcels that were exercised over four or five

14    different options.

15          THE COURT:  And these are all in that Henderson

16    Tuscany development?

17          MR. HUYGENS:  Correct.

18          THE COURT:  Okay.  And Commerce has no relationship

19    to any of the insiders, debtors, affiliates?  It's a

20    separate --

21          MR. HUYGENS:  No.

22          THE COURT:  It was a separate entity?

23          MR. HUYGENS:  A third party.

24          THE COURT:  Okay.  And then Parcel 20?

25          MR. HUYGENS:  Parcel 20 is roughly a 100-acre piece

1    of property on the -- let's see.  What is that -- the southwest

2    corner of the Rhodes Ranch master plan.

3        It's being developed in five phases.  Two of those phrases

4    are under construction with houses being built and sold.

5    That's the primary area inside the gates at Rhodes Ranch where

6    houses are being constructed and sold.

7            THE COURT:  Okay.  And Rhodes Ranch is the project to

8    the west almost to Red Rock and Blue Diamond, right?

9            MR. HUYGENS:  Yeah.  It's at roughly Durango and the

10   215 --

11           THE COURT:  Okay.

12           MR. HUYGENS:  -- a little bit south of that, and then

13   I think, you know, just moving across the bottom here all of

14   these single-purpose landholding companies down on the bottom

15   right, Tick through Chalkline --

16           THE COURT:  Um-h'm.

17           MR. HUYGENS:  -- own land in a superpad condition in

18   and around Rhodes Ranch --

19           THE COURT:  Okay.

20           MR. HUYGENS:  -- and southwest Ranch.  This is all

21   southwest-quadrant-of-the-valley property.

22           THE COURT:  All right.  Thank you.  I think that

23   helps a lot to understand what we have --

24           MR. HUYGENS:  Okay.

25           THE COURT:  -- and how they interrelate.

1          MR. HUYGENS:  I apologize for the earlier chart, by

2     the way.

3          THE COURT:  That's all right.  This one's so much

4     better.

5        Thank you.

6        And thank you again for the additional information.  I

7     think that's going to be helpful to everybody.  What did you

8     label it as, so that people could find it?  It was --

9          MR. STANG:  We --

10         THE COURT:  Oh, revised organizational chart, so I

11    think that can be found and docketed.

12         MR. STANG:  We filed.  There's a notice of filing of

13    the chart and the backup --

14         THE COURT:  Okay.

15         MR. STANG:  -- and then the project summary --

16         THE COURT:  Okay.

17         MR. STANG:  -- within the common names.

18         THE COURT:  Now, so where would you have -- like you

19    were concerned we've -- going back, it's obvious a joint

20    administration was the correct thing to do.  I still think it's

21    correct that we segregated out with proof of claims, so you

22    won't be facing that fight --

23         MR. STANG:  Yes.

24         THE COURT:  -- in the future.

25        One clarification.  I think you know this, already.

1        I was erroneously told because our staff erroneously

2   believed that the Court would send out the notices.

3   Unfortunately or fortunately, the debtor will have to do it

4   through the claims agent.

5              MR. STANG:  Go --

6              THE COURT:  So --

7              MR. STANG:  Going out today, your Honor.

8              THE COURT:  Okay.  Great.  Thank you.  Okay.

9        Go ahead, then.

10             MR. STANG:  Okay.  So, your Honor, I've got the

11  document, and I think it might be a little easier to jump

12  around a little bit, and where I'd like to start, then, is on

13  page 3, item No. 5 which is the wage order.

14             THE COURT:  Yes.

15             MR. STANG:  That --

16             THE COURT:  No. 5.

17             MR. STANG:  That has been uploaded as signed off on

18  by all parties.  And as I said before at the last hearing, it

19  covers all employees within the priority amount but for

20  Mr. Rhodes, and we are preparing an application for his

21  compensation, and so I don't know that I have much more --

22             THE COURT:  Okay.

23             MR. STANG:  -- to say about that.

24             THE COURT:  So that's stipulated, then.

25             UNIDENTIFIED SPEAKER:  Um-h'm.

1           THE COURT:  Any objections?  All right.

2      So that will be granted.

3           MR. STANG:  Thank you, your Honor.

4      No. 6 is the prepetition customer programs.  That has been

5      signed off on by all parties and sent up to you as a final

6      order.

7           THE COURT:  All right.  That's granted.

8           MR. STANG:  No. 7 is cash management.  We are asking

9      that that be approved on a continued interim basis because it

10     has a relationship to the cash collateral which is also we're

11     asking to have continued on an interim basis.

12          The bank has been approved as it approved a depository,

13     and I think that's been confirmed with the U.S. Trustee's

14     Office.

15          (Colloquy not on the record.)

16          MR. LANDIS:  Augie Landis, Assistant United States

17     Trustee.

18          That's accurate.  They moved quickly, and that's positive.

19          We're working through some additional language in the

20     order, but I expect by the 28th we'll be in good shape.

21          THE COURT:  All right.  So that's approved, and we'll

22     continue that until the 28th.

23          MR. STANG:  Thank you.

24     No. 8 is the order authorizing sales of homes.  We had

25     this done on an interim basis last time.  It has worked at

1    least insofar as getting prompt lender responses.

