James I. Stang, Esq. (CA Bar No. 94435)
Shirley S. Cho, Esq. (CA Bar No. 192616)
Werner Disse, Esq. (CA Bar No. 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile:  310/201-0760
Email: jstang@pszjlaw.com
       scho@pszjlaw.com
       wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV  89101
Telephone:  702/382.1170
Facsimile:  702/382.1169
Email: zlarson@lslawnv.com

Attorneys for Debtors and
Debtors in Possession

E-File:  June 16, 2009

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: BK-S-09-14814-LBR<br>(Jointly Administered) |
| THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,[1] | Chapter 11 |
| Debtors. | |
| Affects: | Hearing Date: |

---

[1] The Debtors in these cases, along with their case numbers are: Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

73203-002\DOCS_LA:203619.2

| ☒ All Debtors<br>☐ Affects the following Debtor(s) | Hearing Time:<br>Courtroom 1 |
|---|---|

### DEBTORS' EMERGENCY MOTION FOR AN ORDER EXTENDING CASH COLLATERAL TERMINATION DATE [Relates to Docket No. 126]

The Debtors seek an order extending the use of cash collateral on the basis that the secured lenders are adequately protected, the secured parties and the Debtors are negotiating towards the goal of a consensual plan of reorganization and the Debtors are working with the newly-formed Official Creditors Committee of Unsecured Creditors (the "Committee") to familiarize the Committee and its counsel with the facts of the cases so that the Committee can be a bona fide participant in the plan process.  Since the entry of the order on the first stipulation for use of cash collateral, the Debtors and the First Lien Steering Committee have been negotiating a final plan term sheet and in fact have prepared a draft plan and disclosure statement based on the preliminary drafts.  On June 12, 2009, the Debtors received a revised term sheet from the First Lien Steering Committee that follows extensive due diligence by the First Lien Steering Committee and which details a proposed reorganization encompassing the claims of the First Lien Lenders, the Second Lien Lenders, the non-debtor affiliates and the general unsecured creditors.

Pursuant to the Final Cash Collateral Order (defined below), the Debtors' use of cash collateral on a consensual basis expires on June 28, 2009 (the "Cash Collateral Termination Date").  The Cash Collateral Termination Date can be unilaterally extended by the First Lien Steering Committee in its sole discretion.  Despite request to the First Lien Steering Committee, as of the date and time of filing of this Emergency Motion, the First Lien Steering Committee had not yet consented to the extension of the Cash Collateral Termination Date pending its review of the Debtors' proposed revised Budget attached hereto as **Exhibit A** and pending the outcome of further discussion on the revised plan term sheet.

The Debtors hope that the First Lien Steering Committee will consent to the extension of the Cash Collateral Termination Date but they could not delay further the filing of a motion to seek use of cash collateral.  Under the Case Management Order entered in these cases, any motion for an order shortening time will not be heard on less than 10 days' notice absent an

73203-002\DOCS_LA:203619.2                                    2

extreme emergency. Accordingly, because June 16th is the 10th day prior to the Debtors' omnibus hearing date on June 26, 2009, the Debtors file this Emergency Motion in an abundance of caution for the continued use of cash collateral beyond the Cash Collateral Termination Date in the event that the First Lien Steering Committee does not consent to an extension of the cash collateral usage prior to the June 26th hearing date.

### Background

1. On March 31, 2009, the above-captioned Debtors (the "Primary Filers") except Tuscany Golf Country Club, LLC, Pinnacle Grading, LLC, and Rhodes Homes Arizona, LLC (the "Secondary Filers") filed voluntary petitions for relief under chapter 11 of title 11 of the Bankruptcy Code. On April 1, 2009, the Secondary Filers filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. All references to Petition Date herein shall mean March 31, 2009 for the Primary Filers or April 1, 2009 for the Secondary Filers, as applicable. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2. On April 1, 2009, the Debtors filed the *Debtors' Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, and 364 of Debtors' Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code (A) Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Debtors' Prepetition Secured Parties and (C) Scheduling a Final Hearing; Memorandum of Points and Authorities* [Heritage Docket No. 35] (the "Cash Collateral Motion"). The Cash Collateral Motion and supporting declarations are incorporated as though fully set forth herein.

