Nile Leatham (NV Bar No. 002838)
Timothy P. Thomas (NV Bar No. 005148)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
tthomas@klnevada.com

Ira S. Dizengoff (NY Bar No. 2565687)
Philip C. Dublin (NY Bar No, 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002

E-Mail: idizengoff@akingump.com
pdublin@akingump.com
aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

| | |
|---|---|
| IN RE:<br><br>THE RHODES COMPANIES, LLC,<br>  aka "Rhodes Homes," *et al.*,<br><br>Debtors.[1] | Case No. BK-S-09-14814-LBR<br>(Jointly Administered)<br><br>Chapter 11<br><br>Hearing Date: July 17, 2009<br>Hearing Time: 1:30 p.m. |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

| Affects:<br>☒ All Debtors<br>☐ Affects the following Debtor(s) | § § § § § § § | OBJECTION OF THE FIRST LIEN STEERING COMMITTEE TO DEBTORS' EMERGENCY MOTION FOR AN ORDER EXTENDING CASH COLLATERAL TERMINATION DATE |

The First Lien Steering Committee (the "First Lien Steering Committee"), consisting of certain unaffiliated lenders under the Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the lenders listed therein as the "Lenders" (collectively, the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger, by and through its undersigned counsel, hereby files this objection (the "Objection") to the Debtors' Emergency Motion for an Order Extending Cash Collateral Termination Date (the "Motion"). In support of this Objection, the First Lien Steering Committee respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1. By the Motion, the Debtors seek to further extend their use of the First Lien Lenders' cash collateral on the bases that (i) the secured parties and the Debtors are in negotiations over the terms of a consensual plan of reorganization and (ii) the secured lenders are adequately protected. See Motion at 2. While the First Lien Steering Committee had previously consented to the Debtors' use of the First Lien Lenders' cash collateral, the First Lien Steering Committee is no longer willing to provide such consent if the Debtors retain the exclusive right to propose a plan of reorganization in these cases

2. As set forth in greater detail in the First Lien Steering Committee's objection to the Debtors' exclusivity motion (Docket No. 306) and its recent statement regarding the Debtors' use of cash collateral (Docket No. 285), negotiations between the First Lien Steering Committee, the Debtors and James Rhodes over the terms of a global resolution to these chapter 11 cases have

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

terminated. As a result, the First Lien Steering Committee has focused its efforts on negotiating a consensual restructuring with the Official Committee of Unsecured Creditors appointed in these cases (the "Committee"), which efforts have thus far been very productive.

3. The First Lien Steering Committee is optimistic that it will reach consensus with the Committee on the terms of a plan in the coming weeks and is hopeful that any such plan will also be acceptable to the Debtors. Given the uncertainty currently surrounding the plan process and the Debtors' prospects for a successful reorganization,[3] however, the First Lien Steering Committee can no longer consent to the Debtors' use of cash collateral unless it is provided the opportunity to propose a reorganization plan. To the extent the Debtors' exclusive periods are permitted to lapse (either consensually or by order of the Court), the First Lien Steering Committee would be prepared to consent to a further 30-day extension of the cash collateral period on terms materially consistent with the current cash collateral order (including a budget acceptable to the First Lien Steering Committee).[4]

4. While the Debtors have asserted that the current cash collateral order contains a finding by this Court that the First Lien Lenders are adequately protected, this Court has not been required to make such a finding over the objection of the First Lien Lenders.[5] Rather, to date, the First Lien Lenders have consented to the Debtors' use of cash collateral and, thus, the sufficiency of the Debtors' proposed adequate protection package has not been brought before this Court on a

---

[3] Indeed, the Debtors' recent operating results evidence not only a failure to meet the projections in their most recent 13 Week Budget, but the incurrence of expenses in excess of the parameters of the approved Budget, which is a default under the terms of the current cash collateral order.

[4] The First Lien Steering Committee believes that this additional 30-day window will provide sufficient time for it to file a plan that has the support of the Committee and, hopefully, the Debtors. Upon the filing of the plan, the First Lien Steering Committee would likely then be prepared to consent to a further reasonable extension of the cash Collateral period to achieve confirmation of such plan.

[5] In the unlikely event that the Court were to agree with the Debtors that it had previously found the First Lien Lenders to be adequately protected, the First Lien Lenders retain the right to dispute the sufficiency of their adequate protection under Bankruptcy Code section 363(e). In light of, among other things, (i) the Debtors' failure to meet the projections contained in their 13 Week Budget, (ii) the fact that the Debtors are in breach of the cash collateral order currently in place, and (iii) the Debtors' lack of progress in formulating a consensual plan of reorganization, the First Lien Steering Committee objects to any assertion by the Debtors that the First Lien Lenders are adequately protected at this time.

