# EXHIBIT A1

# EXHIBIT A1

## ● ● ORIGINAL ● ●

**FILED**

Oct 24  4 47 PM '08

*[signature]*

CLERK OF THE COURT

AANS
JANICE J. BROWN
Nevada Bar No. 001118
JOSH COLE AICKLEN
Nevada Bar No. 007254
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
400 South Fourth Street
Suite 500
Las Vegas, Nevada 89101
(702) 893-3383
FAX: (702) 893-3789

Attorneys for Defendants and Cross Claimant
Harsch Investment Properties – NV. LLC

### DISTRICT COURT

### CLARK COUNTY, NEVADA

| | |
|---|---|
| IAN ROSEN, individually,<br><br>Plaintiffs,<br><br>v.<br><br>BRAVO, INC., d/b/a RHODES FRAMING, Nevada Corporation; HARSCH INVESTMENT PROPERTIES, L.L.C., a Oregon Corporation; and DOES 1 through X and ROE CORPORATIONS 1 through X, inclusive,<br><br>Defendants.<br><br>────────────────────<br><br>HARSCH INVESTMENT PROPERTIES - NV LLC.,<br><br>Cross Claimant,<br><br>v.<br><br>BRAVO, INC., Individually and dba RHODES FRAMING, and DOES 1 THROUGH 10, inclusive,<br><br>Cross Defendants. | CASE NO. A570558<br>DEPT NO. XVI |

<u>**DEFENDANT HARSCH INVESTMENT PROPERTIES – NV. LLC,
SUED AS HARSCH INVESTMENT PROPERTIES, LLC'S
AMENDED ANSWER AND CROSS CLAIM**</u>

Defendant/Cross Claimant HARSCH INVESTMENT PROPERTIES – NV. LLC, sued

herein as "HARSCH INVESTMENT PROPERTIES, INC.," DEFENDANT AND CROSS

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

1  CLAIMANT in the above entitled action, by and through its attorneys, LEWIS, BRISBOIS,

2  BISGAARD & SMITH, LLP, as and for an amended answer to the Complaint filed against it by

3  plaintiff herein and as a cross claim against defendant BRAVO., INC., individually and dba

4  RHODES FRAMING, and Does 1 through 10, inclusive, hereby states and alleges as follows:

### GENERAL ALLEGATIONS

### FIRST DEFENSE

7          The general allegations of plaintiff's complaint fail to state a claim against answering

8  defendant upon which relief may be granted.

### SECOND DEFENSE

10         Answering defendant admits allegations contained in  Paragraphs III save and except that

11  "Harsch Investment Properties LLC" is not the answering defendant's name.   Answering

12  defendant admits Paragraph IV of Plaintiff's Complaint; denies each and every allegation of

13  Paragraphs VII and VIII; and  is without information or knowledge sufficient to form a belief as to

14  the truth of allegations contained in Paragraphs I, II, and V of plaintiff's complaint and for that

15  reason denies them.

### FIRST CAUSE OF ACTION

### FIRST DEFENSE

18         Plaintiff's  First Cause of Action  of Plaintiff's Complaint fails to state a claim against

19  answering defendant upon which relief may be granted.

### SECOND DEFENSE

21         In response to Paragraph IX of the First Cause of Action, answering defendant  repeats and

22  realleges as though fully set forth at this point its averments and denials to paragraphs I through

23  XVIII of the General Allegations.  Answering defendant denies each and every allegation of

24  Paragraphs X, XI, XII, XIII, XIV, XV, XVI,  and XVII of the First Cause of Action of Plaintiff's

25  Complaint.

26  (continued).

27

28

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

## SECOND CAUSE OF ACTION

### FIRST DEFENSE

Plaintiff's Second Cause of Action of Plaintiff's Complaint fails to state a claim against answering defendant upon which relief may be granted.

### SECOND DEFENSE

In response to Paragraph XVIII the Plaintiff's Second Cause of Action of his Complaint, answering defendant repeats and realleges as though fully set forth at this point its averments and denials to paragraphs I through XVII of the General Allegations of the Complaint. Answering defendant denies each and every allegation contained in Paragraphs XX, XXI, XXII, XXIII, XXIV, and XXV of Plaintiffs' Second Cause of Action. Paragraph XIX is a statement of the pleader's legal conclusions not facts which must be admitted or denied so that no answer is required to Paragraph XIX . To the extent that an answer is deemed required, Paragraph XIX of the Plaintiff's Second Cause of Action is denied.

### THIRD CAUSE OF ACTION
### FIRST DEFENSE

Plaintiff's Third Cause of Action of Plaintiff's Complaint fails to state a claim against answering defendant upon which relief may be granted.

### SECOND DEFENSE

In response to Paragraph XXVI of the Plaintiff's Third Cause of Action, answering defendant repeats and realleges as though fully set forth at this point its averments and denials to paragraphs I through XVII of the General Allegations and Paragraphs XVIII through XXV of the Plaintiff's Second Cause of Action. To the extent that this cause of action is intended to apply to answering defendant, answering defendant denies each and every allegation of Paragraph XXVII, XXVIII, and Paragraph XXI of the Plaintiff's Third Cause of Action of his Complaint. Paragraphs XXIX and XXX of the Plaintiff's Third Cause of Action state the pleader's legal conclusions rather than facts which must be admitted or denied so that no answer is required to Paragraph XXIX or Paragraph XXX. To the extent that an answer is required to either paragraph, Paragraph XXIX and Paragraph XXX of the Plaintiff's Second Cause of Action are each denied.



1

### FIRST AFFIRMATIVE DEFENSE

2      Plaintiff's claims are barred by the doctrine of laches.

3

### SECOND AFFIRMATIVE DEFENSE

4      Plaintiff's exclusive remedy for the injuries alleged in his complaint is Nevada Revised

5 Statutes, Ch. 616 regarding on the job injuries.

6

### THIRD AFFIRMATIVE DEFENSE

7      Plaintiff's claims are barred by the doctrine of assumption of risk which bars such claims.

8

### FOURTH AFFIRMATIVE DEFENSE

9      Plaintiff's injuries and damages, if proved as alleged, are attributable to the wrongful acts

10 and omissions of third parties over whom defendant had no control and no right to control.

11

### FIFTH AFFIRMATIVE DEFENSE

12      Plaintiff's recovery of damages is subject to provisions of Chapter 616C.010 et seq., and in

13 particular NRS 616C.215.

14

### SIXTH AFFIRMATIVE DEFENSE

15      The plaintiff's Third Cause of Action if asserted against answering defendant is barred for

16 the reason that answering defendant did not have exclusive control of, or right to control, the

17 conditions which are alleged to have caused plaintiff's injuries and damages.

18

### SEVENTH AFFIRMATIVE DEFENSE

19      The plaintiff is not the real party in interest to recover some or all of the damages

20 mentioned in his complaint.

21

### EIGHTH AFFIRMATIVE DEFENSE

22      Some or all of acts or events described in the complaint are due to the wrongful acts or

23 omissions of unnamed parties who are indispensable parties needed for full and final relief and to

24 avoid the risk of inconsistent judgments.

25

### NINTH AFFIRMATIVE DEFENSE

26      Plaintiff has failed to allege special damages with sufficient particularity as required by

27 Rule 9 of Nevada Civil Procedure and plaintiff is barred from recovering special damages that

28 might have been alleged.

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

 

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

### TENTH AFFIRMATIVE DEFENSE

Answering defendant is informed and therefore in good faith alleges that there is a lease between Bravo, Inc., which requires certain actions by Bravo, Inc., and its agents, representatives, successors, predecessors and assigns with respect to defense and indemnity of answering defendant which acts Bravo, Inc., has failed to perform or has performed negligently or with lack of due care.   Answering defendant has fully performed its obligations under the lease.   The party from whom plaintiff is entitled to seek recovery is Bravo, Inc., not the answering defendant.

### ELEVENTH AFFIRMATIVE DEFENSE

To the extent that Rosen is claiming that he has a permanent partial disability greater than the 6% disability rated, awarded and paid under Ch. 616 of Nevada Revised Statutes,  such claim is barred by the principles of collateral estoppel and or *res judicata*, Rosen having failed to exhaust his administrative remedies, including appeal from his employer's third party administrator's decision, in a timely manner.

### TWELFTH AFFIRMATIVE DEFENSE

The answering defendant has been or will be  required to incur attorneys' fees and costs, including expert costs and is entitled to recover such attorneys' fees and costs from the plaintiff in amounts to be proved in the course of the litigation.

Under Rule 11, not all facts and parties are presently known to answering defendant. Answering defendant reserves its rights to amend this answer to allege additional averments and denials and/or affirmative defenses and to assert such affirmative claims as may be justified  by the investigation and discovery in this case.

WHEREFORE, answering defendant seeks judgment as follows:

1.  That the plaintiff take nothing by virtue  of his complaint on file herein;

2.  That this court exercise its jurisdiction to determine claims which may exist as between defendants in this action for defense, indemnity, contribution and/or express/implied/or equitable indemnity;

3. That answering defendant recover its attorneys' fees, costs and expert witness costs incurred or to be incurred in defending this action and asserting any affirmative claims which



1    answering defendants may have.

**CROSS CLAIM**

3    Defendant/Cross claimant HARSCH INVESTMENT PROPERTIES – NV. LLC, sued

4    herein as "HARSCH INVESTMENT PROPERTIES, INC.," (hereinafter, "HARSCH") by and

5    through its attorneys, LEWIS, BRISBOIS, BISGAARD & SMITH, LLP, as and for a cross claim

6    against cross defendant BRAVO., INC., individually and dba RHODES FRAMING,  and against

7    cross defendants Does 1 through 10, inclusive, and all or each of them, states and alleges as

8    follows:

**GENERAL ALLEGATION**

10    1.    Plaintiff IAN ROSEN  (hereinafter ROSEN) has filed a complaint against

11    defendants HARSCH  and BRAVO, INC., DBA RHODES FRAMING (hereinafter "BRAVO").

12    2.  Cross claimant is informed and believes and thereupon alleges that at times material to

13    the complaint ROSEN worked for Tribes Holding LLC. (Hereinafter, "TRIBES).  ROSEN has

14    alleged that "his employer" rented commercial space from HARSCH on or about September 12,

15    2006, in Clark County, State of Nevada.   Cross claimant is informed and believes and therefore

16    alleges that  ROSEN  received  statutory workers' compensation benefits from his statutory

17    employer (TRIBES) for medical payments and disability payments.

18    3.  TRIBES has served a notice of its statutory lien upon Cross Claimant  of its lien which

19    is in a sum less than   seven thousand dollars ($7,000.00)  paid for Rosen's medical treatment and

20    to Rosen as permanent partial disability payments,  but neither Tribes nor its  third party

21    administrator,  Pro Group Management, has intervened in this action as permitted by Nevada

22    workers compensation statutes.

23    4.  At times material to this complaint, Defendant/Cross claimant HARSCH

24    INVESTMENT PROPERTIES – NV. LLC,  was a foreign corporation duly authorized and

25    licensed to conduct business in the State of Nevada and was doing business in Clark County,

26    Nevada.

27    5.  At times material to this complaint, Defendant/Cross defendant BRAVO, INC., dba

28    Rhodes Framing (hereinafter BRAVO), a Nevada corporation, was a tenant in a building owned

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383



1  by HARSCH pursuant to written lease, a which of which is marked Exhibit "A" and attached to

2  this Cross Claim and incorporated as though fully set forth at this point.

3      6. Cross claimant tendered defense and indemnity to Bravo seeking protection against

4  entry of judgment on Rosen's claims for damages  on July 12, 2007, a time well before this suit

5  was filed, all as shown in Exhibit "B" to this Cross Claim, which is incorporated by reference as

6  though fully set forth at this point.

7      7. Cross Defendants DOES 1 through 10, inclusive, are individuals and/or business

8  entities of unknown form authorized to do business in Clark County, Nevada, whose specific

9  identities are unknown to Cross Claimant.  Cross claimant is informed and believes that discovery

10  may show that Does 1 through 10, inclusive, may be legally responsible to Cross Claimant

11  HARSCH in some manner, or were acting on behalf of BRAVO or plaintiff ROSEN or employer

12  TRIBES in some manner presently unknown to Cross claimant.  Cross claimant hereby reserves

13  the right to amend this cross claim as may be necessary to include such additional "Doe"

14  defendants as parties as may be required and/or to amend to name the "DOE" defendants once the

15  true nature of their identities, and/or their specific acts or omissions becomes known to cross

16  claimant.

17      8. Cross claimant is also entitled to a legal determination  that it owed no duty to plaintiff

18  ROSEN, or any lien claimant claiming through him,  at the time and place alleged in plaintiff's

19  complaint. Nonetheless,  if it is determined that cross claimant  HARSCH owed Rosen or any lien

20  clamant  any  legal duty, then Cross claimant  denies that it breached any such  duty or that alleged

21  injuries and damages were caused by or resulted from any such breach of duty.

