Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:     nleatham@klnevada.com

*Electronically Filed*
*September 25, 2009*

Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002
E-Mail:     pdublin@akingump.com
            aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,[1]<br>        Debtors.<br><br>Affects:<br>☒    All Debtors | Case No.: BK-S-09-14814-LBR<br>(Jointly Administered)<br><br>Chapter 11<br><br>Hearing Date:  October 30, 2009<br>Hearing Time:  1:30 p.m. |

---

[1] The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

| ☐   Affects the following Debtor(s) | Courtroom 1 |
|---|---|
| | **DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE FOR THE RHODES COMPANIES, LLC, ET AL.** |

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE FOR THE RHODES COMPANIES, LLC, ET AL. (THE "PLAN"), CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE FIRST LIEN STEERING COMMITTEE BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS.  THE INFORMATION INCLUDED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS THAT ARE ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED HEREIN BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.  FACTUAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE FIRST LIEN STEERING COMMITTEE DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT INFER THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN BETWEEN THE DATE HEREOF AND THE TIME OF SUCH REVIEW.  EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT,

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AND EXHIBITS TO THE PLAN IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  ANY PERSONS DESIRING ANY SUCH ADVICE OR OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO PARTY IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT.  NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE FIRST LIEN STEERING COMMITTEE OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT.  ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING, THREATENED OR POTENTIAL LITIGATION OR ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

ALTHOUGH THE FIRST LIEN STEERING COMMITTEE HAS USED ITS BEST EFFORTS TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE PROJECTIONS PROVIDED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE FIRST LIEN STEERING COMMITTEE WITH THE ASSISTANCE OF ITS ADVISORS.  THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE FIRST LIEN STEERING COMMITTEE, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE FIRST LIEN STEERING COMMITTEE'S CONTROL.  THE FIRST LIEN STEERING COMMITTEE CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE

PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.    FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

SEE ARTICLE VI OF THE DISCLOSURE STATEMENT, ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT OR REJECT THE PLAN.

THE DISCLOSURE STATEMENT HAS BEEN DETERMINED BY THE BANKRUPTCY COURT TO CONTAIN ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101 - 1532 (THE "BANKRUPTCY CODE"), WHICH DETERMINATION DOES NOT CONSTITUTE A RECOMMENDATION OR APPROVAL OF THE PLAN.

UNLESS OTHERWISE STATED, ANY CAPITALIZED TERM USED HEREIN SHALL HAVE THE MEANING ASSIGNED TO SUCH TERM HEREIN OR, IF NO MEANING IS SO ASSIGNED, THE MEANING ASSIGNED TO SUCH TERM IN THE PLAN.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [DECEMBER 17], 2009 AT [9:30 a.m.] PREVAILING PACIFIC TIME BEFORE THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, IN COURTROOM 1 IN THE FOLEY FEDERAL BUILDING LOCATED AT 300 LAS VEGAS BOULEVARD SOUTH, LAS VEGAS, NEVADA 89101.  THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE OTHER THAN AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [DECEMBER 3], 2009, IN ACCORDANCE WITH THE SOLICITATION NOTICE THAT THE FIRST LIEN STEERING COMMITTEE FILED AND SERVED ON HOLDERS OF CLAIMS, HOLDERS OF INTERESTS AND OTHER PARTIES IN INTEREST.  IF OBJECTIONS TO CONFIRMATION ARE NOT TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION NOTICE, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1
2

# TABLE OF CONTENTS

ARTICLE I. SUMMARY ...................................................................................2
    A.    Rules of Interpretation ...........................................................2
    B.    The Purpose of the Plan ........................................................3
    C.    The Debtors' Principal Assets and Indebtedness ...................4
    D.    Treatment of Claims and Interests ........................................4
    E.    Claims Estimates....................................................................9
    F.    Certain Factors to Be Considered Prior to Voting.................10
    G.    Voting and Confirmation .......................................................10
    H.    Consummation of the Plan.....................................................11

ARTICLE II. BACKGROUND ...........................................................................11
    A.    Description of the Debtors' Business Operations ..................11

ARTICLE III.  THE CHAPTER 11 CASES..........................................................15
    A.    Events Leading to the Chapter 11 Cases................................15
    B.    Initiation of the Chapter 11 Cases .........................................15
    C.    Stabilization of Operations ....................................................16
    D.    Appointment of the Creditors' Committee ............................19
    E.    Claims Bar Dates ...................................................................19
    F.    Other Postpetition Events and Negotiations ..........................20

ARTICLE IV. SUMMARY OF THE PLAN .........................................................23
    A.    Overview of Chapter 11 ........................................................23
    B.    Administrative and Priority Claims .......................................24
    C.    Classification and Treatment of Claims ................................25
    D.    Cramdown...............................................................................28
    E.    Means for Implementation of the Plan...................................29
    F.    Treatment of Executory Contracts and Unexpired Leases.......................42

    G.    Procedures for Resolving Disputed Claims ...........................46
    H.    Provisions Governing Distributions.......................................48
    I.    Effect of Confirmation of the Plan.........................................54
    J.    Allowance and Payment of Certain Administrative Claims .....................59
    K.    Conditions Precedent to Confirmation and Consummation of the Plan..........................................................................61
    L.    Modification, Revocation, Or Withdrawal of the Plan ...........64
    M.    Retention of Jurisdiction ........................................................65

ARTICLE V.  STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..........................................................................65
    A.    The Confirmation Hearing.....................................................65
    B.    Confirmation Standards .........................................................66
    C.    Financial Feasibility..............................................................67
    D.    Best Interests of Creditors Test ..............................................67

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

i

E.      Acceptance by Impaired Classes ................................................................70
F.      Confirmation Without Acceptance by All Impaired Classes ....................70

ARTICLE VI. CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING ......71
A.      Certain Bankruptcy Considerations ..........................................................72
B.      Other Considerations .................................................................................74
C.      Plan Risk Factors ......................................................................................75

ARTICLE VII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES....................78
A.      Certain U.S. Federal Income Tax Consequences to Reorganized
        Debtors .......................................................................................................79
B.      Certain Federal Income Tax Consequences to Holders of Claims............81
C.      Other Tax Matters .....................................................................................92

ARTICLE VIII. RECOMMENDATION ............................................................................93

ARTICLE IX. CONCLUSION ..........................................................................................94

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

# ARTICLE I.
# SUMMARY

The following summary is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in the Disclosure Statement.

On either March 31, 2009 or April, 1, 2009 (collectively, the "Petition Date"), The Rhodes Companies, LLC and certain of its affiliates and subsidiaries (collectively, the "Debtors") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Prior to and after the Petition Date, the Debtors operated one of the largest independent homebuilding businesses in Las Vegas and Nevada.

The Disclosure Statement is being furnished by the First Lien Steering Committee pursuant to section 1125 of the Bankruptcy Code in connection with:  (a) the solicitation of votes for the acceptance or rejection of the Plan and (b) the confirmation hearing (the "Confirmation Hearing"), which is scheduled for [December 17], 2009 at [9:30 a.m.] Pacific Time (the "Confirmation Hearing Date").  A copy of the Plan is annexed hereto as Exhibit A and incorporated by reference herein.

The Disclosure Statement describes certain aspects of the Plan, including the treatment of Claims and Interests, and describes certain aspects of the Debtors' operations, projections and other related matters.

A.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan; (2) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine and the neuter gender; (3) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (4) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified or supplemented; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement or to the Disclosure Statement; (7) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits in the Plan Supplement; (8) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (10) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (11)

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management/Electronic Case Filing ("CM/ECF") system; (13) all references to statutes, regulations orders, rules of courts and the like shall mean as amended from time to time, unless otherwise stated; (14) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (15) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

B.    The Purpose of the Plan

The Plan effectuates a reorganization of the Debtors through the issuance of debt and equity in Newco, and the preservation of their business operations and going concern value. Holders of Old Equity Interests will neither receive, nor retain, any property under the Plan, and any potential Causes of Action not released under the Plan will be preserved (subject to any available defenses to such Causes of Action) and prosecuted and litigated, as may be appropriate, by the Reorganized Debtors or the Litigation Trust, and/or their respective successors. The Plan will be funded by way of the Debtors' Cash on hand, existing assets, and the issuance of the New First Lien Notes and Newco Equity Interests.

The Plan contemplates and is predicated upon the substantive consolidation of the Chapter 11 Cases into a single proceeding solely for the purposes of the Chapter 11 Cases and all actions with respect to confirmation, consummation and implementation of the Plan as set forth in more detail in ARTICLE IV below.

As set forth herein and in the exhibits hereto, the First Lien Steering Committee has estimated, based on certain hypothetical operating projections and an assessment of other available assets, the value to be realized from the Debtors' Estates under the Plan. Pursuant to the Plan, Holders of Allowed First Lien Lender Claims will receive their pro rata share of the New First Lien Notes, Newco Equity Interests and Litigation Trust Series C Interests as set forth in ARTICLE IV below.

Holders of Allowed Second Lien Lender Claims will receive a portion of the proceeds from the Stanley Engineering Litigation and Litigation Trust Series C Interests if such Holders vote in favor of the Plan; or if such Holders do not vote in favor of the Plan, their pro rata share of the Litigation Trust Series C Interests. Holders of Allowed Trade Claims will receive either their pro rata share of up to $1,500,000 in Cash if such Holders vote in favor of the Plan or, if such Holders do not vote in favor the Plan, their pro rata share of the Litigation Trust Series A Interests. Holders of Allowed General Unsecured Claims will receive their pro rata share of Litigation Trust Series B Interests.

All Old Equity Interests will be extinguished and the Holders of such Old Equity Interests will not receive or retain any property on account of such Old Equity Interests. Intercompany Claims of the Debtors will be extinguished through the Plan and such Holders will not directly receive or retain any property under the Plan on account of such Old Equity Interests unless the Reorganized Debtors elect to reinstate such Claims. Holders of Subordinated Claims will not receive or retain any property on account of their Claims.

Finally, all other Allowed Claims, such as Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Other Secured Claims, will be Unimpaired pursuant to the terms of the Plan.

C.    The Debtors' Principal Assets and Indebtedness

The principal assets of the Debtors include their homebuilding assets, which include inventory of undeveloped land and developed lots, and constructed homes (sold and unsold). The Debtors' principal indebtedness includes: (1) First Lien Lender Claims; (2) Second Lien Lender Claims; (3) Other Secured Claims; (4) Priority Non-Tax Claims; (5) Trade Claims, (6) General Unsecured Claims; (7) Rhodes Entities Claims; (8) Insured Claims; (9) Subordinated Claims; and (10) Intercompany Claims.

D.    Treatment of Claims and Interests

Except for unclassified Administrative Claims and Priority Tax Claims, the Plan divides all Claims against the Debtors into various Classes. The table set forth below summarizes the Classes of Claims and Interests under the Plan, the treatment of Claims and Interests and projected recovery for Holders of Allowed Claims in such Classes and the entitlement of Holders of Claims in such Classes to vote to accept or reject the Plan.

The allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

1.    Summary and Treatment of Allowed Unclassified Claims.

| DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | TREATMENT FOR ALLOWED CLAIMS |
|---|---|---|
| Administrative Claims | $750,000 | Each Allowed Administrative Claim shall be paid in full, in Cash, (i) on the later of (a) the Effective Date, (b) the date on which the Bankruptcy Court enters an order allowing such Allowed Administrative Claim, or (c) the date on which the |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, New York 10036**
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent) and the Holder of such Allowed Administrative Claim otherwise agree, and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Debtors, (b) are Allowed by the Bankruptcy Court, (c) may be agreed upon between the Holder of such Allowed Administrative Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), or (d) may otherwise be required under applicable law. Such Allowed Administrative Claims shall include costs incurred in the operation of the Debtors' businesses after the Petition Date, the allowed fees and expenses of Professionals retained by the Debtors and the Creditors' Committee and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

| | | |
|---|---|---|
| Priority Tax Claims | $125,000 | Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) upon such other terms as may be agreed to between the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), and any Holder of an Allowed Priority Tax Claim; provided, however, that the Reorganized Debtors or Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, may make Cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, unless otherwise provided herein, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at the Federal statutory rate; provided, further, that deferred Cash payments on account of an Allowed Priority Tax Claim shall be paid quarterly over a period of six years commencing with the quarter after which such Priority Tax Claim has been Allowed. |

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | TREATMENT FOR ALLOWED CLAIMS/PROJECTED RECOVERY/STATUS/VOTING RIGHTS |
|---|---|---|---|
| A-1 | First Lien Lender Claims | $325,200,000<br><br>Deficiency Claim: $247,100,000 | On the Effective Date, each of the First Lien Lenders shall receive on account of its Claims, (x) its pro rata share of 100% of the New First Lien Notes, (y) its pro rata share of 100% of the Newco |

5

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | TREATMENT FOR ALLOWED CLAIMS/PROJECTED RECOVERY/STATUS/VOTING RIGHTS |
|---|---|---|---|
| | | | Equity Interests (subject to dilution for any Newco Equity Interests issued pursuant to a Management and Director Equity Incentive Plan); and (z) its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the First Lien Lender Claims.<br><br>Projected Recovery: 24.4%<br>Status: Impaired<br>Voting: Entitled to Vote |
| A-2 | Second Lien Lender Claims | Principal Amount: $70,665,402.38<br><br>Interest (as of 3/31/09): $2,182,955.27<br><br>Interest (as of 4/1/09): $2,202,944.34<br><br>Deficiency Claim: $70,800,000 | On the Effective Date, only if the Class of Second Lien Lender Claims votes in favor of the Plan, each of the Second Lien Lenders shall receive (x) its pro rata share of 50% of the net proceeds of the Stanley Engineering Litigation; and (y) its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the Second Lien Lender Claims on account of its deficiency claims, without a reduction on account of the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent, subject to an aggregate cap of $500,000. If the Class of Second Lien Lender Claims votes against the Plan, each of the Second Lien Lenders shall receive its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the Second Lien Lender Claims on account of its deficiency claims, subject to payment of the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent.<br><br>Projected Recovery: 2.8%%<br>Status: Impaired<br>Voting: Entitled to Vote |
| A-3 | Other Secured Claims | $2.3 million | To the extent not satisfied by the Debtors, pursuant to Bankruptcy Court order, in the ordinary course of business prior to the Effective Date, at the option of the Reorganized Debtors on or after the Effective Date (i) an Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) a Holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | TREATMENT FOR ALLOWED CLAIMS/PROJECTED RECOVERY/STATUS/VOTING RIGHTS |
|---|---|---|---|
| | | | Secured Claim, or as soon thereafter as is practicable, (iii) a Holder of an Allowed Other Secured Claim shall receive the Collateral securing both its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iv) a Holder of an Allowed Other Secured Claim shall receive such treatment as to which such Holder and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.<br><br>Projected Recovery: 100%<br>Status: Unimpaired<br>Voting: Deemed to Accept |
| B | Priority Non-Tax Claims | $0 | Each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, unless the Holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.<br><br>Projected Recovery: N/A<br>Status: Unimpaired<br>Voting: Deemed to Accept |
| C-1 | Trade Claims | $500,000-$1,500,000 | On the Effective Date, each Holder of an Allowed Trade Claim shall receive its pro rata share of the Litigation Trust Series A Interests; provided, that if the Class of Trade Claims votes in favor of the Plan, the Holders of Trade Claims shall be deemed to accept their pro rata share of up to $1,500,000 in Cash from the First Lien Lenders' collateral on account of the Litigation Trust Series A Interests, with such Litigation Trust Series A Interests being transferred to the First Lien Lenders in exchange for such Cash payment.  The up to $1,500,000 in Cash payable to the Holders of Allowed Trade Claims shall be paid as follows:  (i) $400,000 on the Effective Date and (ii) the remaining up to $1,100,000 in five quarterly installments of $220,000 beginning on the first day of the fourth month following the Effective Date; provided, that the |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | TREATMENT FOR ALLOWED CLAIMS/PROJECTED RECOVERY/STATUS/VOTING RIGHTS |
|---|---|---|---|
| | | | Reorganized Debtors shall have the right to defer up to two quarterly payments, with such deferred amount(s) to be paid on the next quarterly payment date (and the amount scheduled to be paid on such quarterly payment date deferred for another quarter; provided that all amounts due to the Holders of Allowed Trade Claims shall be paid within eighteen months of the Effective Date.  Notwithstanding the foregoing, under no circumstances shall the Holders of Allowed Trade Claims receive in excess of 100% payment on account of their Allowed Claims.

If Class C-1 does not vote to accept the Plan, each Holder of an Allowed Trade Claim shall only receive its pro rata share of the Litigation Trust Series A Interests on account of its Allowed Claim.

<u>Projected Recovery</u>: 100% (if vote in favor of the Plan)
<u>Status</u>: Impaired
<u>Voting</u>: Entitled to vote |
| C-2 | General Unsecured Claims | Estimated asserted amount $15 million + | On the Effective Date, each Holder of an Allowed General Unsecured Claim (including any Allowed Rhodes Entities Claims) shall receive its pro rata share of the Litigation Trust Series B Interests allocable to the Holders of General Unsecured Claims on account of its Allowed Claim.

<u>Projected Recovery</u>: less than 1%
<u>Status</u>: Impaired
<u>Voting</u>: Entitled to Vote |
| C-3 | Subordinated Claims | $0 | Claims subordinated under applicable law (including any Rhodes Entities Claims that are subordinated) shall not receive any recovery on account of their Claims.

<u>Projected Recovery</u>: N/A
<u>Status</u>: Impaired
<u>Voting</u>: Deemed to Reject |
| D | Old Equity Interests | | Each holder of an Old Equity Interest shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Old Equity Interest.

<u>Projected Recovery</u>: 0%
<u>Status</u>: Impaired
<u>Voting</u>: Deemed to Reject |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS (CONSOLIDATED BASIS) | TREATMENT FOR ALLOWED CLAIMS/PROJECTED RECOVERY/STATUS/VOTING RIGHTS |
|---|---|---|---|
| E | Intercompany Claims | $500,000,000 | At the election of the Reorganized Debtors, Intercompany Claims will be (i) reinstated, in full or in part, (ii) resolved through set-off, distribution, or contribution, in full or in part, or (iii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.<br><br>Projected Recovery: 0%<br>Status: Impaired<br>Voting: Deemed to Reject |

E.    Claims Estimates

      Upon information and belief, as of September 18, 2009, the Claims and Solicitation Agent had received approximately 453 Proofs of Claim and the total amount of Claims Filed against one or more of the Debtors was over $12.5 billion, of which $12 billion are duplicate Claims that will be automatically deemed to be eliminated upon the Effective Date. Additionally, the First Lien Steering Committee believes that many of the Filed Proofs of Claim are invalid, untimely, and/or overstated.  Therefore, the Debtors, the Reorganized Debtors and/or the First Lien Steering Committee will object to such Claims.

