1                UNITED STATES BANKRUPTCY COURT

2                     DISTRICT OF NEVADA

3                     LAS VEGAS, NEVADA

4    In re:  THE RHODES COMPANIES,    )  E-Filed:  11/03/09
     LLC,                             )
5                                     )
                Debtor.               )  Case No.
6                                     )  BK-S-09-14814-LBR
     _____)  Chapter 11
7

8

9

10

11               TRANSCRIPT OF PROCEEDINGS
                            OF
12               HEARING RE: MOTIONS
                        VOLUME 1
13          BEFORE THE HONORABLE LINDA B. RIEGLE
               UNITED STATES BANKRUPTCY JUDGE
14
                 Friday, October 30, 2009
15
                        1:30 p.m.
16

17

18

19

20

21

22

23    Court Recorder:        Liberty Ringor

24

      Proceedings recorded by electronic sound recording;
25    transcript produced by transcription service.

2

```
 1    APPEARANCES:

 2    For the Debtor:          SHIRLEY S. CHO, ESQ.
                               Pachulski, Stang, Ziehl & Jones
 3                             10100 Santa Monica Boulevard
                               Eleventh Floor
 4                             Los Angeles, California 90067

 5                             ZACHARIAH LARSON, ESQ.
                               Larson & Stephens, LLC
 6                             810 South Casino Center Boulevard
                               Suite 104
 7                             Las Vegas, Nevada 89101

 8                             ANNE M. LORADITCH, ESQ.
                               Greenberg Traurig, LLP
 9                             3773 Howard Hughes Parkway
                               Suite 500
10                             Las Vegas, Nevada 89169

11    For the United States    EDWARD M. McDONALD, ESQ.
      Trustee:                 Department of Justice
12                             Office of the United States Trustee
                               300 Las Vegas Boulevard South
13                             Suite 4300
                               Las Vegas, Nevada 89101
14
      For the First Lien       MEREDITH A. LAHAIE, ESQ.
15    Steering Committee:      ABID QURESHI, ESQ.
                               PHILIP C. DUBLIN, ESQ.
16                             Akin, Gump, Strauss, Hauer & Feld, LLP
                               One Bryant Park
17                             New York, New York 10036

18                             NILE LEATHAM, ESQ.
                               Kolesar & Leatham, Chtd.
19                             3320 West Sahara Avenue
                               Suite 380
20                             Las Vegas, Nevada 89102

21    For Credit Suisse,       JAMES MacROBBIE, ESQ.
      Cayman Islands Branch:   Sylvester & Polednak, Ltd.
22                             7371 Prairie Falcon Road
                               Suite 120
23                             Las Vegas, Nevada 89128

24

25
```

Cline Transcription Services, Inc.  (702) 644-1123

```
 1                              VAN C. DURRER, II, ESQ.
                                RAMON M. NAGUIAT, ESQ.
 2                              Skadden, Arps, Slate, Meagher
                                  & Flom, LLP
 3                              300 South Grand Avenue
                                Suite 3400
 4                              Los Angeles, California 90071

 5      For Stanley            JANIECE S. MARSHALL, ESQ.
        Consultants, Inc.:     Anderson, McPharlin & Conners, LLP
 6                              777 North Rainbow Boulevard
                                Suite 145
 7                              Las Vegas, Nevada 89107

 8      For Wells Fargo,        MARK R. SOMERSTEIN, ESQ.
        N.A.:                   Ropes & Gray, LLP
 9                              1211 Avenue of the Americas
                                New York, New York 10036
10
        For Clark County,      PHILIP S. GERSON, ESQ.
11      Nevada:                Olson, Cannon, Gormley & Desruisseaux
                                9950 West Cheyenne Avenue
12                              Las Vegas, Nevada 89129

13      For the Unsecured       J. THOMAS BECKETT, ESQ.
        Creditors Committee:   Parsons, Behle & Latimer, PLC
14                              201 South Main Street
                                Suite 1800
15                              Salt Lake City, Utah 84111

16                              REW R. GOODENOW, ESQ.
                                Parsons, Behle & Latimer, PLC
17                              3753 Howard Hughes Parkway
                                Suite 200
18                              Las Vegas, Nevada 89169

19      Also Present:          PAUL HUYGENS
                                Senior Vice President
20                              The Rhodes Companies, LLC

21

22

23

24

25
```

4

1              (Court convened at 01:37:02 p.m.)

2                   THE CLERK:  All rise.

3          (Colloquy not on the record.)

4                   THE CLERK:  Bankruptcy court is now in session.

5                   THE COURT:  Be seated.

6          (Colloquy not on the record.)

7                   THE COURT:  Okay.  Rhodes Companies.

8          Appearances, please.

9          (Colloquy not on the record.)

10          MS. CHO:  Good afternoon, your Honor.  Shirley Cho of

11   Pachulski, Stang.  Also, with me in court is Paul Huygens from

12   the company.

13          MR. LARSON:  Good afternoon, your Honor.  Zach Larson

14   on behalf of the debtor companies.

15          MR. McDONALD:  Edward McDonald, Department of

16   Justice, for the U.S. Trustee.  Good afternoon, your Honor.

17          MS. LORADITCH:  Good afternoon, your Honor.

18   Anne Loraditch of Greenberg Traurig on behalf of the Rhodes

19   entities.

20          MS. LAHAIE:  Good afternoon, your Honor.

21   Meredith Lahaie and Abid Qureshi, Akin, Gump, on behalf of the

22   First Lien Steering Committee.

23          MR. LEATHAM:  Good afternoon, your Honor.

24   Nile Leatham also on behalf of the First Lien Steering

25   Committee.

```
 1              MR. MacROBBIE:  Good afternoon, your Honor.
 2    James MacRobbie of Sylvester & Polednak.  Van Durrer and
 3    Ray Naguiat of Skadden, Arps, Slate, Meagher & Flom on behalf
 4    of Credit Suisse, Cayman Islands Branch as agent for the first
 5    lien lenders.
 6              MR. DURRER:  Good afternoon, your Honor.
 7              THE COURT:  Okay.
 8              MS. MARSHALL:  Janiece Marshall on behalf of
 9    Stanley Engineering Consultants.
10              MR. SOMERSTEIN:  Mark Somerstein, Ropes & Gray, for
11    Wells Fargo as second lien agent.
12              MR. GERSON:  Philip Gerson on behalf of Clark County.
13              MR. BECKETT:  Good afternoon, your Honor.
14    Tom Beckett, Parsons, Behle & Latimer, Salt Lake City, for the
15    Unsecured Creditors Committee.  Rew Goodenow of our Nevada
16    office is on the phone.
17              THE COURT:  Okay.
18              MR. BECKETT:  Thank you.
19              THE COURT:  All right.  I guess let's take care of
20    the smaller matters first.  The first is I have the objection
21    of the IRS which I guess we're continuing again; is that
22    correct?
23              MS. CHO:  It is, your Honor.  We submitted a
24    stipulation.  I do have the order which I will submit after the
25    hearing.  I believe we may have resolved the one final issue,
```

1    so we may be able to submit an order, yet.

2              THE COURT:  All right.  So that was set over -- did I

3    set that order in the -- set that over to a specific date in

4    the order?

5              MS. CHO:  I think November 16th.

6              THE COURT:  Okay.  Then we have -- No. 2 and No. 3

7    are the same.

8         No. 4, Ford Motor Credit.

9         (Colloquy not on the record.)

10             MS. CHO:  Your Honor, we have received no objection

11   with responses to this objection.

12             THE COURT:  The certificate doesn't show that he was

13   noticed of the hearing --

14             MS. CHO:  We did --

15             THE COURT:  -- Mr. Sloan.

16             MS. CHO:  We did notice Ford Motor Credit on -- let

17   me see.

