# EXHIBIT J

EXHIBIT J

## Exhibit J

**Newco LLC Operating Agreement**

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

# PRELIMINARY DRAFT AGREEMENT – SUBJECT TO CONTINUING AMENDMENT AND REVIEW

[NEWCO], LLC

(A DELAWARE LIMITED LIABILITY COMPANY)

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

JANUARY [_____], 2010

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## TABLE OF CONTENTS

Page

Section 1.    Definitions; Rules of Construction. ............................................................1

Section 2.    Name; Company History; Bylaws; Schedule of Members; Capital
Contributions.................................................................................................2

Section 3.    Purpose; No Termination. ..............................................................................3

Section 4.    Offices.............................................................................................................3

Section 5.    Management of the Company; Board of Managers.................................3

Section 6.    Company Actions Requiring Approvals. ...................................................5

Section 7.    Authorized Units; Preemptive Rights. ........................................................7

Section 8.    Conversion Rights of Class B Units. ...........................................................9

Section 9.    Voting Rights. ...............................................................................................10

Section 10.   Representations by Members Upon Acquisition or Receipt of Units. ..................10

Section 11.   Distributions Generally. ..............................................................................12

Section 12.   Discretionary and Liquidating Distributions. ..........................................12

Section 13.   Tax Distributions..........................................................................................12

Section 14.   Distributions In Kind. ..................................................................................13

Section 15.   Capital Accounts. .........................................................................................13

Section 16.   Book Allocations of Net Profit and Net Loss. .........................................13

Section 17.   Special Book Allocations. ...........................................................................14

Section 18.   Tax Allocations. ...........................................................................................15

Section 19.   Liability for Return of Capital. ...................................................................15

Section 20.   Tax Reports and Elections. .........................................................................16

Section 21.   Transfer Restrictions. ..................................................................................18

Section 22.   Withdrawal....................................................................................................20

Section 23.   Additional Members. ...................................................................................20

Section 24.   Dissolving Events. .......................................................................................21

Section 25.   Dissolution and Winding-Up. ....................................................................21

Section 26.   Distributions in Cash or in Kind Upon Dissolution...............................21

Section 27.   Termination Upon Dissolution...................................................................22

i

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Section 28.    Information Rights; Observer Rights; Confidentiality; Other Restrictive Covenants...................................................................................................22

Section 29.    Registration Rights....................................................................................23

Section 30.    Exculpation and Indemnification................................................................23

Section 31.    Insurance....................................................................................................25

Section 32.    Competitive Opportunity............................................................................25

Section 33.    Notices.......................................................................................................26

Section 34.    Amendments...............................................................................................26

Section 35.    Certain Members........................................................................................27

Section 36.    Management Members' Services.................................................................27

Section 37.    No Conflicting Agreements........................................................................27

Section 38.    Entire Agreement.......................................................................................27

Section 39.    Governing Law; Jurisdiction, Waiver of Jury Trial...................................28

Section 40.    No Third Party Beneficiaries......................................................................28

Section 41.    Further Assurances.....................................................................................28

Section 42.    Counterparts...............................................................................................29

Section 43.    Separability of Provisions..........................................................................29

Section 44.    Spousal Consent.........................................................................................29

Section 45.    Recapitalizations, Exchanges, Splits, Etc..................................................29

Section 46.    Remedies....................................................................................................30

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

<u>Annex, Schedules and Exhibits</u>

**Annex**

Annex I          –     Definitions

**Schedules**

Schedule I        –     Schedule of Members and Unit Ownership

**Exhibits**

Exhibit A         –     Bylaws of the Company

Exhibit B         –     Joinder Agreement

Exhibit C         –     Spousal Consent

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

# PRELIMINARY DRAFT AGREEMENT – SUBJECT TO CONTINUING AMENDMENT AND REVIEW

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**, dated as of [          ], 2010 (this "Agreement"), of [Newco], LLC, a Delaware limited liability company (the "Company"), among the Company and the parties listed on Schedule I hereto from time to time.

**WHEREAS**, the parties hereto are entering into this Agreement for the purpose of governing the affairs of, and the conduct of the business of, a limited liability company formed pursuant to the provisions of the Delaware Limited Liability Company Act, codified in the Delaware Code Annotated, Title 6, Section 18-101, et seq., as the same may be amended from time to time (the "Delaware Act").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as set forth below.

**Section 1.**　　**Definitions; Rules of Construction.**

(a)　　Capitalized terms used in this Agreement are defined in Annex I hereto.

(b)　　The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require.

(c)　　Except when the context requires otherwise, any reference in this Agreement to a singular number shall include the plural.

(d)　　Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not so followed.

(e)　　All references to "$" or dollar amounts are to lawful currency of the United States of America, unless otherwise expressly stated.

(f)　　Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope or intent of this Agreement or of any of its provisions. All references in this Agreement to any numbered Sections are, unless otherwise indicated, references to the Sections of this Agreement which are so numbered.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

All references to the numbered or lettered Exhibits are references to the Exhibits so numbered or lettered which are appended to this Agreement, as such Exhibits may be amended, supplemented or otherwise modified from time to time.  Such references to Exhibits are to be construed as incorporating by reference the contents of each Exhibit to which such reference is made as though such contents were set out in full at the place in this Agreement where such reference is made.

**Section 2.    Name; Company History; Bylaws; Schedule of Members; Capital Contributions.**

(a)    The name of the Company shall be "[Newco], LLC" or such other name as the Board of Managers may from time to time hereafter designate; provided, however, that any such name shall comply with the Delaware Act.

(b)    The Company was formed upon the execution and filing by [_____] (such Person being hereby authorized to take such action) with the Secretary of State of the State of Delaware of a certificate of formation (the "Certificate") of the Company on [_____], 2009. The parties hereto ratify and confirm the filing of the Certificate.

(c)    The bylaws of the Company attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time, the "Bylaws") are hereby adopted and approved by the Members.

(d)    This Agreement (including the definitions set forth in Annex I hereto) and the Bylaws are intended to serve as a "limited liability company agreement," as such term is defined in Section 18-101(7) of the Delaware Act.

(e)    The name and business, mailing or residence address of each of the Members of the Company are set forth on Schedule I hereto.  The Board of Managers shall amend Schedule I from time to time to accurately reflect the names and business, mailing or residence addresses of each of the Members and each of the Persons who shall become Members after the Effective Date.  Any Person (other than a Member on the Effective Date) who holds Units in accordance with the terms hereof shall execute and deliver to the Company a Joinder Agreement, substantially in the form of Exhibit B hereto, pursuant to which such Person will thereupon become a party to and be bound by and obligated to comply with all of the terms and provisions of this Agreement.

(f)    Capital Contributions.  No Member shall be obligated to make any Capital Contributions to the Company.  Subject to the approval of the Board of Managers and the other terms of this Agreement, the Members may make additional Capital Contributions to the Company from time to time through the purchase of additional Units.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 3.**    <u>**Purpose; No Termination.**</u>

(a)    The purpose of the Company shall be to engage in any lawful business activities that may be engaged in by a limited liability company organized under the Delaware Act, as such business activities may be determined by the Board of Managers from time to time.

(b)    No Member's death, status as a debtor in a bankruptcy case, disability, resignation, retirement or other termination of employment with the Company or any Affiliate thereof shall result in the dissolution, winding up or termination of the Company.

**Section 4.**    <u>**Offices.**</u>

(a)    The principal office of the Company, and such additional offices as the Board of Managers may establish, shall be located at such place or places inside or outside the State of Delaware as the Board of Managers may designate from time to time. The initial principal office of the Company is set forth in <u>Section 33(a)(i)</u>.

(b)    The registered office of the Company in the State of Delaware shall be 1209 Orange Street, Wilmington, Delaware 19801 or as hereafter determined by the Board of Managers in accordance with Delaware Act. The registered agent of the Company for service of process at such address shall be The Corporation Trust Company or as hereafter determined by the Board of Managers in accordance with Delaware Act.

**Section 5.**    <u>**Management of the Company; Board of Managers.**</u>

(a)    Subject to the delegation of rights and powers provided for herein and in the Bylaws, the Board of Managers shall have the sole right to manage the business and affairs of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company. The Board of Managers shall consist initially of five (5) Managers, appointed from time to time in accordance with this Agreement and the Bylaws. Notwithstanding the foregoing, upon the affirmative vote of a majority of the Board of Managers, the chief executive officer or the senior representative of the Operations Manager, if any, may be appointed as a sixth Manager. Each Manager shall have one vote with respect to any matters that come before the Board of Managers. Each Member agrees to vote all of his Units on matters subject to the vote of such Member and to take all other necessary or desirable actions within his control (whether in such Member's capacity as a Member or otherwise, and including, without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company will, as promptly as practicable, take all necessary and desirable actions within its control (including, without limitation, calling special meetings of the Board of Managers and the Members), so that each Manager on the Board of Managers shall be elected from nominees determined, or removed as directed, as follows:

(i)    For so long as the Highland Managed Funds collectively continues to own at least 15.0% of the outstanding Units (excluding any Securities of the Company

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services), the Highland Managed Funds shall be entitled (A) to nominate one individual to the Board of Managers to serve as Manager (the "Highland Manager") until his successor is elected and qualified, (B) to nominate each successor to the Highland Manager and (C) to direct the removal from the Board of Managers of the Highland Manager nominated under the foregoing clauses (A) and (B).

(ii)     For so long as Credit Suisse Loan Funding and Credit Suisse SWAP continue to own, in the aggregate, at least 15.0% of the outstanding Units (excluding any Securities of the Company issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services), Credit Suisse Loan Funding and Credit Suisse SWAP, collectively, shall be entitled (A) to nominate one individual to the Board of Managers to serve as Manager (the "Credit Suisse Manager") until his successor is elected and qualified, (B) to nominate each successor to the Credit Suisse Manager and (C) to direct the removal from the Board of Managers of the Credit Suisse Manager nominated under the foregoing clauses (A) and (B).

(iii)     For so long as CSAM and Candlewood continue to own, in the aggregate, at least 15.0% of the outstanding Units (excluding any Securities of the Company issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services), CSAM and Candlewood, collectively, shall be entitled (A) to nominate one individual to the Board of Managers to serve as Manager (the "CSAM Manager") until his successor is elected and qualified, (B) to nominate each successor to the CSAM Manager and (C) to direct the removal from the Board of Managers of the CSAM Manager nominated under the foregoing clauses (A) and (B).

