# EXHIBIT K

# EXHIBIT K

## Exhibit K

### New First Lien Credit Agreement

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## CREDIT AGREEMENT

DATED AS OF [_____]

among

[NEWCO LLC],
THE RHODES COMPANIES, LLC
RHODES RANCH GENERAL PARTNERSHIP
RHODES RANCH GOLF AND COUNTRY CLUB, LLC
HERITAGE LAND COMPANY, LLC,
TICK, LP,
GLYNDA, LP,
CHALKLINE, LP,
BATCAVE, LP,
JACKKNIFE, LP,
WALLBOARD, LP,
OVERFLOW, LP,
TUSCANY ACQUISITIONS, LLC,
TUSCANY ACQUISITIONS II, LLC,
TUSCANY ACQUISITIONS III, LLC,
TUSCANY ACQUISITIONS IV, LLC,
PARCEL 20 LLC,
RHODES DESIGN AND DEVELOPMENT CORPORATION,
C&J HOLDINGS INC.,
RHODES REALTY, INC.,
JARUPA LLC,
ELKHORN INVESTMENTS, INC.,
RHODES HOMES ARIZONA, LLC,
RHODES ARIZONA PROPERTIES, LLC,
TRIBES HOLDINGS LLC,
SIX FEATHERS HOLDINGS, LLC,
ELKHORN PARTNERS, A NEVADA LIMITED PARTNERSHIP
BRAVO INC.,
GUNG-HO CONCRETE, LLC,
GERONIMO PLUMBING, LLC,
APACHE FRAMING, LLC,
TUSCANY GOLF COUNTRY CLUB, LLC,
and
PINNACLE GRADING, LLC
as the Borrowers,

THE LENDERS LISTED HEREIN,
as the Lenders,

and

[_____],
as Administrative Agent and Collateral Agent

**$50,000,000 SENIOR SECURED CREDIT FACILITY**

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS ...........................................................................................3

    1.1    Certain Defined Terms ....................................................................................3
    1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
            Calculations Under Agreement .....................................................................32

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS .........................33

    2.1    Commitments; Loans .....................................................................................33
    2.2    Interest on the Loans .....................................................................................33
    2.3    Fees ...............................................................................................................36
    2.4    Repayments and Prepayments; General Provisions Regarding Payments ............36
    2.5    [Intentionally Omitted] .................................................................................40
    2.6    Special Provisions Governing LIBOR Loans ..................................................40
    2.7    Increased Costs; Taxes ..................................................................................42
    2.8    Mitigation Obligations; Replacement of Lenders .............................................45
    2.9    Releases; Subordinations ...............................................................................46
    2.10   Subordinations in connection with Map Approvals ...........................................47
    2.11   Subordinations in connection with Qualified Sales Agreements ..........................48

SECTION 3. CONDITIONS TO EFFECTIVENESS .....................................................48

    3.1    Conditions to Effectiveness ...........................................................................48

SECTION 4. REPRESENTATIONS AND WARRANTIES .............................................55

    4.1    Organization and Qualification ......................................................................55
    4.2    Power and Authority .....................................................................................55
    4.3    Legally Enforceable Agreement .....................................................................56
    4.4    No Conflict....................................................................................................56
    4.5    Capital Structure ...........................................................................................56
    4.6    Licenses........................................................................................................57
    4.7    Corporate Names ..........................................................................................57
    4.8    Business Locations; Agent for Process ...........................................................57
    4.9    Title to Properties..........................................................................................57
    4.10   Priority of Liens; UCC-1 Financing Statements ...............................................58
    4.11   No Subordination ..........................................................................................59
    4.12   Permits; Licenses; Franchises ........................................................................59
    4.13   Indebtedness..................................................................................................59
    4.14   [Intentionally Omitted] .................................................................................59

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

| 4.15 | Disclosure | 59 |
|---|---|---|
| 4.16 | Solvent Financial Condition | 60 |
| 4.17 | Surety Obligations | 60 |
| 4.18 | Taxes | 60 |
| 4.19 | Brokers | 60 |
| 4.20 | Intellectual Property | 61 |
| 4.21 | Governmental Authorization | 61 |
| 4.22 | Compliance with Laws | 61 |
| 4.23 | Burdensome Contracts | 62 |
| 4.24 | Litigation | 62 |
| 4.25 | No Defaults | 62 |
| 4.26 | Leases | 62 |
| 4.27 | Employee Benefit Plans | 63 |
| 4.28 | Trade Relations | 64 |
| 4.29 | Labor Relations | 64 |
| 4.30 | Not a Regulated Entity | 64 |
| 4.31 | Margin Stock | 64 |
| 4.32 | No Material Adverse Change | 64 |
| 4.33 | Environmental Matters | 64 |
| 4.34 | Material Contracts | 66 |
| 4.35 | Utilities | 67 |
| 4.36 | Entitlements | 67 |

**SECTION 5. AFFIRMATIVE COVENANTS** .......... 68

| 5.1 | Visits and Inspections | 68 |
|---|---|---|
| 5.2 | Notices | 68 |
| 5.3 | Financial Statements and Other Reports | 70 |
| 5.4 | Corporate Existence | 75 |
| 5.5 | Payment of Taxes and Claims; Tax Consolidation | 75 |
| 5.6 | Maintenance of Properties; Insurance | 76 |
| 5.7 | Lender Meeting | 76 |
| 5.8 | Compliance with Laws | 76 |
| 5.9 | Environmental Disclosure and Inspection | 76 |
| 5.10 | Remedial Action Regarding Hazardous Materials | 78 |
| 5.11 | Additional Collateral; Execution of Guaranty and Collateral Documents by Future Subsidiaries | 78 |
| 5.12 | Intentionally Omitted.] | 81 |
| 5.13 | Further Assurances | 81 |
| 5.14 | Title | 81 |
| 5.15 | Maintenance of Entitlements; Development Agreements | 81 |

**SECTION 6. NEGATIVE COVENANTS** .......... 82

| 6.1 | Indebtedness | 82 |
|---|---|---|

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

| | | |
|---|---|---|
| 6.2 | Liens and Related Matters | 84 |
| 6.3 | Investments | 85 |
| 6.4 | Contingent Obligations | 87 |
| 6.5 | Restricted Payments | 87 |
| 6.6 | Financial Covenants | 88 |
| 6.7 | Restriction on Fundamental Changes | 89 |
| 6.8 | Sale or Discount of Receivables | 89 |
| 6.9 | Asset Sales | 89 |
| 6.10 | Transactions with Shareholders and Affiliates | 92 |
| 6.11 | Conduct of Business | 93 |
| 6.12 | [Intentionally Omitted] | 93 |
| 6.13 | Amendments or Waivers of Certain Agreements | 93 |
| 6.14 | Fiscal Year | 93 |
| 6.15 | Hedge Agreements | 93 |
| 6.16 | [Intentionally Omitted] | 93 |
| 6.17 | Limitation on Unentitled Properties | 93 |
| 6.18 | Limitation on Purchase of Real Property Assets | 94 |

**SECTION 7. EVENTS OF DEFAULT** ................................................................. 94

| | | |
|---|---|---|
| 7.1 | Payment of Obligations | 94 |
| 7.2 | Misrepresentations | 94 |
| 7.3 | Breach of Certain Covenants | 94 |
| 7.4 | Breach of Other Covenants | 94 |
| 7.5 | Default Under Loan Documents | 95 |
| 7.6 | Other Defaults | 95 |
| 7.7 | Insolvency Proceedings | 96 |
| 7.8 | Business Disruption; Condemnation | 96 |
| 7.9 | ERISA | 96 |
| 7.10 | Challenge to Loan Documents; Invalidity | 96 |
| 7.11 | Judgment | 97 |
| 7.12 | Repudiation of or Default Under Guaranty | 97 |
| 7.13 | Criminal Forfeiture | 97 |
| 7.14 | Change of Control | 97 |

**SECTION 8. AGENTS** ..................................................................................... 98

| | | |
|---|---|---|
| 8.1 | Appointment | 98 |
| 8.2 | Rights as a Lender | 99 |
| 8.3 | Exculpatory Provisions | 99 |
| 8.4 | Reliance by the Agents | 100 |
| 8.5 | Delegation of Duties | 100 |
| 8.6 | Resignation of Administrative Agent and/or Collateral Agent | 101 |
| 8.7 | Collateral Documents | 102 |
| 8.8 | Non-Reliance on Agents and Other Lenders | 102 |

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

SECTION 9. MISCELLANEOUS ............................................................................................103

| | | |
|---|---|---|
| 9.1 | Assignments and Participations in Loans ............................................................103 |
| 9.2 | Expenses; Indemnity; Damage Waiver ...............................................................107 |
| 9.3 | Right of Set-Off ..................................................................................................108 |
| 9.4 | Sharing of Payments by Lenders ........................................................................109 |
| 9.5 | Amendments and Waivers ...................................................................................109 |
| 9.6 | Independence of Covenants .................................................................................111 |
| 9.7 | Notices .................................................................................................................111 |
| 9.8 | Survival of Representations, Warranties and Agreements ...................................113 |
| 9.9 | Failure or Indulgence Not Waiver; Remedies Cumulative ..................................113 |
| 9.10 | Marshalling; Payments Set Aside ........................................................................113 |
| 9.11 | Severability ..........................................................................................................114 |
| 9.12 | Obligations Several; Independent Nature of the Lenders' Rights .......................114 |
| 9.13 | Maximum Amount ...............................................................................................114 |
| 9.14 | Headings ..............................................................................................................115 |
| 9.15 | Applicable Law ....................................................................................................115 |
| 9.16 | Successors and Assigns ........................................................................................115 |
| 9.17 | Consent to Jurisdiction and Service of Process ..................................................115 |
| 9.18 | Waiver of Jury Trial ............................................................................................116 |
| 9.19 | Confidentiality .....................................................................................................117 |
| 9.20 | Borrowers' Responsibility For Compliance With Environmental Laws .............118 |
| 9.21 | Joint and Several Liability ...................................................................................118 |
| 9.22 | Counterparts; Integration; Effectiveness; Electronic Execution.........................120 |
| 9.23 | USA Patriot Act Notification ..............................................................................121 |

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## EXHIBITS

Exhibit I ............Form of Administrative Questionnaire
Exhibit II ...........Form of Assignment Agreement
Exhibit III..........Form of Assignment of Declarant's Rights
Exhibit IV..........Form of Compliance Certificate
Exhibit V...........[Intentionally Omitted]
Exhibit VI..........[Intentionally Omitted]
Exhibit VII ........[Intentionally Omitted]
Exhibit VIII .......Form of Note
Exhibit IX..........[Intentionally Omitted]
Exhibit X...........Form of Pledge and Security Agreement
Exhibit XI..........Description of Projects
Exhibit XII ........Form of Guaranty
Exhibit XIII.......Form of Copyright Security Agreement
Exhibit XIV.......[Intentionally Omitted]

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "**Agreement**") is dated as of |_____| and entered into by and among |NEWCO LLC|, a |_____| limited liability company |("**Newco**")|, THE RHODES COMPANIES, LLC ("**Rhodes Companies**"), RHODES RANCH GENERAL PARTNERSHIP ("**Rhodes GP**"), RHODES RANCH GOLF AND COUNTRY CLUB, LLC ("**Rhodes Ranch Golf**"), HERITAGE LAND COMPANY, LLC, a Nevada limited liability company ("**Heritage Land**"), TICK, LP, a Nevada limited partnership ("**Tick**"), GLYNDA, LP, a Nevada limited partnership ("**Glynda**"), CHALKLINE, LP, a Nevada limited partnership ("**Chalkline**"), BATCAVE, LP, a Nevada limited partnership ("**Batcave**"), JACKKNIFE, LP, a Nevada limited partnership ("**Jackknife**"), WALLBOARD, LP, a Nevada limited partnership ("**Wallboard**"), OVERFLOW, LP, a Nevada limited partnership ("**Overflow**"), TUSCANY ACQUISITIONS, LLC, a Nevada limited liability company ("**Tuscany Acquisitions**"), TUSCANY ACQUISITIONS II, LLC, a Nevada limited liability company ("**Tuscany Acquisitions II**"), TUSCANY ACQUISITIONS III, LLC, a |_____| limited liability company ("**Tuscany Acquisitions III**"), TUSCANY ACQUISITIONS IV, LLC, a |_____| limited liability company ("**Tuscany Acquisitions IV**"), PARCEL 20 LLC, a |_____| limited liability company ("**Parcel**"), RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("**Rhodes Design**"), C&J HOLDINGS INC., a Nevada corporation ("**C&J**"), RHODES REALTY, INC., a Nevada corporation ("**Rhodes Realty**"), JARUPA LLC, a |_____| limited liability company ("**Jarupa**"), ELKHORN INVESTMENTS, INC., a Nevada corporation ("**Elkhorn Investments**"), RHODES HOMES ARIZONA, LLC, an Arizona limited liability company ("**Rhodes Homes Arizona**"), RHODES ARIZONA PROPERTIES, LLC, an |_____| limited liability company ("**Rhodes Arizona Properties**"), TRIBES HOLDINGS LLC, a Nevada limited liability company ("**Tribes**"), SIX FEATHERS HOLDINGS, LLC, a |_____| limited liability company ("**Six Feathers**"), ELKHORN PARTNERS, A NEVADA LIMITED PARTNERSHIP, a Nevada limited partnership ("**Elkhorn Partners**"), BRAVO INC., a Nevada corporation ("**Bravo**"), GUNG-HO CONCRETE, LLC, a Nevada limited liability company ("**Gung-Ho**"), GERONIMO PLUMBING, LLC, a |_____| limited liability company ("**Geronimo**"), APACHE FRAMING, LLC, a Nevada limited liability company ("**Apache**"), TUSCANY GOLF COUNTRY CLUB, LLC, a Nevada limited liability company ("**Tuscany Golf**"), and PINNACLE GRADING, LLC a Nevada limited liability company ("**Pinnacle**" and, collectively with |Newco|, Rhodes Companies, Rhodes GP, Rhodes Ranch Golf, Heritage Land, Tick, Glynda, Chalkline, Batcave, Jackknife, Wallboard, Overflow, Tuscany Acquisitions, Tuscany Acquisitions II, Tuscany Acquisitions III, Tuscany Acquisitions IV, Parcel, Rhodes Design, C&J, Rhodes Realty, Jarupa, Elkhorn Investments, Rhodes Homes Arizona, Rhodes Arizona Properties, Tribes, Six Feathers, Elkhorn Partners, Bravo, Gung-Ho, Geronimo, Apache, and Tuscany Golf, the "**Borrowers**" and each, individually, a "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (together with their respective successors and permitted assigns, each individually referred to herein as a "**Lender**" and collectively as the "**Lenders**"), and |_____| as administrative agent for the Lenders (together with its successors in such capacity, the "**Administrative Agent**"), as collateral agent

