# EXHIBIT 1

# EXHIBIT 1

**EXECUTION COPY**

RHODES ENTITIES' MEDIATION SETTLEMENT PROPOSAL

| | |
|---|---|
| **Releases for Rhodes Entities:** | The Rhodes Entities (as set forth on Attachment A) shall receive a full release for chapter 5 causes of action with respect to transfers made by the Debtors to the Rhodes Entities during the 2 years prior to the Petition Date provided, that, such release shall only apply to transfers expressly set forth in the Debtors' statements of financial affairs as filed with the Bankruptcy Court as of August 1, 2009 or as disclosed in Attachment B. |
| **Releases for Debtors' officers, employees and professionals** | To the extent permitted by applicable law, the Plan shall provide that, but for (i) the Rhodes Entities and their affiliates; (ii) insiders of any of the Rhodes Entities (except as to Thomas Robinson and Joseph Schramm who were also employees of the Debtors), (iii) relatives of James Rhodes,  the Debtors' officers, employees (including Thomas Robinson and Joseph Schramm), and professionals, as of the Petition Date, and Paul Huygens shall receive a general release from the Debtors' estates. |
| **Exculpation:** | The Plan shall contain standard exculpation provisions. |
| **Bond Replacement or Indemnification:** | The Plan shall provide for one of the following: (i) those performance bonds guaranteed by the Rhodes Entities in favor of the Debtors to be replaced on a renewal date by new performance bonds or, in the alternative, (ii) subject to the Rhodes Entities being reasonably satisfied with the creditworthiness of the Reorganized Debtors, which shall be satisfied solely as of the Effective Date by the Court finding that the Plan is feasible, the existing performance bonds guaranteed by the Rhodes Entities and such guarantees to remain in place. The applicable Rhodes Entity's agreement to remain a guarantor under the existing performance bonds as such performance bonds may be renewed shall be at  no cost to the Rhodes Entities (including, but not limited to, the payment of bond premiums).  In the event the Reorganized Debtors fail to perform their obligations underlying such renewed performance bonds after the Effective Date, the Reorganized Debtors will indemnify the Rhodes Entities under such outstanding performance bonds for damages incurred by the Rhodes Entities on account of their guarantee of such performance bonds solely as a result of the Reorganized Debtors' failure to perform such obligations subsequent to the Effective Date.  The Reorganized Debtors shall use commercially reasonable efforts to replace all outstanding performance bonds backstopped by Rhodes Entities within 30 months of the Effective Date.  The Bankruptcy Court shall retain jurisdiction to resolve any disputes arising out of this paragraph. |
| **HOA Board Seats:** | The Rhodes Entities shall ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA Boards that in any way are related to the Debtors, Reorganized Debtors or their businesses and Declarant rights or the like shall be transferred to the Reorganized Debtors or their designee(s). |
| **Licensing:** | The Rhodes Entities shall take commercially reasonable steps and/or enter into any agreements or similar documentation reasonably necessary to ensure the Reorganized Debtors' continued use of all of the Debtors' applicable professional licenses at no cost to the Rhodes Entities for a period of up to twelve months following the Effective Date.  Additionally, provided that the parties have executed this Mediation Settlement Term Sheet, Sagebrush Enterprises, Inc. shall rescind by September 25, 2009 its revocation of its indemnity of the Nevada Contractors' license held by Rhodes Design & Development Corporation to the extent such rescission does not negatively |

EXECUTION COPY

| | |
|---|---|
| | affect the general contractor's license held by Rhodes Design & Development Corporation provided that Sagebrush shall be entitled to file an administrative claim on behalf of any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arose from and after the effectiveness of Sagebrush's recission of its indemnity through the Effective Date, provided that the allowance of such administrative claim shall be subject to resolution by the Bankruptcy Court and/or such other court(s) of competent jurisdiction. The Reorganized Debtors shall indemnify Sagebrush for any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arise from and after the Effective Date.  Professional licenses include, but are not limited to the Nevada State Contractor's Board license, and any other general business or similar licenses in any county, state, municipality or other jurisdiction in which the Reorganized Debtors conduct business or own assets as of the Effective Date.  The Rhodes Entities shall use commercially reasonable efforts to maintain third party agreements with their real estate brokers and sales agents. |
| **Rhodes Entities' Claim Treatment:** | To the extent allowed, the Rhodes Entities' Claims shall be treated in the same class as and treated *pari passu* with General Unsecured Claims, excluding Trade Claims.  The First Lien Steering Committee, any First Lien Lender and/or the Reorganized Debtors shall have until sixty days following the Effective Date to object to the proofs of claim filed by the Rhodes Entities in the Debtors' chapter 11 cases (provided, that, such objection shall not seek to subordinate the Rhodes Entities Claims, if allowed).  Neither the Litigation Trust nor the Reorganized Debtors shall commence any litigation against the Rhodes Entities until the Bankruptcy Court rules on the allowance of the Rhodes Entities Claims set forth in such proofs of claim (for the avoidance of doubt, the First Lien Lenders are not bound by this provision).  To the extent any statute of limitations to pursue any claims belonging to the Debtors against the Rhodes Entities would lapse, from execution of this term sheet and prior to the Bankruptcy Court's resolution of the allowance of the Rhodes Entities Claims, as set forth in filed proofs of claim, the Rhodes Entities shall be deemed to have consented to a tolling of the applicable statute of limitations until sixty days following the Bankruptcy Court's ruling on the allowance of the Rhodes Entities Claims. |
| **Tax Treatment:** | The Plan shall be structured in a tax efficient manner to the Rhodes Entities to effectuate the benefits set forth in item 4 on Attachment C; provided, that there shall be no adverse impact on the Reorganized Debtors or the First Lien Lenders.  The Rhodes Entities and the First Lien Steering Committee shall agree on the structure necessary to implement the tax treatment on or before September 25, 2009. |
| **Effective Date:** | The Plan Effective Date shall occur no earlier than January 4, 2010. |
| **Rhodes Ranch Golf Course:** | The term Rhodes Ranch Golf Course, as referred to herein, shall mean the golf course situated within the Rhodes Ranch master-planned community located in the southwestern Las Vegas valley. |
| **Conditions Precedent to Effective Date:** | 1.  The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors.<br><br>2.  The Confirmation Order shall have become a Final Order in form and substance acceptable to the First Lien Steering Committee.<br><br>3.  The most current version of the Plan Supplement and all of the schedules, |

