# AKIN GUMP
# STRAUSS HAUER & FELDLLP
▬▬▬▬▬▬ Attorneys at Law

PHILIP C. DUBLIN
212.872.8083/fax: 212.872.1002
pdublin@akingump.com

November 13, 2009

VIA E-MAIL

The Honorable Linda B. Riegle
United States Bankruptcy Court
300 Las Vegas Boulevard South
Las Vegas, NV 89101

**Re: The Rhodes Companies, LLC, aka "Rhodes Homes," et al. (the "Debtors")**

Dear Judge Riegle:

As you know, we are counsel to the First Lien Steering Committee in the above referenced chapter 11 cases. I am writing to inform you of recent events in the Debtors' chapter 11 cases that have forced the First Lien Steering Committee to reconsider going forward with its proposed plan and related disclosure statement (and the hearing scheduled for Monday, November 16, 2009 on the adequacy of such disclosure statement). Indeed, these recent events raise significant issues regarding Mr. Rhodes' good faith participation in the mediation ordered by Your Honor on July 21, 2009 and the viability of the proposed plan of reorganization on file with the Court.

As Your Honor is aware, on August 17, 24 and 25, 2009, the First Lien Steering Committee, the Debtors, certain non-Debtor entities controlled by James Rhodes (the "Rhodes Entities") and the Official Committee of Unsecured Creditors, among others (collectively, the "Mediation Parties"), participated in a mediation before the Honorable Richard Neiter with respect to the terms of a plan of reorganization for the Debtors' chapter 11 cases. Pursuant to the stipulation entered into between the Mediation Parties and so ordered by Your Honor on July 21, 2009, each of the Mediation Parties was to participate in the mediation in good faith. A copy of the stipulation and order is attached hereto as Exhibit A.

The mediation, while contentious at times, was ultimately successful, and an agreement reached at the mediation formed the basis for the consensual plan of reorganization filed by the First Lien Steering Committee. An initial hearing on the disclosure statement for the First Lien Steering Committee's plan took place on October 30, 2009, at which Your Honor requested a number of modifications to ensure sufficient disclosure for the Debtors' creditors. The First Lien Steering Committee worked diligently with the Mediation Parties to address Your Honor's

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━━ Attorneys at Law

Hon. Linda B. Riegle
November 13, 2009
Page 2

concerns subsequent to October 30, and filed an amended disclosure statement on November 12, 2009.

Included in the revisions to the disclosure statement requested by Your Honor was additional disclosure surrounding the prepetition transfer of the Rhodes Ranch Golf Course from the Debtors to an non-Debtor entity controlled by Mr. Rhodes. Your Honor was rightfully focused on these details as the Rhodes Ranch Golf Course (through the equity of the non-Debtor owner of such course) was to be transferred back to the reorganized Debtors under the proposed plan. In order to ensure that the disclosures regarding the prepetition transfer of the Rhodes Ranch Golf Course were accurate, Akin Gump, on behalf of the First Lien Steering Committee, requested that Debtors' counsel supply the necessary information required to respond to your Honor's request. By email dated November 3, 2009, Shirley Cho of Pachulski Stang Ziehl & Jones LLP circulated an e-mail containing, among other things, the following information for inclusion in the amended disclosure statement:

> The Rhodes Entities financed $5.9 million of the purchase price and paid $2.1 million in cash for the Rhodes Ranch Golf Course.

A copy of Ms. Cho's email correspondence is attached hereto as Exhibit B.

On November 12, 2009, subsequent to the filing of the amended plan and disclosure statement, I received the following email communication from Anne Loraditch of Greenburg Traurig on behalf of Mr. Rhodes:

> We received late comments from our clients with respect to your disclosure statement and plan that involve the RRGI debtor, and Brett asked that I send you this email as soon as possible re the issue. Please note that neither of us nor our clients have yet reviewed the revised disclosure statement and plan documents just filed in these cases.

> The issue concerns the source of the funds used by RRGI to purchase the Rhodes Ranch Golf Course. The purchase monies were comprised of (i) a loan in the amount of $5.9 million to RRGI from Vestin (third-party lender); and (ii) a loan in the amount of $2.4 million ro [*sic*] RRGI from Jim Rhodes personally. The first amended disclosure statement did not reflect the $2.4 million loan from Jim, and the first amended plan did not provide for any treatment of the $2.4 million loan.

AKIN GUMP
STRAUSS HAUER & FELD LLP
Attorneys at Law

Hon. Linda B. Riegle
November 13, 2009
Page 3

> As I understand it, our clients' position is that the loan need not be written off and
> that Jim will extend a forbearance on the loan to RRGI until Jim gets the golf
> course back. As they are your disclosure statement and plan, it is obviously your
> decision whether to include a description of the loan and Jim's intended
> forbearance in the documents. Brett is less concerned about the $2.4 million loan
> being disclosed in the disclosure statement or treated in the plan but wanted to
> bring the existence of the loan to your attention since it may implicate the free and
> clear conveyance of the golf course.

A copy of Ms. Loraditch's email (and all subsequent email correspondence related thereto) is
attached as Exhibit C.

In sum, Ms. Loraditch's email asserts that the purchase of the Rhodes Ranch Gold Course
was consummated through the procurement of a $5.9 million loan from unrelated third-party
Vestin *and* a $2.4 million loan provided by Mr. Rhodes in his individual capacity. In contrast,
Ms. Cho's description of the golf course transaction (which is included in the current version of
the disclosure statement) states that the Rhodes Entities financed $5.9 million of the purchase
price and paid $2.1 million *in cash* in exchange for title to the Rhodes Ranch Golf Course.

Ms. Cho's description of how the Rhodes Entities acquired Rhodes Ranch Golf Course is
entirely consistent with all information disclosed by the Debtors and the Rhodes Entities at the
mediation. It is also consistent with independent auditing performed at the request of the First
Lien Steering Committee. The attached financial report, prepared by third party auditor Century
Golf and attached hereto as Exhibit D, reflects indebtedness of $5.9 million. The report does not
reference, nor was Century Golf apprised of, the purported $2.4 million loan made by Mr.
Rhodes.

