AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

15. **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

16. **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **[January 514]**, **2010** to take place at **[9:00 a.m.]** (prevailing Pacific Time) before the Honorable Linda B. Riegle, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Nevada, located at 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101. The Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to interested parties.

Objections to Confirmation of the Plan must be filed and served on the First Lien Steering Committee, and certain other parties, by no later than [~~December 18~~January 4], ~~2009~~2010 at **[4:00 p.m.]** (prevailing Pacific Time). Any objections to the Plan must be (i) in writing, (ii) conform to the Bankruptcy Rules and the Local Rules, (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity, (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, (v) and be actually received by no later than [~~December 18~~January 4], ~~2009~~2010 at **4:00 P.M.**

17. **What is the purpose of the Confirmation Hearing?**

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

18. **What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Confirmation of the Plan and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related

to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code and as otherwise set forth in the Plan.

19. **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. As a result of the Mediation Settlement, the Plan contemplates that, upon the Debtors' emergence from chapter 11, the Debtors will continue to operate as a going concern homebuilder primarily in the Las Vegas market. For additional details on the Plan, see "Plan Overview" beginning on page 1 of this Disclosure Statement. Additional details regarding the Mediation Settlement can be found in the section entitled "Settlement Overview" beginning on page 2 of this Disclosure Statement.

20. **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

The Plan contemplates that the First Lien Lenders will be the owners of the Reorganized Debtors. Pursuant to the Plan, a new parent company for the Debtors will be formed ("Newco") and each of the First Lien Lenders will receive their pro rata share of 100% of the equity interests in Newco on account of its First Lien Lender Secured Claim. As a result of certain transactions to be undertaken in connection with the Plan, Newco will control the Reorganized Debtors upon their emergence from bankruptcy. The boards of directors of the Reorganized Debtors will consist of one or more members appointed by the First Lien Steering Committee. The First Lien Steering Committee will also appoint a chief executive officer or other similar officer to manage the Reorganized Debtors. The First Lien Steering Committee is in the process of selecting such officers and directors. The identity of such officers and directors will be publicly disclosed prior to the Confirmation Hearing, which is scheduled to take place on [January 5 14], 2010 at 9:00 a.m.

21. **Does the First Lien Steering Committee recommend voting in favor of the Plan?**

Yes. In the opinion of the First Lien Steering Committee, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Holders of Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased Administrative Claims, which would result in smaller distributions to the Holders of Claims. Accordingly, the First Lien Steering Committee recommends that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.

H.  <u>Voting and Confirmation</u>

The Classes entitled to vote will have accepted the Plan if (1) the Holders of at least two thirds in dollar amount of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept the Plan and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept

the Plan. Assuming the requisite acceptances are obtained, the First Lien Steering Committee intends to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence on [January 5̶14], 2010 at [9:00 a.m.] prevailing Pacific Time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class of Claims that is Impaired under the Plan.

To the extent a Holder of one or more First Lien Lender Claims also holds one or more Second Lien Lender Claims, if such Holder votes in favor of the Plan on account of its First Lien Lender Claim(s), the Holder shall be deemed to vote in favor of the Plan on account of its Second Lien Lender Claim(s) regardless of whether the Holder actually votes its Second Lien Lender Claim(s) in favor of the Plan.

THE FIRST LIEN STEERING COMMITTEE WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE FIRST LIEN STEERING COMMITTEE RESERVES THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

The Bankruptcy Court has established [November 1̶6̶24], 2009 (the "Record Date"), as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots, along with this Disclosure Statement, the Plan and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Record Date that are entitled to vote. A return envelope will be included with Ballots, as appropriate.

The Claims and Solicitation Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Claims and Solicitation Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan. The address for the Claims and Solicitation Agent is:

Omni Management Group
Attn: Rhodes Homes Claims Agent
16501 Ventura Boulevard, Suite 440
Encino, CA 91436

Or if by email to scott@omnimgt.com or by fax to 818-783-2737. If you have any questions on voting procedures, please call the Claims and Solicitation Agent at the following toll free number: (818) 906-8300.

