reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

B.    Administrative and Priority Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

1.    Administrative Claims

Each Allowed Administrative Claim shall be paid in full, in Cash, (i) on the later of (a) the Effective Date, (b) the date on which the Bankruptcy Court enters an order allowing such Allowed Administrative Claim, or (c) the date on which the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent) and the Holder of such Allowed Administrative Claim otherwise agree, and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Debtors, (b) are Allowed by the Bankruptcy Court, (c) may be agreed upon between the Holder of such Allowed Administrative Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), or (d) may otherwise be required under applicable law.   Such Allowed Administrative Claims shall include costs incurred in the operation of the Debtors' businesses after the Petition Date, the allowed fees and expenses of Professionals retained by the Debtors and the Creditors' Committee and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

2.    Priority Tax Claims

Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) upon such other terms as may be agreed to between the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), and any Holder of an Allowed Priority Tax Claim; provided, however, that the Reorganized Debtors or Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, may make Cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, unless otherwise provided herein, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at the Federal statutory rate; provided, further, that deferred Cash payments on account of an Allowed Priority Tax Claim shall be paid quarterly over a period of six years commencing with the quarter after which such Priority Tax Claim has been Allowed.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

C.    Classification and Treatment of Claims

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are classified in the Classes set forth below. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    Class A-1 – First Lien Lender Secured Claims

First Lien Lender Secured Claims include any Secured Claim on account of the First Lien Credit Agreement.

Class A-1 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date or such other date as set forth herein, each of the First Lien Lenders (or its Permitted Nominee) shall receive on account of its Secured Claims, (w) its pro rata share of $1.5 million in Cash from the proceeds of the First Lien Lenders' Collateral, (x) its pro rata share of 100% of the New First Lien Notes, and (y) its pro rata share of 100% of the Newco Equity Interests (subject to dilution for any Newco Equity Interests issued pursuant to a Management and Director Equity Incentive Plan). The $1.5 million payment to the First Lien Lenders shall be allocated and deemed paid to the First Lien Lenders in accordance with Article VII.F. of the Plan.

2.    Class A-2 – Second Lien Lender Secured Claims

Second Lien Lender Secured Claims include any Secured Claim on account of the Second Lien Credit Agreement.

Class A-2 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, only if the Class of Second Lien Lender Secured Claims votes in favor of the Plan, each of the Second Lien Lenders (or its Permitted Nominee) shall receive its pro rata share of a 50% interest in the Stanley Engineering Litigation, without a reduction on account of the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent, subject to an aggregate cap of $500,000, each of which such fees shall be paid in Cash to the Second Lien Agent on the Effective Date. If the Class of Second Lien Lender Secured Claims votes in favor of the Plan, upon final resolution of the Stanley Engineering Litigation, each holder of an Allowed Second Lien Lender Claim will receive its pro rata share of the net proceeds of the Stanley Engineering Litigation. If the Class of Second Lien Lender Secured Claims votes against the Plan, each of the Second Lien Lenders shall receive no recovery on account of such Secured Claims.

3.    Class A-3 – Other Secured Claims

Other Secured Claims include any Secured Claim other than a: (a) First Lien Lender Secured Claim; or (b) Second Lien Lender Secured Claim.

Class A-3 is Unimpaired and deemed to accept the Plan. To the extent not satisfied by the Debtors, pursuant to Bankruptcy Court order, in the ordinary course of business prior to the Effective Date, at the option of the Reorganized Debtors on or after the Effective Date (i) an Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) a Holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, (iii) a Holder of an Allowed Other Secured Claim shall receive the Collateral securing both its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iv) a Holder of an Allowed Other Secured Claim shall receive such treatment as to which such Holder and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.

4.    <u>Class B – Priority Non-Tax Claims</u>

Priority Non-Tax Claims include any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

Class B is Unimpaired and deemed to accept the Plan. Each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, unless the Holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.

5.    <u>Class C-1 – General Unsecured Claims (including any Allowed Rhodes Entities Claims)</u>

General Unsecured Claims include any Claim (including any Allowed Rhodes Entities Claims) against any of the Debtors that is not a/n (a) Administrative Claim, (b) Priority Tax Claim, (c) Priority Non-Tax Claim, (d) First Lien Lender Secured Claim, (e) Second Lien Lender Secured Claim, (f) Other Secured Claim, (g) First Lien Lender Deficiency Claim, (h) Second Lien Lender Deficiency Claim, (i) Subordinated Claim, or (j) Intercompany Claim.

Class C-1 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, each Holder of an Allowed General Unsecured Claim (including any Allowed Rhodes Entities Claims) shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of General Unsecured Claims on account of its Allowed Claim.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

6. Class C-2 – First Lien Lender Deficiency Claims

First Lien Lender Deficiency Claims include any deficiency Claim arising under the First Lien Credit Agreement.

Class C-2 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, each Holder of a First Lien Lender Deficiency Claim shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of First Lien Lender Deficiency Claims on account of its Allowed Claim.

7. Class C-3 – Second Lien Lender Deficiency Claims

Second Lien Lender Deficiency Claims include any deficiency Claims arising under the Second Lien Credit Agreement.

Class C-3 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, each Holder of an Allowed Second Lien Lender Deficiency Claim shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of Second Lien Lender Deficiency Claims on account of its Allowed Claim. If the Class of Second Lien Lender Secured Claims votes against the Plan, the distribution of Litigation Trust Interests allocable to the Holders of Second Lien Lender Deficiency Claims shall be subject to the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent.

8. Class C-4 – Subordinated Claims

Subordinated Claims include all Claims subject to subordination under Bankruptcy Code section 510. The First Lien Steering Committee does not believe there are any Subordinated Claims but has created such Class out of an abundance of caution.

Class C-4 is Impaired and deemed to have rejected the Plan. Claims subordinated under applicable law shall not receive any recovery on account of their Claims.

9. Class D – Old Equity Interests

Old Equity Interests include all of the Interests in any of the Debtors and any rights, options, warrants, calls, subscriptions or other similar rights or agreements, commitments or outstanding securities obligating the Debtors to issue, transfer or sell any Interests.

Class D is Impaired and deemed to reject the Plan. Each holder of an Old Equity Interest shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Old Equity Interest.

10. Class E – Intercompany Claims

Intercompany Claims include any Claim held by a Debtor against another Debtor.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Class E is Impaired and deemed to reject the Plan. At the election of the Reorganized Debtors, Intercompany Claims will be (i) reinstated, in full or in part, (ii) resolved through set-off, distribution, or contribution, in full or in part, or (iii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.

D.    Bankruptcy Code Section 1111(b) Election

Bankruptcy Code section 1111(b)(1)(A) authorizes a class of secured claims to elect, by at least two-thirds in amount and more than half in number, to waive any deficiency claim otherwise assertable against the debtor and instead require the debtor to make payments equal to the total amount of the claims, with such payment obligation having a present value equal to the current value of the creditors' collateral. A section 1111(b) election must be made by a class of secured creditors at or prior to the conclusion of the hearing on the Disclosure Statement. No class of Secured Claims made a section 1111(b) election at or prior to the conclusion of the hearing on the Disclosure Statement. Accordingly, Bankruptcy Code section 1111(b) is not applicable to the Plan.

E.    Cramdown

The First Lien Steering Committee will request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The First Lien Steering Committee reserves the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

F.    Means for Implementation of the Plan

1.    Substantive Consolidation

The Plan shall serve as a motion by the First Lien Steering Committee seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and distributions to be made under the Plan. The effect of substantive consolidation is that on the Effective Date: (a) solely for the purposes of the Plan and the distributions and transactions contemplated thereunder, all assets and liabilities of the Debtors' Estates shall be deemed consolidated into a single estate; (b) all cross-corporate guarantees made by the Debtors prepetition shall be deemed eliminated (regardless of whether such guaranty is secured, unsecured, liquidated, unliquidated, contingent, or disputed); (c) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be a single obligation of the consolidated Debtors; (d) any Claims Filed or to be Filed in connection with any such obligation and such guarantees referenced in subsection (c) hereof shall be deemed to be a single Claim against the consolidated Debtors; (e) each and every Claim Filed in the individual Chapter 11 Case of any of the Debtors shall be deemed to be a single obligation of all of the Debtors under the Plan; (f) all duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives

against the consolidated Debtors (but in no way shall such surviving Claim be deemed Allowed by reason of this Section); and (g) the Intercompany Claims will be automatically eliminated. All Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor or of any other Person shall be discharged, released and of no further force and effect; provided, however, that nothing in the Plan shall affect the obligations of each of the Debtors under the Plan. Notwithstanding the substantive consolidation of these Cases for purposes of the Plan, each of the Debtors shall, as Reorganized Debtors, continue to exist after the Effective Date as separate corporate entities.

