AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

settlement is in the best interests of the Debtors, their Estates, and holders of claims and interests and is fair, equitable, and reasonable.

4.    **Releases by the Debtors of the Released Parties**

As described in greater detail below, the Plan contemplates that the Released Parties will receive a release of all Claims and Causes of Action other than Claims and Causes of Action for gross negligence or willful misconduct. The "Released Parties" include each of: (a) the First Lien Lenders in their capacity as such; (b) the First Lien Steering Committee; (c) the Second Lien Lenders in their capacity as such; (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' predecessors, successors and assigns; (e) the Creditors' Committee and the members thereof in their capacity as such; (f) with respect to each of the foregoing Entities in clauses (a) through (e), such Entities' subsidiaries, affiliates, officers, members, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals; (g) the Debtors' officers, employees (including Thomas Robinson and Joseph Schramm) and Professionals, as of the Petition Date; and (h) Paul Huygens; provided, however, that clause (g) shall not include (i) the Rhodes Entities or their affiliates; (ii) insiders of any of the Rhodes Entities (except as to Thomas Robinson and Joseph Schramm); or (iii) relatives of Rhodes.

The Plan provides the First Lien Lenders and the Second Lien Lenders with the releases described below as consideration for the First Lien Lenders' and Second Lien Lenders' good faith participation in the mediation session described in Article I.A and Article I.B hereof. Moreover, the First Lien Lenders are being released in exchange for their agreement to accept equity in Newco on account of the Secured portion of their Claims rather then exercising their contractual right to foreclose on their Collateral, and the First Lien Lenders' willingness to provide junior classes with a recovery in the form of the Claims purchase procedures outlined in Article VII.G of the Plan and the payment of the Second Lien Agent's legal fees.

Pursuant to section 1123(b) of the Bankruptcy Code and except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, and as part of the global settlement described in Article I.B. hereof, on and after the Effective Date, the Released Parties are deemed released by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtors, taking place on or before the Effective Date, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of,

or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any of the Released Parties, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

5.   <u>Releases by the Debtors of the Rhodes Entities</u>

The Rhodes Entities shall be deemed released from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever arising under chapter 5 of the Bankruptcy Code with respect to transfers made by the Debtors to the Rhodes Entities during the 2 years prior to the Petition Date; provided, however, that such release shall only apply to transfers expressly set forth in the Schedules as Filed with the Bankruptcy Court as of August 1, 2009 or as disclosed in Attachment B to the Mediation Term Sheet.

6.   <u>Releases by First Lien Lenders of First Lien Lenders</u>

As described in greater detail below, the Plan contemplates that each First Lien Lender can elect to release all other First Lien Lenders for all Claims and Causes of Action other than Claims and Causes of action for gross negligence or willful misconduct.

Pursuant to Bankruptcy Rule 9019, and except as otherwise specifically provided in the Plan, to the extent a First Lien Lender elects on its Ballot to release the First Lien Lenders in accordance with Section VIII.F. of the Plan, for good and valuable consideration, on and after the Effective Date, to the extent permitted under applicable law, each of the First Lien Lenders electing to grant this release, shall be deemed to release each of the other First Lien Lenders that has elected to grant this release and each of their affiliates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such First Lien Lender would have been legally entitled to assert against any other First Lien Lender that elected to grant this release, based on or relating to, or in any manner arising from, in whole or in part, the First Lien Credit Agreement, the First Lien Lender Claims, any other claims arising under or related to the First Lien Credit Agreement, the Debtors, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to any First Lien Lender Claim, the restructuring of the First Lien Lender Claims prior to or during the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; with such releases constituting an express waiver and relinquishment by each First Lien Lender electing to grant this release of any claims, whether known or unknown that such First Lien Lender may have under Section 1542 of the California Civil code or other analogous state or federal law

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

related to the matters being released; provided, however, that Claims or liabilities arising out of or relating to any act or omission of any First Lien Lender or any of its affiliates that constitutes gross negligence or willful misconduct shall not be released.

7.    **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability to one another or to any Exculpating Party for any Exculpated Claim, except for gross negligence, willful misconduct or fraud but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the First Lien Steering Committee and the Reorganized Debtors (and each of their respective agents, members, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan, and therefore are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.    **Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims against the Debtors, and all Entities holding Interests, are permanently enjoined, from and after the Effective Date, from: (1) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized Debtors or the property or estates of the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors or Reorganized Debtors or against the property or Estates of the Debtors or Reorganized Debtors on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise (provided, that, to the extent the Rhodes Entities Claims are Allowed, the Rhodes Entities, without the need to file any such motion, shall retain the right to assert a setoff against any Claims or Causes of Action that the Reorganized Debtors or Litigation Trust may assert against the Rhodes Entities, with the Reorganized Debtors and Litigation Trust, as applicable, reserving the right to challenge the propriety of any such attempted

setoff, with any such challenge to be resolved by the Bankruptcy Court); and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

9.    Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

10.    **Setoffs**

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor, Reorganized Debtor or the Litigation Trust, as applicable, may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor or the Litigation Trust of any such Claims, rights, and Causes of Action that such Reorganized Debtor or the Litigation Trust may possess against such Holder.  In no event shall any Holder of Claims be entitled to setoff any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise; provided, however, that, to the extent the Rhodes Entities Claims are Allowed, the Rhodes Entities, without the need to file any such motion, shall retain the right to assert a setoff against any Claims or Causes of Action that the Reorganized Debtors or Litigation Trust may assert against the Rhodes Entities, with the Reorganized Debtors and Litigation Trust, as applicable, reserving the right to challenge the propriety of any such attempted setoff, with any such challenge to be resolved by the Bankruptcy Court).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

11. **Recoupment**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors and the First Lien Steering Committee on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

12. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Upon the Effective Date, the Confirmation Order shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to release any mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates; and each of the foregoing persons and entities is hereby directed to accept for filing the Confirmation Order any and all of the documents and instruments necessary and appropriate to effectuate the discharge.

13. Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors in the ordinary course of business. Copies of all Debtors' books and records shall be delivered to the Rhodes Entities at no cost to the Rhodes Entities on or prior to the Effective Date.

14. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date: (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

K.    Allowance and Payment of Certain Administrative Claims

1.    Professional Claims

a.    Final Fee Applications

All final requests for payment of Claims of a Professional shall be Filed no later than forty-five days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

b.    Payment of Interim Amounts

Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Interim Compensation Order.

c.    Reimbursable Expenses

The reasonable fees and expenses incurred by (i) the First Lien Agent, including its professionals, to the extent provided by the First Lien Credit Agreement, (ii) the Second Lien Agent, including its professionals, to the extent provided by the Second Lien Credit Agreement (only to the extent the Class of Second Lien Lender Secured Claims votes in favor of the Plan, and (iii) the First Lien Steering Committee, including its professionals, in connection with the Chapter 11 Cases shall be paid by the Debtors or Reorganized Debtors, as applicable, within 15 days of receipt of an invoice from such parties or their advisors.

d.    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Reorganized Debtors and First Lien Steering Committee. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

e.    Substantial Contribution Compensation and Expenses

Except as otherwise specifically provided in the Plan, any Entity who requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and the First Lien Steering Committee and the Creditors' Committee, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code on or before the

Administrative Claim Bar Date or be forever barred from seeking such compensation or expense reimbursement.

2.    Other Administrative Claims

All requests for payment of an Administrative Claim must be Filed with the Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable, and the First Lien Steering Committee on or before the Administrative Claim Bar Date. Any request for payment of an Administrative Claim that is not timely Filed and served shall be disallowed automatically without the need for any objection by the Debtors, Reorganized Debtors, or the First Lien Steering Committee. The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

L.    Conditions Precedent to Confirmation and Consummation of the Plan

1.    Conditions to Confirmation

The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with Article X.C of the Plan:

A.    The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Plan Proponent, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

B.    The Confirmation Order shall be in form and substance acceptable to the Plan Proponent.

C.    The terms and conditions of employment or retention of any Persons proposed to serve as officers or directors of Newco, including, without limitation, as to compensation, shall be acceptable to the Plan Proponent and shall be disclosed at or prior to the Confirmation Hearing.

D.    Any disclosures made pursuant to 11 U.S.C. § 1129(a)(5) shall be acceptable to the Plan Proponent.

E.    All of the schedules, documents, and exhibits ancillary to the Plan and Disclosure Statement including, but not limited to, (i) the Claim Purchase Schedule, (ii) the Litigation Trust Agreement, (iii) the Newco LLC Operating Agreement, (iv) the New First Lien Notes credit agreement, (v) the Schedule of Causes of Action, (vi) the Asset and Stock Transfer Agreement, and (vii) the Schedule of Assumed

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Executory Contracts and Unexpired Leases shall be in form and substance acceptable to the Plan Proponent.

