1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:      nleatham@klnevada.com

Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002

E-Mail:      pdublin@akingump.com
             aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

*Electronically Filed*
*January 11, 2010*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, New York 10036**
**Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

IN RE:

THE RHODES COMPANIES, LLC,
   aka "Rhodes Homes," *et al.*,

       Debtors.[1]

§
§
§
§
§
§
§
§
§
§

**Case No. 09-14814-LBR**
**(Jointly Administered)**

**Chapter 11**

**Hearing Date: January 14, 2010**
**Hearing Time: 9:00 a.m.**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

| | |
|---|---|
| **Affects:** | § |
| ☒ **All Debtors** | § |
| ☐ **Affects the following** | § |
| **Debtor(s)** | § |

§  **FIRST LIEN STEERING COMMITTEE'S**
§  **MEMORANDUM OF LAW IN SUPPORT OF**
§  **CONFIRMATION OF THE SECOND**
§  **AMENDED MODIFIED PLAN OF**
§  **REORGANIZATION PURSUANT TO**
§  **CHAPTER 11 OF THE BANKRUPTCY**
§  **CODE FOR THE RHODES COMPANIES,**
§  **LLC, ET AL.**

The First Lien Steering Committee (the "First Lien Steering Committee"), consisting

of certain unaffiliated lenders under the Credit Agreement dated as of November 21, 2005

among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch

General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders

(collectively, the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch, as

Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead

Arranger, by and through its undersigned counsel, hereby files this Memorandum of Law

(the "Memorandum") in Support of the Second Amended Modified Plan of Reorganization

Pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC, *et al*. (the

"Plan").  In support of this Memorandum, the First Lien Steering Committee respectfully

represents as follows:

**PRELIMINARY STATEMENT**[2]

1.      Over the course of the Debtors' Chapter 11 Cases, the First Lien Steering

Committee has worked constructively with the Debtors, the Rhodes Entities, the Creditors'

Committee, the Second Lien Agent, the First Lien Agent and all other parties in interest

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

towards the goal of achieving a confirmable, consensual plan of reorganization.  The Plan represents the realization of that goal.

2.     Through extensive negotiations culminating in the Mediation Settlement (as defined below), the First Lien Steering Committee has proposed a Plan that (i) provides a meaningful recovery to both the Debtors' secured and unsecured creditors and (ii) is supported by virtually all of the major parties-in-interest in the Debtors' Chapter 11 Cases. In light of the considerable support enjoyed by the Plan among the Debtors' creditors, the First Lien Steering Committee believes that the Plan provides the best mechanism for maximizing the value of the Debtors' Estates for the benefit of all creditors and facilitating the Debtors' emergence from bankruptcy.

3.     Moreover, the First Lien Steering Committee submits that this Memorandum, together with the additional evidence to be adduced at the Confirmation Hearing (as defined below), demonstrates that the Plan satisfies all of the requirements for confirmation under the Bankruptcy Code and should therefore be confirmed.

## **BACKGROUND**

**A.     The Debtors and the Chapter 11 Cases**

4.     The Debtors are primarily engaged in the business of building and selling detached homes in Nevada.  In total, the Debtors have developed 40 communities since their founding in 1988, generating over $2.4 billion in total revenues.  The Debtors have built more than 6,000 homes in the Las Vegas valley during the past two decades.

5.     In connection with the nationwide downturn in the housing market in 2008, the Las Vegas housing market and the Debtors' businesses began to decline.  At the end of the fourth quarter of 2008, sales in the Las Vegas housing market of new, detached homes

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

were down 93% (to 522 net sales) from the peak (7,731 quarterly net sales) that occurred in the second quarter of 2005.  The median base price for a detached single family home dropped 39% from the peak achieved in the fourth quarter of 2005.

6.    Although the Debtors made cost reductions in general overhead and other areas, including employee layoffs, many factors, including the severe downturn of the Las Vegas market, significant supply overhang, and general economic malaise combined to create an environment where the Debtors were unable to meet their March 2009 debt and amortization payments.  The First Lien Steering Committee was formed in early March 2009 to negotiate the terms of a forbearance agreement and consensual restructuring with the Debtors after it became apparent that the Debtors would not be able to make their regularly scheduled interest and amortization payments under the First Lien Credit Agreement.

7.    On March 31, 2009, an interest payment in the amount of approximately $9 million and a principal payment in the amount of $10.75 million was due and owing on the First Lien Credit Agreement and an interest payment in the amount of approximately $2.4 million was due and owing on the Second Lien Credit Agreement.  Despite extended and intensive negotiations between the First Lien Lenders and the Debtors, the parties were unable to reach agreement, and the Debtors commenced the Chapter 11 Cases on March 31, 2009 and April 1, 2009 (collectively, the "Petition Date").

8.    Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtors are currently authorized to operate their businesses and manage their properties as debtors in possession.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

9.      On May 26, 2009, pursuant to Bankruptcy Code section 1102, the United States Trustee for the District of Nevada appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee").  The Creditors' Committee currently consists of four members: G.C. Wallace, Inc.; Interstate Plumbing & Air Conditioning; M & M Electric, Inc.; and Southwest Iron Works, LLC.

**B.      The Mediation Settlement and the Plan**

10.      On August 17, 24 and 25, 2009, the First Lien Steering Committee, the Second Lien Agent, the Creditors' Committee, the Debtors and the Rhodes Entities (collectively, the "Mediation Parties") participated in a mediation over the terms of a proposed plan of reorganization for the Debtors before the Honorable Richard Neiter of the United States Bankruptcy Court for the Central District of California.  During the mediation, the Mediation Parties reached an agreement in principle on a comprehensive settlement (the "Mediation Settlement").  The Plan embodies the terms of the Mediation Settlement.

11.      In general, the Mediation Settlement and the Plan provide, among other things, that the First Lien Lenders will assume ownership of the Debtors and will continue to operate the Debtors as a going concern homebuilder primarily in the Las Vegas, Nevada market.  In addition, the First Lien Lenders will receive, on account of their Secured Claims, $1.5 million in Cash from their collateral and their pro rata share of $50 million in new secured notes.  The First Lien Lenders will use the $1.5 million Cash portion of their recovery to purchase the Claims of many of the Debtors' creditors that hold General Unsecured Claims for the allowed amount of such Claim.  The Second Lien Lenders will receive 50% of the net proceeds of certain pending litigation on account of their Secured Claims.  The Rhodes Entities will, among other things, pay $3.5 million in Cash to the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Reorganized Debtors and will receive, among other things, (i) a limited release as described in the Plan and (ii) certain assets located in Arizona. The Plan also provides for the establishment of a Litigation Trust that will pursue certain Claims and Causes of Action belonging to the Debtors' Estates for the benefit of those creditors holding General Unsecured Claims whose Claims are not purchased by the First Lien Lenders. The First Lien Lenders and the Second Lien Lenders will also receive distributions from the Litigation Trust as unsecured creditors on account of their First Lien Lender Deficiency Claims and Second Lien Lender Deficiency Claims.

**C.     Plan Solicitation Process and Voting Status**

12.     On December 1, 2009, the Court entered the Order (A) Approving the Adequacy of the First Lien Steering Committee's Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the First Lien Steering Committee's Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto (Docket No. 809) (the "Solicitation Procedures Order"). The Solicitation Procedures Order (i) approved the Disclosure Statement for the Plan as containing adequate information within the meaning of Bankruptcy Code section 1125(a), (ii) fixed December 1, 2009, as the record date for purposes of determining eligibility to vote to accept or reject the Plan, (iii) fixed January 4, 2010 at 4:00 p.m. (Pacific Time) as the deadline for submitting ballots accepting or reject the Plan, (iv) fixed January 4, 2010 at 4:00 p.m. (Pacific Time) as the deadline for filing objections to the Plan, (v) fixed January 11, 2010, as the deadline for filing the Memorandum, (vi) fixed January 11, 2010 as the deadline by which Omni Management Group, LLC (the "Claims and Solicitation Agent") must file its report

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

summarizing the results of voting on the Plan (the "Voting Report"), and (vii) fixed January 14, 2010 at 9:00 a.m. (Pacific Time) as the date and time for the hearing of the confirmation hearing (the "Confirmation Hearing") on the Plan.  The Solicitation Procedures Order also approved certain procedures for soliciting votes to accept or reject the Plan (the "Solicitation Procedures").

13.    In accordance with the Solicitation Procedures Order, the solicitation materials described in the Solicitation Procedures were transmitted to and served on all Holders of Claims that were entitled to vote to accept or reject the Plan, as well as certain other parties in interest in the Debtors' Chapter 11 Cases.

14.    On January 11, 2010, the Claims and Solicitation Agent filed its Voting Report setting forth the Plan voting results.  Pursuant to the Plan, each of the following Classes were entitled to vote on the Plan:  (i) Class A-1 (First Lien Lender Secured Claims); Class A-2 (Second Lien Lender Secured Claims); Class C-1 (General Unsecured Claims); Class C-2 (First Lien Lender Deficiency Claims); and Class C-3 (Second Lien Lender Deficiency Claims).  Classes A-1, A-2, C-2 and C-3 voted to accept the Plan.  Class C-1 voted to reject the Plan.  Holders of claims in Class A-3 (Other Secured Claims) and Class B (Priority Non-Tax Claims) are conclusively presumed to have accepted the Plan and were not entitled to vote on the Plan.  Holders of claims in Class C-4 (Subordinated Claims), Class D (Old Equity Interests) and Class E (Intercompany Claims) are deemed to have rejected the Plan and were not entitled to vote on the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**ARGUMENT**

**A.    The First Lien Steering Committee Satisfies the Burden of Proof under Bankruptcy Code Section 1129**

15.     To confirm the Plan, the First Lien Steering Committee must demonstrate that the Plan satisfies the applicable provisions of Bankruptcy Code section 1129 by a preponderance of the evidence.  As set forth by the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit") in *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship.)*, "[t]he bankruptcy court must confirm a Chapter 11 [plan proponent's] plan of reorganization if the [plan proponent] proves by a preponderance of the evidence" that the plan satisfies Bankruptcy Code section 1129.  115 F.3d 650, 653 (9th Cir. 1997); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1164-65 (5th Cir. 1993) (concluding that preponderance of the evidence is the appropriate standard for both consensual and nonconsensual plan confirmation); 7 *Collier on Bankruptcy* ¶ 1129.02[4], at 1129-22 (15th ed. rev. 2009) ("[T]he proponent bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied.").

16.     Based upon (i) the Disclosure Statement and all exhibits thereto, including the Going Concern Analysis and the Liquidation Analysis, (ii) the Declaration of Brian Osborne Certifying Tabulation of Ballots Regarding Vote on Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.*, dated January 11, 2010 (the "Osborne Declaration"), (iii) the Voting Report attached to the Osborne Declaration as Exhibit A, (iv) the Declaration of Richard Dix in Support of Confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies,

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

LLC, *et al.* (the "Dix Declaration"), and (v) any other declarations, testimony and evidence introduced at the Confirmation Hearing, the First Lien Steering Committee has proven by a preponderance of the evidence that all subsections of Bankruptcy Code section 1129 have been satisfied in respect of the Plan.

**B.      The Plan Complies with Bankruptcy Code Section 1122: Classification of Claims and Interests**

17.      Bankruptcy Code section 1122 governs the classification of claims or interests under a plan and provides, in pertinent part, as follows:

> [A] plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).  Under this section, the relevant inquiries are (i) whether all claims and interests in a class have substantially similar rights with respect to the debtor's assets, and (ii) whether there are sufficient business or legal justifications to justify separate classes of similar claims or interests.  *See Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*, 166 B.R. 892, 897 (B.A.P. 9th Cir. 1994) ("Separate classifications for unsecured creditors are only justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors'") (citation and internal quotation marks omitted); *Principal Mut. Life Ins. Co. v. Baldwin Park Towne Ctr., Ltd (In re Baldwin Park Towne Ctr., Ltd.)*, 171 B.R. 374, 376 (Bankr. C.D. Cal. 1994) (holding that substantially similar claims may be separately classified if there is some business or economic justification for doing so).

18.      Article III.A of the Plan provides for the classification of Claims and Interests in ten individual Classes, each based upon the legal nature and/or priority of such Claims and Interests.  Administrative Claims and Priority Tax Claims are not classified and are

separately treated in Article II of the Plan.  The Classes of Claims and Interests are as follows:

| Class | Claim or Interest Type |
|-------|------------------------|
| A-1 | First Lien Lender Secured Claims |
| A-2 | Second Lien Lender Secured Claims |
| A-3 | Other Secured Claims |
| B | Priority Non-Tax Claims |
| C-1 | General Unsecured Claims |
| C-2 | First Lien Lender Deficiency Claims |
| C-3 | Second Lien Lender Deficiency Claims |
| C-4 | Subordinated Claims |
| D | Old Equity Interests |
| E | Intercompany Claims |

19.     Each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Accordingly, the First Lien Steering Committee's classification of Claims and Interests does not prejudice the rights of Holders of such Claims and Interests.  *Steelcase, Inc v. Johnston (In re Johnston)*, 21 F.3d 323, 327-28 (9th Cir. 1994) (holding that separate classification was permissible and that bankruptcy courts have broad discretion to classify claims); *Tucson Self-Storage, Inc.*, 166 B.R. at 897 (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting); *State St. Bank & Trust Co. v. Elmwood, Inc. (In re Elmwood, Inc.)*, 182 B.R. 845, 849 (D. Nev. 1995) ("A plan may place substantially similar claims in different classes when a reasonable nondiscriminatory basis exists for such treatment.").  The classification of Claims and Interests in the Plan complies with Bankruptcy Code section 1122(a).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**C.      The Plan Complies with Bankruptcy Code Section 1123: Contents of the Plan**

**1.      11 U.S.C. § 1123(a)**

20.      Bankruptcy Code section 1123(a) sets forth eight requirements with which every chapter 11 plan must comply.  *See* 11 U.S.C § 1123(a).  As demonstrated below, the Plan fully complies with those requirements.

