Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone: 702.979.2357
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com

Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002

E-Mail: pdublin@akingump.com
aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

*Electronically Filed*
*January 11, 2010*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: | § Case No. 09-14814-LBR |
| | § (JointlyAdministered) |
| THE RHODES COMPANIES, LLC, | § |
| aka "Rhodes Homes," *et al.*, | § Chapter 11 |
| | § |
| Debtors.[1] | § |
| | § |
| | § |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

| Affects: | § | **DECLARATION OF RICHARD DIX IN** |
|---|---|---|
| ☒ **All Debtors** | § | **SUPPORT OF CONFIRMATION OF THE** |
| ☐ **Affects the following** | § | **SECOND AMENDED MODIFIED PLAN** |
| **Debtor(s)** | § | **OF REORGANIZATION PURSUANT TO** |
| | § | **CHAPTER 11 OF THE BANKRUPTCY** |
| | § | **CODE FOR THE RHODES COMPANIES,** |
| | § | **LLC, ET AL.** |

I, Richard Dix, hereby declare:

1.    I am the founder, President and Chief Executive Officer of Winchester Carlisle Holdings and its subsidiaries or affiliates, Winchester Carlisle Partners ("WCP"), Nathan Grace Real Estate, Carwin Advisors, and Dunhill Homes. Previously, I served as the Mountain West Area President for Pulte Homes, Inc. ("Pulte") based in Las Vegas from March 2007 until February 2008. I also served as Division President of Pulte for Dallas/Fort Worth from November 2003 until March 2007. From February 2003 to November 2003, I served in various management roles with Pulte in the Detroit and Philadelphia metropolitan areas. Prior to joining Pulte Homes, I served as Director of Business Development & Strategy – Information Services & Systems for General Motors from October 2000 to February 2003. I also have experience operating various entrepreneurial ventures in manufacturing, retail and technology.

2.    I submit this declaration in support of confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (as may be amended, the "Plan"). Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

2

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

## History of Proposed Restructuring[2]

3.      As represented by the Debtors, at the end of the fourth quarter of 2008, sales in the Las Vegas market of new, detached homes were down 93% (to 522 net sales) from the peak (7,731 quarterly net sales) that occurred in the second quarter of 2005. The median base price for a detached single family home dropped 39% from the peak achieved in the fourth quarter of 2005.

4.      Although the Debtors had made cost reductions in general overhead and other areas, including employee layoffs, many factors, including the severe downturn of the Las Vegas market, significant supply overhang, and general economic malaise combined to create an environment where the Debtors were unable to meet their March 2009 debt and amortization payments. The First Lien Steering Committee was formed in early March 2009 to negotiate the terms of a forbearance agreement and consensual restructuring with the Debtors after it became apparent that the Debtors would not be able to make their regularly scheduled interest and amortization payments on the first lien debt.

5.      On March 31, 2009, an interest payment in the amount of approximately $9 million and a principal payment in the amount of $10.75 million was due and owing on the First Lien Credit Agreement and an interest payment in the amount of approximately $2.4 million was due and owing on the Second Lien Credit Agreement. Despite extended and intensive negotiations between the First Lien Lenders and the Debtors, when no agreement was reached by March 31, 2009, the Debtors commenced these Chapter 11 Cases on March 31, 2009 and April 1, 2009 to avail themselves of the protections of the Bankruptcy Code.

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

6.   On either March 31, 2009 or April 1, 2009, each of the Debtors Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.   On August 17, 24 and 25, 2009, the First Lien Steering Committee, the Second Lien Agent, the Creditors' Committee, the Debtors and the Rhodes Entities (collectively, the "Mediation Parties") participated in a mediation over the terms of a proposed plan of reorganization for the Debtors before the Honorable Richard Neiter, United States Bankruptcy Court, Central District of California.  During the mediation, the Mediation Parties reached agreement in principle on a comprehensive settlement (the "Mediation Settlement").  The Plan embodies the terms of the Mediation Settlement.

