**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

recapitalization or exchange of securities of the Company in which the Members do not receive any cash or other assets or (b) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units.

"Drag-Along Sale" shall have the meaning set forth in Section 21(c)(i).

"Drag-Along Sale Notice" shall have the meaning set forth in Section 21(c)(ii).

"Drag-Along Securities" shall have the meaning set forth in Section 21(c)(ii).

"Drag-Along Seller" shall have the meaning set forth in Section 21(c)(i).

"Drag-Along Threshold" means either (i) 50% of the outstanding Units, if the Drag-Along Sale attributes to the Company an enterprise value in excess of $100,000,000 or (ii) 66.66% of the outstanding Units, if the Drag-Along Sale attributes to the Company an enterprise value less than or equal to $100,000,000.

"Effective Date" shall mean [            ], 2010.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Securities" mean Securities of the Company (a) issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services; (b) issued as a dividend or pro rata distribution to existing Members, or any split, recapitalization or other subdivision or combination of Units; (c) issued in connection with, or for the purpose of, an acquisition (whether by stock sale, merger, recapitalization, asset sale or otherwise) of another Person (or any portion thereof) or its respective businesses or operations; and (c) issued in a public offering of Securities of the Company.

"Exercise Period" shall have the meaning set forth in Section 7(b).

"Fair Market Value" shall mean, as of the date of determination, (a) in the case of publicly-traded Securities, the average of their last sales prices on the applicable trading exchange or quotation system in each trading day during the five trading-day period ending on such date and (b) in the case of any other Securities or property, the fair market value of such Securities or property, as reasonably determined in good faith by the Board of Managers.

"First Lien Steering Committee Member" shall mean any of Candlewood, Credit Suisse Loan Funding, CSAM, CypressTree, GE, the Highland Managed Funds and Sorin.

"Fiscal Year" means (a) the taxable year of the Company, which shall be the calendar year unless otherwise required (or, in the Board of Managers' reasonable discretion, permitted) by Section 706(b) of the Code, and (b) for purposes of Section 11 through Section 14, the portion

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

of any Fiscal Year for which the Company is required to (or does) allocate gross income, Net Profit, Net Loss, or other items pursuant to <u>Section 11</u> through <u>Section 14</u>.

"<u>Forfeited Unit Transferees</u>" shall have the meaning set forth in <u>Section 17(c)</u>.

"<u>Forfeiture Transfer</u>" shall have the meaning set forth in <u>Section 17(c)</u>.

"<u>GE</u>" shall mean [          ].

"<u>Governmental Authority</u>" shall mean any domestic or foreign government or political subdivision thereof, whether on a federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"<u>Highland Managed Funds</u>" shall mean all of [          ] and its associated related affiliated funds (and any direct designee of [          ]).

"<u>Highland Manager</u>" shall have the meaning set forth in <u>Section 5(a)(i)</u>.

"<u>Indemnitee</u>" shall have the meaning set forth in <u>Section 30(b)</u>.

"<u>IPO</u>" shall mean the closing of the first public offering of and sale of Securities of the Company (or any other entity created through any reorganization of the Company) (other than on Forms S-4 or S-8 or their equivalent), pursuant to an effective registration statement filed by the Company under the Securities Act.

"<u>IRS</u>" shall mean the Internal Revenue Service.

"<u>Management Members</u>" shall mean (a) [          ] and (b) any other Member designated as a "Management Member" by the Board of Managers from time to time.

"<u>Manager</u>" shall mean any Person that is a member of the Board of Managers.

"<u>Members</u>" shall mean the holders of Class A Units and Class B Units signatory to this Agreement (including pursuant to the execution and delivery of a Joinder Agreement, substantially in the form attached hereto as <u>Exhibit B</u>).

"<u>Net Profits</u>" and "<u>Net Losses</u>" shall mean, with respect to any Accounting Period, net income or net loss of the Company for such Accounting Period, determined in accordance with § 703(a) of the Code, including any items that are separately stated for purposes of § 702(a) of the Code, as determined in accordance with federal income tax accounting principles with the following adjustments:

    (a)    any income of the Company that is exempt from United States federal income tax shall be included as income;

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(b)    any expenditures of the Company described in § 705(a)(2)(B) of the Code or treated as expenditures pursuant to § 1.704-1(b)(2)(iv)(i) of the Treasury Regulations shall be treated as current expenses;

(c)    any items of income, gain, loss or deduction specially allocated pursuant to this Agreement, including pursuant to <u>Section 17(a)</u>, <u>Section 17(b)</u> and <u>Section 17(d)</u>, shall be excluded from the determination of Net Profit and Net Loss;

(d)    any adjustment to the Carrying Values of the Company's assets pursuant to the definition of Carrying Value shall be treated as Net Profit and Net Loss; and

(e)    in lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with the definition of "Depreciation".

"<u>New First Lien Notes</u>" shall mean those certain New First Lien Notes, dated as of [        , 2010], issued by the Company pursuant to [                 ].

"<u>New Securities</u>" shall have the meaning set forth in <u>Section 7(b)</u>.

"<u>Notice of Proposed Issuance</u>" shall have the meaning set forth in <u>Section 7(b)</u>.

"<u>Observer</u>" shall have the meaning set forth in <u>Section 28(b)</u>.

"<u>Operations Manager</u>" shall mean the Person designated by the holders of 66.66% of the outstanding Units from time to time to manage the business of the Company.  Initially, the Operations Manager shall be [        ].

"<u>Permitted Transfer</u>" means:

(a)    in the case of any Member who is an individual, a Transfer of Units to a trust or estate planning-related entity for the sole benefit of such Member or solely upon the death of such individual in accordance with such individual's will or pursuant to laws of intestacy;

(b)    in the case of any Member that is a partnership (other than a Management Member), (i) a Transfer of Units to its limited, special and general partners as a Distribution by such partnership to its partners and (ii) a Transfer of Units made to any Affiliate of such Member or any of its Affiliates; or

(c)    in the case of any Member that is a corporation, company or limited liability company (in each case, other than a Management Member), (i) a Transfer of Units to its shareholders or members, as the case may be, as a Distribution by such Person to its shareholders or members, as the case may be and (ii) a Transfer made to any Affiliate of such Member or any of its Affiliates.

A-I-6

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"Permitted Transferee" means any Person acquiring Units from a Member in accordance with the provisions of this Agreement.

"Person" means any legal person, including any individual, corporation, investment fund, partnership, limited partnership, limited liability company, joint venture, joint stock company, association, trust, unincorporated entity or Governmental Authority.

"Pro Rata Portion" shall mean, with respect to any Member in respect of Units, a fraction (expressed as a percentage), the numerator of which is the number of Units held by such Member, and the denominator of which is the total number of Units outstanding, at the time in question.

"Proposed Rules" shall have the meaning set forth in Section 20(e)(i).

"Purchasing Member" shall have the meaning set forth in Section 7(b)(vii).

"Representatives" shall have the meaning set forth in Section 32.

"Rule 144" shall have the meaning set forth in Section 10(c).

"Safe Harbor Election" shall have the meaning set forth in Section 20(e)(i).

"Sale of the Company" shall mean (a) the Transfer of all or substantially all of the Company's assets, (b) the Transfer of the outstanding equity Securities of the Company or (c) the merger or consolidation of the Company with another Person, in each case in clauses (b) and (c) above under circumstances in which the holders of a majority of the issued and outstanding Units, immediately prior to such transaction, hold less than 50% of the outstanding Units (or less than 50% of the voting power of the outstanding equity Securities of the surviving or resulting Person, as the case may be) immediately following such transaction.

"SEC" shall mean the Securities and Exchange Commission and any other Governmental Authority at the time administering the Securities Act.

"Securities" shall mean, with respect to any Person, all equity interests of such Person, all securities convertible into or exchangeable for equity interests of such Person, and all options, warrants, and other rights to purchase or otherwise acquire from such Person equity interests, including any equity appreciation or similar rights, contractual or otherwise.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Sorin" shall mean [          ].

"Spousal Consent" shall mean a consent, in the form attached to this Agreement as Exhibit C, executed by the spouse of any Member who is an individual.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"Subject Parties" shall have the meaning set forth in Section 28(d).

"Subsidiary" shall mean, with respect to any Person, any corporation, association, partnership, limited liability company or other business entity of which 50% or more of the total voting power of equity interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, representatives or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more subsidiaries of such Person, or (c) one or more subsidiaries of such Person. For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Tag-Along Notice" shall have the meaning set forth in Section 21(d)(iv).

"Tax Distributions" shall have the meaning set forth in Section 13.

"Tax Matters Partner" shall have the meaning set forth in Section 20(c).

"Transfer" shall mean, as applicable, (a) as to any Security or asset (the "Subject Property"), to sell, transfer, assign, gift, pledge, grant a security interest in, distribute, encumber, hypothecate or otherwise dispose of (including, without limitation, the foreclosure or other acquisition by any lender with respect to the Subject Property pledged to such lender by the holder of the Subject Property), whether directly or indirectly (including, without limitation, by means of a Transfer of any Security issued by a Person that holds, directly or indirectly, an interest in the Subject Property), such Subject Property, either voluntarily or involuntarily and with or without consideration or (b) the act of such sale, transfer, assignment, gift, pledge, grant of security interest, Distribution, encumbrance, hypothecation or other disposition.

