The First Lien Steering Committee estimates that, at the conclusion of the Claims objection, reconciliation and resolution process, the aggregate amount of Claims will be as set forth on the charts in Article I.E. The Claims Register, which reflects all Claims Filed against each Debtor Entity, is available for inspection at www.omnimgt.com/rhodes.

The Claims estimates are approximate and based upon numerous assumptions and represent significant reductions in the aggregate face amount of Claims Filed. There is no guarantee that the ultimate amount of each category of Claims will conform to the estimates stated herein, and the majority of Claims underlying such estimates are subject to challenge. A number of Claims have been asserted in unliquidated amounts. The First Lien Steering Committee believes that certain Claims are without merit, and the Debtors, the Reorganized Debtors and/or the First Lien Steering Committee will object to all such Claims. There can be no assurance, however, that Claim objections will achieve the significant reductions in Claims set forth above. Moreover, additional Claims may be Filed or identified during the Claims objection, reconciliation and resolution process that may materially affect the foregoing estimates.

G.    Questions and Answers Regarding this Disclosure Statement and the Plan

1.    **What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize or wind-down its business for the benefit of itself and holders of claims against and interests in the debtor. Chapter 11 also is designed to promote equality of treatment for similarly situated holders of claims against the debtor and similarly situated holders of interests in the debtor with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

10

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

2.    **Why is the First Lien Steering Committee sending me this Disclosure Statement?**

The Disclosure Statement is being furnished by the First Lien Steering Committee in connection with: (a) the solicitation of votes for the acceptance or rejection of the Plan; and (b) the confirmation hearing (the "Confirmation Hearing"), which is scheduled for January 14, 2010 at 9:00 a.m. Pacific Time (the "Confirmation Hearing Date").

Before soliciting votes for the acceptance or rejection of the Plan, Bankruptcy Code section 1125 requires the First Lien Steering Committee to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.

3.    **Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution under the Plan, if any, depend on what kind of Claim or Interest you hold.  A summary of the Classes of Claims and Interests (each, a category of Holders of Claims or Interests as set forth in Article IV of this Disclosure Statement and Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, which we refer to as a "Class") and their respective voting statuses is set forth below.

You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims and Interests in each of the Classes below.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| A-1 | First Lien Lender Secured Claims | Impaired | Entitled to Vote |
| A-2 | Second Lien Lender Secured Claims | Impaired | Entitled to Vote |
| A-3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| B | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| C-1 | General Unsecured Claims | Impaired | Entitled to Vote |
| C-2 | First Lien Lender Deficiency Claims | Impaired | Entitled to Vote |
| C-3 | Second Lien Lender Deficiency Claims | Impaired | Entitled to Vote |
| C-4 | Subordinated Claims | Impaired | Deemed to Reject |
| D | Old Equity Interests | Impaired | Deemed to Reject |
| E | Intercompany Claims | Impaired | Deemed to Reject |

For more information about the treatment of Claims and Interests see "Classification and Treatment of Claims," which begins on page 31 of this Disclosure Statement.

4.    **What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their business.  If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated by the Plan and the Mediation Settlement could be implemented and what Holders of Claims would ultimately receive in respect of their

Claims. It is possible that any alternative plan would result in substantially less favorable treatment for Holders of Claims than such Holders would receive under the Plan. Moreover, non-Confirmation of the Plan may result in an extended chapter 11 proceeding. For a more detailed description of the consequences of the Plan or of a liquidation scenario, see "Best Interests of Creditors Test," which begins on page 82 of this Disclosure Statement, and the Going Concern Analysis and Liquidation Analysis attached as Exhibits D and Exhibit E to this Disclosure Statement.

5.    **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter. See "Conditions Precedent to Confirmation and Consummation of the Plan," which begins on page 75 of this Disclosure Statement, for a discussion of the conditions to Confirmation and the Effective Date.

6.    **Where is the cash required to fund the Plan coming from?**

Although the Plan provides for the option of obtaining exit financing, the Plan contemplates that the Reorganized Debtors will fund distributions under the Plan with Cash on hand, existing assets, and the issuance of the New First Lien Notes and Newco Equity Interests. In addition, the Plan provides that the Rhodes Entities will pay $3.5 million in Cash to the Reorganized Debtors, which will be used to fund distributions under the Plan and provide working capital to the extent of any excess. Finally, the Reorganized Debtors will provide funding for the Litigation Trust in the initial amount of $100,000 (the "Litigation Trust Funding Amount"). The Litigation Trust Funding Amount will be repaid to the Reorganized Debtors from the first proceeds received by the Litigation Trust.

7.    **Is there potential litigation related to the Plan?**

Yes. In the event that any Impaired Class of Claims does not accept the Plan, the First Lien Steering Committee may seek Confirmation of the Plan notwithstanding the dissent of such Class of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an Impaired Class of Claims if it determines that the Plan satisfies the requirements of Bankruptcy Code section 1129(b). There can be no assurance, however, that the Bankruptcy Court will order that the Plan be confirmed over the objection of an Impaired Class of Claims. In addition, the First Lien Steering Committee is aware of the possibility that Stanley Consultants, Inc. may object to the Plan based upon arguments previously raised in connection with Stanley Consultants, Inc.'s objection to the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1  Disclosure Statement. See "Certain Bankruptcy Considerations," which begins on page 87 of
2  this Disclosure Statement.

3        8.      **What are the Claims and Causes of Action that will be transferred to the**
              **Litigation Trust?**
4

5        Pursuant to the terms of the Litigation Trust Agreement, the Debtors will transfer to
the Litigation Trust all Claims and Causes of Action on which the First Lien Lenders do not
6  have a lien and that have not been released pursuant to the Plan or by order of the Bankruptcy
Court.  Such Claims and Causes of Action include those Claims and Causes of Action
7  belonging to the Debtors against the Rhodes Entities (other than any claims released against
the Rhodes Entities pursuant to the Plan) and those Claims and Causes of Action listed on
8  Exhibit G hereto.  Although the First Lien Steering Committee is still in the process of
9  analyzing and reviewing potential Claims and Causes of Action against the Rhodes Entities,
the First Lien Steering Committee believes that such Claims and Causes of Action may
10  potentially include (i) Claims for breach of fiduciary duty, (ii) Claims for misappropriation of
Debtors' assets for personal use, (iii) Claims for usurping corporate opportunities for the
11  benefit of competing interests, (iv) Claims for mismanagement of the Debtors' operations, (v)
12  Claims for fraudulent transfers (to the extent not expressly released by the Plan), and (vi)
Claims for the diversion of corporate resources for the benefit of competing interests.  For
13  additional information regarding the Claims and Causes of Action to be transferred to the
Litigation Trust, please see Exhibit G to this Disclosure Statement.  For additional details
14  regarding Claims and Causes of Action against the Rhodes Entities, see "Potential Claims
15  Against the Rhodes Entities," which begins on page 4 of this Disclosure Statement.

16        9.      **What is the process by which the First Lien Lenders will purchase certain**
              **general unsecured claims?**
17

18        Under the terms of the Plan, the First Lien Lenders will receive $1.5 million in Cash
from the proceeds of the First Lien Lenders' collateral. The First Lien Lenders have agreed to
19  use the $1.5 million Cash payment provided to them under the Plan to purchase the General
Unsecured Claims of Creditors who are listed on the Claims Purchase Schedule attached to
20  this Disclosure Statement as Exhibit H to the extent such Claims are outstanding as of the
Effective Date and subject to certain other limitations and conditions.  Pursuant to the Plan,
21  the First Lien Lenders will be paid the $1.5 million in Cash through a series of payments
22  made over the course of eighteen months. Payments on account of the purchased Claims will
be made on the same time frame as the First Lien Lenders receive Cash payments from the
23  Reorganized Debtors under the Plan.  The First Lien Steering Committee may add Claims to
the Claim Purchase Schedule at any time so long as the amount to be paid for all Claims listed
24  on the Claim Purchase Schedule does not exceed $1.5 million.  No Creditor listed on the
Claim Purchase Schedule will receive an amount in excess of the full amount of its Claim.
25  For additional details regarding the purchase of Claims by the First Lien Lenders, see
26  "General Unsecured Claims Purchase," which begins on page 63 of this Disclosure Statement.

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10.    **Why does the Plan provide for substantive consolidation?**

As discussed in more detail in this Disclosure Statement, the First Lien Steering Committee believes that substantive consolidation of the Debtors' Estates is warranted based on several factors and will provide the greatest recovery for unsecured creditors. Among other things, these factors include that the Debtors (i) operate as a single business enterprise under a single name, (ii) operate on a centralized basis with a centralized cash management system, (iii) share common parent companies, (iv) rely on a single corporate office for operational and other support services, (v) regularly conduct business with each other such that the flow of funds and transactions would be difficult to entangle, and (vi) are all obligated on the First Lien Lender Claims and the Second Lien Lender Claims. Moreover, as the First Lien Lenders and Second Lien Lenders can assert the full amount of their claims at every Debtor and general unsecured creditors can only assert claims against the specific Debtor against which such creditor has a claim, substantive consolidation will result in greater potential recoveries to unsecured creditors. In addition, a large amount of intercompany claims were owed between the various Debtors as of the Petition Date, and numerous Proofs of Claim were Filed against the incorrect Debtor entity. For additional information regarding the substantive consolidation of the Debtors' Estates, see "Substantive Consolidation," which begins on page 35 of this Disclosure Statement.

11.    **What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

All Creditors who are eligible to vote on the Plan will receive a solicitation package containing (a) a cover letter: (i) describing the contents of the Solicitation Package and instructions on how paper copies of any materials that may be provided in CD-ROM format can be obtained at no charge; and (ii) urging the Holders in each of the Voting Classes (as defined below) to vote to accept the Plan, (b) the Solicitation Procedures Order, (c) a copy of the solicitation procedures, (d) an appropriate form of Ballot, (e) a copy of a letter signed by the Mediation Parties in support of the Plan, (f) a copy of a letter signed by the Creditors' Committee in support of the Plan, (g) this Disclosure Statement (together with the Plan, which is Exhibit A thereto) in either paper or CD-ROM format; and (h) such other materials as the Bankruptcy Court may direct.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are available for viewing by any party at: www.omnimgt.com/rhodes.

12.    **Will there be releases granted to parties in interest under the plan?**

Yes. The Plan provides for the Debtors' estates to grant releases to (a) the First Lien Lenders in their capacity as such, (b) the First Lien Steering Committee, (c) the Second Lien Lenders in their capacity as such, (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' predecessors, successors and assigns, (e) the Creditors' Committee and the members thereof in their capacity as such, (f) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' subsidiaries, affiliates, officers, members, directors, principals, employees, agents, financial advisors, attorneys, accountants,

14

investment bankers, consultants, representatives, and other Professionals, (g) the Debtors' officers, employees (including Thomas Robinson and Joseph Schramm) and Professionals, as of the Petition Date, and (h) Paul Huygens; provided, however, that clause (g) shall not include (i) the Rhodes Entities or their affiliates, (ii) insiders of any of the Rhodes Entities (except as to Thomas Robinson and Joseph Schramm), or (iii) relatives of Rhodes.

In addition, the Plan provides that the Rhodes Entities shall be deemed released from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever arising under chapter 5 of the Bankruptcy Code with respect to transfers made by the Debtors to the Rhodes Entities during the 2 years prior to the Petition Date; provided, however, that such release shall only apply to transfers expressly set forth in the Schedules as Filed with the Bankruptcy Court as of August 1, 2009 or as disclosed in Attachment B to the Mediation Term Sheet.

Finally, the Plan provides that, pursuant to Bankruptcy Rule 9019, and except as otherwise specifically provided in the Plan, to the extent a First Lien Lender elects on its Ballot to release the First Lien Lenders in accordance with this Section VIII.F. of the Plan, each of the First Lien Lenders electing to grant such a release, shall be deemed to release each of the other First Lien Lenders that has elected to grant such a release; provided, however, that Claims or liabilities arising out of or relating to any act or omission of any First Lien Lender or any of its affiliates that constitutes gross negligence or willful misconduct shall not be released.

13.    **What is the deadline to vote on the Plan?**

**4:00 p.m. (prevailing Pacific Time) on January 4, 2010.**

14.    **How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of a Claim in the following Classes, you may vote for or against the Plan by completing the Ballot and returning in the manner provided on the Ballot:

- **Class A-1 (First Lien Lender Secured Claims)**

- **Class A-2 (Second Lien Lender Secured Claims)**

- **Class C-1 (General Unsecured Claims)**

- **Class C-2 (First Lien Lender Deficiency Claims)**

- **Class C-3 (Second Lien Lender Deficiency Claims)**

The Debtors, with the approval of the Bankruptcy Court, have engaged Omni Management Group, LLC, Attn: Brian Osborne, 16161 Ventura Blvd. Suite C, PMB 477, Encino, CA 91436, to serve as the Claims and Solicitation Agent.  The Claims and

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

15

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is **4:00 p.m.**, (prevailing Pacific Time), on **January 4, 2010.**

| BALLOTS |
|---|
| Ballots must be actually received by the Claims and Solicitation Agent by **4:00 p.m.** (prevailing Pacific Time) on **January 4, 2010.** Ballots can be sent by hand delivery, mail, fax or email to the following addresses: |
| <u>Hand Delivery/Mail:</u> The Rhodes Companies, LLC Omni Management Group Attn: Brian Osborne 16161 Ventura Blvd. Suite C, PMB 477 Encino, CA 91436 |
| <u>Fax:</u> (818) 783-2737 |
| <u>Email:</u> Nova@omnimgt.com |
| If you have any questions on the procedure for voting on the Plan, please contact the Claims and Solicitation Agent by telephone at (866) 989-6144 or contact Brian Osborne at bosborne@omnimgmt.com. |

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by **4:00 p.m.** (prevailing Pacific Time), on **January 4, 2010.**

It is important to follow the specific instructions provided on each Ballot. Each Ballot must be completed and returned in the manner indicated on the Ballot.

