<u>Exhibit B</u>

**Debtors' Organizational Chart**

Rhodes Homes - Organizational Structure

8:46:36 AM 4/15/2009

**Exhibit C**

Current Cash Collateral Budget

Rhodes Homes 17 Week Cash Flow Forecast
Revised 7/23/2009

[illegible]

## EXHIBIT D

### Going Concern Analysis

The First Lien Steering Committee believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the First Lien Steering Committee analyzed the Debtors' ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The First Lien Steering Committee, through its financial advisor, Winchester Carlisle Partners ("WCP"), and its valuation consultant, Robert Charles Lesser & Company ("RCLCO"), developed a business plan and prepared financial projections (the "Projections") for the fiscal years 2010 to 2014 (the "Projection Period"). The Going Concern Analysis relies principally upon the application of the discounted cash flow methodology (as further explained below), to arrive at a total enterprise value range of the Reorganized Debtors as of January 1, 2010, of $89.2 million to $111.5 million.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the First Lien Steering Committee does not anticipate that the Debtors will, and disclaims any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with any governmental or regulatory entity or otherwise make such information public.

In connection with the development of the Plan, the Projections were prepared by the First Lien Steering Committee to present the anticipated impact of the Plan. The Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and Disclosure Statement. Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Projections included herein were prepared in September 2009. The First Lien Steering Committee and its professionals are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.

The Projections consist of the following unaudited pro forma financial statements: a balance sheet (the "Opening Balance Sheet") projected as of an assumed Effective Date of January 1, 2010; a projected balance sheet (the "Balance Sheet") as of each year end from December 31, 2010 through December 31, 2014; a projected income statement (the "Income Statement") for January 1, 2010 through December 31, 2014; and a projected cash flow statement (the "Cash Flow Statement") for January 1, 2010 through December 31, 2014. The Projections should be read in conjunction with the significant assumptions and qualifications set forth in the notes below, and elsewhere in the Disclosure Statement, which comprise an integral part of the Projections and should be referenced in connection with any review of the Projections.

THE FIRST LIEN STEERING COMMITTEE PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF ITS PROFESSIONALS. THE FIRST LIEN STEERING COMMITTEE DID NOT PREPARE SUCH PROJECTIONS TO COMPLY, OR ALLOW THE DEBTORS TO COMPLY, WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS ANY OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. THE PROJECTIONS ARE QUALIFIED IN THEIR ENTIRETY BY THE DESCRIPTION THEREOF CONTAINED IN ARTICLE V OF THE DISCLOSURE STATEMENT.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND THE FIRST LIEN STEERING COMMITTEE, INCLUDING THE CONSUMMATION AND IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, COMMODITY PRICE FLUCTUATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTENANCE OF GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE VI OF THE DISCLOSURE STATEMENT ENTITLED "CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE FIRST LIEN STEERING COMMITTEE, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE FIRST LIEN STEERING COMMITTEE CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FIRST LIEN STEERING COMMITTEE PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE FIRST LIEN STEERING COMMITTEE, DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER

ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

## Pro Forma Balance Sheet

| | Estimated Pre-Effective Date (12/31/09) Balance Sheet | Effective Date Accounting Adjustments | | Pro Forma Balance Sheet of Reorganized Debtors |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | 823,099 | 1,625,000 | (a) | 2,448,099 |
| Accounts receivable—net | 160,368 | (160,368) | (b) | - |
| Due from related parties | 678,697 | (678,697) | (c) | - |
| Inventories | 162,449,747 | (53,745,109) | (d) | 108,704,638 |
| Land Held for Investment | 13,764,478 | 73,488,575 | (d) | 87,253,053 |
| Property, plant, and equipment—net | 3,707,997 | | | 3,707,997 |
| Deposits and other assets—net | 9,584,063 | (6,301,039) | (e) | 3,283,024 |
| **TOTAL ASSETS** | 191,168,449 | 14,228,362 | | 205,396,811 |
| **LIABILITIES** | | | | |
| Notes payable - Wells Fargo | 72,868,346 | (72,868,346) | (f) | - |
| Notes payable - Credit Suisse | 305,752,225 | (305,752,225) | (f) | - |
| Interest rate hedge - Credit Suisse | 20,195,341 | (20,195,341) | (f) | - |
| Notes payable - Pre-effective date | | | | |
| Notes payable - New First Lien | - | 50,000,000 | (g) | 50,000,000 |
| Accounts payable and accrued liabilities | 5,256,547 | (1,580,061) | (h) | 3,676,486 |
| Due to related parties | 10,753,010 | (10,753,010) | (c) | - |
| Customer deposits | 231,439 | | | 231,439 |
| **TOTAL LIABILITIES** | 415,056,908 | (361,148,983) | | 53,907,925 |
| Minority Partners | 240,690 | (240,690) | (c) | - |
| Equity | (224,129,149) | 375,618,035 | (i) | 151,488,886 |
| **TOTAL LIABILITIES AND EQUITY** | 191,168,449 | 14,228,362 | | 205,396,811 |

NOTES TO PRO FORMA PROJECTED BALANCE SHEET

(a) Reflects cash disbursements made pursuant to the Plan at closing and includes $400,000 payment on emergence to Holders of First Lien Lender Claims consistent with the terms of the Plan (with additional payments anticipated in the amount of $220,000 per quarter for the next five quarters), $600,000 payment on emergence to Secured Creditors holding Other Secured Claims, and $3.5 million to be received from the Rhodes Entities consistent with the terms of the Mediation Settlement. Additionally, this balance reflects $875,000 paid to satisfy Administrative and Priority Claims related to the Chapter 11 cases.

(b) Reflects the elimination of remaining miscellaneous accounts receivable balances determined to be uncollectible. No accounts receivable balances were assumed going forward as the nature of the Reorganized Debtors' business will be exclusively homebuilding and will generate only short term (typically less than 5 days) receivables from title companies on home closings. As such, these funds were included in cash in future years.

3

(c) Reflects the elimination of all pre-Effective Date related party receivable and payable balances (intercompany). These amounts may be disputed by the Reorganized Debtors, but solely for purposes of this analysis are presumed to have been paid.

(d) Reflects the "fresh start" accounting adjustment to revalue the inventory assets to market value at the Effective Date.

(e) Represents adjustments to the Deposits and Other Assets to (1) eliminate $5.7 million in unamortized loan fees on the pre-Effective Date debt that is being restructured, and (2) eliminate $645,000 in capitalized costs on land held for investment, which is being revalued at the Effective Date and included in Inventory (see d).

(f) This amount reflects restructuring and/or forgiveness of debt of (i) $305.8 million of first lien debt, (ii) $20.2 million interest rate hedge on first lien debt, and (iii) $72.9 million of second lien debt.

(g) Represents the New First Lien Notes of $50 million.

(h) Reflects the adjustment to reduce warranty accrual to $360,000 based on recent historical warranty expenses and number of homes under warranty at the Effective Date.

(i) Reflects the net effect of the above changes, which are adjustments to the equity value of the Reorganized Debtors.

## PROJECTIONS

The First Lien Steering Committee prepared the Projections for the Projection Period. The Projections are based on a number of assumptions made by the First Lien Steering Committee with respect to the future performance of the Reorganized Debtors' operations. Although the First Lien Steering Committee has prepared the Projections in good faith and believes the assumptions to be reasonable, it is important to note that the First Lien Steering Committee can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and must be considered. The Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth herein.

4

**Projected Balance Sheet**

| | 2010 Plan | 2011 Plan | 2012 Plan | 2013 Plan | 2014 Plan |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash | 9,626,434 | 15,000,000 | 15,000,000 | 15,000,000 | 66,386,990 |
| Inventories and land | 186,731,254 | 175,761,785 | 160,982,565 | 144,940,865 | 103,910,082 |
| Property, plant, and equipment—net | 963,946 | | | | |
| Deposits and other assets—net | 4,221,092 | 3,470,638 | 2,720,183 | 4,221,092 | 3,470,638 |
| **TOTAL ASSETS** | 201,542,724 | 194,222,423 | 178,702,748 | 164,161,957 | 173,767,705 |
| **LIABILITIES** | | | | | |
| Notes payable - New First Lien | 53,199,008 | 48,692,672 | 30,284,158 | 2,228,096 | - |
| Accounts payable and accrued liabilities | 4,582,904 | 3,748,369 | 2,862,426 | 4,280,253 | 3,430,893 |
| Customer deposits | 263,089 | 346,169 | 482,659 | 565,740 | 664,646 |
| **TOTAL LIABILITIES** | 58,045,001 | 52,789,111 | 33,629,262 | 7,074,092 | 4,095,535 |
| **Equity** | 143,497,723 | 141,434,312 | 145,073,496 | 157,087,865 | 169,672,171 |
| **TOTAL LIABILITIES AND EQUITY** | 201,542,724 | 194,222,423 | 178,702,748 | 164,161,957 | 173,767,705 |

5

## Projected Statement of Cash Flows

| | 2010 Plan | 2011 Plan | 2012 Plan | 2013 Plan | 2014 Plan |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | |
| Net Income | (7,115,163) | (1,843,411) | 3,628,184 | 12,014,369 | 12,684,306 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | |
| Depreciation and amortization | 2,744,052 | 963,545 | | | |
| Interest expense | 3,199,008 | 2,118,530 | 1,374,161 | 638,274 | 18,103 |
| Changes in operating assets and liabilities: | | | | | |
| Inventories and land | 9,228,437 | 10,979,463 | 14,769,220 | 16,041,700 | 41,030,783 |
| Net cash provided (used) by operating activities | 8,058,335 | 12,218,533 | 19,782,568 | 28,694,344 | 53,633,192 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | |
| Net cash provided (used) by Investing activities | - | - | - | - | - |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | |
| Debt payments | - | (6,624,966) | (19,782,565) | (28,694,344) | (2,246,202) |
| Payments to General Unsecured Creditors | (880,000) | (220,000) | - | - | - |
| Net cash provided (used) by financing activities | (880,000) | (6,844,966) | (19,782,565) | (28,694,344) | (2,246,202) |
| **NET INCREASE/(DECREASE) IN CASH** | 7,178,335 | 5,373,566 | - | - | 51,386,990 |
| **CASH - Beginning of Period** | 2,448,059 | 9,626,434 | 15,000,000 | 15,000,000 | 15,000,000 |
| **CASH - End of Period** | 9,626,434 | 15,000,000 | 15,000,000 | 15,000,000 | 66,386,990 |

6

| Pro Forma Statement of Operations | 2010 Plan | 2011 Plan | 2012 Plan | 2013 Plan | 2014 Plan |
|---|---|---|---|---|---|
| Home Closings | 133 | 176 | 244 | 286 | 338 |
| **Revenues** | | | | | |
| Sales of inventory | 28,655,038 | 41,378,058 | 62,000,761 | 82,815,340 | 104,006,797 |
| Sales of land | | | 1,365,909 | | 14,783,628 |
| Green fees and other golf revenues | 8,221,404 | 8,472,839 | 8,732,154 | 8,999,610 | 9,275,261 |
| Contract sales | | | | | |
| **Total revenues** | 36,876,442 | 49,850,897 | 72,098,824 | 91,814,950 | 128,065,686 |
| **Costs and expenses:** | | | | | |
| Cost of sales - inventory (homes) | 14,588,377 | 19,758,075 | 27,548,829 | 33,968,084 | 41,189,976 |
| Land cost of sales - inventory (homes) | 8,541,250 | 11,238,600 | 15,669,680 | 18,366,920 | 21,577,920 |
| Cost of sales - land development | 3,837,774 | 4,718,096 | 7,118,557 | 8,289,260 | 9,983,259 |
| Cost of sales - land sales | | | 1,037,337 | | 21,273,300 |
| Selling, general and administrative | 3,581,880 | 5,172,267 | 7,760,096 | 10,361,918 | 13,000,860 |
| Depreciation and amortization | 2,744,052 | 963,946 | | | |
| Golf course costs and expenses | 7,495,264 | 7,724,904 | 7,951,781 | 8,206,126 | 8,457,973 |
| **Total costs and expenses** | 40,788,596 | 49,575,778 | 67,085,478 | 79,162,307 | 115,463,277 |
| **Operating income (Loss)** | (3,912,155) | 275,119 | 5,013,345 | 12,652,643 | 12,602,409 |
| **Other (Income) expense** | | | | | |
| Interest expense | 3,199,008 | 2,118,630 | 1,374,161 | 638,274 | 18,103 |
| **Net Income/(Loss)** | (7,111,163) | (1,843,411) | 3,639,184 | 12,014,369 | 12,684,306 |

