PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## ARTICLE VIII
## SUCCESSOR LITIGATION TRUSTEES

8.1    Resignation. The Litigation Trustee may resign from the Litigation Trust by giving at least 30 days prior written notice thereof to each member of the Litigation Trust Advisory Board. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice or (b) the effective date of the appointment of a successor Litigation Trustee in accordance with Section 8.4 hereof and such successor's acceptance of such appointment in accordance with Section 8.5 hereof.

8.2    Removal. The Litigation Trustee may be removed, with or without cause, by an affirmative vote of 66.66% of the members of the Litigation Trust Advisory Board. Such removal shall become effective on the date specified in such action by the Litigation Trust Advisory Board.

8.3    Effect of Resignation or Removal. The resignation, removal, incompetency, bankruptcy, or insolvency of the Litigation Trustee shall not operate to terminate the Litigation Trust or to revoke any existing agency created pursuant to the terms of this Agreement, the Plan, or the Confirmation Order or invalidate any action theretofore taken by the Litigation Trustee. All fees and expenses incurred by the Litigation Trustee prior to the resignation, incompetency, or removal of the Litigation Trustee shall be paid from the Litigation Trust Assets, unless such fees and expenses are disputed by (a) the Litigation Trust Advisory Board or (b) the successor Litigation Trustee, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Litigation Trustee that are subsequently allowed by the Bankruptcy Court shall be paid from the Litigation Trust Assets. In the event of the resignation or removal of the Litigation Trustee, such Litigation Trustee shall: (i) promptly execute and deliver such documents, instruments, and other writings as may be reasonably requested by the successor Litigation Trustee or directed by the Bankruptcy Court to effect the termination of such Litigation Trustee's capacity under this Agreement; (ii) promptly deliver to the successor Litigation Trustee all documents, instruments, records, and other writings related to the Litigation Trust as may be in the possession of such Litigation Trustee; provided, however, that such Litigation Trustee may retain one copy of each of such documents for its purposes, subject to the terms of any joint prosecution and common interest agreement to which the Litigation Trustee is a party; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Trustee.

8.4    Appointment of Successor. In the event of the resignation, removal, incompetency, bankruptcy, or insolvency of the Litigation Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by the affirmative vote of 66.66% of the Litigation Trust Advisory Board. In the event that a successor Litigation Trustee is not appointed within 30 days after the date of such vacancy, the Bankruptcy Court, upon its own motion or the motion of a Litigation Trust Beneficiary or member of the Litigation Trust Advisory Board, shall appoint a successor Litigation Trustee.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

8.5     Acceptance of Appointment by Successor Litigation Trustee.  Any successor Litigation Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and, in case of the Litigation Trustee's resignation, to the resigning Litigation Trustee.  Thereupon, such successor Litigation Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion, and privileges of its predecessor in the Litigation Trust with like effect as if originally named Litigation Trustee and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The resigning or removed Litigation Trustee shall duly assign, transfer, and deliver to such successor Litigation Trustee all property and money held by such retiring Litigation Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Litigation Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Trustee upon the Litigation Trust herein expressed, all the liabilities, duties, powers, rights, title, discretion, and privileges of such resigning or removed Litigation Trustee.

### ARTICLE IX
### MISCELLANEOUS PROVISIONS

9.1     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to conflicts of law).

9.2     Jurisdiction.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive jurisdiction over the Litigation Trust and the Litigation Trustee, including, without limitation, the administration and activities of the Litigation Trust and the Litigation Trustee; provided, however, that notwithstanding the foregoing, the Litigation Trustee shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any Causes of Action in respect of the Litigation Trusts Assets.

9.3     Severability.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

9.4     Notices.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by telex, facsimile, or other telegraphic means, sent by nationally recognized overnight delivery service, or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation, or (d) three Business Days after service by first class mail, to the receiving party's below address(es):

                    (i)      if to the Litigation Trustee, to:

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

[_____]

(ii)   if to a member of the Litigation Trust Advisory Board, to the address set forth on [_____], or such other address as may be provided to the Litigation Trustee by such member of the Litigation Trust Advisory Board.

(iii)   if to any Litigation Trust Beneficiary, to the last known address of such Litigation Trust Beneficiary according to the Litigation Trustee's records; and

(iv)   if to the Reorganized Debtors, to:

[_____]

with copy to:

[_____]

9.5    Headings. The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

9.6    Plan and Confirmation Order. The terms of this Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order. Accordingly, in the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan and the Confirmation Order, on the other hand, the provisions of the Plan and the Confirmation Order, as applicable, shall govern and control.

9.7    Cooperation. The Debtors and/or the Reorganized Debtors shall turn over or otherwise make available to the Litigation Trustee at no cost to the Litigation Trust or the Litigation Trustee, copies of all books and records reasonably required by the Litigation Trustee to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Litigation Trustee in carrying out its duties hereunder.

9.8    Entire Agreement. This Agreement and the Exhibits and Annexes attached hereto contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof. To the extent there is inconsistency between this Agreement and the Plan, the Plan shall control; provided, however, that the Confirmation Order shall control over the Plan.

9.9    Amendment. This Agreement may be amended by (a) order of the Bankruptcy Court or (b) approval by the Litigation Trustee and all members of the Litigation Trust Advisory Board; provided, however, that the approval of the Bankruptcy Court shall be required for any changes or amendments to this Agreement that are inconsistent with the terms of the Plan or the

-24-

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Confirmation Order. In the event that the Litigation Trust shall fail or cease to qualify as a liquidating trust in accordance with Treasury Regulations Section 301.7701-4(d), this Agreement may be amended by the Litigation Trustee to the extent necessary for the Litigation Trustee to take such action as it shall deem appropriate to have the Litigation Trust classified as a partnership for federal tax purposes under Treasury Regulations Section 301.7701-3 (but not a "publicly traded partnership" subject to Section 7704(a) of the Tax Code), including, if necessary, creating or converting it into a Delaware limited liability partnership or limited liability company that is so classified.

9.10    Meanings of Other Terms. Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations, and other entities. All references herein to Articles, Sections, and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections, and other subdivisions of this Agreement, and the words herein and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. The term "including" shall mean "including, without limitation."

9.11    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument. A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

**[Remainder of Page Blank — Signature Page Follows]**

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives, or agents, effective as of the date first above written.

**RHODES COMPANIES LLC,**
**on its own behalf as a Debtor and**
**a Reorganized Entity and on behalf of**
**each other Debtor and Reorganized**
**Entity**

[_____], as the
**Reorganized Debtor**

By:_____
Name:
Title:

By:_____
Name:
Title:

[_____], as Litigation Trustee

By:_____
Name:
Title:

26

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**APACHE FRAMING, LLC**

**BATCAVE, LP**

By:_____

By:_____

Name:

Name:

Title:

Title:

**BRAVO INC.**

**C&J HOLDINGS, INC.**

By:_____

Name:

By:_____

Title:

Name:

Title:

**CHALKLINE, LP**

**ELKHORN INVESTMENTS, INC.**

By:_____

By:_____

Name:

Name:

Title:

Title:

**ELKHORN PARTNERS, A NEVADA LIMITED PARTNERSHIP**

**GERONIMO PLUMBING, LLC**

By:_____

By:_____

Name:

Name:

Title:

Title:

**GLYNDA, LP**

**GUNG-HO CONCRETE, LLC**

By:_____

By:_____

Name:

Name:

Title:

Title:

27

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**HERITAGE LAND COMPANY, LLC**

By:_____
Name:
Title:

**JACKKNIFE, LP**

By:_____
Name:
Title:

**JARUPA LLC**

By:_____
Name:
Title:

**OVERFLOW, LP**

By:_____
Name:
Title:

**PARCEL 20 LLC**

By:_____
Name:
Title:

**PINNACLE GRADING, LLC**

By:_____
Name:
Title:

**RHODES ARIZONA PROPERTIES, LLC**

By:_____
Name:
Title:

**RHODES DESIGN AND DEVELOPMENT CORP.**

By:_____
Name:
Title:

**RHODES HOMES ARIZONA, LLC**

By:_____
Name:
Title:

**RHODES RANCH GENERAL PARTNERSHIP**

By:_____
Name:
Title:

28

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**RHODES RANCH GOLF AND COUNTRY CLUB**    **RHODES REALTY, INC.**

By:_____    By:_____
Name:    Name:
Title:    Title:


**SIX FEATHERS HOLDINGS, LLC**    **TICK, LP**

By:_____    By:_____
Name:    Name:
Title:    Title:


**TRIBES HOLDINGS LLC**    **TUSCANY ACQUISITIONS, LLC**

By:_____    By:_____
Name:    Name:
Title:    Title:


**TUSCANY ACQUISITIONS II, LLC**    **TUSCANY ACQUISITIONS III, LLC**

By:_____    By:_____
Name:    Name:
Title:    Title:


**TUSCANY ACQUISITIONS IV, LLC**    **TUSCANY GOLF COUNTRY CLUB, LLC**

By:_____    By:_____
Name:    Name:
Title:    Title:

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

WALLBOARD, LP.

