**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

**2.3**  <u>Fees</u>.

The Borrowers agree to pay such fees to the Agents as may hereafter be (or have previously been) agreed upon.

**2.4**  <u>Repayments and Prepayments; General Provisions Regarding Payments</u>.

**A.**  **Scheduled Payments of Loans.**

The Borrowers shall repay the principal amount of the Loans on the Maturity Date, together with all other amounts owing by the Borrowers under this Agreement with respect to the Loans.

**B.**  **Prepayments of Loans.**

(i)  <u>Voluntary Prepayments</u>.

(a)  Subject to the terms of subsection 2.4B(i)(b), the Borrowers may, upon not less than three (3) Business Days' prior irrevocable written or telephonic notice, promptly confirmed in writing to the Administrative Agent (which notice the Administrative Agent will promptly transmit to each Lender), at any time and from time to time prepay the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; <u>provided</u>, <u>however</u>, that in the event the Borrowers elect to prepay a LIBOR Loan other than on the expiration of the Interest Period applicable thereto, the Borrowers shall, at the time of such prepayment, also pay any amounts payable under subsection 2.6D hereof; and <u>provided</u>, <u>further</u>, that if such notice of prepayment indicates that such prepayment is with respect to all outstanding Loans and is to be funded with the proceeds of a Refinancing, such notice may be revoked if the Refinancing is not consummated. Notice of prepayment having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein. Any voluntary prepayments pursuant to this subsection 2.4B(i) shall be applied as specified in subsection 2.4C. Concurrently with each voluntary prepayment pursuant to this subsection 2.4B(i) the Borrowers shall deliver to the Administrative Agent an Officer's Certificate that identifies the source of the funds used to finance such voluntary prepayment, including a statement as to whether such voluntary prepayment of the Loans is being made directly or indirectly with the proceeds of any issuance of debt Securities or other Indebtedness of any of the Borrowers or any Subsidiary.

(b)  [<u>Intentionally Omitted</u>.]

36

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(ii) .   Mandatory Prepayments.

The Loans shall be prepaid in the manner provided in subsection 2.4C upon the occurrence of the following circumstances:

(a)     Prepayments Due to Issuance of Debt.   Subject to the terms of subsection 2.4B(ii)(f), no later than the first (1st) Business Day following the closing of any transaction pursuant to which any of the Borrowers or any of their Subsidiaries issue debt Securities or incur additional Indebtedness for borrowed money (other than Indebtedness permitted under subsection 6.1), the Borrowers shall prepay the Loans in an amount equal to the principal amount of such debt Securities or Indebtedness for borrowed money, net of the underwriting discounts and commissions paid or payable to the Borrowers or their Subsidiaries, plus an amount equal to the prepayment premium, if any.

(b)     Prepayments Due to Issuance of Equity Securities.   No later than the first (1st) Business Day following the closing of any transaction pursuant to which any of the Borrowers or any of their Subsidiaries receive any Equity Proceeds (other than Equity Proceeds received by a Borrower's wholly-owned Subsidiary from Investments made by a Borrower or another of its Subsidiaries in such Subsidiary and permitted by subsection 6.3), the Borrowers shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds.

(c)     [Intentionally Omitted].

(d)     Prepayments from Unrestricted Cash and Cash Equivalents.   No later than the third $(3^{rd})$ Business Day following the last day of the each Fiscal Quarter, the Borrowers shall prepay the Loans, after the payments of interest (and capitalized interest) required hereunder, if (a) the average of the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of each of the two (2) immediately preceding consecutive Fiscal Quarters is greater than $15,000,000, or (b) the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of the immediately preceding Fiscal Quarter is greater than $15,000,000; provided that such prepayment shall not be required to the extent that, after giving effect to such prepayment, the Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors as of the last day of the immediately preceding Fiscal Quarter is reduced to less than $10,000,000; and provided further that such prepayment shall not be required to the extent that (i) the Board and a majority of the outstanding Common Units have affirmatively voted to set aside an amount not to exceed $7,000,000 from such amounts that are otherwise required to be prepaid, or (ii) the Board and 66.67% of the outstanding Common Units have affirmatively voted to set aside an amount in excess of $7,000,000, from such amounts that are otherwise required to be prepaid, in each case for (i) and (ii) above, to effectuate an Identified Acquisition and so long as such funds

37

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

have been deposited into a segregated deposit account (subject to a perfected security interest in favor of the Collateral Agent for the benefit of the Lenders) for such purpose.

(iii)     No Waiver.  Nothing contained in subsection 2.4B(ii) shall be deemed to permit any Loan Party to incur Indebtedness or enter into any transaction not otherwise permitted under this Agreement.

**C.     Application of Prepayments.**

(i)     Application of Prepayments.     Each prepayment received by the Administrative Agent from the Borrowers under subsection 2.4B(i) or (ii) with respect to the Loans shall be applied in the following order:  First, to the payment of any late charges due and payable hereunder; second, to the repayment of any amounts advanced by the Administrative Agent or the Collateral Agent in accordance with the Mortgages or any of the other Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by the Administrative Agent or the Collateral Agent in connection with the collection of the Loans or under, or in connection with, the Loan Documents (including all attorneys' fees payable hereunder); third, to the payment of accrued and unpaid interest to the extent then due and payable; fourth, to fund any reserves or escrows required by the Administrative Agent or the Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; fifth, to the payment of any LIBOR breakage costs incurred by Lenders on account of such payment; and sixth, to reduction of the outstanding principal balance of the Loans (provided that any First Lien Declined Amounts to be applied pursuant to this clause sixth shall be distributed to the prepayment, on a pro rata basis, of the Loans held by Lenders that have elected to accept such First Lien Declined Amounts).  Notwithstanding the foregoing, (i) if an Event of Default has occurred and is continuing, the Administrative Agent may apply any payments received in such order or proportion as the Administrative Agent, in its sole discretion, may determine and (ii) as among the Lenders, such payments shall be applied in accordance with subsection 2.4D(iii) below.  The Borrowers shall deliver to the Administrative Agent and each Lender notice of each prepayment of Loans in whole or in part pursuant to subsection 2.4B(ii) not less than five (5) Business Days prior to the date such prepayment shall be made (each, a "**Mandatory Prepayment Date**").  Such notice shall set forth (i) the Mandatory Prepayment Date, (ii) the aggregate amount of such prepayment and (iii) the option of each Lender to (x) decline its share of such prepayment or (y) accept First Lien Declined Amounts.  Any Lender that wishes to exercise its option to decline such prepayment or to accept First Lien Declined Amounts shall notify the Administrative Agent by facsimile not later than three (3) Business Days prior to the Mandatory Prepayment Date.  Any Lender that does not decline such prepayment in writing on or prior to the third (3rd) Business Day prior to the Mandatory Prepayment Date shall be deemed to have accepted such prepayment but not elected to accept First Lien Declined Amounts.

38

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

     (ii)    [Intentionally Omitted].

**D.**    **General Provisions Regarding Payments**.

     (i)    <u>Manner and Time of Payment</u>.  All payments by the Borrowers of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 Noon (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent after that time on such due date shall, at the Administrative Agent's sole discretion, be deemed to have been paid by the Borrowers on the next succeeding Business Day.

     (ii)    <u>Application of Payments to Principal, Interest and Prepayment Fees</u>. Except as provided in subsection 2.2C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest and prepayment fees, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest and prepayment fees, if any, before application to principal.

     (iii)    <u>Apportionment of Payments</u>.  The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares. The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent.

     (iv)    <u>Payments on Business Days</u>.  Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

     (v)    <u>Notation of Payment</u>.  Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; <u>provided</u> that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect such disposition or the obligations of the Borrowers hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

E.    **Application of Proceeds of Collateral.**

Except as provided in subsection 2.4B(ii) with respect to prepayments, all proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document shall, in the discretion of the Collateral Agent, be held by the Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by the Administrative Agent against, the applicable Obligations in the following order of priority:

(a)    to the payment of all costs and expenses of such sale, collection or other realization, including, without limitation, reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent thereunder for the account of the applicable Loan Party (excluding principal and interest in respect of any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(b)    thereafter, to the extent of any excess proceeds, to the payment of all other Obligations on a pro rata basis; and

(c)    thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.5    [Intentionally Omitted.]**.

**2.6    Special Provisions Governing LIBOR Loans**.

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to LIBOR Loans as to the matters covered:

A.    **Determination of Applicable Interest Rate**.    As soon as practicable after 11:00 a.m. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrowers and each Lender.

40

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

B.      **Inability to Determine Applicable Interest Rate.**  In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of LIBOR Rate the Administrative Agent shall on such date give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and each Lender of such determination, whereupon no Loans may be continued as LIBOR Loans (including, without limitation, pursuant to subsection 2.2D hereof), until such time as the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed).

C.      **Illegality or Impracticability of LIBOR Loans.**  In the event that on any date any Lender (in the case of clause (i)) and the Required Lenders (in the case of clause (ii)) shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrowers and the Administrative Agent) that the making, maintaining or continuation of its LIBOR Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender).  Thereafter (a) the obligation of the Affected Lender to make Loans as LIBOR Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, and (b) the Affected Lender's obligation to maintain its outstanding LIBOR Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law.  Nothing in this subsection 2.6C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as LIBOR Loans in accordance with the terms of this Agreement.

D.      **Compensation For Breakage or Non-Commencement of Interest Periods.**  The Borrowers shall compensate each Lender, upon written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by such Lender to the lenders of funds borrowed by it to make or carry its LIBOR Loans and any actual loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds) which such Lender may sustain:  (i) if any prepayment (including any prepayment pursuant to subsection 2.4B or assignment pursuant to subsection 2.8) of any of its LIBOR Loans occurs on a date that is not the last day of an Interest Period applicable to that

41

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Loan, (ii) if any prepayment of any of its LIBOR Loans is not made on any date specified in a notice of prepayment given by the Borrowers or (iii) as a consequence of any other default by the Borrowers in the repayment of its LIBOR Loans when required by the terms of this Agreement.

E.    **Booking of LIBOR Loans**.  Any Lender may make, carry or transfer LIBOR Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

F.    **Assumptions Concerning Funding of LIBOR Loans**.  Calculation of all amounts payable to a Lender under this subsection 2.6 and under subsection 2.7A shall be made as though that Lender had actually funded each of its relevant LIBOR Loans through the purchase of a eurodollar deposit bearing interest at the rate obtained pursuant to the definition of LIBOR Rate in an amount equal to the amount of such LIBOR Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its LIBOR Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this subsection 2.6 and under subsection 2.7A.

G.    **LIBOR Loans After Default**.  After the occurrence of and during the continuation of a Default or Event of Default, no Loan may be continued as a LIBOR Loan and the Borrowers may no longer maintain any Loan as a LIBOR Loan after the expiration of any Interest Period then in effect for that Loan.

2.7    **Increased Costs; Taxes**.

