1  Nile Leatham (NV Bar No. 002838)
2  KOLESAR & LEATHAM
   Wells Fargo Financial Center
3  3320 W. Sahara Ave.
   Las Vegas, NV 89102
4  Telephone:  702.979.2357
   Facsimile:  702.362.9472
5  E-Mail:     nleatham@klnevada.com
6
7  Philip C. Dublin (NY Bar No. 2959344)
   Abid Qureshi (NY Bar No. 2684637)
8  AKIN GUMP STRAUSS HAUER & FELD LLP
   One Bryant Park
9  New York, NY 10036
   Telephone:  212.872.1000
10  Facsimile:  212.872.1002
11  E-Mail:     pdublin@akingump.com
               aqureshi@akingump.com
12
13  Counsel for the First Lien Steering Committee

*Electronically Filed*
*January 27, 2010*

14         UNITED STATES BANKRUPTCY COURT
15                 DISTRICT OF NEVADA
                   SOUTHERN DIVISION
16  IN RE:                          §    **Case No. 09-14814-LBR**
17                                   §    **(JointlyAdministered)**
    **THE RHODES COMPANIES, LLC,**  §
18     aka "Rhodes Homes," *et al.*, §    **Chapter 11**
                                     §
19         **Debtors.**[1]          §
                                     §    **Hearing Date: February 11, 2010**
20                                   §    **Hearing Time: 9:30 a.m.**
21                                   §
22                                   §

*Left margin (vertical):* AKIN GUMP STRAUSS HAUER & FELD LLP  One Bryant Park  New York, New York 10036  Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

23    _____
24    [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).
25
26
27
28

| | |
|---|---|
| **Affects:**<br>☒ **All Debtors**<br>☐ **Affects the following**<br>**Debtor(s)** | **FIRST LIEN STEERING COMMITTEE'S**<br>**SUPPLEMENTAL MEMORANDUM**<br>**OF LAW IN SUPPORT OF**<br>**CONFIRMATION OF THE SECOND**<br>**AMENDED MODIFIED PLAN OF**<br>**REORGANIZATION PURSUANT TO**<br>**CHAPTER 11 OF THE BANKRUPTCY**<br>**CODE FOR THE RHODES COMPANIES,**<br>**LLC, ET AL.** |

The First Lien Steering Committee (the "First Lien Steering Committee"), consisting

of certain unaffiliated lenders under the Credit Agreement dated as of November 21, 2005

among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch

General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders

(collectively, the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch, as

Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead

Arranger, by and through its undersigned counsel, hereby files this Supplemental

Memorandum of Law (the "Supplemental Memorandum") in Support of Confirmation of the

Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the

Bankruptcy Code for the Rhodes Companies, LLC, *et al*. (the "Plan"). In support of this

Supplemental Memorandum, the First Lien Steering Committee respectfully represents as

follows:

## I. PRELIMINARY STATEMENT[2]

1.      The purpose of this Supplemental Memorandum is to provide further support

for confirmation of the Plan. Specifically, this memorandum addresses issues that have been

raised by the Court with respect to (i) the terms of the Mediation Settlement including (x)

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the
Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>New York, New York 10036<br>Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1    the value of the consideration to be received by the Reorganized Debtors thereunder and (y)

2    the cost to the Debtors' Estates of the consideration to be received by the Rhodes Entities

3    pursuant to the settlement, (ii) the Plan's satisfaction of the provisions of Bankruptcy Code

4    section 1129(b) to justify the "cram-down" of the Plan on Classes that voted to reject or are

5    deemed to reject the Plan, (iii) the Plan's compliance with the absolute priority rule codified

6    in Bankruptcy Code section 1129(b)(2), and (iv) the application of the "new value

7    exception" to the absolute priority rule.

8          2.     As the Court may recall, prior to ordering mediation with respect to the

9    formulation of a plan of reorganization, the Debtors and the Rhodes Entities, on the one

10   hand, and the First Lien Steering Committee, on the other, had, over a period of at least five

11   months, attempted but failed to reach consensus on the terms of a consensual restructuring

12   for the Debtors.  Indeed, during such time, a mutual distrust had developed among the

13   parties causing each side to determine that, absent the involvement of a third party arbiter,

14   the Debtors' Chapter 11 Cases were likely to become extremely litigious and that the Estates

15   could liquidate.  Acknowledging that a litigation-filled chapter 11 case would be destructive

16   to value and creditor recoveries, the First Lien Steering Committee agreed with the Debtors

17   and the Rhodes Entities that a final attempt should be made, through the Court-ordered

18   mediation, to resolve the parties' disputes consensually.  While each of the parties was

19   skeptical as to whether the mediation would prove beneficial, each party engaged in the

20   mediation in good faith.  As a result of the significant efforts put forth by the First Lien

21   Steering Committee, the Debtors and the Rhodes Entities, with the assistance of the

22   Honorable Richard Neiter, at the conclusion of the three-day mediation session, the parties

23   reached agreement in principle on the terms of a consensual plan of reorganization that

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

would provide for the Debtors to reorganize as a going concern.  These terms, which continued to be refined until the filing of the initial version of the Plan (Docket No. 502), are embodied in the Plan and the Mediation Term Sheet attached as Exhibit 1 to the Plan and supported by each of the primary constituencies in the Debtors' Chapter 11 Cases.

3.        The Plan is premised on the results achieved at the mediation and provides for, among other things, the Debtors to continue their homebuilding operations in the Las Vegas market and obtain material new value from the Rhodes Entities to ensure a successful reorganization.  Indeed, the Plan and Mediation Settlement contemplate that the Rhodes Entities will provide the Reorganized Debtors with consideration worth between $11.6 million to $20.2 million (or $5.7 million to $14.3 million net of funded debt obligations on the Rhodes Ranch Golf Course) in quantifiable assets together with additional cooperation necessary for the Reorganized Debtors' continued business operations, which cooperation has an indeterminable positive value.  In exchange for this new value, the Estates will provide the Rhodes Entities with consideration with an aggregate cost to the Estates of approximately $2.6 million.

4.        As proposed, the Plan satisfies the absolute priority rule because the value to be obtained by the Rhodes Entities thereunder is pursuant to the terms of a settlement that is fair and equitable under Bankruptcy Rule 9019 and applicable legal precedent in the Ninth Circuit.  Moreover, because the consideration to be provided to the Rhodes Entities is solely on account of the new value they are providing to the Reorganized Debtors to ensure a successful reorganization and not on account of any Rhodes Entity's prepetition equity interests in the Debtors, the Plan complies with the "cram down" provisions of Bankruptcy Code section 1129(b).  Accordingly, for the reasons set forth above and as discussed in

greater detail herein, the First Lien Steering Committee respectfully requests that the Court

confirm the Plan.

## II. **BACKGROUND**

**A.      The Mediation Settlement and the Plan**

5.      On July 21, 2009, this Court entered its Order Granting Plan Exclusivity and

Cash Collateral Stipulation (Docket No. 336) (the "Mediation Order") which approved a

stipulation among the First Lien Steering Committee, the First Lien Agent, the Second Lien

Agent, the Creditors' Committee, the Debtors and the Rhodes Entities (collectively, the

"Mediation Parties") providing for, among other things, the Mediation Parties to participate

in a Court-ordered mediation regarding the formulation of a plan of reorganization for the

Debtors (the "Mediation").  On August 17, 24 and 25, 2009, in accordance with the terms of

the Mediation Order, the Mediation Parties participated in the Mediation over the terms of a

proposed plan of reorganization for the Debtors before the Honorable Richard Neiter of the

United States Bankruptcy Court for the Central District of California.  During the Mediation,

the Mediation Parties (other than the First Lien Agent) reached an agreement in principle on

a comprehensive settlement resolving the Mediation Parties' disputes over the construct of a

plan of reorganization as well as certain issues related to the Debtors' prepetition

relationship with the Rhodes Entities (the "Mediation Settlement").  The Plan is premised, in

part, on the terms of the Mediation Settlement.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

6.      The material terms of the Mediation Settlement embodied in the Plan are as follows:[3]

**Consideration to be received by the Debtors**

- Rhodes Ranch Golf Course:  On the Effective Date, the Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors.

- $3.5 Million Cash Payment:  The Rhodes Entities shall make a cash payment to the Reorganized Debtors of $3.5 million on the Effective Date.

- HOA Board Seats:  The Rhodes Entities shall ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA Boards that in any way are related to the Debtors, Reorganized Debtors or their businesses.

- Licensing:  The Rhodes Entities shall take commercially reasonable steps and/or enter into any agreements or similar documentation reasonably necessary to ensure the Reorganized Debtors' continued use of all of the Debtors' applicable licenses at no cost to the Rhodes Entities for a period of up to twelve months following the Effective Date.

- Maintenance of Performance Bonds:  Subject to the Rhodes Entities being reasonably satisfied with the creditworthiness of the Reorganized Debtors, which shall be satisfied solely as of the Effective Date by the Court finding that the Plan is feasible, the existing performance bonds guaranteed by the Rhodes Entities in favor of the Debtors and such guarantees shall remain in place.  The applicable Rhodes Entity's agreement to remain a guarantor under the existing performance bonds as such performance bonds are renewed shall be at no cost to the Reorganized Debtors.

**Consideration to be received by the Rhodes Entities**

- Limited Release:  The Rhodes Entities shall receive a full release for chapter 5 causes of action with respect to transfers made by the Debtors to the Rhodes Entities during the two years prior to the Petition Date provided that such release shall only apply to transfers expressly set forth in the Debtors' statements of financial affairs as filed with the Bankruptcy Court and as set forth on Attachment B to the Mediation Term Sheet.

