J. Thomas Beckett, Utah Bar 5587
*Admitted Pro Hac Vice, Docket No. 224*
David P. Billings, Utah Bar #11510
*Admitted Pro Hac Vice, Docket Nos. 225*
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
(801) 536-6700
tbeckett@parsonsbehle.com;
dbillings@parsonsbehle.com

Rew R. Goodenow, Bar 3722
PARSONS BEHLE & LATIMER
50 West Liberty Street, Suite 750
Reno, NV 89501
(775) 323-1601
rgoodenow@parsonsbehle.com

*Counsel to the Unsecured Creditors Committee*

**E-filed:** February 2, 2010
**Hearing**: February 11, 2010, 9:30 a.m.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: **THE RHODES COMPANIES,** aka "Rhodes Homes, *et al*.," Debtors. | Case No. BK-S-09-14814-LBR (Jointly Administered) Chapter 11 Honorable Linda B. Riegle |

### UNSECURED CREDITORS COMMITTEE'S STATEMENT IN SUPPORT OF CONFIRMATION

The Official Committee of Unsecured Creditors in these cases (the "UCC"), by and through its undersigned counsel, respectfully submits the following Statement in Support of Confirmation.

### STATEMENT OF SUPPORT

The UCC supports the First Lien Steering Committee's efforts to confirm their Second Amended Modified Plan of Reorganization (the "Plan"). The First Lien Steering Committee has thoroughly briefed the legal issues, and the UCC will not attempt to duplicate any part of that effort. Rather, the UCC will only summarize for the Court why its perspective leads it to support confirmation.

Typically – and in this case – the trade creditor community hopes for two things from a bankruptcy case: (i) that their claims against the debtor are paid, and (ii) that the reorganized debtor is a good trade customer going forward. These objectives will be met, substantially if not perfectly, if the Plan is confirmed.

<u>With respect to trade claims being paid</u>: This case could have dissolved into fearsome litigation between the Debtors / Rhodes Entities and the First Lien Steering Committee. That appeared likely in the initial stages following the filing of the petitions. The likely consequence of that could have been conversion and liquidation. Trade creditors would have received little recovery, if any, on their claims. Fortunately, those parties agreed to mediation and conducted it in good faith. That mediation resulted in a package of terms acceptable to both sides.

This case also could have been predominated by litigation brought by the UCC on account of the underlying ill-advised Credit Suisse loan. Fortunately, again, the mediation resulted in an agreement by the First Lien Steering Committee to purchase at par the undisputed trade claims against the Debtors with some of the proceeds of their distribution under the Plan. And, frankly, since so many of the unsecured trade claims that existed at the beginning of these cases were paid down with bond proceeds during the case, such litigation might well have cost more than was necessary to recover. But in any event, the mediation made that litigation unnecessary, and the ultimate treatment of trade claims is generous.

<u>With respect to the Reorganized Debtors being viable trade customers going forward</u>: In its Supplemental Brief, the First Lien Steering Committee focuses on the relative values of concrete items – the Golf Course, Arizona Assets, cash and releases – that the Reorganized Debtors are receiving from the Rhodes Entities and vice-versa. The demonstrable disparity of those values, the UCC agrees, shows that the Rhodes Entities are in fact providing new value rather than receiving a distribution on account of their equity interests. The UCC, however, focuses more on the value of the less-tangible assets – the designation of HOA Seats, licensing and bonding – that the Rhodes Entities are transferring to the Reorganized Debtors – for those things are necessary for the Reorganized Debtors to be feasible ongoing businesses. That value may be difficult to quantify, but it is certainly substantial. And in the UCC's view, that fact

proves the point that this Plan does not violate the absolute priority rule: In the context of a mediated global settlement, the equity is pumping more necessary things of value into the reorganized emerging business entities than it is taking out of them. And the beneficiaries of that net contribution are the creditors.

The UCC is mindful that the class that best describes its constituency has rejected the Plan, notwithstanding that this is only because the single largest disputed claim in that class voted against the Plan. Nevertheless, the Plan will (i) pay undisputed trade claims in full, (ii) result in a feasible ongoing business emerging from bankruptcy, (iii) insulate a substantial number of trade creditors from preference exposure, and (iv) indemnify the estate's postpetition trade vendors from SIR exposure under prepetition insurance policies. These points in this Plan do not – they cannot – satisfy every creditor that holds an unsecured claim; but they do comprise a result for trade creditors that is very favorable and very much in the best interest of the estates and all their unsecured creditors.

## **CONCLUSION**

The Plan satisfies the letter and spirit of the Bankruptcy Code and embodies a very good result for the unsecured creditors in these cases. Consequently, the UCC supports confirmation of the Plan.

DATED this 2nd day of February, 2010.

**PARSONS BEHLE & LATIMER**

*/s/ J. Thomas Beckett*

J. Thomas Beckett,
David P. Billings,
201 South Main Street, Suite 1800
Salt Lake City, UT 84111

Rew R. Goodenow,
50 West Liberty Street, Suite 750
Reno, NV 89501

*Counsel to the Official Unsecured Creditors Committee*

18422.001/4813-5979-7509.1