1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:      nleatham@klnevada.com

Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002

E-Mail:      pdublin@akingump.com
             aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

*Electronically Filed*
*February 8, 2010*

| | | |
|---|---|---|
| IN RE: | § | **Case No. 09-14814-LBR** |
| | § | **(JointlyAdministered)** |
| **THE RHODES COMPANIES, LLC,** | § | |
| aka "Rhodes Homes," *et al.*, | § | **Chapter 11** |
| | § | |
| Debtors.[1] | § | |
| | § | **Hearing Date: February 11, 2010** |
| | § | **Hearing Time: 9:30 a.m.** |
| | § | |
| | § | |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

| | |
|---|---|
| **Affects:** | § |
| ☒ **All Debtors** | § |
| ☐ **Affects the following** | § |
| **Debtor(s)** | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |

**FIRST LIEN STEERING COMMITTEE'S REPLY TO STANLEY CONSULTANTS, INC'S OPPOSITION TO FIRST LIEN STEERING COMMITTEE'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED MODIFIED PLAN**

<div style="writing-mode: vertical">AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com</div>

The First Lien Steering Committee (the "<u>First Lien Steering Committee</u>"), consisting of certain unaffiliated lenders under the Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders (collectively, the "<u>First Lien Lenders</u>"), and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger, by and through its undersigned counsel, hereby files this Reply (the "<u>Reply</u>") to Stanley Consultants, Inc's Opposition (the "<u>Stanley Objection</u>") to First Lien Steering Committee's Supplemental Memorandum of Law in Support of Confirmation of the Second Amended Modified Plan (the "<u>Plan</u>"). In support of this Reply, the First Lien Steering Committee respectfully represents as follows:

## **<u>REPLY</u>**[2]

1.    On January 27, 2010, the First Lien Steering Committee filed its Supplemental Memorandum in support of Confirmation of the Second Amended Modified Plan of Reorganization (the "<u>Supplemental Memorandum</u>"). By the Supplemental Memorandum, the First Lien Steering Committee provided further support for the Court to confirm the Plan. Specifically, the First Lien Steering Committee provided additional facts

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan or Supplemental Memorandum.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

and legal analysis affirming that (i) the Mediation Settlement described in the Plan was fair and equitable and should be approved under Bankruptcy Rule 9019, and (ii) the consideration to be received by the Rhodes Entities as part of the Mediation Settlement was not received on account of any Equity Interests held by one or more of the Rhodes Entities. On February 2, 2010, Stanley Consulting, Inc. ("Stanley") filed the Stanley Objection, alleging that (i) the First Lien Steering Committee failed to consider water rights associated with the Arizona Assets when valuing such assets, (ii) the First Lien Steering Committee failed to include 19 parcels of land in its valuation of the Arizona Assets, and (iii) because the First Lien Steering Committee undervalued the Arizona Assets, the absolute priority rule has not been satisfied with respect to the consideration to be received by the Rhodes Entities under the Plan.  Each of these arguments is addressed below.

### A.    Value of Water Rights Associated with Arizona Assets

2.    Stanley alleges that the First Lien Steering Committee and its professionals failed to incorporate the "incalculable value" attributable to certain water rights into its valuation of the Arizona Assets.  Stanley's assertion is predicated on the following:  (i) the water rights themselves are extremely valuable, and that value will be transferred to the Rhodes Entities upon consummation of the Plan, and (ii) certain unidentified Debtor and/or non-Debtor entities have spent millions of dollars to obtain the water rights currently held by the Arizona Assets.

3.    As set forth in the Declaration of Gregory Wallace in Support of Confirmation of Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (the "Wallace Declaration"), attached hereto as Exhibit A, the Debtors have completed only the most preliminary steps towards obtaining water rights for the parcels of land included in the

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Arizona Assets.  More specifically, the Debtors hold only an "Analysis of Water Adequacy" for the parcels included in the Arizona Assets and do not hold "water rights" as that term has been used by Stanley.  An Analysis of Water Adequacy is simply a ten-year authorization with two five-year renewals to put water to beneficial use based on a proposed development plan.  Wallace Declaration at 5-6.  Before the Debtors (or a third party) can actually supply a housing development with water, a substantial number of additional steps must be completed as required by Arizona state law.  Wallace Declaration at 9.  Even assuming the continued development of the Arizona Assets (which appears unlikely given the current state of the Arizona housing market), the Debtors are at least several years away from obtaining the water rights necessary to supply a master community with water.  Wallace Declaration at 9.  Completion of the steps required will cost the Debtors millions of dollars. Wallace Declaration at 9.  In addition, there is a material risk that the Debtors will not be able to complete each required step successfully.  Wallace Declaration at 9.  In light of the foregoing (and notwithstanding Stanley's observation that "water rights in the middle of a desert have incalculable value"), the "water rights" associated with the Arizona Assets as they exist today have minimal value.  Wallace Declaration at 9.

4.    The First Lien Steering Committee acknowledges that certain of the Debtor entities and Mr. Rhodes himself have invested substantial sums of money into the Arizona Assets in the hopes of developing one or more master plan communities.  Unfortunately, the current state of the housing market has prevented the Debtors from realizing any benefit on account of their investment in the Arizona Assets.  The simple fact that the Debtors spent millions of dollars to obtain the Arizona Assets and begin the process of developing associated water rights does not correlate to an increased valuation for the Arizona Assets.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

More specifically, the book value of the Arizona Assets does not equate to such assets' market value, which is the appropriate metric for determining how the Arizona Assets should be valued for Plan purposes. Supplemental Hewlett Declaration at 3-4.

5.       As set forth in the Supplemental Declaration of Charles Hewlett in Support of Confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (the "Supplemental Hewlett Declaration"), attached hereto as Exhibit B, "book value" is typically the lesser of (i) what has been paid to acquire an asset plus any improvements purchased, or (ii) market value. "Market value" is an estimate of what a willing buyer would pay to a willing seller, both in a free market, for an asset. Supplemental Hewlett Declaration at 3-4. The market value of an asset often bears no relation to the book value of such asset, regardless of whether the book value of an asset reflects millions of dollars of sunk costs. Supplemental Hewlett Declaration at 4. In performing its valuation of the parcels included in the Arizona Assets, RCLCO conducted both a Comparable Sales analysis and a DCF analysis in order to determine the market value of the parcels. Supplemental Hewlett Declaration at 5. Mr. Hewlett did not attribute any value to the water rights associated with the Arizona Assets because, in his opinion, the water rights do not have any intrinsic value to a potential purchaser. Supplemental Hewlett Declaration at 4. Accordingly, Stanley's contention that the First Lien Steering Committee's failure to attribute value to the water rights held by the Arizona Assets renders the Plan discriminatory and unconfirmable is unsubstantiated and inaccurate.

**B.       Assets not Fully Accounted for or Valued in the Plan**

6.       Stanley also argues that the Plan unfairly discriminates in favor of junior creditors because the Plan and Mediation Statement fail to value all of the Arizona Assets.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Specifically, Stanley contends that the 19 parcels listed on Exhibit 2 to the Stanley Objection were not included in the valuation performed by the First Lien Steering Committee. While the First Lien Steering Committee concedes that certain of the parcels identified by Stanley were erroneously omitted from the valuation performed by the First Lien Steering Committee's professionals, such additional parcels do not have significant value. Below is a chart listing each of the 19 parcels identified by Stanley, and describing whether each parcel was previously valued, erroneously omitted, sold, or of indeterminate ownership. In addition, for those parcels erroneously omitted from the valuation, the chart ascribes a value to such parcel consistent with the valuation methodology previously employed by the First Lien Steering Committee's professionals.

| Parcel No. | Treatment in Initial Valuation | Add'l Value Attributed[3] |
|---|---|---|
| 215-01-093 (well site) | Not Included/Erroneously Excluded | $300 |
| 215-01-094 (well site) | Not Included/Erroneously Excluded | $300 |
| 215-01-095 (well site) | Not Included/Erroneously Excluded | $300 |
| 215-01-096 (well site) | Not Included/Erroneously Excluded | $300 |
| 215-01-097 (well site) | Not Included/Erroneously Excluded | $300 |
| 215-01-098 (well site) | Not Included/Erroneously Excluded | $300 |
| 217-11-147 | Included | N/A |
| 217-11-148 | Not Included/Erroneously Excluded | $700 |
| 217-11-156 | Included | N/A |
| 217-11-182 | Not Included/Property Sold | N/A |
| 217-11-222 | Included | N/A |
| 306-24-091 | Not Included/Ownership in Question | $6,000 |
| 306-30-011 | Not Included/Erroneously Excluded | $11,900 |
| 306-63-009 | Not Included/Ownership in Question | $2,400 |

---

[3] Values are approximate. For additional detail on how values for the additional parcels were derived, please see the Supplemental Declaration of Justin Bono in Support of Confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (the "Supplemental Bono Declaration"). The Supplemental Bono Declaration is attached hereto as Exhibit C.

| | | |
|---|---|---|
| 306-63-010 | Not Included/Ownership in Question | $2,400 |
| 306-63-011 | Not Included/Ownership in Question | $2,400 |
| 306-63-012 | Not Included/Ownership in Question | $2,400 |
| 306-63-013 | Not Included/Ownership in Question | $2,400 |
| 354-34-045A | Not Included/Ownership in Question | $8,900 |
| **TOTAL:** | | **$41,300** |

7.      Of the 19 parcels identified by Stanley, (i) three parcels were included in the First Lien Steering Committee's initial valuation, (ii) one parcel was sold to a third party, (iii) eight parcels were not included in the First Lien Steering Committee's initial valuation, and (iv) seven of the parcels are believed to be already titled in the name of one or more Rhodes Entities.  The eight parcels not included in the initial valuation have an aggregate value of approximately $49,000 in 2015, or $14,000 today when discounted back to present value using the methodologies outlined in the Supplemental Bono Declaration and the Supplemental Hewlett Declaration.  Supplemental Bono Declaration at 5.  The seven parcels believed to be already titled in the name of one or more Rhodes Entities (which were similarly not included in the initial valuation) have an aggregate value of approximately $91,000 in 2015, or $27,000 today when discounted back to present value using the methodologies outlined in the Supplemental Bono Declaration and the Supplemental Hewlett Declaration.  Supplemental Bono Declaration at 5.  Accordingly, the value of the Arizona Assets should be upwardly adjusted by an amount between approximately $14,000 and $41,000.  Supplemental Bono Declaration at 5.  Even assuming all seven parcels the First Lien Steering Committee believes are currently held by the Rhodes Entities are found to be in the possession of the Debtors (and thus are being transferred to the Rhodes Entities pursuant to the Mediation Settlement), the value of the Arizona Assets would increase by

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

only $41,000.

