# EXHIBIT
# F

# EXHIBIT
# F

# CREDIT AGREEMENT

### DATED AS OF NOVEMBER 21, 2005

among

## HERITAGE LAND COMPANY, LLC,
## THE RHODES COMPANIES, LLC
and
## RHODES RANCH GENERAL PARTNERSHIP,
as the Borrowers,

### THE LENDERS LISTED HEREIN,
as the Lenders,

and

### CREDIT SUISSE, CAYMAN ISLANDS BRANCH,
as Administrative Agent, Collateral Agent, Syndication Agent,
Sole Bookrunner and Sole Lead Arranger

### $430,000,000 SENIOR SECURED CREDIT FACILITY
### (FIRST LIEN)

**TABLE OF CONTENTS**

**Page**

SECTION 1. DEFINITIONS ................................................................................................. 1

    1.1     Certain Defined Terms. ............................................................................ 1
    1.2     Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
            Calculations Under Agreement. ............................................................ 31

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS ................... 31

    2.1     Commitments; Loans. ............................................................................ 31
    2.2     Interest on the Loans. ............................................................................ 33
    2.3     Fees. ...................................................................................................... 36
    2.4     Repayments and Prepayments; General Provisions Regarding Payments. ..................... 36
    2.5     Use of Proceeds. ................................................................................... 43
    2.6     Special Provisions Governing Eurodollar Rate Loans. ........................ 43
    2.7     Increased Costs; Taxes. ........................................................................ 45
    2.8     Mitigation Obligations; Replacement of Lenders. .............................. 48
    2.9     Releases; Subordinations. ..................................................................... 48
    2.10    Subordinations in connection with Map Approvals. ........................... 49
    2.11    Subordinations in connection with Qualified Sales Agreements. ........ 50

SECTION 3. CONDITIONS TO EFFECTIVENESS .......................................................... 50

    3.1     Conditions to Effectiveness. ................................................................. 50

SECTION 4. REPRESENTATIONS AND WARRANTIES ................................................ 58

    4.1     Organization and Qualification. ........................................................... 58
    4.2     Power and Authority. ............................................................................ 58
    4.3     Legally Enforceable Agreement. ......................................................... 58
    4.4     No Conflict. ........................................................................................... 58
    4.5     Capital Structure. ................................................................................. 59
    4.6     Licenses. ............................................................................................... 59
    4.7     Corporate Names. ................................................................................. 59
    4.8     Business Locations; Agent for Process. ............................................... 60
    4.9     Title to Properties. ............................................................................... 60
    4.10    Priority of Liens; UCC-1 Financing Statements. ................................. 61
    4.11    No Subordination. ................................................................................. 61
    4.12    Permits; Licenses; Franchises. ............................................................. 61
    4.13    Indebtedness. ........................................................................................ 62
    4.14    Financial Condition; Pro Forma Balance Sheet; Projections. .............. 62
    4.15    Disclosure. ............................................................................................ 62
    4.16    Solvent Financial Condition. ................................................................ 63
    4.17    Surety Obligations. ............................................................................... 63
    4.18    Taxes. ................................................................................................... 63
    4.19    Brokers. ................................................................................................ 63

i

4.20    Intellectual Property. .......................................................................64
4.21    Governmental Authorization. .............................................................64
4.22    Compliance with Laws. .....................................................................64
4.23    Burdensome Contracts. .....................................................................64
4.24    Litigation. ..........................................................................................64
4.25    No Defaults. .......................................................................................65
4.26    Leases. ...............................................................................................65
4.27    Employee Benefit Plans. ...................................................................65
4.28    Trade Relations. ................................................................................66
4.29    Labor Relations. ................................................................................66
4.30    Not a Regulated Entity. ....................................................................66
4.31    Margin Stock. ....................................................................................66
4.32    No Material Adverse Change. ...........................................................67
4.33    Environmental Matters. .....................................................................67
4.34    Material Contracts. ............................................................................68
4.35    Utilities. .............................................................................................69
4.36    Entitlements. ......................................................................................69

SECTION 5. AFFIRMATIVE COVENANTS ..................................................................69

5.1    Visits and Inspections. ......................................................................69
5.2    Notices. ..............................................................................................70
5.3    Financial Statements and Other Reports. ..........................................71
5.4    Corporate Existence. .........................................................................77
5.5    Payment of Taxes and Claims; Tax Consolidation. ..........................77
5.6    Maintenance of Properties; Insurance. ..............................................78
5.7    Lender Meeting. .................................................................................78
5.8    Compliance with Laws, etc. ..............................................................78
5.9    Environmental Disclosure and Inspection. .......................................78
5.10    Remedial Action Regarding Hazardous Materials. ...........................79
5.11    Additional Collateral; Execution of Subsidiary Guaranty and Collateral Documents
       by Future Subsidiaries. .....................................................................80
5.12    Interest Rate Protection. ....................................................................82
5.13    Further Assurances. ...........................................................................82
5.14    Title. ..................................................................................................82
5.15    Maintenance of Entitlements; Development Agreements. .................82
5.16    Interest Reserve Account. ..................................................................83
5.17    Golf Course Equity Payments. ..........................................................83
5.18    Credit Rating. ....................................................................................83
5.19    Post-Closing Covenants. ...................................................................83

SECTION 6. NEGATIVE COVENANTS .......................................................................84

6.1    Indebtedness. .....................................................................................84
6.2    Liens and Related Matters. ...............................................................85
6.3    Investments. .......................................................................................87
6.4    Contingent Obligations. ....................................................................88
6.5    Restricted Payments. .........................................................................89
6.6    Financial Covenants. .........................................................................90
6.7    Restriction on Fundamental Changes. ...............................................91
6.8    Sale or Discount of Receivables. ......................................................91

ii

| | | |
|---|---|---|
| 6.9 | Asset Sales. | 91 |
| 6.10 | Transactions with Shareholders and Affiliates. | 93 |
| 6.11 | Conduct of Business. | 94 |
| 6.12 | Tuscany Option Agreement. | 94 |
| 6.13 | Amendments or Waivers of Certain Agreements. | 95 |
| 6.14 | Fiscal Year. | 95 |
| 6.15 | Hedge Agreements. | 95 |
| 6.16 | Limitation on Standing Inventory. | 95 |
| 6.17 | Limitation on Unentitled Properties. | 95 |
| 6.18 | Limitation on Purchase of Real Property Assets. | 95 |
| 6.19 | Permitted SPE Subsidiary Activities. | 96 |

**SECTION 7. EVENTS OF DEFAULT** ..... 96

| | | |
|---|---|---|
| 7.1 | Payment of Obligations. | 96 |
| 7.2 | Misrepresentations. | 96 |
| 7.3 | Breach of Certain Covenants. | 96 |
| 7.4 | Breach of Other Covenants. | 96 |
| 7.5 | Default Under Loan Documents. | 96 |
| 7.6 | Other Defaults. | 97 |
| 7.7 | Insolvency Proceedings. | 97 |
| 7.8 | Business Disruption; Condemnation. | 97 |
| 7.9 | ERISA. | 98 |
| 7.10 | Challenge to Loan Documents; Invalidity. | 98 |
| 7.11 | Judgment. | 98 |
| 7.12 | Repudiation of or Default Under Subsidiary Guaranty. | 98 |
| 7.13 | Criminal Forfeiture. | 98 |
| 7.14 | Change of Control. | 99 |

**SECTION 8. AGENTS** ..... 99

| | | |
|---|---|---|
| 8.1 | Appointment. | 99 |
| 8.2 | Rights as a Lender. | 100 |
| 8.3 | Exculpatory Provisions. | 100 |
| 8.4 | Reliance by the Agents. | 101 |
| 8.5 | Delegation of Duties. | 101 |
| 8.6 | Resignation of Administrative Agent and/or Collateral Agent. | 101 |
| 8.7 | Collateral Documents; Successor Collateral Agent. | 102 |
| 8.8 | Non-Reliance on Agents and Other Lenders. | 103 |

**SECTION 9. MISCELLANEOUS** ..... 103

| | | |
|---|---|---|
| 9.1 | Assignments and Participations in Loans. | 103 |
| 9.2 | Expenses; Indemnity; Damage Waiver. | 106 |
| 9.3 | Right of Set-Off. | 108 |
| 9.4 | Sharing of Payments by Lenders. | 108 |
| 9.5 | Amendments and Waivers. | 109 |
| 9.6 | Independence of Covenants. | 110 |
| 9.7 | Notices. | 110 |
| 9.8 | Survival of Representations, Warranties and Agreements. | 111 |
| 9.9 | Failure or Indulgence Not Waiver; Remedies Cumulative. | 112 |

