(excluding principal and interest in respect of any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(b)     thereafter, to the extent of any excess proceeds, to the payment of all other Obligations, including all Obligations related to Specified Hedge Agreements, on a pro rata basis; and

(c)     thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## 2.5 Use of Proceeds.

**A. Loans.** The proceeds of the Loans made to the Borrowers shall be applied (i) to repay all amounts owing under the Existing Indebtedness (other than Permitted Existing Indebtedness), (ii) for working capital and general corporate purposes of the Borrowers, (iii) to finance Permitted Real Property Acquisitions, (iv) to pay the Transaction Costs, (v) to fund the Interest Reserve Account and (vi) to make the Permitted Distribution.

**B. Compliance With Laws.** The Borrowers undertake that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

**C. Margin Regulations.** Without limiting the generality of subsection 2.5B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrowers or any of their Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

## 2.6 Special Provisions Governing Eurodollar Rate Loans.

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

**A. Determination of Applicable Interest Rate.** As soon as practicable after 11:00 a.m. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrowers and each Lender.

**B. Inability to Determine Applicable Interest Rate.** In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate the Administrative

Agent shall on such date give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrowers with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrowers; provided, however that, at the option of the Borrowers, any such Disbursement Authorization may be re-submitted to the Administrative Agent indicating that the Borrowers are electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization in accordance with subsection 2.1B.

C. **Illegality or Impracticability of Eurodollar Rate Loans.** In the event that on any date any Lender (in the case of clause (i)) and the Required Lenders (in the case of clause (ii)) shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrowers and the Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans, shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrowers pursuant to the Disbursement Authorization or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law and (d) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrowers pursuant to a Notice of Conversion/Continuation, the Borrowers shall have the option, subject to the provisions of subsection 2.6D, to rescind such Disbursement Authorization or Notice of Conversion/Continuation as to all Lenders by giving notice (by telecopy or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this subsection 2.6C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms of this Agreement.

D. **Compensation For Breakage or Non-Commencement of Interest Periods.** The Borrowers shall compensate each Lender, upon written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by such Lender to the lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any actual loss, expense or liability

44

sustained by such Lender in connection with the liquidation or re-employment of such funds) which such Lender may sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Disbursement Authorization or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment (including any prepayment pursuant to subsection 2.4B or assignment pursuant to subsection 2.8) or conversion of any of its Eurodollar Rate Loans occurs on a date that is not the last day of an Interest Period applicable to that Loan, (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by the Borrowers or (iv) as a consequence of any other default by the Borrowers in the repayment of its Eurodollar Rate Loans when required by the terms of this Agreement.

E. **Booking of Eurodollar Rate Loans.** Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

F. **Assumptions Concerning Funding of Eurodollar Rate Loans.** Calculation of all amounts payable to a Lender under this subsection 2.6 and under subsection 2.7A shall be made as though that Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of Reserve Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this subsection 2.6 and under subsection 2.7A.

G. **Eurodollar Rate Loans After Default.** After the occurrence of and during the continuation of a Default or Event of Default, (i) the Borrowers may not elect to have a Loan be continued as or converted to, a Eurodollar Rate Loan and the Borrowers may no longer maintain any Loan as a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan and (ii) subject to the provisions of subsection 2.6D, any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrowers with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by the Borrowers.

2.7    **Increased Costs; Taxes.**

A. **Increased Costs Generally.** If any Change in Law shall: (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Reserve Adjusted Eurodollar Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

45

**B. Capital Requirements.** If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

**C. Certificates for Reimbursement.** A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection 2.7A or 2.7B and delivered to the Borrowers shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

**D. Delay in Requests.** Failure or delay on the part of any Lender to demand compensation pursuant to this subsection 2.7 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this subsection 2.7 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**E. Taxes.**

(i)    Payments Free of Taxes. Subject to subsection 2.7E(v) below, any and all payments by or on account of any obligation of the Borrowers hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(ii)    Payment of Other Taxes by the Borrowers. Without limiting the provisions of paragraph (i) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    Indemnification by the Borrowers. The Borrowers shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this subsection 2.7E) paid by such Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate stating the

46

amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrowers by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)     Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)     Status of Lenders. Any Lender, if requested by the Borrowers or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements. Without limiting the generality of the foregoing, in the event that any of the Borrowers is a resident for tax purposes in the United States of America, each Foreign Lender shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent), whichever of the following is applicable: (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party; (ii) duly completed copies of Internal Revenue Service Form W-8ECI; (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Internal Revenue Code or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN; or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrowers or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrowers or the Administrative Agent to permit the Borrowers to determine the withholding or deduction required to be made. A Foreign Lender shall not be required to deliver any form or statement pursuant to this subsection 2.7E(v) that such Foreign Lender is not legally able to deliver.

