(v)     No Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Real Property Asset.

(vi)    Without in any way limiting the generality of the foregoing, except as would not reasonably be expected to result in a Material Adverse Effect, none of the Real Property Assets contain any: underground storage tanks; asbestos; polychlorinated biphenyls ("**PCBs**"); underground injection wells; radioactive materials; or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed.

(vii)   The Borrowers have provided to the Lenders all material assessments, reports, data, results of investigations or audits, and other information that is in the possession of or reasonably available to the Borrowers regarding environmental matters pertaining to or the environmental condition of the business of the Borrowers and their Subsidiaries, or the compliance (or noncompliance) by the Borrowers or any of their Subsidiaries with any Environmental Laws.

**4.34    Material Contracts.**

A.  As of the Effective Date, the Borrowers and their Subsidiaries are not party to or bound by any contract, agreement, commitment or other document (or any related series of contracts, agreements, commitments or documents) that contemplates (x) the payment by the Borrowers or any of their Subsidiaries of Cash or other consideration with a value exceeding an aggregate amount of $10,000,000 to a Person that is not a Loan Party or (y) the receipt by the Borrowers or any of their Subsidiaries of Cash or other consideration with a value exceeding an aggregate amount of $10,000,000 from a Person that is not a Loan Party, other than the Transaction Documents and the Material Contracts.

B.  The Borrowers have heretofore furnished to the Administrative Agent a true, correct and complete copy of each Material Contract, and all exhibits, schedules and Modifications thereto. The Material Contracts have not been Modified or clarified except as set forth on Schedule 4.34.

C.  Each Material Contract, as of the date hereof, is in full force and effect and constitutes a legal, valid and binding obligation of the applicable Borrower Entity, and, to the Borrowers' Knowledge, each other party thereto.

D.  No Borrower Entity, as of the date hereof, is in default or breach (with or without the giving notice or the passage of time) of any Material Contract. No Borrower Entity has received notice of, or is otherwise aware of, any alleged default under the Tuscany Option Agreement. Except as set forth on Schedule 4.34, the Borrowers have no knowledge that any other party is in default or breach of any Material Contract, or the existence of any conditions which, with the giving of notice or the passage of time, or both, could constitute a default or breach. As of the date hereof, none of the material rights and privileges under the Material Contracts inuring to any Borrower Entity has lapsed, and neither Clark County nor any other party has any right as of the date hereof to terminate any of the Material Contracts.

E.  As of the date hereof, each applicable Borrower Entity has paid all fees, made all dedications, posted all bonds and other security, completed all improvements and otherwise performed all obligations required to be performed by the applicable Borrower Entity under the Material Contracts in accordance therewith to the date hereof.

**4.35** **Utilities.**

As of the date hereof, all material water, sewer, gas, electric, telephone and drainage facilities and all other utilities required (by Applicable Law or otherwise) to be installed for the current stage of development and the current usage of each Project are installed to the property lines of each Project, are all connected and operating pursuant to valid permits, are adequate to service the current usage of each Project, and are connected to each Project by means of one or more public or private easements extending from such Project to one or more public streets, public rights-of-way or utility facilities. The Borrowers reasonably expect to obtain on a timely basis in the Ordinary Course of Business all water, sewer, gas, electric, telephone and drainage facilities and all other utilities (if not already so obtained) required (by Applicable Law or otherwise) for, and adequate to service, the intended full usage, development and operation of each Project, materially consistent with the Effective Date Projections.

