escrow in connection with the acquisition of interests in real property by such SPE Subsidiary pursuant to the exercise of an option by such SPE Subsidiary or any Affiliate thereof under the Tuscany Option Agreement. In addition, the Borrowers shall pledge (if they are the direct owner of Capital Stock of such Subsidiary) or shall cause each of their applicable Subsidiaries to pledge (if any of such other Subsidiaries is the direct owner of Capital Stock of such Subsidiary, each such owner, whether the Borrowers or any of their other Subsidiaries, the "**Pledging Parent**") all of the Capital Stock of such Pledging Parent's Subsidiary to the Collateral Agent pursuant to the applicable Collateral Documents and to take all such further action and execute all such further documents and instruments as may be required or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in such Capital Stock. Each SPE Subsidiary shall be required to deliver to the Administrative Agent and the Collateral Agent, no later than three (3) Business Days after the closing of escrow in connection with the acquisition of an interest in real property by such SPE Subsidiary pursuant to the exercise of an option by such SPE Subsidiary or any Affiliate thereof under the Tuscany Option Agreement, Subsidiary Loan Documents, including a counterpart of the Subsidiary Guaranty, the Pledge and Security Agreement and a Mortgage with respect to all Real Property Assets owned any such SPE Subsidiary. The Borrowers shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing the Subsidiary Guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such Subsidiary Guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded except to the extent reflected therein and (ii) if and to the extent requested by the Administrative Agent, a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Administrative Agent and its counsel, as to (a) the valid existence and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such Subsidiary Guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such Subsidiary Guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the Pledging Parent of such Subsidiary in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel. In addition, the Borrowers shall promptly deliver a supplement to <u>Schedule 4.1</u> to the Administrative Agent if any Subsidiary is created or acquired.

      **C.** If requested by the Collateral Agent, with respect to each Real Property Asset that is subject to a Mortgage pursuant to subsection 5.11A or subsection 5.11B, provide (and in the case of the following clause (v) use commercially reasonable efforts to provide) the Collateral Agent with (i) Mortgagee Policies of the type described in subsection 3.1G(iii) covering such Real Property Collateral in an amount at least equal to the purchase price of such Real Property Collateral (or such other amount as shall be reasonably specified by the Collateral Agent), (ii) an ALTA/ACSM survey with respect to such Real Property Collateral dated a date, and prepared by a Person and in form and substance, reasonably satisfactory to the Collateral Agent, (iii) environmental reports of the type described in subsection 3.1N with respect to such Real Property Collateral dated a date, and in form and substance reasonably

81

satisfactory to the Collateral Agent, (iv) title reports issued by the Title Company with respect to such Real Property Collateral, dated a date, and in form and substance, satisfactory to the Collateral Agent (and which may include Permitted Encumbrances), and (v) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with the Mortgages relating to such Real Property Collateral, in form and substance reasonably satisfactory to the Collateral Agent.

**5.12   Interest Rate Protection.**

In the case of the Loan Parties, commencing not later than one hundred-eighty (180) days after the Effective Date, maintain in effect one or more Hedge Agreements in form and substance satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the sum of the aggregate outstanding principal amount of all Loans and Second Lien Loans. Such Hedge Agreements shall be maintained for not less than three (3) years in a form and with a Qualified Counterparty approved by the Administrative Agent (such approval not to be unreasonably withheld).

**5.13   Further Assurances.**

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, each Borrower will, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents and to provide for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents. In furtherance and not in limitation of the foregoing, the Borrowers shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Subsidiary Guarantors and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of this Agreement) of the Borrowers and their Subsidiaries.

**5.14   Title.**

Each of the Borrowers shall warrant and defend (a) its title to the Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity, perfection and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. The Borrowers shall reimburse each Agent for any costs or expenses (including reasonable attorneys' fees and court costs) incurred by such Agent if an interest in any of the Collateral, other than as permitted hereunder, is claimed by another Person.

**5.15   Maintenance of Entitlements; Development Agreements.**

Warrant and defend, and otherwise maintain, all of the material Entitlements obtained by any of the Borrowers or any of their Subsidiaries in connection with any Real Property Collateral as necessary (i) for the development of Rhodes Ranch, Tuscany, South West Ranch, Spanish Hills and any Additional Project with an appraised value in excess of $35,000,000, as contemplated in all material respects by (a) (x) in the case of Rhodes Ranch, Tuscany, South West Ranch and Spanish Hills, the Initial Appraisal or

(y) in the case of any such Additional Project, the first Qualified Appraisal Update in which such Additional Project is included, (b) the Development Agreements and/or (c) the Effective Date Projections and (ii) to ensure each Project is in compliance in all material respects with Applicable Laws. The Borrowers and their Subsidiaries shall on a timely basis obtain all material Entitlements that have not been obtained as of the Effective Date as necessary (i) for the development of Rhodes Ranch, Tuscany, South West Ranch, Spanish Hills and any Additional Project with an appraised value in excess of $35,000,000 as contemplated in all material respects by (a) (x) in the case of Rhodes Ranch, Tuscany, South West Ranch and Spanish Hills, the Initial Appraisal or (y) in the case of any such Additional Project, the first Qualified Appraisal Update in which such Additional Project is included, (b) the Development Agreements and/or (c) the Effective Date Projections and (ii) to ensure each Project is in compliance in all material respects with Applicable Laws. To the extent any material Entitlements (including, without limitation, the terms of the Development Agreements) require any obligations or conditions to be fulfilled by the Borrowers or any of their Subsidiaries, the Borrowers will perform (or caused to be performed) such obligations or conditions.

