**AMENDMENT NO. 2**
**(First Lien)**

dated as of
April 24, 2008

among

**HERITAGE LAND COMPANY, LLC,**
**THE RHODES COMPANIES, LLC**
**and**
**RHODES RANCH GENERAL PARTNERSHIP,**
**as the Borrowers,**

**THE SUBSIDIARY GUARANTORS PARTY HERETO,**

**THE LENDERS PARTY HERETO,**

**AND**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
**as Administrative Agent and as Collateral Agent**

AMENDMENT NO. 2

dated as of April 24, 2008

Reference is made to the Credit Agreement, dated as of November 21, 2005 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"; capitalized terms used but not defined herein having the meanings set forth therein), among HERITAGE LAND COMPANY, LLC, a Nevada limited liability company ("**Heritage Land**"), THE RHODES COMPANIES, LLC, a Nevada limited liability company ("**Rhodes Companies**"), RHODES RANCH GENERAL PARTNERSHIP, a Nevada general partnership ("**Rhodes GP**" and, collectively with Heritage Land and Rhodes Companies, the "**Borrowers**"), the banks and other financial institutions or entities from time to time party thereto as lenders (the "**Lenders**"), and CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as administrative agent for the Lenders (together with its successors in such capacity, the "**Administrative Agent**"), as collateral agent for the Secured Parties (together with its successors in such capacity, the "**Collateral Agent**") and as syndication agent for the Lenders.

PRELIMINARY STATEMENTS:

WHEREAS, the Borrowers, the Requisite Lenders, the Administrative Agent and the Collateral Agent desire to amend the Credit Agreement as set forth below on and subject to the terms of this Amendment No. 2;

WHEREAS, Events of Default have occurred and are continuing under the Credit Agreement as a result of (i) the failure to comply with the provisions set forth in Section 5.3(ii) of the Credit Agreement with respect to delivery of financial statements for the Fiscal Year ended December 31, 2007 (together with the narrative reports, auditor's reports and all other deliverables required under Section 5.3(ii) to be delivered concurrently therewith) within 90 days after the end of such Fiscal Year, (ii) the failure to comply with the provisions set forth in Section 5.11 in connection with WAZUU Design, LLC, a Nevada limited liability company ("**Wazuu**") having become a Subsidiary of the Borrowers, (iii) the failure to comply with the provisions set forth in Section 6.7 in connection with the dissolution of Wazuu, Palm Gardens Corporation, a Nevada corporation and Arapahoe Cleaning LLC, a Nevada limited liability company and (iv) the failure to deliver the notices required by Sections 5.2(v) and 5.3(xi) in respect of the above referenced Events of Default (the "**Current Events of Default**");

WHEREAS, Events of Default have occurred and are continuing under the Credit Agreement as a result of the (i) failure to comply with the provisions set forth in Section 6.6C of the Credit Agreement with respect to the Interest Coverage Ratio for the Fiscal Year ended December 31, 2007, (ii) failure to comply with the provisions set forth in Section 6.6A of the Credit Agreement with respect to the Total Debt LTV Ratio for the Fiscal Quarter ended March 31, 2008, (iii) failure to comply with the provisions set forth in Section 6.6B of the Credit Agreement with respect to the First Lien Debt LTV Ratio for the Fiscal Quarter ended March 31, 2008, (iv) failure to comply with the provisions set forth in Section 6.6C of the Credit Agreement with respect to the Interest Coverage Ratio for the Fiscal Quarter ended March 31, 2008, (v) failure to comply with the provisions set forth in Section 6.6D of the Credit Agreement with respect to the amount of Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors commencing on March 31, 2008 and continuing through the Amendment No. 2 Effective Date and (vi) the failure to deliver the notices required by Sections 5.2(v) and 5.3(xi) in respect of the above referenced Events of Default (collectively, the "**Financial Covenant Events of Default**"); and

WHEREAS, the Borrowers have requested that the Requisite Lenders waive the Current Events of Default and the Financial Covenant Events of Default.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained (including, but not limited to, the bargained for provisions contained in the Waiver of Stay (as defined below)), the parties hereto agree as follows:

SECTION 1.  <u>Limited Waiver and Release</u>.

(a)  <u>Limited Waiver of Current Events of Default</u>.  Notwithstanding any other provisions of any of the Loan Documents to the contrary, the Requisite Lenders, the Administrative Agent and the Collateral Agent hereby waive the Current Events of Default, <u>provided</u> that the such waiver with respect to the failure to comply with the provisions set forth in Section 5.3(ii) of the Credit Agreement with respect to the delivery of financial statements for the Fiscal Year ended December 31, 2007 is conditioned upon the Borrowers' compliance with the provisions of Section 5.3(ii), as amended hereby, with respect to the delivery of financial statements for the Fiscal Year ended December 31, 2007 (together with the narrative reports, auditor's reports and all other deliverables required under Section 5.3(ii) to be delivered concurrently therewith).

(b)  <u>Limited Waiver of Financial Covenant Events of Default</u>.  Notwithstanding any other provisions of any of the Loan Documents to the contrary, the Requisite Lenders, the Administrative Agent and the Collateral Agent hereby waive the Financial Covenant Events of Default for the period of time commencing on the Amendment No. 2 Effective Date and continuing through and until June 29, 2009.  Notwithstanding anything to the contrary contained herein or in the Loan Documents, on and after June 30, 2009, the waiver by the Requisite Lenders, the Administrative Agent and the Collateral Agent of the Financial Covenant Events of Default shall expire and terminate and each of the Financial Covenant Events of Default shall then and thereafter constitute an Event of Default for all purposes of the Loan Documents and the Lenders and the other Secured Parties shall have the right to exercise all remedies provided for in the Loan Documents and otherwise available at law and in equity with respect thereto. Each Borrower and each other Loan Party hereby acknowledge and agree that nothing contained in this Amendment No. 2 or otherwise shall limit in any respect the exercise of remedies by the Lenders and the other Secured Parties with respect to the Financial Covenant Events of Default on and after June 30, 2009, or constitute to give rise to any agreement or obligation to enter into any further amendment or waiver of the Loan Documents.

SECTION 2.  <u>Amendments to Credit Agreement</u>.

SUBSECTION 2.1.  <u>Amendments to Section 1.1</u>.  Section 1.1 of the Credit Agreement is hereby amended in the following respects:

(a) The definition of "Applicable Base Rate Margin" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended by deleting the phrase "2.50%" in such definition and inserting in lieu thereof:

"6.50%".

(b) The definition of "Applicable Eurodollar Rate Margin" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended by deleting the phrase "3.50%" in such definition and inserting in lieu thereof:

"7.50%".

(c) The definition of "Appraised Value" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

2

"**Appraised Value**" means (i) prior to the Amendment No. 2 Effective Date (and with respect to the Qualified Appraisal Update required to be delivered pursuant to subsection 5.3(ix) in connection with the financial statements for the Fiscal Year ended December 31, 2007), the "Total Net Value" (as determined by the Appraiser in the most recent Qualified Appraisal Update or, until the first Qualified Appraisal Update, the Initial Appraisal) of (a) the Real Property Collateral encumbered by a First Priority Lien of the Mortgages that is included in the most recent Qualified Appraisal Update or, until the first Qualified Appraisal Update, the Initial Appraisal, and (b) if in respect of a period on or prior to December 31, 2007, each parcel of real property owned by Commerce Associates that is subject to a valid purchase option (which remains in full force and effect) in favor of Rhodes Design pursuant to the Tuscany Option Agreement less the "Base Price", "Lot Premium" and "Profit Participation" (as such terms are defined in the Tuscany Option Agreement as of the date hereof) applicable or attributable to each such parcel of real property and any other amounts payable in respect of such parcels of real property pursuant to the Tuscany Option Agreement and any related agreements and (ii) on and after the Amendment No. 2 Effective Date (other than with respect to the Qualified Appraisal Update required to be delivered pursuant to subsection 5.3(ix) in connection with the financial statements for the Fiscal Year ended December 31, 2007), the "as is" appraised value (as determined by the Appraiser in the most recent Qualified Appraisal Update) of the Real Property Collateral.  As of the Effective Date, the Appraised Value of the Real Property Collateral was $1,579,000,000.  "Total Net Value" shall be determined in a manner consistent with the determination thereof and methodology used in the Initial Appraisal.  In all cases, the "as is" appraised value of any Real Property Collateral shall be determined in accordance with the standards and methodology set forth in FIRREA.

