Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone:  702.979.2357
Facsimile:  702.362.9472
E-Mail:    nleatham@klnevada.com

Philip C. Dublin (NY Bar No. 2959344)
Meredith A. Lahaie (NY Bar No. 4518023)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone:  212.872.1000
Facsimile:  212.872.1002
E-Mail:    pdublin@akingump.com
           mlahaie@akingump.com

*Counsel for the Reorganized Debtors*

*Electronically Filed*
*June 7, 2010*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: § | Case No. 09-14814-LBR |
| § | (JointlyAdministered) |
| THE RHODES COMPANIES, LLC, § | |
|   aka "Rhodes Homes," *et al.*, § | Chapter 11 |
| § | |
|   Reorganized Debtors.[1] § | |
| § | |
| § | |
| § | |
| § | |

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); and Pinnacle Grading, LLC (4838).

|  |  |
|---|---|
| Affects:<br>☒ All Debtors<br>☐ Affects the following Debtor(s) | §  REORGANIZED DEBTORS' OBJECTION<br>§  TO MOTION TO COMPEL<br>§  REIMBURSEMENT OF FEES AND<br>§  EXPENSES PURSUANT TO<br>§  CONFIRMATION ORDER AND CASH<br>§  COLLATERAL ORDER |

The above-captioned reorganized debtors (collectively, the "Reorganized Debtors"), by and through their undersigned counsel, hereby file this objection (the "Objection") to the Motion to Compel Reimbursement of Fees and Expenses Pursuant to Confirmation Order and Cash Collateral Order (the "Motion") filed by Credit Suisse, AG Cayman Islands Branch (the "First Lien Agent"). In support of this Objection, the Reorganized Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1. By the Motion, the First Lien Agent seeks entry of an order compelling the Reorganized Debtors to reimburse the First Lien Agent and its professionals for fees and expenses totaling in excess of $950,000, of which over $915,000 is attributable to the fees and expenses incurred by Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), as primary counsel to the First Lien Agent. The Reorganized Debtors do not object to the payment of the agency fees and out of pocket expenses incurred by the First Lien Agent or the fees and expenses of its local counsel. The Reorganized Debtors do object, however, to the reimbursement of Skadden's fees on the bases that (i) the extent of such fees is not reasonable in light of the First Lien Agent's limited role in the chapter 11 cases (which was primarily related to administrative services and non-substantive matters complimentary to the substantive actions taken by the First Lien Steering Committee (as defined below)) and (ii) Skadden's time entries are vague and, thus, do not permit a proper assessment of the value and appropriateness of the services for which it seeks compensation.

2

**BACKGROUND**

2. On either March 31, 2009 or April 1, 2009 (collectively, the "Petition Date"), each of the debtors (the "Debtors") commenced with the Court a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. Prior to the Petition Date, the Debtors were parties to that certain Credit Agreement dated as of November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership, as the Borrowers, the Lenders Listed Therein as the Lenders (the "First Lien Lenders"), and Credit Suisse, Cayman Islands Branch, as Administrative Agent, Collateral Agent, Syndication Agent, Sole Bookrunner and Sole Lead Arranger (the "First Lien Credit Agreement"). The Debtors' obligations under the First Lien Credit Agreement were secured by a blanket first lien on substantially all of the Debtors' assets. The First Lien Agent was the administrative agent under the First Lien Credit Agreement.

4. In early March 2009, after it became apparent that the Debtors would not be able to make their regularly scheduled interest and amortization payments under the First Lien Credit Agreement due on March 31, 2009, a steering committee consisting of certain lenders under the First Lien Credit Agreement (the "First Lien Steering Committee") was organized. The First Lien Steering Committee was established to negotiate the terms of a forbearance agreement and consensual restructuring with the Debtors. Despite extended and intensive negotiations between the First Lien Steering Committee (representing the interests of in excess of a majority of the First Lien Lenders) and the Debtors, the parties were unable to reach agreement on either a forbearance or consensual restructuring.

