

# FIGURE 10 - GV RANCH
# STORM WATER COLLECTION SYSTEM OVERVIEW



| | |
|---|---|
| DATE: | MAY 2006 |
| DRAWN: | |
| APPROVED: | |

Holy Moses Wash. These washes are all tributaries to the Sacramento Wash which enters the project site on the western boundary and exits at the southern boundary. The proposed storm drainage system is a separate system from the sanitary sewer system and maintains the historic flow patterns while routing flows away from the sanitary sewer collection or treatment facilities. Please refer to Figure 10, "GV Ranch Stormwater Collection System Overview".

The north and northeast portions of the project site drain by way of surface facilities to the Powerline Channel, then west to the Thirteen Mile Wash. Pod 3 drains into 42-inch and 54-inch pipes that cross Aztec Road and drain into the depressed golf course.

Pod 2 likewise drains into the golf course. Pod 1 drains to three collection points to a storm drain system in West Loop Road. This drainage system with a maximum pipe size of 84-inches drains into the golf course. The depressed golf course serves as a detention basin to reduce flows back to the predevelopment condition. Flows from the golf course are conveyed by culverts and open channels to the Cerbat and Sacramento Washes.

The western and southern portions of the site, including the Town Center, will drain by separate facilities to the tributaries of the Holy Moses Wash.

***Pretreatment Requirements.*** There will be no required pretreatment of residential sewage. Commercial and industrial pretreatment requirements will meet 40 CFR Part 403 as enforced by ADEQ, as well as other state and local requirements in place at the time the owner of the establishment applies for the building permit for the facility. PMUC staff will coordinate with the County building department as part of their pretreatment program duties. These requirements will also be provided at the time the owner of the facility applies for a sewer connection. The City of Kingman will be expected to adhere to these requirements as a condition of PMUC accepting sewage from the Downtown WWTP.

**Design and Construction Scheduling**

***Interim WWTP.*** The interim WWTP is under the following design and construction schedule:

1. Design and permit submission– ongoing, completion date of September 2006.
2. Equipment procurement – Starting July 2006.
3. Construction – Starting October 2006.
4. Substantial Completion/WWTP startup – March 2007.

This schedule is designed to have the interim WWTP ready for service prior to the closing of the first residential unit. As such, there will be no septic systems in GV Ranch.

Construction priorities for the interim WWTP include procurement of the process equipment, approval of the 208 plan amendment, approval of the APP, AZPDES and Reuse permits, and completion of the development infrastructure (water, sewer and electric utilities, in particular) so that the WWTP can have a potable water supply, a means to convey the sewage from the homes to the plant, and a power supply for the equipment and controls.

***Permanent WWTP.*** Phase 1 of the permanent WWTP (1 mgd capacity) is under the following design and construction schedule:

1. Design and permit submission– Starting in July 2006, complete in January 2007.
2. Equipment procurement – Starting October 2006.
3. Construction – Starting January 2007.
4. Substantial Completion/WWTP startup – December 2007.

This schedule is designed to have the permanent WWTP ready for service prior to the interim WWTP reaching 80% of its rated design capacity. This schedule reinforces the "no septic tank" philosophy of GV Ranch.

At this time, the project priority is to begin the design process on schedule. Submission of the APP, AZPDES and Reuse permits for this facility will be a top design priority. The main construction priority is similar to the interim WWTP – complete the development infrastructure (water, sewer and electric utilities, in particular) so that the WWTP can have a potable water supply, a means to convey the sewage from the homes to the plant, and a power supply for the equipment and controls.

Future phases of WWTP Design and Construction are listed below. These are based on an average housing absorption rate of 50 homes per month, and the wastewater and land use assumptions included in this document.

Phase 2 – 2 mgd upgrade, capacity to 3 mgd – January 2009 to September 2010
Phase 3 – 2 mgd upgrade, capacity to 5 mgd – April 2017 to December 2018
Phase 4 – 2 mgd upgrade, capacity to 7 mgd – April 2028 to December 2029
Phase 5 – 2.4 mgd upgrade, capacity to 9.4 mgd – April 2040 to December 2041

**Permitting Requirements**

Both the interim and permanent WWTPs will require the following permits:

1. Mohave County 208 Plan Amendment (this document).
2. Aquifer Protection Permit (APP).
3. Arizona Permit Discharge Elimination System Permit (AZPDES) for sewage discharge.
4. ADEQ Individual Reclaimed Water Permit.
5. Mohave County Building Permit.
6. ADEQ Air Quality permit.
7. AZPDES Stormwater Pollution Prevention Permit (contractor to obtain)
8. Dust Control Plan for construction (contractor to submit).

A copy of the July 2005 meeting notes discussing permitting is included in Appendix C.

***Mohave County 208 Plan Amendment.*** The GV Ranch development represents the first major plan amendment since the Mohave County 208 Plan was approved in December 2003. Rhodes and Mohave County are using this document to move the plan approval process forward. ADEQ approval is anticipated by October 2006.

***Aquifer Protection Permit.*** The State Aquifer Protection Permit (APP) Program was established by the Environmental Quality Act and serves to regulate WWTPs that will

discharge to the local aquifer.  The interim WWTP will process less than 250,000 gpd, and will follow a streamlined approval process in accordance with ADEQ guidelines for facilities that process less than 250,000 gpd.  The application for the interim WWTP was submitted on February 3, 2006 and currently is defined as "administratively incomplete" because the 208 Plan Amendment has not been approved.

The APP for the permanent WWTP will require proof of Best Available Demonstrated Control Technology (BADCT), as defined in the ADEQ BADCT guidance documents. The APP application for the permanent WWTP is scheduled for submission in Fall 2006.

***AZPDES for Sewage Discharge.***  An AZPDES permit for sewage discharge is required for both WWTPs due to potential discharge into a tributary of Thirteen Mile Wash.

Figure 10 shows the location of the discharge point for the interim WWTP.  The AZPDES permit application for the interim WWTP will be submitted in July 2006.

The discharge location for the permanent WWTP will be defined during the detailed design of the WWTP.  The AZPDES permit application for the Permanent WWTP will be submitted in Fall 2006.

***ADEQ Individual Reclaimed Water Permit.***  An individual reclaimed water permit is required for both WWTPs due to the use of reclaimed water for golf course irrigation. The application for the interim WWTP is scheduled for submittal in July 2006.  The application for the permanent WWTP is scheduled for a Fall 2006 submittal.  Figure 6 shows the discharge point to the golf course irrigation system.  This discharge point will be the same for both WWTPs.

***Mohave County Building Permit.***  A Mohave County Building permit is required for both WWTPs, as both WWTPs will have some type of habitable structure at the site.  For the interim WWTP, Rhodes will coordinate with the appropriate Mohave County department, obtain exactly what is required for the submittal, and submit the permit information by July 2006.  The application for the permanent WWTP is scheduled for a Fall 2006 submission.

***ADEQ Air Quality Permit.***  An ADEQ air quality permit will be required for the permanent WWTP.  The main parameters to be regulated will be odor emissions and the emissions from the on-site generator.  This permit is scheduled for a Fall 2006 submittal.

The interim WWTP will not require an air quality permit.  The plant complies with the 1,000 foot buffer zone required of WWTPs that have no formal odor control system, and the emergency generator can be exempted since it will be smaller than 300 bhp in output.

***AZPDES Stormwater Pollution Prevention Permit (contractor to obtain).***  The Contractor will have to submit an AZPDES Stormwater Pollution Prevention Permit (SWPPP) for both WWTPs.  The intent of this permit is to verify that the Contractor conforms with appropriate measures to contain and treat (if necessary) stormwater runoff that occurs during the construction process. The Contractor must submit this plan prior to starting site work for both WWTPs.  They must coordinate with ADEQ's permit section to construct the WWTPs.

***Dust Control Plan (contractor to submit for review).*** The Contractor is required to submit a dust control plan to the construction administrator for review and approval for both WWTPs. There is no formal permitting process for dust control in Mohave County, but the Contractor must submit an internal plan and must follow the plan during the construction process. Water or other dust control materials must be available on-site at all times.

### Project Financing and Cost Opinions

Both the interim WWTP and the first phase of the permanent WWTP are being privately financed by Rhodes. Rhodes will turn the facilities over to the PMUC for operation and maintenance upon operational acceptance of the WWTPs. Rhodes will finance future phases of the permanent WWTP and will turn those phases over to PMUC for operation and maintenance, as well. The consolidated financial statement for Sagebrush Enterprises, Inc. and Subsidiaries (Rhodes' parent company) is included in Appendix D. Rhodes has filed the required financial information for the formation of the PMUC with the ACC. This information details the expected financial operation of the company for the first five years of operation. This information is included in Appendix D.

Project construction cost opinions are detailed in Table 5 below. All costs are in 2006 dollars.

**TABLE 5**
**GV RANCH INTERIM AND PERMANENT WWTPs**
**CONSTRUCTION COST OPINIONS**

| INTERIM WWTP (240,000 gpd) | |
|---|---|
| Construction Schedule | October 2006 – March 2007 |
| Construction Cost | $ 2,900,000 |
| Admin, O&M, Insurance + Contingency (20%) | $ 580,000 |
| Total Cost | $ 3,480,000 |
| **PERMANENT WWTP, PHASE I (1 mgd)** | |
| Construction Schedule | January 2007 – December 2007 |
| Construction Cost ($11.5/gal) | $ 11,500,000 |
| Admin, O&M, Insurance + Contingency (35%) | $ 4,000,000 |
| Total Cost | $ 15,500,000 |
| **PERMANENT WWTP, PHASE 2 (3 mgd)** | |
| Construction Schedule | September 2009 – September 2010 |
| Construction Cost ($6.5/gal) | $ 13,000,000 |
| Admin, O&M, Insurance + Contingency (35%) | $ 4,500,000 |
| Total Cost | $ 17,500,000 |
| **PERMANENT WWTP, PHASE 3 (5 mgd)** | |
| Construction Schedule | January 2018 – December 2018 |
| Construction Cost ($8.5/gal) | $ 17,000,000 |
| Admin, O&M, Insurance + Contingency (35%) | $ 6,000,000 |
| Total Cost | $ 23,000,000 |
| **PERMANENT WWTP, PHASE 4 (7 mgd)** | |
| Construction Schedule | January 2029 – December 2029 |
| Construction Cost ($5.5/gal) | $ 11,000,000 |
| Admin, O&M, Insurance + Contingency (35%) | $ 3,850,000 |
| Total Cost | $ 14,850,000 |

| PERMANENT WWTP, PHASE 5 (9.4 mgd) | |
|---|---|
| Construction Schedule | January 2041 – December 2041 |
| Construction Cost ($4.5/gal) | $ 10,800,000 |
| Admin, O&M, Insurance + Contingency (35%) | $ 3,800,000 |
| Total Cost | $ 14,600,000 |

**Project Impacts and Benefits**

The GV Ranch project will impact the Golden Valley/Kingman Area of Mohave County in many ways. These impacts are listed below.

***The Project will Increase the Mohave County Tax Base.*** The housing and commercial components of the project will add to the Mohave County tax base without costing the County capital for construction, as Rhodes is financing the infrastructure development and construction.

***Master Planned Community Prevents Haphazard Development.*** The GV Ranch community will be master planned, with all community development aspects being approved by Mohave County in accordance with the County's general plan. This will prevent wildcat or haphazard development of the area and add the first "destination" style community to the region.

***Recreational Opportunities will be Added to the Region.*** GV Ranch will add a 155 acre regional park, an 18 hole championship golf course, and a Town Center shopping, dining and entertainment district to a region that has few recreational and entertainment opportunities within 30 minutes' drive.

***Use of Reclaimed Water for Irrigation.*** The use of reclaimed water for irrigation in the GV Ranch community will minimize the use of the groundwater resource. The interim WWTP is expected to be able to essentially deliver all of its treated wastewater to the golf course irrigation system. As the development grows and the permanent WWTP comes on line, the treated wastewater volume delivered to the golf course irrigation system will be sufficient to irrigate the golf course year round, thus eliminating the use of groundwater for irrigation. In addition, irrigation of the parkland green space in GV Ranch with reclaimed water will allow for the full use of these amenities without additional depletion of the groundwater resource.

***Potential Improvement to the Kingman Wastewater System.*** The City of Kingman and Rhodes are negotiating for Kingman to route up to 250,000 gpd of flow from its Downtown WWTP to the GV Ranch permanent WWTP. In anticipation of a successful negotiation, this flow has already been included in the implementation schedule for the permanent WWTP. This would have the benefit of removing an operationally challenged plant from the Kingman system, thus improving regional water quality. An additional benefit could be to provide a significant base flow to the first phase of the permanent WWTP, which would eliminate operational concerns of low flows and allow for quicker decommissioning of the interim WWTP.

**Public Comment Process**

The public will have an opportunity to review this plan and provide comment in a public forum. Mohave County staff will publicly advertise the delivery of the plan to the County and will notify the residents of Mohave County where they can review the document. The public comment period will be 45 days from the time of public posting of the document to the time of the public meeting on the Plan document. In addition, Mohave County will send mail notifications to those residents and businesses determined to be directly impacted by the project.

Mohave County will hold a public meeting to discuss the Plan amendment. This public meeting will provide a forum for the public to express support, concerns, or answer questions on the project. These comments, and responses to the comments generated by the public input process, will be incorporated into the Plan document prior to a final decision on the Plan amendment.

