Kevin N. Anderson (SBN 4512)
FABIAN & CLENDENIN
215 South State Street, Suite 1200
Salt Lake City, Utah 84111-2323
Telephone:    801-531-8900
Facsimile:    801-596-2814
Email:    kanderson@fabianlaw.com

*Attorneys for James M. Rhodes*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,

Reorganized Debtors

☒ Affects all Debtors

☐ Affects the following Debtors

Case No.: 09-14814-LBR
(Jointly Administered)

Chapter 11

**JAMES RHODES' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HIS ENTITLEMENT TO TAX CLAIM INCLUDED IN PROOF OF CLAIM NO. 814-33**

Hearing Date:    November 4, 2010
Hearing Time:    9:30 a.m.
Place:    Courtroom 1

James M. Rhodes ("**Rhodes**"), by and through his counsel, hereby submits this supplemental memorandum of law (the "**Supplemental Memorandum of Law**") in support of his claim for tax reimbursement found in proof of claim number 814-33. In support hereof, Rhodes states as follows:

**PRELIMINARY STATEMENT**

On July 17, 2009, Rhodes filed *Proof of Claim No. 814-33*, seeking, among other things, reimbursement for taxes he paid on account of taxable income allocated to him from Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership (collectively, the "**Debtor Entities**") in the amount of $9,729,151.00 (the "**Tax Claim**"). On May 27, 2010, the above-captioned debtors (the "**Reorganized Debtors**" or "**Debtors**") filed their *Objection to James Rhodes' Proof of Claim No. 814-33 and Notice of Amendment of Schedules and Assets and Liabilities* (the "**Objection**"). The Objection seeks entry of an order from this Court disallowing and expunging the Tax Claim in its entirety and noticing that the Reorganized Debtors had amended their schedules and liabilities to remove certain claims. The Objection has been divided into two parts.[1] This Supplemental Memorandum of Law addresses only the issue regarding Rhodes' entitlement to the Tax Claim. Rhodes does not seek, however, to collect his claim for the Tax Claim from the Debtors, but merely seeks a setoff against any claims the Reorganized Debtors may have against him.

As set forth below, Rhodes' entitlement to the Tax Claim as a means to preserve his setoff rights is based upon: (1) the governing documents of the Debtor Entities and the Rhodes Entities (as defined below); (2) the "enabling provision" contained in the First Lien Credit Agreement (as defined below) to which the Debtor Entities are parties; and (3) the closely-held nature of the Rhodes corporate structure and the documented course of conduct whereby the corporate entities regularly paid Rhodes' income tax liability attributable to the Debtor Entities and the Rhodes Entities (together with the Rhodes Entities and other Debtors, the "**Rhodes Corporate Structure**"). Furthermore, Rhodes' entitlement to the Tax Claim is consistent with the books and

---

[1] At a status conference held on August 24, 2010, the parties agreed to separate the issues presented in the Objection into two parts. Part I addresses Rhodes' entitlement to the Tax Claim. Part II will address any discovery, if necessary, to support the amount of the Tax Claim, the allowance of the Greenway Claim, and the issues regarding the scheduling of claims.

records of the Debtors and the bankruptcy schedules and statements signed by the Debtors under penalty of perjury. Accordingly, the Tax Claim should be allowed in its entirety.

**STIPULATED FACTS**

1. By the Tax Claim, Rhodes seeks reimbursement for the Taxes he paid on account of taxable income allocated to him from Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership (collectively, the "**Debtor Entities**").

2. The taxable income from the Debtor Entities was passed through to Rhodes through the following non-Debtors: (a) Sedora Holdings, LLC; (b) Rhodes Ranch, LLC; and (c) Sagebrush Enterprises, Inc. (collectively, the "**Rhodes Entities**").

3. The books and records of The Rhodes Companies, LLC contain a ledger entry dated March 31, 2009 in the amount of $9,729,151 due to Rhodes.

4. On either March 31, 2009 or April 1, 2009 (collectively, the "**Petition Date**"), each of the Debtors, including the Debtor Entities, filed for chapter 11 under title 11 of the United States Code in United States Bankruptcy Court for the District of Nevada.

