```
1                 UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF NEVADA
2

3   _____
                                    )
    In re:                          )
4                                   )
    THE RHODES COMPANIES, LLC    CH: 11   )    09-14814-LBR
5                                   )
    CONTINUED STATUS HEARING RE: OBJECTION  )
6   TO JAMES RHODES' PROOF OF CLAIM NO.     )
    814-33 AND AMENDMENT OF SCHEDULES OF    )
7   ASSETS AND LIABILITIES FILED BY NILE    )
    LEATHAM ON BEHALF OF REORGANIZED        )
8   DEBTORS_____ )

9                               U.S. Bankruptcy Court
                                300 Las Vegas Boulevard South
10                              Las Vegas, Nevada 89101

11                              November 4, 2010
                                9:35 a.m.
12

13            BEFORE THE HONORABLE LINDA B. RIEGLE, Judge

    APPEARANCES:
14

15  For The Reorganized Debtors:  Abid Qureshi
                                  AKIN, GUMP STRAUSS HAUER & FELD,
                                  LLP
16                                One Bryant Park
                                  New York, New York 10036-6745
17

18  For James Rhodes:             Kevin N. Anderson
                                  FABIAN & CLENDENIN
19                                215 S. State Street, Suite 1200
                                  Salt Lake City, Utah 84111-2323
20

21  For The Rhodes Companies,     Zachariah Larson
    LLC:                          LARSON & STEPHENS
22                                810 S. Casino Center Blvd., #104
                                  Las Vegas, Nevada 89101-6719
23

24  Proceedings recorded by electronic sound technician, Patricia
    Lilly; transcript produced by AVTranz.
25
```

2

```
 1            THE CLERK:  Bankruptcy Court is now in session.

 2            THE COURT:  Proceed.  All right, Rhodes appearances,

 3    please.

 4            MR. QURESHI:  Good morning, Your Honor.  Abid

 5    Qureshi, Akin, Gump, Strauss, Hauer & Feld, on behalf of the

 6    reorganized debtors.

 7            MR. ANDERSON:  Kevin Anderson, with Fabian &

 8    Clendenin, on behalf of Mr. Rhodes.

 9            THE COURT:  All right.  Okay.  Go ahead.  Oh.  Sorry.

10    I note Mr. Larson's appearance.

11            MR. LARSON:  Yes.

12            MR. QURESHI:  Good morning, Your Honor.  May I

13    proceed?

14            THE COURT:  Yes, please.

15            MR. QURESHI:  Your Honor, we are here this morning

16    pursuant to a stipulation entered into between the parties and

17    approved by the Court, concerning certain claims filed by Mr.

18    Rhodes.  Today's hearing, pursuant to that stipulation, is

19    limited to the question of Mr. Rhodes' entitlement to the tax

20    claim.

21            Just to refresh Your Honor briefly, with the

22    underlying facts, Mr. Rhodes has asserted a claim in the amount

23    of $9,700,029, approximately.  The claim is on account of taxes

24    that Mr. Rhodes was obligated, as a matter of federal tax law,

25    to pay as a result of taxable income generated by three debtor
```

3

1    entities, Heritage Land, LLC, The Rhodes Companies, LLC, and

2    Rhodes Ranch General Partnership.  Now the taxable income from

3    those three debtor entities, Your Honor, was passed through, to

4    three non-debtor entities, and those three non-debtors are

5    Sedora (phonetic) Holdings, LLC, Rhodes Ranch, LLC, and Sage

6    Brush Enterprises.

7            So the question before the Court, Your Honor, it

8    really is an entirely legal one, and it boils down to this, is

9    Mr. Rhodes a creditor, as defined in the bankruptcy code, does

10   he hold the claim, as those terms are defined in the code.  So

11   let's start there.

12           Bankruptcy Code § 101, Supp. 10, defines creditor to

13   be an entity that has a claim against the debtor, that arose

14   prepetition.  So of course the question then becomes, what is a

15   claim?  1015 of the Code, in turn broadly defines claim to be a

16   right of payment or a right to an equitable remedy for a breach

17   of performance if the breach gives rise to a payment.

18           Your Honor, the case law is indeed clear, that the

19   definition of claim that is used in the bankruptcy code should

20   have the broadest possible meaning, but the meaning is not

21   limitless.  And I would refer Your Honor to the Supreme Court

22   decision in Next Wave.  It's a 2003 case; it's cited in our

23   papers.  And in that case what the Supreme Court says that the

24   right to payment means, in the definition of claim, in the

25   bankruptcy code, is, and I'm quoting, Your Honor, "nothing

1  more, nor less, than an enforceable obligation."  And that

2  citation is 537 US 293 F. 303.

3          And so, Your Honor, the question here, the burden on

4  Mr. Rhodes, is to demonstrate that a debtor entity has an

5  enforceable obligation to reimburse Mr. Rhodes for a tax

6  payment that he made, on account of taxable income that was

7  passed through to him through the corporate structure of LLCs

8  and partnerships.

9          THE COURT:  Now this is an aside --

10          MR. QURESHI:  Yeah.

11          THE COURT:  -- and I'm not sure what legal or

12  relevance this has.  This was income that was passed through,

13  at a time when creditors were being -- were not being paid,

14  correct?

