NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
**KOLESAR & LEATHAM**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No. (702) 362-7800
Facsimile No. (702) 362-9472
E-Mail:    nleatham@klnevada.com
           ssherman@klnevada.com

PHILIP C. DUBLIN (NY Bar No, 2959344)
ABID QURESHI (NY Bar No. 2684637)
MEREDITH A. LAHAIE (NY Bar No. 4518023)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:    pdublin@akingump.com
           aqureshi@akingump.com
           mlahaie@akingump.com

Counsel for **Reorganized Debtors**

*Electronically Filed*
*March 31, 2011*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,<br><br>    Reorganized Debtors.[1]<br><br>Affects:<br><br>☒ All Debtors<br>☐ The Following Debtor(s): | CASE NO. BK-09-14814-LBR<br>(Jointly Administered)<br><br>Chapter 11 |

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

**REORGANIZED DEBTORS' OBJECTION TO COMMERCE ASSOCIATES' PROOF OF CLAIM NO. 61-1 PURSUANT TO BANKRUPTCY RULE 3007 AND BANKRUPTCY CODE SECTION 502(b)**

The above-captioned reorganized debtors (collectively, the "Reorganized Debtors"), by and through their undersigned counsel, hereby object (the "Objection") pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") to the proof of claim (the "Commerce Claim") filed by Commerce Associates, LLC ("Commerce"), a copy of which is attached hereto as Exhibit A. In support of this Objection, the Reorganized Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction over the Objection under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 502 and Bankruptcy Rule 3007.

## BACKGROUND

A. **General Background**

1. On either March 31, 2009 or April 1, 2009 (collectively, the "Petition Date"), each of the debtors (collectively, the "Debtors") commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

2. On April 13, 2009, the Court issued a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines establishing August 5, 2009 as the deadline for all creditors other than governmental units to file proofs of claim asserting claims in the Chapter 11 Cases.

3. On March 12, 2010, the Court entered an order confirming the Third Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, *et al.* (the "Plan"). Pursuant to the Plan, the deadline for the Reorganized Debtors to object to claims is the date that is one year after the effective date (the "Effective Date") of the Plan. On April 1, 2010, the Effective Date of the Plan occurred. Accordingly, the

deadline to object to the Commerce Claim is April 1, 2011.

**B.     The Purchase Agreement**

4.      On November 14, 2003, Debtor Rhodes Design and Development Corporation ("RDD") entered into a purchase agreement and grant of options with Commerce (the "Purchase Agreement," a copy of which is attached hereto as Exhibit B). Pursuant to the Purchase Agreement, Commerce sold RDD certain development parcels located in Henderson, Nevada for development into a master planned community ("Tuscany"). In addition, the Purchase Agreement granted RDD the option to purchase additional development parcels. The parcels sold pursuant to the Purchase Agreement are hereinafter referred to as the "Parcels".

5.      Under the terms of the Purchase Agreement, RDD paid Commerce a base price of approximately $76,078,784 for the purchase of certain of the Parcels. In addition, pursuant to the Purchase Agreement, RDD had the option to purchase additional Parcels. Pursuant to the Purchase Agreement RDD agreed to pay Commerce (i) profit participations (the "Profit Participations") in the amount of 2% of the net profit, as defined in the Purchase Agreement (the "Net Profit"), resulting from the sale of completed homes in the Tuscany development and (ii) lot premiums (the "Lot Premiums") upon RDD's purchase of each Parcel.

6.      In connection with the purchase of the Parcels, RDD and Commerce entered into development declarations (the "Development Declarations") setting forth the parties' respective rights with respect to the development of the Parcels.[2] The Development Declarations also granted Commerce a lien on the particular Parcel to which that Development Declaration related in order to secure RDD's obligations under the Development Declarations, including with respect to the payment of the Lot Premiums and the Profit Participation. The parties entered into a separate Development Declaration each time RDD purchased an additional Parcel or set of

. . .

. . .

. . .

---

[2] A sample Development Declaration is attached hereto as Exhibit C.

914264.doc (7540-1)                                    - 3 -

Parcels from Commerce, resulting in a total of thirteen Development Declarations, all of which have been recorded in the Official Records of Clark County, Nevada.[3]

7. On or about November 21, 2005, the Debtors entered into both the First Lien Credit Agreement and the Second Lien Credit Agreement (each as defined in the Plan described below) with Credit Suisse, Cayman Islands Branch, as administrative agent on behalf of the lenders thereunder ("Credit Suisse"). Both the First Lien Credit Agreement and the Second Lien Credit Agreement were secured by, *inter alia*, all of the Debtors' real property.

