# EXHIBIT A

1  JANET L. CHUBB, ESQ.
   Nevada State Bar No. 176
2  JONES VARGAS
   100 W. Liberty St, 12th Floor
3  P.O. Box 281
   Reno, NV 89504-0281
4  Telephone: 775-786-5000
   Fax: 775-786-1177
5  Email: jlc@jonesvargas.com
      and  tbw@jonesvargas.com
6
   Attorneys for Commerce Associates, LLC
7

8                **UNITED STATES BANKRUPTCY COURT**
                       **DISTRICT OF NEVADA**
9

10 In re                              Case No.    BK-S-09-14814-lbr
                                       Chapter     11
11 THE RHODES COMPANIES, LLC aka
   "RHODES HOMES", et al.,
12
              Debtor.                  **PROOF OF CLAIM**
13 ┌─────────────────────────────────
   │ □ Affects all Debtors.
14 │ ■ Affects the Following Debtors:
   │
15 │ RHODES DESIGN AND DEVELOPMENT
   │ CORPORATION; TUSCANY
16 │ ACQUISITIONS, LLC; TUSCANY
   │ ACQUISITIONS II, LLC; TUSCANY
17 │ ACQUISITIONS III, LLC; TUSCANY
   │ ACQUISITIONS IV, LLC. and RHODES
18 │ RANCH GOLF COUNTRY CLUB LLC
   └─────────────────────────────────
19        The undersigned is the agent of Commerce Associates, LLC, and is authorized to make

20 this Proof of Claim on its behalf.

21 Name and Address of Creditor:          Commerce Associates, LLC
                                           c/o Jones Vargas
22                                         P. O. Box 281
                                           Reno, NV 89504-0281
23
24 Identification No.:                     020860-00012

25 Basis for this claim:                   Profit Participation and Lot Premiums

   Classification of claim:                **SECURED**
26
   Security for claim:                     Lien Pursuant to Purchase Agreement
27
28       TOTAL AMOUNT CLAIMED: *Amount Is Unknown At This Time*
                    plus accruing interest, attorney's fees and costs

                                   1

1  Date petition filed:                                    March 31, 2009

2  Date debt was incurred:                              November 14, 2003

3  Explanation of Claim:

4          Claimant has profit participation rights to lot premium payments.  Sales on some of the
   lots have not been completed.  Some estimated lot premium payments have been made by
5  Debtors, but no accounting of the amounts of the sales has been provided to Claimant, so the
   actual amounts due are not known at this time.  This claim will be supplemented or amended at
6  such time as Claimant is able to make the calculations necessary.

7          Copies of the relevant portion of the Purchase Agreement and Grant of Options that

8  defines the profit participation and lot premium agreement, a sample Development Declaration, a

9  sample Additional Consideration Memorandum and a chart of current status of lots sold to the

10 best of Claimant's knowledge are attached hereto and incorporated herein by this reference in

11 support of this claim.  Other supporting documents are available upon request.

12         Judgment has not been rendered in this claim.

13         This claim is not subject to any setoff or counterclaim.  The amounts of all payments on

14 this claim have been credited or deducted for the purpose of making this Claim.  Claimant has

15 deducted all amounts that claimant owes to Debtors.

16         DATED this 4th day of August, 2009.

17                                              JONES VARGAS

18                                              By: /s/ Janet L. Chubb
                                                   JANET L. CHUBB, ESQ.
19

20                                              Attorneys for Commerce Associates, LLC

21

22

23

24

25

26

27

28

JONES VARGAS
100 W. Liberty Street, 12th Floor
P.O. Box 281
Reno, Nevada 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

2

A portion of Section 3 of the Purchase Agreement and Grant of Options

**3.2** **Profit Participation and Lot Premiums.** **As additional consideration to Seller over and above the Base Prices, Purchaser shall pay to Seller: (i) two percent (2%) of the Net Profit from the sale of each Residence (collectively, the "Profit Participation") and (ii) a lot premium for the Multi-Family Parcel and each Lot acquired hereunder in the applicable amounts set forth on Exhibit E (each, a "Lot Premium").** Until the Lot Premiums have been paid in full, the applicable Lot Premiums shall be paid to Seller, in cash at the close of escrow of the sale or conveyance by Purchaser or, if applicable, an SPE of each Lot  (a "Lot Closing") or other portion of the Property (a "Parcel Closing"), whether such sale is made to a Homebuyer, a third party developer or any other buyer (including any Affiliate of Purchaser or an SPE), provided, however, that notwithstanding the foregoing, all of the unpaid Lot Premiums applicable to a Parcel shall be due and payable in full no later than three (3) years from the Closing Date for such Parcel ("Final Premium Due Date").  **The estimated amount of Profit Participation (as reasonably determined by Purchaser or the applicable grantor of the Lot or other portion of the Property for which the Profit Participation is due) shall also be paid at the applicable Lot Closing or Parcel Closing.  The actual amount of Profit Participation shall be determined annually based upon Purchaser's or such grantor's annual financial statements, which shall be prepared in accordance with generally accepted accounting principles, consistently applied by certified public accountants reasonably acceptable to Seller.  Based on such annual financial statements: (i) if the estimated amounts of Profit Participation paid to Seller during the prior year exceed the actual Profit Participation due Seller, the excess shall be applied as a credit against the next due payments of estimated Profit Participation or, if none, paid to Purchaser or such grantor 20 days following the determination of such amount; and (ii) if the estimated amounts of Profit Participation paid to Seller during the prior year are less than the actual Profit participation due Seller, the deficiency shall be due and payable to Seller 20 days following the determination of such amount.**

    a.    Definitions.  As used herein:

    i.    "Affiliate" means, as to any Person: (i) any other Person or entity controlling, controlled by or under common control with, such Person and entity; (ii) any entity, other than a publicly traded company, in which such Person or entity owns any legal, equitable or beneficial interest; and (iii) any employee, officer or director of such Person or entity;

    ii.    "Approved Construction Loan Mortgage" means a deed of trust lien securing a bona fide loan ("Approved Construction Loan") of money to Purchaser (or, if applicable, an SPE or its assignee) from a lender that is not an Affiliate of Purchaser or Jim Rhodes, the proceeds of which have been used to develop the real property encumbered by such deed of trust (and no other real property), and which has been approved by Seller, such approval not to be unreasonably withheld or delayed;

iii.    "**Net Profit**" means the Sales Price of a Residence less the sum of the Lot Cost, Direct Cost, Finance Cost, Closing Cost plus Sales Cost, where: (1) "**Sales Price**" is the total sales price of the Residence including lot premium and options; (2) "**Lot Cost**" is the cost of the land including carrying cost plus the cost of all land development; (3) "**Direct Cost**" is the cost of all vertical construction; (4) "**Finance Cost**" includes interest, points and fees on any Approved Construction Loan and capitalized interest calculated by the outside auditors; (5) "**Closing Cost**" means actual and reasonable escrow fees, title fees, transfer taxes and all other fees charged to the seller as shown on the closing statement, not to exceed 2% of the Sales Price; and (6) "**Sales Cost**" is the real estate sales commission, not to exceed 6% of the Sales Price. Notwithstanding the foregoing, for purposes of determining the Net Sales Proceeds on the sale of any Lot to an Affiliate, there shall be no deduction for any commissions or bonuses, except where such Affiliate is an individual who is not an officer, director, or employee of Purchaser or any Affiliate. (Note: The land development cost and Direct Cost is charged an additional 10% of expenses as an allocation of overhead.)

iv.    "Person" means an individual or a corporation, association, joint venture, general partnership, limited partnership, trust, limited liability company, limited liability partnership or other private entity or governmental agency.

b.    **Security for Payment**. The Premium Participation shall be secured by the lien contained in the Development Declaration. A memorandum reciting the Purchaser's, SPE's or grantee's obligations with respect to the Premium Participation shall be recorded at each Close of Escrow (the "**Additional Consideration Memorandum**"), in the form attached hereto as **Exhibit F**.

c.    Monthly Sales Report. Purchaser shall, no later than the twenty-fifth (25th) of each calendar month after the first Lot Closing deliver to Seller a schedule (the "Monthly Sales Report") showing each Lot sold or closed in Tuscany during the preceding calendar month.

d.    Payment. Purchaser or, if applicable the SPE or its nominee shall instruct each escrow agent responsible for any Lot Closing or Parcel Closing ("Purchaser's Escrowee") to pay to Seller, directly from the escrow out of Purchaser's proceeds, the applicable Lot Premiums, upon the sale of each Lot or other portion of the Property immediately following the Lot Closing or Parcel Closing. Notwithstanding such instructions to Purchaser's Escrowee, Purchaser shall be personally responsible for the payment of the Lot Premiums. Unpaid Lot Premiums shall bear interest at the Agreed Rate from the date of the applicable Lot Closing or Parcel Closing or Final Premium Due Date, whichever is applicable, and, if not paid within 30 days thereafter shall bear interest at the Default Rate until paid.

e.    Survival. The provisions set forth in this Section 3.2 shall survive each Close of Escrow and/or the termination of this Agreement.

