# EXHIBIT B

## PURCHASE AGREEMENT

### AND

### GRANT OF OPTIONS

between

## COMMERCE ASSOCIATES, LLC

and

## RHODES DESIGN AND DEVELOPMENT CORPORATION

Dated: November 14, 2003

## TABLE OF CONTENTS

Description                                                      Page

R E C I T A L S: ...................................................................................... 1

**AGREEMENT** .......................................................................................... 3

1.    Purchase and Sale of Property; Grant of Options........................ 3
     1.1      Purchase and Sale of Phase I Lots ................................. 3
         a.      Selection of Parcel 18 Lots ................................. 3
         b.      Closing Procedure ................................................ 3
         c.      Extensions of Phase I Lots Closing Date ............ 4
     1.2      Options............................................................................ 4
         a.      First Option ......................................................... 4
         b.      Second Option ..................................................... 4
         c.      Third Option........................................................ 5
         d.      Fourth Option ...................................................... 5
         e.      Fifth Option ......................................................... 5
         f.      Sixth Option ........................................................ 5
         g.      Seventh Option..................................................... 5
         h.      Eighth Option....................................................... 5
         i.      Multi-Family Development Parcel Option ......... 6
     1.3      Number and Location of Lots ........................................ 6
     1.4      Exercise of Option ......................................................... 7
     1.5      Excluded Property.......................................................... 7
     1.6      Golf Course Right of First Refusal ............................... 8

2.    Deposits............................................................................................ 8
     2.1      Deposits .......................................................................... 8
     2.2      Application of Deposits ................................................. 9

3.    Purchase Price.................................................................................. 9
     3.1      Base Price ....................................................................... 9
     3.2      Profit Participation and Lot Premiums ......................... 9
         a.      Definitions........................................................... 10
         b.      Security for Payment .......................................... 11
         c.      Monthly Sales Report......................................... 11
         d.      Payment............................................................... 11
         e.      Survival............................................................... 11
     3.3      SNWA and Related Fees ............................................... 11

4.    Option Consideration ....................................................................... 12
     4.1      Option Fee ....................................................................... 12

Draft of November 13, 2003                                          i

|       | 4.2 | Impositions and Common Element Expenses | 12 |
|       | 4.3 | Application of Option Consideration | 12 |
| 5.    | Closing Payments. | | 12 |
|       | 5.1 | Phase I Lots | 13 |
|       | 5.2 | Option Parcels | 13 |
| 6.    | Escrow. | | 13 |
|       | 6.1 | Escrow Instructions | 13 |
|       | 6.2 | Definition of "Close of Escrow" | 13 |
|       | 6.3 | Concerning the Duties of Escrow. | 13 |
|       |     | a.  General | 13 |
|       |     | b.  The Initial Deposit | 14 |
|       |     | c.  Conflicting Claims | 14 |
|       |     | d.  Escrow Funds | 14 |
|       |     | e.  Disbursements | 14 |
| 7.    | Approval of Investigations of Property. | | 14 |
|       | 7.1 | Investigations | 14 |
|       | 7.2 | Reliance on Investigations | 15 |
|       | 7.3 | No Inadvertent Seller Representations; Third-Party Materials | 15 |
| 8.    | Condition of Title. | | 15 |
|       | 8.1 | Permitted Exceptions | 15 |
|       |     | a.  Master Declaration | 15 |
|       |     | b.  Record Matters | 16 |
|       |     | c.  Development Declaration | 16 |
|       |     | d.  Other Matters | 17 |
|       |     | e.  Subdivision Map(s) Conditions | 17 |
|       |     | f.  Preprinted Exceptions | 17 |
|       | 8.2 | Title Insurance Policy | 17 |
|       | 8.3 | Seller's Financing | 18 |
| 9.    | Subdivision Maps; Improvement Plans. | | 18 |
|       | 9.1 | Project Final Maps | 18 |
|       | 9.2 | Improvement, Other Plans | 19 |
|       | 9.3 | Conditions of Approval | 19 |
|       | 9.4 | Seller's Work | 19 |
|       | 9.5 | Completion; Inspection | 19 |
|       | 9.6 | Outside Date; Termination | 20 |
|       | 9.7 | Remedies for Seller Caused Delays | 20 |
|       |     | a.  Liquidated Damages | 20 |
|       |     | b.  Self Help Remedy | 21 |

Draft of November 13, 2003

       c.     Period of Seller Delay ............................................................... 21

9.8    Purchaser's Obligations ........................................................................... 21

9.9    Reservation of Rights by Seller ............................................................. 21

9.10   Cooperation; Consents............................................................................. 22

9.11   Improvement Bonds................................................................................. 22

9.12   Plans and Specifications ........................................................................ 22

10.  Construction, Maintenance of Common Areas and Perimeter Walls. ..................... 23

10.1   Neighborhood and Community Facilities............................................. 23

10.2   Purchaser as Declarant........................................................................... 23

10.3   Perimeter Walls and Fence Rails ......................................................... 24

10.4   Completion of Project Common Areas, Walls .................................... 24

10.5   Maintenance and Repair of Completed Improvements ....................... 24

10.6   Conveyance of Common Areas ............................................................. 24

11.  The Projects. ................................................................................................................... 25

11.1   Design Guidelines................................................................................... 25

11.2   Project Plan Work ................................................................................... 26

11.3   Construction of Projects ......................................................................... 26

11.4   Fees .......................................................................................................... 26

11.5   Utility Deposits ....................................................................................... 27

11.6   Easements and Rights of Way; Rights of Entry................................... 27

11.7   At Risk Development Work .................................................................... 27

12.  Conditions Precedent. ................................................................................................... 27

12.1   Purchaser's Conditions ........................................................................... 28

       a.     Default ............................................................................... 28

       b.     Project Final Map ............................................................. 28

       c.     Seller's Work .................................................................... 28

       d.     Building Permits ............................................................... 28

       e.     Title Policy ....................................................................... 28

12.2   Seller Condition ...................................................................................... 28

       a.     Closing Payment ............................................................... 28

       b.     Default ............................................................................... 28

12.3   Failure of Condition................................................................................ 28

12.4   Option Conditions ................................................................................... 29

       a.     Purchase of Prior Parcel .................................................. 29

       b.     Exercise of Option ........................................................... 29

       c.     Default............................................................................... 29

13.  Close of Escrow............................................................................................................. 29

13.1   Closing..................................................................................................... 29

|        |      | 13.2 | Escrow Cancellation. | 29 |
|        |      | a. | Default | 29 |
|        |      | b. | Termination | 29 |
|        | 13.3 | | Return of Seller's Documents | 29 |
|        | 13.4 | | Return of Purchaser's Documents | 30 |
|        | 13.5 | | Items to be Delivered into Escrow | 30 |
|        |      | a. | By Seller | 30 |
|        |      | b. | By Purchaser | 31 |
|        | 13.6 | | Escrow Holder's Instructions | 32 |
|        | 13.7 | | Post-Closing Matters | 32 |
|        |      | a. | To Seller | 32 |
|        |      | b. | To Purchaser/SPE: | 33 |
|        | 13.8 | | Transfer of Possession | 33 |
| 14. | Costs and Prorations. | | | 33 |
|        | 14.1 | | Impositions | 33 |
|        | 14.2 | | Association Assessments | 34 |
|        | 14.3 | | Other Prorations | 34 |
|        | 14.4 | | Costs to be Paid by Seller | 34 |
|        | 14.5 | | Costs to be Paid by Purchaser | 34 |
| 15. | Purchaser's Covenants, Representations and Warranties | | | 34 |
|        | 15.1 | | Organization; Qualification | 34 |
|        | 15.2 | | Licensed Contractor | 35 |
|        | 15.3 | | Agreement is Authorized and Binding | 35 |
|        | 15.4 | | Litigation | 35 |
|        | 15.5 | | Conflicts | 35 |
|        | 15.6 | | Condition of Property | 35 |
|        | 15.7 | | Purchaser Reliance | 35 |
|        | 15.8 | | Seller's Work | 36 |
|        | 15.9 | | Alleged Breaches | 36 |
|        | 15.10 | | Threatened Claims | 36 |
|        | 15.11 | | Cooperating Brokers | 36 |
|        | 15.12 | | Single Purpose Entity | 37 |
|        | 15.13 | | Separateness Matters | 37 |
|        | 15.14 | | Homebuyer Notice | 39 |
|        | 15.15 | | Golf Course | 40 |
|        | 15.16 | | Acknowledgment | 40 |
| 16. | Seller's Covenants, Representations and Warranties | | | 40 |
|        | 16.1 | | General Representations | 40 |

|  |  | a. | Authority | 41 |
|  |  | b. | No Other Agreements | 41 |
|  |  | c. | Agreement is Authorized and Binding | 41 |
|  |  | d. | Condemnation | 41 |
|  |  | e. | Litigation | 41 |
|  |  | f. | Conflicts | 41 |
|  |  | g. | Title | 41 |
|  |  | h. | Labor | 41 |
|  |  | i. | Material Defect | 42 |
|  | 16.2 | Environmental Representations. | | 42 |
|  |  | a. | Hazardous Materials | 42 |
|  |  | b. | No Release for Pre-Escrow Conditions | 42 |
|  |  | c. | Benefit of Representation. | 42 |
|  |  | d. | Definition of Hazardous Material | 42 |
|  |  | e. | Expiration of Representations and Warranties | 42 |
|  |  | f. | Environmental Hazards Insurance | 43 |
|  | 16.3 | No Other Representations or Warranties | | 43 |
|  | 16.4 | Covenants | | 43 |
|  |  | a. | Alterations of Property | 43 |
|  |  | b. | Matters Affecting Title. | 43 |
|  |  | c. | Threatened Claims | 44 |
|  |  | d. | Completion of Improvements | 44 |
| 17. | Pre-Closing Activities. | | | 44 |
|  | 17.1 | Entry by Purchaser onto the Property | | 44 |
|  | 17.2 | Purchaser's Activities | | 44 |
|  | 17.3 | Indemnity for Development Work | | 45 |
|  | 17.4 | Waiver and Release | | 45 |
|  | 17.5 | Survival; Non-Exclusive Provision | | 46 |
|  | 17.6 | Seller's Activities. | | 46 |
| 18. | Default and Remedies. | | | 46 |
|  | 18.1 | Purchaser's Events of Default | | 46 |
|  | 18.2 | Seller Defaults | | 47 |
|  | 18.3 | Seller's Remedies. | | 48 |
|  |  | a. | Liquidated Damages | 48 |
|  |  | b. | Post-Closing Default | 49 |
|  |  | c. | "Fail-Safe" Option Termination | 49 |
|  | 18.4 | Right of First Refusal | | 49 |
|  | 18.5 | Purchaser's Remedies for Seller Closing Default | | 50 |

|  | 18.6 | Failure to Return the Deposits | 51 |
|  | 18.7 | Seller Default Following Close of Escrow | 51 |
|  | 18.8 | Waiver of Jury Trial | 51 |
| 19. | Risk of Loss | | 51 |
| 20. | Condemnation | | 52 |
| 21. | Confidentiality | | 52 |
| 22. | Brokerage Commissions | | 52 |
| 23. | Trademarks | | 53 |
| 24. | Miscellaneous | | 53 |
|  | 24.1 | Notices | 53 |
|  | 24.2 | Time of the Essence | 54 |
|  | 24.3 | Interpretation; Governing Law | 54 |
|  | 24.4 | Attorneys' Fees | 54 |
|  | 24.5 | Further Assurances; Survival | 55 |
|  | 24.6 | Entire Agreement; Amendments | 55 |
|  | 24.7 | Waivers | 55 |
|  | 24.8 | No Assignment | 55 |
|  | 24.9 | Binding Effect | 56 |
|  | 24.10 | Headings; Attachments; Cross References | 56 |
|  | 24.11 | Performance of Acts on Business Days | 56 |
|  | 24.12 | Backup Withholding | 56 |
|  | 24.13 | No Third Party Beneficiaries | 56 |
|  | 24.14 | No Recording; Quitclaim; Releases | 56 |
|  | 24.15 | Counterparts | 57 |
| 25. | Certain Definitions | | 57 |
|  | 25.1 | "Agreed Rate" | 57 |
|  | 25.2 | "Effective Date" | 57 |
|  | 25.3 | "Force Majeure Delays" | 57 |
|  | 25.4 | "Record", "Recorded" and "Recordation" | 57 |
|  | 25.5 | "Substantially Complete" | 58 |
|  | 25.6 | Miscellaneous Terms | 58 |
| 26. | Mediation and Arbitration | | 58 |
|  | 26.1 | Mediation | 58 |
|  | 26.2 | Arbitration | 58 |
|  | 26.3 | Survival | 59 |
| 27. | Not an Offer | | 59 |

