such SPE shall be responsible, at its cost, for conformity with such changes. Seller represents and warrants that it shall not request any changes by the City without the consent of Purchaser. Seller shall reasonably cooperate with Purchaser (at no out-of-pocket cost to Seller) should Purchaser seek to obtain reasonable changes in the Design Guidelines.

11.2    Project Plan Work. The construction work required by a Project Plan is referred to as the "Project Plan Work". The type and number of Residences that Purchaser will construct on each Parcel shall be limited to the type and number generally described on Exhibits A-1 through A-16 or, with respect to the Multi-Family Development Parcel, as reasonably approved by Seller, and to be described more fully in each Project Plan. Seller's approval of a Project Plan shall not be unreasonably withheld or delayed and, provided Purchaser has complied with the Pre-Submittal Meeting requirements described in the Development Declaration (as defined therein), Seller's approval shall be deemed made if not disapproved in writing specifying the reasons for such disapproval within ten (10) business days of submittal of all information and materials required by the Development Declaration. Notwithstanding that the Project Plan approval process is set forth in the Development Declaration, to be executed and Recorded at a Close of Escrow, Seller agrees that any Plans (as defined in the Development Declaration) submitted to Seller prior to a Close of Escrow shall be subject to the approval process described in the Development Declaration notwithstanding that the Development Declaration has not been executed and Recorded.

11.3    Construction of Projects. Upon commencement of each discrete item of the Project Plan Work, Purchaser or, if applicable, the SPE shall cause such item of the Project Plan Work to be diligently and continuously prosecuted to its completion, subject however, to the effect of Force Majeure Delays.

11.4    Fees. Unless otherwise listed on Schedule 11.4 as a fee to be paid by Seller or required to be paid as a part of Seller's Work, Purchaser and, with respect to the Parcel acquired by it, each SPE shall be responsible for and shall pay (or if Seller is required to advance the same as a condition to the performance of any Seller's Work, reimburse Seller for) all fees and costs applicable to development and construction of the Projects, including, (i) fees and costs applicable to the Recordation of each Project Final Map (including, without limitation, the Map Costs and the City's Water Meter Fee) and (ii) all fees and costs normally required upon the "pulling" of a building permit to construct Residences on the Lots, which fees may include, without limitation, sewer development service charges and all other connection fees, water reservation and contract fees, water development service charges and all connection fees, water meter fees, transportation fees, any applicable wash or bridge fees, building permit fees, traffic fees, Nevada Power Company fees, Sprint fees, any in-lieu fees, and VA/FHA and related inspection fees. Any such fees and expenses advanced by Seller which are outstanding as of a Close of Escrow, as evidenced by copies of written receipts delivered to Purchaser and Escrow Holder no later than ten (10) business days prior to a Close of Escrow, shall be paid at such Close of Escrow; any such fees and expenses advanced by Seller not paid at a Close of Escrow shall be paid within 30 days after written demand. Purchaser and the applicable SPE shall be responsible for any and all other fees hereafter required by any governmental agency related to subdivision lot construction and development which are not expressly required by this Agreement to be paid by Seller in connection with Seller's performance of any Seller's Work. Fees payable by Purchaser or an SPE pursuant to this provision shall, if advanced by Seller, and not paid when

due in accordance with this section shall bear interest at the Agreed Rate from date due, and, if not paid within 30 days thereafter shall bear interest at the Default Rate. This paragraph shall survive each Close of Escrow and the termination of this Agreement.

      11.5   Utility Deposits.  Purchaser and each SPE shall be responsible to timely establish or place all deposits with utility companies in connection with the construction of the Residences and improvements in accordance with this Agreement.

      11.6   Easements and Rights of Way; Rights of Entry.  Purchaser (for itself and each SPE) and Seller each agrees that if either of them shall require necessary easements or rights-of-way for public or common element improvements, utilities, sewer, drainage, slopes or other necessary purposes over property owned by the other in order to develop any Parcel (in the case of Purchaser or an SPE) or Tuscany (in the case of Seller) in accordance with any final subdivision map or in order to construct any work of improvement required under the terms of this Agreement or by the City, then, from and after the Phase I Lots Closing Date, each agrees to grant such easements or rights-of-way to the other, upon written reasonable request therefor and if available, through established easement areas or dedicated rights-of-way and provided that such easement or right of way can be granted in a manner that does not materially and adversely affect Purchaser's or an SPE's development of any Parcel or Seller's development of any other portion of Tuscany. Purchaser (for itself and each SPE) and Seller (and their respective employees, contractors and other agents) shall also be entitled to such rights of entry on the property of the other for temporary construction or such other purposes as may be reasonably necessary or desirable in connection with the construction of any work of improvement required under the terms of this Agreement. The provisions of this paragraph shall be self operative, but shall, upon the reasonable request of either party from time to time, be confirmed in writing. Purchaser (and, if applicable, each SPE) and Seller shall each be responsible for the costs of any necessary restoration in connection with the exercise of its rights under this Section. In addition, the easements, rights-of-way and rights of entry provided for in this Section shall be located and utilized so as to minimize the impact on Purchaser's (and an SPE's) and Seller's uses and development of its respective property. Each of the parties hereto hereby shall indemnify the other and hold the other and its property free of, clear and harmless from and against any and all claims, liens, losses, liabilities, damages and expenses (including reasonable attorneys' fees and court costs) arising from, in connection with or as a result of such party's (its employees and agents) entry upon the other's property after a Close of Escrow pursuant to this paragraph to perform hereunder, whether such loss involves death, injury to person, damage to property or claims of any other nature. The provisions of this paragraph shall survive each Close of Escrow.

      11.7   At Risk Development Work.  Seller agrees not to unreasonably withhold or delay its consent to any reasonable request by Purchaser for a license to enter upon a Parcel prior to the Close of Escrow with respect thereto for the purpose of constructing certain improvements thereon in advance of the Closing Date for that Parcel (including the construction of homes or model homes), provided that such construction work may lawfully be undertaken and any work permitted is subject to a separate license agreement substantially in the form attached hereto as Exhibit Q (a "Construction License").

      12.   Conditions Precedent.

12.1   <u>Purchaser's Conditions</u>.   Each of the following shall be a condition precedent, for the sole·benefit of Purchaser or, if applicable, an SPE, to the obligation ·of Purchaser or such SPE to purchase each Parcel on the applicable Closing Date.

a.   <u>Default</u>.  No Seller Default shall exist as of the applicable Close of Escrow.

b.   <u>Project Final Map</u>.  The Project Final Map(s) applicable to the Lots in such Parcel shall have been Recorded.

c.   <u>Seller's Work</u>  The Seller's Work applicable to such Parcel shall be Substantially Complete.

d.   <u>Building Permits</u>  Purchaser's ability to pull building permits on any Lot within such Parcel shall not be impaired by any failure of Seller to complete any Seller Work.

e.   <u>Title Policy</u>.  Escrow Holder shall be prepared to issue to the grantee of the portion of the Property to be conveyed hereunder the required Owner's Title Policy or, if applicable, the ALTA Owner's Policy as of such Close of Escrow.

12.2   <u>Seller Condition</u>.  Each of the following shall be a condition precedent, for the sole benefit of Seller, to the obligation of Seller hereunder to sell each Parcel on the applicable Closing Date:

a.   <u>Closing Payment</u>.  Escrow Holder shall be prepared to deliver to Seller the required Closing Payment as of such Close of Escrow, less Seller's share of the applicable closing costs and prorations.

b.   <u>Default</u>.  No Purchaser Default shall exist as of the applicable Close of Escrow.

12.3   <u>Failure of Condition</u>.  Upon a failure of any condition precedent described in Sections 12.1, 12.2 or 12.4, the party entitled to the benefit of such·condition may elect, by written notice given within fifteen (15) days of such failure of condition, to terminate its obligation to purchase or to sell, as applicable, the applicable Parcel, and, in such event, (i) this Agreement shall terminate with respect to such Parcel and any Unconveyed Property; (ii) Purchaser promptly shall return the Due Diligence Materials affecting any Unconveyed Property to Seller and deliver to Seller copies of all studies, surveys and other similar materials produced by or at the request of Purchaser with respect to the Unconveyed Property, other than Purchaser's confidential proforma, projections, proprietary information, internal accounting and financial information, which may be excluded from such delivery; (iii) Escrow Holder or Seller, as applicable, shall return any unapplied portion of the Deposits to Purchaser; and (iv) except as otherwise provided herein, neither party shall have any further right, duty or obligation under this Agreement except with respect to those provisions which, by their express terms, survive such a termination.  In addition, if the failure of condition also constitutes a Purchaser Default or Seller Default, Seller or Purchaser, as applicable, shall also be entitled to exercise the remedies provided in Section 18.3 (Seller's remedies) or 18.5 (Purchaser's remedies).

12.4    Option Conditions.    In addition to the conditions stated in Section 12.2, each of the following shall constitute a condition precedent, for the sole benefit of Seller, to Seller's obligation to sell an Option Parcel to an SPE each of which may be waived only by a written waiver executed by Seller and delivered to Escrow Holder:

a.    Purchase of Prior Parcel.    Purchaser and, to the extent applicable, each SPE shall have purchased the Phase I Lots and/or the prior Option Parcel, as applicable.

b.    Exercise of Option.    The applicable SPE shall have timely exercised the Option for the applicable Option Parcel, in accordance with Section 1.4, the representations and warranties of Purchaser and the SPE contained in the applicable Option Notice shall be true and correct in all material respects, and Seller shall have approved such Option Notice as provided in Section 1.4.

c.    Default.    No Purchaser Default shall exist as of the applicable Close of Escrow.

13.    Close of Escrow.

13.1    Closing.    Provided that all of the conditions precedent to the Close of Escrow on the applicable Parcel have been satisfied or waived (by the person entitled to the benefit of such condition), the consummation of the applicable purchase transaction shall occur at the office of Escrow Holder or at such other location to which the parties may reasonably agree.    Each Close of Escrow shall take place on or before the required Scheduled Closing Date unless Seller and Purchaser and the applicable SPE otherwise agree in writing.    If a Close of Escrow for any Parcel does not occur, other than by reason of a Seller Default, or a failure of any of the Purchaser's conditions under Section 12.1, on or before the required Scheduled Closing Date for that Parcel, Purchaser's and any and all SPEs' rights to purchase that Parcel, together with all of Purchaser's and any SPE's other rights under this Agreement, including all unexercised Options and the right to purchase any unpurchased portion of the Property, shall automatically terminate and be of no further force or effect.    Escrow Holder, by closing the Escrow, shall be deemed to have irrevocably committed to cause the Title Insurer to issue the applicable Owner's Title Policy or, if applicable, the ALTA Owner's Policy.

13.2    Escrow Cancellation.

a.    Default.    If Escrow fails to close by reason of the default of Seller or Purchaser (which shall include the default of an SPE), the defaulting party shall pay Escrow Holder's normal and customary escrow cancellation charges (the "Cancellation Charges").

b.    Termination.    If Escrow fails to close for any reason other than the default of Seller or Purchaser, Seller and Purchaser shall be equally responsible for the payment of the Cancellation Charges.

13.3    Return of Seller's Documents.    If Escrow or this Agreement is terminated for any reason other than a Seller Default, Purchaser shall, within five (5) business days following such termination, deliver to Seller all documents and materials relating to the Property previously delivered to Purchaser by Seller and copies of all reports, studies, documents and

materials obtained by Purchaser from third parties in connection with the Property in and Purchaser's Investigations to the extent the same relate to any Unconveyed Property. In such event, Escrow Holder shall deliver all undelivered documents and materials deposited by Seller and then in Escrow Holder's possession to Seller and shall destroy any undelivered documents executed by both Purchaser and Seller. Upon delivery by Escrow Holder to Seller (or such destruction, as applicable) of such documents and materials, Escrow Holder's obligations with regard to such documents and materials under this Agreement shall be deemed fulfilled and Escrow Holder shall have no further liability with regard to such documents and materials to either Seller or Purchaser.

13.4    <u>Return of Purchaser's Documents</u>.    If Escrow or this Agreement is terminated for any reason other than a Purchaser Default, Escrow Holder shall deliver all undelivered documents and materials deposited by Purchaser and then in Escrow Holder's possession to Purchaser and shall destroy any undelivered documents executed by both Purchaser and Seller. Upon delivery by Escrow Holder to Purchaser (or such destruction, as applicable) of such documents and materials, Escrow Holder's obligations with regard to such documents and materials under this Agreement shall be deemed fulfilled and Escrow Holder shall have no further liability with regard to such documents and materials to either Seller or Purchaser.

