1  Nile Leatham (NV Bar No. 002838)
2  Shlomo S. Sherman (NV Bar No. 009688)
   KOLESAR & LEATHAM
3  Wells Fargo Financial Center
   3320 W. Sahara Ave.
4  Las Vegas, NV 89102
   Telephone: 702.979.2357
5  Facsimile: 702.362.9472
6  E-Mail:    nleatham@klnevada.com

7  Philip C. Dublin (NY Bar No. 2959344)
   Abid Qureshi (NY Bar No. 2684637)
8  Meredith A. Lahaie (NY Bar No. 4518023)
9  AKIN GUMP STRAUSS HAUER & FELD LLP
   One Bryant Park
10 New York, NY 10036
   Telephone: 212.872.1000
11 Facsimile: 212.872.1002
12 E-Mail:    pdublin@akingump.com
              aqureshi@akingump.com
13            mlahaie@akingump.com

14
   *Counsel for the Reorganized Debtors*
15
              UNITED STATES BANKRUPTCY COURT
16                  DISTRICT OF NEVADA
                     SOUTHERN DIVISION
17
18 IN RE:                              §   Case No. 09-14814-LBR
                                       §   (Jointly Administered)
19 THE RHODES COMPANIES, LLC,          §
      aka "Rhodes Homes," *et al.*,    §   Chapter 11
20                                     §
21      **Reorganized Debtors.**[1]    §
                                       §
22                                     §

23      [1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax
   identification number, if applicable, are:  Heritage Land Company, LLC (2918); The Rhodes Companies, LLC
24 (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281);
   Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf
25 and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany
   Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design
26 and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090);
   Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC
27 (8738); Tribes Holdings LLC (4347); Six Feathers Holdings LLC (8451); Elkhorn Partners, A Nevada Limited
   Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897);
28 Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

| Affects: | § | **REORGANIZED DEBTORS' REPLY IN** |
|---|---|---|
| ☒ **All Debtors** | § | **SUPPORT OF OBJECTION TO** |
| ☐ **Affects the following** | § | **COMMERCE ASSOCIATES CLAIM** |
| **Debtor(s)** | § | **PURSUANT TO BANKRUPTCY RULE 3007** |
| | § | **AND BANKRUPTCY CODE SECTION 502(b)** |

The above-captioned reorganized debtors (collectively, the "Reorganized Debtors"), by and through their undersigned counsel, hereby submit their reply in support of their Objection to Commerce Associates' Claim Pursuant to Bankruptcy Rule 3007 and Bankruptcy Code Section 502(b), filed on April 1, 2011 as Docket No. 1382 (the "Objection").

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### INTRODUCTION

On or about April 25, 2011, Commerce Associates, LLC ("Commerce") filed its opposition to the above-referenced Objection as Docket No. 1396 (the "Opposition"). The Opposition, though brief, is not easy reading; nevertheless, it appears to present three grounds for opposing the Objection, each as spurious as the next.

First, Commerce argues that its lien upon the lots acquired by Tuscany Acquisitions III, LLC ("TA3") and Tuscany Acquisitions IV, LLC ("TA4") – occasionally referred to herein as "takedowns" – are not subject to the particular sample subordination agreement attached to the Objection as Exhibit D. The basis for this conclusion by Commerce appears to be two-fold: (1) neither TA3 nor TA4 were parties to the aforesaid subordination agreement; and (2) TA3 and TA4 acquired their properties subsequent to the recordation of the aforesaid subordination agreement.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

2

Next, Commerce argues that "Reorganized Debtors have failed to substantiate that they failed to make a profit on the sale of homes in Tuscany." *See* Opposition, ¶ 20.

Finally, Commerce appears to argue that the Reorganized Debtors are required to affirmatively demonstrate that there has been no "Material Amendment" to the senior debt held by Credit Suisse.

For the following reasons, these arguments are entirely without merit, and the Objection must be sustained.

**II**

**LEGAL AUTHORITY**

A.    **Commerce's Liens on the Lots Owned by Tuscany Acquisitions III, LLC and Tuscany Acquisitions IV, LLC Were Expressly Subordinated to Credit Suisse's Liens**

Commerce's argument that its liens on the lots acquired by TA3 and TA4 are not subject to the particular subordination agreement presented in the Objection contains several fatal flaws. Firstly, *none* of whom Commerce refers to as the "Debtor parties" were parties to the subordination agreement, for the simple reason that the subordination agreement was solely between *Credit Suisse and Commerce* – the two lienholders on the property that was the subject of the agreement. In that agreement, Commerce agreed to subordinate its liens to Credit Suisse's credit facility, in order to permit the financing and survival of the project. In addition, the fact that the subordination agreement did not specifically *name* TA3 and TA 4, as it did the other "Debtor parties," is for the simple reason that *they had not yet been created.* They were formed on January 4, 2006 and September 1, 2006, respectively – after the November 21, 2005 recordation of Credit Suisse's liens and the particular subordination agreement referenced in the Objection.

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Far more importantly, however, after TA3 and TA4 acquired their respective properties, the following two key documents were recorded in connection with each takedown[2]: (1) a security instrument, pursuant to which the properties acquired by TA3 and TA4 were pledged to Credit Suisse as additional security for the Credit Suisse credit facility; and (2) *a subordination agreement that expressly subordinated Commerce's liens on those properties to Credit Suisse's liens*. Recorded copies of the subordination agreements relating to the TA3 and TA4 properties are attached hereto as **Exhibits "1" through "3"**.

These documents, *executed by Commerce*, are of *public record*. The Reorganized Debtors are baffled that Commerce would base its Opposition upon the disingenuous premise that its liens on certain properties are not subject to an *earlier* subordination agreement – despite having full knowledge that it itself had executed additional subordination agreements in connection with its liens *on those very properties*.

As the recorded documents reflect, and as was quite evidently the intention of the parties, Credit Suisse's liens on the entirety of the project were senior to the Commerce's subordinated liens. Pursuant to the Plan (as described in the Objection), the consequences of this hierarchy are such that, whatever Commerce's claim is, it has been reduced to an unsecured claim. Accordingly, the Reorganized Debtors reiterate their request that Commerce's claim be deemed unsecured and subject to the treatment set forth in the Plan for the Class C-1 general unsecured claims.

---

[2] The takedowns on September 11 and November 13 of 2006 by TA4 appear to have been addressed with a single set of security and subordination documents, recorded on March 2, 2007. Thus, one set of security and subordination documents executed in connection with the TA3 takedowns on January 26, 2006 were recorded on March 2, 2007, one set of security and subordination documents executed in connection with TA4's September and November 2006 takedowns were recorded on March 2, 2007, and a third set of security and subordination documents executed in connection with TA4's March 16, 2007 takedowns was recorded on July 31, 2007.

**B.** **Commerce Bears the Burden of Proof to Demonstrate the Validity of its Claim and the Amount Thereof, and Commerce Has Failed to Satisfy This Burden**

Fed. R. Bankr. P. 3001(f) provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

Pursuant to Fed. R. Bank. P. 3001(a), a proof of claim "shall conform substantially to the appropriate Official Form." Commerce's proof of claim, however, did not. Moreover, pursuant to the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines (the "Notice"), August 5, 2009 was established as the deadline for all creditors other than governmental units to file proofs of claim asserting claims in the Chapter 11 Cases. Commerce's proof of claim, however, was filed late, on August 6, 2009.

However, even if Commerce's proof of claim is to be treated as one "executed and filed in accordance with these rules," the presumption of validity afforded by Rule 3001(f) is defeated by the filing of a substantive objection. "Under section 502(a), a proof of claim as filed is 'presumptively valid unless a party in interest submits an objection.'" *In re Medina*, 205 B.R. 216, 222 (9th Cir BAP 1996) citing *In re Hobdy*, 130 B.R. 318, 320 (9th Cir. BAP 1991). "Once such a claim has been filed, the burden then shifts to the objecting party to present evidence to overcome the prima facie case." *Medina*, 205 B.R. at 222. However, "[i]f the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (internal citations omitted).

"The ultimate burden of persuasion remains at all times upon the claimant." *Id.*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

The Objection rebutted any presumption of validity to which Commerce's proof of claim may have been entitled by presenting competent evidence, in the form of publicly recorded documents, and the two spreadsheets attached to the Objection as Exhibits E and F, which have been authenticated by the Declaration of Justin Bono in support of the Objection (the "Bono Declaration") filed concurrently herewith.

In response to the Objection, Commerce has filed an Opposition that simply ignores publicly recorded documents that Commerce itself executed, and that seeks to improperly shift the burden to the Reorganized Debtors to "prove" (beyond the information already provided in the Exhibits to the Objection) that "they failed to make a profit on the sale of homes in Tuscany" and to present further "evidence of no Material Modification."

On the other hand, Commerce has *still* failed to even give an amount to its claim. Thus, more than 21 months after filing its proof of claim, which stated simply that "Amount Is Unknown at this Time", and despite having its claim disputed by the Reorganized Debtors, Commerce is *still* not in a position to liquidate the amount of its claim.  Rather, Commerce proposes at this late hour to shift all of the burden to the Reorganized Debtors, while "reserving its right" to "object to the calculations of amounts which Reorganized Debtors allege are owed or not owed to Commerce based on a review of the 'books and records' upon which Reorganized Debtors rely." *See* Opposition, ¶ 21.

Of particular significance is the fact that, with respect to each of the properties that were acquired by TA3 and TA4, upon which the Opposition is based, the Debtors paid the Lot Premiums *at the time of closing*, as reflected in the settlement statements executed in connection with each of those closings.  With respect to Profit Participation, as discussed in the Objection, the Debtors actually overpaid their Profit Participation payments to

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

1   Commerce.  Thus, Commerce actually has no lien at all on the properties that are the subject

2   of its Opposition.

3       The Court should not countenance Commerce's slothful defense of its claim.  Two

4   years after filing a vague proof of claim, and a claim that does not substantially conform to

5   the appropriate Official Form, Commerce has opposed the Reorganized Debtors' Objection,

6   without bothering to glance at the publicly-recorded documents that it executed, without

7   presenting a shred of relevant evidence, and without even asserting an amount that it

8   believes it is owed.  The ultimate burden of persuasion is on the claimant – and Commerce

9   has woefully failed to satisfy this burden.

10      For the aforementioned reasons, the Reorganized Debtors respectfully request that

11  the Court sustain the Objection.

