Nile Leatham (NV Bar No. 002838)
Shlomo S. Sherman (NV Bar No. 009688)
KOLESAR & LEATHAM
Wells Fargo Financial Center
3320 W. Sahara Ave.
Las Vegas, NV 89102
Telephone: 702.979.2357
Facsimile: 702.362.9472
E-Mail:   nleatham@klnevada.com

Philip C. Dublin (NY Bar No. 2959344)
Abid Qureshi (NY Bar No. 2684637)
Meredith A. Lahaie (NY Bar No. 4518023)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:   pdublin@akingump.com
          aqureshi@akingump.com
          mlahaie@akingump.com

*Counsel for the Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA
## SOUTHERN DIVISION

| IN RE: | § | Case No. 09-14814-LBR |
|---|---|---|
| | § | (Jointly Administered) |
| THE RHODES COMPANIES, LLC, | § | |
| aka "Rhodes Homes," *et al.*, | § | Chapter 11 |
| | § | |
| Reorganized Debtors.[1] | § | |
| | § | |

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC (0206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Club, LLC (7132); Pinnacle Grading, LLC (4838).

|                                      |                                              |
|--------------------------------------|----------------------------------------------|
| Affects:<br>☒ All Debtors<br>☐ Affects the following Debtor(s) | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ DECLARATION OF JUSTIN BONO IN SUPPORT OF OBJECTION TO COMMERCE ASSOCIATES CLAIM PURSUANT TO BANKRUPTCY RULE 3007 AND BANKRUPTCY CODE SECTION 502(b) |

I, JUSTIN BONO, hereby declare and state as follows:

1. I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2. I make this Declaration in support of the Reorganized Debtors' Objection to Commerce Associates Claim Pursuant To Bankruptcy Rule 3007 And Bankruptcy Code Section 502(B) (the "Objection").

3. I am the Vice President of the Manager of the Reorganized Debtors, and make this declaration based upon my personal knowledge and my review of the Debtors' and the Reorganized Debtors' books and records, except where such statements are noted as being made upon information and belief.

***Procedural History***

4. On either March 31, 2009 or April 1, 2009 (collectively, the "Petition Date"), each of the debtors (collectively, the "Debtors") commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court (the "Chapter 11 Cases").

5. On April 13, 2009, the Court issued a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines (the "Notice") establishing August 5, 2009 as the deadline for all creditors other than governmental units to file proofs of claim asserting claims in the Chapter 11 Cases.

6. Commerce Associates, LLC appears to have filed the Commerce Claim, as described in the Objection, on August 6, 2009 – a day after the deadline set forth in the Notice.

7. On March 12, 2010, the Court entered an order confirming the Third Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, et al. (the "Plan").

8. Pursuant to the Plan, the deadline for the Reorganized Debtors to object to claims is the date that is one year after the effective date (the "Effective Date") of the Plan.

9. On April 1, 2010, the Effective Date of the Plan occurred.

***The Purchase Agreement and Related Transactions***

10. On November 14, 2003, Debtor Rhodes Design and Development Corporation ("RDD") entered into a purchase agreement and grant of options with Commerce (the "Purchase Agreement," a copy of which is attached to the Objection as Exhibit B). Pursuant to the Purchase Agreement, Commerce sold RDD certain development parcels located in Henderson, Nevada for development into a master planned community ("Tuscany"). In addition, the Purchase Agreement granted RDD the option to purchase additional development parcels. The parcels sold pursuant to the Purchase Agreement are hereinafter referred to as the "Parcels".

11. Under the terms of the Purchase Agreement, RDD paid Commerce a base price of approximately $76,078,784 for the purchase of certain of the Parcels. In addition, pursuant to the Purchase Agreement, RDD had the option to purchase additional Parcels. Pursuant to the Purchase Agreement RDD agreed to pay Commerce (i) profit participations (the "Profit Participations") in the amount of 2% of the net profit, as defined in the Purchase

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Tel: 212.872.1000 Facsimile: 212.872.1002 / akingump.com

Agreement (the "Net Profit"), resulting from the sale of completed homes in the Tuscany development and (ii) lot premiums (the "Lot Premiums") upon RDD's purchase of each Parcel.

12. In connection with the purchase of the Parcels, RDD and Commerce entered into development declarations (the "Development Declarations") setting forth the parties' respective rights with respect to the development of the Parcels.[2] The Development Declarations also granted Commerce a lien on the particular Parcel to which that Development Declaration related in order to secure RDD's obligations under the Development Declarations, including the payment of the Lot Premiums and the Profit Participation. The parties entered into a separate Development Declaration each time RDD purchased an additional Parcel or set of Parcels from Commerce, resulting in a total of thirteen Development Declarations, all of which have been recorded in the Official Records of Clark County, Nevada.[3]

13. On or about November 21, 2005, the Debtors entered into both the First Lien Credit Agreement and the Second Lien Credit Agreement (each as defined in the Plan described below) with Credit Suisse, Cayman Islands Branch, as administrative agent on behalf of the lenders thereunder ("Credit Suisse"). Both the First Lien Credit Agreement and the Second Lien Credit Agreement (the "Credit Suisse Facility Documents") were secured by, *inter alia*, all of the Debtors' real property.

---

[2] A sample Development Declaration is attached to the Objection as Exhibit C.

[3] The Declaration of Development Covenants and Restrictions (Lot 21) recorded on March 31, 2005 does not grant Commerce a lien to secure the payment of the Lot Premium and Profit Participation on the particular Lot to which such Development Declaration relates. As such, there are only twelve Development Declarations granting Commerce a lien to secure the payment of the Lot Premiums and Profit Participations on particular Lots.

