Exhibit 1

1

2

3

4                    UNITED STATES DISTRICT COURT

5                        DISTRICT OF NEVADA

6
   EDWIN K. SLAUGHTER, et. al.                    )
7                                                 )        2:08-cv-1223-RCJ-GWF
                        Plaintiffs,               )
8                                                 )
   vs.                                            )              ORDER
9                                                 )
   UPONOR, INC. a Minnesota Corporation; et. al.  )
10                                                )
                        Defendants.               )
11  _____ )

12          This case is a class action products liability lawsuit against Defendants who allegedly

13  manufactured, marketed, distributed, and installed allegedly defective plumbing components, which

14  Plaintiffs allege caused harm to their residences located in Clark County, Nevada.  The Motion

15  pending before the Court is Defendants Ferguson Enterprises, Inc. and United Plumbing, LLC.'s

16  Request for Preliminary Injunction (#209), Defendant RCR Plumbing filed a joinder (#211),

17  Defendant Interstate Plumbing filed a joinder (#212), Plaintiffs filed a response (#215), Defendants

18  Ferguson and United filed a reply (#220) and a supplement (#261).  For the reasons given herein, the

19  Motion is DENIED.

20  I.      FACTS AND PROCEDURAL HISTORY

21          On July 28, 2008, Plaintiffs Edwin K. Slaughter, Rebecca Flinn, Mel Healey and Carol

22  Healey filed the present cause of action, on behalf of themselves and all others similarly situated,

23  in the District Court for Clark County, Nevada (#1;Ex A).  Defendants Uponor, Inc.; Uponor

24  North America, Inc.; Uponor Corp.; RCR Plumbing & Mechanical, Inc.; Interstate Plumbing &

25  Air Conditioning, LLC; United Plumbing, LLC; Ferguson Enterprises, Inc.; Hughes Water &

26  Sewer LP; and HD Supply Construction Supply Limited Partnership are alleged to be engaged in

1    the business of designing, developing, manufacturing, distributing, marketing, selling, and

2    installing the Wirsbo PEX plumbing system, Wirsbo brass fittings, and other plumbing materials

3    as part of the potable water supply systems of residential dwellings in Clark County, Nevada.

4    Uponor North America, Inc., and/or HD Supply Construction Supply were previously dismissed

5    in this case.

6         Plaintiffs are alleging that all of the Wirsbo brass fittings installed as part of the potable

7    water systems of the residential dwellings in Clark County, Nevada are defective.  Plaintiffs are

8    alleging that the Wirsbo brass fittings are reacting with the potable water in such a manner as to

9    result in a chemical reaction known as dezincification.  As a result of the dezincification process,

10   Plaintiffs allege that zinc is leaching out of the Wirsbo brass fittings, causing leaks, and

11   impairing the operation of the residences' plumbing systems and homes.  Plaintiffs are suing

12   under the following theories of liability: (1) product liability; (2) strict liability; (3) breach of

13   express warranty; (4) breach of implied warranty; (5) breach of warranty of merchantability; and

14   (6) negligence.  Plaintiffs are seeking general and special damages in excess of $10,000,000.

15        On September 15, 2008, Defendants removed the lawsuit from state court to federal court

16   pursuant to the Class Action Fairness Act ("CAFA") on the grounds that the amount in

17   controversy exceeds $5,000,000, there is diversity of citizenship between Plaintiffs and more

18   than one primary Defendant, and there are claimed to be more than 100 class members. (#1).

19        On or about December 24, 2008, six months after filing his complaint, Plaintiff Edwin

20   Slaughter served a notice pursuant to NRS 40.600 *et. seq.* alleging a defective condition existed

21   within his home, to wit, the allegedly defective Wirsbo brass fittings.  On April 1, 2009, Dennis

22   and Carmen Fabbri served a Chapter 40 notice based upon the same problem; the Wirsbo brass

23   fittings.  On April 6, 2009, Richard and Peggy Sanders served a Chapter 40 notice for their

24   Wirsbo brass fittings.  On April 20, 2009, Plaintiffs filed their Motion to Certify Class (#110).

25   On April 21, 2009, Plaintiffs Mel Healey and Carol Healey served their Chapter 40 notice for

26   Wirsbo brass fittings.  On May 12, 2009, James and Anamarie Pemberton served a Chapter 40

1  notice regarding Wirsbo brass fittings.  On August 7, 2009, James and Tara Winters served a

2  Chapter 40 notice for their Wirsbo brass fittings.  At the time these notices were served,

3  Slaughter and the Healeys were named Plaintiffs and the Sanders, Pembertons, Winters and

4  Fabbris were putative class members.  The Flinns have not served a Chapter 40 notice.

5      On September 3, 2009, Defendants United Plumbing and Ferguson Enterprises filed a

6  Request for a Temporary Restraining Order and Preliminary Injunction to obtain an order

7  stopping the class representatives and other putative class members from pursuing administrative

8  pre-litigation remedies pursuant to Nevada Revised Statutes 40.600 *et. seq.* during the pendency

9  of the instant litigation on the basis that the litigation and the pre-litigation administrative

10  proceedings were identical; they are both based upon the Wirsbo brass fittings.  Plaintiffs filed an

11  opposition disagreeing with United Plumbing and Ferguson Enterprises' characterization as to

12  the mature of the claims being pursued in this litigation and pursuant to the provisions of NRS

13  40.600 *et. seq.*

14  **II.    LEGAL STANDARDS**

15      **A.    Nevada Revised Statutes 40.600**

16      NRS 40.600 *et. seq.* provides for a pre-litigation administrative-type of process for the

17  resolution of constructional defect claims.  NRS 40.640 sets forth the conditions for the

18  commencement of the proceeding: "[i]n a claim to recover damages from a construction defect, a

19  contractor is liable for his acts or omissions or the acts or omissions of his agents, employees or

20  subcontractors . . . ."  Except where a litigation is filed to toll the applicable statutes of limitation

21  and/or repose pursuant to NRS 40.647(2)(b), before an action is commenced or a complaint is

22  amended, the claimant must give notice to a contractor and *may* give notice to a subcontractor.

