1

1              UNITED STATES BANKRUPTCY COURT

2                  DISTRICT OF NEVADA

3                  LAS VEGAS, NEVADA

4   In re:  THE RHODES COMPANIES,    )  E-Filed:  08/08/11
    LLC,                             )
5                                    )
             Debtor.                 )  Case No.
6                                    )  BK-S-09-14814-LBR
    _____)  Chapter 11
7

8

9

10

11              TRANSCRIPT OF PROCEEDINGS
                          OF
12             CONTINUED STATUS HEARING
                RE: OBJECTION TO CLAIM 61
13       OF COMMERCE ASSOCIATES, LLC, NO. 1416
                         AND
14     OBJECTION TO CLAIM 814-33 OF JAMES RHODES, NO. 1466
                         AND
15     ARGUMENT RE: MOTION TO RECONSIDER ORDER SUSTAINING
    REORGANIZED DEBTOR'S OBJECTION TO JAMES RHODES' ENTITLEMENT
16   TO THE TAX CLAIM FOUND IN PROOF OF CLAIM NO. 814-33, NO. 1431
                       VOLUME 1
17         BEFORE THE HONORABLE LINDA B. RIEGLE
              UNITED STATES BANKRUPTCY JUDGE
18
                 Tuesday, August 2, 2011
19
                      9:30 a.m.
20

21

22

23   Court Recorder:        Helen C. Smith

24

    Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

```
1    APPEARANCES:

2    For the Reorganized     ABID QURESHI, ESQ.
     Debtor:                 MEREDITH A. LAHAIE, ESQ.
3                            Akin, Gump, Strauss, Hauer & Feld, LLP
                             One Bryant Park
4                            New York, New York 10036

5    For James Rhodes:       KEVIN N. ANDERSON, ESQ.
                             Fabian & Clendenin
6                            215 South State Street
                             Suite 1200
7                            Salt Lake City, Utah 84111

8    For Commerce            TRACY A. DiFILLIPPO, ESQ.
     Associates, LLC:        Jones Vargas
9                            3773 Howard Hughes Parkway
                             Third Floor South
10                           Las Vegas, Nevada 89169

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              (Court convened at 09:35:41 a.m.)

2                   THE CLERK:  All rise.  Bankruptcy court is now in

3       session.

4            (Colloquy not on the record.)

5                   THE COURT:  Be seated.

6            (Colloquy not on the record.)

7                   THE COURT:  All right.  Rhodes.

8            Appearances, please.

9                   MR. QURESHI:  Good morning, your Honor.  For the

10      record, on behalf of the reorganized debtors, Abid Qureshi and

11      Meredith Lahaie from Akin, Gump, Strauss, Hauer & Feld.

12                  MR. ANDERSON:  Good morning, your Honor.

13      Kevin Anderson, Fabian & Clendenin, on behalf of Mr. Rhodes.

14                  THE COURT:  Okay.

15                  MS. DiFILLIPPO:  Good morning, your Honor.

16      Tracy DiFillippo on behalf of the creditor,

17      Commerce Associates.

18                  THE COURT:  Okay.  So what's the story with

19      Commerce Associates?  That's the first one we have on our

20      calendar.

21                  MS. DiFILLIPPO:  Your Honor, I believe we've come to

22      an agreement on Commerce Associates, the fact that everything

23      is an unsecured claim.  We are just now working on the amount.

24           I received the documentation from the reorganized debtors

25      yesterday, so I just need my client to verify that, and that's
```

4

1    where we're at.

2            THE COURT:  Okay.  All right.  Thank you.  So do you

3    need a --

4            MS. DiFILLIPPO:  Thank you.

5            THE COURT:  You don't need a continued hearing date,

6    correct?

7            MS. DiFILLIPPO:  No.

8            MR. QURESHI:  I don't think so, your Honor.  We'll

9    just present what should be an agreed-upon order, hopefully,

10   within the next week or so.

11           THE COURT:  All right.  Good.  Thank you.

12           MS. DiFILLIPPO:  Thank you --

13           MR. QURESHI:  Thank you.

14           MS. DiFILLIPPO:  -- your Honor.

15           THE COURT:  All right.  And then on the motion to

16   reconsider.

17       (Colloquy not on the record.)

18           MR. QURESHI:  Your Honor, just before we proceed with

19   the motion for reconsideration, I just want to make sure

20   because I didn't see it on the docket sheet outside that the

21   other matter that was scheduled for today is the hearing with

22   respect to the reorganized debtor's objections to the other two

23   claims that Mr. Rhodes filed, the Greenway claim and the

24   schedule of claims.  That had been set for a hearing for

25   today --

1          THE COURT:  Well, your stipulation wasn't exactly a

2    modicum of clarity.  The Greenway I'm aware of.  But the other

3    scheduled claims, where were the briefings on that?

4          MR. QURESHI:  They were briefed together.

5          THE COURT:  Oh, okay.

6          THE CLERK:  Do you know what docket number those are

7    by any chance?

8       (Colloquy not on the record.)

9          MR. ANDERSON:  1466 is the supplemental brief of the

10   reorganized debtors, and ours is 1463, and then I think there

11   were reply briefs, 1470.

