# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT

                         DISTRICT OF NEVADA

          THE HON. DAVID A. EZRA, U.S. DISTRICT JUDGE,

                             PRESIDING


UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )   Case No:
                                )   2:05-cr-121-DAE-RJJ
     vs.                        )
                                )
ROBERT DAVID KAHRE, et al.,     )
                                )
          Defendants.           )
                                )
```

REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

(TESTIMONY OF ROBERT KAHRE)
(EXPEDITED TRANSCRIPT)

MONDAY, JULY 24, 2009

APPEARANCES:   (See Page 2)

Court Reporter:  Andrea N. Picard, CRR, CCR NO. 887

```
APPEARANCES:


For Plaintiff:

            J. GREGORY DAMM, ESQ.
            ASSISTANT UNITED STATES ATTORNEY
            333 Las Vegas Boulevard South
            Suite 5000
            Las Vegas, Nevada 89101
            TEL:  (702) 388-6336



For Defendant Robert A. Kahre:

            WILLIAM A. COHAN, ESQ.
            WILLIAM A. COHAN, P.C.
            PO BOX 3448
            Rancho Santa Fe, California 92067
            TEL:  (858) 832-1632



For Defendant Robert A. Kahre:
(Local counsel)

            LISA RASMUSSEN, ESQ.
            LAW OFFICE OF LISA RASMUSSEN
            616 South 8th Street
            Las Vegas, Nevada 89101
            TEL:  (702) 461-1436



For Defendant Alexander C. Loglia:

