1   James I. Stang, Esq. (CA Bar No. 94435)

James I. Stang, Esq. (CA Bar No. 94435)
Shirley S. Cho, Esq. (CA Bar No. 192616)
PACHULSKI STANG ZIEHL & JONES
   LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Facsimile: 310/201-0760
Email: jstang@pszjlaw.com
      scho@pszjlaw.com

Zachariah Larson, Esq. (NV Bar No. 7787)
LARSON & LARSON
810 S. Casino Center Blvd., Ste. 104
Las Vegas, NV  89101
Telephone:  702/382.1170
Facsimile:  702/382.1169
Email: zlarson@larsonlawnv.com

Attorneys for Reorganized Debtors

E-File:  September 21, 2011

ABID QURESHI (NY Bar No. 2684637)
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:  aqureshi@akingump.com

Attorneys for Reorganized Debtors

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka
"Rhodes Homes, et al.,[1]

          Debtors.

_____

Affects:

☐   All Debtors
☒   Affects the following Debtor(s):

  Bravo, Inc. 09-14825

Case No.: BK-S-09-14814-LBR
(Jointly Administered)

Chapter 11

Hearing Date:   September 27, 2011
Hearing Time:   10:30 a.m.
Courtroom 1

---

[1]  The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No.

DOCS_LA:244823.1  73203-035

**REPLY IN SUPPORT OF OBJECTION TO CLAIM NO. 7 FILED BY THE INTERNAL REVENUE SERVICE AGAINST DEBTOR BRAVO, INC. PURSUANT TO SECTIONS 105, 502(b) AND 505 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULES 3001, 3003 AND 3007 [RE: DOCKET NO. 1377]**

The above-captioned reorganized debtors (collectively, the "Reorganized Debtors") hereby file this Reply in support of their Objection [Docket No. 1377] previously filed to claim No. 7 (as amended from time to time, the "IRS Bravo Claim") filed by the Internal Revenue Service (the "IRS") against Debtor Bravo, Inc. ("Bravo").

**PRELIMINARY STATEMENT**

Resolution of this Objection turns on one legal question – was Union Pacific Construction ("UPC") acting as Bravo's subcontractor such that Bravo has no tax liability for UPC's failure to properly remit taxes for UPC employees, or was UPC acting as a mere payroll process provider for Bravo such that Bravo retained legal liability as an employer to pay for these taxes?

In its opposition, the IRS submits several declarations of witnesses from Robert Kahre's criminal trial in support of its argument that Kahre was a criminal that failed to pay taxes properly. The IRS's evidence is largely irrelevant to the legal question at hand as none of the witnesses (several of whom are felons themselves) were asked directly or were even qualified to answer as a legal matter whether UPC hired Bravo's former employees as its own employees or whether UPC was simply running payroll for Bravo.

The IRS's evidence does not refute the direct evidence that the Reorganized Debtors have submitted that: (i) Bravo hired UPC as a subcontractor; (ii) Bravo's clear understanding was that UPC would have the sole responsibility for its employees, including paying taxes, providing workman's compensation insurance, and all of the other indicia of being an employer; (iii) during the time periods in question, Bravo correctly paid taxes for its own employees; (iv) Bravo maintained and processed its own payroll for its own employees such that hiring an additional payroll process provider during the same time period, as the IRS contends, makes no sense; and

**LARSON & LARSON**
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

(v) Bravo had no knowledge that UPC was engaged in a fraudulent tax scheme to not pay taxes for its own employees.

Unfortunately for Bravo, it retained UPC to provide manual labor to build its houses. However, the fact that UPC was later found to be engaged in a criminal tax evasion scheme has no bearing on the relationship between Bravo and UPC, which was one of a subcontract relationship. The IRS is unfairly attempting to recoup losses from UPC's misconduct from Bravo, which had no knowledge of UPC's wrongdoings, was not complicit in UPC's wrongdoings, and diligently paid its own employee taxes while it was operating. Not only is the IRS attempting to pin UPC's failure for paying its own employee taxes on Bravo, it is also attempting to pin Bravo with penalties and interest for willful intent relating to UPC's failure to pay taxes. Indeed, half of the asserted IRS Bravo claim (or approximately $1.7 million) is for penalties associated with UPC's willful failure to pay taxes. The IRS has submitted no evidence of Bravo's intent to intentionally or knowingly fail to pay taxes, nor has the IRS submitted any direct evidence that the relationship between Bravo and the UPC was anything other than a subcontract relationship. For the reasons set forth herein and in the Objection, the IRS's opposition should be overruled and Bravo's Objection to the IRS Bravo Claim sustained.

## PROCEDURAL BACKGROUND

1. On March 31, 2009 (the "Petition Date"), Bravo, one the above-captioned Debtors, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. On April 13, 2010 the IRS filed the IRS Bravo Claim against Bravo in the amount of $3,886,456.75, which was designated as Claim No. 7-2 in the claims register maintained by the Bankruptcy Court in Bravo's case. A true and correct copy of the IRS Bravo Claim is attached as **Exhibit A** to the Objection.

3. On March 31, 2011, the Debtors filed the Objection to the IRS Bravo Claim. [Docket No. 1377] The Reorganized Debtors and the IRS subsequently entered into two scheduling stipulations, which were approved by Order of this Court. [Docket No.1445 and 1536] Based upon the parties' agreement, the IRS's response deadline to the Objection was extended to September 16, 2011. On September 15, 2011, the IRS filed its Response in

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1    Opposition to the Objection.  [Docket No. 1540] (the "IRS Response").  The Reorganized

2    Debtors' reply deadline was extended to September 21, 2011.

3        4.    Although the parties have continued to engage in good faith settlement

4    discussions, as of the date and time of filing this Reply, the parties have not yet reached an

5    agreement to resolve the Objection.

6

7                    **BRAVO HIRED UPC AS A SUBCONTRACTOR**

8        5.    Bravo was previously in the business of framing houses for the Debtors' various

9    homebuilding operations.  Bravo ceased operations approximately two years prior to the Petition

10    Date, or in 2007.  *See* Objection, Ex. A, Bono Declaration, ¶ 3.

11        6.    In the early 2000's, there was a housing market boom.  Consequently, during that

12    time, Bravo was very busy on a number of building projects and the number of manual laborers

13    employed by Bravo grew at a high rate.  Bravo became concerned with its ability to handle the

14    administrative and recordkeeping requirements for the employment of the growing number of

15    new laborers that it needed to sustain production on the increasing number of building projects.

16    *See* Declaration of Dean Griffith in Support of Objection [Docket No. 1532] ("Griffith

17    Declaration") at ¶ 3.

18        7.    One of Bravo's employees, a superintendent named Dean Griffith, met with

19    Kahre on one occasion.  As set forth in the Griffith Declaration, Kahre represented that his

20    company, UPC, could provide manual laborers for Bravo's projects as a subcontractor, thereby

21    eliminating Bravo's administrative burden and payment obligations with respect to these

22    laborers.  *See* Griffith Declaration at ¶ 4.  On this basis, Bravo engaged UPC beginning in the

23    early 2000's as a subcontractor to provide laborers to work on Bravo's building projects.  *Id.*

24        8.    After Bravo engaged UPC, UPC (with Bravo's consent) hired certain of Bravo's

25    employees as its own employees.  UPC had the sole responsibility of paying the former Bravo

26    employees hired by UPC, as well as any other employees of UPC, who worked for it on Bravo's

27    building projects.  UPC was also responsible for all other matters that an employer would have

28    with respect to its own employees, including payroll, workmans' compensation insurance, labor

disputes, and withholding and payment of taxes to the proper taxing authorities.  *Id.* at ¶ 5.

9.      After Bravo hired UPC as a subcontractor, Bravo continued to maintain its own employees, who were long-time hourly or salaried employees, such as supervisors and foremen, and for which it continued to pay taxes.  *Id.* at ¶ 6; Bono Decl., ¶ 5.

10.      During the time that UPC served as subcontractor to Bravo, Bravo was not aware that Kahre or UPC may not have paid or withheld taxes owed by UPC or UPC's employees. After UPC had been engaged by Bravo for a period of time, when Bravo learned of UPC's gold coin payment scheme, Bravo immediately terminated its relationship with UPC and Kahre. Griffith Decl. at ¶ 7.

## THE IRS HAS NOT SUBMITTED ANY DIRECT EVIDENCE TO SUPPORT ITS THEORY

11.      Contrary to the IRS's assertion in the IRS Response, Bravo has submitted direct evidence as set forth above of a subcontract relationship with UPC.  On the other hand, the IRS has submitted trial testimony from Kahre's trial, which does not rebut Bravo's evidence or support the IRS's theory.

### A.   The IRS's Evidence Does Not Establish Whether The "Workers" For Whom UPC Was Running Its Payroll Scheme Worked For Bravo Or UPC

12.      The IRS contends that "Bravo had an agreement with Robert Kahre (hereinafter "Kahre") for Kahre to provide payroll services for Bravo Employees."  IRS Response at ¶ 3. The IRS cites to Kahre's criminal trial transcript, Ex. 1, p. 146-147, portions of which are attached to the IRS Response.  Kahre specifically states that he met with a Bravo "underling" on one occasion.  IRS Response, Ex. 1., at p. 146.  When asked specifically whether Kahre discussed his payroll scheme with Bravo, Kahre responded:  "I didn't go into tremendous detail because I get what you call the 'deer in the headlights effect,' you know."  *Id.* at p. 147.  Kahre's testimony at most supports the contention that there was an agreement between Bravo and UPC, but nothing in his testimony addresses whether such a relationship was a subcontractor or as a payroll process provider.

13.      The IRS then cites to the testimony of Heidi Molesworth to support the same proposition that Kahre was acting as Bravo's payroll services provider.  IRS Response, Ex. 2 at

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

p. 56, Ex. 3 at pp. 5-14. As a preliminary matter, Molesworth was herself convicted of tax evasion and had embezzled funds from Kahre, and is thus a convicted felon. Ex. A hereto, pp. 140 – 41.

14.     Molesworth generally testified to a payroll processing scheme whereby "workers" were paid with gold coin, which the workers then exchanged for cash. Ex. A hereto, pp. 5 – 15. She testified that this occurred for not only Kahre's companies, but several other construction companies in the Las Vegas area, including Bravo. *Id.* Importantly, Molesworth was never asked whether the workers in question whom she was paying were Bravo's employees at the time, or were UPC employees that were former employees of Bravo working on Bravo's projects, as Bravo contends.

15.     In fact, there was utter confusion during her trial testimony as to the nature of the employees that were affiliated with the various contractors on several occasions as evidenced by the trial transcript. Ex. A attached hereto, at p. 84 ("objection to the use of the word 'employees'"); at pp. 88-89 ("did any of the workers for the other contractors receive a W-2 form for Mr. Kahre? A  No. . . Because we were independent subcontractors"); at pp. 109-110 (" And so the check would be turned into cash to give to the 35 businesses who were not employees, so I thought the use of the terms "employees" was misleading."). As evidenced above, there were continuing questions as to how to characterize Kahre's relationship with the workers that it was paying in gold coin. Ms. Molesworth was not asked her opinion with respect to whether UPC was acting as a subcontractor for Bravo.

16.     Similarly, the Rodriguez testimony does not support the IRS's position either. IRS Response, Ex. 4, at pp. 92-93. Rodriguez, like Molesworth, was also convicted of felony tax evasion. Ex. C hereto, at p. 88. While Rodriguez testified that Bravo's "workers" were paid in gold and silver coin, he was not asked whether these workers were employees of UPC or Bravo. Ex. C hereto, at 92-93.

17.     Finally, the IRS offers the testimony of Ryan Rickey, an employee of the IRS, the only non-criminal of the bunch. IRS Response, Ex. 6 thereto, at ¶ 4. Rickey did not mention Bravo on the pages for which the IRS cites, nor anywhere else in his entire trial testimony for

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1   that matter.  There was similar confusion during Rickey's testimony as to whether or not the

2   employees who received cash from Kahre were "employees" or "independent contractors" of the

3   general construction contractors.  Ex. D hereto, at pp. 56 – 57 (Court sustaining objection to the

4   characterization of the contractor's workers as "employees").

5         18.    Thus, the IRS's witnesses were never asked to opine on whether or not Kahre's

6   relationships with the contractors was generally one of a subcontract relationship.  Certainly

7   none of the IRS's witnesses ever opined on the specific nature of the UPC/ Bravo relationship,

8   nor would their opinion had any bearing on the question, which is ultimately a legal one.

9   ***B.   The IRS's Evidence Supports Bravo's Argument That The Relationship Was A***

10        ***Subcontract Relationship***

11         19.    The IRS offers up portions of testimony from Jorge Fernandez, a childhood friend

12   of Kahre's, who himself was terminated by Kahre for allegedly stealing from Kahre and also

13   underreported income taxes.  *See* IRS Response at ¶¶ 4, 5; Ex. B hereto, at pp. 107, 110.

14   However, as evident from the Fernandez testimony, Fernandez testified about a general

15   contractor named First Premier, not Bravo.  Ex. 7 at pp. 81 – 83, 143.  Presumably, the IRS's

16   position is that whatever was true with respect to First Premier's relationship with Kahre was

17   also true of Bravo's relationship with UPC.  Regardless, Fernandez's testimony supports Bravo's

18   position, not the IRS's position.

19         20.    Specifically, Jorge Fernandez testified that (i) he did not know whether or not the

20   workers of First Premier signed independent contractor agreements with Kahre or one of Kahre's

21   companies; and (ii) First Premier thought that their taxes would be taken care of by Kahre:

22        Q  And what was the benefit to First Premier?

23        A  He – his taxes would be running through Mr. Kahre.  He wouldn't be

24   responsible for the taxes.

25        Q  First Premier wouldn't be responsible?

26        A  Correct.

27   Ex. B hereto, at pp. 162, 164.

28

**LARSON & LARSON**
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

**LARSON & LARSON**
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170   Fax: (702) 382-1169

Thus, it was not only Bravo's understanding that Kahre's company would take care of employer-related taxes as set forth in the Griffith Declaration, this view was shared by other general contractors, presumably based on the same misrepresentation that Kahre told them. More importantly, the understanding and expectation that Kahre, not First Premier, was to take care of paying employer-related taxes, but never did, was a fact that was known to Kahre's employees.

**(1) UPC Provided "Workers Compensation Insurance" To Its Employees**

21.     The IRS's witness testimony further _supports_ Bravo's position that the UPC arrangement was one of a subcontract relationship based on other facts as well. Bravo's understanding was that UPC, as an employer, would take on all of the indicia of an employer, such as paying taxes and payroll for its employees, as well workers' compensation. Griffith Decl. ¶ 5.

22.     Molesworth testified that the fee charged to construction companies included workers' compensation insurance in addition to a processing payroll fee:

Q  Now Ms. Molesworth, if you know, what—what did Mr. Kahre provide for this fee?

A  The payroll service; Workers' Comp insurance.  That's as far as I know.

Q  How do you know Mr. Kahre provided Workers' Comp insurance for these individuals?

A  Because – well, when their – some of their people got hurt, he covered the – the paperwork and stuff would be filled out under his company.

Q  Did he refer them to the – the Nevada Workers' Compensation department?

A  Not in the beginning.

Q  How did he handle the –

A  He paid them cash and took care of their medical bills.

Ex. A hereto, at pp 82 – 83.

Similarly, Fernandez, testified:

Q  And what would Mr. Kahre provide to the contractor in return?

1    A  Insurance, you know.  We –we're in charge of – anybody would get hurt on their

2  companies, we would take them to the doctor.  We would pay their compensation for being out

3  of work, all that stuff.

4  Ex. B hereto, at p. 78.

5        23.    Fernandez further testified that he set up cash accounts at various local hospitals

6  to cover the workers' injuries in the name of two of *Kahre's* companies, Gold Contract and

7  Wright Painting.  Ex. B hereto, at pp. 162-63.

8        24.    Thus, both Molesworth and Fernandez's testimony above is consistent with

9  Bravo's understanding that UPC, as the employer, would take responsible for all things that an

10  employer would take responsibility of, including workman's compensation claims.  *See* Griffith

11  Decl., ¶ 5.

12        **(2)  Kahre Maintained Control Over Its Subcontract Projects**

13        25.    The IRS then asserts that Bravo continued to exert control over its former

14  employees because, according to Fernandez, with respect to First Premier (an unrelated

15  contractor), First Premier supervised and provided tools and training to the employees.  IRS

16  Response at ¶ 5 (citing Fernandez's testimony at p. 143).  First, there is no such testimony with

17  respect to Bravo and UPC.  Second, in any event, Fernandez's testimony is to the contrary.

18  Fernandez testified that he (as Kahre's employee) had the authority to supervise crew leaders,

19  and the crew leaders were the ones were "mostly in charge of the work."  Ex. B attached hereo,

20  at pp.165-66.

21        26.    Generally an employee relationship exists when the person for whom services are

22  performed has the right to control and direct the individual who performs the services, not only

23  as to the result to be accomplished by the work but also as to the details and means by which that

24  result is accomplished.  Treasury Regulations § 31.3121(d)-1(c)(2).  The ultimate question asked

25  to determine whether an individual is an employee or an independent contractor is whether the

26  employer, as the principal, has the right to direct and control the worker, as the agent.

27  *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318 (1992).  Industry-pertinent facts and

28  circumstances help determine whether the employer has the right to direct and control the

**LARSON & LARSON**
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

worker. *Clackamas Gastroenterology Associates, P.C. v. Wells*, 538 U.S. 440 (2003).  While many factors determine whether the employer has the right to direct and control the worker, the element of control over the manner in which workers performed their duties is a key factor. *General Investment Corp. v. U.S.*, 823 F.2d 337 (9th Cir. 1987); *Crowd Management Services, Inc. v. U.S.*, 27 F.3d 1142 (9th Cir. 1994).  Where there are two possible employers, the determination of which entity is the employer is based on which entity has the right to direct and control the worker.  *Transport Labor Contract/Leasing Inc. and Subs. v. Comm.*, 123 TC 154 (2004), *reconsideration den.* TC Memo 2005-173 (2005), *rev'd on other issue*, 461 F3d 1030 (2006).  Fernandez testified that he (as Kahre's employee) went to "inspect the work" of the crew leaders.  Ex. B attached hereto, at pp. 165-66.  Fernandez also testified that if there were any problems, he went to the broker "to make sure it got fixed." *Id.*  Fernandez's testimony shows that First Premier was not directing and controlling either the broker or the crew leaders, and among the two possibilities for employers, First Premier or Kahre's company, it was Kahre's company that was engaging in the activities that directed and controlled the broker and crew leaders.

27.     Finally, if the Department of Justice is relying on the Kahre criminal trial to define the scope of the activities involved, the U.S. Attorney of Nevada's News Release of August 14, 2009 (attached as Ex. B to the Objection) regarding Kahre's conviction, stated, "Kahre owned and operated six construction businesses in the Las Vegas area", including UPC. The release continues: "These businesses employed hundreds of employees, many of them laborers, but the exact number is unknown because of the way in which Robert Kahre operated his businesses. *Additionally*, Kahre provided a payroll service to approximately 35 other construction contractors, which employed thousands of employees." [Emphasis added.]  Thus, the DOJ has acknowledged that UPC employed the workers and provided construction services to the construction industry in the area.  There is no evidence that the relationship between UPC and Bravo was other than as described by the U.S. Attorney – the provision of construction services by UPC's employees to Bravo.

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

1

## CONCLUSION

2          Bravo does not dispute that the IRS's evidence shows that Kahre did not properly pay

3    taxes for himself or his employees.  However, it does not have any bearing on the legal question

4    before the Court, which is whether, as the IRS contends, Kahre was acting as a payroll process

5    provider only for Bravo, or, as Bravo's evidence shows, that Bravo hired UPC as a

6    subcontractor.  The fact that UPC/ Kahre apparently failed to remit withholding taxes for former

7    employees of Bravo to the government should not fall onto Bravo or the Reorganized Debtors.

8    Based on the direct evidence provided by Bravo, and no evidence to the contrary provided by the

9    IRS, the Reorganized Debtors hereby respectfully request that this Court enter an order

10   disallowing the IRS Bravo Claim in its entirety.

11   **DATED** this 21st day of September, 2011.

12

13                                              **LARSON & LARSON**

14                                               _/s/ Zachariah Larson, Esq._____

15                                              Zachariah Larson, Bar No. 7787
                                                810 S. Casino Center Blvd., Suite 104
16                                              Las Vegas, NV  89101
                                                702/382-1170
17                                              Attorneys for Reorganized Debtors

18

19

20

21

22

23

24

25

26

27

28

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

**DECLARATION OF SHIRLEY S. CHO IN SUPPORT OF REPLY TO OBJECTION TO CLAIM NO. 7 FILED BY THE IRS AGAINST DEBTOR BRAVO, INC.**

I, Shirley S. Cho, declare as follows:

1.      I am an attorney at Pachulski Stang Ziehl & Jones LLP, and am counsel to the above-captioned Reorganized Debtors.  Unless otherwise stated herein, the facts set forth in this Declaration are personally known to me and, if called as a witness, I could and would testify thereto.

2.      I have been provided copies of trial transcripts from the Department of Justice, counsel for the IRS, true and correct copies of which are attached hereto as Exhibits A through D.  Specifically:

3.      Attached as **Exhibit A** hereto is a true and correct copy of Heidi Molesworth's testimony (partial) from July 7, 2009.

4.      Attached as **Exhibit B** hereto is a true and correct copy of Jorge Fernandez's testimony dated July 15, 2009.

5.      Attached as **Exhibit C** hereto is a true and correct copy of excerpts from George Rodriguez's testimony (partial) from June 30, 2009.

6.      Attached as **Exhibit D** hereto is a true and correct copy of excerpts of Ryan Ricky's testimony from July 21, 2009.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 21st day of September, 2011, at Los Angeles, California.

_/s/ Shirley S. Cho_
Shirley S. Cho

LARSON & LARSON
810 S. Casino Center Blvd., Suite 104
Las Vegas, Nevada 89101
Tel: (702) 382-1170  Fax: (702) 382-1169

# EXHIBIT

# A

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

THE HON. DAVID A. EZRA, U.S. DISTRICT JUDGE,

PRESIDING

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )  Case No:
                                   )  2:05-cr-121-DAE-RJJ
     vs.                           )
                                   )
ROBERT DAVID KAHRE, et al.,        )
                                   )
          Defendants.              )
                                   )

REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

(TESTIMONY OF HEIDI MOLESWORTH)

TUESDAY, JULY 7, 2009

APPEARANCES:  (See Page 2)

Court Reporter:  Andrea N. Picard, CRR, CCR NO. 887

Heidi Molesworth, 7-7-09

APPEARANCES:


For Plaintiff:

                    J. GREGORY DAMM, ESQ.
                    ASSISTANT UNITED STATES ATTORNEY
                    333 Las Vegas Boulevard South
                    Suite 5000
                    Las Vegas, Nevada 89101
                    TEL:  (702) 388-6336


For Defendant Robert A. Kahre:

                    WILLIAM A. COHAN, ESQ.
                    WILLIAM A. COHAN, P.C.
                    PO BOX 3448
                    Rancho Santa Fe, California 92067
                    TEL:  (858) 832-1632


For Defendant Robert A. Kahre:
(Local counsel)

                    LISA RASMUSSEN, ESQ.
                    LAW OFFICE OF LISA RASMUSSEN
                    616 South 8th Street
                    Las Vegas, Nevada 89101
                    TEL:  (702) 461-1436


For Defendant Alexander C. Loglia:

                    JOEL F. HANSEN
                    ATTORNEY AT LAW
                    415 South 6th Street
                    Las Vegas, Nevada 89101
                    TEL:  (702) 385-5533

Heidi Molesworth, 7-7-09

---

**Page 3**

APPEARANCES:
(Continued)

For Defendant Lori Kahre:
    MICHAEL J. KENNEDY, ESQ.
    FIRST ASSISTANT FEDERAL DEFENDER
    411 East Bonneville Street
    Suite 250
    Las Vegas, Nevada 89101
    TEL: (702) 388-6577

For Defendant Danille Cline:

    LYNN E. PENAGAKOS
    ATTORNEY AT LAW
    345 Queen Street
    Honolulu, Hawaii 96813
    TEL: (808) 521-3336

---

**Page 4**

LAS VEGAS, NEVADA; WEDNESDAY, JULY 7, 2009, 8:42 AM
-oOo-
PROCEEDINGS
    THE COURT: All right. Any reason why we
can't bring the jury in?
    MR. DAMM: No, Your Honor.
    THE COURT: Bring the jury in.
    (Jurors entered proceedings.)
    THE COURT: All right. Good morning, ladies
and gentlemen. Nice to see you back. The court would
note the presence of all counsel, ladies and gentlemen
of the jury. And I would remind you you remain under
oath. Okay.
    MR. COHAN: I can barely hear you, judge.
    THE COURT: Is that better?
    MR. COHAN: Now that's much better.
    THE COURT: Is that better?
    MR. COHAN: Much better. Thank you.
    THE COURT: I was going to say, "Is that a
bad thing?"
    MR. COHAN: Fifth Amendment.
    MR. DAMM: Good morning, Your Honor, ladies
and gentlemen of the jury.
/ / /
/ / /

---

**Page 5**

1        DIRECT EXAMINATION (Continued)
2  BY MR. DAMM:
3    Q  Good morning, Ms. Molesworth.
4    A  Good morning.
5    Q  How are you this morning?
6    A  Fine. Thank you.
7    Q  Yesterday we were talking about some exhibits
8  in the 9N series, 9N.1 through -126 -- or -125
9  regarding ABC Roofing. Do you recall those exhibits?
10    A  Yes, I do.
11    Q  Can you tell us again what the relationship
12  ABC Roofing had to Robert Kahre's businesses?
13    A  ABC Roofing was one of the payroll companies
14  that Bobby's businesses did. Bobby was contracted out
15  to do the payroll for the company.
16    Q  And how did that payroll service --
17    THE COURT: You have to speak -- the easiest
18  way to do it -- see, what's happening is the mic is
19  there, and you're speaking this way; so why don't you
20  move this over a little bit, the mic this way, and then
21  you'll speak right into it.
22    THE WITNESS: Okay. What was the question
23  again?
24  BY MR. DAMM:
25    Q  We were talking about ABC Roofing. And what

---

**Page 6**

1  relationship did ABC Roofing have with Robert Kahre's
2  businesses?
3    A  Bobby did the payroll for the company.
4    Q  And how did that process work?
5    A  They turned in time and hours on time sheets
6  to — usually, it was Lori. She processed it, sent
7  them out an invoice, and then they cut a check for the
8  amount of the payroll, plus a fee.
9    Q  And what would happen to the check?
10    A  It would be picked up by one of the runners
11  or Bobby and cashed on payday, and then the check would
12  be — the cash from the check would be brought to the
13  payroll office.
14    Q  And what would happen to the cash?
15    A  It would be divided up into different
16  envelopes according to the list that was given to us.
17    Q  And were there names on the envelopes?
18    A  Yes, there was.
19    Q  Whose names were on the envelopes?
20    A  The workers from that company.
21    Q  And would those envelopes be distributed at
22  some point in time?
23    A  Yes, usually.
24    Q  And from where would they be distributed?
25    A  From the payroll office.

Heidi Molesworth, 7-7-09

Page 7

1    Q   And would sometimes one representative from
2  the company come in and pick up all of the envelopes?
3    A   Yes.
4    Q   What I'd like to do now is to ask you to take
5  a look at another set of exhibits. This would be
6  910.174 through -181 regarding American Bar & Cabinet.
7  Do you have those exhibits in front of you?
8    A   Yes, I do.
9    Q   And do you recognize them?
10   A   Yes, I do.
11   Q   And how do you recognize them?
12   A   It was the invoice sent out to this
13  particular company for payroll that week.
14   Q   And are these records similar to the ones for
15  ABC Roofing and Action Concrete?
16   A   Yes.
17   Q   And was this done on a regular -- on a
18  regular weekly basis with Mr. Robert Kahre's companies?
19   A   Yes.
20   Q   And you actually worked in this process?
21   A   Yes.
22   Q   And the portion you worked in was what?
23   A   I usually handed out payroll -- put the cash
24  in the envelopes and handed out the payroll.
25   Q   And, on occasion, if Lori Kahre was absent,

Page 8

1  did you fill in for her?
2    A   Yes.
3    Q   And would you receive the pay sheets from the
4  companies?
5    A   Yes.
6    Q   And would you create the invoices?
7    A   Yes.
8      MR. DAMM: Your Honor, at this time I'd move
9  for the admission of Government's Exhibit 9.10.174
10  through -181.
11     MR. KENNEDY: No objection, Your Honor.
12     MS. PANAGAKOS: No objection.
13  BY MR. DAMM:
14   Q   Ms. Molesworth, we have --
15     THE COURT: Ms. Rasmussen is not present,
16  Mr. Cohan. I assume there's no objection.
17     MS. RASMUSSEN: Your Honor, it's --
18     MR. COHAN: She's --
19     MS. RASMUSSEN: I said --
20     THE COURT: Oh --
21     MS. RASMUSSEN: -- I believe I stated --
22     THE COURT: I beg your pardon.
23     MS. RASMUSSEN: And I apologize.
24     THE COURT: My fault.
25     MR. KENNEDY: No problem, Your Honor.

Page 9

1  Mr. Barry is out sick, as you know, so Ms. Rasmussen
2  moved over to his chair.
3      THE COURT: That's what kind of threw me off.
4      MR. KENNEDY: Right.
5      THE COURT: She's in a different chair than
6  she normally sits. All right. The document will be
7  received.
8      (Plaintiff's Exhibit 9.10.174 through
9      -181 was admitted into evidence.)
10     MR. DAMM: Thank you, Your Honor.
11  BY MR. DAMM:
12   Q   Ms. Molesworth, we -- we have a number of
13  these to go through, and what I'd like to do is I'd
14  like to just go through the documents, seek their
15  admittance, and then we can come back and talk about
16  them, if -- if that's okay with you.
17   A   Of course.
18   Q   Referring now to 9.10.182 through -191, do
19  you recognize those documents?
20   A   Yes, I do.
21   Q   And to which company do they pertain?
22   A   American Graffiti.
23   Q   And is American Graffiti another company that
24  participated in Mr. Kahre's payroll system?
25   A   Yes.

Page 10

1    Q   And processed work as previously described
2  with ABC Roofing, Action Concrete, and American Bar &
3  Cabinet?
4    A   Yes.
5      MR. DAMM: Your Honor, at this time I'd move
6  for 9.10.182 through -191.
7      MS. RASMUSSEN: No objection.
8      MR. KENNEDY: No objection, Your Honor.
9      THE COURT: All right. Be received.
10     (Plaintiff's Exhibits 9.10.182 through
11     9.10.191 were admitted into evidence.)
12  BY MR. DAMM:
13   Q   Let's take a look at 9.10.192 through -207.
14  Do you recognize these documents?
15   A   Yes, I do.
16   Q   And how do you recognize them?
17   A   They're invoices that were sent out to the --
18  the companies for the payroll system.
19   Q   And which company do they pertain to?
20   A   This one is Aspen Homes.
21   Q   And were they created in the similar fashion
22  that you've discussed?
23   A   Yes.
24     MR. DAMM: Your Honor, at this time I'd move
25  for the admission of 9.10.192 through -207.

Heidi Molesworth, 7-7-09

Page 11

1           MR. KENNEDY: No objection, Your Honor.
2           MS. RASMUSSEN: No objection.
3           THE COURT: All right. It will be received.
4           (Plaintiff's Exhibits 9.10.192 through
5           9.10.207 were admitted into evidence.)
6    BY MR. DAMM:
7       Q   And if we could move now to 9.10.208 through
8    -237. Do you recognize these documents?
9       A   Yes, I do.
10      Q   And what company do they pertain to?
11      A   BHB.
12      Q   And, again, these were payroll documents
13   processed through Robert Kahre's companies?
14      A   Yes.
15          MR. DAMM: Your Honor, at this time I'd move
16   for the admission of 9.10.208 through -237.
17          MR. KENNEDY: No objection, Your Honor.
18          MS. RASMUSSEN: No objection.
19          THE COURT: All right. Be received.
20          (Plaintiff's Exhibits 9.10.208 through
21          9.10.237 were admitted into evidence.)
22   BY MR. DAMM:
23      Q   And, Ms. Molesworth, 9.10.238 through -305 --
24   do you recognize these documents?
25      A   Yes, I do.

Page 12

1       Q   And they're payroll documents again?
2       A   Yes, they are.
3       Q   For what company?
4       A   Big Bear Concrete.
5       Q   And kept and maintained and processed in the
6    same manner was previously discussed?
7       A   Yes, sir.
8           MR. DAMM: Your Honor, at this time I'd move
9    for the admission of 9.10.238 through -305.
10          MR. KENNEDY: I don't think I have an
11   objection, Your Honor, but if you'd just give me a
12   moment to look through them.
13          THE COURT: Sure.
14          MR. KENNEDY: No objection, Your Honor.
15          MS. RASMUSSEN: None here either.
16          THE COURT: All right. It will be received.
17          (Plaintiff's Exhibits 9.10.238 through
18          9.10.305 were admitted into evidence.)
19   BY MR. DAMM:
20      Q   And, Ms. Molesworth, 9.10.306 through -333.
21      A   They're not here.
22          MR. DAMM: May I have the court's indulgence
23   to obtain another binder?
24          THE COURT: Yes.
25          MR. DAMM: Thank you, Your Honor.

Page 13

1    BY MR. DAMM:
2       Q   Have you found -306 through -333?
3       A   Yes, I have.
4       Q   And can you tell me what these documents
5    represent?
6       A   Invoices to Bingbam Construction for payroll.
7       Q   And were these created in the same fashion as
8    previously discussed?
9       A   Yes.
10          MR. DAMM: Your Honor, at this time I'd move
11   for the admission of 9.10.306 through -333.
12          MR. KENNEDY: No objection, Your Honor.
13          MS. RASMUSSEN: No objection, Your Honor.
14          THE COURT: All right. It will be received.
15          (Plaintiff's Exhibits 9.10.306 through
16          9.10.333 were admitted into evidence.)
17   BY MR. DAMM:
18      Q   And, Ms. Molesworth, 9.10.334 through -342.
19      A   Okay.
20      Q   Do you recognize these documents?
21      A   Yes, I do.
22      Q   And what do they represent?
23      A   Invoicing to Bowles Plumbing for payroll.
24      Q   And processed in the same manner as
25   previously discussed?

Page 14

1       A   Yes.
2           MR. DAMM: Your Honor, at this time I'd move
3    for the admission of 9.10.334 through -342.
4           MR. KENNEDY: No objection.
5           MS. RASMUSSEN: Okay. No objection.
6           THE COURT: All right.
7           (Plaintiff's Exhibits 9.10.334 through
8           9.10.342 were admitted into evidence.)
9    BY MR. DAMM:
10      Q   And, Ms. Molesworth, could you take a look at
11   9.10.343 through -394.
12      A   Okay.
13      Q   Do you recognize these documents?
14      A   Yes, I do.
15      Q   And what do they represent?
16      A   Billing to Bravo for payroll.
17      Q   And processed in the same manner?
18      A   Yes.
19          MR. DAMM: I'd move for the admission, Your
20   Honor, of 9.10.343 through -394.
21          MR. KENNEDY: Your Honor, if I could just
22   have a moment to go through them?
23          THE COURT: Sure.
24          MR. KENNEDY: Thank you.
25          A JUROR: Your Honor, we're still having

Heidi Molesworth, 7-7-09

Page 15

1    trouble -- a couple of jurors are having trouble with
2    the microphones.
3         THE COURT: Okay. Would everybody make an
4    effort to speak a little louder, not necessarily
5    closer, because when you get close, we get feedback,
6    and that causes interruption so you sound a little bit
7    like you're bouncing around the deck.
8         MR. DAMM: I certainly don't want to do that,
9    Your Honor.
10        Can -- can everyone hear me?
11        A JUROR: It's mainly the witness, sir.
12        THE WITNESS: I'm sorry. I'll speak louder.
13        MR. KENNEDY: Your Honor, I don't think I
14   have an objection, but I just have a couple questions.
15             VOIR DIRE EXAMINATION
16   BY MR. KENNEDY:
17        Q   Ma'am, do you have 9.10.365 up there that you
18   can find? Do you have that in front of you?
19        A   Yes, I do.
20        Q   Okay. Now, if I understand your testimony
21   yesterday correctly, most of the time what you did was
22   you worked during the actual payment process with these
23   35 businesses; right?
24        A   Yes, I did.
25        Q   All right. So you were involved with

Page 16

1    figuring out the gold and silver to pay them with first
2    and then the envelopes for which, if they chose to
3    exchange it, you would give to them; right?
4        A   Yes, sir.
5        Q   All right. Now, I've seen what is shown in
6    9.10.365 filled out. I just wondered if this was a
7    form that you, yourself, used.
8        A   I recognize it from early on, from when I
9    first started doing payroll. But towards the end, I
10   don't -- I don't believe we used it that often. I
11   don't remember.
12        Q   Okay. Because I take it that these are
13   selected documents now. Early on, did you recognize it
14   when Micki was running the payroll?
15        A   That was so long ago, sir, I don't remember.
16        Q   Okay. Now, did you, yourself, use 36 --
17   9.10.365 or 9.10.366?
18        A   Obviously, I did. My initials are on it.
19        Q   Okay.
20        A   So that was me who did that.
21        Q   All right. And did you use it as a standard
22   practice early on, do you remember, or --
23        A   I don't remember.
24        Q   Okay. Because -- I'm asking you these
25   questions because these aren't, obviously, all of the

Page 17

1    sheets for every week for all these companies.
2        A   Right.
3        Q   But I take it was -- at some point it was a
4    standard practice to use what's shown in 9.10.365?
5        A   Yes, sir.
6        MR. KENNEDY: All right. With that, Your
7    Honor, I have no objection.
8        THE COURT: All right.
9        MS. RASMUSSEN: No objection from me.
10       THE COURT: All right. Thank you. It will
11   be received.
12        (Plaintiff's Exhibits 9.10.343 through
13        9.10.394 were admitted into evidence.)
14   BY MR. DAMM:
15       Q   Ms. Molesworth, I'd like to move to the next
16   series of documents now, 9.10.395 through -438.
17       A   Okay.
18       Q   Do you recognize these documents?
19       A   Yes, I do.
20       Q   And what type of documents are they?
21       A   They were invoices for payroll to Bricker
22   Construction.
23       Q   And were these processed in the same fashion
24   as previously discussed?
25       A   Yes.

Page 18

1        MR. DAMM: Your Honor, at this time I'd move
2    for the admission of 9.10.395 through -438.
3        MR. KENNEDY: Could I have a moment, Your
4    Honor?
5        THE COURT: I'm sorry, Mr. Kennedy?
6        MR. KENNEDY: Could I just have a moment to
7    look at the documents?
8        THE COURT: Sure.
9        MR. KENNEDY: Thank you. No objection, Your
10   Honor.
11        MS. RASMUSSEN: None here either.
12        THE COURT: All right. It will be received.
13        (Plaintiff's Exhibits 9.10.395 through
14        9.10.438 were admitted into evidence.)
15   BY MR. DAMM:
16       Q   And, Ms. Molesworth, if we could move to
17   9.10.439 through -546.
18       A   Okay.
19       Q   Do you recognize these documents?
20       A   They're invoices to Color Country for
21   payroll.
22       Q   And they were processed in the same fashion
23   as previously discussed?
24       A   Yes.
25        MR. DAMM: Your Honor, at this time I'd move

Heidi Molesworth, 7-7-09

Page 19

1    for the admission of 9.10.439 through -546.

2         MR. KENNEDY: Little time to get through

3    them, Your Honor, but I doubt that I have an objection.

4         THE COURT: In order to save time, let me go

5    ahead and provisionally admit them. If you have a

6    concern, Mr. Kennedy --

7         MR. KENNEDY: No. That would be fine, Your

8    Honor.

9         THE COURT: All right. Why don't you

10   proceed. The Court will receive them provisionally,

11   unless there is some objection.

12        (Plaintiff's Exhibits 9.10.439 through

13            9.10.546 were admitted into evidence.)

14        MR. DAMM: Thank you, Your Honor.

15   BY MR. DAMM:

16   Q    Ms. Molesworth, if you take a look at

17   9.10.547 through -593, do you recognize these

18   documents?

19   A    Yes, I do. They're invoices to Consolidated

20   Roofing for the payroll services.

21        MR. DAMM: And I'd move for their provisional

22   admission.

23        THE COURT: We don't want to get too far

24   ahead here.

25        MS. RASMUSSEN: The problem is that last

Page 20

1    batch was over a hundred documents, so we're just --

2         MR. KENNEDY: No objection, Your Honor.

3         MS. RASMUSSEN: No objection from me either.

4         THE COURT: All right. Be received.

5         (Plaintiff's Exhibits 9.10.547 through

6             9.10.593 were admitted into evidence.)

7         MR. DAMM: Let's see. Was that -- did we end

8    up with Consolidated Roofing?

9         MR. KENNEDY: You did, -593, Counsel.

10        THE WITNESS: Yes.

11        MR. DAMM: Thank you, Mr. Kennedy.

12        MR. KENNEDY: You're welcome.

13   BY MR. DAMM:

14   Q    Can you take a look now at 9.10.594 through

15   -699, Ms. Molesworth.

16   A    Okay.

17   Q    Do you recognize these documents?

18   A    Yes, I do.

19   Q    And what do they represent?

20   A    They're invoices to D&L Construction for

21   payroll services.

22        MR. DAMM: Your Honor, I'd move for the

23   admission of -594 through -699 of the 9.10 series.

24        MR. KENNEDY: I don't believe I have an

25   objection to the group of them. There's a document

Page 21

1    that we're looking at right now.

2         MS. RASMUSSEN: Your Honor, may I just ask a

3    couple questions?

4         THE COURT: Of course.

5         MS. RASMUSSEN: Thank you.

6             VOIR DIRE EXAMINATION

7    BY MS. RASMUSSEN:

8    Q    Can you take a look at document -674 --

9    9.10.674.

10   A    Okay.

11   Q    Okay. The other documents we've been looking

12   at are payroll sheets and ledgers and things of that

13   nature; and this one is different, so do you know what

14   it is? Are you familiar with that particular document?

15   A    Not this particular document, no.

16        MS. RASMUSSEN: Okay. Then, Your Honor, I

17   would agree with the admission of all of the documents

18   in the set except for -674.

19        MR. DAMM: That would be fine, Your Honor.

20        THE COURT: All right.

21        MR. KENNEDY: I have no objection, Your

22   Honor.

23        THE COURT: Okay. It will be received.

24   ///

25   ///

Page 22

1         (Plaintiff's Exhibits 9.10.594 through

2             9.10.673 and 9.10.675 through 9.10.699

3             were admitted into evidence.)

4         DIRECT EXAMINATION (Continued)

5    BY MR. DAMM:

6    Q    Now, Ms. Molesworth, if we could take a look

7    at 9.10.700 through -777.

8    A    Okay.

9    Q    Do you recognize these documents?

10   A    Yes, I do.

11        MS. RASMUSSEN: I'm sorry, Counsel. Can I

12   have the page numbers again?

13        MR. KENNEDY: -700 to -777.

14        MS. RASMUSSEN: Okay.

15        MR. KENNEDY: -700 to -777, Counsel?

16        MR. DAMM: (Nods head.)

17        MR. KENNEDY: Okay.

18   BY MR. DAMM:

19   Q    Do you recognize these documents,

20   Ms. Molesworth?

21   A    Yes, I do.

22   Q    And what do they represent?

23   A    They're invoicing to Desert Plastering for

24   payroll services.

25   Q    And prepared in the fashion as previously

Heidi Molesworth, 7-7-09

Page 23

1    discussed?
2        A   Yes.
3            MR. DAMM:  Your Honor, I'd move for the
4    admission of 9.10.700 through -777.
5            MS. RASMUSSEN:  One minute, Your Honor.
6            MR. KENNEDY:  No objection, Your Honor.
7            MS. RASMUSSEN:  No objection from me either.
8            THE COURT:  Okay.  Be received.
9            (Plaintiff's Exhibits 9.10.700 through
10           9.10.777 were admitted into evidence.)
11           MR. DAMM:  Thank you, Your Honor.
12   BY MR. DAMM:
13       Q   Ms. Molesworth, taking a look at now 9.10.778
14   through -786, do you recognize these documents?
15       A   I recognize the documents, but I don't
16   remember the company name.
17       Q   Are the documents similar to the other
18   payroll documents that we've discussed?
19       A   Yes, they are.
20       Q   And do they bear the same format that the
21   other documents do?
22       A   Yes, they are.
23       Q   And are they dated at or about the same date
24   and time?
25       A   Yes.

Page 24

1        Q   And it's just the name of the company that
2    you don't particularly recognize?
3        A   I don't recognize it.
4        Q   But in all other respects, the documents
5    appear to be payroll documents?
6        A   Yes, they do.
7            MR. COHAN:  Your Honor, at this time I'd move
8    for the admission of 9.10.778 through -786.
9            MR. KENNEDY:  Your Honor, can I just ask some
10   brief questions?
11           THE COURT:  Yes.
12           VOIR DIRE EXAMINATION
13   BY MR. KENNEDY:
14       Q   Ma'am, looking at those documents, they look
15   like they come from the year of 1998?
16       A   Yeah.
17       Q   My understanding is that when you began
18   working for Mr. Robert Kahre, you began working as a
19   runner in the beginning; is that right?
20       A   Yeah.  That was '97.
21       Q   And then there was a period of time where you
22   did some work and you didn't move into the payroll
23   department until 1999?
24       A   I don't remember the exact date.
25       Q   Okay.  What I'm getting at is it looks like

Page 25

1    these documents may be from a time period where you
2    weren't working in the payroll department.  That may be
3    why you don't recognize them?
4        A   That's possible.
5        Q   Okay.  At that time, was Micki running the
6    payroll?
7        A   I think so.  I don't remember.  Again, it was
8    so long ago, I don't remember the exact dates.
9        Q   Okay.  And so, unlike the other documents
10   where you can look at them and remember working with
11   them in the payroll office, these are just documents
12   that appear to be before you began working?
13       A   I don't recognize the name.  That's --
14   everything else looks the same.
15       Q   Okay.
16           MR. KENNEDY:  I don't have any further
17   questions, Your Honor.
18           MR. DAMM:  Any objection, Mr. Kennedy?
19           MR. KENNEDY:  I think we have a lack of
20   foundation on these, your Honor.
21           MS. RASMUSSEN:  I object based on lack of
22   foundation and the fact that she doesn't recognize the
23   name of the company.
24           THE COURT:  The court grants the request.
25           You need to lay further foundation before the

Page 26

1    Court will admit them.
2            MR. DAMM:  No.  That's -- that's fine, Your
3    Honor.
4            DIRECT EXAMINATION (Continued)
5    BY MR. DAMM:
6        Q   Mr. Molesworth, can you take a look at
7    Government's Exhibit -- what's been marked 9.10.878
8    through -913.
9        A   -878, did you say?
10       Q   Actually, I think -- if we could back up, I
11   think I missed one.  9.10.787 through -877.  I'm sorry,
12   Ms. Molesworth.
13       A   Okay.
14       Q   Do you recognize these documents?
15       A   Yes, I do.
16       Q   And what do they represent?
17       A   Invoices to First Premier for payroll
18   services.
19       Q   And do you recognize this company?
20       A   Excuse me?
21       Q   Do you recognize this company?
22       A   Yes, I do.
23       Q   And were these payroll documents processed in
24   the same fashion as previously discussed?
25       A   Yes, they were.

Heidi Molesworth, 7-7-09

Page 27

1        MR. DAMM: Your Honor, at this time I'd move
2   for the admission of 9.10.787 through -877.
3        MR. KENNEDY: Your Honor, if we could just
4   have a few seconds so we can get through these hundred
5   pages?
6        THE COURT: Sure.
7        MR. KENNEDY: No objection, Your Honor.
8        THE COURT: Okay.
9        MS. RASMUSSEN: No objection.
10       (Plaintiff's Exhibits 9.10.787 through
11       9.10.877 were admitted into evidence.)
12  BY MR. DAMM:
13    Q   Ms. Molesworth, if we could take a look now
14  at 9.10.878 through -913.
15    A   Okay.
16    Q   Do you recognize these documents?
17    A   Yes, I do.
18    Q   And what do they represent?
19    A   Invoices to Leonard's Framing for payroll
20  services.
21    Q   And do you recognize the name of the company?
22    A   Yes, I do.
23    Q   And these were processed in the manner
24  previously discussed?
25    A   Yes, they were.

Page 28

1        MR. DAMM: Your Honor, at this time I'd move
2   for the admission of Government's Exhibit 9.10.878
3   through -913.
4        MR. KENNEDY: I don't think I have an
5   objection, Your Honor, to the group, but I have a
6   question about one of the documents in it.
7        THE COURT: Okay.
8             VOIR DIRE EXAMINATION
9   BY MR. KENNEDY:
10    Q   Would you please look at 9.10.910, and let me
11  ask you if this is a document that you used.
12    A   It was for -- I'm thinking. This particular
13  document -- I don't recognize it.
14    Q   Okay. So this would not be something that
15  you used in your work for Mr. Robert Kahre's companies?
16    A   If I did, I don't remember.
17    Q   Okay. The reason I ask is because it's
18  somewhat hard to tell from the document what it relates
19  to. Is that a fair statement?
20    A   Yeah.
21       MR. KENNEDY: Your Honor, I have no
22  objection, but I think 9.10.910 should be removed.
23       MR. DAMM: We'd be pleased to do so, Your
24  Honor.
25       THE COURT: All right. So it will be

Page 29

1   received. Ms. Rasmussen?
2        MS. RASMUSSEN: No objection.
3        THE COURT: All right. It will be received
4   with the exception noted.
5        (Plaintiff's Exhibits 9.10.878 through
6        9.10.909 and 9.10.911 through 9.10.913
7        were admitted into evidence.)
8   BY MR. DAMM:
9     Q   Ms. Molesworth, if we could have you take a
10  look now at 9.10.914 through -928. I think I need to
11  get a new binder for you.
12    A   Yes, you do. What were the page numbers
13  again?
14    Q   Let's see. I believe we're at 9.10.914
15  through -928.
16    A   Okay.
17    Q   Do you recognize those documents?
18    A   Yes, I do.
19    Q   And how do you recognize them?
20    A   They're invoices to Lunas Wooden Pallets for
21  payroll services.
22    Q   And what do they represent? Are these
23  payroll documents?
24    A   Yes.
25    Q   And you recognize the name of the company?

Page 30

1     A   Yes, I do.
2     Q   And they were processed in the same manner as
3   previously discussed?
4     A   Yes.
5        MR. DAMM: Your Honor, at this time I'd move
6   for the admission of 9.10.914 through -928.
7        MS. RASMUSSEN: I'm sorry. I didn't catch
8   the name of the company.
9   BY MR. DAMM:
10    Q   Can you tell us the name of the company
11  again, Ms. Molesworth?
12    A   Yes. Lunas Wood Pallets.
13    Q   That's Lunas, L-U-N-A-S?
14    A   Yes.
15       MS. RASMUSSEN: No objection.
16       MR. KENNEDY: No objection, Your Honor.
17       THE COURT: Be received.
18       (Plaintiff's Exhibits 9.10.914 through
19       9.10.928 were admitted into evidence.)
20  BY MR. DAMM:
21    Q   And, Ms. Molesworth, if you could take a look
22  at 9.10.929 through -1017.
23    A   Okay.
24    Q   Do you recognize these documents?
25    A   Yes, I do.

Heidi Molesworth, 7-7-09

Page 31

1    Q   And what do they represent?
2    A   **Billing to Mitchell Framing for payroll**
3    **services.**
4    Q   And do you recognize the company name?
5    A   **Yes, I do.**
6    Q   And they were processed in the same manner as
7    previously discussed?
8    A   **Yes, they were.**
9        MR. DAMM:  Your Honor, at this time I'd move
10   for the admission of 9.10.929 through -1017.
11       MS. RASMUSSEN:  May we have just a moment,
12   please?
13       THE COURT:  (No response.)
14       (Pause in proceedings.)
15       MR. KENNEDY:  No objection, Your Honor.
16       MS. RASMUSSEN:  No objection.
17       THE COURT:  Be received.
18       (Plaintiff's Exhibits 9.10.929 through
19       9.10.1017 were admitted into evidence.)
20   BY MR. DAMM:
21   Q   Ms. Molesworth, if you could take a look now
22   at what's been marked as Government's Exhibit 9.10.1018
23   through -1030.
24   A   **Okay.**
25   Q   Do you recognize those documents?

Page 32

1    A   **Yes, I do.**
2    Q   And what do they represent?
3    A   **Billing for payroll services to Nava Framing.**
4    Q   And do you recognize the company name?
5    A   **Yes, I do.**
6        MR. DAMM:  Your Honor, at this time I'd move
7    for the admission of Government's 9.10.1018 through
8    -1030.
9        MR. KENNEDY:  Your Honor, I just have a
10   question about one document.
11       THE COURT:  All right.
12       VOIR DIRE EXAMINATION
13   BY MR. KENNEDY:
14   Q   Ms. Molesworth, would you take a look at
15   9.10.1030, right at the end there.
16   A   **Yes.  I see it.**
17   Q   Do you recognize that document?
18   A   **Yes, I do.**
19   Q   Okay.  And it looks to me to be a labor
20   release.  Do you see that?
21   A   **Yes, I do.**
22   Q   Okay.  And that was a document that was used?
23   A   **Yes.**
24   Q   Okay.  And the general contractor's Union
25   Pacific Construction?

Page 33

1    A   **Yes.**
2    Q   All right.  And so in relation to what we've
3    been looking at, I take it Nava was a subcontractor?
4    A   **Yes.**
5        MR. KENNEDY:  Then I have no objection to
6    1030, Your Honor.
7        THE COURT:  All right.
8        MR. KENNEDY:  Nor any of the other documents.
9        THE COURT:  Be received.
10       MS. RASMUSSEN:  No objection.
11       (Plaintiff's Exhibits 9.10.1018 through
12       9.10.1030 were admitted into evidence.)
13       DIRECT EXAMINATION (Continued)
14   BY MR. DAMM:
15   Q   Ms. Molesworth, asking you to take a look now
16   at 9.10.1031 through -1041.  Can you let me if you
17   recognize these exhibits?
18   A   **Yes, I do.  They're invoices to NorPak**
19   **Construction for payroll services.**
20   Q   And do you recognize the company name?
21   A   **Yes, I do.  It's NorPak.**
22   Q   And they were prepared in the same manner as
23   previously discussed?
24   A   **Yes.**
25       MR. DAMM:  Your Honor, I'd move for the

Page 34

1    admission now of 9.10.1031 through -1041.
2        MR. KENNEDY:  Your Honor, just a couple of
3    questions about three of the documents in here.
4        VOIR DIRE EXAMINATION
5    BY MR. KENNEDY:
6    Q   Ms. Molesworth, if you could turn to
7    9.10.1038 --
8    A   **Okay.**
9    Q   -- -1039, and -1040.  Do you recognize those
10   three documents?
11   A   **Just like the other one, I don't recognize**
12   **it.**
13   Q   Okay.  And so this doesn't appear to be a
14   document that you used in the process with the 35
15   companies that we've been going through?
16   A   **Not that I remember.**
17   Q   Okay.  Is there anything about the document
18   that would relate to your work that you've been
19   describing to the ladies and gentlemen of the jury?
20   A   **It looks like sign-off sheets for a safety**
21   **meeting.**
22   Q   Yeah.  It looks like they're a program that
23   was put on by this company for some training, safety
24   meeting?
25   A   **I couldn't — I couldn't say one way or the**

Heidi Molesworth, 7-7-09

Page 35

1   other. I don't know.
2       Q   Okay. Would there be any reason that you
3   would have this in your role that you've been
4   describing?
5       A   I don't know.
6       Q   Okay. Well, if --
7           MR. KENNEDY: Your Honor, with that, I
8   would -- no objection, except these three documents I
9   think should be removed.
10          MS. RASMUSSEN: Your Honor, no objection to
11  -1031 through -1037 and then -1041.
12          MR. DAMM: Your Honor, that would be fine.
13  We'd withdraw -1038 through --
14          THE COURT: All right. Be received with that
15  exception.
16          MR. DAMM: -- through -1040.
17          (Plaintiff's Exhibits 9.10.1031 through
18          9.10.1037 and 9.10.1041 were admitted
19          into evidence.)
20          MR. DAMM: Your Honor, just for the Court's
21  information and the jury, we have, by my count, I think
22  14 more companies to go through. I'm sorry for the
23  somewhat tedious nature of this, but we're getting
24  there.
25          A JUROR: Could we take a brief break please?

Page 36

1           THE COURT: I'm sorry?
2           MR. KENNEDY: I believe he asked for a brief
3   break, Your Honor.
4           A JUROR: I apologize.
5           THE COURT: All right. Take about a
6   five-minute recess.
7           MR. DAMM: Thank you, Your Honor.
8           (Recess taken.)
9           THE COURT: You may proceed. The Court would
10  note the presence of the jurors.
11          MR. DAMM: Thank you, Your Honor.
12  BY MR. DAMM:
13      Q   Ms. Molesworth, continuing on, can we take a
14  look at 9.10.1042 through -1106.
15      A   Okay.
16      Q   Do you recognize those documents?
17      A   Yes, I do.
18      Q   And what do they represent?
19      A   They're invoicing to Olympic Framing for
20  payroll services.
21      Q   And were they prepared in the same manner as
22  previously discussed?
23      A   Yes.
24          MR. DAMM: Your Honor, at this time I'd move
25  for the admission of Government's Exhibit 9.10.1042

Page 37

1   through -1106.
2           MR. KENNEDY: No objection, Your Honor.
3           MS. RASMUSSEN: No objection.
4           THE COURT: Be received.
5           (Plaintiff's Exhibits 9.10.1042 through
6           9.10.1106 were admitted into evidence.)
7   BY MR. DAMM:
8       Q   And, Ms. Molesworth, taking a look now at
9   9.10.1107 through -1134.
10      A   Okay.
11      Q   Do you recognize these documents?
12      A   Yes, I do. They're invoices to PatchCo for
13  payroll services.
14      Q   And prepared in the same fashion?
15      A   Yes.
16          MR. DAMM: Your Honor, I'd move for the
17  admission of 9.10.1107 through -1134.
18          MR. KENNEDY: No objection, Your Honor.
19          MS. RASMUSSEN: No objection.
20          THE COURT: Be received.
21          (Plaintiff's Exhibits 9.10.1107 through
22          9.10.1134 was admitted into evidence.)
23  BY MR. DAMM:
24      Q   Ms. Molesworth, will you take a look at
25  9.10.1135 through -1144.

Page 38

1       A   Okay.
2       Q   Do you recognize these documents?
3       A   Yes, I do.
4       Q   And what company do they relate to?
5       A   Point Blank Framing.
6       Q   And what type of documents are they?
7       A   Invoices to Point Blank Framing for payroll
8   services.
9       Q   And prepared in the same manner as previously
10  discussed?
11      A   Yes.
12          MR. DAMM: Your Honor, at this time I'd move
13  for the admission of Government's Exhibit 9.10.1135
14  through -1144.
15          MR. KENNEDY: Your Honor, I just have one
16  question about one of the documents.
17          THE COURT: Yes.
18          VOIR DIRE EXAMINATION
19  BY MR. KENNEDY:
20      Q   Ms. Molesworth, if you could look at
21  9.10.1142, please.
22      A   Okay.
23      Q   Now, is this a document that you used in your
24  work with Mr. Kahre?
25      A   No.

Heidi Molesworth, 7-7-09

Page 39

1    Q   Okay. Do you recognize -- I take it that
2    the -- were you aware that part of the -- do you
3    recognize the name Union Pacific?
4    A   Yes, I do.
5    Q   Okay. Were you aware that part of the
6    process was that these workers would be independent
7    contractors, like you?
8    A   Yes.
9    Q   All right. And so part of this is supplying
10   the -- the letterhead to keep track of the labor pool?
11   A   Yeah.
12   Q   And so I take it that these amounts and the
13   Social Securities and the names on here were names and
14   amounts that you used in your work with Mr. Kahre?
15   A   **The names and the amounts. Mr. Kahre didn't**
16   **use Social Security numbers.**
17   Q   Okay. And -- but here, at least with respect
18   to this company, it's provided by this company?
19   A   **That would have to have come from Point Blank**
20   **Framing.**
21   Q   Okay. So in -- 9.10.1142 is coming from
22   Point Blank Framing?
23   A   Yes.
24   Q   And they're using, it looks like, a Union
25   Pacific document to submit the information as part of

Page 40

1    the service?
2    A   Yes.
3        MR. KENNEDY: All right. With that
4    understanding, Your Honor, I have no objection.
5        MS. RASMUSSEN: No objection.
6        THE COURT: Be received.
7        (Plaintiff's Exhibits 9.10.1135 through
8        9.10.1144 were admitted into evidence.)
9        DIRECT EXAMINATION (Continued)
10   BY MR. DAMM:
11   Q   Ms. Molesworth, I'd like you to take a look
12   now, if you would, at 9.10.1145 through -1156.
13   A   Okay.
14   Q   Do you recognize these documents?
15   A   Yes, I do.
16   Q   And what do they represent?
17   A   **They're invoices to R.J. Framing for payroll**
18   **services.**
19   Q   And prepared in the same manner as the other
20   documents?
21   A   Yes.
22       MR. DAMM: Your Honor, at this time I'd move
23   for the admission of 9.10.1145 through -1156.
24       MR. KENNEDY: No objection, Your Honor.
25       MS. RASMUSSEN: No objection.

Page 41

1        THE COURT: Be received.
2        (Plaintiff's Exhibits 9.10.1145 through
3        9.10.1156 were admitted into evidence.)
4    BY MR. DAMM:
5    Q   And if you could take a look now,
6    Ms. Molesworth, at 9.10.1157 through -1179.
7    A   Okay.
8    Q   Do you recognize these documents?
9    A   Yes, I do.
10   Q   And what do they represent?
11   A   **Invoices to Robert Dillon Framing for payroll**
12   **services.**
13   Q   And prepared in the same fashion?
14   A   Yes.
15       MR. DAMM: Your Honor, at this time I'd move
16   for the admission of 9.10.1157 through -1179.
17       MR. KENNEDY: No objection, Your Honor.
18       MS. RASMUSSEN: No objection.
19       THE COURT: Be received.
20       (Plaintiff's Exhibits 9.10.1157 through
21       9.10.1179 were admitted into evidence.)
22   BY MR. DAMM:
23   Q   Ms. Molesworth, looking at 9.10.1180 through
24   -1226, do you recognize these documents?
25   A   Yes, I do.

Page 42

1    Q   How do you recognize them?
2    A   **They're invoices to R.W. Stucco for payroll**
3    **services.**
4    Q   Prepared in the same manner as previously
5    discussed?
6    A   Yes.
7        MR. DAMM: Your Honor, I'd move for the
8    admission of 9.10.1180 through -1226.
9        MR. KENNEDY: One moment, Your Honor. I
10   don't believe I have an objection to these. No
11   objection, Your Honor.
12       MS. RASMUSSEN: No objection.
13       THE COURT: Okay.
14       (Plaintiff's Exhibits 9.10.1180 through
15       9.10.1226 were admitted into evidence.)
16   BY MR. DAMM:
17   Q   Ms. Molesworth, looking now at 9.10.1227
18   through -1282, do you recognize these documents?
19   A   Yes, I do.
20   Q   How do you recognize them?
21   A   **Invoices to Silver State Glass & Mirror for**
22   **payroll services.**
23   Q   And prepared in the same fashion as the other
24   companies?
25   A   Yes.

Heidi Molesworth, 7-7-09

Page 43

1        MR. DAMM: Your Honor, at this time I'd move
2    for the admission of 9.10.1227 through -1282.
3        MR. KENNEDY: No objection, Your Honor.
4        MS. RASMUSSEN: No objection.
5    BY MR. DAMM:
6    Q   Ms. Molesworth, looking now --
7        THE COURT: All right. They'll be received.
8        (Plaintiff's Exhibits 9.10.1227 through
9         9.10.1282 were admitted into evidence.)
10       MR. DAMM: Sorry, Your Honor.
11       THE COURT: That's okay.
12   BY MR. DAMM:
13   Q   Ms. Molesworth, looking now at 9.10.1283
14   through -1290, do you recognize these documents?
15   A   Yes, I do.
16   Q   And what do they represent?
17   A   Invoices to Summit for payroll services.
18   Q   And prepared as the other companies'
19   documents?
20   A   Yes.
21       MR. DAMM: Your Honor, at this time I'd move
22   for the admission of 9.10.1283 through -1290.
23       MR. KENNEDY: No objection, Your Honor.
24       MS. RASMUSSEN: No objection.
25       THE COURT: Be received.

Page 44

1        (Plaintiff's Exhibits 9.10.1283 through
2         9.10.1290 were admitted into evidence.)
3    BY MR. DAMM:
4    Q   Ms. Molesworth, look now at 9.10.1291 through
5    -1317.
6    A   Okay.
7    Q   Do you recognize these documents?
8    A   Yes, I do.
9    Q   And are they payroll documents?
10   A   They're invoices to T. Barras Framing for
11   payroll services.
12   Q   And prepared as previously discussed?
13   A   Yes.
14       MR. DAMM: Your Honor, I'd move for the
15   admission of 9.10.1291 through -1317.
16       MR. KENNEDY: Your Honor, I just have a
17   question about one of the documents.
18            VOIR DIRE EXAMINATION
19   BY MR. DAMM:
20   Q   Ms. Molesworth, if you could look at
21   9.10.1292, please.
22   A   Okay.
23   Q   Do you recognize that document as one of the
24   documents you used in your work?
25   A   Yeah.

Page 45

1    Q   Do you recognize the name Ishmael Currio?
2    A   Yes, I do.
3    Q   Do you recognize him as someone who worked
4    for Mr. Robert Kahre?
5    A   Yes, I do.
6    Q   Okay. And he also was working for T. Barras
7    Framing Company as well?
8    A   Yes.
9    Q   And he worked for some of these other
10   businesses at that time?
11   A   I believe so, yeah.
12   Q   First Premier?
13   A   I don't remember right off exactly who.
14   Q   Okay. And they're listing his -- his name
15   was -- do you recognize him as a crew leader who would
16   have come in and picked up for his crew?
17   A   He was a supervisor, so yeah.
18   Q   Okay. And he's also over at T. Barras
19   Framing Company, Inc., by 9.10.1292?
20   A   That sounds about right.
21   Q   Looking at this document?
22   A   Yeah.
23   Q   Okay.
24       MR. KENNEDY: Okay. With that, Your Honor, I
25   have no objection.

Page 46

1        MS. RASMUSSEN: No objection.
2        THE COURT: Be received.
3        (Plaintiff's Exhibits 9.10.1291 through
4         9.10.1317 were admitted into evidence.)
5        MR. DAMM: Thank you, Your Honor.
6        DIRECT EXAMINATION (Continued)
7    BY MR. DAMM:
8    Q   Ms. Molesworth, looking at Exhibit 9.10.1318
9    through -1366, can you tell me if you recognize this
10   document?
11   A   Yes, I do. It's to T & F Marble for payroll
12   services.
13   Q   And prepared as the other documents that
14   we've discussed?
15   A   Yes.
16       MR. DAMM: Your Honor, at this time I'd move
17   for the admission of 9.10.1318 through -1366.
18       MR. KENNEDY: Your Honor, if I can just have
19   a moment, I can get through them pretty quickly.
20       THE COURT: Yeah.
21       MR. KENNEDY: No objection Your Honor.
22       MS. RASMUSSEN: No objection.
23       THE COURT: All right. Be received.
24       (Plaintiff's Exhibits 9.10.1318 through
25        9.10.1366 were admitted into evidence.)

Heidi Molesworth, 7-7-09

Page 47

1    BY MR. DAMM:
2        Q    Just a few more, Ms. Molesworth. Looking at
3    9.10.1367 through -1402, do you recognize that
4    document --
5        A    Yes, I do.
6        Q    -- or these documents?
7            And can you tell me what they represent?
8        A    They're invoices to Torro Concrete for
9    payroll services.
10       Q    And prepared in a similar fashion as the
11   other companies' documents?
12       A    Yes.
13           MR. DAMM: Your Honor, at this time I'd move
14   for the admission of 9.10.1367 through -1402.
15           MR. KENNEDY: No objection, Your Honor.
16           MS. RASMUSSEN: No objection.
17           THE COURT: Be received.
18           (Plaintiff's Exhibits 9.10.1367 through
19           9.10.1402 were admitted into evidence.)
20   BY MR. DAMM:
21       Q    And, Ms. Molesworth, asking you to take a
22   look at now 9.10.1403 through -1420. Let me ask you if
23   you recognize these documents.
24       A    The document's familiar but the name's not.
25       Q    You don't recall West Coast Framing?

Page 48

1        A    It's familiar, but I don't remember working
2    with them. Which does — I — it could have been Lori
3    or Danielle Alires who worked with this one.
4        Q    Otherwise, do the documents look familiar to
5    you?
6        A    Absolutely.
7        Q    And do you recall ever handing out payroll to
8    anyone from West Coast Framing?
9        A    No, I don't.
10       Q    Can you take a look at 9.10.1421 through
11   -1434. Do you recognize these documents?
12       A    Yes, I do. They're invoices to Whitey Bill
13   Concrete for payroll services.
14       Q    And were they prepared in the same fashion as
15   previously discussed?
16       A    Yes.
17           MR. DAMM: Your Honor, at this time I'd move
18   for the admission of 9.10.1421 through -1434.
19           MR. KENNEDY: No objection, Your Honor.
20           MS. RASMUSSEN: No objection.
21           THE COURT: Be received.
22           (Plaintiff's Exhibits 9.10.1421 through
23           9.10.1434 were admitted into evidence.)
24           MR. DAMM: May I have the court's indulgence
25   to confer with Mr. Kennedy for just a moment?

Page 49

1            THE COURT: Sure.
2            MR. DAMM: Your Honor, counsel has indicated
3    that they would object to West Coast Framing documents,
4    so I will not be offering those.
5            THE COURT: All right. Then they'll be
6    received with the exception of that.
7    BY MR. DAMM:
8        Q    And, let's see, just two more,
9    Ms. Molesworth. I'm sorry. 9.10.1435 through -1442.
10       A    They're more invoicing for NorPak
11   Construction.
12       Q    And do you recognize these, as you've
13   previously testified?
14       A    Yes, I do, except for the request for
15   liability and workman's comp insurance.
16       Q    And can you tell us what page that --
17       A    9.010.1442.
18       Q    Do you recognize the handwriting on
19   Page -1442?
20       A    Yes, I do.
21       Q    Who's handwriting is it?
22       A    It's Lori Kahre's.
23       Q    Otherwise, the documents represent payroll
24   documents prepared as previously discussed?
25       A    Yes.

Page 50

1            MR. DAMM: Your Honor, at this time I'd move
2    for the admission of Government's Exhibit 9.10.1435
3    through -1441.
4            MR. KENNEDY: No objection, your Honor. I
5    also don't have an objection to -1442, if counsel wants
6    to offer it.
7            MR. DAMM: Very well. We can include -1442.
8            MS. RASMUSSEN: I have no objection to that
9    proposal.
10           THE COURT: All right. They'll be received.
11           (Plaintiff's Exhibits 9.10.1435 through
12           9.10.1442 were admitted into evidence.)
13           MR. DAMM: If I might have the Court's
14   indulgence to shift binders?
15           THE COURT: Yes.
16   BY MR. DAMM:
17       Q    Ms. Molesworth, I'm asking you now to take a
18   look at Government's Exhibit 96.1.1 through -1258. I
19   know these are a lot of documents, but have you had a
20   chance to look at these documents previously?
21       A    I believe so, yes. I'm sorry. Yes, I have.
22       Q    And can you tell me what they represent?
23       A    Invoices to First Premier for payroll
24   services.
25       Q    And were they prepared in the manner that

Heidi Molesworth, 7-7-09

Page 51

1  you've previously discussed?
2      A   Yes.
3      MR. DAMM:  Your Honor, at this time I'd move
4  for the admission of 96.1.1 through Page -1258, and I
5  know Mr. Kennedy indicated he may need some time to
6  take a look at these.
7      MR. KENNEDY:  Yes.
8      THE COURT:  All right.
9      MR. KENNEDY:  These I didn't know about.
10     THE COURT:  We have a good chunk of documents
11  here, and rather than have you sit here, we're going to
12  take about a 15-minute recess to let Ms. Rasmussen and
13  Mr. Kennedy have the opportunity with their clients to
14  go over these documents.  Hopefully that will speed
15  things up if we don't do it document by document, which
16  will take us the rest of the day.  So hopefully it will
17  be 15, 20 minutes.  Okay?
18     Court stands in recess.
19     (Recess taken.)
20     (Jurors not present.)
21     THE COURT:  Where are we?
22     MR. KENNEDY:  Well, I'm at -- I've looked
23  through the 1,258 documents.  I've got a list of ones I
24  think we'll pull out based on the earlier conversation.
25  But Ms. Rasmussen and Mr. Cohan are still looking at

Page 52

1  others, but I've completed my task.
2      MS. RASMUSSEN:  Well, Your Honor, I'm not
3  doing so well.  I have -- I'm only on Page 216 out of
4  1,200, and I -- I hesitate to tell you -- I mean --
5      THE COURT:  I need -- I need to emphasize
6  something here.  I -- I don't know what caused this,
7  but it's totally and absolutely unacceptable.
8      MR. DAMM:  Your Honor, if I might explain to
9  the Court, these documents are simply a sample set of
10  the documents included in our 1006 summary that we gave
11  the defendants notice of a year or more ago.  These
12  documents should not come as any surprise to them,
13  whatsoever.
14     THE COURT:  Yeah.  What I'm -- what I'm
15  having a difficult time understanding is why we're
16  going through this exercise here, taking up valuable
17  trial time, inconveniencing the jury.  This is just not
18  acceptable.
19     MS. RASMUSSEN:  Is Your Honor upset with me?
20     THE COURT:  I don't know who to be upset
21  with.  I can assure you that I'm upset.
22     MR. KENNEDY:  Your Honor, here's -- here's
23  the answer -- and I agree with the Court.  What I did
24  is I looked at the minutes from the last trial.  I
25  tried to go through the thousands of documents prior to

Page 53

1  today.  I don't recall these being introduced or on the
2  minutes at all.  I didn't look at the 1,200.  The
3  summary that Mr. Damm referred to -- we don't have a
4  draft of the summary yet for the summary witnesses next
5  week, so --
6      THE COURT:  Ms. Rasmussen, would you stop
7  that for a minute, please, so I can hear Mr. Kennedy.
8      MR. KENNEDY:  I apologize, Your Honor.  I
9  wanted to look at the 1,258.  I've identified one, two,
10  three, four, five, six, seven, eight, nine -- at least
11  ten of them that, based on this morning, earlier
12  rulings should come out.  But Ms. Rasmussen needs more
13  time.  These are invoices.  Plus, there's
14  correspondence and other things in here that require
15  more time for counsel to look at.  Had I -- you know, I
16  didn't have a list that said we're going to introduce
17  these exhibits through Ms. Molesworth, so what I did on
18  my own is look at the minutes of the prior proceeding.
19  And I could see that we went through the 9.10 series,
20  so I tried to familiarize with those.  Obviously I was
21  looking at 150 pages pretty quickly over there to make
22  certain I hadn't missed anything, Your Honor, and then
23  asked various questions.  So I tried to come prepared
24  for what I anticipated would be coming into evidence.
25     The Court had instructed earlier that exhibit

Page 54

1  numbers for prospective witness be identified.  I
2  didn't get anything that said this 96 series, which is
3  1,200 documents, would be here today.  If I had, I
4  would have looked at them because I, too, appreciate
5  the jury being here, and I'd rather be in trial than
6  looking at 1,200 documents on my screen.
7      Thank you, Your Honor.
8      MS. RASMUSSEN:  May I be heard, or are you
9  upset with me?
10     THE COURT:  Ms. Rasmussen, I don't know who
11  to be upset with.
12     MS. RASMUSSEN:  Okay.
13     THE COURT:  I'm upset with the process.  I'm
14  upset with the fact that I am waiting here, and I'm
15  upset with the fact that that box is empty; we don't
16  have any jurors sitting in it.  I'm upset with the fact
17  that this is not the first time this has happened in
18  this case.
19     I was an experienced trial lawyer.  I
20  understood that when I came into Federal court, I
21  had -- and I'm not pointing the finger at you,
22  Ms. Rasmussen; I'm talking about this to all of the
23  lawyers, collectively -- I had to have my matters ready
24  to go or else the judge would just say, "You're not
25  ready to go?  Too bad.  We're moving forward," period.

Heidi Molesworth, 7-7-09

Page 55

1    I've tried to be as understanding as I
2    possibly can, but there's an end to patience, and my
3    patience with regard to this kind of thing have run
4    out. So the lawyers are on notice. This kind of
5    thing, where we are waiting and waiting and waiting, is
6    simply not going to be tolerated again. I will -- this
7    time I'm not going to pursue it. I'm not pointing the
8    finger at anybody. Next time I will, and if it's the
9    Government's fault, they will forfeit the opportunity
10   to introduce the documents. If it's the defense fault,
11   they will forfeit the opportunity to object. We're not
12   going to have this again -- ever again in this trial.
13   Yes, Mr. Kennedy?
14   MR. KENNEDY: Before Ms. Rasmussen --
15   MS. RASMUSSEN: I am waiting to speak, and I
16   have come up to the podium, and I'm tired of waiting to
17   speak.
18   THE COURT: Don't raise --
19   MR. KENNEDY: I'll address my comments after
20   she's done.
21   MS. RASMUSSEN: Go ahead, Mr. Kennedy.
22   MR. KENNEDY: I'm just responding to the
23   Court, ma'am. I apologize if I --
24   MS. RASMUSSEN: I would like to address the
25   Court when it's time.

Page 56

1    THE COURT: Ms. Rasmussen -- Ms. Rasmussen,
2    you are an officer of the Court, and you're a
3    professional. Do not raise your voice in the court.
4    MS. PANAGAKOS: I have asked politely. May I
5    address the Court?
6    THE COURT: I told you I wasn't pointing the
7    finger at anyone.
8    MS. PANAGAKOS: I have things I'd like to
9    say. Thank you. When it's time, you let me know.
10   When Mr. Kennedy is done talking, let me know.
11   THE COURT: All right, Ms. Rasmussen.
12   MS. RASMUSSEN: May I speak?
13   THE COURT: You may say what you'd like to
14   say.
15   MS. RASMUSSEN: There's about -- I'm on
16   Page 215, and this is Page 215. I see -- I can see --
17   as you can tell, you cannot read the document. There's
18   at least 40 of these that I've identified on Pages 1
19   through 215.
20   THE COURT: Wait a minute. Let me ask you
21   this question: When were these turned over to you?
22   MS. RASMUSSEN: Your Honor, we've had --
23   THE COURT: No. Just answer that question.
24   MS. RASMUSSEN: We've had these documents for
25   years. Why would the Government seek to introduce a

Page 57

1    piece of paper that you cannot read? What potential
2    evidentiary value is this?
3    THE COURT: Maybe -- maybe the document is
4    the best evidence they have.
5    MS. RASMUSSEN: They didn't tell us that they
6    were going to introduce this set of blank documents --
7    it's interspersed with blank documents today, so I am
8    sitting here at this table going through documents that
9    have absolutely nothing on them. Now, if Mr. Kennedy
10   wants to stipulate to documents that have nothing on
11   them, that's fine. But I can see that this has no
12   evidentiary value to this trial, this jury, or the
13   issues at -- that we're presented with in this case.
14   Why would I stipulate to a blank piece of
15   paper that is completely illegible? And there's, like
16   I said, 30 or 40 of these on Pages 1 through 215. So
17   if you are irritated with me for some reason that I'm
18   having to sit here and go through this ridiculous
19   exercise, I apologize.
20   THE COURT: Ms. Rasmussen, I didn't say I was
21   irritated with you. I said I wasn't pointing the
22   finger at anybody. Did you hear me say I was unhappy
23   with you? I said I was unhappy with the process.
24   My job is to move this case along as quickly
25   as is possible, giving everyone an ample and

Page 58

1    appropriate time to be ready. An ample and appropriate
2    time does not mean that we come in here and then we
3    have to break for 45 minutes or an hour in the middle
4    of a witness's testimony so that counsel can review
5    documents that they've had for a year. Now, I, from my
6    own experience as a trial lawyer and my own experience
7    as a judge, understand that in Federal court, that's
8    not acceptable.
9    Now, whose fault it is, I don't know. And
10   quite frankly, today -- for today's purposes, I do not
11   care. I'm just telling counsel from both sides that
12   this is an unacceptable practice. It is not the first
13   time it's happened here. I haven't raised my voice. I
14   haven't pointed the finger at anybody. I'm just saying
15   that it's not going to happen again; because if it does
16   happen again, I will inquire, I will make a
17   determination as to who's responsibility it was, and I
18   will take decisive action in accordance with my
19   responsibility to move the case forward.
20   I am not going to have the jury cooling their
21   heels back in the jury lounge for an hour to an hour
22   and a half while counsel looks over documents. It's
23   not acceptable, it's neither appropriate, nor is it
24   right. And from my many years of sitting my
25   designation on the Court of Appeals, this is not the

Page 59

1    first time I've seen this, either as a trial judge or
2    as an appellate judge. And I can tell you I've never
3    seen one circumstance ever where a judge under the
4    facts of this case, what we've had going on here, has
5    ever been reversed for taking the kind of action that's
6    appropriate under circumstances such as this.
7        I have bent over backwards here not to
8    penalize anybody in spite of the fact that we've had
9    repeated instances of this. But now we're getting down
10   to a point where it could impact the integrity of the
11   trial. I do not want the jurors to become so disgusted
12   and unhappy that they lose sight of their
13   responsibilities. That is an over-arching
14   responsibility I have.
15       So I'm not pointing the finger at you. And
16   why you take this personally, I don't know.
17       MS. RASMUSSEN: Well, Your Honor, the minute
18   I start trying to introduce blank illegible documents,
19   I think you should be quite angry with me.
20       THE COURT: Well, Ms. Rasmussen, look, I -- I
21   could read some material on there, and the witness
22   might be able to identify it. I don't know. All I
23   know is that if there were illegible documents, either
24   that you believe should not be introduced, that could
25   have been brought to the Court's attention much earlier

Page 60

1    by way of a motion in limine or the Government could
2    have identified those documents much earlier. I don't
3    know which, but I'm not going to get into it.
4        MS. RASMUSSEN: I'm not trying to introduce
5    blank documents. It's the Government's responsibility
6    not to introduce them.
7        THE COURT: I'm not interested today in
8    getting into a blame game. Do you understand?
9        MS. RASMUSSEN: Yes.
10       THE COURT: That is not why I'm saying this
11   to you. I'm not pointing the finger at you or
12   Mr. Kennedy or Mr. Cohan or Mr. Damm. I am just saying
13   that the process is unacceptable. And I can assure
14   you, Ms. Rasmussen, if someday you happen to sit at a
15   bench like this with robes on and somebody says to you
16   in the middle of a trial that's been going on for five
17   or six weeks, "Oh, Judge, these are documents that were
18   turned over to the defense a year ago" -- and I'm not
19   using that to put the blame on the defense, because
20   there's going to be reasons why it's the Government's
21   fault -- "and we're going to take an hour and a half in
22   the middle of the trial so that counsel can look over
23   these documents to determine whether we have any
24   objections to them," you are not going to be a happy
25   judge.

Page 61

1        MS. RASMUSSEN: Well, Your Honor, turning
2    documents over to us is one thing. Trying to admit
3    blank documents in trial is entirely different. Why
4    would I file a motion in limine? I would presume
5    counsel would have the common sense not to try to admit
6    documents you can't read or blank documents.
7        THE COURT: In a document production of
8    hundreds of documents, there may be a few that are
9    less -- less legible than other documents. Okay? And
10   maybe it was missed. I have no idea. Or maybe that is
11   the best copy they could procure from the source and
12   they intend to ask the witness if the witness can
13   identify what it is. I mean, I've had cases where
14   illegible documents or seemingly illegible documents
15   had a value as evidence simply for that reason.
16       So I -- I don't know, and I'm not taking your
17   side. I'm not taking their side. I'm not taking
18   anybody's side. I'm not sanctioning anybody. I'm not
19   moving off of this. I'm going to allow counsel the
20   opportunity to go forward and to review them so that
21   you can make whatever objections you need to make. All
22   I'm saying is this process should not have happened.
23   And anybody who suggests that a Federal trial that's
24   been going on for six weeks with these kinds of issues,
25   that is a retrial on top of that, should have these

Page 62

1    kinds of -- of breaks for lawyers to review documents
2    in the middle of the trial, holding up witnesses, is in
3    a totally different universe than I practiced for the
4    last 40 years, because it isn't the universe I've been
5    in.
6        So that's all I'm saying. We need to step up
7    to the plate and buck up when it comes to these
8    documents, because next time this happens I am going to
9    inquire, and I'm going to take appropriate action,
10   whether it be against the Government or against the
11   defense. Whoever it is that's responsible for not
12   being diligent is going to lose the opportunity to
13   introduce that evidence.
14       We have an interesting circuit here. When it
15   comes to these kinds of things, they say the judge has
16   to warn counsel. I've done it before. I'm doing it
17   now, big time, on the record. So the next time,
18   counsel on all sides have been officially warned on the
19   record. Now when I take action, it will stay stuck.
20       So that's all I'm saying. And you happen to
21   be the one who decided to come to the podium, so you're
22   the one I'm speaking to, but I'm not really speaking to
23   you. I'm speaking to all counsel, Government and the
24   defense. I'm just warning counsel. And I'm telling
25   you -- and I'm looking now at the Government -- you

Heidi Molesworth, 7-7-09

Page 63

1 have about a week to go or so I suspect, and you have
2 some more documents. You make sure they know ahead of
3 time what is going to be introduced so that you can
4 stand up as an officer of the court if this happens
5 again and say, "Judge, here is what we told them we
6 were going to introduce."
7 And I'm talking to the defense now. If they
8 tell you that, and you sit on your hands and you pop up
9 at trial, you know, like who knows from behind the
10 bushes and say, "Oh, Judge, Judge, I was so busy last
11 night, I didn't get a chance to look." That excuse is
12 not going to fly.
13 So both sides have ample warning. Take it or
14 leave it at your own peril. Okay?
15 MS. RASMUSSEN: Your Honor, I do have one
16 helpful suggestion, and that is I think if I can
17 quickly just voir dire the witness on some basic
18 questions, like dates that she would have knowledge of
19 documents, that may cut out a lot of the individual
20 objections that I would have to some of them.
21 THE COURT: I don't think you need to voir
22 dire the witness.
23 MS. RASMUSSEN: Okay.
24 THE COURT: Why don't you get -- just listen
25 to me.

Page 64

1 MS. RASMUSSEN: I was just trying to be
2 helpful.
3 THE COURT: No. Listen to me, Ms. Rasmussen,
4 Okay? Please just listen for a minute. I hope that we
5 haven't degenerated to the point where we can't do
6 things informally. In fact, we have a process in
7 Federal courts called "meet and confer." You know
8 about all of that because you've practiced it, I'm
9 sure, because it's in the rules. I want you to meet,
10 you and Mr. Kennedy, with Mr. Damm, because we're going
11 to recess now until 1:30 so that this can be taken care
12 of, and I want you to then talk to Ms. -- I'm sorry. I
13 missed your last name.
14 MS. RASMUSSEN: Molesworth.
15 THE COURT: This is Ms. Rasmussen. I don't
16 want to get you two confused.
17 Ms. Molesworth will be available. I want her
18 available for this process, and get those questions
19 answered. And -- so that we don't have to waste the
20 jury's time by -- or my time or anybody's else's time
21 by having a big voir dire up here for no good purpose.
22 We don't need to do a mini trial in these documents.
23 We've got enough stuff going on now in this case as it
24 is.
25 Does everybody understand what I'm saying?

Page 65

1 MR. DAMM: Your Honor, I think that is an
2 excellent suggestion, that we meet and confer, and I'm
3 ready to do that immediately and would be more than
4 happy to --
5 THE COURT: Ms. Molesworth is sitting right
6 back there, and counsel are here, so you can do that.
7 Just sit down with her at a table if -- you know, we've
8 got one of our better CSOs sitting back there. He will
9 be more than happy to find you one if you can't find
10 one. And just look at them, go over them, and do it in
11 a civil way. And Ms. Molesworth will be sitting there,
12 and which one she recognizes and which one she doesn't
13 so we don't waste our time in front of the jury.
14 MR. DAMM: That's an excellent suggestion,
15 Your Honor. I appreciate the warning and the
16 opportunity to meet and confer, and I'm more than happy
17 to do that.
18 THE COURT: Okay. Everybody on the same
19 page?
20 MR. KENNEDY: Yes, your Honor. The only
21 thing I was going to say was --
22 THE COURT: Mr. Hansen over here has kept his
23 head down. That's --
24 MR. HANSEN: Well, Your Honor, I'm fine with
25 it. I'm not really -- that's their part of the case,

Page 66

1 and so I've heard the warning.
2 THE COURT: What they used to say in Texas
3 when I went to law school is "You don't have a dog in
4 that fight."
5 MR. HANSEN: Well, I do, but I think counsel
6 is handling it.
7 THE COURT: All right.
8 MR. KENNEDY: What I was trying to say, Your
9 Honor, earlier, which I apologize I interrupted
10 Ms. Rasmussen, was the foundation --
11 THE COURT: It's all right. She was here --
12 MR. KENNEDY: That's all right. That's all
13 right. She had good reason. She had something to say.
14 The -- part of the problem was the foundation
15 for these documents is that they pertain to one company
16 and that in looking at them, they were interspersed
17 with other companies, so that took more time.
18 THE COURT: I'm not pointing a finger at
19 anybody.
20 MR. KENNEDY: No. I just said it took a
21 little bit more time. That's all.
22 THE COURT: I don't know who's at fault. I
23 have no idea. You know, it's a little bit like a car
24 accident, where somebody rear ends somebody else. You
25 have the technical, legal fault, and then you have the

Heidi Molesworth, 7-7-09

Page 67

1   real fault; right?
2           MR. KENNEDY: Right.
3           THE COURT: And I'm not interested in getting
4   into who's really at fault here.
5           MR. KENNEDY: Doesn't matter.
6           THE COURT: I could do it, and we could have
7   a little mini evidentiary hearing here, and I can
8   figure out, make a ruling on it, and take action on it.
9   I'm not interested in doing that. I was just
10  interested in saying when you have something like that,
11  you know somebody's at fault. Okay? This doesn't
12  happen out of the blue. So without trying to figure
13  out who it is, let's just make sure it doesn't happen
14  again.
15          MR. KENNEDY: Sounds good.
16          THE COURT: Okay. So we'll stand in recess,
17  and you can meet and confer on these documents. Let's
18  get it past us.
19          Now, are there any other -- please, let's --
20  you know what I tell my law students? Before you file
21  a lawsuit, look at the end of the rainbow and make sure
22  there's a sack of gold instead of a sack of tin, you
23  know? Look over the rainbow and see: Are there any
24  more of these little incidents that are going to happen
25  in the next day or two? And talk about those as well

Page 68

1   so we can get this off the table so we can just
2   simply -- and I was really happy this morning. We
3   seemed to be, you know, cruising along, and I said to
4   myself, gee, this is good. Bad --
5           MR. KENNEDY: So did I.
6           THE COURT: -- bad, bad, bad. Bad move on my
7   part. So let's -- let's just get to it and let the
8   parties go and have lunch or do something. And we'll
9   let the jury take a break, and I will just have Theresa
10  tell them privately that we've got some evidentiary
11  issues that need to be resolved, which we do, actually,
12  and -- instead of having them sit there, I'm going to
13  excuse them until 1:30. Okay?
14          MR. DAMM: Thank you, Your Honor.
15          THE COURT: Court stands in recess.
16          (Recess taken.)
17          THE COURT: The Court would note the presence
18  of the ladies and gentlemen of the jury.
19  Unfortunately, the good news is that we're here. The
20  bad news is that the monitor system is completely, as
21  the Germans would say, "kaput," so they're having to
22  order a new replacement system. So we'll have to see
23  how that goes and whether they'll switch us from this
24  courtroom to another one or what's going to happen. We
25  may just have to do it the old fashioned way. Okay.

Page 69

1           Mr. Damm?
2           MR. DAMM: Thank you, Your Honor.
3   BY MR. DAMM:
4   Q   Good afternoon, Ms. Molesworth.
5   A   Hello.
6   Q   What I'd like to do is I'd like to take you
7   back to what we've marked as Government's
8   Exhibit 96.1.1 through Page -1258. Do you recall those
9   documents?
10  A   This notebook?
11  Q   I believe it's actually both notebooks.
12  A   The ones for First Premier?
13  Q   Yes.
14  A   Yes, I do.
15  Q   And did you take a look at Pages 1 through
16  576 in those notebooks?
17  A   I believe so, yes.
18  Q   And did those documents relate to -- what
19  company?
20  A   Mitchell Framing, I think. I looked at a few
21  of them.
22  Q   Okay. Let's -- can you open up the first
23  notebook and take a quick look at it.
24  A   Sure. Would you repeat the page number?
25  Q   Starting with Page 1 and going to Page 576.

Page 70

1   A   Yes. These are the ones from First Premier.
2   Q   Okay. And then, if you can, take a look at
3   Pages -577 through -625.
4   A   Yes. These are Mitchell Framing.
5   Q   And then can you take a look at -626 through
6   -644.
7   A   Okay. These are PatchCo.
8   Q   And -645 to -676?
9   A   Olympic Framing.
10  Q   And -677 to -1258?
11  A   Those are all First Premier.
12  Q   Now, what type of records are represented by
13  Exhibit 96?
14  A   They're all invoices to the general
15  contractors for payroll services.
16  Q   And were these completed in the manner that
17  was previously discussed?
18  A   Yes, sir.
19          MR. DAMM: Your Honor, at this time I believe
20  Mr. Kennedy has one exhibit in that series that he
21  would like to ask Ms. Molesworth about on voir dire.
22          THE COURT: All right.
23          MR. DAMM: And I have no objection.
24  ///
25  ///

Heidi Molesworth, 7-7-09

Page 71

1              VOIR DIRE EXAMINATION
2    BY MR. KENNEDY:
3        Q    Ms. Molesworth, you have Page 106 in that
4    series in the book that is in front of you?
5        A    Yes, I do.
6        Q    Do you see the name Arterio Valencia?
7        A    Yes, I do.
8        Q    Yesterday you were asked a question about
9    some minute meeting notes, and you didn't recognize
10   that name?
11       A    Yes, I —
12       Q    Seeing it in this context, does that help
13   you? Because I believe these are in respect to First
14   Premier.
15       A    Yes.
16       Q    Seeing it here, does that help you place that
17   individual that you were asked about yesterday?
18       A    They're a couple different people that worked
19   for both companies at different times. I can't place
20   the face exactly.
21       Q    Okay. And Mr. Valencia may be one of those
22   folks?
23       A    Yes.
24           MR. KENNEDY: Okay. That's the only
25   questions I have, Your Honor. Subject to the documents

Page 72

1    that we pulled out, and the Government offering them, I
2    have no objection.
3           THE COURT: It will be received.
4           (Plaintiff's Exhibits 96.1.1 through
5           96.1.1258, excluding withdrawn exhibits
6           listed subsequently with the court
7           clerk, were admitted into evidence.)
8           MR. DAMM: Your Honor, I have a list of I
9    think ten documents to which we've stipulated to
10   withdraw, and there were I think some 25 or so
11   documents that were either blank or illegible. We've
12   agreed to withdraw those as well.
13          THE COURT: All right.
14          MR. DAMM: And there was one additional page,
15   and I have a list of those that I can give to the clerk
16   or I can read it into the record.
17          THE COURT: Why don't you just give it to the
18   clerk. So those have been agreed to?
19          MR. DAMM: Yes. That's correct.
20          THE COURT: All right. They'll be received.
21          DIRECT EXAMINATION (Continued)
22   BY MR. DAMM:
23       Q    Ms. Molesworth, I'd like to ask you some
24   general questions now, if I could, about this payroll
25   system. First, can you tell me how long or when Lori

Page 73

1    Kahre first started working for her brother Robert
2    Kahre?
3        A    It was before I knew her.
4        Q    And when did you first meet Lori Kahre?
5        A    Probably sometime in '95 or '96.
6        Q    Was she working for Mr. Robert Kahre at that
7    time?
8        A    I assume so. I — I met her through my
9    soon-to-be husband, now ex-husband, and it was at a
10   family meeting. We didn't exactly talk about jobs and
11   business.
12       Q    At some point in time, though, you -- you
13   learned that she was working for her brother Robert
14   Kahre?
15       A    Yeah.
16       Q    And was this before you went to work for
17   Mr. Kahre yourself?
18       A    Yes.
19       Q    And you went to work for Mr. Kahre when?
20       A    In June of '97.
21       Q    And would it have been sometime before then
22   that you would have learned that Ms. Lori Kahre was
23   working for her brother?
24       A    Yes.
25       Q    Do you know how much before?

Page 74

1        A    No, I don't.
2        Q    When you first started working for Mr. Robert
3    Kahre in 1997, was the payroll system for the other
4    contractors in existence at that time?
5        A    As far as I know.
6        Q    And do you know how many contractors were
7    involved initially?
8        A    No.
9        Q    When you first started working with the
10   payroll system, how many other contractors were
11   involved?
12       A    I don't know. I know there — the only one
13   that comes to mind is — well, two, actually: First
14   Premier and Mitchell Framing. Those are the only two
15   I didn't work with the payroll system when I first
16   started working there. I don't know what happened
17   prior to that.
18       Q    Well, can you tell us when you first started
19   working for the --
20       A    — payroll system?
21       Q    -- payroll system?
22       A    Probably some time in '98, early to mid '98.
23   I don't have an exact date. I didn't —
24       Q    And do you recall at that time how many
25   companies were participating in the payroll system?

Heidi Molesworth, 7-7-09

Page 75

1      A  I don't know, six, seven maybe.  I don't -- I
2  didn't think about it.
3      Q  Did the number of companies participating in
4  the payroll system increase over time?
5      A  Yes.
6      Q  And to the best of your recollection, it was
7  six or seven at the outset?
8      A  As far as I can remember.  I mean, like I
9  said, I -- I'm not sure, but there were -- there were a
10  handful, at least.
11      Q  And the total number of companies that we
12  discussed was approximately 35?
13      MS. RASMUSSEN:  Objection:  Leading.
14      THE COURT:  Sustained.
15  BY MR. DAMM:
16      Q  Do you know how many companies approximately
17  that we discussed that participated in the payroll
18  system?
19      A  Thirty something.  35, 36, something like
20  that.  I don't know.  I never counted.
21      Q  But you do recall that there weren't that
22  many participating at the outset?
23      A  Not when I first --
24      MS. RASMUSSEN:  Objection:  Leading and asked
25  and answered.

Page 76

1      THE COURT:  Sustained.
2  BY MR. DAMM:
3      Q  Do you know who it was that -- or do you know
4  if anyone from Robert Kahre's company was promoting
5  this payroll system?
6      A  Just from what I heard around the office.  I
7  know Bobby was working on it, and I believe Jorge
8  Fernandez was at one point and somebody named John
9  Greco.
10      Q  What I'd like to do now is to -- to take a
11  look at just a couple of these actual payroll sheets
12  that we've been talking about all morning.
13      MR. DAMM:  And, Ms. King, if we could go to
14  9.10.806, which has been admitted in the evidence.
15  BY MR. DAMM:
16      Q  Ms. Molesworth, do you recognize
17  Exhibit 9.10.806?
18      A  Yes, I -- I recognize the format and the
19  name, yes.
20      Q  And can you tell us what this document
21  represents?
22      A  Billing for payroll to one of the general
23  contractors that Bobby did payroll for.
24      Q  Now, how would this -- or from what
25  information would this invoice be created?

Page 77

1      A  Information back up into that would be --
2  would receive -- would be received from First Premier
3  Paint and Drywall, and then the invoice would be
4  created off of that.
5      MR. DAMM:  And if we could go to the next
6  page, Ms. King, 9.10.807.
7  BY MR. DAMM:
8      Q  Now, do you recognize this document?
9      A  Yes, I do.
10      Q  And what is this?
11      A  That would be one of the sheets when I
12  counted the money out into the envelopes I would use to
13  count it out.
14      Q  Would you use this sheet to fill the
15  envelopes?
16      A  Yes.
17      Q  And would you put an amount of money in the
18  envelopes corresponding to the name on this sheet and
19  the amount?
20      A  Yes.
21      Q  Can you tell me, would this sheet be used to
22  create the invoice?
23      A  I'm not 100 percent sure, but, yes, I -- I
24  think it was.
25      MR. DAMM:  And can we -- Ms. King, if we can

Page 78

1  look at the bottom portion of this.
2  BY MR. DAMM:
3      Q  Do you see the figures at the bottom of this
4  document, Ms. Molesworth?
5      A  Yes.
6      Q  Do you know what those figures represent?
7      A  One is the total payroll, and one is the fee
8  that Bobby charged to do the payroll.
9      Q  And can you tell us which is which?
10      A  The $223,763 is the payroll.  The twenty six
11  thousand, eight something two is the fee.
12      Q  And the figure to the left, the $250,000?
13      A  The total of the two.
14      MR. DAMM:  Now, if we could go back one page,
15  Ms. King, and if we could highlight the bottom portion.
16  BY MR. DAMM:
17      Q  Now, do those figures correspond to the
18  previous page that we just looked at?
19      A  It looks like -- I can't really read the
20  entire number.
21      Q  Well, let's see.  The -- let's see if we can
22  maybe get a little -- that's not the -- the best copy.
23  Let me just ask you a couple of questions about this,
24  and then we'll see if we can find a more legible copy.
25  There's a section at the -- on the bottom of the first

Heidi Molesworth, 7-7-09

Page 79

1    page, the invoice, in the -- let's see.
2        MR. DAMM: Ms. King, if we can get the whole
3    line there, the next to last figure.
4    BY MR. DAMM:
5        Q    There's a figure there that says "extra
6    materials." Do you see that, Ms. Molesworth?
7        A    Yes.
8        Q    Can you tell us what that figure represents?
9        A    The fee that Bobby charged.
10       Q    Now, do you know why his fee was referred to
11   as "extra materials"?
12       A    No, I don't.
13       Q    Can you tell us if -- if you look at the
14   payroll sheet that had a figure of $250,615 that -- was
15   that the figure that would have been billed to First
16   Premier?
17       A    Yes.
18       Q    Then what would have happened?
19       A    They would have written a check for the
20   $250,615 to cover the payroll and the fee.
21       Q    And what would have happened to the check?
22       A    Either a runner or Bobby would have picked it
23   up.
24       Q    And would you have done something with the
25   money once it was received?

Page 80

1        A    It was taken -- excuse me.  The bank should
2    have received a cash order sheet breaking down the
3    amount on what they needed -- what needed to be -- the
4    certain denominations of the cash, and then Bobby would
5    usually pick it up and bring it by the -- the warehouse
6    where we did payroll, and then I would break it down
7    per envelope.
8        Q    Now, did you make a -- an envelope for a
9    Mr. Robert Kahre?
10       A    Yes.
11       Q    And in this case, would it have been filled
12   with $22,832?
13       A    No.  It would be the $26,800 -- whatever is
14   on there.
15       Q    Whatever the extra materials fee happened to
16   be?
17       A    Yeah.
18       Q    And what would you do with the envelope once
19   you filled it with that -- that fee?
20       A    I would seal it, and then I would put it in
21   the -- behind the door until Bobby came to pick it up.
22   And if he didn't come to pick it up, I would put it in
23   the safe.
24       Q    And do you know what Mr. Kahre did with that
25   money after he picked it up?

Page 81

1        A    I never saw him do anything with it.  I knew
2    part of it went back into the company to cover some of
3    the expenses for payroll, but I never saw any of it
4    after that.
5        Q    How do you know any of it went back into the
6    company?
7        A    That's what I was told.
8        Q    Who told you that?
9        A    Lori.
10       Q    But you never saw the disposition of any of
11   the money?
12       A    No.
13       Q    Let's take a look at just one more of these
14   First Premier invoices.
15           MR. DAMM: If we could take a look, Ms. King,
16   at 9.10.795.  And if we could maybe pull up at the same
17   time 9.10.796, and maybe if we could blow up the -- the
18   bottom portions that pick up the totals on both
19   documents, Ms. King.
20   BY MR. DAMM:
21       Q    Now, Ms. Molesworth, can you tell us what the
22   first sheet with the names on it represents, 9.10.796?
23   That's the one with the handwritten total at the
24   bottom.
25       A    That's the sheet of names for payroll that

Page 82

1    comes across before -- you know, when they turn in
2    their payroll to be billed and paid.
3        Q    And would this be a weekly payroll?
4        A    Yes.
5        Q    And was there a -- a fee that --
6            MR. DAMM: And if we could go up to 9.10.795
7    and pick up the extra material portion, Ms. King.
8    BY MR. DAMM:
9        Q    Is there a portion of this weekly payroll
10   that Mr. Kahre would receive as a fee?
11       A    Yes.
12       Q    And how much is that?
13       A    The $20,140.
14       Q    Now, Ms. Molesworth, if you know, what --
15   what did Mr. Kahre provide for this fee?
16       A    The payroll service; Workers' Comp insurance.
17   That's as far as I know.
18       Q    How do you know Mr. Kahre provided Workers'
19   Comp insurance for these individuals?
20       A    Because -- well, when their -- some of their
21   people got hurt, he covered the -- the paperwork and
22   stuff would be filled out under his company.
23       Q    Did he refer them to the -- the Nevada
24   Workers' Compensation department?
25       A    Not in the beginning.

Heidi Molesworth, 7-7-09

Page 83

1      Q   How did he handle the --
2      A   He paid them cash and took care of their
3   medical bills.
4      Q   And let's take a look at one more of these
5   invoices, if we could.
6          MR. DAMM:  Ms. King, if we could take a look
7   at 9.10.290.
8   BY MR. DAMM:
9      Q   Do you recognize this invoice?
10     A   I recognize the format, like we've talked
11  about before.
12     Q   And do you recognize the company Big Bear
13  Concrete?
14     A   Yes, I do.
15     Q   Is that a company for which Mr. Robert Kahre
16  provided payroll services?
17     A   Yes.
18         MR. DAMM:  And if we could take a look at
19  9.10.291.
20  BY MR. DAMM:
21     Q   Ms. Molesworth, would this be a list of the
22  names that were to be paid by Mr. Robert Kahre?
23     A   It looks like it.
24     Q   And these were individuals that worked for
25  Big Bear Concrete?

Page 84

1      A   Yes.
2          MR. DAMM:  And if we could go back to
3   9.10.290.
4   BY MR. DAMM:
5      Q   There's a figure at the bottom of this
6   invoice for $4,664.  Do you see that, Ms. Molesworth?
7      A   Yes, I do.
8      Q   Do you know what that represents?
9      A   It doesn't have a label on it, but I'm
10  assuming that it means the extra materials.
11     Q   Were there invoices created sometimes that
12  didn't say "extra materials"?
13     A   Obviously, there was.  I didn't create those,
14  but yes.
15     Q   And that would have, again, been Mr. Robert
16  Kahre's fee?
17     A   Yes.
18     Q   And I think we may have taken a look at a
19  list of jobs rather than a list of employees.
20         MR. DAMM:  If we could go to 9.10.292.
21         MS. RASMUSSEN:  Your Honor, objection to the
22  use of the word "employees": Lacks foundation.
23         MR. DAMM:  I'll call them "workers," Your
24  Honor.
25     ///

Page 85

1   BY MR. DAMM:
2      Q   Would this be the list of the Big Bear
3   workers?
4          MR. DAMM:  Maybe we can just enlarge a
5   portion of that, Ms. King.
6          THE WITNESS:  It looks like it, yeah.
7          MR. DAMM:  And if we could enlarge the
8   section at the very bottom.
9   BY MR. DAMM:
10     Q   And can you tell us what those last three
11  figures represent at the far right-hand column?
12     A   You want the three figures on the right?  It
13  looks like $27,400, which is the payroll amount, times
14  1.17.  That would equal the fee for Bobby, and then the
15  total for both of them.
16     Q   All right.  Thank you, Ms. Molesworth.
17         I'd like to ask you to take a look now at an
18  exhibit that has not yet been admitted into evidence,
19  and that's 6.97.1.
20         MR. DAMM:  And if I might approach the
21  witness --
22         THE COURT:  Yes.
23         MR. DAMM:  -- Your Honor?
24  BY MR. DAMM:
25     Q   Do you recognize that exhibit,

Page 86

1   Ms. Molesworth?
2      A   Yes.  It's a list of the payroll companies
3   and their addresses, the companies that used Bobby's
4   payroll service.
5      Q   Can you speak up just a little -- little bit?
6      A   It's a name and address listing of the
7   contractors who use Bobby's payroll service.
8      Q   And do you recognize the handwritten note on
9   this form?
10     A   Yes.  That's my writing.
11     Q   And to whom is this note addressed?
12     A   Alex.
13     Q   And by "Alex," who do you mean?
14     A   Alex Loglia.
15     Q   And do you recall the purpose for providing
16  this information to Mr. Loglia?
17     A   No.
18     Q   But it -- it does relate to the payroll
19  companies?
20     A   Yes, it does.  That's who's on -- those are
21  the only people that are on here.
22     Q   To your knowledge, was Mr. Loglia involved
23  with the payroll system?
24     A   I never had any direct contact with him with
25  the payroll system.  It's possible.

Heidi Molesworth, 7-7-09

Page 87

1    Q   Do you know what would have prompted your
2    sending this particular document to him?
3    A   He would have asked for me it.
4        MR. DAMM: Your Honor, at this time I move
5    for the admission of Government's Exhibit 6.97.1.
6        MR. HANSEN: No objection.
7        MR. KENNEDY: No objection, Your Honor.
8        MS. RASMUSSEN: No objection.
9        THE COURT: Be received.
10       (Plaintiff's Exhibit 6.97.1 was admitted
11       into evidence.)
12       MR. DAMM: And if we could publish that to
13   the jury?
14       THE COURT: Yes.
15   BY MR. DAMM:
16       Q   And, Ms. Molesworth, just to help the jury
17   understand this document, the printed names on this
18   document refer to what?
19       A   The general contractor's name.
20       Q   And these are general contractors that
21   participated in the payroll system?
22       A   Yes, yes.
23       Q   And then the note —
24       MR. DAMM: If we could enlarge that,
25   Ms. King.

Page 88

1        MR. HANSEN: Your Honor, beyond the fact that
2    it's on there, she's already indicated she has no
3    knowledge what it's about and so on, so I would object
4    to any further questions with regard to the note. She
5    doesn't know anything about it.
6        MR. DAMM: I don't have any further questions
7    that I was going to ask her anyway, Your Honor.
8        THE COURT: Okay.
9        MR. HANSEN: I withdraw the objection then.
10   BY MR. DAMM:
11       Q   Now, Ms. Molesworth, let me ask you about the
12   payroll system now just for the other contractors.
13   Were they required to go through the same exchange
14   system at the two windows as all of Mr. Robert Kahre's
15   workers?
16       A   Yes.
17       Q   At the end of the year, did any of the
18   workers for the other contractors receive a W-2 form
19   for Mr. Kahre?
20       A   No.
21       Q   Did they receive a 1099 form for Mr. Robert
22   Kahre?
23       A   No.
24       Q   Did you have any discussions with Lori Kahre
25   regarding why this information was not provided to the

Page 89

1    Internal Revenue Service?
2        A   Because we were independent subcontractors,
3    that Bobby wasn't going to keep the Government's books.
4        Q   Bobby wasn't going to keep the Government's
5    books?
6        A   Yeah.
7        Q   And who told you that?
8        A   Lori.
9        Q   Did you ask her what she meant by that?
10       A   I knew what she meant.
11       Q   And what did she mean?
12       A   It means we weren't going to do their
13   accounting work for them.
14       Q   Did she indicate why?
15       A   No. We kind of just dropped it after that.
16       Q   And is that the reason, to your knowledge,
17   that Mr. Robert Kahre never provided a W-2 form to
18   anyone?
19       MS. RASMUSSEN: Objection: Lack of
20   foundation; calls for speculation.
21       MR. DAMM: I'm just asking her her knowledge.
22   This is just —
23       THE COURT: Objection is overruled.
24       THE WITNESS: Would you repeat the question,
25   please.

Page 90

1    BY MR. DAMM:
2        Q   To your knowledge, is this the reason that
3    Mr. Robert Kahre never provided a W-2 income form to
4    any workers or to the IRS?
5        A   I don't know. We were expected to keep our
6    own — keep track of our own payroll, our own — what
7    we took in every week, so I guess the answer to that is
8    yes.
9        Q   And is that the same for a 1099 form?
10       A   I didn't know that much about the 1099s back
11   then, so — I was only familiar with the personal tax
12   forms.
13       Q   And that would have been the W-2?
14       A   Yeah.
15       Q   Now, all of the — other contractors that
16   used Mr. Robert Kahre's payroll system were charged a
17   fee for their participation in the system?
18       A   Yeah. I don't know if "participation" is the
19   right word. It was the service that Bobby provided.
20       Q   The payroll service that Bobby provided to
21   the other contractors was the — the payment that
22   you've just described of putting the cash in the
23   envelopes?
24       MS. RASMUSSEN: Objection: Leading.
25       THE COURT: It's leading.

Heidi Molesworth, 7-7-09

Page 91

1     MR. DAMM: I'll rephrase the question.
2   BY MR. DAMM:
3     Q   What was the payroll service that Mr. Robert
4   Kahre provided to the other contractors?
5     A   We would take care of doing the payroll.
6   They would give us one lump sum, and we would
7   distribute it accordingly.
8     Q   And you did that in cash?
9     A   Yes.
10    Q   And for that Mr. Robert Kahre charged each of
11  the other contractors a fee every week?
12    A   Yes.
13      MS. RASMUSSEN: Objection: Asked and
14  answered.
15      THE COURT: Overruled.
16  BY MR. DAMM:
17    Q   And that's the fee that we saw reflected on
18  the invoices that we just took a look at?
19    A   Yes.
20    Q   What I'd like to do now, Ms. Molesworth, is
21  to ask you to take a look at some exhibits in the 95
22  series.
23      MR. DAMM: And if I might have the Court's
24  indulgence to obtain a binder?
25  ///

Page 92

1   BY MR. DAMM:
2     Q   Ms. Molesworth, do you recognize what's been
3   previously marked as Government's Exhibit 95.1.1?
4     A   Yes, I do.
5     Q   How do you recognize it?
6     A   They're the payroll vouchers we had to sign
7   before we were paid.
8     Q   And can you tell me who generated these
9   documents?  Who prepared them?
10    A   Usually it was Lori.
11    Q   By "Lori," you mean Lori Kahre?
12    A   Yes.
13    Q   And what did this type of document represent?
14    A   The gold and/or silver amounts that we were
15  to receive when we were paid.
16    Q   And is that the same for 95.1 through 95.16,
17  if you could take -- take a look at all of these
18  documents, 1 through 16.
19    A   Part of this document I can't even read.
20    Q   And which one are you referring to?
21    A   95.0022.
22    Q   All right.  Thank you.  And can you continue
23  through the documents, please.
24    A   I recognize them.
25    Q   You recognize them all?

Page 93

1     A   Yes, I do.
2     Q   And can you tell me what they all represent?
3     A   They're the vouchers we were given to sign
4   for the gold or silver we were to receive before we
5   were paid.
6     Q   And who gave those to you?
7     A   Who gave them to us?
8     Q   Yes.
9     A   Usually, it was Lori Kahre, whoever was
10  working behind the window.
11      MR. DAMM: Your Honor, at this time I'd move
12  for the admission of Government's Exhibit 95.1 through
13  95.16.
14      MR. KENNEDY: Just a couple brief questions,
15  Your Honor.  I don't believe I have any objections to
16  them.
17      THE COURT: All right.
18        VOIR DIRE EXAMINATION
19  BY MR. KENNEDY:
20    Q   Ms. Molesworth, these are obviously
21  photocopies; right?
22    A   Yes.
23    Q   All right.  The actual -- and they're called
24  "intercompany warrants"?
25    A   Vouchers, yeah.

Page 94

1     Q   Or vouchers, okay.
2         Originally, they were -- we're looking at the
3   top portion, and there was a bottom portion that one
4   could tear off, and then it was handed to the person as
5   the voucher.  Is that how it worked?
6     A   Yeah.
7     Q   Okay.  So just so the jury has this in mind,
8   it's sort of like you get a bill, and the portion you
9   send back with the bill -- you rip that portion along
10  the perforated line?  Is that how these were set up?
11    A   All we ever got was the actual voucher, just
12  that one piece.
13    Q   Okay.  So at the -- at the window, when you
14  received the gold and silver coin, they sign the
15  portion that you kept, and then you provided them with
16  the other portion of the voucher; right?
17    A   No.
18    Q   Isn't that the part that ripped, the bottom
19  portion?
20    A   We didn't never keep the bottom portion.
21  They were always torn off prior to coming down to the
22  warehouse.
23    Q   Okay.  So do you have any idea why they
24  weren't made part of this or --
25    A   I don't know.

Heidi Molesworth, 7-7-09

Page 95

1    Q   Okay.  Thank you.
2        MR. KENNEDY:  I have no objections, Your
3    Honor.
4        THE COURT:  All right.  Be received.
5        (Plaintiff's Exhibits 95.1 through 95.16
6        were admitted into evidence.)
7        DIRECT EXAMINATION (Continued)
8    BY MR. DAMM:
9    Q   Ms. Molesworth, if we could take a look at
10   95.1.1, and I believe Ms. King will pull it up on the
11   screen.  Now, the first document --
12       MR. DAMM:  If we could enlarge that,
13   Ms. King.
14   BY MR. DAMM:
15   Q   Do you see that Ms. Molesworth?
16   A   Yes.
17   Q   And can you tell me what this document
18   represents?
19   A   That was for Bobby.
20   Q   Do you remember --
21   A   A voucher for Bobby.
22   Q   And it's in -- are these in dollars?
23   A   No.  It's in gold and silver -- or silver
24   amount.
25       MR. HANSEN:  I'm going to object to that

Page 96

1    because gold and silver are dollars, Your Honor.  It's
2    confusing.  They say "dollar" on the face of them.
3        MR. DAMM:  I'll ask some additional
4    questions.
5    BY MR. DAMM:
6    Q   Ms. Molesworth, there's the figure that's
7    highlighted in yellow that says "125."
8    A   Yes.
9    Q   Now, it looks like they're -- are those a
10   couple of asterisks before that?
11   A   Yes.
12   Q   Now, just to the -- to the left of those
13   asterisks, is there a dollar sign there?
14   A   Yes.
15   Q   Did you ever receive any instruction from
16   anyone regarding the use of the dollar sign?
17   A   Yes.  We don't use a dollar sign because
18   it -- it -- the -- true money is made of gold and
19   silver, and that's what the dollar sign was used for.
20   That's the simplest way to explain it.
21   Q   So what is it on this document that tells you
22   that this is a document in gold and silver?
23   A   125 silver coins.
24   Q   What is it on the document that tells you
25   that?

Page 97

1    A   I don't know.  It's just something that I
2    worked with and I knew.
3    Q   But there's nothing on the document itself
4    that says that?
5    A   Not that I can see.
6    Q   Now, when it says "125," would that be 125
7    gold coins?
8    A   No, silver coins.
9    Q   And how do you know that?
10   A   Because it was always calculated in silver.
11   Q   And do you know what the dollar calculation
12   would be that was associated with this warrant?
13   A   Eight dollars.  It's 125 $8 -- which is fair
14   market value, silver coins.
15   Q   So this would be worth eight dollars in cash?
16   A   No.  Take the 125, multiply it by eight.
17   Q   Okay.  So that would be $1,000?
18   A   Yes.
19   Q   And that ratio didn't change?
20   A   No.
21   Q   Now, did Mr. Robert Kahre issue any W-2 forms
22   to any of the workers at the gold and silver amount?
23   A   No.
24   Q   Did he issue any 1099 forms to the workers at
25   the gold and silver amount?

Page 98

1    A   No.
2    Q   And do you know why he didn't do that?
3    A   I never really thought about it.  It just
4    wasn't done.
5    Q   Not at the cash amount and not at the gold
6    and silver amount?
7    A   No.
8    Q   Now, did Mr. Robert Kahre go through the gold
9    and silver exchange?
10   A   I don't remember him ever doing it with me,
11   but that's just me.
12       MR. DAMM:  Let's go take a look at the next
13   check, Ms. King, if we could.
14   BY MR. DAMM:
15   Q   Now, Ms. Molesworth, do you recognize this
16   document?
17   A   Yes.  That's -- that one is for me.
18   Q   And is that the false name that you used?
19   A   For payroll, yes.
20       MR. DAMM:  And if we could go to the last
21   document.
22   BY MR. DAMM:
23   Q   And do you recognize this document?
24   A   Yes.  It's a voucher for Alex Loglia.
25   Q   Now, to your knowledge, did Mr. Loglia go

Heidi Molesworth, 7-7-09

Page 99

1  through the gold and silver exchange?
2      A  Yes. He did.
3      Q  Now, were any of the workers that went
4  through the gold and silver exchange given any record
5  to show how much gold and silver they received?
6      A  No.
7      Q  And if we could take a look at the back page
8  of these intercompany warrants. That would be 95.11.2.
9  Are there any endorsements on these, Ms. Molesworth?
10     A  No.
11     Q  Let's take a look, if we could, at 95.3.1.
12  Do you recognize this document, Ms. Molesworth?
13     A  It's another voucher for me.
14     Q  And -- do you need some water?
15     A  No. I've got some. Thank you.
16     Q  Was this in the gold and silver amount?
17     A  Yes.
18     Q  And if we could take a look at the next page,
19  which would show the endorsement. Do you recognize
20  that endorsement?
21     A  Yeah. That means somebody picked up my check
22  besides me.
23     Q  And do you know who that somebody was?
24     A  It could have only been one of a handful of
25  people because they would bring it back up to the

Page 100

1  office. It had to have been --
2      MR. KENNEDY: Objection. She doesn't know
3  the answer.
4      MR. DAMM: Your Honor, I think she indicated
5  that it would have only been --
6      THE COURT: Objection is overruled.
7      THE WITNESS: It could have only been
8  probably Danielle Alires because she's the only one
9  who's name I -- fake name I didn't recognize.
10  BY MR. DAMM:
11     Q  And did she use a false name for payroll
12  purposes?
13     A  Now that I think about it, I believe it's
14  Pepe Garcia, yeah.
15     Q  And if we could go to 95.4.1. Again, is this
16  an intercompany warrant for you?
17     A  Yes.
18     Q  And if we could go to the next page and see
19  who endorsed this document.
20     A  Same person, Pepe Garcia.
21     Q  And that would have been Danielle Alires?
22     A  Um-hmm. Yes.
23     MR. DAMM: And if we could to 95.6.
24  BY MR. DAMM:
25     Q  Do you recognize this document,

Page 101

1  Ms. Molesworth?
2      A  Yeah. That's Rita Garcia.
3      Q  And do you know who -- was that a real
4  person?
5      A  That was Debra Rosenbaum.
6      Q  And that was a false name that was used for
7  payroll purposes?
8      A  Yes.
9      MR. DAMM: And if we could go to the next
10  page to see who endorsed it.
11     THE WITNESS: Pepe Garcia.
12  BY MR. DAMM:
13     Q  Who would have been --
14     A  -- Danielle Alires.
15     MR. DAMM: And if you would take a look at
16  95.7.1. And if we could enlarge the warrant in the
17  upper left-hand corner.
18  BY MR. DAMM:
19     Q  And do you recognize this?
20     A  That's Donna Hall.
21     Q  And was that a real name or a false name?
22     A  It was a fake name. It's really Lori Kahre.
23     MR. DAMM: And if we could take a look at the
24  next page that shows the endorsements.
25  ///

Page 102

1  BY MR. DAMM:
2      Q  Do you recognize that endorsement?
3      A  Yeah. That's Lori's writing.
4      Q  Now, did -- let me ask you this: How -- how
5  did Mr. Kahre address you -- what -- what name did he
6  use to address you?
7      A  Usually it was "Heidi," but occasionally just
8  out of gest he would call me "Sarah."
9      Q  And did you hear him address Lori Kahre by
10  the name "Donna Hall"?
11     A  I think so. I don't remember right off the
12  top of my head.
13     Q  How about Danielle Alires? Did you ever hear
14  him address her as "Pepe Garcia"?
15     A  No. I don't -- I don't remember that.
16     Q  How about Debra Rosenbaum? Did --
17     A  I think I remember him calling her "Rita."
18     Q  And that would have been for Rita Garcia, her
19  false name?
20     A  Um-hmm. Yes.
21     MR. DAMM: And if we could take a look at
22  95.15.1.
23  BY MR. DAMM:
24     Q  Do you recognize this document?
25     A  That was for Myra Wellman.

**Heidi Molesworth, 7-7-09**

Page 103

1    Q    And was the name "M.L. Well" used on anything
2    other than payroll documents for Ms. Myra Wellman?
3    A    Not that I know of.
4    Q    And who was Ms. Myra Wellman?
5    A    Bobby's mom. Bobby and Lori's mother. She
6    was a runner for the company.
7    Q    And is that the same job that you had when
8    you started working for the company?
9    A    It was a little bit more detailed out because
10   they were busier when she was doing the running, but
11   yeah.
12   Q    You started out as a runner?
13   A    Yeah, pretty much.
14   Q    What I'd like to do now is to ask you about
15   some checks that have already been admitted into
16   evidence, and these would be checks in the Exhibit 22
17   series.
18         MR. DAMM:  And if we could go to 22.2.180,
19   and if we could blow that check up, Ms. King.
20   BY MR. DAMM:
21   Q    Do you recognize this check?
22   A    Yes, I do.
23   Q    And how do you recognize it?
24   A    It was a check given to Bruce Barclay to go
25   get petty cash.

Page 104

1    Q    Now, can you tell us the -- the purpose for
2    petty cash at Robert Kahre's companies?
3    A    For payroll.
4    Q    And can you tell me why it -- why it was that
5    these checks were entitled "petty cash" if they were
6    for payroll?
7    A    That's what was always on the bottom of the
8    check.
9    Q    And who would make out the checks?
10   A    Lori Kahre.
11         MR. DAMM:  And if we could go to 22.2.189.
12   BY MR. DAMM:
13   Q    And do you recognize this document?
14   A    Yes, I do.
15   Q    And how do you recognize it?
16   A    It's a check made out for petty cash.
17   Q    And who is the payee on the check?
18   A    Bruce Barclay.
19   Q    And can you tell us the amount of the check?
20   A    $9,136.
21   Q    And can you recognize the handwriting in the
22   lower left-hand corner in the memo section?
23   A    Yes, I do.
24   Q    And who's handwriting is that?
25   A    It's Lori Kahre's.

Page 105

1    Q    And was there some practice with respect to
2    the amount of money for which these petty -- petty cash
3    checks were issued?
4    A    Can you clarify that?  I'm not sure I
5    understand.
6    Q    Now, this check is for $9,356?
7    A    $136 -- oh, you're right, $356.  I'm sorry.
8    Q    It's hard for me to see too, but I'm a little
9    bit closer.
10        Is there a reason that these checks were
11   under $10,000?
12        MS. RASMUSSEN:  Your Honor, I object to the
13   leading nature of the question.
14        THE COURT:  He just asked her if there
15   was any reason.  He didn't tell her -- he didn't
16   suggest to her the reason for the question.  The
17   objection is overruled.
18        THE WITNESS:  I was told anything -- as long
19   as we kept it under $10,000, that we wouldn't have to
20   fill out paperwork at the bank.
21   BY MR. DAMM:
22   Q    And who told you that?
23   A    Lori Kahre did.
24        MR. DAMM:  And if we could take a look at
25   22.2.245.

Page 106

1    BY MR. DAMM:
2    Q    Is this another check made payable to Bruce
3    Barclay?
4    A    Yes.
5    Q    Now, do you know, after these checks were
6    cashed, where the -- where the cash would go?
7    A    They would go back to the payroll office.
8    Q    And how would the cash be used in the payroll
9    office?
10   A    To pay workers.
11   Q    And how so?
12   A    They were paid -- when they traded in their
13   gold and silver, they would get cash.
14   Q    In an envelope?
15   A    Yes.
16   Q    Now, were there other employees besides
17   Mr. Barclay that would participate in this petty cash
18   payroll scheme?
19   A    I know Lori took checks, so did I, and so did
20   Debra Rosenbaum.
21   Q    I'm sorry.  Who was the first person?
22   A    Lori.
23   Q    Lori Kahre?
24   A    Yes.
25        MR. DAMM:  And if we could take a look at

Heidi Molesworth, 7-7-09

Page 107

1    2.2.257.
2    BY MR. DAMM:
3    Q    Did Danielle Alires's participate in the cash
4    scheme?
5    A    It's possible.
6    Q    Do you recognize this particular check?
7    A    It's a check for petty cash written out for
8    Union Pacific Construction.
9    Q    Do you know if there was ever any other use
10   for petty cash other than for payroll purposes?
11   A    Not that I'm aware of.
12       MR. DAMM:    And if we could take a look at
13   22.2.264.
14   BY MR. DAMM:
15   Q    Do you recognize this check?
16   A    Yeah.  It's a check for petty cash made out
17   to Lori.
18   Q    And would this have been another check for
19   payroll purposes?
20   A    As far as I know, yes.
21       MR. DAMM:    And if we could take a look at
22   22.2.269.
23   BY MR. DAMM:
24   Q    And do you recognize this check?
25   A    Yes.  That's for payroll for -- it's made out

Page 108

1    to me for $9,000.
2    Q    How often would these individuals that we've
3    noticed here who had checks made out to them with the
4    "petty cash" entry in the memo section receive and cash
5    these type -- types of checks?
6    A    I don't know.  I did it two or three times, I
7    think.  Maybe more than that.  I don't remember.
8    Q    And each time who was it that gave the check
9    to you?
10   A    Lori.
11   Q    Was there anything that prohibited Ms. Lori
12   Kahre from just writing a check to the employee that
13   was to be paid in cash?
14   A    They were to be paid in gold and silver.
15       MR. KENNEDY:    I'd object to the terminology.
16   The jury is here to make the determination at the end.
17   Counsel knows it.
18       THE COURT:    That doesn't really go to the
19   ultimate issue.  It may be evidence toward the ultimate
20   issue, but it doesn't go to the ultimate issue.  All he
21   asked was is there some accounting issue which would
22   have precluded the payment of the employee by check.
23       MR. KENNEDY:    Right, and Ms. Rasmussen --
24       THE COURT:    The objection is overruled.
25       MR. KENNEDY:    Well, these people would be for

Page 109

1    the 35 contractors.  Is it the Government's position
2    they're employees?
3        THE COURT:    I beg your pardon?
4        MR. KENNEDY:    These people are for the 35
5    contractors.  Is it the Government's position that
6    they're employees, because at this time in 2004 --
7        THE COURT:    I think he was referring to the
8    people -- were you not? -- whose names were on the
9    checks.  Or who are you referring to?
10       MR. DAMM:    No, the -- just the names on the
11   checks, Your Honor.
12       MR. KENNEDY:    I thought we were talking about
13   the workers, the employees.
14       THE COURT:    What were you talking about?
15   Maybe now I'm confused.
16       MR. KENNEDY:    The reason I'm confused, Your
17   Honor, is the Government has introduced bank checks
18   going to people who worked for Robert Kahre in 2004.
19   So my understanding is this dealt with the 35
20   businesses, and I didn't think it was their position
21   that they were somehow employees.  So the use of the
22   term "employees" is somewhat --
23       THE COURT:    I don't know.  I -- was it
24   your -- was the gist of your question what precluded,
25   say, Mr. Kahre from simply writing a check to the bank

Page 110

1    on his business account and going down and getting cash
2    and having it brought back and used for payroll,
3    instead of using -- instead of using the petty cash
4    thing here that was going on?  Was that it?
5        MR. DAMM:    Yeah.  That's precisely my
6    question, Your Honor.
7        THE COURT:    That's what I thought he was
8    asking.  That doesn't go to the ultimate issue.  The
9    objection is overruled.
10       MR. KENNEDY:    No.  I meant with respect to who
11   was paid.  That raises another issue that we'd have to
12   have a sidebar --
13       THE COURT:    I don't know what other issue it
14   raises, but it doesn't raise the one you raised.
15       MR. KENNEDY:    I was just -- I thought he was
16   talking about writing a check.
17       THE COURT:    We've cleared that up now.
18       MR. KENNEDY:    Isn't this a check?  And so the
19   check would be turned into cash to give to the 35
20   businesses who were not employees, so I thought the use
21   of the terms "employees" was misleading.  I thought the
22   payroll system we're talking about --
23       THE COURT:    My understanding is, and I don't
24   think there's a dispute in this case, that the
25   employees were eventually paid in cash.

Page 111

1      MR. KENNEDY:  No.  In this time, Your Honor,
2    whether they're employees or independent contractors,
3    as the Government knows, post the search warrant, there
4    were bank checks given to people who worked for
5    Mr. Kahre's company.
6          THE COURT:  There may or may not have.  He's
7    asking about these particular items, whether there was
8    some accounting reason that she's aware of that a
9    single check could not have been written to the bank on
10   the company's account.  And so they go down there or an
11   armored car delivered the proceeds back at the business
12   and pay the people.  They were going to pay them in
13   cash with that single check instead of making checks
14   out to the Heidi Rasmussen and Pepe, whoever, and all
15   these other people.
16         MR. KENNEDY:  And so his answer is that he
17   wants that reason?
18         THE COURT:  I don't --
19         MR. KENNEDY:  Okay.  Then that --
20         THE COURT:  He wants to know if there was any
21   impediment.
22         MR. KENNEDY:  Okay.
23         THE COURT:  That's the question.
24         MR. KENNEDY:  And, Your Honor --
25         THE COURT:  Look.  All right.  Mr. Kennedy, I

Page 112

1    have ruled.  You may be seated.  Okay?
2          MR. KENNEDY:  Thank you.
3          THE COURT:  He may answer the question --
4          MR. KENNEDY:  All right.  Thank you, sir.
5          THE COURT:  -- or she may answer the
6    question.  We're wasting time here.
7    BY MR. DAMM:
8      Q   Ms. Molesworth, is there any reason Lori
9    Kahre could not have just written a check to the
10   employee who was to eventfully receive the cash as the
11   result of people cashing --
12         THE COURT:  Okay.  Now you've asked a
13   different question.
14         MS. RASMUSSEN:  Objection to the use of the
15   word --
16         THE COURT:  Just a minute.  Be seated.
17   You've asked a different question now.  I
18   don't know if you intended to or not, but you asked a
19   different question.
20         MR. DAMM:  Well, no.  I --
21         THE COURT:  Because when you say "employee,"
22   the confusion is which employee.  What are you talking
23   about?
24         MS. RASMUSSEN:  I object to the use of the
25   word "employee."  It's lacks foundation.

Page 113

1          THE COURT:  That is overruled.  Which --
2          MR. DAMM:  Well, I don't know --
3          THE COURT:  Be seated, Ms. Rasmussen.
4          MS. RASMUSSEN:  Your Honor, there is no
5    foundation with this witness --
6          THE COURT:  Just a minute.  I'm not finished.
7    Be seated.
8          Yes, Mr. Damm?
9          MR. DAMM:  I'll try and --
10         THE COURT:  Rephrase your question.
11         MR. DAMM:  -- rephrase my question.
12   BY MR. DAMM:
13     Q   Ms. Molesworth, do you know who it was that
14   was the ultimate beneficiary of this petty cash money?
15     A   It was the payroll office.  A specific
16   person?  No, I don't know.
17     Q   My question then is:  Is there anything to
18   your knowledge that prevented Ms. Lori Kahre from just
19   paying that person by check rather than by cash?
20         MS. RASMUSSEN:  Objection:  Lack of
21   foundation.  She doesn't know where the money
22   ultimately went.  How could she answer a question about
23   "that person"?
24         THE COURT:  Well, I don't know if that's an
25   appropriate objection.  I think it isn't, but the

Page 114

1    appropriate objection is:  We don't know who that
2    person is.
3          MR. KENNEDY:  Objection on foundation, Your
4    Honor, with this witness.
5          THE COURT:  That is an appropriate objection.
6          MR. DAMM:  Regardless of who the person
7    was --
8          THE COURT:  Down, Mr. Kennedy.  I've
9    sustained your objection.  I don't know how many times
10   the Court has to address you.  When I say "down," stay
11   down.
12         MR. KENNEDY:  Even if I have a different
13   ground?
14         THE COURT:  No.  You don't need to have --
15         MR. KENNEDY:  All right.
16         THE COURT:  Mr. Kennedy, if the Court
17   sustains an objection on one ground, you do not need to
18   raise another ground on the same question.
19         MR. KENNEDY:  All right.
20         THE COURT:  You re-ask the question a
21   different way.  And if there is another ground on which
22   you wish to state an objection, you may do so.
23         MR. KENNEDY:  I will do so.
24         THE COURT:  When I issue an opinion, whether
25   I'm sitting here or sitting on the Court of Appeals and

Heidi Molesworth, 7-7-09

Page 115

1   we reverse or affirm on the basis of one ground, we
2   often don't get to the second or third ground because
3   it's unnecessary.
4       You may proceed.
5       MR. DAMM: Thank you, Your Honor.
6   BY MR. DAMM:
7       Q   Ms. Molesworth, do you know why individuals
8   that worked for Mr. Robert Kahre or for the other
9   contractors were paid in cash and not simply by check?
10      A   Not really. It was just the way we did it.
11  **It was easy to do the gold and silver exchange with**
12  **them.**
13      Q   Could the gold and silver just as easily been
14  exchanged for a check as opposed to cash?
15      A   Yes.
16      Q   In fact, wouldn't it have been easier to just
17  write a check than to -- to issue a cash order sheet to
18  the bank and go down and pick up all that money and
19  then have to sort it and count it and stuff it in
20  envelopes?
21      A   Probably, yeah.
22      Q   Now, at some point in time, was there a
23  change from payment in cash to payment by check through
24  the gold and silver exchange?
25      A   Yes.

Page 116

1       Q   And when did that occur?
2       A   After -- after our offices were raided.
3       Q   And that's after the search warrants were
4   executed by the Internal Revenue Service?
5       A   Yes.
6       Q   And did everybody switch to check at that
7   time?
8       A   **Most everybody did. There was still -- there**
9   **was still a few companies that were paid with the cash.**
10      Q   Were there still some of Mr. Robert Kahre's
11  workers that were still paid by cash?
12      A   That, I don't know.
13      Q   Ms. Molesworth, I'd like to show you now
14  what's been previously marked as Government's
15  Exhibit 127 through 135 and ask you if you recognize
16  these items.
17      MR. DAMM: If I might have the Court's
18  indulgence for a moment?
19      THE COURT: Sure.
20      (Discussion held off the record.)
21      THE COURT: Are we playing charades over
22  here? All right. Just one second. Just one second.
23      Where are you here so we can decide whether
24  we need to take a -- I think the jurors need a recess.
25  Is this a good time for the recess?

Page 117

1       MR. DAMM: It would be a great time, Your
2   Honor.
3       THE COURT: All right. About 15 minutes.
4       (Recess taken.)
5       THE COURT: All right. The Court would note
6   presence of the counsel as well as the ladies and
7   gentlemen of the jury.
8       You may continue, Mr. Damm.
9       MR. DAMM: Thank you, Your Honor.
10  BY MR. DAMM:
11      Q   Ms. Molesworth, just to follow up on a few
12  areas, you worked for Mr. Robert Kahre for how long?
13      A   **Eight years. Eight years.**
14      Q   Now, during that time period, when warrants
15  were issued, can you tell me where they were prepared?
16  These are the -- the gold and silver warrants.
17      A   **The vouchers for payroll?**
18      Q   Yes.
19      A   **At our offices.**
20      Q   Now, is that someplace different than where
21  pay -- excuse me, payroll took place?
22      A   **Yes.**
23      Q   Now, when the vouchers were prepared, there
24  was a -- a part -- a receipt part attached to the
25  bottom of the voucher?

Page 118

1       A   **Yeah.**
2       Q   What happened to that?
3       A   **I'm not sure. They were never included with**
4   **what went down to the warehouse for payroll.**
5       Q   Were they removed from the vouchers before
6   the vouchers were taken to the payroll office?
7       A   **Yes.**
8       Q   So they were never given to any of the
9   workers?
10      A   **No.**
11      Q   Did you know Mr. Alex Loglia?
12      A   **Yes.**
13      Q   Did he work for Mr. Robert Kahre?
14      A   **Yes.**
15      Q   What did he do for Mr. Kahre?
16      A   **Legal work. He helped us out with a lot of**
17  **the liens on the properties we had to do when**
18  **contractors wouldn't pay.**
19      Q   Any other type of work that Mr. Loglia was
20  involved in?
21      A   **Other legal work.**
22      THE COURT: Wait a minute. When you say
23  "legal work," you're saying Mr. Loglia was providing
24  legal advice?
25      THE WITNESS: No. He helped us fill out the

Page 119

1  forms that we needed to -- for when we placed liens on
2  properties. He worked in a different location than I
3  did, so I'm not real sure exactly.
4      THE COURT: All right.
5  BY MR. DAMM:
6      Q  Do you know if Mr. Loglia was an attorney?
7      A  I don't think he was.
8      Q  Do you know any other work that Mr. Loglia
9  may have performed?
10     A  No.
11     Q  What I've placed in front of you are
12 Exhibits 126.1.1 through 135.1.1. You recognize those
13 exhibits? And maybe we could start with 126. And you
14 can take it out of the plastic bag, if you'd like.
15     A  Looks like -- excuse me. It looks like the
16 envelopes and the payroll sheets for the payroll week.
17     Q  And is that something that you would have
18 handled during your work for Mr. Robert Kahre?
19     A  I don't know if this exact one, but yeah.
20     Q  Is this how the payroll was distributed on a
21 weekly basis to the -- the workers and the -- workers
22 of Mr. Robert Kahre and the workers for the other
23 contractors?
24     A  Yes.
25     Q  Don't worry about those bags. They're kind

Page 120

1  of tricky.
2      THE COURT: I don't think there's any
3  contamination there.
4      THE WITNESS: Sorry.
5      (Laughter.)
6      THE WITNESS: Go ahead.
7  BY MR. DAMM:
8      Q  Have you previously had a chance to take a
9  look at the other --
10     A  Yes, I have.
11     Q  And do they all represent payroll sheets?
12     A  Yes, they do.
13     Q  And envelopes with names on them
14 corresponding to the payroll sheets?
15     A  Yes.
16     Q  And what was placed in those envelopes?
17     A  Cash.
18     Q  Ever place any gold or silver in those
19 envelopes?
20     A  No.
21     MR. DAMM: Your Honor, at this time I move
22 for the admission of Exhibit -- or Exhibits 126.1.1,
23 which is a pay sheet and corresponding envelopes,
24 through 136.1.1. They're -- within that range, they're
25 all pay sheets with corresponding envelopes, Your

Page 121

1  Honor.
2      MR. KENNEDY: No objection.
3      MS. RASMUSSEN: No objection.
4      THE COURT: All right. They'll be received.
5      (Plaintiff's Exhibits 126.1.1 through
6  135.1.1 were admitted into evidence.)
7  BY MR. DAMM:
8      Q  Now, Ms. Molesworth, I'd --
9      MR. DAMM: If I might have the Court's
10 indulgence, I'll retrieve the envelopes.
11     MR. KENNEDY: Counsel, did you mean 135?
12 Because 136 is a different thing on here, so I didn't
13 know if you just misspoke.
14     MR. DAMM: It should be 135.
15     MR. KENNEDY: Okay. Thank you.
16     MR. DAMM: Ms. Lam, I misspoke when I
17 mentioned the exhibits. It should be 126 through 135,
18 not 136. Thank you.
19 BY MR. DAMM:
20     Q  Ms. Molesworth, I'd like to show you another
21 exhibit, and this is an Exhibit No. 83, and I'd like to
22 ask you if you recognize this exhibit.
23     MR. DAMM: Actually, for the -- the record,
24 this is 83.3.
25 ///

Page 122

1  BY MR. DAMM:
2      Q  Do you recognize this exhibit,
3  Ms. Molesworth?
4      A  Yes, I do.
5      Q  And have you previously taken a look at it?
6      A  Yes, I have.
7      Q  And did you use this exhibit on a regular
8  basis during the eight years that you worked for
9  Mr. Robert Kahre?
10     A  During the time I worked in the payroll
11 office.
12     Q  And can you tell us what it represents?
13     A  It kept track of the gold, silver, and petty
14 cash that was in the safe.
15     Q  And was it used on a regular basis as part of
16 the payroll operation at Mr. Robert Kahre's offices?
17     A  As far as, you know, logging the gold and
18 silver, yes.
19     Q  And did you use it personally?
20     A  Yes.
21     Q  And did you personally inventory the gold and
22 silver in the safe?
23     A  Yes.
24     Q  Did you make entries in this -- this logbook?
25     A  Yes.

Page 123

1    Q    And did you make sure that the logbook
2    corresponded to the amount of gold and silver in the
3    safe?
4        A    Yes.
5        Q    And can you tell us how else you used the --
6    the logbook?
7        A    Subtract the petty cash whenever something
8    was taken out.
9        Q    Now, is this a different petty cash than the
10   petty cash that we talked about earlier that was used
11   for payroll?
12       A    Yes.
13       Q    What was this petty cash used for?
14       A    Every day expenses, maybe, you know, one of
15   the guys needed money for gas or what -- little stuff
16   like that.
17       Q    But you didn't have any $9,000 checks that
18   were added to this petty cash?
19           MS. RASMUSSEN:  Objection:  Leading.
20           MR. DAMM:  I don't think it's leading.  We
21   had evidence that there were.
22           THE COURT:  The objection is overruled.
23           THE WITNESS:  No, not when I worked with it.
24           MR. DAMM:  Your Honor, at this time I'd move
25   for the admission of Government's Exhibit 83.3.1 and

Page 124

1    there are 52 pages, I believe, in this particular
2    ledger.
3            MR. KENNEDY:  No objection, Your Honor.
4            MS. RASMUSSEN:  No objection.
5            THE COURT:  All right.
6            (Plaintiff's Exhibit 83.3.1 was admitted
7            into evidence.)
8            MR. DAMM:  Ms. King, I think we can bring
9    this exhibit up now, 83.3.
10   BY MR. DAMM:
11       Q    Ms. Molesworth, do you see this first entry
12   in Exhibit 83.3?
13       A    Yes, I do.
14       Q    Now, there's a name written there.  Can you
15   tell me who that represents?
16       A    Her name is Micki.
17       Q    And do you know who Micki -- Micki is?
18       A    Yeah.  She's the one that helped train me
19   with what to do with payroll.
20           MR. DAMM:  Is the witness cutting out?
21           A JUROR:  Yeah.
22           THE WITNESS:  She helped train me with
23   payroll.
24   BY MR. DAMM:
25       Q    And can you tell us what -- what sort of

Page 125

1    training you received with respect to payroll?
2        A    She just showed me how she separated out the
3    cash and put them in the envelopes and the gold and
4    silver exchange.  That's about it.
5        Q    Did she explain how the ledger was used?
6        A    No.  It's just -- you open it up.  It's
7    pretty much self-explanatory.
8        Q    And can you tell us how the ledger was used?
9        A    Well, anytime gold or silver or petty cash
10   was taken out, it was logged in as a negative.  Every
11   time it was put in, it was logged in as a positive.
12       Q    Now, every time a worker went to Window
13   No. 1, would there be an entry made in the --
14       A    No.
15       Q    -- ledger?
16       A    No.  Every time a worker were to keep -- you
17   know, keep that portion of silver or gold that he
18   wanted, take it with him instead of trading it in for
19   cash.
20       Q    So the only entries in the ledger would --
21   would be ones where someone walked out of the payroll
22   office with the -- with gold or silver coin?
23       A    Yes.
24       Q    And it would not reflect any exchanges from
25   Window 1 to Window No. 2?

Page 126

1        A    No.
2            MR. DAMM:  Can we take a look at the next
3    page, 83.3.2.
4    BY MR. DAMM:
5        Q    Ms. Molesworth, can you tell me what the
6    ledger represents on Page 83.3.2?
7        A    I'm not sure about the top entry, but the
8    bottom entry looks like 70 pieces of silver, and the
9    middle one is 275 on 4/17 and 4/23/98, and 4/24/98 is
10   201 pieces of silver.  That was for -- taken out.
11       Q    Now, when -- when they're these entries in
12   the logbook -- starting with the first highlighted one,
13   can you tell me what that one represents?
14       A    That's not usually how I did it:  It looks
15   like that on 4/17 there was 70 pieces of silver in the
16   safe.
17       Q    So is -- is that an inventory of what was in
18   the safe?
19       A    Yes.
20       Q    That's not -- not a transaction?
21       A    No.
22       Q    Now, down at the bottom, 4/24 of '98, can you
23   tell me what that represents?
24       A    Means we started out with 270 pieces of
25   silver -- or gold or silver.  Four were taken out, with

Page 127

1    a balance of 271 at the end of the day.
2    Q   Okay. Is -- is "AG" gold or is "AG" silver?
3    A   I believe "AG" is silver.
4    Q   Now, four were taken out. Can you tell from
5    the ledger why they were taken out?
6    A   No.
7    Q   Okay. Can you tell by the ledger to whom
8    they were given?
9    A   No.
10       MR. DAMM: If we can go to 83.3.3.
11   BY MR. DAMM:
12   Q   Can you tell me what this page in the ledger
13   represents?
14   A   I don't recognize the writing, but if I -- it
15   just looks like an accounting of what went down for --
16   for -- what was it? -- 4/30 of '98, and it doesn't look
17   like there was any gold or silver taken away.
18   Q   Can you speak up just a little bit or maybe
19   pull that microphone just a little bit closer?
20   A   It doesn't look like there was any
21   transactions of people keeping the silver, the best I
22   can tell. It's hard to say. That's not my writing.
23   That's not my work.
24   Q   Was there a time when you were making entries
25   personally into this ledger?

Page 128

1    A   Yeah.
2    Q   Let's go to 83.3.4, if we could. Do you
3    recognize any entries of yourself on this page?
4    A   No.
5    Q   And 83.3.5?
6    A   No.
7    Q   83.3.6?
8    A   No.
9    Q   Do you recognize the handwriting in the
10   ledger?
11   A   No.
12   Q   Who was handling the ledger at this point in
13   time?
14   A   '98? I would have to -- that's not Lori's
15   writing, and it's not mine. I would have to say it's
16   Micki's.
17   Q   And if we could go to 83.3.9.
18   A   Nope.
19   Q   Actually, can you take a look at the ledger
20   in front of you and -- well, let me -- let me -- let me
21   ask this: Let's go to 83.3.15. I'm not sure the
22   numbers in the ledger -- or the pages in the ledger are
23   numbered, so we better look at the screen,
24   Ms. Molesworth.
25       Do you recognize the handwriting on 83.3.15?

Page 129

1    I -- I -- just look at the screen.
2    A   It looks like some of it's mine, yes.
3    Q   And can you -- can you tell me what's
4    happening with respect to gold on this particular page
5    of the ledger?
6    A   There's -- originally started out with 100.
7        THE COURT: You have to speak --
8        MR. DAMM: Can't hear --
9        THE WITNESS: I'm sorry. We originally
10   started out with 108 pieces of gold. Three were kept
11   and -- which left a balance of 105.
12   BY MR. DAMM:
13   Q   Now, is there any indication what the date
14   was?
15   A   No.
16   Q   Is there any indication as to who kept the
17   gold?
18   A   No.
19   Q   Could Mr. Robert Kahre have taken gold from
20   the safe?
21   A   That's possible.
22   Q   How about Mr. Alex Loglia?
23       MR. HANSEN: Objection. There's no
24   foundation for this, whatsoever. It's all speculation.
25   She doesn't know.

Page 130

1        MR. DAMM: Well, no, I don't -- I'll lay a
2    little more foundation, Your Honor.
3    BY MR. DAMM:
4    Q   When you worked in the payroll office, were
5    you in charge of the -- keeping an inventory of the
6    gold and silver?
7    A   Yeah.
8    Q   And did you record the gold and silver
9    transactions in this ledger?
10   A   Yes.
11   Q   And if someone came in and kept a piece of
12   gold or silver, would you record it in the ledger?
13   A   Yes.
14   Q   Were there certain people that could come in
15   and take gold and silver from the safe?
16   A   Just Bobby.
17   Q   Could Mr. Loglia take gold and silver from
18   the safe?
19   A   Only if we had prior permission from Bobby.
20   Q   Did he ever do so?
21   A   I never did a transaction like that, that
22   I -- that I can recall.
23   Q   But going back to 83.3.15, according to your
24   records, three pieces of gold left at some point in
25   time to some unknown person?

Heidi Molesworth, 7-7-09

Page 131

```
 1    A   Yep.
 2    Q   And can you explain the -- the silver
 3  transactions?
 4    A   It's the same thing.  We started out with
 5  204.  There's a deduction of 10, and then 13 and then
 6  so on and so forth, until we finally reached 166, it
 7  looks like, which that math doesn't work out, but --
 8  it's the same -- same concept as the gold.
 9    Q   And the only person that could take gold from
10  the safe was Mr. Robert Kahre?
11    A   Unless it -- unless we were paying somebody a
12  gold piece for payroll.
13    Q   And if you're paying somebody a gold piece
14  for payroll, would you record that person's name?
15    A   No.
16    Q   Okay.  How would you -- how would you know or
17  keep track of whether or not someone received gold or
18  silver?
19    A   It was their gold.  If they decided to keep
20  it, it's -- it was theirs.
21    Q   But you wouldn't -- wouldn't have any way of
22  knowing who kept gold on a particular basis?
23    A   No.
24    Q   But would you know how much cash people kept?
25    A   Sometimes, yeah.
```

Page 132

```
 1    Q   Well, you'd know from the -- the payroll
 2  sheets how much cash?
 3    A   Oh, yeah.  Yes.  Yes.
 4    Q   And looking at 83.3.16, were there any gold
 5  transactions during this time period?
 6    A   No.
 7    Q   Any silver transactions?
 8    A   Yes.
 9    Q   And can you explain the silver transactions?
10    A   We started out with a balance.  It looks like
11  it started out -- we had a balance of 146 and there was
12  500 coins added, which gave it 646, and then five
13  deducted and then three, two, and ten, which brought us
14  to 626.
15    Q   Now, how would silver have been added?
16    A   A delivery may have come in from a coin shop.
17    Q   And who would have arranged for that
18  transaction to occur?
19    A   Bobby.
20    Q   But you didn't keep any record of where the
21  coins came from?
22    A   No.
23    Q   And, again, no record of where the coins
24  went?
25    A   No.
```

Page 133

```
 1          MR. DAMM:  Let's go to 83.3.17, and if we
 2  could highlight the -- the cash column.
 3  BY MR. DAMM:
 4    Q   Is this the petty cash that you talked about
 5  just a moment ago?
 6    A   Yes.
 7    Q   I notice there's an entry down towards the
 8  bottom that says "new payroll."  Do you recognize that?
 9    A   It's not my writing.  I don't know what it
10  is.
11    Q   Do you recognize the writing?
12    A   I think it's Lori Kahre's.
13    Q   Do you know what that means:  "New payroll"?
14    A   Could be a new company.
15    Q   Is there some reason these -- these
16  transaction pages were not dated?
17    A   No.
18          MR. DAMM:  Let's take a look at 83.3.26, if
19  we could.
20  BY MR. DAMM:
21    Q   Again, there were transactions in gold and
22  silver?
23    A   Yes.
24    Q   And there were transactions in cash?
25    A   Yes.
```

Page 134

```
 1          MR. DAMM:  And if we could highlight the cash
 2  column.
 3  BY MR. DAMM:
 4    Q   Are there entries for some of the cash items?
 5    A   Yes.
 6    Q   And do you know what -- what some of those
 7  represent?
 8    A   One of them, the top one, was a six dollar
 9  shortage from the bank.  The second one I can't read.
10    Q   Does the second item now appear legible to
11  you?
12    A   It says Bobby paid D&L report wrong.  I don't
13  remember what I meant when I wrote that.
14    Q   Is this your handwriting?
15    A   Yes, it is.
16    Q   So you'd make notations with respect to the
17  cash?
18    A   Yes.
19    Q   But not with respect to the gold and silver?
20    A   No.
21    Q   Now, when you handled the -- the payroll,
22  would you always make sure that there was enough cash
23  on hand to cover payroll?
24    A   That would always come in deliveries that
25  day, so it wasn't really -- I knew it was going to be
```

Heidi Molesworth, 7-7-09

Page 135

1   there.
2       Q   You knew there'd always be enough cash to
3   handle payroll?
4       A   Yes.
5       Q   Did you ever check to make sure that there
6   was enough gold and silver to cover payroll?
7       A   No.
8       Q   Why not?
9       A   Because most people just came in — we —
10  they didn't keep the gold and silver. Maybe a few
11  people did. But for the most part we always had enough
12  to cover whoever came in, as long as nobody kept any of
13  it.
14          MR. DAMM: And if we could take a look at
15  83.3.32.
16  BY MR. DAMM:
17      Q   Do you recognize the — the handwriting on —
18  on this particular page?
19      A   Yeah. It looks like it's probably mine and
20  Lori's.
21          MR. DAMM: Let's take a look at Page 83.3.39.
22  BY MR. DAMM:
23      Q   Do you recognize the handwriting on this
24  page?
25      A   It looks like it's both mine and Lori's.

Page 136

1       Q   It looks like there were some transactions
2   regarding the silver?
3       A   Yes.
4       Q   Can you recall what those transactions
5   involved?
6       A   No.
7       Q   Okay. There's the reference there to Alex?
8           MS. RASMUSSEN: Objection: Leading.
9           MR. HANSEN: She said she didn't recall.
10          MS. RASMUSSEN: She doesn't recall, so he's
11  asking her to testify about what's on the document.
12          THE COURT: The objection is sustained.
13          MR. DAMM: If we could take a look at
14  83.3.40.
15  BY MR. DAMM:
16      Q   Do you recognize that handwriting?
17      A   Yes. It's Lori Kahre's.
18      Q   At some point in time did people start adding
19  dates to the ledger?
20      A   It looks like it, yeah.
21      Q   Do you know why that was?
22      A   No, I don't.
23          MR. DAMM: If we could take a look at
24  83.3.42.
25  ///

Page 137

1   BY MR. DAMM:
2       Q   Were there some silver transactions that were
3   recorded on this page?
4       A   It looks like it.
5       Q   And is there any indication of what the
6   exchange rate for some of these transactions may have
7   been?
8       A   No.
9       Q   If we look, there a -- what's the -- can you
10  tell us what the column is on the right-hand side?
11      A   It's cash.
12          MR. DAMM: And if we can enlarge that column
13  about halfway down.
14  BY MR. DAMM:
15      Q   Do you see the entry there that says two
16  silver?
17      A   Yeah.
18      Q   And that says $22?
19      A   Yeah.
20      Q   Would that represent the exchange?
21      A   Yes.
22      Q   And what would that mean to you?
23      A   That means somebody kept two silvers — two
24  silver coins, and they turned in $11 in cash — or $22
25  in cash, $11 per piece per silver coin.

Page 138

1       Q   Now, is that a different ratio that was used
2   for silver than used on the vouchers?
3       A   Yes.
4       Q   And what was the ratio on the vouchers?
5       A   Eight dollars.
6       Q   And here, though, the -- it was $11 per
7   silver coin?
8       A   Yes.
9       Q   Why -- why is there that difference
10  between --
11      A   I don't know. I — they were calculated at
12  eight dollars.
13      Q   Did that eight dollar calculation ratio ever
14  change?
15      A   Not that I know of.
16      Q   Can you tell me what -- for what businesses
17  this ledger was used?
18      A   I don't think there was any specific
19  business. It was just kept in the payroll office.
20      Q   Was it used for all of Mr. Robert Kahre's
21  businesses?
22      A   Yes.
23      Q   Was it used for the 35 or so other
24  contractors?
25      A   Anytime we had an entry to make in -- for

Page 139

1   gold, silver, or cash, it would go into the book.
2   Q   Did you record the cash that was used, excuse
3   me, for payroll in this ledger?
4   A   That was -- that people kept every week?
5   Q   Yes.
6   A   No.
7   Q   What was the -- the inventory of gold and
8   silver in this safe used for?
9   A   Payroll.
10  Q   Any other uses?
11  A   Occasionally Bobby would come in and get
12  some, but mainly it was payroll.
13  Q   Were there, excuse me, periods of time,
14  Ms. Molesworth, when there was no -- no change in
15  the -- the gold or silver amount that was kept in the
16  safe?
17  A   I'm sorry. Say that again.
18  Q   Were there periods of time when there were no
19  transactions in gold and silver that were recorded in
20  the ledger? That's -- let me --
21  A   I'm not quite -- I mean, if there's no
22  transactions, how can they be recorded?
23  Q   Well, that's a good point. Let me -- let me
24  see if I can rephrase the question. I don't think that
25  was a good question.

Page 140

1          How often were -- were there transactions in
2   gold and silver?
3   A   It varied from week to week, no real set
4   amount.
5   Q   Were there times when no transactions
6   occurred?
7   A   Yes.
8          MR. DAMM: Let's take a look at 83.3.43. And
9   if we could just take a look at the top of that column
10  on the right-hand side.
11  BY MR. DAMM:
12  Q   I believe that you indicated that this was
13  the -- the cash column?
14  A   Yes.
15  Q   And there's a notation up at the top. Can
16  you tell us what that represents?
17  A   Federal Reserve notes.
18  Q   And can you recognize the handwriting?
19  A   Yes. It's Lori's -- Lori Kahre's.
20  Q   Let me ask you now about some other areas,
21  and I'm going to -- to change subjects on you.
22          Were you charged with the -- with the felony
23  of income tax evasion in this case?
24  A   Yes.
25  Q   And did you plead guilty?

Page 141

1   A   Yes, I did.
2   Q   And have you been sentenced yet?
3   A   No.
4   Q   Now, when you worked for Robert Kahre, you
5   indicated that you did so for a period of eight years?
6   A   Yes.
7   Q   And at some point in time that employment was
8   terminated?
9   A   Yes.
10  Q   And can you tell me why?
11  A   Because I was stealing from the company.
12  Q   And can you tell me how that occurred?
13  A   I'm sorry. What?
14  Q   How did you steal from the company?
15  A   I wrote myself checks.
16  Q   And what sort of checks were these?
17  A   Regular checks that you cash at the bank.
18          MR. DAMM: Your Honor, if I might approach
19  the witness with some additional exhibits?
20          THE COURT: Yes.
21  BY MR. DAMM:
22  Q   Ms. Molesworth, do you recognize the exhibit
23  that's been placed in front of you, Exhibit No. 1013?
24  A   Yes. Yes.
25  Q   How do you recognize it?

Page 142

1   A   It was the check that I wrote to myself.
2   Q   And how do you recognize this as a check that
3   you wrote for -- wrote to yourself?
4   A   Because it's my -- my signature. I signed
5   Bobby's name.
6   Q   And is this a check that was written to you
7   for money that you were not entitled to?
8   A   Yes.
9          MR. KENNEDY: Your Honor, I believe that this
10  one, just for the clerk's knowledge, would be Defense
11  Exhibit 1013.
12          MR. DAMM: That's fine, Your Honor.
13          MS. RASMUSSEN: Well, it is a defense
14  exhibit, so if the Government doesn't think it's a
15  defense exhibit, it should say so.
16          MR. DAMM: It's an exhibit marked 1013, and
17  it has been previously marked by the defendants, Your
18  Honor, and that's fine with me.
19          THE COURT: All right.
20          MR. DAMM: At this time I'd move for the
21  admission of Exhibit 1013.
22          MR. KENNEDY: No objection, Your Honor.
23          MS. RASMUSSEN: No objection.
24          MR. DAMM: And --
25          THE COURT: Be received.

Heidi Molesworth, 7-7-09

Page 143

1     (Defendants' Exhibit 1013 was admitted
2     into evidence.)
3   BY MR. DAMM:
4     Q   Ms. Molesworth, can you take a look at
5   Exhibits 1014, 1015, -16, -17 -- if you'd keep going
6   through the binder to ten -- let's go up to 1078 and
7   just -- I'm just going to ask you if you recognize
8   these -- these exhibits.
9     A   I do.  Some of them I signed on the signature
10  line, but some of them are stamped.  Some of them Lori
11  did.
12    Q   But, regardless, do you -- do you recognize
13  them?
14    A   Yes, I do.
15    Q   And what do they represent?
16    A   Checks that were written to me.
17        MR. DAMM:  At this time I'd move for the
18  admission of Defendants Exhibits 1014 through 1079.
19        MS. RASMUSSEN:  Your Honor, I have no
20  objection; but the original exhibits are here, and
21  those are the ones that should be admitted into the
22  record, not the Government's copies of the defense
23  exhibits.
24        MR. DAMM:  That's fine, Your Honor.  I'd be
25  pleased to have those admitted.

Page 144

1         MS. RASMUSSEN:  So shall I hand them up?  Is
2   1079 your last?
3         MR. DAMM:  Yes.
4         MS. RASMUSSEN:  I actually don't have them in
5   that order.
6         (Discussion held off the record.)
7         (Defendants' Exhibits 1014 through 1079
8   were admitted into evidence.)
9   BY MR. DAMM:
10    Q   Ms. Molesworth, do you have Exhibit 1014 in
11  front of you?
12    A   Yes, I do.
13    Q   And can you tell me what that represents?
14    A   A check written to me for petty cash.
15    Q   Now, is this a check that -- that was part of
16  what you stole from Mr. Robert Kahre?
17    A   No.
18    Q   What was this check used for?
19    A   It was petty cash that was turned back into
20  the payroll department.
21    Q   And who gave this check to you?
22        MS. RASMUSSEN:  Are these exhibits admitted
23  or not?
24        MR. KENNEDY:  Yes.
25        They've been received right, Your Honor?

Page 145

1         MR. DAMM:  Yes.
2         MS. RASMUSSEN:  They're not being published.
3         MR. DAMM:  Okay.  We can stick this one up.
4         THE WITNESS:  The signature looks like Lori's
5   handwriting.
6   BY MR. DAMM:
7     Q   You've indicated that this is Lori Kahre's
8   handwriting?
9     A   It looks like it, yes.
10        MS. RASMUSSEN:  Which exhibit number is this?
11        MR. DAMM:  This would be 1014.
12        MS. RASMUSSEN:  Defense Exhibit 1014; right?
13        MR. DAMM:  Yes.
14  BY MR. DAMM:
15    Q   Can you take a look at Exhibit 1015.
16    A   It was a check written to me.
17    Q   Now, can you tell me what this check was for?
18    A   A paycheck.
19    Q   In May of 2004, what was your weekly pay
20  rate?
21    A   $700.
22        MR. DAMM:  And if we could take a look at
23  1016.
24  BY MR. DAMM:
25    Q   Do you recognize that check?

Page 146

1     A   Yes, I do.
2     Q   And was that another paycheck?
3     A   Yes, it was, for the same week.
4     Q   Now, were you entitled to two $700 paychecks
5   for the same week?
6     A   No.
7     Q   Can you explain how that happened?
8     A   I took money that didn't belong to me.
9     Q   Do you know which one of these checks
10  represent your salary and which represented money that
11  didn't belong to you?
12    A   I can't tell right off.  I'm assuming this
13  one, because it looks like my signature on it, is the
14  one that didn't belong to me.
15    Q   Now, when you say "this one," which exhibit?
16    A   The one that you have up on the screen.
17    Q   That would be 1016?
18    A   Yes.
19    Q   Is that one of the ways in which you would
20  take money from Mr. Robert Kahre?
21    A   Yes.
22    Q   Did you have access to the Production
23  Plumbing and Air-conditioning account?
24    A   Yes, I did.
25    Q   And you were authorized to write checks on

Heidi Molesworth, 7-7-09

Page 147

1 that account?
2   A   Yes, I was.
3   Q   Were you authorized to write checks to
4 yourself?
5   A   My paychecks, yes.
6   Q   But --
7   A   Nothing more than that.
8   Q   Do you recall how often you took money from
9 Mr. Robert Kahre in this fashion?
10   A   No, I don't.
11   Q   Did you ever offer to repay Mr. Robert Kahre?
12   A   Yes, I did.
13   Q   And did you do so?
14   A   I have not yet.
15       MR. DAMM:   If we could take a look at what's
16 been marked as Defendants' Exhibit 1018.
17 BY MR. DAMM:
18   Q   Can you tell me what this exhibit represents?
19   A   A paycheck.
20   Q   And how can you tell that this is a paycheck?
21   A   On the bottom, it has the "Exchange 31 USC
22 5112 NRS 662.085."
23       MR. DAMM:   Can we enlarge that, Ms. King,
24 maybe just that top check.
25   ///

Page 148

1 BY MR. DAMM:
2   Q   Now, Ms. Molesworth, do you know what it
3 meant by "Exchange 31 USC 5112, NRS" Space "662.085"?
4   A   I don't remember anymore, but it had
5 something to do with the gold and silver exchange.
6   Q   Now, was this a check that you would have
7 prepared yourself?
8   A   Yes.
9   Q   Now, did someone tell you to make that entry
10 on payroll checks?
11   A   Yes. Mr. Kahre did.
12   Q   Now, did you make this entry when you paid a
13 vendor?
14   A   No.
15   Q   Why not?
16   A   Because they didn't go through the gold and
17 silver exchange.
18   Q   And why didn't they do that?
19   A   Because we just paid them checks.
20   Q   And why didn't you pay the workers in checks?
21   A   I don't know. We did, at this point, because
22 it was after the raid, but I'm not -- I mean, it had to
23 do with the gold and silver exchange, is why they were
24 paid the cash and not the checks.
25   Q   But after the search warrants, there was

Page 149

1 still a gold and silver exchange?
2   A   Yes, but there was more checks then.
3   Q   And less cash?
4   A   Yes.
5   Q   And do you know why there had to be cash and
6 not checks?
7   A   No. I didn't do payroll after that. I
8 couldn't.
9       MR. DAMM:   Let's take a look, if we could, at
10 Defense Exhibit 1024. And if we could maybe just blow
11 up the top portion of that check.
12 BY MR. DAMM:
13   Q   Do you recognize this check, Ms. Molesworth?
14   A   It's a check written to me.
15   Q   And was this for legitimate services or was
16 this for --
17   A   I -- I don't know. It's -- I didn't sign
18 this particular check.
19   Q   Do you know who signed this particular check?
20   A   It looks like it's Lori's signature.
21   Q   Now, it indicates 6/19/2004 to 6/25/2004 pay
22 period, and it's only for $82.40. Do you recall
23 earning that amount of money during this time period?
24   A   I earned more than that.
25   Q   Did you ever receive reimbursements for

Page 150

1 expenses?
2   A   Once, maybe twice, but not that often.
3   Q   Does this look like a reimbursement check to
4 you?
5   A   No. I don't know. It's been five years.
6       THE COURT:   I think it's clear she doesn't
7 remember the circumstances, Mr. Damm, so you might as
8 well move on.
9       MR. DAMM:   Let's take a look at Defense
10 Exhibit 1037 if we could.
11 BY MR. DAMM:
12   Q   Do you recognize this check, Ms. Molesworth?
13   A   Yes. It's a check cut to me for $9,000 from
14 Union Pacific Construction.
15   Q   And who issued this check to you?
16   A   It had to have been Lori.
17   Q   And what was the purpose of this check?
18   A   It indicates on the check that it's petty
19 cash.
20   Q   Did you ever write any petty cash checks to
21 yourself?
22   A   I could have for payroll at one point in time
23 or another, if we needed to pull it out of the account,
24 but I didn't do this one.
25   Q   Did you ever take any money from Mr. Robert

Page 151

1    Kahre by writing checks to yourself and entering "petty
2    cash" in the memo section?
3    **A  No.**
4    Q  Let me ask you now to take a look at some
5    additional checks. These would be Defendant's
6    Exhibit 1080, 1081, 1082, 1083, 1084. Do you see
7    those, Ms. Molesworth?
8    **A  Yes, I do.**
9    Q  Do you recognize these checks?
10   **A  Yes, I do.**
11   Q  And how do you recognize them?
12   **A  They were checks written to me.**
13   Q  And for what purpose?
14   **A  Looks like one of them was a paycheck and one**
15   **was something extra that I wrote myself.**
16   MR. DAMM: Your Honor, at this time I'd move
17   for if the admission of Defendants' Exhibits 1080
18   through 1084.
19   MR. KENNEDY: No objection, Your Honor.
20   MS. RASMUSSEN: No objection.
21   THE COURT: All right. It will be received.
22   (Defendants' Exhibits 1080 through 1084
23   were admitted into evidence.)
24   BY MR. DAMM:
25   Q  And can you take a look at Defense Exhibit

Page 152

1    1080 --
2    THE WITNESS: Excuse me, can I say something?
3    THE COURT: Yes.
4    THE WITNESS: Some of these are duplicates.
5    THE COURT: Some of those are duplicates?
6    THE WITNESS: Yes.
7    BY MR. DAMM:
8    Q  They're marked --
9    **A  No. The check numbers are the same.**
10   Q  And they -- do they have different exhibit
11   numbers on them?
12   **A  Yes, they do.**
13   Q  Can -- can you tell me which is a duplicate?
14   **A  Well, the first one I noticed, because the**
15   **date of it, was -- Exhibit 1015 and Exhibit 1080 are**
16   **the same.**
17   MR. KENNEDY: No objection to removing the
18   first page of 1080, Your Honor, and just using 1015.
19   MR. DAMM: Likewise, Your Honor, I have no
20   objection.
21   THE WITNESS: And the same goes with 1016,
22   and there isn't an exhibit number on this one.
23   MR. DAMM: Your Honor, maybe what we can do
24   is I can get together with defense counsel and we can
25   double-check and make sure there's no duplication and

Page 153

1    we'll -- we'll try and resolve that this evening and
2    not waste time now to do it, if that's acceptable to
3    the Court.
4    THE COURT: All right.
5    BY MR. DAMM:
6    Q  Ms. Molesworth, I'd ask you to take a look at
7    one additional check, and let me know if you recognize
8    this. And it -- it may very well be a duplicate as
9    well: Do you recognize Defendants' Exhibit 1085?
10   **A  Yes, I do.**
11   Q  And how do you recognize it?
12   **A  It's a payroll check to me.**
13   MR. DAMM: Your Honor, I'd move for the
14   admission of Defendants' Exhibit 1085 at this time,
15   unless, of course, it's a duplicate, and we'll try and
16   sort that out this evening.
17   MR. KENNEDY: No objection, Your Honor.
18   MS. RASMUSSEN: No objection, and it may be a
19   duplicate, Your Honor, but that is the way I marked
20   them for my cross-examination.
21   THE WITNESS: It is a duplicate.
22   MS. RASMUSSEN: Right, but I marked them a
23   certain way for ease of my cross.
24   (Defendants' Exhibit 1085 was admitted
25   into evidence.)

Page 154

1    BY MR. DAMM:
2    Q  Ms. Molesworth, I'd like to switch gears for
3    a moment and ask you a few additional questions about
4    some other areas.
5    You mentioned earlier with respect to
6    Mr. Alexander Loglia that he assisted Mr. Robert Kahre
7    in the filing of liens on properties. Do you recall
8    that?
9    **A  Yes.**
10   Q  Do you recall whether or not those were
11   mechanics liens?
12   **A  They were full mechanics liens.**
13   Q  And can you tell us what -- what Mr. Loglia
14   did with respect to these liens?
15   **A  I'm not exactly sure. We handed him over the**
16   **files for the contractors that needed to be liened, and**
17   **then he took it from there.**
18   Q  Now, was there a -- a method or a certain
19   software that was used in the payroll office for
20   accounting purposes?
21   **A  QuickBooks.**
22   Q  And who is it that handled the -- the
23   QuickBooks in the accounting office?
24   **A  Every -- all us girls worked with the**
25   **QuickBooks.**

Heidi Molesworth, 7-7-09

Page 155

1    Q   And by the "girls," who do you mean?
2    A   Lori, Debbie Rosenbaum, and Danielle Alires
3    and myself.
4    Q   And what were these QuickBooks used for?
5    A   Accounts receivable. We would invoice to
6    general contractors for work that we had done, the work
7    done in payroll, accounts payable -- accounts payable.
8    Q   And for accounts payable, did you distinguish
9    how various people were paid?
10   A   I don't understand. Accounts payable was our
11   vendors.
12   Q   Just your vendors?
13   A   Yes.
14   Q   Accounts payable didn't include payroll?
15   A   No.
16   Q   In what office was it in which the QuickBooks
17   were used?
18   A   Wright Painting; Union Pacific; Production
19   Plumbing; Production Electric/HVAC; Sherman Tile &
20   Marble.
21   Q   And were they -- the QuickBooks used in -- in
22   just the office where the -- the girls worked that you
23   just mentioned?
24   A   Yeah. And I think Bill Whitney did his own
25   billing.

Page 156

1    Q   Do you know whether or not he used
2    QuickBooks?
3    A   I'm not sure. I think he did, but I can't
4    tell you 100 percent.
5    Q   Now, do you know whether or not any of the
6    workers for any of Robert Kahre's companies ever wore
7    uniforms?
8    A   I think they did for a short time. It was
9    very short-lived.
10   Q   And do you know what -- what company or
11   companies in which these workers would have worn
12   uniforms?
13   A   No.
14   Q   But do you recall uniforms at some point in
15   time?
16   A   Yes, I do.
17   Q   During the eight years that you worked for
18   Mr. Robert Kahre, did you have a -- a set starting time
19   and a set quitting time?
20   A   Pretty much, yeah. I mean, we could -- we
21   could come in late or stay late. It didn't really
22   matter, as long as we got our work done.
23   Q   What was your normal start time?
24   A   I usually started at eight o'clock.
25   Q   And quitting?

Page 157

1    A   Four.
2    Q   And did you work 40 hours a week?
3    A   Yes.
4    Q   Were you expected to put in 40 hours a week?
5    A   I guess so, yeah. We did.
6    Q   And did Mr. Robert Kahre provide office space
7    for you?
8    A   Yes.
9    Q   Did he provide a desk?
10   A   Yes.
11   Q   Did he provide a chair?
12   A   Yes.
13   Q   Did he provide filing cabinets?
14   A   Yes.
15   Q   Did he provide office supplies?
16   A   Yes.
17   Q   Did he pay the rent or the mortgage on the
18   building?
19   A   Yes.
20   Q   Did he pay the utility bills?
21   A   Yes.
22   Q   Were you told where to purchase services and
23   supplies?
24   A   No.
25   Q   Could you buy supplies anywhere you wanted

Page 158

1    to?
2    A   Oh, we usually ordered them from Office Depot
3    or went by and picked them up.
4    Q   And who would pay for those supplies?
5    A   Bobby did.
6    Q   During the time that you worked for
7    Mr. Robert Kahre, did you work on any other projects
8    for anyone else?
9    A   No.
10   Q   Did anyone else in the office that you worked
11   for work for anyone else?
12   A   I think Danielle Alires had her own business
13   that she worked with. She was a manicurist. But aside
14   from that, no.
15   Q   And your relationship with Mr. Kahre lasted
16   for eight years?
17   A   Yes.
18        THE COURT: You might want to find a
19   convenient place to break, Mr. Damm, because we're
20   getting very close to the end of the day.
21        MR. DAMM: Your Honor, this would be a good
22   time to break.
23        THE COURT: Okay. All right. Tomorrow we
24   have a full day; right?
25        THE CLERK: (Nods head.)

Heidi Molesworth, 7-7-09

Page 159

        THE COURT: Okay. Ma'am, I need to have you here by 8:30 tomorrow. We can go off the record for this.

        --oOo--

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter.

/s/ ANDREA N. PICARD, CRR, CCR 887

DATED: AUGUST 24, 2009

Page 1

**A**

abc (7) 5:9,12,13,25
  6:1 7:15 10:2
able (1) 59:22
aboveentitled (1)
  159:8
absent (1) 7:25
absolutely (3) 48:6
  52:7 57:9
acceptable (4) 52:18
  58:8,23 153:2
access (1) 146:22
accident (1) 66:24
account (5) 110:1
  111:10 146:23 147:1
  150:23
accounting (6) 89:13
  108:21 111:8 127:15
  154:20,23
accounts (6) 155:5,7,7
  155:8,10,14
action (7) 7:15 10:2
  58:18 59:5 62:9,19
  67:8
actual (4) 15:22 76:11
  93:23 94:11
added (3) 123:18
  132:12,15
adding (1) 136:18
additional (6) 72:14
  96:3 141:19 151:5
  153:7 154:3
address (9) 55:19,24
  56:5 86:6 102:5,6,9
  102:14 114:10
addressed (1) 86:11
addresses (1) 86:3
admission (42) 8:9
  10:25 11:16 12:9
  13:11 14:3,19 18:2
  19:1,22 20:23 21:17
  23:4 24:8 27:2 28:2
  30:6 31:10 32:7 34:1
  36:25 37:17 38:13
  40:23 41:16 42:8
  43:2,22 44:15 46:17
  47:14 48:18 50:2
  51:4 87:5 93:12
  120:22 123:25

142:21 143:18
  151:17 153:14
admit (4) 19:5 26:1
  61:2,5
admittance (1) 9:15
admitted (47) 9:9
  10:11 11:5,21 12:18
  13:16 14:8 17:13
  18:14 19:13 20:6
  22:3 23:10 27:11
  29:7 30:19 31:19
  33:12 35:18 37:6,22
  40:8 41:3,21 42:15
  43:9 44:2 46:4,25
  47:19 48:23 50:12
  72:7 76:14 85:18
  87:10 95:6 103:15
  121:6 124:6 143:1,21
  143:25 144:8,22
  151:23 153:24
advice (1) 118:24
affirm (1) 115:1
afternoon (1) 69:4
ag (3) 127:2,2,3
ago (5) 16:15 25:8
  52:11 60:18 133:5
agree (2) 21:17 52:23
agreed (2) 72:12,18
ahead (5) 19:5,24
  55:21 63:2 120:6
airconditioning (1)
  146:23
al (1) 1:9
alex (7) 86:12,13,14
  98:24 118:11 129:22
  136:7
alexander (2) 2:19
  154:6
alires (7) 48:3 100:8,21
  101:14 102:13 155:2
  158:12
aliress (1) 107:3
allow (1) 61:19
amendment (1) 4:21
america (1) 1:6
american (4) 7:6 9:22
  9:23 10:2
amount (17) 6:8 77:17
  77:19 80:3 85:13

95:24 97:22,25 98:5
  98:6 99:16 104:19
  105:2 123:2 139:15
  140:4 149:23
amounts (4) 39:12,14
  39:15 92:14
ample (3) 57:25 58:1
  63:13
andrea (2) 1:23 159:10
angry (1) 59:19
answer (8) 52:23 56:23
  90:7 100:3 111:16
  112:3,5 113:22
answered (3) 64:19
  75:25 91:14
anticipated (1) 53:24
anybody (7) 55:8
  57:22 58:14 59:8
  61:18,23 66:19
anybodys (2) 61:18
  64:20
anymore (1) 148:4
anytime (2) 125:9
  138:25
anyway (1) 88:7
apologize (6) 8:23 36:4
  53:8 55:23 57:19
  66:9
appeals (2) 58:25
  114:25
appear (4) 24:5 25:12
  34:13 134:10
appearances (3) 1:20
  2:1 3:1
appellate (1) 59:2
appellate (2) 54:4
  65:15
approach (2) 85:20
  141:18
appropriate (8) 58:1,1
  58:23 59:6 62:9
  113:25 114:1,5
approximately (2)
  75:12,16
areas (3) 117:12
  140:20 154:4
arent (1) 16:25
armored (1) 111:11
arranged (1) 132:17

arterio (1) 71:6
aside (1) 158:13
asked (13) 36:2 53:23
  56:4 71:8,17 75:24
  87:3 91:13 105:14
  108:21 112:12,17,18
asking (8) 16:24 33:15
  47:21 50:17 89:21
  110:8 111:7 136:11
aspen (1) 10:20
assistant (2) 2:4 3:4
assisted (1) 154:6
associated (1) 97:12
assume (2) 8:16 73:8
assuming (2) 84:10
  146:12
assure (2) 52:21 60:13
asterisks (2) 96:10,13
attached (1) 117:24
attention (1) 59:25
attorney (4) 2:4,20
  3:10 119:6
august (1) 159:11
authorized (2) 146:25
  147:3
available (2) 64:17,18
aware (4) 39:2,5
  107:11 111:8

**B**

back (21) 4:10 9:15
  26:10 58:21 65:6,8
  69:7 77:1 78:14 81:2
  81:5 84:2 90:10 94:9
  99:7,25 106:7 110:2
  111:11 130:23
  144:19
backwards (1) 59:7
bad (8) 4:20 54:25
  68:4,6,6,6,6,20
bag (1) 119:14
bags (1) 119:25
balance (4) 127:1
  129:11 132:10,11
bank (9) 80:1 105:20
  109:17,25 111:4,9
  115:18 134:9 141:17
bar (2) 7:6 10:2
barclay (4) 103:24

104:18 106:3,17
**barely (1)** 4:14
**barras (3)** 44:10 45:6
   45:18
**barry (1)** 9:1
**based (3)** 25:21 51:24
   53:11
**basic (1)** 63:17
**basis (6)** 7:18 115:1
   119:21 122:8,15
   131:22
**batch (1)** 20:1
**bear (5)** 12:4 23:20
   83:12,25 85:2
**beg (2)** 8:22 109:3
**began (3)** 24:17,18
   25:12
**beginning (2)** 24:19
   82:25
**believe (21)** 8:21 16:10
   20:24 29:14 36:2
   42:10 45:11 50:21
   59:24 69:11,17 70:19
   71:13 76:7 93:15
   95:10 100:13 124:1
   127:3 140:12 142:9
**belong (3)** 146:8,11,14
**bench (1)** 60:15
**beneficiary (1)** 113:14
**bent (1)** 59:7
**best (5)** 57:4 61:11
   75:6 78:22 127:21
**better (6)** 4:15,16,17
   4:18 65:8 128:23
**beyond (1)** 88:1
**bhb (1)** 11:11
**big (6)** 12:4 62:17
   64:21 83:12,25 85:2
**bill (4)** 48:12 94:8,9
   155:24
**billed (2)** 79:15 82:2
**billing (5)** 14:16 31:2
   32:3 76:22 155:25
**bills (2)** 83:3 157:20
**binder (4)** 12:23 29:11
   91:24 143:6
**binders (1)** 50:14
**bingham (1)** 13:6
**bit (9)** 5:20 15:6 66:21

66:23 86:5 103:9
   105:9 127:18,19
**blame (2)** 60:8,19
**blank (12)** 38:5,7
   39:19,22 57:6,7,14
   59:18 60:5 61:3,6
   72:11
**blow (3)** 81:17 103:19
   149:10
**blue (1)** 67:12
**bobby (24)** 5:14 6:3,11
   76:7,23 78:8 79:9,22
   80:4,21 85:14 89:3,4
   90:19,20 95:19,21
   103:5 130:16,19
   132:19 134:12
   139:11 158:5
**bobbys (5)** 5:14 86:3,7
   103:5 142:5
**bonneville (1)** 3:5
**book (2)** 71:4 139:1
**books (2)** 89:3,5
**bottom (17)** 78:1,3,15
   78:25 81:18,24 84:5
   85:8 94:3,18,20
   104:7 117:25 126:8
   126:22 133:8 147:21
**boulevard (1)** 2:5
**bouncing (1)** 15:7
**bowles (1)** 13:23
**box (2)** 2:10 54:15
**bravo (1)** 14:16
**break (7)** 35:25 36:3
   58:3 68:9 80:6
   158:19,22
**breaking (1)** 80:2
**breaks (1)** 62:1
**bricker (1)** 17:21
**brief (4)** 24:10 35:25
   36:2 93:14
**bring (5)** 4:5,7 80:5
   99:25 124:8
**brother (3)** 73:1,13,23
**brought (4)** 6:12 59:25
   110:2 132:13
**bruce (3)** 103:24
   104:18 106:2
**buck (1)** 62:7
**building (1)** 157:18

**bushes (1)** 63:10
**busier (1)** 103:10
**business (5)** 73:11
   110:1 111:11 138:19
   158:12
**businesses (9)** 5:12,14
   6:2 15:23 45:10
   109:20 110:20
   138:16,21
**busy (1)** 63:10
**buy (1)** 157:25

## C

**cabinet (2)** 7:6 10:3
**cabinets (1)** 157:13
**calculated (2)** 97:10
   138:11
**calculation (2)** 97:11
   138:13
**california (1)** 2:11
**call (2)** 84:23 102:8
**called (2)** 64:7 93:23
**calling (1)** 102:17
**calls (1)** 89:20
**cant (11)** 4:5 61:6 64:5
   65:9 71:19 78:19
   92:19 129:8 134:9
   146:12 156:3
**car (2)** 66:23 111:11
**care (4)** 58:11 64:11
   83:2 91:5
**case (11)** 1:7 54:18
   57:13,24 58:19 59:4
   64:23 65:25 80:11
   110:24 140:23
**cases (1)** 61:13
**cash (75)** 6:12,14 7:23
   80:2,4 83:2 90:22
   91:8 97:15 98:5
   103:25 104:2,5,16
   105:2 106:6,8,13,17
   107:3,7,10,16 108:4
   108:4,13 110:1,3,19
   110:25 111:13
   112:10 113:14,19
   115:9,14,17,23 116:9
   116:11 120:17
   122:14 123:7,9,10,13
   123:18 125:3,9,19

131:24 132:2 133:2,4
   133:24 134:1,4,17,22
   135:2 137:11,24,25
   139:1,2 140:13
   141:17 144:14,19
   148:24 149:3,5
   150:19,20 151:2
**cashed (2)** 6:11 106:6
**cashing (1)** 112:11
**catch (1)** 30:7
**caused (1)** 52:6
**causes (1)** 15:6
**ccr (2)** 1:23 159:10
**certain (5)** 53:22 80:4
   130:14 153:23
   154:18
**certainly (1)** 15:8
**certify (1)** 159:5
**chair (3)** 9:2,5 157:11
**chance (3)** 50:20 63:11
   120:8
**change (5)** 97:19
   115:23 138:14
   139:14 140:21
**charades (1)** 116:21
**charge (1)** 130:5
**charged (5)** 78:8 79:9
   90:16 91:10 140:22
**check (66)** 6:7,9,11,12
   79:19,21 98:13 99:21
   103:19,21,24 104:8
   104:16,17,19 105:6
   106:2 107:6,7,15,16
   107:18,24 108:8,12
   108:22 109:25
   110:16,18,19 111:9
   111:13 112:9 113:19
   115:9,14,17,23 116:6
   135:5 142:1,2,6
   144:14,15,18,21
   145:16,17,25 147:24
   148:6 149:11,13,14
   149:18,19 150:3,12
   150:13,15,17,18
   152:9 153:7,12
**checks (34)** 103:15,16
   104:5,9 105:3,10
   106:5,19 108:3,5
   109:9,11,17 111:4,13

123:17 141:15,16,17
143:16 146:9,25
147:3 148:10,19,20
148:24 149:2,6
150:20 151:1,5,9,12
**chose (1)** 16:2
**chunk (1)** 51:10
**circuit (1)** 62:14
**circumstance (1)** 59:3
**circumstances (2)** 59:6
150:7
**civil (1)** 65:11
**clarify (1)** 105:4
**clear (1)** 150:6
**cleared (1)** 110:17
**clerk (4)** 72:7,15,18
158:25
**clerks (1)** 142:10
**clients (1)** 51:13
**cline (1)** 3:8
**close (2)** 15:5 158:20
**closer (3)** 15:5 105:9
127:19
**coast (3)** 47:25 48:8
49:3
**code (1)** 159:6
**cohan (11)** 2:9,10 4:14
4:16,18,21 8:16,18
24:7 51:25 60:12
**coin (5)** 94:14 125:22
132:16 137:25 138:7
**coins (8)** 96:23 97:7,8
97:14 132:12,21,23
137:24
**collectively (1)** 54:23
**color (1)** 18:20
**column (7)** 85:11
133:2 134:2 137:10
137:12 140:9,13
**come (17)** 7:2 9:15
24:15 39:19 45:16
52:12 53:12,23 55:16
58:2 62:21 80:22
130:14 132:16
134:24 139:11
156:21
**comes (4)** 62:7,15
74:13 82:1
**coming (3)** 39:21 53:24

94:21
**comments (1)** 55:19
**common (1)** 61:5
**comp (3)** 49:15 82:16
82:19
**companies (25)** 5:13
7:18 8:4 10:18 11:13
17:1 28:15 34:15
35:22 42:24 43:18
47:11 66:17 71:19
74:25 75:3,11,16
86:2,3,19 104:2
116:9 156:6,11
**company (43)** 5:15 6:3
6:20 7:2,13 9:21,23
10:19 11:10 12:3
23:16 24:1 25:23
26:19,21 27:21 29:25
30:8,10 31:4 32:4
33:20 34:23 38:4
39:18,18 45:7,19
66:15 69:19 76:4
81:2,6 82:22 83:12
83:15 103:6,8 111:5
133:14 141:11,14
156:10
**companys (1)** 111:10
**compensation (1)**
82:24
**completed (2)** 52:1
70:16
**completely (2)** 57:15
68:20
**concept (1)** 131:8
**concern (1)** 19:6
**concrete (7)** 7:15 10:2
12:4 47:8 48:13
83:13,25
**confer (5)** 48:25 64:7
65:2,16 67:17
**confused (3)** 64:16
109:15,16
**confusing (1)** 96:2
**confusion (1)** 112:22
**consolidated (2)** 19:19
20:8
**construction (8)** 13:6
17:22 20:20 32:25
33:19 49:11 107:8

150:14
**contact (1)** 86:24
**contamination (1)**
120:3
**context (1)** 71:12
**continue (2)** 92:22
117:8
**continued (9)** 3:1 5:1
22:4 26:4 33:13 40:9
46:6 72:21 95:7
**continuing (1)** 36:13
**contracted (1)** 5:14
**contractors (25)** 32:24
39:7 70:15 74:4,6,10
76:23 86:7 87:19,20
88:12,18 90:15,21
91:4,11 109:1,5
111:2 115:9 118:18
119:23 138:24
154:16 155:6
**convenient (1)** 158:19
**conversation (1)** 51:24
**cooling (1)** 58:20
**copies (1)** 143:22
**copy (3)** 61:11 78:22
78:24
**corner (2)** 101:17
104:22
**correct (2)** 72:19 159:7
**correctly (1)** 15:21
**correspond (1)** 78:17
**corresponded (1)**
123:2
**correspondence (1)**
53:14
**corresponding (4)**
77:18 120:14,23,25
**couldnt (3)** 34:25,25
149:8
**counsel (24)** 2:14 4:11
20:9 22:11,15 49:2
50:5 53:15 58:4,11
58:22 60:22 61:5,19
62:16,18,23,24 65:6
66:5 108:17 117:6
121:11 152:24
**count (3)** 35:21 77:13
115:19
**counted (2)** 75:20

77:12
**country (1)** 18:20
**couple (9)** 15:1,14 21:3
34:2 71:18 76:11
78:23 93:14 96:10
**course (3)** 9:17 21:4
153:15
**court (212)** 1:1,23 4:4
4:7,9,10,15,17,19
5:17 8:15,20,22,24
9:3,5 10:9 11:3,19
12:13,16,24 13:14
14:6,23 15:3 17:8,10
18:5,8,12 19:4,9,10
19:23 20:4 21:4,20
21:23 23:8 24:11
25:24,24 26:1 27:6,8
28:7,25 29:3 30:17
31:13,17 32:11 33:7
33:9 35:14 36:1,5,9,9
37:4,20 38:17 40:6
41:1,19 42:13 43:7
43:11,25 46:2,20,23
47:17 48:21 49:1,5
50:10,15 51:8,10,18
51:21 52:5,9,14,20
52:23 53:6,25 54:10
54:13,20 55:18,23,25
56:1,2,3,5,6,11,13,20
56:23 57:3,20 58:7
58:25 59:20 60:7,10
61:7 63:4,21,24 64:3
64:15 65:5,18,22
66:2,7,11,18,22 67:3
67:6,16 68:6,15,15
68:17,17 70:22 72:3
72:6,13,17,20 75:14
76:1 85:22 87:9,14
88:8 89:23 90:25
91:15 93:17 95:4
100:6 105:14 108:18
108:24 109:3,7,14,23
110:7,13,17,23 111:6
111:18,20,23,25
112:3,5,12,16,21
113:1,3,6,10,24
114:5,8,10,14,16,16
114:20,24,25 116:19
116:21 117:3,5,5

118:22 119:4 120:2
121:4 123:22 124:5
129:7 136:12 141:20
142:19,25 150:6
151:21 152:3,5 153:3
153:4 158:18,23
159:1
**courtroom (1)** 68:24
**courts (9)** 12:22 35:20
48:24 50:13 59:25
64:7 91:23 116:17
121:9
**cover (5)** 79:20 81:2
134:23 135:6,12
**covered (1)** 82:21
**create (3)** 8:6 77:22
84:13
**created (5)** 10:21 13:7
76:25 77:4 84:11
**crew (2)** 45:15,16
**cross (1)** 153:23
**crossexamination (1)**
153:20
**crr (2)** 1:23 159:10
**cruising (1)** 68:3
**csos (1)** 65:8
**currio (1)** 45:1
**cut (3)** 6:7 63:19
150:13
**cutting (1)** 124:20

**D**

**damm (293)** 2:4 4:6,22
5:2,24 8:8,13 9:10,11
10:5,12,24 11:6,15
11:22 12:8,19,22,25
13:1,10,17 14:2,9,19
15:8 17:14 18:1,15
18:25 19:14,15,21
20:7,11,13,22 21:19
22:5,16,18 23:3,11
23:12 25:18 26:2,5
27:1,12 28:1,23 29:8
30:5,9,20 31:9,20
32:6 33:14,25 35:12
35:16,20 36:7,11,12
36:24 37:7,16,23
38:12 40:10,22 41:4
41:15,22 42:7,16

43:1,5,10,12,21 44:3
44:14,19 46:5,7,16
47:1,13,20 48:17,24
49:2,7 50:1,7,13,16
51:3 52:8 53:3 60:12
64:10 65:1,14 68:14
69:1,2,3 70:19,23
72:8,14,19,22 75:15
76:2,13,15 77:5,7,25
78:2,14,16 79:2,4
81:15,20 82:6,8 83:6
83:8,18,20 84:2,4,20
84:23 85:1,4,7,9,20
85:23,24 87:4,12,15
87:24 88:6,10 89:21
90:1 91:1,2,16,23
92:1 93:11 95:8,12
95:14 96:3,5 98:12
98:14,20,22 100:4,10
100:23,24 101:9,12
101:15,18,23 102:1
102:21,23 103:18,20
104:11,12 105:21,24
106:1,25 107:2,12,14
107:21,23 109:10
110:5 112:7,20 113:2
113:8,9,11,12 114:6
115:5,6 116:17 117:1
117:8,9,10 119:5
120:7,21 121:7,9,14
121:16,19,23 122:1
123:20,24 124:8,10
124:20,24 126:2,4
127:10,11 129:8,12
130:1,3 133:1,3,18
133:20 134:1,3
135:14,16,21,22
136:13,15,23 137:1
137:12,14 140:8,11
141:18,21 142:12,16
142:20,24 143:3,17
143:24 144:3,9 145:1
145:3,6,11,13,14,22
145:24 147:15,17,23
148:1 149:9,12 150:7
150:9,11 151:16,24
152:7,19,23 153:5,13
154:1 158:19,21
**danielle (8)** 48:3 100:8

100:21 101:14
102:13 107:3 155:2
158:12
**danille (1)** 3:8
**date (5)** 23:23 24:24
74:23 129:13 152:15
**dated (3)** 23:23 133:16
159:11
**dates (3)** 25:8 63:18
136:19
**david (2)** 1:3,9
**day (7)** 51:16 67:25
123:14 127:1 134:25
158:20,24
**dealt (1)** 109:19
**debbie (1)** 155:2
**debra (3)** 101:5 102:16
106:20
**decide (1)** 116:23
**decided (2)** 62:21
131:19
**decisive (1)** 58:18
**deck (1)** 15:7
**deducted (1)** 132:13
**deduction (1)** 131:5
**defendant (5)** 2:8,13
2:19 3:3,8
**defendants (13)** 1:10
52:11 142:17 143:1
143:18 144:7 147:16
151:5,17,22 153:9,14
153:24
**defender (1)** 3:4
**defense (15)** 55:10
60:18,19 62:11,24
63:7 142:10,13,15
143:22 145:12
149:10 150:9 151:25
152:24
**degenerated (1)** 64:5
**delivered (1)** 111:11
**deliveries (1)** 134:24
**delivery (1)** 132:16
**denominations (1)**
80:4
**department (4)** 24:23
25:2 82:24 144:20
**depot (1)** 158:2
**described (2)** 10:1

90:22
**describing (2)** 34:19
35:4
**desert (1)** 22:23
**designation (1)** 58:25
**desk (1)** 157:9
**detailed (1)** 103:9
**determination (2)**
58:17 108:16
**determine (1)** 60:23
**didnt (42)** 24:22 30:7
39:15 51:9 53:2,16
54:2 57:5,20 63:11
71:9 73:10 74:15,23
75:2 80:22 84:12,13
90:10 94:20 97:19
98:2 100:9 105:15,15
109:20 121:12
123:17 132:20
135:10 136:9 146:8
146:11,14 148:16,18
148:20 149:7,17
150:24 155:14
156:21
**difference (1)** 138:9
**different (18)** 6:15 9:5
21:13 61:3 62:3
71:18,19 112:13,17
112:19 114:12,21
117:20 119:2 121:12
123:9 138:1 152:10
**difficult (1)** 52:15
**diligent (1)** 62:12
**dillon (1)** 41:11
**dire (14)** 15:15 21:6
24:12 28:8 32:12
34:4 38:18 44:18
63:17,22 64:21 70:21
71:1 93:18
**direct (9)** 5:1 22:4 26:4
33:13 40:9 46:6
72:21 86:24 95:7
**discussed (24)** 10:22
12:6 13:8,25 17:24
18:23 23:1,18 26:24
27:24 30:3 31:7
33:23 36:22 38:10
42:5 44:12 46:14
48:15 49:24 51:1

| | | | |
|---|---|---|---|
| 70:17 75:12,17 | 59:23 60:2,5,17,23 | 133:9 134:12 136:22 | 110:21,25 111:2 |
| discussion (2) 116:20 | 61:2,3,6,6,8,9,14,14 | 138:11,18 139:24 | employment (1) 141:7 |
| 144:6 | 62:1,8 63:2,19 64:22 | 144:4 147:10 148:4 | empty (1) 54:15 |
| discussions (1) 88:24 | 66:15 67:17 69:9,18 | 148:21 149:17 150:5 | endorsed (2) 100:19 |
| disgusted (1) 59:11 | 71:25 72:9,11 81:19 | 155:10 | 101:10 |
| disposition (1) 81:10 | 92:9,18,23 103:2 | door (1) 80:21 | endorsement (3) 99:19 |
| dispute (1) 110:24 | doesnt (21) 25:22 | doublecheck (1) | 99:20 102:2 |
| distinguish (1) 155:8 | 34:13 65:12 67:5,11 | 152:25 | endorsements (2) 99:9 |
| distribute (1) 91:7 | 67:13 84:9 88:5 | doubt (1) 19:3 | 101:24 |
| distributed (3) 6:21,24 | 100:2 108:18,20 | draft (1) 53:4 | ends (1) 66:24 |
| 119:20 | 110:8,14 113:21 | dropped (1) 89:15 | enlarge (7) 85:4,7 |
| district (3) 1:1,2,3 | 127:16,20 129:25 | drywall (1) 77:3 | 87:24 95:12 101:16 |
| divided (1) 6:15 | 131:7 136:10 142:14 | duplicate (5) 152:13 | 137:12 147:23 |
| document (47) 9:6 | 150:6 | 153:8,15,19,21 | entered (1) 4:8 |
| 20:25 21:8,14,15 | dog (1) 66:3 | duplicates (2) 152:4,5 | entering (1) 151:1 |
| 28:11,13,18 32:10,17 | doing (7) 16:9 52:3 | duplication (1) 152:25 | entire (1) 78:20 |
| 32:22 34:14,17 38:23 | 62:16 67:9 91:5 | | entirely (1) 61:3 |
| 39:25 44:23 45:21 | 98:10 103:10 | **E** | entitled (3) 104:5 |
| 46:10 47:4 51:15,15 | dollar (8) 96:2,13,16 | earlier (8) 51:24 53:11 | 142:7 146:4 |
| 56:17 57:3 61:7 | 96:17,19 97:11 134:8 | 53:25 59:25 60:2 | entries (6) 122:24 |
| 76:20 77:8 78:4 87:2 | 138:13 | 66:9 123:10 154:5 | 125:20 126:11 |
| 87:17,18 92:13,19 | dollars (6) 95:22 96:1 | early (4) 16:8,13,22 | 127:24 128:3 134:4 |
| 95:11,17 96:21,22,24 | 97:13,15 138:5,12 | 74:22 | entry (10) 108:4 |
| 97:3 98:16,21,23 | donna (2) 101:20 | earned (1) 149:24 | 124:11 125:13 126:7 |
| 99:12 100:19,25 | 102:10 | earning (1) 149:23 | 126:8 133:7 137:15 |
| 102:24 104:13 | dont (109) 5:19 12:10 | ease (1) 153:23 | 138:25 148:9,12 |
| 136:11 | 15:8,13 16:10,10,11 | easier (1) 115:16 | envelope (4) 80:7,8,18 |
| documents (122) 9:14 | 16:15,23 19:9,23 | easiest (1) 5:17 | 106:14 |
| 9:19 10:14 11:8,12 | 20:24 23:15 24:2,3 | easily (1) 115:13 | envelopes (20) 6:16,17 |
| 11:24 12:1 13:4,20 | 24:24 25:3,7,8,13,16 | east (1) 3:5 | 6:19,21 7:2,24 16:2 |
| 14:13 16:13 17:16,18 | 28:4,13,16 34:11 | easy (1) 115:11 | 77:12,15,18 90:23 |
| 17:20 18:7,19 19:18 | 35:1,5 42:10 45:13 | effort (1) 15:4 | 115:20 119:16 |
| 20:1,17 21:11,17 | 47:25 48:1,9 50:5 | eight (15) 53:10 78:11 | 120:13,16,19,23,25 |
| 22:9,19 23:14,15,17 | 51:15 52:6,20 53:1,3 | 97:13,15,16 117:13 | 121:10 125:3 |
| 23:18,21 24:4,5,14 | 54:10,15 55:18 58:9 | 117:13 122:8 138:5 | equal (1) 85:14 |
| 25:1,9,11 26:14,23 | 59:16,22 60:2 61:16 | 138:12,13 141:5 | esq (4) 2:4,9,15 3:4 |
| 27:16 28:6 29:17,23 | 63:21,24 64:15,19,22 | 156:17,24 158:16 | et (1) 1:9 |
| 30:24 31:25 33:8 | 65:13 66:3,22 72:17 | either (8) 12:15 18:11 | evasion (1) 140:23 |
| 34:3,10 35:8 36:16 | 74:1,12,16,23 75:1,1 | 20:3 23:7 59:1,23 | evening (2) 153:1,16 |
| 37:11 38:2,6,16 | 75:20 79:12 88:6 | 72:11 79:22 | eventfully (1) 112:10 |
| 40:14,20 41:8,24 | 90:5,18 93:15 94:25 | electric (1) 155:19 | eventually (1) 110:25 |
| 42:18 43:14,19 44:7 | 96:17 97:1 98:10 | elses (1) 64:20 | everybody (5) 15:3 |
| 44:9,17,24 46:13 | 102:11,15,15 108:6,7 | emphasize (1) 52:5 | 64:25 65:18 116:6,8 |
| 47:6,11,23,24 48:4 | 109:23 110:13,23 | employee (6) 108:12 | evidence (50) 9:9 |
| 48:11 49:3,23,24 | 111:18 112:18 113:2 | 108:22 112:10,21,22 | 10:11 11:5,21 12:18 |
| 50:19,20 51:10,14,23 | 113:16,24 114:1,9,14 | 112:25 | 13:16 14:8 17:13 |
| 52:9,10,12,25 54:3,6 | 115:2 116:12 119:7 | employees (12) 84:19 | 18:14 19:13 20:6 |
| 55:10 56:24 57:6,7,8 | 119:19,25 120:2 | 84:22 106:16 109:2,6 | 22:3 23:10 27:11 |
| 57:10 58:5,22 59:18 | 123:20 127:14 130:1 | 109:13,21,22 110:20 | 29:7 30:19 31:19 |

33:12 35:19 37:6,22
40:8 41:3,21 42:15
43:9 44:2 46:4,25
47:19 48:23 50:12
53:24 57:4 61:15
62:13 72:7 76:14
85:18 87:11 95:6
103:16 108:19 121:6
123:21 124:7 143:2
144:8 151:23 153:25
**evidentiary (4)** 57:2,12
67:7 68:10
**exact (4)** 24:24 25:8
74:23 119:19
**exactly (5)** 45:13 71:20
73:10 119:3 154:1
**examination (18)** 5:1
15:15 21:6 22:4
24:12 26:4 28:8
32:12 33:13 34:4
38:18 40:9 44:18
46:6 71:1 72:21
93:18 95:7
**excellent (2)** 65:2,14
**exception (3)** 29:4
35:15 49:6
**exchange (16)** 16:3
88:13 98:9 99:1,4
115:11,24 125:4
137:6,20 147:21
148:3,5,17,23 149:1
**exchanged (1)** 115:14
**exchanges (1)** 125:24
**excluding (1)** 72:5
**excuse (9)** 26:20 63:11
68:13 80:1 117:21
119:15 139:2,13
152:2
**executed (1)** 116:4
**exercise (2)** 52:16
57:19
**exhibit (59)** 8:9 9:8
26:7 28:2 31:22
36:25 38:13 46:8
50:2,18 53:25 69:8
70:13,20 76:17 85:18
85:25 87:5,10 92:3
93:12 103:16 116:15
120:22 121:21,21,22

122:2,7 123:25 124:6
124:9,12 141:22,23
142:11,14,15,16,21
143:1 144:10 145:10
145:12,15 146:15
147:16,18 149:10
150:10 151:6,25
152:10,15,15,22
153:9,14,24
**exhibits (56)** 5:7,9 7:5
7:7 10:10 11:4,20
12:17 13:15 14:7
17:12 18:13 19:12
20:5 22:1 23:9 27:10
29:5 30:18 31:18
33:11,17 35:17 37:5
37:21 40:7 41:2,20
42:14 43:8 44:1 46:3
46:24 47:18 48:22
50:11 53:17 72:4,5
91:21 95:5 119:12,13
120:22 121:5,17
141:19 143:5,8,18,20
143:23 144:7,22
151:17,22
**exhusband (1)** 73:9
**existence (1)** 74:4
**expected (2)** 90:5
157:4
**expenses (3)** 81:3
123:14 150:1
**experience (2)** 58:6,6
**experienced (1)** 54:19
**explain (6)** 52:8 96:20
125:5 131:2 132:9
146:7
**extra (7)** 79:5,11 80:15
82:7 84:10,12 151:15
**ezra (1)** 1:3

─────────────
**F**
**face (2)** 71:20 96:2
**fact (8)** 25:22 54:14,15
54:16 59:8 64:6 88:1
115:16
**facts (1)** 59:4
**fair (2)** 28:19 97:13
**fake (2)** 100:9 101:22
**false (5)** 98:18 100:11

101:6,21 102:19
**familiar (5)** 21:14
47:24 48:1,4 90:11
**familiarize (1)** 53:20
**family (1)** 73:10
**far (7)** 19:23 74:5 75:8
82:17 85:11 107:20
122:17
**fashion (12)** 10:21
13:7 17:23 18:22
22:25 26:24 37:14
41:13 42:23 47:10
48:14 147:9
**fashioned (1)** 68:25
**fault (10)** 8:24 55:9,10
58:9 60:21 66:22,25
67:1,4,11
**fe (1)** 2:11
**federal (6)** 3:4 54:20
58:7 61:23 64:7
140:17
**fee (16)** 6:8 78:7,11
79:9,10,20 80:15,19
82:5,10,15 84:16
85:14 90:17 91:11,17
**feedback (1)** 15:5
**felony (1)** 140:22
**fernandez (1)** 76:8
**fifth (1)** 4:21
**fight (1)** 66:4
**figure (10)** 67:8,12
78:12 79:3,5,8,14,15
84:5 96:6
**figures (5)** 78:3,6,17
85:11,12
**figuring (1)** 16:1
**file (2)** 61:4 67:20
**files (1)** 154:16
**filing (2)** 154:7 157:13
**fill (4)** 8:1 77:14
105:20 118:25
**filled (4)** 16:6 80:11,19
82:22
**finally (1)** 131:6
**find (5)** 15:18 65:9,9
78:24 158:18
**fine (10)** 5:6 19:7
21:19 26:2 35:12
57:11 65:24 142:12

142:18 143:24
**finger (8)** 54:21 55:8
56:7 57:22 58:14
59:15 60:11 66:18
**finished (1)** 113:6
**first (34)** 3:4 16:1,9
26:17 45:12 50:23
54:17 58:12 59:1
69:12,22 70:1,11
71:13 72:25 73:1,4
74:2,9,13,15,18
75:23 77:2 78:25
79:15 81:14,22 95:11
106:21 124:11
126:12 152:14,18
**five (4)** 53:10 60:16
132:12 150:5
**fiveminute (1)** 36:6
**fly (1)** 63:12
**folks (1)** 71:22
**follow (1)** 117:11
**foregoing (1)** 159:6
**forfeit (2)** 55:9,11
**form (7)** 16:7 86:9
88:18,21 89:17 90:3
90:9
**format (3)** 23:20 76:18
83:10
**forms (4)** 90:12 97:21
97:24 119:1
**forth (1)** 131:6
**forward (3)** 54:25
58:19 61:20
**found (1)** 13:2
**foundation (13)** 25:20
25:22,25 66:10,14
84:22 89:20 112:25
113:5,21 114:3
129:24 130:2
**four (4)** 53:10 126:25
127:4 157:1
**framing (20)** 27:19
31:2 32:3 36:19 38:5
38:7 39:20,22 40:17
41:11 44:10 45:7,19
47:25 48:8 49:3
69:20 70:4,9 74:14
**frankly (1)** 58:10
**front (8)** 7:7 15:18

65:13 71:4 119:11
128:20 141:23
144:11
**full (2)** 154:12 158:24
**further (4)** 25:16,25
88:4,6

---

### G

**game (1)** 60:8
**garcia (6)** 100:14,20
101:2,11 102:14,18
**gas (1)** 123:15
**gears (1)** 154:2
**gee (1)** 68:4
**general (7)** 32:24
70:14 72:24 76:22
87:19,20 155:6
**generated (1)** 92:8
**gentlemen (6)** 4:10,11
4:23 34:19 68:18
117:7
**germans (1)** 68:21
**gest (1)** 102:8
**getting (7)** 24:25 35:23
59:9 60:8 67:3 110:1
158:20
**girls (3)** 154:24 155:1
155:22
**gist (1)** 109:24
**give (6)** 12:11 16:3
72:15,17 91:6 110:19
**given (7)** 6:16 93:3
99:4 103:24 111:4
118:8 127:8
**giving (1)** 57:25
**glass (1)** 42:21
**go (49)** 9:13,14 14:22
19:4 35:22 51:14
52:25 54:24,25 55:21
57:18 61:20 63:1
65:10 68:8 76:13
77:5 78:14 82:6 84:2
84:20 88:13 98:8,12
98:20,25 100:15,18
101:9 103:18,24
104:11 106:6,7
108:18,20 110:8
111:10 115:18 120:6
127:10 128:2,17,21

133:1 139:1 143:6
148:16 159:2
**goes (2)** 68:23 152:21
**going (47)** 4:19 34:15
51:11 52:16 53:16
55:6,7,12 57:6,8
58:15,20 59:4 60:3
60:16,20,21,24 61:19
61:24 62:8,9,12 63:3
63:6,12 64:10,23
65:21 67:24 68:12,24
69:25 88:7 89:3,4,12
95:25 109:18 110:1,4
111:12 130:23
134:25 140:21 143:5
143:7
**gold (67)** 16:1 67:22
92:14 93:4 94:14
95:23 96:1,18,22
97:7,22,25 98:5,8
99:1,4,5,16 106:13
108:14 115:11,13,24
117:16 120:18
122:13,17,21 123:2
125:3,9,17,22 126:25
127:2,17 129:4,10,17
129:19 130:6,8,12,15
130:17,24 131:8,9,12
131:13,17,19,22
132:4 133:21 134:19
135:6,10 139:1,7,15
139:19 140:2 148:5
148:16,23 149:1
**good (15)** 4:9,22 5:3,4
51:10 64:21 66:13
67:15 68:4,19 69:4
116:25 139:23,25
158:21
**government (9)** 56:25
60:1 62:10,23,25
72:1 109:17 111:3
142:14
**governments (23)** 8:9
26:7 28:2 31:22 32:7
36:25 38:13 50:2,18
55:9 60:25,20 69:7
87:5 89:3,4 92:3
93:12 109:1,5 116:14
123:25 143:22

**graffiti (2)** 9:22,23
**grants (1)** 25:24
**great (1)** 117:1
**greco (1)** 76:9
**gregory (1)** 2:4
**ground (6)** 114:13,17
114:18,21 115:1,2
**group (2)** 20:25 28:5
**guess (2)** 90:7 157:5
**guilty (1)** 140:25
**guys (1)** 123:15

---

### H

**hadnt (1)** 53:22
**half (2)** 58:22 60:21
**halfway (1)** 137:13
**hall (2)** 101:20 102:10
**hand (2)** 134:23 144:1
**handed (4)** 7:23,24
94:4 154:15
**handful (2)** 75:10
99:24
**handing (1)** 48:7
**handle (2)** 83:1 135:3
**handled (3)** 119:18
134:21 154:22
**handling (2)** 66:6
128:12
**hands (1)** 63:8
**handwriting (13)**
49:18,21 104:21,24
128:9,25 134:14
135:17,23 136:16
140:18 145:5,8
**handwritten (2)** 81:23
86:8
**hansen (10)** 2:20 65:22
65:24 66:5 87:6 88:1
88:9 95:25 129:23
136:9
**happen (10)** 6:9,14
58:15,16 60:14 62:20
67:12,13,24 68:24
**happened (9)** 54:17
58:13 61:22 74:16
79:18,21 80:15 118:2
146:7
**happening (2)** 5:18
129:4

**happens (2)** 62:8 63:4
**happy (5)** 60:24 65:4,9
65:16 68:2
**hard (3)** 28:18 105:8
127:22
**havent (3)** 58:13,14
64:5
**hawaii (1)** 3:11
**head (4)** 22:16 65:23
102:12 158:25
**hear (7)** 4:14 15:10
53:7 57:22 102:9,13
129:8
**heard (3)** 54:8 66:1
76:6
**hearing (1)** 67:7
**heels (1)** 58:21
**heidi (3)** 1:16 102:7
111:14
**held (3)** 116:20 144:6
159:8
**hello (1)** 69:5
**help (3)** 71:12,16 87:16
**helped (4)** 118:16,25
124:18,22
**helpful (2)** 63:16 64:2
**heres (2)** 52:22,22
**hes (3)** 45:18 111:6
136:10
**hesitate (1)** 52:4
**highlight (3)** 78:15
133:2 134:1
**highlighted (2)** 96:7
126:12
**holding (1)** 62:2
**homes (1)** 10:20
**hon (1)** 1:3
**honolulu (1)** 3:11
**honor (172)** 4:6,22 8:8
8:11,17,25 9:10 10:5
10:8,24 11:1,15,17
12:8,11,14,25 13:10
13:12,13 14:2,20,21
14:25 15:9,13 17:7
18:1,4,10,25 19:3,8
19:14 20:2,22 21:2
21:16,19,22 23:3,5,6
23:11 24:7,9 25:17
25:20 26:3 27:1,3,7

28:1,5,21,24 30:5,16
31:9,15 32:6,9 33:6
33:25 34:2 35:7,10
35:12,20 36:3,7,11
36:24 37:2,16,18
38:12,15 40:4,22,24
41:15,17 42:7,9,11
43:1,3,10,21,23
44:14,16 45:24 46:5
46:16,18,21 47:13,15
48:17,19 49:2 50:1,4
51:3 52:2,8,19,22
53:8,22 54:7 56:22
59:17 61:1 63:15
65:1,15,20,24 66:9
68:14 69:2 70:19
71:25 72:8 84:21,24
85:23 87:4,7 88:1,7
93:11,15 95:3 96:1
100:4 105:12 109:11
109:17 110:6 111:1
111:24 113:4 114:4
115:5 117:2,9 120:21
121:1 123:24 124:3
130:2 141:18 142:9
142:12,18,22 143:19
143:24 144:25
151:16,19 152:18,19
152:23 153:13,17,19
158:21
**hope (1)** 64:4
**hopefully (2)** 51:14,16
**hour (4)** 58:3,21,21
60:21
**hours (3)** 6:5 157:2,4
**hundred (2)** 20:1 27:4
**hundreds (1)** 61:8
**hurt (1)** 82:21
**husband (1)** 73:9
**hvac (1)** 155:19

**I**

**id (62)** 7:4 8:8 9:13,13
10:5,24 11:15 12:8
13:10 14:2,19 17:15
18:1,25 19:21 20:22
23:3 24:7 27:1 28:1
30:5 31:9 32:6 33:25
36:24 37:16 38:12

40:11,22 41:15 42:7
43:1,21 44:14 46:16
47:13 48:17 50:1
51:3 54:5 56:8 69:6,6
72:23 76:10 85:17
91:20 93:11 103:14
108:15 116:13 121:8
121:20,21 123:24
142:20 143:17,24
151:16 153:6,13
154:2
**idea (3)** 61:10 66:23
94:23
**identified (4)** 53:9 54:1
56:18 60:2
**identify (2)** 59:22
61:13
**ill (8)** 15:12 55:19
84:23 91:1 96:3
113:9 121:10 130:1
**illegible (6)** 57:15
59:18,23 61:14,14
72:11
**im (97)** 15:12 16:24
18:5 22:11 24:25
26:11 28:12 30:7
35:22 36:1 49:9
50:17,21 51:22 52:2
52:3,14,14,21 54:13
54:13,14,16,21,22
55:7,7,16,22 56:15
57:17 58:11,14 59:15
60:3,4,7,10,11,18
61:16,17,17,18,18,19
61:22 62:6,9,16,20
62:22,22,23,23,24,24,25
63:7 64:8,12,25 65:2
65:16,24,25 66:18
67:3,9 68:12 75:9
77:23 84:9 89:21
95:25 105:4,7,8
106:21 107:11
109:15,16 113:6
114:25 118:3 119:3
126:7 128:21 129:9
139:17,21 140:21
141:13 143:7 146:12
148:22 154:15 156:3
**immediately (1)** 65:3

**impact (1)** 59:10
**impediment (1)** 111:21
**incidents (1)** 67:24
**include (2)** 50:7
155:14
**included (2)** 52:10
118:3
**income (2)** 90:3 140:23
**inconveniencing (1)**
52:17
**increase (1)** 75:4
**independent (3)** 39:6
89:2 111:2
**indicate (1)** 89:14
**indicated (7)** 49:2 51:5
88:2 100:4 140:12
141:5 145:7
**indicates (2)** 149:21
150:18
**indication (3)** 129:13
129:16 137:5
**individual (2)** 63:19
71:17
**individuals (4)** 82:19
83:24 108:2 115:7
**indulgence (6)** 12:22
48:24 50:14 91:24
116:18 121:10
**informally (1)** 64:6
**information (6)** 35:21
39:25 76:25 77:1
86:16 88:25
**initially (1)** 74:7
**initials (1)** 16:18
**inquire (2)** 58:16 62:9
**instances (1)** 59:9
**instructed (1)** 53:25
**instruction (1)** 96:15
**insurance (3)** 49:15
82:16,19
**integrity (1)** 59:10
**intend (1)** 61:12
**intended (1)** 112:18
**intercompany (3)**
93:24 99:8 100:16
**interested (4)** 60:7
67:3,9,10
**interesting (1)** 62:14
**internal (2)** 89:1 116:4

**interrupted (1)** 66:9
**interruption (1)** 15:6
**interspersed (2)** 57:7
66:16
**introduce (9)** 53:16
55:10 56:25 57:6
59:18 60:4,6 62:13
63:6
**introduced (4)** 53:1
59:24 63:3 109:17
**inventory (4)** 122:21
126:17 130:5 139:7
**invoice (9)** 6:7 7:12
76:25 77:3,22 79:1
83:9 84:6 155:5
**invoices (28)** 8:6 10:17
13:6 17:21 18:20
19:19 20:20 26:17
27:19 29:20 33:18
37:12 38:7 40:17
41:11 42:2,21 43:17
44:10 47:8 48:12
50:23 53:13 70:14
81:14 83:5 84:11
91:18
**invoicing (4)** 13:23
22:23 36:19 49:10
**involved (6)** 15:25
74:7,11 86:22 118:20
136:5
**irritated (2)** 57:17,21
**irs (1)** 90:4
**ishmael (1)** 45:1
**isnt (5)** 62:4 94:18
110:18 113:25
152:22
**issue (11)** 97:21,24
108:19,20,20,21
110:8,11,13 114:24
115:17
**issued (3)** 105:3
117:15 150:15
**issues (3)** 57:13 61:24
68:11
**item (1)** 134:10
**items (3)** 111:7 116:16
134:4
**ive (16)** 16:5 51:22,23
52:1 53:9 55:1 56:18

59:1,2 61:13 62:4,16
66:1 99:15 114:8
119:11

**J**

job (2) 57:24 103:7
jobs (2) 73:10 84:19
joel (1) 2:20
john (1) 76:8
jorge (1) 76:7
judge (13) 1:3 4:14
54:24 58:7 59:1,2,3
60:17,25 62:15 63:5
63:10,10
july (2) 1:17 4:1
june (1) 73:20
juror (5) 14:25 15:11
35:25 36:4 124:21
jurors (7) 4:8 15:1
36:10 51:20 54:16
59:11 116:24
jury (20) 1:15 4:5,7,12
4:23 34:19 35:21
52:17 54:5 57:12
58:20,21 65:13 68:9
68:18 87:13,16 94:7
108:16 117:7
jurys (1) 64:20

**K**

kahre (69) 1:9 2:8,13
3:3 7:25 24:18 38:24
39:14,15 45:4 73:1,2
73:4,6,14,17,19,22
74:3 80:9,24 82:10
82:15,18 83:15,22
88:19,22,24 89:17
90:3 91:4,10 92:11
93:9 97:21 98:8
101:22 102:5,9
104:10 105:23
106:23 108:12
109:18,25 112:9
113:18 115:8 117:12
118:13,15 119:18,22
122:9 129:19 131:10
141:4 144:16 146:20
147:9,11 148:11
151:1 154:6 156:18
157:6 158:7,15

kahres (22) 5:12 6:1
7:18 9:24 11:13
28:15 49:22 76:4
84:16 88:14 90:16
104:2,25 111:5
116:10 122:16
133:12 136:17
138:20 140:19 145:7
156:6
kaput (1) 68:21
keep (13) 39:10 89:3,4
90:5,6 94:20 125:16
125:17 131:17,19
132:20 135:10 143:5
keeping (2) 127:21
130:5
kennedy (138) 3:4
8:11,25 9:4 10:8 11:1
11:17 12:10,14 13:12
14:4,21,24 15:13,16
17:6 18:3,5,6,9 19:2
19:6,7 20:2,9,11,12
20:24 21:21 22:13,15
22:17 23:6 24:9,13
25:16,18,19 27:3,7
28:4,9,21 30:16
31:15 32:9,13 33:5,8
34:2,5 35:7 36:2 37:2
37:18 38:15,19 40:3
40:24 41:17 42:9
43:3,23 44:16 45:24
46:18,21 47:15 48:19
48:25 50:4 51:5,7,9
51:13,22 52:22 53:7
53:8 55:13,14,19,21
55:22 56:10 57:9
60:12 64:15 65:20
66:8,12,20 67:2,5,15
68:5 70:20 71:2,24
87:7 93:14,19 95:2
100:2 108:15,23,25
109:4,12,16 110:10
110:15,18 111:1,16
111:19,22,24,25
112:2,4 114:3,8,12
114:15,16,19,23
121:2,11,15 124:3
142:9,22 144:24
151:19 152:17

153:17
kept (15) 12:5 65:22
94:15 105:19 122:13
129:10,16 130:11
131:22,24 135:12
137:23 138:19 139:4
139:15
kind (6) 9:3 55:3,4
59:5 89:15 119:25
kinds (3) 61:24 62:1,15
king (17) 76:13 77:6
77:25 78:15 79:2
81:15,19 82:7 83:6
85:5 87:25 95:10,13
98:13 103:19 124:8
147:23
knew (6) 73:3 81:1
89:10 97:2 134:25
135:2
know (112) 9:1 21:13
35:1,5 50:19 51:5,9
52:6,20 53:15 54:10
56:9,10 58:9 59:16
59:22,23 60:3 61:16
63:2,9 64:7 65:7
66:22,23 67:11,20,23
68:3 73:25 74:5,6,12
74:12,16 75:1,16,20
76:3,3,7 78:6 79:10
80:24 81:5 82:1,14
82:17,18 84:8 87:1
88:5 90:5,10,18
94:25 97:1,9,11 98:2
99:23 100:2 101:3
103:3 106:5,19 107:9
107:20 108:6 109:23
110:13 111:20
112:18 113:2,13,16
113:21,24 114:1,9
115:7 116:12 118:11
119:6,8,19 121:13
122:17 123:14
124:17 125:17
129:25 131:16,24
132:1 133:9,13 134:6
136:21 138:11,15
146:9 148:2,21 149:5
149:17,19 150:5
153:7 156:1,5,10

knowing (1) 131:22
knowledge (9) 63:18
86:22 88:3 89:16,21
90:2 98:25 113:18
142:10
knows (3) 63:9 108:17
111:3

**L**

label (1) 84:9
labor (2) 32:19 39:10
lack (4) 25:19,21 89:19
113:20
lacks (2) 84:22 112:25
ladies (6) 4:9,11,22
34:19 68:18 117:6
lam (1) 121:16
las (6) 2:5,6,16,21 3:6
4:1
lasted (1) 158:15
late (2) 156:21,21
laughter (1) 120:5
law (5) 2:15,20 3:10
66:3 67:20
lawsuit (1) 67:21
lawyer (2) 54:19 58:6
lawyers (3) 54:23 55:4
62:1
lay (2) 25:25 130:1
leader (1) 45:15
leading (8) 75:13,24
90:24,25 105:13
123:19,20 136:8
learned (2) 73:13,22
leave (1) 63:14
ledger (22) 124:2
125:5,8,15,20 126:6
127:5,7,12,25 128:10
128:12,19,22,22
129:5 130:9,12
136:19 138:17 139:3
139:20
ledgers (1) 21:12
left (4) 78:12 96:12
129:11 130:24
lefthand (2) 101:17
104:22
legal (5) 66:25 118:16
118:21,23,24

**legible (3)** 61:9 78:24
134:10
**legitimate (1)** 149:15
**leonards (1)** 27:19
**letterhead (1)** 39:10
**liability (1)** 49:15
**liened (1)** 154:16
**liens (6)** 118:17 119:1
154:7,11,12,14
**likewise (1)** 152:19
**limine (2)** 60:1 61:4
**line (3)** 79:3 94:10
143:10
**lisa (2)** 2:15,15
**list (10)** 6:16 51:23
53:16 72:8,15 83:21
84:19,19 85:2 86:2
**listed (1)** 72:6
**listen (3)** 63:24 64:3,4
**listing (2)** 45:14 86:6
**little (17)** 5:20 15:4,6
19:2 66:21,23 67:7
67:24 78:22 86:5,5
103:9 105:8 123:15
127:18,19 130:2
**local (1)** 2:14
**location (1)** 119:2
**logbook (4)** 122:24
123:1,6 126:12
**logged (2)** 125:10,11
**logging (1)** 122:17
**loglia (15)** 2:19 86:14
86:16,22 98:24,25
118:11,19,23 119:6,8
129:22 130:17 154:6
154:13
**long (7)** 16:15 25:8
72:25 105:18 117:12
135:12 156:22
**look (100)** 7:5 10:13
12:12 14:10 18:7
19:16 20:14 21:8
22:6 23:13 24:14
25:10 26:6 27:13
28:10 29:10 30:21
31:21 32:14 33:15
36:14 37:8,24 38:20
40:11 41:5 44:4,20
47:22 48:4,10 50:18

50:20 51:6 53:2,9,15
53:18 59:20 60:22
63:11 65:10 67:21,23
69:15,23 70:2,5
76:11 78:1 79:13
81:13,15 83:4,6,18
84:18 85:17 91:18,21
92:17 95:9 98:12
99:7,11,18 101:15,23
102:21 105:24
106:25 107:12,21
111:25 120:9 122:5
126:2 127:16,20
128:19,23 129:1
133:18 135:14,21
136:13,23 137:9
140:8,9 143:4 145:15
145:22 147:15 149:9
150:3,9 151:4,25
153:6
**looked (5)** 51:22 52:24
54:4 69:20 78:18
**looking (18)** 21:1,11
24:14 33:3 41:23
42:17 43:6,13 45:21
46:8 47:2 51:25
53:21 54:6 62:25
66:16 94:2 132:4
**looks (30)** 24:25 25:14
32:19 34:20,22 39:24
58:22 78:19 83:23
85:6,13 96:9 119:15
119:15 126:8,14
127:15 129:2 131:7
132:10 135:19,25
136:1,20 137:4 145:4
145:9 146:13 149:20
151:14
**lori (35)** 3:3 6:6 7:25
48:2 49:22 72:25
73:4,22 81:9 88:24
89:8 92:10,11,11
93:9 101:22 102:9
104:10,25 105:23
106:19,22,23 107:17
108:10,11 112:8
113:18 133:12
136:17 140:19
143:10 145:7 150:16

155:2
**loris (8)** 102:3 103:5
128:14 135:20,25
140:19 145:4 149:20
**lose (2)** 59:12 62:12
**lot (3)** 50:19 63:19
118:16
**louder (2)** 15:4,12
**lounge (1)** 58:21
**lower (1)** 104:22
**lump (1)** 91:6
**lunas (4)** 29:20 30:12
30:13,13
**lunch (1)** 68:8
**lynn (1)** 3:9

____

**M**

**maam (4)** 15:17 24:14
55:23 159:1
**maintained (1)** 12:5
**making (2)** 111:13
127:24
**manicurist (1)** 158:13
**manner (13)** 12:6
13:24 14:17 27:23
30:2 31:6 33:22
36:21 38:9 40:19
42:4 50:25 70:16
**marble (2)** 46:11
155:20
**marked (11)** 26:7
31:22 69:7 92:3
116:14 142:16,17
147:16 152:8 153:19
153:22
**market (1)** 97:14
**material (2)** 59:21 82:7
**materials (5)** 79:6,11
80:15 84:10,12
**math (1)** 131:7
**matter (3)** 67:5 156:22
159:8
**matters (1)** 54:23
**mean (13)** 52:4 58:2
61:13 75:8 86:13
89:11 92:11 121:11
137:22 139:21
148:22 155:1 156:20
**means (6)** 84:10 89:12

99:21 126:24 133:13
137:23
**meant (5)** 89:9,10
110:10 134:13 148:3
**mechanics (2)** 154:11
154:12
**medical (1)** 83:3
**meet (6)** 64:7,9 65:2,16
67:17 73:4
**meeting (4)** 34:21,24
71:9 73:10
**memo (3)** 104:22 108:4
151:2
**mentioned (3)** 121:17
154:5 155:23
**met (1)** 73:8
**method (1)** 154:18
**mic (2)** 5:18,20
**michael (1)** 3:4
**micki (5)** 16:14 25:5
124:16,17,17
**mickis (1)** 128:16
**microphone (1)** 127:19
**microphones (1)** 15:2
**mid (1)** 74:22
**middle (5)** 58:3 60:16
60:22 62:2 126:9
**mind (2)** 74:13 94:7
**mine (4)** 128:15 129:2
135:19,25
**mini (2)** 64:22 67:7
**minute (9)** 23:5 53:7
56:20 59:17 64:4
71:9 112:16 113:6
118:22
**minutes (6)** 51:17
52:24 53:2,18 58:3
117:3
**mirror (1)** 42:21
**misleading (1)** 110:21
**missed (4)** 26:11 53:22
61:10 64:13
**misspoke (2)** 121:13
121:16
**mitchell (4)** 31:2 69:20
70:4 74:14
**molesworth (93)** 1:16
5:3 8:14 9:12 11:23
12:20 13:18 14:10

17:15 18:16 19:16
20:15 22:6,20 23:13
26:6,12 27:13 29:9
30:11,21 31:21 32:14
33:15 34:6 36:13
37:8,24 38:20 40:11
41:6,23 42:17 43:6
43:13 44:4,20 46:8
47:2,21 49:9 50:17
53:17 64:14,17 65:5
65:11 69:4 70:21
71:3 72:23 76:16
78:4 79:6 81:21
82:14 83:21 84:6
85:16 86:1 87:16
88:11 91:20 92:2
93:20 95:9,15 96:6
98:15 99:9,12 101:1
112:8 113:13 115:7
116:13 117:11 121:8
121:20 122:3 124:11
126:5 128:24 139:14
141:22 143:4 144:10
148:2 149:13 150:12
151:7 153:6 154:2
**mom (1)** 103:5
**moment (11)** 12:12
14:22 18:3,6 31:11
42:9 46:19 48:25
116:18 133:5 154:3
**money (18)** 77:12,17
79:25 80:25 81:11
96:18 105:2 113:14
113:21 115:18
123:15 142:7 146:8
146:10,20 147:8
149:23 150:25
**monitor (1)** 68:20
**morning (8)** 4:9,22 5:3
5:4,5 53:11 68:2
76:12
**mortgage (1)** 157:17
**mother (1)** 103:5
**motion (2)** 60:1 61:4
**move (51)** 5:20 8:8
10:5,24 11:7,15 12:8
13:10 14:2,19 17:15
18:1,16,25 19:21
20:22 23:3 24:7,22

27:1 28:1 30:5 31:9
32:6 33:25 36:24
37:16 38:12 40:22
41:15 42:7 43:1,21
44:14 46:16 47:13
48:17 50:1 51:3
57:24 58:19 68:6
87:4 93:11 120:21
123:24 142:20
143:17 150:8 151:16
153:13
**moved (1)** 9:2
**moving (2)** 54:25
61:19
**multiply (1)** 97:16
**myra (3)** 102:25 103:2
103:4

**N**
**name (37)** 23:16 24:1
25:13,23 27:21 29:25
30:8,10 31:4 32:4
33:20 39:3 45:1,14
64:13 71:6,10 76:19
77:18 86:6 87:19
98:18 100:9,9,11
101:6,21,21,22 102:5
102:10,19 103:1
124:14,16 131:14
142:5
**named (1)** 76:8
**names (13)** 6:17,19
39:13,13,15 47:24
81:22,25 83:22 87:17
109:8,10 120:13
**nature (3)** 21:13 35:23
105:13
**nava (2)** 32:3 33:3
**necessarily (1)** 15:4
**need (16)** 25:25 29:10
51:5 52:5,5 61:21
62:6 63:21 64:22
68:11 99:14 114:14
114:17 116:24,24
159:1
**needed (6)** 80:3,3
119:1 123:15 150:23
154:16
**needs (1)** 53:12

**negative (1)** 125:10
**neither (1)** 58:23
**nevada (7)** 1:2 2:6,16
2:21 3:6 4:1 82:23
**never (13)** 59:2 75:20
81:1,3,10 86:24
89:17 90:3 94:20
98:3 118:3,8 130:21
**new (5)** 29:11 68:22
133:8,13,14
**news (2)** 68:19,20
**nice (1)** 4:10
**night (1)** 63:11
**nine (1)** 53:10
**nods (2)** 22:16 158:25
**nope (1)** 128:18
**normal (1)** 156:23
**normally (1)** 9:6
**norpak (3)** 33:18,21
49:10
**notation (1)** 140:15
**notations (1)** 134:16
**note (8)** 4:11 36:10
68:17 86:8,11 87:23
88:4 117:5
**notebook (2)** 69:10,23
**notebooks (2)** 69:11,16
**noted (1)** 29:4
**notes (2)** 71:9 140:17
**notice (3)** 52:11 55:4
133:7
**noticed (2)** 108:3
152:14
**nrs (2)** 147:22 148:3
**number (7)** 9:12 69:24
75:3,11 78:20 145:10
152:22
**numbered (1)** 128:23
**numbers (7)** 22:12
29:12 39:16 54:1
128:22 152:9,11

**O**
**oath (1)** 4:13
**object (8)** 25:21 49:3
55:11 88:3 95:25
105:12 108:15
112:24
**objection (114)** 8:11

8:12,16 10:7,8 11:1,2
11:17,18 12:11,14
13:12,13 14:4,5
15:14 17:7,9 18:9
19:3,11 20:2,3,25
21:21 23:6,7 25:18
27:7,9 28:5,22 29:2
30:15,16 31:15,16
33:5,10 35:8,10 37:2
37:3,18,19 40:4,5,24
40:25 41:17,18 42:10
42:11,12 43:3,4,23
43:24 45:25 46:1,21
46:22 47:15,16 48:19
48:20 50:4,5,8 70:23
72:2 75:13,24 84:21
87:6,7,8 88:9 89:19
89:23 90:24 91:13
100:2,6 105:17
108:24 110:9 112:14
113:20,25 114:1,3,5
114:9,17,22 121:2,3
123:19,22 124:3,4
129:23 136:8,12
142:22,23 143:20
151:19,20 152:17,20
153:17,18
**objections (5)** 60:24
61:21 63:20 93:15
95:2
**obtain (2)** 12:23 91:24
**obviously (5)** 16:18,25
53:20 84:13 93:20
**occasion (1)** 7:25
**occasionally (2)** 102:7
139:11
**occur (2)** 116:1 132:18
**occurred (2)** 140:6
141:12
**oclock (1)** 156:24
**offer (2)** 50:6 147:11
**offering (2)** 49:4 72:1
**office (22)** 2:15 6:13,25
25:11 76:6 100:1
106:7,9 113:15 118:6
122:11 125:22 130:4
138:19 154:19,23
155:16,22 157:6,15
158:2,10

officer (2) 56:2 63:4
offices (3) 116:2
117:19 122:16
officially (1) 62:18
oh (6) 8:20 60:17 63:10
105:7 132:3 158:2
okay (98) 4:13 5:22
9:16 13:19 14:5,12
15:3,20 16:12,16,19
16:24 17:17 18:18
20:16 21:10,11,16,23
22:8,14,17 23:8
24:25 25:5,9,15
26:13 27:8,15 28:7
28:14,17 29:16 30:23
31:24 32:19,22,24
34:8,13,17 35:2,6
36:15 37:10 38:1,22
39:1,5,17,21 40:13
41:7 42:13 43:11
44:6,22 45:6,14,18
45:23,24 51:17 54:12
61:9 63:14,23 64:4
65:18 67:11,16 68:13
68:25 69:22 70:2,7
71:21,24 88:8 94:1,7
94:13,23 95:1 97:17
111:19,22 112:1,12
121:15 127:2,7
131:16 136:7 145:3
158:23 159:1
old (1) 68:25
olympic (2) 36:19 70:9
once (3) 79:25 80:18
150:2
ones (6) 7:14 51:23
69:12 70:1 125:21
143:21
ooo (2) 4:2 159:4
open (2) 69:22 125:6
operation (1) 122:16
opinion (1) 114:24
opportunity (6) 51:13
55:9,11 61:20 62:12
65:16
opposed (1) 115:14
order (5) 19:4 68:22
80:2 115:17 144:5
ordered (1) 158:2

original (1) 143:20
originally (3) 94:2
129:6,9
outset (2) 75:7,22
overarching (1) 59:13
overruled (8) 89:23
91:15 100:6 105:17
108:24 110:9 113:1
123:22

**P**

pacific (6) 32:25 39:3
39:25 107:8 150:14
155:18
page (35) 1:20 22:12
29:12 49:16,19 51:4
52:3 56:16,16 65:19
69:8,24,25,25 71:3
72:14 77:6 78:14,18
79:1 99:7,18 100:18
101:10,24 126:3,6
127:12 128:3 129:4
135:18,21,24 137:3
152:18
pages (9) 27:5 53:21
56:18 57:16 69:15
70:3 124:1 128:22
133:16
paid (19) 82:2 83:2,22
92:7,15 93:5 106:12
108:13,14 110:11,25
115:9 116:9,11
134:12 148:12,19,24
155:9
paint (1) 77:3
painting (1) 155:18
pallets (2) 29:20 30:12
panagakos (3) 8:12
56:4,8
paper (2) 57:1,15
paperwork (2) 82:21
105:20
pardon (2) 8:22 109:3
part (16) 39:2,5,9,25
65:25 66:14 68:7
81:2 92:19 94:18,24
117:24,24 122:15
135:11 144:15
partial (1) 1:15

participate (2) 106:17
107:3
participated (3) 9:24
75:17 87:21
participating (3) 74:25
75:3,22
participation (2) 90:17
90:18
particular (13) 7:13
21:14,15 28:12 87:2
107:6 111:7 124:1
129:4 131:22 135:18
149:18,19
particularly (1) 24:2
parties (1) 68:8
patchco (2) 37:12 70:7
patience (2) 55:2,3
pause (1) 31:14
pay (15) 8:3 16:1
106:10 111:12,12
117:21 118:18
120:23,25 145:19
148:20 149:21
157:17,20 158:4
payable (6) 106:2
155:7,7,8,10,14
paycheck (5) 145:18
146:2 147:19,20
151:14
paychecks (2) 146:4
147:5
payday (1) 6:11
payee (1) 104:17
paying (3) 113:19
131:11,13
payment (5) 15:22
90:21 108:22 115:23
115:23
payroll (150) 5:13,15
5:16 6:3,8,13,25 7:13
7:23,24 9:24 10:18
11:12 12:1 13:6,23
14:16 16:9,14 17:21
18:21 19:20 20:21
21:12 22:24 23:18
24:5,22 25:2,6,11
26:17,23 27:19 29:21
29:23 31:2 32:3
33:19 36:20 37:13

38:7 40:17 41:11
42:2,22 43:17 44:9
44:11 46:11 47:9
48:7,13 49:23 50:23
70:15 72:24 74:3,10
74:15,20,21,25 75:4
75:17 76:5,11,22,23
78:7,8,10 79:14,20
80:6 81:3,25 82:2,3,9
82:16 83:16 85:13
86:2,4,7,18,23,25
87:21 88:12 90:6,16
90:20 91:3,5 92:6
98:19 100:11 101:7
103:2 104:3,6 106:7
106:8,18 107:10,19
107:25 110:2,22
113:15 117:17,21
118:4,6 119:16,16,20
120:11,14 122:10,16
123:11 124:19,23
125:1,21 130:4
131:12,14 132:1
133:8,13 134:21,23
135:3,6 138:19 139:3
139:9,12 144:20
148:10 149:7 150:22
153:12 154:19 155:7
155:14
penagakos (1) 3:9
penalize (1) 59:8
people (20) 71:18
82:21 86:21 99:25
108:25 109:4,8,18
111:4,12,15 112:11
127:21 130:14
131:24 135:9,11
136:18 139:4 155:9
pepe (5) 100:14,20
101:11 102:14
111:14
percent (2) 77:23
156:4
perforated (1) 94:10
performed (1) 119:9
peril (1) 63:14
period (8) 24:21 25:1
54:25 117:14 132:5
141:5 149:22,23

**periods (2)** 139:13,18
**permission (1)** 130:19
**person (11)** 94:4
  100:20 101:4 106:21
  113:16,19,23 114:2,6
  130:25 131:9
**personal (1)** 90:11
**personally (4)** 59:16
  122:19,21 127:25
**persons (1)** 131:14
**pertain (4)** 9:21 10:19
  11:10 66:15
**petty (26)** 103:25
  104:2,5,16 105:2,2
  106:17 107:7,10,16
  108:4 110:3 113:14
  122:13 123:7,9,10,13
  123:18 125:9 133:4
  144:14,19 150:18,20
  151:1
**photocopies (1)** 93:21
**picard (2)** 1:23 159:10
**pick (7)** 7:2 80:5,21,22
  81:18 82:7 115:18
**picked (6)** 6:10 45:16
  79:22 80:25 99:21
  158:3
**piece (7)** 57:1,14 94:12
  130:11 131:12,13
  137:25
**pieces (6)** 126:8,10,15
  126:24 129:10
  130:24
**place (5)** 71:16,19
  117:21 120:18
  158:19
**placed (4)** 119:1,11
  120:16 141:23
**plaintiff (2)** 1:7 2:3
**plaintiffs (37)** 9:8
  10:10 11:4,20 12:17
  13:15 14:7 17:12
  18:13 19:12 20:5
  22:1 23:9 27:10 29:5
  30:18 31:18 33:11
  35:17 37:5,21 40:7
  41:2,20 42:14 43:8
  44:1 46:3,24 47:18
  48:22 50:11 72:4

87:10 95:5 121:5
  124:6
**plastering (1)** 22:23
**plastic (1)** 119:14
**plate (1)** 62:7
**playing (1)** 116:21
**plead (1)** 140:25
**please (10)** 28:10 31:12
  35:25 38:21 44:21
  53:7 64:4 67:19
  89:25 92:23
**pleased (2)** 28:23
  143:25
**plumbing (3)** 13:23
  146:23 155:19
**plus (2)** 6:8 53:13
**po (1)** 2:10
**podium (2)** 55:16
  62:21
**point (19)** 6:22 17:3
  38:5,7 39:19,22
  59:10 64:5 73:12
  76:8 115:22 128:12
  130:24 136:18
  139:23 141:7 148:21
  150:22 156:14
**pointed (1)** 58:14
**pointing (7)** 54:21 55:7
  56:6 57:21 59:15
  60:11 66:18
**politely (1)** 56:4
**pool (1)** 39:10
**pop (1)** 63:8
**portion (16)** 7:22 78:1
  78:15 82:7,9 85:5
  94:3,3,8,9,15,16,19
  94:20 125:17 149:11
**portions (1)** 81:18
**position (3)** 109:1,5,20
**positive (1)** 125:11
**possible (5)** 25:4 57:25
  86:25 107:5 129:21
**possibly (1)** 55:2
**post (1)** 111:3
**potential (1)** 57:1
**practice (4)** 16:22 17:4
  58:12 105:1
**practiced (2)** 62:3 64:8
**precisely (1)** 110:5

**precluded (2)** 108:22
  109:24
**premier (11)** 26:17
  45:12 50:23 69:12
  70:1,11 71:14 74:14
  77:2 79:16 81:14
**prepared (21)** 22:25
  33:22 36:21 37:14
  38:9 40:19 41:13
  42:4,23 43:18 44:12
  46:13 47:10 48:14
  49:24 50:25 53:23
  92:9 117:15,23 148:7
**presence (4)** 4:11
  36:10 68:17 117:6
**present (2)** 8:15 51:20
**presented (1)** 57:13
**presiding (1)** 1:4
**presume (1)** 61:4
**pretty (5)** 46:19 53:21
  103:13 125:7 156:20
**prevented (1)** 113:18
**previous (1)** 78:18
**previously (27)** 10:1
  12:6 13:8,25 17:24
  18:23 22:25 26:24
  27:24 30:3 31:7
  33:23 36:22 38:9
  42:4 44:12 48:15
  49:13,24 50:20 51:1
  70:17 92:3 116:14
  120:8 122:5 142:17
**printed (1)** 87:17
**prior (5)** 52:25 53:18
  74:17 94:21 130:19
**privately (1)** 68:10
**probably (5)** 73:5
  74:22 100:8 115:21
  135:19
**problem (3)** 8:25 19:25
  66:14
**proceed (3)** 19:10 36:9
  115:4
**proceeding (1)** 53:18
**proceedings (3)** 4:8
  31:14 159:8
**proceeds (1)** 111:11
**process (11)** 6:4 7:20
  15:22 34:14 39:6

54:13 57:23 60:13
  61:22 64:6,18
**processed (12)** 6:6
  10:1 11:13 12:5
  13:24 14:17 17:23
  18:22 26:23 27:23
  30:2 31:6
**procure (1)** 61:11
**production (4)** 61:7
  146:22 155:18,19
**professional (1)** 56:3
**program (1)** 34:22
**prohibited (1)** 108:11
**projects (1)** 158:7
**promoting (1)** 76:4
**prompted (1)** 87:1
**properties (3)** 118:17
  119:2 154:7
**proposal (1)** 50:9
**prospective (1)** 54:1
**provide (6)** 82:15
  157:6,9,11,13,15
**provided (10)** 39:18
  82:18 83:16 88:25
  89:17 90:3,19,20
  91:4 94:15
**providing (2)** 86:15
  118:23
**provisional (1)** 19:21
**provisionally (2)** 19:5
  19:10
**publish (1)** 87:12
**published (1)** 145:2
**pull (5)** 51:24 81:16
  95:10 127:19 150:23
**pulled (1)** 72:1
**purchase (1)** 157:22
**purpose (5)** 64:21
  86:15 104:1 150:17
  151:13
**purposes (6)** 58:10
  100:12 101:7 107:10
  107:19 154:20
**pursuant (1)** 159:5
**pursue (1)** 55:7
**put (9)** 7:23 34:23
  60:19 77:17 80:20,22
  125:3,11 157:4
**putting (1)** 90:22

| | | | |
|---|---|---|---|
| **Q** | 51:12,25 52:2,19 | **receivable (1)** 155:5 | 128:3,9,25 133:8,11 |
| **queen (1)** 3:10 | 53:6,12 54:8,10,12 | **receive (12)** 8:3 19:10 | 135:17,23 136:16 |
| **question (28)** 5:22 | 54:22 55:14,15,21,24 | 77:2 82:10 88:18,21 | 140:18 141:22,25 |
| 28:6 32:10 38:16 | 56:1,1,11,12,15,22 | 92:15 93:4 96:15 | 142:2 143:7,12 |
| 44:17 56:21,23 71:8 | 56:24 57:5,20 59:17 | 108:4 112:10 149:25 | 145:25 149:13 |
| 89:24 91:1 105:13,16 | 59:20 60:4,9,14 61:1 | **received (45)** 9:7 10:9 | 150:12 151:9,11 |
| 109:24 110:6 111:23 | 63:15,23 64:1,3,14 | 11:3,19 12:16 13:14 | 153:7,9,11 |
| 112:3,6,13,17,19 | 64:15 66:10 75:13,24 | 17:11 18:12 20:4 | **recognizes (1)** 65:12 |
| 113:10,11,17,22 | 84:21 87:8 89:19 | 21:23 23:8 29:1,3 | **recollection (1)** 75:6 |
| 114:18,20 139:24,25 | 90:24 91:13 105:12 | 30:17 31:17 33:9 | **record (15)** 62:17,19 |
| **questions (17)** 15:14 | 108:23 111:14 | 35:14 37:4,20 40:6 | 72:16 99:4 116:20 |
| 16:25 21:3 24:10 | 112:14,24 113:3,4,20 | 41:1,19 43:7,25 46:2 | 121:23 130:8,12 |
| 25:17 34:3 53:23 | 121:3 123:19 124:4 | 46:23 47:17 48:21 | 131:14 132:20,23 |
| 63:18 64:18 71:25 | 136:8,10 142:13,23 | 49:6 50:10 72:3,20 | 139:2 143:22 144:6 |
| 72:24 78:23 88:4,6 | 143:19 144:1,4,22 | 77:2 79:25 80:2 87:9 | 159:2 |
| 93:14 96:4 154:3 | 145:2,10,12 151:20 | 94:14 95:4 99:5 | **recorded (3)** 137:3 |
| **quick (1)** 69:23 | 153:18,22 | 121:4 125:1 131:17 | 139:19,22 |
| **quickbooks (7)** 154:21 | **rate (2)** 137:6 145:20 | 142:25 144:25 | **records (3)** 7:14 70:12 |
| 154:23,25 155:4,16 | **ratio (4)** 97:19 138:1,4 | 151:21 | 130:24 |
| 155:21 156:2 | 138:13 | **recess (12)** 36:6,8 | **refer (2)** 82:23 87:18 |
| **quickly (4)** 46:19 | **reached (1)** 131:6 | 51:12,18,19 64:11 | **reference (1)** 136:7 |
| 53:21 57:24 63:17 | **read (8)** 56:17 57:1 | 67:16 68:15,16 | **referred (2)** 53:3 79:10 |
| **quite (3)** 58:10 59:19 | 59:21 61:6 72:16 | 116:24,25 117:4 | **referring (4)** 9:18 |
| 139:21 | 78:19 92:19 134:9 | **recognize (122)** 7:9,11 | 92:20 109:7,9 |
| **quitting (2)** 156:19,25 | **ready (4)** 54:23,25 | 9:19 10:14,16 11:8 | **reflect (1)** 125:24 |
| | 58:1 65:3 | 11:24 13:20 14:13 | **reflected (1)** 91:17 |
| **R** | **real (5)** 67:1 101:3,21 | 16:8,13 17:18 18:19 | **regard (2)** 55:3 88:4 |
| **raid (1)** 148:22 | 119:3 140:3 | 19:17 20:17 22:9,19 | **regarding (5)** 5:9 7:6 |
| **raided (1)** 116:2 | **really (11)** 62:22 65:25 | 23:14,15 24:2,3 25:3 | 88:25 96:16 136:2 |
| **rainbow (2)** 67:21,23 | 67:4 68:2 78:19 98:3 | 25:13,22 26:14,19,21 | **regardless (2)** 114:6 |
| **raise (4)** 55:18 56:3 | 101:22 108:18 | 27:16,21 28:13 29:17 | 143:12 |
| 110:14 114:18 | 115:10 134:25 | 29:19,25 30:24 31:4 | **regular (5)** 7:17,18 |
| **raised (2)** 58:13 110:14 | 156:21 | 31:25 32:4,17 33:17 | 122:7,15 141:17 |
| **raises (2)** 110:11,14 | **rear (1)** 66:24 | 33:20 34:9,11 36:16 | **reimbursement (1)** |
| **rancho (1)** 2:11 | **reask (1)** 114:20 | 37:11 38:2 39:1,3 | 150:3 |
| **range (1)** 120:24 | **reason (16)** 4:4 28:17 | 40:14 41:8,24 42:1 | **reimbursements (1)** |
| **rasmussen (117)** 2:15 | 35:2 57:17 61:15 | 42:18,20 43:14 44:7 | 149:25 |
| 2:15 8:15,17,19,21 | 66:13 89:16 90:2 | 44:23 45:1,3,15 46:9 | **relate (4)** 34:18 38:4 |
| 8:23 9:1 10:7 11:2,18 | 105:10,15,16 109:16 | 47:3,23 48:11 49:12 | 69:18 86:18 |
| 12:15 13:13 14:5 | 111:8,17 112:8 | 49:18 71:9 76:16,18 | **relates (1)** 28:18 |
| 17:9 18:11 19:25 | 133:15 | 77:8 83:9,10,12 | **relation (1)** 33:2 |
| 20:3 21:2,5,7,16 | **reasons (1)** 60:20 | 85:25 86:8 92:2,5,24 | **relationship (3)** 5:11 |
| 22:11,14 23:5,7 | **recall (17)** 5:9 47:25 | 92:25 98:15,23 99:12 | 6:1 158:15 |
| 25:21 27:9 29:1,2 | 48:7 53:1 69:8 74:24 | 99:19 100:9,25 | **release (1)** 32:20 |
| 30:7,15 31:11,16 | 75:21 86:15 130:22 | 101:19 102:2,24 | **remain (1)** 4:12 |
| 33:10 35:10 37:3,19 | 136:4,9,10 147:8 | 103:21,23 104:13,15 | **remember (23)** 16:11 |
| 40:5,25 41:18 42:12 | 149:22 154:7,10 | 104:21 107:6,15,24 | 16:15,22,23 23:16 |
| 43:4,24 46:1,22 | 156:14 | 116:15 119:12 | 24:24 25:7,8,10 |
| 47:16 48:20 50:8 | **receipt (1)** 117:24 | 121:22 122:2 127:14 | 28:16 34:16 45:13 |

48:1 75:8 95:20
98:10 102:11,15,17
108:7 134:13 148:4
150:7
**remind (1)** 4:12
**removed (3)** 28:22
35:9 118:5
**removing (1)** 152:17
**rent (1)** 157:17
**repay (1)** 147:11
**repeat (2)** 69:24 89:24
**repeated (1)** 59:9
**rephrase (4)** 91:1
113:10,11 139:24
**replacement (1)** 68:22
**report (1)** 134:12
**reported (1)** 159:7
**reporter (1)** 1:23
**reporters (1)** 1:15
**represent (26)** 13:5,22
14:15 20:19 22:22
26:16 27:18 29:22
31:1 32:2 36:18
40:16 41:10 43:16
47:7 49:23 50:22
78:6 85:11 92:13
93:2 120:11 134:7
137:20 143:15
146:10
**representative (1)** 7:1
**represented (2)** 70:12
146:10
**represents (14)** 76:21
79:8 81:22 84:8
95:18 122:12 124:15
126:6,13,23 127:13
140:16 144:13
147:18
**request (2)** 25:24
49:14
**require (1)** 53:14
**required (1)** 88:13
**reserve (1)** 140:17
**resolve (1)** 153:1
**resolved (1)** 68:11
**respect (10)** 39:17
71:13 105:1 110:10
125:1 129:4 134:16
134:19 154:5,14

**respects (1)** 24:4
**responding (1)** 55:22
**response (1)** 31:13
**responsibilities (1)**
59:13
**responsibility (4)**
58:17,19 59:14 60:5
**responsible (1)** 62:11
**rest (1)** 51:16
**result (1)** 112:11
**retrial (1)** 61:25
**retrieve (1)** 121:10
**revenue (2)** 89:1 116:4
**reverse (1)** 115:1
**reversed (1)** 59:5
**review (3)** 58:4 61:20
62:1
**ridiculous (1)** 57:18
**right (86)** 4:4,9 5:21
9:4,6 10:9 11:3,19
12:16 13:14 14:6
15:23,25 16:3,5,21
17:2,6,8,10 18:12
19:9 20:4 21:1,20
24:19 28:25 29:3
32:11,15 33:2,7
35:14 36:5 39:9 40:3
43:7 45:13,20 46:23
49:5 50:10 51:8
56:11 58:24 65:5
66:7,11,12,13 67:1,2
70:22 72:13,20 85:12
85:16 90:19 92:22
93:17,21,23 94:16
95:4 102:11 105:7
108:23 111:25 112:4
114:15,19 116:22
117:3,5 119:4 121:4
124:5 142:19 144:25
145:12 146:12
151:21 153:4,22
158:23,24
**righthand (3)** 85:11
137:10 140:10
**rip (1)** 94:9
**ripped (1)** 94:18
**rita (3)** 101:2 102:17
102:18
**robert (53)** 1:9 2:8,13

5:12 6:1 7:18 11:13
24:18 28:15 41:11
45:4 73:1,6,13 74:2
76:4 80:9 83:15,22
84:15 88:14,21 89:17
90:3,16 91:3,10
97:21 98:8 104:2
109:18 115:8 116:10
117:12 118:13
119:18,22 122:9,16
129:19 131:10
138:20 141:4 144:16
146:20 147:9,11
150:25 154:6 156:6
156:18 157:6 158:7
**robes (1)** 60:15
**role (1)** 35:3
**roofing (9)** 5:9,12,13
5:25 6:1 7:15 10:2
19:20 20:8
**rosenbaum (4)** 101:5
102:16 106:20 155:2
**ruled (1)** 112:1
**rules (1)** 64:9
**ruling (1)** 67:8
**rulings (1)** 53:12
**run (1)** 55:3
**runner (4)** 24:19 79:22
103:6,12
**runners (1)** 6:10
**running (3)** 16:14 25:5
103:10

---

**S**

**sack (2)** 67:22,22
**safe (12)** 80:23 122:14
122:22 123:3 126:16
126:18 129:20
130:15,18 131:10
139:8,16
**safety (2)** 34:20,23
**salary (1)** 146:10
**sample (1)** 52:9
**sanctioning (1)** 61:18
**santa (1)** 2:11
**sarah (1)** 102:8
**save (1)** 19:4
**saw (4)** 81:1,3,10
91:17

**saying (9)** 58:14 60:10
60:12 61:22 62:6,20
64:25 67:10 118:23
**says (9)** 60:15 79:5
96:7 97:4,6 133:8
134:12 137:15,18
**scheme (2)** 106:18
107:4
**school (1)** 66:3
**screen (5)** 54:6 95:11
128:23 129:1 146:16
**seal (1)** 80:20
**search (3)** 111:3 116:3
148:25
**seated (4)** 112:1,16
113:3,7
**second (5)** 115:2
116:22,22 134:9,10
**seconds (1)** 27:4
**section (6)** 78:25 85:8
104:22 108:4 151:2
159:5
**securities (1)** 39:13
**security (1)** 39:16
**see (31)** 1:20 4:10 5:18
20:7 29:14 32:16,20
49:8 53:19 56:16,16
57:11 67:23 68:22
71:6 78:3,21,21,24
79:1,6 84:6 95:15
97:5 100:18 101:10
105:8 124:11 137:15
139:24 151:6
**seeing (2)** 71:12,16
**seek (2)** 9:14 56:25
**seemingly (1)** 61:14
**seen (3)** 16:5 59:1,3
**selected (1)** 16:13
**selfexplanatory (1)**
125:7
**send (1)** 94:9
**sending (1)** 87:2
**sense (1)** 61:5
**sent (3)** 6:6 7:12 10:17
**sentenced (1)** 141:2
**separated (1)** 125:2
**series (9)** 5:8 17:16
20:23 53:19 54:2
70:20 71:4 91:22

103:17
**service (10)** 5:16 40:1
82:16 86:4,7 89:1
90:19,20 91:3 116:4
**services (26)** 19:20
20:21 22:24 26:18
27:20 29:21 31:3
32:3 33:19 36:20
37:13 38:8 40:18
41:12 42:3,22 43:17
44:11 46:12 47:9
48:13 50:24 70:15
83:16 149:15 157:22
**set (8)** 7:5 21:18 52:9
57:6 94:10 140:3
156:18,19
**seven (3)** 53:10 75:1,7
**sheet (9)** 77:14,18,21
79:14 80:2 81:22,25
115:17 120:23
**sheets (12)** 6:5 8:3 17:1
21:12 34:20 76:11
77:11 119:16 120:11
120:14,25 132:2
**sherman (1)** 155:19
**shes (7)** 8:18 9:5 55:20
88:2 100:8 111:8
124:18
**shift (1)** 50:14
**shop (1)** 132:16
**short (1)** 156:8
**shortage (1)** 134:9
**shortlived (1)** 156:9
**show (4)** 99:5,19
116:13 121:20
**showed (1)** 125:2
**shown (2)** 16:5 17:4
**shows (1)** 101:24
**sick (1)** 9:1
**side (5)** 61:17,17,18
137:10 140:10
**sidebar (1)** 110:12
**sides (3)** 58:11 62:18
63:13
**sight (1)** 59:12
**sign (8)** 92:6 93:3
94:14 96:13,16,17,19
149:17
**signature (5)** 142:4

143:9 145:4 146:13
149:20
**signed (3)** 142:4 143:9
149:19
**signoff (1)** 34:20
**silver (76)** 16:1 42:21
92:14 93:4 94:14
95:23,23 96:1,19,22
96:23 97:8,10,14,22
97:25 98:6,9 99:1,4,5
99:16 106:13 108:14
115:11,13,24 117:16
120:18 122:13,18,22
123:2 125:4,9,17,22
126:8,10,15,25,25
127:2,3,17,21 130:6
130:8,12,15,17 131:2
131:18 132:7,9,15
133:22 134:19 135:6
135:10 136:2 137:2
137:16,24,25 138:2,7
139:1,8,15,19 140:2
148:5,17,23 149:1
**silvers (1)** 137:23
**similar (4)** 7:14 10:21
23:17 47:10
**simplest (1)** 96:20
**simply (6)** 52:9 55:6
61:15 68:2 109:25
115:9
**single (2)** 111:9,13
**sir (7)** 12:7 15:11 16:4
16:15 17:5 70:18
112:4
**sit (6)** 51:11 57:18
60:14 63:8 65:7
68:12
**sits (1)** 9:6
**sitting (8)** 54:16 57:8
58:24 65:5,8,11
114:25,25
**six (7)** 53:10 60:17
61:24 75:1,7 78:10
134:8
**social (2)** 39:13,16
**software (1)** 154:19
**somebody (9)** 60:15
66:24,24 76:8 99:21
99:23 131:11,13

137:23
**somebodys (1)** 67:11
**someday (1)** 60:14
**someplace (1)** 117:20
**somewhat (3)** 28:18
35:23 109:22
**soontobe (1)** 73:9
**sorry (17)** 15:12 18:5
22:11 26:11 30:7
35:22 36:1 43:10
49:9 50:21 64:12
105:7 106:21 120:4
129:9 139:17 141:13
**sort (5)** 94:8 115:19
124:25 141:16
153:16
**sound (1)** 15:6
**sounds (2)** 45:20 67:15
**source (1)** 61:11
**south (3)** 2:5,16,21
**space (2)** 148:3 157:6
**speak (10)** 5:17,21
15:4,12 55:15,17
56:12 86:5 127:18
129:7
**speaking (4)** 5:19
62:22,22,23
**specific (2)** 113:15
138:18
**speculation (2)** 89:20
129:24
**speed (1)** 51:14
**spite (1)** 59:8
**stamped (1)** 143:10
**stand (2)** 63:4 67:16
**standard (2)** 16:21
17:4
**stands (2)** 51:18 68:15
**start (4)** 59:18 119:13
136:18 156:23
**started (15)** 16:9 73:1
74:2,9,16,18 103:8
103:12 126:24 129:6
129:10 131:4 132:10
132:11 156:24
**starting (3)** 69:25
126:12 156:18
**state (2)** 42:21 114:22
**stated (1)** 8:21

**statement (1)** 28:19
**states (4)** 1:1,6 2:4
159:6
**stay (3)** 62:19 114:10
156:21
**steal (1)** 141:14
**stealing (1)** 141:11
**stenographically (1)**
159:7
**step (1)** 62:6
**stick (1)** 145:3
**stipulate (2)** 57:10,14
**stipulated (1)** 72:9
**stole (1)** 144:16
**stop (1)** 53:6
**street (4)** 2:16,21 3:5
3:10
**stucco (1)** 42:2
**stuck (1)** 62:19
**students (1)** 67:20
**stuff (4)** 64:23 82:22
115:19 123:15
**subcontractor (1)** 33:3
**subcontractors (1)**
89:2
**subject (1)** 71:25
**subjects (1)** 140:21
**submit (1)** 39:25
**subsequently (1)** 72:6
**subtract (1)** 123:7
**suggest (1)** 105:16
**suggestion (3)** 63:16
65:2,14
**suggests (1)** 61:23
**suite (2)** 2:5 3:5
**sum (1)** 91:6
**summary (4)** 52:10
53:3,4,4
**summit (1)** 43:17
**supervisor (1)** 45:17
**supplies (4)** 157:15,23
157:25 158:4
**supplying (1)** 39:9
**sure (24)** 12:13 14:23
18:8 27:6 49:1 63:2
64:9 67:13,21 69:24
75:9 77:23 105:4
116:19 118:3 119:3
123:1 126:7 128:21

134:22 135:5 152:25
154:15 156:3
**surprise (1)** 52:12
**suspect (1)** 63:1
**sustained (4)** 75:14
76:1 114:9 136:12
**sustains (1)** 114:17
**switch (3)** 68:23 116:6
154:2
**system (22)** 9:24 10:18
68:20,22 72:25 74:3
74:10,15,20,21,25
75:4,18 76:5 86:23
86:25 87:21 88:12,14
90:16,17 110:22

___

**T**

**table (3)** 57:7 65:7
68:1
**take (95)** 7:4 10:13
14:10 16:12 17:3
19:16 20:14 21:8
22:6 26:6 27:13 29:9
30:21 31:21 32:14
33:3,15 35:25 36:5
36:13 37:24 39:1,12
40:11 41:5 47:21
48:10 50:17 51:6,12
51:16 58:18 59:16
60:21 62:9,19 63:13
67:8 68:9 69:6,15,23
70:2,5 76:10 81:13
81:15 83:4,6,18
85:17 91:5,21 92:17
92:17 95:9 97:16
98:12 99:7,11,18
101:15,23 102:21
105:24 106:25
107:12,21 116:24
119:14 120:8 125:18
126:2 128:19 130:15
130:17 131:9 133:18
135:14,21 136:13,23
140:8,9 143:4 145:15
145:22 146:20
147:15 149:9 150:9
150:25 151:4,25
153:6
**taken (17)** 36:8 51:19

64:11 68:16 80:1
84:18 117:4 118:6
122:5 123:8 125:10
126:10,25 127:4,5,17
129:19
**talk (4)** 9:15 64:12
67:25 73:10
**talked (3)** 83:10
123:10 133:4
**talking (11)** 5:7,25
54:22 56:10 63:7
76:12 109:12,14
110:16,22 112:22
**task (1)** 52:1
**tax (2)** 90:11 140:23
**tear (1)** 94:4
**technical (1)** 66:25
**tedious (1)** 35:23
**tel (6)** 2:6,11,17,22 3:6
3:11
**tell (59)** 5:11 13:4
28:18 30:10 46:9
47:7 49:16 50:22
52:4 56:17 57:5 59:2
63:8 67:20 68:10
72:25 74:18 76:20
77:21 78:9 79:8,13
81:21 85:10 92:8
93:2 95:17 104:1,4
104:19 105:15
117:15 122:12 123:5
124:15,25 125:8
126:5,13,23 127:4,7
127:12,22 129:3
137:10 138:16
140:16 141:10,12
144:13 145:17
146:12 147:18,20
148:9 152:13 154:13
156:4
**telling (2)** 58:11 62:24
**tells (2)** 96:21,24
**ten (4)** 53:11 72:9
132:13 143:6
**term (1)** 109:22
**terminated (1)** 141:8
**terminology (1)**
108:15
**terms (1)** 110:21

**testified (1)** 49:13
**testify (1)** 136:11
**testimony (3)** 1:16
15:20 58:4
**texas (1)** 66:2
**thank (28)** 4:18 5:6
9:10 12:25 14:24
17:10 18:9 19:14
20:11 21:5 23:11
36:7,11 46:5 54:7
56:9 68:14 69:2
85:16 92:22 95:1
99:15 112:2,4 115:5
117:9 121:15,18
**thats (63)** 4:16 9:3,16
25:4,13 26:2,2 30:13
43:11 57:11 58:7
59:5 60:16 61:23
62:6,11,20 65:14,23
65:25 66:12,12,21
71:24 72:19 78:22
81:7,23,25 82:17
85:19 86:10,20 91:17
96:6,19,20 98:11,17
101:2,20 102:3 104:7
107:25 110:5,7
111:23 113:24 116:3
125:4 126:14,20
127:22,23 128:14
129:21 139:20,23
141:23 142:12,18
143:24 153:2
**theirs (1)** 131:20
**thered (1)** 135:2
**theres (25)** 8:16 20:25
53:13 55:2 56:15,17
57:15 60:20 67:22
78:25 79:5 84:5 96:6
97:3 110:24 120:2
124:14 129:6,23
131:5 133:7 136:7
139:21 140:15
152:25
**theresa (1)** 68:9
**theyll (6)** 43:7 49:5
50:10 68:23 72:20
121:4
**theyre (36)** 10:17 12:1
12:21 18:20 19:19

20:20 22:23 29:20
33:18 34:22 36:19
37:12 39:24 40:17
42:2 44:10 45:14
47:8 48:12 49:10
68:21 70:14 71:18
92:6 93:3,23 96:9
109:2,6 111:2 119:25
120:24,24 126:11
145:2 152:8
**theyve (2)** 58:5 144:25
**thing (8)** 4:20 55:3,5
61:2 65:21 110:4
121:12 131:4
**things (6)** 21:12 51:15
53:14 56:8 62:15
64:6
**think (46)** 12:10 15:13
25:7,19 26:10,11
28:4,22 29:10 35:9
35:21 51:24 59:19
63:16,21 65:1 66:5
69:20 72:9,10 75:2
77:24 84:18 100:4,13
102:11,17 108:7
109:7,20 110:24
113:25 116:24 119:7
120:2 123:20 124:8
133:12 138:18
139:24 142:14 150:6
155:24 156:3,8
158:12
**thinking (1)** 28:12
**third (1)** 115:2
**thirty (1)** 75:19
**thought (6)** 98:3
109:12 110:7,15,20
110:21
**thousand (1)** 78:11
**thousands (1)** 52:25
**three (10)** 34:3,10 35:8
53:10 85:10,12 108:6
129:10 130:24
132:13
**threw (1)** 9:3
**tile (1)** 155:19
**time (108)** 6:5,5,22 8:8
10:5,24 11:15 12:8
13:10 14:2 15:21

18:1,25 19:2,4 23:24
24:7,21 25:1,5 27:1
28:1 30:5 31:9 32:6
36:24 38:12 40:22
41:15 43:1,21 45:10
46:16 47:13 48:17
50:1 51:3,5 52:15,17
53:13,15 54:17 55:7
55:8,25 56:9 58:1,2
58:13 59:1 62:8,17
62:17 63:3 64:20,20
64:20 65:13 66:17,21
70:19 73:7,12 74:4
74:22,24 75:4 81:17
87:4 93:11 108:8
109:6 111:1 112:6
115:22 116:7,25
117:1,14 120:21
122:10 123:24
125:11,12,16 127:24
128:13 130:25 132:5
136:18 139:13,18
141:7 142:20 143:17
149:23 150:22
151:16 153:2,14
156:8,15,18,19,23
158:6,22

**times (5)** 71:19 85:13
108:6 114:9 140:5
**tin (1)** 67:22
**tired (1)** 55:16
**title (1)** 159:5
**today (5)** 53:1 54:3
57:7 58:10 60:7
**todays (1)** 58:10
**told (8)** 56:6 63:5 81:7
81:8 89:7 105:18,22
157:22
**tolerated (1)** 55:6
**tomorrow (2)** 158:23
159:2
**top (9)** 61:25 94:3
102:12 126:7 134:8
140:9,15 147:24
149:11
**torn (1)** 94:21
**torro (1)** 47:8
**total (5)** 75:11 78:7,13
81:23 85:15

**totally (2)** 52:7 62:3
**totals (1)** 81:18
**track (4)** 39:10 90:6
122:13 131:17
**traded (1)** 106:12
**trading (1)** 125:18
**train (2)** 124:18,22
**training (2)** 34:23
125:1
**transaction (4)** 126:20
130:21 132:18
133:16
**transactions (16)**
127:21 130:9 131:3
132:5,7,9 133:21,24
136:1,4 137:2,6
139:19,22 140:1,5
**transcript (2)** 1:15
159:7
**trial (17)** 1:15 52:17,24
54:5,19 55:12 57:12
58:6 59:1,11 60:16
60:22 61:3,23 62:2
63:9 64:22
**tricky (1)** 120:1
**tried (4)** 52:25 53:20
53:23 55:1
**trouble (2)** 15:1,1
**true (2)** 96:18 159:6
**try (4)** 61:5 113:9
153:1,15
**trying (6)** 59:18 60:4
61:2 64:1 66:8 67:12
**tuesday (1)** 1:17
**turn (2)** 34:6 82:1
**turned (6)** 6:5 56:21
60:18 110:19 137:24
144:19
**turning (1)** 61:1
**twenty (1)** 78:10
**twice (1)** 150:2
**two (15)** 49:8 53:9
64:16 67:25 74:13,14
78:11,13 88:14 108:6
132:13 137:15,23,23
146:4
**type (6)** 17:20 38:6
70:12 92:13 108:5
118:19

**types (1)** 108:5

**U**

**ultimate (5)** 108:19,19
108:20 110:8 113:14
**ultimately (1)** 113:22
**umhmm (2)** 100:22
102:20
**unacceptable (3)** 52:7
58:12 60:13
**understand (7)** 15:20
58:7 60:8 64:25
87:17 105:5 155:10
**understanding (6)**
24:17 40:4 52:15
55:1 109:19 110:23
**understood (1)** 54:20
**unfortunately (1)**
68:19
**unhappy (3)** 57:22,23
59:12
**uniforms (3)** 156:7,12
156:14
**union (6)** 32:24 39:3
39:24 107:8 150:14
155:18
**united (4)** 1:1,6 2:4
159:6
**universe (2)** 62:3,4
**unknown (1)** 130:25
**unnecessary (1)** 115:3
**upper (1)** 101:17
**upset (9)** 52:19,20,21
54:9,11,13,14,15,16
**usc (2)** 147:21 148:3
**use (19)** 16:16,21 17:4
39:16 77:12,14 84:22
86:7 96:16,17 100:11
102:6 107:9 109:21
110:20 112:14,24
122:7,19
**uses (1)** 139:10
**usually (10)** 6:6,23
7:23 80:5 92:10 93:9
102:7 126:14 156:24
158:2
**utility (1)** 157:20

**V**

**valencia (2)** 71:6,21

**valuable (1)** 52:16
**value (4)** 57:2,12 61:15
97:14
**varied (1)** 140:3
**various (2)** 53:23
155:9
**vegas (6)** 2:5,6,16,21
3:6 4:1
**vendor (1)** 148:13
**vendors (2)** 155:11,12
**voice (2)** 56:3 58:13
**voir (14)** 15:15 21:6
24:12 28:8 32:12
34:4 38:18 44:18
63:17,21 64:21 70:21
71:1 93:18
**voucher (7)** 94:5,11,16
95:21 98:24 99:13
117:25
**vouchers (10)** 92:6
93:3,25 94:1 117:17
117:23 118:5,6 138:2
138:4
**vs (1)** 1:8

**W**

**w2 (5)** 88:18 89:17
90:3,13 97:21
**wait (2)** 56:20 118:22
**waiting (6)** 54:14 55:5
55:5,5,15,16
**walked (1)** 125:21
**want (9)** 15:8 19:23
59:11 64:9,12,16,17
85:12 158:18
**wanted (3)** 53:9
125:18 157:25
**wants (4)** 50:5 57:10
111:17,20
**warehouse (3)** 80:5
94:22 118:4
**warn (1)** 62:16
**warned (1)** 62:18
**warning (4)** 62:24
63:13 65:15 66:1
**warrant (4)** 97:12
100:16 101:16 111:3
**warrants (6)** 93:24
99:8 116:3 117:14,16

148:25
wasnt (6) 56:6 57:21
  89:3,4 98:4 134:25
waste (3) 64:19 65:13
  153:2
wasting (1) 112:6
water (1) 99:14
way (13) 5:18,19,20
  34:25 60:1 65:11
  68:25 96:20 114:21
  115:10 131:21
  153:19,23
ways (1) 146:19
wed (3) 28:23 35:13
  110:11
wednesday (1) 4:1
week (14) 7:13 17:1
  53:5 63:1 90:7 91:11
  119:16 139:4 140:3,3
  146:3,5 157:2,4
weekly (5) 7:18 82:3,9
  119:21 145:19
weeks (2) 60:17 61:24
welcome (1) 20:12
wellman (3) 102:25
  103:2,4
went (13) 53:19 66:3
  73:16,19 81:2,5 99:3
  113:22 118:4 125:12
  127:15 132:24 158:3
west (3) 47:25 48:8
  49:3
weve (19) 21:11 23:18
  33:2 34:15 46:14
  56:22,24 59:4,8
  64:23 65:7 68:10
  69:7 72:9,11 76:12
  83:10 108:2 110:17
whats (11) 5:18 17:4
  26:7 31:22 68:24
  92:2 116:14 129:3
  136:11 137:9 147:15
whatsoever (2) 52:13
  129:24
whitey (1) 48:12
whitney (1) 155:24
whos (7) 49:21 58:17
  66:22 67:4 86:20
  100:9 104:24

william (2) 2:9,10
window (5) 93:10
  94:13 125:12,25,25
windows (1) 88:14
wish (1) 114:22
withdraw (4) 35:13
  72:10,12 88:9
withdrawn (1) 72:5
witness (32) 5:22
  15:11,12 20:10 54:1
  59:21 61:12,12 63:17
  63:22 85:6,21 89:24
  100:7 101:11 105:18
  113:5 114:4 118:25
  120:4,6 123:23
  124:20,22 129:9
  141:19 145:4 152:2,4
  152:6,21 153:21
witnesses (2) 53:4 62:2
witnesss (1) 58:4
wondered (1) 16:6
wood (1) 30:12
wooden (1) 29:20
word (4) 84:22 90:19
  112:15,25
wore (1) 156:6
work (27) 6:4 10:1
  24:22 28:15 34:18
  38:24 39:14 44:24
  73:16,19 74:15 89:13
  118:13,16,19,21,23
  119:8,18 127:23
  131:7 155:6,6 156:22
  157:2 158:7,11
worked (26) 7:20,22
  15:22 45:3,9 48:3
  71:18 83:24 94:5
  97:2 109:18 111:4
  115:8 117:12 119:2
  122:8,10 123:23
  130:4 141:4 154:24
  155:22 156:17 158:6
  158:10,13
worker (2) 125:12,16
workers (23) 6:20 39:6
  82:16,18,24 84:23
  85:3 88:15,18 90:4
  97:22,24 99:3 106:10
  109:13 116:11 118:9

119:21,21,22 148:20
  156:6,11
working (18) 24:18,18
  25:2,10,12 45:6 48:1
  73:1,6,13,23 74:2,9
  74:16,19 76:7 93:10
  103:8
workmans (1) 49:15
worn (1) 156:11
worry (1) 119:25
worth (1) 97:15
wouldnt (5) 105:19
  115:16 118:18
  131:21,21
wright (1) 155:18
write (4) 115:17
  146:25 147:3 150:20
writing (11) 86:10
  102:3 108:12 109:25
  110:16 127:14,22
  128:15 133:9,11
  151:1
written (11) 79:19
  107:7 111:9 112:9
  124:14 142:6 143:16
  144:14 145:16
  149:14 151:12
wrong (1) 134:12
wrote (6) 134:13
  141:15 142:1,3,3
  151:15

**X**

**Y**
yeah (43) 24:16,20
  28:20 34:22 39:11
  44:25 45:11,17,22
  46:20 52:14 73:15
  80:17 85:6 89:6
  90:14,18 93:25 94:6
  99:21 100:14 101:2
  102:3 103:11,13
  107:16 110:5 115:21
  118:1 119:19 124:18
  124:21 128:1 130:7
  131:25 132:3 135:19
  136:20 137:17,19
  155:24 156:20 157:5
year (5) 24:15 52:11

58:5 60:18 88:17
years (10) 56:25 58:24
  62:4 117:13,13 122:8
  141:5 150:5 156:17
  158:16
yellow (1) 96:7
yep (1) 131:1
yesterday (4) 5:7 15:21
  71:8,17
youd (6) 12:11 56:13
  119:14 132:1 134:16
  143:5
youll (1) 5:21
youre (9) 5:19 15:7
  20:12 54:24 56:2
  62:21 105:7 118:23
  131:13
youve (10) 10:22 34:18
  35:3 49:12 51:1 64:8
  90:22 112:12,17
  145:7

**Z**

**0**
000 (7) 78:12 97:17
  105:11,19 108:1
  123:17 150:13
0022 (1) 92:21
010 (1) 49:17
05cr121daerjj (1) 1:8
085 (2) 147:22 148:3

**1**
1 (55) 5:8 50:18,18
  51:4,4,23 52:4 53:2,9
  54:3,6 56:18 57:16
  64:11 68:13 69:8,8
  69:15,25 72:4,4,5
  85:14,19 87:5,10
  92:3,3,16,18 93:12
  95:5,10,10 97:17
  99:11 100:15 101:16
  102:22 119:12,12,12
  119:12 120:22,22,24
  120:24 121:5,5,6,6
  123:25 124:6 125:13
  125:25
10 (164) 8:9 9:8,18
  10:6,10,11,13,25

11:4,5,7,16,20,21,23
12:9,17,18,20 13:11
13:15,16,18 14:3,7,8
14:11,20 15:17 16:6
16:17,17 17:4,12,13
17:16 18:2,13,14,17
19:1,12,13,17 20:5,6
20:14,23 21:9 22:1,2
22:2,2,7 23:4,9,10,13
24:8 26:7,11 27:2,10
27:11,14 28:2,10,22
29:5,6,6,10,14 30:6
30:18,19,22 31:10,18
31:19,22 32:7,15
33:11,12,16 34:1,7
35:17,18,18 36:14,25
37:5,6,9,17,21,22,25
38:13,21 39:21 40:7
40:8,12,23 41:2,3,6
41:16,20,21,23 42:8
42:14,15,17 43:2,8,9
43:13,22 44:1,2,4,15
44:21 45:19 46:3,4,8
46:17,24,25 47:3,14
47:18,19,22 48:10,18
48:22,23 49:9 50:2
50:11,12 53:19 76:14
76:17 77:6 81:16,17
81:22 82:6 83:7,19
84:3,20 105:11,19
131:5
**100 (3)** 77:23 129:6
156:4
**1006 (1)** 52:10
**1013 (5)** 141:23 142:11
142:16,21 143:1
**1014 (6)** 143:5,18
144:7,10 145:11,12
**1015 (4)** 143:5 145:15
152:15,18
**1016 (3)** 145:23 146:17
152:21
**1017 (3)** 30:22 31:10
31:19
**1018 (4)** 31:22 32:7
33:11 147:16
**1024 (1)** 149:10
**1030 (5)** 31:23 32:8,15
33:6,12

**1031 (4)** 33:16 34:1
35:11,17
**1037 (3)** 35:11,18
150:10
**1038 (2)** 34:7 35:13
**1039 (1)** 34:9
**1040 (2)** 34:9 35:16
**1041 (4)** 33:16 34:1
35:11,18
**1042 (3)** 36:14,25 37:5
**105 (1)** 129:11
**106 (1)** 71:3
**1078 (1)** 143:6
**1079 (3)** 143:18 144:2
144:7
**108 (1)** 129:10
**1080 (6)** 151:6,17,22
152:1,15,18
**1081 (1)** 151:6
**1082 (1)** 151:6
**1083 (1)** 151:6
**1084 (3)** 151:6,18,22
**1085 (3)** 153:9,14,24
**1099 (3)** 88:21 90:9
97:24
**1099s (1)** 90:10
**11 (4)** 99:8 137:24,25
138:6
**1106 (3)** 36:14 37:1,6
**1107 (3)** 37:9,17,21
**1134 (3)** 37:9,17,22
**1135 (3)** 37:25 38:13
40:7
**1142 (2)** 38:21 39:21
**1144 (3)** 37:25 38:14
40:8
**1145 (3)** 40:12,23 41:2
**1156 (3)** 40:12,23 41:3
**1157 (3)** 41:6,16,20
**1179 (3)** 41:6,16,21
**1180 (3)** 41:23 42:8,14
**1226 (3)** 41:24 42:8,15
**1227 (3)** 42:17 43:2,8
**125 (7)** 5:8 96:7,23
97:6,6,13,16
**1258 (5)** 50:18 51:4
69:8 70:10 72:5
**126 (6)** 5:8 119:12,13
120:22 121:5,17

**127 (1)** 116:15
**1282 (3)** 42:18 43:2,9
**1283 (3)** 43:13,22 44:1
**1290 (3)** 43:14,22 44:2
**1291 (3)** 44:4,15 46:3
**1292 (2)** 44:21 45:19
**13 (1)** 131:5
**1317 (3)** 44:5,15 46:4
**1318 (3)** 46:8,17,24
**135 (6)** 116:15 119:12
121:6,11,14,17
**136 (5)** 104:20 105:7
120:24 121:12,18
**1366 (3)** 46:9,17,25
**1367 (3)** 47:3,14,18
**14 (1)** 35:22
**140 (1)** 82:13
**1402 (3)** 47:3,14,19
**1403 (1)** 47:22
**1420 (1)** 47:22
**1421 (3)** 48:10,18,22
**1434 (3)** 48:11,18,23
**1435 (3)** 49:9 50:2,11
**1441 (1)** 50:3
**1442 (6)** 49:9,17,19
50:5,7,12
**146 (1)** 132:11
**15 (6)** 51:17 102:22
117:3 128:21,25
130:23
**150 (1)** 53:21
**15minute (1)** 51:12
**16 (6)** 92:16,18 93:13
95:5 132:4 143:5
**166 (1)** 131:6
**17 (5)** 85:14 126:9,15
133:1 143:5
**174 (3)** 7:6 8:9 9:8
**180 (1)** 103:18
**181 (3)** 7:6 8:10 9:9
**182 (3)** 9:18 10:6,10
**189 (1)** 104:11
**19 (1)** 149:21
**191 (3)** 9:18 10:6,11
**192 (3)** 10:13,25 11:4
**1997 (1)** 74:3
**1998 (1)** 24:15
**1999 (1)** 24:23

**2**

**2 (13)** 1:8,20 99:8
103:18 104:11
105:25 107:1,1,13,22
125:25 126:3,6
**20 (2)** 51:17 82:13
**200 (4)** 52:4 53:2 54:3
54:6
**2004 (5)** 109:6,18
145:19 149:21,21
**2009 (3)** 1:17 4:1
159:11
**201 (1)** 126:10
**204 (1)** 131:5
**207 (3)** 10:13,25 11:5
**208 (3)** 11:7,16,20
**215 (4)** 56:16,16,19
57:16
**216 (1)** 52:3
**22 (9)** 80:12 103:16,18
104:11 105:25
107:13,22 137:18,24
**223 (1)** 78:10
**23 (1)** 126:9
**237 (3)** 11:8,16,21
**238 (3)** 11:23 12:9,17
**24 (3)** 126:9,22 159:11
**245 (1)** 105:25
**25 (2)** 72:10 149:21
**250 (4)** 3:5 78:12 79:14
79:20
**257 (1)** 107:1
**258 (2)** 51:23 53:9
**26 (2)** 80:13 133:18
**264 (1)** 107:13
**269 (1)** 107:22
**27 (1)** 85:13
**270 (1)** 126:24
**271 (1)** 127:1
**275 (1)** 126:9
**28 (1)** 159:6
**290 (2)** 83:7 84:3
**291 (1)** 83:19
**292 (1)** 84:20

**3**

**3 (25)** 99:11 121:24
123:25 124:6,9,12
126:3,6 127:10,10

128:2,5,7,17,21,25
130:23 132:4 133:1
133:18 135:15,21
136:14,24 140:8
**30 (5)** 57:16 64:11
68:13 127:16 159:2
**305 (3)** 11:23 12:9,18
**306 (4)** 12:20 13:2,11
13:15
**31 (2)** 147:21 148:3
**32 (1)** 135:15
**333 (5)** 2:5 12:20 13:2
13:11,16
**334 (3)** 13:18 14:3,7
**342 (3)** 13:18 14:3,8
**343 (3)** 14:11,20 17:12
**3448 (1)** 2:10
**345 (1)** 3:10
**35 (9)** 15:23 34:14
75:12,19 109:1,4,19
110:19 138:23
**356 (2)** 105:6,7
**36 (2)** 16:16 75:19
**365 (4)** 15:17 16:6,17
17:4
**366 (1)** 16:17
**3855533 (1)** 2:22
**3886336 (1)** 2:6
**3886577 (1)** 3:6
**39 (1)** 135:21
**394 (3)** 14:11,20 17:13
**395 (3)** 17:16 18:2,13

**4**

**4 (9)** 84:6 100:15 126:9
126:9,15,22 127:16
128:2
**40 (7)** 56:18 57:16 62:4
136:14 149:22 157:2
157:4
**400 (1)** 85:13
**411 (1)** 3:5
**415 (1)** 2:21
**42 (2)** 4:1 136:24
**43 (1)** 140:8
**438 (3)** 17:16 18:2,14
**439 (3)** 18:17 19:1,12
**45 (1)** 58:3
**4611436 (1)** 2:17

**5**

**5 (1)** 128:5
**500 (1)** 132:12
**5000 (1)** 2:5
**5112 (2)** 147:22 148:3
**52 (1)** 124:1
**5213336 (1)** 3:11
**546 (3)** 18:17 19:1,13
**547 (2)** 19:17 20:5
**576 (2)** 69:16,25
**577 (1)** 70:3
**593 (3)** 19:17 20:6,9
**594 (3)** 20:14,23 22:1

**6**

**6 (7)** 85:19 87:5,10
100:23 128:7 149:21
149:21
**615 (2)** 79:14,20
**616 (1)** 2:16
**625 (1)** 70:3
**626 (2)** 70:5 132:14
**644 (1)** 70:6
**645 (1)** 70:8
**646 (1)** 132:12
**662 (2)** 147:22 148:3
**664 (1)** 84:6
**673 (1)** 22:2
**674 (3)** 21:8,9,18
**675 (1)** 22:2
**676 (1)** 70:8
**677 (1)** 70:10
**699 (3)** 20:15,23 22:2
**6th (1)** 2:21

**7**

**7 (3)** 1:17 4:1 101:16
**70 (2)** 126:8,15
**700 (7)** 22:7,13,15 23:4
23:9 145:21 146:4
**702 (4)** 2:6,17,22 3:6
**753 (1)** 159:5
**763 (1)** 78:10
**777 (5)** 22:7,13,15 23:4
23:10
**778 (2)** 23:13 24:8
**786 (2)** 23:14 24:8
**787 (3)** 26:11 27:2,10
**795 (2)** 81:16 82:6

**796 (2)** 81:17,22

**8**

**8 (3)** 4:1 97:13 159:2
**800 (1)** 80:13
**806 (2)** 76:14,17
**807 (1)** 77:6
**808 (1)** 3:11
**82 (1)** 149:22
**83 (24)** 121:21,24
123:25 124:6,9,12
126:3,6 127:10 128:2
128:5,7,17,21,25
130:23 132:4 133:1
133:18 135:15,21
136:14,24 140:8
**832 (1)** 80:12
**8321632 (1)** 2:11
**858 (1)** 2:11
**877 (3)** 26:11 27:2,11
**878 (5)** 26:7,9 27:14
28:2 29:5
**887 (2)** 1:23 159:10
**89101 (4)** 2:6,16,21 3:6
**8th (1)** 2:16

**9**

**9 (168)** 8:9 9:8,18 10:6
10:10,11,13,25 11:4
11:5,7,16,20,21,23
12:9,17,18,20 13:11
13:15,16,18 14:3,7,8
14:11,20 15:17 16:6
16:17,17 17:4,12,13
17:16 18:2,13,14,17
19:1,12,13,17 20:5,6
20:14,23 21:9 22:1,2
22:2,2,7 23:4,9,10,13
24:8 26:7,11 27:2,10
27:11,14 28:2,10,22
29:5,6,6,6,10,14 30:6
30:18,19,22 31:10,18
31:19,22 32:7,15
33:11,12,16 34:1,7
35:17,18,18 36:14,25
37:5,6,9,17,21,22,25
38:13,21 39:21 40:7
40:8,12,23 41:2,3,6
41:16,20,21,23 42:8
42:14,15,17 43:2,8,9

43:13,22 44:1,2,4,15
44:21 45:19 46:3,4,8
46:17,24,25 47:3,14
47:18,19,22 48:10,18
48:22,23 49:9,17
50:2,11,12 53:19
76:14,17 77:6 81:16
81:17,22 82:6 83:7
83:19 84:3,20 104:20
105:6 108:1 123:17
128:17 150:13
**909 (1)** 29:6
**910 (3)** 7:6 28:10,22
**911 (1)** 29:6
**913 (4)** 26:8 27:14 28:3
29:6
**914 (4)** 29:10,14 30:6
30:18
**92067 (1)** 2:11
**928 (4)** 29:10,15 30:6
30:19
**929 (3)** 30:22 31:10,18
**95 (17)** 73:5 91:21 92:3
92:16,16,21 93:12,13
95:5,5,10 99:8,11
100:15,23 101:16
102:22
**96 (8)** 50:18 51:4 54:2
69:8 70:13 72:4,5
73:5
**96813 (1)** 3:11
**97 (5)** 24:20 73:20
85:19 87:5,10
**98 (7)** 74:22,22 126:9,9
126:22 127:16
128:14
**9n (2)** 5:8,8

# EXHIBIT

# B

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3     THE HON. DAVID A. EZRA, U.S. DISTRICT JUDGE, PRESIDING

4

5  UNITED STATES OF AMERICA,          )
                                      )
6                 Plaintiff,          )  **Case No. 2:05-cr-121-DAE-RJJ**
                                      )
7         vs.                         )  **\*COPY\***
                                      )
8  ROBERT DAVID KAHRE, et al.         )
                                      )
9                 Defendants.         )
   _____)

10

11

12

13

14          **REPORTER'S TRANSCRIPT OF JURY TRIAL**

15                  **July 15, 2009**

16

17

18

19
   **APPEARANCES:  (See page 2)**
20

21

22

23

24  **Court Reporter:  Andrea N. Martin, CRR, CCR No. 887**

25

Case 09-14814-gwz   Doc 1553   Entered 09/21/11 16:16:58   Page 79 of 257
Case 2:05-cr-00121-DAE-RJJ   Document 2748   Filed 07/22/10   Page 2 of 178

2:05-cr-121-DAE-RJJ - July 15, 2009          2

```
 1  APPEARANCES:

 2  For the Plaintiff:

 3                     J. GREGORY DAMM, ESQ.
                       Assistant United States Attorney
 4                     333 Las Vegas Boulevard South
                       Suite 5000
 5                     Las Vegas, Nevada 89101
                       (702) 388-6336
 6
                       CHRISTOPHER J. MAIETTA, ESQ.
 7                     U.S. Department of Justice
                       Tax Division
 8                     P. O. Box 972
                       Washington, D.C. 20044
 9                     (202) 514-4661

10  For the Defendant Robert David Kahre:

11                     WILLIAM A. COHAN, ESQ.
                       WILLIAM A. COHAN, P.C.
12                     P. O. Box 3448
                       Rancho Santa Fe, California 92067
13                     (858) 832-1632

14  For the Defendant Robert David Kahre:
    (Local counsel)
15
                       LISA RASMUSSEN, ESQ.
16                     LAW OFFICE OF LISA RASMUSSEN
                       616 South 8th Street
17                     Las Vegas, Nevada 89101
                       (702) 461-1436
18
    For the Defendant Alexander C. Loglia:
19
                       JOEL F. HANSEN, ESQ.
20                     415 South 6th Street
                       Las Vegas, Nevada 89101
21                     (702) 385-5533

22

23  ***

24  ***

25  ***
```

```
 1   APPEARANCES:
     (Continued.)
 2
     For the Defendant Lori Kahre:
 3
                        MICHAEL J. KENNEDY, ESQ.
 4                      First Assistant Federal Defender
                        411 East Bonneville Street
 5                      Suite 250
                        Las Vegas, Nevada 89101
 6                      (702) 388-6577

 7
     For the Defendant Danille Cline:
 8
                        LYNN E. PANAGAKOS, ESQ.
 9                      345 Queen Street
                        Honolulu, Hawaii 96813
10                      (808) 521-3336

11
                          *    *    *    *    *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 09-14814-gwz AE-RJJ Document 2748 Filed 07/22/10 Page 4 of 178
Case 2:05-cr-00121-DAE-RJJ Document 2748 Filed 07/22/10 Page 81 of 257

2:05-cr-121-DAE-RJJ - July 15, 2009          4

1                        --oOo--

2                   I N D E X

3

4       MATTHEW JOHNSON (Cont'd)                         PAGE

5       Direct Examination (Cont'd) by Mr. Damm          29

6       Cross-Examination by Mr. Cohan                   43

7       Cross-Examination by Mr. Kennedy                 55

8       Redirect Examination by Mr. Damm                 59

9       Recross-Examination by Mr. Cohan                 61

10      Recross-Examination by Mr. Kennedy               64

11

12      JORGE FERNANDEZ                                  PAGE

13      Direct Examination by Mr. Damm                   67

14      Cross-Examination by Mr. Kennedy                 112

15      Cross-Examination by Mr. Cohan                   138

16      Redirect Examination by Mr. Damm                 161

17      Recross-examintaion by Mr. Kennedy               170

18

19

20

21

22

23

24

25

```
 1              MR. DAMM:  No further questions, Your Honor.  Thank
 2 you.
 3              THE COURT:  Sir, you may step down.
 4              MR. DAMM:  We'd call Mr. Jorge Fernandez, your Honor.
 5
 6                        JORGE FERNANDEZ,
 7         Having been first duly sworn to testify to the truth,
 8 the whole truth, and nothing but the truth, was examined and
 9 testified as follows:
10
11              THE CLERK:  Please be seated.  Will you please state
12 your name for the record and spell your first and last name.
13              THE WITNESS:  My name is Jorge Alfredo Fernandez.  It's
14 J-O-R-G-E, last name is F-E-R-N-A-N-D-E-Z.
15              MR. DAMM:  May I have the Court's indulgence for a
16 moment just for a little housekeeping?
17              THE COURT:  Yes.
18              MR. DAMM:  Get these things out of your way.
19              MR. KENNEDY:  Your Honor, while we're doing a little
20 housekeeping, would this be a good time to do the stipulation
21 that we arrived at yesterday?
22              THE COURT:  All right.
23         Ladies and gentlemen of the jury, yesterday we had some
24 documents, custom reports, the entire series is in with respect
25 to the companies, and those would be paper copies of the custom
```

 1  reports seized at the scene, and both of us have agreed to put

 2  in the entire set.

 3          Is that a correct statement?     -

 4          MR. MAIETTA:  That's correct.

 5          MR. KENNEDY:  Thank you so much.  So you will have them

 6  in the jury room.

 7

 8                       DIRECT EXAMINATION

 9          BY MR. DAMM:

10  Q.  Good morning, Mr. Fernandez.

11  A.  Good morning.

12  Q.  How are you?

13  A.  Pretty good.  Thank you.

14  Q.  Do you know Mr. Robert Kahre?

15  A.  Yes, sir.

16  Q.  How do you know Mr. Kahre?

17  A.  Mr. Kahre and I have known each other since we were in

18  elementary school.

19  Q.  And where did you go to elementary school?

20  A.  Lincoln Elementary School.

21  Q.  And where was that located?

22  A.  North Las Vegas.

23  Q.  And did you know Mr. Robert Kahre's sister at that time?

24  A.  Yes.  I knew Robert.  I knew Lori and his mom Myra, his

25  brother John?

Case 2:05-cr-00121-DAE-RJJ Document 2748 Filed 07/22/10 Page 68 of 478
Case 09-14814-pwz AE Doc 1553 Entered 08/21/11 16:16:58 Page 84 of 257

2:05-cr-121-DAE-RJJ - July 15, 2009          68

 1  Q.  Now, did you -- after elementary school, did you go through
 2  high school with Mr. Kahre?
 3  A.  Mr. Kahre and I went to elementary school, junior high
 4  school, high school, junior college, and one year of college.
 5  Q.  And did you go to -- through school with his sister as well?
 6  A.  High school.  She was younger.
 7  Q.  At some point in time did you go to work for Mr. Kahre?
 8  A.  After college, when I came home, I bounced around a few
 9  jobs, and then Mr. Kahre offered me a job as a painter.
10  Q.  And was he the owner of a company at that period of time?
11  A.  Yeah.  He was partners in a company called KHD.
12  Q.  And he hired you as a painter?
13  A.  Yes, sir.
14  Q.  Did the name of that company later change?
15  A.  Yes, sir.
16  Q.  And what did it change to?
17  A.  Wright Painting & Drywall.
18  Q.  For what period of time were you a painter at either HKG or
19  Wright Painting & Drywall?
20  A.  As an actual worker, pretty close to, I'd say, six -- six to
21  eight years.
22  Q.  Did you get promoted at some point in time?
23  A.  I was promoted to a foreman.
24  Q.  And what were your duties and responsibilities as a foreman?
25  A.  I ran jobs.  I was assigned several jobs to be in charge of,

 1  to make sure that the painting and the drywall process was done
 2  correctly.
 3  Q.  Now, when Mr. Kahre was operating HKG, did he have any
 4  partners?
 5  A.  Yeah, he had a partner.
 6  Q.  And did that partnership remain?
 7  A.  No.  I can't remember -- I think he had a problem with the
 8  guy not keeping up his part of the deal on things.
 9  Q.  And so do you know what happened to the company after that?
10  A.  He kept the company for a while and then changed the name.
11  Q.  Did Mr. Kahre also have another business called Bobby K's?
12  A.  Bobby K's Carpet Cleaning.
13  Q.  And what kind of a business was that?
14  A.  They did commercial and home carpet restoration and
15  cleaning.
16  Q.  And how did you become familiar with that business?
17  A.  It was in the same office as we ran Wright Painting &
18  Drywall.
19  Q.  And did you have discussions with Mr. Robert Kahre regarding
20  this particular business?
21  A.  Just about if it was going good or bad.  You know, I didn't
22  go into that realm.
23  Q.  Do you know whether or not Mr. Kahre ever discussed any
24  problems with you regarding Bobby K's and the Internal Revenue
25  Service?

1  **A.**  I don't know if it was because of Bobby K's or Wright
2  Painting, but we were -- we had a siege once where they came in
3  and took all our vehicles and painting equipment and all kinds
4  of stuff like that.  So I don't know if it was from the carpet
5  side or the painting side.
6  **Q.**  And do you know why that was?
7  **A.**  I really couldn't tell you exactly why it was.  They just
8  came in and took our stock and said -- from what the agents had
9  said, it I was on the taxes.  He was late on the taxes.
10  **Q.**  Did Mr. Kahre ever discuss this seisure with you?
11  **A.**  You know, not at the time.  I wasn't -- you know, I was,
12  like I said, just a foreman, even though we were friends.  It
13  was not my -- in my realm of work.
14  **Q.**  At some later point in time did Mr. Kahre discuss this
15  seisure with you?
16  **A.**  Yes.
17  **Q.**  And what was Mr. -- what were Mr. Kahre's statements to you
18  regarding the seizure?
19  **A.**  That -- that it was wrong; they had no right to do that; it
20  was unlawful; they were just throwing their weight around.
21  **Q.**  Did Mr. Kahre indicate to you at that time how he felt about
22  the Internal Revenue Service?
23  **A.**  I think we all agreed because we were losing our jobs
24  because they came in and took our stuff -- they sucked.
25  **Q.**  Were you able to continue in business?

```
 1  A.  We tried really hard to overcome, tried to get our equipment
 2  back from the auction house, and continue to work.
 3  Q.  And was Mr. Kahre successful in doing that?
 4  A.  Yes.
 5  Q.  How were you paid when you first went to work for Mr. Kahre?
 6  A.  I was given a check with -- on a weekly basis.
 7  Q.  And were taxes withheld from your -- from your paycheck?
 8  A.  No.
 9  Q.  Never during the time that you worked for Mr. Kahre?
10  A.  Never.
11  Q.  Did -- did your form of payment change at some point in time
12  from check to some other form?
13  A.  It went from receiving the check -- excuse me.  It went from
14  receiving a check to a kind of system set up to where you'd come
15  in and you would be paid in gold and silver.  And if you wanted
16  to keep the gold, you could walk away with it -- or the silver,
17  or you could exchange it for what we were taught to be Federal
18  Reserve notes instead of dollars.
19  Q.  Who set up this system?
20  A.  Mr. Kahre.
21  Q.  Were you ever told by Mr. Kahre why he set up this system?
22  A.  Had to be set up so that -- for the taxes, for the tax
23  reasons.
24  Q.  And what were the tax reasons?
25  A.  We didn't have to pay taxes.
```

Case 09-14814-gwz Doc 1553 Entered 09/21/11 16:16:58 Page 88 of 257

2:05-cr-121-DAE-RJJ - July 15, 2009          72

1  Q.  And why was that?

2  A.  Because he -- gold was circulated, and according to -- what

3  I was told, in 1986, Ronald Reagan had passed a law that you

4  could use silver and gold as legal tender as long as they're

5  circulated.

6  Q.  And were there tax consequences associated with using the

7  gold and silver?

8  A.  Yeah.  He said you only had to pay tax on what he was paying

9  in silver, not what the value in dollars was, in paper dollars.

10 Q.  And who told you that?

11 A.  Mr. Kahre.

12 Q.  Now, did you ever take gold and silver home?

13 A.  I took a few.

14 Q.  When you say "a few," what do you mean?

15 A.  About four or five silver pieces.

16 Q.  Any gold?

17 A.  No.

18 Q.  And how long did you work for Mr. Kahre?

19 A.  I want to say about 15 years, 13, somewhere in there.

20 Q.  And during that entire time period, you took home four or

21 five silver pieces?

22 A.  I couldn't afford it.

23 Q.  I'm sorry?

24 A.  I couldn't afford to keep the silver.

25 Q.  You could not afford to keep it?

1  **A.**  No.  I needed the notes.

2  **Q.**  And by "notes," you mean cash?

3  **A.**  Yeah.

4  **Q.**  Where was -- where were Mr. Kahre's businesses located when

5  you initially went to work for him?

6  **A.**  There was one on -- over by the airport, not Harmon, but --

7  there was one on Patrick.  From there we moved to Boulder

8  Highway, and then from there to Kimberly.

9  **Q.**  And at which location did you work at?

10  **A.**  All locations.

11  **Q.**  Did you ever have any discussions with Mr. Kahre about

12  telling government officials where he worked?

13  **A.**  We just told him he wasn't around, just pretty much was

14  never there, so...

15  **Q.**  Did anyone instruct you to -- to --

16          MR. COHAN:  Object to leading.

17          THE COURT:  Sustained.

18          BY MR. DAMM:

19  **Q.**  Why did you do that?

20  **A.**  Because we were told by Mr. Kahre that if anybody came

21  looking for him, that he wasn't there.

22  **Q.**  Did Mr. Kahre indicate to you why he wanted you to say that?

23  **A.**  He basically wanted just to make sure that if somebody came

24  to subpoena him or something like that, he would have the time

25  to prepare for whatever was coming at him, wouldn't get caught

Case 09-14814-gwz AE RJJ Document 2748 Filed 07/22/10 Page 74 of 178
Case 2:05-cr-00121-DAE-RJJ Document 2748 Filed 07/22/10 Page 90 of 257

2:05-cr-121-DAE-RJJ - July 15, 2009          74

```
 1   by surprise.
 2   Q.  And do you know what sort of preparation he wanted to -- to
 3   accomplish?
 4   A.  Legal.
 5   Q.  Are you familiar with a location at 1555 Bledsoe that was
 6   owned by Mr. Kahre?
 7   A.  Yes.
 8   Q.  How so?
 9   A.  The addresses confuse me.  There was two properties.  There
10   was one near Washington, and there was one closer to Owens.  The
11   one near Washington was his home of residence.  The one near
12   Owens was offices.
13   Q.  Now, when you say "offices," what do you mean?
14   A.  That's where we had our secretaries and ran the business out
15   of there.
16   Q.  Was there any equipment storage area associated with 1555
17   Bledsoe?
18   A.  Which one is that?
19   Q.  The office location.
20   A.  Okay.  In the back, there was a big warehouse --
21   Q.  And --
22   A.  -- and kept equipment back there.
23   Q.  And what sort of equipment would you have kept back there?
24   A.  There was stuff like spray rigs -- old spray rigs, a couple
25   of those machines we used to go over the cement to polish it.
```

1  There was a truck that was used for special mining, all kinds of
2  stuff like that --
3  Q.   Mr. --
4  A.   -- paint.
5  Q.   I'm sorry?
6  A.   Paint.  There was a lot of paint that -- from overstock.
7  Q.   Did Mr. Kahre store records there?
8  A.   I -- I didn't see any records in that particular storage
9  area.
10 Q.   Was there room for the storage of records there?
11 A.   Yes.
12         MR. COHAN:  Object to leading, your Honor.
13         THE COURT:  The objection is sustained.
14         BY MR. DAMM:
15 Q.   Can you tell us the size of the garage there?
16 A.   It was big.  You could drive a front-end loaders in there.
17 Q.   Now, can you tell us the type of business that Mr. Kahre was
18 engaged in with Wright Painting & Drywall.
19 A.   We did just about every kind of drywall hanging and painting
20 that we could get our hands on, commercial and residential,
21 whatever needed to be done.
22 Q.   And who would -- who would you work for?
23 A.   Lennar Homes -- I'm sorry, U.S. Homes, Greystone Homes,
24 Richmond America, anybody that we could get work from.
25 Q.   Now, over time, did Mr. Kahre establish other businesses?

1  **A.**   Yes.

2  *Q.*   And what other businesses did he establish?

3  **A.**   HVAC, electrical, plumbing, and tile.

4  *Q.*   And were there individuals that Mr. Kahre hired to run those

5  businesses?

6  **A.**   Yes.

7  *Q.*   Did he have foremen for those businesses?

8  **A.**   They did.

9  *Q.*   And supervisors?

10 **A.**   Mainly the guy that ran the company was the supervisor.

11 *Q.*   Now, you've indicated that when you first went to work for

12 Mr. Kahre, you were paid by check?

13 **A.**   Yeah.

14 *Q.*   And then you went to the gold and silver payroll system?

15 **A.**   Yes, sir.

16 *Q.*   Did Mr. Kahre offer this gold and payroll -- this gold and

17 silver payroll system to anyone else?

18 **A.**   Anybody that wanted to do it.

19 *Q.*   And do you know how those presentations were made?

20 **A.**   If you worked for Wright Painting & Drywall, that was the

21 only way you were going to get paid.  If you worked for any of

22 the other companies that he owned, that's the way you were going

23 to get paid.  There was no other system.

24 *Q.*   Now, were other contractors not associated with Mr. Kahre

25 invited to participate in this payroll system?

1 **A.**    Yes.

2 *Q.*    How did that occur?

3 **A.**    Mr. Kahre, at first, made some contacts with a couple of
4 companies, and then the guy named Phil -- I can't remember
5 Phil's last name.  He was an accountant -- started introducing
6 him to more people.  And after Phil passed away, John Greco was
7 the one that did a lot of that.  At times, me, myself -- I tried
8 to get somebody -- if they wanted to join, I was offered a
9 percentage.

10 *Q.*    Who offered you a percentage?

11 **A.**    Mr. Kahre.

12 *Q.*    And what would that percentage have been?

13 **A.**    It depends how much the -- they had to pay as far as the
14 burden of taxes.

15 *Q.*    Can you tell me how that -- how that worked?  How would --
16 how would Mr. Kahre determine how much to charge another
17 contractor for handling that contractor's payroll?

18          MR. COHAN:  Object:  Lack of foundation at this point.

19          THE COURT:  Overruled.  He's testified he was involved
20 in this process.

21          THE WITNESS:  He would -- the way Mr. Kahre explained
22 it to me, he would take whatever -- we called it the mock
23 factor -- whatever the burden of payment to the IRS was, and he
24 would reduce it by a percentage according to how much the
25 payroll was.

```
 1           BY MR. DAMM:
 2   Q.   Now what -- what did you call this factor?
 3   A.   Mock factor, you know, the -- the amount of burden that you
 4   had to pay.
 5   Q.   So can you give me an example?
 6   A.   Say if you were a real big company and, you know, you
 7   brought in a lot of money, you'd pay less as far as your
 8   percentage of the taxes.
 9   Q.   So a large company would have a larger --
10   A.   -- payroll.
11   Q.   Would have a larger payroll but a smaller percentage of
12   taxes?
13   A.   Yes.
14   Q.   Now, if this contractor went to -- or participated in
15   Mr. Kahre's payroll system, what would Mr. Kahre do for the
16   contractor?
17   A.   He'd break it in half or break it even less than half of
18   what his burden was, and he would be responsible for that part.
19   Q.   And what would Mr. Kahre provide to the contractor in
20   return?
21   A.   Insurance, you know.  We -- we're in charge of -- anybody
22   would get hurt on their companies, we would take them to the
23   doctor.  We would pay their compensation for being out of work,
24   all that stuff.
25   Q.   Was that through the State industrial insurance system?
```

 1  **A.**  No, unless somebody got seriously hurt and the ambulance got

 2  there before one of the foremans or myself, we would take care

 3  of them.

 4  **Q.**  And who instructed you to take care of these employees in

 5  that way?

 6  **A.**  Mr. Kahre.

 7  **Q.**  Do you know who it was that actually handled the paperwork

 8  for this cash payroll system for Mr. Kahre's companies?

 9  **A.**  I don't understand who --

10  **Q.**  Was there a payroll office?

11  **A.**  Oh, yes.  It started with Micki, and then he passed it on to

12  his sister, Debra, and Heidi would be the ones.

13  **Q.**  And would they also handle the payroll system for the other

14  contractors?

15  **A.**  Yes.

16  **Q.**  Do you recall who the largest other contractor/payroll

17  customer was at this time?

18  **A.**  First Premier.

19  **Q.**  And what was First Premier?

20  **A.**  Painting and drywall company.

21  **Q.**  Now, you mentioned a Mr. Phil Bracken?

22  **A.**  That was his last name.  I'm sorry.  I couldn't remember.

23  **Q.**  What role did he play in this system, if any?

24  **A.**  He's the one that helped start this whole thing, getting

25  people involved to come run their payroll through.  He was

1  pretty much Mr. -- excuse me, Mr. Kahre's accountant.

2  Q.  I'm sorry.  Mr. Kahre's --

3  **A.**  He was his accountant-type representative, you know, numbers

4  and stuff.

5  Q.  Is -- and do you know where -- where this gold and silver

6  payment system originated, where it began?

7  **A.**  I do not.

8  Q.  Did Mr. Kahre, to your knowledge, look towards any specific

9  type of other contracting business that might be receptive to

10  his gold and silver payroll system?

11  **A.**  Usually, people that were in trouble financially.

12  Q.  And -- and why would Mr. Kahre, if you know, look for that

13  type of company?

14  **A.**  In a way, he was -- I feel he was being innovative because

15  he took -- instead of just running one company, he had a bunch

16  of companies come together so he can bid the work -- more types

17  of work.  So, like, for example, the VH -- the HVAC company.  He

18  was being robbed by the guys who was working at, the other

19  partners he had with.  He had all kinds of problems with the guy

20  writing checks, all kinds of bad things happening to him.  So

21  Mr. Kahre approached him and said, "Hey, I'll help you out.  You

22  come work for us."

23       And we took -- basically went over and cleared out the

24  warehouse and took all the things that belonged to Bill and put

25  it all in our warehouse and started an HVAC company.

1   Q.   And with respect to the other contractors that -- where

2   Mr. Kahre just would perform payroll services, did he look for

3   any particular type of companies?

4   **A.**   Just every -- every company that he can get his hands on

5   that would benefit the conglomerate group of guys to bid for

6   bigger jobs.

7   Q.   Now, was there an actual payroll office where individuals

8   were -- were paid that either worked for other contractors or

9   for Mr. Kahre?

10  **A.**   Yes.

11  Q.   And where was that payroll office?

12  **A.**   It was -- we had one on Patrick.  We had one on Boulder

13  Highway.  We had one on Kimberly.  It depends where offices

14  moved to.

15  Q.   Did you assist in the building of those payroll offices?

16  **A.**   Yes.

17  Q.   Did you ever provide security services for Mr. Kahre?

18  **A.**   I was the only one that provided security for many, many

19  years until we hired two extra guys when we went over to the

20  Kimberly office.

21  Q.   And were you armed when you provided security?

22  **A.**   Yes.

23  Q.   And when the other two individuals were hired, were they

24  armed?

25  **A.**   Yes.

Case 2:05-cr-00121-DAE-RJJ Document 2748 Filed 07/22/10 Page 82 of 178
Case 09-14814-gwz Doc 1553 Entered 08/21/11 16:16:58 Page 98 of 257

2:05-cr-121-DAE-RJJ - July 15, 2009          82

 1  Q.  And why was it that you needed security for Mr. Kahre's
 2  contracting business?
 3  **A.**  Large amount of cash.
 4  Q.  When you say a "large amount of cash," how much are you
 5  talking about?
 6  **A.**  Maybe $300, $400.
 7             THE COURT:  I mean --
 8             THE WITNESS:  -- thousand.
 9             THE COURT:  $300 or $400, I assumed.
10             THE WITNESS:  Sorry.  Thousand.
11             THE COURT:  $300,000 or $400,000; is that right?
12             THE WITNESS:  Yes, sir.
13             BY MR. DAMM:
14  Q.  Can you tell me how the -- the payroll office would
15  run?  How would individuals of other contractors get
16  paid?
17  **A.**  If you were a large contractor, you would come in and you
18  would pick up the payroll for the whole company.  You go to one
19  of the windows, and you would get your amount of gold that would
20  be equivalent to your payroll.  And you would go to the next
21  window, return the gold, and then you would receive the
22  envelopes with the cash inside.
23             A lot of contractors would stay in there and go through
24  and make sure that every name and the amounts were correct.
25             If you were an individual, you would just come in,

 1  receive the gold, go to the next window, get your envelope.

 2          Our statement to everyone was always the same:  "If you

 3  leave the inside of this office and then come back and say

 4  you're short, too bad.  You count your money before you leave."

 5  Q.  Now, why weren't workers just given gold and silver and

 6  sent -- sent out the door?

 7  **A.**  They were given the same opportunity, and if they wanted to

 8  keep it, they could keep it or they can trade it in.

 9  Q.  Now, if somebody came to pick up for a big contractor, how

10  would an individual worker pick up gold or silver?

11  **A.**  He'd have to talk to his boss, make those prearranged.

12  Q.  Did individuals regularly keep gold and silver?

13  **A.**  Some did.  Some people did.  Every once in a while would

14  keep -- you know, buy -- buy some of it.

15  Q.  What do you mean by that?

16  **A.**  Well, you know, you trade -- you just -- you have to go from

17  this window to the other window.  And in this window is where

18  you got your cash, and this is where you have to return the

19  amount of cash for whatever the silver value was at the time, or

20  gold, to retain it.

21  Q.  Now, if you had a ten dollar bill, could you exchange the

22  ten dollar bill for ten silver dollars?

23  **A.**  No.  The exchange was -- well, whatever the exchange was in

24  the market.  It wasn't a one-to-one value.

25  Q.  And what about for gold?

1  **A.**  The same.  It was whatever the gold was going at that rate

2  that they gave you the cash for.

3  *Q.*  So Mr. -- Mr. Kahre wouldn't pay if -- if a -- if a worker

4  was owed $800 for a week, he wouldn't get $800 in gold coins?

5  **A.**  He'd receive that in the one window.

6          THE COURT:  I think he's asking you a different

7  question.

8          If a worker, say, was due $1,000, he might get, as I

9  understand from your testimony, whatever the face -- not --

10 not -- whatever the market value of gold or silver coins would

11 be to equal $800?

12         THE WITNESS:  Correct.

13         THE COURT:  He wouldn't get $800 in face value of gold

14 or silver?

15         THE WITNESS:  No.

16         THE COURT:  Because that would be market value way in

17 excess of a thousand; right?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  So I imagine if that happened, everybody

20 would run out the door with their gold or silver.

21         THE WITNESS:  Yes, sir.

22         THE COURT:  All right.

23         BY MR. DAMM:

24 *Q.*  Now, when -- when you were hired to work for

25 Mr. Kahre, were you told anything about payroll -- or

1  anything about income taxes?

2          MR. COHAN:  I'm sorry.  Could you repeat the question?

3  I couldn't --

4          BY MR. DAMM:

5  Q.  Were you told anything about income taxes when you

6  went to work for Mr. Kahre?

7  A.  Didn't need to file taxes because we were making under

8  the -- the level that is required.

9          THE COURT:  Did somebody actually tell you that?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  Who told you that?

12         THE WITNESS:  Mr. Kahre.

13         BY MR. DAMM:

14  Q.  When you were hired to work for Mr. Robert Kahre,

15  were you given a private and independent contract

16  agreement to sign?

17  A.  Yes, sir.

18  Q.  Did you sign it?

19  A.  I signed, yeah, many -- many years ago I signed one.

20  Q.  And did you read it?

21  A.  He just told me basically -- you know, it's not very simple

22  to read, you know.  I mean, I've been to college, but I'm still

23  not -- didn't understand the writing and what it pertained to,

24  so I just asked him what it was.

25          And he said, "You know, it's an agreement with me that,

 1  you know, basically whatever happens, I don't say nothing and

 2  you don't say nothing.  You're an independent contractor.  Leave

 3  it at that."

 4  Q.  You wouldn't -- you agreed not to say anything, and he

 5  agreed not to say anything?

 6  A.  Yeah.

 7  Q.  To whom?

 8  A.  To anybody that asked, you know.  We don't talk about our

 9  business, you know.

10  Q.  Now, when -- when Mr. Kahre solicited other contractors to

11  participate in his gold and silver payroll system, was the

12  system explained to them?

13  A.  I don't know how he explained it to the owners, because I

14  wasn't there.

15  Q.  Were you there at other meetings with the individual

16  workers?

17  A.  I was there with the workers.  Most of the workers were

18  Hispanic, non-English-speaking, so I was there to translate.

19          THE COURT:  You speak fluent Spanish?

20          THE WITNESS:  Yes, sir.

21          BY MR. DAMM:

22  Q.  And what would you tell the individual workers?

23  A.  It was a routine.  Every time we went in, we showed them a

24  silver dollar and pass it around and then pull out a dollar and

25  go, "Which one would you rather have:  The silver or the gold,

 1  because, you know, that's real money that weighs, you can tell.
 2  But what is this?"

 3          And then we'd explain to them about the note.
 4  Everything Mr. Kahre would say I'd repeat to the guys, and then
 5  he pulled out the contracts for everybody to sign.  And
 6  basically what he would tell me -- you know what I would tell
 7  them, according to what he's told me, is, "Hey, you don't say
 8  nothing to anybody, we don't say nothing.  You'll get straight
 9  money.  If you make $400, you get $400.  If you make $1,000, you
10  get $1,000.  There will be no money taken out of your taxes."
11  Q.  Was there any discussion about whether or not W-2 forms
12  would be provided at the end of the year?
13  **A.**  That was told to them, that you want to do it, you do it.
14  You go file a 1099, I will file no forms.
15  Q.  And did Mr. Kahre ever explain to you why he would not
16  report workers paid to the Internal Revenue Service?
17  **A.**  No.

18          THE COURT:  Did anyone ever explain to these workers
19  while you were there the potential legal consequences of their
20  not filing taxes?

21          THE WITNESS:  No.  Most of these guys are illegal
22  workers.  They really aren't looking to really care to put in,
23  you know, any taxes.  They just want to see how much money they
24  could get out of the system.

25          THE COURT:  So a lot of these people weren't legal

1  anyway?

2          THE WITNESS:  No, they weren't.

3          THE COURT:  They weren't -- they weren't Social

4  Security -- they weren't nothing, they were just here legally.

5          THE WITNESS:  Using false IDs.

6          THE COURT:  Okay.

7          BY MR. DAMM:

8  Q.  In what language was the contract written?

9  A.  At first, it was just in English, and then it was in English

10  and Spanish.

11  Q.  At -- at first, was a Spanish version given to the

12  non-English speakers?

13  A.  Yes.  When -- when the contract was made into Spanish, yeah.

14  But before that, I was the one that would pretty much tell them

15  my interpretation that I was told of what it meant.

16          THE COURT:  Just a second, Mr. Damm.  We've got some

17  jurors that need to have their break, so we're going to take

18  about a 10- to 15-minute recess at this point.

19          MR. DAMM:  Great.  This would be a good time.  Thank

20  you, your Honor.

21              (Recess taken.)

22          THE COURT:  All right.  The court notes the

23  presence of all the parties as well as the ladies and

24  gentlemen of the jury.

25          Okay.  Mr. Damm, you can continue on.

1          MR. DAMM:  Thank you, your Honor.

2          BY MR. DAMM:

3    Q.  Mr. Fernandez, getting back to the cash payroll

4    system for a minute, when a worker was hired by one of

5    Mr. Kahre's companies, was that worker required to

6    provide a true name?

7    A.  He was required to provide identification, Social Security

8    card, and a driver's license, U.S. -- well, from wherever, but

9    as long as they had -- it was their face, and their I D.

10   Q.  Now, were Social Security numbers required on any of the

11   employment documents?

12   A.  I can't remember.

13   Q.  Now, with respect to the -- the method of pay, was there any

14   withholding for Social Security taxes?

15   A.  No.

16   Q.  Any withholding for federal income taxes?

17   A.  No.

18   Q.  Any withholding for Medicare?

19   A.  No.

20   Q.  No -- no withholding, whatsoever?

21   A.  Nope.

22   Q.  No W-2s issued?

23   A.  No 1099s.

24   Q.  Now, did you ever have the opportunity to deliver payroll to

25   one of the other contractors?

Case 09-14814-gwz Doc 1553 Entered 08/21/11 16:16:58 Page 106 of 257
Case 2:05-cr-00121-DAE-RJJ Document 2748 Filed 07/22/10 Page 90 of 178

2:05-cr-121-DAE-RJJ - July 15, 2009          90

1   **A.**   I did once.

2   *Q.*   And do you recall the name of the contractor?

3   **A.**   It was for First Premier.

4   *Q.*   And can you tell me how that process worked?

5   **A.**   I picked up the envelope, a manila envelope, large manila

6   envelope, and met Oscar Spencer on the north side of town

7   because he was busy with some work out there and he couldn't

8   come pickup payroll.

9   *Q.*   And did you go through the exchange?

10  **A.**   Yes.

11  *Q.*   When you went through the exchange, did you count the gold

12  or silver?

13  **A.**   No.

14  *Q.*   Do you know whether or not a -- there were gold coins?

15  **A.**   There were two racks of silver, and then on top there was a

16  couple of gold coins.

17  *Q.*   And could you see those coins?

18  **A.**   They were in a plastic carrying case.  You could see the

19  difference in the color.

20  *Q.*   But other than that, could you tell what was in the cases?

21  **A.**   It has a solid green lid, and it's plastic all the way

22  through.

23  *Q.*   And how did you know --

24          THE COURT:  An opaque plastic?

25          THE WITNESS:  Yes, sir.

```
 1          BY MR. DAMM:
 2   Q.  How did you know if you were getting the right amount
 3   of gold and/or silver?                    -
 4   A.  To be honest, that wasn't the important part.  The important
 5   part was to get the guys paid correctly.  That was my concern.
 6   I never opened up and counted the silver, made sure it was all
 7   there.  Nobody else ever did.  There's -- there was tape on top
 8   of these plastic holding things.
 9   Q.  Was the lid taped on?
10   A.  Yeah.  And so what were you concerned with in terms of
11   accurate pay?
12          MR. COHAN:  It's been asked and answered.
13          THE COURT:  Overruled.
14          THE WITNESS:  Sorry.  I didn't hear you.
15          BY MR. DAMM:
16   Q.  What were you concerned about in terms of the
17   accuracy of the cash payroll system?
18   A.  As long as the cash equaled what was on my list, pay the
19   workers.  That was my concern.
20   Q.  Let's take a look at a document that's already been admitted
21   into evidence, and I think it will appear on your screen there.
22   This is 9.6.248.
23          Do you recognize this document, Mr. Fernandez?
24   A.  Yes.
25   Q.  How do you recognize it?
```

 1  *A.*  It was the list that we would be given with -- it's similar
 2  to the list that I would be given with the names of the
 3  employees and the amount that they were supposed to get.
 4  *Q.*  Now, who would give this list to you?
 5  *A.*  Whoever was handing out the money through the windows.
 6  *Q.*  And who would normally hand out the money through the
 7  windows?
 8  *A.*  It varied:  Lori, Debbie, or Heidi.
 9  *Q.*  Now, do you know what it was that Lori Kahre did for
10  Mr. Robert Kahre?
11  *A.*  As far as I'm concerned, she was the secretary.
12  *Q.*  And did she work in the payroll office?
13  *A.*  Yes.
14  *Q.*  And did she work with payroll?
15  *A.*  Yes.
16  *Q.*  Now, when you indicated that you were concerned about making
17  sure that the employees received the right amount of money,
18  would you use this payroll report to make that determination?
19  *A.*  Yes.
20  *Q.*  And how would you do that?
21  *A.*  I would take this with me to the office where I work, and as
22  I handed it out, I would have the employees count the money to
23  make sure it was all there.  If there was a problem, which
24  sometimes it happened where they weren't paid for a certain task
25  they did, you know, they were short, then I would bring in

 1  Mr. Ron Ruggles who is the one that approved all the payroll to
 2  be paid, and we'd go over it and make sure it was taken care of.
 3  Q.  Now, how was the -- the rate of pay determined for these
 4  individuals?
 5  **A.**  We set a piece price.
 6  Q.  And can you explain what you mean by "a piece price"?
 7  **A.**  If you were going to do an exterior of a home according to
 8  the size of the home, you were paid X amount of dollars for
 9  getting the paint; you were paid so many cents a foot to hang
10  whatever amount of sheets were inside the house and so forth.
11  Q.  Now, did these workers bid on these houses and submit a
12  proposal to Wright Painting & Drywall?
13  **A.**  No.  We set the piece price, Ron, myself, and Mr. Kahre.
14  Q.  And was there any negotiating with the workers over the
15  piece price?
16  **A.**  No.
17  Q.  Did you tell these -- the workers that you supervised when
18  and where to do their work?
19  **A.**  There were foremans under me that ran different areas.  I
20  had four foremans, and I divided the town, north, east, south,
21  and west, like that.  And then I -- they would have certain
22  tracts or certain jobs.  And then they would be handed a list of
23  what they were supposed to pay per job, per task.
24  Q.  So you would assign the work?
25  **A.**  I basically would be told, "We got this tract, we're doing

 1  this, here is the piece prices."  And then I would assign it to
 2  the foreman on that area, and then I'd oversee it and make sure
 3  that everything was being done and being paid and everything was
 4  going right.
 5  Q.  Who supplied the -- the paint for the jobs that you worked
 6  on?
 7  A.  As far as the company?
 8  Q.  Yes.
 9  A.  Sherwin-Williams.
10  Q.  Oh, I mean -- I'm sorry.  Did the individual workers pay for
11  the paint?
12  A.  No.  We -- we supplied -- we supplied all materials.
13  Q.  And when you say "we," do you mean Wright Painting &
14  Drywall?
15  A.  Wright Painting & Drywall.
16  Q.  Did you -- did you do the hiring of the workers for Wright
17  Painting & Drywall?
18  A.  Yes.
19  Q.  And did you have the right to fire these individuals?
20  A.  We didn't fire people.  We just told them there wasn't work
21  for them when we felt that they were doing a bad job and we
22  couldn't control them.
23  Q.  And did anyone tell you to use that process?
24  A.  Yes.
25  Q.  Who was that?

```
 1  A.   Mr. Kahre said they're independent contractors, we didn't
 2  have the right to fire them.
 3  Q.   When they were hired, were they given a copy of their
 4  contract?
 5  A.   No.
 6  Q.   And could you tell them that -- at any time that there
 7  wasn't enough work for them?
 8  A.   Yes.
 9  Q.   And would you have any financial obligation to them if there
10  wasn't work?
11  A.   No.  If -- they were all there piece working, so if -- we
12  just let them know, "Hey, we don't have nothing for you today."
13  After a few times, get the hint, move on.
14          Each of the foremen had that task.  They could do it.
15  It wasn't just coming from me.  It would be, you know -- I mean,
16  I would do that, but every one of them, if they had somebody
17  working for them that wasn't producing, you know, a good job --
18  they had the right to do that.
19  Q.   Now, did these individuals -- these workers ever wear
20  uniforms?
21  A.   After awhile, yeah, we did.
22  Q.   Can you tell me about that?
23  A.   I talked to Mr. Kahre into getting us some uniforms, and
24  they would have the guy's name on it.  It just looked a lot more
25  professional.  We were getting complaints from some of the
```

1  people that we're going to the houses to do touch up, clean up
2  the houses, you know, with paint or drywall because they had
3  jeans on and, you know, T-shirts that had different things on
4  them.  So we started a system for a while there that -- we let
5  them rent out -- for five bucks a week, they'd get all their
6  uniform pants and shirt, the whole set.
7  Q.  And were they required to wear these uniforms?
8  A.  Yes.
9  Q.  And how often did the employees of Wright Painting & Drywall
10  get paid?
11  A.  Once a week.
12  Q.  If there were any expenses involved, if they had to buy a
13  tool or a -- some paint or something, would they get reimbursed?
14  A.  On some things, they would, but they were responsible for
15  their own equipment.  Some things -- I mean, like tips for the
16  spray gun -- sometimes if, you know, one of the guys that was --
17  been with us for a long time -- their gun would break, wouldn't
18  work, we'd take it in, get it fixed, and take care of it.
19  Q.  Now, did you ever have to rent any kind of scissor lifts
20  or --
21  A.  Yes.
22  Q.  -- hoists for jobs?
23  A.  Yes, sir.  We had 800 rentals.
24  Q.  And who would pay for that?
25  A.  Wright Painting.

 1 | Q. Were you furnished a vehicle when you worked for Wright
 2 | Painting & Drywall?
 3 | **A.** I was given a vehicle. It was registered in my name, but
 4 | Wright Painting made the payment on it.
 5 | Q. And was that part of your compensation?
 6 | **A.** Yes.
 7 | Q. And were your foremen given vehicles?
 8 | **A.** Yes.
 9 | Q. And did they have radios or cellphones provided by the
10 | business?
11 | **A.** Yes, cellphones after awhile.
12 | Q. And who paid the bill on those cellphones?
13 | **A.** Wright Painting.
14 | Q. And were the foremen reimbursed for gas expenses?
15 | **A.** No.
16 | Q. Who -- who owned the vehicles that they drove?
17 | **A.** I'm sorry?
18 | Q. Who owned the vehicles, the cars or trucks, that they drove?
19 | **A.** Some of them would be owned by the company. Some guys --
20 | depending on your seniority, you know, so almost -- they drove
21 | their own cars.
22 | Q. If someone was more senior, would they get a company
23 | vehicle?
24 | **A.** As far as being a foreman, yeah.
25 | Q. Now, did you have any investment interest in Wright Painting

 1 | & Drywall?

 2 | **A.**   I invested everything in Wright Painting & Drywall.  I gave

 3 | everything I had for the company, but as far as financial, no.

 4 | **Q.**   Did any of the workers that you hired have an investment in

 5 | Wright Painting & Drywall?

 6 | **A.**   No.

 7 | **Q.**   Were any of those workers licensed contractors on their own?

 8 | **A.**   I think there was a few.  They'd have their own little

 9 | license for different things.

10 | **Q.**   For painting and drywall?

11 | **A.**   A couple guys had it for just drywall.  I know one guy that

12 | had his maintenance license.  We didn't really go in to check,

13 | you know, if you had a license or not for the drywall or paint

14 | part.

15 | **Q.**   It didn't make any difference?

16 | **A.**   No.  We had all the licenses, Wright Painting did.

17 |          MR. DAMM:  Now, if we could take a look, again,

18 | Ms. King, at 9.6.248, and if we could go to the second page.

19 |          BY MR. DAMM:

20 | **Q.**   Now, this is a -- a -- a weekly payroll sheet for

21 | November 2nd through 6th, 2001?  Do you see that,

22 | Mr. Fernandez?

23 | **A.**   Yes, sir.

24 | **Q.**   Now, does Mr. Robert Kahre's name appear on this sheet?

25 | **A.**   Yes, sir.

1   Q.   And was he paid this particular week?

2   **A.**   The money that he was paid, it was held in the office until

3   he come to pick it up.

4   Q.   And what form did it take?  Was it in gold and silver?

5   **A.**   No.   It was cash.

6   Q.   And did you ever have any discussions with Mr. Robert Kahre

7   about how much money he made?

8   **A.**   We talked about it once, you know, about just getting out of

9   the business and -- because he was really overwhelming us.   I

10  was getting very sick, and he wasn't looking too good.  And, you

11  know, I told -- I guessed -- I guesstimated about $5 million.   I

12  said -- and he just looked at me and chuckled.

13  Q.   Did he confirm or deny that that figure was accurate?

14  **A.**   No.   That I can remember, no.  He just looked at me and just

15  chuckled.

16  Q.   Were you ever asked to deliver pay to Mr. Robert Kahre?

17  **A.**   Usually he would leave the money in the safe, and I'd stay

18  there until he come and got it; but, you know, that wasn't my --

19  my business.

20  Q.   I'd like to ask you now about some of Mr. Robert Kahre's

21  properties.  And did you know whether or not Mr. Kahre owned any

22  property in Oregon?

23  **A.**   Yes.

24  Q.   What property did he own up in Oregon?

25  **A.**   He owned a property on a road called Mink Lane.   It was a --

 1  a ranch-type -- an old mink ranch.
 2  Q.  Were you working for Mr. Kahre when he -- when he bought
 3  this property?
 4  A.  Yes.
 5  Q.  Did he talk to you about it?
 6  A.  Yes.
 7  Q.  And what did he tell you?
 8  A.  He said he found a real nice place up in Oregon that would
 9  be a good place to settle after, you know, we were done.
10  Q.  Did you have any discussions with Mr. Kahre about how the --
11  the title on the property would be held?
12  A.  Not at first, but later on we did talk, and I told him --
13  you know, I asked him, "How are you getting that done?"
14          And he told me it was going under his mom's name.
15  Q.  Did he indicate to you why?
16  A.  Not really.  You know, it was more like, you know, why, kind
17  of deal, you know.  He never told me.
18  Q.  Did you know whether or not Mr. Kahre had any tax problems
19  with the Internal Revenue Service at that time?
20  A.  I didn't -- I don't know if he did or not at that time.
21  Q.  Did you ever do any work on the -- the Oregon property?
22  A.  Yes.  We repainted the house.  There was two more houses on
23  there.  We fixed them all up.
24  Q.  And when you say "we" did that, who are you referring to?
25  A.  I brought a crew from Vegas to do the work up there.

1  Q.  And do you mean a Wright Painting & Drywall crew?

2  A.  Yes.

3  Q.  And who paid -- who paid that crew?   -

4  A.  Mr. Kahre.

5  Q.  And who paid for the materials?

6  A.  Mr. Kahre.

7  Q.  And who paid for the travel expenses?

8  A.  Mr. Kahre.

9  Q.  Now, did you -- did you own a piece of property in Oregon as

10 well?

11 A.  Yes, I did.  I bought a piece up there, about a mile or so

12 away -- 2 miles.

13 Q.  And do you know what purpose Mr. Kahre made of the Oregon

14 property?

15 A.  I'm sorry?

16 Q.  What did Mr. Kahre do with the Oregon property?  Did he live

17 there?

18 A.  We'd visit there.  It was mostly his wife and kids would go

19 up there, stay for a while.  His mother-in-law and father-in-law

20 lived there permanently.

21 Q.  Did Mr. Kahre's mother live there?

22 A.  No.  She lived here in Vegas.

23 Q.  Was there a home on the property that Mr. Kahre kept for

24 himself?

25 A.  Yes, the main house.

1  Q.  And for what purpose did he keep that home?

2  A.  They stayed up there, you know -- like I said, his wife

3  would live there for awhile.  He would go up there and stay with

4  his family.

5  Q.  But his mother lived here in Las Vegas during that time?

6  A.  Yes.

7  Q.  Now, are you familiar with another property that Mr. Kahre

8  lived in at 6385 North Grand Canyon?

9  A.  Yes.

10  Q.  How are you familiar with that property?

11  A.  It's across the street from my house.

12  Q.  And did you help Mr. Kahre move into that property?

13  A.  Yes.  We renovated the house and the yard.

14  Q.  And, again, was this -- were these crews from Mr. Kahre's

15  companies?

16  A.  Yes.

17  Q.  And who paid for the renovations?

18  A.  Mr. Kahre.

19  Q.  And who eventually lived in that home?

20  A.  Mr. Kahre and his family.

21  Q.  Did you help him move into that home?

22  A.  Yes.

23  Q.  Did you live nearby?

24  A.  Right across the street.

25          MR. COHAN:  Asked and answered.  He just said it.

1          THE COURT:  I think you covered this.

2          MR. DAMM:  Oh, thanks, your Honor and Mr. Cohan.

3          BY MR. DAMM:

4   Q.  Did you ever have any discussions with Mr. Kahre about who

5   lived at -- or whose name 6385 North Grand Canyon -- in whose

6   name the property was titled?

7   A.  Yes.

8   Q.  And what discussions did you have with Mr. Kahre?

9   A.  The electric power in that house was in my name, and the

10  house was in Lori's name.

11  Q.  And can you tell us why you had the utilities in your name?

12  A.  I wanted my daughter to go to Centennial High School, and we

13  hadn't found a place to move to, so I used that address to get

14  her up there.

15  Q.  This was before you bought the property across the street?

16  A.  Yes.

17  Q.  After you bought the property across the street, did you

18  keep the utilities in your name?

19  A.  Yes.

20  Q.  And did Mr. Kahre ask you to do that?

21  A.  It just never came up to change it.

22  Q.  And did Mr. Kahre tell you why the -- the property was in

23  his sister's name?

24  A.  No.

25  Q.  But who was it that lived in 6385 North Grand Canyon?

 1  **A.**  Mr. Kahre and his family.  Also, we enclosed the garage, and

 2  his sister moved in.

 3  **Q.**  Into the garage?

 4  **A.**  Yeah.  We made it into a bedroom.

 5        MR. DAMM:  If we could go back to 9.6.248, Ms. King,

 6  and look at the top of that page, if we could just --

 7        BY MR. DAMM:

 8  **Q.**  Now, there's a -- a name on this pay sheet, the third

 9  one down, Alex Loglia.

10  **A.**  Yes.

11  **Q.**  Do you recognize that, Mr. Fernandez?

12  **A.**  Yes, I do.

13  **Q.**  How do you recognize that?

14  **A.**  It was introduced to me by Mr. Kahre.

15  **Q.**  And that's Alex Loglia?

16  **A.**  Yes.

17  **Q.**  And how did Mr. Kahre introduce Mr. Loglia to you?

18  **A.**  He said that he was an acquaintance from New York that was

19  coming down to help us with any legal work that we might need

20  help with.

21  **Q.**  Did you know if Mr. Loglia was an attorney?

22  **A.**  At first, I didn't know anything.  I just took Mr. Kahre's

23  word, and then I found out that, no, he's just -- just

24  knowledgeable -- very knowledgeable.

25  **Q.**  And did he, to your knowledge, handle Mr. Kahre's legal

 1  matters?

 2  **A.**  Yes.  We had to put a lien on our house -- anything like

 3  that, that I was, you know, involved with, he was the one that

 4  we would go to.

 5  *Q.*  And he was paid through Wright Painting & Drywall?

 6  **A.**  Yes.

 7  *Q.*  Did he attend any meetings where presentations were made to

 8  other contractors regarding the cash payroll system?

 9  **A.**  Yes.

10  *Q.*  Can you tell me about that?

11  **A.**  He accompanied us in a few of them where we went to talk to

12  the workers.

13  *Q.*  Now, when you say, "we," who do you mean?

14  **A.**  Robert Kahre, Alex, and myself.

15  *Q.*  And what was Mr. Loglia's role at those meetings?

16  **A.**  He's also fluent in Spanish, so he would help me make sure

17  that everybody -- if anybody had any questions or anything like

18  that.

19  *Q.*  Any of the non-English-speaking workers?

20  **A.**  Correct.

21  *Q.*  Would he translate?

22  **A.**  Yes, he would.

23          MR. DAMM:  May I have the Court's indulgence for one

24  moment, please?

25          THE COURT:  Yes.

```
 1        BY MR. DAMM:
 2   Q.  Mr. Fernandez, did Mr. Robert Kahre ever use your
 3   house across the street to stay for short periods of
 4   time?
 5   A.  Yes.
 6   Q.  Can you explain how that happened?
 7   A.  If there was somebody out front of his house that we felt
 8   was waiting for him, there was -- you know, they were
 9   unannounced, we would let him know, and he would drive into my
10   yard and just come in the house until they left.
11   Q.  And do you know why he did that?
12   A.  Didn't want to meet them face-to-face, I guess.
13   Q.  Now, was your employment with Mr. Kahre terminated at some
14   point in time?
15   A.  Yes, sir.
16   Q.  Can you tell us when that was?
17   A.  It was back in 2001.
18   Q.  And were you given a reason by Mr. Kahre for your
19   termination?
20   A.  Yeah.  He said that I stole from him, that I embezzled money
21   from his company.
22   Q.  And was that true?
23   A.  No, sir.
24   Q.  Was anyone else involved in your termination?
25   A.  No.
```

 1  *Q.*  Did you get any correspondence from Mr. Loglia?

 2  **A.**  He actually came to the house and talked to me, and I was --

 3  and I told him that I wanted to take a lie detector test because

 4  I couldn't believe what I was being accused of.

 5  *Q.*  Did -- did Mr. Kahre, during the time that you worked for

 6  him, fire you more than once?

 7  **A.**  Several times.  I quit; he fired me.  Our personalities, you

 8  know, being friends for so long, you know, had a tendency to

 9  clash.

10  *Q.*  Was the last time he fired you permanent?

11  **A.**  Yes.  He came to my house and asked me for my resignation,

12  and I told him -- I said, "I don't have any reason to resign.

13  You have to fire me.  I didn't do anything."

14         And that's when he and I sat in the back of my house

15  and he told me that I'd tooken money from him that I was

16  supposed to be paying doctors and some of the employees that

17  were hurt and kept it and told me that I had taken tile that

18  belonged to the tile company.  I walked him through my house,

19  through my garage, and showed him.  He also said that I had

20  workers come to my house and clean up a mess in the back.  And I

21  told him "Yes, I did."

22         He had the -- he didn't want to be involved, but the

23  tile company that was there, Joe -- I can't remember Joe's name.

24  He was the foreman -- brought guys over and did the tile at my

25  house when I first bought it.  And I owed him $4,000 for that,

1  and I told him, "I have that money for you.  Why are you" -- you
2  know, "I know that I owe it to you." · But his main thing was
3  that I was stealing money.                        -
4        I told him at the time -- I says, "Real simple, I get
5  the money that's left.  I turn it over to Heidi," who runs those
6  people, you know, that -- that certain part.  I said, "I have no
7  reason, you know, real simple."
8        Besides being like a brother to me, he was my sugar
9  daddy.  Without him, I have nothing.  And I've struggled ever
10 since he fired me just to keep the things that I have, to keep
11 my family where they live.  I had a house in Oregon because he
12 helped me get it.  I drove a truck because he helped me get it.
13 You know?  My children had opportunities because he helped get
14 it.  There was no reason at all for me to sit there and steal
15 pennies when anything I needed I could go to him and say, "Hey,"
16 and, you know, sooner or later he'd help me with it.
17 Q.  Did he loan you money at any point in time?
18 **A.**  He paid for the property.  He paid the money on the down
19 payment on the property in Oregon for me.
20 Q.  Do you know how much that was?
21 **A.**  About $32,000.
22 Q.  And how did he give that money to you?
23 **A.**  He gave -- gave me -- I can't remember exactly how I -- he
24 gave it to me in cash or a check, but he gave it to me to pay
25 Oregon Realty with.  I mean, I would never have been able to

```
 1  have that house up there.  I would never be able to have the
 2  house where I live at now if it wasn't for him.
 3  Q.  And when you bought the property in Oregon, was that at or
 4  about the same time that he bought the property in Oregon?
 5  A.  It was a little later.  You know, he said he wanted to have
 6  me close when he was up there.  You know, we were real close.
 7  My children call him "Uncle."  His daughters call me "Uncle,"
 8  you know.  There was no reason for this.
 9  Q.  Did you provide security for Mr. Kahre?
10          MR. COHAN:  Asked and answered.
11          THE COURT:  I think that he's already testified that he
12  did.
13          MR. DAMM:  That was -- I'm talking about personally,
14  not at the payroll.
15          THE COURT:  Oh, personal security.  All right.
16          THE WITNESS:  I went with him to the bank, you know.  I
17  did everything he asked me.  For him, for his sister, for his
18  mother, for his wife, his children -- there was no hesitation.
19  That was my brother asking me to do something, and I did it.
20          BY MR. DAMM:
21  Q.  Now, after you lost your job with Mr. Kahre, at some
22  point in time were you in jeopardy of losing your home?
23  A.  Yeah.  I missed three payments on my house.  I didn't have
24  the money to pay, you know.  I got real lucky that they called
25  me from the company that I was -- had my mortgage with and told
```

```
 1  me that I could refinance the house and they could put those
 2  three payments.
 3         Also, the truck that I had for work, since it was in my
 4  name, they stopped paying for it, and I had to put that on my
 5  mortgage.
 6  Q.  When you say "they," do you mean --
 7  A.  Wright Painting.
 8  Q.  And Mr. Kahre?
 9  A.  Yes, sir.
10  Q.  Now, you indicated that in the payroll system, there were no
11  withholdings and you didn't receive any W-2s or 1099s.
12         When it came to your own personal income tax returns,
13  did you report the money that you received from Mr. Robert
14  Kahre?
15  A.  I reported money, yes.
16  Q.  Did you report all of it?
17  A.  No.
18  Q.  The fact that you didn't report all of it, was that based
19  on --
20         MR. COHAN:  Object to leading.  He can answer why.
21         THE COURT:  Objection is sustained.
22         BY MR. DAMM:
23  Q.  Did the fact that you didn't receive a W-2 form --
24         MR. COHAN:  Object to leading.
25         THE COURT:  He's already testified he didn't get a W-2
```

1  form, so he's really merely restating a fact in evidence.

2  Overruled.

3          MR. COHAN:  No.  He's providing the witness an excuse

4  for his own conduct, your Honor.  That's what he's doing.

5          THE COURT:  I don't think so.  I think he said he

6  didn't get a W-2 form, and so he's -- I don't know what his

7  question is because he can't finish his question because you

8  keep interrupting him, so let him finish his question.

9          MR. DAMM:  I'll just rephrase the question.

10          BY MR. DAMM:

11  Q.  Why didn't you report all of the income that you

12  didn't receive from Mr. Kahre?

13  A.  I didn't have anything to base it on.  You know, real

14  simple.  I believed in what he told me, so I used the

15  silver-type as an equation, and then I didn't have a W-2 form to

16  look at to really know or a 1099.  So I knew I had to file

17  something.

18  Q.  So you reported some income?

19  A.  Yes.

20  Q.  Were you ever given a statement indicating how much gold and

21  silver you'd been paid?

22  A.  No.

23          MR. DAMM:  May I have the Court's indulgence for a

24  moment, please?

25          THE COURT:  Yes.

```
 1              MR. DAMM:  Your Honor, I have no further questions of
 2   Mr. Fernandez at this time.  Thank you.
 3              MR. COHAN:  Your Honor, should we start cross or should
 4   we --
 5              THE COURT:  No.  We'll wait until after lunch.
 6              MR. COHAN:  Okay.  Thank you, your Honor.
 7              THE COURT:  Okay.  Break for lunch.
 8              (Lunch recess taken.)
 9                  (Proceedings held not transcribed as
10                   part of excerpt.)
11              THE COURT:  All right.  Mr. Kennedy, at any time
12   you wish, you may proceed.
13              MR. KENNEDY:  Thank you, your Honor.
14
15                           CROSS-EXAMINATION
16          BY MR. KENNEDY:
17   Q.  Good afternoon, sir.
18   A.  Good afternoon.
19   Q.  In listening to you this morning, I understand that in grade
20   school you met Robert Kahre.
21   A.  Yes, sir.
22   Q.  And you met my client, Lori Kahre?
23   A.  Yes, sir.
24   Q.  And so you knew the Kahre family?
25   A.  Yes.
```

```
 1  Q.  You were a little bit bigger than Bobby; right?  But he was
 2  tough?
 3  A.  He was a tough guy.
 4  Q.  And you guys went to grade school --
 5  A.  Yes.
 6  Q.  -- together?
 7  A.  Yes, sir.
 8  Q.  Junior high?
 9  A.  Yes, sir.
10  Q.  Played football together here in Las Vegas --
11  A.  Yes.
12  Q.  -- High School?
13      That continued in junior college as well; right?
14  A.  Yes, sir.
15  Q.  And at UNLV?
16  A.  No, sir.
17  Q.  Bobby just there?
18  A.  Bobby was at UNLV.  Before we went to junior college, I was
19  at University of Texas at Arlington.  And then we met up, were
20  working together here, and a friend of ours asked us if we would
21  go give a look at Snow Junior College, and that's when we joined
22  up playing ball.
23  Q.  Okay.  And I understand you played football together there
24  at Snow Junior College?
25  A.  Yes, sir.  And from there we went to New Mexico.
```

 1  *Q.*  All right.  And then after you get a little older, it's hard
 2  to be doing it for a living.  Then you both went back to the
 3  business of --
 4  *A.*  Yes, sir.
 5  *Q.*  -- working?
 6  *A.*  Mr. Kahre came back and -- to do iron work.  I finished out
 7  my fourth year, and then I came back home.
 8  *Q.*  So Mr. Kahre was doing iron work while you were finishing up
 9  your last year at school?
10  *A.*  Yes, sir.
11  *Q.*  And so he was an iron worker?
12  *A.*  Yes, sir.
13  *Q.*  And soon you came back, and you were looking for a job;
14  right?
15  *A.*  Yes, sir.
16  *Q.*  And I heard you this morning say that you worked a few jobs
17  after you got back?
18  *A.*  Yes, sir.
19  *Q.*  And eventually Mr. Kahre started -- like a lot of people,
20  put a little money together, put some scraps together, and
21  started his own business?
22  *A.*  Yes, sir.
23  *Q.*  Okay.  And eventually you joined him in that as a painter?
24  *A.*  Yes, sir.
25  *Q.*  Okay.  Now, that would be roughly the time period around the

1  late 1980s, first part of 1990?

2  **A.**   I'd say more toward the late '80s.

3  **Q.**   Okay.

4  **A.**   Mid to late '80s.

5  **Q.**   All right.  And then you worked as a painter with him and

6  became a foreman?

7  **A.**   Yes, sir, worked my way through.

8  **Q.**   And then eventually, in about 1993, you -- you indicated

9  that at some point law enforcement/the IRS came in and seized

10  vehicles, took painting equipment, trucks, took everything;

11  right?

12  **A.**   Yeah.  It was in the '90s, yeah.

13  **Q.**   And you had nothing left to paint with?

14  **A.**   No.  He had nothing.  We had to -- like I said before, we

15  tried to scrap around and went -- we actually went to the

16  auction to try to retrieve all the things back that were taken.

17  **Q.**   So you went to the auction to buy back what you had before

18  just to keep going, and you and Mr. Kahre did that together?

19  **A.**   Me, myself, Bobby, Lori -- you know, the company.

20  **Q.**   And you said this morning that this was about perhaps losing

21  your job; right?

22  **A.**   Yeah.

23  **Q.**   And so I think you described your reaction, from, I take it,

24  the three of you, that it was wrong, it wasn't right, and it

25  wasn't awful in your minds?

1  **A.**  I didn't have full understanding of why it happened, but I

2  didn't feel that, you know, whatever personal thing was

3  happening with the company should affect the rest of us workers.

4  We were all there just to earn a living.

5  **Q.**  And so eventually, I guess, at the auction you got some of

6  the equipment back and you -- and you kept going?

7  **A.**  Yes, sir.

8  **Q.**  Okay.  And prior to that time, I think you indicated that

9  you had received your -- your wages for your labor in the form

10  of a check?

11  **A.**  Yes, sir.

12  **Q.**  Okay.  And then eventually, right after the seizure, I take

13  it, the payroll system changed?

14  **A.**  I can't remember exactly when it changed, you know, the

15  date, you know, but it did change after.

16  **Q.**  Okay.  And is it right around that time period?  I wouldn't

17  expect you to --

18  **A.**  I'd say around there, give or take.

19  **Q.**  Give or take a couple of months?

20  **A.**  Yeah.

21  **Q.**  Okay.

22  **A.**  Give or take some time.

23  **Q.**  Okay.  Because we're in 2009, and covering a lot of ground,

24  so I just want to help the jury understand?

25  **A.**  Yeah.  I don't remember exactly when.

1  Q.  Okay.  So give or take a few months around that time period.

2  Is that the best of your recollection here in two thousand --

3  A.  Yeah, best I can think of.

4  Q.  All right.  So then the system was put in place, and I think

5  you described it as you were paid in gold and silver coin?

6  A.  Yes, sir.

7  Q.  And you understood that Ronald Reagan had passed a law in

8  1986?

9  A.  Yep.

10  Q.  And that this gold and silver coin was circulating; right?

11  A.  Yeah.  That's what I was told by Mr. Kahre.

12  Q.  Okay.  And that he set this up for tax reasons, is I think

13  your own words; right?

14  A.  Yes, sir.

15  Q.  Okay.  And it was a way to minimize your tax obligation;

16  right?

17  A.  Correct.

18  Q.  Okay.  And the agreement was every worker had the right, as

19  you said, to get paid in the gold and silver coin, turn around,

20  walk out the door, and keep it; right?

21  A.  That was the setup.

22  Q.  All right.  So the worker himself or herself had all the

23  authority to make that decision?

24  A.  In -- in some cases, if the worker was the one picking up

25  the money, yes.  But when the foremans for the companies picked

1  up the money, they weren't there, so --

2  Q.  That's true.  So the worker themselves would have to take

3  the extra step, I take it from your answer --

4  A.  Yeah.

5  Q.  -- and go there and do that if he or she wanted to do it?

6  A.  Yes, sir.

7  Q.  Okay.  If they did not want to do it, then there was an

8  exchange set up for what you referred to as Federal Reserve

9  notes?

10  A.  Yes, sir.

11  Q.  And you understood that if you walked out to the door, you

12  could -- had you ever been to a coin shop?

13  A.  Yes, sir.

14  Q.  So at least that was available if you wanted to exchange

15  that form of money for another form; right?

16  A.  According to the person, whatever they wanted to do with it.

17  Q.  Right.  And so what Mr. Kahre did was allow the convenience

18  of doing that exchange at the warehouse?

19  A.  Yes, sir.

20  Q.  First, I think you said -- was it over on Patrick?

21  A.  Yes.

22  Q.  Then it went to Bledsoe?

23  A.  No.

24  Q.  The second warehouse?

25  A.  No.  It went from Patrick to the Boulder Highway.

1  Q.  Boulder Highway, I'm sorry.  And then to Kimberly?  Is
2  that --
3  A.  Yes, sir.
4  Q.  Okay.  And so at each of these locations you had the same
5  system in place for the worker; right?
6  A.  Yes, sir.
7  Q.  Okay.  Now, with respect to Mr. Kahre, there was some
8  questions asked about -- I take this -- at this certain point,
9  whether he was around and you were -- you said -- you said that
10 you were -- you said he wasn't around.  Do you recall that?
11 A.  Yeah.  Most of the time he wasn't there for the day-to-day
12 operations.  He was more communication by phone.
13 Q.  Okay.  And that was because in terms of the company, you
14 indicated a Bill with respect to the air conditioning and that
15 company?
16 A.  Bill's the owner.
17 Q.  Bill --
18 A.  -- was the foreman.
19 Q.  That was his expertise; right?
20 A.  Right.
21 Q.  So he had that business; right?
22 A.  Before he came to work with us, yes.
23 Q.  Yeah.  And you described that basically what you did is you
24 and Mr. Kahre went over there, took his equipment, brought him
25 in and rescued him from a bad financial situation?

 1 | **A.**  Correct.
 2 | *Q.*  And so you brought in his expertise in that area; right?
 3 | **A.**  Yep.
 4 | *Q.*  That was done in the electric area as well?
 5 | **A.**  Mr. Poser [phonetic].
 6 | *Q.*  In the tile area?
 7 | **A.**  Frank Little.
 8 | *Q.*  And in other areas of the construction trade; right?
 9 | **A.**  That and plumbing.
10 | *Q.*  Okay.  And you mentioned that you deemed it to be
11 | innovative; right?
12 | **A.**  Yes.
13 | *Q.*  Because it allowed Mr. Kahre to bid on jobs and provide a
14 | fuller array of services; right?
15 | **A.**  Yes.  Instead of just painting and drywall, then we had
16 | electrical, the paint -- you know, we had four -- four or five
17 | things to bid on.
18 | *Q.*  And so you had those individuals who were there to provide
19 | their expertise; right?
20 | **A.**  To run the -- as myself, to be the foreman or the general
21 | for the company.
22 | *Q.*  Okay.  And then in -- with respect to when he wasn't around,
23 | what he required time for is he just wanted -- you were asked
24 | some questions about he wanted to have legal preparation time;
25 | do you remember that?

 1 | **A.**   What I said was if somebody came asking for him, that he
 2 | would tell us not to tell then where he was in order to be
 3 | prepared for whatever was coming.
 4 | **Q.**   Because I understand that at that time he was taking a legal
 5 | approach in regard to disputes that he had?
 6 | **A.**   I -- I don't know what he was doing, personally --
 7 | **Q.**   Okay.
 8 | **A.**   -- at that time, but it was just what he asked me to do.
 9 | **Q.**   Okay.  Now, you mentioned in terms of the workers with the
10 | payroll system -- and I believe these were your words -- if you
11 | worked for one of his companies, the only way you were going to
12 | get paid was to go through the payroll system?
13 | **A.**   Yes, sir.
14 | **Q.**   Okay.  And so even the day that you were asked on the one
15 | occasion to go to the 35 companies to deliver that envelope,
16 | you, yourself, went through the payroll system and got gold and
17 | silver that day before you got the envelope; correct?
18 | **A.**   I received an envelope, a manila envelope.  It was the
19 | original, you know, breakdown, and I was asked to bring it to
20 | this guy because he couldn't get off work.
21 | **Q.**   And you testified earlier this morning that you went and got
22 | gold first and you described --
23 | **A.**   Yeah, I went through the routine.
24 | **Q.**   And then how you could tell the difference between the gold
25 | and the silver by color; right?

1  **A.**  Yes.

2  **Q.**  And you could feel in the tubes, the weight of the tubes?

3  **A.**  Yes.

4  **Q.**  Now, with respect to these 35 or 30 --

5  **A.**  They were -- I'm sorry.

6  **Q.**  Go ahead.

7  **A.**  You had 35.  One company I did that for.

8  **Q.**  Okay.  No.  I'm sorry.  I didn't -- that was my mistake,

9  sir.  That was just that one occasion.

10  **A.**  Yes.

11  **Q.**  Now with respect to these other companies -- and I

12  apologize.  That was -- that was my mistake, not yours.

13       With respect to these other companies you were asked

14  some questions this morning, and your answer, if I -- I believe

15  was:  "Anyone who wanted to do it, Mr. Kahre would go talk with

16  them"; right?

17  **A.**  Correct.

18  **Q.**  Okay.  So there wasn't anything involved with either Lori

19  Kahre or Robert Kahre here or yourself where you were trying to

20  keep this secret; right?

21  **A.**  Not really.

22  **Q.**  Because if you're going to go talk to company after company

23  after company in the valley, you're telling them exactly what

24  the payroll process was; right?

25  **A.**  The way it was set up was there was a gentleman, Phillip

 1  Bracken, first, and then John Greco.

 2  Q.  Let me stop you there and just ask you some questions.

 3       As I understand it, this Phil Bracken, who Mr. Damm

 4  supplied you with the last name so you remembered it -- you said

 5  he had somewhat of an accounting-type background; right?

 6  A.  Yes.

 7  Q.  Okay.  And he was involved with it, and Mr. Kahre was

 8  involved with it when you came back to the company; right?

 9  A.  Mr. Bracken was the person that would help find some of

10  these companies that were in trouble --

11  Q.  Okay.

12  A.  -- and would introduce them to Mr. Kahre.

13  Q.  Okay.

14  A.  And then Mr. Greco, after Mr. Bracken passed away, sort of

15  took on that responsibility.  He wasn't an accountant or

16  anything.  He would -- there was a -- some kind of -- I can't

17  remember the name of the function, but it was to -- mainly to

18  teach you about yourself, personal skills, how to --

19  Q.  Kind of a self-help guy?

20  A.  -- kind of come-out-of-the-box type of deal.

21  Q.  Okay.  Now, let me ask you some questions because I

22  understood there's a -- there's a period of time in the middle

23  of when you worked for the Robert -- one of the Robert Kahre's

24  companies, Wright Painting & Drywall, that you did some work as

25  a teacher or maybe as a teacher --

1  **A.**  Yes.

2  **Q.**  -- aide during that period of time?

3  **A.**  Teacher's aide.

4  **Q.**  Okay.  Was there a time that you just did that job and

5  didn't do any painting or did you do both at the same time?

6  **A.**  No.  I just did that.

7  **Q.**  Okay.  So that went on for a couple of years.  Was it right

8  about the time -- around the time where everything was seized,

9  just to try to help the jury on this timeline?

10  **A.**  No.  It was -- I think it was before, '93 -- '92, '93 -- I

11  only taught for a couple of years, you know, aided for a couple

12  of years, so I -- I can't remember the exact time.

13  **Q.**  That's fine, sir.

14  **A.**  I'm sorry.

15  **Q.**  Don't be.

16        Now, I -- I take it, then, that the payroll system -- I

17  think you explained it, how it was presented, and I'm trying to

18  find your words -- okay.  Okay.  I believe you would explain to

19  them about silver dollars and gold dollars -- right? -- when you

20  would explain it; is that correct?

21  **A.**  Yes, sir.

22  **Q.**  And then you would make a comparison to what you called a

23  "note," for a Federal Reserve note?

24  **A.**  We never used the gold coin.  We used the silver coin.

25  **Q.**  Okay.

1  **A.**  I'm sorry.

2  *Q.*  So you used the silver coin?

3  **A.**  Yes.

4  *Q.*  And you mentioned you had a difference of "You have a dollar

5  here and a dollar here, which one would you rather have?"

6  **A.**  "Which one do you feel is worth more?"

7  *Q.*  Okay.  And the idea was that this one that had the silver in

8  it --

9  **A.**  You could see that it was silver, but the paper said "note"

10  on it, so what is it really worth?

11  *Q.*  Understand.  And so then folks who wanted to participate in

12  this were allowed to; is that right?

13  **A.**  Yes, sir.

14  *Q.*  And folks who said no, that was the end of it; right?

15  **A.**  We never had any of the companies' workers say no.  They all

16  signed up for it if they wanted to keep working.

17  *Q.*  And I take it that was -- you said Mr. Kahre spoke with the

18  owners, not you, so you would be coming in after that had

19  occurred?

20  **A.**  Yeah.  I would come in after and explain to the workers what

21  was going to happen with the company.

22  *Q.*  All right.  Now, in terms of how the payroll system worked,

23  I believe you mentioned that in the beginning there was a woman

24  by the name of Micki?

25  **A.**  Yeah.

1  Q.  And Micki, I take it, ran the payroll system for a number of

2  years?

3  A.  Yeah.  When -- she was given the -- the money, and she would

4  break it down for the different companies and different people

5  that would come up.

6  Q.  Okay.  And then that was -- what, sir? -- for four or five,

7  six years?  Do you recall the time period?

8  A.  She was -- she started back by the airport when we had our

9  office at the airport, and then she did -- I'd say probably a

10 few years over at the Boulder Highway office.

11 Q.  Okay.  And then eventually Lori took over that role, and I

12 think you mentioned Debra and Heidi assisted?

13 A.  Yes.

14 Q.  Okay.  Now, in terms of your own situation, you mentioned

15 that you believed, based upon what you were told, that you

16 should account for your taxes at the face value of the gold and

17 silver coins you received; correct?

18 A.  Yes, sir.

19 Q.  And you conducted your affairs in that manner over the

20 years; right?

21 A.  Trying to straighten out some of the amounts.

22 Q.  Oh, I understand.  But based on -- that's what you were

23 following during those years; right?

24 A.  Yes.

25 Q.  Okay.  And there were years where you may not have made

1   enough to file, I think you said you understood it that way.

2   **A.**   What I said was that there was a certain amount that if you

3   didn't make more than that, you didn't have to, but I filed.

4   *Q.*   And so as I understand it, you -- you -- you continued to

5   file.   Your wife was also with you at that time; right?

6   **A.**   Right.   I came in to my tax attorney at H&R Block, and I

7   explained to -- he asked me -- he said, "Where are you wages?   I

8   need a W-2.   I need a 1099 or something like that."

9             I said, "I don't have any of that."

10  *Q.*   Right?

11  **A.**   So they're the ones that advised me to create my own

12  company --

13  *Q.*   Okay.

14  **A.**   -- per se, George's Painting.

15  *Q.*   All right.

16  **A.**   Because I had to file the taxes.

17  *Q.*   And then -- and then --

18  **A.**   So that's what I did.   I followed the direction of my guy

19  from H&R Block.

20  *Q.*   Okay.   And then I take it you -- you testified earlier this

21  morning that you put down some of the money; right?

22  **A.**   Yeah.

23  *Q.*   And you were basing that on the value of the gold and silver

24  coin as opposed to the fair market value that his honor asked

25  you some questions about?

1  A.  Right.

2  Q.  Okay.  Now, with respect to the payroll system, you did some

3  security for it as well?

4  A.  Yes, sir.

5  Q.  And you mentioned 300 or 400.  We established that as

6  $300,000, $400,000; right?

7  A.  At times, yes.

8  Q.  Okay.  And there was also gold and silver dollars on hand as

9  well?

10  A.  Yes.

11  Q.  Okay.  And that was the reason for the security; right?

12  A.  Yes.  We also had security for the people that were there,

13  to make sure they knew that everything was going to be okay once

14  they got paid as cash that --

15  Q.  Sure.  Because that -- the warehouse -- week after week

16  on Wednesdays, Thursdays, and Fridays people were getting paid;

17  right?

18  A.  Right.

19  Q.  And so anyone in the neighborhood could see the pattern of

20  this happening; right?

21  A.  Yes, sir.

22  Q.  So you needed some security to allow people to get to their

23  cars and get out of there; right?

24  A.  Yes.

25  Q.  And if I remember, the first location would have been over

1  about -- was it Washington and Bledsoe?

2  **A.**   No.

3  *Q.*   Where was the first one?

4  **A.**   The first -- when I first started doing the security was at

5  Boulder Highway.

6  *Q.*   Oh, Boulder Highway.  Okay.  Now, in terms of some of the

7  workers, you mentioned Mr. Ronald Ruggles was the one who was

8  setting piece rates through the company?

9  **A.**   He and Mr. Kahre would sit together and set the piece rate

10  according to what -- because Mr. Ruggles was the one that did

11  the bidding for the jobs.

12  *Q.*   Okay.

13  **A.**   So they would get together and set the price and hand me a

14  sheet with -- for the project, of what should be paid for

15  whatever task was performed.

16  *Q.*   Now, with respect to the -- your status, you understood

17  yourself to be an independent contractor under the system that

18  Mr. Kahre set up?

19  **A.**   That's what he told us, yes.

20  *Q.*   Okay.  And as someone running Wright Painting & Drywall, he

21  told you that you did not have the right to fire anybody because

22  they were all also independent contractors; right?

23  **A.**   Correct.

24  *Q.*   So what you did is you -- any drywall and painting is

25  dependent upon the jobs that you have; right?

1  **A.**  Yes, sir.

2  *Q.*  It goes up; it goes down; it depends on when the work is

3  there?

4  **A.**  Yes, sir.

5  *Q.*  So with folks who weren't as talented by piece, those folks

6  were just told that you didn't have jobs?

7  **A.**  Yes, sir.

8  *Q.*  And eventually they caught on that maybe they weren't as

9  good at working at piecework; right?

10  **A.**  Correct.

11  *Q.*  That way you could advance the company's interest; right?

12  **A.**  That's what I was being paid for.

13  *Q.*  You were there under a general contractor to do a job and do

14  it right, and that helped you do it; right?

15  **A.**  Correct.

16  *Q.*  Now, I believe you said at a certain point that -- and if I

17  understood it correctly, what you were trying to say in response

18  to Mr. Damm's question was that although you had no financial

19  investment in Mr. Kahre's companies, specifically Wright

20  Painting & Drywall, you had put essentially your sweat, your

21  blood, and your labor into it; right?

22  **A.**  Put my family into it.  Everything was into making sure that

23  Bobby was successful, because then I know that I would be

24  successful.

25  *Q.*  And at a certain point -- now we're up into maybe 2001,

2:05-cr-121-DAE-RJJ - July 15, 2009          131

1   2002 -- you've progressed doing this, as we've talked about; and
2   if I understand it, at that point you had -- first Mr. Kahre,
3   his children, his family were living over at 6385 North Grand
4   Canyon; right?
5   A.   Yes.
6   Q.   And Lori Kahre, my client, was living over there as well;
7   right?
8   A.   Yes.
9   Q.   Now, without going into any of the detail, she had just
10  walked away from a marriage that she had had for a lot of time?
11  A.   Right.
12  Q.   And so you helped build the garage out so there would be
13  basically a separate home with a bathroom and a bedroom so that
14  she could live there; right?
15  A.   Yes.
16  Q.   And very soon after Lee Belcher moved in and was able to
17  live there with her; right?
18  A.   I don't remember how soon after, but he did move in with
19  her --
20  Q.   Okay.
21  A.   -- but -- yeah.
22  Q.   And that way, then, Mr. Kahre had his family over there in a
23  separate unit without his sister and Mr. Belcher in the middle?
24  A.   Correct.
25  Q.   Okay.  And whether there's a lease agreement that they did

 1   on this property, you don't know anything about that, right?

 2   **A.**   No.

 3   *Q.*   Okay.

 4   **A.**   Can I ask you a question?

 5   *Q.*   No, sir.  Unfortunately, the --

 6   **A.**   Okay.

 7   *Q.*   -- the role here, and I have to honor his Honor --

 8   **A.**   No problem.

 9   *Q.*   -- is I have to ask the questions and --

10   **A.**   I just didn't understand what house you were talking about

11   when Lee moved in.

12   *Q.*   Over at 6385 North Grand Canyon.  And then I understand they

13   also eventually, after that property was sold, moved in up the

14   block at 6295 North Grand Canyon.

15   **A.**   No.  They lived there before the property was sold.  That's

16   why I was confused.

17   *Q.*   Okay.  They moved out into the other property while getting

18   it ready to sell.  It sold, and then they stayed up at the --

19   her step-father's, up at that house; right?

20   **A.**   No.  The house across the street from me -- you're talking

21   about on Grand Canyon -- wasn't sold.

22   *Q.*   When they moved out?

23   **A.**   It was sold way before Lori and Lee moved out.

24   *Q.*   Okay.  Got it.

25   **A.**   I mean, I'm sorry.  It wasn't sold.  They moved out before

1  it was sold.

2  Q.  Right.  And then it sold after it had been listed, and they

3  were up the block; is that right?

4  A.  I don't know when he listed it but --

5  Q.  Okay.  All right.  Now, at this point in time -- we'll get

6  to -- in 2001 or 2002 I understand that at this point you went

7  away for a vacation outside the country; right?

8  A.  Yes, sir.

9  Q.  Okay.  And you were gone for a period of time, and you got

10  back and you were approached about this issue involving the

11  alleged theft?

12  A.  I was approached when I was in -- out of the country, on a

13  phone call.

14  Q.  Okay.  And you believed in -- in your mind that you were in

15  the right, there was nothing that you had done; right?

16  A.  I didn't say that.  I said that I knew that I owed him for

17  certain things, you know; but I've never taken a cent from the

18  company in any -- in any way.

19  Q.  Okay.  And there were other people, and I think you

20  mentioned that you had -- your words were you had "turned it

21  over to Heidi."  Do you recall that?

22  A.  Yes, sir.

23  Q.  And so while you were gone, you understood that Heidi

24  started talking about you?

25  A.  I didn't know -- 'til this day, I don't know who came to

1  Mr. Kahre and told Mr. Kahre that I was doing something wrong.

2  Q. Okay. And that, then, led eventually to your termination

3  when he asked you to resign and you didn't; right?

4  A. Yeah. When I came back from my vacation, he met me at my

5  house that morning and just told me -- didn't tell me why.

6  Didn't tell me anything. He said, "I want your resignation."

7  Q. Okay.

8  A. I was -- my life stopped.

9  Q. A couple years went by, and you understood that Mr. Kahre's

10  offices were again subject to a search warrant from the IRS;

11  right?

12  A. No, sir.

13  Q. Or eventually at some point the IRS, in 2005, came out to

14  your home; right?

15  A. They came out two months after the raid happened on the --

16  approximately there, after it happened.

17  Q. Okay. And then without going through each and every one,

18  there were a series of meetings that -- some would last a couple

19  hours, some would be shorter, where the IRS sat down and talked

20  with you; right?

21  A. Yes.

22  Q. And many of those meetings were out at your house in the

23  beginning? They would come out there, and they'd meet with you

24  for an hour or two; correct?

25  A. Correct.

2:05-cr-121-DAE-RJJ - July 15, 2009          135

1  Q.  And you would tell them what you knew as you went along;
2  right?
3  A.  First, I told them that I couldn't talk to them.
4  Q.  Okay.
5  A.  I needed for them to have a subpoena --
6  Q.  Okay.
7  A.  -- before I could talk to them.
8  Q.  All right.
9  A.  And then they had it -- brought a subpoena, and then that's
10  when they asked me questions, and I just talked to them.
11  Q.  Okay.  And over a period of time, then, in 2005, 2006, and
12  into the spring of 2007, you met with them a number of times at
13  your home?
14  A.  Yes, sir.
15  Q.  You met with them a number of times at this building; right?
16  A.  A couple times here and a couple times at the old IRS
17  building.
18  Q.  Okay.  Then there was also a gentleman by the name of
19  Mr. Joe Burns who would call you from time to time?
20  A.  Yes, sir.
21  Q.  And he would ask questions about how the business operated?
22  A.  Yes, sir.
23  Q.  Okay.  And you tried to explain to him as best you
24  understood during that time?
25  A.  Yes, sir.

1  Q.  All right.  And eventually it came to about May of 2007, and

2  you sat down with them in this building; right?

3  A.  Yes, sir.

4  Q.  Okay.  And at that time they were talking to you about

5  providing some testimony under oath at a prior proceeding --

6  A.  Yes.

7  Q.  -- do you recall that?  Okay.

8         And now you've been working with them for -- since at

9  least 2005, 2006, and 2007.  So you asked them, first off, if

10  you would just not be sought after on the moneys that you owed

11  them; right?  You said, one, "I'd like the collections not to be

12  sent out at me"; right?

13  A.  No, I -- I told them that if they were going to come after

14  me for some reason --

15  Q.  Um-hmm.

16  A.  -- you know -- that's why I said I'm taking care of whatever

17  I have to take care of on my end, you know.

18  Q.  So you asked them to give you their word that the IRS

19  collections could be proceed against you; right?

20  A.  Yes, sir.

21  Q.  That you could handle it on your own; correct?

22  A.  Yep.

23  Q.  Because you had been putting down what you understood your

24  obligation to be in your taxes; right?

25  A.  I just asked them -- I mainly asked them about my

1   limitations, my time limitations, and learned about that, you

2   know.

3   Q.   And you knew that there was -- you asked them that you

4   wouldn't -- they'd just tell you you wouldn't be criminally

5   prosecuted; right?

6   A.   No.   They said they couldn't promise me any deal.   They

7   couldn't promise me anything; otherwise, my testimony would not

8   be worth anything.

9   Q.   Okay.   So at that point, then, you gave no testimony in the

10  prior proceeding; correct?   This is the first time that

11  you've been --

12  A.   Yes.

13  Q.   -- testifying under oath?

14          All right.   So eventually, now, you're here testifying

15  today; right?

16  A.   Yes, sir.

17  Q.   All right.   And I understand that, in addition, you asked

18  for a reward?

19  A.   I -- I asked if there was any compensation that I would

20  receive for this due to the fact of the malicious way that

21  Mr. Kahre has come after me to discredit me that has cost me a

22  bankruptcy, that has cost me just about everything I own to try

23  to maintain my family.   I'm still dealing with the bankruptcy.

24  Now they want me to do a Chapter 7 bankruptcy.

25  Q.   So you told them that if you were testifying, you wanted to

1  get paid?

2  **A.**  I told them if there was anything that I could file to

3  receive any compensation for my testimony.

4  **Q.**  And you've filed that paperwork; have you not?

5  **A.**  Yes, sir.

6  **Q.**  And that's pending today?

7  **A.**  Yes, sir.

8  **Q.**  And that's part of the reason that you're here today?

9  **A.**  No, sir.

10  **Q.**  Have you withdrawn the paperwork?

11  **A.**  No.  I don't even know if it's still good or -- I did it

12  once, and they sent me a letter and said that it was no longer

13  effective.

14  **Q.**  Okay.

15  **A.**  So I don't know what's happened.

16  **Q.**  Have you asked them?

17  **A.**  I haven't talked to them.

18  **Q.**  Have they told you it's no longer effective?

19  **A.**  They haven't said that either.

20          MR. KENNEDY:  I have no further questions, your Honor.

21

22                         CROSS-EXAMINATION

23          BY MR. COHAN:

24  **Q.**  Good afternoon, Mr. Fernandez.

25  **A.**  How are ya?

 1  Q.  I'm all right.  Yourself?

 2  A.  Hanging in there.

 3  Q.  Yeah, really, not -- not the best day-of your life today?

 4  A.  Second worst.

 5  Q.  Pardon?

 6  A.  Second worst.

 7  Q.  Okay.  Well, I'll make this as quick as I can.

 8       You did spend quite a bit of time with the IRS,

 9  explaining a lot about the things that you learned working for

10  Mr. Bobby Kahre over a number of years; right?

11  A.  Repetitive, the same thing over and over.

12  Q.  Well, but you covered a lot of ground.  For example, you

13  went through most of the 35 companies which participated in the

14  payroll system and identified the principal players there;

15  didn't you?

16  A.  On some of them, yes.

17  Q.  As many as you knew?

18  A.  As many as I can remember.

19  Q.  Okay.  And do you recall -- they asked you every question

20  they could think of about Mr. Kahre; didn't they?

21  A.  Yes, sir.

22  Q.  Bobby Kahre, including about John Nelson.  Do you remember

23  telling them anything about the courses or course --

24  A.  Yes.

25  Q.  Okay.  So you -- did you take -- my understanding is you did

 1  take a course from John Nelson?

 2  **A.**  Yes, sir.

 3  **Q.**  And it was kind of the -- the legal political world economic

 4  basis for a lot of what Bobby Kahre --

 5  **A.**  Yes, sir.

 6  **Q.**  -- professed to believe; is that true?

 7  **A.**  Yes, sir.

 8  **Q.**  Okay.  So it kind of explained what this gold and silver

 9  payroll system was about, that it was an alternative to this

10  other system?

11  **A.**  Yes, sir.

12  **Q.**  Okay.  And so you did have a -- at least at one time, a much

13  better understanding of it than you do now?  Is that a fair

14  statement?

15  **A.**  It's been a long time.

16  **Q.**  Right.  I mean, I don't know when you took those classes or

17  that class, but it was a long time ago.

18  **A.**  Yes, sir.

19  **Q.**  And it was complex material?

20  **A.**  Yeah.

21  **Q.**  Okay.  But you observed that Mr. Bobby Kahre spent a

22  tremendous amount of time reading the material, studying the

23  material, talking about the material to anybody who would be

24  interested in it?  Isn't that true?

25  **A.**  Overwhelming time.

1   Q.   Okay.   And did you know -- well, you did know that Mr. Kahre

2   worked with Mr. John Nelson to file some lawsuits against the

3   International Monetary Fund and the IRS? -

4   **A.**   I know some of what they were doing, but a lot of that stuff

5   he just kept to his personal.

6   Q.   Okay.   You did tell the -- the IRS at one point that John

7   Nelson is an extremely bright guy and he's a mentor to

8   Mr. Kahre?

9   **A.**   I believe so.

10   Q.   Okay.

11   **A.**   He's --

12   Q.   And you also told them that Robert Kahre believes that when

13   he pays a person with a $50 gold coin, it's only taxed at $50;

14   right?

15   **A.**   Correct.

16   Q.   Face value?

17   **A.**   Yep.

18   Q.   I mean, that was really the basis for the tax benefit of the

19   payroll system as you understood it; right?

20   **A.**   Yes.

21   Q.   Now, you -- you spent at least a few sessions and several

22   hours going over the -- the 20 factor test for determining

23   whether a person was an independent contractor or an employee

24   with Revenue Agent Joe Burns; correct?

25   **A.**   I missed some of what you said.   I didn't understand.

 1  *Q.*  Okay.  Let me try again.  That was kind of quick.

 2        You became familiar with the 20 factor test that was

 3  used -- well, maybe you didn't become familiar with it.

 4        Do you recall a Mr. Joe Burns, a revenue agent with the

 5  IRS, asking you more than one time all about the details of how

 6  the work was performed by the painters and drywallers --

 7  *A.*  Yes, sir.

 8  *Q.*  -- who controlled the labor and who trained and --

 9  *A.*  Yes.

10  *Q.*  -- who had the tools and all that?

11        And you went over that with Mr. Burns and told him

12  exactly how the whole labor broker, crew leader --

13  *A.*  Yes.

14  *Q.*  -- worker system functioned; correct?

15  *A.*  Yes, sir.

16  *Q.*  Okay.  And you told him that neither you nor Mr. Kahre nor

17  anybody working for Mr. Kahre supervised the details of how the

18  work was done but, rather, the crew leader did that; right?

19  *A.*  What I told him was I had my foremen that worked for Wright

20  Painting.

21  *Q.*  Right.

22  *A.*  The crew leaders had their own people that they would bring

23  on the job, and they were the ones responsible for those people.

24  We were responsible only to communicate with the crew leader.

25  *Q.*  Right.  And the crew leader -- you explained to Mr. Burns

2:05-cr-121-DAE-RJJ - July 15, 2009          143

1  that the crew leader was actually the one who supervised the
2  workers who did the work --
3  **A.**   The leader was, yeah.
4  *Q.*   -- right?  And as for the -- for example, First Premier, you
5  testified about them -- you knew they were probably about the
6  biggest drywall and painting company associated with Mr. Kahre;
7  isn't that right?
8  **A.**   Yes, sir.
9  *Q.*   And you understood that the payroll that was handled through
10  the gold and silver for the First Premier drywall people, for
11  example, Mr. Kahre -- nobody in Mr. Kahre's can supervise any of
12  those people; right?
13  **A.**   None of them.
14  *Q.*   Right.  In other words, these companies, these 35 companies,
15  including First Premier -- they didn't get any workers from
16  Mr. Kahre.  They already had their own workforce.
17  **A.**   Correct.
18  *Q.*   Okay.  And they supervised their own people?
19  **A.**   Yes.
20  *Q.*   And they provided their own tools and training and so forth?
21  **A.**   Yes, sir.
22  *Q.*   Mr. Kahre just did the payroll service and provided the
23  insurance --
24  **A.**   Yes.
25  *Q.*   -- which you worked on, and actually you took care of paying

2:05-cr-121-DAE-RJJ - July 15, 2009          144

1   hospital bills when people did get injured --
2   **A.**   Yes, sir.
3   *Q.*   -- and distributing that pay --
4   **A.**   Yes.
5   *Q.*   -- to people?  Okay.  Just one other area that I'd like to
6   inquire about.
7          You mentioned that Bobby Kahre gave you $32,000 to buy
8   a house in Oregon?
9   **A.**   Yes, sir.
10  *Q.*   He didn't own the house after he gave it to you; did he?
11  **A.**   No, not the -- not the house that I lived in.  I did.
12  *Q.*   Right.  Didn't try to control you in any way?
13  **A.**   (Shakes head.)
14  *Q.*   As far as the house is concerned, you weren't the nominee
15  for Mr. Kahre; were you?
16  **A.**   No.
17          THE COURT:  Excuse me.  Could I see counsel at sidebar
18  for a minute?
19          MR. COHAN:  Certainly, your Honor.
20              (Discussion held at sidebar.)
21              (Proceedings held not transcribed as part of
22              excerpt.
23              (Recess taken.)
24              (Proceedings held not transcribed as part of
25              excerpt.)

```
 1            THE COURT:  All right.  Mr. Cohan, you may
 2   continue.
 3            MR. COHAN:  Thank you.
 4            BY MR. COHAN:
 5   Q.  I just have one brief area or hopefully a fairly
 6   brief area of inquiry, and that is:  With respect to your
 7   conversations with Joe Burns and the underlying basis for
 8   those conversations about whether workers were classified
 9   appropriately as independent contractors.  And I'm not
10   asking you for the conclusion, but I am going to ask you
11   about some of the questions that he asked you and about
12   the answers that you gave.  And I'm not going to ask you
13   when, because I know you've met with him a number of
14   times.  So whenever it was that you met with him, you had
15   discussion about basically how jobs got assigned and how
16   the work was done and who did the supervising; right?
17   A.  Yes, sir.
18   Q.  And who provided tools --
19   A.  Yes, sir.
20   Q.  -- and so forth?  So I'll be more specific now, and we'll
21   get through this.  Okay.
22            The first question I have is with respect to working
23   for more than one firm.  Do you recall being asked a question
24   about that, whether the workers worked for more than one firm or
25   employer?
```

 1 | **A.** Yes, sir.
 2 | *Q.* Okay. And do you recall saying that crew leaders and crews
 3 | do the framing, drywall, painting, roofing, concrete, and tile,
 4 | and that the brokers assign the jobs to the crew leaders?
 5 | **A.** Yes, sir.
 6 | *Q.* Okay. So once the jobs are assigned to crew leaders, then
 7 | the crew leaders take their crews -- first of all, the crew
 8 | leaders are responsible, generally speaking, for transporting
 9 | the men who are actually doing the work to the jobs; right?
10 | **A.** Yes.
11 | *Q.* And that would be true for framing, drywall, painting,
12 | roofing, concrete, and tile; right?
13 | **A.** Yes, sir.
14 | *Q.* Okay. And so the only person who's supervising the details
15 | of how the worker is actually doing the work is the crew leader
16 | on the spot; right?
17 | **A.** No. My foreman is. He's -- he is liable for everything
18 | that happens on that job. The crew leader is mostly the
19 | director of -- you know, he is the one that communicates to the
20 | workers what we want done and how we want it done.
21 | *Q.* Okay. The crew leader is the one who does that?
22 | **A.** Yes, sir. My foreman or myself would direct them on what we
23 | wanted done so they could tell the other what to do.
24 | *Q.* Okay. Here's the distinction I'm trying to -- to draw with
25 | you, and let me try to articulate the question: You're saying

1  that the superintendent says this is what needs to be
2  accomplished; right --
3  **A.**  Yes.
4  *Q.*  -- this is what we need to do.  But the actual supervision,
5  the details of doing it as its being done, that supervision is
6  provided by the crew leader; right?
7  **A.**  And the foreman on the job.
8  *Q.*  Okay.  And the foreman on the job could also be involved in
9  that?
10  **A.**  Well, he has to be involved because he has to answer to the
11  company of -- you know, our company -- myself; Mr. Kahre -- on
12  why something didn't get done on time or correct.
13  *Q.*  Because you all have to answer to the contractor who's
14  really controlling the whole job; right?
15  **A.**  Yes.
16  *Q.*  Okay.  Let me go farther on.
17         Now, the workers can work for anybody, not -- they
18  don't always work for the same crew; do they?
19  **A.**  Most of the crews stick together.  They just work for
20  different companies.
21  *Q.*  Okay.
22  **A.**  They can go to any other company that will hire them, but
23  most of them -- they stick together.  It's -- you know, you kind
24  of train them how to work together.  It's a lot of teamwork
25  involved, so you don't want to keep flipping guys all over the

 1  place.

 2  Q.  Okay.  But the crews, the crew leader and the guys who work

 3  under that crew leader, can work for various different

 4  contractors and subcontractors?

 5  A.  Yes.

 6  Q.  Okay.  Then some are paid by the -- by the hour and by the

 7  day, and some are paid by piecework; right?

 8  A.  Yes.

 9  Q.  Okay.  And you testified earlier that you didn't -- you and

10  Wright Painting, I guess would be the example, didn't have the

11  right to terminate because they're independent contractors.  You

12  just didn't give them more work if they didn't do good work?

13  A.  Correct.

14  Q.  Okay.  Then the training of the workers -- I think you --

15  according to these notes, anyway, you told Mr. Burns that the

16  crew leader teaches the new guys by showing them how and they

17  watch and learn --

18  A.  Correct.

19  Q.  -- is that right?  So the training wasn't provided by Wright

20  Painting?

21  A.  No.

22  Q.  Okay.  It's provided by a crew leader?

23  A.  Yes.

24  Q.  That crew leader worked for Wright Painting and ten other

25  contractors in the valley; right?

 1  **A.**  Right.  We would tell them how we want our work done, and

 2  they would tell the workers how -- on those particular jobs,

 3  what they wanted.

 4  **Q.**  Okay.  Then the next questions were about instructions.  You

 5  said the nailing sheets were provided by the builder, handed

 6  down to the contractor, to the labor broker, and to the crew

 7  leader; and the then crew leader would direct the worker in how

 8  the -- I think you put -- how the sheer walls must be screwed

 9  in, which sheets can be nailed, and the fastener spacing;

10  correct?

11  **A.**  Right.

12  **Q.**  And that's -- that supervision is done by the crew leader;

13  right?

14  **A.**  Passed on by my foreman, yes, sir.

15  **Q.**  Okay.  Now -- let's see what else.

16          The control of the hours of work, you said, was by the

17  crew leader, especially if the crew leader is providing

18  transportation to the job site; right?

19  **A.**  Correct.

20  **Q.**  And typically in all the trades that we just mentioned --

21  framing, drywall, painting, roofing, concrete, and tile -- it's

22  the crew leader?

23  **A.**  With us, the painting was more controlled by us, at Wright.

24  We didn't have crew leaders for painting except for, like, two

25  guys.  Everything else was controlled by our people.  The other

2:05-cr-121-DAE-RJJ - July 15, 2009          150

```
 1  stuff, the drywall, the framing -- they started at eight o'clock
 2  in the morning, and they could be working until the next day if
 3  the superintendent would let them.
 4  Q.  Okay.  And -- and you indicated that the crew leader -- in
 5  terms of the order or sequence of work, that the crew leader
 6  just passes on the -- what's ordered by the contractor --
 7  A.  By us.
 8  Q.  -- is that right?
 9       So in this scenario, the contractor would be Wright
10  Painting & Drywall?
11  A.  Correct.
12  Q.  Okay.
13       MR. DAMM:  Excuse me, Counsel, for just a second.  Can
14  you tell us what memo you're reading from?
15       MR. COHAN:  Yes, I am.  This is -- I'm sorry.  This one
16  is September 18th of '03.  It's 260_J111_0001 and continuing.
17  I'm right now on Page 3.
18       MR. DAMM:  Thank you, Mr. Cohan.
19       MR. COHAN:  Sure.
20       BY MR. COHAN:
21  Q.  And the indication, according to this, is that you
22  told Mr. Burns that the hiring, supervising and, painting
23  is primarily done by the crew leaders in these trades?
24  A.  People that have crews, yeah, they -- they control -- we pay
25  them; they control the workers.
```

```
 1   Q.   Okay.  And the work that we're talking about here is
 2   never -- I shouldn't say "never," but it's not generally
 3   performed on the employers' premises.  It's performed wherever
 4   the houses are located are being built or if it's commercial,
 5   the building that's being worked on?
 6   A.   Wherever the job's at.
 7   Q.   Right.  And with respect to tools, I think you already
 8   testified that the workers were generally expected to provide
 9   their own tools?
10   A.   Pretty much --
11   Q.   Okay.
12   A.   -- except for tips --
13   Q.   Okay.
14   A.   -- you know, things like that, an occasional gun.
15           THE COURT:   You are talking about the nail gun, I
16   assume?
17           THE WITNESS:   Like spray guns.  Screw guns -- if we
18   buy if --
19           THE COURT:   You're not toting around firearms.
20           THE WITNESS:   Yeah.  No, no.  If we would get a
21   specific amount of screws, they would throw in a free nailing
22   gun, so we'd give it to the workers.  But they're responsible
23   for their tools.
24           BY MR. COHAN:
25   Q.   Okay.  Just one more.
```

 1              I asked you about the $32,000 that Mr. Kahre gave you

 2   to make a down payment on the home that became your home?

 3   **A.**   Yes, sir.

 4   **Q.**   Okay.  Mr. Kahre was very close to his own family; wasn't

 5   he?

 6   **A.**   Yes, sir.

 7   **Q.**   As far as you know, still is?

 8   **A.**   Yes, sir.

 9   **Q.**   His mother; his sister; his wife; his children?

10   **A.**   (Nods head.)

11   **Q.**   He did everything he could to provide for them; did he not?

12   **A.**   Yes, sir.

13   **Q.**   Okay.  So you don't know who really owned the home that was

14   purchased from Myra Wellman?  If it's titled in her name, you

15   don't know that it isn't hers; do you?

16   **A.**   On paper, I'd never saw it.

17   **Q.**   Right.

18   **A.**   But verbally, that's all we talked about:  "This is my

19   house, this is --"

20              THE COURT:  When you say "this is," who told you this?

21              THE WITNESS:  Mr. Kahre, you know.  "I bought this

22   house on Mink Lane."

23              BY MR. COHAN:

24   **Q.**   Right.

25   **A.**   "Wait until you see it."

1  Q.  I understand.

2  **A.**  You know, and that's where his family lived.  His mom never

3  lived there.

4  Q.  Right.  But his mom would have the right to it if he died?

5          THE COURT:  Okay.  Now you're asking him to speculate.

6  He wouldn't know that.

7          MR. COHAN:  Okay.  All right.

8          THE COURT:  He wouldn't know that answer.

9          MR. COHAN:  Okay.  I have nothing further.  Thank you.

10          THE COURT:  Okay.

11              (Proceedings held not transcribed as

12              part of excerpt.)

13              (Jurors excused from proceedings.)

14          THE COURT:  Okay.  The door is still open.  Why

15  is the door still open?  Okay.  All right.  Now the door

16  is not open.

17          All right.  The jury has departed.  All right.  We're

18  doing a -- the record -- let me get the recorder back on here.

19  The record should reflect that we're having a brief in-camera

20  hearing regarding this issue outside the presence of the jury.

21  All right, Mr. Kennedy.

22

23                    IN-CAMERA EXAMINATION

24          BY MR. KENNEDY:

25  Q.  Sir, I just want to ask you some questions about your

1  termination and the polygraph exam.  Okay?

2  **A.**  Okay.

3  *Q.*  And prefacing these questions -- I just want you to

4  understand that I don't think they're all that accurate.  I'm

5  not asking you about whether they gave good responses or bad

6  responses, because I have my own personal opinions about them,

7  and I'm not in favor of them.

8         What the questions are, sir, is:  Back -- you testified

9  that when you spoke with Mr. Kahre about the termination, you

10 volunteered that you would take a polygraph; is that correct?

11 **A.**  I asked for it.

12 *Q.*  You asked for it.  And then was one set up so that you could

13 go take it?

14 **A.**  Yes.

15 *Q.*  All right.  Did you go forward and then voluntarily take

16 that?

17 **A.**  Yes.

18 *Q.*  All right.  And was it your understanding that results were

19 obtained from the polygraph, right or wrong?

20 **A.**  Both of them.

21 *Q.*  From both of them?

22        THE COURT:  You took two polygraphs?

23        THE WITNESS:  I took the first one.

24        BY MR. KENNEDY:

25 *Q.*  Okay.  And let me stop you there.

1  **A.**   Okay.

2  **Q.**   You took the first one.  Were there results obtained from

3  that polygraph, as far as you knew?

4  **A.**   Yes, sir.

5  **Q.**   Okay.  Were the results that -- right or wrong, that you had

6  failed it, as you understood it?

7  **A.**   From that one, no.  He told me that he had some kind of

8  glitch --

9  **Q.**   Okay.

10  **A.**   -- that he needed to do it again.

11  **Q.**   All right.

12  **A.**   And then he asked me what was I thinking about when I took

13  it.

14  **Q.**   Okay.

15  **A.**   And I told him, "I was thinking exactly what you told me to

16  do, relax and think about the question and just answer it.

17  **Q.**   Okay.

18  **A.**   And that's what I did."

19  **Q.**   And so was -- so this one was basically we have to redo it

20  because this one is no good for his or her purposes?  Is that a

21  fair statement, as you understood it?

22  **A.**   I -- you know, yeah.

23  **Q.**   Okay.  Now, was the second one done that same day or at a

24  later time?

25  **A.**   Same day.

```
 1  Q.   All right.  At the same location?
 2  A.   Yep.
 3  Q.   With the same polygrapher?
 4  A.   Yes.
 5  Q.   Okay.  And then at the end of this second independent one,
 6  were you provided any results that day?
 7  A.   Nope.
 8  Q.   Okay.  Did there come a time where you learned first that
 9  the polygrapher had provided some results?
10  A.   There was a time, yeah.
11  Q.   Okay.  And did you understand that Mr. Kahre was given those
12  results?
13  A.   Yes.
14  Q.   And did you understand at some point that you were given
15  those results?
16  A.   Yes.
17  Q.   Okay.  Did you understand that Mr. Kahre was told that you
18  had failed the exam?
19  A.   I don't know what he was told.
20  Q.   Okay.  Because I understand when he spoke to the -- to the
21  Government back in -- July 29th of 2003, that you understood that
22  you -- that you were informed that you had failed the polygraph
23  test.
24  A.   According to the paperwork I got on the lawsuit.
25  Q.   Okay.  So -- so you had understood that you had failed
```

1  according to that paperwork?

2  **A.** Correct.

3  *Q.* And as I say, right or wrong.          -

4          And then in terms of your present testimony here, I

5  understand that, as in many cases, you may dispute the accuracy

6  of that result; right?

7  **A.** I would say so.

8  *Q.* Okay. But you don't dispute the fact that at least

9  Mr. Kahre, based upon these results, was informed that you had

10  failed it; right?

11  **A.** Yeah.

12  *Q.* Okay. And that would be the only area that I -- that we're

13  talking about here, sir.

14          THE COURT: Do you know -- do you know that Mr. Kahre

15  was informed of that before you were terminated?

16          THE WITNESS: I don't know, your Honor. I just got a

17  paper. I was terminated before I took the polygraph test.

18          THE COURT: You were terminated before?

19          THE WITNESS: Yes.

20          BY MR. KENNEDY:

21  *Q.* And then what happened after that, sir? Did you --

22  you volunteered to take it?

23  **A.** Yeah, I -- you know, I -- I basically got on my hands and

24  knees and told him I would never do that.

25  *Q.* Okay.

 1  **A.**   Okay?  Alex was the one -- Alex Loglia was the mediator.

 2  And I told him, and he even said, "You know, that would be a

 3  good thing."

 4  *Q.*   Okay.

 5  **A.**   And I was the one that asked for it.

 6  *Q.*   Okay.

 7  **A.**   I wanted to do this, but he already had told me "You're

 8  done."

 9  *Q.*   Did you understand that you were taking the polygraph --

10         THE COURT:  Who had told you --

11         BY MR. KENNEDY:

12  *Q.*   -- for a reason?

13         THE COURT:  Just a minute.

14         Who had told you you were done?

15         THE WITNESS:  Mr. Kahre.  He fired me the morning that

16  I got back from vacation.

17         THE COURT:  This was before the polygraph was taken?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  I don't --

20         BY MR. KENNEDY:

21  *Q.*   When you took the -- when you took the polygraph,

22  were you taking it in connection with his decision, as

23  you understood it, to give you a chance?  I'm just trying

24  to get --

25  **A.**   I took it to prove that I was innocent.

1  Q.  Okay.  And then you described what you took it for.  And
2  then at some point, then, the results were communicated to him,
3  and then he wrote you or the company sent you a letter, as I
4  understand it?
5  **A.**  I can't remember if it was from his lawyer or from the
6  company.
7  Q.  Okay.  And he --
8  **A.**  Because I asked him for results, and he says he couldn't do
9  that because they'd been requested by my employer.
10  Q.  All right.  And so then you received some correspondence, I
11  understand, from Mr. Kahre or on his behalf that included the
12  fact that you had failed the polygraph in terms of the notice to
13  you; is that correct?
14  **A.**  Yeah.
15  Q.  Mr. Damm has mentioned something about a letter that I don't
16  know that I've seen, sir.
17  **A.**  Yeah.  I was sent a -- from -- I think it was through his
18  lawyer from -- I can't remember when.  It -- it never said that
19  I passed it.  It just says it was inconclusive to what -- the
20  questions that I was asked.  I'm not quite sure.
21          THE COURT:  Where did you get the impression that you
22  failed?
23          THE WITNESS:  From getting sued, from getting, you
24  know, told that I -- you know, I'm not working there anymore.  I
25  mean, it was a constant barrage.

```
 1              THE COURT:  But who gave you a letter and said the
 2   results were inconclusive?
 3              THE WITNESS:  I received a letter -- I think if it
 4   wasn't from Mr. Kahre, it was from his lawyer.
 5              THE COURT:  Mr. Kahre's lawyer saying the results of
 6   the polygraph were --
 7              THE WITNESS:  They sent me a copy from the polygraph
 8   guy.
 9              THE COURT:  And it said your results were inconclusive?
10              THE WITNESS:  I think that's what it said.  I'm not 100
11   percent.
12              THE COURT:  Aye, aye, aye.
13              BY MR. KENNEDY:
14   Q.   The reason I'm asking you that, sir, is I'm -- I'm
15   looking at just some notes of an interview where it
16   purports to say that -- that you informed the Government
17   that you had failed the polygraph test, so that's why I'm
18   asking you this question.
19   A.   Yeah, because I -- you know, what else can I assume?  I took
20   two, you know, the first one.
21              THE COURT:  All right.
22              THE WITNESS:  Then I took the second one, you know,
23   against my wife's wishes, the second -- you know, the second
24   one.  She says, "Hey, you already did it.  Let it go."
25   Q.   Was she there with you?
```

```
 1  A.  Yes, sir.
 2  Q.  Okay.
 3          THE COURT:  Okay.  Sir, can I have you just step
 4  outside?
 5          THE WITNESS:  Sure.  This way or this way?
 6          THE COURT:  That way.
 7              (Witness Fernandez exited the
 8              courtroom.)
 9              (Proceedings held not transcribed as part of
10              excerpt.)
11          THE COURT:  The Court would note the return of
12  the jury.  Who -- who was up?  I can't --
13          MR. KENNEDY:  Mr. Cohan had completed his
14  cross-examination.
15          THE COURT:  Oh, yeah, Mr. Cohan had completed.  And you
16  didn't have anything else at this time?
17          MR. KENNEDY:  No, your Honor.
18          THE COURT:  Okay.  Mr. Damm?
19          MR. DAMM:  Yes, thank you, your Honor.
20
21                      REDIRECT EXAMINATION
22          BY MR. DAMM:
23  Q.  Mr. Fernandez, how are you doing?
24  A.  Hanging in there.
25  Q.  You were asked some questions about the payroll service
```

1  provided to workers at First Premier.

2  **A.**  (Nods head.)

3  **Q.**  Now, that -- was that one of Mr. Robert Kahre's companies?

4  **A.**  No, sir.

5  **Q.**  It was another company?

6  **A.**  That belonged to Mr. Gil Dahl [phonetic].

7  **Q.**  Now, did the workers of First Premier have to sign an

8  independent contractor agreement?

9  **A.**  That was set up before I was involved in that.

10 **Q.**  So you don't know if they did or they didn't?

11 **A.**  No.

12 **Q.**  Now, I believe you indicated that -- that Mr. Kahre, in

13 addition to providing the payroll through the cash and

14 envelopes, also provided hospital services?

15 **A.**  Yes, sir.

16 **Q.**  And how were they accounted for and paid for?

17 **A.**  I would set up an account with accounts payable at the

18 hospital.  I would go in and tell them that any worker that came

19 with my consent we would pay for it in cash.  They would all

20 start giving us a nice percentage.  Because we paid in cash,

21 they would lower our percentage of debt.  And so when somebody

22 got hurt from any of the companies, whether it was Wright

23 Painting or one of our immediate companies or one of the

24 companies that did the payroll, they would call me and let me

25 know that they got hurt.

1     I'd set up accounts at UMC, North Las Vegas,

2  Summerlin -- trying to cover all the areas, so wherever they

3  were closest to, I would make a phone call to the contact person

4  that I had there, and they would admit them and take care of

5  them.

6  Q.   In whose name did you set up the accounts?

7  A.   It was under Gold Contract and Wright Painting.

8  Q.   What was the first one?

9  A.   Gold Contracts.

10 Q.   Were those Mr. Kahre's companies?

11 A.   Yes.

12 Q.   Why weren't these bills paid by check?

13 A.   We got a better rate if we would pay in cash.

14 Q.   And why weren't the workers of First Premier paid by check?

15 A.   Because I was the one that handled everything, so they would

16 all come through me, so I -- you know -- I mean, I don't

17 understand.  You're asking me about somebody got hurt?

18 Q.   No.  I'm sorry.  I'm switching gears on you a little bit.

19 A.   Okay.

20 Q.   I'm talking about the payroll system.

21 A.   Because they'd have two guys mainly pick up the money for

22 that whole company, Art Spencer and his brother -- I just said

23 it a little while ago.  I'm sorry.  It just left my mind, but I

24 know it's Spencer's brother, Art and his brother.  I can't

25 remember.

1  *Q.* What I'm really interested in, Mr. Fernandez, is why

2  Mr. Kahre would pay -- would set up a system to pay cash to

3  First Premier workers and not simply pay them by check.

4  **A.** He would get money back from the owner of the company for

5  saving him money on the taxes. He would get a percentage back.

6  *Q.* From the owner of First Premier?

7  **A.** Yep.

8  *Q.* He'd get money back because he wasn't paying the taxes?

9  **A.** Because the owner of First Premier wasn't paying the taxes.

10  He was running it for Mr. Kahre, so he only had to pay X amount.

11          MR. COHAN:  Object.  It's nonresponsive, the question

12  of why it's being paid by cash or check.

13          THE COURT:  The objection is sustained.

14          BY MR. DAMM:

15  *Q.* Can you just tell us how the -- how the system

16  worked?  I'm -- what was the benefit to Mr. Kahre for

17  running this system?

18  **A.** He would get a percentage of the money that was brought in

19  through payroll.

20  *Q.* And what was the benefit to First Premier?

21  **A.** He -- his taxes would be running through Mr. Kahre.  He

22  wouldn't be responsible for the taxes.

23  *Q.* First Premier wouldn't be responsible?

24  **A.** Correct.

25  *Q.* But did Mr. Kahre pay any taxes?

1  **A.**  I couldn't tell you.  I --

2  *Q.*  Well, did he withhold any taxes?

3  **A.**  No.

4  *Q.*  So First Premier would benefit, and Mr. Kahre would benefit?

5  **A.**  Yes, sir.

6  *Q.*  And would anything go to the Internal Revenue Service?

7  **A.**  No, sir.

8  *Q.*  Now, with respect to the -- you talked about crew leaders.

9  Did the crew leaders have to sign independent contractor

10  agreements?

11  **A.**  Yes.

12  *Q.*  And did the people that they supervised have to sign

13  independent contractor agreements?

14  **A.**  We never ran those guys.

15  *Q.*  I'm sorry?

16  **A.**  No.

17  *Q.*  They --

18  **A.**  There was nothing given to them.  Their names didn't appear

19  on any form of payment, so we didn't require any identification

20  from them, only from the guy in charge that would come get the

21  money.  We paid him -- whatever was finished, we would pay him

22  for the work that was done.

23  *Q.*  But that person, the crew leader, had to sign an independent

24  contractor agreement?

25  **A.**  Yes.  Actually, the -- the guy that was above him, the

 1  broker, would be the one that would come pick up the money

 2  from -- from the company, not the crew leader.  The crew leader

 3  was mostly in charge of the work.

 4  Q.  So the crew leader didn't have to sign an independent

 5  contractor agreement?

 6  **A.**  No.

 7  Q.  Just the broker?

 8  **A.**  Yes, sir.

 9  Q.  And did you supervise the broker?

10  **A.**  Yes, sir.

11  Q.  And did you have the authority to supervise the crew

12  leaders?

13  **A.**  Yes, but we very seldom went and did anything except inspect

14  the work.  If there was something wrong, then we'd get the

15  broker to make sure it got fixed.

16  Q.  Now, you -- you indicated that most of the workers were paid

17  a piecework rate?

18  **A.**  Yeah.  We based our -- all our painting and drywall was

19  based on piecework, X number of sheets pays X number of dollars.

20  X number of feet, we gonna pay X number of dollars for painting.

21  Drywall is measured in, you know, 48 feet -- or 48 square feet

22  per sheet, 4 by 12, so we'd average it out, you know, say seven

23  cents per sheet, 100 sheets, that's what we'd pay them.

24  Q.  How were you paid?

25  **A.**  I was paid in gold and silver, and then went through the

```
 1 | routine.  I was salary.
 2 | Q.  Okay.  That's -- that's -- that's what I meant.  Poor
 3 | question on my part.
 4 | A.  That's all right.
 5 | Q.  You received a salary every week?
 6 | A.  Yes, sir.
 7 | Q.  And was that the same amount every week?
 8 | A.  Yes, sir.
 9 | Q.  And did your -- you indicated that you had to sign an
10 | independent contract?
11 | A.  Yeah, when I first started.
12 | Q.  Did that contract tell you what work you were to perform?
13 | A.  No.
14 | Q.  Did it tell you how much you were to be paid?
15 | A.  No.
16 | Q.  And did you sign your independent contractor agreement?
17 | A.  I don't have one.  They don't have a copy of anything that I
18 | signed.  I kept a contract.  I didn't turn it in.
19 | Q.  So you never signed it or executed it?
20 | A.  At the beginning of -- when I started first working for
21 | Wright Painting I did, but we had to re-sign everything again
22 | because they got lost, and I didn't sign mine.
23 | Q.  Now, the payroll system was discussed, and the workers had
24 | to go through the -- the -- the window system to receive their
25 | cash envelopes -- or a representative?
```

 1  **A.**  A representative.

 2  **Q.**  Did the Sherwin-Williams have to go through the payroll

 3  system?

 4  **A.**  No.

 5  **Q.**  Okay.  Why not?

 6  **A.**  We just bought stuff from them.  They weren't, you know,

 7  part of our company.  They were just a vendor.

 8  **Q.**  Were they independent contractors?

 9  **A.**  I don't know, you know.  They -- we didn't have any dealings

10  with them.  We'd just pay them straight out.

11  **Q.**  How about Rew Materials?

12  **A.**  Same way.

13  **Q.**  By check?

14  **A.**  I -- you know, that was the office that paid them.

15  **Q.**  But they didn't go through the --

16  **A.**  -- payroll system --

17  **Q.**  -- payroll system?

18  **A.**  -- no.

19  **Q.**  Did you ever receive more than two tubes of coins at the

20  payroll window?

21  **A.**  No.

22  **Q.**  Did the -- the number of coins in the tubes change depending

23  upon the amount of payroll you picked up?

24  **A.**  Sometimes.  Ours was the smallest payroll, so we didn't

25  really have to worry about that.

1  Q.  You didn't have to worry about how many tubes you received?

2  **A.**  No, we -- usually one tube, slide it under and go.

3  Q.  And how many coins per tube?

4  **A.**  I think there's ten.  I'm not sure.

5  Q.  Now, you were asked whether or not the payroll system was

6  kept secret.  Do you recall that question?

7  **A.**  Yes, sir.

8  Q.  And I believe you indicated that the payroll system was not

9  a secret?

10  **A.**  Everybody in town knew what we were doing.  I mean, it was a

11  big joke every time we went somewhere they say, "Oh, you're the

12  guys that pay in gold and silver."  So I don't know what kind of

13  secret was being kept, you know.

14  Q.  If the payroll system wasn't a secret, why weren't the

15  workers allowed to keep a copy of their contract?

16  **A.**  I don't know.

17  Q.  Who made that decision?

18  **A.**  Mr. Kahre.

19  Q.  If the payroll system was not a secret, why would you

20  instruct workers that "You don't tell; I don't tell"?

21  **A.**  Pretty much it was meant more for any questions on where

22  you're going to go pay taxes.  Because that was the biggest

23  question everybody asked me, you know:  "So what happens if the

24  IRS comes after me?"

25          And, really simple, was, "Hey, you don't tell, we don't

```
 1   tell, so it's more like you don't exist."
 2   Q.  So the whole payroll system really just revolved around
 3   avoiding taxes?
 4          MR. KENNEDY:  It's leading.  Objection.
 5          THE COURT:  Overruled.
 6          THE WITNESS:  Pretty much meant nobody paid any taxes.
 7          MR. DAMM:  May I have the Court's indulgence for a
 8   moment, please?
 9              (Pause in proceedings.)
10          MR. DAMM:  No further questions of this witness
11   at this time.  Thank you, your Honor.
12
13                      RE-CROSS EXAMINATION
14          BY MR. KENNEDY:
15   Q.  Sir, as you testified earlier, the reason for that
16   was your belief that you could value --
17          MR. DAMM:  Objection as to -- objection, Mr. Kennedy.
18          THE COURT:  Yes.  Just a minute.
19          MR. DAMM:  As to Mr. Fernandez's belief, your Honor.
20   That's not relevant.
21          THE COURT:  Sustained.
22          BY MR. KENNEDY:
23   Q.  You testified about the understanding of a
24   threshold --
25          MR. DAMM:  Objection, your Honor.
```

 1          MR. KENNEDY:  It's been covered before, your Honor,
 2   brought out on direct.
 3          THE COURT:  I don't know what the -- I don't know what
 4   you're asking, Mr. Kennedy.  I have no idea.  What is this?
 5   Where are you going?
 6          BY MR. KENNEDY:
 7   Q.  You valued your tax obligation on the face value of
 8   the gold and silver coin; correct?
 9          MR. DAMM:  Again --
10          THE COURT:  He can ask -- no, he can ask him that.  It
11   isn't beyond because you asked him some questions about taxes.
12          THE WITNESS:  Yes.
13          THE COURT:  Okay.
14          MR. DAMM:  No further questions, your Honor.
15          MR. KENNEDY:  I'm finished, your Honor.
16          THE COURT:  You may step down.  Okay.  Too late for
17   another witness, so we will see you, ladies and gentlemen,
18   tomorrow morning at 8 a.m.  Have a good evening.
19              (Jury panel exited the proceedings.)
20          MR. COHAN:  We recess at two, Your Honor, with a
21   45-minute lunch break?
22          THE COURT:  It may be sooner than two.  It depends upon
23   some things that I will discuss with counsel in just a moment.
24          THE COURT:  Okay.  Tomorrow is -- we're going to start
25   off with Mr. Ricky.

1          MR. DAMM:  No, Your Honor, Stephanie York.

2          THE COURT:  Oh, okay.  All right.  But she is what?

3    She's not an IRS agent; right?

4          MR. DAMM:  No, no, no, she's -- she was a former

5    employee of Mr. Kahre's, worked in --

6          THE COURT:  Mr. Kahre, you don't need to be standing.

7    It's okay.

8          MR. DAMM:  -- worked in the accounting and payroll

9    office and will provide testimony from the insider standpoint.

10         THE COURT:  All right.  So I assume she's not going to

11   be a short witness?

12         MR. DAMM:  No.  I don't -- I don't believe she'll be

13   perhaps as long as Mr. Fernandez but, no, she's not a custodian.

14         THE COURT:  Okay.  So I'm hoping to get, as we've

15   discussed, your -- Mr. Ricky's chart --

16         MR. DAMM:  Yes.  We've --

17         THE COURT:  -- and the defense get Mr. Ricky's chart.

18         MR. DAMM:  They've been sent to your clerk, oh, an hour

19   or so ago, Your Honor.

20         THE COURT:  Okay.

21         MR. DAMM:  Your Honor?

22         THE COURT:  But I don't know if -- were they sent to

23   defense counsel?

24         MR. DAMM:  Well, they -- they've received an earlier

25   version.  What I'd really recommend to the Court --

1      THE COURT:  See, let me explain to you what my problem
2  is.

3      MR. DAMM:  Okay.

4      THE COURT:  The first thing Mr. Ricky is going to want
5  to do is he's going to want to have that chart displayed.  I
6  have to give an instruction to the jury that the chart is not
7  evidence, and they're not to consider it as evidence in the
8  case.  It's simply a demonstrative tool, and they may consider
9  the demonstrative tool in connection with considering the
10 credibility of -- of Mr. Ricky's testimony, but, in any event,
11 the chart is not evidence.  It's the underlying information, and
12 if they see a difference between what is in the chart and what
13 the underlying -- you know, the standard instruction that I'm
14 required to give.  But I can't put -- let him put the chart up
15 and start unless I've ruled on what can be in the chart, and I
16 can't rule on it unless I've seen the chart and had a chance to
17 look at it, and I can't do that if I'm sitting here trying to
18 listen to all these objections and make all these ruling that I
19 have to make about a hundred times a day.

20      And so my thought is that it might -- as much as I
21 would love to get started with Mr. Ricky, it might make sense,
22 given the defense's need to look at the chart and give me their
23 objections -- because I can't do it unless I get their
24 objections, and I think part of the objections are going to come
25 from Ms. Panagakos.

1            MS. PANAGAKOS:  There are 22 charts.

2            THE COURT:  Yeah, well, that's the problem.  And so

3    there's no way between now and tomorrow Ms. Panagakos as well as

4    Mr. Kennedy and possibly Mr. Cohan are going to have the full

5    opportunity to do that.  Well, they may get done tonight.  I

6    don't know.  They get it to me at eight o'clock tomorrow

7    morning, how can I look at it?  I'm sitting here, so I can't do

8    that.  So I suggest that Mr. Ricky is going to have to just

9    simply wait until Tuesday.  We will just do that witness,

10   Ms. York, get her done, and then just recess so that we can then

11   deal with the chart issue.

12           And what I'm going to have defense counsel do is to

13   e-mail to my law clerk their objections -- I hate to do this to

14   you -- on -- no later than Sunday so that I have a chance to

15   spend my airplane flight back to Las Vegas on Monday morning

16   looking at charts.  It should really be a very interesting

17   airplane flight.

18           MR. KENNEDY:  Hopefully you'll sit by someone who you

19   wish you'll have charts, and you'll have them now.

20           THE COURT:  Nine hours of charts.  This is going to be

21   exciting.

22           So that's -- and then I'll be ready on Tuesday morning

23   to actually make a ruling, and Mr. Ricky will be ready, you

24   know, to go.

25           Now, we may have to have some redactions, and that's

Case 09-14814-gwz   Doc 1553   Entered 09/21/11 16:16:58   Page 191 of 257
Case 2:05-cr-00121-DAE -RJJ   Document 2748   Filed 07/22/10   Page 175 of 178

2:05-cr-121-DAE-RJJ - July 15, 2009          175

 1  the other problem because I won't be able to communicate my

 2  ruling until Tuesday morning because that's the first time I see

 3  you.  And if we put Mr. Ricky on the stand, there's some

 4  preliminary questions you can ask Mr. Ricky without those charts

 5  going on.  Mr. Halper may have to become the chart master over

 6  here, making the -- and Mr. Maietta, making the changes -- well,

 7  but unfortunately probably what's going on here is that

 8  Mr. Ricky probably has these in his computer?

 9          MR. DAMM:  He does, Your Honor.

10          THE COURT:  But I'm sure that it could be worked out

11  because there undoubtedly will have to be some changes, I'm

12  sure.

13          MR. DAMM:  Your Honor, if I can suggest when defense

14  counsel -- when they e-mail their objections to the Court, if

15  they would e-mail --

16          THE COURT:  Well, I'm presuming that that will be done.

17  As soon as the objections are made and sent to Ms. Schabinger,

18  which you have her e-mail address I think --

19          MR. COHAN:  Could we get that again?

20          THE COURT:  Sure.  It's Laura, L-A-U-R-A, underscore --

21          MR. COHAN:  Right.

22          THE COURT:  Just an underscore.

23          MR. COHAN:  Got it.

24          THE COURT:  -- Schabinger, which is

25  S-C-H-A-B-I-N-G-E-R, a good German name.

Case 09-14814-gwz - Doc 1553 Entered 09/21/11 16:16:58 Page 192 of 257
Case 2:05-cr-00121-DAE -RJJ Document 2748 Filed 07/22/10 Page 176 of 178

2:05-cr-121-DAE-RJJ - July 15, 2009          176

```
 1            MR. KENNEDY:  Laura, L-A-U-R-A, at --

 2            THE COURT:  Just a minute.  Let me do it again.

 3   Laura_Schabinger, S-C-H-A-B-I-N-G-E-R, @hid.uscourts.gov.

 4            MR. COHAN:  H-I-D, as in "dog," uscourts.gov.

 5            THE COURT:  Yeah.

 6            MR. COHAN:  Thank you.

 7            THE COURT:  H-I-D just stands for the Hawaii district.

 8            MR. KENNEDY:  Your Honor, to help you with deciding

 9   these things, the other summary witness -- can we have those

10   charts so that we can submit it all at once?

11            THE COURT:  Yes.  They should be provided as well.

12            MR. KENNEDY:  Because we don't have those yet, so -- if

13   I'm looking at a bunch of charts --

14            THE COURT:  As soon as they're available.  I mean, I

15   hope the government has -- you know, this is second trial, and

16   we're down the road here.

17            MR. DAMM:  May I have the Court's indulgence for just

18   one moment?

19            THE COURT:  Yeah.  We have to remember now this summary

20   -- this is always a problem with summary charts because the

21   summary charts are based upon the evidence that's come in to

22   that point and, of course, they don't know precisely what

23   evidence has come in until we reach that point.

24            MR. KENNEDY:  I don't think there's anything that

25   Ms. York --
```

1          THE COURT:  -- can testify to --

2          MR. KENNEDY:  -- that would change the charts from my

3     memory.

4          THE COURT:  -- that's going to be anything exciting or

5     new.  I'm sure not.

6          MR. COHAN:  She's not involved in the real estate

7     charts, which those we've never seen.

8          THE COURT:  I don't know how long Ms. York will take,

9     but I suspect that we'll be done by noon.

10          MR. KENNEDY:  Yeah.  I think we will, Your Honor, based

11     on what happened last time.

12          THE COURT:  I think so.  You can plan your lives

13     accordingly.

14          MR. HANSEN:  Your Honor, one more question on the

15     e-mail address:  Is it H-I-D as in "dog"?

16          THE COURT:  That's right, dot H-I-D dot US -- and if

17     you want to send me a nasty e-mail, it's

18     David_Ezra@hid.uscourts.gov.  Okay?

19          MR. KENNEDY:  I've got too many clients from time to

20     time who get into trouble with their e-mail, so I try to avoid

21     e-mail.

22          THE COURT:  I've gotten some humdingers over the years.

23     Believe me.  All right.  Court stands in recess until tomorrow

24     morning, eight o'clock, remember now.

25

Case 2:05-cr-00121-DAE-RJJ Document 2348-1 Filed 07/22/10 Page 178 of 178
Case 09-14814-gwz Doc 1553 Entered 09/21/11 16:18:58 Page 994 of 257

2:05-cr-121-DAE-RJJ - July 15, 2009          178

```
1                          --oOo--

2         I hereby certify that pursuant to Section 753, Title 28,

3    United States Code, the foregoing is a true and correct

4    transcript of the stenographically reported proceedings held in

5    the above-entitled matter.

6

7              /s/ ANDREA N. MARTIN, CRR, CCR 887

8              DATED:   APRIL 10, 2010

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT

# C

2:05-cr-121-DAE-RJJ - June 30, 2009

1

1        UNITED STATES DISTRICT COURT

2           DISTRICT OF NEVADA

3    THE HON. DAVID A. EZRA, U.S. DISTRICT JUDGE,

4              PRESIDING

5

6   UNITED STATES OF AMERICA,        )
                                     )
7           Plaintiff,               )   Case No.
                                     )   2:05-cr-121-DAE-RJJ
8        vs.                         )
                                     )   *COPY*
9   ROBERT DAVID KAHRE, et al.       )
                                     )
10          Defendants.              )
                                     )
11   _____)

12

13

14

15     REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL

16        (TESTIMONY OF GEORGE RODRIGUEZ)

17              June 30, 2009

18

19

20

21
     APPEARANCES:  (See page 2)
22

23

24

25   Court Reporter:   Gayle Pichierri, RPR, CRR

2:05-cr-121-DAE-RJJ - June 30, 2009

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3                    J. GREGORY DAMM, ESQ.
                      Assistant United States Attorney
 4                    333 Las Vegas Boulevard South
                      Suite 5000
 5                    Las Vegas, Nevada 89101
                      (702) 388-6336
 6
                      CHRISTOPHER J. MAIETTA, ESQ.
 7                    U.S. Department of Justice
                      Tax Division
 8                    P. O. Box 972
                      Washington, D.C. 20044
 9                    (202) 514-4661

10    For the Defendant Robert David Kahre:

11                    WILLIAM A. COHAN, ESQ.
                      WILLIAM A. COHAN, P.C.
12                    P. O. Box 3448
                      Rancho Santa Fe, California 92067
13                    (858) 832-1632

14    For the Defendant Robert David Kahre:
      (Local counsel)
15
                      LISA RASMUSSEN, ESQ.
16                    LAW OFFICE OF LISA RASMUSSEN
                      616 South 8th Street
17                    Las Vegas, Nevada 89101
                      (702) 461-1436
18
      For the Defendant Alexander C. Loglia:
19
                      JOEL F. HANSEN, ESQ.
20                    415 South 6th Street
                      Las Vegas, Nevada 89101
21                    (702) 385-5533

22    * * *

23    * * *

24    * * *

25
```

2:05-cr-121-DAE-RJJ - June 30, 2009

3

1   **APPEARANCES:**
    (Continued.)

2

    **For the Defendant Lori Kahre:**

3

                    **MICHAEL J. KENNEDY, ESQ.**
4                   First Assistant Federal Defender
                    411 East Bonneville Street
5                   Suite 250
                    Las Vegas, Nevada 89101
6                   (702) 388-6577

7

    **For the Defendant Danille Cline:**

8

                    **LYNN E. PANAGAKOS, ESQ.**
9                   345 Queen Street
                    Honolulu, Hawaii 96813
10                  (808) 521-3336

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:05-cr-121-DAE-RJJ - June 30, 2009

4

1                          --oOo--

2                        I N D E X
   WITNESS                                    PAGE
3
   GEORGE RODRIGUEZ
4
   Direct examination by Mr. Damm              6
5  Cross-examination by Mr. Kennedy           89
   Cross-examination by Mr. Cohan            204
6  Voir Dire examinations by Mr. Damm        108
   . . .                                     112
7  . . .                                     127
   . . .                                     138
8  . . .                                     145
   . . .                                     149
9  . . .                                     158
   . . .                                     163
10

11                     E X H I B I T S
   Government's                          Received
12
   6.65.132-137                             15
13
   6.65.140-145                             15
14
   -139                                     15
15
   9.6.1-9.6.402                            51
16

17
   Defendants'
18
   1162-1164 (redacted)                    131
19
   1165                                    110
20
   1157                                    115
21
   1166                                    122
22
   1500-1504                               140
23
   1158-1161                               159
24
   1167                                    166
25

2:05-cr-121-DAE-RJJ - June 30, 2009

5

1    **LAS VEGAS, NEVADA; JUNE 30, 2009; 9:28 A.M.**

2                        **--oOo--**

3                **P R O C E E D I N G S**

4

5             MR. DAMM:  Your Honor, we would call

6    Mr. George Rodriguez.

7             THE COURT:  Okay.

8             THE CLERK:  Raise your right hand.

9             Do you solemnly swear the testimony

10   you are about to give before this Court shall

11   be the truth, the whole truth and nothing but

12   the truth, so help you God?

13            THE WITNESS:  Yes.

14            THE CLERK:  You can be seated.  If

15   you will state your name and spell your first

16   and last name for the record.

17            THE WITNESS:  George Rodriguez,

18   G-E-O-R-G-E, R-O-D-R-I-G-U-E-Z.

19

20                 GEORGE RODRIGUEZ,

21   called as a witness on behalf of the plaintiff,

22   having been duly sworn, was examined and

23   testified as follows:

24   ///

25   ///

2:05-cr-121-DAE-RJJ - June 30, 2009

6

1                      DIRECT EXAMINATION
2    BY MR. DAMM:
3         Q.   Good morning, Mr. Rodriguez.
4         A.   Good morning.
5         Q.   How are you?
6         A.   Good.
7         Q.   Can you tell us the city and state in
8    which you live?
9         A.   I live in Las Vegas -- in Las Vegas,
10   Nevada.
11        Q.   Would you like a glass of water?
12        A.   Sure.
13             THE CLERK:  I'll get it.
14             MR. DAMM:
15        Q.   Mr. Rodriguez, how long have you
16   lived here in Las Vegas?
17        A.   My whole life.
18        Q.   Are you currently employed?
19        A.   Yes.
20        Q.   And can you tell me the type of work
21   that you are engaged in?
22        A.   In sales.  I work for Findley
23   Volkswagen, and I'm a sales consultant.
24        Q.   During the time in which you grew up
25   here in Las Vegas, did you meet an individual

7

1    by the name of Robert Kahre?

2         A.   Yes.

3         Q.   How did you meet Mr. Kahre?

4         A.   I met him through Jorge Fernandez

5    when I was a young boy, approximately five or

6    six years old.

7         Q.   And have you known Mr. Kahre since

8    that time?

9         A.   Yes.

10        Q.   Did there come a point in time when

11   you went to work for Mr. Kahre?

12        A.   Yes, in '98.

13        Q.   And what type of work was it that you

14   were engaged in at that time?

15        A.   At that time it was painting.

16        Q.   Were you hired by Mr. Kahre in 1998?

17        A.   No.  I was hired by Mr. Fernandez.

18        Q.   And did Mr. Fernandez work for

19   Mr. Kahre?

20        A.   Yes.

21        Q.   In what capacity did Mr. Fernandez

22   work for Mr. Kahre?

23        A.   Jorge Fernandez, he was the general

24   superintendent for Wright Painting and

25   Drywall.

2:05-cr-121-DAE-RJJ - June 30, 2009

8

1       Q.   And do you know what sort of work it
2   was that was performed by Wright Painting and
3   Drywall?
4       A.   At the time that I started, it was
5   just painting.
6       Q.   And the type of work that you were
7   hired to do at the time of your hire?
8       A.   Was painting.
9       Q.   And did you engage in that type of
10  work for some period of time for Wright
11  Painting and Drywall?
12      A.   Yes.
13      Q.   And do you know who it was that owned
14  Wright Painting and Drywall at that time?
15      A.   Yes.  It was Robert Kahre.
16      Q.   At the time you were hired, was your
17  salary discussed?
18      A.   Um, yes.
19      Q.   And what was -- what was your pay at
20  the time you were hired?
21      A.   Okay.  When I first started, I was
22  paid -- you know, I was being paid hourly.  So
23  it was approximately $10 an hour.
24      Q.   And who was it that set that rate of
25  pay?

2:05-cr-121-DAE-RJJ - June 30, 2009

9

1      A.   Jorge Fernandez.

2      Q.   Now, during the course of time that

3   you worked for Wright Painting and Drywall,

4   did your job duties and responsibilities

5   change?

6      A.   Yes.

7      Q.   How so?

8      A.   You know, after -- like after six to

9   about eight months, I became a foreman.

10     Q.   And how did your duties and

11  responsibilities change when you became a

12  foreman?

13     A.   You know -- okay.  Like, you know, I

14  was given a couple of tracts to actually

15  supervise.  So I was a foreman like, you know,

16  supervising other painters.

17     Q.   Now, when you say tracts, what do you

18  mean?

19     A.   Job tracts.

20     Q.   Would this be residential or

21  commercial construction?

22     A.   It was residential.

23     Q.   And as a painter, what type of

24  painting did you do?  Commercial or

25  residential?

2:05-cr-121-DAE-RJJ - June 30, 2009

10

1      A.   Well, at the time we did both, but I
2   was in charge -- or, you know, my tracts were
3   just residential.
4      Q.   So after you were promoted to the
5   position of a foreman, you were in charge of
6   some residential tract homes?
7      A.   Yes.
8      Q.   Were these new homes that were being
9   constructed?
10     A.   Yes.
11     Q.   How many people were you in charge of
12  at that time?
13     A.   Anywhere from 12 to 20.
14     Q.   And how long did you remain in the
15  position of a foreman?
16     A.   A few years, you know.  You know, I
17  would say probably about four or five years.
18     Q.   Now, did your pay change at the time
19  you were promoted to the position of a
20  foreman?
21     A.   Yes.  I became a salary employee.
22     Q.   And do you recall what your salary
23  was?
24     A.   It was $500 a month -- I mean, a
25  week.  I'm sorry.

2:05-cr-121-DAE-RJJ - June 30, 2009

11

1      Q.   And did that increase over time?

2      A.   Yes.

3      Q.   At some point in time were you

4  promoted to another position beyond foreman?

5      A.   Yes.

6      Q.   And what position was that?

7      A.   Superintendent.

8      Q.   And that would have been the

9  superintendent of what entity?

10      A.   Of Wright Painting and Drywall.

11      Q.   And what did that entail being the

12  superintendent of Wright Painting and Drywall?

13      A.   Basically, you know, I overlooked the

14  whole company as far as, you know, like all

15  the foremans and all the jobs in the painting

16  and drywall.

17      Q.   And how long did you remain in that

18  capacity?

19      A.   Until 2005.  Until July of 2005.

20      Q.   And can you tell me how many foremen

21  that you supervised as superintendent?

22      A.   Approximately five to six.

23      Q.   And how many job sites were there

24  that you were responsible for as

25  superintendent?

2:05-cr-121-DAE-RJJ - June 30, 2009

1      A.   Yes, 25,000.

2      Q.   Would you have picked that up?

3      A.   No.

4      Q.   Now, during the time that you worked

5   for Wright Painting and Drywall, did you

6   become aware of other Robert Kahre companies

7   that were being operated out of the same

8   location?

9      A.   Yes.

10     Q.   And what companies did you become

11   aware of?

12     A.   We had Production Plumbing.  We had

13   like Production -- you know, the HVAC.  We had

14   Sherman Tile.  We had like Union Pacific

15   Framing.  Wright Painting and Drywall, of

16   course.

17     Q.   Was there a -- do you know whether or

18   not there was a Wright Painting and Drywall

19   operation in Texas?

20     A.   Yes, there was.

21     Q.   How about was there an electrical

22   company that --

23          THE COURT:  Counsel, you're leading

24   the witness.

25          MR. DAMM:  Very well, Your Honor.

2:05-cr-121-DAE-RJJ - June 30, 2009

1    Q.   Do you recall any other trades that

2    were represented by Mr. Kahre's companies?

3    A.   Yes.

4    Q.   And can you tell me those, please?

5    A.   I mean, we also had Dick running the

6    electrical, you know, company; HVAC.  Painting

7    and drywall; Sherman Tile; Production

8    Plumbing; the framing company.  We had a

9    general -- we had -- we had the -- our like

10   general contractor was like Union Pacific.  We

11   had -- at one time we had a granite, you know,

12   company going on there with the tile company.

13   Q.   Now, with respect to these other

14   companies, were you aware of how the employees

15   for those companies were paid?

16   A.   They were being paid the same way

17   that we were.

18   Q.   Now, in addition to the employees

19   that Robert Kahre paid for his companies, do

20   you know whether or not there were other

21   companies that participated in this same

22   payroll system that were not companies owned

23   by Mr. Robert Kahre?

24   A.   Yes.

25   Q.   Can you explain that, please?

2:05-cr-121-DAE-RJJ - June 30, 2009

71

1      A.   Well, basically he had numerous
2   companies that were running their payroll
3   through his the same way that we did ours.
4   There is -- I mean, I don't know exactly how
5   many -- approximately around 30 other
6   companies that were, you know, getting their
7   pay through us.
8      Q.   Do you recall the names of some of
9   those other companies?
10     A.   Yes.  First Premier Drywall, D and L,
11  Action Concrete, ABC Roofing, Bricker
12  Construction.  There was numerous.
13         Like R W Stucco.  All American, you
14  know, Graffiti -- American Graffiti.  There's
15  numerous.  I mean, it's been a long time since
16  I've been there, so...
17     Q.   If I were to show you a list of
18  companies, would that help refresh your
19  recollection?
20     A.   Sure.
21         MR. DAMM:   If I might have the
22  Court's indulgence for a moment?
23         THE COURT:   Yes.
24         (Pause in the proceedings.)
25         MR. DAMM:

**PRESTIGE COURT REPORTING**
(702) 525-2997

2:05-cr-121-DAE-RJJ - June 30, 2009

72

1    Q.  Mr. Rodriguez, looking at that list,
2    does that refresh your recollection?
3    A.  Yes.
4    Q.  And I would ask you not to read from
5    the list, but can you tell us if there are any
6    others that you recall?
7    A.  Big Bear Concrete, I remember them.
8    Bravo.  I already mentioned, you know,
9    Bricker.  D and L.  First Premier I already
10   mentioned.  And then Mitchell Framing.
11   Patch Co., you know, Kelly.
12   Q.  When you say "Kelly," who do you
13   mean?
14   A.  Kelly Musler.  Silver State Glass,
15   and then T and F Marble.
16   Q.  Those were the ones that you
17   recognized that participated in this payroll
18   system?
19   A.  Yes.
20   Q.  Now, going back to Exhibit 9.6.252,
21   can you tell me, on your own behalf do you
22   ever recall picking up gold and silver for
23   yourself and keeping it after going to the
24   first pay window?
25   A.  No.

2:05-cr-121-DAE-RJJ - June 30, 2009

1    Q.   With respect to the other individuals

2  whose pay you picked up, do you ever recall

3  keeping gold or silver after going to the pay

4  windows?

5    A.   No.

6    Q.   Do you recall where the offices were

7  located when you first started working for

8  Robert Kahre?

9    A.   Well, we always had the warehouse

10  since day one.  We only had one section of the

11  warehouse.  When I originally started to work

12  there, the payroll was going through a Boulder

13  Highway office that we had on Boulder Highway.

14  I think I remember the address:  6049 Boulder

15  Highway.  And the warehouse was on Kimberly

16  that we were actually running the workers

17  through.

18    Q.   Do you know who owned the Boulder

19  Highway address?

20    A.   Robert Kahre, as far as I know.

21    Q.   How about the Kimberly address?

22    A.   Like that was a lease, but it was,

23  you know, being leased out by Robert Kahre.

24    Q.   Now, during the time that you worked

25  for Robert Kahre, did you know whether or not

2:05-cr-121-DAE-RJJ - June 30, 2009

74

1    he ever owned any property in Oregon?

2        A.    Yes.

3        Q.    And can you describe that?  Well, let

4    me ask you:  How would you know that?

5        A.    Well, actually, I've been there one

6    time, and I was sent with a crew of painters

7    to go out and paint his three houses that, you

8    know, was out there.  So I've been out there

9    one time for a week.

10       Q.    And that was at whose direction?

11       A.    By Robert Kahre and Jorge Fernandez

12   both.

13       Q.    And do you know where that property

14   was located?

15       A.    It was in Oregon.

16       Q.    And what sort of property was it?

17       A.    It was an old mink farm.  It was

18   146 acres or a 140-something acres.

19       Q.    And did you know who owned that

20   property?

21       A.    Yeah.  Yeah, Robert Kahre owned it.

22             THE COURT:  When you went out there,

23   was it just you or --

24             THE WITNESS:  No.  Me and a crew of

25   about four guys.

2:05-cr-121-DAE-RJJ - June 30, 2009

75

1          THE COURT:  Who paid your expenses to
2    go to Oregon?
3          THE WITNESS:  It was Robert Kahre.
4          THE COURT:  Were you paid extra or
5    overtime, or just your regular salary?
6          THE WITNESS:  No.  I was just, you
7    know, paid my regular salary.
8          MR. DAMM:
9    Q.   Where did you stay when you went
10   there?
11   A.   In Robert Kahre's house.
12   Q.   And who paid for the food?
13   A.   You know, Robert Kahre paid for the
14   food.
15   Q.   And who paid for the transportation
16   expenses?
17   A.   It was Robert Kahre.
18   Q.   When you first started working for
19   Robert Kahre, do you know where he was living?
20   A.   When I first started to work there?
21   Q.   Yes.
22   A.   I think he was still -- Bledsoe.  I
23   think he was still living in the house on
24   Bledsoe, where Alex lived afterwards.
25   Q.   Now, by Alex, you mean who?

1        A.    I mean, you know --

2        Q.    Mr. Loglia?

3        A.    Yes.

4        Q.    Now, the Bledsoe address was a home

5    that Mr. Kahre lived in?

6        A.    Yes.

7        Q.    And did Mr. Kahre move someplace

8    else?

9        A.    Yes.

10       Q.    And did somebody move into that

11   Bledsoe address?

12       A.    Well, he had two houses on Bledsoe:

13   One was sort of like an office, and then one

14   was actually his residence.  Now, like this

15   goes back to '98, you know -- like, you know,

16   like in the very beginning, you know, when I

17   first started to work there.  So he lived on

18   Bledsoe in like one of the houses, and then in

19   like the other house was the office where the

20   girls were working out of.

21             And then he moved -- I want to say

22   from there he moved to Grand Canyon, but I'm

23   not a hundred percent sure he went from

24   Bledsoe to Grand Canyon.

25       Q.    When he left Bledsoe, did someone

1    else move into that?

2        A.   Yes; it was Alex Loglia.

3        Q.   Now, at some point in time you

4    indicated that Mr. Kahre ended up on Grand

5    Canyon?

6        A.   Yes.

7        Q.   Do you recall the address?

8        A.   I do not.

9        Q.   Do you recall whether or not that

10   location was close to any other homes that you

11   were familiar with?

12       A.   Yes.  It was right in front of Jorge

13   Fernandez's house.

14       Q.   When you say in front --

15       A.   Like directly in front.  They had the

16   two corner lots on like Grand Canyon and

17   Centennial.  It was the two corner houses.  So

18   the one side was Bobby's house, and then right

19   directly in front was Jorge Fernandez's house.

20       Q.   Did you ever visit that Grand Canyon

21   home of Mr. Kahre's?

22       A.   Yes.

23       Q.   On how many occasions?

24       A.   Many, many times.

25       Q.   And why would you visit that

2:05-cr-121-DAE-RJJ - June 30, 2009

78

1   location?

2       A.   Because when he originally bought the

3   house, it wasn't to his standards, so we had

4   to remodel the whole house.

5       Q.   When you say "we," who do you mean?

6       A.   You know, the crews.  My painting

7   crews, my drywall crews.  You know, it was

8   many, many, you know -- like, you know -- you

9   know, like it was many people that took that

10  job on.

11      Q.   Would these have been other trades

12  working for Mr. Kahre?

13      A.   Yes.

14      Q.   And how much time did you spend

15  there?

16      A.   We must have worked on that house for

17  approximately almost a month.

18      Q.   And who were the expenses billed to?

19      A.   We just ran, you know, all the

20  expense of the company through Wright

21  Painting.

22      Q.   And that would have been for your

23  salary?

24      A.   Yes.

25      Q.   The materials?

2:05-cr-121-DAE-RJJ - June 30, 2009

1      A.   Yes.

2      Q.   Any other equipment needed?

3      A.   Yeah.   There was a lot of equipment.

4   Like I was only helping with the painting

5   aspect of it, you know, and the drywall -- me

6   and Jorge both, Jorge Fernandez.   So the only

7   part that I knew about was the painting and

8   drywall.

9          I mean, he had a lot of stuff done to

10  the house.   He remodeled it.   So there was a

11  lot of other trades that did work that had --

12  you know, that I didn't know who they were,

13  you know.   I mean, he redid all the windows,

14  you know.   I mean, he did like numerous stuff,

15  you know.

16     Q.   Do you know how long Mr. Kahre lived

17  at that address?

18     A.   Until I would say probably 2001,

19  2002.

20     Q.   And do you know, did Mr. Kahre move

21  from that address at some point in time?

22     A.   Yes.

23     Q.   And where did he move to?

24     A.   He moved -- he moved right around the

25  corner to a house on Ruffian.

2:05-cr-121-DAE-RJJ - June 30, 2009

80

1    Q.    Did you ever visit that location?

2    A.    One time.

3    Q.    And what was the reason for visiting

4    that location?

5    A.    We moved him out of that house.

6    Q.    When you say, "we," who do you mean?

7    A.    Me and a crew of guys, you know, like

8    a bunch of laborers, you know.  There was

9    probably ten, twelve of us.

10    Q.    Were these employees of Wright

11    Painting and Drywall?

12    A.    Yes.

13    Q.    And what did you use to move

14    Mr. Kahre?

15    A.    Our trucks.

16    Q.    Were these the Wright Painting and

17    Drywall trucks?

18    A.    Yes.

19    Q.    And who paid for the services of

20    yourself and the other laborers?

21    A.    We were paid by Robert Kahre.

22    Q.    Was this through the Wright Painting

23    and Drywall payroll system?

24    A.    No.

25    Q.    This was other work?

2:05-cr-121-DAE-RJJ - June 30, 2009

81

1      A.   Yeah.

2      Q.   How were you paid?

3      A.   He just paid us on the side for that.

4      Q.   How did he pay you?

5      A.   In cash.

6      Q.   Do you know whether or not Mr. Kahre

7   had an office on Grand Canyon?

8      A.   Yes.

9      Q.   How do you know that?

10     A.   It was four blocks -- it was like

11   four or five houses down from his house was

12   the office.  The girls moved from the -- you

13   know, when they moved from the Bledsoe office,

14   they moved into that Grand Canyon office.

15     Q.   Do you know who owned that property?

16     A.   I don't know exactly who owned it.  I

17   mean, it was Robert, you know, Kahre's

18   business.  So the girls were basically like

19   running all the office stuff through that,

20   that house.

21     Q.   Did you ever visit that particular

22   home?

23     A.   Yes.

24     Q.   Why would you visit there?

25     A.   We visit there numerous times to, you

1    know, turn in paperwork to the girls or pick
2    some paperwork up.  Or if we had some sort of
3    meeting, you know, we met there a couple of
4    times to just have meetings in general.
5         Q.   Was this a commercial property?
6         A.   No.  It was a residential.  It was
7    like a two-acre parcel, you know.  You know,
8    on that whole street like every house has like
9    horse properties; they're either half acres or
10   acres or two acres.  I think on that
11   particular property it probably was an acre.
12        Q.   Now, I believe you indicated that you
13   visited the Ruffian Road house?  Was that at
14   the time you moved Mr. Kahre into that home?
15        A.   Yeah.  The only time that I ever went
16   to that house was when we moved him out from
17   there to St. George.  That was it.  That was
18   the only time I ever went to that house.
19        Q.   That's the Ruffian Road?
20        A.   Yes.
21        Q.   So you didn't move him from Grand
22   Canyon into Ruffian?
23        A.   No.
24        Q.   Did you have anything to do with the
25   Ruffian Road home?

2:05-cr-121-DAE-RJJ - June 30, 2009

83

1    A.   You know, actually, when he moved out
2    from Grand Canyon, you know, I actually helped
3    pack -- you know, I actually helped pack some
4    of the guys up because Robert Kahre actually
5    gave me his bedroom set.  So I actually took
6    the bedroom set to my house.  And then
7    everybody else moved the rest of his stuff to
8    Ruffian.  So I never even knew where he was
9    moving to.
10    Q.   Did you know why he was moving?
11    A.   He was -- you know, he was moving
12    because he didn't want to be in front of Jorge
13    Fernandez -- you know, like living up and
14    across the street from Jorge.
15    Q.   Did you know who owned the Ruffian
16    Road home?
17    A.   You know, no, I don't know exactly
18    who owned it.  I know who lived there; it was
19    Robert Kahre.
20    Q.   Now, you indicated that you moved
21    Mr. Kahre from the Ruffian Road home?
22    A.   Yes.
23    Q.   Do you recall when that was?
24    A.   I don't.  I don't know the exact
25    year, month.  I don't.

2:05-cr-121-DAE-RJJ - June 30, 2009

84

1      Q.   Was it while you were still working
2   at --
3      A.   Oh, yes.
4      Q.   -- Wright Painting and Drywall?
5      A.   Yes.
6      Q.   Can you tell me about that move?
7      A.   Yeah.  It was -- I mean, it took --
8   you know, it took a lot of effort.  We used my
9   truck and my trailer and his truck and his
10  trailer.  And there was probably about four
11  different trucks and trailers.  And, you know,
12  everybody packed everything up and we all, you
13  know, we all caravaned to St. George and we
14  moved them into that house in Bloomington,
15  right outside of St. George.
16     Q.   And do you know who owned that home?
17     A.   Yeah.  Robert Kahre owned it.
18     Q.   And did you ever visit that
19  St. George home on any other occasions?
20     A.   No.  No.  That was the first and last
21  time I ever was there.
22     Q.   Now, when you were supervising
23  projects for Wright Painting and Drywall, was
24  Wright Painting and Drywall working for other
25  general contractors?

1       A.   Yeah, many.

2       Q.   Can you name any of those general

3   contractors?

4       A.   Our main -- our main contractor was

5   U.S. Homes.  We did work for Beazer Homes,

6   Concordia Homes, Rhodes Homes.  I mean, those

7   are all the ones that come, you know, on the

8   top of my head.

9       Q.   Do you know how Mr. Kahre was paid by

10  those companies?

11      A.   No, I don't.

12      Q.   Now, at the time just before you left

13  your employment at Robert Kahre's business

14  Wright Painting and Drywall, did you know how

15  much you were being paid?

16      A.   A thousand dollars a week.

17      Q.   Now, at the end of each year while

18  you were working at Wright Painting and

19  Drywall, did you get any sort of a W-2 form

20  indicating the amount of your wages?

21      A.   No.

22      Q.   Was there any money deducted from

23  your wages for federal income tax purposes?

24      A.   No.

25      Q.   Was there any money deducted from

2:05-cr-121-DAE-RJJ - June 30, 2009

86

1    your wages for Medicare?

2        A.   No.

3        Q.   Was there any money deducted from

4    your wages for unemployment compensation

5    purposes?

6        A.   No.

7        Q.   Was there any deductions from your

8    wages whatsoever?

9        A.   No.

10       Q.   Was the same true for the individuals

11   that you supervised?

12       A.   Yes.

13       Q.   Did you receive a 1099 form from

14   Mr. Kahre?

15       A.   No.

16       Q.   Did any of the other workers receive

17   a 1099 form from Mr. Kahre?

18       A.   No.

19       Q.   Did you report any of the income that

20   you received from Mr. Kahre to the Internal

21   Revenue Service?

22       A.   No.

23       Q.   Why not?

24       A.   Because I -- because I think -- you

25   know, because I thought that I didn't have to,

2:05-cr-121-DAE-RJJ - June 30, 2009

1   you know, because of the way I was getting

2   paid in gold and silver.  That the way we were

3   getting paid in gold and silver, that -- that

4   the amount on the coins were less than what we

5   were actually getting paid.  So technically,

6   you know, I guess there is a certain threshold

7   that if you make -- so, you know, I guess

8   there is a certain threshold if you make under

9   that threshold you don't, you know, have to

10  claim taxes.

11          So we were told that since we were

12  getting paid in gold and silver coins, that

13  the threshold was under that amount, so we

14  didn't need to claim.

15     Q.  And so you didn't claim any of your

16  income?

17     A.  Not from '98 until 2003.  I think I

18  started in 2003.

19     Q.  Now, you indicated that you didn't

20  report it because you were under a threshold?

21     A.  Right.

22     Q.  But how many times did you keep the

23  gold and silver?

24     A.  Never.

25     Q.  What did you keep?

2:05-cr-121-DAE-RJJ - June 30, 2009

88

1        A.   Cash.

2        Q.   Did you report the cash?

3        A.   No.

4        Q.   Were you ultimately charged with a

5    crime?

6        A.   Yes.

7        Q.   And what was that?

8        A.   It was tax evasion.

9        Q.   And did you plead guilty?

10       A.   Yes.

11       Q.   Were you sentenced?

12       A.   Yes.

13       Q.   And what sort of sentence did you

14   receive?

15       A.   I got five years of probation, got

16   90 -- got 90 days of house arrest, a hundred

17   hours of community service.  Had to go to a

18   psychologist like every week for two months.

19   I think that's it.

20       Q.   Are you still on probation?

21       A.   Yes.

22            MR. DAMM:  May I have the Court's

23   indulgence for a moment, please?

24            THE COURT:  Sure.

25            MR. DAMM:  Your Honor, no additional

1   questions of Mr. Rodriguez at this time.
2   Thank you.
3          THE COURT:  All right.  Who will
4   start with cross?
5          MR. KENNEDY:  I am, Your Honor.
6          THE COURT:  Okay.
7          (Pause in the proceedings.)
8
9                  CROSS-EXAMINATION
10  BY MR. KENNEDY:
11     Q.  Good morning, sir.
12     A.  Hello.  Good morning.
13     Q.  I want to start by asking you some
14  questions about the gold and silver that you
15  and everyone were paid in; okay?
16     A.  Okay.
17     Q.  All right.  There were some questions
18  asked about other companies.  So I just want
19  to start there.  All right?
20     A.  Okay.
21     Q.  If I understand it, you were aware
22  that ABC Roofing was paid the same way you
23  were; right?
24     A.  Right.
25     Q.  They were paid in gold and silver

2:05-cr-121-DAE-RJJ - June 30, 2009

90

```
1   coin; right?
2       A.   Right.
3       Q.   And each individual had the option to
4   keep that coin as part of their pay?
5       A.   Right.
6       Q.   All right.  And so ABC Roofing,
7   another company in town, was paid the same way
8   you were; right?
9       A.   Right.
10      Q.   Now, you indicated that you were also
11  aware of a second company called Action
12  Concrete; right?
13      A.   Right.
14      Q.   This company too was paid in gold and
15  silver coin?
16      A.   Right.
17      Q.   And they too had the option of
18  keeping the gold and silver coin?
19      A.   Right.
20      Q.   And that was up to each individual
21  who was paid that way?
22      A.   Right.
23      Q.   I believe you indicated a third
24  company, American Graffiti?
25      A.   Yes.
```

1      Q.   Now, these three companies are all in
2    the Las Vegas Valley; right?
3      A.   Correct.
4      Q.   This third company, workers for them
5    were paid in gold and silver coin?
6      A.   Yes.
7      Q.   Just like you were?
8      A.   Right.
9      Q.   And they had the option of keeping
10   the gold and silver coin?
11     A.   Right.
12          THE COURT:   Mr. Kennedy, let's be
13   sure we are clear about what time frame we are
14   talking about.  He is not talking about
15   currently because they are not doing that.
16          MR. KENNEDY:   No, I didn't think
17   currently.  What I --
18          THE COURT:   They are not doing that
19   any more.
20          MR. KENNEDY:   Thank you, Your Honor.
21     Q.   What I am talking about, sir, as I
22   understand it, Jorge Fernandez gave you a call
23   and you began working in about 1998?
24     A.   In '98, correct.
25     Q.   And then you left the employ in July

2:05-cr-121-DAE-RJJ - June 30, 2009

92

1    of 2005?

2        A.   Correct.

3        Q.   All right.  So what I am talking

4    about is that time period.

5        A.   Right.

6        Q.   Okay.

7             MR. KENNEDY:  Thank you, Your Honor.

8        Q.   Now, with respect to Big Bear

9    Concrete, this is now a fourth company that

10   you are aware of in the Las Vegas Valley;

11   right?

12       A.   Right.

13       Q.   That was paid in gold and silver

14   coin?

15       A.   Right.

16       Q.   Exactly the way you were; right?

17       A.   Yes.

18       Q.   And they had the option of keeping

19   the gold and silver coin?

20       A.   Yes.

21       Q.   And that was left up to each

22   individual worker who was paid that way;

23   right?

24       A.   Yes.

25       Q.   Another company was -- that you were

2:05-cr-121-DAE-RJJ - June 30, 2009

93

1    aware of is Bravo, Inc.?

2         A.   Yes.

3         Q.   Now, Bravo, Inc., were you aware that

4    Jim Rhodes is involved with that company?

5         A.   Yes.

6         Q.   Okay.  And so Bravo, Inc.'s workers

7    were paid the exact same way you were, in gold

8    and silver coin?

9         A.   Yes.

10        Q.   And they each had the option of

11   keeping that gold and silver coin, just like

12   you did?

13        A.   Right.

14        Q.   Moving on to Bricker Construction

15   Company, this is another company that you were

16   aware of; right?

17        A.   Yes.

18        Q.   And they, too, had the option of

19   keeping the gold and silver coin that they

20   were paid in?

21        A.   Yes.

22        Q.   And they were paid in gold and silver

23   coin; right?

24        A.   Yes.

25        Q.   And each individual had the option

2:05-cr-121-DAE-RJJ - June 30, 2009

94

1    themselves?

2        A.   Yes.

3        Q.   I believe D and L Construction is

4    another company that you were aware of; right?

5        A.   Correct.

6        Q.   They -- each one who worked for D and

7    L Construction was paid in gold and silver

8    coin?

9        A.   Yes.

10       Q.   And each one had the option of

11   keeping that gold and silver coin; right?

12       A.   Yes.

13       Q.   Every worker that was paid that way.

14            You mentioned another company --

15            MR. DAMM:   Excuse me, Your Honor.   I

16   don't believe we had an answer.   I think we

17   need some foundation.

18            MR. KENNEDY:   Mr. Damm is right.   I

19   didn't hear an answer.   I apologize.

20            THE WITNESS:   Yes.

21            MR. KENNEDY:

22       Q.   Now, you mentioned First Premier as a

23   company that worked in the Las Vegas Valley, I

24   take it?

25       A.   Yes.

2:05-cr-121-DAE-RJJ - June 30, 2009

95

1    Q.   And they, too, were paid in gold and
2    silver coin?
3    A.   Yes.
4    Q.   Now, First Premier is a large drywall
5    company in the Valley, is it not?
6    A.   Yes.
7    Q.   First Premier was one of the major
8    five drywall companies in the Valley during
9    that time; right?
10   A.   At one time, yeah.
11   Q.   During the time period that's
12   relevant here?
13   A.   Yes.
14   Q.   Okay.  And all the people that worked
15   for First Premier were paid in gold and silver
16   coin exactly like you were; right?
17   A.   Yes.
18   Q.   And each of those individuals had the
19   option of keeping that gold and silver coin?
20   A.   Yes.
21   Q.   Mitchell Framing was a framing
22   company; right?
23   A.   Yes.
24   Q.   And you were aware that they too
25   participated in this gold and silver payroll

2:05-cr-121-DAE-RJJ - June 30, 2009

96

1    system; right?

2        A.   Yes.

3            MR. DAMM:   Your Honor, objection.  I

4    think we need some foundation here.  I don't

5    know that there has been any testimony how

6    Mr. --

7            THE COURT:   The objection is

8    sustained.

9            MR. KENNEDY:   The foundation, Your

10   Honor, is I was handed this that indicated

11   this witness had knowledge of these companies.

12           THE COURT:   Well, you need to ask him

13   that.

14           MR. KENNEDY:   All right.  Sir -- may

15   I approach?

16           THE COURT:   Sure.

17           MR. KENNEDY:

18       Q.   Were you shown this list at some

19   point today and asked to put marks next to the

20   companies that you recognized?

21       A.   Yes.

22       Q.   All right.  Do you see those marks

23   there?

24       A.   Yes.

25       Q.   Now, do some of the companies have

2:05-cr-121-DAE-RJJ - June 30, 2009

97

1   marks next to them?

2        A.   Yes.

3        Q.   And do some of the companies not have

4   marks next to them?

5        A.   No.

6        Q.   Does it appear to you, in looking at

7   this, that the ones that have marks next to

8   them are the ones that you indicated you had

9   personal knowledge about?

10       A.   Yes.

11            MR. KENNEDY:   All right.   May I

12   approach, Your Honor?

13            THE COURT:   Yes.

14            MR. KENNEDY:   Thank you, sir.

15            THE WITNESS:   Um-hum.

16       Q.   Now, Mitchell Framing is one of those

17   companies; right?

18       A.   Yes.

19       Q.   And they, too, were paid in gold and

20   silver coin; right?

21       A.   Yes.

22       Q.   Just like you were; right?

23       A.   Yes.

24       Q.   With the option that each

25   individual --

2:05-cr-121-DAE-RJJ - June 30, 2009

98

1          MR. DAMM:  Objection, Your Honor.
2     The point I have is not that they -- these
3     other companies participated in the payroll
4     system, but counsel is taking that a step
5     further and asking whether or not this witness
6     knows whether or not they had the option.
7          THE COURT:  Yeah.  He knows what
8     happened with respect to Mr. Kahre's companies
9     because he actually worked there and he
10    observed it.  He may have knowledge that they
11    had some sort of gold and silver payment.  But
12    unless you can establish that he actually
13    knows of his own personal knowledge how they
14    did it or what they did or what they reported
15    or what they didn't report, he is not in a
16    position to testify to that.  And any
17    testimony in that regard without such
18    foundation is stricken.
19          MR. KENNEDY:
20    Q.   Sir, I take it that you were asked
21    questions about these companies to determine
22    whether they participated in a payroll system
23    that was the same as the one you did; right?
24    A.   I don't understand the question.  Say
25    that again, please.

2:05-cr-121-DAE-RJJ - June 30, 2009

1      Q.   Yes.  You indicated that you marked

2   these companies as companies that you

3   recognized; right?

4      A.   Yes.

5      Q.   You recognize them as companies whose

6   workers participated in getting paid in gold

7   and silver coin; right?

8      A.   Right.

9      Q.   The same system that you were

10  explaining to all the individuals that you

11  hired; right?

12     A.   Right.

13     Q.   Some of those workers that you hired

14  also worked for these companies from time to

15  time; right?

16     A.   No.

17     Q.   Well, for instance, Enrique Ceballos,

18  he had about 50 crews; right?

19     A.   Right.

20     Q.   So he did work for First Premier;

21  right?

22     A.   Yes.

23     Q.   And so he also did work for Wright

24  Painting and Drywall; right?

25     A.   Yes.

2:05-cr-121-DAE-RJJ - June 30, 2009

1      Q.   And when I am talking about crews,
2  this individual had 50 different sets of
3  workers who worked with him on drywall cases?
4      A.   Yes.
5      Q.   So if you hire Enrique Ceballos, you
6  hire one or more of his crews; right?
7      A.   Right.
8      Q.   And then he could choose to do work
9  for, say, First Premier; right?
10     A.   Yes.
11     Q.   And when his workers worked for First
12 Premier, they entered and received pay through
13 the gold and silver process that you
14 described; right?
15     A.   Yes.
16     Q.   And when they were doing work --
17          THE COURT:  Just a minute.  Do you
18 know this of your own personal knowledge?
19          THE WITNESS:  I mean, I knew that
20 they got paid in gold and silver.  I mean, you
21 know, as far as how their bosses, you know,
22 like pay their workers, I don't know if they
23 paid them in food stamps or what.  I mean, no.
24          MR. KENNEDY:
25     Q.   But you know they went through the

2:05-cr-121-DAE-RJJ - June 30, 2009

1    initial steps of the process.  And what they

2    did after they left is something you don't

3    know?

4        A.   Right.

5        Q.   But what you know is they were paid

6    in gold and silver coin?

7        A.   Yes.

8        Q.   Okay.  Now, Patch Co, Inc. is one

9    that you recognized.  And you said Kelly, and

10   Kelly Musler; right?

11       A.   Correct.

12       Q.   Mr. Musler had his own separate

13   company; right?

14       A.   Yes.

15       Q.   And that was Patch Co, Inc.?

16       A.   Correct.

17       Q.   Patch Co, Inc. was one of the

18   companies that participated in the gold and

19   silver payment system just like you; right?

20       A.   Yes.

21       Q.   And they were paid in gold and silver

22   coin; right?

23       A.   Yes.

24       Q.   Now, Mr. Musler, in addition to his

25   own company, worked for Wright Painting on the

1    commercial side; right?

2         A.   On all the sides.  He was actually

3    the general superintendent before I took over.

4         Q.   Okay.  So he had his own company,

5    Patch Co, Inc.; right?

6         A.   Yes, at the same time he was working

7    for -- he had his own company, he had Patch

8    Co, Inc. and at the same time he was a general

9    superintendent for Wright Painting before I

10   took over.  So he was doing both.

11        Q.   Okay.  And so he had jobs where he

12   was working as general superintendent for

13   Wright Painting and Drywall; right?

14        A.   Correct.

15        Q.   And for those jobs he and his

16   workers, just as you have described, were paid

17   in gold and silver coin?

18        A.   Yes.

19        Q.   Then he had his own company, Patch

20   Co, that also did other projects; right?

21        A.   Yes.

22        Q.   And that -- those workers were paid

23   in gold and silver coin as well?

24        A.   Yes.

25        Q.   Okay.  You mentioned -- I believe you

2:05-cr-121-DAE-RJJ - June 30, 2009

103

1   mentioned earlier this morning R W Stucco is

2   another company?

3        A.  Yes.

4        Q.  Now, this is another company in the

5   Valley that was paid in gold and silver coin?

6        A.  Yes.

7        Q.  In the manner in which you've

8   described?

9        A.  Yes.

10       Q.  And each of those individuals had the

11   option to keep their gold and silver coin as

12   payment for the labor; right?

13            MR. DAMM:  Objection.  Foundation,

14   Your Honor.

15            THE WITNESS:  Yes.

16            THE COURT:  Sustained.  You know, I

17   have to make sure you are testifying here

18   based on your own personal knowledge.  Do you

19   know that for sure, or are you just testifying

20   because you think that's what they did?  Or do

21   you know that's what they did because you know

22   it from your own personal knowledge?

23            THE WITNESS:  No.  I know it from my

24   own personal knowledge.  You know, when they

25   were doing the payroll system, you have to

2:05-cr-121-DAE-RJJ - June 30, 2009

104

1    understand I was like part of their security.

2          MR. KENNEDY:  Right.

3          THE COURT:  So the objection is

4    overruled.

5          MR. KENNEDY:  I understand that, and

6    I appreciate that.

7          THE WITNESS:  I used to strap the gun

8    on me to help with the payroll system.  And I

9    obviously witnessed these people going through

10   and them standing in the parking lot and

11   them -- and their foremans handing out like

12   envelopes -- not gold and silver -- cash.  So,

13   yes, I have witnessed a lot of this.

14         MR. KENNEDY:

15     Q.   Now, let me ask you some questions

16   about that, sir.

17     A.   Sure.

18     Q.   There was gold and silver coin on the

19   premises; right?

20     A.   Yes.

21     Q.   There was what you have referred to

22   as cash on the premises; right?

23     A.   Yes.

24     Q.   That was the Kimberly address

25   warehouse?

2:05-cr-121-DAE-RJJ - June 30, 2009

105

1      A.   Um, the Boulder Highway.  It started

2    there.

3      Q.   It started at Boulder Highway?

4      A.   It started at Boulder Highway.  And

5    then it went to Kimberly when we built the new

6    vault in Kimberly.

7      Q.   All right.  Let's start with the

8    Boulder Highway area.  Is that near Tropicana?

9      A.   Yes.

10      Q.   Okay.  So it's over in the Boulder

11   Highway-Tropicana area, during that time

12   period, you provided some security; right?

13      A.   Yes.  You know, I actually sat inside

14   the house.  The house was all boarded up, it

15   had bars.  We had a side room on the side

16   where the guys would come in for their gold

17   and silver.

18        Me and my cousin -- he isn't

19   technically my cousin.  Jorge Fernandez, you

20   know, I knew him since I was born, so our

21   whole life, we still claimed we were cousins,

22   but blood we are not.  We would sit inside

23   that house and then make sure that, you know,

24   no one would come rob us or the IRS wouldn't

25   come and, you know, break down the door.  And

2:05-cr-121-DAE-RJJ - June 30, 2009

1    we would sit inside that office for hours and

2    hours.  That was part of my job.

3        Q.  And you sat inside the office for

4    hours and hours because people were lined up.

5    And it was obvious to anyone that there was

6    payroll going on?

7            MR. DAMM:  Objection.

8            THE COURT:  Sustained.

9            THE WITNESS:  Of course.

10           MR. KENNEDY:

11       Q.  That's why you were there; right?

12           MR. DAMM:  Objection.

13           THE COURT:  Sustained.  You have this

14   habit, when I sustain an objection, to just

15   keep talking.  When I sustain an objection,

16   stop.

17           MR. KENNEDY:  All right.  I thought I

18   asked a different question.  But let's move

19   on.

20       Q.  I take it you went over to the

21   Kimberly area; right?  The Kimberly Avenue --

22       A.  Yeah.  The warehouse in Kimberly,

23   yes.

24       Q.  And also you provided security there

25   as well?

2:05-cr-121-DAE-RJJ - June 30, 2009

107

1      A.   Yes.

2      Q.   So you personally saw these

3  companies, their employees, their workers

4  going through the gold and silver process?

5      A.   Not every one of them.  Their bosses,

6  their foremans.  And some companies, their

7  bosses didn't want to do it.  Like the roofing

8  company, you know, they would send all 50 guys

9  through there individually at times.

10      Q.   Okay.  So the other businesses had

11  the option to do it in a manner that those

12  businesses, I guess, decided?

13      A.   Right.

14      Q.   Okay.  Now, with respect to the pay

15  in gold and silver coin, you are aware,

16  through some documents that you have seen

17  before, that the company kept records of the

18  amounts of gold and silver that you were paid;

19  right?

20      A.   Right.

21      Q.   Okay.  And let's just get started

22  with some of those.

23          May I approach?

24          THE COURT:  Yes.

25          MR. KENNEDY:

# EXHIBIT

# D

```
 1                   UNITED STATES DISTRICT COURT

 2                        DISTRICT OF NEVADA

 3        THE HON. DAVID A. EZRA, U.S. DISTRICT JUDGE, PRESIDING

 4

 5  UNITED STATES OF AMERICA,        )

 6                  Plaintiff,       )   Case No. 2:05-cr-121-DAE-RJJ

 7        vs.                        )   *COPY*

 8  ROBERT DAVID KAHRE, et al.       )

 9                  Defendants.      )
    _____ )

10

11

12

13

14            REPORTER'S TRANSCRIPT OF JURY TRIAL

15                        JULY 21, 2009

16

17

18

19
    APPEARANCES: (See page 2)
20

21

22

23

24  Court Reporter:  Gayle Pichierri, RPR, CRR

25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:

 3                       J. GREGORY DAMM, ESQ.
                         Assistant United States Attorney
 4                       333 Las Vegas Boulevard South
                         Suite 5000
 5                       Las Vegas, Nevada 89101
                         (702) 388-6336
 6
                         CHRISTOPHER J. MAIETTA, ESQ.
 7                       U.S. Department of Justice
                         Tax Division
 8                       P. O. Box 972
                         Washington, D.C. 20044
 9                       (202) 514-4661

10   For the Defendant Robert David Kahre:

11                       WILLIAM A. COHAN, ESQ.
                         WILLIAM A. COHAN, P.C.
12                       P. O. Box 3448
                         Rancho Santa Fe, California 92067
13                       (858) 832-1632

14   For the Defendant Robert David Kahre:
     (Local counsel)
15
                         LISA RASMUSSEN, ESQ.
16                       LAW OFFICE OF LISA RASMUSSEN
                         616 South 8th Street
17                       Las Vegas, Nevada 89101
                         (702) 461-1436
18
     For the Defendant Alexander C. Loglia:
19
                         JOEL F. HANSEN, ESQ.
20                       415 South 6th Street
                         Las Vegas, Nevada 89101
21                       (702) 385-5533

22

23   ***

24   ***

25   ***
```

2:05-CR-121-DAE-RJJ - July 21, 2009          3

```
 1   APPEARANCES:
     (Continued.)
 2
     For the Defendant Lori Kahre:
 3
                         MICHAEL J. KENNEDY, ESQ.
 4                       First Assistant Federal Defender
                         411 East Bonneville Street
 5                       Suite 250
                         Las Vegas, Nevada 89101
 6                       (702) 388-6577

 7
     For the Defendant Danille Cline:
 8
                         LYNN E. PANAGAKOS, ESQ.
 9                       345 Queen Street
                         Honolulu, Hawaii 96813
10                       (808) 521-3336

11
                         *    *    *    *    *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            --oOo--

 2                          I N D E X

 3   WITNESS                                        PAGE

 4

 5        RYAN RICKEY

 6           Direct examination by Mr. Damm          46
             Cross-examination by Mr. Kennedy       147
 7

 8

 9

10

11

12                        E X H I B I T S

13   Government's                                Received

14           1.119.1 - 1.119.767                     68

15

16

17

18

19

20

21

22

23

24

25
```

 1 amount, so it really wouldn't be a wage to them.  So this
 2 summarizes all those reimbursements.
 3 Q.  And this summary includes pages 1 through 41?
 4 A.  That's correct.
 5 Q.  And what are the total of reimbursements from January 4th of
 6 1999 through the third quarter of 2002?
 7 A.  On page 40 there is a total of $242,911.25.
 8 Q.  And then are the reimbursements also on page 40 and 41
 9 summarized by quarter?
10 A.  Yes, they're summarized by quarter.  And that total is the
11 same, $242,911.25.
12 Q.  And is this a document that Ms. Cutler will use in her
13 calculations?
14 A.  Yes.
15 Q.  Mr. Rickey, moving on to the summary under Tab 2, can you
16 tell us what that summary represents?
17 A.  Yes.  During the time period that Mr. Kahre was conducting
18 business here in Las Vegas between the time -- the years 1998
19 and 2003, there were various other contractors throughout the
20 valley that were using Mr. Kahre's payroll service through which
21 they were paying their employees in cash amounts.
22      This summary shows -- it summarizes voluminous records
23 that include invoices from Mr. Kahre's company as well as backup
24 sheets that show the total amounts that each company both paid
25 out to Mr. Kahre and the cash amounts that those companies then

1  paid out to their employees.

2          MR. COHAN:  Your Honor, I would only object to the use

3  of the term "employees" because of its being a legal conclusion.

4  They're workers.

5          THE COURT:  Well, I think the -- well, I am going to

6  sustain the objection because it is an ultimate fact for the

7  jury.  They are the ones that are going to have to decide

8  whether these were truly employees or whether they were

9  independent contractors.

10          MR. DAMM:  Your Honor, we will endeavor to use the term

11  "worker."

12          MR. COHAN:  Thank you.

13          MR. DAMM:

14  Q.  Mr. Rickey, can you take a look at the summary pages under

15  Tab 2 from -- starting at page 2 running through page 67?  And

16  can you tell us what those summary sheets represent?

17  **A.**  What this summary represents is that -- if you look at this

18  summary on the first page, on page 2, actually, these

19  companies -- and I'll start with the first one.  ABC Roofing was

20  a company that participated in Mr. Kahre's cash payroll

21  business.  They would send Mr. Kahre backup documentation

22  showing that they had workers that earned a certain amount of

23  money for that particular week.  Mr. Kahre would then or someone

24  at Mr. Kahre's business would create an invoice that would be

25  sent back to those companies showing that, hey, this is the

<u>**CERTIFICATE OF SERVICE**</u>

1.  On the 21st day of September 2011, I served the following document(s):

**REPLY IN SUPPORT OF OBJECTION TO CLAIM NO. 7
FILED BY THE INTERNAL REVENUE SERVICE AGAINST DEBTOR
BRAVO, INC. PURSUANT TO SECTIONS 105, 502(b) AND 505
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3001,
3003 AND 3007 [RE: DOCKET NO. 1377]**

2.  I served the above-named document(s) by the following means to the persons as listed below:
    *(check all that apply)*

    ■    a.    **United States mail, postage fully prepaid**
              *(List persons and addresses.  Attach additional paper if necessary)*

    <u>Attorneys for the United States of America</u>
    Daniel Bogden
    United States Attorney
    333 Las Vegas Blvd. S., Ste. 5000
    Las Vegas, NV  89101

3.  On **September 21, 2011** I served the above-named document(s) by the following means to the persons as listed below:

    *(check all that apply)*

    ■    a.    **ECF System** *(You must attach the "Notice of Electronic Filing", or list all persons and addresses and attach additional paper if necessary)*

*SEE SERVICE LIST ATTACHED*

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed on (date): September 21, 2011

<u>Sophia L. Lee</u>                              <u>            /s/ Sophia L. Lee            </u>
(Name of Declarant)                              (Signature of Declarant)

**ECF SERVICE LIST**

KEVIN N. ANDERSON on behalf of Creditor JAMES RHODES
kanderson@fabianlaw.com, sburdash@fabianlaw.com

BRETT A. AXELROD on behalf of Creditor SAGEBRUSH ENTERPRISES, INC.
baxelrod@foxrothschild.com,
pkois@foxrothschild.com;rdittrich@foxrothschild.com;msheffield@foxrothschild.com;ldupree
@foxrothschild.com

J. THOMAS BECKETT on behalf of Creditor CREDITORS COMMITTEE
ECF@parsonsbehle.com

SHIRLEY S. CHO on behalf of Debtor THE RHODES COMPANIES, LLC
scho@pszjlaw.com

JANET L. CHUBB on behalf of Creditor COMMERCE ASSOCIATES, LLC
bsalinas@armstrongteasdale.com

DAVID A. COLVIN on behalf of Creditor DANA KEPNER COMPANIES, LLC
dcolvin@maclaw.com, mwalters@maclaw.com;kgallegos@maclaw.com;tszostek@maclaw.com

NATALIE M. COX on behalf of Plaintiff EUGENE DAVIS
ncox@klnevada.com, bankruptcy@klnevada.com;kdunn@klnevada.com

THOMAS E. CROWE on behalf of Creditor SHANE SMITH
tcrowelaw@yahoo.com

DAMON K. DIAS on behalf of Creditor X-It at 215, LLC
ddias@diaslawgroup.com, bankruptcy@diaslawgroup.com

TRACY A. DIFILLIPPO on behalf of Creditor COMMERCE ASSOCIATES, LLC
tdifillippo@jonesvargas.com, enunez@jonesvargas.com

CONOR P. FLYNN on behalf of Creditor COMMERCE ASSOCIATES, LLC
cflynn@jonesvargas.com

PHILIP S. GERSON on behalf of Creditor CLARK COUNTY
banknv@rocgd.com, mburgener@rocgd.com

REW R. GOODENOW on behalf of Creditor CREDITORS COMMITTEE
ecf@parsonsbehle.com

JAMES D. GREENE on behalf of Plaintiff EUGENE DAVIS
jgreene@greeneinfusolaw.com,
fritchie@greeneinfusolaw.com;kfarney@greeneinfusolaw.com;bschmidt@greeneinfusolaw.com;

2

cwalton@greeneinfusolaw.com


KIRBY C. GRUCHOW on behalf of Creditor NEVADA POWER COMPANY
hkelley@leachjohnson.com

DAVID R HAGUE on behalf of Creditor JAMES RHODES
dhague@fabianlaw.com, dromero@fabianlaw.com

CAROL L. HARRIS on behalf of Creditor In re Kitec Fitting Litigation Class Plaintiffs
c.harris@kempjones.com, jlm@kempjones.com

RODNEY M. JEAN on behalf of Creditor Credit Suisse, Cayman Islands Branch
RJEAN@LIONELSAWYER.COM,
gbagley@lionelsawyer.com;bklsclv@lionelsawyer.com;mstow@lionelsawyer.com

ROBERT R. KINAS on behalf of Creditor CATERPILLAR FINANCIAL SERVICES
CORPORATION
rkinas@swlaw.com,
jmath@swlaw.com;mfull@swlaw.com;cdossier@swlaw.com;nbaig@swlaw.com;bgriffith@swlaw.com;nunzueta@swlaw.com;docket_las@swlaw.com

KEITH S. KNOCHEL on behalf of Creditor VALERIE SILVAS
law@lawyersinarizona.com, bank@lawyersinarizona.com

BART K. LARSEN on behalf of Creditor Reef Colonial, LLC
blarsen@klnevada.com, jierien@klnevada.com;bankruptcy@klnevada.com

ZACHARIAH LARSON on behalf of Debtor APACHE FRAMING, LLC
cshurtliff@larsonlawnv.com, sstanton@larsonlawnv.com;akosina@larsonlawnv.com

NILE LEATHAM on behalf of Creditor STEERING COMMITTEE OF SENIOR SECURED
LENDERS
nleatham@klnevada.com, ckishi@klnevada.com;bankruptcy@klnevada.com

ANNE M. LORADITCH on behalf of Creditor JAMES RHODES
aloraditch@foxrothschild.com,
pkois@foxrothschild.com;rdittrich@foxrothschild.com;msheffield@foxrothschild.com

VIRGINIA CRONAN LOWE on behalf of Creditor UNITED STATES OF AMERICA -
INTERNAL REVENUE SERVICE
virginiacronan.lowe@usdoj.gov, Western.Taxcivil@usdoj.gov

ERIC D. MADDEN on behalf of Other Prof. THE LITIGATION TRUST OF THE RHODES
COMPANIES, LLC
emadden@diamondmccarthy.com, cburrow@diamondmccarthy.com

JANIECE S MARSHALL on behalf of Creditor STANLEY CONSULTANTS, INC.
, car@amclaw.com;lom@amclaw.com;crb@amclaw.com;csh@amclaw.com

EDWARD M. MCDONALD on behalf of U.S. Trustee U.S. TRUSTEE - LV - 11
edward.m.mcdonald@usdoj.gov

SUSAN L. MYERS on behalf of Creditor Credit Suisse, Cayman Islands Branch
smyers@lacsn.org, emontes@lacsn.org;bklsclv@lionelsawyer.com

JEFFREY D. OLSTER on behalf of Creditor HARSCH INVESTMENT PROPERTIES -
NEVADA, LLC
sallade@lbbslaw.com

OMNI MANAGEMENT GROUP, LLC (bo)
bosborne@omnimgt.com, sewing@omnimgt.com

ERIC RANSAVAGE on behalf of Creditor Leslie Blasco, et al.
eransavage@ssllplaw.com, agutierrez@ssllplaw.com

JACOB J ROBERTS on behalf of Other Prof. THE LITIGATION TRUST OF THE RHODES
COMPANIES, LLC
jroberts@diamondmccarthy.com, cburrow@diamondmccarthy.com

BRIAN D. SHAPIRO on behalf of Other Prof. THE LITIGATION TRUST OF THE RHODES
COMPANIES, LLC
bshapiro@brianshapirolaw.com,
ecf@brianshapirolaw.com;brianshapiroesq@yahoo.com;bshapiro@brianshapirolaw.com;candice
@brianshapirolaw.com

SHLOMO S. SHERMAN on behalf of Interested Party REORGANIZED DEBTORS
ssherman@klnevada.com, bankruptcy@klnevada.com;bbroussard@klnevada.com

MARK R. SOMERSTEIN on behalf of Creditor WELLS FARGO BANK, N.A.
mark.somerstein@ropesgray.com

ELIZABETH E. STEPHENS on behalf of Attorney SULLIVAN HILL LEWIN REZ & ENGEL
stephens@sullivanhill.com,
calderone@sullivanhill.com;vidovich@sullivanhill.com;roberts@sullivanhill.com;hill@sullivan
hill.com;Manning@sullivanhill.com;stein@sullivanhill.com

JEFFREY R. SYLVESTER on behalf of Creditor CREDIT SUISSE, CAYMAN ISLANDS
BRANCH
jeff@sylvesterpolednak.com

TIMOTHY P. THOMAS on behalf of Creditor STEERING COMMITTEE OF SENIOR

SECURED LENDERS
, veralynn@tthomaslaw.com

U.S. TRUSTEE - LV - 11
USTPRegion17.lv.ecf@usdoj.gov

DONALD H. WILLIAMS on behalf of Creditor Westar Kitchen & Bath, LLC
DonaldHWilliamsLaw@gmail.com, taylorsellers@gmail.com

GREGORY F WILSON on behalf of Witness SANTORO, DRIGGS, WALCH, KEARNEY,
HOLLEY & THOMPSON gfwilson@wilsonquint.com, pwilson@wilsonquint.com

MICHAEL B WIXOM on behalf of Interested Party MUTUAL OF OMAHA BANK
mbw@slwlaw.com, ef@slwlaw.com

MICHAEL YODER on behalf of Other Prof. THE LITIGATION TRUST OF THE RHODES
COMPANIES, LLC
myoder@diamondmccarthy.com, cburrow@diamondmccarthy.com