Kevin N. Anderson
Nevada Bar No. 4512
David R. Hague
Nevada Bar No. 012389
FABIAN & CLENDENIN
 a Professional Corporation
215 South State Street, Suite 1200
Salt Lake City, Utah 84111-2323
Telephone:    801-531-8900
Facsimile:    801-596-2814
Email:    kanderson@fabianlaw.com
          dhague@fabianlaw.com

*Counsel for James M. Rhodes*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,<br><br>Reorganized Debtors<br><br><br>☒ Affects all Debtors<br><br>☐ Affects the following Debtors | Case No.: 09-14814-LBR<br>(Jointly Administered)<br><br>Chapter 11<br><br>**MOTION FOR RECUSAL**<br><br>Hearing Date:    _____<br>Hearing Time:    _____<br>Place:    Courtroom 1 |

James M. Rhodes ("**Rhodes**"), through counsel, respectfully moves this Court pursuant to

28 U.S.C. § 455, made applicable herein by Rule 5004 of the Federal Rules of Bankruptcy

Procedure, for entry of an order disqualifying the Honorable Linda B. Riegle, United States

Bankruptcy Judge ("**Judge Riegle**"), from presiding over any proceeding or contested matter in the above-entitled bankruptcy case.  In support hereof, Rhodes states as follows:

### FACTUAL BACKGROUND

1.      On either March 31, 2009 or April 1, 2009"", each of the debtors (collectively, the "**Debtors**") commenced with this Court a voluntary case under Chapter 11 of title 11 of the United States Bankruptcy Code"".

2.      On July 17, 2009, Rhodes filed proof of claim No. 814-33 (the "**Proof of Claim**") seeking $10,598,000 for:  (i) the reimbursement of taxes paid by Rhodes for the 2006 tax year in the amount of $9,729,151; and (ii) $868,849 advanced to Greenway Partners, LLC.   Rhodes repeatedly has informed the Court that he does not seek to collect his claim for the taxes paid from the Debtors, but merely seeks a setoff against any claims the above-captioned Reorganized Debtors (the "**Reorganized Debtors**") (through the Litigation Trust) may have against him.

3.      On May 27, 2010, the Reorganized Debtors filed an objection to the Proof of Claim.  Additionally, the Reorganized Debtors indicated that contemporaneously with the filing of their objection they were amending their schedules and statements to remove certain scheduled claims.

4.      On June 17, 2010, Rhodes filed an opposition to the objection in the bankruptcy case.

5.      Throughout the consideration of the Reorganized Debtors' objection, Judge Riegle has shown open and blatant animosity towards Rhodes and his business practices and has exhibited clear one-sidedness.  Indeed, at the November 4, 2010 hearing on the Reorganized Debtors' objection to the Proof of Claim, and without any adversary proceeding having ever been

commenced against Rhodes, Judge Riegle implied that Rhodes had defrauded creditors and it was improper for him to have accepted certain distributions from the Debtors at a time when he controlled those entities:

> THE COURT:  – and I'm not sure what legal or relevance this has.  This was income that was passed through, at a time when creditors were being – were not being paid, correct?
>
> MR. QURESHI:  I believe that is correct.
>
> THE COURT:  And so we have millions of creditors who weren't paid – well, the 23 million was passed through to him.
>
> MR. QURESHI:  That's correct.

(November 4, 2010 Hearing Transcript at 4:11–19, attached hereto as "**Exhibit A**").

6.    Later in the same hearing, Judge Riegle openly suggested that Rhodes conduct constituted a breach of fiduciary duty, even though that hearing had nothing to do with Rhodes' alleged conduct with respect to the Debtors and, again, no adversary proceeding had been commenced:

> THE COURT:  Well, doesn't that also raise issues of his breach of fiduciary duty?

(November 4, 2010 Hearing Transcript at 16:14–15, Ex. A).

> THE COURT:  So you would say that he would knowingly breach his fiduciary duty, in order to give himself this payment.
>
> MR. ANDERSON:  How does he breach a fiduciary duty when he owns a hundred percent of Sage Brush. Sage Brush –
>
> THE COURT:  When creditors aren't paid.
>
> MR. ANDERSON:  Well, what fiduciary duty does he have to creditors?
>
> THE COURT:  A deepening insolvency.

