1    Kevin N. Anderson
     Nevada Bar No. 4512
2    David R. Hague
     Nevada Bar No. 012389
3    **FABIAN & CLENDENIN**
     a Professional Corporation
4    215 South State Street, Suite 1200
     Salt Lake City, Utah 84111-2323
5    Telephone:    801-531-8900
     Facsimile:     801-596-2814
6
     Email:      kanderson@fabianlaw.com
7               dhague@fabianlaw.com

8
     *Counsel for James M. Rhodes*
9

10                   **UNITED STATES BANKRUPTCY COURT**

11                       **DISTRICT OF NEVADA**

| | |
|---|---|
| 12   In re: | Case No.: 09-14814-LBR |
| 13   THE RHODES COMPANIES, LLC, aka | (Jointly Administered) |
| 14   "Rhodes Homes," et al., | Chapter 11 |
| 15                 Reorganized Debtors | **JAMES M. RHODES'** |
| 16 | **SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THE GREENWAY PARTNERS CLAIM, THE COMPENSATION CLAIM AND THE SEDORA CLAIM** |
| 17 | |
| 18   ☒ Affects all Debtors | Hearing Date:    December 5, 2011 |
| 19   ☐ Affects the following Debtors | Hearing Time:   9:30 a.m.<br>Place:         Courtroom 1 |
| 20 | |

21       James M. Rhodes ("**Rhodes**"), through counsel, respectfully submits this *Supplemental*

22 *Memorandum of Law in Support of the Greenway Partners Claim, the Compensation Claim and*

23 *the Sedora Claim.* In support hereof, Rhodes states as follows:

24

25

26

**PROCEDURAL BACKGROUND**

1.      On either March 31, 2009 or April 1, 2009 (collectively, the "**Petition Date**"), each of the debtors (collectively, the "**Debtors**") commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.

2.      On April 30, 2009, each of the Debtors filed their schedules of assets and liabilities (the "**Schedules**").  The Schedules were subsequently amended on July 2, 2009 and again on January 20, 2010 (the "**Amended Schedules**").

3.      The Schedules and Amended Schedules reflect that Rhodes and certain of his affiliated entities are scheduled as having the following claims against the Debtors: (1) Rhodes Home Arizona's obligation to reimburse Rhodes for compensation to Chris Stephens and Jacob Hanson ($151,999.01) (the "**Compensation Claim**"); (2) Pinnacle Grading, LLC's obligation to make certain rental payments to Pinnacle Equipment Rental, LLC ($557,302.09) (the "**Pinnacle Equipment Claim**"); and (3) Heritage Land Company's obligation to reimburse Sedora Holdings, LLC for its payment of certain litigation expenses ($167,901.86) (the "**Sedora Claim**") (collectively, the "**Scheduled Claims**").

4.      On July 17, 2009, Rhodes filed proof of claim No. 814-33 (the "**Proof of Claim**") seeking $10,598,000 for:  (i) the reimbursement of taxes paid by Rhodes for the 2006 tax year in the amount of $9,729,151 (the "**Tax Claim**"); and (ii) $868,849 advanced to Greenway Partners, LLC (the "**Greenway Partners Claim**").

5.      On May 27, 2010, the above-captioned reorganized debtors (collectively, the "**Reorganized Debtors**") filed an objection (the "**Objection**") in the Bankruptcy Case to the Proof of Claim.  Additionally, the Reorganized Debtors indicated that contemporaneously with the filing of their Objection they were amending their schedules and statements to remove the Scheduled Claims, post-confirmation and post-effective date.

6.      On June 17, 2010, Rhodes filed an opposition (the "**Opposition**") to the Objection in the Bankruptcy Case.

7.    On November 4, 2010, the Court held a hearing on the Objection to the Tax Claim.

8.    On November 16, 2010, the Court entered its *Order Sustaining Reorganized Debtors' Objection to James Rhodes' Entitlement to the Tax Claim Found in Proof of Claim No. 814-33* (the "**Order**").

9.    On August 2, 2011, the Court held a hearing regarding the Reorganized Debtors' objection to the Greenway Partners Claim and continued the hearing with respect to the Scheduled Claims.

10.    On September 27, 2011, this Court heard further arguments with respect to the Greenway Partners Claim and initial arguments regarding the Scheduled Claims. The Court sustained the Reorganized Debtors' objection to the Pinnacle Equipment Claim.

