EXHIBIT A

1

1          UNITED STATES BANKRUPTCY COURT

2               DISTRICT OF NEVADA

3               LAS VEGAS, NEVADA

4   In re:  THE RHODES COMPANIES,    )  E-Filed:  10/04/11
    LLC,                             )
5                                    )
            Debtor.                  )  Case No.
6                                    )  BK-S-09-14814-LBR
    _____ )  Chapter 11
7

8

9

10

11          TRANSCRIPT OF PROCEEDINGS
                      OF
12          HEARING RE: MOTIONS
                  VOLUME 1
13   BEFORE THE HONORABLE LINDA B. RIEGLE
          UNITED STATES BANKRUPTCY JUDGE
14
            Tuesday, September 27, 2011
15
                  10:30 a.m.
16

17

18

19

20

21

22

23   Court Recorder:        Deborah Hemstreet

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

1    APPEARANCES:

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    APPEARANCES (Cont.):

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          (Court convened at 10:42:01 a.m.)

2              THE CLERK:  Bankruptcy court is now in session.

3      (Colloquy not on the record.)

4              THE COURT:  Be seated.

5      (Colloquy not on the record.)

6              THE COURT:  All right.  Rhodes.

7          Appearances, please.

8              MR. QURESHI:  Good morning, your Honor.  For the

9      record, Abid Qureshi, Akin, Gump, Strauss, Hauer & Feld, on

10     behalf of the reorganized debtors.  With me in the courtroom is

11     Meredith Lahaie, and on the phone also from Akin, Gump is

12     Howard Jacobson.

13             THE COURT:  Okay.

14             MS. LOWE:  Virginia Lowe with the Department of

15     Justice representing the United States.

16             MR. SHERMAN:  Good morning, your Honor.

17     Shlomo Sherman, local counsel for the reorganized debtors.

18             THE COURT:  All right.  All right.  Should we do the

19     IRS claim first?

20             MR. QURESHI:  Sure, your Honor.  And, your Honor,

21     also on the phone is Shirley Cho of Pachulski, Stang also on

22     behalf of the reorganized debtors.

23             MR. MADDEN:  Your Honor --

24             MR. QURESHI:  (Indiscernible).

25             MR. MADDEN:  -- you also have --

5

```
1              THE COURT:  Oh, sorry.

2              MR. QURESHI:  I'm sorry.

3              MR. MADDEN:  Your Honor, you also have Eric Madden

4    and Michael Yoder on the phone for the Litigation Trust.

5              THE COURT:  Okay.  Thank you.

6              MR. QURESHI:  Okay.

7              THE COURT:  Okay.

8              MR. QURESHI:  And --

9              THE COURT:  First, we have the objection to the IRS

10   claim.

11             MR. QURESHI:  Yes, your Honor.  If I may proceed,

12   your Honor, first, just by way of background with respect to

13   this claim?

14        So what the IRS claim is about is an attempt by the IRS to

15   recover millions of dollars in avoided tax liability from a tax

16   fraud that was committed about a decade ago, and this is a tax

17   fraud, your Honor, that the reorganized debtors and, in

18   particular, Bravo, which is the debtor entity against whom the

19   claim was filed had nothing to do with and nor is it alleged

20   that Bravo was in any way implicated a part of this fraudulent

21   scheme to defraud the IRS.

22        What the IRS is seeking to do, your Honor, we think is try

23   to tag the debtors with liability with this scheme and to do so

24   inappropriately and without evidence.  Let me start with the

25   genesis of the claim itself.
```

6

1          Bravo, rather, was a subsidiary in the Rhodes

2     organization, and the function of that entity was to provide

3     framing services.  This was the subsidiary through which

4     laborers built the frame.

5          Your Honor, I apologize.  I just got a note that the

6     people on the phone cannot hear anything.

7               THE COURT:  Okay.

8               MS. CHO:  No.  We're on Abid.

9               MR. QURESHI:  Oh, you are?  Okay.  Thank you.  I

10    apologize, your Honor.  So during the time period from 2000

11    until 2003 -- and that, your Honor, is the period of time

12    during which these tax liabilities were allegedly incurred --

13    Bravo hired a subcontractor through which it received laborers

14    that were necessary to complete the framing work that was going

15    on during the housing boom, and I'll come back to that in a

16    little bit more detail.

17         The company that was retained as a subcontractor was

18    Union Pacific Construction, and I will refer to them,

19    your Honor, as UPC.

20         So in 2009, the owner of UPC, a gentleman by the name of

21    Robert Kahre -- and I apologize if I'm mispronouncing his

22    name -- he and a number of his associates were convicted in a

23    criminal tax-fraud case by the district court here in

24    Las Vegas, and he I believe is serving a sentence of somewhere

25    in the order of 15 years, and a number of his associates

1    involved in the scheme are also serving jail sentences.

2        Now, the scheme that was run by UPC was as follows,

3    your Honor:  Apparently, UPC provided among other things

4    payroll services to a number of construction companies in the

5    Las Vegas area.

6        And what Mr. Kahre did through this scheme was he claimed

7    to pay the employees of these various construction companies in

8    gold and silver coins which the employees would then

9    immediately exchange for cash, and what was reported to the IRS

10   was the face amount of the gold and the silver coins which was

11   approximately one-eighth the value of the cash that those

12   employees actually received.

13       Now, the IRS has alleged that the UPC provided those same

14   fraudulent payroll services to Bravo, and so what it's seeking

15   to recover from the reorganized debtors is the following,

16   your Honor:  A priority claim totalling approximately

17   1.32 million dollars.

18       Now, importantly, that 1.32 breaks down into approximately

19   $879,000 in unpaid taxes and $446,000 in penalty interest which

20   I believe runs up to the petition date and, in addition, an

21   unsecured claim in the total amount of 2.56 million dollars,

22   and that claim, your Honor, is 432,000 in principal and 849,000

23   approximately in penalty interest.

24       Now, the legal issue before the Court, your Honor, I think

25   it's actually a fairly straightforward one, the reorganized

1    debtor's claim and our objection and with a supporting

2    affidavit that Bravo hired UPC as a subcontractor.

3         There is no dispute, your Honor, that if that is correct,

4    if, indeed, UPC was hired as a subcontractor, Bravo bears no

5    responsibility for any taxes that UPC may have failed to pay.

6         Now, on the other hand, what the IRS claims is that Bravo

7    hired UPC not as a subcontractor, but, instead, as a payroll

8    servicer.  That Bravo remained the employer of its laborers

9    and, therefore, remained liable to remit the appropriate

10   payroll taxes to the IRS.

11        And so the legal question that I think is ultimately

12   determinative of this claim is did Bravo retain UPC as a

13   subcontractor or did Bravo retain UPC as a payroll servicer.

14            THE COURT:  Why isn't that a factual question as

15   opposed to a legal question?

16            MR. QURESHI:  I apologize, your Honor.  It is a

17   factual question which is determinative of the legal issue of

18   whether they have a valid claim.  That is absolutely correct,

19   so let's start with the proof of claim filed by the IRS.

20            THE COURT:  Well, if it's a factual question, how do

21   we get anyplace today?

22            MR. QURESHI:  Well, here's how we get anyplace today,

23   your Honor.  We have submitted in connection with our objection

24   an affidavit.  The affidavit is from a Mr. Dean Griffiths

25   (phonetic).  He was a former employee of Bravo during the

9

1    relevant time period here, and his declaration, your Honor, is

2    at Docket No. 1532.

3        He was employed by Bravo from 1996 through 2004, and among

4    the titles that he held during his employment at Bravo was

5    general manager and general superintendent.

6            THE COURT:  But why?  You're not going to dispute a

7    material factual issue here --

8            MR. QURESHI:  Respectfully, your Honor --

9            THE COURT:  -- because you're, in essence, asking me

10   to discern (indiscernible) --

11           MR. QURESHI:  I --

12           THE COURT:  -- a summary judgment.

13           MR. QURESHI:  Your Honor, I actually don't think it's

14   disputed, and let me explain.  So we've submitted his

15   declaration.  In his declaration, Mr. Griffiths says very

16   clearly and very directly Bravo hired UPC as a subcontractor.

17       Now, the IRS I believe has no objection to the

18   admissibility of this declaration.  It has not requested the

19   presence of Mr. Griffiths to be cross-examined, and so I don't

20   believe that there is any contrary evidence to dispute what

21   Mr. Griffiths has said.

22       What the IRS offers, your Honor, is trial transcripts from

23   the underlying criminal proceeding.  And through those trial

24   transcripts, the IRS believes that it can establish that Bravo,

25   in fact, retained UPC as a payroll servicer.

1       But, in fact, your Honor, the trial transcripts, all of

2   them -- and set to the side for a moment their admissibility

3   because, in fact, I don't think they're admissible here.

4       But setting that to the side, those trial transcripts

5   nowhere say that Bravo retained UPC as a payroll servicer.

6   That is an implication that the IRS asks this Court to draw

7   from those transcripts, and we don't believe it can do so.  We

8   don't believe that those transcripts come even close to

9   establishing that.

10      And if I might for a moment, your Honor, address on the

11  assumption that the IRS will seek to offer those transcripts

12  into evidence, I think they are plainly inadmissible.

13      Let's start with testimony provided in another proceeding

14  is hearsay.  It's clearly hearsay under the federal rules, so

15  the next question is is there an exception through which that

16  hearsay becomes admissible in these proceedings.