2        And I don't know if we've actually closed any of the

3    houses, yet.  But, certainly, between the debtor and the

4    lenders getting something to the title companies, that has

5    worked.  That has worked fine.

6            THE COURT:  So do we need a --

7            MR. STANG:  That's a --

8            THE COURT:  Do you need a continuance --

9            MR. STANG:  We've submitted it as a final --

10            THE COURT:  -- or are we all set with this one?

11            MR. STANG:  We're done.

12            THE COURT:  Okay.  So that's approved.

13            MR. STANG:  Okay.  And then I'm going to jump to the

14    front which is on -- let's do utilities, your Honor, which is

15    No. 3.

16            THE COURT:  All right.

17            MR. STANG:  You have, actually, No. 3 and 4.  One was

18    the order shortening time.  That's No. 3 under Heritage, and

19    then under 4 --

20            THE COURT:  Okay.

21            MR. STANG:  -- was the substantive --

22            THE COURT:  So 3 and 4 are the same.

23            MR. STANG:  Right.  By the way, your Honor, we have

24    fixed the caption.

25            THE COURT:  Yes.

```
1            MR. STANG:  There are notices in the different cases
2    that send everyone to The Rhodes Homes, a/k/a Rhodes Homes, so
3    I think we got it straightened out.
4            THE COURT:  And before we conclude today, don't let
5    me forget to follow up on that case-management order --
6            MR. STANG:  Yes.
7            THE COURT:  -- and finishing up our omnibus dates.  I
8    just --
9            MR. STANG:  Okay.
10           THE COURT:  I have to remind myself before I forget.
11        (Colloquy not on the record.)
12           MR. STANG:  Yeah.  Yeah.  Go ahead.
13           MR. GRUCHOW:  Kirby Gruchow on behalf of NV Energy on
14   the utility motion, your Honor.
15           THE COURT:  Okay.  All right.  So on the utility
16   motion.
17           MR. STANG:  Your Honor, we have received one response
18   from counsel.  We would ask that the motion be granted except
19   as to -- is it Nevada Power --
20           MR. GRUCHOW:  Nevada Power Company --
21           MR. STANG:  -- Nevada Power Company.
22           MR. GRUCHOW:  -- d/b/a NV Energy.
23           MR. STANG:  And then counsel would like to tell you
24   what our agreement is as to them.
25           THE COURT:  Okay.  Now, vis-à-vis the other
```

1  companies, I think regardless of what happens I think the

2  procedure aspect of it is probably well-taken in the sense.

3      Now, vis-à-vis those who don't appear and have an

4  objection as to adequate assurance, I think you're right.  I

5  think you can by a motion say this is what we proposed, and

6  it's sort of like a sale free and clear.  If you don't object,

7  that means you have consented.

8      But the procedures aspect where they have to go through

9  all of that --

10     (Colloquy not on the record.)

11         THE COURT:  -- I think imparts into the statute more

12  than it's required.  Clearly, they can't do it without bringing

13  a motion.

14     So to those who didn't appear, I think I would make some

15  alterations to that procedure.  We can discuss it after what we

16  hear that --

17         MR. STANG:  Okay.

18         THE COURT:  -- you're going to do it with

19  Nevada Energy.

20         MR. STANG:  Okay.

21         MR. GRUCHOW:  Thank you, your Honor.

22     We've discussed this and agree that it will be carved out

23  of the order you're going to grant with respect to all the

24  other utilities.

25     We'll have a separate stipulation order with respect to

1    the debtor entities and NV Energy.  That will address 150

2    percent of the average monthly bills.  It will be deposited as

3    a form of cash deposit.

4        After this hearing, we're going to work together on the

5    31 debtor entities we haven't yet audited.

6        With respect to the Rhodes Design & Development, we

7    already have an agreement of 36,810 that that will serve as the

8    postpetition security deposit, and that's 150 percent of the

9    average monthly billing.

10        Additionally, the debtor will bring any postpetition

11    amounts that are currently delinquent current.  I don't know if

12    there are any, but we're going to work together on that to make

13    sure those get current.

14        They will timely pay postpetition payments in the ordinary

15    course of business.  The deposits that we develop will be held

16    in security and not apply it to any billings unless the debtor

17    doesn't make a payment on time.

18        In the event the debtor doesn't make a payment on time,

19    then NV Energy has the right to use that security deposit to

20    apply to any past-due delinquency and has the right to proceed

21    with its nonbankruptcy remedies to alter, refuse, or

22    discontinue service.

23        We'll comply with all nonbankruptcy laws.  We'll have that

24    in a stipulation.

25        With respect to the entities we haven't yet audited, we

1    have a conceptual agreement that that will be 150 percent of

2    the average monthly billing over the last 12 months.

3         Mr. Stang has brought up the fact that he hasn't seen

4    those numbers, so we're going to work that out between now and

5    May 15 when we expect to enter the order.

6         And, additionally, because this is a necessary and

7    critical expense to the estate, we have an agreement that this

8    is going to be treated as an administrative-expense priority

9    with respect to any unpaid postpetition delinquent amounts.

10             THE COURT:  Okay.  I assume there's no objection

11    that --

12             MR. STANG:  Your Honor, my only comment was because

13    we are living within a cash-collateral budget, and we don't

14    know the numbers, you know, we may have some reflection on that

15    as might the Steering Committee and the different agents.