3. On April 10, 2009, the Court entered the *Stipulated Interim Order (I) Authorizing Limited Use of Cash Collateral Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code, (II) Granting Adequate Protection and Super Priority Administrative Expense Priority to Prepetition Secured Lenders, and (III) Scheduling a Final Hearing* [Heritage Docket No. 125] (the "First Cash Collateral Order"). Under the First Cash Collateral Order, the Debtors were authorized to use cash collateral through April 17, 2009.

4. On April 17, 2009, the Court entered the *Second Stipulated Order (I) Authorizing Use of Cash Collateral Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code, (II) Granting Adequate Protection and Super Priority Administrative Expense Priority to Prepetition Secured Lenders, and (III) Scheduling a Final Hearing* [The Rhodes Companies Docket No. 73] (the "<u>Second Cash Collateral Order</u>"). Under the Second Cash Collateral Order, the Debtors were authorized to use cash collateral through April 28, 2009.

5. On April 28, 2009, the Court approved the *Final Stipulated Order (I) Authorizing Use of Cash Collateral Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code, (II) Granting Adequate Protection and Super Priority Administrative Expense Priority to Prepetition Secured Lenders Re Debtors' Cash Collateral Motion* [The Rhodes Companies Docket No. 126], (the "<u>Final Cash Collateral Order</u>"). The Final Cash Collateral Order was entered on April 30, 2009.

6. Paragraph 3(i) of the Final Cash Collateral Order provides as follows:

> The Debtors' authorization to use Cash Collateral hereunder shall terminate upon the earlier to occur of (i) the Cash Collateral Termination Date or (ii) expiration of the Budget Period [June 28, 2009] unless the Debtors shall have proposed and the First Lien Steering Committee, in its sole discretion (but in consultation with the Agent), shall have approved, an extension of the Cash Collateral Period.

The Cash Collateral Termination Date is defined in paragraph 12 of the Final Cash Collateral Order as: "the earlier of (i) June 28, 2009 at 11:59 p.m. (prevailing Pacific Time) (unless such date is extended in the sole discretion of the First Lien Steering Committee (in consultation with the Agents)) and (ii) absent further order of the Court, the date that is one (1) business day after the delivery by the First Lien Agent or the First Lien Steering Committee of written notice to the Debtors of the occurrence of any of the following events (any event shall be referred to as a "Cash Collateral Termination Event"). . . ."

**Relief Requested**

7. By this Motion, the Debtors seek authority to continue the use of cash collateral on the same terms as set forth in the Final Cash Collateral Order through October 2, 2009 pursuant to the revised Budget attached hereto as **Exhibit A**.

**The Continued Use of Cash Collateral Is in the Best Interests Of These Estates and All Parties in Interest**

8. The Debtors need cash to operate their business and pay payroll. Without an extension of the Cash Collateral Termination Date, the Debtors will be unable to pay for services and expenses necessary to continue their business operations, pay their employees and maintain the value of the Debtors' estates and preserve the Lenders' collateral. Therefore, continued use of cash collateral is in the best interests of these estates and all parties in interest.

9. The Debtors propose to operate under the Final Cash Collateral Order, which has previously been approved by the Court as providing adequate protection to the Lenders. If necessary, the Debtors will be prepared to provide evidence at the hearing on this Emergency Motion that the continued use of cash collateral and the protections provided under the Final Cash Collateral Order will continue to grant the Lenders adequate protection against the diminution in value of their interests in collateral pursuant to sections 105(a), 363(c)(1) and 363(c)(2) of the Bankruptcy Code.

10. As set forth in more detail in the Debtors' Reply to the Cash Collateral Motion [Rhodes Docket No. 59], the Debtors have already provided adequate protection to the Lenders by granting replacement liens on all unencumbered assets of the Debtors to the extent of any diminution in value. The Debtors have also provided the Lenders all of the "Lender Protections" contained in the Final Cash Collateral Order, including, but not limited to: weekly reports of variances between operations and the Budget; reasonable access to the Debtors' personnel, books and records; payment of fees and expenses of the advisors to the First Lien Steering Committee and First Lien Agent; superpriority administrative expense claims for diminution in value of collateral; and waiver of the Debtors' ability to prime or surcharge the First Lien Lenders' Collateral.