3

contested basis. Indeed, the Debtors cannot meet their burden of proving that the First Lien Lenders are adequately protected and, therefore, cannot obtain continued authorization to use cash collateral absent the First Lien Lenders' express consent. For the foregoing reasons, as further elaborated upon below, the First Lien Steering Committee respectfully submits that the Motion must be denied and that the Debtors' continued use of Cash Collateral must be subject to the conditions set forth herein.

## BACKGROUND

5. On either March 31, 2009 or April, 1, 2009 (collectively, the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

6. Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are currently authorized to operate their businesses and manage their properties as debtors in possession. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only. No trustee or examiner has been appointed in these chapter 11 cases.

7. On May 26, 2009, pursuant to Bankruptcy Code section 1102, the United States Trustee for the District of Nevada appointed the Committee. The Committee currently consists of four members: G.C. Wallace, Inc.; Interstate Plumbing & Air Conditioning; M & M Electric, Inc.; and Southwest Iron Works, LLC.

8. On April 1, 2009, the Debtors filed a motion (the "Cash Collateral Motion") seeking, among other things, authorization to use cash collateral and granting adequate protection to the Debtors' prepetition secured lenders.

9. Subsequent to the filing of the Cash Collateral Motion, the Court entered a series of stipulated orders authorizing the Debtors to use cash collateral with the consent of the First Lien Steering Committee. On April 10, 2009, the Court entered a stipulated interim order authorizing the Debtors to use cash collateral through April 17, 2009.

10. On April 17, 2009, the Court entered a second stipulated interim order, which extended the Debtors' authorization to use cash collateral through April 28, 2009.

11. On April 28, 2009, the Court entered a final stipulated order authorizing the Debtors to use cash collateral through June 28, 2009.

12. On June 16, 2009, the Debtors filed the Motion seeking to extend their authority to use cash collateral through October 2, 2009.

13. In response to the Motion, the First Lien Steering Committee again agreed to extend the Debtors' authorization to use cash collateral. The First Lien Steering Committee agreed to permit the Debtors to use cash collateral through July 17, 2009 in order to engage in further negotiations with the Debtors and the Committee regarding a plan of reorganization.

## OBJECTION

**I. The Debtors Cannot Demonstrate that the First Lien Lenders' Security Interests will be Adequately Protected**

**A. Legal Standard for Adequate Protection**

14. Bankruptcy Code section 363(a) defines cash collateral as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents." 11 U.S.C. § 363(a). Pursuant to Bankruptcy Code 363(c)(2), a debtor may not use cash collateral unless: (i) each entity with an interest in the cash collateral consents, or (ii) the court, after notice and a hearing, authorizes such use, sale, or lease. See 11 U.S.C. § 363(c)(2). In order for a court to authorize a debtor's use of cash collateral, the debtor must provide adequate protection of the creditor's interest in such cash collateral. See 11 U.S.C. § 363(e); Matter of Plaza Family P'ship, 95 B.R. 166, 171 (E.D. Cal. 1989) ("Cash collateral can be authorized only where secured creditors are adequately protected in accordance with Bankruptcy Code section 363(e).").

15. The purpose of adequate protection is to ensure that prepetition lenders receive the security they bargained for prior to the petition date. In re WorldCom, Inc., 304 B.R. 611, 618-619 (Bankr. S.D.N.Y. 2004) (citations omitted). Stated differently, adequate protection "is provided to safeguard the creditor against depreciation in the value of its collateral." In re Weinstein, 227 B.R. 284, 296 (9th Cir. B.A.P. 1998) (citations omitted). See also, In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (adequate protection must "protect[] ... the secured creditor from

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

diminution in the value of its collateral during the reorganization process.") (citations omitted). Congress contemplated that courts would have broad discretion in fashioning such adequate protection. See 11 U.S.C. § 361 (adequate protection may be provided by (i) requiring the debtor to make periodic cash payments, (ii) providing additional or replacement liens, or (iii) granting such other relief as will result in the creditor receiving the "indubitable equivalent" of its interest in the property). The debtor bears the burden of proving that the interests of its prepetition secured lenders are adequately protected. In re Scottsdale Medical Pavilion, 159 B.R. 295, 302 (9th Cir. B.A.P. 1993).

### B. The Proposed Adequate Protection does not Safeguard the First Lien Lenders Against the Diminution in the Value of their Collateral

16. Where the secured lender objects to a debtor's use of cash collateral, the court must consider whether the secured lender's interests are, in fact, adequately protected. In re Proalert, LLC, 314 B.R. 436, 442 (9th Cir. B.A.P. 2004). For the reasons set forth below, the proposed adequate protection does not safeguard the First Lien Lenders against the diminution in value of their collateral and is therefore insufficient as a matter of law.