22      **FIRST CAUSE OF ACTION**

23      **(EXPRESS  AND/OR IMPLIED INDEMNITY)**

24      (AGAINST ALL CROSS DEFENDANTS)

25      9. Cross claimant repeats and realleges and incorporates by reference Paragraphs 1

26  through 8 of the Cross claim as though fully set forth at this point.

27      10. Cross claimant HARSCH  and cross defendant BRAVO entered into the lease

28  agreement attached as Exhibit "A" pertaining to  the HARSCH property known as  470 Mirror

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 600
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383



1    Court, # 106, Henderson, Nevada 89011 (hereinafter, Mirror Court building)  on or about

2    February 1, 2005, on an "AS-IS" basis, all as provided in paragraphs 2.2 and 7.1.1 of Exhibit "A".

3         11.  Pursuant to paragraph 7.2.2 of the lease (Exhibit "A") Bravo was required to maintain

4    the "electrical and lighting systems" of the premises leased.

5         12.  In Paragraph 11.3 of the lease (Exhibit "A") Bravo expressly agreed to indemnify

6    Harsch against all claims and, losses as described in the paragraph, including but not limited to

7    injury to persons relating to the tenant's use and occupancy of the premises.

8         13.  If plaintiff is entitled to recover damages as alleged in his complaint from any

9    defendant, such damages would be attributable to Bravo and/or Does 1 through 10's negligent acts

10   or omissions including without limiting its  failure to maintain the electrical and lighting systems

11   at the Mirror Court building all as required in the lease agreement marked as Exhibit "A" to this

12   Cross Claim.  The lease agreement  is incorporated at this point as though fully set forth.

13   HARSCH is entitled to recover damages, costs, expenses, interest and other payments from

14   BRAVO, INC., and or Does 1 through 10, inclusive, pursuant to  the express indemnification

15   provisions of the agreement in sums which cross claimant alleges and believes will exceed

16   $10,000, according to proof at trial.

17         14.  In the alternative, cross claimant at times material had a special relationship with

18   Bravo, Inc. sufficient to support a claim for implied indemnity, and is entitled to recover from

19   Bravo all sums which it may be required to pay to plaintiff Rosen because of injury caused by

20   alleged defects in the electrical switch in Bravo's premises at Mirror Court all as described in

21   Paragraphs preceding.

22         15.  Cross claimant HARSCH is also entitled to be immediately defended and indemnified

23   by Bravo by reason of Bravo's breaches of the lease agreement between them and wrongful acts

24   towards Rosen.

25         16.  Prior to suit, when HARSCH became aware of plaintiff's demands,  HARSCH made

26   demand upon BRAVO to honor the terms of the lease agreement by  assuming the defense of

27   Harsch, including the duty to indemnify Harsch against claims by Rosen.  BRAVO failed and

28   refused to do so.

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383



1    17. By reason of Bravo's and Does 1 through 10, inclusive, and each of their's, wrongful

2    failure and refusal to defend and indemnify HARSCH, HARSCH has been required to incur

3    attorneys' fees, costs, and economic damages responding to the complaint Rosen has filed and

4    bringing this Cross Claim in excess of $10,000, according to proof at trial and is entitled to

5    recover all such payments, sums and losses proximately caused by the failure and refusal to

6    defend.

**SECOND CAUSE OF ACTION.**

**(BREACH OF CONTRACT)**

(AGAINST ALL CROSS DEFENDANTS)

10    18. Cross claimant repeats and realleges and incorporates by reference Paragraphs 1

11   through 8 of the General Allegations of the Cross Claim and Paragraphs 9 through 17 of the First

12   Cause of Action  as though fully set forth at this point.

13   19. In its Lease Agreement with Cross Claimant HARSCH, Cross defendant BRAVO also

14   agreed to provide insurance as set forth in Exhibit "B" of  the original lease.  Instead of fulfilling

15   its contractual duties with respect to insurance, apparently Bravo obtained only  one certificate of

16   insurance, a copy of which is marked Exhibit "C" to this complaint.  The terms of the certificate of

17   insurance are  incorporated at this point by reference as though fully set forth.  The certificate of

18   insurance as issued and delivered to HARSCH does not  comply with the insurance requirements

19   of the lease.

20   20. Neither of the companies listed in the Certificate of Insurance (Exhibit "C")  have

21   agreed to accept the defense of this case or indemnify HARSCH from any loss or payment to

22   Rosen, or those claiming through him, which HARSCH may be required to make as a result of

23   plaintiff's complaint.  Instead of providing Harsch coverage  in a form satisfying  the requirements

24   described in Exhibit B of the lease,  cross claimant is informed and believes that the primary

25   policy which  Bravo purchased has a large self-insured retention before the excess carriers' duty to

26   defend is triggered, a circumstance which  Exhibit B of the Lease Agreement explicitly prohibited.

27   Exhibit B of the Lease Agreement (found in Exhibit "A" to this Cross Claim) is incorporated by

28   reference as though fully set forth at this point.

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383



21.  Pursuant to holdings of the Nevada Supreme Court in cases such as *Schier v. Hertz Corp.*, 99 Nev. 474, 633 P.2d 1185 (1983) and *Coblentz v. Union Welfare Fund*, 112 Nev. 1161, 925 P.2d 496 (1996), Bravo's wrongful acts and omissions (and those of all or any Doe defendant) in refusing to insure, defend and indemnify HARSCH as required by the lease between them entitles HARSCH to recover all economic loss which would have been avoided had HARSCH been covered by the policy of primary liability insurance as required.

22.  Although Rosen's medical specials and disability payments are less than $7,000, Cross claimant HARSCH is informed and believes that demand by plaintiff will for sums far in excess of those amounts. Therefore, there will be extensive discovery and investigation of the medical and damage claims, the cost of which should be borne by BRAVO which, having failed to procure the primary insurance requested. In this circumstance, if there is no primary insurance applicable, then BRAVO, INC. must defend as if it were the primary insurance carrier on the loss.

23.  BRAVO's failure to purchase the insurance contemplated by the lease agreement by BRAVO and/or his appointed insurance companies and representatives and/or BRAVO'S broker's agent's failure to purchase insurance commensurate with the requirements of the lease, was a breach of the lease agreement and demonstrates lack of due care in placement of bargained for insurance. HARSCH, as a result, has and will incur costs of defense, interest, expert fees, and court costs as well as other economic damage which results from having no primary insurance as provided by the lease agreement between HARSCH and BRAVO. HARSCH is informed and believes that such damages may exceed $10,000, depending upon proof at trial.

### THIRD CAUSE OF ACTION

### (BREACH OF DUTIES OF GOOD FAITH AND FAIR DEALING)

### (AGAINST ALL CROSS DEFENDANTS)

24.  Cross claimant repeats and realleges and incorporates by reference Paragraphs 1 through 8 of the General Allegations of the Cross Claim, Paragraphs 8 through 17 of the First Cause of Action and Paragraphs 18 through 23 of the Second Cause of Action as though fully set forth at this point.

25.  In failing and refusing to defend HARSCH on the Rosen pre-suit claims and

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

4811-6414-0035.1

10

1  complaint, BRAVO breached the provisions of the lease agreement relating to insurance and also

2  breached BRAVO's express agreement to indemnify and hold harmless HARSCH from damages

3  resulting from personal injury to third persons related to the tenant's use and occupancy of the

4  premises.  See Paragraph 11.3 of the lease agreement (Exhibit "A") which is incorporated by

5  reference as though fully set forth at this point.

6      26. There is a covenant of good faith and fair dealing inherent in every contract.  BRAVO

7  has not acted with requisite good faith in performing the terms of its lease agreement and the terms

8  and conditions and requirements thereof and has breached the duties owed.

9      27. Cross defendants are liable to cross claimant in both tort and contract, having failed to

10 honor the terms of the lease agreement and its insuring obligations with requisite good faith and

11 fair dealing, in sums in excess of $10,000.

12     28. As a result of the its breach of good faith and fair dealing in performing the obligations

13 of the lease agreement, HARSCH is entitled to recover damages from Cross defendant BRAVO

14 and/or the respective Doe defendants in sums proved at trial, damages which Cross claimant

15 believes and alleges will exceed $10,000 and cross claimant is entitled to damages which will

16 punish Bravo, Inc. and deter others from failing to exercise good faith in the performance of

17 contracts which they have executed with others such as HARSCH.  Cross claimant is informed

18 and believes that BRAVO, INC.'s net worth permits imposition of punitive damages in amounts in

19 excess of $10,000.

20              **FOURTH  CAUSE OF ACTION**

21                **(CONTRIBUTION, NRS CH. 17)**

22              (AGAINST ALL CROSS DEFENDANTS)

23     29. Cross claimant repeats and realleges and incorporates by reference Paragraphs 1

24 through 8 of the General Allegations of the Cross Claim, Paragraphs 9 through 17 of the First

25 Cause of Action, Paragraphs 18 through 23 of the Second Cause of Action and Paragraphs 24

26 through 28 of the Third Cause of Action as though fully set forth at this point.

27     30. Cross claimant HARSCH is entitled to recover from cross defendants BRAVO and

28 Does 1 through 10, inclusive, any and all sums that HARSCH may be required to pay to Plaintiff

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

4811-6414-0035.1                                           11

1  Ian Rosen, or any other person claiming through him, including without limiting lien claimant Pro

2  Group Management, against any settlement, judgment, award or verdict which plaintiff Rosen

3  may receive against any defendant in this action.

4        31. Rosen has alleged circumstances in his complaint by which HARSCH and BRAVO

5  could be determined to be joint tortfeasors, albeit HARSCH denies it owed any duties to Rosen,

6  denies that it breached any duty, and/or standard of care or statute found applicable to this case.

7  If such allegations are proved, however, then Cross claimant alleges and believes that Bravo is the

8  active tortfeasor and HARSCH, if negligent or guilty of any wrongful conduct whatsoever, is the

9  passive tortfeasor. Pursuant to applicable statutes in Ch. 17 of Nevada Revised Statutes, Cross

10  Claimant HARSCH would then be entitled to recover any sums it was required to pay to Rosen

11  which exceeded its equitable share.

12        32. Bravo's active negligence and want of care in the matters relating to the state of the

13  lighting at the leased premises was the proximate cause of the accident described in plaintiff's

14  complaint which a jury may determined caused plaintiff's injuries and damages alleged. Cross

15  claimant HARSCH is entitled to recover from BRAVO any and all costs, interest, and attorneys'

16  fees incurred in prosecuting this Cross Claim, a Cross Claim which is required only because of

17  BRAVO'S and or Doe 1 through 10's want of care, negligence and breach of the lease agreement

18  BRAVO, INC., entered into with HARSCH.

19        33. Cross claimant HARSCH has been required to retain counsel to defend the plaintiff's

20  action and is entitled to recovery attorneys' fees and costs associated with that action from

21  HARSCH, including any damages, costs, expert fees' interest or other economic damage awarded

22  to Rosen which HARSCH must pay to Rosen to discharge the common liability, if any.

23       WHEREFORE, cross claimant HARSCH INVESTMENT CORPORATION, demands

24  judgment against Cross Defendant BRAVO, INC., dba RHODES FRAMING, and Does 1

25  through 10, inclusive, whether individual or as follows:

26       1. For specific performance of applicable terms of the lease agreement between the Cross

27  claimant HARSCH and the cross defendant BRAVO, INC dba Rhodes Framing.

28       2. For recovery of all sums from cross defendant BRAVO, and/or Does 1 through 10,

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

4811-6414-0035.1

LEWIS BRISBOIS BISGAARD & SMITH LLP
400 SOUTH FOURTH STREET, SUITE 500
LAS VEGAS, NEVADA 89101
TELEPHONE 702.893.3383

1  which adjudged against cross claimant HARSCH whether in favor of plaintiff Ian Rosen or in

2  favor of those claiming through him, including without limiting the workers comp lien claimant,

3  Pro Group Management, including without limiting, attorneys' fees, costs, expert fees', interest,

4  liens, and/or other economic loss of any kind or description, including HARSH's loss of use of

5  money, which cross claimant believes and alleges will exceed $10,000.

6      3. For an award of attorneys' fees, expert fees, interest and costs incurred by the necessity

7  of bringing this Cross Claim in such sums as may be proved at trial which are the direct result of

8  Bravo's wrongful refusal to accept the tender of defense and indemnity previously made to it.

9      4. For Special Damages according to proof.

10      5. For General Damages according to proof.

11      6. For punitive damages according to proof.

12      7. For orders determining that HARSCH should be insured and indemnified as provided

13  by the lease agreement (Exhibit "A") and/or by the insurers listed in the policies represented by

14  the certificate of insurance issued to HARSCH as additional insured (Exhibit "C") and/or any

15  other certificate of insurance issued on BRAVO'S behalf to HARSCH the terms of which are not

16  presently known to cross claimant.