      The First Lien Steering Committee estimates that, at the conclusion of the Claims objection, reconciliation and resolution process, the aggregate amount of Claims will be as set forth on the chart in Article I.D.1.

      These estimates are approximate and based upon numerous assumptions and represent significant reductions in the aggregate face amount of Claims Filed.  There is no guarantee that the ultimate amount of each category of Claims will conform to the estimates stated herein, and the majority of Claims underlying such estimates are subject to challenge.  A number of Claims have been asserted in unliquidated amounts.  The First Lien Steering Committee believes that certain Claims are without merit, and the Debtors, the Reorganized Debtors and/or the First Lien Steering Committee will object to all such Claims.  There can be no assurance, however, that Claim objections will achieve the significant reductions in Claims set forth above.  Moreover, additional Claims may be Filed or identified during the Claims objection, reconciliation and resolution process that may materially affect the foregoing estimates.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

F.    Certain Factors to Be Considered Prior to Voting

Holders of Claims entitled to vote on the Plan should carefully consider the risks set forth in ARTICLE VI herein prior to accepting or rejecting the Plan.

G.    Voting and Confirmation

The Classes entitled to vote will have accepted the Plan if (1) the Holders of at least two thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan.  Assuming the requisite acceptances are obtained, the First Lien Steering Committee intends to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on [December 17], 2009 at [9:30 a.m.] prevailing Pacific Time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims that is Impaired under the Plan.

THE FIRST LIEN STEERING COMMITTEE WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE FIRST LIEN STEERING COMMITTEE RESERVES THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

The Bankruptcy Court has established [October 30], 2009 (the "Record Date"), as the date for determining which Holders of Claims are eligible to vote on the Plan.  Ballots, along with this Disclosure Statement, the Plan and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Record Date that are entitled to vote.  A return envelope will be included with Ballots, as appropriate.

The Claims and Solicitation Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation.   The Claims and Solicitation Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.  The address for the Claims and Solicitation Agent is:

Omni Management Group
Attn:  Rhodes Homes Claims Agent
16501 Ventura Boulevard, Suite 440
Encino, CA 91436

Or if by email to scott@omnimgt.com or by fax to 818-783-2737.  If you have any questions on voting procedures, please call the Claims and Solicitation Agent at the following toll free number:  (818) 906-8300.

TO BE COUNTED, BALLOTS (OR MASTER BALLOTS OF THE RESPECTIVE NOMINEE HOLDER, IF APPLICABLE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. PREVAILING PACIFIC TIME ON [DECEMBER 3], 2009

(THE "VOTING DEADLINE").  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

THE FIRST LIEN STEERING COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS.  THE FIRST LIEN STEERING COMMITTEE RECOMMENDS THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

H.    Consummation of the Plan

It will be a condition to Confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article X of the Plan.  Following Confirmation, the Plan will be consummated on the Effective Date, which will be no earlier than the eleventh day following entry of an order, in form and substance acceptable to the First Lien Steering Committee, by the Bankruptcy Court confirming the Plan and satisfaction of all conditions to Confirmation and the Effective Date having been satisfied or waived in accordance with the terms of the Plan.

**ARTICLE II.**
**BACKGROUND[2]**

A.    Description of the Debtors' Business Operations

1.    Organizational Structure

The Debtors' organizational chart is attached hereto as Exhibit B.  In addition to the Debtor entities below, the Debtors are affiliated with several other companies that are not Debtors in these Chapter 11 Cases.

Rhodes Ranch GP is the primary holder of land associated with the Rhodes Ranch master-planned community and also owns some commercial properties outside of the Rhodes Ranch master-planned community.  The Rhodes Ranch master-planned community consists of several developments, including developments built by non-Debtor affiliated developers. Rhodes Design and Development Corp. holds the Debtors' contractor's license in Nevada along with holding some land.  Previously, Rhodes Ranch Golf and Country Club was the owner and operator of the golf course and club house in the Rhodes Ranch development, but on December 22, 2008, as required by the First Lien Credit Agreement, its assets were sold to non-Debtor Rhodes Ranch Golf, Inc.

The Rhodes Companies, LLC is a real estate development holding company.

---

[2] ARTICLE II is based primarily on representations made by the Debtors.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

The following Debtors hold parcels of land associated with the Tuscany development: Rhodes Design and Development; Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC; Tuscany Acquisitions III, LLC; and Tuscany Acquisitions IV, LLC. Tuscany Golf Country Club, LLC owns and operates the golf club located at the Tuscany development.

The following Debtors own land in Arizona: Rhodes Homes Arizona, LLC; Rhodes Arizona Properties, LLC; and Elkhorn Investments. Rhodes Homes Arizona, LLC also holds the Debtors' Arizona contractor's license.

Heritage Land Company, LLC is the land management company for its subsidiaries and does not hold any real estate directly. The following Debtors are subsidiaries of Heritage Land Company, LLC and hold various parcels of land primarily located in Nevada: Tick, LP; Glynda, LP; Chalkline, LP; Batcave, LP; Jacknife, LP; Wallboard, LP; and Overflow LP.

The Debtors are also involved in land acquisition, development, and some utility and design work. Exterior and interior design is provided by Rhodes Design & Development Corporation. Rhodes Realty, Inc. is the Debtor that provides sales and marketing services for the Debtors. C & J Holdings, Inc. is the homeowners association management company for Rhodes Ranch, Tuscany, and three other smaller communities.

Pinnacle Grading, LLC provides grading and excavation services to the Debtors. Previously, the following Debtors also provided specific services to the Debtors, but have ceased operations: Bravo Inc.; Gung-Ho Concrete, LLC; Geronimo Plumbing, LLC; Arapahoe Cleaning, LLC; Apache Framing, LLC; Six Feathers Holding, LLC; and Tribes Holding LLC.

Elkhorn Investments, Inc. is a holding company for Elkhorn Partners, LP. Elkhorn Partners, LP is a limited partnership that was formed for the construction and sale of several communities in Northwest Las Vegas. As of the Petition Date, only one home remained unsold.

2.    History and Projects

The Debtors are engaged primarily in the business of detached home building and sales in Nevada and Arizona. Collectively, the Debtors developed 40 communities since their founding in 1988, generating over $2.4 billion in total revenues. The Debtors have built more than 6,000 homes in the Las Vegas Valley during the past two decades. In 2008, the Debtors sold 390 homes, generating revenue of $118.3 million, or $54.6 million net of expenses.

Currently, the Debtors have two signature master planned communities under development, Rhodes Ranch and Tuscany Residential Village. Both communities are recognized for their accessible location to employment centers and the Las Vegas Strip, for their community amenities, country club lifestyle, and for the quality and value of home design and construction.

Rhodes Ranch is located in southwestern Las Vegas and opened in 1997. It has a gated entry and 24-hour security detail with patrols. The development is built around a Ted Robinson-designed 18-hole championship golf course. The development features a multi-

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

million dollar community center with swimming pool, gymnasium, multiple basketball courts, fitness center, and card/club rooms.  The community also has a nearly completed community park and sports complex.  There are 314 available finished lots remaining to be sold as of March 31, 2009, and approximately 1,993 lots to be developed.

Tuscany Residential Village is located in southeast Las Vegas and opened in 2005.  The development is also built around a Ted-Robinson designed 18-hole championship golf course.  It has gated entry and 24-hour security detail (with patrols), an existing 35,000 square foot community center similar to Rhodes Ranch, and a planned Tuscan-themed retail center.  As of March 31, 2009, Tuscany had 350 finished lots remaining to be sold and 559 partially developed lots.

Spanish Hills is a high-end development located in southwest Las Vegas.  The community is built on over 100 acres and features custom homes in excess of 5,400 square feet of living space.  As of March 31, 2009, it had 2 partially developed single family estate lots and 2 finished lots remaining to be sold.  It also had 10 acres of undeveloped land.

The Debtors homebuilding operations in Arizona ("Arizona") will be transferred to the Rhodes Entities on the Effective Date pursuant to the Plan.  Arizona consists of all of the real and personal property of three of the Debtors:  Rhodes Homes Arizona Properties, LLC, Rhodes Homes Arizona, LLC, and Elkhorn Investments, Inc.  Included within the Arizona Assets is Pravada, which is a Rhodes Homes development located in Mohave County (vicinity of Kingman, Arizona) on approximately 1,312 acres, which has 3,591 partially developed lots.  Also included in Arizona, which is located within and around Pravada, are 4 model homes, 4 standing inventory homes, and 327 acres of land.  The full list of Arizona Assets being transferred to the Rhodes Entities is set forth on Attachment D to the Mediation Term Sheet.  The Arizona Assets do not include any assets owned by Pinnacle Grading located in Arizona, except for Pinnacle Grading office equipment, furniture, computers located in Arizona, which is set forth on Attachment D to the Mediation Term Sheet.

The Debtors own a number of additional lots and commercial-zoned properties in various stages of development in Nevada and Arizona.  As of the first quarter of 2009, development on all projects except Rhodes Ranch and Tuscany has ceased pending improvement in the real estate market.

3.    Principal Debt and Capital Structure

The Debtors are party to a First Lien Credit Agreement, pursuant to which there was approximately $302 million outstanding as of the Petition Date.  The First Lien Steering Committee is comprised of certain lenders under the Debtors' First Lien Credit Agreement that hold, in the aggregate, approximately 60% of the outstanding first lien debt.[3]  Three of the Debtors are primary obligors under the First Lien Credit Agreement.  The remainder of the

---

[3] The members of the First Lien Steering Committee are Credit Suisse Asset Management, Candlewood Special Situations Master Fund, Credit Suisse Loan Funding LLC, CypressTree Investment Management LLP, General Electric Capital Corporation, Highland Capital Management, L.P., and Sorin Capital Management.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Debtors executed guarantees under the same facility.  The First Lien Credit Agreement is secured by a blanket first lien on substantially all of the Debtors' property.  The Debtors are also party to a swap transaction, pursuant to which there was approximately $20.2 million outstanding on the Petition Date.  Obligations outstanding under the swap transaction are *pari passu* with obligations outstanding under the First Lien Credit Agreement.

In addition, the Debtors are party to a Second Lien Credit Agreement, pursuant to which there was approximately $70.7 million outstanding as of the Petition Date.  The Second Lien Lenders are subject to the terms of an intercreditor agreement that, among other things, prohibits the Second Lien Lenders from receiving a recovery from the collateral securing the first lien and second lien debt unless the First Lien Lenders are repaid in full.

The Debtors are also obligated to approximately nine equipment lenders who hold purchase money security interests in various office equipment and equipment used in the Debtors' operations.  As of the Petition Date, the Debtors estimate that they are obligated to these equipment lenders in the approximate amount of $2.5 million.

In the ordinary course of business, the Debtors are required to post bonds, either on an unsecured or partially secured basis backed by collateral, as support for the Debtors' completion of certain performance and/or payment obligations for the benefit of various third party beneficiaries, generally governmental entities, agencies, jurisdictions or homeowners associations with which they conduct business.  The Debtors rely on bonding companies to post the bonds and have issued indemnities in favor of the bonding companies in the event that the bonds come due.  The Debtors estimate that they currently have approximately $31 million in outstanding bonds, none of which amounts have been called.

Allowed Trade Claims in these Chapter 11 Cases are expected to range from $500,000 to $1,500,000, excluding Claims asserted by the Rhodes Entities.

4.    The Rhodes Entities Claims

The Debtors are affiliated with several non-Debtor entities that are not obligors or guarantors under the First Lien Credit Agreement or the Second Lien Credit Agreement.  The non-Debtor entity affiliates, collectively the "Rhodes Entities" are directly or indirectly owned by James M. Rhodes, the founder and President of the Debtors.  The Rhodes Entities have alleged pre-petition Claims on an aggregate basis against the Debtors for approximately $10.598 million consisting primarily of tax payments allegedly made by the Rhodes Entities on behalf of the Debtors.  The First Lien Steering Committee is in the process of analyzing the Rhodes Entities Claims and any and all claims that the Debtors' estates may hold against the Rhodes Entities.

5.    Management of the Debtors

James Rhodes leads the management team of the Debtors.  Upon the Effective Date, it is contemplated that James Rhodes will not have a management role with the Reorganized Debtors.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

# ARTICLE III.[4]
# THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including the events leading up to the chapter 11 filings, the stabilization of the Debtors' operations following the chapter 11 filings, certain administrative matters addressed during the Chapter 11 Cases and the Debtors' restructuring initiatives since the chapter 11 filings.

A.    Events Leading to the Chapter 11 Cases

At the end of the fourth quarter of 2008, sales in the Las Vegas market of new, detached homes were down 93% (to 522 net sales) from the peak (7,731 quarterly net sales) that occurred in the second quarter of 2005.  The median base price for a detached single family home dropped 39% from the peak achieved in the fourth quarter of 2005.

Although the Debtors had made cost reductions in general overhead and other areas, including employee layoffs, many factors, including the severe downturn of the Las Vegas market, significant supply overhang, and general economic malaise combined to create an environment where the Debtors were unable to meet their March 2009 debt and amortization payments.  The First Lien Steering Committee was formed in early March 2009 to negotiate the terms of a forbearance agreement and consensual restructuring with the Debtors after it became apparent that the Debtors would not be able to make their regularly scheduled interest and amortization payments on the first lien debt.

On March 31, 2009, an interest payment in the amount of approximately $9 million and a principal payment in the amount of $10.75 million was due and owing on the First Lien Credit Agreement and an interest payment in the amount of approximately $2.4 million was due and owing on the Second Lien Credit Agreement.  Despite extended and intensive negotiations between the First Lien Lenders and the Debtors, when no agreement was reached by March 31, 2009, the Debtors commenced these Chapter 11 Cases on March 31, 2009 and April 1, 2009 to avail themselves of the protections of the Bankruptcy Code.

B.    Initiation of the Chapter 11 Cases

On either March 31, 2009 or April 1, 2009, each of the Debtors Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On April 13, 2009, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No trustee or examiner has been appointed in the Chapter 11 Cases.

---

[4] ARTICLE III includes information that is based on representations made by the Debtors.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

C.    Stabilization of Operations

After commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to minimize disruption to their operations and facilitate the administration of the Chapter 11 Cases.  Several of these orders are briefly summarized below.

1.    Cash Collateral Motion

The Debtors Filed a motion (the "Cash Collateral Motion") seeking entry of interim and final orders (i) authorizing the Debtors to use cash collateral, (ii) granting adequate protection to the Debtors' prepetition secured creditors, and (iii) scheduling a final hearing on the Cash Collateral Motion [Heritage Docket No. 15].  Subsequent to the filing of the Cash Collateral Motion, the Court entered a series of stipulated orders authorizing the Debtors to use cash collateral with the consent of the First Lien Steering Committee.  On April 10, 2009, the Court entered a stipulated interim order (the "First Stipulated Cash Collateral Order") authorizing the Debtors to use cash collateral through April 17, 2009 [Heritage Docket No. 125].  On April 17, 2009, the Court entered a second stipulated interim order (the "Second Stipulated Cash Collateral Order"), which extended the Debtors' authorization to use cash collateral through April 28, 2009 [Rhodes Docket No. 73] on similar terms to the First Stipulated Cash Collateral Order.  On April 30, 2009, the Court entered a final stipulated order authorizing the Debtors to use cash collateral through June 28, 2009 [Rhodes Docket No. 126].  In response to further requests for extension of the Debtors' authority to use cash collateral, the First Lien Steering Committee has consented to periodic continuances of the Debtors' use of cash collateral.  A copy of the current cash collateral budget is attached hereto as Exhibit C.

2.    Cash Management Motion

The Debtors Filed a motion (the "Cash Management Motion") seeking entry of interim and final orders (i) authorizing the Debtors to continue to use their existing, centralized cash management system, bank accounts and business forms; (ii) granting administrative expense priority status to intercompany claims arising on and after the Petition Date; (iii) waiving the investment and deposit requirements under section 345 of the Bankruptcy Code; and (iv) granting related relief [Rhodes Docket No. 13].  On April 17, 2009, the Bankruptcy Court granted the Cash Management Motion on an interim basis with certain modifications [Rhodes Docket No. 78].  On April 30, 2009, the Bankruptcy Court entered a final order granting the Cash Management Motion on a final basis [Rhodes Docket No. 123].

3.    Home Sale Motion

The Debtors Filed a motion (the "Home Sale Motion") for authority to, among other things, (i) continue the construction, sale and closing of homes to customers in the ordinary course of business, (ii) honor certain prepetition contract obligations to homebuyers, including, where appropriate in the Debtors' business judgment and not inconsistent with past business practices, to refund deposits or provide other customer incentives, (iii) provide that the sale of homes to the Debtors' customers shall be free and clear of all liens, claims, encumbrances and other interests, (iv) pay claims secured by liens out of the proceeds of

home sales, (v) establish procedures for resolving disputed lien claims, (vi) proceed immediately with the sale of homes and establishment of the lien procedures, and (vii) permit financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing [Rhodes Docket No. 14].  As set forth in the Home Sale Motion, the Debtors' ability to, among other things, satisfy their contractual obligations to their customers and continue to contract for and complete the construction and sale of homes, free and clear of liens, is critical to the Debtors' operations.  On April 10, 2009 the Bankruptcy Court entered an interim order granting the Home Sale Motion [Rhodes Docket No. 20], and subsequently entered a final order, with certain modifications, on April 17, 2009 (the "Final Home Sale Order") [Rhodes Docket No. 77].  Among other things, the Final Home Sale Order established that the construction and sale of homes was required to be consistent with any cash collateral orders and provided the Debtors' prepetition lenders with rights to receive certain information and object to certain lien payments.

### 4. Customer Programs Motion

The Debtors Filed a motion (the "Customer Programs Motion") seeking entry of an order authorizing the Debtors to honor certain prepetition obligations to customers and continue customer practices and programs (the "Customer Practices and Programs") in the ordinary course of business [Rhodes Docket No. 12].  The Customer Practices and Programs included, among other things, (i) a one year limited warranty that was offered to all homebuyers, (ii) customer sale incentives, (iii) payment of homeowner association dues, and (iv) certain programs related to the Tuscany golf pro shop.  On April 17, 2009, the Bankruptcy Court entered an order approving the Customer Programs Motion [Rhodes Docket No. 75].