18             THE COURT:  Did you notice Mr. Sloan?

19             MS. CHO:  Mr. Sloan, I believe we did.  I checked it

20   yesterday.

21        (Colloquy not on the record.)

22             MS. CHO:  It's Docket No. 530, your Honor, page 5 at

23   the top.

24             THE COURT:  Okay.  The certificate doesn't say that.

25             MS. CHO:  Well, it's under the service list.  It

1  starts with a 2002 service list, but it's on the top, so it

2  might --

3          THE COURT:  Okay.

4          MS. CHO:  If you're looking at the normal service

5  list, you might not see it.

6          THE COURT:  All right.  So that's sustained, and it

7  was a wrong-case issue, correct?

8          MS. CHO:  Correct.

9          THE COURT:  Okay.  And then we have the omnibus

10  objection on the paid claims.

11          MS. CHO:  Correct, your Honor.  With respect to this

12  omnibus objection, two of the claims were actually withdrawn

13  after we filed the objection, so --

14          THE COURT:  And this is all on the basis these claims

15  have now been paid?

16          MS. CHO:  Correct, your Honor.

17          THE COURT:  All right.  So those are sustained.

18     And then as to the insufficient-documentation claims.

19          MS. CHO:  Your Honor, we have received no response.

20          THE COURT:  My notes indicate that Mr. Damus nor

21  Citibank were noticed of the hearing.

22          MS. CHO:  Similarly, your Honor, the -- and, perhaps,

23  this is a problem with the way the certificate of service is

24  drafted, but the claimants do show up on the top of the

25  certificate of service --

1          THE COURT:  Okay.

2          MS. CHO:  -- before the 2002 list.

3          THE COURT:  So Mr. Damus was noticed?

4          MS. CHO:  And let me just confirm that.  Correct,

5     your Honor, at the top of page 5, Docket No. 529.

6          THE COURT:  Okay.  And Citibank as well.

7          MS. CHO:  Correct.

8          THE COURT:  All right.  So those are sustained.  And,

9     of course, all claims are always subject to reconsideration

10    under the rules, so all right.

11        Now to the disclosure statement.

12        MS. CHO:  And, your Honor, because this is a

13    disclosure statement propounded --

14        THE COURT:  Right.

15        MS. CHO:  -- by the First Lien Steering Committee,

16    I'll accede the podium.

17        THE COURT:  Okay.

18        (Colloquy not on the record.)

19        MS. LAHAIE:  Good afternoon, your Honor.  Again, for

20    the record, Meredith Lahaie, Akin, Gump, Strauss, Hauer & Feld,

21    for the First Lien Steering Committee.

22        THE COURT:  To start with, let me have you describe

23    as if you were describing it to the Business Press what this

24    plan is, and, I mean, the first instance -- two parts.

25        The first instance, what's the plan, small P, strategic

1   plan?  What are you doing, and then, secondly, how are you

2   paying the creditors?

3           MS. LAHAIE:  Very well, your Honor.  With respect to

4   our strategic plan, the First Lien Steering Committee

5   anticipates that it will be the managing entity for the

6   reorganized debtors, and that these entities will continue to

7   operate in accordance with how they're currently being

8   operated.

9       And it also contemplates that certain noncore assets

10  will be divested as is contemplated by the mediation

11  settlement.

12          THE COURT:  Well, what do you mean operate?  Are you

13  going to hold the properties?  Are you going to sell the

14  properties?  Are you going to -- what are you going to do?

15          MS. LAHAIE:  You know, with respect to more specific

16  details as to the business plan, I'd like to defer to

17  Mr. Dublin who is actually participating by phone.

18          THE COURT:  Okay.

19          MR. DUBLIN:  Good afternoon, your Honor.

20  Phil Dublin, Akin, Gump, on behalf of the First Lien Steering

21  Committee.

22      Your Honor, we contemplate that the reorganized debtors

23  will continue to be homebuilders in the Las Vegas market.  The

24  objective of the first lien lenders upon taking ownership of

25  the reorganized debtors will be to have a management team in

1    place which we are currently in the process of selecting.

2         We actually yesterday had a session in New York where we

3    had six groups come present to the management team for the

4    reorganized debtors.

5         And we are in the process of whittling that down to three

6    to then have supplemental interviews and more in-depth

7    interviews.

8         But we will continue to be an ongoing homebuilder,

9    hopefully, providing the best possible product to the

10   marketplace on a go-forward basis.

11            THE COURT:  Okay.

12            MR. DUBLIN:  We also will -- as necessary or

13   appropriate, we would sell land either in a completed form or

14   bulk sale to the extent it no longer fits into the business

15   plan.  But, in general, we'll be a go-forward homebuilder in

16   the marketplace.

17            THE COURT:  Okay.

18            MR. DUBLIN:  There are certain noncore assets as

19   Ms. Lahaie mentioned in Arizona which really -- if you had a

20   picture of a doughnut, the middle of the doughnut are assets

21   that the debtors currently own.

22         Everything in the surrounding area around the middle of

23   the doughnut is currently owned by the Rhodes entities.  And as

24   part of the mediation settlement, the middle of the doughnut is

25   being transferred to Mr. Rhodes to complete his circle.

1           THE COURT:  Okay.  Well, and part of my point in

2      asking the question is your disclosures reading this -- now, I,

3      quote, "knew" what your plan was, but it's almost impossible to

4      understand that from the disclosure statement.

5           Nowhere in here -- I mean, I read better press articles

6      about what this case is about than in this disclosure

7      statement.

8           You have got to in plain English at the beginning of the

9      plan describe what the plan is, and I don't mean by the use of

10     15 pages of boilerplate.  You've got to describe in two parts.

11          First of all -- and not necessarily in this order, but

12     people need to know, first of all, what is the plan.  And by

13     that, I mean small P plan.  What are you going to do?

14          I mean, in other words, I gather Newco is going to take

15     the equity interest in the reorganized debtor.  The property

16     itself is not being transferred to a new entity I gather,

17     although I'm a little unclear about that.  That's almost more

18     detail.

19          But then you've got to describe what you're going to do

20     after that.  Is it going to be held?  Are you going to build

21     homes?  Are you selling lots?  What's the plan?

22          And then, next, I think you need to describe in the

23     beginning what the Rhodes entities receive, and you need to

24     describe in plain terms what everybody is going to receive.

25     Now, you've sort of done that by your summary, but I think you

1    need to articulate this issue.

2        And, for example, I've read in the Business Press about

3    how the Rhodes entities are going to take the golf course.

4    Well, it's described in here, but it's described better in the

5    Business Press than you've described it in your disclosure

6    statement.

7        And I think it's the point that when you talk to the

8    Business Press you talk in plain English, and you describe what

9    the function is and what you intend to do as opposed to just

10   lawyerese.  You've spent way too much in boilerplate.

11   Somebody's put in too much boilerplate.

12       That's the first thing that has got to be done in this

13   plan, the most important thing.  When I say first, I mean the

14   highest priority.

15       Now, let me go through each page of this, and I think it's

16   easier for me to go through each page.  It doesn't necessarily

17   mean it's in that priority.  It doesn't necessarily mean

18   that -- but it's just easier.  All right.

19       So let's start page -- we all have the first amended

20   disclosure statement filed December -- excuse me --

21   October 27th, correct?  Okay.  All right.

22       On page 3 in your boilerplate, you say, "The projections

23   have been prepared and are based on a variety of estimates and

24   assumptions."  I don't have any projections.

25       Are there projections in the supplements that are going to

1    be filed or is this just boilerplate that you added from

2    something?

3        Page 2, a little I, okay, the last page, line 23, "The

4    projections provided in the disclosure statement."  What

5    projections?