(iv)     The remaining Managers, and, to the extent that any of the Highland Managed Funds, Credit Suisse Loan Funding, Credit Suisse SWAP, CSAM or Candlewood loses its right to appoint a Manager pursuant to the above provisions, the relevant board seat(s), will thereafter be designated for nomination and election, and such Managers may be removed by an affirmative vote of the Members holding at least a majority of the outstanding Class A Units (excluding any Member who has the right to nominate a Manager pursuant to paragraphs (i) through (iii) above for so long as such Member has such right). Any Manager appointed pursuant to this Section 5(a)(iv) shall not be an Affiliate of any Member and the qualifications, experience, integrity, independence and disinterestedness of any such Manager shall be satisfactory to the Members holding at least a majority of the outstanding Class A Units (excluding any Member who has the right to nominate a Manager pursuant to paragraphs (i) through (iii) above for so long as such Member has such right).

(b)     Except to the extent any Member loses its rights to nominate a Manager as set forth in Section 5(a), (i) no Manager elected pursuant to Section 5(a)(i), (ii) or (iii) may be removed without the consent of the Member who is entitled to nominate such individual as a

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Manager pursuant this Agreement, (ii) such Manager may only be removed at the direction of the party that was entitled to nominate such Manager and (iii) the vacancy created by any former Manager may only be filled by a nominee of the party that was entitled to nominate such former Manager.

(c)    Subject to the foregoing, in the event a vacancy is created on the Board of Managers by reason of the death, disability, resignation or termination (with cause or without cause) of any Manager, each of the Members hereby agrees that such vacancy shall be filled in accordance with the procedures set forth in this <u>Section 5</u>.

(d)    The Company shall reimburse each Manager for all necessary and proper costs and expenses (including reasonable and properly documented travel, lodging and meal expenses) incurred in connection with such Manager's attendance and participation at meetings of the Board of Managers to the extent not otherwise reimbursed by the Company or any of its Subsidiaries by virtue of the status of such Manager as an employee or service provider of the Company or any of its Subsidiaries.

(e)    The nominees designated in <u>Section 5(a)</u> will be elected as Managers at any annual or special meeting of the Members (or by written consent in lieu of a meeting of the Members) and will serve until their successors are duly elected and qualified pursuant to the terms of this Agreement and the Bylaws or until their earlier death, disability, resignation, termination (with cause or without cause) or other removal.  The Members will vote all of their Units in order to elect or remove the Managers as designated pursuant to <u>Section 5(a)</u>.

(f)    No Member, by reason of such Member's status as a Member, shall have any authority to act for or bind the Company but shall have only the right to vote on or approve the actions to be voted on or approved by such Member as specified in this Agreement or the Bylaws or as required under the Delaware Act.

(g)    The officers of the Company shall be elected, removed and perform such functions as are provided in the Bylaws.  The Board of Managers may delegate to any officer of the Company or to any such other Person such authority to act on behalf of the Company as the Board of Managers may from time to time deem appropriate in its sole discretion.

Section 6.    <u>**Company Actions Requiring Approvals.**</u>

(a)    Without the affirmative vote of (x) the Board of Managers and (y) Members owning at least a majority of the then outstanding Units, voting together as a single class, the Company shall not, and shall cause each of its Subsidiaries not to, take any of the following actions:

(i)    sell, transfer or otherwise dispose of any asset of the Company or any of its Subsidiaries for consideration in excess of $20,000,000;

(ii)    sell, transfer or otherwise dispose of the Rhodes Ranch master planned community for consideration in excess of $[60,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Rhodes Ranch master planned community);

(iii)    sell, transfer or otherwise dispose of the Tuscany master planned community for consideration in excess of $[40,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Tuscany master planned community);

(iv)    enter into any recapitalization, reorganization, consolidation or merger of the Company or sell all or substantially all of the consolidated assets of the Company, in each case, for consideration in excess of $[100,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior recapitalizations, reorganizations, consolidations or asset sales); or

(v)    agree to any of the foregoing.

(b)    Without the prior approval of (x) the Board of Managers and (y) Members owning at least 66.66% of the then outstanding Units, voting together as a single class, the Company shall not, and shall cause each of its Subsidiaries not to, take any of the following actions:

(i)    except as otherwise set forth in <u>Section 5(a)</u>, increase or decrease the size of the Board of Managers;

(ii)    except for transactions between the Company and its Subsidiaries, enter into any transaction with any Affiliate of a Member or any Affiliate of an officer or manager of the Company or its Subsidiaries (other than in the ordinary course of business on commercially reasonable terms no less favorable to the Company and its Subsidiaries than what a third-party negotiating on an arms-length basis could reasonably expect);

(iii)    change the nature of the Company's or its Subsidiaries' primary business;

(iv)    incur any indebtedness other than (A) in the ordinary course of business, (B) the New First Lien Notes and (C) indebtedness permitted to be incurred under the New First Lien Notes;

(v)    create, authorize or issue, or grant any options, warrants, or other rights to purchase or obtain any Units of the Company ranking pari passu with or senior to the Units as to dividends or liquidation preference, or modifying any of the rights of any class or series of Units;

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(vi)     enter into any transaction or series of transactions to effect the liquidation, dissolution or winding up of the Company;

(vii)    enter into a transaction providing for the use of any parcel of real property owned by the Company, other than for the development of residential homes and communities and commercial development currently contemplated by the Company's business plan as of the Effective Date;

(viii)   sell, transfer or otherwise dispose of the Rhodes Ranch master planned community for consideration less than $[60,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Rhodes Ranch master planned community);

(ix)     sell, transfer or otherwise dispose of the Tuscany master planned community for consideration less than $[40,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Tuscany master planned community);

(x)      enter into any recapitalization, reorganization, consolidation or merger or sell all or substantially all of the assets of the Company, in each case for consideration less than $[100,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior recapitalizations, reorganizations, consolidations or asset sales);

(xi)     make any investments in, or acquire the Securities of, any Person (other than wholly-owned Subsidiaries of the Company having no material assets);

(xii)    purchase, redeem or otherwise acquire for value (or pay into or set aside a sinking fund for such purpose) Securities of the Company (other than any Securities owned by any employee of the Company upon such employee's termination of employment);

(xiii)   agree to become liable for any indemnification obligation that is out of the ordinary course of business, including without limitation, any indemnification obligation in connection with the environmental condition of any parcel of real property owned by the Company or any of its Subsidiaries and sold out of the ordinary course of business; or

(xiv)    agree to any of the foregoing.

**Section 7.**     **Authorized Units; Preemptive Rights.**

(a)     <u>Authorized Units</u>.  The Company shall be authorized to issue from time to time up to an aggregate of 125,000 Units, consisting of two classes of Units, as follows: (i) 100,000 Class A Units and (ii) 25,000 Class B Units.  Each authorized Unit may be issued

7

pursuant to such agreements and on such terms (including valuation and pricing) as the Board of Managers shall approve. In addition, the Company may reissue any Units that have been repurchased by the Company. The Board of Managers shall have the right to increase the number of authorized Units from time to time. Fractional Units may be issued.

(b)     Preemptive Rights. After the Effective Date and prior to any IPO or Sale of the Company, other than in the case of issuances or grants of any Excluded Securities, the Company shall not (x) issue additional Units, warrants and/or any other Securities of the Company convertible into or exchangeable for Units to any Person or (y) issue any debt to any Member of the Company or any of its Affiliates ((x) and (y) hereinafter referred to as "New Securities"), in each case, other than in accordance with the following terms:

(i)     The Company shall not issue any New Securities unless it first delivers to each Member who holds Units and is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) (each such Person, a "Buyer"), a written notice ("Notice of Proposed Issuance") specifying the type, total number and all the material terms of such New Securities that the Company then intends to issue, and stating that the Buyer shall have the right to purchase the New Securities in the manner specified in this Section 7(b) for the same price per New Security and in accordance with the same terms and conditions specified in such Notice of Proposed Issuance.

(ii)     During the ten Business Day period commencing on the date the Company delivers to the Buyers the Notice of Proposed Issuance ("Exercise Period") in accordance with Section 7(b)(i), the Buyers shall have the right (but not the obligation), to purchase New Securities at the same price per New Security and upon the same terms and conditions specified in the Notice of Proposed Issuance. Each Buyer electing to purchase New Securities must give irrevocable written notice of its election to the Company prior to the expiration of the Exercise Period, and if a Buyer has not provided such irrevocable notice within the Exercise Period, such Buyer shall be deemed to have waived and rejected its right to purchase New Securities. If the New Securities are being offered as part of an investment unit together with debt or other instruments, any election by a Buyer to purchase New Securities shall also constitute an election to purchase a like portion of such debt or other instruments.

(iii)     Each Buyer shall have the right to purchase its Pro Rata Portion of New Securities.

(iv)     If some or all of the New Securities have not been purchased by the Buyers pursuant to paragraphs (i)-(iii) of this Section 7(b), then the Company shall offer such remaining New Securities to any of the Buyers who have exercised their right to purchase their respective full Pro Rata Portion of the New Securities and have indicated a desire to purchase any unsubscribed New Securities. If some or all of the New Securities have not been purchased by the Buyers pursuant to paragraphs (i) – (iii) of this Section 7(b) and the immediately prior sentence, then the Company shall have the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

right to issue such remaining New Securities to one or more parties at not less than, and on terms no more favorable to the buyers thereof than, the price and other terms specified in the Notice of Proposed Issuance. If such issuance or sale is not closed within 90 days after the expiration of the Exercise Period the Company shall not thereafter issue or sell any New Securities, without first again offering such New Securities to the Members in the manner provided in this Section 7(b).

(v)    The Notice of Proposed Issuance shall specify the place, time and date of the consummation of the purchase of the New Securities.

(vi)    If any Class A Units are included in the New Securities, each Member shall have the right to elect to purchase Class B Units in lieu of Class A Units on identical terms as offered with respect to the Class A Units.