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

for the Secured Parties (as defined below) (together with its successors in such capacity, the "**Collateral Agent**" and together with the Administrative Agent collectively, the "**Agents**") for the Lenders.

R E C I T A L S

**A.    WHEREAS**, Heritage Land, Rhodes Companies, Rhodes GP (collectively, the "**Original Borrowers**"), Credit Suisse Cayman Islands Branch, as administrative agent, collateral agent and syndication agent, and the financial institutions party thereto, as lenders, are parties to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Pre-Petition Credit Agreement**").

**B.    WHEREAS**, on March 31, 2009 or, for Tuscany Golf, Pinnacle, and Rhodes Homes Arizona, April 1, 2009 ("**Petition Date**"), the Original Borrowers and certain affiliates, as debtors and debtors-in-possession (the "**Debtors**"), commenced voluntary cases under Chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), which cases are being jointly administered (the "**Chapter 11 Cases**").

**C.    WHEREAS**, the Second Amended Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC et al. dated November [___], 2009, filed with the Bankruptcy Court and any Modifications (as defined below) thereto (the "**Plan of Reorganization**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the effectiveness of this Agreement, the effective date with respect to such Plan of Reorganization has occurred.

**D.    WHEREAS**, in connection with the Plan of Reorganization, the Pre-Petition Credit Agreement has been terminated and it has been agreed by the parties hereto to enter into this Agreement.

**E.    WHEREAS**, the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrowers subject to the terms and conditions contained herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree to enter into this Agreement as follows:

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## SECTION 1.
## DEFINITIONS

**1.1** **Certain Defined Terms**.

The following terms used in this Agreement shall have the following meanings:

"**Acceptable Appraisal**" means an appraisal commissioned by and addressed to the Agents (and reasonably acceptable to the Requisite Lenders as to form, assumptions, substance, and appraisal date), prepared by a qualified professional appraiser acceptable to the Requisite Lenders, and complying in all material respects with the requirements of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989; provided, that with respect to any Real Property Collateral, until a new Acceptable Appraisal has been completed following the Effective Date, the appraisal existing as of the Effective Date shall be deemed to constitute the Acceptable Appraisal with respect thereto.

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form of Exhibit I annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in subsection 2.6C.

"**Affected Loans**" has the meaning assigned to that term in subsection 2.6C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Affiliate Transaction**" has the meaning assigned to that term in subsection 6.10.

"**Agents**" has the meaning assigned to that term in the preamble to this Agreement.

"**Agreement**" has the meaning assigned to that term in the preamble hereto.

"**Apache**" has the meaning assigned to that term in the preamble to this Agreement.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrowers, any of their Subsidiaries, any Project or any Collateral (including, without limitation, any Real Property Collateral), or any of the other assets of the Borrowers and their Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrowers or any of their Subsidiaries, at any time

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrowers and their Subsidiaries.

"**Applicable Tax Rate**" means, with respect to each Fiscal Year, the sum of the highest marginal tax rates applicable to individuals under the United States federal income tax laws and applicable state and local income tax laws for such years.

"**Appraised Value**" means, with respect to the Real Property Collateral or any portion thereof, the "as is" appraised value of such Real Property Collateral or portion thereof set forth in the most-recent Acceptable Appraisal received by the Agents pursuant to the Loan Documents.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition by the Borrowers or any of their Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock (including, without limitation, of any of the Capital Stock of any of the Borrowers or any of their Subsidiaries, or the issuance of Capital Stock any Subsidiary of the Borrowers to any Person that is not a Loan Party), but excluding (a) sales, leases and other dispositions of products and services in connection with the golf and other ancillary facilities of any Project (including sales of memberships in the clubs relating to such facilities), in each case, in the Ordinary Course of Business, (b) sales, exchanges and other dispositions of obsolete, worn out or excess equipment in the Ordinary Course of Business, which, in the case of such asset sales in excess of $1,000,000 in a single transaction or series of related transactions, shall be certified in an Officer's Certificate as being a sale of obsolete, worn out or excess equipment in the Ordinary Course of Business, (c) any use of Cash and Cash Equivalents in a manner not prohibited hereunder, and (d) the non-exclusive licensing of intellectual property in the Ordinary Course of Business.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Assignment of Declarant's Rights**" means the collective reference to (i) the Assignment of Declarant's Rights, dated as of _____, made by _____ in favor of the Agents, substantially in the form of Exhibit III-A annexed hereto, (ii) the Assignment of Declarant's Rights, dated as of _____, made by _____ in favor of the Agents, substantially in the form of Exhibit III-B annexed hereto, and (iii) the Assignment of Declarant's Rights, dated as of _____, made by _____

**PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE**

in favor of the Agents, substantially in the form of <u>Exhibit III-C</u> annexed hereto, as each may hereafter be Modified from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute, together with all official rules and regulations thereunder.

"**Bankruptcy Court**" shall have the meanings set forth in the recitals hereto.

"**Batcave**" has the meaning assigned to that term in the preamble to this Agreement.

"**Board**" means the Board of Managers of [Newco].

"**Borrower Entity**" means any one of the Borrowers or their respective Subsidiaries.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401 (a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by any Borrower Entity.

"**Borrowers**" has the meaning assigned to that term in the preamble to this Agreement.

"**Borrowers' Knowledge**" means the actual knowledge, after reasonable inquiry, of any Responsible Officer.

"**Bravo**" has the meaning assigned to that term in the preamble to this Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"**Calculation Date**" has the meaning assigned to that term in subsection 6.6A.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) investment funds with a rating of at least AAA from S&P investing 95% of their assets in securities of the type described in clauses (a), (c) and (d) above; and (f) eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash Interest Threshold**" has the meaning assigned to such term in subsection 2.2C(ii).

"**Cash Pay Rate Margin**" means 2.00% per annum.

"**Chalkline**" has the meaning assigned to that term in the preamble to this Agreement.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means, at any time, [_____] shall cease to beneficially own (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) and Control (without giving effect to clause (a) of the definition of "Control") more than 50.0% of the economic interests in the Capital Stock of [Newco] (determined on a fully diluted basis) and more than 50.0% of the Capital Stock of [Newco] (determined on a fully diluted basis) ordinarily entitled to vote or consent with respect to actions of the members of [Newco].

"**Chapter 11 Cases**" shall have the meaning set forth in the recitals hereto.

"**Clark County**" means Clark County, a political subdivision of the State of Nevada.

"**Cleanup**" means all actions required or prudent to: (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are granted or purported to be granted by the Collateral Documents.

"**Collateral Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Collateral Documents**" means (a) this Agreement, (b) the Pledge and Security Agreement, (c) the Copyright Security Agreement, (d) the Mortgages, (e) each Assignment of Declarant's Rights, and (f) any other documents, instruments or agreements delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in subsection 2.1 A of this Agreement in the amount set forth in the Register.

"**Common Units**" means the limited liability company interests of [Newco], including any limited liability company interests with limited voting rights.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit IV annexed hereto delivered to the Administrative Agent by the Borrowers pursuant to subsection 5.3(iii).

"**Communications**" has the meaning assigned to that term in subsection 9.7B(ii).

"**Condemnation Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Confirmation Order**" means the Findings of Fact, Conclusions of Law, and Order Confirming the Borrowers' Plan of Reorganization issued by the Bankruptcy Court and entered on [_____] in the Chapter 11 Cases.

"**Consolidated EBITDA**" means, for any period, without duplication, (a) the sum of the amounts for such period (as determined for the Borrowers and their Subsidiaries on a combined consolidated basis) of (i) Consolidated Net Income, (ii) Consolidated Interest Expense, to the extent deducted in the calculation of Consolidated Net Income for such period, (iii) provisions for taxes based on income, to the extent deducted in the calculation of Consolidated Net Income for such period, (iv) total depreciation expense to the extent deducted in the calculation of Consolidated Net Income for such period, (v) total amortization expense to the extent deducted in the calculation of Consolidated Net Income for such period, (vi) other non-cash items reducing Consolidated Net Income to the extent reflected as a charge or otherwise deducted from

the determination of Consolidated Net Income for such period (other than any non-cash charges to the extent such charges represent an accrual of or reserve for cash expenditures in any future period) and (vii) extraordinary or non-recurring items reducing Consolidated Net Income, less (b) the sum of (i) non-cash items increasing Consolidated Net Income and (ii) extraordinary or non-recurring items, in each case, increasing Consolidated Net Income, all of the foregoing (except as otherwise provided in the definition of any term used herein) as determined on a consolidated basis in conformity with GAAP. For the purposes of this definition, provisions for taxes based on income shall also include such state or local taxes that, in lieu of taxable income, are assessed on an alternate taxing methodology, such as net worth or tangible assets.

"**Consolidated Interest Expense**" means, for any period (as determined for the Borrowers and their Subsidiaries on a consolidated basis), (1) interest expense for such period determined in accordance with GAAP paid in such period or payable in cash, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedge Agreements, plus capitalized interest to the extent included in cost of sales (excluding, however, any amounts referred to in subsection 2.3 payable to Agents or the Lenders on or before the Effective Date) less (2) Cash interest income earned on Cash and Cash Equivalents in such period; provided that for the purposes of this definition only, notwithstanding anything to the contrary herein, for the initial four Fiscal Quarters ending following the Effective Date, Consolidated Interest Expense shall equal the product of (x) Consolidated Interest Expense from the Effective Date to the applicable Calculation Date and (y) a fraction, the numerator of which is 365 and the denominator of which is the number of days from the Effective Date to the applicable Calculation Date.

"**Consolidated Net Income**" means, for any period, the net income (or loss) of the Borrowers and their Subsidiaries, on a combined consolidated basis for such period taken as a single accounting period determined in conformity with GAAP; provided that there shall be excluded therefrom (a) the income (or loss) of any Person (other than a Subsidiary of a Borrower) in which a Borrower or any of its Subsidiaries has an equity interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrowers or any Subsidiary of the Borrowers by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrowers, is merged into or consolidated with one of the Borrowers or any Subsidiary of the Borrowers, or that Person's assets are acquired by the Borrowers or any Subsidiary of the Borrowers, (c) the income of any Subsidiary of the Borrowers to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to discontinued operations, and (e) to the extent not included above, any net extraordinary gains or net non-cash extraordinary losses.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the

Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Control**" means the possession, directly or indirectly, of the power to either (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Copyright Security Agreement**" means the Copyright Security Agreement, dated as of the date hereof, by the applicable Loan Parties in favor of the Collateral Agent, in the form of Exhibit XIII annexed hereto, as such Copyright Security Agreement may be Modified from time to time.