EXECUTION COPY

| | |
|---|---|
| | documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the First Lien Steering Committee. |
| | 4. The documents governing the New First Lien Notes, the Newco Charter, the Newco Bylaws and the Stockholders Agreement shall be in form and substance acceptable to the First Lien Steering Committee. |
| | 5. The Confirmation Date shall have occurred. |
| | 6. The First Lien Steering Committee shall have designated and replaced each existing Qualified Employee with a new Qualified Employee. |
| | 7. The current debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. |
| | 8. Copies of all Debtors' books and records shall have been delivered to the Rhodes Entities at no cost to the Rhodes Entities. |
| | 9. The Arizona Assets shall have been transferred to the Rhodes Entities (or their designee) free and clear of all liens and claims pursuant to section 363(f) of the Bankruptcy Code on the Effective Date provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000. |
| | 10. The Debtors shall have assumed and assigned all executory contracts and unexpired leases related solely to the Arizona Assets to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors, with all Cure costs associated therewith to be borne by the Rhodes Entities |
| | 11. The Rhodes Entities and the First Lien Steering Committee shall have agreed on the structure necessary to implement the tax structure benefits set forth in Exhibit C. |
| | 12. The Rhodes Entities and First Lien Steering Committee shall have agreed on the Golf Course Security Property. |
| | 13. The Rhodes Entities shall have ensured that designees identified by the Reorganized Debtors shall have replaced the Rhodes Entities on any HOA Boards that in any way are related to the Debtors, Reorganized Debtors or their businesses and Declarant rights or the like shall be transferred to the Reorganized Debtors or their designee(s) |
| | 14. The Rhodes Entities shall have performed all of their obligations under the Plan including, without limitation, depositing $3.5 million in Cash in an account designated by the Debtors, with the consent of the First Lien Steering Committee and transferring the equity in the entity that owns the Rhodes Ranch Golf Course and related contracts and assets to the Reorganized Debtors pursuant to the terms of a stock transfer agreement in form and substance acceptable to the Rhodes Entities and the First Lien Steering Committee. |
| | 15. All other customary Conditions Precedent to the Effective Date as determined by and acceptable to the First Lien Steering Committee, in its sole discretion. |
| **Waiver of Conditions Precedent** | The First Lien Steering Committee may waive any of the conditions to the |