The existence of this previously undisclosed "loan" is of paramount importance because,
as noted above, pursuant to the plan, the reorganized Debtors are to acquire the equity in the
entity that owns the Rhodes Ranch Golf Course and its associated liabilities. Thus, the continued
existence of the purported $2.4 million "loan" from Mr. Rhodes would over lever the golf course
entity, not to mention give rise to potential adverse tax consequences to the reorganized Debtors.
Moreover, the First Lien Steering Committee is unaware of how the "loan" was treated
previously by Mr. Rhodes or the entity that owns the Rhodes Ranch Golf Course and, thus, what
other potential liabilities may exist that the reorganized Debtors potentially could be assuming.
Needless to say, the last minute disclosure of this "loan" was shocking to the First Lien Steering
Committee and, I believe, to the Debtors' and Mr. Rhodes' professionals, but not to Mr. Rhodes
who attended the mediation and was actively involved in negotiating the mediation settlement
term sheet that was signed by the parties on September 25, 2009.

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━━━ Attorneys at Law

Hon. Linda B. Riegle
November 13, 2009
Page 4

Based on the timing of the disclosure and the unknown consequences of the loan (including tax consequences and potential forgiveness of indebtedness income), I requested, on behalf of the First Lien Steering Committee, that Mr. Rhodes confirm, by 2:00 pm (ET) today, his willingness to forgive any loan actually made by Mr. Rhodes and to indemnify the Debtors, the reorganized Debtors, the golf course entity and any other legal entity established for purposes of implementing the plan for any tax or other obligation resulting from the loan forgiveness. Mr. Rhodes agreed to the foregoing; however, his agreement was made expressly contingent on a potentially material modification to the existing terms of the mediation settlement.

As the Court may recall, the plan currently provides that the Debtors' non-core assets located in Arizona and listed on Attachment D to the Mediation Term Sheet (which is attached to the plan as exhibit 1) shall be transferred to the Rhodes Entities as part of the global settlement reached between the Mediation Parties. Mr. Rhodes demanded that, before he would agree to forgive the $2.4 million "loan" and provide indemnification with respect thereto, the First Lien Steering Committee had to agree (i) not to transfer the foregoing Arizona assets but, rather, the stock of the Debtors' Arizona entities and (ii) to indemnify Mr. Rhodes for any guarantees he may personally have in respect of the Rhodes Ranch Golf Course. On behalf of the First Lien Steering Committee, I advised Mr. Rhodes' counsel that it would take some time to consider these requests and determine whether they were feasible in light of, among other things, the tax and other obligations that may be triggered as a result of the stock transfer and guarantee forgiveness. I did advise Mr. Rhodes' counsel, however, that the First Lien Steering Committee would be prepared to consider modifying the structure of the Arizona asset transfer and indemnifying Mr. Rhodes for his guarantee, in good faith, but not as a quid pro quo for Mr. Rhodes' forgiveness of the previously undisclosed loan.

Although the First Lien Steering Committee remains committed to working in good faith to achieve a consensual resolution of all issues in these chapter 11 cases, Mr. Rhodes' conduct in connection with the purported $2.4 million "loan" causes the First Lien Steering Committee to question Mr. Rhodes' good faith involvement in the mediation process and whether he has been hiding information that is pertinent to the Debtors' reorganization and consummation of a consensual plan in these cases. In light of Mr. Rhodes' recent behavior, absent a remarkable turn of events, the First Lien Steering Committee does not believe it will be in a position to seek approval of its disclosure statement on Monday. We will, however, keep the Court apprised of any developments, and will be present at Monday's hearing to provide the Court with a status report.

We know that the Court has devoted a substantial amount of time to the Debtors' cases, including reviewing multiple proposed disclosure statements, and apologize for any

AKIN GUMP
STRAUSS HAUER & FELD LLP
━━━━━━━━ Attorneys at Law

Hon. Linda B. Riegle
November 13, 2009
Page 5


inconvenience imposed on the Court.  Please note that notwithstanding this potential set back, the First Lien Steering Committee remains committed to enabling the Debtors' reorganization and the preservation of value for all creditor constituencies.   We will, of course, keep the Court informed of our intentions and look forward to addressing these issues before Your Honor on Monday.

I am available at the Court's convenience in advance of Monday's hearing at (212) 872-8083 (office) or 516-316-1442 (cell).

Very truly yours,

Philip C. Dublin


cc:      Hon. Richard Neiter
         James Stang
         Shirley Cho
         Brett Axelrod
         Thomas Beckett
         Mark Somerstein
         Van Durrer

## Exhibit A

Case 09-14814-lbr    Doc 336    Entered 07/21/09 16:08:34    Page 1 of 10

**Entered on Docket**
**July 21, 2009**

Hon. Linda B. Riegle
United States Bankruptcy Judge

James I. Stang, Esq. (SBN 94435)
Shirley S. Cho, Esq. (SBN 192616)
Werner Disse, Esq. (SBN 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
Email: jstang@pszjlaw.com
        scho@pszjlaw.com
        wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV 89101
Telephone: 702/382.1170
Facsimile: 702/382.1169
Email: zlarson@lslawnv.com

Attorneys for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 09-14814-LBR<br>(Jointly Administered) |
| THE RHODES COMPANIES, LLC, aka<br>"Rhodes Homes," et al.,[1] | Chapter 11 |
| Debtors. | Hearing Date: July 17, 2009<br>Hearing Time: 1:30 p.m.<br>Courtroom:    1 |

---

[1] The Debtors in these cases, along with their case numbers are: Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14823); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-

DOCS_LA:202371

Affects:

☒ All Debtors
☐ Affects the following Debtor(s)

## ORDER GRANTING PLAN EXCLUSIVITY AND CASH COLLATERAL STIPULATION [Re Docket Nos. 233, 236, 261]

Upon consideration of the Plan Exclusivity and Cash Collateral Stipulation attached hereto as Exhibit A (the "Stipulation"), and good cause appearing.