TO BE COUNTED, BALLOTS (OR MASTER BALLOTS OF THE RESPECTIVE NOMINEE HOLDER, IF APPLICABLE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. PREVAILING PACIFIC TIME ON [D̶E̶C̶E̶M̶B̶E̶R̶ 1̶8̶JANUARY 4], 2̶0̶0̶9̶2010 (THE "VOTING DEADLINE"). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

THE FIRST LIEN STEERING COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS. THE FIRST LIEN STEERING

COMMITTEE RECOMMENDS THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

I.      Consummation of the Plan

It will be a condition to Confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article X of the Plan. Following Confirmation, the Plan will be consummated on the Effective Date, which will be no earlier than the eleventh day following entry of an order, in form and substance acceptable to the First Lien Steering Committee, by the Bankruptcy Court confirming the Plan and satisfaction of all conditions to Confirmation and the Effective Date having been satisfied or waived in accordance with the terms of the Plan.

## Article II.
## BACKGROUND[2]

A.      Description of the Debtors' Business Operations

1.      Organizational Structure

The Debtors' organizational chart is attached hereto as Exhibit B. In addition to the Debtor entities below, the Debtors are affiliated with several other companies that are not Debtors in these Chapter 11 Cases.

Rhodes Ranch GP is the primary holder of land associated with the Rhodes Ranch master-planned community and also owns some commercial properties outside of the Rhodes Ranch master-planned community. The Rhodes Ranch master-planned community consists of several developments, including developments built by non-Debtor affiliated developers. Rhodes Design and Development Corp. holds the Debtors' contractor's license in Nevada along with holding some land. Previously, Rhodes Ranch Golf and Country Club was the owner and operator of the golf course and club house in the Rhodes Ranch development, but on December 22, 2008, as required by the First Lien Credit Agreement, its assets were sold to non-Debtor Rhodes Ranch Golf, Inc.

The Rhodes Companies, LLC is a real estate development holding company.

The following Debtors hold parcels of land associated with the Tuscany development: Rhodes Design and Development; Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC; Tuscany Acquisitions III, LLC; and Tuscany Acquisitions IV, LLC. Tuscany Golf Country Club, LLC owns and operates the golf club located at the Tuscany development.

The following Debtors own land in Arizona: Rhodes Homes Arizona, LLC; Rhodes Arizona Properties, LLC; and Elkhorn Investments, Inc.. Rhodes Homes Arizona, LLC also holds the Debtors' Arizona contractor's license.

---

[2] Article II is based primarily on representations made by the Debtors.

course. It has gated entry and 24-hour security detail (with patrols), an existing 35,000 square foot community center similar to Rhodes Ranch, and a planned Tuscan-themed retail center. As of March 31, 2009, Tuscany had 350 finished lots remaining to be sold and 559 partially developed lots. The First Lien Steering Committee estimates the value of Tuscany Residential Village on a going concern basis to be approximately $48.1 million.

Spanish Hills is a high-end development located in southwest Las Vegas. The community is built on over 100 acres and features many custom homes in excess of 5,400 square feet of living space. As of March 31, 2009, it had 2 partially developed single family estate lots and 2 finished lots remaining to be sold. It also had 10 acres of undeveloped land. The First Lien Steering Committee estimates value of the Spanish Hills development on a going concern basis to be approximately $1 million.

The Debtors did not operate their developments by legal entity, so for purposes of estimating Claims against each of these developments, the Debtors would need to conduct a Claim-by-Claim analysis. In several cases, the Claims filed by Creditors were asserted against The Rhodes Companies, LLC, which is the lead Debtor for purposes of the Chapter 11 Cases, but not necessarily the contracting party with whom the such Creditors may have conducted business. There is, however, approximately $390 million of Secured First Lien Lender debt and Second Lien Lender debt filed against each Debtor. For a more complete discussion of the total Claims asserted against all the Debtors, see Article I.F hereof.