Substantive consolidation causes no harm to creditors and the benefits of substantive consolidation are numerous. First, over $12 billion in duplicate secured debt claims will be eliminated because the First Lien Lender Claims and the Second Lien Lender Claims each will be allowed only once against the consolidated Estate. Second, over $500 million in Intercompany Claims will be deemed eliminated because the multiple Debtors will be deemed only one Debtor. Third, over $4.6 million of other duplicate Unsecured Claims that have been filed in multiple Chapter 11 Cases will be automatically eliminated. Fourth, approximately 35% of the Claims that have been Filed are asserted incorrectly against the wrong Debtor. Substantive consolidation will eliminate the need for the objection to such Claims. Accordingly, the Plan Proponent submits that substantive consolidation is warranted in the Chapter 11 Cases.

The following additional factors support substantive consolidation:

- The Debtors operate as a single business enterprise called "Rhodes Homes" rather than along distinct legal entities.

- The Debtors operate on a centralized basis with a central cash management system. All of the Debtors' operating expenses are paid for by one Debtor entity on behalf of the other Debtors. Likewise, all funds received by the Debtors are automatically remitted to the central cash management account as required by the First Lien Credit Agreement. The Debtors' financial reporting is also on a consolidated basis and the Debtors file consolidated tax returns.

- The Debtors share common parent companies. The Debtors have overlapping directors or managing members and officers among parent and subsidiaries. Because the Debtors all have the same director/managing member and principal shareholder, Mr. Rhodes, there were no regular meetings of the subsidiaries' boards of directors. Also, for most of the Debtors who are LLCs, no board meetings are required. Rather, all corporate actions are done by written consent of the sole shareholder and director/ managing member. All of the Debtors' corporate activities are characterized by centralized decision making, including the filing of the bankruptcies.

- All of the Debtors rely on the corporate office for their accounting, legal, human resources, administrative support. In addition to shared corporate support, all of the Debtors also share common insurance policies.

- The Debtors regularly conduct business with each other such that the flow of funds is numerous and would be extraordinarily difficult and time consuming to disentangle. As of the Petition Date, the Debtors estimate that approximately $500 million in intercompany claims were owed between the Debtors.

- The Debtors are all obligated, either as obligors or guarantors, under the First Lien Credit Agreement and the Second Lien Credit Agreement.

- Based on the 461 Proofs of Claims Filed, at least 160 claimants have Filed Claims against the wrong Debtor entity. Therefore, there is confusion amongst the Creditor body as to which Debtor is the Debtor that is legally obligated on the Claim.

2.      Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, proceeds from the Mediation Settlement, existing assets, and the issuance of the New First Lien Notes and Newco Equity Interests.

a.      Newco Equity Interests

On the Effective Date, but not more than thirty days after the Effective Date for initial distributions on account of Allowed Claims, Newco shall issue Newco Equity Interests (based upon the Newco Total Enterprise Value) to the Holders of First Lien Lender Secured Claims. Each share of Class A-2 Equity Interest will be convertible at the option of the holder, exercisable at any time, into one Class A-1 Equity Interest.

The economic rights of the Class A-1 Equity Interests and Class A-2 Equity Interests shall be identical. The Class A-2 Equity Interests will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A-1 Equity Interests, as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking equal or senior to the Newco Equity Interests as to dividends or liquidation preference, including additional Newco Equity Interests, (ii) any amendment to the Newco's certificate of incorporation or by-laws, (iii) any amendment to any shareholders agreement, (iv) any sale, lease or other disposition of all or substantially all of the assets of the Reorganized Debtors through one or more transactions, (v) any recapitalization, reorganization, consolidation or merger of the Reorganized Debtors, (vi) to the extent that holders of Class A-1 Equity Interests have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of the Reorganized Debtors, except as may be provided for under any management incentive plan, and (vii) to the extent that holders of Class A-1 Equity Interests have the right to vote thereon, any redemption, purchase or other acquisition by the Newco of any of its capital stock (except for purchases from employees upon termination of employment).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

The Class A-2 Equity Interests will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class A-2 Equity Interests that does not equally affect the Class A-1 Equity Interests. In any liquidation, dissolution or winding up of the Reorganized Debtors, all assets will be distributed to holders of the Newco Equity Interests on a pro rata basis.

(i)    Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the Newco Equity Interests, shall, to the fullest extent permitted by applicable law, be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by the Plan, including the Newco Equity Interests and New First Lien Notes, will be freely tradable and transferable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments set forth in the Newco LLC Operating Agreement, a draft of which is attached hereto as Exhibit J; and (iii) applicable regulatory approval.

(ii)    Issuance and Distribution of the Newco Equity Interests

The Newco Equity Interests, when issued or distributed as provided in the Plan, will be duly authorized, validly issued, and, if applicable, fully paid and nonassessable. Each distribution and issuance shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

b.    New First Lien Notes

On the Effective Date or as soon as reasonably practicable thereafter, Newco shall issue the New First Lien Notes. The Reorganized Debtors shall be co-borrowers and guarantors under the New First Lien Notes. The New First Lien Notes shall have the terms set forth on Exhibit 2 to the Plan and as otherwise provided in the terms of the documents governing the New First Lien Notes. A draft of the New First Lien Notes credit agreement is attached hereto as Exhibit K.

c.    Exit Financing

To the extent the board of directors of Newco (or such other governing body) determines that additional financing is necessary for the operation of the Reorganized Debtors' businesses, Newco and/or the Reorganized Debtors may obtain additional financing. The First Lien Steering Committee does not anticipate that additional sources of funding in

addition to Cash on hand, the Newco Equity Interests and the New First Lien Notes will be necessary to fund distributions under the Plan on the Effective Date.

3.    <u>Corporate Existence</u>

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

4.    <u>Vesting of Assets in the Reorganized Debtors</u>

Except for any Claims or Causes of Action transferred to the Litigation Trust and unless otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.    <u>Cancellation of Equity Securities and Related Obligations</u>

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Old Equity Interests and any other Certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Equity Interests and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements or Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; <u>provided</u>, <u>however</u>, that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

solely for purposes of: (w) allowing Holders to receive distributions under the Plan; (x) allowing a Servicer to make distributions on account of such Claims as provided in the applicable governing agreement; (y) permitting such Servicer to maintain any rights and Liens it may have against property other than the Reorganized Debtors' property for fees, costs, and expenses pursuant to such indenture or other agreement; and (z) governing the rights and obligations of non-Debtor parties to such agreements vis-à-vis each other (including, without limitation, the rights and obligations of non-Debtor parties under the First Lien Credit Agreement and the Second Lien Credit Agreement, which, for the avoidance of doubt, shall not be affected by the Plan except as otherwise expressly provided in the Plan); provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors. The Reorganized Debtors shall not have any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise provided in the Plan.