2.    Conditions Precedent to the Effective Date

The following are conditions precedent to Consummation that must be satisfied or waived in accordance with Article X.C of the Plan:

A.    The Bankruptcy Court shall have authorized the assumption and rejection of executory contracts and unexpired leases by the Debtors as contemplated by Article V of the Plan.

B.    All of the schedules, documents, and exhibits ancillary to the Plan and Disclosure Statement including, but not limited to, (i) the Claim Purchase Schedule, (ii) the Litigation Trust Agreement, (iii) the Newco LLC Operating Agreement, (iv) the New First Lien Notes credit agreement, (v) the Schedule of Causes of Action, (vi) the Asset and Stock Transfer Agreement, and (vii) the Schedule of Assumed Executory Contracts and Unexpired Leases shall be in form and substance acceptable to the Plan Proponent.

C.    The Confirmation Order shall have become a Final Order in form and substance acceptable to the Plan Proponent.

D.    The documents governing the New First Lien Notes and the Newco LLC Operating Agreement shall be in form and substance acceptable to the Plan Proponent.

E.    The Confirmation Date shall have occurred.

F.    The First Lien Steering Committee shall have designated and replaced each existing Qualified Employee of the Debtors with a new Qualified Employee for the Reorganized Debtors.

G.    The third party debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on terms and conditions acceptable to Rhodes and the First Lien Steering Committee and the personal loan of James Rhodes to the entity that owns the Rhodes Ranch Golf Course shall have been contributed as equity without any new equity being issued to James Rhodes and James Rhodes shall have provided the Debtors, the Reorganized Debtors, Newco and the entity that owns the Rhodes Ranch Golf Course an indemnity for any liability arising from the contribution of such loan.

H.    Copies of all Debtors' books and records shall have been delivered to the Rhodes Entities at no cost to the Rhodes Entities.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

I.     The Arizona Assets shall have been transferred to the Rhodes Entities (or their designee) free and clear of all liens and claims pursuant to section 363(f) of the Bankruptcy Code on the Effective Date; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000.

J.     The Debtors shall have assumed and assigned all executory contracts and unexpired leases related solely to the Arizona Assets to the Rhodes Entities (or their designee), at no cost to the Debtors or the Reorganized Debtors, with all Cure costs associated therewith to be borne by the Rhodes Entities.

K.     The tax structure set forth in Article IV.F of the Plan shall be implemented.

L.     The Rhodes Entities and First Lien Steering Committee shall have agreed on the Golf Course Security Property.

M.     The Rhodes Entities shall have performed all of their obligations under the Plan including, without limitation, depositing $3.5 million in Cash in an account designated by the Debtors, with the consent of the First Lien Steering Committee, and transferred the Rhodes Ranch Golf Course and related contracts and assets as required by Article IV.S. of the Plan to the Reorganized Debtors.

3.    <u>Waiver of Conditions Precedent</u>

The First Lien Steering Committee may waive any of the conditions to the Effective Date at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan; provided, that the First Lien Steering Committee will not waive the conditions precedent in items X.B.6 through 12 of the Plan if the Rhodes Entities shall have complied with all of their obligations hereunder and in the Plan by the Effective Date (or such earlier date specifically set forth herein). In the event the Rhodes Entities fail to comply with any of their obligations under the Mediation Term Sheet or under the Plan by the Effective Date (or such earlier date specifically set forth herein) and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, then the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) modify the Plan to remove any provisions hereof that were included for the benefit of the Rhodes Entities; and (iii) consummate the Plan, as modified. Upon entry of an order of the Bankruptcy Court finding a breach by the Rhodes Entities and authorizing the modifications to the Plan to remove any

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

provisions that were included for the benefit of the Rhodes Entities, the First Lien Steering shall be authorized to make such modifications and consummate the Plan.

4.  Effect of Non-Occurrence of Conditions to Consummation

Each of the conditions to Consummation must be satisfied or duly waived pursuant to Article X.C. of the Plan, and Consummation must occur within 180 days of Confirmation, or by such later date established by Bankruptcy Court order.  If Consummation has not occurred within 180 days of Confirmation, then upon motion by a party in interest made before Consummation and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if Consummation occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to Article X.D of the Plan or otherwise, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments, or rejections of executory contracts or unexpired leases pursuant to Article V of the Plan, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action; (2) prejudice in any manner the rights of the Debtors, the First Lien Steering Committee or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the First Lien Steering Committee or any other Entity.

5.  Satisfaction of Conditions Precedent to Confirmation

Upon entry of a Confirmation Order acceptable to the Plan Proponent, each of the conditions precedent to Confirmation, as set forth in Article X.A of the Plan, shall be deemed to have been satisfied or waived in accordance with the Plan.

M.  Modification, Revocation, Or Withdrawal of the Plan

1.  Modification and Amendments

The Plan Proponent shall not modify materially the terms of the Plan without the prior consent of the parties to the Mediation Term Sheet; provided, that in the event the Rhodes Entities fail to comply with any of their obligations under the Mediation Term Sheet and under the Plan by the Effective Date (or such other date set forth in the Plan) and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, then the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) modify the Plan to remove any provisions hereof that were included for the benefit of the Rhodes Entities; and (iii) consummate the Plan, as modified.  Upon entry of an order of the Bankruptcy Court finding a breach by the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Rhodes Entities and authorizing the modifications to the Plan to remove any provisions that were included for the benefit of the Rhodes Entities, the First Lien Steering shall be authorized to make such modifications and consummate the Plan. Except as otherwise specifically provided in the Plan, the Plan Proponent reserves the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponent expressly reserves its rights to revoke, withdraw, alter, amend, or modify materially the Plan with respect to any Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI.A of the Plan. The Plan, Disclosure Statement and all ancillary documents may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at http://www.nvb.uscourts.gov. All documents to be entered into in connection with the consummation of the Plan as described in the Plan and/or Disclosure Statement are integral to the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

    2.    Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

    3.    Revocation or Withdrawal of Plan

The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization; provided, that, any subsequently filed plan shall be consistent with the Mediation Settlement unless the Rhodes Entities fail to comply with any of their obligations under the Mediation Term Sheet or the Plan by the Effective Date (or such other date set forth herein) and fail to cure such alleged breach within ten (10) days' written notice to the Rhodes Entities, in which case the First Lien Steering Committee shall be entitled to file a motion on at least seven (7) days notice to (i) determine that a breach has occurred (except that the failure of the parties to agree on the refinancing of the Rhodes Ranch Golf Course solely as a result of the First Lien Steering Committee acting unreasonably or in bad faith shall not be deemed a failure of the Rhodes Entities to comply with their obligations hereunder or under the Plan), and the Rhodes Entities reserve their right to object to such motion; (ii) revoke or withdraw the Plan as a result of such breach; and (iii) file a subsequent plan that removes the benefits provided to the Rhodes Entities pursuant to the Mediation Term Sheet. If the Plan Proponent revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any document or

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Plan Proponent or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Plan Proponent or any other Entity.

N.       Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code and as otherwise set forth in the Plan.

## Article V.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Plan Confirmation process.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own attorneys.

A.       The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation (the "Confirmation Hearing").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON JANUARY 14, 2010 AT 9:00 A.M. PREVAILING PACIFIC TIME BEFORE THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA, IN COURTROOM 1 IN THE FOLEY FEDERAL BUILDING LOCATED AT 300 LAS VEGAS BOULEVARD SOUTH, LAS VEGAS, NEVADA 89101. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR ANY ADJOURNMENT THEREOF.

OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE JANUARY 4, 2010, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES ORDER FILED AND SERVED ON HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST.   UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

B.    Confirmation Standards

To confirm the Plan, the Bankruptcy Court must find, among other things, that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  The requirements of section 1129 of the Bankruptcy Code are listed below:

1.    the Plan complies with the applicable provisions of the Bankruptcy Code;

2.    the First Lien Steering Committee, as Plan Proponent, will have complied with the applicable provisions of the Bankruptcy Code;

3.    the Plan has been proposed in good faith and not by any means forbidden by law;

4.    any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the cases, has been disclosed to the Bankruptcy Court, and any such payment made before the Confirmation is reasonable, or if such payment is to be fixed after the Confirmation, such payment is subject to the approval of the Bankruptcy Court as reasonable;

5.    with respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code;

6.    each Class of Claims that is entitled to vote on the Plan either has accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code;

7.    except to the extent that the Holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative and Allowed Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon as reasonably practicable thereafter;

8.    at least one Class of Impaired Claims or Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim or Interest of such Class;

9.    Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan;

10.    all fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date; and

11.    the Plan addresses payment of retiree benefits, if any, in accordance with section 1114 of the Bankruptcy Code.