**a.      The Plan Designates Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1)**

21.      Bankruptcy Code section 1123(a)(1) requires that a plan designate classes of claims, other than claims of a kind specified in Bankruptcy Code sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap" period in an involuntary case), or 507(a)(8) (priority tax claims).  *See* 11 U.S.C. § 1123(a)(1).  As set forth above, Article III.A of the Plan designates 9 Classes of Claims and one Class of Interests and therefore complies with Bankruptcy Code section 1123(a)(1).

**b.      The Plan Specifies Unimpaired Classes – 11 U.S.C. § 1123(a)(2)**

22.      Bankruptcy Code section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan."  *See* 11 U.S.C. § 1123(a)(2).  Article III.B of the Plan specifies the Classes of Claims and Interests that are Unimpaired under the Plan, and thus the Plan complies with Bankruptcy Code section 1123(a)(2).

**c.      The Plan Adequately Specifies the Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)**

23.      Bankruptcy Code section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."  *See* 11 U.S.C. § 1123(a)(3).  Article III.B of the Plan specifies the treatment of those Claims and Interests that are Impaired under the Plan, and thus the Plan complies with Bankruptcy Code section 1123(a)(3).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

### d.    The Plan Provides for the Same Treatment for Claims or Interests Within the Same Class – 11 U.S.C. § 1123(a)(4)

24.    Bankruptcy Code section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  This provision provides creditors of the same class with a right to equality of treatment.  Article III.B of the Plan provides for equality of treatment for each Claim or Interest within a particular Class.  Thus, the Plan complies with Bankruptcy Code section 1123(a)(4).

### e.    The Plan Provides Adequate Means for Its Implementation – 11 U.S.C. § 1123(a)(5)

25.    Bankruptcy Code section 1123(a)(5) requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, sales of the debtor's property, satisfaction or modification of any lien, and issuance of securities of the debtor in exchange for claims or interests.  11 U.S.C. § 1123(a)(5).  Article IV of the Plan provides for, among other things: (i) the substantive consolidation of the Estates into a single Estate for all purposes associated with confirmation and distributions to be made under the Plan (*See* Plan Art. IV.A); (ii) the issuance of Newco Equity Interests (based upon the Newco Total Enterprise Value) to the Holders of First Lien Lender Secured Claims (*See* Plan Art. IV.B.1); (iii) the issuance of $50 million in New First Lien Notes to the Holders of First Lien Lender Secured Claims (*See* Plan Art. IV.B.2); (iv) the cancellation of Old Equity Interests and certain other existing securities (*See* Plan Art. IV.E); (v) any restructuring transaction deemed necessary or appropriate to effectuate the Plan (*See* Plan Art. IV.G); (vi) the selection of the initial board of directors and officers of the Reorganized Debtors

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(*See* Plan Art. IV.M); (vii) the establishment of a Litigation Trust for the benefit of Holders of Allowed Claims in Classes C-1, C-2 and C-3 (*See* Plan Art. IV.O); (viii) the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors pursuant to the terms of a stock transfer agreement (*See* Plan Art. IV.S); (ix) the payment of $3.5 million in Cash to the Reorganized Debtors by the Rhodes Entities on the Effective Date (*See* Plan Art. IV.T); and (x) the transfer of the Arizona Assets set forth on Attachment D to the Mediation Term Sheet to the Rhodes Entities (*See* Plan Art. IV.U).  In addition, the Plan provides that the Holders of First Lien Lender Secured Claims will receive $1.5 million in Cash from the proceeds of the First Lien Lenders' collateral for the purpose of purchasing the General Unsecured Claims set forth on Exhibit H to the Disclosure Statement.  *See* Plan Art. VII.F-G.  Thus, the Plan complies with Bankruptcy Code section 1123(a)(5).

> **f.    *Prohibition on the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6)***

26.    Bankruptcy Code section 1123(a)(6) requires a plan of reorganization to provide for the inclusion in a debtor's corporate charter of provisions prohibiting the issuance of non-voting equity securities and arranging "an appropriate distribution" of power among the classes of securities possessing voting power.  *See* 11 U.S.C. § 1123(a)(6). Article IV.J of the Plan expressly provides that:

> The organizational documents for Newco shall, among other things:
> (1) authorize issuance of the Newco Equity Interests; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

*See* Plan Art. IV.J.  The Plan therefore complies with Bankruptcy Code section 1123(a)(6).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

g.    *The Plan Contains Appropriate Provisions with Respect to the Selection of Post-Confirmation Directors and Officers – 11 U.S.C. § 1123(a)(7)*

27.    Bankruptcy Code section 1123(a)(7) provides that a plan may "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).

28.    Article IV.M of the Plan provides that the board of directors of the Reorganized Debtors or similar governing entities will be composed of one or more members appointed by the First Lien Steering Committee.  *See* Plan Art. IV.M.  In addition, the Plan provides that, on the Effective Date, a chief executive officer or similar officer selected by the board of directors of the Reorganized Debtors shall be appointed.  *See* Plan Art. IV.M.  Finally, the Plan provides that the identity of such officers and directors shall be disclosed at or prior to the Confirmation Hearing.  *See* Plan Art. IV.M.  The provisions of the Plan for the selection of directors and officers are consistent with the interests of creditors and Interest Holders and with public policy as to the manner and selection of any officer, director, or trustee and any successor thereto.  Moreover, as described further below, such Plan provisions satisfy the requirements of Bankruptcy Code section 1129(a)(5) in that the First Lien Steering Committee will disclose, on or prior to the Confirmation Date, the identity and affiliations of any Person proposed to serve on the initial boards of directors of the Reorganized Debtors and, to the extent such Person is an insider, the nature of any compensation to be paid to such Person.  *See* Notice of Disclosure of Directors and Officers Pursuant to 11 U.S.C. § 1129(a)(5) for Second Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC *et al.*  (Docket No.

14

911).  The classification and composition of the boards of directors of each of the

Reorganized Debtors will be consistent with each Reorganized Debtor's amended or restated

certificate of incorporation, as applicable, the other applicable constituent documents of each

Reorganized Debtor, and applicable law.  The Plan therefore complies with Bankruptcy

Code section 1123(a)(7).

> **h.** **Bankruptcy Code Section 1123(a)(8) is Not Implicated by the Plan – 11 U.S.C. § 1123(a)(8)**

29.    Bankruptcy Code section 1123(a)(8) states that a plan that is filed in a case in

which the debtor is an individual must "provide for the payment to creditors under the plan

of all or such portion of earnings from personal services performed by the debtor after the

commencement of the case or other future income of the debtor as is necessary for the

execution of the plan."  *See* 11 U.S.C. § 1123(a)(8).  Each of the Debtors are business

entities, and not individuals.  Accordingly, Bankruptcy Code section 1123(a)(8) is not

implicated by the Plan.

> **2.** **11 U.S.C. § 1123(b)**

30.    Bankruptcy Code section 1123(b) sets forth the permissive provisions that

may be incorporated into a chapter 11 plan, including any "provision not inconsistent with

the applicable provisions of [the Bankruptcy Code]."  *See* 11 U.S.C. § 1123(b)(6).

> **a.** **The Plan Impairs Certain Classes and Leaves Others Unimpaired – 11 U.S.C. 1123(b)(1)**

31.    Bankruptcy Code section 1123(b)(1) provides that a plan may "impair or

leave unimpaired any class of claims, secured or unsecured, or of interests."  11 U.S.C.

§ 1123(b)(1).  Pursuant to Article III.B of the Plan, Classes A-3 and B are Unimpaired, and

Classes A-1, A-2, C-1, C-2, C-3, C-4, D and E are Impaired.  The Plan complies with

Bankruptcy Code section 1123(b)(1).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

b.     *Treatment of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2)*

32.     Bankruptcy Code section 1123(b)(2) allows a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to Bankruptcy Code section 365.  Article V.A of the Plan provides that the Debtors' executory contracts and unexpired leases that have not been assumed or rejected pursuant to an order of the Court prior to the Effective Date shall be deemed rejected, except for those executory contracts and unexpired leases that (i) are listed on the schedule of Assumed Executory Contracts and Unexpired Leases attached to the Disclosure Statement as Exhibit N, (ii) are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract was previously rejected or is the subject of a motion to reject pending as of the Effective Date, (iii) are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to an order of the Court), (iv) are subject to a motion to reject with a requested effective date of rejection after the Effective Date, or (v) are otherwise expressly assumed or rejected pursuant to the Plan.

c.     *Settlement or Retention of Claims or Interests – 11 U.S.C. § 1123(b)(3)*

33.     Bankruptcy Code section 1123(b)(3) provides that a plan may provide for the settlement or retention of any claim or interest belonging to the debtor.  Article IV.P of the Plan provides that the Reorganized Debtors and/or the Litigation Trust, as applicable, shall retain and may enforce any and all Causes of Action, whether arising before or after the Petition Date, including those actions specifically enumerated on Exhibit L to the Disclosure Statement.  *See* Plan Art. IV.P.  Moreover, the Plan provides that the Reorganized Debtors

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1    and/or the Litigation Trust, as applicable, may pursue such Causes of Action in accordance

2    with the best interests of the Reorganized Debtors and the Litigation Trust, as applicable.

3    *See* Plan Art. IV.P.  The Causes of Action to be transferred to the Litigation Trust are

4    specifically set forth in Exhibit G to the Disclosure Statement.  *See* Disclosure Statement Ex.

5    G.

6

7            34.    Notwithstanding the foregoing, the Plan provides for (i) the release of the

8    Rhodes Entities from certain avoidance actions arising under chapter 5 of the Bankruptcy

9    Code, (ii) the release of the Released Parties (as defined below) from certain Claims and

10   Causes of Action belonging to the Debtors, and (iii) the voluntary release of First Lien

11   Lenders from certain Claims and Causes of Action that could be asserted by other First Lien

12   Lenders as part of the Mediation Settlement embodied in the Plan.  As more fully discussed

13   below, the First Lien Steering Committee believes that the Mediation Settlement is fair and

14   reasonable and that the releases granted in connection with the Mediation Settlement and the

15   Plan are appropriate.  The First Lien Steering Committee therefore submits that Bankruptcy

16   Code section 1129(b)(3) is satisfied.

17

18          **d.    *Other Appropriate Measures – 11 U.S.C. § 1123(b)(6)***

19          35.    Bankruptcy Code section 1123(b)(6) is a catch-all provision that permits

20   inclusion of any appropriate provision so long as it is consistent with the applicable

21   provisions of the Bankruptcy Code.  Article XII of the Plan provides that, among other

22   things, the Court shall retain jurisdiction over all matters arising out of and related to the

23   Chapter 11 Cases and the Plan.  This provision is appropriate because the Court otherwise

24   has jurisdiction over all of these matters during the pendency of the Chapter 11 Cases, and

25   case law establishes that a bankruptcy court may retain jurisdiction over the debtor or the

26

27

28

17

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

property of the estate following confirmation. *See Carraher v. Morgan Elecs., Inc. (In re Carraher)*, 971 F.2d 327, 328 (9th Cir.1992) (holding that bankruptcy courts may retain jurisdiction over related cases when the underlying bankruptcy case is dismissed). Accordingly, the continuing jurisdiction of the Court is consistent with applicable law and is therefore permissible under Bankruptcy Code section 1123(b)(6).

36.      Based upon the foregoing, the Plan fully complies with the requirements of Bankruptcy Code sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of Bankruptcy Code section 1129(a)(1).

**D.     The Plan Satisfies the Requirements of Bankruptcy Code Section 1129(a)**

*1.      The Plan Satisfies the Requirements of Bankruptcy Code Section 1129(a)(1)*

37.      Bankruptcy Code section 1129(a)(1) requires that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Section 1129(a)(1) has been interpreted by the courts as requiring that a plan comply with section 1122 (governing classification of claims) and 1123 (governing the contents of a plan). *Official Comm. of Unsecured Creditors of W. Farm Credit Bank v. Michelson (In re Michelson)*, 141 B.R. 715, 721 (Bankr. E.D. Cal. 1992); *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("Drexel I") (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan"); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (stating that "[p]aragraph (1) [of 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as §§ 1122 and 1123, governing classification of [a] plan"); H.R. REP. NO. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 (same). As discussed above, the Plan

complies fully with the requirements of both sections 1122 and 1123, as well as other provisions of the Bankruptcy Code.