8.   In general, the Mediation Settlement and the Plan provide, among other things, that the First Lien Lenders will assume ownership of the Debtors and will continue to operate the Debtors as a going concern homebuilder primarily in the Las Vegas, Nevada market.  In addition, the First Lien Lenders will receive, on account of their Secured Claims, $1.5 million in cash from their collateral and their pro rata share of $50 million in new secured notes.  The First Lien Lenders will use the $1.5 million of the cash they receive from their collateral to purchase certain General Unsecured Claims for the allowed amount of such Claims.  The Second Lien Lenders will receive 50% of the net proceeds of certain pending litigation on account of their Secured Claims.  The Rhodes Entities will, among other things, pay $3.5 million in cash to the Reorganized Debtors and will receive, among other things, (i) a limited release as described in the Plan, (ii) certain assets located in Arizona, and (iii) certain tax benefits.  The Plan also provides for the establishment of a

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

4

Litigation Trust that will pursue certain Claims and Causes of Action belonging to the Debtors' estates for the benefit of those Holders of General Unsecured Claims whose Claims are not purchased by the First Lien Lenders. The First Lien Lenders and the Second Lien Lenders will also receive distributions from the Litigation Trust as unsecured creditors on account of their First Lien Lender Deficiency Claims and Second Lien Lender Deficiency Claims.

9.      I believe that confirmation of the Plan is in the best interests of the Debtors and all creditor constituencies and represents the best possible restructuring alternative for the Debtors' businesses.

**Valuation Analysis**

10.      In connection with the First Lien Steering Committee's efforts to formulate and implement a plan of reorganization, the First Lien Steering Committee requested that WCP perform a valuation analysis of the Reorganized Debtors.  I have been directly involved in the preparation by professionals at WCP of an analysis of the Reorganized Debtors' total enterprise value on a going concern basis upon the Reorganized Debtors' emergence from chapter 11.  In preparing the analysis (the "Valuation"), WCP used a valuation date of January 1, 2010.  WCP prepared the Valuation based on financial projections and financial and market conditions prevailing as of the date of the Valuation. WCP was assisted in the preparation of the Valuation by Robert Charles Lesser & Co. ("RCLCO"), the First Lien Steering Committee's valuation consultant.

11.      In preparing the Valuation, WCP, among other things, (i) reviewed certain internal financial and operating data of the Debtors; (ii) reviewed certain operating and financial forecasts; (iii) performed discounted cash flow ("DCF") analyses; (iv) considered

5

sales transactions for properties comparable to certain of the Debtors' assets; (v) considered information from qualified third party sources relating to revenue and cost assumptions; and (vi) conducted such other analyses as deemed necessary to complete the Valuation.

12.     Based on the foregoing, WCP provided a valuation to the First Lien Steering Committee that the total enterprise value on a "reorganization value" basis for the Reorganized Debtors, on an assumed valuation date of January 1, 2010, is between $89.2 million and $111.5 million, with a midpoint value of $99.6 million.

13.     Based upon the estimated range of the reorganization value of the Reorganized Debtors of between $89.2 million and $111.5 million and assumed total debt of approximately $415 million, WCP believes there is no value available for distribution to Holders of Equity Interests.

14.     The estimates contained in WCP's analysis and the ranges of valuations resulting from any particular analysis are not necessarily indicative of actual values or predictive of future results or values, which may be significantly different from the values suggested by the analyses. Further, in addition to the assumptions and qualifications discussed herein, the valuation analyses are subject to the assumptions and qualifications set forth in the Disclosure Statement.

### **The Disclosure Statement**

15.     This Court has determined that the Disclosure Statement provided adequate information for creditors to make an informed judgment about the Plan. The First Lien Steering Committee, with the assistance of its professionals, expended a significant amount of time and effort preparing the Disclosure Statement and welcomed input and comment from all parties in interest. The Disclosure Statement contains summaries of certain

6

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

provisions of the Plan, statutory provisions, documents relating to such, events leading to the commencement of the Chapter 11 Cases, and financial information. Specifically, the Disclosure Statement sets forth certain detailed information regarding the Debtors' history, projections for future operations, and significant events that occurred during the Chapter 11 Cases. The Disclosure Statement also describes the Plan, effects of the Confirmation Order, and the manner in which distributions will be made under the Plan. Additionally, the Disclosure Statement discusses the confirmation process and the voting procedures that creditors in the Voting Classes must follow for their votes to be counted.