"Transferee" shall mean any Person to whom a Member shall Transfer Units in accordance with the terms of this Agreement.

"Treasury Regulations" shall mean regulations promulgated pursuant to the Code.

"Units" shall mean all Class A Units and Class B Units held at any time during the term of this Agreement by any Member, and shall include any Securities issued in respect of or in exchange for such Class A Units or Class B Units, whether by way of dividend or other Distribution, split, reverse split, recapitalization, merger, rollup transaction, consolidation, conversion or reorganization.

*******

A-I-8

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Exhibit A

BYLAWS

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Exhibit B**

### JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Limited Liability Company Operating Agreement dated [_____], 2010, as amended, modified, restated or supplemented from time to time, (the "Operating Agreement"), of [Newco], LLC, a Delaware limited liability company (the "Company").

By executing and delivering this Joinder Agreement to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with all of the provisions of the Operating Agreement in the same manner as if the undersigned were an original signatory to the Operating Agreement.

The undersigned agrees that the undersigned shall be a [Member/Management Member], as such term is defined in the Operating Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.

_____

*Signature of Member*

_____

*Print Name of Member*

_____

_____

*Address*

_____

*Facsimile*

_____

*Telephone*

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Exhibit C**

## SPOUSAL CONSENT

Dated: _____

Reference is hereby made to the Limited Liability Company Operating Agreement of [Newco], LLC, dated as of [_____], 2010, as may be amended, supplemented, modified or restated from time to time (the "Operating Agreement"). Capitalized terms used herein but not otherwise defined shall have the meaning ascribed thereto in the Operating Agreement.

This Spousal Consent is being delivered pursuant to Section 44 of the Operating Agreement, a copy of which has been provided to the undersigned ("Spouse"). Spouse, as the spouse of _____ (the "Relevant Member"), consents to all of the provisions of the Operating Agreement and to the extent that Spouse may lawfully do so, Spouse confirms that the Relevant Member may act alone with respect to all matters in connection with the Operating Agreement. Spouse also confirms that the Relevant Member may enter into agreements pursuant to the Operating Agreement and consent to and execute amendments thereof, without further signature or consent of, or notice to, Spouse. Spouse further agrees that he/she will not take any action to oppose or otherwise hinder the operation of the provisions of the Operating Agreement.

To the extent of any property interest that Spouse may have in such Units, Spouse consents to be bound by the terms of the Operating Agreement, including, without limitation, restrictions on transfer and obligations to sell set forth therein.

_____
Name of Spouse:

**Exhibit K**

**New First Lien Credit Agreement**

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## CREDIT AGREEMENT

DATED AS OF [_____]

among

[NEWCO LLC],
THE RHODES COMPANIES, LLC
RHODES RANCH GENERAL PARTNERSHIP
RHODES RANCH GOLF AND COUNTRY CLUB, LLC
HERITAGE LAND COMPANY, LLC,
TICK, LP,
GLYNDA, LP,
CHALKLINE, LP,
BATCAVE, LP,
JACKKNIFE, LP,
WALLBOARD, LP,
OVERFLOW, LP,
TUSCANY ACQUISITIONS, LLC,
TUSCANY ACQUISITIONS II, LLC,
TUSCANY ACQUISITIONS III, LLC,
TUSCANY ACQUISITIONS IV, LLC,
PARCEL 20 LLC,
RHODES DESIGN AND DEVELOPMENT CORPORATION,
C&J HOLDINGS INC.,
RHODES REALTY, INC.,
JARUPA LLC,
ELKHORN INVESTMENTS, INC.,
RHODES HOMES ARIZONA, LLC,
RHODES ARIZONA PROPERTIES, LLC,
TRIBES HOLDINGS LLC,
SIX FEATHERS HOLDINGS, LLC,
ELKHORN PARTNERS, A NEVADA LIMITED PARTNERSHIP
BRAVO INC.,
GUNG-HO CONCRETE, LLC,
GERONIMO PLUMBING, LLC,
APACHE FRAMING, LLC,
TUSCANY GOLF COUNTRY CLUB, LLC,
and
PINNACLE GRADING, LLC
as the Borrowers,

THE LENDERS LISTED HEREIN,
as the Lenders,

and

[_____],
as Administrative Agent and Collateral Agent

**$50,000,000 SENIOR SECURED CREDIT FACILITY**

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ........................................................................................................3

    1.1    Certain Defined Terms ..........................................................................................3
    1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
            Calculations Under Agreement ..............................................................................32

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS .........................33

    2.1    Commitments; Loans ...........................................................................................33
    2.2    Interest on the Loans ...........................................................................................33
    2.3    Fees ....................................................................................................................36
    2.4    Repayments and Prepayments; General Provisions Regarding Payments ...........36
    2.5    [Intentionally Omitted] .......................................................................................40
    2.6    Special Provisions Governing LIBOR Loans .......................................................40
    2.7    Increased Costs; Taxes ........................................................................................42
    2.8    Mitigation Obligations; Replacement of Lenders .................................................45
    2.9    Releases; Subordinations .....................................................................................46
    2.10   Subordinations in connection with Map Approvals ..............................................47
    2.11   Subordinations in connection with Qualified Sales Agreements ...........................48

SECTION 3. CONDITIONS TO EFFECTIVENESS .................................................................48

    3.1    Conditions to Effectiveness .................................................................................48

SECTION 4. REPRESENTATIONS AND WARRANTIES .......................................................55

    4.1    Organization and Qualification ............................................................................55
    4.2    Power and Authority ...........................................................................................55
    4.3    Legally Enforceable Agreement ..........................................................................56
    4.4    No Conflict..........................................................................................................56
    4.5    Capital Structure .................................................................................................56
    4.6    Licenses..............................................................................................................57
    4.7    Corporate Names ................................................................................................57
    4.8    Business Locations; Agent for Process .................................................................57
    4.9    Title to Properties................................................................................................57
    4.10   Priority of Liens; UCC-1 Financing Statements ...................................................58
    4.11   No Subordination ................................................................................................59
    4.12   Permits; Licenses; Franchises .............................................................................59
    4.13   Indebtedness.......................................................................................................59
    4.14   [Intentionally Omitted] .......................................................................................59

| | | |
|---|---|---|
| 4.15 | Disclosure | 59 |
| 4.16 | Solvent Financial Condition | 60 |
| 4.17 | Surety Obligations | 60 |
| 4.18 | Taxes | 60 |
| 4.19 | Brokers | 60 |
| 4.20 | Intellectual Property | 61 |
| 4.21 | Governmental Authorization | 61 |
| 4.22 | Compliance with Laws | 61 |
| 4.23 | Burdensome Contracts | 62 |
| 4.24 | Litigation | 62 |
| 4.25 | No Defaults | 62 |
| 4.26 | Leases | 62 |
| 4.27 | Employee Benefit Plans | 63 |
| 4.28 | Trade Relations | 64 |
| 4.29 | Labor Relations | 64 |
| 4.30 | Not a Regulated Entity | 64 |
| 4.31 | Margin Stock | 64 |
| 4.32 | No Material Adverse Change | 64 |
| 4.33 | Environmental Matters | 64 |
| 4.34 | Material Contracts | 66 |
| 4.35 | Utilities | 67 |
| 4.36 | Entitlements | 67 |

SECTION 5. AFFIRMATIVE COVENANTS .......... 68

| | | |
|---|---|---|
| 5.1 | Visits and Inspections | 68 |
| 5.2 | Notices | 68 |
| 5.3 | Financial Statements and Other Reports | 70 |
| 5.4 | Corporate Existence | 75 |
| 5.5 | Payment of Taxes and Claims; Tax Consolidation | 75 |
| 5.6 | Maintenance of Properties; Insurance | 76 |
| 5.7 | Lender Meeting | 76 |
| 5.8 | Compliance with Laws | 76 |
| 5.9 | Environmental Disclosure and Inspection | 76 |
| 5.10 | Remedial Action Regarding Hazardous Materials | 78 |
| 5.11 | Additional Collateral; Execution of Guaranty and Collateral Documents by Future Subsidiaries | 78 |
| 5.12 | Intentionally Omitted.] | 81 |
| 5.13 | Further Assurances | 81 |
| 5.14 | Title | 81 |
| 5.15 | Maintenance of Entitlements; Development Agreements | 81 |

SECTION 6. NEGATIVE COVENANTS .......... 82

| | | |
|---|---|---|
| 6.1 | Indebtedness | 82 |

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

6.2      Liens and Related Matters ...................................................................................84
6.3      Investments ........................................................................................................85
6.4      Contingent Obligations ......................................................................................87
6.5      Restricted Payments...........................................................................................87
6.6      Financial Covenants............................................................................................88
6.7      Restriction on Fundamental Changes .................................................................89
6.8      Sale or Discount of Receivables .........................................................................89
6.9      Asset Sales .........................................................................................................89
6.10     Transactions with Shareholders and Affiliates....................................................92
6.11     Conduct of Business ...........................................................................................93
6.12     [Intentionally Omitted] ......................................................................................93
6.13     Amendments or Waivers of Certain Agreements.................................................93
6.14     Fiscal Year..........................................................................................................93
6.15     Hedge Agreements ..............................................................................................93
6.16     [Intentionally Omitted] ......................................................................................93
6.17     Limitation on Unentitled Properties....................................................................93
6.18     Limitation on Purchase of Real Property Assets.................................................94