15. **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

16.    **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **January 14, 2010** to take place at **9:00 a.m.** (prevailing Pacific Time) before the Honorable Linda B. Riegle, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Nevada, located at 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101.    The Confirmation Hearing may be continued from time to time by announcing such continuance in open court or otherwise, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to interested parties.

Objections to Confirmation of the Plan must be filed and served on the First Lien Steering Committee, and certain other parties, by no later than **January 4, 2010 at 4:00 p.m.** (prevailing Pacific Time). Any objections to the Plan must be (i) in writing, (ii) conform to the Bankruptcy Rules and the Local Rules, (iii) state the name and address of the objecting party and the amount and nature of the Claim of such Entity, (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, (v) and be actually received by no later than **January 4, 2010 at 4:00 P.M.**

17.    **What is the purpose of the Confirmation Hearing?**

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

18.    **What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Confirmation of the Plan and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code and as otherwise set forth in the Plan.

19.    **What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code.  As a result, the Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. As a result of the Mediation Settlement, the Plan contemplates that, upon the Debtors' emergence from chapter 11, the Debtors will continue to operate as a going

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  concern homebuilder primarily in the Las Vegas market. For additional details on the Plan,
2  see "Plan Overview" beginning on page 1 of this Disclosure Statement. Additional details
3  regarding the Mediation Settlement can be found in the section entitled "Settlement Overview" beginning on page 2 of this Disclosure Statement.

4      20.    **Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**
5

6      The Plan contemplates that the First Lien Lenders will be the owners of the
7  Reorganized Debtors. Pursuant to the Plan, a new parent company for the Debtors will be
   formed ("Newco") and each of the First Lien Lenders will receive their pro rata share of 100%
8  of the equity interests in Newco on account of its First Lien Lender Secured Claim. As a
9  result of certain transactions to be undertaken in connection with the Plan, Newco will control
   the Reorganized Debtors upon their emergence from bankruptcy. The boards of directors of
10 the Reorganized Debtors will consist of one or more members appointed by the First Lien
   Steering Committee. The First Lien Steering Committee will also appoint a chief executive
11 officer or other similar officer to manage the Reorganized Debtors. The First Lien Steering
12 Committee is in the process of selecting such officers and directors. The identity of such
   officers and directors will be publicly disclosed prior to the Confirmation Hearing, which is
13 scheduled to take place on January 14, 2010 at 9:00 a.m.

14     21.    **Does the First Lien Steering Committee recommend voting in favor of the Plan?**

15     Yes. In the opinion of the First Lien Steering Committee, the Plan is preferable to the
16 alternatives described in this Disclosure Statement because it provides for a larger distribution
   to the Holders of Claims than would otherwise result in a liquidation under chapter 7 of the
17 Bankruptcy Code. In addition, any alternative other than Confirmation could result in
18 extensive delays and increased Administrative Claims, which would result in smaller
   distributions to the Holders of Claims. Accordingly, the First Lien Steering Committee
19 recommends that Holders of Claims entitled to vote on the Plan support Confirmation and
   vote to accept the Plan.
20

21 H.    Voting and Confirmation

22     The Classes entitled to vote will have accepted the Plan if (1) the Holders of at least
   two thirds in dollar amount of the Allowed Claims actually voting in each such Class, as
23 applicable, have voted to accept the Plan and (2) the Holders of more than one half in number
   of the Allowed Claims actually voting in each such Class, as applicable, have voted to accept
24 the Plan. Assuming the requisite acceptances are obtained, the First Lien Steering Committee
25 intends to seek Confirmation of the Plan at the Confirmation Hearing scheduled to commence
   on January 14, 2010 at 9:00 a.m. prevailing Pacific Time, before the Bankruptcy Court.
26 Section 1129(a)(10) of the Bankruptcy Code will be satisfied for purposes of Confirmation by
   acceptance of the Plan by at least one Class of Claims that is Impaired under the Plan.

27     Subject to entry of the Confirmation Order, to the extent a Holder of one or more First
28 Lien Lender Claims also holds one or more Second Lien Lender Claims, if such Holder votes

in favor of the Plan on account of its First Lien Lender Claim(s), the Holder shall be deemed to vote in favor of the Plan on account of its Second Lien Lender Claim(s) regardless of whether the Holder actually votes its Second Lien Lender Claim(s) in favor of the Plan.

THE FIRST LIEN STEERING COMMITTEE WILL SEEK CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY IMPAIRED CLASSES PRESUMED TO REJECT THE PLAN, AND THE FIRST LIEN STEERING COMMITTEE RESERVES THE RIGHT TO DO SO WITH RESPECT TO ANY OTHER REJECTING CLASS OR TO MODIFY THE PLAN.

The Bankruptcy Court has established November 24, 2009 (the "Record Date"), as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots, along with this Disclosure Statement, the Plan and the Solicitation Procedures Order, will be mailed to all registered Holders of Claims as of the Record Date that are entitled to vote. A return envelope will be included with Ballots, as appropriate.

The Claims and Solicitation Agent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials and oversee the voting tabulation. The Claims and Solicitation Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan. The address for the Claims and Solicitation Agent is:

Omni Management Group<br>
Attn: Rhodes Homes Claims Agent<br>
16501 Ventura Boulevard, Suite 440<br>
Encino, CA 91436

Or if by email to scott@omnimgt.com or by fax to 818-783-2737. If you have any questions on voting procedures, please call the Claims and Solicitation Agent at the following toll free number: (818) 906-8300.

TO BE COUNTED, BALLOTS (OR MASTER BALLOTS OF THE RESPECTIVE NOMINEE HOLDER, IF APPLICABLE) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE CLAIMS AND SOLICITATION AGENT NO LATER THAN 4:00 P.M. PREVAILING PACIFIC TIME ON JANUARY 4, 2010 (THE "VOTING DEADLINE"). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED.

THE FIRST LIEN STEERING COMMITTEE BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS. THE FIRST LIEN STEERING COMMITTEE RECOMMENDS THAT ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.

I.    Consummation of the Plan

It will be a condition to Confirmation of the Plan that all provisions, terms, and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

19

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  waived pursuant to the provisions of Article X of the Plan. Following Confirmation, the Plan
2  will be consummated on the Effective Date, which will be no earlier than the eleventh day
   following entry of an order, in form and substance acceptable to the First Lien Steering
3  Committee, by the Bankruptcy Court confirming the Plan and satisfaction of all conditions to
4  Confirmation and the Effective Date having been satisfied or waived in accordance with the
   terms of the Plan.

5
6                                 **Article II.**
                                 **BACKGROUND[2]**

7  A.    Description of the Debtors' Business Operations

8        1.    Organizational Structure

9        The Debtors' organizational chart is attached hereto as Exhibit B. In addition to the
10 Debtor entities below, the Debtors are affiliated with several other companies that are not
   Debtors in these Chapter 11 Cases.

11       Rhodes Ranch GP is the primary holder of land associated with the Rhodes Ranch
12 master-planned community and also owns some commercial properties outside of the Rhodes
   Ranch master-planned community. The Rhodes Ranch master-planned community consists of
13 several developments, including developments built by non-Debtor affiliated developers.
14 Rhodes Design and Development Corp. holds the Debtors' contractor's license in Nevada
   along with holding some land. Previously, Rhodes Ranch Golf and Country Club was the
15 owner and operator of the golf course and club house in the Rhodes Ranch development, but
16 on December 22, 2008, as required by the First Lien Credit Agreement, its assets were sold to
   non-Debtor Rhodes Ranch Golf, Inc.

17       The Rhodes Companies, LLC is a real estate development holding company.

18       The following Debtors hold parcels of land associated with the Tuscany development:
19 Rhodes Design and Development; Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC;
   Tuscany Acquisitions III, LLC; and Tuscany Acquisitions IV, LLC. Tuscany Golf Country
20 Club, LLC owns and operates the golf club located at the Tuscany development.

21       The following Debtors own land in Arizona: Rhodes Homes Arizona, LLC; Rhodes
22 Arizona Properties, LLC; and Elkhorn Investments, Inc.. Rhodes Homes Arizona, LLC also
   holds the Debtors' Arizona contractor's license.
23
24       Heritage Land Company, LLC is the land management company for its subsidiaries
   and does not hold any real estate directly. The following Debtors are subsidiaries of Heritage
25 Land Company, LLC and hold various parcels of land primarily located in Nevada: Tick, LP;
   Glynda, LP; Chalkline, LP; Batcave, LP; Jacknife, LP; Wallboard, LP; and Overflow LP.
26
27  _____
28       [2] Article II is based primarily on representations made by the Debtors.

The Debtors are also involved in land acquisition, development, and some utility and design work. Exterior and interior design is provided by Rhodes Design & Development Corporation. Rhodes Realty, Inc. is the Debtor that provides sales and marketing services for the Debtors. C & J Holdings, Inc. is the homeowners association management company for Rhodes Ranch, Tuscany, and three other smaller communities.

Pinnacle Grading, LLC provides grading and excavation services to the Debtors. Previously, the following Debtors also provided specific services to the Debtors, but have ceased operations: Bravo Inc.; Gung-Ho Concrete, LLC; Geronimo Plumbing, LLC; Arapahoe Cleaning, LLC; Apache Framing, LLC; Six Feathers Holding, LLC; and Tribes Holding LLC.

Elkhorn Investments, Inc. is a holding company for Elkhorn Partners, LP. Elkhorn Partners, LP is a limited partnership that was formed for the construction and sale of several communities in Northwest Las Vegas. As of the Petition Date, only one home remained unsold.

2.    History and Projects

The Debtors are engaged primarily in the business of detached home building and sales in Nevada and Arizona. Collectively, the Debtors developed 40 communities since their founding in 1988, generating over $2.4 billion in total revenues. The Debtors have built more than 6,000 homes in the Las Vegas Valley during the past two decades. In 2008, the Debtors sold 390 homes, generating revenue of $118.3 million, or $54.6 million in gross profit.

Currently, the Debtors have two signature master planned communities under development, Rhodes Ranch and Tuscany Residential Village. Both communities are recognized for their accessible location to employment centers and the Las Vegas Strip, for their community amenities, country club lifestyle, and for the quality and value of home design and construction.

Rhodes Ranch is located in southwestern Las Vegas and opened in 1997. It has a gated entry and 24-hour security detail with patrols. The development is built around a Ted Robinson-designed 18-hole championship golf course. The development features a multi-million dollar community center with swimming pool, gymnasium, multiple basketball courts, fitness center, and card/club rooms. The community also has a community park and sports complex. There are 314 available finished lots remaining to be sold as of March 31, 2009, and approximately 1,993 lots to be developed. The First Lien Steering Committee estimates the value of the Rhodes Ranch development on a going concern basis to be approximately $65.4 million.

Tuscany Residential Village is located in southeast Las Vegas and opened in 2005. The development is also built around a Ted-Robinson designed 18-hole championship golf course. It has gated entry and 24-hour security detail (with patrols), an existing 35,000 square foot community center similar to Rhodes Ranch, and a planned Tuscan-themed retail center. As of March 31, 2009, Tuscany had 350 finished lots remaining to be sold and 559 partially

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

21

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

developed lots. The First Lien Steering Committee estimates the value of Tuscany Residential Village on a going concern basis to be approximately $48.1 million.

Spanish Hills is a high-end development located in southwest Las Vegas. The community is built on over 100 acres and features many custom homes in excess of 5,400 square feet of living space. As of March 31, 2009, it had 2 partially developed single family estate lots and 2 finished lots remaining to be sold. It also had 10 acres of undeveloped land. The First Lien Steering Committee estimates value of the Spanish Hills development on a going concern basis to be approximately $1 million.

The Debtors did not operate their developments by legal entity, so for purposes of estimating Claims against each of these developments, the Debtors would need to conduct a Claim-by-Claim analysis. In several cases, the Claims filed by Creditors were asserted against The Rhodes Companies, LLC, which is the lead Debtor for purposes of the Chapter 11 Cases, but not necessarily the contracting party with whom the such Creditors may have conducted business. There is, however, approximately $390 million of Secured First Lien Lender debt and Second Lien Lender debt filed against each Debtor. For a more complete discussion of the total Claims asserted against all the Debtors, see Article I.F hereof.

The Debtors' homebuilding operations in Arizona ("Arizona") will be transferred to the Rhodes Entities on the Effective Date pursuant to the Plan. Arizona consists of all of the real and personal property of three of the Debtors: Rhodes Homes Arizona Properties, LLC, Rhodes Homes Arizona, LLC, and Elkhorn Investments, Inc. Included within the Arizona Assets is Pravada, which is a Rhodes Homes development located in Mohave County (vicinity of Kingman, Arizona) on approximately 1,312 acres, which has 3,591 partially developed lots. Also included in Arizona, which is located within and around Pravada, are 4 model homes, 4 standing inventory homes, and 327 acres of land. A list of Arizona Assets being transferred to the Rhodes Entities is set forth on Attachment D to the Mediation Term Sheet. The Arizona Assets do not include any assets owned by Pinnacle Grading located in Arizona, except for Pinnacle Grading office equipment, furniture, computers located in Arizona, which is set forth on Attachment D to the Mediation Term Sheet. The Arizona Assets being transferred also do not include intercompany claims, the Stanley Engineering Litigation or any cash owned by any of the foregoing legal entities.