KEY ASSUMPTIONS

A.  **General**

1.  Methodology: The Projections were developed based on inputs from the Debtors, WCP, and RCLCO. The Projections are based on assumptions and initiatives, including expectations on market stabilization.  The key drivers are: (1) average sales price; (2) average cost of construction; (3) average lot cost and; (4) annual home sales and closings.  These key drivers were utilized to forecast the operational plan reflected in the income statement, balance sheet, and statement of cash flows. Furthermore, a discounted cash flow ("DCF") methodology was utilized to arrive at a value for the Debtors' real estate assets by discounting unlevered projected free cash flows to a net present value as of the Effective Date.  Revenue is derived from the construction and sale of single family homes on all single family lots currently in inventory, as well as certain multi-family lots and commercial parcels where it was determine that single family homes were the highest and best use.  Pricing and sales velocity for these homes were projected to recover from their currently depressed levels as determined by an analysis of recent and historical sales data, to more sustainable levels of growth by 2011.  Additional revenue is derived from the sale of certain land parcels at prices and dates supportable by market conditions, as well as operation and sale of the Tuscany Golf Course and the Rhodes Ranch Golf Course.

    A discount rate range of 20%-25% was used in the Going Concern Analysis, reflecting the prevailing capital market requirements of similar transactions.  Based on the methodologies described above and further review, discussions, considerations and assumptions, the value of the Debtors' real estate assets as of January 1, 2010 under a Going Concern analysis ranges from $89.2 million to $111.5 million with a midpoint of $99.6 million.

2.  Plan Consummation: The operating assumptions assume that the Plan will have an Effective Date of January 1, 2010.

3.  Projected Subsidiaries: The Projections include the assets of all the Debtor entities. Pinnacle Grading, LLC and the entities under Tribes Holdings, LLC will be phased out and operations ended by the Effective Date.

B.  **Projected Balance Sheets and Statements of Cash Flow**

1.  Cash: The Projections assume the Reorganized Debtors will maintain a minimum cash balance of $15 million after debt service in 2011 and forward, in accordance with the anticipated New First Lien Notes.

2.  Working Capital: Capital expenditures for inventory were forecast based on the assumptions for sales absorptions.  Inventory days are projected to remain static throughout the Projection Period.

3.  Property, Plant, and Equipment: The equipment and fixed assets of the company are forecast to be fully depreciated by the end of 2011. As the Debtors currently have

excess PP&E for the go forward operation, it is not anticipated that any substantial purchases in the future will be required.

4. **Deposits and Other Assets:** As insurance policies are renewed, premiums are prepaid and amortized over the life of the policy periods.

5. **Borrowing (Repayment) of Debt:** The first lien debt at the Effective Date is projected to be $50 million. Interest on the New First Lien Notes shall be payable in Cash quarterly in arrears at the Cash pay rate of LIBOR +2%; provided that if the average of the Reorganized Debtors' unrestricted consolidated Cash as of the last day of each of the two immediately preceding consecutive quarters is less than $15 million or if the unrestricted consolidated Cash as of the last day of the immediately preceding quarter is less than $15 million (collectively, the "<u>Cash Interest Threshold</u>"), then the Reorganized Debtors shall have the option to capitalize the amount of interest due in excess of LIBOR for the immediately preceding quarter, with such capitalized interest to be capitalized on such interest payment date, and all such capitalized interest shall be due on the next interest payment date to the extent the Cash Interest Threshold is met after giving effect to the payment of interest and capitalized interest or as the Reorganized Debtors otherwise elect. All capitalized interest not previously paid shall be paid on the Maturity Date. LIBOR shall be subject to a cap of 2%.

C. **Projected Statements of Operations**

1. **Total Revenue:** Consolidated Revenues consist of Homebuilding Revenue, Land Sales, and Golf Course Revenue. Home sales absorptions are projected to remain static in 2010 and 2011 and increase slowly throughout the remaining forecast period. Average sales price is expected to decrease 9.3% in 2010 and then increase 9.8%, 9.1%, 11.3%, and 4.0% in years 2011 through 2014, respectively. The Company's land assets are forecast to be monetized at prices and dates supportable by market conditions. The revenues of the Tuscany Golf Course and the Rhodes Ranch Golf Course are forecast based on historical sales and operations.

2. **Cost of Sales:** The Company's vertical construction costs are estimated to remain flat on average throughout the projection period. Lot costs are based on the allocation of the land basis, valued at the Effective Date, to the individual lots, and the projected land development costs to be incurred throughout the projection period. While it is anticipated that costs will generally rise toward the latter half of the Projection Period, the Reorganized Debtors anticipate that they can achieve design and other cost efficiencies to offset any market increases.

3. **Selling, General, and Administrative Expenses:** Overhead operating expenses are projected based on historical averages as a percentage of home sales revenue, which percentages are projected to remain static throughout the Projection Period.

4. **Golf Course Expenses:** The Tuscany Golf Course and Rhodes Ranch Golf Course expenses are forecast based on historical profit margins and operations.

5. Interest Expense: Interest expense is based on the New First Lien Notes of $50 million. Interest on the New First Lien Notes shall be payable in Cash quarterly in arrears at the Cash pay rate of LIBOR +2%; provided that if the average of the Reorganized Debtors' unrestricted consolidated Cash as of the last day of each of the two immediately preceding consecutive quarters is less than $15 million or if the unrestricted consolidated Cash as of the last day of the immediately preceding quarter is less than $15 million (collectively, the "Cash Interest Threshold"), then the Reorganized Debtors shall have the option to capitalize the amount of interest due in excess of LIBOR for the immediately preceding quarter, with such capitalized interest to be capitalized on such interest payment date, and all such capitalized interest shall be due on the next interest payment date to the extent the Cash Interest Threshold is met after giving effect to the payment of interest and capitalized interest or as the Reorganized Debtors otherwise elect. All capitalized interest not previously paid shall be paid on the Maturity Date. LIBOR shall be subject to a cap of 2%.

6. Taxes: The Projections assume the Reorganized Debtor will not have income tax liability throughout the projection period based on the utilization of net operating losses. Property taxes are capitalized and are included in the lot cost of sales. Sales taxes on the golf course operations are included in the Tuscany Golf Course and Rhodes Ranch Golf Course expenses.

10

### EXHIBIT E

### Liquidation Analysis

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the First Lien Steering Committee has prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement, and in the accompanying Liquidation Analysis notes. The conclusion of the Liquidation Analysis, as set forth below, is a value range of $44.2 million to $55.0 million.

The Liquidation Analysis was prepared by the First Lien Steering Committee through its financial advisors, Winchester Carlisle Partners ("WCP"), and its valuation consultants, Robert Charles Lesser & Company ("RCLCO"). The Liquidation Analysis estimates the potential cash distributions available to Holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets. The preparation of this Liquidation Analysis involved extensive use of estimates and assumptions that, although considered reasonable by the First Lien Steering Committee and its professionals, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors and the First Lien Steering Committee. The First Lien Steering Committee and its professionals undertake no obligation to update or revise the Liquidation Analysis.

The following notes present the general assumptions that were relied upon in preparing the Liquidation Analysis, comprise an integral part of the Liquidation Analysis, and should be referenced in connection with any review of the Liquidation Analysis.

THE FIRST LIEN STEERING COMMITTEE AND ITS ADVISORS MAKE NO REPRESENTATION OR WARRANTY THAT, IF THE DEBTORS WERE IN FACT TO UNDERGO A CHAPTER 7 LIQUIDATION, THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

### NOTES

Basis of Presentation

(1) The Liquidation Analysis presents high, low, and average recovery scenarios, based upon a range of assumptions relating to the costs incurred during a liquidation and the proceeds realized therefrom. It is assumed that under a liquidation scenario, certain distinctive factors would limit recoveries from the sale of the Debtors' operations and other land assets. The Liquidation Analysis assumes that a chapter 7 trustee will attempt to maximize recoveries by selling the Debtors' assets on an orderly basis over a period of twelve months commencing on January 1, 2010. It is assumed that homes under construction as of this commencement date will be sold as is in their then current state of construction. Given the current depressed state of the homebuilding and real estate markets, as well as the limited availability of credit, this expedited sale process could materially reduce recoveries from the Debtors' assets.

(2) Recovery values are estimated on a consolidated basis for all of the Debtors' entities.

(3) Asset liquidation ranges are assumed to be estimated recovery amounts before deduction of any commissions or chapter 7 trustee fees, but net of property taxes, association dues, bond fees, and other operating costs specific to each asset.

Assets

(1) Cash.  The cash balance is the actual cash balance as of June 30, 2009, with certain roll-forward adjustments to estimate the cash balance as of 12/31/09.

(2) Accounts Receivable -- Pinnacle Grading.  This accounts receivable balance represents receivables from grading contract work completed, and is assumed to have cash recovery ranging from 80% to 100% of book value.

(3) Accounts Receivable -- Other.  This account represents miscellaneous receivables in the ordinary course of business and is assumed to have a cash recovery ranging from 0% to 20% of book value.

(4) Due from Related Parties.  This account represents related party receivables and is assumed to have zero value in liquidation.

(5) Inventories.  This account represents all real estate holdings, including homes under construction, completed homes and model homes, and developed and undeveloped land and is net of overhead costs incurred to operate the Debtors during the liquidation phase.  The cash recovery for these assets ranges from 20.5% to 25.7% of book value.

(6) Property, Plant & Equipment.  This includes furniture and fixtures, leasehold improvements, office equipment, vehicles, and the construction equipment of the grading company, Pinnacle Grading, LLC.  The grading equipment is assumed to have a liquidation value, net of the notes on the equipment, of approximately $450,000.  Inclusive of the remaining assets, the total liquidation value is assumed to range from 16.2% to 31.4% of book value.

(7) Deposits and Other Assets.  This category of assets includes various prepaid expenses, utility deposits, and debt issuance costs, and is assumed to have zero value in a chapter 7 liquidation.

Liabilities and Wind-down Expenses

(1) Bond Release Costs.  During the prepetition period, the Debtors routinely used performance and improvement bonds to provide assurance to municipalities that certain infrastructure work would be completed in conjunction with development orders tied to the Debtors' real estate developments.  The projects associated with these bonds include projects for "onsite" improvements (i.e., within the Debtors' developments) and "offsite" improvements (i.e., within the municipality but outside of the Debtors' development).  In a hypothetical liquidation, it is assumed that the Debtors proceed only with onsite improvements that have a direct impact on the value of the real estate assets and the ability to sell such real estate assets.  It is assumed that the cost to complete such onsite projects is treated as an Administrative Claim (by expending cash to complete) and that no prepetition Claims from the bond issuers arise given that these projects are completed.  It is assumed the offsite projects are not completed by the

2

Debtors and therefore give rise to General Unsecured Claims from the bond issuers against the Debtors. Any costs to be incurred are expected to be minimal as most assets will be sold in an "as is" state.

(2) <u>Wind-down Expenses.</u>   In addition to Administrative and Priority Claims, the wind-down expenses include expenses directly related to liquidation of the assets, such as commissions to real estate brokers of an average of 4% of estimated liquidation proceeds, and fees paid to a chapter 7 trustee and its professionals totaling approximately 2% of liquidation proceeds.