By:_____

Name:

Title:

30

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## Annex A

The composition of the Litigation Trust Advisory Board shall be determined by the First Lien Steering Committee and shall be disclosed at or prior to the Plan confirmation hearing.

31

**Exhibit J**

Newco LLC Operating Agreement

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

# PRELIMINARY DRAFT AGREEMENT -- SUBJECT TO CONTINUING AMENDMENT AND REVIEW

[NEWCO], LLC

(A DELAWARE LIMITED LIABILITY COMPANY)

LIMITED LIABILITY COMPANY OPERATING AGREEMENT

JANUARY [＿＿＿], 2010

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

## TABLE OF CONTENTS

Page

Section 1.    Definitions; Rules of Construction. ...........................................................................1

Section 2.    Name; Company History; Bylaws; Schedule of Members; Capital
              Contributions...............................................................................................................2

Section 3.    Purpose; No Termination. ...........................................................................................3

Section 4.    Offices..........................................................................................................................3

Section 5.    Management of the Company; Board of Managers.................................................3

Section 6.    Company Actions Requiring Approvals. ....................................................................5

Section 7.    Authorized Units; Preemptive Rights. ........................................................................7

Section 8.    Conversion Rights of Class B Units. ...........................................................................9

Section 9.    Voting Rights. ............................................................................................................10

Section 10.   Representations by Members Upon Acquisition or Receipt of Units. ...................10

Section 11.   Distributions Generally. ............................................................................................12

Section 12.   Discretionary and Liquidating Distributions. ..........................................................12

Section 13.   Tax Distributions.......................................................................................................12

Section 14.   Distributions In Kind. ................................................................................................13

Section 15.   Capital Accounts. ......................................................................................................13

Section 16.   Book Allocations of Net Profit and Net Loss. .........................................................13

Section 17.   Special Book Allocations...........................................................................................14

Section 18.   Tax Allocations. ........................................................................................................15

Section 19.   Liability for Return of Capital. ..................................................................................15

Section 20.   Tax Reports and Elections. .......................................................................................16

Section 21.   Transfer Restrictions. ................................................................................................18

Section 22.   Withdrawal.................................................................................................................20

Section 23.   Additional Members. .................................................................................................20

Section 24.   Dissolving Events. .....................................................................................................21

Section 25.   Dissolution and Winding-Up. ...................................................................................21

Section 26.   Distributions in Cash or in Kind Upon Dissolution.................................................21

Section 27.   Termination Upon Dissolution..................................................................................22

i

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Section 28.  Information Rights; Observer Rights; Confidentiality; Other Restrictive Covenants...................................................................................................................22

Section 29.  Registration Rights................................................................................................23

Section 30.  Exculpation and Indemnification..........................................................................23

Section 31.  Insurance...............................................................................................................25

Section 32.  Competitive Opportunity. ....................................................................................25

Section 33.  Notices. .................................................................................................................26

Section 34.  Amendments. ........................................................................................................26

Section 35.  Certain Members...................................................................................................27

Section 36.  Management Members' Services. ..........................................................................27

Section 37.  No Conflicting Agreements. .................................................................................27

Section 38.  Entire Agreement. .................................................................................................27

Section 39.  Governing Law; Jurisdiction, Waiver of Jury Trial. ............................................28

Section 40.  No Third Party Beneficiaries. ...............................................................................28

Section 41.  Further Assurances.................................................................................................28

Section 42.  Counterparts...........................................................................................................29

Section 43.  Separability of Provisions. ...................................................................................29

Section 44.  Spousal Consent.....................................................................................................29

Section 45.  Recapitalizations, Exchanges, Splits, Etc. ...........................................................29

Section 46.  Remedies................................................................................................................30

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

<u>Annex, Schedules and Exhibits</u>

**Annex**

Annex 1          ·     Definitions

**Schedules**

Schedule 1       --    Schedule of Members and Unit Ownership

**Exhibits**

Exhibit A        --    Bylaws of the Company

Exhibit B        --    Joinder Agreement

Exhibit C        --    Spousal Consent

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

# PRELIMINARY DRAFT AGREEMENT — SUBJECT TO CONTINUING AMENDMENT AND REVIEW

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**, dated as of [            ], 2010 (this "Agreement"), of [Newco], LLC, a Delaware limited liability company (the "Company"), among the Company and the parties listed on Schedule I hereto from time to time.

**WHEREAS**, the parties hereto are entering into this Agreement for the purpose of governing the affairs of, and the conduct of the business of, a limited liability company formed pursuant to the provisions of the Delaware Limited Liability Company Act, codified in the Delaware Code Annotated, Title 6, Section 18-101, et seq., as the same may be amended from time to time (the "Delaware Act").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as set forth below.

**Section 1.**    **Definitions; Rules of Construction.**

(a)    Capitalized terms used in this Agreement are defined in Annex I hereto.

(b)    The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require.

(c)    Except when the context requires otherwise, any reference in this Agreement to a singular number shall include the plural.

(d)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not so followed.

(e)    All references to "$" or dollar amounts are to lawful currency of the United States of America, unless otherwise expressly stated.

(f)    Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope or intent of this Agreement or of any of its provisions. All references in this Agreement to any numbered Sections are, unless otherwise indicated, references to the Sections of this Agreement which are so numbered.

1

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

All references to the numbered or lettered Exhibits are references to the Exhibits so numbered or lettered which are appended to this Agreement, as such Exhibits may be amended, supplemented or otherwise modified from time to time. Such references to Exhibits are to be construed as incorporating by reference the contents of each Exhibit to which such reference is made as though such contents were set out in full at the place in this Agreement where such reference is made.

**Section 2.    Name; Company History; Bylaws; Schedule of Members; Capital Contributions.**

(a)    The name of the Company shall be "[Newco], LLC" or such other name as the Board of Managers may from time to time hereafter designate; provided, however, that any such name shall comply with the Delaware Act.

(b)    The Company was formed upon the execution and filing by [_____] (such Person being hereby authorized to take such action) with the Secretary of State of the State of Delaware of a certificate of formation (the "Certificate") of the Company on [_____], 2009. The parties hereto ratify and confirm the filing of the Certificate.

(c)    The bylaws of the Company attached hereto as Exhibit A (as amended, restated, supplemented or otherwise modified from time to time, the "Bylaws") are hereby adopted and approved by the Members.

(d)    This Agreement (including the definitions set forth in Annex I hereto) and the Bylaws are intended to serve as a "limited liability company agreement," as such term is defined in Section 18-101(7) of the Delaware Act.

(e)    The name and business, mailing or residence address of each of the Members of the Company are set forth on Schedule I hereto. The Board of Managers shall amend Schedule I from time to time to accurately reflect the names and business, mailing or residence addresses of each of the Members and each of the Persons who shall become Members after the Effective Date. Any Person (other than a Member on the Effective Date) who holds Units in accordance with the terms hereof shall execute and deliver to the Company a Joinder Agreement, substantially in the form of Exhibit B hereto, pursuant to which such Person will thereupon become a party to and be bound by and obligated to comply with all of the terms and provisions of this Agreement.