A.    **Increased Costs Generally**.  If any Change in Law shall:  (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the LIBOR Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any LIBOR Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

B.    **Capital Requirements**.  If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have

42

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

      C.      **Certificates for Reimbursement.**  A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection 2.7A or 2.7B and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

      D.      **Delay in Requests.**  Failure or delay on the part of any Lender to demand compensation pursuant to this subsection 2.7 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this subsection 2.7 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

      E.      **Taxes.**

      (i)      Payments Free of Taxes.  Subject to subsection 2.7E(v) below, any and all payments by or on account of any obligation of the Borrowers hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

      (ii)      Payment of Other Taxes by the Borrowers.  Without limiting the provisions of paragraph (i) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

      (iii)      Indemnification by the Borrowers.  The Borrowers shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this subsection 2.7E) paid by such Agent or such Lender and any penalties, interest and

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrowers by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

    (iv)    Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

    (v)    Status of Lenders. Any Lender, if requested by the Borrowers or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements. Without limiting the generality of the foregoing, in the event that any of the Borrowers is a resident for tax purposes in the United States of America, each Foreign Lender shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent), whichever of the following is applicable: (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party; (ii) duly completed copies of Internal Revenue Service Form W-8ECI; (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Internal Revenue Code or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN; or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrowers or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrowers or the Administrative Agent to permit the Borrowers to determine the withholding or deduction required to be made. A Foreign Lender shall not be required to deliver any form or statement pursuant to this subsection 2.7E(v) that such Foreign Lender is not legally able to deliver.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(vi)    Treatment of Certain Refunds.  If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to subsection 2.7E, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under subsection 2.7E with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrowers, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrowers or any other Person.

2.8    **Mitigation Obligations; Replacement of Lenders**.

A.    **Designation of a Different Lender Office**. If any Lender requests compensation under subsection 2.7A or 2.7B, or requires the Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to subsection 2.7 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

B.    **Replacement of Lenders**. If any Lender requests compensation under subsection 2.7A or 2.7B, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its LIBOR Loans in accordance with subsection 2.6.C hereof, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, subsection 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) in the case of assignments not made using an electronic settlement system (e.g., ClearPar), the Borrowers shall have paid to the Administrative Agent the assignment fee specified in subsection 9.1B(i)(c), (ii)

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under subsection 2.6D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, LIBOR Loans, (iv) in the case of any such assignment resulting from a claim for compensation under subsection 2.7A or 2.7B or payments required to be made pursuant to subsection 2.7E, such assignment will result in a reduction in such compensation or payments thereafter and (v) such assignment does not conflict with applicable law. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

## 2.9    Releases; Subordinations.

**A.    Release Upon Qualified Sale or Required Dedication.**  In connection with any Permitted Collateral Asset Sale, Major Collateral Asset Sale or Required Dedication, the Collateral Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgages (such portion of the Real Property Collateral, a "Released Parcel"); provided that all of the applicable conditions set forth in subsection 6.9 have been satisfied and the applicable Borrowers shall have submitted to the Collateral Agent not less than ten (10) days (or such shorter period as is acceptable to the Collateral Agent) prior to the date of such proposed release (which must be on a Business Day), a reconveyance or release of Liens (and related Loan Documents) for each Released Parcel (for execution by the Collateral Agent) (or its agent) in a form appropriate for recordation in the applicable jurisdiction and otherwise satisfactory to the Collateral Agent (or its agent) in its good faith discretion and all other documentation as the Collateral Agent reasonably requires to be delivered by the Borrowers in connection with such release (collectively, the "Release Instruments") for each Released Parcel (for execution by Collateral Agent) together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement and (iii) the release to be effected will not impair or otherwise adversely affect the Liens and other rights of the Collateral Agent under the Loan Documents not being released.  The Collateral Agent is authorized by the Lenders to enter into release and/or escrow arrangements with the Title Company or any other third-party designated by the Collateral Agent for purposes of delivery of Release Instruments.

**B.**    Subordinations in connection with Specified Encumbrances.  If required by the applicable Permitted Special Improvement District, upon ten (10) Business Days prior written notice from the Borrowers, the Collateral Agent shall subordinate the First Priority Lien of the applicable Mortgage to any Liens granted by the Borrowers or their Subsidiaries in favor of such Permitted Special Improvement District securing Special Improvement Bonds issued by such Permitted Special Improvement District after the Effective Date ("**Specified Encumbrances**") that, in each case, as certified by a Responsible Officer, are necessary or desirable in connection

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

with the development of the Projects; provided that (i) any such signature of the Collateral Agent is expressly made with no implied duty or obligation on the part of the Collateral Agent to review any documentation relating to such Specified Encumbrances and is only made for the purpose of subordinating the First Priority Lien of the applicable Mortgage to, such Specified Encumbrance, (ii) no Default or Event of Default has occurred and is continuing, (iii) the Borrowers have provided evidence to the Collateral Agent that such consent and/or subordination is required by the applicable Permitted Special Improvement District, (iv) the Collateral Agent shall, as a condition to such subordination, be satisfied in its reasonable discretion that such subordination could not reasonably be expected to (a) have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral or (b) materially impair the value of the Real Property Collateral and (v) the Collateral Agent shall have received evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to any such subordination shall be maintained following such subordination.  The Borrowers shall pay all costs and expenses of the Collateral Agent and the Title Company in connection with any such subordination.

## 2.10   Subordinations in connection with Map Approvals.

Upon not less than ten (10) Business Days' prior written notice from the Borrowers, the Collateral Agent shall subordinate the First Priority Lien of the applicable Mortgage to any proposed "subdivision," "parcel," "tract" or other maps approved by the applicable Governmental Authority and contemplated to be recorded in connection with the development of a Project (collectively, the "**Maps**"), and, to the extent required by Applicable Law or the applicable Governmental Authority, the Collateral Agent agrees to sign and acknowledge any such Map; provided, in each such case, that (i) the Collateral Agent's signature is expressly made with no implied duty or obligation on the part of the Collateral Agent to review such Maps and is only made for the purpose of subordinating the Lien of the applicable Mortgage to such Map, (ii) no Default or Event of Default has occurred and is continuing, (iii) the Borrowers have provided evidence to the Collateral Agent that such subordination and/or execution is required for the subdivision approval of the appropriate Governmental Authority or otherwise reasonably necessary or desirable in connection with the development of a Project, (iv) the Collateral Agent shall, as a condition to such subordination and/or execution, be satisfied in its reasonable discretion that such subordination and/or execution could not reasonably be expected to have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral or materially impair the value of the Real Property Collateral, (v) the Collateral Agent shall have received evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages so subordinated with respect to the remaining Real Property Collateral subject to such Mortgages after giving effect to any such subordination shall be maintained following such subordination and (vi) the documentation evidencing such subordination shall be reasonably satisfactory to the Collateral Agent.  The Borrowers shall pay all costs and expenses of the Collateral Agent and the Title Company in connection with any such subordination.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**2.11    Subordinations in connection with Qualified Sales Agreements.**

Upon not less than ten (10) Business Days' prior written notice from the Borrowers and provided no Event of Default has occurred and is continuing, the Collateral Agent shall enter into a subordination and non-disturbance agreement, in form and substance reasonably satisfactory to the Collateral Agent, with a homebuilder or other commercial developer who is party to a Qualified Sales Agreement and the Borrower pursuant to which such homebuilder or other commercial developer confirms, among other things, that its interest in the relevant Real Property Collateral and the applicable Qualified Sales Agreement are subordinate to the First Priority Lien of the Collateral Agent and the Collateral Agent agrees, subject to certain conditions, to recognize the validity of the Qualified Sales Agreement in the event of a realization upon such First Priority Lien, provided that the Collateral Agent shall not be required to enter into any such subordination and non-disturbance agreement unless the Collateral Agent is reasonably satisfied that the sales contemplated by such Qualified Sales Agreement are, and will be, permitted under Section 6.9.

## SECTION 3.
## CONDITIONS TO EFFECTIVENESS

**3.1    Conditions to Effectiveness.**

The effectiveness of this Agreement, and the obligation of each Lender to make the extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A.        Borrowers' Documents.**  On or before the Effective Date, each Borrower shall deliver or cause to be delivered to the Administrative Agent the following, each, unless otherwise noted, dated the Effective Date:

(i)      certified copies of its Organizational Certificate (in form and substance reasonably satisfactory to the Administrative Agent), together with a good standing certificate from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation, each state in which any of its Real Property Assets are located, and each other state in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(ii)     copies of its Organizational Documents (in form and substance reasonably satisfactory to the Administrative Agent), certified as of the Effective Date by its corporate secretary or an assistant secretary;

(iii)    copies of its Organizational Authorizations approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is party or by which it or its assets may be bound that are to be delivered on the

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification;

(iv)    incumbency certificates of its officers executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which it is a party that are to be delivered on the Effective Date;

(vi)    copies of each of the Material Contracts to which it is a party, certified by a Responsible Officer; and

(vii)    such other documents as the Administrative Agent may reasonably request.

B.    [Intentionally Omitted].

C.    Consummation of Transactions.

(i)    (a) Each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent; and

(ii)    after giving effect to the transactions contemplated hereby, the Borrowers and their Subsidiaries shall have no outstanding Indebtedness or preferred Capital Stock other than (a) the Loans under this Agreement, and (b) the Permitted Existing Indebtedness.

D.    Lender Signatures.  The Lenders and the Agents shall have executed and delivered this Agreement.

E.    Necessary Consents and Estoppels.  The Borrowers shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the transactions contemplated hereby and the continued operation of the business conducted by the Borrowers and their Subsidiaries, and all applicable appeal periods shall have expired, and shall have received estoppels from such Persons as may be reasonably requested by the Administrative Agent, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent.  Such approvals and consents and estoppels shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)    executed estoppel certificates from all homeowners' associations and property owners' associations related to each Project;

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(ii)    executed consents from any other lenders of the Borrowers or any of their Subsidiaries, as required by the terms of any other loan documents to which the Borrowers or such Subsidiaries, as applicable, are a party;

(iii)    executed consents from any Person required in connection with the Pledge and Security Agreement and executed consents from any Person required in connection with the other Collateral Documents; and

(iv)    executed estoppel certificates from Clark County regarding the Rhodes Ranch Development Agreement.

F.    **Perfection of Security Interests**. The Borrowers shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Pledge and Security Agreement or other applicable Collateral Documents. Such actions shall include: (i) the delivery pursuant to the applicable Collateral Documents of (a) such certificates or other instruments (each of which shall be registered in the name of the Collateral Agent or properly endorsed in blank for transfer or accompanied by irrevocable undated stock or equivalent powers duly endorsed in blank, all in form and substance satisfactory to the Collateral Agent) representing all of the shares or other interests of Capital Stock required to be pledged pursuant to the Collateral Documents identified on Schedule 3.1F-1 and (b) all promissory notes or other instruments (duly endorsed, where appropriate, in a manner satisfactory to the Collateral Agent) evidencing any Collateral; (ii) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (iii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority Liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made or will be made concurrently with the Effective Date. All "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of any of the Borrowers (other than any such deposit accounts identified on Schedule 3.1F-2) shall be subject to effective control agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent, all of which have been duly executed and delivered by each party thereto and are in full force and effect.