---

[3] The terms of the Mediation Settlement set forth herein are in summary form.  For the full text of the Mediation Settlement refer to Exhibit B to the Plan.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

- <u>Arizona Assets</u>:  On the Effective Date, the Debtors shall transfer the Arizona Assets to the Rhodes Entities free and clear of all liens, claims and encumbrances.

- <u>Tax Treatment</u>:  The Plan shall be structured in a tax efficient manner to the Rhodes Entities provided that there shall be no adverse impact on the Reorganized Debtors or the First Lien Steering Committee.

- <u>Trademarks and Tradenames</u>:  Within the earlier of thirty days following: (i) completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) the bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes the trademarks and tradenames set forth on Attachment E to the Mediation Term Sheet.

- <u>Books and Records</u>:  Copies of all of the Debtors' books and records shall be delivered to the Rhodes Entities at no cost to the Rhodes Entities.

7.       In addition to containing the terms of the Mediation Settlement as outlined above, the Plan provides, among other things, that the First Lien Lenders will assume ownership of the Debtors and will continue to operate the Debtors as a going concern homebuilder primarily in the Las Vegas, Nevada market.  The First Lien Lenders will also receive, on account of their Secured Claims, $1.5 million in cash from their collateral and their pro rata share of $50 million in new secured notes.  The First Lien Lenders will use the $1.5 million cash portion of their recovery to purchase the Claims of many of the Debtors' creditors that hold General Unsecured Claims for the allowed amount of such Claim.  The Second Lien Lenders will receive 50% of the net proceeds of certain pending litigation on account of their Secured Claims.  The Plan also provides for the establishment of a Litigation Trust that will pursue certain Claims and Causes of Action belonging to the Debtors' Estates for the benefit of those creditors holding General Unsecured Claims whose Claims are not purchased by the First Lien Lenders.  The First Lien Lenders and the Second Lien Lenders will also receive distributions from the Litigation Trust as unsecured creditors

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

on account of their First Lien Lender Deficiency Claims and Second Lien Lender Deficiency Claims.

**B.     Plan Solicitation Process and Voting Status**

8.     On December 1, 2009, the Court entered its Order (A) Approving the Adequacy of the First Lien Steering Committee's Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the First Lien Steering Committee's Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto (Docket No. 809) (the "Solicitation Procedures Order"). The Solicitation Procedures Order (i) approved the Disclosure Statement for the Plan as containing adequate information within the meaning of Bankruptcy Code section 1125(a), (ii) fixed December 1, 2009, as the record date for purposes of determining eligibility to vote to accept or reject the Plan, (iii) fixed January 4, 2010 at 4:00 p.m. (Pacific Time) as the deadline for submitting ballots accepting or rejecting the Plan, (iv) fixed January 4, 2010 at 4:00 p.m. (Pacific Time) as the deadline for filing objections to the Plan (the "Plan Objection Deadline"), (v) fixed January 11, 2010, as the deadline for filing the Initial Memorandum (as defined below), (vi) fixed January 11, 2010 as the deadline by which Omni Management Group, LLC (the "Claims and Solicitation Agent") must file its report summarizing the results of voting on the Plan (the "Voting Report"), and (vii) fixed January 14, 2010 at 9:00 a.m. (Pacific Time) as the date and time for the hearing on the confirmation (the "Confirmation Hearing") of the Plan. The Solicitation Procedures Order also approved certain procedures for soliciting votes to accept or reject the Plan (the "Solicitation Procedures").

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

9.      In accordance with the Solicitation Procedures Order, the solicitation materials described in the Solicitation Procedures were transmitted to and served on all Holders of Claims that were entitled to vote to accept or reject the Plan, as well as certain other parties in interest in the Debtors' Chapter 11 Cases.

10.     Two objections were filed to the Plan. One of the objections was withdrawn by the objecting party, and the other objection was resolved consensually.

11.     On January 11, 2010, the First Lien Steering Committee filed the First Lien Steering Committee's Memorandum of Law in Support of Confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC, *et al*. (Docket No. 912) (the "Initial Memorandum").

12.     On January 11, 2010, the Claims and Solicitation Agent filed its Voting Report setting forth the initial Plan voting results.  The Claims and Solicitation Agent filed an amended Voting Report on January 15, 2010 (the "Amended Voting Report") reflecting the retabulation of certain ballots pursuant to the Solicitation Procedures.  On January 27, 2010, the Claims and Solicitation Agent filed a second amended Voting Report (the "Second Amended Voting Report").  The Second Amended Voting Report reflects a further retabulation of certain ballots in accordance with the Solicitation Procedures and the direction of the Court.

13.     Pursuant to the Plan, each of the following Classes were entitled to vote on the Plan:  (i) Class A-1 (First Lien Lender Secured Claims); (ii) Class A-2 (Second Lien Lender Secured Claims); (iii) Class C-1 (General Unsecured Claims); (iv) Class C-2 (First Lien Lender Deficiency Claims); and (v) Class C-3 (Second Lien Lender Deficiency Claims).  As reflected in the Second Amended Voting Report, Classes A-1, A-2, C-2 and C-3

voted to accept the Plan, and Class C-1 voted to reject the Plan. Holders of Claims in Class A-3 (Other Secured Claims) and Class B (Priority Non-Tax Claims) are conclusively presumed to have accepted the Plan and were not entitled to vote on the Plan. Holders of Claims in Class C-4 (Subordinated Claims), Class D (Old Equity Interests) and Class E (Intercompany Claims) are deemed to have rejected the Plan and were not entitled to vote on the Plan.

## III.  ARGUMENT

### A.    The Mediation Settlement Embodied in the Plan Should be Approved

14.    As set forth in the Initial Memorandum, the First Lien Steering Committee believes that the Mediation Settlement embodied in the Plan is fair and equitable and should be approved under Bankruptcy Rule 9019. In order to determine whether a compromise may be approved under Bankruptcy Rule 9019, four factors must be considered: (i) the probability of success of the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views. *See, e.g., Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986). A compromise may be approved even if all four of the factors do not favor the compromise so long as the factors weigh in favor of the compromise when taken as a whole. *See In re Pac. Gas and Elec. Co.*, 304 B.R. 395, 416-17 (Bankr. N.D. Cal. 2004). In addition, a compromise does not have to be the best compromise that could have possibly been obtained but, instead, must only fall within a reasonable range of possible outcomes. *In re WCI Cable, Inc.*, 282 B.R. 457, 473-74 (Bankr. D. Or. 2002).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

15.     The First Lien Steering Committee believes that the compromise embodied in the Plan and the Mediation Settlement is fair and equitable and should be approved under the standards espoused by the United States Court of Appeals for the Ninth Circuit (the "Ninth Circuit").  The Debtors' Estates will derive significant value from the consideration pledged by the Rhodes Entities in connection with the Mediation Settlement, value well in excess of the corresponding costs to be borne by the Estates on account of the consideration to be provided to the Rhodes Entities.  The chart below lists the various forms of consideration to be exchanged between the Rhodes Entities and the Debtors, and compares the cost to the Debtors (or Reorganized Debtors) of providing the Rhodes Entities with the consideration listed therein to the benefits to be obtained by the Debtors (or Reorganized Debtors).  As depicted in the chart, the dollar value of the consideration to be provided to the Estates pursuant to the Mediation Settlement exceeds the dollar value of the consideration to be received by the Rhodes Entities by between $9 million and $17.6 million ($3.1 million to $11.7 million net of funded debt obligations on the Rhodes Ranch Golf Course).  In addition, the Estates will receive substantial benefits that are integral to the continued operation of the Debtors' businesses that cannot be quantified in dollars.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

11

| Mediation Settlement Benefits | Mediation Settlement Costs |
|---|---|
| • $3.5 Million Cash Payment from Rhodes Entities to Reorganized Debtors – *Value to Reorganized Debtors of $3.5 million*<br><br>• Transfer of Rhodes Ranch Golf Course from non-Debtor Rhodes Entity to Reorganized Debtors – *Value to Reorganized Debtors of approximately $8 million ($2.1 million net of current debt on Rhodes Ranch Golf Course) plus additional indeterminable positive value*<br><br>• Continued Maintenance of Prepetition Performance Bonds for up to 30 Months Post-Effective Date with James Rhodes' Personal Guaranty – *Value to Reorganized Debtors of approximately $109,000 to $8.7 million*<br><br>• Continued Use by Reorganized Debtors of Professional Licenses in the name of Rhodes Entities – *Value to Reorganized Debtors is of indeterminable positive value*<br><br>• Replacement of Rhodes Entities by Designees of Reorganized Debtors on HOA Boards – *Value to Reorganized Debtors is of indeterminable positive value* | • Limited Release by Estates from Potential Chapter 5 Avoidance Actions – *Maximum cost to the Estates/Reorganized Debtors (exclusive of potential litigations costs that would reduce recovery) of approximately $1,125,134*<br><br>• Transfer of Arizona Assets to Rhodes Entities – *Present value of assets to be transferred to Rhodes Entities is approximately $1,208,525*<br><br>• Structuring of Plan in Tax Efficient Manner for Rhodes Entities So Long as No Adverse Consequences to the Estates/Reorganized Debtors – *Cost to the Estates/Reorganized Debtors is $0*<br><br>• Provision of Copies of Debtors' Books and Records to the Rhodes Entities – *Maximum estimated cost for third party copy service is $300,000*<br><br>• Transfer by Reorganized Debtors to Rhodes Entities of Specific Trade names/Trademarks Currently Used By Debtors But Which Will Not Be Used Post-Effective Date – *Cost to the Reorganized Debtors is $0.* |
| **Total Value to Reorganized Debtors:** Aggregate Value to be Obtained by the Reorganized Debtors from the Rhodes Entities:  approximately **$11.6 million to 20.2 million ($5.7 million to $14.3 million net of current debt on Rhodes Ranch Golf Course), plus additional indeterminable value** | **Total Cost to Reorganized Debtors:**  Aggregate Cost to the Estates/Reorganized Debtors of Consideration to be Received by Rhodes Entities: approximately **$2,633,659** |