### C.  The Plan Satisfies the Absolute Priority Rule

8.     Stanley argues that, as a result of the First Lien Steering Committee's failure to attribute substantial value to the Arizona Assets' water rights and incorporate certain parcels of land into its valuation, the Plan is not fair and equitable for purposes of cram down under Bankruptcy Code section 1129(b).  Stanley further argues that, because the Arizona Assets are significantly more valuable than disclosed by the First Lien Steering Committee, the Rhodes Entities are not providing sufficient consideration to the Debtors' Estates.  However, when taken as a whole, the Mediation Settlement continues to be in the Debtors' best interests and should be approved.

9.     As set forth in detail in the First Lien Steering Committee's Supplemental Memorandum, the Rhodes Entities are to receive approximately $2.63 million of value pursuant to the Plan.  Based on the First Lien Steering Committee's supplemental analysis outlined herein, the additional parcels identified by Stanley could add, at most, an additional $41,000 of value to the consideration being received by the Rhodes Entities.  Such amount is still substantially less than the $11.6 million to $20.2 million ($5.7 to $14.3 million net of current debt on Rhodes Ranch Golf Course) to be received by the Estates in connection with the Mediation Settlement.  Stanley does not refute the value of the consideration pledged by the Rhodes Entities to the Estates, and has not substantiated its allegations that the Arizona Assets have been vastly undervalued.  The First Lien Steering Committee, on the other hand, has submitted five declarations in support of its valuation of the Arizona Assets, a valuation supported by conventional and uncontroverted valuation methodologies.  In light of the foregoing and as set forth in the Initial Memorandum and Supplemental Memorandum, the First Lien Steering Committee believes that the Plan represents the best alternative for all

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

creditor constituencies, and that all requirements for confirmation have been satisfied.

## CONCLUSION

WHEREFORE, for the reasons set forth above, the First Lien Steering Committee respectfully requests that the Court (i) overrule the Stanley Objection, (ii) confirm the Plan and (iii) grant the First Lien Steering Committee such other and further relief as is just, proper and equitable.

Dated this 8th day of February, 2010.

By:  *Philip C. Dublin*
Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
(702) 979-2357 (Telephone)
(702) 362-9472 (Facsimile)
Nleatham@klnevada.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
pdublin@akingump.com
aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

EXHIBIT A

EXHIBIT A

1    Nile Leatham (NV Bar No. 002838)
2    KOLESAR & LEATHAM
     Wells Fargo Financial Center
3    3320 W. Sahara Ave.
     Las Vegas, NV 89102
4    Telephone:  702.979.2357
     Facsimile:  702.362.9472
5    E-Mail:    nleatham@klnevada.com
6
7    Philip C. Dublin (NY Bar No. 2959344)
     Abid Qureshi (NY Bar No. 2684637)
8    AKIN GUMP STRAUSS HAUER & FELD LLP
     One Bryant Park
9    New York, NY 10036
     Telephone:  212.872.1000
10   Facsimile:  212.872.1002
11   E-Mail:    pdublin@akingump.com
12              aqureshi@akingump.com
13   *Counsel for the First Lien Steering Committee*
14

15               **UNITED STATES BANKRUPTCY COURT**
                      **DISTRICT OF NEVADA**
16                     **SOUTHERN DIVISION**

17   **IN RE:**                         §    **Case No. 09-14814-LBR**
18                                      §    **(JointlyAdministered)**
                                        §
     **THE RHODES COMPANIES, LLC,**     §
19       **aka "Rhodes Homes," et al.,** §    **Chapter 11**
                                        §
20            **Debtors.**[1]           §
                                        §
21   _____§
22                                      §

23   _____

         [1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification
24   number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060);
     Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave,
25   LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country
     Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions
26   III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and
     Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090);
27   Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC
     (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited
28   Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897);
     Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

*(left margin, vertical)* AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

| Affects: | § | **DECLARATION OF GREGORY WALLACE** |
|---|---|---|
| ☒ **All Debtors** | § | **IN SUPPORT OF CONFIRMATION OF** |
| ☐ **Affects the following** | § | **SECOND AMENDED MODIFIED** |
| **Debtor(s)** | § | **PLAN OF REORGANIZATION PURSUANT** |
| | § | **TO CHAPTER 11 OF THE BANKRUPTCY** |
| | § | **CODE FOR THE RHODES COMPANIES,** |
| | § | **LLC, ET AL.** |

I, Gregory Wallace, hereby declare:

**Introduction and Personal Background**

**A.    Name, Employment and Purpose of Declaration**

1.    I am a hydrologist and a principal in the firm of Errol L. Montgomery and Associates, Inc. ("Montgomery and Associates"), located at 5010 East Shea Blvd, Suite D110, Scottsdale, Arizona 85254. Montgomery and Associates is the "specialty co-consultant" referred to in the Opposition to First Lien Steering Committee's Supplemental Memorandum in Support of Confirmation of the Second Amended Modified Plan (the "Stanley Opposition") filed by Stanley Consultants, Inc. ("Stanley"). As a result of my employment with Montgomery and Associates and with the Arizona State Department of Water Resources (the "ADWR") (as discussed in further detail below), I have extensive knowledge of (i) the Pravada Project (as defined below) in Arizona and (ii) the State of Arizona's water requirements for residential subdivisions, including the processes required for obtaining the authority to subdivide land in the State of Arizona.

2.    The purpose of this declaration is to address Stanley's assertion that the land in the Pravada Project that will be transferred to the Rhodes Entities as part of the Arizona Assets is "extremely valuable" as a result of "water rights" secured for that land. Specifically, this declaration will address the significance of the "Analysis of Water

2

Adequacy" that, as noted in paragraph 25 of the Declaration of David Frohnen, Rhodes succeeded in obtaining from the ADWR.

       3.      Based on my experience with the ADWR, and with the Pravada Project in particular, I believe that the receipt of the "Analysis of Water Adequacy" adds only minimal value to the properties in question as a result of: (i) the substantial number of additional steps that must be completed prior to receipt of final regulatory approval; (ii) the fact that such steps will take at least several years to complete; (iii) the substantial risks associated with completing each of those steps; and (iv) the substantial costs involved of at least millions of dollars worth of engineering and infrastructure which need to be completed prior to the first lot or home being sold.

**B.**    **Education**

       4.      I earned a bachelors degree in Geology from the University of South Dakota in 1979. I am an independent professional geologist (AIPG #6867). I also earned a certificate of public management from Arizona State University in 1984. A copy of my resume is attached hereto as <u>Exhibit A</u>.

**C.**    **Prior Water Resources Experience**

       5.      I have been involved in water resource investigations, planning and management at the state and regional levels for my entire career, which spans more than 30 years. I began working with the South Dakota State Geological Survey in 1979, and I was subsequently employed by the Association of Central Oklahoma Governments from 1980 to 1985. During that period, I developed a groundwater management and protection plan for 2,200 square miles of central Oklahoma aquifer. From 1985 to 2003, I served as the Chief Hydrologist and Assistant Director for the ADWR. While employed at the ADWR, I served

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

as an expert witness on behalf of the ADWR in both administrative proceedings and the Gila

River adjudications in the Superior Court in the Arizona.  From 2003 to the present, I have

served as a hydrologist and principal at Montgomery and Associates, a water resources

consulting firm.  In that capacity, I am responsible for (i) the management of regional

hydrogeologic investigations and (ii) the permitting of large water projects in Arizona.  My

experience also includes the following:

- During my 17 years with the ADWR, among my many duties was the operation of the Assured and Adequate Water Supply program and review and evaluation of all subdivision water supply for the State of Arizona.  Also during my tenure at ADWR, department staff, under my direction, developed the first assured water supply rules which were implemented in 1995.

- During my tenure at the ADWR, I was responsible for the collection and dissemination of all data and information collected by the ADWR.  The preparation of any and all technical reports during that time were completed under my direct supervision.  This was accomplished by publication of departmental documents knows as hydrologic maps series, groundwater modeling reports, open file reports and hydrologic monitoring reports.

- It was also during my time at the ADWR that we developed the first Assured and Adequate Rules for the State of Arizona.  Those rules are contained at the following site: http://www.azsos.gov/public_services/Title_12/12-15.htm.

- It was during that Assured Water Supply rule-making process that the formal procedure was developed for issuance of what is today known as an "Analysis of Water Adequacy."  It is the Analysis of Water Adequacy which is the substance of any inferred water rights held by Rhodes Homes and the main objection in the Stanley complaint.  (Page 4 line 24).  The rules specific to an Analysis of Water Adequacy are contained at: http://www.azsos.gov/pub lic_services/Title_12/12-15.htm.  Detailed descriptions of the ADWR permit process are available on their website at; www.azwater.gov.