9.10    Marshalling; Payments Set Aside. ...............................................................112
9.11    Severability. ..............................................................................................112
9.12    Obligations Several; Independent Nature of the Lenders' Rights. ..................112
9.13    Maximum Amount. ....................................................................................112
9.14    Headings. ..................................................................................................113
9.15    Applicable Law. .........................................................................................113
9.16    Successors and Assigns. .............................................................................113
9.17    Consent to Jurisdiction and Service of Process. ...........................................113
9.18    Waiver of Jury Trial. ..................................................................................115
9.19    Confidentiality. .........................................................................................115
9.20    Borrowers' Responsibility For Compliance With Environmental Laws ........116
9.21    Joint and Several Liability. .........................................................................116
9.22    Counterparts; Integration; Effectiveness; Electronic Execution. ...................118
9.23    USA Patriot Act Notification ......................................................................118

iv

## EXHIBITS

Exhibit I ...........Form of Administrative Questionnaire
Exhibit II..........Form of Assignment Agreement
Exhibit III.........Form of Assignment of Declarant's Rights
Exhibit IV ........Form of Compliance Certificate
Exhibit V..........Form of Disbursement Authorization
Exhibit VI ........Financial Plan
Exhibit VII .......Form of Intercreditor Agreement
Exhibit VIII......Form of Note
Exhibit IX ........Form of Notice of Conversion/Continuation
Exhibit X..........Form of Pledge and Security Agreement
Exhibit XI ........Description of Projects
Exhibit XII .......Form of Subsidiary Guaranty
Exhibit XIII......Form of Copyright Security Agreement
Exhibit XIV......Form of Solvency Certificate

413775.11-Los Angeles Server 2A - MSW

HERITAGE LAND COMPANY, LLC,
THE RHODES COMPANIES, LLC
and
RHODES RANCH GENERAL PARTNERSHIP

CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "<u>Agreement</u>") is dated as of November 21, 2005 and entered into by and among **HERITAGE LAND COMPANY, LLC**, a Nevada limited liability company ("<u>Heritage Land</u>"), **THE RHODES COMPANIES, LLC**, a Nevada limited liability company ("<u>Rhodes Companies</u>"), and **RHODES RANCH GENERAL PARTNERSHIP**, a Nevada general partnership ("<u>Rhodes GP</u>") and, collectively with Heritage Land and Rhodes Companies, the "<u>Borrowers</u>" and each, individually, a "<u>Borrower</u>"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (together with their respective successors and permitted assigns, each individually referred to herein as a "<u>Lender</u>" and collectively as the "<u>Lenders</u>"), and **CREDIT SUISSE**, Cayman Islands Branch ("<u>Credit Suisse</u>"), as administrative agent for the Lenders (together with its successors in such capacity, the "<u>Administrative Agent</u>"), as collateral agent for the Secured Parties (as defined below) (together with its successors in such capacity, the "<u>Collateral Agent</u>"), and as syndication agent (together with its successors in such capacity, the "<u>Syndication Agent</u>"; together with the Administrative Agent and the Collateral Agent, the "<u>Agents</u>") for the Lenders.

R E C I T A L S

**A. WHEREAS**, the Borrowers desire that the Lenders extend certain term loans to the Borrowers hereunder, the proceeds of which will be used, along with the proceeds of the Second Lien Loans (as defined below): (i) to repay all amounts owing under the Existing Indebtedness (as defined below) (other than Permitted Existing Indebtedness (as defined below)), (ii) for working capital and general corporate purposes of the Borrowers and their Subsidiaries, (iii) to finance Permitted Real Property Acquisitions (as defined below), (iv) to pay the Transaction Costs (as defined below), (v) to fund the Interest Reserve Account (as defined below) and (vi) to make a one-time distribution to Sedora Holdings, LLC, a Delaware limited liability company ("<u>Sedora</u>"), in an aggregate amount equal to $70,000,000 (such one-time distribution, the "<u>Permitted Distribution</u>").

**B. WHEREAS**, the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrowers subject to the terms and conditions contained herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree to enter into this Agreement as follows:

SECTION 1.
DEFINITIONS

1.1     <u>Certain Defined Terms</u>.

The following terms used in this Agreement shall have the following meanings:

"**Additional Material Contract**" means any contract, agreement, commitment or other document (other than any Second Lien Loan Document) entered into by any Borrower Entity after the Effective Date and affecting any Borrower Entity or any portion of the Collateral that contemplates the payment by any Borrower Entity to a Person that is not a Loan Party or receipt by any Borrower Entity from a Person that is not a Loan Party of cash or other consideration with a value exceeding an aggregate amount of $25,000,000.

"**Additional Project**" means each development in respect of Real Property Assets initiated, acquired or assumed by the Borrowers or their Subsidiaries following the Effective Date.

"**Administrative Agent**" has the meaning corresponding to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire substantially in the form of Exhibit I annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in subsection 2.6C.

"**Affected Loans**" has the meaning assigned to that term in subsection 2.6C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Affiliate Transaction**" has the meaning assigned to that term in subsection 6.10.

"**Agents**" has the meaning assigned to that term in the preamble to this Agreement.

"**Agreement**" has the meaning assigned to that term in the preamble hereto.

"**Applicable Base Rate Margin**" means with respect to Loans that are Base Rate Loans, 2.25% per annum.

"**Applicable Eurodollar Rate Margin**" means with respect to Loans that are Eurodollar Rate Loans, 3.25% per annum.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrowers, any of their Subsidiaries, any Project or any Collateral (including, without limitation, any Real Property Collateral), or any of the other assets of the Borrowers and their Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrowers or any of their Subsidiaries, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrowers and their Subsidiaries.

"**Applicable Tax Rate**" means, with respect to each Fiscal Year, the sum of the highest marginal tax rates applicable to individuals under the United States federal income tax laws and applicable state and local income tax laws for such years.

2

"**Appraised Value**" means the "Total Net Value" (as determined by the Appraiser in the most recent Qualified Appraisal Update or, until the first Qualified Appraisal Update, the Initial Appraisal) of (a) the Real Property Collateral encumbered by a First Priority Lien of the Mortgages that is included in the most recent Qualified Appraisal Update or, until the first Qualified Appraisal Update, the Initial Appraisal, and (b) each parcel of real property owned by Commerce Associates that is subject to a valid purchase option (which remains in full force and effect) in favor of Rhodes Design pursuant to the Tuscany Option Agreement less the "Base Price", "Lot Premium" and "Profit Participation" (as such terms are defined in the Tuscany Option Agreement as of the date hereof) applicable or attributable to each such parcel of real property and any other amounts payable in respect of such parcels of real property pursuant to the Tuscany Option Agreement and any related agreements. As of the Effective Date, the Appraised Value of the Real Property Collateral is $1,579,000,000. "Total Net Value" shall be determined in a manner consistent with the determination thereof and methodology used in the Initial Appraisal.

"**Appraiser**" means the collective reference to Cushman & Wakefield of Nevada, Inc. and Cushman & Wakefield of Texas, Inc., or such other independent appraisal firm or firms selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition by the Borrowers or any of their Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock (including, without limitation, of any of the Capital Stock of any of the Borrowers or any of their Subsidiaries, or the issuance of Capital Stock of Rhodes GP or any Subsidiary of the Borrowers to any Person that is not a Loan Party), but excluding (a) sales, leases and other dispositions of products and services in connection with the golf and other ancillary facilities of any Project (including sales of memberships in the clubs relating to such facilities), in each case, in the Ordinary Course of Business, (b) sales, exchanges and other dispositions of obsolete, worn out or excess equipment in the Ordinary Course of Business, which in the case of such asset sales in excess of $1,000,000 in a single transaction or series of related transactions, shall be certified in an Officer's Certificate as being a sale of obsolete, worn out or excess equipment in the Ordinary Course of Business, (c) any use of Cash and Cash Equivalents in a manner not prohibited hereunder, (d) the non-exclusive licensing of intellectual property in the Ordinary Course of Business and (e) transfers of Excluded Real Property Assets to Affiliates of the Borrowers by grant, bargain and sale deed reasonably satisfactory to the Administrative Agent.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Assignment of Declarant's Rights**" means the collective reference to (i) the First Lien Assignment of Declarant's Rights, dated as of November 21, 2005, made by Rhodes GP in favor of the Agents, substantially in the form of Exhibit III-A annexed hereto, (ii) the First Lien Assignment of Declarant's Rights, dated as of November 21, 2005, made by Rhodes GP in favor of the Agents, substantially in the form of Exhibit III-B annexed hereto, and (iii) the First Lien Assignment of Declarant's Rights, dated as of November 21, 2005, made by Rhodes Design in favor of the Agents, substantially in the form of Exhibit III-C annexed hereto, as each may hereafter be Modified from time to time.