(vi)     Treatment of Certain Refunds. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to subsection 2.7E, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under subsection 2.7E with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Borrowers, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the

47

event such Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrowers or any other Person.

**2.8**   **Mitigation Obligations; Replacement of Lenders.**

**A. Designation of a Different Lender Office.** If any Lender requests compensation under subsection 2.7A or 2.7B, or requires the Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to subsection 2.7 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**B. Replacement of Lenders.** If any Lender requests compensation under subsection 2.7A or 2.7B, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its Eurodollar Rate Loans in accordance with subsection 2.6.C hereof, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, subsection 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) in the case of assignments not made using an electronic settlement system (*e.g.*, ClearPar), the Borrowers shall have paid to the Administrative Agent the assignment fee specified in subsection 9.1B(i)(c), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under subsection 2.6D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, Eurodollar Rate Loans, (iv) in the case of any such assignment resulting from a claim for compensation under subsection 2.7A or 2.7B or payments required to be made pursuant to subsection 2.7E, such assignment will result in a reduction in such compensation or payments thereafter and (v) such assignment does not conflict with applicable law. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**2.9**   **Releases; Subordinations.**

**A. Release Upon Qualified Sale or Required Dedication.** In connection with any Permitted Collateral Asset Sale, Major Collateral Asset Sale or Required Dedication, the Collateral Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgages (such portion of the Real Property Collateral, a "**Released Parcel**"); provided that all of the applicable conditions set forth in subsection 6.9 have been satisfied and the applicable Borrowers shall have submitted to the Collateral Agent not less than ten (10) days (or such shorter period

48

as is acceptable to the Collateral Agent) prior to the date of such proposed release (which must be on a Business Day), a reconveyance or release of Liens (and related Loan Documents) for each Released Parcel (for execution by the Collateral Agent) (or its agent) in a form appropriate for recordation in the applicable jurisdiction and otherwise satisfactory to the Collateral Agent (or its agent) in its good faith discretion and all other documentation as the Collateral Agent reasonably requires to be delivered by the Borrowers in connection with such release (collectively, the "**Release Instruments**") for each Released Parcel (for execution by Collateral Agent) together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement and (iii) the release to be effected will not impair or otherwise adversely affect the Liens and other rights of the Collateral Agent under the Loan Documents not being released. The Collateral Agent is authorized by the Lenders to enter into release and/or escrow arrangements with the Title Company or any other third-party designated by the Collateral Agent for purposes of delivery of Release Instruments.

    **B. Subordinations in connection with Specified Encumbrances.** If required by the applicable Permitted Special Improvement District, upon ten (10) Business Days prior written notice from the Borrowers, the Collateral Agent shall subordinate the First Priority Lien of the applicable Mortgage to any Liens granted by the Borrowers or their Subsidiaries in favor of such Permitted Special Improvement District securing Special Improvement Bonds issued by such Permitted Special Improvement District after the Effective Date ("**Specified Encumbrances**") that, in each case, as certified by a Responsible Officer, are necessary or desirable in connection with the development of the Projects; provided that (i) any such signature of the Collateral Agent is expressly made with no implied duty or obligation on the part of the Collateral Agent to review any documentation relating to such Specified Encumbrances and is only made for the purpose of subordinating the First Priority Lien of the applicable Mortgage to such Specified Encumbrance, (ii) no Default or Event of Default has occurred and is continuing, (iii) the Borrowers have provided evidence to the Collateral Agent that such consent and/or subordination is required by the applicable Permitted Special Improvement District, (iv) the Collateral Agent shall, as a condition to such subordination, be satisfied in its reasonable discretion that such subordination could not reasonably be expected to (a) have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral or (b) materially impair the value of the Real Property Collateral and (v) the Collateral Agent shall have received evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to any such subordination shall be maintained following such subordination. The Borrowers shall pay all costs and expenses of the Collateral Agent and the Title Company in connection with any such subordination.