**4.36** **Entitlements.**

**A.** The Loan Parties have (i) all Entitlements necessary for the current stage of development and the current usage of each Project, and (ii) except as set forth in Part A of Schedule 4.36, all Major Entitlements necessary to permit the full development and usage of each Project (other than Additional Projects) in a manner, and in a time period, consistent with the Effective Date Projections and the assumptions with respect to the Real Property Collateral set forth in the Initial Appraisal (collectively, the "**Existing Entitlements**"). All of the Existing Entitlements are in full force and effect. All Major Entitlements that are Existing Entitlements are set forth in Part B of Schedule 4.36. All the Existing Entitlements are vested in the Real Property Collateral, and the consummation of the Transactions shall not affect the same. There are no unperformed obligations or conditions with respect to the effectiveness of any of the Existing Entitlements that were or are required to be completed as of the Effective Date, and there are no material uncured defaults or breaches under any of the same. As of the date hereof, no Borrower Entity is aware of any defects or actual or potential actions, challenges or proceedings by any third party or Governmental Authority with respect to the Existing Entitlements. No Borrower has received notice of any changes to any of the Existing Entitlements; all of the material documents relating to the Major Entitlements that are Existing Entitlements are identified in Part B of Schedule 4.36 (collectively, the "**Entitlement Documents**"), and there are no other material documents relating to the Existing Entitlements other than those set forth on Schedule 4.36.

**B.** The Borrowers reasonably believe that all Entitlements necessary to permit the full development and usage of each Project, in a manner, and in a time period, materially consistent with the Effective Date Projections and the assumptions with respect to the Real Property Collateral set forth in the Initial Appraisal have been obtained or will be obtained on a timely basis in the Ordinary Course of Business, and no Borrower is aware of any actual or potential adverse actions, challenges or proceedings by any third party or Governmental Authority with respect to any such Entitlements.

## SECTION 5.
## AFFIRMATIVE COVENANTS

Each of the Borrowers covenants and agrees that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, each of the Borrowers shall and shall cause each of its Subsidiaries to:

**5.1** **Visits and Inspections.**

Permit representatives of the Administrative Agent, from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of

Default exists) upon reasonable prior notice to such Borrower, to visit and inspect the properties of such Borrower and each of its Subsidiaries, conduct appraisals of a Borrower's properties, inspect, audit and make extracts from each Borrower's and each of its respective Subsidiary's books and records, and discuss with its officers, its employees and (with a Responsible Officer) its independent accountants, such Borrower's and each of its Subsidiary's business, financial condition, business prospects and results of operations. Representatives of the Borrowers (including, without limitation, the Borrowers' accountants) shall be authorized to accompany the Administrative Agent (or representative thereof) on any such visit or inspection, but such authorization shall in no manner be deemed to be a requirement or condition of the Administrative Agent's visits or inspections, and to the extent any of the Borrowers' representatives accompany the Administrative Agent on any visit or audit, such Persons shall in no manner hinder or delay the audits or inspections of the Administrative Agent. Representatives of each Lender shall be authorized to accompany the Administrative Agent on each such visit and inspection and to participate with the Administrative Agent therein, but at their own expense, unless a Default or Event of Default exists. Neither the Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

**5.2**   **Notices.**

Notify the Administrative Agent and Lenders in writing, promptly after any Borrower's obtaining knowledge of the following:

(i)   the institution of, or written threat of, any action, suit, proceeding, governmental investigation or arbitration against or affecting the Borrowers or their Subsidiaries and not previously disclosed, which action, suit, proceeding, governmental investigation or arbitration (a) exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances expose, such Persons, in the Borrowers' reasonable judgment, to liability in an amount aggregating $7,500,000 or (b) seeks injunctive or other relief which, if obtained, could reasonably be expected to have a Material Adverse Effect, providing such other information as may be reasonably available to enable Administrative Agent and its counsel to evaluate such matters; the Borrowers, upon request of the Administrative Agent, shall promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration;

(ii)   any labor dispute to which any of the Borrowers or their Subsidiaries may become a party, any strikes or walkouts relating to any of its property or facilities, and the expiration of any labor contract to which it is a party or by which it is bound, which could reasonably be expected to have a Material Adverse Effect;

(iii)   any default by any of the Borrowers or their Subsidiaries under, or termination of, any Material Contract or any Additional Material Contract, or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness of such Person exceeding $7,500,000 (or receipt of any notice claiming such a default or termination or giving notice thereof);

(iv)   termination, suspension or revocation of any Entitlements which could reasonably be expected to have a Material Adverse Effect;

(v)    the existence of any (a) Default, (b) Event of Default or (c) event, circumstance or change that has caused or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect;

(vi)    the occurrence of or forthcoming occurrence of any ERISA Event or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan sponsor concerning an ERISA Event;