**5.16    Interest Reserve Account.**

On the Effective Date, pay or cause to be paid directly into the Interest Reserve Account an aggregate amount equal to $50,000,000 and maintain such Interest Reserve Account until the one year anniversary of the Effective Date; provided the Borrowers shall not withdraw or cause the withdrawal of any amounts therein during such period other than for the application of amounts towards interest payments in respect of the Loans pursuant to subsection 2.4D(i) and interest payments on the Second Lien Loans.

**5.17    Golf Course Equity Payments.**

In the event that there shall exist a Golf Course Operations Deficit Amount for any Fiscal Year after the Fiscal Year ending December 31, 2005, the Borrowers shall cause Sagebrush to make a capital contribution to the Borrowers in an amount equal to such Golf Course Operations Deficit Amount for such Fiscal Year (and the Borrowers shall designate any amounts received in connection therewith as "Golf Course Equity Payments" within two Business Days of any such capital contribution, in a written notice to the Administrative Agent (such capital contribution so designated, a "**Golf Course Equity Payment**")) no later than the date upon which the Borrowers are required to deliver financial statements under subsection 5.3(ii) with respect to the applicable Fiscal Year. The Borrowers shall provide a detailed calculation of the existence (or absence) of a Golf Course Operations Deficit Amount in the Compliance Certificate delivered pursuant to subsection 5.3(iii) with respect to such Fiscal Year.

**5.18    Credit Rating.**

Use commercially reasonable efforts to maintain at all times public credit ratings by Moody's and S&P with respect to the Loans.

**5.19    Post-Closing Covenants.**

Deliver or cause to be delivered the documents and other agreements set forth on Schedule 5.19 within the time frames specified on such Schedule 5.19.

# SECTION 6.
# NEGATIVE COVENANTS

Each of the Borrowers covenants and agrees that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations, each of the Borrowers shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1    Indebtedness.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that each of the Borrowers and their Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)    Each of the Loan Parties may become and remain liable with respect to its respective Obligations pursuant to the terms of this Agreement and the other Loan Documents;

(ii)    Each of the applicable Loan Parties may remain liable for the Permitted Existing Indebtedness or the Refinancing of any such Permitted Existing Indebtedness; <u>provided</u> that any such Refinancing must not do any of the following:  (i) change the obligor on or guarantors of such Indebtedness; (ii) increase the principal amount of such Indebtedness beyond the then existing balance (except (x) by an amount equal to the premium on the principal amount paid and fees and expenses reasonably incurred in connection with any such Refinancing and (y) with respect to revolving Existing Indebtedness identified on <u>Schedule 1.1(c)</u>, the principal amount of such Indebtedness may be increased up to the commitment amount identified on such <u>Schedule 1.1(c)</u>); (iii) result in the maturity of the principal amount of such Indebtedness being earlier than the maturity of the Indebtedness being Refinanced; or (iv) extend any security interests beyond the assets securing the Indebtedness being Refinanced;

(iii)    The Borrowers and their Subsidiaries may become and remain liable after the Effective Date with respect to Indebtedness under Capital Leases capitalized on the consolidated balance sheet of the Borrowers and purchase money Indebtedness (including mortgage financing) to provide all or a portion of the purchase price or cost of construction of an asset or improvement of an asset; <u>provided</u> that (a) such Indebtedness when incurred shall not exceed the purchase price or cost of construction or improvement of such asset, (b) no such Indebtedness shall be Refinanced for a principal amount in excess of the principal balance outstanding at the time of such Refinancing (except by an amount equal to the premium on the principal amount paid and fees and expenses reasonably incurred in connection with any such Refinancing), (c) such Indebtedness shall be secured only by the asset acquired, constructed or improved with the proceeds of such Indebtedness and (d) the aggregate amount of all Indebtedness outstanding under this clause (iii) at any time shall not exceed $10,000,000;

(iv)    Each of the Borrowers and the Subsidiary Guarantors may become and remain liable with respect to Indebtedness to any other Borrower or Subsidiary Guarantor; <u>provided</u> that, in each case, (a) all such intercompany Indebtedness shall be evidenced by promissory notes which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (b) all such intercompany Indebtedness owed by a Borrower to any of its respective Subsidiaries shall be unsecured and subordinated in right of payment to the payment in full of the

84

Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent and (c) any payment by any Subsidiary under any Subsidiary Guaranty or any payment by a Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by such Borrower or by such Subsidiary to such Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(v) The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under performance, surety, appeal or indemnity bonds (or letters of credit used for these purposes) required by Governmental Authorities in connections with the development of any Project, in each case incurred in the Ordinary Course of Business;

(vi) The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under the Hedge Agreements required under subsection 5.12 and any other Hedge Agreements that are entered into and maintained for *bona fide* hedging activities and are not for speculative purposes;

(vii) The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under Special Improvement Bonds in an amount not to exceed $50,000,000 at any time outstanding plus such greater amount as may be reasonably acceptable to Administrative Agent;

(viii) The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness to Commerce Associates constituting unpaid amounts in respect of "Profit Participation" and "Lot Premium" (as such terms are defined in the Tuscany Option Agreement as of the date hereof) under and in accordance with the terms of the Tuscany Option Agreement;

(ix) Subject to the terms of the Intercreditor Agreement, the Borrowers and the Subsidiary Guarantors may become and remain liable with respect to Indebtedness under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $70,000,000 less the amount of any permanent repayments or prepayments thereof (other than to the extent constituting a refinancing with a replacement second lien credit facility in accordance with the terms of the Intercreditor Agreement);

(x) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the Ordinary Course of Business; provided, however, that such Indebtedness is extinguished within five (5) Business Days of incurrence; and

(xi) The Borrowers and their Subsidiaries may become and remain liable for unsecured Indebtedness in an aggregate principal amount (for the Borrowers and all their Subsidiaries) not to exceed $10,000,000.