(d) The definition of "Excess Cash Flow" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

""**Excess Cash Flow**" means, for any period, without duplication, the sum, if positive, of (a) the sum for such period, without duplication, of (i) Cash from Investments, (ii) Cash from Land Sales, (iii) Cash from Operations and (iv) Cash from Permitted Equipment Sales, <u>minus</u> (b) the sum for such period, without duplication, of (i) Land and Operation Expenses, (ii) Debt Service, the aggregate amount of payments applied to the Loans pursuant to subsection 2.4(B)(ii)(g) and fees paid pursuant to Section 2.3A and (iii) distributions made under subsection 6.5(iii), other than distributions made with respect to tax obligations relating to the tax years ended December 31, 2004 and December 31, 2005."

(e) The definition of "Investments" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended by deleting the phrase "or did not arise from sales to that other Person in the Ordinary Course of Business" set forth therein.

(f) The definition of "Permitted Collateral Asset Sale" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

""**Permitted Collateral Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral in the Ordinary Course of Business pursuant to a Qualified Sales Agreement that does not constitute a Major Collateral Asset Sale, a Specified Type-I Parcel Sale, a Specified Type-II Parcel Sale, a Specified Golf Course Sale or a Permitted Non-Ordinary Course Asset Sale."

(g) The definition of "Qualified Appraisal" set forth in <u>Section 1.1</u> of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

""**Qualified Appraisal**" means (i) prior to the Amendment No. 2 Effective Date (and with respect to the Qualified Appraisal Update required to be delivered pursuant to subsection 5.3(ix) in

3

connection with the financial statements for the Fiscal Year ended December 31, 2007), the Initial Appraisal and any other real estate appraisal conducted in accordance with the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all requirements of Applicable Law applicable to the Administrative Agent undertaken by an Appraiser, and providing an assessment of "Total Net Value" (as defined in the Initial Appraisal) of the remaining Real Property Collateral, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment, and (ii) on and after the Amendment No. 2 Effective Date (other than with respect to the Qualified Appraisal Update required to be delivered pursuant to subsection 5.3(ix) in connection with the financial statements for the Fiscal Year ended December 31, 2007), any "as is" real estate appraisal conducted in compliance with the provisions of FIRREA and all requirements of any Applicable Law applicable to the Administrative Agent undertaken by an Appraiser, and providing an assessment of the "as is" appraised value of the remaining Real Property Collateral, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment."

(h) Section 1.1 of the Credit Agreement is hereby amended by inserting the following new definitions therein in the appropriate alphabetical order:

"**Amendment No. 2**" means the Amendment No. 2 to this Agreement, dated as of April 24, 2008, among the Borrowers, the Subsidiary Guarantors, the Lenders, the Administrative Agent and the Collateral Agent.

"**Amendment No. 2 Effective Date**" means April 24, 2008.

"**Cash from Permitted Equipment Sales**" means, for any period, Cash receipts of the Borrowers and their Subsidiaries from any Permitted Equipment Sale.

"**Consolidated Cash Flow**" means, with respect to the Borrowers and their Subsidiaries, for any Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2008 through the Fiscal Quarter ending December 31, 2009, without duplication, the sum of (a) Cash From Land Sales solely with respect to (i) real estate transactions constituting an arms-length sale for fair market value of single family and multi-family residential units and lots in the Ordinary Course of Business pursuant to a Qualified Sales Agreement and (ii) Permitted Non-Ordinary Course Asset Sales (it being understood and agreed that Cash from Specified Type-I Sales, Specified Type-II Sales and Specified Golf Course Sales shall not be included in the calculation of Consolidated Cash Flow); plus (b) Cash from Operations; plus (c) the proceeds received by the Borrowers (net of legal costs and other related deductions) from the settlement relating to the litigation filed by Rhodes Ranch General Partnership against Richmond American Homes which was initially filed on December 16, 2005 and has been settled for an amount equal to $2,050,000; minus (d) Land and Operating Expenses.

"**Cumulative Consolidated Cash Flow**" means, for any period, an amount equal to the aggregate cumulative amount of Consolidated Cash Flow for each Fiscal Quarter (giving effect to negative amounts of Consolidated Cash Flow) commencing with the Fiscal Quarter ending March 31, 2008 through the Fiscal Quarter most recently ended for which financial statements have been or are required to have been delivered pursuant to Section 5.3(i) and Section 5.3(ii).

"**Excess Interest Amount**" has the meaning assigned to that term in Section 2.2A.

"**FIRREA**" means Federal Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time, and any successor statute.

4

"**Fort Apache Post Commercial Site**" means those certain commercial developments located in Clark County commonly known as Fort Apache/Post Commercial Site, as depicted on the maps attached hereto as Schedule 1.1(e).

"**Golden Valley Parcels**" means those certain parcels of land totaling approximately 1,297.5 acres located in Mojave County, Arizona, as depicted on the maps attached hereto as Schedule 1.1(g).

"**I-215 Parcels**" means those certain parcels of undeveloped mixed-use land totaling approximately 48.7 acres located in Clark County, Nevada, adjacent to the I-215 freeway in Las Vegas, Nevada, as depicted on the maps attached hereto as Schedule 1.1(f).

"**Jim Rhodes Guaranty**" means an agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) in form and substance satisfactory to the Administrative Agent among Rhodes and the Administrative Agent, whereby Rhodes personally, irrevocably and unconditionally (subject to the second proviso below) guarantees, for the benefit of the Lenders and the other Secured Parties, that the Rhodes Ranch Golf Course shall be sold (x) pursuant to the terms and at the time set forth under the Jim Rhodes Purchase Agreement or (y) under another Asset Sale to a Person that is not an Affiliate of the Borrowers that, in each case, (i) closes on or prior to September 30, 2008 (the "**Threshold Date**"), (ii) is for a purchase price that is no less than the Rhodes Ranch Golf Course Purchase Price and (iii) is otherwise permitted under Section 6.9 and Section 6.10; provided, that the Threshold Date shall be extended to a date that is the earlier of (I) December 31, 2008 or (II) the first date upon which either (1) Rhodes ceases to actively and diligently seek to arrange the purchase of the Rhodes Ranch Golf Course by a third party or (2) an Event of Default under Section 7.1 has occurred and is continuing other than such Event of Default caused by the acceleration of the Obligations due to a non-monetary Event of Default; provided, further, that the Jim Rhodes Guaranty shall require Rhodes to repay the Loans in an amount equal to the Rhodes Ranch Golf Course Purchase Price (whether or not the Rhodes Ranch Golf Course is transferred to Rhodes or any other Person at such time) in the event that (a) a sale of the Rhodes Ranch Golf Course pursuant to clause (y) above has not occurred on or prior to the Threshold Date and (b) Rhodes fails to close the Jim Rhodes Purchase Agreement on or prior to the Threshold Date, so long as neither the Loan Documents nor any Insolvency Proceeding prohibits at such time the transfer of the Rhodes Ranch Golf Course to Rhodes in accordance with and pursuant to the Jim Rhodes Purchase Agreement and the Rhodes Ranch Golf Course is capable of being conveyed as required under the Jim Rhodes Purchase Agreement, upon the payment of the Rhodes Ranch Golf Course Purchase Price.