5.      Following the commencement of the Chapter 11 Cases, the First Lien Steering Committee continued to play a significant role in the Debtors' reorganization. On April 7, 2010, the First Lien Steering Committee filed (i) a motion (the "Trustee Motion") seeking appointment of a chapter 11 trustee in the Debtors' Chapter 11 Cases (Case No. 09-14778, Docket No. 85) and (ii) an objection (the "Cash Collateral Objection") (Case No. 09-14778, Docket No. 83) to the Debtors' motion (the "Cash Collateral Motion") for authorization to use the First Lien Lenders' cash collateral (Case No. 09-14778, Docket No. 35). The First Lien Agent filed a joinder to the Cash Collateral Objection (Case No. 09-14778, Docket No. 79).

6.      After the filing of the Trustee Motion and the Cash Collateral Objection, the Debtors entered into negotiations with the First Lien Steering Committee over the terms of a consensual cash collateral order. Eventually, the parties reached agreement on the consensual use of cash collateral and, on April 30, 2009, the Court entered an agreed order (the "Cash Collateral Order") authorizing the Debtors to use the First Lien Lenders' cash collateral (Docket No. 126).[2] As discussed in more detail below, the Cash Collateral Order provided for, among other things, the payment of the reasonable fees and expenses incurred by the First Lien Agent and its professionals as adequate protection for the Debtors' use of the First Lien Lenders' cash collateral. The Debtors' authorization to use cash collateral was subsequently extended by additional stipulations among the relevant parties through the Effective Date (as defined below).

7.      Shortly after the entry of the Cash Collateral Order, the Debtors and the First Lien Steering Committee renewed their negotiations over the terms of a consensual

---

[2] Where no case number is referenced, docket numbers refer to entries in case number 09-14814.

4

restructuring. The negotiations between the Debtors and the First Lien Steering Committee broke down in June 2009 as a result of, among other things, the multiple non-fiduciary interests of James Rhodes ("Rhodes").

8. After the break down in negotiations in June 2009, the First Lien Steering Committee began to pursue negotiations over the terms of a consensual plan of reorganization with the official committee of unsecured creditors (the "Creditors' Committee") appointed in the Chapter 11 Cases and the agent for the Debtors' second lien debt (the "Second Lien Agent"). The First Lien Agent was not actively involved in these efforts. In addition, on July 9, 2009, the First Lien Steering Committee filed an objection (the "Exclusivity Objection") (Docket No. 306) to the Debtors' motion to extend their exclusive plan filing and solicitation periods (the "Exclusivity Periods") (Docket No. 261). The First Lien Agent filed a four page joinder to the Exclusivity Objection (Docket No. 308).

9. On July 17, 2009, the First Lien Steering Committee and the Debtors resolved their dispute regarding the requested extension of the Exclusivity Periods by entering into a stipulation pursuant to which (x) the Exclusivity Periods were terminated and (y) the Debtors, Rhodes and his non-debtor affiliates (the "Rhodes Entities"), the First Lien Steering Committee, the First Lien Agent, the Second Lien Agent and the Creditors' Committee agreed to participate in non-binding mediation (the "Mediation") regarding the terms of a plan of reorganization (Docket No. 332). The Mediation was held on August 17, 24 and 25, 2009. Following the Mediation and extensive negotiations among the parties, the Debtors, the First Lien Steering Committee, the Rhodes Entities, the Second Lien Agent and the Creditors' Committee entered into a global settlement to implement the Debtors'

5

restructuring (the "Mediation Settlement").  Notably, the First Lien Agent, who attended the Mediation but did not play an active role, declined to become a party to the Mediation Settlement.  Upon information and belief, the First Lien Agent did not become a party to the Mediation Settlement because the settlement did not provide for a global release by the First Lien Lenders of the First Lien Agent.  The Mediation Settlement contemplated that the First Lien Steering Committee would file a plan of reorganization for the Debtors that would be supported by all parties to the Mediation Settlement.

10. On November 23, 2009, the First Lien Steering Committee filed the Second Amended Modified Plan of Reorganization for The Rhodes Companies, LLC, et al. (the "Second Amended Plan") (Docket No. 775) and the accompanying Second Amended Modified Disclosure Statement for the Plan (the "Disclosure Statement") (Docket No. 774). The Second Amended Plan and the Disclosure Statement were based on the terms of the Mediation Settlement, which terms the First Lien Agent remained unwilling to support.