## Appendix A

# 208 Plan Amendment Checklist

## 208 PLAN AMENDMENT CHECKLIST

### Section 208 Clean Water Act

### 40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| **AUTHORITY**<br>Proposed Designated Management Agency (DMA) shall self-certify that it has the authorities required by Section 208( c ) (2) of the Clean Water Act to implement the plan for its proposed planning and service areas. Self-certification shall be in the form of a legal opinion by the DMA or entity attorney. | Mohave County is the Designated Planning Agency (DPA) for this project. Perkins Mountain Utilities Company will own, operate and maintain the system as a private utility. There is no DMA for the project. | Page 3 |
| **20-YEAR NEEDS**<br>*[Clearly describe the existing wastewater treatment (WWT) facilities;]*<br> ▪ Describe existing WWT facilities. | There are no public wastewater collection or treatment facilities within the plan area. Existing residential development in the areas adjacent to the plan area are rural in nature and served by on-site septic systems. The closest WWTP (the Black Mountain Prison WWTP) is approximately 7 miles south of the plan area and is owned by a private utility. The plant would require significant upgrades (denitrification, filtration and disinfection) to meet the reuse needs of the development, plus an additional 7 miles of gravity main, a reuse water pump station, and an additional 7 miles of reuse force main. This site was financially infeasible and was not chosen for further study. | Pages 1-2<br><br>Figure 1 |
| ▪ Show WWT certified and service areas for private utilities and sanitary district boundaries if appropriate. | There are currently no private utilities or sanitary districts within the plan area. The location of private utilities and sanitary district boundaries in the vicinity of GV Ranch are shown in Figure 1. The location of the interim and permanent WWTP and the Perkins Mountain Utilities Company/GV Ranch service area are also illustrated in Figure 1. The Perkins Mountain Utilities Company (PMUC) has filed with the ACC for a Certificate of Convenience & Necessity (CC&N) for GVR. | Page 1<br><br>Figure 1 |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 1 of 12


Stanley Consultants INC.

## 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| Clearly describe alternatives and the recommended WWT plan:<br>▪ Provide POPTAC population estimates (or COG-approved estimates only where POPTAC not available) over 20-year period. | POPTAC population estimates as published in the approved Mohave County 208 Plan, Arizona Department of Economic Security (ADES) population projections calculated in 2005, and GV Ranch community population projections are shown in Table 1. The development of the GV Ranch Master Planned Community exceeds both government population projections. GV Ranch population projections will be used for WWTP phasing. | Page 4<br><br>Table 1 |
| ▪ Provide wastewater flow estimates over the 20-year planning period. | Flow estimates for the interim and permanent WWTPs are shown in Tables 2, 3 and 4. These estimates are based on population projections for GV Ranch. The addition of up to 250,000 gpd of City of Kingman Downtown WWTP wastewater is also included in the Permanent WWTP Flow estimate table (Table 3). | Pages 5, 6<br><br>Tables 2, 3 and 4 |
| ▪ Illustrate the WWT planning and service areas. | Planning and Service Area is shown in Figure 1. | Page 1<br><br>Figure 1 |
| ▪ Describe the type and capacity of the recommended WWT Plant. | Wastewater treatment capacity will be constructed in multiple phases. An interim plant sized for an average day of maximum month (admm) flow of 0.24 mgd will be constructed first. Concurrent to the interim plant, the first phase (1.0 mgd admm) of an ultimate 9.4 mgd admm WWTP will be designed and constructed. The Interim and Permanent plants will provide Class A+ wastewater through a tertiary treatment process including filtration, nutrient removal and disinfection. The interim WWTP will use membrane bioreactor technology. The permanent WWTP will use SBR technology for the first two phases, with a re-evaluation and possible technology retrofit for subsequent phases. | Pages 6 - 9<br><br>Figures 4 and 8 |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 2 of 12

Stanley Consultants INC.

# 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| Identify water quality problems, consider alternative control measures, and recommend solution for implementation. | There will be no anticipated water quality problems for either WWTP. | Pages 7-9 |
| ▪ If private WWT utilities with certificated areas are within the proposed regional service area, define who (municipal or private utility) serves what area and when. Identify whose sewer lines can be approved in what areas and when. | There are no existing private WWT utilities in the plan area.<br><br>See Figure 1.<br><br>The PMUC has filed with the ACC for a CC&N for the GV Ranch service area. | Page 1<br><br>Figure 1 |
| ▪ Describe method of effluent disposal and reuse sites (if appropriate). | Effluent from the interim WWTP will be reused for golf course irrigation. The water will be delivered to the golf course lake system. If the golf course lake system is at capacity, effluent will be discharged into a tributary of the Thirteen Mile Wash via an approved discharge permit.<br><br>Effluent from the permanent WWTP will be reused for golf course and park irrigation. Although we anticipate 100% reuse year round, in the event that the effluent cannot be used on-site, the effluent will be discharged into a tributary of the Thirteen Mile Wash via an approved discharge permit. | Pages 7, 9<br><br>Figures 6 and 7 |



Stanley Consultants INC.

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02–208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 3 of 12

# 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| ▪ If sanitary districts are within a proposed planning or service area, describe who serves the sanitary districts and when. | There are no sanitary districts in the GV Ranch plan area.<br><br>See Figure 1. | Page 1<br><br>Figure 1 |
| ▪ Describe ownership of land proposed for plant sites and reuse areas. | The land on which both WWTPs will be constructed belongs to Rhodes. The interim and permanent WWTP properties will be transferred to PMUC when each of the WWTP's initial phases are ready for service. Rhodes will retain ownership of the golf course. The parks will be owned by the community HOA. | Pages 7, 8 |
| ▪ Address time frames in the development of the treatment works. | The interim WWTP will be available for operation prior to occupation of the first residential unit. The facility is currently under design, with procurement of equipment starting in July of 2006, construction starting in October 2006, and substantial completion anticipated for March 2007. The permanent WWTP is scheduled to begin design in July of 2006, with procurement of equipment starting in October 2006, construction starting in January 2007, and substantial completion anticipated for December 2007. This implementation schedule is designed to bring the permanent WWTP on-line prior to reaching 80% of the capacity of the Interim WWTP. | Pages 10, 11 |
| ▪ Address financial constraints in the development of the treatment works. | Both the interim and permanent WWTPs are being privately financed by Rhodes, the parent company of the PMUC. Rhodes has demonstrated the financial stability to fund these projects as a part of the ACC C&N filing for PMUC. | Pages 13, 14 |


Stanley Consultants inc.

# 208 PLAN AMENDMENT CHECKLIST

## Section 208 Clean Water Act

### 40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| ■ Describe how discharges will comply with EPA municipal and industrial stormwater discharge regulations (Section 405, CWA). | Section 405 of the Clean Water Act deals with sewage sludge. Liquid sludge from the interim WWTP will be removed from the site and hauled to a landfill for disposal. The transfer location will have provisions to be fully contained in the event of any spillage during sludge transfer. Spillage will be drained back to the influent pump station. Sludge from the permanent WWTP may initially be hauled in liquid form under a process identical to the interim WWTP. As flows increase, sludge will be thickened and dewatered mechanically, with the dewatered "sludge cake" being removed from site and hauled to a landfill for disposal. Any fluid generated by the dewatering process will be returned to the headworks of the plant. As such, there will be no sludge drying beds on site and no anticipated "discharge" from the solids handling facilities of either plant.<br><br>Stormwater discharges are not anticipated. The sites will be graded and drained to stormwater retention basins sized to meet regulatory requirements for stormwater retention. | Pages 7, 8, 9<br><br>Figure 10 |
| ■ Describe how open areas and recreational opportunities will result from improved water quality and how those will be used. | The "improved water quality" created by treating the development's wastewater allows for the operation of a golf course using reclaimed water for irrigation, reducing the dependence on the groundwater aquifer for golf course watering. Both the interim and permanent facilities will route treated wastewater to the golf course for this purpose. In addition to the golf course, the permanent WWTP will provide several regional parks with effluent for irrigation. | Page 14 |
| ■ Describe potential use of lands associated with treatment works and increased access to water-based recreation, if applicable. | The WWTP properties will only be used for treatment purposes. | N/A |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc      Page 5 of 12

Stanley Consultants INC.

## 208 PLAN AMENDMENT CHECKLIST

### Section 208 Clean Water Act

### 40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| REGULATIONS<br>• Describe types of permits needed, included NPDES, APP and reuse. | Permits required for the interim and permanent facilities are the 208 Plan Amendment, APP, AZPDES and Reclaimed Water permits. In addition, an Air quality permit will be required for the permanent facility. A Mohave County building permit will also be required. The Contractor must obtain an AZPDES SWPPP permit. | Pages 11-13 |
| • Describe restrictions on NPDES permits, if needed, for discharge and sludge disposal. | Both the interim and permanent facilities will treat to Class A+ effluent standards and will have solids handling processes that will not generate any discharges from the site. In addition, reuse options will be utilized prior to specific AZPDES discharges. As such, there are no restrictions on AZPDES permits. | Pages 7, 9 |
| • Provide documentation of communication with ADEQ Permitting Section 30 to 60 days prior to public hearing regarding the need for specific permits. | There is no dispute on the need for the permits listed within. Permitting discussions have been held with ADEQ and consensus has been reached on all applicable permits for these WWTPs. See meeting notes included in Appendix C. | Pages 11-13<br><br>Appendix C |
| • Describe pretreatment requirements and method of adherence to requirements (Section 208(b)(2)(D), CWA). | There will be no residential pretreatment requirements. Commercial and industrial pretreatment requirements will meet state requirements and industry standards in place at the time the establishment is constructed. These requirements will be provided to the owner of the establishment at the time that the owner applies for a sewer connection. Adherence to pretreatment requirements will be enforced by building inspectors during construction and PMUC inspectors thereafter. Any flows from the City of Kingman Downtown WWTP will be required to adhere to these same standards. | Page 10 |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 6 of 12

Stanley Consultants INC.

# 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| ▪ Identify, if appropriate, specific pollutants that will be produced from excavations and procedures that will protect ground and surface water quality (Section 208(b)(2)(K) and Section 304, CWA). | Specific pollutants typical of construction projects include dust, migration of soil due to stormwater runoff, construction debris and trash, and construction vehicle fluids. Dust control procedures will be implemented, stormwater runoff will be retained on-site via ponds and silt fences, construction trash will be collected in approved receptacles daily, and construction vehicles will have a designated area for maintenance and fluid replacement, with said area provided with a physical barrier to prevent migration of these fluids into the soil. All protection measures will be in compliance with sections 208 (b)(2)(k) and 304 of the Clean Water Act (CWA). | Pages 10, 13 |
| ▪ Define alternatives and recommendation in the disposition of sludge generated. (Section 405 CWA). | Liquid sludge from the interim WWTP will be removed from site and hauled to a landfill for disposal. Sludge from the permanent WWTP may initially be hauled in liquid form under a process identical to the interim WWTP. As flows increase, though, sludge will be thickened and dewatered mechanically, with the dewatered "sludge cake" being removed from site and hauled to a landfill for disposal. | Pages 7, 9 |
| ▪ Define any nonpoint issues related to the proposed facility and outline procedures to control them. | Non-point discharges are not anticipated. | N/A |
| ▪ Describe process to handle all mining runoff, orphan sites and underground pollutants, if applicable. | This is not a mine site. | N/A |
| ▪ If mining related, define where collection of pollutants has occurred, and what procedures are going to be initiated to contain contaminated areas. | This is not a mine site. | N/A |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Stanley Consultants INC.

## 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| • If mining related, define what specialized procedures will be initiated for orphan sites, if applicable. | This is not a mine site. | N/A |
| CONSTRUCTION<br>Define construction priorities and time schedules for initiation and completion. | The interim facility is currently under design, with procurement of equipment starting in July of 2006, construction starting in October 2006, and substantial completion anticipated for March 2007. The permanent facility is scheduled to begin design in July of 2006, with procurement of equipment starting in October 2006, construction starting in January 2007, and substantial completion anticipated for December 2007. This implementation schedule is designed to bring the permanent facility on-line prior to reaching 80% of the capacity of the Interim facility. | Pages 10, 11 |
| Identify agencies who will construct, operate and maintain the facilities and otherwise carry out the plan. | Rhodes is responsible for construction of the WWTPs and has hired Stanley to assist with program management, design, procurement and construction administration. The WWTP will be operated and maintained by the PMUC. | Page 3 |
| Identify construction activity-related sources of pollution and set forth procedures and methods to control, to the extent feasible, such sources. | Specific pollutants typical of construction projects include dust, migration of soil due to stormwater runoff, construction debris and trash, and construction vehicle fluids. Dust control measures will be implemented, stormwater runoff will be retained on-site via ponds and silt fences, construction trash will be collected in approved receptacles daily, and construction vehicles will have a designated area for maintenance and fluid replacement, with said area provided with a physical barrier to prevent migration of these fluids into the soil. All protection measures will be in compliance with sections 208 (b)(2)(K) and 304 of the CWA. | Pages 10, 13 |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

 Stanley Consultants inc.

# 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| **FINANCING AND OTHER MEASURES NECESSARY TO CARRY OUT THE PLAN**<br><br>▪ If plan proposes to take over certificated private utility, describe how, when financing will be managed. | There are no certificated private utilities in the service area. | Page 1<br><br>Figure 1 |
| ▪ Describe any significant measure necessary to carry out the plan, e.g., institutional, financial, economic, etc. | Both the interim and permanent WWTPs are being privately financed by Rhodes, the parent company of the PMUC. Rhodes has demonstrated the financial stability to fund these projects as part of the ACC CC&N filing for PMUC. If the City of Kingman and PMUC reach a service agreement, Kingman will finance the conveyance system for their sewage, inclusive of pipeline, pump station, connection into the PMUC system, and any oversizing of the PMUC sewage collection trunk mains. | Pages 13, 14 |
| ▪ Describe proposed method(s) of community financing. | Both WWTPs will be financed by Rhodes. PMUC will finance the operation of the system within the guidelines of the CC&N. | Pages 13, 14 |
| ▪ Provide financial information to assure DMA has financial capability to operate and maintain wastewater system over its useful life. | There is no DMA for this project. Rhodes has provided financial data for O&M of these facilities to the ACC in the CC&N application for PUMC. This information is included in Appendix D. | Pages 3, 13, 14<br><br>Appendix D |


Stanley Consultants INC.

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 9 of 12

## 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| ▪ Provide a time line outlining period of time necessary for carrying out plan implementation. | The interim facility is currently under design, with procurement of equipment starting in July of 2006, construction starting in October 2006, and substantial completion anticipated for March 2007. The permanent facility is scheduled to begin design in July of 2006, with procurement of equipment starting in October 2006, construction starting in January 2007, and substantial completion anticipated for December 2007. This implementation schedule is designed to bring the permanent facility on-line prior to reaching 80% of the capacity of the interim facility. Future phases will be based on need. | Pages 10, 11 |
| ▪ Provide financial information indicating the method and measures necessary to achieve project financing. (Section 201 CWA or Section 604 may apply). | All relevant financial data is included in Appendix D. | Pages 13, 14<br><br>Appendix D |
| IMPLEMENTABILITY<br><br>Describe impacts and implementability of Plan:<br><br>▪ Describe impacts on existing wastewater (WW) facilities, e.g., sanitary district, infrastructure/facilities and certificated areas. | There are no existing centralized WWT facilities in the service area. Any septic tanks in the service area will be removed from service. The Black Mountain Prison WWTP will not be impacted. | Pages 1, 2 |
| ▪ Describe how and when existing package plants will be connected to a regional system. | The interim WWTP will be decommissioned and relocated once the permanent WWTP is ready for service. | Page 11 |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

 Stanley Consultants inc.