5. Since 2005 and prior to the Petition Date, the Debtor Entities have made distributions to the Rhodes Entities that were not prohibited by section 6.5(iii) of the Credit Agreement dated November 21, 2005 among Heritage Land Company, LLC, The Rhodes Companies, LLC, Rhodes Ranch General Partnership, the lenders listed therein, and Credit Suisse, Cayman Islands Branch, as administrative agent, collateral agent, and syndication agent for the first lien lenders (the "**First Lien Credit Agreement**").

6. None of the Debtors paid Rhodes any portion of the $9,729,151 referred to in paragraph 2 above prior to the Petition Date.

7. Paragraph 5 of the Amended and Restated General Partnership Agreement of Rhodes Ranch General Partnership is captioned "**DISTRIBUTIONS**" and states:

> Partnership cash accounts (the "cash accounts") shall be set up on the Partnership's books for each Partner. No Partner shall receive a salary for his services to the Partnership. Each Partner's cash account shall be

credited with his proportionate share (in accordance with his Partnership percentages) of all cash revenues of the Partnership from operations during any period, and shall be charged with his proportionate share of (1) all principal and interest payments on any indebtedness of the Partnership, and (2) all cash expenses incurred incident to the operation of the Partnership's business. Each Partner may make withdrawals from his cash account from time to time, to the extent permitted by the Partnership.

8. Paragraph 9.03 of the Amended and Restated General Partnership Agreement of Rhodes Ranch General Partnership is captioned "**Capital Accounts**" and states:

> Each Partner's capital account shall be initially equal to the cash it contributes and its share of liabilities which it has assumed, and during the term of the Partnership shall be:
>
> (a) Increased by:
>
> (1) the amount of taxable income allocated to the Partner,
>
> (2) the Partner's proportionate share of liabilities he has assumed, and
>
> (3) the amount of any additional cash contributed by the Partner or paid to his cash account, and shall be
>
> (b) Decreased by:
>
> (1) the amount of tax losses allocated to the Partner, and
>
> (2) the amount of cash distributed to the Partner, whether from his cash account or otherwise.

9. Article V of the Heritage Land Company Operating Agreement, which is captioned "**DISTRIBUTIONS TO MEMBERS**," contains the following provisions:

> 5.1 <u>Distributions of Net Cash Flow</u>. Prior to the dissolution of the Company and the commencement of the liquidation of its assets and winding up of its affairs, the Manager may in its sole discretion, distribute from time to time the Net Cash Flow to the Members pro rata in accordance with their respective Percentage Interests.
>
> …

> 5.3  <u>Amounts Withheld</u>.  All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member for all purposes of this Agreement.

**ADDITIONAL FACTS RELEVANT TO THE TAX CLAIM**

10. The First Lien Credit Agreement provides, in pertinent part:

> The Borrowers and their Subsidiaries may make Restricted Payments to the Parents for the purposes of permitting the direct or indirect holders of Capital Stock of the Parents to pay their respective United States federal, state or local income tax obligations with respect to net income allocated to them from the Borrowers and their Subsidiaries (including, without limitation, with respect to tax obligations relating to the Fiscal Year ending December 31, 2004 and December 31, 2005).

(First Lien Credit Agreement, Section 6.5(iii)).

11. The First Lien Credit Agreement defines "Borrowers" as the Heritage Land Company, LLC, The Rhodes Companies, LLC, and Rhodes Ranch General Partnership (*i.e*., the Debtor Entities).

12. The First Lien Credit Agreement defines "Parents" as follows: (a) Sagebrush, the sole member of Rhodes Companies, (b) Sedora, the Managing Member of Heritage Land, and (c) Rhodes Ranch, LLC, a member of Heritage Land and partner of Rhodes GP (*i.e.,* the Rhodes Entities).

13. The Tax Claim seeks payment of an amount equal to the 2006 tax liability that Rhodes paid as a result of his direct and indirect interests in the Debtor Entities. Rhodes controlled and owned interests in the Debtor Entities through the Rhodes Entities (*i.e*., Sagebrush (an S-corporation), Rhodes Ranch, LLC (a disregarded entity for federal tax purposes), and Sedora Holdings, LLC (a partnership for federal tax purposes)). The Rhodes Entities, including Sagebrush, which has historically been Rhodes' primary operating entity, serves as the conduits through which Rhodes received income from the Debtor Entities.