15          MR. QURESHI:  I believe that is correct.

16          THE COURT:  And so we have millions of creditors who

17  weren't paid -- well, the 23 million was passed through to him.

18          MR. QURESHI:  That's correct.

19          So, Your Honor, before -- Mr. Rhodes advances three

20  principle arguments, as to why he's entitled to this claim.

21  First, he says that there's an equitable right, as a result of

22  a course of conduct that existed between Mr. Rhodes and various

23  of these -- of these entities.  Second, he argues that the

24  governing documents of these LLCs and these partnerships

25  entitle him to this claim.  And third, he points to a provision

1   in the First Lien credit agreement.

2           But, Your Honor, before I address each of those, and

3   each is without merit, and there are a couple of additional

4   arguments that are raised that I will also address, but I'd

5   like to spend a moment, if I could, Your Honor, just to

6   describe the pass-through structure, because I think it's

7   important to understand that.

8           The debtor entities that are involved here, they are

9   two LLCs and one partnership.  And for tax purposes, and this

10  is a function of federal tax law, these entities are what is

11  described as pass-through entities.  What that means is that

12  the entities, themselves, do not have the tax obligation.  The

13  tax obligation flows through the entities, to, in the case of

14  LLCs, the members, and in the case of a partnership, of course

15  the partners.

16          Thus, the debtor entities, themselves, have no

17  obligation to pay taxes on any of the taxable income that they

18  generate.  It is the individual behind those entities, in this

19  case, Mr. Rhodes, that bears the ultimate responsibility, as a

20  matter of federal tax law, and this is not disputed, to pay the

21  taxes, on account of the taxable income generated.

22          So the obligation exists, the obligation of Mr.

23  Rhodes, as the LLC member, or as the partner in these entities,

24  to pay the federal income taxes.  That exists, irrespective of

25  whether Mr. Rhodes receives a distribution from the LLC or a

1  distribution from the partnership, in an amount equal to the

2  taxes, it does not matter.  Again, undisputed, as a matter of

3  federal tax law, he owes the taxes, period, full stop.

4  So what Mr. Rhodes has to demonstrate, in order to

5  have a claim here, is that the debtor entities were mandated,

6  were required, to reimburse him for these tax payments.  He can

7  show that in three ways.  He can show that there is a statutory

8  requirement that the debtor entities make a distribution equal

9  to the taxes paid; he can show that there's a provision in the

10  operative document of the debtor entities, the LLCs or the

11  partnership agreements, that require that kind of distribution

12  when he makes a tax payment; or third, he can point to a

13  decision by the LLC members or the partners in the partnership,

14  to make a distribution.  And he fails on all three.

15  And there is a case that we refer to in our pleadings

16  that I think is particularly helpful in understanding this

17  framework that I'd like to spend a minute on.  It's of course

18  not by any precedent, but it's instructive nonetheless.  It's

19  the Five Star Concrete case.  It's from the Indiana Court of

20  Appeals.  And there, Your Honor, that Court considered the

21  question of whether a member who was withdrawing from an LLC

22  had a right to a distribution from the LLC in an amount equal

23  to the pass-through taxes that that entity was required to pay.

24  So same structure under Indiana law.  The LLC is a

25  pass-through, the members of it have to pay the taxes, this

1    withdrawing member had to pay the taxes and was now looking for

2    a distribution from the LLC in an amount equal to the taxes.

3    Here's what the -- how the Indiana Court analyzed it, and I

4    submit, Your Honor, that it's the right way to analyze it here.

5            First, the Court looked to applicable Indiana

6    statutes, to see if there was any requirement that a LLC make a

7    distribution to a member, on account of income taxes paid, and

8    there was no such requirement in Indiana law, and as I'll get

9    to in a moment, there's no such requirement under Nevada law,

10   which is applicable here.

11           Second, the Court looked to the operative documents

12   of the LLC, to see if, in those operative documents, there was

13   a requirement that the LLC make a distribution, and again, as

14   here, there was not.  And finally, the Court found that there

15   was no decision that was taken, on behalf of the LLC, to make

16   the distribution.  And thus, the withdrawing member was -- you

17   know, still had to pay the taxes, because that was the

18   withdrawing member's obligation, as a function of federal tax

19   law, but was not entitled to a distribution, on account of that

20   payment.  And the reason is identical here.

21           So let's start with the first prong, is there a

22   statutory requirement that obligates the debtor entities to

23   make a distribution to Mr. Rhodes on account of these taxes?

24   And the answer is again not disputed; there is no such

25   requirement.  The applicable provisions of the Nevada statute

1   provide that the right of a partner, in a partnership, or the

2   right of a member in an LLC, to receive a distribution is

3   governed by the operative documents of the entity, and of

4   course by whether there is a decision by the LLC or the

5   partnership to make a distribution.  There is no independent

6   obligation, nor is there argued to be, as a function of Nevada

7   law, that requires a distribution to be made in certain

8   circumstances.