8. Contemporaneously with the Debtors' entry into the prepetition First Lien Credit Agreement, Commerce and Credit Suisse entered into a Subordination Agreement[4] (the "Subordination Agreement"), pursuant to which Commerce agreed to subordinate all of its then-existing and prospective liens on the Parcels to the liens securing the Debtors' indebtedness under the First Lien Credit Agreement and the Second Lien Credit Agreement. A copy of the Subordination Agreement is attached hereto as Exhibit D.

9. On or about March 12, 2010, the Court entered its order confirming the Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for the Rhodes Companies, LLC, et al. (the "Plan")

10. Pursuant to Article V.A of the Plan, as of the effective date of the Plan, the Purchase Agreement and the Development Declarations, both of which are executory contracts within the meaning of Bankruptcy Code section 365, were rejected.

C. **The Commerce Claim**

11. On August 6, 2009, Commerce filed the Commerce Claim. In the Commerce Claim, Commerce asserted a secured claim against RDD and other Debtor entities in an unknown amount on account of Profit Participations and Lot Premiums purportedly owing under

---

[3] The Declaration of Development Covenants and Restrictions (Lot 21) recorded on March 31, 2005 does not grant Commerce a lien to secure the payment of the Lot Premium and Profit Participation on the particular Lot to which such Development Declaration relates. As such, there are only twelve Development Declarations granting Commerce a lien to secure the payment of the Lot Premiums and Profit Participations on particular Lots.

[4] The Subordination Agreement was acknowledged by Rhodes Design and Development Corporation, Tuscany Acquisitions, LLC, and Tuscany Acquisitions II, LLC, which were not parties to the agreement.

914264.doc (7540-1)                                - 4 -

the Purchase Agreement. In the Commerce Claim, Commerce maintains that it cannot calculate the amount owing because "no accounting of the amounts of the sales has been provided to Claimant." *Commerce Claim*, p. 2.[5]

# OBJECTION[6]

12. By this Objection, the Reorganized Debtors seek entry of an order, pursuant to Bankruptcy Code section 502(b) and Bankruptcy Rule 3007, reclassifying the Commerce Claim as an unsecured claim in the amount of approximately $2,741,096, which amount is consistent with the Debtors' book and records.

## I. The Commerce Claim is Wrongfully Classified as a Secured Claim

13. Pursuant to Bankruptcy Code section 506(a), a claim is a secured claim only to the extent of the value of the creditor's interest in the estate's interest in estate property. 11 U.S.C. § 506(a); *In re Zimmer*, 313 F.2d 1220, 1222 (9th Cir. 2002). To the extent that the value of the creditor's interest in the estate's interest in estate property is less than the amount of the creditor's claim, the creditor's claim is unsecured. *See* 11 U.S.C. § 506(a); *In re Zimmer*, 313 F.2d at 1222.

14. Similarly, Article I.A.135 of the Plan itself provides that "Secured," when referred to a claim, means "(a) secured by a Lien on property in which the Estate has an interest…to the extent of the value of the Creditor's interest in the Estate's interest in such property…as determined pursuant to section 506(a) of the Bankruptcy Code."

15. Section V(D)(1) of the Disclosure Statement provides that:

> The first lien indebtedness and second lien indebtedness total nearly $400 million, which indebtedness is secured by first and second liens, respectively, on substantially all of the Debtors' assets at each Debtor entity. Given that the Liquidation Analysis reflects a midpoint value of $49.3 million, the First Lien Steering Committee believes that *there is no value available for claims beyond the first lien indebtedness at any Debtor entity on either a liquidation or going concern basis.*

---

[5] The Reorganized Debtors will work with Commerce to ensure that Commerce has access to the documentation it needs to verify the information set forth in this Objection, and will endeavor to come to a consensual resolution of the issues raised herein prior to the hearing scheduled in connection with this Objection.

[6] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

*Disclosure Statement*, p. 84.

### a. Lot Premiums

16. Pursuant to section 3.2 of the Purchase Agreement, the Debtors were obligated to pay Lot Premiums to Commerce upon the purchase of Parcels. The Debtors' obligations to pay Lot Premiums were secured by liens on such Parcels, which liens were documented and perfected by Development Declarations.