CURRENT STATUS OF LOTS SOLD - to the best of Claimant's Knowledge

| Parcel | # of Lots | | |
|---|---|---|---|
| 6b | 74 | Sold April 1, 2005 | Complete (All lots owned have homes built) |
| 6c | 87 | Sold September 17, 2004 | Complete |
| 17 | 3 | Sold 8/31/07 | Complete |
| 12 | 59 | Sold April 1, 2005 | Over 50% |
| 16 | 81 | Sold September 11, 2006 | Over 50% |
| 18 | 217 | Sold June 14, 2005 | Over 50% |
| 19 | 111 | Sold September 17, 2004 | Over 50% |
| 25 | 65 | Sold April 1, 2005 | Over 50% |
| 25 | 173 | Sold December 19, 2005 | Over 50% |
| 15 (multi-family) | 201 | Sold January 26, 2006 | Less than 50% |
| 24 | 96 | Sold September 17, 2004 | Less than 50% |
| 6A | 183 | Sold 9/27/2007 | No homes |
| 10 | 78 | Sold November 13, 2006 | No homes |
| 11 | 96 | Sold March 16, 2007 | No homes |
| 14 | 64 | Sold March 16, 2007 | No homes |
| 23 | 24 | Sold January 26, 2006 | No homes |
| | 1,612 | | |

Exhibit L to Purchase Agreement and Grant Options

APN #_____

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

Jones Vargas
3773 Howard Hughes Parkway, 300 South
Las Vegas, Nevada 89109
Attention: Michael E. Buckley

Escrow # _____

_____
(Space above line for Recorder's use only)

## DECLARATION OF
## DEVELOPMENT COVENANTS AND RESTRICTIONS

THIS DECLARATION OF DEVELOPMENT COVENANTS AND RESTRICTIONS
("Development Declaration") dated, for purposes of reference only, as of the ____ day of _____,
2005, is entered into between COMMERCE ASSOCIATES, LLC, a Nevada limited liability company
("Commerce") and RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada
corporation ("Rhodes") and TUSCANY ACQUISITIONS, LLC, a Nevada limited liability company
("Purchaser" and, together with Rhodes, individually and collectively referred to as "Builder"), with reference
to the following facts and objectives:

### R E C I T A L S :

A.    Commerce owns or has owned and conveyed and is the master developer of certain real
property located in the City of Henderson (the "City"), Clark County, Nevada, commonly known as
"Tuscany" (f/k/a Palm City) as more particularly described on Attachment B attached hereto ("Tuscany").

B.    Pursuant to that certain Purchase Agreement and Grant of Options dated as of November
14, 2003 between Commerce and Rhodes (together with any amendments thereto, the "Purchase
Agreement"), Commerce, of even date herewith, is conveying to Builder the real property described on
Attachment A attached hereto (the "Covered Property") located within Tuscany. Terms used herein which
are not defined herein have the meaning given those terms in the Purchase Agreement.

C.    Commerce proposes to sell and/or has sold portions of Tuscany, other than the Covered
Property, for development as residential and other uses in a manner consistent with Commerce's overall

1

concept and design for Tuscany as set forth in the Design Guidelines.  Builder acknowledges receipt of a copy of the Design Guidelines, as amended to date.

D.      Under the Purchase Agreement, Builder agreed to construct a residential homesite development (the "Project") on the Covered Property, in conformance with the Design Guidelines and the Project Plan (Section 1.5) to be prepared by Builder and approved in writing by Commerce in accordance with this Development Declaration.

E.      In order to assure that the Covered Property and the Project are developed in a manner consistent with the Project Plan and the Design Guidelines, Commerce has required, as a prior condition to its conveyance to Builder of the Covered Property, that Builder execute and acknowledge this Development Declaration.

F.      Commerce continues to own portions of Tuscany, including, but not limited to, other parcels situated near or adjacent to the Covered Property as to which development is in process or has not yet begun (the "Benefited Property").

G.      Builder desires to subject the Covered Property to this Development Declaration setting forth certain obligations owing to Commerce by Builder concerning the activities of Builder on and in connection with the Covered Property, which are imposed for the benefit of the Builder and the Benefited Property.

## D E C L A R A T I O N:

NOW, THEREFORE, Builder hereby covenants, agrees, and declares that all of its interest, as the same may from time to time appear, in the Covered Property shall be held and conveyed subject to the following covenants and restrictions, which shall run with the Covered Property or any portion thereof until released as provided herein and shall be binding upon all parties having or acquiring any right, title or interest in or to the Covered Property or any portion thereof and which are hereby declared to be for the benefit of the Benefited Property, as follows:

1.      Preparation and Approval of Project Plan.

1.1      No Construction Prior to Project Plan Approval.  No construction or alteration of any building, structure or improvement (individually, an "Improvement" and collectively the "Improvements") shall be commenced, erected, or maintained upon the Covered Property until Builder has met with Commerce and prepared and submitted to Commerce and Commerce has approved a Project Plan in accordance with this Development Declaration. Commerce's approval of the Project Plan or any individual Plan shall not be unreasonably withheld.  The Project Plan shall describe three separate elements of the Project: (i) the Site Improvements, (ii) the Landscape Improvements, and (iii) the Building Improvements.

2

1.2    Site Improvements.  The "Site Improvements" shall be described in the "Site Improvements Plan", which shall clearly illustrate final grading; and grading details (including, without limitation, sections of typical corner lots steeper than 3:1 and drainage-ways); street lighting improvements; and common area improvements; perimeter wall opening location with dimensions; and list of construction quantities.

1.3    Landscape Improvements.  The "Landscape Improvements" shall be described in (i) the Landscape Plan, (ii) the Landscape Materials Sample Board, and (iii) the Landscape Construction Drawings.

1.3.1    Landscape Plan.  The "Landscape Plan" shall clearly illustrate all of the following:

(a)    street tree locations;

(b)    plant list;

(c)    typical lot landscape including all corner lots;

(d)    common area landscaping;

(e)    section drawings through landscaped drainage-ways; and

(f)    entry wall locations and identification signage.

1.3.2    Landscape Materials Sample Board.  The "Landscape Materials Sample Board" shall include the following:

(a)    color chips;

(b)    manufacturer's cut sheets;

(c)    photographs and/or material samples for all landscape materials including, without limitation, walls, fences, textured paving, gravel, mulch, site furnishings, stucco, paint, stain and other visible exterior finishes.

1.3.3    Landscape Construction Drawings.  The "Landscape Construction Drawings" shall consist of fully complete construction documents for all landscape and irrigation improvements to be constructed as Neighborhood Facilities or Community Facilities.  The Landscape Construction Drawings shall be prepared with construction details sufficiently shown, with figured dimensions given and specifications stated, so as to enable prospective bidders to

3

make accurate and reliable estimates of the quantity, quality and character of the labor, materials and equipment required to construct the proposed improvements and to enable workmen of ordinary skill and competence to construct such improvements.

1.4    Building Improvements.  The "Building Improvements" shall be described in (i) the Architectural Concept Plan, (ii) the Preliminary Plot Plan, (iii) the Architectural Materials Sample Board, (iv) the Final Plot Plan and (v) the Marketing Signage Plan.

1.4.1    Architectural Concept Plan.  The "Architectural Concept Plan" shall consist of the following:

(a)    photographs or sketches of front elevations (and side and rear elevations if visible from any street) of each Residence; and

(b)    floor plan for each Residence.

1.4.2    Preliminary Plot Plan.  The "Preliminary Plot Plan" shall illustrate typical lots for each type of Residence indicating building footprints, setback requirements, driveway locations and wall locations.

1.4.3    Architectural Materials Sample Board.  The "Architectural Materials Sample Board" shall include color chips, manufacturer cut sheets, photographs, and/or material samples for all building materials including roofing, doors, garage doors, windows, stucco, fascia, trim, paint, stain, architectural walls, and other visible exterior features.

1.4.4    Final Plot Plan.  The "Final Plot Plan" shall clearly illustrate the plot plan for each individual lot within the Covered Property and describe building footprints, setbacks, use of FAR variances, driveway locations and wall locations.

1.4.5    Marketing Signage Plan.  The "Marketing Signage Plan" shall illustrate the layout and design details for all informational, directional, temporary and construction signs.