## EXHIBITS & SCHEDULES

| Exhibit | Description | Reference |
|---------|-------------|-----------|
| A | Legal Descriptions of Property | Recital B |
| A-1 - A-7 | Proposed Maps | Recital B |
| B | Master Site Plan | Recital A |
| C | Option Notice | Section 1.3 |
| D | Memorandum of Agreement | Section 2.1 |
| E | Base Prices and Lot Premiums | Section 3.1, 3.2 |
| F | Additional Consideration Memorandum | Section 3.2(b) |
| G | Map Costs Note | Section 3.3 |
| H | Map Costs Mortgage | Section 3.3 |
| I | Due Diligence Materials | Section 7.1 |
| J | Master Declaration | Section 8.1(a) |
| K | Title Reports for Property | Section 8.1(b) |
| L | Declaration of Development Covenants and Restrictions | Section 8.1(c) |
| M | French Drain Exhibit | Section 8.1(d) |
| N | SNDA Form | Section 8.3 |
| O | Grading Plan | Section 9.4 |
| P | Perimeter Walls Exhibit | Section 10.3 |
| Q | Construction License | Section 11.7 |
| R | Form of Lot Deed | Section 13.5(a)(i) |
| S | Form of Neighborhood Facilities Deed | Section 13.5(a)(i) |
| T | Form of Non-Foreign Transferor Declaration | 13.5(a)(ii) |
| U | Amendment to Memorandum | 13.5(a)(vi) |
| V | Master Declaration Assignment | Section 10.2 |
| W | Restated Prior Note | Section 2.1 |

| Schedule | | |
|----------|-------------|-------|
| 9.4 | Seller Work | 9.4 |
| 10.1 | Community Facilities to Be Constructed By Purchaser | 10.1 |
| 11.4 | Development and Other Fees to Be Paid by Seller | 11.4 |

## INDEX OF DEFINED TERMS

| Defined Term | Section Reference |
|---|---|
| Actual Costs | 26.2 |
| Actual Damages | 18.5 |
| Additional Consideration Memorandum | 3.2(b) |
| Additional Title Policy Charges | 8.2 |
| Affiliate | 3.2(a)(i) |
| Agreed Rate | 25.1 |
| Agreement | Preamble |
| ALTA Owner's Policy | 8.2 |
| Amendment to Memorandum | 13.5(a)(vi) |
| Apparent Breaches | 15.9 |
| Approved Construction Loan | 3.2(a)(ii) |
| Approved Construction Loan Mortgage | 3.2(a)(ii) |
| Authorizing Resolutions | 1.4 |
| Base Price | 3.1 |
| Cable Contract | 8.1(d) |
| Cancellation Charges | 13.2(a) |
| City | Recital A |
| Close of Escrow | 6.2 |
| Closing Cost | 3.2(a)(iii) |
| Closing Date | 1.1(b) |
| Closing Documents | 15.6 |
| Closing Payment | 13.5(b)(i) |
| common elements | 10.1 |
| Community Facilities | 10.1 |
| Completed Perimeter Walls | 10.6 |
| Completed Project Common Areas | 10.6 |
| Completion Notice | 9.5, 10.6 |
| Conditions of Approval | 8.1(e) |
| Confidential Information | 21 |
| Construction License | 11.7 |
| Deeds | 13.5(a)(i) |
| Default Rate | 4.1 |
| Deposits | 2.1 |
| Design Guidelines | 11.1 |
| Development Declaration | 8.1(c) |
| Development Declaration Amendment | 8.1(c) |
| Development Parcel | Recital B |
| Direct Cost | 3.2(a)(iii) |
| Disapproved Exception | 8.1(b) |
| Dispute | 26.1 |
| Due Diligence Materials | 7.1 |
| Effective Date | 25.2 |

Draft of November 13, 2003

| **Defined Term** | **Section Reference** |
| --- | --- |
| Eighth Option | 1.2(h) |
| Eighth Option Parcel | 1.2(h) |
| Environmental Hazards Policy | 16.2(f) |
| Escrow | 6.1 |
| Escrow Holder | 6.1 |
| Existing Approvals | 9.1 |
| Extension Option | 1.1(c) |
| Extension Payment | 1.1(c) |
| Fence Rail | 10.3 |
| Fence Rail Cost | 10.3 |
| Fifth Option | 1.2(e) |
| Fifth Option Parcel | 1.2(e) |
| Final Premium Due Date | 3.2 |
| Finance Cost | 3.2(a)(iii) |
| First Option | 1.2(a) |
| First Option Parcel | 1.2(a) |
| First Outside Date | 9.6 |
| Force Majeure Delays | 25.3 |
| Fourth Option | 1.2(d) |
| Fourth Option Parcel | 1.2(d) |
| Golf Course | Recital G |
| Golf Course Transfer | 1.6 |
| Golf Course Walls | 10.3 |
| Hazardous Materials | 16.2(d) |
| HDN (Homebuyer's Disclosure Notice) | 15.14 |
| HOA Cable Agreement | 8.1(d) |
| Homebuyers | Recital I |
| Impositions | 4.2 |
| Improvement Plans | 9.2 |
| Indemnified Parties | 17.2, 17.6 |
| Indemnitor | 22 |
| Information Return | 13.6(f) |
| Initial Deposit | 2.1 |
| Insolvency Proceeding | 18.1(a) |
| Investigations | 7.1 |
| JAMS | 26.1 |
| JAMS Rules | 26.2 |
| Kelley | 8.1(d) |
| Lakeside | Recital N |
| Lender's Estoppel | 8.3 |
| limited common elements | 10.1 |
| Liquidated Delay Damages | 9.7(a) |
| Lot | Recital C |
| Lot Closing | 3.2 |
| Lot Cost | 3.2(a)(iii) |

| **Defined Term** | **Section Reference** |
| --- | --- |
| Lot Deed | 13.5(a)(i) |
| Lot Premium | 3.2 |
| Map Costs | 3.3 |
| Map Costs Mortgage | 3.3 |
| Map Costs Note | 3.3 |
| Map Is Ready Notice | 1.1(b) |
| Marks | 23 |
| Master Association | 8.1(a) |
| Master Declaration | 8.1(a) |
| Master Declaration Assignment | 10.2 |
| Master Site Plan | Recital A |
| Maximum Number | 1.3 |
| Memorandum of Agreement | 2.1 |
| Minimum Number | 1.3 |
| Monetary Liens | 8.1(b) |
| Monthly Sales Report | 3.2(b) |
| Multi-Family Development Parcel | Recital B |
| Multi-Family Option | 1.2(i) |
| Neighborhood Facilities | 10.1 |
| Neighborhood Facilities Deed | 13.5(a)(i) |
| Net Profit | 3.2(a)(iii) |
| New Title Exception | 8.1(b) |
| Non-Foreign Transferor Declaration | 13.5(a)(ii) |
| Notice of Annexation | 8.1(a) |
| Notice of Seller's Failure | 15.9 |
| Notice of Title Defect | 8.1(b) |
| OPA | Recital M |
| Operating Expenses | 4.2 |
| Option | 1.2(i) |
| Option Cash Deposit | 1.3 |
| Option Closing Payment | 5.2 |
| Option Consideration | 4 |
| Option Expiration Date | 1.4 |
| Option Fee | 4.1 |
| Option Notice | 1.4 |
| Option Parcel | 1.2(i) |
| Option Period | 4.1 |
| Organizational Documents | 15.12 |
| Original Phase I Closing Date | 1.1(c) |
| Other Uses | Recital F |
| Owner's Title Policy | 8.2 |
| Parcel | 1.2(i) |
| Parcel Closing | 3.2 |
| Parcel Perimeter Walls | 10.3 |
| Perimeter Walls | 10.3 |

Draft of November 13, 2003

| **Defined Term** | **Section Reference** |
|---|---|
| Period of Seller Delay | 9.7(c) |
| Permitted Exceptions | 8.1 |
| Person | 3.2(a)(iv) |
| Phase I Closing Payment | 5.1 |
| Phase I Lots | Recital C |
| Post-Closing Seller's Work Default | 9.7(a) |
| Pre-Closing Seller's Work Default | 9.7(a) |
| Prior Note | Recital N |
| Profit Participation | 3.2 |
| Project | Recital E |
| Project Common Areas | 10.1 |
| Project Final Map | 9.1 |
| Project Plan | 11.1 |
| Project Plan Work | 11.2 |
| Property | Recital B |
| Proposed Map | Recital B |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Purchaser Default | 18.1 |
| Purchaser's Action | 18.3(a) |
| Purchaser's actual knowledge | 15.9 |
| Purchaser's Closing Costs | 14.5 |
| Purchaser's Escrowee | 3.2(d) |
| Purchaser's Work | 9.7(a) |
| Record, Recordable, Recordation, Recorded and Recorder | 25.4 |
| Reimbursable Costs | Recital M |
| Reimbursable Improvements Costs | 9.4 |
| Required Endorsements | 8.2 |
| Resale | 18.4 |
| Residences | Recital I |
| Residential Development Parcel | Recital B |
| RPTT Declaration | 13.6(b) |
| Sales Cost | 3.2(a)(iii) |
| Sales Price | 3.2(a)(iii) |
| Scheduled Closing Date | 1.1(b) |
| Second Deposit | 2.1 |
| Second Option | 1.2(b) |
| Second Option Parcel | 1.2(b) |
| Second Outside Date | 9.6 |
| Self-Help Remedy | 9.7(b) |
| Seller | Preamble |
| Seller Caused Delay | 9.7 |
| Seller Closing Default | 18.5 |
| Seller Default | 18.2 |
| Seller's Actual Knowledge | 16 |

| Defined Term | Section Reference |
|---|---|
| Seller's Alleged Breach | 15.9 |
| Seller's Closing Costs | 14.4 |
| Seller's Financing | 8.3 |
| Seller's Lender | 8.3 |
| Seller's Mortgage | 8.3 |
| Seller's Work | 9.4 |
| Seventh Option | 1.2(g) |
| Seventh Option Parcel | 1.2(g) |
| Sixth Option | 1.2(f) |
| Sixth Option Parcel | 1.2(f) |
| SNDA | 8.3 |
| SPE | 1.4 |
| SPE Assumption | 1.4 |
| Specific Improvements | 9.4 |
| Sub-Association | 10.1 |
| Substantially Complete | 25.5 |
| Third Option | 1.2(c) |
| Third Option Parcel | 1.2(c) |
| Title Insurer | 8.2 |
| Total Base Price | 2.2 |
| Tuscany | Recital A |
| unit | 10.1 |
| Unconveyed Property | 4.1 |
| Unpaid Net Purchase Price | 4.1 |

Draft of November 13, 2003

## PURCHASE AGREEMENT
## AND GRANT OF OPTIONS

THIS PURCHASE AGREEMENT AND GRANT OF OPTIONS ("Agreement"), dated, for identification purposes only, as of the 14th day of November, 2003, is made by and between COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Seller"), and RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("Purchaser"), with reference to the following facts and purposes:

### R E C I T A L S:

A.    Seller is the master developer of a planned community in Henderson (the "City"), Nevada commonly known as Tuscany (f/k/a Palm City) ("Tuscany"), as depicted on the map of Tuscany attached hereto as Exhibit B (the "Master Site Plan").

B.    Tuscany includes the 16 single family residential parcels designated on the Master Site Plan as Parcels 5, 6A, 6B, 6C, 10, 11, 12, 14, 16, 17, 18, 19, 22, 23, 24 and 25 (each a "Residential Development Parcel"), and the multi-family parcel designated on the Master Site Plan as Parcel 15 (together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto, the "Multi-Family Development Parcel" and, together with the Residential Development Parcels, each a "Development Parcel"), all of which are legally described on Exhibit A attached hereto and referred to collectively as the "Property". Proposed tentative subdivision maps for each of the Residential Development Parcels are attached hereto as Exhibits A-1 through A-7 (each, a "Proposed Map").

C.    Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, that portion of the Property consisting of all of the Lots in Development Parcel 19 and 160 Lots (to be identified as hereinafter provided) in Development Parcel 18 (together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto, collectively, the "Phase I Lots"). As used herein, the term "Lot" refers to a residential building lot, as generally set forth on the Proposed Maps, whether or not such lot is, as of a particular date, the subject of a Recorded subdivision map.

D.    Upon Purchaser's purchase of the Phase I Lots, Seller is willing to grant certain options to purchase all of the remaining Lots in the Residential Development Parcels and an option to purchase the Multi-Family Development Parcel.

E.    Seller and Purchaser intend that, if purchased in accordance with this Agreement, each Residential Development Parcel will be developed into a single family residential subdivision in accordance with the applicable Proposed Map and that the Multi-Family Residential Parcel will be developed into a multi family residential project (as applicable, each, a "Project"), and that each Project will conform to the provisions of this Agreement and the applicable Development Declaration.

F.      Land within Tuscany has been used in the past for non-residential purposes, including sand and gravel mining, and land within the vicinity of Tuscany has been or is being used for non-residential purposes, including a radio tower, industrial ponds used in connection with the Henderson (BMI) industrial complex and the City's landfill and wastewater treatment facility (all of which uses are collectively referred to herein as the "Other Uses"). The City has required that certain Other Uses be disclosed to purchasers of property within Tuscany.