13.5    <u>Items to be Delivered into Escrow</u>.

a.    <u>By Seller</u>. Unless an earlier time is otherwise specified, on or before one (1) business day prior to the date set for each Close of Escrow, and provided Purchaser and the applicable SPE shall have made all deposits into Escrow and complied with all other conditions required by this Agreement, Seller shall deposit in the Escrow the following documents:

i.    A grant, bargain and sale deed substantially in the form of <u>Exhibit R</u> (the "<u>Lot Deed</u>") conveying the Lots in the Parcel to the applicable SPE, and, if appropriate, a grant, bargain and sale deed substantially in the form of <u>Exhibit S</u>, with respect to any related, necessary or appurtenant Neighborhood Facilities (the "<u>Neighborhood Facilities Deed</u>" and, together with the Lot Deed, the "<u>Deeds</u>"), each duly executed and acknowledged by Seller and in Recordable form.

ii.    A non-foreign transferor declaration (the "<u>Non-foreign Transferor Declaration</u>"), substantially in the form of <u>Exhibit T</u> attached hereto, duly executed by Seller.

iii.    Executed counterparts of the Development Declaration or, if applicable, Development Declaration Amendment and a Notice of Annexation for the Parcel, each of which shall be acknowledged by Seller and in Recordable form.

iv.    Any additional funds and/or instruments, signed and properly acknowledged by Seller if appropriate, as may be necessary to comply with this Agreement.

v.     An executed settlement statement reflecting the prorations and adjustments required under Article 14.

vi.     With respect to the Phase I Lots closing only, an executed counterpart, duly acknowledged by Purchaser, of an amendment to the Memorandum of Agreement (the "Amendment to Memorandum"), substantially in the form of Exhibit U attached hereto and made a part hereof.

vii.     Any certifications and evidence of proprietary rights required by Section 9.2.

viii.     Evidence of the insurance coverage under the Environmental Hazards Policy, as required by Section 16.3(f).

b.     By Purchaser.  Unless an earlier time is otherwise specified, on or before one business day prior to the date set for each Close of Escrow, Purchaser shall deposit (or cause the SPE to deposit) in Escrow the following:

i.     Immediately available collected funds in the form of one or more cashier's check(s) drawn on a local Las Vegas bank or wire transfer to the account of Escrow Holder in an amount equal to the Phase I Closing Payment or Option Closing Payment (as applicable, the "Closing Payment").

ii.     With respect to the Phase I Lots Close of Escrow only, the Map Costs Note, the Map Costs Mortgage and the Master Declaration Assignment, each duly executed and, in the case of the Map Costs Mortgage and the Master Declaration Assignment, acknowledged, by the applicable SPE.

iii.     With respect to each Option Parcel, the applicable SPE Assumption.

iv.     Executed counterparts of the Development Declaration or, if applicable, Development Declaration Amendment, and the Notice of Annexation for the Parcel, each of which shall be acknowledged by the applicable SPE and in Recordable form.

v.     Any additional funds and/or instruments, signed and properly acknowledged by Purchaser and/or the applicable SPE, if appropriate, as may be necessary to comply with this Agreement.

vi.     An executed settlement statement reflecting the prorations and adjustments required under Article 14.

vii.     With respect to the Phase I Lots closing only, an executed counterpart, duly acknowledged by Seller and/or the applicable SPE, of the Amendment to Memorandum.

viii.     Any Notice of Seller's Failure, if appropriate under Section 15.9.

13.6    Escrow Holder's Instructions.  At such time as the conditions precedent to the applicable Close of Escrow have been satisfied or waived, Escrow Holder shall perform the acts set forth below in the following order:

a.    Date as of the date of such Close of Escrow, all instruments calling for a date.

b.    Prepare a Declaration of Value in such form as required by NRS 375.060 (the "RPTT Declaration").

c.    Record the following documents in the following order:

i.    The Notice of Annexation.

ii.    The Deeds.

iii.    The Development Declaration or, if applicable, the Development Declaration Amendment.

iv.    In the case of the Close of Escrow on the Phase I Lots only, the Amendment to Memorandum.

d.    Deliver to Seller by intrabank transfer or wire transfer of funds an amount equal to the applicable Closing Payment, less Seller's Closing Costs.

e.    Deliver to the grantee the Owner's Title Policy or, if applicable, the ALTA Owner's Policy and the Non-foreign Transferor Declaration.

f.    Prepare and submit to the Internal Revenue Service the information return and statement concerning the closing of the Escrow (the "Information Return") required by Section 6045(e) of the Internal Revenue Code of 1986, unless the Information Return is not required under the regulations promulgated under Section 6045(e).

g.    Make the prorations described in Article 14 on the basis of a 365 or 366 day year, as applicable, charge Seller with Seller's Closing Costs and charge Purchaser with Purchaser's Closing Costs.

h.    Compute and insert appropriate dates and amounts on documents delivered to Escrow Holder in escrow pursuant to this Agreement.

i.    Deliver to the parties conformed copies of all documents delivered into Escrow in connection with this Agreement and the Close of Escrow.

13.7    Post-Closing Matters.  The instruments that are required to be Recorded under this Agreement shall provide that the Recorder shall return them to Escrow Holder after Recordation, and upon receipt thereof, Escrow Holder shall deliver the following:

a.    To Seller:

i.    Originals of the Notice of Annexation and Development

Declaration or Development Declaration Amendment, as applicable, and, with respect to the Phase I Lots Closing Date, the Amendment to Memorandum.

      ii.     Copies, as Recorded, of the Deeds.

      iii.    Plain copies of the RPTT Declaration.

   b.   <u>To Purchaser/SPE</u>:

      i.     The original of the Deeds.

      ii.    Copies, as Recorded, of the Notice of Annexation and Development Declaration or Development Declaration Amendment, as applicable, and, with respect to the Phase I Lots Closing Date, the Amendment to Memorandum.

      iii.    Plain copies of the RPTT Declaration.

13.8   <u>Transfer of Possession</u>.  Subject to Section 11.7 and Section 17.1, possession of a Parcel shall be transferred to the grantee at the time of the Close of Escrow with respect to such Parcel, subject to the Permitted Exceptions.

14.   <u>Costs and Prorations</u>.

14.1  <u>Impositions</u>. Subject to Purchaser's obligation to pay for Impositions as part of the Option Consideration, as provided in Section 3.2, all Impositions applicable to the Parcel being conveyed, whether payable in installments or not, for the tax year in which the Close of Escrow occurs shall be prorated to the date of the Close of Escrow, based on the latest available tax rate and assessed valuation, to be re-prorated by Seller and Purchaser between themselves or by Escrow Holder at a subsequent Close of Escrow based on actual tax rates and valuations promptly following the time such actual amounts become known. The prorations shall be based on the most recent tax bill issued for the assessor's parcel or parcels of which the Parcel is a part. An allocation of the taxes between the Parcel and the balance of property covered by such tax bill shall be determined on an equitable basis in accordance with Escrow Holder's usual procedures. After a Close of Escrow, and until the Parcel is segregated from any other portions of Tuscany by the County Assessor as a separate assessor's parcel or parcels, if Seller receives property tax bills which include portions of the Parcel conveyed, or Purchaser receives property tax bills which include portions of Tuscany other than the Parcel conveyed, the parties shall timely pay their respective portions of those bills allocated by acreage as set forth above. If, before or after a Close of Escrow, any supplemental taxes are assessed against any Parcel, Escrow Holder or the parties (as appropriate) shall equitably prorate such supplemental taxes.

If real property taxes are apportioned at Close of Escrow based on the tax rate for the preceding period applied to the latest assessed valuation (or based on such other estimate as the parties may agree) and if following the Closing, actual or better estimates of tax rates and assessed valuation become available, the parties agree to reapportion such real property taxes based on such updated information. If, after receipt of such information, neither Seller nor Purchaser has received written request from the other within a reasonable time after such receipt, to reapportion such

real property taxes, then Purchaser and Seller shall each be deemed to have waived any right to seek such reapportionment

14.2    <u>Association Assessments</u>.   Each Lot shall be annexed into the Master Declaration at the Close of Escrow.  Assessments payable to the Master Association thereunder shall be assessed against each Lot in accordance with the provisions of the Master Declaration and Escrow Holder shall have no obligation to make any prorations with respect to such assessments.  Nothing contained in this Section is intended to obligate Seller to fund any capital assessments payable by a purchaser from Seller.

14.3    <u>Other Prorations</u>.   In the case of Impositions or any other customary prorations not specifically provided for in Section 14.1, Escrow Holder or, if applicable, the parties, shall prorate or pay their respective shares of the applicable Impositions in accordance with customary practice in Clark County, Nevada.

14.4    <u>Costs to be Paid by Seller</u>.  Seller shall pay the following costs ("<u>Seller's Closing Costs</u>"):

a.    The premium for the Owner's Title Policy and the Required Endorsements.

b.    The real property transfer tax imposed on the Deed pursuant to NRS Chapter 375.

c.    Fees for Recording the Notice of Annexation.

d.    One-half (½) of the Escrow fee.

e.    Seller's share of the Impositions and prorations described in Sections 14.1, 14.2 and 14.3 as reasonably calculated by Escrow Holder.

14.5    <u>Costs to be Paid by Purchaser</u>.  Purchaser or the applicable SPE shall pay the following costs ("<u>Purchaser's Closing Costs</u>"):

a.    If applicable, the Additional Title Policy Charges.

b.    Fees for Recording the Deeds, Development Declaration or Development Declaration Amendment and Amendment to Memorandum.

c.    One-half (½) of the Escrow fee.

d.    Purchaser's share of the Impositions and prorations described in Sections 14.1, 14.2 and 14.3 as reasonably calculated by Escrow Holder.

15.    <u>Purchaser's Covenants, Representations and Warranties</u>.  As a material inducement to Seller to enter into this Agreement, Purchaser covenants, represents and warrants to Seller as of the date hereof and as of each Close of Escrow, as follows:

15.1    <u>Organization; Qualification</u>.  Purchaser is a duly organized, validly existing corporation formed under the laws of the State of Nevada, in good standing thereunder,

and has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Purchaser is a party.

15.2    Licensed Contractor.  Purchaser is a Nevada licensed contractor pursuant to NRS Chapter 624.  Purchaser's Contractor License Number is 28530.

15.3    Agreement is Authorized and Binding.  This Agreement has been, and all of the documents executed by Purchaser that are to be delivered to Seller at each Close of Escrow shall, as of such Close of Escrow, have been, duly authorized, executed and delivered by Purchaser and is or will, as applicable, be the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of and other principles relating to or limiting the right of contracting parties generally).

15.4    Litigation.  There are no pending or, to Purchaser's actual knowledge, threatened claims, proceedings or lawsuits of any kind that would materially and adversely affect the ability of Purchaser to purchase the Phase I Lots or, after exercise of an Option, the applicable Option Parcel or to perform its obligations under this Agreement.

15.5    Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated thereby will not, to Purchaser's actual knowledge, violate any provision of or require any consent, authorization, or approval under any law, administrative regulation, order, award, judgment, writ, injunction, or decree applicable to, or any governmental permit or license issued to, Purchaser.

15.6    Condition of Property.  Purchaser agrees that (i) except as expressly set forth in this Agreement or any of the agreements or instruments executed and delivered by Seller and Purchaser at a Close of Escrow (collectively, the "Closing Documents"), each sale of a Parcel is concluded without warranties, representations or guarantees made by Seller; (ii) each Parcel is purchased by Purchaser on an "AS-IS" basis with all faults and conditions thereon (except as otherwise required in connection with Seller's Work); and (iii) Purchaser's decision to purchase each Parcel shall be based only on the Investigations as made by Purchaser and/or Purchaser's agents, employees, representatives and/or independent contractors in accordance with this Agreement and Seller's representations and agreements set forth in the Closing Documents. Except as otherwise specifically provided in the Closing Documents, it is expressly understood by Purchaser and Seller that all statements and representations made by Seller and Seller's agents and independent contractors (a) are intended by Purchaser and Seller to be made only as an accommodation to Purchaser and Purchaser's Investigations and not in lieu of Purchaser's Investigation, and (b) are not to be relied and acted on by Purchaser.