12

13                                III

14                         **CONCLUSION**

15

16      WHEREFORE, for the reasons set forth above, the Reorganized Debtors respectfully

17  reiterate their request that the Court (i) enter the order attached to the Objection as Exhibit

18  G: (a) deeming the entirety of Commerce's claim unsecured and subject to treatment

19  afforded Class C-1 under the Plan for General Unsecured Claims, and (b) liquidating

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27

28

1  Commerce's claim in the amount of $2,741,096; and (ii) grant the Reorganized Debtors such

2  other and further relief as is just, proper and equitable.

3      DATD this 2nd day of May, 2011.

4

5                          KOLESAR & LEATHAM

6  

7                      By:

8                          Nile Leatham (NV Bar No. 002838)
                           Shlomo S. Sherman (NV Bar No. 009688)
9                          Wells Fargo Financial Center
                           3320 W. Sahara Ave.
10                         Las Vegas, NV 89102
                           (702) 979-2357 (Telephone)
11                         (702) 362-9472 (Facsimile)
                           Nleatham@klnevada.com
12

13                         AKIN GUMP STRAUSS HAUER & FELD LLP
                           Philip C. Dublin (NY Bar No. 2959344)
14                         Abid Qureshi (NY Bar No. 2684637)
                           Meredith A. Lahaie (NY Bar No. 4518023)
15                         One Bryant Park
                           New York, New York 10036
16                         (212) 872-1000 (Telephone)
                           (212) 872-1002 (Facsimile)
17                         pdublin@akingump.com
                           aqureshi@akingump.com
18                         mlahaie@akingump.com

19

20                         *Counsel for the Reorganized Debtors*

21

22

23

24

25

26

27

28

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000  Facsimile: 212.872.1002 / akingump.com

8

# EXHIBIT 1

# EXHIBIT 1





20070302-0002287

Fee: $33.00
N/C Fee: $0.00

03/02/2007                13:24:57
T20070037188
Requestor:
   CHICAGO TITLE

Debbie Conway              RMS
Clark County Recorder     Pgs: 20

APN(s) 160-32-001 thru 024; 160-32-614-001 thru 009; 160-32-614-010 thru 169 and 160-32-715-001 thru 014

WHEN RECORDED RETURN TO:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Attention: Rand S. April, Esq.

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "**Agreement**") made as of this **31** day of January, 2007, by and among (A) COMMERCE ASSOCIATES, LLC, a Nevada limited liability company, having an office at c/o TG Investments, LLC, 4511 W. Cheyenne Ave., Suite 801, N. Las Vegas, NV 89032 (hereinafter referred to as the "**Subordinate Lienholder**"); (B) CREDIT SUISSE, Cayman Islands Branch, as collateral agent (together with its successors in such capacity, the "**First Lien Collateral Agent**") for the First Lien Lenders (as hereinafter defined), having an office at Eleven Madison Avenue, New York, New York 10010 (hereinafter referred to as the "**Senior First Lienholder**"); and (C) CREDIT SUISSE, Cayman Islands Branch, as collateral agent (together with its successors in such capacity, the "**Second Lien Collateral Agent**") for the Second Lien Lenders (as hereinafter defined), having an office at Eleven Madison Avenue, New York, New York 10010 (hereinafter referred to as the "**Senior Second Lienholder**", and together with the Senior First Lienholder, the "**Senior Lienholders**").

W I T N E S S E T H :

WHEREAS, pursuant to that Purchase Agreement and Grant of Options, dated November 13, 2003 (as amended, restated, supplemented or otherwise modified from time to time, including by that certain Third Amendment to Purchase Agreement and Grant of Options, dated as of November 21, 2005, the "**Tuscany Option Agreement**"), by and between Subordinate Lienholder and Rhodes Design and Development Corporation, a Nevada corporation ("**Rhodes Design**"), and certain subsidiaries of Rhodes Design, Rhodes Design has acquired the fee interest in certain real property located in the County of Clark, State of Nevada, as more particularly described on Exhibit A attached hereto and made a part hereof (together with all improvements located thereon, collectively, the "**Mortgaged Property**");

WHEREAS, the Subordinate Lienholder is the owner and holder of certain recorded instruments described on Exhibit B attached hereto (collectively, the "**Subordinate Lien Documents**") (the liens and security interests created thereby, together with any other liens and security interests securing the Secured Option Obligations (as defined below), and any replacement liens and security interests, are referred to herein as the "**Subordinate Lien**"), encumbering the Mortgaged Property, securing certain obligations of Subsidiary to the Subordinate Lienholder on account of the "Map Costs", "Profit Participation" and/or "Lot Premium" (as each such term is defined in the Tuscany Option Agreement) with respect to the Mortgaged Property (together with any refinancings or replacements of any thereof, the "**Secured Option Obligations**");

WHEREAS, pursuant to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**First Lien Credit Agreement**"), by and among Heritage Land Company, LLC, a Nevada limited liability company ("**Heritage Land**"), The Rhodes Companies, LLC, a Nevada limited liability company ("**Rhodes Companies**"), and Rhodes Ranch General Partnership, a Nevada general partnership ("**Rhodes GP**" and, collectively with Heritage Land and Rhodes Companies, the "**Borrowers**" and each, individually, a "**Borrower**"), the lenders from time to time party thereto (the "**First Lien Lenders**"), and Senior First Lienholder, as administrative agent, syndication agent and collateral agent for the First Lien Lenders, the First Lien Lenders have agreed to provide a term loan facility to Borrowers in the original principal amount of $430,000,000 (as such amount may be increased or decreased from time to time pursuant to the First Lien Credit Agreement, the "**Senior First Lien Loan**");

WHEREAS, pursuant to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Second Lien Credit Agreement**", and collectively with the First Lien Credit Agreement, the "**Credit Agreements**"), by and among the Borrowers, the lenders from time to time party thereto (the "**Second Lien Lenders**"), and Senior Second Lienholder, as administrative agent, syndication agent and collateral agent for the Second Lien Lenders, the Second Lien Lenders have agreed to provide a term loan facility to Borrowers in the original principal amount of $70,000,000 (as such amount may be increased or decreased from time to time pursuant to the Second Lien Credit Agreement, the "**Senior Second Lien Loan**" and together with the Senior First Lien Loan, the "**Senior Loans**");

WHEREAS, pursuant to the First Lien Credit Agreement, the Borrowers have agreed to cause certain subsidiaries (including Tuscany Acquisitions III, LLC (the "**Subsidiary**")) to guaranty the obligations of the Borrowers under the First Lien Credit Agreement, and accordingly, within three business days of the execution of this Agreement, the Subsidiary will execute and deliver to the Senior First Lienholder (i) a Subsidiary Guaranty (as defined in the First Lien Credit Agreement) (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Senior First Lien Guaranty**") and (ii) a Mortgage (as defined in the First Lien Credit Agreement) on the Mortgaged Property (the liens and security interests created by any such Mortgage, and any extensions, modifications, consolidations, refinancings and replacements thereof, being hereinafter referred to as the "**Senior First Lien**") securing such Subsidiary Guaranty, evidencing and securing the

2

obligations of the Subsidiary under such Subsidiary Guaranty (the "**Senior First Lien Obligations**");

WHEREAS, pursuant to the Second Lien Credit Agreement, the Borrowers have agreed to cause certain subsidiaries (including the Subsidiary) to guaranty the obligations of the Borrowers under the Second Lien Credit Agreement, and accordingly, within three business days of the execution of this Agreement, the Subsidiary will execute and deliver to the Senior Second Lienholder (i) a Subsidiary Guaranty (as defined in the Second Lien Credit Agreement) (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Senior Second Lien Guaranty**" and collectively with the Senior First Lien Guaranty, the "**Senior Guaranties**") and (ii) a Mortgage (as defined in the Second Lien Credit Agreement) on the Mortgaged Property (the liens and security interests created by any such Mortgage, and any extensions, modifications, consolidations, refinancings and replacements thereof, being hereinafter referred to as the "**Senior Second Lien**", and together with the Senior First Lien, the "**Senior Liens**") securing such Subsidiary Guaranty, evidencing and securing the obligations of the Subsidiary under such Subsidiary Guaranty (the "**Senior Second Lien Obligations**", and together with the Senior First Lien Obligations, the "**Senior Obligations**"); and

WHEREAS, the Subordinate Lien has been, and the Senior Liens will be, recorded in the Office of the County Recorder of Clark County, Nevada.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the Subordinate Lienholder and the Senior Lienholders hereby agree as follows:

1.    The Subordinate Lien (whether now existing or hereafter created or arising) is and shall continue to be expressly subordinate and junior in priority, operation and effect to the Senior Liens (whether now existing or hereafter created or arising). The foregoing shall apply, notwithstanding the availability of other collateral to the Senior Lienholders or the actual date and time of execution, delivery, recordation, filing or perfection of the Senior Liens or the Subordinate Lien, or the priority thereof, and notwithstanding the fact that the Senior Loans or any claim for the Senior Loans or the Senior Obligations or any claim for the Senior Obligations is subordinated, avoided or disallowed, in whole or in part, under Title 11 of the United States Code (the "**Bankruptcy Code**") or other applicable federal or state law.

2.    The Subordinate Lienholder hereby represents and warrants that (a) it is now the owner and holder of the Subordinate Lien; (b) the Subordinate Lien is now in full force and effect; (c) to the actual knowledge of the Subordinate Lienholder, neither the Subsidiary nor Rhodes Design is in default in the observance and/or performance of any of the obligations required to be observed and performed by the Subsidiary or Rhodes Design under the Tuscany Option Agreement or the Subordinate Lien Documents (the "**Tuscany Documents**"); (d) to the actual knowledge of the Subordinate Lienholder, no event has occurred, which, with the passing of time or the giving of notice or both would constitute a default under the Tuscany Documents by the Subsidiary or Rhodes Design; and (e) as of the date hereof, the Tuscany Option Agreement is now in full force and effect.