4

14. Contemporaneously with the Debtors' entry into the prepetition First Lien Credit Agreement, Commerce and Credit Suisse entered into a Subordination Agreement[4] (the "Subordination Agreement"), pursuant to which Commerce agreed to subordinate all of its then-existing and prospective liens on the Parcels to the liens securing the Debtors' indebtedness under the First Lien Credit Agreement and the Second Lien Credit Agreement. A copy of the Subordination Agreement is attached to the Objection as Exhibit D.

15. Following the execution and recordation of the Credit Suisse Facility Documents, on January 4, 2006, the Debtors formed Tuscany Acquisitions III, LLC ("TA3") as a wholly-owned subsidiary, and then on January 26, 2006, the Debtors exercised their option under the Purchase Agreement and caused TA3 to acquire certain Parcels. A Development Declaration was executed and recorded in conjunction with this takedown.

16. On September 1, 2006, the Debtors formed Tuscany Acquisitions, IV, LLC ("TA4") as wholly-owned subsidiary, and then on September 11, 2006 and again on November 13, 2006, the Debtors caused TA4 to acquire certain additional Parcels. Development Declarations were executed and recorded in conjunction with each of these takedowns.

17. On March 2, 2007, both TA3 and TA4 executed deeds of trust in favor of Credit Suisse, pursuant to which they each pledged the Parcels that they had acquired on January 26, September 11, and November 13, 2006, respectively to Credit Suisse as additional security for the Credit Suisse Facility. Contemporaneously therewith, Commerce and Credit Suisse jointly executed subordination agreements pursuant to which Commerce

---

[4] The Subordination Agreement was acknowledged by Rhodes Design and Development Corporation, Tuscany Acquisitions, LLC, and Tuscany Acquisitions II, LLC, who were not parties to the agreement.

agreed to subordinate all of its then-existing and prospective liens on those Parcels to Credit Suisse's liens.

18. On March 16, 2007, the Debtors caused TA4 to acquire additional Parcels pursuant to the Purchase Agreement, and a Development Declaration was executed and recorded in conjunction therewith. On July 31, 2007, TA4 executed an additional security instrument pursuant to which those Parcels were pledged as additional security to the Credit Suisse Facility. Contemporaneously therewith, Commerce and Credit Suisse jointly executed a subordination agreement pursuant to which Commerce agreed to subordinate all of its then-existing and prospective liens on those Parcels to Credit Suisse's liens.[5]

***The True-Up Calculations***

19. In connection with the Chapter 11 Cases, I prepared the spreadsheets attached to the Objection as Exhibits E and F, which reflect, to the best of my knowledge, the Lot Premiums owed and payments made in connection therewith as set forth in the Debtors' books and records, and the Profit Participation payments owed and payments made as set forth in the Debtors' books and records.

20. With respect to Lot Premiums, based upon my review of the Debtors' books and records and as reflected in the spreadsheet attached to the Objection as Exhibit E, Commerce was entitled to a total of $13,890,827 in Lot Premiums with respect to the seven Parcels purchased prior to November 21, 2005. Of the $13,890,827 owed to Commerce, the Debtors have paid Commerce $10,879,505, leaving a balance of $3,011,322. After November 21, 2005, the Debtors' purchased an additional eight Parcels in the Tuscany

---

[5] The subordination agreements referenced in paragraphs 17 and 18 were acknowledged by RDD and either TA3 or TA4, as appropriate, who were not parties to the agreements.

6

development, for which the Debtors' books and records indicate that Commerce was owed $14,540,558 in Lot Premiums. The Debtors have paid this amount in full.

21. With respect to each of the properties that were acquired by TA3 and TA4 specifically, the Debtors paid the Lot Premiums *at the time of closing*, as reflected in the settlement statements executed in connection with each of those closings.

22. Thus, the total Lot Premiums owed in connection with the Parcels purchased from Commerce totals no more than $3,011,322.

23. With respect to Profit Participation Payments, pursuant to § 3.2 of the Purchase Agreement, Commerce was also entitled to Profit Participation payments to the extent the Debtors realized a profit on the sale of homes in the Tuscany development. Each Profit Participation payment corresponds to 2% of the Net Profit resulting from the sale of a home in Tuscany, meaning that if the Debtors failed to turn a profit on a home sale, Commerce would not be entitled to any share of the sale proceeds. The 2% Profit Participation payment would initially be estimated, and that estimate would typically be paid to Commerce out of escrow in connection with the sale of a Tuscany home. Sometimes, that payment proved to be less than 2% of the actual profit realized from the sale of the home. More often, however, that payment proved to be *more* than 2% of the actual profit realized from the sale of the home.

24. As further provided in § 3.2 of the Purchase Agreement, there was to be an annual "true-up" that would reconcile the Profit Participation payments made to Commerce with the actual profits or losses realized from the sale of Tuscany homes during that year, and that would reimburse the Debtors for any overpayment, or that would require the

Debtors to pay any deficiency. Upon information and belief, this annual reconciliation did not occur.

25. However, based upon my review of the Debtors' books records, and as reflected in the spreadsheet attached to the Objection as Exhibit F, after payment of the estimated Profit Participation from the homes sold by the Debtors, the Debtors overpaid a total amount of $293,925 in connection with the sale of certain homes, and underpaid a total amount of $23,699 in connection with the sale of other homes.[6] Taken together, these figures result in a net credit to the Debtors in the amount of $270,226 on account of Profit Participation.

26. I declare, under penalty of perjury of the laws of the United States of America, that the foregoing statements are true and correct to the best of information, knowledge and belief.

Executed this 2nd day of May, 2011, in Dallas, Texas.

_____
JUSTIN BONO

---

[6] These underpayments include home sales in which the Debtors did not make any estimated Profit Participation payments at all.