23  NRS 40.645(1)(a)-(b).  Such a notice must (1) specify the defects, damage or injury to each

24  residence of the subject claim; (2) describe the cause of the defects, (3) the nature and extent of

25  damage resulting from the alleged defects; and (4) the location of the alleged defects.  NRS

26  40.645(2).  Notice can also be construed when an expert opinion has been given regarding the

1   alleged defects, and such opinion may be sent to all similarly situated owners of residences which

2   may have the common construction defect. NRS 40.645(3)-(4).

3       **B.    Preliminary Injunction**

4           In order to obtain relief in the form of a preliminary injunction, the moving party must

5   show that: (1) it has a likelihood of success on the merits; (2) it is likely to suffer irreparable

6   injury absent the injunction; (3) the balance of equities tip in its favor; and (4) the public interest

7   is served by granting injunctive relief. See *Stormans, inc. v. Selecky*, 571 F.3d 960 (9th Cir. 2009);

8   *Winter v. Natural Resources Defense Counsel*, 129 S.Ct. 365 (2008). *Owner-Operator Indep.*

9   *Drivers Assoc., Inc. v. Swift Transp. Co., Inc.*, 367 F.3d 1108, 1111 (9th Cir. 2004) (citations

10  omitted) (listing factors); *Sells v. McDaniel*, 2009 WL 2168819 *1, *2 (D. Nev. 2009) (slip

11  copy).

12          This Court also has authority under the All Writs Act to protect its jurisdiction and

13  effectuate its orders including the issuance of injunctive relief. 28 U.S.C. § 1651(a) (granting

14  court power to enter writs necessary and appropriate in aid of jurisdiction); *U.S. v. New York Tel.*

15  *Co.*, 434 U.S. 159, 172 (1997)(court has authority under the All Writs Act to grant injunction to

16  prevent frustration of previously entered orders); see also 28 U.S.C. § 2283 (Anti-Injunction Act)

17  (stating injunction to stay state proceedings is appropriate where "necessary in aid of jurisdiction,

18  or to protect or effectuate [the courts] judgment"). This includes the authority to grant

19  injunctions where no actions are pending in state court. *Dombrowski v. Pfister*, 380 U.S. 479,

20  484, 85 S. Ct. 1116, 1120 n.2 (1965); *Cenergy Corp. v. Bryson Oil & Gas P.L.C.*, 657 F.Supp.

21  867, 872 (D.Nev. 1987).

22      **C.    Election of Remedies**

23          The doctrine of election of remedies is well established law. It requires a plaintiff to

24  choose between two inconsistent and irreconcilable remedies available to redress a single wrong.

25  *Concrete Spaces, Inc. v. Sender*, 2 S.W. 3d 901, 906 (Tenn. 1999); *J.A. Jones const. Co. v.*

26  *Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 288, 89 P.3d 1009, 1017 (2004). It has been

1  equated to as a "specific application of the equitable doctrine of estoppel." *California Golf, LLC*

2  *v. Cooper*, 163 Cal. App. 4th 1053, 1065-66, 78 Cal. Rptr. 3d 153, 164 (2008).

3       **D.     Equitable Remedial Powers**

4          A federal court has broad equitable remedial powers *Stone v. City and County of San*

5  *Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). When district courts are properly acting as courts

6  of equity, they have discretion unless a statute clearly provides otherwise. *United States v.*

7  *Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 496, 121 S.Ct. 1711, 1720 (2001). "For

8  'several hundred years' courts of equity have enjoyed 'sound discretion' to consider the

9  'necessities of the public interest' when fashioning injunctive relief." *Id.*    In employing these

10  powers, the court should "'exercise the least possible power adequate to the end proposed.'"

11  *Stone*, 968 F.2d at 861(citing *Spallone v. United States*, 493 U.S. 265, 280, 110 S.Ct. 625, 634

12  (1990))

13  **III.     ANALYSIS**

14          The Court having reviewed the facts and applicable case law is in agreement that NRS

15  40.600 *et. seq.* (Chapter 40) is a pre-litigation device created by the Nevada Legislature and

16  intended to save legal fees, avoid litigation and provide homeowners a quicker option to relief.

17  The preliminary injunction sought is only as to the putative or punitive plaintiffs; those not

18  specifically named in the Complaint. The Court leaves to another day any ruling that the named

19  Plaintiffs have waived Chapter 40 by filing this lawsuit.

20          With respect to the putative or punitive Plaintiffs, this Court sees as inconsistent and

21  irreconcilable the Chapter 40 administrative pre-litigation procedure and the ongoing litigation.