12         THE COURT:  So it was just the one brief on the

13   Greenway.  The Greenway brief covered everything, right?

14         MR. ANDERSON:  Correct.

15         MR. QURESHI:  Correct --

16         THE COURT:  Okay.

17         MR. QURESHI:  -- your Honor.

18         THE CLERK:  So the 1466, that objection should be on

19   calendar today.  Okay.

20         THE COURT:  So --

21         THE CLERK:  Now --

22         THE COURT:  But the problem is -- which is the order

23   that you put this in?  Oh, here it is, 1456 (sic).

24      (Colloquy not on the record.)

25         THE COURT:  You never defined the words -- you

1    defined remaining claims -- you never defined the remaining

2    claims.  Oh, here it is.  Okay.  The status of the Greenway and

3    the scheduled.  Okay.

4        You know, when you draft these things, draft them with a

5    little bit more clarity because the CAs are trying -- I picked

6    this up because I knew it was there.

7        But I didn't bother to tell the vCal people because

8    it's -- you know, you got to be a little clearer, I mean,

9    because when the people are trying to docket this how are they

10   going to tell what the, quote, "remaining claims" are?  So be a

11   little better on that.

12              MR. QURESHI:  Understood, your Honor.

13              THE COURT:  Okay.  All right.

14              THE CLERK:  Do you want --

15              THE COURT:  So on the motion to reconsider.

16              MR. ANDERSON:  Yes, your Honor.  This is Mr. Rhodes'

17   motion to reconsider the tax-claim issue.

18              THE COURT:  Now, were you counsel the first time

19   around?

20              MR. ANDERSON:  For --

21              THE COURT:  On this one?

22              MR. ANDERSON:  Yeah.  Not in the very beginning, we

23   were not, but we've --

24              THE COURT:  It --

25              MR. ANDERSON:  We've --

```
 1              THE COURT:  It wasn't you that argued this motion,

 2    though.  Another counsel argued the motion.

 3              MR. ANDERSON:  No.  I argued it previously to this

 4    Court.

 5              THE COURT:  Oh, okay.

 6              MR. ANDERSON:  Yeah.  And was it in November --

 7              MR. QURESHI:  I think --

 8              MR. ANDERSON:  -- of --

 9              MR. QURESHI:  -- it was in November.

10              THE COURT:  Okay.

11              MR. ANDERSON:  And it was actually in that oral

12    argument, you know, your Honor focused on the critical issue

13    here is is there an enforceable claim that, you know, before we

14    get to the issue of the offset we have to have a legitimate

15    claim.

16         And your Honor asked, and I don't think I made it clear

17    enough, and I don't think that we had focused specifically

18    enough on what has been briefed in the reconsideration which is

19    that a declaration of a dividend or a distribution of an LLC

20    does create an enforceable right.

21         And that was the issue that the Court was looking for

22    before was where was the enforceable right.  The enforceable

23    right comes up in the context of the fact that there was a

24    declaration made.

25         And the fact that we have a closely-held corporation and
```

8

1    group of entities, LLCs, controlled by Mr. Rhodes, it is

2    admittedly not a formal declaration.

3        As indicated in our brief, a formal declaration is not

4    required in Nevada.  We have Mr. Rhodes' declaration where he

5    states that prior to the petition date that he made the

6    declaration.

7        We've previously argued in a slightly different context

8    the fact that the tax claims had been performed previously.  In

9    fact, going back to 2006, there was some reimbursement to

10   Mr. Rhodes of the 2006 tax payments.  The net amount that was

11   due and owing at the end of 2006 is the 6,974,159.

12       That amount plus intervening penalties and interest up to

13   the petition date constitutes the total that is in the proof of

14   claim.

15       It's our position that this should adequately respond to

16   the Court's search for an enforceable claim by Mr. Rhodes.  The

17   question of insolvency I think is not yet ripe at this point in

18   time because the declaration of the distribution happened

19   sometime prior to the petition date.

20       So the fact that the debtor entities were insolvent as of

21   the petition date I don't think is an adequate response from

22   the reorganized debtors.

23           THE COURT:  Well, you don't have anything to rebut

24   that concerning solvency.  You're not even clear when it was

25   declared.

1            MR. ANDERSON:  Well, we have Mr. Rhodes' declaration

2    that it happened prior to the petition date.

3            THE COURT:  Right.

4            MR. ANDERSON:  We --

5            THE COURT:  But prior when?

6            MR. ANDERSON:  Well, we have the supporting schedule

7    with the proof of claim that Mr. Rhodes put into evidence

8    through his declaration that shows that in 2006 there had been

9    -- of 21,000,000 in taxes, that he had been -- pursuant to that

10   distribution, he had been reimbursed 14,000,000 just leaving a

11   net of approximately 7,000,000, but your Honor is correct.  His

12   declaration does not give a specific date --

13           THE COURT:  Which is very convenient.

14           MR. ANDERSON:  -- of when the distribution was.

15           THE COURT:  Okay.

16           MR. ANDERSON:  If there are no other questions, I

17   know your Honor --

18           THE COURT:  Okay.

19           MR. ANDERSON:  -- is very familiar with all of this.

20           THE COURT:  Okay.

21           MR. ANDERSON:  Thank you.

22           THE COURT:  All right.  Thank you.

23      Response.

24           MR. QURESHI:  Thank you, your Honor.  Again, for the

25   record, Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld on

1    behalf of the reorganized debtors.