            JOEL F. HANSEN
            ATTORNEY AT LAW
            415 South 6th Street
            Las Vegas, Nevada 89101
            TEL:  (702) 385-5533
```

Page 3

APPEARANCES:
(Continued)

For Defendant Lori Kahre:
    MICHAEL J. KENNEDY, ESQ.
    FIRST ASSISTANT FEDERAL DEFENDER
    411 East Bonneville Street
    Suite 250
    Las Vegas, Nevada 89101
    TEL: (702) 388-6577

For Defendant Danille Cline:

    LYNN E. PENAGAKOS
    ATTORNEY AT LAW
    345 Queen Street
    Honolulu, Hawaii 96813
    TEL: (808) 521-3336

Page 4

Page 5

1    LAS VEGAS, NEVADA; MONDAY, JULY 24, 2009, 10:42 AM
2    -oOo-
3    PROCEEDINGS
4    (Previous proceedings not transcribed as
5    part of excerpt.)
6    THE COURT: Mr. Cohan, do you wish to call
7    your first witness?
8    MR. COHAN: I do, Your Honor, and that would
9    be Mr. Robert Kahre.
10    THE COURT: All right. Mr. Kahre, you can
11    take the stand.
12    ROBERT KAHRE,
13    having been first duly sworn to testify to the truth,
14    the whole truth, and nothing but the truth, was
15    examined and testified as follows:
16    THE CLERK: Please have a seat. State your
17    name for the record, and spell your last name.
18    THE WITNESS: Robert Kahre, K-A-H-R-E.
19    THE COURT: You may proceed.
20    MR. COHAN: Thank you, Your Honor.
21    DIRECT EXAMINATION
22    BY MR. COHAN:
23    Q  Good morning, Mr. Kahre. How are you doing?
24    A  Good morning.
25    Q  Well, my first question was: "How you

Page 6

1    doing?"
2    A  Pretty good.
3    Q  Okay. Well, with that cautious beginning,
4    let me ask you, first of all, arbitrarily on my part,
5    about whether you have any familiarity with the iron
6    working trade.
7    A  Yes. I started in about '86. I started as
8    an iron worker on a permit.
9    Q  Okay. And what does that mean, to start as
10    an iron worker on a permit in terms of a job or career?
11    A  Well, it's a union job, and you don't get
12    access to the union book until you go through a
13    process. Process on a permit is they let you go out
14    every month if there's work. If there's not work, you
15    can't go out. So you have to get 12 consecutive months
16    to get a union book.
17    Q  And so in about 1986, you began this process
18    of becoming qualified to be -- is it called a
19    journeyman or --
20    A  Well, we called them "book hands" --
21    Q  Okay.
22    A  -- is the term in the trades.
23    Q  Okay. And what kinds of skills do you have
24    to acquire in order to qualify to be an iron worker?
25    A  Well, normally you're supposed to go through

Page 143

1  Now, you've -- we've all looked at two of
2  these -- or these two statutes here, 22 USC 611 and 18
3  USC 951?
4  A  Yes.
5  Q  Can you reduce what this paragraph is saying
6  to a simple form and explain what it means to the jury
7  as far as your understanding of the agreement that
8  you're reaching with people who sign it and participate
9  in your payroll system or work for one of your sole
10 proprietorships?
11 A  What I was saying by this is I was telling
12 them that I was not an agent of a foreign principal and
13 I was not going to withhold.
14    My understanding is the funding goes to the
15 IRS and, in turn, the Secretary of Treasury, who
16 directs and controls finances and subsidizes them, is
17 the governor of the World Bank and the International
18 Monetary Fund and several other international financial
19 institutions.
20    And so, as we get through some of the other
21 provisions here in the contract, it was my
22 understanding, by reading this and studying it, that
23 they're promoting world government by this. There's
24 100 -- I believe right now there's 100 countries that
25 are involved in the IMF and the World Bank.

Page 144

1  The United States holds stock in the World
2  Bank in the International Monetary Fund. I believe
3  it's like 16 and change percent of the stock. So all
4  these countries are grouped together. And what happens
5  is, is the IMF, they -- they get what is called
6  "quotas" by the United States. Well, those quotas are
7  income -- those quotas are -- are what we call taxes.
8  I call them forced contributions. And I believe, from
9  what I've studied and looked at, that they're promoting
10 world government.
11 Q  So you're saying in this paragraph "I'm not
12 participating, and you can if you want, but I'm not
13 participating"?
14 A  I left the option open. I said, "If you want
15 a 1099, you want a W-2, go get your own, but this is
16 what I'm doing, and here's why."
17 Q  Now, there was testimony during this trial
18 about your having instructed people that this contract
19 was not to be distributed. Do you recall that?
20 A  Yes, I do.
21 Q  Okay. Did you ever make any statements that
22 you didn't want these agreements distributed?
23 A  Yes. There was a brief time that I said
24 that. And the reason why I said it was because I had
25 somebody take it and try to reduplicate it and redo it,

Page 145

1  and it was -- it was a friend of mine. And so I did
2  that -- say that at one time. And at that time -- from
3  there on, though, you could go into our office, and you
4  could readily get a copy of one of those. They weren't
5  like they were hidden or in a vault or anything. And
6  if anybody ever wanted to talk to me about it, I'd talk
7  to them about it. I'd explain it.
8  Q  This --
9  A  The --
10 Q  I'm sorry. Continue.
11 A  Go ahead.
12 Q  Were you finished with your answer?
13 A  Yes.
14 Q  Okay. Did you hear Dick Bozer [phonetic]
15 testify that he refused to sign the Independent
16 Contract Agreement?
17 A  Yes, I did.
18 Q  Did you insist that people sign it?
19 A  No.
20 Q  But you wanted them to?
21 A  Yes. I wanted -- I wanted people to
22 understand this. I didn't want to force it down their
23 throat. This is the way I operated my business. There
24 are plenty of people that may not agree with me, but