(November 4, 2010 Hearing Transcript at 20:24–21:7, Ex. A).

3

7. Similarly, at the September 27, 2011 hearing, and again without any adversary proceeding having been commenced against Rhodes, Judge Riegle suggested that Rhodes had somehow acted improperly when several of his entities filed for bankruptcy but he did not file personally:

> THE COURT:  There are a number of entities that did not file bankruptcy that Mr. Rhodes held.
>
> MR. HAGUE:  That –
>
> THE COURT:  And Mr. Rhodes –
>
> MR. HAGUE:  That's correct.
>
> THE COURT:  – indeed, did not file bankruptcy himself.
>
> MR. HAGUE:  That's correct, your Honor.

(September 27, 2011 Hearing Transcript at 38:16–24, attached hereto as "**Exhibit B**").

8. Yet again, at the September 27, 2011 hearing, Judge Riegle's comments did little to hide her unreserved bias and animosity towards Rhodes and his business practices. Repeatedly, Judge Riegle implied that Rhodes was motivated by greed and "cheat[ed]" or otherwise "sneakily" operated his businesses because he "want[ed] even more money":

> THE COURT:  Why isn't it a gift?
>
> MR. HAGUE:  Because they did services for the debtor.
>
> THE COURT:  He can make a gift.  It's his companies.
>
> MR. HAGUE:  Yeah.  But that's not what he has stated in his declaration, so we now know there's not a gift.  These are facts.  These are facts –
>
> THE COURT:  Well, sure.  After the fact, he does it.
>
> MR. HAGUE:  No.  This happens as he goes through.  That's why he has already

4

been reimbursed 1.2 million.

THE COURT:  And he wants even more money.

MR. HAGUE:  He wants what he paid out, your Honor.

THE COURT:  He wants even more money.

MR. HAGUE:  Your Honor, you may not like the situation.  I understand that, but I'm just telling you what we have submitted and what they have failed –

THE COURT:  After he –

MR. HAGUE:  – to even rebut.

THE COURT:  – sneakily –

MR. HAGUE:  I'm sorry?

THE COURT:  After he goes around his own company to pay these people –

MR. HAGUE:  Your Honor –

THE COURT:  – how is that equity?

MR. HAGUE:  Your Honor, he was –

THE COURT:  How does he have clean hands?

MR. HAGUE:  He was the –

THE COURT:  You're asking for equity.  How does he have clean hands?

MR. HAGUE:  Well, I'm not even necessarily – I'm asking for more than equity.  I'm asking for something that's just built into a contract pretty much and performance.

THE COURT:  Why didn't he write –

MR. HAGUE:  Now, you're asking –

THE COURT:  – a contract?

MR. HAGUE:  I'm sorry?

THE COURT:  Why didn't he do a contract?

MR. HAGUE:  Why did he need to do a contract if there was performance? You're asking that why they did this around his companies.

Your Honor, he was the companies.  He was the nondebtor.  He was the debtor. He was the CEO.  And as the CEO and the director and the sole shareholder, he has 100-percent right to be able to say this is the type of arrangement we're going to do.

I'm going to employ you, but guess what?  There's a whole bunch of other folks in this office –

THE COURT:  I want to cheat.

MR. HAGUE:  There's a whole bunch of other folks in this office who are going to want to cheat up their amount that they're owed.

They're going to come and say, hey, what about us.  We just found out he's making this amount of money through his W-2, so what does he do because – give you an example.  Chris Stephens, he was in charge –

THE COURT:  So he chooses –

MR. HAGUE:  – of entitlements.

THE COURT:  – to employ them on his own.

MR. HAGUE:  So he chooses to pay them on his own for the work they were doing for the debtors –

THE COURT:  Which helped him as well.

MR. HAGUE:  – which helped the debtors.

THE COURT:  Which helped him.

MR. HAGUE:  I guess if you're saying they're one economic unit, and he is benefiting the exact same way the debtors are.

(September 27, 2011 Hearing Transcript at 40:11–42:25 (emphasis added), Ex. B).