11.    Regarding the Greenway Partners Claim, the Compensation Claim and the Sedora Claim, the Court held that a material issue of fact remains with respect to whether or not there was a course of conduct sufficient to establish the existence of a contract between the parties.

12.    On October 13, 2011, the Parties filed a scheduling order stipulating that the evidentiary hearing with respect to the Greenway Partners Claim, the Compensation Claim and the Sedora Claim had been scheduled for December 5, 2011 at 9:30 a.m.

13.    On November 15, 2011, the Court entered an order regarding the schedule with respect to pre-trial submissions, depositions, and briefing.

## FACTS RELEVANT TO THE GREENWAY PARTNERS CLAIM, THE COMPENSATION CLAIM AND THE SEDORA CLAIM

### The Greenway Partners Claim

14.    Greenway Partners is a Nevada limited liability company that is or was owned by Frederick Chin and James Coyne. (*See Declaration of James M. Rhodes in Support of Opposition to Reorganized Debtors' Objection to James Rhodes' Proof of Claim No. 814-33 and Notice of*

*Amendment of Schedules of Assets and Liabilities*, ¶ 8, dated June 17, 2010 [Doc. No. 1177] (the "**Rhodes Declaration**")).

15.    Rhodes personally paid a portion of the salaries owed to Chin, Coyne and another employee named Chris Stephens at the direction of the Debtors in order to avoid a disruptive conflict in the offices related to the amount of compensation negotiated.  (Rhodes Declaration, at ¶ 8).

16.    Chin was employed as Chief Operating Officer by the Debtors pre-petition from Spring 2004 through Spring 2007.  Coyne was employed by the Debtors pre-petition from Spring 2004 through late Fall 2007.  Stephens was employed by the Debtors pre-petition from mid-2006 through mid-2008.  (Rhodes Declaration, at ¶ 8).

17.    Rhodes was directed by the Debtors to make some of these payments to Chin's and Coyne's company, Greenway Partners.  The outside compensation that Rhodes advanced, and for which he has not received reimbursement, totals approximately $868,849.00.  (Rhodes Declaration, at ¶ 6).

**The Compensation Claim**

18.    The amount of $151,999.01 scheduled by Rhodes Home Arizona represents a portion of the salaries Rhodes paid, at the direction of the Debtors, to Chris Stephens and Jacob Hanson and is set forth in the pre-petition books and records of Rhodes Home Arizona.  (*See Declaration of Paul D. Huygens in Support of James M. Rhodes Supplemental Memorandum of Law in Support of His Opposition to Reorganized Debtors' Objection to the Greenway Partners Claim Found in Proof of Claim No. 814-33 and Notice of Amendment of Schedules of Assets and Liabilities*, ¶ 5, dated July 19, 2011 [Doc. No. 1464]  ("**Huygens Declaration**")).  True and correct copies of the Debtors' pre-petition books and records are attached to the Huygens Declaration.

**The Sedora Claim**

19.     The amount of $167,901.86 scheduled by Heritage Land Company, LLC as owed to Sedora Holdings, is a valid, existing claim for litigation expenses related to the defense of the Debtors in the case styled *Deutsche Bank Securities, Inc. v. James M. Rhodes, Sagebrush Enterprises, Inc., The Rhodes Companies, LLC, Heritage Land Company, LLC, Rhodes Design and Development Corp. and Rhodes Ranch General Partnership*, case no. 1:06-cv-00413-DC (the "**New York Litigation**").  Rhodes retained the law firm of Stewart Occhipinti, LLP to defend all the defendants in the New York Litigation, which ultimately settled.  (Rhodes Declaration, ¶ 11).

20.     The scheduled claim for litigation expenses reflects payments made at the direction of the Debtors by Sedora Holdings, a Rhodes entity outside the credit facility and a non-party to the New York Litigation, which was recorded in the Debtors' pre-petition books and records.  (Huygens Declaration, ¶ 7).  True and correct copies of the Debtors' pre-petition books and records are attached to the Huygens Declaration.  The books and records [Doc. No. 1464-2] show that the first eight payments beginning with $100,000 and ending with $6,375.12 were made by the guarantors of the Credit Agreement (*i.e.,* the first $195,208.26).  The remaining payments were made by Rhodes and his entities (*i.e.,* $206,927.16).  Of the $206,927.16, Rhodes was reimbursed for $39,025.30, leaving a remaining balance owing to Rhodes of $167,901.86.