17      The Federal Rule of Evidence 804(b)(1) is the rule that we

18  look to to see if there is an exception to the hearsay rule

19  that applies here.  There are two components to that exception

20  that must be met for these transcripts even to be admissible.

21      First, your Honor, the witness has to be unavailable,

22  and --

23          THE COURT:  Well, that's pretty clear.

24          MR. QURESHI:  Well, actually, that's what I thought,

25  too, your Honor.  There's actually case law that says that

1  because a witness is incarcerated does not conclusively

2  establish that the witness is unavailable.

3         THE COURT:  Well, he's not in this jurisdiction, is

4  he?

5         MR. QURESHI:  I don't know.  He was convicted in

6  Las Vegas.  I don't know where he is incarcerated, but --

7         THE COURT:  Well, there's no federal prison in

8  Nevada, so --

9         MR. QURESHI:  Well, there's the answer, then.  I

10  guess he's not in this jurisdiction, but that doesn't matter,

11  your Honor, because the second part of the test clearly cannot

12  be met.

13     The second part of the test under 804(b)(1) for this

14  testimony to be admissible in these proceedings is that the

15  party against whom the testimony is being offered, in this

16  case, the reorganized debtors, must have had an opportunity to

17  cross-examine the witness in whatever that prior proceeding

18  was.

19     Well, we weren't there, your Honor, during the criminal

20  trial.  We had no opportunity to question any of the witnesses

21  whose trial testimony is now being offered in these

22  proceedings.

23         THE COURT:  Well, were any of the Rhodes entities

24  indicted or --

25         MR. QURESHI:  No.

1           THE COURT:  All right.

2           MR. QURESHI:  Your Honor, the Rhodes entities --

3     there is no allegation that the Rhodes entities were in any way

4     involved.

5           And so what your Honor respectfully is left with in terms

6     of a factual record is a proof of claim filed by the IRS which

7     does nothing, your Honor, except for lay out in a schedule

8     amounts owed and dates those obligations were incurred.

9           It says nothing about the question of whether Bravo

10    retained UPC as a payroll servicer, and it has no documentary

11    attachment that would suggest that that is the case.

12          On the other hand, in our objection, we again have the

13    declaration of Mr. Griffiths to which there is no objection.

14    He is competent to testify on the issue.  He was the general

15    manager at the time.

16          And he has stated unequivocally that Bravo retained UPC as

17    a contractor.  That it did so, your Honor, because this

18    occurred during the housing boom when there were more homes

19    that required framing than Bravo was able to keep up with.

20          And given as he explains in his declaration the

21    administrative burden of hiring additional employees and

22    dealing with the paperwork that that involves, Bravo elected to

23    effectively farm that out to an independent contractor, in this

24    case, UPC, and so we don't think, your Honor, that there really

25    is a factual dispute.

1        Now, I'm prepared if your Honor would like to go through

2   in much more detail the specific sections of the trial

3   testimony to which the IRS points to explain to your Honor why

4   we don't think that raises even a suggestion that Bravo was

5   retaining UPC as a payroll processer let alone proof of that

6   fact.

7              THE COURT:  Okay.

8              MR. QURESHI:  So if your Honor would like, I can do

9   that.  If your Honor wants to hear from the IRS first,

10  however --

11             THE COURT:  Let me hear from the IRS first.

12             MR. QURESHI:  Okay.

13             THE COURT:  Okay.

14             MS. LOWE:  Good morning, your Honor.  The debtors say

15  that Kahre's company was strictly a subcontractor.  However, as

16  debtor's counsel has pointed out, there was a criminal trial in

17  which Mr. Kahre was prosecuted.

18       And one of the elements that he was indicted for was

19  conspiracy, and this conspiracy was to defraud the

20  United States by dishonest means for purposes of impeding,

21  impairing, and defeating the lawful collection and assessment

22  of Internal Revenue taxes.  Those taxes were both income taxes

23  and employment taxes.

24       The manner of the conspiracy was this payroll-service

25  company that he -- those payroll-service process that he sold

1    to other contractors.  There was a total of between -- there

2    was a total of 35 contractors which participated in this

3    process.

4         In the trial testimony, numerous times, witnesses

5    testified to that process.  They testified that Bravo was one

6    of those contractors that used this payroll-service process.

7         It has been established in the criminal trial, and that is

8    what he is found guilty of is using this payroll-service

9    process, and this process that he sold to other contractors

10   which participated.

11        And in addition, they have submitted the declaration

12   of Dean Griffiths which is not inconsistent with that

13   scenario.

14        Mr. Griffiths states in his declaration that Bravo became

15   concerned with its ability to handle administrative and

16   recordkeeping requirements from its growing employment, so it

17   was that process which then was transferred over to Kahre to

18   pay some of the Bravo employees.

19        He said it was an administrative burden, the payment

20   obligations, and so that is exactly what Bravo did.  It

21   transferred numerous of its employees over to Kahre to

22   participate in Kahre's payroll-service company.

23        All of the witness testified to the exact nature of

24   Kahre's relationship to the contractors.  We have submitted

25   some of that testimony in support of the IRS claim.

1          The debtors have not to this date objected to the amount

2     of the claim.  They're just objecting to the fact that they

3     have to pay the claim.

4          A taxpayer ultimately is responsible for employment

5     taxes.  And these employment taxes, you cannot delegate that

6     duty away.

7          There was a payroll-service company.  The payroll-service

8     company did not pay them.  And as the cases I've cited in my

9     response to their objection to claim, you can't delegate that

10    away.  The employer is ultimately responsible for the payment

11    of those taxes.

12          THE COURT:  Now, if it was truly a subcontractor that

13    provided labor, you agree that Rhodes is not liable.

14          MS. LOWE:  I think we would actually then have to

15    look at all the indices, and, many times, subcontractors are

16    still found liable for employment taxes, so we would have to

17    look at all the specific nature of what -- frankly, they have

18    not submitted any evidence other than Mr. Griffiths'

19    declaration in support of the subcontractor relationship.

20          And even there in that declaration, it supports the fact

21    that they were transferring over to Bravo the recordkeeping and

22    administrative requirements for the employees of Bravo.  They

23    admitted those were Bravo employees that were transferred over

24    onto Kahre's payroll system.

25          And as Courts have regularly held, in a payroll-service

1  type process, ultimately, the employer is the one responsible

2  for the taxes, and that cannot be delegated away.  It is a

3  responsibility that remains with the employer.

4      It doesn't matter if the payroll-service company fails to

5  pay it.  The action then is against that company to not pay the

6  taxes.

7          THE COURT:  Now, Mr. Griffiths' affidavit says,

8  "Bravo engaged Pacific as a subcontractor to provide laborers

9  to work on Bravo's building projects."

10          MS. LOWE:  And then he says that the laborers

11 provided were the Bravo employees themselves, former Bravo

12 employees, so what they did is they transferred over a number

13 of their employees to the Kahre payroll service.

14      And he states in paragraph 3, "Bravo became concerned with

15 the ability to handle administrative and recordkeeping

16 requirements for its growing employment."

17      What they were transferring over to Kahre is their payroll

18 service function, and it's consistent with what was found at

19 the criminal trial of Robert Kahre.  He was operating a payroll

20 service for at least 35 other contractors in the area.

21      And this was found in a court with a jury.  They found him

22 guilty of providing this payroll-service company.  He was

23 charging the contractors for it.  He didn't pay the payroll

24 over, and it is now due, and it is Bravo's responsibility.

25          THE COURT:  Okay.  All right.  Response.

1          MR. QURESHI:  Thank you, your Honor.  A couple of

2    points.  Counsel says that there was testimony in the criminal

3    proceeding that Bravo used UPC as a payroll processer.

4          Respectfully, your Honor, that's not the case.  That is

5    an implication that the IRS seeks to draw from that

6    testimony.

7          Nowhere in that testimony is it directly stated by any

8    witness that that is the case.  There is general testimony

9    about 35 companies that used these services.

10          Now, your Honor, it's important also to look at the

11    Department of Justice's own press release issued following the

12    conviction by the jury of Mr. Kahre, and that is attached to

13    our objection.  It's Exhibit B at Docket 1377.

14          And in that press release from the Department of Justice,

15    they say the following, your Honor:  "Between 1997 and 2003,

16    Kahre owned and operated six construction businesses in the

17    Las Vegas area."  It goes on to list the six, one of which is

18    UPC.

19          THE COURT:  Well, now talk about admissible evidence.

20          MR. QURESHI:  Well, a fair point, your Honor, and --

21          THE COURT:  I could --

22          MR. QURESHI:  And, again --

23          THE COURT:  Wait.  If we do that, we got every

24    article in the RJ --

25          MR. QURESHI:  Well --

1          THE COURT:  -- as evidence in this case.  I --

2          MR. QURESHI:  And I'm happy, your Honor, to strictly

3    apply the Rules of Evidence here because there is no question

4    that the entirety of those trial transcripts are inadmissible.

5          They're hearsay, and there hasn't even been an argument,

6    your Honor, that there's some kind of an exception to the

7    hearsay rule that applies here.

8          Now, your Honor, if I may?  One other point which is

9    counsel suggested that the debtors have not objected to the

10   amount of the claim.  Also, not true, your Honor.

11         We do object.  We say so in our objection.  Our issue is

12   that in addition to the principal amount the IRS is seeking

13   penalty interest.