16         But before we get into a discussion of a problem not

17    knowing if there's a problem, you know, we'll --

18             THE COURT:  Okay.  And, of course --

19             MR. STANG:  We'll just --

20             THE COURT:  -- the lienholders I think recognize they

21    got to keep the utilities on, so I suspect that -- and, you

22    know, with 366 amendments, it sort of put debtors over the

23    barrel.

24         Vis-a-vis the other utilities, I'll grant the motion

25    except as to the procedures part, so let's look at that for a

1    second.

2              MR. STANG:  Okay.

3              THE COURT:  Part A, "If the provider is not satisfied

4    with the assurance, it must serve an objection."  I need to let

5    you --

6              MR. STANG:  Oh --

7              THE COURT:  -- catch up with me.

8              MR. STANG:  -- thank you, your Honor.

9              THE COURT:  So that's on page 6 --

10             MR. STANG:  Got it.

11             THE COURT:  -- of --

12             MR. STANG:  Got it.

13             THE COURT:  -- your motion.

14             MR. STANG:  Got it.

15             THE COURT:  So --

16             MR. STANG:  Yes.

17             THE COURT:  -- if the utility provider is not

18   satisfied --

19             MR. STANG:  They have to --

20             THE COURT:  -- "it must serve an objection instead of

21   a written request --

22             MR. STANG:  Okay.

23        (Colloquy not on the record.)

24             THE COURT:  -- setting forth the location, the

25   account number, and outstanding balance, period."

```
1              MR. STANG:  Okay.

2              THE COURT:  And then it must be served on you and

3    let's say Mr. Larson.

4              MR. LARSON:  Thank you, your Honor.

5              MR. STANG:  Okay.

6              THE COURT:  And then C is fine, and D is fine, oh,

7    except I think you should do it within ten days after the

8    request, and then you put a motion on the regular omnibus

9    calendar.

10             MR. STANG:  All right.

11             THE COURT:  And, of course, they have the right to

12   file a request on calendar.

13             MR. STANG:  Sure.

14             THE COURT:  And then E is fine.

15             MR. STANG:  Okay.  All right.  We'll make that -- we

16   will fix the order to reflect those changes.

17             THE COURT:  Okay.

18             MR. GRUCHOW:  Thank you, your Honor.

19             THE COURT:  All right.  Thank you.  All right.

20             MR. STANG:  All right.

21             THE COURT:  Then --

22             MR. STANG:  So that --

23             THE COURT:  -- we have --

24             MR. STANG:  That took care of 3 and 4.

25             THE COURT:  Right.  And so, again, just let me make
```

1    the appropriate findings.

2        Again, I find that I have no evidence to the contrary that

3    wouldn't constitute adequate assurance.

4        Now, all the utilities were served, correct?

5            MR. STANG:  Yes, your Honor.

6            THE COURT:  Okay.  So I deem their nonobjection to be

7    consent, and we have provided the adequate procedure provided

8    by the statute for modifications of those.

9            MR. STANG:  Okay.  Thank you --

10           THE COURT:  All right.

11           MR. STANG:  -- your Honor.

12           THE COURT:  Thank you.

13           MR. STANG:  That leaves us with two things, the

14   proposed stipulation for interim cash-collateral usage and the

15   trustee motion.  Your Honor, I don't know if you've received

16   these things, but you should have received the proposed

17   stipulation --

18           THE COURT:  I did.

19           MR. STANG:  -- and a black-line.

20           THE COURT:  I don't think I got -- I may have gotten

21   a black-line.

22           MR. STANG:  But I --

23           THE COURT:  But in any case --

24           THE CLERK:  (Indiscernible).

25           MR. STANG:  I'm not sure how long ago it was given --

```
1              THE CLERK:  She said it was a red one.

2              MR. STANG:  -- to you.

3              THE COURT:  Okay.

4              MR. STANG:  I'm not presuming that you've looked at

5    it.

6              THE COURT:  I looked --

7              MR. STANG:  And --

8              THE COURT:  -- at the other one.

9              MR. STANG:  Oh --

10             THE COURT:  And I --

11             MR. STANG:  -- and we --

12             THE COURT:  I skimmed through it, and I recall what

13   it said, but this is more helpful --

14             MR. STANG:  Okay.

15             THE COURT:  -- to see the redline, so --

16             MR. STANG:  Your Honor, at a high level, what this

17   does -- and I'll just kind of do it as a page turn.  There are

18   corporate --

19        (Colloquy not on the record.)

20             MR. STANG:  There's a corporation of allegations

21   regarding the second lien --

22             THE COURT:  Right.

23             MR. STANG:  -- which kind of takes us through page 9.

24   At various instances and not in every instance where things are

25   given or be it they rights or notices or documents to the first
```

1   agent, they're now being given to the second agent, but that's

2   not true --

3            THE COURT:  So we'll now include --

4            MR. STANG:  -- in every instance.

5            THE COURT:  -- the second lienholder in this --

6            MR. STANG:  Well --

7            THE COURT:  -- more or less.

8            MR. STANG:  -- yes.  But there are certain things.

9       For example, if we want to enter into a construction

10  agreement that takes us past the cash-collateral period, we've

11  built-in protection so that those subs or third parties get

12  paid.