73203-002\DOCS_LA:203619.2        5

11.     The Debtors' use of property of the estate is governed by section 363 of the Bankruptcy Code.  *See* 11 U.S.C. §§ 363(c)(1), 1107(a) and 1108.  Section 363(c)(2) allows a debtor in possession to use "cash collateral" under subsection (c)(1) if:

> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U S.C. § 363(c)(2)(A) and (B).

12.     Section 361 provides three non-exclusive means of providing adequate protection, where the same is required, in that adequate protection may take many forms.  3 *Collier on Bankruptcy*, (15th Ed. 2008), section 361.03, p. 361-9.  Among other things, the term "indubitable equivalent" has been interpreted liberally.  *In re Mocco*, 176 B. R. 355 (Bankr. D.NJ. 1995) citing to *United Savings Association v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 378 (1988), 108 S. Ct. 626, L.Ed. 2d 740.  The use of cash collateral involves balancing the interests of the debtor and the secured creditor and the equities must thus be balanced in each case.  *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982).  It is recognized that "the purpose of Chapter 11 is to rehabilitate debtors and generally, access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D. N.H. 1993), quoting *In re Stein*, *supra*, 19 B.R. at 459.  In order to encourage reorganization, a flexible approach should be used in the application of adequate protection.  *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 267 (Bankr. C.D. Cal. 1988) (citing to *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The debtor's use of cash collateral during case administration must be considered in light of the quest of a successful reorganization.  *In re O'Connor*, 808 F.2d 1393, 1397 (10th Cir. 1987).  Adequate protection is not intended nor need it stand as an absolute guarantee to the secured creditor that it will receive the value of its interest in the collateral; the cash collateral.  *In re McCombs Properties VI, Ltd.*, *supra*; *In re Elliott Lease Cars, Inc.*, 20 B.R. 893 (Bankr. D.R.I. 1982).

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

13. The Debtors submit that the facts and circumstances of these cases justify the continued use of cash collateral as proposed by the Debtors and the adequate protection to be provided to the Lenders is more than adequate. It is well settled that the use of cash collateral for the preservation of the value of a secured creditor's lien is in and of itself sufficient to provide adequate protection to a secured creditor for use of those funds. *Federal Natl. Mortgage v. Dacon Bollingsbrook Associates Limited Partnership*, 153 B.R. 204; 214 (N.D. Ill. 1993); *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988); *In re Stein*, *supra*; *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981). In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs*, *supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations, and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral. The ordinary and customary costs of maintenance, operation and preservation of property are expenses that preserve and enhance the value of the secured creditor's interest in cash collateral. Such expenses are the same expenses a lender or the lender's receiver would have to pay to preserve and protect the property, and thus, there should be no dispute of the appropriateness of payment of such expenses for their collateral properties by the Lenders. *See*, *In re Princeton Square Associates, L.P.*, 201 B.R. 90, 96 (Bankr. S.D.N.Y. 1996). The Debtors' use of cash collateral will only preserve and increase the value of the Lenders' collateral, not diminish the value.

14. The Debtors respectfully submit that they have satisfied the standards applicable for the continued use of cash collateral. As described above, it is vital to the success of the Debtors' reorganization efforts that they continue to be able to use cash collateral and the proposed terms of the use of cash collateral are identical (but for the budget) to the earlier stipulated use. Absent this Court's extension of the Cash Collateral Termination Date, the

Debtors face complete disruption to their business operations, irreparable damage to their relationships with their vendors and customers, and the inability to maintain the value of their assets.

WHEREFORE, for the foregoing reasons, the Debtors respectfully request that the Court enter an order extending the Cash Collateral Termination Date through and including October 2, 2009 consistent with the terms of the Final Cash Collateral Order and grant such other relief as is just or appropriate.