*i)   The Continued Operation of a Debtor's Business does not Constitute Adequate Protection under Applicable Law*

17. The Debtors allege that the First Lien Lenders will be adequately protected by the continued operation of the Debtors' businesses. The Debtors are mistaken. Indeed, in a case remarkably similar to these cases, the United States Bankruptcy Court for the Western District of Washington expressly held that a debtor homebuilder could not adequately protect its secured lenders for the use of the lenders' cash collateral simply by continuing to operate its business. In re Pacific Lifestyle Homes, Inc., No. 08-45328, 2009 WL 688908 (Bankr. W.D. Wash. March 16, 2009).

18. In Pacific Lifestyle Homes, the debtor argued that, by allowing it to use the lenders' cash collateral to continue construction, the value of the lenders' collateral would be increased. The debtor contended that absent the use of cash collateral to complete construction, as a result of

current market conditions, the value of the lenders' collateral would decline significantly. <u>In re Pacific Lifestyle Homes</u>, 2009 WL 688908 at *9. The court noted that "central to the [d]ebtor's argument is that allowing its business to continue will result in an increase in value to the [lenders' collateral] greater than would be realized if the [d]ebtor ceased operating." <u>Id</u>. at *11. The lenders disagreed with the debtor's position, "contending that there is no guarantee of success and that under this proposal they will assume the risk of future nonprofitability at the expense of . . . cash available to them now." <u>Id</u>.

19. The court agreed with the lenders, holding that "continued construction based on projections and improvements to the property does not alone constitute adequate protection." <u>Id</u>. at *12 (citing <u>Town of Westport v. Inn at Longshore, Inc. (In re Inn at Longshore, Inc.)</u>, 32 B.R. 942, 946 (Bankr. D. Conn. 1983)). The <u>Pacific Lifestyle Homes</u> Court observed that "those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements." <u>Id</u>. (citations omitted).

20. The <u>Pacific Lifestyle Homes</u> Court also found that determining when the housing market will recover is based purely on speculation and "through its proposed adequate protection, the [d]ebtor has offered little, if anything, of additional value to the [l]enders in exchange for the use of their cash collateral. Instead, the [d]ebtor relies on its hopes and projections of future profitability, and does so during a period of financial crisis unprecedented in recent history." <u>Id.</u> Accordingly, the court concluded that the debtor's speculation could not compensate the lenders for the present value of their cash collateral.

21. In reaching its conclusion, the court acknowledged that "the evidence indicates that if the [d]ebtor is unable to reorganize, the [l]enders will be left with the finished lots, which testimony establishes is likely worth less than lots containing homes (assuming that these homes could be sold quickly for the asking price). It is also undisputed that currently there is virtually no market for bulk sale lots. Yet the [c]ourt must evaluate the value and security of the [l]enders' cash collateral . . . , that the homes may not sell, or sell for less than expected; and that the [l]enders

could be left with maintaining unsold homes, which are far more expensive than lots. There also can be no question that the [l]enders are aware of the losses that will occur if they are forced to foreclose on the lots." Id. at *13. The court correctly held, however, that the debtor did not meet its burden in establishing that the proposed adequate protection for the use of the lenders' cash collateral adequately protected the lenders' interests under the contemplated "all or nothing" approach. Id.

22.     The Pacific Lifestyle Homes decision is a nearly contemporaneous commentary on the exact issue facing this Court – namely whether allowing the Debtors' continued operation will necessarily result in increased value for the First Lien Lenders. The answer here, as it was in Pacific Lifestyle Homes, is no.[6]

> ii)    *The Debtors' Performance as Compared to the 13 Week Budget Undermines their Assertions that the First Lien Lenders are Adequately Protected*

23.     The Debtors also assert that the First Lien Lenders' interests will be adequately protected by subjecting the use of cash collateral to the Debtors' 13 Week Budget and providing the First Lien Lenders with weekly reports of variances between operations and budget. This form of adequate protection is inadequate in light of, among other things, the Debtors' performance over the course of these chapter 11 cases.