17      8. For a declaration of the parties' rights under the contract attached hereto as Exhibit "A"

18  insofar as it is necessary to resolve issues between the parties; and

19      For such other relief as the Court may deem proper in the premises.

20  Dated this 24th day of __October,__ 2008.

                    LEWIS BRISBOIS BISGAARD & SMITH LLP

22             By _Jennifer W. Aldag  #8729 for_
                JANICE J. BROWN

23                  Nevada Bar No. 001118
                JOSH COLE AICKLEN

24                  Nevada Bar No. 007254
                400 South Fourth Street, Suite 500

25                  Las Vegas, Nevada 89101
                (702) 893-3383; FAX: (702) 893-3789

26                  Attorneys for Defendants/Cross claimant
                HARSCH INVESTMENT PROPERTIES – NV

27                  LLC. Incorrectly Sued as Harsch Investment
                Properties, Inc.

28

**CERTIFICATE OF SERVICE**

Pursuant to N.R.C.P 5(b), I certify that I am an employee of LEWIS BRISBOIS BISGAARD & SMITH LLP and that on this 14 day of October, 2008, I did cause a true copy of DEFENDANT HARSCH INVESTMENT PROPERTIES – NV. LLC sued as HARSCH INVESTMENT PROPERTIES, INC.'S AMENDED ANSWER AND CROSS CLAIM to be placed in the United States Mail, with first class postage prepaid thereon, and addressed as follows:

Lloyd W. Baker, Esq.
Jason W. Barrus, Esq.
BAKER LAW OFFICES
500 South Eighth Street
Las Vegas, NV 89101
*Attorneys for Plaintiff*

*Separate Service will be made upon Bravo, Inc., who has not appeared in this action.*

BY: _____
An Employee of
LEWIS BRISBOIS BISGAARD & SMITH LLP

4811-6414-0035.1                              14

A

## LEASE AGREEMENT
(Net)

THIS LEASE AGREEMENT ("Lease") is made between Harsch Investment Properties – Nevada, LLC, an Oregon limited liability company ("Landlord"), and Bravo, Inc, a Nevada Corporation dba Rhodes Framing ("Tenant"), as of December 7, 2004 (the "date of this Lease").

### BASIC LEASE INFORMATION

**DESCRIPTION OF PREMISES:** 470 Mirror Court, Suite 104 & 106, Henderson, Nevada 89015, (the Premises as shown on <u>Exhibit A</u>), consisting of approximately 29,570 square feet within Building B (the "Building") of Landlord's multi-tenant development known as Henderson Commerce Center (the "Project"). "Tenant's Proportionate Share" (a) of the Building is 44.371% and/or (b) of the Project is 7.569%.

**PERMITTED USE:** Tenant shall utilize the premises for general office/administration offices, warehousing for welding, drywall prep, storage of construction materials, as allowed under current Henderson Zoning restrictions and for no other purpose.

**INITIAL LEASE TERM:** Fifty-two (52) months      **EARLY OCCUPANCY DATE:**  Upon completion of Tenant Improvements

**SCHEDULED COMMENCEMENT DATE:** February 1, 2005      **SCHEDULED EXPIRATION DATE:**  May 31, 2009

**BASE RENT, OPERATING EXPENSES AND SECURITY DEPOSIT:**

(a) Base Rent due pursuant to Paragraph 3:

| | |
|---|---|
| February 1, 2005 through March 31, 2005 | $00.00 per month |
| April 1, 2005 through September 30, 2005 | $14,027.00 per month |
| October 1, 2005 through January 31, 2006 | $18,310.00 per month |
| February 1, 2006 through January 31, 2007 | $19,042.00 per month |
| February 1, 2007 through January 31, 2008 | $19,804.00 per month |
| February 1, 2008 through January 31, 2009 | $20,596.00 per month |
| February 1, 2009 through May 31, 2009 | $21,420.00 per month |

(b) Tenant's Proportionate Share of First Year Estimated Operating Expenses pursuant to Paragraph 4.2:  $3,548.40 per month

(c) Security Deposit pursuant to Paragraph 6: $24,968.40.

(d) Monthly HVAC Service Charge pursuant to Paragraph 7.1.2: $00.00 per month

| NOTICE ADDRESSES: | NOTICE TO LANDLORD: | NOTICE TO TENANT: |
|---|---|---|
| | Harsch Investment Properties - Nevada, LLC | Bravo, Inc. |
| | 3111 South Valley View Blvd., Suite K-101 | 470 Mirror Court, Suite B-105 & 106 |
| | Las Vegas, Nevada 89102 | Henderson, Nevada 89015 |
| | Attn: Property Manager | Attn: Wes D. Gritton |
| | Fax: (702) 368-2930 | Telephone: 702-739-7649 |

| BILLING AND PAYMENT ADDRESSES: | LOCKBOX REMITTANCE TO LANDLORD: | BILLING TO TENANT: |
|---|---|---|
| | Henderson Commerce Ctr. | Bravo, Inc. |
| | Unit No. 21 | 470 Mirror Court, Suite B-105 & 106 |
| | P O Box 5000 | Henderson, Nevada 89015 |
| | Portland, Oregon 97208- 5000 | Attn: Wes D. Gritton |

**TENANT'S TAXPAYER ID #: 88-0282642**

**GUARANTOR:** James M. Rhodes (If any, see <u>Exhibit G</u>)

**TENANT CONTACT:** Wes D. Gritton      Telephone: 702-739-7649      Fax:

IN WITNESS WHEREOF, the parties hereto have executed this Lease, consisting of the foregoing Basic Lease Information, the following Paragraphs 1 through 33 (the "Standard Lease Provisions") and Exhibits A (Premises/Project), B (Insurance), C (Signage Criteria), D (Tenant Improvement Agreement), E (Rules & Regulations) F (Further Provisions) and G (Guaranty of Lease) all of which are incorporated herein by this reference (collectively, this "Lease"). In the event of any conflict between the provisions of the Basic Lease Information and the provisions of the Standard Lease Provisions, the Standard Lease Provisions shall control.

| | |
|---|---|
| Landlord | Tenant |
| Harsch Investment Properties -Nevada, LLC | Bravo, Inc, a Nevada corporation |
| By: | By: |
| Name | Wes D. Gritton - President |
| Title VP of Operations | |

Revision 2 – March 2004                          -1-

**STANDARD LEASE PROVISIONS**
(Net)

1.    <u>Premises</u>.    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, subject to the following terms and conditions, the Premises located in the Project and described in the Basic Lease Information and shown on the attached <u>Exhibit A</u>.  Landlord reserves the right to make such changes, additions and/or deletions to the Project and/or the common areas and parking or other facilities thereof as it shall determine from time to time.

2.    <u>Term</u>.

2.1    Unless delayed or sooner terminated in accordance herewith, the term of this Lease (the **"Term"**) shall be as set forth in the Basic Lease Information. If the Term Commencement Date (defined below) is not the first day of a calendar month, there shall be added to the Term the partial month (**"Partial Lease Month"**) from the Term Commencement Date through the last day of that calendar month containing the Term Commencement Date.

2.2    The Term shall commence as specified in the Basic Lease Information on the Scheduled Term Commencement Date unless the Landlord has not delivered the Premises to Tenant by that date. In the latter event, the Term Commencement Date shall be the earlier of the date Landlord delivers the Premises. to Tenant or the date Tenant takes possession or commences use of any portion of the Premises for any business purpose (including moving in).  If this Lease contemplates the construction of tenant improvements in the Premises by Landlord, Landlord shall be deemed to have delivered the Premises to Tenant on the date determined by Landlord's space planner to be the date of substantial completion of the work to be performed by Landlord (as described in the Tenant Improvement Agreement, if any, attached hereto as <u>Exhibit D</u>). Tenant acknowledges that Tenant has inspected and accepts the Premises in their present condition, "AS-IS" (WITH ALL FAULTS), except for tenant improvements (if any) to be constructed by Landlord in the Premises.

2.3    This Lease shall be a binding contractual obligation upon execution and delivery hereof by Landlord and Tenant, notwithstanding the later commencement of the Term. If the Term Commencement Date is delayed, this Lease shall not be void or voidable, the Term shall not be extended (except as provided in Paragraphs 2.1 & 2.2, and Landlord shall not be liable to Tenant for any loss or damage resulting therefrom; provided that Tenant shall not be liable for any Rent (defined below) for any period prior to the Term Commencement Date.

2.4    Upon full execution and delivery of this Lease and receipt by Landlord of satisfactory evidence of Tenant's compliance with the insurance provisions of the Lease, Tenant may be permitted to occupy the Premises prior to the Term Commencement Date to install furniture, fixtures and the like. Early occupancy shall not advance the expiration date of the Lease and no Base Rent shall be payable, but Tenant shall be responsible for any separately metered utility usage and bound by all other provisions of the Lease, including, without limitation, Additional Rent (defined below). During any early occupancy or other period in which Landlord and Tenant are simultaneously occupying and/or performing work in the Premises, Landlord's construction supervisor shall be authorized to resolve any conflicts as to scheduling, access or the like.

3.    <u>Rent; Payment of Additional Rent; Operating Expenses</u>.

3.1    Subject to the provisions of this Paragraph 3, Tenant agrees to pay during the Term as rent for the Premises the sums specified in the Basic Lease Information (as increased from time to time as provided in the Basic Lease Information or as may otherwise be provided in this Lease) (the **"Base Rent"**). Base Rent shall be payable in consecutive monthly installments, in advance, without prior notice, demand, deduction or offset, commencing on the Term Commencement Date and continuing on the first day of each calendar month thereafter, except that the first full monthly installment of Base Rent shall be payable upon Tenant's execution of this Lease. If the Term Commencement Date is not the first day of a calendar month, then the Base Rent for the Partial Lease Month shall be prorated based on a 30-day month and shall be payable on the first day of the calendar month following the Term Commencement Date.

3.2    All monies to be paid by Tenant hereunder, including Tenant's Proportionate Share of Operating Expenses as specified in Paragraph 4 (estimated and/or revised), and all other amounts, fees, payments or charges payable hereunder by Tenant (collectively, **"Additional Rent"**), together with Base Rent, shall (i) each constitute rent payable hereunder (and shall sometimes collectively be referred to herein as **"Rent"**), (ii) be payable to Landlord in lawful money of the United States when due without any prior demand therefor, except as may be expressly provided to the contrary herein, (iii) be payable to Landlord at Landlord's Remittance Address set forth in the Basic Lease Information or to such other person or to such other place as Landlord may from time to time designate in writing to Tenant, and (iv) if applicable, be prorated based upon a 30 day month for any partial month.

4.    **Operating Expenses**.

4.1    **Operating Expenses**.  In addition to the Base Rent required to be paid hereunder, Tenant shall pay as Additional Rent, Tenant's Proportionate Share of the Building and/or Project (as applicable), as defined in the Basic Lease Information, of Operating Expenses (defined below) in the manner set forth below.  Landlord and Tenant acknowledge that if the number of buildings which constitute the Project increases or decreases, or if physical changes are made to the Premises, Building and/or Project or the configuration of any thereof, Landlord may at its discretion reasonably adjust Tenant's Proportionate Share of the Building and/or Project to reflect the change.  Landlord's determination of Tenant's Proportionate Share of the Building and/or Project shall be conclusive absent manifest error.  "Operating Expenses" shall mean all expenses and costs of every kind and nature which Landlord shall pay or become obligated to pay, because of or in connection with the ownership, management, maintenance, repair, preservation, replacement and operation of the Building and/or Project and its supporting facilities and such additional facilities now and in subsequent years as may be determined by Landlord to be necessary or desirable to the Building and/or Project (as determined in a reasonable manner) other than those expenses and costs which are specifically attributable to Tenant or which are expressly made the financial responsibility of Landlord or specific tenants of the Building or Project pursuant to this Lease.  Operating Expenses shall include, but are not limited to, the following:

4.1.1    Taxes.  All real property taxes and assessments, possessory interest taxes, sales taxes, personal property taxes, business or license taxes or fees, gross receipts taxes, service payments in lieu of such taxes or fees, annual or periodic license or use fees, excises, transit charges, and other impositions, general and special, ordinary and extraordinary, unforeseen as well as foreseen, of any kind (including fees "in-lieu" of any such tax or assessment) which are now or hereafter assessed, levied, charged, confirmed, or imposed by any public authority upon the Landlord, Building, or the Project, its operations or the Rent (or any portion or component thereof), or any tax, assessment or fee imposed in substitution, partially or totally, of any of the above.  Operating Expenses shall also include any taxes, assessments, reassessments, or other fees or impositions with respect to the development, leasing, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, Building or Project or any portion thereof, including, without limitation, by or for Tenant, and all increases therein or reassessments thereof whether the increases or reassessments result from increased rate and/or valuation (whether upon a transfer of the Building or Project or any portion thereof or any interest therein or for any other reason).  Operating Expenses shall not include inheritance or estate taxes imposed upon or assessed against the interest of any person in the Project, or taxes computed upon the basis of the net income of any owners of any interest in the Project.  If it shall not be lawful for Tenant to reimburse Landlord for all or any part of such taxes, the monthly rental payable to Landlord under this Lease shall be revised to net Landlord the same net rental after imposition of any such taxes by Landlord as would have been payable to Landlord prior to the payment of any such taxes.