### 5. Utilities Motion

To comply with the requirements of section 366 of the Bankruptcy Code, the Debtors Filed a motion (the "Utilities Motion") seeking an order authorizing them to provide, within 20 days of the Petition Date, an adequate assurance deposit equal to one-half of the Debtors' estimated monthly charges, subject to certain provisions as set forth in the motion [Rhodes Docket No. 11].  If any of the utility service providers believed that additional assurance of payment for services was required, the Utilities Motion authorized such utility service provider to request such additional adequate assurance.  On April 30, 2009, the Bankruptcy Court granted the Utilities Motion on an interim basis with certain modifications [Rhodes Docket No. 122].  On May 18, 2009, the Bankruptcy Court entered a final order granting the Utilities Motion [Rhodes Docket No. 181].

### 6. Employee Wages and Benefits Motion

As of the Petition Date, the Debtors' workforce consisted of approximately 124 employees.  Given the critical functions performed by the Debtors' employees and their importance to the Debtors' businesses and efforts to reorganize, the Debtors Filed a motion (the "Employee Wages and Benefits Motion") seeking entry of an order authorizing them, in accordance with their ordinary course policies and practices and in the Debtors' discretion, to (i) pay and/or honor prepetition wages, salaries, employee benefits, and other compensation or reimbursements, (ii) remit withholding obligations, (iii) maintain employee compensation and

benefits programs and pay related administrative obligations, and (iv) have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests [Rhodes Docket No. 10]. An interim order approving the Employee Wages and Benefits Motion was entered on April 10, 2009 [Rhodes Docket No. 19], and a final order approving the Employee Wages and Benefits Motion was entered on April 17, 2009 [Rhodes Docket No. 74], which required that any compensation for postpetition wages to be paid to Rhodes or his relatives be made by separate motion for insider compensation (the "Wages Orders").

       7.    Sales and Use Tax Motion

The Debtors Filed a motion (the "Sales and Use Tax Motion") seeking authority to pay certain prepetition sales and use taxes. In connection with the normal operation of their homebuilding business, the Debtors incur sales and use taxes, which are not property of the Debtors' estates and must be paid in order for the Debtors to avoid any attempt by authorities to suspend the Debtors' businesses. On May 18, 2009, the Bankruptcy Court entered an order granting the Sales and Use Tax Motion with certain modifications [Rhodes Docket No. 179].

       8.    Insider Compensation Motion

As required by the Wages Orders, the Debtors Filed a motion for an order authorizing the Debtors to pay the salary of the Debtors' president, James M. Rhodes, through June 26, 2009, the time period of the Debtors' 13 week budget, or any such further time period as authorized by the Court or agreed upon by the First Lien Lenders pursuant to any cash collateral order entered in these cases [Rhodes Docket Number 94]. The United States Trustee filed an objection, which was resolved in the order approving the motion on July 21, 2009.

       9.    Appointment of Claims and Noticing Agent

To relieve the Clerk's Office of the Bankruptcy Court of the significant burden as a result of the potential for having approximately 10,000 creditors in these cases, the Debtors Filed an application (the "Claims and Noticing Agent Application") seeking entry of an order appointing Omni Management Group, LLC ("Omni") as the Debtors' Claims and Solicitation Agent to, among other things: (i) prepare and serve notices required in the Debtors' Chapter 11 Cases, including notice of the commencement of these cases and the initial meeting of creditors under section 341 of the Bankruptcy Code; (ii) maintain the official Claims Register; and (iii) mail Ballots in connection with any vote to accept or reject a plan or plans of reorganization proposed in these cases [Heritage Docket No. 63]. The Bankruptcy Court entered an order approving the Claims and Noticing Agent Application on April 8, 2009 [Heritage Docket No. 111]. On April 10, 2009, the Bankruptcy Court entered an amended order with a notation that Omni shall maintain a separate Claims Register for each Debtor and shall abide by the Guidelines for Claims Agents used in the District of Nevada [Heritage Docket No. 123]. Among other services, Omni maintains a website with case information and copies of all pleadings free of charge in these Chapter 11 Cases. *See* www.omnimgt.com/rhodes.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

10.    Retention of Debtors' Professionals

Throughout the Chapter 11 Cases, the Debtors retained certain Professionals to assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases. These Professionals included: (a) Pachulski Stang Ziehl & Jones LLP, as general bankruptcy counsel; (b) Larson & Stephens, LLC, as local counsel; (c) Acceleron Group, LLC, as valuation advisor; and (d) Sullivan Group Real Estate Advisors, as market research consultant. The Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases.

11.    Ordinary Course Professionals

The Debtors desired to continue to employ certain professionals such as attorneys and accountants not involved in the administration of the Debtors' cases (the "Ordinary Course Professionals") for the same purposes as such services were provided prior to the Petition Date. Accordingly, pursuant to sections 105(a), 327, 328 and 330 of the Bankruptcy Code and Bankruptcy Rule 2014(a), the Debtors Filed a motion (the "OCP Motion") seeking entry of an order authorizing them to retain, employ, and pay Ordinary Course Professionals in the ordinary course of the Debtors' businesses, on the terms and conditions set forth in the OCP Motion, and subject to certain monthly payment caps [Rhodes Docket No. 141]. The Bankruptcy Court entered an order approving the OCP Motion on May 19, 2009 [Rhodes Docket No. 187].

D.    Appointment of the Creditors' Committee

On May 26, 2009, the United States Trustee appointed the Creditors' Committee. The members of the Creditors' Committee are: G.C. Wallace, Inc., Interstate Plumbing & Air Conditioning, M&M Electric, Inc. and Southwest Iron Works, LLC. The Creditors' Committee retained the law firm of Parsons Behle & Latimer as counsel.

E.    Claims Bar Dates

On April 30, 2009, each of the Debtors Filed their schedules of assets and liabilities and statement of financial affairs as amended from time to time (collectively, the "Schedules") with the Bankruptcy Court. Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the District of Nevada, Southern Division, 300 Las Vegas Boulevard South, Las Vegas, NV 89101 or by visiting www.omnimgt.com/rhodes.

By notice dated March 31, 2009, the Court set the claims bar date for 90 days after the date first set for the meeting of creditors, or August 5, 2009 (the "Bar Date Notice") [Heritage Docket No. 3]. The Bar Date Notice was served on the Debtors' master mailing lists on April 17, 2009. Accordingly, the following Bar Dates have been established:

(i)    August 5, 2009 for all Holders of General Unsecured Claims against all Debtors;

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

(ii)    September 28, 2009 for all Holders of Claims of Governmental Units for all Debtors except the following three Debtors:  Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887);

(iii)    September 29, 2009 for all Holders of Claims of Governmental Units for the following three Debtors:  Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

On May 27, 2009, the Debtors Filed the Motion of Debtors for Entry of an Order Authorizing the Debtors to Publish Notice of the Bar Dates and Approving the Form of the Publication Notice Pursuant to FRBP 2002(l).  The Bankruptcy Court entered an order (the "Bar Date Publication Order") granting the motion on July 9, 2009 [Rhodes Docket Number 305].  The Bar Date Publication Order authorized the Debtors to publish notice of the Bar Dates in the *Las Vegas Review-Journal*, the *Kingman Daily Miner* and such other local publications as the Debtors deemed appropriate within ten days of the entry of the Bar Date Publication Order.

The First Lien Steering Committee and the Debtors have been reviewing various Proofs of Claim and will continue to review and evaluate each Proof of Claim Filed prior to the applicable Bar Date to determine whether grounds exist to object to the allowance of such Claims.  The First Lien Steering Committee believes that the Claims asserted against the Debtors will likely be resolved and/or reduced to aggregate amounts that approximate the estimates for Allowed Claims set forth herein.  However, the actual aggregate amounts of the Allowed Claims in any Class may differ significantly from the First Lien Steering Committee's estimates thereof and any variance from such estimates may affect distributions in certain Classes.

F.    Other Postpetition Events and Negotiations

On April 7, 2009, the First Lien Steering Committee moved for the appointment of a chapter 11 trustee (the "Trustee Motion").  The Trustee Motion was based, in part, on allegations of questionable and unlawful business dealings, and suspicions concerning the propriety of Mr. Rhodes' conduct as the Debtors' President as detailed in a report prepared by a nationally recognized firm retained by the First Lien Agent to conduct an investigation into the Debtors' business operations (the "Rhodes Report").  In light of the allegations contained in the Rhodes Report, and as a result of Mr. Rhodes' conduct during the prepetition negotiations, the First Lien Steering Committee did not believe that Mr. Rhodes had been acting in accordance with his fiduciary duties.  Thus, the First Lien Steering Committee Filed the Trustee Motion.

The Rhodes Entities and the Debtors opposed the Trustee Motion and objected to the Rhodes Report as containing unsubstantiated allegations and hearsay.  The Debtors provided extensive discovery and a deposition at the request of the First Lien Steering Committee.  Prior to the hearing on this matter, the First Lien Steering Committee took the Trustee Motion

off calendar in light of the progress the parties were making on negotiations over the plan of reorganization.

The negotiations for a plan of reorganization, which began prior to the Petition Date, continued in earnest during the Chapter 11 Cases until the negotiations reached a stalemate in June. In June, the First Lien Steering Committee objected to the Debtors' request to extend their exclusive period to file a plan of reorganization and continue use of cash collateral. The Debtors agreed to give up their exclusive right to file a plan of reorganization in exchange for an agreement by the parties to participate in non-binding plan mediation before a neutral third party mediator to attempt to work out a consensual plan. All parties did so agree to mediate and the mediation was held in Los Angeles on August 17, 24 and 25, 2009 before the Honorable Richard Neiter, United States Bankruptcy Court, Central District of California. During the mediation, the parties reached agreement in principle on a comprehensive settlement (the "Mediation Settlement"). The terms of the Mediation Settlement are set forth on Exhibit 1 to the Plan (the "Mediation Term Sheet") and provide for, among other things, the following:

- The Rhodes Entities  shall receive a full release for chapter 5 causes of action with respect to transfers made by the Debtors to the Rhodes Entities during the 2 years prior to the Petition Date provided, that, such release shall only apply to transfers expressly set forth in the Debtors' statements of financial affairs as filed with the Bankruptcy Court as of August 1, 2009 or as set forth on the Mediation Term Sheet.

- To the extent permitted by applicable law, the Plan shall provide that, but for (i) the Rhodes Entities and their affiliates; (ii) insiders of any of the Rhodes Entities (except as to Thomas Robinson and Joseph Schramm who were also employees of the Debtors), (iii) relatives of James Rhodes, the Debtors' officers, employees (including Thomas Robinson and Joseph Schramm), and professionals, as of the Petition Date, and Paul Huygens shall receive a general release from the Debtors' estates.

- The Plan shall provide for one of the following: (i) those performance bonds guaranteed by the Rhodes Entities in favor of the Debtors to be replaced on a renewal date by new performance bonds or, in the alternative, (ii) subject to the Rhodes Entities being reasonably satisfied with the creditworthiness of the Reorganized Debtors, which shall be satisfied solely as of the Effective Date by the Court finding that the Plan is feasible, the existing performance bonds guaranteed by the Rhodes Entities and such guarantees to remain in place.

- The Rhodes Entities shall ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA boards that in any way are related to the Debtors, Reorganized Debtors or their businesses and declarant rights or the like shall be transferred to the Reorganized Debtors or their designee(s).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

- The Rhodes Entities shall take commercially reasonable steps and/or enter into any agreements or similar documentation reasonably necessary to ensure the Reorganized Debtors' continued use of all of the Debtors' applicable professional licenses at no cost to the Rhodes Entities for a period of up to twelve months following the Effective Date.

- To the extent allowed, the Rhodes Entities' Claims shall be treated in the same class as and treated *pari passu* with General Unsecured Claims, excluding Trade Claims.

- The Heritage Equity Securities shall be purchased by Newco, as described in Article IV.E.6 herein and Article IV.F of the Plan.

- On the Effective Date, the applicable Rhodes Entities shall transfer their interests in the Rhodes Ranch Golf Course to the Reorganized Debtors, subject to any outstanding debt on the Rhodes Ranch Golf Course.  The existing debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Mr. Rhodes and the First Lien Steering Committee.

- The Rhodes Entities shall make a Cash payment to the Reorganized Debtors of $3.5 million in Cash on the Effective Date.

- On the Effective Date, the Debtors shall (i) transfer Pravada and the other Arizona Assets to the Rhodes Entities free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and (ii) assume and assign to the Rhodes Entities (or their designee) all executory contracts and unexpired leases associated solely with the Arizona Assets at no cost to the Debtors or the Reorganized Debtors and all Cure costs associated therewith shall be borne by the Rhodes Entities.

For a more detailed discussion of terms of the Mediation Settlement, see Article IV.E. of the Disclosure Statement.  The provisions of the Plan encompassing the terms of the Mediation Settlement, shall pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Mediation Settlement, constitute a good faith compromise of all Claims, Interests, and controversies relating to the subject matter of the Mediation Settlement.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of the matters subject to the Mediation Settlement as well as a finding by the Bankruptcy Court that such compromise and  settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

# ARTICLE IV.
## SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AND INTERESTS, THE ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize or wind-down its business for the benefit of itself and holders of claims against and interests in the debtor. Chapter 11 also is designed to promote equality of treatment for similarly situated holders of claims against the debtor and similarly situated holders of interests in the debtor with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by provisions of the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, the Debtors need not solicit votes from the Holders of Claims or Interests in such Classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a chapter 11 plan shall classify claims against and interests in the debtor. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Plan Proponent is also required, as discussed above, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes. The First Lien Steering Committee believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the First Lien Steering Committee intends, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

B.    Administrative and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

1.    Administrative Claims

Each Allowed Administrative Claim shall be paid in full, in Cash, (i) on the later of (a) the Effective Date, (b) the date on which the Bankruptcy Court enters an order allowing such Allowed Administrative Claim, or (c) the date on which the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the

24

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

First Lien Agent and Second Lien Agent) and the Holder of such Allowed Administrative Claim otherwise agree, and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Debtors, (b) are Allowed by the Bankruptcy Court, (c) may be agreed upon between the Holder of such Allowed Administrative Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), or (d) may otherwise be required under applicable law.  Such Allowed Administrative Claims shall include costs incurred in the operation of the Debtors' businesses after the Petition Date, the allowed fees and expenses of Professionals retained by the Debtors and the Creditors' Committee and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

      2.    <u>Priority Tax Claims</u>

Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) upon such other terms as may be agreed to between the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), and any Holder of an Allowed Priority Tax Claim; <u>provided</u>, <u>however</u>, that the Reorganized Debtors or Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, may make Cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, unless otherwise provided herein, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at the Federal statutory rate; <u>provided</u>, <u>further</u>, that deferred Cash payments on account of an Allowed Priority Tax Claim shall be paid quarterly over a period of six years commencing with the quarter after which such Priority Tax Claim has been Allowed.

C.    <u>Classification and Treatment of Claims</u>

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are classified in the Classes set forth below.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

      1.    <u>Class A-1 – First Lien Lender Claims</u>

First Lien Lender Claims include any Claim on account of the First Lien Credit Agreement.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Class A-1 is Impaired and entitled to vote to accept or reject the Plan.  On the Effective Date, each of the First Lien Lenders shall receive on account of its Claims, (x) its pro rata share of 100% of the New First Lien Notes, (y) its pro rata share of 100% of the Newco Equity Interests (subject to dilution for any Newco Equity Interests issued pursuant to a Management and Director Equity Incentive Plan); and (z) its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the First Lien Lender Claims.

2.    Class A-2 – Second Lien Lender Claims

Second Lien Lender Claims include any Claim on account of the Second Lien Credit Agreement.

Class A-2 is Impaired and entitled to vote to accept or reject the Plan.  On the Effective Date, only if the Class of Second Lien Lender Claims votes in favor of the Plan, each of the Second Lien Lenders shall receive (x) its pro rata share of 50% of the net proceeds of the Stanley Engineering Litigation; and (y) its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the Second Lien Lender Claims on account of its deficiency claims, without a reduction on account of the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent, subject to an aggregate cap of $500,000.  If the Class of Second Lien Lender Claims votes against the Plan, each of the Second Lien Lenders shall receive its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the Second Lien Lender Claims on account of its deficiency claims, subject to payment of the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent.

3.    Class A-3 – Other Secured Claims

Other Secured Claims include any Secured Claim other than a: (a) First Lien Lender Claim; or (b) Second Lien Lender Claim.

Class A-3 is Unimpaired and deemed to accept the Plan.  To the extent not satisfied by the Debtors, pursuant to Bankruptcy Court order, in the ordinary course of business prior to the Effective Date, at the option of the Reorganized Debtors on or after the Effective Date (i) an Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) a Holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, (iii) a Holder of an Allowed Other Secured Claim shall receive the Collateral securing both its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iv) a Holder of an Allowed Other Secured Claim shall receive such treatment as to which such Holder and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

4.    <u>Class B – Priority Non-Tax Claims</u>

Priority Non-Tax Claims include any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

Class B is Unimpaired and deemed to accept the Plan.  Each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, unless the Holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.

5.    <u>Class C-1 – Trade Claims</u>

Trade Claims include Unsecured Claims for goods or services provided to the Debtors prepetition, as determined by the Debtors, the Creditors' Committee and the First Lien Steering Committee by the hearing on the Disclosure Statement or, if no such agreement can be reached, by the Bankruptcy Court.

Class C-1 is Impaired and entitled to vote to accept or reject the Plan.  On the Effective Date, each Holder of an Allowed Trade Claim shall receive its pro rata share of the Litigation Trust Series A Interests; provided, that if the Class of Trade Claims votes in favor of the Plan, the Holders of Trade Claims shall be deemed to accept their pro rata share of up to $1,500,000 in Cash from the First Lien Lenders' collateral on account of the Litigation Trust Series A Interests, with such Litigation Trust Series A Interests being transferred to the First Lien Lenders in exchange for such Cash payment.  The up to $1,500,000 in Cash payable to the Holders of Allowed Trade Claims shall be paid as follows:  (i) $400,000 on the Effective Date and (ii) the remaining up to $1,100,000 in five quarterly installments of $220,000 beginning on the first day of the fourth month following the Effective Date; provided, that the Reorganized Debtors shall have the right to defer up to two quarterly payments, with such deferred amount(s) to be paid on the next quarterly payment date (and the amount scheduled to be paid on such quarterly payment date deferred for another quarter; provided that all amounts due to the Holders of Allowed Trade Claims shall be paid within eighteen months of the Effective Date).  Notwithstanding the foregoing, under no circumstances shall the Holders of Allowed Trade Claims receive in excess of 100% payment on account of their Allowed Claims.