6            MS. LAHAIE:  Just let me confer with counsel,

7    your Honor.

8            THE COURT:  Okay.

9        (Colloquy not on the record.)

10           MS. LAHAIE:  Your Honor, the projections referenced

11   in page little 3 are contained in Exhibits D and E that were

12   also filed.

13           THE COURT:  When were they filed?

14           MS. LAHAIE:  October 27th.

15           THE COURT:  Nobody bothered to give them to me.

16           MS. LAHAIE:  I apologize, your Honor.  I can hand up

17   a set.

18           THE COURT:  I've got the IRS.  I've got Stanley's

19   objections.  Well, of course, October 27th was when, yesterday?

20           MS. LAHAIE:  Tuesday, your Honor.

21           THE COURT:  Tuesday.  Were all the exhibits filed

22   then?

23           MS. LAHAIE:  Your Honor, we refiled exhibits that had

24   been previously filed, and Exhibits D and E were filed for the

25   first time on the 27th.  Do you want me --

1           THE COURT:  Okay.

2           MS. LAHAIE:  -- to approach the bench?

3           THE COURT:  Yes, please.

4       (Colloquy not on the record.)

5           THE COURT:  Okay.  So that's D -- okay.  That answers

6   that question -- and E.  Okay.  All right.  So that answers

7   that question.

8       Going to page 1, Article 1, line 24, you talk about all

9   references to the disclosure statement to exhibits are

10  references to exhibits in the plan supplement.  Where is the

11  plan supplement?  Why is it in the plan supplement?  Why isn't

12  it in the disclosure statement?

13          MS. LAHAIE:  Your Honor, that plan supplement is

14  going to be filed by November 16th.  That's the deadline

15  contemplated by the plan documents.

16          THE COURT:  Well, how am I supposed to review the

17  adequacy of that if I don't even have them between now and

18  then, and what's going to be in the plan supplements?

19      Again, this is what happens when you just put boilerplate

20  in everything.  When somebody actually reads it, what are you

21  talking about?

22          MS. LAHAIE:  Understood, your Honor.

23          THE COURT:  So I'm just saying when you do this I

24  don't think the exhibits should be to a plan supplement.  I

25  think the exhibits should be to a disclosure statement, not to

1    a plan supplement.  All right.

2        Page 2, this question doesn't necessarily belong in the

3    purpose of the plan, but it's a major issue, and I mentioned

4    this to Ms. Cho at the last hearing, and, again, she was

5    probably the wrong person since she was just the messenger at

6    that stage.

7        The litigation trust, I am clueless and so is everybody

8    else about what assets are in the litigation trust.  How is it

9    funded?  How is it going to proceed?

10       You have now gotten rid of that first, second, and third.

11   I don't understand this interest allocable.  What does that

12   mean?

13       Does it mean that if you've got 800,000,000 of the

14   equivalent of unsecured claims, and you've got 1,000,000 each

15   person gets one-eight-hundredth?  Is that what that means?

16            MS. LAHAIE:  That's the way I understand it,

17   your Honor.  Each entity would receive --

18            THE COURT:  Okay.  Well --

19            MS. LAHAIE:  -- its --

20            THE COURT:  -- you've got to have a whole section

21   which describes that litigation trust.  Importantly, in that

22   litigation trust, you've got to make it clear that that trust

23   does not include any claims against Rhodes because I think

24   throughout this plan you make its -- one who didn't read

25   carefully would assume that claims against the Rhodes are

```
1    included in the litigation trust.

2         I'm not saying that they should or they shouldn't.  I'm

3    not saying you haven't met the settlement aspects later.  I'm

4    just saying people need to know that.  I think there is an

5    inference that there's some money in that litigation trust.

6         I don't understand.  You've had all these advisers both

7    sides for months that have been paid millions of dollars and

8    how you can be clueless at this stage.  What assets are in the

9    litigation trust?  I don't know.

10        (Colloquy not on the record.)

11             THE COURT:  I mean, we don't even know where it's,

12   arguably, $1 or 800,000,000.  We don't know, so that has got to

13   be in here, maybe not here, but you have got to put it in the

14   litigation trust.

15        On page --

16             MR. DUBLIN:  Your Honor, it's --

17             THE COURT:  Sorry.

18             MR. DUBLIN:  It's Phil Dublin.  I apologize for

19   interrupting.  There will be claims and causes of action

20   against the Rhodes entities included in the litigation trust.

21        The only claims that are being released against the Rhodes

22   entities pursuant to the contemplated settlement are Chapter 5

23   causes of action that occurred within the two years prior to

24   the filing and that have been explicitly exclosed (sic) -- I'm

25   sorry -- disclosed either in the schedules filed by the company
```

1    in accordance with the applicable bankruptcy rules or as

2    otherwise listed on schedule B to the mediation settlement.

3        So any claims outside of Chapter 5 causes of action during

4    that two-year period that exist against the Rhodes entities are

5    being transferred to the litigation trust.

6            THE COURT:  Right.  But what --

7            MR. DUBLIN:  And we will make --

8            THE COURT:  -- are they?

9            MR. DUBLIN:  -- that clear.

10           THE COURT:  What could they possibly be except

11   Chapter 5?

12           MR. DUBLIN:  But there are.  It's just the

13   two-year -- it's just the disclosed two-year period

14   transactions.

15       So if there are claims for mismanagement or

16   misappropriation -- and I'm not saying there are any, but

17   there's a diligence that will occur by the litigation trust.

18       And those types of claims if there are any as well as any

19   other claims except for those specifically set forth in those

20   two schedules will be pursued.

21       So, for example, if there is a fraudulent-transfer claim

22   that occurred three years ago, that can be pursued as long as

23   it's within the applicable Statute of Limitations.

24           THE COURT:  I understand what it says and what it

25   doesn't, but the point is it would seem to me that people

18

1    would -- you should have some kind of sense of what kind of

2    claims there might be.  Also, your Statute of Limitations is

3    going to run.

4        I mean, you've got to put some dollar amount in that

5    litigation trust.  You can't have people out there voting

6    saying I'm going to take a litigation trust when you're

7    clueless as to what claims may or may not be in there.

8        I realize all you can do is estimate I recognize, and I'm

9    not suggesting -- I'm not getting into the whole issue of

10   reservation of jurisdiction and whether or not you're going to

11   lose your claims against those people because they're not

12   included.

13       I'm just saying you can't tell somebody you're going to

14   get a share of a litigation trust and not even have any clue

15   whether that's worth $1 or as I said 800,000,000.

16       And if you're not aware of any claims against the Rhodes

17   entities now, you've got to say so.  If you are aware, it would

18   seem to me it would be prudent to do so as well, so it's got to

19   be disclosed.

20       And, again, if you're going to have a litigation trust, I

21   don't understand the mechanics of it and who's going to fund

22   it.  It may well be buried in here, and I missed it, but it

23   needs to be in one point.  All right.

24       On page 2, line 28, there's just a -- I see.  It was just

25   I thought this was a heading as opposed to the end of the

1   sentence, so that's all right.

2           MS. LAHAIE:  Your Honor, are you looking at the clean

3   or the black line?

4           THE COURT:  I have the black line because I need --

5           MS. LAHAIE:  Okay.

6           THE COURT:  -- to see where I am, so I do have a

7   copy --

8           MS. LAHAIE:  Okay.

9           THE COURT:  -- of the black line -- I mean, the

10  unredlined if you will.  I'm going from the black line just

11  because that way I could see what changes were made.  All

12  right.

13      Going to the summary and treatment of allowed claims, I've

14  discussed it with you before how you've got to do that partly

15  in English as well.