(vii)    Nothing in Section 7(b) or any other provision of this Agreement shall prevent the Company from issuing or selling to any Person any New Securities without first complying with the provisions of Section 7(b); provided, that in connection with such issuance or sale (a) the Company gives reasonably prompt notice to the other Members of such investment (prior to such investment having occurred), which notice shall describe in reasonable detail the New Securities being purchased by the Person making such purchase (for purposes of this Section 7, the "Purchasing Member") and the purchase price thereof and (b) the Purchasing Member and the Company enable the other Members to effectively exercise their respective rights under Section 7(b) with respect to their purchase of their Pro Rata Portion of the New Securities issued to the Purchasing Member within 45 days after such purchase by the Purchasing Member on the terms specified in Section 7(b).

### Section 8.    Conversion Rights of Class B Units.

At any time and from time to time after the Effective Date, each Class B Unit shall be convertible, at the option of the holder thereof, at the principal office of the Company, into an equal number of validly issued, fully paid and nonassessable Class A Units. Before any holder of Class B Units shall be entitled to convert the same into Class A Units pursuant to this Section 8, such holder shall give written notice to the Company at its principal office, of the election to convert the same. The Company shall, as soon as practicable thereafter, issue to such holder of Class B Units, an acknowledgment of registration for the number of Class A Units to which such holder shall be entitled as aforesaid and shall amend Schedule I hereto to reflect such conversion. The issuance of Class A Units upon conversion of the Class B Units shall be made without charge to the holders of Class B Units. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of receipt of notice thereof, and the Person entitled to receive the Class A Units issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Class A Units as of such date.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 9.**     <u>Voting Rights.</u>

On any matter to be voted on by the Members hereunder, each Member shall have one vote for each Class A Unit held by such Member and the holders of Class B Units shall have no voting rights, other than as specifically set forth in <u>Section 6</u>, <u>Section 21(c)</u> and <u>Section 34</u>.

**Section 10.**     <u>Representations by Members Upon Acquisition or Receipt of Units.</u>

Upon the acquisition or receipt of any Units, in addition to any other representations and warranties set forth in any other document required by the Board of Managers with respect to such acquisition or receipt, each Member makes the representations and warranties set forth below to the Company and the other Members with respect to such Units, effective upon the acquisition or receipt thereof and upon such Member's execution and delivery of a counterpart hereof or such other document required by the Board of Managers.

(a)     Such Member is acquiring the Units for his own account, for investment and not with a view to the Distribution thereof or any interest therein in violation of the Securities Act or applicable state securities laws.

(b)     Such Member understands that (i) the Units have not been registered under the Securities Act by reason of their issuance by the Company in a transaction exempt from the registration requirements of the Securities Act and Applicable Law and (ii) the Units must be held by such Member indefinitely unless a subsequent Transfer thereof is registered under the Securities Act and Applicable Law or is exempt from such registration.

(c)     Such Member further understands that the exemption from registration afforded by Rule 144 (the provisions of which are known to such Member) promulgated under the Securities Act ("<u>Rule 144</u>") depends on the satisfaction of various conditions, and that, if applicable, Rule 144 may afford the basis for sales of the Units acquired hereunder in limited amounts.

(d)     Such Member (i) is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) or (ii) has a pre-existing personal or business relationship with the Company, its Subsidiaries or certain members of the Board of Managers or officers of the Company which is of a nature and duration sufficient to make such Member aware of the character, business acumen and general business and financial circumstances of the Company, and/or such Members or the Board of Managers or officers of the Company, if any.

(e)     The Company has made available to such Member or its representatives all agreements, documents, records and books that such Member has requested relating to an investment in the Units being acquired by the Member. Such Member has had an opportunity to ask questions of, and receive answers from, Persons acting on behalf of the Company, concerning the terms and conditions of this investment, and answers have been provided to all of such questions to the full satisfaction of such Member. Such Member has such knowledge and

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

experience in financial and business matters that it is capable of evaluating the risks and merits of this investment and to suffer a complete loss of its investment.

(f)    Such Member has no need for liquidity in its investment in the Units. Such Member can bear the economic risk of investment in the Units and has such knowledge and experience in financial or business matters to be capable of evaluating the merits and risks of the investment in the Units. Such Member has consulted with its professional, tax and legal advisors with respect to the federal, state, local and foreign income tax consequences of such Member's participation as a Member of the Company.

(g)    Such Member understands that there is no public market for the Units and that the transferability of the Units is restricted.

(h)    The execution, delivery and performance of this Agreement by such Member has been duly authorized. This Agreement has been duly executed and delivered by such Member and (assuming the valid authorization, execution and delivery of this Agreement by the other parties hereto) is the legal, valid and binding agreement of such Member, enforceable against such Member in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

(i)    Such Member has not granted and is not a party to any proxy, voting trust or other agreement which is inconsistent with or conflicts with the provisions of this Agreement without the prior written consent of the Board of Managers.

(j)    The execution, delivery and performance by such Member of this Agreement, the consummation of the transactions contemplated hereby, and the compliance by such Member with the provisions hereof will not (i) conflict with or result in a breach of any provision of the certificate of incorporation, bylaws, operating agreement, formation agreement, partnership agreement or any other organizational document of such Member, as applicable, (ii) violate or conflict with or constitute (with notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any encumbrance upon such Member's Units pursuant to, the terms, conditions or provisions of any contract, note, bond, lease, mortgage, indenture, license, agreement or other instrument or obligation to which such Member is a party or by which such Member or such Member's properties or assets are bound or (iii) violate any provision of Applicable Law or any order, judgment, award, writ, injunction or decree applicable to such Member or any of such Member's properties or assets.

(k)    No permit, authorization, consent or approval of or by, or notification of or filing with, any Person is required in connection with the execution, delivery or performance by such Member of this Agreement.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

### Section 11.     Distributions Generally.

Any Distributions of cash or other assets by the Company to Members shall be made in accordance with <u>Section 11</u> through <u>Section 14</u>. Available cash shall be distributed, at such times and in such amounts as the Board of Managers determines in its discretion. Notwithstanding any other provision hereof, the Company shall cause its Subsidiaries to distribute or otherwise transfer to the Company, to the fullest extent possible within the limits imposed by Applicable Law, the cash or cash equivalents necessary for the Company to make the Distributions to be made hereunder.

### Section 12.     Discretionary and Liquidating Distributions.

(a)     Subject to the other provisions of <u>Section 11</u> through <u>Section 14</u>, in the discretion of the Board of Managers, the Company may distribute available cash from time to time to the holders of Units in accordance with their Pro Rata Portion.

(b)     Notwithstanding anything to the contrary contained herein, the Company may issue from time to time, pursuant to an equity incentive plan approved by the Board of Managers, additional units or Securities of the Company representing up to 10% of the economic value of the equity of the Company as equity incentives to employees, officers, managers, directors and/or consultants or service providers of the Company, and that such issuances will be dilutive to all Units proportionately.

### Section 13.     Tax Distributions.

To the extent of available cash and to the extent permitted by the Delaware Act, the Board of Managers shall cause the Company to make distributions to the Members to provide them with funds to pay applicable United States federal, state and local income tax liabilities attributable to Company income allocated to them pursuant to <u>Section 18</u> (calculated based on the Assumed Tax Rate taking into account any losses of the Company (including prior year losses) to the extent such losses are available under such income tax laws applicable to corporations to offset such income (or would be available if losses utilized against income other than Company income in prior years were instead carried forward to offset Company income in subsequent years) ("<u>Tax Distributions</u>"). Any Tax Distribution shall be made to all such Members, whether or not they are subject to United States federal, state and local income taxes, in the same proportions as the Company taxable income is allocated in accordance with <u>Section 18</u>. The Company shall make Tax Distributions quarterly based on the Board of Managers good faith calculation of such distribution. With respect to a Fiscal Year, the excess of (a) the aggregate quarterly Tax Distributions made to a Member, over (b) the amount of Tax Distributions that would be permitted to be made to a Member pursuant to this <u>Section 13</u> if only annual distributions were permitted, shall be treated as an advance of, and shall reduce, subsequent Tax Distributions which such Member would otherwise be entitled to receive pursuant to this <u>Section 13</u>.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 14.    Distributions In Kind.**

If the Company makes Distributions in kind, then (a) for purposes of making Distributions under <u>Section 12</u> hereof, the Distribution shall only be included in calculating the thresholds set forth in <u>Section 12</u> at such time as such Distribution in kind is converted to cash by sale or otherwise and (b) for all other purposes of this Agreement, the Distribution shall be treated as if the Company had sold such distributed property for cash in an amount equal to the Fair Market Value of such property and distributed such cash to the Members instead.

**Section 15.    Capital Accounts.**

A separate capital account (a "<u>Capital Account</u>") shall be established and maintained for each Member.  The initial Capital Account of each Member shall equal the amount next to such Member's name as shown on <u>Schedule I</u>[1]on the Effective Date.  As of the end of each Accounting Period, the balance in each Member's Capital Account shall be adjusted by (a) increasing such balance by such Member's (i) allocable share of Net Profit (allocated in accordance with <u>Section 16</u>) and (ii) the amount of cash and the Fair Market Value of any property (as of the date of the contribution thereof and net of any liabilities encumbering such property) contributed by such Member to the Company during such Accounting Period, if any, and (b) decreasing such balance by (i) the amount of cash and the Fair Market Value of any property (as of the date of the Distribution thereof and net of any liabilities encumbering such property) distributed to such Member during such Accounting Period and (ii) such Member's allocable share of Net Loss (allocated in accordance with <u>Section 16</u>).  Each Member's Capital Account shall be further adjusted with respect to any Special Book Allocations pursuant to <u>Section 17</u>.  The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b) and § 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  At no time during the term of the Company or upon dissolution and liquidation thereof shall a Member with a negative balance in its Capital Account have any obligation to the Company or the other Members to restore such negative balance, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 16.    Book Allocations of Net Profit and Net Loss.**

Except as otherwise provided in <u>Section 17</u> or elsewhere in this Agreement, Net Profit and Net Loss and to the extent necessary, individual items of income, gain or loss or deduction of the Company, shall be allocated among the Members in a manner such that the Capital Account of each Member, after giving effect to such allocation and the Special Book Allocations set forth in <u>Section 17</u>, is, as nearly as possible, equal (proportionately) to (a) the Distributions that would be made pursuant to <u>Section 12</u> (taking into account and treating as distributed any amounts set

---

[1]    To be equal to each Member's pro rata share of the purchase price/Fair Market Value of the assets on formation.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

aside with respect to Unvested Units) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Carrying Value (except that any Company asset that is realized in such Fiscal Year shall be treated as if sold for an amount of cash equal to the sum of any net cash proceeds and the Fair Market Value of any property actually received by the Company in connection with such disposition), all Company liabilities were satisfied (limited with respect to each non-recourse liability to the Carrying Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 12 to the Members immediately after making such allocation, minus (b) such Member's share of "partnership minimum gain" (as determined pursuant to Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d)) and partner nonrecourse debt minimum gain, computed immediately prior to the hypothetical sale of assets.  For purposes of the preceding sentence, "partner nonrecourse minimum gain" shall mean an amount, with respect to each "partner nonrecourse debt" (as defined in Treasury Regulations § 1-704-2(b)(4)), equal to the partner nonrecourse minimum gain that would result if the partner nonrecourse debt were treated as a nonrecourse liability pursuant to Treasury Regulations § 1.704-2(i)(3).