"**Debt Service**" means, for any period, all cash payments of interest on Indebtedness of the Borrowers and their Subsidiaries made or required to be made during such period, all scheduled payments of principal of Indebtedness of the Borrowers and their Subsidiaries made during such period (including, without limitation, with respect to assessments payable by the Borrowers and their Subsidiaries in connection with Special Improvement Bonds), and all voluntary prepayments of the Loans made during such period (other than such scheduled payments of principal and voluntary prepayments of the Loans made directly or indirectly with the proceeds of any issuance of debt Securities or other Indebtedness of any of the Borrowers or any Subsidiary or any Insurance Proceeds).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Development Agreements**" means the (i) the Rhodes Ranch Development Agreement and (ii) each other effective development agreement (or similar agreement) with a Governmental Authority relating to any of the Real Property Collateral.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means such date on which the conditions to effectiveness set forth in subsection 3.1 are satisfied.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act) that extends credit or buys loans in the ordinary course and is approved by the Administrative Agent and (so long as no Default or Event of Default has occurred and is continuing) the Borrower (such approvals not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include any Borrower Entity or any Affiliate of any Borrower Entity.

"**Elkhorn Investments**" has the meaning assigned to that term in the preamble to this Agreement.

"**Elkhorn Partners**" has the meaning assigned to that term in the preamble to this Agreement.

"**Entitlement Documents**" has the meaning assigned to that term in subsection 4.36A.

"**Entitlements**" means those certain Governmental Authorizations which are required under Applicable Law to be obtained and maintained (as applicable) or appropriate in order to allow the expeditious and efficient completion of the development of the Real Property Collateral and the sale of the Real Property Collateral (and portions thereof), as legal lots, all as

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

contemplated by the most recent Acceptable Appraisal, and/or any applicable Development Agreement, and including, without limitation, all Governmental Authorizations necessary to permit applicable platting, subdividing, earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto.

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers any of their Subsidiaries or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Laws**" means all federal, state, local and foreign laws, regulations and other governmental requirements relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management or use of natural resources, as now or may at any time hereafter be in effect.

"**Environmental Liabilities**" means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and Environmental Claims against any Loan Party or their Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or their Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers or their Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Equity Proceeds**" means the sum of (i) cash proceeds from: (a) the issuance of any Capital Stock or other equity Securities of, or (b) the making of any capital contribution to, any of the Borrowers after the Effective Date (other than any such issuances that are made to, or capital contributions that are made by, any of the other Borrowers); less (ii) bona fide, direct costs actually incurred by Borrowers in connection with the receipt of Equity Proceeds, including, without limitation, underwriting discounts or commissions and fees and expenses of counsel and other advisors in connection therewith.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrowers are a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrowers are a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrowers, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrowers or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrowers or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrowers or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrowers or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrowers or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401 (a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501 (a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" has the meaning assigned to that term in Section 7.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any of the Borrowers are located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrowers under subsection 2.8B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with subsection 2.7E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to subsection 2.7E(i).

"**Existing Entitlements**" has the meaning assigned to that term in subsection 4.36A.

"**Existing Indebtedness**" means the Indebtedness described on Schedule 1.1(a) attached hereto.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing shall have expired.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**First Lien Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6B.

"**First Lien Declined Amounts**" means mandatory prepayments of the Loans pursuant to subsection 2.4B(ii) that are declined by Lenders.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than (a) Permitted Title Exceptions, (b) Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by subsection 5.5, (c) Liens permitted under clause (iv) of subsection 6.2A and (d) Specified Encumbrances to which any Lien created in any Collateral pursuant to any Collateral Document has been subordinated pursuant to subsection 2.9B) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means Real Property Collateral located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938, as amended from time to time, and any successor statute.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrowers are residents for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course.

"**Funding and Payment Office**" means the office of the Administrative Agent located at [＿＿＿＿＿＿] (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in subsection 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**Geronimo**" has the meaning assigned to that term in the preamble to this Agreement.

"**Glynda**" has the meaning assigned to that term in the preamble to this Agreement.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**Gung-Ho**" has the meaning assigned to that term in the preamble to this Agreement.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to that term in subsection 9.1G.

"**Guarantors**" means the Borrowers and the Subsidiary Guarantors.

"**Guaranty**" means the Guaranty, substantially in the form of <u>Exhibit XII</u> annexed hereto, executed and delivered by the Guarantors on the Effective Date, or executed and delivered by any additional Subsidiary Guarantor from time to time thereafter pursuant to subsection 5.11, as each such Guaranty may hereafter be Modified from time to time.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to human health and safety or to the indoor or outdoor environment.

"**Hedge Agreement**" means any agreement with respect to any swap, collar, cap, floor, hedge, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; <u>provided</u> that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any of the Borrowers or any of their Subsidiaries shall be a "Hedge Agreement".

"**Heritage Land**" has the meaning assigned to that term in the preamble to this Agreement.

"**Homesites**" means those portions of the Real Property Collateral that have been legally subdivided into lots suitable for the construction of single family and multi-family residences pursuant to recorded plats.

"**Identified Acquisition**" means an acquisition transaction identified by the Borrowers approved by the Administrative Agent and the Requisite Lenders.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**Improvements**" means all buildings, structures, fixtures, tenant improvements, and other improvements of any kind and description now or hereafter located in or on or attached to any land that is a Real Property Asset, including all building materials, water, sanitary and storm sewers, drainage, electricity, steam, gas, telephone and other utility, facilities, parking areas, roads, driveways, walks and other site improvements; and all additions and betterments thereto and all renewals, substitutions and replacements thereof.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit, whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding deferred compensation, any such obligations incurred under ERISA and current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of any Borrower or any Subsidiary of any Borrower, (i) solely for purposes of subsection 6.1 and subsection 7.6, net obligations under Hedge Agreements, including, as of any date of determination, the net amounts, if any, that would be required to be paid by such Person if such Hedge Agreements were terminated on such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, (k) all obligations under Special Improvement Bonds and (l) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person (including, without limitation, Special Improvement Bonds relating to Real Property Assets of the Borrowers and their Subsidiaries); provided that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (1) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning assigned to that term in subsection 9.2B.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Insolvency Proceeding**" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in the case of each of the foregoing clauses (a) and (b), undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Interest Coverage Ratio**" has the meaning assigned to that term in subsection 6.6C.

"**Interest Payment Date**" means the last day Business Day in each of March, June, September and December of each year, commencing on March 31, 2010.

"**Interest Period**" means select an interest period applicable to each LIBOR Loan, which Interest Period shall be a [one (1)/two (2)/three (3)/six (6)] month period.

"**Interest Rate Determination Date**" means each date for calculating the LIBOR Rate, for purposes of determining the interest rate in respect of an Interest Period. The Interest Rate Determination Date for purposes of calculating the LIBOR Rate shall be the second Business Day prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

"**Investment**" means, with respect to any Person, (a) any direct or indirect purchase or other acquisition by such Person of, or of a beneficial interest in, Capital Stock or other Securities of, all or substantially all of the assets of, or any other investment in, any other Person or (b) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business), extension of credit (by way of guaranty or otherwise) or capital contribution by such Person to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IP Collateral**" has the meaning assigned to the term "Intellectual Property" in the Pledge and Security Agreement.

17

"**Jackknife**" has the meaning assigned to that term in the preamble to this Agreement.

"**Jarupa**" has the meaning assigned to that term in the preamble to this Agreement.

"**Joint Venture**" means any Subsidiary that is not a wholly-owned Subsidiary.

"**Land and Operation Expenses**" means, for any period, the costs and cash expenditures reasonably allocable to, without duplication, (i) the operations of the Projects and amenities related to the Projects (including sales of club memberships, operations related to the golf courses and other recreational operations relating to the operation of the Projects) and/or (ii) the ownership, development, construction and sale of the Real Property Collateral, including, without limitation, general and administrative expenses, marketing and selling expenses (including subsidies, incentives and rebates relating thereto), net land development costs (consisting of (x) land development costs (excluding any land development costs funded with amounts received from Clark County, Mohave County or any other Governmental Authority, any Permitted Special Improvement District or any other Person in respect of any Special Improvement Bonds) minus (y) all reimbursements (including, without limitation, reimbursements or other payments received in respect of Special Improvement Bonds) from Clark County, Mohave County or any other Governmental Authority, any Permitted Special Improvement District or any other Person, for land development costs).

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to subsection 9.1.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrowers promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrowers and the Administrative Agent.

"**LIBOR Loans**" means Loans bearing interest at rates determined by reference to the LIBOR Rate as provided in subsection 2.2A.

"**LIBOR Rate**" shall mean, with respect to any Interest Period for the LIBOR Loans, a rate *per annum* equal to the quotient (rounded upward if necessary to the nearest 1/16 of 1%) of (a) the rate *per annum* appearing on the Telerate Page 3750 (or such other display screen as may replace Page 3750 on Telerate Access Service or any successor publication) on the second Business Day prior to the first day of such Interest Period at or about 11:00 a.m. (London time) (or as soon thereafter as practicable) (for delivery on the first day of such Interest Period) for a term comparable to such Interest Period and in an amount approximately equal to the amount of the Loan to be made or funded by the Administrative Agent as part of such borrowing, divided by (b) one minus the Reserve Requirement for such Loans in effect from time to time. If for any reason rates are not available as provided in clause (a) of the preceding sentence, the rate to be

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

used in clause (a) shall be (in each case, rounded upward if necessary to the nearest 1/16 of 1%), (i) the rate *per annum* at which Dollar deposits are offered to the Administrative Agent in the London interbank eurodollar currency market or (ii) the rate at which Dollar deposits are offered to the Administrative Agent in, or by the Administrative Agent to major banks in, any offshore interbank eurodollar market selected by the Administrative Agent, in each case on the second Business Day prior to the commencement of such Interest Period at or about 10:00 a.m. (for delivery on the first day of such Interest Period) for a term comparable to such Interest Period and in an amount approximately equal to the amount of the Loan to be made or funded by the Administrative Agent as part of such borrowing.    The LIBOR Rate shall be adjusted automatically as to all LIBOR Loans then outstanding as of the effective date of any change in the Reserve Requirement, and in no event shall the LIBOR Rate exceed 2% per annum.

"**Lien**" means any lien, mortgage, pledge, assignment, hypothecation, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**LLC Agreement**" means the Limited Liability Company Operating Agreement of [Newco], dated as of [_____], as such Limited Liability Company Operating Agreement of [Newco] may be Modified from time to time.

"**Loan Documents**" means this Agreement, the Notes, the Guaranties, the Collateral Documents and other documents evidencing or securing Obligations, and all other documents, instruments and agreements delivered by any Loan Party to any Agent or any Lender in connection with this Agreement or any other Loan Document.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Parties**" means the Borrowers and the Subsidiary Guarantors.

"**Loans**" means the loans outstanding or made by the Lenders pursuant to subsection 2.1A.

"**Major Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that contemplates (i) a gross sales price in excess of $20,000,000 or (ii) the sale of Real Property Collateral with an Appraised Value in excess of $20,000,000.

"**Major Entitlements**" means all (i) zoning approvals, (ii) mapping approvals, (iii) development agreements and (iv) solely with respect to commercial developments, use permits, necessary or appropriate in order to allow the expeditious and efficient completion of the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

development of real property and the sale and usage of such real property in accordance with all Applicable Law.

"**Mandatory Prepayment Date**" has the meaning assigned to that term in subsection 2.4C(i).

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets, financial condition or prospects of the Borrowers and their Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties of the Loan Documents, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under the Loan Documents, or (e) a material adverse effect upon the value of the Real Property Collateral taken as a whole; provided that, neither the Chapter 11 Cases nor the events leading thereto shall constitute a Material Adverse Effect.

"**Material Contracts**" means each of the Development Agreements in effect on the Effective Date.

"**Material Environmental Liability**" means an Environmental Liability which could reasonably be expected to result in (i) a discontinuation of a substantial portion of the business, operations or development of the Borrowers and their Subsidiaries, taken as a whole, (ii) potential costs, liabilities or other losses in excess of $7,500,000, (iii) any designation of any portion of the Real Property Assets on the federal National Priorities List, or any similar state list or (iv) any designation of any portion of the Real Property Assets on any other list maintained by any Governmental Authority of sites at which a Release of Hazardous Materials has occurred if such Release could reasonably be expected to result in potential costs, liabilities or other losses in excess of (x) for purposes of the provisions of subsection 5.9A, $7,500,000 or (y) for purposes of all other provisions hereof, $1,000,000.

"**Material Licenses**" has the meaning assigned to that term in subsection 4.6.

"**Maturity Date**" means [_____], 2016.

"**Maximum Amount**" has the meaning assigned to that term in subsection 9.13A.

"**Modifications**" means any amendments, restatements, amendment and restatements, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**", or related words shall have meanings correlative thereto.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Mohave County**" means Mohave County, a political subdivision of the State of Arizona.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a deed of trust, assignment of leases and rents, security agreement and fixture filing executed and delivered by any Loan Party on or after the Effective Date in such form as may be approved by the Collateral Agent, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in subsection 3.1G.

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrowers or any ERISA Affiliate is contributing or to which the Borrowers or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Non-Consenting Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Notes**" means (a) the promissory notes of the Borrowers issued pursuant to subsection 2.1D and (b) any promissory notes issued by the Borrowers in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VIII annexed hereto, as they may be Modified from time to time.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent, whether for principal, interest (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Borrower or any Subsidiary Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) or payments for fees, expenses, indemnification or otherwise.