3

EXECUTION COPY

| | |
|---|---|
| to the Effective Date | Effective Date at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, that the First Lien Steering Committee will not waive the conditions precedent in items 6 through 12 above if the Rhodes Entities shall have complied with all of their obligations hereunder and in the Plan by the Effective Date (or such earlier date specifically set forth herein). In the event the Rhodes Entities fail to comply with any of their obligations hereunder or under the Plan by the Effective Date and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, then the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) modify the Plan to remove any provisions hereof that were included for the benefit of the Rhodes Entities; and (iii) consummate the Plan, as modified. Upon entry of an order of the Bankruptcy Court finding a breach by the Rhodes Entities and authorizing the modifications to the Plan to remove any provisions that were included for the benefit of the Rhodes Entities, the First Lien Steering shall be authorized to make such modifications and consummate the Plan. |
| Modification of the Plan | The First Lien Steering Committee shall not modify materially the terms of the Plan without the prior consent of the parties to this term sheet so long as such parties have complied with all of their obligations hereunder and under the Plan by January 4, 2010 (or such other date specifically set forth herein). |
| Plan Support: | The Debtors and Rhodes Entities shall only support a plan of reorganization filed by the First Lien Steering Committee containing all of the provisions of this Mediation Settlement Term Sheet and consistent with the Plan to which this term sheet is an exhibit and will not file a competing plan of reorganization or support any other plan of reorganization filed in the Debtors' chapter 11 cases. |
| Golf Course Transfer: | On the Effective Date, the applicable Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors (together with any equipment, golf carts, contracts or other assets determined by the First Lien Steering Committee to be necessary for the operation of the Rhodes Ranch Golf Course) pursuant to the terms of a stock transfer agreement in form and substance acceptable to the First Lien Steering Committee and Rhodes, subject to any outstanding debt on the Rhodes Ranch Golf Course. The stock transfer agreement shall contain representations by the Rhodes Entities that the entity that owns the Rhodes Ranch Golf Course does not have any liabilities other than ordinary course liabilities related to the Rhodes Ranch Golf Course and indemnification provisions in favor of the Reorganized Debtors by the Rhodes Entities for any non-ordinary course liabilities. In addition, prior to the deadline for filing objections to the Disclosure Statement, the Rhodes Entities shall provide the First Lien Steering Committee with a list of all liabilities of the entity that owns the Rhodes Ranch Golf Course, a lien analysis and copies of all contracts related to the Rhodes Ranch Golf Course and to which the entity that owns the Rhodes Ranch Golf Course is a party, each of which must be acceptable to the First Lien Steering Committee.<br><br>The existing debt outstanding on the Rhodes Ranch Golf Course shall be |

EXECUTION COPY

refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. The parties will work together in good faith to refinance the existing debt. The Reorganized Debtors shall pay the reasonable costs and expenses associated with the refinancing; provided, that the terms of such refinancing are acceptable to the First Lien Steering Committee. The First Lien Steering Committee acknowledges that the loan documentation may provide that, upon the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors on the Effective Date, additional collateral from the Reorganized Debtors may be required. The Rhodes Entities shall transfer to the Reorganized Debtors on the Effective Debt any contracts related to the operation of and revenue generated by any cell towers located on the property of the Rhodes Ranch Golf Course. Any funds received after July 31, 2009 from the Las Vegas Valley Water District or other similar entity as an incentive for converting the golf course from a green course to a desert course shall be used for operating expenses associated with the Rhodes Ranch Golf Course, with any excess to become property of the Reorganized Debtors on the Effective Date.

Rhodes and/or his designee shall have the absolute right to repurchase the Rhodes Ranch Golf Course from the Reorganized Debtors at eight (8) years from the Effective Date for $5.9 million in cash. The Reorganized Debtors may require Rhodes to purchase the Rhodes Ranch Golf Course any time between four (4) and eight (8) years from the Effective Date for $5.9 million in cash provided that the Reorganized Debtors shall provide Rhodes with at least one year advance notice of its intent to sell the Rhodes Ranch Golf Course back to Rhodes. Such transfer shall occur on the applicable anniversary date of the Effective Date. For the avoidance of doubt, if the Reorganized Debtors put the Rhodes Ranch Golf Course to Rhodes in accordance with the terms hereof and Rhodes fails to comply with his obligation to purchase the Rhodes Ranch Golf Course, Rhodes shall be deemed to have forfeited his option to purchase the Rhodes Ranch Golf Course.

On the Effective Date, Rhodes's obligations to comply with the repurchase shall be secured by either (i) $500,000 in cash in an escrow account or (ii) property worth at least $2 million (the "Golf Course Security Property"), with the value of such property to be agreed to by Rhodes and the First Lien Steering Committee or otherwise valued by an independent third party appraisal firm acceptable to both Rhodes and the First Lien Steering Committee (except Cushman Wakefield). In the event that Rhodes does not meet the repurchase request, provided that the Rhodes Ranch Golf Course is in the standard condition (defined below), then the Reorganized Debtors shall be entitled to liquidated damages in the form of security pledged (i.e., the $500,000 or the Golf Course Security Property).

So long as Rhodes has not defaulted on his obligation to repurchase the Rhodes Ranch Golf Course, Rhodes shall have the absolute and sole discretion to replace the Golf Course Security Property with $500,000 in cash on 30 days written notice to the Reorganized Debtors. Upon deposit of the $500,000 in cash, the Golf Course Security Property shall be released to Rhodes or his designee. Notwithstanding anything to the contrary contained herein, if the Rhodes Ranch Golf Course is not maintained with substantially the same performance and rating criteria at the time of the repurchase request as verified by an independent third party rating agency as it was on the Effective Date ("Standard Condition"), James Rhodes can (i) require the