1.    IT IS HEREBY ORDERED that the Stipulation is approved.

Prepared and Submitted this 17th day of July, 2009 by:

LARSON & STEPHENS

By: /s/ Zachariah Larson
Zachariah Larson, Esq. (NV Bar No 7787)
Kyle O. Stephens, Esq. (NV Bar No. 7928)
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV 89101
(702) 382-1170 (Telephone)
(702) 382-1169
*Attorney for Debtors and Debtors in Possession*

APPROVED / DISAPPROVED
SARA L. KISTLER,
ACTING UNITED STATES TRUSTEE

By: [signature]
August B. Landis
Assistant United States Trustee
300 Las Vegas Blvd. S., Ste. 4300
Las Vegas, NV 89101
Telephone:     (702) 388-6600 Ext. 235
Telefax:        (702) 388-6658
Email:         augie.landis@usdoj.gov

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20 LLC (Case No. 09-14848); Tuscany Acquisitions IV LLC (Case No. 09-14849); Tuscany Acquisitions III LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852; Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, LLC (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

DOCS_LA:205217.1                          2

# EXHIBIT A

Case 09-14814-lbr    Doc 352    Entered 07/21/09 16:07:52    Page 4 of 10

James I. Stang, Esq. (CA Bar No. 94435)       E-File: July 17, 2009
Shirley S. Cho, Esq. (CA Bar No. 192616)
Werner Disse, Esq. (CA Bar No. 143458)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
Email: jstang@pszjlaw.com
     scho@pszjlaw.com
     wdisse@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & STEPHENS
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV 89101
Telephone: 702/382.1170
Facsimile: 702/382.1169
Email: zlarson@lslawnv.com

Attorneys for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

In re:                        Case No. 09-14814 LBR

THE RHODES COMPANIES, LLC, aka "Rhodes
Homes," et al.,[1]           Date:  July 17, 2009
                      Time: 1:30 p.m.
          Debtors.       Place:  Courtroom 1

☒ Affects All Debtors
☐ Affects the following Debtors:

## PLAN EXCLUSIVITY AND CASH COLLATERAL STIPULATION

[1] The Debtors in these cases, along with their case numbers are: Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20 LLC (Case No. 09-14848); Tuscany Acquisitions IV LLC (Case No. 09-14849); Tuscany Acquisitions III LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, LLC (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

DOCS_LA:205245.1

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

Case 09-14814-lbr    Doc 352    Entered 07/21/09 17:07:52    Page 2 of 10

This Stipulation is entered into by and between the Debtors, the First Lien Steering Committee ("FLSC"), the Administrative Agent for the First Lien Lenders (the "Agent"), the Administrative Agent for the Second Lien Lenders (the "Second Lien Agent"), the Official Committee of Unsecured Creditors (the "OCUC"), and certain non-Debtor affiliates of the Debtors (the "Non-Debtor Affiliates"). The foregoing parties (together, the "Parties") hereby enter into this Stipulation and agree as follows:

## RECITALS

WHEREAS, the Debtors filed the *Emergency Motion to Extend Time on the 90-Day Time Period to File a Plan Under Section 362(d)(3) of the Bankruptcy Code for Certain of the Debtors* [Rhodes Docket No. 233] (the "SARE Motion");

WHEREAS, the Debtors filed the *Emergency Motion to Extend Cash Collateral Termination Date* [Docket No. 236] (the "Cash Collateral Extension Motion");

WHEREAS, the Debtors filed the *Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and/or Disclosure Statement* [Docket No. 261] (the "Exclusivity Extension Motion");

WHEREAS, the FLSC filed the *Objection of the First Lien Steering Committee to Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and/or Disclosure Statement* [Docket No. 306];

WHEREAS, the FLSC filed the *Objection of the First Lien Steering Committee to Debtors' Emergency Motion for an Order Extending Cash Collateral Termination Date* [Docket Number 236] [Docket No. 321];

WHEREAS, the Agent filed the *Objection to Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and/or Disclosure Statement and Joinder in First Lien Steering Committee's Objection Thereto* [Rhodes Docket No. 308];

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

DOCS_LA:205245.1

2

Case 09-14814-lbr    Doc 335    Entered 07/21/09 17:07:52    Page 3 of 10

WHEREAS, the Agent filed the *Objection to and Joinder in First Lien Steering Committee's Objection to Debtors' Emergency Motion for an Order Extending Cash Collateral Termination Date* [Docket No. 314];

WHEREAS, the OCUC filed the *Committee's Statement Regarding Debtors' Pending Motions to Extend Exclusivity and Allow Continued Use of Cash Collateral* [Docket No. 324];

WHEREAS, on April 30, 2009, the Court entered that *Final Stipulated Order (I) Authorizing Use of Cash Collateral Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code and (II) Granting Adequate Protection and Super Priority Administrative Expense Priority to Prepetition Secured Lenders re Debtors' Motion for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, and 364, etc.* [Docket No. 126] (the "Final Cash Collateral Order");

WHEREAS, the Parties have agreed to a plan mediation pursuant to the agreement set forth below with either Judge Zive (District of Nevada), Judge Neiter (Central District California) or a mutually acceptable mediator to determine if the terms of a consensual plan between the Parties can be reached (the "Plan Mediation");

NOW THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration (the receipt and sufficiency of which are acknowledged), it is hereby stipulated and agreed by and between the Parties as follows:

## AGREEMENT

1.      The exclusive period under section 1121(d)(1) of the Bankruptcy Code under which only the Debtors may file a plan of reorganization is terminated immediately, provided that none of the Parties shall file a plan of reorganization or facilitate any other person in filing a plan of reorganization prior to August 28, 2009, regardless of the status of the Plan Mediation.

2.      The 90-day period under Section 362(d)(3) of the Bankruptcy Code is extended until August 28, 2009.

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

3.    The Parties shall engage in good faith non-binding Plan Mediation session(s) and the Plan Mediation shall last no longer than a total of 24 hours over three business days, unless (i) the Mediator declares an impasse prior to the expiration of such three business day (24 hour) period, or (ii) all of the Parties otherwise agree.