The Debtors' homebuilding operations in Arizona ("Arizona") will be transferred to the Rhodes Entities on the Effective Date pursuant to the Plan. Arizona consists of all of the real and personal property of three of the Debtors: Rhodes Homes Arizona Properties, LLC, Rhodes Homes Arizona, LLC, and Elkhorn Investments, Inc. Included within the Arizona Assets is Pravada, which is a Rhodes Homes development located in Mohave County (vicinity of Kingman, Arizona) on approximately 1,312 acres, which has 3,591 partially developed lots. Also included in Arizona, which is located within and around Pravada, are 4 model homes, 4 standing inventory homes, and 327 acres of land. ~~The full~~A list of Arizona Assets being transferred to the Rhodes Entities is set forth on Attachment D to the Mediation Term Sheet. The Arizona Assets do not include any assets owned by Pinnacle Grading located in Arizona, except for Pinnacle Grading office equipment, furniture, computers located in Arizona, which is set forth on Attachment D to the Mediation Term Sheet. <ins>The Arizona Assets being transferred also do not include intercompany claims, the Stanley Engineering Litigation or any cash owned by any of the foregoing legal entities.</ins>

The Debtors own a number of additional lots and commercial-zoned properties in various stages of development in Nevada and Arizona. As of the first quarter of 2009, development on all projects except Rhodes Ranch and Tuscany has ceased pending improvement in the real estate market.

3.  Principal Debt and Capital Structure

The Debtors are party to a Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders, and Credit Suisse,

Administrative Claim on behalf of any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arose from and after the effectiveness of Sagebrush's recission of its indemnity through the Effective Date, provided that the allowance of such Administrative Claim shall be subject to resolution by the Bankruptcy Court and/or such other court(s) of competent jurisdiction. Sagebrush has not asserted any Administrative Claims against the Estates as of the date hereof, and the First Lien Steering Committee believes that no such Claims will be made by Sagebrush.

The Reorganized Debtors shall indemnify Sagebrush for any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arise from and after the Effective Date. Professional licenses include, but are not limited to the Nevada State Contractor's Board license, and any other general business or similar licenses in any county, state, municipality or other jurisdiction in which the Reorganized Debtors conduct business or own assets as of the Effective Date. The Rhodes Entities shall use commercially reasonable efforts to maintain third party agreements with their real estate brokers and sales agents.

19. Transfer of Rhodes Ranch Golf Course

Under the terms of the First Lien Credit Agreement, certain of the Rhodes Entities were required to either sell the Rhodes Ranch Golf Course, or if no seller could be found, to buy the Rhodes Ranch Golf Course from the Debtors for a guaranteed purchase price of $8 million. Because the Rhodes Entities could not find a buyer given the state of the economy in December 2008, the Rhodes Entities were forced to purchase the Rhodes Ranch Golf Course for $8 million as required under the First Lien Credit Agreement. The purchase price was based on an appraisal from an independent third party, which appraised the value of the Rhodes Ranch Golf Course at approximately $8.0 million. The First Lien Steering Committee had been advised that the Rhodes Entities financed $5.9 million of the purchase price and paid $2.1 million in cash for the Rhodes Ranch Golf Course. The Rhodes Entities subsequently asserted that $2.4 million of the purchase price was financed through a personal loan from James Rhodes, which loan will be contributed by James Rhodes to the entity that owns the Rhodes Ranch Golf Course in connection with the transfer of the equity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors.

Because the purchase of the Rhodes Ranch Golf Course was based on a fair market value appraisal, the Debtors received reasonably equivalent value for the Rhodes Ranch Golf Course such that the transaction could not be avoided as a fraudulent transfer.

The Rhodes Ranch Golf Course is the centerpiece of the Debtors' Rhodes Ranch development, which is the most valuable asset of the Debtors' estates. Given that there is no operating agreement between the Rhodes Entities and the Debtors, the Reorganized Debtors desire to own the Rhodes Ranch Golf Course in order to manage the Rhodes Ranch Golf Course to maximize the value of the Debtors' assets.

After much negotiation, the Rhodes Entities agreed to transfer the Rhodes Ranch Golf Course to the Reorganized Debtors upon certain terms and conditions set forth in more detail below.