6.    Restructuring Steps and Transfer of Certain Interests to Newco

In the event the Rhodes Entities comply with all of their obligations pursuant to the Mediation Settlement and the Plan, on the Effective Date or, in the case of step (d) below, effective the next day, the following transactions shall be deemed to have occurred in the order set forth below.

a.    Newco shall be formed as a new limited liability company. The First Lien Lender Secured Claims shall be deemed to have been exchanged for the membership interests in Newco. Newco shall be deemed to hold all of the First Lien Lender Secured Claims. At the option of a holder, membership interests in Newco may be transferred to a corporation prior to step (b).

b.    Newco shall purchase all of the Heritage Equity Securities for $10.00. The Heritage Equity Securities have negligible value and are being purchased for $10 by Newco as part of the Mediation Settlement.

c.    Contemporaneous with or subsequent to Newco's purchase of the Heritage Equity Securities, The Rhodes Companies, LLC - the general partner of each of Tick, LP; Glynda, LP; Jackknife, LP; LP; Batcave, LP; Overflow, LP; Wallboard, LP; and Chalkline, LP, --shall sell its general partnership interests in such entities to Newco for $1.00. Alternatively, the membership interest in The Rhodes Companies, LLC may be acquired from its sole member – Sagebrush Enterprises, Inc. – in consideration for release of its obligations under the First Lien Lender Secured Claims.

d.    Newco's members may agree to continue Newco as an LLC, file a check the box election effective the day after the Effective Date to treat Newco as a corporation for tax purposes, or convert into a corporation as of the day after the Effective Date.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

In any event, to the extent any cancellation of indebtedness is derived from the foregoing transactions under the Internal Revenue Code, it shall be allocable to the holders of the Old Equity Interests as required by the Internal Revenue Code.  To be clear, Newco's purchase of the Heritage Equity Securities shall occur (a) contemporaneously with or immediately before the membership interests of those entities described in Article IV.F.6.c, immediately above, are acquired; (b) before any debt or obligations of the Debtors are canceled or forgiven; (d) before any new notes are issued or existing debt is modified by the Reorganized Debtors; and (e) before any of the other acts or events contemplated in Article III.B, et seq., of the Plan.  The holders of the Heritage Equity Securities and Newco will report the sale and purchase of the Heritage Equity Securities in accordance with revenue ruling 99-6, 1991-1 CB 432.

7.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Roll-Up Transactions; (5) the establishment of a liquidation trust or other appropriate vehicle to hold assets for sale that will not be utilized in the business of the Reorganized Debtors; and (6) all other actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions.  The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction.  Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.

8.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity.  Without limiting the foregoing, such actions may include:  the adoption and filing of the Newco LLC Operating Agreement; the adoption and filing of organization documents of the other Reorganized Debtors; the appointment of directors and officers for the Reorganized Debtors; and the adoption, implementation, and amendment of the Management and Director Equity Incentive Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

9.    Post-Confirmation Property Sales

To the extent the Reorganized Debtors sell any of their property prior to or including the date that is one year after Confirmation, the Reorganized Debtors may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code.

10.    Organizational Documents

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships or other forms of Entity) of the Debtors shall be in form and substance acceptable to the First Lien Steering Committee and shall be consistent with the provisions of the Plan and the Bankruptcy Code. The Newco LLC Operating Agreement shall be in form and substance acceptable to the First Lien Steering Committee. The organizational documents for Newco shall, among other things:    (1) authorize issuance of the Newco Equity Interests; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities. On or as soon as reasonably practicable after the Effective Date, to the extent required, each of the Reorganized Debtors shall file new certificates of incorporation (or other formation documents relating to limited liability companies limited partnerships, or other forms of Entity) in form and substance acceptable to First Lien Steering Committee, with the secretary (or equivalent state officer or Entity) of the state under which each such Reorganized Debtor is or is to be incorporated or organized. On or as soon as reasonably practicable after the Effective Date, to the extent required, Newco shall file the applicable organizational documents with the secretary (or equivalent state officer or Entity) of the state under which Newco is to be incorporated or organized. After the Effective Date, each Reorganized Debtor may amend and restate its new certificate of incorporation and other constituent documents as permitted by the relevant state corporate law.

11.    Effectuating Documents, Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors (or other governing bodies) thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

12.    Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security

interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.    Directors and Officers of the Reorganized Debtors

On the Effective Date, the board of directors of the Reorganized Debtors or similar governing entities shall be composed of one or more members appointed by the First Lien Steering Committee. On the Effective Date, a chief executive officer or similar officer selected by the board of directors of the Reorganized Debtors shall be appointed. The identity of such officers and directors shall be disclosed at or prior to the Confirmation Hearing.

14.    Management and Director Equity Incentive Plan

The Reorganized Debtors reserve the right to implement a Management and Director Equity Incentive Plan. The terms and conditions of any Management and Director Equity Incentive Plan shall be determined by the Board of Directors of Newco.

15.    The Litigation Trust

On the Effective Date, the Litigation Trust will be implemented pursuant to the terms of the Litigation Trust Agreement. A draft of the Litigation Trust Agreement is attached hereto as Exhibit I. On the Effective Date, pursuant to the terms of the Litigation Trust Agreement, the Debtors will transfer the Litigation Trust Assets for and on behalf of the Litigation Trust Beneficiaries, which will be the Holders of Allowed Claims in Classes C-1, C-2 and C-3. For all federal income tax purposes, the beneficiaries of the Litigation Trust shall be treated as grantors and owners thereof and it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is owned by its beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Litigation Trust Beneficiaries be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust. The Litigation Trust will initially be funded with $100,000, which amount will be transferred to the Litigation Trust on the Effective Date and which will be repaid to the Reorganized Debtors from the first proceeds received by the Litigation Trust.

The Litigation Trust shall issue non-transferable interests to Holders of Allowed First Lien Lender Deficiency Claims, Allowed Second Lien Lender Deficiency Claims, and Allowed General Unsecured Claims (including any Allowed Rhodes Entities Claims) with

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

each Holder of an Allowed Claim in each of the foregoing Classes of Claims receiving its pro rata share of the Litigation Trust Interests allocable to each such Class of Claims.

A list of Litigation Trust Assets is attached hereto as Exhibit G. The Litigation Trust Assets shall include all claims existing against the Rhodes Entities that are not expressly released under the Plan. The claims include the following claims, among others:

- Claims for beach of fiduciary duty;

- Claims for misappropriation of Debtor assets for personal use;

- Claims for usurping corporate opportunity for the benefit of competing interests;

- Claims for mismanagement of the Debtors' operations;

- Claims for fraudulent transfers (to the extent not expressly released under the Plan);

- Claims for the diversion of corporate resources for the benefit of competing interests.

Additional discovery and analysis will be required to be performed by the Litigation Trustee before any determination can be made whether the foregoing claims or any other claims are colorable and should be pursued by the Litigation Trust against the Rhodes Entities. The Litigation Trust will undertake a detailed analysis of any potential claims before making a determination on whether to pursue any litigation against the Rhodes Entities. While it is impossible at this time to predict with any certainty whether the foregoing claims or any other claims will be prosecuted and, if they are prosecuted, whether they will be successful, the First Lien Steering Committee believes that prosecution of claims against the Rhodes Entities may yield up to $10 million or more in judgments in favor of the Litigation Trust. However, such claims could also yield no proceeds if they are unsuccessful, or if the Rhodes Entities have valid claims that are permitted to be used as offsets against any liabilities that the Rhodes Entities may be determined to have to the Debtors.

The Rhodes Entities do not believe that viable claims or causes of action exist against them and they will vigorously defend any litigation based on the allegations contained in the Trustee Motion or otherwise, which allegations the Rhodes Entities assert are baseless and premised on inadmissible hearsay.

16.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Reorganized Debtors and the Litigation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated on Exhibit L, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors and the Litigation Trust, as applicable, may pursue

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors and the Litigation Trust, as applicable. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors, Reorganized Debtors or the Litigation Trust, as applicable, will not pursue any and all available Causes of Action against them. The Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtors and the Litigation Trust, as applicable, reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors and the Litigation Trust, as the case may be, on the Effective Date. The applicable Reorganized Debtor and the Litigation Trust, as applicable, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action belonging to it. The Reorganized Debtors and the Litigation Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Neither the Litigation Trust nor the Reorganized Debtors shall commence any litigation against the Rhodes Entities until the Bankruptcy Court rules on the allowance of the Rhodes Entities Claims set forth in Proofs of Claim, included in the Debtors' Schedules or otherwise set forth in the Mediation Term Sheet. To the extent any statute of limitations to pursue any claims belonging to the Debtors against the Rhodes Entities would lapse from the execution date of the Mediation Term Sheet through the Bankruptcy Court's resolution of the allowance of the Rhodes Entities Claims, the Rhodes Entities shall be deemed to have consented to an extension of the applicable statute of limitations until sixty days following the Bankruptcy Court's ruling on the allowance of the Rhodes Entities Claims. The Litigation Trust shall have no liability to any entity for any Claims or Causes of Action it determines not to pursue.