The First Lien Steering Committee believes that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code, including that (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code, (2) the First Lien Steering Committee has complied or will have complied with all of the requirements of chapter 11 and (3) the Plan has been proposed in good faith.

C.      Financial Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that Confirmation is not likely to be followed by the liquidation of the Debtors, unless such liquidation is proposed in the Plan, or the need for further financial reorganization. To determine whether the Plan meets this requirement, the First Lien Steering Committee has analyzed the ability of the Debtors to meet their obligations under the Plan.

**With respect to the Reorganized Debtors, based on the analyses set forth in Exhibit D to the Disclosure Statement and the operational, business and other assumptions set forth therein, the First Lien Steering Committee believes that the Reorganized Debtors will have the financial capability to satisfy their obligations following the Effective Date pursuant to the Plan, including the payment of all Cash distributions contemplated by the Plan.** Based on the analysis and related information set forth in Exhibit D to the Disclosure Statement, the First Lien Steering Committee will seek a ruling that the Plan is feasible in connection with the Confirmation of the Plan.

D.      Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that each Holder of a Claim or Interest in each Impaired Class: (1) has accepted the Plan or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Chapter 11 Case were converted to a chapter 7 case and the assets of such Estate were liquidated; (b) determine the distribution ("Liquidation Distribution") that each non-accepting Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such Holder would receive if the Plan were Confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7), the First Lien Steering Committee, through its financial advisor, Winchester Carlisle Partners ("WCP"), and it valuation consultant, Robert Charles Lesser & Co, ("RCLCO"), has prepared a liquidation analysis (the "Liquidation Analysis") and a going concern analysis (the "Going Concern Analysis"). The Liquidation Analysis and Going Concern Analysis compare the proceeds to be realized if the Debtors were to be liquidated in hypothetical cases under chapter 7 of the Bankruptcy Code against the proceeds to be realized

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

under the Plan as a going concern. These analyses employ a discounted cash flow ("DCF") methodology to arrive at a range of values for the Debtors' real estate assets as of December 31, 2009, and incorporate various estimates and assumptions, including a hypothetical conversion to chapter 7 liquidation as of January 1, 2010. Further, each analysis is subject to potential material changes including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation and going concern values of the Debtors could vary materially from the estimates provided in the Liquidation and Going Concern Analyses, respectively.

1.    Liquidation Analysis

Under chapter 7 liquidation, certain distinctive factors would limit recovery from the sale of the Debtors' homebuilding operations and other land assets. RCLCO and WCP assumed that an orderly liquidation would be performed over a period of twelve months commencing as of January 1, 2010, the projected date of conversion to a hypothetical chapter 7 liquidation. Given the current depressed state of homebuliding and real estate markets, as well as the limited availability of credit, this expedited sale process could materially reduce recovery from the Debtors' land assets. In addition, RCLCO and WCP assumed that a potential buyer of the Debtors' assets will expect a higher risk premium and lower achievable home sale prices relative to a going concern valuation due to the stigma attached to a community and/or company that is in a liquidation mode.

The Liquidation Analysis, attached hereto as Exhibit E, presents both "High" and "Low" estimates of the value of the Debtors' real estate assets under liquidation, representing a range of assumptions relating to the risk and costs incurred during a liquidation. The DCF analysis derives an estimated value of the Debtors' real estate assets by discounting the unlevered projected free cash flows a buyer or buyers of the Debtors' assets could expect to achieve, based on market projections, to a net present value as of the effective date. RCLCO used a discount rate range of 25% - 30% in the Liquidation Analysis, reflecting the higher risk premium required by investors under this scenario.

Based on the methodologies described above, and after further review, discussions, considerations, and assumptions, RCLCO and WCP estimate that the liquidation value of the Debtors' real estate assets as of January 1, 2010, ranges from $44.2 million dollars to $55.0 million dollars, with a midpoint of $49.3 million dollars.

As reflected on Exhibit E hereto, RCLCO and WCP performed the Liquidation Analysis on a consolidated basis and did not provide a liquidation value for each individual Debtor entity. The first lien indebtedness and second lien indebtedness total nearly $400 million, which indebtedness is secured by first and second liens, respectively, on substantially all of the Debtors' assets at each Debtor entity. Given that the Liquidation Analysis reflects a midpoint value of $49.3 million, the First Lien Steering Committee believes that there is no value available for claims beyond the first lien indebtedness at any Debtor entity on either a liquidation or going concern basis. The First Lien Steering Committee therefore does not believe that an entity by entity liquidation analysis is necessary or appropriate on the facts of these Chapter 11 Cases.

2.    Going Concern Analysis

In preparing the Going Concern Analysis, RCLCO and WCP, among other things: reviewed certain internal financial and operating data of the Debtors made available by the Debtors and WCP; reviewed certain operating and financial forecasts; performed DCF analyses; considered sales transaction for properties comparable to certain of the Debtors' assets; considered information from qualified third party sources relating to revenue and cost assumptions, and conducted such other analyses as deemed necessary to complete the analysis.

The Going Concern Analysis assumes that various documents and data provided by the Debtors, including cost information, are reliable and accurate.

In addition to the foregoing, RCLCO assumed in preparing the Going Concern Analysis that the Effective Date occurs on January 1, 2010. The Projections used also assume that general economic, financial, and market conditions as of the Effective Date will not differ materially from those conditions prevailing as of the date of the Going Concern Analysis. Although subsequent developments may affect the conclusions, neither RCLCO, WCP nor the First Lien Steering Committee have any obligation to update, revise, or reaffirm its analysis following the Confirmation Hearing.

The DCF methodology was used to arrive at a value for the Debtors' real estate assets. The DCF analysis derives an estimated value of the Debtors' real estate assets by discounting their unlevered projected free cash flows based on market projections to a net present value as of the Effective Date.  Revenue is derived from the construction and sale of single family homes on all single-family lots currently in inventory, as well as on certain multifamily and commercial parcels where it was determined that single-family homes were the highest and best use.  Pricing and sales velocity for these homes were projected to recover from their currently depressed levels, as determined by an analysis of recent and historical sales data, to more sustainable level of growth by 2011. Additional revenue is derived from the sale of certain land parcels at prices and dates supportable by market conditions, as well as the operation and sale of the Tuscany Golf Course. RCLCO used a discount rate range of 20% - 25% in the Going Concern Analysis, reflecting the prevailing capital market requirements of similar transactions.

Based on the methodologies described above, and after further review, discussions, considerations, and assumptions, RCLCO and WCP have estimated that the going concern value of the Debtors' real estate assets as of January 1, 2010, ranges from $89.2 million to $111.5 million, with a midpoint of $99.6 million.

E.    Acceptance by Impaired Classes

The Bankruptcy Code also requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan accept the plan, with the exception described in the following section.  A class that is not "impaired" under a plan of reorganization is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan (1) leaves unaltered the legal,

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest or (2) cures any default and reinstates the original terms of the obligation.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of interests has accepted the plan if holders of such interests holding at least two thirds in amount actually voting have voted to accept the plan.

F.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan; provided that such plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code states that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan will be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it provides a treatment to the class that is substantially equivalent to the treatment that is provided to other classes that have equal rank. In determining whether a plan discriminates unfairly, courts will take into account a number of factors. Accordingly, two classes of unsecured claims could be treated differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that: (1) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the secured claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan and (2) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either: (1) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the Effective Date, equal to the allowed amount of such claim; or (2) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either: (1) the plan provide that each holder of an

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the effective date of the plan, equal to the greater of (a) the allowed amount of any fixed liquidation preference to which such holder is entitled, (b) any fixed redemption price to which such holder is entitled or (c) the value of such interest; or (2) if the class does not receive such an amount as required under (1), no class of interests junior to the non-accepting class may receive a distribution under the plan.

The First Lien Steering Committee shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Impaired Class, as applicable, presumed to reject the Plan, and the First Lien Steering Committee reserves the right to do so with respect to any other rejecting Class of Claims or Interests, as applicable, or to modify the Plan.    Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Class that is Impaired under the Plan.