### 2.    The Plan Proponent Has Complied with the Provisions of Title 11 as Required by Bankruptcy Code Section 1129(a)(2)

38.    Bankruptcy Code section 1129(a)(2) requires the proponent of a plan to comply "with the applicable provisions of this title." *See* 11 U.S.C. § 1129(a)(2). Whereas Bankruptcy Code section 1129(a)(1) focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code. *See* Lawrence P. King, 7 *Collier on Bankruptcy* ¶ 1129.03[2], at 1129-26 (15th ed. rev. 2006); *see also Andrew v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) ("Bankruptcy Code § 1127(b) requires that a modified plan must comply with Bankruptcy Code § 1129. Section 1129(a)(2) in turn requires that the proponent of the plan complies with the applicable provisions of Title 11."). In determining whether a plan proponent has complied with this section, courts focus on whether the disclosure and solicitation requirements adhere to Bankruptcy Code sections 1125 and 1126. *See, e.g.*, *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 192-93 (B.A.P. 9th Cir. 2003) (focusing its analysis under section 1129(b) on the adequacy of the disclosure and solicitation of the plan); *Drexel I*, 138 B.R. at 759 (noting that the legislative history of section 1129(a)(2) explains that this provision embodies the disclosure and solicitation requirements under sections 1125 and 1126); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part, on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) (stating that "[o]bjections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code"); *see also* S. Rep. No.

95-989, 95th Cong., 2d Sess. 126 (1978) (stating that section 1129(a)(2) "requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure"); H.R. REP. NO. 95-595, 95th Cong., 1st Sess. 412 (1977). The First Lien Steering Committee has complied with the applicable provisions of title 11, including the provisions of sections 1125 and 1126 regarding the adequacy of disclosure and plan solicitation.

39.     Pursuant to the Solicitation Procedures Order entered on December 1, 2009, after notice and a hearing, this Court approved the Disclosure Statement pursuant to Bankruptcy Code section 1125(b) as containing "adequate information" of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the Holders of Claims entitled to vote on the Plan to make an informed judgment as to whether to accept or reject the Plan. As evidenced by the Certificate of Service of Nova George, filed December 9, 2009, each Holder of a Claim or Interest received the materials required by the Solicitation Procedures Order, including, for Holders of Claims entitled to vote, the Disclosure Statement (which includes, as an exhibit, a copy of the Plan), and a Ballot. The Solicitation Packages were transmitted in connection with the solicitation of votes to accept or reject the Plan in compliance with Bankruptcy Code section 1125 and the Solicitation Procedures Order. *See* 11 U.S.C. §§ 1125(b) and (c). The First Lien Steering Committee did not solicit votes on the Plan prior to the transmission of the Disclosure Statement.

40.     Bankruptcy Code section 1126 specifies the requirements for acceptance of the Plan. Under Bankruptcy Code section 1126, only holders of allowed claims in impaired classes of claims that will receive or retain property under a plan of reorganization on account of such claims may vote to accept or reject such plan. As set forth in the Osborne

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  Declaration, in accordance with Bankruptcy Code section 1126, the First Lien Steering

2  Committee solicited acceptances of the Plan from the Holders of all Claims in each Class of

3  Impaired Claims that is to receive distributions under the Plan.  The Impaired Classes

4  entitled to vote under the Plan are Classes A-1, A-2, C-1, C-2 and C-3.  *See* Plan Art. III.B.

5  The Plan reflects that Classes A-3 and B are Unimpaired and thus are conclusively

6  presumed to have accepted the Plan.  *See* Plan Art. III.B.  The Plan also reflects that Holders

7  of Claims and Interests in Classes C-4, D and E will receive no property under the Plan and

8  are conclusively presumed to have rejected the Plan.  *See* Plan Art. III.B.  In accordance

9  with Article III.C. of the Plan, the First Lien Steering Committee did not solicit acceptances

10  from the Holders of Claims and Interests in such Classes.  Based upon the foregoing, the

11  requirements of Bankruptcy Code section 1129(a)(2) have been satisfied.

12  **3.    The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3)**

13  41.    Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in

14  good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Ninth

15  Circuit has held that, although the Bankruptcy Code does not define "good faith," "[a] plan

16  is proposed in good faith where it achieves a result consistent with the objectives and

17  purposes of the Code."  *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002) (citing *Ryan v. Loui ( In re Corey )*, 892 F.2d

18  829, 835 (9th Cir.1989)).  "[F]or purposes of determining good faith under section

19  1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will

20  fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."

21  *Id.* (quoting *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th

22  Cir. 1988).  A plan may also be found to have been proposed in good faith where there is a

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  showing that "the plan was proposed with honesty and good intentions and with a basis for

2  expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp. (In re*

3  *Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (citing *Koebl v. Glessing* (*In re*

4  *Koebl*), 751 F.2d 137, 139 (2d Cir. 1984) (quoting *Manati Sugar Co. v. Mock*, 75 F.2d 284,

5  285 (2d Cir. 1935)).  Moreover, "[w]here the plan is proposed with the legitimate and honest

6  purpose to reorganize and has a reasonable hope of success, the good faith requirement of

7  section 1129(a)(3) is satisfied." *Brite v. Sun Country Dev., Inc. (In re Sun Country Dev.,*

8  *Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).  The requirement of good faith must be viewed in

9  light of the totality of the circumstances surrounding the establishment of a chapter 11 plan.

10  *Sylmar Plaza, L.P.*, 314 F.3d at 1074.  The Plan achieves these goals by enabling the

11  Debtors to emerge from bankruptcy and continue in the operation of their businesses while

12  providing creditors with substantial satisfaction of their Claims.

13        42.    The Plan is the product of extensive negotiations and embodies the terms of

14  the Mediation Settlement.  The Mediation Settlement was reached among the First Lien

15  Steering Committee, the Debtors, the Rhodes Entities, the Creditors' Committee and the

16  Second Lien Agent following a three day mediation session held on August 17, 24 and 25,

17  2009 before the Honorable Richard Neiter of the United States Bankruptcy Court for the

18  Central District of California.  As more fully discussed below, the First Lien Steering

19  Committee believes that the Mediation Settlement is fair and reasonable and should be

20  approved by the Court.  In addition, the First Lien Steering Committee, the Debtors, the

21  Creditors' Committee and the Second Lien Agent all support the Plan, and have encouraged

22  the Holders of Claims in Classes entitled to vote to accept the Plan.  The support of these

23  constituencies reflects the collective acknowledgement by the Debtors' major creditors that

the Plan provides fundamental fairness and the greatest possible recovery to all creditors. *See In re Eagle-Picher Indus.*, 203 B.R. 256, 274 (Bankr. S.D. Ohio 1996), *aff'd*, 172 F.3d 48 (6th Cir. 1998) (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive negotiations among the plan proponents and other parties in interest).

### 4. The Plan Provides for Court Approval of Payment of Services and Expenses – 11 U.S.C. § 1129(a)(4)

43.    Bankruptcy Code section 1129(a)(4) provides that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." *See* 11 U.S.C. § 1129(a)(4). This subsection requires that any and all postpetition fees in the bankruptcy case be disclosed and subject to the court's review. *See In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. 756, 774 (Bankr. D. Nev. 1998) (noting that "[a]ll payments made or to be made by [the debtor] for services or for costs and expenses in or in connection with the case, or in connection with a plan and incident to the case, have been approved by, or are subject to the approval of, the court as reasonable as required by 11 U.S.C. § 1129(a)(4)."); *In re Pomare, Ltd.*, No. 08-01448, 2009 WL 3232851, *7 (Bankr. D. Haw. Oct. 2, 2009) (confirming plan with all post-confirmation fees subject to court approval).

44.    Pursuant to the interim application procedures established in the Chapter 11 Cases, the Court has authorized and approved the payment of certain fees and expenses of Professionals retained in the Chapter 11 Cases. Except as otherwise ordered by the Court, all such fees and expenses, as well as all other accrued fees and expenses of Professionals

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

through the Effective Date, remain subject to final review for reasonableness by the Court

under Bankruptcy Code section 331.  In addition, pursuant to Bankruptcy Code sections

503(b)(3) and (4), the Court must review any application for substantial contribution

compensation to ensure compliance with the statutory requirements and that the fees

requested are reasonable.

45.    The Plan also specifically provides for the review of fees and expenses to be

paid to Professionals.  Article IX.A.1 of the Plan provides that all final requests for payment

of the fees and expenses of Professionals retained in the Chapter 11 Cases must be filed no

later than 45 days after the Effective Date, and that the allowed amounts of such fees and

expenses shall be determined by the Court.  Additionally, Article IX.A.5 of the Plan

provides that any Entity requesting compensation or reimbursement of expenses for making

a substantial contribution to the Chapter 11 Cases pursuant to Bankruptcy Code sections

503(b)(3), (4) or (5) must file an application for allowance of fees and expenses with the

Court by no later than the Administrative Claim Bar Date.

46.    The foregoing procedures for the Court's review and ultimate determination

of the fees and expenses to be paid to Professionals participating in the Chapter 11 Cases

satisfy the objectives of section 1129(a)(4).  *See In re Sagewood Manor Assocs. Ltd. P'ship*,

223 B.R. at 774; *In re Elsinore Shore Assocs*., 91 B.R. 238, 268 (Bankr. D.N.J. 1988)

(requirements of section 1129(a)(4) satisfied where plan provided for payment of only

"allowed" administrative expenses); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr.

S.D. Ohio 1988) ("Court approval of payments for services and expenses is governed by

various Code provisions – e.g. §§ 328, 329, 330, 331, and 503(b) – and need not be

explicitly provided for in a Chapter 11 plan."); 5 *Collier on Bankruptcy* ¶ 1129.02[4], at

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1129-33, 1129-34 (15th ed. rev. 1993).  Based upon the foregoing, the Plan complies with

the requirements of Bankruptcy Code section 1129(a)(4).

### 5. All Necessary Information Regarding the Directors and Officers of the Debtors Under the Plan has been Disclosed – 11 U.S.C. § 1129(a)(5)

47.    Bankruptcy Code section 1129(a)(5) requires that (i) the plan disclose the

identity and affiliations of the proposed officers and directors of the reorganized debtors,

(ii) the appointment or continuance of such officers and directors be consistent with the

interests of creditors and equity security holders and with public policy, and (iii) there be

disclosure of the identity and compensation of any insiders to be retained or employed by

the reorganized debtors.  *See* 11 U.S.C. § 1129(a)(5).

48.    The First Lien Steering Committee has satisfied the foregoing requirements.

In accordance with Article IV.M, the First Lien Steering Committee has disclosed the

identity of the officers and directors of the Reorganized Debtors to the Court.  On January

11, 2010, the First Lien Steering Committee filed the Notice of Disclosure of Directors and

Officers Pursuant to 11 U.S.C. § 1129(a)(5) for Second Amended Modified Plan of

Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies,

LLC, *et al.* (the "Notice of Disclosure") disclosing that as of the Effective Date, Dunhill

Homes will provide management services to the Reorganized Debtors and disclosing the

terms of compensation to be paid for such management services.  The Notice of Disclosure

also discloses (i) the identity of the members of the initial board of directors of the

Reorganized Debtors, (ii) the identity of the Litigation Trustee, and (iii) the compensation to

be provided to each of the foregoing.

49.    Based upon the foregoing, the Plan satisfies the requirements of Bankruptcy

Code section 1129(a)(5).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

**6.    The Plan Does Not Contain Rate Changes Subject to the Jurisdiction of any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)**

50.    Bankruptcy Code section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in a plan of reorganization.  *See* 11 U.S.C. § 1129(a)(6).  Bankruptcy Code 1129(a)(6) is inapplicable because the Plan does not provide for a change in any rates subject to regulatory approval.  As this provision is inapplicable to the Plan, the requirements of Bankruptcy Code section 1129(a)(6) have been satisfied.

**7.    The Plan is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7)**

51.    Bankruptcy Code section 1129(a)(7) requires that a plan be in the best interests of creditors and stockholders.  The best interests test focuses on individual dissenting creditors rather than classes of claims.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).  Under the best interests test, the court must find that each non-accepting creditor will receive or retain value that is not less than the amount such creditor would receive if the debtor were liquidated.  *See 203 N. LaSalle*, 526 U.S. at 441-42; *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996).  As Bankruptcy Code section 1129(a)(7) makes clear, this liquidation analysis applies only to non-accepting impaired claims or equity interests.  If a class of claims or equity interests unanimously accepts the plan, the best interests test is automatically deemed satisfied for all members of that class.

52.    The best interests test is satisfied as to each Unimpaired Class of Claims.  Pursuant to Bankruptcy Code section 1126(f), each Holder of a Claim in Classes A-3 and B is deemed to have accepted the Plan.  *See* 11 U.S.C. § 1126(f).  Therefore, the best interests

26

test is satisfied with respect to those Classes.  Further, as noted above, the best interests test

is deemed satisfied for all Holders of Claims in Classes A-1, A-2, C-2 and C-3 that voted to

accept the Plan.  Because a chapter 7 liquidation of the Debtors' Estates would result in a

distribution that is the same as or lower than the distributions described for each Holder of a

Claim or Interest in Classes C-1, C-4, D and E, the best interests test is likewise satisfied as

to (a) each Holder of a Claim in Class C-1 that voted to reject the Plan; and (b) each Holder

of a Claim or Interest in Classes C-4, D and E that was deemed to have rejected the Plan.

53.     Specifically, the First Lien Steering Committee believes that in the context of

a chapter 7 liquidation, the Debtors' secured creditors, including the First Lien Lenders,

would not be paid in full, and the Holders of Claims and Interests in Classes A-2, B, C-1, C-

2, C-3, C-4, D and E would receive no recovery.  In addition, the First Lien Steering

Committee believes that the value of the Debtors' land assets would be materially reduced in

a chapter 7 liquidation in light of (i) the depressed state of the homebuilding and real estate

markets, (ii) the limited availability of credit, and (iii) the expedited sale process typically

associated with liquidations.