## Solicitation of the Plan

16.     I have been advised and believe that the First Lien Steering Committee's procedures for solicitation of votes to accept or reject the Plan were in compliance with the rules, regulations, and the Solicitation Procedures Order, and that such procedures satisfy Bankruptcy Code section 1126 and Bankruptcy Rules 3017 and 3018.

17.     By order of this Court, dated April 8, 2009, the Debtors retained Omni Management Group, LLC ("Omni") to serve as their Claims and Solicitation Agent. In connection with its role as the Debtors' Claims and Solicitation Agent, Omni was directed to (i) solicit votes from Holders of Claims entitled to vote on the Plan and (ii) review and tabulate the ballots that were subsequently submitted. As set forth in the chart below and in the Voting Report filed contemporaneously herewith as Exhibit A to the Osborne Declaration (the "Voting Report"), on which the chart below is based, the Plan has been accepted by Holders of Claims in Classes A-1, A-2, C-2 and C-3:

| Total Ballots Received | | | |
|---|---|---|---|
| ACCEPT | | REJECT | |
| Number | Amount | Number | Amount |
| Class A-1 – First Lien Lender Secured Claims | | | |
| 89 | $303,788,681.44 | 6 | $7,602,129.55 |
| Class A-2 – Second Lien Lender Secured Claims | | | |
| 19 | $37,856,465.48 | 0 | $0 |
| Class C-1 – General Unsecured Claims | | | |
| 10 | $483,486.91 | 5 | $9,976,695.10 |
| Class C-2 – First Lien Lender Deficiency Claims | | | |
| 62 | $228,906,370.83 | 6 | $7,602,129.55 |
| Class C-3 – Second Lien Lender Deficiency Claims | | | |
| 19 | $37,856,465.48 | 0 | $0 |

18.    Because of their treatment as Unimpaired under the Plan, the First Lien Steering Committee did not solicit the votes of Holders of (i) Administrative Claims and Priority Tax Claims and (ii) Claims in Class A-3 (Other Secured Claims) and Class B (Priority Non-Tax Claims).

19.    Because they were deemed to reject the Plan, the First Lien Steering Committee did not solicit votes from Holders of Claims or Interests in Class C-4 (Subordinated Claims), Class D (Old Equity Interests) and Class E (Intercompany Claims).

20.    To the best of my knowledge, the First Lien Steering Committee did not engage in any solicitation of acceptances of the Plan other than by utilizing the solicitation materials and procedures described in the Osborne Declaration.

## Compliance with Bankruptcy Code Sections 1122 and 1123

21.    Article III.A of the Plan provides for the separate classification of Claims and Interests in ten individual Classes, based upon the legal nature and/or priority of such Claims and Interests. Administrative Claims and Priority Tax Claims are not classified and are separately treated in Articles II.A and II.B of the Plan, respectively. The Classes of Claims and Interests are as follows:

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

8

| Class A-1 | Class A-1 provides for the separate classification of First Lien Lender Secured Claims |
|---|---|
| Class A-2 | Class A-2 provides for the separate classification of Second Lien Lender Secured Claims |
| Class A-3 | Class A-3 provides for the separate classification of Other Secured Claims |
| Class B | Class B provides for the separate classification of Priority Non-Tax Claims |
| Class C-1 | Class C-1 provides for the separate classification of General Unsecured Claims |
| Class C-2 | Class C-2 provides for the separate classification of First Lien Lender Deficiency Claims |
| Class C-3 | Class C-3 provides for the separate classification of Second Lien Lender Deficiency Claims |
| Class C-4 | Class C-4 provides for the separate classification of Subordinated Claims |
| Class D | Class D provides for the separate classification of Old Equity Interests |
| Class E | Class E provides for the separate classification of Intercompany Claims |

22.     I am advised and believe that each of the Claims or Interests in each

particular class is substantially similar to the other Claims or Interests in such Class.

### Compliance With Bankruptcy Code Section 1123

(A)     Contents of Plan (11 U.S.C. 1123(a))

23.     Designation of Classes of Claims and Interests. As set forth above, Article

III.A of the Plan designates nine Classes of Claims and one Class of Interests. I am advised

and believe, therefore, that the Plan complies with Bankruptcy Code section 1123(a)(1).