SECTION 7. EVENTS OF DEFAULT.......................................................................................94

7.1      Payment of Obligations.......................................................................................94
7.2      Misrepresentations .............................................................................................94
7.3      Breach of Certain Covenants ..............................................................................94
7.4      Breach of Other Covenants.................................................................................94
7.5      Default Under Loan Documents .........................................................................95
7.6      Other Defaults.....................................................................................................95
7.7      Insolvency Proceedings ......................................................................................96
7.8      Business Disruption; Condemnation....................................................................96
7.9      ERISA ................................................................................................................96
7.10     Challenge to Loan Documents; Invalidity ...........................................................96
7.11     Judgment ............................................................................................................97
7.12     Repudiation of or Default Under Guaranty .........................................................97
7.13     Criminal Forfeiture ............................................................................................97
7.14     Change of Control...............................................................................................97

SECTION 8. AGENTS .............................................................................................................98

8.1      Appointment .......................................................................................................98
8.2      Rights as a Lender...............................................................................................99
8.3      Exculpatory Provisions .......................................................................................99
8.4      Reliance by the Agents......................................................................................100
8.5      Delegation of Duties .........................................................................................100
8.6      Resignation of Administrative Agent and/or Collateral Agent ..........................101
8.7      Collateral Documents........................................................................................102
8.8      Non-Reliance on Agents and Other Lenders .....................................................102

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

SECTION 9. MISCELLANEOUS ...........................................................................................103

| | | |
|---|---|---|
| 9.1 | Assignments and Participations in Loans ...........................................................103 |
| 9.2 | Expenses; Indemnity; Damage Waiver ..............................................................107 |
| 9.3 | Right of Set-Off ...............................................................................................108 |
| 9.4 | Sharing of Payments by Lenders ......................................................................109 |
| 9.5 | Amendments and Waivers ................................................................................109 |
| 9.6 | Independence of Covenants ..............................................................................111 |
| 9.7 | Notices .............................................................................................................111 |
| 9.8 | Survival of Representations, Warranties and Agreements ..................................113 |
| 9.9 | Failure or Indulgence Not Waiver; Remedies Cumulative ..................................113 |
| 9.10 | Marshalling; Payments Set Aside .....................................................................113 |
| 9.11 | Severability ......................................................................................................114 |
| 9.12 | Obligations Several; Independent Nature of the Lenders' Rights.......................114 |
| 9.13 | Maximum Amount............................................................................................114 |
| 9.14 | Headings ..........................................................................................................115 |
| 9.15 | Applicable Law.................................................................................................115 |
| 9.16 | Successors and Assigns.....................................................................................115 |
| 9.17 | Consent to Jurisdiction and Service of Process ..................................................115 |
| 9.18 | Waiver of Jury Trial .........................................................................................116 |
| 9.19 | Confidentiality .................................................................................................117 |
| 9.20 | Borrowers' Responsibility For Compliance With Environmental Laws .............118 |
| 9.21 | Joint and Several Liability ................................................................................118 |
| 9.22 | Counterparts; Integration; Effectiveness; Electronic Execution.........................120 |
| 9.23 | USA Patriot Act Notification ...........................................................................121 |

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## EXHIBITS

Exhibit I ............Form of Administrative Questionnaire
Exhibit II ...........Form of Assignment Agreement
Exhibit III..........Form of Assignment of Declarant's Rights
Exhibit IV..........Form of Compliance Certificate
Exhibit V ...........[Intentionally Omitted]
Exhibit VI..........[Intentionally Omitted]
Exhibit VII .......[Intentionally Omitted]
Exhibit VIII.......Form of Note
Exhibit IX..........[Intentionally Omitted]
Exhibit X...........Form of Pledge and Security Agreement
Exhibit XI..........Description of Projects
Exhibit XII ........Form of Guaranty
Exhibit XIII.......Form of Copyright Security Agreement
Exhibit XIV.......[Intentionally Omitted]

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "**Agreement**") is dated as of [_____] and entered into by and among [NEWCO LLC], a [_____] limited liability company [("Newco")], THE RHODES COMPANIES, LLC ("**Rhodes Companies**"), RHODES RANCH GENERAL PARTNERSHIP ("**Rhodes GP**"), RHODES RANCH GOLF AND COUNTRY CLUB, LLC ("**Rhodes Ranch Golf**"), HERITAGE LAND COMPANY, LLC, a Nevada limited liability company ("**Heritage Land**"), TICK, LP, a Nevada limited partnership ("**Tick**"), GLYNDA, LP, a Nevada limited partnership ("**Glynda**"), CHALKLINE, LP, a Nevada limited partnership ("**Chalkline**"), BATCAVE, LP, a Nevada limited partnership ("**Batcave**"), JACKKNIFE, LP, a Nevada limited partnership ("**Jackknife**"), WALLBOARD, LP, a Nevada limited partnership ("**Wallboard**"), OVERFLOW, LP, a Nevada limited partnership ("**Overflow**"), TUSCANY ACQUISITIONS, LLC, a Nevada limited liability company ("**Tuscany Acquisitions**"), TUSCANY ACQUISITIONS II, LLC, a Nevada limited liability company ("**Tuscany Acquisitions II**"), TUSCANY ACQUISITIONS III, LLC, a [_____] limited liability company ("**Tuscany Acquisitions III**"), TUSCANY ACQUISITIONS IV, LLC, a [_____] limited liability company ("**Tuscany Acquisitions IV**"), PARCEL 20 LLC, a [_____] limited liability company ("**Parcel**"), RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("**Rhodes Design**"), C&J HOLDINGS INC., a Nevada corporation ("**C&J**"), RHODES REALTY, INC., a Nevada corporation ("**Rhodes Realty**"), JARUPA LLC, a [_____] limited liability company ("**Jarupa**"), ELKHORN INVESTMENTS, INC., a Nevada corporation ("**Elkhorn Investments**"), RHODES HOMES ARIZONA, LLC, an Arizona limited liability company ("**Rhodes Homes Arizona**"), RHODES ARIZONA PROPERTIES, LLC, an [_____] limited liability company ("**Rhodes Arizona Properties**"), TRIBES HOLDINGS LLC, a Nevada limited liability company ("**Tribes**"), SIX FEATHERS HOLDINGS, LLC, a [_____] limited liability company ("**Six Feathers**"), ELKHORN PARTNERS, A NEVADA LIMITED PARTNERSHIP, a Nevada limited partnership ("**Elkhorn Partners**"), BRAVO INC., a Nevada corporation ("**Bravo**"), GUNG-HO CONCRETE, LLC, a Nevada limited liability company ("**Gung-Ho**"), GERONIMO PLUMBING, LLC, a [_____] limited liability company ("**Geronimo**"), APACHE FRAMING, LLC, a Nevada limited liability company ("**Apache**"), TUSCANY GOLF COUNTRY CLUB, LLC, a Nevada limited liability company ("**Tuscany Golf**"), and PINNACLE GRADING, LLC a Nevada limited liability company ("**Pinnacle**") and, collectively with [Newco], Rhodes Companies, Rhodes GP, Rhodes Ranch Golf, Heritage Land, Tick, Glynda, Chalkline, Batcave, Jackknife, Wallboard, Overflow, Tuscany Acquisitions, Tuscany Acquisitions II, Tuscany Acquisitions III, Tuscany Acquisitions IV, Parcel, Rhodes Design, C&J, Rhodes Realty, Jarupa, Elkhorn Investments, Rhodes Homes Arizona, Rhodes Arizona Properties, Tribes, Six Feathers, Elkhorn Partners, Bravo, Gung-Ho, Geronimo, Apache, and Tuscany Golf, the "**Borrowers**" and each, individually, a "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (together with their respective successors and permitted assigns, each individually referred to herein as a "**Lender**" and collectively as the "**Lenders**"), and [_____] as administrative agent for the Lenders (together with its successors in such capacity, the "**Administrative Agent**"), as collateral agent

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

for the Secured Parties (as defined below) (together with its successors in such capacity, the "**Collateral Agent**" and together with the Administrative Agent collectively, the "**Agents**") for the Lenders.

R E C I T A L S

     A.     **WHEREAS**, Heritage Land, Rhodes Companies, Rhodes GP (collectively, the "**Original Borrowers**"), Credit Suisse Cayman Islands Branch, as administrative agent, collateral agent and syndication agent, and the financial institutions party thereto, as lenders, are parties to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**Pre-Petition Credit Agreement**").

     B.     **WHEREAS**, on March 31, 2009 or, for Tuscany Golf, Pinnacle, and Rhodes Homes Arizona, April 1, 2009 ("**Petition Date**"), the Original Borrowers and certain affiliates, as debtors and debtors-in-possession (the "**Debtors**"), commenced voluntary cases under Chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"), which cases are being jointly administered (the "**Chapter 11 Cases**").