The Debtors own a number of additional lots and commercial-zoned properties in various stages of development in Nevada and Arizona. As of the first quarter of 2009, development on all projects except Rhodes Ranch and Tuscany has ceased pending improvement in the real estate market.

3.    Principal Debt and Capital Structure

The Debtors are party to a Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders, and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger (the "First Lien Credit Agreement"). As of the Petition Date, there was approximately $302 million in principal amount outstanding under the First

22

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1 | Lien Credit Agreement. The First Lien Steering Committee is comprised of certain lenders
2 | under the First Lien Credit Agreement that hold, in the aggregate, approximately 70% of the
outstanding first lien debt.[3] Three of the Debtors are primary obligors under the First Lien
3 | Credit Agreement. The remaining Debtors executed guarantees under the same facility. The
4 | First Lien Credit Agreement is secured by a blanket first lien on substantially all of the
Debtors' property. The First Lien Lenders assert that the Stanley Engineering Litigation is
5 | among the assets included in their collateral package.

6 | In addition, the Debtors are party to a Credit Agreement dated as of November 21,
7 | 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch
General Partnership, as the Borrowers, the Lenders Listed Therein, as the Lenders, and Credit
8 | Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication
9 | Agent, Sole Bookrunner and Sole Lead Arranger (the "Second Lien Credit Agreement"). As
of the Petition Date, there was approximately $70.7 million in principal amount outstanding
10 | under the Second Lien Credit Agreement. The Second Lien Credit Agreement is secured by a
11 | blanket second lien on substantially all of the Debtors' property. The Second Lien Lenders
also assert that the Stanley Engineering Litigation is among the assets included in their
collateral package.

12 | The First Lien Lenders and the Second Lien Lenders are party to an intercreditor
13 | agreement that, among other things, prohibits the Second Lien Lenders from receiving a
recovery from the collateral securing the first lien and second lien debt unless the First Lien
14 | Lenders are repaid in full. Moreover, to the extent the Second Lien Agent receives Collateral
15 | or the proceeds thereof prior to the discharge of the first lien indebtedness, the Second Lien
Agent must pay over such Collateral or proceeds to the First Lien Agent for the benefit of
16 | First Lien Lenders. Absent the consent of the First Lien Lenders, the Second Lien Lenders
would not be entitled to a recovery in these cases. The intercreditor agreement does not,
17 | however, prevent the Second Lien Lenders from voting against the Plan. Notwithstanding the
18 | foregoing provisions, the First Lien Lenders have agreed to gift a 50% interest in the Stanley
Engineering Litigation to the Second Lien Lenders on account of the Second Lien Lenders'
19 | Secured Claims if the Class of Second Lien Lender Secured Claims votes in favor of the Plan.

20 | Proceeds from the first lien indebtedness and the second lien indebtedness were used
21 | as follows: (i) approximately $240 million was used to pay off other secured loan debt of the
Debtors; (ii) approximately $50 million was placed in an interest reserve for both the first lien
22 | credit facility and the second lien credit facility; (iii) approximately $70 million was paid to
equity, and (iv) the remainder was used by the Debtors to fund operating expenses. The
23 | interest reserve was applied during the first 18 months of the credit agreement, or by the end
of 2006, pursuant to the terms of the credit agreement. Accordingly, there are no funds
24 | remaining in the aforementioned interest reserve.

25 |

26 | _____

27 | [3] The members of the First Lien Steering Committee are Credit Suisse Asset Management, Candlewood
Special Situations Master Fund, Credit Suisse Loan Funding LLC, CypressTree Investment Management LLP,
28 | General Electric Capital Corporation, Highland Capital Management, L.P., and Sorin Capital Management.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

The Debtors are also party to a swap transaction, pursuant to which there was approximately $20.2 million outstanding on the Petition Date. The swap is an interest rate hedging arrangement with an affiliate of the First Lien Agent to hedge against the floating interest rate applicable to amounts outstanding under the First Lien Credit Agreement. The swap involves the payment by the Debtors of fixed amounts to the affiliate of the First Lien Agent, and the payment of variable amounts (based on agreed upon floating interest rates) by the affiliate to the Debtors. Obligations outstanding under the swap transaction are equal in priority with obligations outstanding under the First Lien Credit Agreement.

The Debtors are also obligated to approximately nine equipment lenders who hold purchase money security interests in various office equipment and equipment used in the Debtors' operations. As of the Petition Date, the Debtors estimate that they are obligated to these equipment lenders in the approximate amount of $2.5 million.

In the ordinary course of business, the Debtors are required to post bonds, either on an unsecured or partially secured basis backed by collateral, as support for the Debtors' completion of certain performance and/or payment obligations for the benefit of various third party beneficiaries, generally governmental entities, agencies, jurisdictions or homeowners associations with which they conduct business. The Debtors rely on bonding companies to post the bonds and have issued indemnities in favor of the bonding companies in the event that the bonds come due. The Debtors estimate that they currently have approximately $31 million in outstanding bonds, none of which amounts have been called. The First Lien Steering Committee anticipates the existing performance bonds will continue in effect upon the Debtors' emergence from chapter 11.

4.    The Rhodes Entities Claims

The Debtors are affiliated with several non-Debtor entities that are not obligors or guarantors under the First Lien Credit Agreement or the Second Lien Credit Agreement. The non-Debtor entity affiliates, (the Rhodes Entities) are directly or indirectly owned by James M. Rhodes, the founder and President of the Debtors. The Rhodes Entities have alleged pre-petition Claims on an aggregate basis against the Debtors for approximately $10.598 million consisting primarily of tax payments allegedly made by the Rhodes Entities on behalf of the Debtors. The First Lien Steering Committee is in the process of analyzing the Rhodes Entities Claims and any and all claims that the Debtors' estates may hold against the Rhodes Entities.

5.    Management of the Debtors

James Rhodes leads the management team of the Debtors. Upon the Effective Date, it is contemplated that James Rhodes will not have a management role with the Reorganized Debtors.

B.    Pending Significant Litigation

Rhodes Homes Arizona, LLC filed suit against Stanley Consultants, Inc. ("Stanley"), an Iowa corporation, in August, 2006 in the Superior Court of Arizona, Maricopa County. An amended complaint was filed on October, 23 2007. The amended complaint seeks recovery against Stanley for breach of contract, bad faith, declaratory relief, fraud, punitive damages,

24

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

and professional negligence arising out of approximately $7 million worth of charges for work that was substantially unusable. Damages have been itemized to counsel for Stanley in the amount of $25,140,595.96, which amount does not include exemplary damages. Stanley has filed a counterclaim to recover approximately $2 million in unpaid charges. A significant portion of discovery has been completed in connection with the lawsuit. Upon information and belief, no trial date has been set and the First Lien Steering Committee and Debtors do not know when a trial will be held or a judgment may entered in connection therewith. As a result, it is uncertain if there will be any proceeds from the Stanley Engineering Litigation and, if there are, when the net proceeds may be distributed in accordance with the terms of the Plan.

Stanley Filed Proofs of Claim against Rhodes Homes Arizona, LLC, Rhodes Design and Development Corporation and Rhodes Ranch General Partnership asserting Claims in the total aggregate amount of $4,609,249.00 on account of prepetition services allegedly rendered pursuant to agreements entered into with (i) Rhodes Homes Arizona, LLC and (ii) Rhodes Design and Development Corporation and Rhodes Ranch General Partnership. The Reorganized Debtors will evaluate and, if appropriate, file objections to such Claims prior to the Claims Objection Deadline. The Reorganized Debtors also intend to pursue the Stanley Engineering Litigation post-emergence.

Stanley disputes the Debtors' ability to transfer any intellectual property created by Stanley to the Rhodes Entities.

### Article III.[4]
### THE CHAPTER 11 CASES

The following is a general summary of the Chapter 11 Cases, including the events leading up to the chapter 11 filings, the stabilization of the Debtors' operations following the chapter 11 filings, certain administrative matters addressed during the Chapter 11 Cases and the Debtors' restructuring initiatives since the chapter 11 filings.

A.    Events Leading to the Chapter 11 Cases

At the end of the fourth quarter of 2008, sales in the Las Vegas market of new, detached homes were down 93% (to 522 net sales) from the peak (7,731 quarterly net sales) that occurred in the second quarter of 2005. The median base price for a detached single family home dropped 39% from the peak achieved in the fourth quarter of 2005.

Although the Debtors had made cost reductions in general overhead and other areas, including employee layoffs, many factors, including the severe downturn of the Las Vegas market, significant supply overhang, and general economic malaise combined to create an environment where the Debtors were unable to meet their March 2009 debt and amortization payments. The First Lien Steering Committee was formed in early March 2009 to negotiate the terms of a forbearance agreement and consensual restructuring with the Debtors after it

[4] Article III includes information that is based on representations made by the Debtors.

25

became apparent that the Debtors would not be able to make their regularly scheduled interest and amortization payments on the first lien debt.

On March 31, 2009, an interest payment in the amount of approximately $9 million and a principal payment in the amount of $10.75 million was due and owing on the First Lien Credit Agreement and an interest payment in the amount of approximately $2.4 million was due and owing on the Second Lien Credit Agreement. Despite extended and intensive negotiations between the First Lien Lenders and the Debtors, when no agreement was reached by March 31, 2009, the Debtors commenced these Chapter 11 Cases on March 31, 2009 and April 1, 2009 to avail themselves of the protections of the Bankruptcy Code.

B.    Initiation of the Chapter 11 Cases

On either March 31, 2009 or April 1, 2009, each of the Debtors Filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On April 13, 2009, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No trustee or examiner has been appointed in the Chapter 11 Cases.

C.    Stabilization of Operations

After commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to minimize disruption to their operations and facilitate the administration of the Chapter 11 Cases. Several of these orders are briefly summarized below.

1.    Cash Collateral Motion

The Debtors Filed a motion (the "Cash Collateral Motion") seeking entry of interim and final orders (i) authorizing the Debtors to use cash collateral, (ii) granting adequate protection to the Debtors' prepetition secured creditors, and (iii) scheduling a final hearing on the Cash Collateral Motion [Heritage Docket No. 15]. Subsequent to the filing of the Cash Collateral Motion, the Court entered a series of stipulated orders authorizing the Debtors to use cash collateral with the consent of the First Lien Steering Committee. On April 10, 2009, the Court entered a stipulated interim order (the "First Stipulated Cash Collateral Order") authorizing the Debtors to use cash collateral through April 17, 2009 [Heritage Docket No. 125]. On April 17, 2009, the Court entered a second stipulated interim order (the "Second Stipulated Cash Collateral Order"), which extended the Debtors' authorization to use cash collateral through April 28, 2009 [Rhodes Docket No. 73] on similar terms to the First Stipulated Cash Collateral Order. On April 30, 2009, the Court entered a final stipulated order authorizing the Debtors to use cash collateral through June 28, 2009 [Rhodes Docket No. 126]. In response to further requests for extension of the Debtors' authority to use cash collateral, the First Lien Steering Committee has consented to periodic continuances of the Debtors' use of cash collateral. A copy of the current cash collateral budget is attached hereto as Exhibit C.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

26

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

2.    Cash Management Motion

The Debtors Filed a motion (the "Cash Management Motion") seeking entry of interim and final orders (i) authorizing the Debtors to continue to use their existing, centralized cash management system, bank accounts and business forms; (ii) granting administrative expense priority status to intercompany claims arising on and after the Petition Date; (iii) waiving the investment and deposit requirements under section 345 of the Bankruptcy Code; and (iv) granting related relief [Rhodes Docket No. 13]. On April 17, 2009, the Bankruptcy Court granted the Cash Management Motion on an interim basis with certain modifications [Rhodes Docket No. 78]. On April 30, 2009, the Bankruptcy Court entered a final order granting the Cash Management Motion on a final basis [Rhodes Docket No. 123].

3.    Home Sale Motion

The Debtors Filed a motion (the "Home Sale Motion") for authority to, among other things, (i) continue the construction, sale and closing of homes to customers in the ordinary course of business, (ii) honor certain prepetition contract obligations to homebuyers, including, where appropriate in the Debtors' business judgment and not inconsistent with past business practices, to refund deposits or provide other customer incentives, (iii) provide that the sale of homes to the Debtors' customers shall be free and clear of all liens, claims, encumbrances and other interests, (iv) pay claims secured by liens out of the proceeds of home sales, (v) establish procedures for resolving disputed lien claims, (vi) proceed immediately with the sale of homes and establishment of the lien procedures, and (vii) permit financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating to the foregoing [Rhodes Docket No. 14]. As set forth in the Home Sale Motion, the Debtors' ability to, among other things, satisfy their contractual obligations to their customers and continue to contract for and complete the construction and sale of homes, free and clear of liens, is critical to the Debtors' operations. On April 10, 2009 the Bankruptcy Court entered an interim order granting the Home Sale Motion [Rhodes Docket No. 20], and subsequently entered a final order, with certain modifications, on April 17, 2009 (the "Final Home Sale Order") [Rhodes Docket No. 77]. Among other things, the Final Home Sale Order established that the construction and sale of homes was required to be consistent with any cash collateral orders and provided the Debtors' prepetition lenders with rights to receive certain information and object to certain lien payments.

4.    Insider Compensation Motion

As required by the Wages Orders, the Debtors Filed a motion for an order authorizing the Debtors to pay the salary of the Debtors' president, James M. Rhodes, through June 26, 2009, the time period of the Debtors' 13 week budget, or any such further time period as authorized by the Court or agreed upon by the First Lien Lenders pursuant to any cash collateral order entered in these cases [Rhodes Docket Number 94]. The United States Trustee filed an objection, which was resolved in the order approving the motion on July 21, 2009.