(3) <u>Secured Claims – Prepetition Secured Debt.</u>   These liabilities include the first and second lien outstanding debt, accrued interest and certain fees, as well as secured hedging agreements.

(4) <u>Other Secured Claims.</u>   This group of liabilities represents mechanics lien claims and claims by equipment lenders.

(5) <u>General Unsecured Claims.</u>   This group of liabilities includes prepetition claims by vendors and subcontractors, in addition to other unsecured claims, including anticipated claims by issuers of performance bonds due to the anticipated non-performance of the related work.

**Rhodes Homes**
**Liquidation Analysis**
**Asset Schedule**

| | Book Value 6/30/09 [1] | Adjustments [2] | Adjusted Book Value | Recovery Factor | | | Recovery Value | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Low | High | Average | Low | High | Average |
| Cash | 4,751,307 | (428,200) | 4,323,099 | 100.0% | 100.0% | 100.0% | 4,323,099 | 4,323,099 | 4,323,099 |
| Accounts Receivable - Pinnacle Grading | 2,777,951 | | 2,777,951 | 80.0% | 100.0% | 90.0% | 2,222,361 | 2,777,951 | 2,500,156 |
| Accounts Receivable - Other | 159,417 | | 159,417 | 0.0% | 20.0% | 10.0% | | 31,883 | 15,942 |
| Due from Related Parties | 678,697 | | 678,697 | 0.0% | 0.0% | 0.0% | | | |
| Inventories | 179,715,545 | | 179,715,545 | 20.5% | 25.7% | 22.9% | 36,506,169 | 45,606,923 | 40,231,669 |
| Property, Plant & Equipment | 7,336,958 | | 7,336,958 | 16.2% | 31.4% | 23.8% | 1,191,599 | 2,303,999 | 1,747,799 |
| Deposits and Other Assets | 10,359,383 | | 10,359,383 | 0.0% | 0.0% | 0.0% | | | |
| Total Assets | 203,779,258 | (428,200) | 203,351,050 | 21.0% | 29.6% | 25.2% | 44,243,228 | 55,043,855 | 49,318,665 |
| | | | | | | | | | |
| Total Assets Available to Creditors | | | | | | | 44,243,228 | 55,043,855 | 49,318,665 |

Notes:
1. Book values are per Rhodes Homes 6/30/09 consolidated financial statements
2. Amount reflects the adjustments to roll-forward the estimated cash balance to 12/31/09, including $3.5 million to be received from Rhodes Entities at the effective date

3

**Rhodes Homes**
**Liquidation Analysis**
**Claims Recovery Schedule**

|  | Amount |
|---|---|
| **Total Assets Available to Creditors** | 49,318,665 |
| | |
| Total Wind Down Expenses | 2,450,000 |
| Total Administrative Claims | 750,000 |
| Total Priority Claims | 125,000 |
| | |
| Estimated Recovery (Administrative and Priority Claims) | 3,325,000 |
| Net Estimated Recovery | 100.0% |
| | |
| Assets Available to Creditors Holding Other Secured Claims | 45,993,665 |
| | |
| Total Other Secured Claims | 2,300,000 |
| | |
| Estimated Recovery (Other Secured Claims) | 2,300,000 |
| Net Estimated Recovery | 100.0% |
| | |
| Assets Available to Secured Creditors | 43,693,665 |
| | |
| Secured Claims - First Lien | 325,947,566 |
| | |
| Estimated Recovery (Secured Claims - First Lien) | 43,693,665 |
| Net Estimated Recovery | 13.4% |
| | |
| Assets Available to Secured Creditors | - |
| | |
| Secured Claims - Second Lien | 72,868,347 |
| | |
| Estimated Recovery (Secured Claims - Second Lien) | - |
| Net Estimated Recovery | 0.0% |
| | |
| Assets Available to Unsecured Creditors | - |
| | |
| Total Unsecured Claims | 15,000,000 |
| | |
| Estimated Recovery (Unsecured Claims) | - |
| Net Estimated Recovery | 0.0% |

<u>Exhibit F</u>

Pending Litigation

CLAIMS AND ALL PENDING CASES
SEPTEMBER 18, 2009

| PENDING CASES | CASE NUMBER | COURT | Plaintiff's attorney | ADDRESS | NATURE OF THE CASE | STATUS |
|---|---|---|---|---|---|---|
| G. C. WALLACE, INC. VS. RHODES DESIGN AND DEVELOPMENT CORPORATION | 03-A-392220 | Nevada District Court | Robert I. Avila, Esq. | 90 South Jones Blvd. #203 Las Vegas, NV 89107 | CONTRACT CLAIM | DISCOVERY STAGE |
| MRI METHODS CORP VS. RHODES DESIGN AND DEVELOPMENT | 09-A-385543 | Nevada District Court | Craig Rhea, Esq. | 800 East Charleston Blvd. Las Vegas, NV 89104 | BREACH OF LEASE | CASE FILED 7/16/09 & SERVED 4/10/09. NO POST COMPLAINT PLEADINGS OR DISCOVERY |
| INTEGRITY MASONRY, INC. VS. TUSCANY ACQUISITIONS IV, LLC, et al | 09-A-382055 | Nevada District Court | Richard Sheizer, Esq. | Buckwell, Houser & Bailey, PC 3993 Howard Hughes Pkwy, #550 Las Vegas, NV 89169 | LIEN FORCLOSURE | CASE FILED JUST PRIOR TO STAY ORDER   NO RESPONSIVE PLEADINGS FILED. |
| T.I. RESIDENTIAL, INC. VS. RHODES DESIGN AND DEVELOPMENT & RHODES RANCH GENERAL PARTNERSHIP | 09-A-585544 | Nevada District Court | Dana J. Nitz, Esq | aw Offices of Rawlings, Olson, Cannon, Gormley & Desruisseaux 9950 W. Cheyenne Ave Las Vegas, NV 89129 | CONTRACT CLAIM | CASE SERVED POST PETITION AND NO RESPONSIVE PLEADINGS ON FILE |

| PENDING CASES | CASE NUMBER | COURT | Plaintiff's attorney | ADDRESS | NATURE OF THE CASE | STATUS |
|---|---|---|---|---|---|---|
| LESLIE BLASCO, NEIL SCIELSA, NANCY WILSON-SCIELSA, ESHLIE C. LIAO, VIRGILIO BERTO, JOHN | 06-A-376060 | Nevada District Court | Shimick, Ryan & Ramsarjugo P.C. | 2881 Business Park Court, Ste 710 Las Vegas, NV 89128 | CONSTRUCTION DEFECT | SUIT FILED BUT NOT SERVED |

DOCS_LA 206200v1

CLAIMS AND ALL PENDING CASES
SEPTEMBER 18, 2009

| PENDING CASES | CASE NUMBER | NATURE OF THE CASE | STATUS |
| --- | --- | --- | --- |
| JIMMY L. DICKIE, HAZEL M. DICKIE, YVETTE DANG, JOSE ARMANDO ELIXILE, JOHN A. HERMAN, PIA FLORES-HERMANN, ALI JORDON, KEN MUMBLY, PEARL H NEAL, BENJAMIN GWYOUNG, CLARENCE J. FSCHWALESKAMY Y CHENG, GREGORIO CORTEZ, DONNA GWYOND VIOLETA CORTEZ, DEVRIES, PRASHANT GUPTE, RUPALI GUPTE, ANDREW TAXIARCHOS, ALEXANDRA TAXIARCHOS-JAMES KHAFELL, LESLIE KHAFELL, VAUD YOUSIF, FAIZA YOUSIF, ROMAN E. GARZON, YVONNE SWRZEZYNA, JAMES E REMMERT, ROLONO GARCIA, HANK MAZE V.S. RHODES RANCH LIMITED PARTNERSHIP, RHODES DESIGN AND DEVELOPMENT. | NONE-NEVADA CHAP. 40 NOTICE OF CONSTRUCTION DEFECT NO SUIT FILED | CONSTRUCTION DEFECT | IN INITIAL CHAPTER 40 NOTICE PERIOD |
| PALM HILLS FIVE HOME CONSTRUCTION DEFECT VS. DESERT COMMUNITIES, INC. | NONE-NEVADA CHAP. 40 NOTICE OF CONSTRUCTION DEFECT CLAIMS RECEIVED NO SUIT FILED | CONSTRUCTION DEFECT | IN INITIAL CHAPTER 40 NOTICE PERIOD |
| IN RE: KITEC FITTING LITIGATION (CLASS ACTION "IN RE KITEC") | 08-A-493202 — Nevada District Court | CONSTRUCTION DEFECT | SETTLED AND PENDING SETTLEMENT BANKRUPTCY APPROVAL RE 25 HOMES. REMAINING PORTION OF CASE STAYED |

CLAIMS AND ALL PENDING CASES
SEPTEMBER 18, 2009

| | | | | | CONSTRUCTION DEFECT | N/A Active |
|---|---|---|---|---|---|---|
| KEISER VS. RHODES HOMES (Timothy Andino) | NONE-NEVADA CHAP 40 NOTICE OF CONSTRUCTION DEFECT CLAIMS RECEIVED NO SUIT FILED | | | | | |
| CASIMIRO VS. RHODES HOMES | NONE-NEVADA CHAP 40 NOTICE OF CONSTRUCTION DEFECT CLAIMS RECEIVED NO SUIT FILED | | Robert Maddox, Esq. | 3511 W. Charleston Blvd., #1111 Las Vegas, NV 89121 | CONSTRUCTION DEFECT | N/A Active |
| RHODES HOMES ARIZONA, LLC VS. STANLEY CONSULTANT VS. RHODES RANCH GENERAL PARTNERSHIP RHODES DESIGN AND DEVELOPMENT AND DESERT COMMUNITIES, LLC DBA CUSTOM QUALITY HOMES, LLC | MARICOPA COUNTY, AZ SUPERIOR COURT NO. CV2006-090026 | Maricopa County, Arizona Superior Court | | | RHODES COMPLAINT FOR PROFESSIONAL NEGLIGENCE AND COUNTER CLAIM FOR BREACH OF CONTRACT | Extensive Discovery prior to stay |
| MATTHEW R. TUREK, INC. VS RHODES HOMES ARIZONA, LLC, THE RHODES COMPANIES, LLC, & DESERT COMMUNITIES, LLC DBA CUSTOM QUALITY HOMES, LLC | SAN BERNARDINO COUNTY, CALIFORNIA NO. CIVSS 900049 | San Bernardino County | | | BREACH OF CONTRACT | Debtors are not the real defendant and matter is being defended by Custom Quality Homes. |

| PENDING CASES | CASE NUMBER | | | NATURE OF THE CASE | STATUS |
|---|---|---|---|---|---|
| VIRGINIA SPRING-ALL SMITH and SHANE SMITH VS. ROBERTO GUZMAN LANDINAS, GUNG-HO CONCRETE, LLC | 09-A-592334 | Nevada Clark County | | AUTO ACCIDENT PERSONAL INJURY | CASE FILED 6/22/2009. CASE STAYED. NO RESPONSIVE PLEADINGS ON FILE. |
| DEBORA GENATO VS NIGEL PARRITT, THOMAS ROBINSON, JAMES RHODES AND C2J HOLDINGS, INC. | 09-A-566025 | Nevada Clark County | | EMPLOYEE MATTER SEXUAL HARRASSMENT, HOSTILE WORK ENVIRONMENT GENDER DISCRIMINATION SLANDER PER SE | FILED POST PETITION. PLAINTIFF'S INJUNCTION RELIEF DENIED. NO DISCOVERY OR RESPONSIVE PLEADING TO THE UNDERLYING COMPLAINT. CASE IS SUBJECT TO STAY. |