(f)    Capital Contributions. No Member shall be obligated to make any Capital Contributions to the Company. Subject to the approval of the Board of Managers and the other terms of this Agreement, the Members may make additional Capital Contributions to the Company from time to time through the purchase of additional Units.

2

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**Section 3.**     **Purpose; No Termination.**

(a)     The purpose of the Company shall be to engage in any lawful business activities that may be engaged in by a limited liability company organized under the Delaware Act, as such business activities may be determined by the Board of Managers from time to time.

(b)     No Member's death, status as a debtor in a bankruptcy case, disability, resignation, retirement or other termination of employment with the Company or any Affiliate thereof shall result in the dissolution, winding up or termination of the Company.

**Section 4.**     **Offices.**

(a)     The principal office of the Company, and such additional offices as the Board of Managers may establish, shall be located at such place or places inside or outside the State of Delaware as the Board of Managers may designate from time to time.  The initial principal office of the Company is set forth in Section 33(a)(i).

(b)     The registered  office of the Company in the State of Delaware shall be 1209 Orange Street, Wilmington, Delaware 19801 or as hereafter determined by the Board of Managers in accordance with Delaware Act.  The registered agent of the Company for service of process at such address shall be The Corporation Trust Company or as hereafter determined by the Board of Managers in accordance with Delaware Act.

**Section 5.**     **Management of the Company; Board of Managers.**

(a)     Subject to the delegation of rights and powers provided for herein and in the Bylaws, the Board of Managers shall have the sole right to manage the business and affairs of the Company and shall have all powers and rights necessary, appropriate or advisable to effectuate and carry out the purposes and business of the Company.  The Board of Managers shall consist initially of five (5) Managers, appointed from time to time in accordance with this Agreement and the Bylaws. Notwithstanding the foregoing, upon the affirmative vote of a majority of the Board of Managers, the chief executive officer or the senior representative of the Operations Manager, if any, may be appointed as a sixth Manager. Each Manager shall have one vote with respect to any matters that come before the Board of Managers.  Each Member agrees to vote all of his Units on matters subject to the vote of such Member and to take all other necessary or desirable actions within his control (whether in such Member's capacity as a Member or otherwise, and including, without limitation, attendance at meetings in person or by proxy for purposes of obtaining a quorum and execution of written consents in lieu of meetings), and the Company will, as promptly as practicable, take all necessary and desirable actions within its control (including, without limitation, calling special meetings of the Board of Managers and the Members), so that each Manager on the Board of Managers shall be elected from nominees determined, or removed as directed, as follows:

(i)     For so long as the Highland Managed Funds collectively continues to own at least 15.0% of the outstanding Units (excluding any Securities of the Company

3

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services), the Highland Managed Funds shall be entitled (A) to nominate one individual to the Board of Managers to serve as Manager (the "Highland Manager") until his successor is elected and qualified, (B) to nominate each successor to the Highland Manager and (C) to direct the removal from the Board of Managers of the Highland Manager nominated under the foregoing clauses (A) and (B).

(ii)     For so long as Credit Suisse Loan Funding and Credit Suisse SWAP continue to own, in the aggregate, at least 15.0% of the outstanding Units (excluding any Securities of the Company issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services), Credit Suisse Loan Funding and Credit Suisse SWAP, collectively, shall be entitled (A) to nominate one individual to the Board of Managers to serve as Manager (the "Credit Suisse Manager") until his successor is elected and qualified, (B) to nominate each successor to the Credit Suisse Manager and (C) to direct the removal from the Board of Managers of the Credit Suisse Manager nominated under the foregoing clauses (A) and (B).

(iii)    For so long as CSAM and Candlewood continue to own, in the aggregate, at least 15.0% of the outstanding Units (excluding any Securities of the Company issued or granted to Managers, directors, officers or employees of the Company or its Subsidiaries as incentive compensation for services), CSAM and Candlewood, collectively, shall be entitled (A) to nominate one individual to the Board of Managers to serve as Manager (the "CSAM Manager") until his successor is elected and qualified, (B) to nominate each successor to the CSAM Manager and (C) to direct the removal from the Board of Managers of the CSAM Manager nominated under the foregoing clauses (A) and (B).

(iv)    The remaining Managers, and, to the extent that any of the Highland Managed Funds, Credit Suisse Loan Funding, Credit Suisse SWAP, CSAM or Candlewood loses its right to appoint a Manager pursuant to the above provisions, the relevant board seat(s), will thereafter be designated for nomination and election, and such Managers may be removed by an affirmative vote of the Members holding at least a majority of the outstanding Class A Units (excluding any Member who has the right to nominate a Manager pursuant to paragraphs (i) through (iii) above for so long as such Member has such right). Any Manager appointed pursuant to this Section 5(a)(iv) shall not be an Affiliate of any Member and the qualifications, experience, integrity, independence and disinterestedness of any such Manager shall be satisfactory to the Members holding at least a majority of the outstanding Class A Units (excluding any Member who has the right to nominate a Manager pursuant to paragraphs (i) through (iii) above for so long as such Member has such right).

(b)     Except to the extent any Member loses its rights to nominate a Manager as set forth in Section 5(a), (i) no Manager elected pursuant to Section 5(a)(i), (ii) or (iii) may be removed without the consent of the Member who is entitled to nominate such individual as a

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Manager pursuant this Agreement, (ii) such Manager may only be removed at the direction of the party that was entitled to nominate such Manager and (iii) the vacancy created by any former Manager may only be filled by a nominee of the party that was entitled to nominate such former Manager.

(c)     Subject to the foregoing, in the event a vacancy is created on the Board of Managers by reason of the death, disability, resignation or termination (with cause or without cause) of any Manager, each of the Members hereby agrees that such vacancy shall be filled in accordance with the procedures set forth in this Section 5.

(d)     The Company shall reimburse each Manager for all necessary and proper costs and expenses (including reasonable and properly documented travel, lodging and meal expenses) incurred in connection with such Manager's attendance and participation at meetings of the Board of Managers to the extent not otherwise reimbursed by the Company or any of its Subsidiaries by virtue of the status of such Manager as an employee or service provider of the Company or any of its Subsidiaries.

(e)     The nominees designated in Section 5(a) will be elected as Managers at any annual or special meeting of the Members (or by written consent in lieu of a meeting of the Members) and will serve until their successors are duly elected and qualified pursuant to the terms of this Agreement and the Bylaws or until their earlier death, disability, resignation, termination (with cause or without cause) or other removal.  The Members will vote all of their Units in order to elect or remove the Managers as designated pursuant to Section 5(a).

(f)     No Member, by reason of such Member's status as a Member, shall have any authority to act for or bind the Company but shall have only the right to vote on or approve the actions to be voted on or approved by such Member as specified in this Agreement or the Bylaws or as required under the Delaware Act.

(g)     The officers of the Company shall be elected, removed and perform such functions as are provided in the Bylaws.  The Board of Managers may delegate to any officer of the Company or to any such other Person such authority to act on behalf of the Company as the Board of Managers may from time to time deem appropriate in its sole discretion.

**Section 6.     Company Actions Requiring Approvals.**

(a)     Without the affirmative vote of (x) the Board of Managers and (y) Members owning at least a majority of the then outstanding Units, voting together as a single class, the Company shall not, and shall cause each of its Subsidiaries not to, take any of the following actions:

(i)     sell, transfer or otherwise dispose of any asset of the Company or any of its Subsidiaries for consideration in excess of $20,000,000;

5

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(ii)     sell, transfer or otherwise dispose of the Rhodes Ranch master planned community for consideration in excess of $[60,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Rhodes Ranch master planned community);

(iii)    sell, transfer or otherwise dispose of the Tuscany master planned community for consideration in excess of $[40,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Tuscany master planned community);

(iv)     enter into any recapitalization, reorganization, consolidation or merger of the Company or sell all or substantially all of the consolidated assets of the Company, in each case, for consideration in excess of $[100,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior recapitalizations, reorganizations, consolidations or asset sales); or

(v)      agree to any of the foregoing.