G.    **Real Property**. The Administrative Agent shall have received on or prior to the Effective Date from the Borrowers and each other applicable Loan Party:

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(i)     **Mortgages.** Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of Clark County or Mohave County, as applicable, encumbering the Real Property Collateral listed on Schedule 3.1G, in each case in form and substance satisfactory to the Collateral Agent;

(ii)    **Opinions of Local Counsel.** An opinion of counsel (which counsel shall be satisfactory to the Collateral Agent) with respect to the enforceability of the Mortgages to be recorded in the real property records of Clark County or Mohave County, as applicable, and such other related matters as the Collateral Agent may reasonably request, in each case in form and substance satisfactory to the Collateral Agent;

(iii)   **Title Insurance.** ALTA extended coverage mortgagee title insurance policies (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on Schedule 3.1G. in amounts not less than the respective amounts designated on such Schedule with respect to any particular Real Property Collateral, insuring fee simple title to each such Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent including an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the Clark County or Mohave County, as applicable, real property records;

(iv)    [Intentionally Omitted];

(v)     [Intentionally Omitted];

(vi)    [Intentionally Omitted];

(vii)   [Intentionally Omitted];

(viii)  [Intentionally Omitted];

51

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(ix)    **Matters Relating to Flood Hazard Properties.** If any Real Property Collateral constitutes a Flood Hazard Property, and if such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrowers have obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

**H.**    **[Intentionally Omitted.]**.

**I.**    **[Intentionally Omitted.]**.

**J.**    **Transaction Costs, Fees and Expenses.** On or prior to the Effective Date, the Borrowers shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instruments or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Loan Documents, as well as all fees reasonably estimated to be incurred following the Effective Date, including with respect to the perfection and recordation of the Liens granted under the Collateral Documents. On or prior to the Effective Date, the Borrowers shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrowers' estimate of the transaction costs (other than fees payable to any of the Agents).

**K.**    **Opinions of Loan Parties' Counsel.** The Administrative Agent and its counsel shall have received the written opinions of (i) [[_____], **special Nevada and Arizona counsel for the Loan Parties,]** (ii) [[_____], **special New York counsel for the Loan Parties,]** and (iii) each other special and local counsel for the Loan Parties as the Administrative Agent may reasonably request, in each case, (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**L.**    **Financial Information.** Prior to the Effective Date, the Administrative Agent shall have received from the Borrowers such financial statements and other cash flow and financial information as the Administrative Agent may reasonably request, all in form and substance reasonably satisfactory to the Administrative Agent.

**M.**    **Evidence of Insurance.** The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to subsection 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**N.**    **Environmental.** The Administrative Agent shall have received one or more environmental assessment reports which, in their totality, provide a detailed environmental

52

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

assessment of the Projects, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrowers and their Subsidiaries may be subject after giving effect to the transactions contemplated hereby, and with the plans of the Borrowers or such Subsidiaries with respect thereto.

**O.**    **[Intentionally Omitted].**

**P.**    **Corporate and Capital Structure, Ownership, Management.**

(i)    Organizational Structure. The corporate organizational structure of the Borrowers and their Subsidiaries as of the Effective Date shall be as set forth on Schedule 4.5.

(ii)    Capital Structure and Ownership. The capital structure and ownership of the Borrowers and their Subsidiaries as of the Effective Date shall be as set forth on Schedule 4.5.

**Q.**    **Representations and Warranties; Performance of Agreements.**    The Borrowers shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 4 hereof and in the other Loan Documents are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the transactions contemplated hereby, to the same extent as though made on and as of that date, that the Borrowers have performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date, and that no Default or Event of Default has occurred on and as of the Effective Date before and after giving effect to the transactions contemplated hereby.

**R.**    **[Intentionally Omitted].**

**S.**    **No Litigation.**    There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the transactions contemplated hereby.

**T.**    **Completion of Proceedings.**    All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the transactions contemplated hereby shall be satisfactory in form and substance to the Administrative Agent and its counsel, and the Administrative Agent and its counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request (including, without limitation, consents and approvals with respect to the execution, delivery and performance by each applicable Loan Party of the Credit Agreement, the Guaranty,

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

and the other Loan Documents to which it is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification). Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

      U.      **Money Laundering.** The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

      V.      **[Intentionally Omitted].**

      W.      **Confirmation Order.** The Agents and the Lenders shall have received the Confirmation Order. **Plan of Reorganization.** The terms and provisions of the Plan of Reorganization shall be reasonably satisfactory to the Agents and Lenders (it being acknowledged by the Agents and the Lenders that the terms and provisions of the Plan of Reorganization, and filed with the Bankruptcy Court on [_____], are satisfactory), and the Confirmation Order shall include such provisions with respect to the Loans as are reasonably satisfactory to the Agents and the Lenders and, providing, among other things, that the Borrowers shall be authorized to (i) enter into the Loan Documents, (ii) grant the Liens and security interests and incur or guarantee the Obligations under the Loan Documents and (iii) issue, execute and deliver all documents, agreements and instruments necessary or appropriate to implement and effectuate all obligations under the Loan Documents and to take all other actions necessary to borrow Loans under the Loan Documents. Except as consented to by the Agents and the Lenders, the Bankruptcy Court's retention of jurisdiction under the Confirmation Order shall not govern the enforcement of the Loan Documents or any rights or remedies related thereto.

      Y.      **Final Order.** The Agents and the Lenders shall have received evidence, reasonably satisfactory to the Agents and the Lenders, that (i) the "Effective Date" under and as defined in the Plan of Reorganization shall have occurred, the Confirmation Order shall be valid, subsisting and continuing as a Final Order and all conditions precedent to the effectiveness of the Plan of Reorganization shall have been fulfilled, or validly waived with the consent of the Lenders, including, without limitation, the execution, delivery and performance of all of the conditions thereof other than conditions that have been validly waived with the consent of the Lenders (but not including conditions consisting of the effectiveness of the Loan Documents) and (ii) no motion, action or proceeding by any creditor or other party-in-interest to the Chapter 11 Cases which would adversely affect the Plan of Reorganization, the consummation of the Plan of Reorganization, the business or operations of the Borrowers or the transactions contemplated by the Loan Documents, as determined by the Lenders in good faith, shall be pending.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**Z.**    **As of the Effective Date:**

(i)    The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)    No event shall have occurred and be continuing or would result from the consummation of the borrowings contemplated by this Agreement that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)    No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans and in order to induce the Agents to enter into this Agreement, each of the Borrowers represents and warrants to each Lender and each Agent, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

**4.1    Organization and Qualification.**

Each Borrower and each of its Subsidiaries is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Borrower and each of its Subsidiaries is duly qualified and is authorized to do business and is in good standing as a foreign corporation or other organization in each state or jurisdiction listed on Schedule 4.1 hereto and in all other states and jurisdictions in which the failure of such Borrower or any of such Subsidiaries to be so qualified could reasonably be expected to have a Material Adverse Effect.

**4.2    Power and Authority.**

Each of the Borrowers and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which it is a party. This Agreement has been duly and validly executed and delivered by the Borrowers and the other Loan Documents entered into on the Effective Date have been duly and validly executed and delivered by the Loan Parties party thereto. The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action.

55

**4.3**    **Legally Enforceable Agreement.**

This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of each Borrower and each of its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or general equitable principals, whether applied in law or equity.

**4.4**    **No Conflict.**

The execution, delivery and performance by each of the applicable Loan Parties of the Loan Documents, the issuance, delivery and payment of the Notes and the Loans, and the consummation of the transactions contemplated hereby do not and will not (i) violate, contravene, or cause any Loan Party to be in default under, any provision of any law or any governmental rule or regulation applicable to any Loan Party, the Organizational Certificate or any other Organizational Documents of any Loan Party or any order, judgment, injunction, decree, determination or award in effect having applicability to any Loan Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any indenture or loan or credit agreement or any other material agreement, contract, lease or instrument to which any Loan Party is a party or by which any of them or any of its or their property may be bound or affected, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets now owned or hereafter acquired by any Loan Party (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent), (iv) require any approval or consent of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which any Loan Party is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the Organizational Certificate or other Organizational Documents of any Loan Party or any Material Contract to which any Loan Party is a party or by which any Loan Party is bound.

**4.5**    **Capital Structure.**

As of the date hereof, Schedule 4.5 hereto states (i) the correct name of each Borrower and each Subsidiary, the jurisdiction of organization of each Borrower and each Subsidiary, and the owners of the Capital Stock of each Borrower and each Subsidiary (including the percentage ownership of each such Person) and (ii) the number of authorized and issued Capital Stock (and treasury shares) of each Borrower and each Subsidiary. Each Borrower has good title to all of the shares it purports to own of the Capital Stock of each of its Subsidiaries, free and clear in each case of any Lien (except as permitted by this Agreement). All such Capital Stock have been duly issued and are fully paid and non-assessable. As of the date hereof, no Borrower has obligated itself to make any Restricted Payment. No Borrower has issued any options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue

56

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

or sell, or any Capital Stock or obligations convertible into, shares of the Capital Stock of such Borrower or any of its Subsidiaries. Except as set forth on Schedule 4.5 hereto, as of the date hereof, to the Borrowers' Knowledge, there are no outstanding agreements or instruments binding upon the holders of a Borrower's Capital Stock relating to the ownership of its Capital Stock.

### 4.6    Licenses.

The Loan Parties have obtained (or caused to be obtained) all material licenses, permits, approvals, easements and rights of way (and all such items are currently in full force and effect) required from any Governmental Authority having jurisdiction over each of Rhodes Ranch, Tuscany, Spanish Hills and South West Ranch, or from private parties (collectively, "**Material Licenses**") necessary or advisable (i) for the current (and each former) stage of development and usage of each Project and (ii) to ensure vehicular and pedestrian ingress to and egress to permit the current (and former) development of each of Rhodes Ranch, Tuscany, Spanish Hills and South West Ranch. The Loan Parties reasonably believe they will obtain on a timely basis in the Ordinary Course of Business all Material Licenses necessary or advisable (i) for the full development and usage of each Project and (ii) to ensure vehicular and pedestrian ingress to and egress as required to permit the full development and usage of each of Rhodes Ranch, Tuscany, Spanish Hills and South West Ranch.

### 4.7    Corporate Names.

During the 5-year period preceding the date of this Agreement and as of the Effective Date, no Borrower nor any Subsidiary has been known as or used any corporate, fictitious or trade names except those listed on Schedule 4.7 hereto. Except as set forth on Schedule 4.7, neither the Borrowers nor any Subsidiary has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

### 4.8    Business Locations; Agent for Process.

As of the date hereof, the chief executive office and other places of business of each Borrower and each Subsidiary are as listed on Schedule 4.8 hereto. During the 5-year period preceding the date of this Agreement, neither of Borrowers nor any Subsidiary has had an office, place of business or agent for service of process other than as listed on Schedule 4.8. Except as shown on Schedule 4.8 on the date hereof, no inventory of any Borrower or any Subsidiary is stored with a bailee, warehouseman or similar Person, nor is any inventory consigned to any Person.