### 1.    The Probability of Success in Litigation and Complexity, Cost, Inconvenience and Delay Associated with Such Litigation

16.    As noted above, the first element of the *A&C Properties* test is the probability of success in litigation and the third element of the test is the complexity of, and the expense, inconvenience and delay necessarily attendant to, such litigation.  Pursuant to the Mediation Settlement, the Mediation Parties have agreed to settle various potential causes of action, the most paramount of which is litigation related to the formulation and prosecution of a plan of reorganization for the Debtors' cases.  As the Court may recall, the

AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>New York, New York 10036<br>Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Mediation Order resolved the First Lien Steering Committee's objection to a motion filed by the Debtors to extend their exclusive periods and established protocols for conducting the Mediation and for the filing of a plan of reorganization in these cases.  The First Lien Steering Committee believes that absent the agreement reached in the Mediation Settlement, there likely would have been at least two (and potentially more) competing plans of reorganization in the Debtors' Chapter 11 Cases that would have resulted in expensive, complex litigation -- litigation that would have (i) delayed the Debtors' Chapter 11 Cases indefinitely and (ii) likely consumed the value of the Debtors' Estates.  While the First Lien Steering Committee believes that it ultimately would have prevailed in prosecuting a plan of reorganization not premised on the Mediation Settlement, the ultimate outcome of plan-related litigation is unknown.  Moreover, the consideration to be received by the Debtors in connection with the Mediation Settlement makes the Estates more valuable than they would otherwise be without the settlement in place.

17.     In addition to plan-related litigation, the Mediation Settlement also resolves prospective litigation related to potential Causes of Action that the Debtors' Estates may possess against certain of the Rhodes Entities under chapter 5 of the Bankruptcy Code. Specifically, the Mediation Settlement contemplates the limited release of potential preference and fraudulent transfer actions against certain Rhodes Entities with respect to certain transfers made by the Debtors that have been specifically disclosed.

18.     The First Lien Steering Committee estimates that the total amount of all potentially preferential payments made by the Debtors to the Rhodes Entities within the one-year period prior to the Petition Date is in excess of $9 million.  Diligence performed by the First Lien Steering Committee, however, indicates that, of the approximately $9 million in

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1   potentially preferential payments made by the Debtors to the Rhodes Entities, the payment

2   of all but $1,125,134 was made in the ordinary course of business between the Debtors and

3   the non-Debtor Rhodes Entities.  The litigation in respect of the remaining $1,125,134 in

4   potential preferential payments would have been contentious and costly, and the ultimate

5   resolution of such litigation cannot be predicted with any certainty.

6   

7        19.    The Mediation Settlement also reflects a resolution of potential fraudulent

8   conveyance actions held by the Estates against the Rhodes Entities.  The First Lien Steering

9   Committee believes that these claims would also have been heavily litigated in the absence

10  of a settlement.  While the First Lien Steering Committee believes that it may have

11  ultimately prevailed on certain of such Claims, there can be no guarantee that a successful

12  result would have been obtained for the Estates.  In addition, as with the prosecution of the

13  potential preference actions, the prosecution of the potential fraudulent conveyance claims

14  would have resulted in substantial expense for the Estates, while at the same time likely

15  delaying the Debtors' emergence from chapter 11.

16       20.    Based on the foregoing, the First Lien Steering Committee believes that the

17  first and third prongs of the *A&C Properties* test weigh heavily in favor of the approval of

18  the Mediation Settlement.[4]

19  

20  

21  

22  

23  

---

24  [4] The second factor to be considered by the Court in evaluating a settlement proposal is the
difficulties, if any, to be encountered in the matter of collection.  The First Lien Steering Committee has not
completed a detailed review of the financial information of each Rhodes Entity that may have been liable in
25  connection with the claims released under the Plan, and cannot therefore make a determination as to whether
each such entity could have satisfied its obligations in connection with any judgment entered by the Court.
26  The First Lien Steering Committee does, however, believe that the Rhodes Entities may not have been able to
comply financially with the terms of judgments received in connection with successful litigation regarding the
27  claims being released under the Plan.

28  

14

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

2.      **The Mediation Settlement is in the Paramount Interest of Creditors and Approval Thereof Reflects Proper Deference to Their Reasonable Views**

21.     The fourth factor of the *A&C Properties* test requires the Court to consider the paramount interest of creditors.  As reflected in the chart above, the creditors of the Estates will derive material benefits from the approval of the Mediation Settlement, including improved liquidity for the Reorganized Debtors' businesses, the acquisition of assets material to the development and operation of the Reorganized Debtors' communities and the cooperation of the Rhodes Entities that will enable a smooth transition out of chapter 11 for the Reorganized Debtors.  Specifically, the Reorganized Debtors will obtain the following benefits from the Rhodes Entities in connection with the Mediation Settlement:

- **Rhodes Ranch Golf Course.**  On the Effective Date, the Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors.  The transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors represents one of the most valuable components of the Mediation Settlement from the Debtors' and First Lien Steering Committee's perspective.  The Rhodes Ranch Golf Course is valued at approximately $8 million, as set forth in a recent 2009 appraisal provided to the Mediation Parties during the course of the Mediation.  The Rhodes Ranch Golf Course has $5.9 million in outstanding debt, yielding a net value to the Reorganized Debtors of approximately $2.1 million.  As one of the Reorganized Debtors' most valuable assets, the Rhodes Ranch Community could decrease in value if the Golf Course is not properly maintained under the ownership of the Rhodes Entities or another third party.  Declaration of Justin Bono in Support of Confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC, *et al.* at 4 (the "Bono Declaration") (Attached hereto as Exhibit A).

- **$3.5 Million Cash Payment.**  On the Effective Date, the Rhodes Entities shall transfer $3.5 million in cash to the Reorganized Debtors.  This transfer is expected to nearly double the Reorganized Debtors' opening cash balance, giving them additional liquidity upon their exit from chapter 11 and providing them with additional cash to fund distributions contemplated by the Plan.  Bono Declaration at 4.

- **Maintenance of Performance Bonds.**  The Debtors currently have approximately $8.7 million in performance bonds outstanding, which

15

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

bonds are required by various governmental agencies in connection with the Debtors' development activities. These performance bonds have the personal guaranty of James Rhodes. Pursuant to the Mediation Settlement, the Rhodes Entities have agreed to the Reorganized Debtors' maintenance of such bonds, together with James Rhodes' personal guaranty, for 30 months after the Effective Date. The Reorganized Debtors will replace the bonds before the expiry of the 30 month period. The current market for performance bonds is extremely challenging, and the First Lien Steering Committee's professionals question whether the Reorganized Debtors could obtain comparable replacement bonds on the Effective Date if the Rhodes Entities were not willing to maintain the currently outstanding bonds. Without bonds in place, the Reorganized Debtors would be required to post substantial cash deposits, which would jeopardize their ability to consummate the Plan, or would be required to cease many of their operations. Bono Declaration at 4.

- **Licensing.** The Mediation Settlement requires that the Rhodes Entities keep the Debtors' existing contractors' license active by substituting a Qualified Employee of the Reorganized Debtors' choosing for James Rhodes, who is currently serving as Qualified Employee under the licensing requirements. While the proposed management team for the Reorganized Debtors is in the process of obtaining a new contractors' license, there is no guaranty that such license will be obtained in advance of the Effective Date. Therefore, the Reorganized Debtors' ability to utilize the existing license through the cooperation of the Rhodes Entities will enable the Reorganized Debtors to operate without interruption on the Effective Date. Without the ability to use the existing license, the Reorganized Debtors' post-effective date cash flow and home closings would be negatively impacted. Bono Declaration at 4-5.

- **HOA Boards.** The Mediation Settlement contemplates that the Rhodes Entities will ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA Boards that are in any way related to the Debtors or their businesses. The value of such transfer is indeterminable, but has significant value for the Reorganized Debtors. The HOA Boards govern all building activity, set building standards and architectural guidelines, approve building materials, and approve floor plans for construction. If the designees appointed by the Rhodes Entities were to remain in place, the HOA Boards could alter the building standards in the Reorganized Debtors' communities, causing disruptions in construction and potentially increased building costs. Moreover, by controlling the HOA Boards, the Reorganized Debtors can adjust building requirements to build a product that meets market demand. Bono Declaration at 5.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

22.    In exchange for the foregoing, the Mediation Settlement contemplates the

following consideration for the Rhodes Entities:

- **Limited Release.**  The Rhodes Entities will receive a full release for chapter 5 causes of action with respect to transfers made by the Debtors to the Rhodes Entities during the two years prior to the Petition Date, provided that such release will only apply to transfers expressly set forth in the Debtors' statements of financial affairs as filed with the Bankruptcy Court and on Attachment B to the Mediation Term Sheet.  As noted above, the First Lien Steering Committee has determined that all but $1,125,134 of such transfers were made in the ordinary course of business and are therefore likely not subject to valid attack.  Bono Declaration at 5.