- During my tenure at the ADWR, I managed the ADWR Assured and Adequate Water Supply subdivision evaluation process.  Staff and I reviewed and issued hundreds of water adequacy evaluations and water reports signed by me.  The current list of approved water adequacy documents are listed by the ADWR on their website and updated regularly.  http://www.azwater.gov/azdwr /WaterManagement/ AAWS/OAAWSLaunch.htm#IssuedDeterminations.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**D.      Prior Experience with the Pravada Project**

6.      From 2005 to 2008 I served as Montgomery and Associate's project manager for the Rhodes Homes' Golden Valley 5800 project (the "Pravada Project") in Mohave County, Arizona.  In that capacity, I was responsible for coordinating the hydrology studies required in connection with the "Analysis of Water Adequacy" for the Pravada Project. Specifically, I directed the work required to evaluate and demonstrate the physical availability of a water supply for the Pravada Project, including, among other things, drilling and testing wells and preparing and submitting applications to the ADWR to demonstrate the physical availability of a water supply.

7.      Following the issuance of an "Analysis of Water Adequacy" by the ADWR, Rhodes Homes pursued the formation of a private water company called Perkins Mountain Water Company ("Perkins").  Based on information made available in connection with extensive hearings before the Arizona Corporation Commission and other publicly available information, Perkins was sold in its entirety to Utilities, Inc. ("UI"), one of the largest privately owned water and wastewater utilities in the country.  *See* http://www.utilitiesinc-usa.com/press/index.php?articleId=20.  The Arizona Corporation Commission ("ACC") has issued an order preliminary for water service.  *See* https://edocket.azcc.gov/DocketSearch.aspx (Docket No. sw-20379A-05-0489).

8.      During 2005, applications for an "Analysis of Water Adequacy" as well as all related master plans and plan amendments were prepared for the Pravada Project by Montgomery and Associates under my direct supervision.  Those applications were completed, submitted and approved by the ADWR.  An "Analysis of Water Adequacy" is a 10-year authorization with two five-year renewals to put water to beneficial use based on the

proposed development plan and the first, preliminary step in the development of a large master planned community in Arizona.

## **Explanation of Process to Obtain Water Rights in Mohave County**

9.      In Arizona in 1973, the legislature enacted a statewide water adequacy statute as a consumer protection measure.  The Assured Water Supply program was created as part of the historic 1980 Groundwater Management Act, and operates within Arizona's five Active Management Areas.  Applicants are required to demonstrate an assured water supply that will be physically, legally, and continuously available for the next 100 years before the developer can record plats or sell parcels.  The Arizona Department of Real Estate will not issue a public report, which allows the developer to sell lots, without a demonstration of an assured water supply.  The developer can prove a 100-year supply by satisfying the requirements to obtain a Certificate of Assured Water Supply or by a written commitment of service from a provider with a Designation of Assured Water Supply.

10.     Mohave  County has for many years required the ADWR water adequacy criteria be met through their county planning and zoning process.  Subdivision developers are required to obtain a determination of water adequacy regarding the availability of water supplies prior to marketing lots for sale to the general public.  The definition of water adequacy is the demonstration that the applicant has demonstrated a physical, legal and continuously available water supply for 100 or more years.

11.     The process for large master planned communities has evolved into a procedure that allows the development to slowly move forward based on a preliminary "analysis of water supply" and then gradually progress over time.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

12.     At each step in the process, more detail is required of the developer to demonstrate the viability of the subdivision.  These steps include:

a.     Analysis of Water Adequacy for the conceptual project;

b.     Design of the first phase of the project;

c.     Water company formation;

d.     Testing of wells and production;

e.     Water quality;

f.     New source approvals;

g.     Certificate of Convenience & Necessity establishment;

h.     Arizona Corporation Commission hearings;

i.     Master plan approval process;

j.     Zoning approvals;

k.     Lot studies;

l.     Engineering of preliminary plat of roads;

m.     Infrastructure, easements, etc.;

n.     County preliminary plat approval;

o.     Approval of water company line extension agreements;

p.     ADEQ water quality approval;

q.     Performance bond for infrastructure construction;

r.     Permits and inspections;

s.     Submission of water report to ADWR;

t.     Application to Department of Real Estate for Public report;

u.     Generation of sales materials;

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

v.      Construction of improvements and creation of finished lots; and

w.      Approval for the sale of lots to the public to commence.

13.     All of the above steps must be complied with before a developer will be able to sell lots to the public.  In addition, the developer must demonstrate that it has the financial capability to construct adequate delivery, storage, and treatment works for the subdivision.

## Status of Pravada Project

14.     As previously mentioned, the ADWR issued an "Analysis of Water Adequacy" for the Pravada Project, but to date, the Debtors have not undertaken any of the additional steps referenced above to obtain final approval of the completion of the Pravada Project.

15.     Based on my experience working with the ADWR and with the Pravada Project in particular, I believe that complying with the above-referenced requirements for obtaining water rights and the final approval of the Pravada Project would require several years of effort and the incurrence of millions of dollars in expenses.  Moreover, any effort to obtain water rights and complete the Pravada Project would involve substantial risks.  First, given the current housing slump in Arizona, there is a risk as to whether approval will ever be obtained.  Second, there is a substantial risk that the Pravada Project will never be completed.  It is customary that once an analysis letter is completed by a developer that millions of dollars and several years expire before the first plan for a project is designed and approved and constructed.  Some developments never move forward and subsequently expire.  One similar project, the Sterling project, already exists in the Golden Valley area.  The Sterling project had a letter of water adequacy issued July 26, 1999 for 8,230 acre feet and extended November 8, 2006.  *See*

http://www.azwater.gov/AzDWR/GeneralServices/Imaging/default.htm. Nevertheless, the Sterling project has yet to construct any semblance of a subdivision much less a master planned community.

### Conclusion

16.     Based on my experience with the ADWR, and with the Pravada Project in particular, I believe that the receipt of the "Analysis of Water Adequacy" issued in connection with the Pravada Project adds only minimal value to the properties in question as a result of: (i) the numerous items that must be completed as detailed above and the many stakeholders that must be involved to move the Pravada Project forward; (ii) the fact that such steps, in my experience, will take at least several years to complete; (iii) the substantial risks associated with completing each of those steps; (iv) the risk that the ADWR will modify the analysis letter in connection with, among other things, a change in ownership of the land, well locations or approved demand; and (v) the substantial costs that would be incurred in connection with engineering and infrastructure projects that would need to be completed prior to the first lot or home being sold, which costs, based on my experience, are likely to be in the millions of dollars. There are additional risks associated with the Arizona Corporation Commission's regulation and oversight of UI, which now controls the entire service area of the Pravada Project. Finally, master planned communities such as Sterling have demonstrated the present lack of a market for additional housing in the area surrounding Golden Valley, Arizona. Based on all of the foregoing, the likelihood of the realization of a profit based on the sale of the first house within the Pravada Project is likely decades away.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 08, 2010

Gregory Wallace

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1

**<u>Exhibit A</u>**

2

3

4

5

6

7

8

9

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# GREGORY L. WALLACE

**10680 West Solano Drive**
**Glendale, Arizona 85307**
**602-818-2399/gwallace@elmontgomery.com**

## EXPERIENCE

**CONSULTANT  – Errol L. Montgomery & Associates, Inc.**
2003 – Present

- Oversight of drilling and construction of municipal water supply wells
- Member of the committee drafting new well impact and well spacing rules in concert with the Arizona Department of Water Resources
- Project management of hydro-geologic field investigations
- Conduct and supervise regional and site-specific hydro-geologic investigations
- Data automation and transducer network establishment
- Project manager for various projects coordinating between municipal governments and private developers
- Application of all aspects of hydrological consulting, marketing, water supply and water resources investigations for a variety of clients
- Project management and administration of applications of appropriate planning for water resources development and coordination with various state and federal agencies
- Proposal writing and development, new client contacts and development of new projects
- Arsenic Remediation Investigations
- Member of Arizona Sustainability committee and ADD water committees

**ASSISTANT DIRECTOR FOR HYDROLOGY – Arizona Department of Water Resources**
1997-2003

- Directed and managed a staff of sixty-five hydrologists in the areas of hydrologic modeling, technical reviews, field services, water resources management and subsidence monitoring programs
- Evaluated and coordinated the Governor's statewide subsidence monitoring programs throughout all Active Management Areas
- Oversight of groundwater modeling analyses and projections
- Coordination of technical programs with various governmental agencies
- Development of large-scale data collection networks
- Served as the expert witness for ADWR on water resources technical and policy issues for hydrologic issues
- Responsible for all staffing and budgetary requirements of the technical functions within the Department which included a 2.5 million dollar annual budget
- Development and implementation of long range planning and coordination with other divisions to ensure that policies are developed and implemented which assure Arizona's full utilization of it's CAP allocation and protection of Arizona's long term water supply. Main areas of responsibility included implementation of new assured water supply rules, evaluation of groundwater recharge projects, development of AMA wide groundwater models, statewide data collection networks and Indian Water Right settlement negotiations
- Responsible for ADWR transducer implementation program which resulted in significant efficiencies in statewide data collection programs

**CHIEF HYDROLOGIST – Arizona Department of Water Resources**
1986-1997

- Directed and managed a professional staff of 42 hydro-geologists. Performed all aspects of hydrologic investigations and report preparation. Coordination of field investigations, remedial activities at EPA Superfund sites, feasibility studies, groundwater recharge projects. Development of recommendations for groundwater recovery and treatment, groundwater-sampling protocol, soil gas sampling and monitor well construction/installation
- Current budget of $1.8 million with approximately $500,000 in federal cooperative projects and contracts. Coordination with other state agencies, USGS, EPA Region 9 and associated consultants
- Manage the entire Division and represent the Department at seminars, conferences, meetings and technical expert for the division.