3

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, at any time, a rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the higher of (a) the Prime Rate or (b) the rate which is 0.5% in excess of the Federal Funds Effective Rate. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in subsection 2.2A.

"**Borrower Entity**" means any one of the Borrowers or their respective Subsidiaries.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by any Borrower Entity.

"**Borrowers**" has the meaning assigned to that term in the preamble to this Agreement.

"**Borrowers' Knowledge**" means the actual knowledge, after reasonable inquiry, of any Responsible Officer.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that, with respect to matters relating to Eurodollar Rate Loans, the term "**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City or London, England, are authorized or required by law to close.

"**Calculation Date**" has the meaning assigned to that term in subsection 6.6A.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and,

at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) investment funds with a rating of at least AAA from S&P investing 95% of their assets in securities of the type described in clauses (a), (c) and (d) above; and (f) Eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash from Golf Course Operations**" means, for any period, Cash received by the Borrowers and their Subsidiaries directly attributable to the operation of the golf courses located at Rhodes Ranch and Tuscany (including, without limitation, Cash received in respect of sales of memberships, green fees, cart fees, golf shop sales, food and beverage sales at such golf courses and other operations related to such golf courses) during such period.

"**Cash from Investments**" means, for any period, Cash in respect of Investments received by the Borrowers or their Subsidiaries during such period (but excluding (i) proceeds from the disposition of Cash Equivalents and (ii) proceeds received from Loan Parties with respect to intercompany Investments); provided, however, that with respect to Subsidiaries that are not wholly-owned Subsidiaries, such Cash received by such Subsidiaries shall be included in Cash from Investments only to the extent such Cash actually is distributed to a Borrower or a wholly-owned Subsidiary of a Borrower.

"**Cash from Land Sales**" means, with respect to the Borrowers and their Subsidiaries, for any period and without duplication, (a) Cash received during such period attributable to real estate transactions (other than real estate transactions between or among Loan Parties) recognized for GAAP purposes which occurred during or prior to such period as either (i) a sale of real property, (ii) an option for the purchase of real property, or (iii) a transfer of real property (i.e., title has been transferred) that would be recognized as a sale of real property for GAAP purposes if a sufficient Cash payment had been received on account of such transfer (all amounts described in clause (ii) above included only if the Cash received with respect such transaction is nonrefundable); (b) principal collected in Cash on receivables arising from real estate transactions (other than real estate transactions between or among Loan Parties); (c) Cash previously received in connection with a transaction described in clause (a)(ii) above which was previously refundable, but became nonrefundable during the current period; and (d) reduced by commissions and closing costs properly allocable to such transactions; provided, however, that with respect to Subsidiaries that are not wholly-owned Subsidiaries, such Cash received by such Subsidiaries shall be included in Cash from Land Sales only to the extent such Cash actually is distributed to a Borrower or a wholly-owned Subsidiary of a Borrower.

"**Cash from Operations**" means, for any period, Cash receipts of the Borrowers and their Subsidiaries from operations of any golf, commercial, hotel, residential or other development (including, without limitation, Cash received in respect of membership fees and deposits, operations related to golf courses and other recreational operations relating to the operation of any Project) during such period; provided, however, that with respect to Subsidiaries that are not wholly-owned Subsidiaries, such Cash received by such Subsidiaries shall be included in Cash from Operations only to the extent such Cash actually is distributed to a Borrower or a wholly-owned Subsidiary of a Borrower.

"**Cash Reserve Amount**" means the positive difference, if any, between (x) $35,000,000 minus (y) the amount of Unrestricted Cash and Cash Equivalents that would be reflected on a combined

5

consolidated balance sheet of the Borrowers and their Subsidiaries immediately after giving effect to the prepayment to be made pursuant to Section 2.4B(ii)(d) (determined without reference to clause (b)(iv) of the definition of "Excess Cash Flow").

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means, at any time, (a) Rhodes shall cease to beneficially own (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) and Control (without giving effect to clause (a) of the definition of "Control") more than 50.0% of the economic interests in the Capital Stock of each of Rhodes Companies and Rhodes GP (determined on a fully diluted basis) and more than 50.0% of the Capital Stock of each of Rhodes Companies and Rhodes GP (determined on a fully diluted basis) ordinarily entitled to vote or consent with respect to actions of the members of Rhodes Companies and the partners of Rhodes GP, (b) James M. Rhodes Dynasty Trust I and James M. Rhodes Dynasty Trust 2 shall cease to beneficially own (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) more than 50.0% of the economic interests in the Capital Stock of Heritage Land (determined on a fully diluted basis) or (c) Rhodes shall cease to Control (without giving effect to clause (a) of the definition of "Control") more than 50.0% of the Capital Stock of Heritage Land (determined on a fully diluted basis) ordinarily entitled to vote or consent with respect to actions of the members of Heritage Land.

"**Clark County**" means Clark County, a political subdivision of the State of Nevada.

"**Cleanup**" means all actions required or prudent to: (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are granted or purported to be granted by the Collateral Documents.

"**Collateral Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Collateral Documents**" means (a) this Agreement, (b) the Intercreditor Agreement, (c) the Pledge and Security Agreement, (d) the Copyright Security Agreement, (e) the Mortgages, (f) each Assignment of Declarant's Rights, and (g) any other documents, instruments or agreements delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations.

"**Commerce Associates**" means Commerce Associates, LLC, a Nevada limited liability company.

"**Commerce Associates' Liens**" means the Liens of each applicable deed of trust, assignment of leases and rents, security agreement, fixture filing, declaration of development covenants and restrictions or other agreement, in favor of Commerce Associates encumbering any portion of the Real Property Collateral acquired by any Loan Party under the Tuscany Option Agreement and securing "Map Costs",

6

"Lot Premiums" or "Profit Participation" (as such terms are defined in the Tuscany Option Agreement as of the date hereof).

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in subsection 2.1A of this Agreement in the amount set forth in the Register.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit IV annexed hereto delivered to the Administrative Agent by the Borrowers pursuant to subsection 5.3(iii).

"**Communications**" has the meaning assigned to that term in subsection 9.7B(ii).

"**Condemnation Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Confidential Information Memorandum**" means the Confidential Information Memorandum dated October 2005, relating to the Transactions.

"**Consolidated EBITDA**" means, for any period, without duplication, (a) the sum of the amounts for such period (as determined for the Borrowers and their Subsidiaries on a combined consolidated basis) of (i) Consolidated Net Income, (ii) Consolidated Interest Expense, to the extent deducted in the calculation of Consolidated Net Income for such period, (iii) provisions for taxes based on income, to the extent deducted in the calculation of Consolidated Net Income for such period, (iv) total depreciation expense to the extent deducted in the calculation of Consolidated Net Income for such period, (v) total amortization expense to the extent deducted in the calculation of Consolidated Net Income for such period, (vi) other non-cash items reducing Consolidated Net Income to the extent reflected as a charge or otherwise deducted from the determination of Consolidated Net Income for such period (other than any non-cash charges to the extent such charges represent an accrual of or reserve for cash expenditures in any future period) and (vii) extraordinary or non-recurring items reducing Consolidated Net Income, less (b) the sum of (i) non-cash items increasing Consolidated Net Income and (ii) extraordinary or non-recurring items, in each case, increasing Consolidated Net Income, all of the foregoing (except as otherwise provided in the definition of any term used herein) as determined on a consolidated basis in conformity with GAAP. For the purposes of this definition, provisions for taxes based on income shall also include such state or local taxes that, in lieu of taxable income, are assessed on an alternate taxing methodology, such as net worth or tangible assets.

"**Consolidated Interest Expense**" means, for any period (as determined for the Borrowers and their Subsidiaries on a consolidated basis), (1) interest expense for such period determined in accordance with GAAP paid in such period or payable in cash, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedge Agreements, plus capitalized interest to the extent included in cost of sales (excluding, however, (a) any amounts referred to in subsection 2.3 payable to Agents or the Lenders on or before the Effective Date, (b) any amounts referred to in subsection 2.3 of the Second Lien Credit Agreement payable to the Agent and Lenders (as such terms are defined therein) on or before the Effective Date, (c) any amortized Transaction Costs, and (d) amounts payable to Commerce Associates pursuant to the Tuscany Option Agreement (to the extent otherwise included in interest expense for such period)) less (2) Cash interest income earned on Cash and Cash Equivalents in such period; provided that for the purposes of this definition only, notwithstanding anything to the contrary herein, for the initial four Fiscal Quarters ending following the Effective Date, Consolidated Interest Expense shall equal the product of (x) Consolidated Interest Expense from the Effective Date to the applicable Calculation Date and (y) a fraction, the numerator of which is 365 and the denominator of which is the number of days from the Effective Date to the applicable Calculation Date.