2.10  **Subordinations in connection with Map Approvals.**

    Upon not less than ten (10) Business Days' prior written notice from the Borrowers, the Collateral Agent shall subordinate the First Priority Lien of the applicable Mortgage to any proposed "subdivision", "parcel", "tract" or other maps approved by the applicable Governmental Authority and contemplated to be recorded in connection with the development of a Project (collectively, the "**Maps**"), and, to the extent required by Applicable Law or the applicable Governmental Authority, the Collateral Agent agrees to sign and acknowledge any such Map; provided, in each such case, that (i) the Collateral Agent's signature is expressly made with no implied duty or obligation on the part of the Collateral Agent to review such Maps and is only made for the purpose of subordinating the Lien of the applicable Mortgage to such Map, (ii) no Default or Event of Default has occurred and is continuing, (iii) the Borrowers have provided evidence to the Collateral Agent that such subordination and/or execution is required for the subdivision approval of the appropriate Governmental Authority or otherwise reasonably necessary or desirable in connection with the development of a Project, (iv) the Collateral Agent shall, as

49

a condition to such subordination and/or execution, be satisfied in its reasonable discretion that such subordination and/or execution could not reasonably be expected to have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral or materially impair the value of the Real Property Collateral, (v) the Collateral Agent shall have received evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages so subordinated with respect to the remaining Real Property Collateral subject to such Mortgages after giving effect to any such subordination shall be maintained following such subordination and (vi) the documentation evidencing such subordination shall be reasonably satisfactory to the Collateral Agent. The Borrowers shall pay all costs and expenses of the Collateral Agent and the Title Company in connection with any such subordination.

**2.11** **Subordinations in connection with Qualified Sales Agreements.**

Upon not less than ten (10) Business Days' prior written notice from the Borrowers and provided no Event of Default has occurred and is continuing, the Collateral Agent shall enter into a subordination and non-disturbance agreement, in form and substance reasonably satisfactory to the Collateral Agent, with a homebuilder or other commercial developer who is party to a Qualified Sales Agreement and the Borrower pursuant to which such homebuilder or other commercial developer confirms, among other things, that its interest in the relevant Real Property Collateral and the applicable Qualified Sales Agreement are subordinate to the First Priority Lien of the Collateral Agent and the Collateral Agent agrees, subject to certain conditions, to recognize the validity of the Qualified Sales Agreement in the event of a realization upon such First Priority Lien, provided that the Collateral Agent shall not be required to enter into any such subordination and non-disturbance agreement unless the Collateral Agent is reasonably satisfied that the sales contemplated by such Qualified Sales Agreement are, and will be, permitted under Section 6.9.

## SECTION 3.
## CONDITIONS TO EFFECTIVENESS

**3.1** **Conditions to Effectiveness.**

The effectiveness of this Agreement, and the obligation of each Lender to make the extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A. Borrowers' Documents.** On or before the Effective Date, each Borrower shall deliver or cause to be delivered to the Administrative Agent the following, each, unless otherwise noted, dated the Effective Date:

(i) certified copies of its Organizational Certificate (in form and substance reasonably satisfactory to the Administrative Agent), together with a good standing certificate from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation, each state in which any of its Real Property Assets are located, and each other state in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(ii) copies of its Organizational Documents (in form and substance reasonably satisfactory to the Administrative Agent), certified as of the Effective Date by its corporate secretary or an assistant secretary;

   (iii)  copies of its Organizational Authorizations approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents and other Transaction Documents to which it is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification;

   (iv)  incumbency certificates of its officers executing this Agreement and the other Transaction Documents to which it is a party as of the Effective Date;

   (v)  executed originals of this Agreement and the other Loan Documents to which it is a party that are to be delivered on the Effective Date;

   (vi)  copies of each of the other Transaction Documents and Material Contracts to which it is a party, certified by a Responsible Officer; and

   (vii)  such other documents as the Administrative Agent may reasonably request.