(vii)    any judgment against any of the Borrowers or their Subsidiaries in an amount exceeding $7,500,000;

(viii)    any violation or asserted violation by any of the Borrowers or their Subsidiaries of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect or result in liability of such Borrower or Subsidiary in an amount in excess of $7,500,000;

(ix)    any Release on any property owned or occupied by any of the Borrowers or their Subsidiaries if such Release could reasonably be expected to require Cleanup under Environmental Laws at an expected cost of greater than $7,500,000;

(x)    the discharge of such Borrower's independent accountants or any withdrawal of resignation by such independent accountants from their acting in such capacity; in addition, each Borrower shall give the Administrative Agent at least ten (10) Business Days' prior written notice of any change in any Borrower's or Subsidiary Guarantor's chief executive office, legal name or jurisdiction of organization;

(xi)    copies of any Tax assessments in an amount in excess of $7,500,000; and

(xii)    such other information and data with respect to such Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lender.

5.3    **Financial Statements and Other Reports.**

Maintain all necessary and proper books and records including a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP. Deliver to the Administrative Agent for distribution to each Lender:

(i)    Quarterly Financials: as soon as available and in any event within forty five (45) days after the end of each Fiscal Quarter (other than the fourth Fiscal Quarter of any Fiscal Year), commencing with the Fiscal Quarter ending September 30, 2005, (a) the respective combined consolidated balance sheets of Sagebrush and its Subsidiaries and Affiliates, as at the end of such Fiscal Quarter and the related combined consolidated statements of income and statement of cash flows of Sagebrush and its Subsidiaries and Affiliates for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth, (x) supplemental consolidating schedules reflecting (1) the consolidated balance sheets of the Borrowers and their Subsidiaries as at the end of such Fiscal Quarter, and the related consolidated statements of income and statement of cash flows of the Borrowers and their Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, (2) the consolidated balance sheets of

71

Subsidiaries and Affiliates of Sagebrush that are not Loan Parties for such Fiscal Quarter and the related consolidated statements of income and statement of cash flows of the Subsidiaries and Affiliates of Sagebrush that are not Loan Parties for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, (3) eliminations for such period and (4) consolidating schedules for such period and, (y) in the case of statements of income only, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year (provided that for the third Fiscal Quarter of 2005 and the first and second Fiscal Quarters of 2006, comparative statements of income shall be required solely for Sagebrush and its Subsidiaries and Affiliates) and the corresponding financial results from the Financial Plan for the current Fiscal Year, all prepared in accordance with GAAP (other than the financial results from the Financial Plan, which shall be prepared in accordance with customary accounting practices) and in reasonable detail and certified by the chief financial officer of Sagebrush and each Borrower that they fairly present, in all material respects, (1) the financial condition of Sagebrush and its Subsidiaries and Affiliates and (2) the financial condition of the Borrowers and their Subsidiaries, as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of the Borrowers and their Subsidiaries, in each case, taken as a whole, for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, which report shall include a summary describing (1) the number of real property parcels sold during such Fiscal Quarter with corresponding revenue and average price calculations, (2) the number of real property parcels constituting inventory backlog at the end of such Fiscal Quarter with corresponding revenue and average price calculations, (3) by subdivision, the number of real property parcels sold to date on a cumulative basis, and the remaining number of real property parcels constituting inventory, and (4) the number of Homesites completed and under construction at the end of such Fiscal Quarter;