6.2  **Liens and Related Matters.**

**A. Prohibition on Liens.** The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable or Capital Stock) of any Borrower or any of its Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or knowingly permit to remain

85

in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the UCC of any state or under any similar recording or notice statute, except (solely with respect to the Borrowers and their Subsidiaries):

   (i)   any Permitted Encumbrances; <u>provided, however,</u> that (a) with respect to any Real Property Collateral, no Permitted Encumbrances except Permitted Title Exceptions and Specified Encumbrances shall be senior or prior to the Liens under the Mortgages; and (b) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of any Borrower or its Subsidiaries;

   (ii)   Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Secured Party pursuant to the terms of this Agreement;

   (iii)   Subject to the terms of the Intercreditor Agreement, Liens on the Collateral securing obligations under the Second Lien Credit Agreement and the other Second Lien Loan Documents;

   (iv)   Liens securing Indebtedness under Capital Leases or purchase money Indebtedness (including mortgage financing) of any Borrower or any Subsidiary incurred in accordance with subsection 6.1, or to Refinance any such Indebtedness incurred solely for such purpose; <u>provided</u> that (a) such Liens shall be created substantially simultaneously with (or within 90 days of) the acquisition or construction of such assets or improvements, or at the time of such Refinancing, as the case may be, (b) such Liens do not at any time encumber any assets other than the assets acquired, constructed or improved with the proceeds of such Indebtedness (or securing such Indebtedness being Refinanced) and (c) in the case of a Refinancing, the amount of Indebtedness secured thereby is not increased (except by an amount equal to the premium on the principal amount paid and fees and expenses reasonably incurred in connection with any such Refinancing);

   (v)   Liens securing Indebtedness permitted by subsection 6.1(vii); and

   (vi)   Precautionary UCC financing statement filings (made by lessors) that do not at any time perfect any Liens, regarding operating leases entered into by the Borrowers and their Subsidiaries.

  **B. No Further Negative Pledges.** Neither any Borrower nor any of its Subsidiaries shall enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Borrower or any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, other than: (i) this Agreement and the other Loan Documents and the Second Lien Credit Agreement and the other Second Lien Loan Documents (including any agreement executed in connection with a refinancing of the Second Lien Credit Agreement permitted hereunder and under the terms of the Intercreditor Agreement); (ii) any agreements governing any purchase money Indebtedness or Capital Leases otherwise permitted by subsection 6.1 (in which case, any prohibition or limitation shall only be effective against the assets financed thereby); (iii) customary non-assignment and non-pledge provisions in any lease or licenses entered into in the Ordinary Course of Business; and (iv) agreements and instruments entered into by Joint Ventures relating to the property of such Joint Venture so long as such prohibitions or limitations do not apply to the Capital Stock in the Joint Venture owned by any Loan Party.

**C. No Restrictions on Distributions, etc.** Except for (a) restrictions existing under the Loan Documents or the Second Lien Loan Documents (including any agreement executed in connection with a refinancing of the Second Lien Credit Agreement permitted hereunder and under the terms of the Intercreditor Agreement), (b) customary contractual non-assignment provisions in leases, licenses or contracts entered into in the Ordinary Course of Business, (c) restrictions governing Capital Leases, mortgage financings or purchase money Indebtedness to the extent such restrictions restrict the transfer of the property subject to such Capital Leases, mortgage financings or purchase money Indebtedness, (d) restrictions imposed on assets to be sold in a manner permitted hereby pending the closing of such sale or disposition, and (e) customary provisions in joint venture agreements and other similar arrangements, each Borrower will not, and will not permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Subsidiary of a Borrower to (i) make Restricted Payments in respect of any such Subsidiary's Capital Stock, (ii) repay or prepay any Indebtedness owed by such Subsidiary to a Borrower or any other Subsidiary of a Borrower, (iii) make loans or advances to, or other Investments in, a Borrower or any other Subsidiary of a Borrower or (iv) transfer any of its property or assets to a Borrower or any other Subsidiary of a Borrower.

**6.3** **Investments.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, make or own any Investments except:

(i)     The Borrowers and their Subsidiaries may continue to own the Investments owned by them as of the Effective Date in any Borrower Entities as listed on Schedule 6.3(i);

(ii)    The Borrowers and the Subsidiary Guarantors may make and own intercompany loans to the extent permitted by subsection 6.1(iv);

(iii)   The Borrowers and their Subsidiaries may make and own Investments in Cash Equivalents;

(iv)    Any Borrower may make Investments in any other Borrower or any Subsidiary Guarantor;

(v)     Any Subsidiary Guarantor may make Investments in any other Subsidiary Guarantor or any Borrower;

(vi)    Investments in Persons not engaged in any material respect in any business other than the ownership and development of real property and whose principal assets consist of interests in real property shall be permitted; provided that each such Investment results in the acquisition of either (I) one hundred percent (100%) of the Capital Stock of such Person or (II) all or substantially all of the assets of such Person and, in the case of clause (I), such acquired Capital Stock is pledged to the Collateral Agent and such Person promptly becomes a Subsidiary Guarantor in accordance with subsection 5.11 and, in either case, grants mortgages and Liens on its assets in favor of the Collateral Agent as required under subsection 5.11;