"**Jim Rhodes Purchase Agreement**" means a definitive and binding purchase and sale agreement between Rhodes Ranch General Partnership, as seller, and Rhodes, as purchaser, with respect to the Rhodes Ranch Golf Course in form and substance reasonably satisfactory to the Administrative Agent and providing, among other things, for the sale of the Rhodes Ranch Golf Course to Rhodes to close no later than the Threshold Date in the event that no prior sale of the Rhodes Ranch Golf Course to any other Person that is not an Affiliate of the Borrowers for a purchase price of no less than the Rhodes Ranch Golf Course Purchase Price has occurred.

"**Parcel 13**" means those certain parcels of land designated as Parcel 13 located in Clark County within the development commonly known as South West Ranch, as depicted on the maps attached hereto as Schedule 1.1(h).

"**Parcel 13/43**" means either Parcel 13 or Parcel 43, as specified by the Borrowers to the Collateral Agent in writing prior to the date on which the first of Parcel 13 or Parcel 43 are sold (or of which any portion thereof is sold).

5

"**Parcel 43**" means those certain parcels of land designated as Parcel 43 located in Clark County within the development commonly known as Rhodes Ranch, as depicted on the maps attached hereto as Schedule 1.1(i).

"**Permitted Equipment Sale**" has the meaning assigned to that term in Section 6.9(vi).

"**Permitted Non-Ordinary Course Asset Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Real Property Collateral pursuant to a Qualified Sales Agreement in an aggregate amount not to exceed $10,000,000.

"**PIK Interest Amount**" has the meaning assigned to that term in Section 2.2A.

"**Rhodes Ranch Golf Course**" means those certain golf developments located in Clark County within the development commonly known as Rhodes Ranch, as depicted on the maps attached hereto as Schedule 1.1(j-1) and the personal property relating to such golf developments described on Schedule 1.1(j-2) attached hereto.

"**Rhodes Ranch Golf Course Purchase Price**" has the meaning assigned to that term in Section 6.9(v)(h).

"**Second Lien Amendment No. 2**" means the Amendment No. 2 to the Second Lien Credit Agreement, dated as of April 24, 2008, among the Borrowers, the Subsidiary Guarantors, the Second Lien Lenders, the Second Lien Administrative Agent and the Second Lien Collateral Agent.

"**South West Ranch Commercial Property**" means those certain commercial developments located in Clark County commonly known as South West Ranch, as depicted on the maps attached hereto as Schedule 1.1(k).

"**Specified Golf Course Sale**" means any transaction (or series of related transactions with the same or related parties) with respect to the (i) Rhodes Ranch Golf Course or (ii) Tuscany Golf Course, in each case constituting an arms-length sale for fair market value pursuant to a definitive and binding purchase and sale agreement.

"**Specified Type-I Parcels**" means (i) the I-215 Parcels and (ii) the Golden Valley Parcels.

"**Specified Type-I Parcel Sale**" means any transaction (or series of related transactions with the same or related parties) constituting an arms-length sale for fair market value of any portion of the Specified Type-I Parcels pursuant to a definitive and binding purchase and sale agreement.

"**Specified Type-II Parcel Sale**" means any transaction (or series of related transactions with the same or related parties) with respect to (i) the Fort Apache Post Commercial Site, (ii) South West Ranch Commercial Property, (iii) Tuscany Commercial Property or (iv) Parcel 13/43, in each case constituting an arms-length sale for fair market value pursuant to a Qualified Sales Agreement.

"**Threshold Date**" has the meaning assigned to that term in the definition of the term "Jim Rhodes Guaranty".

"**Tuscany Commercial Property**" means those certain commercial developments located in the City of Henderson, County of Clark commonly known as Tuscany, as depicted on the maps attached hereto as Schedule 1.1(l).

6

"**Tuscany Golf Course**" means those certain golf developments located in the City of Henderson, County of Clark within the development commonly known as Tuscany, as depicted on the maps attached hereto as Schedule 1.1(m).

SUBSECTION 2.2.   Amendments to Section 2.2A.   Section 2.2A of the Credit Agreement is hereby amended in the following respects:

(a) Clause (ii) of Section 2.2A of the Credit Agreement is hereby amended by deleting the period at the end thereof and inserting a semicolon in lieu thereof.

(b) Section 2.2A of the Credit Agreement is hereby amended by adding the following at the end thereof:

"; provided that, notwithstanding the foregoing clauses (i) or (ii), commencing on the Amendment No. 2 Effective Date, the portion of such interest in the amount of 4.0% per annum (the "**Excess Interest Amount**") shall be paid on each Interest Payment Date through the addition of such amount to the then outstanding aggregate principal amount of the Loans, unless the Borrowers elect by delivery of a written notice to the Administrative Agent not less than ten (10) days prior to the applicable Interest Payment Date, to pay all or any portion of the Excess Interest Amount in cash.  Any Excess Interest Amount (or any portion thereof) that the Borrowers do not elect to pay in cash shall be paid through the addition of such amount  (such added amount, the "**PIK Interest Amount**") to the then outstanding aggregate principal amount of the Loans.  For all purposes under this Agreement, all PIK Interest Amounts shall be treated as principal amounts of the Loans and all references in this Agreement to Loans shall include PIK Interest Amounts.  PIK Interest Amounts shall be allocated ratably to the principal amounts of the Loans of each Lender in accordance with the aggregate principal amount of outstanding Loans of such Lender."

SUBSECTION 2.3.   Amendments to Section 2.4B.   Clause (ii) of Section 2.4B of the Credit Agreement is hereby amended by inserting the following at the end thereof:

"(g)     Prepayments from Proceeds of Specified Type-I Parcels.   Concurrently with, and as a condition to the closing of, any Specified Type-I Parcel Sale by any Borrower Entity, the Borrowers shall prepay the Loans in an amount equal to the 100% of the Cash received in connection with such sale or disposition (net of (i) reasonable commissions and closing costs properly allocated to such sale or disposition and (ii) taxes that are reasonably anticipated to be payable in connection with such sale or disposition with respect to the Fiscal Year of such sale or disposition after taking into account any current or prior year losses and credits of the Borrowers and their Subsidiaries allocated to the direct or indirect holders of Capital Stock of the Parents that would be available to offset such taxes (the calculation of such deductions to be demonstrated in reasonable detail in an Officer's Certificate delivered to the Administrative Agent concurrently with such closing))."

SUBSECTION 2.4.   Amendments to Section 2.9.   Amendments to Section 2.9.   Section 2.9 of the Credit Agreement is hereby amended in the following respects:

(a) Section 2.9A of the Credit Agreement is hereby amended by inserting the phrase "Specified Type-I Parcel Sale, Specified Type-II Parcel Sale, Specified Golf Course Sale" immediately following the phrase "In connection with any Permitted Collateral Asset Sale, Major Collateral Asset Sale" set forth therein.

(b) Section 2.9A of the Credit Agreement is hereby further amended by inserting the following at the end thereof:

7

"In connection with (i) the closing of the Jim Rhodes Purchase Agreement as in effect on the Amendment No. 2 Effective Date in accordance with the terms thereof for a purchase price of no less than the Rhodes Ranch Golf Course Purchase Price or (ii) the payment in full of the Jim Rhodes Guaranty of no less than the Rhodes Ranch Golf Course Purchase Price, the Collateral Agent or its duly authorized attorney-in-fact shall release the Rhodes Ranch Golf Course from the Lien of the Mortgages.  The Collateral Agent is authorized by the Lenders to enter into release and/or escrow arrangements with the Title Company or any other third-party designated by the Collateral Agent for purposes of delivery of reconveyance or release of Liens (and related Loan Documents) for the Rhodes Ranch Golf Course in connection with the closing of the Jim Rhodes Purchase Agreement or the payment in full of the Jim Rhodes Guaranty for execution by the Collateral Agent) (or its agent) in a form appropriate for recordation in the applicable jurisdiction and otherwise satisfactory to the Collateral Agent (or its agent) in its good faith discretion and all other documentation as the Collateral Agent reasonably requires to be delivered by the Borrowers or Rhodes in connection with such release."