11. On January 5, 2010, the First Lien Agent filed a limited objection (the "Plan Objection") to the Second Amended Plan seeking to clarify the Second Amended Plan's treatment of certain indemnification obligations in favor the First Lien Agent under the First Lien Credit Agreement (Docket No. 899).  Specifically, the Plan Objection requested the creation of a reserve of litigation trust interests that would be available to satisfy amounts owed to the First Lien Agent on account of certain indemnification obligations contained in the First Lien Credit Agreement (see Exhibit A attached hereto).  Plan Objection at 3.

12. The First Lien Agent eventually withdrew the Plan Objection on January 13, 2010 after the Court indicated that it would not be favorably disposed to sustain a plan objection where the objecting party had voted in favor of and generally supported

6

confirmation of the Plan.

14. On February 18, 2010, the First Lien Steering Committee filed the Third Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, et al. (the "Third Amended Plan") (Docket No. 1013). On March 12, 2010, the Court entered an order (the "Confirmation Order") confirming the Third Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, et al. (the "Plan") (Docket No. 1053). As discussed in more detail below, the Plan provides for the payment of the *reasonable* fees and expenses incurred by the First Lien Agent and its professionals.

14. The effective date of the Plan occurred on April 1, 2010 (the "Effective Date").

C.  **The First Lien Agent's Motion to Compel**

15. On May 24, 2010, the First Lien Agent filed the Motion seeking entry of an order compelling the Reorganized Debtors to reimburse the fees and expenses of the First Lien Agent and its professionals. Specifically, the First Lien Agent seeks reimbursement of the following fees and expenses:

| Period | Professional | Type of Professional | Total Fees & Expenses |
|---|---|---|---|
| 12/1/08 – 4/30/10 | Skadden, Arps, Slate, Meagher & Flom LLP | Primary Legal Counsel | $915,109.86 |
| 12/1/09 – 4/20/10 | Sylvester & Poledniak, Ltd. ("S&P") | Local Counsel | $14,559.08 |
| 8/1/08 – 8/26/08 | Udall Law Firm, LLP ("Udall") | Local Counsel | $2,740.00 |
| 4/1/09 – 4/1/10 | Credit Suisse AG, Cayman Islands Branch | First Lien Agent | $19,195.21 |

In support of the Motion, the First Lien Agent alleges that the Reorganized Debtors are required to reimburse the First Lien Agent and its professionals for the above-referenced

7

fees and expenses pursuant to the terms of (i) the Cash Collateral Order, (ii) the Confirmation Order and the Plan, and (iii) the First Lien Credit Agreement. The First Lien Agent further alleges that it previously requested payment of such fees and expenses by letters dated February 18, 2010 and May 3, 2010. The First Lien Steering Committee and the Debtors sent letters to Skadden on March 18, 2010 (the "March 18 Letter") and March 19, 2010, respectively, objecting to Skadden's fees (copies of which are attached hereto as Exhibits B and C). The bases for the objections contained in the March 18 Letter are the same as those which underlie this Objection. *See* March 18 Letter.

## OBJECTION

**A.  The First Lien Agent and Its Professionals are Only Entitled to the Reimbursement of Reasonable Fees and Expenses**

16.  Pursuant to the terms of the Cash Collateral Order, the Plan and the First Lien Credit Agreement, the First Lien Agent and its professionals are only entitled to the reimbursement of reasonable fees and expenses. In relevant part, the Cash Collateral Order provides:

> As further adequate protection for the use of Cash Collateral during the Budget Period, the Debtors shall, after receipt of an applicable invoice, pay in full, in cash by wire transfer the fees and expenses incurred by the professionals for . . . the First Lien Agent (including Skadden, Arps, Slate, Meagher & Flom, LLP and the First Lien Agent's local counsel) . . . .

Cash Collateral Order ¶ 5(c). In order to be compensated under the Cash Collateral Order, however, the First Lien Agent and its professionals were required to submit monthly invoices to the Debtors and the United States Trustee, giving each party 10 days to evaluate the reasonableness of the requested fees and expenses. *Id.* Thus, under the terms of the Cash Collateral Order, any right to payment of the fees and expenses incurred by the First Lien Agent and its professionals must be qualified by the requirement that such fees and

8

expenses be reasonable. Skadden never submitted a monthly invoice pursuant to the terms of the Cash Collateral Order prior to the Effective Date.