# 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| ▪ Describe the impact on communities and businesses affected by the plan. | As there are no existing businesses or communities in the service area, there is no impact to existing businesses or communities.<br><br>The phasing of the interim and permanent WWTPs will allow the proposed development to be built at the pace dictated by the market. As such, there is no discernable impact to future communities and businesses.<br><br>If the City of Kingman routes its flow from Kingman's Downtown WWTP, Kingman will benefit by removing an O+M challenged, overtaxed WWTP from their system and GV Ranch will benefit by having a reliable base flow for the permanent WWTP. Any schedule or capacity impacts can be minimized during the design of the permanent WWTP. | Page 14 |
| ▪ If a municipal wastewater (WWT) system is proposed, describe how WWT service will be provided until the municipal system is completed, i.e., will package plants and septic systems be allowed and under what circumstances. (Interim services). | The interim WWTP will be on-line prior to issuance of the Certificate of Occupancy of the first residential unit. There will be no septic systems allowed. The permanent WWTP will replace the interim WWTP when the permanent WWTP is ready for service. | Pages 7, 11 |
| PUBLIC PARTICIPATION<br><br>▪ Submit copy of mailing list used to notify the public of the public hearing on the 208 amendment. (40 CFR, Chapter 1, Part 25.5) | Mohave County will submit the mailing list to Rhodes at the appropriate time in the review process and Rhodes will distribute the public notifications as required. This list will be included in Appendix E. | Page 15<br><br>Appendix E |

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 11 of 12



Stanley Consultants INC.

## 208 PLAN AMENDMENT CHECKLIST

Section 208 Clean Water Act

40 CFR Part 130.6

| REQUIREMENT | BRIEF SUMMARY OF HOW THE REQUIREMENTS IS ADDRESSED: | ADDRESSED ON PAGE: |
|---|---|---|
| ▪ List location where documents are available for review at least 30 days before public hearing. | Rhodes will submit all relevant documents to Mohave County who will have the information available for public review. In addition, Rhodes will include statements that the information can be viewed at the Mohave County offices with the public notification letters. This information will be included in Appendix E. | Page 15<br><br>Appendix E |
| ▪ Submit copy of the public notice of the public hearing as well as an official affidavit of publication from the area newspaper. Clearly show the announcement that appeared in the newspaper at least 45 days before the hearing. | Mohave County will provide this information to Rhodes for inclusion in the 208 Plan Amendment document when the County has this information. This information will be included in Appendix E. | Page 15<br><br>Appendix E |
| ▪ Submit affidavit of publication for official newspaper publication. | Mohave County will provide this information to Rhodes for inclusion in the 208 Plan Amendment document when the County has this information. This information will be included in Appendix E. | Page 15<br><br>Appendix E |
| ▪ Submit responsiveness summary for public hearing. | Mohave County will provide this information to Rhodes for inclusion in the 208 Plan Amendment document when the County has this information. This information will be included in Appendix E. | Page 15<br><br>Appendix E |


Stanley Consultants inc.

June 1, 2006
Golden Valley Ranch
Wastewater Treatment Plant – Draft 208 Plan Amendment Check List

Q:\18449\05-Regulatory\02-208 Amendment\208 for Public Comment July 05\18449 208 final checklist 2006-07-06.doc    Page 12 of 12

## Appendix B

City of Kingman Meeting Minutes
of November 7, 2005

CITY OF KINGMAN
City Council Chambers - 310 N. 4th Street

REGULAR MEETING OF THE COMMON COUNCIL

5:00 P.M.                                   AGENDA                          Monday, November 7, 2005

CALL TO ORDER & ROLL CALL
INVOCATION will be given by Pastor Ken Davidson of the Desert Church of Christ
PLEDGE OF ALLEGIANCE

THE COUNCIL MAY GO INTO EXECUTIVE SESSION FOR LEGAL COUNSEL IN ACCORDANCE WITH A.R.S.38-431.03(A)(3)
TO DISCUSS ANY AGENDA ITEM.  THE FOLLOWING ITEMS MAY BE DISCUSSED, CONSIDERED AND DECISIONS MADE
RELATING THERETO:

1.    APPROVAL OF MINUTES (October 3, 2005 and Work Session of October 17, 2005)

2.    APPOINTMENTS
      -Parks and Recreation Advisory Commission
      -Golf Course Advisory Commission

3.    CALL TO THE PUBLIC - COMMENTS FROM THE PUBLIC
      -Those wishing to address the Council should fill out request forms in advance. Action taken as a result of public comments will be limited to
      directing staff to study the matter or rescheduling the matter for consideration and decision at a later time.  Comments should be limited to no
      longer than 5 minutes.

4.    CONSENT AGENDA
      All matters listed here are considered to be routine by the City Council and will be enacted by one motion.  There will be no separate
      discussion of these items.  If discussion is desired, that item will be removed from the CONSENT AGENDA and will be considered separately.

      a)    Liquor License application - Extension of Premises
            -Gerard Guedon, Hotel Brunswick, located at 315 E. Andy Devine Avenue, Kingman, Arizona, has applied
            for a permanent extension of premises for an added meeting room adjacent to the hotel

      b)    Resolution No. 4190
            Approving the final plat and accepting property escrow assurances from TransNation Title for La Costa,
            Tract 6000

      c)    Resolution No. 4197
            Accepting improvements and authorizing the release of property escrow assurances for Rancho Santa Fe
            Tr. 1953-F

      d)    Resolution No. 4202
            Approval of final plat and improvement plans for Rancho Santa Fe IV, Tract 1953-I

      e)    Resolution No. 4199
            Approving the final plat and accepting improvement plans for Southern Vista III, Tract 6002

      f)    Resolution No. 4211
            Request to release the property escrow assurances for Mission Hills II, Tract 1992, and accepting a cash
            assurance in the amount of $50,000 for all remaining improvements

      g)    Resolution No. 4212
            Approving the release of the first Letter of Credit for $321,852 and the acceptance of a new Letter of Credit
            for $49,844.40 for uncompleted sidewalks and punch list items in Arroyo Vista

      h)    Resolution No. 4213
            Approving the release of the property escrow assurance for the off-site improvements and the acceptance
            of a $50,000 subdivision bond for the value of the work to be completed in The Villas, Tract 1946 - C & D

      i)    Resolution No. 4214
            Approving the final plat, improvement plans and proposed assurances for Canyon Bluff Estates, Tract 6001

j)    **1-Resolution No. 4203**
Acceptance of Deed of Dedication for right-of-way for Stockton Hill Road, Section 24, T22N, R17W of the G&SRM from Majid Nayeri, Vahid Nayeri, and Mohammad Kasra Zarbinian, grantors.

**2-Resolution No. 4204**
Acceptance of Deed of Dedication for right-of-way for Grace Neal Road, Section 24, T22N, R17W of the G&SRM from Majid Nayeri, Vahid Nayeri, and Mohammad Kasra Zarbinian, grantors.

k)    **Resolution No. 4198**
Accepting ADOT Grant # E-6F47 ARFF (Aircraft Rescue Firefighter Vehicle) and Building at the Kingman Airport Authority & Industrial Park

l)    **Resolution No. 4205**
Amend Personnel Classification Exhibit B and Personnel Rules and Regulations Rule 1. Section 35. and Section 43.

m)    **Resolution No. 4200**
Declaring the City's intent to collect water paybacks for N. Bank St. [project No. 03-W-0022]

n)    **Resolution No. 4201**
Declaring the City's intent to collect sewer paybacks for N. Bank St. [project No. 03-S-0023]

o)    Declaring the Kingman Fire Department's low pressure breathing air compressor as surplus property and donating it to the Golden Valley Fire District for their use

p)    1-Change Order No. 3 to JNJ Engineering Construction, Inc, for the drainage channel improvement [Contract No. 04/05-01] increasing the contract total by $1,602.67. This will provide for additional construction requirements to meet MAG standards.

2-Change Order No. 4 to JNJ Engineering Construction, Inc, for the drainage channel improvement [Contract No. 04/05-01] increasing the contract total by $7,859.24. This will provide for an increase to bid quantities for the construction of a drainage spillway, a rip-rap lined channel and a time extension to allow for the construction of these items.

q)    1 -Change Order No. 2 to JNJ Engineering, [contract No. 04/05-02], for water and sewer project, increasing the contract by $5,338.26

2-Acceptance of water and sewer projects [contract no. 04/05-02] and approving final payment to JNJ Engineering in the amount of $34,751.81

r)    Authorizing the Mayor to sign an agreement with Breckenridge Group Architects/Planners *in the* amount of $183,355 for architectural services for the Fire Station #2 replacement project

s)    Authorize the Mayor to sign a Delegation Agreement with ADEQ allowing the City to Review and Approve Extensions to the City's Water and Sewer Systems

t)    Authorization to sell Parcel IV-U-B-C at the Kingman Airport & Industrial Park on December 5, 2005

u)    Authorization to sell Parcel IV-U-B-B at the Kingman Airport & Industrial Park on December 5, 2005

v)    Authorization to sell Parcel VI-E-C-G at the Kingman Airport & Industrial Park on December 5, 2005

w)    Authorization to sell Parcel VI-E-D at the Kingman Airport & Industrial Park on December 5, 2005

x)    Authorizing the City Manager to sign an agreement with PinnacleOne for a Space Needs Assessment not to exceed $35,000

y)    **Municipal Utilities Commission Recommendation**
**-1)  Resolution No. 4215**
-water service to a 4.63 acre parcel for a proposed subdivision to be called Morrow Acres III, Tract 6008, located east of N. Glen, and south of Kino. This site is inside the City limits, and inside the water service boundary area. This was requested by Mohave Engineering, applicant for Greg Benetti, property owner.

-2) Resolution No. 4216
-water service to an approximate 15.1 acre subdivision to be called Canyon Bluff Estates II, Tract 6005, located on the east side of Canyon Road south of Mission Boulevard. This site is inside the City limits and inside the water service boundary area.

z)   AWARD OF BIDS/PROPOSALS/CONTRACTS
-PW-Award of Bid -10 (ten) new vehicles to Mel Clayton Ford in the amount of $274,000; 3 (three) new vehicles to Martin Swanty Chrysler in the amount of $40,000; and 1 (one) new vehicle to Five Star Ford in the amount of $67,000
-KFD - Award of Bid to Frontier Emergency Products in the amount of $197,678.87 for one (1) Emergency Support Rescue Vehicle [per Code Section 2-160E, Cooperative Purchase with Kenai, Alaska]
-CDBG Project #163-05- Award of Bid for the Boys & Girls Club, Renovation Phase III Electrical, to Mestizo Electrical Contractors, Inc in the amount of $20,257.75

Unfinished Business:   (for action)

5.    a)   Ordinance No. 1502 - This item was tabled at the October 3, 2005 Council Meeting
A request from Greg Benetti, applicant and property owner, to rezone certain property from R-R: Rural Residential to R-1-6: Residential, Single Family, 6,000 square foot lot minimum. The proposed rezoning would allow for the development of a subdivision called Morrow Acres III, Tract 6008, containing up to 19 single family residential units. The subject property is located north of Morrow Avenue, south of Kino Avenue and east of North Glen Street. The property is 4.63 acres in size and is further described as a portion of Block 2 of Morrow Acres, Unit 2, Section 6, T21N, R16W, of the G&SRM, Mohave County, Arizona.

b)   Resolution No. 4192 - This item was tabled at the October 3, 2005 Council Meeting
A request from Greg Benetti, property owner, and Mohave Engineering Associates, project engineer, for approval of a preliminary plat for a single family residential subdivision to be known as Morrow Acres III, Tract 6008. The property is 4.63 acres in size and is located along the east side of North Glen Street, south of Kino Avenue and north of Morrow Avenue. The subdivision is proposed to have 19 lots ranging in size from 6,967 to 18,073 square feet in size. The subject property is further described as a portion of Block 2 of Morrow Acres, Unit 2, Section 6, R16W, T21N, of the G&SRM, Mohave County, Arizona.

c)   Public Auction
The sale of Parcel IV-U-B-A at the Kingman Airport & Industrial Park delineated on plat recorded August 16, 2005 at reception number 2005-089352 records of Mohave County, Arizona situate in the south half of Section 26, T22N, R16W, G&SRM Mohave County, Arizona. This parcel contains an area of 6 acres more or less and the minimum acceptable sale price of said property is a total of Two Hundred Thirty Four Thousand Dollars ($234,000)

New Business:    (for review, comment and/or action)

6.    PUBLIC HEARINGS on Planning and Zoning Commission Recommendations
a)   Resolution No 4206.
A request from Rhodes Homes to approve a major amendment to the Projected Land Use Map of the Kingman General Plan 2020, for the Golden Valley Ranch area, by adding approximately 16,800 acres of property to the Projected Land Use Map. The subject property extends approximately seven miles to the west and four miles to the south of the existing incorporated boundary of the City of Kingman.

b)   Resolution No 4207.
A request from Rhodes Homes to approve a major amendment to the Kingman General Plan 2020 by adding approximately 14,600 acres of property to the Projected Land Use Map. The subject property extends approximately nine miles east of the Kingman Airport north and east of the existing incorporated boundary of the City of Kingman.

c)   Resolution No 4208.
A request from Mohave Engineering Associates, applicant and El Quiescence, LLC, property owner, for a minor amendment to the Kingman General Plan 2020 to modify approximately 10.2 acres of Medium Density Residential 3-8 du/ac and 4.9 acres of Intermediate Density Residential 4-16 du/ac to 15.1 acres of Community Commercial land uses. The subject property is located north of I-40, south of Vista Bella and east of Prospector Street, further described as portions of Kingman Ranch, Unit 2, Parcels 9 & 10, Section 10, T21N, R16W, of the G&SRM, Mohave County, Arizona.