14. In 2006, the Debtor Entities were owned as follows: (1) Heritage Land Company, LLC, was taxed as a partnership and was owned by Rhodes Ranch, LLC (5.694%) and Sedora

Holdings, LLC (94.306%); (2) Rhodes Ranch General Partnership was taxed as a partnership and was owned by The Rhodes Companies, LLC (94.363%) and Rhodes Ranch, LLC (5.673%); and (3) The Rhodes Companies, LLC, was wholly owned by Sagebrush and, as a single-member limited liability company, was a disregarded entity for tax purposes. The Rhodes Entities were wholly owned directly and indirectly by Rhodes.

15. Because the Debtor Entities and the Rhodes Entities were all pass-through entities for federal tax purposes, all of the taxable income for the 2006 tax year generated by the Debtor Entities and the Rhodes Entities was allocated to Rhodes and was properly reported on Rhodes' personal income tax return.

16. In the 2006 tax year, Heritage Land Company, LLC produced approximately $24.7 million in net losses, Rhodes Ranch General Partnership generated approximately $59.3 million in net profits, and The Rhodes Companies, LLC generated approximately $25.9 million in net profits. The total tax liability generated by the Debtor Entities that flowed through and was allocated to Rhodes during the 2006 tax year was $21,014,159. Sagebrush made estimated tax payments on the income attributable to the Debtor Entities for the 2006 tax year in the amount of $14,040,000. Rhodes' cash resources were used to pay the remaining 2006 tax year liability in the amount of $9,729,151. The books and records of The Rhodes Companies, LLC contain a ledger entry dated March 31, 2009 in the amount of $9,729,151 due to Rhodes. (*See* Stipulated Facts, at 3).

17. On April 30, 2009, the Debtors filed bankruptcy schedules and statements (the "**Original Schedules**"), based upon their respective books and records and signed under penalty of perjury. The Original Schedules—consistent with the books and records of The Rhodes Companies, LLC's ledger entry dated March 31, 2009—show Rhodes having a general unsecured claim in the amount of $9,729,151, and such claim is scheduled as undisputed, uncontingent and liquidated. (Original Schedules, at 10).

18. On July 2, 2009, the Debtors filed amended bankruptcy schedules and statements (the "**Amended Schedules**"), based upon their respective books and records and signed under penalty of perjury. The Amended Schedules amended Rhodes' claim to the amount of $9,718,652.41, a difference of $10,498.59. The Amended Claim is scheduled as undisputed, uncontingent, and liquidated. (Amended Schedules, at 7).

19. On February 18, 2010, the Debtors filed their *Third Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC, et al.* (the "**Plan**"). The Plan was confirmed on March 12, 2010.

20. The Plan preserved Rhodes' right to setoff, as was previously agreed to in the settlement agreement resulting from the court-ordered mediation held in August 2009. (Plan, at Article VIII, §§ H, J).

## ARGUMENT

### I. RHODES HAS A RIGHT TO OFFSET HIS TAX CLAIM PURSUANT TO 11 U.S.C. § 553.

Section 553 of the Bankruptcy Code permits the setoff of mutual debts that arose before the commencement of the case. 11 U.S.C. § 553(a). Section 553 preserves the right of a creditor to offset a mutual debt owing by such creditor to the debtor if such right otherwise exists under applicable non-bankruptcy law. *In re Gould,* 401 B.R. 415, 423 (B.A.P. 9th Cir. 2009). Setoff does not eviscerate the debt of either the debtor or the creditor, but allows the court to net pre-petition mutual obligations between two parties. *In re Bridge Info. Sys., Inc.,* 314 B.R. 421, 432 (Bankr. E.D. Mo. 2004). A presumption exists in favor of enforcing a creditor's right to setoff pre-petition mutual debts under § 553 and is "generally favored." *In re De Laurentiis Entm't Group, Inc.,* 963 F.2d 1269, 1277 (9th Cir. 1992). The Ninth Circuit in *De Laurentiis* explained as part of the reason for enforcement of setoffs in bankruptcy:

> Moreover, the primacy of setoffs is essential to the equitable treatment of creditors. A setoff is allowed as a defense to a claim brought by the debtor against a creditor. The creditor can claim only an amount large enough to offset its debt; it cannot collect anything from the debtor.