9         So that takes us, then, to the governing documents.

10  And again, here the question is, is there an affirmative

11  obligation, in the governing documents, for the debtor entities

12  to make a distribution to Mr. Rhodes, when Mr. Rhodes fulfills

13  his obligations to make a federal tax payment.  Now Mr. Rhodes

14  points, first, to the operating agreement of Sedora Holding,

15  LLC.  Now just as an aside, we've never seen the operating

16  agreement.  We've asked for it.  It hasn't been provided to us.

17  As far as I'm aware, it hasn't been provided to the Court.

18        But what they say in the papers is that, and they

19  quote a provision of that agreement, that that agreement

20  mandates distributions to partners in an amount sufficient for

21  the partners to pay their tax liabilities.  The problem, Your

22  Honor, is that Sedora Holdings is a non-debtor entity, so it's

23  irrelevant what the operating agreement -- the operating

24  documents of a non-debtor entity says has no force, of course

25  with respect to the Debtors. The obligation to pay has to be an

9

1    obligation of the debtor entity, in order for it to be a claim.

2    And here, it clearly isn't.

3            So turning then, to the operative documents that

4    actually do matter, which are of course the operating documents

5    of the debtor entities, and this is important, Your Honor.  Mr.

6    Rhodes concedes in his papers that those documents do not

7    mandate a distribution.  He quotes from the documents and

8    correctly concludes that those documents are permissive,

9    they're not mandatory.  They allow for that type of a

10   distribution to be made, but they do not mandate.  So again,

11   undisputed, there is no requirement in the operative documents

12   of the debtor entities for this type of a distribution to be

13   made.

14           Next, Mr. Rhodes refers to the first-line credit

15   agreement.  And again, even ignoring, for the moment, whether

16   that's even a relevant provision to look at, the first-line

17   credit agreement, similarly, has no affirmative requirement, on

18   a debtor entity, to make a distribution to Mr. Rhodes, on

19   account of tax payments, it is permissible.  And again, not

20   disputed, Your Honor.

21           Mr. Rhodes, in his papers, describes the provision in

22   the first-line credit agreement as an enabling provision, and

23   that's exactly what it is.  It basically says if the LLC or a

24   partnership, if the debtor entity wishes to make that kind of a

25   distribution, it's not prohibited by the first-line credit

1    agreement.  That is not an affirmative obligation of the

2    Debtor, to make the distribution, not even close.

3            So in accordance with the Five Star Concrete case,

4    and how that case looked at it, Your Honor, that ends the

5    inquiry.  There's no statutory obligation, there's no

6    obligation in the operative documents of the debtor entities,

7    and there also has been no decision made by the debtor

8    entities, to make the distribution.  And all three of those

9    points are undisputed.

10           Now Mr. Rhodes advances a couple of additional

11    arguments that I think are easily dismissed, and I'll deal with

12    quickly, if I may.  First, his papers actually begin with a

13    rather lengthy recitation of the right to offset the tax claim.

14    And, Your Honor, that's simply putting the cart before the

15    horse.  Of course, before there's a right to offset, you have

16    to have a claim.  And so we didn't get into, in our papers, the

17    question of whether there's an offset right, here, because

18    again, it's not a relevant question until there's a

19    determination that he actually has a claim.  But certainly, the

20    right to offset cannot, in itself, create a claim, needless to

21    say.

22           Second, Mr. Rhodes points to the statements and

23    schedules that were filed by the Debtor, and suggest that in

24    these statements and schedules, there was somehow a binding

25    judicial admission that these payments were owed.  So let me

1    just briefly review the facts.

2          On March 31, of 2009, which was, for most of the

3    Debtors, the petition date.  It was March 31 or April 1.  On

4    March 31, at a time when of course Mr. Rhodes was in control of

5    the Debtors, there was a ledger entry made, in the Debtors'

6    books and records, that reflected an amount owing to Mr. Rhodes

7    of $9.7 million, an amount equal to the tax payment.  The day

8    before the petition or the day of the petition.

9          A month later, on April the 30th, of 2009, the

10   Debtors, again at a time when Mr. Rhodes was in control, filed

11   their first statements and schedules, and they did so in

12   reliance on a general ledger that was done as of the petition

13   date, and so those statements and schedules reflected the same

14   thing, an amount owing to Mr. Rhodes, equal to the tax claim.

15         So those original schedules, Your Honor, on April

16   30th, and every iteration of the schedules that was filed

17   thereafter, contained a very clear reservation of rights of the

18   Debtors, that said that the Debtors expressly reserve the right

19   to dispute any claim reflected on its schedules, as to amount,

20   as to liability, as to classification.  That reservation was

21   there every time.  Likewise, Your Honor, in the plan there's a

22   similar reservation.  There, the debtor entities again

23   expressly reserve the right to object to any and all claims.

24   So on their face, these schedules are not binding.

25         But lastly, Your Honor, the schedules don't

1  constitute a judicial admission.  I mean separate and apart

2  from all of the reservations that clearly say that the Debtors

3  are reserving their right to object.  And for obvious reasons,

4  bearing in mind that Mr. Rhodes was in control when those were

5  created.  They're not pleadings.  Their contents are therefore

6  not judicial admissions.  They were filed in the general

7  bankruptcy case, pursuant to Bankruptcy Code §  521.  They were

8  not filed in connection with a specific contested matter, with

9  an adversary proceeding, and as such, they don't constitute a

10  judicial admission.