17. As reflected in the Plan and Disclosure Statement, the Debtors' property was substantially underwater and of insufficient value to satisfy even the lien reflected in the First Lien Credit Agreement. Accordingly, all claims based upon liens junior thereto are treated by the Bankruptcy Code and the Plan as unsecured claims.

18. Of the thirteen Development Declarations recorded pursuant to the Purchase Agreement, only five of the Development Declarations pre-date the Debtors' entry into the First Lien Credit Agreement, and an additional eight Development Declarations were recorded after the recordation of the deed of trust securing the First Lien Credit Agreement.

19. Prior to November 21, 2005, the Debtors exercised their option under the Purchase Agreement to acquire an additional seven Parcels from Commerce. The Debtors' rights and obligations (including the obligation to pay Lot Premiums) with respect to these seven Parcels were documented in five Development Declarations, recorded on September 17, 2004, (two on) March 31, 2005,[7] June 14, 2005, and July 13, 2005, respectively. The Development Declarations also operated to perfect Commerce's liens on the Parcels, thereby securing Commerce's entitlement to Lot Premiums on the purchased Parcels. The Debtors' books and records reflect that Commerce was entitled to a total of $13,890,827 in Lot Premiums with respect to the seven Parcels purchased prior to November 21, 2005. Of the $13,890,827 owed to

---

[7] As noted in footnote 3 above, the Declaration of Development Covenants and Restrictions (Lot 21) recorded on March 31, 2005 does not grant Commerce a lien to secure the payment of the Lot Premium and Profit Participation on the particular Lot to which such Development Declaration relates. As such, there are only four Development Declarations recorded prior to November 21, 2005 granting Commerce a lien to secure the payment of the Lot Premiums and Profit Participations on particular Lots.

914264.doc (7540-1)                                          - 6 -

1  Commerce, the Debtors have paid Commerce $10,879,505, leaving a balance of $3,011,322.[8]

2  20.  *After* November 21, 2005, the Debtors exercised their option under the Purchase
3  Agreement to acquire an additional eight Parcels in the Tuscany development. The Debtors'
4  books and records indicate that Commerce was owed $14,540,558 in Lot Premiums on account
5  of the Debtors' purchase of these eight Parcels. The Debtors have paid this amount in full.

6  21.  As set forth above, contemporaneously with the Debtors' entry into the
7  prepetition First Lien Credit Agreement, Commerce agreed to subordinate all of its existing and
8  prospective liens on the Parcels to the liens securing the Debtors' indebtedness under the First
9  Lien Credit Agreement. The Subordination Agreement, therefore, conclusively precludes an
10 assertion by Commerce that it is entitled to a secured claim for payment of any of the Lot
11 Premiums, regardless of whether the Parcels were purchased before or after the Debtors' entry
12 into the First Lien Credit Agreement.[9]

13 22.  Thus, the total Lot Premiums owed in connection with Parcels purchased from
14 Commerce totals no more than **$3,011,322. As such,** the Reorganized Debtors believe that
15 Commerce is entitled to assert **an unsecured claim of no more than $3,011,322** against these
16 estates for unpaid Lot Premiums (the "Lot Premium Claim").

17   b.  Profit Participations

18 23.  Under section 3.2 of the Purchase Agreement, Commerce was also entitled to
19 Profit Participation payments to the extent the Debtors realized a profit on the sale of homes in
20 the Tuscany development. Each Profit Participation payment corresponds to 2% of the Net
21 Profit resulting from the sale of a home in Tuscany, meaning that if the Debtors failed to turn a
22 profit on a home sale, Commerce would not be entitled to any share of the sale proceeds.

---

[8] A spreadsheet prepared by the Reorganized Debtors reflecting Lot Premiums owed and payments made as set forth in the Debtors' books and records is attached hereto as Exhibit E.

[9] Moreover, the Development Declarations themselves each contain the following proviso: "Such lien shall be automatically subject and subordinate to any lien which secures the financing of Improvements constructed upon the Covered Property in accordance with the terms of the Purchase Agreement or this Development Declaration." The Development Declarations further define "Improvements" to be the "construction or alteration of any building, structure or improvement." Thus, to the extent the proceeds of either the First Lien Credit Agreement or the Second Lien Credit Agreement were used to finance "Improvements" constructed on the parcels at issue, Commerce's liens would be subordinated to those liens by operation of the Development Declarations themselves.