1.5    Plan Submittals and Review Charges.  Each of the plans, maps and sample boards referred to in subsections 1.2., 1.3.1, 1.3.2, 1.3.3, 1.4.1, 1.4.2, 1.4.3, 1.4.4 and 1.4.5 is hereinafter referred to as a "Plan." All of such Plans collectively, as approved by Commerce in accordance with this Development Declaration, shall constitute the "Project Plan." Builder shall submit each of the Plans to Commerce in such form as specified above and in the Design Guidelines. In accordance with Section 1.6, Commerce shall, within ten (10) business days after receipt of each of such Plans either (i) approve such Plan as submitted, or (ii) disapprove such Plan and advise Builder in reasonable detail of the reasons for such disapproval.  Commerce shall take similar action on each resubmittal of a Plan following any disapproval.  Commerce's initial review and the first and second review following resubmittal of any Plan

4

will be conducted at no charge to Builder. If a third review of any of the following Plans is required, Builder shall reimburse Commerce upon demand for any out-of-pocket expenses incurred by Commerce, up to $700 per revision, for such third and any subsequent review: the Landscape Plan, Material Sample Boards, Landscape Construction Drawings, Preliminary Plot Plan, Architectural Materials Sample Board and Final Plot Plan. The third review of the following Plans will be at no charge to Builder; provided, however, Builder shall reimburse Commerce upon demand for any out-of-pocket expenses incurred by Commerce, up to $700 per revision, for the fourth and any subsequent review of the following Plans: the Site Improvements Plan, Architectural Concept Plan and Marketing Signage Plan.

       1.6    Project Plan Approval. Commerce may, in its reasonable discretion, disapprove any or all portions of the Project Plan submitted for its approval, but Commerce's right of disapproval shall be limited to (a) the conformity of the Project Plan with this Development Declaration as to the total number of Residences to be constructed in the Project, (b) the conformity of the Project Plan to the terms of the Purchase Agreement and the general description of the Project attached thereto, (c) exterior design, elevation, materials, and colors and other architectural and design elements and landscaping, (d) roof equipment, (e) size and location of Improvements, (f) the proportionate use of FAR variances throughout the Project, (g) conformity to the Design Guidelines, and (h) other matters that bear on the compatibility of the Project with the Benefited Property, Tuscany, and the real property in the vicinity of the Covered Property. In any event, Commerce may condition its approval of the Project Plan upon such changes therein as are consistent with the scope of its review as set forth above and may require submission of additional Plans or other information prior to approving or disapproving material submitted. Until receipt by Commerce of all required information, Commerce may postpone review of a Plan submitted for approval.

       1.7    Governmental Approvals. Commerce's approvals under this Development Declaration are in addition to and not in lieu of any approvals, permits, consents or reviews required by the City or any other governmental authority (collectively, "Governmental Approvals") or utility in connection with the Project.

       2.    Construction of the Project.

       2.1    Manner of Construction. Builder, at its sole cost and expense, shall cause to be performed or constructed all of the work and improvements required or contemplated by the Project Plan to be performed by Builder or by this Development Declaration (collectively, the "Project Plan Work"). Builder shall cause the Project Plan Work to be performed or constructed by duly licensed general contractors and duly licensed subcontractors in a good and workmanlike manner in accordance with (a) the Project Plan approved by Commerce, (b) all applicable laws, regulations, codes and ordinances, (c) all requirements of governmental authorities and other duly qualified bodies having jurisdiction with respect to each work of improvement, and (d) generally accepted engineering standards concerning geotechnical and soils conditions. Builder shall supervise and direct the Project Plan Work using its best skill and attention. Builder shall be solely responsible for all means, methods, techniques, sequences and procedures used in the performance or construction of the Project Plan Work and shall diligently pursue the same to completion.

5

Builder shall be responsible for the application for and the obtaining of all Governmental Approvals required for the Project Plan Work. Builder shall meet with Commerce, at Commerce's request, to discuss the status and scheduling of all construction by Builder.

      2.2     <u>Commencement and Completion of Project Plan Work</u>. Upon the commencement of each discrete item of the Project Plan Work, Builder shall cause such item of the Project Plan Work to be diligently and continuously prosecuted to its completion. Each discrete item of the Project Plan Work shall be deemed to be completed upon the acceptance of the same by the appropriate governmental authorities and Builder's completion thereof in accordance with the Purchase Agreement and the requirements of this Development Declaration.

      2.3     <u>Builder's Work of Improvement</u>. Builder agrees to construct those Project Common Areas and Project Perimeter Walls which are designated as Builder's responsibility in the Purchase Agreement, together with any Purchaser's Optional Work (herein, "<u>Builder's Work of Improvement</u>") within the time periods set forth in the Purchase Agreement.

      2.4     <u>Failure to Complete Builder's Work of Improvement</u>.

      2.4.1     <u>Commerce's Right to Complete</u>. If Builder fails to complete any portion of Builder's Work of Improvement within the time periods specified in the Purchase Agreement, Commerce shall have the right, upon 30 days' written notice, to cause any licensed contractor to complete such improvements; <u>provided</u>, however, Commerce shall not exercise its right to prosecute such work pursuant to this Section 2.4 (but Commerce shall retain any other rights including the right to seek damages for breach of Builder's obligation hereunder), if, prior to the expiration of such 30-day period, Builder commences work on such improvements and thereafter diligently prosecutes such improvements to completion.

      2.4.2     <u>Builder's Obligation</u>. If Commerce undertakes construction of any portion of Builder's Work of Improvement pursuant to this Section 2.4 because of Builder's failure to complete timely construction of such improvements, Builder shall pay to Commerce an amount equal to 110% of the actual costs incurred by Commerce in constructing such improvement or causing any licensed contractor to complete such improvement, which amount shall be due and payable by Builder, within 30 days of its receipt of (i) reasonable documentation evidencing such costs, and (ii) unconditional waivers of lien evidencing that no claim of any laborer or material supplier will become a lien on the Covered Property based on work undertaken by Commerce pursuant to its rights under this Section.

      2.5     <u>Insurance</u>. Prior to commencement of any construction on the Covered Property, Builder shall obtain and, at all times prior to completion of both the Project Plan Work and the Builder's Work of Improvement or for such longer period as may be set forth below, maintain in effect the following policies of insurance:

6

     (a)    Comprehensive general public liability insurance with a single per occurrence limit of not less than $3,000,000.00 and an aggregate limit of not less than $5,000,000 with respect to the Covered Property and the operations of any Builder Party (as defined below) in, on or about the Covered Property;

     (b)    Workers' compensation insurance covering liability arising from claims of workers in respect of and during the period of the performance of the Project Plan Work with statutory coverage limits;

     (c)    Standard course of construction policy with coverage of not less than $3,000,000 per occurrence;

     (d)    Automobile liability insurance with Combined Single Limit coverage of not less than $3,000,000 (including excess policy coverage), covering both personal injury and property damage, which covers non-owned and/or rented vehicles used in connection with the development of the Project;

     (e)    Completed operations coverage for each Residence in the Project which coverage must continue for a period of ten (10) years following the close of escrow for such Residence following a sale to a homebuyer; and

     (f)    Employer's liability insurance with a limit (including excess policy coverage) of not less than $3,000,000 per occurrence.

Builder shall furnish Commerce with certificates evidencing the insurance coverages required under Section 2.5 before commencing the Project Plan Work or Builder's Work of Improvement.  As used in this Agreement, "Builder Parties" shall mean Builder, its affiliates and each of their respective officers, directors, manager, members, partners, principals and employees.  "Commerce Parties" shall mean Commerce, its affiliates and each of their respective officers, directors, manager, members, partners, principals and employees.  Builder shall also require its contractors and licensees and their respective subcontractors to provide insurance coverages reasonably acceptable to Commerce (taking into account the type and/or magnitude of work involved).

     2.6    Forms of Policies.  All policies of insurance required to be maintained pursuant to Section 2.5 above must also comply with the following:

     (a)    each policy shall be issued by an insurance company authorized to do business in Nevada and with a financial rating of at least "A-IX" status as rated in the most recent edition of Best's Insurance Reports, unless otherwise consented to in writing by Commerce, which consent may be withheld in Commerce's reasonable discretion;

7

(b)      each policy shall provide coverage against claims which may arise out of or result from a Builder Party's negligent acts or omissions with respect to its performance of the Project Plan Work or Builder's Work of Improvement or which may arise in connection with the negligent acts or omissions of any Builder Party or anyone employed by any of them;

(c)      each policy shall provide that it may not be canceled or reduced in coverage until the insurer has endeavored to give 30 days written notice to Commerce of such cancellation or reduction in coverage;

(d)      each policy (except worker's compensation) shall name Commerce and such other Commerce Parties as Commerce may designate as additional insureds as to claims by third parties.

2.7      Additional Insurance.  Commerce shall have the right to require Builder to increase the amount of the liability/coverage limits with respect to any insurance required to be maintained by Builder under this Agreement, or to require Builder to secure additional insurance coverage, if in Commerce's reasonable discretion, such increased and/or additional insurance coverage is reasonably necessary or prudent given the circumstances at the time such determination is made.