G.      An 18-hole golf course (the "Golf Course") will be located within the physical boundaries of Tuscany. The Golf Course, however, is presently intended to be operated separate and apart from the Tuscany residential community and the Master Association. Neither Purchaser nor any of its Homebuyers acquires any right, title or interest in the Golf Course pursuant to this Agreement.

H.      Purchaser has been afforded the opportunity to inspect the Property and to evaluate and satisfy all its questions and concerns regarding the Property and Tuscany, including (i) soils, ground water, seismic, flood and other conditions affecting the engineering and building of the Projects; (ii) the absence or presence of Hazardous Materials; (iii) existing and proposed federal, state and local governmental laws and regulations, including zoning and subdivision ordinances and building codes, affecting the Projects and Tuscany; (iv) the availability of water, power and other utilities; (v) the impact of the Other Uses; (vi) matters of record affecting the Property; (vii) market factors and the economic feasibility of the Projects; (viii) the separate ownership and operation of the Golf Course; and (ix) the Master Declaration and the common elements and other matters involving the Master Association, and Purchaser has approved the same.

I.      A material consideration inducing Seller to enter into this Agreement is Purchaser's representation that, except for transfers permitted hereunder, the Phase I Lots and, upon exercise of the Options, the remaining Property, will be developed with residential dwelling units (whether in a single family or, in the case of the Multi-Family Development Parcel, a multi-family project) ("Residences") thereon in accordance with an approved Project Plan for each Project, prior to the transfer of any interest herein or therein, except for the sale of Residences to members of the home-buying public ("Homebuyers").

J.      Purchaser acknowledges that Seller is engaged in master planning the development of Tuscany. Seller, Purchaser, Homebuyers and other builders and developers within Tuscany all will benefit materially from an orderly pattern of development on, and marketing of, the Property. To achieve orderly development, it is necessary to control the sale of parcels to selected builders and developers in order to encourage development by persons desiring to construct residential or other permitted developments and having the knowledge, expertise, good reputation and financial capability to do so in a timely fashion. Seller agrees to sell the Phase I Lots to Purchaser and to grant the Options in part in reliance on Purchaser's representation that the Residences will be built as represented above.

K.      Seller and Purchaser desire to utilize an escrow to receive and transfer certain of the documents and funds to be exchanged pursuant to this Agreement, and to cause the requisite assurance of title to be obtained.

Draft of November 13, 2003                                                                    2

L.      Certain capitalized terms used in this Agreement have the meanings given them elsewhere in this Agreement.

M.      Tuscany is located within a redevelopment area of the City, and Seller is a party to an Owner Participation Agreement (the "OPA") with the City dated April 16, 2002, pursuant to which certain development and construction costs for Tuscany (the "Reimbursable Costs") may be recovered in the future from the City or its redevelopment agency based on increased property tax receipts from Tuscany, and Seller and Purchaser intend that Seller retain all rights to Reimbursable Costs under the OPA.

N.      On or about January 28, 2000, Seller executed and delivered to Lakeside, LLC, a Nevada limited liability company ("Lakeside"), an Affiliate of Purchaser, that certain Promissory Note (the "Prior Note"), pursuant to which, among other things, Seller agreed to pay to the order of Lakeside the principal sum of $2,600,000.00 upon the terms and conditions set forth in the Prior Note.

## AGREEMENT

NOW, THEREFORE, based upon the foregoing Recitals and in consideration of the mutual covenants and agreements set forth herein, Seller and Purchaser hereby agree as follows:

1.      Purchase and Sale of Property; Grant of Options.

1.1     Purchase and Sale of Phase I Lots.  Subject to the terms and conditions of this Agreement, on or before the First Scheduled Closing Date, Seller agrees to sell the Phase I Lots to Purchaser, and Purchaser agrees to purchase the Phase I Lots from Seller.

a.      Selection of Parcel 18 Lots.  Purchaser shall notify Seller no later than December 31, 2003 of the location of the 160 Lots in Development Parcel 18 Purchaser desires to include in the Phase I Lots.  Seller shall have fifteen (15) days, after receipt of such notice, within which to approve the Lots Purchaser has selected.  The criteria for the location of such Lots shall be governed by the same criteria set forth in Section 1.3, regarding the location of Lots included in an Option.  If, within such 15-day period, Seller fails to object to the Lots Purchaser has selected for the Phase I Lots, Seller shall be deemed to have approved Purchaser's selection of Lots.  If Seller timely objects to the Lots Purchaser has selected, the parties shall reasonably negotiate in good faith to reach an agreement on the Lots to be included as the Phase I Lots.  If the parties are unable to agree on the Lots, the matter shall be subject to arbitration in accordance with Section 26 of this Agreement, which shall be concluded no later than 45 days after the date of Purchaser's original notice selecting the Lots.

b.      Closing Procedure.  The Close of Escrow for the Phase I Lots shall occur in accordance with the following procedures.  Seller shall (or shall cause its engineers to) notify Purchaser in writing (with a copy to Escrow Holder) when the Project Final Maps applicable to Development Parcels 18 and 19 are ready to be Recorded (such a notice, whether referring to Development Parcels 18 and 19 or any other Development Parcel is referred to as a "Map Is Ready Notice").  Within fifteen (15) days thereafter, Purchaser shall deposit into Escrow

the Map Costs associated with the Recording of such maps. Upon receipt by Escrow Holder of the applicable Map Costs, Escrow Holder shall release the Map Costs to Seller and Seller shall cause the Project Final Maps for Development Parcels 18 and 19 to be Recorded, utilizing the Map Costs deposited by Purchaser into Escrow and released to Seller to pay such Map Costs. Subject to the foregoing provisions of this Section, the satisfaction of the conditions to the Close of Escrow described in Article 12 and the provisions of Section 9.6, the Close of Escrow for the Phase I Lots shall occur on the date that is the later of (i) January 15, 2004 or (ii) three (3) business days after the Recordation of the Project Final Maps applicable to the Phase I Lots. (The date on which the Close of Escrow for the Phase I Lots or any other portion of the Property is scheduled to occur is referred to as a "Scheduled Closing Date", and the date such Close of Escrow actually occurs is referred to as a "Closing Date").

        c.      Extensions of Phase I Lots Closing Date.  Subject to the satisfaction of the conditions precedent set forth in the following sentence, Purchaser shall have the right, upon no less then ten (10) days written notice to Seller and Escrow Holder, to extend the original Scheduled Closing Date for the Phase I Lots (the "Original Phase I Closing Date") for 30 days (an "Extension Option"), which right Purchaser may exercise a second and third time (but not all at once), upon a similar written notice, resulting in two additional extensions of 30 days each, for a total extension of the Original Phase I Closing Date of up to 90 days. Purchaser's right to exercise an Extension Option is subject to the satisfaction of the following conditions precedent: (i) as a condition precedent to Purchaser's exercise of the first Extension Option, Purchaser shall deliver the Second Deposit to Seller; and (ii) as a condition precedent to Purchaser's exercise of any Extension Option, Purchaser shall deliver to Seller an amount (the "Extension Payment") equal to result obtained by (a) multiplying $127,500,000 by the Agreed Rate, (b) dividing the result thereof by 366 and (c) multiplying the result by 30. The Extension Payment is intended to compensate Seller for the delay in receiving the purchase money consideration hereunder and is not applicable to the purchase price, not refundable and fully earned when due. If Seller does not receive the Second Deposit or any Extension Deposit when due under this paragraph (and prior to the then current Scheduled Closing Date for the Phase I Lots), this Agreement, other than those provisions which by their express terms survive a termination, shall automatically terminate and Purchaser shall have no further right or interest in the Property.

      1.2    Options.

        a.      First Option.  Upon and subject to the Close of Escrow on the Phase I Lots, Seller grants to an SPE an exclusive option (the "First Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the First Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "First Option Parcel". The Scheduled Closing Date for the First Option shall be 180 days after the Closing Date for the Phase I Lots.

        b.      Second Option.  Upon and subject to the Close of Escrow on the First Option Parcel, Seller grants to an SPE an exclusive option (the "Second Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Second Option, together with the related appurtenant streets, rights of

way, easements and other interests within or relating thereto are referred to as the "Second Option Parcel". The Scheduled Closing Date for the Second Option shall be 180 days after the First Option Closing Date.

        c.       Third Option.  Upon and subject to the Close of Escrow on the Second Option Parcel, Seller grants to an SPE an exclusive option (the "Third Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Third Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Third Option Parcel".  The Scheduled Closing Date for the Third Option shall be 180 days after the Second Option Closing Date.

        d.       Fourth Option.  Upon and subject to the Close of Escrow on the Third Option Parcel, Seller grants to an SPE an exclusive option (the "Fourth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Fourth Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Fourth Option Parcel".  The Scheduled Closing Date for the Fourth Option shall be 180 days after the Third Option Closing Date.

        e.       Fifth Option.  Upon and subject to the Close of Escrow on the Fourth Option Parcel, Seller grants to an SPE an exclusive option (the "Fifth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Fifth Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Fifth Option Parcel".  The Scheduled Closing Date for the Fifth Option shall be 180 days after the Fourth Option Closing Date.

        f.       Sixth Option.  Upon and subject to the Close of Escrow on the Fifth Option Parcel, Seller grants to an SPE an exclusive option (the "Sixth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Sixth Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Sixth Option Parcel".  The Scheduled Closing Date for the Sixth Option shall be 180 days after the Fifth Option Closing Date.

        g.       Seventh Option.  Upon and subject to the Close of Escrow on the Sixth Option Parcel, Seller grants to an SPE an exclusive option (the "Seventh Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Seventh Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Seventh Option Parcel".  The Scheduled Closing Date for the Seventh Option shall be 180 days after the Sixth Option Closing Date.

        h.       Eighth Option.  Upon and subject to the Close of Escrow on the Seventh Option Parcel, Seller grants to an SPE an exclusive option (the "Eighth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Eighth Option, together with the related appurtenant streets, rights of

way, easements and other interests within or relating thereto are referred to as the "Eighth Option Parcel". The Scheduled Closing Date for the Eighth Option shall be 180 days after the Seventh Option Closing Date.

    i.  Multi-Family Development Parcel Option. Subject to the terms and conditions of this Agreement, upon and subject to the Close of Escrow on the Phase I Lots, Seller grants to an SPE an exclusive option (the "Multi-Family Option") to purchase the Multi-Family Development Parcel in accordance with the terms and conditions of this Agreement. The Scheduled Closing Date for the Multi-Family Option shall be on or prior to the second (2nd) anniversary of the Phase I Lots Closing Date. The First Option, Second Option, Third Option, Fourth Option, Fifth Option, Sixth Option, Seventh Option, Eighth Option and Multi-Family Option are each referred to as an "Option." The First Option Parcel, Second Option Parcel, Third Option Parcel, Fourth Option Parcel, Fifth Option Parcel, Sixth Option Parcel, Seventh Option Parcel, Eighth Option Parcel and Multi-Family Development Parcel are each referred to as an "Option Parcel." The Phase I Lots and each of the Option Parcels are sometimes referred to herein as a "Parcel".

    1.3  Number and Location of Lots. The number of Lots included in an Option Parcel shall be (i) at least the lesser of (a) 186 Lots or (b) all Remaining Lots(the "Minimum Number"); and (ii) no more than 225 Lots (the "Maximum Number"), unless Purchaser makes the Option Cash Deposit at the time the applicable Option is exercised, in which event the Maximum Number shall be equal to 225 plus the number of Lots whose Base Prices are covered by the Option Cash Deposit. As used herein, "Option Cash Deposit" means an amount of immediately available funds equal to the Base Prices of those Lots within an Option that are in excess of 225, and which shall be held by Seller to be applied against the Base Prices of those Lots in excess of 225 or, if the Close of Escrow does not occur, through no fault of Seller, retained by Seller as additional consideration for the granting of the Options. If the exercise and consummation of an Option results in more than 186 Lots in an Option Parcel being conveyed on an Option Closing Date, such excess, so long as it exists, may be applied as a credit against the Minimum Number of Lots in a future Option. The location of the Lots taken down pursuant to an Option shall be subject to the reasonable approval of Seller and Purchaser, subject, however, to the following provisions of this paragraph. The parties intend and agree that order and location of the Lots included within an Option Parcel (i) shall result in an orderly and logical development of each Development Parcel (e.g., no "leap frogging" or "cherry picking" of purchased Lots) and (ii) shall not result in (A) the unpurchased Lots in a Development Parcel being unmarketable or having an unreasonably or disproportionately lower value or fewer rights, entitlements, waivers or amenities (e.g. view or location) than the purchased Lots or (B) the unpurchased Lots within a Development Parcel ever being landlocked or not having reasonably comparable access to the same utilities, common elements and other facilities, services and amenities as are applicable to the Lots included within an Option Parcel. Options must be exercised in the order set forth above. Seller shall have twenty (20) days within which to approve the Lots Purchaser has included within an Option Parcel. If Seller fails to object to the Lots described in an Option Notice within such 20-day period, Seller shall be deemed to have approved the selection of Lots. If Seller timely objects to the Lots selected, the parties shall negotiate in good faith to reach an agreement on the Lots to be included in the Option, based on the selection criteria described in this Section. If the parties are unable to agree on the Lots, the

matter shall be subject to arbitration in accordance with Section 26 of this Agreement, which shall be concluded no later than 60 days prior to the Scheduled Closing Date for such Option.