15.7    Purchaser Reliance.  Purchaser is an experienced homebuilder and is knowledgeable about the ownership, development and management of real estate and the construction of Residences, and Purchaser has relied and will rely exclusively on its own consultants, advisors, counsel, employees, agents, principals and/or studies, investigations and/or

inspections with respect to the Property, its condition, value and potential. Purchaser agrees that, notwithstanding the fact that it has received certain information from Seller or its agents or consultants, Purchaser has relied solely upon and will continue to rely solely upon its own analysis and will not rely on any information provided by Seller or its agents or consultants, except as otherwise expressly set forth in Section 15.6.

15.8    Seller's Work.  Purchaser understands and acknowledges that, except with respect to the Seller's Work (as to which Seller is responsible): (a) Purchaser is solely responsible for the performance of all work necessary to complete the Projects, (b) Seller will not be responsible for any work required to complete the Projects, and (c) Seller will not be responsible for cost overruns or unforeseen expenditures which may be incurred in order to complete the Projects. Purchaser by closing Escrow, shall be deemed to have accepted the Parcel to be conveyed at such closing in the condition called for by this Agreement, including, without limitation, the completion of all Seller's Work required to have been completed as of the applicable Closing Date, except as otherwise provided on a punchlist prepared in accordance with Section 9.5.

15.9    Alleged Breaches.  If, as of the date which is five (5) days prior to any Scheduled Closing Date, Purchaser has actual knowledge that Seller is in material breach of its obligations with respect to any work or improvement within or affecting a Parcel (collectively, "Seller's Alleged Breach"), Purchaser may (but is not obligated to) proceed to the Close of Escrow without waiving its rights or remedies with respect to Seller's Alleged Breach if and only if Purchaser, no later than one (1) business day prior to the applicable Scheduled Closing Date delivers to Seller a written notice describing with particularity Seller's Alleged Breach as well as any corrective action Purchaser requires to remedy Seller's Alleged Breach (a "Notice of Seller's Failure").  If Purchaser fails to give a Notice of Seller's Failure with respect to any Seller's Alleged Breach of which Purchaser has actual knowledge at the appropriate time (collectively, the "Apparent Breaches"), Purchaser shall be deemed to have waived any right to assert any Apparent Breach as a Seller Default.  If Purchaser shall have provided its written Notice of Seller's Failure to Seller in accordance with this provision, Purchaser may (but is not obligated to) elect to proceed to a Close of Escrow without waiving any applicable Seller Default arising from the Seller's Alleged Breach described in the Notice of Seller's Failure.  As used in this Agreement, the phrase "Purchaser's actual knowledge" or words of like import shall mean the actual knowledge of Jim Rhodes and/or Dean Walker.  There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation.

15.10    Threatened Claims.  Purchaser shall promptly notify Seller of any asserted or threatened claim of which Purchaser has actual knowledge that directly or indirectly materially and adversely affects Seller, this Agreement, Tuscany or the unpurchased portions of the Property.

15.11    Cooperating Brokers.  Purchaser agrees to pay a commercially reasonable commission (as reasonably determined by Purchaser, but not to exceed three percent (3%)) to any cooperating broker who represents a Homebuyer if the Residence is sold during the term of such cooperating broker's agency relationship with the Homebuyer; provided, however, that such cooperating broker negotiated on behalf of the Homebuyer or showed the Residence to the

Homebuyer on the first occasion the Homebuyer viewed the Residence or model. The foregoing provision is not intended and shall not be construed as conferring any benefit on any third party or establishing the amount of any commission, and neither Seller nor Purchaser shall have any obligation whatsoever to any cooperating broker pursuant to this Agreement.

15.12  Single Purpose Entity.  Each Option shall be exercised by a separate SPE who shall be the person acquiring title to the applicable Option Parcel. Notwithstanding any other provision of the SPE's articles of incorporation, bylaws, partnership agreement, articles of organization, operating agreement and/or other documents governing the formation and organization of the SPE (collectively, the "Organizational Documents") or any provision of law that otherwise empowers the SPE and as a condition to the exercise of an Option by an SPE, the SPE's Organizational Documents shall provide that the SPE shall not, without the written consent of Seller, which Seller may grant or withhold in its sole discretion, do any of the following prior to the Close of Escrow for the Parcel it acquires:

(i)  engage in any business or activity other than the ownership of the particular Option it exercises, the acquisition of the portion of the Property acquired from Seller hereunder and the sale or conveyance of such property to homebuilders;

(ii)  incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than Approved Construction Loans, except unsecured trade and operational debt incurred with trade creditors in the ordinary course of its business of owning and operating the applicable Option Parcel in such amounts as are normal and reasonable under the circumstances, provided that such debt is not evidenced by a note and is paid when due;

(iii)  seek the dissolution or winding up, in whole or in part, of the SPE;

(iv)  cause the SPE to merge into or consolidate with any person or entity or dissolve, terminate or liquidate, in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; or

(v)  file a voluntary petition or otherwise initiate proceedings to have the SPE adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against Purchaser or the SPE, or file a petition seeking or consenting to reorganization or relief of Purchaser or the SPE as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to Purchaser or the SPE; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of Purchaser or the SPE or of all or any substantial part of the properties and assets of Purchaser or the SPE, or make any general assignment for the benefit of creditors of Purchaser or the SPE, or admit in writing the inability of the SPE to pay its debts generally as they become due or declare or effect a moratorium on SPE debt or take any action in furtherance of any such action.

15.13  Separateness Matters.  Each SPE has not and shall not, at any time prior to the Close of Escrow for the Parcel it acquires:

(a)     acquire or own any material asset other than (i) the Option which it intends to exercise and the portion of the Property acquired from Seller pursuant to such Option, and (ii) such incidental personal property as may be necessary for the ownership, operation and maintenance of such property;

(b)     fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Seller, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(c)     own any subsidiary or make any investment in or acquire the obligations or securities of any other person or entity without the consent of Seller;

(d)     commingle its assets with the assets of any shareholder, principal or affiliate of Purchaser, or of any other person or entity or transfer any assets to any such person or entity other than distributions on account of equity interests in Purchaser which do not render the SPE "insolvent" under any definition of such term;

(e)     allow any person or entity to pay its debts and liabilities (except for a person obligated under any indemnity given or permitted hereunder) or fail to pay its debts and liabilities solely from its own assets;

(f)     fail to maintain its records, books of account and bank accounts separate and apart from those of the shareholders, members, managers or partners, principals and affiliates of Purchaser (including any other SPE), the affiliates of the shareholders, members, managers or partners of Purchaser and any other person or entity or fail to prepare and maintain its own financial statements in accordance with generally accepted accounting principles and susceptible to audit, or if such financial statements are consolidated fail to cause such financial statements to contain footnotes disclosing that the applicable Option and any portion of the Property acquired hereunder is actually owned by such SPE;

(g)     enter into any contract or agreement with any shareholder, member, manager, partner, principal or affiliate of Purchaser or any partner, member, shareholder, principal or affiliate thereof (including any other SPE), except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than any shareholder, member, manager, partner, principal or affiliate of Purchaser, as the case may be, any guarantor or any partner, member, shareholder, principal or affiliate thereof;

(h)     fail to correct any known misunderstandings regarding the separate identity of the SPE;

(i)     hold itself out to be responsible or pledge its assets or credit worthiness for the debts of another person or entity or allow any person or entity to hold itself out to be responsible or pledge its assets or credit worthiness for the debts of Purchaser or any other SPE (except for a person obligated under any indemnity given or permitted hereunder);

Draft of November 13, 2003                                                                 38

(j)     make any loans or advances to any third party, including any shareholder, member, manager, partner, principal or affiliate of Purchaser (or any other SPE), or any shareholder, partner, member, principal or affiliate thereof;

(k)     fail to file its own tax returns or to use separate contracts, purchase orders, stationary, invoices and checks;

(l)     fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that SPE is responsible for the debts of any third party (including any shareholder, member, manager, partner, principal or affiliate of Purchaser or any other SPE or any shareholder, partner, member, principal or affiliate thereof);

(m)     fail to allocate fairly and reasonably among SPE and any third party (including Purchaser ands any other SPE) any overhead for common employees, shared office space or other overhead and administrative expenses;   ·

(n)     allow any person or entity to pay the salaries of its own employees or fail to maintain a sufficient number of employees for its contemplated business operations;

(o)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(p)     share any common logo with or hold itself out as or be considered as a department or division of (i) any shareholder, member, manager, partner, principal, or affiliate of Purchaser (or any other SPE), (ii) any affiliate of a shareholder, member, manager or partner of Purchaser (or any other SPE), or (iii) any other person or entity or allow any person or entity to identify the SPE as a department or division of that person or entity; or

(q)     conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of the SPE or the creditors of any other person or entity.

15.14   Homebuyer Notice.  Purchaser acknowledges that Tuscany includes or is in close proximity to the Other Uses, which are more particularly described in the Homebuyer's Disclosure Notice referred to in the Development Declaration (the "HDN"), which Seller reserves the right to modify (and Purchaser agrees to modify) from time to time if required by the City. Purchaser represents, acknowledges and agrees that it is entering into this Agreement with knowledge of the existence of the Other Uses and that its Investigations will include the possible effect of the Other Uses on the Projects.  Purchaser agrees to disclose the existence of the Other Uses to Homebuyers as required by the City and to deliver to each Homebuyer the HDN to be prepared by Seller; agrees for itself and its successors and assigns, including Homebuyers and their respective successors and assigns, and including mortgagees and beneficiaries under deeds of trust affecting the Property or any portion thereof, that the existence of such Other Uses shall never be the basis for the assertion of any claim against Seller by Purchaser; and covenants and agrees never to institute, maintain or support any legal proceeding or action of any kind against

Seller on account of the Other Uses. Purchaser further agrees to protect, defend, indemnify and hold Seller harmless from any liability from claims asserted against Seller by any purchaser from Purchaser based upon or arising out of the failure of Purchaser to disclose the existence of the Other Uses. Purchaser acknowledges the HDN is not intended as a substitute for any statutory notice required to be given by Purchaser to Homebuyers, including any notice under NRS 113.070.

15.15 <u>Golf Course</u>. Purchaser acknowledges: (i) that the Golf Course is not owned by the Master Association and is not a Community Facility; (ii) that property ownership in Tuscany **does not** entitle Purchaser or any Homebuyer or other Lot owner to access to, or the use of, any of the Golf Course facilities nor does such property ownership entitle Purchaser or any Homebuyer or other Lot owner to join any golf or country club operating the Golf Course; and (iii) that nothing in this Agreement, any Closing Document or any other instrument or agreement entered into or delivered in accordance with this Agreement or as of the Close of Escrow is intended to create any right, title or interest in or to the Golf Course or any Golf Course facilities. Purchaser covenants and agrees to disclose the foregoing state of affairs to Homebuyers from Purchaser, and further covenants and agrees: (i) that the status of the Golf Course shall never be the basis for the assertion of any liability for claims against Seller by Purchaser; and (ii) to protect, defend, indemnify and hold Seller harmless from any claims asserted against Seller by any purchaser or other transferee from Purchaser based upon or arising out of the failure of Purchaser to disclose the status of the Golf Course.

15.16 <u>Acknowledgment</u>. By initialing this paragraph Purchaser specifically consents and agrees to the agreements and understandings contained in Sections 15.15 and 15.16.

Purchaser: _____

initials

16. <u>Seller's Covenants, Representations and Warranties</u>. The matters set forth in Sections 16.1 constitute representations and warranties by Seller which are now and (subject to matters contained in any notice given pursuant to the next succeeding sentence) shall, in all material respects, at each Close of Escrow be true and correct. If Seller has actual knowledge that any of the representations and warranties contained in Sections 16.1(d), (e) or (i) or Section 16.2 may cease to be true, Seller shall give prompt notice to Purchaser (which notice shall include copies of the instrument, correspondence, or document, if any, upon which Seller's notice is based). As used in this Agreement, the phrase "<u>Seller's actual knowledge</u>" or words of like import shall mean the actual knowledge of Barry Fieldman or Bob Unger. There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation. To the extent Purchaser has or acquires actual knowledge prior to the Effective Date that these representations and warranties are inaccurate, untrue or incorrect in any way, such representations and warranties shall be deemed modified to reflect Purchaser's actual knowledge.

16.1 <u>General Representations</u>. As a material inducement to Purchaser to enter into this Agreement, Seller covenants, represents and warrants to Purchaser as follows:

Seller on account of the Other Uses. Purchaser further agrees to protect, defend, indemnify and hold Seller harmless from any liability from claims asserted against Seller by any purchaser from Purchaser based upon or arising out of the failure of Purchaser to disclose the existence of the Other Uses. Purchaser acknowledges the HDN is not intended as a substitute for any statutory notice required to be given by Purchaser to Homebuyers, including any notice under NRS 113.070.