3

3.     The Subordinate Lienholder hereby agrees that so long as any Senior Obligations shall remain outstanding:

(a)     The Subordinate Lienholder shall send to the Senior Lienholders copies of any written notice of default under the Subordinate Lien Documents and the Tuscany Documents and any notices of termination or default under the Subordinate Lien Documents or Tuscany Documents. Each Senior Lienholder shall have the right, but shall not have any obligation whatsoever, to cure any such default within ten (10) days after the expiration of the applicable grace period permitted to Rhodes Design or the Subsidiary under the Tuscany Documents or the Subordinate Lien Documents, as applicable;

(b)     The Subordinate Lienholder shall not, without the prior written consent of the Senior Lienholders, take (or cause to be taken) any Enforcement Action. For the purposes of this Agreement, the term **"Enforcement Action"** shall mean with respect to the Subordinate Lien Documents as they apply to the Mortgaged Property, any foreclosure proceedings, the exercise of any power of sale, the acceptance by the holder of the Subordinate Lien of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of possession or control of the Mortgaged Property;

(c)     (i) If, after the consent required under paragraph 3(b) above has been obtained, any action or proceeding shall be brought to foreclose the Subordinate Lien or any other Enforcement Action shall be commenced, no portion of the rents, issues and profits of the Mortgaged Property shall be collected except through a receiver appointed by the court in connection with such Enforcement Action, after due notice of the application for the appointment of such receiver shall have been given to the Senior Lienholders and the rents, issues and profits so collected by such receiver shall be applied first to the payment of maintenance of taxes and insurance on the Mortgaged Property, and then to the payment of the Senior Obligations prior to the payment, if any, of any principal or interest due and owing on the Subordinate Lien; (ii) if during the pendency of any such foreclosure action or proceeding, an action or proceeding shall be brought by any Senior Lienholder for the foreclosure of the Senior Lien held by such Senior Lender and an application is made by such Senior Lienholder for an extension of such receivership for the benefit of such Senior Lienholder, all such rents, issues and profits held by such receiver as of the date of such application shall be applied by the receiver solely for the benefit of such Senior Lienholder, and the Subordinate Lienholder shall not be entitled to any portion thereof until all Senior Obligations have been paid in full and applied as aforesaid; and (iii) notice of the commencement of any foreclosure of the Subordinate Lien shall be given to the Senior Lienholders and true copies of all notices thereof and papers served or entered in such action shall be delivered to the Senior Lienholders;

(d)     In the event the Senior Lienholders shall release, for the purposes of restoration of all or any part of the improvements on or within the Mortgaged Property, its right, title and interest in and to the proceeds under policies of insurance thereon, and/or its right, title and interest in and to any awards, or its right, title and interest in and

4

to other compensation made for any damages, losses or compensation for other rights by reason of a taking in eminent domain, the Subordinate Lienholder shall release for such purpose all of its right, title and interest, if any, in and to all such insurance proceeds, awards or compensation and the Subordinate Lienholder agrees that the balance of such proceeds remaining shall be applied to the reduction of principal under the Senior Obligations, and if a Senior Lienholder holds such proceeds, awards or compensation and/or monitors the disbursement thereof, the Subordinate Lienholder agrees that such Senior Lienholder shall also hold and monitor the disbursement of such proceeds, awards and compensation to which the Subordinate Lienholder is entitled. Nothing contained in this Agreement shall be deemed to require a Senior Lienholder, in any way whatsoever, to act for or on behalf of the Subordinate Lienholder or to hold or monitor any proceeds, awards or compensation in trust for or on behalf of the Subordinate Lienholder, and all or any of such sums so held or monitored may be commingled with any funds of such Senior Lienholder;

(e)    The Subordinate Lienholder hereby expressly consents to and authorizes, at the option of any Senior Lienholder, the release of all or any portion of the Mortgaged Property from the lien of the applicable Senior Lien, and hereby waives any equitable right in respect of marshalling it might have, in connection with any release of all or any portion of the Mortgaged Property by such Senior Lienholder under such Senior Lien, to require the separate sales of any portion of the Mortgaged Property or to require such Senior Lienholder to exhaust its remedies against any portion of the Mortgaged Property or any other collateral for the Senior Obligations, or any combination of the portions of the Mortgaged Property or any other collateral for the Senior Obligations, or to require such Senior Lienholder to proceed against any portion of the Mortgaged Property or any other collateral for the Senior Obligations or combination of the portions of the Mortgaged Property or any other collateral for the Senior Obligations, before proceeding against any other portion of the Mortgaged Property or combination of the portions of the Mortgaged Property;

(f)    In any case commenced by or against the Subsidiary under Chapter 11 of the Bankruptcy Code or any similar provision thereof or any similar federal or state statute, the Senior Lienholders shall have the exclusive right to exercise any voting rights in respect of the Senior Liens and the other Senior Obligations, and the Subordinate Lienholder shall have the exclusive right to exercise any voting rights in respect of its claims against the Subsidiary; and

(g)    To the extent any payment of the Senior Obligations (whether by or on behalf of the Subsidiary or any other obligor, as proceeds of security or enforcement of any right of set-off or otherwise) is for any reason repaid or returned to the Subsidiary or any such other obligor or the insolvent estate of any of them, or avoided, set aside or required to be paid to the Subsidiary or any such obligor, a trustee, receiver or other similar party under the Bankruptcy Code or any other bankruptcy, insolvency, receivership or similar law, then the Senior Liens, or any part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding to the extent of any

5

repayment, return, or other action as if such payment had not occurred, and this Agreement shall remain in effect with respect to any such reinstatement.

4.      Nothing herein is intended, or shall be construed, to affect the legal ranking of the Secured Option Obligations as senior obligations of Rhodes Design and Subsidiary, which are pari passu in right of payment with all other unsubordinated obligations of Rhodes Design and Subsidiary, or to effect any subordination in right of payment of the Secured Option Obligations to the Senior First Lien Obligations or the Senior Second Lien Obligations.

5.      The Senior Lienholders and the Subordinate Lienholder shall reasonably cooperate with each other in order to promptly and fully carry out the terms and provisions of this Agreement.  Each party hereto shall from time to time execute and deliver such other agreements, documents or instruments and take such other actions as may be reasonably necessary or desirable to effectuate the terms of this Agreement.

6.      No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

7.      Each party hereto acknowledges that to the extent that no adequate remedy at law exists for breach of its obligations under this Agreement, in the event any party fails to comply with its obligations hereunder, the other parties shall have the right to obtain specific performance of the obligations of such defaulting party, injunctive relief or such other equitable relief as may be available.

8.      Any notice to be given under this Agreement shall be in writing and shall be deemed to be given, in the case of delivery by registered mail, two (2) business days after mailing; in the case of delivery by hand delivery, when received by the party to whom it is addressed; or in the case of delivery by overnight courier, one (1) business day after transmittal. Notices shall be in writing and sent by registered mail, hand delivery or by reputable overnight courier (in each case, return receipt requested).  Notices to the other party hereto shall be sent to the address first set forth herein or such other address or addressees as shall be designated by such party in a written notice to the other parties.

9.      In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinate Lien or the other Subordinate Lien Documents, the provisions of this Agreement shall prevail.

10.      No person, including, without limitation, Rhodes Design or Subsidiary, other than the parties hereto and their successors and assigns as holders of the Senior Liens and the Subordinate Lien shall have any rights under this Agreement.

11.      This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

6

12.     No amendment, supplement, modification, waiver or termination of this Agreement shall be effective against a party against whom the enforcement of such amendment, supplement, modification, waiver or termination would be asserted, unless such amendment, supplement, modification, waiver or termination was made in a writing signed by such party.

13.     In case any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

14.     This Agreement shall be construed in accordance with and governed by the laws of the state where the Mortgaged Property is located.

15.     This Agreement shall bind and inure to the benefit of the Senior Lienholders and the Subordinate Lienholder and their respective successors, permitted transferees and assigns.

7

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SENIOR FIRST LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior First Lienholder

By: _____

Name: **BILL O'DALY**
Title: **DIRECTOR**

MIKHAIL FAYBUSOVICH
ASSOCIATE

**SENIOR SECOND LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior Second Lienholder

By: _____

Name: **BILL O'DALY**
Title: **DIRECTOR**

MIKHAIL FAYBUSOVICH
ASSOCIATE

**SUBORDINATE LIENHOLDER**

COMMERCE ASSOCIATES, LLC,
a Nevada limited liability company

By: _____

Name:
Title:

8

# ACKNOWLEDGMENTS

STATE OF _NEW YOAK_    )
                      ) ss.
COUNTY OF _NEW YORK_   )

This instrument was acknowledged before me on _DECEMBER 20, 2006_ by _MIKHAIL FRIDMANICH_ as _DIRECTOR ASSOCIATE_ of _____ .

MARJORIE E. BULL
Notary Public, State of New York
No. 01BU6055282
Qualified in New York County
Commission Expires February 20, 20__

_____
(Signature of Notarial Officer)

STATE OF _NEW YORK_ )
                            ) ss.
COUNTY OF _NEW YORK_ )


    This instrument was acknowledged before me on _DECEMBER 20, 2006_ by _BILL O'DALY_ _MIKHAIL FAYBUSOVICH_ as _DIRECTOR ASSOCIATE_ of _____.

MARJORIE E. BULL
Notary Public, State of New York
No. 01BU6055282
Qualified in New York County
Commission Expires February 20, 20 _07_

_____
(Signature of Notarial Officer)

STATE OF _NEW YORK_    )
                      ) ss.
COUNTY OF _NEW YORK_  )


    This instrument was acknowledged before me on _DECEMBER 20, 2006_ by _BILL O'DALY_ _MIKHAIL PANTOUSOVICH_ as _DIRECTOR_ _ASSOCIATE_ of _____.

                            _____
                            (Signature of Notarial Officer)

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SENIOR FIRST LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior First Lienholder

By: _____
     Name:
     Title:

**SENIOR SECOND LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior Second Lienholder

By: _____
     Name:
     Title:

**SUBORDINATE LIENHOLDER**

COMMERCE ASSOCIATES, LLC,
a Nevada limited liability company

By: _~Sx Eckenhardt~_
     Name: GEORGE REINHARDT
     Title: MANAGER

8

## ACKNOWLEDGMENTS

STATE OF <u>Nevada</u> )
                            ) ss.
COUNTY OF <u>Clark</u> )

This instrument was acknowledged before me on <u>January 9, 2007</u> by <u>George Reinhardt</u> as <u>Manager</u> of <u>Commerce Associates</u>, LLC.