22  This Court recognizes that should it certify a class in the instant litigation, class members still

23  have the right to opt out of the class. The Court views the service of a Chapter 40 notice on

24  behalf of a specific individual or homeowner as a pre-class certification opt out. Thus, those

25  parties are now choosing to pursue their remedies under the Chapter 40 scheme adopted by the

26  State of Nevada.

1    Were the Defendants to be required to proceed against the class in this litigation and, at

2  the same time, against individual pre-litigation cases, they would suffer prejudice.   Participation

3  in pre-litigation administrative procedures and the class at the same time is inconsistent.

4  Therefore, under either the All Writs Act or general principles of preliminary injunctions,

5  Defendants are entitled to a preliminary injunction against being required to participate in

6  Chapter 40 proceedings for any party also a class member, named, putative or punitive.

7    This Court has the authority to fashion equitable relief under its remedial equitable

8  power.  Therefore, considering the necessities of the public interest, this Court will provide to the

9  putative or punitive Plaintiffs equitable relief from the proposed preliminary injunction in the

10  form of an election of remedies to choose between being a member of the instant matter and any

11  class that results therefrom and to opt out of the class altogether and proceed individually under

12  the state sanctioned Chapter 40 pre-litigation administrative process.  Putative or punitive class

13  members who opt out and proceed under Chapter 40 are estopped from attempting to return to

14  the class in this case and from alleging a class in a subsequent proceeding pursuant to Chapter

15  40.  Counsel for Plaintiffs, named, putative and punitive, have elected the remedy of allowing

16  homeowners who so choose to opt out of this case and the class and proceed individually under

17  Chapter 40 and are estopped from inclusion as a class member on the claims in this case.  In open

18  Court, counsel for the named Plaintiffs and the punitive and putative class members elected this

19  remedy on behalf of the punitive or putative class and therefore has affirmatively elected this

20  equitable remedy and estopped the class on this point of law.

21

22

23

24

25

26  ///

1

**CONCLUSION**

2    IT IS HEREBY ORDERED that putative or punitive class members have through class

3   counsel elected the remedy of pursuing a claim under NRS 40.600 *et. seq.* as opposed to

4   remaining a class member in this case and are equitably estopped from pursuing their claims as a

5   member of the class in this court or in a further state court action upon the filing of a Chapter 40

6   notice on their individual behalf.  The Request for Permanent Injunction (#209) is hereby

7   DENIED.

8       DATED:    January 25, 2010                        .

9

10

11

12   Honorable Robert C. Jones
     United States District Judge

13

14   RESPECTFULLY SUBMITTED BY

15   OLSON, CANNON, GORMLEY
     & DESRUISSEAUX

16

17   By: /s/ *Philip S. Gerson*
     Philip S. Gerson, Esq.
18   9950 W. Cheyenne Avenue
     Las Vegas, Nevada 89129
19   Attorney for Defendants
     United Plumbing, LLC and
20   Ferguson Enterprises, Inc.

21

22

23

24

25

26

Exhibit 2

1

2

3

4

5

6

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| EDWIN K. SLAUGHTER et al., | ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 2:08-cv-01223-RCJ-GWF |
| UPONOR, INC. et al., | ) ) | **ORDER** |
| Defendants. | ) ) | |

This is a class action products liability lawsuit against Defendants, who manufactured, marketed, distributed, and installed allegedly defective plumbing components, which Plaintiffs allege caused harm or are likely to cause harm to their residences in Clark County, Nevada. The Court has dismissed the case with prejudice, and Plaintiffs have appealed. One Defendant has now moved for the Court to stay similar litigation in state court pending the outcome of the appeal in this case. Several Defendants have joined the motion. For the reasons given herein, the Court denies the motion.

## I.    FACTS AND PROCEDURAL HISTORY

On July 28, 2008, Plaintiffs Edwin K. Slaughter, Rebecca Flinn, Mel Healey, and Carol Healey filed the present class action in the District Court for Clark County, Nevada. (*See* Compl., July 28, 2008, ECF No. 1, Ex. A). Defendants Uponor, Inc.; Uponor North America, Inc.; RCR Plumbing and Mechanical, Inc. ("RCR"); Interstate Plumbing & Conditioning, LLC; United Plumbing, LLC; Ferguson Enterprises, Inc.; Hughes Water & Sewer LP; Standard Wholesale Supply Company; and HD Supply Construction Supply, LP are engaged in the

1   business of designing, developing, manufacturing, distributing, marketing, selling, and installing

2   the Wirsbo PEX plumbing system, Wirsbo brass fittings, and other plumbing materials.

3   Plaintiffs alleged that the Wirsbo brass fittings installed in certain residences throughout Clark

4   County, Nevada were defective.  Brass is a metal alloy of copper and zinc containing a copper-

5   to-zinc ratio from 10:1 to 1:1, and sometimes containing small amounts of other metals.

6   "Yellow brass" has a copper-to-zinc ratio of 2:1.  Plaintiffs alleged the Wirsbo yellow brass

7   fittings reacted with the water in Clark County in a chemical reaction known as dezincification,

8   whereby zinc leaches out of yellow brass.  In a few cases, this caused leaks or breaks in pipes,

9   causing water damage, and Plaintiffs anticipated more leaks or breaks would occur in the future.

10  Plaintiffs sued in state court under the following theories of liability: (1) product liability; (2)

11  strict liability; (3) breach of express warranty; (4) breach of implied warranty; (5) breach of

12  warranty of merchantability; and (6) negligence.  Plaintiffs sought damages in excess of

13  $10,000,000.  Defendants removed pursuant to the Class Action Fairness Act.