2        If I may, your Honor, first just address a procedural

3    point that we did mention in the papers -- and I do believe

4    it's important and worth mentioning -- when we originally came

5    before this Court with respect to all three of these claims, a

6    decision was made by the parties to bifurcate the tax claim and

7    to argue the objection just with respect to the tax claim.

8        On the day that your Honor ruled from the bench denying

9    that claim, your Honor posed the question to counsel would you

10   like me to certify the ruling.

11       There was no response made and no motion filed to certify

12   the ruling.  What happened next was counsel for Mr. Rhodes

13   filed a Notice of Appeal with respect to the tax claim.

14       Now, our view, your Honor, is that once the notice

15   of appeal was filed this Court was divested of

16   jurisdiction.

17       What next happened is we went back to Judge Zive for a

18   mediation session with respect to the two remaining claims,

19   Greenway and the scheduled claims.

20       (Ringing in courtroom at 09:45:53 a.m.)

21       MR. QURESHI:  At that point, Mr. Rhodes determined

22   that he did not want to proceed with respect to the appeal, and

23   we entered into the stipulation.

24       My understanding, your Honor, of the stipulation was that

25   it was a standstill.  That the purpose of the stipulation was

1    simply to freeze everything in time, so that we could pursue

2    the mediation, and no party would be prejudiced by that.

3        We certainly were very taken aback.  When after filing a

4    stipulation that withdrew the appeal and preserved Mr. Rhodes'

5    right to continue with the appeal at a later date, we were

6    frankly shocked when he filed a motion for reconsideration.

7    That was not the purpose of the stipulation.

8        (Colloquy not on the record.)

9            MR. QURESHI:  We certainly didn't enter into that to

10   give Mr. Rhodes another shot at arguing the same issue before

11   this Court, so I mention that by way of background, your Honor.

12       But I do think that this is not a motion for

13   reconsideration that was filed in good faith in light of what

14   we certainly perceived to be a clear agreement by the parties

15   to enter into a standstill and not to create additional rights

16   for Mr. Rhodes.

17       Your Honor, one more procedural issue if I may also

18   address it, and that is what is the appropriate rule under

19   which this motion for reconsideration is brought.

20       Mr. Rhodes says 7054(b) which is the provision that

21   provides that with respect to an interlocutory order the Court

22   can revise its order essentially whenever it likes.

23       There is no specific statutory criteria nor is there a

24   deadline during which that must occur.  Our view is that that

25   rule is inapplicable here, and that what should be applied is

1  Rule 60(b).

2      Now, again, I don't think, your Honor, that this

3  procedural issue ultimately should affect the outcome today,

4  but we did brief it, so I think I should mention it briefly.

5      Our reading of Rule 9014, 9014 is the provision that

6  Mr. Rhodes relies upon as a hook to the application of

7  Rule 7054.

8      And what Bankruptcy Rule 9014 says, your Honor, is that in

9  contested matters it lists certain Part VII rules that will

10  apply, and Rhodes is correct that Rule 54 is listed.  It's

11  listed as Rule 54(256) (phonetic).

12      However, if your Honor then turns to Rule 7054, what

13  your Honor will see is that it says Subsections A through C

14  apply in adversary proceedings.

15      That leaves Subsection D which according to Rule 9014

16  would still apply to a contested matter, so, again, our view,

17  your Honor --

18          THE COURT:  Well, but why doesn't 9014(c) make 7054

19  applicable?

20          MR. QURESHI:  It does make 7054 applicable,

21  your Honor, but then when your Honor goes to 7054 what -- 7054

22  has four parts, A, B, C, and D.

23          THE COURT:  Right.

24          MR. QURESHI:  And what 7054 says at the outset is A

25  through C applies in adversary proceedings, so our reading of

1    it was that Subsection D is what applies in contested matters,

2    but A through C is still what applies only in adversary

3    proceedings which this is not.

4              THE COURT:  Okay.

5              MR. QURESHI:  But, again, your Honor, I don't think

6    it is particularly dispositive to the outcome because I think

7    either way the motion for reconsideration must fail, and it

8    must fail for a couple of reasons.

9         First of all, your Honor, let there be no doubt.  This

10   issue was presented to the Court, was in their papers, and was

11   argued.

12        As we point out in our opposition, your Honor, counsel at

13   the initial hearing on this matter said the key issue for

14   your Honor to focus on, the single fact that should change

15   everything, is that there was a liability entered into the

16   books and the records.

17        Clearly, what counsel was saying was a decision was made

18   by the reorganized debtor to pay this dividend.  It's reflected

19   in the books and records.  That should be determinative.

20        And that argument was made.  That appeared in Mr. Rhodes'

21   declaration, and it appeared very prominently in oral argument,

22   and it's all over the transcript, and, again, we've quoted that

23   back.

24        Now, your Honor, again, that fact is not what this Court

25   focused on.  What this Court focused on in the ruling was where

1    is the evidence in this record that a distribution was

2    declared.

3        It doesn't say in Mr. Rhodes' declaration.  All Mr. Rhodes

4    says is sometime prior to the petition date I declared a

5    dividend.

6        But there's not one iota of evidence that establishes that

7    that occurred or when that occurred.  It's simply Mr. Rhodes

8    saying I declared a dividend.