25 this is what I studied. This is what I learned. This

Page 146

1  is how I set my business up. This was -- and I never
2  had any problems with anybody until after the raid and
3  the indictments.
4  Q  Okay. The raid that you're talking about now
5  is the one in 2003?
6  A  Yes.
7  Q  Okay.
8     Now, once you started -- and there's been
9  testimony about your entering into agreements with at
10 least 33 other businesses in Las Vegas.
11    Can you describe the process of -- and I
12 don't know whether it was the same with all 33, so I
13 guess that's my first question.
14    Did you meet with 33 different business
15 owners over the course of, I guess, several years?
16 A  Actually, no. I'll give you one example.
17 Jim Rhodes, Rhodes Homes. He owned Bravo Framing, and
18 I never met with him, but he was signed up, and we were
19 doing work with him as well.
20 Q  Did you authorize somebody to, as you put it,
21 sign Jim Rhodes up to participate in this program?
22 A  Actually, I met some of the people, his
23 underlings that worked at -- I think it was Bravo
24 Framing, is the name of the company. And I worked -- I
25 worked with them. I met with them one time, and I sat

Page 147

1  down and I -- telling them what I believe, just like
2  I'm telling you, and they signed up.
3      Q   And what did you tell them about the
4  valuation of the coins that you were using to pay and
5  the exchange option that was available? Can you
6  explain to this -- to this jury what you said when you
7  made presentations?
8      A   Yes. I told people that -- I explained a
9  little bit about the monetary system, a little bit
10 about the money. I didn't go into tremendous detail
11 because I get what you call the "deer in the headlights
12 effect," you know. Some of this information is
13 shocking to people. I'm not going to deny that. And
14 so you can't -- I never tried to give people too much
15 all at once. There are people that wanted to know
16 more, and I would talk to them about it; but, for the
17 most part, from what I've experienced with it, people
18 just didn't really seem to -- they liked the
19 information, but I was, I think, the guy that went out
20 there and actually took the information out of all the
21 books and applied it, so --
22     Q   So John Nelson, to your knowledge, taught
23 this course and provided these materials to -- do you
24 know how many other people: Dozens? Hundreds?
25 Thousands?

Page 148

1      A   I wouldn't -- I wouldn't know that at all. I
2  know that there was a couple classes here in Las Vegas,
3  but I wouldn't know where else and how many people, no.
4      Q   Did you ever discuss with Mr. Nelson whether
5  anyone else had implemented a similar payroll
6  arrangement such as yours, by which I mean the paying
7  in gold and silver coin?
8      A   I never heard him say that he knew anybody
9  that did this.
10     Q   Okay. Now, what did you tell the prospective
11 contractors who ultimately ended up using your payroll
12 system about the system and about your understanding of
13 tax sequences, if you said anything at all?
14     A   We really didn't discuss that. I told them
15 that I would treat everybody as an independent
16 contractor, and I told them that I would have everybody
17 sign an independent contractor and basically told them
18 I would explain the details in the contract.
19     Q   Okay. Now, there's been testimony that
20 representations were made that, for tax consequences,
21 the face value could be used to reduce or eliminate tax
22 liability.
23         MR. DAMM: Objection: Leading, Your Honor.
24         THE COURT: Sustained.
25         MR. COHAN: I haven't asked the question yet.

Page 149

1          THE COURT: Well, you prefaced it with a
2  leading comment, so his -- even if you asked the
3  question, it would be defective, so you have to
4  rephrase.
5          MR. COHAN: I just was trying to invite the
6  witness's attention.
7  BY MR. COHAN:
8      Q   Did you authorize anybody or did you,
9  yourself, make any statements to that effect, to the
10 effect that these coins can be considered only taxable
11 at face value?
12     A   Well, that's a two-part question.
13         THE COURT: Exactly right. That's why it's
14 objectionable, because it's -- you have to rephrase
15 your question.
16         MR. COHAN: Okay.
17 BY MR. COHAN:
18     Q   What, if anything, did you say to anyone who
19 was a prospective participant in your payroll system
20 about the tax consequences of paying people in gold and
21 silver coin minted after 1985 in the United States, the
22 $50, $1 silver coins that Mr. Hanson always has with
23 him and that we've talked about throughout the trial?
24     A   Well, let me explain so I can answer your
25 question.

Page 150

1      Q   I just have one here.
2      A   Yeah. Okay.
3      Q   Go ahead, please.
4      A   First of all, you keep saying "the tax
5  consequences," and as I've laid out in the Independent
6  Contract Agreement, these were forced contributions. I
7  never claimed that they were a tax. They were forced
8  contributions. And as far as the face value, I left it
9  open for everybody. They had a -- they had a choice to
10 do what they wanted to do. Whether they wanted to get
11 involved in the information and study was their choice.
12 So I never authorized or told anybody or tried to give
13 that type of legal advice. I might have said, well, if
14 it was me and if you were concerned and you wanted to
15 file, I said I would do it on the face value, but I
16 don't ever recall saying that too many times to
17 anybody.
18     Q   Okay. Did you ever tell anybody that you'd
19 gotten a legal opinion from a CPA or an attorney or any
20 court that said what you just represented about face
21 value for tax consequences?
22     A   Did I ever get an opinion?
23     Q   Right.
24     A   No.
25     Q   Okay. Did any of the contractors with whom