9.      At one point during the September 27, 2011 hearing, Judge Riegle went so far as to act as an advocate for the Litigation Trust.  Judge Riegle suggested Rhodes would be liable for fraudulent conveyance.  Indeed, she invited the opposing counsel to ***amend*** their lawsuit (even though <u>no</u> lawsuit has been filed) to include such a claim:

> THE COURT:   And if you intend to amend your lawsuit for a fraudulent conveyance of what he's paid back, already, <u>do it</u>.   <u>I mean, maybe what he was paid already is a fraudulent conveyance.  I don't see why it wouldn't be.</u>

(September 27, 2011 Hearing Transcript at 58:7–10, Ex. B) (emphasis added)).

10.      Most recently, at the October 5, 2011 hearing, Judge Riegle again showed her disdain for Rhodes and implied his business practices were inappropriate:

> THE COURT:  Okay.  So he doesn't control – how do we know what entities he even controls?
>
> MR. ANDERSON:  Well, the –
>
> THE COURT:  He's kind of kept all that quiet.

(October 5, 2011 Hearing Transcript at 12:6–9, attached hereto as Ex. C).

> THE COURT:  We already know that Mr. Rhodes kind of led a slipshod way of doing business.  We have in the proof-of-claim process.  He is claiming he should be reimbursed for paying a third party because he wanted to keep it off the books.
>
> All these kinds of transactions deserve investigation in other contexts as well.  We know he didn't care much about his books and records from the way he did his business.

(October 5, 2011 Hearing Transcript at 21:13–19, Ex. C).

## **ARGUMENT**

**I.    JUDGE RIEGLE SHOULD RECUSE HERSELF FROM ANY PROCEEDINGS IN THE ABOVE-ENTITLED CASE BECAUSE HER CLEAR SHOWING OF DISDAIN AND ANIMOSITY TOWARDS RHODES AND HIS BUSINESS PRACTICES DEMONSTRATE SHE IS UNABLE TO ACT IMPARTIALLY.**

Judge Riegle should recuse herself from any further proceedings in the above-entitled case because her improper statements show hostility towards Rhodes and may lead a reasonable person to question her impartiality.  Pursuant to 28 U.S.C. § 455(a), made applicable herein by Rule 5004 of the Federal Rules of Bankruptcy Procedure, a bankruptcy judge "shall disqualify [herself] in any proceeding in which [her] impartiality might reasonably be questioned."  *Id*. (Emphasis added).  Section 455(a) is a "catchall" recusal provision that covers both "interest or relationship" and "bias or prejudice" grounds, "but require[s] them *all* to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994) (emphasis in original).  Accordingly, 28 U.S.C. § 455 imposes an affirmative duty upon judges to recuse themselves when "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."  *United States v. Hernandez,* 109 F.3d 1450, 1453 (9th Cir. 1997) (internal quotation marks and citations omitted); *Yagman v. Republic Ins.,* 987 F.2d 622, 626 (9th Cir. 1993) (citations and internal quotation marks omitted).  Indeed, "a judge's participation in a case must never reach the point where it appears, or is even perceived to appear, that the judge is aligned with any party in the pending litigation."  *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 166 (3d Cir. 1993) (emphasis added).

To that end, if a judge has any question about the propriety of sitting in a particular case, the judge should exercise her discretion in favor of disqualification.  *See Nichols v. Alley*, 71 F.3d

347, 352 (10th Cir. 1995); *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir.1993).  While beliefs or opinions that merit recusal generally involve an extrajudicial factor, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings may constitute a basis for bias or partiality if "they display a deep-seated favoritism or antagonism that would make fair judgment impossible."  *Liteky*, 510 U.S. at 555.

In *Fairley v. Andrews*, 423 F. Supp. 2d 800 (N. D. Ill. 2006), the court found recusal was appropriate under 28 U.S.C. § 455(a) when a judge made statements that, when considered together, "may give pause to a non-legal observer, not versed in the ways of the courtroom and the risks of litigation."  *Id.* at 821.  The judge in question made statements regarding public corruption and the governmental defendants' obstinate refusal to consider settlement in an inmate abuse case.  *Id.*  The judge repeatedly accused the defense counsel of wasting public money by refusing to settle.  *Id.*  In its analysis, the court noted that there was no extrajudicial source of bias and that, when viewed in the proper context, the judge's individual statements did not warrant recusal.  *Id.*  Regardless, the court found that, when considered together, especially in the wider context of the court's negative interactions with defendants' counsel, a reasonable person may question the judge's impartiality and, therefore, recusal was required.  *Id.*