## ARGUMENT

### I.     A COURSE OF CONDUCT EXISTED BETWEEN THE PARTIES SUFFICIENT TO ESTABLISH THE EXISTENCE OF A CONTRACT AND A CLAIM WITHIN THE MEANING OF SECTION 101(5).

"The terms of an express contract are stated in words while those of an implied contract are manifested by conduct."  *Smith v. Recrion Corp.*, 514 P.2d 663, 664–65 (Nev. 1975); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a (1979) ("Contracts are often spoken of as express or implied.  The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent.  Just as assent may be manifested by words or other

conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance.").  Indeed, "implied-in-fact contracts arise because an accepted course of conduct would permit a reasonable juror to find that the parties understood that their acts were sufficient to manifest an agreement." *Staley v. Taylor,* 994 P.2d 1220, 1224 n.6 (Or. Ct. App. 2000).  Accordingly, "performance and circumstantial evidence can be a basis by which a court can determine whether the parties assented to the terms of an unwritten implied-in-fact contract." *DC3 Entm't, LLC v. John Galt Entm't, Inc.,* 412 F. Supp. 2d 1125, 1146 (W.D. Wash. 2006).

In *In re FirstLine Corp.,* No. 06-70145, 2007 WL 2460766 (Bankr. M.D. Ga. August 23, 2007), the debtor, FirstLine Corporation, filed a Chapter 11 petition on March 6, 2006.  *Id*. at *1. At the time of filing, Donald J. Murphy was the president and sole shareholder of the company. *Id*.  He signed the petition on behalf of the debtor.  *Id*.  On April 20, 2006, debtor filed its schedules, including Schedule F, which listed Murphy as an unsecured creditor with an undisputed, noncontingent, liquidated claim of $61,600 for a loan.  *Id*.  The Liquidating Agent for the case objected to Murphy's scheduled claim on three grounds:  (1) no documents were furnished to support the claim; (2) Murphy could be the subject of an avoidable transfer claim; and (3) the claim should be treated as an equity interest.  *Id*.  The court held a hearing on the objection, during which the Liquidating Agent focused on the lack of loan documents as a reason to treat the advances as equity.  *Id*.

Murphy was able to produce checks showing that money came out of his own pocket to the pay the debtor.  *Id.*  The parties agreed no promissory notes or other formal documents were executed to memorialize the advances as loans.  *Id.*  As a consequence, there was no agreement as to any repayment terms, including time of repayment or interest rate.  *Id.*  Murphy testified that he advanced a portion of money because an emergency arose; however, he was unable to recall any

details about the emergency.  *Id.*  And the checks payable to the debtor shed no light on the subject.  *Id.*  "He also testified that he <u>expected to be repaid for the advance</u>."  *Id.* (emphasis added.)  Furthermore, most of the money advanced "did not appear on any of the Debtor's 2004 or 2005 financial records."  *Id.* at *2.

The issue before the court in the *FirstLine* case was whether Murphy's claim should be allowed.  *Id.*  In overruling the Liquidating Agent's objection and allowing Murphy's claim, and in determining that the advances were not capital contributions, the court focused on several factors including, but not limited to, the following:

(1) <u>Right to enforce payment of principal and interest</u>.  The court held that while the "lack of loan documents could complicate proving the existence of a loan and its terms" the law "does not require a loan agreement to be in writing." Indeed, <u>"[b]ecause Mr. Murphy was the president and sole shareholder when he made the loan to the Debtor, he likely could demonstrate a meeting of the minds as to the terms of the contract, giving him the right to enforce those terms."</u>  *Id.* at *4 (emphasis added).

*(2)* <u>Participation in management flowing as a result of advances</u>.  The court also concluded, "[a]t the time he made the advances, Mr. Murphy was the president and sole shareholder of Debtor.  Therefore, the advances did not provide him with any new or additional influence over company management."  *Id.*

(3) <u>Intent of the parties</u>.  The court further found that "[t]he evidence in this case shows the parties intended the advances to be loans.  <u>Mr. Murphy testified he intended to loan the money and to be repaid</u>."  *Id.* (emphasis added).