14         Penalties, my understanding, your Honor, is those are

15   penalties that in order to be imposed require a knowing and

16   intentional withholding of taxes that are owing to the IRS.

17   There's not even an allegation that Bravo knowingly did

18   anything here.

19         And, again, just to return one last time and if your Honor

20   will indulge me, I'm happy to go through the details.  But line

21   by line, the evidence, the trial transcripts, the inadmissible

22   trial transcripts to which the IRS points as evidence that UPC

23   was a payroll processer, those excerpts, they just don't say

24   that, your Honor.

25         It's an implication that they would like this Court to

1   draw.  It's not surprising given that there are 35 companies

2   that were wrapped up in this scheme.

3        The closest they come, your Honor, in the testimony they

4   cite is to say that some -- there is testimony that says -- I

5   believe it's by a Mr. Rodriguez (phonetic) -- that some workers

6   of Bravo were paid in gold and silver coins.

7        It does not say in that excerpt, your Honor, whether those

8   workers were employees of UPC or whether those workers were

9   employees of Bravo, and that, your Honor, is the best they can

10  do.

11       All of the other excerpts are merely general statements in

12  which the nature of the scheme is described in great detail.

13  But without even an implication let alone a direct statement,

14  that Bravo used UPC as a payroll processer.

15       The DOJ's press release makes clear -- and the trial

16  transcripts to the extent your Honor let's them in which,

17  again, we don't think they should be let in.

18       But if they are, those trial transcripts also establish

19  that in addition to this payroll service that, indeed,

20  Mr. Kahre fraudulently sold to other entities they also had

21  construction companies through which they provided laborers,

22  hundreds of laborers.  That's what's in their press release.

23  That is entirely consistent with Mr. Griffiths' testimony.

24       And Mr. Griffiths by the way does not say in his

25  declaration, your Honor, that all of Bravo's employees were

1    transferred to UPC, and that's all there was.

2        He says Bravo could not keep up with the demand for

3    laborers.  They hired UPC to provide laborers.  And once that

4    was done with Bravo's consent, Bravo then took its existing

5    laborers, transferred those employees to UPC such that they

6    became employees of UPC with the exception of managers and

7    supervisors for whom Bravo continued to appropriately I might

8    add withhold payroll taxes.

9        Now, your Honor, we also submitted a declaration from

10   Mr. Bono (phonetic).  That also is attached to our objection at

11   Docket 1377.

12       And what that declaration says, your Honor, is that we

13   went back and I believe actually got these records from the IRS

14   to look at the payroll taxes and records that were filed by

15   Bravo during this period.

16       And what it shows, your Honor, is that Bravo continued to

17   pay and withhold payroll taxes as it was obligated to do, and

18   so that fact, your Honor, is entirely inconsistent with the

19   theory of the IRS.

20       If Bravo was trying to pass off to UPC its payroll

21   processing function, well, it doesn't make sense that it would

22   then continue to do that very thing, process payroll and

23   withhold payroll taxes.  But, in fact, we have uncontradicted

24   evidence that that's what they did.

25       So, again, if your Honor strictly applies the

1    Rules of Evidence -- and there's no reason not to -- there is

2    no factual dispute here.  There is no evidence that contradicts

3    Mr. Griffiths' testimony.

4        Even if your Honor let's in the transcripts, your Honor,

5    those transcripts simply do not establish anything to refute

6    what Mr. Griffiths clearly says in his declaration.

7            THE COURT:  Okay.  All right.

8            MS. LAHAIE:  Your Honor, I apologize.  Could I confer

9    briefly with Mr. Qureshi?

10       (Colloquy not on the record.)

11           MR. QURESHI:  That's fine, your Honor.

12           THE COURT:  Okay.  I'm going to -- it seems to me

13   there's a general issue of material fact.  I don't think that

14   Mr. Griffiths' affidavit is sufficient to establish as a matter

15   of law that UPC was merely a payroll company.

16       And even then as Ms. Lowe indicated, there may be

17   circumstances in which a company could be liable, so this needs

18   an evidentiary trial.

19       And I think we should bifurcate, first, as to whether

20   Bravo (sic) was -- I'm sorry -- whether UPC was a subcontractor

21   which merely provided payroll or a subcontractor who provided

22   labor as well as payroll.

23       Then if I determine that they provided merely payroll,

24   then we could have a separate evidentiary trial as to the

25   penalty and interest portion, the willing and knowing, so we

1   don't need to go into that in the beginning.

2       First, it is strictly a limited issue, were they the

3   subcontractor for merely payroll or the subcontractor for

4   labor.

5       Question, do you want -- I doubt you could do a settlement

6   conference.  Do you want a settlement conference?  That's a

7   little difficult with the IRS issues, but I can give you one if

8   you want.

9       (Colloquy not on the record.)

10          MS. LOWE:  No.

11          THE COURT:  No?  Okay.  So do you want to go to trial

12  in March?

13          MR. QURESHI:  Your Honor, may I raise one point

14  before we get to dates?  Would it be appropriate just to

15  streamline things for us to brief the question of the

16  admissibility of these trial transcripts?

17          THE COURT:  I'm relying on Mr. Griffiths' affidavit

18  alone.  I'm going to assume --

19          MR. QURESHI:  Okay.

20          THE COURT:  -- they're inadmissible at this point.

21          MR. QURESHI:  Okay.  Thank you.

22          THE COURT:  I just find his affidavit is just a

23  little bit too ambiguous for me, and --

24          MR. QURESHI:  Okay.

25          THE COURT:  And nothing he can say can fix it, and I

1    think that's because there are genuine issues of material fact.

2    I mean, this is an area in which, you know, those lines are

3    crossed.  I mean, it sounds like they may have provided some

4    payroll and some -- so it's a genuine issue of material fact.

5             MR. QURESHI:  Right.  But to be clear, your Honor, as

6    to what the factual issue is, it's not whether they were a

7    subcontractor for payroll services versus laborers.

8         If they are, in fact, a subcontractor as I understand the

9    way it works, the laborers are the employees of UPC and not of

10   Bravo, and UPC provides those laborers and, in turn,

11   workers' compensation, et cetera, and then it also has the

12   obligation to remit taxes on behalf --

13            THE COURT:  Well, you --

14            MR. QURESHI:  -- of those employees.

15            THE COURT:  You could still be a subcontractor for

16   one point.  You could be a subcontractor to provide payroll and

17   administrative.

18            MR. QURESHI:  Fair enough.

19            THE COURT:  We're saying the same thing.

20            MR. QURESHI:  Okay.  As far as the date, your Honor,

21   we'd be pleased to do it earlier if that was possible.  But if

22   not, March, certainly.

23            THE COURT:  How long do you need to finish doing

24   discovery and how long do you think a trial would take?

25            MR. QURESHI:  Well, your Honor, based on our

1    knowledge today of witnesses, I would think it's a single day.

2              THE COURT:  Okay.

3              MR. QURESHI:  And as far as discovery goes --

4              THE COURT:  I can't see how --

5              MR. QURESHI:  -- I cannot --

6              THE COURT:  I mean, you've fooled around with this

7    for six months now.  I don't see how you're going to be ready

8    for trial before March.  But if you think you are, fine.

9         I mean, you claim that there aren't any witnesses around,

10   and now you say you're going to go to trial and bring those

11   witnesses.

12        Oh, and by the way, I find Mr. Bono's affidavit to be

13   somewhat useless, so the point being he basically says I don't

14   know anything, and these are my opinions, so it's somewhat

15   useless.

16        (Colloquy not on the record.)

17             MS. LOWE:  Your Honor, we would like -- a trial in

18   March is fine with us.

19        (Colloquy not on the record.)

20             THE COURT:  I mean, I could do January, but will you

21   be ready by January?  This is October, already.

22             MR. QURESHI:  Your Honor, I guess -- again, first of

23   all, the reason for the delay is there had been settlement

24   discussions that unfortunately didn't go anywhere.

25        I guess the difficulty is that this is all ten years ago,

1   and so we do have a genuine issue with finding people that were

2   involved.  We --

3           THE COURT:  So I don't get why you want to go to

4   trial earlier since you can't find your witnesses.  That

5   doesn't quite make sense --

6           MR. QURESHI:  March is fine --

7           THE COURT:  -- to me, but --

8           MR. QURESHI:  -- your Honor.

9           THE COURT:  Okay.  Let me do the week of March 5th,

10  and I may have Judge Thurman who's assisting us on matters do

11  the trial or I may do it.  I'll confer with him and see how our

12  calendars go, so we'll do it March 5th.

13      And, pretrial, let's have a pretrial hearing on

14  January 31st, and that can be telephonic for everyone, and have

15  your pretrial briefs (sic) in by -- sorry -- pretrial

16  statements in by January 26th.

17      In this one, I think it will be very helpful to have

18  pretrial briefs as well in beforehand, so that as I'm going

19  through the evidence I can see, well, what is the law in this

20  regard, what's the dividing line between merely a payroll and

21  merely a laborer.  Okay.