13      While notice of that request is given to the second agent,

14  it is the firsts' financial adviser who signs off, and the

15  seconds don't have to sign off.

16      I guess if they wanted to do something about it they could

17  come see you, but we can proceed if we don't hear from them or

18  even if they object, but don't come to you.  It's only the

19  first that's the gatekeeper.

20            THE COURT:  But this is the agreement of the seconds.

21            MR. STANG:  Well, I'm going to have to let them say

22  that.  I don't know that they've actually consented to it or

23  simply not objected or aren't objecting at this moment since

24  it's still interim.

25            THE COURT:  Okay.

1          MR. STANG:  We can walk through it.  Do you want to

2    go through it and then have the seconds speak to that or maybe

3    counsel could do it now?

4          MR. DeAMICIS:  Well, let me just introduce myself.

5    Don DeAmicis from Ropes & Gray representing Wells Fargo as

6    agent for the second lienholders, and we have worked with the

7    First Lienholders Steering Committee.

8       We are subject to an intercreditor agreement that, you

9    know, sort of defines certain rights and certain things that we

10   are sort of entitled to and not entitled to.  We've worked with

11   the debtor --

12         THE COURT:  Oh, okay.

13         MR. DeAMICIS:  -- on this.

14         THE COURT:  So it's an inter se agreement between the

15   first and the second as much as anything.

16         MR. DeAMICIS:  That's correct.

17         THE COURT:  Okay.

18         MR. DeAMICIS:  That helps govern, you know, sort of

19   why this ends up as it is, your Honor.

20         THE COURT:  Okay.  All right.  And I'm not sure my

21   question even made any difference.  I was just curious to know

22   whether or not --

23         MR. DeAMICIS:  Right.

24         THE COURT:  -- it was a scream or die or a consent --

25         MR. DeAMICIS:  Well, they're --

```
 1                THE COURT:  -- or what, so --

 2                MR. DeAMICIS:  In lieu of Mr. Huygens being deposed,

 3       a lot of time was spent yesterday --

 4                THE COURT:  Yes.

 5                MR. DeAMICIS:  -- with the various constituents

 6       coming to this.

 7                THE COURT:  Okay.

 8                MR. DeAMICIS:  Thank you, your Honor.

 9                THE COURT:  Thank you.

10                MR. STANG:  So, substantively, your Honor on

11       page 10 -- and I'm sorry.  I'm working off the redline now --

12                THE COURT:  That's fine.

13                MR. STANG:  -- we've got an extension of cash

14       collateral until the 28th.

15           The next subparagraph deals with this concept of being

16       able to enter into longer-term agreements that take us past

17       that date, and there's a subordination of claims and liens and

18       consent to use of cash collateral to finish those contracts.

19           Paragraph C is a provision that kind of resembles one that

20       was in the prior agreement regarding Pinnacle Grading, and this

21       has become kind of a specially-highlighted item because as I

22       think as I said to you before Mr. Rhodes owns approximately

23       49 percent of Pinnacle Grading.

24           And what this says is that you can get a little ahead of

25       your revenues.  Your expenses can get a little -- your cash out
```

1   on your expenses can get a little ahead of your revenues, but

2   only to the extent of $60,000, so there's a little flexibility

3   there.

4       There are a number of line items in D which while they're

5   on the budget can't be paid because the cutoff on the use of

6   cash collateral is before May 1, and these were May 1 items.

7   So depending on when your calendar actually permits us to come

8   back, this might take a little modification.

9       But if we're back on the 28th or 29th, and I think you had

10  given us some trustee dates maybe that we can sub in for a

11  final cash-collateral hearing, these items are really -- we're

12  going into the next period, so that's why they're highlighted.

13      On E, this is the rent that is paid to Mrs. Rhodes on

14  account of a house that some of the consultants use while

15  they're in Las Vegas.

16      The check for $2500 for the April rent has been mailed to

17  my office, but I've been away for a day, so I'm not sure it's

18  been received, yet, and we're working towards trying to get the

19  consent to get those moneys released.  Let's see.

20      Some flexibility in F for nonbudgeted items with the

21  consent of the financial adviser for the Steering Committee.

22  Let's see.

23      I'm now on page 13, your Honor.  This adequate-protection

24  provision merely mirrors what was in the last one, but it does

25  add in the second lienholders.

1        But we do make clear that they're only entitled to these

2   protections, replacement liens, superpriority claims to the

3   extent they are actually secured under 506, and that takes care

4   of (indiscernible) through page 15.  Let's see.

5        Page 16 has some further kind of subordinations if you

6   will to admin claims of noninsiders, but you'll notice at lines

7   12 and 13 that the exception to the admin claim for service

8   providers as to affiliates of Mr. Rhodes or the debtor has an

9   exception to the exception because Spirit Underground and

10  Freedom Underground are entities that provide underground

11  cables, utilities.

12       And the like, and the first-lien financial adviser

13  determined that those are important service providers and,

14  presumably, that they're reasonably priced, so they do get

15  admin-expense priority I guess is what the exception to the

16  exception is.

17       Paragraph C which takes us from page 16 through 17 are

18  additional fees to the first-lien representatives and be it the

19  First Lien Steering Committee counsel, agent.  It's an

20  additional $280,000, and it's still subject to the

21  recharacterization provision that we had earlier.