**DATED** this 16th day of June, 2009.

**LARSON & STEPHENS**

  /s/ Zachariah Larson, Esq.
Zachariah Larson, Bar No. 7787
Kyle O. Stephens, Bar No. 7928
810 S. Casino Center Blvd., Suite 104
Las Vegas, NV  89101
702/382-1170
Attorneys for Debtors and Debtors in Possession

# EXHIBIT A

Rhodes Homes 17 Week Cash Flow Forecast - DRAFT
Prepared 6/16/2009

6/16/2009
Noon

Starting Cash on 6/5/2009 (Projection)    $ 4,047,398

| Line # | Week Ending | 11 6/12/2009 | 12 6/19/2009 | 13 6/26/2009 | 14 7/3/2009 | 15 7/10/2009 | 16 7/17/2009 | 17 7/24/2009 | 18 7/31/2009 | 19 8/7/2009 | 20 8/14/2009 | 21 8/21/2009 | 22 8/28/2009 | 23 9/4/2009 | 24 9/11/2009 | 25 9/18/2009 | 26 9/25/2009 | 27 10/2/2009 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Units Closed - Backlog (Sold) | 3 | 1 | 6 | 2 | 5 | 4 | 3 | 2 | 3 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 31 |
| 2 | Units Closed - New Sales Not Started (Projected) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 3 | 3 | 2 | 2 | 3 | 3 | 2 | 22 |
| 3 | Units Closed - Unsold Standing Inventory (Projected) | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 5 |
| 4 | Net Revenues - Backlog (Sold) | $ 271,664 | $ 277,100 | $ 1,445,564 | $ 387,270 | $ 1,318,387 | $ 798,084 | $ 633,985 | $ 415,251 | $ 626,597 | $ 213,361 | $ - | $ - | $ - | $ - | $ 380,310 | $ - | $ - | $ 6,767,573 |
| 5 | Net Revenues - New Sales Not started (Projected) | | | | | | | | | 390,000 | 390,000 | 585,000 | 585,000 | 390,000 | 390,000 | 585,000 | 585,000 | 390,000 | 4,290,000 |
| 6 | Net Revenues - Unsold Standing Inventory (Projected) | 393,361 | | | | | | 286,650 | 295,750 | 250,250 | 368,550 | 377,650 | | | | | | | 1,972,211 |
| 7 | Revenues - Park Construction | | | | | | | | | | | | | | | 315,000 | | | 315,000 |
| 8 | Tuscany Golf Course Revenues | 57,694 | 51,000 | 54,000 | 52,000 | 48,000 | 48,000 | 48,000 | 48,000 | 51,000 | 51,000 | 51,000 | 51,000 | 67,000 | | | 25,000 | | 702,694 |
| 9 | Pinnacle Grading Revenues | | | 943,364 | | | | 573,500 | 2,009,103 | | | | 304,475 | | | | | | 3,830,442 |
| 10 | Miscellaneous Refunds and Fees | 75,973 | | | | | | | | | | | | | | | | | 75,973 |
| 11 | Total Cash Receipts | 798,692 | 328,100 | 2,757,928 | 439,270 | 1,366,387 | 846,084 | 1,542,135 | 2,768,104 | 1,317,847 | 1,022,911 | 1,013,650 | 940,475 | 457,000 | 390,000 | 965,310 | 585,000 | 415,000 | 17,953,893 |
| 12 | Insurance Financing | | | | 22,287 | | | | | 22,287 | | | | 22,287 | | | | 22,287 | 89,149 |
| 13 | IT Services / Equip. | 1,778 | | | 8,591 | | | | | 8,591 | | | | 8,591 | | | | 8,591 | 36,140 |
| 14 | Storag | | | | 1,665 | | | | | 1,665 | | | | 1,665 | | | | 1,665 | 6,660 |
| 15 | Rent | | | | 30,509 | | | | | 30,509 | | | | 30,509 | | | | 30,509 | 122,035 |
| 16 | Brokerage Licens | | | | 1,000 | | | | | 1,000 | | | | 1,000 | | | | 1,000 | 4,000 |
| 17 | HOA Fees (1) | 21,100 | | | 9,308 | | | | | 9,308 | | | | 9,308 | | | | 9,308 | 58,332 |
| 18 | Model Home Leases (2) | | | | 30,014 | | | | | 30,014 | | | | 30,014 | | | | 30,014 | 120,056 |
| 19 | Total 1st of Month Payments | 22,878 | - | - | 103,374 | - | - | - | - | 103,374 | - | - | - | 103,374 | - | - | - | 103,374 | 436,372 |