---

[6] The Debtors cite two cases for the proposition that the use of cash collateral to operate and maintain a debtor's business will only increase the value of the secured lender's collateral and, therefore, will result in such lender being adequately protected. See In re Stein (Stein v. United States Farmers Home Admin.), 19 B.R. 458 (Bankr. E.D. Pa. 1982); In re McCombs Properties VI, Ltd. (McCombs Properties VI, Ltd. v. First Texas Savings Ass'n), 88 B.R. 261 (Bankr. C.D. Cal. 1988). Neither of the cases cited by the Debtors is applicable to the facts presented here. In Stein, the court considered whether a secured creditor's liens on livestock and crops would be adequately protected by allowing cash collateral to be used to fund the debtor's operational needs. The Stein Court reasoned that, since the livestock continued to reproduce and the crops continued to be harvested, the overall value of the secured creditor's lien similarly continued to increase. The Debtors here do not argue and cannot argue that the value of their homebuilding assets will appreciate in a manner akin to the reproduction of livestock. McCombs is similarly inapposite. In McCombs, the court considered whether rental proceeds representing a creditor's cash collateral could be used by the debtor to protect the subject property from further deterioration. The McCombs Court (after noting that the secured lender had a substantial equity cushion) found that the use of cash collateral solely to improve and maintain the rental property would result in increased rentals and therefore increased cash collateral. The McCombs decision is distinguishable from this case in several key respects. First, the debtor's secured lenders in McCombs had a substantial equity cushion. Second, the McCombs decision was issued in 1988, at which time the world's financial markets were drastically different. Third, the debtor in McCombs operated rental properties. There is simply no analogy to be made between a debtor who operated a single piece of rental property in 1988, and a homebuilder facing the unprecedented crash of today's housing markets.

24. The Debtors' 13 Week Cash Flow Variance and Asset Sales Report for the week ending June 26, 2009 indicated, among other things, that the Debtors' cash balance at the end of the original 13-week period was $3.5 million, compared to a projected ending cash balance of $4.3 million. In other words, the Debtors had nearly 20% less cash on hand as of June 26, 2009 than had originally been projected. The Debtors attribute the negative variance to two factors: (i) fewer home closings than projected due to slower than anticipated sales pace and appraisal difficulties that have caused cancellations and delay in closings; and (ii) lagging Pinnacle Grading project revenues.

25. Focusing solely on the Debtors' Pinnacle Grading project, it is apparent that the Debtors' performance undermines their assertion that the 13 Week Budget adequately protects the interests of the First Lien Lenders. As reflected in a cash report received by the First Lien Steering Committee on July 7, 2009, total revenue attributable to the Pinnacle Grading project is $1,747,893 while total job costs are $1,948,464. The Debtors' overage on the project is $200,571 (calculated as total job costs minus total revenue). Pursuant to the cash collateral order currently in place, the Debtors are allowed an overage of no more than $60,000. By the Debtors' own admission, overage on the Pinnacle Grading project exceeds the current cap by more than 200%. Based on the foregoing, the Debtors are in breach of the current cash collateral order and, therefore, implementation of the 13 Week Budget and the Debtors' subsequent willingness to provide the First Lien Steering Committee with variance reports relating thereto do not support the Debtors' allegations that the First Lien Lenders are adequately protected. Indeed, the Debtors' operating performance to date is indicative of the fact that the First Lien Lenders are not adequately protected.

> iii) *General Economic Conditions Continue to Plague the Las Vegas Housing Market and, Over Time, Could have a Further Negative Impact on the Value of the First Lien Lenders' Collateral*

26. To satisfy their burden of proof that the First Lien Lenders are adequately protected, the Debtors must demonstrate that the First Lien Lenders' collateral – i.e. *all* of the Debtors'

property, including cash – will be adequately protected. As discussed above, the Debtors' own variance reports reflect a wide discrepancy between the Debtors' projections and actual operating results. Moreover, the Debtors have not demonstrated and cannot demonstrate that the First Lien Lenders' collateral (including cash collateral) will be adequately protected during these chapter 11 cases. Indeed, if the Debtors' operating results to date are any indication, the First Lien Lenders' collateral remains subject to the highly volatile and depressed housing markets within which the Debtors conduct business.

27. The Pacific Lifestyle Homes Court cited an expert for the debtor's secured lender as stating "[i]t is impossible at this time to predict whether housing prices will continue to fall and for how long, let alone when they will start to level off and rebound." In re Pacific Lifestyle Homes, 2009 WL 688908 at *12. The Debtors are not in a position to represent to this Court or to the First Lien Lenders that the further passage of time will not negatively affect the First Lien Lenders' collateral. Accordingly, the Debtors cannot demonstrate that the First Lien Lenders are adequately protected.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

## CONCLUSION

WHEREFORE, for the reasons set forth above, the First Lien Steering Committee respectfully requests the Court (i) deny the Motion and (ii) grant the First Lien Steering Committee such other and further relief as is just and proper under the circumstances.

Dated this 10th day of July 2009.

By: _____
Nile Leatham (NV Bar No. 002838)
Timothy P. Thomas (NV Bar No. 005148)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
tthomas@klnevada.com


AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff (NY Bar No. 2565687)
Philip C. Dublin (NY Bar No, 2959344)
Abid Qureshi (NY Bar No. 2684637)
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
idizengoff@akingump.com
pdublin@akingump.com
aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*