4.1.2    Insurance.  All insurance premiums and costs, including, but not limited to, any deductible amounts, premiums and other costs of insurance incurred by Landlord, including for the insurance coverage required under Paragraph 11.1 herein.

4.1.3    Common Area Maintenance.

4.1.3.1    Repairs, replacements, and general maintenance of and for the Building and Project and public and common areas and facilities of and comprising the Building and Project, including, but not limited to, the roof and roof membrane, elevators, mechanical rooms, alarm systems, pest extermination, landscaped areas, parking and service areas, driveways, sidewalks, truck staging areas, rail spur areas, fire sprinkler systems, sanitary and storm sewer lines, utility services, heating/ventilation/air conditioning systems, electrical, mechanical or other systems, telephone equipment and wiring servicing, plumbing, lighting, and any other items or areas which affect the operation or appearance of the Building or Project, which determination shall be at Landlord's discretion, except for: those items to the extent paid for by the proceeds of insurance; and those items attributable solely or jointly to specific tenants of the Building or Project.

4.1.3.2    Repairs, replacements, and general maintenance shall include the cost of any improvements made to or assets acquired for the Project or Building that in Landlord's discretion may reduce any other Operating Expenses, including present or future repair work, are reasonably necessary for the health and safety of the occupants of the Building or Project, or for the operation of the Building systems, services and equipment, or are required to comply with any Regulation, such costs or allocable portions thereof to be amortized over such reasonable period as Landlord shall determine, together with interest on the unamortized balance.

4.1.3.3  Payment under or for any easement, license, permit, operating agreement, declaration, restrictive covenant or instrument relating to the Building or Project.

4.1.3.4  All expenses and rental related to services and costs of supplies, materials and equipment used in operating, managing and maintaining the Premises, Building and Project, the equipment therein and the adjacent sidewalks, driveways, parking and service areas, including, without limitation, expenses related to service agreements regarding security, fire and other alarm systems, janitorial services to the extent not furnished by Tenant under Paragraph 7.2 hereof, window cleaning, elevator maintenance, Building exterior maintenance, landscaping and expenses related to the administration, management and operation of the Project.

4.1.3.5  The cost of supplying any services and utilities which benefit all or a portion of the Premises, Building or Project to the extent not furnished by Tenant under Paragraph 7.2 hereof.

4.1.3.6  Legal expenses and the cost of audits by certified public accountants; provided, however, that legal expenses chargeable as Operating Expenses shall not include the cost of negotiating leases, collecting rents, evicting tenants nor shall it include costs incurred in legal proceedings with or against any tenant or to enforce the provisions of any lease.

4.1.3.7  A management fee equal to five percent (5%) of the sum of the Landlord's effective gross income from the Project which consists of the gross rents charged the tenants of the Project plus expense reimbursements and other operating income.

If the rentable area of the Building and/or Project is not fully occupied during any calendar year of the Term as determined by Landlord, an adjustment shall be made in Landlord's discretion in computing the Operating Expenses for such year so that Tenant pays an equitable portion of all variable items (e.g., utilities, janitorial services and other component expenses that are affected by variations in occupancy levels) of Operating Expenses, as reasonably determined by Landlord; provided, however, that in no event shall Landlord be entitled to collect in excess of one hundred percent (100%) of the total variable Operating Expenses from all of the tenants in the Building or Project, as the case may be.

The above enumeration of services and facilities shall not be deemed to impose an obligation on Landlord to make available or provide such services or facilities except to the extent if any that Landlord has specifically agreed elsewhere in this Lease to make the same available or provide the same. Without limiting the generality of the foregoing, Tenant acknowledges and agrees that it shall be responsible for providing adequate security for its use of the Premises, the Building and the Project and that Landlord shall have no obligation or liability with respect thereto, except to the extent if any that Landlord has specifically agreed elsewhere in this Lease to provide the same.

4.2     **Payment of Estimated Operating Expenses.** "Estimated Operating Expenses" for any particular year shall mean Landlord's estimate of the Operating Expenses for such calendar year. During the last month of each calendar year during the Term, or as soon thereafter as practicable, Landlord shall give Tenant written notice of the Estimated Operating Expenses for the ensuing calendar year. Tenant shall pay Tenant's Proportionate Share of the Estimated Operating Expenses with installments of Base Rent for the calendar year to which the Estimated Operating Expenses applies in monthly installments on the first day of each calendar month during such year, in advance, prorated for any partial month, if applicable. If at any time during the course of the calendar year, Landlord determines that Operating Expenses are projected to vary from the then Estimated Operating Expenses by more than five percent (5%), Landlord may, by written notice to Tenant, revise the Estimated Operating Expenses for the balance of such calendar year, and Tenant's monthly installments for the remainder of such year shall be adjusted so that by the end of such calendar year Tenant has paid to Landlord Tenant's Proportionate Share of the revised Estimated Operating Expenses for such year.

4.3     **Computation of Operating Expense Adjustment.** "Operating Expense Adjustment" shall mean the difference between Estimated Operating Expenses and actual Operating Expenses for any calendar year determined as hereinafter provided. Within one hundred twenty (120) days after the end of each calendar year, or as soon thereafter as practicable, Landlord shall deliver to Tenant a statement of actual Operating Expenses for the calendar year just ended, accompanied by a computation of Operating Expense Adjustment. If such statement shows that Tenant's payment based upon Estimated Operating Expenses is less than Tenant's Proportionate Share of Operating Expenses, then Tenant shall pay to Landlord the difference within twenty (20) days after receipt of such statement. If such statement shows that Tenant's payments of Estimated Operating Expenses exceed Tenant's Proportionate Share of Operating Expenses, then (provided that Tenant is not in default under this Lease) Landlord shall pay to Tenant the difference within twenty (20) days after delivery of such statement to Tenant. If this Lease has been terminated or the Term hereof has expired prior to the date of such statement, then the Operating Expense Adjustment shall be paid by the appropriate party within twenty (20) days after the date of delivery of the statement. Tenant's Proportionate Share of the Operating Expense Adjustment shall be prorated based on a month of 30

days and the number of calendar months during such calendar year that this Lease is in effect. Notwithstanding anything to the contrary contained in Paragraph 4.1 or 4.2, Landlord's failure to provide any notices or statements within the time periods specified in those paragraphs shall in no way excuse Tenant from its obligation to pay Tenant's Proportionate Share of Operating Expenses.

4.4     **Net Lease.** This shall be a net Lease and Base Rent shall be paid to Landlord net of all costs and expenses, except as specifically provided to the contrary in this Lease. The provisions for payment of Operating Expenses and the Operating Expense Adjustment are intended to pass on to Tenant and reimburse Landlord for all costs and expenses of the nature described in Paragraph 4.1. incurred in connection with the ownership, management, maintenance, repair, preservation, replacement and operation of the Building and/or Project and its supporting facilities and such additional facilities now and in subsequent years as may be determined by Landlord to be necessary or desirable to the Building and/or Project.

4.5     **Tenant Audit.** If Tenant shall dispute the amount set forth in any statement provided by Landlord under Paragraph 4.3 above, Tenant shall have the right, not later than twenty (20) days following receipt of such statement and upon the condition that Tenant shall first deposit with Landlord the full amount in dispute, to cause Landlord's books and records with respect to Operating Expenses for such calendar year to be audited by certified public accountants selected by Tenant and subject to Landlord's reasonable right of approval. The Operating Expense Adjustment shall be appropriately adjusted on the basis of such audit. If such audit discloses a liability for a refund in excess of ten percent (10%) of Tenant's Proportionate Share of the Operating Expenses previously reported, the cost of such audit shall be borne by Landlord; otherwise the cost of such audit shall be paid by Tenant. If Tenant shall not request an audit in accordance with the provisions of this Paragraph 4.5 within twenty (20) days after receipt of Landlord's statement provided pursuant to Paragraph 4.3, such statement shall be final and binding for all purposes hereof. Tenant acknowledges and agrees that any information revealed in the above described audit may contain proprietary and sensitive information and that significant damage could result to Landlord if such information were disclosed to any party other than Tenant's auditors. Tenant shall not in any manner disclose, provide or make available any information revealed by the audit to any person or entity without Landlord's prior written consent, which consent may be withheld by Landlord in its sole and absolute discretion. The information disclosed by the audit will be used by Tenant solely for the purpose of evaluating Landlord's books and records in connection with this Paragraph 4.5.

5.     **Delinquent Payment; Handling Charges.** If Tenant is more than ten (10) days late in paying any amount of Rent, Tenant shall pay Landlord a late charge equal to ten percent (10%) of the delinquent amount. In addition, any amount due from Tenant to Landlord which is not paid within ten (10) days of the date due shall bear interest at an annual rate (the "Default Rate") equal to fifteen percent (15%).

6.     **Security Deposit.** Upon execution of this Lease, Tenant shall pay to Landlord the amount of Security Deposit specified in the Basic Lease Information. If Tenant defaults with respect to any provision of this Lease, Landlord may, but shall not be required to, use, apply or retain all or any part of the Security Deposit. If any portion of the Security Deposit is so used or applied, Tenant shall, within ten (10) days after demand therefor by Landlord, deposit with Landlord cash in an amount sufficient to restore the Security Deposit to the amount required to be maintained by Tenant hereunder. Anytime the Base Rent increases during the term of this Lease, Tenant shall, upon written request from Landlord, deposit additional monies with Landlord sufficient to maintain the same ratio between the Security Deposit and the Base Rent as those amounts are specified in the Basic Lease Information. Within a reasonable period following expiration or the sooner termination of this Lease, provided that Tenant has performed all of its obligations hereunder, Landlord shall return to Tenant the remaining portion of the Security Deposit. The Security Deposit may be commingled by Landlord with Landlord's other funds, and no interest shall be paid thereon.

7.     **Repairs and Maintenance.**

7.1     **Landlord's Obligations.**

7.1.1     Landlord shall, subject to reimbursement under Paragraph 4, maintain in good repair, reasonable wear and tear excepted, the structural soundness of the roof, foundations, and exterior walls of the Building together with the common areas and other equipment used in common by tenants in the Project. The term "exterior walls" as used herein shall not include windows, glass or plate glass, doors, dock bumpers or dock plates, special store fronts or office entries. Any damage caused by or repairs necessitated by any negligence or act of Tenant, including, without limitation, any contractor, employee, agent, invitee or visitor of Tenant (each, a "Tenant Party") may be repaired by Landlord at Landlord's option and Tenant's expense. Tenant shall immediately give Landlord written notice of any defect or need of repairs in such components of the Building for which Landlord is responsible, after which Landlord shall have a reasonable opportunity and the right to enter the Premises at all reasonable times to repair same. Landlord's liability with respect to any defects, repairs, or maintenance for which Landlord is responsible under any of the provisions of this Lease shall be limited to the cost of such

repairs or maintenance, and there shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with Tenant's business arising from the making of repairs, alterations or improvements in or to any portion of the Premises, the Building or the Project or to fixtures, appurtenances or equipment in the Building, except as provided in Paragraph 15. By taking possession of the Premises, Tenant accepts them "as is," as being in good order, condition and repair, and the condition in which Landlord is obligated to deliver them and suitable for the Permitted Use and Tenant's intended operations in the Premises, whether or not any notice of acceptance is given.

7.1.2   At Tenant's expense, Landlord shall have responsibility for the performance of preventive maintenance, repair and replacement of the heating, ventilation and air conditioning (HVAC) systems serving the Premises. In addition to Base Rent, Tenant shall pay a monthly HVAC Service Charge as set forth in the Basic Lease Information, the amount of which may be increased by Landlord no more frequently than once per year. Alternatively, Landlord may, upon notice to Tenant, require Tenant to obtain a regularly scheduled preventative maintenance/service contract at Tenant's own expense and in such event both the maintenance contractor and the contract must be approved by Landlord. Any service contract obtained by Tenant must include all services suggested by the equipment manufacturer within the operation/maintenance manual and must become effective and a copy thereof delivered to Landlord no later than the date specified by Landlord.