If Class C-1 does not vote to accept the Plan, each Holder of an Allowed Trade Claim shall only receive its pro rata share of the Litigation Trust Series A Interests on account of its Allowed Claim.

6.    <u>Class C-2 – General Unsecured Claims (other than Rhodes Entities Claims)</u>

General Unsecured Claims include any Claim (including any Allowed Rhodes Entities Claims) against any of the Debtors that is not a/n (a) Administrative Claim, (b) Priority Tax Claim, (c) Priority Non-Tax Claim, (d) First Lien Lender Claim, (e) Second Lien Lender

Claim, (f) Other Secured Claim, (g) Subordinated Claim, (h) Intercompany Claim, or (i) Trade Claim.

Class C-2 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, each Holder of an Allowed General Unsecured Claim (including any Allowed Rhodes Entities Claims) shall receive its pro rata share of the Litigation Trust Series B Interests allocable to the Holders of General Unsecured Claims on account of its Allowed Claim.

7.      Class C-3 – Subordinated Claims

Subordinated Claims include all Claims subject to subordination under Bankruptcy Code section 510.

Class C-6 is Impaired and deemed to have rejected the Plan. Claims subordinated under applicable law (including any Rhodes Entities Claims that are subordinated) shall not receive any recovery on account of their Claims.

8.      Class D – Old Equity Interests

Old Equity Interests include all of the Interests in any of the Debtors and any rights, options, warrants, calls, subscriptions or other similar rights or agreements, commitments or outstanding securities obligating the Debtors to issue, transfer or sell any Interests.

Class D is Impaired and deemed to reject the Plan. Each holder of an Old Equity Interest shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Old Equity Interest.

9.      Class E – Intercompany Claims

Intercompany Claims include any Claim held by a Debtor or an Affiliate.

Class E is Impaired and deemed to reject the Plan. At the election of the Reorganized Debtors, Intercompany Claims will be (i) reinstated, in full or in part, (ii) resolved through set-off, distribution, or contribution, in full or in part, or (iii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.

D.      Cramdown

The Plan Proponent will request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The First Lien Steering Committee reserves the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

E.    Means for Implementation of the Plan

    1.    Substantive Consolidation

The Plan shall serve as a motion by the First Lien Steering Committee seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and distributions to be made under the Plan.  The effect of substantive consolidation is that on the Effective Date: (a) solely for the purposes of the Plan and the distributions and transactions contemplated thereunder, all assets and liabilities of the Debtors' Estates shall be deemed consolidated into a single estate; (b) all cross-corporate guarantees made by the Debtors prepetition shall be deemed eliminated (regardless of whether such guaranty is secured, unsecured, liquidated, unliquidated, contingent, or dispute); (c) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be a single obligation of the consolidated Debtors; (d) any Claims filed or to be filed in connection with any such obligation and such guarantees referenced in subsection (c) hereof shall be deemed to be a single Claim against the consolidated Debtors; (e) each and every Claim filed in the individual Chapter 11 Case of any of the Debtors shall be deemed to be a single obligation of all of the Debtors under the Plan; (f) all duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives against the consolidated Debtors (but in no way shall such surviving Claim be deemed Allowed by reason of this Section); and (g) the Intercompany Claims will be automatically eliminated. All Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor or of any other Person shall be discharged, released and of no further force and effect; provided, however, that nothing in the Plan shall affect the obligations of each of the Debtors under the Plan.  Notwithstanding the substantive consolidation of these Cases for purposes of the Plan, each of the Debtors shall, as Reorganized Debtors, continue to exist after the Effective Date as separate corporate entities.

Substantive consolidation causes no harm to creditors and the benefits of substantive consolidation are numerous.  First, over $12 billion in duplicate secured debt will be eliminated because the First Lien Lender Claims and the Second Lien Lender Claims each will be allowed only once against the consolidated Estate.  Second, over $500 million in Intercompany Claims will be deemed eliminated because the multiple Debtors will be deemed only one Debtor.  Third, over $5 million of other duplicate Unsecured Claims that have been filed in multiple Chapter 11 Cases will be automatically eliminated.  Fourth, approximately 35% of the Claims that have been Filed are asserted incorrectly against the wrong Debtor. Substantive consolidation will eliminate the need for the objection to such Claims. Accordingly, the Plan Proponent submits that substantive consolidation is warranted in the Chapter 11 Cases.

The following additional factors support substantive consolidation:

- The Debtors operate as a single business enterprise called "Rhodes Homes" rather than along distinct legal entities.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

- The Debtors operate on a centralized basis with a central cash management system.  All of the Debtors' operating expenses are paid for by one Debtor entity on behalf of the other Debtors.  Likewise, all funds received by the Debtors are automatically remitted to the central cash management account as required by the First Lien Credit Agreement.  The Debtors' financial reporting is also on a consolidated basis and the Debtors file consolidated tax returns.

- The Debtors share common parent companies.  The Debtors have overlapping directors or managing members and officers among parent and subsidiaries.  Because the Debtors all have the same director/managing member and principal shareholder, Mr. Rhodes, there were no regular meeting of the subsidiaries' boards of directors.  Also, for most of the Debtors who are LLCs, no board meetings are required.  Rather, all corporate actions are done by written consent of the sole shareholder and director/ managing member.  All of the Debtors' corporate activities are characterized by centralized decision making, including the filing of the bankruptcies.

- All of the Debtors rely on the corporate office for their accounting, legal, human resources, administrative support.  In addition to shared corporate support, all of the Debtors also share common insurance policies.

- The Debtors regularly conduct business with each other such that the flow of funds is numerous and would be extraordinarily difficult and time consuming to disentangle.  As of the Petition Date, the Debtors estimate that approximately $500 million in intercompany claims were owed between the Debtors.

- The Debtors are all obligated, either as obligors or guarantors, on the First Lien Lender Claims and Second Lien Lender Claims.

- Based on the 453 Proofs of Claims Filed, at least 160 claimants have Filed Claims against the wrong Debtor entity.  Therefore, there is confusion amongst the Creditor body as to which Debtor is the Debtor that is legally obligated on the Claim.

2.    Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, existing assets, and the issuance of the New First Lien Notes and Newco Equity Interests.

a.    Newco Equity Interests

On the Effective Date, but not more than thirty days after the Effective Date for initial distributions on account of Allowed Claims, Newco shall issue Newco Equity Interests (based upon the Newco Total Enterprise Value) to the Holders of First Lien Lender Claims.  Each share of Class A-2 Equity Interest will be convertible at the option of the holder, exercisable at any time, into one Class A-1 Equity Interest.

The economic rights of the Class A-1 Equity Interests and Class A-2 Equity Interests shall be identical. The Class A-2 Equity Interests will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A-1 Equity Interests, as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking pari passu with or senior to the Newco Equity Interests as to dividends or liquidation preference, including additional Newco Equity Interests, (ii) any amendment to the Newco's certificate of incorporation or by-laws, (iii) any amendment to any shareholders agreement, (iv) any sale, lease or other disposition of all or substantially all of the assets of the Reorganized Debtors through one or more transactions, (v) any recapitalization, reorganization, consolidation or merger of the Reorganized Debtors, (vi) to the extent that holders of Class A-1 Equity Interests have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of the Reorganized Debtors, except as may be provided for under any management incentive plan, and (vii) to the extent that holders of Class A-1 Equity Interests have the right to vote thereon, any redemption, purchase or other acquisition by the Newco of any of its capital stock (except for purchases from employees upon termination of employment).

The Class A-2 Equity Interests will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class A-2 Equity Interests that does not equally affect the Class A-1 Equity Interests. In any liquidation, dissolution or winding up of the Reorganized Debtors, all assets will be distributed to holders of the Newco Equity Interests on a pro rata basis.

(i)      Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the Newco Equity Interests, shall, to the fullest extent permitted by applicable law, be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by the Plan, including the Newco Equity Interests and New First Lien Notes, will be freely tradable and transferable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments set forth in the Stockholders Agreement; and (iii) applicable regulatory approval.

(ii)      Issuance and Distribution of the Newco Equity Interests

The Newco Equity Interests, when issued or distributed as provided in the Plan, will be duly authorized, validly issued, and, if applicable, fully paid and nonassessable. Each distribution and issuance shall be governed by the terms and conditions set forth in the Plan

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### b.    New First Lien Notes

On the Effective Date or as soon as reasonably practicable thereafter, Newco shall issue the New First Lien Notes.  The Reorganized Debtors shall be co-borrowers and guarantors under the New First Lien Notes.  The New First Lien Notes shall have the terms set forth on Exhibit 2 to the Plan and as otherwise provided in the terms of the documents governing the New First Lien Notes which shall be included in the Plan Supplement.

### c.    Exit Financing

To the extent the board of directors of Newco (or such other governing body) determines that additional financing is necessary for the operation of the Reorganized Debtors' businesses, Newco and/or the Reorganized Debtors may obtain additional financing. The First Lien Steering Committee does not anticipate that additional sources of funding in addition to Cash on hand, the Newco Equity Interests and the New First Lien Notes will be necessary to fund distributions under the Plan on the Effective Date.

### 3.    Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

### 4.    Vesting of Assets in the Reorganized Debtors

Except for any Claims or Causes of Action transferred to the Litigation Trust and unless otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

5.      Cancellation of Equity Securities and Related Obligations

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Old Equity Interests and any other Certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Equity Interests and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements or Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of: (w) allowing Holders to receive distributions under the Plan; (x) allowing a Servicer to make distributions on account of such Claims as provided in the applicable governing agreement; (y) permitting such Servicer to maintain any rights and Liens it may have against property other than the Reorganized Debtors' property for fees, costs, and expenses pursuant to such indenture or other agreement; and (z) governing the rights and obligations of non-Debtor parties to such agreements vis-à-vis each other (including, without limitation, the rights and obligations of non-Debtor parties under the First Lien Credit Agreement and the Second Lien Credit Agreement, which, for the avoidance of doubt, shall not be affected by the Plan except as otherwise expressly provided in the Plan); provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.  The Reorganized Debtors shall not have any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise provided in the Plan.

6.      Restructuring Steps and Transfer of Certain Interests to Newco

In the event the Rhodes Entities comply with all of their obligations pursuant to the Mediation Settlement and the Plan, on the Effective Date or, in the case of step (d) below, effective the next day, the following transactions shall be deemed to have occurred in the order set forth below.

a.      Newco shall be formed as a new limited liability company.  The First Lien Lender Claims shall be deemed to have been exchanged for the membership interests in Newco.  Newco shall be deemed to hold all of the First Lien Lender Claims.  At the option of a holder, membership interests in Newco may be transferred to a corporation prior to step (b).

b.      Newco shall purchase all of the Heritage Equity Securities for $10.00.

c.   Contemporaneous with or subsequent to Newco's purchase of the Heritage Equity Securities, The Rhodes Companies, LLC - the general partner of each of Tick, LP; Glynda, LP; Jackknife, LP; LP; Batcave, LP; Overflow, LP; Wallboard, LP; and Chalkline, LP, --shall sell its general partnership interests in such entities to Newco for $1.00. Alternatively, the membership interest in The Rhodes Companies, LLC may be acquired from its sole member – Sagebrush Enterprises, Inc. – in consideration for release of its obligations under the First Lien Lender Claims.

d.   Newco's members may agree to continue Newco as an LLC, file a check the box election effective the day after the Effective Date to treat Newco as a corporation for tax purposes, or convert into a corporation as of the day after the Effective Date.

In any event, to the extent any cancellation of indebtedness is derived from the foregoing transactions under the Internal Revenue Code, it shall be allocable to the holders of the Old Equity Interests as required by the Internal Revenue Code. To be clear, Newco's purchase of the Heritage Equity Securities shall occur (a) contemporaneously with or immediately before the membership interests of those entities described in Article IV.E.6.c, immediately above, are acquired; (b) before any debt or obligations of the Debtors are canceled or forgiven; (d) before any new notes are issued or existing debt is modified by the Reorganized Debtors; and (e) before any of the other acts or events contemplated in Article III.B, et seq., of the Plan. The holders of the Heritage Equity Securities and Newco will report the sale and purchase of the Heritage Equity Securities in accordance with revenue ruling 99-6, 1991-1 CB 432.

7.   Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Roll-Up Transactions; (5) the establishment of a liquidation trust or other appropriate vehicle to hold assets for sale that will not be utilized in the business of the Reorganized Debtors; and (6) all other actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions. The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction. Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

34

8.      Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity. Without limiting the foregoing, such actions may include:  the adoption and filing of the Newco Charter and Newco Bylaws; the adoption and filing of amended organization documents of the other Reorganized Debtors; the appointment of directors and officers for the Reorganized Debtors; the execution of the Stockholders Agreement; and the adoption, implementation, and amendment of the Management and Director Equity Incentive Plan.

9.      Post-Confirmation Property Sales

To the extent the Reorganized Debtors sell any of their property prior to or including the date that is one year after Confirmation, the Reorganized Debtors may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code.

10.     Certificate of Incorporation and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships or other forms of Entity) of the Debtors shall be amended, in form and substance acceptable to the First Lien Steering Committee, as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code.  The Newco Charter and Newco Bylaws shall be in form and substance acceptable to the First Lien Steering Committee and shall be included in the Plan Supplement, which will be Filed on the Plan Supplement Filing Date.  The certificate of incorporation of Newco shall, among other things:  (1) authorize issuance of the Newco Equity Interests; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.  On or as soon as reasonably practicable after the Effective Date, to the extent required, each of the Reorganized Debtors shall file new certificates of incorporation (or other formation documents relating to limited liability companies limited partnerships, or other forms of Entity) in form and substance acceptable to First Lien Steering Committee, with the secretary (or equivalent state officer or Entity) of the state under which each such Reorganized Debtor is or is to be incorporated or organized.  On or as soon as reasonably practicable after the Effective Date, to the extent required, Newco shall file the Newco Charter with the secretary (or equivalent state officer or Entity) of the state under which Newco is to be incorporated or organized.  After the Effective Date, each Reorganized Debtor may amend and restate its new certificate of incorporation and other constituent documents as permitted by the relevant state corporate law.

11.     Effectuating Documents, Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors (or other governing bodies) thereof, are authorized to and

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

12.    Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.    Directors and Officers of the Reorganized Debtors

On the Effective Date, the board of directors of the Reorganized Debtors or similar governing entities shall be composed of one or more members appointed by the First Lien Steering Committee.  On the Effective Date, a chief executive officer or similar officer selected by the board of directors of the Reorganized Debtors shall be appointed.  The identity of such officers and directors shall be disclosed prior to the Confirmation Hearing.

14.    Management and Director Equity Incentive Plan

The Reorganized Debtors reserve the right to implement a Management and Director Equity Incentive Plan.  The terms and conditions of any Management and Director Equity Incentive Plan shall be determined by the Board of Directors of Newco.

15.    The Litigation Trust

On the Effective Date, the Litigation Trust will be implemented pursuant to the terms of the Litigation Trust Agreement.  On the Effective Date, pursuant to the terms of the Litigation Trust Agreement, the Debtors will transfer the Litigation Trust Assets for and on behalf of the Litigation Trust Beneficiaries, which will be the Holders of Allowed Claims in Classes A-1, A-2, C-1, and C-2.  For all federal income tax purposes, the beneficiaries of the Litigation Trust shall

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

be treated as grantors and owners thereof and it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Litigation Trust Beneficiaries be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust. The Litigation Trust will initially be funded by the Litigation Trust Funding Amount, which will be transferred to the Litigation Trust on the Effective Date and which will be repaid to the Reorganized Debtors from the first proceeds received by the Litigation Trust.

The Litigation Trust shall issue non-transferable interests to Holders of Allowed First Lien Lender Claims, Allowed Second Lien Lender Claims, Allowed Trade Claims, and Allowed General Unsecured Claims (including any Allowed Rhodes Entities Claims). Holders of Allowed Trade Claims shall receive their pro rata share of the Litigation Trust Series A Interests, Holders of General Unsecured Claims (including any Allowed Rhodes Entities Claims) shall receive their pro rata share of the Litigation Trust Series B Interests, and Holders of Allowed First Lien Lender Claim and Second Lien Lender Claims shall receive their pro rata share of the Litigation Trust Series C Interests. The series of Litigation Trust Interests shall be *pari passu*.

16.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Reorganized Debtors and the Litigation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors and the Litigation Trust, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors and the Litigation Trust, as applicable. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, Reorganized Debtors or the Litigation Trust, as applicable, will not pursue any and all available Causes of Action against them. The Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtors and the Litigation Trust, as applicable, reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

37

Debtor may hold against any Entity shall vest in the Reorganized Debtors and the Litigation Trust, as the case may be, on the Effective Date.  The applicable Reorganized Debtor and the Litigation Trust, as applicable, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action belonging to it.   The Reorganized Debtors and the Litigation Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  Neither the Litigation Trust nor the Reorganized Debtors shall commence any litigation against the Rhodes Entities until the Bankruptcy Court rules on the allowance of the Rhodes Entities Claims set forth in Proofs of Claim, included in the Debtors' Schedules or otherwise set forth in the Mediation Term Sheet.  To the extent any statute of limitations to pursue any claims belonging to the Debtors against the Rhodes Entities would lapse from the execution date of the Mediation Term Sheet through the pending the Bankruptcy Court's resolution of the allowance of the Rhodes Entities Claims, the Rhodes Entities shall be deemed to have consented to an extension of the applicable statute of limitations until sixty days following the Bankruptcy Court's ruling on the allowance of the Rhodes Entities Claims.

Notwithstanding anything contained in the Plan to the contrary, if Class C-1 votes in favor of the Plan, neither the Reorganized Debtors nor the Litigation Trust shall seek to avoid any transfer to Holders of Allowed Trade Claims under Bankruptcy Code section 547 to the extent the resulting Claim from the avoidance of such transfer would likewise be an Allowed Trade Claim.

17.    HOA Board Seats

The Rhodes Entities shall ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA boards that in any way are related to the Debtors, Reorganized Debtors or their businesses and Declarant rights or the like shall be transferred to the Reorganized Debtors or their designee(s).