16      Now, with respect to the first lien lenders -- and this is

17  going to get to another part, yeah, of the disclosure.  As I

18  understand it, there is no one first lien lender.  There is a

19  number of entities who have rights to the first lien.  Is that

20  a fair statement?

21          MS. LAHAIE:  That's correct, your Honor.  There are a

22  number of lenders within the first lien lender group.

23          THE COURT:  Okay.  And as I understand this plan, you

24  have not classified the secured and the unsecured claim

25  separately.  You've treated them all in one class.  How can you

1    do that?

2         And then that brings up the issue that since each of these

3    lenders are not one lender how do you avoid giving them an

4    1111(b) election?

5         I recognize as a practical matter it may not make any

6    difference, but the niceties of the code is how -- don't they

7    have a right?

8         First of all, classification, I don't think you can.

9    Maybe it's not a disclosure-statement issue, but let me give

10   you a heads-up now.

11        How can you classify the first lien in one class when

12   they're not totally secured, and then, secondly, how do they

13   not have a right to the 1111(b) election?

14        As I understand it, the Steering Committee probably

15   doesn't hold the majority that's required to make that

16   election, so it's not (indiscernible) enough that you said you

17   had the requisite amount.  You said we have made the election.

18   If that's the case, say so.

19        Next, and this relates more to what the first lien claims

20   is.  Is this 1.5 million dollars?  Does the lien lenders claim

21   they have a security interest in that case?

22             MS. LAHAIE:  Your Honor, the 1.5 million dollars in

23   cash is there's a secured portion of the claim, obviously, and

24   a deficiency portion of the claim.

25             THE COURT:  Um-h'm.

1          MS. LAHAIE:  The secured portion of that claim, the

2    first lien lenders are going to receive a number of things on

3    account of just the secured portion of the claim.

4        And one of the things that the secured lenders are going

5    to receive on account of the secured portion of their claim now

6    is the 1.5 million dollars which as I'm sure you noted later on

7    in the plan will be used to purchase certain claims.

8          THE COURT:  But the 1.5 million is the money coming

9    from Rhodes, right?

10          MS. LAHAIE:  No.  That's coming from the debtors,

11    from the reorganized debtors.

12          THE COURT:  So you contend that 1.5 is their cash

13    collateral.

14          MS. LAHAIE:  That's correct, your Honor.  It's --

15          THE COURT:  Okay.

16          MS. LAHAIE:  It's going to be working-capital cash

17    that's within the company upon emergence.

18          THE COURT:  All right.  When we get to that, don't

19    let me forget you're going to have to disclose that fact

20    because your point is if that 1.5 was not cash collateral what

21    rights would the lien creditors have to those funds as against

22    the unsecureds because you're wholly unsecured as to that

23    portion.

24        So maybe that's not a disclosure issue, but I think you

25    should disclose what your contention is as to why the secured

1    lien creditors have the rights to those moneys.

2        Now, on the second lien claims -- and let me say this.  I

3    appreciate very much the fact that Judge (indiscernible) had a

4    settlement, and you've all worked very hard for this.  I don't

5    mean to denigrate that in any manner.

6        But these are disclosure-statement issues, and we all know

7    that you get some parties together, and you can't maybe

8    necessarily take care of all interests.

9        On the second lien lender claims, did the second lien

10    lenders have a security interest in litigation?

11            MS. LAHAIE:  Your Honor, I don't believe that the

12    second lien lenders do have a security interest pursuant to

13    their credit agreement.

14            THE COURT:  So how?  You're going to have to explain

15    I guess how they would have rights since they're wholly

16    unsecured to the litigation, the Stanley litigation.

17            MR. SOMERSTEIN:  Your Honor, Mark Somerstein,

18    Ropes & Gray, for the second lien lenders.  We have the

19    identical collateral package as the first lien lenders.

20            THE COURT:  Right.  But do you contend you have a

21    lien in that kind of litigation?

22            MR. SOMERSTEIN:  That's my understanding, your Honor.

23            THE COURT:  Okay.  Well, I think it should be put in

24    there.  If that's your contention, that's your contention.

25            MR. SOMERSTEIN:  Very well.

1          Thank you.

2              THE COURT:  And I'm not agreeing or disagreeing.  I'm

3     just -- so that people can understand when they're voting what

4     your contention is.

5              MR. SOMERSTEIN:  Understood.

6          Thank you.

7              MS. LAHAIE:  We'll clarify that, your Honor.

8              THE COURT:  Okay.  Other secured claims, I understand

9     how you're treating them in your feasibility section.  I think

10    you're going to have to explain how that's going to be feasible

11    to pay them because you say you're going to pay them

12    afterwards.

13             MS. LAHAIE:  Okay, your Honor.

14             THE COURT:  With respect to the unsecured claims,

15    again, I think the litigation-trust definition will clarify

16    that.

17         Subordinated claims, this makes it appear as if you have

18    some Rhodes entities' claims that are subordinated.  As far as

19    I can tell, there are no Rhodes entities' claims that are

20    subordinated.  This would make unsecured creditors think that

21    you're subordinating some claims when you're not.

22             MS. LAHAIE:  Your Honor, the Rhodes entities to the

23    extent they're allowed, they'll be treated as general unsecured

24    claims.

25         And to the extent they're later determined to be

1  appropriately subordinated, they'll be treated as subordinated

2  general unsecured claims.

3          THE COURT:  But didn't you release all rights to do

4  that under the plan?

5          MR. DUBLIN:  That's correct, your Honor.  This is

6  Phil Dublin.  That's a mistake from a prior (indiscernible) and

7  disclosure statement.  We'll have that fixed.

8          THE COURT:  Okay.  So I think you should take out

9  subordinated claims.  Well, take out -- including any Rhodes

10  entities' claims that are subordinated because you're not going

11  to do that.

12      And, again, I don't want people thinking things are going

13  to happen when they're not, and it's not to say that it isn't a

14  fair plan, and the plan can be confusing, but everybody needs

15  to know what the plan really is.

16      Intercompany claims, we have that.  Okay.

17      Now going to -- we'll talk about dates later.

18      Page 9, you mentioned the record date.  Is that part of

19  the motion today?  Have we determined that, and is that the

20  right -- how do you intend to do that?

21          MS. LAHAIE:  It is part of the motion today,

22  your Honor.

23          THE COURT:  Okay.  All right.  Page 10 and, really,

24  more going to page 11 where you talk about each of these

25  projects, I'd like you to include a sentence which sets forth

1    what you ascertain the value of each of those projects to be.

2         And you can say we estimate the value to be X, see exhibit

3    whatever it is it's in, but there I think it's important

4    because what we're doing is -- since we're talking about

5    substantive consolidation, creditors need to know, okay, here's

6    a value of X.  I have a claim against this.

7         I think you should also in that regard indicate your

8    estimate of nonduplicative claims against that entity separate

9    and apart from, you know, your overall debt and indicate which

10   of these is the -- in other words, if it's Rhodes Ranch, if the

11   lien creditors have the actual lien there by the debtor as

12   opposed to the guarantee.

13        Just associate it with each track because that's how

14   people are going to establish whether or not substantive

15   consolidation makes sense.

16        Very importantly, what's being transferred to the Rhodes

17   entities needs to be valued --

18        (Colloquy not on the record.)

19        THE COURT:  -- or your belief in the value, you know,

20   what your belief in the value is.

21        Capital debt and structure, this section is totally

22   inadequate.  We need to have a history of this debt.  When was

23   this lien credit agreement initiated?

24        A brief description of the structure, that is how many

25   lenders, and when was this debt put on?  I don't even know that

1    myself.  It's certainly not in here.

2              MS. LAHAIE:  I believe it's in the definition in the

3    plan.