### Section 17.    Special Book Allocations.

(a)    Qualified Income Offset.  If any Member unexpectedly receives any adjustment, allocation or Distribution described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d) (4), (5) or (6) and such adjustment, allocation or Distribution causes or increases a deficit in such Member's Capital Account (a "Deficit"), items of gross income and gain for such Accounting Period and each subsequent Accounting Period shall be specifically allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit of such Member as quickly as possible; provided, that an allocation pursuant to this Section 17(a) shall be made only if and to the extent that such Member would have a Deficit after all other allocations provided for in Section 15 through Section 18 have been tentatively made as if this Section 17(a) were not in this Agreement.  This Section 17(a) is intended to comply with the qualified income offset provision of Treasury Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(b)    Special Allocations and Capital Account Maintenance.  Special allocations shall be made in accordance with the requirements set forth in the Treasury Regulations §§ 1.704-2(f), (g) and (j) (minimum gain chargeback), 1.704-1(g) (gross income allocation), 1.704-2(i)(2) (nonrecourse deductions), and to the extent that a Section 754 election is in effect, 1.704-1(b)(2) (iv)(m) (Section 754 adjustments).

(c)    Forfeitures.  In the event of a forfeiture of a Unit, such Unit and the Capital Account associated therewith, if any, shall be transferred (the "Forfeiture Transfer") to the other Members pro rata in accordance with Capital Accounts (the "Forfeited Unit Transferees").  If the Forfeiture Transfer gives rise to the receipt of taxable income to the Forfeited Unit Transferee pursuant to Section 83 of the Code in the year of the Forfeiture Transfer or any subsequent year, any deduction to which the Company is entitled pursuant to Section 83 of the Code as a result of such income receipt shall be allocated among the Members (other than the Forfeited Unit Transferee) in the taxable year of the Forfeiture Transfer and any

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

subsequent year in which the Forfeited Unit Transferee recognizes income as a result of the Forfeiture Transfer so as to minimize any income or gain required to be recognized by the Company as a result of the Forfeiture Transfer and any excess deduction shall be allocated to the Forfeited Unit Transferee or in such other manner as the Board of Managers deems to be appropriate to the extent permitted by law.

(d)    Restorative Allocations.  Any special allocations of items of income or gain pursuant to this Section 17 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount for any item so allocated and all other items allocated to each Member pursuant to this Agreement shall be equal, to the extent possible, to the net amount that would have been allocated to each Member pursuant to the provisions of this Agreement if such special allocations had not occurred.

(e)    For purposes of determining the Net Profit, Net Loss, or any other items allocable to any period, Net Profit, Net Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers, using any permissible method under Code Section 706 and the Regulations thereunder.

(f)    The Members are aware of the income tax consequences of the allocations made by Section 15, Section 16, Section 17, and Section 18 and hereby agree to be bound by the provisions of these Sections in reporting their share of Company income and loss for income tax purposes.

### Section 18.    **Tax Allocations.**

The income, gains, losses, credits and deductions recognized by the Company shall be allocated among the Members, for U.S. federal, state and local income tax purposes, to the extent permitted under the Code and the Treasury Regulations, in the same manner that each such item is allocated to the Members' Capital Accounts.  Notwithstanding the foregoing, the Board of Managers shall have the power to make such allocations for U.S. federal, state and local income tax purposes as may be necessary to maintain substantial economic effect, or to insure that such allocations are in accordance with the Members' interests in the Company, in each case within the meaning of the Code and the Treasury Regulations.  In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for U.S. federal income tax purposes and its Fair Market Value at the time of contribution by applying any permissible method selected by the Board of Managers.

### Section 19.    **Liability for Return of Capital.**

No Member or Manager shall have any liability for the return of any Member's Capital Contribution, which Capital Contribution shall be payable solely from the assets of the Company at the absolute discretion of the Board of Managers, subject to the requirements of the Delaware

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Act.  No Member, nor any successor-in-interest to any Member, shall have the right, while this Agreement remains in effect, to have the property of the Company partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the Company partitioned, and each of the Members, on behalf of itself and its successors, representatives and assigns, hereby irrevocably waives any such right.

### Section 20.    Tax Reports, Elections and Withholding.

(a)    No later than 90 calendar days after the end of each Fiscal Year, the Board of Managers shall cause the Company to furnish each Member a estimated IRS Schedule K-1, and not later than 270 calendar days after the end of each Fiscal Year, the Board of Managers shall cause the Company to furnish each Member the IRS Schedule K-1 and any similar form required for the filing of state or local income tax returns for such Member for such Fiscal Year. Upon the written request of any such Member and at the expense of such Member, the Company will use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any state, local and foreign income tax return that must be filed by such Member.

(b)    The Board of Managers shall determine, subject to Section 20(e), whether to make or revoke any available election pursuant to the Code.  Each Member will, upon request, supply the information necessary to give proper effect to any such election.

(c)    To the extent applicable, the Company hereby designates [_____] to act as the "Tax Matters Partner" (as defined in Section 6231(a)(7) of the Code) in accordance with Sections 6221 through 6233 of the Code and any similar provision of state, local or foreign tax Applicable Law.  The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith; provided, that the Tax Matters Partner may be removed and replaced by, and shall act in such capacity at the direction of, the Board of Managers.  Each Member agrees to cooperate with the Tax Matters Partner and to do or refrain from doing any or all things reasonably requested by the Tax Matters Partner with respect to the conduct of such proceedings.  Subject to the foregoing proviso, the Tax Matters Partner will have reasonable discretion to determine whether the Company (either on its own behalf or on behalf of the Member) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority.  Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member, and if paid by the Company, will be recoverable from such Member (including by offset against Distributions otherwise payable to such Member).

(d)    Except as otherwise required (i) by Applicable Law or (ii) as a result of an election by the Company to be classified as a corporation for Federal income tax purposes in anticipation of an IPO, (A) each of the Members and the Company shall take no action inconsistent with, and shall make or cause to be made all applicable elections with respect to (1) the treatment of the Company as a partnership for Federal income tax purposes and (2) the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

treatment of the Company as not a publicly traded partnership for Federal income tax purposes, and (B) neither the Company nor any Member on its behalf shall file an election to be excluded from Subchapter K of the Code.

(e)      <u>Elections with Respect to Issuance of Certain Compensatory Equity Interests</u>.

(i)      The Tax Matters Partner is hereby authorized and directed to cause the Company to make an election to value any interests issued by the Company as compensation for services to the Company (collectively, "<u>Compensatory Interests</u>") at liquidation value (the "<u>Safe Harbor Election</u>"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Treasury Regulations § 1.83-3(l) and IRS Notice 2005-43 (collectively, the "<u>Proposed Rules</u>"). The Tax Matters Partner shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

(ii)      Any such Safe Harbor Election shall be binding on the Company and on all of its Members with respect to all Transfers of Compensatory Interests thereafter made by the Company while a Safe Harbor Election is in effect.  A Safe Harbor Election once made may be revoked by the Tax Matters Partner as permitted by the Proposed Rules or any Applicable Law.

(iii)      Each Member (including any person to whom a Compensatory Interest is transferred in connection with the performance of services), by signing this Agreement or by accepting such Transfer, hereby agrees to comply with all requirements of the Safe Harbor Election with respect to all Compensatory Interests transferred while the Safe Harbor Election remains effective.

(iv)      The Tax Matters Partner shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to Transfers of Compensatory Interests covered by such Election.

(v)      The Board of Managers is hereby authorized and empowered to amend the Agreement as necessary to comply with the Proposed Rules or any rule, in order to provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member.  Any undertakings by the Members necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and to the extent so reflected shall be binding on each Member, respectively.

(vi)    Each Member agrees to cooperate with the Tax Matters Partner to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by the Tax Matters Partner.

(vii)    Costs and expenses incurred by the Tax Matters Partner in making and preserving (or if revoked, revoking) the Safe Harbor Election shall be paid by the Company.

(f)    The Company shall be entitled to deduct or withhold taxes as required by applicable law with respect to any amounts payable to any Member.  Any amounts so deducted or withheld shall be timely remitted to the applicable taxing authority and shall be treated as amounts otherwise distributed to the Member pursuant to Section 13 or, if applicable, Section 11 or Section 12, with respect to which such amounts were deducted or withheld.

### Section 21.    **Transfer Restrictions.**

(a)    Limitations on Transfers.  No Member shall be permitted to Transfer any Units held by such Member, except for (i) Permitted Transfers and (ii) Transfers made in accordance with this Section 21.