"**OECD**" means the Organisation for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the board (if an officer) or chief executive officer or by the chief executive officer or the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and/or (c) if such person is one of the Borrowers or a Subsidiary of the Borrowers, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to a specific Person, the ordinary course of such Person's business, substantially as conducted by any such Person prior to and as of the Effective Date (to the extent such Person was a Loan party as of the Effective Date) or as otherwise contemplated in connection with the development of the Projects, and which shall not in any event interfere in any material respect with the ongoing operation of the assets of such Person.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or other Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, its Organizational Certificate and the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Health Act of 1970, as amended from time to time, and any successor statute.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Overflow**" has the meaning assigned to that term in the preamble to this Agreement.

"**Parcel**" has the meaning assigned to that term in the preamble to this Agreement.

"**Participant**" has the meaning assigned to that term in subsection 9.1D.

"**Participant Register**" has the meaning assigned to that term in subsection 9.1.D(iv).

"**Paying Agent**" has the meaning assigned to that term in subsection 8.6.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in subsection 4.33(vi).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrowers or any ERISA Affiliate.

"**Permitted Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that does not constitute a Major Collateral Asset Sale.

"**Permitted Encumbrances**" means the following types of Liens:

> (a)    Liens    (including,    without    limitation,    Specified Encumbrances) for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by subsection 5.5;

> (b)    statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;

> (c)    Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

> (d)    any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(e)    leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the Ordinary Course of Business or the operations of the Borrowers or any of their Subsidiaries;

(f)    easements,    covenants,    conditions,    rights-of-way, restrictions, minor defects, encroachments or irregularities in title and other similar charges or encumbrances entered into or arising in the Ordinary Course of Business of the Borrowers or any of their Subsidiaries;

(g)    any (i) interest or title of a lessor or sublessor under any Capital Lease permitted by subsection 6.1(iii) or any operating lease not prohibited by this Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii);

(h)    deposits in the Ordinary Course of Business to secure liabilities to insurance carriers, lessors, utilities and other service providers;

(i)    zoning,    building    codes    and    other    Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset which are not violated and would not be violated by the current and contemplated use, development and/or occupancy of such Real Property Asset or the operation of the business of the Borrowers or any of their Subsidiaries thereon; and

(j)    bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business.

"**Permitted Existing Indebtedness**" means the Indebtedness described on Schedule 1(c) attached hereto.

"**Permitted Real Property Acquisitions**" means one or more bona fide arms-length acquisitions for fair market value by any Loan Party of an interest in real property.

"**Permitted Special Improvement Districts**" means one or more special improvement districts, special assessment districts or community facility districts established for the benefit of a Project after the Effective Date.

"**Permitted Title Exceptions**" means (a) the Permitted Encumbrances reflected in the Mortgagee Policies delivered pursuant to subsection 3.1G(iii) and (b) Permitted Encumbrances reasonably satisfactory to the Administrative Agent reflected in Mortgagee Policies delivered pursuant to subsection 5.11).

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, joint stock company, unincorporated association, company, partnership, limited partnership, Governmental Authority or other entity of whatever nature.

"**Petition Date**" shall have the meaning set forth in the recitals hereto.

"**PIK Margin**" means 5.00% per annum.

"**Pinnacle**" has the meaning assigned to that term in the preamble to this Agreement.

"**Plan of Reorganization**" shall have the meaning set forth in the recitals hereto.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement dated as of the date hereof and entered into by and among the Borrowers, the Collateral Agent, and any Subsidiary Guarantor that becomes party thereto, substantially in the form of Exhibit X annexed hereto, as such Pledge and Security Agreement may hereafter be Modified from time to time.

"**Pledging Parent**" has the meaning assigned to that term in subsection 5.11.

"**Pre-Petition Credit Agreement**" shall have the meanings set forth in the recitals hereto.

"**Proceedings**" has the meaning assigned to that term in subsection 5.3(xii).

"**Projects**" means the collective reference to Rhodes Ranch, Tuscany, South West Ranch, and Spanish Hills.

"**Properly Contested**" means, in the case of any obligations of a Loan Party (including any Taxes) that are not paid as and when due or payable by reason of such Loan Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof: (i) such obligations are being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Loan Party has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such obligations could not reasonably be expected to have a Material Adverse Effect; (iv) no Lien is imposed upon any of such Loan Party's assets with respect to such obligations unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the obligations result from, or are determined by the entry, rendition or issuance against a Loan Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Loan Party, such Loan Party forthwith (and in any event prior to commencement of any enforcement proceedings against such Loan Party or any property of such Loan Party) pays such obligations and all penalties, interest and other amounts due in connection therewith.

"**Pro Rata Share**" means, with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by <u>dividing</u> (i) the Loan Exposure of that Lender by (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to subsection 9.1. The initial Pro Rata Share of each Lender is set forth in the Register.

"**PTO**" means the United States Patent and Trademark Office.

"**Qualified Sales Agreement**" means a definitive and binding purchase and sale agreement between any of the Loan Parties and a non-affiliated third party purchaser with respect to any Real Property Collateral.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Borrower Entity in any real property.

"**Real Property Collateral**" means the portion of the Collateral comprising a Real Property Asset in which one or more of the Loan Parties hold fee simple title or a valid leasehold interest, as determined from time to time, which is, or is required pursuant to the terms of this Agreement or the other Loan Documents to be, encumbered by a Lien of the Mortgages.

"**Recovery Event**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Refinancing**" means, in respect of any Indebtedness, to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. "**Refinanced**" and "**Refinance**" have meanings correlative thereto.

"**Register**" has the meaning assigned to that term in subsection 9.1C.

"**Registered Loan**" has the meaning assigned to that term in subsection 9.1C.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, advisors, controlling Persons and members of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Release Instruments**" has the meaning assigned to that term in subsection 2.9A.

"**Released Parcel**" has the meaning assigned to that term in subsection 2.9A.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**Required Dedication**" means a dedication or conveyance of a portion of the Real Property Collateral at the direction of a Governmental Authority or a public utility, or pursuant to or in connection with a Development Agreement, or to a homeowners or condominium owners association, to (i) such Governmental Authority (or any designee of such Governmental Authority), or (ii) a utility provider or (iii) a homeowners or condominium owners association, for parks, schools, recreation centers, common community facilities, public streets, utility easements and installations, slopes or other rights-of-way or public use; provided any such dedication or conveyance (individually and/or taken together will all other such dedications and conveyances) (i) has not had and could not reasonably be expected to have a Material Adverse Effect or (ii) has not impaired and could not reasonably be expected to impair the Collateral Agent's First Priority Lien on the remaining Real Property Collateral.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders.

"**Reserve Requirements**" shall mean, with respect to any day in an Interest Period for a LIBOR Loan, the aggregate of the maximum of the reserve requirement rates (expressed as a decimal) in effect on such day for Eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Federal Reserve Board) maintained by a member bank of the Federal Reserve System. As used herein, the term "reserve requirement" shall include, without limitation, any basic, supplemental or emergency reserve requirements imposed on any Lender by any Governmental Authority.

"**Responsible Officer**" means the chairman of the board (if an officer), chief executive officer, president/chief operating officer, any vice president, general counsel, chief financial officer, managing member, officer, or board member of the Borrowers and their Subsidiaries, as applicable, but in any event, with respect to financial matters, the chief financial officer, treasurer, managing member, or board member of the Borrowers and their Subsidiaries, as applicable.

"**Restricted**" means, when referring to Cash or Cash Equivalents of the Borrowers or any of the Subsidiary Guarantors, that such Cash or Cash Equivalents (a) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrowers or of any such Subsidiary Guarantor (unless such appearance is related to the Loan Documents or Liens created thereunder), (b) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties or (c) are not otherwise generally available for use by the Borrowers or such Subsidiary Guarantor.

"**Restricted Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other

rights to acquire shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding.

"**Restricted Seller Carry-Back Notes**" means promissory notes issued as consideration to any of the Borrowers or any of their Subsidiaries by the purchaser under a Qualified Sales Agreement that (i) are secured by a first priority Lien in favor of any of the Borrowers or any of their Subsidiaries on the interest in real property sold to such purchaser pursuant to such Qualified Sales Agreement and (ii) have a final maturity date that is prior to the Maturity Date.

"**Rhodes Arizona Properties**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Design**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes GP**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Homes Arizona**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Ranch**" means those certain golf, commercial and residential developments located in Clark County commonly known as Rhodes Ranch, as depicted on the maps attached hereto as **Exhibit XI.**

"**Rhodes Ranch Development Agreement**" means the Development Agreement, dated December 18, 1996, by and among Clark County and Rhodes Ranch Limited Partnership, a Nevada limited partnership, Rhodes Ranch Land Holdings Limited Partnership, a Delaware limited partnership, Southwestern Opportunities Limited Partnership, a Nevada limited partnership, and Durango/Springs Limited Partnership, a Nevada limited partnership, each as predecessors to Rhodes Design & Development.

"**Rhodes Ranch Golf**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Realty**" has the meaning assigned to that term in the preamble to this Agreement.

"**S&P**" means Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"**Secured Parties**" means the collective reference to the Agents and the Lenders.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or

participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Six Feathers**" has the meaning assigned to that term in the preamble to this Agreement.

"**Solvent**" means, with respect to any Person, that as of any date of determination, (a) the sum of the "fair value" of the assets of such Person will, as of such date, exceed the sum of all debts of such Person as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the "present fair saleable value" of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability on existing debts of such Person as such debts become absolute and matured, as such quoted term is determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct any business in which it is or is about to become engaged and (d) such Person does not intend to incur, or believe or reasonably should believe that it will incur, debts beyond its ability to pay as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured. For purposes of this definition, the amount of any contingent, unliquidated and disputed claim and any claim that has not been reduced to judgment at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such liabilities meet the criteria for accrual under the Financial Accounting Standards Board Statement of Financial Accounting Standards No. 5).

"**South West Ranch**" means those certain commercial and residential developments located in Clark County commonly known as South West Ranch, as depicted on the maps attached hereto as Exhibit XI.

"**Spanish Hills**" means those certain residential developments located in Clark County commonly known as Spanish Hills, as depicted on the maps attached hereto as Exhibit XI.

"**Special Improvement Bonds**" means special improvement district bonds, special assessment bonds, community facility district bonds, private activity bonds, tax increment financing, general obligation bonds, special assessment revenue bonds and any similar bonds (i) issued by a Permitted Special Improvement District, (ii) the terms of which have been reviewed and approved by the Administrative Agent and the Requisite Lenders, (iii) the proceeds of which are solely available to directly pay or to reimburse the Borrowers or their Subsidiaries for Land

and Operation Expenses, (iv) which are paid or satisfied (in whole or in part) through Special Taxes and (v) for which the aggregate amount of all Special Taxes paid in any Fiscal Year does not exceed the Special Tax Cap for such Fiscal Year.

"**Special Tax Cap**" means the special tax levy or assessment per year equal to the special taxes or assessments for the base year that together with ad valorem real estate taxes, and other real property liens and charges by a Governmental Authority, does not exceed 2% of the market value of the Homesites located in, or in the vicinity of, the applicable Permitted Special Improvement District (which is the issuer of the applicable Permitted Special Improvement Bonds) intended to be sold (projected as of the date of issuance of such Special Improvement Bonds), as determined by the Governmental Authority through which such Permitted Special Improvement District is established, which special tax levy or assessment may be increased by up to 2% per year thereafter.  For purposes of this Agreement, such Special Tax Cap includes any charges for maintenance and services imposed as a charge against real property, including such fees and charges imposed through a landscape and lighting maintenance district, special improvement district, special assessment district, a community facilities district, a community services district or other similar mechanism.

"**Special Taxes**" means special taxes or assessments on Real Property Assets used to pay or satisfy Special Improvement Bonds.

"**Specified Encumbrances**" has the meaning assigned to that term in subsection 2.9B.

"**SPV**" has the meaning assigned to that term in subsection 9.1G.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or the management of which is otherwise controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof.    Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of any of the Borrowers (including Subsidiaries of a Borrower that are Borrowers).

"**Subsidiary Guarantor**" means any Subsidiary of the Borrowers that is a party to the Guaranty at any time pursuant to subsection 5.11.

"**Subsidiary Loan Documents**" has the meaning assigned to that term in subsection 5.11B.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in subsection 8.1B.

"**Tax Distributions**" means Restricted Payments made pursuant to subsection 6.5(iii).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Terminated Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Test Period**" means each period of four consecutive Fiscal Quarters then last ended on each Calculation Date, in each case taken as one accounting period.

"**The Rhodes Companies**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tick**" has the meaning assigned to that term in the preamble to this Agreement.

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

"**Total Consolidated Indebtedness**" means, as at any date of determination, the aggregate amount of all Indebtedness of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"**Total Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6A.