| | |
|---|---|
| | Reorganized Debtors to cure any conditions to return the Rhodes Ranch Golf Course to its Standard Condition (provided, that the cost of such cure does not exceed $500,000), or (ii) choose not to purchase the Rhodes Ranch Golf Course. Upon either the repurchase of the Rhodes Ranch Golf Course or the written decision to not repurchase the Rhodes Ranch Golf Course (in accordance with the preceding sentence), the Golf Course Security Property or the $500,000 Cash (if not applied to the repurchase of the Rhodes Ranch Golf Course) shall be returned to Rhodes within 30 days.<br><br>On the Effective Date, the Reorganized Debtors shall record a memorandum of agreement against the Rhodes Ranch Golf Course to evidence the above. |
| **Golf Course Audit:** | During the period from September 1, 2009 through September 23, 2009, the Rhodes Entities shall provide access to the First Lien Steering Committee or its designee to undertake a financial and operational audit of the Rhodes Ranch Golf Course. The results of such audit must be acceptable to the First Lien Steering Committee in its sole discretion and evidence, among other things, that the financial performance of the Rhodes Ranch Golf Course is sufficient to pay operating expenses and service the debt on the Rhodes Ranch Golf Course without the need for additional liquidity. |
| **Cash Payment:** | The Rhodes Entities shall make a cash payment to the Reorganized Debtors of $3.5 million in cash on the Effective Date. |
| **Arizona:** | On the Effective Date, pursuant to an asset transfer agreement in form and substance acceptable to the First Lien Steering Committee and the Rhodes Entities, the Debtors shall transfer Pravada and the other Arizona assets set forth on Attachment D hereto, plus the Golden Valley Ranch tradename to the Rhodes Entities free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000; provided that such assets shall not include assets owned by Pinnacle Grading located in Arizona and related contracts associated with the assets,. Debtors shall provide James Rhodes notice of any proposed sale of the Pinnacle assets, and James Rhodes shall be granted a right to bid on the sale of such assets within 10 days of such notice. Rhodes Entities shall permit storage of Pinnacle Grading equipment at current locations at no cost to the Reorganized Debtors for a period through six months following the Effective Date.<br><br>All executory contracts and unexpired leases associated solely with Arizona shall be assumed and assigned to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors and all cure costs associated therewith shall be borne by the Rhodes Entities. |
| **Plan Filing:** | The Debtors, the Rhodes Entities, the First Lien Steering Committee, the First Lien Agent, the Second Lien Agent and the Creditors Committee shall agree not to file a plan of reorganization until the earlier of (i) the date the parties agree on the terms of a plan of reorganization (and accompanying disclosure statement) or (ii) September 25, 2009. |
| **Cash Collateral:** | The First Lien Steering Committee, First Lien Agent and Second Lien Agent will agree to the continued use of cash collateral on existing terms and subject to an agreed upon budget, through January 11, 2010. |

**EXECUTION COPY**

| | |
|---|---|
| **Trademarks and Trade Names** | Within the earlier of thirty (30) days following: (i) upon completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes (or his designee) the trademarks and tradenames set forth on Attachment E. |
| **Trade Claims Analysis** | The First Lien Steering Committee, the Debtors and the Creditors Committee will agree, prior to the hearing on the Disclosure Statement, (i) which filed or scheduled claims shall be classified as Trade Claims and (ii) on a procedure for the reconciliation of Trade Claims. If the parties are unable to agree on (i) or (ii) above in advance of the Disclosure Statement hearing, the Bankruptcy Court shall resolve any disputes at the Disclosure Statement hearing. |
| **Preference Claims Against Holders of Allowed Trade Claims** | The Reorganized Debtors shall not seek to avoid prepetition transfers to holders of allowed Trade Claims under Bankruptcy Code section 547 to the extent the resulting claim from the avoidance of such a preferential transfer would likewise be an allowed Trade Claim. |
| **Stanley Engineering** | In the event the Stanley Engineering Litigation is resolved either by judgment or settlement in a manner favorable to the Reorganized Debtors and such resolution does not provide for Cash consideration to be received by the Reorganized Debtors and Second Lien Lenders, the Reorganized Debtors and the Second Lien Agent shall engage in good faith negotiations to ensure that the Second Lien Lenders receive consideration equivalent to 50% of the net value of such resolution and to determine the timing of payment of any such consideration. In the event the Reorganized Debtors and the Second Lien Agent are unable to agree on the amount or form of such consideration, the parties will submit the matter to binding arbitration with the costs thereof to be split evenly among the Reorganized Debtors and the Second Lien Agent (with the costs of the Second Lien Agent to be reimbursed from the consideration to be distributed to the Second Lien Lenders on account of the Stanley Engineering Litigation) |

Dated:  September 25, 2009

APPROVED

By:

Name:  Phil P Vitt:
Title: Partner, Akin Gump Strauss Hein & Feld LLP
Counsel to the First Lien Steering Committee, with
authority from each of the members thereof

APPROVED

By: _____
Name:
Title:
Counsel to Wells Fargo, N.A., as Agent for the Second
Lien Lenders