4.    Subject to the Debtors' continued compliance with all other terms of the Final Cash Collateral Order, the First Lien Steering Committee has agreed to an extension of the Cash Collateral Termination Date set forth in paragraph 3(i)(a) of the Final Cash Order through August 28, 2009 at 11:59 p.m. (prevailing Pacific Time) based on the Budget attached hereto as **Exhibit A**, which shall supplement the original Budget attached to the Final Cash Collateral Order, with all other provisions of the Final Cash Collateral Order remaining in full force and effect.

5.    The Budget attached hereto as **Exhibit A** is the governing Budget under the Final Cash Collateral Order, with all other provisions of the Final Cash Collateral Order remaining in full force and effect except for compliance with paragraph 3(b) regarding Pinnacle, which the FLSC and Agent waive.

6.    Notwithstanding anything to the contrary in this Order, the budget line items for Pinnacle in **Exhibit A** shall be included in any Cash Collateral Order(s) through October 2, 2009.

7.    The SARE Motion and Exclusivity Extension Motion shall be deemed withdrawn, with prejudice, upon entry of an Order by the Bankruptcy Court approving this Stipulation.

8.    The Cash Collateral Extension Motion shall be continued to August 28, 2009.

Dated: July 17, 2009

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170    Fax: (702) 382-1169

DOCS_LA:205245.1

4

APPROVED

By: _____
AKIN GUMP STRAUSS
HAUER & FELD LLP
Ira S. Dizengoff (NY Bar No. 2565687)
Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 268437)
One Bryant Park
New York, NY 10036
*Counsel for the First Lien Steering Committee*

APPROVED

By: _____
ROPES & GRAY LLP
Don S. De Amicis
Mark R. Somerstein
Benjamin L. Schneider
1211 Avenue of the Americas
New York, NY 10036-8704
*Counsel for Wells Fargo, N.A., as Agent for
the Second Lien Lenders*

APPROVED

By: _____
Brett A. Axelrod
Greenberg Traurig, LLP
3773 Howard Hughes Parkway
Suite 400 North
Las Vegas, NV 89169
*Counsel for James M. Rhodes and Sagebrush
Enterprises, Inc.*

APPROVED

By: _____
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Ramon M. Naguiat
300 S. Grand Ave., #3400
Los Angeles, CA 90071
*Counsel for Credit Suisse, Cayman Islands
Branch, as Agent for First Lien Lenders*

APPROVED

By: _____
J. Thomas Beckett
Parsons Behle & Latimer
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
*Counsel for Official Committee of
Unsecured Creditors*

APPROVED

By: _____
James I. Stang
Pachulski Stang Ziehl Young & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067
*Counsel for Debtors and Debtors-in-
Possession*

LARSON & STEPHENS
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Error! Unknown document property name.                5

# EXHIBIT A

Nevada Master 13 Week Cash Flow forecast
Revised 7/15/2009

## Exhibit B

**Dublin, Philip**

| | |
|---|---|
| **From:** | Shirley S. Cho [scho@pszjlaw.com] |
| **Sent:** | Tuesday, November 03, 2009 2:21 PM |
| **To:** | Dublin, Philip; Lahaie, Meredith |
| **Subject:** | FW: Section 19 |

Brett may have additional comments, but here is what I have on the golf course insert.

### 1 .        Transfer of Rhodes Ranch Golf Course

Under the terms of the First Lien Credit Agreement, certain of the Rhodes Entities were required to either sell the Rhodes Ranch Golf Course, or if no seller could be found, to buy the Rhodes Ranch Golf Course from the Debtors for a guaranteed purchase price of $8 million. Because the Rhodes Entities could not find a buyer given the state of the economy in December 2008, the Rhodes Entities were forced to purchase the Rhodes Ranch Golf Course for $8 million as required under the First Lien Credit Agreement. The purchase price was based on an appraisal from an independent third party, which appraised the value of the Rhodes Ranch Golf Course at approximately $8.0 million. The Rhodes Entities financed $5.9 million of the purchase price and paid $2.1 million in cash for the Rhodes Ranch Golf Course. Because the purchase of the Rhodes Ranch Golf Course was based on a fair market value appraisal, the Debtor received reasonably equivalent value for the Rhodes Ranch Golf Course such that the transaction could not be avoided as a fraudulent transfer.

The Rhodes Ranch Golf Course is the centerpiece of the Debtors' Rhodes Ranch development, which is the most valuable asset of the Debtors' estates. Given that there is no operating agreement between the Rhodes Entities and the Debtors, the Reorganized Debtors desire to own the Rhodes Ranch Golf Course in order to manage the Rhodes Ranch Golf Course to maximize the value of the Debtors' assets.

After much negotiation, the Rhodes Entities agreed to sell the Rhodes Ranch Golf Course to the Reorganized Debtors upon certain terms and conditions set forth in more detail below for the purchase price of the outstanding loan amount, or $5.9 million, provided that the Rhodes Entities shall have a right to repurchase the Rhodes Ranch Golf Course after a period of time, which will allow the Reorganized Debtors to build out and fully realize the value of the Rhodes Ranch development for the estates.

On the Effective Date, the applicable Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors (together with any equipment, golf carts, contracts or other assets determined by the First Lien Steering Committee to be necessary for the operation of the Rhodes Ranch Golf Course) pursuant to the terms of a stock transfer agreement in form and substance acceptable to the First Lien Steering Committee and Rhodes, subject to any outstanding debt on the Rhodes Ranch Golf Course. The stock transfer agreement shall contain representations by the Rhodes Entities that the entity that owns the Rhodes Ranch Golf Course does not have any liabilities other than ordinary course liabilities related to the

Rhodes Ranch Golf Course and indemnification provisions in favor of the Reorganized Debtors by the Rhodes Entities for any non-ordinary course liabilities. In addition, prior to the deadline for filing objections to the Disclosure Statement, the Rhodes Entities shall provide the First Lien Steering Committee with a list of all liabilities of the entity that owns the Rhodes Ranch Golf Course, a lien analysis and copies of all contracts related to the Rhodes Ranch Golf Course and to which the entity that owns the Rhodes Ranch Golf Course is a party, each of which must be acceptable to the First Lien Steering Committee.