On the Effective Date, the applicable Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors (together with any equipment, golf carts, contracts or other assets determined by the First Lien Steering Committee to be necessary for the operation of the Rhodes Ranch Golf Course) pursuant to the terms of a stock transfer agreement in form and substance acceptable to the First Lien Steering Committee and Rhodes, subject to any outstanding debt on the Rhodes Ranch Golf Course. The stock transfer agreement shall contain representations by the Rhodes Entities that the entity that owns the Rhodes Ranch Golf Course does not have any liabilities other than ordinary course liabilities related to the Rhodes Ranch Golf Course and indemnification provisions in favor of the Reorganized Debtors by the Rhodes Entities for any non-ordinary course liabilities. In addition, prior to the deadline for filing objections to the Disclosure Statement, the Rhodes Entities shall provide the First Lien Steering Committee with a list of all liabilities of the entity that owns the Rhodes Ranch Golf Course, a lien analysis and copies of all contracts related to the Rhodes Ranch Golf Course and to which the entity that owns the Rhodes Ranch Golf Course is a party, each of which must be acceptable to the First Lien Steering Committee. _Pursuant to the stock and asset transfer agreement governing the transfer of the equity in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors, the entity that owns the Rhodes Ranch Golf Course post-Effective Date shall agree to indemnify James Rhodes for any ordinary course liability first incurred post-Effective Date by such entity under any contract related to the operation of the Rhodes Ranch Golf Course for which James Rhodes has provided a personal guaranty._

Other than the $5.9 million _third party_ loan used to originally purchase the Rhodes Ranch Golf Course from the Debtors, the First Lien Steering Committee does not believe that there have been any additional obligations placed on the Rhodes Ranch Golf Course other than ordinary course liabilities. ~~The existing~~ _though the First Lien Steering Committee has been advised that James Rhodes may have provided a $2.4 million loan to the entity that owns the Rhodes Ranch Golf Course. This $2.4 million loan will be contributed by James Rhodes to the entity that owns the Rhodes Ranch Golf Course and he will indemnify the Debtors, the Reorganized Debtors, Newco and the entity that owns the Rhodes Ranch Golf Course from any liability arising from the contribution of such loan. The existing $5.9 million third party_ debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. The parties will work together in good faith to refinance the existing _third party_ debt and have been actively working since August on the refinancing and are talking to multiple lending sources. The First Lien Steering Committee believes that the refinancing will be accomplished prior to the Effective Date and, indeed, one of the conditions precedent to the occurrence of the Effective Date is that the refinancing has occurred. As of the date hereof, new financing has not been obtained for the Rhodes Ranch Golf Course. The Rhodes Entities and the First Lien Steering Committee, however, have been engaged in discussions with potential lenders for the Rhodes Ranch Golf Course and are optimistic that favorable financing will be obtained. The potential terms of such financing have not been provided in this Disclosure Statement to ensure that potential lenders do not obtain an unfair negotiating advantage with respect to such terms. Upon obtaining a final commitment for refinancing for

the Rhodes Ranch Golf Course, the First Lien Steering Committee will disclose such terms in a filing with the Bankruptcy Court.

The Reorganized Debtors shall pay the reasonable costs and expenses associated with the refinancing; provided, that the terms of such refinancing are acceptable to the First Lien Steering Committee. The First Lien Steering Committee acknowledges that the loan documentation may provide that, upon the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors on the Effective Date, additional collateral from the Reorganized Debtors may be required. The Rhodes Entities shall transfer to the Reorganized Debtors on the Effective Debt any contracts related to the operation of and revenue generated by any cell towers located on the property of the Rhodes Ranch Golf Course. Any funds received after July 31, 2009 from the Las Vegas Valley Water District or other similar entity as an incentive for converting the golf course from a green course to a desert course shall be used for operating expenses associated with the Rhodes Ranch Golf Course, with any excess to become property of the Reorganized Debtors on the Effective Date.

The golf course is beneficial to the preservation of the Reorganized Debtors' Rhodes Ranch assets and, as part of the Mediation Settlement, the Reorganized Debtors will obtain title to the Rhodes Ranch Golf Course (through the assumption of the third party debt on such course not to exceed $5.9 million).