17. <u>HOA Board Seats</u>

The Rhodes Entities shall ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA boards that in any way are related to the Debtors, Reorganized Debtors or their businesses and Declarant rights or the like shall be transferred to the Reorganized Debtors or their designee(s).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

18.    Licensing

The Rhodes Entities shall take commercially reasonable steps and/or enter into any agreements or similar documentation reasonably necessary to ensure the Reorganized Debtors' continued use of all of the Debtors' applicable professional licenses at no cost to the Rhodes Entities for a period of up to twelve months following the Effective Date.    To the extent, Sagebrush Enterprises, Inc. shall have rescinded by September 25, 2009 its revocation of its indemnity of the Nevada contractors' license held by Rhodes Design & Development Corporation and such rescission did not negatively affect the general contractor's license held by Rhodes Design & Development Corporation, Sagebrush shall be entitled to file an Administrative Claim on behalf of any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arose from and after the effectiveness of Sagebrush's recission of its indemnity through the Effective Date, provided that the allowance of such Administrative Claim shall be subject to resolution by the Bankruptcy Court and/or such other court(s) of competent jurisdiction.    Sagebrush has not asserted any Administrative Claims against the Estates as of the date hereof, and the First Lien Steering Committee believes that no such Claims will be made by Sagebrush.

The Reorganized Debtors shall indemnify Sagebrush for any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arise from and after the Effective Date.    Professional licenses include, but are not limited to the Nevada State Contractor's Board license, and any other general business or similar licenses in any county, state, municipality or other jurisdiction in which the Reorganized Debtors conduct business or own assets as of the Effective Date.    The Rhodes Entities shall use commercially reasonable efforts to maintain third party agreements with their real estate brokers and sales agents.

19.    Transfer of Rhodes Ranch Golf Course

Under the terms of the First Lien Credit Agreement, certain of the Rhodes Entities were required to either sell the Rhodes Ranch Golf Course, or if no seller could be found, to buy the Rhodes Ranch Golf Course from the Debtors for a guaranteed purchase price of $8 million. Because the Rhodes Entities could not find a buyer given the state of the economy in December 2008, the Rhodes Entities were forced to purchase the Rhodes Ranch Golf Course for $8 million as required under the First Lien Credit Agreement.    The purchase price was based on an appraisal from an independent third party, which appraised the value of the Rhodes Ranch Golf Course at approximately $8.0 million. The First Lien Steering Committee had been advised that the Rhodes Entities financed $5.9 million of the purchase price and paid $2.1 million in cash for the Rhodes Ranch Golf Course.    The Rhodes Entities subsequently asserted that $2.4 million of the purchase price was financed through a personal loan from James Rhodes, which loan will be contributed by James Rhodes to the entity that owns the Rhodes Ranch Golf Course in connection with the transfer of the equity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors.

Because the purchase of the Rhodes Ranch Golf Course was based on a fair market value appraisal, the Debtors received reasonably equivalent value for the Rhodes Ranch Golf Course such that the transaction could not be avoided as a fraudulent transfer.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

The Rhodes Ranch Golf Course is the centerpiece of the Debtors' Rhodes Ranch development, which is the most valuable asset of the Debtors' estates. Given that there is no operating agreement between the Rhodes Entities and the Debtors, the Reorganized Debtors desire to own the Rhodes Ranch Golf Course in order to manage the Rhodes Ranch Golf Course to maximize the value of the Debtors' assets.

After much negotiation, the Rhodes Entities agreed to transfer the Rhodes Ranch Golf Course to the Reorganized Debtors upon certain terms and conditions set forth in more detail below.

On the Effective Date, the applicable Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors (together with any equipment, golf carts, contracts or other assets determined by the First Lien Steering Committee to be necessary for the operation of the Rhodes Ranch Golf Course) pursuant to the terms of a stock transfer agreement in form and substance acceptable to the First Lien Steering Committee and Rhodes, subject to any outstanding debt on the Rhodes Ranch Golf Course. The stock transfer agreement shall contain representations by the Rhodes Entities that the entity that owns the Rhodes Ranch Golf Course does not have any liabilities other than ordinary course liabilities related to the Rhodes Ranch Golf Course and indemnification provisions in favor of the Reorganized Debtors by the Rhodes Entities for any non-ordinary course liabilities. In addition, prior to the deadline for filing objections to the Disclosure Statement, the Rhodes Entities shall provide the First Lien Steering Committee with a list of all liabilities of the entity that owns the Rhodes Ranch Golf Course, a lien analysis and copies of all contracts related to the Rhodes Ranch Golf Course and to which the entity that owns the Rhodes Ranch Golf Course is a party, each of which must be acceptable to the First Lien Steering Committee. Pursuant to the stock and asset transfer agreement governing the transfer of the equity in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors, the entity that owns the Rhodes Ranch Golf Course post-Effective Date shall agree to indemnify James Rhodes for any ordinary course liability first incurred post-Effective Date by such entity under any contract related to the operation of the Rhodes Ranch Golf Course for which James Rhodes has provided a personal guaranty.

Other than the $5.9 million third party loan used to originally purchase the Rhodes Ranch Golf Course from the Debtors, the First Lien Steering Committee does not believe that there have been any additional obligations placed on the Rhodes Ranch Golf Course other than ordinary course liabilities though the First Lien Steering Committee has been advised that James Rhodes may have provided a $2.4 million loan to the entity that owns the Rhodes Ranch Golf Course. This $2.4 million loan will be contributed by James Rhodes to the entity that owns the Rhodes Ranch Golf Course and he will indemnify the Debtors, the Reorganized Debtors, Newco and the entity that owns the Rhodes Ranch Golf Course from any liability arising from the contribution of such loan. The existing $5.9 million third party debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. The parties will work together in good faith to refinance the existing third party debt and have been actively working since August on the refinancing and are talking to multiple lending sources. The First Lien Steering Committee believes that the refinancing will be accomplished prior to the

Effective Date and, indeed, one of the conditions precedent to the occurrence of the Effective Date is that the refinancing has occurred. As of the date hereof, new financing has not been obtained for the Rhodes Ranch Golf Course. The Rhodes Entities and the First Lien Steering Committee, however, have been engaged in discussions with potential lenders for the Rhodes Ranch Golf Course and are optimistic that favorable financing will be obtained. The potential terms of such financing have not been provided in this Disclosure Statement to ensure that potential lenders do not obtain an unfair negotiating advantage with respect to such terms. Upon obtaining a final commitment for refinancing for the Rhodes Ranch Golf Course, the First Lien Steering Committee will disclose such terms in a filing with the Bankruptcy Court.

The Reorganized Debtors shall pay the reasonable costs and expenses associated with the refinancing; provided, that the terms of such refinancing are acceptable to the First Lien Steering Committee. The First Lien Steering Committee acknowledges that the loan documentation may provide that, upon the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors on the Effective Date, additional collateral from the Reorganized Debtors may be required. The Rhodes Entities shall transfer to the Reorganized Debtors on the Effective Debt any contracts related to the operation of and revenue generated by any cell towers located on the property of the Rhodes Ranch Golf Course. Any funds received after July 31, 2009 from the Las Vegas Valley Water District or other similar entity as an incentive for converting the golf course from a green course to a desert course shall be used for operating expenses associated with the Rhodes Ranch Golf Course, with any excess to become property of the Reorganized Debtors on the Effective Date.

The golf course is beneficial to the preservation of the Reorganized Debtors' Rhodes Ranch assets and, as part of the Mediation Settlement, the Reorganized Debtors will obtain title to the Rhodes Ranch Golf Course (through the assumption of the third party debt on such course not to exceed $5.9 million).

Rhodes and/or his designee shall have the absolute right to repurchase the Rhodes Ranch Golf Course from the Reorganized Debtors at eight (8) years from the Effective Date for $5.9 million in cash. The Reorganized Debtors may require Rhodes to purchase the Rhodes Ranch Golf Course any time between four (4) and eight (8) years from the Effective Date for $5.9 million in cash provided that the Reorganized Debtors shall provide Rhodes with at least one year advance notice of its intent to sell the Rhodes Ranch Golf Course back to Rhodes. Such transfer shall occur on the applicable anniversary date of the Effective Date. For the avoidance of doubt, if the Reorganized Debtors put the Rhodes Ranch Golf Course to Rhodes in accordance with the terms hereof and Rhodes fails to comply with his obligation to purchase the Rhodes Ranch Golf Course, Rhodes shall be deemed to have forfeited his option to purchase the Rhodes Ranch Golf Course.