The First Lien Steering Committee submits that if the First Lien Steering Committee "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan will be structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  If the First Lien Steering Committee seeks to "cram down" the Plan on Holders of Secured Claims, all such Holders shall receive a distribution that satisfies the fair and equitable requirement.  The Plan also satisfies the fair and equitable requirement with respect to Holders of Unsecured Claims because even though such Holders will not receive payment in full on account of the Allowed amount of their Claims, no junior Claim or Interest receives any distribution under the Plan.    Holders of Interests will receive no distribution under the Plan, but there is no junior Claim or Interest that will receive any distribution under the Plan either.  Therefore, the requirements of section 1129(b) of the Bankruptcy Code would be satisfied in the event that the First Lien Steering Committee is required to "cram down."

## Article VI.
## CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THE DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND THE FINANCIAL PROJECTIONS INCLUDED AS EXHIBITS D AND E TO THE DISCLOSURE STATEMENT.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

A.    Certain Bankruptcy Considerations

    1.    The First Lien Steering Committee May Not Be Able to Obtain Confirmation of the Plan.

    The First Lien Steering Committee cannot ensure that they will receive the requisite acceptances to confirm the Plan. Even if the First Lien Steering Committee receives the requisite acceptances, the First Lien Steering Committee cannot ensure that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of Claims and Interests might challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

    As discussed in further detail in Article V herein, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things: (a) a finding by the Bankruptcy Court that the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims and interests within a particular class under the plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code. While there can be no assurance that these requirements will be met, the First Lien Steering Committee believes that the Plan complies with section 1129 of the Bankruptcy Code.

    Confirmation and Consummation also are subject to certain conditions described in Article V herein. If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests ultimately would receive and it is possible that an alternative plan would result in substantially less favorable treatment for Holders of Claims or Interests than such Holders would receive under the Plan.

    2.    The Bankruptcy Court May Not Approve the Compromise and Settlement Contemplated By the Plan

    As described in more detail in Article Article IV.J.3 herein, the Plan constitutes a settlement, compromise and release of rights arising from or relating to the allowance, classification and treatment of all Allowed Claims and Allowed Interests and their respect distributions and treatments under the Plan and takes into account, and conforms to, the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination or section 510(b) or (c) of the Bankruptcy Code. This settlement, compromise and release requires approval by the Bankruptcy Court in the Confirmation Order. The First Lien Steering Committee cannot ensure that the Bankruptcy Court will approve the settlement described in Article VIII.C. of the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

3.    Parties in Interest May Object to the First Lien Steering Committee's Classification of Claims

Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may classify a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The First Lien Steering Committee believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there is no assurance that the Bankruptcy Court will hold that the Plan's classification of Claims and Interests complies with the Bankruptcy Code.

4.    Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the First Lien Steering Committee intends to seek Confirmation as promptly as practicable thereafter. In the event that sufficient votes are not received, the First Lien Steering Committee may propose an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

5.    The First Lien Steering Committee, the Debtors or the Reorganized Debtors May Object to the Amount or Secured or Priority Status of a Claim

The Debtors, the Reorganized Debtors and the First Lien Steering Committee reserve the right to object to the amount or the secured or priority status of any Claim or Interest. The estimates set forth in the Disclosure Statement cannot be relied on by any Holder of a Claim or Interest whose Claim or Interest is subject to an objection. Any such Holder of a Claim or Interest may not receive its specified share of the estimated distributions described in the Disclosure Statement.

6.    Procedures for Contingent and Unliquidated Claims

Notwithstanding any language in any Proof of Claim or otherwise, the Holder of a contingent or unliquidated Claim shall not be entitled to receive or recover any amount in excess of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date; or (b) if the Proof of Claim does not ascribe a monetary value to such Holder's Claim on the Distribution Record Date, the amount the First Lien Steering Committee elects to withhold on account of such Claim.

7.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such plan at the plan proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The First Lien Steering Committee believes that the Plan satisfies these requirements, and the First Lien Steering Committee may request such nonconsensual Confirmation in

accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

B.    Other Considerations

1.    Avoidance Action Analysis

The First Lien Steering Committee has not yet comprehensively evaluated all of the preference and fraudulent transfer claims that the Debtors may have against third parties. The Debtors Filed their Schedules listing all transfers that the Debtors made within ninety days of the Petition Date and all transfers to insiders made by the Debtors within one year of the Petition Date. All such transfers listed in the Schedules may be the subject of an Avoidance Action to set aside the transfer if the transfer is avoidable under Bankruptcy Code sections 544, 545, 547, 548, 549, or 550, or otherwise except as expressly released by the Plan. Accordingly, the Reorganized Debtors or Litigation Trust, as applicable, will retain rights to seek to avoid any transfer made within ninety days of the Petition Date and one year of the Petition Date (as to Insiders) or such longer periods as may be available under applicable non-bankruptcy law.

The listing of transfers made by the Debtors within ninety days (for non-insiders) and one year (for Insiders) that may be potentially avoidable as preferences is not included in this Disclosure Statement. Copies of the Schedules (which include the identification of transfers made by the Debtors within ninety days (for non-insiders) and one year (for Insiders)) are on file with the Bankruptcy Court and also available for review on the Claims and Solicitation Agent's website, www.omnimgmt/rhodes. Creditors and interested parties are encouraged to review such Schedules to determine if any transfers made to a particular Creditor are included thereon. Any such transfers listed in the Schedules may be the subject of an Avoidance Action to set aside the transfer if the transfer is avoidable. However, with respect to such transfers listed on the Debtors' Schedules, the First Lien Steering Committee has not yet determined whether the transferees of those transfers would have defenses to an avoidance action.

2.    Other Potential Litigation Recoveries

In addition to Avoidance Actions, the First Lien Steering Committee has been reviewing available information regarding potential Causes of Action against third parties and, possibly, Affiliates and/or Insiders of the Debtors, which review is ongoing and which will continue to be conducted by the First Lien Steering Committee, the Reorganized Debtors and/or their respective successors or representatives after the Effective Date. Due to the size and scope of the business operations of the Debtors and the multitude of business transactions therein, there may be various Causes of Action that currently exist or may subsequently arise in addition to any matters identified in the Plan. The potential net proceeds from the potential Causes of Action identified herein or that may subsequently arise or be pursued are speculative and uncertain. Prepetition, the Debtors were party to numerous lawsuits. A list of the pending litigation in which the Debtors were a party as of the Petition Date is attached to the Disclosure Statement as Exhibit F.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Except as expressly released through the Plan, existing or potential Causes of Action that may be pursued by the Debtors and/or their respective successors or representatives (as applicable) include, without implied limitation, the following: (a) any and all Avoidance Actions; (b) any and all litigation against Affiliates and Insiders; (c) all other Causes of Action and Defenses identified on Exhibit L to the Disclosure Statement; (d) any other Causes of Action against current or former officers, directors, and/or employees of the Debtors, including without implied limitation, any pending or potential claims with respect to directors and officers' insurance coverage for the Debtors' current or former officers and directors; (e) any and all Causes of Action relating to the matters listed on the Debtors' Schedules; (f) any other litigation, whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' businesses or operations, including, without limitation: disputes with suppliers and customers, overpayments, any amounts owed by any creditor, vendor or other entity, employee, management, or operational matters, disputes with current or former employees, financial reporting, environmental matters, insurance matters, accounts receivable, warranties, contractual obligations, or tort claims that may exist or subsequently arise; and (g) any Causes of Action not expressly identified herein or in the Plan.

3.    Estimation of Claims

Before or after the Effective Date, the Debtors, the First Lien Steering Committee, or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

C.    Plan Risk Factors

Although the First Lien Steering Committee believes that the Plan is confirmable, there are some risks to the performance of the Plan. Certain specific risks to performance of the Plan are described below. In particular, distributions to Holders of First Lien Lender Secured Claims are driven by the success of the Reorganized Debtors in, among other things, the development and completion of their real property assets and sale or other disposition

91

thereof. Additionally, because of the significant issues that must be addressed with respect to the allowance of Claims, there may be significant delay before any distribution is made on account of Allowed Claims. However, the First Lien Steering Committee believes the very same risks described herein are present in, and significantly greater to Creditors in, chapter 7 cases.

1.    The Chapter 7 Liquidation Analysis and Going Concern Analysis Are Based on Estimates and Numerous Assumptions

Underlying the chapter 7 Liquidation Analysis and Going Concern Analysis are a number of estimates and assumptions that, although developed and considered reasonable by RCLCO, are inherently subject to economic, business and competitive uncertainties and contingencies beyond the First Lien Steering Committee's or RCLCO's control. Accordingly, there can be no assurance that the values assumed in the chapter 7 Liquidation Analysis or Going Concern Analysis will be realized.