54.     Exhibits D and E to the Disclosure Statement set forth the Going Concern

Analysis and Liquidation Analysis for the Debtors.  The Going Concern Analysis and the

Liquidation Analysis demonstrate that each Holder of an Impaired Claim against or Interest

in the Debtors will receive or retain under the Plan, on account of such Claim or Interest,

property of a value, as of the Effective Date, that is not less than the amount that such

Holder would receive or retain if the Debtors were liquidated under chapter 7 of the

Bankruptcy Code.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

55.    Based on the foregoing, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(7).

### 8.    *Acceptance by all Impaired Classes – 11 U.S.C. § 1129(a)(8)*

56.    Bankruptcy Code section 1129(a)(8) requires that each class of impaired claims or interests accept the plan:  "With respect to each class of claims or interests - (A) such class has accepted the plan; or (B) such class is not impaired under the plan."  11 U.S.C. § 1129(a)(8).  Regardless of the outcome of the votes on the Plan, the Claims and Interests in Classes C-4, D and E are Impaired and deemed to reject the Plan under Bankruptcy Code section 1126(f) because they are not entitled to a recovery under the Plan, and thus section 1129(a)(8) is not satisfied.  As a result, the First Lien Steering Committee must satisfy the "cram down" requirements of Bankruptcy Code section 1129(b) (as discussed below in Section E) to confirm the Plan.

### 9.    *The Plan Provides for Payment in Full of all Allowed Priority Claims – 11 U.S.C. § 1129(a)(9)*

57.    Bankruptcy Code section 1129(a)(9) requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) requires a plan to provide as follows:

(1)    with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(2)    with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive -

(a)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

(b)    if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(3)    with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash -

(a)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(b)    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(c)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b));

(4)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9).

58.    In accordance with sections 1129(a)(9)(A) and (B), Article II.A of the Plan provides that all Allowed Administrative Claims shall be paid in full in Cash (i) on the later of (a) the Effective Date, (b) the date on which the Court enters an order allowing such Allowed Administrative Claim, or (c) the date on which the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent) and the Holder of such Allowed Administrative Claim otherwise agree, and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Debtors, (b) are Allowed by the Court, (c) may be agreed upon between the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent) or (d) may otherwise be required under applicable

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

law.  Allowed Administrative Claims relating to liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors or by the Reorganized Debtors in the ordinary course of business and subject to the conditions of the agreements governing or relating to such obligations.  Thus, the Plan satisfies the requirements of Bankruptcy Code sections 1129(a)(9)(A) and (B).

59.    The Plan also satisfies the requirements of Bankruptcy Code section 1129(a)(9)(C) with respect to the treatment of Priority Tax Claims.  Pursuant to Article II.B of the Plan, Holders of Allowed Priority Tax Claims will be paid in full, in Cash, upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (iii) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) upon such other terms as may be agreed to between the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), and any Holder of an Allowed Priority Tax Claim.  Article II.B of the Plan further provides that, in lieu of payment in full on the Effective Date, the Reorganized Debtors or the Debtors may make deferred Cash payments, together with interest as provided in the Plan, in respect of Allowed Priority Tax Claims.  Based on the foregoing, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9).

**10.    *The Plan Has Been Accepted by at Least One Impaired Class that is Entitled to Vote – 11 U.S.C. § 1129(a)(10)***

60.    Bankruptcy Code Section 1129(a)(10) requires that, if a class of claims is impaired under a plan, at least one class of impaired claims must have voted to accept the plan.  *See* 11 U.S.C. § 1129(a)(10).  The Plan satisfies that requirement.  Classes A-1, A-2, C-2 and C-3 have each voted to accept the Plan.  These Classes, therefore, qualify as

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

impaired accepting classes and satisfy the requirement of Bankruptcy Code section 1129(a)(10).

### 11.    The Plan is Not Likely to be Followed by Liquidation or the Need for Further Financial Reorganization – 11 U.S.C. § 1129(a)(11)

61.    Bankruptcy Code section 1129(a)(11) requires that, as a condition precedent to confirmation, the court determine that the plan is feasible.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  As discussed in Article V.C of the Disclosure Statement, the Plan is feasible within the meaning of this provision.

62.    The feasibility test set forth in section 1129(a)(11) requires the court to determine whether the plan is workable and has a reasonable likelihood of success.  *See United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th Cir. 1986) (finding that a plan met the feasibility requirement under section 1129(a)(11) where the debtor presented evidence demonstrating that the plan had a reasonable probability of success); *Kane v. Johns-Manville Corp (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988).

63.    On feasibility, the Ninth Circuit has held that "'[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"  *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11], at 1129-34 (15th ed. rev. 1984)).  Nevertheless, "only 'a relatively low threshold of proof [is] necessary

to satisfy the feasibility requirement.'"  *In re Sagewood Manor Assocs. Ltd. P'ship*, 223

B.R. 756, 762 (Bankr. D. Nev. 1998) (quoting *Berkely Fed. Bank & Trust v. Sea Garden

Motel & Apartments (In re Sea Garden Motel and Apartments)*, 195 B.R. 294, 305 (D.N.J.

1996) (alteration in original)).  "The key element of feasibility is whether there exists a

reasonable probability that the provisions of the plan of reorganization can be performed."

*Id.*  "[T]he feasibility standard is whether the plan offers a reasonable assurance of success.

Success need not be guaranteed."  *In re Johns-Manville Corp.*, 843 F.2d at 649; *see also In

re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("Feasibility does not, nor can it,

require the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th

Cir. 1986); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *168 ("The feasibility test set

forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable

and has a reasonable likelihood of success."); *In re One Times Square Assocs. Ltd. P'ship*,

159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993), *aff'd* 165 B.R. 773 (S.D.N.Y.), *aff'd* 41 F.3d

1502 (2d Cir. 1994) ("It is not necessary that the success be guaranteed, but only that the

plan present a workable scheme of reorganization and operation from which there may be a

reasonable expectation of success.") (quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11], at

1129-54 (15th ed. rev. 1992)); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr.

S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection

of the [Bankruptcy] Code is not the standard under § 1129(a)(11).").

64.    The key element of feasibility is whether there exists a reasonable probability

that the provisions of the plan can be performed.  The purpose of the feasibility test is to

protect against visionary or speculative plans.  *See Pizza of Haw., Inc.*, 761 F.2d at 1382.

"Just as speculative prospects of success cannot sustain feasibility, speculative prospects of

32

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds." *In re Drexel I*, 138 B.R. at 762.

65.    Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

(i)    the adequacy of the capital structure;

(ii)    the earning power of the business;

(iii)    economic conditions;

(iv)    the ability of management;

(v)    the probability of the continuation of the same management; and

(vi)    any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. at 763; *In re Trans Max Techs., Inc.*, 349 B.R. 80, 92 (Bankr. D. Nev. 2006); *see also In re Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (citing 7 *Collier on Bankruptcy* ¶ 1129.LH[2], at 1129-82 (15th ed. rev. 1996)); *In re Texaco*, 84 B.R. 893, 910 (Bankr. S.D.N.Y 1988); *Prudential Energy*, 58 B.R. at 862-63.  The foregoing list is neither exhaustive nor exclusive.  *In re Sagewood Manor Assocs. Ltd. P'ship*, 223 B.R. at 763; *Drexel I*, 138 B.R. at 763.  The Plan satisfies these standards of feasibility.

66.    For purposes of determining whether the Plan satisfies the above-described feasibility standards, the First Lien Steering Committee has analyzed the Reorganized Debtors' ability to fulfill their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.  As part of this analysis, the First Lien Steering Committee has prepared financial projections for the Reorganized Debtors for the years

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

2010 through 2014 (the "Projections"). The Projections are attached to the Disclosure Statement as Exhibit D and are discussed in detail in Articles V.C and V.D of the Disclosure Statement. Based upon the information contained in the Disclosure Statement and the Projections, the First Lien Steering Committee believes that the Reorganized Debtors will have the financial capability to satisfy their obligations following the Effective Date pursuant to the Plan.

67. Based upon the foregoing, the Plan is feasible because there is a reasonable likelihood that the Reorganized Debtors will meet their financial obligations under the Plan in the ordinary course of business, and because confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Reorganized Debtors. The Plan therefore satisfies the feasibility standard of Bankruptcy Code section 1129(a)(11).

**12.    *The Plan Provides for Full Payment of all Statutory Fees – 11 U.S.C. § 1129(a)(12)***

68. Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 [title 28, the United States Code], as determined by the court at the hearing on confirmation of the plan...." 11 U.S.C. § 1129(a)(12). Bankruptcy Code section 507 provides that "any fees and charges assessed against the estate under [section 1930,] chapter 123 of title 28" are afforded priority as administrative expenses. *Id*. at § 507(a)(2). In accordance with Bankruptcy Code sections 507 and 1129(a)(12), Article II.A of the Plan provides that all such fees and charges will be paid in full, in Cash. Thus, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(12).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

### 13. *11 U.S.C. § 1129(a)(13) is Inapplicable as the Debtors Have No Retiree Obligations*

69.    Bankruptcy Code section 1129(a)(13) requires a plan to provide for retiree benefits at levels established pursuant to Bankruptcy Code section 1114. *See* 11 U.S.C. § 1129(a)(13). Because the Debtors have no retiree benefit obligations, Bankruptcy Code section 1129(a)(13) is inapplicable to the Plan.

### 14. *The Debtors Do Not Need to Pay Domestic Support Obligations – 11 U.S.C. § 1129(a)(14)*

70.    Bankruptcy Code section 1129(a)(14) requires individual chapter 11 debtors who are required by judicial or administrative order, or by statute, to pay a domestic support obligation. *See* 11 U.S.C. § 1129(a)(14). Each of the Debtors are business entities and are not required to pay domestic support obligations. Accordingly, Bankruptcy Code section 1129(a)(14) is not implicated by the Plan.

### 15. *The Debtors Do Not Need to Pay Five Years' Worth of Disposable Income to Unsecured Creditors – 11 U.S.C. § 1129(a)(15)*

71.    Bankruptcy Code section 1129(a)(15) requires either that an individual chapter 11 debtor pay all unsecured claims in full or that the debtor's plan devote an amount equal to five years' worth of the debtor's projected disposable income to unsecured creditors. *See* 11 U.S.C. § 1129(a)(15). Each of the Debtors are business entities. Accordingly, Bankruptcy Code section 1129(a)(15) is not implicated by the Plan.

### 16. *The Plan Does Not Provide for Transfers of Property by Nonprofit Entities – 11 U.S.C. § 1129(a)(16)*

72.    Under Bankruptcy Code section 1129(a)(16), all transfers under a plan must be made in accordance with "any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust." 11 U.S.C. § 1129(a)(16). Although this provision could

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

be read to apply to all transfers (regardless of whether the debtor is a non-profit entity), Congress was clear in the legislative history that this provision was meant to "restrict the authority of a trustee to use, sell, or lease property by a nonprofit corporation or trust." H.R. REP. NO. 109-31, 109th Cong., 1st Sess. 145 (2005).

73.    Each of the Debtors is a moneyed, business or commercial corporation, partnership or limited liability company. Accordingly, Bankruptcy Code section 1129(a)(16) is not implicated by the Plan.

**E.    The Plan Satisfies the "Cram Down" Requirements Under Bankruptcy Code Section 1129(b)**

74.    Bankruptcy Code Section 1129(b) provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and/or equity interests. This mechanism is commonly referred to as "cram down." Section 1129(b) provides in pertinent part:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph *if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

11 U.S.C. § 1129(b)(1) (emphasis added). Thus, under Bankruptcy Code section 1129(b), the court may "cram down" a plan over the deemed rejection by impaired classes of claims or equity interests that receive no distributions under the plan as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

### 1.    *The Plan Does Not Discriminate Unfairly with Respect to the Rejecting Classes*

75.    Bankruptcy Code section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is *unfair.  See In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).  The weight of judicial authority holds that a plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) only if similar classes are treated differently without a reasonable basis for the disparate treatment.  *See In re Johnston*, 21 F.3d at 328 (holding that a plan's different treatment and classification did not discriminate unfairly because "there were reasonable, nondiscriminatory reasons" for the treatment); *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990); *Johns-Manville*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986).  The Ninth Circuit has stated that

> [d]iscrimination between classes must satisfy four criteria to be considered fair under 11 U.S.C. § 1129(b): (1) the discrimination must be supported by a reasonable basis; (2) the [plan proponent] could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination.

*Liberty Nat'l Enters. V. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship.)*, 115 F.3d 650, 656 (9th Cir. 1997) (citing *Amfac Distrib. Corp. v. Wolff (In re Wolff)*, 22 B.R. 510, 511-12 (B.A.P. 9th Cir. 1982)).