24.     Specification of Unimpaired Classes. Article III.B of the Plan specifies the

Classes of Claims that are Unimpaired under the Plan. I am advised and believe, therefore,

that the Plan complies with Bankruptcy Code section 1123(a)(2).

25.     Treatment of Impaired Classes. Article III.B of the Plan specifies the

treatment of those Claims and Interests that are Impaired under the Plan. I am advised and

believe, therefore, that the Plan complies with Bankruptcy Code section 1123(a)(3).

26.    Equal Treatment Within Classes.  Article III.B of the Plan provides for

equality of treatment for each Claim or Interest within a particular Class.  I am advised and

believe, therefore, that the Plan complies with Bankruptcy Code section 1123(a)(4).

27.    Implementation of Plan.  I am advised and believe that the Plan provides

adequate and proper means for its implementation, including, but not limited to, (i) the

issuance of Newco Equity Interests and the New First Lien Notes, and (ii) the cancellation

of existing Equity Securities.  I am advised and believe, therefore, that the Plan complies

with Bankruptcy Code section 1123(a)(5).

28.    Charter Provisions.  Article IV.J of the Plan provides that the Newco

organizational documents will, among other things, include a provision prohibiting the

issuance of non-voting Equity Securities to the extent required by Bankruptcy Code section

1123(a)(6).  Based on the foregoing, I am advised and believe that the Plan complies with

Bankruptcy Code section 1123(a)(6).

29.    Selection of Officers and Directors.  Article IV.M of the Plan provides that

the board of directors of the Reorganized Debtors or similar governing entities will be

composed of one or more members appointed by the First Lien Steering Committee.  In

addition, the Plan provides that, on the Effective Date, a chief executive officer or similar

management selected by the board of directors of the Reorganized Debtors shall be

appointed.  Finally, the Plan provides that the identity of such officers and directors shall be

disclosed at or prior to the Confirmation Hearing.  The provisions of the Plan for the

selection of directors and officers are consistent with the interests of creditors and Interest

Holders and with public policy as to the manner and selection of any officer, director, or

trustee and any successor thereto.  Moreover, as described further below, such Plan

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

provisions satisfy the requirements in Bankruptcy Code section 1129(a)(5) in that the First

Lien Steering Committee will disclose, on or prior to the Confirmation Date, the identity and

affiliations of any Person proposed to serve on the initial boards of directors of the

Reorganized Debtors and, to the extent such Person is an insider, the nature of any

compensation to be paid to such Person. I am advised that the classification and

composition of the boards of directors of each of the Reorganized Debtors are consistent

with each Reorganized Debtor's amended or restated certificate of incorporation, as

applicable, the other applicable constituent documents of each Reorganized Debtor, and

applicable law. I am advised and believe, therefore, that the Plan complies with Bankruptcy

Code section 1123(a)(7).

30.    Future Income. Each of the Debtors are corporations, partnerships or limited

liability companies. Accordingly, I am advised and believe that Bankruptcy Code section

1123(a)(8) is not implicated by the Plan.

(B)    Contents of Plan (11 U.S.C. 1123(b))

31.    I am advised and believe that each provision of the Plan is consistent with

Bankruptcy Code section 1123(b):

> • Pursuant to Article III.B of the Plan, Classes A-3 and
> B are Unimpaired, and Classes A-1, A-2, C-1, C-2, C-
> 3, C-4, D and E are Impaired, as contemplated by
> Bankruptcy Code section 1123(b)(1).

> • Article V.A of the Plan provides that the Debtors'
> executory contracts and unexpired leases that have not
> been assumed or rejected pursuant to an order of the
> Court prior to the Effective Date shall be deemed
> rejected, except for certain executory contracts and
> unexpired leases identified in the Plan, as
> contemplated by Bankruptcy Code section 1123(b)(2).