     C.     **WHEREAS**, the Second Amended Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC et al. dated November [___], 2009, filed with the Bankruptcy Court and any Modifications (as defined below) thereto (the "**Plan of Reorganization**") has been confirmed pursuant to the Confirmation Order (as defined below), and concurrently with the effectiveness of this Agreement, the effective date with respect to such Plan of Reorganization has occurred.

     D.     **WHEREAS**, in connection with the Plan of Reorganization, the Pre-Petition Credit Agreement has been terminated and it has been agreed by the parties hereto to enter into this Agreement.

     E.     **WHEREAS**, the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrowers subject to the terms and conditions contained herein.

     **NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree to enter into this Agreement as follows:

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## SECTION 1.
## DEFINITIONS

**1.1    Certain Defined Terms.**

The following terms used in this Agreement shall have the following meanings:

"**Acceptable Appraisal**" means an appraisal commissioned by and addressed to the Agents (and reasonably acceptable to the Requisite Lenders as to form, assumptions, substance, and appraisal date), prepared by a qualified professional appraiser acceptable to the Requisite Lenders, and complying in all material respects with the requirements of the Federal Financial Institutions Reform, Recovery and Enforcement Act of 1989; provided, that with respect to any Real Property Collateral, until a new Acceptable Appraisal has been completed following the Effective Date, the appraisal existing as of the Effective Date shall be deemed to constitute the Acceptable Appraisal with respect thereto.

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form of Exhibit I annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in subsection 2.6C.

"**Affected Loans**" has the meaning assigned to that term in subsection 2.6C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Affiliate Transaction**" has the meaning assigned to that term in subsection 6.10.

"**Agents**" has the meaning assigned to that term in the preamble to this Agreement.

"**Agreement**" has the meaning assigned to that term in the preamble hereto.

"**Apache**" has the meaning assigned to that term in the preamble to this Agreement.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrowers, any of their Subsidiaries, any Project or any Collateral (including, without limitation, any Real Property Collateral), or any of the other assets of the Borrowers and their Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrowers or any of their Subsidiaries, at any time

3

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrowers and their Subsidiaries.

"**Applicable Tax Rate**" means, with respect to each Fiscal Year, the sum of the highest marginal tax rates applicable to individuals under the United States federal income tax laws and applicable state and local income tax laws for such years.

"**Appraised Value**" means, with respect to the Real Property Collateral or any portion thereof, the "as is" appraised value of such Real Property Collateral or portion thereof set forth in the most-recent Acceptable Appraisal received by the Agents pursuant to the Loan Documents.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition by the Borrowers or any of their Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock (including, without limitation, of any of the Capital Stock of any of the Borrowers or any of their Subsidiaries, or the issuance of Capital Stock any Subsidiary of the Borrowers to any Person that is not a Loan Party), but excluding (a) sales, leases and other dispositions of products and services in connection with the golf and other ancillary facilities of any Project (including sales of memberships in the clubs relating to such facilities), in each case, in the Ordinary Course of Business, (b) sales, exchanges and other dispositions of obsolete, worn out or excess equipment in the Ordinary Course of Business, which, in the case of such asset sales in excess of $1,000,000 in a single transaction or series of related transactions, shall be certified in an Officer's Certificate as being a sale of obsolete, worn out or excess equipment in the Ordinary Course of Business, (c) any use of Cash and Cash Equivalents in a manner not prohibited hereunder, and (d) the non-exclusive licensing of intellectual property in the Ordinary Course of Business.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Assignment of Declarant's Rights**" means the collective reference to (i) the Assignment of Declarant's Rights, dated as of _____, made by _____ in favor of the Agents, substantially in the form of Exhibit III-A annexed hereto, (ii) the Assignment of Declarant's Rights, dated as of _____, made by _____ in favor of the Agents, substantially in the form of Exhibit III-B annexed hereto, and (iii) the Assignment of Declarant's Rights, dated as of _____, made by _____

4

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

in favor of the Agents, substantially in the form of <u>Exhibit III-C</u> annexed hereto, as each may hereafter be Modified from time to time.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute, together with all official rules and regulations thereunder.

"**Bankruptcy Court**" shall have the meanings set forth in the recitals hereto.

"**Batcave**" has the meaning assigned to that term in the preamble to this Agreement.

"**Board**" means the Board of Managers of [Newco].

"**Borrower Entity**" means any one of the Borrowers or their respective Subsidiaries.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401 (a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by any Borrower Entity.

"**Borrowers**" has the meaning assigned to that term in the preamble to this Agreement.

"**Borrowers' Knowledge**" means the actual knowledge, after reasonable inquiry, of any Responsible Officer.

"**Bravo**" has the meaning assigned to that term in the preamble to this Agreement.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

"**Calculation Date**" has the meaning assigned to that term in subsection 6.6A.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-l from S&P or at least P-l from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-l from S&P or at least P-l from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) investment funds with a rating of at least AAA from S&P investing 95% of their assets in securities of the type described in clauses (a), (c) and (d) above; and (f) eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash Interest Threshold**" has the meaning assigned to such term in subsection 2.2C(ii)

"**Cash Pay Rate Margin**" means 2.00% per annum.

"**Chalkline**" has the meaning assigned to that term in the preamble to this Agreement.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means, at any time, [_____] shall cease to beneficially own (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) and Control (without giving effect to clause (a) of the definition of "Control") more than 50.0% of the economic interests in the Capital Stock of [**Newco**] (determined on a fully diluted basis) and more than 50.0% of the Capital Stock of [**Newco**] (determined on a fully diluted basis) ordinarily entitled to vote or consent with respect to actions of the members of [**Newco**].

"**Chapter 11 Cases**" shall have the meaning set forth in the recitals hereto.

"**Clark County**" means Clark County, a political subdivision of the State of Nevada.

"**Cleanup**" means all actions required or prudent to: (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of

6

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are granted or purported to be granted by the Collateral Documents.

"**Collateral Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Collateral Documents**" means (a) this Agreement, (b) the Pledge and Security Agreement, (c) the Copyright Security Agreement, (d) the Mortgages, (e) each Assignment of Declarant's Rights, and (f) any other documents, instruments or agreements delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in subsection 2.1 A of this Agreement in the amount set forth in the Register.

"**Common Units**" means the limited liability company interests of [Newco], including any limited liability company interests with limited voting rights.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit IV annexed hereto delivered to the Administrative Agent by the Borrowers pursuant to subsection 5.3(iii).

"**Communications**" has the meaning assigned to that term in subsection 9.7B(ii).

"**Condemnation Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Confirmation Order**" means the Findings of Fact, Conclusions of Law, and Order Confirming the Borrowers' Plan of Reorganization issued by the Bankruptcy Court and entered on [_____] in the Chapter 11 Cases.

"**Consolidated EBITDA**" means, for any period, without duplication, (a) the sum of the amounts for such period (as determined for the Borrowers and their Subsidiaries on a combined consolidated basis) of (i) Consolidated Net Income, (ii) Consolidated Interest Expense, to the extent deducted in the calculation of Consolidated Net Income for such period, (iii) provisions for taxes based on income, to the extent deducted in the calculation of Consolidated Net Income for such period, (iv) total depreciation expense to the extent deducted in the calculation of Consolidated Net Income for such period, (v) total amortization expense to the extent deducted in the calculation of Consolidated Net Income for such period, (vi) other non-cash items reducing Consolidated Net Income to the extent reflected as a charge or otherwise deducted from

7

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

the determination of Consolidated Net Income for such period (other than any non-cash charges to the extent such charges represent an accrual of or reserve for cash expenditures in any future period) and (vii) extraordinary or non-recurring items reducing Consolidated Net Income, less (b) the sum of (i) non-cash items increasing Consolidated Net Income and (ii) extraordinary or non-recurring items, in each case, increasing Consolidated Net Income, all of the foregoing (except as otherwise provided in the definition of any term used herein) as determined on a consolidated basis in conformity with GAAP. For the purposes of this definition, provisions for taxes based on income shall also include such state or local taxes that, in lieu of taxable income, are assessed on an alternate taxing methodology, such as net worth or tangible assets.

"**Consolidated Interest Expense**" means, for any period (as determined for the Borrowers and their Subsidiaries on a consolidated basis), (1) interest expense for such period determined in accordance with GAAP paid in such period or payable in cash, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedge Agreements, plus capitalized interest to the extent included in cost of sales (excluding, however, any amounts referred to in subsection 2.3 payable to Agents or the Lenders on or before the Effective Date) less (2) Cash interest income earned on Cash and Cash Equivalents in such period; provided that for the purposes of this definition only, notwithstanding anything to the contrary herein, for the initial four Fiscal Quarters ending following the Effective Date, Consolidated Interest Expense shall equal the product of (x) Consolidated Interest Expense from the Effective Date to the applicable Calculation Date and (y) a fraction, the numerator of which is 365 and the denominator of which is the number of days from the Effective Date to the applicable Calculation Date.