27

5.    Retention of Debtors' Professionals

Throughout the Chapter 11 Cases, the Debtors retained certain Professionals to assist them in carrying out their duties as debtors in possession and to otherwise represent their interests in the Chapter 11 Cases. These Professionals included: (a) Pachulski Stang Ziehl & Jones LLP, as general bankruptcy counsel; (b) Larson & Stephens, LLC, as local counsel; (c) Acceleron Group, LLC, as valuation advisor; and (d) Sullivan Group Real Estate Advisors, as market research consultant.  The Bankruptcy Court entered an order approving certain procedures for the interim compensation and reimbursement of retained Professionals in the Chapter 11 Cases.

6.    Ordinary Course Professionals

The Debtors desired to continue to employ certain professionals such as attorneys and accountants not involved in the administration of the Debtors' cases (the "Ordinary Course Professionals") for the same purposes as such services were provided prior to the Petition Date. Accordingly, pursuant to sections 105(a), 327, 328 and 330 of the Bankruptcy Code and Bankruptcy Rule 2014(a), the Debtors Filed a motion (the "OCP Motion") seeking entry of an order authorizing them to retain, employ, and pay Ordinary Course Professionals in the ordinary course of the Debtors' businesses, on the terms and conditions set forth in the OCP Motion, and subject to certain monthly payment caps [Rhodes Docket No. 141].  The Bankruptcy Court entered an order approving the OCP Motion on May 19, 2009 [Rhodes Docket No. 187].

D.    Appointment of the Creditors' Committee

On May 26, 2009, the United States Trustee appointed the Creditors' Committee. The members of the Creditors' Committee are: G.C. Wallace, Inc., Interstate Plumbing & Air Conditioning, M&M Electric, Inc. and Southwest Iron Works, LLC.  The Creditors' Committee retained the law firm of Parsons Behle & Latimer as counsel.

E.    Claims Bar Dates

On April 30, 2009, each of the Debtors Filed their schedules of assets and liabilities and statement of financial affairs as amended from time to time (collectively, the "Schedules") with the Bankruptcy Court.  Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the District of Nevada, Southern Division, 300 Las Vegas Boulevard South, Las Vegas, NV 89101 or by visiting www.omnimgt.com/rhodes.

By notice dated March 31, 2009, the Court set the claims bar date for 90 days after the date first set for the meeting of creditors, or August 5, 2009 (the "Bar Date Notice") [Heritage Docket No. 3]. The Bar Date Notice was served on the Debtors' master mailing lists on April 17, 2009. Accordingly, the following Bar Dates have been established:

(i)    August 5, 2009 for all Holders of General Unsecured Claims against all Debtors;

*AKIN GUMP STRAUSS HAUER & FELD LLP*
*One Bryant Park*
*New York, New York 10036*
*Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com*

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

(ii)    September 28, 2009 for all Holders of Claims of Governmental Units for all Debtors except the following three Debtors: Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887);

(iii)    September 29, 2009 for all Holders of Claims of Governmental Units for the following three Debtors: Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

On May 27, 2009, the Debtors Filed the Motion of Debtors for Entry of an Order Authorizing the Debtors to Publish Notice of the Bar Dates and Approving the Form of the Publication Notice Pursuant to FRBP 2002(l). The Bankruptcy Court entered an order (the "Bar Date Publication Order") granting the motion on July 9, 2009 [Rhodes Docket Number 305]. The Bar Date Publication Order authorized the Debtors to publish notice of the Bar Dates in the *Las Vegas Review-Journal*, the *Kingman Daily Miner* and such other local publications as the Debtors deemed appropriate within ten days of the entry of the Bar Date Publication Order.

The First Lien Steering Committee and the Debtors have been reviewing various Proofs of Claim and will continue to review and evaluate each Proof of Claim Filed prior to the applicable Bar Date to determine whether grounds exist to object to the allowance of such Claims. The First Lien Steering Committee believes that the Claims asserted against the Debtors will likely be resolved and/or reduced to aggregate amounts that approximate the estimates for Allowed Claims set forth herein. However, the actual aggregate amounts of the Allowed Claims in any Class may differ significantly from the First Lien Steering Committee's estimates thereof and any variance from such estimates may affect distributions in certain Classes.

### Article IV.
### SUMMARY OF THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AND INTERESTS, THE ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

A.    Overview of a Chapter 11 Plan

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case. A chapter 11 plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a chapter 11 plan by a bankruptcy court makes the plan binding upon the debtor, any person or entity acquiring property under the plan and any holder of claims against or interests in the debtor, whether or not such holder of claims or interests (1) is impaired under or has accepted the plan or (2) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therewith the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by provisions of the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, the Debtors need not solicit votes from the Holders of Claims or Interests in such Classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a chapter 11 plan shall classify claims against and interests in the debtor. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Plan Proponent is also required, as discussed above, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes. The First Lien Steering Committee believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the First Lien Steering Committee intends, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

30

reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

**B.    Administrative and Priority Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

**1.    Administrative Claims**

Each Allowed Administrative Claim shall be paid in full, in Cash, (i) on the later of (a) the Effective Date, (b) the date on which the Bankruptcy Court enters an order allowing such Allowed Administrative Claim, or (c) the date on which the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with First Lien Agent and Second Lien Agent) and the Holder of such Allowed Administrative Claim otherwise agree, and (ii) in such amounts as (a) are incurred in the ordinary course of business by the Debtors, (b) are Allowed by the Bankruptcy Court, (c) may be agreed upon between the Holder of such Allowed Administrative Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), or (d) may otherwise be required under applicable law. Such Allowed Administrative Claims shall include costs incurred in the operation of the Debtors' businesses after the Petition Date, the allowed fees and expenses of Professionals retained by the Debtors and the Creditors' Committee and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930.

**2.    Priority Tax Claims**

Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of (a) the Effective Date, (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim, (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Cases had not been commenced, or (d) upon such other terms as may be agreed to between the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), and any Holder of an Allowed Priority Tax Claim; provided, however, that the Reorganized Debtors or Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), in lieu of payment in full of Allowed Priority Tax Claims on the Effective Date, may make Cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code and, in such event, unless otherwise provided herein, interest shall be paid on the unpaid portion of such Allowed Priority Tax Claim at the Federal statutory rate; provided, further, that deferred Cash payments on account of an Allowed Priority Tax Claim shall be paid quarterly over a period of six years commencing with the quarter after which such Priority Tax Claim has been Allowed.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

31

C.    Classification and Treatment of Claims

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are classified in the Classes set forth below. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.    Class A-1 – First Lien Lender Secured Claims

First Lien Lender Secured Claims include any Secured Claim on account of the First Lien Credit Agreement.

Class A-1 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date or such other date as set forth herein, each of the First Lien Lenders (or its Permitted Nominee) shall receive on account of its Secured Claims, (w) its pro rata share of $1.5 million in Cash from the proceeds of the First Lien Lenders' Collateral, (x) its pro rata share of 100% of the New First Lien Notes, and (y) its pro rata share of 100% of the Newco Equity Interests (subject to dilution for any Newco Equity Interests issued pursuant to a Management and Director Equity Incentive Plan). The $1.5 million payment to the First Lien Lenders shall be allocated and deemed paid to the First Lien Lenders in accordance with Article VII.F. of the Plan.

2.    Class A-2 – Second Lien Lender Secured Claims

Second Lien Lender Secured Claims include any Secured Claim on account of the Second Lien Credit Agreement.

Class A-2 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, only if the Class of Second Lien Lender Secured Claims votes in favor of the Plan, each of the Second Lien Lenders (or its Permitted Nominee) shall receive its pro rata share of a 50% interest in the Stanley Engineering Litigation, without a reduction on account of the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent, subject to an aggregate cap of $500,000, each of which such fees shall be paid in Cash to the Second Lien Agent on the Effective Date. If the Class of Second Lien Lender Secured Claims votes in favor of the Plan, upon final resolution of the Stanley Engineering Litigation, each holder of an Allowed Second Lien Lender Claim will receive its pro rata share of the net proceeds of the Stanley Engineering Litigation. If the Class of Second Lien Lender Secured Claims votes against the Plan, each of the Second Lien Lenders shall receive no recovery on account of such Secured Claims.

3.    Class A-3 – Other Secured Claims

Other Secured Claims include any Secured Claim other than a: (a) First Lien Lender Secured Claim; or (b) Second Lien Lender Secured Claim.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Class A-3 is Unimpaired and deemed to accept the Plan. To the extent not satisfied by the Debtors, pursuant to Bankruptcy Court order, in the ordinary course of business prior to the Effective Date, at the option of the Reorganized Debtors on or after the Effective Date (i) an Allowed Other Secured Claim shall be Reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, (ii) a Holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, (iii) a Holder of an Allowed Other Secured Claim shall receive the Collateral securing both its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (iv) a Holder of an Allowed Other Secured Claim shall receive such treatment as to which such Holder and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.

4.    Class B – Priority Non-Tax Claims

Priority Non-Tax Claims include any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

Class B is Unimpaired and deemed to accept the Plan. Each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim on the later of the Effective Date and the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, unless the Holder of an Allowed Priority Non-Tax Claim and the Reorganized Debtors or the Debtors, with the consent of the First Lien Steering Committee (and in consultation with the First Lien Agent and Second Lien Agent), otherwise agree.

5.    Class C-1 – General Unsecured Claims (including any Allowed Rhodes Entities Claims)

General Unsecured Claims include any Claim (including any Allowed Rhodes Entities Claims) against any of the Debtors that is not a/n (a) Administrative Claim, (b) Priority Tax Claim, (c) Priority Non-Tax Claim, (d) First Lien Lender Secured Claim, (e) Second Lien Lender Secured Claim, (f) Other Secured Claim, (g) First Lien Lender Deficiency Claim, (h) Second Lien Lender Deficiency Claim, (i) Subordinated Claim, or (j) Intercompany Claim.

Class C-1 is Impaired and entitled to vote to accept or reject the Plan. On the Effective Date, each Holder of an Allowed General Unsecured Claim (including any Allowed Rhodes Entities Claims) shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of General Unsecured Claims on account of its Allowed Claim.

33

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

6.      Class C-2 -- First Lien Lender Deficiency Claims

First Lien Lender Deficiency Claims include any deficiency Claim arising under the First Lien Credit Agreement.

Class C-2 is Impaired and entitled to vote to accept or reject the Plan.  On the Effective Date, each Holder of a First Lien Lender Deficiency Claim shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of First Lien Lender Deficiency Claims on account of its Allowed Claim.

7.      Class C-3 -- Second Lien Lender Deficiency Claims

Second Lien Lender Deficiency Claims include any deficiency Claims arising under the Second Lien Credit Agreement.

Class C-3 is Impaired and entitled to vote to accept or reject the Plan.  On the Effective Date, each Holder of an Allowed Second Lien Lender Deficiency Claim shall receive its pro rata share of the Litigation Trust Interests allocable to the Holders of Second Lien Lender Deficiency Claims on account of its Allowed Claim.  If the Class of Second Lien Lender Secured Claims votes against the Plan, the distribution of Litigation Trust Interests allocable to the Holders of Second Lien Lender Deficiency Claims shall be subject to the reasonable fees and expenses of Ropes & Gray LLP and local counsel for the Second Lien Agent.

8.      Class C-4 -- Subordinated Claims

Subordinated Claims include all Claims subject to subordination under Bankruptcy Code section 510.  The First Lien Steering Committee does not believe there are any Subordinated Claims but has created such Class out of an abundance of caution.

Class C-4 is Impaired and deemed to have rejected the Plan.  Claims subordinated under applicable law shall not receive any recovery on account of their Claims.

9.      Class D -- Old Equity Interests

Old Equity Interests include all of the Interests in any of the Debtors and any rights, options, warrants, calls, subscriptions or other similar rights or agreements, commitments or outstanding securities obligating the Debtors to issue, transfer or sell any Interests.

Class D is Impaired and deemed to reject the Plan.  Each holder of an Old Equity Interest shall not be entitled to, and shall not receive or retain any property or interest in property on account of such Old Equity Interest.

10.      Class E -- Intercompany Claims

Intercompany Claims include any Claim held by a Debtor against another Debtor.

34

Class E is Impaired and deemed to reject the Plan. At the election of the Reorganized Debtors, Intercompany Claims will be (i) reinstated, in full or in part, (ii) resolved through set-off, distribution, or contribution, in full or in part, or (iii) cancelled and discharged, in full or in part, in which case such discharged and satisfied portion shall be eliminated and the Holders thereof shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such portion under the Plan.

D.    Bankruptcy Code Section 1111(b) Election

Bankruptcy Code section 1111(b)(1)(A) authorizes a class of secured claims to elect, by at least two-thirds in amount and more than half in number, to waive any deficiency claim otherwise assertable against the debtor and instead require the debtor to make payments equal to the total amount of the claims, with such payment obligation having a present value equal to the current value of the creditors' collateral. A section 1111(b) election must be made by a class of secured creditors at or prior to the conclusion of the hearing on the Disclosure Statement. No class of Secured Claims made a section 1111(b) election at or prior to the conclusion of the hearing on the Disclosure Statement. Accordingly, Bankruptcy Code section 1111(b) is not applicable to the Plan.