DOCS_LA 208306v1

CLAIMS AND ALL PENDING CASES
SEPTEMBER 18, 2009

| | | | PERSONAL INJURY | |
|---|---|---|---|---|
| IAN ROSEN VS. HARSCH INVESTMENTS 7 BRAVO, INC. AND HARSCH INVESTMENTS VS. BRAVO, INC | 08-A-570559 | Nevada Clark County | | ROSEN FORMER TRIBE EMPLOYEE SUIT FOR PERSONAL INJURY ON BRAVO PREMISES. HARSCH LANDLORD SUIT FOR INDEMNIFICATION IN PLEADING STAGE. STAYED, MOTION TO LIFT STAY PENDING ON 10/2/09 TO LIFT STAY TO PURSUE INSURANCE POLICY ONLY |

**PENDING SETTLED CASES WITH INSURANCE**

| | | | |
|---|---|---|---|
| FULKS VS. ELKHORN (34 HOMES - $4,000,000) INSURED SETTLEMENT | 5-A-529056 | Nevada District Court | CONSTRUCTION DEFECT |
| PRESERVES AT ELKHORN HOA VS RHODES HOMES (COMMON ELEMENTS) $190,000 INSURED SETTLEMENT | 5-A-536359 | Nevada District Court | CONSTRUCTION DEFECT |
| In Re XMac (25 Homes in Preserves) $200,000 INSURED SETTLEMENT | 6-A-533322 | Nevada District Court | CONSTRUCTION DEFECT |

**NOTICE OF CLAIMS NO SUIT FILED**

| NATURE OF CLAIM | INSURED | | CLAIMANT | AMOUNT CLAIMED |
|---|---|---|---|---|
| CONTRACT CLAIM ARISING FROM TUSCANY OPTION AGREEMENT | UNSURED | | Commerce Associates, LLC | UNKNOWN |
| BREACH OF CONTRACT FAILURE TO COMPLETE POST CLOSING CONSTRUCTION IN SPANISH HILLS | UNSURED | | Xanadu 5,6,7 Family Trust vs. Rhodes Design and Development Corporation | APPROXIMATELY $18,000 |

DOCS_LA:208208v1

CLAIMS AND ALL PENDING CASES
SEPTEMBER 18, 2009

| BREACH OF CONTRACT FAILURE TO COMPLETE POST CLOSING CONSTRUCTION IN SPANISH HILLS | UNSECURED | The Robert Baldwin Trust vs Rhodes Design and Development Corporation | UNKNOWN |
|---|---|---|---|
| 8/18/2009 NOTICE OF MOLD CLAIM NO CASE PENDING | INSURED | Curtis A. and Susan Burca and Family | UNKNOWN |

DOCS_LA:208206v1

**Exhibit G**

**Litigation Trust Assets**

## NON-EXCLUSIVE LIST OF LITIGATION TRUST ASSETS

ARTICLE IV.O OF THE PLAN PROVIDES THAT, ON THE EFFECTIVE DATE, THE DEBTORS SHALL TRANSFER THE LITIGATION TRUST ASSETS TO THE LITIGATION TRUST FOR AND ON BEHALF OF THE LITIGATION TRUST BENEFICIARIES.  SET FORTH BELOW IS A NON-EXCLUSIVE LIST OF THOSE CAUSES OF ACTION TO BE TRANSFERRED TO THE LITIGATION TRUST PURSUANT TO ARTICLE IV.O OF THE PLAN.  SUCH CAUSES OF ACTION INCLUDE, BUT ARE NOT LIMITED TO, CAUSES OF ACTION HELD BY THE ESTATES AGAINST THE RHODES ENTITIES, AND CAUSES OF ACTION THAT ARE NOT INCLUDED IN THE FIRST LIEN LENDERS' COLLATERAL.

FOR AVOIDANCE OF DOUBT, UNLESS EXPRESSLY RELEASED PURSUANT TO THE PLAN OR A FINAL ORDER IN THEIR CAPACITIES AS SUCH, ENTITIES NOT LISTED ON THE ATTACHED LIST ARE NOT RELEASED AND THE DEBTORS AND THE LITIGATION TRUST OR REORGANIZED DEBTORS, AS APPLICABLE, EXPRESSLY RETAIN ALL CAUSES OF ACTION OF ANY KIND WHATSOEVER AGAINST ALL SUCH ENTITIES, INCLUDING WITHOUT LIMITATION THE CAUSES OF ACTION SET FORTH BELOW.

FAILURE TO ATTRIBUTE ANY SPECIFIC CAUSE OF ACTION TO A PARTICULAR ENTITY ON THE ATTACHED LIST SHALL NOT UNDER ANY CIRCUMSTANCES BE INTERPRETED TO MEAN THAT SUCH CAUSE OF ACTION IS NOT RETAINED AGAINST SUCH ENTITY.  ALL POSSIBLE CAUSES OF ACTION, INCLUDING CAUSES OF ACTION NOT LISTED BELOW,  ARE RETAINED AGAINST ALL ENTITIES NOT EXPRESSLY RELEASED PURSUANT TO THE PLAN OR A FINAL ORDER IN THEIR CAPACITIES AS SUCH.

IN THE EVENT OF ANY APPARENT INCONSISTENCY BETWEEN THE RELEASES OF ENTITIES IN THEIR CAPACITIES AS SUCH PURSUANT TO THE PLAN OR A BANKRUPTCY COURT ORDER AND THE ATTACHED LIST, SUCH RELEASES GRANTED PURSUANT TO THE PLAN OR FINAL ORDER SHALL GOVERN.

The Litigation Trust Assets shall include, but are not limited to, the following:

1.    Claims and Causes of Action held by the Estates against the Rhodes Entities, including:

   a.    Claims for beach of fiduciary duty;

   b.    Claims for misappropriation of Debtor assets for personal use;

   c.    Claims for usurping corporate opportunity for the benefit of competing interests;

   d.    Claims for mismanagement of the Debtors' operations;

e. Claims for fraudulent transfers (to the extent not expressly released under the Plan); and

f. Claims for the diversion of corporate resources for the benefit of competing interests.

2. Claims and Causes of Action that are not included in the First Lien Lenders' Collateral.

## Exhibit H

**Claim Purchase Schedule**

Claim Purchase Schedule

| Owner | Claim No. | Claimant | Address 1 | Address 2 | Address 3 | Address 4 | Fixed Secured | Fixed Unsecured | Fixed Priority | Total Filed Claim | Allowed Amount (Claim Purchase) | Disputed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Claim Purchase Schedule

| Debtor | Claim No. | Claimant | Address 1 | Address 2 | Address 3 | Address 4 | Filed Secured | Filed Unsecured | Filed Priority | Total Filed Claim | Allowed Amount Claim Purchase | Deemed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Claim Purchase Schedule

| Debtor | Claim No. | Claimant | Address 1 | Address 2 | Address 3 | Address 4 | Filed Secured | Filed Unsecured | Filed Priority | Total Filed Claim | Allowed Amount (Claim Purchase Amount) | Disputed |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## Exhibit I

**Litigation Trust Agreement**

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## LITIGATION TRUST AGREEMENT

This LITIGATION TRUST AGREEMENT, dated as of January [ ], 2010 (this "Agreement"), is hereby entered into by and among The Rhodes Companies, LLC and its subsidiaries and affiliates signatory hereto and any successors in interest (collectively, the "Debtors")[1] as settlors in their capacities as debtors in the Chapter 11 Cases (as defined below) and as reorganized debtors as of the Effective Date (as defined in the Plan (as defined below)) (in such capacities, the "Reorganized Debtors"), and [_____], as trustee of the Litigation Trust referred to herein (in such capacity, the "Litigation Trustee"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Second Amended Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC et al. dated November 12, 2009 (including all exhibits attached thereto or referenced therein, as the same may be amended, modified, or supplemented, the "Plan").

### Background

A.      On either March 31, 2009 or April 1, 2009, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"), commencing their chapter 11 cases (the "Chapter 11 Cases").

B.      The Plan incorporates, among other things, the terms of the Mediation Settlement. The Plan and the Confirmation Order also provide for the establishment of the Litigation Trust for the benefit of the Holders of Allowed Claims in Classes C-1, C-2, and C-3, or as otherwise provided for the benefit of the Reorganized Debtors in Article VII.C.3. of the Plan (collectively, the "Litigation Trust Beneficiaries").

C.      The Plan and the Confirmation Order further provide that, on the Effective Date, the Debtors shall transfer the Litigation Trust Funding Amount and shall grant, assign, transfer, convey, and deliver all of their right, title, and interest in and to all of the Litigation Trust Assets including, without limitation, interest earned thereon (together with any and all other earnings, other income, or other assets of or comprising the Litigation Trust Assets) to the Litigation Trust on behalf and for the benefit of the Litigation Trust Beneficiaries.

D.      On _____, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order").

---

[1] The Debtors are: Apache Framing, LLC; Batcave, LP; Bravo Inc.; C&J Holdings, Inc.; Chalkline, LP; Elkhorn Investments, Inc.; Elkhorn Partners, A Nevada Limited Partnership; Geronimo Plumbing, LLC; Glynda, LP; Gung-Ho Concrete, LLC; Heritage Land Company, LLC; Jackknife, LP; Jarupa LLC; Overflow, LP; Parcel 20 LLC; Pinnacle Grading, LLC; Rhodes Arizona Properties, LLC; Rhodes Companies, LLC; Rhodes Design and Development Corp.; Rhodes Homes Arizona, LLC; Rhodes Ranch General Partnership; Rhodes Ranch Golf and Country Club; Rhodes Realty, Inc.; Six Feathers Holdings, LLC; Tick, LP; Tribes Holdings LLC; Tuscany Acquisitions, LLC; Tuscany Acquisitions II, LLC; Tuscany Acquisitions III, LLC; Tuscany Acquisitions IV, LLC; Tuscany Golf Country Club, LLC; Wallboard, LP.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

E.    On the date hereof, the Effective Date of the Plan occurred.

F.    The Litigation Trust is being created pursuant to this Agreement for the purposes of liquidating the Litigation Trust Assets and distributing or utilizing the proceeds thereof to or for the benefit of the Litigation Trust Beneficiaries, as described in Articles IV.O. and VII.C.3. of the Plan.

G.    The Litigation Trustee shall have all powers necessary to implement the provisions of this Agreement and administer the Litigation Trust as provided herein.

### Agreement

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein, the Debtors and the Litigation Trustee agree as follows:

### ARTICLE I
### DECLARATION OF LITIGATION TRUST

1.1    Creation of Litigation Trust. The Debtors and the Litigation Trustee, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby constitute and create the Litigation Trust on the terms set forth herein.

1.2    Litigation Trust Interests. The Litigation Trust Interests shall be distributed to certain Holders of Allowed Claims as follows:

(a)    Holders of Allowed General Unsecured Claims. Each of the Holders of Allowed General Unsecured Claims (including any Allowed Rhodes Entities Claims) shall receive a pro rata share of the Litigation Trust Interests based on a percentage equal to the total amount of the applicable Holder's Allowed General Unsecured Claim (including any Allowed Rhodes Entities Claim) divided by the aggregate total amount of all Allowed Claims of holders of Litigation Trust Interests.

(b)    Holders of Allowed First Lien Lender Deficiency Claims . Each of the Holders of Allowed First Lien Lender Deficiency Claims shall receive a pro rata share of the Litigation Trust Interests based on a percentage equal to the total amount of the applicable Holder's Allowed First Lien Lender Deficiency Claim divided by the aggregate total amount of all Allowed Claims of holders of Litigation Trust Interests.