(b)     Without the prior approval of (x) the Board of Managers and (y) Members owning at least 66.66% of the then outstanding Units, voting together as a single class, the Company shall not, and shall cause each of its Subsidiaries not to, take any of the following actions:

(i)      except as otherwise set forth in Section 5(a), increase or decrease the size of the Board of Managers;

(ii)     except for transactions between the Company and its Subsidiaries, enter into any transaction with any Affiliate of a Member or any Affiliate of an officer or manager of the Company or its Subsidiaries (other than in the ordinary course of business on commercially reasonable terms no less favorable to the Company and its Subsidiaries than what a third-party negotiating on an arms-length basis could reasonably expect);

(iii)    change the nature of the Company's or its Subsidiaries' primary business;

(iv)     incur any indebtedness other than (A) in the ordinary course of business, (B) the New First Lien Notes and (C) indebtedness permitted to be incurred under the New First Lien Notes;

(v)      create, authorize or issue, or grant any options, warrants, or other rights to purchase or obtain any Units of the Company ranking pari passu with or senior to the Units as to dividends or liquidation preference, or modifying any of the rights of any class or series of Units;

6

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(vi)     enter into any transaction or series of transactions to effect the liquidation, dissolution or winding up of the Company;

(vii)    enter into a transaction providing for the use of any parcel of real property owned by the Company, other than for the development of residential homes and communities and commercial development currently contemplated by the Company's business plan as of the Effective Date;

(viii)   sell, transfer or otherwise dispose of the Rhodes Ranch master planned community for consideration less than $[60,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Rhodes Ranch master planned community);

(ix)     sell, transfer or otherwise dispose of the Tuscany master planned community for consideration less than $[40,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior sales of assets associated with the Tuscany master planned community);

(x)      enter into any recapitalization, reorganization, consolidation or merger or sell all or substantially all of the assets of the Company, in each case for consideration less than $[100,000,000] (such amount to be reduced by any net cash proceeds received by the Company for any prior recapitalizations, reorganizations, consolidations or asset sales);

(xi)     make any investments in, or acquire the Securities of, any Person (other than wholly-owned Subsidiaries of the Company having no material assets);

(xii)    purchase, redeem or otherwise acquire for value (or pay into or set aside a sinking fund for such purpose) Securities of the Company (other than any Securities owned by any employee of the Company upon such employee's termination of employment);

(xiii)   agree to become liable for any indemnification obligation that is out of the ordinary course of business, including without limitation, any indemnification obligation in connection with the environmental condition of any parcel of real property owned by the Company or any of its Subsidiaries and sold out of the ordinary course of business; or

(xiv)    agree to any of the foregoing.

**Section 7.     Authorized Units; Preemptive Rights.**

(a)      Authorized Units.  The Company shall be authorized to issue from time to time up to an aggregate of 125,000 Units, consisting of two classes of Units, as follows: (i) 100,000 Class A Units and (ii) 25,000 Class B Units. Each authorized Unit may be issued

7

pursuant to such agreements and on such terms (including valuation and pricing) as the Board of Managers shall approve. In addition, the Company may reissue any Units that have been repurchased by the Company. The Board of Managers shall have the right to increase the number of authorized Units from time to time. Fractional Units may be issued.

(b)    Preemptive Rights. After the Effective Date and prior to any IPO or Sale of the Company, other than in the case of issuances or grants of any Excluded Securities, the Company shall not (x) issue additional Units, warrants and/or any other Securities of the Company convertible into or exchangeable for Units to any Person or (y) issue any debt to any Member of the Company or any of its Affiliates ((x) and (y) hereinafter referred to as "New Securities"), in each case, other than in accordance with the following terms:

(i)    The Company shall not issue any New Securities unless it first delivers to each Member who holds Units and is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) (each such Person, a "Buyer"), a written notice ("Notice of Proposed Issuance") specifying the type, total number and all the material terms of such New Securities that the Company then intends to issue, and stating that the Buyer shall have the right to purchase the New Securities in the manner specified in this Section 7(b) for the same price per New Security and in accordance with the same terms and conditions specified in such Notice of Proposed Issuance.

(ii)    During the ten Business Day period commencing on the date the Company delivers to the Buyers the Notice of Proposed Issuance ("Exercise Period") in accordance with Section 7(b)(i), the Buyers shall have the right (but not the obligation), to purchase New Securities at the same price per New Security and upon the same terms and conditions specified in the Notice of Proposed Issuance. Each Buyer electing to purchase New Securities must give irrevocable written notice of its election to the Company prior to the expiration of the Exercise Period, and if a Buyer has not provided such irrevocable notice within the Exercise Period, such Buyer shall be deemed to have waived and rejected its right to purchase New Securities. If the New Securities are being offered as part of an investment unit together with debt or other instruments, any election by a Buyer to purchase New Securities shall also constitute an election to purchase a like portion of such debt or other instruments.

(iii)    Each Buyer shall have the right to purchase its Pro Rata Portion of New Securities.

(iv)    If some or all of the New Securities have not been purchased by the Buyers pursuant to paragraphs (i)-(iii) of this Section 7(b), then the Company shall offer such remaining New Securities to any of the Buyers who have exercised their right to purchase their respective full Pro Rata Portion of the New Securities and have indicated a desire to purchase any unsubscribed New Securities. If some or all of the New Securities have not been purchased by the Buyers pursuant to paragraphs (i) – (iii) of this Section 7(b) and the immediately prior sentence, then the Company shall have the

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

right to issue such remaining New Securities to one or more parties at not less than, and on terms no more favorable to the buyers thereof than, the price and other terms specified in the Notice of Proposed Issuance. If such issuance or sale is not closed within 90 days after the expiration of the Exercise Period the Company shall not thereafter issue or sell any New Securities, without first again offering such New Securities to the Members in the manner provided in this Section 7(b).

(v)　　The Notice of Proposed Issuance shall specify the place, time and date of the consummation of the purchase of the New Securities.

(vi)　　If any Class A Units are included in the New Securities, each Member shall have the right to elect to purchase Class B Units in lieu of Class A Units on identical terms as offered with respect to the Class A Units.

(vii)　　Nothing in Section 7(b) or any other provision of this Agreement shall prevent the Company from issuing or selling to any Person any New Securities without first complying with the provisions of Section 7(b); provided, that in connection with such issuance or sale (a) the Company gives reasonably prompt notice to the other Members of such investment (prior to such investment having occurred), which notice shall describe in reasonable detail the New Securities being purchased by the Person making such purchase (for purposes of this Section 7, the "Purchasing Member") and the purchase price thereof and (b) the Purchasing Member and the Company enable the other Members to effectively exercise their respective rights under Section 7(b) with respect to their purchase of their Pro Rata Portion of the New Securities issued to the Purchasing Member within 45 days after such purchase by the Purchasing Member on the terms specified in Section 7(b).

**Section 8.　　Conversion Rights of Class B Units.**

At any time and from time to time after the Effective Date, each Class B Unit shall be convertible, at the option of the holder thereof, at the principal office of the Company, into an equal number of validly issued, fully paid and nonassessable Class A Units. Before any holder of Class B Units shall be entitled to convert the same into Class A Units pursuant to this Section 8, such holder shall give written notice to the Company at its principal office, of the election to convert the same. The Company shall, as soon as practicable thereafter, issue to such holder of Class B Units, an acknowledgment of registration for the number of Class A Units to which such holder shall be entitled as aforesaid and shall amend Schedule I hereto to reflect such conversion. The issuance of Class A Units upon conversion of the Class B Units shall be made without charge to the holders of Class B Units. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of receipt of notice thereof, and the Person entitled to receive the Class A Units issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Class A Units as of such date.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**Section 9.**     **Voting Rights.**

On any matter to be voted on by the Members hereunder, each Member shall have one vote for each Class A Unit held by such Member and the holders of Class B Units shall have no voting rights, other than as specifically set forth in Section 6, Section 21(c) and Section 34.

**Section 10.**     **Representations by Members Upon Acquisition or Receipt of Units.**

Upon the acquisition or receipt of any Units, in addition to any other representations and warranties set forth in any other document required by the Board of Managers with respect to such acquisition or receipt, each Member makes the representations and warranties set forth below to the Company and the other Members with respect to such Units, effective upon the acquisition or receipt thereof and upon such Member's execution and delivery of a counterpart hereof or such other document required by the Board of Managers.