### 4.9    Title to Properties.

A.    Each Borrower and each of its Subsidiaries has good and marketable title to and fee simple ownership of, or in the case of the leased Real Property Assets described on Schedule 4.9A. valid and subsisting leasehold interests in, all of its Real Property Assets (including, without limitation, the Real Property Collateral), and good title to all of its personal

57

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

property, including all property reflected in the financial statements referred to in subsection 4.14 or delivered pursuant to subsection 5.3, in each case free and clear of all Liens except for Liens permitted by this Agreement. Each Borrower has paid or discharged, and has caused each Subsidiary to pay and discharge, all lawful claims which, if unpaid, could reasonably be expected to become a Lien against any properties of such Borrower or such Subsidiary that is not permitted by this Agreement, except to the extent such claim is being Properly Contested. The Liens granted to the Collateral Agent pursuant to the Collateral Documents are First Priority Liens, subject only to those Liens which are expressly permitted by the terms of this Agreement.

B.    There are no material exceptions or material adverse matters (other than Permitted Encumbrances) affecting the Real Property Collateral that would be disclosed by a survey of the Real Property Collateral. A true, accurate and complete depiction of each Project as of the Effective Date is set forth on the maps attached hereto as Exhibit XI and which map identifies the portions of each Project comprising the Real Property Collateral as of the Effective Date. Attached hereto as Schedule 4.9B-1 is a true, correct and complete list of all Real Property Assets owned by each Borrower and each of its Subsidiaries as of the date hereof, setting forth the name of the record owner of such Real Property Asset, the tax parcel identification number or similar designation of such Real Property Asset, and the property description (including parcel number and development).

C.    No Borrower Entity has received any notice of any material special assessment or proceeding affecting any Project, change in the tax rate or the assessed valuation of any Project or any other material changes affecting the taxes, assessments or other charges with respect to any Project which is not reflected in the title reports provided to the Administrative Agent prior to the Effective Date pursuant to subsection 3.1G(iv). Other than those disclosed on Schedule 4.9C. to the Borrowers' Knowledge there are no special assessment districts, or plans for the same, or for any other scheme that would involve the imposition of taxes, in each case relating to any Project. There are no zoning or other land-use regulation proceedings or known change or proposed change in any applicable laws, regulations or the Entitlements which could detrimentally and materially affect the use, value, development or operation of any Project, including the Real Property Collateral.

4.10    **Priority of Liens; UCC-1 Financing Statements**.

A.    As of the Effective Date, each of the Liens in the Collateral granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to any of the Collateral Documents (i) will (when but only to the extent) any UCC-1 Financing Statements and/or any other filings, recordations or control agreements required under or in respect of such Collateral Documents in appropriate form are filed or recorded in the appropriate offices of Governmental Authorities or are executed and delivered, as applicable) constitute valid and fully perfected security interests under the UCC or other Applicable Law in all of the Collateral described therein and (ii) will be a First Priority Lien.

B.    UCC-1 Financing Statements containing a correct, complete and adequate description of the Collateral have been delivered to the Administrative Agent for filing in the

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

office of the Secretary of State of the State of organization of each Loan Party and the State in which each Project is located, and for recording in the official records of the county in which each Project is located, to the extent necessary to establish under the UCC a valid and perfected lien in favor of the Collateral Agent, for the benefit of the Secured Parties, in all Collateral in which a lien may be perfected by filing a UCC-1 Financing Statement, and no further or subsequent filing, recording or registration is necessary in any such jurisdiction or elsewhere in respect of Collateral that may be perfected by filing a UCC-1 Financing Statement, except as provided under the UCC with respect to the filing of continuation statements or in connection with any change in the name, identity or location of any such Loan Party.

**4.11    No Subordination.**

There is no agreement, indenture, contract or instrument to which the Borrowers or any of their Subsidiaries is subject or by which the Borrowers or their Subsidiaries may be bound that requires the subordination in right of payment of any of Borrowers' obligations under this Agreement to any other obligations of Borrowers.

**4.12    Permits; Licenses; Franchises.**

The Borrowers and each of their Subsidiaries possess, in accordance with all Applicable Laws, and without conflict with the rights of any third parties, all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable them to conduct the business (i) in which they are now engaged as of the Effective Date and (ii) in which they are contemplated to be engaged on and after the Effective Date, subject, in the case of clause (ii), to the receipt of further permits and licenses with respect to additional subdivisions as each Project is more fully developed, as contemplated by the applicable Development Agreements, except to the extent the failure to obtain or possess any of the foregoing could not reasonably be expected to result in a Material Adverse Effect. The Borrowers reasonably believe that all such further permits and licenses will be received in a timely manner in the Ordinary Course of Business.

**4.13    Indebtedness.**

As of the Effective Date, the Borrowers and their Subsidiaries have no Indebtedness except for Indebtedness permitted pursuant to subsection 6.1.

**4.14    [Intentionally Omitted].**

**4.15    Disclosure.**

The representations and warranties of each of the Borrowers and their Subsidiaries contained in the Loan Documents and the information contained in the other documents, certificates and written statements furnished to any of the Agents or the Lenders by or on behalf of any Borrower or any of its Subsidiaries for use in connection with the transactions contemplated by this Agreement or any other Loan Document, when considered with all other

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

information then provided, do not contain, as at its date and as of the Effective Date, any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and financial information prepared to give effect to the transactions contemplated hereby and contained in such materials are based upon good faith estimates and assumptions believed by the Borrowers to be reasonable at the time made and at the Effective Date, it being recognized by the Agents and the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that the differences may be material. There is no fact known to any Borrower that has had, or could reasonably be expected to result in, a Material Adverse Effect and that has not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

**4.16    Solvent Financial Condition.**

Each Borrower and each of its Subsidiaries is now Solvent and, after giving effect to the Loans to be made hereunder and the consummation of the transactions contemplated hereby, each Borrower and, after giving effect to all rights of contribution, reimbursement and subrogation arising in connection with the Guaranty, each of its Subsidiaries, will be Solvent.

**4.17    Surety Obligations.**

Except as set forth on <u>Schedule 4.17</u> hereto on the date hereof, the Borrowers and their Subsidiaries are not obligated as surety or indemnitor under any surety or similar bond or other contract issued or entered into any agreement to assure payment, performance or completion of performance of any undertaking or obligation of any Person.

**4.18    Taxes.**

The FEIN of each Borrower and each of its Subsidiaries, on the date hereof, is as shown on <u>Schedule 4.18</u> hereto. Each Borrower and each of its Subsidiaries has filed all federal, state and other material Tax returns and other reports it is required by law to file and has paid, or made provision for the payment of, all Taxes shown on such returns to be due and payable, together with all other material Taxes upon it, its income and properties as and when such Taxes are due and payable, except to the extent being Properly Contested. The provision for Taxes on the books of each Borrower and each of its Subsidiaries are adequate for all years not closed by applicable statutes, and for its current Fiscal Year. The Borrowers are not aware of any proposed material Tax assessment against any Loan Party.

**4.19    Brokers.**

There are no claims against any Borrower or amounts owing or to be owed by any Borrower for brokerage commissions, finder's fees or investment banking or similar fees in connection with the Transactions. Each of the Borrowers hereby indemnifies the Agents and the

Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such commission or broker's or finder's fees or investment banking or similar fees alleged to have been incurred in connection herewith or therewith, and any claim, demand or liability relating thereto, and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

**4.20   Intellectual Property.**

Each Borrower and each of its Subsidiaries owns or has the lawful right to use all Intellectual Property necessary for the present and planned future conduct of its business without, to Borrowers' Knowledge, any conflict with the rights of others except to the extent the failure to own or possess any such right to use or any such conflict could not reasonably be expected to result in a Material Adverse Effect; there is no objection to, or pending (or, to the Borrowers' Knowledge, threatened) claim with respect to, such Borrower's or any of its Subsidiaries' right to use any such Intellectual Property (except to the extent any such objection or claim could not reasonably be expected to result in a Material Adverse Effect and such Borrower is not aware of any grounds for challenge or objection thereto; and, except as may be disclosed on Schedule 4.20 hereto, none of the Borrowers nor any of their Subsidiaries pay any royalty or other compensation to any Person for the right to use any Intellectual Property (other than with respect to off-the-shelf or prepackaged software). All patents, trademarks, service marks, tradenames, copyrights, licenses and other similar rights of the Loan Parties, as of the date hereof, are listed on Schedule 4.20 hereto, to the extent they are registered under any Applicable Law or applications for registration thereof have been made under any Applicable Law.

**4.21   Governmental Authorization.**

Each Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Authorizations necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its properties as now owned or leased by it, except where the failure to have such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect.

**4.22   Compliance with Laws.**

Each Borrower, each of its Subsidiaries, each Project and the use and operations of each Project are in compliance in all material respects with, the provisions of all Applicable Laws (other than Environmental Laws) and there have been no citations, notices or orders of noncompliance issued to such Borrower or any of the Subsidiaries under any such law, rule or regulation. Each Borrower and each of its Subsidiaries is in compliance with all Environmental Laws applicable to it and properties owned by it except to the extent failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**4.23    Burdensome Contracts.**

None of the Borrowers nor any of their respective Subsidiaries is a party or subject to any contract, agreement, or charter or other corporate restriction, which has or (after giving effect to the transactions contemplated by this Agreement) could be reasonably expected to have a Material Adverse Effect.

**4.24    Litigation.**

Except as set forth on Schedule 4.24 hereto, there are no actions, suits, proceedings or investigations pending or, to the Borrowers' Knowledge, threatened on the date hereof against or affecting the Borrowers or any of their Subsidiaries, or the business, operations, properties, prospects, profits or condition of the Borrowers or any of their Subsidiaries, (i) which relate to any of the Loan Documents or any Material Contract, or any of the transactions contemplated thereby or (ii) which could reasonably be expected to have a Material Adverse Effect. Neither the Borrowers nor any of their Subsidiaries is in default on the date hereof with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal.

**4.25    No Defaults.**

No event has occurred and no condition exists which would, upon or after the execution and delivery of this Agreement or such Borrower's performance hereunder, constitute a Default or an Event of Default. None of the Borrowers nor any of their respective Subsidiaries is in default, and no event has occurred and no condition exists which constitutes or which with the passage of time or the giving of notice or both would constitute a default, (x) in the payment of any Indebtedness of such Borrower or any Subsidiary to any Person which would result in a Default or Event of Default hereunder or that could reasonably be expected to have a Material Adverse Effect or (y) under any Material Contract.