- **Arizona Assets.**  The Plan provides that, on the Effective Date, the Debtors will transfer the Arizona Assets to the Rhodes Entities free and clear of all liens, claims and encumbrances.  The Arizona Assets include approximately 1,300 partially graded acres, four partially built homes, four model homes, and miscellaneous office equipment.  The acreage was evaluated by Robert Charles Lesser Co., a third party valuation consultant retained by the First Lien Steering Committee to assist Winchester Carlisle Partners, the First Lien Steering Committee's financial advisor, in performing the going concern and liquidation analyses contained in the Disclosure Statement and Plan exhibits.  Based on existing listings in the surrounding Mohave County, Arizona area and an understanding of the development challenges associated with the property, the First Lien Steering Committee estimates that the acreage will have a value of approximately $1.3 million in 2015 and has a present value of approximately $385,000.  The property is located in remote northern Arizona in an area currently not developed for residential housing.  Moreover, the property is wholly surrounded by property owned by the Rhodes Entities, which would require any purchaser to cooperate with the Rhodes Entities for any future development.  Additionally, the property does not have access to a water supply sufficient for developing the entire property as it currently has water rights to serve only approximately 60% of the property as a whole.  These water rights will expire in 2015 unless substantial cost and effort is undertaken to satisfy the requirements necessary to obtain an extension.  The First Lien Steering Committee does not believe that the property will be viable for development by 2015, particularly in light of the property's limited access to water.  Finally, the Debtors' remaining homebuilding assets are located in Nevada.  Maintaining and developing property in Arizona will require additional infrastructure and associated costs.  Accordingly, the property is of limited value to the Reorganized Debtors.  The four partially built homes have been valued at approximately $70,000 per home based on recent sales of similar properties and discussions with the real estate agent

17

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

responsible for selling these homes.  The four model homes have been valued at $125,000 each based on a recent offer for one of the properties, and discussions with the real estate agent responsible for selling the partially built homes.  Substantially all of the Debtors' office equipment in Arizona will be transferred to the Rhodes Entities, and is valued in the aggregate at $43,525 in the Debtors' most recent books and records.  Declaration of Charles Hewlett in Support of Confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* at 3-4 (Attached hereto as <u>Exhibit B</u>); Bono Declaration at 5-6.

- **Tax Treatment.**  The First Lien Steering Committee has proposed a Plan that incorporates a tax structure beneficial for the Rhodes Entities.  The structure proposed in the Plan does not negatively benefit any creditor of these Estates and will not result in any additional cost for the Debtors or Reorganized Debtors.  Bono Declaration at 6.

- **Trademarks and Tradenames.**  As noted above, the Mediation Settlement contemplates that within the earlier of thirty days following: (i) completion of the buildout of all of the Reorganized Debtors' homebuilding assets and inventory (regardless of when such assets and inventory were acquired), or (ii) the bulk sale of the remaining inventory of the Reorganized Debtors, the Reorganized Debtors shall transfer to James Rhodes the trademarks and tradenames set forth on Attachment E to the Mediation Term Sheet.  The First Lien Steering Committee expects to phase out the use of the Debtors' current trademarks and tradenames on or around the Effective Date and rebrand the Reorganized Debtors' operations.  Moreover, as the transfer of the tradenames and trademarks will not occur until the Reorganized Debtors have completed all of their homebuilding activities, there is no cost to the Reorganized Debtors associated with the transfer of this intellectual property.  Bono Declaration at 6-7.

- **Books and Records.**  Copies of the Debtors' books and records will be delivered to the Rhodes Entities at no cost to the Rhodes Entities.  Given the voluminous nature of the Debtors' books and records, recent bids obtained indicate that the Estates will incur approximately $300,000 to have the documents copied.  Bono Declaration at 7.

23.    In addition, all claims and causes of action against the Rhodes Entities that are not covered by the limited release provided for in the Mediation Settlement will be transferred to the Litigation Trust for the benefit of all creditors, to be prosecuted and/or settled post-emergence, as appropriate.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

24.    Taken as a whole, the First Lien Steering Committee estimates that the Estates will obtain anywhere from approximately $11.6 million to $20.2 million (or $5.7 million to $14.3 million net of funded debt obligations on the Rhodes Ranch Golf Course) in quantifiable value from the Rhodes Entities pursuant to the Mediation Settlement.  By contrast, the Estates will incur no more than approximately $2.6 million in costs on account of the consideration to be given to the Rhodes Entities.  Accordingly, the Mediation Settlement will provide creditors of the Debtors' Estates with between $3.1 million to $11.7 million in net value in excess of the costs to be incurred by the Estates in connection therewith (separate and apart from the intangible but material benefits to be obtained by the Estates).  The Mediation Settlement also provides for what the First Lien Steering Committee expects to be a smooth transition to new ownership and management, ensuring that the value of the Debtors' businesses will be maximized post-emergence.  Accordingly, the First Lien Steering Committee believes that the fourth prong of the *A&C Properties* test has been satisfied in that all creditors of the Estates will be benefited by approval of the Mediation Settlement.

25.    Given the range of issues involved, and the nature and character of the disputes between the First Lien Steering Committee, the Debtors and the Rhodes Entities, the First Lien Steering Committee believes that approval of the Mediation Settlement is appropriate.  In addition, as set forth above, the Mediation Statement satisfies the fair and reasonable standards articulated by courts in this circuit.  Moreover, and as discussed in greater detail below, all consideration to be obtained by the Rhodes Entities in connection with the Mediation Settlement will be in exchange for the Rhodes Entities' participation in the Mediation Settlement and the contribution of substantial new value outlined above, and

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

not on account of any Rhodes Entity's equity interests in the Debtors.  *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009).

**B.    The Plan Satisfies the "Cram Down" Requirements Under Bankruptcy Code Section 1129(b)**

      **1.    Cram Down and the Absolute Priority Rule**

      26.    Bankruptcy Code section 1129(b) provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and/or equity interests.  This mechanism is commonly referred to as "cram down."  Section 1129(b) provides in pertinent part:

> [n]otwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph *if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

11 U.S.C. § 1129(b)(1) (emphasis added).  Thus, under Bankruptcy Code section 1129(b), the court may "cram down" a plan over the rejection by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.

      27.    In order be "fair and equitable" for purposes of "cram down" under Bankruptcy Code section 1129(b), a plan must satisfy the absolute priority rule.  In general terms, the absolute priority rule provides that a dissenting class of claims or interests must be provided for in full before any junior class can receive or retain any property under a plan. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).  Bankruptcy Code

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

section 1129(b) codifies the absolute priority rule and provides that a plan satisfies the

absolute priority rule where the following conditions are met:

> (i)  the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; *or*
>
> (ii)  the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan *on account of such junior claim or interest* any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under Bankruptcy Code section 1115, subject to the requirements of subsection (a)(14) of Bankruptcy Code section 1129.

11 U.S.C. § 1129(b)(2)(B) (emphasis added).

> **2.    The Plan is Fair and Equitable and Satisfies the Absolute Priority Rule**

28.    The Plan is fair and equitable and satisfies the absolute priority rule with

respect to the Rejecting Classes notwithstanding the fact that the Rhodes Entities will

receive certain consideration under the Plan.  Indeed, the Plan does not violate the absolute

priority rule and thus should be confirmed because (i) the consideration to be received by the

Rhodes Entities under the Plan is not on account of any prepetition equity interests one or

more of the Rhodes Entities may hold in the Debtors, but *solely* on account of the Rhodes

Entities' agreement to provide the substantial consideration and cooperation outlined above

in connection with the Mediation Settlement, and (ii) the consideration to be provided by the

Rhodes Entities to the Reorganized Debtors constitutes "new value" satisfying the standards

articulated by the Ninth Circuit with respect to the new value exception the absolute priority

rule.  *See In re Bonner Mall P'Ship,* 2 F.3d 899 (9th Cir. 1993).

> **a.    The Rhodes Entities are Not Receiving a Distribution Under the Plan On Account of Their Equity Interests**

1    29.    As an initial matter, the Plan does not violate the absolute priority rule

2  because the Rhodes Entities are not receiving a distribution under the Plan on account of

3  their equity interests.  The absolute priority rule is violated only where "an equity interest

4  holder 'leapfrogs' unsecured creditors and receives property *on account of* a junior interest."

5  *In re Charter Commc'ns*, 419 B.R. at 269 (emphasis added).  Significantly, courts have

6  recognized that the absolute priority rule does not prevent an equity interest holder from

7  receiving property in connection with a plan of reorganization in all circumstances.  *See*

8  *Bank of America Nat'l Trust and Sav. Assoc. v. 203 N. LaSalle Street P'ship*, 526 U.S. 434,

9  451-52 (1999) ("LaSalle I") (rejecting the "starchy" position that "an old equity holder

10  simply cannot take property under a plan if creditors are not paid in full"); *In re Bonner Mall*

11  *P'Ship,* 2 F.3d at 909 (noting that "[h]ad Congress intended that old equity never receive any

12  property under a reorganization plan where senior claim classes are not paid in full, it could

13  simply have omitted the 'on account of' language from section 1129(b)(2)(B)(ii)").  Where

14  property is transferred to an equity holder for some reason other than "on account of" an

15  interest in the debtor, the absolute priority rule is not violated.  *See In re Bonner Mall*

16  *P'Ship,* 2 F.3d at 911; *In re PWS Holding Corp.*, 228 F.3d 224, 238 (3d Cir. 2000)

17  (recognizing that property may be transferred to junior interest holders under a plan for

18  reasons other than "on account of" interests in the debtor).  In other words, a transfer of

19  property to an equity holder in connection with a plan of reorganization violates the absolute

20  priority rule only where it can be shown that there is a causal relationship between the equity

21  holder's receipt of property under the plan and such equity holder's interest in the debtor.

22  *See LaSalle I*, 526 U.S. at 452-55 (discussing the level of causation required to show that

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1  property was received "on account of" an equity interest); *In re PWS Holding Corp.*, 228

2  F.3d at 238 (same).

3          30.     Where, as here, a former equity holder has entered into a settlement

4  agreement that provides substantial value to a debtor, courts have found that transfers to

5  such former equity holder under a plan of reorganization do not violate the absolute priority

6  rule because such transfers are not made on account of the equity holder's interest in the

7  debtor.  In *Charter*, a former equity holder entered into a settlement agreement with the

8  debtors that formed the cornerstone of the debtors' plan of reorganization.  419 B.R. at 253.