**WATER RESOURCES DIVISION DIRECTOR – Associations of Central Oklahoma Governments**
1980-1986

- Associations of Central Oklahoma Governments – Supervised and coordinated major hydrologic investigation in Central Oklahoma. Major work plan was to design, develop and implement a groundwater protection and management plan for an aquifer covering 2200 square miles. Major duties included coordination of various federal, state and local entities, as well as subcontractors and budget management. The project was funded through local support and the U.S. EPA. Local officials and the Robert S. Kerr Environmental Research laboratory directed the project with transferability to other areas of the County.
- Responsible for compilation of reports and grant proposals resulting in supervision and development of work programs and personnel. Total annual budget $526.000

**COMPUTER SKILLS**

- Microsoft Office Suite
- Excell
-

**EDUCATION AND PROFESSIONAL AFFILIATIONS**:

BACHELOR OF SCIENCE, Geology, University of South Dakota at Vermillion, South Dakota.
CERTIFIED PROFESSIONAL GEOLOGIST, #6867
CERTIFIED PUBLIC MANAGER, Arizona State University
Member of the Phoenix Town Planning Committee

ACHIEVEMENTS AND ACCOMPLISHMENTS

**Manager of the Year** – Arizona Department of Water Resources

References available upon request.

## PROFESSIONAL EXPERIENCE AND PUBLICATIONS

Fifth International Conference on urban Storm Drainage,
July 23-27, 1990, Osaka, Japan

Water, City and Human Living Public forum, panelist by invitation,
July 31, 1990, Tama, Japan

Artificial Groundwater Recharge Symposium,
February, 1989, Tempe, Arizona

Geological Society of American Annual Meeting Groundwater Supply,
The Urbanized Desert,
October, 1987, Phoenix, Arizona

Arizona Hydrologic society symposium
Arizona watershed sustainability
Annual conference

Rocky Mountain Groundwater Conference Arizona's Water Situation,
Scottsdale, Arizona

Institutional Capacity for Groundwater Pollution Control,
Denver, Colorado

National Conference on disposal of Drilling Wastes,
Norman, Oklahoma

Association of Independent Professional Geologists, Section Meeting,
Oklahoma City, Oklahoma

U.S.G.S. Water Information Needs Seminar,
Oklahoma City, Oklahoma

Presented Paper to American Society of Civil Engineers

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**AKIN GUMP STRAUSS HAUER & FELD LLP**
**One Bryant Park**
**New York, New York 10036**
**Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com**

# EXHIBIT B

# EXHIBIT B

Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:      nleatham@klnevada.com


Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002

E-Mail:      pdublin@akingump.com
             aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 09-14814-LBR** |
| | § | **(JointlyAdministered)** |
| **THE RHODES COMPANIES, LLC,** | § | |
|   aka "Rhodes Homes," *et al.*, | § | **Chapter 11** |
| | § | |
|       **Debtors.**[1] | § | |
| | § | |
| | § | |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

| | |
|---|---|
| **Affects:**<br><br>☒ **All Debtors**<br>☐ **Affects the following**<br>   **Debtor(s)** | §    **SUPPLEMENTAL DECLARATION OF**<br>§    **CHARLES HEWLETT IN SUPPORT OF**<br>§    **CONFIRMATION OF THE SECOND**<br>§    **AMENDED MODIFIED PLAN OF**<br>§    **REORGANIZATION PURSUANT TO**<br>§    **CHAPTER 11 OF THE BANKRUPTCY**<br>§    **CODE FOR THE RHODES COMPANIES,**<br>§    **LLC, ET AL.** |

I, Charles Hewlett, hereby declare:

1.      I am a Managing Director based in the Washington, D.C., area office of Robert Charles Lesser & Co., LLC ("RCLCO"). I have over 25 years of experience in real estate and have consulted on a broad spectrum of residential and commercial properties, including large-scale master-planned communities and resorts, single-family subdivisions, rental apartments, condominiums, hotels, urban redevelopment and mixed-use complexes, and retail and office buildings and business/industrial parks. My consulting activities include a full range of market and financial feasibility analysis, demographic and economic forecasting, business and investment valuation, product planning, and market opportunity analysis. I graduated from Brown University in Providence, Rhode Island. I am a frequent guest speaker, moderator, and panelist at numerous real estate industry events, including the Urban Land Institute ("ULI"), National Multi Housing Council, the International Council of Shopping Centers, the National Association of Homebuilders, and the Mortgage Bankers Association. I am the co-author of Strategy for Real Estate Companies, a ULI book released in March 2008. I am also a Full Member of ULI.

2.      I submit this supplemental declaration in support of confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (as may be amended, the "Plan"). Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>New York, New York 10036<br>Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

### Book Value Versus Market Value[2]

3.      In its Opposition to the First Lien Steering Committee's Supplemental Memorandum of Law in Support of Confirmation of the Second Amended Modified Plan (the "Stanley Opposition"), Stanley Consultants, Inc. ("Stanley") states that "Rhodes and his Arizona entities have spent millions of dollars developing the water rights associated with the Arizona Assets." Stanley Opposition at 3. Stanley concludes, therefore, that the First Lien Steering Committee has undervalued the Arizona Assets and that the Rhodes Entities are therefore receiving favorable treatment under the Plan to Stanley's detriment. Stanley's argument presupposes, however, that the "book value" of certain of the Arizona Assets equals the "market value." As set forth below, market value is the appropriate metric for valuing the Arizona Assets.

4.      Book value in accounting parlance is typically the lesser of what has been paid to acquire an asset (in this case 1,447 acres of land) plus any improvements (in this case, grading, soft costs to secure entitlements, water rights, etc.), or market value. When the market value of an asset on a company's books is less than the book value, accounting principles dictate that that asset be "impaired" or reduced to the market value of that asset. Simply because a company has paid a certain amount to acquire an asset, and then sunk additional monies into improving that asset, does not mean that the asset is "worth" that amount in the marketplace.

5.      A common definition of "fair market value" is as follows[3]:

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

[3] Alfred M. King. "Determining Fair Value." *Strategic Finance.* January 2009. <http://www.imanet.org/pdf/01_2009_king.pdf>

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1

2

3

4

5

*The price for which property would exchange between a willing buyer and a willing*

*seller, each having reasonable knowledge of all relevant facts, neither under*

*compulsion to buy or sell, and with equity to both.*

6    The market value often does not have any relationship to the book value on a company's

7    balance sheet, and it is not uncommon for a company, particularly in the homebuilding and

8    land development industry during the most recent economic downturn and housing market

9    collapse, to take massive impairments to write down the book value of their assets to reflect

10   market value.

11

12       6.    This concept applies equally to the "water rights," Area Plan approvals, and

13   Letters of Water Adequacy cited in the Stanley Opposition.  Land and associated rights and

14   entitlements do not have any intrinsic value.  They only have value when they can be

15   monetized, either by sale to another entity, or put into production for consumption by end

16   users, either homebuilders who purchase lots, or homebuyers who purchase/contract for

17   homes.

18

19       7.    This is not to say that a parcel of land with water rights is not more valuable

20   than a comparable parcel that does not have such rights – it is potentially more valuable, in

21   that it would require less cost and time to be put into production and monetized.  However, it

22   is absolutely possible that both such analogous parcels, one with water rights and one

23   without, could result in a negative net present value ("NPV") using a discounted cash flow

24   ("DCF") analysis.  The parcel without water rights would require higher costs to be put into

25   production, and therefore would return an even more negative NPV than the parcel with

26

27

28

5

water rights.  And yet, in both instances, the conclusion would be that both of these parcels would have a zero fair market value.

8.        In determining the market value of residential assets, most real estate professionals and investors rely on cash flow pro formas that project future revenues and expenses for an individual asset or community over the life of the project—a so-called LOP analysis, or DCF analysis.  The future net cash flows are then discounted back into current dollars, expressed as a NPV.  Builders, land developers and real estate investors are typically aware of what land transacts for at various staged of entitlement/development, but rarely will they rely upon a comparable sale analysis to determine value, given the fact that each development, particularly a large-scale community such as the one contemplated for the Arizona Assets, is unique in terms of cost, market positioning and timing – all of which need to be accounted for in a project-specific DCF.

9.        As set forth in greater detail in my initial declaration, RCLCO conducted both a DCF and a Comparable Sales analysis to determine the fair market value of the Arizona Assets.  The DCF returned a negative NPV, indicating that the Arizona Assets have a zero value as of the date of the valuation.  The Comparable Sales analysis revealed that there were no relevant analogous transactions in the marketplace to make this a particularly reliable method for valuation.  However, in an effort to be conservative, RCLCO expanded its field of investigation to include similarly situated large ranch and agricultural parcels elsewhere in the desert southwest.  These admittedly flawed comparables (they were not analogous in terms of either location or market timing, making an adjustment of these "comparables" unreliable) indicated that the Arizona Assets had a value of $1,000 per acre.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Despite the fact that the DCF analysis indicated a zero value, to be conservative, I relied on the higher value indicated by the Comparable Sales analysis.

### Assets Not Fully Accounted For or Valued in the Plan

10.     Stanley also contends that the Plan fails to identify all of the property owned in Arizona by the Debtors that will be transferred to the Rhodes Entities.  Specifically, Stanley asserts that it has identified 19 plots (including 6 water wells) that allegedly were not included in the valuation of the Arizona Assets performed by the First Lien Steering Committee's professionals.

11.     In August 2009, RCLCO was retained to assist the First Lien Steering Committee in performing a going concern and liquidation analysis of the Debtors' Estates in connection with the Plan.  The going concern and liquidation analysis performed by RCLCO included valuing the Arizona Assets.