7

"**Consolidated Net Income**" means, for any period, the net income (or loss) of the Borrowers and their Subsidiaries, on a combined consolidated basis for such period taken as a single accounting period determined in conformity with GAAP; provided that there shall be excluded therefrom (a) the income (or loss) of any Person (other than a Subsidiary of a Borrower) in which a Borrower or any of its Subsidiaries has an equity interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrowers or any Subsidiary of the Borrowers by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrowers, is merged into or consolidated with one of the Borrowers or any Subsidiary of the Borrowers, or that Person's assets are acquired by the Borrowers or any Subsidiary of the Borrowers, (c) the income of any Subsidiary of the Borrowers to the extent that the declaration or payment of dividends or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary, (d) any after-tax gains or losses attributable to discontinued operations, (e) one time Transaction Costs amortized in such period and (f) to the extent not included above, any net extraordinary gains or net non-cash extraordinary losses.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Control**" means the possession, directly or indirectly, of the power to either (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Copyright Security Agreement**" means the Copyright Security Agreement, dated as of the date hereof, by the applicable Loan Parties in favor of the Collateral Agent, in the form of Exhibit XIII annexed hereto, as such Copyright Security Agreement may be Modified from time to time.

"**Credit Suisse**" has the meaning assigned to that term in the preamble to this Agreement.

8

"**Debt Service**" means, for any period, all cash payments of interest on Indebtedness of the Borrowers and their Subsidiaries made or required to be made during such period (exclusive of amounts withdrawn or paid from the Interest Reserve Account pursuant to subsection 2.4D(i)), all scheduled payments of principal of Indebtedness of the Borrowers and their Subsidiaries made during such period (including, without limitation, with respect to assessments payable by the Borrowers and their Subsidiaries in connection with Special Improvement Bonds), and all voluntary prepayments of the Loans made during such period (other than such scheduled payments of principal and voluntary prepayments of the Loans made directly or indirectly with the proceeds of any issuance of debt Securities or other Indebtedness of any of the Borrowers or any Subsidiary or any Insurance Proceeds).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Development Agreements**" means the (i) the Rhodes Ranch Development Agreement and (ii) each other effective development agreement (or similar agreement) with a Governmental Authority relating to any of the Real Property Collateral.

"**Disbursement Authorization**" means a notice in the form of Exhibit V annexed hereto delivered by the Borrowers to the Administrative Agent pursuant to subsection 2.1B with respect to a proposed borrowing.

"**Dollars**" and the sign "$" mean the lawful money of the United States of America.

"**Effective Date**" means such date on which the conditions to effectiveness set forth in subsection 3.1 are satisfied.

"**Effective Date Projections**" has the meaning assigned to that term in subsection 4.14B.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) that is an "accredited investor" (as defined in Regulation D under the Securities Act) that extends credit or buys loans in the ordinary course and is approved by the Administrative Agent and (following the primary syndication of the Loans by Credit Suisse and its Affiliates, and so long as no Default or Event of Default has occurred and is continuing) the Borrower (such approvals not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include any Borrower Entity or any Affiliate of any Borrower Entity.

9

"**Entitlement Documents**" has the meaning assigned to that term in subsection 4.36A.

"**Entitlements**" means those certain Governmental Authorizations which are required under Applicable Law to be obtained and maintained (as applicable) or appropriate in order to allow the expeditious and efficient completion of the development of the Real Property Collateral and the sale of the Real Property Collateral (and portions thereof), as legal lots, all as contemplated by (a) (i) in the case of Real Property Collateral owned on the Effective Date, the Initial Appraisal or (ii) in the case of Real Property Collateral acquired after the Effective Date, the first Qualified Appraisal Update in which such Real Property Collateral is included, (b) any applicable Development Agreement and/or (c) the Effective Date Projections, and including, without limitation, all Governmental Authorizations necessary to permit applicable platting, subdividing, earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto.

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers any of their Subsidiaries or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Laws**" means all federal, state, local and foreign laws, regulations and other governmental requirements relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management or use of natural resources, as now or may at any time hereafter be in effect.

"**Environmental Liabilities**" means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and Environmental Claims against any Loan Party or their Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or their Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers or their Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Equity Proceeds**" means the sum of (i) cash proceeds from: (a) the issuance of any Capital Stock or other equity Securities of, or (b) the making of any capital contribution to, any of the Borrowers after the Effective Date (other than any such issuances that are made to, or capital contributions that are made by, any of the other Borrowers); less (ii) bona fide, direct costs actually incurred by Borrowers in connection with the receipt of Equity Proceeds, including, without limitation, underwriting discounts or commissions and fees and expenses of counsel and other advisors in connection therewith.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

10

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrowers are a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrowers are a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrowers, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrowers or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrowers or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrowers or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrowers or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrowers or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Pension Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Reserve Requirements**" means, for each Interest Period for each Eurodollar Rate Loan, the highest reserve percentage applicable to any Lender during such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System or any successor for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement), with respect to liabilities or assets consisting of or including Eurocurrency liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**" means the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date which is two (2) Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Disbursement Authorization or Notice of Conversion/Continuation) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers'

11

Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Reference Lenders at approximately 11:00 a.m. (London time) on the date which is two (2) Business Days prior to the beginning of such Interest Period. If any of the Reference Lenders shall be unable or shall otherwise fail to supply such rates to the Administrative Agent upon its request, the rate of interest shall be determined on the basis of the quotations of the remaining Reference Lenders.

"**Eurodollar Rate Loans**" means Loans bearing interest at rates determined by reference to the Reserve Adjusted Eurodollar Rate as provided in subsection 2.2A.

"**Event of Default**" has the meaning assigned to that term in Section 7.

"**Excess Cash Flow**" means, for any period, without duplication, the sum, if positive, of (a) the sum for such period, without duplication, of (i) Cash from Investments, (ii) Cash from Land Sales and (iii) Cash from Operations, minus (b) the sum for such period, without duplication, of (i) Land and Operation Expenses (excluding amounts paid during such period in respect of Permitted Real Property Acquisitions that were deducted pursuant to clause (v) below in determining Excess Cash Flow for the immediately prior period), (ii) Debt Service, (iii) distributions made under subsection 6.5(iii), other than distributions made with respect to tax obligations relating to the tax years ended December 31, 2004 and December 31, 2005, (iv) the Cash Reserve Amount and (v) amounts paid in cash by the Loan Parties within forty-five (45) days following the end of such period in respect of each Permitted Real Property Acquisition that is subject to a definitive and binding purchase and sale agreement entered into prior to the end of such period between any of the Loan Parties and a non-affiliated third party seller and that closed within forty-five (45) days following the end of such period.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Real Property Assets**" means the Real Property Assets described on Schedule 1.1(d) attached hereto.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which any of the Borrowers are located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrowers under subsection 2.8B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with subsection 2.7E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to subsection 2.7E(i).

"**Existing Entitlements**" has the meaning assigned to that term in subsection 4.36A.

"**Existing Indebtedness**" means the Indebtedness described on Schedule 1.1(a) attached hereto.

"**Existing Purchase Agreements**" means agreements in effect as of the Effective Date between a Borrower or a Subsidiary and a third party purchaser relating to the Real Property Collateral, each of which is identified on Schedule 1.1(b).

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**Financial Plan**" means a financial plan for the Borrowers and their Subsidiaries in substantially the form of Exhibit VI attached hereto, for the Fiscal Years 2005 through 2010 and for the Fiscal Quarter in which the Effective Date occurs, as may be supplemented from time to time in accordance with subsection 5.3(x).

"**First Lien Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6B.

"**First Lien Declined Amounts**" means mandatory prepayments of the Loans pursuant to subsection 2.4B(ii) that are declined by Lenders.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than (a) Permitted Title Exceptions, (b) Liens for taxes, assessments or governmental charges or claims the payment of which is not at the time, required by subsection 5.5, (c) and Liens permitted under clause (iv) of subsection 6.2A and (d) Specified Encumbrances to which any Lien created in any Collateral pursuant to any Collateral Document has been subordinated pursuant to subsection 2.9B) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means Real Property Collateral located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938, as amended from time to time, and any successor statute.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrowers are residents for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

13

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course.