  **B. Subsidiary Documents.** On or before the Effective Date, the Borrowers shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following for each Subsidiary Guarantor (which may be waived by the Administrative Agent for any Subsidiary Guarantor with respect to the items described in clause (i) below), each, unless otherwise noted, dated the Effective Date:

   (i)  certified copies of its Organizational Certificate (in form and substance reasonably satisfactory to the Administrative Agent), together with a good standing certificate from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation, each state in which any of its Real Property Assets are located, and each other state in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

   (ii)  copies of its Organizational Documents (in form and substance reasonably satisfactory to the Administrative Agent), certified as of the Effective Date by its corporate secretary or an assistant secretary;

   (iii)  copies of its Organizational Authorizations approving and authorizing the execution, delivery and performance of the Subsidiary Guaranty, as the case may be, and the other Loan Documents and other Transaction Documents to which it is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification;

   (iv)  incumbency certificates of its officers executing the Subsidiary Guaranty and the other Transaction Documents to which it is a party as of the Effective Date;

   (v)  executed originals of the Subsidiary Guaranty and the other Loan Documents to which it is a party that are to be delivered on the Effective Date;

   (vi)  copies of each of the other Transaction Documents and Material Contracts to which it is a party, certified by a Responsible Officer; and

   (vii)  such other documents as the Administrative Agent may reasonably request.

### C. Consummation of Transactions.

(i)   (a) Each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)   (a) the Second Lien Loan Documents shall have been duly executed and delivered by each party thereto and shall be in full force and effect and the Borrowers shall have received loans under the Second Lien Credit Agreement in an aggregate principal amount of not less than $70,000,000 (prior to giving effect to any original issue discount); and (b) all other conditions set forth in the Second Lien Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Second Lien Administrative Agent;

(iii)   simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iv)   simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(v)   after giving effect to the Transactions and the other transactions contemplated hereby, the Borrowers and their Subsidiaries shall have no outstanding Indebtedness or preferred Capital Stock other than (a) the Loans under this Agreement, (b) the Second Lien Loans and (c) the Permitted Existing Indebtedness.

### D. Lender Signatures.
The Lenders and the Agents shall have executed and delivered this Agreement.

### E. Necessary Consents and Estoppels.
The Borrowers shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrowers and their Subsidiaries, and all applicable appeal periods shall have expired, and shall have received estoppels from such Persons as may be reasonably requested by the Administrative Agent, and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. Such approvals and consents and estoppels shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)   executed estoppel certificates from all homeowners' associations and property owners' associations related to each Project;

(ii)   executed consents from any other lenders of the Borrowers or any of their Subsidiaries, as required by the terms of any other loan documents to which the Borrowers or such Subsidiaries, as applicable, are a party;

52

(iii) executed consents from any Person required in connection with the Pledge and Security Agreement and executed consents from any Person required in connection with the other Collateral Documents; and

(iv) executed estoppel certificates from Clark County regarding the Rhodes Ranch Development Agreement.

**F. Perfection of Security Interests.** The Borrowers shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Pledge and Security Agreement or other applicable Collateral Documents. Such actions shall include: (i) the delivery pursuant to the applicable Collateral Documents of (a) such certificates or other instruments (each of which shall be registered in the name of the Collateral Agent or properly endorsed in blank for transfer or accompanied by irrevocable undated stock or equivalent powers duly endorsed in blank, all in form and substance satisfactory to the Collateral Agent) representing all of the shares or other interests of Capital Stock required to be pledged pursuant to the Collateral Documents identified on Schedule 3.1F-1 and (b) all promissory notes or other instruments (duly endorsed, where appropriate, in a manner satisfactory to the Collateral Agent) evidencing any Collateral; (ii) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (iii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority Liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made or will be made concurrently with the Effective Date. All "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of any of the Borrowers (other than any such deposit accounts identified on Schedule 3.1F-2) shall be subject to effective control agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent, all of which have been duly executed and delivered by each party thereto and are in full force and effect.