(ii)     Year-End Financials: as soon as available and in any event within ninety (90) days (or, in the case of the Fiscal Year ending December 31, 2005, one hundred-twenty (120) days) after the end of each Fiscal Year, (a) the respective audited combined consolidated balance sheets of Sagebrush and its Subsidiaries and Affiliates, as at the end of such Fiscal Year and the related audited consolidated and unaudited consolidating statements of income and statement of cash flows of each for such Fiscal Year (which shall also contain reviewed but unaudited supplemental consolidating schedules reflecting (1) the consolidated balance sheets of the Borrowers and their Subsidiaries as at the end of such Fiscal Year, and the related consolidated statements of income and statement of cash flows of the Borrowers and their Subsidiaries for such Fiscal Year, (2) the consolidated balance sheets of Subsidiaries and Affiliates of Sagebrush that are not Loan Parties for such Fiscal Year and the related consolidated statements of income and statement of cash flows of the Subsidiaries and Affiliates of Sagebrush that are not Loan Parties for such Fiscal Year, (3) eliminations for such period and (4) consolidating schedules for such period, setting forth, in the case of statements of income only, in comparative form the corresponding figures for the previous Fiscal Year and the corresponding financial results from the Financial Plan for the Fiscal Year covered by such financial statements, all prepared in accordance with GAAP (other than the financial results from the Financial Plan, which shall be prepared in accordance with customary accounting practices) and in reasonable detail and certified by the chief financial officer of Sagebrush and each Borrower that they fairly present, in all material respects, (x) the financial condition of Sagebrush and its Subsidiaries and Affiliates and (y) the financial condition of the Borrowers and their Subsidiaries, as at the dates indicated and the results of their operations and their cash flows for the periods indicated; (b) a narrative report describing the operations of the Borrowers and their Subsidiaries, in each case,

72

taken as a whole, for such Fiscal Year, which report shall include a summary describing (1) the number of real property parcels sold during such Fiscal Year with corresponding revenue and average price calculations, (2) the number of real property parcels constituting inventory backlog at the end of such Fiscal Year with corresponding revenue and average price calculations, (3) by subdivision, the number of real property parcels sold to date on a cumulative basis, and the remaining number of real property parcels constituting inventory, and (4) the number of Homesites completed and under construction at the end of such Fiscal Year; and (c) in the case of such combined consolidated financial statements of Sagebrush and its Subsidiaries and Affiliates, a report thereon of independent certified public accountants of recognized national standing selected by Sagebrush and the Borrowers and reasonably satisfactory to the Administrative Agent, which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception, and shall state that (x) such consolidated financial statements fairly present, in all material respects, the combined consolidated financial position of Sagebrush and its Subsidiaries and Affiliates as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the audit by such accountants in connection with such combined consolidated financial statements has been made in accordance with generally accepted auditing standards and (y) such schedules have been subject to audit procedures by such accountants;

      (iii)      <u>Officer's Certificates; Compliance Certificates</u>: together with each delivery of financial statements of Sagebrush and its Subsidiaries and Affiliates pursuant (a) to subdivisions (i) and (ii) of this subsection 5.3, an Officer's Certificate of the Borrowers stating that the signer has reviewed the terms of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of Sagebrush and its Subsidiaries and Affiliates during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signer did not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or Event of Default, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action the Borrowers have taken, are taking and propose to take with respect thereto; and (b) to subdivisions (i) and (ii) of this subsection 5.3, a Compliance Certificate demonstrating in reasonable detail (x) compliance during and at the end of the applicable accounting periods with the covenants set forth in subsections 6.6 and 6.16, (y) solely with respect to subdivision (ii) of this subsection 5.3, commencing with the financial statements for the Fiscal Year ending December 31, 2006, the calculation of Excess Cash Flow for the Fiscal Year covered by such financial statements and (z) solely with respect to subdivision (ii) of this subsection 5.3, commencing with the financial statements for the Fiscal Year ending December 31, 2006, the calculation of the Golf Course Operations Deficit Amount for the Fiscal Year covered by such financial statements;

      (iv)      <u>Reconciliation Statements</u>: if, as a result of any change in accounting principles and policies from those used in the preparation of the audited financial statements referred to in subsection 4.14, the consolidated financial statements delivered pursuant to subdivisions (i), (ii) or (x) of this subsection 5.3 will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subsections had no such change in accounting principles and policies been made, then (a) together with the first delivery of financial statements pursuant to subdivision (i), (ii) or (x) of this subsection 5.3 following such change, consolidated financial statements for (y) the current Fiscal Year to the effective date of such change and (z) the two (2) full Fiscal Years immediately preceding the

73

Fiscal Year in which such change is made, in each case prepared on a pro forma basis as if such change had been in effect during such periods and (b) together with each delivery of financial statements pursuant to subdivision (i), (ii) or (x) of this subsection 5.3 following such change, a written statement of the chief accounting officer or chief financial officer of each Borrower setting forth the differences which would have resulted if such financial statements had been prepared without giving effect to such change, if reasonably requested by the Administrative Agent;