(vii)   The Borrowers and their Subsidiaries may make and own Investments in Hedge Agreements entered into pursuant to subsection 5.12 and any other Hedge Agreements that are entered into for *bona fide* hedging activities and are not for speculative purposes;

87

(viii)     Investments constituting accounts receivable arising, and trade credit granted, in the Ordinary Course of Business, and any securities received by a Borrower or any of its Subsidiaries in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss, and any prepayments and other credits to suppliers made in the Ordinary Course of Business shall be permitted;

(ix)     The Borrowers and their Subsidiaries may make and own Investments in (A) Restricted Seller Carry-Back Notes (other than Restricted Seller Carry-Back Notes relating to sales of real property interests in Golden Valley) in an aggregate principal amount not to exceed $35,000,000 at any time outstanding, (B) Unrestricted Seller Carry-Back Notes relating to sales of real property interests in Golden Valley in an aggregate principal amount not to exceed $25,000,000 at any time outstanding and (C) Restricted Seller Carry-Back Notes relating to sales of real property interests in Golden Valley, in each case, issued by purchasers in connection with Asset Sales permitted under subsections 6.9(i) and 6.9(ii); provided that not more than $10,000,000 in aggregate principal amount of any such Restricted Seller Carry-Back Notes at any time outstanding may have a maturity date later than (3) years following the date of original issuance thereof; provided that notwithstanding the foregoing that Borrowers and their Subsidiaries may not make and own Investments in Restricted Seller Carry-Back Notes or Unrestricted Seller Carry-Back Notes relating to the sale of single family homes, residential buildings or other housing units; and

(x)     The Borrowers and their Subsidiaries may make other Investments not otherwise permitted above so long as the total amount of all of such Investments does not exceed $7,500,000 in the aggregate at any one time outstanding; provided that no Default or Event of Default has occurred and is continuing or would result therefrom.

**6.4     Contingent Obligations.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)     The Subsidiary Guarantors may become and remain liable with respect to Contingent Obligations arising under the Subsidiary Guaranty;

(ii)     The Borrowers and their Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations of any such Person incurred in connection with Asset Sales permitted by this Agreement;

(iii)     The Borrowers and their Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of any Indebtedness, that if outstanding, would be permitted under subsection 6.1 (including guarantees of Indebtedness under the Second Lien Loan Documents);

(iv)     The Borrowers and their Subsidiaries may become and remain liable with respect to Hedge Agreements entered into pursuant to subsection 5.12 and any other Hedge Agreements that are entered into for *bona fide* hedging activities and are not for speculative purposes;

88

(v) The Borrowers and their Subsidiaries may become and remain liable with respect to letters of credit permitted under subsection 6.1(v);

(vi) The Borrowers and their Subsidiaries may become and remain liable with respect of Contingent Obligations arising in connection with operating leases entered into by a Borrower or any Subsidiary Guarantor from time to time; and

(vii) The Borrowers and their Subsidiaries may become and remain liable with respect to Contingent Obligations granted in favor of title insurers in the Ordinary Course of Business; provided that any such Contingent Obligations entered into by the Borrowers and Subsidiary Guarantors shall apply to Real Property Assets of the Borrowers and Subsidiary Guarantors.

**6.5** **Restricted Payments.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment; provided that:

(i) The Borrowers may make the Permitted Distribution;

(ii) The Borrowers may make Restricted Payments to the holders of the Capital Stock of the Borrowers in an aggregate amount not to exceed the Permitted Restricted Payment Amount; provided that no such Restricted Payments may be made at any time that (1) the Total Debt LTV Ratio for the immediately preceding Fiscal Quarter for which financial statements have been or are required to be delivered under subsection 5.3(i) or (ii) is (or would be, after giving Pro Forma Effect to such Restricted Payment) greater than or equal to thirty percent (30%) or (2) a Default or Event of Default has occurred and is continuing or would result therefrom;

(iii) The Borrowers and their Subsidiaries may make Restricted Payments to the Parents for the purposes of permitting the direct or indirect holders of Capital Stock of the Parents to pay their respective United States federal, state or local income tax obligations with respect to net income allocated to them from the Borrowers and their Subsidiaries (including, without limitation, with respect to tax obligations relating to the Fiscal Years ending December 31, 2004 and December 31, 2005); provided that the amount of such Restricted Payments with respect to any Fiscal Year shall not exceed the Consolidated Net Income of the Borrowers and their Subsidiaries for such Fiscal Year (calculated in accordance with GAAP) multiplied by the Applicable Tax Rate. For purposes of this provision, the net income allocated to the direct or indirect holders of Capital Stock of the Parents from the Borrowers and their Subsidiaries for any Fiscal Year shall be calculated by applying any prior year allocations of losses and credits of the Borrowers and their Subsidiaries not previously used to offset taxes in respect of allocations of net income of the Borrowers and their Subsidiaries;

(iv) The Borrowers may make Restricted Payments to other Borrowers;

(v) Any Subsidiary of a Borrower may make Restricted Payments to the holders of its Capital Stock on a pro rata basis;

(vi) Subject to the terms of the Intercreditor Agreement, (a) the Borrowers may make required payments of interest in respect of the Indebtedness incurred under the Second Lien Credit Agreement, (b) the Borrowers may apply First Lien Declined Amounts to make required payments of principal in respect of the Indebtedness incurred under the Second Lien Credit

Agreement to the extent permitted under subsection 2.4C and (c) the outstanding Indebtedness under the Second Lien Credit Agreement may be Refinanced to the extent permitted under the Intercreditor Agreement; and

(vii) The Borrowers may make Restricted Payments to the Parents in an aggregate amount not to exceed $2,500,000 in any Fiscal Year; provided that no such Restricted Payments may be made at any time that a Default or Event of Default has occurred and is continuing or would result therefrom.