SUBSECTION 2.5.  Amendments to Section 4.25.  Section 4.25 of the Credit Agreement is hereby amended by inserting the following at the end thereof:

"Notwithstanding the foregoing, it is agreed that any financial projections delivered by the Borrowers in connection with the Amendment No. 2, the contents of which reflect that a Default or Event of Default would occur if such projections become true, shall not, in and of themselves or by the delivery thereof, be deemed to be a condition that with the passage of time or the giving of notice or both would constitute a Default or Event of Default."

SUBSECTION 2.6.  Amendments to Section 5.3.  Section 5.3 of the Credit Agreement is hereby amended in the following respects:

(a)  Section 5.3(i) of the Credit Agreement is hereby amended by inserting the phrase "(or, in the case of the Fiscal Quarter ending March 31, 2008, sixty (60) days)" immediately after the phrase "as soon as available and in any event within forty five (45) days" set forth therein.

(b)  Section 5.3(ii) of the Credit Agreement is hereby amended by deleting the phrase "(or, in the case of the Fiscal Year ending December 31, 2005, one hundred-twenty (120) days)" and inserting in lieu thereof the phrase "(or, (x) in the case of the Fiscal Year ending December 31, 2005, one hundred-twenty (120) days and (y) in the case of the Fiscal Year ending December 31, 2007, one hundred-fifty (150) days; provided that nothing contained herein shall extend the date by which the Officer's Certificate, Compliance Certificate and Qualified Appraisal Updates are required to be delivered pursuant to subsections 5.3(iii) and 5.3(ix), in each case with respect to the Fiscal Year ended December 31, 2007, to a date that is later than one hundred-twenty (120) days after the end of the Fiscal Year ended December 31, 2007; provided, further that such Compliance Certificate may be revised upon delivery of audited financial statements for the Fiscal Year ending December 31, 2007 pursuant to subsection 5.3(ii))".

(c)  Section 5.3(ii) of the Credit Agreement is hereby further amended by deleting the phrase "which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception" set forth therein an inserting in lieu there of the phrase "which report shall be unqualified as to scope of audit and contains no other material qualification or exception other than a qualification as to going concern".

(d)  Section 5.3(ix) of the Credit Agreement is hereby amended by inserting the following at the end thereof:

" provided, further, that no Qualified Appraisal Update shall be required to be delivered in connection with financial statements that are deliverable pursuant to subdivision (i) of this subsection 5.3 earlier than (1) with respect to the Fiscal Quarter ended March 31, 2008, ninety (90) days after the Amendment No. 2 Effective Date and (2) with respect to the Fiscal Quarters ended June 30, 2008 and September 30, 2008, sixty (60) days after the end of such Fiscal Quarters;"

(e) Section 5.3(x) of the Credit Agreement is hereby amended by deleting the phrase "together with an Officer's Certificate demonstrating compliance with the covenants set forth in subsection 6.6" set forth therein and inserting in lieu thereof the phrase "together with an Officer's Certificate comparing such forecasted financial results with each of the financial covenants set forth in Section 6.6".

SUBSECTION 2.7.  Amendments to Section 5.7.  Section 5.7 of the Credit Agreement is hereby amended by inserting the following new paragraph at the end thereof:

"At least once per Fiscal Quarter, the Borrowers shall host a telephone conference call with the Lenders for the purpose of providing the Lenders with a meaningful update on the Borrowers' and their Subsidiaries' business, Projects and financial results and to answer any questions the Lenders may have with respect thereto."

SUBSECTION 2.8.  Amendments to Section 5.15.  Section 5.15 of the Credit Agreement is hereby amended by inserting (i) the phrase "(as supplemented by the business plan and projections delivered to the Administrative Agent in connection with the Amendment No. 2)" immediately following each reference to the "Effective Date Projections" set forth therein and (ii) the following at the end thereof:

"Notwithstanding the foregoing, the Borrowers and their Subsidiaries may make such modifications with respect to Entitlements on the Real Property Collateral in a manner that could not be reasonably expected to have a material adverse effect upon the value of the Real Property Collateral taken as a whole."

SUBSECTION 2.9.  Amendment to Section 5.  Section 5 of the Credit Agreement is hereby amended by adding at the end thereof, immediately following Section 5.19:

"**5.20    Rhodes Ranch Golf Course Appraisal.**

No later than the earlier of (x) the closing date of any sale of the Rhodes Ranch Golf Course (or any portion thereof) and (y) September 30, 2008, the Borrowers shall deliver to the Administrative Agent an "as is" real estate appraisal conducted in compliance with the provisions of FIRREA and all requirements of any Applicable Law applicable to the Administrative Agent undertaken by an Appraiser, and providing an assessment of the "as is" appraised value of the Real Property Collateral comprising the Rhodes Ranch Golf Course (and, but only to the extent not covered by the foregoing appraisal, a certification from an independent qualified third party as to the fair market value of the personal property comprising the Rhodes Ranch Golf Course).  In the event that such "as is" real estate appraisal and such personal property certificate has not been delivered to the Administrative Agent on or prior to such date, then the Administrative Agent shall be authorized to obtain such appraisal and certification on behalf of, and at the sole cost and expense of, the Borrowers.  Any amounts paid by the Administrative Agent in connection with such appraisals and certificates shall be reimbursed to the Administrative Agent by the Borrowers promptly after demand therefor and in no event later than two Business Days after such demand."

9

SUBSECTION 2.10.    Amendments to Section 6.1.    Section 6.1(ix) of the Credit Agreement is hereby amended by inserting the phrase "plus any amount of interest accrued under the Second Lien Credit Agreement that is paid-in-kind through the addition of such interest to the principal amount of the Second Lien Loans as contemplated in the Second Lien Amendment No. 2" immediately after the phrase "in an aggregate principal amount not to exceed $70,000,000" set forth therein.

SUBSECTION 2.11.    Amendments to Section 6.6. Section 6.6 of the Credit Agreement is hereby amended in the following respects:

(a) Sections 6.6A, 6.6B, 6.6C and 6.6D of the Credit Agreement are hereby amended and restated in their entirety to read as follows:

**A.    Total Debt LTV Ratio.**  The Borrowers shall not permit the ratio (the "**Total Debt LTV Ratio**") of (i) Total Consolidated Indebtedness as of the last day of each Fiscal Quarter (any such day being a "**Calculation Date**"), to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date (giving effect to Assets Sales and dispositions of Real Property Collateral prior to such Calculation Date) to exceed the following ratios:

| Fiscal Quarter Ending | Total Debt LTV Ratio |
|---|---|
| After the Effective Date and prior to the Amendment No. 2 Effective Date | 42.5% |
| After June 29, 2009 and thereafter | 35.0% |

**B.    First Lien Debt LTV Ratio.**  The Borrowers shall not permit the ratio (the "**First Lien Debt LTV Ratio**") of (i) the aggregate outstanding principal amount of the Loans as of any Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of such Calculation Date (giving effect to Assets Sales and dispositions of Real Property Collateral prior to such Calculation Date) to exceed the following ratios:

| Fiscal Quarter Ending | First Lien Debt LTV Ratio |
|---|---|
| After the Effective Date and prior to the Amendment No. 2 Effective Date | 32.5% |
| After June 29, 2009 and thereafter | 25.0% |

**C.    Interest Coverage Ratio.**  The Borrowers shall not permit the ratio (the "**Interest Coverage Ratio**") of (i) Consolidated EBITDA for any Test Period to (ii) Consolidated Interest Expense for such Test Period to be less than the following ratios:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| After the Effective Date and on or prior to March 31, 2006 | 2.25 to 1.00 |
| After March 31, 2006 and on or prior to June 30, 2006 | 2.50 to 1.00 |
| After June 30, 2006 and on or prior to December 31, 2006 | 2.75 to 1.00 |
| After December 31, 2006 and on or prior to March 31, 2007 | 3.50 to 1.00 |
| After March 31, 2007 and on or prior to June 30, 2007 | 1.90 to 1.00 |
| After June 30, 2007 and on or prior to December 31, 2007 | 1.75 to 1.00 |
| After December 31, 2007 and on or prior to March 31, 2008 | 1.80 to 1.00 |
| After March 31, 2008 and prior to the Amendment No. 2 Effective Date | 1.90 to 1.00 |
| After June 29, 2009 and thereafter | 4.00 to 1.00 |

10

**D.**    **Cash on Balance Sheet**.   The Borrowers shall not permit the aggregate amount of Unrestricted Cash and Cash Equivalents held by the Borrowers and the Subsidiary Guarantors to be less than (i) on and after the Effective Date and prior to the Amendment No. 2 Effective Date, $25,000,000, (ii) on and after the Amendment No. 2 Effective Date and prior to June 30, 2009, $1,000,000 and (iii) thereafter, $25,000,000.