17. The Plan and the First Lien Credit Agreement similarly provide that the Reorganized Debtors are required to reimburse the First Lien Agent and its professionals for reasonable fees and expenses. The Plan provides, in relevant part:

> The *reasonable fees and expenses* incurred by (i) the First Lien Agent, including its professionals, to the extent provided by the First Lien Credit Agreement . . . shall be paid by the Debtors or the Reorganized Debtors, as applicable, within 15 days of receipt of an invoice from such parties or their advisors.

Plan, Art. IX.A.3 (emphasis added). The First Lien Credit Agreement states that:

> Each of the Borrowers shall pay all actual and documented out-of-pocket expenses incurred by each Agent and its Affiliates, including the *reasonable and documented fees*, charges and disbursements of its appraiser, counsel (including without limitation, special and local counsel) for each Agent and its affiliates . . . .

First Lien Credit Agreement § 9.2A (emphasis added). Pursuant to the terms of the Plan and the First Lien Credit Agreement, and consistent with the Cash Collateral Order, the First Lien Agent and its professionals are therefore entitled to the reimbursement of their fees and expenses only to the extent such fees and expenses are reasonable.

**B.    Skadden's Fees and Expenses are not Reasonable**

18. While none of the Cash Collateral Order, the Plan or the First Lien Credit Agreement defines what constitutes reasonable fees and expenses, bankruptcy courts typically consider several factors in evaluating the reasonableness of fee requests under Bankruptcy Code section 330. These factors include the following: (i) the time spent on such services; (ii) the rates charged for such services; (iii) the necessity and benefit of the services to the administration of the estates; (iv) whether the services were performed within

9

a reasonable amount of time commensurate with the complexity, importance, and nature of the problem; (v) the skill of the professionals providing such services; and (vi) the customary compensation of comparably skilled professionals in other cases. *See* 11 U.S.C. § 330(a)(3); *see also Am. Law Ctr. PC v. Stanley (In re Jastrem)*, 253 F.3d 438, 443 (9th Cir. 2001) (listing factors); *In re Virissimo*, 354 B.R. 284, 291-92 (Bankr. D. Nev. 2006) (discussing the standard for determining whether fees and expenses are reasonable under Bankruptcy Code section 330). In addition, compensation is not permitted for services that were duplicative or unnecessary. *See* 11 U.S.C. § 330(4)(A).

19. In this case, the most relevant of the foregoing factors are (i) the time spent on the services for which Skadden seeks compensation, (iii) the necessity and benefit of the services to the administration of the estates, and (iv) whether the services performed by Skadden were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem. Based on a review of the time records attached to the Motion, the Reorganized Debtors submit that, in light of the First Lien Agent's limited role in the Chapter 11 Cases, Skadden's incurrence of over $915,000 in fees evidences that Skadden spent an unreasonable amount of time on the services it provided and/or performed services that did not benefit the administration of the estates (or the interests of the First Lien Lenders).

20. As discussed in the Motion, the invoices submitted by Skadden are organized into five broad categories of services: (i) plan/disclosure statement; (ii) loan administration; (iii) loan litigation; (iv) mediation; and (v) fee matters. A review of Skadden's invoices shows that many of the services provided by Skadden in categories (i) through (iv) were

10

unnecessary, duplicative, excessive or of no benefit to the First Lien Lenders or to the administration of the Debtors' estates.

### 1. Services Related to Plan/Disclosure Statement

21. As set forth in the Motion, Skadden spent a total of 267.05 hours on issues related to the Plan and the Disclosure Statement. Based on the Reorganized Debtors' review of Skadden's invoices, the majority of the work performed in this category of services related to (i) attending hearings regarding the Plan and Disclosure Statement, (ii) preparing the Plan Objection and engaging in related negotiations with the First Lien Steering Committee and (iii) reviewing the Plan and the Disclosure Statement. The Reorganized Debtors do not object to the fees incurred by Skadden in connection with (x) its attendance at Plan-related hearings or (y) a reasonable review of the Plan and Disclosure Statement. The Reorganized Debtors do object, however, to all fees incurred by Skadden in connection with the First Lien Agent's efforts to obtain a global release or expansive indemnification from the First Lien Lenders. Indeed, the Reorganized Debtors submit that the Debtors' estates should not be required to reimburse the First Lien Agent for fees incurred in connection with the Plan Objection (including drafting, analysis and research associated therewith) or other efforts to obtain a release or broad indemnification from the First Lien Lenders. Unfortunately, based on the vagueness of Skadden's time entries, the Reorganized Debtors are unable to assess the value of Skadden's services that are properly compensable under the Plan. Indeed, many of the time entries for this category refer simply to "plan issues," "plan matters" or "analysis re plan." Examples of such entries include the following:

11

| Date | Skadden Professional | Description |
| --- | --- | --- |
| 9/1/09 | Ramon Naguiat | Correspondence regarding plan issues; review various plan-related materials and related matters/issues; confer and correspond with V. Durrer re same. |
| 9/3/09 | Ramon Naguiat | Research re plan matters/issues; review and revise plan term sheet, and confer and correspond with V. Durrer regarding same; correspond with Credit Suisse regarding same. |
| 9/25/09 | Van C. Durrer II | Analysis re plan filed by First Lien Steering Committee; review and revise comments to plan. |
| 9/28/09 | Ramon Naguiat | Conference call with CS and V. Durrer regarding plan issues. |

Further, the amount of time spent on matters that were directly within the scope of the limited role played by the First Lien Agent is only a small fraction of the time captured within this category. For example, Skadden spent only approximately 15-25 hours on matters related to plan solicitation and balloting.

**2.    Services Related to Loan Administration**

22.    As discussed in the Motion, Skadden spent 670.25 hours on matters related to loan administration. The First Lien Agent alleges that the loan administration category is a catch-all category designed to record time related to tasks that do not fall into other categories of services, which tasks included the following: (i) monitoring and analyzing pleadings and documents related to the Chapter 11 Cases; (ii) preparing and filing proofs of claim; (iii) communicating with the First Lien Lenders regarding bankruptcy matters; (iv) conducting research regarding issues related to the Chapter 11 Cases; (v) negotiating stipulations regarding the filing of proofs of claims with the Debtors; and (vi) attending hearings and meetings related to the Chapter 11 Cases.

23.    Based on their review of Skadden's invoices, the Reorganized Debtors believe that the fees and expenses related to this category are excessive and unreasonable. For example, Skadden's time records reflect that Skadden spent more than 100 hours and incurred fees of approximately $54,500 preparing and filing proofs of claim against each of

the Debtors. The proofs of claim filed by the First Lien Agent, an example of which is attached hereto as Exhibit D, consist of a standard proof of claim form and an identical four page attachment setting forth the basis for the secured claims asserted against the Debtors. The Reorganized Debtors maintain that the devotion of over 100 hours to preparing and filing simple proof of claim forms is not justified on the facts of these cases. By contrast, the Second Lien Agent spent approximately 25 hours preparing and filing its proofs of claim, at a total cost of approximately $10,800.[3]

24. In addition, time spent by Skadden reviewing (i) the claims register, (ii) the Debtors' schedules of assets and liabilities and statements of financial affairs, and (iii) the docket and recent filings in the Chapter 11 Cases on a regular basis was unnecessary given the active role of the First Lien Steering Committee and the limited role and responsibility of the First Lien Agent in the Chapter 11 Cases.

### 3. Services Related to Loan Litigation

25. Skadden spent 520.8 hours on services in the loan litigation category. The First Lien Agent alleges that the loan litigation category includes services performed by Skadden related to certain contested matters, including the Trustee Motion and the Debtors' Cash Collateral Motion. While the invoices submitted by Skadden reflect that a portion of the services performed in this category were related to the Trustee Motion and the Cash Collateral Motion, a substantial portion of such services were performed after the First Lien Steering Committee agreed to adjourn the Trustee Motion indefinitely and after entry of the Cash Collateral Order (collectively, the "Other Loan Litigation Services").

---

[3] For the Court's reference, a sample proof of claim prepared by the Second Lien Agent is attached hereto as Exhibit E.