d) **Resolution No 4209.**

A request from Landmark Engineering, Inc, applicant, and Axel Development, Inc, Campana Family, LLC, Z Bella Investments, LLC, property owners, for a minor amendment to the Kingman General Plan 2020 by changing the projected land use by increasing land use areas for Medium Density Residential (3-8 du/ac), Neighborhood and Community Commercial, Light Industrial and Public/Quasi-Public, and decreasing land use areas for Intermediate Density Residential (9-16 du/ac) and a golf course area currently designated as Parks and Open Space. The subject property is located north of I-40, east of Andy Devine and both north and south of Airway Avenue and is further described as being located north and east of the existing Valle del Sol (Vista Bella), The Villas and Castle Rock Village subdivisions.

e) **Ordinance No. 1504**

Nicholas E. Main, applicant and Barbara Linn, property owner, have requested the rezoning of certain property described as a portion of the SE 1/4, Government Lot 2, Section 7, T21N, R16W of the G&SRM, Mohave County, Arizona, from O: Recreational Open Space to C-3: Commercial, Service Business. The proposed rezoning would facilitate the development of a construction and landscape office. The property is approximately 1.88 acres in size and is located along the west side of Harrison Street between the Kingman Academy of Learning to the south and the UniSource Energy Equipment yard to the north.

f) **Ordinance No. 1505**

A request for Council to approve a text amendment to the Zoning Ordinance adding a new overlay district and Section (15.000), Bank Street Design Review Overlay District

7. **Ordinance No. 1503**

Review and direction from Council regarding proposed change of City elections from a Spring Primary and General, to a Fall Primary and General Election

8. **Revenue and Fee Study Final Report**

a. Presentation of the October 2005 Revenue and Fee Study Final Report

b. Ordinance No. 1506 -Adjusting Business License Fee Changes, Planning & Zoning Fee Changes, Engineering Fee Changes

c. Notice of Intent to Establish Impact Fees for Parks, Police, Fire, Streets, Storm Drainage and General Government

d. Ordinance No. 1501  - to Increase City Sales Tax by .5% (from 2% to 2.5%)

9. **ANNOUNCEMENTS BY MAYOR & COUNCILMEMBERS**

10. **EXECUTIVE SESSION (per A.R.S.§ 38-431.03 A.3)**

-There is no need for an executive session

ADJOURNMENT                                          POSTED:_____by_____

CITY OF KINGMAN

## REGULAR MEETING OF THE COMMON COUNCIL

| 5:00 P.M. | Minutes | Monday, November 7, 2005 |

| Members: | Officers: | Visitors Signing In: |
|---|---|---|
| M. Gates, Mayor | P. Beecher, City Manager | See attached list |
| T. Spear, Vice Mayor | T. Duranceau, P & Z Director | |
| J. Baker | R. Taylor, City Attorney | |
| T. Carter | T. Weddle, City Clerk | |
| P. Moon | A. Gray, Deputy City Clerk | |
| D. French | C. Loyd, Finance Director | |
| R. Lyons | C. Osterman, Fire Chief | |
| | P. Johnson, Engineer | |
| | | |
| | | |
| | | |
| | | |

Mayor Gates called the meeting to order at 5 p.m. and roll call was taken. All Council Members were present. The Invocation was given by Pastor Ken Davidson of the Desert Church of Christ, after which, the Pledge of Allegiance was said in unison.

1.  **APPROVAL OF MINUTES** (October 3, 2005 and Work Session of October 17, 2005)

    Councilmember Carter made a MOTION to approve the Minutes of October 3, 2005 as written. Vice Mayor Spear SECONDED and it was UNANIMOUSLY APPROVED.

    Councilmember French made a MOTION to approve the Minutes of the Work Session of October 17, 2005 as written. Councilmember Carter SECONDED and it was UNANIMOUSLY APPROVED.

2.  **APPOINTMENTS**
    BParks and Recreation Advisory Commission

    Mayor Gates stated that the Parks & Recreation Advisory Commission has recommended appointing Brent Potter to this Commission.

    After no further discussion, Councilmember Carter made a MOTION to APPOINT Brent Potter to the Parks & Recreation Advisory Commission for a three year term expiring in December of 2008. Councilmember Lyons SECONDED and it was UNANIMOUSLY APPROVED.

    BGolf Course Advisory Commission

    Mayor Gates stated that the Golf Course Advisory Commission has recommended appointing Donald Morgan to this Commission.

    After no further discussion, Councilmember French made a MOTION to APPOINT Donald Morgan to the Golf Course Advisory Commission for a three year term expiring in December of 2008. Vice Mayor Spear SECONDED and it was UNANIMOUSLY APPROVED.

3.    CALL TO THE PUBLIC - COMMENTS FROM THE PUBLIC
There were no Calls to the Public at this time.

4.    CONSENT AGENDA

a)    **Liquor License application – Extension of Premises**
BGerard Guedon, Hotel Brunswick, located at 315 E. Andy Devine Avenue, Kingman, Arizona, has applied for a permanent extension of premises for an added meeting room adjacent to the hotel

b)    **Resolution No. 4190**
Approving the final plat and accepting property escrow assurances from TransNation Title for La Costa, Tract 6000

c)    **Resolution No. 4197**
Accepting improvements and authorizing the release of property escrow assurances for Rancho Santa Fe Tr. 1953-F

d)    **Resolution No. 4202**
Approval of final plat and improvement plans for Rancho Santa Fe IV, Tract 1953-I

e)    **Resolution No. 4199**
Approving the final plat and accepting improvement plans for Southern Vista III, Tract 6002

f)    **Resolution No. 4211**
Request to release the property escrow assurances for Mission Hills II, Tract 1992, and accepting a cash assurance in the amount of $50,000 for all remaining improvements

g)    **Resolution No. 4212**
Approving the release of the first Letter of Credit for $321,852 and the acceptance of a new Letter of Credit for $49,844.40 for uncompleted sidewalks and punch list items in Arroyo Vista

h)    **Resolution No. 4213**
Approving the release of the property escrow assurance for the off-site improvements and the acceptance of a $50,000 subdivision bond for the value of the work to be completed in The Villas, Tract 1946 - C & D

i)    **Resolution No. 4214**
Approving the final plat, improvement plans and proposed assurances for Canyon Bluff Estates, Tract 6001

j)    **1-Resolution No. 4203**
Acceptance of Deed of Dedication for right-of-way for Stockton Hill Road, Section 24, T22N, R17W of the G&SRM from Majid Nayeri, Vahid Nayeri, and Mohammad Kasra Zarbinian, grantors.

**2-Resolution No. 4204**
Acceptance of Deed of Dedication for right-of-way for Grace Neal Road, Section 24, T22N, R17W of the G&SRM from Majid Nayeri, Vahid Nayeri, and Mohammad Kasra Zarbinian, grantors.

k)    **Resolution No. 4198**
Accepting ADOT Grant # E-6F47 ARFF (Aircraft Rescue Firefighter Vehicle) and Building at the Kingman Airport Authority & Industrial Park

l)    **Resolution No. 4205**
Amend Personnel Classification Exhibit B and Personnel Rules and Regulations Rule 1. Section 35. and Section 43.

m)    **Resolution No. 4200**
Declaring the City's intent to collect water paybacks for N. Bank St. [project No. 03-W-0022]

n)    **Resolution No. 4201**
Declaring the City's intent to collect sewer paybacks for N. Bank St. [project No. 03-S-0023]

o)    Declaring the Kingman Fire Department's low pressure breathing air compressor as surplus property and donating it to the Golden Valley Fire District for their use

p)   1-Change Order No. 3 to JNJ Engineering Construction, Inc, for the drainage channel improvement [Contract No. 04/05-01] increasing the contract total by $1,602.67.  This will provide for additional construction requirements to meet MAG standards.

2-Change Order No. 4 to JNJ Engineering Construction, Inc, for the drainage channel improvement [Contract No. 04/05-01] increasing the contract total by $7,859.24.  This will provide for an increase to bid quantities for the construction of a drainage spillway, a rip-rap lined channel and a time extension to allow for the construction of these items.

q)   1-Change Order No. 2 to JNJ Engineering, [contract No. 04/05-02], for water and sewer project, increasing the contract by $5,338.26

2-Acceptance of water and sewer projects [contract no. 04/05-02] and approving final payment to JNJ Engineering in the amount of $34,751.81

r)   Authorizing the Mayor to sign an agreement with Breckenridge Group Architects/Planners in the amount of $183,355 for architectural services for the Fire Station #2 replacement project

s)   Authorize the Mayor to sign a Delegation Agreement with ADEQ allowing the City to Review and Approve Extensions to the City's Water and Sewer Systems

t)   Authorization to sell Parcel IV-U-B-C at the Kingman Airport & Industrial Park on December 5, 2005

u)   Authorization to sell Parcel IV-U-B-B at the Kingman Airport & Industrial Park on December 5, 2005

v)   Authorization to sell Parcel VI-E-C-G at the Kingman Airport & Industrial Park on December 5, 2005

w)   Authorization to sell Parcel VI-E-D at the Kingman Airport & Industrial Park on December 5, 2005

x)   Authorizing the City Manager to sign an agreement with PinnacleOne for a Space Needs Assessment not to exceed $35,000

y)   **Municipal Utilities Commission Recommendation**
     -1)   **Resolution No. 4215**
     Bwater service to a 4.63 acre parcel for a proposed subdivision to be called Morrow Acres III, Tract 6008, located east of N. Glen, and south of Kino.  This site is inside the City limits, and inside the water service boundary area.  This was requested by Mohave Engineering, applicant for Greg Benetti, property owner.

     -2) **Resolution No. 4216**
     -water service to an approximate 15.1 acre subdivision to be called Canyon Bluff Estates II, Tract 6005, located on the east side of Canyon Road south of Mission Boulevard.  This site is inside the City limits and inside the water service boundary area.

z)   **AWARD OF BIDS/PROPOSALS/CONTRACTS**
     BPW-Award of Bid - 10 (ten) new vehicles to Mel Clayton Ford in the amount of $274,000; 3 (three) new vehicles to Martin Swanty Chrysler in the amount of $40,000; and 1 (one) new vehicle to Five Star Ford in the amount of $67,000
     -KFD – Award of Bid to Frontier Emergency Products in the amount of $197,678.87 for one (1) Emergency Support Rescue Vehicle [per Code Section 2-160E, Cooperative Purchase with Kenai, Alaska]
     -CDBG Project #163-05- Award of Bid for the Boys & Girls Club, Renovation Phase III Electrical, to Mestizo Electrical Contractors, Inc in the amount of $20,257.75

Mayor Gates requested that Item T be pulled from the Consent Agenda.  Councilmember Carter stated that he would be abstaining from voting on Items C, D, E, F, I and Y.  Councilmember Baker stated that he would be abstaining from voting on Items M and N.

Councilmember Baker made a MOTION to APPROVE the remainder of the Consent Agenda.
Councilmember Lyons SECONDED and it was UNANIMOUSLY APPROVED.

(Resolution No. 4190)

<div align="center">
(Resolution No. 4212)<br>
(Resolution No. 4213)<br>
(Resolution No. 4203)<br>
(Resolution No. 4204)<br>
(Resolution No. 4198)<br>
(Resolution No. 4205)<br>
(Resolution No. 4216)
</div>

<u>Item T:</u>
Economic Development Director, Bob Riley of the Kingman Airport Authority & Industrial Park, requested that this item be pulled from the Consent Agenda due to the item being incomplete.

After no further discussion, Councilmember Baker made a MOTION to POSTPONE the authorization to sell Parcel IV-U-B-C at the Kingman Airport & Industrial Park on December 5, 2005. Councilmember Carter SECONDED and it was UNANIMOUSLY APPROVED.

<u>Items C, D, E, F, I and Y:</u>
Councilmember Baker made a MOTION to APPROVE Items C, D, E, F, I and Y. Vice Mayor Spear SECONDED and it was APPROVED by a vote of 6-0 with Councilmember Carter abstaining.

<div align="center">
(Resolution No. 4197)<br>
(Resolution No. 4202)<br>
(Resolution No. 4199)<br>
(Resolution No. 4211)<br>
(Resolution No. 4214)<br>
(Resolution No. 4215)
</div>

<u>Items M and N:</u>
Councilmember Carter made a MOTION to approve Items M and N. Vice Mayor Spear SECONDED and it was APPROVED by a vote of 6-0 with Councilmember Baker abstaining.

<div align="center">
(Resolution No. 4200)<br>
(Resolution No. 4201)
</div>

<u>Unfinished Business:</u>  (for action)

5.    a)    **Ordinance No. 1502 – This item was tabled at the October 3, 2005 Council Meeting**
A request from Greg Benetti, applicant and property owner, to rezone certain property from R-R: Rural Residential to R-1-6: Residential, Single Family, 6,000 square foot lot minimum. The proposed rezoning would allow for the development of a subdivision called Morrow Acres III, Tract 6008, containing up to 19 single family residential units. The subject property is located north of Morrow Avenue, south of Kino Avenue and east of North Glen Street. The property is 4.63 acres in size and is further described as a portion of Block 2 of Morrow Acres, Unit 2, Section 6, T21N, R16W, of the G&SRM, Mohave County, Arizona.

Councilmember Carter stated that he would be abstaining from any discussion or voting on Items 5a and 5b.

City Manager Paul Beecher stated that the applicant was in the audience and that staff recommends approval with the conditions as outlined in Ordinance No. 1502.

The Public Hearing was opened. Citizen comments included:

Greg Benetti, applicant and property owner stated that Mohave Engineering had worked on the proposal and the decision was to stay with the original R-1-6 zoning.

Bill Watkins, 106 Yucca, stated that he owns three properties in Kingman and feels that Mr. Bennetti's work upgrades the areas and he's in support of this.

The Public Hearing was closed and after no further discussion, Councilmember Lyons made a MOTION to APPROVE Ordinance No. 1502. Councilmember French SECONDED, Mayor Gates, Vice Mayor Spear and Councilmember Baker voted NAY and Councilmember Carter abstained. The vote was polled by the City Clerk and Ordinance No. 1502 FAILED due to a tie vote of 3 voting AYE and 3 voting NAY.