> Absent a setoff, a creditor in NBC's position is in the worst of both worlds: it must pay its debt to the debtor in full, but is only entitled to receive a tiny fraction of the money the debtor owes it. It was to avoid this unfairness to creditors that setoffs were allowed in bankruptcy in the first place.

*Id.*

Although the Plan of the Debtors has been confirmed, the Ninth Circuit has held that the right of setoff cannot be taken away by a reorganization plan. *De Laurentiis*, 963 F.2d at 1278. Indeed, the Ninth Circuit stated:

> An equally venerable part of the bankruptcy laws allows a creditor to "set off" a claim that the debtor owes it against a claim that it owes the debtor, as long as both debts arose before the bankruptcy. Thus, if the debtor and the creditor each owed the other $20, they could set those debts off against each other, rather than attempting to collect from each other. 11 U.S.C. § 553 protects the right to a setoff from the operation of the remainder of the bankruptcy code. 11 U.S.C. § 553 provides that: (a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

*Id.* at 1274. The language in section 553 of the Bankruptcy Code establishes a right to setoffs in bankruptcy that takes precedence over any other provision of the Bankruptcy Code, including a discharge. *Id.* at 1277–78; *see also In re Buckenmaier*, 127 B.R. 233, 237 (B.A.P. 9th Cir. 1991) (also noting that "[m]ost cases hold that a valid setoff claim cannot be defeated by a discharge in bankruptcy."). The Ninth Circuit also explained that "a contrary conclusion essentially would nullify section 553:"

> Section 553 does not by itself create a right of setoff. Instead, it merely allows setoffs in bankruptcy to the same extent they are allowed under state law. *Buckenmaier*, 127 B.R. at 237. If section 1141 were to take precedence over section 553, setoffs would be allowed under Chapter 11 only where they were written into a plan of reorganization. Section 553 would then be largely superfluous, since a setoff could be written into the reorganization plan even without section 553. A reading of section 553 which renders it meaningless should be highly suspect.

*De Laurentiis,* 963 F.2d at 1277. Where, as here, Rhodes does not seek to collect his claim for the Tax Claim from the Borrower Entities but merely seeks a setoff against any claims the Reorganized Debtors may have against him, the strong policies favoring setoffs entitle Rhodes to assert his setoff against the Reorganized Debtors.

## II. RHODES' TAX CLAIM SHOULD BE ALLOWED BECAUSE RHODES IS A CREDITOR AND HOLDS A CLAIM AGAINST THE DEBTORS THAT AROSE PRE-PETITION.

### A. Definition of "Creditor" and "Claim."

Pursuant to section 101(10) of the Bankruptcy Code, a "creditor" includes an entity that has a "claim" against the debtor that arose at the time of or prior to the order for relief concerning the debtor. 11 U.S.C. § 101(10).

Bankruptcy Code section 101(5) defines the term "claim" as any "right to payment," regardless of whether the right is reduced to judgment, and regardless of whether the right is legal, equitable, liquidated, unliquidated, matured, unmatured, contingent, fixed, disputed, undisputed, secured or unsecured. As noted by *Collier on Bankruptcy,* "[t]he concept of a 'claim' is thus decidedly broad, and the definition is intended to encompass virtually <u>any type of obligation reducible to some monetary equivalence</u>." COLLIER ON BANKRUPTCY ¶ 553.02[1][a] at 553-12 (Alan N. Resnick & Henry J. Somme eds., 16th ed.) (emphasis added). Indeed, courts have consistently reiterated that Congress intended the term "claim" to have the broadest possible meaning under the Bankruptcy Code. *See, e.g., F.C.C. v. Nextwave Personal Commc'ns Inc.,* 537 U.S. 293, 302 (2003) (citing *Johnson v. Home State Bank,* 501 U.S. 78, 83 (1991)); *In re Sherman*, 491 F.3d 948, 958 (9th Cir. 2007). However, courts have refined "claim" under the Bankruptcy Code to mean a right to payment arising from an obligation owed by the debtor, which the claimant may enforce under state or federal law. *See Nextwave Personal Commc'ns Inc.,* 537 U.S. at 294. Creditor entitlements in bankruptcy are generally determined by rights to payment pursuant to the underlying state law. *See Travelers Cas. & Sur. Co. of Am. V. Pac. Gas & Elec. Co.,* 549 U.S. 443, 450–51 (2007); *In re First Alliance Mortgage Co.*, 269 B.R. 428, 435