11         Last point, Your Honor, the equitable claim.  And

12  again, here Mr. Rhodes is arguing that as a result of a past

13  practice that he alleges took place, the debtor entities

14  should, now in bankruptcy, continue to be obligated to

15  reimburse him for the tax payment.  There's a fundamental

16  problem, though, with his argument.

17         The course of conduct that is alleged, the course of

18  conduct that is described in Mr. Rhodes' pleadings, and I'm

19  going to quote, briefly, from the pleading, where he says,

20  quote, "Sage Brush calculated the incomes and losses allocated

21  to Rhodes, and subsequently made payments to the IRS on behalf

22  of Rhodes, in satisfaction of Rhodes' federal income tax

23  liability."  Mr. Rhodes points to that history and says,

24  therefore, the debtor entities here have the same obligation.

25         The problem, Your Honor, is Sage Brush is a non-

1    debtor.  And so a course of conduct between Mr. Rhodes and a

2    non-debtor entity controlled by him is utterly irrelevant to

3    the question of whether that should somehow form the basis for

4    the Debtors, as a matter of equity, to have an obligation here.

5              But even if it was a course of conduct engaged in by

6    the debtor entities, Your Honor, I would submit that it is not

7    even close, as a matter of equity, as to whether the debtor

8    entities ought to be obligated to reimburse Mr. Rhodes for that

9    payment.  The payments, to the extent that they may have been

10   made in the past, were purely discretionary.  And again, we get

11   there by looking at the undisputed operative documents of the

12   debtor entities, which do not contain an affirmative obligation

13   to make the payments.  And so those documents, and any past

14   practice, are insufficient to create an obligation, in

15   bankruptcy, on the debtor entities.

16             So the other point, Your Honor, that I think entirely

17   dismisses this argument is that it's Mr. Rhodes' obligation, as

18   a matter of federal tax law, again undisputed.  It's his

19   obligation to make these payments, and nobody else's.  That is

20   not an obligation of the debtor entities.  So for all those

21   reasons, Your Honor, we think that the claim should be

22   disallowed and expunged.

23             THE COURT:  Okay.

24             MR. QURESHI:  If Your Honor has any questions.

25             THE COURT:  No.  Thank you.  Okay.  Opposition.

14

1      MR. ANDERSON:  Good morning, Your Honor.  Perhaps one

2  important clarification, based on your question, there is no

3  money that passed through Mr. Rhodes, at a time when people

4  were not being paid.  This is just a line entry on the books

5  and records of one of the debtor entities, that recognized this

6  obligation.  So there was no transfer of actual cash to Mr.

7  Rhodes.

8      He paid the $9.7 million in tax liability out of his

9  own pocket, based on the understanding that he was entitled to

10  reimbursement, which at this point, as we've stated our papers,

11  we do not even seek, as a claim against the estate, for

12  purposes of receiving any portion of the payment be made by the

13  estate, but only as a set-off against any future claims that

14  may be made against Mr. Rhodes.  That was the purpose of our

15  going into the set-off provisions.

16      Let me start with Number 3, of the ways that we could

17  -- that Mr. Abid Qureshi stated that we could establish Mr.

18  Rhodes's claim, and that was a decision to make the

19  distribution.  That one was kind of glossed over awfully

20  quickly.  The definition of a claim, as I think the reorganized

21  debtors would want you to read, they would want you to read

22  only every other word, it is not a right to a payment, that is

23  reduced to a liquidated, fixed, matured, undisputed legal

24  right.  That's not the code.  The code establishes that it is a

25  right to payment, whether or not such right is reduced to a

1   judgment, a liquidated or unliquidated, a fixed or a

2   contingent, a matured or a disputed, undisputed legal or

3   equitable, or an unsecured right.

4          Our fundamental basis for proving to this Court, at

5   this point, that as a matter of law this claim can continue,

6   but we're not here with evidence and discovery, to get to the

7   substance of these issues.  It is the equivalent, I think, of a

8   motion to dismiss, as whether there is -- you know, a probable

9   ground for Mr. Rhodes to be able to establish that he is

10  entitled, under state law.  We don't disagree with that.

11         And I think that the single fact that should change

12  everything, in the Court's mind, is the fact that before the

13  bankruptcy was filed, whether that was a minute before, a day

14  before, a week, a month, a year before, one of the debtor

15  entities, controlled through Sage Brush, so the fact that Sage

16  Brush had done this in the past is relevant, one of the debtor

17  entities entered, into its books and records, this liability.

18  That fact is important.  That fact should be recognized by the

19  Court.  You know, that fact is one that the reorganized debtors

20  are stuck with, because it --

21         THE COURT:  Well, why not have an affidavit or

22  anything that says that it was more than some bookkeeper who

23  sees this number here, and says, "Oh, gosh.  I guess I should

24  put it in the ledger."

25         MR. ANDERSON:  Well, we --

1    THE COURT:  You're relying on a decision.  Why don't

2    I have anything -- you know, okay, he's talking to himself, but

3    you still have to go through procedures, to make a decision.