914264.doc (7540-1)                - 7 -

24. The 2% Profit Participation payment would initially be estimated, and that estimate would typically be paid to Commerce out of escrow in connection with the sale of a Tuscany home. Sometimes, that payment proved to be less than 2% of the actual profit realized from the sale of the home. More often, however, that payment proved to be more than 2% of the actual profit realized from the sale of the home.

25. As further provided in § 3.2 of the Purchase Agreement, there was to be an annual "true-up" that would reconcile the Profit Participation payments made to Commerce with the actual profits or losses realized from the sale of Tuscany homes during that year, and that would reimburse the Debtors for any overpayment, or that would require the Debtors to pay any deficiency. This annual reconciliation did not occur.

26. However, the Debtors' records reflect that, after payment of the estimated Profit Participation from the homes sold by the Debtors, the Debtors overpaid a total amount of $293,925 in connection with the sale of certain homes, and underpaid a total amount of $23,699 in connection with the sale of other homes.[10] Taken together, these figures result in a net credit to the Debtors in the amount of $270,226 on account of their Profit Participation.[11]

27. Thus, Commerce does not have a claim against the estates for Profit Participation payments, and in fact holds funds that are the rightful property of the Reorganized Debtors.

28. Assuming Commerce exercises its ability to set off the $270,226 in total overpayments/unauthorized payments received from the Debtors on account of the Profit Participations against the Lot Premium Claim, Commerce's aggregate unsecured claim for Lot Premiums and Profit Participations will be no more than $2,741,096. Accordingly, by this Objection, the Reorganized Debtors seek to fix Commerce's claim at a $2,741,096 unsecured claim for all purposes, including distributions under the Plan.

. . .

---

[10] These underpayments include home sales in which the Debtors did not make any estimated Profit Participation payments at all.

[11] A spreadsheet prepared by the Reorganized Debtors reflecting Profit Participation payments owed and payments made as set forth in the Debtors' books and records is attached hereto as Exhibit F.

914264.doc (7540-1)                                        - 8 -

## II. Commerce is Not Entitled to a Claim for Rejection Damages

29. The Reorganized Debtors rejected the Purchase Agreement and the Development Declarations on the Effective Date.

30. Article V.D of the Plan states in relevant part that "[u]nless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' executory contracts and unexpired leases pursuant to the Plan or otherwise must be Filed with Claims and Solicitation Agent no later than the Rejection Damages Claim Deadline." Plan at Article V.D. The Plan defines "Rejection Damages Claim Deadline" as the "deadline to file a Rejection Damages Claim which shall be thirty days after the later of the Effective Date or the effective date of rejection or repudiation of an executory contract or unexpired lease." *Plan* at Article I.A.122.

31. Accordingly, to the extent that Commerce seeks damages arising out of the Debtors' rejection of the Purchase Agreement and/or the Development Declarations, it had until 30 days after the Effective Date of the Plan (which also corresponds to 30 days after the effective date of rejection) – or April 30, 2010 – to file a Rejection Damages Claim. Commerce never filed a Rejection Damages Claim, and thus is not entitled to assert a Rejection Damages Claim against the Reorganized Debtors.

. . .

. . .

. . .

## CONCLUSION

WHEREFORE, for the reasons set forth above, the Reorganized Debtors respectfully request that the Court (i) enter the order attached hereto as Exhibit G: (a) deeming the entirety of the Commerce Claim unsecured and subject to treatment afforded Class C-1 under the Plan for General Unsecured Claims, and (b) liquidating the Commerce Claim in the amount of $2,741,096; and (ii) grant the Reorganized Debtors such other and further relief as is just, proper and equitable.

Dated this 31st day of March, 2011.

By: 
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
**KOLESAR & LEATHAM**
3320 West Sahara Avenue, Suite 380
Las Vegas, Nevada 89102-3202
Telephone No. (702) 362-7800
Facsimile No. (702) 362-9472
E-Mail:   nleatham@klnevada.com
          ssherman@klnevada.com
      and
PHILIP C. DUBLIN (NY Bar No, 2959344)
ABID QURESHI (NY Bar No. 2684637)
MEREDITH A. LAHAIE (NY Bar No. 4518023)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
E-Mail:   pdublin@akingump.com
          aqureshi@akingump.com
          mlahaie@akingump.com

*Counsel for Reorganized Debtors*