2.8      Correction of Defects.  If any Builder's Work of Improvements or Seller's Work on the Covered Property or slopes or any other portion of the Covered Property on which no structural improvements have been constructed shall prove to be defective or shall require repair so as to prevent the deterioration of the Covered Property and improvements constructed thereon by erosion or otherwise, Builder or Commerce, as the person responsible for the construction of such work of improvement (as applicable, the "Responsible Party") shall, promptly on written demand by Commerce or Builder, as the person entitled to the benefits of such work of improvement (as applicable, the "Benefited Party") specifying the defect or required repair, and in no event later than thirty (30) days thereafter, commence to correct such defect or effect such repair and diligently and continuously prosecute the same to completion at its sole cost and expense.  The Responsible Party shall be obligated under this Section regardless of the reason requiring such action, except to the extent caused by the negligence or willful misconduct of the Benefited Party.  If the Responsible Party fails to commence to correct such defect within said thirty (30) day period, or if the Responsible Party timely commences to correct such defect but fails to diligently and continuously prosecute such repair work to completion, the Benefited Party shall have the right but not the obligation to enter upon the Covered Property to take such actions as are necessary to correct such defect.  Any costs incurred by the Benefited Party in performing such corrective work (to the extent within the responsibility of the Responsible Party) shall be due and payable by the Responsible Party within thirty (30) days of demand therefor by the Benefited Party, together with such receipts and lien releases as the Responsible Party may reasonably request.  It is expressly acknowledged that work undertaken by either Commerce or Builder under this Section shall not be an admission that the party performing such work is responsible for the defect so corrected.  The obligation of the Responsible Party pursuant to this Section shall be binding on it until

8

such time as action against the Responsible Party on account of any such defect shall be barred by an applicable statute of limitations. Builder's obligations under this Section are in addition to and not in limitation of Builder's other obligations to Commerce to correct defects in the Builder Work of Improvement. This Section is not intended to apply to Builder's obligations under law to purchasers of Residences under warranty or other theories.

    2.9    Grant of Construction Easement. Builder shall have the non-exclusive right to temporarily enter upon those parcels of land owned by Commerce that adjoin the Covered Property as may be reasonably necessary for the purpose of constructing the Project Plan Work, Builder's Work of Improvements and any improvements Builder elects to install pursuant to Section 2.4 above. The use of the land subject to the easement granted to Builder under this Section shall be limited to the reasonable vicinity of the applicable Builder's Work of Improvements or the work or other improvements that Builder elects to install pursuant to Section 2.4, and shall automatically terminate (i) upon completion of all such improvements, whether by Builder, under Section 2.2, or by Builder or Commerce, as applicable, with respect to Seller Work, (ii) the sale of any property subject thereto to a residential homebuyer or (iii) three (3) years from the date this Development Declaration is Recorded.

    3.    Builder's Obligations With Respect to Construction of the Project.

    3.1    Damage to Roads, Other Property. Should Builder's construction activities in connection with the Project Plan Work cause any damage to any public or private right-of-way or to any improvement within the right-of-way or within the Open Space, whether completed or under construction by Commerce or others, Builder shall, upon demand from Commerce, promptly repair and restore such right-of-way and/or improvement. If Builder fails to commence such repair work within 10 business days after receipt of such notice and diligently prosecute the same to its completion, then Commerce shall have the right to make such repairs, and Builder shall, within thirty (30) days after demand, reimburse Commerce for 110% of Commerce's expenses incurred in repairing and restoring such right-of-way and/or improvement. If such improvement is, at the time of repair, subject to any warranty obligation of the construction contractor which constructed the improvement, Commerce may require that the work of repair be performed by such contractor.

    3.2    Additional Obligations. If the City or any other governmental authority imposes any conditions, fees, or other obligations (in the broadest sense of that word) in connection with the Project, including, without limitation, construction of infrastructure, driveways, curb cuts, sidewalks, perimeter walls, retaining walls, irrigation and drainage systems, landscaping, monuments, and directional signs ("Additional Obligations"), in addition to those described herein or in the Purchase Agreement as being the responsibility of Builder (and which are not expressly designated as Seller's Work), the performance and satisfaction of such Additional Obligations shall be the sole and exclusive responsibility of Builder, and Commerce shall have no responsibility with respect thereto, unless Commerce expressly agrees in writing to perform or satisfy the Additional Obligation(s).

3.3    <u>Indemnity</u>.  Commerce and Builder (as applicable the "<u>Indemnitor</u>") shall each, to the maximum extent permitted by law, indemnify and hold harmless the other party and such party's respective partners, members, managers, divisions, subsidiaries and affiliated companies and its and their respective employees, officers, directors, members, shareholders, agents, professional consultants and representatives, and its and their respective successors and assigns, and each of them (together with such other party hereto, collectively, the "<u>Indemnitees</u>") from and against any and all claims, damages, losses, liabilities, demands and expenses, including, but not limited to, reasonable attorneys' fees, court costs and expenses of litigation (collectively, hereinafter referred to as "<u>Liabilities</u>"), arising out of or resulting from, or claimed to arise out of or result from, in whole or in part, any fault, act or omission of the Indemnitor, any contractor or subcontractor employed by it, any sales agent or marketing representative employed directly or indirectly by the Indemnitor, anyone directly or indirectly employed by any of the foregoing entities, or anyone for whose acts any of the foregoing entities may be liable, in connection with:  (a) the Indemnitor's development of the Covered Property and/or the performance or construction of the Indemnitor's obligations with respect to the Project (including, without limitation, in the case of Builder, Builder's Work of Improvements and construction or sale or other conveyance of Residences thereon; and, in the case of Commerce, the Seller's Work), including, without limitation, any such loss, damage, injury or claim arising from or caused by or alleged to have arisen from or have been caused by:  (i) any use of the Covered Property or any part thereof, (ii) any defect in the design, construction of, or material in, any structure or other improvement upon the Covered Property, (iii) any defect in soils or in the preparation of soils or in the design and accomplishment of grading, including a spill of any contaminants or hazardous materials in or on the soil, (iv) any accident or casualty on the Covered Property, (v) any material misrepresentations by Indemnitor or any of its agents or employees, including any such misrepresentations contained in any public offering statement or similar materials prepared by the Indemnitor, (vi) a violation or alleged violation by the Indemnitor, its employees or agents of any applicable law, (vii) any slope failure or subsurface geologic or groundwater condition, (viii) any work of design, construction, engineering or other work with respect to the Covered Property provided or performed by or for the Indemnitor either before or after the date hereof, or (ix) any other cause whatsoever in connection with Indemnitor's use of the Covered Property, or Indemnitor's performance under this Development Declaration or the Purchase Agreement; or (b) the negligence or willful misconduct of Indemnitor or its agents, employees, licensees, invitees or contractors in the development, construction, grading or other work performed off the Covered Property by Indemnitor pursuant to this Development Declaration or any defect in any such work.  The foregoing indemnity and waiver shall apply to a claim or action brought by a private party or by a governmental agency or entity under any statute or common law now or hereinafter in effect and is intended to apply with respect to loss, damage, injury or claim arising before or after the conveyance of all of the Residences on the Covered Property.  With regard to design, construction methods, materials, locations and other matters for which Commerce or Builder has given or will give its approval, recommendation or other direction, the foregoing indemnity and waiver shall apply irrespective of such person's approval, recommendation or other direction, but, in the case of Commerce indemnification obligations, such indemnity is limited by Section 4.4 below.

Notwithstanding the foregoing, the indemnity agreement and waiver created herein shall not indemnify any Indemnitee against, or constitute a waiver with respect to, any Liabilities to the extent

such Liabilities: (a) arise from the negligent acts or omissions or willful misconduct of such Indemnitee; provided, however, that (i) any act or omission of Commerce or its agents, servants or independent contractors with respect to the review of the Project Plan and/or the drawings or specifications related to the Project Plan Work, or (ii) any inspection or failure to inspect the construction activities of Indemnitor by Commerce or Builder (as applicable), or (iii) any direction or suggestion given by an Indemnitee with respect to construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Project Plan Work, or the failure to give any such direction or suggestion, shall not be deemed a negligent act or omission or willful misconduct of such Indemnitee relieving Indemnitor of its indemnity obligation hereunder; (b) are covered by insurance; (c) are expressly limited by another provision in the Purchase Agreement; or (d) arise from any failure, inaccuracy or untruth of Builder's or Commerce's (as applicable) representations and warranties reasonably relied on by the Indemnitor.

3.4     <u>Rules and Regulations</u>.  During the period of construction of the Project, Builder and Builder's contractors and subcontractors, and their respective employees and agents, shall observe the following rules and regulations.

3.4.1     All construction vehicles and equipment shall use the construction access routes designated by Commerce for access to the Covered Property.  No such vehicles or equipment shall be permitted on any public or private streets or rights of way or undeveloped areas within Tuscany not approved by Commerce for construction traffic.  Without limiting the foregoing, there shall be no construction access through the main entrance to Tuscany.

3.4.2     No equipment maintenance or construction work of any type shall be performed or conducted on or about the Covered Property between the hours of 8:00 p.m. and 6:00 a.m.

3.4.3     No temporary structures, including construction trailers or other temporary office or sales facilities, shall be placed or maintained on the Covered Property until the appearance and location of such facilities have received the approval of Commerce, which approval shall not be unreasonably withheld.

3.4.4     Portions of the Covered Property which are visible from surrounding property shall be kept free of weeds and debris, and all scrap materials generated by the construction activities shall be removed as soon as reasonably possible.

3.4.5     Builder shall maintain a concrete wash-out site on the Covered Property and shall not wash trucks or equipment on any other property within Tuscany without the prior written consent of the Builder thereof.