      1.4    Exercise of Option.  Each Option must be exercised by Purchaser's giving written notice to Seller (the "Option Notice") in substantially the form set forth in Exhibit C, with a copy to Escrow Holder, that a Person formed solely for the purpose of acquiring title to the applicable Option Parcel, who satisfies the requirements set forth in Sections 15.13 and 15.14 (the "SPE") will acquire title to the Option Parcel and, if applicable, by the SPE delivering the Option Cash Deposit directly to Seller.  An Option Notice for more than 225 Lots without Seller's contemporaneous receipt of the required Option Cash Deposit shall be void in its entirety.  The Option Notice shall include the (i) SPE's Organizational Documents, (ii) resolutions authorizing the exercise of the applicable Option and the acquisition of the applicable portion of the Property to be acquired pursuant to such Option (the "Authorizing Resolutions"); (iii) representations, warranties and covenants by the SPE of the same substance as set forth in Article 15; and (iv) an assumption of Purchaser's obligations hereunder and under Any Development Declaration with respect to the Option Parcel.  Subject to the final sentence of this paragraph, the Option Notice must be given no later than 90 days prior to the applicable Option Scheduled Closing Date, which date shall be the applicable "Option Expiration Date," time being of the essence.  Each Option Notice must be given in accordance with the notice provisions of this Agreement and must, together with all required attachments, be received by Seller and Escrow Holder (and Seller must receive any required Option Cash Deposit) prior to 5:00 p.m., Las Vegas time, on the applicable Option Expiration Date.  If an Option is not exercised strictly in conformity with this Section on or before the applicable Option Expiration Date, that Option and all other remaining, unexercised Options shall, subject to the notice and cure provisions of Section 18.3(c), automatically expire and be of no further force or effect.

Notwithstanding anything to the contrary contained in this Agreement, an Option Notice shall not be effective: (i) unless Seller shall have approved the SPE's Organizational Documents and Authorizing Resolutions, which approval shall be granted or withheld within ten (10) business days following Seller's receipt of the Option Notice and shall not be unreasonably withheld; or (ii) if, as of the date of such notice, any Purchaser Default exists.  As a condition to the conveyance of any Parcel to an SPE, the applicable SPE shall assume, pursuant to a written assumption agreement reasonably satisfactory to Seller (the "SPE Assumption"), all rights, duties and obligations of Purchaser hereunder or under any other agreements between Seller and Purchaser or any Development Declaration applicable to the Parcel being conveyed. An Option may be exercised and closed earlier than the dates set forth in Section 1.2, with Seller's reasonable consent, but not later.  If Seller permits an Option to be exercised and closed earlier than required by Section 1.2, (i) the completion date for any Seller's Work shall remain unchanged and the failure of the Seller to complete such work as of any earlier date shall not constitute a condition to an SPE's obligation to close Escrow on the Parcel being purchased at such earlier date; and (ii) the Option Expiration Date for future Options shall be calculated from the original Scheduled Closing Date for the Option, rather than the actual Option Closing Date.

      1.5    Excluded Property.  Purchaser acknowledges and agrees that neither Purchaser nor any SPE acquires any right, title or interest in or to the OPA or any Reimbursable Costs, the rights to which shall be retained by Seller.  Purchaser acknowledges that certain Reimbursable Costs may be based upon improvements constructed by Purchaser or other

Purchaser activities. Purchaser shall reasonably cooperate with Seller and the City for the purpose of including as Reimbursable Costs all development and construction costs relating to Tuscany as may be properly subject to reimbursement under the OPA. Payment of Reimbursable Costs by the City shall be made to Seller, and, should Purchaser receive any such payments, Purchaser shall immediately remit the same to Seller.

      1.6    <u>Golf Course Right of First Refusal</u>. Provided no Purchaser Default has occurred and no Option has gone unexercised, Seller agrees that any sale, transfer or conveyance of the Golf Course (other than a sale, transfer or conveyance to an Affiliate of Seller) (a "<u>Golf Course Transfer</u>") shall occur unless Seller has complied with the right of first refusal provisions contained in this Section. Any Golf Course Transfer not complying with the terms and conditions of this Section shall be null and void. Any Golf Course Transfer agreement entered into by Seller shall state specifically that the contract is contingent and subject to the provisions of this Section. If Seller enters into a Golf Course Transfer agreement within five (5) years from the Effective Date, then Seller shall forward a copy of the contract to Purchaser, and Purchaser shall have the right, for a period of 20 days after receipt of the Golf Course Transfer agreement, to notify Seller that Purchaser elects to purchase the Golf Course, for the purchase price provided in, and under the terms of the Golf Course Transfer agreement. If Purchaser does not so notify Seller within such 20-day period that Purchaser elects to purchase the Golf Course, then Seller shall have the right, for a period of 180 days following Purchaser's failure to so elect, to convey the Golf Course subject to the Golf Course Transfer agreement upon the terms and conditions provided therein, without modification. Seller shall notify Purchaser in writing in the event the Golf Course Transfer agreement fails to close within such 180-day period and of any modification of the Golf Course Transfer agreement, and, after the expiration of the 180-day period, then any sale or proposed sale by Seller of the Golf Course (including a sale pursuant to a Golf Course Transfer agreement which has failed to close within such 180-day period or sale upon modified terms) shall again be subject to the terms of this Section 1.6. Purchaser's rights under this Section 1.6 will be subordinate to the rights of any bona fide lender, holding a deed of trust for value on the Golf Course or any portion thereof.

      2.    <u>Deposits</u>.

      2.1    <u>Deposits</u>. No later than three (3) business days following the Effective Date, Purchaser shall deliver to Escrow Holder the sum of $2,500,000 as an earnest money deposit (together with any interest earned thereon in Escrow, collectively, the "<u>Initial Deposit</u>") and shall cause Lakeside to accept from Seller an Amended and Restated Promissory Note, in the form attached hereto as <u>Exhibit W</u> (the "<u>Restated Prior Note</u>"), and, upon receipt of the Restated Prior Note, to deliver the original Prior Note to Seller, marked "cancelled (and replaced)," together with evidence of Lakeside's and Purchaser's respective power and authority to accept the Restated Prior Note and deliver the Prior Note to Seller. The payment on the Prior Note reflected by the Restated Prior Note is given as partial consideration for Seller entering into this Agreement and is not subject to rescission or cancellation under any circumstances. The Initial Deposit shall be held by Seller as security for Purchaser's obligations to purchase the Phase I Lots, and except as otherwise expressly provided in Section 12.1 (Purchaser's Conditions), Section 18.5 (Purchaser's Remedies) or elsewhere in this Agreement, the Initial Deposit shall be immediately non-refundable and Escrow Holder shall release the Initial Deposit to Seller immediately, provided that, as a condition to the release of the Initial Deposit to Seller, Escrow

Holder shall have Recorded a memorandum of this Agreement against the Phase I Lots, in the form attached hereto as <u>Exhibit D</u> (the "<u>Memorandum of Agreement</u>") fully executed and acknowledged by Seller and Purchaser. As part of the Phase I Closing Payment, Purchaser shall deliver to Escrow Holder the additional sum of $2,000,000 (together with any interest earned thereon in Escrow, collectively, the "<u>Second Deposit</u>" and, together with the Initial Deposit, collectively, the "<u>Deposits</u>"). The Second Deposit shall be retained by Seller as additional consideration for the granting of the Options, and except as otherwise expressly provided in Section 12.1 (Purchaser's Conditions), Section 18.5 (Purchaser's Remedies) or elsewhere in this Agreement, the Second Deposit shall be immediately non-refundable and Escrow Holder shall deliver the Second Deposit to Seller at the Close of Escrow.

2.2     <u>Application of Deposits</u>. At the Close of Escrow for the Phase I Lots, (i) a portion of the Deposits, in an amount equal to $625,056.40 (i.e., the amount of the Deposits multiplied by a fraction, the numerator of which equals the Base Prices for the Phase I Lots and the denominator of which equals the Base Prices for the entire Property (the "<u>Total Base Price</u>") shall be applied to the Phase I Closing Payment; and (ii) Seller shall retain the balance of the Deposits as partial consideration for the granting of the Options. On each Option Closing Date, Seller agrees to apply against the applicable Option Closing Payment a portion of the Deposits, in an amount equal to the amount of the Deposits multiplied by a fraction, the numerator of which equals the Base Prices for the Lots included in the Option Parcel (or if applicable the Base Price for the Multi-Family Parcel) and the denominator of which equals the Total Base Prices; provided, however, that, if all of the Property is acquired pursuant to this Agreement, on the last Option Closing Date, the entire amount of the unapplied Deposits shall be applied to the applicable Closing Payment.

3.     <u>Purchase Price</u>.

3.1     <u>Base Price</u>. The purchase price for each Parcel ("<u>Purchase Price</u>") shall be equal to the sum of the Base Prices for the Lots being purchased or, if applicable Multi-Family Parcel. <u>Exhibit E</u> lists the base prices ("<u>Base Price</u>") for each Lot or other portion of the Property. The Purchase Price for the Phase I Lots is $12,771,875.00. Purchaser acknowledges that the Base Prices and Lot Premiums have been agreed upon by the parties based upon, among other things, the payment on the Prior Note reflected by the Restated Prior Note.

3.2     <u>Profit Participation and Lot Premiums</u>. As additional consideration to Seller over and above the Base Prices, Purchaser shall pay to Seller: (i) two percent (2%) of the Net Profit from the sale of each Residence (collectively, the "<u>Profit Participation</u>") and (ii) a lot premium for the Multi-Family Parcel and each Lot acquired hereunder in the applicable amounts set forth on <u>Exhibit E</u> (each, a "<u>Lot Premium</u>"). Until the Lot Premiums have been paid in full, the applicable Lot Premiums shall be paid to Seller, in cash at the close of escrow of the sale or conveyance by Purchaser or, if applicable, an SPE of each Lot (a "<u>Lot Closing</u>") or other portion of the Property (a "<u>Parcel Closing</u>"), whether such sale is made to a Homebuyer, a third party developer or any other buyer (including any Affiliate of Purchaser or an SPE), provided, however, that notwithstanding the foregoing, all of the unpaid Lot Premiums applicable to a Parcel shall be due and payable in full no later than three (3) years from the Closing Date for such Parcel ("<u>Final Premium Due Date</u>"). The estimated amount of Profit Participation (as reasonably determined by Purchaser or the applicable grantor of the Lot or other portion of the

Property for which the Profit Participation is due) shall also be paid at the applicable Lot Closing or Parcel Closing. The actual amount of Profit Participation shall be determined annually based upon Purchaser's or such grantor's annual financial statements, which shall be prepared in accordance with generally accepted accounting principles, consistently applied by certified public accountants reasonably acceptable to Seller. Based on such annual financial statements: (i) if the estimated amounts of Profit Participation paid to Seller during the prior year exceed the actual Profit Participation due Seller, the excess shall be applied as a credit against the next due payments of estimated Profit Participation or, if none, paid to Purchaser or such grantor 20 days following the determination of such amount; and (ii) if the estimated amounts of Profit Participation paid to Seller during the prior year are less than the actual Profit participation due Seller, the deficiency shall be due and payable to Seller 20 days following the determination of such amount.

     a.     <u>Definitions</u>. As used herein:

     i.     "<u>Affiliate</u>" means, as to any Person: (i) any other Person or entity controlling, controlled by or under common control with, such Person and entity; (ii) any entity, other than a publicly traded company, in which such Person or entity owns any legal, equitable or beneficial interest; and (iii) any employee, officer or director of such Person or entity;

     ii.     "<u>Approved Construction Loan Mortgage</u>" means a deed of trust lien securing a bona fide loan ("<u>Approved Construction Loan</u>") of money to Purchaser (or, if applicable, an SPE or its assignee) from a lender that is not an Affiliate of Purchaser or Jim Rhodes, the proceeds of which have been used to develop the real property encumbered by such deed of trust (and no other real property), and which has been approved by Seller, such approval not to be unreasonably withheld or delayed;

     iii.     "<u>Net Profit</u>" means the Sales Price of a Residence less the sum of the Lot Cost, Direct Cost, Finance Cost, Closing Cost plus Sales Cost, where: (1) "<u>Sales Price</u>" is the total sales price of the Residence including lot premium and options; (2) "<u>Lot Cost</u>" is the cost of the land including carrying cost plus the cost of all land development; (3) "<u>Direct Cost</u>" is the cost of all vertical construction; (4) "<u>Finance Cost</u>" includes interest, points and fees on any Approved Construction Loan and capitalized interest calculated by the outside auditors; (5) "<u>Closing Cost</u>" means actual and reasonable escrow fees, title fees, transfer taxes and all other fees charged to the seller as shown on the closing statement, not to exceed 2% of the Sales Price; and (6) "<u>Sales Cost</u>" is the real estate sales commission, not to exceed 6% of the Sales Price. Notwithstanding the foregoing, for purposes of determining the Net Sales Proceeds on the sale of any Lot to an Affiliate, there shall be no deduction for any commissions or bonuses, except where such Affiliate is an individual who is not an officer, director, or employee of Purchaser or any Affiliate. (Note: The land development cost and Direct Cost is charged an additional 10% of expenses as an allocation of overhead.)