15.15  Golf Course. Purchaser acknowledges: (i) that the Golf Course is not owned by the Master Association and is not a Community Facility; (ii) that property ownership in Tuscany does not entitle Purchaser or any Homebuyer or other Lot owner to access to, or the use of, any of the Golf Course facilities nor does such property ownership entitle Purchaser or any Homebuyer or other Lot owner to join any golf or country club operating the Golf Course; and (iii) that nothing in this Agreement, any Closing Document or any other instrument or agreement entered into or delivered in accordance with this Agreement or as of the Close of Escrow is intended to create any right, title or interest in or to the Golf Course or any Golf Course facilities. Purchaser covenants and agrees to disclose the foregoing state of affairs to Homebuyers from Purchaser, and further covenants and agrees: (i) that the status of the Golf Course shall never be the basis for the assertion of any liability for claims against Seller by Purchaser; and (ii) to protect, defend, indemnify and hold Seller harmless from any claims asserted against Seller by any purchaser or other transferee from Purchaser based upon or arising out of the failure of Purchaser to disclose the status of the Golf Course.

15.16  Acknowledgment. By initialing this paragraph Purchaser specifically consents and agrees to the agreements and understandings contained in Sections 15.15 and 15.16.

Purchaser: _____ 
                              initials

16.    Seller's Covenants, Representations and Warranties. The matters set forth in Sections 16.1 constitute representations and warranties by Seller which are now and (subject to matters contained in any notice given pursuant to the next succeeding sentence) shall, in all material respects, at each Close of Escrow be true and correct. If Seller has actual knowledge that any of the representations and warranties contained in Sections 16.1(d), (e) or (i) or Section 16.2 may cease to be true, Seller shall give prompt notice to Purchaser (which notice shall include copies of the instrument, correspondence, or document, if any, upon which Seller's notice is based). As used in this Agreement, the phrase "Seller's actual knowledge" or words of like import shall mean the actual knowledge of Barry Fieldman or Bob Unger. There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation. To the extent Purchaser has or acquires actual knowledge prior to the Effective Date that these representations and warranties are inaccurate, untrue or incorrect in any way, such representations and warranties shall be deemed modified to reflect Purchaser's actual knowledge.

16.1   General Representations. As a material inducement to Purchaser to enter into this Agreement, Seller covenants, represents and warrants to Purchaser as follows:

Draft of November 13, 2003                                                    40

a.    <u>Authority</u>.  Seller is a duly formed, validly existing limited liability company organized under the laws of the State of Nevada and has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Seller is a party.

b.    <u>No Other Agreements</u>.  Except in connection with the Seller's Work, Seller's Financing, the Permitted Exceptions and the matters disclosed in the Preliminary Title Report, Seller has not entered into any lease or other agreement for possession with any person or entity (except Purchaser) pursuant to which such person or entity has any current or future right or interest to occupy, possess, or use all or any portion of the Property.

c.    <u>Agreement is Authorized and Binding</u>.  This Agreement has been, and all of the documents executed by Seller that are to be delivered to Purchaser at each Close of Escrow shall, as of such Close of Escrow, have been, duly authorized, executed and delivered by Seller and is or will be, as applicable, legal, the valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of and other principles relating to or limiting the right of contracting parties generally).

d.    <u>Condemnation</u>.  To Seller's actual knowledge, Seller has received no notice of any pending or contemplated condemnation or other similar proceedings affecting the Property or any part thereof.

e.    <u>Litigation</u>.  To Seller's actual knowledge, there are no pending or threatened claims, proceedings or lawsuits of any kind, whether for taxes or otherwise, concerning the Property or that would materially and adversely affect Purchaser's ability to construct any of the Projects or prohibit the sale of any Parcel to Purchaser.

f.    <u>Conflicts</u>.  The execution and delivery of this Agreement and the consummation of the transactions contemplated thereby will not, to Seller's actual knowledge, violate any provision of or require any consent, authorization, or approval under any law, administrative regulation, order, award, judgment, writ, injunction or decree applicable to, or any governmental permit or license issued to, Seller relating to any Parcel.

g.    <u>Title</u>.  Seller has and will convey to Purchaser or the applicable SPE good and marketable fee simple title to each Parcel subject only to the Permitted Exceptions.

h.    <u>Labor</u>.  No labor has been performed or material furnished for any Parcel at the request of Seller or with the consent of Seller or for which a statutory lien may be claimed under NRS 108.221 et seq., for which Seller has not heretofore fully paid or will pay prior to Closing, or for which a mechanic's or materialmen's liens, or any other lien, can be claimed by any person.

i.      <u>Material Defect</u>. To Seller's actual knowledge, the Due Diligence Materials have not been amended in any material respect and, together with the plans, maps and other materials referred to in this Agreement, include all material information in Seller's possession or control relating to the Property and there is no material defect in the Property which would have a material adverse effect upon Purchaser's construction, development, ownership or use of a Parcel, except as may be disclosed elsewhere in this Agreement or in the Due Diligence Materials. To Seller's actual knowledge, except as may be disclosed elsewhere in this Agreement or in the Due Diligence Materials, there is no other material defect in the Property, which would have a material adverse effect upon Purchaser's construction, development, ownership or use of a Parcel.

16.2    <u>Environmental Representations</u>.

a.      <u>Hazardous Materials</u>. To Seller's actual knowledge, except as disclosed in any of the Due Diligence Materials, (i) no portion of the Property is being used or has been used for the disposal, storage, treatment, processing or other handling of Hazardous Materials, and (ii) no condition on the Property is in material violation of applicable federal, state, county or other municipal law, ordinance, order, regulation or requirement relating to Hazardous Materials. Notwithstanding anything to the contrary contained herein, Seller makes no representation or warranty with respect to conditions affecting any Parcel arising after the conveyance of such Parcel hereunder or the earlier delivery of possession to Purchaser or an SPE under any Construction License, unless caused by Seller or its contractors in performing the work provided for herein.

b.      <u>No Release for Pre-Escrow Conditions</u>. Seller acknowledges and agrees that no transfer of any Parcel to Purchaser or an SPE shall relieve or release Seller of any legal liability or responsibility that Seller would otherwise have as the owner of such Parcel, whether by way of damages, penalties, remedial actions or otherwise, for any adverse effects or consequences resulting at any time from any contamination existing on, above or under a Parcel at the time of the Close of Escrow on such Parcel; provided, however that the foregoing is not intended to relieve Purchaser from any liability or responsibility caused by or arising in connection with the activities of, or injury by, Purchaser or its employees, agents or other representatives, upon the Property prior to the Close of Escrow.

c.      <u>Benefit of Representation</u>. Seller's representations and warranties hereunder are for the exclusive benefit of Purchaser and shall not inure to nor are they made for the benefit of any other person or entity.

d.      <u>Definition of Hazardous Material</u>. The term "<u>Hazardous Materials</u>" shall mean any substance, water or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety and property, including all of those materials, wastes and substances designated as hazardous or toxic under NRS 40.504 or by the U.S. Environmental Protection Agency, the U.S. Department of Labor, the U.S. Department of Transportation and/or any other governmental agency now or hereafter authorized to regulate materials and substances in the environment.

e.      <u>Expiration of Representations and Warranties</u>. Seller's representation and warranties under Section 16.2(a) shall survive for 3 years after the Phase I

Lots Closing Date. Purchaser shall not be entitled to recover damages or obtain relief for any breach of such representations or warranties and releases Seller from any claim relating to Hazardous Materials unless (i) written notice specifically setting forth the grounds of such breach is promptly given to Seller by Purchaser within such 3 year period, (ii) a suit by Purchaser against Seller is filed in a court of competent jurisdiction within such 3 year period and (iii) service of such complaint is made on Seller within 30 days after the complaint is filed.

        f.    <u>Environmental Hazards Insurance</u>. As of each Close of Escrow Seller shall cause Purchaser or the applicable SPE to be named as an additional insured under that certain "Pollution Legal Liability Select Policy issued by American International Specialty Lines Insurance Company (Policy Number 8089459) (the "<u>Environmental Hazards Policy</u>") with respect to the Parcel being conveyed to Purchaser or such SPE.

        16.3   <u>No Other Representations or Warranties</u>. Except as set forth in the Closing Documents, Seller makes no representation or warranty, express or implied, with respect to the Property. Without limiting the generality of the foregoing, Seller disclaims any obligation to construct any improvements other than the Seller's Work. Furthermore, notwithstanding the fact that the Property is proposed to be located in a master planned community, Seller disclaims any obligation to develop or cause the development of any portion of Tuscany, other than the Seller's Work and the preparation and Recording of the applicable Project Final Maps. Although Purchaser has or may have been advised by employees, agents or representatives of Seller of certain proposed, planned or intended projects of development within the Tuscany, Seller shall be under no obligation whatsoever to construct or develop such projects unless otherwise explicitly set forth herein or in the Closing Documents.

        16.4   <u>Covenants</u>. Seller hereby covenants with Purchaser as follows:

        a.    <u>Alterations of Property</u>. Except for the Seller's Work or as permitted or contemplated by the Permitted Exceptions or any other obligations of Seller hereunder, Seller agrees that it will not, prior to the Close of Escrow with respect to a Parcel, permit any alteration, modification, or addition to such Parcel, except for insubstantial and immaterial changes that do not adversely affect the same or the value thereof.

        b.    <u>Matters Affecting Title</u>. Seller agrees that it will not cause or permit any new encumbrances or liens to be Recorded against title to the Property after the Effective Date other than (i) matters, including Monetary Liens, which Seller shall cause to be removed at or prior to the applicable Close of Escrow; (ii) Permitted Exceptions, including (A) rights of way, easements or other rights necessary for the construction of the Projects or Seller's Work or necessary for Recordation of any Project Final Map or Seller's performance of any other of its obligations hereunder; and (B) water, power and other utility easements and similar easements normally incident to the development of real property in the City which do not materially interfere with a Project (e.g., avigation easements), provided Seller notifies Purchaser of the proposed matter and Seller obtains the consent of Purchaser to the location of any locatable easement, which consent shall not be unreasonably withheld or delayed, and shall be deemed given unless objection is made, specifying the reasons therefor, within ten (10) business days after Purchaser's receipt of a request for approval under this provision.

c.     Threatened Claims.  Seller shall promptly notify Purchaser of any asserted or threatened claim of which Seller has actual knowledge that directly or indirectly materially and adversely affects Seller, this Agreement, Tuscany, or the Property, including, but not limited to, the discovery of Hazardous Materials on the Property.

d.     Completion of Improvements.  Seller shall perform and complete the Seller's Work (i) in a good and workmanlike manner in accordance with all applicable Conditions of Approval and applicable plans and specifications, including any applicable Improvement Plans, (ii) in compliance with all applicable governmental laws and regulations, and (iii) without any material defects.

17.     Pre-Closing Activities.

17.1    Entry by Purchaser onto the Property.  Seller hereby grants to Purchaser a nonexclusive license, during the term of this Agreement, to enter upon the Unconveyed Property, prior to the Close of Escrow with respect thereto for the purpose of allowing Purchaser to conduct, at its sole expense, the Investigations of the Property.  Prior to any such entry by Purchaser on the Property and at all times during which such entry is permitted, Purchaser shall provide Seller with a certificate of Purchaser's liability insurance policy designating Seller as an additional insured, and such certificate shall evidence coverage in the amount of $3,000,000.00 to protect Seller against any loss, damage, or injury which may occur as a result of Purchaser's use of or entry upon the Property, whether prior to or after the Effective Date of this Agreement.

17.2    Purchaser's Activities.    Purchaser, its representatives, agents and contractors shall (i) perform all Purchaser's Investigations and other pre-closing work on the Property in a diligent, expeditious and safe manner, (ii) not allow any dangerous or hazardous condition created by Purchaser or its representatives, agents or contractors to continue beyond the completion of any activity permitted under this Agreement, (iii) comply with all applicable laws and governmental regulations applicable to Purchaser's activities, and (iv) keep the Unconveyed Property free and clear of all mechanics' and materialmen's liens or other liens arising out of the entry and work or activities performed under this Agreement by Purchaser, its representatives, agents and contractors.  After any entry, Purchaser shall immediately restore the affected Property to the same condition as before Purchaser entered such property.  Purchaser shall indemnify, defend (with counsel acceptable to Seller in its reasonable judgment) and hold harmless Seller, its officers, directors, shareholders, members, managers or partners, members, managers, employees, partners, representatives, agents, successors and assigns (as used in this Section, collectively, the "Indemnified Parties") from and against all claims, liabilities, damages, losses, costs or expenses (including, without limitation, attorneys' fees) arising from or relating to the entry on the Property by Purchaser, its representatives, agents or contractors.  Purchaser's obligations to indemnify, defend and hold harmless the Indemnified Parties shall survive the termination of this Agreement and each Close of Escrow and shall not be limited by any insurance required under Section 17.1.