_____
(Signature of Notarial Officer)

Subordination Agreement

**RECORDER'S NOTE:**
NOTARY STAMP IS PRESENT,
HOWEVER THE INK COLOR
MAY NOT BE REPRODUCIBLE

ACKNOWLEDGED AND AGREED TO
AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN:

RHODES DESIGN AND DEVELOPMENT CORPORATION,
a Nevada corporation

By:    _____
       Name:  Paul Huygens
       Title:  Chief Financial Officer and Treasurer


TUSCANY ACQUISITIONS III, LLC,
a Nevada limited liability company

By:    RHODES DESIGN AND DEVELOPMENT CORPORATION,
       its sole member

By:    _____
       Name:  Paul Huygens
       Title:  Chief Financial Officer and Treasurer

9

## ACKNOWLEDGMENTS

STATE OF _Nevada_ )
                  ) ss.
COUNTY OF _Clark_ )

NOTARY PUBLIC, STATE OF NEVADA
County Of Clark
SARALYN ROSENLUND
No: 02-76733-1
My Appointment Expires July 17, 2010

   This instrument was acknowledged before me on _December 19, 2006_, by _Paul Huygens_, as _Cheif Finan Officer_ of _Rhodes Design and Development_

_(Signature)_
(Signature of Notarial Officer)

STATE OF <u>Nevada</u>           )
                                 ) ss.
COUNTY OF <u>Clark</u>           )



This instrument was acknowledged before me on <u>December 19, 2006</u>, by <u>Paul Huygens</u>, as <u>Cheif Finan Officer</u> of <u>Rhodes Design and Development</u>

_____
(Signature of Notarial Officer)

## **EXHIBIT A**

(Description of Mortgaged Property)

Exhibit "A"

**Parcel Nos.: 160-32-312-001 through 160-32-312-024; 160-32-614-001 through 160-32-614-009; 160-32-614-010 through 160-32-614-169; and 160-32-715-001 through 014;**

PARCEL I:

Lots One (1) through Twenty-Two (22), inclusive in Block One (1); Lots Fifty-Seven (57) through Ninety (90), inclusive in Block Two (2); Lots One Hundred Twenty-One (121) through One Hundred Fifty-Six (156), inclusive in Block Three (3); Lots One Hundred Eighty-Nine (189) through Two Hundred (200), inclusive in Block Four (4); Lots One Hundred Seventy-Five (175) through One Hundred Eighty-Eighty (188), inclusive in Block Five (5); Lots One Hundred Five (105) through One Hundred Twenty (120), inclusive and Lots One Hundred Fifty-Seven (157) through One Hundred Seventy-Four (174), inclusive in Block Six (6); Lots Twenty-Three (23) through Forty-Eight (48), inclusive in Block Seven (7); Lots Forty-Nine (49) through Fifty-Six (56), inclusive and Lots Ninety-One (91) through One Hundred Four (104), inclusive in Block Eight (8), of Final Map of Tuscany Parcel 15 as shown by map thereof on file in Book 131 of Plats, Page 39, in the Office of the County Recorder of Clark County, Nevada.

PARCEL IA:

Non exclusive easement and other rights set forth and established by that certain "Declaration of Easements, Covenants and Restrictions" recorded February 23, 2004 in Book 20040223 as Document No. 01927 and re-recorded July 14, 2004 in Book 20040714 as Document No. 01407, Official Records, Clark County, Nevada.

PARCEL IB:

A non-exclusive right and easement of use and access in and to the Common Elements and Private Streets subject to and as set for in the Master Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Tuscany Residential Community recorded July 28, 2005 in Book 20050728 as Document No. 04296, Official Records.

PARCEL II:

Lots One (1) through Twenty-Four (24) in Block One (1) of Tuscany Parcel 23 (formerly known as Palm City-Phase 1 Lot 23) as shown by map thereof on file in Book 125 of Plats, Page 34, in the Office of County Recorder of Clark County, Nevada.

PARCEL IIA:

Non exclusive easement and other rights set forth and established by that certain 'Declaration of Easements, Covenants, and Restrictions" recorded February 23, 2004 in Book 20040223 as Document No. 01927 and re-recorded July 14, 2004 in Book 20040714 as Document No. 01407, Official Records, Clark County, Nevada.

PARCEL IIB:

A non-exclusive right and easement of use and access in and to the Common Elements and Private Streets subject to and as set for in the Master Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Tuscany Residential Community recorded July 28, 2005 in Book 20050728 as Document No. 04296, Official Records.

# EXHIBIT B

## Fourth Option-Parcel 23

Memorandum of Additional Consideration dated as of January 26, 2006 by and between Tuscany Acquisitions III, LLC, a Nevada limited-liability company, as Purchaser, and Commerce Associates, LLC, a Nevada limited-liability company, as Seller, recorded in the Official Records of Clark County, Nevada on January 26, 2006 in Book 20060126 as Instrument 0003292.

Declaration of Development Covenants and Restrictions dated as of January 26, 2006 between Commerce Associates, LLC, a Nevada limited-liability company, Rhodes Design and Development Corporation, a Nevada corporation, and Tuscany Acquisitions III, LLC, a Nevada limited-liability company, as Purchaser, recorded in the Official Records of Clark County, Nevada on January 26, 2006 in Book 20060126 as Instrument 0003291.

# EXHIBIT 2

EXHIBIT 2



20070302-0002288

Fee: $30.00
N/C Fee:  $0.00

03/02/2007                    13:24:57
T20070037188
Requestor:
  CHICAGO TITLE

Debbie Conway              RMS
Clark County Recorder     Pgs: 17

APN(s) ___160-32-713-001 through 081___

WHEN RECORDED RETURN TO:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Attention:  Rand S. April, Esq.

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "**Agreement**") made as of this
**3/** day of January, 2007, by and among (A) COMMERCE ASSOCIATES, LLC, a Nevada
limited liability company, having an office at c/o TG Investments, LLC, 4511 W. Cheyenne Ave.,
Suite 801, N. Las Vegas, NV 89032 (hereinafter referred to as the "**Subordinate Lienholder**");
(B) CREDIT SUISSE, Cayman Islands Branch, as collateral agent (together with its successors
in such capacity, the "**First Lien Collateral Agent**") for the First Lien Lenders (as hereinafter
defined), having an office at Eleven Madison Avenue, New York, New York 10010 (hereinafter
referred to as the "**Senior First Lienholder**"); and (C) CREDIT SUISSE, Cayman Islands
Branch, as collateral agent (together with its successors in such capacity, the "**Second Lien
Collateral Agent**") for the Second Lien Lenders (as hereinafter defined), having an office at
Eleven Madison Avenue, New York, New York 10010 (hereinafter referred to as the "**Senior
Second Lienholder**", and together with the Senior First Lienholder, the "**Senior Lienholders**").

W I T N E S S E T H :

WHEREAS, pursuant to that Purchase Agreement and Grant of Options, dated
November 13, 2003 (as amended, restated, supplemented or otherwise modified from time to
time, including by that certain Third Amendment to Purchase Agreement and Grant of Options,
dated as of November 21, 2005, the "**Tuscany Option Agreement**"), by and between
Subordinate Lienholder and Rhodes Design and Development Corporation, a Nevada
corporation ("**Rhodes Design**"), and certain subsidiaries of Rhodes Design, Rhodes Design has
acquired the fee interest in certain real property located in the County of Clark, State of Nevada,
as more particularly described on Exhibit A attached hereto and made a part hereof (together
with all improvements located thereon, collectively, the "**Mortgaged Property**");

WHEREAS, the Subordinate Lienholder is the owner and holder of certain
recorded instruments described on Exhibit B attached hereto (collectively, the "**Subordinate
Lien Documents**") (the liens and security interests created thereby, together with any other liens

and security interests securing the Secured Option Obligations (as defined below), and any replacement liens and security interests, are referred to herein as the "**Subordinate Lien**"), encumbering the Mortgaged Property, securing certain obligations of Subsidiary to the Subordinate Lienholder on account of the "Map Costs", "Profit Participation" and/or "Lot Premium" (as each such term is defined in the Tuscany Option Agreement) with respect to the Mortgaged Property (together with any refinancings or replacements of any thereof, the "**Secured Option Obligations**");

WHEREAS, pursuant to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**First Lien Credit Agreement**"), by and among Heritage Land Company, LLC, a Nevada limited liability company ("**Heritage Land**"), The Rhodes Companies, LLC, a Nevada limited liability company ("**Rhodes Companies**"), and Rhodes Ranch General Partnership, a Nevada general partnership ("**Rhodes GP**" and, collectively with Heritage Land and Rhodes Companies, the "**Borrowers**" and each, individually, a "**Borrower**"), the lenders from time to time party thereto (the "**First Lien Lenders**"), and Senior First Lienholder, as administrative agent, syndication agent and collateral agent for the First Lien Lenders, the First Lien Lenders have agreed to provide a term loan facility to Borrowers in the original principal amount of $430,000,000 (as such amount may be increased or decreased from time to time pursuant to the First Lien Credit Agreement, the "**Senior First Lien Loan**");

WHEREAS, pursuant to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Second Lien Credit Agreement**", and collectively with the First Lien Credit Agreement, the "**Credit Agreements**"), by and among the Borrowers, the lenders from time to time party thereto (the "**Second Lien Lenders**"), and Senior Second Lienholder, as administrative agent, syndication agent and collateral agent for the Second Lien Lenders, the Second Lien Lenders have agreed to provide a term loan facility to Borrowers in the original principal amount of $70,000,000 (as such amount may be increased or decreased from time to time pursuant to the Second Lien Credit Agreement, the "**Senior Second Lien Loan**" and together with the Senior First Lien Loan, the "**Senior Loans**");

WHEREAS, pursuant to the First Lien Credit Agreement, the Borrowers have agreed to cause certain subsidiaries (including Tuscany Acquisitions IV, LLC (the "**Subsidiary**")) to guaranty the obligations of the Borrowers under the First Lien Credit Agreement, and accordingly, within three business days of the execution of this Agreement, the Subsidiary will execute and deliver to the Senior First Lienholder (i) a Subsidiary Guaranty (as defined in the First Lien Credit Agreement) (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Senior First Lien Guaranty**") and (ii) a Mortgage (as defined in the First Lien Credit Agreement) on the Mortgaged Property (the liens and security interests created by any such Mortgage, and any extensions, modifications, consolidations, refinancings and replacements thereof, being hereinafter referred to as the "**Senior First Lien**") securing such Subsidiary Guaranty, evidencing and securing the obligations of the Subsidiary under such Subsidiary Guaranty (the "**Senior First Lien Obligations**");

WHEREAS, pursuant to the Second Lien Credit Agreement, the Borrowers have agreed to cause certain subsidiaries (including the Subsidiary) to guaranty the obligations of the Borrowers under the Second Lien Credit Agreement, and accordingly, within three business days of the execution of this Agreement, the Subsidiary will execute and deliver to the Senior Second Lienholder (i) a Subsidiary Guaranty (as defined in the Second Lien Credit Agreement) (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Senior Second Lien Guaranty**" and collectively with the Senior First Lien Guaranty, the "**Senior Guaranties**") and (ii) a Mortgage (as defined in the Second Lien Credit Agreement) on the Mortgaged Property (the liens and security interests created by any such Mortgage, and any extensions, modifications, consolidations, refinancings and replacements thereof, being hereinafter referred to as the "**Senior Second Lien**", and together with the Senior First Lien, the "**Senior Liens**") securing such Subsidiary Guaranty, evidencing and securing the obligations of the Subsidiary under such Subsidiary Guaranty (the "**Senior Second Lien Obligations**", and together with the Senior First Lien Obligations, the "**Senior Obligations**"); and

WHEREAS, the Subordinate Lien has been, and the Senior Liens will be, recorded in the Office of the County Recorder of Clark County, Nevada.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the Subordinate Lienholder and the Senior Lienholders hereby agree as follows:

1.      The Subordinate Lien (whether now existing or hereafter created or arising) is and shall continue to be expressly subordinate and junior in priority, operation and effect to the Senior Liens (whether now existing or hereafter created or arising).  The foregoing shall apply, notwithstanding the availability of other collateral to the Senior Lienholders or the actual date and time of execution, delivery, recordation, filing or perfection of the Senior Liens or the Subordinate Lien, or the priority thereof, and notwithstanding the fact that the Senior Loans or any claim for the Senior Loans or the Senior Obligations or any claim for the Senior Obligations is subordinated, avoided or disallowed, in whole or in part, under Title 11 of the United States Code (the "**Bankruptcy Code**") or other applicable federal or state law.