14         During the litigation, the Court ruled that no Plaintiff or putative class member could

15  pursue Chapter 40 remedies under state law and also recover in the class action, because that

16  would constitute double recovery for the same harm.  In other words, those who had pursued

17  Chapter 40 remedies were excluded from a potential class, and any named Plaintiffs who had

18  done so were dismissed.  Unhappy with this ruling, Plaintiffs moved to voluntarily dismiss the

19  entire case without prejudice and withdrew their pending motion to certify the class.  The Court

20  granted the motion in part, dismissing with prejudice.  Plaintiffs appealed that order and all

21  previous rulings in the case.  The Ninth Circuit scheduled briefing to be completed by July 7,

22  2010.  Plaintiffs amended the notice of appeal three times to include appeals of the Court's

23  denial of a motion to reconsider and its grant of attorneys fees and costs.  The Ninth Circuit has

24  scheduled supplemental briefing to be completed by April 27, 2011.  RCR has now moved for

25  the Court to stay a state court action, *The Gables Condominium Owners' Association v. Uponor,*

1    *Inc.*, No. A533498 (the "*Gables* litigation").

2    **II.    LEGAL STANDARDS**

3        The All Writs Act and the Anti-Injunction Act together define the scope of a federal

4 court's ability to enjoin state court proceedings. "The Supreme Court and all courts established

5 by Act of Congress may issue all writs necessary or appropriate in aid of their respective

6 jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). However,

7 "[a] court of the United States may not grant an injunction to stay proceedings in a State court

8 except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction,

9 or to protect or effectuate its judgments." 28 U.S.C. § 2283.

10    **III.    ANALYSIS**

11        RCR asks the Court to enjoin state court litigation where the uncertified putative class in

12 the present, now-dismissed federal action is the same as a potential class in the pending state

13 court action. RCR is not a party to the *Gables* litigation, although it alleges to have received a

14 subpoena duces tecum in that case. Still, RCR is a party to the present case, and it therefore has

15 standing to ask this Court to enjoin state court proceedings that threaten this Court's jurisdiction

16 in the present case.

17        The Court has made clear that the Dismissal Order did not necessarily bar Chapter 40

18 claims or separate state court actions by putative class members, but that the Court would not

19 permit any party to proceed in the federal class action who had also pursued Chapter 40 claims:

20      [T]he Dismissal Order almost certainly does not prevent Chapter 40 claims by former
putative class members, nor was it designed to do so. Former putative class

21      members will have to await a ruling in state court whether this Court's order bars a
Chapter 40 (or other) action in state court. This Court simply ruled that putative

22      class members could not simultaneously pursue Chapter 40 remedies and join a
separate class action based on the same alleged tort and thereby make Defendants

23      defend twice against the same cause of action. But the Court specifically stated that
putative class members had the right to elect Chapter 40 remedies. Another court

24      will have to determine whether Chapter 40 remedies have been waived as a matter
of law simply because the present, now-dismissed class action lawsuit was brought

25      before Chapter 40 procedures were initiated—this appears to be Interstate's position

1    in the unrelated matter—but this Court has never ruled on that question.

2    (Order 4 & n.1, May 18, 2010, ECF No. 415). The Court then refused Plaintiffs' request to

3    pronounce prospectively that the Dismissal Order or the previous Preliminary Injunction Order

4    (the "PI Order") did not have the effect of barring any future action in state court, because that

5    issue was not ripe:

6        Plaintiffs ask the Court to amend the Dismissal Order to announce that the PI Order
         no longer has any force or effect. Specifically, Plaintiffs ask the Court to rule that
7        its previous ruling—that simultaneous prosecution of Chapter 40 claims and a class
         action based on the same alleged tort constitute duplicative actions—is a nullity in
8        light of dismissal of the case with prejudice. Plaintiffs presumably desire such a
         pronouncement so that they may commence a class action in state court (or perhaps
9        even in federal court) while simultaneously pursuing separate Chapter 40
         proceedings. This Court's amendment of the Dismissal Order in the way Plaintiffs'
10       desire could not have the effect Plaintiffs apparently seek. The efficacy of the PI
         Order as of dismissal of this case is a question that a future court with jurisdiction
11       over a pending matter must decide for itself. This Court's own view on the res
         judicata effect of its orders has no force in another court. Plaintiffs must cite the res
12       judicata case law to the court they wish to persuade to honor or ignore this Court's
         prior rulings, and that court must then determine those rulings' res judicata effect.
13       But this Court cannot pronounce the res judicata effect of its own rulings by fiat, as
         if it had unlimited and preemptive appellate jurisdiction over any trial court that
14       might consider the question in the future.

15       Still, there is the possibility that a Defendant may in the future request this
         Court to stay state court proceedings initiated by a Plaintiff on the ground that such
16       proceedings would conflict with the PI Order. Because this is a possibility, the initial
         inclination might be to assume that the Court must examine whether the PI Order can
17       have any effect in light of the dismissal of the case with prejudice (Plaintiffs argue
         that it cannot) and amend the Dismissal Order to clarify this. However, the Court
18       will not amend the Dismissal Order at this time, because the Court will have to
         examine the question only if a Defendant in this case applies for an injunction
19       against a state court proceeding that it views to be barred by the PI Order. At that
         time, and not before, will the Court have the facts required to determine whether an
20       injunction against a state court proceeding is required to protect the efficacy of the
         PI Order [pursuant to the Anti-Injunction Act].
21
     (*Id.* 5:3–6:9).
22
         The issue is now ripe. The preclusive effects of two of the Court's orders are at issue.
23
     The PI Order barred putative class members from joining the class upon eventual certification if
24
     they had pursued Chapter 40 remedies. (*See* Order 5–6, Jan. 25, 2010, ECF No. 348). Upon
25

Page 4 of 6

1    certification, such class members would have to make the choice to opt out of the class if they

2    had not yet pursued Chapter 40 remedies but wished to, and those putative class members who

3    had already pursued Chapter 40 remedies had effectively opted out of any class action

4    prospectively. (*See id.* at 5). The PI Order was preliminary; the Court denied a permanent

5    injunction. (*See id.* at 6–7). The Court finds that the efficacy of the PI Order itself is not

6    threatened by the *Gables* litigation. A preliminary injunction is a "judgment" because it is

7    appealable. *Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1419 n.5 (9th Cir. 1984).