9        And so in the motion for reconsideration, the one new

10   statutory provision that is cited is the provision of the

11   Nevada Revised Code that provides that when a dividend is

12   declared, a valid dividend -- and that's an important point,

13   your Honor -- but when a dividend is declared the beneficiary

14   of that dividend, in effect, becomes a creditor of the company

15   from which the dividend was declared.  There is a right

16   generated at that point to receive that dividend.

17       However, in our opposition, your Honor, we cite another

18   provision of the same Nevada Revised Statute that, of course,

19   says that a dividend, rather, cannot be made if the company is

20   insolvent.

21       Now, at the last hearing, the position taken by the

22   debtors was the books and records, the ledger entry that

23   created an obligation owing from the debtors to Rhodes for

24   $9,000,000 and change, that is the evidence of there being a

25   dividend which was payable to Mr. Rhodes.

1        And the date of that, your Honor, was the day before the

2   petition date or on the petition date depending on the debtor

3   entity.  It was March 31 of 2009.

4        Clearly, one cannot escape the conclusion, your Honor,

5   that on the petition date the debtor was insolvent.  The

6   first-day affidavit establishes it.

7        The first-day affidavit concedes that since 2008 the

8   debtor was not able to pay its obligations when they became

9   due.

10       Specifically, the first-day affidavit acknowledges that

11  interest payments were not being made with respect to the

12  first-lien debt and the second-lien debt, and it had not been

13  made for many months in advance of the petition date, so how

14  does Rhodes deal with that point in the reply?

15       Well, the reply is very sketchy in terms of when this

16  dividend was declared, and what we are left with is sometime

17  before the petition date.

18       So we don't know if it was the day before the entry was

19  created on the books and records that shows that $9,000,000 is

20  payable to Mr. Rhodes or if it was a month before that or if it

21  was six months before that.  There's simply no evidence that a

22  dividend was ever declared.  There is just none in the record.

23       And the only piece of evidence upon which Mr. Rhodes has

24  relied is again that entry in the books and records that

25  $9,000,000 was owing, and that entry of the day is not

1    disputed.  It's the petition date or the day before the

2    petition date.

3         And so I think, your Honor, it's fair for the Court to

4    conclude that the only evidence as to when this dividend was

5    supposedly declared was on the petition date.

6         And on the petition date, again, there is evidence this

7    Court can take notice of in the form of the first-day affidavit

8    that the company was insolvent.

9         And, therefore, the dividend to the extent that it was

10   declared on that date was under Nevada law not effective, and

11   no right on Mr. Rhodes' behalf to receive that dividend was

12   declared or was established I should say.

13        In the initial hearing, your Honor, what Mr. Rhodes relied

14   upon to establish that there was a dividend owing to him was

15   the stipulated facts that the parties had submitted in advance

16   of the original hearing on this matter.

17        And what those facts stipulated to, your Honor, was

18   nothing more than the ledger entry on the petition date showing

19   the $9,000,000.

20        So in terms of the facts that are before your Honor as to

21   when the dividend was declared, the only facts in the record

22   are that the dividend was declared on or one day before the

23   petition date.

24        Again, your Honor's basis for denying the claim the first

25   time around was that there was no evidence whatsoever that a

1    dividend had ever been declared, and that has not changed.

2        There is absolutely nothing new that was presented in the

3    motion for reconsideration, and so whether your Honor considers

4    it under Rule 54(b) or under Rule 60(b) does not matter.  In

5    either event, the motion should be denied.

6            THE COURT:  Okay.

7            MR. QURESHI:  So unless the Court has any questions,

8    that's all I have.

9            THE COURT:  No, thank you.  All right.

10            MR. QURESHI:  Thank you.

11            THE COURT:  Reply.

12            MR. ANDERSON:  A couple of points, your Honor, if I

13    might?

14            THE COURT:  Go ahead.

15            MR. ANDERSON:  Speaking to the standstill agreement

16    of the stipulation, you know, there is a stipulation that did

17    have a standstill agreement in it.

18        It clearly expired on February 15th, and it was after that

19    point in time when we did the appeal on the brief.  There's

20    been no shenanigans, no hiding the fact.

21        We actually submitted the motion to reconsideration well

22    in advance of the mediation, so that, you know, we could

23    discuss the new issues that came up.

24        They had actually even been discussed at the first

25    mediation, and then we did the reconsideration after the first

1    mediation.

2        I understand that it came as a surprise to Mr. Qureshi,

3    and --

4            THE COURT:  Well, why didn't you include this in your

5    stipulation of July if it was so obvious?

6            MR. ANDERSON:  In which --

7            THE COURT:  Your July 14th stipulation if you were

8    going to file your motion for reconsideration.  When did you

9    file --

10            MR. ANDERSON:  I think we had filed it --

11            THE COURT:  -- the motion?

12            MR. ANDERSON:  We filed it in June I think.

13            THE COURT:  Okay.

14            MR. ANDERSON:  And so we had already had that, and

15    it's the prior stipulation I think from March that set the

16    schedule that --

17            THE COURT:  Okay.

18            MR. ANDERSON:  That after the February 15th

19    conference that there was no more standstill on that

20    issue.

21        And the Appellate Court, you know, by stipulation of the

22    parties returned jurisdiction of this issue back to this court.