Here, like in *Fairley*, Judge Riegle has made several improper and completely unsubstantiated statements that undoubtedly throw her impartiality into question.  Judge Riegle has repeatedly suggested that Rhodes has committed fraud and breached his fiduciary duties.  Indeed, Judge Riegle has described Rhodes as a "cheat" motivated by greed who "sneakily" operated his businesses in an effort to get "even more money."  These improper statements have been made in a proof of claim proceeding.  No litigation has even been commenced against

Rhodes.  From the outset, Judge Riegle has made it clear that Rhodes and his business practices are repugnant to her.  Judge Riegle has repeatedly made comments that Rhodes has "taken" payments from the Debtors and improperly remained out of personal bankruptcy while the Debtors did not.  She has even gone so far as to suggest that opposing counsel add additional claims against Rhodes for fraudulent conveyance and indicated that such claims would most likely prevail, even though no adversary proceeding has ever been commenced against Rhodes.  There is no question that any reasonable person—especially a non-legal observer—might question Judge Riegle's impartiality.  And if there were ever a case where a judge was aligned with a party and displayed a deep-seated favoritism or antagonism that would make fair judgment impossible, it is this Bankruptcy Case.

Furthermore, even if Judge Riegle has no actual bias or prejudice towards Rhodes, which is certainly questionable in light of her repeated and baseless comments, the standard for recusal is simply whether a reasonable person could question her impartiality.  *Hernandez,* 109 F.3d at 1453.  This standard is clearly met.  Moreover, if there is any question, which there clearly is, the balance tips in favor of disqualification.  *Nichols*, 71 F.3d at 352.  As in *Fairely*, Judge Riegle's comments, when taken together, would give any reasonable person cause to question her impartially.  Accordingly, to maintain the Court's integrity, Judge Riegle should be disqualified from any proceedings in the above-entitled case.

## **CONCLUSION**

For the reasons stated above, Rhodes respectfully requests that the Court enter an order disqualifying Judge Riegle from presiding over any proceeding or contested matter in the above-entitled bankruptcy case.

DATED this 14th day of November, 2011.

/s/ David R. Hague

Kevin N. Anderson
David R. Hague
FABIAN & CLENDENIN
*Attorneys for James M. Rhodes*

1

## CERTIFICATE OF SERVICE

2

3          I hereby certify that on the 14th day of November, 2011, I caused the foregoing document

4    to be filed electronically via the electronic filing system of the United States Bankruptcy Court

5    for the District of Nevada, which caused a true and correct copy of the foregoing to thereafter be

6    served electronically via the Bankruptcy Court's ECF noticing system upon those parties

7    registered to receive electronic service in this case.

8

9                                          /s/ David R. Hague

10

11

12    4833-3448-0653, v.  2

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEVADA

```
                                        )
In re:                                  )
                                        )
THE RHODES COMPANIES, LLC      CH: 11   )    09-14814-LBR
                                        )
CONTINUED STATUS HEARING RE: OBJECTION  )
TO JAMES RHODES' PROOF OF CLAIM NO.     )
814-33 AND AMENDMENT OF SCHEDULES OF    )
ASSETS AND LIABILITIES FILED BY NILE    )
LEATHAM ON BEHALF OF REORGANIZED        )
DEBTORS                                 )
```

U.S. Bankruptcy Court
300 Las Vegas Boulevard South
Las Vegas, Nevada 89101

November 4, 2010
9:35 a.m.

BEFORE THE HONORABLE LINDA B. RIEGLE, Judge

APPEARANCES:

For The Reorganized Debtors:    Abid Qureshi
                                AKIN, GUMP STRAUSS HAUER & FELD,
                                LLP
                                One Bryant Park
                                New York, New York 10036-6745


For James Rhodes:               Kevin N. Anderson
                                FABIAN & CLENDENIN
                                215 S. State Street, Suite 1200
                                Salt Lake City, Utah 84111-2323


For The Rhodes Companies,       Zachariah Larson
LLC:                            LARSON & STEPHENS
                                810 S. Casino Center Blvd., #104
                                Las Vegas, Nevada 89101-6719


Proceedings recorded by electronic sound technician, Patricia
Lilly; transcript produced by AVTranz.