The Court considered several other factors which it determined were irrelevant or otherwise inapplicable.  *Id.* at *5.  In conclusion, the court held as follows:

With little other evidence as to the nature of the transactions, <u>the case falls primarily on the intent of the parties</u>.  Even the evidence of intent is somewhat limited.  Nevertheless, it weighs in favor of treating the advances as loans.  Mr. Murphy intended them to be loans . . . .  Based on this evidence . . . the Liquidating Agent's objection will be overruled, and Mr. Murphy's claim will be allowed.

*Id.* (emphasis added).

Like the *FirstLine* case, Rhodes has set forth evidence of contractual intent and the exchange of mutual promises between the parties as proven by their conduct.  The facts are not in

dispute.  These claims arose prior to the Petition Date.  At that time, it is undisputed that Rhodes controlled both the non-debtor entities and the Debtor entities.  Like *FirstLine*, Rhodes sat on both sides of the bargaining table and had the absolute right and authority to enter into contracts on behalf of the non-debtor entities and the Debtor entities and can demonstrate a meeting of the minds.  These contracts included, among other things, certain promises and expectations that if Rhodes personally paid a portion of the salaries owed to Frederick Chin, James Coyne, and Chris Stephens—all of whom were employees of the Debtors pre-petition—he would be repaid.  In fact, he was repaid over $1 million dollars for a portion of the payments he made on the Greenway Partners Claim.  These facts cannot be refuted.  Rhodes was in control.  Rhodes made the promises and fully intended to contract.  The Reorganized Debtors have not set forth any evidence to contradict this because they do not have any.  In fact, the Reorganized Debtors have acknowledged the following:

> MS. LAHAIE: Your Honor, <u>we are not contesting the fact that there has been evidence produced in connection with these claims</u>, and, again, <u>we have not contested the admissions made in the declaration.</u>
>
> And, your Honor, the reorganized debtors <u>are not contesting the fact that these individuals are employees of the debtors</u>.
>
> We're <u>not even contesting the fact at this point, your honor, that these payments were made to these individuals</u>, and that, your Honor, is the sum and substance of the evidence that has been produced on these claims.

(September 27, 2011 Hearing Transcript at 46: 11-25; 47: 1-3) (emphasis added).

Similarly, concerning the Compensation Claim, Rhodes made additional compensation payments to Chris Stephens as set forth in the pre-petition books and records of Rhodes Home Arizona.  Rhodes made these payments at the direction of the Debtors with a promise and the full understanding that he and his entities would be reimbursed by the Debtors.

Finally, the Sedora Claim is a valid, existing claim for litigation expenses related to the New York Litigation.  Rhodes retained the law firm of Stewart Occhipinti, LLP to defend all the defendants in the New York Litigation, which ultimately settled.  The Sedora Claim for litigation

expenses reflects payments made at the direction of the Debtors by Sedora Holdings, a Rhodes entity outside the credit facility and a non-party to the New York Litigation.  The New York Litigation related solely to a lawsuit stemming from the Debtors exclusivity agreement with Deutsche Bank and the Debtors' need for refinancing.  Other than the payments made by Sedora Holdings, all payments were made by the Debtors or, if paid by a non-debtor entity, were immediately reimbursed as set forth in the Debtors' pre-petition books and records, attached hereto.  Rhodes made these payments at the direction of the Debtors with a promise and the full understanding that he and his entities would be reimbursed by the Debtors.

In short, as with the *FirstLine* case, this case falls primarily on the intent of the parties (*i.e.*, Mr. Rhodes).  And even if the evidence of intent is somewhat limited, Rhodes' testimony that the parties intended to contract and that promises were made provides more than enough weight to establish the existence of a binding contract and a claim within the meaning of 11 U.S.C. § 101(5).

**WHEREFORE**, for the reasons stated above, Rhodes respectfully requests that this Court enter an order (i) denying the Reorganized Debtors' objection to the Greenway Partners Claim, and (ii) disallowing the Reorganized Debtors' amendments to the Compensation Claim and the Sedora Claim.

DATED this 16th day of November, 2011.


/s/ David R. Hague
Kevin N. Anderson
David R. Hague
FABIAN & CLENDENIN
*Attorneys for James M. Rhodes*

4835-1367-1694, v. 1