22      Thank you.

23          MS. LOWE:  Thank you.

24          MR. QURESHI:  Your Honor, I'm sorry.  Is there a time

25  of day for --

```
 1                 THE COURT:  Oh, excuse me.

 2                 MR. QURESHI:  -- the status conference --

 3                 THE COURT:  I apologize.

 4                 MR. QURESHI:  -- on --

 5                 THE COURT:  Yes.

 6                 MR. QURESHI:  -- the 31st?

 7                 THE COURT:  9:30.

 8                 MR. QURESHI:  Thank you.

 9                 THE COURT:  Let's make it 10:00 since that is

10       probably -- or 10:30?

11                 THE CLERK:  10:30?

12                 THE COURT:  Don't you think that makes sense because

13       the 9:30 matters seem to take forever?

14                 THE CLERK:  Sure.  We'll do it at 10:30 --

15                 THE COURT:  Okay.  10:30.

16                 THE CLERK:  -- then.

17                 MR. QURESHI:  Thank you.

18                 THE COURT:  Okay.  Thank you.  All right.

19             Now let's go to the -- and, Ms. Lowe, you can certainly

20       stay or you can be excused, whatever you wish.

21             (Colloquy not on the record.)

22                 THE COURT:  All right.  Next, let's go to Greenway.

23                 MS. LAHAIE:  Good morning, your Honor.

24       Meredith Lahaie, Akin, Gump --

25                 MS. CHO:  And, your Honor --
```

```
1              MS. LAHAIE:  -- Strauss --

2              MS. CHO:  -- it's Shirley Cho.  May I be excused as

3    well?

4              THE COURT:  Yes.

5         (Thereupon, Shirley Cho, Esq., was excused

6         at 11:13:40 a.m.)

7              MS. LAHAIE:  -- Akin, Gump, Strauss, Hauer & Feld,

8    for the reorganized debtors.

9              THE COURT:  Okay.

10             MR. HAGUE:  Good morning, your Honor.  David Hague on

11   behalf of James Rhodes of Fabian & Clendenin.

12             THE COURT:  Okay.  All right.  Go ahead.

13             MS. LAHAIE:  As your Honor may recall, we were last

14   here before you with respect to the first half of the

15   reorganized debtor's claim objection as it related to the

16   Greenway Partners claim, and the Court had deferred

17   consideration of the scheduled claims.

18        Before I move into the substance of my argument on the

19   scheduled claims, your Honor, there's one matter I'd like to

20   address.

21        And that is shortly before court began this morning when

22   my colleague and I were on the way to court, we received

23   notification that a further declaration had been filed just

24   this morning.

25        It's unclear what matters the declaration relates to.
```

1    Although based on the facts, it may relate to both the Greenway

2    claim and the first of the three scheduled claims.

3        I've also advised your Honor that opposing counsel does

4    not have copies, although I will say that I have read the brief

5    contents of the declaration.

6        But, your Honor, at this point in the process, we have

7    been through two rounds of briefs on this claim objection, one

8    in 2010 and one that took place over the summer.

9        At which point, both sides submitted briefs and

10   declarations and whatever other materials they thought may

11   advance their argument.

12       And, your Honor, the reorganized debtors at this point

13   have to object to Mr. Rhodes' last-second Hail Mary litigation

14   strategy that has typified his actions in connection with this

15   matter.  We simply do not think it's appropriate for the

16   declaration to be considered at this time.

17              THE COURT:  Okay.

18              MS. LAHAIE:  I don't know if you want to deal with

19   that matter first, your Honor.

20              THE COURT:  Well, I'll strike the declaration, too

21   late.

22              MS. LAHAIE:  Your Honor, before I move into the

23   scheduled claims, I believe there was one matter that was still

24   outstanding from the end of our last hearing, and that related

25   to one evidentiary matter with respect to the Greenway claim.

1    And that was Mr. Anderson's allegation that the

2    Main Amundson (phonetic) report which forms the basis of a

3    number of Rhodes' arguments that that document should be

4    admitted under one of the hearsay exceptions to the

5    Federal Rules of Evidence, and, your Honor, I believe that the

6    specific exception that was cited was the business-records

7    exception.

8    Your Honor, I can speak to the rule itself, and I can read

9    the rule into the record, and, obviously, your Honor is I'm

10   sure familiar with the rule and knows that the simple fact that

11   Mr. Anderson stated that that rule and his belief would make

12   the Main Amundson report admissible Mr. Anderson has not met

13   any of these requirements that are, you know, contained within

14   that rule.

15   He has not submitted any evidence as to whether or not the

16   Main Amundson report was prepared in the ordinary course of

17   business as would be required under the Rule of Evidence.

18   We don't think it's applicable, and, your Honor, I'm happy

19   to address it further or submit something in addition if you

20   feel that it's necessary.

21        THE COURT:  Okay.  All right.

22        MS. LAHAIE:  Your Honor, that brings us, then, to the

23   scheduled claims which are on for today.  Your Honor, the

24   reorganized debtors in a number of their submissions have

25   included a chart that may assist the Court as I go through my

1    argument, and I can direct your Honor to one of those

2    instances.

3        It's in Docket No. 1466 which is the reorganized debtor's

4    objection, and there is a chart that appears on page 10 of that

5    document that sets forth the three scheduled claims --

6        THE COURT:  Okay.

7        MS. LAHAIE:  -- and a short recitation of the

8    reasons why the reorganized debtors believe those claims to be

9    invalid.

10       At the outset, your Honor, I will note that the

11   reorganized debtors believe that we do have authority to amend

12   the schedules, and we're seeking, obviously, a declaration from

13   this Court that you agree with that.  And to the extent that

14   you don't, we're seeking to have these claims disallowed.

15       So, your Honor, that brings us to the first of the

16   scheduled claims which is a claim asserted by Rhodes against

17   Rhodes Homes Arizona in the amount of approximately $151,999.

18       Your Honor, this claim ties very closely to the

19   Greenway Partners claim.  Mr. Rhodes alleges that he is

20   entitled to this amount as compensation for the fact that he

21   had to advance funds to certain of the debtor's employees.

22       Again, your Honor, we're in the circumstance that we were

23   in connection with the Greenway Partners claim.  There is no

24   evidence.  There is no documentation.

25       Rhodes alleges that the mere fact that this claim appears

1    on the schedules should be evidence that this Court should

2    consider that the debtors have conceded to the validity of this

3    claim.

4         However, as set forth in the briefs, your Honor, that is

5    not the case.  The debtors have made no such admission, and,

6    again, there is certainly no evidence to support any

7    entitlement on Rhodes' behalf to that claim.

8         And, again, as your Honor may recall in connection with

9    the Greenway arguments, Rhodes himself was in charge of

10   preparing the schedules.

11        And this is, yet again, another instance when Rhodes most

12   likely either himself made that ledger entry or directed

13   someone else to make the ledger entry that reflects $151,000

14   being owed to him by that company, and, your Honor, that's

15   simply not evidence that this Court should recognize to

16   substantiate that claim.

17        Turning next, your Honor, to the Pinnacle Equipment

18   (phonetic) claim which appears on page 11 of the chart, this is

19   the most substantial of the three claims, and its asserted

20   value is $557,000.

21        Your Honor, the basis of this claim appears to be a

22   contract that Rhodes alleges existed, but that he has not been

23   able to find and has not been able to produce, and that is

24   referenced to the Main Amundson report, but it is not attached.

25        Your Honor, we've obviously requested the document, and

1  neither party has it within their possession.  I can only state

2  that Rhodes has conceded on numerous occasions that the

3  document does, in fact, exist, and that it does govern the

4  parties' understanding with respect to the debtor's usage of

5  that equipment.

6       Now, your Honor, the substance of Rhodes' allegation here

7  is that the debtor entity, that Pinnacle Grading (phonetic)

8  that used the equipment at issue, overutilized that equipment

9  more than what had been contemplated by the parties when

10 entering into the contract.

11      But, your Honor, Rhodes hasn't been able to identify any

12 provision within the contract that he can produce that would

13 enable him to assert some kind of true-up payment or other

14 legally-cognizable basis under the contract that would entitle

15 him to be paid and compensated for amounts that he claims were

16 generated in excess of what is bound by the contract.

17      Saying it differently, your Honor, there is no provision

18 and no alleged provision in this alleged contract that says if

19 the debtors overutilize the equipment that Rhodes will then be

20 entitled to a corresponding claim for that amount.

21      Your Honor, what Rhodes is, in effect, doing is admitting

22 that he struck or at least in his own words and in his own

23 opinion that he struck a bad deal, a bad bargain with the

24 debtor entities, that did not cover the actual usage that the

25 debtors had employed this machine for.

33

1        And he basically wants to be able to restrike that deal

2   and have this Court impose some kind of equitable arrangement

3   which, your Honor, this Court should not do given that Rhodes

4   himself has conceded the existence of the contract.

5        But he wants to be able to rewrite that deal and to

6   restrike that bargain after he has already admitted that he has

7   executed a document with the debtors that's supposed to govern

8   the usage of that piece of equipment.

9        And, your Honor, Mr. Rhodes cannot have it both ways.  He

10  cannot say that on one hand there is a contract that governs

11  the usage of this equipment, but, on the other hand, well, that

12  document isn't really sufficient to protect me and what I think

13  that I'm equitably entitled to, and, your Honor, yet again,

14  Rhodes has not asserted a legally-cognizable justification to

15  those funds.

16       And, lastly, your Honor, is the Sedora Holdings claim

17  which is at the bottom of the chart, and this is a $167,000

18  claim asserted against Heritage.

19       Your Honor, I should note that Rhodes has referenced a

20  document that he believes contains the lenders' acknowledgement

21  that this claim existed which in some ways substantiates his

22  entitlement to be reimbursed for that portion of litigation

23  expenses.