22       I'm skimming through now to page 20, your Honor.  We're

23  dealing again here with adding the second lienholders if you

24  will to various provisions of what was otherwise already in the

25  order.  This does take us through the 28th.

1          And now we're at page 20, line 23, page 20, line 23 which

2     is a determination date for the cash collateral.  It is

3     essentially end of the day on the 28th.

4          (Colloquy not on the record.)

5          MR. STANG:  I'm sorry, your Honor.  The fees for the

6     various professionals, I think I said 285.  I meant to say 185.

7     Well, I meant to say 285.  I should have said 185.  Let's see.

8          Skipping to page 22, there's a provision for continued

9     access by Winchester Carlyle Partners (phonetic) regarding

10    presence at the company, the ability to interview people.

11         I should say, your Honor, that one of the things that I

12    think was a lot of the bridge building and confidence building

13    that got us to today is that Mr. Dix (phonetic) and his staff

14    at Winchester Carlyle spent -- I'm not sure -- days, full days,

15    of interviewing people.

16         They interviewed people that worked on that Exhibit C

17    which was the kind of interviewee list.  There were given I

18    believe over 4,000 pages of documents.

19         There was a lot of -- when you have that much contact,

20    some of those formalities break down a little bit.  There was a

21    lot of exchange going on even beyond a formal-interview

22    process, and I think that really facilitated a lot of the

23    progress that we've seen and that I anticipate we'll have.

24         That is it, your Honor, on the substantive changes in the

25    proposed second stipulation.

1          We are hoping to have a final hearing on the 28th.  This

2     hearing today was noticed as a final hearing, so we would like

3     to give notice only to those people who have responded or

4     otherwise --

5                THE COURT:  Well, let --

6                MR. STANG:  -- they appeared today.

7                THE COURT:  This is just a technical question.  Since

8     we only have an interim -- since this expires by its terms on

9     the 28th, this isn't really the final.  This is the --

10               MR. STANG:  Yes.  This is not the final.

11               THE COURT:  I mean, I don't have a problem with --

12    I'm not going to require additional notice --

13               MR. STANG:  Right.

14               THE COURT:  -- because, again, I can waive that

15    notice if there's a settlement reached in the meantime.  It's

16    just different than sort of the dilemma I had before.

17               MR. STANG:  Yes.

18               THE COURT:  It's not really a final hearing because I

19    don't really have a final --

20               MR. STANG:  Correct.

21               THE COURT:  -- final.

22               MR. STANG:  That's true.

23               THE COURT:  But I think -- and I'll listen to

24    Mr. Landis.  I think I can set a final hearing.  And if you at

25    that hearing some up with something and say we now agree it

1    goes through reorganization, I don't think I have to resend

2    that out again.

3             MR. STANG:  Okay.

4             THE COURT:  Mr. Landis is my rules expert, my walking

5    code.

6             MR. LANDIS:  But I'm not bringing it with me.

7             MR. STANG:  I have one at the --

8             MR. LANDIS:  No.  I have one.

9         The answer, Judge, is I think that's an appropriate way to

10   proceed.  This was noticed as a final cash-collateral hearing.

11   People have the opportunity to participate to the extent that

12   they desire.  They chose not to.

13        You're right.  We went through this at the last hearing

14   regarding what the impact is of an agreement regarding cash

15   collateral and who's required to be noticed.

16        I believe that if, in fact, just any agreement that's

17   reached in advance of the 28th is provided to parties in

18   interest, and if they have a final hearing on the 18th the

19   Court can enter an order approving cash collateral at that time

20   without further notice.

21             THE COURT:  Okay.

22        (Colloquy not on the record.)

23             MR. STANG:  So between now and the 28th, your Honor,

24   beyond what --

25             THE COURT:  So I'll approve this --

1          MR. STANG:  I'm sorry.

2          THE COURT:  -- as an interim cash collateral.

3          MR. STANG:  Thank you.

4          THE COURT:  I find that it's appropriate --

5          MR. STANG:  Okay.

6          THE COURT:  -- under the facts and circumstances, and

7     so I'll approve that.

8          MR. STANG:  Okay.  So what we're shooting for as a

9     group -- and there's been some progress made I think even on

10    the lenders' side to start educating its constituency -- is to

11    get to a plan term sheet, and what we'll like to do on the

12    trustee motion which is on page 5.  The OST is on page 5.

13         THE COURT:  It's No. 1.  Oh, I've got --

14         MR. STANG:  No. 1 on --

15         THE COURT:  No. 1 on the 10:00 o'clock calendar.

16         MR. STANG:  Yes.  Is to continue the trustee motion

17    to May 15th.

18         THE COURT:  Okay.

19         MR. STANG:  When we come back to you on the 28th --

20         THE COURT:  So the trustee motion for May 15th.

21    Okay.

22         MR. STANG:  Right.

23         THE COURT:  Okay.

24         MR. STANG:  When we come back to you on the final

25    hearing which we would like to have on the 28th --

1           THE COURT:  All right.

2           MR. STANG:  -- the final hearing on the cash

3    collateral, assuming that we have continued to make the

4    progress towards having a plan term sheet between the parties,

5    we would anticipate that the trustee motion would either be

6    withdrawn or go off calendar depending on what your procedures

7    are.

8         I think the lenders would prefer it to go off calendar,

9    but I don't know if you take matters off calendar or not.