| 20 | Rhodes Homes Payroll (3) | 72,549 | 72,549 | 72,549 | 181,053 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 80,895 | 1,450,337 |
| 21 | Rhodes Homes Ordinary Course Professionals | | | | 20,000 | | | | | 20,000 | | | | 20,000 | | | | 20,000 | 80,000 |
| 22 | Rhodes Homes Consultants | | | | | | | | | | | | | | | | | | |
| 23 | Rhodes Homes AZ Payroll | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 813.43 | 13,828 |
| 24 | Pinnacle Payroll | 18,211 | 16,000 | 12,800 | 12,800 | 11,500 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 191,311 |
| 25 | Total Payroll and Benefits | 91,573 | 89,362 | 86,162 | 214,666 | 93,209 | 91,709 | 91,709 | 91,709 | 111,709 | 91,709 | 91,709 | 91,709 | 111,709 | 91,709 | 91,709 | 91,709 | 111,709 | 1,735,476 |
| 26 | Pinnacle (Job Cost) | | | 856,699 | 9,346 | 9,346 | 59,281 | 499,033 | 1,012,696 | 7,696 | 57,631 | 7,696 | 165,883 | 7,696 | 57,631 | 7,696 | 7,696 | 11,408 | 2,777,434 |
| 27 | Pinnacle (Equipment Notes Payments) | | | 93,000 | | | 93,000 | | | | 93,000 | | | | 93,000 | | | | 372,000 |
| 28 | RH Vertical Costs to Complete - Backlog+Standing (Unsold) | 99,040 | 175,099 | 169,793 | 137,957 | 127,345 | 100,815 | 79,591 | 58,366 | 42,448 | 21,224 | 10,612 | 5,306 | 5,306 | 5,306 | 5,306 | | | 1,043,516 |
| 29 | RH Vertical Costs to Complete - New Sales Not Started(4) | 25,549 | 21,000 | 42,000 | 73,500 | 105,000 | 136,500 | 168,000 | 215,250 | 262,500 | 262,500 | 262,500 | 262,500 | 262,500 | 262,500 | 262,500 | 262,500 | 262,500 | 3,149,299 |
| 30 | Rhodes Homes Land Dev. (Cost to Complete) (5) | 47,702 | 59,569 | 67,303 | 169,415 | 55,750 | 20,384 | 32,200 | 29,218 | 18,718 | 20,130 | 23,476 | 31,433 | 87,654 | 32,117 | 23,476 | 37,510 | 19,432 | 775,485 |
| 31 | Rhodes Ranch Park (Job Cost) | | | | | | | | | | | | | | | | 7,925 | | 7,925 |
| 32 | Rhodes Homes Warranty Repairs (Job Cost) | 7,367 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 247,367 |
| 33 | Rhodes Homes Vertical Costs - A/P | | | | | | | | | | | | | | | | | | - |
| 34 | Rhodes Homes Land Dev. - A/P | | | | | | | | | | | | | | | | | | - |
| 35 | Rhodes Homes Land Dev. - Spirit Underground A/P | | | | | | | | | | | | | | | | | | - |
| 36 | Rhodes Homes Land Dev. - Park A/P | 61,197 | | | | | | | | | | | | | | | | | 61,197 |
| 37 | Total Job Cost | 248,779 | 270,668 | 1,243,795 | 405,218 | 312,441 | 424,980 | 793,824 | 1,330,531 | 346,362 | 469,485 | 319,284 | 480,122 | 378,156 | 465,554 | 313,978 | 322,706 | 308,340 | 8,434,222 |
| 38 | Sales / Marketing | 24,126 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 16,070 | 281,252 |
| 39 | G & A | 12,919 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 18,400 | 307,319 |
| 40 | Utility Deposits | | 3,151 | | | | 8,786 | | | | | | | | | | | | 11,937 |
| 41 | Builder Subsidies to Tuscany HOA (6) | 55,047 | | | 18,349 | | | | | 18,349 | | | | 18,349 | | | | 18,349 | 128,443 |
| 42 | Sales and Use Tax / Property Taxes | | | | | | | | | | | | | 526,937 | | | | | 526,937 |