7.2   **Tenant's Obligations.**

7.2.1   Tenant shall (to the extent possible) contract for and pay directly when due for all gas, heat, air conditioning, light, power, telephone and data, sprinkler charges, cleaning, waste disposal in excess of that provided by Landlord, and other utilities and services (the "Services") used on or from the Premises, together with any taxes (other than real estate taxes), penalties, surcharges or the like pertaining thereto. If any such Services are not separately billed or metered to Tenant, Tenant shall pay an equitable share, as determined in good faith by Landlord, of all charges jointly billed or metered with other premises in the Project. Tenant shall also be responsible and pay for any personal property, sales, use or income taxes associated with Tenant's use or occupancy of the Premises, insurance required to be carried by Tenant under the Lease, and Tenant's repair and maintenance duties under the Lease.

7.2.2   Tenant shall at all times during the Term at Tenant's expense maintain all parts of the Premises and such portions of the Building as are within the exclusive control of Tenant in a good, clean and secure condition and promptly make all necessary repairs and replacements, as determined by Landlord, including but not limited to, all windows, glass, doors, walls, including demising walls, and wall finishes, floors and floor covering, heating, ventilating and air conditioning systems, ceiling insulation, truck doors, hardware, dock bumpers, dock plates and levelers, plumbing work and fixtures, downspouts, entries, skylights, smoke hatches, roof vents, electrical and lighting systems, and fire sprinklers, with materials and workmanship of the same character, kind and quality as the original. Tenant shall at Tenant's expense also perform regular removal of trash and debris. Notwithstanding anything to the contrary contained herein, Tenant shall, at its expense, promptly repair any damage to the Premises or the Building or Project resulting from or caused by any negligence or act of Tenant or Tenant's Parties. Nothing herein shall expressly or by implication render Tenant Landlord's agent or contractor to effect any repairs or maintenance required of Tenant under Paragraph 7.2, as to all of which Tenant shall be solely responsible.

7.2.3   Tenant shall be responsible for and shall pay prior to delinquency any taxes or governmental service fees, possessory interest taxes, fees or charges in lieu of any such taxes, capital levies, or other charges imposed upon, levied with respect to or assessed against its fixtures, furnishings, equipment, personal property or its Alterations (defined below), and on Tenant's interest pursuant to this Lease, or any increase in any of the foregoing. To the extent that any such taxes are not separately assessed or billed to Tenant, Tenant shall pay the amount thereof as invoiced to Tenant by Landlord.

8.   **Improvements, Alterations & Mechanic's Liens.**

8.1   **Improvements; Alterations.**

8.1.1   Tenant shall not make, or allow to be made, any alterations, physical additions, improvements or partitions, including without limitation the attachment of any fixtures or equipment, in, about or to the Premises ("Alterations") without obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld with respect to proposed Alterations which: (1) comply with all applicable Regulations; (2) are, in Landlord's opinion, compatible with the Building or the Project and its mechanical, plumbing, electrical, heating/ventilation/air conditioning systems, and will not cause the Building or Project or such systems to be required to be modified to comply with any Regulations (including, without limitation, the Americans With Disabilities Act); and (3) will not interfere with the use and occupancy of any other portion of the Building or Project by any other tenant or its invitees. Specifically, but without limiting the generality of the

foregoing, Landlord shall have the right of written consent for all plans and specifications for the proposed Alterations, construction means and methods, all appropriate permits and licenses, any contractor or subcontractor to be employed on the work of Alterations, and the time for performance of such work, and may impose rules and regulations for contractors and subcontractors performing such work. Tenant shall also supply to Landlord any documents and information reasonably requested by Tenant in connection with Landlord's consideration of a request for approval hereunder. Tenant shall cause all Alterations to be accomplished in a good and workmanlike manner, and to comply with all applicable Regulations. Tenant shall at Tenant's sole expense, perform any additional work required under applicable Regulations due to the Alterations hereunder. No review or consent by Landlord of or to any proposed Alteration or additional work shall constitute a waiver of Tenant's obligations under this Paragraph 8.1. Tenant shall reimburse Landlord for all costs which Landlord may incur in connection with granting approval to Tenant for any such Alterations, including any costs or expenses which Landlord may incur in electing to have outside architects and engineers review said plans and specifications. All such Alterations shall remain the property of Tenant until the expiration or earlier termination of this Lease, at which time they shall be and become the property of Landlord; provided, however, that Landlord may, at Landlord's option, require that Tenant, at Tenant's expense, remove any or all Alterations made by Tenant and restore the Premises by the expiration or earlier termination of this Lease, to their condition existing prior to the construction of any such Alterations. All such removals and restoration shall be accomplished in a first-class and good and workmanlike manner so as not to cause any damage to the Premises or Project whatsoever. If Tenant fails to remove such Alterations or Tenant's trade fixtures or furniture or other personal property, Landlord may keep and use them or remove any of them and cause them to be stored or sold in accordance with applicable law, at Tenant's sole expense.

8.1.2    Notwithstanding the foregoing, at Landlord's option (but without obligation), all or any portion of the Alterations shall be performed by Landlord for Tenant's account and Tenant shall pay Landlord's estimate of the cost thereof (including a reasonable charge for Landlord's overhead and profit) prior to commencement of the work. In addition, at Landlord's election and notwithstanding the foregoing, however, Tenant shall pay to Landlord the cost of removing any such Alterations and restoring the Premises to their original condition such cost to include a reasonable charge for Landlord's overhead and profit as provided above, and such amount may be deducted from the Security Deposit or any other sums or amounts held by Landlord under this Lease.

8.1.3    At least ten (10) business days before beginning construction of any Alteration, Tenant shall give Landlord written notice of the expected commencement date of that construction to permit Landlord to post and record a notice of non-responsibility. Upon substantial completion of construction, if the law so provides, Tenant shall cause a timely notice of completion to be recorded in the office of the recorder of the county in which the Building is located.

8.2    **Mechanic's Liens**. Tenant shall not cause, suffer or permit any mechanic's or materialman's lien or claim to be filed or asserted against the Premises or the Project for any work performed, materials furnished, or obligation incurred by or at the request of Tenant or any Tenant Party.

9.    **Use**.

9.1    **Permitted Use**. Tenant shall continuously occupy and use the Premises only for the Permitted Use stated in the Basic Lease Information (the "Permitted Use") and shall not create or permit any nuisance or unreasonable interference with or disturbance of any other tenants of Landlord. Tenant shall at its sole cost and expense strictly comply with all existing or future applicable governmental laws, rules, requirements and regulations, and covenants, easements and restrictions of record governing and relating to the use, occupancy or possession of the Premises, or to Tenant's use of the common areas together with all rules which may now or hereafter be adopted by Landlord affecting the Premises and/or the common areas (collectively "Regulations"). Should any Regulation now or hereafter be imposed on Tenant or Landlord by any governmental body relating to the use or occupancy of the Premises by Tenant or any Tenant Party, then Tenant agrees, at its sole cost and expense, to comply promptly with such Regulations.

9.2    **Hazardous Materials**. As used in this Lease, the term "**Hazardous Material**" means any flammable items, hazardous or toxic substances, including any substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials" or "toxic substances" now or subsequently regulated under any applicable federal, state or local laws or regulations, including without limitation petroleum-based products, paints, pesticides, asbestos, PCBs and similar compounds, and including any materials subsequently found to have adverse effects on the environment or the health and safety of persons. Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Property by Tenant or any Tenant Party without the prior written consent of Landlord. Notwithstanding the foregoing, Tenant may, without Landlord's prior written consent but in compliance with all applicable laws and Regulations, use any materials customarily used by occupants of commercial office space, so long as such

use does not expose the Premises, the Building or the Project to any meaningful risk of contamination or damage or expose Landlord to any liability therefore.

10.    **Assignment and Subletting.**

10.1    **Transfers; Consent.**  Tenant shall not, without the prior written consent of Landlord, (a) assign, transfer, mortgage, hypothecate, or encumber this Lease or any estate or interest herein, whether directly, indirectly or by operation of law, (b) permit any other entity to become a Tenant hereunder by merger, consolidation, or other reorganization, (c) if Tenant is a corporation, partnership, limited liability company, limited liability partnership, trust, association or other business entity (other than a corporation whose stock is publicly traded), permit, directly or indirectly, the transfer of any ownership interest in Tenant so as to result in (i) a change in the current control of Tenant, (ii) a transfer of twenty-five percent (25%) or more in the aggregate in any twelve (12) month period in the beneficial ownership of such entity or (iii) a transfer of all or substantially all of the assets of Tenant, (d) sublet any portion of the Premises, or (e) grant any license, concession, or other right of occupancy of or with respect to any portion of the Premises, or (f) permit the use of the Premises by any party other than Tenant or a Tenant Party (each of the events listed in this Paragraph 9.1 being referred to herein as a "Transfer"). At least twenty (20) business days prior to the effective date of any proposed Transfer, Tenant shall provide Landlord with a written description of all terms and conditions of the proposed Transfer and all consideration therefor, copies of the proposed documentation, and such information as Landlord may reasonably require. Any Transfer made without Landlord's consent shall be void and shall constitute an Event of Default by Tenant. Tenant shall pay to Landlord $500 as a review fee for each Transfer request, and reimburse Landlord for its reasonable attorneys' fees and all other costs incurred in connection with considering any request for consent to a proposed Transfer. Landlord's consent to a Transfer shall not release Tenant from its obligations under this Lease (or any guarantor of this Lease of its obligations with respect thereto). Landlord's consent to any Transfer shall not waive Landlord's rights as to any subsequent Transfers.

10.2    **Cancellation and Recapture.**  Notwithstanding Paragraph 10.1, Landlord may (but shall not be obligated to), within ten (10) business days after receipt of Tenant's written request for Landlord's consent to an assignment or subletting, cancel this Lease as to the portion of the Premises proposed to be sublet or subject to an assignment of this Lease ("Transfer Space") as of the date such proposed Transfer is proposed to be effective and, thereafter, Landlord may lease such portion of the Premises to the prospective transferee (or to any other person or entity or not at all) without liability to Tenant

11.    **Insurance, Waivers, Subrogation and Indemnity.**

11.1    **Insurance.**  Each of Landlord and Tenant shall maintain throughout the Term insurance policies as required on **Exhibit B** attached hereto and shall otherwise comply with the obligations and requirements provided on **Exhibit B**.

11.2    **Waiver of Subrogation.**  Landlord and Tenant each waives any claim, loss or cost it might have against the other for any damage to or theft, destruction, loss, or loss of use of any property (a "Loss"), to the extent the same is insured against (or is required to be insured against under the terms hereof) under any "all risk" property damage insurance policy covering the Building, the Project, the Premises, Landlord's or Tenant's fixtures, personal property, leasehold improvements, or business, regardless of whether the negligence of the other party caused such Loss.

11.3    **Indemnity.**  Subject to Paragraph 11.2, Tenant shall indemnify, defend by counsel reasonably acceptable to Landlord, protect and hold harmless Landlord and its affiliates, and each of their respective directors, shareholders, partners, lenders, members, managers, contractors, affiliates and employees (collectively, "Landlord Indemnitees") from and against all claims, losses, liabilities, causes of suit or action, judgments, damages, penalties, costs and expenses (including, without limitation, reasonable attorneys' fees, consultant's fees, and court costs) arising from or asserted in connection with the use or occupancy of the Premises, the Building or the Project by Tenant or any Tenant Party, or any negligence or misconduct or omissions of Tenant or of any Tenant Party in or about the Premises or the Project, or Tenant's breach of any of its covenants under this Lease, except in each case to the extent arising from the gross negligence or willful misconduct of Landlord or any Landlord Indemnitee.  Except to the extent expressly provided in this Lease, Tenant hereby waives all claims against and releases Landlord and each Landlord Indemnitee for any injury to or death of persons, damage to property or business loss in any manner related to (i) Tenant's use and occupancy of the Premises, the Building or the Project by or from any cause whatsoever (other than Landlord's gross negligence or willful misconduct), (ii) acts of God, (iii) acts of third parties, or (iv) any matter outside of the reasonable control of Landlord. This Paragraph 11.3 shall survive termination or expiration of this Lease.

**12.**     <u>Subordination; Attornment</u>.

    12.1    <u>Subordination</u>. This Lease is subject and subordinate to all present and future ground or master leases of the Project and to the lien of all mortgages or deeds of trust (collectively, "**Security Instruments**") now or hereafter encumbering the Project, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of any such Security Instruments, unless the holders of any such mortgages or deeds of trust, or the lessors under such ground or master leases (such holders and lessors are sometimes collectively referred to herein as "**Holders**") require in writing that this Lease be superior thereto. Tenant shall, within fifteen (15) days of request to do so by Landlord, execute, acknowledge and deliver to Landlord such further instruments or assurances as Landlord may deem necessary or appropriate to evidence or confirm the subordination or superiority of this Lease to any such Security Instrument.