18.    Licensing

The Rhodes Entities shall take commercially reasonable steps and/or enter into any agreements or similar documentation reasonably necessary to ensure the Reorganized Debtors' continued use of all of the Debtors' applicable professional licenses at no cost to the Rhodes Entities for a period of up to twelve months following the Effective Date.   To the extent, Sagebrush Enterprises, Inc. shall have rescinded by September 25, 2009 its revocation of its indemnity of the Nevada contractors' license held by Rhodes Design & Development Corporation and such rescission did not negatively affect the general contractor's license held by Rhodes Design & Development Corporation, Sagebrush shall be entitled to file an Administrative Claim on behalf of any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arose from and after the effectiveness of Sagebrush's recission of its indemnity through the Effective Date, provided that the allowance of such Administrative Claim shall be subject to resolution by the Bankruptcy Court and/or such other court(s) of competent jurisdiction.  The Reorganized Debtors shall indemnify Sagebrush for

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arise from and after the Effective Date.  Professional licenses include, but are not limited to the Nevada State Contractor's Board license, and any other general business or similar licenses in any county, state, municipality or other jurisdiction in which the Reorganized Debtors conduct business or own assets as of the Effective Date.  The Rhodes Entities shall use commercially reasonable efforts to maintain third party agreements with their real estate brokers and sales agents.

19.    Transfer of Rhodes Ranch Golf Course

On the Effective Date, the applicable Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors (together with any equipment, golf carts, contracts or other assets determined by the First Lien Steering Committee to be necessary for the operation of the Rhodes Ranch Golf Course) pursuant to the terms of a stock transfer agreement in form and substance acceptable to the First Lien Steering Committee and Rhodes, subject to any outstanding debt on the Rhodes Ranch Golf Course.  The stock transfer agreement shall contain representations by the Rhodes Entities that the entity that owns the Rhodes Ranch Golf Course does not have any liabilities other than ordinary course liabilities related to the Rhodes Ranch Golf Course and indemnification provisions in favor of the Reorganized Debtors by the Rhodes Entities for any non-ordinary course liabilities.  In addition, prior to the deadline for filing objections to the Disclosure Statement, the Rhodes Entities shall provide the First Lien Steering Committee with a list of all liabilities of the entity that owns the Rhodes Ranch Golf Course, a lien analysis and copies of all contracts related to the Rhodes Ranch Golf Course and to which the entity that owns the Rhodes Ranch Golf Course is a party, each of which must be acceptable to the First Lien Steering Committee.

The existing debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. The parties will work together in good faith to refinance the existing debt.  The Reorganized Debtors shall pay the reasonable costs and expenses associated with the refinancing; provided, that the terms of such refinancing are acceptable to the First Lien Steering Committee.  The First Lien Steering Committee acknowledges that the loan documentation may provide that, upon the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors on the Effective Date, additional collateral from the Reorganized Debtors may be required.  The Rhodes Entities shall transfer to the Reorganized Debtors on the Effective Debt any contracts related to the operation of and revenue generated by any cell towers located on the property of the Rhodes Ranch Golf Course.  Any funds received after July 31, 2009 from the Las Vegas Valley Water District or other similar entity as an incentive for converting the golf course from a green course to a desert course shall be used for operating expenses associated with the Rhodes Ranch Golf Course, with any excess to become property of the Reorganized Debtors on the Effective Date.

Rhodes and/or his designee shall have the absolute right to repurchase the Rhodes Ranch Golf Course from the Reorganized Debtors at eight (8) years from the Effective Date for $5.9 million in cash.  The Reorganized Debtors may require Rhodes to purchase the Rhodes Ranch Golf Course any time between four (4) and eight (8) years from the Effective Date for $5.9 million in cash provided that the Reorganized Debtors shall provide Rhodes with at least one

year advance notice of its intent to sell the Rhodes Ranch Golf Course back to Rhodes. Such transfer shall occur on the applicable anniversary date of the Effective Date. For the avoidance of doubt, if the Reorganized Debtors put the Rhodes Ranch Golf Course to Rhodes in accordance with the terms hereof and Rhodes fails to comply with his obligation to purchase the Rhodes Ranch Golf Course, Rhodes shall be deemed to have forfeited his option to purchase the Rhodes Ranch Golf Course.

On the Effective Date, Rhodes's obligations to comply with the repurchase shall be secured by either (i) $500,000 in cash in an escrow account or (ii) property worth at least $2 million (the "Golf Course Security Property"), with the value of such property to be agreed to by Rhodes and the First Lien Steering Committee or otherwise valued by an independent third party appraisal firm acceptable to both Rhodes and the First Lien Steering Committee (except Cushman Wakefield). In the event that Rhodes does not meet the repurchase request, provided that the Rhodes Ranch Golf Course is in the standard condition (defined below), then the Reorganized Debtors shall be entitled to liquidated damages in the form of security pledged (i.e., the $500,000 or the Golf Course Security Property).

So long as Rhodes has not defaulted on his obligation to repurchase the Rhodes Ranch Golf Course, Rhodes shall have the absolute and sole discretion to replace the Golf Course Security Property with $500,000 in cash on 30 days written notice to the Reorganized Debtors. Upon deposit of the $500,000 in cash, the Golf Course Security Property shall be released to Rhodes or his designee. Notwithstanding anything to the contrary contained herein, if the Rhodes Ranch Golf Course is not maintained with substantially the same performance and rating criteria at the time of the repurchase request as verified by an independent third party rating agency as it was on the Effective Date ("Standard Condition"), James Rhodes can (i) require the Reorganized Debtors to cure any conditions to return the Rhodes Ranch Golf Course to its Standard Condition (provided, that the cost of such cure does not exceed $500,000), or (ii) choose not to purchase the Rhodes Ranch Golf Course. Upon either the repurchase of the Rhodes Ranch Golf Course or the written decision to not repurchase the Rhodes Ranch Golf Course (in accordance with the preceding sentence), the Golf Course Security Property or the $500,000 Cash (if not applied to the repurchase of the Rhodes Ranch Golf Course) shall be returned to Rhodes within 30 days.

On the Effective Date, the Reorganized Debtors shall record a memorandum of agreement against the Rhodes Ranch Golf Course to evidence the above.

20.    <u>Cash Payment</u>

The Rhodes Entities shall make a cash payment to the Reorganized Debtors of $3.5 million in Cash on the Effective Date.

21.    <u>Transfer of Arizona Assets</u>

On the Effective Date, pursuant to an asset transfer agreement in form and substance acceptable to the First Lien Steering Committee and the Rhodes Entities, the Debtors shall transfer Pravada and the other Arizona Assets set forth on Attachment D to the Mediation Term Sheet, plus the Golden Valley Ranch tradename to the Rhodes Entities free and clear of

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000; provided, that such assets shall not include assets owned by Pinnacle Grading located in Arizona and related contracts associated with the assets.  The Debtors shall provide James Rhodes notice of any proposed sale of the Pinnacle assets, and James Rhodes shall be granted a right to bid on the sale of such assets within 10 days of such notice.  The Rhodes Entities shall permit storage of Pinnacle Grading equipment at current locations at no cost to the Reorganized Debtors for a period through six months following the Effective Date.

All executory contracts and unexpired leases associated solely with Arizona shall be assumed and assigned to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors and all cure costs associated therewith shall be borne by the Rhodes Entities.

22.    Trademark and Trade Names

Within the earlier of thirty (30) days following:  (i) upon completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes (or his designee) the trademarks and tradenames set forth on Attachment E to the Mediation Term Sheet.

23.    Self Insured Retention Obligations

The Reorganized Debtors shall indemnify subcontractors that are obligated under any of the Reorganized Debtors' existing insurance policies for any post-Effective Date self insured retention obligations paid and/or to be paid by such subcontractors pursuant to such existing insurance policies.

24.    Bond Replacement or Indemnification

Those performance bonds guaranteed by the Rhodes Entities in favor of the Debtors shall be replaced on a renewal date by new performance bonds.  In the alternative, subject to the Rhodes Entities being reasonably satisfied with the creditworthiness of the Reorganized Debtors, which shall be satisfied solely as of the Effective Date by the Court finding that the Plan is feasible, the existing performance bonds guaranteed by the Rhodes Entities and such guarantees shall remain in place. The applicable Rhodes Entity's agreement to remain a guarantor under the existing performance bonds as such performance bonds may be renewed shall be at  no cost to the Rhodes Entities (including, but not limited to, the payment of bond premiums).  In the event the Reorganized Debtors fail to perform their obligations underlying such renewed performance bonds after the Effective Date, the Reorganized Debtors will indemnify the Rhodes Entities under such outstanding performance bonds for damages incurred by the Rhodes Entities on account of their guarantee of such performance bonds solely as a result of the Reorganized Debtors' failure to perform such obligations subsequent to the Effective Date.  The Reorganized Debtors shall use commercially reasonable efforts to replace all outstanding performance bonds

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

backstopped by Rhodes Entities within 30 months of the Effective Date. The Bankruptcy Court shall retain jurisdiction to resolve any disputes arising out of this paragraph.

Contingent Bond Indemnity Claims will be released in the ordinary course of business as time passes or as work on the underlying project is completed. To the extent that a Contingent Bond Indemnity Claim becomes an Allowed or estimated Claim, such Contingent Bond Indemnity Claim shall be treated as a General Unsecured Claim.

25.    Stanley Engineering Litigation

In the event the Stanley Engineering Litigation is resolved either by judgment or settlement in a manner favorable to the Reorganized Debtors and such resolution does not provide for Cash consideration to be received by the Reorganized Debtors and Second Lien Lenders, the Reorganized Debtors and the Second Lien Agent shall engage in good faith negotiations to ensure that the Second Lien Lenders receive consideration equivalent to 50% of the net value of such resolution and to determine the timing of payment of any such consideration. In the event the Reorganized Debtors and the Second Lien Agent are unable to agree on the amount or form of such consideration, the parties will submit the matter to binding arbitration with the costs thereof to be split evenly among the Reorganized Debtors and the Second Lien Agent (with the costs of the Second Lien Agent to be reimbursed from the consideration to be distributed to the Second Lien Lenders on account of the Stanley Engineering Litigation).

F.    Treatment of Executory Contracts and Unexpired Leases

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) that are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date; (3) that are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (4) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (5) that are otherwise expressly assumed or rejected pursuant to the Plan. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in the Plan, the Plan Proponent and the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in the Plan Supplement at any time through and including fifteen days after the Effective Date.  All executory contracts and unexpired leases associated solely with the Arizona Assets shall be assumed and assigned to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors and all Cure costs associated therewith shall be borne by the Rhodes Entities.

2.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

With respect to each of the Debtors' executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Plan Proponent shall have designated a proposed Cure, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.  Except with respect to executory contracts and unexpired leases in which the Plan Proponent or the Debtors, with the consent of the First Lien Steering Committee, and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Court on or before the Cure Bar Date.  Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, or First Lien Steering Committee object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors with the consent of the First Lien Steering Committee, or the Reorganized Debtors and the counterparty to the executory contract or unexpired lease.  Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Debtors, with the consent of the First Lien Steering Committee, or the Reorganized

Debtors, as applicable, reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim Filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

All Cure costs associated with Executory Contracts related to the Arizona Assets shall be borne by the Rhodes Entities.

3.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity, guarantee of workmanship, or continued maintenance obligations on goods or services previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts.

4.      Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Claims and Solicitation Agent no later than the Rejection Damages Claim Deadline. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' executory contracts or unexpired leases that are not timely Filed by the Rejection Damages Claim Deadline shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

5.   Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date

Intercompany Contracts, contracts, and leases entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

6.   Home Sales

All pending home sale contracts shall be assumed by the applicable Reorganized Debtor.

7.   Warranties

All eligible prepetition home sale contracts with one-year warranty obligations shall be performed in the ordinary course of business of the Reorganized Debtors.  Upon the Effective Date, any remaining warranty obligations that are to be assumed by the Reorganized Debtors, which shall only be assumed with the consent of the First Lien Steering Committee, shall be transferred to the Reorganized Debtors.  Warranty obligations that are not expressly assumed shall be rejected and treated as General Unsecured Claims.

8.   Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions

All executory contracts and unexpired leases to be assumed, or conditionally assumed, under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, or so conditionally assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

9.   Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

45

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

10.    <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or the First Lien Steering Committee that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the consent of the First Lien Steering Committee, or Reorganized Debtors shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

11.    <u>Nonoccurrence of Effective Date</u>

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.    <u>Procedures for Resolving Disputed Claims</u>

1.    <u>Allowance of Claims</u>

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately prior to the Effective Date, including the Causes of Action referenced in Article IV of the Plan.

2.    <u>Claims Administration Responsibilities</u>

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  During the period prior to the hearing on the Disclosure Statement, the Debtors, the Creditors' Committee and the First Lien Steering Committee shall have agreed on (i) which Claims shall be classified as Trade Claims and (ii) the Trade Claims Reconciliation Procedures.  If the parties are unable to agree on which Claims should be classified as Trade Claims or the Trade Claims Reconciliation Procedures, any dispute shall be resolved by the Bankruptcy Court.

3.    <u>Estimation of Claims</u>

Before or after the Effective Date, the First Lien Steering Committee or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

4.    Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Beginning on the end of the first full calendar quarter that is at least ninety days after the Effective Date, the Reorganized Debtors shall publish and File every calendar quarter a list of all Claims that have been paid, satisfied, amended, or superseded during such prior calendar quarter.

5.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (1) the applicable Claims Objection Deadline and (2) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date.  Notwithstanding the foregoing, the First Lien Steering Committee, any First Lien Lender and/or the Reorganized Debtors shall have until sixty days following the Effective Date to object to the Proofs of Claim filed by the Rhodes Entities in the Debtors' chapter 11 cases (provided, that, such objections shall not seek to subordinate the Rhodes Entities Claims, if Allowed).

6.    Disallowance of Claims

Except for Allowed Trade Claims if Class C-1 votes in favor of the Plan, any Claims held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the Litigation Trust, as applicable.

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.

7.    Offer of Judgment

The Reorganized Debtors shall be authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.   To the extent the Holder of a Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors shall be entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

8.    Amendments to Claims

On or after the Effective Date, except as expressly authorized in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

H.    Provisions Governing Distributions

1.    Total Enterprise Value for Purposes of Distributions Under the Plan

Distributions of Newco Equity Interests to Holders of Allowed First Lien Lender Claims shall be based upon, among other things, the Newco Total Enterprise Value.   For purposes of distribution, the Newco Equity Interests shall be deemed to have the value assigned to them based upon, among other things, the Newco Total Enterprise Value, regardless of the date of distribution.

2.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Steering Committee, initial distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

3.    Distributions on Account of Claims Allowed After the Effective Date

a.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Steering Committee, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claim has been Allowed.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims or Interests pursuant to Article VII.C.3 of the Plan.  Subject to Article IX.A.5 of the Plan, all distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

c.    Reserve of Litigation Trust Interests

On the Effective Date, the Reorganized Debtors shall maintain in reserve Litigation Trust Interests for distribution to Holders of Disputed Claims that become Allowed after the Effective Date.  As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, Litigation Trust Interests to Holders of Allowed Claims, and the Disputed Claims Reserve shall be adjusted.  The Distribution Agent shall withhold in the Disputed Claims Reserve any payments or other distributions made on account of, as well as any obligations arising from, the Litigation Trust Interests initially withheld in the Disputed Claims Reserve, to the extent that such Litigation Trust Interests continue to be withheld in the Disputed Claims Reserve at the time such distributions are

49

made or such obligations arise, and such payments or other distributions shall be held for the benefit of Holders of Disputed Claims whose Claims, if Allowed, are entitled to distributions under the Plan. The Reorganized Debtors may (but are not required to) request estimation for any Disputed Claim that is contingent or unliquidated. If Class C-1 votes against the Plan, any Cash held in the Disputed Claims Reserve for the benefit of the Holders of Litigation Trust Series A Interests, shall be paid to the Holders of Allowed Trade Claims (until such claims are paid in full) and any excess amounts shall revert to the Reorganized Debtors.

Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a distribution under the Plan on account of a Claim in excess of the lesser of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Reorganized Debtors elect to withhold on account of such Claim in the Disputed Claims Reserve and set forth in the Plan Supplement, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount deposited in the Disputed Claim Reserve to satisfy such Claim after such estimation.

4.  Delivery of Distributions

a.  Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

b.  Distribution Agent

The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

c.  Delivery of Distributions in General

Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Except as otherwise provided in the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the First Lien Steering Committee, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

   d.  Accrual of Distributions and Other Rights

   For purposes of determining the accrual of distributions or other rights after the Effective Date, the Newco Equity Interests and the Litigation Trust Interests, as applicable, shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed even though the Reorganized Debtors shall not make any such distributions or distribute such other rights until distributions of the Newco Equity Interests and the Litigation Trust Interests, as applicable, actually take place.

   e.  Allocation Between Principal and Accrued Interest

   Except as otherwise provided in the Plan, distributions on account of Allowed Claims shall be treated as allocated first to principal and thereafter to any interest.

   f.  Compliance Matters

   In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

   g.  Fractional, De Minimis, Undeliverable, and Unclaimed Distributions

    (i)  Fractional Distributions

Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of Newco Equity Interests or fractions of Litigation Trust Interests shall not be made. The Distribution Agent shall not be required to make distributions or payments of fractions of Newco Equity Interests, Litigation Trust Interests or dollars. Whenever any payment of Cash of a fraction of a dollar or payment of a fraction of Newco Equity Interests or fraction of Litigation Trust Interests pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars, half Newco Equity Interests or half Litigation Trust Interests or less being rounded down.

(ii)    Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors pursuant to Article VII.D.7.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iii)    Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is a distribution of Newco Equity Interests, such Newco Equity Interests shall be deemed cancelled. Upon such revesting, the Claim of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

h.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer. Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims shall be null and void if not presented within 120 days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors pursuant to Article VII.D.7.c of the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

52

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

i.        Surrender of Cancelled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. No distribution of property pursuant to the Plan shall be made to or on behalf of any such Holder that is a Holder of a Claim unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer. Any Holder of a Claim who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim discharged with no further action, be forever barred from asserting any such Claim against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights and Claims with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.