4         (Colloquy not on the record.)

5              MS. LAHAIE:  Ms. Cho is telling me November 21st,

6    2005.

7              THE COURT:  Okay.  So it's '05, and it's probably --

8    and this is an '09 case.  All right.

9         Similarly, with the second lien, when was that debt put

10   on?  Was it a first debt that was subordinated?  When was it

11   put on?

12        We'll talk about this later, but let me mention when you

13   deal with that.  On the subordination agreement, is the second

14   lien creditor also precluded from voting against a plan that

15   the first lien submits?

16        I think that's important for creditors to know if there's

17   such a provision.  In other words, what agreements are in there

18   between the first and the second that may impact the voting?

19        On page 13, paragraph 4, you say, "The First Lien Steering

20   Committee is in the process of analyzing the Rhodes entities

21   claims and any and all claims the debtor states it may hold

22   against the Rhodes entities."  Is that true?

23             MS. LAHAIE:  It is, your Honor.

24             THE COURT:  Okay.

25             MS. LAHAIE:  And to the extent there are claims that

1    are not being released pursuant to the Chapter 5 release, those

2    are claims and causes of action that will be transferred to the

3    litigation trust.

4              THE COURT:  Okay.  Again, you're going to disclose

5    what you believe they are, correct --

6              MS. LAHAIE:  Yes, your Honor.

7              THE COURT:  -- because this, certainly, again makes

8    it apply that there are claims you're going to pursue.

9         Significantly, litigation, when I finish through here,

10   I'll have Ms. Marshall explain if she thinks anything should be

11   added to that description.

12        I would think that you'd probably want to add that Stanley

13   claims that no intellectual property can be transferred.  I'm

14   not sure why that would make a difference to any creditor of

15   these estates, but, conceivably, it would in case they have

16   guarantees.  All right.

17        I have no real comments about the history of the case

18   other than I'm not sure all that's necessary in the detail, but

19   it doesn't do it harm.  All right.

20        Now, page 20, the mediation, I think you should

21   indicate -- it's my understanding from reading the mediation

22   sheet who the participants were.

23              MS. LAHAIE:  Um-h'm.

24              THE COURT:  But I think you need to indicate who was

25   present -- not who, but what --

```
1              MS. LAHAIE:  What parties --

2              THE COURT:  -- parties --

3              MS. LAHAIE:  -- were present, your Honor.

4              THE COURT:  -- were at the mediation.

5              MS. LAHAIE:  Understood.

6              THE COURT:  On line 18 through 22, your syntax is off
```
in that at first I thought it read that the plan shall provide

for -- it just didn't read right.  I thought all of these

people were getting general releases as opposed to the

converse.

     You state it correctly when you have it in the plan on

what the definition of released parties is, but here the syntax

is off, and it's ambiguous, and I think it conveys the wrong

image, quite frankly, the wrong statement.

     On page 21, obviously, you deal with this later, but

you're going to need to describe what the Heritage equity

securities are.

     I know it's a defined term, but that doesn't help me

understand.  What is it?  What is this company?  What is this

entity?  What's its value?  Again, we get to it later.

     But as to the transfer of the Arizona assets, does this

mean -- we need to know were there any claims that this debtor

is going to be paying notwithstanding the transfer.  It's being

conveyed free and clear of liens, but are there any claims

besides the liens of the first and second lien?

```
 1          In other words, if I am a creditor of those entities,
 2     and -- well, now, Pravada wasn't even a part of this estate; is
 3     that correct?  We don't know?  We're unclear?
 4              MS. LAHAIE:  It is, your Honor, I believe.
 5              THE COURT:  It is.  Okay.  If I'm a creditor of
 6     Pravada, and I guess you're attempting to transfer that out and
 7     make the creditor rely on this estate, then that needs to be
 8     made clear, so you're going to have to list all those
 9     creditors -- I mean, you're going to have to deal with that
10     section especially since unsecureds are getting nothing.
11          Is this a -- oh, yes.  It's a 363 sale.  Okay.  You
12     have -- thank you -- added your A&C Properties analysis.
13     Whether or not it's correct -- or whether or not it's
14     sufficient, at least, you've got the analysis in there.
15              MS. LAHAIE:  Understood, your Honor.
16              THE COURT:  Going to -- no.  I've dealt with that.
17          Now, the unsecured claims, page 29, and then also dealing
18     with the new provision for the 1.5, you're going to have to
19     list who you're going to pay.  And if you're not paying
20     everybody, what's the basis for it?
21          And at confirmation if you're picking and choosing, I'm
22     going to expect a briefing on why that's appropriate.  I
23     understand that a New York court has said that you can gift.
24          I don't know if that's correct or not, but just a
25     heads-up, so that you're not going through this whole process
```

1    and discover that maybe that's not the right answer.

2         And you must include with this disclosure statement who's

3    being paid and who's not, and I would put that in bold.  If you

4    intend to buy some claims, you put -- if your name isn't on the

5    list, your claim is not being bought.

6         Subordinated, we dealt with that.

7         On intercompany claims, were there any claims against the

8    Arizona entities that are now being transferred?

9              MS. LAHAIE:  I don't know, your Honor, but I will

10   find out.

11             THE COURT:  Okay.  And add that.  I already did that.

12        On page 38 is where we talk about the litigation trust.

13   This is the section that needs to be explained.

14        Page 39 where you say, "The litigation trust nor" --

15   "Neither the debtors or reorganized debtors can commence any

16   litigation against the Rhodes entities until the Court rules on

17   all allowance of the Rhodes entities claims."

18        Is there any attempt?  Is there going to be any time to

19   file an objection?  They must file it, plus who's going to file

20   the objection?

21             MS. LAHAIE:  Your Honor, the disclosure statement and

22   the plan do not provide who will file the objection, but there

23   is a deadline by which any objections must be filed.

24             THE COURT:  Okay.  So I guess this means the Rhodes

25   entity files a claim.  Nobody objects.  That claim is allowed,

1    then the trust could commence litigation against them on those

2    few remaining things.

3         But if an objection is not filed -- if an objection is

4    filed, nothing can happen until that objection is resolved, and

5    the objection-to-claims deadline is when?  It's relatively

6    short, isn't it?

7              MS. LAHAIE:  Your Honor, I believe it's 60 days --

8              THE COURT:  Okay.

9              MS. LAHAIE:  -- for the Rhodes entities.

10             THE COURT:  Okay.  I'm just concerned that it runs so

11   long that we end up with a stalemate.  I think this part should

12   be disclosed in the whole how you deal with the Rhodes entities

13   as well.

14        On page 40, the Sagebrush administrative claim, how much

15   is that?  Is it $5?  Is it $5,000,000?  That could have a

16   significant impact on the case.

17        The transfer of the Rhodes Ranch Golf Course, either here

18   or in the part that describes about the loan you need to

19   describe the circumstances surrounding the transfer of the

20   Rhodes Ranch.

21        I know you have said it was in accordance with the loan

22   agreement, but what happened?  Was there a reduction of

23   liability?  How much was transferred?  What was the value?

24        You need to describe how that happened because if I was a

25   creditor the first thing that would come to my mind is what

1    would be so hard about recovering that.  It was within one

2    year.  It was in 30 days.  What's the problem?  So I'd want to

3    know why there is a defense to that.

4          And what is the outstanding debt on the golf course?  How

5    much?  And I assume it's just debt that was existent by these

6    lien creditors as opposed to any debt put on, previously, and,

7    perhaps, the next section deals with that.

8          The refinance, I think you're going to have to disclose

9    because it's a condition of the effectiveness what the terms

10   you anticipate are, what the likelihood is that this will

11   happen.