(b)    Transfer Prerequisites.  No Transfer of any Units shall become effective (i) unless prior written notice thereof has been delivered to the Board of Managers, (ii) unless such Transfer complies with subsections (b) through (d) of this Section 21, (iii) until the Transferee (unless already party to this Agreement) executes and delivers to the Company a Joinder Agreement in the form attached hereto as Exhibit B, (iv) if the Transfer will result in the number of partners hereunder being more than 100 within the meaning of Treasury Regulations §.1.7704-(h) (unless such Transfer is approved by the affirmative vote of the holders of at least 66.66% of the then outstanding Units), (v) until, upon request by the Board of Managers, an opinion of counsel, in form and substance reasonably satisfactory to the Board of Managers, is delivered to the Board of Managers, with respect to the compliance of the Transfer with Applicable Law and (vi) if the Board of Managers reasonably determines in good faith that such Transfer is to a direct or indirect competitor of the Company or its Subsidiaries.  Upon such Transfer and execution and delivery, the Transferee shall be bound by, and entitled to the benefits of, this Agreement with respect to the Transferred Units in the same manner as the Member effecting such Transfer.

(c)    Drag-Along Rights.

(i)    If Members representing the Drag-Along Threshold (collectively, the "Drag-Along Sellers") desire to effect a Sale of the Company (a "Drag-Along Sale"), the Drag-Along Sellers may require all Members to sell the same Pro Rata Portion of their respective Units as the Drag-Along Sellers desire to sell to any Transferee that is not affiliated with any Drag-Along Seller in such Drag Along Sale on the same terms and conditions as apply to those Units to be sold by the Drag-Along Sellers.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(ii)    Written notice of the Drag-Along Sale (the "<u>Drag-Along Sale Notice</u>") shall be provided by the Company to all holders of Units.  Such Drag-Along Sale Notice shall disclose in reasonable detail the number and class of Units to be subject to the Drag-Along Sale (the "<u>Drag-Along Securities</u>"), an estimate of the proposed price, the other proposed terms and conditions of the proposed Drag-Along Sale (including copies of the definitive agreements relating thereto, if available) and the identity of the prospective purchaser.

(iii)    With respect to any Drag-Along Sale, each Member agrees that it shall use its reasonable best efforts to effect the Drag-Along Sale as expeditiously as practicable, including delivering all documents necessary or reasonably requested in connection with such Drag-Along Sale, voting in support of such transaction and entering into any contract, instrument, undertaking or obligation necessary or reasonably requested in connection with such Drag-Along Sale (as specified in the Drag-Along Sale Notice).  Subject to the terms and conditions of this <u>Section 21(c)</u> and without limiting the generality of the foregoing, the Company and each Member shall take or cause to be taken all actions, and do, or cause to be done, on behalf and in respect of the Company any and all actions that may be reasonably requested consistent with this <u>Section 21(c)</u> in connection with any Drag-Along Sale.  In addition, each holder of Drag-Along Securities shall (A) pay its Pro Rata Portions of the reasonable expenses (if any) incurred by the Company in connection with such Drag-Along Sale; and (B) join on a pro rata basis (based on respective Pro Rata Portions), severally and not jointly, in any and all indemnification or other obligations that are specified in the Drag-Along Sale Notice, other than any such obligations which relate specifically and particularly to another holder such as indemnification with respect to representations and warranties given by a holder regarding such holder's title to and ownership of Units and other fundamental customary representations and warranties; <u>provided</u> that no holder shall be obligated under this clause in connection with such Transfer to agree to indemnify or hold harmless the Transferee with respect to an amount in excess of the net proceeds received by the holder in respect of such holder's Units in connection with such Drag-Along Sale.

(iv)    In the event of a Drag-Along Sale, each Member shall be required to Transfer such Units held by such holder as provided in the Drag-Along Sale Notice to the extent such Transfer is required under <u>Section 21(c)(i)</u> hereof.

(v)    Each Member acknowledges and agrees that it shall not be entitled to (and hereby waives any) appraisal, dissenter's or any similar rights in connection with any Drag-Along Sale.

(d)    <u>Co-Sale Rights</u>.

If any one or more Members (collectively, the "<u>Co-Sale Transferors</u>") propose to Transfer (other than a Permitted Transfer) Units representing 25% or more of the then outstanding Units to any Person (the "<u>Co-Sale Transferee</u>") in one transaction or a series of related transactions, the parties hereto shall comply with the following procedures:

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(i)  The Co-Sale Transferors shall, at least five Business Days before such proposed Transfer, deliver a written notice (a "Co-Sale Notice") to each other Member that (i) sets forth substantially the same information required in a Drag-Along Sale Notice pursuant to Section 21(c) and (ii) indicates that the Co-Sale Transferee has been informed of the co-sale rights provided for in this Section 21(d) and has agreed to purchase Units (the "Co-Sale Units") from the other Members in accordance with the terms hereof.

(ii)  The Co-Sale Transferors shall not Transfer any Units to the Co-Sale Transferee unless each of the other Members is permitted to Transfer simultaneously therewith a number of Units equal to his Pro Rata Portion of the aggregate number of Units to which the offer to the Co-Sale Transferors relates (A) at a price per Unit equal to the same price per Unit proposed to be paid to the Co-Sale Transferor for each Unit and (B) otherwise on the same terms and conditions.  To the extent one or more of Members exercise such right of participation in accordance with the terms and conditions set forth herein, the number of Units that each other Member, including the Co-Sale Transferors, may Transfer in such Transfer shall be reduced pro rata.

(iii)  Within five Business Days after delivery of the Co-Sale Notice, each Member may elect to participate in the proposed Transfer by delivering to the Co-Sale Transferors a notice (the "Tag-Along Notice") specifying the number of Units (up to his Pro Rata Portion) with respect to which such Member shall exercise his rights under this Section 21(d), and the number of Units to be Transferred to the Co-Sale Transferee by the Co-Sale Transferors shall be reduced accordingly.

(iv)  Any Units requested to be included in any Tag-Along Notice shall be Transferred at the price per Unit set forth in this Section 21(d) and otherwise on the same terms and conditions as are set forth in the Co-Sale Notice.

**Section 22.    Withdrawal.**

No Member shall have the right to withdraw from the Company except with the consent of the Board of Managers and upon such terms and conditions as may be specifically agreed upon between the Company and the withdrawing Member.

**Section 23.    Additional Members.**

The Board of Managers shall have the right to cause the Company to issue additional Units and to admit additional Members upon the issuance of such Units upon such terms and conditions, at such time or times, and for such Capital Contributions as shall be determined by the Board of Managers, subject to the limits set forth herein.  In connection with the admission of an additional Member or additional Capital Contributions, the Board of Managers shall amend Schedule I hereto to reflect the name and address of each additional Member and the amount of any additional Capital Contributions.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 24.    Dissolving Events.**

The Company shall be dissolved and its affairs wound up in the manner hereinafter provided upon the happening of any of the following events:

(a)    the Board of Managers and the Members, in accordance with Section 6(b)(vi), shall vote or agree in writing to dissolve the Company; and

(b)    any event which under Applicable Law would cause the dissolution of the Company; provided, that unless required by Applicable Law, the Company shall not be wound up as a result of any such event and the business of the Company shall continue.

**Section 25.    Dissolution and Winding-Up.**

Upon the dissolution of the Company, the assets of the Company shall be liquidated or distributed under the direction of and to the extent determined by the Board of Managers and the business of the Company shall be wound up. Within a reasonable time after the effective date of dissolution of the Company, the Company's assets shall be distributed in the following manner and order:

(a)    First, to creditors in satisfaction of indebtedness, whether by payment or the making of reasonable provision for payment, and the expenses of liquidation, whether by payment or the making of reasonable provision for payment, including the establishment of reasonable reserves (which may be funded by a liquidating trust) determined by the Board of Managers or the liquidating trustee, as the case may be, to be reasonably necessary for the payment of the Company's expenses, liabilities and other obligations (whether fixed, conditional, unmatured or contingent); and

(b)    Second, to the Members in the same manner as Distributions under Section 12.

**Section 26.    Distributions in Cash or in Kind Upon Dissolution.**

Upon the dissolution of the Company, the Board of Managers shall use all commercially reasonable efforts to liquidate all of the Company's assets in an orderly manner and apply the proceeds of such liquidation as set forth in Section 25; provided that if in the good faith judgment of the Board of Managers, a Company asset should not be liquidated, the Board of Managers shall cause the Company to distribute such assets in accordance with Section 25, and for purposes of making such Distribution, and for all other purposes of this Agreement (excluding Section 12), the Distribution shall be treated as if the Company had sold such assets for cash in an amount equal to their Fair Market Value and distributed such cash to the Members instead.

### Section 27.    <u>Termination Upon Dissolution</u>.

The Company shall terminate when the winding up of the Company's affairs has been completed, all of the assets of the Company have been distributed and an application for a Certificate of Dissolution has been filed by the Registered Agent of the Company in accordance with the Delaware Act.

### Section 28.    <u>Information Rights; Observer Rights; Confidentiality; Other Restrictive Covenants</u>.

(a)    <u>Information Rights</u>.  Subject to the terms of <u>Section 28(c)</u> and (d): each (x) First Lien Steering Committee Member, for so long as such Person owns any Units and (y) each Member, for so long as such Person continues to own at least 5.0% of the outstanding Units, in each case, shall have the right, upon ten (10) days' prior written notice and during normal business hours, to inspect the properties, books and other business records of the Company and its Subsidiaries and to reasonably request from time to time (i) any other information (financial or otherwise) about the Company and (ii) to have reasonable access to the Company's or any Subsidiary's management, auditors and legal counsel.

(b)    <u>Observer Rights</u>.  Each (x) First Lien Steering Committee Member, for so long as such Person owns any Units and (y) Member, for so long as such Person continues to own at least 5.0% of the outstanding Units, in each case, shall have the right to have one representative (each, an "<u>Observer</u>") present at all meetings of the Board of Managers.  The Company will give each Observer reasonable prior notice (it being agreed that substantially the same prior notice given to the members of the Board of Managers shall be deemed reasonable prior notice) of the time and place of any proposed meeting of the Board of Managers.  The Company will deliver to each Observer copies of all material documentation distributed from time to time to the members of the Board of Managers, at such time as such documents are so distributed to them, including copies of any written consent.  The Company reserves the right to and may, in its sole discretion, withhold any information and to exclude any Observer from any meeting or portion thereof if the Company reasonably determines in good faith that access to such information or attendance at such meeting (i) could be reasonably expected to create a potential or actual conflict of interest or adversely affect the attorney-client privilege between the Company and its counsel, (ii) is prohibited by an agreement with a third party or (iii) will not be in the best interest of the Company.  Notwithstanding anything to the contrary contained in this Agreement, the Observers may not use or disclose any confidential information received by the Observers and the Observers shall agree in writing to be bound by confidentiality provisions substantially similar to those in <u>Section 28(d)</u>.