"**Tribes**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany**" means those certain golf, commercial and residential developments located in Clark County commonly known as Tuscany, as depicted on the maps attached hereto as <u>Exhibit XI</u>.

"**Tuscany Acquisitions**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Acquisitions II**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Acquisitions III**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Acquisitions IV**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Golf**" has the meaning assigned to that term in the preamble to this Agreement.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other jurisdiction govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such jurisdiction.

"**Unrestricted**" means, when referring to Cash or Cash Equivalents of the Borrowers or any of the Subsidiary Guarantors, that such Cash or Cash Equivalents are not Restricted.

"**Wallboard**" has the meaning assigned to that term in the preamble to this Agreement.

## 1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.

**A.**    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time Modified (subject to any restrictions on such Modifications set forth herein), (b) any reference herein (i) to any Person (other than a natural person) shall be construed to include such Person's permitted successors and assigns and (ii) to any Borrower or any other Loan Party shall be construed to include such Borrower or such other Loan Party as debtor and debtor-in-possession and any receiver or trustee for such Borrower or such other Loan Party, as the case may be, in any insolvency or liquidation proceeding, (c) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, without limitation, Real Property Assets, fixtures, Cash, securities, Capital Stock, accounts and contract rights, and Proceeds (as such term is defined in the Pledge and Security Agreement) therefrom.

**B.**    Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrowers to the Lenders pursuant to clauses (i), (ii) and (x) of subsection 5.3 shall be prepared in accordance with GAAP (except, with respect to interim financial statements, for the absence of normal year-end audit adjustments and explanatory footnotes) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 5.3(iv)). Calculations in connection with the definitions, covenants and other provisions of this

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements referred to in subsection 4.14A; provided, that should such accounting principles and policies change, the Borrowers, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

## SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

**2.1    Commitments; Loans.**

**A.    Loans.** Each Lender has prior to the Effective Date funded term loans under the Pre-Petition Credit Agreement.  In connection with the implementation of the Plan of Reorganization and in partial satisfaction of the Lenders' claims under the Pre-Petition Credit Agreement, on the Effective Date, each Borrower hereby incurs loans (as to each Lender a "**Loan**" and collectively, the "**Loans**") in an initial aggregate principal amount equal to $50,000,000 as Obligations hereunder. Each Lender's Commitment shall terminate immediately and without further action after giving effect to the incurrence of the Loans by the Borrowers. The proceeds of the Loans shall be used for the purposes identified in subsection 2.5A.  Loans, once repaid or prepaid, may not be reborrowed.

**B.    [Intentionally Omitted].**

**C.    [Intentionally Omitted].**

**D.    Notes.** The Borrowers shall execute and deliver on the Effective Date to each Lender requesting the same (or to the Administrative Agent for that Lender) a Note substantially in the form of Exhibit VIII annexed hereto to evidence that Lender's Loan.  Any Lender not receiving a Note may request at any time that the Borrowers issue it such Note on the terms set forth herein, and the Borrowers agree to issue such Note promptly upon the request of a Lender. The Notes and the Obligations evidenced thereby shall be governed by, subject to and benefit from all of the terms and conditions of this Agreement and the other Loan Documents and shall be secured by the Collateral.

**2.2    Interest on the Loans.**

**A.    Rate of Interest.** Subject to the provisions of subsections 2.2E, 2.6 and 2.7, each Loan shall bear interest on the unpaid principal amount thereof from the date made to maturity (whether by acceleration or otherwise) at a rate determined by reference to the LIBOR Rate. Subject to the provisions of subsections 2.2E, 2.6 and 2.7, the Loans shall bear interest through maturity as follows:

(i)    if a LIBOR Loan, and the interest is paid in Cash on the applicable Interest Payment Date and not capitalized pursuant to subsection 2.2C(i), then at the sum of the LIBOR Rate for the relevant Interest Period plus the Cash Pay Rate Margin.

(ii)    if a LIBOR Loan, and the interest is not paid in Cash on the applicable Interest Payment Date and capitalized pursuant to subsection 2.2C(ii), then at the sum of the LIBOR Rate for the relevant Interest Period plus the PIK Margin.

**B.    Interest Periods.** The following terms shall be applicable to each Interest Period:

(i)    each successive Interest Period shall automatically commence on the day on which the next preceding Interest Period expires;

(ii)    if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), shall, end on the last Business Day of a calendar month; and

(iv)    no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date.

**C.    Interest Payments.**

(i)    Interest Payments Generally. Subject to the provisions of subsections 2.1C(ii) and 2.2E below, interest on each Loan shall be payable in arrears in Cash on each Interest Payment Date applicable to that Loan, upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity, by acceleration or otherwise).

(ii)    Capitalization of Interest. If an Interest Payment Date occurs and (a) the average of the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of each of the two (2) consecutive Fiscal Quarters immediately preceding such Interest Payment Date is less than $15,000,000, or (b) the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the Fiscal Quarter immediately preceding the Fiscal Quarter in which such Interest Payment Date occurs is less than $15,000,000 (collectively, the "Cash Interest Threshold"), then on such Interest Payment Date the Borrowers may, at their option and in their sole discretion, in lieu of the payment in whole or in part of interest due on such Loan on such Interest Payment Date which is in excess of the LIBOR Rate then in effect for such Loan for such Fiscal Quarter, pay such amounts of interest by adding such amounts to the principal amount of such Loan on such Interest Payment Date. For the avoidance of doubt, (x) on the relevant Interest Payment Date the Borrower shall pay in Cash the interest due on such Interest Payment Date attributable to the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

LIBOR Rate, and (y) the interest capitalized on the relevant Interest Payment Date pursuant to this subsection 2.2C(ii) shall be attributable to the PIK Margin (or the interest relating to that portion of the PIK Margin not paid in Cash on the relevant Interest Payment Date). Capitalized interest shall be payable in cash on any future Interest Payment Date to the extent the Cash Interest Threshold is met after giving effect to the payment of interest and capitalized interest due on such Interest Payment Date or, if the Cash Interest Threshold is not met on such Interest Payment Date, as the Borrowers may otherwise elect. If the Borrowers elect to pay a portion of the interest due on any Loan through an increase in the principal amount of such Loan as provided in this subsection 2.2C(ii), the Borrowers shall, within two (2) Business Days of each relevant Interest Payment Date, deliver to the Administrative Agent written notice of such election, which notice shall also state the amount of interest so added to the principal of the Loan and the new principal amount of the Loan. To the extent not previously paid, all capitalized interest shall be paid in cash at maturity (including final maturity, by acceleration or otherwise).

**D.    Automatic Continuation.** Subject to the provisions of subsection 2.6, upon the expiration of any Interest Period applicable to a LIBOR Loan and until prepayment of such LIBOR Loan in full or until maturity (including final maturity, by acceleration or otherwise), such LIBOR Loan shall automatically be continued for a successive Interest Period.

**E.    Post-Default Interest.** Upon the occurrence and during the continuation of any Event of Default (x) under subsections 7.1 or 7.7, and (y) during the continuation of any other Event of Default, following written notice thereof to the Borrowers, at the election of the Administrative Agent (which may be revoked at the option of the Requisite Lenders notwithstanding any provision of subsection 9.5A that would require the consent of all Lenders thereto), the outstanding principal amount of all Loans and, to the extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans. Payment or acceptance of the increased rates of interest provided for in this subsection 2.2E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

**F.    Computation of Interest.** Interest on the Loans shall be computed on the basis of a 360-day year and for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

**PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE**

2.3    <u>Fees</u>.

The Borrowers agree to pay such fees to the Agents as may hereafter be (or have previously been) agreed upon.

2.4    <u>Repayments and Prepayments; General Provisions Regarding Payments</u>.

A.    **Scheduled Payments of Loans**.

The Borrowers shall repay the principal amount of the Loans on the Maturity Date, together with all other amounts owing by the Borrowers under this Agreement with respect to the Loans.

B.    **Prepayments of Loans**.

(i)    <u>Voluntary Prepayments</u>.

(a)    Subject to the terms of subsection 2.4B(i)(b), the Borrowers may, upon not less than three (3) Business Days' prior irrevocable written or telephonic notice, promptly confirmed in writing to the Administrative Agent (which notice the Administrative Agent will promptly transmit to each Lender), at any time and from time to time prepay the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; <u>provided, however</u>, that in the event the Borrowers elect to prepay a LIBOR Loan other than on the expiration of the Interest Period applicable thereto, the Borrowers shall, at the time of such prepayment, also pay any amounts payable under subsection 2.6D hereof; and <u>provided, further</u>, that if such notice of prepayment indicates that such prepayment is with respect to all outstanding Loans and is to be funded with the proceeds of a Refinancing, such notice may be revoked if the Refinancing is not consummated. Notice of prepayment having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein. Any voluntary prepayments pursuant to this subsection 2.4B(i) shall be applied as specified in subsection 2.4C. Concurrently with each voluntary prepayment pursuant to this subsection 2.4B(i) the Borrowers shall deliver to the Administrative Agent an Officer's Certificate that identifies the source of the funds used to finance such voluntary prepayment, including a statement as to whether such voluntary prepayment of the Loans is being made directly or indirectly with the proceeds of any issuance of debt Securities or other Indebtedness of any of the Borrowers or any Subsidiary.

(b)    [Intentionally Omitted.]

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(ii)    Mandatory Prepayments.

The Loans shall be prepaid in the manner provided in subsection 2.4C upon the occurrence of the following circumstances:

(a)    Prepayments Due to Issuance of Debt.    Subject to the terms of subsection 2.4B(ii)(f), no later than the first (1st) Business Day following the closing of any transaction pursuant to which any of the Borrowers or any of their Subsidiaries issue debt Securities or incur additional Indebtedness for borrowed money (other than Indebtedness permitted under subsection 6.1), the Borrowers shall prepay the Loans in an amount equal to the principal amount of such debt Securities or Indebtedness for borrowed money, net of the underwriting discounts and commissions paid or payable to the Borrowers or their Subsidiaries, plus an amount equal to the prepayment premium, if any.

(b)    Prepayments Due to Issuance of Equity Securities.    No later than the first (1st) Business Day following the closing of any transaction pursuant to which any of the Borrowers or any of their Subsidiaries receive any Equity Proceeds (other than Equity Proceeds received by a Borrower's wholly-owned Subsidiary from Investments made by a Borrower or another of its Subsidiaries in such Subsidiary and permitted by subsection 6.3), the Borrowers shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds.

(c)    [Intentionally Omitted].

(d)    Prepayments from Unrestricted Cash and Cash Equivalents.    No later than the third (3rd) Business Day following the last day of the each Fiscal Quarter, the Borrowers shall prepay the Loans, after the payments of interest (and capitalized interest) required hereunder, if (a) the average of the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of each of the two (2) immediately preceding consecutive Fiscal Quarters is greater than $15,000,000, or (b) the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of the immediately preceding Fiscal Quarter is greater than $15,000,000; provided that such prepayment shall not be required to the extent that, after giving effect to such prepayment, the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of the immediately preceding Fiscal Quarter is reduced to less than $10,000,000; and provided further that such prepayment shall not be required to the extent that (i) the Board and a majority of the outstanding Common Units have affirmatively voted to set aside an amount not to exceed $7,000,000 from such amounts that are otherwise required to be prepaid, or (ii) the Board and 66.67% of the outstanding Common Units have affirmatively voted to set aside an amount in excess of $7,000,000, from such amounts that are otherwise required to be prepaid, in each case for (i) and (ii) above, to effectuate an Identified Acquisition and so long as such funds

have been deposited into a segregated deposit account (subject to a perfected security interest in favor of the Collateral Agent for the benefit of the Lenders) for such purpose.

(iii)    No Waiver. Nothing contained in subsection 2.4B(ii) shall be deemed to permit any Loan Party to incur Indebtedness or enter into any transaction not otherwise permitted under this Agreement.