APPROVED

By:
Name: James M. Rhodes
Title: President
*The Rhodes Entities*

APPROVED

By: _____
Name:
Title:
Counsel to the Official Committee of
Unsecured Creditors

APPROVED

By:
Name: James M. Rhodes
Title: President
*Debtors and Debtors-in-Possession*

EXECUTION COPY

| | |
|---|---|
| **Trademarks and Trade Names** | Within the earlier of thirty (30) days following: (i) upon completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes (or his designee) the trademarks and tradenames set forth on Attachment E. |
| **Trade Claims Analysis** | The First Lien Steering Committee, the Debtors and the Creditors Committee will agree, prior to the hearing on the Disclosure Statement, (i) which filed or scheduled claims shall be classified as Trade Claims and (ii) on a procedure for the reconciliation of Trade Claims. If the parties are unable to agree on (i) or (ii) above in advance of the Disclosure Statement hearing, the Bankruptcy Court shall resolve any disputes at the Disclosure Statement hearing. |
| **Preference Claims Against Holders of Allowed Trade Claims** | The Reorganized Debtors shall not seek to avoid prepetition transfers to holders of allowed Trade Claims under Bankruptcy Code section 547 to the extent the resulting claim from the avoidance of such a preferential transfer would likewise be an allowed Trade Claim. |
| **Stanley Engineering** | In the event the Stanley Engineering Litigation is resolved either by judgment or settlement in a manner favorable to the Reorganized Debtors and such resolution does not provide for Cash consideration to be received by the Reorganized Debtors and Second Lien Lenders, the Reorganized Debtors and the Second Lien Agent shall engage in good faith negotiations to ensure that the Second Lien Lenders receive consideration equivalent to 50% of the net value of such resolution and to determine the timing of payment of any such consideration. In the event the Reorganized Debtors and the Second Lien Agent are unable to agree on the amount or form of such consideration, the parties will submit the matter to binding arbitration with the costs thereof to be split evenly among the Reorganized Debtors and the Second Lien Agent (with the costs of the Second Lien Agent to be reimbursed from the consideration to be distributed to the Second Lien Lenders on account of the Stanley Engineering Litigation) |

Dated: September 25, 2009

APPROVED

By: _____
Name:
Title:
*Counsel to the First Lien Steering Committee, with
authority from each of the members thereof*

APPROVED

By: _____
Name:
Title: Counsel
*Counsel to Wells Fargo, N.A., as Agent for the Second
Lien Lenders*

APPROVED

By: _____
Name: James M. Rhodes
Title: President
*The Rhodes Entities*

APPROVED

By: _____
Name:
Title:
*Counsel to the Official Committee of
Unsecured Creditors*

APPROVED

By: _____
Name: James M. Rhodes
Title: President
*Debtors and Debtors-in-Possession*

8200277 v.13

7

**EXECUTION COPY**

| | |
|---|---|
| **Trademarks and Trade Names** | Within the earlier of thirty (30) days following: (i) upon completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes (or his designee) the trademarks and tradenames set forth on Attachment E. |
| **Trade Claims Analysis** | The First Lien Steering Committee, the Debtors and the Creditors Committee will agree, prior to the hearing on the Disclosure Statement, (i) which filed or scheduled claims shall be classified as Trade Claims and (ii) on a procedure for the reconciliation of Trade Claims. If the parties are unable to agree on (i) or (ii) above in advance of the Disclosure Statement hearing, the Bankruptcy Court shall resolve any disputes at the Disclosure Statement hearing. |
| **Preference Claims Against Holders of Allowed Trade Claims** | The Reorganized Debtors shall not seek to avoid prepetition transfers to holders of allowed Trade Claims under Bankruptcy Code section 547 to the extent the resulting claim from the avoidance of such a preferential transfer would likewise be an allowed Trade Claim. |
| **Stanley Engineering** | In the event the Stanley Engineering Litigation is resolved either by judgment or settlement in a manner favorable to the Reorganized Debtors and such resolution does not provide for Cash consideration to be received by the Reorganized Debtors and Second Lien Lenders, the Reorganized Debtors and the Second Lien Agent shall engage in good faith negotiations to ensure that the Second Lien Lenders receive consideration equivalent to 50% of the net value of such resolution and to determine the timing of payment of any such consideration. In the event the Reorganized Debtors and the Second Lien Agent are unable to agree on the amount or form of such consideration, the parties will submit the matter to binding arbitration with the costs thereof to be split evenly among the Reorganized Debtors and the Second Lien Agent (with the costs of the Second Lien Agent to be reimbursed from the consideration to be distributed to the Second Lien Lenders on account of the Stanley Engineering Litigation) |

Dated:  September 25, 2009

APPROVED

By: _____
Name: Philip Vogi
Title: Partner, DLA Piper Straus Hair & Feld LLP
*Counsel to the First Lien Steering Committee, with
authority from each of the members thereof*

APPROVED

By: _____
Name:
Title:
*Counsel to Wells Fargo, N.A., as Agent for the Second
Lien Lenders*

APPROVED

By: _____
Name:  James M. Rhodes
Title:  President
*The Rhodes Entities*

APPROVED

By: _____
Name: J. Thomas Beckett
Title: Shareholder, Parsons Behle & Latimer
*Counsel to the Official Committee of
Unsecured Creditors*

APPROVED

By: _____
Name:  James M. Rhodes
Title:  President
*Debtors and Debtors-in-Possession*

8200277 v.13

7

**EXECUTION COPY**

## ATTACHMENT A - RHODES ENTITIES

James M. Rhodes

Glynda Rhodes

John Rhodes

James M. Rhodes Dynasty Trust I

James M. Rhodes Dynasty Trust II

JMR Children's Irrevocable Educational Trust

Truckee Springs Holdings, Inc.