**Other than the $5.9 million loan used to originally purchase the Rhodes Ranch Golf Course from the Debtors, the First Lien Steering Committee does not believe that there have been any additional obligations placed on the Rhodes Ranch Golf Course other than ordinary course liabilities.** The existing debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. The parties will work together in good faith to refinance the existing debt **and have been actively working since August on the refinancing and are talking to multiple lending sources. The First Lien Steering Committee believes that the refinancing will be accomplished prior to the Effective Date and, indeed, one of the conditions precedent to the occurrence of the Effective Date is that the refinancing has occurred.**

The Reorganized Debtors shall pay the reasonable costs and expenses associated with the refinancing; provided, that the terms of such refinancing are acceptable to the First Lien Steering Committee. The First Lien Steering Committee acknowledges that the loan documentation may provide that, upon the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors on the Effective Date, additional collateral from the Reorganized Debtors may be required. The Rhodes Entities shall transfer to the Reorganized Debtors on the Effective Debt any contracts related to the operation of and revenue generated by any cell towers located on the property of the Rhodes Ranch Golf Course. Any funds received after July 31, 2009 from the Las Vegas Valley Water District or other similar entity as an incentive for converting the golf course from a green course to a desert course shall be used for operating expenses associated with the Rhodes Ranch Golf Course, with any excess to become property of the Reorganized Debtors on the Effective Date.

The transaction is intended to be a net cash neutral transaction to the Reorganized Debtors and the Rhodes Entities. The golf course is essential to the preservation of the Reorganized Debtors' most valuable asset and as an accommodation to the Debtors and the Reorganized Debtors, the Rhodes Entities, as part of the 9019 settlement, have allowed the Reorganized Debtors to use the Rhodes Ranch Golf course for as long as needed up to eight years by purchasing the golf course for the amount of the current loan on the golf course, instead of the at the price that the Rhodes Entities purchased the golf course for in December 2008, which was $2.1 million higher than the amount of the loan, or $8 million.

To that end, Rhodes and/or his designee shall have the absolute right to repurchase the Rhodes Ranch Golf Course from the Reorganized Debtors at eight (8) years from the Effective Date for $5.9 million in cash. The Reorganized Debtors may require Rhodes to purchase the Rhodes Ranch Golf Course any time between four (4) and eight (8) years from the Effective Date for $5.9 million in cash provided that the Reorganized Debtors shall provide Rhodes with at least one year advance notice of its intent to sell the Rhodes Ranch Golf Course back to Rhodes. Such transfer shall occur on the applicable anniversary date of the Effective Date. For the avoidance of doubt, if the Reorganized Debtors put the Rhodes

Ranch Golf Course to Rhodes in accordance with the terms hereof and Rhodes fails to comply with his obligation to purchase the Rhodes Ranch Golf Course, Rhodes shall be deemed to have forfeited his option to purchase the Rhodes Ranch Golf Course.

On the Effective Date, Rhodes's obligations to comply with the repurchase shall be secured by either (i) $500,000 in cash in an escrow account or (ii) property worth at least $2 million (the "Golf Course Security Property"), with the value of such property to be agreed to by Rhodes and the First Lien Steering Committee or otherwise valued by an independent third party appraisal firm acceptable to both Rhodes and the First Lien Steering Committee (except Cushman Wakefield). In the event that Rhodes does not meet the repurchase request, provided that the Rhodes Ranch Golf Course is in the standard condition (defined below), then the Reorganized Debtors shall be entitled to liquidated damages in the form of security pledged (i.e., the $500,000 or the Golf Course Security Property).

So long as Rhodes has not defaulted on his obligation to repurchase the Rhodes Ranch Golf Course, Rhodes shall have the absolute and sole discretion to replace the Golf Course Security Property with $500,000 in cash on 30 days written notice to the Reorganized Debtors. Upon deposit of the $500,000 in cash, the Golf Course Security Property shall be released to Rhodes or his designee. Notwithstanding anything to the contrary contained herein, if the Rhodes Ranch Golf Course is not maintained with substantially the same performance and rating criteria at the time of the repurchase request as verified by an independent third party rating agency as it was on the Effective Date ("Standard Condition"), James Rhodes can (i) require the Reorganized Debtors to cure any conditions to return the Rhodes Ranch Golf Course to its Standard Condition (provided, that the cost of such cure does not exceed $500,000), or (ii) choose not to purchase the Rhodes Ranch Golf Course. Upon either the repurchase of the Rhodes Ranch Golf Course or the written decision to not repurchase the Rhodes Ranch Golf Course (in accordance with the preceding sentence), the Golf Course Security Property or the $500,000 Cash (if not applied to the repurchase of the Rhodes Ranch Golf Course) shall be returned to Rhodes within 30 days.

On the Effective Date, the Reorganized Debtors shall record a memorandum of agreement against the Rhodes Ranch Golf Course to evidence the above, the form of which is attached to the Plan as Exhibit ___.

**Exhibit C**

## Dublin, Philip

| | |
|---|---|
| **From:** | Dublin, Philip |
| **Sent:** | Friday, November 13, 2009 2:34 PM |
| **To:** | Paul Huygens; axelrodb@gtlaw.com; loraditcha@gtlaw.com |
| **Cc:** | scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; Dizengoff, Ira; crice@harmonylasvegas.com |

**Subject:** RE: In re The Rhodes Companies, et. al.

Paul, fyi, Greenberg was copied on your email so I will leave them on mine. I have no way to verify what you reference below right now though I believe that you believe what you are saying below to be true. That said, to diligence the below and any ancillary issues will take time and I know none of it will be resolved by Monday. Thus, as I stated previously, we are prepared to analyze the requests and related issues in good faith but will not be forced into agreeing to something we are just now hearing about after months of negotiation without proper business and legal analysis. Therefore, our position remains the same. We need Jim to confirm (i) the unconditional forgiveness of the alleged loan and (ii) his agreement to indemnify the Debtors, the entity that owns the Rhodes Ranch Golf Course, the reorganized Debtors or any new entity to be formed under the Plan for any tax liability or other obligations resulting from the forgiveness of such indebtedness. Please confirm.

Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
212.872.8083
212.872.1002 (fax)
pdublin@akingump.com

---

**From:** Paul Huygens [mailto:phuygens@provinceadvisors.com]
**Sent:** Friday, November 13, 2009 2:22 PM
**To:** Dublin, Philip; axelrodb@gtlaw.com; loraditcha@gtlaw.com
**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; Dizengoff, Ira; crice@harmonylasvegas.com
**Subject:** RE: In re The Rhodes Companies, et. al.

Phil – I'm only sending this email to akin, wincar, clayton rice and pszj. On the stock transfer for the AZ entities, I can add a little color here that may be helpful and bring the tenor down somewhat. The list of real estate to transfer is not as clear as one would think. There are different versions of the ownership in the accounting books, the county recorders office and the assessors office in Mohave county. In many cases, all three sources show different ownership. There are also deeds of trust from CS recorded in some areas of the CS collateral, but not others. Incidentally, the deeds of trust were done off legal descriptions, not legal parcels, so that creates an obvious uncertainty as to whether the entire donut hole in Pravada is transferring or whether slivers will be left behind. The list we've all talked about is either what the books and records (the equitable version) or the recorders office (one of the legal versions) shows, whichever is more inclusive. Mohave County is still in the stone age as far as keeping records so it's a nightmare. The information we were able to get came piecemeal on line from the recorders office, and Rhodes is right in being concerned that the recorders own version of ownership doesn't even tie back to the actual documents. We know for certain the assessors office is incorrect in most cases. We've spent a ton of time on this and are no more certain of the right answer today than we

were when we started. The only way to be sure that there aren't fights in the future over the AZ real property is to get the entities (at least that we've been able to come up with). As far as this issue is concerned, its not bad faith I can assure you, but a very real concern. Rhodes bargained for all the real property owned by those entities. They contain nothing else that we're aware of besides those items listed in the personal property except model furniture in the model homes that are transferring. Don't know if this helps or not

**From:** Dublin, Philip [mailto:pdublin@AkinGump.com]
**Sent:** Friday, November 13, 2009 11:02 AM
**To:** axelrodb@gtlaw.com; loraditcha@gtlaw.com
**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; phuygens@provinceadvisors.com; Mark Somerstein; TBeckett@parsonsbehle.com; Dizengoff, Ira; crice@harmonylasvegas.com; Durrer II, Van C; Naguiat, Ramon M
**Subject:** RE: In re The Rhodes Companies, et. al.

That is not what we discussed and we cannot agree to that in advance of Monday. As I said, we need to diligence that request and will do so in good faith but cannot agree to a stock deal at this point. There is a specific list of Arizona assets attached to the Mediation Term Sheet that were to be transferred to the Rhodes Entities and we do not know Rhodes' motivation in wanting to change the structure of the transaction. This appears like a blatant retrade on our mediation settlement or an attempt to exert leverage to get something extra and I question whether Mr. Rhodes has acted in good faith in connection with all matters pertinent to the mediation as was required by Court order. You leave us with no choice but to raise this with the Court on Monday.

Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
212.872.8083
212.872.1002 (fax)
pdublin@akingump.com

**From:** axelrodb@gtlaw.com [mailto:axelrodb@gtlaw.com]
**Sent:** Friday, November 13, 2009 1:52 PM
**To:** Dublin, Philip; loraditcha@gtlaw.com
**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; phuygens@provinceadvisors.com; Mark Somerstein; TBeckett@parsonsbehle.com; Dizengoff, Ira; crice@harmonylasvegas.com
**Subject:** RE: In re The Rhodes Companies, et. al.

Phil,

Sorry if I was not clear. Jim Rhodes is willing to provide the forgiveness of debt and indemnify for the tax liability or other obligations resulting from the forgiveness provided that the transfer of the Arizona Assets are via the stock transfer that he has requested. I understand that you are still in the process of evaluating the transfer request. Jim Rhodes' willingness to write off the golf course loan and provide the indemnity is tied to the transfer request being accepted.

**From:** Dublin, Philip [mailto:pdublin@AkinGump.com]
**Sent:** Friday, November 13, 2009 10:45 AM
**To:** Axelrod, Brett (Shld-LV-Bky); Loraditch, Anne (Assoc-LV-Bky)

**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; phuygens@provinceadvisors.com; Mark Somerstein; TBeckett@parsonsbehle.com; Dizengoff, Ira; crice@harmonylasvegas.com
**Subject:** RE: In re The Rhodes Companies, et. al.

Brett, this is not what we discussed. As I advised you, we will analyze the requests below regarding how the Arizona Assets will be transferred and issues related to the guarantees in good faith but will not be in a position to make a determination on either in advance of Monday's disclosure statement hearing. We do, however, need confirmation of the issues I raised below by 2 pm (et), which you have yet to confirm (i) the unconditional forgiveness of the alleged loan and (ii) Jim Rhodes' agreement to indemnify the Debtors, the entity that owns the Rhodes Ranch Golf Course, the reorganized Debtors or any new entity to be formed under the Plan for any tax liability or other obligations resulting from the forgiveness of such indebtedness. Please confirm by 2 p.m. (et).

Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
212.872.8083
212.872.1002 (fax)
pdublin@akingump.com

---

**From:** axelrodb@gtlaw.com [mailto:axelrodb@gtlaw.com]
**Sent:** Friday, November 13, 2009 1:37 PM
**To:** Dublin, Philip; loraditcha@gtlaw.com
**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; phuygens@provinceadvisors.com; Mark Somerstein; TBeckett@parsonsbehle.com; Dizengoff, Ira; crice@harmonylasvegas.com
**Subject:** RE: In re The Rhodes Companies, et. al.

Phil,

Rhodes is willing to write off the 2.4 million dollar loan and indemnify the Debtors and the entity that owns Rhodes Ranch Golf Course provided that the Arizona assets are transferred via the stock purchase of the Rhodes Arizona entities. I previously sent to you by separate email a list of personal guaranties that have been executed by Jim Rhodes for the golf course obligations which are the only other related party transactions. After title to the golf course has changed hands Jim Rhodes will have to be indemnified on these guaranties or the guaranties will have to be canceled.

Please call me if you have any questions.