Rhodes and/or his designee shall have the absolute right to repurchase the Rhodes Ranch Golf Course from the Reorganized Debtors at eight (8) years from the Effective Date for $5.9 million in cash. The Reorganized Debtors may require Rhodes to purchase the Rhodes Ranch Golf Course any time between four (4) and eight (8) years from the Effective Date for $5.9 million in cash provided that the Reorganized Debtors shall provide Rhodes with at least one year advance notice of its intent to sell the Rhodes Ranch Golf Course back to Rhodes. Such transfer shall occur on the applicable anniversary date of the Effective Date. For the avoidance of doubt, if the Reorganized Debtors put the Rhodes Ranch Golf Course to Rhodes in accordance with the terms hereof and Rhodes fails to comply with his obligation to purchase the Rhodes Ranch Golf Course, Rhodes shall be deemed to have forfeited his option to purchase the Rhodes Ranch Golf Course.

On the Effective Date, Rhodes's obligations to comply with the repurchase shall be secured by either (i) $500,000 in cash in an escrow account or (ii) property worth at least $2 million (the "Golf Course Security Property"), with the value of such property to be agreed to by Rhodes and the First Lien Steering Committee or otherwise valued by an independent third party appraisal firm acceptable to both Rhodes and the First Lien Steering Committee (except Cushman Wakefield). In the event that Rhodes does not meet the repurchase request, provided that the Rhodes Ranch Golf Course is in the standard condition (defined below), then the Reorganized Debtors shall be entitled to liquidated damages in the form of security pledged (i.e., the $500,000 or the Golf Course Security Property).

So long as Rhodes has not defaulted on his obligation to repurchase the Rhodes Ranch Golf Course, Rhodes shall have the absolute and sole discretion to replace the Golf Course Security Property with $500,000 in cash on 30 days written notice to the Reorganized Debtors. Upon deposit of the $500,000 in cash, the Golf Course Security Property shall be

released to Rhodes or his designee. Notwithstanding anything to the contrary contained herein, if the Rhodes Ranch Golf Course is not maintained with substantially the same performance and rating criteria at the time of the repurchase request as verified by an independent third party rating agency as it was on the Effective Date ("Standard Condition"), James Rhodes can (i) require the Reorganized Debtors to cure any conditions to return the Rhodes Ranch Golf Course to its Standard Condition (provided, that the cost of such cure does not exceed $500,000), or (ii) choose not to purchase the Rhodes Ranch Golf Course. Upon either the repurchase of the Rhodes Ranch Golf Course or the written decision to not repurchase the Rhodes Ranch Golf Course (in accordance with the preceding sentence), the Golf Course Security Property or the $500,000 Cash (if not applied to the repurchase of the Rhodes Ranch Golf Course) shall be returned to Rhodes within 30 days.

On the Effective Date, the Reorganized Debtors shall record a memorandum of agreement against the Rhodes Ranch Golf Course to evidence the above.

20. Cash Payment

The Rhodes Entities shall make a cash payment to the Reorganized Debtors of $3.5 million in Cash on the Effective Date. The $3.5 million cash payment shall be used to fund distributions under the Plan and provide working capital to the extent of any excess.

21. Transfer of Arizona Assets

On the Effective Date, pursuant to ~~the~~a stock and asset transfer agreement, a draft of which is attached hereto as Exhibit M, the Debtors shall transfer Pravada and the other Arizona Assets set forth on Attachment D to the Mediation Term Sheet, plus the Golden Valley Ranch tradename to the Rhodes Entities free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000; provided, further, that such assets shall not include assets owned by Pinnacle Grading located in Arizona and related contracts associated with the assets. **All Claims asserted against the Arizona Assets shall be deemed asserted against the Estates and shall be classified in accordance with Article III of the Plan for distribution purposes.** The Arizona Assets shall be transferred through the Rhodes Entities' acquisition of the stock of Rhodes Arizona Properties LLC and Elkhorn Investments, Inc. and certain assets of Rhodes Homes Arizona LLC. Any non-real property assets or assets not listed on Attachment D to the Mediation Term Sheet that are titled in Rhodes Arizona Properties LLC or Elkhorn Investments, Inc. shall be transferred to Newco pursuant to the stock and asset transfer agreement. To the extent any real property assets located in Arizona are titled in any Debtor other than Rhodes Arizona Properties LLC, Elkhorn Investments, Inc. or Rhodes Homes Arizona, such real property assets shall be transferred to the Rhodes Entities pursuant to the stock and asset transfer agreement. All intercompany claims assertable by Rhodes Arizona Properties LLC or Elkhorn Investments, Inc. against any other Debtor shall be deemed cancelled.