On the Effective Date, Rhodes's obligations to comply with the repurchase shall be secured by either (i) $500,000 in cash in an escrow account or (ii) property worth at least $2 million (the "Golf Course Security Property"), with the value of such property to be agreed to by Rhodes and the First Lien Steering Committee or otherwise valued by an independent third party appraisal firm acceptable to both Rhodes and the First Lien Steering Committee (except Cushman Wakefield). In the event that Rhodes does not meet the repurchase request, provided that the Rhodes Ranch Golf Course is in the standard condition (defined below),

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

then the Reorganized Debtors shall be entitled to liquidated damages in the form of security pledged (i.e., the $500,000 or the Golf Course Security Property).

So long as Rhodes has not defaulted on his obligation to repurchase the Rhodes Ranch Golf Course, Rhodes shall have the absolute and sole discretion to replace the Golf Course Security Property with $500,000 in cash on 30 days written notice to the Reorganized Debtors. Upon deposit of the $500,000 in cash, the Golf Course Security Property shall be released to Rhodes or his designee. Notwithstanding anything to the contrary contained herein, if the Rhodes Ranch Golf Course is not maintained with substantially the same performance and rating criteria at the time of the repurchase request as verified by an independent third party rating agency as it was on the Effective Date ("Standard Condition"), James Rhodes can (i) require the Reorganized Debtors to cure any conditions to return the Rhodes Ranch Golf Course to its Standard Condition (provided, that the cost of such cure does not exceed $500,000), or (ii) choose not to purchase the Rhodes Ranch Golf Course. Upon either the repurchase of the Rhodes Ranch Golf Course or the written decision to not repurchase the Rhodes Ranch Golf Course (in accordance with the preceding sentence), the Golf Course Security Property or the $500,000 Cash (if not applied to the repurchase of the Rhodes Ranch Golf Course) shall be returned to Rhodes within 30 days.

On the Effective Date, the Reorganized Debtors shall record a memorandum of agreement against the Rhodes Ranch Golf Course to evidence the above.

20.    Cash Payment

The Rhodes Entities shall make a cash payment to the Reorganized Debtors of $3.5 million in Cash on the Effective Date. The $3.5 million cash payment shall be used to fund distributions under the Plan and provide working capital to the extent of any excess.

21.    Transfer of Arizona Assets

On the Effective Date, pursuant to a stock and asset transfer agreement, a draft of which is attached hereto as Exhibit M, the Debtors shall transfer Pravada and the other Arizona Assets set forth on Attachment D to the Mediation Term Sheet, plus the Golden Valley Ranch tradename to the Rhodes Entities free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000; provided, further, that such assets shall not include assets owned by Pinnacle Grading located in Arizona and related contracts associated with the assets. **All Claims asserted against the Arizona Assets shall be deemed asserted against the Estates and shall be classified in accordance with Article III of the Plan for distribution purposes.** The Arizona Assets shall be transferred through the Rhodes Entities' acquisition of the stock of Rhodes Arizona Properties LLC and Elkhorn Investments, Inc. and certain assets of Rhodes Homes Arizona LLC. Any non-real property assets or assets not listed on Attachment D to the Mediation Term Sheet that are titled in Rhodes Arizona Properties LLC or Elkhorn Investments, Inc. shall be transferred to Newco pursuant to the stock and asset transfer agreement. To the extent any real property assets located in Arizona are titled in any Debtor other than Rhodes Arizona Properties LLC, Elkhorn Investments, Inc. or Rhodes Homes Arizona, such real property assets shall be

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

transferred to the Rhodes Entities pursuant to the stock and asset transfer agreement. All intercompany claims assertable by Rhodes Arizona Properties LLC or Elkhorn Investments, Inc. against any other Debtor shall be deemed cancelled.

The Debtors shall provide James Rhodes notice of any proposed sale of the Pinnacle assets, and James Rhodes shall be granted a right to bid on the sale of such assets within 10 days of such notice. The Rhodes Entities shall permit storage of Pinnacle Grading equipment at current locations at no cost to the Reorganized Debtors for a period through six months following the Effective Date.

All executory contracts and unexpired leases associated solely with Arizona shall be assumed and assigned to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors and all cure costs associated therewith shall be borne by the Rhodes Entities.

22.    Trademark and Trade Names

Within the earlier of thirty (30) days following: (i) upon completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes (or his designee) the trademarks and tradenames set forth on Attachment E to the Mediation Term Sheet.

23.    Self Insured Retention Obligations

The Reorganized Debtors shall indemnify subcontractors that are obligated under any of the Reorganized Debtors' existing insurance policies for any post-Effective Date self insured retention obligations paid and/or to be paid by such subcontractors pursuant to such existing insurance policies.

24.    Bond Replacement or Indemnification

Those performance bonds guaranteed by the Rhodes Entities in favor of the Debtors shall be replaced on a renewal date by new performance bonds. In the alternative, subject to the Rhodes Entities being reasonably satisfied with the creditworthiness of the Reorganized Debtors, which shall be satisfied solely as of the Effective Date by the Court finding that the Plan is feasible, the existing performance bonds guaranteed by the Rhodes Entities and such guarantees shall remain in place. The applicable Rhodes Entity's agreement to remain a guarantor under the existing performance bonds as such performance bonds may be renewed shall be at no cost to the Rhodes Entities (including, but not limited to, the payment of bond premiums). In the event the Reorganized Debtors fail to perform their obligations underlying such renewed performance bonds after the Effective Date, the Reorganized Debtors will indemnify the Rhodes Entities under such outstanding performance bonds for damages incurred by the Rhodes Entities on account of their guarantee of such performance bonds solely as a result of the Reorganized Debtors' failure to perform such obligations subsequent to the Effective Date. The Reorganized Debtors shall use commercially reasonable efforts to replace all outstanding performance bonds backstopped by Rhodes Entities within 30 months

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

of the Effective Date. The Bankruptcy Court shall retain jurisdiction to resolve any disputes arising out of this paragraph.

Contingent Bond Indemnity Claims will be released in the ordinary course of business as time passes or as work on the underlying project is completed. To the extent that a Contingent Bond Indemnity Claim becomes an Allowed or estimated Claim, such Contingent Bond Indemnity Claim shall be treated as a General Unsecured Claim.

25.    Stanley Engineering Litigation

In the event the Stanley Engineering Litigation is resolved either by judgment or settlement in a manner favorable to the Reorganized Debtors and such resolution does not provide for Cash consideration to be received by the Reorganized Debtors and Second Lien Lenders, the Reorganized Debtors and the Second Lien Agent, assuming the Class of Second Lien Lender Secured Claims votes in favor of the Plan, shall engage in good faith negotiations to ensure that the Second Lien Lenders receive consideration equivalent to 50% of the net value of such resolution and to determine the timing of payment of any such consideration. In the event the Reorganized Debtors and the Second Lien Agent are unable to agree on the amount or form of such consideration, the parties will submit the matter to binding arbitration with the costs thereof to be split evenly among the Reorganized Debtors and the Second Lien Agent (with the costs of the Second Lien Agent to be reimbursed from the consideration to be distributed to the Second Lien Lenders on account of the Stanley Engineering Litigation).

G.    Treatment of Executory Contracts and Unexpired Leases

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" attached hereto as Exhibit N; (2) that are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date; (3) that are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (4) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (5) that are otherwise expressly assumed or rejected pursuant to the Plan. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date. Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable

51

by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Plan Proponent and the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in Exhibit N hereto at any time through and including fifteen days after the Effective Date. All executory contracts and unexpired leases associated solely with the Arizona Assets shall be assumed and assigned to the Rhodes Entities (or their designee) to the extent set forth on the schedule of Assumed Executory Contracts and Unexpired Leases attached hereto as Exhibit N, at no cost to the Debtors or the Reorganized Debtors and all Cure costs associated with such scheduled Arizona contracts or leases shall be borne by the Rhodes Entities.

2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

With respect to each of the Debtors' executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Plan Proponent shall have designated a proposed Cure, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. Except with respect to executory contracts and unexpired leases in which the Plan Proponent or the Debtors, with the consent of the First Lien Steering Committee, and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Court on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, or First Lien Steering Committee object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors with the consent of the First Lien Steering Committee, or the Reorganized Debtors and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption of any

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

executory contract or unexpired lease will be deemed to have consented to such assumption. The Debtors, with the consent of the First Lien Steering Committee, or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim Filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

All Cure costs associated with Executory Contracts related to the Arizona Assets shall be borne by the Rhodes Entities.