2.    The Reorganized Debtors May Lose the Services of Critical Employees with Extensive Knowledge of Operations

The First Lien Steering Committee believes that the Reorganized Debtors' ability to maximize the value of the Debtors' estates pursuant to the Plan will depend to a large extent on the efforts of certain employees currently working for the Debtors, which personnel have substantial experience with and knowledge of the Debtors' businesses, operations and assets. While the Reorganized Debtors hope to retain such employees' services after the Effective Date, to the extent needed, it is possible that some or many of said employees may resign or otherwise leave the employ of the Reorganized Debtors. In such case, the business related efforts undertaken pursuant to the Plan may be negatively affected, resulting in potentially less recovery for Creditors under the Plan.

3.    The Reorganized Debtors May Not Be Successful With Respect to Contested Claims

If the First Lien Steering Committee, the Reorganized Debtors, and/or their successors or representatives under the Plan are unsuccessful in their objections to contested and contingent Claims that have been Filed against the Estates or their Avoidance Actions, the Estates' total liabilities will be greater than expected, and there may be less Cash available for distribution to Holders of unsecured non-priority Claims. The First Lien Steering Committee intends to vigorously oppose the allowance of all Claims that it believes are either entirely or in part without merit and prosecute Avoidance Actions and other Causes of Action. However, if the First Lien Steering Committee's objections and actions are not upheld by the Bankruptcy Court, and the applicable Claims are Allowed in amounts in excess of the amounts that have been accrued by the Debtors, the total liabilities of the Debtors will be greater than expected, and there will be less Cash than expected available for distribution to Creditors.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

4.    Litigation Recoveries and Results Are Highly Speculative and Uncertain

The success of the Litigation Trust, Reorganized Debtors and/or their respective successors or representatives under the Plan in pursuing Avoidance Actions and/or other Causes of Action and defenses, is speculative and uncertain. Litigation may be complex and involve significant expense and delay. Furthermore, even if successful in the Causes of Action, in some cases, the Litigation Trust, Reorganized Debtors and/or their respective successors or representatives under the Plan may encounter difficulty in collection. Although potential litigation recoveries are not included in the First Lien Steering Committee's Plan Distribution Analysis or chapter 7 Liquidation Analysis, such recoveries may have a significant impact upon the distributions that may be made to Creditors.

THESE CONSIDERATIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD–LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. WORDS SUCH AS "EXPECT," "PLANS," "ANTICIPATES," "INDICATES," "BELIEVES," "FORECAST," "GUIDANCE," "OUTLOOK" AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD LOOKING STATEMENTS. ADDITIONALLY, FORWARD LOOKING STATEMENTS INCLUDE STATEMENTS WHICH DO NOT RELATE SOLELY TO HISTORICAL FACTS, SUCH AS STATEMENTS WHICH IDENTIFY UNCERTAINTIES OR TRENDS, DISCUSS THE POSSIBLE FUTURE EFFECTS OF CURRENT KNOWN TRENDS OR UNCERTAINTIES OR WHICH INDICATE THAT THE FUTURE EFFECTS OF KNOWN TRENDS OR UNCERTAINTIES CANNOT BE PREDICTED, GUARANTEED OR ASSURED. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, THE REORGANIZED DEBTORS OR THE FIRST LIEN STEERING COMMITTEE INCLUDING, WITHOUT LIMITATION, THOSE DESCRIBED ELSEWHERE IN THIS DISCLOSURE STATEMENT, THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, ACTIONS OF GOVERNMENTAL BODIES AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD LOOKING STATEMENTS, AND NONE OF THE DEBTORS, THE REORGANIZED DEBTORS OR THE FIRST LIEN STEERING COMMITTEE SHALL BE REQUIRED TO UNDERTAKE OR HAVE ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE FIRST LIEN STEERING COMMITTEE OR THAT THE FIRST LIEN STEERING COMMITTEE CURRENTLY BELIEVES TO BE IMMATERIAL MAY ALSO IMPAIR THE DEBTORS' BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS AND THE VALUE OF THE DEBTORS' ESTATES. IF ANY OF THE RISKS OCCUR, THE DEBTORS' BUSINESS, FINANCIAL CONDITION, OPERATING RESULTS AND THE VALUE OF THE DEBTORS' ESTATES, AS WELL AS THE FIRST

LIEN STEERING COMMITTEE'S ABILITY TO CONSUMMATE THE PLAN, COULD BE MATERIALLY ADVERSELY AFFECTED.

## Article VII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Claims. **Tax consequences for the Reorganized Debtors are addressed in Article VII.A. below.** The following summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code" or "IRC"), Treasury Regulations promulgated thereunder (the "Regulations"), judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The First Lien Steering Committee has not requested and will not request a ruling from the Internal Revenue Service or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the Internal Revenue Service will adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Internal Revenue Code, foreign taxpayers, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, investors in pass through entities and Holders of Claims who are themselves in bankruptcy). Furthermore, this discussion assumes that Holders of Claims hold only Claims in a single Class. Holders of Claims should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

This discussion assumes that, except as recharacterized by a Final Order of the Bankruptcy Court, the various debt and other arrangements to which the Debtors are a party will be respected for federal income tax purposes in accordance with their form.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE UNITED STATES INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT WRITTEN TO SUPPORT THE PROMOTION, MARKETING OR RECOMMENDATION TO ANOTHER PARTY OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    Certain U.S. Federal Income Tax Consequences to Reorganized Debtors

1.    Introduction

The majority of the Debtors are either partnerships (general or limited) or LLCs.  For U.S. federal income tax purposes, the single member limited liability companies have not elected to be treated as associations taxable as corporations.  Debtors that are multi-member LLCs are taxed as partnerships for U.S. federal income tax purposes.  The First Lien Steering Committee does not believe that the Debtors will suffer any adverse tax consequences as a result of the consummation of the Plan.

2.    Partnership

A partnership is not itself a taxpaying entity for U.S. federal income tax purposes, and a partnership's income or loss (and items thereof) for each taxable period during which it is in existence is allocated among its partners, who are required to report the income or loss (and items thereof) allocated to them on their own tax returns.  Generally, a partner is not allowed to deduct his or her share of partnership losses for the year in excess of the adjusted tax basis of his or her interest in the partnership, determined as of the end of the partnership's taxable year in which the loss occurs. Any excess is allowed in any subsequent year in which the adjusted tax basis increases. A partner's tax basis is initially equal to the amount of cash and the adjusted tax basis of property contributed to the partnership.

Thereafter, tax basis increases for such items as additional contributions and the partner's share of taxable and tax-exempt income and gain, and tax basis decreases for such items as distributions and the partner's share of losses. An increase in a partner's share of partnership liabilities or a partner's assumption of partnership liabilities is treated as a cash contribution to the partnership that increases tax basis, and a decrease in a partner's share of partnership liabilities or the assumption by the partnership of a partner's liabilities decreases tax basis, but not below zero. (Cash distributions, including a decrease in a partner's share of partnership liabilities, in excess of tax basis is taxable and generally treated as gain from the sale of a partnership interest.) A partner shares partnership recourse liabilities to the extent the partner bears the economic risk of loss with respect to the liabilities, i.e., based on a hypothetical partnership liquidation at a time when the partnership has no assets, after taking into account any rights of contribution or reimbursement from other partners or third parties that are related to other partners. A partner also shares partnership nonrecourse liabilities.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

3.    Cancellation of Indebtedness Income

Under the Internal Revenue Code, cancellation of indebtedness ("COD") income is recognized by a partnership to the extent, and at the time, that certain debts are discharged for less than full payment. The COD income recognized at the partnership level is then allocated among the partners pursuant to the allocation provisions of the partnership agreement, if such provisions comply with the requirements of the Internal Revenue Code regarding allocations, or, if not, in accordance with the partners' interests in the partnership. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of debt that is not publicly traded nor deemed exchanged for publicly traded property and (z) the fair market value of any new consideration (including partnership interests) given in satisfaction of such indebtedness at the time of the exchange.  COD income also includes any interest that the taxpayer deducted under the accrual method of accounting but remains unpaid at the time the indebtedness is discharged.   COD income generally does not include the discharge of indebtedness to the extent the payment of the liability would have given rise to a deduction.

The Plan currently contemplates that Newco will hold the assets of some and the equity of at least one of the Reorganized Debtors, which ordinarily would result in COD income upon the discharge of the debts.  Based on Revenue Ruling 99-6, however, the purchase of the membership interests in Heritage Land Company, LLC, however, may be treated as a taxable exchange of their membership interests by its members resulting in the recognition of gain or loss to the members based on a sales price of $10 plus the amount of the First Lien Lender Secured Claims, and as a purchase of assets for their their fair market value by Newco, with any cancellation of debt attributable to the former members of Heritage. Because the Plan provides that Holders of certain Allowed Claims will receive Newco Equity Interests, the sales price and/or the amount of COD income will depend on the fair market value of the Newco Equity Interests exchanged therefor.  This value cannot be known with certainty until after the Effective Date.   The Plan provides that any cancellation of indebtedness that may be derived from the foregoing transactions be allocable to the holders of the Old Equity Interests.  However, it is unclear whether this provision will be binding on the Internal Revenue Service.