76.    The Plan does not "discriminate unfairly" with respect to Impaired Classes of Claims and Interests that are deemed to have rejected the Plan.  Class C-4 (Subordinated Claims) and Class D (Old Equity Interests) consist of (i) Interests (Class D) or (ii) Claims that have been subordinated to other Classes of Claims receiving distributions under the Plan pursuant to Bankruptcy Code section 510 (Class C-4).  These Claims and Interests are dissimilar in their legal nature from, and subordinate to, the Secured and Unsecured Claims

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

receiving distributions under the Plan.  Further, there is a reasonable basis for the disparate

treatment of the Claims in Class E (Intercompany Claims), and the claims are treated

appropriately according to the differences.  Specifically, the treatment of Claims in Class E

is appropriate in light of the fact that the Plan calls for the substantive consolidation of the

Debtors' Estates, without which resolution of these cases would be too complex for the First

Lien Steering Committee to confirm a plan.  The effect of the substantive consolidation of

the Debtors' Estates will be that each of the multiple Debtor's Estates will be deemed to be

consolidated into a single Estate, and the Intercompany Claims will therefore be deemed

eliminated.  Thus, the different treatment is precisely proportional to the reasonable basis for

differentiating among such claims.  Accordingly, the treatment of the Claims in Class E is

reasonable, appropriate, and necessary.

77.    Under the foregoing standards, the Plan does not "discriminate unfairly," as

the Holders of Claims and Interests, whose Classes rejected the Plan, shall be treated in the

exact same manner as the other Claims or Interests in such Classes.

### 2.    The Plan is Fair and Equitable with Respect to the Rejecting Classes and the Classes that Voted to Reject the Plan

78.    Class C-1 voted to reject the Plan.  Classes C-4, D and E are deemed to have

rejected the Plan.  The Plan, however, is fair and equitable with respect to these Classes.

Bankruptcy Code section 1129(b) defines the phrase "fair and equitable" as follows:

(a)    As to secured creditors:  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this [section 1129(b)].

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

(b)    As to unsecured creditors:  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    As to equity interest holders:  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

11 U.S.C. § 1129(b)(2).  In the instant case, the "fair and equitable" rule is satisfied as to the

Holders of (i) Interests in Class D and (ii) Claims in Classes C-1, C-4 and E because, as a

result of the valuation of the Debtors, these Holders are not entitled to any recovery under

the Plan, and no Classes junior to Classes C-1, C-4, D or E will receive any distributions or

retain any property under the Plan.

### 3.    The Purchase of General Unsecured Claims by the Holders of First Lien Lender Secured Claims Does Not Violate Bankruptcy Code Section 1129(b)

79.    Articles VII.F and VII.G of the Plan provide that the Holders of First Lien

Lender Secured Claims will use the $1.5 million Cash portion of their recovery under the

Plan to acquire those General Unsecured Claims listed on Exhibit H to the Disclosure

Statement (the "Claims Purchase Schedule") to the extent that certain conditions regarding

the purchase of such Claims are satisfied.  The First Lien Steering Committee believes that

the purchase of the General Unsecured Claims listed on the Claims Purchase Schedule does

not violate Bankruptcy Code section 1129(b).

### a.    The Purchase of General Unsecured Claims Constitutes Permissible Claims Trading and Does Not Implicate Bankruptcy Code Section 1129(b)

80.    The First Lien Steering Committee believes that the purchase of the General

Unsecured Claims listed on the Claims Purchase Schedule does not implicate the provisions

of Bankruptcy Code section 1129(b). As set forth in the Disclosure Statement, the First Lien Steering Committee believes that the purchase of General Unsecured Claims provided for under Articles VII.F and VII.G of the Plan constitutes permissible claims trading under the Bankruptcy Code, the Bankruptcy Rules and applicable case law.

81.    Neither the Bankruptcy Code nor the Bankruptcy Rules prohibit the purchase or sale of claims. *See Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1314 (1st Cir. 1993) (noting that "neither the [Bankruptcy Code] nor the [Bankruptcy Rules] prohibit or discourage creditors from receiving cash from nondebtors in exchange for their claims"). In addition, Bankruptcy Rule 3001(e)(2) limits the role of bankruptcy courts in the claims transfer process to resolving disputes regarding transfers of claims. *See Resurgent Capital Servs. v. Burnett (In re Burnett)*, 306 B.R. 313, 319 (B.A.P. 9th Cir. 2004), *aff'd*, 435 F.3d 971 (9th Cir. 2006) (explaining that Bankruptcy Rule 3001(e)(2) was amended to limit the bankruptcy court's role to adjudicating disputes over transfers of claims); *Viking Assocs., L.L.C. v. Drewes (In re Olson)*, 120 F.3d 98, 102 (8th Cir. 1997) (noting that "[w]here there is no dispute [with respect to a claims transfer], there is no longer any role for the court"). For purposes of Bankruptcy Rule 3001(e)(2), a "dispute" regarding a transfer of a claim exists only if the alleged transferor files an objection to the transfer. *See Id.* at 102. Bankruptcy Rule 3001(e)(2) does not require the parties to a claims transfer to disclose the terms of such transfer to the bankruptcy court. *See In re Burnett*, 306 B.R. at 318. Finally, there is no requirement in the Bankruptcy Code or the Bankruptcy Rules that a non-debtor that purchases claims from one member of a class of creditors must seek to purchase the claims of all of the members of that class.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

82.    Based on the foregoing, the First Lien Steering Committee believes that the Holders of First Lien Lender Secured Claims (i) are permitted to purchase the Claims listed on the Claim Purchase Schedule under the Bankruptcy Code and the Bankruptcy Rules and (ii) have the discretion to purchase only a portion of the total number of General Unsecured Claims.  Moreover, absent an objection to the purchase of a Claim, the First Lien Steering Committee submits that the Claim purchase procedures contemplated by the Plan do not require the approval of the Court, and that the First Lien Lenders are authorized to implement the Claim purchase procedures in accordance with Article VII.G. of the Plan. The First Lien Steering Committee therefore believes that Bankruptcy Code section 1129(b) does not apply to the purchase of Claims by the First Lien Lenders under the Plan.

**b.    *The Purchase of General Unsecured Claims by the Holders of First Lien Lender Secured Claims Does Not Violate Bankruptcy Code Section 1129(b) Because the Holders of First Lien Lender Secured Claims are Permitted to Share their Recovery Under the Plan***

83.    Even if the purchase of the Claims listed on the Claims Purchase Schedule does not constitute permissible claims trading, the First Lien Steering Committee believes that the purchase of such Claims is entirely consistent with the requirements of Bankruptcy Code section 1129(b) and relevant case law.  Both relevant case law and the statute itself support the ability of the holders of secured claims to gift a portion of their own recovery to certain junior classes.  As one court noted:

> Any enhanced value received by holders of [junior classes] on account of contributions from [secured creditors] is not a treatment of these Claims under the plan and does not constitute unfair discrimination . . . .  The greater value received by a [junior class] does not violate the Bankruptcy Code because [such greater value is] the result of [secured] creditors . . . voluntarily sharing their recoveries under the Plan [and thus] is not the result of the Debtors' distribution of estate property to such creditors.

*See In re Worldcom, Inc.*, 2003 Bankr. LEXIS 1401 at *178.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

84.     A majority of courts throughout the country have held that a plan provision pursuant to which secured creditors gift a portion of their recovery to junior classes of claims (i) does not implicate, let alone violate, the absolute priority rule, and (ii) to the extent that only a portion of the holders of claims in such junior classes receive a gift from holders of senior claims, such gift does not constitute unfair discrimination. *See Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1312 (1st Cir. 1993) (The absolute priority rule "does not come into play until all valid liens on the property are satisfied."); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 297-98 (Bankr. D. Del. 2006) (approving, in a situation similar to this case, a carve-out provision in a pre-plan settlement agreement whereby the secured creditor gave a gift to the general unsecured creditors); *In re Protocol Servs., Inc.*, Nos. 05-6782 JM11 – 05-6786 JM11, 2005 Bankr. LEXIS 3191, at *5 (Bankr. S.D. Cal. Dec. 23, 2005) (sharing by the under-secured creditors of the proceeds of their collateral with a junior class was "an acceptable carve-out provision"); *In re Union Fin. Servs. Group, Inc.*, 303 B.R. 390, 423 (Bankr. E.D. Mo. 2003) (holding that a plan provision that provided for the payment of a portion of the secured creditors' collateral to unsecured creditors did not affect an unfair discrimination); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618 (Bankr. D. Del. 2001) (secured creditors "are free to allocate [value otherwise distributable to them] without violating the 'fair and equitable' requirement").  Thus, where, as here, holders of secured claims agree to share a portion of the recovery they were entitled to receive on account of their claims with, among others, certain holders of general unsecured claims, the absolute priority rule is neither implicated nor violated, and there is no unfair discrimination for purposes of Bankruptcy Code section 1129(b).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

**F.      The Limited Release, Exculpation, and Injunction Provisions of the Plan Should
be Approved**

85.      The Plan provides for (i) the release of certain Claims and Causes of Action
of the Debtors and their Estates against the Released Parties (as defined below), (ii) the
release of certain avoidance actions of the Debtors against the Rhodes Entities, (iii) the
voluntary release by certain First Lien Lenders of certain Claims and Causes of Action
against all other First Lien Lenders, (iv) the exculpation of claims for certain parties, and
(v) a permanent injunction precluding Holders of Claims or Interests from asserting those
Claims or Interests, or claims or actions based upon such Claims or Interests, against the
Debtors.  These releases are proper because, among other things, such releases are the
product of arm's length negotiations and have been critical to the formulation of a
consensual Plan.  Moreover, the releases are integral to the Mediation Settlement embodied
in the Plan and are appropriately limited.

*1.      Exculpation*

86.      Pursuant to Article VIII.G of the Plan (the "Exculpation"), no Exculpated
Party shall have or incur, and each Exculpated Party is released and exculpated from any
Claim, obligation, Cause of Action, or liability to one another or to any Exculpating Party
for any Exculpated Claim, except for gross negligence, willful misconduct or fraud, but in
all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with
respect to their duties and responsibilities pursuant to the Plan.  In addition, Article VIII.G
of the Plan provides that the Debtors, the First Lien Steering Committee and the
Reorganized Debtors (and each of their respective agents, members, directors, officers,
employees, advisors, and attorneys) have, and upon confirmation of the Plan shall be
deemed to have, participated in good faith and in compliance with the applicable provisions

of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the

Plan, and therefore are not, and on account of such distributions shall not be, liable at any

time for the violation of any applicable law, rule, or regulation governing the solicitation of

acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

87.    The Exculpation is limited to those parties that were instrumental to the

Debtors' restructuring efforts and to the formulation of the Plan, and the Exculpation is

limited solely to acts in connection with, related to, or arising out of the Chapter 11 Cases.

Thus, the Exculpation, which "generally follows the text that has become standard . . ., is

sufficiently narrow to be unexceptionable." *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr.

S.D.N.Y. 2006); s*ee also (Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326

B.R. 497, 504 (S.D.N.Y. 2005).

88.    Further, the Exculpation is appropriately limited to a qualified immunity for

acts of negligence, but does not relieve any party of gross negligence, willful misconduct or

fraud.  *See W.R. Huff Asset Mgmt Co., LLC v. PWS Holding Corp. (In re PWS Holding

Corp.)*, 228 F.3d 224, 246-47 (3d Cir. 2000) (similar exculpation provision reflecting

Bankruptcy Code's limitation of liability did not violate third party release prohibition of

section 524(e)); *DJS Props., L.P. v. Simplot*, 397 B.R. 493, 502 (D. Id. 2008) (approving

plan with exculpation provision releasing estate representative for all claims and causes of

action except for fraud, breach of fiduciary duties, gross negligence, or willful misconduct).

89.    Exculpation for participating in the plan process is appropriate where plan

negotiation could not have occurred without protection from liability.  As recognized by

several courts, where a plan of reorganization requires the settlement of numerous complex

issues, protection of third parties against legal exposure may be a key component of the

1     settlement.  *DJS Props., L.P.*, 397 B.R. at 507 (holding that the exculpation and

2     indemnification provisions were reasonable in light of threatened suit against the estate

3     representative), *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burham*

4     *Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("Drexel II"); *In re Enron Corp.*,

5     326 B.R. at 503 (excising similar exculpation provision would "tend to unravel the entire

6     fabric of the Plan, and would be inequitable to all those who participated in good faith to

7     bring it into fruition"); *In re Metricom, Inc.*, 275 B.R. 364, 371 (Bankr. N.D. Cal. 2002)

8     (noting "that the Code does not prohibit indemnity/contribution or exculpation provisions,

9     and that there is no statutory or binding bankruptcy case law basis upon which to establish a

10    *per se* rule against such protections").

11            **2.     Injunction**

12            90.     Article VIII.H of the Plan provides that, except as otherwise expressly

13    provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have

14    held, hold, or may hold Claims against the Debtors, and all Entities holding Interests, are

15    permanently enjoined, from and after the Effective Date, from: (1) commencing or

16    continuing in any manner any action or other proceeding of any kind against the Debtors or

17    Reorganized Debtors on account of or in connection with or with respect to any such Claims

18    or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any

19    judgment, award, decree or order against the Debtors or Reorganized Debtors on account of

20    or in connection with or with respect to any such Claims or Interests; (3) creating,

21    perfecting, or enforcing any encumbrance of any kind against the Debtors or Reorganized

22    Debtors or the property or Estates of the Debtors or Reorganized Debtors on account of or in

23    connection with or with respect to any such Claims or Interests; (4) asserting any right of

24    setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

or Reorganized Debtors or against the property or Estates of the Debtors or Reorganized

Debtors on account of or in connection with or with respect to any such Claims or Interests

unless such Holder has filed a motion requesting the right to perform such setoff on or

before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or

Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff

pursuant to Bankruptcy Code section 553 or otherwise (provided, that, to the extent the

Rhodes Entities Claims are Allowed, the Rhodes Entities, without the need to file any such

motion, shall retain the right to assert a setoff against any Claims or Causes of Action that

the Reorganized Debtors or Litigation Trust may assert against the Rhodes Entities, with the

Reorganized Debtors and Litigation Trust, as applicable, reserving the right to challenge the

propriety of any such attempted setoff, with any such challenge to be resolved by the Court);

and (5) commencing or continuing in any manner any action or other proceeding of any kind

on account of or in connection with or with respect to any such Claims or Interests released

or settled pursuant to the Plan.