> • Article IV.P of the Plan provides that the Reorganized
> Debtors and/or the Litigation Trust, as applicable, shall

retain and may enforce any and all Causes of Action, whether arising before or after the Petition Date, including those actions specifically enumerated on Exhibit L to the Disclosure Statement. The Causes of Action to be transferred to the Litigation Trust are specifically set forth in Exhibit G to the Disclosure Statement. Notwithstanding the foregoing, the Plan provides for (i) the release of the Rhodes Entities from certain avoidance actions arising under chapter 5 of the Bankruptcy Code, (ii) the release of the Released Parties (as defined below) from certain Claims and Causes of Action belonging to the Debtors, and (iii) the voluntary release of First Lien Lenders from certain Claims and Causes of Action that could be asserted by other First Lien Lenders as part of the Mediation Settlement embodied in the Plan. Such provisions are contemplated by Bankruptcy Code section 1123(b)(3).

- Article XII of the Plan provides that, among other things, the Court shall retain jurisdiction over all matters arising out of and related to the Chapter 11 Cases and the Plan. Such provision is appropriate under Bankruptcy Code section 1123(b)(6).

## Compliance With Bankruptcy Code Section 1129

32.    I believe that the First Lien Steering Committee submitted the Plan in good faith and I have been advised that the Plan satisfies (i) each of the requirements of Bankruptcy Code section 1129(a), with the exception of section 1129(a)(8), and (ii) each of the requirements set forth in Bankruptcy Code section 1129(b)(1).

33.    Although I have been informed that the Plan does not comply with Bankruptcy Code section 1129(a)(8) with respect to Classes C-1, C-4, D and E (together, the "Rejecting Classes"), I have been advised and believe that the Plan is confirmable because the Plan satisfies Bankruptcy Code sections 1129(b)(1) and 1129(b)(2) of the Bankruptcy Code with respect to such Classes.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

12

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

34.    Section 1129(a)(1).    I have been advised and believe that the Plan complies fully with the requirements of both sections 1122 and 1123 (as described above), as well as other provisions of the Bankruptcy Code, as required by Bankruptcy Code section 1129(a)(1).

35.    Section 1129(a)(2).    I am advised and believe that the First Lien Steering Committee has complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2).

36.    Section 1129(a)(3).    The Plan is proposed with the legitimate and honest purpose of restructuring the Debtors (and I am advised and believe not by any means forbidden by law) and expeditiously making distributions to the Debtors' creditors. The Plan is the product of extensive, arm's-length negotiations between the First Lien Steering Committee, the Debtors, the Rhodes Entities, the Creditors' Committee and the Second Lien Agent. The Plan reflects the results of these negotiations and takes into account the interests of the Debtors' creditor constituencies. At the same time, the Plan allows for the Reorganized Debtors to emerge from bankruptcy as viable, new entities with cash flows and financing necessary to implement their business plan. I am advised and believe, therefore, that the Plan complies with Bankruptcy Code section 1129(a)(3).

37.    Section 1129(a)(4). I have been informed that, except as otherwise ordered by the Court, all fees and expenses of Professionals accrued through the Effective Date will be subject to the interim (if applicable) and final approval of this Court. I am advised and believe, therefore, that the Plan complies with Bankruptcy Code section 1129(a)(4).

38.    Section 1129(a)(5). Pursuant to Article IV.M of the Plan, the First Lien Steering Committee has disclosed the identity and compensation of the officers and directors

of the Reorganized Debtors to the Court. *See* Notice of Disclosure of Directors and Officers

Pursuant to 11 U.S.C. § 1129(a)(5) for Second Amended Modified Plan of Reorganization

Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.*,

which has been filed contemporaneously herewith. Accordingly, I am advised and believe

that Bankruptcy Code section 1129(a)(5) has been complied with.

39.     Section 1129(a)(6). I am advised and believe that Bankruptcy Code section

1129(a)(6) is inapplicable because the Plan does not provide for changes in any rates subject

to regulatory approval.

40.     Section 1129(a)(7). As set forth in greater detail below, the Liquidation

Analysis (as defined below) contained in the Disclosure Statement establishes that each

Holder of a Claim or Interest in an Impaired Class either (i) has accepted the Plan or (ii) will

receive or retain under the Plan, on account of such Claim or Interest, property of a value, as

of the Effective Date of the Plan, that is the same or greater than the amount that it would

have received if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. I am

advised and believe, therefore, that the Plan complies with Bankruptcy Code section

1129(a)(7).