"**Consolidated Net Income**" means, for any period, the net income (or loss) of the Borrowers and their Subsidiaries, on a combined consolidated basis for such period taken as a single accounting period determined in conformity with GAAP; provided that there shall be excluded therefrom (a) the income (or loss) of any Person (other than a Subsidiary of a Borrower) in which a Borrower or any of its Subsidiaries has an equity interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrowers or any Subsidiary of the Borrowers by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrowers, is merged into or consolidated with one of the Borrowers or any Subsidiary of the Borrowers, or that Person's assets are acquired by the Borrowers or any Subsidiary of the Borrowers, (c) the income of any Subsidiary of the Borrowers to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to discontinued operations, and (e) to the extent not included above, any net extraordinary gains or net non-cash extraordinary losses.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the

8

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Control**" means the possession, directly or indirectly, of the power to either (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Copyright Security Agreement**" means the Copyright Security Agreement, dated as of the date hereof, by the applicable Loan Parties in favor of the Collateral Agent, in the form of Exhibit XIII annexed hereto, as such Copyright Security Agreement may be Modified from time to time.

"**Debt Service**" means, for any period, all cash payments of interest on Indebtedness of the Borrowers and their Subsidiaries made or required to be made during such period, all scheduled payments of principal of Indebtedness of the Borrowers and their Subsidiaries made during such period (including, without limitation, with respect to assessments payable by the Borrowers and their Subsidiaries in connection with Special Improvement Bonds), and all voluntary prepayments of the Loans made during such period (other than such scheduled payments of principal and voluntary prepayments of the Loans made directly or indirectly with the proceeds of any issuance of debt Securities or other Indebtedness of any of the Borrowers or any Subsidiary or any Insurance Proceeds).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

9

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Development Agreements**" means the (i) the Rhodes Ranch Development Agreement and (ii) each other effective development agreement (or similar agreement) with a Governmental Authority relating to any of the Real Property Collateral.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means such date on which the conditions to effectiveness set forth in subsection 3.1 are satisfied.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act) that extends credit or buys loans in the ordinary course and is approved by the Administrative Agent and (so long as no Default or Event of Default has occurred and is continuing) the Borrower (such approvals not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include any Borrower Entity or any Affiliate of any Borrower Entity.

"**Elkhorn Investments**" has the meaning assigned to that term in the preamble to this Agreement.

"**Elkhorn Partners**" has the meaning assigned to that term in the preamble to this Agreement.

"**Entitlement Documents**" has the meaning assigned to that term in subsection 4.36A.

"**Entitlements**" means those certain Governmental Authorizations which are required under Applicable Law to be obtained and maintained (as applicable) or appropriate in order to allow the expeditious and efficient completion of the development of the Real Property Collateral and the sale of the Real Property Collateral (and portions thereof), as legal lots, all as

contemplated by the most recent Acceptable Appraisal, and/or any applicable Development Agreement, and including, without limitation, all Governmental Authorizations necessary to permit applicable platting, subdividing, earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto.

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers any of their Subsidiaries or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Laws**" means all federal, state, local and foreign laws, regulations and other governmental requirements relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management or use of natural resources, as now or may at any time hereafter be in effect.

"**Environmental Liabilities**" means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and Environmental Claims against any Loan Party or their Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or their Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers or their Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Equity Proceeds**" means the sum of (i) cash proceeds from: (a) the issuance of any Capital Stock or other equity Securities of, or (b) the making of any capital contribution to, any of the Borrowers after the Effective Date (other than any such issuances that are made to, or capital contributions that are made by, any of the other Borrowers); less (ii) bona fide, direct costs actually incurred by Borrowers in connection with the receipt of Equity Proceeds, including, without limitation, underwriting discounts or commissions and fees and expenses of counsel and other advisors in connection therewith.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrowers are a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrowers are a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrowers, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrowers or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrowers or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrowers or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrowers or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrowers or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401 (a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501 (a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" has the meaning assigned to that term in Section 7.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any of the Borrowers are located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrowers under subsection 2.8B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with subsection 2.7E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to subsection 2.7E(i).

"**Existing Entitlements**" has the meaning assigned to that term in subsection 4.36A.

"**Existing Indebtedness**" means the Indebtedness described on Schedule 1.1(a) attached hereto.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing shall have expired.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

"**First Lien Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6B.

"**First Lien Declined Amounts**" means mandatory prepayments of the Loans pursuant to subsection 2.4B(ii) that are declined by Lenders.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than (a) Permitted Title Exceptions, (b) Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by subsection 5.5, (c) Liens permitted under clause (iv) of subsection 6.2A and (d) Specified Encumbrances to which any Lien created in any Collateral pursuant to any Collateral Document has been subordinated pursuant to subsection 2.9B) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means Real Property Collateral located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938, as amended from time to time, and any successor statute.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrowers are residents for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course.

"**Funding and Payment Office**" means the office of the Administrative Agent located at [_____] (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in subsection 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**Geronimo**" has the meaning assigned to that term in the preamble to this Agreement.

"**Glynda**" has the meaning assigned to that term in the preamble to this Agreement.

"**Gung-Ho**" has the meaning assigned to that term in the preamble to this Agreement.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to that term in subsection 9.1G.

"**Guarantors**" means the Borrowers and the Subsidiary Guarantors.

"**Guaranty**" means the Guaranty, substantially in the form of Exhibit XII annexed hereto, executed and delivered by the Guarantors on the Effective Date, or executed and delivered by any additional Subsidiary Guarantor from time to time thereafter pursuant to subsection 5.11, as each such Guaranty may hereafter be Modified from time to time.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to human health and safety or to the indoor or outdoor environment.

"**Hedge Agreement**" means any agreement with respect to any swap, collar, cap, floor, hedge, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any of the Borrowers or any of their Subsidiaries shall be a "Hedge Agreement".

"**Heritage Land**" has the meaning assigned to that term in the preamble to this Agreement.

"**Homesites**" means those portions of the Real Property Collateral that have been legally subdivided into lots suitable for the construction of single family and multi-family residences pursuant to recorded plats.

"**Identified Acquisition**" means an acquisition transaction identified by the Borrowers approved by the Administrative Agent and the Requisite Lenders.

"**Improvements**" means all buildings, structures, fixtures, tenant improvements, and other improvements of any kind and description now or hereafter located in or on or attached to any land that is a Real Property Asset, including all building materials, water, sanitary and storm sewers, drainage, electricity, steam, gas, telephone and other utility, facilities, parking areas, roads, driveways, walks and other site improvements; and all additions and betterments thereto and all renewals, substitutions and replacements thereof.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit, whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding deferred compensation, any such obligations incurred under ERISA and current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of any Borrower or any Subsidiary of any Borrower, (i) solely for purposes of subsection 6.1 and subsection 7.6, net obligations under Hedge Agreements, including, as of any date of determination, the net amounts, if any, that would be required to be paid by such Person if such Hedge Agreements were terminated on such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, (k) all obligations under Special Improvement Bonds and (l) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person (including, without limitation, Special Improvement Bonds relating to Real Property Assets of the Borrowers and their Subsidiaries); provided that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (1) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning assigned to that term in subsection 9.2B.

"**Insolvency Proceeding**" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in the case of each of the foregoing clauses (a) and (b), undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Interest Coverage Ratio**" has the meaning assigned to that term in subsection 6.6C.

"**Interest Payment Date**" means the last day Business Day in each of March, June, September and December of each year, commencing on March 31, 2010.

"**Interest Period**" means select an interest period applicable to each LIBOR Loan, which Interest Period shall be a [one (1)/two (2)/three (3)/six (6)] month period.

"**Interest Rate Determination Date**" means each date for calculating the LIBOR Rate, for purposes of determining the interest rate in respect of an Interest Period.  The Interest Rate Determination Date for purposes of calculating the LIBOR Rate shall be the second Business Day prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

"**Investment**" means, with respect to any Person, (a) any direct or indirect purchase or other acquisition by such Person of, or of a beneficial interest in, Capital Stock or other Securities of, all or substantially all of the assets of, or any other investment in, any other Person or (b) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business), extension of credit (by way of guaranty or otherwise) or capital contribution by such Person to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IP Collateral**" has the meaning assigned to the term "Intellectual Property" in the Pledge and Security Agreement.

17

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Jackknife**" has the meaning assigned to that term in the preamble to this Agreement.

"**Jarupa**" has the meaning assigned to that term in the preamble to this Agreement.

"**Joint Venture**" means any Subsidiary that is not a wholly-owned Subsidiary.

"**Land and Operation Expenses**" means, for any period, the costs and cash expenditures reasonably allocable to, without duplication, (i) the operations of the Projects and amenities related to the Projects (including sales of club memberships, operations related to the golf courses and other recreational operations relating to the operation of the Projects) and/or (ii) the ownership, development, construction and sale of the Real Property Collateral, including, without limitation, general and administrative expenses, marketing and selling expenses (including subsidies, incentives and rebates relating thereto), net land development costs (consisting of (x) land development costs (excluding any land development costs funded with amounts received from Clark County, Mohave County or any other Governmental Authority, any Permitted Special Improvement District or any other Person in respect of any Special Improvement Bonds) minus (y) all reimbursements (including, without limitation, reimbursements or other payments received in respect of Special Improvement Bonds) from Clark County, Mohave County or any other Governmental Authority, any Permitted Special Improvement District or any other Person, for land development costs).