E.    Cramdown

The First Lien Steering Committee will request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The First Lien Steering Committee reserves the right to modify the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

F.    Means for Implementation of the Plan

1.    Substantive Consolidation

The Plan shall serve as a motion by the First Lien Steering Committee seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and distributions to be made under the Plan. The effect of substantive consolidation is that on the Effective Date: (a) solely for the purposes of the Plan and the distributions and transactions contemplated thereunder, all assets and liabilities of the Debtors' Estates shall be deemed consolidated into a single estate; (b) all cross-corporate guarantees made by the Debtors prepetition shall be deemed eliminated (regardless of whether such guaranty is secured, unsecured, liquidated, unliquidated, contingent, or disputed); (c) any obligation of any Debtor and all guarantees thereof executed by one or more of the Debtors shall be deemed to be a single obligation of the consolidated Debtors; (d) any Claims Filed or to be Filed in connection with any such obligation and such guarantees referenced in subsection (c) hereof shall be deemed to be a single Claim against the consolidated Debtors; (e) each and every Claim Filed in the individual Chapter 11 Case of any of the Debtors shall be deemed to be a single obligation of all of the Debtors under the Plan; (f) all duplicative Claims (identical in both amount and subject matter) Filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

35

against the consolidated Debtors (but in no way shall such surviving Claim be deemed Allowed by reason of this Section); and (g) the Intercompany Claims will be automatically eliminated. All Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor or of any other Person shall be discharged, released and of no further force and effect; provided, however, that nothing in the Plan shall affect the obligations of each of the Debtors under the Plan. Notwithstanding the substantive consolidation of these Cases for purposes of the Plan, each of the Debtors shall, as Reorganized Debtors, continue to exist after the Effective Date as separate corporate entities.

Substantive consolidation causes no harm to creditors and the benefits of substantive consolidation are numerous. First, over $12 billion in duplicate secured debt claims will be eliminated because the First Lien Lender Claims and the Second Lien Lender Claims each will be allowed only once against the consolidated Estate. Second, over $500 million in Intercompany Claims will be deemed eliminated because the multiple Debtors will be deemed only one Debtor. Third, over $4.6 million of other duplicate Unsecured Claims that have been filed in multiple Chapter 11 Cases will be automatically eliminated. Fourth, approximately 35% of the Claims that have been Filed are asserted incorrectly against the wrong Debtor. Substantive consolidation will eliminate the need for the objection to such Claims. Accordingly, the Plan Proponent submits that substantive consolidation is warranted in the Chapter 11 Cases.

The following additional factors support substantive consolidation:

- The Debtors operate as a single business enterprise called "Rhodes Homes" rather than along distinct legal entities.

- The Debtors operate on a centralized basis with a central cash management system. All of the Debtors' operating expenses are paid for by one Debtor entity on behalf of the other Debtors. Likewise, all funds received by the Debtors are automatically remitted to the central cash management account as required by the First Lien Credit Agreement. The Debtors' financial reporting is also on a consolidated basis and the Debtors file consolidated tax returns.

- The Debtors share common parent companies. The Debtors have overlapping directors or managing members and officers among parent and subsidiaries. Because the Debtors all have the same director/managing member and principal shareholder, Mr. Rhodes, there were no regular meetings of the subsidiaries' boards of directors. Also, for most of the Debtors who are LLCs, no board meetings are required. Rather, all corporate actions are done by written consent of the sole shareholder and director/ managing member. All of the Debtors' corporate activities are characterized by centralized decision making, including the filing of the bankruptcies.

- All of the Debtors rely on the corporate office for their accounting, legal, human resources, administrative support. In addition to shared corporate support, all of the Debtors also share common insurance policies.

36

- The Debtors regularly conduct business with each other such that the flow of funds is numerous and would be extraordinarily difficult and time consuming to disentangle. As of the Petition Date, the Debtors estimate that approximately $500 million in intercompany claims were owed between the Debtors.

- The Debtors are all obligated, either as obligors or guarantors, under the First Lien Credit Agreement and the Second Lien Credit Agreement.

- Based on the 461 Proofs of Claims Filed, at least 160 claimants have Filed Claims against the wrong Debtor entity. Therefore, there is confusion amongst the Creditor body as to which Debtor is the Debtor that is legally obligated on the Claim.

2.    Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan with Cash on hand, proceeds from the Mediation Settlement, existing assets, and the issuance of the New First Lien Notes and Newco Equity Interests.

a.    Newco Equity Interests

On the Effective Date, but not more than thirty days after the Effective Date for initial distributions on account of Allowed Claims, Newco shall issue Newco Equity Interests (based upon the Newco Total Enterprise Value) to the Holders of First Lien Lender Secured Claims. Each share of Class A-2 Equity Interest will be convertible at the option of the holder, exercisable at any time, into one Class A-1 Equity Interest.

The economic rights of the Class A-1 Equity Interests and Class A-2 Equity Interests shall be identical. The Class A-2 Equity Interests will not be entitled to general voting rights, but will be entitled to vote on an "as converted" basis (together with the holders of the Class A-1 Equity Interests, as a single class) on certain non-ordinary course transactions, including (i) any authorization of, or increase in the number of authorized shares of, any class of capital stock ranking equal or senior to the Newco Equity Interests as to dividends or liquidation preference, including additional Newco Equity Interests, (ii) any amendment to the Newco's certificate of incorporation or by-laws, (iii) any amendment to any shareholders agreement, (iv) any sale, lease or other disposition of all or substantially all of the assets of the Reorganized Debtors through one or more transactions, (v) any recapitalization, reorganization, consolidation or merger of the Reorganized Debtors, (vi) to the extent that holders of Class A-1 Equity Interests have the right to vote thereon, any issuance or entry into an agreement for the issuance of capital stock (or any options or other securities convertible into capital stock) of the Reorganized Debtors, except as may be provided for under any management incentive plan, and (vii) to the extent that holders of Class A-1 Equity Interests have the right to vote thereon, any redemption, purchase or other acquisition by the Newco of any of its capital stock (except for purchases from employees upon termination of employment).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

The Class A-2 Equity Interests will be entitled to a separate class vote on any amendment or modification of any rights or privileges of the Class A-2 Equity Interests that does not equally affect the Class A-1 Equity Interests. In any liquidation, dissolution or winding up of the Reorganized Debtors, all assets will be distributed to holders of the Newco Equity Interests on a pro rata basis.

(i)    Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by the Plan and any and all settlement agreements incorporated therein, including the Newco Equity Interests, shall, to the fullest extent permitted by applicable law, be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by the Plan, including the Newco Equity Interests and New First Lien Notes, will be freely tradable and transferable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments set forth in the Newco LLC Operating Agreement, a draft of which is attached hereto as Exhibit J; and (iii) applicable regulatory approval.

(ii)    Issuance and Distribution of the Newco Equity Interests

The Newco Equity Interests, when issued or distributed as provided in the Plan, will be duly authorized, validly issued, and, if applicable, fully paid and nonassessable. Each distribution and issuance shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

b.    New First Lien Notes

On the Effective Date or as soon as reasonably practicable thereafter, Newco shall issue the New First Lien Notes. The Reorganized Debtors shall be co-borrowers and guarantors under the New First Lien Notes. The New First Lien Notes shall have the terms set forth on Exhibit 2 to the Plan and as otherwise provided in the terms of the documents governing the New First Lien Notes. A draft of the New First Lien Notes credit agreement is attached hereto as Exhibit K.

c.    Exit Financing

To the extent the board of directors of Newco (or such other governing body) determines that additional financing is necessary for the operation of the Reorganized Debtors' businesses, Newco and/or the Reorganized Debtors may obtain additional financing. The First Lien Steering Committee does not anticipate that additional sources of funding in

38

addition to Cash on hand, the Newco Equity Interests and the New First Lien Notes will be necessary to fund distributions under the Plan on the Effective Date.

3.    Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

4.    Vesting of Assets in the Reorganized Debtors

Except for any Claims or Causes of Action transferred to the Litigation Trust and unless otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.    Cancellation of Equity Securities and Related Obligations

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the Old Equity Interests and any other Certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Old Equity Interests and any other Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements or Certificates, notes or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, that notwithstanding Confirmation, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

39

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  solely for purposes of: (w) allowing Holders to receive distributions under the Plan; (x)
2  allowing a Servicer to make distributions on account of such Claims as provided in the
   applicable governing agreement; (y) permitting such Servicer to maintain any rights and Liens
3  it may have against property other than the Reorganized Debtors' property for fees, costs, and
4  expenses pursuant to such indenture or other agreement; and (z) governing the rights and
   obligations of non-Debtor parties to such agreements vis-à-vis each other (including, without
5  limitation, the rights and obligations of non-Debtor parties under the First Lien Credit
   Agreement and the Second Lien Credit Agreement, which, for the avoidance of doubt, shall
6  not be affected by the Plan except as otherwise expressly provided in the Plan); provided,
7  further, however, that the preceding proviso shall not affect the discharge of Claims or
   Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in
8  any expense or liability to the Reorganized Debtors.  The Reorganized Debtors shall not have
   any obligations to any Servicer for any fees, costs, or expenses, except as expressly otherwise
9  provided in the Plan.

10      6.    Restructuring Steps and Transfer of Certain Interests to Newco

11          In the event the Rhodes Entities comply with all of their obligations pursuant to the
   Mediation Settlement and the Plan, on the Effective Date or, in the case of step (d) below,
12  effective the next day, the following transactions shall be deemed to have occurred in the
13  order set forth below.

14          a.    Newco shall be formed as a new limited liability company.  The First
15                Lien Lender Secured Claims shall be deemed to have been exchanged
                  for the membership interests in Newco.  Newco shall be deemed to hold
16                all of the First Lien Lender Secured Claims.  At the option of a holder,
                  membership interests in Newco may be transferred to a corporation
17                prior to step (b).

18          b.    Newco shall purchase all of the Heritage Equity Securities for $10.00.
19                The Heritage Equity Securities have negligible value and are being
                  purchased for $10 by Newco as part of the Mediation Settlement.

20          c.    Contemporaneous with or subsequent to Newco's purchase of the
21                Heritage Equity Securities, The Rhodes Companies, LLC - the general
                  partner of each of Tick, LP; Glynda, LP; Jackknife, LP; LP; Batcave,
22                LP; Overflow, LP; Wallboard, LP; and Chalkline, LP, --shall sell its
23                general partnership interests in such entities to Newco for $1.00.
                  Alternatively, the membership interest in The Rhodes Companies, LLC
24                may be acquired from its sole member -- Sagebrush Enterprises, Inc. --
                  in consideration for release of its obligations under the First Lien
25                Lender Secured Claims.

26          d.    Newco's members may agree to continue Newco as an LLC, file a
27                check the box election effective the day after the Effective Date to treat
                  Newco as a corporation for tax purposes, or convert into a corporation
28                as of the day after the Effective Date.

In any event, to the extent any cancellation of indebtedness is derived from the foregoing transactions under the Internal Revenue Code, it shall be allocable to the holders of the Old Equity Interests as required by the Internal Revenue Code. To be clear, Newco's purchase of the Heritage Equity Securities shall occur (a) contemporaneously with or immediately before the membership interests of those entities described in Article IV.F.6.c, immediately above, are acquired; (b) before any debt or obligations of the Debtors are canceled or forgiven; (d) before any new notes are issued or existing debt is modified by the Reorganized Debtors; and (e) before any of the other acts or events contemplated in Article III.B, et seq., of the Plan. The holders of the Heritage Equity Securities and Newco will report the sale and purchase of the Heritage Equity Securities in accordance with revenue ruling 99-6, 1991-1 CB 432.

7.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; (4) the Roll-Up Transactions; (5) the establishment of a liquidation trust or other appropriate vehicle to hold assets for sale that will not be utilized in the business of the Reorganized Debtors; and (6) all other actions that the Reorganized Debtors determine are necessary or appropriate, including the making of filings or recordings in connection with the relevant Roll-Up Transactions. The form of each Roll-Up Transaction shall be determined by the Reorganized Debtor that is party to such Roll-Up Transaction. Implementation of the Roll-Up Transactions shall not affect any distributions, discharges, exculpations, releases, or injunctions set forth in the Plan.

8.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors, or any other Entity. Without limiting the foregoing, such actions may include: the adoption and filing of the Newco LLC Operating Agreement; the adoption and filing of organization documents of the other Reorganized Debtors; the appointment of directors and officers for the Reorganized Debtors; and the adoption, implementation, and amendment of the Management and Director Equity Incentive Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

41

9. Post-Confirmation Property Sales

To the extent the Reorganized Debtors sell any of their property prior to or including the date that is one year after Confirmation, the Reorganized Debtors may elect to sell such property pursuant to sections 363, 1123, and 1146(a) of the Bankruptcy Code.

10. Organizational Documents

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships or other forms of Entity) of the Debtors shall be in form and substance acceptable to the First Lien Steering Committee and shall be consistent with the provisions of the Plan and the Bankruptcy Code. The Newco LLC Operating Agreement shall be in form and substance acceptable to the First Lien Steering Committee. The organizational documents for Newco shall, among other things: (1) authorize issuance of the Newco Equity Interests; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities. On or as soon as reasonably practicable after the Effective Date, to the extent required, each of the Reorganized Debtors shall file new certificates of incorporation (or other formation documents relating to limited liability companies limited partnerships, or other forms of Entity) in form and substance acceptable to First Lien Steering Committee, with the secretary (or equivalent state officer or Entity) of the state under which each such Reorganized Debtor is or is to be incorporated or organized. On or as soon as reasonably practicable after the Effective Date, to the extent required, Newco shall file the applicable organizational documents with the secretary (or equivalent state officer or Entity) of the state under which Newco is to be incorporated or organized. After the Effective Date, each Reorganized Debtor may amend and restate its new certificate of incorporation and other constituent documents as permitted by the relevant state corporate law.