(c)    Holders of Allowed Second Lien Lender Deficiency Claims. Each of the Holders of Allowed Second Lien Lender Deficiency Claims shall receive a pro rata share of the Litigation Trust Interests based on a percentage equal to the total amount of the applicable Holder's Allowed Second Lien Lender Deficiency Claim divided by the aggregate total amount of all Allowed Claims of holders of Litigation Trust Interests. Distributions to Holders of Allowed Second Lien Lender Deficiency Claims on account of their Litigation Trust Interests shall be made to the Second Lien Agent for distribution to such holders.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

1.3     Purpose of Litigation Trust. The purpose of this Agreement is to implement the Plan on behalf, and for the benefit, of the Litigation Trust Beneficiaries, and to serve as a mechanism for prosecuting all Causes of Action in respect of the Litigation Trust Assets and distributing the proceeds thereof to or for the benefit of the Litigation Trust Beneficiaries in accordance with this Agreement, the Plan, and the Confirmation Order. The Litigation Trust Assets shall be liquidated in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors or the Reorganized Debtors for any purpose other than as specifically set forth herein or in the Plan and the Confirmation Order. The Litigation Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the holders of Litigation Trust Interests treated as grantors and owners of the Litigation Trust.

1.4     Transfer of Litigation Trust Assets.

(a)     In full satisfaction of all Allowed Claims in Classes C-1, C-2, and C-3, as applicable, the Debtors hereby transfer as of the Effective Date, for the sole benefit of the Litigation Trust Beneficiaries, pursuant to Bankruptcy Code sections 1123(a)(5)(B) and 1123(b)(3)(B) and in accordance with the Plan and the Confirmation Order, the Litigation Trust Assets to the Litigation Trust, free and clear of any and all liens, claims, encumbrances, and interests (legal, beneficial, or otherwise) of all other entities to the maximum extent contemplated by and permissible under Bankruptcy Code section 1141(c). Nothing in this Agreement is intended to, or shall be construed to, effect a release, extinguishment, or compromise of any Litigation Trust Asset transferred to the Litigation Trust pursuant to this Agreement. The Litigation Trust Assets are to be held and utilized or distributed, as applicable, by the Litigation Trustee in accordance with the terms hereof for the benefit of the Litigation Trust Beneficiaries, and for no other party, subject to the further covenants, conditions, and terms hereinafter set forth.

(b)     To the extent any assets of the Debtors ("Restricted Assets") cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable nonbankruptcy law that is not superseded by Bankruptcy Code section 1123 or any other provision of the Bankruptcy Code, such Restricted Assets shall be retained by the applicable Debtors and Estates. The proceeds of any such Restricted Asset retained by the Debtors and the Estates shall be allocated to the Litigation Trust pursuant to the Plan as if such transfer had not been restricted under applicable nonbankruptcy law. The Litigation Trustee may commence an action in the Bankruptcy Court to resolve any dispute regarding the allocation of the proceeds of any Restricted Assets retained by the Debtors. To the extent necessary or appropriate, the Litigation Trustee may be designated as a representative of one or more of the Estates pursuant to Bankruptcy Code section 1123(b)(3)(B) to enforce or pursue any rights, claims, or Causes of Action that remain property of the Estates after the Effective Date.

(c)     For all federal, state, and local income tax purposes, each holder of an Allowed Claim in Classes C-1, C-2, and C-3 shall be treated as transferring all of such Allowed

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Claim to the applicable Debtors in exchange for the holder's pro rata share of the Litigation Trust Assets, and then transferring the holder's pro rata share of the Litigation Trust Assets (subject to such liabilities) to the Litigation Trust in exchange for such holder's pro rata share of the Litigation Trust Interests in accordance with the terms of <u>Section 4.3(a)</u> of this Agreement.

(d)    As soon as practicable after the Effective Date, but no later than 180 days following the Effective Date, the Litigation Trustee (to the extent that the Litigation Trustee deems it necessary or appropriate in his or her sole discretion) shall make a good faith determination of the value of Litigation Trust Assets as of the Effective Date and shall provide such valuation in writing to each Litigation Trust Beneficiary. The valuation shall be used consistently by all parties for all federal and other income tax purposes. The Bankruptcy Court shall resolve any dispute regarding such valuation.

1.5    <u>Liquidation of Litigation Trust Assets</u>. The Litigation Trustee shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order and this Agreement, liquidate and convert the Litigation Trust Assets to Cash, make timely distributions in accordance with the terms hereof and not unduly prolong the existence of the Litigation Trust. The Litigation Trustee shall exercise reasonable business judgment and liquidate the Litigation Trust Assets to maximize net recoveries to the Litigation Trust Beneficiaries; provided that the Litigation Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of such recoveries. Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment, or dismissal of any or all Causes of Action in respect of the Litigation Trust Assets or otherwise or through the sale or other disposition of the Litigation Trust Assets (in whole or in combination, and including the sale of any or all Litigation Trust Assets). Pursuant to an agreed upon budget in accordance with <u>Section 4.5</u> of this Agreement, the Litigation Trustee may incur any reasonable and necessary expenses in connection with the liquidation of the Litigation Trust Assets and distribution of the proceeds thereof.

1.6    <u>Appointment and Acceptance of Litigation Trustee</u>. The Litigation Trustee shall be deemed to be appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The Litigation Trustee accepts the Litigation Trust created by this Agreement and the grant, assignment, transfer, conveyance, and delivery to the Litigation Trust and the Litigation Trustee, on behalf, and for the benefit of, the Litigation Trust Beneficiaries, by the Debtors of all of their respective right, title, and interest in the Litigation Trust Assets, upon and subject to the terms and conditions set forth herein, in the Plan, and in the Confirmation Order.

1.7    <u>Reversion to Reorganized Debtors</u>. The Litigation Trust Funding Amount, which the Debtors will transfer to the Litigation Trust on the Effective Date pursuant to the Plan and Section 4.2 hereof, will be repaid to the Reorganized Debtors from the first proceeds received by the Litigation Trust. In no event shall any other Litigation Trust Assets revert to or be distributed to any of the Reorganized Debtors.

1.8    <u>Incidents of Ownership</u>. The Litigation Trust Beneficiaries shall be the sole beneficiaries of the Litigation Trust and the Litigation Trust Assets, and the Litigation Trustee

-4-

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including, but not limited to, those powers set forth in Section 6.1 hereof.

1.9     Intervention. On the Effective Date, and without having to obtain any further order of the Bankruptcy Court, the Litigation Trustee shall be deemed to have intervened as plaintiff, movant, or additional party, as appropriate, in any applicable Causes of Action in respect of the Litigation Trust Asset, including adversary proceedings, contested matters, avoidance actions, motions, and other actions, in each case filed by any Debtor, Creditors' Committee, or any other Estate representative prior to the Effective Date. Without limiting the foregoing, the Litigation Trustee shall take any and all actions necessary or prudent to intervene in Causes of Action in respect of the Litigation Trust Assets in a timely manner.

## ARTICLE II
## LITIGATION TRUST BENEFICIARIES

2.1     Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to a Litigation Trust Interest, the Litigation Trustee shall be entitled, at its sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Litigation Trustee may elect to make no payment or distribution with respect to the Litigation Trust Interest represented by the claims or demands involved, or any part thereof, and the Litigation Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. In so doing, the Litigation Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Litigation Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or (b) all differences have been resolved by a written agreement among all of such parties and the Litigation Trustee, which agreement shall include a complete release of the Litigation Trust and the Litigation Trustee with respect to the subject matter of the dispute (the occurrence of either (a) or (b) being referred to as a "Dispute Resolution"). Until a Dispute Resolution is reached with respect to such conflicting claims or demands, the Litigation Trustee shall hold in a segregated interest-bearing account with an Approved Financial Institution (as defined below) any payments or distributions from the Litigation Trust to be made with respect to the Litigation Trust Interest(s) at issue. Promptly after a Dispute Resolution is reached, the Litigation Trustee shall transfer the payments and distributions, if any, held in the segregated account, together with any interest and income generated thereon, in accordance with the terms of such Dispute Resolution.

"Approved Financial Institution" means a commercial bank, savings bank, or savings and loan association organized under the laws of the United States, or any state thereof, and having a combined capital and surplus of at least $1,000,000,000.

2.2     Rights of Litigation Trust Beneficiaries. Each Litigation Trust Beneficiary shall be entitled to participate in the rights and benefits due to a Litigation Trust Beneficiary hereunder according to the terms of its Litigation Trust Interest. Each Litigation Trust Beneficiary shall

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

take and hold the same, subject to all the terms and conditions of this Agreement, the Plan, and the Confirmation Order. The interest of a Litigation Trust Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, a Litigation Trust Beneficiary shall have no title to, right to, possession of, management of, or control of the Litigation Trust or the Litigation Trust Assets.

2.3    Litigation Trust Interest Only. The ownership of a Litigation Trust Interest in the Litigation Trust shall not entitle any Litigation Trust Beneficiary to any title in or to the Litigation Trust Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein.

2.4    Evidence of Litigation Trust Interest. Ownership of a Litigation Trust Interest in the Litigation Trust shall not be evidenced by any certificate, security, or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee (or any agent appointed by the Litigation Trustee for purposes of maintaining a record of the Litigation Trust Beneficiaries and their respective Litigation Trust Interests in the Litigation Trust). The Litigation Trustee shall, upon written request of a holder of a Litigation Trust Interest, provide reasonably adequate documentary evidence of such holder's Litigation Trust Interest, as indicated in the books and records of the Litigation Trust. The expense of providing such documentation shall be borne by the requesting Litigation Trust Beneficiary.

2.5    No Transfers of Litigation Trust Interests. The Litigation Trust Interests shall not be assignable or transferable, except by will, intestate succession, or operation of law.

2.6    Limited Liability. No provision of this Agreement, the Plan, or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Litigation Trust Interest holder, shall give rise to any liability of such Litigation Trust Interest holder solely in its capacity as such, whether such liability is asserted by the Reorganized Debtors, by creditors, or employees of the Reorganized Debtors, or by any other Person. Litigation Trust Interest holders are deemed to receive the Litigation Trust Assets in accordance with the provisions of this Agreement, the Plan, and the Confirmation Order in full satisfaction of their Allowed Claims, as applicable, without further obligation or liability of any kind, but subject to the provisions of this Agreement.

## ARTICLE III
## DURATION AND TERMINATION OF LITIGATION TRUST

3.1    Duration. The Litigation Trust shall be deemed effective upon the Effective Date and shall remain and continue in full force and effect until terminated as provided herein. The Litigation Trust shall terminate (the "Termination Date") upon the occurrence of the earlier of (a) the full liquidation, administration, and distribution of the Litigation Trust Assets in accordance with the Plan, the Confirmation Order, and this Agreement and the full performance of all other duties and functions of the Litigation Trustee set forth in the Plan, the Confirmation Order and

-6-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

this Agreement or (b) the fifth anniversary of the Effective Date, subject to one or more finite extensions, which must be approved by the Bankruptcy Court pursuant to the terms set forth in the Plan within six months prior to the then-current Termination Date and provided that the Litigation Trustee receives a favorable ruling from the Internal Revenue Service to the effect that any such extension would not adversely affect the status of the Litigation Trust as a grantor trust for federal income tax purposes. Notwithstanding anything to the contrary in this Agreement, in no event shall the Litigation Trustee unduly prolong the duration of the Litigation Trust, and the Litigation Trustee shall, in the exercise of its reasonable business judgment and in the interests of the Litigation Trust Beneficiaries, at all times prosecute the Causes of Action in respect of the Litigation Trust Assets in a manner reasonably calculated to maximize net recoveries to the Litigation Trust Beneficiaries.

        3.2     Continuance of Litigation Trust for Winding Up. After the termination of the Litigation Trust and solely for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until its duties have been fully performed. Upon distribution of all the Litigation Trust Assets, the Litigation Trustee shall retain the books, records, and files that shall have been delivered to or created by the Litigation Trustee. At the Litigation Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six years after the final distribution of Litigation Trust Assets (unless such records and documents are necessary to fulfill the Litigation Trustee's obligations pursuant to Sections 4.8(a) and 6.1 hereof) subject to the terms of any joint prosecution and common interests agreement(s) to which the Litigation Trustee may be a party. Except as otherwise specifically provided herein, upon the final distribution of Litigation Trust Assets, the Litigation Trustee shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Litigation Trust Beneficiaries as provided in Section 4.5 hereof and as may be imposed on the Litigation Trustee by virtue of Section 6.1 hereof, the Litigation Trust Interests shall be cancelled, and the Litigation Trust shall be deemed to have been dissolved.