(a)     Such Member is acquiring the Units for his own account, for investment and not with a view to the Distribution thereof or any interest therein in violation of the Securities Act or applicable state securities laws.

(b)     Such Member understands that (i) the Units have not been registered under the Securities Act by reason of their issuance by the Company in a transaction exempt from the registration requirements of the Securities Act and Applicable Law and (ii) the Units must be held by such Member indefinitely unless a subsequent Transfer thereof is registered under the Securities Act and Applicable Law or is exempt from such registration.

(c)     Such Member further understands that the exemption from registration afforded by Rule 144 (the provisions of which are known to such Member) promulgated under the Securities Act ("Rule 144") depends on the satisfaction of various conditions, and that, if applicable, Rule 144 may afford the basis for sales of the Units acquired hereunder in limited amounts.

(d)     Such Member (i) is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) or (ii) has a pre-existing personal or business relationship with the Company, its Subsidiaries or certain members of the Board of Managers or officers of the Company which is of a nature and duration sufficient to make such Member aware of the character, business acumen and general business and financial circumstances of the Company, and/or such Members or the Board of Managers or officers of the Company, if any.

(e)     The Company has made available to such Member or its representatives all agreements, documents, records and books that such Member has requested relating to an investment in the Units being acquired by the Member. Such Member has had an opportunity to ask questions of, and receive answers from, Persons acting on behalf of the Company, concerning the terms and conditions of this investment, and answers have been provided to all of such questions to the full satisfaction of such Member. Such Member has such knowledge and

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

experience in financial and business matters that it is capable of evaluating the risks and merits of this investment and to suffer a complete loss of its investment.

(f)     Such Member has no need for liquidity in its investment in the Units. Such Member can bear the economic risk of investment in the Units and has such knowledge and experience in financial or business matters to be capable of evaluating the merits and risks of the investment in the Units. Such Member has consulted with its professional, tax and legal advisors with respect to the federal, state, local and foreign income tax consequences of such Member's participation as a Member of the Company.

(g)     Such Member understands that there is no public market for the Units and that the transferability of the Units is restricted.

(h)     The execution, delivery and performance of this Agreement by such Member has been duly authorized. This Agreement has been duly executed and delivered by such Member and (assuming the valid authorization, execution and delivery of this Agreement by the other parties hereto) is the legal, valid and binding agreement of such Member, enforceable against such Member in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium, and similar laws of general application relating to or affecting creditors' rights and to general equity principles.

(i)     Such Member has not granted and is not a party to any proxy, voting trust or other agreement which is inconsistent with or conflicts with the provisions of this Agreement without the prior written consent of the Board of Managers.

(j)     The execution, delivery and performance by such Member of this Agreement, the consummation of the transactions contemplated hereby, and the compliance by such Member with the provisions hereof will not (i) conflict with or result in a breach of any provision of the certificate of incorporation, bylaws, operating agreement, formation agreement, partnership agreement or any other organizational document of such Member, as applicable, (ii) violate or conflict with or constitute (with notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, or result in the creation of any encumbrance upon such Member's Units pursuant to, the terms, conditions or provisions of any contract, note, bond, lease, mortgage, indenture, license, agreement or other instrument or obligation to which such Member is a party or by which such Member or such Member's properties or assets are bound or (iii) violate any provision of Applicable Law or any order, judgment, award, writ, injunction or decree applicable to such Member or any of such Member's properties or assets.

(k)     No permit, authorization, consent or approval of or by, or notification of or filing with, any Person is required in connection with the execution, delivery or performance by such Member of this Agreement.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**Section 11.    Distributions Generally.**

Any Distributions of cash or other assets by the Company to Members shall be made in accordance with Section 11 through Section 14. Available cash shall be distributed, at such times and in such amounts as the Board of Managers determines in its discretion. Notwithstanding any other provision hereof, the Company shall cause its Subsidiaries to distribute or otherwise transfer to the Company, to the fullest extent possible within the limits imposed by Applicable Law, the cash or cash equivalents necessary for the Company to make the Distributions to be made hereunder.

**Section 12.    Discretionary and Liquidating Distributions.**

(a)    Subject to the other provisions of Section 11 through Section 14, in the discretion of the Board of Managers, the Company may distribute available cash from time to time to the holders of Units in accordance with their Pro Rata Portion.

(b)    Notwithstanding anything to the contrary contained herein, the Company may issue from time to time, pursuant to an equity incentive plan approved by the Board of Managers, additional units or Securities of the Company representing up to 10% of the economic value of the equity of the Company as equity incentives to employees, officers, managers, directors and/or consultants or service providers of the Company, and that such issuances will be dilutive to all Units proportionately.

**Section 13.    Tax Distributions.**

To the extent of available cash and to the extent permitted by the Delaware Act, the Board of Managers shall cause the Company to make distributions to the Members to provide them with funds to pay applicable United States federal, state and local income tax liabilities attributable to Company income allocated to them pursuant to Section 18 (calculated based on the Assumed Tax Rate taking into account any losses of the Company (including prior year losses) to the extent such losses are available under such income tax laws applicable to corporations to offset such income (or would be available if losses utilized against income other than Company income in prior years were instead carried forward to offset Company income in subsequent years) ("Tax Distributions"). Any Tax Distribution shall be made to all such Members, whether or not they are subject to United States federal, state and local income taxes, in the same proportions as the Company taxable income is allocated in accordance with Section 18. The Company shall make Tax Distributions quarterly based on the Board of Managers good faith calculation of such distribution. With respect to a Fiscal Year, the excess of (a) the aggregate quarterly Tax Distributions made to a Member, over (b) the amount of Tax Distributions that would be permitted to be made to a Member pursuant to this Section 13 if only annual distributions were permitted, shall be treated as an advance of, and shall reduce, subsequent Tax Distributions which such Member would otherwise be entitled to receive pursuant to this Section 13.

12

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**Section 14.    Distributions In Kind.**

If the Company makes Distributions in kind, then (a) for purposes of making Distributions under Section 12 hereof, the Distribution shall only be included in calculating the thresholds set forth in Section 12 at such time as such Distribution in kind is converted to cash by sale or otherwise and (b) for all other purposes of this Agreement, the Distribution shall be treated as if the Company had sold such distributed property for cash in an amount equal to the Fair Market Value of such property and distributed such cash to the Members instead.

**Section 15.    Capital Accounts.**

A separate capital account (a "Capital Account") shall be established and maintained for each Member. The initial Capital Account of each Member shall equal the amount next to such Member's name as shown on Schedule I[1] on the Effective Date. As of the end of each Accounting Period, the balance in each Member's Capital Account shall be adjusted by (a) increasing such balance by such Member's (i) allocable share of Net Profit (allocated in accordance with Section 16) and (ii) the amount of cash and the Fair Market Value of any property (as of the date of the contribution thereof and net of any liabilities encumbering such property) contributed by such Member to the Company during such Accounting Period, if any, and (b) decreasing such balance by (i) the amount of cash and the Fair Market Value of any property (as of the date of the Distribution thereof and net of any liabilities encumbering such property) distributed to such Member during such Accounting Period and (ii) such Member's allocable share of Net Loss (allocated in accordance with Section 16). Each Member's Capital Account shall be further adjusted with respect to any Special Book Allocations pursuant to Section 17. The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations § 1.704-1(b) and § 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations. At no time during the term of the Company or upon dissolution and liquidation thereof shall a Member with a negative balance in its Capital Account have any obligation to the Company or the other Members to restore such negative balance, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 16.    Book Allocations of Net Profit and Net Loss.**

Except as otherwise provided in Section 17 or elsewhere in this Agreement, Net Profit and Net Loss and to the extent necessary, individual items of income, gain or loss or deduction of the Company, shall be allocated among the Members in a manner such that the Capital Account of each Member, after giving effect to such allocation and the Special Book Allocations set forth in Section 17, is, as nearly as possible, equal (proportionately) to (a) the Distributions that would be made pursuant to Section 12 (taking into account and treating as distributed any amounts set

---

[1]    To be equal to each Member's pro rata share of the purchase price/Fair Market Value of the assets on formation.