**4.26    Leases.**

Schedule 4.26 hereto is a complete listing of each Capitalized Lease and Operating Lease of each Borrower and each of its Subsidiaries on the date hereof that provides for payments in excess of $7,500,000 over the term of such Capitalized Lease or Operating Lease. Each Borrower and each of its Subsidiaries is in substantial compliance with all of the terms of each of its respective Capitalized Leases and Operating Leases and there is no basis upon which the lessors under any such leases could terminate the same prior to the scheduled maturity or stated termination date thereof or declare such Borrower or any of its Subsidiaries in default thereunder, which, in any case, would result in a Default or Event of Default hereunder or that could reasonably be expected to have a Material Adverse Effect.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

4.27    **Employee Benefit Plans.**

A.    Except as disclosed on Schedule 4.27 hereto, neither any of the Borrowers nor any of their Subsidiaries nor any of their ERISA Affiliates maintains, contributes or participates in or may incur any liability under any Pension Plan as of the date hereof. Each of the Borrowers and their Subsidiaries and each of their ERISA Affiliates are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Pension Plan and Borrower Pension Plan, and have performed all their obligations under each Pension Plan and Borrower Pension Plan, except those where failure to perform such obligations could not reasonably be expected to result in material liability to any Borrower or any Subsidiary. With respect to each Pension Plan and Borrower Pension Plan, no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any such Pension Plan or Borrower Pension Plan or any trust established under Title IV of ERISA has been, or is expected by any of the Borrowers or any of their Subsidiaries or any of their ERISA Affiliates to be, incurred by any of the Borrowers or any of their Subsidiaries or any of their ERISA Affiliates.

B.    No ERISA Event has occurred or could reasonably be expected to occur which has resulted or is reasonably likely to result in any material liability to any Borrower or any Subsidiary. No fact or situation that could reasonably be expected to have a Material Adverse Effect exists with respect to any Pension Plan or Borrower Pension Plan.

C.    Except as could not reasonably be expected to result in material liability to any Borrower or any Subsidiary, no Borrower nor any of their Subsidiaries maintains or contributes to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employees of such Borrower or any Subsidiary other than as required under Section 4980B of the Internal Revenue Code or Part 6 of Subtitle B of Title I of ERISA.

D.    Except as could not reasonably be expected to result in material liability to any Borrower or any Subsidiary, no Pension Plan has any "unfunded benefit liability" as defined in Section 4001(a)(18) of ERISA (but excluding from the definition of "current value" of "assets" of such Pension Plan, accrued but unpaid contributions).

E.    Except as could not reasonably be expected to result in material liability to any Borrower or any Subsidiary, each Borrower and its Subsidiaries and each ERISA Affiliate has complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and is not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither any of the Borrowers nor any of their Subsidiaries nor any of their ERISA Affiliates has incurred or could reasonably be expected to incur any withdrawal liability in connection with a Multiemployer Plan.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**4.28**  **Trade Relations.**

There exists no actual or, to the Borrowers' Knowledge, threatened termination, cancellation or material limitation of, or any materially adverse Modification or change in, the business relationship between any Borrower or any Subsidiary and any customer or any group of customers whose purchases individually or in the aggregate are material to the business of the Loan Parties, taken as a whole, or with any material supplier, contractor, builder or group of suppliers, contractors or builders and there exists no condition or state of facts or circumstances which could reasonably be expected to have a Material Adverse Effect or prevent such Borrower or any Subsidiary from conducting such business after the consummation of the transactions contemplated by this Agreement in substantially the same manner as it has heretofore been conducted.

**4.29**  **Labor Relations.**

Except as described on Schedule 4.29 hereto, neither the Borrowers nor any of their Subsidiaries is a party to any collective bargaining agreement on the date hereof.  On the date hereof, there are no material grievances, disputes or controversies with any union or any other organization of the Borrowers and their Subsidiaries.

**4.30**  **Not a Regulated Entity.**

No Loan Party is (i) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; (ii) a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935; or (iii) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

**4.31**  **Margin Stock.**

Neither any Borrower nor any Subsidiary is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

**4.32**  **No Material Adverse Change.**

Since the Effective Date, no event or change has occurred that has caused or evidences or could reasonably be expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect.

**4.33**  **Environmental Matters.**

Except as disclosed on Schedule 4.33 hereto, as of the date hereof:

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(i)     Each Borrower, each of its Subsidiaries (including, without limitation, all operations and conditions at or in the Real Property Assets), and, to the Borrowers' Knowledge, each of the tenants under any leases or occupancy agreements affecting any portion of any Real Property Assets, are in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by any Borrower, each of its Subsidiaries and each of such tenants of all permits and other Governmental Authorizations required under applicable Environmental Laws, and compliance with the terms and conditions thereof), except where failure to be in compliance could not reasonably be expected to result in a Material Adverse Effect. Neither any Borrower nor any of its Subsidiaries, nor, to the Borrowers' Knowledge, any tenants under any leases or occupancy agreements affecting any portion of the Real Property Assets has received any communication, whether from a Governmental Authority, citizens group, employee or otherwise, alleging that any Borrower, any of its Subsidiaries, or any such tenant is not in such compliance, and to the Borrowers' Knowledge there are no past or present actions, activities, circumstances conditions, events or incidents that could reasonably be expected to prevent or interfere with such compliance in the future, except in each case to the extent the failure to be in compliance could not reasonably be expected to result in a Material Adverse Effect.

(ii)     There is no Environmental Claim pending or, to the Borrowers' Knowledge, threatened against any Borrower or any of its Subsidiaries or, to the Borrowers' Knowledge, against any Person whose liability for any Environmental Claim any Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(iii)     There are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release or presence of any Hazardous Material, which could reasonably be expected to form the basis of any Environmental Claim against any Borrower or any of its Subsidiaries, or to the Borrowers' Knowledge, against any Person whose liability for any Environmental Claim any Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which could reasonably be expected to result in a Material Adverse Effect.

(iv)     Each Borrower and each of its Subsidiaries have not, and to the Borrowers' Knowledge, no other Person has placed, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials on, beneath or adjacent to any property currently or formerly owned, operated or leased by any Borrower or any of its Subsidiaries, in each case, which, individually or in the aggregate, which could reasonably be expected to result in a Material Adverse Effect.

(v)     No Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Real Property Asset.

(vi)    Without in any way limiting the generality of the foregoing, except as would not reasonably be expected to result in a Material Adverse Effect, none of the Real Property Assets contain any:  underground storage tanks; asbestos; polychlorinated biphenyls ("**PCBs**"); underground injection wells; radioactive materials; or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed.

(vii)    The Borrowers have provided to the Lenders all material assessments, reports, data, results of investigations or audits, and other information that is in the possession of or reasonably available to the Borrowers regarding environmental matters pertaining to or the environmental condition of the business of the Borrowers and their Subsidiaries, or the compliance (or noncompliance) by the Borrowers or any of their Subsidiaries with any Environmental Laws.

## 4.34    Material Contracts.

**A.**    As of the Effective Date, the Borrowers and their Subsidiaries are not party to or bound by any contract, agreement, commitment or other document (or any related series of contracts, agreements, commitments or documents) that contemplates (x) the payment by the Borrowers or any of their Subsidiaries of Cash or other consideration with a value exceeding an aggregate amount of $10,000,000 to a Person that is not a Loan Party or (y) the receipt by the Borrowers or any of their Subsidiaries of Cash or other consideration with a value exceeding an aggregate amount of $10,000,000 from a Person that is not a Loan Party, other than the Material Contracts.

**B.**    The Borrowers have heretofore furnished to the Administrative Agent a true, correct and complete copy of each Material Contract, and all exhibits, schedules and Modifications thereto. The Material Contracts have not been Modified or clarified except as set forth on Schedule 4.34.

**C.**    Each Material Contract, as of the date hereof, is in full force and effect and constitutes a legal, valid and binding obligation of the applicable Borrower Entity, and, to the Borrowers' Knowledge, each other party thereto.

**D.**    No Borrower Entity, as of the date hereof, is in default or breach (with or without the giving notice or the passage of time) of any Material Contract.  Except as set forth on **Schedule 4.34**, the Borrowers have no knowledge that any other party is in default or breach of any Material Contract, or the existence of any conditions which, with the giving of notice or the passage of time, or both, could constitute a default or breach.  As of the date hereof, none of the material rights and privileges under the Material Contracts inuring to any Borrower Entity has lapsed, and neither Clark County nor any other party has any right as of the date hereof to terminate any of the Material Contracts.

**E.**    As of the date hereof, each applicable Borrower Entity has paid all fees, made all dedications, posted all bonds and other security, completed all improvements and otherwise

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

performed all obligations required to be performed by the applicable Borrower Entity under the Material Contracts in accordance therewith to the date hereof.

**4.35    Utilities.**

As of the date hereof, all material water, sewer, gas, electric, telephone and drainage facilities and all other utilities required (by Applicable Law or otherwise) to be installed for the current stage of development and the current usage of each Project are installed to the property lines of each Project, are all connected and operating pursuant to valid permits, are adequate to service the current usage of each Project, and are connected to each Project by means of one or more public or private easements extending from such Project to one or more public streets, public rights-of-way or utility facilities.  The Borrowers reasonably expect to obtain on a timely basis in the Ordinary Course of Business all water, sewer, gas, electric, telephone and drainage facilities and all other utilities (if not already so obtained) required (by Applicable Law or otherwise) for, and adequate to service, the intended full usage, development and operation of each Project.

**4.36    Entitlements.**

A.    The Loan Parties have (i) all Entitlements necessary for the current stage of development and the current usage of each Project, and (ii) except as set forth in Part A of Schedule 4.36, all Major Entitlements necessary to permit the full development and usage of each Project (collectively, the "**Existing Entitlements**").  All of the Existing Entitlements are in full force and effect.  All Major Entitlements that are Existing Entitlements are set forth in Part B of Schedule 4.36.  All the Existing Entitlements are vested in the Real Property Collateral, and the consummation of the transactions contemplated hereby shall not affect the same.  There are no unperformed obligations or conditions with respect to the effectiveness of any of the Existing Entitlements that were or are required to be completed as of the Effective Date, and there are no material uncured defaults or breaches under any of the same.  As of the date hereof, no Borrower Entity is aware of any defects or actual or potential actions, challenges or proceedings by any third party or Governmental Authority with respect to the Existing Entitlements.  No Borrower has received notice of any changes to any of the Existing Entitlements; all of the material documents relating to the Major Entitlements that are Existing Entitlements are identified in Part B of Schedule 4.36 (collectively, the "**Entitlement Documents**"), and there are no other material documents relating to the Existing Entitlements other than those set forth on Schedule 4.36.