9  Pursuant to the settlement agreement, the former equity holder, among other things, agreed

10  to (i) cooperate with the debtors with respect to maintaining certain levels of voting power in

11  order to enable the debtors to reinstate a credit agreement and preserve valuable tax

12  attributes, (ii) transfer certain assets to the debtors and (iii) compromise certain contract

13  claims.  *Id.* at 269.  The estimated value to the debtors' estates of the former equity holder's

14  agreement to maintain a certain level of voting power was in excess of $3 billion.  In

15  exchange for his participation in the settlement, the former equity holder received

16  approximately $375 million worth of various forms of consideration.  *Id.* at 253.  A group of

17  bondholders that were not receiving full payment of their claims objected to the debtors'

18  plan on the grounds that the consideration to be paid to the former equity holder violated the

19  absolute priority rule.  Finding that the consideration was to be paid to the former equity

20  holder on account of his participation in the global settlement rather than on account of his

21  equity interests in the debtors, the court rejected the bondholders' objection and confirmed

22  the debtors' plan.  *Id.* at 268-69.

23

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

31.     As in *Charter*, the Rhodes Entities will receive certain forms of consideration under the Plan on account of their agreement to provide the Estates with invaluable cooperation and other valuable forms of consideration.  As previously discussed, pursuant to the Mediation Settlement, the Rhodes Entities will (i) transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors, (ii) make a cash payment of $3.5 million to the Reorganized Debtors on the Effective Date, (iii) replace designees of the Rhodes Entities with designees of the Reorganized Debtors on all applicable HOA Boards, (iv) ensure uninterrupted compliance with strict licensing requirements, and (v) enable the Reorganized Debtors to continue their existing operations under outstanding performance bonds guaranteed by the Rhodes Entities, thereby saving the Reorganized Debtors up to $8.7 million in cash requirements.  The assets, operational assistance and cost savings to be received by the Reorganized Debtors from the Rhodes Entities is of substantial value (net of consideration to be paid to the Rhodes Entities and funded debt obligations on the Rhodes Ranch Golf Course, the Debtors' Estates will receive *at least* $3.1 million and up to $11.7 million in tangible value) and will ensure a smooth transition to new ownership under the Plan.

32.     In exchange for their assistance and the valuable property to be transferred to the Reorganized Debtors pursuant to the Plan and the Mediation Settlement, the Rhodes Entities will receive (i) a release from certain avoidance actions under chapter 5 of the Bankruptcy Code, (ii) the Arizona Assets, (iii) certain tax benefits, (iv) copies of books and records and (v) certain trademarks and tradenames upon the conclusion of the Reorganized Debtors' homebuilding operations.  The Rhodes Entities are not receiving property "on account of" their equity interests in the Debtors.  Accordingly, no Class junior to the Class

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

of General Unsecured Claims or any other Rejecting Class will receive a recovery on account of their Claims, and the Plan does not violate the absolute priority rule.

### b.    The Requirements of the New Value Exception to the Absolute Priority Rule are Satisfied

33.    The Plan also complies with the absolute priority rule in that the terms of the Plan and the Mediation Settlement satisfy the new value exception articulated by the Ninth Circuit.  The Ninth Circuit has expressly held that the new value exception to the absolute priority rule remains a vital principle of bankruptcy law.  *In re Bonner Mall P'Ship,* 2 F.3d at 907.  The new value exception is a set of conditions that, if satisfied, permit an existing equity holder of a debtor in bankruptcy to receive a distribution under a plan of reorganization over the objection of senior classes that have not been paid in full.  *See id.* at 906; *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 195 (B.A.P. 9th Cir. 2003) (noting that new value exception allows junior interest holders to receive a distribution under a plan of reorganization under certain conditions).

34.    Pursuant to the new value exception, an existing equity holder may receive a distribution of property under a plan of reorganization if such equity holder offers value to the debtor that is (i) new, (ii) substantial, (iii) money or money's worth, (iv) necessary for a successful reorganization and (v) reasonably equivalent to the value or interest received.  *In re Bonner Mall*, 2 F.3d at 908; *Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*, 166 B.R. 892, 899 (B.A.P. 9th Cir. 1994).  Where the foregoing conditions are satisfied, the absolute priority rule is not violated because the property to be obtained by an equity holder will be received in exchange for new value contributed to the debtor rather than the equity holder's prior interest in the debtor.  *In re Bonner Mall*, 2 F.3d at 911.

35.     In determining whether an infusion of new value by an existing equity holder to a debtor satisfies the requirements of the new value exception, courts make a factual determination based on all of the circumstances of the case.  *Bank of America, Illinois v. 203 N. LaSalle Street P'Ship (In re LaSalle)*, 195 B.R. 692, 709 (N.D. Ill. 1996), *rev'd on other grounds*, 526 U.S. 434 (1999) ("LaSalle II").  Based on the facts and circumstances of the Debtors' Chapter 11 Cases, the First Lien Steering Committee believes that the requirements of the new value exception have been met.

36.     First, the value that will be contributed by the Rhodes Entities to the Reorganized Debtors pursuant to the Plan is "new."  In order to be new for purposes of the new value exception, the value contributed to the debtor must come from an outside source and may not consist of property that already belongs to the debtor.  *In re Saleha*, Case No. 93-00638, 1995 WL 128495, at *3 (Bankr. D. Idaho Mar. 10, 1995) ("[T]he 'new value' must come from outside of the debtor's business.");  *Berkeley Fed. Bank & Trust v. Sea Garden Motel and Apartments. (In re Sea Garden Motel & Apartments.)*, 195 B.R. 294, 302 (D. N.J. 1996) (noting that the infusion of capital must come from an outside source); *In re S.A.B.T.C. Townhouse Ass'n, Inc.*, 152 B.R. 1005, 1010 (Bankr. M.D. Fla. 1993) ("[T]he existing equity holders must contribute something to the [d]ebtor that does not already belong to the [d]ebtor or to which the [d]ebtor is already entitled").

37.     In this case, all of the value that will be contributed to the Debtors by the Rhodes Entities is new because it comes from an outside source and does not consist of property that already belongs to the Debtors.  The $3.5 million cash payment to be made by the Rhodes Entities will consist entirely of funds belonging to the Rhodes Entities in which the Debtors hold no interests.  In addition, the Rhodes Entities assumed ownership of the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Rhodes Ranch Golf Course in December 2008, and the Rhodes Ranch Golf Course is not currently owned by the Debtors.  Finally, the Rhodes Entities will (i) continue to guarantee existing performance bonds for the benefit of the Debtors, (ii) ensure that the Reorganized Debtors have the continued use of professional licenses and (iii) ensure that designees of the Reorganized Debtors replace the designees of the Rhodes Entities on any HOA Boards related to the Debtors or Reorganized Debtors.  Absent the Rhodes Entities' voluntary cooperation with respect to the foregoing, the Debtors would face a significant hurdle in attempting to reorganize their businesses.  Thus, the requirement that the value contributed be new is satisfied with respect to each form of consideration received by the Debtors pursuant to the Plan.

38.     Second, the new value that will be contributed by the Rhodes Entities to the Debtors pursuant to the Plan is "substantial."  While no mathematical relationship exists for determining whether a contribution of new value is substantial, courts in the Ninth Circuit have held that a contribution of new value must be "real and necessary to the successful implementation of a feasible plan."  *State Street Bank and Trust Co. v. Elmwood, Inc. (In re Elmwood, Inc.)*, 182 B.R. 845, 852-53 (D. Nev. 1995) (quoting *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994)).  New value that is nominal, gratuitous or token is not substantial.  *Id.*  Even if only the value of the $3.5 million cash payment and the transfer of the Rhodes Ranch Golf Course to the Debtors are taken into account, the Debtors will receive over $11.5 million in value ($5.6 million net of funded debt obligations on the Rhodes Ranch Golf Course) from the Rhodes Entities.  In addition, if the value of (i) the maintenance of performance bonds through the guarantees provided by the Rhodes Entities, (ii) the continued use of professional licenses and (iii) the replacement of the Rhodes

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Entities by designees of the Debtors on HOA Board seats are taken into account, the value received by the Debtors may exceeds $20.2 million ($14.3 million net of funded debt obligations on the Rhodes Ranch Golf Course).

39. The new value that will be provided by the Rhodes Entities is also necessary to the successful implementation of the Plan. Without the $3.5 million cash payment, there would be less capital available to (i) fund distributions under the Plan and (ii) finance the Debtors' ongoing business operations. Further, in addition to providing the Debtors with approximately $8 million of value ($2.1 million net of debt obligations) on the Effective Date, the transfer of the Rhodes Ranch Golf Course to the Debtors will ensure that (i) the centerpiece of the Rhodes Ranch community is adequately maintained and (ii) the Debtors' operations will not be harmed by diminished home sales or home prices as a result of a decline in the quality of the amenities available to the Rhodes Ranch community. Similarly, replacing the Rhodes Entities' designees on the HOA Boards with designees of the Reorganized Debtors will ensure that the Reorganized Debtors have continued control over building standards in their communities and help to avoid disruptions or increases in costs in the Reorganized Debtors' operations. Finally, the maintenance of performance bonds through the guarantees provided by the Rhodes Entities and the assistance of the Rhodes Entities with respect to the use of professional licenses will allow the Debtors to transition to new ownership without disruption in their business activities and avoid substantial costs related to replacing existing performance bonds or posting cash deposits. In the absence of any of the foregoing forms of consideration to be contributed to the Debtors by the Rhodes Entities, the successful implementation of the Plan would be significantly jeopardized.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

40.    Third, the new value to be contributed to the Debtors by the Rhodes Entities pursuant to the Plan is in the form of "money or money's worth."  In order to satisfy this requirement, the new value contributed to a debtor (i) "must consist of money or property which is freely traded in the economy" and (ii) "must be a present contribution, taking place on the effective date of the [p]lan rather than a future contribution."  *In re Ambanc La Mesa Ltd. P'Ship*, 115 F.3d 650, 655 (9th Cir. 1997).  While certain forms of the new value to be contributed by the Rhodes Entities to the Reorganized Debtors may fall outside of the scope of a strict application of this standard, the Debtors will indisputably receive new value in form of money or money's worth in the minimum amount of $11.5 million on the Effective Date of the Plan comprised of (i) the $3.5 million cash payment and (ii) approximately $8 million in respect of the transfer of the Rhodes Ranch Golf Course ($2.1 million net of funded debt obligations on the Rhodes Ranch Golf Course).  The amount of new value to be received by the Reorganized Debtors may, in fact, exceed $20.2 million.[5]  The Rhodes Entities have therefore contributed new value in the form of money or money's worth to the Debtors.