12.     At the time of my initial valuation of the Arizona Assets, it was my understanding that Arizona Assets consisted entirely of an approximately 1,307-acre parcel of land located in Arizona and owned by Debtor Rhodes Homes Arizona, LLC ("Rhodes Homes Arizona"), and that such 1,307-acre parcel of land was the only real estate asset in the Rhodes Homes Arizona portfolio subject to the valuation exercise.  Subsequent to my initial valuation, I have been made aware that there are other "scattered site" parcels of land in the vicinity of the main 1,307-acre parcel that should have been included in my initial valuation.  My understanding as to why these parcels of land were not included in the original valuation is that it was either (i) unknown that Debtor entities owned such parcels of land or (ii) controlling interests in such parcels of land had not been clearly established.  Accordingly, RCLCO valued only the 1,307-acre parcel.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

13.     Based on information provided to RCLCO subsequent to my initial valuation, I understand that the Arizona Assets include an additional 8 to 15 scattered site parcels of land (the "Scattered Site Parcels"), totaling approximately 48.9 to 139.5 acres of land. These additional parcels include (i) eight parcels mistakenly omitted from the original 1,307 acres, and (ii) seven parcels shown by the applicable Arizona tax assessor to be owned by the Debtors, but which the First Lien Steering Committee believes are in fact owned by the Rhodes Entities.[4]  Further, it is my understanding that the Scattered Site Parcels are all vacant desert plots with no utilities or improvements.  While scattered, the location of the Scattered Site Parcels is generally consistent with that of the main 1,307-acre parcel of land. Accordingly, it is reasonable to apply the valuation and timing of sale attributed to the main 1,307-acre parcel of land to the Scattered Site Parcels for the purpose of valuing the Scattered Site Parcels.  Under the Comparable Sales analysis outlined above, this would result in a valuation of $1,000 per acre, or approximately $49,000 to $140,000, in 2015. Discounted at an appropriate rate consistent with the main parcel (22.5%), the present value of the Scattered Site Parcels under the Comparable Sales analysis would be an additional $14,000 to $41,000.

14.     Given the size and location of the Scattered Site Parcels, incorporating the Scattered Site Parcels into the DCF analysis would result in higher development costs and lower revenues, as these sites are not contiguous to the main 1,307-acre parcel.  This would

---

[4] Based upon the information received by RCLCO, I believe that the remaining four parcels of land identified in the Stanley Opposition consist of (i) three parcels of land which were included in the initial valuation of the Arizona Assets and (ii) one parcel of land which was sold to a third party on July 31, 2009 and is no longer owned by the Debtors.  It is my understanding that the parcel of land that was sold to a third party will not be transferred to the Rhodes Entities.

1    result in a lower and, therefore, still negative overall NPV for the combined assets.

2    Accordingly, under the DCF analysis, the Scattered Site Parcels have no value.

3        15.    Based on the two commonly accepted methods for determining value, for

4    purposes of valuing property similar to the Scattered Site Parcels that comprise the Arizona

5    Assets, and in order to be conservative, I have relied on the Comparable Sales analysis for

6    valuation.  This analysis indicates a present value of approximately $14,000 to $41,000 for

7    the Scattered Site Parcels.

8

9

10

11    I declare under penalty of perjury that the foregoing is true and correct.

12    Executed this  8th  day of February, 2010.

13                                By:  _____

14                                     Charles A. Hewlett

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

EXHIBIT C

EXHIBIT C

Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:    nleatham@klnevada.com

Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002

E-Mail:    pdublin@akingump.com
           aqureshi@akingump.com

*Counsel for the First Lien Steering Committee*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:** | § **Case No. 09-14814-LBR** |
| | § **(JointlyAdministered)** |
| **THE RHODES COMPANIES, LLC,** | § |
| aka "Rhodes Homes," *et al.*, | § **Chapter 11** |
| | § |
| **Debtors.**[1] | § |
| | § |
| | § |

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

| Affects: | § | SUPPLEMENTAL DECLARATION OF |
| --- | --- | --- |
| ☒ **All Debtors** | § | **JUSTIN BONO IN SUPPORT OF** |
| ☐ **Affects the following** | § | **CONFIRMATION OF THE SECOND** |
| **Debtor(s)** | § | **AMENDED MODIFIED PLAN OF** |
| | § | **REORGANIZATION PURSUANT TO** |
| | § | **CHAPTER 11 OF THE BANKRUPTCY** |
| | § | **CODE FOR THE RHODES COMPANIES,** |
| | § | **LLC, ET AL.** |

I, Justin Bono, hereby declare:

1.     I am the Executive Vice President of Winchester Carlisle Holdings and its subsidiaries or affiliates, Winchester Carlisle Partners ("WCP"), Nathan Grace Real Estate, Carwin Advisors, and Dunhill Homes.  Previously, I served as President and CEO of Dubose Model Homes USA and its affiliated companies from October 2006 to August 2008. During that time, I oversaw investments in residential real estate in 13 states, including Nevada.  Prior to that position, I served in various positions with Pulte Homes, Inc. ("Pulte") from May 2002 until September 2006, including Vice President of Operations for Pulte's Houston Division and Vice President of Finance for Pulte's Dallas/Fort Worth Division. From May 1999 to April 2002, I was in the Assurance and Advisory Services practice of Arthur Andersen, LLP in Dallas, Texas.  While not currently active, I am a Certified Public Accountant in the State of Texas.

2.     I submit this declaration in support of confirmation of the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (as may be amended, the "Plan").  Unless otherwise stated, I have personal knowledge of the facts stated in this declaration.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

**The Stanley Opposition**[2]

3.    On February 2, 2010, Stanley Consultants, Inc. ("Stanley") filed its Opposition to First Lien Steering Committee's Supplemental Memorandum of Law in Support of Confirmation of Second Amended Modified Plan (the "Stanley Opposition") (Docket No. 975). By the Stanley Opposition, Stanley asserts, among other things, that certain parcels of land (and, therefore, significant value) were not accounted for in the value to be transferred to the Rhodes Entities under the Plan. These parcels and their alleged value were identified in Exhibit 2 (the "Stanley Exhibit") to the Stanley Opposition.

4.    While I agree that the Plan contemplates that a portion of the parcels identified in the Stanley Exhibit will be transferred to the Rhodes Entities, and that such parcels were accidently excluded from my valuation, I believe that the value of such parcels is of a nominal amount. In addition, three of the parcels identified on the Stanley Exhibit were included in the value of the assets to be transferred to the Rhodes Entities set forth in my initial disclosure, and one of the parcels is no longer owned by the Debtors because it was sold to a third party on July 31, 2009.

5.    Nevertheless, I address each of the parcels of land identified in the Stanley Exhibit and the impact of each such parcel on the value of the assets that will be transferred to the Rhodes Entities under the Plan below and in Exhibit A hereto.

**Impact on Value of Arizona Assets**

6.    As set forth in additional detail on Exhibit A, Stanley asserts that the analysis of the value of the Arizona Assets in my initial declaration omitted 19 parcels of land that will be transferred to the Rhodes Entities under the Plan. Based on additional review of the

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement"), as applicable.

relevant records and documentation, I have concluded that only a portion of the 19 parcels

of land identified in the Stanley Exhibit were erroneously omitted from the analysis of the

value of the Arizona Assets in my initial declaration.  In order to clarify which parcels of

land were omitted or included in my initial analysis of the value of the Arizona Assets and

reconcile my initial valuation of the Arizona Assets with the revised value of such assets, I

have divided the 19 parcels of land identified in the Stanley Exhibit into the following

categories:[3]

- **Parcels of Land Not Excluded from Initial Valuation.**  Three of the parcels of land identified in the Stanley Exhibit were not excluded from the analysis set forth in my initial declaration.  These parcels of land total approximately 7.1 acres and are referred to in my initial declaration as "partially built homes."  These three parcels of land were included in my initial valuation of the Arizona Assets at a value of $70,000 each, or a total of $210,000.  As such, there is no additional value being transferred to the Rhodes Entities to be considered with respect to these parcels of land.

- **Parcel of Land Sold to Third Party.**  One of the parcels of land identified in the Stanley Exhibit was sold to a third party on July 31, 2009 and is no longer owned by the Debtors.  This parcel of land represented approximately 2.4 acres and was a partially built home, the sale of which yielded net proceeds to the Debtors of approximately $57,000.  This parcel of land will not be transferred to the Rhodes Entities.  As such this parcel of land was not included in my initial valuation of the Arizona Assets and should not be included in the Stanley Exhibit because it does not represent any additional value being transferred to the Rhodes Entities.  The closing statement for the sale of this parcel of land is attached hereto as Exhibit B.

- **Parcels Not Included in Initial Valuation But Owned by Debtors.** Eight of the parcels of land identified in the Stanley Exhibit were not included in my initial valuation of the Arizona Assets but are owned by the Debtors.  These parcels of land consist of approximately 48.9 acres of vacant land.  It is currently anticipated that these parcels of land will be transferred to the Rhodes Entities under the Plan.  These parcels of land were excluded from my initial valuation of the

---

[3] Each of the 19 parcels is identified and categorized on Exhibit A.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Arizona Assets because they were not known to be owned by the Debtors at the time of the Mediation or the filing of the Plan. However, as detailed in the Supplemental Declaration of Charles Hewlett, these parcels of land would have a value of approximately $1,000/acre, totaling approximately $49,000 in 2015, or $14,000 today when discounted back to present value using the same discount rate used in the going concern model in the Plan.

- **Parcels of Land Not Included in Initial Valuation Because They are Owned by Non-Debtors.** Seven of the parcels of land identified in the Stanley Exhibit were not included in my initial valuation and are under uncertain ownership. These parcels of land total approximately 90.6 acres and, while they are shown by the applicable Arizona tax assessor to be owned by the Debtors, the Rhodes Entities and the Debtors believe that the deed to such properties is vested in the name of one of the Rhodes Entities. Nevertheless, in the event that it were determined that the properties are owned by the Debtors, the Debtors and the First Lien Steering Committee have agreed to transfer such parcels of land to the Rhodes Entities. These parcels of land are vacant, and according to the Supplemental Declaration of Charles Hewlett, they would have a value of $1,000/acre, totaling approximately $91,000 in 2015, or $27,000 today when discounted back to present value using the same discount rate used in the going concern model in the Plan.