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 10010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in subsection 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**Golden Valley**" means those certain golf, commercial and residential developments located in Mohave County commonly known as Golden Valley, as depicted on the maps attached hereto as Exhibit XI.

"**Golf Course Equity Payment**" has the meaning assigned to that term in subsection 5.17.

"**Golf Course Operation Deficit Amount**" means, for any period, without duplication, the amount, if positive, by which (a) Golf Course Operation Expenses exceeds (b) Cash from Golf Course Operations.

"**Golf Course Operation Expenses**" means, for any period, the costs and expenses reasonably attributable to, without duplication, (i) the operations of the golf courses located at Rhodes Ranch and Tuscany (including sales of club memberships) and (ii) the ownership, development and maintenance, including, without limitation, general and administrative expenses, marketing and selling expenses, carry costs (consisting of Clark County or any other Governmental Authority assessments, taxes, insurance costs and capital expenditures) and maintenance costs, in each case, in connection with the golf courses located at Rhodes Ranch and Tuscany.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to that term in subsection 9.1G.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to human health and safety or to the indoor or outdoor environment.

"**Hedge Agreement**" means any agreement with respect to any swap, collar, cap, floor, hedge, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar

14

transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of any of the Borrowers or any of their Subsidiaries shall be a "Hedge Agreement".

"**Heritage Land**" has the meaning assigned to that term in the preamble to this Agreement.

"**Homesites**" means those portions of the Real Property Collateral that have been legally subdivided into lots suitable for the construction of single family and multi-family residences pursuant to recorded plats.

"**Improvements**" means all buildings, structures, fixtures, tenant improvements, and other improvements of any kind and description now or hereafter located in or on or attached to any land that is a Real Property Asset, including all building materials, water, sanitary and storm sewers, drainage, electricity, steam, gas, telephone and other utility, facilities, parking areas, roads, driveways, walks and other site improvements; and all additions and betterments thereto and all renewals, substitutions and replacements thereof.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit, whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding deferred compensation, any such obligations incurred under ERISA and current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of any Borrower or any Subsidiary of any Borrower, (i) solely for purposes of subsection 6.1 and subsection 7.6, net obligations under Hedge Agreements, including, as of any date of determination, the net amounts, if any, that would be required to be paid by such Person if such Hedge Agreements were terminated on such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, (k) all obligations under Special Improvement Bonds and (l) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person (including, without limitation, Special Improvement Bonds relating to Real Property Assets of the Borrowers and their Subsidiaries); provided that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (l) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

15

"**Indemnitee**" has the meaning assigned to that term in subsection 9.2B.

"**Initial Appraisal**" means that certain Appraisal of Real Property, Rhodes Homes Southwest Las Vegas Property Holdings Comprising of the Remaining Portions of: Rhodes Ranch Residential Community, Golf Course and Bulk Parcels; South West Ranch Parcels; Spanish Hills and Tuscany Residential Community and Golf Course, In A Self-Contained Appraisal Report, dated as of September 6, 2005, and prepared by the Appraiser for Credit Suisse First Boston.

"**Insolvency Proceeding**" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or (b) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors, in the case of each of the foregoing clauses (a) and (b), undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of the date hereof, and entered into by and among the Administrative Agent, the Collateral Agent, the Second Lien Administrative Agent and the Second Lien Collateral Agent, substantially in the form of Exhibit VII annexed hereto, as such Intercreditor Agreement may hereafter be Modified from time to time in accordance with the terms thereof.

"**Interest Coverage Ratio**" has the meaning assigned to that term in subsection 6.6C.

"**Interest Payment Date**" means:

(a)    with respect to any Base Rate Loan, the last Business Day in each of March, June, September and December of each year, commencing on December 31, 2005; and

(b)    with respect to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include the date that is three months after the commencement of such Interest Period.

"**Interest Period**" has the meaning assigned to that term in subsection 2.2B.

"**Interest Rate Determination Date**" means each date for calculating the Reserve Adjusted Eurodollar Rate, for purposes of determining the interest rate in respect of an Interest Period. The Interest Rate Determination Date for purposes of calculating the Reserve Adjusted Eurodollar Rate shall be the second Business Day prior to the first day of the related Interest Period.

"**Interest Reserve Account**": as defined in subsection 3.1X.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

16

"**Investment**" means, with respect to any Person, (a) any direct or indirect purchase or other acquisition by such Person of, or of a beneficial interest in, Capital Stock or other Securities of, all or substantially all of the assets of, or any other investment in, any other Person or (b) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business), extension of credit (by way of guaranty or otherwise) or capital contribution by such Person to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IP Collateral**" has the meaning assigned to the term "Intellectual Property" in the Pledge and Security Agreement.

"**Joint Venture**" means any Subsidiary that is not a wholly-owned Subsidiary.

"**KB Home Liens**" means any Liens under or created pursuant to the Memorandum of Agreement for the Construction of Major Infrastructure Improvements, executed in connection with an Agreement for the Construction of Major Infrastructure Improvements, dated as of June 4, 2003, between Rhodes Design and KB Home Nevada Inc., securing construction cost reimbursement obligations of Rhodes Design that are outstanding as of the Effective Date, in an amount not exceeding $4,000,000.

"**Land and Operation Expenses**" means, for any period, the costs and cash expenditures reasonably allocable to, without duplication, (i) the operations of the Projects and amenities related to the Projects (including sales of club memberships, operations related to the golf courses and other recreational operations relating to the operation of the Projects) and/or (ii) the ownership, development, construction and sale of the Real Property Collateral, including, without limitation, general and administrative expenses, marketing and selling expenses (including subsidies, incentives and rebates relating thereto), net land development costs (consisting of (x) land development costs (excluding any land development costs funded with amounts received from Clark County, Mohave County or any other Governmental Authority, any Permitted Special Improvement District or any other Person in respect of any Special Improvement Bonds) minus (y) all reimbursements (including, without limitation, reimbursements or other payments received in respect of Special Improvement Bonds) from Clark County, Mohave County or any other Governmental Authority, any Permitted Special Improvement District or any other Person, for land development costs), acquisition costs related to the purchase of land under the Tuscany Option Agreement, amounts paid for, or in connection with, Permitted Real Property Acquisitions and carry costs (including costs under the Tuscany Option Agreement) (consisting of Clark County and Mohave County or any other Governmental Authority assessments, taxes, Special Taxes, insurance costs, capital expenditures, and property owners association subsidies) (for the avoidance of doubt, it is expressly understood and agreed that "Land and Operation Expenses" shall not include any costs and/or cash expenditures allocable (or attributable) to Excluded Real Property Assets).

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to subsection 9.1.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrowers promptly but no

later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrowers and the Administrative Agent.

"**Lien**" means any lien, mortgage, pledge, assignment, hypothecation, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Documents**" means this Agreement, the Notes, the Subsidiary Guaranties and the Collateral Documents and other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Parties**" means the Borrowers and the Subsidiary Guarantors.

"**Loans**" means the loans outstanding or made by the Lenders pursuant to subsection 2.1A.

"**Major Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that contemplates (i) a gross sales price in excess of $50,000,000 or (ii) the sale of Real Property Collateral with an Appraised Value in excess of $50,000,000.

"**Major Entitlements**" means all (i) zoning approvals, (ii) mapping approvals, (iii) development agreements and (iv) solely with respect to commercial developments, use permits, necessary or appropriate in order to allow the expeditious and efficient completion of the development of real property and the sale and usage of such real property in accordance with all Applicable Law.

"**Mandatory Prepayment Date**" has the meaning assigned to that term in subsection 2.4C(i).

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Additional Project**" means any Additional Project relating to Real Property Assets acquired for a purchase price greater than or equal to $35,000,000.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets, financial condition or prospects of the Borrowers and their Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties of the Loan Documents, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under the Loan Documents, or (e) a material adverse effect upon the value of the Real Property Collateral taken as a whole.

"**Material Contracts**" means (i) each of the Development Agreements in effect on the Effective Date and (ii) the Tuscany Option Agreement.

"**Material Environmental Liability**" means an Environmental Liability which could reasonably be expected to result in (i) a discontinuation of a substantial portion of the business, operations or

18

development of the Borrowers and their Subsidiaries, taken as a whole, (ii) potential costs, liabilities or other losses in excess of $7,500,000, (iii) any designation of any portion of the Real Property Assets on the federal National Priorities List, or any similar state list or (iv) any designation of any portion of the Real Property Assets on any other list maintained by any Governmental Authority of sites at which a Release of Hazardous Materials has occurred if such Release could reasonably be expected to result in potential costs, liabilities or other losses in excess of (x) for purposes of the provisions of subsection 5.9A, $7,500,000 or (y) for purposes of all other provisions hereof, $1,000,000.