**G. Real Property.** The Administrative Agent shall have received on or prior to the Effective Date from the Borrowers and each other applicable Loan Party:

(i) <u>Mortgages</u>. Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of Clark County or Mohave County, as applicable, encumbering the Real Property Collateral listed on Schedule 3.1G, in each case in form and substance satisfactory to the Collateral Agent;

(ii) <u>Opinions of Local Counsel</u>. An opinion of counsel (which counsel shall be satisfactory to the Collateral Agent) with respect to the enforceability of the Mortgages to be recorded in the real property records of Clark County or Mohave County, as applicable, and such

53

other related matters as the Collateral Agent may reasonably request, in each case in form and substance satisfactory to the Collateral Agent;

(iii)   Title Insurance. ALTA extended coverage mortgagee title insurance policies (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on Schedule 3.1G, in amounts not less than the respective amounts designated on such Schedule with respect to any particular Real Property Collateral, insuring fee simple title to each such Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent including an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the Clark County or Mohave County, as applicable, real property records;

(iv)   Title Reports. With respect to each parcel of Real Property Collateral, a title report issued by the Title Company with respect thereto, dated a date, and in form and substance, satisfactory to the Collateral Agent and may include Permitted Encumbrances;

(v)   Surveys. Any surveys or other documentation as may be deemed necessary by the Title Company in connection with the issuance of the Mortgagee Policies with respect to each parcel of Real Property Collateral, dated a date, and prepared by a Person and in form and substance, reasonably satisfactory to the Collateral Agent;

(vi)   Appraisal. One original of the Initial Appraisal, in form and substance satisfactory to the Collateral Agent;

(vii)   Entitlement Documents. The Administrative Agent shall have received true, correct and complete copies of all Entitlement Documents, including, without limitation, evidence that each Project and the Collateral are in compliance with applicable zoning, subdivision and all other applicable federal state or local laws affecting the development of the Collateral and the use and operation of each Project, together with a certificate, in form and substance satisfactory to the Administrative Agent, from a Responsible Officer of each of the Borrowers certifying that the Borrowers are (a) in compliance with the terms and conditions of all Entitlement Documents and (b) in compliance with all applicable zoning, subdivision and all other applicable federal state or local laws affecting the development of the Collateral and the use and operation of the Projects;

(viii)   Copies of Documents Relating to Title Exceptions. Copies of all recorded documents listed as exceptions to title or otherwise referred to in the Mortgagee Policies or in the title reports delivered pursuant to clause (iv) above; and

(ix)   Matters Relating to Flood Hazard Properties. (a) Evidence, which may be in the form of a letter from an insurance broker, as to whether (1) any Real Property Collateral is a

54

Flood Hazard Property and (2) the community in which any such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) if there are any such Flood Hazard Properties, such Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent (1) as to the existence of each such Flood Hazard Property and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (c) in the event any such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrowers have obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

**H. Subordination of Commerce Associates' Liens; Amendment of Tuscany Option Agreement.** The Borrowers shall have delivered to the Administrative Agent copies of (i) an effective subordination agreement and such other documents or instruments (including, without limitation, an effective amendment to the Tuscany Option Agreement) necessary to effect the subordination of the Commerce Associates' Liens (and any additional Liens that may be granted to Commerce Associates from time to time pursuant to the terms of the Tuscany Option Agreement) to the Liens of the Mortgages and (ii) an effective amendment to the Tuscany Option Agreement to eliminate any requirement to prepare or deliver annual financial statements of Rhodes Design or any Subsidiary of Rhodes Design in connection with the determination of the amount of "Profit Participation" (as defined in the Tuscany Option Agreement as of the date hereof) or otherwise, that, in each case, has been validly executed and delivered by Commerce Associates and each applicable Loan Party, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

**I. Financial Condition and Solvency Certificate.** The Borrowers shall have delivered to the Administrative Agent a certificate from the chief financial officer of each of the Borrowers, substantially in the form of Exhibit XIV attached hereto.

**J. Transaction Costs, Fees and Expenses.** On or prior to the Effective Date, the Borrowers shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instruments or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Transaction Documents, as well as all fees reasonably estimated to be incurred following the Effective Date, including with respect to the perfection and recordation of the Liens granted under the Collateral Documents. On or prior to the Effective Date, the Borrowers shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrowers' estimate of the Transaction Costs (other than fees payable to any of the Agents).

**K. Opinions of Loan Parties' Counsel.** The Administrative Agent and its counsel shall have received the written opinions of (i) Snell & Wilmer LLP, special Nevada and Arizona counsel for the Loan Parties, (ii) Gibson, Dunn & Crutcher LLP, special New York counsel for the Loan Parties, and (iii) each other special and local counsel for the Loan Parties as the Administrative Agent may reasonably request, in each case, (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**L. Financial Information.** Prior the Effective Date, the Administrative Agent shall have received from the Borrowers (i) the Effective Date Projections and such financial statements and other