(v) <u>Accountants' Certification</u>: together with each delivery of combined consolidated financial statements of Sagebrush and its Subsidiaries and Affiliates pursuant to subdivision (ii) of this subsection 5.3, a written statement by the independent certified public accountants giving the report thereon (a) stating that their audit has included a reading of the terms of this Agreement and the other Loan Documents as they relate to the covenants set forth in subsection 6.6 and accounting matters and (b) stating whether, in connection with their audit examination, any condition or event, insofar as such condition or event relates to the covenants set forth in subsection 6.6 or accounting matters, that constitutes an Default or Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof; <u>provided</u> that such accountants shall not be liable by reason of any failure to obtain knowledge of any such Default or Event of Default that would not be disclosed in the course of their audit examination;

(vi) <u>Accountants' Reports</u>: promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to Sagebrush, its Subsidiaries and/or Affiliates by a national independent certified public accountants in connection with each annual, interim or special audit of the financial statements of Sagebrush and its Subsidiaries and Affiliates made by such accountants, including, without limitation, any comment letter submitted by such accountants to management in connection with their annual audit;

(vii) <u>Press Releases</u>: promptly upon their becoming available, copies of all press releases and other statements made available generally by the Borrowers or any of their Subsidiaries to the public concerning material developments in the business of the Borrowers or any of their Subsidiaries;

(viii) <u>Casualty</u>: promptly upon the occurrence of any casualty involving any property of the Borrowers or any of their Subsidiaries involving a loss that could reasonably be expected to exceed $7,500,000, written notice with sufficient detail describing the casualty and the extent to which any losses resulting from such casualty will be covered by insurance;

(ix) <u>Appraisal Updates</u>: together with each delivery of financial statements of Sagebrush and its Subsidiaries and Affiliates pursuant to subdivision (i) of this subsection 5.3, a Qualified Appraisal Update that provides an Appraised Value of the remaining portion of any Real Property Collateral (x) included in the Initial Appraisal or the most recent prior Qualified Appraisal Update, as applicable, or (y) acquired for a purchase price greater than or equal to $35,000,000 but not included in the Initial Appraisal or the most recent prior Qualified Appraisal Update, as applicable, effective as of the last day of the preceding Fiscal Quarter; and together with each delivery of financial statements of Sagebrush, the Borrowers and their Subsidiaries pursuant to subdivision (ii) of this subsection 5.3, a Qualified Appraisal Update that provides an Appraised Value of the remaining portion of all Real Property Collateral effective as of the last day of the preceding Fiscal Year; <u>provided</u> that no Qualified Appraisal Update shall include any Real Property Collateral that (a) was not included in the Initial Appraisal or the most recent prior

Qualified Appraisal Update, as applicable, and (b) with respect to which the Appraiser, as determined in its sole discretion, has not had adequate time and/or has not received documentation and other information sufficient to allow the Appraiser to determine the "Total Net Value" (in a manner consistent with the determination thereof and methodology used in the Initial Appraisal) of such Real Property Collateral for purposes of such Qualified Appraisal Update;

(x) Financial Plan Updates and Supplements: (a) as soon as practicable and in any event no later than ninety (90) days after the end of each Fiscal Year (commencing with the Fiscal Year ended December 31, 2006; provided that a supplement to the Financial Plan containing quarterly financial projections for the 2006 Fiscal Year shall be delivered to the Administrative Agent no later than ninety (90) days after the end of the 2005 Fiscal Year), an updated Financial Plan for the next succeeding Fiscal Year, including, without limitation, forecasted quarterly financial results of the Borrowers and their Subsidiaries for such Fiscal Year, together with an Officer's Certificate demonstrating compliance with the covenants set forth in subsection 6.6, prepared on a pro forma basis to give effect to such forecasted financial results for such Fiscal Year and an explanation of the assumptions on which such forecasts are based and such other information and projections as the Administrative Agent may reasonably request, and (b) not less than ninety (90) days after the initiation, acquisition or assumption of any Material Additional Project, a supplement to the Financial Plan setting forth capital expenditure budgets and operating plans for such Material Additional Project;