**6.6   Financial Covenants.**

A. **Total Debt LTV Ratio.** The Borrowers shall not permit the ratio (the "**Total Debt LTV Ratio**") of (i) Total Consolidated Indebtedness as of the last day of each Fiscal Quarter (any such day being a "**Calculation Date**"), to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date (giving effect to Assets Sales and dispositions of Real Property Collateral prior to such Calculation Date) to exceed the following ratios:

| Fiscal Quarter Ending | Total Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to December 31, 2007 | 42.5% |
| Thereafter | 35.0% |

B. **First Lien Debt LTV Ratio.** The Borrowers shall not permit the ratio (the "**First Lien Debt LTV Ratio**") of (i) the aggregate outstanding principal amount of the Loans as of any Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of such Calculation Date (giving effect to Assets Sales and dispositions of Real Property Collateral prior to such Calculation Date) to exceed the following ratios:

| Fiscal Quarter Ending | First Lien Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to December 31, 2007 | 32.5% |
| Thereafter | 25.0% |

C. **Interest Coverage Ratio.** The Borrowers shall not permit the ratio (the "**Interest Coverage Ratio**") of (i) Consolidated EBITDA for any Test Period to (ii) Consolidated Interest Expense for such Test Period to be less than the following ratios:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| After the Effective Date and on or prior to March 31, 2006 | 2.25 to 1.00 |
| After March 31, 2006 and on or prior to June 30, 2006 | 2.50 to 1.00 |
| After June 30, 2006 and on or prior to December 31, 2006 | 2.75 to 1.00 |
| After December 31, 2006 and on or prior to December 31, 2007 | 3.50 to 1.00 |
| Thereafter | 4.00 to 1.00 |

D. **Cash on Balance Sheet.** The Borrowers shall not permit the aggregate amount of Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors to be less than $25,000,000 at any time.

90

**6.7** **Restriction on Fundamental Changes.**

Neither any of the Borrowers nor any of their Subsidiaries shall, directly or indirectly, (a) enter into any merger, consolidation, reorganization or recapitalization, or liquidate, wind up or dissolve, or cause or consent to any other Borrower or Subsidiary to enter into any merger, consolidation, reorganization or recapitalization, or to liquidate, wind up or dissolve, or (b) sell all or substantially all of the assets of the Borrowers and their Subsidiaries, on a consolidated basis, in a single transaction or series of related transactions; provided that, notwithstanding the foregoing, (i) any Subsidiary may sell all or substantially all of its assets to a Subsidiary Guarantor or any Borrower, (ii) any Subsidiary Guarantor may merge or consolidate with and into a Borrower; provided such Borrower shall be the continuing or surviving Person, (iii) any Subsidiary Guarantor may merge or consolidate with and into or another Subsidiary Guarantor; provided that a Subsidiary Guarantor that is wholly-owned (directly or indirectly) by the Borrowers shall be the continuing or surviving Person, (iv) any Borrower may merge or consolidate with and into another Borrower, (v) any Subsidiary Guarantor may be liquidated, wound up or dissolved if the continued existence of such Subsidiary Guarantor is not necessary to the continued conduct of the business of the Borrowers and their Subsidiaries as evidenced by an Officer's Certificate delivered to the Administrative Agent, and the assets of such Subsidiary Guarantor are distributed to the Loan Parties, and (vi) a Borrower or a Subsidiary may consummate any merger if such merger is in furtherance of an Investment permitted by subsection 6.3(vi) and, if such transaction involves a Borrower, such Borrower shall be the continuing or surviving Person.

**6.8** **Sale or Discount of Receivables.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, sell with recourse, or discount or otherwise sell for less than the face value thereof, any of its notes or accounts receivable.

**6.9** **Asset Sales.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, engage in any Asset Sales, except as follows:

(i) With respect to Real Property Collateral, a Permitted Collateral Asset Sale, provided that each of the following conditions has been satisfied:

(a) the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale, shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(b) to the extent required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to the Collateral Agent that (i) the priority of the Liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale and (ii) the remaining Real Property Collateral is not subject to any Liens other than Liens permitted by subsection 6.2;

(c) the consideration received from such Asset Sale shall be paid solely in Cash, Restricted Seller Carry-Back Notes and/or Unrestricted Seller Carry-Back Notes

91

(<u>provided</u> that (x) not more than $35,000,000 in aggregate principal amount of Restricted Seller Carry-Back Notes (other than Restricted Seller Carry-Back Notes issued in connection with the sale of property in Golden Valley) and (y) not more than $25,000,000 in aggregate principal amount of Unrestricted Seller Carry-Back Notes, may be outstanding at any time); and

(d)   the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with the release of the applicable portion of the Real Property Collateral from the Lien of the Mortgages, to the extent invoices therefor have been presented.