(b) Section 6.6 of the Credit Agreement is hereby amended by adding the following at the end thereof:

**E.**    **Minimum Cash Flow From Operations**.    The Borrowers shall not permit the Cumulative Consolidated Cash Flow as at the last day of any Fiscal Quarter ending with any Fiscal Quarter set forth below to be less than the amount set forth below opposite such Fiscal Quarter:

| Fiscal Quarter Ending | Cumulative Consolidated Cash Flow |
| --- | --- |
| March 31, 2008 | $6,100,000 |
| June 30, 2008 | $17,000,000 |
| September 30, 2008 | $30,100,000 |
| December 31, 2008 | $48,500,000 |
| March 31, 2009 | $55,800,000 |
| June 30, 2009 | $70,600,000 |
| September 30, 2009 | $78,300,000 |
| December 31, 2009 | $91,100,000 |

SUBSECTION 2.12.  Amendments to Section 6.9.  Section 6.9 of the Credit Agreement is hereby amended by adding the following at the end thereof:

"(iv)    With respect to Real Property Collateral, a Specified Type-I Parcel Sale, provided that each of the following conditions have been satisfied (and a Responsible Officer has certified as to the satisfaction of the conditions specified in clauses (b) through (e)):

(a)    the terms of such Asset Sale (including copies of all contracts relating to such Asset Sale) shall have been provided to the Lenders, and the Requisite Lenders shall have consented to such Asset Sale on such terms which shall include, without limitation, the following:

(1) the consideration received from such Asset Sale shall be paid solely in Cash; and

(2) with respect to any such Asset Sale constituting a sale of all or any portion of (i) the I-215 Parcels, the aggregate amount of Cash proceeds received by the Borrowers or their Subsidiaries from such Asset Sale shall be no less than $65,000,000 (provided that if the initial sale of any portion of the I-215 Parcels has resulted in the receipt of at least such amount of Cash proceeds, additional sales of such remaining portion of the I-215 Parcels may be made without giving effect to this clause (i)), and (ii) the Golden Valley Parcels, the aggregate amount of Cash proceeds received by the Borrowers or their Subsidiaries from such Asset Sale, together with the amount of Cash proceeds received by the Borrower and their Subsidiaries from all prior Asset Sales of such Golden Valley Parcels made after the Amendment No. 2 Effective Date, shall be no less than $30,000,000 (provided that if the initial sale of any portion of the Golden Valley Parcels has resulted in the receipt of at least such amount of Cash proceeds, additional

11

sales of such remaining portion of the Golden Valley Parcels may be made without giving effect to this clause (ii));

(b) the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale, shall constitute a legal parcel in accordance with all Applicable Laws and Governmental Authorizations;

(c) to the extent required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to the Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Liens permitted by subsection 6.2;

(d) the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with the release of the applicable portion of the Real Property Collateral from the Lien of the Mortgages, to the extent invoices therefor have been presented; and

(e) the Collateral Agent shall have received an "as is" real estate appraisal conducted in compliance with the provisions of FIRREA and all requirements of any Applicable Law applicable to the Administrative Agent undertaken by an Appraiser, and providing an assessment of the "as is" appraised value of the Real Property Collateral subject to such Asset Sale, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment.

(v) With respect to Real Property Collateral, any (x) Specified Type-II Parcel Sale, (y) Specified Golf Course Sale or (z) Permitted Non-Ordinary Course Asset Sale, provided that, in each case, each of the following conditions have been satisfied (and a Responsible Officer has certified as to the satisfaction of the conditions specified in clauses (a) through (g)):

(a) no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale) or would result therefrom;

(b) not less than ten (10) days' (or such shorter period as is acceptable to the Collateral Agent) prior written notice of the closing of such sale and (x) in the case of a Specified Type-II Parcel and Permitted Non-Ordinary Course Asset Sales, a true, correct and complete copy of the relevant Qualified Sales Agreement and (y) in the case of a Specified Golf Course Sale, a true, correct and complete copy of the sales contract applicable to such sale shall have been provided to the Administrative Agent;

(c) the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale, shall constitute a legal parcel in accordance with all Applicable Laws and Governmental Authorizations;

(d) to the extent required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to the Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Liens permitted by subsection 6.2;

(e)    the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with the release of the applicable portion of the Real Property Collateral from the Lien of the Mortgages, to the extent invoices therefor have been presented;

(f)    the consideration received from such Asset Sale shall be paid solely in Cash;

(g)    with respect to any such Asset Sale (other than (x) a sale of the (i) Fort Apache Post Commercial Site, (ii) South West Ranch Commercial Property, (iii) Rhodes Ranch Golf Course or (iv) Tuscany Commercial Property or (y) a Permitted Non-Ordinary Course Asset Sale where (1) the total consideration is no greater than $2,000,000 and (2) no more than ten (10) lots and/or units are sold) the Collateral Agent shall have received an "as is" real estate appraisal conducted in compliance with the provisions of FIRREA and all requirements of any Applicable Law applicable to the Administrative Agent undertaken by an Appraiser, and providing an assessment of the "as is" appraised value of the Real Property Collateral subject to such Asset Sale, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment; and

(h)    with respect to any such Asset Sale constituting a sale of all or any portion of the Rhodes Ranch Golf Course, the purchase price shall be no less than the greater of (x) $8,000,000 and (y) the appraised value of the Rhodes Ranch Golf Course as reflected in the real property appraisal and the personal property certification delivered to the Administrative Agent pursuant to Section 5.20 (the "**Rhodes Ranch Golf Course Purchase Price**").

(vi)    With respect to Collateral other than Real Property Collateral, sales or other dispositions of (i) equipment used primarily in connection with the Borrowers' grading business and (ii) other excess equipment (each a "**Permitted Equipment Sale**"), provided that each of the following conditions have been satisfied (as certified by a Responsible Officer):

(a) with respect to any such sale or other disposition in excess of $1,000,000 the Borrowers shall have delivered to the Collateral Agent a certificate from a Person who is not an Affiliate that is qualified to value such equipment, as reasonably approved by the Collateral Agent, setting forth the fair market value of such equipment;

(b) such sale or other disposition is made in an arms-length transaction for fair market value to a Person that is not an Affiliate; and

(c) such Collateral, in the reasonably business judgment of the Borrowers, is not necessary for the operations of the Borrowers and their Subsidiaries as then currently conducted.

(vii)    With respect to the Rhodes Ranch Golf Course, (a) an Asset Sale pursuant to the Jim Rhodes Purchase Agreement as in effect as of the Amendment No. 2 Effective Date for a purchase price of no less than the Rhodes Ranch Golf Course Purchase Price and (b) the transfer of the Rhodes Ranch Golf Course after the payment in full under the Jim Rhodes Guaranty as in effect as of the Amendment No. 2 Effective Date of an amount no less than the Rhodes Ranch Golf Course Purchase Price."