13

26.     Unfortunately, the entries included on the Skadden Invoices related to the Other Loan Litigation Services are vague and do not allow for a determination of the nature, necessity or benefit of the services provided. Numerous entries in this category relate to "bankruptcy litigation," "fact research regarding loan" or "bankruptcy litigation issues." Examples of such entries include the following:

| Date | Skadden Professional | Description |
| --- | --- | --- |
| 6/10/09 | Douglas B. Adler | Preparation regarding and conference call with team and with client regarding strategy regarding bankruptcy litigation; review potential litigation issues; various emails. |
| 6/12/09 | Van C. Durrer II | Analysis re strategy with respect to potential litigation. |
| 6/25/09 | Allen L. Lanstra | Research regarding bankruptcy litigation issues. |
| 8/10/09 | Rina A. Hunter | Perform fact research regarding loan and related matters. |

Without additional detail regarding the Other Loan Litigation Services or the potential litigation that the First Lien Agent was analyzing, the Reorganized Debtors have no basis to evaluate the reasonableness of the fees requested and must object to the payment of any such amounts. This is particularly true given that at no point prior to or during the administration of the Chapter 11 Cases did litigation arise related to the validity of the First Lien Credit Agreement or the obligations incurred thereunder.

### 4.     Services Related to the Mediation

27.     Skadden spent approximately 151.00 hours on matters related to the Mediation. Based on the Reorganized Debtors' review of Skadden's invoices, the majority of the work performed by Skadden under this category relates to reviewing mediation statements and term sheets, and communicating with various parties by conference call. Examples of entries reflecting such services include the following:

| Date | Skadden Professional | Description |
| --- | --- | --- |
| 8/13/09 | Ramon Naguiat | Conference call with A. Zausmer regarding mediation issues and review related materials. |

14

| 8/31/09 | Van C. Durrer II | Call with client group re settlement issues; call with A. Zausmer re same; call with A. Qureshi re same and format and prepare memo to clients re presentation to lender group. |
|---|---|---|
| 9/21/09 | Van C. Durrer II | Call with CS team re approach to settlement. |
| 9/23/09 | Van C. Durrer II | Conference call with clients re general update and strategy for settlement. |
| 9/9/09 | David C. Reamer | Calls with CS; issues regarding term sheet. |

Skadden appears to have spent considerably less time preparing the First Lien Agent's brief mediation statement and attending the Mediation. Moreover, although the First Lien Agent (and Skadden professionals) attended the Mediation, they were not actively involved in the negotiation of the Mediation Settlement and were not a party to the settlement. Accordingly, the Reorganized Debtors believe that the time expended on this category of services by Skadden was excessive, and that a significant percentage of the services provided by Skadden in this category may have related to efforts to procure a global release or broader indemnification and were of little or no benefit to the administration of the Debtors' estates.

**C.   The Fees and Expenses of the Second Lien Agent and its Professionals Demonstrate that Skadden's Fees and Expenses are not Reasonable**

28.   As noted above, based on their review of Skadden's invoices, the Reorganized Debtors have been unable to quantify the extent of the "reasonable" fees and expenses incurred by Skadden. The Reorganized Debtors, submit, however, that a proxy for reasonable fees and expenses are those incurred by the Second Lien Agent, which aggregated a total of approximately $412,000. While the Second Lien Agent did not have the advantage of a steering committee to take a leading role in the Chapter 11 Cases and played a more substantive role in the Mediation and the development of the Plan, the Second Lien Agent's counsel incurred fees and expenses that were less than half of those incurred by counsel to the First Lien Agent.

15

29.     The Reorganized Debtors believe that the fees and expenses incurred by counsel to the Second Lien Agent are a reasonable barometer of the fees and expenses to which Skadden should be entitled, and, therefore, submit the Reorganized Debtors' obligation to reimburse Skadden should be limited to $412,000.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the Reorganized Debtors respectfully request that the Court (i) deny the Motion as it relates to Skadden's fees and expenses and (ii) grant the Reorganized Debtors such other relief as is just, proper and equitable.

Dated this 7th day of June, 2010.

By:  /s/  Philip C. Dublin
Nile Leatham (NV Bar No. 002838)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
(702) 979-2357 (Telephone)
(702) 362-9472 (Facsimile)
Nleatham@klnevada.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Philip C. Dublin (NY Bar No. 2959344)
Meredith A. Lahaie (NY Bar No. 4518023)
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
pdublin@akingump.com
mlahaie@akingump.com

*Counsel for the Reorganized Debtors*