(Ordinance No. 1502)

b) **Resolution No. 4192 – This item was tabled at the October 3, 2005 Council Meeting**
A request from Greg Benetti, property owner, and Mohave Engineering Associates, project engineer, for approval of a preliminary plat for a single family residential subdivision to be known as Morrow Acres III, Tract 6008. The property is 4.63 acres in size and is located along the east side of North Glen Street, south of Kino Avenue and north of Morrow Avenue. The subdivision is proposed to have 19 lots ranging in size from 6,967 to 18,073 square feet in size. The subject property is further described as a portion of Block 2 of Morrow Acres, Unit 2, Section 6, R16W, T21N, of the G&SRM, Mohave County, Arizona.

Councilmember Carter stated that he would be abstaining from any discussion or voting on Resolution No. 4192.

Councilmember Baker stated that due to the fact the applicant has paid the appropriate fees for this project, he should have another opportunity to work with staff to reach a compromise in considering higher density in the proposed area instead of lower density.

The Public Hearing was opened. Citizen comments included:

Greg Benetti, property owner, stated that Mohave Engineering designed the area to have the zoning of R-1-6 or R-2.

Councilmember Baker asked Mr. Beecher if a Special Meeting could be held before the Work Session on November 21, 2005. Mr. Beecher stated that he would look into it.

The Public Hearing was closed. No action was taken on this item.

c) **Public Auction**
The sale of Parcel IV-U-B-A at the Kingman Airport & Industrial Park delineated on plat recorded August 16, 2005 at reception number 2005-089352 records of Mohave County, Arizona situate in the south half of Section 26, T22N, R16W, G&SRM Mohave County, Arizona. This parcel contains an area of 6 acres more or less and the minimum acceptable sale price of said property is a total of Two Hundred Thirty Four Thousand Dollars ($234,000)

Economic Development Director for the Kingman Airport Authority & Industrial Park, Bob Riley, stated that Starrfoam Manufacturing, Inc. is the only qualified bidder who can meet the Conditions of Sale as specified in the Public Notice at this time and requested that Mayor Gates open the Public Auction to see if there were any other qualified bidders.

Mayor Gates opened the Public Auction and after three calls for other qualified bidders and none were received, closed the Public Auction.

After no further discussion, Councilmember French made a MOTION to APPROVE the sale of Parcel IV-U-B-A at the Kingman Airport Authority & Industrial Park to Starrfoam Manufacturing, Inc. in the amount of $234,000. Councilmember Carter SECONDED and it was UNANIMOUSLY APPROVED.

New Business:    (for review, comment and/or action)

6.    **PUBLIC HEARINGS on Planning and Zoning Commission Recommendations**
a) **Resolution No 4206.**
A request from Rhodes Homes to approve a major amendment to the Projected Land Use Map of the Kingman General Plan 2020, for the Golden Valley Ranch area, by adding approximately 16,800 acres of property to the Projected Land Use Map. The subject property extends approximately seven miles to the west and four miles to the south of the existing incorporated boundary of the City of Kingman.

City Manager Paul Beecher stated that staff concurs with the Planning and Zoning Commission's recommendation to approve Resolution No. 4206 with the conditions as outlined in the Resolution.

The Public Hearing was opened. Citizen comments included:

Donald Van Brunt, 2484 S Hwy 66, stated his concerns as to how people will get to this area and stated he didn't believe that all of Walnut Creek and south of Walnut Creek had to be included in this amendment.

Ed Grimes, Golden Valley, stated that he didn't feel this should be done without consulting the residents of Golden Valley first.

Councilmember Carter stated that the air quality could negatively impact Golden Valley as well as the water supply. Mayor Gates stated that the City should only look at development that is within the City's sphere of influence or control.

The Public Hearing was closed and after no further discussion, Councilmember Baker made a MOTION to APPROVE Resolution No. 4206. Vice Mayor Spear SECONDED and it was UNANIMOUSLY APPROVED.

(Resolution No. 4206)

b)  **Resolution No 4207.**
A request from Rhodes Homes to approve a major amendment to the Kingman General Plan 2020 by adding approximately 14,600 acres of property to the Projected Land Use Map. The subject property extends approximately nine miles east of the Kingman Airport north and east of the existing incorporated boundary of the City of Kingman.

City Manager Paul Beecher stated that staff recommends approval of Resolution No. 4207.

The Public Hearing was opened and after no discussion, closed.

Vice Mayor Spear made a MOTION to APPROVE Resolution No. 4207. Councilmember Baker SECONDED and it was UNANIMOUSLY APPROVED.

(Resolution No. 4207)

c)  **Resolution No 4208.**
A request from Mohave Engineering Associates, applicant and El Quiescence, LLC, property owner, for a minor amendment to the Kingman General Plan 2020 to modify approximately 10.2 acres of Medium Density Residential 3-8 du/ac and 4.9 acres of Intermediate Density Residential 4-16 du/ac to 15.1 acres of Community Commercial land uses. The subject property is located north of I-40, south of Vista Bella and east of Prospector Street, further described as portions of Kingman Ranch, Unit 2, Parcels 9 & 10, Section 10, T21N, R16W, of the G&SRM, Mohave County, Arizona.

Councilmember Carter stated that he would be abstaining from any discussion or voting on Resolution No. 4208.

City Manager Paul Beecher stated that staff recommends APPROVAL of the following portion of Resolution No. 4208: APPROVE the 10.2 acres of Medium Density Residential 3-8 du/ac.

Mr. Beecher then stated that staff recommends DENIAL of the following portion of Resolution No. 4208: DENY the 4.9 acres of Intermediate Density Residential 4-16 du/ac.

The Public Hearing was opened. Citizen comments included:

Pete Proffit, Mohave Engineering Associates, stated that he was available for any questions one may have.

The Public Hearing was closed and after no further discussion, Councilmember French made a MOTION to APPROVE Resolution No. 4208 as proposed by Mr. Beecher. Vice Mayor Spear SECONDED and it was approved by a vote of 6-0 with Councilmember Carter abstaining.

(Resolution No. 4208)

d)   **Resolution No 4209.**

A request from Landmark Engineering, Inc, applicant, and Axel Development, Inc, Campana Family, LLC, Z Bella Investments, LLC, property owners, for a minor amendment to the Kingman General Plan 2020 by changing the projected land use by increasing land use areas for Medium Density Residential (3-8 du/ac), Neighborhood and Community Commercial, Light Industrial and Public/Quasi-Public, and decreasing land use areas for Intermediate Density Residential (9-16 du/ac) and a golf course area currently designated as Parks and Open Space. The subject property is located north of I-40, east of Andy Devine and both north and south of Airway Avenue and is further described as being located north and east of the existing Valle del Sol (Vista Bella), The Villas and Castle Rock Village subdivisions.

City Manager Paul Beecher stated that this was heard at the Planning and Zoning Commission level and the Planning and Zoning Commissioners had a 3-3 vote which resulted in no action being taken at the Planning and Zoning Commission level. Mr. Beecher then stated that staff recommends approval with the conditions noted as follows:  Approval of Resolution No. 4209 with Condition A stating "Before any property is issued building permits," instead of stating "rezoned," "for commercial purposes within the subject site, there shall be an overall plan developed for the expansion of the necessary water and sewer infrastructure to serve development in the area."

Also, Condition B should be restated as:  "Before commercial parcels 32, 39 and 40 are approved for development, that the estimated traffic levels on Airway Avenue must exceed 10,000 trips per day, as quantified by an agreed upon qualified third party."

Mayor Gates asked if the City is looking at substantial changes and another public hearing. Mr. Beecher stated that there are no substantial changes and there could be some delay in the timing of the community development.

Councilmember Lyons stated that he felt the General Plan 2020 has been changed too many times and Councilmember Carter agreed.

The Public Hearing was opened.  Citizen comments included:

Leonard Deutsch, 4078 Rimmel Road, stated that he attended the meetings the developer had with the residents and felt that there was misrepresentation from the meeting with the developer than what's being presented to Council. Mr. Deutsch stated that he wasn't comfortable with a cemetery being planned for this area.

Charles Sperrazza, 4087 Roma Road, stated that he spoke with most homeowners in this area and agrees that the presentation was flawed and misleading and he feels this is a major amendment instead of a minor amendment.

Yvonne Walker, 3241 N. Central, voiced her concerns over the lack of schools planned for this area. Ms. Walker also stated that she feels a church should be added to the plan, too.

Mike Bihuniak, 4116 E. Airway, voiced his displeasure with this item, also.

Doug Swallow, Celebrate Homes, thanked staff and the residents. Mr. Swallow stated that this meets or exceeds the criteria. Mr. Swallow stated that each time there was a revision, it was due to residents' comments. Mr. Swallow further stated that the recreational vehicle area was put on the proposed map for discussion purposes; parks and open space must be designated. The parks will be in each neighborhood and will be linked by a trail system that will link approximately 30 subdivisions together. The concept is a 'whole life community'.

Councilmember Baker asked if the number of dwelling units that will be for consideration at the rezoning hearing before the Planning and Zoning Commission will change. Tom Duranceau, Planning and Zoning Administrator, stated that no, that number will not change.

Ms. Sperrazza, 4087 Roma Road, stated that she felt this takes away open space in her neighborhood.

Mr. Duranceau stated that the number of C-2 sites indicated, the Recreational Vehicle Park and cemetery, are conceptual ideas.

Another representative for Celebrate Homes indicated that the maximum number of dwelling units applied for will be 3,600.

Ed Packard, Landmark Engineering, Inc, stated that he concurred with the staff recommendation of restating Condition A of Resolution No. 4209.

The Public Hearing was closed and after no further discussion, Councilmember Baker made a MOTION to APPROVE Resolution No. 4209 with the restating of the aforementioned Conditions A and B. Vice Mayor Spear SECONDED, Councilmember Lyons voted NAY and Resolution No. 4209 was approved by a vote of 6-1.

(Resolution No. 4209)

e)  **Ordinance No. 1504**
Nicholas E. Main, applicant and Barbara Linn, property owner, have requested the rezoning of certain property described as a portion of the SE ¼, Government Lot 2, Section 7, T21N, R16W of the G&SRM, Mohave County, Arizona, from O: Recreational Open Space to C-3: Commercial, Service Business. The proposed rezoning would facilitate the development of a construction and landscape office. The property is approximately 1.88 acres in size and is located along the west side of Harrison Street between the Kingman Academy of Learning to the south and the UniSource Energy Equipment yard to the north.

City Manager Paul Beecher stated that staff recommends approval of Ordinance No. 1504.

The Public Hearing was opened and after no discussion, closed.

Councilmember Carter made a MOTION to APPROVE Ordinance No. 1504. Councilmember French SECONDED and it was UNANIMOUSLY APROVED.

(Ordinance No. 1504)

f)  **Ordinance No. 1505**
A request for Council to approve a text amendment to the Zoning Ordinance adding a new overlay district and Section (15.000), Bank Street Design Review Overlay District

Councilmember Baker stated that he would be abstaining from any discussion or voting on Ordinance No. 1505.

City Manager Paul Beecher stated that Planning and Zoning has studied this for months and staff concurs with the recommendation of approval.

The Public Hearing was opened and after no discussion, closed.

Councilmember Lyons made a MOTION to APPROVE Ordinance No. 1505. Councilmember Carter SECONDED and Ordinance No. 1505 was APPROVED by a vote of 6-0 with Councilmember Baker abstaining.

(Ordinance No. 1505)

7.  **Ordinance No. 1503**
Review and direction from Council regarding proposed change of City elections from a Spring Primary and General, to a Fall Primary and General Election

City Clerk Toni Weddle stated that adoption of Ordinance No. 1503 would reduce the City's cost of an election by approximately two-thirds by changing the election cycle to a fall election. Ms. Weddle also stated that the cost of the Primary and General Elections in 2004 was $41,936.27.

Mayor Gates stated that she doesn't feel comfortable with Council extending their own terms as this would extend their terms by six months.

Councilmember French stated that he doesn't want specific City issues lost in the ballot along with other state and/or federal issues.

Councilmember Baker stated that voter response is important and asked if the Ordinance could be amended. Mr. Beecher stated that it could be amended to indicate the change for the year 2010 so that there would be no conflicts of current Councilmembers extending their terms.

After no further discussion, Councilmember Carter made a MOTION to APPROVE Ordinance No. 1503 with the condition of the year 2010 being the start of the new election cycle. Vice Mayor Spear SECONDED, Councilmember French voted NAY and Ordinance No. 1503 was APPROVED by a vote of 6-1.

Mayor Gates stated that she had Judy Johnson signed up to speak on this item and apologized for the oversight as this was a Public Hearing. Ms. Johnson stated that she was in opposition of the Council extending their terms and was happy with the decision that was made.

<div align="center">(Ordinance No. 1503)</div>

8.    **Revenue and Fee Study Final Report**

    **a.** Presentation of the October 2005 Revenue and Fee Study Final Report

City Manager Paul Beecher stated that the City of Kingman engaged the services of Red Oak Consulting to work with a Citizen Panel, City Council and City Staff to review a variety of revenue and fee options and develop a long-term financial plan for the City. A recommendation was needed to fund the City's Capital Improvements Plan. The Building Inspection Fees increased in May 2005 which will help in establishing and implementing growth paying for growth. The Revenue and Fee Study included an evaluation of new and existing revenue sources and paired the sources with the City's long-term capital improvements plan as well as ongoing operating and maintenance expenses. The study included an evaluation of business license fees, transportation and storm drainage user fees, sales taxes and property taxes. The final report includes recommendations to adjust business license fees, engineering fees and planning and zoning fees to a level which would allow the City to recover costs associated with services provided by these departments; implement investment fees to fund growth related capital improvements; increase the City sales tax rate by one-half of one percent to fund the non-growth portions of capital improvements and to fund portions of operating expenses which have continued to increase in direct relationship to inflation, population, new municipal services and the expanding service boundary area.

    **b.** Ordinance No. 1506 – Adjusting Business License Fee Changes, Planning & Zoning Fee Changes, Engineering Fee Changes

City Manager Paul Beecher stated that staff recommends approval of Ordinance No. 1506.

The Public Hearing was opened and after no discussion, closed.

Vice Mayor Spear made a MOTION to APPROVE Ordinance No. 1506. Councilmember Carter SECONDED and it was UNANIMOUSLY APPROVED.