(Bankr. C.D. Cal. 2001) ("Whether a right to payment exists in a bankruptcy case is generally determined by reference to state law.").

### B. Rhodes' Income Attributable to Pass-Through Entities and Disregarded Entities.

Partnerships and limited liability companies are commonly referred to as "pass-through" entities because their tax obligations pass to their partners or members. *See* 26 U.S.C. § 701. While federal tax law governs the tax systems of these pass-through entities, state law governs the rights and responsibilities of the partners and members regarding their respective entities. Under the Nevada Revised Statute, partners and members have the discretion to demand distributions. *See* Nev. Rev. Stat. Chapters 86 and 87 (2010). Thus, Nevada limited liability companies and partnerships are free to make distributions to reimburse their partners and members for taxes attributable to their interests in the entities and are free to provide for such distribution in their governing documents. *See* Nev. Rev. Stat. § 86.341 (2010) ("A limited-liability company may, from time to time, divide the profits of its business and distribute them to its members . . . upon the basis stipulated in the operating agreement."); *See also* Nev. Rev. Stat. § 87.4316 (2010) ("relations among the partners and between the partners and the partnership are governed by the partnership agreement.).

The Reorganized Debtors cite *Five State Concrete, L.L.C. v. Klink, Inc.,* 693 N.E. 583, 586 (Ind. Ct. App. 1998), an Indiana case, to support the premise that members do not have an inherent right to demand distributions from the limited liability companies of which they are members unless state statutes or the governing documents provide for such rights. The member in *Five Star Concrete* was a withdrawing member seeking reimbursement for taxes paid on income allocated to him by the LLC in the year of the member's withdrawal. The LLC in *Five Star Concrete* (i) was not a closely-held LLC, (ii) did not historically make distributions to its members to account for income taxes attributable to their interests in the LLC, and (iii) the former member was demanding distributions after he withdrew from the Company and surrendered

control over the operations of the company. Here, however, Rhodes owned, directly or indirectly, 100% of the Debtor Entities and the Rhodes Entities and, as set forth below, was historically reimbursed by the Borrower Entities and Rhodes Entities for income taxes attributable to his interests in the Debtor Entities and the Rhodes Entities.

### C. Rhodes is Entitled to the Tax Claim Because the Tax Claim is Listed in the Debtors' Statements and Schedules and Constitutes a Judicial Admission.

Statements made in bankruptcy schedules are executed under penalty of perjury and, when offered against the debtor, "are eligible for treatment as [evidentiary] admissions." *Suter v. Goedert*, 396 B.R. 535, 541–42 (D. Nev. 2008) (citing *In re Bohrer,* 266 B.R. 200, 201 (Bankr. C.D. Cal. 2001)). Judicial admissions are conclusively binding on the party who made them. *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988) (quoting *In re Fordson Eng'g Corp.,* 25 B.R. 506, 509 (Bankr. E.D. Mich. 1982)). Even when schedules are amended, the old schedules are subject to consideration by the court as evidentiary admissions. *In re Kaskel*, 269 B.R. 709, 715 (Bankr. D. Idaho 2001); *Bohrer*, 266 B.R. at 201.