4    Why don't I have that?

5    MR. ANDERSON:  I believe that's in Mr. Rhodes's

6    declaration, that that was the purpose for that entry.  I don't

7    think anybody opposes the fact that that was for the purpose.

8    In fact, I'll have to check our stipulated facts,

9    acknowledge -- well, that just that it contains the ledger, the

10    ledger entry was all that was stipulated to.  But it is in the

11    exact amount that we're claiming, and you know, those facts --

12    you know, that now gets into the factual process of the

13    decision of making that.

14    THE COURT:  Well, doesn't that also raise issues of

15    his breach of fiduciary duty?

16    MR. ANDERSON:  It absolutely could, but I -- but, you

17    know, that's not an issue for this, on the legal issue of

18    whether or not he is entitled to pursue this claim, and we can

19    get into factual issues about whether he breached his fiduciary

20    duty in doing that.  You know, our statement -- version of the

21    facts and understanding of the facts is that this was a

22    practice that was allowed, that had been previously done, that

23    Mr. Rhodes had relied on, and that was approved by the

24    necessary entities, however --

25    THE COURT:  Where is that, in the affidavit?

1          MR. ANDERSON:  -- however casually.

2          THE COURT:  Where is that, in the affidavit?  I mean

3     I'm not saying it's not there, I just want you to tell me where

4     it is in the affidavit.  And my intent was, that when you did

5     this new briefing you were to not rely on old affidavits, but

6     to reattach them if necessary, so I wasn't quamming (phonetic)

7     through all those old pleadings.

8          MR. ANDERSON:  I apologize.  I believe we did cite to

9     the declaration one or two places.  Because the stipulated

10    facts obviously didn't cover 100 percent of the facts.

11         In paragraph 21 of Mr. Rhodes's declaration, I have

12    it on page 8.

13         THE COURT:  Is that document 1177?

14         MR. ANDERSON:  Yes.

15         THE COURT:  Okay.

16         MR. ANDERSON:  Mr. Rhodes states that, in the text,

17    in the 2006 tax year, estimated tax payments attributable to

18    Rhodes corporate structure amounted to 14-plus million, which

19    were paid --

20         THE COURT:  I'm sorry.  Which paragraph again?

21         MR. ANDERSON:  Excuse me?

22         THE COURT:  Which paragraph?

23         MR. ANDERSON:  Oh.  21.  It's 21.

24         THE COURT:  21.

25         MR. ANDERSON:  I have it on page 8.

1          THE COURT:  Okay.

2          MR. ANDERSON:  In 2006, the estimated income tax

3    payments attributable to the Rhodes corporate structure

4    amounted to $14 million, were paid by Sage Brush in or around

5    late 2007, upon completion of the tax return, to the Rhodes

6    corporate structure, for that tax year.  It became clear that

7    the total tax liability for the 2006 tax year was increased by

8    the estimated tax payments.  Therefore, approximately 9.7

9    million of his cash reserves were used to satisfy the remaining

10   tax liability for 2006.  And such payment was accounted for in

11   the books and records as a dividend payable to me.

12         THE COURT:  Well, he says it's a course of conduct.

13   He didn't say a word about a decision.

14         MR. ANDERSON:  Well, no.  He is saying that --

15         THE COURT:  Read the next sentence.

16         MR. ANDERSON:  Yeah, remained accrued and unpaid for

17   those according on the form --

18         THE COURT:  Demonstrate a course of conduct.  He

19   never once used the word, "I made the decision," the decision

20   was made.

21         MR. ANDERSON:  Well, I think that a course of conduct

22   -- granted, Your Honor, but the course of conduct is a viable

23   basis for that to be reflected on the books and records.  It

24   being reflected on the books and records is a recognition of

25   the course of conduct.

1          THE COURT:  Why was it done one day before the

2    filing?

3          MR. ANDERSON:  I don't know, Your Honor.  That could

4    be a matter of discovery, as to a breach of fiduciary duty, or

5    other issues.  I don't -- I honestly don't know when the tax

6    records were prepared and when the liability was incurred.

7          THE COURT:  Okay.  All right.

8          MR. ANDERSON:  Anyway, the -- I think that the fact

9    that the debtor entity, on their books and records, on their

10   schedules, recognize this obligation, they knew what the

11   purpose of the obligation was, is all we need, to get by this

12   stage of the proceedings.

13          That fact, for example, clearly distinguishes this

14   case from the Five Star case.  If the Court reads the Five Star

15   case in detail, as we point out in our brief, that was a

16   situation, it was not a closely held corporation.  There was

17   no --

18          THE COURT:  Well, what if I had -- let's take a fact

19   situation where let's assume a company illegally made

20   distributions to its partner every year, every year for ten

21   years.  And it was clearly illegal, because there were

22   creditors to be paid, there was no right to dividends under the

23   operating agreements.  Aren't you saying that that course of

24   conduct means they have a right to payment?

25          MR. ANDERSON:  No.  I would agree with the

1    reorganized debtors, that the governing documents would

2    control.  If it is not allowed, under the governing documents,

3    if it is an improper payment, then no, that would not be a

4    viable course of conduct.