11

3.4.6    Builder shall not leave any debris or material on any other property within Tuscany without the prior written consent of the Builder thereof.

3.4.7    Builder shall provide at least one (1) covered trash enclosure for every two Residences under construction. The location, size and design of trash enclosures shall be reasonably acceptable to Commerce and shall, unless Commerce otherwise agrees in writing, be maintained within fenced-in areas. All debris will be placed in one of these enclosures at the end of each day.

3.4.8    Builder shall take such action as may be prudent and use its best efforts to employ all commercially reasonable methods, equipment, techniques and activities to control ambient dust and the accumulation of dust on the Covered Property or dispersion of dust from the Covered Property; and

3.4.9    Builder shall take such action as may be prudent and use its best efforts to employ all commercially reasonable methods, equipment, techniques and activities to abate noise, and to mitigate and abate noise pollution. Builder warrants that it will not use any equipment or undertake any activity in connection with the construction and development of the Project which will generate unreasonable noise.

3.4.10    Builder shall provide street sweeping and cleaning services as required by Commerce so as to maintain neat and attractive streets and sidewalks within all occupied areas, and model and sales areas and along the access routes utilized by Tuscany residents and prospective purchasers within Tuscany.

3.5    Protection of Open Space. Builder shall not loosen or remove soils or rock with any explosive charge within twenty feet (20') of the boundaries of the Covered Property adjacent to those areas of Tuscany designated by Commerce as linear or other parks, trails, slope areas or open space areas ("Open Space"). Builder shall construct a temporary construction fence along any Open Space boundary line(s) of the Covered Property prior to any development activity on the Covered Property and will maintain such fence until the completion of development of the Residences or Project Perimeter Wall adjacent to such areas. Builder agrees to use its best efforts to minimize any disturbance to the Open Space as a result of its construction activities on the Covered Property. Builder further agrees to promptly remove any Project materials or debris from the Open Space and to repair any damage to and restore all landscaping in the Open Space to the same condition as prior to such damage and in a manner that is consistent with the Open Space development plans. If Builder, after fifteen (15) days written notice of a breach of its obligations under this paragraph shall fail to cure or correct such breach, Commerce may elect to cure or correct the breach on its own without further notice to Builder.

4.    Development Restrictions.

4.1    Maximum Number of Residences. The type and number of Residences that Builder will construct within the Covered Property shall be limited to 133 Residences to be described more fully in the Project Plan. The maximum number of Residences and the product types constructed within the Project shall not exceed the number and type approved by Commerce hereunder. The Covered Property shall be developed, improved and maintained only with Residences as provided herein. Builder acknowledges and agrees that the maximum number of Residences permitted hereunder is for Builder's use on the Covered Property only, and that if the number of Residences on the Covered Property authorized by any subsequent approvals sought by Builder from any governmental authority (which approvals to be sought by Builder are subject to Commerce's prior reasonable consent) is less than the maximum number of Residences permitted hereunder, the right to construct such excess Residences within Tuscany shall belong exclusively to Commerce. Builder has further represented that it has not purchased the Covered Property with the intent to transfer its interest therein except for the sale of Residences to the home-buying public.

4.2    Compliance With Zoning. Builder agrees that construction of the Project on the Covered Property pursuant to the Project Plan shall be in compliance with all applicable Governmental Approvals, including all zoning, land use and similar governmental restrictions pertaining to the Covered Property. Builder shall not seek to change any zoning or other land use approvals or restrictions applicable to the Covered Property nor seek any variances or waivers thereof (including any FAR waivers), without, in each case, the prior written consent of Commerce, which consent may be granted or withheld in Commerce's reasonable discretion. All requests or applications together with all supporting documentation for Governmental Approvals which require discretionary action on the part of a governmental authority, whether or not such approvals are specifically herein required to be obtained, shall be submitted by Builder to and approved by Commerce prior to filing with the appropriate governmental authority, and in the event of disapproval, Commerce shall specify the reasons therefor. Failure to so disapprove within ten (10) business days shall be deemed approval thereof. Builder shall send Commerce copies of all written communications between Builder and the governmental authority processing such requests or applications.

4.3    No Waiver of Future Approvals. The approval by Commerce of any zone change, variance, waiver, proposal, drawing or specification for any work done or proposed or in connection with any other matter requiring the approval and consent of Commerce shall not be deemed to constitute a waiver of any right whatsoever to withhold approval of or consent to any similar proposals, drawings, specifications, or other matters subsequently or additionally submitted for approval or consent.

4.4    Non-Liability of Commerce. Neither Commerce nor any of its members, managers or affiliates and their respective officers, directors, members, managers, shareholders, partners and employees acting on behalf of Commerce shall be liable to Builder for any Liabilities arising out of or in any way connected with the exercise of Commerce's rights under this Development Declaration, unless due to the willful misconduct or bad faith of Commerce. Commerce shall not be responsible for reviewing, nor

13

shall its approval of any Plan be deemed approval of such Plan from the standpoint of structural safety or conformance with building or safety codes or ordinances or other governmental regulations.

        4.5    <u>Easement for Inspection</u>.  Builder hereby expressly grants and conveys to Commerce, its successors and assigns, a temporary non-exclusive easement in gross in and across the Covered Property as is necessary for Commerce, or persons designated by Commerce, to inspect Improvements thereon or to complete any Seller's Work.

        4.6    <u>Master Association</u>.  The Tuscany Master Association (the "<u>Master Association</u>"), a non-profit corporation, has been delegated and assigned the powers of owning, maintaining, and administering certain property within Tuscany, of which the Covered Property is a portion. The provisions of this Development Declaration are in addition to and are not intended to affect the provisions of the Master Declaration.

        4.7    <u>Sub-Association and Supplemental Declaration</u>.  Builder may, with Commerce's approval, which shall not be unreasonably withheld, elect to form a sub-association (the "<u>Sub-Association</u>") in accordance with the requirements of NRS Chapter 116 (the "<u>Act</u>"), composed of owners of Residences within the Covered Property, for the purpose of administering and enforcing covenants, conditions, restrictions, reservations, easements affecting the Project and owning and maintaining certain Neighborhood Facilities.  In the event Builder causes to be executed and Recorded a supplemental declaration of covenants, conditions and restrictions (the "<u>Supplemental Declaration</u>") applicable to the Project, the Supplemental Declaration shall be subject to Commerce's prior review and approval in its reasonable discretion.

        The Master Declaration shall control in the event of any conflict between the Supplemental Declaration and the provisions of the Master Declaration, although such documents shall be construed to be consistent with one another to the extent possible.  The inclusion in the Supplemental Declaration of covenants, conditions, restrictions, land uses and limitations which are more restrictive or more inclusive than the restrictions contained in the Master Declaration shall not be deemed to constitute a conflict with the provisions of the Master Declaration.  Builder may not amend the Supplemental Declaration without the prior written consent of Commerce, which shall not be unreasonably withheld.  Builder shall not impose any restrictive covenants, conditions, restrictions or land use limitations on the Covered Property or any portion thereof except with the written consent of Commerce in accordance with this Section 4.7.

        4.8    <u>Private Streets</u>.  Unless Commerce and Builder otherwise agree in writing (such agreement not to be unreasonably withheld by either party), prior to or concurrently with the conveyance of the first Residence within a phase of development of the Covered Property, the private streets within that phase shall be conveyed to the Master Association, if the Master Association has agreed to accept such property free of all monetary encumbrances (other than taxes and assessments not then delinquent).  Conveyance of private streets shall include, unless previously existing, access to adjacent public streets.  Such conveyance shall be made on a grant, bargain and sale deed form supplied or approved by

14

Commerce. Prior to such conveyance, the applicable private streets shall be subject to a non-exclusive easement for ingress and egress and public and private utilities over such streets for the benefit of Commerce, individually, and all owners of the lots within the phase.

4.9    Common Area Lots. Certain portions of the Covered Property may consist of open space and slopes, and that the appropriate governmental authorities may require that such open space and slopes be landscaped and conveyed to the Master Association. The Master Association shall accept or reject any offer to transfer property to the Master Association in its reasonable discretion. In connection with the subdivision of the Covered Property, the appropriate governmental authorities may require that such open space and slopes be designated on the relevant final maps as separately lettered lots (each a "Common Area Lot"). In such event, at all times prior to the conveyance of the Common Area Lots to the Master Association, Builder shall landscape, improve and maintain the Common Area Lots in a manner consistent with the Design Guidelines, including, without limitation maintaining vegetation necessary to avoid erosion, controlling weed growth, and providing for adequate irrigation. Prior to the completion of such landscaping and improvements. Builder shall cause the Common Area Lots to be free of weeds and debris and to be in a neat and attractive condition. Upon the conveyance of a Common Area Lot to the Master Association, the maintenance obligation of Builder set forth in this Section 4.9 shall terminate if the Master Declaration contains a provision that the Master Association shall maintain the Common Area Lot in the manner required herein.