iv.     "Person" means an individual or a corporation, association, joint venture, general partnership, limited partnership, trust, limited liability company, limited liability partnership or other private entity or governmental agency.

b.     Security for Payment. The Premium Participation shall be secured by the lien contained in the Development Declaration. A memorandum reciting the Purchaser's, SPE's or grantee's obligations with respect to the Premium Participation shall be recorded at each Close of Escrow (the "Additional Consideration Memorandum"), in the form attached hereto as Exhibit F.

c.     Monthly Sales Report.  Purchaser shall, no later than the twenty-fifth (25th) of each calendar month after the first Lot Closing deliver to Seller a schedule (the "Monthly Sales Report") showing each Lot sold or closed in Tuscany during the preceding calendar month.

d.     Payment.  Purchaser or, if applicable the SPE or its nominee shall instruct each escrow agent responsible for any Lot Closing or Parcel Closing ("Purchaser's Escrowee") to pay to Seller, directly from the escrow out of Purchaser's proceeds, the applicable Lot Premiums, upon the sale of each Lot or other portion of the Property immediately following the Lot Closing or Parcel Closing.  Notwithstanding such instructions to Purchaser's Escrowee, Purchaser shall be personally responsible for the payment of the Lot Premiums.  Unpaid Lot Premiums shall bear interest at the Agreed Rate from the date of the applicable Lot Closing or Parcel Closing or Final Premium Due Date, whichever is applicable, and, if not paid within 30 days thereafter shall bear interest at the Default Rate until paid.

e.     Survival.  The provisions set forth in this Section 3.2 shall survive each Close of Escrow and/or the termination of this Agreement.

3.3     SNWA and Related Fees . As additional consideration for the purchase of the Phase I Lots, the granting of the Options and, if applicable, the purchase of the Option Parcels, Purchaser shall pay all fees, costs and other expenses required for the City's approval and the Recording of each Project Final Map, including, without limitation the Southern Nevada Water Authority Regional Water Fee (collectively, the "Map Costs").  Map Costs shall be due and payable as follows: (i) all Map Costs applicable to Development Parcels 18 and 19 shall be payable prior to the Scheduled Closing date for the Phase I Lots as provided in Section 1.1;  (ii) all Map Costs applicable to Development Parcels 6B, 6C,10, 11, 22 and 25 shall be due and payable by Purchaser's execution and delivery to Seller on the Closing Date for the Phase I Lots of a promissory note in the form attached hereto as Exhibit G (the "Map Costs Note"), which shall be secured by a deed of trust and assignment of rents in the form attached hereto as Exhibit H (the "Map Costs Mortgage") Recorded against and constituting a lien upon the Phase I Lots; and (iii) all other Map Costs shall be due and payable within (A) 15 days after Purchaser's receipt of a Map Is Ready Notice or (B) 30 days after Purchaser's receipt of written notice from Seller that Seller was required to pay such Map Costs as a result of Purchaser's purchase of the affected property.  Any such fees and costs not paid when due shall bear interest at the Agreed Rate from the date such payment was due, and, if not paid within 30 days thereafter shall bear interest at the Default Rate until paid.  Purchaser acknowledges that its obligation to pay the Map Costs as well

as Purchaser's obligations under Section 9.10 (Improvement Bonds) may arise with respect to portions of the Property which have not yet been acquired pursuant to the Options. The provisions of this paragraph shall survive each Close of Escrow and/or the termination of the Agreement (with respect to those portions of the Property acquired by Purchaser or an SPE). Seller agrees to subordinate the lien of the Map Costs Mortgage to the lien of an Approved Construction Loan Mortgage.

    4.    <u>Option Consideration</u>. As additional consideration for the granting of the Options (the "<u>Option Consideration</u>"), Purchaser shall pay to Seller the Option Fee, Impositions and Operating Expenses as follows:

    4.1    <u>Option Fee</u>. As partial consideration for the granting of the Options, an option fee ("<u>Option Fee</u>") shall accrue during the period which begins on the Sewer Completion Date and ends on the earlier of the date this Agreement is terminated or all of the Property has been conveyed pursuant to the Options ("<u>Option Period</u>"), provided, however, that if Seller is unable to convey title to an Option Parcel by a Scheduled Closing Date for such Option, the period of such delay shall be excluded from the Option Period. The Option Fee shall be a per annum amount determined by multiplying (i) the Unpaid Net Purchase Price by (ii) the Agreed Rate. "<u>Unpaid Net Purchase Price</u>" means, as of any date of determination, the sum of the aggregate of the Base Prices for the portion of the Property that has not been conveyed hereunder as of such date (collectively, the "<u>Unconveyed Property</u>") less the portions of the Deposits which have not, as such date, been applied against the Purchase price upon a Close of Escrow. The Option Fee shall be payable in installments, in arrears, commencing on the First Option Closing Date and on each Option Parcel Closing Date thereafter. Any Option Fee not paid when due shall bear interest at a per annum rate of interest equal to the Agreed Rate plus five percent (5%) (the "<u>Default Rate</u>").

    4.2    <u>Impositions and Common Element Expenses</u>. As partial consideration for the granting of the Options, commencing on the First Option Closing Date and on each Option Closing Date thereafter, Purchaser shall, at Seller's option, pay directly to Seller or deposit into Escrow as of such Closing Date the amounts of (a) all Impositions which accrue with respect to the Unconveyed Property during the Option period, and (b) all costs and operating expenses of the Master Association (but not capital improvements) and any Completed Project Common Areas (collectively, the "<u>Operating Expenses</u>") which accrue during the Option Period. As used herein, "<u>Impositions</u>" means all taxes and assessments of every type or nature affecting all or any part of the Unconveyed Property.

    4.3    <u>Application of Option Consideration</u>. The Option Consideration is intended to compensate Seller for holding the Option Parcels available for purchase under this Agreement and is fully earned and non-refundable when due, except to the extent Purchaser may be entitled to recover such amounts by reason of a Seller Default or the failure of a condition precedent to an SPE's obligation to purchase an Option Parcel. None of the Option Consideration is applicable to the Purchase Price. Without limiting the foregoing, the Option Consideration shall not be returned if an Option, with respect to which the Option Consideration has been paid, is not exercised.

    5.    <u>Closing Payments</u>.

5.1    Phase I Lots.  Upon the Close of Escrow for the Phase I Lots, Purchaser shall (a) pay to Seller an amount equal to the Purchase Price for the Phase I Parcel less $625,056.40, which is the applicable portion of the Deposits to be applied thereto as provided in Section 2.2, (b) pay the Purchaser's Closing Costs, (c) pay to Seller the Reimbursable Improvements Costs and any unpaid Map Costs and (d) pay any other amounts required by this Agreement to be paid by Purchaser at the Close of Escrow on the Phase I Lots.  The amounts referred to in clauses (a) through (e) of this Section are collectively referred to as the "Phase I Closing Payment."  The Phase I Closing Payment shall be payable in cash at the Close of Escrow on the First Scheduled Closing Date as provided in Section 13.5(b)(i).

5.2    Option Parcels.  Following the exercise of an Option, upon the Close of Escrow for an Option Parcel, the applicable SPE shall (a) pay to Seller an amount equal to the applicable Purchase Price for the Option Parcel less the applicable portion of the Deposits (and, if applicable, any Option Cash Deposit) to be applied thereto as provided in Section 2.2, (b) pay the Purchaser's Closing Costs, (c) pay to Seller the amounts of Option Consideration then due, (d) pay to Seller any and all Reimbursable Improvements Costs and Fence Rail Costs, unpaid Map Costs and any unpaid Lot Premiums then due and (f) pay any other amounts required by this Agreement to be paid by Purchaser at the Close of Escrow on an Option Parcel.  The applicable amounts referred to in clauses (a) through (f) of this Section are collectively referred to as an "Option Closing Payment."  Each Option Closing Payment shall be payable in cash at the Close of Escrow on the applicable Option Scheduled Closing Date as provided in Section 13.5(b)(i).

6.    Escrow.

6.1    Escrow Instructions.   The purchase and sale of each Parcel shall be consummated through an escrow (the "Escrow") to be established at United Title of Nevada ("Escrow Holder"), 2300 West Sahara Avenue, Suite 140, Las Vegas, Nevada, 89102, Attn: Jay Pugh.  The Escrow shall be opened within three (3) business days following the Effective Date by delivery to Escrow Holder of a fully executed copy of this Agreement, which shall constitute Escrow Holder's instructions.  Seller and Purchaser agree to execute and deliver to Escrow Holder such additional and supplemental instructions as Escrow Holder may reasonably require in order to clarify Escrow Holder's duties under this Agreement. Absent a clear written expression signed by Seller and Purchaser, that Seller and Purchaser intend to change a provision in this Agreement, if a conflict or inconsistency exists between this Agreement and any additional or supplemental instructions delivered to Escrow Holder, the terms of this Agreement shall govern the duties of Escrow Holder and the rights and obligations of Seller and Purchaser. The failure of any party to timely execute the escrow instructions shall in no way affect the party's liability or obligations hereunder.

6.2    Definition of "Close of Escrow".  For purposes of this Agreement, the term "Close of Escrow" shall mean the time when Escrow Holder shall have Recorded all of the instruments to be Recorded as set forth in Section 13.5.

6.3    Concerning the Duties of Escrow.

a.    General.   Escrow Holder shall not have any liability or responsibility for any provision in this Agreement not within the control of Escrow Holder or that survives a Close of Escrow.

b. The Initial Deposit. Escrow Holder is instructed to release the Initial Deposit to Seller, with no further instruction to Escrow Holder, on the first business day after Escrow Holder's receipt of the Initial Deposit and the Recording of the Memorandum of Agreement. Payment of the Initial Deposit to Seller prior to the Phase I Lots Closing Date in accordance with this Agreement is made without liability or recourse to Escrow Holder. Purchaser acknowledges and agrees that Escrow Holder will not aid in the recovery of any monies released to Seller if the purchase contemplated by this Agreement is not consummated. Escrow Holder is relieved of all liability and responsibility in connection with the release of the Initial Deposit to Seller if the Escrow is not closed for any reason, provided, that the foregoing is not intended to release Escrow Holder for liability or responsibility in connection with (i) Escrow Holder's failure to comply with its duties as Escrow Holder under this Agreement, (ii) any negligent act or omission of Escrow Holder or (iii) the willful misconduct of Escrow Holder.

Purchaser: _____         Seller: _____
                    initials                                  initials

c. Conflicting Claims. If conflicting claims are made upon Escrow Holder, Escrow Holder is authorized to hold all money and instruments in Escrow pending agreement of the parties or final order of a court of competent jurisdiction. Seller and Purchaser, however, expressly agree that Escrow Holder shall have the absolute right, at its election, to file a suit in interpleader and obtain an order from a court of competent jurisdiction requiring the claimants to interplead and litigate in such court their several claims and rights amongst themselves. If suit is brought, Seller and Purchaser jointly and severally agree to pay (without prejudice to Seller's or Purchaser's right of recourse against the other pursuant to any other provision of this Agreement) Escrow Holder's reasonable costs, expenses and attorneys' fees incurred in such interpleader suit, the amount thereof to be fixed and judgment therefore to be rendered by the court in such suit. Upon filing of such suit and the deposit into court of all documents and money then held in Escrow, Escrow Holder shall thereupon be fully released and discharged from all obligation to further perform any further duties or obligations otherwise imposed by the terms of the Escrow.

d. Escrow Funds. Escrow Holder is instructed to invest any sums placed in Escrow by Purchaser in U.S. Treasury bills or notes or such other prudent investments as approved by Seller in writing, so long as such sums are available for release to Seller at the times and in the manner provided for herein. In the absence of such written instructions, Escrow Holder shall invest such sums in one or more interest bearing trust accounts with local, federally insured banking institutions.

e. Disbursements. Unless otherwise instructed in writing by a party to whom a disbursement is due, all disbursements by Escrow Holder are to be made by check of Escrow Holder, drawn on a federally insured bank doing business in Las Vegas, Nevada.