Notwithstanding the foregoing, Purchaser's indemnity and defense obligations, and Purchaser's obligation to repair or restore any damage to the Property caused by Purchaser pursuant to Section 17.1 above shall not apply to (i) any loss, liability, costs or expenses to the extent arising from or relating to the gross negligence or willful misconduct of Seller; (ii) any

diminution in value of the Property arising from or relating to matters discovered (but not caused) by Purchaser or its employees, agents or contractors during Purchaser's Investigations of the Property; (iii) any latent defects in the Property discovered (but not caused) by Purchaser; and (iv) the release or spread of any Hazardous Materials which are discovered by Purchaser (but not deposited by Purchaser or its agents or contractors) on or under the Property.

      17.3   <u>Indemnity for Development Work</u>.  Although Seller is performing certain development work with respect to each Parcel, the parties acknowledge that Purchaser shall be solely responsible for construction of the Residences, including all soils preparation. Accordingly, Purchaser shall indemnify, protect, defend (with counsel reasonably approved by Seller), and hold harmless Seller and the Indemnified Parties, its from any and all losses, damages, liabilities, actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses including reasonable attorneys' fees, arising from any fault, act or omission of Purchaser, any contractor or subcontractor employed by it, any sales agent or marketing representative employed directly or indirectly by Purchaser, anyone directly or indirectly employed by any of the foregoing entities, or anyone for whose acts any of the foregoing entities may be liable, in connection with Purchaser's construction of the Residences (including, without limitation, any and all necessary soils preparation) and/or the act or failure to act of the Master Association or committee, officer, agent or representative thereof relating to any of the Residences or other portions of the Property when Purchaser (or any of its Affiliates or their respective employees, agents, or other representative) is  in control of the board of directors of such association or constitute a majority of  a committee thereof or are an officer, agent or representative thereof.  Notwithstanding the foregoing, Purchaser shall not be obligated to indemnify Seller or any of the other Indemnified Parties against any claim or liability to the extent such claim or liability arises from the breach by Seller of its obligations under this Agreement or from the grossly negligent acts or omissions or willful misconduct of Seller or any such Indemnified Party, including claims related to Seller's Work other than soils preparation or other Seller's Work subsequently modified by Purchaser.  The parties specifically acknowledge and agree that Seller is not in the homebuilding business, and that once any part of the Property is delivered to Purchaser or any grantee for construction of Residences or any other modification or alteration, Purchaser or such grantee shall be solely responsible for determining the suitability of such land for construction of Residences and further development.  Without limiting the foregoing, the parties acknowledge and agree that it is their intention that any and all claims relating to the construction of Residences shall, as between Seller and Purchaser and any SPE (and its Homebuyers and their successors), be the sole and exclusive responsibility of Purchaser and be subject to the Purchaser's obligations to indemnify, protect, defend and hold harmless Seller as provided herein.  Purchaser's obligations under this Section 17.3 shall survive the termination of this Agreement and each Close of Escrow, and shall be assumed by each SPE under the Development Declaration applicable to the Parcel it acquires hereunder.

      17.4   <u>Waiver and Release</u>.  As a material part of the consideration of this Agreement, Purchaser hereby waives and releases, on behalf of itself and its successors and assigns, all claims and demands against Seller and the other Seller Indemnified Parties for (i) any such loss, damage, injury or claim described in Section 17.3; (ii) any offsite condition relating to the Property other than a condition arising by reason of Seller's performance of any Seller's Work; and (iii)  the act or failure to act of the Master Association or committee, officer, agent or

representative thereof relating to any of the Residences or other portions of the Property when any of the Seller Indemnified Parties are in control of the board of directors of such association or constitute a majority of a committee thereof or are an officer, agent or representative thereof).

17.5    <u>Survival; Non-Exclusive Provision</u>.    Purchaser's obligations under Sections 17.2, 17.3 and 17.4 shall survive the termination of this Agreement and each Close of Escrow and shall not be limited by any insurance required under Section 17.1 or the Development Declaration. The provisions of Sections 17.2, 17.3 and 17.4 shall be in addition to, and not in limitation, any release, waiver and/or obligation to indemnify, protect, defend and/or hold harmless under any other agreement entered into between Purchaser and Seller or any other Seller Indemnified Parties, including any easement or license agreement.

17.6    <u>Seller's Activities</u>.    Seller, its representatives, agents and contractors shall (i) perform all Seller's Work on the Property in a diligent, expeditious and safe manner, (ii) not allow any dangerous or hazardous condition created by Seller or its representatives, agents or contractors to continue beyond the completion of any Seller's Work, (iii) comply with all applicable laws and governmental regulations applicable to Seller's Work, and (iv) keep the such portions of the Property as have been conveyed to Purchaser pursuant to this Agreement free and clear of all mechanics' and materialmen's liens or other liens arising out of Seller's entry on such property and the Seller's Work. Subject to Purchaser's obligations under Section 17.3, Seller shall indemnify, defend (with counsel acceptable to Purchaser in its reasonable judgment) and hold harmless Purchaser, its officers, directors, shareholders, members, managers or partners, members, managers, employees, partners, representatives, agents, successors and assigns (as used in this Section, collectively, the "<u>Indemnified Parties</u>") from and against all claims, liabilities, damages, losses, costs or expenses (including, without limitation, attorneys' fees) arising from or relating to the entry on the Parcels conveyed to Purchaser, by Seller, its representatives, agents or contractors, including damages resulting from the release of Hazardous Materials of the Property by Seller or its representatives, agents or contractors. Seller's obligations to indemnify, defend and hold harmless the Indemnified Parties shall survive the termination of this Agreement and each Close of Escrow.

Notwithstanding the foregoing, Seller's indemnity and defense obligations, and Seller's obligation to repair or restore any damage to any of the Parcels conveyed to Purchaser caused by Seller in connection with the Seller's Work shall not apply to any loss, liability, costs or expenses to the extent arising from or relating to the negligence or willful misconduct of Purchaser or its agents or contractors.

18.    <u>Default and Remedies</u>.

18.1    <u>Purchaser's Events of Default</u>.    The occurrence of any of the following prior or subsequent to a Close of Escrow, shall be a "<u>Purchaser Default</u>" hereunder:

a.    The filing of a petition or the institution of proceedings of, by, or against Purchaser or any SPE pursuant to the Bankruptcy Reform Act of 1978, as amended, or any successor statute or pursuant to any state bankruptcy, insolvency, moratoria, reorganization, or similar laws (as applicable, an "<u>Insolvency Proceeding</u>"), and, in the case of any involuntary proceeding, such petition or proceeding is not dismissed within 90 days; or Purchaser's or any SPE's making a general assignment for

the benefit of its creditors or the entering by Purchaser into any compromise or arrangement with its creditors generally; or Purchaser's or any SPE's becoming insolvent in the sense that Purchaser or such SPE is unable to pay its debts as they mature or in the sense that Purchaser's or such SPE's debts exceed the fair market value of Purchaser's or such SPE's assets;

      b.    The failure of Purchaser or any SPE to deliver to Seller or into Escrow, as required by this Agreement, (i) the Initial Deposit, (ii) the Second Deposit, (iii) any Map Costs or (iv) any Extension Fee;

      c.    Any of Purchaser's representations and warranties set forth in Article 15 shall be untrue in any material way; or

      d.    The failure of Purchaser or any SPE (i) to perform any material act to be performed by it, (ii) to refrain from performing any material prohibited act or (iii) to fulfill any material condition to be fulfilled by it under this Agreement or any Closing Document, or under any agreement referred to herein or attached hereto as a schedule or an exhibit, unless such failure results from the failure of one or more of Purchaser's conditions to the Close of Escrow set forth in Section 12.1 to be satisfied or waived, which failure is not cured by Purchaser or such SPE within the relevant cure period set forth below.  Purchaser or the SPE shall cure any default consisting of Purchaser's or such SPE's failure to deposit any Closing Payment into Escrow within twenty (20) business days after receipt of written notice of default from Seller.  Purchaser or such SPE shall cure any other curable default within thirty (30) days after receipt of written notice of default from Seller; provided, however, that if the default is not the failure to pay money and the default is of a nature that it can be cured but cannot be cured within such 30-day period, then a Purchaser Default shall not exist so long as Purchaser or such SPE, as applicable, shall commence to cure such failure within such 30-day period, and shall diligently prosecute such cure to its completion.  The cure periods specified in this Section 18.1(c) shall not apply to those Purchaser Defaults specified in any other paragraph of this Section 18.1.

      18.2   Seller Defaults.   The occurrence of any of the following, prior or subsequent to the Close of Escrow, shall be a "Seller Default" hereunder:

      a.    The failure of Seller (i) to perform any material act to be performed by it under this Agreement, or (ii) to refrain from performing any material prohibited act or (iii) to fulfill any material conditions to be fulfilled by it under this Agreement, unless such failure results from the failure of one or more of Seller's conditions to the Close of Escrow set forth in Sections 12.2 or 12.4 to be satisfied or waived, which failure is not cured by Seller within the relevant cure period.  Seller shall cure any default consisting of Seller's failure to make any delivery into the Escrow necessary for the Close of Escrow within twenty (20) days after receipt of written notice of default from Purchaser.  Seller shall cure any other curable default within thirty (30) days after receipt of written notice from Purchaser; provided, however, that if the default is not the failure to pay money and the default is of a nature that it can be cured, but cannot be cured within such 30-day period, then a Seller Default shall not exist so long as Seller shall commence to cure such

failure within such 30-day period, and shall diligently prosecute such cure to its completion; or

   b.   Any of Seller's representations and warranties set forth in Article 16 shall be untrue in any material way.

   18.3   <u>Seller's Remedies</u>.

   a.   <u>Liquidated Damages</u>.  IF PURCHASER OR ANY SPE FAILS TO COMPLETE THE PURCHASE OF THE PHASE I LOTS OR, AFTER EXERCISE OF AN OPTION, ANY OPTION PARCEL AS PROVIDED IN THIS AGREEMENT FOR ANY REASON OTHER THAN A SELLER DEFAULT OR THE NONFULFILLMENT OF A CONDITION TO PURCHASER'S PERFORMANCE UNDER THIS AGREEMENT, THEN SELLER SHALL BE RELEASED FROM ALL ITS OBLIGATIONS UNDER THIS AGREEMENT, THE UNEXERCISED OPTIONS SHALL TERMINATE AND SELLER, AS ITS SOLE REMEDY, SHALL BE ENTITLED TO OBTAIN AND KEEP ALL UNAPPLIED PORTIONS OF THE DEPOSITS IN ACCORDANCE WITH THIS AGREEMENT AS LIQUIDATED DAMAGES (INCLUDING, IF APPLICABLE, ANY OPTION CASH DEPOSITS OR OTHER SUMS PAID BY PURCHASER OR AN SPE TO SELLER OR ESCROW HOLDER AS ADDITIONAL EARNEST MONEY INSTALLMENTS OR AS EXTENSION FEES TO BE TREATED AS PART OF THE DEPOSITS PURSUANT TO THE TERMS OF THIS AGREEMENT OR ANY SUBSEQUENT AMENDMENT OF THIS AGREEMENT).  IN LIGHT OF THE DIFFICULTY THE PARTIES WOULD HAVE IN DETERMINING SELLER'S ACTUAL DAMAGES AS A RESULT OF SUCH A FAILURE TO PURCHASE THE PHASE I LOTS OR, AFTER EXERCISE OF AN OPTION, ANY OPTION PARCEL, THE PARTIES AGREE THAT THE AMOUNT OF THE DEPOSITS (OR, IF APPLICABLE, THE UNAPPLIED PORTION THEREOF) IS A REASONABLE ESTIMATE OF THE EXTENT TO WHICH SELLER WOULD BE DAMAGED BY PURCHASER'S OR SUCH SPE'S FAILURE TO CONSUMMATE SUCH PURCHASE. IMMEDIATELY UPON ANY SUCH FAILURE BY PURCHASER TO COMPLETE THE PURCHASE OF SUCH PARCEL, PURCHASER AND EACH SPE HEREBY AUTHORIZES ESCROW HOLDER TO PAY THE DEPOSITS TO SELLER, TO THE EXTENT NOT PREVIOUSLY DELIVERED.   IN CONSIDERATION OF SELLER RECEIVING THE LIQUIDATED DAMAGES, SELLER WILL BE DEEMED TO HAVE WAIVED ALL OF ITS CLAIMS AGAINST PURCHASER AND THE APPLICABLE SPE(S) FOR DAMAGES AND SPECIFIC PERFORMANCE OF PURCHASER'S OR SUCH SPE'S OBLIGATION TO PURCHASE THE PROPERTY (OR PROPERTY WITH RESPECT TO WHICH AN OPTION HAS BEEN EXERCISED).   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS SECTION 18.3(a), IF PURCHASER OR ANY SPE BRINGS AN ACTION AGAINST SELLER FOR AN ALLEGED BREACH OR DEFAULT BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, AND, IN CONNECTION WITH THAT ACTION, RECORDS A <u>LIS PENDENS</u> OR OTHERWISE ENJOINS OR RESTRICTS SELLER'S ABILITY TO SELL OR TRANSFER ANY PORTION OF THE PROPERTY NOT PREVIOUSLY CONVEYED TO PURCHASER OR AN SPE IN ACCORDANCE WITH THIS AGREEMENT ("<u>PURCHASER'S ACTION</u>"), SELLER SHALL NOT BE RESTRICTED BY THE PROVISIONS OF THIS SECTION 18.3(a) FROM SEEKING EXPUNGEMENT OR RELIEF FROM THAT <u>LIS PENDENS</u>, INJUNCTION OR OTHER RESTRAINT, AND