2.      The Subordinate Lienholder hereby represents and warrants that (a) it is now the owner and holder of the Subordinate Lien; (b) the Subordinate Lien is now in full force and effect; (c) to the actual knowledge of the Subordinate Lienholder, neither the Subsidiary nor Rhodes Design is in default in the observance and/or performance of any of the obligations required to be observed and performed by the Subsidiary or Rhodes Design under the Tuscany Option Agreement or the Subordinate Lien Documents (the "**Tuscany Documents**"); (d) to the actual knowledge of the Subordinate Lienholder, no event has occurred, which, with the passing of time or the giving of notice or both would constitute a default under the Tuscany Documents by the Subsidiary or Rhodes Design; and (e) as of the date hereof, the Tuscany Option Agreement is now in full force and effect.

3.      The Subordinate Lienholder hereby agrees that so long as any Senior Obligations shall remain outstanding:

3

(a)     The Subordinate Lienholder shall send to the Senior Lienholders copies of any written notice of default under the Subordinate Lien Documents and the Tuscany Documents and any notices of termination or default under the Subordinate Lien Documents or Tuscany Documents. Each Senior Lienholder shall have the right, but shall not have any obligation whatsoever, to cure any such default within ten (10) days after the expiration of the applicable grace period permitted to Rhodes Design or the Subsidiary under the Tuscany Documents or the Subordinate Lien Documents, as applicable;

(b)     The Subordinate Lienholder shall not, without the prior written consent of the Senior Lienholders, take (or cause to be taken) any Enforcement Action. For the purposes of this Agreement, the term **"Enforcement Action"** shall mean with respect to the Subordinate Lien Documents as they apply to the Mortgaged Property, any foreclosure proceedings, the exercise of any power of sale, the acceptance by the holder of the Subordinate Lien of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of possession or control of the Mortgaged Property;

(c)     (i) If, after the consent required under paragraph 3(b) above has been obtained, any action or proceeding shall be brought to foreclose the Subordinate Lien or any other Enforcement Action shall be commenced, no portion of the rents, issues and profits of the Mortgaged Property shall be collected except through a receiver appointed by the court in connection with such Enforcement Action, after due notice of the application for the appointment of such receiver shall have been given to the Senior Lienholders and the rents, issues and profits so collected by such receiver shall be applied first to the payment of maintenance of taxes and insurance on the Mortgaged Property, and then to the payment of the Senior Obligations prior to the payment, if any, of any principal or interest due and owing on the Subordinate Lien; (ii) if during the pendency of any such foreclosure action or proceeding, an action or proceeding shall be brought by any Senior Lienholder for the foreclosure of the Senior Lien held by such Senior Lender and an application is made by such Senior Lienholder for an extension of such receivership for the benefit of such Senior Lienholder, all such rents, issues and profits held by such receiver as of the date of such application shall be applied by the receiver solely for the benefit of such Senior Lienholder, and the Subordinate Lienholder shall not be entitled to any portion thereof until all Senior Obligations have been paid in full and applied as aforesaid; and (iii) notice of the commencement of any foreclosure of the Subordinate Lien shall be given to the Senior Lienholders and true copies of all notices thereof and papers served or entered in such action shall be delivered to the Senior Lienholders;

(d)     In the event the Senior Lienholders shall release, for the purposes of restoration of all or any part of the improvements on or within the Mortgaged Property, its right, title and interest in and to the proceeds under policies of insurance thereon, and/or its right, title and interest in and to any awards, or its right, title and interest in and to other compensation made for any damages, losses or compensation for other rights by reason of a taking in eminent domain, the Subordinate Lienholder shall release for such purpose all of its right, title and interest, if any, in and to all such insurance proceeds,

4

awards or compensation and the Subordinate Lienholder agrees that the balance of such proceeds remaining shall be applied to the reduction of principal under the Senior Obligations, and if a Senior Lienholder holds such proceeds, awards or compensation and/or monitors the disbursement thereof, the Subordinate Lienholder agrees that such Senior Lienholder shall also hold and monitor the disbursement of such proceeds, awards and compensation to which the Subordinate Lienholder is entitled. Nothing contained in this Agreement shall be deemed to require a Senior Lienholder, in any way whatsoever, to act for or on behalf of the Subordinate Lienholder or to hold or monitor any proceeds, awards or compensation in trust for or on behalf of the Subordinate Lienholder, and all or any of such sums so held or monitored may be commingled with any funds of such Senior Lienholder;

(e)    The Subordinate Lienholder hereby expressly consents to and authorizes, at the option of any Senior Lienholder, the release of all or any portion of the Mortgaged Property from the lien of the applicable Senior Lien, and hereby waives any equitable right in respect of marshalling it might have, in connection with any release of all or any portion of the Mortgaged Property by such Senior Lienholder under such Senior Lien, to require the separate sales of any portion of the Mortgaged Property or to require such Senior Lienholder to exhaust its remedies against any portion of the Mortgaged Property or any other collateral for the Senior Obligations, or any combination of the portions of the Mortgaged Property or any other collateral for the Senior Obligations, or to require such Senior Lienholder to proceed against any portion of the Mortgaged Property or any other collateral for the Senior Obligations or combination of the portions of the Mortgaged Property or any other collateral for the Senior Obligations, before proceeding against any other portion of the Mortgaged Property or combination of the portions of the Mortgaged Property;

(f)    In any case commenced by or against the Subsidiary under Chapter 11 of the Bankruptcy Code or any similar provision thereof or any similar federal or state statute, the Senior Lienholders shall have the exclusive right to exercise any voting rights in respect of the Senior Liens and the other Senior Obligations, and the Subordinate Lienholder shall have the exclusive right to exercise any voting rights in respect of its claims against the Subsidiary; and

(g)    To the extent any payment of the Senior Obligations (whether by or on behalf of the Subsidiary or any other obligor, as proceeds of security or enforcement of any right of set-off or otherwise) is for any reason repaid or returned to the Subsidiary or any such other obligor or the insolvent estate of any of them, or avoided, set aside or required to be paid to the Subsidiary or any such obligor, a trustee, receiver or other similar party under the Bankruptcy Code or any other bankruptcy, insolvency, receivership or similar law, then the Senior Liens, or any part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding to the extent of any repayment, return, or other action as if such payment had not occurred, and this Agreement shall remain in effect with respect to any such reinstatement.

5

4.     Nothing herein is intended, or shall be construed, to affect the legal ranking of the Secured Option Obligations as senior obligations of Rhodes Design and Subsidiary, which are pari passu in right of payment with all other unsubordinated obligations of Rhodes Design and Subsidiary, or to effect any subordination in right of payment of the Secured Option Obligations to the Senior First Lien Obligations or the Senior Second Lien Obligations.

5.     The Senior Lienholders and the Subordinate Lienholder shall reasonably cooperate with each other in order to promptly and fully carry out the terms and provisions of this Agreement.  Each party hereto shall from time to time execute and deliver such other agreements, documents or instruments and take such other actions as may be reasonably necessary or desirable to effectuate the terms of this Agreement.

6.     No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

7.     Each party hereto acknowledges that to the extent that no adequate remedy at law exists for breach of its obligations under this Agreement, in the event any party fails to comply with its obligations hereunder, the other parties shall have the right to obtain specific performance of the obligations of such defaulting party, injunctive relief or such other equitable relief as may be available.

8.     Any notice to be given under this Agreement shall be in writing and shall be deemed to be given, in the case of delivery by registered mail, two (2) business days after mailing; in the case of delivery by hand delivery, when received by the party to whom it is addressed; or in the case of delivery by overnight courier, one (1) business day after transmittal. Notices shall be in writing and sent by registered mail, hand delivery or by reputable overnight courier (in each case, return receipt requested).  Notices to the other party hereto shall be sent to the address first set forth herein or such other address or addressees as shall be designated by such party in a written notice to the other parties.

9.     In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinate Lien or the other Subordinate Lien Documents, the provisions of this Agreement shall prevail.

10.     No person, including, without limitation, Rhodes Design or Subsidiary, other than the parties hereto and their successors and assigns as holders of the Senior Liens and the Subordinate Lien shall have any rights under this Agreement.

11.     This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

12.     No amendment, supplement, modification, waiver or termination of this Agreement shall be effective against a party against whom the enforcement of such amendment,

6

supplement, modification, waiver or termination would be asserted, unless such amendment, supplement, modification, waiver or termination was made in a writing signed by such party.

13.    In case any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

14.    This Agreement shall be construed in accordance with and governed by the laws of the state where the Mortgaged Property is located.

15.    This Agreement shall bind and inure to the benefit of the Senior Lienholders and the Subordinate Lienholder and their respective successors, permitted transferees and assigns.