8    Because it is an interlocutory order, however, a preliminary injunction "dissolves *ipso facto*

9    when a final judgment is entered in the cause." *See U.S. Philips Corp. v. KBC Bank, N.V.*, 590

10    F.3d 1091, 1093–94 (9th Cir. 2010).

11        The Dismissal Order, however, is binding. As discussed at the hearing, it has two main

12    effects. First, it precludes the certification of a class in any subsequent litigation that mirrors the

13    putative class in the present case. Second, it precludes even individual cases or Chapter 40

14    actions by the named Plaintiffs in the present case. The Dismissal Order was a final judgment,

15    and in most states, as well as under the Restatement, final judgments have preclusive effect

16    despite an appeal. *See Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 329 n.7 (9th Cir.

17    1995) (citing *Baker v. Leary*, 261 P.2d 1013 (Nev. 1953); Restatement (Second) of Judgments

18    § 13 & cmt. f; *id.* § 16 & cmt. a.). The Court retains jurisdiction to protect this order and will

19    stay or dismiss state court actions in the future if the efficacy of the Dismissal Order is

20    threatened. What the Dismissal Order did not necessarily do is prevent members of the putative,

21    uncertified class in the present case from bringing their own separate actions in state or federal

22    court, joining such actions, or pursuing Chapter 40 remedies. Any court in which such plaintiffs

23    file such an action may determine this question for itself, but this Court will not enjoin such

24    actions. The *Gables* litigation appears to fall into this category of cases, because The Gables

25    Condominium Owners' Association is apparently the only plaintiff in that case, and there is no

1   motion for class certification or even any class allegation in that case.  If and when any plaintiff

2   in that case or another case attempts to file class allegations or certify a class, this Court may

3   enjoin such an action based on the Dismissal Order.  Unless and until this occurs, however, this

4   Court's judgments are not threatened.

**CONCLUSION**

6   IT IS HEREBY ORDERED that the Motion to Stay State Court Action (ECF No. 485) is

7   DENIED.

8   IT IS FURTHER ORDERED that the Motions to Strike (ECF Nos. 501, 503) are

9   DENIED.

10   IT IS SO ORDERED.

11   Dated this 1st day of April, 2011.

_____
ROBERT C. JONES
United States District Judge

Exhibit 3

*Canepa Riedy & Rubino*
851 So. Rampart Boulevard, Ste. 160
Las Vegas, Nevada 89145
Telephone: (702) 304-2335 Fax: (702) 304-2336

✦ ✦ ✦ ✦ ✦ ✦ ✦ ✦

*Lynch Hopper & Salzano, LLP*
231 South Third Street, Ste. 130
Las Vegas, Nevada 89101
Telephone: (702) 868-1115 Fax: (702) 868-1114

*Harrison Kemp Jones & Coulthard, LLP*
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000 Fax: (702) 385-6001

✦ ✦ ✦ ✦ ✦ ✦ ✦ ✦

*Robert C. Maddox & Associates*
3811 West Charleston Blvd., Ste 110
Las Vegas, Nevada 89521
Telephone: (702) 366-1900 Fax: (702) 366-1999

---

December 29, 2008

<u>VIA CERTIFIED MAIL, RETURN-RECEIPT REQUESTED</u>

James Rhodes
Rhodes Design and Development
4730 South Fort Apache Road
Las Vegas, Nevada 89147

*Re:*        *Arturo Casimiro and Mirajoy Rayo*
             *Notice of Defect Pursuant to NRS 40.645*

Dear Sir or Madam:

The undersigned represent the above-referenced homeowner who owns the residence at the following address.

        Arturo Casimiro and Mirajoy Rayo
        441 Punto Vallata
        Henderson, Nevada 89011

Your legal rights are affected by this written Notice, which is given pursuant to Nevada Revised Statutes ("NRS") Section 40.645. The purpose of this Notice is to inform you that Arturo Casimiro and Mirajoy Rayo (hereinafter sometimes referred to as "Homeowner" or "Claimant") hereby makes a claim against Rhodes Design and Development for construction defects in their home, located at the above-listed address, and *all similarly situated homes that include the construction defect at issue* ("Claimants"). You should carefully read NRS 40.645 and consult an attorney to determine your specific rights and obligations.

NRS 40.600 (*et seq.*), requires that before commencing litigation against you and/or your company, the Homeowner must provide written notice on behalf of themselves and all similarly situated homes involving the defect at issue, specifying in reasonable detail the construction defects suffered as a result of Rhodes Design and Development's acts or omissions. The description below of the defect and damages sustained by these residences is intended to comply with this requirement.