23    I don't think that it was certified as a final order.

24        And that was the reason we dismissed the appeal was we

25    were going to wait for a final order on all the proof of claim

19

1    issues and appeal at that point in time.

2        The main point I want to make on the substance of the

3    claim is at no time in the prior and, you know, certainly not

4    now has Mr. Rhodes asserted or have I argued that it was the

5    entry of the obligation on the books and records that created

6    the obligation.  That is a misstatement and maybe is the fine

7    distinction.

8        We always asserted that that reflected a course of

9    conduct, and it reflected the fact that a declaration of the

10   dividend or distribution had been made by Mr. Rhodes.

11       And, clearly, his declaration which is before the Court

12   and is evidence before the Court states that that was done

13   prior to the petition date.

14       The proof of claim attaches the spreadsheet on the claim

15   detail that establishes that it was done well prior to the

16   petition date.  If your Honor --

17           THE COURT:  Okay.

18           MR. ANDERSON:  -- has no further questions --

19           THE COURT:  All right.  Thank you.

20           MR. ANDERSON:  -- thank you.

21           THE COURT:  Well, I'm going to deny the motion for

22   reconsideration even insofar as I'm going to abide by my prior

23   ruling.

24       With respect to the procedural grounds, there really isn't

25   anything new except this gives the Court the opportunity to

1    articulate further reasons and articulate the basis of this

2    aspect of the claim.

3         With respect to 54(b), whether or not 54(b) applies -- and

4    I always understood the rule to mean that the provisions of

5    9014 trumped the provisions of 54 because it was saying while

6    it doesn't apply in the adversary this does apply.

7         But even if I'm wrong, 3008 allows reconsideration of

8    claims at any time, and I don't think there's a ten-day limit

9    under 3008.

10        Indeed, there's an appellate case, one of my cases I was

11   affirmed on, in which I found that latches was an appropriate

12   limitation, but, otherwise, there was no such limitation, so I

13   think the motion for reconsideration can appropriately be

14   brought.

15        Now, on the merits, it seems to me that the debtor has

16   failed -- the debtor cannot merely -- the prior debtor, the

17   insider -- excuse me -- Mr. Rhodes cannot rely on merely saying

18   I'm entitled to these funds without showing that it was a valid

19   dividend, and he has offered nothing in the record to show that

20   it was a valid dividend.

21        We don't even get to the point where I think that it

22   becomes a genuine issue of material fact if you will if you're,

23   in essence, applying the rules of summary judgment because he's

24   done nothing to show that, indeed, it was issued before 2008.

25        It would seem anomalous to me that he could be entitled to

1    a claim that would be if it was paid the day before a

2    preference, if it was paid sometime before in '08 or even a

3    fraudulent transfer if the debtor was insolvent, and that's

4    just impossible to me.

5         But, again, under Nevada law, it has to be a valid

6    dividend.  It wasn't a valid dividend.  There's been nothing to

7    show that it was, so I'll deny that motion.  All right.

8         Let's go to the Greenway.

9         MS. LAHAIE:  Good morning, your Honor.

10   Meredith Lahaie, Akin, Gump, Strauss, Hauer & Feld, for the

11   reorganized debtors.

12        Before you today is the reorganized debtor's objection to

13   the Greenway claims, in addition, your Honor, the reorganized

14   debtor's request to the extent the Court deems it necessary for

15   authorization to amend its schedules and remove certain

16   scheduled claims as I'll discuss in greater detail.

17        Your Honor, something you said in your ruling on the

18   motion for reconsideration I think is very applicable to what

19   I'm about to say.

20        And what you said, generally speaking, your Honor, is that

21   you cannot rely on merely stating I'm entitled to these funds

22   without evidence that the underlying obligation is valid.

23        And, your Honor, I think that that ruling applies to each

24   and every one of the claims that Rhodes is now asserting.  So

25   unless your Honor has opening questions, I'll turn first to the

1    Greenway claims.

2               THE COURT:  Okay.  Sure.

3               MS. LAHAIE:  Your Honor, in connection with the proof

4    of claim Rhodes filed in this case, Rhodes is seeking an

5    allowed claim for compensation that he allegedly paid to

6    three senior debtor executives, and those individuals were

7    Frederick Chin, James Coyne, and Christopher Stephens.

8        And in Rhodes' actual proof of claim that he filed in

9    2009, Rhodes lists the amount of the Greenway claim of

10   $868,849.

11       And before I, your Honor, turn to the merits of the

12   Greenway claim, as set forth in what was our initial objection

13   before this process was bifurcated --

14               THE COURT:  I need to ask a basic question and pardon

15   my ignorance, but Greenway's not a debtor.

16               MS. LAHAIE:  It's not, your Honor.

17               THE COURT:  Okay.  So he's asking for money he paid

18   to a nondebtor.

19               MS. LAHAIE:  That's correct, your Honor.

20               THE COURT:  Okay.

21               MS. LAHAIE:  As your Honor is aware and as was

22   briefed in connection with the opening objection that the

23   reorganized debtors filed with respect to both the tax claim

24   and the Greenway claim -- this was back in 2010.  It's Docket

25   No. 1149.

1     And starting on page 16, the reorganized debtors go

2  through at great length what exactly the burden of proof is

3  with respect to what a claimant must show in order to have a

4  prima facie valid proof of claim.