1   more, nor less, than an enforceable obligation."  And that

2   citation is 537 US 293 F. 303.

3          And so, Your Honor, the question here, the burden on

4   Mr. Rhodes, is to demonstrate that a debtor entity has an

5   enforceable obligation to reimburse Mr. Rhodes for a tax

6   payment that he made, on account of taxable income that was

7   passed through to him through the corporate structure of LLCs

8   and partnerships.

9          THE COURT:  Now this is an aside --

10         MR. QURESHI:  Yeah.

11         THE COURT:  -- and I'm not sure what legal or

12  relevance this has.  This was income that was passed through,

13  at a time when creditors were being -- were not being paid,

14  correct?

15         MR. QURESHI:  I believe that is correct.

16         THE COURT:  And so we have millions of creditors who

17  weren't paid -- well, the 23 million was passed through to him.

18         MR. QURESHI:  That's correct.

19         So, Your Honor, before -- Mr. Rhodes advances three

20  principle arguments, as to why he's entitled to this claim.

21  First, he says that there's an equitable right, as a result of

22  a course of conduct that existed between Mr. Rhodes and various

23  of these -- of these entities.  Second, he argues that the

24  governing documents of these LLCs and these partnerships

25  entitle him to this claim.  And third, he points to a provision

1    THE COURT:  You're relying on a decision.  Why don't

2  I have anything -- you know, okay, he's talking to himself, but

3  you still have to go through procedures, to make a decision.

4  Why don't I have that?

5    MR. ANDERSON:  I believe that's in Mr. Rhodes's

6  declaration, that that was the purpose for that entry.  I don't

7  think anybody opposes the fact that that was for the purpose.

8  In fact, I'll have to check our stipulated facts,

9  acknowledge -- well, that just that it contains the ledger, the

10  ledger entry was all that was stipulated to.  But it is in the

11  exact amount that we're claiming, and you know, those facts --

12  you know, that now gets into the factual process of the

13  decision of making that.

14    THE COURT:  Well, doesn't that also raise issues of

15  his breach of fiduciary duty?

16    MR. ANDERSON:  It absolutely could, but I -- but, you

17  know, that's not an issue for this, on the legal issue of

18  whether or not he is entitled to pursue this claim, and we can

19  get into factual issues about whether he breached his fiduciary

20  duty in doing that.  You know, our statement -- version of the

21  facts and understanding of the facts is that this was a

22  practice that was allowed, that had been previously done, that

23  Mr. Rhodes had relied on, and that was approved by the

24  necessary entities, however --

25    THE COURT:  Where is that, in the affidavit?

Case 09-14814-gwz   Doc 1598   Entered 11/24/11 15:34:17   Page 17 of 30
Case 09-14814-gwz   Doc 1329   Entered 11/24/10 15:48:36   Page 20 of 32

20

1    reorganized debtors, that the governing documents would

2    control.  If it is not allowed, under the governing documents,

3    if it is an improper payment, then no, that would not be a

4    viable course of conduct.

5         What we have here are permissive governing documents.

6    They don't disallow it, they don't say you can't do it, they

7    say you can do it.  They don't say that you have to do it.  But

8    they say that you can.  And the fact that they did, as

9    reflected on the books and records, is all the we need, to

10   establish a -- you know, disputed, unliquid -- you know,

11   equitable claim at this point.

12        I acknowledge that we have a bit of an uphill road,

13   in terms of evidence and proof, but I believe that we can meet

14   those, based on the past practice, and when we dive into the

15   events -- you know, that happened on March 31st, when that was

16   recorded on the books and records, and what everybody's

17   understanding was.  You know, understanding, you know, as the

18   Court just did, it would essentially be Mr. Rhodes talking to

19   himself.

20        You know, I would assert the premise, you know, here,

21   for purposes of argument, that the fact that even in his own

22   mind, as the controlling -- the person who controlled Sage

23   Brush, which --

24        THE COURT:  So you would say that he would knowingly

25   breach his fiduciary duty, in order to give himself this

Case 09-14814-gwz   Doc 1598   Entered 11/24/11 15:34:17   Page 18 of 30
Case 09-14814-gwz   Doc 1529   Entered 11/24/10 15:48:36   Page 24 of 32

21

1 payment.