24       And, your Honor, I'd like if we could to turn to that

25  portion of Rhodes' submission, and I'm looking now, your Honor,

1   at Docket No. 1464-3.  This is Mr. Huygens' declaration, and

2   it's attached as an exhibit, your Honor.

3        (Colloquy not on the record.)

4            THE COURT:  Hang on.  I don't have it for some

5   reason.  Wait.

6        (Colloquy not on the record.)

7            MS. LAHAIE:  Your Honor, I'm happy to hand up the

8   page I have.  I'm not sure I need it to speak from.

9            THE COURT:  Yeah.  That would be helpful.  We have a

10  new system which doesn't work with that.

11           MS. LAHAIE:  I'll just read it into the record --

12           THE COURT:  Okay.

13           MS. LAHAIE:  -- your Honor --

14           THE COURT:  That's fine.

15           MS. LAHAIE:  -- before I hand it up as well.

16           THE COURT:  Yeah.

17           MS. LAHAIE:  Your Honor, the reference that

18  Mr. Huygens makes is to a portion of the credit agreement, and

19  it's schedule 4.19 that corresponds I believe to Section 4.19

20  which in the credit agreement is labelled brokers.

21       I won't read the section from the credit agreement, but I

22  will read what I believe Mr. Rhodes had been referring to which

23  is a schedule labelled brokers fees.

24       And it's two lines, your Honor, and it states that, "The

25  borrowers have received oral correspondence in respect of a

1    claim for an alternate transaction fee from Deutsche Bank.  As

2    of the date hereof, the borrowers believe that this claim is

3    without merit."

4        And, your Honor, as best as the reorganized debtors can

5    tell, this is the concession that Rhodes is citing to in which

6    the lenders have acknowledged that this litigation has existed.

7        And that, presumably, there have been litigation fees

8    incurred that the reorganized debtors now share a burden to

9    participate in.

10       But, your Honor, as I'm sure you can tell from me reading

11   those two lines into the record, there is no admission, no

12   recognition, no acknowledgement of any litigation, any

13   litigation fees incurred, anything that would substantiate the

14   allocation of litigation expenses across any of the debtor or

15   nondebtor entities.

16       And in no way does this document, your Honor, substantiate

17   any entitlement that Rhodes may have to assert a claim for

18   these litigation fees.

19       And, your Honor, the other point that we make in our

20   briefs -- and I'll make it brief up here as well -- is that the

21   way that the Rhodes entities, both the debtor and the nondebtor

22   entities, were structured it was a pass-through structure, so

23   that anything that was attributable to the debtor entities

24   would have flown up.

25       So to the extent that there would rightly have been --

36

1    which, again, there's no evidence in the record to

2    substantiate.

3         But to the extent that Rhodes could somehow demonstrate

4    that some portion of these litigation costs should be allocated

5    to Heritage, the fact that Heritage is a pass-through entity

6    and whatever value it does or doesn't have ultimately flowed up

7    to Rhodes in any event, it's irrelevant whether Rhodes actually

8    allocated that value to Heritage in the first place.

9         Your Honor, I have nothing else to add.  There are a

10   number of other arguments that Rhodes makes, some of them I

11   alluded to at the beginning of my presentation with respect to

12   Rhodes' position that the reorganized debtors have somehow

13   conceded to the validity of these claims.

14        Those are all set forth in detail in the papers.  If

15   your Honor has any other questions, I'm happy --

16             THE COURT:  No.

17             MS. LAHAIE:  -- to answer them.

18             THE COURT:  Thank you.  Okay.

19        Opposition.

20             MR. HAGUE:  Good morning, your Honor.  David Hague on

21   behalf of Jim Rhodes.  The reorganized debtors have continued

22   to assert that there is just simply no evidence or no

23   documentation before this Court on any of these claims, the

24   Greenway or the scheduled claims.

25        What is before the Court are several reports.  There's

declarations.  There are W-2s that show that they are employees
of the debtor's.  There are copies of checks.  There's copies
of wire transfers.

There's books and records that shows reimbursements going
to Rhodes because he's made these payments.  He's made these
payments for compensation.

There is a lot of evidence that Mr. Rhodes has put
forward before this Court that they haven't done anything to
rebut.

They haven't asked to take a 2004 examination of any of
these individuals.  They haven't done any subpoenas.  They
haven't done anything to even demonstrate that what we've put
forward is not relevant.

They haven't done anything to even rebut what's in any of
the declarations, Mr. Rhodes' declaration or Mr. Huygens'
declaration.

In their briefs, they have said that if Rhodes puts forth
facts or evidence sufficient to establish a claim, then the
burden shifts to the debtors to show facts tending to defeat
the claim by probative force equal to that of the allegations
of the proof of claim.

And as I have stated, with the Greenway claim and with the
compensation claim which is on the Rhodes Home -- I'm kind of
trying to talk about those together because it was the same
principle -- Mr. Rhodes was making compensation payments to

1   employees of the debtors.

2       This was shown by the W-2s that we have submitted.

3   They're attached to Mr. Rhodes' declaration that show that

4   these were debtor employees.

5       In his declaration, he says, "In order to avoid a

6   disruption in the office, I made these payments to them on the

7   side."

8       I submitted a declaration today which has been stricken

9   that says the same, but that is the arrangement that he had,

10  and there are payments that have come back in to Mr. Rhodes to

11  show and to account for these.

12      Now, on the Greenway one, he wasn't paid about $800,000

13  for these payments, but I have set forth --

14          THE COURT:  Now, Mr. --

15          MR. HAGUE:  -- with this Court --

16          THE COURT:  There are a number of entities that did

17  not file bankruptcy that Mr. Rhodes held.

18          MR. HAGUE:  That --

19          THE COURT:  And Mr. Rhodes --

20          MR. HAGUE:  That's correct.

21          THE COURT:  -- indeed, did not file bankruptcy

22  himself.

23          MR. HAGUE:  That's correct, your Honor.

24          THE COURT:  Okay.

25          MR. HAGUE:  That's correct.  But my point is is that

1    these were employed by debtor entities.  Coyne, Chin, Stephens,

2    and Hansen (phonetic) were all employed by debtor entities.

3         And I don't know what else we can show this Court other

4    than through declarations that haven't been challenged, through

5    W-2s that haven't been challenged, through checks that haven't

6    been challenged, and through wires that haven't been challenged

7    that are coming from Rhodes accounts --

8              THE COURT:  Why couldn't it --

9              MR. HAGUE:  -- to these individuals.

10              THE COURT:  -- have been a capital contribution, in

11   essence?

12              MR. HAGUE:  Why could what?

13              THE COURT:  Why wasn't it, in essence, a capital

14   contribution?

15              MR. HAGUE:  Well, Rhodes was entitled to a

16   distribution of 2.5 million under the credit agreement, and

17   that's oftentimes how it would work.

18         If he made payments to these individuals, then they would

19   go ahead and subtract what he was owed at the end of the year

20   under this 2.5-million-dollar distribution, but the books show

21   that he did not receive a distribution up to this amount.

22         Now, he paid over $2,000,000 worth of wages to these

23   individuals and was reimbursed about 1.2 million, but that's

24   the arrangement they had in the office.

25         And they keep talking about no agreement and no contract.

1  Well, there was performance.  These individuals worked for

2  several years.

3      It's in Mr. Huygens' declaration.  It's in Mr. Rhodes'

4  declaration, and no one has done anything to rebut that

5  testimony.  I mean, talk about, you know, genuine issues of

6  material fact.

7      If these were employees of the debtor which no one has

8  fought about and if, in fact, he made these payments to them

9  outside out of his own pocket, then he is entitled to

10  reimbursement.

11          THE COURT:  Why isn't it a gift?

12          MR. HAGUE:  Because they did services for the debtor.

13          THE COURT:  He can make a gift.  It's his companies.

14          MR. HAGUE:  Yeah.  But that's not what he has stated

15  in his declaration, so we now know there's not a gift.  These

16  are facts.  These are facts --

17          THE COURT:  Well, sure.  After the fact, he does it.

18          MR. HAGUE:  No.  This happens as he goes through.

19  That's why he has already been reimbursed 1.2 million.

20          THE COURT:  And he wants even more money.

21          MR. HAGUE:  He wants what he paid out, your Honor.

22          THE COURT:  He wants even more money.

23          MR. HAGUE:  Your Honor, you may not like the

24  situation.  I understand that, but I'm just telling you what we

25  have submitted and what they have failed --

```
 1              THE COURT:  After he --

 2              MR. HAGUE:  -- to even rebut.

 3              THE COURT:  -- sneakily --

 4              MR. HAGUE:  I'm sorry?

 5              THE COURT:  After he goes around his own company to

 6   pay these people --

 7              MR. HAGUE:  Your Honor --

 8              THE COURT:  -- how is that equity?

 9              MR. HAGUE:  Your Honor, he was --

10              THE COURT:  How does he have clean hands?

11              MR. HAGUE:  He was the --

12              THE COURT:  You're asking for equity.  How does he

13   have clean hands?

14              MR. HAGUE:  Well, I'm not even necessarily -- I'm

15   asking for more than equity.  I'm asking for something that's

16   just built into a contract pretty much and performance.

17              THE COURT:  Why didn't he write --

18              MR. HAGUE:  Now, you're asking --

19              THE COURT:  -- a contract?

20              MR. HAGUE:  I'm sorry?

21              THE COURT:  Why didn't he do a contract?

22              MR. HAGUE:  Why did he need to do a contract if there

23   was performance?  You're asking that why they did this around

24   his companies.

25         Your Honor, he was the companies.  He was the nondebtor.
```

1    He was the debtor.  He was the CEO.  And as the CEO and the

2    director and the sole shareholder, he has 100-percent right to

3    be able to say this is the type of arrangement we're going to

4    do.