10          THE COURT:  I don't, but I think what you -- since

11   you filed an opposition, you can withdraw it by a stipulation,

12   so file a stipulation.  I would let you withdraw it at the

13   hearing.

14        And, again, I very much appreciate the fact that you

15   called me in advance to let me know that you didn't intend to

16   go forward, but, technically, it stays on calendar until I have

17   a stipulation taking it off.

18          MR. STANG:  Okay.

19          THE COURT:  And that's a general practice I have

20   because I've been burned too many times by people who said, oh,

21   yeah, we have an agreement, and then it turns out they didn't

22   have an agreement.

23          MR. STANG:  Right.

24          THE COURT:  So that's why.  But if you file the

25   stipulation in advance, then the order will take it off.

```
 1                MR. STANG:  Okay.
 2                THE COURT:  And, also, technically, once you file the
 3      opposition, it can't just be withdrawn without consent of the
 4      other party --
 5                MR. STANG:  Right.
 6                THE COURT:  -- because 7042 kicks in.
 7                MR. STANG:  Got it.  So what we're hoping is that --
 8                THE COURT:  And, again, I have no problem at the
 9      hearing you say, you know, withdrawing the motion --
10                MR. STANG:  Right.
11                THE COURT:  -- or --
12                MR. STANG:  Right.  So --
13                THE COURT:  -- stipulating.
14                MR. STANG:  So the concept is we make a lot of
15      progress up to the 28th.  At 28th, we have the final cash
16      collateral, parties have felt we've made enough progress on
17      plan negotiations to vacate or take off calendar the hearing on
18      the 15th, and then we continue working to --
19                THE COURT:  Yeah.  It's makes so much more sense.
20                MR. STANG:  -- get it done.
21                THE COURT:  I think I intimated that -- well, you all
22      know this.  You're experienced people.  It makes so much more
23      sense to negotiate, instead of prepare for war.  I mean, you
24      just lose so much energy preparing for war --
25                MR. STANG:  Right.
```

1          THE COURT:  -- and bringing up things as opposed to

2     some constructive answer to fix it from now going forward, you

3     know, whatever problems you had in the past, but now you got to

4     fix it --

5          MR. STANG:  Right.

6          THE COURT:  -- from going forward.

7          MR. STANG:  Well, we're keeping our fingers crossed,

8     and that's all the debtors have today, your Honor.

9          THE COURT:  Okay.  So I assume, then, the motion to

10    strike is continued to the 15th or is that withdrawn or --

11         MS. AXELROD:  Your Honor, that would also be

12    continued.

13         THE COURT:  Okay.

14         MS. AXELROD:  Thank you.

15         THE COURT:  All right.  And just so I can clear up my

16    calendar, so, really, what's being continued is item No. 2 and

17    then item No. 3 which is a duplicate of 1 since they're all

18    Rhodes matters now, so we'll continue with the Rhodes case.

19         MR. STANG:  Okay.

20         THE COURT:  I'm just trying to save my clerk --

21         MR. STANG:  Yes.

22         THE COURT:  -- from going nuts.  All right.

23    Let's go through these omnibus dates and see if we can get

24    that order.  That's Lake Las Vegas.

25         (Colloquy not on the record.)

```
 1                THE COURT:  And have you had a chance to look at that
 2      case-management order, yet, to get one prepared?  I guess,
 3      arguably, we should, but, you know --
 4                MR. STANG:  I --
 5                THE COURT:  -- you --
 6                MR. STANG:  I thought you said you were going to --
 7                THE COURT RECORDER:  I'm sorry, Counsel.
 8                MR. STANG:  -- generate something.
 9                THE COURT RECORDER:  Could you speak into one of the
10      microphones?  I'm sorry.
11                MR. STANG:  I apologize.
12          Your Honor, my best recollection is that I thought
13      something was going to get generated out of your chambers --
14                THE COURT:  Oh, okay.
15                MR. STANG:  -- for us to --
16                THE COURT:  And my recollection was you were going to
17      do it, but that's all right.
18                MR. STANG:  You know what?  I'm --
19                THE COURT:  The only reason I suggest that --
20                MR. STANG:  We'll take care --
21                THE COURT:  -- is that --
22                MR. STANG:  -- of it.
23                THE COURT:  Either way.  I can just use the form I
24      have, but you may think of things you'd like --
25                MR. STANG:  Right.
```

1          THE COURT:  -- in the case-management order that

2    you'd like added to those things.  I don't want anything

3    deleted from that case-management order, but you may think of

4    things between the parties that, you know, in doing this case

5    this is something we'd like to add.

6          MR. STANG:  We'll address ourselves to it promptly.

7          THE COURT:  And then, also, you can put in that order

8    about the docket sheet, the joint administration and where to

9    look on the docket sheet, because this will go out to

10   everybody.  It's going to be a road map for everybody.

11         MR. STANG:  Yes.

12         THE COURT:  And what was I going to say?  What else

13   might be in the order?

14      We've got Court Call in there.  We've got courtesy copies.

15   We've got omnibus dates.  We've got setting hearings.

16         THE CLERK:  I believe we (indiscernible) order at the

17   last hearing.