| 43 | Debtor's Restructuring Professionals (7) | 508,875 | | | | 300,500 | | | | 279,250 | | | | | 495,250 | | | 530,000 | 2,113,875 |
| 44 | Committee's Restructuring Professionals (8) | | | | | 75,000 | | | | 75,000 | | | | | 114,706 | | | 88,235 | 352,941 |
| 45 | Lenders' Professionals (9) | | | 510,000 | | 447,000 | | | | 365,000 | | | | | 340,000 | | | 365,000 | 2,027,000 |
| 46 | US Trustee Payment Center | | | | | | | | 55,000 | | | | | | | | | | 55,000 |
| 47 | Employee & Consultant Housing and Travel Expenses | 2,234 | 2,000 | 2,000 | 4,500 | 2,000 | 2,000 | 2,000 | 2,000 | 4,500 | 2,000 | 2,000 | 2,000 | 4,500 | 2,000 | 2,000 | 2,000 | 4,500 | 44,234 |
| 48 | G&A Expenditures | 603,201 | 39,621 | 546,470 | 57,319 | 858,970 | 45,257 | 36,470 | 91,470 | 776,569 | 36,470 | 36,470 | 36,470 | 584,257 | 986,426 | 36,470 | 36,470 | 1,040,554 | 5,848,938 |
| 49 | Tuscany Golf Course Costs | 138,972 | 23,000 | 65,000 | 104,000 | 101,200 | 20,920 | 67,300 | 104,000 | 110,500 | 51,420 | 70,800 | 24,000 | 179,000 | 23,620 | 74,240 | 24,560 | 74,240 | 1,256,772 |
| 50 | Starting Cash Position | 4,047,398 | 3,740,688 | 3,646,137 | 4,462,637 | 4,017,330 | 4,017,897 | 4,281,117 | 4,833,949 | 5,984,343 | 5,853,677 | 6,227,504 | 6,722,890 | 7,031,064 | 6,131,569 | 4,954,260 | 5,403,172 | 5,512,727 | 4,047,398 |
| 51 | Projected Net Revenu | 798,692 | 328,100 | 2,757,928 | 439,270 | 1,366,387 | 846,084 | 1,542,135 | 2,768,104 | 1,317,847 | 1,022,911 | 1,013,650 | 940,475 | 457,000 | 390,000 | 965,310 | 585,000 | 415,000 | 17,953,893 |
| 52 | Disbursement for Week | 1,105,402 | 422,651 | 1,941,428 | 884,577 | 1,365,820 | 582,865 | 989,303 | 1,617,710 | 1,448,513 | 649,084 | 518,263 | 632,301 | 1,356,495 | 1,567,309 | 516,397 | 475,445 | 1,638,216 | 17,711,779 |
| 53 | Ending Cash Position | $ 3,740,688 | $ 3,646,137 | $ 4,462,637 | $ 4,017,330 | $ 4,017,897 | $ 4,281,117 | $ 4,833,949 | $ 5,984,343 | $ 5,853,677 | $ 6,227,504 | $ 6,722,890 | $ 7,031,064 | $ 6,131,569 | $ 4,954,260 | $ 5,403,172 | $ 5,512,727 | $ 4,289,511 | $ 4,289,511 |

Notes:
(1) HOA fees paid for completed communities in which the Company continues to own lots / property - (i) Spanish Hills $2,760, (ii) Preserves $48, (iii) $5,000 X-It, and (iv) $1,500 West 57th.
(2) Lease payments paid to owners of model homes (11 units) which are representative of product that continues to be sold in Tuscany and in Rhodes Ranch.
(3) Week 1 includes Jim Rhodes salary catch-up payment of $100,000 and $8,504 of payroll tax liabilities (subject to court approval).
(4) Vertical construction costs incurred related to prospective, ongoing sales of product that are at the dirt lot phase of construction.
(5) Land development work as required by development agmts; includes $238,560 of work required for bond exonerations and $137,495 related to renewal of performance bonds.
(6) Includes monthly (i) $1,600 sales office rent estimate and (ii) $16,749 Tuscany HOA support.
(7) Payments to Pachulski-Stang, Larson & Stephens, Omni, Acceleron Group and the Sullivan Group.
(8) Payments to Beckett; Holdback of $39,706 on 9/11.
(9) Payments to WCP, Akin Gump, Koslear & Leatharn.