    12.2    <u>Attornment</u>. Tenant covenants and agrees that in the event that any proceedings are brought for the foreclosure of any mortgage or deed of trust, or if any ground or master lease is terminated, it shall attorn, without any deductions or set-offs whatsoever, to the purchaser upon any such foreclosure sale, or to the lessor of such ground or master lease, as the case may be, if so requested to do so by such purchaser or lessor, and to recognize such purchaser or lessor as "Landlord" under this Lease. In the event that the holder of any such mortgage or deed of trust becomes the "Landlord" under this Lease, such holder shall not be liable for any act or omission of Landlord which occurred prior to such holder's acquisition of title.

**13.**     <u>Rules and Regulations and Signage</u>. Tenant shall comply, and shall cause each Tenant Party to comply, with the Rules and Regulations of the Project which are attached hereto as **Exhibit E** and the signage criteria which are attached hereto as **Exhibit C**, and all such nondiscriminatory modifications, additions, deletions and amendments thereto as Landlord shall adopt in good faith from time to time.

**14.**     <u>Condemnation</u>. If the entire Project or Premises are taken by right of eminent domain or conveyed by Landlord in lieu thereof (a "**Taking**"), this Lease shall terminate as of the date of the Taking. If any material portion, but less than all of the Premises or the Building, become subject to a Taking and such Taking will render the Premises untenantable for a period of more than one hundred eighty (180) days, then Tenant may terminate this Lease as of the date of such Taking by giving written notice to Landlord within thirty (30) days after the Taking, and all Rent paid or payable hereunder shall be apportioned between Landlord and Tenant as of the date of such Taking. If any material portion, but less than all, of the Project, Building or the Premises becomes subject to a Taking, or if Landlord is required to pay any of the proceeds received for a Taking to any Holder of any Security Instrument, then Landlord may terminate this Lease by delivering written notice thereof to Tenant within thirty (30) days after such Taking, and all Rent paid or payable hereunder shall be apportioned between Landlord and Tenant as of the date of such Taking. If this Lease is not so terminated, then Base Rent thereafter payable hereunder shall be abated for the duration of the Taking in proportion to that portion of the Premises rendered untenantable by such Taking. If any Taking occurs, then Landlord shall receive the entire award or other compensation for the land on which the Project is situated, the Project, and other improvements taken, and Tenant may separately pursue a claim (to the extent it will not reduce Landlord's award).

**15.**     <u>Fire or Other Casualty</u>.

    15.1    <u>Repair Estimate; Right to Terminate</u>. If all or any portion of the Premises or the Project is damaged by fire or other casualty (a "**Casualty**"), Landlord shall, within ninety (90) days after Landlord's discovery of such damage, deliver to Tenant its good faith estimate (the "**Damage Notice**") of the time period following such notice needed to repair the damage caused by such Casualty. Landlord may elect to terminate this Lease in any case where (a) any portion of the Premises or any material portion of the Project are damaged and (b) either (i) Landlord estimates in good faith that the repair and restoration of such damage under Paragraph 15.2 ("**Restoration**") cannot reasonably be completed (without the payment of overtime) within two hundred (200) days of Landlord's actual discovery of such damage, (ii) the Holder of any Security Instrument requires the application of any insurance proceeds with respect to such Casualty to be applied to the outstanding balance of the obligation secured by such Security Instrument, (iii) the cost of such Restoration is not fully covered by insurance proceeds available to Landlord and/or payments received by Landlord from tenants, or (iv) Tenant shall be entitled to an abatement of rent under this Paragraph 15 for any period of time in excess of thirty-three percent (33%) of the remainder of the Term.

    15.2    <u>Repair Obligation; Abatement of Rent</u>. Subject to Paragraph 15.1, Landlord shall, within a reasonable time after the discovery by Landlord of any damage resulting from a Casualty, begin with reasonable diligence to restore the Premises to substantially the same condition as existed immediately before such Casualty, except for modifications required by

Regulations, and modifications to the Project reasonably deemed desirable by Landlord; provided, however, that Landlord shall not be required as part of the Restoration to repair or replace any of the Alterations, furniture, equipment, fixtures, and other improvements which may have been placed by, or at the request of, Tenant or other occupants in the Premises. Landlord shall have no liability for any inconvenience or annoyance to Tenant or injury to Tenant's business as a result of any Casualty, regardless of the cause therefor. Base Rent shall abate if and to the extent a Casualty damages the Premises and renders them unfit for occupancy, and are not occupied by Tenant.

16.    **Parking**.  Tenant shall have the right to the nonexclusive use of the parking facilities of the Project for the parking of motor vehicles used by Tenant and Tenant Parties only; such rights are not transferable without Landlord's approval. The use of such parking facilities shall be subject to such rules and regulations as may be adopted by Landlord from time to time for the use of such facilities.

17.    **Events of Default**.  Each of the following occurrences shall be an "Event of Default" and shall constitute a material default and breach of this Lease by Tenant:  (a) any failure by Tenant to pay Rent or any other amount due and payable hereunder when due; (b) the abandonment or vacation of the Premises by Tenant; (c) any failure by Tenant to obtain insurance and/or deliver insurance certificates required under Paragraph 11; (d) any failure by Tenant to execute and deliver any estoppel certificate or other document described in Paragraphs 12 or 21 requested by Landlord, where such failure continues for five (5) days after delivery of written notice of such failure by Landlord to Tenant; (e) any failure by Tenant to fully perform any other obligation of Tenant under this Lease, where such failure continues for thirty (30) days after delivery of written notice of such failure by Landlord to Tenant; (f) the voluntary or involuntary filing of a petition by or against Tenant or any general partner of Tenant or any guarantor (i) in any bankruptcy or other insolvency proceeding, (ii) seeking any relief under any state or federal debtor relief law, or (iii) for the appointment of a liquidator or receiver for all or substantially all of Tenant's property or for Tenant's interest in this Lease; (g) the default, repudiation or revocation of any guarantor of Tenant's obligations hereunder. Any notice of any failure of Tenant required under this Paragraph 17 shall be in lieu of, and not in addition to, any notice required under applicable law.

18.    **Remedies**.  Upon the occurrence of any Event of Default by Tenant, Landlord shall have, in addition to any other remedies available at law or in equity, the option to pursue any one (1) or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever:

18.1    Terminate this Lease, and Landlord may recover from Tenant all amounts permitted by law necessary to compensate Landlord for the detriment proximately caused by Tenant's failure to perform its obligations under this Lease (specifically including, without limitation, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises, the Building, or any portion thereof for a new tenant, whether for the same or a different use, and any special concessions made to obtain a new tenant);

18.2    If Landlord does not elect to terminate this Lease on account of any Event of Default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due.

18.3    Landlord shall at all times have the right to seek any declaratory, injunctive, or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

18.4    Following the occurrence of two instances of payment of Rent more than ten (10) days late in any twelve (12) month period, the late charge set forth in Paragraph 5 shall apply from the date payment was due and Landlord may require that all remaining monthly installments of Rent payable under this Lease shall be payable by cashier's check or electronic funds transfer two (2) months in advance, and may require that Tenant increase the Security Deposit to an amount equal to two times the current month's Rent at the time of the most recent default.

18.5    Cure Tenant's default at the expense of Tenant (A) immediately and without notice in the case (1) of emergency, (2) where such default unreasonably interferes with any other tenant in the Project, or (3) where such default will result in the violation of any Regulation or the cancellation of any insurance policy maintained by Landlord, and (B) in any other case if such default continues for ten (10) days following the receipt by Tenant of notice of such default from Landlord and all costs incurred by Landlord in curing such default(s), including, without limitation, attorneys' fees, shall be reimbursable by Tenant as Rent hereunder upon demand, together with interest thereon, from the date such costs were incurred by Landlord, at the Default Rate.

19.    **Surrender of Premises.**  No agreement to accept a surrender of the Premises shall be valid unless it is in writing and signed by Landlord.  At the expiration or earlier termination of this Lease, Tenant shall deliver to Landlord all keys to the Premises, and Tenant shall deliver to Landlord the Premises in the same condition as existed on the date Tenant originally took possession thereof, ordinary wear and tear excepted.  In addition, prior to the expiration of the Term or any sooner termination thereof, (a) Tenant shall remove such Alterations as Landlord shall request (even if installed with Landlord's consent) and shall restore the portion of the Premises affected by such Alterations and such removal to its condition existing immediately prior to the making of such Alterations, (b) Tenant shall remove from the Premises all unattached trade fixtures, furniture, equipment and personal property located in the Premises, including, without limitation, phone equipment, wiring, cabling and all garbage, waste and debris, and (c) Tenant shall repair all damage to the Premises or the Project caused by any such removal including, without limitation, full restoration of all holes and gaps resulting from any such removal and repainting required thereby.  All personal property and fixtures of Tenant not so removed shall, to the extent permitted under applicable Regulations, be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without any obligation to account for such items.

20.    **Holding Over.**  If Tenant holds over after the expiration or earlier termination of the Term hereof, with or without the express or implied consent of Landlord, Tenant shall be only a month-to-month tenant and otherwise upon the terms, covenants and conditions herein specified and Tenant's Base Rent shall be at a rate equal to one hundred fifty percent (150%) of the monthly installment of Base Rent payable by Tenant immediately prior to such expiration or termination.

21.    **Substitution or Demolition.**

    21.1    **Substitution.**  Upon at least sixty (60) days prior written notice, Landlord may relocate Tenant within the Project (or to any other facility owned by Landlord or an affiliate of Landlord within the vicinity of the Project) to substitute space. As used herein, "substitute space" means space containing square footage which is not more than 15 percent greater or lesser than the approximate square footage of the Premises set forth in the Basic Lease Information and which is comparable in utility and condition to the Premises.  If Landlord exercises this right to relocate Tenant, Landlord shall reimburse Tenant for (a) Tenant's reasonable out-of-pocket expenses for moving Tenant's furniture, equipment and supplies from the Premises to the substitute space; (b) the cost of installing leasehold improvements in the substitute space comparable to those in the Premises; (c) reprinting Tenant's stationery of the same quality and quantity as Tenant's stationery supply on hand immediately before Landlord's exercise of this relocation right. In the event Tenant is relocated pursuant to this Paragraph 21, Tenant shall surrender the Premises to Landlord in accordance with all terms and conditions of this Lease prior to the termination of the 60-day period and shall promptly upon Landlord's request execute an amendment to this Lease which shall designate the substitute space as the "Premises" subject to this Lease and adjust the Base Rent and Additional Rent to reflect any increase or decrease in the floor area of the substitute space or, if Tenant is relocated outside the Project, to execute a new lease in substantially the same form as the existing Lease with the affiliate of Landlord.

    21.2    **Demolition.**  Landlord shall have the right to terminate this Lease in the event Landlord elects to demolish 75 percent or more of the total floor area in the building containing the Premises. In such event, Landlord shall give Tenant a notice of termination at least 180 days prior to the effective date of such termination and shall pay Tenant, on the termination date, the cost (less depreciation) of Tenant's fixtures (other than removable trade fixtures) and of leasehold improvements installed in the Premises at Tenant's expense.  For the purposes of this provision, depreciation of Tenant's fixtures and leasehold improvements shall be calculated on a straight-line basis over the Term of this Lease (exclusive of any permitted extensions of the Term).  Upon payment to Tenant of the amount specified in this paragraph and any prepaid Rent or security deposit, Landlord shall be relieved of all further liability to Tenant hereunder and the Lease shall terminate as of the effective date of such termination except for the rights and obligations accrued as of the date of such termination.

22.    **Landlord Transfers and Liability.**  Landlord may, without restriction, sell, assign or transfer in any manner all or any portion of the Project, any interest therein or any of Landlord's rights under this Lease and then Landlord shall automatically be released from any further obligations hereunder.  The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease or with respect to any obligation or liability related to the Premises or the Project shall be recoverable only from the interest of Landlord in the Project, and neither Landlord nor any affiliate thereof shall have any personal liability with respect thereto and in no case shall Landlord be liable to Tenant for any lost profits, damage to business, or any form of special, indirect or consequential damage on account of any breach of this Lease.  In the event that the holder of a mortgage or deed of trust on the Premises becomes the "Landlord" under this Lease, such holder shall not be liable for any act or omission of Landlord which occurred prior to such holder's acquisition of title.

23.    **Estoppel Certificates; Financial Statements.**  At any time and from time to time during the Term, Tenant shall, without charge, execute, acknowledge and deliver to Landlord within ten (10) days after Landlord's request therefor, an estoppel certificate in recordable form containing such factual certifications and other provisions as are commonly found in the estoppel certificate forms requested by institutional lenders and purchasers.