5.        Claims Paid or Payable by Third Parties

a.        Claims Paid by Third Parties

The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Further, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

b.        Claims Payable by Insurance

Holders of Insured Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Reorganized Debtors shall have no obligation to pay any amounts in respect of pre-petition deductibles or self insured retention amounts. Allowed Insured Claim amounts in excess of

available insurance shall be treated as General Unsecured Claims. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    c.  Applicability of Insurance Policies

    Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except for Claims and Causes of Action released under the Plan to the Released Parties and Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

I.  <u>Effect of Confirmation of the Plan</u>

    1.  <u>Discharge of Claims and Termination of Interests</u>

    Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of any employee, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

2.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Plan Proponent or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

3.    Compromise and Settlement of Claims and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

**4.    Releases by the Debtors of the Released Parties**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, taking place on or before the Effective Date, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any of the Released Parties, the**

55

restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

**5.    Releases by the Debtors of the Rhodes Entities**

The Rhodes Entities shall be deemed released from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever arising under chapter 5 of the Bankruptcy Code with respect to transfers made by the Debtors to the Rhodes Entities during the 2 years prior to the Petition Date; provided, however, that such release shall only apply to transfers expressly set forth in the Schedules as Filed with the Bankruptcy Court as of August 1, 2009 or as disclosed in Attachment B to the Mediation Term Sheet.

**6.    Releases by First Lien Lenders of First Lien Lenders**

Pursuant to Bankruptcy Rule 9019, and except as otherwise specifically provided in the Plan or the Plan Supplement, to the extent a First Lien Lender elects on its Ballot to release the First Lien Lenders in accordance with Section VIII.F. of the Plan, for good and valuable consideration, on and after the Effective Date, each of the First Lien Lenders electing to grant this release, shall be deemed to release each of the other First Lien Lenders that has elected to grant this release and each of their Affiliates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such First Lien Lender would have been legally entitled to assert against any other First Lien Lender that elected to grant this release, based on or relating to, or in any manner arising from, in whole or in part, the First Lien Credit Agreement, the First Lien Lender Claims, any other claims arising under or related to the First Lien Credit Agreement, the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to any First Lien Lender Claim, the restructuring of the First Lien Lender Claims prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; with such releases constituting an express waiver and relinquishment by each First Lien Lender electing to grant this release of any claims, whether known or unknown that such First Lien Lender may have under Section 1542 of the California Civil code or other analogous state or federal law related to the matters being released; provided, however, that Claims or liabilities arising out of or relating to any act or omission of any First Lien Lender or any of its Affiliates that constitutes gross negligence or willful misconduct shall not be released.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

7.      **Exculpation**

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability to one another or to any Exculpating Party for any Exculpated Claim, except for gross negligence, willful misconduct or fraud but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the First Lien Steering Committee and the Reorganized Debtors (and each of their respective agents, members, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.      **Injunction**

**Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims against the Debtors, and all Entities holding Interests, are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Debtors or Reorganized Debtors account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or the property or estates of the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or Estates of the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise (provided, that, to the extent the Rhodes Entities Claims are Allowed, the Rhodes Entities, without the need to file any such motion, shall retain the right to assert a setoff against any Claims or Causes of Action that the Reorganized Debtors or Litigation Trust may assert against the Rhodes Entities, with the Reorganized Debtors and Litigation Trust, as applicable, reserving the right to challenge the propriety of any such attempted setoff, with any such challenge to be resolved by the Bankruptcy Court); and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

9.      Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**10.     Setoffs**

**Except as otherwise expressly provided for in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor, Reorganized Debtor or the Litigation Trust, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor or the Litigation Trust of any such Claims, rights, and Causes of Action that such Reorganized Debtor or the Litigation Trust may possess against such Holder.  In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise; provided, however, that, to the extent the Rhodes Entities Claims are Allowed, the Rhodes Entities, without the need to file any such motion, shall retain the right to assert a setoff against any Claims or Causes of Action that the Reorganized Debtors or Litigation Trust may assert against the Rhodes Entities, with the Reorganized Debtors and Litigation Trust, as applicable, reserving the right to challenge the propriety of any such attempted setoff, with any such challenge to be resolved by the Bankruptcy Court).**

**11.     Recoupment**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors and the First Lien**

58

**Steering Committee on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

### 12. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

### 13. Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors in the ordinary course of business. Copies of all Debtors' books and records shall be delivered to the Rhodes Entities at no cost to the Rhodes Entities on or prior to the Effective Date.

### 14. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date:  (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### J. Allowance and Payment of Certain Administrative Claims

#### 1. Professional Claims

##### a. Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

##### b. Payment of Interim Amounts

Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Interim Compensation Order.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

c.      Reimbursable Expenses

The reasonable fees and expenses incurred by (i) the First Lien Agent, including its professionals, to the extent provided by the First Lien Credit Agreement, (ii) the Second Lien Agent, including its professionals, to the extent provided by the Second Lien Credit Agreement (only to the extent the Class of Second Lien Lender Claims votes in favor of the Plan), and (iii) the First Lien Steering Committee, including its professionals, in connection with the Chapter 11 Cases shall be paid by the Debtors or Reorganized Debtors, as applicable, within 15 days of receipt of an invoice from such parties or their advisors.

d.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtors and First Lien Steering Committee. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

e.      Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and the First Lien Steering Committee and the Creditors' Committee, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the Administrative Claim Bar Date or be forever barred from seeking such compensation or expense reimbursement.

2.      Other Administrative Claims

All requests for payment of an Administrative Claim must be Filed with the Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable, and the First Lien Steering Committee on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim that is not timely Filed and served shall be disallowed automatically without the need for any objection by the Debtors, Reorganized Debtors, or the First Lien Steering Committee. The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for

payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

K.    Conditions Precedent to Confirmation and Consummation of the Plan

1.    Conditions to Confirmation

The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with Article X.C of the Plan:

A.    The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Plan Proponent, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

B.    The Confirmation Order shall be in form and substance acceptable to the Plan Proponent.

C.    The terms and conditions of employment or retention of any Persons proposed to serve as officers or directors of Newco, including, without limitation, as to compensation, shall be acceptable to the Plan Proponent and be set forth in the Plan Supplement.

D.    Any disclosures made pursuant to 11 U.S.C. § 1129(a)(5) shall be acceptable to the Plan Proponent.

E.    The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (including the Newco Bylaws and the Newco Charter) shall have been Filed in form and substance acceptable to the Plan Proponent.

2.    Conditions Precedent to the Effective Date

The following are conditions precedent to Consummation that must be satisfied or waived in accordance with Article X.C of the Plan:

A.    The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated by Article V of the Plan.

B.    The Confirmation Order shall have become a Final Order in form and substance acceptable to the Plan Proponent.

C.    The most current version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the Plan Proponent.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

D. The documents governing the New First Lien Notes, the Newco Charter, the Newco Bylaws and the Stockholders Agreement shall be in form and substance acceptable to the Plan Proponent.

E. The Confirmation Date shall have occurred.

F. The First Lien Steering Committee shall have designated and replaced each existing Qualified Employee of the Debtors with a new Qualified Employee for the Reorganized Debtors.

G. The debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on terms and conditions acceptable to Rhodes and the First Lien Steering Committee.

H. Copies of all Debtors' books and records shall have been delivered to the Rhodes Entities at no cost to the Rhodes Entities.

I. The Arizona Assets shall have been transferred to the Rhodes Entities (or their designee) free and clear of all liens and claims pursuant to section 363(f) of the Bankruptcy Code on the Effective Date; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000.

J. The Debtors shall have assumed and assigned all executory contracts and unexpired leases related solely to the Arizona Assets to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors, with all Cure costs associated therewith to be borne by the Rhodes Entities.

K. The tax structure set forth in Article IV.F of the Plan shall be implemented.

L. The Rhodes Entities and First Lien Steering Committee shall have agreed on the Golf Course Security Property.

M. The Rhodes Entities shall have performed all of their obligations under the Plan including, without limitation, depositing $3.5 million in Cash in an account designated by the Debtors, with the consent of the First Lien Steering Committee, and transferred the Rhodes Ranch Golf Course and related contracts and assets as required by Article IV.S. of the Plan to the Reorganized Debtors.

3.  <u>Waiver of Conditions Precedent</u>

The First Lien Steering Committee may waive any of the conditions to the Effective Date at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, that the First Lien Steering Committee will not waive the conditions precedent in items X.B.6 through 12 of the Plan if

the Rhodes Entities shall have complied with all of their obligations hereunder and in the Plan by the Effective Date (or such earlier date specifically set forth herein). In the event the Rhodes Entities fail to comply with any of their obligations under the Mediation Term Sheet or under the Plan by the Effective Date (or such earlier date specifically set forth herein) and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, then the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) modify the Plan to remove any provisions hereof that were included for the benefit of the Rhodes Entities; and (iii) consummate the Plan, as modified. Upon entry of an order of the Bankruptcy Court finding a breach by the Rhodes Entities and authorizing the modifications to the Plan to remove any provisions that were included for the benefit of the Rhodes Entities, the First Lien Steering shall be authorized to make such modifications and consummate the Plan.

4.    Effect of Non-Occurrence of Conditions to Consummation

Each of the conditions to Consummation must be satisfied or duly waived pursuant to Article X.C. of the Plan, and Consummation must occur within 180 days of Confirmation, or by such later date established by Bankruptcy Court order. If Consummation has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before Consummation and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if Consummation occurs before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Article X.D of the Plan or otherwise, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, or rejections of executory contracts or unexpired leases pursuant to Article V of the Plan, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice in any manner the rights of the Debtors, the First Lien Steering Committee or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the First Lien Steering Committee or any other Entity.

5.    Satisfaction of Conditions Precedent to Confirmation

Upon entry of a Confirmation Order acceptable to the Plan Proponent, each of the conditions precedent to Confirmation, as set forth in Article X.A of the Plan, shall be deemed to have been satisfied or waived in accordance with the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

L.      Modification, Revocation, Or Withdrawal of the Plan

    1.      Modification and Amendments

The Plan Proponent shall not modify materially the terms of the Plan without the prior consent of the parties to the Mediation Term Sheet; provided, that in the event the Rhodes Entities fail to comply with any of their obligations under the Mediation Term Sheet and under the Plan by the Effective Date (or such other date set forth in the Plan) and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, then the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) modify the Plan to remove any provisions hereof that were included for the benefit of the Rhodes Entities; and (iii) consummate the Plan, as modified.   Upon entry of an order of the Bankruptcy Court finding a breach by the Rhodes Entities and authorizing the modifications to the Plan to remove any provisions that were included for the benefit of the Rhodes Entities, the First Lien Steering shall be authorized to make such modifications and consummate the Plan.   Except as otherwise specifically provided in the Plan, the Plan Proponent reserves the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.   Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponent expressly reserves its rights to revoke, withdraw, alter, amend, or modify materially the Plan with respect to any Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI.A of the Plan.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at http://www.nvb.uscourts.gov.   The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

    2.      Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

    3.      Revocation or Withdrawal of Plan

The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization; provided, that, any

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

subsequently filed plan shall be consistent with the Mediation Settlement unless the Rhodes Entities fail to comply with any of their obligations under the Mediation Term Sheet or the Plan by the Effective Date (or such other date set forth herein) and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, in which case the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) revoke or withdraw the Plan as a result of such breach; and (iii) file a subsequent plan that removes the benefits provided to the Rhodes Entities pursuant to the Mediation Term Sheet.  If the Plan Proponent revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Plan Proponent or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponent or any other Entity.

M.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code and as otherwise set forth in the Plan.

**ARTICLE V.**
**STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

The following is a brief summary of the Plan Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [DECEMBER 17], 2009 AT [9:30 a.m.] PREVAILING PACIFIC TIME BEFORE THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, IN COURTROOM 1 IN THE FOLEY FEDERAL BUILDING

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

LOCATED AT 300 LAS VEGAS BOULEVARD SOUTH, LAS VEGAS, NEVADA 89101. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [DECEMBER 3], 2009, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER FILED AND SERVED ON HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST.    UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find, among other things, that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The requirements of section 1129 of the Bankruptcy Code are listed below:

1.    the Plan complies with the applicable provisions of the Bankruptcy Code;

2.    the First Lien Steering Committee, as Plan Proponent, will have complied with the applicable provisions of the Bankruptcy Code;

3.    the Plan has been proposed in good faith and not by any means forbidden by law;

4.    any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation is reasonable, or if such payment is to be fixed after the Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5.    with respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code;

6.    each Class of Claims that is entitled to vote on the Plan either has accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code;

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

7.     except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter;

8.     at least one Class of Impaired Claims or Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of such Class;

9.     Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan;

10.     all fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date; and

11.     the Plan addresses payment of retiree benefits, if any, in accordance with section 1114 of the Bankruptcy Code.

The First Lien Steering Committee believes that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including that (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (2) the First Lien Steering Committee has complied or will have complied with all of the requirements of chapter 11 and (3) the Plan has been proposed in good faith.

C.     <u>Financial Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that Confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. To determine whether the Plan meets this requirement, the First Lien Steering Committee has analyzed the ability of the Debtors to meet their obligations under the Plan.

With respect to the Reorganizing Debtors, based on one potential hypothetical scenario described in Exhibit D attached hereto and the operational, business and other assumptions set forth therein, the First Lien Steering Committee believes that the Debtors will have the financial capability to satisfy their obligations following the Effective Date pursuant to the Plan. Based on the analysis and related information set forth in Exhibit D attached hereto, the First Lien Steering Committee will seek a ruling that the Plan is feasible in connection with the Confirmation of the Plan.

D.     <u>Best Interests of Creditors Test</u>

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that each Holder of a Claim or Interest in each Impaired Class: (1) has accepted the Plan or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the

Bankruptcy Code.  To make these findings, the Bankruptcy Court must:  (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a Chapter 7 trustee would generate if each Chapter 11 Case were converted to a chapter 7 case and the assets of such Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the First Lien Steering Committee, through its financial advisor, Winchester Carlisle Partners ("WCP"), and it valuation consultant, Robert Charles Lesser & Co, ("RCLCO"), has prepared a liquidation analysis (the "Liquidation Analysis") and a going concern analysis (the "Going Concern Analysis").  The Liquidation Analysis and Going Concern Analysis compare the proceeds to be realized if the Debtors were to be liquidated in hypothetical cases under chapter 7 of the Bankruptcy Code against the proceeds to be realized under the Plan as a going concern.  These analyses employ a discounted cash flow ("DCF") methodology to arrive at a range of values for the Debtors' real estate assets as of December 31, 2009, and incorporate various estimates and assumptions, including a hypothetical conversion to chapter 7 liquidation as of January 1, 2010.  Further, each analysis is subject to potential material changes including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation and going concern values of the Debtors could vary materially from the estimates provided in the Liquidation and Going Concern Analyses, respectively.

    1.    Liquidation Analysis

Under chapter 7 liquidation, certain distinctive factors would limit recovery from the sale of the Debtors' homebuilding operations and other land assets.  RCLCO and WCP assumed that an orderly liquidation would be performed over a period of twelve months commencing as of January 1, 2010, the projected date of conversion to a hypothetical chapter 7 liquidation.  Given the current depressed state of homebuliding and real estate markets, as well as the limited availability of credit, this expedited sale process could materially reduce recovery from the Debtors' land assets.  In addition, RCLCO and WCP assumed that a potential buyer of the Debtors' assets will expect a higher risk premium and lower achievable home sale prices relative to a going concern valuation due to the stigma attached to a community and/or company that is in a liquidation mode.

The Liquidation Analysis, attached hereto as Exhibit E presents both "High" and "Low" estimates of the value of the Debtors' real estate assets under liquidation, representing a range of assumptions relating to the risk and costs incurred during a liquidation.  The DCF analysis derives an estimated value of the Debtors' real estate assets by discounting the unlevered projected free cash flows a buyer or buyers of the Debtors' assets could expect to achieve, based on market projections, to a net present value as of the effective date. RCLCO used a discount rate range of 25% - 30% in the Liquidation Analysis, reflecting the higher risk premium required by investors under this scenario.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Based on the methodologies described above, and after further review, discussions, considerations, and assumptions, RCLCO and WCP estimate that the liquidation value of the Debtors' real estate assets as of January 1, 2010, ranges from $38.1 million dollars to $47.4 million dollars, with a midpoint of $42.5 million dollars.

2.    Going Concern Analysis

In preparing the Going Concern Analysis, RCLCO and WCP, among other things: reviewed certain internal financial and operating data of the Debtors made available by the Debtors and WCP; reviewed certain operating and financial forecasts; performed DCF analyses; considered sales transaction for properties comparable to certain of the Debtors' assets; considered information from qualified third party sources relating to revenue and cost assumptions, and conducted such other analyses as deemed necessary to complete the analysis.

The Going Concern Analysis assumes that various documents and data provided by the Debtors, including cost information, are reliable and accurate.

In addition to the foregoing, RCLCO assumed in preparing the Going Concern Analysis that the Effective Date occurs on January 1, 2010. The Projections used also assume that general economic, financial, and market conditions as of the Effective Date will not differ materially from those conditions prevailing as of the date of the Going Concern Analysis. Although subsequent developments may affect the conclusions, neither RCLCO, WCP nor the First Lien Steering Committee have any obligation to update, revise, or reaffirm its analysis following the Confirmation Hearing.

The DCF methodology was used to arrive at a value for the Debtors' real estate assets. The DCF analysis derives an estimated value of the Debtors' real estate assets by discounting their unlevered projected free cash flows based on market projections to a net present value as of the Effective Date. Revenue is derived from the construction and sale of single family homes on all single-family lots currently in inventory, as well as on certain multifamily and commercial parcels where it was determined that single-family homes were the highest and best use. Pricing and sales velocity for these homes were projected to recover from their currently depressed levels, as determined by an analysis of recent and historical sales data, to more sustainable level of growth by 2011. Additional revenue is derived from the sale of certain land parcels at prices and dates supportable by market conditions, as well as the operation and sale of the Tuscany Golf Course. RCLCO used a discount rate range of 20% - 25% in the Going Concern Analysis, reflecting the prevailing capital market requirements of similar transactions.

Based on the methodologies described above, and after further review, discussions, considerations, and assumptions, RCLCO and WCP have estimated that the going concern value of the Debtors' real estate assets as of January 1, 2010, ranges from $79.0 million to $98.7 million, with a midpoint of $88.1 million.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

69

E.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan accept the plan, with the exception described in the following section. A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan (1) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default and reinstates the original terms of the obligation.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted the plan if holders of such interests holding at least two thirds in amount actually voting have voted to accept the plan.

F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan; provided that such plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan will be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank. In determining whether a plan discriminates unfairly, courts will take into account a number of factors. Accordingly, two classes of unsecured claims could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the secured claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the debtor's plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

70

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date, equal to the allowed amount of such claim; or (2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either:  (1) the plan provide that each holder of an interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled or (c) the value of such interest; or (2) if the class does not receive such an amount as required under (1), no class of interests junior to the non-accepting class may receive a distribution under the plan.