12         You need to put values.  If he has the right to purchase

13   it for 5.9 million, what do you -- is that what you believe the

14   value is or is this a discount or a compromise?  What is this?

15         And, again, this could -- I saw a better description of

16   this in the Business Press than this, so this could use a

17   little plain English in the beginning and then the more precise

18   distinction later, and I feel guilty about saying I read the

19   Business Press, but I guess we all do.

20         On page 50 about distributions, I'm just not sure this is

21   boilerplate that really meshes within this plan.  If it does,

22   it does.  It's fine.  It's fine.  It's got distributions.  I'm

23   not quite clear what distributions there will be.

24         But on account of disputed claims, should we

25   (indiscernible) a periodic distribution date?  Are you really

1    going to be having periodic distribution dates?

2        I mean, maybe you are with the trust.  Maybe that's part

3    of my problem (indiscernible) on what the trust does.  I'll

4    just have you look at that such that if it's correct it's

5    correct.

6        If it's not -- on page 55 is where we talk about the

7    one-million-five.  That's where -- well, I don't know if that's

8    where it belongs, but, again, I've dealt with how you need to

9    describe this.

10        What is the 3.95 that the Rhodes entities are paying going

11    to be used for?  That should be in the plan someplace.  Is it

12    administrative expenses?  Is it operations?  Why would that be

13    cash collateral?  Why wouldn't that be distributed?  I guess

14    the point is if it's administrative expenses, so what's that to

15    be used for?  Okay.

16        On this whole unsecured-claims purchase, how in the world

17    can you tell somebody you're going to purchase their claim, and

18    then they vote, and then the effective date comes, and you say,

19    oh, I didn't mean that?  I'm not going to buy their claim.  I

20    mean, this is the structure.  They may have a problem with your

21    structure.

22        MS. LAHAIE:  Your Honor, over on this section, I do

23    have one additional language change --

24        THE COURT:  Uh-huh.

25        MS. LAHAIE:  -- that the creditors committee has

1    requested.

2              THE COURT:  Okay.

3              MS. LAHAIE:  It's about three lines up from the

4    bottom.  It's little 2 where it says --

5              THE COURT:  Um-h'm.

6              MS. LAHAIE:  -- its claims are subject to a setoff.

7    The creditors committee has requested that we insert a

8    parenthetical there for a setoff saying (indiscernible) under

9    Section 547 of the bankruptcy code.

10             THE COURT:  Okay.

11             MS. LAHAIE:  Obviously --

12             THE COURT:  And you did say that under the next page,

13   so that was added (indiscernible).

14        On page 58, the releases, the released parties include --

15   oh, here I think you should include the definition of released

16   parties right here, so that people don't have to refer back to

17   the plan.

18        Those parties include the first lien lenders and the

19   second lien lenders.  What's your basis for doing that?  I know

20   it says except as allowed by law, but I don't want to get in

21   the Supreme Court trap, so what's the basis for doing that?

22        If you're attempting to do that as between the first

23   lender group and if it's permitted under your agreement, then

24   say so.

25        Page 59, the --

```
1            (Colloquy not on the record.)
2            THE COURT:  So as I understand it, as we know under
3    548, a trustee can look at state law, and state law, for
4    example, in Nevada is a four-year lookback.  So if the transfer
5    occurred three years ago, that's not being released?
6            MS. LAHAIE:  That's correct, your Honor.
7            THE COURT:  Okay.  Now, releases by first lien
8    lenders -- and, perhaps, I got ahead of myself -- it looks like
9    belt and suspenders here.
10           You had released parties before where you're releasing the
11   first lien lenders there.  Now you're doing it again by
12   releasing the first lien lenders, releasing the first lien
13   lenders.
14           That may be separate and apart from the first one where
15   the creditors released the first lien lenders.  That is why it
16   is important that the first lien lenders describe the nature of
17   the transaction and how the first transaction was released.
18           I suspect it's probably appropriate just to say how much
19   money went to the estate, how much money went to the Rhodes
20   entities, how much money went in fees.  All these issues that
21   we see are now raising their ugly head.
22           An injunction, I think -- let's see.  Okay.  The Rhodes
23   entities get the right of a setoff even though other people
24   don't; is that right?  Yes.
25           MS. LAHAIE:  Yes, your Honor.
```

```
 1              THE COURT:  Put that in the section which deals with
 2     how you treat with the Rhodes entities.
 3         Finally, your liquidation analysis, again, I was rather at
 4     a disadvantage because I didn't have D and E.  I am
 5     presuming -- let me see.  You've done this on a consolidated
 6     basis.
 7              MS. LAHAIE:  We have, your Honor.
 8              THE COURT:  How can you do that?  We haven't
 9     substantively consolidated these cases.  I want a liquidation
10     analysis done per debtor.
11              MS. LAHAIE:  Understood.
12              THE COURT:  Going concern, that makes sense because
13     if your plan is confirmed you've got substantively
14     consolidated.
15         But, you know, since you're substantively consolidating,
16     you've got to demonstrate the pros and the cons.  You've
17     certainly demonstrated from the part of the standards, the one
18     entity, the guarantees, et cetera, but creditors have a right
19     to now how they would be affected if the case was substantively
20     consolidated --
21              MR. DUBLIN:  And --
22              THE COURT:  -- especially since --
23              MR. DUBLIN:  -- your Honor --
24              THE COURT:  Um-h'm.  Sorry.
25              MR. DUBLIN:  Sorry to interrupt, your Honor.  It's
```

1    Phil Dublin again.  I just request that we can get relief from

2    that request from your Honor.

3         Based on the amount of debt that each -- the amount of the

4    first lien debt and the amount of the second lien debt for

5    which each of the debtor entities are a guarantor, the

6    enterprise in the aggregate -- and the enterprise

7    (indiscernible) in the aggregate as you've noticed from the

8    disclosure statement is 99.6 million dollars on a going-concern

9    basis.

10         But, obviously, on a liquidation basis, everything is

11    substantially less, and there would not be enough value to

12    satisfy the first or second lien debt.

13         Therefore, on either an entity-by-entity basis or on a

14    consolidated basis, there would be no value for anybody past

15    the secured creditors, so the --

16              THE COURT:  Well --

17              MR. DUBLIN:  The utility of an

18    entity-by-entity liquidation --

19              THE COURT:  Okay.

20              MR. DUBLIN:  -- analysis I don't believe -- and, of

21    course, I'll defer to your Honor.  Would it really provide any

22    value to the creditors voting on the plan?

23              THE COURT:  But you don't have a first lien.  You

24    don't have a lien on all the entities, correct?

25              MR. DUBLIN:  We do, your Honor, on all of the debtor

1    entities.

2                 THE COURT:  Do --

3                 MR. DUBLIN:  The --

4                 THE COURT:  -- or do not?

5                 MR. DUBLIN:  We do, yes.  We have liens on the assets

6    of all the debtor entities.

7                 THE COURT:  Okay.  So there are none of the -- what

8    about Rhodes Ranch Golf Course?

9                 MR. DUBLIN:  Rhodes Ranch Golf Course is owned on a

10   nondebtor Rhodes entity.

11                THE COURT:  So --

12                MR. DUBLIN:  And it is being transferred to the

13   debtors, to the reorganized debtors, as part of the global

14   settlement --

15                THE COURT:  Okay.

16                MR. DUBLIN:  -- in exchange for the swap of lender

17   collateral out of the estates.  It's bringing in additional

18   assets subject to debt.  That would be -- in essence, the

19   lenders will be required to assume.

20                THE COURT:  Wasn't the Rhodes Ranch Golf Course a

21   part of your collateral --

22                MR. DUBLIN:  It was --

23                THE COURT:  -- originally?

24                MR. DUBLIN:  Originally, it was part of the

25   collateral.  It was purchased pursuant to a (indiscernible) in

1    the credit agreement by Jim Rhodes.  I believe it was a little

2    over a year ago, and it is being reacquired in connection with

3    the settlement.