(c)    <u>Competitors</u>.  Notwithstanding anything to the contrary contained herein, in no event shall any Member be entitled to any of the information, inspection rights or access set forth in <u>Section 28(a)</u> or be entitled to designate an Observer if the Company reasonably determines in good faith that such Member is a direct or indirect competitor of the Company or its Subsidiaries.

(d)     Confidentiality. Each Member, on behalf of itself and its Affiliates (collectively, the "Subject Parties") shall be bound by the provisions contained in this Section 28(d). The Subject Parties recognize and acknowledge that they have been provided by the Company, its Subsidiaries and their respective agents certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries including, without limitation, customer information, pricing information, financial plans, business plans, business concepts, supplier information, know-how and intellectual property and materials related thereto (the "Confidential Information"). Each Subject Party agrees that it will not, directly or indirectly, use, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except for the benefit of the Company and its Subsidiaries and except as is required to be disclosed under Applicable Law; provided, that the party required to make such disclosure shall, to the extent permitted by law, provide the Company with prompt notice of any such disclosure and shall use commercially reasonable efforts to limit the extent of such disclosure. Notwithstanding the foregoing, Confidential Information shall not include any information which (i) was publicly known and available in the public domain prior to the time of disclosure by the Company; (ii) becomes publicly known and available in the public domain after disclosure by the Company through no action or inaction of the Subject Party; (iii) is in the possession of the Subject Party at the time of disclosure by the Company and the Subject Party was not aware of its confidential nature at the time of its receipt of such information; (iv) is independently developed by the Subject Party without use of or reference to the Confidential Information; or (v) is received by the Subject Party from a third party without an accompanying duty of confidentiality.

### Section 29.     Registration Rights.

Upon the request of the holders of a majority of the outstanding Units, the Company shall enter into a registration rights agreement with the Members upon such terms and conditions that are reasonably satisfactory to the holders of a majority of the outstanding Units.

### Section 30.     Exculpation and Indemnification.

(a)     Except as otherwise provided under the Delaware Act, no Member, in such capacity, shall be liable for any debts, liabilities, contracts or any other obligations of the Company, except for and only to the extent of such Member's Capital Contribution, and then only to the extent and under the circumstances set forth in the Delaware Act, or for any debts, liabilities contracts or obligations of any other Member. Except as otherwise provided in the Delaware Act, this Agreement or in any separate written instrument signed by the Member, no Member of the Company shall be obligated personally for any debt, obligation or liability of the Company or of any other Member solely by reason of being a Member of the Company. Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company. No Member shall have any responsibility to restore any negative balance in his capital account or to contribute to or in respect of the liabilities or obligations of the Company or to return Distributions made by the Company, except as required by the Delaware Act or other Applicable Law.

(b)    No Member, Manager, officer, or any direct or indirect officer, director, Affiliate, stockholder, member or partner of a Member (each, an "Indemnitee"), shall be liable, responsible or accountable in damages or otherwise to the Company or any Member for any act or failure to act by such Indemnitee in connection with the conduct of the business of the Company, or by any other such Indemnitee in performing or participating in the performance of the obligations of the Company, so long as such Indemnitee acted in the good faith belief that such action or failure to act was in the best interests, or not opposed to the best interests, of the Company and/or its Subsidiaries and such action or failure to act was not in material violation of this Agreement and did not constitute gross negligence or willful misconduct.  Except as otherwise required by the Delaware Act, no Person who is a Member, Manager or officer, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Member, Manager, officer or any combination of the foregoing.

(c)    The Company shall indemnify and hold harmless each Indemnitee to the fullest extent permitted by Applicable Law (as in effect on the date hereof or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification) against losses, damages, liabilities, costs or expenses (including reasonable attorneys' fees and expenses and amounts paid in settlement) incurred by any such Indemnitee in connection with any action, suit or proceeding to which such Indemnitee may be made a party or otherwise involved (including, without limitation, as a witness) or with which it shall be threatened by reason of its being a Member, Manager, officer, or any direct or indirect officer, director, Affiliate stockholder or partner of a Member, or while acting as (or on behalf of) a Member on behalf of the Company or in the Company's interest.  Such attorneys' fees and expenses shall be paid by the Company as they are incurred upon receipt, in each case, of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification with respect thereto.

(d)    The right of an Indemnitee to indemnification hereunder shall not be exclusive of any other right or remedy that a Member, Manager or officer may have pursuant to Applicable Law or this Agreement.

(e)    An Indemnitee shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which Distributions to the Member might properly be paid.

(f)    To the extent that, at law or in equity, an Indemnitee has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Indemnitee, an Indemnitee acting within the scope of this Agreement shall not be liable to the Company or to any other Indemnitee for its good faith reliance on the provisions of this Agreement or any

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

approval or authorization granted by the Company or any other Indemnitee. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of an Indemnitee otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnitee.

(g)    In the event that any Indemnitee is entitled to indemnification under this Section 30 and such Indemnitee is also entitled to, or has received, indemnification by any of its Affiliates (whether by way of payment or reimbursement to a director of any such amounts), whether pursuant to any agreement, the governing or constituent documents of any entity or by applicable law, then (i) the Company acknowledges and agrees that, as between the Company and its Affiliates, on the one hand, and the Affiliates of such Indemnitee, on the other hand, the indemnification obligations of the Company and its Affiliates shall be a primary obligation and the indemnification obligation of the Affiliates of such Indemnitee shall be a secondary obligation; and (ii) the Affiliates of such Indemnitee shall be subrogated to the rights of the Indemnitee against the Company and its Affiliates, as the case may be, with respect to any amounts paid by the Affiliates of such Indemnitee in connection with any such indemnification obligation

(h)    The foregoing provisions of this Section 30 shall (i) survive any termination of this Agreement and (ii) be contract rights, and no amendment, modification, supplement, restatement or repeal of this Section 30 shall have the effect of limiting or denying any such rights with respect to actions giving rise to losses, damages, liabilities, costs or expenses (including reasonable attorneys' fees and expenses and amounts paid in settlement) prior to any such amendment, modification, supplementation or repeal.

**Section 31.    Insurance.**

The Company shall have the power to purchase and maintain customary and reasonable D&O insurance for its Managers and executive officers and any other insurance on behalf of any Indemnitee or any Person who is or was an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as an agent, whether or not the Company would have the power to indemnify such Person against such liability under the provisions of Section 30 or under Applicable Law.

**Section 32.    Competitive Opportunity.**

If any Member (other than a Management Member) or any of such Member's partners, members, shareholders, directors, officers or Affiliates (collectively, "Representatives"), acquires knowledge of a potential transaction or matter which may be an investment or business opportunity or prospective economic or competitive advantage in which the Company could have an interest or expectancy (a "Competitive Opportunity") or otherwise is then exploiting any Competitive Opportunity, the Company will have no interest in, and no expectation that, such Competitive Opportunity be offered to it. Any such interest or expectation is hereby renounced so that such Member and its Representatives shall (a) have no duty to communicate or present such Competitive Opportunity to the Company and (b) have the right to either hold any such

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Competitive Opportunity for such Member's (and its agents', partners' or affiliates') own account and benefit or to recommend, assign or otherwise transfer such Competitive Opportunity to Persons other than the Company or any Affiliate of the Company.

        **Section 33.**     **Notices.**

        (a)     All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person or by telecopy (or similar electronic means with a copy following by nationally recognized overnight courier) or sent by nationally-recognized overnight courier or first class registered or certified mail, return receipt requested, postage prepaid, addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties.

        (i)     If, to the Company:

> [Newco], LLC
> [_____]
> Attention:
> Telephone:
> Facsimile:
>
> with a copy to (which shall not constitute notice):
>
> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, New York  10036
> Attention:  Philip C. Dublin
>               David J. D'Urso
> Telephone:  212-872-1000
> Facsimile:  212-872-1002; and

        (ii)     if to any Member, to their respective address set forth on Schedule I hereto.

        (b)     All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by facsimile, on the date of such delivery, (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch and (iii) in the case of mailing, on the fifth Business Day after the posting thereof.

        **Section 34.**     **Amendments.**

        Except as otherwise expressly set forth herein, this Agreement may only be amended, modified, restated or supplemented, and provisions hereof may only be waived, by an instrument in writing duly executed and delivered by the Company and holders of 66.66% of the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

outstanding Units; <u>provided</u>, <u>however</u>, that (a) any amendment, modification, restatement, supplement or waiver that would materially and adversely affect the rights or obligations of any Member, in its capacity as a holder of Units, without similarly affecting the rights or obligations hereunder of all holders of Units, shall not be effective as to such Member without its prior written consent and (b) the Company shall automatically amend <u>Schedule I</u> hereto without the consent of the Members upon any change required thereby in accordance with the terms of this Agreement. Any waiver of any provision of this Agreement requested by any party hereto must be in writing by the party granting such waiver.

### Section 35.    <u>Certain Members</u>.

Each Member that is not an individual and is a special purpose entity organized or incorporated for the primary purpose of holding Units, agrees that (a) certificates or instruments reflecting equity interests in such entity will note the restrictions contained in this Agreement on the transfer of Units as if such equity interests were Units and (b) no equity interests of such entity may be Transferred to any Person other than in accordance with the terms and provisions of this Agreement as if such equity interests were Units. The Company shall have the right to audit each Management Member that is subject to this <u>Section 35</u> for compliance with this <u>Section 35</u> from time to time upon prior written notice to such Management Member.

### Section 36.    <u>Management Members' Services</u>.

Nothing contained in this Agreement shall be deemed to obligate the Company or any Subsidiary to employ or retain the Services of any Management Member in any capacity whatsoever or to prohibit or restrict the Company or any Subsidiary from terminating the services of any Management Member at any time or for any reason whatsoever, with or without cause.

### Section 37.    <u>No Conflicting Agreements</u>.

No Member shall enter into any agreements or arrangements of any kind with any Person with respect to any Units or other Securities of the Company on terms inconsistent with the provisions of this Agreement (whether or not such agreements or arrangements are with other Members or with Persons that are not party to this Agreement).