## C.    **Application of Prepayments.**

(i)    Application of Prepayments.    Each prepayment received by the Administrative Agent from the Borrowers under subsection 2.4B(i) or (ii) with respect to the Loans shall be applied in the following order:    First, to the payment of any late charges due and payable hereunder; second, to the repayment of any amounts advanced by the Administrative Agent or the Collateral Agent in accordance with the Mortgages or any of the other Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by the Administrative Agent or the Collateral Agent in connection with the collection of the Loans or under, or in connection with, the Loan Documents (including all attorneys' fees payable hereunder); third, to the payment of accrued and unpaid interest to the extent then due and payable; fourth, to fund any reserves or escrows required by the Administrative Agent or the Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; fifth, to the payment of any LIBOR breakage costs incurred by Lenders on account of such payment; and sixth, to reduction of the outstanding principal balance of the Loans (provided that any First Lien Declined Amounts to be applied pursuant to this clause sixth shall be distributed to the prepayment, on a pro rata basis, of the Loans held by Lenders that have elected to accept such First Lien Declined Amounts).    Notwithstanding the foregoing, (i) if an Event of Default has occurred and is continuing, the Administrative Agent may apply any payments received in such order or proportion as the Administrative Agent, in its sole discretion, may determine and (ii) as among the Lenders, such payments shall be applied in accordance with subsection 2.4D(iii) below.    The Borrowers shall deliver to the Administrative Agent and each Lender notice of each prepayment of Loans in whole or in part pursuant to subsection 2.4B(ii) not less than five (5) Business Days prior to the date such prepayment shall be made (each, a "**Mandatory Prepayment Date**").    Such notice shall set forth (i) the Mandatory Prepayment Date, (ii) the aggregate amount of such prepayment and (iii) the option of each Lender to (x) decline its share of such prepayment or (y) accept First Lien Declined Amounts. Any Lender that wishes to exercise its option to decline such prepayment or to accept First Lien Declined Amounts shall notify the Administrative Agent by facsimile not later than three (3) Business Days prior to the Mandatory Prepayment Date.    Any Lender that does not decline such prepayment in writing on or prior to the third (3rd) Business Day prior to the Mandatory Prepayment Date shall be deemed to have accepted such prepayment but not elected to accept First Lien Declined Amounts.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(ii)    [Intentionally Omitted].

**D.    General Provisions Regarding Payments**.

(i)    <u>Manner and Time of Payment</u>.    All payments by the Borrowers of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 Noon (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent after that time on such due date shall, at the Administrative Agent's sole discretion, be deemed to have been paid by the Borrowers on the next succeeding Business Day.

(ii)    <u>Application of Payments to Principal, Interest and Prepayment Fees</u>. Except as provided in subsection 2.2C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest and prepayment fees, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest and prepayment fees, if any, before application to principal.

(iii)    <u>Apportionment of Payments</u>.    The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares. The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent.

(iv)    <u>Payments on Business Days</u>.    Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

(v)    <u>Notation of Payment</u>. Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; <u>provided</u> that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect such disposition or the obligations of the Borrowers hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.

E.    **Application of Proceeds of Collateral.**

Except as provided in subsection 2.4B(ii) with respect to prepayments, all proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document shall, in the discretion of the Collateral Agent, be held by the Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by the Administrative Agent against, the applicable Obligations in the following order of priority:

(a)    to the payment of all costs and expenses of such sale, collection or other realization, including, without limitation, reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent thereunder for the account of the applicable Loan Party (excluding principal and interest in respect of any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(b)    thereafter, to the extent of any excess proceeds, to the payment of all other Obligations on a pro rata basis; and

(c)    thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.5    [Intentionally Omitted.].**

**2.6    Special Provisions Governing LIBOR Loans.**

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to LIBOR Loans as to the matters covered:

**A.    Determination of Applicable Interest Rate.**    As soon as practicable after 11:00 a.m. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrowers and each Lender.

**B.      Inability to Determine Applicable Interest Rate.** In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of LIBOR Rate the Administrative Agent shall on such date give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and each Lender of such determination, whereupon no Loans may be continued as LIBOR Loans (including, without limitation, pursuant to subsection 2.2D hereof), until such time as the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed).

**C.      Illegality or Impracticability of LIBOR Loans.** In the event that on any date any Lender (in the case of clause (i)) and the Required Lenders (in the case of clause (ii)) shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrowers and the Administrative Agent) that the making, maintaining or continuation of its LIBOR Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as LIBOR Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, and (b) the Affected Lender's obligation to maintain its outstanding LIBOR Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law. Nothing in this subsection 2.6C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as LIBOR Loans in accordance with the terms of this Agreement.

**D.      Compensation For Breakage or Non-Commencement of Interest Periods.** The Borrowers shall compensate each Lender, upon written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by such Lender to the lenders of funds borrowed by it to make or carry its LIBOR Loans and any actual loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds) which such Lender may sustain: (i) if any prepayment (including any prepayment pursuant to subsection 2.4B or assignment pursuant to subsection 2.8) of any of its LIBOR Loans occurs on a date that is not the last day of an Interest Period applicable to that

41

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Loan, (ii) if any prepayment of any of its LIBOR Loans is not made on any date specified in a notice of prepayment given by the Borrowers or (iii) as a consequence of any other default by the Borrowers in the repayment of its LIBOR Loans when required by the terms of this Agreement.

E.    **Booking of LIBOR Loans.**   Any Lender may make, carry or transfer LIBOR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

F.    **Assumptions Concerning Funding of LIBOR Loans.**   Calculation of all amounts payable to a Lender under this subsection 2.6 and under subsection 2.7A shall be made as though that Lender had actually funded each of its relevant LIBOR Loans through the purchase of a eurodollar deposit bearing interest at the rate obtained pursuant to the definition of LIBOR Rate in an amount equal to the amount of such LIBOR Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its LIBOR Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this subsection 2.6 and under subsection 2.7A.

G.    **LIBOR Loans After Default.**   After the occurrence of and during the continuation of a Default or Event of Default, no Loan may be continued as a LIBOR Loan and the Borrowers may no longer maintain any Loan as a LIBOR Loan after the expiration of any Interest Period then in effect for that Loan.

## 2.7    Increased Costs; Taxes.

A.    **Increased Costs Generally.**   If any Change in Law shall: (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the LIBOR Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

B.    **Capital Requirements.**   If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

**C.**    **Certificates for Reimbursement**.    A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection 2.7A or 2.7B and delivered to the Borrowers shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

**D.**    **Delay in Requests**.    Failure or delay on the part of any Lender to demand compensation pursuant to this subsection 2.7 shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Borrowers shall not be required to compensate a Lender pursuant to this subsection 2.7 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**E.**    **Taxes.**

(i)    <u>Payments Free of Taxes</u>.    Subject to subsection 2.7E(v) below, any and all payments by or on account of any obligation of the Borrowers hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(ii)    <u>Payment of Other Taxes by the Borrowers</u>.    Without limiting the provisions of paragraph (i) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    <u>Indemnification by the Borrowers</u>.    The Borrowers shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this subsection 2.7E) paid by such Agent or such Lender and any penalties, interest and

reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrowers by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)    Evidence of Payments.    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)    Status of Lenders.    Any Lender, if requested by the Borrowers or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements. Without limiting the generality of the foregoing, in the event that any of the Borrowers is a resident for tax purposes in the United States of America, each Foreign Lender shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent), whichever of the following is applicable: (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party; (ii) duly completed copies of Internal Revenue Service Form W-8ECI; (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Internal Revenue Code or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN; or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrowers or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrowers or the Administrative Agent to permit the Borrowers to determine the withholding or deduction required to be made. A Foreign Lender shall not be required to deliver any form or statement pursuant to this subsection 2.7E(v) that such Foreign Lender is not legally able to deliver.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(vi)    <u>Treatment of Certain Refunds</u>. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to subsection 2.7E, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under subsection 2.7E with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that the Borrowers, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrowers or any other Person.

## 2.8    <u>Mitigation Obligations; Replacement of Lenders</u>.

**A.    Designation of a Different Lender Office.** If any Lender requests compensation under subsection 2.7A or 2.7B, or requires the Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to subsection 2.7 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**B.    Replacement of Lenders.** If any Lender requests compensation under subsection 2.7A or 2.7B, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its LIBOR Loans in accordance with subsection 2.6.C hereof, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, subsection 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) in the case of assignments not made using an electronic settlement system (<u>e.g.</u>, ClearPar), the Borrowers shall have paid to the Administrative Agent the assignment fee specified in subsection 9.1B(i)(c), (ii)

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under subsection 2.6D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, LIBOR Loans, (iv) in the case of any such assignment resulting from a claim for compensation under subsection 2.7A or 2.7B or payments required to be made pursuant to subsection 2.7E, such assignment will result in a reduction in such compensation or payments thereafter and (v) such assignment does not conflict with applicable law. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**2.9    Releases; Subordinations.**

    **A.    Release Upon Qualified Sale or Required Dedication.** In connection with any Permitted Collateral Asset Sale, Major Collateral Asset Sale or Required Dedication, the Collateral Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgages (such portion of the Real Property Collateral, a "Released Parcel"); provided that all of the applicable conditions set forth in subsection 6.9 have been satisfied and the applicable Borrowers shall have submitted to the Collateral Agent not less than ten (10) days (or such shorter period as is acceptable to the Collateral Agent) prior to the date of such proposed release (which must be on a Business Day), a reconveyance or release of Liens (and related Loan Documents) for each Released Parcel (for execution by the Collateral Agent) (or its agent) in a form appropriate for recordation in the applicable jurisdiction and otherwise satisfactory to the Collateral Agent (or its agent) in its good faith discretion and all other documentation as the Collateral Agent reasonably requires to be delivered by the Borrowers in connection with such release (collectively, the "Release Instruments") for each Released Parcel (for execution by Collateral Agent) together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement and (iii) the release to be effected will not impair or otherwise adversely affect the Liens and other rights of the Collateral Agent under the Loan Documents not being released. The Collateral Agent is authorized by the Lenders to enter into release and/or escrow arrangements with the Title Company or any other third-party designated by the Collateral Agent for purposes of delivery of Release Instruments.

    **B.    Subordinations in connection with Specified Encumbrances.** If required by the applicable Permitted Special Improvement District, upon ten (10) Business Days prior written notice from the Borrowers, the Collateral Agent shall subordinate the First Priority Lien of the applicable Mortgage to any Liens granted by the Borrowers or their Subsidiaries in favor of such Permitted Special Improvement District securing Special Improvement Bonds issued by such Permitted Special Improvement District after the Effective Date ("**Specified Encumbrances**") that, in each case, as certified by a Responsible Officer, are necessary or desirable in connection

with the development of the Projects; provided that (i) any such signature of the Collateral Agent is expressly made with no implied duty or obligation on the part of the Collateral Agent to review any documentation relating to such Specified Encumbrances and is only made for the purpose of subordinating the First Priority Lien of the applicable Mortgage to, such Specified Encumbrance, (ii) no Default or Event of Default has occurred and is continuing, (iii) the Borrowers have provided evidence to the Collateral Agent that such consent and/or subordination is required by the applicable Permitted Special Improvement District, (iv) the Collateral Agent shall, as a condition to such subordination, be satisfied in its reasonable discretion that such subordination could not reasonably be expected to (a) have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral or (b) materially impair the value of the Real Property Collateral and (v) the Collateral Agent shall have received evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to any such subordination shall be maintained following such subordination. The Borrowers shall pay all costs and expenses of the Collateral Agent and the Title Company in connection with any such subordination.

### 2.10    Subordinations in connection with Map Approvals.

Upon not less than ten (10) Business Days' prior written notice from the Borrowers, the Collateral Agent shall subordinate the First Priority Lien of the applicable Mortgage to any proposed "subdivision," "parcel," "tract" or other maps approved by the applicable Governmental Authority and contemplated to be recorded in connection with the development of a Project (collectively, the "**Maps**"), and, to the extent required by Applicable Law or the applicable Governmental Authority, the Collateral Agent agrees to sign and acknowledge any such Map; provided, in each such case, that (i) the Collateral Agent's signature is expressly made with no implied duty or obligation on the part of the Collateral Agent to review such Maps and is only made for the purpose of subordinating the Lien of the applicable Mortgage to such Map, (ii) no Default or Event of Default has occurred and is continuing, (iii) the Borrowers have provided evidence to the Collateral Agent that such subordination and/or execution is required for the subdivision approval of the appropriate Governmental Authority or otherwise reasonably necessary or desirable in connection with the development of a Project, (iv) the Collateral Agent shall, as a condition to such subordination and/or execution, be satisfied in its reasonable discretion that such subordination and/or execution could not reasonably be expected to have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral or materially impair the value of the Real Property Collateral, (v) the Collateral Agent shall have received evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages so subordinated with respect to the remaining Real Property Collateral subject to such Mortgages after giving effect to any such subordination shall be maintained following such subordination and (vi) the documentation evidencing such subordination shall be reasonably satisfactory to the Collateral Agent. The Borrowers shall pay all costs and expenses of the Collateral Agent and the Title Company in connection with any such subordination.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**2.11**    **Subordinations in connection with Qualified Sales Agreements.**

Upon not less than ten (10) Business Days' prior written notice from the Borrowers and provided no Event of Default has occurred and is continuing, the Collateral Agent shall enter into a subordination and non-disturbance agreement, in form and substance reasonably satisfactory to the Collateral Agent, with a homebuilder or other commercial developer who is party to a Qualified Sales Agreement and the Borrower pursuant to which such homebuilder or other commercial developer confirms, among other things, that its interest in the relevant Real Property Collateral and the applicable Qualified Sales Agreement are subordinate to the First Priority Lien of the Collateral Agent and the Collateral Agent agrees, subject to certain conditions, to recognize the validity of the Qualified Sales Agreement in the event of a realization upon such First Priority Lien, provided that the Collateral Agent shall not be required to enter into any such subordination and non-disturbance agreement unless the Collateral Agent is reasonably satisfied that the sales contemplated by such Qualified Sales Agreement are, and will be, permitted under Section 6.9.