Sedora Holdings LLC

Gypsum Resources, LLC

Tulare Springs Holdings, Inc.

Escalante-Zion Investments, LLC

HH Trust

Harmony Homes, LLC

Tock, LP

Tapemeasure, LP

Joshua Choya, LLC

American Land Management, LLC

South Dakota Conservancy, LLC

Meridian Land Company, LLC

Yucca Land Company, LLC

Sagebrush Enterprises, Inc.

Rhodes Ranch, LLC

Westward Crossing, LLC

Pinnacle Equipment Rental, LLC

Desert Communities, Inc.

Spirit Underground, LLC

8200277 v.13

**EXECUTION COPY**

Tropicana Durango Investments, Inc.

Tropicana Durango, Ltd. I

Dirt Investments, LLC

Underground Technologies, LLC

South Dakota Aggregate and Engineering, LLC

Freedom Underground, LLC

Jerico Trust

Canberra Holdings, LLC

Custom Quality Homes, LLC

Rhodes Ranch Golf, Inc.

ID Interior Design, LLC

*8200277 v.13*

**EXECUTION COPY**

**ATTACHMENT B**

1. The following distributions were made and permitted pursuant to terms of Credit Agreement:

| Date | Amount | Distribution Comments |
|------|--------|----------------------|
| 4/17/2007 | $42,705 | Heritage → Sedora |
| 4/17/2007 | $707,295 | Heritage → Sagebrush |
| 5/4/2007 | $56,939 | Heritage → Sedora |
| 5/4/2007 | $943,061 | Heritage → Sagebrush |
| TOTAL | $1,750,000 | |

2. Transactions with Spirit Underground and Freedom Underground (as set forth below):

[ATTACHED]

*8200277 v.13*

10

**EXECUTION COPY**

### ATTACHMENT C

1.      The lenders would form a new entity ("Newco"). Newco would be either a corporation or a limited liability company. The First Lien loans would be deemed contributed to Newco.

2.      Newco would purchase all of the interests in Heritage from its members for $10.00.

3.      Revenue Ruling 99-6 provides that on a sale of all of the interests of a partnership for tax purposes (which would include a limited liability company), the sellers are treated as selling "partnership interests". On the other hand, the buyer is deemed to be buying the assets of the partnership. As a result, from the Heritage members' perspective they would be treated as selling all of the interests in Heritage. Newco would be treated for federal income tax purposes as purchasing the 99% partnership interests in each of the limited partnerships held by Heritage and the 1% partnership interest held by Truckee Springs. Further, assuming that the general partner of each of the limited partnerships in turn sells its general partnership interests to Newco, Newco would be deemed to have owned the real estate owned by the limited partnerships (since each of the partnerships would have terminated for federal income tax purposes). At that point Newco would own all of the real estate.

4.      For federal income tax purposes, each Heritage member would have a gain equal to the excess of the liabilities of Heritage allocable to such member (which the transaction relieves the member of) minus the member's tax basis in its Heritage interest. This gain would be treated as long-term capital gain (except to the extent Heritage holds, directly or indirectly, assets subject to Section 751 of the Code, generally inventory or receivables arising from the sale of inventory).

5.      Therefore, contemporaneous with or subsequent to Newco's purchase of the Heritage membership interests, The Rhodes Companies, LLC - the general partner of each of Tick, LP; Glynda, LP; Jackknife, LP; LP; Batcave, LP; Overflow, LP; Wallboard, LP; and Chalkline, LP, -- shall sell its general partnership interests in such entities to Newco for $1.00. Alternatively, the membership interest in The Rhodes Companies, LLC may be acquired from its sole member -- Sagebrush Enterprises, Inc. -- in consideration for release of its obligations under the First Lien Lender Claims.

6.      Newco's members may agree to continue Newco as an LLC, file a check the box election effective the day after the Effective Date to treat Newco as a corporation for tax purposes, or convert into a corporation as of the day after the Effective Date.

7.      The holders of the Heritage membership interests and Newco will report the sale and purchase of the Heritage membership interests in accordance with Revenue Ruling 99-6, 1999-1 CB 432.