Regard,

Brett Axelrod

---

**From:** Dublin, Philip [mailto:pdublin@AkinGump.com]
**Sent:** Friday, November 13, 2009 8:55 AM
**To:** Axelrod, Brett (Shld-LV-Bky); Loraditch, Anne (Assoc-LV-Bky)
**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; phuygens@provinceadvisors.com; Mark Somerstein; TBeckett@parsonsbehle.com; Dizengoff, Ira

11/13/2009

**Subject:** RE: In re The Rhodes Companies, et. al.

Please confirm that, to the extent the loan referenced below or any other amount that is allegedly due and owing by the entity that owns the Rhodes Ranch Golf Course to James Rhodes, in his individual capacity, or any other entity owned by or affiliated with James Rhodes will be forgiven and that Mr. Rhodes will agree to indemnify the Debtors, the entity that owns the Rhodes Ranch Golf Course, the reorganized Debtors or any new entity to be formed under the Plan for any tax liability or other obligations resulting from the forgiveness of such indebtedness by **no later than 2:00 pm (ET) today**. Please also confirm that there are no other related party transactions between Mr. Rhodes (or his spouse, relatives or other affiliates) and Rhodes Ranch Golf Course (or the entity that owns the course) or any of the Debtors that have not been previously and properly disclosed to the First Lien Steering Committee by 2:00 p.m. (ET). Absent your agreement to the foregoing by 2:00 pm (ET) today, we will advise the Bankruptcy Court that the First Lien Steering Committee will not seek approval of its Disclosure Statement at Monday's hearing as result of, among other things, the bad faith and potential fraudulent activity of Mr. Rhodes. We reserve all rights under applicable law with respect to the foregoing or any other issues arising in connection therewith. Thank you.

Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
212.872.8083
212.872.1002 (fax)
pdublin@akingump.com

---

**From:** axelrodb@gtlaw.com [mailto:axelrodb@gtlaw.com]
**Sent:** Friday, November 13, 2009 10:12 AM
**To:** Dublin, Philip; loraditcha@gtlaw.com
**Cc:** scho@pszjlaw.com; richard.dix@wincarpartners.com; Qureshi, Abid; Lahaie, Meredith; justin.bono@wincarpartners.com; phuygens@provinceadvisors.com
**Subject:** Re: In re The Rhodes Companies, et. al.

I have requested the documentation of the loan

---

**From:** Dublin, Philip <pdublin@AkinGump.com>
**To:** Loraditch, Anne (Assoc-LV-Bky)
**Cc:** Axelrod, Brett (Shld-LV-Bky); 'scho@pszjlaw.com' <scho@pszjlaw.com>; 'richard.dix@wincarpartners.com' <richard.dix@wincarpartners.com>; Qureshi, Abid <aqureshi@AkinGump.com>; Lahaie, Meredith <mlahaie@akingump.com>; 'justin.bono@wincarpartners.com' <justin.bono@wincarpartners.com>; 'phuygens@provinceadvisors.com' <phuygens@provinceadvisors.com>
**Sent:** Fri Nov 13 03:54:40 2009
**Subject:** Re: In re The Rhodes Companies, et. al.

Can you please answer my questions? Anne? Brett? Shirley? Paul?
Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
212-872-8083
212-872-1002 (fax)
pdublin@akingump.com

11/13/2009

**From:** Dublin, Philip
**To:** 'loraditcha@gtlaw.com'
**Cc:** 'axelrodb@gtlaw.com' ; 'scho@pszjlaw.com' ; 'richard.dix@wincarpartners.com' ; Qureshi, Abid; Lahaie, Meredith; 'justin.bono@wincarpartners.com' ; 'phuygens@provinceadvisors.com'
**Sent:** Thu Nov 12 21:22:46 2009
**Subject:** Re: In re The Rhodes Companies, et. al.

How is it possible this is just coming up now? We are not assuming this loan and not taking the golf course subject to any such loan whether by forbearance or otherwise. My understanding is that it is not on any balance sheet for the golf course we were ever provided nor did it come up in the audit. It was never disclosed in the mediation or at any other time and was not disclosed in the language we were provided from your side to include in the disclosure statement. Please forward evidence of this " loan" as soon as possible.
Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
212-872-8083
212-872-1002 (fax)
pdublin@akingump.com

**From:** loraditcha@gtlaw.com
**To:** Dublin, Philip
**Cc:** axelrodb@gtlaw.com
**Sent:** Thu Nov 12 21:15:26 2009
**Subject:** In re The Rhodes Companies, et. al.
Phil ~

We received late comments from our clients with respect to your disclosure statement and plan that involve the RRGI debtor, and Brett asked that I send you this email as soon as possible re the issue.  Please note that neither of us nor our clients have yet reviewed the revised disclosure statement and plan documents just filed in these cases.

The issue concerns the source of the funds used by RRGI to purchase the Rhodes Ranch Golf Course.  The purchase monies were comprised of (i) a loan in the amount of $5.9 million to RRGI from Vestin (third-party lender); and (ii) a loan in the amount of $2.4 million ro RRGI from Jim Rhodes personally.  The first amended disclosure statement did not reflect the $2.4 million loan from Jim, and the first amended plan did not provide for any treatment of the $2.4 million loan.

As I understand it, our clients' position is that the loan need not be written off and that Jim will extend a forbearance on the loan to RRGI until Jim gets the golf course back.  As they are your disclosure statement and plan, it is obviously your decision whether to include a description of the loan and Jim's intended forbearance in the documents.  Brett is less concerned about the $2.4 million loan being disclosed in the disclosure statement or treated in the plan but wanted to bring the existence of the loan to your attention since it may implicate the free and clear conveyance of the golf course.

Regards,

Anne Loraditch
Associate
Greenberg Traurig, LLP
3773 Howard Hughes Parkway | Suite 400 North
Las Vegas, Nevada 89169
Tel 702.938.6892
Fax 702.974.1541
loraditcha@gtlaw.com | www.gtlaw.com

11/13/2009

## GT GreenbergTraurig

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, please send an email to postmaster@gtlaw.com.