The Debtors shall provide James Rhodes notice of any proposed sale of the Pinnacle assets, and James Rhodes shall be granted a right to bid on the sale of such assets within 10 days of such notice. The Rhodes Entities shall permit storage of Pinnacle Grading equipment

b. Claims Payable by Insurance

Holders of Insured Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Reorganized Debtors shall have no obligation to pay any amounts in respect of pre-petition deductibles or self insured retention amounts. Allowed Insured Claim amounts in excess of available insurance shall be treated as General Unsecured Claims. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

c. Applicability of Insurance Policies

Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except for Claims and Causes of Action released under the Plan to the Released Parties and Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6. Payment of $1.5 Million to First Lien Lenders

The $1,500,000 in Cash payable to the Holders of First Lien Lender Secured Claims from the proceeds of their Collateral pursuant to Article III.B.1. shall be paid as follows: (i) $400,000 on the Effective Date and (ii) the remaining up to $1,100,000 in five quarterly installments of $220,000 beginning on the first day of the fourth month following the Effective Date; provided, that the Reorganized Debtors shall have the right to defer up to two quarterly payments, with such deferred amount(s) to be paid on the next quarterly payment date (and the amount scheduled to be paid on such quarterly payment date deferred for another quarter; provided that the full $1.5 million payment shall be made to the Holders of First Lien Lender Secured Claims within eighteen months of the Effective Date). Notwithstanding the foregoing, in the event that, as of the Effective Date, the debt on the Rhodes Ranch Golf Course has been refinanced on terms and conditions acceptable to the First Lien Steering Committee and the Reorganized Debtors have unrestricted cash of at least $3.5 million (after taking into account any amounts required to be paid to reduce the amount of third party debt on the Rhodes Ranch Golf Course below $5.9 million and without taking into consideration amounts that may have been borrowed under any exit facility unless such amounts were used to pay-down debt on the Rhodes Ranch Golf Course, in which case any amounts used to pay-down debt on the Rhodes Ranch Golf Course will be deemed to reduce unrestricted cash on a dollar for dollar basis), then the initial $400,000 payment to the First Lien Lenders will be increased as follows: (i) if unrestricted cash (as calculated above) is

Executory Contracts and Unexpired Leases shall be in form and substance acceptable to the Plan Proponent.

2.  <u>Conditions Precedent to the Effective Date</u>

The following are conditions precedent to Consummation that must be satisfied or waived in accordance with Article X.C of the Plan:

A.  The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated by Article V of the Plan.

B.  All of the schedules, documents, and exhibits ancillary to the Plan and Disclosure Statement including, but not limited to, (i) the Claim Purchase Schedule, (ii) the Litigation Trust Agreement, (iii) the Newco LLC Operating Agreement, (iv) the New First Lien Notes credit agreement, (v) the Schedule of Causes of Action, (vi) the Asset and Stock Transfer Agreement, and (vii) the Schedule of Assumed Executory Contracts and Unexpired Leases shall be in form and substance acceptable to the Plan Proponent.

C.  The Confirmation Order shall have become a Final Order in form and substance acceptable to the Plan Proponent.

D.  The documents governing the New First Lien Notes and the Newco LLC Operating Agreement shall be in form and substance acceptable to the Plan Proponent.

E.  The Confirmation Date shall have occurred.

F.  The First Lien Steering Committee shall have designated and replaced each existing Qualified Employee of the Debtors with a new Qualified Employee for the Reorganized Debtors.