3.    <u>Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases</u>

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, insurance coverage, utilitiy services, warranties, indemnity, guarantee of workmanship, or continued maintenance obligations on goods or services previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts. The Reorganized Debtors expressly reserve and do not waive the right to receive coverage under any past insurance policy to extent that coverage has not expired under the terms of the insurance policy, regardless of whether such insurance policy is listed as an assumed contract. Similarly, the Reorganized Debtors expressly reserve and do not waive the right to receive services under any contract with a utility provider, regardless of whether such agreement with a utility provider is listed as an assumed contract.

4.    <u>Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases</u>

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Claims and Solicitation Agent no later than the Rejection Damages Claim Deadline. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' executory contracts or unexpired leases that are not timely Filed by the Rejection Damages Claim Deadline shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases shall be classified as General Unsecured Claims.

5.    Intercompany Contracts, Contracts, and Leases Entered Into After the Petition Date

Intercompany Contracts, contracts, and leases entered into after the Petition Date by any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

6.    Home Sales

All pending home sale contracts shall be assumed by the applicable Reorganized Debtor.

7.    Warranties

All eligible prepetition home sale contracts with one-year warranty obligations shall be performed in the ordinary course of business of the Reorganized Debtors.  Upon the Effective Date, any remaining warranty obligations that are to be assumed by the Reorganized Debtors, which shall only be assumed with the consent of the First Lien Steering Committee, shall be transferred to the Reorganized Debtors.  Warranty obligations that are not expressly assumed shall be rejected and treated as General Unsecured Claims.

8.    Modification of Executory Contracts and Unexpired Leases Containing Equity Ownership Restrictions

All executory contracts and unexpired leases to be assumed, or conditionally assumed, under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be deemed so assumed, or so conditionally assumed, without giving effect to any provisions contained in such executory contracts or unexpired leases restricting the change in control or ownership interest composition of any or all of the Debtors, and upon the Effective Date (1) any such restrictions shall be deemed of no further force and effect and (2) any breaches that may arise thereunder as a result of Confirmation or Consummation shall be deemed waived by the applicable non-Debtor counterparty.

9.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

10.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on Exhibit N hereto, nor anything contained in the Plan, shall constitute an admission by the Debtors or the First Lien Steering Committee that any such contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, with the consent of the First Lien Steering Committee, or Reorganized Debtors shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

11.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.    Procedures for Resolving Disputed Claims

1.    Allowance of Claims

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately prior to the Effective Date, including the Causes of Action referenced in Article IV of the Plan.

2.    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3.    Estimation of Claims

Before or after the Effective Date, the First Lien Steering Committee or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

4.    Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Beginning on the end of the first full calendar quarter that is at least ninety days after the Effective Date, the Reorganized Debtors shall publish and File every calendar quarter a list of all Claims that have been paid, satisfied, amended, or superseded during such prior calendar quarter.

5.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (1) the applicable Claims Objection Deadline and (2) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date. Notwithstanding the foregoing, the First Lien Steering Committee, any First Lien Lender and/or the Reorganized Debtors shall have until sixty days following the Effective Date to object to the Proofs of Claim filed by the Rhodes Entities in the Debtors' chapter 11 cases (provided, that, such objections shall not seek to subordinate the Rhodes Entities Claims, if Allowed).

6.    Disallowance of Claims

Except as otherwise set forth in the Plan, any Claims held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled

or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the Litigation Trust, as applicable.

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.

7.      Offer of Judgment

The Reorganized Debtors shall be authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.    To the extent the Holder of a Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors shall be entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

8.      Amendments to Claims

On or after the Effective Date, except as expressly authorized in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

I.    Provisions Governing Distributions

1.      Total Enterprise Value for Purposes of Distributions Under the Plan

Distributions of Newco Equity Interests to Holders of Allowed First Lien Lender Secured Claims shall be based upon, among other things, the Newco Total Enterprise Value of $99.6 million.   For purposes of distribution, the Newco Equity Interests shall be deemed to have the value assigned to them based upon, among other things, the Newco Total Enterprise Value, regardless of the date of distribution.

2.      Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Steering Committee, initial distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

business, or industry practice and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

> 3.    Distributions on Account of Claims Allowed After the Effective Date

> > a.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Steering Committee prior to the Effective Date or the Reorganized Debtors after the Effective Date, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

> > b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claim has been Allowed.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims or Interests pursuant to Article VII.C.3 of the Plan.  Subject to Article IX.A.5 of the Plan, all distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

> > c.    Reserve of Litigation Trust Interests

On the Effective Date, the Reorganized Debtors shall maintain in reserve Litigation Trust Interests for distribution to Holders of Disputed Claims that become Allowed after the Effective Date.  As Disputed Claims are Allowed, the Distribution Agent shall distribute, in

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

accordance with the terms of the Plan, Litigation Trust Interests to Holders of Allowed Claims, and the Disputed Claims Reserve shall be adjusted. The Distribution Agent shall withhold in the Disputed Claims Reserve any payments or other distributions made on account of, as well as any obligations arising from, the Litigation Trust Interests initially withheld in the Disputed Claims Reserve, to the extent that such Litigation Trust Interests continue to be withheld in the Disputed Claims Reserve at the time such distributions are made or such obligations arise, and such payments or other distributions shall be held for the benefit of Holders of Disputed Claims whose Claims, if Allowed, are entitled to distributions under the Plan. The Reorganized Debtors may (but are not required to) request estimation for any Disputed Claim that is contingent or unliquidated.

Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a distribution under the Plan on account of a Claim in excess of the lesser of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Reorganized Debtors elect to withhold on account of such Claim in the Disputed Claims Reserve, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount deposited in the Disputed Claim Reserve to satisfy such Claim after such estimation.

4.    Delivery of Distributions

a.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

b.    Distribution Agent

The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

c.    Delivery of Distributions in General

Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate: (a) in

accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Except as otherwise provided in the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the First Lien Steering Committee, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### d.    Accrual of Distributions and Other Rights

For purposes of determining the accrual of distributions or other rights after the Effective Date, the Newco Equity Interests and the Litigation Trust Interests, as applicable, shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed even though the Reorganized Debtors shall not make any such distributions or distribute such other rights until distributions of the Newco Equity Interests and the Litigation Trust Interests, as applicable, actually take place.

### e.    Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, distributions on account of Allowed Claims shall be treated as allocated first to principal and thereafter to any interest.

### f.    Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

g.      Fractional, De Minimis, Undeliverable, and Unclaimed Distributions

(i)      Fractional Distributions

Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of Newco Equity Interests or fractions of Litigation Trust Interests shall not be made.   The Distribution Agent shall not be required to make distributions or payments of fractions of Newco Equity Interests, Litigation Trust Interests or dollars.   Whenever any payment of Cash of a fraction of a dollar or payment of a fraction of Newco Equity Interests or fraction of Litigation Trust Interests pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars, half Newco Equity Interests or half Litigation Trust Interests or less being rounded down.

(ii)      Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.   Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors pursuant to Article VII.D.7.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iii)      Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is a distribution of Newco Equity Interests, such Newco Equity Interests shall be deemed cancelled.   Upon such revesting, the Claim of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary.   The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

h.      Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer.   Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims shall be null and void if not

presented within 120 days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors pursuant to Article VII.D.7.c of the Plan.

i.    Surrender of Cancelled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. No distribution of property pursuant to the Plan shall be made to or on behalf of any such Holder that is a Holder of a Claim unless and until such Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer. Any Holder of a Claim who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim discharged with no further action, be forever barred from asserting any such Claim against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights and Claims with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.