Because most of the Debtors' indebtedness is owed by entities that are partnerships or disregarded entities for U.S. federal income tax purposes, virtually all of the Debtors' COD income that will be generated from the Plan will be allocated to the members of Heritage Land Company LLC or other Reorganized Debtor based on their respective percentage ownership interests in Heritage Land Company LLC or other Reorganized Debtor.  Under the U.S. federal income tax rules dealing with COD income, the tax treatment of that income will be determined with respect to each member at the member level.

A member of Heritage Land Company LLC or other Reorganized Debtor will not be required to include any amount of COD income in gross income if the member is (i) under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding or (ii) insolvent before the Effective Date (in which, the COD income may be excluded to the extent of the insolvency). As a consequence of such exclusion, a member must reduce its tax attributes by the amount of COD income that it

excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"); (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A member with COD income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Nonetheless, any attribute reduction will be applied as of the first day following the taxable year in which a member recognizes COD income. If a member has a suspended loss with respect to its membership interest in Heritage Land Company LLC, the allocation of COD income may allow some or all of such suspended losses to be used to offset the COD income.

A recently enacted amendment to the COD income rules provides that taxpayers that recognize COD income in 2009 or 2010 may elect to forgo the COD income exclusion and attribute reduction rules described above. Instead, the taxpayer may elect to take into taxable income the COD income with respect to such debt in equal installments in 2014 through 2018 (i.e., the taxpayer would report 20% of the COD income in each such year). This election to defer COD income is made separately with respect to each debt instrument on which COD income is realized, must be made on the taxpayer's tax return for the year that includes the transaction that creates the COD income, and, in the case of debt of a partnership, is made at the partnership level, but recent IRS guidance allows taxpayers to make partial elections and permits partnerships to choose which partners defer which amount, if any. The guidance also provides that a taxpayer is not required to make an election for the same COD income portion arising from each reacquired applicable debt instrument, though he or she may make an election for different portions of such income arising from different applicable debt instruments. The Debtors have not yet determined whether such an election will be made with respect to the COD income generated in connection with the consummation of the Plan.

4.    Recent Tax Amendments

The law governing net operating loss ("NOL") carrybacks was amended November 6, 2009. It permits taxpayers to elect to carry back either their 2008 or 2009 operating losses for 3, 4 or even 5 years, rather than the normal 2 years. Losses may be carried back 3 or 4 years to offset all income generated in those years. Losses carried back the 5th year can only offset half of the income in that year. In addition, this law suspends the application of the normal year that NOLs can only offset 90% of alternative minimum taxable income for losses for the carrybacks covered by this provision. Taxpayers may file an irrevocable election to carry back 2008 or 2009 losses (but not both 2008 and 2009 losses) for this extended period at any time up to the due date of their 2009 returns (including extensions). The Rhodes Entities may realize additional tax benefits as a result of the foregoing amendment.

In the case of a partnership (or LLC treated as a partnership for tax purposes), these rules apply at the partner level, with the partner including its allocable share of the entity's losses. In the case of an S corporation, similar rules apply, albeit with different limitations on the ability to use such losses due to different basis rules. Since the Debtors' businesses were not carried on by a corporation, but were carried on through pass-through entities (i.e., partnerships, LLCs taxable as partnerships, an S corporation, and LLCs disregarded for tax purposes), this legislation will not result in any recoveries to the Debtors from carrying back NOLs the additional three years.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

B.    Certain Federal Income Tax Consequences to Holders of Claims

    1.    Consequences to Holders of Allowed Class A-1 First Lien Lender Secured Claims

On the Effective Date, each of the First Lien Lenders shall receive (i) its pro rata share of $1.5 million in Cash from the proceeds of the First Lien Lenders' Collateral, (ii) its pro rata share of 100% of the New First Lien Notes, and (iii) its pro rata share of 100% of the Newco Equity Interests on account of its Allowed Secured Claim.

        a.    New First Lien Notes

           (i)    Significant Modification

The U.S. federal income tax consequences of the exchange of an Allowed First Lien Lender Secured Claim for an interest in the New First Lien Notes will depend on whether the exchange results in a "significant modification" of the Allowed First Lien Lender Secured Claims (i.e., whether the terms of the New First Lien Notes are significantly different from the terms of the First Lien Lender Secured Claims exchanged therefor). The Treasury Regulations under section 1001 of the IRC provide specific rules for determining whether certain modifications are "significant." One such rule provides that a change in the annual yield of an instrument will be considered "significant" if the modified rate varies from the original rate by more than the greater of (a) 25 basis points and (b) 5 percent of the annual yield of the unmodified instrument. Another rule provides that the deferral of a scheduled payment will be considered 'significant' unless the deferred payments are unconditionally payable during the period that begins on the initial due date for such payment and extends for the lesser of five years or 50% of the original term of the debt instrument. The exchange should result in a significant modification of the First Lien Lender Secured Claims because the terms of the New First Lien Notes, including the issuer, the interest rate and maturity date, are significantly different from the terms of the First Lien Lender Secured Claims. Therefore, the exchange of Allowed First Lien Lender Secured Claims for New First Lien Notes should be a taxable exchange under section 1001 of the IRC.

           (ii)    Recognition of Gain or Loss

A Holder who receives New First Lien Notes with respect to an Allowed First Lien Lender Secured Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the issue price (as described below) of any New First Lien Notes received and (b) the Holder's adjusted basis in its Allowed First Lien Lender Secured Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the First Lien Lender Secured Claims were held for more than one year. To the extent that a portion of the New First Lien Notes received represents accrued but unpaid interest that the Holder has not already included in income, the Holder may recognize ordinary interest income (as described below). A Holder's tax basis in any New First Lien Notes received should equal the issue price of the New First Lien Notes as of the date distributed to the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Holder, and a Holder's holding period for the New First Lien Notes should begin on the day following the exchange.

(iii)    Stated Interest and Original Issue Discount

A Holder of the New First Lien Notes will be required to include stated interest on the New First Lien Notes in income in accordance with the Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." All stated interest on the New First Lien Notes that is unconditionally payable in Cash or property (other than debt instruments of the issuer, such as PIK interest (discussed below)) at least annually will be generally treated as "qualified stated interest". The amount of qualified stated interest and the amount of original issue discount ("OID"), if any, that accrues during an accrual period on a New First Lien Note will be calculated by assuming that LIBOR is a fixed rate equal to the value of LIBOR as of the issue date. The qualified stated interest allocable to an accrual period is increased (or decreased) if the interest actually paid during an accrual period exceeds (or is less than) the interest assumed to be paid during the accrual period pursuant to the foregoing rules.

Because the New First Lien Notes provide for the payment of PIK interest in lieu of paying Cash interest, the New First Lien Notes will be treated as issued with OID. The payment of PIK interest will generally not be treated as a payment of interest for federal income tax purposes. Instead, a New First Lien Note and any PIK interest will be treated as a single debt instrument under the OID rules. For U.S. federal income tax purposes, increasing the principal amount of the New First Lien Notes will generally be treated the same as the payment of PIK interest.

Each Creditor will generally be required to include OID in its gross income as such OID accrues over the term of the New First Lien Notes without regard to the Creditor's regular method of accounting for U.S. federal income tax purposes and in advance of the receipt of Cash payments attributable to that income. Accordingly, a Holder could be treated as receiving interest income in advance of a corresponding receipt of Cash.

The rules regarding OID are complex and the rules described above may not apply in all cases. Accordingly, Holders should consult their own tax advisors regarding their application.

b.    Newco Equity Interests

(i)    Exchange Treatment

For U.S. federal income tax purposes, the treatment of the exchange of Allowed First Lien Lender Secured Claims for Newco Equity Interests is unclear. Such exchange is treated (i) as a tax-free contribution of property to Heritage Land Company LLC or other Reorganized Debtor under section 721 of the Internal Revenue Code or, alternatively, (ii) as a taxable exchange under section 1001 of the Internal Revenue Code in its entirety. Under the regulations proposed by the Treasury, the exchange would be treated as a tax-free contribution. No gain or loss should be recognized with respect to the exchange of Claims for Newco Equity Interests and a Holder will have an initial tax basis in such Newco Equity

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Interests equal to the tax basis of the Secured Claims deemed exchanged therefor. A Holder's holding period for the Newco Equity Interests should include the holding period of the Secured Claims deemed exchanged therefor.