91.      The injunction is necessary to preserve and enforce the releases and

discharges granted by the Plan and is narrowly tailored to achieve that purpose.

### 3.      Release Provisions

92.      Article VIII.D of the Plan provides that, for good and valuable consideration,

including the facilitation of the expeditious reorganization of the Debtors and the

implementation of the restructuring contemplated by the Plan, and as part of the Mediation

Settlement, (i) the First Lien Lenders, (ii) the First Lien Steering Committee, (iii) the Second

Lien Lenders, (iv) the predecessors, successors and assigns of the entities listed in

(i) through (iii), (v) the Creditors' Committee and the members thereof, (vi) the subsidiaries,

affiliates, officers, members, directors, principals, employees, agents, financial advisors,

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

attorneys, accountants, investment bankers, consultants, representatives, and other Professionals of the entities listed in (i) through (v), (vii) the Debtors' officers, employees (including Thomas Robinson and Joseph Schramm) and Professionals, as of the Petition Date, and (viii) Paul Huygens (collectively, the "Released Parties") shall be deemed released from any and all Claims and Causes of Action related to, among other things, the Debtors, the Debtors' restructuring and the Chapter 11 Cases, which Claims and Causes of Action arose prior to the Effective Date.

93.    In addition, Article VIII.E of the Plan provides that the Rhodes Entities shall be deemed released from avoidance actions under chapter 5 of the Bankruptcy Code with respect to transfers made by the Debtors to the Rhodes Entities during the two years prior to the Petition Date.  The release granted to the Rhodes Entities is specifically limited, however, to apply only to transfers expressly set forth in the Debtors' Schedules as of August 1, 2009, or as disclosed in Attachment B to the Mediation Term Sheet.

94.    Finally, Article VIII.F of the Plan provides that, pursuant to Bankruptcy Rule 9019, each of the First Lien Lenders that votes on the Plan may elect to release the other First Lien Lenders, for good and valuable consideration, on and after the Effective Date, from all Claims and Causes of Action that such First Lien Lender would have been entitled to assert against any other First Lien Lender electing to grant a release prior to the Effective Date relating to, among other things, the First Lien Credit Agreement, the First Lien Lender Claims, the Debtors, the Chapter 11 Cases, the restructuring of the First Lien Lender Claims, or the Plan and the Disclosure Statement.  Any release granted pursuant to Article VIII.F of the Plan does not apply, however, to claims or liabilities arising out of any act or omission that constitutes gross negligence or willful misconduct.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

95.    The release provisions contained in Articles VIII.D, VIII.E and VIII.F of the Plan were agreed to as part of the Mediation Settlement that is embodied in the Plan.  As discussed more fully below, the First Lien Steering Committee believes that the Mediation Settlement is in the best interests of the Debtors and all creditor constituencies and represents the best possible restructuring alternative for the Debtors' businesses.  Among other things, the Mediation Settlement allows for the resolution of (i) potential preference actions relating to transfers in excess of $9 million to certain of the Rhodes Entities within the one year period prior to the Petition Date that would have been heavily contested by the Rhodes Entities and (ii) potential fraudulent conveyance actions held by the Debtors' Estates against the Rhodes Entities that likewise would have been heavily contested by the Rhodes Entities.  Based on the foregoing, the First Lien Steering Committee believes that the release provisions contained in Articles VIII.D, VIII.E and VIII.F of the Plan are supported by adequate consideration and should be approved as integral components of the Mediation Settlement.

96.    In addition, the First Lien Steering Committee notes that the releases granted by the Debtors pursuant to Articles VIII.D and VIII.E of the Plan are limited solely to Claims or Causes of Action that belong to the Debtors.  *In re Oneida Ltd.*, 351 B.R. at 94 n.21 ("Under the Plan, the Debtors also released their own claims against third parties, but these do not raise any 'third-party release' issues of the type discussed here.")  As no third-party rights are impacted by these provisions, and a debtor is authorized to settle claims in the plan of reorganization, this provision is consistent with applicable law.

97.    A plan that proposes to release a claim or action that belongs to the debtor is considered a "settlement" for purposes of satisfying Bankruptcy Code section

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1123(b)(3)(A).  *See, e.g.*, *In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Ore. 2002) ("I find that the release and injunction provisions of . . . the WCI plan are submitted for approval by the court pursuant to § 1123(b)(3)(A) and [Rule 9019(a) of the Federal Rules of Bankruptcy Procedure]"); *Resolution Trust Corp. v. Best Prods. Co.* (*In re Best Prods. Co.*), 68 F.3d 26, 33 (2d Cir. 1995) (finding that § 1123(b)(3)(A) and Rule 9019(a) applied); *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at *117 (same); *In re Cellular Info. Sys.*, 171 B.R. 926, 947-948 (Bankr. S.D.N.Y. 1994) (same).  In reviewing releases of a debtor's claims pursuant to Bankruptcy Code section 1123(b)(3)(A), the court should be guided by the "reasonable business judgment" standard of Bankruptcy Rule 9019.  *See In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401 at * 117; *In re WCI Cable, Inc.*, 282 B.R. at 474; *Drexel I*, 138 B.R. at 750-760.

98.     It is also clear that the release may include not only claims assertable directly by the debtor, but also claims assertable on behalf of, or derivative of the rights of, the debtor, i.e., all claims belonging to the estate or that may be brought by the chapter 11 debtor (including shareholder derivative actions, fraudulent conveyance claims, preference actions, and other similar types of actions subject to settlement by the debtor).  *See Hasell v. PWS Holding Corp. (In re PWS Holding Corp.)*, 303 F.3d 308, 315 (3d Cir. 2002); *In re WCI Cable, Inc.*, 282 B.R. at 474 (confirming settlement as a reasonable exercise of business judgment); *In re Texaco*, 84 B.R. 893, 900 (Bankr. S.D.N.Y. 1988); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 311-312 (Bankr. W.D. Pa. 1990); *Huddleston v. Nelson Bunker Hunt Trust Estate*, 117 BR. 231, 233-34 (N.D. Tex. 1990) (confirming plan containing release of claims against banks to the extent they were derivative of the debtor's claims).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

99.     Over the course of the Chapter 11 Cases, the parties receiving releases pursuant to Articles VIII.D, VIII.E and VIII.F of the Plan have contributed substantial value to the Debtors and the formulation of the Plan.  The efforts of the such parties in reaching the Mediation Settlement and negotiating and ultimately formulating the Plan enabled the First Lien Steering Committee to file the Plan.  The recoveries negotiated by the key constituencies in the Chapter 11 Cases are better than would likely be available if other alternatives were pursued.

100.     Significantly, and as evidenced by the voting results confirmed in the Osborne Declaration, the Plan was approved by a substantial majority of Holders of Claims voting on the Plan and no creditor has objected to the release provisions contained in Articles VIII.D, VIII.E and VIII.F of the Plan.

**G.     The Mediation Settlement Embodied in the Plan Should be Approved**

101.     The First Lien Steering Committee believes that the Mediation Settlement embodied in the Plan is reasonable and should be approved under Bankruptcy Rule 9019.  In order to determine whether a compromise may be approved under Bankruptcy Rule 9019, four factors must be considered: (i) the probability of success of the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views.  *See, e.g., Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).  A compromise may be approved even if all four of the factors do not favor the compromise so long as the factors weigh in favor of the compromise when taken as a whole.  *See In re Pac. Gas and Elec. Co.*, 304 B.R. 395, 416 (Bankr. N.D. Cal. 2004).  In addition, a compromise does not have to be the best compromise that could have possibly been obtained but, instead,

must only fall within a reasonable range of possible outcomes.  *In re WCI Cable, Inc.*, 282

B.R. at 473-74.

102.     Based on the foregoing, the First Lien Steering Committee believes that the

compromise embodied in the Plan and the Mediation Settlement is fair and equitable.

Specifically, the Mediation Settlement represents a global resolution of, among other things,

potential preference actions held by the Debtors' Estates relating to the transfer of funds to

certain Rhodes Entities within the one year period prior to the Petition Date, issues related to

the operation of the Reorganized Debtors' businesses and the ownership of the Rhodes

Ranch Golf Course.

103.     The First Lien Steering Committee estimates that the total amount of all

payments made by the Debtors to the Rhodes Entities within the year prior to the Petition

Date is in excess of $9 million.  With respect to the first factor articulated by the *A&C*

*Properties* Court, litigation over the potential preference payments identified herein would

have been contentious and hard fought.  The Rhodes Entities would likely have asserted a

number of defenses to the preference claims, including that such payments were received in

the ordinary course of business.  Moreover, based on the First Lien Steering Committee's

review of all payments made to insiders within the one year period prior to the Petition Date

as reflected in the Debtors' Schedules and Schedule B to the Mediation Settlement Term

Sheet, and on subsequent conversations with Debtors' counsel, the First Lien Steering

Committee believes that the Rhodes Entities may have had valid defenses to certain of these

transfers.  The Mediation Settlement also reflects a resolution of potential fraudulent

conveyance actions held by the Estates against the Rhodes Entities.  The First Lien Steering

Committee believes that these claims would also have been heavily litigated in the absence

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

of a settlement and, while the First Lien Steering Committee believes that it would have ultimately prevailed on certain of such claims, there can be no guarantee that a successful result would have been obtained for the Estates. In addition, the prosecution of both the fraudulent conveyance claims and the preference claims would have resulted in substantial expense for the Estates, while at the same time likely delaying the Debtors' emergence from chapter 11. Therefore, the First Lien Steering Committee believes that the third factor of the *A&C Properties* test also weighs in favor of the approval of the Mediation Settlement.[3]

104. The fourth factor of the *A&C Properties* test requires the Court to consider the paramount interest of creditors. The creditors of the Estates will derive a material benefit from the approval of the Mediation Settlement because, among other things, the Mediation Settlement (i) contemplates a $3.5 million Cash payment from the Rhodes Entities to the Reorganized Debtors, which payment will be used to fund working capital needs and distributions contemplated by the Plan, (ii) provides for the transfer of the Arizona Assets, which were non-core assets to the Reorganized Debtors that likely would have required significant additional funding for development, to the Rhodes Entities, (iii) provides for the transfer of the Rhodes Ranch Golf Course, the maintenance and continued operation of which is paramount to maximizing the value of the Reorganized Debtors' assets, to the Reorganized Debtors, (iv) avoids the significant expense and time

---

[3] The second factor to be considered by the Court in evaluating a settlement proposal is the difficulties, if any, to be encountered in the matter of collection. The First Lien Steering Committee has not completed a detailed review of the financial information of each Rhodes Entity that may have been liable in connection with the claims released under the Plan, and cannot therefore make a determination as to whether each such entity could have satisfied its obligations in connection with any judgment entered by the Court. The First Lien Steering Committee does, however, believe that the Rhodes Entities may not have been able to comply financially with the terms of judgments received in connection with successful litigation regarding the claims being released under the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  delay associated with litigating the claims released under the Plan, which would have

2  yielded uncertain results, and (v) enables the Debtors to emerge from bankruptcy

3  expeditiously and consensually, without any unnecessary eradication of value through a

4  prolonged stay in chapter 11.  In addition, all claims and causes of action against the Rhodes

5  Entities that are not covered by the limited release provided for in the Mediation Settlement

6  will be transferred to the Litigation Trust for the benefit of all creditors, to be prosecuted

7  and/or settled post-emergence, as appropriate.

8          105.    In addition to the material benefits listed above, the First Lien Steering

9  Committee believes that the Mediation Settlement will also ensure a smooth transition to

10  new ownership under the Plan.  The Mediation Settlement contemplates that stringent bond

11  and licensing requirements will be maintained through the cooperation of the Rhodes

12  Entities, thus allowing the Reorganized Debtors to continue operations without interruption

13  upon emergence.  The Mediation Settlement also contemplates that new Qualified

14  Employees and HOA board representatives will be elected by the Reorganized Debtors to

15  ensure a unified and organized post-Effective Date management team.  On balance, the First

16  Lien Steering Committee believes that the Estates and their creditors will be obtaining value

17  far in excess of the consideration to be given to the Rhodes Entities if the Mediation

18  Settlement is approved.  Given the range of issues involved, and the nature and character of

19  the disputes between the First Lien Steering Committee, the Debtors and the Rhodes

20  Entities, the First Lien Steering Committee believes that approval of the Mediation

21  Settlement is appropriate.  In addition, as set forth above, the Mediation Statement satisfies

22  the fair and reasonable standards articulated by courts in this circuit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**H.        The Substantive Consolidation of the Debtors' Estates is Appropriate**

106.    As previously noted, Article IV.A of the Plan provides for the substantive consolidation of all of the Estates into a single Estate for all purposes associated with confirmation and distributions to be made under the Plan.  The substantive consolidation of all of the Debtors' Estates into a single consolidated Estate for purposes of confirmation and distributions to be made under the Plan is appropriate under the circumstances of the Chapter 11 Cases, and will result in significant benefits for the Debtors' creditors.  In determining whether substantive consolidation is appropriate, courts consider (i) "whether creditors dealt with entities as a single economic unit and did not rely on their separate identity in extending credit," or (ii) "whether the affairs of the debtor are so entangled that consolidation will benefit all creditors."  *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 766 (9th Cir. 2000); *In re Cent. European Indus. Dev. Co. LLC*, 288 B.R. 572, 575-76 (Bankr. N.D. Cal. 2003); *In re Standard Brands Paint Co.*, 154 B.R. 563, 572 (Bankr. C.D. Cal. 1993).  Substantive consolidation may be ordered when the facts of a case demonstrate that either of these two factors is present.  *In re Bonham*, 229 F.3d at 766.