41.     Section 1129(a)(8). As set forth in the Voting Report, the Holders of Claims

in the following Classes voted to accept the Plan: (i) Class A-1 (First Lien Lender Secured

Claims); (ii) Class A-2 (Second Lien Lender Secured Claims); (iii) Class C-2 (First Lien

Lender Deficiency Claims); and (iv) Class C-3 (Second Lien Lender Deficiency Claims).

Classes C-4 (Subordinated Claims), Class D (Old Equity Interests) and Class E

(Intercompany Claims) are not entitled to receive or retain any property under the Plan and I

am advised and believe that they are deemed to have rejected the Plan pursuant to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1 Bankruptcy Code section 1126(g).  In addition, Class C-1 (General Unsecured Claims)

2 voted to reject the Plan.

3       42.     I am advised and believe, therefore, that the Plan does not satisfy Bankruptcy

4 Code section 1129(a)(8).  Notwithstanding the lack of compliance with Bankruptcy Code

5

6 section 1129(a)(8) with respect to the Rejecting Classes, I am advised and believe that the

7 Plan is confirmable because the Plan satisfies Bankruptcy Code section 1129(b) with respect

8 to such Classes.

9       43.     Section 1129(a)(9).  I am advised and believe that, in accordance with

10 Bankruptcy Code section 1129(a)(9)(A), Article II.A of the Plan provides that each Allowed

11 Administrative Claim shall be paid in full in cash (i) on the later of (a) the Effective Date,

12

13 (b) the date on which the Court enters an order allowing such Allowed Administrative

14 Claim, or (c) the date on which the Reorganized Debtors or the Debtors, with the consent of

15 the First Lien Steering Committee (and in consultation with the First Lien Agent and Second

16 Lien Agent) and the Holder of such Allowed Administrative Claim otherwise agree, and

17

18 (ii) in such amounts as (a) are incurred in the ordinary course of business by the Debtors,

19 (b) are Allowed by the Court, (c) may be agreed upon between the Debtors, with the consent

20 of the First Lien Steering Committee (and in consultation with the First Lien Agent and

21

22 Second Lien Agent) or (d) may otherwise be required under applicable law.  Allowed

23 Administrative Claims relating to liabilities incurred in the ordinary course of business by

24 the Debtors, as debtors in possession, shall be paid by the Debtors or by the Reorganized

25 Debtors in the ordinary course of business and subject to the conditions of the agreements

26 governing or relating to such obligations.

27

28

44.     Article II.B of the Plan classifies all Priority Tax Claims and provides that such Claims will be paid in full, in cash, upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (iii) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (iv) upon such other terms as may be agreed to between the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), and any Holder of an Allowed Priority Tax Claim. Article II.B of the Plan further provides that, in lieu of payment in full on the Effective Date, the Reorganized Debtors or the Debtors may make deferred cash payments, together with interest as provided in the Plan, in respect of Allowed Priority Tax Claims.

45.     For the reasons set forth above, I am advised and believe that the Plan complies with Bankruptcy Code section 1129(a)(9).

46.     Section 1129(a)(10). As set forth in the Voting Report, the following Classes of Impaired Claims have voted to accept the Plan, without including the acceptance of the Plan by insiders, if any, in such Classes: Class A-1 (First Lien Lender Secured Claims); Class A-2 (Second Lien Lender Secured Claims; Class C-2 (First Lien Lender Deficiency Claims); and Class C-3 (Second Lien Lender Deficiency Claims). Accordingly, I am advised and believe that the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(10).

47.     Section 1129(a)(11). As set forth in greater detail below, I believe that the Plan is feasible. The Debtors will have sufficient funds to make all the cash payments called for under the Plan. Sources of available cash include existing cash balances and the $3.5

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

16

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1   million cash payment to be made by the Rhodes Entities to the Reorganized Debtors as

2   contemplated by the Mediation Settlement, and the Reorganized Debtors or post

3   Confirmation Date borrowings under other available facilities of the Debtors or the

4   Reorganized Debtors. I also believe that it is likely that the Debtors will be able to continue

5   as viable entities. No reasonable analysis leads to the conclusion that following

6

7   confirmation of the Plan, the Debtors will be liquidated or require further financial

8   reorganization. Confirmation of the Plan will allow the Reorganized Debtors to emerge

9   from chapter 11 as viable entities with cash flows and financing sufficient to permit them to

10  implement their business strategy as described in the Disclosure Statement. I am advised

11  and believe, therefore, that the Plan complies with Bankruptcy Code section 1129(a)(11).