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to subsection 9.1.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrowers promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrowers and the Administrative Agent.

"**LIBOR Loans**" means Loans bearing interest at rates determined by reference to the LIBOR Rate as provided in subsection 2.2A.

"**LIBOR Rate**" shall mean, with respect to any Interest Period for the LIBOR Loans, a rate *per annum* equal to the quotient (rounded upward if necessary to the nearest 1/16 of 1%) of (a) the rate *per annum* appearing on the Telerate Page 3750 (or such other display screen as may replace Page 3750 on Telerate Access Service or any successor publication) on the second Business Day prior to the first day of such Interest Period at or about 11:00 a.m. (London time) (or as soon thereafter as practicable) (for delivery on the first day of such Interest Period) for a term comparable to such Interest Period and in an amount approximately equal to the amount of the Loan to be made or funded by the Administrative Agent as part of such borrowing, divided by (b) one minus the Reserve Requirement for such Loans in effect from time to time. If for any reason rates are not available as provided in clause (a) of the preceding sentence, the rate to be

18

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

used in clause (a) shall be (in each case, rounded upward if necessary to the nearest 1/16 of 1%), (i) the rate *per annum* at which Dollar deposits are offered to the Administrative Agent in the London interbank eurodollar currency market or (ii) the rate at which Dollar deposits are offered to the Administrative Agent in, or by the Administrative Agent to major banks in, any offshore interbank eurodollar market selected by the Administrative Agent, in each case on the second Business Day prior to the commencement of such Interest Period at or about 10:00 a.m. (for delivery on the first day of such Interest Period) for a term comparable to such Interest Period and in an amount approximately equal to the amount of the Loan to be made or funded by the Administrative Agent as part of such borrowing.   The LIBOR Rate shall be adjusted automatically as to all LIBOR Loans then outstanding as of the effective date of any change in the Reserve Requirement, and in no event shall the LIBOR Rate exceed 2% per annum.

"**Lien**" means any lien, mortgage, pledge, assignment, hypothecation, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**LLC Agreement**" means the Limited Liability Company Operating Agreement of [Newco], dated as of [_____], as such Limited Liability Company Operating Agreement of [Newco] may be Modified from time to time.

"**Loan Documents**" means this Agreement, the Notes, the Guaranties, the Collateral Documents and other documents evidencing or securing Obligations, and all other documents, instruments and agreements delivered by any Loan Party to any Agent or any Lender in connection with this Agreement or any other Loan Document.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Parties**" means the Borrowers and the Subsidiary Guarantors.

"**Loans**" means the loans outstanding or made by the Lenders pursuant to subsection 2.1A.

"**Major Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that contemplates (i) a gross sales price in excess of $20,000,000 or (ii) the sale of Real Property Collateral with an Appraised Value in excess of $20,000,000.

"**Major Entitlements**" means all (i) zoning approvals, (ii) mapping approvals, (iii) development agreements and (iv) solely with respect to commercial developments, use permits, necessary or appropriate in order to allow the expeditious and efficient completion of the

19

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

development of real property and the sale and usage of such real property in accordance with all Applicable Law.

"**Mandatory Prepayment Date**" has the meaning assigned to that term in subsection 2.4C(i).

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets, financial condition or prospects of the Borrowers and their Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties of the Loan Documents, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under the Loan Documents, or (e) a material adverse effect upon the value of the Real Property Collateral taken as a whole; provided that, neither the Chapter 11 Cases nor the events leading thereto shall constitute a Material Adverse Effect.

"**Material Contracts**" means each of the Development Agreements in effect on the Effective Date.

"**Material Environmental Liability**" means an Environmental Liability which could reasonably be expected to result in (i) a discontinuation of a substantial portion of the business, operations or development of the Borrowers and their Subsidiaries, taken as a whole, (ii) potential costs, liabilities or other losses in excess of $7,500,000, (iii) any designation of any portion of the Real Property Assets on the federal National Priorities List, or any similar state list or (iv) any designation of any portion of the Real Property Assets on any other list maintained by any Governmental Authority of sites at which a Release of Hazardous Materials has occurred if such Release could reasonably be expected to result in potential costs, liabilities or other losses in excess of (x) for purposes of the provisions of subsection 5.9A, $7,500,000 or (y) for purposes of all other provisions hereof, $1,000,000.

"**Material Licenses**" has the meaning assigned to that term in subsection 4.6.

"**Maturity Date**" means [_____], 2016.

"**Maximum Amount**" has the meaning assigned to that term in subsection 9.13A.

"**Modifications**" means any amendments, restatements, amendment and restatements, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**", or related words shall have meanings correlative thereto.

20

"**Mohave County**" means Mohave County, a political subdivision of the State of Arizona.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a deed of trust, assignment of leases and rents, security agreement and fixture filing executed and delivered by any Loan Party on or after the Effective Date in such form as may be approved by the Collateral Agent, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in subsection 3.1G.

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrowers or any ERISA Affiliate is contributing or to which the Borrowers or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Non-Consenting Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Notes**" means (a) the promissory notes of the Borrowers issued pursuant to subsection 2.1D and (b) any promissory notes issued by the Borrowers in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VIII annexed hereto, as they may be Modified from time to time.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent, whether for principal, interest (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Borrower or any Subsidiary Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) or payments for fees, expenses, indemnification or otherwise.

"**OECD**" means the Organisation for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the board (if an officer) or chief executive officer or by the chief executive officer or the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and/or (c) if such person is one of the Borrowers or a Subsidiary of the Borrowers, a Responsible Officer.

21

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to a specific Person, the ordinary course of such Person's business, substantially as conducted by any such Person prior to and as of the Effective Date (to the extent such Person was a Loan party as of the Effective Date) or as otherwise contemplated in connection with the development of the Projects, and which shall not in any event interfere in any material respect with the ongoing operation of the assets of such Person.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or other Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, its Organizational Certificate and the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Health Act of 1970, as amended from time to time, and any successor statute.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Overflow**" has the meaning assigned to that term in the preamble to this Agreement.

"**Parcel**" has the meaning assigned to that term in the preamble to this Agreement.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Participant**" has the meaning assigned to that term in subsection 9.1D.

"**Participant Register**" has the meaning assigned to that term in subsection 9.1.D(iv).

"**Paying Agent**" has the meaning assigned to that term in subsection 8.6.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in subsection 4.33(vi).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrowers or any ERISA Affiliate.

"**Permitted Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that does not constitute a Major Collateral Asset Sale.

"**Permitted Encumbrances**" means the following types of Liens:

> (a)    Liens    (including,    without    limitation,    Specified Encumbrances) for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by subsection 5.5;

> (b)    statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;

> (c)    Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

> (d)    any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

23

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(e)    leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the Ordinary Course of Business or the operations of the Borrowers or any of their Subsidiaries;

(f)    easements,    covenants,    conditions,    rights-of-way, restrictions, minor defects, encroachments or irregularities in title and other similar charges or encumbrances entered into or arising in the Ordinary Course of Business of the Borrowers or any of their Subsidiaries;

(g)    any (i) interest or title of a lessor or sublessor under any Capital Lease permitted by subsection 6.1(iii) or any operating lease not prohibited by this Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii);

(h)    deposits in the Ordinary Course of Business to secure liabilities to insurance carriers, lessors, utilities and other service providers;

(i)    zoning,    building    codes    and    other    Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset which are not violated and would not be violated by the current and contemplated use, development and/or occupancy of such Real Property Asset or the operation of the business of the Borrowers or any of their Subsidiaries thereon; and

(j)    bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business.

"**Permitted Existing Indebtedness**" means the Indebtedness described on Schedule 1(c) attached hereto.

"**Permitted Real Property Acquisitions**" means one or more bona fide arms-length acquisitions for fair market value by any Loan Party of an interest in real property.

"**Permitted Special Improvement Districts**" means one or more special improvement districts, special assessment districts or community facility districts established for the benefit of a Project after the Effective Date.

"**Permitted Title Exceptions**" means (a) the Permitted Encumbrances reflected in the Mortgagee Policies delivered pursuant to subsection 3.1G(iii) and (b) Permitted Encumbrances reasonably satisfactory to the Administrative Agent reflected in Mortgagee Policies delivered pursuant to subsection 5.11).

24

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, joint stock company, unincorporated association, company, partnership, limited partnership, Governmental Authority or other entity of whatever nature.

"**Petition Date**" shall have the meaning set forth in the recitals hereto.

"**PIK Margin**" means 5.00% per annum.

"**Pinnacle**" has the meaning assigned to that term in the preamble to this Agreement.

"**Plan of Reorganization**" shall have the meaning set forth in the recitals hereto.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement dated as of the date hereof and entered into by and among the Borrowers, the Collateral Agent, and any Subsidiary Guarantor that becomes party thereto, substantially in the form of Exhibit X annexed hereto, as such Pledge and Security Agreement may hereafter be Modified from time to time.

"**Pledging Parent**" has the meaning assigned to that term in subsection 5.11.

"**Pre-Petition Credit Agreement**" shall have the meanings set forth in the recitals hereto.

"**Proceedings**" has the meaning assigned to that term in subsection 5.3(xii).

"**Projects**" means the collective reference to Rhodes Ranch, Tuscany, South West Ranch, and Spanish Hills.