11. Effectuating Documents, Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors (or other governing bodies) thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

12. Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

42

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

13.    Directors and Officers of the Reorganized Debtors

On the Effective Date, the board of directors of the Reorganized Debtors or similar governing entities shall be composed of one or more members appointed by the First Lien Steering Committee.  On the Effective Date, a chief executive officer or similar officer selected by the board of directors of the Reorganized Debtors shall be appointed.  The identity of such officers and directors shall be disclosed at or prior to the Confirmation Hearing.

14.    Management and Director Equity Incentive Plan

The Reorganized Debtors reserve the right to implement a Management and Director Equity Incentive Plan.  The terms and conditions of any Management and Director Equity Incentive Plan shall be determined by the Board of Directors of Newco.

15.    The Litigation Trust

On the Effective Date, the Litigation Trust will be implemented pursuant to the terms of the Litigation Trust Agreement.  A draft of the Litigation Trust Agreement is attached hereto as Exhibit I.  On the Effective Date, pursuant to the terms of the Litigation Trust Agreement, the Debtors will transfer the Litigation Trust Assets for and on behalf of the Litigation Trust Beneficiaries, which will be the Holders of Allowed Claims in Classes C-1, C-2 and C-3.  For all federal income tax purposes, the beneficiaries of the Litigation Trust shall be treated as grantors and owners thereof and it is intended that the Litigation Trust be classified as a liquidating trust under Section 301.7701-4 of the Treasury Regulations and that such trust is owned by its beneficiaries.  Accordingly, for federal income tax purposes, it is intended that the Litigation Trust Beneficiaries be treated as if they had received a distribution of an undivided interest in the Litigation Trust Assets and then contributed such interests to the Litigation Trust.  The Litigation Trust will initially be funded with $100,000, which amount will be transferred to the Litigation Trust on the Effective Date and which will be repaid to the Reorganized Debtors from the first proceeds received by the Litigation Trust.

The Litigation Trust shall issue non-transferable interests to Holders of Allowed First Lien Lender Deficiency Claims, Allowed Second Lien Lender Deficiency Claims, and Allowed General Unsecured Claims (including any Allowed Rhodes Entities Claims) with

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  each Holder of an Allowed Claim in each of the foregoing Classes of Claims receiving its pro
2  rata share of the Litigation Trust Interests allocable to each such Class of Claims.

3       A list of Litigation Trust Assets is attached hereto as Exhibit G. The Litigation Trust
   Assets shall include all claims existing against the Rhodes Entities that are not expressly
4  released under the Plan. The claims include the following claims, among others:

5  • Claims for beach of fiduciary duty;

6  • Claims for misappropriation of Debtor assets for personal use;

7  • Claims for usurping corporate opportunity for the benefit of competing interests;

8  • Claims for mismanagement of the Debtors' operations;

9
10 • Claims for fraudulent transfers (to the extent not expressly released under the
      Plan);
11
   • Claims for the diversion of corporate resources for the benefit of competing
12     interests.

13      Additional discovery and analysis will be required to be performed by the Litigation
14 Trustee before any determination can be made whether the foregoing claims or any other
   claims are colorable and should be pursued by the Litigation Trust against the Rhodes Entities.
15 The Litigation Trust will undertake a detailed analysis of any potential claims before making a
   determination on whether to pursue any litigation against the Rhodes Entities. While it is
16 impossible at this time to predict with any certainty whether the foregoing claims or any other
17 claims will be prosecuted and, if they are prosecuted, whether they will be successful, the
   First Lien Steering Committee believes that prosecution of claims against the Rhodes Entities
18 may yield up to $10 million or more in judgments in favor of the Litigation Trust. However,
   such claims could also yield no proceeds if they are unsuccessful, or if the Rhodes Entities
19 have valid claims that are permitted to be used as offsets against any liabilities that the Rhodes
20 Entities may be determined to have to the Debtors.

21      The Rhodes Entities do not believe that viable claims or causes of action exist against
   them and they will vigorously defend any litigation based on the allegations contained in the
22 Trustee Motion or otherwise, which allegations the Rhodes Entities assert are baseless and
23 premised on inadmissible hearsay.

24      16.    Preservation of Causes of Action

25      In accordance with section 1123(b) of the Bankruptcy Code, except as otherwise
   provided in the Plan, the Reorganized Debtors and the Litigation Trust shall retain and may
26 enforce all rights to commence and pursue, as appropriate, any and all Causes of Action,
27 whether arising before or after the Petition Date, including any actions specifically
   enumerated on Exhibit L, and the Reorganized Debtors' rights to commence, prosecute, or
28 settle such Causes of Action shall be preserved notwithstanding the occurrence of the
   Effective Date. The Reorganized Debtors and the Litigation Trust, as applicable, may pursue

44

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1 such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized
2 Debtors and the Litigation Trust, as applicable. **No Entity may rely on the absence of a**
3 **specific reference in the Plan or the Disclosure Statement to any Cause of Action against**
**them as any indication that the Debtors, Reorganized Debtors or the Litigation Trust, as**
4 **applicable, will not pursue any and all available Causes of Action against them. The**
**Reorganized Debtors and the Litigation Trust, as applicable, expressly reserve all rights**
5 **to prosecute any and all Causes of Action against any Entity, except as otherwise**
6 **expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly
waived, relinquished, exculpated, released, compromised, or settled in the Plan or a
7 Bankruptcy Court order, the Reorganized Debtors and the Litigation Trust, as applicable,
expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion
8 doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim
9 preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of
Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective
10 Date.

11     The Reorganized Debtors and the Litigation Trust, as applicable, reserve and shall
retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any
12 executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In
13 accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a
Debtor may hold against any Entity shall vest in the Reorganized Debtors and the Litigation
14 Trust, as the case may be, on the Effective Date. The applicable Reorganized Debtor and the
Litigation Trust, as applicable, through its authorized agents or representatives, shall retain
15 and may exclusively enforce any and all such Causes of Action belonging to it. The
16 Reorganized Debtors and the Litigation Trust, as applicable, shall have the exclusive right,
authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle,
17 compromise, release, withdraw, or litigate to judgment any such Causes of Action and to
decline to do any of the foregoing without the consent or approval of any third party or further
18 notice to or action, order, or approval of the Bankruptcy Court. Neither the Litigation Trust
19 nor the Reorganized Debtors shall commence any litigation against the Rhodes Entities until
the Bankruptcy Court rules on the allowance of the Rhodes Entities Claims set forth in Proofs
20 of Claim, included in the Debtors' Schedules or otherwise set forth in the Mediation Term
21 Sheet. To the extent any statute of limitations to pursue any claims belonging to the Debtors
against the Rhodes Entities would lapse from the execution date of the Mediation Term Sheet
22 through the Bankruptcy Court's resolution of the allowance of the Rhodes Entities Claims, the
Rhodes Entities shall be deemed to have consented to an extension of the applicable statute of
23 limitations until sixty days following the Bankruptcy Court's ruling on the allowance of the
Rhodes Entities Claims. The Litigation Trust shall have no liability to any entity for any
24 Claims or Causes of Action it determines not to pursue.

25     17.    HOA Board Seats

26     The Rhodes Entities shall ensure that designees identified by the Reorganized Debtors
27 shall replace the Rhodes Entities on any HOA boards that in any way are related to the
Debtors, Reorganized Debtors or their businesses and Declarant rights or the like shall be
28 transferred to the Reorganized Debtors or their designee(s).

45

18.   Licensing

The Rhodes Entities shall take commercially reasonable steps and/or enter into any agreements or similar documentation reasonably necessary to ensure the Reorganized Debtors' continued use of all of the Debtors' applicable professional licenses at no cost to the Rhodes Entities for a period of up to twelve months following the Effective Date.   To the extent, Sagebrush Enterprises, Inc. shall have rescinded by September 25, 2009 its revocation of its indemnity of the Nevada contractors' license held by Rhodes Design & Development Corporation and such rescission did not negatively affect the general contractor's license held by Rhodes Design & Development Corporation, Sagebrush shall be entitled to file an Administrative Claim on behalf of any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arose from and after the effectiveness of Sagebrush's recission of its indemnity through the Effective Date, provided that the allowance of such Administrative Claim shall be subject to resolution by the Bankruptcy Court and/or such other court(s) of competent jurisdiction.   Sagebrush has not asserted any Administrative Claims against the Estates as of the date hereof, and the First Lien Steering Committee believes that no such Claims will be made by Sagebrush.

The Reorganized Debtors shall indemnify Sagebrush for any and all claims asserted against Sagebrush as a result of Sagebrush being the indemnitor that arise from and after the Effective Date.   Professional licenses include, but are not limited to the Nevada State Contractor's Board license, and any other general business or similar licenses in any county, state, municipality or other jurisdiction in which the Reorganized Debtors conduct business or own assets as of the Effective Date.  The Rhodes Entities shall use commercially reasonable efforts to maintain third party agreements with their real estate brokers and sales agents.

19.   Transfer of Rhodes Ranch Golf Course

Under the terms of the First Lien Credit Agreement, certain of the Rhodes Entities were required to either sell the Rhodes Ranch Golf Course, or if no seller could be found, to buy the Rhodes Ranch Golf Course from the Debtors for a guaranteed purchase price of $8 million.  Because the Rhodes Entities could not find a buyer given the state of the economy in December 2008, the Rhodes Entities were forced to purchase the Rhodes Ranch Golf Course for $8 million as required under the First Lien Credit Agreement.  The purchase price was based on an appraisal from an independent third party, which appraised the value of the Rhodes Ranch Golf Course at approximately $8.0 million.  The First Lien Steering Committee had been advised that the Rhodes Entities financed $5.9 million of the purchase price and paid $2.1 million in cash for the Rhodes Ranch Golf Course.  The Rhodes Entities subsequently asserted that $2.4 million of the purchase price was financed through a personal loan from James Rhodes, which loan will be contributed by James Rhodes to the entity that owns the Rhodes Ranch Golf Course in connection with the transfer of the equity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors.

Because the purchase of the Rhodes Ranch Golf Course was based on a fair market value appraisal, the Debtors received reasonably equivalent value for the Rhodes Ranch Golf Course such that the transaction could not be avoided as a fraudulent transfer.

46

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

The Rhodes Ranch Golf Course is the centerpiece of the Debtors' Rhodes Ranch development, which is the most valuable asset of the Debtors' estates. Given that there is no operating agreement between the Rhodes Entities and the Debtors, the Reorganized Debtors desire to own the Rhodes Ranch Golf Course in order to manage the Rhodes Ranch Golf Course to maximize the value of the Debtors' assets.

After much negotiation, the Rhodes Entities agreed to transfer the Rhodes Ranch Golf Course to the Reorganized Debtors upon certain terms and conditions set forth in more detail below.

On the Effective Date, the applicable Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors (together with any equipment, golf carts, contracts or other assets determined by the First Lien Steering Committee to be necessary for the operation of the Rhodes Ranch Golf Course) pursuant to the terms of a stock transfer agreement in form and substance acceptable to the First Lien Steering Committee and Rhodes, subject to any outstanding debt on the Rhodes Ranch Golf Course. The stock transfer agreement shall contain representations by the Rhodes Entities that the entity that owns the Rhodes Ranch Golf Course does not have any liabilities other than ordinary course liabilities related to the Rhodes Ranch Golf Course and indemnification provisions in favor of the Reorganized Debtors by the Rhodes Entities for any non-ordinary course liabilities. In addition, prior to the deadline for filing objections to the Disclosure Statement, the Rhodes Entities shall provide the First Lien Steering Committee with a list of all liabilities of the entity that owns the Rhodes Ranch Golf Course, a lien analysis and copies of all contracts related to the Rhodes Ranch Golf Course and to which the entity that owns the Rhodes Ranch Golf Course is a party, each of which must be acceptable to the First Lien Steering Committee. Pursuant to the stock and asset transfer agreement governing the transfer of the equity in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors, the entity that owns the Rhodes Ranch Golf Course post-Effective Date shall agree to indemnify James Rhodes for any ordinary course liability first incurred post-Effective Date by such entity under any contract related to the operation of the Rhodes Ranch Golf Course for which James Rhodes has provided a personal guaranty.

Other than the $5.9 million third party loan used to originally purchase the Rhodes Ranch Golf Course from the Debtors, the First Lien Steering Committee does not believe that there have been any additional obligations placed on the Rhodes Ranch Golf Course other than ordinary course liabilities though the First Lien Steering Committee has been advised that James Rhodes may have provided a $2.4 million loan to the entity that owns the Rhodes Ranch Golf Course. This $2.4 million loan will be contributed by James Rhodes to the entity that owns the Rhodes Ranch Golf Course and he will indemnify the Debtors, the Reorganized Debtors, Newco and the entity that owns the Rhodes Ranch Golf Course from any liability arising from the contribution of such loan. The existing $5.9 million third party debt outstanding on the Rhodes Ranch Golf Course shall be refinanced on or before the Effective Date, for a period of no less than twelve (12) months from the Effective Date, on terms and conditions acceptable to Rhodes and the First Lien Steering Committee. The parties will work together in good faith to refinance the existing third party debt and have been actively working since August on the refinancing and are talking to multiple lending sources. The First Lien Steering Committee believes that the refinancing will be accomplished prior to the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Effective Date and, indeed, one of the conditions precedent to the occurrence of the Effective Date is that the refinancing has occurred. As of the date hereof, new financing has not been obtained for the Rhodes Ranch Golf Course. The Rhodes Entities and the First Lien Steering Committee, however, have been engaged in discussions with potential lenders for the Rhodes Ranch Golf Course and are optimistic that favorable financing will be obtained. The potential terms of such financing have not been provided in this Disclosure Statement to ensure that potential lenders do not obtain an unfair negotiating advantage with respect to such terms. Upon obtaining a final commitment for refinancing for the Rhodes Ranch Golf Course, the First Lien Steering Committee will disclose such terms in a filing with the Bankruptcy Court.