## ARTICLE IV
## ADMINISTRATION OF LITIGATION TRUST

        4.1     Payment of Claims, Expenses, and Liabilities. Subject to the budget agreed upon by the Litigation Trust Advisory Board in accordance with Section 4.5 of this Agreement, the Litigation Trustee shall expend the Cash of the Litigation Trust: (a) to pay reasonable administrative expenses of the Litigation Trust that are incurred (including, but not limited to, any taxes imposed on the Litigation Trust or professional fees and expenses in connection with the administration and liquidation of the Litigation Trust Assets and preservation of books and records as provided in Section 3.2 hereof); (b) to satisfy other obligations or other liabilities incurred or assumed by the Litigation Trust (or to which the Litigation Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, this Agreement and applicable United States and non United States law or regulation (it being understood that the Litigation Trust has not assumed any obligations or liabilities of the Debtors), including fees and costs incurred in connection with the protection, preservation, liquidation, and distribution of the

-7-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Litigation Trust Assets, the reasonable, documented out-of-pocket expenses of the Litigation Trust Advisory Board members, and the costs of investigating, prosecuting, and resolving the Causes of Action in respect of the Litigation Trust Assets; and (c) to satisfy any other obligations of the Litigation Trust expressly set forth in the Plan, the Confirmation Order, or this Agreement.

4.2     Funding of the Litigation Trust.  On the Effective Date, (i) the Debtors shall transfer, and shall be deemed to have automatically transferred, the Litigation Trust Funding Amount and (ii) the Debtors shall transfer, and shall be deemed to have automatically transferred, the Litigation Trust Assets in accordance with Section 1.3 hereof, in each case, to the Litigation Trust for and on behalf of the Litigation Trust Beneficiaries.  No further amounts shall be paid or payable by the Debtors for any purpose whatsoever.  The Litigation Trust Funding Amount shall be repaid to the Reorganized Debtors from the first proceeds received by the Litigation Trust.

4.3     Distributions.

(a)     Generally.  On the terms and subject to the conditions set forth in this Section 4.3, from the Effective Date through the Termination Date on each Distribution Date (as defined below), each holder of Litigation Trust Interests shall receive pro rata distributions of Litigation Trust Assets distributed on such Distribution Date.

(b)     Timing and Amount of Distributions.  The Litigation Trustee shall make distributions of the Litigation Trust Assets Available for Distribution (as defined below) on each Periodic Distribution Date (as defined below) and on such additional dates that the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, determines are appropriate from time to time (each Periodic Distribution Date and any such additional date, a "Distribution Date"); provided, however, that the Litigation Trustee shall be entitled, with the consent of the Litigation Trust Advisory Board, to defer any such distribution to the next Distribution Date if the Litigation Trustee determines that the amount of Litigation Trust Assets Available for Distribution at such time is insufficient to justify the cost of effecting the distribution.

"Periodic Distribution Date" means, as applicable, (a) the first Business Day that is as soon as reasonably practicable occurring approximately ninety days after the Distribution Date, and (b) thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety days after the immediately preceding Periodic Distribution Date.

(c)     Litigation Trust Assets Available for Distribution.  Notwithstanding anything in this Agreement to the contrary, the Litigation Trustee shall cause the Litigation Trust at all times to retain sufficient funds (the "Expense Reserve") as the Litigation Trustee shall determine, in consultation with the Litigation Trust Advisory Board and subject to the budget agreed upon by the Litigation Trust Advisory Board in accordance with Section 4.5 of this Agreement, are reasonably necessary for the Litigation Trust to:  (i) meet contingent liabilities and maintain the value of the Liquidation Trust Assets; (ii) make the payments and satisfy the obligations and liabilities described in Section 4.1 as well as satisfy all obligations to remit amounts pursuant to applicable United States and non United States laws relating to taxes; and

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(iii) fund any other amounts as required under the Plan and as identified in the Litigation Trust budget, and fund the reasonable, documented out-of-pocket fees and expenses of the Litigation Trustee, the Litigation Trust Professionals (as defined below), and the Litigation Trust, and the reasonable, documented out-of-pocket expenses of the Litigation Trust Advisory Board members. The Litigation Trustee shall not be deemed to be an "underwriter" in connection with its distribution of any Litigation Trust Assets, as such term is defined in section 1145(b) of the Bankruptcy Code, and no employees, agents, or representatives of the Litigation Trustee shall be deemed to be a "broker-dealer" as such term is defined in the Securities Exchange Act of 1934, as amended, or any rules promulgated thereunder.

"Litigation Trust Assets Available for Distribution" means the portion of Litigation Trust Assets calculated by subtracting the Expense Reserve from the then available proceeds of the Litigation Trust Assets, as determined by the Litigation Trustee in advance of each Distribution Date in consultation with the Litigation Trust Advisory Board.

(d)    Priority of Distribution of Proceeds of the Litigation Trust. Any Litigation Trust Assets Available for Distribution shall be applied (a) first, to pay or reimburse, as applicable, the reasonable, documented out-of-pocket fees, costs, expenses, and liabilities of the Litigation Trust and the Litigation Trustee, and the reasonable, documented out-of-pocket expenses of the Litigation Trust Advisory Board members as provided in Section 4.1; (b) second, to repay the Litigation Trust Funding Amount to the Reorganized Debtors and (c) third, to distributions to Litigation Trust Beneficiaries, in accordance with Section 4.3(a) of this Agreement.

(e)    Distribution of Proceeds of the Litigation Trust Upon Termination. Promptly following the termination of the Litigation Trust, the Litigation Trustee shall distribute any Litigation Trust Assets Available for Distribution not yet distributed from the Litigation Trust to the Litigation Trust Beneficiaries in accordance with the terms of this Agreement, the Plan, and the Confirmation Order.

(f)    Location for Distributions; Notice of Change of Address. Distributions to the Litigation Trust Beneficiaries shall be made by the Litigation Trustee to the Litigation Trust Beneficiaries as of the applicable Distribution Date (a) at the addresses set forth on the Proofs of Claim filed by such holders of Claims (or at the last known addresses of such holders of Claims if no Proof of Claim is filed or if the Reorganized Debtors have been notified in writing of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Litigation Trustee after the date of any related Proof of Claim, or (c) in the case of Holders of Allowed Second Lien Lender Deficiency Claims, to the Second Lien Agent. Each Litigation Trust Beneficiary shall be responsible for providing the Litigation Trustee with timely written notice of any change in address. The Litigation Trustee is not obligated to make any effort to determine the correct address of any Litigation Trust Beneficiary.

4.4    Undeliverable Property.

-9-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(a)     If any distribution of proceeds of the Litigation Trust or other Litigation Trust Assets to a Litigation Trust Beneficiary is returned to the Litigation Trustee as undeliverable, no further distribution to such Litigation Trust Beneficiary shall be made unless and until the Litigation Trustee is notified in writing of such Litigation Trust Beneficiary's then-current address, at which time all missed distributions shall be made to such Litigation Trust Beneficiary without interest.  For purposes of this Agreement, undeliverable distributions shall include checks sent to a Litigation Trust Beneficiary, respecting distributions to such Litigation Trust Beneficiary, which checks have not been cashed within six months following the date of issuance of such checks.  Undeliverable distributions shall remain in the possession of the Litigation Trustee until the next Distribution Date that the relevant distribution becomes deliverable (in which event it shall be distributed to such Litigation Trust Beneficiary), subject to Section 4.3(b) hereof.

(b)     Any Litigation Trust Beneficiary that does not assert a claim for an undeliverable distribution of proceeds of the Litigation Trust or other Litigation Trust Assets held by the Litigation Trust at least [__] days prior to the first anniversary of the Distribution Date on which such distribution was made shall no longer have any further claim to or interest in the funds represented by such undeliverable distribution and all title to and all Litigation Trust Interests related thereto shall revert to or remain in the Litigation Trust and shall be redistributed to the remaining holders of Litigation Trust Interests in accordance with Section 4.3 hereof.

    4.5     Reports.

(a)     The Litigation Trustee shall deliver reports ("Reports") to members of the Litigation Trust Advisory Board not later than [__] days prior to each fiscal quarter.  Such Reports shall specify in reasonable detail (i) the status of the Litigation Trust Assets, including any settlements entered into by the Litigation Trust, (ii) the fees and expenses of the Litigation Trust, the Litigation Trustee, and the Litigation Trust Professionals incurred and/or earned during the prior fiscal quarter, (iii) the aggregate fees and expenses of the Litigation Trust, the Litigation Trustee, and the Litigation Trust Professionals incurred and/or earned since the date of this Agreement, (iv) the amount of proceeds of the Litigation Trust received by the Litigation Trust during the prior fiscal quarter, (v) the aggregate amount of proceeds of the Litigation Trust received by the Litigation Trust since the date of this Agreement, (vi) the calculation of the Litigation Trust Assets Available for Distribution for the next Distribution Date, including the amounts of available proceeds of the Litigation Trust and the Expense Reserve, (vii) the aggregate amount of distributions from the Litigation Trust to Litigation Trust Beneficiaries since the date of this Agreement, and (viii) such other information as the Litigation Trust Advisory Board may reasonably request from time to time.  The Litigation Trustee shall also timely prepare, file, and distribute such additional statements, reports, and submissions (A) as may be necessary to cause the Litigation Trust and the Litigation Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Litigation Trust Advisory Board.

(b)     The Litigation Trustee shall prepare and submit to the Litigation Trust Advisory Board for approval an annual plan and budget at least [__] days prior to the

-10-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

commencement of each fiscal year of the Litigation Trust; provided, however, that the first such report shall be submitted no later than 90 days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail: (i) the Litigation Trustee's anticipated actions to administer and liquidate the Litigation Trust Assets; and (ii) the anticipated expenses, including professional fees, associated with conducting the affairs of the Litigation Trust. Such annual plan and budget shall be updated and submitted to the Litigation Trust Advisory Board for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Litigation Trust to date. All actions by the Litigation Trustee must be substantially consistent with the plan and budget, as updated on a quarterly basis and approved by the Litigation Trust Advisory Board; provided, however, that the Litigation Trustee may take action outside of the plan and budget with the prior approval of the Litigation Trust Advisory Board.

(c)     The Litigation Trustee shall provide the Litigation Trust Advisory Board with such other information as may be reasonably requested from time to time or on a regular basis by the Litigation Trust Advisory Board.

(d)     The Litigation Trustee shall make available by delivery, by posting on a website, or otherwise, to all Litigation Trust Beneficiaries, the Reports set forth in Section 4.5(a) above, in such form and in such detail as the Litigation Trustee deems appropriate in consultation with the Litigation Trust Advisory Board.

4.6     Exchange Act. In addition to certain requirements set forth in this Agreement, the Litigation Trust shall take such precautions as the Litigation Trustee shall deem necessary or appropriate for the Litigation Trust to avoid becoming subject to the registration requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); provided, however, that if the Litigation Trust becomes subject to such registration requirements, the Litigation Trustee shall cause the Litigation Trust to register pursuant to, and comply with, the applicable reporting requirements of the Exchange Act.

4.7     Fiscal Year. Except for the first and last years of the Litigation Trust, the fiscal year of the Litigation Trust shall be the calendar year. For the first and last years of the Litigation Trust, the fiscal year of the Litigation Trust shall be such portion of the calendar year that the Litigation Trust is in existence.

4.8     Books and Records. (a) The Debtors and/or Reorganized Debtors shall deliver to and/or make available to the Litigation Trustee, and the Litigation Trustee shall retain and preserve, copies of the Debtors' and Reorganized Debtors' books, records, and files related to the Litigation Trust Assets, including all such books, records, and files as may be needed to investigate, prosecute, and resolve the Litigation Trust Assets held by the Litigation Trust and otherwise liquidate the Litigation Trust Assets. The Litigation Trustee shall cause the Litigation Trust to perform its obligations under any non-prosecution agreement and/or joint prosecution and common interest agreement to which the Litigation Trust has succeeded or the Litigation Trustee is a party, and shall retain or destroy copies of any information that was provided or received pursuant to the terms of any such agreement.