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

aside with respect to Unvested Units) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Carrying Value (except that any Company asset that is realized in such Fiscal Year shall be treated as if sold for an amount of cash equal to the sum of any net cash proceeds and the Fair Market Value of any property actually received by the Company in connection with such disposition), all Company liabilities were satisfied (limited with respect to each non-recourse liability to the Carrying Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with <u>Section 12</u> to the Members immediately after making such allocation, <u>minus</u> (b) such Member's share of "partnership minimum gain" (as determined pursuant to Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d)) and partner nonrecourse debt minimum gain, computed immediately prior to the hypothetical sale of assets. For purposes of the preceding sentence, "partner nonrecourse minimum gain" shall mean an amount, with respect to each "partner nonrecourse debt" (as defined in Treasury Regulations § 1-704-2(b)(4)), equal to the partner nonrecourse minimum gain that would result if the partner nonrecourse debt were treated as a nonrecourse liability pursuant to Treasury Regulations § 1.704-2(i)(3).

**Section 17.    Special Book Allocations.**

(a)    <u>Qualified Income Offset</u>. If any Member unexpectedly receives any adjustment, allocation or Distribution described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(d) (4), (5) or (6) and such adjustment, allocation or Distribution causes or increases a deficit in such Member's Capital Account (a "<u>Deficit</u>"), items of gross income and gain for such Accounting Period and each subsequent Accounting Period shall be specifically allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit of such Member as quickly as possible; <u>provided</u>, that an allocation pursuant to this <u>Section 17(a)</u> shall be made only if and to the extent that such Member would have a Deficit after all other allocations provided for in <u>Section 15</u> through <u>Section 18</u> have been tentatively made as if this <u>Section 17(a)</u> were not in this Agreement. This <u>Section 17(a)</u> is intended to comply with the qualified income offset provision of Treasury Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted in a manner consistent therewith.

(b)    <u>Special Allocations and Capital Account Maintenance</u>. Special allocations shall be made in accordance with the requirements set forth in the Treasury Regulations §§ 1.704-2(f), (g) and (j) (minimum gain chargeback), 1.704-1(g) (gross income allocation), 1.704-2(i)(2) (nonrecourse deductions), and to the extent that a Section 754 election is in effect, 1.704-1(b)(2) (iv)(m) (Section 754 adjustments).

(c)    <u>Forfeitures</u>. In the event of a forfeiture of a Unit, such Unit and the Capital Account associated therewith, if any, shall be transferred (the "<u>Forfeiture Transfer</u>") to the other Members <i>pro rata</i> in accordance with Capital Accounts (the "<u>Forfeited Unit Transferees</u>"). If the Forfeiture Transfer gives rise to the receipt of taxable income to the Forfeited Unit Transferee pursuant to Section 83 of the Code in the year of the Forfeiture Transfer or any subsequent year, any deduction to which the Company is entitled pursuant to Section 83 of the Code as a result of such income receipt shall be allocated among the Members (other than the Forfeited Unit Transferee) in the taxable year of the Forfeiture Transfer and any

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

subsequent year in which the Forfeited Unit Transferee recognizes income as a result of the Forfeiture Transfer so as to minimize any income or gain required to be recognized by the Company as a result of the Forfeiture Transfer and any excess deduction shall be allocated to the Forfeited Unit Transferee or in such other manner as the Board of Managers deems to be appropriate to the extent permitted by law.

(d)     Restorative Allocations.  Any special allocations of items of income or gain pursuant to this Section 17 shall be taken into account in computing subsequent allocations pursuant to this Agreement, so that the net amount for any item so allocated and all other items allocated to each Member pursuant to this Agreement shall be equal, to the extent possible, to the net amount that would have been allocated to each Member pursuant to the provisions of this Agreement if such special allocations had not occurred.

(e)     For purposes of determining the Net Profit, Net Loss, or any other items allocable to any period, Net Profit, Net Loss, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers, using any permissible method under Code Section 706 and the Regulations thereunder.

(f)     The Members are aware of the income tax consequences of the allocations made by Section 15, Section 16, Section 17, and Section 18 and hereby agree to be bound by the provisions of these Sections in reporting their share of Company income and loss for income tax purposes.

## Section 18.    Tax Allocations.

The income, gains, losses, credits and deductions recognized by the Company shall be allocated among the Members, for U.S. federal, state and local income tax purposes, to the extent permitted under the Code and the Treasury Regulations, in the same manner that each such item is allocated to the Members' Capital Accounts.  Notwithstanding the foregoing, the Board of Managers shall have the power to make such allocations for U.S. federal, state and local income tax purposes as may be necessary to maintain substantial economic effect, or to insure that such allocations are in accordance with the Members' interests in the Company, in each case within the meaning of the Code and the Treasury Regulations.  In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for U.S. federal income tax purposes and its Fair Market Value at the time of contribution by applying any permissible method selected by the Board of Managers.

## Section 19.    Liability for Return of Capital.

No Member or Manager shall have any liability for the return of any Member's Capital Contribution, which Capital Contribution shall be payable solely from the assets of the Company at the absolute discretion of the Board of Managers, subject to the requirements of the Delaware

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Act. No Member, nor any successor-in-interest to any Member, shall have the right, while this Agreement remains in effect, to have the property of the Company partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the Company partitioned, and each of the Members, on behalf of itself and its successors, representatives and assigns, hereby irrevocably waives any such right.

Section 20.    **Tax Reports, Elections and Withholding.**

(a)    No later than 90 calendar days after the end of each Fiscal Year, the Board of Managers shall cause the Company to furnish each Member a estimated IRS Schedule K-1, and not later than 270 calendar days after the end of each Fiscal Year, the Board of Managers shall cause the Company to furnish each Member the IRS Schedule K-1 and any similar form required for the filing of state or local income tax returns for such Member for such Fiscal Year. Upon the written request of any such Member and at the expense of such Member, the Company will use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any state, local and foreign income tax return that must be filed by such Member.

(b)    The Board of Managers shall determine, subject to Section 20(e), whether to make or revoke any available election pursuant to the Code. Each Member will, upon request, supply the information necessary to give proper effect to any such election.

(c)    To the extent applicable, the Company hereby designates [_____] to act as the "Tax Matters Partner" (as defined in Section 6231(a)(7) of the Code) in accordance with Sections 6221 through 6233 of the Code and any similar provision of state, local or foreign tax Applicable Law. The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith; provided, that the Tax Matters Partner may be removed and replaced by, and shall act in such capacity at the direction of, the Board of Managers. Each Member agrees to cooperate with the Tax Matters Partner and to do or refrain from doing any or all things reasonably requested by the Tax Matters Partner with respect to the conduct of such proceedings. Subject to the foregoing proviso, the Tax Matters Partner will have reasonable discretion to determine whether the Company (either on its own behalf or on behalf of the Member) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member, and if paid by the Company, will be recoverable from such Member (including by offset against Distributions otherwise payable to such Member).

(d)    Except as otherwise required (i) by Applicable Law or (ii) as a result of an election by the Company to be classified as a corporation for Federal income tax purposes in anticipation of an IPO, (A) each of the Members and the Company shall take no action inconsistent with, and shall make or cause to be made all applicable elections with respect to (1) the treatment of the Company as a partnership for Federal income tax purposes and (2) the

16

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

treatment of the Company as not a publicly traded partnership for Federal income tax purposes, and (B) neither the Company nor any Member on its behalf shall file an election to be excluded from Subchapter K of the Code.

        (e)    Elections with Respect to Issuance of Certain Compensatory Equity Interests.

        (i)    The Tax Matters Partner is hereby authorized and directed to cause the Company to make an election to value any interests issued by the Company as compensation for services to the Company (collectively, "Compensatory Interests") at liquidation value (the "Safe Harbor Election"), as the same may be permitted pursuant to or in accordance with the finally promulgated successor rules to Proposed Treasury Regulations § 1.83-3(l) and IRS Notice 2005-43 (collectively, the "Proposed Rules"). The Tax Matters Partner shall cause the Company to make any allocations of items of income, gain, deduction, loss or credit (including forfeiture allocations and elections as to allocation periods) necessary or appropriate to effectuate and maintain the Safe Harbor Election.