B.    The Borrowers reasonably believe that all Entitlements necessary to permit the full development and usage of each Project have been obtained or will be obtained on a timely basis in the Ordinary Course of Business, and no Borrower is aware of any actual or potential adverse actions, challenges or proceedings by any third party or Governmental Authority with respect to any such Entitlements.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## SECTION 5.
## AFFIRMATIVE COVENANTS

Each of the Borrowers covenants and agrees that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, each of the Borrowers shall and shall cause each of its Subsidiaries to:

### 5.1    Visits and Inspections.

Permit representatives of the Administrative Agent, from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to such Borrower, to visit and inspect the properties of such Borrower and each of its Subsidiaries, conduct appraisals of a Borrower's properties, inspect, audit and make extracts from each Borrower's and each of its respective Subsidiary's books and records, and discuss with its officers, its employees and (with a Responsible Officer) its independent accountants, such Borrower's and each of its Subsidiary's business, financial condition, business prospects and results of operations. Representatives of the Borrowers (including, without limitation, the Borrowers' accountants) shall be authorized to accompany the Administrative Agent (or representative thereof) on any such visit or inspection, but such authorization shall in no manner be deemed to be a requirement or condition of the Administrative Agent's visits or inspections, and to the extent any of the Borrowers' representatives accompany the Administrative Agent on any visit or audit, such Persons shall in no manner hinder or delay the audits or inspections of the Administrative Agent. Representatives of each Lender shall be authorized to accompany the Administrative Agent on each such visit and inspection and to participate with the Administrative Agent therein, but at their own expense, unless a Default or Event of Default exists. Neither the Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

### 5.2    Notices.

Notify the Administrative Agent and Lenders in writing, promptly after any Borrower's obtaining knowledge of the following:

(i)    the institution of, or written threat of, any action, suit, proceeding, governmental investigation or arbitration against or affecting the Borrowers or their Subsidiaries and not previously disclosed, which action, suit, proceeding, governmental investigation or arbitration (a) exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances expose, such Persons, in the Borrowers' reasonable judgment, to liability in an amount aggregating $7,500,000 or (b) seeks injunctive or other relief which, if obtained, could reasonably be expected to have a Material Adverse Effect, providing such other information as may be reasonably available to enable Administrative Agent and its counsel to evaluate such matters; the Borrowers, upon

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

request of the Administrative Agent, shall promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration;

(ii)    any labor dispute to which any of the Borrowers or their Subsidiaries may become a party, any strikes or walkouts relating to any of its property or facilities, and the expiration of any labor contract to which it is a party or by which it is bound, which could reasonably be expected to have a Material Adverse Effect;

(iii)    any default by any of the Borrowers or their Subsidiaries under, or termination of, any Material Contract, or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness of such Person exceeding $5,000,000 (or receipt of any notice claiming such a default or termination or giving notice thereof);

(iv)    termination, suspension or revocation of any Entitlements which could reasonably be expected to have a Material Adverse Effect;

(v)    the existence of any (a) Default, (b) Event of Default or (c) event, circumstance or change that has caused or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect;

(vi)    the occurrence of or forthcoming occurrence of any ERISA Event or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan sponsor concerning an ERISA Event;

(vii)    any judgment against any of the Borrowers or their Subsidiaries in an amount exceeding $5,000,000;

(viii)    any violation or asserted violation by any of the Borrowers or their Subsidiaries of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect or result in liability of such Borrower or Subsidiary in an amount in excess of $5,000,000;

(ix)    any Release on any property owned or occupied by any of the Borrowers or their Subsidiaries if such Release could reasonably be expected to require Cleanup under Environmental Laws at an expected cost of greater than $5,000,000;

(x)    the discharge of such Borrower's independent accountants or any withdrawal of resignation by such independent accountants from their acting in such capacity; in addition, each Borrower shall give the Administrative Agent at least ten (10) Business Days' prior written notice of any change in any Borrower's or Subsidiary Guarantor's chief executive office, legal name or jurisdiction of organization;

(xi)    copies of any Tax assessments in an amount in excess of $5,000,000; and

69

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(xii)    such other information and data with respect to such Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lender.

## 5.3    Financial Statements and Other Reports.

Maintain all necessary and proper books and records including a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP.  Deliver to the Administrative Agent for distribution to each Lender:

(i)    Quarterly Financials:  as soon as available and in any event within forty five (45) days after the end of each Fiscal Quarter (other than the fourth Fiscal Quarter of any Fiscal Year), commencing with the Fiscal Quarter ending March 31, 2010, (a) the respective combined consolidated balance sheets of the Borrowers and their respective Subsidiaries and Affiliates, as at the end of such Fiscal Quarter and the related combined consolidated statements of income and statement of cash flows of the Borrowers and their respective Subsidiaries and Affiliates for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth, (x) supplemental consolidating schedules reflecting (1) the consolidated balance sheets of the Borrowers and their Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income and statement of cash flows of the Borrowers and their Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, (2) eliminations for such period and (3) consolidating schedules for such period and, (y) in the case of statements of income only, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of each Borrower that they fairly present, in all material respects, the financial condition of the Borrowers and their respective Subsidiaries and Affiliates, as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of the Borrowers and their Subsidiaries, in each case, taken as a whole, for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, which report shall include a summary describing (1) the number of real property parcels sold during such Fiscal Quarter with corresponding revenue and average price calculations, (2) the number of real property parcels constituting inventory backlog at the end of such Fiscal Quarter with corresponding revenue and average price calculations, (3) by subdivision, the number of real property parcels sold to date on a cumulative basis, and the remaining number of real property parcels constituting inventory, and (4) the number of Homesites completed and under construction at the end of such Fiscal Quarter;

(ii)    Year-End Financials:  as soon as available and in any event within ninety (90) days after the end of each Fiscal Year, (a) the respective audited combined

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

consolidated balance sheets of the Borrowers and their respective Subsidiaries and Affiliates, as at the end of such Fiscal Year and the related audited consolidated and unaudited consolidating statements of income and statement of cash flows of each for such Fiscal Year (which shall also contain reviewed but unaudited supplemental consolidating schedules reflecting (1) the consolidated balance sheets of the Borrowers and their Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income and statement of cash flows of the Borrowers and their Subsidiaries for such Fiscal Year, (2) the consolidated balance sheets of Subsidiaries and Affiliates of any Borrower that are not Loan Parties for such Fiscal Year and the related consolidated statements of income and statement of cash flows of the Subsidiaries and Affiliates of any Borrower that are not Loan Parties for such Fiscal Year, (3) eliminations for such period and (4) consolidating schedules for such period, setting forth, in the case of statements of income only, in comparative form the corresponding figures for the previous Fiscal Year, all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of each Borrower that they fairly present, in all material respects, the financial condition of the Borrowers and their respective Subsidiaries and Affiliates, as at the dates indicated and the results of their operations and their cash flows for the periods indicated; (b) a narrative report describing the operations of the Borrowers and their Subsidiaries, in each case, taken as a whole, for such Fiscal Year, which report shall include a summary describing (1) the number of real property parcels sold during such Fiscal Year with corresponding revenue and average price calculations, (2) the number of real property parcels constituting inventory backlog at the end of such Fiscal Year with corresponding revenue and average price calculations, (3) by subdivision, the number of real property parcels sold to date on a cumulative basis, and the remaining number of real property parcels constituting inventory, and (4) the number of Homesites completed and under construction at the end of such Fiscal Year; and (c) in the case of such combined consolidated financial statements of the Borrowers and their respective Subsidiaries and Affiliates, a report thereon of independent certified public accountants of recognized national standing selected by the Borrowers and reasonably satisfactory to the Administrative Agent, which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception, and shall state that (x) such consolidated financial statements fairly present, in all material respects, the combined consolidated financial position of the Borrowers and their respective Subsidiaries and Affiliates as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the audit by such accountants in connection with such combined consolidated financial statements has been made in accordance with generally accepted auditing standards and (y) such schedules have been subject to audit procedures by such accountants;

(iii)    Officer's Certificates; Compliance Certificates:    together with each delivery of financial statements of the Borrowers and their respective Subsidiaries and Affiliates pursuant (a) to subdivisions (i) and (ii) of this subsection 5.3, an Officer's

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Certificate of the Borrowers stating that the signer has reviewed the terms of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of the Borrowers and their respective Subsidiaries and Affiliates during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signer did not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or Event of Default, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action the Borrowers have taken, are taking and propose to take with respect thereto; and (b) to subdivisions (i) and (ii) of this subsection 5.3, a Compliance Certificate demonstrating in reasonable detail compliance during and at the end of the applicable accounting periods with the covenants set forth in subsections 6.6 and 6.16.

      (iv)    [Intentionally Omitted]

      (v)    [Intentionally Omitted]

      (vi)    Accountants' Reports:  promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to any Borrower, its Subsidiaries and/or Affiliates by a national independent certified public accountants in connection with each annual, interim or special audit of the financial statements of such Borrower, its Subsidiaries, and Affiliates made by such accountants, including, without limitation, any comment letter submitted by such accountants to management in connection with their annual audit;

      (vii)    [Intentionally Omitted]

      (viii)  Casualty:  promptly upon the occurrence of any casualty involving any property of the Borrowers or any of their Subsidiaries involving a loss that could reasonably be expected to exceed $5,000,000, written notice with sufficient detail describing the casualty and the extent to which any losses resulting from such casualty will be covered by insurance;

      (ix)    Appraisal Updates:  together with each delivery of financial statements of the Borrowers and their respective Subsidiaries and Affiliates pursuant to subdivision (ii) of this subsection 5.3, an Acceptable Appraisal that provides an Appraised Value of the remaining portion of all Real Property Collateral, effective as of the last day of the preceding Fiscal Year; provided, that, in addition to the foregoing, Administrative Agent will be entitled to obtain, at Borrowers' expense, additional Acceptable Appraisals of any such Real Property Collateral (or any portion thereof) if (i) an Event of Default exists, or (ii) an appraisal is required under applicable Law;

      (x)    Budgets:  as soon as practicable and in any event no later than ninety (90) days after the end of each Fiscal Year, a budget for the next succeeding Fiscal Year of the

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

Borrowers in form and substance reasonably satisfactory to the Requisite Lenders, including, without limitation, forecasted quarterly financial results of the Borrowers and their Subsidiaries for such Fiscal Year, together with an Officer's Certificate demonstrating compliance with the covenants set forth in subsection 6.6, prepared on a pro forma basis to give effect to such forecasted financial results for such Fiscal Year and an explanation of the assumptions on which such forecasts are based and such other information and projections as the Required Lenders may reasonably request;

    (xi)    <u>Events of Default</u>:  promptly upon any Responsible Officer obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default, (b) that any Person has given any written notice to the Borrowers or any of their Subsidiaries or taken any other action that could reasonably be expected to have a material adverse effect on the Borrowers or any of their Subsidiaries with respect to a claimed default or event or condition of the type referred to in subsection 7.6 or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrowers (or applicable Subsidiaries) have taken, are taking and propose to take with respect thereto;

    (xii)    <u>Litigation or Other Proceedings</u>:  (a) promptly upon any Responsible Officer obtaining knowledge of (x) the institution of, or written threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Borrowers or any of their Subsidiaries or any property of the Borrowers or any of their Subsidiaries (collectively, "**Proceedings**") not previously disclosed in writing by the Borrowers to the Lenders or (y) any material development in any Proceeding that, in any case:

        (a)    could reasonably be expected to have a Material Adverse Effect; or

        (b)    seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

written notice thereof together with such other information as may be reasonably available to the Borrowers and as the Borrowers and their counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty-five (45) days after the end of each Fiscal Quarter of the Borrowers, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrowers or any of their Subsidiaries equal to or greater than $5,000,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

its counsel to evaluate any of such Proceedings; provided, however, that the Borrowers and their counsel may withhold information if in their reasonable determination, disclosure of such information would jeopardize the attorney-client privilege with respect to such Proceeding;

(xiii)  ERISA Events:  promptly upon the Borrowers becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrowers or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

(xiv)  ERISA Notices:  with reasonable promptness, copies of (a) all written notices received by the Borrowers or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

(xv)  Insurance:  as soon as practicable and in any event by the last day of each Fiscal Year, a certificate in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such report by the Borrowers and their Subsidiaries and all material insurance coverage planned to be maintained by the Borrowers and their Subsidiaries in the immediately succeeding Fiscal Year;

(xvi)  Environmental Audits and Reports:  promptly upon their becoming available, copies of all environmental audits and reports, whether prepared by personnel of the Borrowers or any of their Subsidiaries or by independent consultants, with respect to environmental matters affecting any property owned or operated by the Borrowers or their Subsidiaries or which relate to any Environmental Liabilities of the Borrowers or its Subsidiaries, to the extent reflecting any matters which, in any such case, could reasonably be expected to result in a Material Environmental Liability;

(xvii)  Regulatory Notices:  as soon as practicable, notification of any change in any law, rule or regulation relating to the business of the Borrowers and their Subsidiaries which could reasonably be expected to have a Material Adverse Effect;

(xviii)  Material Contracts:  (a) concurrently with each delivery of quarterly financial statements, and within forty-five (45) days after the end of each Fiscal Year, a report indicating any Material Contract that terminated or expired, or that was Modified in any manner which is materially adverse to the Borrowers and their Subsidiaries during the quarterly period then last ended and (b) promptly after any notice or other communication is delivered by any party to any Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter that could reasonably be expected to have adverse financial consequences to the Borrowers or any of their

74

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Subsidiaries in excess of $$5,000,000 or (y) any other non-financial matter which could reasonably be expected to have material adverse consequences to the business of the Borrowers and their Subsidiaries (whether or not constituting a Material Adverse Effect), notice and a copy thereof;

(xix)   [Intentionally Omitted]

(xx)   Monthly Sales Reports:  within five (5) Business Days after the end of each month, deliver a sales report in form and substance reasonably acceptable to the Administrative Agent setting forth a summary describing (1) the number of real property parcels sold during such month with corresponding revenue and average price calculations, (2) the number of real property parcels constituting inventory backlog at the end of such month with corresponding revenue and average price calculations, (3) by subdivision, the number of real property parcels sold to date on a cumulative basis, and the remaining number of real property parcels constituting inventory, and (4) the number of Homesites completed and under construction at the end of such month; and

(xxi)   Other Information:  with reasonable promptness, such other information and data with respect to the Borrowers or any of their Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lenders, and such other documentation, information and certifications described in subsection 3.1U as from time to time requested by the Administrative Agent or any Lender.

**5.4   Corporate Existence.**

At all times preserve and keep in full force and effect its organizational existence (except to the extent permitted by subsection 6.7) and all rights and franchises material to the business of the Borrowers and their Subsidiaries (on a consolidated basis).

**5.5   Payment of Taxes and Claims; Tax Consolidation.**

**A.**   Pay all income and other material taxes, assessments (including, without limitation, Special Taxes) and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty accrues thereon, and all material claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; provided that no such tax, charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefore.

**B.**   Not file or consent to the filing of any consolidated, combined or other similar income tax return with any Person (other than the Borrowers and Subsidiaries of the Borrowers) (it being expressly understood that each direct and indirect equity holder of the Borrowers may

75

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

file income tax returns that include such equity holder's share of the financial results of the Borrowers and their Subsidiaries as may be required under Applicable Law).

**5.6**    **Maintenance of Properties; Insurance.**

Maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrowers and their Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof. Maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds and with respect to liability substantially similar to such insurance maintained as of the Effective Date. Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Secured Parties as additional insured and as the loss payee thereunder for all losses, subject to application of proceeds as required by subsection 2.4B(iii)(c), each such policy of liability insurance coverage shall name the Collateral Agent, for the benefit of the Secured Parties, as additional insureds, and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy.

**5.7**    **Lender Meeting.**

Upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and the Lenders at least once during each Fiscal Year (and will participate in such other meetings at such other times as the Borrowers and the Administrative Agent may agree) to be held at the Borrowers' corporate offices (or such other location as may be agreed to by the Borrowers and the Administrative Agent) at such time as may be agreed to by the Borrowers and the Administrative Agent.

**5.8**    **Compliance with Laws**

Comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other non-compliances, could reasonably be expected to cause a Material Adverse Effect.

**5.9**    **Environmental Disclosure and Inspection.**

A.    Exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws, except for any such noncompliance which could not reasonably be expected to result in a Material Environmental Liability.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

**B.**    The Borrowers agree that the Administrative Agent may, from time to time, retain, at the Borrowers' expense, an independent professional consultant reasonably acceptable to the Borrowers to review any report relating to Hazardous Materials prepared by or for the Borrowers and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances) of any Real Property Asset currently owned, leased, operated or used by the Borrowers or any of their Subsidiaries, if (x) a Default or an Event of Default shall have occurred and be continuing or (y) the Administrative Agent reasonably believes (1) that an occurrence relating to such Real Property Asset is likely to give rise to an Environmental Liability or (2) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur, which could, in either such case, reasonably be expected to result in a Material Environmental Liability.  The Borrowers shall use their reasonable efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrowers, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrowers or any of their Subsidiaries to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation.  Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrowers and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such Real Property Asset.

**C.**    Promptly advise the Administrative Agent in writing and in reasonable detail of (i) any Release or threatened Release of any Hazardous Materials, or to the Borrowers' Knowledge any tenants under any leases or occupancy agreements affecting any portion of any Real Property Asset, required to be reported to any federal, state, local or foreign governmental or regulatory agency under any applicable Environmental Laws, (ii) any and all written communications with respect to any pending or threatened Environmental Claims and any and all material written communications with respect to any Release or threatened Release of Hazardous Materials, in any case, the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iii) any Cleanup performed by the Borrowers, any Subsidiary or any other Person in response to any Hazardous Materials on, under or about any Real Property Asset, the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iv) any Borrower's or any Subsidiary's discovery of any occurrence or condition on any property that could reasonably be expected to cause any Real Property Asset to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws and (v) any written request for information from any governmental agency that suggests such agency is investigating facts, conditions, events or circumstances which have a reasonable possibility of giving rise to a Material Environmental Liability.

**D.**    Promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrowers or any of their Subsidiaries that could reasonably be expected to expose the Borrowers or any of their Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrowers or any of their Subsidiaries to commence

**PRELIMINARY DRAFT**
**SUBJECT TO MODIFICATION**
**FINAL VERSION MUST BE ACCEPTABLE**
**TO FIRST LIEN STEERING COMMITTEE**

manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrowers or any of their Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrowers and their Subsidiaries as of the Effective Date.

E.     At their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this subsection 5.9.

## 5.10    Remedial Action Regarding Hazardous Materials.

Promptly take any and all necessary or prudent Cleanup in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset under Environmental Laws and Governmental Authorizations. In the event the Borrowers or any of their Subsidiaries undertakes any Cleanup with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrowers or such Subsidiary shall conduct and complete such Cleanup in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrowers' or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested. In the event Borrowers shall fail timely to commence or cause to be commenced or fail diligently to prosecute to completion such Cleanup, Agent or Lenders may, but shall not be obligated to, cause such Cleanup to be performed, and all costs and expenses (including, without limitation, attorneys' and consultants' fees, charges and disbursements) thereof or incurred by Agent and Lenders in connection therewith shall be paid promptly by Borrowers with interest thereon at the rate equal to 2% per annum in excess of the highest interest rates applicable to Loans at such time and otherwise payable under this Agreement.

## 5.11    Additional Collateral; Execution of Guaranty and Collateral Documents by Future Subsidiaries.

A.     In the event that any Borrower Entity acquires any property after the Effective Date (other than property described in subsection 5.11B and other than personal property not required to be perfected pursuant to the Collateral Documents) as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (i) notify the Administrative Agent of that fact, (ii) execute and deliver (or cause to be executed and delivered (and, in the case of any documents, instruments or consents to be executed by a Person that is not a Borrower Entity or any Affiliate thereof, use commercially reasonable efforts to obtain)) to the Administrative Agent and the Collateral Agent, such Modifications to the Pledge and Security Agreement and/or each other applicable Collateral Document, and take all such further action and execute all such further documents and instruments as any Agent may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in:  (a) any such personal property assets;

78

(b) any such owned Real Property Assets and any development agreements (or other similar agreements) related thereto; and (c) any such leasehold interests, the fair market value of which exceeds, individually or in the aggregate, $5,000,000, as reasonably determined by the Administrative Agent. If and to the extent requested by the Administrative Agent, the Borrowers shall deliver to the Administrative Agent, together with such Loan Documents, a favorable opinion of counsel to the Borrower Entities, that is reasonably satisfactory to the Administrative Agent and its counsel, as to (a) the valid existence and good standing of such Borrower Entity, (b) the due authorization, execution and delivery by such Borrower Entity of such Collateral Documents to which it is a party, (c) the enforceability of such Collateral Documents against such Borrower Entity, (d) the validity and perfection of the security interests granted by such Borrower Entity in favor of the Collateral Agent pursuant to the Collateral Documents and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.

     **B.**     In the event that any Person becomes a Subsidiary of the Borrowers (other than any Joint Venture that Investments have been made in under subsection 6.3(x)), promptly notify the Administrative Agent of that fact and, cause such Subsidiary, no later than ten (10) Business Days (or such longer period of time as the Administrative Agent shall agree) after it becomes a Subsidiary, to execute and deliver to the Administrative Agent and the Collateral Agent a counterpart of the Guaranty and the Pledge and Security Agreement and each other applicable Collateral Document, and to take all such further action and execute (and, in the case of any documents, instruments or consents to be executed by a Person that is not a Borrower Entity or any Affiliate thereof, use commercially reasonable efforts to obtain) all such further documents and instruments as any Agent may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in all of the: (a) personal property assets of such Subsidiary; (b) Real Property Assets owned by such Subsidiary; and (c) leasehold interests of such Subsidiary, the fair market value of which exceeds, individually or in the aggregate, $5,000,000, as reasonably determined by the Administrative Agent (such documents and instruments required to be executed and delivered pursuant to this subsection 5.11B, the "Subsidiary Loan Documents"). In addition, the Borrowers shall pledge (if they are the direct owner of Capital Stock of such Subsidiary) or shall cause each of their applicable Subsidiaries to pledge (if any of such other Subsidiaries is the direct owner of Capital Stock of such Subsidiary, each such owner, whether the Borrowers or any of their other Subsidiaries, the "Pledging Parent") all of the Capital Stock of such Pledging Parent's Subsidiary to the Collateral Agent pursuant to the applicable Collateral Documents and to take all such further action and execute all such further documents and instruments as may be required or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in such Capital Stock. The Borrowers shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

Administrative Agent, (b) a copy of such Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing the Guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such Guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded except to the extent reflected therein and (ii) if and to the extent requested by the Administrative Agent, a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Administrative Agent, and its counsel, as to (a) the valid existence and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such Guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such Guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the Pledging Parent of such Subsidiary in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.  In addition, the Borrowers shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired.

C.    If requested by the Collateral Agent, with respect to each Real Property Asset that is subject to a Mortgage pursuant to subsection 5.11A or subsection 5.11B, provide (and in the case of the following clause (v) use commercially reasonable efforts to provide) the Collateral Agent with (i) Mortgagee Policies of the type described in subsection 3.1G(iii) covering such Real Property Collateral in an amount at least equal to the purchase price of such Real Property Collateral (or such other amount as shall be reasonably specified by the Collateral Agent), (ii) an ALTA/ACSM survey with respect to such Real Property Collateral dated a date, and prepared by a Person and in form and substance, reasonably satisfactory to the Collateral Agent, (iii) environmental reports of the type described in subsection 3.1N with respect to such Real Property Collateral dated a date, and in form and substance reasonably satisfactory to the Collateral Agent, (iv) title reports issued by the Title Company with respect to such Real Property Collateral, dated a date, and in form and substance, satisfactory to the Collateral Agent (and which may include Permitted Encumbrances), and (v) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with the Mortgages relating to such Real Property Collateral, in form and substance reasonably satisfactory to the Collateral Agent.

**5.12    Intentionally Omitted.[**.

**5.13    Further Assurances.**

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, each Borrower will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents and to provide for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents. In furtherance and not in limitation of the foregoing, the Borrowers shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Borrowers and the Subsidiary Guarantors and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of this Agreement) of the Borrowers and their Subsidiaries.

**5.14    Title.**

Each of the Borrowers shall warrant and defend (a) its title to the Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity, perfection and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. The Borrowers shall reimburse each Agent for any costs or expenses (including reasonable attorneys' fees and court costs) incurred by such Agent if an interest in any of the Collateral, other than as permitted hereunder, is claimed by another Person.

**5.15    Maintenance of Entitlements; Development Agreements.**

Warrant and defend, and otherwise maintain, all of the material Entitlements obtained by any of the Borrowers or any of their Subsidiaries in connection with any Real Property Collateral as necessary (i) for the development of Rhodes Ranch, Tuscany, South West Ranch, and Spanish Hills, and (ii) to ensure each Project is in compliance in all material respects with Applicable Laws. The Borrowers and their Subsidiaries shall on a timely basis obtain all material Entitlements that have not been obtained as of the Effective Date as necessary (i) for the development of Rhodes Ranch, Tuscany, South West Ranch, Spanish Hills, and (ii) to ensure each Project is in compliance in all material respects with Applicable Laws. To the extent any material Entitlements (including, without limitation, the terms of the Development Agreements) require any obligations or conditions to be fulfilled by the Borrowers or any of their Subsidiaries, the Borrowers will perform (or caused to be performed) such obligations or conditions.

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

## SECTION 6.
## NEGATIVE COVENANTS

Each of the Borrowers covenants and agrees that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, each of the Borrowers shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

### 6.1    Indebtedness.

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that each of the Borrowers and their Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)    Each of the Loan Parties may become and remain liable with respect to its respective Obligations pursuant to the terms of this Agreement and the other Loan Documents;

(ii)    Each of the applicable Loan Parties may remain liable for the Permitted Existing Indebtedness or the Refinancing of any such Permitted Existing Indebtedness; provided that any such Refinancing must not do any of the following: (i) change the obligor on or guarantors of such Indebtedness; (ii) increase the principal amount of such Indebtedness beyond the then existing balance (except by an amount equal to the premium on the principal amount paid and fees and expenses reasonably incurred in connection with any such Refinancing and); (iii) result in the maturity of the principal amount of such Indebtedness being earlier than the maturity of the Indebtedness being Refinanced; or (iv) extend any security interests beyond the assets securing the Indebtedness being Refinanced;

(iii)    The Borrowers and their Subsidiaries may become and remain liable after the Effective Date with respect to Indebtedness under Capital Leases capitalized on the consolidated balance sheet of the Borrowers and purchase money Indebtedness (including mortgage financing) to provide all or a portion of the purchase price or cost of construction of an asset or improvement of an asset; provided that (a) such Indebtedness when incurred shall not exceed the purchase price or cost of construction or improvement of such asset, (b) no such Indebtedness shall be Refinanced for a principal amount in excess of the principal balance outstanding at the time of such Refinancing (except by an amount equal to the premium on the principal amount paid and fees and expenses reasonably incurred in connection with any such Refinancing), (c) such Indebtedness shall be secured only by the asset acquired, constructed or improved with the proceeds of

82

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

such Indebtedness and (d) the aggregate amount of all Indebtedness outstanding under this clause (iii) at any time shall not exceed $10,000,000;

(iv)     Each of the Borrowers and the Subsidiary Guarantors may become and remain liable with respect to Indebtedness to any other Borrower or Subsidiary Guarantor; provided that, in each case, (a) all such intercompany Indebtedness shall be evidenced by promissory notes which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (b) all such intercompany Indebtedness owed by a Borrower to any of its respective Subsidiaries shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent and (c) any payment by any Subsidiary under any Guaranty or any payment by a Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by such Borrower or by such Subsidiary to such Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(v)     The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under performance, surety, appeal or indemnity bonds (or letters of credit used for these purposes) required by Governmental Authorities in connections with the development of any Project, in each case incurred in the Ordinary Course of Business;

(vi)     The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under the Hedge Agreements required under subsection 5.12 and any other Hedge Agreements that are entered into and maintained for bona fide hedging activities and are not for speculative purposes;

(vii)     The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under Special Improvement Bonds in an amount not to exceed $10,000,000 at any time outstanding plus such greater amount as may be reasonably acceptable to Administrative Agent;

(viii)     [Intentionally Omitted];

(ix)     [Intentionally Omitted];

(x)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business; provided, however, that such Indebtedness is extinguished within five (5) Business Days of incurrence; and

(xi)     The Borrowers and their Subsidiaries may become and remain liable for unsecured Indebtedness in an aggregate principal amount (for the Borrowers and all their Subsidiaries) not to exceed $3,000,000; and

PRELIMINARY DRAFT
SUBJECT TO MODIFICATION
FINAL VERSION MUST BE ACCEPTABLE
TO FIRST LIEN STEERING COMMITTEE

(xii)    The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness (which may be senior or pari passu in right of payment to the Indebtedness permitted pursuant to subsection 6.1(i)) under a working capital revolving loan and letter of credit facility in an aggregate principal amount not to exceed $10,000,000 at any time outstanding.

## 6.2    Liens and Related Matters.

A.    **Prohibition on Liens**.  The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable or Capital Stock) of any Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or knowingly permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except (solely with respect to the Borrowers and their Subsidiaries):

(i)    any Permitted Encumbrances; provided, however, that (a) with respect to any Real Property Collateral, no Permitted Encumbrances except Permitted Title Exceptions and Specified Encumbrances shall be senior or prior to the Liens under the Mortgages; and (b) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of any Borrower or its Subsidiaries;

(ii)    Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Secured Party pursuant to the terms of this Agreement;

(iii)    [Intentionally Omitted];

(iv)    Liens securing Indebtedness under Capital Leases or purchase money Indebtedness (including mortgage financing) of any Borrower or any Subsidiary incurred in accordance with subsection 6.1, or to Refinance any such Indebtedness incurred solely for such purpose; provided that (a) such Liens shall be created substantially simultaneously with (or within 90 days of) the acquisition or construction of such assets or improvements, or at the time of such Refinancing, as the case may be, (b) such Liens do not at any time encumber any assets other than the assets acquired, constructed or improved with the proceeds of such Indebtedness (or securing such Indebtedness being Refinanced) and (c) in the case of a Refinancing, the amount of Indebtedness secured thereby is not increased (except by an amount equal to the premium on the principal amount paid and fees and expenses reasonably incurred in connection with any such Refinancing);

(v)    Liens securing Indebtedness permitted by subsection 6.1(vii);

84

(vi)    Liens securing Indebtedness permitted by subsection 6.1(xii), which Liens may rank senior or pari passu in priority to the Liens permitted pursuant to subsection 6.2A(iii); and

(vii)    Precautionary UCC financing statement filings (made by lessors) that do not at any time perfect any Liens, regarding operating leases entered into by the Borrowers and their Subsidiaries.

**B.    No Further Negative Pledges.** Neither any Borrower nor any of its Subsidiaries shall enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Borrower or any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, other than: (i) this Agreement and the other Loan Documents; (ii) any agreements governing any purchase money Indebtedness or Capital Leases otherwise permitted by subsection 6.1 (in which case, any prohibition or limitation shall only be effective against the assets financed thereby); (iii) customary non-assignment and non-pledge provisions in any lease or licenses entered into in the Ordinary Course of Business; and (iv) agreements and instruments entered into by Joint Ventures relating to the property of such Joint Venture so long as such prohibitions or limitations do not apply to the Capital Stock in the Joint Venture owned by any Loan Party.

**C.    No Restrictions on Distributions**  Except for (a) restrictions existing under the Loan Documents, (b) customary contractual non-assignment provisions in leases, licenses or contracts entered into in the Ordinary Course of Business, (c) restrictions governing Capital Leases, mortgage financings or purchase money Indebtedness to the extent such restrictions restrict the transfer of the property subject to such Capital Leases, mortgage financings or purchase money Indebtedness, (d) restrictions imposed on assets to be sold in a manner permitted hereby pending the closing of such sale or disposition, and (e) customary provisions in joint venture agreements and other similar arrangements, each Borrower will not, and will not permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Subsidiary of a Borrower to (i) make Restricted Payments in respect of any such Subsidiary's Capital Stock, (ii) repay or prepay any Indebtedness owed by such Subsidiary to a Borrower or any other Subsidiary of a Borrower, (iii) make loans or advances to, or other Investments in, a Borrower or any other Subsidiary of a Borrower or (iv) transfer any of its property or assets to a Borrower or any other Subsidiary of a Borrower.

**6.3    Investments**.

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, make or own any Investments except:

(i)    The Borrowers and their Subsidiaries may continue to own the Investments owned by them as of the Effective Date in any Borrower Entities as listed on Schedule 6.3(i);

85