41.    Fourth, the new value to be contributed to the Debtors by the Rhodes Entities pursuant to the Plan is necessary for a successful reorganization.  This requirement demands that the new value contributed to the Debtors be necessary to the success of the reorganization.  *See In re Bonner Mall P'Ship*, 2 F.3d at 911; *In re Brotby*, 303 B.R. at 197 (finding an abuse of discretion where there was no finding that a plan could not succeed

---

[5] The issue of whether various contributions to a debtor by an existing equity holder constitute "money or money's worth" for purposes of the new value exception has been the subject of numerous judicial decisions.  Among other things, courts have held that a promise of future services or labor or a delayed stream of payments does not satisfy this requirement.  *In re Ambanc La Mesa Ltd. P'Ship*, 115 F.3d at 655; *In re Davis*, 262 B.R. 791, 796 (Bankr. D. Ariz. 2001).  Courts have also held that the guarantee of a corporate loan

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

without a contribution of new value).  As previously discussed, the new value to be contributed to the Debtors by the Rhodes Entities is necessary for the implementation of the Plan and the reorganization of the Debtors.  In the absence of the $3.5 million cash payment, the Debtors would have less cash available to fund distributions under the Plan and to finance their operations, and without the transfer of the Rhodes Ranch Golf Course to the Debtors, the value of one of the Debtors' most valuable assets (Rhodes Ranch Community) would be jeopardized.  Moreover, without the assistance of the Rhodes Entities with respect to the maintenance of performance bonds, continued use of licenses and the composition of HOA Board seats, the transition to new ownership under the Plan and the smooth operation of the Reorganized Debtors' businesses would be virtually impossible.  The new value contributed by the Rhodes Entities to the Debtors is therefore necessary for a successful reorganization.

42.    Fifth, the new value to be contributed to the Debtors by the Rhodes Entities pursuant to the Plan is reasonably equivalent in value to (and is, in fact, substantially greater in value than) the consideration to be provided to the Rhodes Entities.  In determining whether the Debtors have received reasonably equivalent value, courts must consider whether there will be a "genuine and fair exchange" of new value for a distribution under a plan of reorganization.  *See In re Tucson Self-Storage*, 166 B.R. at 899.  Here, the Debtors have received reasonably equivalent value in exchange for consideration to be paid to the Rhodes Entities.  As discussed above, the Rhodes Entities will contribute new value to the Debtors in money or money's worth in the amount of $11.6 million to $20.2 million (or $5.7 million to $14.3 million net of funded debt obligations on the Rhodes Ranch Golf Course).

by an existing equity holder is not a contribution of value in the form of money or money's worth.  *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1362-63 (7th Cir. 1990).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1  In exchange for such new value, the Rhodes Entities will receive consideration worth

2  approximately $2.6 million.  Thus, the Debtors will receive at least reasonably equivalent

3  value in exchange for the consideration to be paid to the Rhodes Entities.

4          43.     In addition to these traditional requirements, LaSalle I required that any plan

5  that provides for a distribution to an equity holder on account of a new value contribution

6  must satisfy a "market test."  *LaSalle I*, 526 U.S. at 454-59; *Matter of Union Fin. Servs.*

7  *Group*, 303 B.R. 390, 423-24 (Bankr. E.D. Mo. 2003).  The Plan satisfies the "market test"

8  requirement.  The "market test" requirement prevents existing equity holders from enjoying

9  the exclusive right to bid on equity in the debtor or a distribution under a plan by requiring

10  that any plan including such a right be value tested on the open market.  *See LaSalle I*, 526

11  U.S. at 454-55; *In re Hoffinger Indus., Inc.*, 321 B.R. 498, 511 (Bankr. E.D. Ark. 2005).

12  While LaSalle I did not specifically define the manner in which the "market test" may be

13  satisfied, courts have generally assumed that the test is satisfied either (i) where there has

14  been a public bidding process or (ii) where other parties have the opportunity to file an

15  alternative plan because the debtor's exclusive plan filing period was terminated.  *See, e.g.*,

16  *Matter of Union Fin. Servs. Group*, 303 B.R. at 424 (noting that testing the value of the

17  contribution received from existing equity holders requires either a termination of the

18  debtor's exclusivity periods or some other form of exposure to the market); *In re Hoffinger*

19  *Indus., Inc.*, 321 B.R. at 511 (ruling that the "market test" was satisfied where, among other

20  things, the debtor's exclusivity period had terminated); *In re Davis*, 262 B.R. at 799 (noting

21  that LaSalle I suggested that "*either* the right to bid for equity under a plan *or* the

22  opportunity to propose a competing plan" would satisfy the "market test").

44.    In this case, the "market test" established by LaSalle I is satisfied because the Debtors' exclusivity period terminated well before the Plan was filed.  Pursuant to the Mediation Order, the Debtors' exclusivity period was terminated on July 21, 2009. Although the Mediation Order and subsequent stipulations approved by the Court provided that none of the First Lien Steering Committee, the Debtors, the Rhodes Entities, the Creditors' Committee, the First Lien Agent or the Second Lien Agent (the "Parties") could file a plan prior to September 25, 2009, no other parties in interest in the Debtors' Chapter 11 Cases were prevented from filing a plan, and none of the Mediation Parties were prevented from filing a competing Plan after September 25, 2009 if the Mediation failed to produce a settlement.

45.    Moreover, there can be no assumption that the Rhodes Entities are deriving an improper benefit under the Plan on account of their contribution of new value.  As the Court is aware, the Plan is the product of extensive, hard-fought negotiations, and the First Lien Steering Committee (rather than the Debtors) is the proponent of the Plan.  The First Lien Steering Committee and certain other parties had every incentive to minimize the amount to be paid to the Rhodes Entities in consideration for their contribution of new value, and the fairness of the value of the consideration to be paid to the Rhodes Entities under the Plan is demonstrated by the fact that the Plan enjoys the support of virtually all of the major creditor constituencies in the Debtors' Chapter 11 Cases.  Thus, the "market test" requirement has been satisfied.

46.    The Ninth Circuit has held that even where there is no market test and old equity is granted an exclusive right to participate in a new value transaction, the determination of whether such transaction is in accord with the new value exception is a

32

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

factual question. *See In re Bonner Mall P'Ship,* 2 F.3d at 911. The *Bonner* Court held that even where old equity was given an exclusive right to participate in the new value transaction, "[w]hat matters . . . is whether the proposed transaction meets the criterion 'necessary to the success of the reorganization.' In other words, if an exclusive participation plan satisfies that requirement, then it allows [equity owners] the sole right to participate in a new value transaction not because of illegitimate collusion between old equity and the plan proponent but because such participation is necessary for a successful reorganization and in the best interests of all concerned." *Id.* (internal citations omitted). The *Bonner* Court went on to succinctly hold that "[i]n sum, where the strictures of the new value exception are met, there is simply no violation of the absolute priority rule, whether the plan provides for exclusive or non-exclusive participation, because old equity will not retain or receive property 'on account of' its old ownership interests in violation of section 1129(b)(2)(B)(ii)." *Id.*

47.     Based on the foregoing, the First Lien Steering Committee believes that the Plan satisfies the requirements of the new value exception to the absolute priority rule. The Plan therefore fully complies with the absolute priority rule and is fair and equitable with respect to the Rejecting Classes.