7.    Based on the foregoing information and analysis and the Supplemental Declaration of Charles Hewlett, I believe that the value of the Arizona Assets under the Plan should be adjusted upward from my initial valuation by an amount between approximately $14,000 and $41,000 after considering the additional parcels of land identified in the Stanley Exhibit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8TH day of February, 2010.

By: _____

Justin Bono

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Exhibit A</u>**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

## EXHIBIT A

Information from Stanley Exhibit

| Mohave County Parcel Number | Assessor Identified Owner | County Recorder Identified Owner | Acreage | Mohave County Assessor Full Cash Value (2009) | Adjustment to Valuation |
|---|---|---|---|---|---|
| | | **3 Properties Not Excluded from Valuation** | | | |
| 217-11-147 | Elkhorn Investments, Inc. | Elkhorn Investments, Inc. | 2.35 | $ 215,169 | $ - |
| 217-11-156 | Elkhorn Investments, Inc. | Elkhorn Investments, Inc. | 2.35 | $ 258,314 | $ - |
| 217-11-222 | Elkhorn Investments, Inc. | Elkhorn Investments, Inc. | 2.35 | $ 167,091 | $ - |
| | | | 7.05 | $ 640,574 | $ - |
| | | **1 Property Sold to a Third Party** | | | |
| 217-11-182 | Elkhorn Investments, Inc. | De Sousa Alvaro (transferred on 7/31/09) | 2.35 | $ 18,361 | |
| | | | 2.35 | $ 18,361 | $ - |
| | | **8 Properties Not Included in Valuation But Owned by Debtors** | | | |
| 215-01-093 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 1.06 | $ 1,000 | $ 314 |
| 215-01-094 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 1.06 | $ 1,000 | $ 314 |
| 215-01-095 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 1.06 | $ 1,000 | $ 314 |
| 215-01-096 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 1.06 | $ 1,000 | $ 314 |
| 215-01-097 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 1.06 | $ 1,000 | $ 314 |
| 215-01-098 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 1.06 | $ 1,000 | $ 314 |
| 306-30-011 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 40.20 | $ 487,103 | $ 11,896 |
| 217-11-148 | Elkhorn Investments, Inc. | Elkhorn Investments, Inc. | 2.35 | $ 18,361 | $ 695 |
| | | | 48.91 | $ 511,464 | $ 14,474 |
| | | **7 Properties Not Included in Valuation With Uncertain Ownership** | | | |
| 306-24-091 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 20.57 | $ 216,993 | $ 6,087 |
| 306-63-009 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 8.00 | $ 164,072 | $ 2,367 |
| 306-63-010 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 8.00 | $ 164,072 | $ 2,367 |
| 306-63-011 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 8.00 | $ 164,072 | $ 2,367 |
| 306-63-012 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 8.00 | $ 164,072 | $ 2,367 |
| 306-63-013 | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 8.00 | $ 164,072 | $ 2,367 |
| 354-34-045A | Rhodes Homes Arizona, LLC | Rhodes Homes Arizona, LLC | 30.01 | $ 80,000 | $ 8,881 |
| | | | 90.58 | $ 1,117,353 | $ 26,805 |
| **Total** | | | 148.89 | $ 2,287,752 | $ 41,279 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit B**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com



**CHICAGO TITLE**
2899 E. Andy Devine Ave., Kingman, AZ  86401
(928)753-5581  FAX (928)753-6321

Elkhorn Investments, Inc., a Nevada
Corporation
4730 South Ft. Apache Rd., Ste 300
Las Vegas, NV 89147

Date:  July 22, 2009
Escrow No.:  CTM2009001764-CT27
Borrower:  Alvaro De Sousa
Loan No.:
Property Address:
5320 S. Topaz, Golden Valley, Arizona
86413

The above referenced escrow has closed as of July 22, 2009.  The following items are enclosed:

Terms and conditions
Settlement statement
Wired funds in amount of $56,514.63
Supplements

Any documents other than those listed above to which you are entitled will follow under separate
cover.

We trust that this transaction has been handled to your satisfaction and that we may have the
pleasure of serving you again in the future.

Sincerely,

Jo Sheahan
Escrow Officer
(928)753-5581

enclosure(s)

FDAZ0784.rdw

Letter (Closing)

**CHICAGO TITLE**

2699 E. Andy Devine Ave., Kingman, AZ  86401

Phone:  (928)753-5581    Fax:  (928)753-6321

## FINAL MASTER SETTLEMENT STATEMENT

| | |
|---|---|
| **Date:** | July 22, 2009 |
| **Settlement Date:** | July 22, 2009 |
| **Borrower:** | Alvaro De Sousa |
| | P.O. Box 52 |
| | Yucca, AZ 86438 |
| **Seller:** | Elkhorn Investments, Inc., |
| | 4730 South Ft. Apache Rd., Ste 300 |
| | Las Vegas, NV 89147 |
| **Property:** | 5320 S. Topaz |
| | Golden Valley, AZ 86413 |

| | |
|---|---|
| **Time:** | 03:34·PM |
| **Escrow No.:** | CTM2009001764 |
| **Escrow Officer:** | Neva Jo Sheahan |

| SELLER | | | | BORROWER | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | | **Debit** | **Credit** |
| | | **Financial Consideration** | | | |
| | 60,000.00 | Total Consideration | | 60,000.00 | |
| | | Deposit or Earnest money | | | 1,000.00 |
| | | Closing funds | | | 60,242.50 |
| | | Additional closing fund | | | 285.75 |
| | | **Prorations/Adjustments** | | | |
| 93.30 | | County Taxes at $168.58 | | | 93.30 |
| | | 01/01/09 to 07/22/09 | | | |
| | | **Commissions** | | | |
| 2,400.00 | | Listing Broker's Commission to AZ New Home | | | |
| | | and Development Sales, dba Kim Horn Re | | | |
| | | 60,000.00 @ 4.00% = 2,400.00 | | | |
| | | **Escrow Charges** | | | |
| 142.50 | | Settlement or Closing Fee | | 142.50 | |
| | | Chicago Title | | | |
| | | **Title Charges** | | | |
| 528.00 | | Title Insurance | | 361.00 | |
| | | Chicago Title Insurance Company | | | |
| | | Homeowner's Policy  for 60,000.00 528.00 | | | |
| | | ALTA Loan Policy (06/17/2006) for 75,000.00 | | | |
| | | 361.00 | | | |
| 40.00 | | Wire fee | | 20.00 | |
| | | Chicago Title | | | |
| | | **Recording Charges** | | | |
| 12.50 | | Recording Fees | | 37.50 | |
| 12.50 | | Record Disclaimer Deed | | 12.50 | |
| | | **Other Debits/Credits** | | | |
| 256.57 | | County Taxes | | | |
| | | Mohave County Treasurer | | | |
| | | 217-11-182 | | | |

**FINAL MASTER SETTLEMENT STATEMENT - Continued**

| | SELLER | | | BORROWER | |
|---|---|---|---|---|---|
| **Debit** | **Credit** | | | **Debit** | **Credit** |
| 3,485.37 | 60,000.00 | **Subtotals** | | 60,573.50 | 61,621.55 |
| | 0.00 | **Balance Due FROM** | | | 0.00 |
| 56,514.63 | | **Balance Due TO** | | 1,048.05 | |
| 60,000.00 | 60,000.00 | **TOTALS** | | 61,621.55 | 61,621.55 |

Seller                                                                 Borrower

Elkhorn Investments, Inc., a Nevada Corporation

_____                    _____
                                                   Alvaro De Sousa

_____
Tom Robinson, Secretary

_____
Chicago Title
Settlement Agent

(CTM2009001764.PFD/CTM2009001764/72)  July 22, 2009  03:34-PM



**CHICAGO TITLE**

2699 E. Andy Devine Ave., Kingman, AZ 86401

(928)753-5581  FAX (928)753-6321

## SUPPLEMENTAL ESCROW INSTRUCTIONS

Date:         July 9, 2009
Escrow No.:   CTM2009001764-CT27

TO:  Chicago Title

The previous instructions in this escrow are hereby modified and/or amended in the following particulars only:

Buyer and seller hereby instruct escrow agent to WAIVE the Termite Inspection.
Buyer and seller hereby instruct escrow agent to WAIVE the Septic Inspection.
Buyer and seller hereby acknowledge the Septic Transfer can not be completed without a Septic Inspection, therefore Escrow Agent can not assist in the completion of the Septic Transfer.  Buyer and seller hereby agree the Septic Transfer shall be completed direct and outside of escrow.  Chicago Title is hereby relieved of any and all liability herein.

All other terms and conditions remain the same.

_____          Elkhorn Investments, Inc., a Nevada Corporation

Alvaro De Sousa                           _____
                                          Tom Robinson, Secretary



**CHICAGO TITLE**
2699 E. Andy Devine Ave., Kingman, AZ  86401
(928)753-5581  FAX (928)753-6321

**SUPPLEMENTAL ESCROW INSTRUCTIONS**

Date:          July 9, 2009
Escrow No.:    CTM2009001764-CT27

TO:  Chicago Title

The previous Instructions in this escrow are hereby modified and/or amended in the following particulars only:

Buyer and seller hereby instruct escrow agent to WAIVE the Termite Inspection.
Buyer and seller hereby instruct escrow agent to WAIVE the Septic Inspection.
Buyer and seller hereby acknowledge the Septic Transfer can not be completed without a Septic Inspection,
therefore Escrow Agent can not assist in the completion of the Septic Transfer.  Buyer and seller hereby agree the
Septic Transfer shall be completed direct and outside of escrow.  Chicago Title is hereby relieved of any and all
liability herein.


All other terms and conditions remain the same.