"**Material Licenses**" has the meaning assigned to that term in subsection 4.6.

"**Maturity Date**" means November 21, 2010.

"**Maximum Amount**" has the meaning assigned to that term in subsection 9.13A.

"**Modifications**" means any amendments, restatements, amendment and restatements, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**", or related words shall have meanings correlative thereto.

"**Mohave County**" means Mohave County, a political subdivision of the State of Arizona.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a deed of trust, assignment of leases and rents, security agreement and fixture filing executed and delivered by any Loan Party on or after the Effective Date in such form as may be approved by the Collateral Agent, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in subsection 3.1G.

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrowers or any ERISA Affiliate is contributing or to which the Borrowers or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Non-Consenting Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Notes**" means (a) the promissory notes of the Borrowers issued pursuant to subsection 2.1D and (b) any promissory notes issued by the Borrowers in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VIII annexed hereto, as they may be Modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit IX annexed hereto delivered by the Borrowers to the Administrative Agent pursuant to subsection 2.2D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent, Specified Hedge Agreements, whether for principal, interest

19

(including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Borrower or any Subsidiary Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) or payments for early termination of Specified Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organisation for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the board (if an officer) or chief executive officer or by the chief executive officer or the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president and (c) if such person is one of the Borrowers or a Subsidiary of the Borrowers, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to a specific Person, the ordinary course of such Person's business, substantially as conducted by any such Person prior to and as of the Effective Date (to the extent such Person was a Loan party as of the Effective Date) or as otherwise contemplated in connection with the development of the Projects, and which shall not in any event interfere in any material respect with the ongoing operation of the assets of such Person.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or other Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, its Organizational Certificate and the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Health Act of 1970, as amended from time to time, and any successor statute.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan

20

Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Parents**" means (a) Sagebrush, the sole member of Rhodes Companies, (b) Sedora, the managing member of Heritage Land and (c) Rhodes Ranch LLC, a member of Heritage Land and a partner of Rhodes GP.

"**Participant**" has the meaning assigned to that term in subsection 9.1D.

"**Participant Register**" has the meaning assigned to that term in subsection 9.1.D(iv).

"**Paying Agent**" has the meaning assigned to that term in subsection 8.6.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in subsection 4.33(vi).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrowers or any ERISA Affiliate.

"**Permitted Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that does not constitute a Major Collateral Asset Sale.

"**Permitted Distribution**" has the meaning assigned to that term in the recitals to this Agreement.

"**Permitted Encumbrances**" means the following types of Liens:

>    (a)    Liens (including, without limitation, Specified Encumbrances) for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by subsection 5.5;

>    (b)    statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;

>    (c)    Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

>    (d)    any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of

21

Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

(e)    leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the Ordinary Course of Business or the operations of the Borrowers or any of their Subsidiaries;

(f)    easements, covenants, conditions, rights-of-way, restrictions, minor defects, encroachments or irregularities in title and other similar charges or encumbrances entered into or arising in the Ordinary Course of Business of the Borrowers or any of their Subsidiaries;

(g)    any (i) interest or title of a lessor or sublessor under any Capital Lease permitted by subsection 6.1(iii) or any operating lease not prohibited by this Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii);

(h)    deposits in the Ordinary Course of Business to secure liabilities to insurance carriers, lessors, utilities and other service providers;

(i)    zoning, building codes and other Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset which are not violated and would not be violated by the current and contemplated use, development and/or occupancy of such Real Property Asset or the operation of the business of the Borrowers or any of their Subsidiaries thereon;

(j)    bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business;

(k)    the Commerce Associates' Liens; and

(l)    the KB Home Liens.

"**Permitted Existing Indebtedness**" means the Indebtedness described on Schedule 1.1(c) attached hereto.

"**Permitted Real Property Acquisitions**" means one or more bona fide arms-length acquisitions for fair market value by any Loan Party of an interest in real property.

"**Permitted Restricted Payment Amount**" means an aggregate amount equal to (i) the cumulative sum of 50% of Excess Cash Flow (solely to the extent positive) for each Fiscal Year that ends on a Trigger Date minus (ii) the aggregate amount of Restricted Payments made pursuant to subsection 6.5(ii).

"**Permitted Special Improvement Districts**" means one or more special improvement districts, special assessment districts or community facility districts established for the benefit of a Project after the Effective Date.

22

"**Permitted Title Exceptions**" means (a) the Permitted Encumbrances reflected in the Mortgagee Policies delivered pursuant to subsection 3.1G(iii) and (b) Permitted Encumbrances reasonably satisfactory to the Administrative Agent reflected in Mortgagee Policies delivered pursuant to subsection 5.11); provided that the Commerce Associates' Liens shall not be Permitted Title Exceptions.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, joint stock company, unincorporated association, company, partnership, limited partnership, Governmental Authority or other entity of whatever nature.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement dated as of the date hereof and entered into by and among the Borrowers, the Subsidiary Guarantors and the Collateral Agent, substantially in the form of Exhibit X annexed hereto, as such Pledge and Security Agreement may hereafter be Modified from time to time.

"**Pledging Parent**" has the meaning assigned to that term in subsection 5.11.

"**Prime Rate**" means the rate of interest per annum announced from time to time by Credit Suisse as its prime commercial lending rate in effect at its principal office in New York City. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Credit Suisse or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Proceedings**" has the meaning assigned to that term in subsection 5.3(xii).

"**Projects**" means the collective reference to (a) Rhodes Ranch, Tuscany, South West Ranch, Spanish Hills and Golden Valley and (b) each Additional Project.

"**Properly Contested**" means, in the case of any obligations of a Loan Party (including any Taxes) that are not paid as and when due or payable by reason of such Loan Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof: (i) such obligations are being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Loan Party has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such obligations could not reasonably be expected to have a Material Adverse Effect; (iv) no Lien is imposed upon any of such Loan Party's assets with respect to such obligations unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the obligations result from, or are determined by the entry, rendition or issuance against a Loan Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Loan Party, such Loan Party forthwith (and in any event prior to commencement of any enforcement proceedings against such Loan Party or any property of such Loan Party) pays such obligations and all penalties, interest and other amounts due in connection therewith.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by dividing (i) the Loan Exposure of that Lender by (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to subsection 9.1. The initial Pro Rata Share of each Lender is set forth in the Register.

23

"**PTO**" means the United States Patent and Trademark Office.

"**Qualified Appraisal**" means the Initial Appraisal and any other real estate appraisal conducted in accordance with the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all requirements of Applicable Law applicable to the Administrative Agent undertaken by an Appraiser, and providing an assessment of "Total Net Value" (as defined in the Initial Appraisal) of the remaining Real Property Collateral, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Appraisal Update**" means a quarterly update of the Initial Appraisal or other Qualified Appraisal prepared by the Appraiser, the form and substance of such update to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Counterparty**" means, with respect to any Specified Hedge Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement was entered into, was a Lender or Agent or an Affiliate of a Lender or Agent.

"**Qualified Sales Agreement**" means a definitive and binding purchase and sale agreement between any of the Loan Parties and a non-affiliated third party purchaser with respect to any Real Property Collateral.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Borrower Entity in any real property.

"**Real Property Collateral**" means the portion of the Collateral comprising a Real Property Asset in which one or more of the Loan Parties hold fee simple title or a valid leasehold interest, as determined from time to time, which is, or is required pursuant to the terms of this Agreement or the other Loan Documents to be, encumbered by a Lien of the Mortgages.

"**Recovery Event**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Reference Lenders**" means (a) Credit Suisse and (b) another Lender determined by the Administrative Agent with the consent of the Borrowers, which consent shall not be unreasonably withheld or delayed.

"**Refinancing**" means, in respect of any Indebtedness, to refinance, extend, renew, restructure or replace or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part. "**Refinanced**" and "**Refinance**" have meanings correlative thereto.

"**Register**" has the meaning assigned to that term in subsection 9.1C.

"**Registered Loan**" has the meaning assigned to that term in subsection 9.1C.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, advisors, controlling Persons and members of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels,

24

containers or other closed receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Release Instruments**" has the meaning assigned to that term in subsection 2.9A.

"**Released Parcel**" has the meaning assigned to that term in subsection 2.9A.