(xi) Events of Default, etc.: promptly upon any Responsible Officer obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default, (b) that any Person has given any written notice to the Borrowers or any of their Subsidiaries or taken any other action that could reasonably be expected to have a material adverse effect on the Borrowers or any of their Subsidiaries with respect to a claimed default or event or condition of the type referred to in subsection 7.6 or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrowers (or applicable Subsidiaries) have taken, are taking and propose to take with respect thereto;

(xii) Litigation or Other Proceedings: (a) promptly upon any Responsible Officer obtaining knowledge of (x) the institution of, or written threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Borrowers or any of their Subsidiaries or any property of the Borrowers or any of their Subsidiaries (collectively, "**Proceedings**") not previously disclosed in writing by the Borrowers to the Lenders or (y) any material development in any Proceeding that, in any case:

(a) could reasonably be expected to have a Material Adverse Effect; or

(b) seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the Transactions or the other transactions contemplated hereby;

75

written notice thereof together with such other information as may be reasonably available to the Borrowers and as the Borrowers and their counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty-five (45) days after the end of each Fiscal Quarter of the Borrowers, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrowers or any of their Subsidiaries equal to or greater than $7,500,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and its counsel to evaluate any of such Proceedings; provided, however, that the Borrowers and their counsel may withhold information if in their reasonable determination, disclosure of such information would jeopardize the attorney-client privilege with respect to such Proceeding;

(xiii)   ERISA Events:  promptly upon the Borrowers becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrowers or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

(xiv)   ERISA Notices: with reasonable promptness, copies of (a) all written notices received by the Borrowers or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

(xv)   Insurance: as soon as practicable and in any event by the last day of each Fiscal Year, a certificate in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such report by the Borrowers and their Subsidiaries and all material insurance coverage planned to be maintained by the Borrowers and their Subsidiaries in the immediately succeeding Fiscal Year;

(xvi)   Environmental Audits and Reports: promptly upon their becoming available, copies of all environmental audits and reports, whether prepared by personnel of the Borrowers or any of their Subsidiaries or by independent consultants, with respect to environmental matters affecting any property owned or operated by the Borrowers or their Subsidiaries or which relate to any Environmental Liabilities of the Borrowers or its Subsidiaries, to the extent reflecting any matters which, in any such case, could reasonably be expected to result in a Material Environmental Liability;

(xvii)   Regulatory Notices: as soon as practicable, notification of any change in any law, rule or regulation relating to the business of the Borrowers and their Subsidiaries which could reasonably be expected to have a Material Adverse Effect;

(xviii)   Material Contracts: (a) concurrently with each delivery of quarterly financial statements, and within forty-five (45) days after the end of each Fiscal Year, a report indicating any Material Contract or Additional Material Contract that terminated or expired, or that was Modified in any manner which is materially adverse to the Borrowers and their Subsidiaries during the quarterly period then last ended, and indicating any Additional Material Contracts entered into by the Borrowers or any of their Subsidiaries during such quarterly period (and, in the case of any termination or expiration, or Modification of an Additional Material Contract, or

the entering into of any Additional Material Contract, a description in reasonable detail of the material terms thereof) and (b) promptly after any notice or other communication is delivered by any party to any Material Contract or any Additional Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter that could reasonably be expected to have adverse financial consequences to the Borrowers or any of their Subsidiaries in excess of $7,500,000 or (y) any other non-financial matter which could reasonably be expected to have material adverse consequences to the business of the Borrowers and their Subsidiaries (whether or not constituting a Material Adverse Effect), notice and a copy thereof;

(xix)   Price Lists: together with each delivery of financial statements of Sagebrush, the Borrowers and their Subsidiaries pursuant to subdivisions (i) and (ii) of this subsection 5.3, a current price list setting forth the current or proposed, as applicable, sale price for each Speculative Housing Unit constituting Standing Inventory;

(xx)   Monthly Sales Reports: within five (5) Business Days after the end of each month, deliver a sales report in form and substance reasonably acceptable to the Administrative Agent setting forth a summary describing (1) the number of real property parcels sold during such month with corresponding revenue and average price calculations, (2) the number of real property parcels constituting inventory backlog at the end of such month with corresponding revenue and average price calculations, (3) by subdivision, the number of real property parcels sold to date on a cumulative basis, and the remaining number of real property parcels constituting inventory, and (4) the number of Homesites completed and under construction at the end of such month; and

(xxi)   Other Information: with reasonable promptness, such other information and data with respect to the Borrowers or any of their Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lenders, and such other documentation, information and certifications described in subsection 3.1U as from time to time requested by the Administrative Agent or any Lender.