(ii)   With respect to Real Property Collateral, a Major Collateral Asset Sale, provided that each of the following conditions has been satisfied (as certified by a Responsible Officer):

(a)   no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale) or would result therefrom;

(b)   not less than thirty (30) days' (or such shorter period as is acceptable to the Collateral Agent) prior written notice of the closing of such sale has been provided to the Collateral Agent, together with a true, correct and complete copy of the relevant Qualified Sales Agreement;

(c)   the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale, shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(d)   to the extent required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to the Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Liens permitted by subsection 6.2;

(e)   the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with the release of the applicable portion of the Real Property Collateral from the Lien of the Mortgages, to the extent invoices therefor have been presented;

(f)   the consideration received from such Asset Sale shall be paid solely in Cash, Restricted Seller Carry-Back Notes and/or Unrestricted Seller Carry-Back Notes (<u>provided</u> that (x) not more than $35,000,000 in aggregate principal amount of Restricted Seller Carry-Back Notes (other than Restricted Seller Carry-Back Notes issued in connection with the sale of property in Golden Valley) and (y) not more than

$25,000,000 in aggregate principal amount of Unrestricted Seller Carry-Back Notes, may be outstanding at any time); and

(g) the Collateral Agent shall have received a Qualified Appraisal Update demonstrating the Appraised Value of the remaining Real Property Collateral assuming such Major Collateral Asset Sale is consummated, together with calculations based on the Appraised Value contained in such Qualified Appraisal Update, demonstrating compliance, on a pro forma basis to give effect to the Major Collateral Asset Sale, with the financial covenants set forth in subsection 6.6.

(iii) With respect to Real Property Collateral, a Required Dedication, provided that each of the following conditions has been satisfied (as certified by a Responsible Officer):

(a) no Default or Event of Default shall have occurred and be continuing (other than a Default or an Event of Default that will be cured through the consummation of the proposed Asset Sale) or would result therefrom;

(b) not less than thirty (30) days' (or such shorter period as is acceptable to the Collateral Agent) prior written notice of the closing of such Required Dedication has been provided to the Collateral Agent, together with a true, correct and complete copy of the documentation proposed to consummate the Required Dedication;

(c) the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale, shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(d) to the extent required by the Collateral Agent, the Collateral Agent shall have received a title endorsements or other evidence reasonably satisfactory to the Collateral Agent that the priority of the Liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Required Dedication shall be maintained following such Required Dedication; and

(e) the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with the release of the applicable portion of the Real Property Collateral from the Lien of the Mortgages, to the extent invoices therefor have been presented.

**6.10** **Transactions with Shareholders and Affiliates.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or the making of other disbursements) with any holder of 10% or more of any class of equity Securities of the Borrowers or their Subsidiaries or with any Affiliate of the Borrowers or of any such Subsidiaries or holder (each, an "**Affiliate Transaction**"), on terms that are less favorable to the Borrowers or the Subsidiaries, as the case may be, than those that might be obtained reasonably at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not

93

apply to (i) transactions between or among the Borrowers and any wholly-owned Subsidiary Guarantor or between or among any wholly-owned Subsidiary Guarantors, (ii) reasonable and customary fees paid to, and customary indemnification of, members of the boards of directors (or other governing bodies) of the Borrowers and their Subsidiaries, (iii) the Transactions, (iv) Restricted Payments permitted under this Agreement, (v) transfers of Excluded Real Property Assets to Affiliates of the Borrowers by grant, bargain and sale deed reasonably satisfactory to the Administrative Agent and (vi) transactions described on Schedule 6.10; and provided, further, that (a) with respect to any Affiliate Transaction or series of related Affiliate Transactions for aggregate consideration in excess of $25,000,000 solely involving the purchase and/or sale of interests in real property or the Capital Stock of a Person whose principal assets are comprised of interests in real property, prior to the consummation of such Affiliate Transaction or series of related Affiliate Transactions an appraisal of the interests in real property to be acquired (which shall be an "as is" appraisal) or other consideration to be provided in such Affiliate Transaction shall be provided to the Administrative Agent, together with an Officer's Certificate from the Borrowers certifying that the terms of such Affiliate Transaction are no less favorable to the Borrowers and their Subsidiaries than those that might be obtained reasonably at that time from Persons that are not holders of 10% or more of any class of equity securities of the Borrowers or their Subsidiaries or an Affiliate of the Borrowers or of any such Subsidiaries or holder and (b) with respect to any Affiliate Transaction or series of related Affiliate Transactions for aggregate consideration in excess of $25,000,000 (other than any Affiliate Transaction described in the preceding clause (a) of this proviso), prior to the consummation of such Affiliate Transaction or series of related Affiliate Transactions the Borrowers shall provide to the Administrative Agent a fairness opinion in form and substance reasonably satisfactory to the Administrative Agent that provides, and an Officer's Certificate from the Borrowers certifying, that the terms of such Affiliate Transaction are no less favorable to the Borrowers and their Subsidiaries than those that might be obtained reasonably at that time from Persons that are not holders of 10% or more of any class of equity securities of the Borrowers or their Subsidiaries or an Affiliate of the Borrowers or of any such Subsidiaries or holder (it being expressly understood that the provisions of this proviso shall not be applicable to any transfers of Excluded Real Property Assets to Affiliates of the Borrowers).

**6.11** **Conduct of Business.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, engage in any business other than (i) the businesses engaged in by the Borrowers and their Subsidiaries on the Effective Date and (ii) such other lines of business as may be reasonably related thereto.

**6.12** **Tuscany Option Agreement.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, (a) default in the observance or performance of, or otherwise breach, any (x) material agreement or condition set forth in the Tuscany Option Agreement (including any obligations with respect to the exercise of options or acquisition of land thereunder) or (y) any other agreement or condition set forth in the Tuscany Option Agreement where, or if, in the case of this clause (y), the other parties to the Tuscany Option Agreement are exercising or have exercised any rights or remedies in connection therewith, (b) fail to exercise and enforce each "Option" (as defined in the Tuscany Option Agreement as of the date hereof) (including, without limitation, the failure to deliver any "Option Notice" (as defined in the Tuscany Option Agreement as of the date hereof) within the time periods provided therefor) in accordance with the terms of the Tuscany Option Agreement or (c) fail to consummate the acquisition of each "Option Parcel" (as defined in the Tuscany Option Agreement as of the date hereof) under the Tuscany Option Agreement within the time periods provided thereunder.