SUBSECTION 2.13.  Amendment to Section 6.12.  Section 6.12 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"**6.12    Tuscany Option Agreement.**

13

On and after the Amendment No. 2 Effective Date, the Borrowers shall not, and shall not permit any of their Subsidiaries to, without the prior written consent of the Requisite Lenders, (a) exercise any "Option" (as defined in the Tuscany Option Agreement as of the date hereof) (including, without limitation, the delivery of any "Option Notice" (as defined in the Tuscany Option Agreement as of the date hereof)) or (b) make any payments with respect to such Options other than (i) Indebtedness with respect to "Profit Participation" or "Lot Premium" (as such terms are defined in the Tuscany Option Agreement as of the date hereof) permitted under Section 6.1(viii) with respect to any Options exercised by the Borrowers or their Subsidiaries prior to the Amendment No. 2 Effective Date and other nominal costs and (ii) option fees and other nominal costs payable with respect to Options which have not been exercised by the Borrowers or their Subsidiaries prior to the Amendment No. 2 Effective Date (other than option fees and other payments made in connection with the consummation of the acquisition of land or in the exercise of any Options) to the extent such option fees and other nominal costs are reflected in the business plan and projections delivered to the Administrative Agent in connection with the Amendment No. 2."

SUBSECTION 2.14.  Amendment to Section 6.13.  Section 6.13 of the Credit Agreement is hereby amended by inserting the following at the end thereof:

"The Borrowers shall not, and shall not permit any of their respective Subsidiaries to, Modify the Jim Rhodes Purchase Agreement."

SUBSECTION 2.15.  Amendment to Section 6.16.  Section 6.16 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

### 6.16    Limitation on Standing Inventory.

The Borrowers shall not at any time permit the number of Speculative Housing Units that constitute Standing Inventory to exceed 145 Speculative Housing Units.

SUBSECTION 2.16.  Amendment to Section 6.18.  Section 6.18 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

### "6.18    Limitation on Purchase of Real Property Assets.

Neither any of the Borrowers nor any Subsidiary shall purchase any Real Property Asset that is not located in Arizona, California, Colorado, Idaho, Nevada, New Mexico or Utah. Notwithstanding any other provision hereof, subject to the following sentence, neither any of the Borrowers nor any Subsidiary shall directly or indirectly (including, without limitation, through an Investment made pursuant to subsection 6.3) purchase any Real Property Asset unless (i) the Interest Coverage Ratio for the Test Period most recently ended prior to such purchase for which financial statements have been delivered (or, if later, the Test Period most recently ended prior to such purchase for which financial statements were required to be delivered (taking into account the applicable delivery periods set forth therein)) pursuant to subsection 5.3(i) or (ii), as applicable, and, in each case, as determined on a pro forma basis to give effect to any Indebtedness incurred in connection with such purchase (and any other purchases of Real Property Assets consummated following such Test Period) as if such Indebtedness was incurred on the first day of such Test Period, is not less than 3.00 to 1.00 or (ii) such purchase is with respect to real property comprised of well sites located in Golden Valley, Arizona adjacent to the Real Property Collateral; provided that the aggregate purchase price for all such purchases made pursuant to clause (ii) of this Section 6.18 shall not exceed $500,000."

14

SUBSECTION 2.17.  <u>Amendment to Section 6</u>.  <u>Section 6</u> of the Credit Agreement is hereby amended by adding at the end thereof, immediately following Section 6.20:

"**6.21**    **Clear Title to Rhodes Ranch Golf Course.**

The Borrowers shall not, and shall cause their Subsidiaries not to, permit the incurrence or existence of any Liens or other encumbrances (other than Liens securing the Obligations or the Second Lien Obligations) to attach to the Rhodes Ranch Golf Course (or any portion thereof) if such Liens or other encumbrances could reasonably be expected to result in the failure to satisfy the conditions to the closing of the sale of the Rhodes Ranch Golf Course to James Rhodes pursuant to the Jim Rhodes Purchase Agreement on the Threshold Date or excuse Rhodes' failure to purchase the Rhodes Ranch Golf Course under the Jim Rhodes Purchase Agreement on the Threshold Date; <u>provided</u> that this obligation shall terminate following the sale of the Rhodes Ranch Golf Course for the Rhodes Ranch Golf Course Purchase Price pursuant to Section 6.9; <u>provided</u>, further, that it shall not constitute a breach of this Section 6.21 if non-consensual Liens or other non-consensual encumbrances arise prior to the Threshold Date which would reasonably be expected to excuse or postpone Rhode's failure to purchase the Rhodes Ranch Golf Course on the Threshold Date solely to the extent (i) the Borrowers are using their commercially reasonable best efforts to diligently and promptly terminate such Liens and encumbrances and (ii) the Borrowers reasonably believe such Liens and encumbrances will be, and are capable of, being terminated in advance of the Threshold Date (which belief shall be certified in an Officer's Certificate upon request of the Administrative Agent).

SUBSECTION 2.18.  <u>Amendments to Section 7.6</u>.  Section 7.6 of the Credit Agreement is hereby by adding the following immediately after subsection 7.6B contained therein:

"**C.**    Rhodes has failed to perform under the Jim Rhodes Guaranty in accordance with the terms thereof and at the times set forth therein; or

**D.**    a sale of the Rhodes Ranch Golf Course has not closed (x) under the Jim Rhodes Purchase Agreement or (y) under an Asset Sale to a Person that is not an Affiliate of the Borrowers that, in each case, was pursuant to a transaction that occurred (i) on or prior to the Threshold Date, (ii) for a purchase price that is no less than the Rhodes Ranch Golf Course Purchase Price and (iii) otherwise in accordance with Section 6.9 and Section 6.10; or

**E.**    A sale of the I-215 Parcels pursuant to Section 6.9(iv) has not closed on or prior to June 15, 2009; or"

SUBSECTION 2.19.  <u>Amendments to Schedules to Credit Agreement</u>.  The Schedules to the Credit Agreement are hereby amended in the following respects:

(a) Schedules 5.19 to the Credit Agreement is hereby amended by inserting the following at the end thereof:

"4.    Within five (5) Business Days following the Amendment No. 2 Effective Date, (or such later date as acceptable to the Collateral Agent in its sole discretion), the Borrowers shall have delivered to the Collateral Agent (i) an agreement collaterally assigning the Jim Rhodes Purchase Agreement to the Collateral Agent (the "**Collateral Assignment**") in form and substance reasonably acceptable to the Administrative Agent and executed by the Rhodes GP and Rhodes Ranch Golf Country Club, LLC, a Nevada limited liability company and (ii) a consent to the collateral assignment of the Jim Rhodes Purchase Agreement (the "**Consent Agreement**") in form and substance reasonably acceptable to the Administrative Agent and executed by Rhodes.

5.      Within fifteen (15) days following the Amendment No. 2 Effective Date, (or such later date as acceptable to the Collateral Agent in its sole discretion), the Borrowers shall have delivered to the Collateral Agent such amendments to the Mortgages, Notes, Intercreditor Agreement and the other Loan Documents, together with such opinions of counsel and title endorsements and date downs as may be reasonably requested by, and in form and substance reasonably acceptable to, the Collateral Agent in connection with the Amendment No. 2.

6.      Within thirty (30) days following the Amendment No. 2 Effective Date, (or such later date as acceptable to the Collateral Agent in its sole discretion), the Borrowers shall have listed the Specified Type-I Parcels for sale with a nationally recognized broker reasonably acceptable to the Administrative Agent.

7.      Within ninety (90) days following the Amendment No. 2 Effective Date, (or such later date as acceptable to the Collateral Agent in its sole discretion), the Borrowers shall have caused a nationally recognized broker reasonably acceptable to the Administrative Agent to have commenced a commercially reasonably marketing campaign for the sale of the Specified Type-I Parcels in a scope that is reasonably consistent with marketing campaigns and other marketing efforts undertaken by such broker and other nationally recognized brokers for the sale of similar real properties in a similar geographic locations over the twelve months."