<div align="center">(Ordinance No. 1506)</div>

    **c.** Notice of Intent to Establish Impact Fees for Parks, Police, Fire, Streets, Storm Drainage and General Government

City Manager Paul Beecher stated adopting the Notice of Intent to Establish Impact Fees for Parks, Police, Fire, Streets, Storm Drainage and General Government would set a Public Hearing date for February 6, 2006.

The Public Hearing was opened and after no discussion, closed.

Councilmember Carter made a MOTION to APPROVE the Notice of Intent to Establish Impact Fees for Parks, Police, Fire, Streets, Storm Drainage and General Government. Councilmember Moon SECONDED and it was UNANIMOUSLY APPROVED.

**d.** Ordinance No. 1501 - to Increase City Sales Tax by .5% (from 2% to 2.5%)

City Manager Paul Beecher stated that staff recommends approval of Ordinance No. 1501 with an effective date of February 1, 2006.

Councilmember Lyons voiced his displeasure stating that the tax will have the most effect on the poor and that the City should do more to get the word out to the community that taxes could be increasing.

Councilmember Carter stated that there was no tangible discussion about a sales tax increase until the last presentation by Red Oak Consulting. Councilmember Carter further stated that he feels that an increase in sales tax could hinder stores such as Target, etc, from coming into the City Limits of Kingman.

Vice Mayor Spear stated that this is something the City needs to do.

Councilmember French agreed but stated that he was taken off guard when he read this on the agenda. Councilmember French also stated that he does not feel that this was publicized enough.

Councilmember Moon agreed with Councilmember French and stated that the City's does need to do something.

Mayor Gates asked if this item could be put on the agenda for a Special Meeting before the Work Session of November 21, 2005. City Manager Paul Beecher stated yes.

The Public Hearing was opened. Citizen comments included:

Beverly Lyles, President and CEO of the Kingman Area Chamber of Commerce, stated that she was surprised that to hear about this item. Vice Mayor Spear asked Ms. Lyles if she would help get the word out to businesses and she said she would.

Rick Roberts, Anderson Toyota, believes that a sales tax increase would cause buyers to go to other cities to buy their vehicles.

Martin Swanty, Martin Swanty Dodge, Chrysler, Jeep, stated that he believes the City of Kingman has failed in getting the word out and should hold a Public Hearing.

Mr. Beecher stated that this would provide a significant increase to the General Fund to allow the City to go into debt for other necessary projects, such as streets and storm drainage, and would help offset increased operating costs.

Joe Hart, owner of KGMN Radio and Channel 36, stated that he would offer his media services to help get the word out to the citizens.

Richard Johnson, Colorado River Ford, stated his opposition to Ordinance 1501.

Sue Ellen Stewart, 1819 Club Avenue, stated her concerns related to infrastructure in Kingman. Ms. Stewart suggested to Council to possibly look into an off-track betting parlor.

Pastor Kelly Fallis, Cornerstone Mission, stated his opposition to Ordinance No. 1501.

Mayor Gates stated that Ordinance No. 1501 warrants additional discussion and more public input. Mayor Gates also stated that when Council hired City Manager Paul Beecher, it was a consensus of the Council to have Mr. Beecher take care of Kingman and the City must provide him the resources to do so.

The Public Hearing was closed and after no further discussion, Vice Mayor Spear made a MOTION to TABLE Ordinance No. 1501 until the December 5, 2005 Council Meeting.

(Ordinance No. 1501)

9.    ANNOUNCEMENTS BY MAYOR & COUNCILMEMBERS

Councilmember Baker stated that he would like to discuss the Council Retreat due to a location change. At the Regular Meeting of the Common Council held on September 6, 2005, all Councilmembers agreed to holding a retreat on November 12 & 13, 2005. The retreat was scheduled to be held in Prescott and that location has now changed. The retreat is now scheduled to be held at Kingman Regional Medical Center on November 18, 2005 for one day. Councilmember Baker requested action for a consensus of the Council.

Vice Mayor Spear stated the he was very disappointed in the retreat not being held in Prescott as he feels it's beneficial to be in a different setting.

Councilmember Carter made a MOTION to have a one day retreat at the Kingman Regional Medical Hospital on November 18, 2005. Vice Mayor Spear SECONDED and it was UNANIMOUSLY APPROVED.

10.    EXECUTIVE SESSION (per A.R.S. ᵎ 38-431.03 A.3)
ʙThere was no need for an executive session

ADJOURNMENT 7:19 PM

ATTEST:                                            APPROVED:

_____          _____
Toni Weddle, City Clerk                              Monica Gates, Mayor

STATE OF ARIZONA)
COUNTY OF MOHAVE)ss:
CITY OF KINGMAN)

CERTIFICATE OF COUNCIL MINUTES
I, Angela Gray, Recording Secretary of the City of Kingman, Arizona, hereby certify that the foregoing Minutes are a true and correct copy of the Minutes of the Regular Meeting of the Common Council of the City of Kingman held on Monday, November 7, 2005.

Dated this 9th day of November, 2005

_____
Angela Gray, Deputy City Clerk

Appendix C

ADEQ Meeting Notes – Permit Discussion

- Phoenix office to do
  ZOB Commencement Grad
  - APP Request
  - You need to be ultimate to change in
    needs to be included
  - ZOB
  - need help for:
    - dealt plat to open
    - hydraulic
  - 30% change on the ultimate
    sub mit APP w/ change Report    7/6/05

ADEQ
- AZPDES discharge permit to
  checkbox to work
  6-9 months - timeline developing
  agent - discharge flow, discharge
  Applicable U/S/O change prior to
  experience in state
  - can construct while permit is
  - LTF (temporary term planned)
  clock
  - 20 day public notice
  - may have second public
  notice, comment, appeal can be
  appealed by cities
  - California there - be the same in AZ Checkbox

- Bonus - Clipeus + Nickle
  Commitment of 67,100 other
  Chino Co.
  - Met 7:30am Tucker at Phelps
    La Vega Office
  Leo Jones - Geotech Wiggins
  228-6277
  800 W Rainbow Blvd Ste 222
  Phoenix    7/6/05

Mike Silvera, Brice D. Francisco
Don Madden

- ZOB Amendment - ROE temp
  Plant to need to be included?
  - Need to ask ADEQ
  - Storm term to long Luan Plaza
  - Will need APP for okay plant to
    regional plant required to
    endorse other amenities to plant
  - When will permit = plant
    Will 30 or Check = ? 
    250 units x 240 = ~ 250 gpm
  - 200 - 300 plant
  * Steve Queens, Director St. ADEQ
  - Submit APP w/ 30% design
    report - "Notice of Intent" to issue
    above be received before reports w/10%

© Blue Sky / The Color of Imagination, LLC. All rights reserved.

- form 2A & 2S (Bio Solids)
  Application reviews
- over 5 MGD requires pretreat
- 5 yr time frame for renewal
- APP - admin phase 35 w days
  substantive phase 180 w. days
- admin phase review for completeness
- sub standard phase comments addressed.
- times dependent upon consultant response times.
- Public notice after reviews w/ 30 day comment
- if albeit a lot comments could be public hearing
- hold preapplication mtg
  - method of treatment
  - discharge & Hydrology
  - site map
  - process diagrams
  -
- Recommend by-off on APP before we construct
- Release permit
- consequences to change a permit application
- applications are on first come first serve. Priorities as long as the clock ticks

- APP does agree w/ ATC
- Collection system ATC &
- Jason Jones Wastewater
- Kwame Agyare : ADEQ water
- John Calkins " " Super
- Final plat include water & sewer review to county
- Reuse - A+ quality include in APP process. i.e. nitrification
- Apply after APP approved
- Type 2 general permit ($2200 ea) permit for each use
  7 days to process.
- Type 3 agent permit covers multiple uses ($1500) 7 days
- Good for 5 years
- provide chemical feed for standby use. Don't have to do coliform monitoring
- Cindy Traverse - 401 certification who work with the Corp
- SWPPP & NOI turn around in 2 days
- Impaired and unique waters may hold up permit for 30 days. Listed on web site
- who & how file NOI, file multiple NOI break into multiple phases
- Can't terminate part of an NOI

© Blue Sky The Color of Imagination, LLC. All rights reserved.

© Blue Sky The Color of Imagination, LLC. All rights reserved.

# Appendix D

# Financial Information

# Sagebrush Enterprises, Inc. and Subsidiaries

Consolidated Financial Statements for the
Years Ended December 31, 2004 and 2003
and Independent Auditors' Report

# SAGEBRUSH ENTERPRISES, INC. AND SUBSIDIARIES

## TABLE OF CONTENTS

|  | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1 |
| CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2004 AND 2003: | |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Income | 3 |
| Consolidated Statements of Stockholder's Equity | 4 |
| Consolidated Statements of Cash Flows | 5-6 |
| Notes to Consolidated Financial Statements | 7-20 |

# Deloitte.

Deloitte & Touche LLP
Suite 490N
3773 Howard Hughes Parkway
Las Vegas, NV 89109-0950
USA

Tel: +1 702 893 3100
Fax: +1 702 369 1736
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

Stockholder
Sagebrush Enterprises, Inc. and Subsidiaries
Las Vegas, Nevada

We have audited the accompanying consolidated balance sheets of Sagebrush Enterprises, Inc. and Subsidiaries ("SEI") as of December 31, 2004 and 2003 and the related consolidated statements of income, stockholder's equity and cash flows for the years then ended. These financial statements are the responsibility of SEI's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of SEI as of December 31, 2004 and 2003 and the consolidated results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

April 15, 2005

# SAGEBRUSH ENTERPRISES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS
## DECEMBER 31, 2004 AND 2003

### ASSETS

|  | 2004 | 2003 |
|---|---|---|
| Inventories | $ 169,258,664 | $ 73,854,649 |
| Land held for investment | 141,053,876 | 86,246,731 |
| Property, plant and equipment—net | 27,086,462 | 18,690,650 |
| Deposits and other assets—net | 12,373,629 | 5,177,001 |
| Cash | 18,085,935 | 14,962,641 |
| Cash—restricted | 2,720,954 | 2,715,736 |
| Accounts receivable—net | 268,479 | 579,540 |
| Due from related parties | 1,027,943 | 782,986 |
| Pro-shop inventories | 139,726 | 88,508 |
| Equity investments | 1,835,985 | 8,611 |
| TOTAL | $ 373,851,653 | $ 203,107,053 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

LIABILITIES:

|  | 2004 | 2003 |
|---|---|---|
| Notes payable | $ 214,667,215 | $ 85,770,884 |
| Accounts payable and accrued liabilities | 17,081,269 | 8,799,763 |
| Due to related parties | 707,891 | 1,119,611 |
| Notes payable to related parties | 3,191,681 | 3,191,681 |
| Capital lease obligations | 676,276 | 1,005,714 |
| Customer deposits | 299,919 | 163,000 |
| Total liabilities | 236,624,251 | 100,050,653 |
| MINORITY INTEREST | 3,696,080 | 4,937,618 |
| STOCKHOLDER'S EQUITY | 133,531,322 | 98,118,782 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | $ 373,851,653 | $ 203,107,053 |

See notes to consolidated financial statements.

# SAGEBRUSH ENTERPRISES, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF INCOME
### YEARS ENDED DECEMBER 31, 2004 AND 2003

|  | 2004 | 2003 |
|---|---:|---:|
| **REVENUES:** | | |
| Sales of inventory | $143,413,376 | $132,281,101 |
| Sales of land | 3,000,000 | 53,283,800 |
| Contract sales | 6,824,377 | 6,382,651 |
| Investments and management fees | 1,627,377 | 2,567,703 |
| Green fees and other golf revenues | 5,239,691 | 4,822,014 |
| Total revenues | 160,104,821 | 199,337,269 |
| **COSTS AND EXPENSES:** | | |
| Cost of inventory | 68,074,162 | 89,344,337 |
| Cost of land sold | 332,226 | 9,255,670 |
| Cost of contract sales | 7,560,869 | 6,764,171 |
| Selling | 6,818,824 | 5,321,526 |
| Golf course costs and expenses | 4,278,084 | 3,567,482 |
| Preopening expense | 1,457,053 | – |
| Depreciation and amortization | 2,375,039 | 1,216,223 |
| General and administrative | 9,139,496 | 11,395,252 |
| Total costs and expenses | 100,035,753 | 126,864,661 |
| **OPERATING INCOME** | 60,069,068 | 72,472,608 |
| **OTHER (EXPENSE) INCOME:** | | |
| Loss on construction defect settlement | (16,585) | (610,205) |
| Interest income | 207,941 | 337,134 |
| Interest expense—net of capitalized interest | (5,657,231) | (7,759,417) |
| Other—net | 55,688 | 156,155 |
| Total other expense | (5,410,187) | (7,876,333) |
| **INCOME BEFORE MINORITY INTEREST** | 54,658,881 | 64,596,275 |
| **MINORITY INTEREST** | 1,288,469 | 2,188,147 |
| **NET INCOME** | $ 53,370,412 | $ 62,408,128 |

See notes to consolidated financial statements.

# SAGEBRUSH ENTERPRISES, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF STOCKHOLDER'S EQUITY
### YEARS ENDED DECEMBER 31, 2004 AND 2003

| | |
|---|---:|
| BALANCE—January 1, 2003 | $ 30,331,020 |
| Contributions | 21,716,470 |
| Distributions | (16,336,836) |
| Net income | 62,408,128 |
| BALANCE—December 31, 2003 | 98,118,782 |
| Contributions | 2,016,665 |
| Distributions | (19,974,537) |
| Net income | 53,370,412 |
| BALANCE—December 31, 2004 | $ 133,531,322 |

See notes to consolidated financial statements.