On April 30, 2009, the Debtors filed the Original Schedules, based upon their respective books and records and signed under penalty of perjury. The Original Schedules are consistent with the Debtors' books and records and show Rhodes having a general unsecured claim in the amount of $9,729,151. On July 2, 2009, the Debtors filed the Amended Schedules, based upon their respective books and records and signed under penalty of perjury. The Amended Schedules again listed Rhodes and acknowledged Rhodes' entitlement to the Tax Claim. Therefore, despite the Reorganized Debtors' protestations to the contrary, the Debtors have admitted and acknowledged that Rhodes is entitled to the Tax Claim. To permit the disallowance of the Tax Claim at this point in the Chapter 11 Cases—post-confirmation, post-effective date and post-substantial consummation of the Plan, which provides for the preservation of Rhodes' setoff rights—would be to work an injustice upon the very bankruptcy process. The Court should also consider the Original Schedules and Amended Schedules as evidentiary admissions of the

1 Reorganized Debtors in support of the validity of the Tax Claim and, consequently, should allow
2 the Tax Claim in accordance with the Plan provisions that preserve Rhodes' setoff rights.

     **D.    Rhodes is Entitled to the Tax Claim Because the Course of Conduct Between the Rhodes Entities and the Debtor Entities Establishes Rhodes' Equitable Right to Payment Constituting a Claim.**

There is no dispute that the income and losses generated by the Rhodes Corporate Structure passed through to Rhodes directly through his 100% ownership interest in Sagebrush and also through his 100% indirect interest in Sedora Holdings, LLC. Over several tax years prior to the Petition Date, Rhodes and the Rhodes Corporate Structure established a course of conduct whereby Sagebrush calculated the income and losses allocated to Rhodes, pursuant to his direct and indirect ownership interests in the Rhodes Corporate Structure, and subsequently made payments to the IRS on behalf of Rhodes in satisfaction of Rhodes' federal income tax liability attributable to his ownership of the Rhodes Corporate Structure. Such payments made on behalf of Rhodes were appropriately accounted for in the Debtors books and records, which practice has been reviewed and verified by numerous independent audits. This course of conduct is not peculiar to the Rhodes Corporate Structure. Such practice of distributions is common and virtually standard practice among closely held corporations as a means of preserving cash reserves for other uses and, moreover, does not violate Nevada law. *See* Nev. Rev. Stat. §§ 86.341, 86.343, 87.4316, 87.4333.

In the 2006 tax year, estimated income tax payments on income attributable to the Rhodes Corporate Structure, which amounted to approximately $14,040,000, were paid by Sagebrush to the IRS on behalf of Rhodes. In or around late 2007, upon completion of tax returns for the Rhodes Corporate Structure for that tax year, it became clear that the total tax liability for the 2006 tax year was in excess of the estimated tax payments previously made by Sagebrush. Thereafter, approximately $9.7 million of Rhodes' cash resources were used to satisfy the remaining tax liability for the 2006 tax year, and such payment was accounted for in the Debtors'

books and records as a "dividend payable" to Rhodes. Such liability to Rhodes remained accrued and unpaid as of the Petition Date.

### E. Rhodes is Entitled to the Tax Claim Because the Governing Documents for the Debtor Entities and the Rhodes Entities Permit or Even Mandate Distributions to Rhodes for Tax Liability.

The governing documents for the entities included in the Rhodes Corporate Structure permit or even mandate distributions to the partners or members to account for income tax distributions. Section 2.4.2, entitled "Distributions with respect to Taxes," of the Sedora Holdings, LLC Operating Agreement, effective during the 2006 tax year, mandates that Sedora Holdings make priority distributions to partners in amount sufficient for the partners to pay their annual tax liabilities attributable to their interest in the Company. Indeed, the operating agreement provides:

> Notwithstanding any other provision of this Agreement, and <u>before the Company has any obligations to make any of the other distributions provided for in this Section 2.4</u> or to pay Debt except as provided in Section 2.4.1, the Company shall have made distributions to each of the Partners for each prior Company year preceding the year in which any such payment or other Distributions are contemplated, in an amount equal to [*tax formula*] […], the Distributions provided for by this Section 2.4.2 shall be mandatory and shall be made at a time and in a manner intended to permit the respective Partners (or their ultimate beneficial owners) to apply such Distributions to the Payment of the annual tax liabilities of the Partners resulting from the Partner holding an interest in the Company.