5         What we have here are permissive governing documents.

6    They don't disallow it, they don't say you can't do it, they

7    say you can do it.  They don't say that you have to do it.  But

8    they say that you can.  And the fact that they did, as

9    reflected on the books and records, is all the we need, to

10   establish a -- you know, disputed, unliquid -- you know,

11   equitable claim at this point.

12        I acknowledge that we have a bit of an uphill road,

13   in terms of evidence and proof, but I believe that we can meet

14   those, based on the past practice, and when we dive into the

15   events -- you know, that happened on March 31st, when that was

16   recorded on the books and records, and what everybody's

17   understanding was.  You know, understanding, you know, as the

18   Court just did, it would essentially be Mr. Rhodes talking to

19   himself.

20        You know, I would assert the premise, you know, here,

21   for purposes of argument, that the fact that even in his own

22   mind, as the controlling -- the person who controlled Sage

23   Brush, which --

24        THE COURT:  So you would say that he would knowingly

25   breach his fiduciary duty, in order to give himself this

1   payment.

2          MR. ANDERSON:  How does he breach a fiduciary duty

3   when he owns a hundred percent of Sage Brush.  Sage Brush --

4          THE COURT:  When creditors aren't paid.

5          MR. ANDERSON:  Well, what fiduciary duty does he have

6   to creditors?

7          THE COURT:  A deepening insolvency.

8          MR. ANDERSON:  Well, you know, that -- then you have

9   questions of maybe fraudulent conveyance.  But nothing was

10  conveyed here.  Just this obligation.  We're not trying to get

11  the money away from anybody.

12         THE COURT:  Well, he was then.  You've just now

13  changed your mind and said you want it merely as an offset.

14         MR. ANDERSON:  Yeah.  Well, he --

15         THE COURT:  If he filed his claim and he wanted a

16  claim, he wasn't seeking as an offset.  He was seeking to be

17  paid the money.

18         MR. ANDERSON:  But -- I mean he paid the money out

19  and he felt he was entitled to it, because -- based on past

20  practices.  And it was something that was allowed.  The

21  reorganized debtor, you know, in their prior life, as the

22  creditors, also permitted this, in the credit agreement.  They

23  didn't prohibit it.  If it was something that so offends them,

24  that he would do this, whether it's at the -- the minute before

25  he files for bankruptcy or if it was a year before he filed for

1    bankruptcy, they could've precluded it.  They did not.  They

2    allow it.  It is permitted.  He did nothing wrong, based on the

3    facts that the Court has before it right now.  This was a

4    completely permissible action.  It is reflected on the books

5    and records, and it presents a viable legal claim.

6              THE COURT:  Okay.

7              MR. ANDERSON:  If there's no further questions, I

8    think --

9              THE COURT:  No.  Thank you.

10             MR. ANDERSON:  I think that's the heart of our

11   position.

12             THE COURT:  Yes, you're right,  Thank you.

13             THE COURT:  Reply?

14             MR. QURESHI:  Your Honor, may I briefly respond?

15             THE COURT:  Yes, please.

16             MR. QURESHI:  Thank you.

17             Your Honor, a couple of quick points.  First, let's

18   bear in mind, when this tax claim arose.  This is in respect of

19   Mr. Rhodes' tax obligations for the tax year 2006.

20             So what we have is a ledger entry, by Mr. Rhodes, or

21   people that he controlled, on the day of the filing.  No

22   reference of Mr. Rhodes' affidavit, to any resolution of the

23   LLC or decision of the LLC or the partnership, back in 2006 or

24   2007 or even 2008, at the time that the obligation arose, but

25   instead, just a ledger entry on the eve of the filing.  And in

1    Mr. Rhodes' declaration, as Your Honor pointed out, he

2    specifically says, therefore, it establishes a course of

3    conduct.

4              Counsel, in argument, and in Mr. Rhodes' papers,

5    concedes that this is an equitable argument.  And therefore, it

6    bears noting why we're here, Your Honor.  We're here because

7    Mr. Rhodes understands the risk he faces, of lawsuits, or among

8    other things, breach of fiduciary duty, et cetera, as a result

9    of his failure to pay creditors, et cetera, at a time when he

10   was taking distributions.  And what Mr. Rhodes is looking for

11   is for the ability to set off the first almost $10 million of

12   any judgment that should be entered against him down the road.

13   That right there, Your Honor, should put an end to the notion

14   that he should be entitled to any equitable relief from this

15   Court.

16             Your Honor, the other point, counsel referred Your

17   Honor to the definition of a claim, and we don't dispute that

18   the definition of claim is indeed a broad one, and we certainly

19   don't dispute the case law that is cited.  Indeed, in the

20   Supreme Court decision, Your Honor, in <u>Next Wave</u>, the Court

21   goes through all of the case law on how broad he definition of

22   a claim is, and then concludes, notwithstanding that it's

23   liquidated or unliquidated, disputed or undisputed, legal or

24   equitable, et cetera, but at the end of the day, what the

25   phrase, "right to payment," means is nothing more, nor less,

1    than an enforceable obligation.  Enforceable obligation on the

2    debtor.