4.10    Perimeter Walls. Builder shall, upon request by the Master Association, convey to the Master Association an easement for the purpose of allowing the Master Association to maintain all exterior Project perimeter walls, including all walls adjoining the Open Space or any adjoining common areas owned or maintained by the Master Association. Such easement shall, in addition, include easements for all necessary support and easements for the purpose of maintaining all landscaping outside such walls, including necessary utility lines and drainage and slope easements.

4.11    Transfer of Voting Rights. Builder hereby irrevocably transfers to Commerce during the term of this Development Declaration, with full power of substitution, as the true and lawful attorney, agent and proxy of Builder, all of the voting rights to which Builder is or will be entitled, coupled with an interest, for and in the name, place and stead of Builder, to vote upon any and all matters which may lawfully come before the Members (as such term is defined in the Master Declaration) of the Master Association, which matters arise under the Master Declaration, provided, however, that so long as no Purchaser Default exists, Commerce agrees not to exercise such voting rights and consents to the conditional exercise of such voting rights by Builder.

5.    Project Name and Logo. Builder shall submit to Commerce, for Commerce's review and approval, the name it intends to use in connection with the development and marketing of the Project (the "Project Name") and any logo or mark to be used in connection therewith (the "Project Logo"). Builder shall not use in Advertising (as defined below) or place on any sign, billboard or entry monument any

15

Project Name or Project Logo without first obtaining the written consent thereof of Commerce, which consent shall not unreasonably be withheld.

6.  <u>Street Names</u>.  Unless otherwise agreed in writing by Commerce in its reasonable discretion, Builder shall not change any street names in the Project from those set forth on the Recorded final maps.

7.  <u>Prohibited Plant Species</u>.  Builder shall not plant or place any of the following plant species (the "<u>Prohibited Plants</u>") on the Covered Property:

        (a)    Olea europa (Common Olive Tree)
        (b)    Cynoden Dactylon (Common Bermuda Grass)
        (c)    Morus alba (Common Mulberry)

Commerce may, from time to time and at any time, in its reasonable discretion, add or delete any plant species to the list of Prohibited Plants.  If Commerce adds a plant species to the list of Prohibited Plants, Builder shall refrain from planting or placing such plant species on the Covered Property; <u>provided</u>, however, that Builder shall not be obligated to unearth landscaping existing at such time to remove such plant species from the Covered Property.

8.  <u>Construction and Conveyance of Community Facilities</u>.

8.1  <u>Description of Community Facilities</u>.  Builder shall, at its sole expense, construct any Project Common Areas consisting of Community Facilities as required by the Purchase Agreement or the approved Project Plan.  No such Community Facilities shall be installed or constructed until the drawings and specifications therefore have been submitted to and received the approval of Commerce.  In the event Builder has not completed the required Community Facilities substantially in accordance with the drawings and specifications previously approved in writing by Commerce, Commerce shall notify Builder of the corrections and improvements required to be completed.  Failure by Builder to make the corrections and complete such improvements in accordance with the Purchase Agreement and the Project Plan shall be deemed a default under the terms and conditions of this Development Declaration.

8.2  <u>Certificate of Compliance</u>.  Upon completion of each of the Community Facilities, Builder shall submit to Commerce a copy of the certificate of compliance executed by Builder's state licensed consultant (engineer, architect and/or landscape architect) and, if required by law or by the City or by any Permitted Exception, evidence of the acceptance or approval thereof by the City or other governmental agency or authority.  The certificate of compliance shall warrant the installation as substantially conforming to the drawings and specifications approved by Commerce.

8.3  <u>Conveyance to Master Association</u>.  Commerce shall convey the Community Facilities to the Master Association free of all monetary encumbrances arising by reason of any act of

Commerce (other than taxes and assessments not then delinquent) following completion of all improvements thereon by Builder. Such conveyance shall be made on a grant, bargain and sale deed form or other form supplied or approved by Commerce. Notwithstanding conveyance of the Community Facilities to the Master Association, Builder shall, unless Commerce or the Master Association has otherwise agreed in writing, continue to maintain such facilities until the last Residence on the Covered Property has been conveyed to the general public.

        8.4    Continued Maintenance Obligations. Builder shall continue to maintain any Community Facilities until approval by Commerce of ground cover, shrubbery, and landscaping surrounding the Community Facilities. Commerce may withhold its approval if such improvements have not been accepted by the Master Association, or if the warranty period for such improvements has not expired, provided that the Master Association does not unreasonably withhold its approval.

        9.    Cable Television. Builder, at its sole expense, agrees to pre-wire and install a complete cable television system and cable modem ("CATV"), within each Residence in accordance with the requirements of the Cable Contract and the HOA Cable Agreement. It is expressly understood that all components of such system installed outside each Residence ("Reserved Components") shall become the property of Commerce, or, at the option of Commerce, Kelley or the Master Association, as provided in the Cable Contract and the HOA Cable Agreement, without the payment of any consideration therefor. Builder shall execute and deliver to Commerce, Kelley or the Master Association, as applicable, upon demand, a bill of sale for all Reserved Components in the form provided by Commerce. Builder shall expressly reserve ownership of all Reserved Components in the sales contract and/or deed for each Residence sold, and shall provide a non-exclusive easement in gross on, over, under or across the Covered Property for purposes of installation and maintenance of such cable equipment and for the benefit of Kelley and or the Master Association and their respective successors and assigns.

        10.    Governmental Approvals; Builder's Duty. Except for any matters which are the express obligation of Commerce hereunder or under the Purchase Agreement, Builder shall obtain, at its sole expense, all Governmental Approvals which may from time to time be required with respect to the construction or sale of any Improvements (including, without limitation, Residences) upon the Covered Property, including, as applicable and without limitation, FHA/VA and other similar governmental or quasi-governmental financing, and appropriate building permits.

        11.    Marketing and Advertising.

        11.1    Builder's Advertising. Prior to public dissemination, Builder shall submit to Commerce proofs or copies of all proposed advertisements, including without limitation, newspaper ads, television or radio ads, signs or billboards, press releases, and copies of all brochures and other handouts which advertise the Project or the Residences (collectively, "Advertising") and the locations where Builder intends to disseminate the Advertising, if such Advertising refers to Tuscany, Commerce or any of its affiliates or any of the amenities within Tuscany. Commerce shall have the right to disapprove all

17

Advertising insofar as the same may refer to Commerce or any of its affiliates, Tuscany or in any manner to the amenities available or planned therein, provided such approval shall not be unreasonably withheld or delayed. Builder shall also submit to Commerce any and all marketing and sales information obtained or available from Builder's sales efforts of Residences. Builder shall use its commercially reasonable efforts to cause each purchaser and prospective purchaser of Residences to submit information requested by Commerce to be used for demographic and marketing studies.

        11.2   Submission of Builder Advertising. Within 10 business days after actual receipt of any proposed Advertising, Commerce shall: (i) disapprove the Advertising by written notice stating the reasons therefor, in which case Builder shall not permit the same to be publicly disseminated; (ii) disapprove certain parts or elements of the Advertising by written notice stating the necessary changes or corrections, in which case Builder shall not permit the Advertising to be publicly disseminated without first making the required changes or corrections; or (iii) take no action, in which case Builder may permit the Advertising to be publicly disseminated.

        11.3   Tradenames. Builder acknowledges that Commerce has the prior right to the trade name "Tuscany" and all variations thereof and logos used in connection therewith ("Marks"). Builder is granted a royalty free license to use the Marks solely in connection with the Covered Property and the terms of this Development Declaration, and warrants that it shall not use, nor permit others to use, in any manner whatsoever, the Marks without the prior written consent of Commerce, which shall not be unreasonably withheld or delayed.

    12.   Signs and Advertising Devices.

        12.1   Submission to Commerce. Builder shall not place anywhere in Tuscany, or anywhere within ten (10) miles of the boundaries thereof or anywhere within the City of Henderson, any promotional or directional signs or advertising devices (collectively, "Signs") relating to the construction, sale, or renting of any Residence within the Covered Property without first submitting to Commerce a schedule and specifications showing the placement, design, size, material, color typeface, and other similar information and receiving Commerce's prior written approval thereof. Nothing herein shall be deemed to indicate that Commerce agrees to permit the use of property owned by Commerce for any of Builder's Signs.

        12.2   Self-Help. Commerce shall have the right, in addition to any and all other rights it may have, to remove or terminate or cause to be removed or terminated any Signs or Advertising which have not been approved in accordance with this Section 12, and which are not removed or terminated within fifteen (15) days following written notice to Builder from Commerce demanding such removal or termination.

    13.   Notices to Homebuyers. Builder shall distribute the Tuscany Homebuyer's Disclosure Notice ("HDNs"), to be prepared by Commerce, to each prospective buyer of a Residence in the Project.

18

Builder acknowledges that the form and content of the HDNs may be changed from time to time by Commerce in its sole discretion; provided, however, that Commerce's right to change the HDNs shall be limited to changes that reflect the current plans for development of Tuscany existing at the time of such change or are necessary to make the HDNs factually accurate and complete for purposes of full disclosure or to comply with the requirements of the City. Builder acknowledges that the purpose of the HDNs is to provide prospective buyers of Residences with certain information concerning Tuscany and the HDNs do not constitute a representation or warranty by Commerce to Builder or homebuyers, nor are the HDNs intended to be used by Builder in satisfaction of any disclosure requirements imposed on Builder by local, state or federal law.