7. Approval of Investigations of Property.

7.1 Investigations. Purchaser and its representatives, agents and contractors, at its expense, have conducted such physical or other inspections, reviews, analyses, inquiries, surveys, studies, tests and investigations of the Property and uses on adjacent properties (collectively, "Investigations") as Purchaser in its discretion determined to be appropriate in order

05/08/1994  21:14    7024565210                MAKENA                        PAGE  02

b.    The Initial Deposit.  Escrow Holder is instructed to release the Initial Deposit to Seller, with no further instruction to Escrow Holder, on the first business day after Escrow Holder's receipt of the Initial Deposit and the Recording of the Memorandum of Agreement.  Payment of the Initial Deposit to Seller prior to the Phase I Lots Closing Date in accordance with this Agreement is made without liability or recourse to Escrow Holder. Purchaser acknowledges and agrees that Escrow Holder will not aid in the recovery of any monies released to Seller if the purchase contemplated by this Agreement is not consummated. Escrow Holder is relieved of all liability and responsibility in connection with the release of the Initial Deposit to Seller if the Escrow is not closed for any reason, provided, that the foregoing is not intended to release Escrow Holder for liability or responsibility in connection with (i) Escrow Holder's failure to comply with its duties as Escrow Holder under this Agreement, (ii) any negligent act or omission of Escrow Holder or (iii) the willful misconduct of Escrow Holder.

Purchaser: _____  Seller _____
            initials                    initials



c.    Conflicting Claims.  If conflicting claims are made upon Escrow Holder, Escrow Holder is authorized to hold all money and instruments in Escrow pending agreement of the parties or final order of a court of competent jurisdiction.  Seller and Purchaser, however, expressly agree that Escrow Holder shall have the absolute right, at its election, to file a suit in interpleader and obtain an order from a court of competent jurisdiction requiring the claimants to interplead and litigate in such court their several claims and rights amongst themselves.  If suit is brought, Seller and Purchaser jointly and severally agree to pay (without prejudice to Seller's or Purchaser's right of recourse against the other pursuant to any other provision of this Agreement) Escrow Holder's reasonable costs, expenses and attorneys' fees incurred in such interpleader suit, the amount thereof to be fixed and judgment therefore to be rendered by the court in such suit.  Upon filing of such suit and the deposit into court of all documents and money then held in Escrow, Escrow Holder shall thereupon be fully released and discharged from all obligation to further perform any further duties or obligations otherwise imposed by the terms of the Escrow.

d.    Escrow Funds.  Escrow Holder is instructed to invest any sums placed in Escrow by Purchaser in U.S. Treasury bills or notes or such other prudent investments as approved by Seller in writing, so long as such sums are available for release to Seller at the times and in the manner provided for herein.  In the absence of such written instructions, Escrow Holder shall invest such sums in one or more interest bearing trust accounts with local, federally insured banking institutions.

e.    Disbursements.  Unless otherwise instructed in writing by a party to whom a disbursement is due, all disbursements by Escrow Holder are to be made by check of Escrow Holder, drawn on a federally insured bank doing business in Las Vegas, Nevada.

7.    Approval of Investigations of Property.

7.1    Investigations.  Purchaser and its representatives, agents and contractors, at its expense, have conducted such physical or other inspections, reviews, analyses, inquiries, surveys, studies, tests and investigations of the Property and uses on adjacent properties (collectively, "Investigations") as Purchaser in its discretion determined to be appropriate in order

Draft of November 13, 2003                                                    14

to determine whether or not the Property is suitable for Purchaser's intended use, including any effect of the Other Uses on the Projects. By its execution of this Agreement, Purchaser hereby acknowledges that it received a copy of the soils, environmental, drainage, engineering and other studies, reports and materials affecting Tuscany and/or the Property described on <u>Exhibit I</u> attached hereto (collectively, the "<u>Due Diligence Materials</u>") and that it has approved its Investigations of the Property.

       7.2   <u>Reliance on Investigations</u>. Purchaser must purchase the Phase I Lots and any other portions of the Property in reliance upon its own Investigations (including Purchaser's evaluation of the Environmental Hazards Policy) and not upon any representations, warranties or agreements of Seller other than as expressly set forth in this Agreement. Purchaser acknowledges that Purchaser is substantially experienced and upon Purchaser's acquisition of the Phase I Lots or any other portion of the Property, Purchaser shall be solely responsible for such property, its condition, development and operation and all matters pertaining thereto, unless otherwise specifically and expressly set forth herein. Except as specifically and expressly provided to the contrary in this Agreement, Seller is fully and completely released from all responsibility and liability regarding the condition, fitness, suitability, valuation and/or utility of the Property. Without limiting the foregoing, Purchaser understands and acknowledges that, except with respect to Seller's Work: (a) Purchaser is solely responsible for the performance of all work necessary to complete each of the Projects; (b) Seller will not be responsible for any work required to complete any of the Projects; and (c) Seller will not be responsible for cost overruns or unforeseen expenditures which may be incurred by Purchaser in order to complete the Projects.

       7.3   <u>No Inadvertent Seller Representations; Third-Party Materials</u>. Purchaser expressly acknowledges that it has not relied on any warranties, promises, understandings or representations, express or implied, written or oral, of Seller or any agent or other representative or purported agent or representative of Seller relating to Tuscany, the Property, the Projects or any aspect of any of the forgoing except as expressly set forth in this Agreement. Purchaser acknowledges that any and all third party-prepared soils, environmental, drainage, engineering, feasibility or marketing studies, reports or analyses or other information of any type that Purchaser has received or may receive from Seller or Seller's agents or representatives (including the Due Diligence Materials) was furnished on the express condition that Purchaser would make, and Purchaser acknowledges that it has made, an independent verification of the accuracy of any or all such information, all such information being furnished without any warranty whatsoever (express or implied). Purchaser agrees that it will not attempt to assert any liability against Seller or its agents for furnishing such information.

    8.   <u>Condition of Title</u>.

       8.1   <u>Permitted Exceptions</u>. Seller shall convey fee simple title to each Parcel subject only to the following title exceptions (the "<u>Permitted Exceptions</u>"):

         a.   <u>Master Declaration</u>. The Master Declaration of Covenants, Conditions, Restrictions and Reservation of Easements for Tuscany, substantially in the form of <u>Exhibit J</u> attached hereto, (the "<u>Master Declaration</u>") which will be Recorded on or prior to the Phase I Lots Closing Date, and, if necessary, a supplemental declaration in the form required by

the Master Declaration ("Notice of Annexation"), to be Recorded at each Close of Escrow subjecting each Parcel at such Close of Escrow to the Master Declaration and the jurisdiction of the Tuscany Community Association ("Master Association").

b.    Record Matters.    The title exceptions shown on the preliminary title reports attached hereto as Exhibit K, with the exception of those matters referred to in Sections 8.1(a), (c), (d), (e) or (f) or otherwise approved by Purchaser as provided herein, but excluding, however, any Monetary Liens, which shall be removed by Seller on or before the Close of Escrow for the applicable Parcel. "Monetary Liens" means liens, judgments, claims or encumbrances which can be satisfied by the payment of a liquidated amount of money and nothing more, other than (i) current Impositions (which shall be paid as part of the Option Consideration and are subject to proration as elsewhere herein provided) or (ii) any lien, claim or encumbrance arising by reason of any act or omission of Purchaser or its agents or employees.

As used herein, the term "Notice of Title Defect" means a writing from Purchaser to Seller describing any new title exception not otherwise permitted by any other subsection of this Section 8.1, which unreasonably affects Purchaser's ability to develop and construct the Residences in accordance with this Agreement and is not acceptable to Purchaser in its reasonable discretion (a "Disapproved Exception"). In the event any new title information received by Purchaser from a supplemental title report, survey, or other source discloses any new title exceptions (collectively, "New Title Exception"), Purchaser shall have ten (10) days after receipt of a title report, survey or other document disclosing a New Title Exception within which to deliver a Notice of Title Defect. Purchaser's failure to deliver a Notice of Title Defect within such ten (10) day period shall constitute Purchaser's approval thereof and/or a waiver of any objection thereto. Seller, within seven (7) days after receiving the Notice of Title Defect, may deliver to Purchaser a notice stating whether or not Seller will use its reasonable efforts to cure the Disapproved Exception(s) on or before the applicable Close of Escrow. Seller's failure to give timely notice in response to Purchaser's Notice of Defect shall constitute Seller's notice that it will not cure the Disapproved Exception(s) on or before the applicable Close of Escrow. If Seller elects or is deemed to have elected not to cure the Disapproved Exception(s) on or before the applicable Close of Escrow, Purchaser shall be deemed to have waived the Disapproved Exceptions unless Purchaser delivers to Seller a written notice terminating this Agreement within five (5) business days after Seller's notice to that effect has been given or deemed given, unless the Disapproved Exception results from a Seller default, in which event Purchaser shall be entitled to pursue its remedies under Section 18.5 below. Notwithstanding the foregoing, Purchaser need not object to any Monetary Liens, all of which shall be deemed to be objectionable by Purchaser.

c.    Development Declaration.    A Declaration of Development Covenants and Restrictions, substantially in the form attached hereto as Exhibit L, (the "Development Declaration") to be Recorded against the Lots acquired in each Development Parcel at the Close of Escrow affecting such Development Parcel or, in the case of an Option Parcel consisting of Lots located in one or more Development Parcels in which Purchaser has already taken title to Lots, an amendment to the existing Development Declaration for the applicable Development Parcel(s), in the form required by the Development Declaration (the "Development Declaration Amendment"), to be recorded at the Close of Escrow for such Option

Parcel, amending the definition of the "Covered Property" in the affected Development Declaration to include the Lots included in such Option Parcel.

          d.     Other Matters.   Matters created or agreed to by Purchaser or reasonably required pursuant to the provisions of this Agreement, including (i) the OPA; (ii) the easements and other covenants, conditions, restrictions and rights set forth in the Development Declaration or in any of the exhibits or schedules to this Agreement, but excluding, however, any liens arising from Seller's Work; (iii) the Cable Television Infrastructure and Services Agreement dated April 22, 2002 (the "Cable Contract") entered into between Seller and Kelley Communication Company, Inc. ("Kelley") and the Bulk-Basic Cable Agreement to be entered into between Kelley and the Master Association, in accordance with the Cable Contract (the "HOA Cable Agreement"); and (iv) blanket easements for the "French drains", designed to maintain the existing water table within Tuscany, as set forth in Exhibit M attached hereto.

          e.     Subdivision Map(s) Conditions.   Dedications, conditions, restrictions and reservations imposed by the City or other governmental authorities or public utilities on the Property or the development of the Property arising from the approval, in accordance with this Agreement, of any parcel or tentative or final subdivision map(s) by which the Property or any Lot was or is hereafter created as a legal parcel (collectively, the "Conditions of Approval").

          f.     Preprinted Exceptions.  The preprinted exceptions contained in the cover jacket to the form of title insurance policy issued by the Title Insurer.

      8.2    Title Insurance Policy.  At each Close of Escrow and as a condition thereto, Escrow Holder shall: (a) issue to the grantee of the applicable Parcel, at Seller's sole cost and expense, a CLTA standard coverage owner's policy of title insurance (the "Owner's Title Policy") of Chicago Title Insurance Company (the "Title Insurer") as to the Parcel being conveyed, with a limit of liability in the amount of the Purchase Price for such Parcel (and including affirmative coverages protecting the grantee against any mechanics' or materialmen's lien arising from any Seller's Work or any other activities of Seller or its agents or employees upon the conveyed Parcel (collectively, the "Required Endorsements") and subject only to the Permitted Exceptions. If Purchaser or the applicable SPE desires an ALTA extended coverage owner's policy of title insurance ("ALTA Owner's Policy") or any endorsements, Purchaser or the SPE shall notify Escrow Holder no less than thirty (30) days prior to the applicable Scheduled Closing Date. The requirement of an ALTA Owner's Policy or such endorsements shall not permit Purchaser or an SPE to delay any Scheduled Closing Date. Purchaser or the SPE, as applicable, shall be responsible for paying the following amounts (collectively, the "Additional Title Policy Charges"): (i) if an ALTA Owner's Policy is requested by Purchaser or such SPE, the additional cost of the ALTA Owner's Policy over and above the cost of the Owner's Title Policy; and (ii) the cost of any endorsements to the Owner's Title Policy or the ALTA Owner's Policy other than the Required Endorsements. In addition, Purchaser or such SPE shall make all necessary arrangements for the preparation of any required ALTA survey so as not to delay any Closing Date, and shall pay all costs related thereto. Delivery of the Deed and the Owner's Title Policy shall be deemed to fulfill all duties of Seller to the sufficiency of title required hereunder, but shall not be deemed a waiver of Seller's statutory warranties in any deed.