RECOVERING DAMAGES, COSTS OR EXPENSES (INCLUDING ATTORNEYS' FEES) WHICH SELLER MAY SUFFER OR INCUR AS A RESULT OF PURCHASER'S ACTION (PROVIDED, HOWEVER, THAT, IN SUCH CIRCUMSTANCES, SELLER SHALL HAVE NO RIGHT TO SEEK SPECIFIC PERFORMANCE OF THE OBLIGATION TO PURCHASE THE APPLICABLE PARCEL FROM PURCHASER OR SUCH SPE), AND THE AMOUNT OF ANY SUCH DAMAGES AWARDED TO SELLER SHALL NOT BE LIMITED TO THE LIQUIDATED DAMAGES SET FORTH HEREIN.   FURTHERMORE, IN NO EVENT SHALL THIS SECTION 18.3(a).  HAVE ANY APPLICATION TO OR LIMIT SELLER'S RIGHTS AGAINST PURCHASER OR ANY SPE IN CONNECTION WITH ANY RIGHT OF INDEMNITY UNDER THIS AGREEMENT (INCLUDING THOSE UNDER SECTIONS 9.10, 11.6, 15.14, 15.15, 17.2, 17.3 AND 22), SECTION 24.4 (ATTORNEYS' FEES), ANY MISREPRESENTATIONS BY PURCHASER OR ANY SPE, THE PROVISIONS OF SECTION 18.4 OR ANY CONSTRUCTION LICENSE.

Purchaser: _____          Seller: _____
                initials                       initials

          b.     <u>Post-Closing Default</u>.  If a Purchaser Default, consisting of any of Purchaser's or an SPE's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser or such SPE, occurs after the Close of Escrow for that Parcel, Seller shall have all remedies available to it at law or in equity with respect to that Parcel, including, without limitation, any rights and remedies provided for in the Development Declaration or in Section 18.4 of this Agreement.

          c.     <u>"Fail-Safe" Option Termination</u>.     Notwithstanding anything contained in this Agreement to the contrary, before Seller exercise its right to terminate any exercised or unexercised Option(s), Purchaser must have received written notice that Seller intends to terminate such Option(s) and Purchaser must have failed to correct or cure such default within the period of time require by Section 18.1(d); and, in such event, the date as of which the Option can be terminated or must be exercised shall be extended pending the expiration of the applicable notice or cure period under this Section.

       The intent of this provision is to require that, prior to the termination of any Option, Purchaser has received notice of the applicable default, expiration or termination, notice that Seller intends to terminate one or more Options and a reasonable period (which is agreed to be the time set forth in Section 18.1(d) above) within which to prevent the termination of such Option.  This provision shall not be construed as requiring that Purchaser receive more than one notice of default or be given more than one cure period.

       18.4    <u>Right of First Refusal</u>.  Purchaser covenants that it has not entered into this Agreement in order to sell the Parcels or any Lots therein or assign the Options to another person prior to the construction of a Residence on each Lot by Purchaser or an SPE (except in connection with a permitted assignment under Section 24.8), and Purchaser (for itself and each SPE) waives any right to make any profit from any such resale (a "<u>Resale</u>") except in the manner permitted in this Section.  Purchaser further acknowledges that Seller has a continuing interest in the development of the Property and the successful development of Tuscany, and in order to protect such interest of Seller, Purchaser (for itself and each SPE) covenants and agrees that

RECOVERING DAMAGES, COSTS OR EXPENSES (INCLUDING ATTORNEYS' FEES) WHICH SELLER MAY SUFFER OR INCUR AS A RESULT OF PURCHASER'S ACTION (PROVIDED, HOWEVER, THAT, IN SUCH CIRCUMSTANCES,  SELLER SHALL HAVE NO RIGHT TO SEEK SPECIFIC PERFORMANCE OF THE OBLIGATION TO PURCHASE THE APPLICABLE PARCEL FROM PURCHASER OR SUCH SPE), AND THE AMOUNT OF ANY SUCH DAMAGES AWARDED TO SELLER SHALL NOT BE LIMITED TO THE LIQUIDATED DAMAGES SET FORTH HEREIN.   FURTHERMORE, IN NO EVENT SHALL THIS SECTION 18.3(a).  HAVE ANY APPLICATION TO OR LIMIT SELLER'S RIGHTS AGAINST PURCHASER OR ANY SPE IN CONNECTION WITH ANY RIGHT OF INDEMNITY UNDER THIS AGREEMENT (INCLUDING THOSE UNDER SECTIONS 9.10, 11.6, 15.14, 15.15, 17.2, 17.3 AND 22), SECTION 24.4 (ATTORNEYS' FEES), ANY MISREPRESENTATIONS BY PURCHASER OR ANY SPE, THE PROVISIONS OF SECTION 18.4 OR ANY CONSTRUCTION LICENSE.

Purchaser: _____ / initials          Seller _____ / initials

b.  Post-Closing Default.  If a Purchaser Default, consisting of any of Purchaser's or an SPE's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser or such SPE, occurs after the Close of Escrow for that Parcel, Seller shall have all remedies available to it at law or in equity with respect to that Parcel, including, without limitation, any rights and remedies provided for in the Development Declaration or in Section 18.4 of this Agreement.

c.  "Fail-Safe" Option Termination.   Notwithstanding anything contained in this Agreement to the contrary, before Seller exercise its right to terminate any exercised or unexercised Option(s), Purchaser must have received written notice that Seller intends to terminate such Option(s) and Purchaser must have failed to correct or cure such default within the period of time require by Section 18.1(d); and, in such event, the date as of which the Option can be terminated or must be exercised shall be extended pending the expiration of the applicable notice or cure period under this Section.

The intent of this provision is to require that, prior to the termination of any Option, Purchaser has received notice of the applicable default, expiration or termination, notice that Seller intends to terminate one or more Options and a reasonable period (which is agreed to be the time set forth in Section 18.1(d) above) within which to prevent the termination of such Option.  This provision shall not be construed as requiring that Purchaser receive more than one notice of default or be given more than one cure period.

18.4  Right of First Refusal.  Purchaser covenants that it has not entered into this Agreement in order to sell the Parcels or any Lots therein or assign the Options to another person prior to the construction of a Residence on each Lot by Purchaser or an SPE (except in connection with a permitted assignment under Section 24.8), and Purchaser (for itself and each SPE) waives any right to make any profit from any such resale (a "Resale") except in the manner permitted in this Section. Purchaser further acknowledges that Seller has a continuing interest in the development of the Property and the successful development of Tuscany, and in order to protect such interest of Seller, Purchaser (for itself and each SPE) covenants and agrees that

neither Purchaser nor any SPE shall resell any Parcel or Lots (except following the construction of a Residence on a Lot for which a certificate of occupancy has been issued) or assign any Option to any person or entity unless Purchaser or such SPE has complied with the right of first refusal provisions contained in this Section. Any sale or assignment not complying with the terms and conditions of this Section shall be null and void. Any Resale contract entered into by Purchaser or any SPE shall state specifically that the contract is contingent and subject to the provisions of this Section. If Purchaser or an SPE enters into a Resale contract within five (5) years from the Effective Date, then Purchaser or such SPE shall forward a copy of the contract to Seller, and Seller shall have the right, for a period of 20 days after receipt of the Resale contract, to notify Purchaser or such SPE that Seller elects to purchase the Parcel, Lots or Option which are the subject of the Resale Contract, for the purchase price provided in, and under the terms of the Resale contract. If Seller does not so notify Purchaser or such SPE within such 20-day period that Seller elects to purchase the Parcel, Lots or Option subject to the Resale contract, then Purchaser or such SPE shall have the right, for a period of 180 days following Seller's failure to so elect, to convey the Parcel, Lots or Option subject to the Resale contract upon the terms and conditions provided therein, without modification. Purchaser or the applicable SPE shall notify Seller in writing in the event the Resale contract fails to close within such 180-day period and of any modification of the Resale contract, and, after the expiration of the 180-day period, then any sale or proposed sale by Purchaser or an SPE of any Parcel, Lots or Option (including a sale pursuant to a Resale contract which has failed to close within such 180-day period or sale upon modified terms) shall again be subject to the terms of this Section 18.4. Seller's rights under this Section 18.4 will be subordinate to the rights of any bona fide lender, unaffiliated with Purchaser or an SPE, holding a deed of trust for value on those portions of the Property previously conveyed to Purchaser or such SPE. Seller reserves the right to Record (concurrently with or at any time after the Recordation of the Deed) a memorandum evidencing Seller's first refusal rights under this Section 18.4. Notwithstanding the foregoing, following the acquisition of title to the Property or any portion thereof by any purchaser at a foreclosure sale other than such lender and following the transfer of title to the Property by such lender to any unaffiliated transferee, the provisions of this Section shall again be applicable to the Property. Notwithstanding anything contained in this Section to the contrary, Seller's right of first refusal shall not apply to any portion of the Property consisting of any Lot following the sale of such Lot to a Homebuyer after the issuance of a certificate of occupancy for that Lot.

18.5    Purchaser's Remedies for Seller Closing Default. Upon the occurrence of a Seller Closing Default, Purchaser or if applicable, the purchasing SPE, at its option, shall be entitled to one of the following remedies as its sole and exclusive remedy (except as otherwise provided in Sections 18.6 and 18.7): (a) Purchaser or such SPE may treat this Agreement as being in full force and effect and pursue only the specific performance of this Agreement, or (b) Purchaser and such SPE shall have the right to terminate this Agreement with respect to the Unconveyed Property, by delivering written notice to Seller which includes a waiver of any right, title or interest of Purchaser and such SPE in the Unconveyed Property, and obtain the return of the unapplied portion of the Deposits together with Purchaser's Actual Damages. Upon a termination of this Agreement pursuant to this Section 18.5, this Agreement (other than those provisions which by their terms survive termination) shall be of no further force and effect with respect to the Unconveyed Property and in the event of such a termination prior to the Close of Escrow on the Phase I Lots, all of the Deposits shall be returned to Purchaser. In such event

Purchaser shall, (and as a condition to the payment of the Deposits to Purchaser upon a termination to the Close of Escrow on the Phase I Lots) deliver to Seller all of Purchaser's engineering plans and reports concerning the Property and the applicable Project (excluding Purchaser's confidential proformas, proprietary information, projects, internal accounting and financial information and proprietary architectural drawings) which shall become the property of Seller. Thereafter, neither party shall have any liability or obligation to or rights against the other with respect to the Unconveyed Property, except as otherwise provided in those provisions of this Agreement which expressly survive a termination hereof. Purchaser and each SPE waives any right to pursue any other remedy at law or in equity for a Seller Closing Default, including any right to seek, claim or obtain any damages, including punitive damages or consequential damages, other than Actual Damages. The term "Seller Closing Default" means that a Seller Default exists and all of the following: (i) Purchaser or the applicable SPE shall be ready, willing and able to complete the Close of Escrow with respect to a Parcel in accordance with this Agreement as of the applicable Scheduled Closing Date, (ii) Purchaser or the applicable SPE shall have delivered reasonable evidence to Seller that Purchaser or such SPE is ready, willing and able to tender the applicable Closing Payment, and (iii) notwithstanding the foregoing, Seller shall have refused or otherwise failed to complete the Close of Escrow with respect to such Parcel in accordance with this Agreement. The term "Actual Damages" shall mean Purchaser's or such SPE's actual, third-party out-of-pocket expenses (based on supporting invoices or other reasonably appropriate evidence of such expenditures), not to exceed $50,000, reasonably incurred by Purchaser or such SPE in connection with its Investigations (but excluding any such costs relating to any proformas, drawings or other materials which Purchaser is entitled to retain following a termination of this Agreement under this paragraph).