7

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SENIOR FIRST LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch, as Senior First Lienholder

By: _____

Name: **BILL O'DALY**

Title: DIRECTOR

MIKHAIL FAYBUSOVICH
ASSOCIATE

**SENIOR SECOND LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch, as Senior Second Lienholder

By: _____

Name: **BILL O'DA**

Title: DIRECTOR

MIKHAIL FAYBUSOVICH
ASSOCIATE

**SUBORDINATE LIENHOLDER**

COMMERCE ASSOCIATES, LLC, a Nevada limited liability company

By: _____

Name:

Title:

8

## ACKNOWLEDGMENTS

STATE OF _NEW YORK_ )
                       ) ss.
COUNTY OF _NEW YORK_ )

This instrument was acknowledged before me on _DECEMBER 20,2006_ by _RANDALL FERGUSON_ as _DIRECTOR ASSOCIATE_ of _____.

MARJORIE E. BULL
Notary Public, State of New York
No. 01BU6055282
Qualified in New York County
Commission Expires February 20, 2007

_____
(Signature of Notarial Officer)

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SENIOR FIRST LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior First Lienholder

By: _____
          Name:
          Title:

**SENIOR SECOND LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior Second Lienholder

By: _____
          Name:
          Title:

**SUBORDINATE LIENHOLDER**

COMMERCE ASSOCIATES, LLC,
a Nevada limited liability company

By: _____
          Name: GEORGE REINHARDT
          Title: MANAGER

8

## ACKNOWLEDGMENTS

STATE OF ___Nevada___ )
                   ) ss.
COUNTY OF ___Clark___ )

This instrument was acknowledged before me on __January 9, 2007__, by George Reinhardt, as __Manager__ of Commerce Associates, LLC

```
Notary Public - State of Nevada
       County of Clark
       ANGELA BRYANT
     My Appointment Expires
         July 18, 2009
No: 05-98406-1
```

_Angela Bryant_
(Signature of Notarial Officer)

Subordination Agreement

**RECORDER'S NOTE:**
NOTARY STAMP IS PRESENT,
HOWEVER THE INK COLOR
MAY NOT BE REPRODUCIBLE

ACKNOWLEDGED AND AGREED TO
AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN:

RHODES DESIGN AND DEVELOPMENT CORPORATION,
a Nevada corporation

By: _____
      Name:  Paul Huygens
      Title:  Chief Financial Officer and Treasurer


TUSCANY ACQUISITIONS IV, LLC,
a Nevada limited liability company

By:    RHODES DESIGN AND DEVELOPMENT CORPORATION,
        its sole member

By: _____
      Name:  Paul Huygens
      Title:  Chief Financial Officer and Treasurer

9

STATE OF Nevada _____ )
                                        ) ss.
COUNTY OF Clark _____ )

NOTARY PUBLIC, STATE OF NEVADA
County Of Clark
SARALYN ROSENLUND
No: 02-76733-1
My Appointment Expires July 17, 2010

This instrument was acknowledged before me on December 19, 2006, by
Paul Huygens , as Chief Finan Officer of Rhodes Design And Development

_____
(Signature of Notarial Officer)

STATE OF _Nevada_ )
                                  ) ss.
COUNTY OF _Clark_ )

NOTARY PUBLIC, STATE OF NEVADA
County Of Clark
SARALYN ROSENLUND
No: 02-76733-1
My Appointment Expires July 17, 2010

This instrument was acknowledged before me on _December 19, 2006_, by _Paul Huygens_, as _Cheif Finan Officer_ of _Rhodes Design And Development_

_____
(Signature of Notarial Officer)

# **EXHIBIT A**

(Description of Mortgaged Property)

EXHIBIT "A"

**APN's: 160-32-713-001 through 081, inclusive**

Parcel I:

Lots One (1) through Thirty-One (31), inclusive, in Block One (1); Lots Thirty-Two (32) through Forty-Three (43), inclusive, in Block Two (2); Lots Forty-Four (44) through Sixty-Four (64), inclusive, in Block Three (3); Lots Sixty Five (65) through Eighty-One (81), inclusive, in Block Four (4) of TUSCANY PARCEL 16 (formerly known as PALM CITY-PHASE 1 Lot 16) as shown by map thereof on file in Book 128 of Plats, Page 100 in the Office of the County Recorder of Clark County, Nevada.

Parcel IA:

Non-exclusive easement and other rights as set forth and established by that certain "Declaration of Easements, Covenants, and Restrictions" recorded February 23, 2004 in Book 20040223 as Document No. 01927 as re-recorded July 14, 2004 in Book 20040714 as Document No. 01407, Official Records, Clark County, Nevada.

Parcel IB:

A non-exclusive right and easement of use and access in and to Common Elements and Private Streets subject to and as set forth in the "Master Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Tuscany Residential Community" recorded July 28, 2005 in Book 20050728 as Document No. 04296, Official Records.

Parcel II:

Lot Ten (10) of FINAL MAP OF TUSCANY – PHASE 2 (formerly known as Palm City – Phase 2) as shown by map thereof on file in Book 121 of Plats, Page 59, in the Office of the County Recorder of Clark County, Nevada.

# EXHIBIT B

## Parcel 10

Memorandum of Additional Consideration dated as of November 8, 2006 by and between Tuscany Acquisitions IV, LLC, a Nevada limited-liability company, as Purchaser, and Commerce Associates, LLC, a Nevada limited-liability company, as Seller, recorded in the Official Records of Clark County, Nevada on November 13, 2006 in Book 20061113 as Instrument 0001851.

Declaration of Development Covenants and Restrictions dated as of November 8, 2006 between Commerce Associates, LLC, a Nevada limited-liability company, Rhodes Design and Development Corporation, a Nevada corporation, and Tuscany Acquisitions IV, LLC, a Nevada limited-liability company, as Purchaser, recorded in the Official Records of Clark County, Nevada on November 13, 2006 in Book 20061113 as Instrument 0001852.

## Parcel 16

Memorandum of Additional Consideration dated as of September 11, 2006 by and between Tuscany Acquisitions IV, LLC, a Nevada limited-liability company, as Purchaser, and Commerce Associates, LLC, a Nevada limited-liability company, as Seller, recorded in the Official Records of Clark County, Nevada on January 26, 2006 in Book 20060911 as Instrument 0002392.

Declaration of Development Covenants and Restrictions dated as of September 11, 2006 between Commerce Associates, LLC, a Nevada limited-liability company, Rhodes Design and Development Corporation, a Nevada corporation, and Tuscany Acquisitions IV, LLC, a Nevada limited-liability company, as Purchaser, recorded in the Official Records of Clark County, Nevada on September 11, 2006 in Book 20060911 as Instrument 0002393.

# EXHIBIT 3

EXHIBIT 3



20070731-0003609

Fee: $29.00
N/C Fee: $25.00

07/31/2007            13:47:32
T20070137762
Requestor:
    CHICAGO TITLE

Debbie Conway            ADF
Clark County Recorder    Pgs: 16

APN(s)  160-32-~~711~~-001 ~~and~~ *the* 073
        160-32-~~610-001~~
        *616-001 thru 024*

WHEN RECORDED RETURN TO:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Attention:  Rand S. April, Esq.

7000133 SC

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "**Agreement**") made as of this **3\_\_** day of July, 2007, by and among (A) COMMERCE ASSOCIATES, LLC, a Nevada limited liability company, having an office at c/o TG Investments, LLC, 4511 W. Cheyenne Ave., Suite 801, N. Las Vegas, NV 89032 (hereinafter referred to as the "**Subordinate Lienholder**"); (B) CREDIT SUISSE, Cayman Islands Branch, as collateral agent (together with its successors in such capacity, the "**First Lien Collateral Agent**") for the First Lien Lenders (as hereinafter defined), having an office at Eleven Madison Avenue, New York, New York 10010 (hereinafter referred to as the "**Senior First Lienholder**"); and (C) CREDIT SUISSE, Cayman Islands Branch, as collateral agent (together with its successors in such capacity, the "**Second Lien Collateral Agent**") for the Second Lien Lenders (as hereinafter defined), having an office at Eleven Madison Avenue, New York, New York 10010 (hereinafter referred to as the "**Senior Second Lienholder**", and together with the Senior First Lienholder, the "**Senior Lienholders**").

W I T N E S S E T H :

WHEREAS, pursuant to that Purchase Agreement and Grant of Options, dated November 13, 2003 (as amended, restated, supplemented or otherwise modified from time to time, including by that certain Third Amendment to Purchase Agreement and Grant of Options, dated as of November 21, 2005, the "**Tuscany Option Agreement**"), by and between Subordinate Lienholder and Rhodes Design and Development Corporation, a Nevada corporation ("**Rhodes Design**"), Tuscany Acquisitions IV, LLC, a Nevada limited liability company (the "**Subsidiary**") has acquired the fee interest in certain real property located in the County of Clark, State of Nevada, as more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof (together with all improvements located thereon, collectively, the "**Mortgaged Property**");

WHEREAS, the Subordinate Lienholder is the owner and holder of certain recorded instruments described on <u>Exhibit B</u> attached hereto (collectively, the "**Subordinate Lien Documents**") (the liens and security interests created thereby, together with any other liens

and security interests securing the Secured Option Obligations (as defined below), and any replacement liens and security interests, are referred to herein as the "**Subordinate Lien**"), encumbering the Mortgaged Property, securing certain obligations of Subsidiary to the Subordinate Lienholder on account of the "Map Costs", "Profit Participation" and/or "Lot Premium" (as each such term is defined in the Tuscany Option Agreement) with respect to the Mortgaged Property (together with any refinancings or replacements of any thereof, the "**Secured Option Obligations**");

WHEREAS, pursuant to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**First Lien Credit Agreement**"), by and among Heritage Land Company, LLC, a Nevada limited liability company ("**Heritage Land**"), The Rhodes Companies, LLC, a Nevada limited liability company ("**Rhodes Companies**"), and Rhodes Ranch General Partnership, a Nevada general partnership ("**Rhodes GP**" and, collectively with Heritage Land and Rhodes Companies, the "**Borrowers**" and each, individually, a "**Borrower**"), the lenders from time to time party thereto (the "**First Lien Lenders**"), and Senior First Lienholder, as administrative agent, syndication agent and collateral agent for the First Lien Lenders, the First Lien Lenders have agreed to provide a term loan facility to Borrowers in the original principal amount of $430,000,000 (as such amount may be increased or decreased from time to time pursuant to the First Lien Credit Agreement, the "**Senior First Lien Loan**");