Canepa Riedy & Rubino                    ♦    Harrison Kemp Jones & Coulthard, LLP
Lynch Hopper & Salzano, LLP              ♦    Robert C. Maddox & Associates

Rhodes Design and Development
December 29, 2008
Page 2 of 3

---

Please be advised that NRS Chapter 40 affords you a reasonable period of time to inspect the property, investigate the conditions, as well as a repair proposal or monetary offer to cure the defects.

This Notice is being given to satisfy the requirements of NRS 40.645(2). The present defect specifically relates to defective high zinc content brass plumbing fittings that are part of the WIRSBO plumbing system installed by Rhodes Design and Development within the Homeowners' home and all similarly situated homes. High zinc content brass WIRSBO fittings disintegrate and fail because of a well-known chemical reaction called dezincification, which occurs when high zinc content WIRSBO fittings are exposed to water. When exposed to water, zinc corrodes out of the high zinc content brass WIRSBO fittings, leaving behind a weak and porous honeycomb of copper and telltale blockage of zinc oxide that inevitably leads to leaks, restricted water flow, and/or breakage. High zinc content brass WIRSBO fittings therefore not only cause substantial injury to homeowners after they burst and leak, but also impair the ability of a home's plumbing system to effectively operate and provide water to appliances and plumbing fixtures. This construction defect has caused these damages and other as-of-yet undetermined injuries to the residence and property of Homeowner and all similarly situated homes that include this defect.

Based upon the expert opinion of David J. Coates, Ph.D, P.E., a copy of which is attached to this Notice as Exhibit A, *every* home where Rhodes Design and Development has installed high zinc content brass WIRSBO fittings *will* suffer from dezincification. Based upon our investigation to date, Rhodes Design and Development's failure to recognize the susceptibility of high zinc content brass WIRSBO fittings to dezincification has caused the damages suffered by the Homeowner and all similarly-situated owners of homes. Investigation of this issue is continuing, therefore, pursuant to NRS 40.645, Claimant reserves the right to modify, amend or add additional defects.

Be advised that you have ninety (90) days after receipt of this Notice to formally respond. The response must be in writing and sent by certified mail. Your response must address each defect in the Notice and whether you choose to repair the defect or cause the defect to be repaired, and if necessary, to pay costs of temporary housing and removal and relocation of the personal contents and property of the occupants, or whether you elect to pay monetary compensation for each constructional defect. Should you disclaim liability for any constructional defect, you must state the reasons in writing.

Not later than thirty (30) days after the date on which you received this Notice, you must forward a copy of the Notice by certified mail, return-receipt requested, to the last-known address of each subcontractor, supplier or design professional whom you reasonably believe is responsible for a defect specified in the Notice. Failure to do so may prohibit you from commencing an action against the subcontractor, supplier, or design professional related to the construction defect.

Canepa Riedy & Rubino                          ✦    Harrison Kemp Jones & Coulthard, LLP
Lynch Hopper & Salzano, LLP                    ✦    Robert C. Maddox & Associates

Rhodes Design and Development
December 29, 2008
Page 3 of 3

_____

You are urged to give immediate attention to this matter, as the law contained within NRS 40.600 *(et seq.)*, has deadlines and obligations that must be met by you and/or your company. Pursuant to NRS 40.650, if you fail to: a) comply with the provisions of NRS 40.6472; b) make an offer of settlement; c) make a good faith response to the claim asserting no liability; d) agree to a mediator or accept the appointment of a mediation pursuant to NRS 40.680; or e) participate in mediation, the limitations on damages and defenses to liability provided in NRS 40.600 to 40.695, inclusive, <u>will not apply</u> and Claimant may proceed with the filing of a complaint against you for constructional defects without satisfying any other requirement of NRS 40.600 to 40.695, inclusive.

Pursuant to NRS 40.680, Gary Nagle, Esq., is selected to act as mediator of this dispute. You have twenty (20) days following your receipt of this Notice to agree to the selected mediator and that you will mediate this matter before said mediator in due course. If you do not agree with the selection of this mediator, please propose an alternative. If we are unable to agree upon a mediator, a petition will be issued to have a mediator appointed. Once the mediator is appointed, the mediator shall convene the mediation within thirty (30) days after the matter is submitted to him/her and shall complete the mediation within forty five (45) days after the matter is submitted to him/her, unless the parties agree to extend the time.

It is foreseeable that some construction deficiencies to the aforementioned residence and similarly situated residences may be covered by your past and/or present General Liability Insurance Policies. It is strongly recommend that you or your attorney provide copies of this letter to all insurance carriers with whom you have had coverage since these properties were originally developed.

In addition, pursuant to NRS 40.600 *(et seq.)*, you are requested to immediately provide copies of all plans, specifications, or other reports related to your scope of work at the subject property, and in particular, the original lot reports and notes. Copies of all policies of insurance including declaration pages, which may afford coverage for the deficiencies or damage, are also specifically requested.

At the request of the Claimant, all communications, either written, verbal or otherwise, must be made to, and through, the above entitled law firms at 3811 W. Charleston Avenue, Suite 110, Las Vegas, Nevada 89102.

We thank you in advance for your immediate attention to this matter.

Very truly yours,
ROBERT C. MADDOX & ASSOCIATES

Troy L. Isaacson, Esq.

AFFIDAVIT OF DAVID J. COATES, Ph.D, P.E.