5     And, your Honor, generally speaking, the standard is that

6  the claim is deemed valid unless there's an objection.  And

7  once an objection is filed, the burden shifts back to the

8  claimant to prove evidence or to prove facts that would

9  underlie his proof of claim.

10     And, your Honor, Rhodes has not met his burden of proof

11  with respect to any of the claims that he is now seeking before

12  this Court.

13     Your Honor, specific with respect to the Greenway claim,

14  you're going to hear a lot about something called the

15  Main Amundson report.  It's something that Rhodes relies on in

16  connection with a number of these claims.

17     And before I talk about how the Main Amundson report does

18  not establish an entitlement owing to Rhodes on account of the

19  Greenway claim, just two facts about the Main Amundson report.

20     The first, your Honor, as I'm sure you're aware is that

21  it's hearsay, and Rhodes' counsel has not identified any

22  hearsay exception that would render its contents admissible.

23     The second thing, your Honor, upon information and belief,

24  the Main Amundson report was not the product of an audit.

25  Main Amundson did not conduct a full audit on this company.

1        And the contents of the Main Amundson report are simply

2    the results of a partial investigation that Main Amundson

3    concluded.

4        And, your Honor, Rhodes relies on the Main Amundson report

5    to establish that he is entitled to the amount set forth in his

6    proof of claim on account of the Greenway payments.

7        And, your Honor, as an initial matter, Main Amundson

8    recognizes that Rhodes is entitled to approximately $606,000 on

9    account of the payments made to Greenway, but not the amount

10   that Rhodes sets forth in his proof of claim which is almost

11   $270,000 more.

12       So notwithstanding the fact that the Main Amundson report,

13   the document that Rhodes is relying on extremely heavily to

14   support his entitlement to this claim, notwithstanding the fact

15   that it fundamentally conflicts with the very dollar amount

16   that he is now seeking, the fact that Main Amundson may

17   acknowledge or may appear to acknowledge that Rhodes should be

18   entitled to some amount on account of that claim does not

19   substantiate and this did not create an obligation owing from

20   the debtors to Rhodes.

21       As your Honor correctly stated, Greenway is a nondebtor

22   entity.  Rhodes has put no evidence before this Court.  There

23   is nothing in the record as to what exactly these individuals

24   did, what portion of their services were performed for debtor

25   entities versus nondebtor entities, whether their compensation

1    was market.

2         And, your Honor, what Rhodes has said is that this

3    compensation structure was created in a way as to prevent the

4    debtor's then current employees from reacting adversely to the

5    compensation structure, and Rhodes cites that as some kind of

6    indicia of this being an aboveboard transaction.

7         But, your Honor, if it was so aboveboard, there are no

8    employment agreements that document these arrangements.  There

9    are no contracts, documents, evidence of any kind that would

10   substantiate, A, Rhodes owing these amounts to the Greenway

11   employees themselves or, B and more importantly for

12   your Honor's purposes, anything that would obligate the

13   reorganized debtors to reimburse Rhodes for those amounts.

14        In connection with the briefing, your Honor, I'm sure you

15   observed that Rhodes also raises a number of equitable

16   arguments that he claims entitle him both to the Greenway

17   claims and in some instances are applicable to certain of the

18   scheduled claims as I'll get into shortly.

19        He makes two equitable arguments with respect to Greenway.

20   The first is he argues that under theories of promissory

21   estoppel he should be entitled to assert the Greenway claim.

22        Your Honor, both of these equitable remedies are briefed

23   in full in our papers.  I'm happy to answer any questions, but

24   I'm just going to hit on them extremely briefly.

25        Promissory estoppel is not available to Rhodes to

1    substantiate the Greenway claim for the simple matter that

2    promissory estoppel requires among other things the existence

3    of a promise that is clear and unambiguous.

4        Your Honor, there has been no evidence, no allegation,

5    nothing in Rhodes' papers that the debtors made a clear and

6    unambiguous promise to reimburse Rhodes for these amounts.

7        And, your Honor, what you may also hear from Rhodes'

8    counsel after I sit down is that, well, Rhodes had obviously a

9    very intimate relationship with the debtors.

10        He may have some testimony that he may elicit as to what

11    promise may actually have been exacted between the company and

12    Rhodes at that time.

13        But, your Honor, as Rhodes himself conceded in his reply

14    brief that he filed very recently, Rhodes was at the time the

15    CEO, the president, and the sole member of the board of

16    directors.

17        And, your Honor, I cannot imagine that this equitable

18    remedy would be enforceable in a situation where Rhodes would

19    be, in effect, arguing that he made a promise to himself to

20    repay these funds.

21        Your Honor, the second equitable argument he makes in

22    connection with the Greenway claim is equitable estoppel.

23    your Honor, equitable estoppel as I'm sure you're aware can be

24    invoked if the party seeking to assert its rights engaged in

25    inequitable conduct.

1       Your Honor, Rhodes does not go into any details as to how

2  this theory may be applicable to the facts of this case.

3  Presumably, he is not arguing that the debtors at the time he

4  was in control of them engaged in any inequitable conduct.

5       Presumably, if he were to expound on this theory, he would

6  articulate that somehow the reorganized debtors had engaged in

7  inequitable conduct.