2      MR. ANDERSON:  How does he breach a fiduciary duty

3 when he owns a hundred percent of Sage Brush.  Sage Brush --

4      THE COURT:  When creditors aren't paid.

5      MR. ANDERSON:  Well, what fiduciary duty does he have

6 to creditors?

7      THE COURT:  A deepening insolvency.

8      MR. ANDERSON:  Well, you know, that -- then you have

9 questions of maybe fraudulent conveyance.  But nothing was

10 conveyed here.  Just this obligation.  We're not trying to get

11 the money away from anybody.

12      THE COURT:  Well, he was then.  You've just now

13 changed your mind and said you want it merely as an offset.

14      MR. ANDERSON:  Yeah.  Well, he --

15      THE COURT:  If he filed his claim and he wanted a

16 claim, he wasn't seeking as an offset.  He was seeking to be

17 paid the money.

18      MR. ANDERSON:  But -- I mean he paid the money out

19 and he felt he was entitled to it, because -- based on past

20 practices.  And it was something that was allowed.  The

21 reorganized debtor, you know, in their prior life, as the

22 creditors, also permitted this, in the credit agreement.  They

23 didn't prohibit it.  If it was something that so offends them,

24 that he would do this, whether it's at the -- the minute before

25 he files for bankruptcy or if it was a year before he filed for

# EXHIBIT B

1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF NEVADA

3   LAS VEGAS, NEVADA

4   In re:  THE RHODES COMPANIES,     )  E-Filed:  10/04/11
        LLC,                          )
5                                     )
                Debtor.               )  Case No.
6                                     )  BK-S-09-14814-LBR
        _____)  Chapter 11
7

8

9

10

11                  TRANSCRIPT OF PROCEEDINGS
                             OF
12                   HEARING RE: MOTIONS
                          VOLUME 1
13          BEFORE THE HONORABLE LINDA B. RIEGLE
                UNITED STATES BANKRUPTCY JUDGE
14
                 Tuesday, September 27, 2011
15
                       10:30 a.m.
16

17

18

19

20

21

22

23   Court Recorder:        Deborah Hemstreet

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

38

1    employees of the debtors.

2         This was shown by the W-2s that we have submitted.

3    They're attached to Mr. Rhodes' declaration that show that

4    these were debtor employees.

5         In his declaration, he says, "In order to avoid a

6    disruption in the office, I made these payments to them on the

7    side."

8         I submitted a declaration today which has been stricken

9    that says the same, but that is the arrangement that he had,

10   and there are payments that have come back in to Mr. Rhodes to

11   show and to account for these.

12        Now, on the Greenway one, he wasn't paid about $800,000

13   for these payments, but I have set forth --

14             THE COURT:  Now, Mr. --

15             MR. HAGUE:  -- with this Court --

16             THE COURT:  There are a number of entities that did

17   not file bankruptcy that Mr. Rhodes held.

18             MR. HAGUE:  That --

19             THE COURT:  And Mr. Rhodes --

20             MR. HAGUE:  That's correct.

21             THE COURT:  -- indeed, did not file bankruptcy

22   himself.

23             MR. HAGUE:  That's correct, your Honor.

24             THE COURT:  Okay.

25             MR. HAGUE:  That's correct.  But my point is is that

1    these were employed by debtor entities.  Coyne, Chin, Stephens,

2    and Hansen (phonetic) were all employed by debtor entities.

3        And I don't know what else we can show this Court other

4    than through declarations that haven't been challenged, through

5    W-2s that haven't been challenged, through checks that haven't

6    been challenged, and through wires that haven't been challenged

7    that are coming from Rhodes accounts --

8            THE COURT:  Why couldn't it --

9            MR. HAGUE:  -- to these individuals.

10            THE COURT:  -- have been a capital contribution, in

11    essence?

12            MR. HAGUE:  Why could what?

13            THE COURT:  Why wasn't it, in essence, a capital

14    contribution?

15            MR. HAGUE:  Well, Rhodes was entitled to a

16    distribution of 2.5 million under the credit agreement, and

17    that's oftentimes how it would work.