5        I'm going to employ you, but guess what?  There's a whole

6    bunch of other folks in this office --

7            THE COURT:  I want to cheat.

8            MR. HAGUE:  There's a whole bunch of other folks in

9    this office who are going to want to cheat up their amount that

10   they're owed.

11       They're going to come and say, hey, what about us.  We

12   just found out he's making this amount of money through his

13   W-2, so what does he do because -- give you an example.

14       Chris Stephens, he was in charge --

15           THE COURT:  So he chooses --

16           MR. HAGUE:  -- of entitlements.

17           THE COURT:  -- to employ them on his own.

18           MR. HAGUE:  So he chooses to pay them on his own for

19   the work they were doing for the debtors --

20           THE COURT:  Which helped him as well.

21           MR. HAGUE:  -- which helped the debtors.

22           THE COURT:  Which helped him.

23           MR. HAGUE:  I guess if you're saying they're one

24   economic unit, and he is benefiting the exact same way the

25   debtors are.

1    But we're talking about a proof of claim for amounts that

2    he paid the benefit of the debtors, and I'm just talking

3    strictly on the Greenway and the Rhodes Home Arizona.

4    I mean, we've given stacks and stacks of evidence, and

5    they're clamoring for more evidence, and we don't know what

6    else to provide.

7    I think at the very least, though, there's issues of

8    material fact whether or not these employees then were employed

9    or whether or not they did work strictly for the debtors.

10    Now, it says it in the declaration which no one's

11    challenged, but I don't see how we can simply just resolve an

12    issue and call this a clear legal issue when there's this many

13    facts before the Court.  If your Honor would like, I'll move on

14    to the other two in the scheduled claims.

15    THE COURT:  Okay.

16    MR. HAGUE:  I think I've kind of tackled the Greenway

17    and the Rhodes Home Arizona.

18    The Pinnacle Grading, your Honor -- and we still haven't

19    really addressed the Main report.  I understand that counsel

20    has objected to it on the basis of hearsay.

21    But that report was done strictly for the purpose of going

22    in to sort out what was going on between Rhodes, the debtors,

23    and the nondebtors, basically, to determine whether or not it

24    was fair the way things were allocated.  There was over

25    $500,000,000 of intercompany loans.

44

1      And so the Main report comes in, and the reason that
2   that's created is because they wanted to basically make sure
3   that everything was done in a fair manner and allocate it
4   properly.
5      Now, under the equipment and the grading arrangement that
6   happened, they were supposed to pay lease payments.  And,
7   instead, they paid the note payments, and the note payments
8   were less than the lease payments.  They overused the
9   equipment.  The equipment depreciated, and there was a loss.
10  It's as simple as that.
11     Now, it's not Rhodes as the individual that's claiming
12  this.  This is one of his entities that's claiming that they
13  were hurt by the fact that this company did not pay what was
14  due under the lease.  They paid the note payments.
15            THE COURT:  But we don't have the lease.
16            MR. HAGUE:  No.  We don't have a lease.
17            THE COURT:  Got it.  Well, isn't it convenient that
18  you say the lease says that they're entitled to overutilization
19  without a lease?
20            MR. HAGUE:  Yeah.  I understand your point.  There's
21  no lease.  We've tried to find it.  Mr. Rhodes says there's a
22  lease.  The prior CFO in the office says there was a lease.
23  The attorney said that he created a lease, and I cannot find
24  it, your Honor.
25            THE COURT:  Okay.

45

1          MR. HAGUE:  Under the last one which is the

2     Heritage Land -- and that's for the one owed to Sedora -- this

3     one again, your Honor, is quite simple.

4          Several entities including Rhodes were sued by

5     Deutsche Bank under an exclusivity agreement which later became

6     as what -- Credit Suisse later was the one who became the

7     actual lender, and so Deutsche Bank sued several of these

8     entities, including Rhodes.

9          And Sedora who was not in the credit facility and who

10    was not sued ended up fronting a lot of these litigation

11    payments.

12         And so this is simply just a reimbursement for funds that

13    were paid to the law firm that was retained in New York to

14    fight this off.

15         THE COURT:  Wasn't Sedora part of the lawsuit or no?

16         MR. HAGUE:  No.  No.  Sedora is a nondebtor entity.

17    It was not a part of the lawsuit to my understanding, and,

18    again, we have submitted, your Honor, books and records of the

19    debtor that show that the debtors made quite a few of these

20    litigation payments.

21         But there was a screwup in accounting, and so Sedora ended

22    up making, you know, $150,000 or so of these payments on behalf

23    of the debtors, but they had no say in this litigation.  They

24    weren't sued.

25         In fact, Rhodes eventually was dismissed from the lawsuit,

1    and so what you have is just simply again a reimbursement of

2    costs that were done by, one, a nondebtor entity or a debtor

3    entity, and, I mean, that's how you get to the claim under the

4    Heritage Land and the Sedora.  It --

5              THE COURT:  Okay.

6              MR. HAGUE:  Does your Honor have any questions --

7              THE COURT:  No.

8              MR. HAGUE:  -- for me on these?

9              THE COURT:  Thanks.  All right.

10        Response.

11        (Colloquy not on the record.)

12             MS. LAHAIE:  Your Honor, I'll be very brief.  I think

13   your Honor has a very good grasp of the legal issues that are

14   at stake here.

15        And I think that your Honor has hit the nail on the head

16   with respect to the Greenway Partners claim in the first of the

17   scheduled claims, and, your Honor, I also think that opposing

18   counsel and I are talking past each other a little bit here.

19        Your Honor, we are not contesting the fact that there has

20   been evidence produced in connection with these claims, and,

21   again, we have not contested the admissions made in the

22   declaration.

23        And, your Honor, the reorganized debtors are not

24   contesting the fact that these individuals are employees of the

25   debtors.

1    We're not even contesting the fact at this point,

2    your Honor, that these payments were made to these individuals,

3    and that, your Honor, is the sum and substance of the evidence

4    that has been produced on these claims.

5    And, your Honor, what has not been produced and what

6    cannot be produced because it does not exist is a contract or a

7    document or a legally-binding instrument that would demonstrate

8    both that Rhodes has a legal obligation to pay these

9    individuals and then that the reorganized debtors have a legal

10    obligation to reimburse Rhodes.

11    THE COURT:  Well, what about his argument that

12    performance creates the contract?

13    MS. LAHAIE:  Your Honor, there has been no evidence

14    whatsoever that the performance that was undertaken by these

15    individuals was done for the benefit of the debtor entities

16    themselves.

17    Your Honor, it's my understanding that these individuals

18    performed services both for the debtors and for the nondebtor

19    entities, and --

20    THE COURT:  Why doesn't that create a factual issue

21    as to Greenway?  If they perform, if there was performance and

22    if they did work for both, why doesn't that create a factual

23    issue as to allocation or whether or not there was a contract?

24    MS. LAHAIE:  Your Honor, I will admit if there had

25    been a contract and otherwise a legally-binding obligation

1    owing on the part of Rhodes or the reorganized debtors to these

2    individuals or to Rhodes, respectfully, then there may be some

3    kind of factual distinction as to how those allocations should

4    be made and what portion of those fees should ultimately be

5    paid to Rhodes.

6           THE COURT:  Well, did the Rhodes entities pay some of

7    the Greenway amounts and did they reimburse Mr. Rhodes for some

8    of those amounts?

9           MS. LAHAIE:  My understanding, your Honor -- I can

10   confer with Mr. Bono who is here in the court.  My

11   understanding is that those amounts were paid by Rhodes.  Let

12   me just step back, your Honor.

13       Prior to the petition date, I understand that the debtors

14   paid these individuals whatever their salary had been in

15   accordance with what was typical for the company, i.e., what

16   all the other employees were aware that these individuals were

17   making.

18       And that based on my understanding Rhodes had negotiated

19   undocumented understandings and arrangements with these

20   specific individuals.

21       And the purported justification was so that the employees

22   would not be upset or otherwise frustrated by these payments

23   which then your Honor may question whether these were

24   (indiscernible) market payments to begin with these other

25   payments to these individuals.

49

1      And Rhodes made -- you know, it's impossible for me to say

2  whether he made all of the payments that he had allegedly

3  promised these individuals --

4          THE COURT:  No.  Going backwards.

5          MS. LAHAIE:  -- that he would make.

6          THE COURT:  Was there performance by Rhodes entities

7  repaying Rhodes and/or Greenway?

8      (Colloquy not on the record.)

9          THE COURT:  In other words, was there, indeed,

10  performance which can show there is a contract or are you

11  denying there was any performance?

12          MS. LAHAIE:  My understanding, your Honor, is that

13  the Rhodes entities did not reimburse Rhodes for any portions

14  of these payments if that's the question that you're asking.

15          THE COURT:  And counsel said --

16          MS. LAHAIE:  But --

17          THE COURT:  -- the opposite.

18          MR. HAGUE:  Yes, your Honor.  Absolutely.

19          THE COURT:  Okay.

20          MS. LAHAIE:  Your Honor, if I could confer briefly

21  with my client?

22          THE COURT:  Okay.

23      (Colloquy not on the record.)