18         MR. STANG:  We have it, your Honor.

19         THE COURT:  Okay.

20         MR. STANG:  Thank you.

21         THE COURT:  It's the one we used in Lake Las Vegas,

22   and each iteration keeps getting a little bit --

23         MR. STANG:  A little better?

24         THE COURT:  -- more complete, so that's why, you

25   know, any suggestions you have I have no problem adding to

1    that.

2            MR. STANG:  Okay.  Your Honor, we need a time for the

3    continued cash collateral.

4            THE COURT:  Okay.  So that is --

5            THE CLERK:  We currently had --

6            THE COURT:  We currently said --

7            THE CLERK:  -- 10:00 o'clock.

8            THE COURT:  We currently had 10:00.

9        Nothing's been set, yet, on that calendar, right?

10           THE CLERK:  I --

11           THE COURT:  Do you have a problem making it --

12           THE CLERK:  -- (indiscernible).

13           THE COURT:  No.  I mean on --

14           THE CLERK:  No, no, no.

15           THE COURT:  Okay.  Do you want to make it 1:30,

16   instead, or would you rather have 10:00?

17           MR. STANG:  I think it's easier maybe for counsel who

18   may be travelling --

19           THE COURT:  You'd prefer --

20           MR. STANG:  -- (indiscernible) to make it later.

21           MR. DUBLIN:  Yeah.  1:30 would be great, your Honor.

22           THE COURT:  Okay.  Let's do 1:30.

23           THE CLERK:  So that's May 15th at 1:30?

24           MR. STANG:  No.  This is the April --

25           THE COURT:  April 28th.

1           MR. STANG:  -- April 28th.

2           THE CLERK:  Oh, April 28th.

3           THE COURT:  So for omnibus dates, we have April 28th

4    at 1:30.  That one's going to be a little different.

5        Now, nothing else can be set on that calendar as a

6    practical matter because we're within our ten days, and I can't

7    imagine anything else, you know, that's that urgent.

8        The next omnibus date is -- do you still want me to

9    reserve May 1st?

10          MR. STANG:  I think we don't need May 1st.

11          THE COURT:  Okay.

12      (Colloquy not on the record.)

13          MR. DUBLIN:  Yeah.  Phil Dublin, Akin, Gump, for the

14   First Lien Steering Committee.  Your Honor, if it's possible,

15   it may make sense to reserve May 1st --

16          THE COURT:  Okay.

17          MR. DUBLIN:  -- because we all believe we will reach

18   agreement on cash collateral for the 28th.  But in the event we

19   don't, and we have a contested hearing, and we're unable to

20   finish --

21          THE COURT:  Okay.

22          MR. DUBLIN:  -- within your schedule on the 28th, it

23   makes sense to go to the 1st.

24          THE COURT:  All right.  We won't call it an omnibus

25   day.  I'll just note it on my calendar and try not to give it

1      away to somebody else.

2              MR. STANG:  Okay.

3              MR. DUBLIN:  Thank you.

4              THE COURT:  Okay?

5              MR. STANG:  And --

6              THE CLERK:  And are we going to have that at

7      10:00 o'clock or 1:30, your Honor?

8              THE COURT:  I may switch with Judge Nakagawa and take

9      the 13s afternoon, so let's say 10:00.

10             THE CLERK:  10:00?

11             THE COURT:  And then I can switch back if I have to.

12         Then we have May 15th at 10:00.  Again, if you prefer

13     afternoons --

14         (Colloquy not on the record.)

15             THE COURT:  -- we can switch now since nothing's gone

16     out, yet --

17             MR. STANG:  Please.

18             THE COURT:  -- to afternoons.

19             MR. STANG:  We'd like --

20             THE COURT:  Afternoons, then?

21             MR. STANG:  -- afternoons.

22             THE COURT:  All right.  So we'll make all these

23     1:30s, then.

24             THE CLERK:  Except for the first one.

25             MR. STANG:  Except for the May 1st.

```
 1                THE COURT:  Except the first one.

 2                MR. STANG:  We'll make that 10:00 still.

 3                THE COURT:  Then we have -- that's all we've set so

 4      far, right?

 5                THE CLERK:  Yes, your Honor.

 6                THE COURT:  Do you want every two weeks, every three

 7      weeks?  It's okay if nothing goes on.

 8           (Colloquy not on the record.)

 9                MR. STANG:  Let's do three weeks, your Honor.

10                THE COURT:  Okay.  So three weeks from May 15th is --

11      how would you feel about June 5th?  It's a Friday --

12                MR. STANG:  It sounds all right.

13                THE COURT:  -- 1:30?  And then how bad is June 26th

14      for USA?

15           (Colloquy not on the record.)

16                THE COURT:  Of course, it's too early to tell.

17                THE CLERK:  (Indiscernible).

18           (Colloquy not on the record.)

19                THE COURT:  I only got one thing on now.

20           (Colloquy not on the record.)

21                THE COURT:  All right.  June 26th at 1:30.

22                MR. STANG:  Okay.

23                THE COURT:  And July 17th at 1:30, and --

24                MR. STANG:  Do one more?

25                THE COURT:  I've got August 7th.  I've got
```

1   Lake Las Vegas in the morning or I can give you Thursday.

2   Which would you rather have?

3            MR. STANG:  It doesn't matter, your Honor.

4            THE CLERK:  Your Honor, I would suggest breaking it

5   up because --

6            THE COURT:  The calendars get so bad.

7            THE CLERK:  Yes.

8            THE COURT:  Okay.  August 6th.  It's a Thursday at

9   1:30, and then let me give you August 27th as well.