24.    **Notices.**  All Notices, demands, consents, or other information desired or required to be given under this Lease shall be effective only if given in writing and sent by (a) certified United States mail, postage prepaid, return receipt requested, (b) nationally recognized express mail courier that provides written evidence of delivery, fees prepaid, (c) facsimile, (d) United States first-class mail, postage prepaid, or (e) personal delivery, and addressed to the Addresses For Notices as set forth in the Basic Lease Information, or at such other address as may be specified from time to time, in writing, or, if to Tenant, at the Premises.  Any such notice, demand, consent, or other information shall be deemed given (i) if sent by certified mail, on the date of delivery shown on the receipt card, (ii) if sent by courier, on the date it is officially recorded by such courier, (iii) if delivered by facsimile, on the date the sender obtains written telephonic confirmation that the electronic transmission was received, (iv) if sent by United States first-class mail, three (3) business days from the date mailed, or (v) if delivered personally, upon delivery or, if refused by the intended recipient, upon attempted delivery.

25.    **Payment by Tenant; Non-Waiver.**  Landlord's acceptance of Rent following an Event of Default shall not waive Landlord's rights regarding such Event of Default.  No waiver by Landlord of any violation or breach of any of the terms contained herein shall waive Landlord's rights regarding any future violation of such terms.  Landlord's acceptance of any partial payment of Rent shall not waive Landlord's rights with regard to the remaining portion of the Rent that is due, regardless of any endorsement or other statement on any instrument delivered in payment of Rent or any writing delivered in connection therewith; accordingly, Landlord's acceptance of a partial payment of Rent shall not constitute an accord and satisfaction of the full amount of the Rent that is due.

26.    **Certain Rights Reserved by Landlord.**  Landlord hereby reserves and shall have the following rights with respect to the Premises and the Project:  (a) to make inspections, repairs, or improvements, whether structural or otherwise, in and about the Premises or any part thereof; and (b) to enter the Premises at reasonable hours (or at any time in an emergency) to perform repairs, to take any action authorized hereunder, or to show the Premises to prospective purchasers or lenders, or, during the last six (6) months of the Term, prospective tenants.

27.    **Miscellaneous.**  If any clause or provision of this Lease is illegal, invalid, or unenforceable under present or future laws, then the remainder of this Lease shall not be affected thereby.  This Lease may not be amended except by instrument in writing signed by Landlord and Tenant.  No provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing signed by Landlord.  The terms and conditions contained in this Lease shall inure to the benefit of and be binding upon the parties hereto, and upon their respective successors in interest and legal representatives, except as otherwise herein expressly provided.  This Lease constitutes the entire agreement between Landlord and Tenant regarding the subject matter hereof and supersedes all oral statements and prior writings relating thereto.  Tenant and the person or persons signing on behalf of Tenant represent and warrant that Tenant has full right, power, and authority to enter into this Lease, and that all persons signing this Lease on its behalf are authorized to do so.  If Tenant is comprised of more than one party, each such party shall be jointly and severally liable for Tenant's obligations under this Lease.  All exhibits and attachments attached hereto are incorporated herein by this reference.  This Lease shall be governed by and construed in accordance with the laws of the jurisdiction where the Project is located.  In any action which Landlord or Tenant brings to enforce its respective rights hereunder, the unsuccessful party shall pay all costs incurred by the prevailing party, including without limitation, reasonable attorneys' fees and court costs.  Tenant shall not record this Lease or any memorandum hereof.  **TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD AND TENANT EACH WAIVE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR WITH RESPECT TO THIS LEASE.**  This Lease may be executed in any number of counterparts, each of which shall be deemed an original.  Time is of the essence as to the performance of each covenant hereunder in which time of performance is a factor.

28.    **No Broker.**  Landlord and Tenant each warrant that they have dealt with no real estate broker in connection with this transaction with the exception of the brokers, if any, named in Exhibit F.  Landlord and Tenant each agree to hold each other harmless from and against any and all damages, costs and expenses resulting from any claim(s) for a brokerage commission or finder's fee that may be asserted against either of them by any broker or finder with whom the other has dealt.

29.    **Further provisions, if any, are contained in Exhibit F, attached hereto.**

**Submission of this Lease to Tenant does not constitute an option or offer to lease and this Lease is not effective otherwise until execution and delivery by both Landlord and Tenant.**

**EXHIBIT A**
**PREMISES / PROJECT**

## HENDERSON COMMERCE CENTER



**EXHIBIT B**
**INSURANCE**

**Tenant's Insurance.** Tenant shall, at Tenant's sole cost and expense, procure and keep in effect from the date of this Lease (or earlier authorized occupancy) and at all times until the end of the Term, the following insurance coverage:

1.      **Property Insurance.** Insurance on all personal property and fixtures of Tenant and all improvements made by or for Tenant to the Premises on an "All Risk" or "Special Form" basis, for the full replacement value of such property.

2.      **Liability Insurance.** Commercial General Liability insurance written on an ISO CG 00 01 10 93 or equivalent form, on an occurrence basis, with a per occurrence limit of at least $2,000,000, and a minimum general aggregate limit of at least $3,000,000, covering bodily injury and property damage liability occurring in or about the Premises or arising out of the use and occupancy of the Premises and/or the Project by Tenant or any Tenant Party. Such insurance shall include contractual liability coverage insuring Tenant's indemnity obligations under this Lease, and shall be endorsed to name Landlord, any Holder of a Security Instrument and any other party specified by Landlord as an additional insured with regard to liability arising out of the ownership, maintenance or use of the Premises.

3.      **Worker's Compensation and Employer's Liability Insurance.** (a) Worker's Compensation Insurance as required by any Regulation, and (b) Employer's Liability Insurance in amounts not less than $1,000,000 each accident for bodily injury by accident and for bodily injury by disease, and for each employee for bodily injury by disease.

4.      **Commercial Auto Liability Insurance.** Commercial auto liability insurance with a combined limit of not less than One Million Dollars ($1,000,000) for bodily injury and property damage for each accident. Such insurance shall cover liability relating to any auto (including owned, hired and non-owned autos).

5.      **Alterations Requirements.** In the event Tenant shall desire to perform any Alterations, Tenant shall deliver to Landlord, prior to commencing such Alterations (i) evidence satisfactory to Landlord that Tenant carries "Builder's Risk" insurance covering construction of such Alterations in an amount and form approved by Landlord, (ii) such other insurance as Landlord shall reasonably require, and (iii) a lien and completion bond or other security in form and amount satisfactory to Landlord.

6.      **General Insurance Requirements.** All coverages described in this **Exhibit B** shall be endorsed to (i) provide Landlord with thirty (30) days' notice of cancellation or change in terms; and (ii) be primary and non-contributing with Landlord's insurance. The property insurance coverage required of Tenant shall be endorsed to waive all rights of subrogation by the insurance carrier against Landlord or shall otherwise state that the carrier shall be so bound by Tenant's waiver of the carrier's right of subrogation. If at any time during the Term the amount or coverage of insurance which Tenant is required to carry under this **Exhibit B** is, in Landlord's reasonable judgment, materially less than the amount or type of insurance coverage typically carried by owners or tenants of properties located in the general area in which the Premises are located which are similar to and operated for similar purposes as the Premises or if Tenant's use of the Premises should change with or without Landlord's consent, Landlord shall have the right to require Tenant to increase the amount or change the types of insurance coverage required under this **Exhibit B**. All insurance policies required to be carried by Tenant under this Lease shall be written by companies rated AX or better in "Best's Insurance Guide" and authorized to do business in the State of Nevada. Deductible amounts under all insurance policies required to be carried by Tenant under this Lease shall not exceed ~~$10,000~~ $25,000.00 per occurrence. Tenant shall deliver to Landlord on or before the Term Commencement Date, and thereafter at least thirty (30) days before the expiration dates of the expired policies, certified copies of Tenant's insurance policies, or a certificate evidencing the same issued by the insurer thereunder, and, if Tenant shall fail to procure such insurance, or to deliver such policies or certificates, Landlord may, at Landlord's option and in addition to Landlord's other remedies in the event of a default by Tenant under the Lease, procure the same for the account of Tenant, and the cost thereof (with interest thereon at the Default Rate) shall be paid to Landlord as Additional Rent.

**Landlord's Insurance.** All insurance maintained by Landlord shall be for the sole benefit of Landlord and under Landlord's sole control.

1.      **Property Insurance.** Landlord agrees to maintain property insurance insuring the Building against damage or destruction due to risk including fire, vandalism, and malicious mischief in an amount not less than the replacement cost thereof, in the form and with deductibles and endorsements as selected by Landlord. At its election, Landlord may instead (but shall have no obligation to) obtain "All Risk" coverage, and may also obtain earthquake, pollution, and/or flood insurance in amounts selected by Landlord.

2.      **Optional Insurance.** Landlord, at Landlord's option, may also (but shall have no obligation to) carry (i) insurance against loss of rent, in an amount equal to the amount of Base Rent and Additional Rent that Landlord could be required to abate to all Project tenants in the event of condemnation or casualty damage for a period of twelve (12) months; and (ii) liability insurance and such other insurance as Landlord may deem prudent or advisable, including, without limitation, liability insurance in such amounts and on such terms as Landlord shall determine. Landlord shall not be obligated to insure, and shall have no responsibility whatsoever for any damage to, any furniture, machinery, goods, inventory or supplies, or other personal property or fixtures which Tenant may keep or maintain in the Premises, or any leasehold improvements, additions or alterations within the Premises.

March 2004

## EXHIBIT C

## SIGN CRITERIA

1.  Purpose.  These Sign Criteria have been established for the purpose of maintaining a consistent overall appearance of the Project and shall be strictly enforced.

2.  Signage.  As used herein, Signage shall mean any signs, advertising placards, banners, pennants, names, insignias, trademarks, balloons, flags, decals or other decorative or descriptive material installed on the Project.

3.  Tenant Responsibility.  Tenant, at its sole expense, shall be responsible for any Signage it requires at the Premises, including conforming with these Sign Criteria and all applicable laws, obtaining required permits, installing, maintaining and removing such Signage, as well as restoring the Premises to Landlord's satisfaction after such Signage is removed.

4.  Approved Contractor.  Tenant shall contract with a professionally licensed sign company approved by Landlord for the design, fabrication and installation of Tenant's Signage.

5.  Landlord Approval Required.  Tenant shall obtain Landlord's written approval prior to the installation or removal of any Signage on the Premises.  Prior to Tenant's Signage installation, Tenant shall submit to Landlord for its review and approval, a scaled drawing of Tenant's proposed Signage including colors, construction details, method of attachment, electrical loads and electrical plans.  Any sign installed without the prior approval of Landlord will be brought into conformity or removed at Tenant's expense.

6.  Permitted Signage.  Tenant shall be permitted Identification Signage at Tenant's main entrance displaying Tenant's business name, type of business and/or logo only.  Tenant shall also be permitted Information Signage at Tenant's main entrance displaying Tenant's hours of operation and such other information approved by Landlord.  Landlord shall designate the specific location of Tenant's Signage.

7.  Sign Specifications.  All Tenant Signage shall comply with these Sign Criteria and the Sign Specifications attached hereto as Exhibit C-1.

8.  Installation.  Tenant shall notify Landlord prior to the installation of any Signage.  Tenant or its contractor shall repair any damage to any property caused by such installation work.

9.  Maintenance.  Tenant shall be solely responsible for the proper maintenance of its Signage, including illumination.  Landlord may repair or maintain Tenant's Signage, at Tenant's expense, if Tenant has not commenced required maintenance of its signage within ten days after receipt of written notice from Landlord informing Tenant of such required repairs or maintenance.

10. Removal.  Tenant shall remove all of its Signage upon the expiration or early termination of the Lease.  Tenant shall notify Landlord prior to such removal.  Landlord, at Tenant's expense, shall repair any damage to the building required as a result of Tenant's sign removal.

11. Interior Signage.  Except as provided herein, no signs visible from the exterior of the Premises shall be permitted in the interior of the Premises without Landlord's consent.

12. Vehicle Signs.  Without restricting Tenant's right to park its delivery or other vehicles used in the normal course of business on the Project, no signs may be affixed to any vehicles or trailers parked on the Project that advertise promotions or direct customers to the Premises.

13. Prohibited Signs.  Signs consisting of moving, swinging, rotating, flashing, blinking, scintillating, fluctuating or otherwise animated light are prohibited.  Off-premise signs or any sign installed for the purpose of advertising a product, event, person, or subject not related to the premises upon which said sign is located are prohibited, without written consent of the Landlord.

14. No Exceptions.  Except as provided herein, no Signage shall be affixed, without Landlord's prior approval, anywhere on the Project, including but not limited to on the glass, in the window area or on the exterior walls of the building, landscaping areas, sidewalks or the driveways or parking areas of the Project.

15. Changes.  These Sign Criteria are subject to change by Landlord.  In the event Landlord changes the Sign Criteria for the Project during the term of this Lease, Landlord may update Tenant's Signage in compliance with the new Sign Criteria provided that any costs associated with such change shall be at Landlord's sole expense.