The First Lien Steering Committee shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class, as applicable, presumed to reject the Plan, and the First Lien Steering Committee reserves the right to do so with respect to any other rejecting Class of Claims or Interests, as applicable, or to modify the Plan.   Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The First Lien Steering Committee submits that if the First Lien Steering Committee "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  If the First Lien Steering Committee seeks to "cram down" the Plan on Holders of Secured Claims, all such Holders shall receive a distribution that satisfies the fair and equitable requirement.  The Plan also satisfies the fair and equitable requirement with respect to Holders of Unsecured Claims because even though such Holders will not receive payment in full on account of the Allowed amount of their Claims, no junior Claim or Interest receives any distribution under the Plan.   Holders of Interests will receive no distribution under the Plan, but there is no junior Claim or Interest that will receive any distribution under the Plan either.   Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the First Lien Steering Committee is required to "cram down."

## ARTICLE VI.
## CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THE DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND THE FINANCIAL PROJECTIONS IN THE

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

PLAN SUPPLEMENT.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.    Certain Bankruptcy Considerations

    1.    The First Lien Steering Committee May Not Be Able to Obtain Confirmation of the Plan.

    The First Lien Steering Committee cannot ensure that they will receive the requisite acceptances to confirm the Plan.  Even if the First Lien Steering Committee receives the requisite acceptances, the First Lien Steering Committee cannot ensure that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of Claims and Interests might challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

    As discussed in further detail in ARTICLE V herein, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things:  (a) a finding by the Bankruptcy Court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that these requirements will be met, the First Lien Steering Committee believes that the Plan complies with section 1129 of the Bankruptcy Code.

    Confirmation and Consummation also are subject to certain conditions described in ARTICLE V herein.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive and it is possible that an alternative plan would result in substantially less favorable treatment for Holders of Claims or Interests than such Holders would receive under the Plan.

    2.    The Bankruptcy Court May Not Approve the Compromise and Settlement Contemplated By the Plan

    As described in more detail in Article ARTICLE IV.I.3 herein, the Plan constitutes a settlement, compromise and release of rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and Allowed Interests and their respect distributions and treatments under the Plan and takes into account, and conforms to, the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination or section 510(b) or (c) of the Bankruptcy Code.

This settlement, compromise and release requires approval by the Bankruptcy Court in the Confirmation Order. The First Lien Steering Committee cannot ensure that the Bankruptcy Court will approve the settlement described in Article VIII.C. of the Plan.

3.    Parties in Interest May Object to the First Lien Steering Committee's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may classify a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The First Lien Steering Committee believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there is no assurance that the Bankruptcy Court will hold that the Plan's classification of Claims and Interests complies with the Bankruptcy Code.

4.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the First Lien Steering Committee intends to seek Confirmation as promptly as practicable thereafter. In the event that sufficient votes are not received, the First Lien Steering Committee may propose an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

5.    The First Lien Steering Committee, the Debtors or the Reorganized Debtors May Object to the Amount or Secured or Priority Status of a Claim

The Debtors, the Reorganized Debtors and the First Lien Steering Committee reserve the right to object to the amount or the secured or priority status of any Claim or Interest. The estimates set forth in the Disclosure Statement cannot be relied on by any Holder of a Claim or Interest whose Claim or Interest is subject to an objection. Any such Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in the Disclosure Statement.

6.    Procedures for Contingent and Unliquidated Claims

Notwithstanding any language in any Proof of Claim or otherwise, the Holder of a contingent or unliquidated Claim shall not be entitled to receive or recover any amount in excess of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date; or (b) if the Proof of Claim does not ascribe a monetary value to such Holder's Claim on the Distribution Record Date, the amount the First Lien Steering Committee elects to withhold on account of such Claim.

7.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the plan proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The First Lien Steering Committee believes that the Plan satisfies these requirements, and the First Lien Steering Committee may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

B.    Other Considerations

1.    Avoidance Action Analysis

The First Lien Steering Committee has not yet comprehensively evaluated all of the preference and fraudulent transfer claims that the Debtors may have against third parties. The Debtors Filed their Schedules listing all transfers that the Debtors made within ninety days of the Petition Date and all transfers to insiders made by the Debtors within one year of the Petition Date. All such transfers listed in the Schedules may be the subject of an Avoidance Action to set aside the transfer if the transfer is avoidable under Bankruptcy Code sections 544, 545, 547, 548, 549, or 550, or otherwise except as expressly released by the Plan. Accordingly, the Reorganized Debtors or Litigation Trust, as applicable, will retain rights to seek to avoid any transfer made within ninety days of the Petition Date and one year of the Petition Date (as to Insiders) or such longer periods as may be available under applicable non-bankruptcy law.

The listing of transfers made by the Debtors within ninety days (for non-insiders) and one year (for Insiders) that may be potentially avoidable as preferences are not included in this Disclosure Statement. Copies of the Schedules (which include the identification of transfers made by the Debtors within ninety days (for non-insiders) and one year (for Insiders)) are on file with the Bankruptcy Court and also available for review on the Claims and Solicitation Agent's website, www.omnimgmt/rhodes. Creditors and interested parties are encouraged to review such Schedules to determine if any transfers made to a particular Creditor are included thereon. Any such transfers listed in the Schedules may be the subject of an Avoidance Action to set aside the transfer if the transfer is avoidable. However, with respect to such transfers listed on the Debtors' Schedules, the First Lien Steering Committee has not yet determined whether the transferees of those transfers would have defenses to an avoidance action.

2.    Other Potential Litigation Recoveries

In addition to Avoidance Actions, the First Lien Steering Committee has been reviewing available information regarding potential Causes of Action against third parties and, possibly, Affiliates and/or Insiders of the Debtors, which review is ongoing and which will continue to be conducted by the First Lien Steering Committee, the Reorganized Debtors and/or their respective successors or representatives after the Effective Date. Due to the size and scope of the business operations of the Debtors and the multitude of business transactions therein, there may be various Causes of Action that currently exist or may subsequently arise in addition to any matters identified in the Plan. The potential net proceeds from the potential Causes of Action identified herein or that may subsequently arise or be pursued are speculative and uncertain. Prepetition, the Debtors were party to numerous lawsuits. A list of

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

the pending litigation in which the Debtors were a party as of the Petition Date is attached hereto as Exhibit F.

Except as expressly released through the Plan, existing or potential Causes of Action that may be pursued by the Debtors and/or their respective successors or representatives (as applicable) include, without implied limitation, the following:  (a) any and all Avoidance Actions; (b) any and all litigation against Affiliates and Insiders; (c) all other Causes of Action and Defenses identified in the Plan Supplement; (d) any other Causes of Action against current or former officers, directors, and/or employees of the Debtors, including without implied limitation, any pending or potential claims with respect to directors and officers' insurance coverage for the Debtors' current or former officers and directors; (e) any and all Causes of Action relating to the matters listed on the Debtors' Schedules; (f) any other litigation, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation:  disputes with suppliers and customers, overpayments, any amounts owed by any creditor, vendor or other entity, employee, management, or operational matters, disputes with current or former employees, financial reporting, environmental matters, insurance matters, accounts receivable, warranties, contractual obligations, or tort claims that may exist or subsequently arise; and (g) any Causes of Action not expressly identified herein or in the Plan or Plan Supplement.

3.    Estimation of Claims

Before or after the Effective Date, the Debtors, the First Lien Steering Committee, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

C.    Plan Risk Factors

Although the First Lien Steering Committee believes that the Plan is confirmable, there are some risks to the performance of the Plan.  Certain specific risks to performance of

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

the Plan are described below. In particular, distributions to Holders of First Lien Lender Claims are driven by the success of the Reorganized Debtors in, among other things, the development and completion of their real property assets and sale or other disposition thereof. Additionally, because of the significant issues that must be addressed with respect to the allowance of Claims, there may be significant delay before any distribution is made on account of Allowed Claims. However, the First Lien Steering Committee believes the very same risks described herein are present in, and significantly greater to Creditors in, chapter 7 cases.

1.    The Chapter 7 Liquidation Analysis and Going Concern Analysis Are Based on Estimates and Numerous Assumptions

Underlying the chapter 7 Liquidation Analysis and Going Concern Analysis are a number of estimates and assumptions that, although developed and considered reasonable by RCLCO, are inherently subject to economic, business and competitive uncertainties and contingencies beyond the First Lien Steering Committee's or RCLCO's control. Accordingly, there can be no assurance that the values assumed in the chapter 7 Liquidation Analysis or Going Concern Analysis will be realized.

2.    The Reorganized Debtors May Lose the Services of Critical Employees with Extensive Knowledge of Operations

The First Lien Steering Committee believes that the Reorganized Debtors' ability to maximize the value of the Debtors' estates pursuant to the Plan will depend to a large extent on the efforts of certain employees currently working for the Debtors, which personnel have substantial experience with and knowledge of the Debtors' businesses, operations and assets. While the Reorganized Debtors hope to retain such employees' services after the Effective Date, to the extent needed, it is possible that some or many of said employees may resign or otherwise leave the employ of the Reorganized Debtors. In such case, the business related efforts undertaken pursuant to the Plan may be negatively affected, resulting in potentially less recovery for Creditors under the Plan.

3.    The Reorganized Debtors May Not Be Successful With Respect to Contested Claims

If the First Lien Steering Committee, the Reorganized Debtors, and/or their successors or representatives under the Plan are unsuccessful in their objections to contested and contingent Claims that have been Filed against the Estates or their Avoidance Actions, the Estates' total liabilities will be greater than expected, and there may be less Cash available for distribution to Holders of unsecured non-priority Claims. The First Lien Steering Committee intends to vigorously oppose the allowance of all Claims that it believes are either entirely or in part without merit and prosecute Avoidance Actions and other Causes of Action. However, if the First Lien Steering Committee's objections and actions are not upheld by the Bankruptcy Court, and the applicable Claims are Allowed in amounts in excess of the amounts that have been accrued by the Debtors, the total liabilities of the Debtors will be greater than expected, and there will be less Cash than expected available for distribution to Creditors.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

4.      <u>Litigation Recoveries and Results Are Highly Speculative and Uncertain</u>

The success of the Litigation Trust, Reorganized Debtors and/or their respective successors or representatives under the Plan in pursuing Avoidance Actions and/or other Causes of Action and defenses, is speculative and uncertain.  Litigation may be complex and involve significant expense and delay.  Furthermore, even if successful in the Causes of Action, in some cases, the Litigation Trust, Reorganized Debtors and/or their respective successors or representatives under the Plan may encounter difficulty in collection.  Although potential litigation recoveries are not included in the First Lien Steering Committee's Plan Distribution Analysis or chapter 7 Liquidation Analysis, such recoveries may have a significant impact upon the distributions that may be made to Creditors.

THESE CONSIDERATIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD–LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  WORDS SUCH AS "EXPECT," "PLANS," "ANTICIPATES," "INDICATES," "BELIEVES," "FORECAST," "GUIDANCE," "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD LOOKING STATEMENTS.  ADDITIONALLY, FORWARD LOOKING STATEMENTS INCLUDE STATEMENTS WHICH DO NOT RELATE SOLELY TO HISTORICAL FACTS, SUCH AS STATEMENTS WHICH IDENTIFY UNCERTAINTIES OR TRENDS, DISCUSS THE POSSIBLE FUTURE EFFECTS OF CURRENT KNOWN TRENDS OR UNCERTAINTIES OR WHICH INDICATE THAT THE FUTURE EFFECTS OF KNOWN TRENDS OR UNCERTAINTIES CANNOT BE PREDICTED, GUARANTEED OR ASSURED.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, THE REORGANIZED DEBTORS OR THE FIRST LIEN STEERING COMMITTEE INCLUDING, WITHOUT LIMITATION, THOSE DESCRIBED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS, AND NONE OF THE DEBTORS, THE REORGANIZED DEBTORS OR THE FIRST LIEN STEERING COMMITTEE SHALL BE REQUIRED TO UNDERTAKE OR HAVE ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE FIRST LIEN STEERING COMMITTEE OR THAT THE FIRST LIEN STEERING COMMITTEE CURRENTLY BELIEVES TO BE IMMATERIAL MAY ALSO IMPAIR THE DEBTORS' BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND THE VALUE OF THE DEBTORS' ESTATES.  IF ANY OF THE RISKS OCCUR, THE DEBTORS' BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS AND THE VALUE OF THE DEBTORS' ESTATES, AS WELL AS THE FIRST

LIEN STEERING COMMITTEE'S ABILITY TO CONSUMMATE THE PLAN, COULD BE MATERIALLY ADVERSELY AFFECTED.

## ARTICLE VII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code" or "IRC"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The First Lien Steering Committee has not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Internal Revenue Code, foreign taxpayers, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass through entities and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that, except as recharacterized by a Final Order of the Bankruptcy Court, the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR RECOMMENDATION TO ANOTHER PARTY OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    Certain U.S. Federal Income Tax Consequences to Reorganized Debtors

    1.    Introduction

    The majority of the Debtors are either partnerships (general or limited) or LLCs.  For U.S. federal income tax purposes, the single member limited liability companies have not elected to be treated as associations taxable as corporations.  Debtors that are multi-member LLCs are taxed as partnerships for U.S. federal income tax purposes.

    2.    Partnership

    A partnership is not itself a taxpaying entity for U.S. federal income tax purposes, and a partnership's income or loss (and items thereof) for each taxable period during which it is in existence is allocated among its partners, who are required to report the income or loss (and items thereof) allocated to them on their own tax returns.  Generally, a partner is not allowed to deduct his or her share of partnership losses for the year in excess of the adjusted tax basis of his or her interest in the partnership, determined as of the end of the partnership's taxable year in which the loss occurs. Any excess is allowed in any subsequent year in which the adjusted tax basis increases. A partner's tax basis is initially equal to the amount of cash and the adjusted tax basis of property contributed to the partnership.

    Thereafter, tax basis increases for such items as additional contributions and the partner's share of taxable and tax-exempt income and gain, and tax basis decreases for such items as distributions and the partner's share of losses. An increase in a partner's share of partnership liabilities or a partner's assumption of partnership liabilities is treated as a cash contribution to the partnership that increases tax basis, and a decrease in a partner's share of partnership liabilities or the assumption by the partnership of a partner's liabilities decreases tax basis, but not below zero. (Cash distributions, including a decrease in a partner's share of partnership liabilities, in excess of tax basis is taxable and generally treated as gain from the sale of a partnership interest.) A partner shares partnership recourse liabilities to the extent the partner bears the economic risk of loss with respect to the liabilities, i.e., based on a hypothetical partnership liquidation at a time when the partnership has no assets, after taking into account any rights of contribution or reimbursement from other partners or third parties that are related to other partners. A partner also shares partnership nonrecourse liabilities.

    3.    Cancellation of Indebtedness Income

    Under the Internal Revenue Code, cancellation of indebtedness ("COD") income is recognized by a partnership to the extent, and at the time, that certain debts are discharged for less than full payment.  The COD income recognized at the partnership level is then allocated

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

among the partners pursuant to the allocation provisions of the partnership agreement, if such provisions comply with the requirements of the Internal Revenue Code regarding allocations, or, if not, in accordance with the partners' interests in the partnership. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including partnership interests) given in satisfaction of such indebtedness at the time of the exchange. COD income also includes any interest that the taxpayer deducted under the accrual method of accounting but remains unpaid at the time the indebtedness is discharged. COD income generally does not include the discharge of indebtedness to the extent the payment of the liability would have given rise to a deduction.

The Plan currently contemplates that Newco will hold the assets of some and the equity of at least one of the Reorganized Debtors, which ordinarily would result in COD income upon the discharge of the debts. Based on Revenue Ruling 99-6, however, the purchase of the membership interests in Heritage Land Company, LLC, however, may be treated as a taxable exchange of their membership interests by its members resulting in the recognition of gain or loss to the members based on a sales price of $10 plus the amount of the First Lien Lender Claims, and as a purchase of assets for their then fair market value by Newco, with any cancellation of debt attributable to the former members of Heritage. Because the Plan provides that Holders of certain Allowed Claims will receive Newco Equity Interests, the sales price and/or the amount of COD income will depend on the fair market value of the Newco Equity Interests exchanged therefor. This value cannot be known with certainty until after the Effective Date. The Plan provides that any cancellation of indebtedness that may be derived from the foregoing transactions be allocable to the holders of the Old Equity Interests. However, it is unclear whether this provision will be binding on the Internal Revenue Service.

Because most of the Debtors' indebtedness is owed by entities that are partnerships or disregarded entities for U.S. federal income tax purposes, virtually all of the Debtors' COD income that will be generated from the Plan will be allocated to the members of Heritage Land Company LLC or other Reorganized Debtor based on their respective percentage ownership interests in Heritage Land Company LLC or other Reorganized Debtor. Under the U.S. federal income tax rules dealing with COD income, the tax treatment of that income will be determined with respect to each member at the member level.

A member of Heritage Land Company LLC or other Reorganized Debtor will not be required to include any amount of COD income in gross income if the member is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent before the Effective Date (in which, the COD income may be excluded to the extent of the insolvency). As a consequence of such exclusion, a member must reduce its tax attributes by the amount of COD income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A member with COD income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Nonetheless, any attribute reduction will be applied as of the first day

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

following the taxable year in which a member recognizes COD income.  If a member has a suspended loss with respect to its membership interest in Heritage Land Company LLC, the allocation of COD income may allow some or all of such suspended losses to be used to offset the COD income.

A recently enacted amendment to the COD income rules provides that taxpayers that recognize COD income in 2009 or 2010 may elect to forgo the COD income exclusion and attribute reduction rules described above.  Instead, the taxpayer may elect to take into taxable income the COD income with respect to such debt in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD income in each such year).  This election to defer COD income is made separately with respect to each debt instrument on which COD income is realized, must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD income, and, in the case of debt of a partnership, is made at the partnership level, but recent IRS guidance allows taxpayers to make partial elections and permits partnerships to choose which partners defer which amount, if any. The guidance also provides that a taxpayer is not required to make an election for the same COD income portion arising from each reacquired applicable debt instrument, though he or she may make an election for different portions of such income arising from different applicable debt instruments.  The Debtors have not yet determined whether such an election will be made with respect to the COD income generated in connection with the consummation of the Plan.