4            THE COURT:  And that reminds me.  You have got to

5    explain that swap transaction.  There's no -- I mean, just to

6    say a swap transaction doesn't tell us anything, so you've got

7    to explain that and what the consequences are of that swap

8    transaction.  All right.

9        If you think you don't need it to meet your burden for

10   substantive consolidation, I'll leave it to you.

11           MR. DUBLIN:  Thank you, your Honor.

12           THE COURT:  I'm not saying I say that meets your

13   burden.

14           MR. DUBLIN:  I --

15           THE COURT:  I'm not --

16           MR. DUBLIN:  I understand.

17           THE COURT:  Okay.  It --

18           MR. DUBLIN:  Thank you.

19           THE COURT:  It may well.  I hear what you're saying.

20       Part of the -- and, again, the problem is, you know,

21   you've just kind of merged everything together without

22   explaining the nature of the first lien debt.  I mean, one

23   paragraph of 99 pages really isn't sufficient.

24       Finally, the tax consequences -- and I've kind of

25   discussed this before -- nobody wants a lecture on tax law.

40

1    You guys have hired these tax experts.  You've paid them

2    hundreds of thousands of dollars.

3        And the best we can come up with is some lecture on, you

4    know, what the tax consequences are?  I want to know what the

5    impact is on the debtor.

6        If this plan goes through, what, if any, is the tax

7    consequences?  And maybe the answer's none.  I want to know

8    that if it's a -- and it may well be a claim against the

9    estate.

10       I have never thought that one needed to describe the tax

11   consequences to creditors, but I know it's (indiscernible) to

12   do that, and it's fine you've done it, although that's fine.

13       But I think I'm not quite sure why we're paying from the

14   estate tax people to do that because I don't think it's

15   required, but we'll deal with that in the fee applications.

16       So page 85, what is the dollar?  What is the number or

17   some estimate, something?  All right.

18       Ms. Marshall, do you have any additional comments that you

19   had filed an objection?

20           MS. MARSHALL:  Yes, your Honor.  Thank you,

21   your Honor.  Stanley objected to the disclosure statement.

22   They filed the amended disclosure statement.

23       Within the amended disclosure statement, they have

24   included -- and I'm not sure which document you're looking at,

25   but Document 649.  It's Exhibit 1 --

1           THE COURT:  I have --

2           MS. MARSHALL:  -- page 14.

3           THE COURT:  -- 652.

4           MS. MARSHALL:  Well, the two I --

5           THE COURT:  The docket --

6           MS. MARSHALL:  -- took it for --

7           THE COURT:  Is 649 the plan?

8           MS. MARSHALL:  -- was 650 and 651.  It's an execution

9    copy, and it describes the intangibles that are going to be

10   transferred with respect to the Arizona assets.

11          And it includes all architectural and engineer drawings

12   plus work product associated with Pravada and Golden Valley

13   Ranch.

14          As Stanley set forth in its objection, Stanley provided

15   significant engineering work, planning, surveying, construction

16   work for real property in Arizona.

17          Some of that property is owned by the debtor entities, and

18   some of it is owned by the Rhodes entities that are not debtor

19   entities.

20          The contracts were with the debtor entities, but were

21   performed on property that's owned by the nondebtor entities,

22   and Stanley has copyrighted its work that it has provided.

23          The agreements that (indiscernible) the services pursuant

24   to would only give the Rhodes entities the right to use the

25   work that Stanley performed.

1          It's doesn't give them the ownership of it, and that's

2     the subject of the litigation that's presently pending in

3     Arizona.

4          And Stanley was contracted to provide $12,000,000 in

5     services.  It provided approximately $8,000,000 in services.

6     It is owed in excess of close to $4,000,000 on the contracts.

7          And we don't believe that the way that they have

8     structured the statement and the plan that they -- what they've

9     done is they have burdened the debtor entities with all of the

10    work that was performed, those contracts, put it in the

11    bankruptcy estate.

12         And now it appears that the Rhodes entities that are going

13    to walk away with all of the Arizona assets they're not

14    burdened by any of the work that was done for the improvements.

15         And we don't think that they have any right to use our

16    engineering plans, and we certainly don't think they have the

17    right to include in their plan or their statement that they're

18    going to transfer the engineering drawings plus the work

19    product associated with Pravada and Green Valley Ranch.

20         And the Court brought up the issue of the valuation of

21    their Arizona assets and that property.  And the work that

22    Stanley performed, for example, it's the foundational work for

23    these master plans, to develop these master-plan communities.

24         Some of the property includes The Villages at White Hills

25    which is a development that's right outside the Hoover Dam that

1    now that the dam's completed that property value -- it can be

2    developed immediately.

3         And there is no estimation of the valuation of the Arizona

4    assets, and the Rhodes entities are going to pay 3.5 million

5    based on Stanley's expertise and its understanding of the

6    properties.

7         The water rights and the drilling rights are ten times

8    that much if not more, and none of this has been taken into

9    consideration in the amended disclosure statement and the plan.

10        And Stanley just adopts its objections to the

11   original disclosure statement to the amended disclosure

12   statement.

13             THE COURT:  Okay.

14             MS. MARSHALL:  Thank you, your Honor.

15             THE COURT:  All right.  Well, clearly -- and I think

16   this is on page 21.  The transfer of the Arizona assets, we

17   have discussed this.

18        You are going to have to include what those assets are and

19   what the value is, what claims are being assumed by the debtor,

20   and I guess the thing that needs to be clarified is is this

21   being transferred without a warranty.

22        In other words, if you transfer the plans, but you don't

23   have the right to transfer the intellectual property, is it

24   without warranties or without recourse?  What is it?

25        I think you need to add a little bit more to Stanley -- I

1    think we've discussed this before -- to indicate that they

2    claim the intellectual property can't be transferred.

3        I don't think it would hurt to say they contend.  Well,

4    there's no -- anybody can contend anything.  They didn't have

5    -- I'm not going to say that they contend it's worth more.

6        I will not say that because we don't have evidence from

7    them.  Anybody could contend anything, so it's up to you to

8    prove that the value is an appropriate value in the transfer.

9    Okay.

10       I realize this is a lot.  I know you've worked hard at

11   this, and I very much appreciate your work.  I certainly don't

12   mean to denigrate that in any manner, but I think it's

13   important because there's so many creditors in this case.

14       And I also recognize, quite frankly, that the case is

15   hopelessly insolvent.  I fully am cognizant of that, so it may

16   well be there's, you know, no answer to this situation.

17       But if we're going to go through a plan process, it's

18   imperative that we have the disclosure statement and include

19   all of these things, so we can have a fair and full vote.

20       (Colloquy not on the record.)

21       MS. LAHAIE:  Your Honor, Ms. Cho has reminded me that

22   pursuant to the deadlines that we have requested in connection

23   with the solicitation procedures and the disclosure-statement

24   motion the motion contemplates a confirmation hearing for

25   December 17th.

 1          And backing us off, that gets us to sending out

 2     solicitation materials on November 5th.  Obviously, that may be

 3     difficult to do considering the number of changes.

 4          THE COURT:  Well, aren't these deadlines all

 5     self-imposed deadlines?

 6          MS. LAHAIE:  To some extent, your Honor.

 7          THE COURT:  All right.

 8     (Colloquy not on the record.)

 9          THE COURT:  And I appreciate that they were made in

10     good faith in connection with my calendar, but the reality is

11     it makes no sense to -- I mean, I was thinking to do

12     November 16th for coming back on the disclosure statement.

13          And, finally, a final approval of that would give you,

14     gee, almost two weeks to clean it up, and then we could now

15     move to -- we could move confirmation to if you want the last

16     week of December or the first week of January.