### Section 38.    <u>Entire Agreement</u>.

This Agreement and the Bylaws contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, written or oral, with respect to such subject matter. The parties hereto represent and warrant that there are no other agreements or understandings, written or oral, regarding any of the subject matter hereof other than as set forth herein and covenant not to enter into any such agreements or understandings after the Effective Date, except pursuant to an amendment, modification or waiver of the provisions of this Agreement.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 39.     Governing Law; Jurisdiction, Waiver of Jury Trial.**

(a)     This Agreement shall be governed by and construed in accordance with the Applicable Laws of the State of Delaware, without giving effect to any choice of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the Applicable Laws of any jurisdiction other than the State of Delaware to be applied.

(b)     ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS AGREEMENT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND THE PARTIES IRREVOCABLY SUBMIT TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY OR THE SOUTHERN DISTRICT OF NEW YORK AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENTERED IN AND ENFORCED IN ANY COURT HAVING JURISDICTION THEREOF.

(c)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 40.     No Third Party Beneficiaries.**

Except as set forth in Section 30, none of the provisions in this Agreement shall be for the benefit of or enforceable by any Person other than the parties to this Agreement and their respective successors and assigns. The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

**Section 41.     Further Assurances.**

Each Member shall execute all such certificates and other documents and shall do all such other acts as the Board of Managers deem appropriate to comply with the requirements of Applicable Law for the formation of the Company and with any Applicable Laws and third-party requests relating to the acquisition, operation or holding of the property of the Company and to achieve the purpose of the Company, including, without limitation, (a) any documents that the Board of Managers deems necessary or appropriate to form, qualify or continue the Company as a limited liability company in all jurisdictions in which the Company has an office or conducts or

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

plans to conduct business and (b) all such agreements, certificates, tax statements and other documents as may be required to be filed under Applicable Law in respect of the Company.

### Section 42.    **Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same Agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

### Section 43.    **Separability of Provisions.**

It is the desire and intent of the Members that the provisions of this Agreement be enforced to the fullest extent permissible under the Applicable Laws applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

### Section 44.    **Spousal Consent.**

Each Member who is an individual shall cause his or her spouse, as applicable, to execute and deliver a Spousal Consent in the form attached as Exhibit C to this Agreement. The signature of a spouse on a Spousal Consent shall not be construed as making such spouse a Member of the Company or a party to this Agreement except as may otherwise be set forth in such consent. Each Member who is an individual will certify his or her marital status to the Company at the Company's request.

### Section 45.    **Recapitalizations, Exchanges, Splits, Etc.**

The provisions of this Agreement shall apply to the full extent set forth herein with respect to the Units and to any and all Securities of the Company or any successor company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or in substitution of the Units, all of which shall be appropriately adjusted for any equity dividends or Distributions, splits, reverse splits, combinations, recapitalizations and similar transactions occurring from time to time. In the event of any split, reverse split, combination, recapitalization or similar transaction made with respect to the Class A Units, an identical split, reverse split, combination, recapitalization or similar transaction shall be proportionately made to the Class B Units based on the number of outstanding Class A Units and Class B Units at such time.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 46.**    <u>Remedies</u>.

Each party hereto acknowledges and agrees that in the event it fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, no remedy at law will provide adequate relief to the other parties hereto, and agrees that the other parties hereto shall be entitled to specific performance and/or temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

* * * * *

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**IN WITNESS WHEREOF**, the undersigned have duly executed this Limited Liability Company Operating Agreement as of the date first written above.

**THE COMPANY:**

**[NEWCO], LLC**

By: _____
     Name:
     Title:

**[MEMBERS]:**

By: _____
     Name:
     Title:

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## Schedule I
## Schedule of Members and Unit Ownership

| Member Name/Address | Class A Units | Class B Units |
|---|---|---|
|  |  |  |

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

<u>Annex I</u>

DEFINITIONS

"<u>Accounting Period</u>" shall mean, for the first Accounting Period, the period commencing on the Effective Date and ending on the next Adjustment Date. All succeeding Accounting Periods shall commence on the day after an Adjustment Date and end on the next Adjustment Date.

"<u>Adjustment Date</u>" shall mean the last day of each Fiscal Year of the Company or any other date determined by the Board of Managers, in its sole discretion, as appropriate for an interim closing of the Company's books.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the preamble.

"<u>Applicable Law</u>" means, with respect to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates, judgments, decrees or orders of any Governmental Authority applicable to such Person.

"<u>Assumed Tax Rate</u>" shall mean the highest effective marginal statutory combined U.S. federal, state and local income tax rate prescribed for a corporation doing business in New York City, New York (taking into account (a) the deductibility of state and local income taxes for U.S. federal income tax purposes, and (b) the character (long-term or short-term capital gain, dividend income or other ordinary income) of the applicable income).

"<u>Board of Managers</u>" shall mean the board of managers of the Company.

"<u>Business Day</u>" shall mean any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"<u>Buyer</u>" shall have the meaning set forth in <u>Section 7(b)(i)</u>.

"<u>Bylaws</u>" shall have the meaning set forth in <u>Section 2(c)</u>.

"<u>Candlewood</u>" shall mean [          ].

"<u>Capital Account</u>" shall have the meaning set forth in <u>Section 15</u>.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"Capital Contribution" shall mean, with respect to each Member, the total amount of cash and the Fair Market Value of property contributed to the Company by such Member pursuant to Section 15 or otherwise or deemed to be contributed to the Company by such Member for U.S. federal income tax purposes, net of any liabilities associated with such contributed property that the Company is considered to assume or "take subject to" under Section 752 of the Code, which Capital Contribution shall be reflected on Schedule I hereto, as amended from time to time in accordance with the terms of this Agreement.

"Carrying Value" shall mean, with respect to any Company asset, the asset's adjusted basis for U.S. federal income tax purposes, except that the Carrying Values of all Company assets shall be adjusted to equal their respective Fair Market Values (as determined by the Board of Managers), in accordance with the rules set forth in U.S. Treasury Regulations Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, immediately prior to (a) the date of the acquisition of any additional Units by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the date of the Distribution of more than a *de minimis* amount of Company property to a Member, (c) the date of the grant of more than a *de minimis* profits interest to a Member for services rendered or to be rendered to the Company in his capacity as a Member, or (d) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, that adjustment pursuant to clauses (a), (b) and (c) above shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members. The Carrying Value of any Company asset distributed to any Member shall be adjusted immediately prior to such Distribution to equal its Fair Market Value. The Carrying Value of any asset contributed by a Member to the Company shall be the Fair Market Value of the asset at the date of its contribution. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of Depreciation calculated for purposes of the definition of "Net Profits and Net Losses" rather than the amount of depreciation determined for U.S. federal income tax purposes, and Depreciation shall be calculated by reference to Carrying Value rather than tax basis once Carrying Value differs from tax basis.

"Certificate" shall have the meaning set forth in Section 2(b).

"Class A Units" shall mean an interest of the Company designated as a Class A Unit.

"Class B Units" shall mean an interest of the Company designated as a Class B Unit.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in the preamble.

"Compensatory Interests" shall have the meaning set forth in Section 20(e)(i).

"Competitive Opportunity" shall have the meaning set forth in Section 32.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"Confidential Information" shall have the meaning set forth in Section 28(d).

"Co-Sale Notice" shall have the meaning set forth in Section 21(d)(i).

"Co-Sale Transferee" shall have the meaning set forth in Section 21(d)(i).

"Co-Sale Transferor" shall have the meaning set forth in Section 21(d)(i).

"Co-Sale Units" shall have the meaning set forth in Section 21(d)(i).

"Credit Suisse Loan Funding" shall mean [                    ].

"Credit Suisse Manager" shall have the meaning set forth in Section 5(a)(ii).

"Credit Suisse SWAP" shall mean [                    ].

"CSAM" shall mean [                    ].

"CSAM Manager" shall have the meaning set forth in Section 5(a)(iii).

"CypressTree" shall mean [                    ].

"Deficit" shall have the meaning set forth in Section 17(a).

"Delaware Act" shall have the meaning set forth in the recitals.

"Depreciation" shall mean, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for Federal income tax purposes with respect to an asset for such Fiscal Year, except that (a) with respect to any asset the Carrying Value of which differs from its adjusted tax basis for Federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Treasury Regulations, Depreciation for such Fiscal Year shall be the amount of book basis recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Treasury Regulations, and (b) with respect to any other asset the Carrying Value of which differs from its adjusted tax basis for Federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Carrying Value as the Federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that in the case of clause (b) above, if the adjusted tax basis for Federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Carrying Value using any reasonable method selected by the Board of Managers.

"Distribution" shall mean each Distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by Distribution, redemption, repurchase or otherwise; provided that the following shall not be a Distribution: (a) any

recapitalization or exchange of securities of the Company in which the Members do not receive any cash or other assets or (b) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units.

"Drag-Along Sale" shall have the meaning set forth in Section 21(c)(i).

"Drag-Along Sale Notice" shall have the meaning set forth in Section 21(c)(ii).

"Drag-Along Securities" shall have the meaning set forth in Section 21(c)(ii).

"Drag-Along Seller" shall have the meaning set forth in Section 21(c)(i).

"Drag-Along Threshold" means either (i) 50% of the outstanding Units, if the Drag-Along Sale attributes to the Company an enterprise value in excess of $100,000,000 or (ii) 66.66% of the outstanding Units, if the Drag-Along Sale attributes to the Company an enterprise value less than or equal to $100,000,000.

"Effective Date" shall mean [            ], 2010.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Securities" mean Securities of the Company (a) issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services; (b) issued as a dividend or pro rata distribution to existing Members, or any split, recapitalization or other subdivision or combination of Units; (c) issued in connection with, or for the purpose of, an acquisition (whether by stock sale, merger, recapitalization, asset sale or otherwise) of another Person (or any portion thereof) or its respective businesses or operations; and (e) issued in a public offering of Securities of the Company.

"Exercise Period" shall have the meaning set forth in Section 7(b).

"Fair Market Value" shall mean, as of the date of determination, (a) in the case of publicly-traded Securities, the average of their last sales prices on the applicable trading exchange or quotation system in each trading day during the five trading-day period ending on such date and (b) in the case of any other Securities or property, the fair market value of such Securities or property, as reasonably determined in good faith by the Board of Managers.