## SECTION 3.
## CONDITIONS TO EFFECTIVENESS

**3.1**    **Conditions to Effectiveness**.

The effectiveness of this Agreement, and the obligation of each Lender to make the extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A.**    **Borrowers' Documents.**  On or before the Effective Date, each Borrower shall deliver or cause to be delivered to the Administrative Agent the following, each, unless otherwise noted, dated the Effective Date:

(i)    certified copies of its Organizational Certificate (in form and substance reasonably satisfactory to the Administrative Agent), together with a good standing certificate from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation, each state in which any of its Real Property Assets are located, and each other state in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(ii)    copies of its Organizational Documents (in form and substance reasonably satisfactory to the Administrative Agent), certified as of the Effective Date by its corporate secretary or an assistant secretary;

(iii)    copies of its Organizational Authorizations approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is party or by which it or its assets may be bound that are to be delivered on the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification;

(iv)    incumbency certificates of its officers executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which it is a party that are to be delivered on the Effective Date;

(vi)    copies of each of the Material Contracts to which it is a party, certified by a Responsible Officer; and

(vii)    such other documents as the Administrative Agent may reasonably request.

**B.**    **[Intentionally Omitted].**

**C.**    **Consummation of Transactions.**

(i)    (a) Each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent; and

(ii)    after giving effect to the transactions contemplated hereby, the Borrowers and their Subsidiaries shall have no outstanding Indebtedness or preferred Capital Stock other than (a) the Loans under this Agreement, and (b) the Permitted Existing Indebtedness.

**D.**    **Lender Signatures.**    The Lenders and the Agents shall have executed and delivered this Agreement.

**E.**    **Necessary Consents and Estoppels.**    The Borrowers shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the transactions contemplated hereby and the continued operation of the business conducted by the Borrowers and their Subsidiaries, and all applicable appeal periods shall have expired, and shall have received estoppels from such Persons as may be reasonably requested by the Administrative Agent, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. Such approvals and consents and estoppels shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)    executed estoppel certificates from all homeowners' associations and property owners' associations related to each Project;

(ii)    executed consents from any other lenders of the Borrowers or any of their Subsidiaries, as required by the terms of any other loan documents to which the Borrowers or such Subsidiaries, as applicable, are a party;

(iii)    executed consents from any Person required in connection with the Pledge and Security Agreement and executed consents from any Person required in connection with the other Collateral Documents; and

(iv)    executed estoppel certificates from Clark County regarding the Rhodes Ranch Development Agreement.

**F.    Perfection of Security Interests.** The Borrowers shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Pledge and Security Agreement or other applicable Collateral Documents. Such actions shall include: (i) the delivery pursuant to the applicable Collateral Documents of (a) such certificates or other instruments (each of which shall be registered in the name of the Collateral Agent or properly endorsed in blank for transfer or accompanied by irrevocable undated stock or equivalent powers duly endorsed in blank, all in form and substance satisfactory to the Collateral Agent) representing all of the shares or other interests of Capital Stock required to be pledged pursuant to the Collateral Documents identified on Schedule 3.1F-1 and (b) all promissory notes or other instruments (duly endorsed, where appropriate, in a manner satisfactory to the Collateral Agent) evidencing any Collateral; (ii) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (iii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority Liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made or will be made concurrently with the Effective Date. All "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of any of the Borrowers (other than any such deposit accounts identified on Schedule 3.1F-2) shall be subject to effective control agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent, all of which have been duly executed and delivered by each party thereto and are in full force and effect.

**G.    Real Property.** The Administrative Agent shall have received on or prior to the Effective Date from the Borrowers and each other applicable Loan Party:

(i)      **Mortgages.** Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of Clark County or Mohave County, as applicable, encumbering the Real Property Collateral listed on Schedule 3.1G, in each case in form and substance satisfactory to the Collateral Agent;

(ii)      **Opinions of Local Counsel.** An opinion of counsel (which counsel shall be satisfactory to the Collateral Agent) with respect to the enforceability of the Mortgages to be recorded in the real property records of Clark County or Mohave County, as applicable, and such other related matters as the Collateral Agent may reasonably request, in each case in form and substance satisfactory to the Collateral Agent;

(iii)      **Title Insurance.** ALTA extended coverage mortgagee title insurance policies (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on Schedule 3.1G. in amounts not less than the respective amounts designated on such Schedule with respect to any particular Real Property Collateral, insuring fee simple title to each such Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent including an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the Clark County or Mohave County, as applicable, real property records;

(iv)      [**Intentionally Omitted**];

(v)      [**Intentionally Omitted**];

(vi)      [**Intentionally Omitted**];

(vii)      [**Intentionally Omitted**];

(viii)      [**Intentionally Omitted**];

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(ix)     **Matters Relating to Flood Hazard Properties.** If any Real Property Collateral constitutes a Flood Hazard Property, and if such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrowers have obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

**H.**     [Intentionally Omitted.].

**I.**     [Intentionally Omitted.].

**J.**     **Transaction Costs, Fees and Expenses.** On or prior to the Effective Date, the Borrowers shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instruments or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Loan Documents, as well as all fees reasonably estimated to be incurred following the Effective Date, including with respect to the perfection and recordation of the Liens granted under the Collateral Documents. On or prior to the Effective Date, the Borrowers shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrowers' estimate of the transaction costs (other than fees payable to any of the Agents).

**K.**     **Opinions of Loan Parties' Counsel.** The Administrative Agent and its counsel shall have received the written opinions of (i) [[_____], **special Nevada and Arizona counsel for the Loan Parties,**] (ii) [[_____], **special New York counsel for the Loan Parties,**] and (iii) each other special and local counsel for the Loan Parties as the Administrative Agent may reasonably request, in each case, (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**L.**     **Financial Information.** Prior the Effective Date, the Administrative Agent shall have received from the Borrowers such financial statements and other cash flow and financial information as the Administrative Agent may reasonably request, all in form and substance reasonably satisfactory to the Administrative Agent.

**M.**     **Evidence of Insurance.** The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to subsection 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**N.**     **Environmental.** The Administrative Agent shall have received one or more environmental assessment reports which, in their totality, provide a detailed environmental

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

assessment of the Projects, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrowers and their Subsidiaries may be subject after giving effect to the transactions contemplated hereby, and with the plans of the Borrowers or such Subsidiaries with respect thereto.

**O.**     **[Intentionally Omitted].**

**P.**     **Corporate and Capital Structure, Ownership, Management.**

(i)     Organizational Structure. The corporate organizational structure of the Borrowers and their Subsidiaries as of the Effective Date shall be as set forth on Schedule 4.5.

(ii)     Capital Structure and Ownership. The capital structure and ownership of the Borrowers and their Subsidiaries as of the Effective Date shall be as set forth on Schedule 4.5.

**Q.**     **Representations and Warranties; Performance of Agreements.**     The Borrowers shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 4 hereof and in the other Loan Documents are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the transactions contemplated hereby, to the same extent as though made on and as of that date, that the Borrowers have performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date, and that no Default or Event of Default has occurred on and as of the Effective Date before and after giving effect to the transactions contemplated hereby.

**R.**     **[Intentionally Omitted].**

**S.**     **No Litigation.** There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the transactions contemplated hereby.

**T.**     **Completion of Proceedings.**     All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the transactions contemplated hereby shall be satisfactory in form and substance to the Administrative Agent and its counsel, and the Administrative Agent and its counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request (including, without limitation, consents and approvals with respect to the execution, delivery and performance by each applicable Loan Party of the Credit Agreement, the Guaranty,

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

and the other Loan Documents to which it is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification). Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

      **U.**    **Money Laundering**. The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

      **V.**    **[Intentionally Omitted].**

      **W.**    **Confirmation Order.** The Agents and the Lenders shall have received the Confirmation Order. **Plan of Reorganization.** The terms and provisions of the Plan of Reorganization shall be reasonably satisfactory to the Agents and Lenders (it being acknowledged by the Agents and the Lenders that the terms and provisions of the Plan of Reorganization, and filed with the Bankruptcy Court on [_____], are satisfactory), and the Confirmation Order shall include such provisions with respect to the Loans as are reasonably satisfactory to the Agents and the Lenders and, providing, among other things, that the Borrowers shall be authorized to (i) enter into the Loan Documents, (ii) grant the Liens and security interests and incur or guarantee the Obligations under the Loan Documents and (iii) issue, execute and deliver all documents, agreements and instruments necessary or appropriate to implement and effectuate all obligations under the Loan Documents and to take all other actions necessary to borrow Loans under the Loan Documents. Except as consented to by the Agents and the Lenders, the Bankruptcy Court's retention of jurisdiction under the Confirmation Order shall not govern the enforcement of the Loan Documents or any rights or remedies related thereto.

      **Y.**    **Final Order.** The Agents and the Lenders shall have received evidence, reasonably satisfactory to the Agents and the Lenders, that (i) the "Effective Date" under and as defined in the Plan of Reorganization shall have occurred, the Confirmation Order shall be valid, subsisting and continuing as a Final Order and all conditions precedent to the effectiveness of the Plan of Reorganization shall have been fulfilled, or validly waived with the consent of the Lenders, including, without limitation, the execution, delivery and performance of all of the conditions thereof other than conditions that have been validly waived with the consent of the Lenders (but not including conditions consisting of the effectiveness of the Loan Documents) and (ii) no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which would adversely affect the Plan of Reorganization, the consummation of the Plan of Reorganization, the business or operations of the Borrowers or the transactions contemplated by the Loan Documents, as determined by the Lenders in good faith, shall be pending.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Z.      As of the Effective Date:**

(i)      The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)      No event shall have occurred and be continuing or would result from the consummation of the borrowings contemplated by this Agreement that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)      No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

**SECTION 4.**
**REPRESENTATIONS AND WARRANTIES**

In order to induce the Lenders to enter into this Agreement and to make the Loans and in order to induce the Agents to enter into this Agreement, each of the Borrowers represents and warrants to each Lender and each Agent, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

**4.1      Organization and Qualification.**

Each Borrower and each of its Subsidiaries is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Borrower and each of its Subsidiaries is duly qualified and is authorized to do business and is in good standing as a foreign corporation or other organization in each state or jurisdiction listed on Schedule 4.1 hereto and in all other states and jurisdictions in which the failure of such Borrower or any of such Subsidiaries to be so qualified could reasonably be expected to have a Material Adverse Effect.

**4.2      Power and Authority.**

Each of the Borrowers and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which it is a party. This Agreement has been duly and validly executed and delivered by the Borrowers and the other Loan Documents entered into on the Effective Date have been duly and validly executed and delivered by the Loan Parties party thereto. The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action.

55

4.3     **Legally Enforceable Agreement**.

    This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of each Borrower and each of its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or general equitable principals, whether applied in law or equity.

4.4     **No Conflict**.

    The execution, delivery and performance by each of the applicable Loan Parties of the Loan Documents, the issuance, delivery and payment of the Notes and the Loans, and the consummation of the transactions contemplated hereby do not and will not (i) violate, contravene, or cause any Loan Party to be in default under, any provision of any law or any governmental rule or regulation applicable to any Loan Party, the Organizational Certificate or any other Organizational Documents of any Loan Party or any order, judgment, injunction, decree, determination or award in effect having applicability to any Loan Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any indenture or loan or credit agreement or any other material agreement, contract, lease or instrument to which any Loan Party is a party or by which any of them or any of its or their property may be bound or affected, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets now owned or hereafter acquired by any Loan Party (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent), (iv) require any approval or consent of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which any Loan Party is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the Organizational Certificate or other Organizational Documents of any Loan Party or any Material Contract to which any Loan Party is a party or by which any Loan Party is bound.

4.5     **Capital Structure**.

    As of the date hereof, Schedule 4.5 hereto states (i) the correct name of each Borrower and each Subsidiary, the jurisdiction of organization of each Borrower and each Subsidiary, and the owners of the Capital Stock of each Borrower and each Subsidiary (including the percentage ownership of each such Person) and (ii) the number of authorized and issued Capital Stock (and treasury shares) of each Borrower and each Subsidiary. Each Borrower has good title to all of the shares it purports to own of the Capital Stock of each of its Subsidiaries, free and clear in each case of any Lien (except as permitted by this Agreement). All such Capital Stock have been duly issued and are fully paid and non-assessable. As of the date hereof, no Borrower has obligated itself to make any Restricted Payment. No Borrower has issued any options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue

or sell, or any Capital Stock or obligations convertible into, shares of the Capital Stock of such Borrower or any of its Subsidiaries. Except as set forth on <u>Schedule 4.5</u> hereto, as of the date hereof, to the Borrowers' Knowledge, there are no outstanding agreements or instruments binding upon the holders of a Borrower's Capital Stock relating to the ownership of its Capital Stock.

**4.6    Licenses.**

The Loan Parties have obtained (or caused to be obtained) all material licenses, permits, approvals, easements and rights of way (and all such items are currently in full force and effect) required from any Governmental Authority having jurisdiction over each of Rhodes Ranch, Tuscany, Spanish Hills and South West Ranch, or from private parties (collectively, "**Material Licenses**") necessary or advisable (i) for the current (and each former) stage of development and usage of each Project and (ii) to ensure vehicular and pedestrian ingress to and egress to permit the current (and former) development of each of Rhodes Ranch, Tuscany, Spanish Hills and South West Ranch. The Loan Parties reasonably believe they will obtain on a timely basis in the Ordinary Course of Business all Material Licenses necessary or advisable (i) for the full development and usage of each Project and (ii) to ensure vehicular and pedestrian ingress to and egress as required to permit the full development and usage of each of Rhodes Ranch, Tuscany, Spanish Hills and South West Ranch.

**4.7    Corporate Names.**

During the 5-year period preceding the date of this Agreement and as of the Effective Date, no Borrower nor any Subsidiary has been known as or used any corporate, fictitious or trade names except those listed on <u>Schedule 4.7</u> hereto. Except as set forth on <u>Schedule 4.7,</u> neither the Borrowers nor any Subsidiary has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

**4.8    Business Locations; Agent for Process.**

As of the date hereof, the chief executive office and other places of business of each Borrower and each Subsidiary are as listed on <u>Schedule 4.8</u> hereto. During the 5-year period preceding the date of this Agreement, neither of Borrowers nor any Subsidiary has had an office, place of business or agent for service of process other than as listed on <u>Schedule 4.8</u>. Except as shown on <u>Schedule 4.8</u> on the date hereof, no inventory of any Borrower or any Subsidiary is stored with a bailee, warehouseman or similar Person, nor is any inventory consigned to any Person.

**4.9    Title to Properties.**

**A.**    Each Borrower and each of its Subsidiaries has good and marketable title to and fee simple ownership of, or in the case of the leased Real Property Assets described on Schedule 4.9A. valid and subsisting leasehold interests in, all of its Real Property Assets (including, without limitation, the Real Property Collateral), and good title to all of its personal

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

property, including all property reflected in the financial statements referred to in subsection 4.14 or delivered pursuant to subsection 5.3, in each case free and clear of all Liens except for Liens permitted by this Agreement. Each Borrower has paid or discharged, and has caused each Subsidiary to pay and discharge, all lawful claims which, if unpaid, could reasonably be expected to become a Lien against any properties of such Borrower or such Subsidiary that is not permitted by this Agreement, except to the extent such claim is being Properly Contested. The Liens granted to the Collateral Agent pursuant to the Collateral Documents are First Priority Liens, subject only to those Liens which are expressly permitted by the terms of this Agreement.

**B.**     There are no material exceptions or material adverse matters (other than Permitted Encumbrances) affecting the Real Property Collateral that would be disclosed by a survey of the Real Property Collateral. A true, accurate and complete depiction of each Project as of the Effective Date is set forth on the maps attached hereto as Exhibit XI and which map identifies the portions of each Project comprising the Real Property Collateral as of the Effective Date. Attached hereto as Schedule 4.9B-1 is a true, correct and complete list of all Real Property Assets owned by each Borrower and each of its Subsidiaries as of the date hereof, setting forth the name of the record owner of such Real Property Asset, the tax parcel identification number or similar designation of such Real Property Asset, and the property description (including parcel number and development).

**C.**     No Borrower Entity has received any notice of any material special assessment or proceeding affecting any Project, change in the tax rate or the assessed valuation of any Project or any other material changes affecting the taxes, assessments or other charges with respect to any Project which is not reflected in the title reports provided to the Administrative Agent prior to the Effective Date pursuant to subsection 3.1G(iv). Other than those disclosed on Schedule 4.9C. to the Borrowers' Knowledge there are no special assessment districts, or plans for the same, or for any other scheme that would involve the imposition of taxes, in each case relating to any Project. There are no zoning or other land-use regulation proceedings or known change or proposed change in any applicable laws, regulations or the Entitlements which could detrimentally and materially affect the use, value, development or operation of any Project, including the Real Property Collateral.

**4.10    Priority of Liens; UCC-1 Financing Statements**.

**A.**     As of the Effective Date, each of the Liens in the Collateral granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to any of the Collateral Documents (i) will (when but only to the extent any UCC-1 Financing Statements and/or other filings, recordations or control agreements required under or in respect of such Collateral Documents in appropriate form are filed or recorded in the appropriate offices of Governmental Authorities or are executed and delivered, as applicable) constitute valid and fully perfected security interests under the UCC or other Applicable Law in all of the Collateral described therein and (ii) will be a First Priority Lien.

**B.**     UCC-1 Financing Statements containing a correct, complete and adequate description of the Collateral have been delivered to the Administrative Agent for filing in the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

office of the Secretary of State of the State of organization of each Loan Party and the State in which each Project is located, and for recording in the official records of the county in which each Project is located, to the extent necessary to establish under the UCC a valid and perfected lien in favor of the Collateral Agent, for the benefit of the Secured Parties, in all Collateral in which a lien may be perfected by filing a UCC-1 Financing Statement, and no further or subsequent filing, recording or registration is necessary in any such jurisdiction or elsewhere in respect of Collateral that may be perfected by filing a UCC-1 Financing Statement, except as provided under the UCC with respect to the filing of continuation statements or in connection with any change in the name, identity or location of any such Loan Party.

**4.11    No Subordination**.

There is no agreement, indenture, contract or instrument to which the Borrowers or any of their Subsidiaries is subject or by which the Borrowers or their Subsidiaries may be bound that requires the subordination in right of payment of any of Borrowers' obligations under this Agreement to any other obligations of Borrowers.

**4.12    Permits; Licenses; Franchises**.

The Borrowers and each of their Subsidiaries possess, in accordance with all Applicable Laws, and without conflict with the rights of any third parties, all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable them to conduct the business (i) in which they are now engaged as of the Effective Date and (ii) in which they are contemplated to be engaged on and after the Effective Date, subject, in the case of clause (ii), to the receipt of further permits and licenses with respect to additional subdivisions as each Project is more fully developed, as contemplated by the applicable Development Agreements, except to the extent the failure to obtain or possess any of the foregoing could not reasonably be expected to result in a Material Adverse Effect. The Borrowers reasonably believe that all such further permits and licenses will be received in a timely manner in the Ordinary Course of Business.

**4.13    Indebtedness**.

As of the Effective Date, the Borrowers and their Subsidiaries have no Indebtedness except for Indebtedness permitted pursuant to subsection 6.1.

**4.14    [Intentionally Omitted]**.

**4.15    Disclosure**.

The representations and warranties of each of the Borrowers and their Subsidiaries contained in the Loan Documents and the information contained in the other documents, certificates and written statements furnished to any of the Agents or the Lenders by or on behalf of any Borrower or any of its Subsidiaries for use in connection with the transactions contemplated by this Agreement or any other Loan Document, when considered with all other

information then provided, do not contain, as at its date and as of the Effective Date, any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and financial information prepared to give effect to the transactions contemplated hereby and contained in such materials are based upon good faith estimates and assumptions believed by the Borrowers to be reasonable at the time made and at the Effective Date, it being recognized by the Agents and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that the differences may be material. There is no fact known to any Borrower that has had, or could reasonably be expected to result in, a Material Adverse Effect and that has not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

### 4.16    Solvent Financial Condition.

Each Borrower and each of its Subsidiaries is now Solvent and, after giving effect to the Loans to be made hereunder and the consummation of the transactions contemplated hereby, each Borrower and, after giving effect to all rights of contribution, reimbursement and subrogation arising in connection with the Guaranty, each of its Subsidiaries, will be Solvent.

### 4.17    Surety Obligations.

Except as set forth on Schedule 4.17 hereto on the date hereof, the Borrowers and their Subsidiaries are not obligated as surety or indemnitor under any surety or similar bond or other contract issued or entered into any agreement to assure payment, performance or completion of performance of any undertaking or obligation of any Person.

### 4.18    Taxes.

The FEIN of each Borrower and each of its Subsidiaries, on the date hereof, is as shown on Schedule 4.18 hereto. Each Borrower and each of its Subsidiaries has filed all federal, state and other material Tax returns and other reports it is required by law to file and has paid, or made provision for the payment of, all Taxes shown on such returns to be due and payable, together with all other material Taxes upon it, its income and properties as and when such Taxes are due and payable, except to the extent being Properly Contested. The provision for Taxes on the books of each Borrower and each of its Subsidiaries are adequate for all years not closed by applicable statutes, and for its current Fiscal Year. The Borrowers are not aware of any proposed material Tax assessment against any Loan Party.

### 4.19    Brokers.

There are no claims against any Borrower or amounts owing or to be owed by any Borrower for brokerage commissions, finder's fees or investment banking or similar fees in connection with the Transactions. Each of the Borrowers hereby indemnifies the Agents and the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such commission or broker's or finder's fees or investment banking or similar fees alleged to have been incurred in connection herewith or therewith, and any claim, demand or liability relating thereto, and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

**4.20    Intellectual Property.**

Each Borrower and each of its Subsidiaries owns or has the lawful right to use all Intellectual Property necessary for the present and planned future conduct of its business without, to Borrowers' Knowledge, any conflict with the rights of others except to the extent the failure to own or possess any such right to use or any such conflict could not reasonably be expected to result in a Material Adverse Effect; there is no objection to, or pending (or, to the Borrowers' Knowledge, threatened) claim with respect to, such Borrower's or any of its Subsidiaries' right to use any such Intellectual Property (except to the extent any such objection or claim could not reasonably be expected to result in a Material Adverse Effect and such Borrower is not aware of any grounds for challenge or objection thereto; and, except as may be disclosed on Schedule 4.20 hereto, none of the Borrowers nor any of their Subsidiaries pay any royalty or other compensation to any Person for the right to use any Intellectual Property (other than with respect to off-the-shelf or prepackaged software). All patents, trademarks, service marks, tradenames, copyrights, licenses and other similar rights of the Loan Parties, as of the date hereof, are listed on Schedule 4.20 hereto, to the extent they are registered under any Applicable Law or applications for registration thereof have been made under any Applicable Law.

**4.21    Governmental Authorization.**

Each Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Authorizations necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its properties as now owned or leased by it, except where the failure to have such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect.

**4.22    Compliance with Laws.**

Each Borrower, each of its Subsidiaries, each Project and the use and operations of each Project are in compliance in all material respects with, the provisions of all Applicable Laws (other than Environmental Laws) and there have been no citations, notices or orders of noncompliance issued to such Borrower or any of the Subsidiaries under any such law, rule or regulation. Each Borrower and each of its Subsidiaries is in compliance with all Environmental Laws applicable to it and properties owned by it except to the extent failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.

4.23    **Burdensome Contracts**.

None of the Borrowers nor any of their respective Subsidiaries is a party or subject to any contract, agreement, or charter or other corporate restriction, which has or (after giving effect to the transactions contemplated by this Agreement) could be reasonably expected to have a Material Adverse Effect.

4.24    **Litigation**.

Except as set forth on Schedule 4.24 hereto, there are no actions, suits, proceedings or investigations pending or, to the Borrowers' Knowledge, threatened on the date hereof against or affecting the Borrowers or any of their Subsidiaries, or the business, operations, properties, prospects, profits or condition of the Borrowers or any of their Subsidiaries, (i) which relate to any of the Loan Documents or any Material Contract, or any of the transactions contemplated thereby or (ii) which could reasonably be expected to have a Material Adverse Effect. Neither the Borrowers nor any of their Subsidiaries is in default on the date hereof with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal.

4.25    **No Defaults**.

No event has occurred and no condition exists which would, upon or after the execution and delivery of this Agreement or such Borrower's performance hereunder, constitute a Default or an Event of Default. None of the Borrowers nor any of their respective Subsidiaries is in default, and no event has occurred and no condition exists which constitutes or which with the passage of time or the giving of notice or both would constitute a default, (x) in the payment of any Indebtedness of such Borrower or any Subsidiary to any Person which would result in a Default or Event of Default hereunder or that could reasonably be expected to have a Material Adverse Effect or (y) under any Material Contract.

4.26    **Leases**.

Schedule 4.26 hereto is a complete listing of each Capitalized Lease and Operating Lease of each Borrower and each of its Subsidiaries on the date hereof that provides for payments in excess of $7,500,000 over the term of such Capitalized Lease or Operating Lease. Each Borrower and each of its Subsidiaries is in substantial compliance with all of the terms of each of its respective Capitalized Leases and Operating Leases and there is no basis upon which the lessors under any such leases could terminate the same prior to the scheduled maturity or stated termination date thereof or declare such Borrower or any of its Subsidiaries in default thereunder, which, in any case, would result in a Default or Event of Default hereunder or that could reasonably be expected to have a Material Adverse Effect.