**EXECUTION COPY**

ATTACHMENT D – ARIZONA

## RHODES ARIZONA PROPERTIES

| OWNER | NUMBER | ACRES | ADDRESS | TYPE |
|---|---|---|---|---|
| RHODES ARIZONA PROPERTIES LLC | 306-24-115 | 20.25 | 1825 S AZTEC RD | Model Home |
| RHODES ARIZONA PROPERTIES LLC | 306-24-116 | 20.24 | 1807 AZTEC RD | Model Home |
| RHODES ARIZONA PROPERTIES LLC | 306-63-017 | 7.35 | 4536 W DORA DR | Model Home |
| RHODES ARIZONA PROPERTIES LLC | 306-63-018 | 6.83 | 4528 W DORA DR | Model Home |
| RHODES ARIZONA PROPERTIES LLC | 306-42-008A | 19.92 | 1156 S AZTEC RD | Dirt |
| RHODES ARIZONA PROPERTIES LLC | 306-42-001 | 40 | 1094 S AZTEC RD | Dirt |

**Total Acreage    114.59**

| Inside Pravada |
|---|
| Pravada and all parts of Pravada lying within Sections 2, 3, 4, 9 and 10, all in Township 20 North, Range 18 West of the Gila and Salt River Base and Meridian, Mohave County, Arizona and within the following APN numbers: |

| OWNER | NUMBER | ACRES | ADDRESS | TYPE |
|---|---|---|---|---|
| Rhodes Arizona Properties | 215-01-116 | | | Partially Graded |
| Rhodes Arizona Properties | 215-01-113 | | | Partially Graded |
| Rhodes Arizona Properties | 215-01-114 | | | Partially Graded |
| Rhodes Arizona Properties | 215-01-111 | | | Partially Graded |

**Total Acreage    1,306±**

### Arizona Personal Property

**Computers**
HP 5150
HP 5150
HP 5150
HP WX4400
HP WX4400
HP XW4200
Dell

**Laptops**

**Serial Number**
2UA6030J6N
MXL615027R
2UA6030J57
2UA70608F7
2UA70608HV
2UA54215GL
GZOGR61

8200277 v.13                    12

EXECUTION COPY

HPNX6125                                          CND54803LY
HPNX9600                                          CNF6071GBR

**Printers**
HPLaser Jet 4250                                  CNBXD06564
HPLaser Jet 4101                                  USLGY26030
HPLaser Jet 4100                                  USLGY42771
HPLaser Jet 1320                                  CNHC620168
HP color Laser Jet 2600                           CNGC64C1KC
HP color Laser Jet 2804                           JPBG532058
HP color Laser Jet 5550                           JPDC4D2072
HP office jet 6310                                 CN639BGOYK
HP Photosmart D5160                               MY67G110DC
Lexmark 7001-001                                  890CSTB
Lexmark 7001-001                                  890CD3N
Super G3 Printer-Scanner                          J8141101150

**Fax Machines**

2 - HP office jets 7310

6 of the printers and the fax machines have copier capabilities

**Miscellaneous Equipment**
Dell Power Edge Server 2850                       85172579422
HP Design Jet 1055CM Plus Plotter
10 Battery Surge boxes and 10 power strips
11 -computer monitors 20" flat screen
4 calculators
14 telephone owned by Rhodes

**Office Furniture**
2 - drafting tables
3 - work tables with open shelves for plans
12 - file cabinets
    2 - 5 drawer 63 x 18
    1 - 3 drawer 36 x 20
    7 - 4 drawer 18 x 48
    2 - 4 drawer 20 x 48
2 - 3 shelf wood bookcases
4 - 4 shelf bookcases: (2) metal (2) wood
1 - hanging file for plans
1 - metal storage cabinet,  2-door, 4 shelves
2- wooden storage cabinets 2-door, 1 shelf
11 - desks:  (1) metal (10) wood
12 - desk chairs
12 - guest chairs
5 - stacking chairs
1 - 4 x 6 rotating white board
1 - garbage can

**EXECUTION COPY**

10 - waste baskets
3 - 6 foot tables
2 - metal storage shelves- dimensions 5'h x 3'w x 18.5"d
2 - plastic storage shelves- dimensions 6'h x 3'W x 18" d

**Executory Contracts and Unexpired Leases**
To be provided by Plan Supplement Date but shall include, but not be
limited to all development agreements and subcontractor agreements

**Trademarks and Tradenames**
Rhodes Arizona Properties
Rhodes Arizona
Golden Valley Ranch
Pravada

**Intangibles**
All architectural and engineering drawings, plus work product associated
with Pravada and Golden Valley Ranch.
All agreements with municipalities and utilities with respect to Pravada and Golden Valley Ranch.
Arizona general contractor's license.

**EXECUTION COPY**

### ATTACHMENT E – TRADENAMES/TRADEMARKS

All Rhodes Lead Home!
Rhodes Homes
R (logo)
R (logo) Rhodes Homes (owned by Rhodes Homes, Inc.)
RhodeMaster

# EXHIBIT 2

# EXHIBIT 2

## EXHIBIT 2

### Summary of Terms and Conditions ("Term Sheet") for
### $50 Million New First Lien Notes ("New First Lien Notes")

### <u>TERMS</u>

**Borrowers:**   Newco, Heritage Land Company, LLC; The Rhodes Companies, LLC; Rhodes Ranch General Partnership; Tick, LP; Glynda, LP; Chalkline, LP; Batcave, LP; Jackknife, LP; Wallboard, LP; Overflow, LP; Rhodes Ranch Golf and Country Club; Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC; Tuscany Acquisitions III, LLC; Tuscany Acquisitions IV, LLC; Parcel 20 LLC; Rhodes Design and Development Corp.; C&J Holdings, Inc.; Rhodes Realty, Inc.; Jarupa LLC; Elkhorn Investments, Inc.; Rhodes Homes Arizona, LLC; Rhodes Arizona Properties, LLC; Tribes Holdings LLC; Six Feathers Holdings, LLC; Elkhorn Partners, A Nevada Limited Partnership; Bravo Inc.; Gung-Ho Concrete, LLC; Geronimo Plumbing, LLC; Apache Framing, LLC; Tuscany Golf Country Club, LLC; and Pinnacle Grading, LLC, each as may be reorganized pursuant to a joint plan of reorganization to be proposed by the First Lien Steering Committee.

**New First Lien Notes:**   $50 million in first lien secured notes.  Once repaid, the New First Lien Notes may not be reborrowed.

**Guarantors:**   All of the Borrowers.

**Agent:**   To be determined ("Agent").

**Lenders:**   The lenders ("Lenders") under the first lien Credit Agreement dated as of November 21, 2005 (as may have been amended from time to time) among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein as Lenders, and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger, and the other loan documents (as defined in the First Lien Credit Agreement) (as may have been amended from time to time, the "Existing Credit Facility").

**Maturity Date:**   The date that is the sixth anniversary of the Effective Date ("Maturity Date").

**Purpose:**   To refinance a portion of the Existing Credit Facility and satisfy a portion of the Lenders' claims under the Existing Credit Facility.

**Security:**   The New First Lien Notes and all guarantees thereof will be secured by first priority perfected liens on substantially all existing and after acquired property of the Borrowers.

**Interest Rate:**   "<u>Cash Pay Rate</u>": LIBOR plus 2.00% per annum; or

"PIK Rate": LIBOR plus 5.00% per annum.

**Interest Payments:**  Interest on the New First Lien Notes shall be payable in Cash quarterly in arrears at the Cash pay rate of LIBOR +2%; provided that if the average of the Reorganized Debtors' unrestricted consolidated Cash as of the last day of each of the two immediately preceding consecutive quarters is less than $15 million or if the unrestricted consolidated Cash as of the last day of the immediately preceding quarter is less than $15 million (collectively, the "Cash Interest Threshold"), then the Reorganized Debtors shall have the option to capitalize the amount of interest due in excess of LIBOR for the immediately preceding quarter, with such capitalized interest to be capitalized on such interest payment date, and all such capitalized interest shall be due on the next interest payment date to the extent the Cash Interest Threshold is met after giving effect to the payment of interest and capitalized interest or as the Reorganized Debtors otherwise elect. All capitalized interest not previously paid shall be paid on the Maturity Date. LIBOR shall be subject to a cap of 2%.

**Mandatory Prepayments:**  Mandatory prepayments of principal shall be made by the Reorganized Debtors if the average of the Reorganized Debtors' unrestricted consolidated Cash as of the last day of each of the two immediately preceding consecutive quarters is greater than $15 million or if the unrestricted consolidated Cash as of the last day of the immediately preceding quarter is greater than $15 million, in each case, after the payment of interest due on the New First Lien Notes.

**Covenants:**  Customary affirmative and negative covenants for facilities of this type, including but not limited to financial covenants and covenants limiting other indebtedness, off-balance sheet financing, liens, investments, guaranties, restricted junior payments (dividends, redemptions, and payments on subordinated debt), mergers and acquisitions, sales of assets, capital expenditures, transactions with affiliates and conduct of business, subject to exceptions and baskets to be mutually agreed by the parties.

**Senior Revolving Loan and Letter of Credit Facility:**  The New First Lien Notes shall contain provisions permitting the Borrowers to incur up to $10 million in secured indebtedness senior to the New First Lien Notes in the form of a working capital revolving loan and letter of credit facility, subject to the satisfaction of the terms and conditions set forth in the New First Lien Notes Documentation.

**Events of Default:**  Customary for facilities of this type, including but not limited to failure to make payments when due, defaults under other agreements or instruments of indebtedness, noncompliance with covenants, breaches of representations and warranties, bankruptcy, judgments, invalidity of guaranties, impairment of security interests, and change of ownership.

2

**Other Terms:**  The New First lien Notes shall include without limitation a default rate of interest, optional, increased costs or reduced returns, conditions precedent to closing, representations and warranties, assignments/participations, amendment, waiver, and required lender provisions, in each case, customary for facilities of this type.

**Documentation:**  The New First Lien Notes Documentation shall be in form and substance acceptable to the First Lien Steering Committee.