IRS Circular 230 Notice Requirement: This communication is not given in the form of

The information contained in this e-mail message is intended only for the personal a

IRS Circular 230 Notice Requirement: This communication is not given in the form of

The information contained in this e-mail message is intended only for the personal a

IRS Circular 230 Notice Requirement: This communication is not given in the form of

The information contained in this e-mail message is intended only for the personal a

IRS Circular 230 Notice Requirement: This communication is not given in the form of

The information contained in this e-mail message is intended only for the personal a

## **Exhibit D**

**Rhodes Ranch Golf Club**
Proforma Operating Statement

| Assumptions 2010 | 2011 | 2012 | | | Full Year Actual 2005 | 2006 | 2007 | 2008 | T12 July 2009 | Projection 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **Total Rounds** | | 61,501 | 61,993 | 48,931 | 64,772 | 64,534 | 64,489 | 64,489 | 64,489 |
| | | | | | | | | | | | | |
| | | | **Revenues** | | | | | | | | | |
| | | | Course Operations | | 3,246,676 | 3,550,806 | 2,892,123 | 3,762,305 | 3,292,168 | 3,334,307 | 3,451,008 | 3,571,793 |
| | | | Merchandise | | 306,229 | 298,244 | 228,964 | 376,955 | 332,739 | 348,471 | 357,183 | 366,113 |
| | | | Food & Beverage | | 805,683 | 818,055 | 635,211 | 882,968 | 994,507 | 1,013,673 | 1,033,946 | 1,054,625 |
| | | | **Total Revenues** | | 4,358,588 | 4,667,106 | 3,757,298 | 5,022,228 | 4,619,412 | 4,696,451 | 4,842,137 | 4,992,531 |
| | | | | | | | | | | | | |
| | | | **Cost of Sales** | | | | | | | | | |
| | | 62.0% | Merchandise | | 205,308 | 188,982 | 162,785 | 229,029 | 199,868 | 216,052 | 221,454 | 226,990 |
| | | 35.0% | Food & Beverage | | 307,140 | 302,016 | 240,410 | 333,449 | 307,359 | 354,786 | 361,881 | 369,119 |
| | | | Total Cost of Sales | | 512,448 | 490,998 | 403,195 | 562,478 | 507,227 | 570,838 | 583,335 | 596,109 |
| | | | | | | | | | | | | |
| | | | **Payroll** | | | | | | | | | |
| -3.0% | 1.0% | 1.0% | Golf Operations | | 455,746 | 438,460 | 470,525 | 544,494 | 480,405 | 465,993 | 470,653 | 475,359 |
| -5.0% | 1.5% | 2.0% | Golf Course Maintenance | | 712,438 | 752,182 | 745,976 | 748,307 | 608,456 | 578,034 | 586,704 | 598,438 |
| -10.0% | 1.5% | 1.5% | Food & Beverage | | 309,036 | 303,135 | 278,699 | 421,827 | 515,873 | 464,285 | 471,250 | 478,518 |
| 5.0% | 1.0% | 1.0% | General & Administrative | | 143,239 | 162,728 | 126,865 | 160,115 | 125,048 | 131,300 | 132,613 | 133,939 |
| | | | Total Payroll | | 1,620,459 | 1,656,503 | 1,622,064 | 1,874,743 | 1,729,782 | 1,659,612 | 1,661,220 | 1,686,055 |
| | | | | | | | | | | | | |
| | | | **Operating Expenses** | | | | | | | | | |
| 5.0% | 2.0% | 2.0% | Golf Operations | | 282,083 | 257,557 | 264,228 | 279,081 | 304,768 | 320,007 | 326,407 | 332,935 |
| -5.0% | 3.0% | 3.0% | Golf Course Maintenance | | 1,149,747 | 1,190,129 | 1,457,486 | 1,560,250 | 1,472,459 | 1,398,886 | 1,440,801 | 1,484,025 |
| -15.0% | 1.5% | 1.5% | Food & Beverage | | 115,756 | 134,191 | 104,283 | 163,181 | 195,319 | 166,871 | 169,374 | 171,915 |
| 15.0% | 3.0% | 3.0% | General & Administrative | | 342,126 | 348,359 | 261,177 | 302,920 | 192,122 | 220,940 | 227,568 | 234,396 |
| | | | Water Cost Savings | | | | | | | (655,000) | (85,000) | (100,000) |
| | | | Total Operating Expenses | | 1,889,712 | 1,930,236 | 2,087,174 | 2,305,432 | 2,165,669 | 2,041,655 | 2,079,151 | 2,123,271 |
| | | | | | | | | | | | | |
| | | | **Gross Operating Profit** | | 355,969 | 589,369 | (355,136) | 279,574 | 216,735 | 444,347 | 518,431 | 597,096 |
| | | | | | | | | | | | | |
| | | | Water Reclamation Credit ** Not likely to continue beyond 2012 | | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) | (233,333) | (233,333) | (233,333) |
| | | 7,500 | Cell Tower Lease Income | | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) | (90,000) |
| | | | Capital Leases | | | | | | | 30,000 | 65,000 | 80,000 |
| | | 3.5% | Management Load | | 152,551 | 163,249 | 131,505 | 175,778 | 161,679 | 164,376 | 169,475 | 174,739 |
| | | 2.5% | Capital Reserve | | 108,985 | 116,678 | 93,932 | 125,556 | 115,485 | 117,411 | 121,053 | 124,813 |
| | | | EBITDA | | 184,454 | 399,243 | (490,573) | 68,240 | 329,570 | 455,883 | 486,236 | 530,877 |
| | | | | | | | | | | | | |
| | | | **Debt Service** | | | | | | | | | |
| | | 6.25% | Interest | | | | | | | 368,750 | 362,262 | 355,566 |
| 25 Years | | 5,900,000 | Principal | | | | | | | 103,808 | 110,296 | 117,190 |
| | | | Total Debt Service | | | | | | | 472,558 | 472,558 | 472,558 |
| | | | | | | | | | | | | |
| | | | **Net Cash Flow** | | 184,454 | 399,343 | (490,573) | 68,240 | 329,570 | (16,665) | 13,678 | 58,319 |