G.  The <u>third party</u> debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on terms and conditions acceptable to Rhodes and the First Lien Steering Committee <u>and the personal loan of James Rhodes to the entity that owns the Rhodes Ranch Golf Course shall have been contributed as equity without any new equity being issued to James Rhodes and James Rhodes shall have provided the Debtors, the Reorganized Debtors, Newco and the entity that owns the Rhodes Ranch Golf Course an indemnity for any liability arising from the contribution of such loan</u>.

H.  Copies of all Debtors' books and records shall have been delivered to the Rhodes Entities at no cost to the Rhodes Entities.

agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Plan Proponent or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponent or any other Entity.

N.  Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code and as otherwise set forth in the Plan.

## Article V.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Plan Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

A.  The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation (the "Confirmation Hearing"). Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON [JANUARY ~~5~~14], 2010 AT [9:00 ~~a~~A.~~m~~M.] PREVAILING PACIFIC TIME BEFORE THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, IN COURTROOM 1 IN THE FOLEY FEDERAL BUILDING LOCATED AT 300 LAS VEGAS BOULEVARD SOUTH, LAS VEGAS, NEVADA 89101. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [~~DECEMBER 18~~JANUARY 4], ~~2009,~~2010, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER FILED AND SERVED ON HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A member with COD income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Nonetheless, any attribute reduction will be applied as of the first day following the taxable year in which a member recognizes COD income. If a member has a suspended loss with respect to its membership interest in Heritage Land Company LLC, the allocation of COD income may allow some or all of such suspended losses to be used to offset the COD income.

A recently enacted amendment to the COD income rules provides that taxpayers that recognize COD income in 2009 or 2010 may elect to forgo the COD income exclusion and attribute reduction rules described above. Instead, the taxpayer may elect to take into taxable income the COD income with respect to such debt in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD income in each such year). This election to defer COD income is made separately with respect to each debt instrument on which COD income is realized, must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD income, and, in the case of debt of a partnership, is made at the partnership level, but recent IRS guidance allows taxpayers to make partial elections and permits partnerships to choose which partners defer which amount, if any. The guidance also provides that a taxpayer is not required to make an election for the same COD income portion arising from each reacquired applicable debt instrument, though he or she may make an election for different portions of such income arising from different applicable debt instruments. The Debtors have not yet determined whether such an election will be made with respect to the COD income generated in connection with the consummation of the Plan.

4.  Recent Tax Amendments

The law governing net operating loss ("NOL") carrybacks was amended November 6, 2009. It permits taxpayers to elect to carry back either their 2008 or 2009 operating losses for 3, 4 or even 5 years, rather than the normal 2 years. Losses may be carried back 3 or 4 years to offset all income generated in those years. Losses carried back the 5th year can only offset half of the income in that year. In addition, this law suspends the application of the normal year that NOLs can only offset 90% of alternative minimum taxable income for losses for the carrybacks covered by this provision. Taxpayers may file an irrevocable election to carry back 2008 or 2009 losses (but not both 2008 and 2009 losses) for this extended period at any time up to the due date of their 2009 returns (including extensions). The Rhodes Entities may realize additional tax benefits as a result of the foregoing amendment.

In the case of a partnership (or LLC treated as a partnership for tax purposes), these rules apply at the partner level, with the partner including its allocable share of the entity's losses. In the case of an S corporation, similar rules apply, albeit with different limitations on the ability to use such losses due to different basis rules. Since the Debtors' businesses were not carried on by a corporation, but were carried on through pass-through entities (i.e., partnerships, LLCs taxable as partnerships, an S corporation, and LLCs disregarded for tax purposes), this legislation will not result in any recoveries to the Debtors from carrying back NOLs the additional three years.

**Article IX.**
**CONCLUSION**

The First Lien Steering Committee believes that the Plan is in the best interests of Creditors and urges such parties to vote to accept the Plan.

Dated: November ~~12,~~23, 2009            THE FIRST LIEN STEERING COMMITTEE

By: Its Counsel

By:      /s/ Philip C. Dublin
Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
(702) 979-2357 (Telephone)
(702) 362-9472 (Facsimile)
Nleatham@klnevada.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Philip C. Dublin (NY Bar No, 2959344)
Abid Qureshi (NY Bar No. 2684637)
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
pdublin@akingump.com
aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

109
~~109~~