5.    Claims Paid or Payable by Third Parties

a.    Claims Paid by Third Parties

The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Further, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

b.      Claims Payable by Insurance

Holders of Insured Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Reorganized Debtors shall have no obligation to pay any amounts in respect of pre-petition deductibles or self insured retention amounts. Allowed Insured Claim amounts in excess of available insurance shall be treated as General Unsecured Claims. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

c.      Applicability of Insurance Policies

Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except for Claims and Causes of Action released under the Plan to the Released Parties and Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.      Payment of $1.5 Million to First Lien Lenders

The $1,500,000 in Cash payable to the Holders of First Lien Lender Secured Claims from the proceeds of their Collateral pursuant to Article III.B.1. shall be paid as follows:  (i) $400,000 on the Effective Date and (ii) the remaining up to $1,100,000 in five quarterly installments of $220,000 beginning on the first day of the fourth month following the Effective Date; provided, that the Reorganized Debtors shall have the right to defer up to two quarterly payments, with such deferred amount(s) to be paid on the next quarterly payment date (and the amount scheduled to be paid on such quarterly payment date deferred for another quarter; provided that the full $1.5 million payment shall be made to the Holders of First Lien Lender Secured Claims within eighteen months of the Effective Date). Notwithstanding the foregoing, in the event that, as of the Effective Date, the debt on the Rhodes Ranch Golf Course has been refinanced on terms and conditions acceptable to the First Lien Steering Committee and the Reorganized Debtors have unrestricted cash of at least $3.5 million (after taking into account any amounts required to be paid to reduce the amount of third party debt on the Rhodes Ranch Golf Course below $5.9 million and without taking into consideration amounts that may have been borrowed under any exit facility unless such amounts were used to pay-down debt on the Rhodes Ranch Golf Course, in which case any amounts used to pay-down debt on the Rhodes Ranch Golf Course will be deemed to reduce unrestricted cash on a dollar for dollar basis), then the initial $400,000 payment to the First Lien Lenders will be increased as follows: (i) if unrestricted cash (as calculated above) is

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

equal to or greater than $3.5 million but less than $4.5 million, the $400,000 payment shall be increased to $700,000; (ii) if unrestricted cash (as calculated above) is equal to or greater than $4.5 million but less than $5.5 million, the $400,000 payment shall be increased to $1,000,000; and (iii) if unrestricted cash (as calculated above) is equal to or greater than $5.5 million, the $400,000 payment shall be increased to $1.5 million, in each case with the subsequent quarterly installments reduced by a corresponding amount to provide for equal payments over the payout periods discussed above. In no event shall the aggregate Cash payments to the First Lien Lenders exceed $1.5 million.

7.    General Unsecured Claims Purchase

The First Lien Lenders have agreed to use the aggregate $1.5 million Cash payment provided to them under the Plan to acquire those General Unsecured Claims of the Creditors listed on the schedule attached hereto as Exhibit R (the "Claim Purchase Schedule") to the extent such Claims remain outstanding as of the Effective Date; provided that (i) each Holder of a Claim so listed is the original Holder of such Claim and (ii) such Claim(s) is ultimately Allowed.

The Claim Purchase Schedule shall delineate whether such Claims are Allowed or Disputed and Claims may be purchased only to the extent ultimately Allowed. **Claims included on the Claim Purchase Schedule shall be purchased (subject to the conditions contained in Article VII.G of the Plan) for the amounts listed for such Claims under the heading "Allowed Amount (Claim Purchase Amount)" on the Claim Purchase Schedule. Payments on account of the purchased Allowed Claims listed on the Claim Purchase Schedule shall be made on the same time frame as the First Lien Lenders receive their allocable Cash payments under Article VII.F of the Plan, with the First Lien Steering Committee determining the order in which Claims are purchased (which, in the first instance, shall be the order in which they are listed on the Claim Purchase Schedule).** For the avoidance of doubt, any claim listed on the Claim Purchase Schedule that is disputed, will not be purchased until allowed and only to the extent the aggregate purchase price for all claims purchased inclusive of such newly allowed claims are equal to or less than $1.5 million. Claims subsequently allowed will be purchased in the order in which they are allowed. The First Lien Lenders reserve the right to modify the Claim Purchase Schedule prior to or subsequent to the Effective Date without further Court order; provided, that a Creditor may be removed from the Claim Purchase Schedule only to the extent that (i) its Claims are not ultimately Allowed, (ii) its Claims are subject to setoff (other than under section 547 of the Bankruptcy Code); (iii) such Creditor sells its Claim to a party other than the First Lien Lenders pursuant to Article VII.G of the Plan or (iv) the full $1.5 million has been used to purchase other Allowed Claims on the Claim Purchase Schedule before such Creditor's Claim is Allowed.

The First Lien Lenders shall be subrogated to the rights of Creditors whose Claims are purchased hereunder and any distributions otherwise allocable to the Holders of Claims purchased by the First Lien Lenders shall be distributed pro rata to the Holders of First Lien Lender Secured Claims. The Reorganized Debtors shall be authorized to make the foregoing payments to the Creditors on the Claim Purchase Schedule on behalf of the First Lien Lenders with a corresponding reduction in the $1.5 million payable to the First Lien Lenders. Under

no circumstances shall the First Lien Lenders (either directly or through the Reorganized Debtors) pay in excess of $1.5 million in the aggregate for the Claims on the Claim Purchase Schedule. The First Lien Steering Committee may, in its sole discretion (but after consultation with the Debtors and the Creditors' Committee), add Claims to the Claim Purchase Schedule at any time; provided that the amount to be paid for all such Claims listed on the Claim Purchase Schedule does not exceed $1.5 million in the aggregate regardless of the total amount of Allowed Claims reflected on the Claim Purchase Schedule. In the event that Allowed Claims in excess of $1.5 million are listed on the Claim Purchase Schedule, Holders of Claims listed on the Claim Purchase Schedule shall have the right to accept or decline payment of less than 100 cents on account of their Claims from the First Lien Lenders. No Creditor listed on the Claim Purchase Schedule shall receive in excess of 100 cents on the dollar for its Claim, and the Reorganized Debtors shall not pursue Claims under Bankruptcy Code section 547 against any Creditor whose Claim is purchased in accordance with Article VII.G. of the Plan. The Plan shall serve as the notice of transfer of Claim required under Bankruptcy Rule 3001(e). If no objections are received by the Voting Deadline, the First Lien Lenders shall be authorized upon the Effective Date to effectuate the foregoing Claim purchase transactions.

8.    Claims Trading and Gifting are Authorized Under Applicable Law

As described in Article VII.G. of the Plan, the Plan provides that Holders of First Lien Lender Secured Claims will receive, among other things, $1.5 million in Cash from the proceeds of their Collateral to be used to purchase those General Unsecured Claims listed on the Claim Purchase Schedule. The First Lien Steering Committee believes that the purchase of Claims listed on the Claim Purchase Schedule constitutes permissible claims trading under the Bankruptcy Code, the Bankruptcy Rules and applicable case law. As a general rule, neither the Bankruptcy Code nor the Bankruptcy Rules prohibit the purchase or sale of claims. *See Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1314 (1st Cir. 1993) (noting that "neither the [Bankruptcy Code] nor the [Bankruptcy Rules] prohibit or discourage creditors from receiving cash from non-debtors in exchange for their claims"). In addition, Bankruptcy Rule 3001(e)(2) limits the role of bankruptcy courts in the claims transfer process to resolving disputes regarding transfers of claims. *See Resurgent Capital Servs. v. Burnett (In re Burnett)*, 306 B.R. 313, 319 (B.A.P. 9th Cir. 2004) (explaining that Bankruptcy Rule 3001(e)(2) was amended to limit the bankruptcy court's role to adjudicating disputes over transfers of claims); *Viking Assocs., L.L.C. v. Drewes (In re Olson)*, 120 F.3d 98, 102 (8th Cir. 1997) (noting that "[w]here there is no dispute [with respect to a claims transfer], there is no longer any role for the court"). For purposes of Bankruptcy Rule 3001(e)(2), a "dispute" regarding a transfer of a claim exists only if the alleged transferor files an objection to the transfer. *See In re Olson*, 120 F.3d at 102. Bankruptcy Rule 3001(e)(2) does not require the parties to a claims transfer to disclose the terms of such transfer to the bankruptcy court. *See In re Burnett*, 306 B.R. at 318. Finally, there is no requirement in the Bankruptcy Code or the Bankruptcy Rules that a non-debtor that purchases claims from one member of a class of creditors must seek to purchase the claims of all of the members of that class.

Based on the foregoing, the First Lien Steering Committee believes that the purchase of the Claims listed on the Claim Purchase Schedule by the Holders of First Lien Lender

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1   Secured Claims is permissible under the Bankruptcy Code and the Bankruptcy Rules.
2   Moreover, the First Lien Steering Committee believes that the First Lien Lenders have the
    discretion to purchase only a portion of the total number of General Unsecured Claims.
3   Finally, absent an objection to the purchase of a Claim, the First Lien Steering Committee
    submits that the Claim purchase procedures contemplated by the Plan do not require
4   Bankruptcy Court approval and that the First Lien Lenders are authorized to implement the
5   Claim purchase procedures in accordance with Article VII.G. of the Plan.

6          In the alternative, the First Lien Steering Committee believes that the purchase of
    General Unsecured Claims described in Article VII.F. and VII.G of the Plan is consistent with
7   the Bankruptcy Code and applicable case law because the Holders of First Lien Lender
    Secured Claims are permitted to share the distributions they receive under the Plan with
8   Holders of junior Claims if they wish to do so.   Courts have recognized that holders of
9   secured claims are free to grant all or a portion of the distribution they receive under a plan of
    reorganization on account of their secured claims to holders of junior claims.  *See In re SPM*
10  *Mfg. Co.*, 984 F.2d at 1313; *In re Union Fin. Servs. Group, Inc.*, 303 B.R. 390, 422 (Bankr.
    E.D. Mo. 2003); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 602 (Bankr. D. Del. 2001).
11  In addition, courts have concluded that there is no unfair discrimination under the Bankruptcy
12  Code where holders of secured claims share the distribution they receive under a plan of
    reorganization with members of a junior class but not other holders of claims that are equal in
13  priority to such junior class of claims.  *See In re Union Fin. Servs. Group, Inc.*, 303 B.R. at
14  422; *In re Genesis Health Ventures, Inc.*, 266 B.R. at 602.  This is particularly true where
    continued relations with certain junior creditors are important to the future business of a
15  reorganized debtor.   *See In re Union Fin. Servs., Inc.* 303 B.R. at 422.   In light of the
16  foregoing, the First Lien Steering Committee believes that the Holders of First Lien Lender
    Secured Claims should be authorized to gift the $1.5 million in Cash they will receive under
17  the Plan to Holders of those General Unsecured Claims listed on the Claim Purchase
    Schedule.

18         As the Plan provides for all General Unsecured Claims to receive the same treatment
19  under the Plan, the First Lien Lenders are authorized under applicable law to purchase any one
    or more Claims without Bankruptcy Court approval.   In the alternative, the purchase of those
20  Claims listed on the Claim Purchase Schedule constitutes a permissible gift and should be
    authorized by the Bankruptcy Court.   In addition, the payment of the Second Lien Agent's
21  legal fees similarly constitutes a permissible gift from the First Lien Lenders to the Second
22  Lien Lenders and should be authorized by the Bankruptcy Court.

23  J.     Effect of Confirmation of the Plan

24         1.      Discharge of Claims and Termination of Interests

25         Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise
26  specifically provided in the Plan, the distributions, rights, and treatment that are provided in
    the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective
27  Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any
    interest accrued on Claims or Interests from and after the Petition Date, whether known or
28  unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of any employee, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

2.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Plan Proponent or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

3.    Compromise and Settlement of Claims and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

The First Lien Steering Committee believes that the Mediation Settlement is reasonable and should be approved under Bankruptcy Rule 9019. In order to determine whether a compromise may be approved under Bankruptcy Rule 9019, the Bankruptcy Court must consider four factors: (i) the probability of success of the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *See, e.g., In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986). A compromise may be approved even if all four of the factors do not favor the compromise so long as the factors weigh in favor of the compromise when taken as a whole. *See In re Pac. Gas and Elec. Co.*, 304 B.R. 395, 416 (Bankr. N.D. Cal. 2004). In addition, a compromise does not have to be the best compromise that could have possibly been obtained but, instead, must only fall within a reasonable range of possible outcomes. *In re WCI Cable, Inc.*, 282 B.R. 457, 473-74 (Bankr. D. Or. 2002).

Based on the foregoing, the First Lien Steering Committee believes that the compromise embodied in the Plan and the Mediation Settlement is fair and equitable. Specifically, the Mediation Settlement represents a global resolution of, among other things, potential preference actions held by the Debtors' Estates relating to the transfer of funds to certain Rhodes Entities within the one year period prior to the Petition Date, issues related to operation of the Reorganized Debtors' businesses and the ownership of the Rhodes Ranch Golf Course.

The First Lien Steering Committee estimates that the total amount of all payments made by the Debtors to the Rhodes Entities within the year prior to the Petition Date is in excess of $9 million. With respect to the first factor articulated by the *A&C Properties* Court, litigation over the potential preference payments identified herein would have been contentious and hard fought. The Rhodes Entities would likely have asserted a number of defenses to the preference claims, including that such payments were received in the ordinary course of business. Moreover, based on the First Lien Steering Committee's review of all payments made to insiders within the one year period prior to the Petition Date as reflected in the Debtors' Schedules and Schedule B to the Mediation Settlement Term Sheet, and on subsequent conversations with Debtors' counsel, the First Lien Steering Committee believes that the Rhodes Entities may have had valid defenses to certain of these transfers. The Mediation Settlement also reflects a resolution of potential fraudulent conveyance actions held by the Estates against the Rhodes Entities. The First Lien Steering Committee believes that these claims would also have been heavily litigated in the absence of a settlement and, while the First Lien Steering Committee believes that it would have ultimately prevailed on certain of such claims, there can be no guarantee that a successful result would have been obtained for the Estates. In addition, the prosecution of both the fraudulent conveyance claims and the preference claims would have resulted in substantial expense for the Estates, while at the same time likely delaying the Debtors' emergence from chapter 11. Therefore, the First Lien

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Steering Committee believes that the third factor of the *A&C Properties* test also weighs in favor of the approval of the Mediation Settlement.[5]

The fourth factor of the *A&C Properties* test requires the Bankruptcy Court to consider the paramount interest of creditors. The creditors of the Estates will derive a material benefit from the approval of the Mediation Settlement because, among other things, the Mediation Settlement (i) contemplates a $3.5 million cash payment from the Rhodes Entities to the Reorganized Debtors, which payment will be used to fund working capital needs and distributions contemplated by the Plan, (ii) provides for the transfer of the Arizona Assets, which were non-core assets to the Reorganized Debtors that likely would have required significant additional funding for development, to the Rhodes Entities, (iii) provides for the transfer of the Rhodes Ranch Golf Course, the maintenance and continued operation of which is paramount to maximizing the valu`e of the Reorganized Debtors' assets, to the Reorganized Debtors, (iv) avoids the significant expense and time delay associated with litigating the claims released under the Plan, which would have yielded uncertain results, and (v) enables the Debtors to emerge from bankruptcy expeditiously and consensually, without any unnecessary eradication of value through a prolonged stay in chapter 11. In addition, all claims and causes of action against the Rhodes Entities that are not covered by the limited release provided for in the Mediation Settlement will be transferred to the Litigation Trust for the benefit of all Creditors, to be prosecuted and/or settled post-emergence.

In addition to the material benefits listed above, the First Lien Steering Committee believes that the Mediation Settlement will also ensure a smooth transition to new ownership under the Plan. The Mediation Settlement contemplates that stringent bond and licensing requirements will be maintained through the cooperation of the Rhodes Entities, thus allowing the Reorganized Debtors to continue operations without interruption upon emergence. The Mediation Settlement also contemplates that new Qualified Employees and HOA board representatives will be elected by the Reorganized Debtors to ensure a unified and organized post-Effective Date management team. On balance, the First Lien Steering Committee believes that the Estates and their creditors will be obtaining value far in excess of the consideration to be given to the Rhodes Entities if the Mediation Settlement is approved. Given the range of issues involved, and the nature and character of the disputes between the First Lien Steering Committee, the Debtors and Rhodes, the First Lien Steering Committee believes that approval of the Mediation Settlement is appropriate. In addition, as set forth above, the Mediation Statement satisfies the fair and reasonable standards articulated by courts in this circuit. The entry of the Confirmation Order shall therefore constitute the Bankruptcy Court's approval of the compromise and settlement of the matters subject to the Mediation Settlement as well as a finding by the Bankruptcy Court that such compromise and

---

[5] The second factor to be considered by the Bankruptcy Court in evaluating a settlement proposal is the difficulties, if any, to be encountered in the matter of collection. The First Lien Steering Committee has not completed a detailed review of the financial information of each Rhodes Entity that may have been liable in connection with the claims released under the Plan, and cannot therefore make a determination as to whether each such entity could have satisfied its obligations in connection with any judgment entered by the Bankruptcy Court. The First Lien Steering Committee does, however, believe that the Rhodes Entities may not have been able to comply financially with the terms of judgments received in connection with successful litigation regarding the claims being released under the Plan.