If the proposed regulations do not apply and the exchange is treated as a taxable exchange, a Holder who receives Newco Equity Interests with respect to an Allowed First Lien Lender Secured Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair value of the consideration received and (b) the Holder's adjusted basis in its Allowed First Lien Lender Secured Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the First Lien Lender Secured Claims were held for more than one year. To the extent that a portion of the consideration received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income (see discussion below). A Holder's tax basis in Newco Equity Interests received should equal the fair market value of the Newco Equity Interests as of the date distributed to the Holder, and a Holder's holding period for such instruments should begin on the day following the exchange.

(ii)    Certain Tax Aspects of Holding and Disposing Newco Equity Interests

Upon the transfer of the Newco Equity Interests to the First Lien Lenders, Newco will be treated for federal income tax purposes as a partnership on the Effective Date, and a holder of Newco Equity Interests will be treated as a partner on that day. Each holder of Newco Equity Interests will generally be considered a partner in Newco for federal income tax purposes. Each such holder will be required to include its distributive share of the income, gains, losses, deductions and credits of Newco on its own returns, whether or not any distributions are made, and will not be taxable on distributions when received except to the extent such distributions are in excess of the distributee's adjusted basis in the Newco Equity Interests. In general, a holder's adjusted basis in Newco Equity Interests will be increased by its additional capital contributions, if any, to Newco and by such holder's distributive share of income or gains of Newco, and the holder's adjusted basis in Newco Equity Interests will be decreased by the amount of distributions to such holder and such holder's distributive share of losses or deductions of Newco.

Since the deemed purchase of the Heritage Land Company LLC assets will occur on that date, Newco might recognize a loss equal to the difference between its basis in the First Lien Lender Secured Claims and the value of the property received. If it does, such loss would be allocable to the holders of the Newco Equity Interests. Such allocation might not be pro rata, but could vary depending on the basis of each such holders' interest, which will in turn depend on each First Lien Lender's basis in its First Lien Lender Secured Claims. Moreover, since Newco will have engaged in a trade or business while treated as a partnership for tax purposes, its members will have a filing requirement to report such income of a U.S. federal income tax return. If a First Lien Lender is itself treated as a partnership for U.S. tax purposes, its members or partners – including foreign partners or U.S. exempt organizations – could be required to file a U.S. return.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Once the election is made to treat Newco as a corporation, the holders of the Newco Equity Interests generally carry forward their basis in their interests (or shares, if Newco is converted to a corporation), and Newco generally carries forward its basis in its assets. To the extent Newco's basis in its assets is greater than their value as of the election/conversion, it will be required to reduce its basis in its shares to their fair market value or it may elect instead to have the holders of the Newco Equity Interests reduce their basis in such interests by such amount.

Any distributions made on the Newco Equity Interests will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Newco, as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by non-corporate U.S. Holders prior to 2011 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met. Any such dividends received after 2010 will be taxed at the rate applicable to ordinary income.

Dividends paid to a U.S. Holder that is a corporation generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

The benefit of the dividends-received deduction to a corporate shareholder may be effectively reduced or eliminated by operation of the "extraordinary dividend" provisions of Section 1059 of the IRC, which may require the corporate recipient to reduce its adjusted tax basis in its shares by the amount excluded from income as a result of the dividends-received deduction. The excess of the excluded amount over adjusted tax basis may be treated as gain. A dividend may be treated as "extraordinary" if (1) it equals or exceeds 10% of the holder's adjusted tax basis in the stock (reduced for this purpose by the non-taxed portion of any prior extraordinary dividend), treating all dividends having ex-dividend dates within an 85-day period as one dividend, or (2) it exceeds 20% of the holder's adjusted tax basis in the stock, treating all dividends having ex dividend dates within a 365-day period as one dividend.

Dividends paid to a Non-U.S. Holder (to the extent paid out of our current or accumulated earnings and profits, as determined for U.S. federal income tax purposes) generally will be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

To claim the benefit of a tax treaty a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (or such successor form as the IRS designates), in the manner described above, prior to the payment of the dividends. A Non-U.S. Holder that is eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund from the IRS of any excess amounts withheld by filing timely an appropriate claim for refund with the IRS.

A holder will recognize gain or loss upon disposition of its Newco Equity Interests equal to the difference between the amount such holder realizes in connection with the disposition and such holder's adjusted tax basis for such Newco Equity Interests. Any gain or loss will generally be capital gain or loss (which will be long-term capital gain or loss if the Newco Equity Interest has been held in excess of 12 months), subject to the application of certain "recapture" provisions that convert capital gain into ordinary income in certain circumstances. The deductibility of capital loses is subject to limitations.

2.    Consequences to Holders of Allowed Class A-2 Second Lien Lender Secured Claims

If the Second Lien Lenders vote in favor of the Plan, each of the Second Lien Lenders shall receive its pro rata share of 50% of the net proceeds of the Stanley Engineering Litigation on account of its Allowed Secured Claim.

A Holder who receives Cash with respect to an Allowed Second Lien Lender Secured Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Allowed Second Lien Lender Secured Claim. Such gain or loss may be capital in nature (subject to the "market discount" rules described below) and may be long-term capital gain or loss if the Class A-2 Claims were held for more than one year. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already included in income, the Holder may recognize ordinary interest income.

3.    Consequences to Holders of Allowed Class A-3 Other Secured Claims

The following discussion assumes that each Holder of an Allowed Other Secured Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the IRC. Pursuant to the Plan, each Allowed Other Secured Claim, at the election of the Reorganized Debtors, may be (i) Reinstated, (ii) paid in full in Cash, (iii) satisfied by the delivery of the collateral securing such Claim and paying any interest required to be paid, or (iv) otherwise rendered unimpaired. If an Allowed Other Secured Claim is Reinstated, the Holder of such Claim should not recognize gain or loss except to the extent that collateral securing such Claim is changed, and the change in collateral constitutes a "significant modification" of the Allowed Other Secured Claim within the meaning of the Treasury Regulations promulgated under Section 1001 of the IRC. If an Allowed Other Secured Claim is paid in full in Cash, the Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the Holder has held the debt instrument underlying its claim for more than one year) in an amount equal to the amount of Cash received over the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Holder's adjusted basis in the debt instruments underlying its Allowed Other Secured Claim. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income (as described below).

If a Holder of an Allowed Other Secured Claim exchanges its Claim for the collateral securing such Claim, or for Cash in an amount equal to the proceeds actually realized from the sale of such collateral, the exchange should be treated as a taxable exchange under Section 1001 of the IRC. The Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss if the Holder has held the debt instrument underlying its Claim for more than one year) equal to the difference between (i) the fair market value of the collateral received (or, as the case may be, the amount of Cash received from the sale of such collateral), and (ii) the Holder's adjusted tax basis in the debt instrument constituting its Claim. To the extent that a portion of the collateral received (or, as the case may be, the amount of Cash received from the sale of such collateral) in the exchange is allocable to accrued interest that has not already been taken into income by the Holder, the Holder should recognize ordinary interest income (as described below). If, on the Effective Date, the Holder receives the collateral (rather than Cash) in exchange for its Claim, the Holder's tax basis in the collateral should be equal to the fair market value of the collateral on the Effective Date, and the Holder's holding period in the collateral should begin on the day following the Effective Date.

4.    Consequences to Holders of Class C-1 General Unsecured Claims, Class C-2 First Lien Lender Deficiency Claims, and Class C-3 Second Lien Lender Deficiency Claims

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of General Unsecured Claims on account of its Allowed Claim.

The amount received, if any, from the Litigation Trust is contingent on the value obtained from the unencumbered assets and the outcome of the causes of action held by the Litigation Trust. The Holder should recognize gain or loss equal to the difference between (i) the fair market value as of the Effective Date of the Litigation Trust Interests received (to the extent it is not allocable to accrued interest) and (ii) the Holder's tax basis in the Claims surrendered by the Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long term capital gain or loss if the Claims were held for more than one year by the Holder. To the extent that any portion of the Litigation Trust Interests received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income, which is addressed in the discussion below regarding accrued interest. A Holder's tax basis in the Litigation Trust Interests received should equal their fair market value as of the Effective Date. A Holder's holding period for the Litigation Trust Interests should begin on the day following the Effective Date.

It is plausible that a Holder could treat the transaction as an 'open' transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of the Litigation Trust Interests received.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

The federal income tax consequences of an open transaction are uncertain and highly complex and a Holder should consult with its own tax advisor if it believes that open transaction treatment might be appropriate.

     5.    Receipt of Litigation Trust Interests

On the Effective Date, the Litigation Trust will be settled and is currently anticipated to exist as either a grantor trust or partnership for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), pursuant to Treasury Regulation Section 301.7701-4(d) and related Treasury Regulations, the Litigation Trustee may designate and file returns for the Litigation Trust as a "grantor trust" and/or "liquidating trust" and therefore, for federal income tax purposes, the Litigation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.

The Litigation Trustee intends to take a position on the Litigation Trust's tax return that the Litigation Trust should be treated as a grantor trust set up for the benefit of creditors.

Holders of Claims that receive Litigation Trust Interests will be required to report on their U.S. federal income tax returns their share of the Litigation Trust's items of income, gain, loss, deduction and credit in the year recognized by the Litigation Trust whether or not the Litigation Trust is taxed as a partnership or a grantor trust. This requirement may result in Holders being subject to tax on their allocable share of the Litigation Trust's taxable income prior to receiving any cash distributions from the Litigation Trust. In general, Holders of Litigation Trust Interests will not be subject to tax on their receipt of distributions from the trust.

Any Litigation Trust Assets held by the Litigation Trust on account of Disputed Claims shall be treated as held in trust by the Litigation Trust as fiduciary for the benefit of the Holders of Disputed Claims (each a "Disputed Claims Reserve").

Under IRC Section 468B(g), amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Although certain Treasury Regulations have been issued under this section, no Treasury Regulations have as yet been promulgated to address the tax treatment of such accounts in a bankruptcy setting. Thus, depending on the facts of a particular situation, such an account could be treated as a separately taxable trust, as a grantor trust treated as owned by the Holders of Disputed Claims or by the Debtor (or, if applicable, any of its successors), or otherwise. On February 1, 1999, the IRS issued proposed Treasury Regulations that, if finalized in their current form, would specify the tax treatment of reserves of the type here involved that are established after the date such Treasury Regulations become final. In general, such Treasury Regulations would tax such a reserve as a "qualified settlement fund" under Regulation Sections 1.468B-1 et seq. and thus subject to a separate entity level tax. As to previously established escrows and the like, such Treasury Regulations would provide that the IRS would not challenge any reasonably, consistently applied method of taxation for income earned by the escrow or account, and any reasonably, consistently applied method for reporting such income.

Absent definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust will (i) treat each Disputed Claims Reserve as a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim in the Class of Claims to which such reserve relates, in accordance with the trust provisions of Code, and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties shall report consistently with such treatment.

Accordingly, subject to issuance of definitive guidance, the Litigation Trust, in each case as fiduciary for Holders of Disputed Claims, will report as subject to a separate entity level tax any amounts earned by its respective Disputed Claims Reserves, except to the extent such earnings are distributed by such fiduciary during the same taxable year. In such event, any amount earned by a Disputed Claims Reserve that is distributed to a Holder during the same taxable year will be includible in such Holder's gross income.

6.    Consequences to Holders of Allowed Class D Old Equity Interests

Pursuant to the Plan, on the Effective Date, all Old Equity Interests shall be deemed canceled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Old Equity Interests.

For U.S. federal income tax purposes, the tax consequences arising from the cancellation of a Old Equity Interest are complex, and may give rise to a deemed distribution to such Holder and/or an allocation of COD income, as described in more detail above under "Certain U.S. Federal Income Tax Consequences to Reorganized Debtors." Holders of Old Equity Interests are urged to consult with their own tax advisers regarding such consequences.

7.    Accrued but Unpaid Interest

A portion of the consideration received by Holders of Claims may be attributable to accrued but unpaid interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, it is possible that a Holder of Claims may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Claims was previously included in the U.S. holder's gross income but was not paid in full by Debtors. The character of such loss may be ordinary rather than capital, but the tax law is unclear on this issue.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes. The IRS could take the position, however, that the consideration received by the Holder should be allocated in some way other than as provided

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

8.    Market Discount

Holders who exchange Allowed Claims for their pro rata share of each of (a) the New First Lien Notes, (b) Newco Equity Interests, and (c) Cash may be affected by the "market discount" provisions of sections 1276 through 1278 of the IRC. Under these provisions, some or all of the gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the IRC, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued market discount.

9.    Issue Price

For U.S. federal income tax purposes, the "issue price" of a debt instrument depends on whether such instrument is deemed to be "publicly traded." If, at any time during the 60-day period ending 30 days after the issue date of a debt instrument, a substantial amount of the debt instruments in an issue is "traded on an established market" within the meaning of the applicable Regulations, then the debt instrument will be treated as publicly traded and the issue price of the debt instrument will equal the fair market value of that debt instrument on the date of issuance. In general, a debt instrument will be treated as traded on an established securities market if it is listed on a major securities exchange, appears on a system of general circulation that provides a reasonable basis to determine fair market value or otherwise is,

among other things, readily quotable by dealers, brokers or traders. For purposes of applying these rules, each tranche of new debt instruments is treated as a separate issue.

If a tranche of new debt instrument is not publicly traded and the old Claim exchanged for such new debt instrument in such tranche is also not publicly traded, then the issue price of that new debt instrument generally would equal the stated principal amount of such debt instrument. Holders of Claims should consult their tax advisors regarding the issue prices for New First Lien Notes.

10.    Claim Purchase

For U.S. federal income tax purposes, the sale of an Allowed Class C-1 Claim for Cash should be a taxable exchange under section 1001 of the IRC. A Holder who receives Cash in exchange for its Allowed Class C-1 Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and (b) the Holder's adjusted basis in its Allowed Class C-1 Claim. Such gain or loss may be ordinary or capital in nature (subject to the "market discount" rules described above) and may be long-term capital gain or loss if the Class C-1 Claim was held for more than one year. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognized ordinary interest income (as described herein).

C.    Other Tax Matters

1.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is provided to the IRS.

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRS.

The Plan may impose additional U.S. federal income tax filing requirements on indirect holders of the Newco Equity Interests reflecting the activities on the Effective Date, as discussed above in Section B.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

2.    <u>Importance of Obtaining Professional Tax Assistance</u>

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### Article VIII.
### RECOMMENDATION

In the opinion of the First Lien Steering Committee, the Plan is preferable to the alternatives described herein because it provides for a larger distribution to the Holders of Claims than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased Administrative Claims resulting in smaller distributions to the Holders of Claims. **Accordingly, the First Lien Steering Committee recommends that Holders of Claims entitled to vote on the Plan support Confirmation and vote to accept the Plan.**

*[Remainder of Page Intentionally Left Blank]*

**Article IX.**
**CONCLUSION**

    The First Lien Steering Committee believes that the Plan is in the best interests of Creditors and urges such parties to vote to accept the Plan.

Dated:  November 23, 2009                THE FIRST LIEN STEERING COMMITTEE

                                  By: <u>Its Counsel</u>

By:    <u>/s/ Philip C. Dublin</u>
           Nile Leatham (NV Bar No. 002838)
           KOLESAR & LEATHAM
           Wells Fargo Financial Center
           3320 W. Sahara Ave.
           Las Vegas, NV 89102
           (702) 979-2357 (Telephone)
           (702) 362-9472 (Facsimile)
           Nleatham@klnevada.com

           AKIN GUMP STRAUSS HAUER & FELD LLP
           Philip C. Dublin (NY Bar No, 2959344)
           Abid Qureshi (NY Bar No. 2684637)
           One Bryant Park
           New York, New York 10036
           (212) 872-1000 (Telephone)
           (212) 872-1002 (Facsimile)
           pdublin@akingump.com
           aqureshi@akingump.com

           *Counsel for the First Lien Steering Committee*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

LIST OF EXHIBITS

| Exhibit | | Description |
|---------|---|-------------|
| A | ................................................... | Plan of Reorganization |
| B | ................................................... | Debtors' Organizational Chart |
| C | ................................................... | Current Cash Collateral Budget |
| D | ................................................... | Going Concern Analysis |
| E | ................................................... | Liquidation Analysis |
| F | ................................................... | Pending Litigation |
| G | ................................................... | Litigation Trust Assets |
| H | ................................................... | Claim Purchase Schedule |
| I | ................................................... | Litigation Trust Agreement |
| J | ................................................... | Newco LLC Operating Agreement |
| K | ................................................... | New First Lien Credit Agreement |
| L | ................................................... | Schedule of Causes of Action |
| M | ................................................... | Asset and Stock Transfer Agreement |
| N | ................................................... | Schedule of Assumed Executory Contracts and Unexpired Leases |

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com