107.    Courts also generally consider a number of other factors in determining whether substantive consolidation is appropriate:

(a)    the presence or absence of consolidated financial statements;

(b)    the unity of interest and ownership among the various corporate entities;

(c)    the degree of difficulty segregating and ascertaining individual assets and liabilities;

(d)    the transfer of assets among corporate entities without formal observance of corporate formalities;

(e)    the existence of parent and inter-corporate guarantees on loans;

(f)    the commingling of assets and business functions;

54

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

(g)    the profitability of consolidation at a single physical location; and

(h)    the disregard of legal formalities.

*See, e.g.*, *Standard Brands Paint Co.*, 154 B.R. at 568-70; *Union Savs. Bank v. Augie/Restivo Banking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988); *In re Food Fair, Inc.*, 10 B.R. 123, 126 (Bankr. S.D.N.Y. 1981).

108.    Based on the facts and circumstances of the Debtors' Chapter 11 Cases, the First Lien Steering Committee believes that the substantive consolidation of the Debtors' Estates is warranted in light of the fact that the Debtors (i) operate as a single business enterprise under a single name; (ii) operate on a centralized basis with a centralized cash management system; (iii) share common parent companies; (iv) rely on a single corporate office for operational and other support services; (v) regularly conduct business with each other such that the flow of funds and transactions would be difficult to entangle; and (vi) are all obligated on the First Lien Lender Claims and the Second Lien Lender Claims.  In addition, substantial Intercompany Claims existed between the various Debtors as of the Petition Date, and numerous Proofs of Claim were filed against the incorrect Debtor entity.

109.    The First Lien Steering Committee believes that by substantively consolidating and pooling the Debtors' assets and liabilities for purposes of confirmation and distributions under the Plan, the Plan provides significant advantages that benefit all of the Debtors' creditors.  First, over $12 billion in duplicate secured debt Claims will be eliminated because the First Lien Lender Claims and the Second Lien Lender Claims each will be allowed only once against the consolidated Estate.  Second, over $500 million in Intercompany Claims will be deemed eliminated because the multiple Debtors will be deemed only one Debtor.  Third, over $4.6 million of other duplicate Unsecured Claims that have been filed in multiple Chapter 11 Cases will be automatically eliminated.  Fourth,

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

approximately 35% of the Claims that have been filed are asserted against the wrong Debtor, and substantive consolidation will eliminate the need for the objection to such Claims. Accordingly, the First Lien Steering Committee submits that substantive consolidation of the Debtors' Estates is warranted in these cases.

## RESPONSE TO OBJECTIONS

110.    One conditional objection and one limited response were filed in connection with confirmation of the Plan:  (i) the Conditional Objection to Chapter 11 Plan filed by Caterpillar Financial Services Corporation ("Caterpillar") on January 4, 2010 (Docket No. 895) (the "Caterpillar Objection"); and (ii) the Limited Response to Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, et al. filed by Credit Suisse AG, Cayman Islands Branch ("CS") on January 5, 2010 (Docket No. 899) (the "CS Response").

### A.    The Caterpillar Objection

111.    The Caterpillar Objection asserts that, prior to the Petition Date, the Debtors were party to a finance lease agreement (the "Caterpillar Lease") with Caterpillar pursuant to which the Debtors leased certain equipment from Caterpillar (the "Equipment").  The Caterpillar Lease was not listed on Exhibit N to the Disclosure Statement as a contract to be assumed by the Debtors upon the Effective Date of the Plan.  Accordingly, the Caterpillar Lease will be rejected as of the Effective Date.  Caterpillar thus seeks assurance that upon the effectiveness of the rejection of the Caterpillar Lease, the Equipment will be returned to Caterpillar.  The First Lien Steering Committee, as the proponent of the Plan, submits that upon the Effective Date of the Plan, either (i) arrangements will be made for Caterpillar to reclaim its Equipment or (ii) an alternative arrangement shall be made that is acceptable to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Caterpillar and the First Lien Steering Committee with respect to such Equipment. Accordingly, the First Lien Steering Committee submits that the Caterpillar Objection should be deemed resolved or otherwise overruled.

**B.    The CS Response[4]**

112.    Pursuant to the CS Response, CS asserts that it supports confirmation of the Plan but, nevertheless, has filed the CS Response because the Plan is silent as to how distributions for unliquidated claims of First Lien Lenders are to be reserved.  Specifically, CS requests that the Court reserve, and prohibit the distribution of, an undisclosed amount of Newco Equity Interests and New First Lien Notes to satisfy certain undisclosed, unliquidated claims that CS may assert in the future for indemnification under the First Lien Credit Agreement (the "CS Indemnification Claims").

113.    The basis for the CS Indemnification Claims is section 9.2(B) of the First Lien Credit Agreement.  As noted in the CS Response, Section 9.2(B) of the First Lien Credit Agreement provides that the Debtors are required, under certain circumstances, to indemnify CS for certain costs, losses, claims, damages, liabilities and expenses incurred in connection with, among other things, claims or litigation related to the first lien debt.  First Lien Credit Agreement at 9.2(B) (A copy of Section 9.2(B) of the First Lien Credit Agreement is attached hereto as Exhibit A).  As of the date hereof, however, no claims have been asserted against CS that would give rise to any CS Indemnification Claims and, thus, the CS Indemnification Claims are contingent, unliquidated claims.  Applicable law requires that CS's request for the establishment of a reserve be denied.

---

[4] Credit Suisse Loan Funding, LLC recused itself from issues regarding the First Lien Steering Committee's reply to the CS Response.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

114.    As the Court is aware, upon confirmation of a plan, the Bankruptcy Code "discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A).  Bankruptcy Code section 101(12) provides that a "debt" is a "liability on a claim." 11 U.S.C. § 101(12); *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 552 (1990).  Confirmation, therefore, will discharge all claims whether such claim was allowed, liquidated, or a proof of claim was filed.  *See* 11 U.S.C. § 1141(d)(1); *In re Dale's Service, Inc.*, 2008 WL 2225643, at *3 (Bankr. D. Idaho 2008).  Claims for indemnification are included within the claims discharged under a plan by application of Bankruptcy Code section 1141.  *See In re All Seasons Resorts, Inc.*, 79 B.R. 901, 904 (Bankr.C.D.Cal. 1987) (noting indemnification claims will be treated like any prepetition, unsecured claim); *In re Abercrombie*, 139 F.3d 755, 757 (9th Cir. 1998) (treating claims arising from prepetition contracts as non-prioritized, unsecured claims); *see also In re Hemingway Transport, Inc.*, 954 F.2d 1 (1st Cir. 1992).  Accordingly, upon confirmation of the Plan, the Debtors will not have any continuing liability to CS or any other party for any Claims that may be asserted against CS under the First Lien Credit Agreement.

115.    In addition, Bankruptcy Code section 502(e)(1)(B) mandates denial of the establishment of a reserve for potential CS Indemnification Claims.  Bankruptcy Code section 502(e)(1)(B) provides, in pertinent part, that "the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that…such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."  11 U.S.C. § 502(e)(1)(B).  The three requirements that must be met to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

disallow claims under section 502(e)(1)(B) are: (i) the claim must be for reimbursement or contribution; (ii) the party asserting the claim must be liable with the debtor on the claim; and (iii) the claim must be contingent at the time of its allowance or disallowance. *In re Dant & Russell, Inc.*, 951 F.2d 246, 248 (9th Cir. 1991). In this case, all three of the foregoing requirements to disallow the CS Indemnification Claims are satisfied.

116.    First, courts in the Ninth Circuit have repeatedly found indemnity claims to fall within the scope of reimbursement. *See generally In re All Seasons Resorts, Inc.*, 79 B.R. at 904 ("They, in turn can seek indemnification from debtor, but their claim will be treated like any pre-petition, unsecured claim. In all likelihood, they will not get paid in full. *See* § 502(e)."). Second, courts have broadly interpreted the phrase "liable with" to include indemnity agreements. *In re Hill*, 268 B.R. 548, 553 (9th Cir. BAP 2001); *see also In re Krueger*, 127 B.R. 252, 254 (Bankr. D. Idaho 1991) (noting that indemnity claims are subject to section 502(e)(1)(B) and will "thus be denied"). The Ninth Circuit has also noted that "liable with" essentially requires "some version of shared liability." *In re Hill*, 268 B.R. at 554. Third, Ninth Circuit law holds indemnification agreements to be contingent. *In re THC Financial Corp.*, 686 F.2d 799, 802 (9th Cir. 1982) ("The bankruptcy court determined that even though the indemnification claim did not mature until after the bankruptcy petition was filed in late 1976, the claim had existed as a contingent claim since the attornment and indemnification agreements were entered into early in 1976."); *In re Hexcel Corp.*, 174 B.R. 807, 810 (Bankr.N.D.Cal. 1994) (noting claims that might mature in the future "are by definition contingent"). Here, no claims have been asserted against CS and no litigation has been commenced against CS that would give rise to indemnification claims against the Debtors; thus, the CS Indemnification Claims are contingent. Accordingly, legal precedent

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

applying Bankruptcy Code sections 1141(d)(1) and 502(e)(1)(B) make clear that CS's claims for indemnification cannot survive confirmation of the Plan.  Thus, CS's request for the establishment of a reserve to satisfy these non-existent claims must be denied.

117.    Notwithstanding the foregoing, CS may be able to seek reimbursement for CS Indemnification Claims from certain of the First Lien Lenders.  Section 9.2(c) of the First Lien Credit Agreement provides that, subject to the satisfaction of certain conditions, to the extent that the Debtors do not satisfy their obligations under 9.2(b) of the First Lien Credit Agreement, each of the First Lien Lenders has the obligation to reimburse CS for such lender's pro rata share of the Debtors' liability.  *See* First Lien Credit Agreement at Section 9.2(C) (A copy of section 9.2(C) of the First Lien Credit Agreement is attached hereto as Exhibit A).  The Plan and proposed Confirmation Order expressly provide that, except as otherwise provided by the Plan, the First Lien Credit Agreement will continue in effect for purposes of governing the rights and obligations of non-debtor parties to such agreements vis-à-vis each other.  *See* Plan Art. IV.E; Proposed Confirmation Order at ¶50. The Plan and proposed Confirmation Order, however, provide that the foregoing reservation will not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.  *See* Plan Art IV.E; Proposed Confirmation Order at ¶50.  Accordingly, subject to any other provision of the Plan that may limit CS's rights under Section 9.2(C) of the First Lien Credit Agreement, CS will retain its rights against the First Lien Lenders for reimbursement of CS Indemnification Claims that are liquidated and compensable pursuant to the terms of the First Lien Credit Agreement.

118.    For all of the foregoing reasons, the First Lien Steering Committee submits that CS's request that a reserve be established to satisfy the contingent, unliquidated CS Indemnification Claims must be denied.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, New York 10036**
**Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com**

## CONCLUSION

WHEREFORE, for the reasons set forth above, the First Lien Steering Committee respectfully requests the Court (i) confirm the Plan and (ii) grant the First Lien Steering Committee such other and further relief as is just and proper under the circumstances.

Dated this 11 day of January, 2010.

By:    /s/Philip C. Dublin
        Nile Leatham (NV Bar No. 002838)
        KOLESAR & LEATHAM
        Wells Fargo Financial Center
        3320 W. Sahara Ave.
        Las Vegas, NV 89102
        (702) 979-2357 (Telephone)
        (702) 362-9472 (Facsimile)
        Nleatham@klnevada.com

        AKIN GUMP STRAUSS HAUER & FELD LLP
        Philip C. Dublin (NY Bar No. 2959344)
        Abid Qureshi (NY Bar No. 2684637)
        One Bryant Park
        New York, New York 10036
        (212) 872-1000 (Telephone)
        (212) 872-1002 (Facsimile)
        pdublin@akingump.com
        aqureshi@akingump.com

        *Counsel for the First Lien Steering Committee*

1    **Exhibit A**
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

**CREDIT AGREEMENT**

**DATED AS OF NOVEMBER 21, 2005**

among

**HERITAGE LAND COMPANY, LLC,**
**THE RHODES COMPANIES, LLC**
and
**RHODES RANCH GENERAL PARTNERSHIP,**
as the Borrowers,

**THE LENDERS LISTED HEREIN,**
as the Lenders,

and

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
as Administrative Agent, Collateral Agent, Syndication Agent,
Sole Bookrunner and Sole Lead Arranger

**$430,000,000 SENIOR SECURED CREDIT FACILITY**
**(FIRST LIEN)**

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS ..........................................................................................................1

    1.1     Certain Defined Terms..................................................................................1
    1.2     Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
            Calculations Under Agreement. ..................................................................31

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS ...................31

    2.1     Commitments; Loans. ..................................................................................31
    2.2     Interest on the Loans. ...................................................................................33
    2.3     Fees. ..............................................................................................................36
    2.4     Repayments and Prepayments; General Provisions Regarding Payments....36
    2.5     Use of Proceeds. ..........................................................................................43
    2.6     Special Provisions Governing Eurodollar Rate Loans..................................43
    2.7     Increased Costs; Taxes.................................................................................45
    2.8     Mitigation Obligations; Replacement of Lenders. ......................................48
    2.9     Releases; Subordinations. .............................................................................48
    2.10    Subordinations in connection with Map Approvals.....................................49
    2.11    Subordinations in connection with Qualified Sales Agreements. .................50

SECTION 3. CONDITIONS TO EFFECTIVENESS ...........................................................50

    3.1     Conditions to Effectiveness. .........................................................................50

SECTION 4. REPRESENTATIONS AND WARRANTIES ...............................................58

    4.1     Organization and Qualification....................................................................58
    4.2     Power and Authority.....................................................................................58
    4.3     Legally Enforceable Agreement. .................................................................58
    4.4     No Conflict. ..................................................................................................58
    4.5     Capital Structure. .........................................................................................59
    4.6     Licenses. .......................................................................................................59
    4.7     Corporate Names. .........................................................................................59
    4.8     Business Locations; Agent for Process........................................................60
    4.9     Title to Properties.........................................................................................60
    4.10    Priority of Liens; UCC-1 Financing Statements. ........................................61
    4.11    No Subordination. ........................................................................................61
    4.12    Permits; Licenses; Franchises. ....................................................................61
    4.13    Indebtedness.................................................................................................62
    4.14    Financial Condition; Pro Forma Balance Sheet; Projections.......................62
    4.15    Disclosure. ....................................................................................................62
    4.16    Solvent Financial Condition. .......................................................................63
    4.17    Surety Obligations. ......................................................................................63
    4.18    Taxes. ...........................................................................................................63
    4.19    Brokers.........................................................................................................63

i

4.20    Intellectual Property.................................................................................64
4.21    Governmental Authorization. ....................................................................64
4.22    Compliance with Laws. .............................................................................64
4.23    Burdensome Contracts. ..............................................................................64
4.24    Litigation. ...................................................................................................64
4.25    No Defaults. ...............................................................................................65
4.26    Leases. ........................................................................................................65
4.27    Employee Benefit Plans. ............................................................................65
4.28    Trade Relations. .........................................................................................66
4.29    Labor Relations. .........................................................................................66
4.30    Not a Regulated Entity. ..............................................................................66
4.31    Margin Stock. .............................................................................................66
4.32    No Material Adverse Change......................................................................67
4.33    Environmental Matters. ..............................................................................67
4.34    Material Contracts. .....................................................................................68
4.35    Utilities. .....................................................................................................69
4.36    Entitlements. ..............................................................................................69

SECTION 5. AFFIRMATIVE COVENANTS........................................................................69

5.1     Visits and Inspections. ...............................................................................69
5.2     Notices. ......................................................................................................70
5.3     Financial Statements and Other Reports....................................................71
5.4     Corporate Existence. ..................................................................................77
5.5     Payment of Taxes and Claims; Tax Consolidation.....................................77
5.6     Maintenance of Properties; Insurance........................................................78
5.7     Lender Meeting. .........................................................................................78
5.8     Compliance with Laws, etc.........................................................................78
5.9     Environmental Disclosure and Inspection. .................................................78
5.10    Remedial Action Regarding Hazardous Materials.......................................79
5.11    Additional Collateral; Execution of Subsidiary Guaranty and Collateral Documents
        by Future Subsidiaries. ..............................................................................80
5.12    Interest Rate Protection. .............................................................................82
5.13    Further Assurances. ....................................................................................82
5.14    Title.............................................................................................................82
5.15    Maintenance of Entitlements; Development Agreements. ...........................82
5.16    Interest Reserve Account. ...........................................................................83
5.17    Golf Course Equity Payments.....................................................................83
5.18    Credit Rating...............................................................................................83
5.19    Post-Closing Covenants. .............................................................................83

SECTION 6. NEGATIVE COVENANTS ...............................................................................84

6.1     Indebtedness................................................................................................84
6.2     Liens and Related Matters. .........................................................................85
6.3     Investments. ...............................................................................................87
6.4     Contingent Obligations. .............................................................................88
6.5     Restricted Payments....................................................................................89
6.6     Financial Covenants....................................................................................90
6.7     Restriction on Fundamental Changes. ........................................................91
6.8     Sale or Discount of Receivables. ................................................................91

ii

6.9    Asset Sales. ...................................................................................................91
6.10   Transactions with Shareholders and Affiliates. .........................................93
6.11   Conduct of Business. ...................................................................................94
6.12   Tuscany Option Agreement. ........................................................................94
6.13   Amendments or Waivers of Certain Agreements. ......................................95
6.14   Fiscal Year. ..................................................................................................95
6.15   Hedge Agreements. ......................................................................................95
6.16   Limitation on Standing Inventory. ..............................................................95
6.17   Limitation on Unentitled Properties. ..........................................................95
6.18   Limitation on Purchase of Real Property Assets. .......................................95
6.19   Permitted SPE Subsidiary Activities. ..........................................................96

SECTION 7. EVENTS OF DEFAULT ..............................................................................96

7.1    Payment of Obligations. ..............................................................................96
7.2    Misrepresentations. ......................................................................................96
7.3    Breach of Certain Covenants. ......................................................................96
7.4    Breach of Other Covenants. ........................................................................96
7.5    Default Under Loan Documents. .................................................................96
7.6    Other Defaults. .............................................................................................97
7.7    Insolvency Proceedings. ..............................................................................97
7.8    Business Disruption; Condemnation. ..........................................................97
7.9    ERISA. ..........................................................................................................98
7.10   Challenge to Loan Documents; Invalidity. .................................................98
7.11   Judgment. .....................................................................................................98
7.12   Repudiation of or Default Under Subsidiary Guaranty. .............................98
7.13   Criminal Forfeiture. .....................................................................................98
7.14   Change of Control. .......................................................................................99

SECTION 8. AGENTS ........................................................................................................99

8.1    Appointment. ...............................................................................................99
8.2    Rights as a Lender. .....................................................................................100
8.3    Exculpatory Provisions. .............................................................................100
8.4    Reliance by the Agents. .............................................................................101
8.5    Delegation of Duties. .................................................................................101
8.6    Resignation of Administrative Agent and/or Collateral Agent..................101
8.7    Collateral Documents; Successor Collateral Agent. .................................102
8.8    Non-Reliance on Agents and Other Lenders. ............................................103

SECTION 9. MISCELLANEOUS .....................................................................................103

9.1    Assignments and Participations in Loans. .................................................103
9.2    Expenses; Indemnity; Damage Waiver. .....................................................106
9.3    Right of Set-Off. .........................................................................................108
9.4    Sharing of Payments by Lenders. ..............................................................108
9.5    Amendments and Waivers. .........................................................................109
9.6    Independence of Covenants. ......................................................................110
9.7    Notices. .......................................................................................................110
9.8    Survival of Representations, Warranties and Agreements.........................111
9.9    Failure or Indulgence Not Waiver; Remedies Cumulative.........................112

413775.11-Los Angeles Server 2A - MSW

| | | |
|---|---|---|
| 9.10 | Marshalling; Payments Set Aside. | 112 |
| 9.11 | Severability. | 112 |
| 9.12 | Obligations Several; Independent Nature of the Lenders' Rights. | 112 |
| 9.13 | Maximum Amount. | 112 |
| 9.14 | Headings. | 113 |
| 9.15 | Applicable Law. | 113 |
| 9.16 | Successors and Assigns. | 113 |
| 9.17 | Consent to Jurisdiction and Service of Process. | 113 |
| 9.18 | Waiver of Jury Trial. | 115 |
| 9.19 | Confidentiality. | 115 |
| 9.20 | Borrowers' Responsibility For Compliance With Environmental Laws | 116 |
| 9.21 | Joint and Several Liability. | 116 |
| 9.22 | Counterparts; Integration; Effectiveness; Electronic Execution. | 118 |
| 9.23 | USA Patriot Act Notification | 118 |

iv

## EXHIBITS

Exhibit I ...........Form of Administrative Questionnaire
Exhibit II ..........Form of Assignment Agreement
Exhibit III .........Form of Assignment of Declarant's Rights
Exhibit IV ........Form of Compliance Certificate
Exhibit V ..........Form of Disbursement Authorization
Exhibit VI ........Financial Plan
Exhibit VII .......Form of Intercreditor Agreement
Exhibit VIII ......Form of Note
Exhibit IX ........Form of Notice of Conversion/Continuation
Exhibit X ..........Form of Pledge and Security Agreement
Exhibit XI ........Description of Projects
Exhibit XII .......Form of Subsidiary Guaranty
Exhibit XIII ......Form of Copyright Security Agreement
Exhibit XIV ......Form of Solvency Certificate

assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may, without the consent of the Borrowers or the Administrative Agent, create a security interest in all or any portion of the Loans owing to it and the Notes, if any, held by it to the trustee for holders of obligations owed, or Securities issued, by such Fund as security for such obligations or Securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this subsection 9.1, (i) no such pledge shall release the pledging Lender from any of its obligations under this Agreement and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under this Agreement and the Notes even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

**G. SPV Lender.**  Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (a "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrowers, the option to provide to the Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrowers pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  An SPV shall not be entitled to receive any greater payment under subsection 2.7 that the Granting Lender would have been entitled to receive with respect to the Loan or portion of the Loan granted to such SPV, unless the grant to such SPV is made with the Borrowers' prior written consent.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this subsection 9.1, any SPV may (i) with notice to, but without the prior written consent of, the Borrowers and the Administrative Agent and without paying any processing fee therefore, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrowers and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This subsection 9.1 may not be amended without the written consent of the SPV.

**9.2     Expenses; Indemnity; Damage Waiver.**

**A. Costs and Expenses.**  Each of the Borrowers shall pay all actual and documented out-of-pocket expenses incurred by each Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of its appraiser, counsel (including, without limitation, special and local counsel) for each Agent and its Affiliates (and fees and time charges for attorneys who may be employees of such Agent or Affiliates) and filing and recording fees and expenses, in connection with the syndication of the credit facilities provided for herein, the development, preparation, negotiation, execution, delivery, closing, funding, and administration of this Agreement and the other Loan Documents, any Modifications or waivers of the provisions hereof or thereof (whether or not the

106

transactions contemplated hereby or thereby shall be consummated), or in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this subsection 9.2A, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

**B.    Indemnification by the Borrowers.**  Each of the Borrowers shall indemnify each Agent (and any sub-Agent thereof), each Lender, their respective successors and assigns and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all costs, losses, claims, damages, liabilities and expenses (including, without limitation, the reasonable fees, charges and disbursements of any counsel and consultants for any Indemnitee (and fees and time charges for attorneys who may be employees of any Indemnitee)) of any kind or nature whatsoever, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution, delivery, enforcement or administration of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property, any Environmental Claim or any Environmental Liabilities related in any way to any Borrower or any of its Subsidiaries, (iv) any claim, demand or liability for any brokerage commissions, or broker's or finder's fees or investment banking or similar fees incurred or alleged to have been incurred in connection with any of the Transactions, and any claim, demand or liability relating thereto or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Borrowers or any of their respective Affiliates); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such costs, losses, claims, damages, liabilities and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted primarily from the gross negligence or willful misconduct of such Indemnitee.

**C.    Reimbursement by the Lenders.**  To the extent that a Borrower fails to pay any amount required under subsection 9.2A or 9.2B to be paid by it to any Agent (or any sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-Agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-Agent) in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-Agent) in connection with such capacity.  The obligations of the Lenders under this subsection 9.2C are subject to the provisions of subsection 9.12.

**D.    Waiver of Consequential Damages, Etc.**  To the fullest extent permitted by Applicable Law, each of the Borrowers shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection 9.2B above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or

413775.11-Los Angeles Server 2A - MSW

thereby, unless such damages are directly caused solely by the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment.

       **E. Payments.**  All amounts due under this subsection 9.2 shall be payable promptly after demand therefor.

**9.3**     <u>Right of Set-Off.</u>

       Without limitation of any other rights of the Agents or Lenders, and subject to the terms of the Intercreditor Agreement, if an Event of Default shall have occurred and be continuing, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender, or any such Affiliate to or for the credit or the account of a Borrower against any and all of the Obligations of the Borrowers now or hereafter existing under this Agreement or any other Loan Document to such Agent or Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrowers may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.    The rights of each Agent, Lender and their respective Affiliates under this subsection 9.3 are in addition to other rights and remedies (including other rights of setoff) which such Agent, Lender or their respective Affiliates may have and are subject to the terms of the Intercreditor Agreement.    Each Agent and Lender agrees promptly to notify the Borrowers and the Administrative Agent after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**9.4**     <u>Sharing of Payments by Lenders.</u>

       If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for Cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, to the end that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to a Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).    Each of the Borrowers consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

413775.11-Los Angeles Server 2A - MSW