12

13      48.    Section 1129(a)(12). Upon information and belief, all fees required to be

14  paid by Bankruptcy Code section 1129(a)(12) incurred through the date of confirmation of

15  the Plan either have been paid by the Debtors during the pendency of these cases and/or will

16  be paid on the Effective Date. Article II.A of the Plan requires payment of all fees payable

17  under 28 U.S.C. § 1930 on or before the Effective Date.

18

19      49.    Section 1129(a)(13). I am advised and believe that Bankruptcy Code section

20  1129(a)(13) is inapplicable because the Debtors have no retiree obligations.

21

22      50.    Section 1129(a)(14)-(15). Each of the Debtors are business entities.

23  Accordingly, I am advised and believe that Bankruptcy Code sections 1129(a)(14) and (15)

24  are not implicated by the Plan.

25      51.    Section 1129(a)(16). Each of the Debtors is a moneyed, business, or

26  commercial entity. Accordingly, I am advised and believe that Bankruptcy Code section

27  1129(a)(16) is not implicated by the Plan.

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**The Plan Satisfies the "Cram Down"**
**Requirements Under Section 1129(b) of the Bankruptcy Code**

52.     The Plan Does Not Discriminate Unfairly With Respect to the Rejecting Classes.  Class C-4 (Subordinated Claims) and Class D (Old Equity Interests) consist of (i) Interests (Class D) or (ii) Claims that have been subordinated to other Classes of Claims receiving distributions under the Plan pursuant to Bankruptcy Code section 510 (Class C-4). I am advised and believe that there are no other similarly situated Classes.

53.     In addition, I am advised that there is a reasonable basis for the disparate treatment of the Claims in Class E (Intercompany Claims), and the Claims are treated appropriately according to the differences.  Specifically, the treatment of Claims in Class E is appropriate in light of the fact that the Plan calls for the substantive consolidation of the Debtors' Estates.  Accordingly, the treatment of the Claims in Class E is reasonable, appropriate, and necessary.

54.     Finally, I am advised that there is no unfair discrimination arising from the purchase of certain General Unsecured Claims by the First Lien Lenders because such purchase constitutes permissible (i) claims trading or (ii) sharing of the First Lien Lenders' recovery under the Plan on account of the Secured portion of their Claims.

55.     The Plan Is Fair and Equitable With Respect to the Rejecting Classes.  I am advised and believe that the Plan is "fair and equitable" with respect to Class C-1 (General Unsecured Claims), Class C-4 (Subordinated Claims), Class D (Old Equity Interests) and Class E (Intercompany Claims) because, as a result of the Valuation, none of the above Rejecting Classes will receive any distributions or retain any property under the Plan nor will any Classes of Claims senior to such Classes receive property with a value that exceeds the allowed amount of their respective Claims.

18

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

**Liquidation Analysis**

56.    I personally assisted with the preparation and analysis of the estimated recoveries that Holders of Impaired Claims under the Plan would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (the "Liquidation Analysis"). As with the Valuation, the Liquidation Analysis was prepared by both WCP and RCLCO. The Liquidation Analysis is attached to the Disclosure Statement as Exhibit E and is incorporated herein by reference.

57.    The Liquidation Analysis estimates the value of the Debtors' real estate assets under liquidation, representing a range of assumptions relating to the risk and costs incurred during liquidation. The DCF analysis performed in connection therewith derives an estimated value of the Debtors' real estate assets by discounting the unlevered projected free cash flows a buyer or buyers of the Debtors' assets could expect to achieve, based on market projections, to a net present value as of the Effective Date. RCLCO used a discount rate range of 25% to 30% in the Liquidation Analysis, reflecting the higher risk premium required by investors under this scenario. Based on these methodologies, and after further review, discussions, considerations and assumptions, WCP estimates that the liquidation value of the Debtors' real estate assets as of January 1, 2010 ranges from $44.2 million to $55.0 million, with a midpoint of $49.3 million.

58.    As reflected in the Liquidation Analysis, WCP performed the Liquidation Analysis on a consolidated basis and did not provide a liquidation value for each individual Debtor entity. The first lien indebtedness and second lien indebtedness total approximately $415 million, which indebtedness is secured by first and second liens, respectively, on substantially all of the Debtors' assets at each Debtor entity. Given that the Liquidation

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Analysis reflects a midpoint value of $49.3 million, I believe that there is no value available for Claims beyond the first lien indebtedness at any Debtor entity on either a liquidation or going concern basis.

59.     I believe the assumptions underlying the Liquidation Analysis are reasonable, and that the Liquidation Analysis provides an indication of the chapter 7 liquidation value of the Debtors' real estate assets and the distributions that Holders of Claims would receive under such circumstances.

60.     It is my understanding, based on discussions with the First Lien Steering Committee's attorneys, that the "absolute priority rule" would be applicable to liquidation proceedings under chapter 7.  It is also my understanding that, under such rule, no junior creditor could receive any distribution until all senior creditors have been paid in full, and no equity holder would receive any distribution unless all creditors have been paid in full.  The Liquidation Analysis applies the absolute priority rule and indicates that Holders of Secured Claims would receive less than the full value of their Claims and that Holders of General Unsecured Claims and Interests would receive no distribution. The result of this analysis is therefore substantially less favorable to creditors than the proposed Plan.

## Reasonableness of Financial Projections and Feasibility

61.     I understand, based on discussions with the First Lien Steering Committee's counsel, that the Bankruptcy Code's requirement for confirmation of a plan is one of "feasibility."  In other words, the Court must determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.

62.     I personally assisted with the preparation of certain projections (the "Projections"), which are annexed to the Disclosure Statement as Exhibit D and are

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

incorporated herein by reference.  For purposes of determining whether the Plan satisfies this feasibility standard, the First Lien Steering Committee, through WCP and RCLCO, have analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.

63.    As set forth in the Disclosure Statement, the Debtors' revenue is derived from the construction and sale of single family homes on all single-family lots currently in inventory, as well as on certain multifamily and commercial parcels where it was determined that single-family homes were the highest and best use.  The key factors driving the Debtors' financial performance and revenues are: (1) average sales price; (2) average cost of construction; (3) land development costs and; (4) annual home sales and closings.

64.    Pricing and sales velocity for these homes were projected to recover from their currently depressed levels, as determined by an analysis of recent and historical sales data, to more sustainable level of growth by 2011.  Additional revenue is derived from the sale of certain land parcels at prices and dates supportable by market conditions, as well as the operation and sale of the Tuscany Golf Course.

65.    Like the Valuation, the Projections assume an Effective Date of January 1, 2010 with Allowed Claims and Allowed Interests treated as described in the Plan.  The Projections include unaudited pro-forma balance sheets, income statements, and cash flow statements from January 1, 2010 through December 31, 2014.

66.    The Projections should be read in conjunction with the significant assumptions and qualifications set forth in Exhibit D to the Disclosure Statement, which comprise an integral part of the Projections and should be referenced in connection with any review of the Projections, and I hereby incorporate by reference all such information.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1   67.    Any financial projections are only estimates.  Actual results may vary

2   considerably because assumptions may prove not to be correct, and forecasts of future

3   economic conditions are by their nature highly volatile.  However, I believe that the

4

5   Projections are a reasonable estimate of the prospective financial performance of the

6   Debtors.

7   68.    I believe that based on the Projections, the Reorganized Debtors will have the

8   financial capability to satisfy their obligations following the Effective Date pursuant to the

9   Plan, including the payment of all cash distributions contemplated by the Plan.

10

11

12  I declare under penalty of perjury that the foregoing is true and correct.

13  Executed this __11__ day of January, 2010.

14

15                                    By: _____

16                                         Richard Dix

17

18

19

20

21

22

23

24

25

26

27

28