"**Properly Contested**" means, in the case of any obligations of a Loan Party (including any Taxes) that are not paid as and when due or payable by reason of such Loan Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof: (i) such obligations are being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Loan Party has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such obligations could not reasonably be expected to have a Material Adverse Effect; (iv) no Lien is imposed upon any of such Loan Party's assets with respect to such obligations unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the obligations result from, or are determined by the entry, rendition or issuance against a Loan Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Loan Party, such Loan Party forthwith (and in any event prior to commencement of any enforcement proceedings against such Loan Party or any property of such Loan Party) pays such obligations and all penalties, interest and other amounts due in connection therewith.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Pro Rata Share**" means, with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by <u>dividing</u> (i) the Loan Exposure of that Lender by (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to subsection 9.1. The initial Pro Rata Share of each Lender is set forth in the Register.

"**PTO**" means the United States Patent and Trademark Office.

"**Qualified Sales Agreement**" means a definitive and binding purchase and sale agreement between any of the Loan Parties and a non-affiliated third party purchaser with respect to any Real Property Collateral.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Borrower Entity in any real property.

"**Real Property Collateral**" means the portion of the Collateral comprising a Real Property Asset in which one or more of the Loan Parties hold fee simple title or a valid leasehold interest, as determined from time to time, which is, or is required pursuant to the terms of this Agreement or the other Loan Documents to be, encumbered by a Lien of the Mortgages.

"**Recovery Event**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Refinancing**" means, in respect of any Indebtedness, to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. "**Refinanced**" and "**Refinance**" have meanings correlative thereto.

"**Register**" has the meaning assigned to that term in subsection 9.1C.

"**Registered Loan**" has the meaning assigned to that term in subsection 9.1C.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, advisors, controlling Persons and members of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Release Instruments**" has the meaning assigned to that term in subsection 2.9A.

"**Released Parcel**" has the meaning assigned to that term in subsection 2.9A.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

"**Required Dedication**" means a dedication or conveyance of a portion of the Real Property Collateral at the direction of a Governmental Authority or a public utility, or pursuant to or in connection with a Development Agreement, or to a homeowners or condominium owners association, to (i) such Governmental Authority (or any designee of such Governmental Authority), or (ii) a utility provider or (iii) a homeowners or condominium owners association, for parks, schools, recreation centers, common community facilities, public streets, utility easements and installations, slopes or other rights-of-way or public use; provided any such dedication or conveyance (individually and/or taken together will all other such dedications and conveyances) (i) has not had and could not reasonably be expected to have a Material Adverse Effect or (ii) has not impaired and could not reasonably be expected to impair the Collateral Agent's First Priority Lien on the remaining Real Property Collateral.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders.

"**Reserve Requirements**" shall mean, with respect to any day in an Interest Period for a LIBOR Loan, the aggregate of the maximum of the reserve requirement rates (expressed as a decimal) in effect on such day for Eurocurrency funding (currently referred to as "Eurocurrency liabilities" in Regulation D of the Federal Reserve Board) maintained by a member bank of the Federal Reserve System. As used herein, the term "reserve requirement" shall include, without limitation, any basic, supplemental or emergency reserve requirements imposed on any Lender by any Governmental Authority.

"**Responsible Officer**" means the chairman of the board (if an officer), chief executive officer, president/chief operating officer, any vice president, general counsel, chief financial officer, managing member, officer, or board member of the Borrowers and their Subsidiaries, as applicable, but in any event, with respect to financial matters, the chief financial officer, treasurer, managing member, or board member of the Borrowers and their Subsidiaries, as applicable.

"**Restricted**" means, when referring to Cash or Cash Equivalents of the Borrowers or any of the Subsidiary Guarantors, that such Cash or Cash Equivalents (a) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrowers or of any such Subsidiary Guarantor (unless such appearance is related to the Loan Documents or Liens created thereunder), (b) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties or (c) are not otherwise generally available for use by the Borrowers or such Subsidiary Guarantor.

"**Restricted Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other

27

rights to acquire shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding.

"**Restricted Seller Carry-Back Notes**" means promissory notes issued as consideration to any of the Borrowers or any of their Subsidiaries by the purchaser under a Qualified Sales Agreement that (i) are secured by a first priority Lien in favor of any of the Borrowers or any of their Subsidiaries on the interest in real property sold to such purchaser pursuant to such Qualified Sales Agreement and (ii) have a final maturity date that is prior to the Maturity Date.

"**Rhodes Arizona Properties**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Design**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes GP**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Homes Arizona**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Ranch**" means those certain golf, commercial and residential developments located in Clark County commonly known as Rhodes Ranch, as depicted on the maps attached hereto as **Exhibit XI.**

"**Rhodes Ranch Development Agreement**" means the Development Agreement, dated December 18, 1996, by and among Clark County and Rhodes Ranch Limited Partnership, a Nevada limited partnership, Rhodes Ranch Land Holdings Limited Partnership, a Delaware limited partnership, Southwestern Opportunities Limited Partnership, a Nevada limited partnership, and Durango/Springs Limited Partnership, a Nevada limited partnership, each as predecessors to Rhodes Design & Development.

"**Rhodes Ranch Golf**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Realty**" has the meaning assigned to that term in the preamble to this Agreement.

"**S&P**" means Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"**Secured Parties**" means the collective reference to the Agents and the Lenders.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or

participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Six Feathers**" has the meaning assigned to that term in the preamble to this Agreement.

"**Solvent**" means, with respect to any Person, that as of any date of determination, (a) the sum of the "fair value" of the assets of such Person will, as of such date, exceed the sum of all debts of such Person as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the "present fair saleable value" of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability on existing debts of such Person as such debts become absolute and matured, as such quoted term is determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct any business in which it is or is about to become engaged and (d) such Person does not intend to incur, or believe or reasonably should believe that it will incur, debts beyond its ability to pay as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured. For purposes of this definition, the amount of any contingent, unliquidated and disputed claim and any claim that has not been reduced to judgment at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such liabilities meet the criteria for accrual under the Financial Accounting Standards Board Statement of Financial Accounting Standards No. 5).

"**South West Ranch**" means those certain commercial and residential developments located in Clark County commonly known as South West Ranch, as depicted on the maps attached hereto as Exhibit XI.

"**Spanish Hills**" means those certain residential developments located in Clark County commonly known as Spanish Hills, as depicted on the maps attached hereto as Exhibit XI.

"**Special Improvement Bonds**" means special improvement district bonds, special assessment bonds, community facility district bonds, private activity bonds, tax increment financing, general obligation bonds, special assessment revenue bonds and any similar bonds (i) issued by a Permitted Special Improvement District, (ii) the terms of which have been reviewed and approved by the Administrative Agent and the Requisite Lenders, (iii) the proceeds of which are solely available to directly pay or to reimburse the Borrowers or their Subsidiaries for Land

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

and Operation Expenses, (iv) which are paid or satisfied (in whole or in part) through Special Taxes and (v) for which the aggregate amount of all Special Taxes paid in any Fiscal Year does not exceed the Special Tax Cap for such Fiscal Year.

"**Special Tax Cap**" means the special tax levy or assessment per year equal to the special taxes or assessments for the base year that together with ad valorem real estate taxes, and other real property liens and charges by a Governmental Authority, does not exceed 2% of the market value of the Homesites located in, or in the vicinity of, the applicable Permitted Special Improvement District (which is the issuer of the applicable Special Improvement Bonds) intended to be sold (projected as of the date of issuance of such Special Improvement Bonds), as determined by the Governmental Authority through which such Permitted Special Improvement District is established, which special tax levy or assessment may be increased by up to 2% per year thereafter. For purposes of this Agreement, such Special Tax Cap includes any charges for maintenance and services imposed as a charge against real property, including such fees and charges imposed through a landscape and lighting maintenance district, special improvement district, special assessment district, a community facilities district, a community services district or other similar mechanism.

"**Special Taxes**" means special taxes or assessments on Real Property Assets used to pay or satisfy Special Improvement Bonds.

"**Specified Encumbrances**" has the meaning assigned to that term in subsection 2.9B.

"**SPV**" has the meaning assigned to that term in subsection 9.1G.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or the management of which is otherwise controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of any of the Borrowers (including Subsidiaries of a Borrower that are Borrowers).

"**Subsidiary Guarantor**" means any Subsidiary of the Borrowers that is a party to the Guaranty at any time pursuant to subsection 5.11.

"**Subsidiary Loan Documents**" has the meaning assigned to that term in subsection 5.11B.

30

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in subsection 8.1B.

"**Tax Distributions**" means Restricted Payments made pursuant to subsection 6.5(iii).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Terminated Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Test Period**" means each period of four consecutive Fiscal Quarters then last ended on each Calculation Date, in each case taken as one accounting period.

"**The Rhodes Companies**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tick**" has the meaning assigned to that term in the preamble to this Agreement.

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

"**Total Consolidated Indebtedness**" means, as at any date of determination, the aggregate amount of all Indebtedness of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"**Total Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6A.

"**Tribes**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany**" means those certain golf, commercial and residential developments located in Clark County commonly known as Tuscany, as depicted on the maps attached hereto as Exhibit XI.

"**Tuscany Acquisitions**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Acquisitions II**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Acquisitions III**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Acquisitions IV**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tuscany Golf**" has the meaning assigned to that term in the preamble to this Agreement.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other jurisdiction govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such jurisdiction.

"**Unrestricted**" means, when referring to Cash or Cash Equivalents of the Borrowers or any of the Subsidiary Guarantors, that such Cash or Cash Equivalents are not Restricted.

"**Wallboard**" has the meaning assigned to that term in the preamble to this Agreement.

1.2    **Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement**.

A.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time Modified (subject to any restrictions on such Modifications set forth herein), (b) any reference herein (i) to any Person (other than a natural person) shall be construed to include such Person's permitted successors and assigns and (ii) to any Borrower or any other Loan Party shall be construed to include such other Borrower or such other Loan Party as debtor and debtor-in-possession and any receiver or trustee for such Borrower or such other Loan Party, as the case may be, in any insolvency or liquidation proceeding, (c) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, without limitation, Real Property Assets, fixtures, Cash, securities, Capital Stock, accounts and contract rights, and Proceeds (as such term is defined in the Pledge and Security Agreement) therefrom.

B.    Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrowers to the Lenders pursuant to clauses (i), (ii) and (x) of subsection 5.3 shall be prepared in accordance with GAAP (except, with respect to interim financial statements, for the absence of normal year-end audit adjustments and explanatory footnotes) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 5.3(iv)). Calculations in connection with the definitions, covenants and other provisions of this

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements referred to in subsection 4.14A; provided, that should such accounting principles and policies change, the Borrowers, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

## SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

### 2.1    Commitments; Loans.

**A.**    **Loans.**  Each Lender has prior to the Effective Date funded term loans under the Pre-Petition Credit Agreement.   In connection with the implementation of the Plan of Reorganization and in partial satisfaction of the Lenders' claims under the Pre-Petition Credit Agreement, on the Effective Date, each Borrower hereby incurs loans (as to each Lender a "**Loan**" and collectively, the "**Loans**") in an initial aggregate principal amount equal to $50,000,000 as Obligations hereunder.  Each Lender's Commitment shall terminate immediately and without further action after giving effect to the incurrence of the Loans by the Borrowers. The proceeds of the Loans shall be used for the purposes identified in subsection 2.5A.  Loans, once repaid or prepaid, may not be reborrowed.

**B.**    [**Intentionally Omitted**].

**C.**    [**Intentionally Omitted**].

**D.**    **Notes.**  The Borrowers shall execute and deliver on the Effective Date to each Lender requesting the same (or to the Administrative Agent for that Lender) a Note substantially in the form of Exhibit VIII annexed hereto to evidence that Lender's Loan.  Any Lender not receiving a Note may request at any time that the Borrowers issue it such Note on the terms set forth herein, and the Borrowers agree to issue such Note promptly upon the request of a Lender. The Notes and the Obligations evidenced thereby shall be governed by, subject to and benefit from all of the terms and conditions of this Agreement and the other Loan Documents and shall be secured by the Collateral.

### 2.2    Interest on the Loans.

**A.**    **Rate of Interest.**  Subject to the provisions of subsections 2.2E, 2.6 and 2.7, each Loan shall bear interest on the unpaid principal amount thereof from the date made to maturity (whether by acceleration or otherwise) at a rate determined by reference to the LIBOR Rate. Subject to the provisions of subsections 2.2E, 2.6 and 2.7, the Loans shall bear interest through maturity as follows:

(i)    if a LIBOR Loan, and the interest is paid in Cash on the applicable Interest Payment Date and not capitalized pursuant to subsection 2.2C(i), then at the sum of the LIBOR Rate for the relevant Interest Period plus the Cash Pay Rate Margin.

33

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

      (ii)    if a LIBOR Loan, and the interest is not paid in Cash on the applicable Interest Payment Date and capitalized pursuant to subsection 2.2C(ii), then at the sum of the LIBOR Rate for the relevant Interest Period plus the PIK Margin.

**B.**    **Interest Periods.** The following terms shall be applicable to each Interest Period:

      (i)    each successive Interest Period shall automatically commence on the day on which the next preceding Interest Period expires;

      (ii)    if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

      (iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, end on the last Business Day of a calendar month; and

      (iv)    no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date.

**C.**    **Interest Payments.**

      (i)    Interest Payments Generally. Subject to the provisions of subsections 2.1C(ii) and 2.2E below, interest on each Loan shall be payable in arrears in Cash on each Interest Payment Date applicable to that Loan, upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity, by acceleration or otherwise).

      (ii)    Capitalization of Interest. If an Interest Payment Date occurs and (a) the average of the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of each of the two (2) consecutive Fiscal Quarters immediately preceding such Interest Payment Date is less than $15,000,000, or (b) the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the Fiscal Quarter immediately preceding the Fiscal Quarter in which such Interest Payment Date occurs is less than $15,000,000 (collectively, the "Cash Interest Threshold"), then on such Interest Payment Date the Borrowers may, at their option and in their sole discretion, in lieu of the payment in whole or in part of interest due on such Loan on such Interest Payment Date which is in excess of the LIBOR Rate then in effect for such Loan for such Fiscal Quarter, pay such amounts of interest by adding such amounts to the principal amount of such Loan on such Interest Payment Date. For the avoidance of doubt, (x) on the relevant Interest Payment Date the Borrower shall pay in Cash the interest due on such Interest Payment Date attributable to the

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

LIBOR Rate, and (y) the interest capitalized on the relevant Interest Payment Date pursuant to this subsection 2.2C(ii) shall be attributable to the PIK Margin (or the interest relating to that portion of the PIK Margin not paid in Cash on the relevant Interest Payment Date). Capitalized interest shall be payable in cash on any future Interest Payment Date to the extent the Cash Interest Threshold is met after giving effect to the payment of interest and capitalized interest due on such Interest Payment Date or, if the Cash Interest Threshold is not met on such Interest Payment Date, as the Borrowers may otherwise elect. If the Borrowers elect to pay a portion of the interest due on any Loan through an increase in the principal amount of such Loan as provided in this subsection 2.2C(ii), the Borrowers shall, within two (2) Business Days of each relevant Interest Payment Date, deliver to the Administrative Agent written notice of such election, which notice shall also state the amount of interest so added to the principal of the Loan and the new principal amount of the Loan. To the extent not previously paid, all capitalized interest shall be paid in cash at maturity (including final maturity, by acceleration or otherwise).

**D.**     **Automatic Continuation.**  Subject to the provisions of subsection 2.6, upon the expiration of any Interest Period applicable to a LIBOR Loan and until prepayment of such LIBOR Loan in full or until maturity (including final maturity, by acceleration or otherwise), such LIBOR Loan shall automatically be continued for a successive Interest Period.

**E.**     **Post-Default Interest.**  Upon the occurrence and during the continuation of any Event of Default (x) under subsections 7.1 or 7.7, and (y) during the continuation of any other Event of Default, following written notice thereof to the Borrowers, at the election of the Administrative Agent (which may be revoked at the option of the Requisite Lenders notwithstanding any provision of subsection 9.5A that would require the consent of all Lenders thereto), the outstanding principal amount of all Loans and, to the extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans. Payment or acceptance of the increased rates of interest provided for in this subsection 2.2E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

**F.**     **Computation of Interest.**  Interest on the Loans shall be computed on the basis of a 360-day year and for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

2.3    Fees.

The Borrowers agree to pay such fees to the Agents as may hereafter be (or have previously been) agreed upon.

2.4    Repayments and Prepayments; General Provisions Regarding Payments.

A.    Scheduled Payments of Loans.

The Borrowers shall repay the principal amount of the Loans on the Maturity Date, together with all other amounts owing by the Borrowers under this Agreement with respect to the Loans.

B.    Prepayments of Loans.

(i)    Voluntary Prepayments.

(a)    Subject to the terms of subsection 2.4B(i)(b), the Borrowers may, upon not less than three (3) Business Days' prior irrevocable written or telephonic notice, promptly confirmed in writing to the Administrative Agent (which notice the Administrative Agent will promptly transmit to each Lender), at any time and from time to time prepay the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrowers elect to prepay a LIBOR Loan other than on the expiration of the Interest Period applicable thereto, the Borrowers shall, at the time of such prepayment, also pay any amounts payable under subsection 2.6D hereof; and provided, further, that if such notice of prepayment indicates that such prepayment is with respect to all outstanding Loans and is to be funded with the proceeds of a Refinancing, such notice may be revoked if the Refinancing is not consummated. Notice of prepayment having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein. Any voluntary prepayments pursuant to this subsection 2.4B(i) shall be applied as specified in subsection 2.4C. Concurrently with each voluntary prepayment pursuant to this subsection 2.4B(i) the Borrowers shall deliver to the Administrative Agent an Officer's Certificate that identifies the source of the funds used to finance such voluntary prepayment, including a statement as to whether such voluntary prepayment of the Loans is being made directly or indirectly with the proceeds of any issuance of debt Securities or other Indebtedness of any of the Borrowers or any Subsidiary.

(b)    [Intentionally Omitted.]

36