The Reorganized Debtors shall pay the reasonable costs and expenses associated with the refinancing; provided, that the terms of such refinancing are acceptable to the First Lien Steering Committee. The First Lien Steering Committee acknowledges that the loan documentation may provide that, upon the transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors on the Effective Date, additional collateral from the Reorganized Debtors may be required. The Rhodes Entities shall transfer to the Reorganized Debtors on the Effective Debt any contracts related to the operation of and revenue generated by any cell towers located on the property of the Rhodes Ranch Golf Course. Any funds received after July 31, 2009 from the Las Vegas Valley Water District or other similar entity as an incentive for converting the golf course from a green course to a desert course shall be used for operating expenses associated with the Rhodes Ranch Golf Course, with any excess to become property of the Reorganized Debtors on the Effective Date.

The golf course is beneficial to the preservation of the Reorganized Debtors' Rhodes Ranch assets and, as part of the Mediation Settlement, the Reorganized Debtors will obtain title to the Rhodes Ranch Golf Course (through the assumption of the third party debt on such course not to exceed $5.9 million).

Rhodes and/or his designee shall have the absolute right to repurchase the Rhodes Ranch Golf Course from the Reorganized Debtors at eight (8) years from the Effective Date for $5.9 million in cash. The Reorganized Debtors may require Rhodes to purchase the Rhodes Ranch Golf Course any time between four (4) and eight (8) years from the Effective Date for $5.9 million in cash provided that the Reorganized Debtors shall provide Rhodes with at least one year advance notice of its intent to sell the Rhodes Ranch Golf Course back to Rhodes. Such transfer shall occur on the applicable anniversary date of the Effective Date. For the avoidance of doubt, if the Reorganized Debtors put the Rhodes Ranch Golf Course to Rhodes in accordance with the terms hereof and Rhodes fails to comply with his obligation to purchase the Rhodes Ranch Golf Course, Rhodes shall be deemed to have forfeited his option to purchase the Rhodes Ranch Golf Course.

On the Effective Date, Rhodes's obligations to comply with the repurchase shall be secured by either (i) $500,000 in cash in an escrow account or (ii) property worth at least $2 million (the "Golf Course Security Property"), with the value of such property to be agreed to by Rhodes and the First Lien Steering Committee or otherwise valued by an independent third party appraisal firm acceptable to both Rhodes and the First Lien Steering Committee (except Cushman Wakefield). In the event that Rhodes does not meet the repurchase request, provided that the Rhodes Ranch Golf Course is in the standard condition (defined below),

then the Reorganized Debtors shall be entitled to liquidated damages in the form of security pledged (i.e., the $500,000 or the Golf Course Security Property).

So long as Rhodes has not defaulted on his obligation to repurchase the Rhodes Ranch Golf Course, Rhodes shall have the absolute and sole discretion to replace the Golf Course Security Property with $500,000 in cash on 30 days written notice to the Reorganized Debtors. Upon deposit of the $500,000 in cash, the Golf Course Security Property shall be released to Rhodes or his designee. Notwithstanding anything to the contrary contained herein, if the Rhodes Ranch Golf Course is not maintained with substantially the same performance and rating criteria at the time of the repurchase request as verified by an independent third party rating agency as it was on the Effective Date ("Standard Condition"), James Rhodes can (i) require the Reorganized Debtors to cure any conditions to return the Rhodes Ranch Golf Course to its Standard Condition (provided, that the cost of such cure does not exceed $500,000), or (ii) choose not to purchase the Rhodes Ranch Golf Course. Upon either the repurchase of the Rhodes Ranch Golf Course or the written decision to not repurchase the Rhodes Ranch Golf Course (in accordance with the preceding sentence), the Golf Course Security Property or the $500,000 Cash (if not applied to the repurchase of the Rhodes Ranch Golf Course) shall be returned to Rhodes within 30 days.

On the Effective Date, the Reorganized Debtors shall record a memorandum of agreement against the Rhodes Ranch Golf Course to evidence the above.

20.    Cash Payment

The Rhodes Entities shall make a cash payment to the Reorganized Debtors of $3.5 million in Cash on the Effective Date. The $3.5 million cash payment shall be used to fund distributions under the Plan and provide working capital to the extent of any excess.

21.    Transfer of Arizona Assets

On the Effective Date, pursuant to a stock and asset transfer agreement, a draft of which is attached hereto as Exhibit M, the Debtors shall transfer Pravada and the other Arizona Assets set forth on Attachment D to the Mediation Term Sheet, plus the Golden Valley Ranch tradename to the Rhodes Entities free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code; provided, that the non-First Lien Lender/Second Lien Lender liens do not exceed $60,000; provided, further, that such assets shall not include assets owned by Pinnacle Grading located in Arizona and related contracts associated with the assets. **All Claims asserted against the Arizona Assets shall be deemed asserted against the Estates and shall be classified in accordance with Article III of the Plan for distribution purposes.** The Arizona Assets shall be transferred through the Rhodes Entities' acquisition of the stock of Rhodes Arizona Properties LLC and Elkhorn Investments, Inc. and certain assets of Rhodes Homes Arizona LLC. Any non-real property assets or assets not listed on Attachment D to the Mediation Term Sheet that are titled in Rhodes Arizona Properties LLC or Elkhorn Investments, Inc. shall be transferred to Newco pursuant to the stock and asset transfer agreement. To the extent any real property assets located in Arizona are titled in any Debtor other than Rhodes Arizona Properties LLC, Elkhorn Investments, Inc. or Rhodes Homes Arizona, such real property assets shall be

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

49

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  transferred to the Rhodes Entities pursuant to the stock and asset transfer agreement. All
2  intercompany claims assertable by Rhodes Arizona Properties LLC or Elkhorn Investments,
   Inc. against any other Debtor shall be deemed cancelled.
3
4      The Debtors shall provide James Rhodes notice of any proposed sale of the Pinnacle
   assets, and James Rhodes shall be granted a right to bid on the sale of such assets within 10
5  days of such notice. The Rhodes Entities shall permit storage of Pinnacle Grading equipment
   at current locations at no cost to the Reorganized Debtors for a period through six months
6  following the Effective Date.
7      All executory contracts and unexpired leases associated solely with Arizona shall be
8  assumed and assigned to the Rhodes Entities (or their designee), at no cost to the Debtors or
   the Reorganized Debtors and all cure costs associated therewith shall be borne by the Rhodes
9  Entities.
10     22.    Trademark and Trade Names
11     Within the earlier of thirty (30) days following:  (i) upon completion of the buildout of
   all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such
12 assets and inventory were acquired), or (ii) bulk sale of the remaining inventory of the
   Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes (or his
13 designee) the trademarks and tradenames set forth on Attachment E to the Mediation Term
14 Sheet.
15     23.    Self Insured Retention Obligations
16     The Reorganized Debtors shall indemnify subcontractors that are obligated under any
17 of the Reorganized Debtors' existing insurance policies for any post-Effective Date self
   insured retention obligations paid and/or to be paid by such subcontractors pursuant to such
18 existing insurance policies.
19     24.    Bond Replacement or Indemnification
20     Those performance bonds guaranteed by the Rhodes Entities in favor of the Debtors
21 shall be replaced on a renewal date by new performance bonds. In the alternative, subject to
   the Rhodes Entities being reasonably satisfied with the creditworthiness of the Reorganized
22 Debtors, which shall be satisfied solely as of the Effective Date by the Court finding that the
   Plan is feasible, the existing performance bonds guaranteed by the Rhodes Entities and such
23 guarantees shall remain in place. The applicable Rhodes Entity's agreement to remain a
24 guarantor under the existing performance bonds as such performance bonds may be renewed
   shall be at no cost to the Rhodes Entities (including, but not limited to, the payment of bond
25 premiums). In the event the Reorganized Debtors fail to perform their obligations underlying
   such renewed performance bonds after the Effective Date, the Reorganized Debtors will
26 indemnify the Rhodes Entities under such outstanding performance bonds for damages
27 incurred by the Rhodes Entities on account of their guarantee of such performance bonds
   solely as a result of the Reorganized Debtors' failure to perform such obligations subsequent
28 to the Effective Date. The Reorganized Debtors shall use commercially reasonable efforts to
   replace all outstanding performance bonds backstopped by Rhodes Entities within 30 months

50

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

of the Effective Date.  The Bankruptcy Court shall retain jurisdiction to resolve any disputes arising out of this paragraph.

Contingent Bond Indemnity Claims will be released in the ordinary course of business as time passes or as work on the underlying project is completed.  To the extent that a Contingent Bond Indemnity Claim becomes an Allowed or estimated Claim, such Contingent Bond Indemnity Claim shall be treated as a General Unsecured Claim.

25.    Stanley Engineering Litigation

In the event the Stanley Engineering Litigation is resolved either by judgment or settlement in a manner favorable to the Reorganized Debtors and such resolution does not provide for Cash consideration to be received by the Reorganized Debtors and Second Lien Lenders, the Reorganized Debtors and the Second Lien Agent, assuming the Class of Second Lien Lender Secured Claims votes in favor of the Plan, shall engage in good faith negotiations to ensure that the Second Lien Lenders receive consideration equivalent to 50% of the net value of such resolution and to determine the timing of payment of any such consideration.  In the event the Reorganized Debtors and the Second Lien Agent are unable to agree on the amount or form of such consideration, the parties will submit the matter to binding arbitration with the costs thereof to be split evenly among the Reorganized Debtors and the Second Lien Agent (with the costs of the Second Lien Agent to be reimbursed from the consideration to be distributed to the Second Lien Lenders on account of the Stanley Engineering Litigation).

G.    Treatment of Executory Contracts and Unexpired Leases

1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, the Debtors' executory contracts or unexpired leases not assumed or rejected pursuant to a Bankruptcy Court order prior to the Effective Date shall be deemed rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, except for those executory contracts or unexpired leases: (1) listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" attached hereto as Exhibit N; (2) that are Intercompany Contracts, in which case such Intercompany Contracts are deemed automatically assumed by the applicable Debtor as of the Effective Date, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date; (3) that are the subject of a motion to assume or reject pending on the Effective Date (in which case such assumption or rejection and the effective date thereof shall remain subject to a Bankruptcy Court order); (4) that are subject to a motion to reject with a requested effective date of rejection after the Effective Date; or (5) that are otherwise expressly assumed or rejected pursuant to the Plan.  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such executory contracts and unexpired leases in the Plan are effective as of the Effective Date.  Each such executory contract and unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable

51

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Plan Proponent and the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the schedules of executory contracts or unexpired leases identified in Exhibit N hereto at any time through and including fifteen days after the Effective Date. All executory contracts and unexpired leases associated solely with the Arizona Assets shall be assumed and assigned to the Rhodes Entities (or their designee) to the extent set forth on the schedule of Assumed Executory Contracts and Unexpired Leases attached hereto as Exhibit N, at no cost to the Debtors or the Reorganized Debtors and all Cure costs associated with such scheduled Arizona contracts or leases shall be borne by the Rhodes Entities.

2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

With respect to each of the Debtors' executory contracts or unexpired leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Plan Proponent shall have designated a proposed Cure, and the assumption of such executory contract or unexpired lease may be conditioned upon the disposition of all issues with respect to Cure. Any provisions or terms of the Debtors' executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure. Except with respect to executory contracts and unexpired leases in which the Plan Proponent or the Debtors, with the consent of the First Lien Steering Committee, and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Court on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, or First Lien Steering Committee object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors with the consent of the First Lien Steering Committee, or the Reorganized Debtors and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract and unexpired lease that fails to object timely to the proposed assumption of any

executory contract or unexpired lease will be deemed to have consented to such assumption. The Debtors, with the consent of the First Lien Steering Committee, or the Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim Filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

All Cure costs associated with Executory Contracts related to the Arizona Assets shall be borne by the Rhodes Entities.

3. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any executory contract or unexpired lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, insurance coverage, utilitiy services, warranties, indemnity, guarantee of workmanship, or continued maintenance obligations on goods or services previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated executory contracts. The Reorganized Debtors expressly reserve and do not waive the right to receive coverage under any past insurance policy to extent that coverage has not expired under the terms of the insurance policy, regardless of whether such insurance policy is listed as an assumed contract. Similarly, the Reorganized Debtors expressly reserve and do not waive the right to receive services under any contract with a utility provider, regardless of whether such agreement with a utility provider is listed as an assumed contract.

4. Claims Based on Rejection or Repudiation of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with the Claims and Solicitation Agent no later than the Rejection Damages Claim Deadline. Any Proofs of Claim arising from the rejection or repudiation of the Debtors' executory contracts or unexpired leases that are not timely Filed by the Rejection Damages Claim Deadline shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any

53

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  Reorganized Debtor without the need for any objection by the Reorganized Debtors or further
2  notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of
   the rejection or repudiation of the executory contract or unexpired lease shall be deemed fully
3  satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of
4  Claim to the contrary.  All Allowed Claims arising from the rejection or repudiation of the
   Debtors' executory contracts and unexpired leases shall be classified as General Unsecured
5  Claims.

6       5.    Intercompany Contracts, Contracts, and Leases Entered Into After the Petition
              Date
7
          Intercompany Contracts, contracts, and leases entered into after the Petition Date by
8  any Debtor, and any executory contracts and unexpired leases assumed by any Debtor, may be
9  performed by the applicable Reorganized Debtor in the ordinary course of business.

10      6.    Home Sales

11        All pending home sale contracts shall be assumed by the applicable Reorganized
   Debtor.
12
        7.    Warranties
13
          All eligible prepetition home sale contracts with one-year warranty obligations shall be
14 performed in the ordinary course of business of the Reorganized Debtors.  Upon the Effective
15 Date, any remaining warranty obligations that are to be assumed by the Reorganized Debtors,
   which shall only be assumed with the consent of the First Lien Steering Committee, shall be
16 transferred to the Reorganized Debtors.  Warranty obligations that are not expressly assumed
17 shall be rejected and treated as General Unsecured Claims.

18      8.    Modification of Executory Contracts and Unexpired Leases Containing Equity
              Ownership Restrictions
19
          All executory contracts and unexpired leases to be assumed, or conditionally assumed,
20 under the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code shall be deemed so
21 assumed, or so conditionally assumed, without giving effect to any provisions contained in
   such executory contracts or unexpired leases restricting the change in control or ownership
22 interest composition of any or all of the Debtors, and upon the Effective Date (1) any such
23 restrictions shall be deemed of no further force and effect and (2) any breaches that may arise
   thereunder as a result of Confirmation or Consummation shall be deemed waived by the
24 applicable non-Debtor counterparty.

25      9.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

26        Unless otherwise provided in the Plan, each executory contract or unexpired lease that
   is assumed shall include all modifications, amendments, supplements, restatements, or other
27 agreements that in any manner affect such executory contract or unexpired lease, and all
28 executory contracts and unexpired leases related thereto, if any, including all easements,
   licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1    interests, unless any of the foregoing agreements has been previously rejected or repudiated or
2    is rejected or repudiated under the Plan.

3        Modifications, amendments, supplements, and restatements to prepetition executory
     contracts and unexpired leases that have been executed by the Debtors during the Chapter 11
4    Cases shall not be deemed to alter the prepetition nature of the executory contract or
     unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection
5    therewith.

6        10.    Reservation of Rights

7        Neither the exclusion nor inclusion of any contract or lease on Exhibit N hereto, nor
8    anything contained in the Plan, shall constitute an admission by the Debtors or the First Lien
     Steering Committee that any such contract or lease is in fact an executory contract or
9    unexpired lease or that any Reorganized Debtor has any liability thereunder. If there is a
     dispute regarding whether a contract or lease is or was executory or unexpired at the time of
10   assumption or rejection, the Debtors, with the consent of the First Lien Steering Committee,
11   or Reorganized Debtors shall have thirty days following entry of a Final Order resolving such
     dispute to alter their treatment of such contract or lease.

12
13       11.    Nonoccurrence of Effective Date

14       In the event that the Effective Date does not occur, the Bankruptcy Court shall retain
     jurisdiction with respect to any consensual request to extend the deadline for assuming or
15   rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

16   H.   Procedures for Resolving Disputed Claims

17       1.    Allowance of Claims

18       After the Effective Date, each Reorganized Debtor shall have and retain any and all
19   rights and defenses such Debtor had with respect to any Claim immediately prior to the
     Effective Date, including the Causes of Action referenced in Article IV of the Plan.

20
21       2.    Claims Administration Responsibilities

22       Except as otherwise specifically provided in the Plan, after the Effective Date, the
     Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to
23   judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any
     further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer
24   and adjust the Claims Register to reflect any such settlements or compromises without any
25   further notice to or action, order, or approval by the Bankruptcy Court.

26       3.    Estimation of Claims

27       Before or after the Effective Date, the First Lien Steering Committee or the
     Reorganized Debtors, as applicable, may (but are not required to) at any time request that the
28   Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty days after the date on which such Claim is estimated.

4.    Adjustment to Claims Without Objection

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Beginning on the end of the first full calendar quarter that is at least ninety days after the Effective Date, the Reorganized Debtors shall publish and File every calendar quarter a list of all Claims that have been paid, satisfied, amended, or superseded during such prior calendar quarter.

5.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (1) the applicable Claims Objection Deadline and (2) such date as may be fixed by the Bankruptcy Court, after notice and a hearing, whether fixed before or after the date that is one year after the Effective Date. Notwithstanding the foregoing, the First Lien Steering Committee, any First Lien Lender and/or the Reorganized Debtors shall have until sixty days following the Effective Date to object to the Proofs of Claim filed by the Rhodes Entities in the Debtors' chapter 11 cases (provided, that, such objections shall not seek to subordinate the Rhodes Entities Claims, if Allowed).

6.    Disallowance of Claims

Except as otherwise set forth in the Plan, any Claims held by an Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors or the Litigation Trust, as applicable.

EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS ON OR BEFORE THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER.

7.      Offer of Judgment

The Reorganized Debtors shall be authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.    To the extent the Holder of a Claim must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors shall be entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

8.      Amendments to Claims

On or after the Effective Date, except as expressly authorized in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

I.      Provisions Governing Distributions

1.      Total Enterprise Value for Purposes of Distributions Under the Plan

Distributions of Newco Equity Interests to Holders of Allowed First Lien Lender Secured Claims shall be based upon, among other things, the Newco Total Enterprise Value of $99.6 million.  For purposes of distribution, the Newco Equity Interests shall be deemed to have the value assigned to them based upon, among other things, the Newco Total Enterprise Value, regardless of the date of distribution.

2.      Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Steering Committee, initial distributions under the Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of

57

business, or industry practice and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

3.    Distributions on Account of Claims Allowed After the Effective Date

a.    Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the First Lien Steering Committee prior to the Effective Date or the Reorganized Debtors after the Effective Date, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claim has been Allowed.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims or Interests pursuant to Article VII.C.3 of the Plan.  Subject to Article IX.A.5 of the Plan, all distributions made pursuant to the Plan on account of an Allowed Claim shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim had been an Allowed Claim on the dates distributions were previously made to Holders of Allowed Claims included in the applicable Class.

c.    Reserve of Litigation Trust Interests

On the Effective Date, the Reorganized Debtors shall maintain in reserve Litigation Trust Interests for distribution to Holders of Disputed Claims that become Allowed after the Effective Date.  As Disputed Claims are Allowed, the Distribution Agent shall distribute, in

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

58

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

accordance with the terms of the Plan, Litigation Trust Interests to Holders of Allowed Claims, and the Disputed Claims Reserve shall be adjusted. The Distribution Agent shall withhold in the Disputed Claims Reserve any payments or other distributions made on account of, as well as any obligations arising from, the Litigation Trust Interests initially withheld in the Disputed Claims Reserve, to the extent that such Litigation Trust Interests continue to be withheld in the Disputed Claims Reserve at the time such distributions are made or such obligations arise, and such payments or other distributions shall be held for the benefit of Holders of Disputed Claims whose Claims, if Allowed, are entitled to distributions under the Plan. The Reorganized Debtors may (but are not required to) request estimation for any Disputed Claim that is contingent or unliquidated.

Notwithstanding anything in the applicable Holder's Proof of Claim or otherwise to the contrary, the Holder of a Claim shall not be entitled to receive or recover a distribution under the Plan on account of a Claim in excess of the lesser of the amount: (a) stated in the Holder's Proof of Claim, if any, as of the Distribution Record Date, plus interest thereon to the extent provided for by the Plan; (b) if the Claim is denominated as contingent or unliquidated as of the Distribution Record Date, the amount that the Reorganized Debtors elect to withhold on account of such Claim in the Disputed Claims Reserve, or such other amount as may be estimated by the Bankruptcy Court prior to the Confirmation Hearing; or (c) if a Claim has been estimated, the amount deposited in the Disputed Claim Reserve to satisfy such Claim after such estimation.

4. Delivery of Distributions

a. Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Notwithstanding the foregoing, if a Claim is transferred twenty or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

b. Distribution Agent

The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

c. Delivery of Distributions in General

Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate: (a) in

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (d) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Except as otherwise provided in the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the First Lien Steering Committee, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

        d.      Accrual of Distributions and Other Rights

For purposes of determining the accrual of distributions or other rights after the Effective Date, the Newco Equity Interests and the Litigation Trust Interests, as applicable, shall be deemed distributed as of the Effective Date regardless of the date on which they are actually issued, dated, authenticated, or distributed even though the Reorganized Debtors shall not make any such distributions or distribute such other rights until distributions of the Newco Equity Interests and the Litigation Trust Interests, as applicable, actually take place.

        e.      Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, distributions on account of Allowed Claims shall be treated as allocated first to principal and thereafter to any interest.

        f.      Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

g.    Fractional, De Minimis, Undeliverable, and Unclaimed Distributions

(i)    Fractional Distributions

Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of Newco Equity Interests or fractions of Litigation Trust Interests shall not be made. The Distribution Agent shall not be required to make distributions or payments of fractions of Newco Equity Interests, Litigation Trust Interests or dollars. Whenever any payment of Cash of a fraction of a dollar or payment of a fraction of Newco Equity Interests or fraction of Litigation Trust Interests pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars, half Newco Equity Interests or half Litigation Trust Interests or less being rounded down.

(ii)    Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors pursuant to Article VII.D.7.c of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iii)    Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is a distribution of Newco Equity Interests, such Newco Equity Interests shall be deemed cancelled. Upon such revesting, the Claim of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

h.    Manner of Payment Pursuant to the Plan

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer. Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims shall be null and void if not

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  presented within 120 days after issuance, but may be requested to be reissued until the
2  distribution revests in the Reorganized Debtors pursuant to Article VII.D.7.c of the Plan.

3    i.    Surrender of Cancelled Instruments or Securities

4    On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a
Certificate shall surrender such Certificate to the Distribution Agent or a Servicer (to the
5  extent the relevant Claim or Interest is governed by an agreement and administered by a
Servicer). Such Certificate shall be cancelled solely with respect to the Debtors, and such
6  cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis
7  one another with respect to such Certificate. No distribution of property pursuant to the Plan
shall be made to or on behalf of any such Holder that is a Holder of a Claim unless and until
8  such Certificate is received by the Distribution Agent or the Servicer or the unavailability of
9  such Certificate is reasonably established to the satisfaction of the Distribution Agent or the
Servicer. Any Holder of a Claim who fails to surrender or cause to be surrendered such
10 Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the
Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall
11 have its Claim discharged with no further action, be forever barred from asserting any such
Claim against the relevant Reorganized Debtor or its property, be deemed to have forfeited all
12 rights and Claims with respect to such Certificate, and not participate in any distribution under
13 the Plan; furthermore, all property with respect to such forfeited distributions, including any
dividends or interest attributable thereto, shall revert to the Reorganized Debtors,
14 notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the
15 contrary.

16   5.   Claims Paid or Payable by Third Parties

17     a.    Claims Paid by Third Parties

18    The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall
be disallowed without a Claims objection having to be Filed and without any further notice to
19 or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such
20 Claim receives payment in full on account of such Claim from a party that is not a Debtor or
Reorganized Debtor. Further, to the extent a Holder of a Claim receives a distribution on
21 account of such Claim and receives payment from a party that is not a Debtor or a
Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt
22 thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the
23 Holder's total recovery on account of such Claim from the third party and under the Plan
exceeds the amount of such Claim as of the date of any such distribution under the Plan. The
24 failure of such Holder to timely repay or return such distribution shall result in the Holder
owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on
25 such amount owed for each Business Day after the two-week grace period specified above
26 until the amount is repaid.

27

28

62

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

b.    Claims Payable by Insurance

Holders of Insured Claims that are covered by the Debtors' insurance policies shall seek payment of such Claims from applicable insurance policies, provided that the Reorganized Debtors shall have no obligation to pay any amounts in respect of pre-petition deductibles or self insured retention amounts. Allowed Insured Claim amounts in excess of available insurance shall be treated as General Unsecured Claims. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

c.    Applicability of Insurance Policies

Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Except for Claims and Causes of Action released under the Plan to the Released Parties and Exculpated Parties, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.    Payment of $1.5 Million to First Lien Lenders

The $1,500,000 in Cash payable to the Holders of First Lien Lender Secured Claims from the proceeds of their Collateral pursuant to Article III.B.1. shall be paid as follows: (i) $400,000 on the Effective Date and (ii) the remaining up to $1,100,000 in five quarterly installments of $220,000 beginning on the first day of the fourth month following the Effective Date; provided, that the Reorganized Debtors shall have the right to defer up to two quarterly payments, with such deferred amount(s) to be paid on the next quarterly payment date (and the amount scheduled to be paid on such quarterly payment date deferred for another quarter; provided that the full $1.5 million payment shall be made to the Holders of First Lien Lender Secured Claims within eighteen months of the Effective Date). Notwithstanding the foregoing, in the event that, as of the Effective Date, the debt on the Rhodes Ranch Golf Course has been refinanced on terms and conditions acceptable to the First Lien Steering Committee and the Reorganized Debtors have unrestricted cash of at least $3.5 million (after taking into account any amounts required to be paid to reduce the amount of third party debt on the Rhodes Ranch Golf Course below $5.9 million and without taking into consideration amounts that may have been borrowed under any exit facility unless such amounts were used to pay-down debt on the Rhodes Ranch Golf Course, in which case any amounts used to pay-down debt on the Rhodes Ranch Golf Course will be deemed to reduce unrestricted cash on a dollar for dollar basis), then the initial $400,000 payment to the First Lien Lenders will be increased as follows: (i) if unrestricted cash (as calculated above) is

63