-11-

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(b) The Litigation Trustee shall maintain, in respect of the Litigation Trust and the holders of Litigation Trust Interests, books and records relating to the assets and the income of the Litigation Trust and the payment of expenses of the Litigation Trust and the Litigation Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Agreement and applicable provisions of law. The Litigation Trustee shall provide any member of the Litigation Trust Advisory Board or, at its expense, any other Litigation Trust Beneficiary, with access to such books and records during normal business hours as may be reasonably requested with advance notice.

4.9     Cash Payments. All distributions required to be made by the Litigation Trustee to the holders of Litigation Trust Interests shall be made in Cash denominated in United States dollars by checks drawn on a United States domestic bank selected by the Litigation Trustee or, at the option of the Litigation Trustee, by wire transfer from a United States domestic bank selected by the Litigation Trustee; provided, however, that Cash payments to foreign holders of Litigation Trust Interests may be made, at the option of the Litigation Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. All Cash of the Litigation Trust shall be maintained in an Approved Financial Institution.

4.10     Insurance. The Litigation Trust shall maintain customary insurance coverage for the protection of the Litigation Trustee, the members of the Litigation Trust Advisory Board, and any such other Person serving as an administrator and overseer of the Litigation Trust on and after the Effective Date as the Litigation Trustee determines to be reasonably appropriate in consultation with the Litigation Trust Advisory Board.

### ARTICLE V
### TAX MATTERS

5.1     Tax Treatment. The Debtors, the Reorganized Debtors, the Litigation Trustee, and the holders of Litigation Trust Interests will treat the Litigation Trust as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and any comparable provision of state or local law. The Litigation Trust shall be considered a "grantor" trust and is intended to comply with the requirements of a liquidating trust, which is a grantor trust, as set forth in Revenue Procedure 94-45, 1994-2 C.B. 684. Consistent with this treatment, for all federal, state, and local income tax purposes, each holder of an Allowed Claim in Classes C-1, C-2, and C-3, as applicable, shall be treated as transferring all of such Claim to the Debtors in exchange for such holder's share of the Litigation Trust Assets and then as transferring the holder's share of the Litigation Trust Assets (subject to such liabilities) to the Litigation Trust in exchange for the holder's Litigation Trust Interest. The holders of Litigation Trust Interests in the Litigation Trust will be treated solely for tax purposes as the grantors and deemed owners of the Litigation Trust, and the Debtors, the Reorganized Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries will use consistent valuations of the Litigation Trust Assets (and liabilities) as of the Effective Date in accordance with Section 1.3(d) hereof. The Litigation Trustee shall be authorized to take any action necessary to maintain compliance with this Treasury Regulation or its successor that does not contradict the terms of this Agreement, the Plan, or the Confirmation

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Order. In the event the Litigation Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations Section 301.7701-4(d), the Litigation Trustee shall take such action as it shall deem appropriate to have the Litigation Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a "publicly traded partnership" subject to Section 7704(a) of the Internal Revenue Code of 1986, as amended (the "Tax Code")), including, if necessary, creating or converting it into a Delaware limited liability partnership or limited liability company that is so classified.

5.2     Tax Reporting. The "taxable year" of the Litigation Trust shall be the "calendar year" as those terms are defined in Section 441 of the Tax Code. The Litigation Trustee shall file statements for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Litigation Trustee shall annually, within 75 days after the end of each calendar year, send to each record holder of a Litigation Trust Interest a separate statement setting forth the holder's share or items of income, gain, loss, deduction, or credit for such year and will instruct all such holders to report such items on their federal income tax returns for such year. Such reporting shall also occur within 75 days of the dissolution of the Litigation Trust. The Litigation Trust's taxable income, gain, loss, deduction, or credit will be allocated (subject to provisions of the Plan relating to Disputed Claims and Section 5.4 hereof) to the Litigation Trust Beneficiaries in accordance with their relative Litigation Trust Interests in the Litigation Trust.

5.3     Tax Withholdings. The Litigation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code, or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the Litigation Trust Beneficiaries. All such amounts withheld, and paid to the appropriate taxing authority, shall be treated as amounts distributed to such Litigation Trust Beneficiaries for all purposes of this Agreement. The Litigation Trustee shall be authorized to collect such tax information from the Litigation Trust Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan, the Confirmation Order, and this Agreement, prior to making any distribution. The Litigation Trustee may refuse to make a distribution to any Litigation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that upon the Litigation Trust Beneficiary's delivery of such information, the Litigation Trustee shall make such distribution to which the Litigation Trust Beneficiary is entitled, without any interest or income earned thereon.

5.4     Disputed Claims Tax Matters. With respect to any proceeds of Litigation Trust Assets and any other income or gain of the Litigation Trust allocable to Disputed Claims, the Litigation Trustee shall cause the Litigation Trust to pay any taxes imposed on the Litigation Trust by any United States federal, state, or local, or any non United States taxing authority. The amount of such taxes paid by the Litigation Trust with respect to a Disputed Claim, (i) will reduce the amount distributed with respect to such Disputed Claim to the extent it becomes an Allowed Claim, and (ii) to the extent such Disputed Claim does not become an Allowed Claim, will reduce distributions ratably to all Holders in the same Class as such Disputed Claim; provided, however, that any taxes that reduce distributions pursuant to the foregoing clauses (i)

-13-

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

and (ii) shall, for all purposes of this Agreement, be treated as amounts distributed to those Holders of Claims whose distributions are so reduced.

5.5    Foreign Tax Matters. The Litigation Trustee shall take all reasonable steps, including the filing of any necessary documentation or elections with any non United States tax authority, to minimize, under non United States law: (i) the liabilities of the Litigation Trust and the Litigation Trust Beneficiaries for non United States taxes, interest, penalties, and other amounts; (ii) the obligations of the Litigation Trust to file non United States tax or information returns or other documentation; and (iii) the obligations of the Litigation Trust to withhold and remit amounts to any non United States taxing authority in respect of payments or distributions of income or property by the Litigation Trust. The Litigation Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Litigation Trustee or the Litigation Trust under non United States law relating to taxes. Without the consent of the members of the Litigation Trust Advisory Board, the Litigation Trustee, or any other legal representative of the Litigation Trust, shall not distribute Litigation Trust Assets or proceeds thereof without having first obtained all certificates required to have been obtained under applicable non United States law relating to taxes.

## ARTICLE VI
## POWERS OF AND LIMITATIONS ON THE LITIGATION TRUSTEE

6.1    Powers of the Litigation Trustee. The Litigation Trustee shall have only such rights, powers, and privileges expressly set forth in the Plan and this Agreement, and such other powers reasonably incident thereto, and as otherwise provided by applicable law. Subject to the other provisions herein, including, without limitation, the provisions relating to the Litigation Trust Advisory Board in Section 6.3, and subject to Article IV.P. of the Plan, the Litigation Trustee shall be expressly authorized to undertake the following actions, in the Litigation Trustee's good faith judgment, in the best interests of the Litigation Trust Beneficiaries and to maximize net recoveries therefor:

(a)    Hold, administer, prosecute, settle, or otherwise compromise or abandon Causes of Action in respect of Litigation Trust Assets, including, without limitation, take any action with respect to appeals, counterclaims, and defenses of, or with respect to, such Causes of Action or otherwise in respect of the Litigation Trust Assets;

(b)    Liquidate the Litigation Trust Assets;

(c)    Execute any documents and take any other actions related to, or in connection with, the liquidation of the Litigation Trust Assets and the exercise of the Litigation Trustee's powers granted herein;

(d)    Hold legal title to any and all rights of the Litigation Trust Beneficiaries in, to or arising from the Litigation Trust Assets;

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(e)     Protect and enforce the rights to the Litigation Trust Assets vested in the Litigation Trustee by this Agreement by any method deemed reasonably appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(f)     Make distributions of the Litigation Trust Assets to the appropriate Litigation Trust Beneficiaries in accordance with this Agreement, the Plan, and the Confirmation Order;

(g)     Prepare and file, if necessary, any and all tax returns with respect to the Litigation Trust and pay taxes properly payable by the Litigation Trust, if any;

(h)     Prepare and make all necessary filings in accordance with any applicable law, statute, or regulation, including, but not limited to, the Exchange Act;

(i)     Determine and satisfy from the Litigation Trust Assets any and all taxes and ordinary course liabilities, including reasonable professional fees and expenses, created, incurred or assumed by the Litigation Trust;

(j)     Retain, as an expense of the Litigation Trust, Litigation Trust Professionals as may be appropriate to perform the duties required of the Litigation Trustee hereunder or in the Plan;

(k)     Invest monies received by the Litigation Trust or Litigation Trustee or otherwise held by the Litigation Trust or Litigation Trustee in accordance with Section 6.6 hereof, limited, however, to such investments that are consistent with the Litigation Trust's status as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d);

(l)     In the event that the Litigation Trustee determines that the Litigation Trust Beneficiaries or the Litigation Trust may, will or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences;

(m)     In the event that the Litigation Trust shall fail or cease to qualify as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d), take any and all necessary actions as it shall deem appropriate to have the Litigation Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a "publicly traded partnership" subject to Section 7704(a) of the Tax Code), including, if necessary, creating or converting the Litigation Trust into a Delaware limited liability partnership or limited liability company that is so classified;

(n)     Create sub-trusts or title vehicles of which the Litigation Trust or the Litigation Trust Beneficiaries hold the beneficial or ownership interests, as applicable;

-15-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(o)     Provide periodic reports and updates regarding the status of the administration of the Litigation Trust in accordance with Section 4.5;

(p)     Purchase customary insurance coverage in accordance with Section 4.10 hereof;

(q)     Perform such functions and take such actions with respect to the Litigation Trust as are provided for or permitted in the Plan, the Confirmation Order, this Agreement or any other agreement executed pursuant to the Plan;

(r)     Take any of the forgoing actions, and execute any documents relating thereto, in the Litigation Trustee's own name, on behalf of the Litigation Trust; and

(s)     Take any other actions that the Litigation Trustee, in consultation with the Litigation Trust Advisory Board, deems necessary and appropriate to carry out the purposes of this Agreement.

For the avoidance of doubt, in accordance with Article IV.P. of the Plan, neither the Litigation Trust nor the Litigation Trustee shall have the right to commence any litigation against the Rhodes Entities until the Bankruptcy Court rules on the allowance of the Rhodes Entities Claims set forth in Proofs of Claim, included in the Debtors' Schedules or otherwise set forth in the Mediation Term Sheet. Notwithstanding anything to the contrary set forth herein or in the Plan, the Reorganized Debtors shall not pursue Claims under Bankruptcy Code section 547 against any Creditor whose Claim is purchased in accordance with Article VII.G.

6.2    Establishment of the Litigation Trust Advisory Board.

(a)     The Litigation Trust Advisory Board shall have [_____] members and be comprised of the Persons identified on, and in accordance with the terms of, Annex [__] hereto.

(b)     As soon as practicable after the creation of the Litigation Trust, the Litigation Trust Advisory Board shall adopt bylaws approved by all of the members that are consistent with the terms and conditions of this Agreement and include such other provisions as the Litigation Trust Advisory Board deems necessary or appropriate. Such bylaws may include, but shall not necessarily be limited to, guidelines for, among other matters, participation by Litigation Trust Advisory Board members in meetings and for removal of Litigation Trust Advisory Board members.

(c)     Each Litigation Trust Advisory Board member shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Litigation Trust Advisory Board and (ii) an alternate representative to attend meetings and participate in other activities of the Litigation Trust Advisory Board when the representatives designated pursuant to clause (i) above are unavailable to participate in such meetings and activities.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(d)     The purpose of the Litigation Trust Advisory Board shall be to oversee the liquidation and distribution of the Litigation Trust Assets by the Litigation Trustee, in accordance with the terms of this Agreement, the Plan, and the Confirmation Order.

(e)     A quorum for meetings of the Litigation Trust Advisory Board shall consist of a majority of the non-recused members of the Litigation Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a member of the Litigation Trust Advisory Board shall be deemed present if a representative of the member is attending in person, by telephone, or by proxy.

(f)     Except as expressly provided herein, the affirmative vote of a majority of the non-recused members of the Litigation Trust Advisory Board shall be the act of the Litigation Trust Advisory Board with respect to any matter that requires the determination, consent, approval, or agreement of the Litigation Trust Advisory Board. In all matters submitted to a vote of the Litigation Trust Advisory Board, each Litigation Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Litigation Trust Advisory Board member or by proxy. In a matter in which the Litigation Trustee cannot obtain direction or authority from the Litigation Trust Advisory Board, the Litigation Trustee may file a motion, on notice to the Litigation Trust Advisory Board members, requesting such direction or authority from the Bankruptcy Court.

(g)     A Litigation Trust Advisory Board member and its representative shall be recused from the Litigation Trust Advisory Board's deliberations and votes on any matters as to which such member has a conflicting interest. If a Litigation Trust Advisory Board member or its representative does not recuse itself from any such matter, that Litigation Trust Advisory Board member and its representative may be recused from such matter by the majority vote of the remaining members of the Litigation Trust Advisory Board that are not recused from the matter. In such event, such recused member of the Litigation Trust Advisory Board can challenge such decision of the non-recused members of the Litigation Trust Advisory Board with the Bankruptcy Court, which shall have jurisdiction under the Plan to adjudicate such matter.

(h)     Litigation Trust Advisory Board members shall be reimbursed by the Litigation Trust for reasonable, documented out-of-pocket business expenses, other than attorneys' and other professionals' fees, incurred in connection with their service on the Litigation Trust Advisory Board. Litigation Trust Advisory Board members shall not receive any other compensation from the Litigation Trust for their services as Litigation Trust Advisory Board members.

6.3     Approval of the Litigation Trust Advisory Board.  Notwithstanding anything in this Agreement to the contrary, the Litigation Trustee shall submit to the Litigation Trust Advisory Board for its review and prior approval the following matters and any other matters that the Litigation Trust Advisory Board may direct the Litigation Trustee to submit for its approval or that expressly require the approval of the Litigation Trust Advisory Board pursuant to the terms of this Agreement:

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

      (a)     Any proposed final settlement or disposition in connection with a Litigation Trust Asset that has an asserted value of greater than $1,000,000; provided, that the Litigation Trustee will be authorized and empowered to take such action without any further (i) action by the Litigation Trust Advisory Board or (ii) order of the Bankruptcy Court, after at least [10] Business Days written notice to the members of the Litigation Trust Advisory Board and either (A) no objection is received from any member of the Litigation Trust Advisory Board or (B) subject to a further written agreement between the Litigation Trustee and the Litigation Trust Advisory Board;

      (b)     Any transaction to sell, assign, transfer, or abandon any other Litigation Trust Assets in which the amount of the transaction exceeds such amount as may be determined from time to time by the Litigation Trust Advisory Board;

      (c)     Determinations of the amounts of the Expense Reserve and the Litigation Trust Assets Available for Distribution;

      (d)     Determinations of the date and amount of all distributions made on dates other than a Distribution Date and determinations to defer distributions otherwise required on a Distribution Date;

      (e)     Any determinations to retain Litigation Trust Professionals (as defined below);

      (f)     Any determinations to initiate lawsuits or proceedings;

      (g)     Any actions that would give rise to or alleviate adverse tax consequences to the Litigation Trust or the Litigation Trust Beneficiaries; and

      (h)     The reports and budgets described in Section 4.5(a), (b) and (d).

If any objection is interposed by a member of the Litigation Trust Advisory Board to any proposed action of the Litigation Trustee with respect to the Litigation Trust Assets within the time periods prescribed herein, and the Litigation Trustee is not authorized to settle as a result of such objection, then (i) if the Litigation Trust Advisory Board member(s) withdraws for any reason its objection to the proposed action, the Litigation Trustee may pursue the proposed action in accordance with the procedures outlined above or (ii) if the Litigation Trust Advisory Board member(s) does not withdraw its objection, the Litigation Trustee will have the option of (A) foregoing the proposed course of action that is the subject of the Litigation Trust Advisory Board member(s)' objection, (B) modifying the proposed course of action in a way that results in the Litigation Trust Advisory Board member(s) withdrawing its objection, or (C) following five Business Days' written notice to the Litigation Trust Advisory Board, seeking an order of the Bankruptcy Court authorizing the Litigation Trustee to pursue the proposed course of action over the Litigation Trust Advisory Board member(s)' objection.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

6.4  <u>Limitations on Litigation Trustee</u>.  No part of the Litigation Trust Assets shall be used or disposed of by the Litigation Trustee in furtherance of any trade or business.  The Litigation Trustee shall, on behalf of the Litigation Trust, hold the Litigation Trust out as a trust in the process of liquidation and not as an investment company.  The Litigation Trustee shall not engage in any investments or activities inconsistent with the treatment of the Litigation Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) while the Litigation Trust qualifies as a liquidating trust; <u>provided, however</u>, that if the Litigation Trust (or a Delaware limited liability or limited liability partnership into which it shall be converted) shall be classified as a partnership for federal tax purposes under Treasury Regulations 301.7701-3 (but not a "publicly traded partnership" subject to Section 7704(a) of the Tax Code), the foregoing restrictions shall not apply.  The Litigation Trustee shall be restricted to the liquidation of the Litigation Trust Assets on behalf, and for the benefit, of the Litigation Trust Beneficiaries and the distribution and application of Litigation Trust Assets for the purposes set forth in this Agreement, the Plan, and the Confirmation Order, and the conservation and protection of the Litigation Trust Assets and the administration thereof in accordance with the provisions of this Agreement, the Plan, and the Confirmation Order.

6.5  <u>Agents and Professionals; Employees</u>.  The Litigation Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain, as approved by the Litigation Trust Advisory Board, independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Litigation Trustee to have qualifications necessary or desirable to assist in the proper administration of the Litigation Trust, including any estate professionals retained during the bankruptcy cases as may be appropriate in the circumstances (collectively, "<u>Litigation Trust Professionals</u>").  The Litigation Trustee shall pay the reasonable fees and expenses of the Litigation Trust Professionals out of the Litigation Trust Assets in the ordinary course of business without the need for approval of the Bankruptcy Court.  The Litigation Trust may, but shall not be required to, from time to time, employ Litigation Trust Professionals in such capacities as may be approved by the Litigation Trust Advisory Board.  In addition, the Litigation Trust may enter into an agreement with the Debtors to utilize the services of one or more employees of the Debtors.

6.6  <u>Investment of Litigation Trust Monies</u>.  The Litigation Trustee shall, as approved by the Litigation Trust Advisory Board, invest the proceeds of the Litigation Trust received by the Litigation Trustee or otherwise held by the Litigation Trustee in highly-rated short-term investments of which the length of term shall be consistent with the obligations to pay costs, expenses, and other obligations and make distributions under <u>Article IV</u> of this Agreement, which investments shall consist of (a) short-term investments issued or guaranteed by the United States or by a department, agency, or instrumentality of the United States, (b) other short-term instruments of the highest credit rating available of two nationally recognized rating agencies, or (c) other short-term investments approved by the Litigation Trust Advisory Board.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

### ARTICLE VII
### LITIGATION TRUSTEE / LITIGATION TRUST ADVISORY BOARD

7.1     Generally. The Litigation Trustee shall exercise such of the rights and powers vested in it by this Agreement, the Plan and the Confirmation Order, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of its own affairs. No provision of this Agreement, the Plan or the Confirmation Order shall be construed to relieve the Litigation Trustee from liability for its own gross negligence, fraud, or willful misconduct, except that the Litigation Trustee shall not be liable for any error of judgment or any action taken in good faith in reliance upon the advice of professionals retained by the Litigation Trustee in accordance with this Agreement.

7.2     Reliance by Litigation Trustee. Except as otherwise provided in this Agreement, the Plan or the Confirmation Order:

(a)     The Litigation Trustee may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document reasonably believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties; and

(b)     The Litigation Trustee may absolutely and unconditionally presume that any other parties purporting to give any notice of instructions in writing has been duly authorized to do so, and may rely on such notice; and

(c)     Persons (including any Litigation Trust Professionals retained in accordance with this Agreement) engaged in transactions with the Litigation Trustee shall look only to the Litigation Trust Assets to satisfy any liability incurred by the Litigation Trustee to such person in carrying out the terms of this Agreement, the Plan, or the Confirmation Order, and the Litigation Trustee shall have no personal or individual obligation to satisfy any such liability.

7.3     Liability to Third Persons. No Litigation Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract, or otherwise, to any person in connection with the Litigation Trust Assets or the affairs of the Litigation Trustee. The Litigation Trustee, the Litigation Trust Professionals, and the members of the Litigation Trust Advisory Board shall not be subject to any personal liability whatsoever, in tort, contract, or otherwise, to any person in connection with the Litigation Trust Assets or the affairs of the Litigation Trust, except for its own gross negligence, fraud, or willful misconduct, and all such persons shall look solely to the Litigation Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Litigation Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 7.3 shall be deemed to release any Litigation Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.4     Nonliability of Litigation Trustee for Acts of Others. Nothing contained in this Agreement, the Plan, or the Confirmation Order shall be deemed to be an assumption by the

-20-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Litigation Trustee of any of the liabilities, obligations, or duties of the Debtors or Litigation Trust Beneficiaries and shall not be deemed to be or contain a covenant or agreement by the Litigation Trustee to assume or accept any such liability, obligation, or duty. Any successor Litigation Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Litigation Trustee hereunder, and any statement or representation made as to the assets comprising the Litigation Trust Assets or as to any other fact bearing upon the prior administration of the Litigation Trust, so long as it has a good faith basis to do so. A Litigation Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement, or representation if it is later proved to be incomplete, inaccurate, or untrue. A Litigation Trustee or successor Litigation Trustee shall not be liable for any act or omission of any predecessor Litigation Trustee, nor have a duty to enforce any claims against any predecessor Litigation Trustee on account of any such act or omission, unless directed to do so by the Litigation Trust Advisory Board.

7.5     Indemnity. The Litigation Trustee, the members of the Litigation Trust Advisory Board, and their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives, and principals (collectively, the "Indemnified Parties") shall be indemnified and held harmless by the Litigation Trust, to the fullest extent permitted by law, solely from the Litigation Trust Assets, including any insurance obtained by the Litigation Trust for such purposes, for any losses, claims, damages, liabilities, and expenses, including, without limitation, reasonable attorneys' fees, disbursements, and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding, or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of the Litigation Trustee or the members of the Litigation Trust Advisory Board solely in their capacity as such; provided, however, that the Litigation Trust shall not be liable to indemnify any Indemnified Party for any act or omission constituting gross negligence, fraud, or willful misconduct. Notwithstanding any provision herein to the contrary, the Indemnified Parties shall be entitled to obtain advances from the Litigation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual, or alleged, of an Indemnified Party in its capacity as such; provided, however, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Litigation Trust upon the entry of a Final Order finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this Section 7.5. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.6     Compensation and Expenses. The Litigation Trustee shall receive fair and reasonable compensation for its services in accordance with the compensation schedule attached as [_____] hereto. The Litigation Trustee shall be entitled to reimburse itself and the Litigation Trust Professionals from the Litigation Trust Assets on a monthly basis for all reasonable out-of-pocket expenses actually incurred by it in the performance of its duties in accordance with this Agreement, and, when due, professionals' fees in accordance with the terms of such Litigation Trust Professionals' retention.