        (ii)    Any such Safe Harbor Election shall be binding on the Company and on all of its Members with respect to all Transfers of Compensatory Interests thereafter made by the Company while a Safe Harbor Election is in effect. A Safe Harbor Election once made may be revoked by the Tax Matters Partner as permitted by the Proposed Rules or any Applicable Law.

        (iii)    Each Member (including any person to whom a Compensatory Interest is transferred in connection with the performance of services), by signing this Agreement or by accepting such Transfer, hereby agrees to comply with all requirements of the Safe Harbor Election with respect to all Compensatory Interests transferred while the Safe Harbor Election remains effective.

        (iv)    The Tax Matters Partner shall file or cause the Company to file all returns, reports and other documentation as may be required to perfect and maintain the Safe Harbor Election with respect to Transfers of Compensatory Interests covered by such Election.

        (v)    The Board of Managers is hereby authorized and empowered to amend the Agreement as necessary to comply with the Proposed Rules or any rule, in order to provide for a Safe Harbor Election and the ability to maintain or revoke the same, and shall have the authority to execute any such amendment by and on behalf of each Member. Any undertakings by the Members necessary to enable or preserve a Safe Harbor Election may be reflected in such amendments and to the extent so reflected shall be binding on each Member, respectively.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(vi)    Each Member agrees to cooperate with the Tax Matters Partner to perfect and maintain any Safe Harbor Election, and to timely execute and deliver any documentation with respect thereto reasonably requested by the Tax Matters Partner.

(vii)    Costs and expenses incurred by the Tax Matters Partner in making and preserving (or if revoked, revoking) the Safe Harbor Election shall be paid by the Company.

(f)    The Company shall be entitled to deduct or withhold taxes as required by applicable law with respect to any amounts payable to any Member. Any amounts so deducted or withheld shall be timely remitted to the applicable taxing authority and shall be treated as amounts otherwise distributed to the Member pursuant to Section 13 or, if applicable, Section 11 or Section 12, with respect to which such amounts were deducted or withheld.

Section 21.    Transfer Restrictions.

(a)    Limitations on Transfers.  No Member shall be permitted to Transfer any Units held by such Member, except for (i) Permitted Transfers and (ii) Transfers made in accordance with this Section 21.

(b)    Transfer Prerequisites.  No Transfer of any Units shall become effective (i) unless prior written notice thereof has been delivered to the Board of Managers, (ii) unless such Transfer complies with subsections (b) through (d) of this Section 21, (iii) until the Transferee (unless already party to this Agreement) executes and delivers to the Company a Joinder Agreement in the form attached hereto as Exhibit B, (iv) if the Transfer will result in the number of partners hereunder being more than 100 within the meaning of Treasury Regulations §.1.7704-(h) (unless such Transfer is approved by the affirmative vote of the holders of at least 66.66% of the then outstanding Units), (v) until, upon request by the Board of Managers, an opinion of counsel, in form and substance reasonably satisfactory to the Board of Managers, is delivered to the Board of Managers, with respect to the compliance of the Transfer with Applicable Law and (vi) if the Board of Managers reasonably determines in good faith that such Transfer is to a direct or indirect competitor of the Company or its Subsidiaries. Upon such Transfer and execution and delivery, the Transferee shall be bound by, and entitled to the benefits of, this Agreement with respect to the Transferred Units in the same manner as the Member effecting such Transfer.

(c)    Drag-Along Rights.

(i)    If Members representing the Drag-Along Threshold (collectively, the "Drag-Along Sellers") desire to effect a Sale of the Company (a "Drag-Along Sale"), the Drag-Along Sellers may require all Members to sell the same Pro Rata Portion of their respective Units as the Drag-Along Sellers desire to sell to any Transferee that is not affiliated with any Drag-Along Seller in such Drag Along Sale on the same terms and conditions as apply to those Units to be sold by the Drag-Along Sellers.

18

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

(ii)    Written notice of the Drag-Along Sale (the "Drag-Along Sale Notice") shall be provided by the Company to all holders of Units. Such Drag-Along Sale Notice shall disclose in reasonable detail the number and class of Units to be subject to the Drag-Along Sale (the "Drag-Along Securities"), an estimate of the proposed price, the other proposed terms and conditions of the proposed Drag-Along Sale (including copies of the definitive agreements relating thereto, if available) and the identity of the prospective purchaser.

(iii)    With respect to any Drag-Along Sale, each Member agrees that it shall use its reasonable best efforts to effect the Drag-Along Sale as expeditiously as practicable, including delivering all documents necessary or reasonably requested in connection with such Drag-Along Sale, voting in support of such transaction and entering into any contract, instrument, undertaking or obligation necessary or reasonably requested in connection with such Drag-Along Sale (as specified in the Drag-Along Sale Notice). Subject to the terms and conditions of this Section 21(c) and without limiting the generality of the foregoing, the Company and each Member shall take or cause to be taken all actions, and do, or cause to be done, on behalf and in respect of the Company any and all actions that may be reasonably requested consistent with this Section 21(c) in connection with any Drag-Along Sale. In addition, each holder of Drag-Along Securities shall (A) pay its Pro Rata Portions of the reasonable expenses (if any) incurred by the Company in connection with such Drag-Along Sale; and (B) join on a pro rata basis (based on respective Pro Rata Portions), severally and not jointly, in any and all indemnification or other obligations that are specified in the Drag-Along Sale Notice, other than any such obligations which relate specifically and particularly to another holder such as indemnification with respect to representations and warranties given by a holder regarding such holder's title to and ownership of Units and other fundamental customary representations and warranties; provided that no holder shall be obligated under this clause in connection with such Transfer to agree to indemnify or hold harmless the Transferee with respect to an amount in excess of the net proceeds received by the holder in respect of such holder's Units in connection with such Drag-Along Sale.

(iv)    In the event of a Drag-Along Sale, each Member shall be required to Transfer such Units held by such holder as provided in the Drag-Along Sale Notice to the extent such Transfer is required under Section 21(c)(i) hereof.

(v)    Each Member acknowledges and agrees that it shall not be entitled to (and hereby waives any) appraisal, dissenter's or any similar rights in connection with any Drag-Along Sale.

(d)    Co-Sale Rights.

If any one or more Members (collectively, the "Co-Sale Transferors") propose to Transfer (other than a Permitted Transfer) Units representing 25% or more of the then outstanding Units to any Person (the "Co-Sale Transferee") in one transaction or a series of related transactions, the parties hereto shall comply with the following procedures:

19

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(i)    The Co-Sale Transferors shall, at least five Business Days before such proposed Transfer, deliver a written notice (a "Co-Sale Notice") to each other Member that (i) sets forth substantially the same information required in a Drag-Along Sale Notice pursuant to Section 21(c) and (ii) indicates that the Co-Sale Transferee has been informed of the co-sale rights provided for in this Section 21(d) and has agreed to purchase Units (the "Co-Sale Units") from the other Members in accordance with the terms hereof.

(ii)    The Co-Sale Transferors shall not Transfer any Units to the Co-Sale Transferee unless each of the other Members is permitted to Transfer simultaneously therewith a number of Units equal to his Pro Rata Portion of the aggregate number of Units to which the offer to the Co-Sale Transferors relates (A) at a price per Unit equal to the same price per Unit proposed to be paid to the Co-Sale Transferor for each Unit and (B) otherwise on the same terms and conditions.  To the extent one or more of Members exercise such right of participation in accordance with the terms and conditions set forth herein, the number of Units that each other Member, including the Co-Sale Transferors, may Transfer in such Transfer shall be reduced pro rata.

(iii)    Within five Business Days after delivery of the Co-Sale Notice, each Member may elect to participate in the proposed Transfer by delivering to the Co-Sale Transferors a notice (the "Tag-Along Notice") specifying the number of Units (up to his Pro Rata Portion) with respect to which such Member shall exercise his rights under this Section 21(d), and the number of Units to be Transferred to the Co-Sale Transferee by the Co-Sale Transferors shall be reduced accordingly.

(iv)    Any Units requested to be included in any Tag-Along Notice shall be Transferred at the price per Unit set forth in this Section 21(d) and otherwise on the same terms and conditions as are set forth in the Co-Sale Notice.

**Section 22.    Withdrawal.**

No Member shall have the right to withdraw from the Company except with the consent of the Board of Managers and upon such terms and conditions as may be specifically agreed upon between the Company and the withdrawing Member.

**Section 23.    Additional Members.**

The Board of Managers shall have the right to cause the Company to issue additional Units and to admit additional Members upon the issuance of such Units upon such terms and conditions, at such time or times, and for such Capital Contributions as shall be determined by the Board of Managers, subject to the limits set forth herein.  In connection with the admission of an additional Member or additional Capital Contributions, the Board of Managers shall amend Schedule 1 hereto to reflect the name and address of each additional Member and the amount of any additional Capital Contributions.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**Section 24.    Dissolving Events.**

The Company shall be dissolved and its affairs wound up in the manner hereinafter provided upon the happening of any of the following events:

(a)    the Board of Managers and the Members, in accordance with Section 6(b)(vi), shall vote or agree in writing to dissolve the Company; and

(b)    any event which under Applicable Law would cause the dissolution of the Company; provided, that unless required by Applicable Law, the Company shall not be wound up as a result of any such event and the business of the Company shall continue.

**Section 25.    Dissolution and Winding-Up.**

Upon the dissolution of the Company, the assets of the Company shall be liquidated or distributed under the direction of and to the extent determined by the Board of Managers and the business of the Company shall be wound up. Within a reasonable time after the effective date of dissolution of the Company, the Company's assets shall be distributed in the following manner and order:

(a)    First, to creditors in satisfaction of indebtedness, whether by payment or the making of reasonable provision for payment, and the expenses of liquidation, whether by payment or the making of reasonable provision for payment, including the establishment of reasonable reserves (which may be funded by a liquidating trust) determined by the Board of Managers or the liquidating trustee, as the case may be, to be reasonably necessary for the payment of the Company's expenses, liabilities and other obligations (whether fixed, conditional, unmatured or contingent); and

(b)    Second, to the Members in the same manner as Distributions under Section 12.

**Section 26.    Distributions in Cash or in Kind Upon Dissolution.**

Upon the dissolution of the Company, the Board of Managers shall use all commercially reasonable efforts to liquidate all of the Company's assets in an orderly manner and apply the proceeds of such liquidation as set forth in Section 25; provided that if in the good faith judgment of the Board of Managers, a Company asset should not be liquidated, the Board of Managers shall cause the Company to distribute such assets in accordance with Section 25, and for purposes of making such Distribution, and for all other purposes of this Agreement (excluding Section 12), the Distribution shall be treated as if the Company had sold such assets for cash in an amount equal to their Fair Market Value and distributed such cash to the Members instead.

21

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**Section 27.    Termination Upon Dissolution.**

The Company shall terminate when the winding up of the Company's affairs has been completed, all of the assets of the Company have been distributed and an application for a Certificate of Dissolution has been filed by the Registered Agent of the Company in accordance with the Delaware Act.

**Section 28.    Information Rights; Observer Rights; Confidentiality; Other Restrictive Covenants.**

(a)    Information Rights.  Subject to the terms of Section 28(c) and (d): each (x) First Lien Steering Committee Member, for so long as such Person owns any Units and (y) each Member, for so long as such Person continues to own at least 5.0% of the outstanding Units, in each case, shall have the right, upon ten (10) days' prior written notice and during normal business hours, to inspect the properties, books and other business records of the Company and its Subsidiaries and to reasonably request from time to time (i) any other information (financial or otherwise) about the Company and (ii) to have reasonable access to the Company's or any Subsidiary's management, auditors and legal counsel.

(b)    Observer Rights.  Each (x) First Lien Steering Committee Member, for so long as such Person owns any Units and (y) Member, for so long as such Person continues to own at least 5.0% of the outstanding Units, in each case, shall have the right to have one representative (each, an "Observer") present at all meetings of the Board of Managers.  The Company will give each Observer reasonable prior notice (it being agreed that substantially the same prior notice given to the members of the Board of Managers shall be deemed reasonable prior notice) of the time and place of any proposed meeting of the Board of Managers.  The Company will deliver to each Observer copies of all material documentation distributed from time to time to the members of the Board of Managers, at such time as such documents are so distributed to them, including copies of any written consent.  The Company reserves the right to and may, in its sole discretion, withhold any information and to exclude any Observer from any meeting or portion thereof if the Company reasonably determines in good faith that access to such information or attendance at such meeting (i) could be reasonably expected to create a potential or actual conflict of interest or adversely affect the attorney-client privilege between the Company and its counsel, (ii) is prohibited by an agreement with a third party or (iii) will not be in the best interest of the Company.  Notwithstanding anything to the contrary contained in this Agreement, the Observers may not use or disclose any confidential information received by the Observers and the Observers shall agree in writing to be bound by confidentiality provisions substantially similar to those in Section 28(d).

(c)    Competitors.  Notwithstanding anything to the contrary contained herein, in no event shall any Member be entitled to any of the information, inspection rights or access set forth in Section 28(a) or be entitled to designate an Observer if the Company reasonably determines in good faith that such Member is a direct or indirect competitor of the Company or its Subsidiaries.

22

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(d)    Confidentiality. Each Member, on behalf of itself and its Affiliates (collectively, the "Subject Parties") shall be bound by the provisions contained in this Section 28(d). The Subject Parties recognize and acknowledge that they have been provided by the Company, its Subsidiaries and their respective agents certain confidential and proprietary information and trade secrets of the Company and its Subsidiaries including, without limitation, customer information, pricing information, financial plans, business plans, business concepts, supplier information, know-how and intellectual property and materials related thereto (the "Confidential Information"). Each Subject Party agrees that it will not, directly or indirectly, use, take commercial or proprietary advantage of or profit from any Confidential Information or disclose Confidential Information to any Person for any reason or purpose whatsoever, except for the benefit of the Company and its Subsidiaries and except as is required to be disclosed under Applicable Law; provided, that the party required to make such disclosure shall, to the extent permitted by law, provide the Company with prompt notice of any such disclosure and shall use commercially reasonable efforts to limit the extent of such disclosure. Notwithstanding the foregoing, Confidential Information shall not include any information which (i) was publicly known and available in the public domain prior to the time of disclosure by the Company; (ii) becomes publicly known and available in the public domain after disclosure by the Company through no action or inaction of the Subject Party; (iii) is in the possession of the Subject Party at the time of disclosure by the Company and the Subject Party was not aware of its confidential nature at the time of its receipt of such information; (iv) is independently developed by the Subject Party without use of or reference to the Confidential Information; or (v) is received by the Subject Party from a third party without an accompanying duty of confidentiality.

### Section 29.    Registration Rights.

Upon the request of the holders of a majority of the outstanding Units, the Company shall enter into a registration rights agreement with the Members upon such terms and conditions that are reasonably satisfactory to the holders of a majority of the outstanding Units.

### Section 30.    Exculpation and Indemnification.

(a)    Except as otherwise provided under the Delaware Act, no Member, in such capacity, shall be liable for any debts, liabilities, contracts or any other obligations of the Company, except for and only to the extent of such Member's Capital Contribution, and then only to the extent and under the circumstances set forth in the Delaware Act, or for any debts, liabilities contracts or obligations of any other Member. Except as otherwise provided in the Delaware Act, this Agreement or in any separate written instrument signed by the Member, no Member of the Company shall be obligated personally for any debt, obligation or liability of the Company or of any other Member solely by reason of being a Member of the Company. Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company. No Member shall have any responsibility to restore any negative balance in his capital account or to contribute to or in respect of the liabilities or obligations of the Company or to return Distributions made by the Company, except as required by the Delaware Act or other Applicable Law.

23