1

2

**CONCLUSION**

3

4        WHEREFORE, for the reasons set forth above, the First Lien Steering Committee

5 respectfully requests the Court (i) confirm the Plan and (ii) grant the First Lien Steering

6 Committee such other and further relief as is just and proper under the circumstances.

7 Dated this 27th day of January, 2010.

8

9                                By:    Philip C. Dublin
                                        Nile Leatham (NV Bar No. 002838)
10                                       KOLESAR & LEATHAM
                                         Wells Fargo Financial Center
11                                       3320 W. Sahara Ave.
                                         Las Vegas, NV 89102
12                                       (702) 979-2357 (Telephone)
                                         (702) 362-9472 (Facsimile)
13                                       Nleatham@klnevada.com

14

15                                       AKIN GUMP STRAUSS HAUER & FELD LLP
                                         Philip C. Dublin (NY Bar No. 2959344)
16                                       Abid Qureshi (NY Bar No. 2684637)
                                         One Bryant Park
17                                       New York, New York 10036
                                         (212) 872-1000 (Telephone)
18                                       (212) 872-1002 (Facsimile)
                                         pdublin@akingump.com
19                                       aqureshi@akingump.com

20
                                         *Counsel for the First Lien Steering Committee*
21

22

23

24

25

26

27

28

*AKIN GUMP STRAUSS HAUER & FELD LLP*
*One Bryant Park*
*New York, New York 10036*
*Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com*

1

**<u>Exhibit A</u>**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1  Nile Leatham (NV Bar No. 002838)
2  KOLESAR & LEATHAM
   Wells Fargo Financial Center
3  3320 W. Sahara Ave.
   Las Vegas, NV 89102
4  Telephone:  702.979.2357
   Facsimile:  702.362.9472
5  E-Mail:    nleatham@klnevada.com
6
7  Philip C. Dublin (NY Bar No. 2959344)
   Abid Qureshi (NY Bar No. 2684637)
8  AKIN GUMP STRAUSS HAUER & FELD LLP
   One Bryant Park
9  New York, NY 10036
   Telephone:  212.872.1000
10 Facsimile:  212.872.1002
11 E-Mail:    pdublin@akingump.com
12            aqureshi@akingump.com
13
   *Counsel for the First Lien Steering Committee*
14

*AKIN GUMP STRAUSS HAUER & FELD LLP*
*One Bryant Park*
*New York, New York 10036*
*Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com*

15              **UNITED STATES BANKRUPTCY COURT**
                     **DISTRICT OF NEVADA**
16                   **SOUTHERN DIVISION**

17 **IN RE:**                      §    **Case No. 09-14814-LBR**
                                   §    **(JointlyAdministered)**
18 **THE RHODES COMPANIES, LLC,**  §
       **aka "Rhodes Homes," *et al.*,**  §
19                                 §    **Chapter 11**
                                   §
20         **Debtors.**[1]         §
                                   §
21                                 §
                                   §
22                                 §

23 _____

    [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
24 number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060);
    Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave,
25 LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country
    Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions
26 III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and
    Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090);
27 Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC
    (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited
28 Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897);
    Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

| Affects: | § | **DECLARATION OF JUSTIN BONO IN** |
|---|---|---|
| ☒ **All Debtors** | § | **SUPPORT OF CONFIRMATION OF THE** |
| ☐ **Affects the following** | § | **SECOND AMENDED MODIFIED PLAN** |
| **Debtor(s)** | § | **OF REORGANIZATION PURSUANT TO** |
| | § | **CHAPTER 11 OF THE BANKRUPTCY** |
| | § | **CODE FOR THE RHODES COMPANIES,** |
| | § | **LLC, ET AL.** |

I, Justin Bono, hereby declare:

1.      I am the Executive Vice President of Winchester Carlisle Holdings and its subsidiaries or affiliates, Winchester Carlisle Partners ("WCP"), Nathan Grace Real Estate, Carwin Advisors, and Dunhill Homes.  Previously, I served as President and CEO of Dubose Model Homes, USA and its affiliated companies from October 2006 to August 2008.  During that time, I oversaw investments in residential real estate in 13 states, including Nevada.  Prior to that position, I served in various positions with Pulte Homes, Inc. ("Pulte") from May 2002 until September 2006, including Vice President of Operations for Pulte's Houston Division and Vice President of Finance for Pulte's Dallas/Fort Worth Division.  From May 1999 to April 2002, I was in the Assurance and Advisory Services practice of Arthur Andersen, LLP in Dallas, Texas.  While not currently active, I am a Certified Public Accountant in the State of Texas.

2.      I submit this declaration in support of confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (as may be amended, the "Plan").  Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

2

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

### The Plan and the Mediation Settlement[2]

3.     On July 21, 2009, this Court entered its Order Granting Plan Exclusivity and Cash Collateral Stipulation (Docket No. 336) (the "Mediation Order") which approved a stipulation among the First Lien Steering Committee, the First Lien Agent, the Second Lien Agent, the Creditors' Committee, the Debtors and the Rhodes Entities (collectively, the "Mediation Parties") providing for, among other things, the Mediation Parties to participate in Court-ordered mediation regarding the formulation of a plan of reorganization for the Debtor (the "Mediation"). On August 17, 24 and 25, 2009, in accordance with the terms of the Mediation Order, the Mediation Parties participated in the Mediation over the terms of a proposed plan of reorganization for the Debtors before the Honorable Richard Neiter of the United States Bankruptcy Court for the Central District of California. During the Mediation, the Mediation Parties (other than the First Lien Agent) reached an agreement in principle on a comprehensive settlement resolving the Mediation Parties' disputes over the construct of plan of reorganization as well as certain issues related to the Debtors' prepetition relationship with the Rhodes Entities (the "Mediation Settlement"). The Plan is premised, in part, on the terms of the Mediation Settlement.

4.     Based on my review of the Mediation Settlement, I believe that the creditors of the Estates will derive material benefits from the approval of the Mediation Settlement, including improved liquidity for the Reorganized Debtors' businesses, the acquisition of assets material to the development and operation of the Reorganized Debtors' communities and the cooperation of the Rhodes Entities that will enable a smooth transition out of chapter

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

11 for the Reorganized Debtors.  Specifically, the Reorganized Debtors will obtain the

following benefits from the Rhodes Entities in connection with the Mediation Settlement:

- **Rhodes Ranch Golf Course.**  On the Effective Date, the Rhodes Entities shall transfer their equity interests in the entity that owns the Rhodes Ranch Golf Course to the Reorganized Debtors.  The transfer of the Rhodes Ranch Golf Course to the Reorganized Debtors represents one of the most valuable components of the Mediation Settlement from the Debtors' and First Lien Steering Committee's perspective.  The Rhodes Ranch Golf Course is valued at approximately $8 million, as set forth in a recent 2009 appraisal provided to the Mediation Parties during the course of the Mediation.  The Rhodes Ranch Golf Course has $5.9 million in outstanding debt, yielding a net value to the Reorganized Debtors of approximately $2.1 million.  As one of the Reorganized Debtors' most valuable assets, the Rhodes Ranch Community could decrease in value if the Golf Course is not properly maintained under the ownership of the Rhodes Entities or another third party.

- **$3.5 Million Cash Payment.**  On the Effective Date, the Rhodes Entities shall transfer $3.5 million in cash to the Reorganized Debtors.  This transfer is expected to nearly double the Reorganized Debtors' opening cash balance, giving them additional liquidity upon their exit from chapter 11 and providing them with additional cash to fund distributions contemplated by the Plan.

- **Maintenance of Performance Bonds.**  The Debtors currently have approximately $8.7 million in performance bonds outstanding, which bonds are required by various governmental agencies in connection with the Debtors' development activities.  These performance bonds have the personal guaranty of James Rhodes.  Pursuant to the Mediation Settlement, the Rhodes Entities have agreed to the Reorganized Debtors' maintenance of such bonds, together with James Rhodes' personal guaranty, for 30 months after the Effective Date.  The Reorganized Debtors will replace the bonds before the expiry of the 30 month period. The current market for performance bonds is extremely challenging, and the First Lien Steering Committee's professionals question whether the Reorganized Debtors could obtain comparable replacement bonds on the Effective Date if the Rhodes Entities were not willing to maintain the currently outstanding bonds.  Without bonds in place, the Reorganized Debtors would be required to post substantial cash deposits, which would jeopardize their ability to consummate the Plan, or would be required to cease many of their operations.

- **Licensing.**  The Mediation Settlement requires that the Rhodes Entities keep the Debtors' existing contractors' license active by substituting a Qualified Employee of the Reorganized Debtors' choosing for James

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

4

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Rhodes, who is currently serving as Qualified Employee under the licensing requirements. While the proposed management team for the Reorganized Debtors is in the process of obtaining a new contractors' license, there is no guaranty that such license will be obtained in advance of the Effective Date. Therefore, the Reorganized Debtors' ability to utilize the existing license through the cooperation of the Rhodes Entities will enable the Reorganized Debtors to operate without interruption on the Effective Date. Without the ability to use the existing license, the Reorganized Debtors' post-effective date cash flow and home closings would be negatively impacted.

- **HOA Boards.** The Mediation Settlement contemplates that the Rhodes Entities will ensure that designees identified by the Reorganized Debtors shall replace the Rhodes Entities on any HOA Boards that are in any way related to the Debtors or their businesses. The value of such transfer is indeterminable, but has significant value for the Reorganized Debtors. The HOA Boards govern all building activity, set building standards and architectural guidelines, approve building materials, and approve floor plans for construction. If the designees appointed by the Rhodes Entities were to remain in place, the HOA Boards could alter the building standards in the Reorganized Debtors' communities, causing disruptions in construction and potentially increased building costs. Moreover, by controlling the HOA Boards, the Reorganized Debtors can adjust building requirements to build a product that meets market demand.

5.    In exchange for the foregoing, the Mediation Settlement contemplates the following consideration for the Rhodes Entities:

- **Limited Release.** The Rhodes Entities will receive a full release for chapter 5 causes of action with respect to transfers made by the Debtors to the Rhodes Entities during the two years prior to the Petition Date, provided that such release will only apply to transfers expressly set forth in the Debtors' statements of financial affairs as filed with the Bankruptcy Court and on Attachment B to the Mediation Term Sheet. The First Lien Steering Committee has determined that all but $1,125,134 of such transfers were made in the ordinary course of business and are therefore likely not subject to valid attack.

- **Arizona Assets.** The Plan provides that, on the Effective Date, the Debtors will transfer the Arizona Assets to the Rhodes Entities free and clear of all liens, claims and encumbrances. The Arizona Assets include approximately 1,300 partially graded acres, four partially built homes, four model homes, and miscellaneous office equipment. The acreage was evaluated by Robert Charles Lesser Co., a third party valuation consultant retained by the First Lien Steering Committee to assist WCP, the First Lien Steering Committee's financial advisor, in performing the going

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

concern and liquidation analyses contained in the Disclosure Statement
and Plan exhibits.  Based on existing listings in the surrounding Mohave
County, Arizona area and an understanding of the development
challenges associated with the property, the First Lien Steering
Committee estimates that the acreage will have a value of approximately
$1.3 million in 2015 and has a present value of approximately $385,000.
The property is located in remote northern Arizona in an area currently
not developed for residential housing.  Moreover, the property is wholly
surrounded by property owned by the Rhodes Entities, which would
require any purchaser to cooperate with the Rhodes Entities for any future
development.  Additionally, the property does not have access to a water
supply sufficient for developing the entire property as it currently has
water rights to serve only approximately 60% of the property as a whole.
These water rights will expire in 2015 unless substantial cost and effort is
undertaken to satisfy the requirements necessary to obtain an extension.
The First Lien Steering Committee does not believe that the property will
be viable for development by 2015, particularly in light of the property's
limited access to water.  Finally, the Debtors' remaining homebuilding
assets are located in Nevada.  Maintaining and developing property in
Arizona will require additional infrastructure and associated costs.
Accordingly, the property is of limited value to the Reorganized Debtors.
The four partially built homes have been valued at approximately $70,000
per home based on recent sales of similar properties and discussions with
the real estate agent responsible for these homes.  The four model homes
have been valued at $125,000 each based on a recent offer for one of the
properties, and discussions with the real estate agent responsible for
selling the partially built homes.  Substantially all of the Debtors' office
equipment in Arizona will be transferred to the Rhodes Entities, and is
valued in the aggregate at $43,525 in the Debtors' most recent books and
records.

- **Tax Treatment.**  The First Lien Steering Committee has proposed a Plan
that incorporates a tax structure beneficial for the Rhodes Entities.  The
structure proposed in the Plan does not negatively benefit any creditor of
these Estates and will not result in any additional cost for the Debtors or
Reorganized Debtors.

- **Trademarks and Tradenames.**  The Mediation Settlement contemplates
that within the earlier of thirty days following:  (i) completion of the
buildout of all of the Reorganized Debtors' homebuilding assets and
inventory (regardless of when such assets and inventory were acquired),
or (ii) the bulk sale of the remaining inventory of the Reorganized
Debtors, the Reorganized Debtors shall transfer to James Rhodes the
trademarks and tradenames set forth on Attachment E to the Mediation
Term Sheet.  The First Lien Steering Committee expects to phase out the
use of the Debtors' current trademarks and tradenames on or around the
Effective Date and rebrand the Reorganized Debtors' operations.

6

Moreover, as the transfer of the tradenames and trademarks will not occur until the Reorganized Debtors have completed all of their homebuilding activities, there is no cost to the Reorganized Debtors associated with the transfer of this intellectual property.

- **Books and Records.** Copies of the Debtors' books and records will be delivered to the Rhodes Entities at no cost to the Rhodes Entities. Given the voluminous nature of the Debtors' books and records, recent bids obtained indicate that the Estates will incur approximately $300,000 to have the documents copied.

6.     In addition, all claims and causes of action against the Rhodes Entities that are not covered by the limited release provided for in the Mediation Settlement will be transferred to the Litigation Trust for the benefit of all creditors, to be prosecuted and/or settled post-emergence, as appropriate.

### Value of Mediation Settlement Consideration

7.     Taken as a whole, I believe that the Estates will obtain anywhere from approximately $11.6 million to $20.2 million (or $5.7 million to $14.3 million net of funded debt obligations on the Rhodes Ranch Golf Course) in quantifiable value from the Rhodes Entities pursuant to the Mediation Settlement. By contrast, the Estates will incur no more than approximately $2.6 million in costs on account of the consideration to be given to the Rhodes Entities. Accordingly, the Mediation Settlement will provide creditors of the Debtors' Estates with between $3.1 million to $11.7 million in net value in excess of the costs to be incurred by the Estates in connection therewith (separate and apart from the intangible but material benefits to be obtained by the Estates). The Mediation Settlement also provides for what I expect to be a smooth transition to new ownership and management, ensuring that the value of the Debtors' businesses will be maximized post-emergence.

I declare under penalty of perjury that the foregoing is true and correct.

7

Executed this _27 TH_ day of January, 2010.

By: _____
Justin Bono

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit B**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone: 702.979.2357
Facsimile: 702.362.9472
E-Mail:    nleatham@klnevada.com


Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002

E-Mail:    pdublin@akingump.com
           aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 09-14814-LBR** |
| | § | **(JointlyAdministered)** |
| **THE RHODES COMPANIES, LLC,** | § | |
| **aka "Rhodes Homes," *et al.*,** | § | **Chapter 11** |
| | § | |
| **Debtors.**[1] | § | |
| | § | |
| | § | |
| | § | |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

| Affects: | § | **DECLARATION OF CHARLES HEWLETT** |
|---|---|---|
| ☒ **All Debtors** | § | **IN SUPPORT OF CONFIRMATION OF THE** |
| ☐ **Affects the following** | § | **SECOND AMENDED MODIFIED PLAN** |
| **Debtor(s)** | § | **OF REORGANIZATION PURSUANT TO** |
| | § | **CHAPTER 11 OF THE BANKRUPTCY** |
| | § | **CODE FOR THE RHODES COMPANIES,** |
| | § | **LLC, ET AL.** |

I, Charles Hewlett, hereby declare:

1.     I am a Managing Director based in the Washington, D.C., area office of Robert Charles Lesser & Co., LLC ("RCLCO").  I have over 25 years of experience in real estate and have consulted on a broad spectrum of residential and commercial properties, including large-scale master-planned communities and resorts, single-family subdivisions, rental apartments, condominiums, hotels, urban redevelopment and mixed-use complexes, and retail and office buildings and business/industrial parks.  My consulting activities include a full range of market and financial feasibility analysis, demographic and economic forecasting, business and investment valuation, product planning, and market opportunity analysis.  I graduated from Brown University in Providence, Rhode Island.  I am a frequent guest speaker, moderator, and panelist at numerous real estate industry events, including the Urban Land Institute ("ULI"), National Multi Housing Council, the International Council of Shopping Centers, the National Association of Homebuilders, and the Mortgage Bankers Association.  I am the co-author of Strategy for Real Estate Companies, a ULI book released in March 2008.  I am also a Full Member of ULI.

2.     I submit this declaration in support of confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (as may be amended, the "Plan").  Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

**Valuation of the Arizona Assets[2]**

3.        In August 2009, RCLCO was retained to assist the First Lien Steering Committee in performing a going concern and liquidation analysis in connection with the Plan.  Such analysis included valuing the 1300 acres of real property (the "Arizona Acreage") included in what has been termed the "Arizona Assets."

4.        In valuing the Arizona Acreage, I used the following methodologies:  (i) an analysis of comparable sale transactions and (ii) a discounted cash flow analysis.  Based on my over 25 years of experience, I believe that the generally accepted methodologies for valuing the Arizona Acreage are the comparable sale transactions analysis and the discounted cash flow analysis.

5.        A comparable sale transaction analysis values assets based on a review of comparable transactions in the subject market.  To determine the value of the Arizona Acreage using comparable sale transactions, I would ordinarily have begun my analysis by reviewing sales of similar parcels of land recently sold in the Mohave, Arizona vicinity.  Given the downturn in the housing markets and the general state of the economy, there have been very few relevant contemporaneous sales comparable to the Arizona Acreage with regard to location, timing of sales, and size of the parcels.  Accordingly, I broadened my search to sales of large parcels of land (including, for example, large ranch properties, large agricultural parcels, etc.) located elsewhere in the desert southwest.  I then made certain adjustments to each purchase price to account for variables such as the size, location, nature of improvements on the subject land, and the timing of the sale, where such information was available.

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

6.      Based on this comparable sales analysis, and given the highly speculative nature of large scale residential development in this location within the context of the economic and real estate market cycles, it was determined that a reasonable value for the Arizona Acreage is $1,000 per acres, or approximately $1.3 million, to be realized no earlier than 2015 when the market where the Arizona Acreage is located is projected to improve sufficiently to warrant the sale of such parcel given, among other things, the surplus of large parcels available for sale, the current state of the markets and what I perceive to be a relatively slow recovery for the Mohave, Arizona region.  Discounting the $1.3 million back to present value, the Arizona Acreage has a value today to the Debtors of approximately $385,000.  To obtain the present value of the Arizona Acreage, I applied a discount rate of 22.5%, which rate is consistent with the discount rate determined to be appropriate by RCLCO for purposes of the going concern and liquidation analyses incorporated in the Plan.

7.      The second methodology I used to determine the value of the Arizona Acreage is a discounted cash flow ("DCF") analysis to determine a residual value of the land, a methodology typically employed by residential homebuilders, land developers and investors when estimating the value of land for a community development.  A discounted cash flow analysis determines a future free cash flow projection over the life-of-project build out of a community and discounts this cash flow to arrive at a present value.  In conducting the DCF analysis, I considered factors such as the likely timing, pricing, and velocity of "end-user" (i.e., homebuyer) home sales and deducted necessary costs.  I then discounted the resulting net cash flows to present value to account for what a knowledgeable investor would pay for the land today, again using a discount rate of 22.5%.  The DCF analysis indicates that the Arizona Acreage has negative value, which is primarily attributable to the

fact that the costs associated with developing the parcel exceed any reasonable revenue projections.  Using the DCF methodology, and to be conservative, I assume that the Arizona Acreage has no value.

8.    Based on the two commonly accepted methods for determining value  of property similar to the Arizona Acreage, and in order to be conservative, I have relied on the value attributed to the Arizona Acreage based on the comparable sale transaction analysis for all purposes associated with the Plan, including the Mediation Settlement.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this  27th  day of January, 2010.

By:  _____

Charles A. Hewlett

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com