_Alvaro De Sousa_
Alvaro De Sousa

Elkhorn Investments, Inc., a Nevada Corporation

_____
Tom Robinson, Secretary

## TERMS AND CONDITIONS OF ESCROW

To:   Chicago Title
      2699 E. Andy Devine Ave.
      Kingman, AZ 86401

Date: July 9, 2009
Escrow No.: CTM2009001764-CT27
Property Address: 5320 S. Topaz, Golden Valley,
Arizona 86413

1.   EMPLOYMENT OF ESCROW AGENT.  Buyer and Seller agree to employ Chicago Title to act as Escrow Agent in handling the above-referenced escrow.

2.   DEPOSIT OF DOCUMENTS & FUNDS.  Buyer and Seller agree to pay all costs incurred by Escrow Agent in handling the escrow and to deposit into escrow all documents and funds, and do all other things, necessary to complete the transaction that is the subject of the escrow and to enable Escrow Agent to record or deliver these documents.  In addition, Buyer and Seller agree to immediately deposit with or refund to Escrow Agent all funds requested by Escrow Agent after close of escrow to pay any amounts that may be required by any taxing authority or any lender that holds or will hold, at close of escrow, a mortgage or deed of trust encumbering the property.  All funds will be in the form of United States dollars.  Escrow Agent is instructed to deposit all funds in a non-interest bearing general escrow account in one or more financial institutions doing business in Arizona and whose deposits are federally-insured.

     The parties to this escrow acknowledge that the maintenance of such escrow accounts with some depository institutions may result in Escrow Holder's or its affiliates being provided with an array of bank services, accommodations or other benefits by the depository institution.  Escrow Holder or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the depository institution.  All such services, accommodations and other benefits shall accrue to Escrow Holder or its affiliates, and Escrow Holder or its affiliates shall have no obligation to account to the parties to the escrow for the value of such services, accommodations or other benefits.

3.   DISBURSEMENT & RECORDING.  Buyer and Seller instruct Escrow Agent to pay from funds deposited into escrow all amounts necessary to procure documents and all other charges or obligations necessary to consummate this transaction, in accordance with these instructions and the Settlement Statement.  Escrow Agent is authorized to act upon any statement furnished to Escrow Agent by a lien holder or its agent, without liability or responsibility for the accuracy of the statement.  When these instructions have been complied with and the insurer is willing to issue the requested title insurance policy and when Escrow Agent's fees and charges have been paid, Buyer and Seller instruct Escrow Agent to file, deliver, or record all documents.  Disbursement of funds may be in the form of Escrow Agent's check.

4.   CLEARANCE OF FUNDS BY ESCROW AGENT.  Escrow Agent is not liable for any loss or impairment of funds while those funds are in the course of collection or while those funds are on deposit in a financial institution if such loss or impairment results from the failure, insolvency or suspension of such financial institution.  Notwithstanding any provisions of applicable law, and in Escrow Agent's sole discretion, Escrow Agent is not obligated to disburse any funds represented by check or draft until Escrow Agent is advised by the financial institution in which the check or draft is deposited that such check or draft has been honored.

5.   PRORATIONS & ADJUSTMENTS.  Prorations will be calculated on the basis of a 30-day month.  All items to be prorated have been submitted to escrow and Buyer and Seller agree to hold Escrow Agent harmless as to any items or information not submitted to escrow for proration calculation.  Real estate taxes are prorated on the basis of the current year if the taxes for the current year are available on the business day preceding the close of escrow through the real estate tax reporting service used by Escrow Agent or if the parties have delivered to Escrow Agent on or before the business day preceding the close of escrow a copy of the current tax bill issued by the county Treasurer.  Escrow Agent is not liable or responsible for making an adjustment in the escrow settlement if the taxing authority, after the close of escrow, determines that additional taxes are due.

## TERMS AND CONDITIONS OF ESCROW
### (Continued)

6.  INSURANCE OTHER THAN TITLE.  Escrow Agent has no responsibility to procure, renew, or otherwise keep in force any flood insurance or other policies of insurance.  If instructed, Escrow Agent is authorized to execute on behalf of Buyer or Seller form assignments of, or to order changes to, any insurance other than title insurance and to forward policies to the insurer's agent with a request that the insurer consent to a transfer, attach a loss payable clause or other endorsement or make any other additions or corrections that may be required and that the insurer's agent return the policies to the parties entitled to them.  Buyer and Seller are responsible to pay premiums; maintain insurance in full force and effect; renew, transfer, assign or properly endorse policies of insurance; cancel or terminate policies; and determine that the types and amounts of insurance coverage are appropriate or sufficient.  Escrow Agent may rely on the insurance information furnished by Buyer or Seller or their agents, and is not liable for any inaccuracy of such information and is not obligated to inquire into the accuracy or sufficiency of such information.

7.  INDEMNITY.  Buyer and Seller will pay all costs, damages, attorneys' fees, costs, expenses and liabilities that Escrow Agent may incur or sustain in connection with these instructions, the escrow or any court action or dispute resolution procedure arising from these instructions or the escrow, including without limitation any legal action to enforce collection of its fees, costs or charges, unless caused by the bad faith, willful misconduct or gross negligence of Escrow Agent.

8.  ESCROW AGENT'S LIEN.  Buyer and Seller grant Escrow Agent a lien on all property and funds deposited into escrow.  Buyer and Seller hereby authorize Escrow Agent to reimburse itself for its fees, charges and all damages or expenses it may incur in connection with the escrow and the performance of Escrow Agent's duties, including without limitations costs, damages and attorneys' fees.

9.  AFFIDAVIT OF REAL PROPERTY VALUE.  Escrow Agent is instructed to execute and file on behalf of Buyer and Seller the affidavit required by Arizona Revised Statutes Section 11-1133, using the sales price as the total consideration if at the time of filing the affidavit has not been executed by the parties.

10.  PROFESSIONAL ADVICE.  Buyer and Seller acknowledge that Escrow Agent has not given and will not be requested or expected to give financial, tax, or legal advice; to give advice as to the type or form of any instrument to be used in connection with this escrow; to review any documents deposited into escrow to determine their legality or sufficiency; to explain the meaning or legal consequences of any document; to make any inquiry of any nature concerning the financial condition of any party or entity; to opine as to the value or condition of the real or personal property; to assist in negotiating or structuring of the transaction; to verify square footage; or to determine possessory rights.  As a convenience for Buyer and Seller, Escrow Agent may make available certain standard forms of instruments that are commonly used in Arizona but does not, and will not, recommend or select a particular form and will not complete, fill in or alter any form unless specifically instructed to do so by the parties, their attorneys, representatives or agents, who will designate the specific information to be inserted on the form or other specific source of such information.

11.  EXCLUDED MATTERS.  Unless agreed to specifically in writing by Escrow Agent, Escrow Agent will not investigate and assumes no liability for unrecorded liens, including without limitation mechanics' liens; proposed improvement district liens or assessments; homeowner's association liens; personal property taxes or transfer of personal property; utility charges or deposits; boundary lines or location or condition of improvements; square footage; possessory rights, including without limitation delivery of possession; transfer of utilities; compliance with limitations on the use of property, including without limitation building or zoning ordinances or restrictions; taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property as of the closing of this escrow or which were not disclosed to Escrow Agent; reservations or exceptions in patents; transfers or filings of water rights or water rights applications; treatment or investigation of wood infestation; usury in any loan involved in the escrow; the availability of or charges for water, power, or waste collection; compliance with or violation of any environmental law; the legal or tax consequences of vesting; and the sufficiency or correctness as to form or manner of execution of any document deposited by the Buyer or Seller, their agents or any lender, or the identity, authority or right of any person executing documents.

Terms and Conditions
FDAZ0693.rdw

**TERMS AND CONDITIONS OF ESCROW**
(Continued)

12. RESIGNATION. Escrow Agent may resign upon written notice to Buyer and Seller. If Escrow Agent resigns, all funds, less Escrow Agent's charges, and all documents held by Escrow Agent will be returned to the party that deposited them into escrow and Escrow Agent will have no liability under these instructions.

13. JURISDICTION, VENUE, CHOICE OF LAW. Any litigation or arbitration arising out of this escrow that involves Escrow Agent will be filed and maintained in the county in which the real property that is the subject of this escrow is located. The prevailing party or parties in any litigation or arbitration proceeding including Escrow Agent will be awarded, in addition to any other available remedy, all expenses, fees and costs, including expert witness fees, and all reasonable attorneys' fees incurred by the prevailing party or parties. The award of costs, fees, expenses, and attorneys' fees will be determined by the court or arbitrator, and not by a jury. Arizona law will govern all of the terms and provisions of these instructions and the escrow.

14. NOTICE. Buyer and Seller agree that all notices delivered to any party or to Escrow Agent in accordance with the contract between Buyer and Seller will be delivered to all parties and to Escrow Agent to constitute effective notice under the contract.

15. CANCELLATION. Except as otherwise provided in these instructions, any party who wishes to cancel these instructions because of any material breach by another party, and who is not in material breach except as occasioned by a material breach by the other party, may cancel these instructions by delivering written notice of cancellation to both the breaching party and to the Escrow Agent stating the nature of the breach. Cancellation will become effective immediately upon delivery of the written notice of cancellation to both the breaching party and the Escrow Agent. In the event of a dispute between Seller and Buyer regarding earnest money deposited in escrow, Seller and Buyer authorize Escrow Agent to release the earnest money pursuant to the terms and conditions of these instructions. Seller and Buyer specifically authorize Escrow Agent to act in its sole and absolute discretion in the release of earnest money. Seller and Buyer agree to hold harmless and indemnify Escrow Agent against any claim, action or lawsuit of any kind, and from any loss, judgment, or expense, including costs and attorneys' fees, arising from or relating in any way to the release of earnest money. Notwithstanding any other provision in these instructions, Escrow Agent may at its election and in its sole discretion in the event of any conflicting demands made upon it concerning these instructions or this escrow, hold any money and documents deposited in escrow until it receives mutual instructions by all parties or until a civil action has been concluded in a court of competent jurisdiction determining the rights of the parties. In the alternative, Escrow Agent may at any time at its discretion commence a civil action to interplead any conflicting demands to a court of competent jurisdiction and will be entitled to deduct its costs and attorneys' fees from funds deposited in connection this interpleader action.

16. FAILURE OF PARTIES TO ACT. If Escrow Agent is presented with conflicting demands as to any funds or documents on deposit when the escrow is cancelled by either of the parties and the parties cannot agree as to their disposition and no legal action to resolve the conflict has been commenced within one year from the date Escrow Agent notified the parties of the conflicting demands, Escrow Agent will return without further notice the funds and the documents to the party who deposited them, after deducting all charges, and Escrow Agent will have no further duty or liability in connection with the funds, the documents or the escrow. If the parties have taken no action within 6 months after the date set to close escrow, as extended from time to time in writing, Escrow Agent may as its discretion terminate the escrow and return all documents and funds to the parties who deposited them or for whose benefit or credit they were deposited.

Terms and Conditions
FDAZ0693.rdw

## TERMS AND CONDITIONS OF ESCROW
### (Continued)

17.  REAL ESTATE COMMISSIONS.  Upon cancellation of these instructions, if commissions are claimed to be due from Seller or Buyer to any licensed Real Estate Broker, and if the Broker has deposited in escrow a written commission agreement or commission authorization executed by a party to this escrow, Escrow Agent is authorized to disburse funds in accordance with the agreement or authorization. The party obligated to pay the commission will not acquiesce in or agree to any mutual cancellation of these instructions without the written approval of the Real Estate Broker.

18.  INSPECTIONS, CONTINGENCIES, CONDITIONS, AND REPAIRS.  All inspections, contingencies, conditions, or repairs, if any, have been met, satisfied, waived, and paid for directly outside of escrow. Buyer and Seller agree to indemnify and hold Escrow Agent harmless from any liability whatsoever regarding inspections or repairs, or any payment or performance to be handled outside of escrow.

19.  APPROVALS.  Buyer and Seller instruct Escrow Agent to record and disburse upon receipt of all signatures and funds in escrow.  Buyer and Seller have reviewed and approved the Settlement Statement dated on or about close of escrow.  To the best of their knowledge and belief, it is a true and accurate statement of all authorized receipts and disbursements made on their account or by them in connection with this escrow.  Buyer has received and reviewed the Commitment for Title Insurance and Buyer acknowledges Buyer's approval and acceptance of all matters set forth therein.

20.  If this escrow sale transaction and the contract states that the escrow fee and/or recording fee(s) and/or recording service fee shall be allocated in the usual or customary manner, Buyer and Seller acknowledge that said charges shall be paid one-half by Buyer and one-half by Seller.  If the contract does not state how escrow fee and/or recording fee(s) and/or recording service fee shall be paid, then Buyer and Seller acknowledge that said charges shall be paid one-half by Buyer and one-half by Seller.  In either case, the party requesting or benefiting from additional services including but not limited to overnight delivery, courier services, wiring charges, e-mail document fees, payoff tracking fees, signing fees, etc. shall pay for such services if and as incurred.  In circumstances where the buyer is obtaining a new VA loan, the seller shall pay the entire escrow fee.

21.  COMPLIANCE WITH LAW.  Seller represents and warrants to Escrow Agent that Seller has complied with all applicable federal, state, and local laws and regulations relating to the subdivision, lot split, or sale of real property and will pay all costs, damages, attorneys' fees, expenses and liabilities that Escrow Agent may incur or sustain in connection with any breach by Seller of this representation and warranty.

22.  COPIES TO REAL ESTATE AGENTS OR LENDERS.  Escrow Agent is authorized to furnish copies of any documents or papers to the parties' designated real estate agents or lenders.  The parties designate their real estate agents as their duly-authorized agents for the purpose of accepting on their behalf documents or notices intended for delivery to the parties.

23.  DWELLING DEFECTS.  Buyer/Borrower is referred to the provisions of Arizona Revised Statutes Sections 12-1361 through 12-1366 regarding any claim arising out of or relating to the design, construction, condition or sale of any dwelling on the property.

24.  NOTICE OF CLOSING PROTECTION.  Pursuant to ARS §6-841.02, Buyers and Sellers of a residential dwelling are hereby notified that the title insurer may offer a closing protection letter that provides protection for the loss of escrow monies due to fraud or dishonesty of the escrow agent.  For purposes of this notice, "residential dwelling" means an owner occupied structure or an investment property that is designed for residential use by four or fewer families.

25.  NOTICE OF PURCHASER DWELLING ACTION. Pursuant to A.R.S. §12-1363(L), Escrow Agent hereby gives Buyer notice of the provisions of A.R.S. §12-1361, 12-1362 and 12-1363 regarding "Purchaser Dwelling Actions."  Buyer is advised to consult with Buyer's own advisors regarding these statutes. Escrow Agent makes no representations regarding the applicability or effect of these statutes.  Copies of the Statutes are available at http://www.azleg.state.az.us/ArizonaRevisedStatutes.asp

Terms and Conditions
FDAZ0693.rdw

**TERMS AND CONDITIONS OF ESCROW**
(Continued)

26. NOTICE OF RIGHT TO EARN INTEREST.  Pursuant to ARS §6-834(D), notice is hereby given of the right to earn interest on escrowed funds.  An interest bearing account may be opened on your behalf, as follows:

    1.    You must ask your Escrow Agent to set-up and interest bearing account on your behalf.

    2.    You agree to pay the escrow service charge in the amount of $20.00 for establishing such an account.

    3.    To establish an interest bearing account, ask for an "Interest Bearing Account Authorization".  You may also be asked to complete an IRS Form W9 and/or provide your U.S. Taxpayer Identification Number as may be required by the depository to establish such an account.  Any forms requested must be completed and returned to your Escrow Agent before such an account can be opened with the depository.

    4.    You may contact your Escrow Agent at Chicago Title, 2699 E. Andy Devine Ave., Kingman, AZ 86401, (928)753-5581, fax:(928)753-6321.

        As an example, the estimated amount of interest you may earn on a deposit of $1,000 for a 30 day period at an estimated savings account interest rate of 2% per annum is $1.67.  Interest earned is dependant upon the amount of the deposit, the time of deposit and prevailing interest rate at the time.

27. NOTICE OF UNINSURED MONIES: Pursuant to A.R.S. §6-841.03. Notice is hereby given that the monies deposited into an escrow account are not insured against loss from fraud or theft by the State of Arizona or the United States government.  However, escrowed funds are deposited with depositories that are insured by the Federal Deposit Insurance Corporation (FDIC).

28. CERTIFICATION.  Buyer and Seller have read and understand these instructions and all instruments bearing their signature or bestowing a benefit upon them, including without limitation any promissory note in their favor, and understand that their signatures signify their approval of the contents of these instructions and any such instruments.  Buyer and Seller acknowledge that they have been advised of their right to seek independent advice before signing these instructions and any instruments and were given the opportunity to ask questions of the Escrow Officer about these instructions and the Settlement Statement.  Buyer and Seller understand that Escrow Agent is relying upon this certification in closing the escrow, and agree that Escrow Agent will continue to act pursuant to these instructions until served with a written notice of cancellation of these instructions, signed by both Buyer and Seller.

 

_____      Elkhorn Investments, Inc., a Nevada
Alvaro De Sousa                            Corporation

                                        _____
                                        Tom Robinson, Secretary

Dated: _____                 Dated: _7/13/2009_

**received**
7-13-09

Terms and Conditions
FDAZ0893.rdw

## TERMS AND CONDITIONS OF ESCROW
### (Continued)

26. NOTICE OF RIGHT TO EARN INTEREST. Pursuant to ARS §6-834(D), notice is hereby given of the right to earn interest on escrowed funds. An interest bearing account may be opened on your behalf, as follows:

   1. You must ask your Escrow Agent to set-up and interest bearing account on your behalf.

   2. You agree to pay the escrow service charge in the amount of $20.00 for establishing such an account.

   3. To establish an interest bearing account, ask for an "interest Bearing Account Authorization". You may also be asked to complete an IRS Form W9 and/or provide your U.S. Taxpayer Identification Number as may be required by the depository to establish such an account. Any forms requested must be completed and returned to your Escrow Agent before such an account can be opened with the depository.

   4. You may contact your Escrow Agent at Chicago Title, 2699 E. Andy Devine Ave., Kingman, AZ 86401, (928)753-5581, fax:(928)753-6321.

      As an example, the estimated amount of interest you may earn on a deposit of $1,000 for a 30 day period at an estimated savings account interest rate of 2% per annum is $1.67. Interest earned is dependant upon the amount of the deposit, the time of deposit and prevailing interest rate at the time.

27. NOTICE OF UNINSURED MONIES: Pursuant to A.R.S. §6-841.03. Notice is hereby given that the monies deposited into an escrow account are not insured against loss from fraud or theft by the State of Arizona or the United States government. However, escrowed funds are deposited with depositories that are insured by the Federal Deposit Insurance Corporation (FDIC).

28. CERTIFICATION. Buyer and Seller have read and understand these instructions and all instruments bearing their signature or bestowing a benefit upon them, including without limitation any promissory note in their favor, and understand that their signatures signify their approval of the contents of these instructions and any such instruments. Buyer and Seller acknowledge that they have been advised of their right to seek independent advice before signing these instructions and any instruments and were given the opportunity to ask questions of the Escrow Officer about these instructions and the Settlement Statement. Buyer and Seller understand that Escrow Agent is relying upon this certification in closing the escrow, and agree that Escrow Agent will continue to act pursuant to these instructions until served with a written notice of cancellation of these instructions, signed by both Buyer and Seller.

_Alvaro De Sousa_
Alvaro De Sousa

Elkhorn Investments, Inc., a Nevada Corporation

Tom Robinson, Secretary

Dated: 07-10-09

Dated: _____

Terms and Conditions
FDAZ0693.rdw