"**Required Dedication**" means a dedication or conveyance of a portion of the Real Property Collateral at the direction of a Governmental Authority or a public utility, or pursuant to or in connection with a Development Agreement, or to a homeowners or condominium owners association, to (i) such Governmental Authority (or any designee of such Governmental Authority), or (ii) a utility provider or (iii) a homeowners or condominium owners association, for parks, schools, recreation centers, common community facilities, public streets, utility easements and installations, slopes or other rights-of-way or public use; provided any such dedication or conveyance (individually and/or taken together will all other such dedications and conveyances) (i) has not had and could not reasonably be expected to have a Material Adverse Effect or (ii) has not impaired and could not reasonably be expected to impair the Collateral Agent's First Priority Lien on the remaining Real Property Collateral.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders.

"**Reserve Adjusted Eurodollar Rate**" means, with respect to each day during each Interest Period pertaining to a Eurodollar Rate Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"**Responsible Officer**" means the chief executive officer, president/chief operating officer, any vice president, general counsel or chief financial officer of the Borrowers and their Subsidiaries, as applicable, but in any event, with respect to financial matters, the chief financial officer or treasurer of the Borrowers and their Subsidiaries, as applicable.

"**Restricted**" means, when referring to Cash or Cash Equivalents of the Borrowers or any of the Subsidiary Guarantors, that such Cash or Cash Equivalents (a) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of the Borrowers or of any such Subsidiary Guarantor (unless such appearance is related to the Loan Documents or Liens created thereunder or the Second Lien Loan Documents or Liens created thereunder), (b) are subject to any Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties or the Second Lien Collateral Agent for the benefit of the Second Lien Lenders or (c) are not otherwise generally available for use by the Borrowers or such Subsidiary Guarantor; provided that amounts in the Interest Reserve Account shall be deemed "Unrestricted" for purposes of this Agreement.

"**Restricted Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any

25

outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of the Borrowers or any of their Subsidiaries now or hereafter outstanding, (d) management or similar fees payable to Rhodes, any of the Parents, any of their respective Affiliates and (e) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Indebtedness outstanding under the Second Lien Credit Agreement or any Refinancing thereof.

"**Restricted Seller Carry-Back Notes**" means promissory notes issued as consideration to any of the Borrowers or any of their Subsidiaries by the purchaser under a Qualified Sales Agreement that (i) are secured by a first priority Lien in favor of any of the Borrowers or any of their Subsidiaries on the interest in real property sold to such purchaser pursuant to such Qualified Sales Agreement and (ii) have a final maturity date that is prior to the Maturity Date.

"**Rhodes**" means James Rhodes, a natural person.

"**Rhodes Companies**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Design**" means Rhodes Design and Development Corporation, a Nevada corporation.

"**Rhodes GP**" has the meaning assigned to that term in the preamble to this Agreement.

"**Rhodes Ranch**" means those certain golf, commercial and residential developments located in Clark County commonly known as Rhodes Ranch, as depicted on the maps attached hereto as Exhibit XI.

"**Rhodes Ranch LLC**" means Rhodes Ranch LLC, a Nevada limited liability company.

"**Rhodes Ranch Development Agreement**" means the Development Agreement, dated December 18, 1996, by and among Clark County and Rhodes Ranch Limited Partnership, a Nevada limited partnership, Rhodes Ranch Land Holdings Limited Partnership, a Delaware limited partnership, Southwestern Opportunities Limited Partnership, a Nevada limited partnership, and Durango/Springs Limited Partnership, a Nevada limited partnership, each as predecessors to Rhodes Design & Development.

"**S&P**" means Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"**Sagebrush**" means Sagebrush Enterprises, Inc., a Nevada corporation.

"**Second Lien Administrative Agent**" means the administrative agent for the lenders under the Second Lien Credit Agreement.

"**Second Lien Agents**" means the collective reference to the Second Lien Administrative Agent, the Second Lien Collateral Agent, and the syndication agent under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means the Credit Agreement, dated as of the date hereof, by and among the Borrowers, the Second Lien Lenders, Credit Suisse, as administrative agent, as collateral agent and as syndication agent, as such Second Lien Credit Agreement may hereafter be Modified or refinanced from time to time in accordance with this Agreement and the Intercreditor Agreement.

"**Second Lien Collateral Agent**" means the collateral agent for the lenders under the Second Lien Credit Agreement.

26

"**Second Lien Lenders**" means the holders of the senior secured second priority loans under the Second Lien Credit Agreement.

"**Second Lien Loan Documents**" means the collective reference to the Second Lien Credit Agreement and the other documents, instruments and agreements entered into or delivered by a Loan Party in connection therewith.

"**Second Lien Loans**" means the senior secured second priority loans outstanding or made by the Second Lien Lenders pursuant to the Second Lien Credit Agreement.

"**Second Lien Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Second Lien Agents or the Second Lien Lenders or any of them or their respective Affiliates under the Second Lien Loan Documents, whether for principal, interest (including, without limitation, interest accruing after the maturity of the Second Lien Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Borrower or any Subsidiary Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), fees, expenses, indemnification or otherwise.

"**Secured Parties**" means the collective reference to the Agents, the Lenders and any Qualified Counterparties.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Sedora**" has the meaning assigned to that term in the recitals to this Agreement.

"**Solvent**" means, with respect to any Person, that as of any date of determination, (a) the sum of the "fair value" of the assets of such Person will, as of such date, exceed the sum of all debts of such Person as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the "present fair saleable value" of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the probable liability on existing debts of such Person as such debts become absolute and matured, as such quoted term is determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct any business in which it is or is about to become engaged and (d) such Person does not intend to incur, or believe or reasonably should believe that it will incur, debts beyond its ability to pay as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured. For purposes of this definition, the amount of any contingent, unliquidated and disputed claim and any claim that has not been

27

reduced to judgment at any time shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such liabilities meet the criteria for accrual under the Financial Accounting Standards Board Statement of Financial Accounting Standards No. 5).

"**South West Ranch**" means those certain commercial and residential developments located in Clark County commonly known as South West Ranch, as depicted on the maps attached hereto as Exhibit XI.

"**Spanish Hills**" means those certain residential developments located in Clark County commonly known as Spanish Hills, as depicted on the maps attached hereto as Exhibit XI.

"**Special Improvement Bonds**" means special improvement district bonds, special assessment bonds, community facility district bonds, private activity bonds, tax increment financing, general obligation bonds, special assessment revenue bonds and any similar bonds (i) issued by a Permitted Special Improvement District, (ii) the terms of which have been reviewed and approved by the Administrative Agent, (iii) the proceeds of which are solely available to directly pay or to reimburse the Borrowers or their Subsidiaries for Land and Operation Expenses, (iv) which are paid or satisfied (in whole or in part) through Special Taxes and (v) for which the aggregate amount of all Special Taxes paid in any year does not exceed the Special Tax Cap for such Fiscal Year.

"**Special Tax Cap**" means the special tax levy or assessment per year equal to the special taxes or assessments for the base year that together with ad valorem real estate taxes, and other real property liens and charges by a Governmental Authority, does not exceed 2% of the market value of the Homesites located in, or in the vicinity of, the applicable Permitted Special Improvement District (which is the issuer of the applicable Special Improvement Bonds) intended to be sold (projected as of the date of issuance of such Special Improvement Bonds), as determined by the Governmental Authority through which such Permitted Special Improvement District is established, which special tax levy or assessment may be increased by up to 2% per year thereafter.  For purposes of this Agreement, such Special Tax Cap includes any charges for maintenance and services imposed as a charge against real property, including such fees and charges imposed through a landscape and lighting maintenance district, special improvement district, special assessment district, a community facilities district, a community services district or other similar mechanism.

"**Special Taxes**" means special taxes or assessments on Real Property Assets used to pay or satisfy Special Improvement Bonds.

"**Specified Encumbrances**" has the meaning assigned to that term in subsection 2.9B.

"**Specified Hedge Agreement**" means any Hedge Agreement entered into by any of the Borrowers and any Qualified Counterparty (or any Person who was a Qualified Counterparty as of the Effective Date or as of the date such Hedge Agreement was entered into) in respect of interest rates to the extent required under subsection 5.12.

"**Speculative Housing Unit**" means any single family home, residential building or other housing unit (a) (i) that has been under vertical construction or development (e.g., the first stage of framing has been inspected and approved by any applicable Governmental Authority) for longer than (x) in the case of single family housing units, 180 days and (y) in the case of multi-family housing units, 360 days or (ii) that is being held for sale or otherwise built, and (b) not subject to a Qualified Sales Agreement.

28

"**SPE Subsidiary**" means each Subsidiary of Rhodes Companies that (a) is created solely for the purpose of acquiring Real Property Assets pursuant to an exercise of options under the Tuscany Option Agreement, (b) constitutes an "SPE" (as such term in defined under the Tuscany Option Agreement as of the date hereof) under the Tuscany Option Agreement and (c) is in compliance with the provisions of Sections 15.12 and 15.13 of the Tuscany Option Agreement (as in effect on the date hereof).

"**SPV**" has the meaning assigned to that term in subsection 9.1G.

"**Standing Inventory**" means Real Property Assets that have constituted Speculative Housing Units for longer than six (6) months.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or the management of which is otherwise controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of any of the Borrowers (including Subsidiaries of a Borrower that are Borrowers).

"**Subsidiary Guarantor**" means any Subsidiary of the Borrowers that is a party to the Subsidiary Guaranty on the Effective Date (which shall be each Subsidiary existing as of the Effective Date other than Palm Gardens Limited Partnership, a Nevada limited partnership) or at any time after the Effective Date pursuant to subsection 5.11.

"**Subsidiary Guaranty**" means the Subsidiary Guaranty, substantially in the form of Exhibit XII annexed hereto, executed and delivered by the Subsidiary Guarantors on the Effective Date, or executed and delivered by any additional Subsidiary Guarantor from time to time thereafter pursuant to subsection 5.11, as each such Subsidiary Guaranty may hereafter be Modified from time to time.

"**Subsidiary Loan Documents**" has the meaning assigned to that term in subsection 5.11B.

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in subsection 8.1B.

"**Syndication Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Tax Distributions**" means Restricted Payments made pursuant to subsection 6.5(iii).

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Terminated Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Test Period**" means each period of four consecutive Fiscal Quarters then last ended on each Calculation Date, in each case taken as one accounting period.

29

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

"**Total Consolidated Indebtedness**" means, as at any date of determination, the aggregate amount of all Indebtedness of the Borrowers and their Subsidiaries, determined on a consolidated basis in accordance with GAAP.

"**Total Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6A.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrowers and their Subsidiaries in connection with the Transactions and set forth in the schedule delivered by the Borrowers pursuant to subsection 3.1I, including, without limitation, amounts payable to the Agents and the Lenders.

"**Transaction Documents**" means, collectively, (a) the Loan Documents, (b) the Second Lien Credit Agreement and the other Second Lien Loan Documents, and (c) all other documents, instruments and agreements entered into or delivered by the Borrowers and/or any of their Subsidiaries in connection with the Transactions.

"**Transactions**" means, collectively, (a) the consummation of the transactions contemplated under this Agreement (it being expressly understood that the Permitted Real Property Acquisitions shall not be Transactions), (b) the consummation of the transactions contemplated under the Second Lien Credit Agreement, (c) the repayment in full of the obligations owing to the lenders under the Existing Indebtedness, (d) the termination of documents evidencing the Existing Indebtedness and all Liens associated therewith and (e) the making of the Permitted Distribution.

"**Trigger Date**" means the last day of any Fiscal Year on which (i) the aggregate outstanding principal amount of the Loans and the Second Lien Loans on such date shall be less than fifty percent (50%) of the aggregate outstanding principal amount of the Loans and the Second Lien Loans on the Effective Date; (ii) the Total Debt LTV Ratio is less than thirty percent (30%); and (iii) no Default or Event of Default has occurred and is continuing.

"**Tuscany**" means those certain golf, commercial and residential developments located in Clark County commonly known as Tuscany, as depicted on the maps attached hereto as Exhibit XI.

"**Tuscany Option Agreement**" means the Purchase Agreement and Grant of Options, dated November 13, 2003, between Commerce Associates and Rhodes Design, as Modified from time to time.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other jurisdiction govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such jurisdiction.

"**Unrestricted**" means, when referring to Cash or Cash Equivalents of the Borrowers or any of the Subsidiary Guarantors, that such Cash or Cash Equivalents are not Restricted.

"**Unrestricted Seller Carry-Back Notes**" means promissory notes issued as consideration to any of the Borrowers or any of their Subsidiaries by the purchaser under a Qualified Sales Agreement that are secured by a Lien in favor of any of the Borrowers or any of their Subsidiaries on the interest in real property sold to such purchaser pursuant to such Qualified Sales Agreement.

413775.11-Los Angeles Server 2A - MSW

1.2 **Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.**

**A.** The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time Modified (subject to any restrictions on such Modifications set forth herein), (b) any reference herein (i) to any Person (other than a natural person) shall be construed to include such Person's permitted successors and assigns and (ii) to any Borrower or any other Loan Party shall be construed to include such Borrower or such other Loan Party as debtor and debtor-in-possession and any receiver or trustee for such Borrower or such other Loan Party, as the case may be, in any insolvency or liquidation proceeding, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, without limitation, Real Property Assets, fixtures, Cash, securities, Capital Stock, accounts and contract rights, and Proceeds (as such term is defined in the Pledge and Security Agreement) therefrom.

**B.** Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrowers to the Lenders pursuant to clauses (i), (ii) and (x) of subsection 5.3 shall be prepared in accordance with GAAP (except, with respect to interim financial statements, for the absence of normal year-end audit adjustments and explanatory footnotes) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 5.3(iv)). Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements referred to in subsection 4.14A; provided, that should such accounting principles and policies change, the Borrowers, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

## SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

2.1 **Commitments; Loans.**

**A. Loans.** Subject to the terms and conditions of this Agreement, each of the Lenders agrees to make on the Effective Date a Loan in the amount equal to its Commitment; provided that the amount of the Loans required to be funded by each Lender shall be equal to 99.5% of its Commitment. Notwithstanding anything to the contrary and for the avoidance of doubt, the principal amount of Loans owing to each Lender on the Effective Date (before giving effect to any subsequent repayments) shall be an amount equal to such Lender's Commitment irrespective that the amount funded on the Effective Date is less than such Commitment. The Borrowers may only make one borrowing under the Commitments which shall be made on the Effective Date. Each Commitment shall terminate immediately and without

31

further action after giving effect to the making of the Loans. The proceeds of the Loans shall be used for the purposes identified in subsection 2.5A. Loans, once repaid or prepaid, may not be reborrowed.

**B. Disbursement Authorization.** The Borrowers shall deliver to the Administrative Agent a Disbursement Authorization no later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of the Effective Date (in the case of Base Rate Loans to be incurred hereunder), and at least three (3) Business Days in advance of the Effective Date (in the case of Eurodollar Rate Loans to be incurred hereunder). In lieu of delivering the above-described Disbursement Authorization, the Borrowers may give the Administrative Agent telephonic notice by the required time of any proposed borrowing under this subsection 2.1B; provided that such notice shall be promptly confirmed in writing by delivery of a Disbursement Authorization to the Administrative Agent on or before the Effective Date.

Neither the Administrative Agent nor any Lender shall incur any liability to the Borrowers in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to borrow on behalf of the Borrowers or for otherwise acting in good faith under this subsection 2.1B, and upon funding of Loans by the Lenders in accordance with this Agreement pursuant to any such telephonic notice, the Borrowers shall have borrowed the Loans hereunder.

The Borrowers shall notify the Administrative Agent prior to the funding of any Loans in the event that any of the matters to which the Borrowers are required to certify in the Disbursement Authorization are no longer true and correct as of the Effective Date, and the acceptance by the Borrowers of the proceeds of any Loans shall constitute a re-certification by the Borrowers, as of the Effective Date, as to the matters to which the Borrowers are required to certify in the Disbursement Authorization.

**C. Disbursement of Funds.** The Loans shall be made by the Lenders in the amounts of their respective Commitments (provided that the amount of the Loans required to be funded by each Lender shall be equal to 99.5% of its Commitment), it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender to make the particular type of Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 12:00 Noon (New York time) on the Effective Date in same day funds at the Funding and Payment Office. Unless the Administrative Agent shall have received written notice to the contrary prior to the Effective Date, the Administrative Agent may assume that each Lender will fund its respective Commitment as provided herein and may, in reliance upon such assumption, distribute to the Borrowers the amount of each Lender's Commitment required to be funded as provided herein. In such event, if any Lender does not in fact fund its respective Commitment, then the Borrowers jointly and severally agree to repay to the Administrative Agent forthwith on demand the amount so distributed to the Borrowers with interest thereon as computed in accordance with this Agreement, for each day from and including the date such amount is distributed to the Borrowers to the date of payment to the Administrative Agent. Upon satisfaction or waiver of the conditions precedent specified in subsection 3.1, the Administrative Agent shall make the proceeds of such Loans available to the Borrowers on the Effective Date by wire transfer, intra bank transfer or bank credit to the account of the Borrowers specified in the Disbursement Authorization, in an aggregate amount equal to the proceeds of all such Loans (and in like funds) received by the Administrative Agent from the Lenders.