**5.4   Corporate Existence.**

At all times preserve and keep in full force and effect its organizational existence (except to the extent permitted by subsection 6.7) and all rights and franchises material to the business of the Borrowers and their Subsidiaries (on a consolidated basis).

**5.5   Payment of Taxes and Claims; Tax Consolidation.**

**A.** Pay all income and other material taxes, assessments (including, without limitation, Special Taxes) and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty accrues thereon, and all material claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; provided that no such tax, charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefore.

**B.** Not file or consent to the filing of any consolidated, combined or other similar income tax return with any Person (other than the Borrowers and Subsidiaries of the Borrowers) (it being expressly understood that each direct and indirect equity holder of the Borrowers may file income tax returns that

77

include such equity holder's share of the financial results of the Borrowers and their Subsidiaries as may be required under Applicable Law).

### 5.6 Maintenance of Properties; Insurance.

Maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrowers and their Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof. Maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds and with respect to liability substantially similar to such insurance maintained as of the Effective Date. Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Secured Parties as additional insured and as the loss payee thereunder for all losses, subject to application of proceeds as required by subsection 2.4B(iii)(c), each such policy of liability insurance coverage shall name the Collateral Agent, for the benefit of the Secured Parties, as additional insureds, and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy.

### 5.7 Lender Meeting.

Upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and the Lenders at least once during each Fiscal Year (and will participate in such other meetings at such other times as the Borrowers and the Administrative Agent may agree) to be held at the Borrowers' corporate offices (or such other location as may be agreed to by the Borrowers and the Administrative Agent) at such time as may be agreed to by the Borrowers and the Administrative Agent.

### 5.8 Compliance with Laws, etc.

Comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other non-compliances, could reasonably be expected to cause a Material Adverse Effect.

### 5.9 Environmental Disclosure and Inspection.

**A.** Exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws, except for any such noncompliance which could not reasonably be expected to result in a Material Environmental Liability.

**B.** The Borrowers agree that the Administrative Agent may, from time to time, retain, at the Borrowers' expense, an independent professional consultant reasonably acceptable to the Borrowers to review any report relating to Hazardous Materials prepared by or for the Borrowers and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances) of any Real Property Asset currently owned, leased, operated or used by the Borrowers or any of their Subsidiaries, if (x) a Default or an Event of Default shall have occurred and be continuing or (y) the Administrative Agent reasonably believes (1) that an occurrence relating to such Real Property Asset is likely to give rise to an Environmental Liability or (2) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur, which could, in either such case, reasonably be expected to result in a Material Environmental Liability. The Borrowers shall use their

78

reasonable efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrowers, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrowers or any of their Subsidiaries to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation. Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrowers and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such Real Property Asset.

**C.** Promptly advise the Administrative Agent in writing and in reasonable detail of (i) any Release or threatened Release of any Hazardous Materials, or to the Borrowers' Knowledge any tenants under any leases or occupancy agreements affecting any portion of any Real Property Asset, required to be reported to any federal, state, local or foreign governmental or regulatory agency under any applicable Environmental Laws, (ii) any and all written communications with respect to any pending or threatened Environmental Claims and any and all material written communications with respect to any Release or threatened Release of Hazardous Materials, in any case, the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iii) any Cleanup performed by the Borrowers, any Subsidiary or any other Person in response to any Hazardous Materials on, under or about any Real Property Asset, the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iv) any Borrower's or any Subsidiary's discovery of any occurrence or condition on any property that could reasonably be expected to cause any Real Property Asset to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws and (v) any written request for information from any governmental agency that suggests such agency is investigating facts, conditions, events or circumstances which have a reasonable possibility of giving rise to a Material Environmental Liability.

**D.** Promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrowers or any of their Subsidiaries that could reasonably be expected to expose the Borrowers or any of their Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrowers or any of their Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrowers or any of their Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrowers and their Subsidiaries as of the Effective Date.

**E.** At their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this subsection 5.9.

**5.10** **Remedial Action Regarding Hazardous Materials.**

Promptly take any and all necessary or prudent Cleanup in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset under Environmental Laws and Governmental Authorizations. In the event the Borrowers or any of their Subsidiaries undertakes any Cleanup with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrowers or such Subsidiary shall conduct and complete such Cleanup in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrowers' or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested. In the event Borrowers shall fail timely to commence or cause to be commenced or fail diligently to

79

prosecute to completion such Cleanup, Agent or Lenders may, but shall not be obligated to, cause such Cleanup to be performed, and all costs and expenses (including, without limitation, attorneys' and consultants' fees, charges and disbursements) thereof or incurred by Agent and Lenders in connection therewith shall be paid promptly by Borrowers with interest thereon at the rate equal to 2% per annum in excess of the interest rates otherwise payable under this Agreement for Base Rate Loans.

**5.11** **Additional Collateral; Execution of Subsidiary Guaranty and Collateral Documents by Future Subsidiaries.**

**A.** In the event that any Borrower Entity acquires any property after the Effective Date (other than property described in subsection 5.11B and other than personal property not required to be perfected pursuant to the Collateral Documents) as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (i) notify the Administrative Agent of that fact, (ii) execute and deliver (or cause to be executed and delivered (and, in the case of any documents, instruments or consents to be executed by a Person that is not a Borrower Entity or any Affiliate thereof, use commercially reasonable efforts to obtain)) to the Administrative Agent and the Collateral Agent, such amendments to the Pledge and Security Agreement and/or each other applicable Collateral Document, and take all such further action and execute all such further documents and instruments as any Agent may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in: (a) any such personal property assets; (b) any such owned Real Property Assets and any development agreements (or other similar agreements) related thereto; and (c) any such leasehold interests, the fair market value of which exceeds, individually or in the aggregate, $7,500,000, as reasonably determined by the Administrative Agent. If and to the extent requested by the Administrative Agent, the Borrowers shall deliver to the Administrative Agent, together with such Loan Documents, a favorable opinion of counsel to the Borrower Entities, that is reasonably satisfactory to the Administrative Agent and its counsel, as to (a) the valid existence and good standing of such Borrower Entity, (b) the due authorization, execution and delivery by such Borrower Entity of such Collateral Documents to which it is a party, (c) the enforceability of such Collateral Documents against such Borrower Entity, (d) the validity and perfection of the security interests granted by such Borrower Entity in favor of the Collateral Agent pursuant to the Collateral Documents and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.

**B.** In the event that any Person becomes a Subsidiary of the Borrowers (other than any Joint Venture that Investments have been made in under subsection 6.3(x)), promptly notify the Administrative Agent of that fact and, cause such Subsidiary, no later than ten (10) Business Days (or such longer period of time as the Administrative Agent shall agree) after it becomes a Subsidiary, to execute and deliver to the Administrative Agent and the Collateral Agent a counterpart of the Subsidiary Guaranty and the Pledge and Security Agreement and each other applicable Collateral Document, and to take all such further action and execute (and, in the case of any documents, instruments or consents to be executed by a Person that is not a Borrower Entity or any Affiliate thereof, use commercially reasonable efforts to obtain) all such further documents and instruments as any Agent may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in all of the: (a) personal property assets of such Subsidiary; (b) Real Property Assets owned by such Subsidiary; and (c) leasehold interests of such Subsidiary, the fair market value of which exceeds, individually or in the aggregate, $7,500,000, as reasonably determined by the Administrative Agent (such documents and instruments required to be executed and delivered pursuant to this subsection 5.11B, the "**Subsidiary Loan Documents**"); provided that no SPE Subsidiary shall be required to deliver any Subsidiary Loan Documents prior to three Business Days after the closing of