**6.13** **Amendments or Waivers of Certain Agreements.**

None of the Borrowers nor their Subsidiaries shall terminate or agree to any Modification to, or waive any of its rights under, any (i) Material Contract or (ii) Organizational Certificates or other Organizational Documents of any of the Borrowers or their Subsidiaries, if such termination, Modification or waiver would reasonably be expected to be materially adverse to the Borrowers and their Subsidiaries, taken as a whole, or any Agent, Lender or other Secured Party. The Borrowers shall not, and shall not permit any of their respective Subsidiaries to, Modify any of the Second Lien Loan Documents, except as permitted by the Intercreditor Agreement.

**6.14** **Fiscal Year.**

Neither any Borrower nor any Subsidiary shall change its Fiscal Year-end from December 31.

**6.15** **Hedge Agreements.**

Neither any of the Borrowers nor any Subsidiary shall enter into any Hedge Agreement, except Hedge Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates) with respect to any interest-bearing liability or investment of any Borrower or any Subsidiary.

**6.16** **Limitation on Standing Inventory.**

If the Total Debt LTV Ratio for the Fiscal Quarter then last ended and for which financial statements have been or are required to be delivered under subsection 5.3(i) or (ii) is greater than or equal to thirty percent (30%), the Borrowers shall not at any time permit the value of Standing Inventory (calculated according to market prices offered to homebuyers less costs of completion) to account for more than five percent (5%) of the Appraised Value of the Real Property Collateral. If the Total Debt LTV Ratio for the Fiscal Quarter then last ended and for which financial statements have been or are required to be delivered under subsection 5.3(i) or (ii) is less than thirty percent (30%) but greater than or equal to twenty-five percent (25%), the Borrowers shall not at any time permit the value of Standing Inventory (calculated according to market prices offered to homebuyers less costs of completion) to account for more than ten percent (10%) of the Appraised Value of the Real Property Collateral.

**6.17** **Limitation on Unentitled Properties.**

Neither any of the Borrowers nor any Subsidiary shall expend more than $25,000,000 in any Fiscal Year (on an aggregate combined basis for the Borrowers and their Subsidiaries collectively) toward the purchase of Real Property Assets which (i) require any Entitlements (other than customary mapping and subdivision approvals to be obtained in the Ordinary Course of Business pursuant to existing zoning or Development Agreements) for the development and sale of residential single family housing or multi-family housing thereon which have not yet been obtained at the time of purchase by or for the benefit of any Borrower or any of their Subsidiaries and (ii) are located further than five miles from any real property development that has all Major Entitlements and that has an existing use (such existing use to be in accordance with Applicable Law and as permitted by all necessary Governmental Authorizations) similar to the intended use of the Real Property Assets proposed to be purchased.

**6.18** **Limitation on Purchase of Real Property Assets.**

Neither any of the Borrowers nor any Subsidiary shall purchase any Real Property Asset that is not located in Arizona, California, Colorado, Idaho, Nevada, New Mexico or Utah.

**6.19** **Permitted SPE Subsidiary Activities.**

Prior to the execution and delivery by an SPE Subsidiary to the Administrative Agent and the Collateral Agent of the Subsidiary Loan Documents required under subsection 5.11B, such SPE Subsidiary shall not (a) engage in any business or activity other than (i) the acquisition and exercise of an option under the Tuscany Option Agreement and (ii) the acquisition of the interests in real property it acquires from Commerce Associates under the Tuscany Option Agreement pursuant to the exercise of such option and (b) own any assets other than (i) the particular option under the Tuscany Option Agreement it acquires, (ii) the interests in real property it acquires from Commerce Associates under the Tuscany Option Agreement pursuant to the exercise of such option and (iii) other assets not to exceed $1,000,000 in the aggregate for all SPE Subsidiaries.

### SECTION 7.
### EVENTS OF DEFAULT

IF any of the following conditions or events ("**Events of Default**") shall occur:

**7.1** **Payment of Obligations.**

The Borrowers shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise) and, in the case of the failure to pay accrued interest, such amount remains unpaid for five (5) Business Days thereafter; or

**7.2** **Misrepresentations.**

Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of any Loan Party, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished; or

**7.3** **Breach of Certain Covenants.**

The Borrowers shall fail or neglect to perform, keep or observe any covenant contained in subsections 5.1, 5.3(xi), 5.4 (but solely to the extent of a Borrower's continued existence, subject to subsection 6.7), 5.15, 5.18 or Section 6 hereof; or

**7.4** **Breach of Other Covenants.**

A Borrower shall fail or neglect to perform, keep or observe any covenant contained in this Agreement not otherwise addressed in this Section 7 and the breach of such other covenant is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes actually known to any Responsible Officer; provided that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 30-day period; or

**7.5** **Default Under Loan Documents.**

Any Borrower or any other Loan Party shall default in the due and punctual observance or performance (taking into account any applicable grace periods) of any liability or obligation to be observed or performed by it under any of the Loan Documents (except as provided in subsections 7.1, 7.2,

7.3 or 7.4); and the breach of such other covenant is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes actually known to any Responsible Officer; provided that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 30-day period; or

**7.6    Other Defaults.**

**A.** There shall occur an event of default under the Second Lien Credit Agreement or any other Second Lien Loan Document; or

**B.** Any Borrower or any other Loan Party shall (i) default in making any payment of any principal of any Indebtedness (including, without limitation, any Contingent Obligation in respect of Indebtedness, but excluding Obligations of the Borrowers under the Loan Documents) on the scheduled or original due date with respect thereto, or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created, or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due, or to be required to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity or (in the case of any such Indebtedness constituting a Contingent Obligation) to become payable or cash collateral in respect thereof to be demanded; provided, that a default, event or condition described in clauses (i), (ii) or (iii) of this subsection 7.6B shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this subsection 7.6B shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $7,500,000; or

**7.7    Insolvency Proceedings.**

Any Insolvency Proceeding shall be commenced by any Loan Party; an Insolvency Proceeding is commenced against any Loan Party and any of the following events occur: such Loan Party consents to the institution of the Insolvency Proceeding against it; the petition commencing the Insolvency Proceeding is not timely controverted by such Loan Party; the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) days after the date of the filing thereof (provided that, in any event, during the pendency of any such period, Lenders shall be relieved from their obligation to make Loans or otherwise extend credit to or for the benefit of the Borrowers hereunder); an interim trustee is appointed to take possession of all or a substantial portion of the properties of such Loan Party or to operate all or any substantial portion of the business of such Loan Party or an order for relief shall have been issued or entered in connection with such Insolvency Proceeding; or any Loan Party shall make an offer of settlement extension or composition to its unsecured creditors generally; or

**7.8    Business Disruption; Condemnation.**

Any Loan Party shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs; or any Loan Party

shall have received (x) written notice of a material default under any Development Agreement in effect on the date hereof or (y) written notice of default, expiration or termination under the Tuscany Option Agreement (in accordance with Section 18.3(c) of the Tuscany Option Agreement or otherwise) and all applicable cure periods under the Tuscany Option Agreement shall have expired; or the Tuscany Option Agreement shall be terminated by any party thereto; or any material part of the Collateral shall be taken through condemnation or a Required Dedication or the Appraised Value of such property shall be materially impaired through condemnation or a Required Dedication; or

7.9     **ERISA.**

An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if a Borrower or any Subsidiary is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from a Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan; or

7.10    **Challenge to Loan Documents; Invalidity.**

Any Loan Party or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to the Collateral Agent, or any Lien created by any of the Collateral Documents shall cease to be enforceable and of the same effect and priority, in each case, to the extent purported to be created thereby, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof; or

7.11    **Judgment.**

One or more judgments or orders for the payment of money (not covered by insurance as to which an insurance company has acknowledged coverage) in an amount that exceeds, individually or in the aggregate, $7,500,000 shall be entered against a Borrower or any other Loan Party and there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

7.12    **Repudiation of or Default Under Subsidiary Guaranty.**

Any Subsidiary Guarantor shall revoke or attempt to revoke the Subsidiary Guaranty signed by such Subsidiary Guarantor, shall repudiate such Subsidiary Guarantor's liability thereunder, or shall be in default under the terms thereof, or shall fail to confirm in writing, promptly after receipt of the Administrative Agent's written request therefor, such Subsidiary Guarantor's ongoing liability under the Subsidiary Guaranty in accordance with the terms thereof; or

7.13    **Criminal Forfeiture.**

Any Loan Party shall be convicted under any criminal law that could lead to a forfeiture of any property of such Loan Party; or

**7.14**    <u>Change of Control</u>.

A Change of Control shall occur.

**THEN** (i) upon the occurrence of any Event of Default described in subsection 7.7, each of (a) the unpaid principal amount of and accrued interest on the Loans, and (b) all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Borrowers, and the Commitments, if not previously terminated, shall terminate, and (ii) upon the occurrence and during the continuation of any other Event of Default, the Administrative Agent may, or shall upon the written request of the Requisite Lenders, by written notice to the Borrowers, declare the unpaid principal amount of and accrued interest on the Loans, and all other Obligations, to be, and the same shall forthwith become, immediately due and payable, and the Commitments, if not previously terminated, shall terminate. Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent or the Collateral Agent may (and shall as directed by the Requisite Lenders) (A) exercise, on behalf of the Lenders, any and all rights and remedies under any Loan Documents; and/or (B) exercise any and all rights, powers and remedies available to the Administrative Agent, the Collateral Agent or the Lenders at law, in equity or otherwise, all of which rights, powers and remedies are cumulative and not exclusive.

**SECTION 8.
AGENTS**

**8.1**    <u>Appointment</u>.

**A.    Appointment Authority.**  Each of the Lenders hereby irrevocably appoints Credit Suisse as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes Credit Suisse, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to Credit Suisse, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrowers or any of their Subsidiaries. The provisions of this Section 8 are solely for the benefit of the Agents and the Lenders, and the Borrowers shall not have rights as third party beneficiaries of any of such provisions; provided that the Borrowers shall be obligated to perform their obligations under this Section 8.

**B.    Appointment of Supplemental Collateral Agents.**  It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "<u>**Supplemental Collateral Agent**</u>" and collectively as "<u>**Supplemental Collateral Agents**</u>").

99

In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent and (ii) the provisions of this Section 8 and of subsection 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

Should any instrument in writing from the Borrowers or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrowers shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent. In case any Supplemental Collateral Agent, or a successor thereto, shall dissolve, die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

8.2    **Rights as a Lender**.

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity. Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary or other Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

8.3    **Exculpatory Provisions**.

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agents (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in subsection 9.5), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law and (iii)  shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the

100