(b) The Schedules to the Credit Agreement are hereby further amended by inserting Schedule 1.1(e), Schedule 1.1(f), Schedule 1.1(g), Schedule 1.1(h), Schedule 1.1(i), Schedule 1.1(j-1), Schedule 1.1(j-2), Schedule 1.1(k), Schedule 1.1(l) and Schedule 1.1(m), each as attached hereto, in the appropriate order.

SECTION 3.  Change in Pricing.  The amendment to the definitions of "Applicable Base Rate Margin" and "Applicable Eurodollar Rate Margin" shall be effective for the period commencing on the Amendment No. 2 Effective Date (as defined below), and accrued and unpaid interest in respect of any period prior thereto, whether due or paid prior thereto or thereafter, shall be computed based on the Credit Agreement as in effect prior to the effectiveness of this Amendment No. 2.

SECTION 4.  Conditions to Effectiveness of Amendment No. 2.  This Amendment No. 2 shall become effective as of the date hereof (the "**Amendment No. 2 Effective Date**") when all the conditions set forth in this Section 4 shall have been satisfied (provided that such conditions are satisfied no later than April 30, 2008).

SUBSECTION 4.1.  Execution of Counterparts.  The Administrative Agent shall have received counterparts of this Amendment No. 2 executed by (i) the Borrowers, (ii) the Subsidiary Guarantors, (iii) the Administrative Agent, (iv) the Collateral Agent and (v) the Requisite Lenders.

SUBSECTION 4.2.  Resolutions.  The Administrative Agent shall have received certified copies of (i) Organizational Authorizations of the Borrowers and each of the Subsidiary Guarantors evidencing approval of this Amendment No. 2 and all matters and transactions contemplated hereby and (ii) all documents evidencing other necessary corporate action and governmental and other material third party approvals and consents, if any, (or a certification that none are required) with respect to this Amendment No. 2 and the matters and transactions contemplated hereby.

SUBSECTION 4.3.  Amendment Fee.  In consideration of the Requisite Lenders entering into this Amendment No. 2, the Borrowers shall have paid to each Lender that executes this Amendment No. 2 on or before 5:00 p.m. New York City time on April 22, 2008 (each, a "**Consenting Lender**"), an amendment fee in an aggregate amount equal to 0.25% times the Loan Exposure of such Consenting Lender as of the Amendment No. 2 Effective Date.

16

SUBSECTION 4.4.  Payment of Fees and Expenses.  The Borrowers shall have paid all fees agreed to between any of the Agents or their affiliates and the Borrowers and, to the extent invoiced, all out-of-pocket expenses incurred by the Agents in connection with the Loan Documents and this Amendment No. 2, including the reasonable fees, charges and disbursements of Skadden, Arps, Slate, Meagher & Flom LLP as counsel for the Agents and Brownstein Hyatt Farber Schreck, LLP as special Nevada counsel for the Agents, in connection with this Amendment No. 2 and for all services related to any of the Loan Documents from and after the Closing Date.

SUBSECTION 4.5.  Legal Opinions.  The Administrative Agent shall have received the following executed legal opinions:

(a)  The legal opinion of Gibson, Dunn & Crutcher LLP, special New York counsel to the Loan Parties; and

(b)  The legal opinion of special Nevada counsel to the Loan Parties, such counsel to be reasonably satisfactory to the Administrative Agent.

Each such legal opinion shall be in form and substance reasonably satisfactory to the Administrative Agent and shall cover such matters incident to this Amendment No. 2, the other Loan Documents and the transactions contemplated hereby and thereby as the Administrative Agent may reasonably require.

SUBSECTION 4.6.  Second Lien Amendment.  The Administrative Agent shall have received executed counterparts of the Second Lien Amendment No. 2 substantially in the form attached hereto as Exhibit A executed by (i) the Borrowers, (ii) the Subsidiary Guarantors, (iii) the Second Lien Agents and (iv) all of the Second Lien Lenders.

SUBSECTION 4.7.  Amendment to Intercreditor Agreement.  The Administrative Agent shall have received executed counterparts of an amendment to the Intercreditor Agreement substantially in the form attached hereto as Exhibit B executed by (i) the Borrowers, (ii) the First Lien Collateral Agent and (iii) the Second Lien Collateral Agent.

SUBSECTION 4.8.  Jim Rhodes Guaranty.  The Administrative Agent shall have received a fully executed copy of the Jim Rhodes Guaranty.

SUBSECTION 4.9.  Jim Rhodes Purchase Agreement.  The Administrative Agent shall have received a fully executed copy of the Jim Rhodes Purchase Agreement.

SUBSECTION 4.10.  Waiver of Stay.  The Administrative Agent shall have received a fully executed copy of a waiver of the automatic stay with respect to the sale of the Rhodes Ranch Golf Course under the Bankruptcy Code in the form of Exhibit C attached hereto the "**Waiver of Stay**").

SECTION 5.  Representations and Warranties.  Each of the Borrowers and the Subsidiary Guarantors represents and warrants as follows:

(a)  The representations and warranties of each Loan Party set forth in the Loan Documents are true and correct in all material respects on and as of the date hereof, both before and after giving effect to this Amendment No. 2 (except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date).

17

(b)     As of the date hereof, and after giving effect to this Amendment No. 2, no Default or Event of Default shall have occurred and be continuing.

SECTION 6.  Validity of Obligations and Liens.

(a)     Validity of Obligations.    The Borrowers and the Subsidiary Guarantors acknowledge and agree that (i) each Loan Party is indebted to the Lenders and the Agents for the Obligations, without defense, counterclaim or offset of any kind, and each of the Loan Parties hereby ratifies and reaffirms the validity, enforceability and binding nature of such Obligations and (ii) no Loan Party has as of the date hereof any claim, right or cause of action of any kind against any Lender or any Agent or any of such Lender's or Agent's respective present or former subsidiaries, affiliates, officers, directors, employees, attorneys or other representatives or agents in connection with the Obligations, the Credit Agreement and the other Loan Documents, or the transactions contemplated hereby or thereby.

(b)     Validity of Guarantees.  Each of the Subsidiary Guarantors, as a Guarantor (as defined in the Subsidiary Guaranty) under the Subsidiary Guaranty hereby confirms and agrees that notwithstanding the effectiveness of this Amendment No. 2, the Subsidiary Guaranty is, and shall continue to be, in full force and effect and each is hereby ratified and confirmed in all respects, except that, on and after the effectiveness of this Amendment No. 2, each reference in the Subsidiary Guaranty to the "Credit Agreement", "thereunder", "thereof" or words of like import shall mean and be a reference to the Credit Agreement, as amended by this Amendment No. 2.

(c)     Validity of Liens and Loan Documents.    The Borrowers and the Subsidiary Guarantors ratify and reaffirm the validity and enforceability (without defense, counterclaim or offset of any kind) of the Liens and security interests granted to secure any of the Obligations by any Loan Party to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Loan Documents to which any Loan Party is a party and hereby confirms and agrees that notwithstanding the effectiveness of this Amendment No. 2, and except as expressly amended by this Amendment No. 2, each Loan Document is, and shall continue to be, in full force and effect and each is hereby ratified and confirmed in all respects, except that, on and after the effectiveness of this Amendment No. 2, each reference in the Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import shall mean and be a reference to the Credit Agreement as amended by this Amendment No. 2.

SECTION 7.  Lender Consent and Authorization to Certain Amendments.

(a) Each of the Lenders hereby waives the limitations set forth in Section 5.3 of the Intercreditor Agreement and consents to an amendment to the Second Lien Credit Agreement in substantially the form attached hereto as Exhibit A.

(b) Each of the Lenders hereby consents to, and authorizes the Borrowers and the Collateral Agent to enter into, a waiver and amendment to the Intercreditor Agreement in substantially the form attached hereto as Exhibit B to, among other things, waive the requirements set forth in Section 5.3 of the Intercreditor Agreement and to increase the Maximum Priority Amount (as defined in the Intercreditor Agreement) by the amount of interest accrued under the Credit Agreement that is paid-in-kind through the addition of such interest to the principal amount of the Loans.

(c) Each of the Lenders hereby consents to, and authorizes the Administrative Agent and the Collateral Agent to enter into the Waiver of Stay in substantially the form attached hereto as Exhibit C on behalf of the Lenders.

(d) Each of the Lenders hereby consents to, and authorizes the Borrowers, the Subsidiary Guarantors, the Administrative Agent and the Collateral Agent to enter into, (i) such amendments and

18

modifications to the Mortgages, the Notes and the other Loan Documents as the Administrative Agent deems reasonably necessary or desirable in connection with this Amendment No. 2 and (ii) the Collateral Assignment and the Consent Agreement.

SECTION 8.  Governing Law.  This Amendment No. 2 shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 9.  Execution in Counterparts.  This Amendment No. 2 may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Amendment No. 2 by telecopier or in PDF format via electronic mail shall be effective as delivery of an original executed counterpart of this Amendment No. 2.

SECTION 10.  Continuing Effectiveness.  Except as modified by this Amendment No. 2, the Credit Agreement shall remain in full force and effect and is hereby ratified and confirmed in all respects and this Amendment No. 2 shall be a Loan Document for all purposes, and references in the Credit Agreement to "the date hereof" and "the date of this Agreement" and phrases of similar import, shall in all instances be references to, and continue to refer to, November 21, 2005, and not the date of this Amendment No. 2.  This Amendment No. 2 shall not constitute an amendment or waiver of any provision of the Credit Agreement not expressly referred to herein and shall not be construed as an amendment, waiver or consent to any action on the part of any of the Borrowers or any of their respective Subsidiaries that would require an amendment, waiver or consent of any of the Lenders or any of the Agents except as expressly stated herein.

SECTION 11.  WAIVER OF JURY TRIAL.  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AMENDMENT NO. 2, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AMENDMENT NO. 2 BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

SECTION 12.  Headings.  Section and subsection headings in this Amendment No. 2 are included herein for convenience of reference only and shall not constitute a part of this Amendment No. 2 for any other purpose or be given any substantive effect.

SECTION 13.  Successors and Assigns.  This Amendment No. 2 shall be binding upon and inure to the benefit of the Borrowers and the Subsidiary Guarantors and each of their respective successors and assigns, and upon the Agents and the Lenders and their successors and assigns.  Neither any of the Borrowers' nor any of the Subsidiary Guarantors' rights or obligations hereunder nor any interest therein may be assigned or delegated by any of the Borrowers or any of the Subsidiary Guarantors without the prior written consent of all Lenders.

[*Signature pages follow*]

19

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 2 to be executed by their officers thereunto duly authorized as of the date first above written.

BORROWERS:                          **HERITAGE LAND COMPANY, LLC**

                                    By: Sedora Holdings, LLC, its managing member

                                    By: _____
                                      Name:
                                      Title:

                                    **THE RHODES COMPANIES, LLC**

                                    By: Sagebrush Enterprises, Inc., its managing member

                                    By: _____
                                      Name:
                                      Title:

                                    **RHODES RANCH GENERAL PARTNERSHIP**

                                    By: The Rhodes Companies, LLC,
                                    its managing partner

                                    By: Sagebrush Enterprises, Inc.,
                                    its sole member

                                    By: _____
                                      Name:
                                      Title:

SUBSIDIARY GUARANTORS:              **RHODES DESIGN AND DEVELOPMENT**
                                    **CORPORATION**
                                    **BRAVO, INC.**
                                    **RHODES REALTY, INC.**
                                    **ELKHORN INVESTMENTS, INC.**
                                    **C & J HOLDINGS, INC.**

                                    By: _____
                                      Name:
                                      Title:

[Amendment No. 2 (First Lien)]

510778 M

**ELKHORN PARTNERS, A NEVADA LIMITED PARTNERSHIP**

By:  Elkhorn Investments, Inc.,
its general partner

By: _____
    Name:
    Title:


**GUNG-HO CONCRETE LLC**
**GERONIMO PLUMBING LLC**
**APACHE FRAMING, LLC**

By: Tribes Holdings, LLC,
their sole member

By: The Rhodes Companies, LLC,
its sole member

By: Sagebrush Enterprises, Inc.,
its sole member

By: _____
    Name:
    Title:


**RHODES RANCH GOLF COUNTRY CLUB, LLC**

By: Rhodes Ranch General Partnership,
its sole member

By: The Rhodes Companies, LLC,
its managing partner

By: Sagebrush Enterprises, Inc.,
its sole member

By: _____
    Name:
    Title:


[Amendment No. 2 (First Lien)]

510778 M

TUSCANY GOLF COUNTRY CLUB, LLC
RHODES HOMES ARIZONA, L.L.C.
TRIBES HOLDINGS, LLC
JARUPA, LLC
RHODES ARIZONA PROPERTIES, LLC
SIX FEATHERS HOLDINGS, LLC\
PARCEL 20, LLC
TUSCANY ACQUISITIONS, LLC


By:  The Rhodes Companies, LLC,
their sole member (and the sole manager of Parcel 20, LLC)

By:  Sagebrush Enterprises, Inc.,
its sole member

By: _____
    Name:
    Title:


**PINNACLE GRADING, LLC**

By:  Rhodes Homes Arizona, L.L.C.,
its sole member

By:  The Rhodes Companies, LLC,
its sole member

By:  Sagebrush Enterprises, Inc.,
its sole member

By: _____
    Name:
    Title:


**TUSCANY ACQUISITIONS II, LLC**
**TUSCANY ACQUISITIONS III, LLC**
**TUSCANY ACQUISITIONS IV, LLC**

By:  Rhodes Design and Development Corporation,
their sole member

By: _____
    Name:
    Title:


[Amendment No. 2 (First Lien)]

510778 M

**TICK, LP**
**GLYNDA, LP**
**CHALKLINE, LP**
**BATCAVE, LP**
**JACKKNIFE, LP**
**WALLBOARD, LP**
**OVERFLOW, LP**

By: The Rhodes Companies, LLC,
their general partner

By: Sagebrush Enterprises, Inc.,
its sole member

By: _____
    Name:
    Title:

[Amendment No. 2 (First Lien)]

510778 M

**ADMINISTRATIVE AGENT,**
**COLLATERAL AGENT**
**AND REQUISITE LENDERS:**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH,**
as Administrative Agent and as Collateral Agent

By: _____

Name:   **BILL O'DALY**
Title:        **DIRECTOR**

**MIKHAIL FAYBUSOVICH**
**VICE PRESIDENT**

[Amendment No. 2 (First Lien)]

510778 M

_____,
as a Lender

[Amendment No. 2 (First Lien)]

**Schedule 1.1(e)**
**Fort Apache Post Commercial Site**

**Schedule 1.1(f)**
**I-215 Parcels**

**<u>Schedule 1.1(g)</u>**
**<u>Golden Valley Parcels</u>**

**Schedule 1.1(h)**
**Parcel 13**

**Schedule 1.1(i)**
**Parcel 43**

**<u>Schedule 1.1(j-1)</u>**
**<u>Rhodes Ranch Golf Course (real property)</u>**

**Schedule 1.1(j-2)**
**Rhodes Ranch Golf Course (personal property)**

**Schedule 1.1(k)**
**South West Ranch Commercial Property**

**Schedule 1.1(l)**
**Tuscany Commercial Property**

**Schedule 1.1(m)**
**Tuscany Golf Course**

**<u>Exhibit A</u>**
**<u>Form of Amendment No. 2 to the Second Lien Credit Agreement</u>**

**<u>Exhibit B</u>**
**<u>Form of Waiver and Amendment to Intercreditor Agreement</u>**

**<u>Exhibit C</u>**

**<u>Form of Waiver of Stay</u>**