# SAGEBRUSH ENTERPRISES, INC.
# AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
YEARS ENDED DECEMBER 31, 2004 AND 2003

|  | 2004 | 2003 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income | $ 53,370,412 | $ 62,408,128 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 2,375,039 | 1,216,223 |
| Bad debt expense | | 125,425 |
| Loss (Gain) on disposal of property | 22,949 | (5,950) |
| Loss on construction defect settlement | | 610,205 |
| Minority interest | 1,288,469 | 2,188,147 |
| Equity investment income | (1,627,377) | |
| Changes in operating assets and liabilities: | | |
| Due from related parties | (244,957) | (98,601) |
| Accounts receivable, net | 311,061 | (307,214) |
| Inventories | (104,359,194) | 19,200,811 |
| Pro-shop inventories | (51,218) | (2,312) |
| Land held for investment | (36,750,170) | (2,272,121) |
| Deposits and other assets | (7,228,123) | (1,541,978) |
| Accounts payable and accrued liabilities | 8,281,506 | (4,365,313) |
| Due to related parties | (411,720) | (183,982) |
| Customer deposits | 136,919 | (352,136) |
| Net cash (used in) provided by operating activities | (84,886,404) | 76,619,332 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of property and equipment | (9,771,405) | (2,346,269) |
| Proceeds from disposal of property and equipment | 11,700 | 637,631 |
| Change in restricted cash | (5,218) | 632,104 |
| Capitalization of equity method investment | (200,000) | |
| Net cash used in investing activities | (9,964,923) | (1,076,534) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from notes payable | 209,429,822 | 138,292,854 |
| Repayments of notes payable | (100,783,132) | (210,443,158) |
| Payments on related-party notes payable | | (204,450) |
| Payments on capital lease obligations | (329,438) | (202,706) |
| Contributions received from owners | 1,251,218 | 20,124,287 |
| Distributions paid to owners | (11,593,849) | (16,279,712) |
| Net cash provided by (used in) financing activities | 97,974,621 | (68,712,885) |
| NET INCREASE IN CASH | 3,123,294 | 6,829,913 |
| CASH—Beginning of year | 14,962,641 | 8,132,728 |
| CASH—End of year | $ 18,085,935 | $ 14,962,641 |

(Continued)

# SAGEBRUSH ENTERPRISES, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS
### YEARS ENDED DECEMBER 31, 2004 AND 2003

| | 2004 | 2003 |
|---|---|---|
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION—Cash paid during the year for interest, net of capitalized interest | $ 4,000,497 | $ 7,886,668 |
| SUPPLEMENTAL SCHEDULE OF NONCASH INVESTING AND FINANCING ACTIVITIES: | | |
| Contribution of notes receivable from minority partner | | 555,713 |
| Asset additions through capital leases or debt | 2,192,666 | 1,064,920 |
| Payoff of capital lease for disposal of golf carts | | 55,018 |
| Transfer of land deposits to land held for investment | | 8,188,910 |
| Transfer of land held for investment to real estate inventories | | 9,710,608 |
| Purchase of land (real estate inventories) from sole stockholder through assumption of debt | | 7,000,000 |
| Debt obtained to purchase land | - | 46,180,800 |
| Debt assumed from Bravo to purchase land (Hacienda) | 18,056,975 | 680,000 |
| Assumption of loans in land purchased by RRGP | | 5,573,500 |
| Distribution of Madrid Properties | | 70,238 |
| Settlement of related party payable through contributions | | 1,535,059 |
| Noncash distributions | 10,145,248 | |
| Contribution of stockholder's interest in consolidated entity | 765,447 | |

See notes to consolidated financial statements.

(Concluded)

- 6 -

# SAGEBRUSH ENTERPRISES, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2004 AND 2003

1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

*Nature of Business*—Sagebrush Enterprises, Inc. ("Sagebrush" or the "Company") was incorporated in the State of Nevada for the purpose of organizing various limited and general partnerships, limited liability corporations, and joint ventures to acquire, develop, improve, and construct residential homes (custom and tract), operate a golf course in one of the developments, and sell real property. Presently all of its property is in Las Vegas, Nevada and surrounding areas.

As of December 28, 2000, James M. Rhodes contributed 100% of his interest in various Sub "S" Corporation to Sagebrush at their book values.

The accompanying consolidated financial statements present the operations of Sagebrush and its wholly and majority owned subsidiaries which are hereinafter collectively referred to as the Company as well as variable interest entities for which Sagebrush or its subsidiaries are deemed to be the primary beneficiary in accordance with the Financial Accounting Standards Board Interpretation ("FASB") No. 46, *Consolidation of Variable Interest Entities*. The equity method of accounting is used for investments in other companies in which the company has significant influence; generally this represents common stock ownership or partnership equity of at least 20% and not more than 50%.

The Company prepares its financial statements in accordance with accounting principles generally accepted in the United States of America. A summary of the Company's significant accounting policies follows.

*Principles of Consolidation*—The accompanying consolidated financial statements include the following entities:

Rhodes Ranch General Partnership ("RRGP")
Rhodes Design & Development Corporation ("RDD")
Wallboard, LP ("Wallboard")
Tock, LP ("Tock")
Tick, LP ("Tick")
Chalkline, LP ("Chalkline")
Tapemeasure, LP ("Tapemeasure")
Overflow, LP ("Overflow")
Jackknife, LP ("Jackknife")
Glynda, LP ("Glynda")
Batcave, LP ("Batcave")
Joshua Choya, LLC ("Joshua Choya")
American Land Management, LLC ("ALM")
Federal Land Management, LLC ("FLM")
South Dakota Land Conservancy, LLC ("SDC")
Sedora Holdings, LLC ("Sedora")
Michael J. Rhodes Investment Trust ("MJR Trust")

Ryan Rocky Rhodes Investment Trust ("RRR Trust")
Mustang Properties, Inc. (Dissolved as of March 14, 2003)
Coronado Properties, Inc. (Dissolved as of March 14, 2003)
Bravo, Inc. (dba Rhodes Framing) ("Bravo")
C & J Holdings, Inc. (dba Neighborhood Association Group) ("C&J")
Desert Communities, Inc. ("DCI")
Elkhorn Partners Limited Partnership ("EPLP")
Elkhorn Investment, Inc. (General Partner of EPLP) ("EII")
Rhodes Ranch Golf Country Club ("RRGCC")
Gypsum Resources, LLC ("Gypsum")
Palm Gardens Limited Partnership ("PGLP")
Palm Gardens Corporation (General Partnership of PGLP) ("PGC")
Rhodes Realty, Inc. ("RRI")
Sagebrush Enterprises, Inc. ("SEI")
Rhodes Ranch, LLC ("RRLLC")
Rhodes Homes Arizona, LLC ("RHA")
Gung-Ho Concrete, LLC ("GHC")
Arapahoe Cleaning, LLC ("ACL")
Geronimo Plumbing, LLC ("GPL")
Tuscany Golf Country Club, LLC ("TGC")

All material intercompany balances and transactions have been eliminated in consolidation.

*Minority Interest*—Minority interest consists of the unrelated limited partners who have an indirect interest through RRLLC in the following limited partnerships: Wallboard, Tock, Tick, Chalkline, Tapemeasure, Overflow, Jackknife, Glynda, Batcave and Gypsum. Also included is the limited partner who has an equity interest in Gypsum and the beneficiaries' interest in the MJR Trust and RRR Trust, all of which have been consolidated in these financial statements.

*Use of Estimates*—The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Such estimates include, but are not limited to, the allocation of land development costs to cost of sales, the estimated useful lives of property and equipment, the estimated cost of warranties provided to customers, the estimated cash flows used in determining whether long-lived assets are impaired, and the estimated outcome of ongoing litigation. Actual results could differ from those estimates.

*Balance Sheet Presentation*—The operations of the Company involve a variety of real estate transactions, and it is not possible to precisely measure the operating cycles of the Company. The consolidated balance sheets of the Company have been prepared on an unclassified basis in accordance with real estate industry practice.

*Restricted Cash*—Restricted cash at December 31, 2004 and 2003 consisted of $2,720,954 and $2,715,736, respectively. Restricted cash includes certain amounts held in escrow pending completion of improvements to be made on land sold and will be released upon completion of such improvements. In addition, certain amounts were held in escrow for payment of property taxes in connection with notes payable requirements.

*Reclassification*—Notes payable at December 31, 2003 totaling $266,000 and $3,191,681 have been reclassified to due to affiliates and notes payable to related parties, respectively. Land held for investment at December 31, 2003 totaling $1,306,031 has been reclassified to property, plant and equipment. These reclassifications had no effect on net income as previously reported.

*Revenue Recognition*—Revenue from property sales is recognized in accordance with Statement of Financial Accounting Standards ("SFAS") No. 66, *Accounting for Sales of Real Estate*. Accordingly, sales of undeveloped land and home sales are recognized when a closing occurs, which is when payment has been received and title, possession and other attributes of ownership have been transferred to the buyer and the Company is not obligated to perform significant activities after the sale. The cost of land sold is charged to operations on the basis of the allocated parcel cost. Amounts received from buyers in advance of closing are recorded as customer deposits until the time of closing.

Golf operations revenues include golf course services revenues, food and beverage sales, and golf shop sales. Golf course services revenues include revenues generated from greens fees, discount card program sales, driving range fees, golf instruction and golf club rental.

Golf course services revenues, food and beverage sales and golf shop sales are recognized when earned. Discount card revenues collected in advance are deferred as unearned income and are included in accrued liabilities and recognized over the remaining term of the card.

*Inventories*—Inventories are stated at the lower of cost or net realizable value. Inventory costs include preacquisition costs, property taxes, interest and insurance incurred during development and construction, and direct and certain indirect project costs. General and administrative costs are charged to expense as incurred. Model home construction, model home merchandising and semi-permanent signs are capitalized. The Company allocates land, land improvements, acquisition and carrying costs in a manner materially consistent with the relative value method. Construction costs are generally allocated to lots using the specific identification method.

*Property, Plant and Equipment*—Property, plant and equipment, including golf course improvements, are recorded at the lower of cost or estimated market value. Costs relating to the development of golf courses, including legal fees, property taxes, construction costs, interest and other direct costs associated with the development of the golf course, are capitalized as part of the cost of the course. Depreciable golf course improvements are primarily comprised of irrigation systems, cart paths and other land improvements.

Depreciation and amortization on property, plant and equipment begins when assets are placed into service and are charged to operations using the straight-line and double-declining balance methods over the following estimated useful lives:

|  | Years |
|---|---|
| Buildings and improvements | 39 |
| Land and golf course improvements | 5–40 |
| Vehicles | 5 |
| Golf course equipment | 5 |
| Furniture and fixtures | 3–5 |

*Accounts Receivable*—Accounts receivable primarily result from the revenues generated through daily golf fees, pro shop merchandise sales, and food and beverage sales. The Company performs ongoing credit evaluations of its group customers and generally does not require collateral. The Company reviews accounts receivable balances and determines whether an allowance for potential credit losses is

necessary. Management believes that an allowance of $122,326 and $123,075 was adequate at December 31, 2004 and 2003, respectively.

*Pro-Shop Inventories*—Pro-shop inventories are stated at the lower of cost or market using the first-in, first out (FIFO) cost method.

*Deposits and Other Assets*—Included in deposits and other assets are refinancing costs presented net of accumulated amortization. Refinancing costs are being amortized by the straight-line method which approximates the effective interest method over the term of the loan. Amortization of these amounts is included in interest expense.

Also included in deposits and other assets are land option deposits, which will be applied toward the purchase price of land at the time of acquisition or will be expensed if not exercised per the terms of the agreements.

*Capitalized Interest*—The Company capitalizes interest costs incurred in connection with the development of land and construction of homes. The Company capitalized $6,498,086 and $5,193,284 of interest costs during the years ended December 31, 2004 and 2003, respectively.

*Fair Value of Financial Instruments*—The carrying amounts of financial instruments, including cash, deposits, accounts payable and accrued liabilities, approximate fair value because of their short maturity.

The fair value of notes payable is estimated based on market interest rates at December 31, 2004 and 2003, with similar terms and collateral requirements. The fair value of notes payable at December 31, 2004 and 2003 approximated carrying value at those dates.

It is not possible to determine the fair value of non-interest bearing related party notes payable.

*Income Taxes*—The Company, with the consent of its stockholder, has elected to be taxed under the section of the federal income tax law that provides that, in lieu of corporate income tax, the stockholder separately accounts for the company's items of income, deductions, losses and credits. Therefore, these statements do not include any provision for corporation income taxes. Also, no provision has been made for any amounts that may be advanced or paid as dividends to the stockholder to assist in paying personal income taxes on the income of the Company.

*Customer Deposits*—Customer deposits are recorded when received and either applied to the sales price when the home closes or applied to income if the customer cancels his or her purchase, which results in a forfeiture of the deposit to the Company.

*Impairment of Long-Lived Assets*—Included in inventories are completed homes and land and homes under development expected to be completed and sold within the next year. These inventories are accounted for at the lower of cost or fair value less estimated cost to sell. The Company follows the provisions of SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets*. SFAS No. 144 requires that long-lived assets be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net undiscounted cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets.

The Company believes that no adjustment for impairment is necessary at December 31, 2004 and 2003.

*Recent Accounting Pronouncements*—In January 2003, the FASB issued Interpretation No. 46, *Consolidation of Variable Interest Entities,* and subsequently revised the Interpretation in December 2003 (FIN 46R). This interpretation of Accounting Research Bulletin No. 51, *Consolidated Financial Statements,* addresses consolidation by business enterprises of variable interest entities, which have certain characteristics. FIN 46R became effective for financial statements ending after March 31, 2004. The Company adopted FIN 46R as of March 31, 2004, and as a result of its adoption, Wallboard, Tock, Tick, Chalkline, Tapemeasure, Overflow, Jackknife, Glynda, Batcave, Gypsum, Joshua Choya, ALM, FLM, SDC, Sedora, MJR Trust and RRR Trust have been consolidated with Sagebrush for the year ended December 31, 2004.

In November 2004, the FASB issued SFAS No. 151, *Inventory Costs – an amendment of ARB No. 43, Chapter 4.* The amendment clarifies that abnormal amounts of idle facility expense, freight, handling costs, and wasted materials (spoilage) should be recognized as current-period charges and requires the allocation of fixed production overheads to inventory based on the normal capacity of the production facilities. The guidance is effective for inventory costs incurred during fiscal years beginning after June 15, 2005. The Company believes that the adoption of SFAS No. 151 will not have a material impact on its financial position, results of operations, or cash flows.

In December 2004, the FASB issued SFAS No. 123(R), *Share-Based Payment,* which establishes accounting standards for all transactions in which an entity exchanges its equity instruments for goods and services. SFAS No. 123(R) focuses primarily on accounting for transactions with employees, and carries forward without change prior guidance for share-based payments for transactions with non-employees. The provisions of SFAS No. 123(R) are effective for fiscal years beginning after June 15, 2005. The Company believes that the adoption of SFAS No. 123(R) will not have a material impact on its financial position, results of operations, or cash flows.

In December 2004, the FASB issued SFAS No. 153, *Exchanges of Nonmonetary Assets—an amendment of APB No. 29.* SFAS No. 153 amends Opinion 29 to eliminate the exception for nonmonetary exchanges of similar productive assets and replaces it with a general exception for exchanges of nonmonetary assets that do not have commercial substance. SFAS No. 153 specifies that a nonmonetary exchange has commercial substance if the future cash flows of the entity are expected to change significantly as a result of the exchange. SFAS No. 153 is effective for nonmonetary asset exchanges occurring in fiscal periods beginning after June 15, 2005. The Company believes that the adoption of SFAS No. 153 will not have a material impact on its financial position, results of operations, or cash flows.

2.   **INVENTORIES**

Inventories consist of the following as of December 31:

|  | 2004 | 2003 |
|---|---|---|
| Land held for development | $  43,919,925 | $  22,556,546 |
| Cost of development and construction[1] | 125,338,739 | 51,298,103 |
| Total | $ 169,258,664 | $  73,854,649 |

[1]   Included in the prior year balance are completed homes purchased from the original buyers. These repurchases occurred due to a make-whole settlement related to construction defect allegations. The settlement required the Company to repair the damage caused on 16 homes as a

result of the defect allegations. The Company was able to repair five of these homes while they were still owner occupied. The remaining eleven were repurchased by the Company between 2000 and 2003 at a total cost of $3,321,547. One of the repurchased homes was resold in 2003 and the remaining sold in 2004. The sales in 2003 indicated the value of the remaining repurchased but unsold homes was not fully recoverable, and as a result, during 2003 the Company recorded an impairment loss of $470,981. The impairment loss was calculated by comparing the estimated, expected sales price of each home to all anticipated costs. In addition, the Company has expensed $16,585 and $139,224 in 2004 and 2003, respectively, in costs incurred to date and anticipated costs to repair the owner-occupied homes. These amounts have been recorded as loss on construction defect settlement in the statements of income for the years ended December 31, 2004 and 2003.

The Company and Lexington Insurance Company ("Lexington") are currently negotiating the denial of insurance coverage action by Lexington for costs incurred. Management believes the final resolution will include Lexington agreeing to reimburse all of the Company's costs, expenses, attorneys' fees, and interest expensed for the repurchase and repair of homes claimed to have construction defects.

As of December 31, 2004, no amounts have been capitalized or recorded as a receivable related to the Lexington matter due to the uncertainty of the outcome.

3.    PROPERTY, PLANT AND EQUIPMENT

Property, plant and equipment are summarized as follows at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Golf course land | $ 6,236,722 | $ 4,204,547 |
| Golf course improvements | 16,515,775 | 12,635,246 |
| Golf course office equipment | 2,012,924 | 914,384 |
| Golf course clubhouse | 3,077,022 | 2,956,295 |
| Golf course maintenance building | 653,223 | 650,590 |
| Furniture and fixtures | 2,255,901 | 1,367,078 |
| Land | 115,962 | 1,306,031 |
| Deposits on model home furnishings | 466,594 | |
| Office equipment | 1,083,085 | 970,784 |
| Buildings and improvements | 1,125,700 | 855,586 |
| Construction equipment | 810,096 | 1,154,001 |
| Vehicles | 2,194,131 | 774,041 |
| Total | 36,547,135 | 27,788,583 |
| Less accumulated depreciation | (9,460,673) | (9,097,933) |
| Property, plant and equipment—net | $27,086,462 | $18,690,650 |

Substantially all property, plant and equipment are pledged as collateral on debt.

4.   DEPOSITS AND OTHER ASSETS

Deposits and other assets consist of the following as of December 31:

|  | 2004 | 2003 |
|---|---|---|
| Refundable deposits | $  2,415,340 | $4,233,159 |
| Prepaids and other assets | 3,083,848 | 659,825 |
| Refinancing costs—net of amortization of $183,695 and $156,483, respectively | 6,805 | 34,017 |
| Deposits on land held for future developments | 6,867,636 | 250,000 |
| Total deposits and other assets—net | $ 12,373,629 | $5,177,001 |

5.   NOTES PAYABLE

Notes payable consist of the following at December 31:

|  | 2004 | 2003 |
|---|---|---|
| Notes payable to lending institutions, payable in monthly installments of principal and interest at 0% to 10%, collateralized by deeds of trust, guaranteed by James M. Rhodes, maturing February 2007 to February 2010 | $   1,433,235 | $     20,280 |
| Note payable to a lending institution, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1% per annum, collateralized by construction receivables, guaranteed by James M. Rhodes, maturing May 2005 | 447,000 | 272,000 |
| Notes payable to a financial institution, payable in monthly installments of interest only at the prime rate (5.25% at December 31, 2004) plus 1% per annum, maturing throughout 2005, collateralized by deeds of trust, guaranteed by James M. Rhodes (1) | 74,783,982 | 37,543,498 |
| Notes payable to a financial institution, payable in monthly installments of interest only at 11.5% per annum, payable on demand, maturing June 2005 through October 2005, collateralized by deeds of trust, guaranteed by James M. Rhodes | 5,303,500 | 390,000 |
| Note payable to a financial institution, payable in monthly principal and interest installments of $106,929 (except for April and May, for which the payment is $133,661 and August and September, for which the payment is $80,196), at 9.22%, maturing April 2005, collateralized by a deed of trust and substantially all of RRGCC assets, as well as a personal guaranty by James M. Rhodes | 9,910,161 | 10,263,355 |
| Notes payable to individuals and trusts, payable in monthly installments of interest only at 9.25% to 12% per annum, maturing November 2005 through December 2005, collateralized by deeds of trust | * 3,137,500 | 3,137,500 |
| Notes payable to a financial institution, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1% per annum, maturing January 2005 through November 2006, collateralized by deeds of trust, guaranteed by Sagebrush Enterprises, Inc. and James M. Rhodes | 18,072,189 | 5,704,792 |
| Notes payable to a corporation, payable in monthly installments of interest only at 8% per annum, collateralized by deeds of trust, maturing October 2006 | * 1,500,000 |  |

* Note payable relates to a variable interest entity

- 13 -

| | | |
|---|---|---|
| Note payable to a lending institution, payable in monthly installments of interest and principal at 9.75% per annum, collateralized by a deed of trust, guaranteed by James M. Rhodes, maturing July 2005 | * $ 25,000,000 | $ |
| Note payable to a bank, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 0.5% per annum, maturing April 2005, collateralized by deeds of trust, guaranteed by James M. Rhodes | * 4,100,000 | 4,100,000 |
| Note payable to an individual, payable in monthly installments of $26,538, including interest of 9%, maturing December 2009, collateralized by deeds of trust | * 1,261,475 | |
| Note payable to a lending institution, payable in monthly installments of interest and principal at 7% per annum, collateralized by deeds of trust, maturing October 2008 | 57,788 | |
| Note payable to a lending institution, payable in monthly installments of interest only at 8%, maturing August 2009 through August 2014, collateralized by deeds of trust | * 15,630,000 | |
| Note payable to a bank, payable in monthly installments of interest only at the prime rate (5.25% at December 31, 2004) plus 1.5% per annum, never dropping below 6%, collateralized by deeds of trust, guaranteed by James M. Rhodes, paid off during 2004 | | 3,007,528 |
| Note payable to a bank, payable in monthly installments of interest only at prime rate (5.25% at December 31, 2004) plus 1% per annum, maturing July 2005, collateralized by deeds of trust, guaranteed by James M. Rhodes | * 4,970,580 | 4,711,171 |
| Note payable to a bank, payable in monthly installments of principal and interest of $4,969 at 7% per annum, maturing September 2013, collateralized by deeds of trust, guaranteed by James M. Rhodes | * 681,982 | 692,663 |
| Note payable to a bank, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1.25% per annum, maturing March 2005, collateralized by deeds of trust | * 1,793,000 | 1,793,000 |
| Note payable to an individual, payable in annual installments of $250,000 and interest of 10% per annum, collateralized by a deed of trust, guaranteed by James M. Rhodes, paid off during 2004 | | 500,000 |
| Note payable to an individual, payable in monthly installments of interest only at 10% per annum, maturing June 2005, collateralized by a deed of trust, guaranteed by James M. Rhodes | * 248,000 | 248,000 |
| Note payable to a lending institution, payable in semi-annual installments of interest only at 9% per annum, maturing March 2005, collateralized by a deed of trust, guaranteed by James M. Rhodes | * 550,000 | 550,000 |
| Note payable to a corporation, payable in monthly installments of interest only at LIBOR (2.4% at December 31, 2004) plus 3.9% per annum, maturing October 2005, collateralized by deeds of trust, guaranteed by Sagebrush Enterprises, Inc. and James M. Rhodes | 8,183,103 | 3,667,630 |

\* Note payable relates to a variable interest entity

| | | 2004 | 2003 |
|---|---|---|---|
| Notes payable to an individual, payable in monthly installments of interest only at 8% per annum, collateralized by deeds of trust, maturing November 2014 | * $ | 250,000 | $ |
| Notes payable to an individual, payable in quarterly installments of interest only at 8% per annum, collateralized by a deed of trust, maturing October 2014 | * | 650,000 | |
| Note payable to an individual, payable in quarterly installments of interest only at 8% per annum, maturing October 2009, collateralized by a deed of trust | * | 575,168 | |
| Note payable to a lending institution, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1.5% per annum, maturing May 2005, collateralized by a deed of trust | * | 3,574,440 | |
| Note payable to a lending institution, payable in monthly installments of interest only at 8% per annum, maturing December 2008, collateralized by a deed of trust | * | 112,500 | |
| Note payable to a lending institution, payable in monthly installments of interest only at 7% per annum, maturing December 2014, collateralized by a deed of trust | * | 64,000 | |
| Note payable to a corporation, payable in monthly installments of interest only at 10% per annum, maturing November 2009, collateralized by a deed of trust | * | 24,000 | |
| Note payable to a corporation, payable in monthly installments of interest only at 6% per annum, maturing December 2007, collateralized by a deed of trust | * | 65,000 | |
| Notes payable to a bank, payable in monthly installments, including interest at 7.75% per annum, maturing July through October 2007, collateralized by equipment, guaranteed by James M. Rhodes | | 30,183 | 39,842 |
| Note payable to a bank, payable in monthly installments of $718, including interest at 8% per annum, collateralized by equipment, guaranteed by James M. Rhodes, paid off during 2004 | | | 6,207 |
| Note payable to a corporation, payable in monthly principal and interest installments of $24,179, at 7.50%, maturing June 2008, collateralized by substantially all of the TGC's golf course maintenance equipment. | | 890,732 | |
| Notes payable to a financial institution, collateralized by a deed of trust, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1.5% per annum, and guaranteed by Rhodes Design and Development Corporation and James Rhodes, paid in full during 2004. | | | 2,856,386 |
| Notes payable to a bank, payable in monthly installments of interest only at prime rate (5.25% at December 31, 2004) plus 1% per annum, collateralized by deed of trust, guaranteed by sole stockholder | | | 2,656,833 |
| Note payable to a lending institution payable in monthly installments of interest only at 5.00% per annum, collateralized by a deed of trust, guaranteed by the sole stockholder | | | 783,521 |
| Note payable to a lending institution payable in monthly installments of interest only at the Colonial Bank Base Rate (4% at December 31, 2004) plus .5% per annum, interest rate not to be less than 5% per annum, collateralized by a deed of trust, guaranteed by the sole stockholder | | | 519,116 |

* Note payable relates to a variable interest entity

| | 2004 | 2003 |
|---|---|---|
| Notes payable to lending institutions and banks, payable in monthly installments with various payments including interest at 0% to 9.6% per annum, with maturity dates from January 2005 to October 2009, collateralized by vehicles and equipment | $  428,926 | $  94,653 |
| Notes payable to a lending institution including interest at 17.99% per annum, maturing August 2006, collateralized by equipment, paid in full in 2004 | | 12,443 |
| Notes payable to a financial institution, collateralized by a deed of trust, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1% per annum, maturing December 2006, guaranteed by James Rhodes (2) | 2,937,375 | |
| Notes payable to a financial institution, collateralized by a deed of trust, payable in monthly installments of interest only at prime (5.25% at December 31, 2004) plus 1.5% per annum, interest rate not to be less than 5.25%, maturing June 2005, guaranteed by James Rhodes | 12,012,037 | |
| Notes payable to a financial institution, collateralized by a deed of trust, payable in monthly installments of interest only at 3.9% plus LIBOR (2.4% at December 31, 2004) per annum, maturing September 2006, guaranteed by James Rhodes (3) | 13,572,900 | |
| Notes payable to a financial institution, collateralized by a deed of trust, payable in monthly installments of interest only at 5% per annum, maturing April 2005, guaranteed by James Rhodes | 166,532 | |
| Notes payable to a financial institution, collateralized by deeds of trust, guaranteed by Rhodes Design and Development Corporation, payable in monthly installments of interest only at LIBOR (2.4% at December 31, 2004) plus 3.9% per annum, maturing on various dates through March 2005 | 1,710,697 | 1,661,236 |
| Note payable to a financial institution, collateralized by a deed of trust, payable in monthly installments of interest only at 13.5% per annum, maturing April 2005 | 539,230 | 539,230 |
| Total notes payable | 214,667,215 | 85,770,884 |
| Obligations under capital leases | 676,276 | 1,005,714 |
| Total long-term debt | $ 215,343,491 | $ 86,776,598 |

* Note payable relates to a variable interest entity

(1)    The Company has available a $79,500,000 revolving development and construction loan with a lender, which is collateralized by a first deed of trust and guaranteed by James M. Rhodes.  Under the terms of the agreement, interest is payable monthly at Bank One's prime rate (5.25% at December 31, 2004) plus 1%.  Principal of the project loan shall be repaid upon the sale of collateral at amounts prescribed by the agreement. Portions of the project loan mature September 2005.

(2)    The Company entered into a $13,950,000 revolving development and construction loan with a lender, of which $2,937,375 was outstanding as of December 31, 2004, which is collateralized by a first deed of trust and guaranteed by James M. Rhodes.  Under the terms of the agreement, interest is payable monthly at prime (5.25% at December 31, 2004) plus 1% per annum. Principal of the project loan shall be repaid upon the sale of collateral at amounts prescribed by the agreement. The project loan matures December 2006.