(Emphasis added). Furthermore, the governing documents for the Debtor Entities allow for distributions to partners. For example, Section 5.1 of the Heritage Land Company Operating Agreement provides:

> [T]he Manager may, in its sole discretion, distribute from time to time the Net Cash Flow to the members pro rata in accordance with their respective Partnership Interests" and Section 5.3 provides "All amounts withheld pursuant to the Code or any provisions or state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member for all purposes of this Agreement." Paragraph 5 of the Rhodes Ranch General Partnership provides "…each partner may make withdrawals from time to time to the extent permitted by the partnership." Section 5.1 of the Rhodes Ranch, LLC Operating Agreement provides

> "Distributions of available cash flow shall be made, subject to Section 86.343 of the Act, in such amounts and at such times as the Member shall determine in its sole discretion.

**F.    Rhodes is Entitled to the Tax Claim Because the "Enabling Provision" Contained in the First Lien Credit Agreement Acknowledges and Ratifies the Course of Conduct for Reimbursement of Taxes Among Rhodes and the Rhodes Corporate Structure.**

The First Lien Credit Agreement provides, in pertinent part:

> The Borrowers and their Subsidiaries may make Restricted Payments to the Parents for the purposes of permitting the direct or indirect holders of Capital Stock of the Parents to pay their respective United States federal, state or local income tax obligations with respect to net income allocated to them from the Borrowers and their Subsidiaries (including, without limitation, with respect to tax obligations relating to the Fiscal Year ending December 31, 2004 and December 31, 2005).

This "enabling provision" acknowledges the practical realities of managing a large, closely-held business enterprise whereby operating entities pay the income tax liabilities on behalf of their ultimate owners, as attributable to the entities. The enabling provision of the First Lien Credit Agreement ratifies the course of conduct among Rhodes and the Rhodes Corporate Structure whereby the Debtor Entities regularly made payments on behalf of, or distributed income to, their corporate parents for the purpose of satisfying the taxes on income allocated to the parents and Rhodes. Further, the First Lien Credit Agreement's enabling provision acknowledges the Debtor Entities' right to reimburse the Parents for tax liabilities arising from periods both prior to *and following* the date of the First Lien Credit Agreement, which demonstrates the parties were aware of and ratified the Rhodes Corporate Structure policy and course of conduct regarding payment and/or reimbursement of income taxes.

## CONCLUSION

As noted above, Rhodes is not seeking payment of his Tax Claim from the Reorganized Debtors' estate but merely the right to setoff such Tax Claim against any claims that may be asserted against him by the Reorganized Debtors. The tax payment history between Rhodes and the Rhodes Corporate Structure, the permissive and mandatory language regarding distributions

to owners of the Rhodes Corporate Structure, and the language in the enabling provision of the First Lien Credit Agreement acknowledge and ratify the course of conduct between Rhodes and the Rhodes Corporate Structure whereby the ultimate owner of the Rhodes Corporate Structure (Rhodes) was reimbursed for the income tax liability arising from his interests in the Debtor Entities and the Rhodes Entities. Rhodes relied upon this well-documented course of conduct between himself and the Rhodes Corporate Structure and anticipated being reimbursed from the Rhodes Corporate Structure when Rhodes satisfied the remaining 2006 tax year federal income tax liabilities with his personal cash resources. Accordingly, Rhodes has an equitable right to payment, which is within the scope of a claim as defined by Bankruptcy Code Section 101(10), and the Court should overrule the Reorganized Debtors' objection to Rhodes' Tax Claim. Furthermore, the Original Schedules and Amended Schedules, which were signed under penalty of perjury and which listed Rhodes and acknowledged Rhodes' entitlement to the Tax Claim, further evidence Rhodes' entitlement to the Tax Claim. The Court should consider the Original Schedules and Amended Schedules as evidentiary admissions of the Reorganized Debtors in support of Rhodes' entitlement to the Tax Claim.

**WHEREFORE**, Rhodes respectfully requests this Court enter an order denying the Reorganized Debtor's objection to Rhodes' Tax Claim and for any such further relief which the Court may deem just and appropriate under the circumstances.

DATED this 27th day of September, 2010.

/s/ Kevin N. Anderson
Kevin N. Anderson
FABIAN & CLENDENIN
Attorneys for James M. Rhodes

4853-1948-3911, v. 1