3            Here, there's no statute; here, there's no obligation

4    in the governing documents, but there's an admission that those

5    are merely permissive.  So I fail to understand, Your Honor,

6    how a ledger entry made three years after the tax obligation,

7    after the fact, could somehow constitute an enforceable

8    obligation of an LLC, or of a partnership, to make that type of

9    a distribution, when there is not a stitch of evidence in the

10   governing documents.  To the contrary.  There's an admission

11   that the governing documents have no such obligation.  That

12   cannot arise to the type of an enforceable obligation that the

13   Supreme Court says there must be, in order for there to be a

14   claim.

15           THE COURT:  Okay.

16           MR. QURESHI:  Thank you.

17           THE COURT:  All right, thank you.

18           Well, I agree with the reorganized debtors, and will

19   sustain the objection, insofar as precluding any right of said

20   offset, under Section 553.  As counsel has pointed out, and I'm

21   not saying anyone's disagreeing, but just to kind of go through

22   the elements, a setoff is allowed, but it doesn't create a

23   right of setoff.  In order to be allowed the setoff, there must

24   be mutual claim and mutual debt.  Here, a claim, the point,

25   again, as counsel has indicated, it's a right to payment. And

1    here, we have -- I don't believe Mr. Rhodes has established a

2    right to payment of the taxes that he paid.

3              As the parties have stipulated, in the first

4    instance, it is his obligation to pay those taxes, as the pass-

5    through entity.  Secondly, there's no statute which requires

6    the LLC or partnership to pay the taxes.  Next, the documents,

7    operating documents, do not require it.  They permit it, but do

8    not require it.  And finally, to the extent that there was a

9    decision, it seems to me it looks -- you've got to prove to me

10   it's an enforceable decision.

11             And I know we're at summary judgment stage, but --

12   the equivalent of summary judgment, but you've got to come

13   forward with something to show me it would be some sort -- a

14   decision was made, at the time of the events in question, that

15   the entity would pay it, and that's not here.  His affidavit

16   speaks only of course of conduct.  And the course of conduct,

17   what's happened in the past, wouldn't even regulate what

18   happens now.

19             So let's assume, for example, over the past 20 years

20   the entity has always paid the taxes.  But now we're in hard

21   times, and he may well -- they may well have decided, "No.  The

22   entity is not going to pay the taxes, because we are in hard

23   times."  So the course of conduct does nothing to establish

24   what is happening now, and what happened.

25             Also, the fact of the three years in between, the

1    fact there was a ledger in a one day before bankruptcy, to me

2    not only doesn't prove that there was a decision made, that he

3    was liable -- that the entity would pay the taxes, but it works

4    against him.  It's certainly non-judicial admission, in light

5    of the reservation of rights.  In any event, I believe judicial

6    admissions, under Nevada law, are merely presumptions, and

7    which can be rebutted in any case.  And I know we're in a

8    federal case, but I think the evidence rules pick up the

9    presumptions of state law.  So for all those reasons, I find

10   that the -- Mr. Rhodes is not entitled to offset, against any

11   judgment, the tax liability.

12          Now where do we go from here, on the rest of this?

13   Do you want to certify this court's decision, do you want to

14   just go on with the rest of the trial, do you want a

15   settlement?  What do we want to do?

16          MR. QURESHI:  Your Honor, the thinking, and

17   bifurcating, because this was by far the largest part of the

18   claims.

19          THE COURT:  Sure.

20          MR. QURESHI:  Once we resolve this, it would

21   hopefully enable a settlement of the remaining much smaller

22   claims.  That continues to be our hope.  So what I would

23   suggest is let's submit an order, with respect to this piece,

24   allow the parties a little bit of time to discuss settlement of

25   the remaining claims.  Maybe what we ought to do, just in case,

1    is get a date on the calendar, if we may, for those remaining

2    claims, but hopefully within a week or two we'll be able to

3    work those out.

4            THE COURT:  Okay.  In January, we're going to be, and

5    February, we're going to be in good shape, as far as settlement

6    judges go.

7            MR. QURESHI:  Okay.

8            THE COURT:  In January or February I can give you

9    Judge Ross, Judge Peterson, and indeed Judge Zive.  So you tell

10   me what your -- do you want to -- do you want me to tell you

11   the weeks that are available, and you can talk about it and let

12   us know?

13           MR. ANDERSON:  Yeah.  I think Bret (phonetic) may

14   actually be handling those, but why don't we get some tentative

15   dates --

16           MR. QURESHI:  Yeah.  It --

17           MR. ANDERSON:  -- and we can pass those on to her.

18           THE COURT:  Sure.  Judge Ross is available the week

19   of January 10th.  Judge Peterson is available the week of the

20   24th.  Judge Ross is available the week of February 14th.

21   Judge Peterson, the week of January 22nd.

22           MR. ANDERSON:  January or February?

23           THE COURT:  February.  Excuse me.  And then I'll do

24   March too.  Judge Ross, March 7th.  Judge Peterson, March 21st.

25   Judge Zive, we don't have a particular schedule for him, but he

28

1    can do settlements in Reno, whether you can arrange to go to

2    Reno --

3            MR. ANDERSON:  Sure.

4            THE COURT:  It's probably easier, since everybody is

5    from -- well, if Mr. Rhodes is involved -- well, in any event,

6    you can go to Reno or he will be down here at some point.

7            MR. QURESHI:  Do you specific availability for Judge

8    Zive?

9            THE COURT:  I don't have his specific --

10           MR. QURESHI:  Okay.

11           THE COURT:  -- dates.  His office does.

12           MR. QURESHI:  Okay.  So are we permitted to contact

13   his office?

14           THE COURT:  Yes.  You may contact Linda Duffy up

15   there.

16           MR. QURESHI:  Okay.

17           THE COURT:  He is going -- he'll be on recall, so

18   he'll still take -- January is probably going to be hard for

19   him, because he'll be taking -- he's keeping his old cases and

20   taking the new judge's conflicts, if any.

21           MR. QURESHI:  Okay.

22           THE COURT:  And I know he's already arranged a couple

23   of settlement conferences for me, in Reno, for other cases.  So

24   -- but you may contact him directly, if you want to use him

25   instead.

29

```
 1              MR. QURESHI:  I appreciate it, Your Honor.

 2              THE COURT:  Okay?

 3              MR. QURESHI:  Thanks very much.

 4              THE COURT:  All right.  Thank you very much.  And

 5    then I guess you'll come back on the status, telephonic, in a

 6    few weeks, to let me know what you want to do?

 7              MR. QURESHI:  Sure.

 8              MR. ANDERSON:  Yeah.  Probably.

 9              THE COURT:  Okay.

10              MR. QURESHI:  That makes sense.

11              MR. ANDERSON:  And just to make clear, in terms of

12    certifying, you know we would certainly reserve the right to

13    ask the Court to certify this issue.

14              THE COURT:  Sure.  I only mention that just

15    because --

16              MR. ANDERSON:  Yeah.

17              THE COURT:  -- you know, that's an option you may

18    want to consider.

19              MR. ANDERSON:  We went off on the settlement, so I

20    just want to make sure we would reserve that.

21              THE COURT:  Sure.

22              MR. ANDERSON:  We're not waiving it, obviously.

23              THE COURT:  Sure.

24              MR. QURESHI:  So, Your Honor, we'll upload an

25    appropriate order for Your Honor's review.
```

1          THE COURT:  You can just say for the findings and

2     conclusions set forth in the record.

3          MR. QURESHI:  Perfect.  Okay.

4          THE CLERK:  Your Honor, can we set a couple ominous

5     dates, just for those objections to the claims, or anything

6     else that may need to come up?

7          THE COURT:  These people are the wrong people.  They

8     won't know the dates available.  You don't anticipate any --

9     well, you might.  Do you know, are Rhodes matters --

10         MR. QURESHI:  Well, Your Honor, I was mentioning,

11    earlier, that I spoke with Ms. Cho yesterday, and she indicated

12    that we would need at least one additional hearing date, to

13    deal with some remaining --

14         THE COURT:  Oh, all right.

15         MR. QURESHI:  -- claims objections.  I'm not exactly

16    sure what those claims are, but --

17         THE COURT:  Do you want December?

18         MR. QURESHI:  Yes.  I think that'd be fine.

19         THE COURT:  December 17th?  Does that work?

20         MR. QURESHI:  That does work, Your Honor.

21         THE CLERK:  At 9:30?

22         MR. QURESHI:  Sure.  It's ideal.  Your Honor --

23         THE COURT:  And so in any event, we'll do a

24    telephonic on this, that day.

25         MR. QURESHI:  That's perfect.

1          THE COURT:  Okay.  And put in your order, at the end,

2   that there'll be a status hearing, and that you both may appear

3   telephonically.

4          MR. QURESHI:  Okay.

5          THE COURT:  So that refreshes our recollection that

6   you don't need to write in for permission.

7          MR. QURESHI:  Perfect.  And, Your Honor, with respect

8   to that December 17th date, if I may, just immediately after

9   this hearing contact Mr. Cho, to make sure that works for her.

10          THE COURT:  Sure.

11          MR. QURESHI:  And if I don't contact the Court,

12   assume that that's fine.

13          THE COURT:  Oh, you know, we could do it on December

14   16th.  I've got USA, but they're just dribs and drabs now,

15   aren't they?  We could do it -- here's your option.  December

16   16th at 10:30, or December 17th at 9:30.

17          MR. QURESHI:  Okay.

18          THE COURT:  And just let the clerk know -- and

19   whatever date you put in the order will be fine.

20          MR. QURESHI:  Perfect.

21          THE COURT:  Okay.

22          MR. QURESHI:  Thank you very much, Your Honor.

23          THE COURT:  All right, thank you.

24          MR. ANDERSON:  Thank you, Your Honor.

25      (Proceedings Concluded)

32

1        I certify that the foregoing is a correct transcript from

2    the record of proceedings in the above-entitled matter.

3

4    Dated: November 22, 2010              *Melissa Seabaugh*

5                                          AVTranz, Inc.
                                           845 N. Third Avenue
6                                          Phoenix, AZ  85003

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25