14.    General Restrictions. This Section 14 shall apply to all of the Covered Property (including each Residence).

14.1    Permitted Uses. No Improvement upon the Covered Property shall be used for any purpose other than the uses allowed in the Project Plan or reasonably incident thereto, including, but not limited to, the use of such Improvements for parking, delivery, mail and utility or storage areas.

14.2    Nuisances. No rubbish or debris of any kind shall be placed or permitted to accumulate anywhere upon the Covered Property, and no odor shall be permitted to arise therefrom so as to render the Covered Property or any portion thereof unsanitary, unsightly, offensive, or detrimental to any other property in the vicinity thereof or to its occupants. No noise or other nuisance shall be permitted to exist or operate upon any portion of the Covered Property so as to be offensive or detrimental to any other property in the vicinity thereof or to its occupants.

14.3    Exterior Maintenance and Repair. No Improvement anywhere within the Covered Property shall be permitted to fall into disrepair, and each Improvement shall at all times be kept in good condition and repair.

14.4    Drainage. Builder's draining of water, grading activity and the construction of improvements upon the Covered Property shall not interfere with the established drainage pattern within Tuscany. Builder shall not drain or discharge any water, including, without limitation, rain water, onto any property adjacent to or in the vicinity of the Covered Property, except for drainage into an established drainage facility approved by the City for such purpose.

14.5    No Hazardous Activities. No activities shall be conducted on any portion of the Covered Property, and no Improvements shall be constructed on any portion of the Covered Property, which are or might be unsafe or hazardous to any person or property. Without limiting the generality of the foregoing, no firearms shall be discharged on the Covered Property and no open fires shall be lit or permitted on the Covered Property. Commerce acknowledges that the construction of homes and customary activities related thereto shall not be deemed inherently unsafe or hazardous for purposes of this section.

14.6    Excavations.  No portion of the Covered Property shall be used for the purpose of mining, quarrying, drilling, boring, or exploring for or removing water, oil, gas or other hydrocarbons, minerals, rocks, stones, gravel or earth.  Any excavations on the Covered Property by Builder or construction of Improvements shall not damage or interfere with the "French Drain" system located throughout Tuscany.

14.7    Landscaping.  The Covered Property shall at all times be maintained in a neat and attractive condition.  No landscaping upon the Covered Property shall be allowed to deteriorate to a dangerous, unsafe, unsightly, or unattractive condition.  Builder shall have placed (or caused to be placed) all front yard landscaping on each Residence in conformance with the Project Plan within sixty (60) days after the close of escrow for the sale of such Residence to a member of the home-buying public.

14.8    Marketing, Sales and Construction Trailers.  Commerce shall have the right to reasonably approve any trailers or other temporary structures placed or maintained upon the Covered Property for the purpose of marketing, sales or construction activities, which approval shall not be unreasonably withheld or delayed.

15.    Restoration of Damaged or Destroyed Residence.  If at any time commencing after Builder's construction of any Residence(s) and prior to the sale of such Residence(s) to a member of the home-buying public, such improvements or Residence(s) are destroyed by fire or other casualty, Builder shall, not later than one hundred twenty (120) days after occurrence of damage or destruction, commence to repair or restore the same in accordance with the Construction Documents for such improvements or Residence(s) and diligently complete the repair or restoration thereof no later than one (1) year from the date of the occurrence of such damage or destruction.

16.    Release and Termination.

16.1    Residences.  Each Residence within the Project shall be automatically released from the encumbrance of this Development Declaration without the necessity of executing or recording any instrument of release upon the sale of the Residence by Builder to a member of the home-buying public, but not upon the bulk sale of more than two (2) Residences to any person or entity for resale to the public.

16.2    Dedication to Public Agency or Public Utility.  Any portion of the Covered Property, upon dedication or conveyance to, and acceptance by, a public entity or public utility in accordance with the Project Plan, shall be deemed automatically released from the encumbrance of this Development Declaration, without the necessity of executing or recording any instrument of release.

16.3    Transfer to Association.  Any portion of the Covered Property, upon transfer to and acceptance by the Master Association or a Sub-Association, pursuant to this Development Declaration

20

shall be deemed automatically released from the encumbrance of this Development Declaration, without the necessity of executing or recording any instrument of release.

16.4    Acquisition of Covered Property by Commerce.    Upon the acquisition of all or portions of the Covered Property by Commerce by and through any operation of law or instrument of transfer, Commerce shall have the right in its sole discretion to terminate this Development Declaration, and release portions or all of the Covered Property from the covenants and restrictions of this Development Declaration, in which event the covenants and restrictions shall be forever terminated and extinguished.

16.5    Right of Release.    Commerce shall also have the right to release from time to time and at any time, all or any portion of the Covered Property from this Development Declaration for any reason, and the foregoing provisions of this Section 16 shall not be deemed to limit such right in any manner whatsoever.

16.6    Instrument.    Following the release of any portion of the Covered Property from the encumbrance hereof, Commerce shall, if requested by the Builder of such portion of the Covered Property, execute and cause to be Recorded an instrument evidencing such release.    Such instrument shall not be necessary, however, to evidence the automatic release of this Development Declaration as to portions of the Covered Property pursuant to Sections 16.1, 16.2 and 16.3 above.

17.    Enforcement; Assignment by Commerce.

17.1    Grant of Lien on Covered Property.    In accordance with and subject to the following terms of this Section 17.1, Builder hereby grants to Commerce a lien on the Covered Property to secure all amounts owed by Builder to Commerce under the Purchase Agreement, including the Profit Participation and Lot Premium.    Such lien shall be automatically subject and subordinate to any lien which secures the financing of Improvements constructed upon the Covered Property in accordance with the terms of the Purchase Agreement or this Development Declaration.    Commerce shall have the right to enforce the lien granted by this Development Declaration by all means available, both judicially and by nonjudicial foreclosure pursuant to NRS 107.080 (as the same may be amended from time to time), and Builder hereby grants, bargains, sells and conveys the Covered Property, in trust, to such person or persons as Commerce may designate from time to time, as trustee (such designee shall be referred to hereinafter as the "Trustee"), for the purpose of securing the sums due hereunder which remain unpaid. The Trustee may be changed for any reason and at any time and from time to time by execution and Recordation of an instrument in writing signed by Commerce.    In the event Commerce elects to foreclose the lien herein provided for non payment of all or any portion of the amounts secured hereby, then Commerce, or the Trustee acting for the benefit of Commerce, shall have the right to enforce the such lien and cause a sale of all or any portion of the Covered Property, to the extent permitted by Nevada law, together with all rights appurtenant thereto, in accordance with Nevada law, and to make due conveyances to a purchaser or purchasers by deed binding upon the Builder, its heirs, executors, administrators and successors.    In this connection, the provisions of Covenants Nos. 6, 7 (a reasonable percent), 8 and 9 of NRS 107.030 are

21

hereby adopted and made a part of this Development Declaration.  Without limiting the foregoing, Commerce or the Trustee, as applicable, shall give all notices of such proposed sale required by Nevada law.  At any foreclosure, judicial or nonjudicial, Commerce shall be entitled to bid up to the amount of the sum secured by its lien, together with costs and attorneys' fees, and to apply as a cash credit against its bid all sums due to Commerce covered by the lien being foreclosed.

       17.2    Waiver.  Failure by Commerce to enforce any condition, covenant, or restriction herein contained in any certain instance or on any particular occasion shall not be deemed a waiver of such right on any future breach of the same or any other condition, covenant, or restriction by Builder.  Except as expressly provided in the written evidence of approval by Commerce of the Project Plan or any other plans, drawings or specifications for the construction of any Improvement upon the Covered Property, such approval shall not constitute or be deemed a waiver of any requirement contained in this Development Declaration which relates to the conditions upon such construction, or the manner in which such construction shall be performed.  All rights, options, and remedies of Commerce under this Development Declaration are cumulative, and no one of them shall be exclusive of any other, and Commerce shall have the right to pursue any one or all of such rights, options, and remedies or any other remedy or relief which may be provided by law or in equity, whether or not stated in this Development Declaration.

       17.3    Assignment of Rights by Commerce.  Commerce may assign any of its rights and powers under this Development Declaration, in whole or in part, to a permitted assignee under the Purchase Agreement.  Upon the Recordation of such writing accepting such assignment and assuming such duties, such person or entity shall, to the extent of such assignment, have the same rights and powers and be subject to the same obligations and duties as are given to and assumed by Commerce herein.  Without limiting the generality of the foregoing, Commerce may make such assignment as to the entire Covered Property or to any portion thereof.

      18.    Amendments.  Except as provided in this Development Declaration concerning the addition of or substitution for other real property as the Benefited Property, or concerning the assignment by Commerce of its rights under this Development Declaration, this Development Declaration may only be amended by a writing executed by Commerce and the record Builder of the Covered Property, which may be Recorded against the Covered Property.  For purposes of this Section 18 only, "Covered Property" shall not include any parcel or portion of the Covered Property that has been released from the encumbrance of this Development Declaration pursuant to Section 16 above.

      19.    Miscellaneous.

       19.1    Captions.  The captions used herein are for convenience only and are not a part of this Development Declaration and do not in any way limit or amplify the terms and provisions hereof.

       19.2    Interpretation; Government Law.  This Development Declaration shall be construed as if prepared by both parties hereto.  Each party acknowledges that it has had full benefit of legal counsel in

22

the preparation and negotiation of this Development Declaration. This Development Declaration shall be governed by and construed under the laws of the State of Nevada.

 19.3 Attorneys' Fees. In the event any action, arbitration or other proceeding shall be instituted in connection with this Development Declaration, the party prevailing in such action shall be entitled to recover from the other party all of its costs of action, arbitration or other proceeding, including reasonable attorneys' fees as fixed by the court therein and including, in the case of Commerce, the allocated costs of its in-house counsel.

 19.4 Severability. In the event that any phrase, clause, sentence, paragraph, section, article, or other portion of this Development Declaration shall become illegal, null, void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null, void or against public policy, the remaining portions of this Development Declaration shall not be affected thereby and shall remain in force and effect to the full extent permissible by law.

 19.5 Gender and Number. In this Development Declaration (unless the context requires otherwise), the masculine, feminine, and neuter genders and the singular and plural include one another.

 19.6 Covenants to Run With the Land; Term. The covenants, restrictions, and reservations of this Development Declaration shall run with and bind the Covered Property and shall inure to the benefit of and be enforceable by Commerce and its successors and assigns for a term of sixty (60) years from the date of this Development Declaration, unless terminated earlier in accordance with Section 16 above. As used in the preceding sentence, the term "successors and assigns" shall mean and refer to both (a) Commerce's successors and assigns as contemplated by Section 18.2, and (b) Commerce's successors and assigns as to all or substantially all of Commerce's assets or by merger, consolidation or other reorganization.

 19.7 Notices. All notices or other communications between Commerce and Builder required or permitted hereunder shall be given in accordance with the notice provisions of the Purchase Agreement.

 19.8 Effect of Development Declaration. This Development Declaration is made for the purposes set forth in the Recitals to this Development Declaration, and Commerce makes no warranties or representations, express or implied, as to the binding effect or enforceability of all or any portion of this Development Declaration or as to the compliance of any of these provisions with public laws, ordinances and regulations applicable thereto.

 19.9 Rights of Mortgagees. All restrictions and other provisions herein contained shall be deemed subject and subordinate to all bona fide mortgages and deeds of trust now or hereafter executed upon the Covered Property or any portion thereof, and none of said restrictions shall supersede or in any way reduce the security or affect the validity of any such mortgage or deed of trust; provided, however, that

23

if all or a portion of the Covered Property is sold under a foreclosure of any mortgage or under the provisions of any deed of trust, any purchaser at such sale, including, without limitation, the mortgagee or beneficiary of a deed of trust and the successors and assigns of such purchaser, shall hold any and all property so purchased subject to all of the restrictions and other provisions of this Development Declaration. The foregoing provision shall also apply to a deed in lieu of foreclosure and to the transferee of the lender after such deed in lieu.

19.10   Counterparts.  This Agreement may be executed in any number of counter-parts and by the separate parties hereto or in separate counterparts, all of which taken together shall be deemed to be an original and one and the same.

19.11   Joint and Several Liability.  The obligations of Builder hereunder (other than the obligations of Purchaser under Section 16) are joint and several.

20.      Certain Definitions.  In addition to using defined terms from the Purchase Agreement, certain terms are used in this Development Declaration with the meaning given them elsewhere herein. The following is a list of defined terms and the provision in this Development Declaration where the term is defined.

| Defined Term | Section |
| --- | --- |
| Act | Section 4.7 |
| Additional Obligations | Section 3.2 |
| Advertising | Section 11.1 |
| Architectural Concept Plan | Section 1.4.1 |
| Architectural Materials Sample Board | Section 1.4.3 |
| Benefited Party | Section 2.8 |
| Benefited Property | Recital F |
| Builder | Preamble |
| Builder Parties | Section 2.5 |
| Builder's Work of Improvement | Section 2.3 |
| Building Improvements | Section 1.4 |
| CATV | Section 9 |
| City | Recital A |
| Commerce | Preamble |
| Commerce Parties | Section 2.5 |
| Common Area Lot | Section 4.9 |
| Covered Property | Recital B |
| Development Declaration | Preamble |
| Final Plot Plan | Section 1.4.4 |
| Governmental Approvals | Section 1.7 |

24

| | |
|---|---|
| HDNs | Section 13 |
| Improvement | Section 1.1 |
| Improvements | Section 1.1 |
| Indemnitees | Section 3.3 |
| Indemnitor | Section 3.3 |
| Landscape Construction Drawings | Section 1.3.3 |
| Landscape Improvements | Section 1.3 |
| Landscape Materials Sample Board | Section 1.3.2 |
| Landscape Plan | Section 1.3.1 |
| Liabilities | Section 3.3 |
| Marketing Signage Plan | Section 1.4.5 |
| Marks | Section 11.3 |
| Master Association | Section 4.6 |
| Open Space | Section 3.5 |
| Plan | Section 1.5 |
| Preliminary Plot Plan | Section 1.4.2 |
| Prohibited Plants | Section 7 |
| Project | Recital D |
| Project Logo | Section 5 |
| Project Name | Section 5 |
| Project Plan | Section 1.5 |
| Project Plan Work | Section 2.1 |
| Purchase Agreement | Recital B |
| Purchaser | Preamble |
| Reserved Components | Section 9 |
| Responsible Party | Section 2.8 |
| Rhodes | Preamble |
| Signs | Section 12.1 |
| Site Improvements | Section 1.2 |
| Site Improvements Plan | Section 1.2 |
| Sub-Association | Section 4.7 |
| successors and assigns | Section 19.6 |
| Supplemental Declaration | Section 4.7 |
| Trustee | Section 17.1 |
| Tuscany | Recital A |

25

IN WITNESS WHEREOF, Builder and Commerce have executed this instrument on the day and year first above written.

**TUSCANY ACQUISITIONS, LLC, a Nevada limited liability company**

By:_____
Name:_____
Title:_____

**RHODES    DESIGN    AND    DEVELOPMENT CORPORATION**, a Nevada corporation

By:_____
Name:_____
Title:_____

**COMMERCE ASSOCIATES, LLC, a Nevada limited liability company**

By:_____
Name: _____
Title:_____

Exhibit F to Purchase Agreement and Grant Options

APN # _____

RECORDED REQUESTED BY
AND WHEN RECORDED RETURN TO:

Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89109
Attention: Michael E. Buckley, Esq.

## MEMORANDUM OF ADDITIONAL CONSIDERATION

THIS    MEMORANDUM    OF    ADDITIONAL    CONSIDERATION
("**Memorandum**") is made as of the _____ day of _____, 2005, by and between
TUSCANY ACQUISITIONS, LLC, a Nevada limited liability company ("**Purchaser**"), and
COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("**Seller**").

1.      **Additional Consideration.**  Pursuant to Section 3.2 of that certain Purchase
Agreement and Grant of Options, dated as of November 13, 2003 between RHODES
DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("Rhodes") and
Seller, as amended August 16, 2004 and February 28, 2005 (collectively, the **Purchase
Agreement**"), all the terms of which are specifically made a part hereof as though set out in full,
Rhodes agreed to pay to Seller certain additional consideration (collectively, the "**Additional
Consideration**") for the purchase of that certain real property generally located in the City of
Henderson, County of Clark, State of Nevada, and more particularly described on Attachment
A attached hereto (the **Property**").  The obligation to pay such Additional Consideration is
secured by a lien on the Property which Purchaser has granted to Seller pursuant to Section
17.1 of that certain Declaration of Development Covenants and Restrictions recorded of even
date herewith in the official records of Clark County, Nevada.  Such lien shall be automatically
subject and subordinate to any lien which secures the financing of improvements which are
constructed on the Property.

2.      **Purpose of Memorandum.**  This Memorandum is prepared solely for the
purpose of giving notice to third parties and in no way modifies the provisions of the Purchase
Agreement or the Development Declaration.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Additional Consideration as of the date stated hereinabove.

**PURCHASER:**

TUSCANY ACQUISITIONS, LLC,
a Nevada limited liability company

By:_____
Print Name:_____
Title:_____

**SELLER:**

COMMERCE ASSOCIATES, LLC,
a Nevada limited liability company

By:_____
Print Name:_____
Title:_____

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _____, 2005, by _____ as _____ of TUSCANY ACQUISITIONS, LLC, a Nevada limited liability company.

_____
Notary Public

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _____, 2005 by _____ as the _____ of Commerce Associates, LLC.

_____
Notary Public