8.3    Seller's Financing.  Purchaser acknowledges and agrees that Seller has obtained (and may in the future obtain) financing (or refinancing) for all or any portion of Tuscany ("Seller's Financing"), which results in the encumbrance of some or all of the Property, to secure such financing(s), with mortgages, deeds of trust, assignments of rents or other security agreements, grants, liens, security interests or assignments (collectively "Seller's Mortgage") in favor of the lender(s) under such Seller's Financing ("Seller's Lender").  In such event, any Seller's Mortgage affecting a Parcel shall be deemed a Permitted Exception provided the lien of such Seller's Mortgage is released from the Parcel at or prior to the Close of Escrow for such Parcel.  At Seller's written request, Purchaser or any SPE shall execute, deliver and, if appropriate, acknowledge, in favor of Seller's Lender, a subordination, attornment and non disturbance agreement substantially in the form attached hereto as Exhibit O (the "SNDA") and/or one or more estoppel certificates, confirming the existence of this Agreement and such other matters relating hereto as Seller's Lender requests (a "Lender's Estoppel") and shall reasonably cooperate with requests from Seller or Seller's Lender relating to this Agreement. Without limiting the foregoing: (i) Purchaser and any SPE agrees to execute and deliver to Seller's Lender any SNDA and/or Lender's Estoppel within ten (10) business days after written request from Seller or Seller's Lender.  Purchaser's or an SPE's failure to deliver any Lender's Estoppel within such ten (10) business day period shall be conclusive upon Purchaser and such SPE for the benefit of Seller and Seller's Lender, that this Agreement is in full force and effect and has not been modified; (ii) if Purchaser or an SPE fails to deliver the Lender's Estoppel within the required time period, Purchaser and such SPE irrevocably constitutes and appoints Seller as Purchaser's or such SPE's (as applicable) special attorney-in-fact to execute and deliver the certificate to any third party; and (iii) Purchaser's or such SPE's failure to execute, deliver and acknowledge the SNDA or Lender's Estoppel as required by this Agreement shall, at Seller's option, be a Purchaser Default.

9.    Subdivision Maps; Improvement Plans.

9.1    Project Final Maps.  The Lots in each Parcel to be conveyed to Purchaser or any SPE hereunder shall constitute legally subdivided parcels capable of being conveyed in accordance with NRS Chapter 278, in conformity with the applicable Proposed Map (except for the Multi-Family Development Parcel).  On and after the Effective Date, but subject to Purchaser's obligations under Section 3.3, Seller shall use commercially reasonable efforts to cause the preparation, approval and Recording, in accordance with the City's conditions of approval applicable to Tuscany as of the date of this Agreement ("Existing Approvals"), of the subdivision maps required to convey the Lots within each Parcel (other than the Multi-Family Development Parcel) in accordance with the Proposed Maps attached hereto (each, a "Project Final Map").  Seller and Purchaser shall cooperate with each other in the preparation, approval, processing and Recording of each Project Final Map.  Seller shall notify Purchaser or, if applicable, the SPE of the date each Project Final Map is submitted to the Recorder for Recordation and, within five (5) business days after Recording, provide to Purchaser or such SPE a conformed copy of each Recorded Project Final Map.  Notwithstanding the foregoing, Seller and Purchaser acknowledge and agree that no Project Final Map shall be required for the Multi-Family Development Parcel, and such Parcel may be the subject of a parcel map and consist of one lot.

9.2     <u>Improvement, Other Plans</u>.  Subject to Purchaser's obligations under Section 3.3, Seller shall diligently cause or continue the preparation, and hereafter process and use its reasonable best efforts to procure the approval, in accordance with the Existing Approvals, from all applicable governmental agencies, of all subdivision improvement plans and specifications (collectively, the "<u>Improvement Plans</u>") necessary for the approval of each of the Project Final Maps in accordance with Section 9.1.  Seller shall also diligently cause or continue the preparation, and hereafter process and use its reasonable best efforts to procure the approval from all applicable governmental agencies, of all plans and specifications necessary for Seller's Work in accordance with Section 9.4.   Purchaser acknowledges that it has reviewed and approved all Improvements Plans existing as of the date of this Agreement.   Prior to any submission after the Effective Date of any Improvement Plans to the City or any other governmental agency for approval, and prior to any material amendment thereto after the Effective Date, Seller shall submit the applicable plans or amendments to Purchaser, who shall be entitled to approve any such plans or amendments which are inconsistent with the respective obligations of the parties' hereunder or which would alter any of the Projects in any material respect.

9.3     <u>Conditions of Approval</u>.  Purchaser has approved all existing Conditions of Approval applicable to any existing parcel or subdivision map applicable to the Property (including all approved tentative maps) as well as all Conditions of Approval applicable to the Proposed Maps.  After the Effective Date, Seller shall not modify the City-approved and any Purchaser-approved Conditions of Approval in connection with the preparation of any Project Final Map, except for non-material changes and changes which are required by the City in order to comply with the City's ordinances and Development Code and changes approved by the parties.  If Seller proposes any such non-material or other changes required by the City, Seller shall give prompt written notice thereof to Purchaser specifically identifying the proposed changes and Purchaser shall have the right to contest with the City such required changes for a period of up to ten (10) days after its receipt of such notice.

9.4     <u>Seller's Work</u>.   The work and improvements (collectively, "<u>Seller's Work</u>") to be performed by Seller with respect to each Parcel includes the following: (i) Seller shall cause each of the Lots conveyed hereunder to be graded in accordance with the grading plans identified on <u>Exhibit O</u>; and (ii) Seller shall Substantially Complete the work and improvements described on <u>Schedule 9.4</u> for each Parcel ("<u>Specific Improvements</u>") on or before the completion dates set forth on <u>Schedule 9.4</u>, subject to the effect of Force Majeure Delays. Seller's Work shall be performed at the sole cost and expense of Seller, except with respect to any work and improvements indicated on <u>Schedule 9.4</u> which are indicated as an item to be paid for by Purchaser (collectively, the "<u>Reimbursable Improvements Costs</u>").

9.5     <u>Completion; Inspection</u>.  Seller shall notify Purchaser in writing (a "<u>Completion Notice</u>") when Seller has completed the Seller's Work or any discrete portion thereof.   Within five (5) business days after Purchaser's receipt of a Completion Notice, Purchaser and Seller shall conduct a joint inspection of the applicable Seller's Work.  If the inspection reveals deficiencies, then (i) the parties shall immediately prepare a written punchlist, and (ii) Seller shall thereafter promptly proceed to complete or correct such punchlist work within thirty (30) days thereafter.  Purchaser shall be deemed to have accepted Seller's Work following the receipt of a Completion Notice and the joint inspection of such work by the parties,

subject, however, to completion of all punchlist work.  No inspection by Purchaser of Seller's Work is intended to waive any right or remedy based on any latent defect.

        9.6    <u>Outside Date; Termination</u>.  Notwithstanding anything to the contrary contained in this Agreement, if the conditions precedent applicable to the Phase I Lots Close of Escrow have not been satisfied or waived, through no fault of Purchaser, by September 30, 2004 ("<u>First Outside Date</u>"), Purchaser may elect to terminate this Agreement by written notice to Seller, with a copy to Escrow Holder; and if the conditions precedent applicable to the Phase I Lots Close of Escrow have not been satisfied or waived by June 30, 2005 ("<u>Second Outside Date</u>"), this Agreement, other than those provisions which expressly survive a termination,, shall automatically terminate.  Upon a termination of this Agreement, pursuant to this paragraph, Seller or, if applicable, Escrow Holder shall return the Initial Deposit to Purchaser; Purchaser promptly shall return the Due Diligence Materials to Seller and deliver to Seller copies of all studies, surveys and other similar materials produced by or at the request of Purchaser with respect to the Property, other than Purchaser's confidential proforma, projections, proprietary information, internal accounting and financial information, which may be excluded from such delivery; each party shall be responsible for its respective share of the Cancellation Charges; and thereafter the parties shall have no further rights, duties or obligations under this Agreement, except with respect to those provisions which, by their express terms, survive a termination of this Agreement.

        9.7    <u>Remedies for Seller Caused Delays</u>.  As used herein, a "<u>Seller Caused Delay</u>" is the failure of any Seller's Work to be Substantially Complete, when required by this Agreement, by reason of a material default by Seller and not the effect of any Force Majeure Delay.

        a.    <u>Liquidated Damages</u>.  If (i) Purchaser is ready, willing and able to Close Escrow with respect to a Parcel and to commence construction of its project improvements or Residences with respect to the affected Parcel ("<u>Purchaser's Work</u>") but is prevented from doing so solely by reason of a Seller Caused Delay (a "<u>Pre-Closing Seller's Work Default</u>") or (ii) after the Close of Escrow Purchaser is ready, willing and able to commence or continue its Purchaser's Work but is prevented from doing so or prevented from obtaining a building permit and/or a certificate of occupancy for such Residence(s) solely by reason of a Seller Caused Delay (a "<u>Post-Closing Seller's Work Default</u>"), then, unless Seller causes the applicable Seller's Work to be Substantially Completed within thirty (30) days after written notice describing such facts is given by Purchaser to Seller, Seller shall pay Purchaser, as Purchaser's sole monetary remedy, liquidated damages (the "<u>Liquidated Delay Damages</u>") in an amount equal to (A) in the case of a Pre-Closing Seller's Work Default, a daily amount equal to the unapplied portion of the Deposits multiplied by the Agreed Rate divided by 365 for each day during any Period of Seller Delay or (B) in the case of a Post-Closing Seller's Work Default, a daily amount equal to the applicable Purchase Price for the affected Parcel (or portion thereof, in the event not all Lots within a Parcel are affected) multiplied by the Agreed Rate divided by 365 for each day during any Period of Seller Delay.  It is expressly understood and agreed between Seller and Purchaser that Purchaser's actual damages for any Seller Caused Delay that prevents Purchaser commencing, continuing or completing any Purchaser's Work or obtaining a certificate of occupancy would be substantial but extremely difficult to ascertain and the Liquidated Delay Damages constitutes a reasonable estimate of such actual damages.

b.     Self Help Remedy.  If a Pre-Closing Seller's Work Default is not corrected or cured within the time period permitted by Section 9.7(a), Purchaser may elect, by giving written notice to Seller within ten (10) days following the expiration of the cure period to proceed to the Close of Escrow, and, in such event, Purchaser shall be entitled to complete the Seller's Work affected by the Seller Caused Delay to the extent such Seller's Work is located solely within the affected Parcel and/or in any common areas or streets or rights of way immediately adjoining the affected Parcel, as provided in the Development Declaration (the "Self Help Remedy").  Upon Purchaser's exercise of the Self Help Remedy, the actual reasonable amounts expended by Purchaser in exercising the Self Help Remedy, as evidenced by written receipts reasonably acceptable to Seller, shall be payable by Seller to Purchaser on written demand accompanied by the applicable receipts, and if not paid within thirty (30) days after such demand shall bear interest at the Default Rate from the date expended until paid and may be offset against the next Closing Payment.

c.     Period of Seller Delay.  "Period of Seller Delay" means the period Purchaser is delayed, solely by reason of a Seller Caused Delay, in the commencement, continuation or completion of Purchaser's Work or obtaining any building permits and/or certificates of occupancy, excluding the 30-day cure period if Seller cures or corrects the applicable Seller's Work failure within such period, but including the 30-day cure period in the event Seller fails to cure or correct the applicable Seller's Work failure within such period, and continuing until the Seller's Work causing the delay in Purchaser's Work or obtaining building permits and/or certificates of occupancy is Substantially Completed by Seller or, if Purchaser has exercised its Self-Help Remedy, Purchaser, excluding, however, in such latter event, any delays reasonably attributed solely to Purchaser's untimely commencement or performance of the applicable Seller's Work (allowing for reasonable delays in the commencement of such work due to the taking over of such work by Purchaser), it being the intent of this provision that Purchaser's right to Liquidated Delay Damages be limited to periods during which Seller Caused Delays actually adversely impacts Purchaser's development of a Project.

9.8     Purchaser's Obligations. Following the acceptance of any Seller's Work, as described in Section 9.5 above, Purchaser and the SPE grantee of such parcel shall be responsible for maintaining the affected property or improvements in good condition and shall be responsible for any damage caused to any Seller's Work that has been accepted as provided in Section 9.5. Furthermore, and without limiting any other provision of this Agreement, Purchaser and each grantee of any portion of the Property hereunder shall be responsible, from and after the Seller has delivered possession of any Lots within a Development Parcel, to maintain the required moisture content of all Lots within a Development Parcel in which Seller has conveyed any Lots hereunder, whether or not all the Lots in the Development Parcel have been conveyed and whether any SPE has exercised its option to acquire such Lots.

9.9     Reservation of Rights by Seller.  Seller makes no representation that Tuscany will be developed or completed as set forth on any map or plan or exhibit illustrating all or any part of Tuscany (including Exhibit B) and Seller reserves the right to make any changes on or to Tuscany, including (i) the reconfiguration of parcels, (ii) the elimination or removal of open space or other recreational areas or common facilities and/or (iii) the elimination or change to any proposed improvements within Tuscany.  The preceding sentence is not intended to affect, and shall not be construed as affecting, Seller's express obligations to Purchaser or any SPE

Draft of November 13, 2003                                                                                          21

under any other provision of this Agreement, including (i) Seller's obligations to cause the Project Final Maps and Improvement Plans to be prepared, approved and Recorded in accordance with this Agreement, (ii) Seller's obligations to Substantially Complete Seller's Work and (iii) Seller's obligation to convey title to a Parcel in the manner provided for herein.  Purchaser acknowledges that Seller makes no representation, warranty or agreement whatsoever concerning the Golf Course or the improvements thereon.  Notwithstanding the foregoing, Seller agrees not to (i) materially change the means of access to any Parcel or (ii) cause any residentially zoned parcel adjoining any Parcel that is owned by Seller to be zoned for any commercial use.

       9.10   Cooperation; Consents.  The parties shall reasonably cooperate with each other (at no out-of-pocket cost to the party who must cooperate with the performing party, except as expressly provided herein) in obtaining the various governmental approvals applicable to the Projects or Tuscany.  Purchaser agrees not to unreasonably withhold, condition or delay its consent to any matter in this Article 9 requiring Purchaser's consent or approval, and any Purchaser or SPE objection to a matter requiring Purchaser's or an SPE's consent or approval shall specify with particularity the basis for such objection.  Purchaser's or a SPE's failure to respond within ten (10) days to Seller's written request (unless a shorter time is specified herein) for Purchaser's or such SPE's required consent or approval under this Article shall be deemed to be a consent or approval by Purchaser or such SPE to the requested matter.

       9.11   Improvement Bonds.  Purchaser and the SPE grantee of a Parcel shall use commercially reasonable efforts to assist Seller in obtaining the release of any bonds placed by Seller with respect to improvements that Seller has completed.  Purchaser and the SPE grantee of a Parcel shall be responsible for placing and maintaining all surety bonds or other security required in connection with the Improvement Plans or otherwise required in connection with each Project.  If, prior to the Close of Escrow on a Parcel, Seller is required by the City, any utility or other governmental or quasi-governmental agency to post any bonds or other security in connection with any work to be performed by Purchaser or an SPE or which is not the obligation of Seller hereunder, Purchaser or such SPE shall, within thirty (30) days after such Close of Escrow, cause any such bonds or other security applicable to the Parcel being conveyed to be replaced with substitute bonds or security provided by Purchaser or such SPE.  If the City, utility or other governmental or quasi-governmental authority does not permit such replacement or substitution, Purchaser and such SPE shall pay the applicable costs incurred by Seller in connection with the continued maintenance of such bonds or other security, including, without limitation, the applicable portion of any bond premiums, letter of credit fees or interest on cash deposits (at the Agreed Rate) and Purchaser and such SPE shall indemnify, protect, defend and hold Seller harmless with respect to any claims or liability (including Seller's reasonable attorneys' fees) arising from any claims against any such bonds or other security which Purchaser or such SPE is obligated to provide under this paragraph.

       9.12   Plans and Specifications.  Seller shall assign to the grantee of such Lots or Parcel at the Close of Escrow all warranties applicable to any Seller Work or other improvements constructed by Seller which is included in any portion of the Property conveyed by Seller hereunder.  In addition, Seller shall cause the architects and engineers who have prepared the Improvement Plans or any other improvements constructed by Seller applicable to any conveyed Parcel or any other improvements which Purchaser is obligated to maintain hereunder to deliver to Purchaser or the applicable SPE as of each Close of Escrow, the plans and

Draft of November 13, 2003                                      22

specifications necessary to operate and maintain such Seller's Work or other improvements, together with reasonable certifications and proprietary rights appropriate for Purchaser or such SPE to rely upon with respect to those improvements, with respect to which Seller has caused plans and specifications to be prepared, and which, under the terms of this Agreement or any Development Declaration, are Purchaser's or such grantee's obligation to construct.

10.      Construction, Maintenance of Common Areas and Perimeter Walls.

10.1      Neighborhood and Community Facilities.  Project improvements include both (i) improvements, such as private streets, parks, street lamps, common utilities, entrance areas, etc. to be used or held, together with the real property on which such improvements are located (whether in fee or otherwise), for the common benefit of all or some of the homeowners within that Project or Tuscany (referred to as "common elements" in NRS Chapter 116); and (ii) improvements, such as the Residence and other improvements within a Lot, individually owned by a homeowner (referred to as the "unit" in NRS Chapter 116).  Common elements owned or held by the Master Association for the benefit of all members of the Master Association are referred to in this Agreement as "Community Facilities".  Common elements owned or held (A) by the Master Association as "limited common elements" (as defined in NRS Chapter 116) for the benefit of some or all of the owners within a Project and/or (B) by a sub-association whose only members are owners within a Project (a "Sub-Association") are referred to herein as "Neighborhood Facilities". Community Facilities and Neighborhood Facilities within a Parcel are collectively referred to as "Project Common Areas."  Purchaser and the applicable SPE shall be responsible for constructing, at its sole cost, any Neighborhood Facilities within or benefiting a Parcel and shall be responsible for constructing those Community Facilities listed on Schedule 10.1.

10.2      Purchaser as Declarant.  The Master Declaration shall describe Purchaser as the Declarant thereunder, and Purchaser hereby covenants and agrees to assume all of the Declarant's obligations with respect to Tuscany, and protect, defend, indemnify and hold Seller harmless from any and all losses, damages, liabilities, actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses including reasonable attorneys' fees, arising from any fault, act or omission of the declarant under the Master Declaration.  Without limiting the foregoing, Purchaser shall be responsible for preparation of all necessary public offering statements (NRS 116.4103) applicable to the Master Association and Purchaser covenants and agrees to prepare a public offering statement for each of the Projects in accordance with the provisions of NRS Chapter 116 and shall cause the Master Association to enter into the HOA Cable Agreement.  Seller covenants and agrees to cooperate with Purchaser's preparation of the public offering statement, and acknowledges that, as set forth in NRS 116.4102(3), Seller shall be responsible for any false or misleading statement therein or omission of any material fact with respect to that portion of the public offering statement prepared by Seller.  Notwithstanding the foregoing, Purchaser shall execute and deliver to Seller upon the Close of Escrow for the Phase I Lots, an assignment of the declarant's rights under the Master Declaration, substantially in the form attached hereto as Exhibit V (the "Master Declaration Assignment") pursuant to which Seller shall have the right, but not the obligation, to become the declarant under the Master Declaration (effective as of the date the assignment under the Master Declaration Assignment becomes unconditional and effective) in the event all of the Property is not acquired from Seller as contemplated hereunder or upon the occurrence of a Purchaser Default.

10.3 <u>Perimeter Walls and Fence Rails</u>. Purchaser shall be responsible for constructing, at its sole cost, all walls, other than Project Perimeter Walls, required to be constructed along the exterior boundaries of a Parcel, including any necessary retaining walls and those indicated on the maps attached to <u>Exhibit P</u> as "Developer Walls", (collectively, the "<u>Parcel Perimeter Walls</u>"). Parcel Perimeter Walls and Project Perimeter Walls (collectively, "<u>Perimeter Walls</u>") will be owned by the lot owners on whose boundaries such walls are constructed. Following the completion thereof, Perimeter Walls other than any Perimeter Walls adjoining the Golf Course ("<u>Golf Course Walls</u>"), shall be maintained by the owner(s) on whose property the applicable wall is constructed, subject to any obligation of the Master Association to maintain the appearance of such walls, following acceptance of such responsibility, which, subject to completion of the Parcel Perimeter Walls in accordance with this Agreement, shall occur no later than the last Lot Closing within a Development Parcel. Golf Course Walls shall be jointly maintained by the lot owner on whose lot the wall is located and the owner of the Golf Course, subject to the provisions of the Master Declaration. Additionally, prior to the Closing for each Parcel, Seller shall install fence rail (the "<u>Fence Rail</u>") on those Lots indicated on <u>Exhibit P</u> as having a "Full Viewrail Wall". At each Closing, Purchaser or the applicable SPE shall reimburse Seller for Seller's cost to provide and install the Fence Rail (the "<u>Fence Rail Cost</u>").

10.4 <u>Completion of Project Common Areas, Walls</u>. Following each Close of Escrow, Purchaser or the applicable SPE agrees to promptly commence and thereafter diligently complete the Project Common Areas and Parcel Perimeter Walls required to be constructed by Purchaser under Sections 10.1 and 10.2, provided, however, that any entry monumentation which is part of the Project Common Areas within a Development Parcel shall be completed within six (6) months after the first Closing Date on which Lots within that Development Parcel are conveyed hereunder. Such improvements shall be constructed substantially in accordance with: (i) the previously approved Improvement Plans and Conditions of Approval and all other City requirements, (ii) the Design Guidelines, (iii) the Permitted Exceptions, (iv) the Development Declaration, and (v) the Neighborhood Facilities Deed; and Purchaser or such SPE shall cause such improvements to be approved and/or accepted by the City, Seller, the Master Association and/or any applicable Sub-Association, as required by this Agreement, upon their respective completion.

10.5 <u>Maintenance and Repair of Completed Improvements</u>. In addition to Purchaser's and the SPE's obligations under Section 9.7, upon each Close of Escrow Purchaser and the applicable SPE shall assume all responsibility for the maintenance, at Purchaser's and such SPE's sole cost and expense, of any and all Completed Project Common Areas, Completed Perimeter Walls and any other improvements (whether or not constructed by Purchaser) located within a conveyed Parcel, pending the dedication, conveyance or acceptance to (or by) the Master Association, Sub-Association, the City or other owner thereof. In addition, Purchaser and such SPE shall be obligated to repair any damage to such improvements as well as any other Tuscany improvements, whether or not located within the Parcel, caused by the negligence of Purchaser or any SPE or any of its respective employees, agents or contractors.

10.6 <u>Conveyance of Common Areas</u>. The Completed Project Common Areas shall be conveyed by Seller or, if applicable, Purchaser or an SPE (either in fee or by easement) lien-free to the Master Association, the Sub-Association or any other applicable entity upon Substantial Completion of such improvements and, if applicable, acceptance of such Project

Draft of November 13, 2003                                                                                      24

Common Areas by such entity. Seller and/or Purchaser or such SPE shall cause any Project Common Areas constructed by Purchaser, an SPE or Seller that are to be owned by the Master Association to be accepted by the Master Association in accordance with this Section. When Seller, on the one hand, or an SPE or Purchaser, on the other, has Substantially Completed those Project Common Areas and Perimeter Walls to be constructed by it, it shall notify the other party in writing (as used in this section, the "Completion Notice"). Within five (5) business days after the non-constructing party's receipt of a Completion Notice, Purchaser and Seller shall conduct a joint inspection of such Project Common Areas and/or Perimeter Walls and the applicable Project Common Areas or Perimeter Walls shall be deemed to be "Completed Project Common Areas" or "Completed Perimeter Walls" notwithstanding any outstanding punchlist items. If the inspection reveals deficiencies, then (i) the parties shall immediately prepare a written punchlist, and (ii) the party responsible for the construction of such work or improvements shall commence the completion of punchlist items within ten (10) business days and shall proceed to complete or correct such punchlist work within 90 days thereafter. The applicable Completed Project Common Areas shall thereafter be conveyed to the Master Association, Sub-Association or other applicable entity upon completion of the work identified on the punchlist. No inspection by Purchaser, an SPE or Seller of any Project Common Areas or Perimeter Walls constructed by the other is intended to waive any right or remedy based on any latent defect. Following the conveyance of such Completed Project Common Areas, they shall be maintained by such entity. Completion and maintenance of common elements by Purchaser and Seller is further addressed in the Development Declaration, the Neighborhood Facilities Deed and the Master Declaration. Purchaser or Seller, whichever shall be in control of the Master Association, shall cause the Master Association to accept the conveyance of (i) any Community Facilities constructed by Purchaser, an SPE or Seller in accordance with this Agreement and (ii) corner lot setbacks, pedestrian walkways, landscape strips and similar common elements, whether as Community Facilities or Neighborhood Facilities, if designed and constructed in accordance with the reasonable requirements of the Master Association.

11. The Projects.

11.1 Design Guidelines. Seller's overall concept and design for Tuscany is defined in the design criteria, development standards and improvement standards established by Seller as amended to date and approved by the City (collectively, the "Design Guidelines"), which are included in the Due Diligence Materials. By its execution of this Agreement, Purchaser hereby acknowledges receipt of the Design Guidelines. Purchaser or, if applicable, an SPE shall construct each of the Projects in conformance with the terms and conditions of: (i) this Agreement, the Development Declaration and the other schedules and exhibits referred to herein; (ii) plans and specifications for development of such Project (the "Project Plan") to be prepared by Purchaser or such SPE and approved by Seller in accordance with the Development Declaration; and (iii) the Design Guidelines; provided, Purchaser or an SPE shall not be responsible for conformity with any changes in the Design Guidelines which are made subsequent to the execution of this Agreement, if such changes (A) directly result in an increase in the cost of Purchaser's or such SPE's development of the Property, and such cost in the aggregate exceeds $25,000.00 or (B) materially and adversely affects Purchaser's or such SPE's development of a Parcel in accordance with the Project Plan, unless such changes are required by the City (and are not related to any other change initiated by Seller), in which event Purchaser or