       18.6    <u>Failure to Return the Deposits</u>.  In addition to the remedy provided in Section 18.5, Purchaser shall be entitled to receive from Seller interest, at the rate of ten percent (10%) per annum, on the Deposits or any portion thereof which is required to be returned to Purchaser in accordance with an express provision of this Agreement, and which Seller does not return within the time period required by this Agreement or, if no specific time period is mentioned, three (3) business days following the event which requires its return.

       18.7    <u>Seller Default Following Close of Escrow</u>.  In addition to the remedy provided in Section 18.5, if a Seller Default, consisting of any of Seller's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser, occurs after the Close of Escrow for that Parcel, Purchaser shall have all remedies available to it at law or in equity with respect to that Parcel, including those rights and remedies provided for in the Development Declaration.

       18.8    <u>Waiver of Jury Trial</u>.  AS A MATERIAL PART OF THE CONSIDERATION UNDER THIS AGREEMENT, PURCHASER (AND EACH SPE) AND SELLER EACH WAIVES ALL RIGHTS TO TRIAL BY JURY IF LITIGATION ARISES IN CONNECTION WITH THIS AGREEMENT.

       19.    <u>Risk of Loss</u>.  All risk of loss concerning a Parcel shall be borne by Seller only until the Closing Date for that Parcel.  In the event of damage or destruction of all or a material part of a Parcel prior to the Closing Date for that Parcel, without the fault of the Purchaser, Seller shall immediately give Purchaser written notice of the damage.  Within 20 days after delivery of

the notice, Purchaser shall elect, by delivering to Seller a written notice, either: (i) to terminate this Agreement with respect to the Unconveyed Property, in which event Purchaser and Seller shall share equally all Escrow costs and the unapplied portions of the Deposits, less Purchaser's share of any Cancellation Charges, shall be returned to Purchaser, or (ii) to proceed with the purchase and/or continued optioning of the Parcel and consummate this Agreement in accordance with its terms. Purchaser's failure to deliver to Seller notice of its election within the 20-day period shall be deemed Purchaser's election to terminate. If Purchaser elects option (ii), Seller shall, at the applicable Close of Escrow, assign to Purchaser Seller's right, if any, to receive any insurance proceeds payable in connection with such damage or destruction to the affected Parcel.

20.    <u>Condemnation.</u>  If all or part of a Parcel, or any significant interest therein, is taken before the Closing Date for that Parcel as a result of the condemnation (including the filing of any notice of intended condemnation or proceedings in the nature of eminent domain, or negotiations, offers or agreements prior to or in lieu of condemnation or eminent domain proceedings), Seller shall immediately give Purchaser notice of the taking. Within 20 days after Seller delivers the notice, Purchaser shall elect, by delivering to Seller a written notice, either (i) to terminate this Agreement with respect to such Parcel and all Unconveyed Property and terminate all unexercised Options with respect thereto, in which event Purchaser and Seller shall share equally in all Escrow costs and the unapplied portions of the Deposits applicable to the Unconveyed Property which is to be excluded from this Agreement, less Purchaser's Share of any Cancellation Charges, shall be returned to Purchaser, or (ii) to proceed with the purchase and continued optioning of the affected Parcels and consummate this Agreement in accordance with its terms. Purchaser's failure to deliver to Seller notice of its election within the 20-day period shall be deemed Purchaser's election to terminate. If Purchaser elects option (ii), Seller shall, at the Close of Escrow, assign to Purchaser all Seller's right, if any, to receive any portion of any condemnation award with respect to the affected Parcels.

21.    <u>Confidentiality.</u>  The parties hereby covenant to keep confidential all writings, materials  and other information related to this transaction, other than information that: (i) becomes generally available to the public or others as a result of a disclosures by Seller; (ii) was available to Purchaser on a non-confidential basis from a source other than Seller, prior to Purchaser's receipt in connection with this Agreement (provided such information is not subject to another confidentiality agreement with another obligation of secrecy to Seller or another party); (iii) becomes available to Purchaser on a non-confidential basis from sources other than Seller, provided that such source is not prohibited from transmitting the information to Purchaser by a contractual, legal or fiduciary obligation  (collectively, the "<u>Confidential Information</u>"), except that the parties may disclose such Confidential Information to their respective consultants, attorneys, advisors, lenders and employees as may be reasonably necessary in order to evaluate and consummate this transaction.

22.    <u>Brokerage Commissions.</u>  Each party warrants and represents to the other that no broker, finder or other intermediary hired or employed by it is entitled to a commission, finder's fee or other compensation based upon the transaction contemplated hereby and each party (the "<u>Indemnitor</u>") shall protect, defend, indemnify and hold harmless the other party from and against any and all liens, demands, liabilities, causes of action, judgments, costs, claims, damages, suits, losses and expenses, or any combination thereof, including attorneys' fees, of any

nature, kind or description, caused by or arising out of the claim of any broker, finder or other intermediary alleging to have been employed or hired by the Indemnitor, to a commission, finder's fee or other compensation based upon the transactions contemplated hereby..

     23.   <u>Trademarks</u>.  Purchaser acknowledges that Seller has the prior right to the Tuscany tradenames, trademarks, servicemarks and logos (collectively, the "<u>Marks</u>").  Purchaser warrants that it shall not use, nor permit others to use, in any manner whatsoever the Marks or the name Tuscany without the prior written consent of Seller.  Purchaser shall be entitled (without payment of a royalty) to and, in such event agrees to refer to, each of the Projects as a part of Tuscany in accordance with the marketing and advertising guidelines developed by Seller. Further, Purchaser acknowledges and agrees that Purchaser shall acquire no rights in Marks except to use the Marks in connection with the Projects and in accordance with this Agreement.

     24.   <u>Miscellaneous</u>.

     24.1   <u>Notices</u>.  All notices, requests and other communications provided for hereunder shall be in writing (including, unless the context expressly otherwise provides, by facsimile transmission, <u>provided</u> that any matter transmitted by facsimile shall be immediately confirmed by a telephone call to the recipient at the number specified herein) and mailed, (by certified mail, return receipt requested) faxed or delivered, to the following addresses or facsimile numbers:

| | |
|---|---|
| <u>If to Seller</u>: | Commerce Associates, LLC<br>2920 North Green Valley Parkway,<br>Suite 114<br>Henderson, Nevada 89014<br>Attention: Bob Unger<br>Telephone:  (702) 456-5210<br>Telecopy:  (702) 456-8744 |
| <u>and</u>: | Jones Vargas<br>3773 Howard Hughes Parkway<br>Third Floor South<br>Las Vegas, Nevada 89109<br>Attention:  Michael E. Buckley, Esq.<br>Telephone: (702) 862-3300<br>Telecopy:  (702) 734-2722 |
| <u>If to Purchaser</u>: | Rhodes Homes<br>4730 S. Fort Apache Road<br>Suite 300<br>Las Vegas, Nevada 89147<br>Attention: James M. Rhodes, President<br>Telephone: (702) 873-5338<br>Telecopy: (702) 873-5129 |

<u>With a copy to:</u>           Rhodes Homes
                                 4730 S. Fort Apache Road
                                 Suite 300
                                 Las Vegas, Nevada 89147
                                 Telephone: (702) 873-5338
                                 Telecopy: (702) 873-5129

If to Escrow <u>Holder:</u>        United Title of Nevada
                                 3980 Howard Hughes Parkway
                                 Las Vegas, Nevada 89109
                                 Attention: James Bennett
                                 Telephone: (702) 836-8000
                                 Telecopy:  (702) 836-8180

or to such other address or number as shall be designated by such person in a written notice to the other party given in the manner required hereunder.

All such notices, requests and communications shall, if transmitted by overnight delivery, be effective when delivered for overnight (next day) delivery on the next business day; or, if transmitted in legible form by facsimile machine on or before 5:00 p.m. (at the recipient's location) on a business day, on such day, otherwise the next business day; or if mailed, upon receipt or the first refusal to accept such notice, request or other communication, the third business day after the date deposited into the U.S. mail, certified mail, return receipt requested; or if delivered, upon delivery.

        24.2   <u>Time of the Essence</u>.  Time is of the essence of this Agreement and each and every term and provision hereof, including the schedules and exhibits attached hereto.

        24.3   <u>Interpretation; Governing Law</u>.  This Agreement shall be construed as if prepared by both parties.  This Agreement shall be construed, interpreted and governed by the laws of the State of Nevada.

        24.4   <u>Attorneys' Fees</u>.  If any legal action or any other proceeding, including arbitration or an action for declaratory relief (including an action or proceeding between the parties while either is a debtor in a proceeding under the Bankruptcy Code or any successor statute to the Bankruptcy Code and including appellate proceedings), is brought to enforce this Agreement or because of a dispute, breach, default, or misrepresentation in connection with this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees and other costs incurred in that action or proceeding, in addition to any other relief to which that party may be entitled.  Prevailing party shall include without limitation (a) a party who dismisses an action in exchange for sums allegedly due; (b) the party that receives performance from the other party alleged to have breached a covenant or that receives a desired remedy, where these things are substantially equal to the relief sought in an action; or (c) the party determined to be the prevailing party by a court of law.  In addition, and without limiting the foregoing, Seller shall be entitled to recover its reasonable attorneys' fees and other costs incurred in connection with any action or proceeding involving the Options, including attorneys' fees incurred by Seller to monitor such proceedings.

Draft of November 13, 2003                                                         54

24.5    Further Assurances; Survival.  Each party will, whenever and as often as it shall be requested to do so by the other party, execute, acknowledge and deliver, in Recordable form, if appropriate, or cause to be executed, acknowledged and delivered, any and all such further conveyances, assignments, approvals, consents and any and all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement. All covenants and obligations contained in this Agreement which imply or require performance after a Close of Escrow and all representations and warranties of the parties contained in this Agreement shall survive such Close of Escrow, subject to any specified period of limitation contained herein, and provided, further, that, subject to Section 16.2(e), the representations and warranties contained in Articles 15 and 16 shall survive with respect to each Parcel for a period of three (3) years from the Close of Escrow on such Parcel.

24.6    Entire Agreement; Amendments.  This Agreement, together with the other written agreements referred to herein, is intended by the parties to be the final expression of their agreement with respect to the subject matter hereof, and is intended as the complete and exclusive statement of the terms of the agreement between the parties.  As such, this Agreement supersedes any and all prior understandings between the parties, whether oral or written, including any letters of intent.  Any amendments to this Agreement shall be in writing and shall be signed by both parties hereto, and, in such event, all references herein to "this Agreement" shall be to this Agreement as modified.  References to the term "this Agreement" include all schedules and exhibits attached hereto.

24.7    Waivers.  No waiver of any covenant, condition or other provision of this Agreement shall be implied, but shall only be effected by a writing, signed by the person entitled to the benefit of the covenant, condition or other provision, specifically waiving the covenant, condition or other provision.  A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

24.8    No Assignment.  Except as provided below in this Section 24.8, neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent may be granted or withheld in such party's reasonable discretion and any purported assignment in violation of this provision shall be void. Notwithstanding the foregoing, the parties acknowledge and agree that:

    a.    Seller shall have the right, upon written notice to Purchaser and Escrow Holder,  to assign its rights hereunder to (i) a business entity in which Seller, or any of Seller's members, has an ownership interest, or (ii) to an affiliate of Seller or any of Seller's members, provided that such assignee agrees in writing to assume and be bound by the provisions of this Agreement in which event Seller shall have no further liability hereunder and, in such event, all references to "Seller" herein shall refer to such successor entity or affiliate.  Notwithstanding the foregoing, such assignment shall not be effective unless and until Seller provides evidence reasonably satisfactory to Purchaser that the financial condition of the assignee is comparable or better than that of the Seller and there exists a continuity of management.

Draft of November 13, 2003                                                                                    55

b.    Purchaser shall have the right upon written notice to Purchaser and Escrow Holder, to designate an SPE, as provided in Section 1.4, or to designate as a nominee to take title to a Parcel (i) an entity owned and controlled by Purchaser; (ii) an unrelated entity if such entity's ownership of the interest herein or in the Property is solely to provide financing for Purchaser's acquisition, development and/or construction of the Property and Project or (iii) a joint venture or partnership in which Purchaser is the managing partner or venture member, provided that, in all such instances, (A) the Project continues to be developed as a "Rhodes Homes" project; (B) the assignee assumes the obligations of Purchaser hereunder and under any Ancillary Documents pursuant to a written assumption agreement in form and substance satisfactory to Seller and (C) no such assignment shall release Purchaser from its obligations hereunder. Purchaser may not assign the Options without first obtaining Seller's prior written consent which Purchaser may grant or withhold in its sole and absolute discretion.

24.9    Binding Effect. Subject to Section 24.8, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns. Where applicable, references herein to the term "Purchaser" shall include any and all applicable SPEs.

24.10    Headings; Attachments; Cross References.    The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement. All exhibits and schedules attached to this Agreement and the Recitals at the front of this Agreement are incorporated herein by the references thereto contained herein. Unless the context otherwise requires a different meaning, the term, "Agreement" includes all Exhibits, schedules and attachments hereto. Any term used in an exhibit or schedule hereto shall have the same meaning as in this Agreement unless otherwise defined in such exhibit or schedule. All references in this Agreement to subsections, sections, exhibits or schedules shall be to subsections, sections, exhibits and schedules of or to this Agreement, unless otherwise specified.

24.11    Performance of Acts on Business Days.    Unless specifically stated to the contrary, all references to days herein shall be deemed to refer to calendar days. If the final date for payment of any amount or performance of any act hereunder falls on a Saturday, Sunday or federal or state of Nevada holiday, such payment may be made or act performed on the next succeeding business day.

24.12    Backup Withholding.    If any regulations proposed or promulgated by the Internal Revenue Service subject the transactions contemplated hereunder to backup withholding (which would require Purchaser to withhold a portion of any Parcel Price from Seller), then Seller will provide Purchaser with the necessary declaration in order to exempt such transactions from backup withholding.

24.13    No Third Party Beneficiaries.    This Agreement is solely for the benefit of Seller and Purchaser and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party or the general public.

24.14    No Recording; Quitclaim; Releases.    This Agreement shall not be recorded; however the Memorandum of Agreement and Amendment to Memorandum shall be

recorded as provided above. If this Agreement shall expire or terminate and Purchaser shall not have acquired the Phase I Lots pursuant hereto or upon the expiration or termination of any Option, Purchaser shall execute, acknowledge and deliver to Seller a recordable quitclaim deed to the Property or the Unconveyed Property, as applicable, or any other instrument reasonably requested by Seller for the release of the Memorandum of Agreement or Amendment to Memorandum, as applicable, and otherwise indicating the termination of Purchaser's applicable rights hereunder and with respect to the Property or Unconveyed Property. As a condition to Seller or Escrow Holder's obligation to return any portion of the Deposits to Purchaser, Purchaser shall execute and deliver to Seller, in Recordable form, any and all instruments necessary to terminate Purchaser's interest in any Unconveyed Property.

24.15 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. Delivery of this Agreement may be accomplished by facsimile transmission of this Agreement. In such event, the parties hereto shall promptly thereafter deliver to each other executed counterpart originals of this Agreement.

25. <u>Certain Definitions</u>. As used in this Agreement and in any exhibit, schedule or attachment attached hereto, the following terms shall have the meanings set forth below.

25.1 "<u>Agreed Rate</u>" shall mean a per annum interest rate equal to the sum of (i) the "prime rate" as set forth from time to time in the "Money Rates" section of *The Wall Street Journal* (or the highest of such rates if more than one) plus (ii) two percent (2%). Changes in the "prime rate" shall be effective as of the date of such change, and interest shall be calculated on the basis of a 365 day year and actual days.

25.2 "<u>Effective Date</u>" shall mean the date as of which this Agreement is fully executed by Seller and Purchaser (the date as of which the last of the parties has executed this Agreement, as set forth opposite their respective signatures below).

25.3 "<u>Force Majeure Delays</u>" shall mean delays caused by occurrences beyond the reasonable control and without the fault, negligence or financial inability of a party hereto or its contractors, including strikes, labor disputes, material shortages, fire, earthquake, floods and other acts of God, inclement weather, enemy invasion, wars, insurrection, sabotage, terrorism, laws, orders or actions of governmental, civil or military authorities, governmental restrictions, delays in processing by governmental agencies or utilities (including delays caused by Nevada Power Company in reviewing and approving the electrical plans for the Property), riot, civil commotion  judicial or administrative proceedings commenced and maintained by persons not parties to this Agreement and unavoidable casualty. If the performance of an obligation hereunder or under any other agreement or declaration, other than the payment of money, is expressly subject to the effect of Force Majeure Delay, then, unless otherwise provided herein or in such other agreement or declaration to the contrary, the effect of a Force Majeure Delay shall be to extend the time for performance of such obligation for the reasonable period of such Force Majeure Delay, but in no event greater than the period of the Force Majeure Delay.

25.4 "<u>Record</u>", "<u>Recorded</u>" and "<u>Recordation</u>" shall mean, with respect to any document, the recordation of such document in the Office of the County Recorder of Clark

Draft of November 13, 2003

County, Nevada ("Recorder"). "Recordable" means the requirement that a document meet the statutory and/or other legal requirements for Recordation.

25.5    "Substantially Complete" (or any variation thereof) shall mean, with respect to any improvement or work to be constructed or installed, that such improvement or work is sufficiently complete so that it may be lawfully used for the purpose for which it is intended and no permit which requires completion of such improvement or work, is being withheld or delayed solely on the basis that such improvement or work is not deemed complete.

25.6    Miscellaneous Terms.  The term "or" is disjunctive; the term "and" is conjunctive. The term "shall" is mandatory; the term "may" is permissive. Masculine terms also apply to females; feminine terms also apply to males. The term "including" is by way of example and not limitation. Defined terms may used in the singular or plural.

26.    Mediation and Arbitration.

26.1    Mediation.  The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement (a "Dispute"). Either party may initiate negotiations by providing written notice in letter form to the other party, setting forth the subject of the Dispute and the relief requested. The recipient of such notice will respond in writing within seven (7) business days with a statement of its position on and recommended solution to the Dispute. If the Dispute is not resolved by this exchange of correspondence, then representatives of each party with full settlement authority will meet at a mutually agreeable time and place within fifteen (15) business days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the Dispute. If the Dispute is not resolved by these negotiations, the matter will be submitted to J.A.M.S./Endispute ("JAMS"), or its successor, for mediation. The mediation shall take place at a location chosen by the mediator in the County of Clark, State of Nevada. Any information provided to the mediator shall be concurrently supplied to the parties involved in the mediation and the parties shall be given an opportunity to comment to the mediator on the information. Each party shall present the mediator and each other party with a written statement of the party's position and all copies of supporting documentation, at least two (2) business days prior to the mediation. Each party shall have an opportunity to orally present its position to the mediator and the other party. The rules of evidence in NRS 47.020 through NRS 56.020 shall not apply, provided that this shall not be deemed to constitute a waiver of the right to assert any privilege defined in NRS Chapter 49. Each party agrees to designate one or more representatives, having authority to bind that party, who will participate in the mediation process including attending all mediation hearings. If the mediation results in a mutually acceptable resolution of all or some of the matters in Dispute, then the parties shall memorialize such resolution in a settlement agreement. Each party shall bear its own costs incurred in connection with the mediation. The costs of the mediator shall be shared equally between the parties regardless of the outcome.

26.2    Arbitration.  The parties agree that any and all Disputes solely between them that are not resolved through the provisions of Section 26.1 of this Agreement, shall be submitted to JAMS, or its successor, for final and binding arbitration with the arbitration to occur in the County of Clark, State of Nevada. In instances wherein a complete resolution of the Dispute necessarily requires the participation of a third-party as a party to the arbitration, the

failure of the affected third-party to agree to participate in an arbitration as a party pursuant to the provisions of this Section shall be deemed to excuse any party from being bound by the provisions of this Section and, in such latter instance or instances, notwithstanding the existence of Section 26.2 of this Agreement, such a Dispute shall be finally resolved in a court of competent jurisdiction in Clark County, Nevada.

Either party may initiate JAMS arbitration, in the manner prescribed in the JAMS Comprehensive Arbitration Rules & Procedures in effect as of the date the demand for arbitration is first made (the "JAMS Rules"), at any time following the first JAMS mediation session, or 45 days after filing the written request for Mediation, whichever first occurs. If the parties agree, the mediation initiated under Section 26.1 of this Agreement may continue after the commencement of arbitration, however, the mediator cannot also be appointed arbitrator without the agreement of all of the parties to both proceedings.

With the exceptions specifically outlined below, the arbitration shall be governed under the provisions of the JAMS Rules, provided, however, that notwithstanding anything to the contrary in the JAMS Rules, no punitive or consequential damages may be awarded in the arbitration.

The successful party to the arbitration shall be entitled to an award of reasonable attorneys fees under NRS 38.238 along with the Actual Costs of the proceeding. As used herein, the term "Actual Costs" is not limited to the costs defined in NRS 38.238 but shall also include any and all actual costs of the arbitration, including but not limited to the fees paid for the use of the JAMS Arbitration proceeding, facilities, and arbitrators, provided, however, that the initial costs of the arbitration shall be borne equally by the parties to the arbitration, pending the determination of which party is the successful party.

Subject to the provisions of NRS 38.237, 38.241 and 38.242, the determination of the arbitration, as represented in the award, shall be finding and binding, The successful party may seek confirmation of the award pursuant to NRS 28.239 and a judgment on the award pursuant to NRS 38.243. Any disagreement as to whether a particular Dispute is encompassed within the provisions of Section 22.2 of this Agreement shall be finally determined in accordance with the provisions of NRS 38.206 - 38.248, with all such proceedings to be brought in a competent jurisdiction located within Clark County, Nevada.

26.3    Survival.  The provisions of this Article 26 shall survive each Close of Escrow and the termination of this Agreement.

27.    Not an Offer.  Seller's delivery of unsigned copies of this Agreement is solely for the purpose of review by the party to whom delivered, and neither the delivery nor any prior communications between the parties, whether oral or written, shall in any way be construed as an offer by Seller, nor in any way imply that Seller is under any obligation to enter the transaction which is the subject of this Agreement. The signing of this Agreement by Purchaser constitutes an offer which shall not be deemed accepted by Seller unless and until Seller has signed this Agreement and delivered a duplicate original to Purchaser.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date set forth beneath their respective signatures below.

**COMMERCE ASSOCIATES, LLC, a**
**Nevada limited liability company**

**RHODES DESIGN AND DEVELOPMENT**
**CORPORATION, a Nevada corporation**

By:_____

By:_____

Print Name:_____

Print Name:_____

Title:_____

Title:_____

Dated:_____

Dated:_____

Draft of November 13, 2003

60

05/08/1994  20:48     7024565210                      MAKENA                            PAGE  82

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date set forth beneath their respective signatures below.

**COMMERCE ASSOCIATES, LLC, a**          **RHODES DESIGN AND DEVELOPMENT**
**Nevada limited liability company**      **CORPORATION, a Nevada corporation**

By: _____            By: _____

Print Name: _Tom Gonzales_                Print Name: _James M. Rhodes_

Title: _____            Title: _Pres._

Dated: _11 / 17 / 03_                     Dated: _11-14-03_

Draft of November 13, 2003                                              60

## RECEIPT AND AGREEMENT

ESCROW HOLDER hereby acknowledges receipt of the foregoing escrow instructions and agrees to act as Escrow Holder in accordance with the terms and conditions thereof.

Escrow Holder further acknowledges receipt from Purchaser of the Initial Deposit in the amount of $2,500,000.

Dated this _____ day of November, 2003.

**United Title of Nevada**

By:_____

Print Name:_____

Title:_____

Escrow Number:_____

Draft of November 13, 2003

61