WHEREAS, pursuant to that certain Credit Agreement, dated as of November 21, 2005 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Second Lien Credit Agreement**", and collectively with the First Lien Credit Agreement, the "**Credit Agreements**"), by and among the Borrowers, the lenders from time to time party thereto (the "**Second Lien Lenders**"), and Senior Second Lienholder, as administrative agent, syndication agent and collateral agent for the Second Lien Lenders, the Second Lien Lenders have agreed to provide a term loan facility to Borrowers in the original principal amount of $70,000,000 (as such amount may be increased or decreased from time to time pursuant to the Second Lien Credit Agreement, the "**Senior Second Lien Loan**" and together with the Senior First Lien Loan, the "**Senior Loans**");

WHEREAS, pursuant to the First Lien Credit Agreement, the Borrowers have agreed to cause the Subsidiary to guaranty the obligations of the Borrowers under the First Lien Credit Agreement, and accordingly, within three business days of the execution of this Agreement, the Subsidiary will execute and deliver to the Senior First Lienholder (i) a Subsidiary Guaranty (as defined in the First Lien Credit Agreement) (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Senior First Lien Guaranty**") and (ii) a Mortgage (as defined in the First Lien Credit Agreement) on the Mortgaged Property (the liens and security interests created by any such Mortgage, and any extensions, modifications, consolidations, refinancings and replacements thereof, being hereinafter referred to as the "**Senior First Lien**") securing such Subsidiary Guaranty, evidencing and securing the obligations of the Subsidiary under such Subsidiary Guaranty (the "**Senior First Lien Obligations**");

2

WHEREAS, pursuant to the Second Lien Credit Agreement, the Borrowers have agreed to cause certain subsidiaries (including the Subsidiary) to guaranty the obligations of the Borrowers under the Second Lien Credit Agreement, and accordingly, within three business days of the execution of this Agreement, the Subsidiary will execute and deliver to the Senior Second Lienholder (i) a Subsidiary Guaranty (as defined in the Second Lien Credit Agreement) (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time, the "**Senior Second Lien Guaranty**" and collectively with the Senior First Lien Guaranty, the "**Senior Guaranties**") and (ii) a Mortgage (as defined in the Second Lien Credit Agreement) on the Mortgaged Property (the liens and security interests created by any such Mortgage, and any extensions, modifications, consolidations, refinancings and replacements thereof, being hereinafter referred to as the "**Senior Second Lien**", and together with the Senior First Lien, the "**Senior Liens**") securing such Subsidiary Guaranty, evidencing and securing the obligations of the Subsidiary under such Subsidiary Guaranty (the "**Senior Second Lien Obligations**", and together with the Senior First Lien Obligations, the "**Senior Obligations**"); and

WHEREAS, the Subordinate Lien has been, and the Senior Liens will be, recorded in the Office of the County Recorder of Clark County, Nevada.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the Subordinate Lienholder and the Senior Lienholders hereby agree as follows:

1.      The Subordinate Lien (whether now existing or hereafter created or arising) is and shall continue to be expressly subordinate and junior in priority, operation and effect to the Senior Liens (whether now existing or hereafter created or arising). The foregoing shall apply, notwithstanding the availability of other collateral to the Senior Lienholders or the actual date and time of execution, delivery, recordation, filing or perfection of the Senior Liens or the Subordinate Lien, or the priority thereof, and notwithstanding the fact that the Senior Loans or any claim for the Senior Loans or the Senior Obligations or any claim for the Senior Obligations is subordinated, avoided or disallowed, in whole or in part, under Title 11 of the United States Code (the "**Bankruptcy Code**") or other applicable federal or state law.

2.      The Subordinate Lienholder hereby represents and warrants that (a) it is now the owner and holder of the Subordinate Lien; (b) the Subordinate Lien is now in full force and effect; (c) to the actual knowledge of the Subordinate Lienholder, neither the Subsidiary nor Rhodes Design is in default in the observance and/or performance of any of the obligations required to be observed and performed by the Subsidiary or Rhodes Design under the Tuscany Option Agreement or the Subordinate Lien Documents (the "**Tuscany Documents**"); (d) to the actual knowledge of the Subordinate Lienholder, no event has occurred, which, with the passing of time or the giving of notice or both would constitute a default under the Tuscany Documents by the Subsidiary or Rhodes Design; and (e) as of the date hereof, the Tuscany Option Agreement is now in full force and effect.

3.      The Subordinate Lienholder hereby agrees that so long as any Senior Obligations shall remain outstanding:

3

(a)     The Subordinate Lienholder shall send to the Senior Lienholders copies of any written notice of default under the Subordinate Lien Documents and the Tuscany Documents and any notices of termination or default under the Subordinate Lien Documents or Tuscany Documents. Each Senior Lienholder shall have the right, but shall not have any obligation whatsoever, to cure any such default within ten (10) days after the expiration of the applicable grace period permitted to Rhodes Design or the Subsidiary under the Tuscany Documents or the Subordinate Lien Documents, as applicable;

(b)     The Subordinate Lienholder shall not, without the prior written consent of the Senior Lienholders, take (or cause to be taken) any Enforcement Action. For the purposes of this Agreement, the term **"Enforcement Action"** shall mean with respect to the Subordinate Lien Documents as they apply to the Mortgaged Property, any foreclosure proceedings, the exercise of any power of sale, the acceptance by the holder of the Subordinate Lien of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of possession or control of the Mortgaged Property;

(c)     (i) If, after the consent required under paragraph 3(b) above has been obtained, any action or proceeding shall be brought to foreclose the Subordinate Lien or any other Enforcement Action shall be commenced, no portion of the rents, issues and profits of the Mortgaged Property shall be collected except through a receiver appointed by the court in connection with such Enforcement Action, after due notice of the application for the appointment of such receiver shall have been given to the Senior Lienholders and the rents, issues and profits so collected by such receiver shall be applied first to the payment of maintenance of taxes and insurance on the Mortgaged Property, and then to the payment of the Senior Obligations prior to the payment, if any, of any principal or interest due and owing on the Subordinate Lien; (ii) if during the pendency of any such foreclosure action or proceeding, an action or proceeding shall be brought by any Senior Lienholder for the foreclosure of the Senior Lien held by such Senior Lender and an application is made by such Senior Lienholder for an extension of such receivership for the benefit of such Senior Lienholder, all such rents, issues and profits held by such receiver as of the date of such application shall be applied by the receiver solely for the benefit of such Senior Lienholder, and the Subordinate Lienholder shall not be entitled to any portion thereof until all Senior Obligations have been paid in full and applied as aforesaid; and (iii) notice of the commencement of any foreclosure of the Subordinate Lien shall be given to the Senior Lienholders and true copies of all notices thereof and papers served or entered in such action shall be delivered to the Senior Lienholders;

(d)     In the event the Senior Lienholders shall release, for the purposes of restoration of all or any part of the improvements on or within the Mortgaged Property, its right, title and interest in and to the proceeds under policies of insurance thereon, and/or its right, title and interest in and to any awards, or its right, title and interest in and to other compensation made for any damages, losses or compensation for other rights by reason of a taking in eminent domain, the Subordinate Lienholder shall release for such purpose all of its right, title and interest, if any, in and to all such insurance proceeds,

4

Case 09-14814-gwz    Doc 1400    Entered 05/02/11 15:46:03    Page 53 of 64


awards or compensation and the Subordinate Lienholder agrees that the balance of such proceeds remaining shall be applied to the reduction of principal under the Senior Obligations, and if a Senior Lienholder holds such proceeds, awards or compensation and/or monitors the disbursement thereof, the Subordinate Lienholder agrees that such Senior Lienholder shall also hold and monitor the disbursement of such proceeds, awards and compensation to which the Subordinate Lienholder is entitled. Nothing contained in this Agreement shall be deemed to require a Senior Lienholder, in any way whatsoever, to act for or on behalf of the Subordinate Lienholder or to hold or monitor any proceeds, awards or compensation in trust for or on behalf of the Subordinate Lienholder, and all or any of such sums so held or monitored may be commingled with any funds of such Senior Lienholder;

(e)　　The Subordinate Lienholder hereby expressly consents to and authorizes, at the option of any Senior Lienholder, the release of all or any portion of the Mortgaged Property from the lien of the applicable Senior Lien, and hereby waives any equitable right in respect of marshalling it might have, in connection with any release of all or any portion of the Mortgaged Property by such Senior Lienholder under such Senior Lien, to require the separate sales of any portion of the Mortgaged Property or to require such Senior Lienholder to exhaust its remedies against any portion of the Mortgaged Property or any other collateral for the Senior Obligations, or any combination of the portions of the Mortgaged Property or any other collateral for the Senior Obligations, or to require such Senior Lienholder to proceed against any portion of the Mortgaged Property or any other collateral for the Senior Obligations or combination of the portions of the Mortgaged Property or any other collateral for the Senior Obligations, before proceeding against any other portion of the Mortgaged Property or combination of the portions of the Mortgaged Property;

(f)　　In any case commenced by or against the Subsidiary under Chapter 11 of the Bankruptcy Code or any similar provision thereof or any similar federal or state statute, the Senior Lienholders shall have the exclusive right to exercise any voting rights in respect of the Senior Liens and the other Senior Obligations, and the Subordinate Lienholder shall have the exclusive right to exercise any voting rights in respect of its claims against the Subsidiary; and

(g)　　To the extent any payment of the Senior Obligations (whether by or on behalf of the Subsidiary or any other obligor, as proceeds of security or enforcement of any right of set-off or otherwise) is for any reason repaid or returned to the Subsidiary or any such other obligor or the insolvent estate of any of them, or avoided, set aside or required to be paid to the Subsidiary or any such obligor, a trustee, receiver or other similar party under the Bankruptcy Code or any other bankruptcy, insolvency, receivership or similar law, then the Senior Liens, or any part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding to the extent of any repayment, return, or other action as if such payment had not occurred, and this Agreement shall remain in effect with respect to any such reinstatement.

4.      Nothing herein is intended, or shall be construed, to affect the legal ranking of the Secured Option Obligations as senior obligations of Rhodes Design and Subsidiary, which are pari passu in right of payment with all other unsubordinated obligations of Rhodes Design and Subsidiary, or to effect any subordination in right of payment of the Secured Option Obligations to the Senior First Lien Obligations or the Senior Second Lien Obligations.

5.      The Senior Lienholders and the Subordinate Lienholder shall reasonably cooperate with each other in order to promptly and fully carry out the terms and provisions of this Agreement.  Each party hereto shall from time to time execute and deliver such other agreements, documents or instruments and take such other actions as may be reasonably necessary or desirable to effectuate the terms of this Agreement.

6.      No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

7.      Each party hereto acknowledges that to the extent that no adequate remedy at law exists for breach of its obligations under this Agreement, in the event any party fails to comply with its obligations hereunder, the other parties shall have the right to obtain specific performance of the obligations of such defaulting party, injunctive relief or such other equitable relief as may be available.

8.      Any notice to be given under this Agreement shall be in writing and shall be deemed to be given, in the case of delivery by registered mail, two (2) business days after mailing; in the case of delivery by hand delivery, when received by the party to whom it is addressed; or in the case of delivery by overnight courier, one (1) business day after transmittal. Notices shall be in writing and sent by registered mail, hand delivery or by reputable overnight courier (in each case, return receipt requested).  Notices to the other party hereto shall be sent to the address first set forth herein or such other address or addressees as shall be designated by such party in a written notice to the other parties.

9.      In the event of any conflict between the provisions of this Agreement and the provisions of the Subordinate Lien or the other Subordinate Lien Documents, the provisions of this Agreement shall prevail.

10.      No person, including, without limitation, Rhodes Design or Subsidiary, other than the parties hereto and their successors and assigns as holders of the Senior Liens and the Subordinate Lien shall have any rights under this Agreement.

11.      This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

12.      No amendment, supplement, modification, waiver or termination of this Agreement shall be effective against a party against whom the enforcement of such amendment,

6

supplement, modification, waiver or termination would be asserted, unless such amendment, supplement, modification, waiver or termination was made in a writing signed by such party.

13.    In case any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

14.    This Agreement shall be construed in accordance with and governed by the laws of the state where the Mortgaged Property is located.

15.    This Agreement shall bind and inure to the benefit of the Senior Lienholders and the Subordinate Lienholder and their respective successors, permitted transferees and assigns.

7

      IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SENIOR FIRST LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior First Lienholder

By: _____
    Name:    **BILL O'DALY**
    Title:     **DIRECTOR**

By: _____
    Name:
    Title:    MIKHAIL FAYBUSOVICH
              ASSOCIATE

**SENIOR SECOND LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior Second Lienholder

By: _____
    Name:
    Title:    **BILL O'DALY**
              **DIRECTOR**

By: _____
    Name:
    Title:    MIKHAIL FAYBUSOVICH
              ASSOCIATE

**SUBORDINATE LIENHOLDER**

COMMERCE ASSOCIATES, LLC,
a Nevada limited liability company

By: _____
    Name:
    Title:

8

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SENIOR FIRST LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior First Lienholder

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**SENIOR SECOND LIENHOLDER**

CREDIT SUISSE, Cayman Islands Branch,
as Senior Second Lienholder

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**SUBORDINATE LIENHOLDER**

COMMERCE ASSOCIATES, LLC,
a Nevada limited liability company

By: _~~George E Reinhardt~~_
      Name: GEORGE REINHARDT
      Title: MANAGER

8

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of ___MARIN___ }

On _7/30/2007_ before me, _BENJAMIN CHARLES COLTEAUX_
　　　Date　　　　　　　　　　　Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared _GEORGE REINHARDT_
　　　　　　　　　　　　　　　Name(s) of Signer(s)

☒ personally known to me

☐ (or proved to me on the basis of satisfactory evidence)

to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____
　　　　　　　　　Signature of Notary Public

BENJAMIN CHARLES COLTEAUX
COMM. #1718274
NOTARY PUBLIC-CALIFORNIA
MARIN COUNTY
My Comm. Expires January 19, 2011

Place Notary Seal Above

―――――――――――――― **OPTIONAL** ――――――――――――――

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**
Title or Type of Document: _Subordination Agreement_

Document Date: _____    Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____
_____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 2006 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402    Item No. 5907 v609    Reorder: Call Toll-Free 1-800-876-6827

ACKNOWLEDGED AND AGREED TO
AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN:

RHODES DESIGN AND DEVELOPMENT CORPORATION,
a Nevada corporation

By: _____

Name:  MARK BERMAN

Title:  CFO


TUSCANY ACQUISITIONS IV, LLC,
a Nevada limited liability company

By:    RHODES DESIGN AND DEVELOPMENT CORPORATION,
       its sole member

By: _____

Name:  MARK BERMAN

Title:  CFO

9

## ACKNOWLEDGMENTS

STATE OF _N Y_ )
                   ) ss.
COUNTY OF _N Y_ )

This instrument was acknowledged before me on _July 27, 200,7_ by _William O'Daly_ , as _Director_ of _Credit Suisse._

_Tannia Barrientos_
(Signature of Notarial Officer)

**TANNIA BARRIENTOS**
NOTARY PUBLIC, STATE OF NEW YORK
No. 01BA6121581
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES JAN. 18, 2009

STATE OF _N Y_ )
                   ) ss.
COUNTY OF _N Y_ )

This instrument was acknowledged before me on _July 27, 2007_, by _Mikhail Faybusovich_ as _Associate_ of _Credit Suisse._

_Tannia Barrientos_
(Signature of Notarial Officer)

**TANNIA BARRIENTOS**
NOTARY PUBLIC, STATE OF NEW YORK
No. 01BA6121581
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES JAN. 18, 2009

STATE OF _____ )
                   ) ss.
COUNTY OF _____ )

This instrument was acknowledged before me on _____, by _____, as _____ of _____.

_____
(Signature of Notarial Officer)

100248688_5.DOC

STATE OF _____NY_____ )
                                          ) ss.
COUNTY OF _____NY_____ )

This instrument was acknowledged before me on *July 27, 2007*, by *William O'Daly*, as *Director* of *Credit Suisse*.

_____
(Signature of Notarial Officer)

**TANNIA BARRIENTOS**
NOTARY PUBLIC, STATE OF NEW YORK,
No. 01BA6121581
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES JAN. 18, 2009

STATE OF _____NY_____ )
                                          ) ss.
COUNTY OF _____NY_____ )

This instrument was acknowledged before me on *July 27, 2007*, by *Mikhail Foybusovich*, as *Associate* of *Credit Suisse*.

_____
(Signature of Notarial Officer)

**TANNIA BARRIENTOS**
NOTARY PUBLIC, STATE OF NEW YORK
No. 01BA6121581
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES JAN. 18, 2009

STATE OF _____ )
                                          ) ss.
COUNTY OF _____ )

This instrument was acknowledged before me on _____, by _____, as _____ of _____.

_____
(Signature of Notarial Officer)

100248688_5.DOC

STATE OF _Nevada_ )
                          ) ss.
COUNTY OF _Clark_ )

This instrument was acknowledged before me one _July 30, 2007_ by _Mark Berman_, as _CFO_ of _Rhodes Design & Development Corp._

NOTARY PUBLIC
LESLIE S. FULLER
STATE OF NEVADA - COUNTY OF CLARK
MY APPOINTMENT EXP. JANUARY 23, 2010
No: 06-103072-1

_Leslie S Fuller_
(Signature of Notarial Officer)

STATE OF _Nevada_ )
                          ) ss.
COUNTY OF _Clark_ )

This instrument was acknowledged before me on _July 30, 2007_ by _Mark Berman_, as _CFO_ of _Rhodes Design & Development Corp._

NOTARY PUBLIC
LESLIE S. FULLER
STATE OF NEVADA - COUNTY OF CLARK
MY APPOINTMENT EXP. JANUARY 23, 2010
No: 06-103072-1

_Leslie S Fuller_
(Signature of Notarial Officer)

## EXHIBIT A

(Description of Mortgaged Property)

Parcel 1:

Lots One (1) through Forty (40), inclusive in Block One (1); Lots Forty One (41) through Seventy Eight (78), inclusive in Block Two (2) and Lots Seventy Nine (79) through Ninety Seven (97), inclusive in Block Three (3) of Final Map of Tuscany Parcel 11, (formerly known as Palm City – Phase 2 Lot 11) as shown by map thereof on file in Book 136 of Plats, Page 62, in the Office of the County Recorder of Clark County, Nevada.

Parcel 2:

Lots One (1) through Thirty (30), inclusive in Block One (1) and Lots Thirty One (31) through Sixty Four (64), inclusive in Block Two (2) of Final Map of Tuscany Parcel 14 (formerly known as Palm City – Phase 1 Lot 14) as shown by map thereof on file in Book 136 of Plats, Page 63, in the Office of the County Recorder of Clark County, Nevada.

## EXHIBIT B

### Subordinate Lien Documents

### Parcel 11

Memorandum of Agreement by and between Commerce Associates, LLC, a Nevada limited liability company, as Seller and Rhodes Design and Development Corporation, a Nevada corporation, as Purchaser, recorded in the Official Records of Clark County, Nevada on November 18, 2003 in Book 20031118 as Instrument 002497; and thereafter amended by that certain Amendment to Memorandum recorded in the Official Records of Clark County, Nevada on September 17, 2004 in Book 20040917 as Instrument 0000680.

Memorandum of Additional Consideration by and between Commerce Associates, LLC, a Nevada limited liability company, as Seller and Tuscany Acquisitions IV, LLC, a Nevada limited liability company, as Purchaser, recorded in the Official Records of Clark County, Nevada on March 16, 2007 in Book 20070316 as Instrument 0003764.

Declaration of Development Covenants and Restrictions between Commerce Associates, LLC, a Nevada limited liability company, Rhodes Design and Development Corporation, a Nevada corporation and Tuscany Acquisitions IV, LLC, a Nevada limited liability company recorded in the Official Records of Clark County, Nevada on March 16, 2007 in Book 20070316 as Instrument 0003765.

### Parcel 14

Memorandum of Agreement by and between Commerce Associates, LLC, a Nevada limited liability company, as Seller and Rhodes Design and Development Corporation, a Nevada corporation, as Purchaser, recorded in the Official Records of Clark County, Nevada on November 18, 2003 in Book 20031118 as Instrument 002497; and thereafter amended by that certain Amendment to Memorandum recorded in the Official Records of Clark County, Nevada on September 17, 2004 in Book 20040917 as Instrument 0000680.

Memorandum of Additional Consideration by and between Commerce Associates, LLC, a Nevada limited liability company, as Seller and Tuscany Acquisitions IV, LLC, a Nevada limited liability company, as Purchaser, recorded in the Official Records of Clark County, Nevada on March 16, 2007 in Book 20070316 as Instrument 0003767.

Declaration of Development Covenants and Restrictions between Commerce Associates, LLC, a Nevada limited liability company, Rhodes Design and Development Corporation, a Nevada corporation and Tuscany Acquisitions IV, LLC, a Nevada limited liability company recorded in the Official Records of Clark County, Nevada on March 16, 2007 in Book 20070316 as Instrument 0003768.