STATE OF CALIFORNIA   )
             ) SS:
COUNTY OF LOS ANGELES  )

David Coates, being first duly sworn, deposes and attests the following:

1. I am over the age of eighteen and competent to testify as to the matter stated herein.

2. That I am a metallurgical engineer and have been hired to investigate the cause of plumbing failures associated with high zinc content (yellow) brass fittings used within Wirsbo plumbing systems found in residences in Clark County, Nevada.

3. That I have performed visual and laboratory examinations, including destructive testing and chemical analysis, of numerous high zinc brass Wirsbo fittings removed from residences located in Clark County, Nevada.

4. That based on my investigation and testing of high zinc Wirsbo fittings, it is my opinion that:

  a. The brass Wirsbo fittings in question are subject to a corrosion mechanism know as "dezincification" when exposed to water, resulting in occluded water pipes, reduced flow, potential water leakage and property damage. "Dezincification" is a process whereby zinc corrodes out of a brass (copper-zinc) alloy leaving behind a porous copper matrix;

  b. That the brass Wirsbo fittings I have investigated appear to be particularly susceptible to dezincification in their installed locations and are universally prone to deterioration and failure because of this corrosion process; and

c.   That every similar residence where these brass Wirsbo fittings have been installed will ultimately suffer from dezincification and leakage failure when exposed to water in the plumbing systems.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
David J. Coates, Ph.D, P.E.

Subscribed and sworn to before me, a Notary Public, this __23rd__ day of __DECEMBER__, __2008__.



Notary Public in and for said County and State   MALCOLM BROWN

```
M. BROWN
COMM. #1569087
Notary Public-California
LOS ANGELES COUNTY
My Comm. Exp. April 14, 2009
```

Exhibit 4

## DECLARATION OF PETER ELLIOTT, Ph.D., C.Eng.

1.    I am over the age of eighteen and competent to testify as to the matters stated herein.

2.    I am a metallurgical engineer and a corrosion specialist and the principal of Corrosion & Materials Consultancy, Inc. ("C&MC"). C&MC has been retained as a consultant by various law firms representing homeowners and homeowner associations throughout the Las Vegas Valley to provide a metallurgical and corrosion evaluation of brass plumbing fittings, valves and angle stops utilized in potable water delivery systems.

3.    In furtherance of C&MC'S retention, C&MC was provided high zinc content two phase (alpha-beta) brass plumbing components, including but not limited to fittings and valves, removed from various single family homes and condominiums throughout the Las Vegas Valley for metallurgical examination and evaluation, including visual examination, sectioning, scanning electron microscopy (SEM), energy dispersive x-ray analysis (EDX) and metallography. Samples of corrosion deposits were removed from the inside and outside of the brass fittings and valves and analyzed using the EDX analysis capabilities in a SEM. EDX analysis was also performed on the sectioned brass fittings and valves to determine their zinc content. Metallographic sections were prepared of selected fittings and valves and their microstructure was examined and documented in the as-polished and in the etched conditions.

4.    The fittings utilized in the plumbing systems bear identification markings that indicate the fittings were manufactured by or on behalf of Uponor, Inc. (formerly known as "Wirsbo"), Viega (formerly known as "Vanguard"), Rehau, RTI and Kitec. The valves and angle stops utilized in the plumbing systems bear identification markings that indicate they were manufactured by or on behalf of various entities, including but not limited to "BOB", "Red-White", "Brasscraft" and "Watts". The fittings were attached to the pipe via retaining rings, copper crimp rings and/or stainless steel clamp rings.

1

5.      The fittings, valves and angle stops examined show varying amounts of external deposits on the outside surfaces.  More extensive accumulations of "meringue" deposits were found on the interior surfaces of the sectioned fittings, valves and angle stops.  Meringue type deposits on brass fittings, valves and angle stops are classical indicators of dezincification corrosion attack of the brass.  EDX analysis of the external deposits and the internal meringue deposits confirmed the deposits are primarily zinc corrosion deposits (oxides and/or carbonates).  Metallographic sectioning of selected fittings, valves and angle stops show porous and copper rich areas, indicative of dezincification attack.

6.      "Dezincification" is a well-known mode of corrosion attack that is a form of selective dissolution (also known as dealloying), or removal of an element (zinc) from the brass alloy by corrosion.  Dezincification causes the zinc-rich regions of susceptible brasses to be preferentially corroded.  Yellow brasses containing greater than 15% zinc are generally found to be susceptible to dezincification corrosion.  The fittings, valves and angle stops analyzed contained approximately 34-40% zinc and showed a two phase (alpha-beta) microstructure.

7.      Based on C&MC'S examination and evaluation of the fittings, valves and angle stops supplied from hundreds of residential plumbing systems throughout the Las Vegas Valley, which collectively represent a valid and reliable sampling of high zinc content brass plumbing fittings, valves and angle stops, and C&MC'S experience, training, and review and analysis of scientific, technical and industry literature, it is my opinion that all similarly situated residences in the Las Vegas Valley with high zinc content (> 15%) yellow brass plumbing fittings, valves and angle stops will suffer similar degradation due to dezincification corrosion attack leaving porous, brittle copper rich matrices and accumulations of zinc corrosion products (meringue), leading to failure (e.g., reduced material strength and integrity; reduced water flow; water leakage; and/or cracks).  It is my further opinion the degradation of the brass due to dezincification corrosion has or will cause all high

zinc content brass fittings, valves and angle stops throughout the Las Vegas Valley to fail prior to reaching their expected and/or warranted useful life.  Degradation of high zinc content brass due to dezincification corrosion is a well known phenomenon and the issue has been widely researched and addressed in both scientific and industry related literature.

8.     The foregoing opinions and conclusions are based upon (a) my background, education and experience in metallurgical engineering, corrosion and failure analysis; (b) my metallurgical examination and evaluation, including visual examination, sectioning, scanning electron microscopy, energy dispersive x-ray analysis and metallography of high zinc content two phase (alpha-beta) brass plumbing components taken from residences throughout the Las Vegas Valley and other geographical localities; and (c) my review and analysis of technical, scientific and industry literature regarding dezincification corrosion.

9.     The foregoing opinions and conclusions have been developed with a reasonable degree of engineering certainty and are based upon the facts and evidence provided and materials reviewed to date.

10.     I declare under penalty of perjury pursuant to the laws of the States of Nevada and New Jersey that the foregoing is true and correct.


Peter Elliott, Ph.D., C.Eng., FIMMM, FNACE
Declarant

Exhibit 5

## DECLARATION OF DAVID J. COATES, Ph.D, P.E.

1.       I am over the age of eighteen and competent to testify as to the matters stated herein.

2.       I am a metallurgical engineer and the principal of Coates Engineering Services, Inc. ("CES"). CES has been retained as a consultant by various law firms representing homeowners and homeowner associations throughout the Las Vegas Valley to provide a metallurgical and corrosion evaluation of brass plumbing fittings, valves and angle stops utilized in potable water delivery systems.

3.       In furtherance of CES' retention, CES was provided high zinc content two phase (alpha-beta) brass plumbing components, including but not limited to fittings and valves, removed from various single family homes and condominiums throughout the Las Vegas Valley for metallurgical examination and evaluation, including visual examination, sectioning, scanning electron microscopy (SEM), energy dispersive x-ray analysis (EDX) and metallography. Samples of corrosion deposits were removed from the inside and outside of the brass fittings and valves and analyzed using the EDX analysis capabilities in a SEM. EDX analysis was also performed on the sectioned brass fittings and valves to determine their zinc content. Metallographic sections were prepared of selected fittings and valves and their microstructure was examined and documented in the as-polished and in the etched conditions.

4.       The fittings utilized in the plumbing systems bear identification markings that indicate the fittings were manufactured by or on behalf of Uponor, Inc. (formerly known as "Wirsbo"), Viega (formerly known as "Vanguard"), Rehau, RTI and Kitec. The valves and angle stops utilized in the plumbing systems bear identification markings that indicate they were manufactured by or on behalf of various entities, including but not limited to "BOB", "Red-White", "Brasscraft" and "Watts". The fittings were attached to the pipe via retaining rings, copper crimp rings and/or stainless steel clamp rings.

5.    The fittings, valves and angle stops examined show varying amounts of external deposits on the outside surfaces. More extensive accumulations of "meringue" deposits were found on the interior surfaces of the sectioned fittings, valves and angle stops. Meringue type deposits on brass fittings, valves and angle stops are classical indicators of dezincification corrosion attack of the brass. EDX analysis of the external deposits and the internal meringue deposits confirmed the deposits are primarily zinc corrosion deposits (oxides and/or carbonates). Metallographic sectioning of selected fittings, valves and angle stops show porous and copper rich areas, indicative of dezincification attack.

6.    "Dezincification" is a well-known mode of corrosion attack that is a form of selective leaching, or removal of an element (zinc) from the brass alloy by corrosion. Dezincification causes the zinc rich regions of susceptible brasses to be preferentially corroded. Yellow brasses containing greater than 15% zinc are generally found to be susceptible to dezincification corrosion. The fittings, valves and angle stops analyzed contained approximately 34-40% zinc and showed a two phase (alpha-beta) microstructure.

7.    Based on CES' examination and evaluation of the fittings, valves and angle stops supplied from hundreds of residential plumbing systems throughout the Las Vegas Valley, which collectively represent a valid and reliable sampling of high zinc content brass plumbing fittings, valves and angle stops, and CES' experience, training, and review and analysis of scientific, technical and industry literature, it is my opinion that all similarly situated residences in the Las Vegas Valley with high zinc content (> 15%) yellow brass plumbing fittings, valves and angle stops will suffer similar degradation due to dezincification corrosion attack leaving porous, brittle copper rich matrices and accumulations of zinc corrosion products (meringue), leading to failure (e.g., reduced material strength and integrity; reduced water flow; water leakage; and/or cracks). It is my further opinion the degradation of the brass due to dezincification corrosion has or will cause all high

zinc content brass fittings, valves and angle stops throughout the Las Vegas Valley to fail prior to reaching their expected and/or warranted useful life. Degradation of high zinc content brass due to dezincification corrosion is a well known phenomenon and the issue has been widely researched and addressed in both scientific and industry related literature.

8.      The foregoing opinions and conclusions are based upon (a) my background, education and experience in metallurgical engineering, corrosion and failure analysis; (b) my metallurgical examination and evaluation, including visual examination, sectioning, scanning electron microscopy, energy dispersive x-ray analysis and metallography of high zinc content two phase (alpha-beta) brass plumbing components taken from residences throughout the Las Vegas Valley and other geographical localities; and (c) my review and analysis of technical, scientific and industry literature regarding dezincification corrosion.

9.      The foregoing opinions and conclusions have been developed with a reasonable degree of engineering certainty and are based upon the facts and evidence provided and materials reviewed to date.

10.     I declare under penalty of perjury pursuant to the laws of the States of Nevada and California that the foregoing is true and correct.

David J. Coates, Ph.D., P.E.
Declarant