8       But, your Honor, he does not describe what that conduct

9  is, what it might have been, or provide any other justification

10  as to why the reorganized debtors should not be allowed to

11  proceed with its objection.

12       Your Honor, another objection or another response that

13  Rhodes makes that is equally applicable to a number of the

14  claims that I'm going to address today is the fact that Rhodes

15  made these payments both at the debtor's direction, and he made

16  these payments, and that the payments were recorded in the

17  debtor's books and records.

18       And, your Honor, I'd like again to refer you to your own

19  comments at the beginning of the hearing today with respect to

20  what does and does not substantiate a claim.

21       And that merely saying you're entitled to something is not

22  evidence of an underlying obligation to be entitled to that

23  claim.

24       Your Honor, again, as I've said by stating that Rhodes was

25  directed to perform something or directed to pay something,

1    Rhodes is, in effect, saying that he directed himself to do

2    something, and that, your Honor, is not evidence of a legal

3    obligation to a claim.

4        Further, your Honor, Rhodes argues with respect to a

5    number of the claims that the mere fact the claims are included

6    in the company's books and records should somehow be

7    prima facie evidence that these claims are valid.

8        But, again, your Honor, the debtors were controlled

9    by Rhodes at the time the books and records were

10   prepared.

11       So, presumably, your Honor, either Rhodes himself made

12   that entry or Rhodes directed someone at the company to make

13   that entry requiring the company or at least in Rhodes' opinion

14   requiring the company to repay Rhodes for these amounts.

15       And, your Honor, for all of these reasons because Rhodes

16   simply has not provided any evidence of any legal justification

17   to these funds, we do not believe that Rhodes should be

18   allowed, you know, a claim for the Greenway claim.

19       Unless your Honor has any questions on Greenway, I'm going

20   to turn briefly to the scheduled claims.

21           THE COURT:  You know, on the scheduled claims, none

22   of you filed any new briefs on these.  These are all the old

23   briefs on the Greenway, right?

24           MS. LAHAIE:  On Greenway, your Honor?

25           THE COURT:  I mean on this particular objection.

1          MS. LAHAIE:  Your Honor, there was a round -- there

2     was opening briefs that I believe were filed on the 19th and

3     then reply briefs that were filed I believe on the 26th, both

4     of July.  Both sets of briefs addressed both the Greenway claim

5     and the scheduled claims.

6        So at least with respect to the reorganized debtor's

7     briefs, about the first half of the brief was Greenway, and the

8     second half was the scheduled claims.

9          MR. ANDERSON:  If your Honor means to say that I

10    don't think it raised any really different issues, though, I

11    think that they're essentially the same as our prior briefs --

12          THE COURT:  Okay.

13          MS. LAHAIE:  There's certainly --

14          MR. ANDERSON:  -- in content --

15          MS. LAHAIE:  -- a lot of overlap --

16          MR. ANDERSON:  -- your Honor.

17          MS. LAHAIE:  -- your Honor.

18        As, your Honor, there is a lot of overlap between the

19    arguments raised in connection with Greenway and raised in

20    connection with the scheduled claims.

21          THE COURT:  When was your brief filed?

22          MS. LAHAIE:  Your Honor, the first round of briefing

23    was filed on July 19th, and it's Docket No. 1466, and,

24    your Honor, the scheduled claims are also referred to by their

25    individual claim numbers.

1          There are three of them.  There is the Rhodes Homes

2     Arizona claim, the Pinnacle Equipment claim, and then the

3     Heritage Land litigation claim if that's helpful.

4          (Colloquy not on the record.)

5          MS. LAHAIE:  Your Honor, Mr. Qureshi's also reminding

6     me that these objections were also raised in connection with

7     our opening objection which I referenced at the beginning of my

8     remarks --

9          THE COURT:  Right.

10         MS. LAHAIE:  -- which was filed in 2010, and that's

11    Docket No. 1149.

12         THE COURT:  I focused on the Greenway, but not the

13    other schedules.  I don't know how that happened, so I prefer

14    to continue the argument on those.

15         MS. LAHAIE:  Okay.

16         THE COURT:  So let's have a response on Greenway, and

17    then we'll continue both, and you could do your reply to

18    Greenway at the time we do both.  That way I've got --

19         MS. LAHAIE:  Okay.

20         THE COURT:  I pretty much know the answer to

21    Greenway, but I do want to look through it one more time.

22         MS. LAHAIE:  Understood, your Honor.

23         THE COURT:  Okay.

24         THE CLERK:  Your Honor, how far out did you want --

25         THE COURT:  Hold on.

1    THE CLERK:  -- to continue it?  Okay.

2    THE COURT:  I'm going to have his opposition first.

3    MR. ANDERSON:  Thank you, your Honor.

4    THE COURT:  All right.

5    MR. ANDERSON:  It --

6    THE COURT:  Go ahead.

7    MR. ANDERSON:  It is a difficult context when you

8  have one individual who occupies the chief-executive positions

9  of the entities and is also, you know, claiming that he is owed

10 money in an individual capacity.

11     To give the Court some comfort that these are real events

12 and that these are real dollars and these are legitimate

13 claims, recall the context prior to the petition of the debtor

14 entities, now the reorganized debtors, were part of a credit

15 facility involving hundreds of millions of dollars,

16 sophisticated banks.  They were watching Mr. Rhodes' --

17    THE COURT:  But Mr. Rhodes specifically kept some

18 entities out of the bankruptcy presumably because they

19 benefitted him.

20    MR. ANDERSON:  Well, they were outside the credit

21 facility, but presumably.

22    THE COURT:  Okay.  So where in the record anywhere is

23 there a contract for Greenway, a benefit to these estates for

24 that?

25    MR. ANDERSON:  In the record, it is both in

1    Mr. Rhodes' testimony as to the purpose that he employed these

2    individuals, and it is substantiated by the independent

3    Main Amundson --

4              THE COURT:  Well, why --

5              MR. ANDERSON:  -- report.

6              THE COURT:  Why isn't that hearsay?

7              MR. ANDERSON:  The Main Amundson report is based on

8    business records.  It was a business-record report that is in

9    the books and records.  I think it clearly falls within the

10   business-records exception.

11        This is not something that was created for purposes of

12   litigation.  This was an existing document well before the

13   petition was filed.

14        And, again, this is something that Mr. Rhodes isn't doing

15   to make himself happy.  He's doing this because he has

16   auditors, Deloitte & Touche, auditing his entities.

17        And he has to report and satisfy the concerns of

18   Credit Suisse and other banks that have $400,000,000 loaned to

19   him, so, you know, these are substantiated to the extent that

20   they can be, and they were at the time.

21        Granted, Mr. Rhodes is making agreements with himself.

22   That's probably one of the bases for requiring the

23   Main Amundson to review it.

24        Main Amundson does allocate between the work of these

25   individuals between inside the facility and outside the

1    facility which is essentially the same as inside the

2    reorganized debtors and outside the reorganized debtors.

3        And those amounts are -- they dispute the amount that the

4    CFO came up with, and the Main Amundson report are the numbers

5    that are relied on to come up with --

6            THE COURT:  But why don't we have a contract?

7            MR. ANDERSON:  -- the Greenway claim.

8            THE COURT:  Why don't we have any agreement?

9            MR. ANDERSON:  Because one wasn't created at the

10   time.  That's --

11           THE COURT:  So --

12           MR. ANDERSON:  There is no written agreement.  There

13   is no contract.  It was Mr. Rhodes agreeing with Mr. Rhodes in

14   two different capacities, and that transaction was reviewed

15   essentially in real time prepetition as part of the

16   Main Amundson review.

17       You know, if a CEO of a company can never make an

18   agreement with himself as an individual when that agreement and

19   the amounts paid under that agreement are not only audited by

20   the auditors --

21           THE COURT:  Well, but --

22           MR. ANDERSON:  -- Deloitte & Touche --

23           THE COURT:  But nobody's saying he can't make an

24   agreement.  It's just document it.  It's just (indiscernible)

25   convenient that all these agreements are not in writing after

1    he wants to file a proof of claim.

2            MR. ANDERSON:  But the evidence of the performance of

3    the agreement was all prepetition and all part of the books and

4    records and the amounts.

5            THE COURT:  But how is it?  I mean --

6            MR. ANDERSON:  The Main Amundson report was done

7    prior to the petition.  It was done for reasons unrelated to

8    the bankruptcy.  Deloitte & Touche was auditing the books

9    prepetition unrelated to the bankruptcy.

10        Mr. Rhodes had to justify these issues to the credit

11   facility prepetition and unrelated to the bankruptcy.  And

12   prepetition and unrelated to the bankruptcy, these agreements

13   were made and, more importantly, they were performed.

14        Written agreements aren't necessary where you have

15   performance, and everybody recognizes that the performance was

16   made.  There were some disputes about the actual accounting

17   amounts.  Those are resolved by the Main Amundson report.

18        As to the amount in the Main Amundson report, I think the

19   606,000 is derived by error.  That's the difference between

20   what the CFO and what Main Amundson came up with.

21        And that's the total of the difference between the two on

22   the total compensation paid, but that's not the basis for the

23   amount of the claim.

24        There was over 2,000,000 paid, and Mr. Rhodes was

25   reimbursed some of that leaving the balance as the 868,000 I

```
 1   believe it was.
 2        And that amount is -- you know, the substantiation for
 3   that is in Mr. Rhodes' declaration as to what the balance
 4   was.
 5             THE COURT:  Okay.  All right.
 6             MR. ANDERSON:  Thank you.
 7             THE COURT:  All right.  Well, let's continue this
 8   'til August 30th at --
 9             THE CLERK:  Do you want to do it at 1:30, your Honor?
10             THE COURT:  Yes.  All right.
11        So we'll see you then only on the -- I've decided the
12   motion for reconsideration.  We just have the remaining claims.
13             MR. QURESHI:  And --
14             THE COURT:  All right?
15             MR. QURESHI:  -- would your Honor like any further
16   briefing in respect --
17             THE COURT:  I --
18             MR. QURESHI:  -- to --
19             THE COURT:  I don't.  I will let you know if I do.
20             MR. QURESHI:  Okay.
21             THE COURT:  All right?
22             MR. QURESHI:  Thank you.
23             THE COURT:  Thank you.
24             THE CLERK:  Okay.  All rise.
25        (Court concluded at 10:20:45 a.m.)
```

1    I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                    08/08/11

7    Lisa L. Cline, Transcriptionist           Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25