18        If he made payments to these individuals, then they would

19    go ahead and subtract what he was owed at the end of the year

20    under this 2.5-million-dollar distribution, but the books show

21    that he did not receive a distribution up to this amount.

22        Now, he paid over $2,000,000 worth of wages to these

23    individuals and was reimbursed about 1.2 million, but that's

24    the arrangement they had in the office.

25        And they keep talking about no agreement and no contract.

1    Well, there was performance.  These individuals worked for

2    several years.

3         It's in Mr. Huygens' declaration.  It's in Mr. Rhodes'

4    declaration, and no one has done anything to rebut that

5    testimony.  I mean, talk about, you know, genuine issues of

6    material fact.

7         If these were employees of the debtor which no one has

8    fought about and if, in fact, he made these payments to them

9    outside out of his own pocket, then he is entitled to

10   reimbursement.

11             THE COURT:  Why isn't it a gift?

12             MR. HAGUE:  Because they did services for the debtor.

13             THE COURT:  He can make a gift.  It's his companies.

14             MR. HAGUE:  Yeah.  But that's not what he has stated

15   in his declaration, so we now know there's not a gift.  These

16   are facts.  These are facts --

17             THE COURT:  Well, sure.  After the fact, he does it.

18             MR. HAGUE:  No.  This happens as he goes through.

19   That's why he has already been reimbursed 1.2 million.

20             THE COURT:  And he wants even more money.

21             MR. HAGUE:  He wants what he paid out, your Honor.

22             THE COURT:  He wants even more money.

23             MR. HAGUE:  Your Honor, you may not like the

24   situation.  I understand that, but I'm just telling you what we

25   have submitted and what they have failed --

```
 1                    THE COURT:  After he --

 2                    MR. HAGUE:  -- to even rebut.

 3                    THE COURT:  -- sneakily --

 4                    MR. HAGUE:  I'm sorry?

 5                    THE COURT:  After he goes around his own company to

 6      pay these people --

 7                    MR. HAGUE:  Your Honor --

 8                    THE COURT:  -- how is that equity?

 9                    MR. HAGUE:  Your Honor, he was --

10                    THE COURT:  How does he have clean hands?

11                    MR. HAGUE:  He was the --

12                    THE COURT:  You're asking for equity.  How does he

13      have clean hands?

14                    MR. HAGUE:  Well, I'm not even necessarily -- I'm

15      asking for more than equity.  I'm asking for something that's

16      just built into a contract pretty much and performance.

17                    THE COURT:  Why didn't he write --

18                    MR. HAGUE:  Now, you're asking --

19                    THE COURT:  -- a contract?

20                    MR. HAGUE:  I'm sorry?

21                    THE COURT:  Why didn't he do a contract?

22                    MR. HAGUE:  Why did he need to do a contract if there

23      was performance?  You're asking that why they did this around

24      his companies.

25            Your Honor, he was the companies.  He was the nondebtor.
```

1    He was the debtor.  He was the CEO.  And as the CEO and the

2    director and the sole shareholder, he has 100-percent right to

3    be able to say this is the type of arrangement we're going to

4    do.

5        I'm going to employ you, but guess what?  There's a whole

6    bunch of other folks in this office --

7              THE COURT:  I want to cheat.

8              MR. HAGUE:  There's a whole bunch of other folks in

9    this office who are going to want to cheat up their amount that

10   they're owed.

11       They're going to come and say, hey, what about us.  We

12   just found out he's making this amount of money through his

13   W-2, so what does he do because -- give you an example.

14       Chris Stephens, he was in charge --

15             THE COURT:  So he chooses --

16             MR. HAGUE:  -- of entitlements.

17             THE COURT:  -- to employ them on his own.

18             MR. HAGUE:  So he chooses to pay them on his own for

19   the work they were doing for the debtors --

20             THE COURT:  Which helped him as well.

21             MR. HAGUE:  -- which helped the debtors.

22             THE COURT:  Which helped him.

23             MR. HAGUE:  I guess if you're saying they're one

24   economic unit, and he is benefiting the exact same way the

25   debtors are.

1    two issues, the Greenway -- three, Greenway, the Rhodes

2    compensation, and the litigation expenses.

3        We can bifurcate it as to amount, well, and I guess that

4    doesn't make any sense.  We need to have it at the same time to

5    know if there was a contract to what extent, if at all, is the

6    estate responsible.

7        And if you intend to amend your lawsuit for a fraudulent

8    conveyance of what he's paid back, already, do it.  I mean,

9    maybe what he was paid already is a fraudulent conveyance.  I

10   don't see why it wouldn't be.

11            MS. LAHAIE:  Your Honor, if I could just ask for one

12   point of clarification also with respect to the Pinnacle claim?

13   You sustained the debtor's --

14            THE COURT:  Sustained the objection.

15            MS. LAHAIE:  And just to be clear as to procedurally

16   what happened then, we had sought relief, just stricken that

17   from our schedules.

18        My understanding is that once that happens and

19   (indiscernible) do that the Rhodes entities would then have

20   30 days to file a proof of claim.  I don't know to what extent

21   we can try to end run that process.

22            THE COURT:  I just find there's no merit to the

23   Pinnacle claim.

24            MS. LAHAIE:  Okay.

25            MR. HAGUE:  Your Honor, we would not file a proof of

# EXHIBIT C

1          UNITED STATES BANKRUPTCY COURT

2             DISTRICT OF NEVADA

3             LAS VEGAS, NEVADA

4    In re:  THE RHODES COMPANIES,    )  E-Filed:  10/21/11
     LLC,                            )
5                                     )
                Debtor.              )  Case No.
6                                     )  BK-S-09-14814-LBR
     _____)  Chapter 11
7

8

9

10

11          TRANSCRIPT OF PROCEEDINGS
                      OF
12          HEARING RE: MOTIONS
                   VOLUME 1
13   BEFORE THE HONORABLE LINDA B. RIEGLE
          UNITED STATES BANKRUPTCY JUDGE
14

          Wednesday, October 5, 2011
15

               9:30 a.m.
16

17

18

19

20

21

22

23   Court Recorder:        Deborah Hemstreet

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

```
1              THE COURT:  To object vis-a-vis him.
2              MR. ANDERSON:  Vis-a-vis him --
3              THE COURT:  Okay.
4              MR. ANDERSON:  -- And vis-a-vis the entities, the
5    nondebtor entities, that he controls.
6              THE COURT:  Okay.  So he doesn't control -- how do we
7    know what entities he even controls?
8              MR. ANDERSON:  Well, the --
9              THE COURT:  He's kind of kept all that quiet.
10             MR. ANDERSON:  Well, the reorganized debtors and the
11   Litigation Trust are well-aware of it.  They've listed them
12   all.
13        Anyway, I think it's fairly clear that these subpoenas
14   are designed to assist in the litigation as an improper
15   purpose.
16        And I think that the Litigation Trust has acknowledged in
17   numerous conversations with at least several of the recipients
18   of these that they are extremely overbroad.  And at a minimum,
19   this Court needs to have them reign these in.
20        I asked Mr. Yoder on the telephone call.  Supposedly,
21   they have specific transactions that they are concerned
22   about.
23        Mr. Roberts' declaration does not identify them.  He just
24   has conclusions about things that appear to be or that may have
25   happened.
```

1    litigation from time to time.

2         Is it the smartest way that the Trust should make

3    discovery?  I don't know.  That's not my business, but it is a

4    legitimate way.

5         And it's true while an action is pending that a 2004

6    should not be used it's not yet, and to suggest that a 2004

7    isn't appropriate where you're going to lead to litigation is

8    nonsense because that's the whole point.

9         You do a 2004 to see whether or not there are fraudulent

10   conveyances, to see whether or not there are transfers that

11   should be set aside, to see whether or not third parties have

12   assets of the debtor.

13        We already know that Mr. Rhodes kind of led a slipshod way

14   of doing business.  We have in the proof-of-claim process.  He

15   is claiming he should be reimbursed for paying a third party

16   because he wanted to keep it off the books.

17        All these kinds of transactions deserve investigation in

18   other contexts as well.  We know he didn't care much about his

19   books and records from the way he did his business.

20        And, also, it's not the debtor's place to say this

21   subpoena is burdensome.  The persons who are subpoenaed are

22   perfectly able to do that.

23        Secondly and finally, there was not a good-faith attempt

24   to try and resolve this.  It's just Jim Rhodes saying no and

25   counsel taking no for an attitude, and I'm not going to