24          MS. LAHAIE:  Your Honor, unfortunately, I don't have

25  that information.

1           THE COURT:  Okay.

2           MS. LAHAIE:  But based on my understanding, those

3    payments had not been made, but, unfortunately, we can't say

4    definitively at this time.

5           THE COURT:  Okay.

6           MS. LAHAIE:  But, your Honor, it remains the

7    reorganized debtor's position that without a legally-binding

8    document or agreement --

9           THE COURT:  Well, but the Statute of Frauds doesn't

10   require a written contract.  I mean, it requires a contract,

11   but a contract can be shown by acceptance, offer, or

12   performance.  I mean, there's no Statute of Frauds, right?

13          MS. LAHAIE:  Your Honor, I admit I haven't looked

14   closely at that issue.

15          THE COURT:  Okay.

16          MS. LAHAIE:  But it certainly hasn't been raised by

17   the Rhodes entities nor have they submitted any evidence that

18   would support the fact that there was some sort of offer and

19   acceptance by both parties.

20      There has been no evidence that this Court has admitted as

21   to what the understanding was of the individuals that Rhodes

22   allegedly had this informal agreement with that would

23   substantiate that kind of claim.

24          THE COURT:  Okay.

25          MS. LAHAIE:  Your Honor, briefly, with respect to

1    Pinnacle Grading -- and, again, I think your Honor hit the nail

2    on the head with this one, too -- and that there is no lease,

3    and it is very convenient for Rhodes to allege that he is

4    entitled to these sort of makeup or true-up payments under the

5    terms of a document that he acknowledges exists but cannot

6    produce.

7         And, again, your Honor, even Rhodes himself by his

8    opposing counsel's characterization of the Main Amundson report

9    which is -- and I'm paraphrasing maybe a bit, your Honor, here.

10        But opposing counsel characterized it as being strictly

11   for the purposes of determining what was going on between the

12   debtors and nondebtors.

13        And, your Honor, that admission alone I would think means

14   that the Main Amundson report could not possibly be considered

15   a business record that would be exempted from hearsay because

16   it was clearly created for a specific purpose and not in the

17   ordinary course of business.

18        And, your Honor, the reorganized debtors (sic) -- or the

19   Rhodes entities should not be entitled to rely on that as

20   admissible evidence in this court.  Unless your Honor has

21   anything further --

22        THE COURT:  Okay.  And on the actual Greenway claims,

23   he's seeking the money advanced to them.  How is that different

24   from --

25        MS. LAHAIE:  From the --

1    THE COURT:  So on the Greenway claims, I guess

2    counsel is claiming there was performance as to that payment.

3    That they were paid.  That he was reimbursed partially for

4    that.

5      Is that correct?

6        MR. HAGUE:  May I address it --

7        THE COURT:  Yes.

8        MR. HAGUE:  -- real quickly?  Yes, your Honor.  With

9    respect to the Greenway claims as well as the one on the

10   Rhodes Home Arizona, we're talking about the same compensation.

11     We have alleged and through the declaration that he paid

12   over $2,000,000, and that he was reimbursed 1.2.  The same with

13   the lawsuit where he made payments, he has been reimbursed a

14   portion of that, not all of it.

15       THE COURT:  Okay.

16       MR. HAGUE:  That's the course of performance we're

17   talking, no Statute of Frauds --

18       THE COURT:  Okay.

19       MR. HAGUE:  -- not the sale of goods.

20       MS. LAHAIE:  Your Honor, I will also say that there

21   is some discrepancy amongst Rhodes' own documents as to what

22   amounts he is owed in connection with Greenway Partners' claim

23   and what amounts, if any, had been reimbursed.

24     And so I think from that, your Honor, I think the Court

25   should imply or infer that no such amounts -- your Honor should

1    not give the benefit of the doubt to Rhodes.

2        Your Honor may recall that Rhodes had set forth one amount

3    in his proof of claim with respect to the amounts he believed

4    he was owed in connection with the Greenway Partners, and I'm

5    looking for the exact dollar amount, but it was closer to

6    $900,000.  It was certainly in the $800,000 range.

7        And in support of Rhodes' own entitlement to those funds,

8    he cites as his primary form of evidence the Main Amundson

9    report.

10        Aside from the hearsay issues associated with that

11    document, the Main Amundson report sets forth a claim somewhere

12    in the realm of $600,000 that Rhodes is entitled to on account

13    of that claim.

14        So even with respect to Rhodes' own evidence and the

15    evidence he has put forth before this Court, there is no

16    consensus as to what he is owed on account of that Greenway

17    claim.

18        THE COURT:  Okay.  All right.  Thank you.  All right.

19        Well, with respect to Greenway and the Rhodes

20    compensation, there is factual issues about whether or not

21    there was a contract.

22        And your briefing didn't really address that issue.  You

23    just say there's no written contract.  Well, that doesn't end

24    the issue.

25        There doesn't have to be a written contract if there is a

1    contract established by the general principles of contract law,

2    you know, was there a course of performance that shows there

3    was a contract, and that wasn't addressed.

4        So I guess there's a factual issue as to was there a

5    contract for the Rhodes estates to repay Rhodes on account of

6    the compensation.

7        Now, I tend to think that even then there may be other

8    defenses such as you can now recover the money he's repaid

9    because he shouldn't have been paid that.

10       But that's I guess an issue that's all wrapped up in your

11   other litigation as well, so there's a factual issue as to

12   that.

13       I will sustain the objection as to the Pinnacle Grading.

14   There is no written contract.  Well, nobody can produce the

15   contract.

16       If there is a written contract, you certainly can't claim

17   quantum meruit which you haven't really alleged, and there's no

18   reason to believe that the contract would have required

19   overusage, so that objection is sustained.

20       The Heritage Land, there is an allegation that there was,

21   of course, a conduct which establishes a contract to repay

22   those amounts.  A, was there a contract and, B, to what extent

23   did the estate benefit?  Maybe there's a fraudulent transfer.

24       I will sustain the objection to the admission of the

25   Main Amundson report.  I do find that's hearsay.  So in making

1    my decision, I'm not relying on the Main Amundson report.

2        So I guess we need some scheduling orders to see where we

3    are in getting these things all resolved.  Do you want to come

4    back in about a month to let me know where we are?

5            MS. LAHAIE:  I think --

6            THE COURT:  Do you want a settlement conference

7    again?

8            MS. LAHAIE:  Your Honor, we've given that a couple

9    bites at the apple.  I'm not sure at this point it would be

10   productive.

11           THE COURT:  Okay.

12           MS. LAHAIE:  The one thing I will remind, your Honor,

13   if we could move as expeditiously as possible as we can.  As

14   your Honor knows, we do have the litigation, the

15   Litigation Trust, that's awaiting the pendency of the outcome

16   of this.  I --

17           THE COURT:  Well, you're talking about such small

18   amounts now in the scheme of things.  Why are we fooling around

19   with this as opposed to just going forward on the other things?

20   I mean, you're now talking about a total of -- well, he asked

21   for 800,000.

22           MS. LAHAIE:  And your Honor may also recall that the

23   outcome of the tax claim, Rhodes had taken a timely appeal of

24   that issue, and that appeal is still pending also resolution of

25   this issue.

56

```
 1              THE COURT:  Okay.  Well, you tell me when you're
 2   ready for trial.
 3              MR. HAGUE:  Well, just looking at this, there's going
 4   to be several witnesses that I think we're going to have to
 5   take depositions of, and I would --
 6              THE COURT:  Why haven't you done it, already?
 7              MR. HAGUE:  Huh?
 8              THE COURT:  Why haven't you done it, already?
 9              MR. HAGUE:  Well, we submitted the declarations of
10   the witnesses that we have.  The one that I had today was
11   stricken, and so I'm going to have to probably do that again.
12              THE COURT:  I know.  Why haven't you taken their
13   depositions before?
14              MR. HAGUE:  I --
15              THE COURT:  Why have we waited?
16              MR. HAGUE:  Because we thought the declarations would
17   be sufficient evidence.  They're willing to put forward their
18   testimony.  It hasn't been rebutted.  That's why we haven't
19   taken --
20              THE COURT:  Well --
21              MR. HAGUE:  -- their depositions.
22              THE COURT:  -- when are you ready for trial?
23              MR. HAGUE:  I propose the same time you granted the
24   other one which was only a very simple issue which is March.
25              MS. LAHAIE:  Your Honor, I just think that given that
```

1    that there's a whole basket of litigation that's pending the

2    outcome of this.  We just would like to move as

3    expeditiously --

4              THE COURT:  Well --

5              MS. LAHAIE:  -- as possible.

6              THE COURT:  -- look, you guys have continued this

7    thing 20 times, already, so don't blame me because you guys

8    have continued this from like June a year ago.  I mean, I

9    appreciate you want to move it fast, but you waited a year.

10   You can have December 5th.

11             MS. LAHAIE:  December 5th, your Honor?

12             THE COURT:  December 5th.

13             MS. LAHAIE:  That's fine --

14             THE COURT:  Are you going to be ready --

15             MS. LAHAIE:  -- for the reorganized debtors.

16             THE COURT:  -- by December 5th?

17             MS. LAHAIE:  We can be --

18             THE COURT:  If I give you a date --

19             MS. LAHAIE:  -- your Honor.

20             THE COURT:  -- I want you to be ready.  No

21   continuances.

22             MR. HAGUE:  We'll be ready, and this is an

23   evidentiary hearing, correct?

24             THE COURT:  Evidentiary hearing on whether or not

25   there's a contract -- on the objection to claim on those

1    two issues, the Greenway -- three, Greenway, the Rhodes

2    compensation, and the litigation expenses.

3        We can bifurcate it as to amount, well, and I guess that

4    doesn't make any sense.  We need to have it at the same time to

5    know if there was a contract to what extent, if at all, is the

6    estate responsible.

7        And if you intend to amend your lawsuit for a fraudulent

8    conveyance of what he's paid back, already, do it.  I mean,

9    maybe what he was paid already is a fraudulent conveyance.  I

10    don't see why it wouldn't be.

11            MS. LAHAIE:  Your Honor, if I could just ask for one

12    point of clarification also with respect to the Pinnacle claim?

13    You sustained the debtor's --

14            THE COURT:  Sustained the objection.

15            MS. LAHAIE:  And just to be clear as to procedurally

16    what happened then, we had sought relief, just stricken that

17    from our schedules.

18        My understanding is that once that happens and

19    (indiscernible) do that the Rhodes entities would then have

20    30 days to file a proof of claim.  I don't know to what extent

21    we can try to end run that process.

22            THE COURT:  I just find there's no merit to the

23    Pinnacle claim.

24            MS. LAHAIE:  Okay.

25            MR. HAGUE:  Your Honor, we would not file a proof of

1    claim on the Pinnacle.  The way I understand it is because the

2    way it was scheduled we never had to file a proof of claim.

3    This serves as their objection.  We're not going --

4              MS. LAHAIE:  Okay.

5              MR. HAGUE:  -- to file --

6              THE COURT:  Okay.

7              MR. HAGUE:  -- a proof of claim on that.

8              THE COURT:  All right.  Thank you.

9              MS. LAHAIE:  That's all.

10        Thank you.

11             THE COURT:  All right.  So do you want December 5th

12   for a trial?

13             MS. LAHAIE:  We do, your Honor, yes.

14             THE COURT:  All right.

15             MS. LAHAIE:  Thank you.

16             THE COURT:  Is a day sufficient?

17             MS. LAHAIE:  Yes --

18             MR. HAGUE:  I think one day --

19             MS. LAHAIE:  -- your Honor.

20             THE COURT:  Okay.

21             MR. HAGUE:  -- would be fine.

22             THE COURT:  All right.  Thank you.

23             THE CLERK:  Your Honor, are you going to hear that --

24             THE COURT:  I'm sorry.

25             THE CLERK:  You're going --

1              THE COURT:  I can't hear you.

2              THE CLERK:  You're going to hear --

3              THE COURT:  Yes.

4              THE CLERK:  -- the trial December 5th?  Okay.

5              THE COURT:  Okay.  Thank you.

6              THE CLERK:  Thank you.

7         All rise.

8         (Recess at 11:46:54 a.m.)

9         (Court reconvened at 11:49:04 a.m.)

10             THE COURT:  Be seated.

11        (Colloquy not on the record.)

12             THE COURT:  Sorry.  I forgot the motion to quash and

13   look on these shortened times.  Just because you're going to be

14   here on a certain day doesn't mean that you think you can

15   shorten time on stuff four days in advance.

16        That's why I put this for a status only.  It's nonsense,

17   and it's nuts because we never get good responses when things

18   are on shortened time, so don't do it again.  Okay.

19        On the motion to quash, when do you want to argue it?  I

20   want a reply.  I guess I just got the reply today.

21             MR. HAGUE:  Whatever works for this Court.  All we

22   would have left to file would be our response, and I know

23   there's other objections now that have objected to this, and I

24   don't know if the Court would prefer to have this all together.

25   I know there's two other parties here today.

61

```
1              THE COURT:  Yeah.
2              MR. HAGUE:  And --
3              THE COURT:  That's why I think motions to shorten
4     time in this area are stupid.
5              MR. HAGUE:  Your Honor --
6              THE COURT:  And they didn't consent to it, either.
7              MR. HAGUE:  Your Honor, the only reason we did it was
8     to try to get before the Court, so we could get something laid
9     out because of the extent of the subpoenas.
10             THE COURT:  I understand.  But to ask for four-days'
11    notice, you knew this was happening weeks ago.
12             MR. HAGUE:  Your Honor, we filed the motion for
13    shortening time the day we filed for the subpoena which was
14    immediately.  I apologize to this Court, but that's what we
15    did.
16             THE COURT:  Okay.  All right.  Two weeks, is that
17    sufficient?  I want responses.  I want it all together.  Is
18    that sufficient?  Let me know.
19             MR. HAGUE:  No.  I think that we need more time than
20    two weeks.
21             THE COURT:  Okay.
22             MR. HAGUE:  I'd say a month.
23             THE COURT:  Okay.  Now, does that affect the
24    discovery for the trial?
25             MS. LAHAIE:  Your Honor, you're looking over here,
```

1  but I believe the matter is being handled by Litigation Trust

2  counsel on the phone.  I'm not sure if they're still on.

3        THE CLERK:  They're not.  I already hung up.

4        MS. LAHAIE:  Okay.  Your Honor, this is not a matter

5  that Akin, Gump --

6        THE COURT:  Okay.

7        MS. LAHAIE:  -- is handling.

8        MR. HAGUE:  Your Honor, just so I understand, though,

9  if we're on the same page, they have their subpoenas.  We have

10  our objection and motion to quash.  Other parties do as well.

11     They have filed their reply I think just to my motion to

12  quash, not to these others, and now you're asking that we all

13  file replies within a month and have a hearing here within a

14  month?  I --

15        THE COURT:  You all have --

16        MR. HAGUE:  I don't understand.

17        THE COURT:  -- a hearing in month.

18     Well, get them on the phone.

19     (Pause at 11:51:06 p.m.)

20     (Colloquy not on the record.)

21     (Pause concluded at 11:52:33 p.m.)

22        THE COURT:  Well, you know, are they back on?  No?

23     Also, well, where is the certificate that you attempted to

24  confer in good faith --

25        MR. HAGUE:  We filed it with the court.

1          THE COURT:  -- before you filed this?

2          MR. HAGUE:  Yeah.  It was just filed with the court.

3    You're talking about on our motion to expedite?

4          THE COURT:  Right.

5          MR. HAGUE:  Yeah.  It's there.

6          THE COURT:  No.  Your good faith under the discovery

7    rules.

8          MR. HAGUE:  We filed the attorney-acknowledgement

9    form.  I thought that's what we were supposed to file.

10         THE COURT:  But under the Federal Rules of Discovery,

11   you're supposed to attempt to confer in good faith.

12         MR. HAGUE:  We did, your Honor, and we put that in

13   the attorney acknowledgement.  We said that we called counsel

14   and asked if they would be willing to have this hearing today.

15         THE COURT:  That's a separate issue.

16         MR. HAGUE:  Then what issue are you --

17         THE COURT:  Under the discovery rules, you're

18   supposed to confer in good faith before you bring motions to

19   quash.  Did you do that?

20         MR. HAGUE:  Yes, we did.  We did it on a call.  We

21   had a conference call with them.

22         THE COURT:  And did you attempt to resolve anything?

23         MR. HAGUE:  Yes, we did.  It was with the

24   Litigation Trust, the firm out of Texas.

25         THE COURT:  All right.  Well, let's set this hearing

1   for next week.  When did the other parties file their

2   objections and who filed?  I don't see any on -- well, I can't

3   tell.  I can't get on.

4            THE CLERK:  All right.  Thank you.

5            MR. HAGUE:  Your Honor, they filed.  It's Document

6   No. 1555, and I think it's just in response to --

7            THE COURT:  No, no, no, no, no.  You told me other

8   entities have now filed objections to the motion to quash.  Who

9   else --

10            MR. HAGUE:  Oh, I'm --

11            THE COURT:  -- has filed one?

12            MR. HAGUE:  I believe it's Omaha.  Is

13   it --

14            MR. GLOVER:  Your Honor, Chet Glover here on behalf

15   of Mutual of Omaha.  We filed an objection to the subpoena for

16   the 2004 exam.  That's Document 1547.

17            THE COURT:  But you didn't file a motion to quash.

18            MR. GLOVER:  We did not.

19            THE COURT:  Okay.

20            MR. GLOVER:  Yeah.

21            THE COURT:  So then I don't have your motion on, so

22   there's no motion to quash.

23            MR. GLOVER:  Correct, your Honor.

24            THE COURT:  Did anybody else file a motion to quash?

25            MR. THOMAS:  No, your Honor.

65

1          THE COURT:  All right.  Why did you tell me they had?

2          MR. HAGUE:  They filed an objection.  If I misspoke

3  and said a motion to quash, I apologize.  They filed an

4  objection.

5          THE COURT:  All right.  So we'll have a hearing next

6  week, then.  We'll have a hearing on October 5th at 9:30, and

7  I'm going to require presence of counsel, any counsel that

8  intends to argue.  All right.

9      Thank you.

10     And I suggest you try and work it out.

11     (Colloquy not on the record.)

12         THE CLERK:  All rise.

13     (Court concluded at 11:55:16 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

66

1      I certify that the foregoing is a correct transcript

2   from the electronic sound recording of the proceedings in

3   the above-entitled matter.

4

5

6   /s/ Lisa L. Cline                    10/04/11

7   _____          _____
    Lisa L. Cline, Transcriptionist        Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25