10           THE CLERK:  Okay.

11           THE COURT:  And just for future planning, September

12  is going to be difficult to schedule things.  So if you think

13  you're going to -- you know, once you start doing your plan and

14  calendaring and --

15           MR. STANG:  Right.

16           THE COURT:  -- that out --

17           MR. STANG:  Right.

18           THE COURT:  -- let us know sooner, rather than later.

19           MR. STANG:  Right.  Because I'm hoping that we're

20  going to start using some of these times for a disclosure

21  statement and, possibly, even plan confirmation.

22           THE COURT:  Okay.  Good.

23           MR. STANG:  I don't want to be too optimistic, but a

24  lot of people.

25           THE COURT:  Hope springs.

```
 1          THE CLERK:  Your Honor, on the 27th, we have
 2   Chapter 13s in the afternoon.
 3          THE COURT:  Oh, I do, don't I?
 4          THE CLERK:  Yes.
 5          THE COURT:  I bet I could switch weeks with him.
 6   Well, let's do it in the morning, then.
 7          THE CLERK:  Okay.
 8          THE COURT:  That's the only morning one.
 9          THE CLERK:  And do it --
10          MR. STANG:  All right.
11          THE CLERK:  -- at 10:00?
12          THE COURT:  9:30.
13      (Colloquy not on the record.)
14          THE COURT:  Or would you rather have Friday the --
15   what did we say, the 27th?
16          MR. STANG:  You said August 27th at 9:30 --
17          THE COURT:  Oh, well --
18          MR. STANG:  -- is what we've got.
19          THE COURT:  -- let's do it the 28th, then.
20          MR. STANG:  Okay.  Are we still in the morning, then?
21          THE COURT:  Yeah.  You can have afternoon then.
22          MR. STANG:  Okay.
23          THE COURT:  I can't believe that I'm making you
24   people come here at Friday afternoons.
25          MR. DUBLIN:  It will (indiscernible) settlement,
```

1   your Honor.

2           MR. STANG:  That's right.  Okay.

3           THE COURT:  All right.

4           MR. STANG:  So --

5           THE COURT:  Thank you, and so all we have on the 28th

6   is our cash collateral at 1:30.

7           MR. STANG:  Yes, ma'am.

8           THE COURT:  All right.  Good.

9       Thank you very much.

10          THE CLERK:  I have --

11          MR. STANG:  Thank you very much.

12          THE CLERK:  -- just --

13          THE COURT:  Oops, sorry.

14          THE CLERK:  -- one question.

15          MR. STANG:  Yes.

16          THE CLERK:  I've been having a number of calls, and

17  they're wondering if (indiscernible) --

18          THE COURT:  Thank you.  That's what I wanted to us.

19          THE CLERK:  -- set up on (indiscernible) or --

20          MR. STANG:  There is a Web site functioning through

21  the noticing agent.  We've had some conversations with them

22  about what they'll post and what they won't post pleading wise,

23  rather than downloading the entire document and the

24  certificates of service and the like, but it is up and

25  functioning.

1        And I don't think we were able -- well, you know what,

2    your Honor?  Ms. Chubb may be able to --

3            THE COURT:  Okay.

4            MR. STANG:  -- tell you what --

5            THE COURT:  And put in the case-management order as

6    well where people can view documents.

7            MR. STANG:  Right.

8            THE COURT:  Put your Web-site address in there and

9    the PACER address.

10           MR. STANG:  Okay.

11           THE COURT:  That's what I meant to say before I

12   forgot.

13       Thank you.

14       (Colloquy not on the record.)

15           MS. CHO:  I think also for the 28th --

16           THE COURT:  Name, please.

17           THE COURT RECORDER:  Your appearance, please.

18           MS. CHO:  Oh, Shirley Cho with the Pachulski, Stang

19   law firm for the debtors.  I think also on the 28th the interim

20   cash-management --

21           MR. STANG:  Yes.

22           MS. CHO:  -- order will be held on a final basis.

23           THE COURT:  Oh --

24           MS. CHO:  -- so two matters.

25           THE COURT:  -- all right.

1          Thank you.

2          And why wasn't that a final on the cash management?  Oh,

3     because that was an agreement.  Excuse me.  You're right.  That

4     had to be continued, too.

5          Thank you.

6               MS. CHO:  And with respect to Omni, I was in touch

7     yesterday with the claims agent, and it is operational, the Web

8     site, and, previously, they've linked it to PACER.

9          But they are actually uploading the motions and orders, so

10    that creditors can go on-line and view it without having to log

11    into PACER.

12              THE COURT:  Okay.  Good.

13    Thank you.

14              MS. CHO:  Um-h'm.

15              THE COURT:  All right.  Thank you very much.

16              MR. STANG:  Thank you, your Honor.

17              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

18              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

19              THE CLERK:  All rise.

20         (Court concluded at 10:33:05 a.m.)

21

22

23

24

25

1        I certify that the foregoing is a correct transcript from

2    the electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5

6     /s/ Michele Phelps                    05/18/09

7     Michele Phelps, Transcriptionist          Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25