Rev.1/02

## EXHIBIT C-1
## SIGN SPECIFICATIONS

### Henderson Commerce Center

These sign criteria have been established for the purpose of maintaining the overall appearance of Henderson Commerce Center.

Identification Signage

1. Signs shall be made from high-density foam cut letters with black fascia and black sides in a font style to be specified by Tenant. Signs will be glue adhered to the concrete face of the building in a location to be designated by Landlord.

2. The letter style, wording and logo shall be submitted to Landlord for approval.

3. The maximum sign dimensions, including Tenant's logo, shall be 2' 6" in height and 9' 0" in length. The sign and/or logo shall be centered within the center panel above the main entrance. Letters and logo shall have a depth of 2" to 2 ½".

4. No electrical signs shall be permitted.

5. Following, for the purpose of reference only, is an example of a typical to-scale sign layout.



Information Signage

1. Tenant's information signage shall only be installed in the area designated by Landlord on the door or storefront of the building at Tenant's main entrance.

2. Tenant's Information signage shall consist of white vinyl letters not to exceed 2" in height.

**EXHIBIT D**
**TENANT IMPROVEMENTS**

## HENDERSON COMMERCE CENTER

Tenant: Bravo, Inc., a Nevada corporation dba Rhodes Framing

Address of Tenant: 470 Mirror Court, Suite 104 & 106, Henderson, Nevada 89015

Landlord, at Landlord's sole cost and expense, shall complete the following Tenant Improvements to the Premises:

1. Finish construction of office and restroom areas.
2. Office area construction to include paint and install industrial grade carpet in existing office area.
3. Restroom area construction to include paint and install ceramic tile flooring and industrial grade RFP. Tenant agrees to pay Landlord the total cost differential between the ceramic tile and the industrial grade VCT for these areas at lease execution.
4. Tenant shall be permitted to select the color of paint and carpet from the Landlord's standard specifications.
5. Broom sweep warehouse.

Tenant shall accept the balance of the Premises in AS IS condition. Any additional improvements shall be at the sole cost of the Tenant and only permissible with prior written consent by the Landlord, which shall not be unreasonably withheld, conditioned or delayed. The tenant improvements shall be constructed of Landlord's standard building materials. Tenant shall be responsible for any costs above Landlord's standard finishes.



**WPH** ARCHITECTURE inc

105 EAST RENO AVENUE 4
LAS VEGAS NEVADA 89119
TEL 702 891 5201
FAX 702 891 5212

OFFICES:  7,916 SF
WAREHOUSE:  48,085 SF

TOTAL:  56,001 SF

OFFICES

WAREHOUSE

**HARSCH PROPERTIES**

**HENDERSON COMMERCE CENTER**

**HENDERSON, NV**

PROJECT NO
03152

DRAWN
SPG

DATE
04 11 19

TITLE
**SUITES 102 - 106 BUILDING B**

SHEET
**A1**

FLOOR PLAN - SUITES 102 - 106
1" = 50'-0"

## EXHIBIT E
## RULES AND REGULATIONS

Except as otherwise provided in the Multi-Tenant Lease to which this exhibit is attached, the following rules and regulations shall apply:

1.   The sidewalk, entries and driveways of the Project shall not be obstructed by Tenant or its agents or used by them for any purpose other than ingress and egress to and from the Premises.

2.   Tenant shall not place any objects, including antennas, outdoor furniture, etc., in the parking areas, landscaped areas or other areas outside of its Premises or on the roof of the Project.

3.   Except for seeing-eye dogs or service animals, no animals shall be allowed in the offices, halls or corridors in the Project.

4.   Tenant shall not disturb the occupants of the Project or adjoining buildings by the use of any radio or musical instrument or by the making of loud or improper noises.

5.   If Tenant desires telegraphic, telephonic or other electric connections in the Premises, Landlord or its agent will direct the electrician as to where and how the wires may be introduced and, without such direction, no boring or cutting of wires will be permitted. Any such installation or connection shall be made at Tenant's expense.

6.   Tenant shall not install or operate any steam or gas engine or boiler or carry on any mechanical business in the Premises except as specifically approved in the Lease. The use of oil, gas or flammable liquids for heating, lighting or any other purpose is expressly prohibited. Explosives or other articles deemed extra hazardous shall not be brought into the Project.

7.   Parking any type of recreational vehicles is specifically prohibited on or about the Project. No vehicle of any type shall be stored in the parking areas at any time. In the event a vehicle is disabled, it shall be removed within 48 hours. There shall be no "For Sale" or other advertising signs on or about any parked vehicle. All vehicles shall be parked in designated parking areas in conformity with all signs and other markings. All parking will be open parking; numbering or lettering of individual spaces will not be permitted except as specified by Landlord.

8.   Tenant shall maintain the premises free from rodents, insects and other pests.

9.   Landlord reserves the right to exclude or expel from the Project any person who, in Landlord's judgment, is intoxicated or under the influence of liquor or drugs or who shall in any manner do any act in violation of the Rules and Regulations of the Project

10.

   a. Tenant agrees that all Tenant's trash and rubbish shall be deposited in receptacles and that Tenant shall not cause or permit any trash receptacles to remain outside the building. All movable trash receptacles provided by the trash disposal firm for the Premises must be kept in the trash enclosure areas, if any, provided for that purpose. In the event Landlord provides or designates trash receptacles, Tenant agrees, at its own cost and expense, to cause such receptacles to be emptied and trash removed. Tenant agrees to bag trash before depositing it in the authorized trash area. Landlord reserves the right to contract for trash removal and bill Tenant for said service.
   b.Tenant shall not cause any unnecessary labor by reason of Tenant's carelessness or indifference in the preservation of good order and cleanliness. Landlord shall not be responsible to Tenant for any loss of property on the Premises, however occurring, or for any damage done to the effects of Tenant by the janitors or any other employee or person.

11. Tenant shall give Landlord prompt notice of any defects in the water, lawn sprinkler, sewage, gas pipes, electrical lights and fixtures, heating apparatus or any other service equipment affecting the Premises

12.Tenant shall not permit storage outside the Premises including, without limitation, outside storage of trucks and other vehicles or dumping of waste or refuse or permit any harmful materials to be placed in any drainage or sanitary system or trash receptacle in or about the Premises.

13.   No auction, public or private, will be permitted on the Premises or the Project.

14.   No awnings shall be placed over the windows in the Premises except with the prior written consent of Landlord.

15.   The Premises shall not be used for lodging, sleeping or cooking or for any immoral or illegal Purposes or for any purpose other than that specified in the Lease.

16.   Tenant shall ascertain from Landlord the maximum amount of electrical current that can safely be used in the Premises, taking into account the capacity of the electrical wiring in the Project and the Premises and the needs of other tenants and shall not use more than such safe capacity. Landlord's consent to the installation of electric equipment shall not relieve Tenant from the obligation not to use more electricity than such safe capacity.

17.   Tenant assumes full responsibility for protecting the Premises from theft, robbery and pilferage.

18.   Tenant shall not install or operate on the Premises any machinery or mechanical devices of a nature not directly related to Tenant's ordinary use of the Premises and shall keep all such machinery free of vibration, noise and air waves which may be transmitted beyond the Premises.

7/02

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 7/10/2007

| PRODUCER (213) 629-3131 FAX: (866) 808-9088 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| Guaranty CA Insurance Services Inc. CA License #0D44424 445 S. Figueroa St., 36th FL Los Angeles    CA  90071-1602 | |

| INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|

| INSURED | INSURER A: Lloyd's of London |
|---|---|
| Rhodes Design and Development 4730 Fort Apache Road, #300 | INSURER B: Aspen Insurance UK Ltd. |
| | INSURER C: |
| | INSURER D: |
| Las Vegas       NV   89147 | INSURER E: |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADDL INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A B | | **GENERAL LIABILITY** [X] COMMERCIAL GENERAL LIABILITY CLAIMS MADE [ ] OCCUR  GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC | A47504134/A47504134A | 10/1/2004 | 10/1/2007 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 10,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 10,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 10,000,000 |
| | | **AUTOMOBILE LIABILITY** ANY AUTO ALL OWNED AUTOS SCHEDULED AUTOS HIRED AUTOS NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC AUTO ONLY:  AGG | $ |
| | | **EXCESS/UMBRELLA LIABILITY** [ ] OCCUR [ ] CLAIMS MADE  DEDUCTIBLE RETENTION $ | | | | EACH OCCURRENCE | $ |
| | | | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | [ ] WC STATU-TORY LIMITS [ ] OTHER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | **OTHER** | | | | | |

**DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS**
Subject to policy terms, conditions, limitations and exclusions.  *10 days notice for non-payment of premium.
Certificate Holder is included Additional Insured.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Harsch Investment Properties Nevada LLC and Affiliates 6000 S. Eastern, Suite 12F Las Vegas, NV  89119 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL *30 DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE H Shults, Jr./JGARRI |

**ACORD 25 (2001/08)**

© ACORD CORPORATION 1988

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

# DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

ACORD 25 (2001/08)
INS025 (0108).08a

Page 2 of 2



Fireman's
Fund®

July 12, 2007

Bravo, Inc.
dba Rhodes Framing
470 Mirror Court
Suite B104 - B106
Henderson, NV 89015

Re:    Claim Number:            005 07 379760 001 / 407
       Our Insured(s):          Harsch Investment Properties
       Date of Loss:            09/12/2006
       Claimant:                Ian Rosen
       Claimant attorney:       Lloyd W. Baker

To Whom It May Concern,

We have received a report of an accident that occurred on 09/12/2006, on the premises
located at 470 Mirror Court, Suite B-106, Henderson, NV 89015.

Enclosed is a copy of the lease agreement dated 12/07/2004 between Bravo, Inc a Nevada
Corporation dba Rhodes Framing and our insured, Harsch Investment Properties - Nevada LLC;
a copy of a certificate of liability insurance showing Harsch Investment Properties Nevada LLC
as the certificate holder; and a copy of the letter of representation received from Mr. Rosen's
attorney.

Mr. Rosen's incident allegedly involved a light switch in the unit which per the leasing
agreement would be the responsibility of Bravo, Inc. dba Rhodes Framing.

In the lease agreement it does state on page two under section 2.2 that the tenant accepts
the premises "AS-IS", and again on page six under section 7.1.1 states that by taking
possession of the premises that tenant accepts them "as is". Also on page six under section
7.2.2. it states that the tenant is responsible for maintaining all parts of the premises that are
within the control of the tenant, of which "electrical and lighting systems" is specifically listed.
The lease also includes on page eight under section 11.3 the indemnity agreement stating that
tenant will indemnify, defend, protect and hold harmless the landlord and its affiliates from any
claims, losses, liabilities, damages, etc. This same section states that the tenant waives all
claims against and releases the landlord from any injury or damages.

There is also in the lease the section marked "Exhibit B - Insurance", which states that the
tenant will procure and keep in effect liability insurance, and that such insurance will be
endorsed to include the landlord as an additional named insured under this coverage.

We hereby tender this matter and request that you assume the handling of this claim. A copy

Fireman's Fund                3301 Rider Trail South
Insurance Companies          Earth City, MO 63045
A member of the              Phone: 800-870-8857
Allianz Group
                             Fax:   866-653-6720

Bravo, Inc.
July 12, 2007
Page 2 of 2

of this letter has been forwarded to Mr. Rosen's attorney, Mr. Lloyd W. Baker at Baker Law
Offices.

Please send your acknowledgement and acceptance of our tender to my attention at the
address shown at the bottom of this letter.

If you have any questions, please call me at the number below, between 07:00 AM - 03:15
PM CST, Monday through Friday.

Sincerely,

FIREMAN'S FUND INSURANCE COMPANY


Charles Eric Erwin
Claims Adjuster
Core Claims
800-870-8857 x1085  E-mail: cerwin@ffic.com

cc:  Lloyd W. Baker

# EXHIBIT A2

# EXHIBIT A2

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT | District of Nevada | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: The Rhodes Companies, LLC | Case Number: 09-14814 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor (the person or other entity to whom the debtor owes money or property):**
Ian Rosen

☐ Check this box to indicate that this claim amends a previously filed claim.

**Name and address where notices should be sent:**
c/o Baker Law Offices
500 South 8th Street
Las Vegas, NV 89101

**Telephone number:**
(702) 360-4949

Court Claim Number: _____
(If known)

Filed on: _____

**Name and address where payment should be sent (if different from above):**

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 200,000.00

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** personal injury
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property:$_____ Annual Interest Rate_____%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____ Basis for perfection: _____

Amount of Secured Claim: $_____ Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See instruction 7 and definition of "redacted" on reverse side.*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If** any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

| Date: 06/05/2009 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.  *Lloyd Baker*  Lloyd Baker Attorney | FOR COURT USE ONLY |
|---|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*