B.    Certain Federal Income Tax Consequences to Holders of Claims

1.    Consequences to Holders of Allowed Class A-1 First Lien Lender Claims

On the Effective Date, each of the First Lien Lenders shall receive (i) its pro rata share of 100% of the New First Lien Notes, (ii) its pro rata share of 100% of the Newco Equity Interests; and (iii) its pro rata share of the Litigation Trust Series C Interests allocable to the holders of the First Lien Lender Claims.

a.    New First Lien Notes

(i)    Significant Modification

The U.S. federal income tax consequences of the exchange of an Allowed First Lien Lender Claim for an interest in the New First Lien Notes will depend on whether the exchange results in a "significant modification" of the Allowed First Lien Lender Claims (i.e., whether the terms of the New First Lien Notes are significantly different from the terms of the First Lien Lender Claims exchanged therefor).  The Treasury Regulations under section 1001 of the IRC provide specific rules for determining whether certain modifications are "significant."  One such rule provides that a change in the annual yield of an instrument will be considered "significant" if the modified rate varies from the original rate by more than the greater of (a) 25 basis points and (b) 5 percent of the annual yield of the unmodified instrument.  Another rule provides that the deferral of a scheduled payment will be considered 'significant' unless the deferred payments are unconditionally payable during the period that begins on the initial due date for such payment and extends for the lesser of five years or 50% of the original term of the debt instrument.  The exchange should result in a significant

modification of the First Lien Lender Claims because the terms of the New First Lien Notes, including the issuer, the interest rate and maturity date, are significantly different from the terms of the First Lien Lender Claims. Therefore, the exchange of Allowed First Lien Lender Claims for New First Lien Notes should be a taxable exchange under section 1001 of the IRC.

(ii)    Recognition of Gain or Loss

A Holder who receives New First Lien Notes with respect to an Allowed First Lien Lender Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price (as described below) of any New First Lien Notes received and (b) the Holder's adjusted basis in its Allowed First Lien Lender Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the First Lien Lender Claims were held for more than one year. To the extent that a portion of the New First Lien Notes received represents accrued but unpaid interest that the Holder has not already included in income, the Holder may recognize ordinary interest income (as described below). A Holder's tax basis in any New First Lien Notes received should equal the issue price of the New First Lien Notes as of the date distributed to the Holder, and a Holder's holding period for the New First Lien Notes should begin on the day following the exchange.

(iii)    Stated Interest and Original Issue Discount

A Holder of the New First Lien Notes will be required to include stated interest on the New First Lien Notes in income in accordance with the Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." All stated interest on the New First Lien Notes that is unconditionally payable in Cash or property (other than debt instruments of the issuer, such as PIK interest (discussed below)) at least annually will be generally treated as "qualified stated interest". The amount of qualified stated interest and the amount of original issue discount ("OID"), if any, that accrues during an accrual period on a New First Lien Note will be calculated by assuming that LIBOR is a fixed rate equal to the value of LIBOR as of the issue date. The qualified stated interest allocable to an accrual period is increased (or decreased) if the interest actually paid during an accrual period exceeds (or is less than) the interest assumed to be paid during the accrual period pursuant to the foregoing rules.

Because the New First Lien Notes provide for the payment of PIK interest in lieu of paying Cash interest, the New First Lien Notes will be treated as issued with OID. The payment of PIK interest will generally not be treated as a payment of interest for federal income tax purposes. Instead, a New First Lien Note and any PIK interest will be treated as a single debt instrument under the OID rules. For U.S. federal income tax purposes, increasing the principal amount of the New First Lien Notes will generally be treated the same as the payment of PIK interest.

Each Creditor will generally be required to include OID in its gross income as such OID accrues over the term of the New First Lien Notes without regard to the Creditor's regular method of accounting for U.S. federal income tax purposes and in advance of the

receipt of Cash payments attributable to that income.  Accordingly, a Holder could be treated as receiving interest income in advance of a corresponding receipt of Cash.

The rules regarding OID are complex and the rules described above may not apply in all cases.  Accordingly, Holders should consult their own tax advisors regarding their application.

b.    Newco Equity Interests

(i)    Exchange Treatment

For U.S. federal income tax purposes, the treatment of the exchange of Allowed First Lien Lender Claims for Newco Equity Interests is unclear.  Such exchange may be treated (i) as a tax-free contribution of property to Heritage Land Company LLC or other Reorganized Debtor under section 721 of the Internal Revenue Code or, alternatively, (ii) as a taxable exchange under section 1001 of the Internal Revenue Code in its entirety.  Under the regulations proposed by the Treasury, the exchange would be treated as a tax-free contribution.  No gain or loss should be recognized with respect to the exchange of Claims for Newco Equity Interests and a Holder will have an initial tax basis in such Newco Equity Interests equal to the tax basis of the Claims deemed exchanged therefor.  A Holder's holding period for the Newco Equity Interests should include the holding period of the Claims deemed exchanged therefor.

If the proposed regulations do not apply and the exchange is treated as a taxable exchange, a Holder who receives Newco Equity Interests with respect to an Allowed First Lien Lender Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the consideration received and (b) the Holder's adjusted basis in its Allowed First Lien Lender Claim.  Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the First Lien Lender Claims were held for more than one year.  To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income (see discussion below).  A Holder's tax basis in Newco Equity Interests received should equal the fair market value of the Newco Equity Interests as of the date distributed to the Holder, and a Holder's holding period for such instruments should begin on the day following the exchange.

(ii)    Certain Tax Aspects of Holding and Disposing Newco Equity Interests

Upon the transfer of the Newco Equity Interests to the First Lien Lenders, Newco will be treated for federal income tax purposes as a partnership on the Effective Date, and a holder of Newco Equity Interests will be treated as a partner on that day.  Each holder of Newco Equity Interests will generally be considered a partner in Newco for federal income tax purposes.  Each such holder will be required to include its distributive share of the income, gains, losses, deductions and credits of Newco on its own returns, whether or not any distributions are made, and will not be taxable on distributions when received except to the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

extent such distributions are in excess of the distributee's adjusted basis in the Newco Equity Interests.  In general, a holder's adjusted basis in Newco Equity Interests will be increased by its additional capital contributions, if any, to Newco and by such holder's distributive share of income or gains of Newco, and the holder's adjusted basis in Newco Equity Interests will be decreased by the amount of distributions to such holder and such holder's distributive share of losses or deductions of Newco.

Since the deemed purchase of the Heritage Land Company LLC assets will occur on that date, Newco might recognize a loss equal to the difference between its basis in the First Lien Lender Claims and the value of the property received.  If it does, such loss would be allocable to the holders of the Newco Equity Interests.  Such allocation might not be pro rata, but could vary depending on the basis of each such holders' interest, which will in turn depend on each First Lien Lender's basis in its First Lien Lender Claims.  Moreover, since Newco will have engaged in a trade or business while treated as a partnership for tax purposes, its members will have a filing requirement to report such income of a U.S. federal income tax return.  If a First Lien Lender is itself treated as a partnership for U.S. tax purposes, its members or partners – including foreign partners or U.S. exempt organizations – could be required to file a U.S. return.

Once the election is made to treat Newco as a corporation, the holders of the Newco Equity Interests generally carry forward their basis in their interests (or shares, if Newco is converted to a corporation), and Newco generally carries forward its basis in its assets.  To the extent Newco's basis in its assets is greater than their value as of the election/conversion, it will be required to reduce its basis in its shares to their fair market value or it may elect instead to have the holders of the Newco Equity Interests reduce their basis in such interests by such amount.

Any distributions made on the Newco Equity Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Newco, as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by non-corporate U.S. Holders prior to 2011 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met. Any such dividends received after 2010 will be taxed at the rate applicable to ordinary income.

Dividends paid to a U.S. Holder that is a corporation generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the holder's adjusted tax basis in the stock, treating all dividends having ex dividend dates within a 365-day period as one dividend.

Dividends paid to a Non-U.S. Holder (to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes) generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

To claim the benefit of a tax treaty a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or such successor form as the IRS designates), in the manner described above, prior to the payment of the dividends. A Non-U.S. Holder that is eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund from the IRS of any excess amounts withheld by filing timely an appropriate claim for refund with the IRS.

A holder will recognize gain or loss upon disposition of its Newco Equity Interests equal to the difference between the amount such holder realizes in connection with the disposition and such holder's adjusted tax basis for such Newco Equity Interests. Any gain or loss will generally be capital gain or loss (which will be long-term capital gain or loss if the Newco Equity Interest has been held in excess of 12 months), subject to the application of certain "recapture" provisions that convert capital gain into ordinary income in certain circumstances. The deductibility of capital loses is subject to limitations.

c.    Litigation Trust Interests

The amount received, if any, from the Litigation Trust is contingent on the value obtained from the unencumbered assets and the outcome of the Causes of Action held by the Litigation Trust. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Litigation Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Litigation Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the Litigation Trust Interests received should equal their fair

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

market value as of the Effective Date.  A Holder's holding period for the Litigation Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Trust Interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

2.    Consequences to Holders of Allowed Class A-2 Second Lien Lender Claims

On the Effective Date, each of the Second Lien Lenders shall receive (i) its pro rata share of 50% of the net proceeds of the Stanley Engineering Litigation; and (ii) its pro rata share of the Litigation Trust Series C Interests allocable to the Holders of the Second Lien Lender Claims.

A Holder who receives Cash with respect to an Allowed Second Lien Lender Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Allowed Second Lien Lender Claim.  Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class A-2 Claims were held for more than one year.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already included in income, the Holder may recognize ordinary interest income.

The amount received, if any, from the Litigation Trust is contingent on the value obtained from the unencumbered assets and the outcome of the causes of action held by the Litigation Trust.  The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Litigation Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's tax basis in the Claims surrendered by the Holder.  Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder.  To the extent that any portion of the Litigation Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest.  A Holder's tax basis in the Litigation Trust Interests received should equal their fair market value as of the Effective Date.  A Holder's holding period for the Litigation Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Trust Interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

3.      Consequences to Holders of Allowed Class A-3 Other Secured Claims

The following discussion assumes that each Holder of an Allowed Other Secured Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the IRC. Pursuant to the Plan, each Allowed Other Secured Claim, at the election of the Reorganized Debtors, may be (i) Reinstated, (ii) paid in full in Cash, (iii) satisfied by the delivery of the collateral securing such Claim and paying any interest required to be paid, or (iv) otherwise rendered unimpaired. If an Allowed Other Secured Claim is Reinstated, the Holder of such Claim should not recognize gain or loss except to the extent that collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Allowed Other Secured Claim within the meaning of the Treasury Regulations promulgated under Section 1001 of the IRC. If an Allowed Other Secured Claim is paid in full in Cash, the Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its claim for more than one year) in an amount equal to the amount of Cash received over the Holder's adjusted basis in the debt instruments underlying its Allowed Other Secured Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income (as described below).

If a Holder of an Allowed Other Secured Claim exchanges its Claim for the collateral securing such Claim, or for Cash in an amount equal to the proceeds actually realized from the sale of such collateral, the exchange should be treated as a taxable exchange under Section 1001 of the IRC. The Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss if the Holder has held the debt instrument underlying its Claim for more than one year) equal to the difference between (i) the fair market value of the collateral received (or, as the case may be, the amount of Cash received from the sale of such collateral), and (ii) the Holder's adjusted tax basis in the debt instrument constituting its Claim. To the extent that a portion of the collateral received (or, as the case may be, the amount of Cash received from the sale of such collateral) in the exchange is allocable to accrued interest that has not already been taken into income by the Holder, the Holder should recognize ordinary interest income (as described below). If, on the Effective Date, the Holder receives the collateral (rather than Cash) in exchange for its Claim, the Holder's tax basis in the collateral should be equal to the fair market value of the collateral on the Effective Date, and the Holder's holding period in the collateral should begin on the day following the Effective Date.

4.      Consequences to Holders of Allowed Class C-1 Trade Claims

Pursuant to the Plan, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed C-1 Claim shall receive its pro rata share of the Litigation Trust Series A Interests; provided, that if the class of Trade Claims votes in favor of the Plan, the Holders of Trade Claims shall be deemed to accept their pro rata share of up to $1,500,000 in Cash from the First Lien Lenders' collateral on account of the Litigation Trust Series A Interests, with such Litigation Trust Series A Interests being transferred to the First Lien Lenders in exchange for such Cash payment.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

For U.S. federal income tax purposes, the exchange of Allowed Class C-1 Claims for Cash should be a taxable exchange under section 1001 of the IRC. A Holder who receives Cash with respect to an Allowed Class C-1 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Allowed Class C-1 Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class C-1 Claims were held for more than one year. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income (as described below).

The amount received, if any, from the Litigation Trust is contingent on the value obtained from the unencumbered assets and the outcome of the causes of action held by the Litigation Trust. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Litigation Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Litigation Trust beneficial interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the beneficial interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Litigation Trust beneficial interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Trust beneficial interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

5.    Consequences to Holders of Class C-2 General Unsecured Claims

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of the Litigation Trust Series C Interests.

The amount received, if any, from the Litigation Trust is contingent on the value obtained from the unencumbered assets and the outcome of the causes of action held by the Litigation Trust. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Litigation Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Litigation Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued

interest. A Holder's tax basis in the Litigation Trust Interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Litigation Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Trust Interests received. The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

6.     Receipt of Litigation Trust Interests

On the Effective Date, the Litigation Trust will be settled and is currently anticipated to exist as either a grantor trust or partnership for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), pursuant to Treasury Regulation Section 301.7701-4(d) and related Treasury Regulations, the Litigation Trustee may designate and file returns for the Litigation Trust as a "grantor trust" and/or "liquidating trust" and therefore, for federal income tax purposes, the Litigation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.

The Litigation Trustee intends to take a position on the Litigation Trust's tax return that the Litigation Trust should be treated as a grantor trust set up for the benefit of creditors.

Holders of Claims that receive Litigation Trust Interests will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Litigation Trust whether or not the Litigation Trust is taxed as a partnership or a grantor trust. This requirement may result in Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. In general, Holders of Litigation Trust Interests will not be subject to tax on their receipt of distributions from the trust.

Any Litigation Trust Assets held by the Litigation Trust on account of Disputed Claims shall be treated as held in trust by the Litigation Trust as fiduciary for the benefit of the Holders of Disputed Claims (each a "Disputed Claims Reserve").

Under IRC Section 468B(g), amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting. Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the Holders of Disputed Claims or by the Debtor (or, if applicable, any of its successors), or otherwise. On February 1, 1999, the IRS issued proposed Treasury Regulations that, if finalized in their current form, would specify the tax treatment of reserves

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

of the type here involved that are established after the date such Treasury Regulations become final.  In general, such Treasury Regulations would tax such a reserve as a "qualified settlement fund" under Regulation Sections 1.468B-1 et seq. and thus subject to a separate entity level tax.  As to previously established escrows and the like, such Treasury Regulations would provide that the IRS would not challenge any reasonably, consistently applied method of taxation for income earned by the escrow or account, and any reasonably, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust will (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim in the Class of Claims to which such reserve relates, in accordance with the trust provisions of Code, and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes.  In addition, pursuant to the Plan, all parties shall report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Litigation Trust, in each case as fiduciary for Holders of Disputed Claims, will report as subject to a separate entity level tax any amounts earned by its respective Disputed Claims Reserves, except to the extent such earnings are distributed by such fiduciary during the same taxable year.  In such event, any amount earned by a Disputed Claims Reserve that is distributed to a Holder during the same taxable year will be includible in such Holder's gross income.

7.    Consequences to Holders of Allowed Class D Old Equity Interests

Pursuant to the Plan, on the Effective Date, all Old Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Old Equity Interests.

For U.S. federal income tax purposes,   the tax consequences arising from the cancellation of a Old Equity Interest are complex, and may give rise to a deemed distribution to such Holder and/or an allocation of COD income, as described in more detail above under "Certain U.S. Federal Income Tax Consequences to Reorganized Debtors."  Holders of Old Equity Interests are urged to consult with their own tax advisers regarding such consequences.

8.    Accrued but Unpaid Interest

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims.  Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes.  Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but was not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

9.    Market Discount

Holders who exchange Allowed Claims for their pro rata share of each of (a) the New First Lien Notes, (b) Newco Equity Interests, and (c) Cash may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (*i.e.*, up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

10.    Issue Price

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the

debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance.  In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is, among other things, readily quotable by dealers, brokers or traders.  For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If a tranche of new debt instrument is not publicly traded and the old Claim exchanged for such new debt instrument in such tranche is also not publicly traded, then the issue price of that new debt instrument generally would equal the stated principal amount of such debt instrument.  Holders of Claims should consult their tax advisors regarding the issue prices for New First Lien Notes.

C.    Other Tax Matters

1.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the IRS.

The Plan may impose additional U.S. federal income tax filing requirements on indirect holders of the Newco Equity Interests reflecting the activities on the Effective Date, as discussed above in Section B.

2.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VIII.
## RECOMMENDATION

In the opinion of the First Lien Steering Committee, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders of Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased Administrative Claims resulting in smaller distributions to the Holders of Claims. **Accordingly, the First Lien Steering Committee recommends that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.**

*[Remainder of Page Intentionally Left Blank]*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**ARTICLE IX.**
**CONCLUSION**

The First Lien Steering Committee believes that the Plan is in the best interests of Creditors and urges such parties to vote to accept the Plan.

Dated:  September 25, 2009                    THE FIRST LIEN STEERING COMMITTEE

                                             By: <u>Its Counsel</u>

                         By:    <u>/s/ *Philip C. Dublin*</u>
                                Nile Leatham (NV Bar No. 002838)
                                KOLESAR & LEATHAM
                                Wells Fargo Financial Center
                                3320 W. Sahara Ave.
                                Las Vegas, NV 89102
                                (702) 979-2357 (Telephone)
                                (702) 362-9472 (Facsimile)
                                Nleatham@klnevada.com

                                AKIN GUMP STRAUSS HAUER & FELD LLP
                                Philip C. Dublin (NY Bar No, 2959344)
                                Abid Qureshi (NY Bar No. 2684637)
                                One Bryant Park
                                New York, New York 10036
                                (212) 872-1000 (Telephone)
                                (212) 872-1002 (Facsimile)
                                pdublin@akingump.com
                                aqureshi@akingump.com

                                *Counsel for the First Lien Steering Committee*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

LIST OF EXHIBITS

| Exhibit | | Description |
|---|---|---|
| A | ..................................................... | Plan of Reorganization |
| B | ..................................................... | Debtors' Organizational Chart |
| C | | Current Cash Collateral Budget |
| D | ..................................................... | Going Concern Analysis |
| E | ..................................................... | Liquidation Analysis |
| F | | Pending Litigation |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

95