17          MS. LAHAIE:  That would be ideal, your Honor.  We are

18     looking to go effective in January.  So if we could keep it in

19     December --

20          THE COURT:  Okay.

21          MS. LAHAIE:  -- that would be --

22          THE COURT:  All right.  So December 16th will be the

23     continued disclosure-statement hearing.  Please get me a

24     revised disclosure statement by noon on the 12th and give a

25     copy to Ms. Marshall as well.

1        I'm not going to require you to resend out any

2   proposed disclosure statements.  I do want to see all the

3   exhibits.

4            MS. LAHAIE:  We'll do, your Honor.

5            THE COURT:  And, again, I think rather than doing

6   plan supplements it's better to put it in your disclosure

7   statement.

8        But, you know, I don't want to infringe too much on the

9   lawyers' job, and I apologize in that regard, so whatever you

10  think is best.  I'm just trying to think from a standpoint of

11  ease of understanding and reading it.

12       And then, oh, you've got to make a decision about the --

13  you've got the issue about the 1111(b) election because,

14  arguably, that election has to be made by the conclusion of the

15  hearing of the disclosure statement.

16       You should look at whether or not you need to comply with

17  that, and, again, it's one of those things where nobody

18  understands it, anyway, and, secondly, I don't why it would

19  make a difference in this case, but it's there.

20            MS. LAHAIE:  We'll take a look, your Honor.

21            THE COURT:  Okay.

22       (Colloquy not on the record.)

23            THE COURT:  And then we'll move confirmation.  It's

24  now set for December 17th.  Would you like December 28th?

25  That's the Monday after Christmas or how about the 29th?

1          MS. LAHAIE:  Your Honor, either date works for me.  I

2    defer to Mr. Dublin on the phone as to his schedule.

3          MR. DUBLIN:  Your Honor, the 29th will be preferable.

4          THE COURT:  Okay.  The 29th, then.

5          MR. DUBLIN:  At what time, your Honor?

6          THE COURT:  Let's just say 9:00 o'clock or would you

7    prefer 9:30 for flights, et cetera?

8          MR. DUBLIN:  We'll probably come in the day before,

9    your Honor.

10          THE COURT:  Okay.  All right.

11          MR. DUBLIN:  So it's your preference.

12          THE COURT:  Let's say 9:00 o'clock.  It will give us

13    the whole day because the problem is the next day is my motion

14    calendar.

15       And I would have the 31st, but I can't imagine anybody

16    wants -- yeah.  I get you all here for New Year's.  We got to

17    do something with the economy.

18       (Colloquy not on the record.)

19          THE COURT:  You all have to promise to buy a condo,

20    though, if you stay.

21       (Colloquy not on the record.)

22          THE COURT:  You can buy (indiscernible).  Well, the

23    CityCenter should be open that day.  You can all buy five or

24    six condos that day.  All right.  And I recognize we may have

25    to move these dates, but we'll aim for those dates.  Okay?

1          MS. CHO:  Your Honor, a housekeeping matter.  We had

2    originally scheduled December 17th as an omnibus hearing date.

3    Would you like to keep that date or --

4          THE COURT:  Do we have --

5          MS. CHO:  -- should we move --

6          THE COURT:  -- anything now on that date for that

7    date?

8          MS. CHO:  I don't believe so.

9          THE COURT:  Let's move it, then.

10         MS. CHO:  Okay.

11         THE COURT:  Oh, you know what?  Let's keep it.  I'll

12   tell you why.  Maybe you'll have some little things that you

13   have to resolve or objections or something, so we'll keep it.

14   Trust me, if there's nothing on, that's fine with me.

15      (Colloquy not on the record.)

16         MS. CHO:  So Mr. Beckett's reminding me that we

17   probably will have the second interim fee application --

18         THE COURT:  Oh, right.

19         MS. CHO:  -- set for that date, so --

20         THE COURT:  Okay.

21         MR. DUBLIN:  Your --

22         THE COURT:  All right.

23         MR. DUBLIN:  Your Honor --

24         THE COURT:  Yes.

25         MR. DUBLIN:  -- I'm sorry to interrupt.

1           MR. DUBLIN:  I just got a note that one of the people

2     that will need to be at the hearing can't do the 29th.  Is it

3     possible to move it to the first week of January?

4           THE COURT:  Yes.  I could probably give you

5     January 5th.  I could give you January 4th.  I can't imagine

6     you'd want that, the Monday after the holiday, because travel's

7     impossible.  I can give you the 5th.  I'll move a trial.  I can

8     give you the 8th.

9           MR. DUBLIN:  The 5th would be preferable, your Honor.

10          THE COURT:  Okay.

11          THE CLERK:  Your Honor, did you want to do that at

12    9:00 o'clock as well?

13          THE COURT:  Yeah.  We'll do it at 9:00 o'clock as

14    well.

15       So we'll keep the December 17th date.  We will not have

16    court on the 29th.  We will have it on January 5th absent

17    further need to change those deadlines.

18          MS. LAHAIE:  And, your Honor, for November 16th, are

19    we at 1:30 or 9:00?

20          THE COURT:  Let's see what -- 9:30 we have, and I had

21    to set -- well, I just set -- did I set Consolidated for that

22    day?

23          THE CLERK:  For --

24          THE COURT:  When the Consolidated people are coming

25    back.  When are they coming back?

```
 1              THE CLERK:  They're coming back on --

 2              THE COURT:  Yes.  They're coming back at 10:00.

 3        You know what?  Let's move it.

 4              THE CLERK:  (Indiscernible).

 5              THE COURT:  Yeah.  I had to put somebody on at 10:00

 6   on the 16th because I didn't think you were going to take long.

 7   They couldn't do a 1:30.

 8        Would you prefer to move your omnibus hearings to 1:30

 9   that day, so you have a little more time or you -- it may not

10   take us long, but I only have a half hour.

11              MS. CHO:  Your Honor, with respect to December 17th?

12              THE COURT:  No.  November 16th.

13              MS. CHO:  Oh, November 16th at 1:30?

14              THE COURT:  Yeah.  Is that all right for everyone?

15   We now have one matter, but you can just notice them that it's

16   going to be at 1:30.

17        I had to put somebody on at 10:00 thinking you would only

18   have one matter, so this will give you lots of time in case

19   there's any final drafts or anything.

20              MS. CHO:  From the debtor's perspective, it would be

21   preferable, so we could fly in that morning, so --

22              THE COURT:  Yeah.  Okay.  So 1:30, then, instead of

23   9:30, and I'll give you then 'til 5:00 o'clock on the 12th

24   (indiscernible) disclosure statement, then, because I'll have

25   that morning.  Well, I won't now, will I?  The earlier the
```

1    better.  5:00 o'clock at the latest.

2              MS. CHO:  Okay.

3              THE COURT:  All right?  Anything else?  Thank you

4    very much.

5              MS. LAHAIE:  Thank you, your Honor.

6              MS. CHO:  Thank you, your Honor.

7              THE COURT:  Um-h'm.

8              THE CLERK:  All rise.

9              THE COURT:  And if you need these exhibits back,

10   we'll --

11             MS. LAHAIE:  Yeah.  (Indiscernible).

12             THE COURT:  Um-h'm.

13             MS. LAHAIE:  Yes, your Honor.

14             THE COURT:  Oh, thank you.

15        (Court concluded at 02:40:09 p.m.)

16

17

18

19

20

21

22

23

24

25

1       I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                          11/03/09

7    _____              _____
     Lisa L. Cline, Transcriptionist              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25