"First Lien Steering Committee Member" shall mean any of Candlewood, Credit Suisse Loan Funding, CSAM, CypressTree, GE, the Highland Managed Funds and Sorin.

"Fiscal Year" means (a) the taxable year of the Company, which shall be the calendar year unless otherwise required (or, in the Board of Managers' reasonable discretion, permitted) by Section 706(b) of the Code, and (b) for purposes of Section 11 through Section 14, the portion

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

of any Fiscal Year for which the Company is required to (or does) allocate gross income, Net Profit, Net Loss, or other items pursuant to <u>Section 11</u> through <u>Section 14</u>.

"<u>Forfeited Unit Transferees</u>" shall have the meaning set forth in <u>Section 17(c)</u>.

"<u>Forfeiture Transfer</u>" shall have the meaning set forth in <u>Section 17(c)</u>.

"<u>GE</u>" shall mean [            ].

"<u>Governmental Authority</u>" shall mean any domestic or foreign government or political subdivision thereof, whether on a federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"<u>Highland Managed Funds</u>" shall mean all of [            ] and its associated related affiliated funds (and any direct designee of [            ]).

"<u>Highland Manager</u>" shall have the meaning set forth in <u>Section 5(a)(i)</u>.

"<u>Indemnitee</u>" shall have the meaning set forth in <u>Section 30(b)</u>.

"<u>IPO</u>" shall mean the closing of the first public offering of and sale of Securities of the Company (or any other entity created through any reorganization of the Company) (other than on Forms S-4 or S-8 or their equivalent), pursuant to an effective registration statement filed by the Company under the Securities Act.

"<u>IRS</u>" shall mean the Internal Revenue Service.

"<u>Management Members</u>" shall mean (a) [_____] and (b) any other Member designated as a "Management Member" by the Board of Managers from time to time.

"<u>Manager</u>" shall mean any Person that is a member of the Board of Managers.

"<u>Members</u>" shall mean the holders of Class A Units and Class B Units signatory to this Agreement (including pursuant to the execution and delivery of a Joinder Agreement, substantially in the form attached hereto as <u>Exhibit B</u>).

"<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean, with respect to any Accounting Period, net income or net loss of the Company for such Accounting Period, determined in accordance with § 703(a) of the Code, including any items that are separately stated for purposes of § 702(a) of the Code, as determined in accordance with federal income tax accounting principles with the following adjustments:

(a)    any income of the Company that is exempt from United States federal income tax shall be included as income;

(b)    any expenditures of the Company described in § 705(a)(2)(B) of the Code or treated as expenditures pursuant to § 1.704-1(b)(2)(iv)(i) of the Treasury Regulations shall be treated as current expenses;

(c)    any items of income, gain, loss or deduction specially allocated pursuant to this Agreement, including pursuant to <u>Section 17(a)</u>, <u>Section 17(b)</u> and <u>Section 17(d)</u>, shall be excluded from the determination of Net Profit and Net Loss;

(d)    any adjustment to the Carrying Values of the Company's assets pursuant to the definition of Carrying Value shall be treated as Net Profit and Net Loss; and

(e)    in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of "Depreciation".

"<u>New First Lien Notes</u>" shall mean those certain New First Lien Notes, dated as of [        , 2010], issued by the Company pursuant to [            ].

"<u>New Securities</u>" shall have the meaning set forth in <u>Section 7(b)</u>.

"<u>Notice of Proposed Issuance</u>" shall have the meaning set forth in <u>Section 7(b)</u>.

"<u>Observer</u>" shall have the meaning set forth in <u>Section 28(b)</u>.

"<u>Operations Manager</u>" shall mean the Person designated by the holders of 66.66% of the outstanding Units from time to time to manage the business of the Company.  Initially, the Operations Manager shall be [        ].

"<u>Permitted Transfer</u>" means:

(a)    in the case of any Member who is an individual, a Transfer of Units to a trust or estate planning-related entity for the sole benefit of such Member or solely upon the death of such individual in accordance with such individual's will or pursuant to laws of intestacy;

(b)    in the case of any Member that is a partnership (other than a Management Member), (i) a Transfer of Units to its limited, special and general partners as a Distribution by such partnership to its partners and (ii) a Transfer of Units made to any Affiliate of such Member or any of its Affiliates; or

(c)    in the case of any Member that is a corporation, company or limited liability company (in each case, other than a Management Member), (i) a Transfer of Units to its shareholders or members, as the case may be, as a Distribution by such Person to its shareholders or members, as the case may be and (ii) a Transfer made to any Affiliate of such Member or any of its Affiliates.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"Permitted Transferee" means any Person acquiring Units from a Member in accordance with the provisions of this Agreement.

"Person" means any legal person, including any individual, corporation, investment fund, partnership, limited partnership, limited liability company, joint venture, joint stock company, association, trust, unincorporated entity or Governmental Authority.

"Pro Rata Portion" shall mean, with respect to any Member in respect of Units, a fraction (expressed as a percentage), the numerator of which is the number of Units held by such Member, and the denominator of which is the total number of Units outstanding, at the time in question.

"Proposed Rules" shall have the meaning set forth in Section 20(e)(i).

"Purchasing Member" shall have the meaning set forth in Section 7(b)(vii).

"Representatives" shall have the meaning set forth in Section 32.

"Rule 144" shall have the meaning set forth in Section 10(c).

"Safe Harbor Election" shall have the meaning set forth in Section 20(e)(i).

"Sale of the Company" shall mean (a) the Transfer of all or substantially all of the Company's assets, (b) the Transfer of the outstanding equity Securities of the Company or (c) the merger or consolidation of the Company with another Person, in each case in clauses (b) and (c) above under circumstances in which the holders of a majority of the issued and outstanding Units, immediately prior to such transaction, hold less than 50% of the outstanding Units (or less than 50% of the voting power of the outstanding equity Securities of the surviving or resulting Person, as the case may be) immediately following such transaction.

"SEC" shall mean the Securities and Exchange Commission and any other Governmental Authority at the time administering the Securities Act.

"Securities" shall mean, with respect to any Person, all equity interests of such Person, all securities convertible into or exchangeable for equity interests of such Person, and all options, warrants, and other rights to purchase or otherwise acquire from such Person equity interests, including any equity appreciation or similar rights, contractual or otherwise.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Sorin" shall mean [          ].

"Spousal Consent" shall mean a consent, in the form attached to this Agreement as Exhibit C, executed by the spouse of any Member who is an individual.

"Subject Parties" shall have the meaning set forth in Section 28(d).

"Subsidiary" shall mean, with respect to any Person, any corporation, association, partnership, limited liability company or other business entity of which 50% or more of the total voting power of equity interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, representatives or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more subsidiaries of such Person, or (c) one or more subsidiaries of such Person.  For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Tag-Along Notice" shall have the meaning set forth in Section 21(d)(iv).

"Tax Distributions" shall have the meaning set forth in Section 13.

"Tax Matters Partner" shall have the meaning set forth in Section 20(c).

"Transfer" shall mean, as applicable, (a) as to any Security or asset (the "Subject Property"), to sell, transfer, assign, gift, pledge, grant a security interest in, distribute, encumber, hypothecate or otherwise dispose of (including, without limitation, the foreclosure or other acquisition by any lender with respect to the Subject Property pledged to such lender by the holder of the Subject Property), whether directly or indirectly (including, without limitation, by means of a Transfer of any Security issued by a Person that holds, directly or indirectly, an interest in the Subject Property), such Subject Property, either voluntarily or involuntarily and with or without consideration or (b) the act of such sale, transfer, assignment, gift, pledge, grant of security interest, Distribution, encumbrance, hypothecation or other disposition.

"Transferee" shall mean any Person to whom a Member shall Transfer Units in accordance with the terms of this Agreement.

"Treasury Regulations" shall mean regulations promulgated pursuant to the Code.

"Units" shall mean all Class A Units and Class B Units held at any time during the term of this Agreement by any Member, and shall include any Securities issued in respect of or in exchange for such Class A Units or Class B Units, whether by way of dividend or other Distribution, split, reverse split, recapitalization, merger, rollup transaction, consolidation, conversion or reorganization.

*******

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Exhibit A**

**BYLAWS**

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Exhibit B**

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Limited Liability Company Operating Agreement dated [_____], 2010, as amended, modified, restated or supplemented from time to time, (the "Operating Agreement"), of [Newco], LLC, a Delaware limited liability company (the "Company").

By executing and delivering this Joinder Agreement to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with all of the provisions of the Operating Agreement in the same manner as if the undersigned were an original signatory to the Operating Agreement.

The undersigned agrees that the undersigned shall be a [Member/Management Member], as such term is defined in the Operating Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.

_____
*Signature of Member*

_____
*Print Name of Member*

_____

_____

_____
*Address*

_____
*Facsimile*

_____
*Telephone*

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Exhibit C**

## SPOUSAL CONSENT

Dated: _____

Reference is hereby made to the Limited Liability Company Operating Agreement of [Newco], LLC, dated as of [_____], 2010, as may be amended, supplemented, modified or restated from time to time (the "Operating Agreement"). Capitalized terms used herein but not otherwise defined shall have the meaning ascribed thereto in the Operating Agreement.

This Spousal Consent is being delivered pursuant to Section 44 of the Operating Agreement, a copy of which has been provided to the undersigned ("Spouse"). Spouse, as the spouse of _____ (the "Relevant Member"), consents to all of the provisions of the Operating Agreement and to the extent that Spouse may lawfully do so, Spouse confirms that the Relevant Member may act alone with respect to all matters in connection with the Operating Agreement. Spouse also confirms that the Relevant Member may enter into agreements pursuant to the Operating Agreement and consent to and execute amendments thereof, without further signature or consent of, or notice to, Spouse. Spouse further agrees that he/she will not take any action to oppose or otherwise hinder the operation of the provisions of the Operating Agreement.

To the extent of any property interest that Spouse may have in such Units, Spouse consents to be bound by the terms of the Operating Agreement, including, without limitation, restrictions on transfer and obligations to sell set forth therein.

_____
Name of Spouse: