# EXHIBIT B

1

1      UNITED STATES BANKRUPTCY COURT

2          DISTRICT OF NEVADA

3          LAS VEGAS, NEVADA

4  In re:  THE RHODES COMPANIES,    )  E-Filed:  10/21/11
   LLC,                            )
5                                  )
              Debtor.             )  Case No.
6                                  )  BK-S-09-14814-LBR
   _____)  Chapter 11
7

8

9

10

11          TRANSCRIPT OF PROCEEDINGS
                     OF
12          HEARING RE: MOTIONS
                  VOLUME 1
13     BEFORE THE HONORABLE LINDA B. RIEGLE
          UNITED STATES BANKRUPTCY JUDGE
14
          Wednesday, October 5, 2011
15
              9:30 a.m.
16

17

18

19

20

21

22

23  Court Recorder:       Deborah Hemstreet

24

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

2

```
 1   APPEARANCES:

 2   For The Litigation        MICHAEL J. YODER, ESQ.
     Trust of the Rhodes       Diamond McCarthy, LLP
 3   Companies, LLC:           Two Houston Center
                               909 Fannin Street
 4                             Fifteenth Floor
                               Houston, Texas 77010
 5
     For James M. Rhodes:      KEVIN N. ANDERSON, ESQ.
 6                             Fabian & Clendenin
                               215 South State Street
 7                             Suite 1200
                               Salt Lake City, Utah 84111
 8
     For Mutual of Omaha       CHET A. GLOVER, ESQ.
 9   Bank:                     Smith, Larsen & Wixom
                               1935 Village Center Circle
10                             Las Vegas, Nevada 89134

11   For Chicago Title         THOMAS A. RYAN, ESQ.
     Company, Fidelity         Fidelity National Law Group
12   National Title           3980 Howard Hughes Parkway
     Insurance Company,        Suite 230
13   and Security Title:       Las Vegas, Nevada 89169

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          (Court convened at 09:33:57 a.m.)

2              THE CLERK:  Bankruptcy court is now in session.

3      (Colloquy not on the record.)

4              THE COURT:  Be seated.

5      (Colloquy not on the record.)

6              THE COURT:  All right.  Rhodes Companies.

7          Appearances, please.

8              MR. YODER:  Michael Yoder on behalf of the

9      Litigation Trust of the Rhodes Companies, LLC, et al.

10             MR. ANDERSON:  Kevin Anderson on behalf of

11     Jim Rhodes.

12             MR. GLOVER:  Chet Glover on behalf of

13     Mutual of Omaha Bank.

14             MR. RYAN:  Good morning, your Honor.  Thomas Ryan

15     appearing on behalf of Chicago Title, Fidelity National Title,

16     and Security Title.

17             THE COURT:  Okay.  All right.  So let's go ahead.

18             MR. ANDERSON:  Your Honor, this is Mr. Rhodes' motion

19     to quash.

20             THE COURT:  Now, at the last hearing, I specifically

21     asked you if you had complied with the local and federal rules

22     which require a meet-and-confer before the motion's filed, and

23     you told me you had done that.

24             MR. ANDERSON:  Mr. Hague was here that day.  I was

25     not present.  But that said, I did make calls to Mr. Roberts

4

1    before we filed the motion.

2              THE COURT:  Where is that in any of the pleadings?

3              MR. ANDERSON:  I don't know that we filed a

4    declaration that that was done.  In response to the Court's

5    request and instruction after the last hearing, I did have a

6    fairly lengthy conversation with Mr. Yoder on behalf of the

7    Litigation Trust, you know, in an effort to try to resolve the

8    issues.

9              THE COURT:  So what was the context of your

10   conversation before the motion was filed?

11             MR. ANDERSON:  It was a very brief conversation that

12   we objected and were going to file the motion to quash.

13             THE COURT:  And I resent being lied to.  Your counsel

14   last time implied to me that you had met the requirements of

15   the local rule which requires -- and the federal rule.

16        Rule 7037 says, "Discovery motions will not be considered

17   unless a statement of moving counsel is attached certifying

18   that after consultation or effort to do so the parties have

19   been unable to resolve the matter without Court action."

20             MR. ANDERSON:  Well --

21             THE COURT:  And that implies -- and then the federal

22   rule requires a good-faith attempt.  None of this we're filing

23   the motion or else.  Where is your good-faith effort to consult

24   before you filed the motion?

25             MR. ANDERSON:  Well, Mr. Roberts' response was that

5

1    they weren't going to modify or change any of their subpoenas,

2    you know.  I mean, they were going forward no matter what.  We

3    had no alternative but to file the motion to quash.

4            THE COURT:  But where's the certificate about your

5    consultation?

6            MR. ANDERSON:  That we failed to include, your Honor.

7    I apologize.

8            THE COURT:  Well, I really feel like I have been

9    misled because counsel seemed to indicate there was a sincere

10   effort to try and resolve this before the motion was filed.

11           MR. ANDERSON:  Well --

12           THE COURT:  And he implied --

13           MR. ANDERSON:  -- I felt --

14           THE COURT:  -- to me that --

15           MR. ANDERSON:  -- like --

16           THE COURT:  -- why I couldn't find that in their

17   motion, and I was just crazy.

18           MR. ANDERSON:  And I feel like there was a sincere

19   effort, but I think both parties are fairly entrenched which is

20   evidenced by the fact that even in response and following the

21   hearing last -- was it last week -- you know, still the parties

22   are, you know, somewhat entrenched.

23       The Litigation Trust is apparently making accommodations

24   with some of the parties.  But the scope and extent of those

25   accommodations, you know, we're not entirely aware of.

6

1       The only party that I know that they have made no effort

2   to make any accomodation with is the Fabian & Clendenin law

3   firm which has filed a motion to quash and an objection up in

4   Utah.

5       We did receive the letters from them that they've

6   indicated to the Court that they sent advising parties not to

7   respond until first after the hearing last week and then after

8   this hearing.

9           THE COURT:  All right.

10      So, Mr. Yoder, do you know what attempts were made to

11  attempt to confer before the motion was filed?

12          MR. YODER:  Unfortunately, your Honor, Mr. Roberts

13  who had handled the initial call is not here today.  He just is

14  celebrating the birth of his first child over the weekend.

15          THE COURT:  Okay.

16          MR. YODER:  It is my understanding based on

17  conversations with him that the initial call was made regarding

18  whether or not we would consent to the order on the motion to

19  shortening time, not on the actual substance of the subpoenas

20  themselves for the initial one.

21      For the second attempt to meet and confer which occurred

22  last Friday, Mr. Anderson did call me.  We did have a lengthy

23  conversation.  We went back and forth.

24      We couldn't come to agreement on narrowing the subpoena in

25  terms of time or in terms of a limited number of just specific

7

```
1    transactions.

2        I offered to limit the subpoena if there were any

3    specific requests in each of the subpoenas that he had any

4    issue with.

5        We had provided a copy of each subpoena to Mr. Anderson,

6    and I didn't hear back from him on that proposal, and that the

7    reply was filed about an hour later.

8            THE COURT:  Well, I feel like I've been lied to.  And

9    before Mr. Anderson (sic) appears again, he'd better be ready

10   to explain his answers to me --

11           MR. ANDERSON:  Okay.

12           THE COURT:  -- and what attempts were really made.

13           MR. ANDERSON:  Well, I --

14           THE COURT:  Not Mr. Anderson.  I'm sorry.

15       You're Mr. Anderson.

16           MR. ANDERSON:  Mr. Hague.

17           THE COURT:  Mr. Hague.

18           MR. ANDERSON:  Yeah.  Well, I apologize.  There's

19   certainly no intent to mislead the Court.

20           THE COURT:  I mean, he was very adamant about it, and

21   the way he responded was sort of like I'm crazy.  It's

22   obviously here.  It's not.

23           MR. ANDERSON:  Well, and, again, you know, I think he

24   sincerely thought that it was there, but it --

25           THE COURT:  I doubt it.
```

8

```
1              MR. ANDERSON:  It was an oversight.

2              THE COURT:  I don't think he knew what I was talking

3    about and pretended he did.

4              MR. ANDERSON:  Well, I don't know.  I apologize

5    again, your Honor.  Would you like me to address --

6              THE COURT:  Go ahead.

7              MR. ANDERSON:  -- the status of where we're at now?

8              THE COURT:  All right.

9              MR. ANDERSON:  Following my conversation with

10   Mr. Yoder, there are two things that are apparent to me.  The

11   first I think goes to, you know, the entire motion to quash.

12       It is very clear to me that the Litigation Trust has

13   specific litigation in mind.  In fact, Mr. Yoder told me they

14   have a complaint filed and -- I mean, not filed -- prepared and

15   ready to file articulating issues with specific transactions

16   and specific events that they're ready to go on.

17       That said, they wanted to do these broad, extremely

18   overinclusive subpoenas to try to get additional information to

19   perhaps search for additional causes of action or as he put it

20   to refine the scope of some of their transactions that they

21   have questions about.

22       That is an improper use of a Rule 2004 examination.  To

23   use it to support a litigation effort is an improper use of

24   Rule 2004.

25       What they should do is file their complaint, and then
```

1    let's go through the normal discovery process.  The

2    J&R Trucking case as in others say that Rule 2004 is not a tool

3    for discovery.

4         Their response to our motion is replete with we're trying

5    to do discovery.  We're trying to seek discovery here.  We're

6    trying to seek discovery of that.

7         That said and if the Court is willing to allow them to

8    proceed with the 2004 examinations, Mr. Yoder has all but

9    conceded to me on the phone -- and he has certainly conceded to

10   several of the parties with whom they claim to have negotiated

11   a reduction of the scope of the subpoenas -- that they have

12   conceded that the subpoenas are overlybroad.

13        These things are way out of line.  They point to,

14   for example, a couple of checks written to

15   Fabian & Clendenin.

16        Rather than asking about those specific events, they ask

17   for everything going back to January 2005, not only for any

18   debtor entities that Fabian & Clendenin may have represented,

19   but, also, all of the other nondebtor entities as well as

20   individuals who aren't even part of the bankruptcy like

21   Mr. Huygens.

22        Again, that's quite excessive.  They want personal diaries

23   of the attorneys.  They want --

24             THE COURT:  Well, didn't you tell me there's a

25   separate motion to quash for them someplace else?

1          MR. ANDERSON:  On the Fabian one, there is, but --

2          THE COURT:  Okay.

3          MR. ANDERSON:  But --

4          THE COURT:  So I don't want to hear about that.

5          MR. ANDERSON:  Well, that is replete.  Every one of

6   the law-firm subpoenas are identical except for the name of the

7   law firm.

8        Every one of the title-company subpoenas are identical

9   except for the names of the title companies.  Every one of the

10   financial-institution subpoenas are identical except for the

11   names.

12          THE COURT:  Well --

13          MR. ANDERSON:  There is no effort --

14          THE COURT:  -- how does Mr. Rhodes have standing to

15   object to a subpoena asking about transactions with

16   Mrs. Rhodes?

17          MR. ANDERSON:  One, he's a subject of a lot of these

18   subpoenas.  They are seeking his personal information.  And to

19   the extent that Rule 45 allows a party to object, he is a party

20   to the bankruptcy proceedings.

21        The Litigation Trust is well-aware of him.  We're

22   well-aware of the Litigation Trust.  We are a creditor in this

23   bankruptcy proceeding.

24        We have a pending proof-of-claim issue that we'll be

25   taking further evidence on in December before the Court.  Those

1    issues haven't even been resolved.

2        If Mr. Rhodes is not a party, then there is no party.  If

3    somebody who is actively involved in disputes with --

4            THE COURT:  But --

5            MR. ANDERSON:  -- the bankruptcy --

6            THE COURT:  But they're asking --

7            MR. ANDERSON:  -- estate --

8            THE COURT:  -- for documents involving her, so how

9    does he have objection, a right to object?

10           MR. ANDERSON:  Well, they're asking for documents

11   relating to him.

12           THE COURT:  I understand, but you just told me that

13   it's overbroad because they're asking about documents for other

14   people.

15           MR. ANDERSON:  Other people and for him.  I mean,

16   it --

17           THE COURT:  I understand.

18           MR. ANDERSON:  Okay.

19           THE COURT:  You just told me your objection was

20   because they were asking for documents, for example, for his

21   daughter.  How does he have standing to object to documents

22   requested concerning his daughter?

23           MR. ANDERSON:  I don't know that he does.

24           THE COURT:  Okay.  Then why did you tell me that?

25           MR. ANDERSON:  Well, he has standing because he --

1          THE COURT:  To object vis-a-vis him.

2          MR. ANDERSON:  Vis-a-vis him --

3          THE COURT:  Okay.

4          MR. ANDERSON:  -- And vis-a-vis the entities, the

5    nondebtor entities, that he controls.

6          THE COURT:  Okay.  So he doesn't control -- how do we

7    know what entities he even controls?

8          MR. ANDERSON:  Well, the --

9          THE COURT:  He's kind of kept all that quiet.

10         MR. ANDERSON:  Well, the reorganized debtors and the

11   Litigation Trust are well-aware of it.  They've listed them

12   all.

13      Anyway, I think it's fairly clear that these subpoenas

14   are designed to assist in the litigation as an improper

15   purpose.

16      And I think that the Litigation Trust has acknowledged in

17   numerous conversations with at least several of the recipients

18   of these that they are extremely overbroad.  And at a minimum,

19   this Court needs to have them reign these in.

20      I asked Mr. Yoder on the telephone call.  Supposedly,

21   they have specific transactions that they are concerned

22   about.

23      Mr. Roberts' declaration does not identify them.  He just

24   has conclusions about things that appear to be or that may have

25   happened.

13

```
1          THE COURT:  But, now, you haven't even bothered to

2     set forth how they could be limited, right?  You've just said

3     it's all overbroad.  I'm not going to -- they shouldn't respond

4     to anything.

5          MR. ANDERSON:  If --

6          THE COURT:  The whole thing --

7          MR. ANDERSON:  If --

8          THE COURT:  -- should be quashed.

9          MR. ANDERSON:  That's our position, yes.

10          THE COURT:  Okay.  You haven't even bothered to say

11     how they're narrowed.  You're saying just because some might be

12     overbroad the whole thing should be quashed.

13          MR. ANDERSON:  Well, that's all we're required to do,

14     then the burden shifts to them to show good cause as to why

15     they should be allowed to ask for anything.

16          THE COURT:  Okay.

17          MR. ANDERSON:  And Mr. Roberts' declaration doesn't

18     do that.  He is very general.  They supposedly have some

19     specific transactions.

20       They have not identified anything other than, you know,

21     two payments that were supposedly made to Fabian and Clendenin

22     which --

23          THE COURT:  I told you I'm not going to consider the

24     Fabian one because it's under --

25          MR. ANDERSON:  I --
```

1          THE COURT:  You've got a motion to quash someplace

2    else.

3          MR. ANDERSON:  I understand.  That's the only

4    concrete example of two specific transactions.  As to all the

5    others, you know, they don't tell us what events they are

6    looking into.

7       Some of those events could be subject to a release that

8    Mr. Rhodes is entitled to that he negotiated as part of the

9    reorganization plan.  Some of them may not be.

10      But it's now their burden to explain to the Court, you

11   know, what they're after and why and for the Court to limit it

12   to those reasons at a minimum.

13      I think these things are so grossly overbroad they should

14   all be thrown out, and they should be required to go back to

15   the drawing board and have some very targeted discovery

16   requests if this Court's even going to allow them to conduct

17   litigation discovery as part of a 2004 examination.

18          THE COURT:  Okay.

19          MR. ANDERSON:  Thank you, your Honor.

20          THE COURT:  All right.  Response.

21          MR. YODER:  Good morning, your Honor.  I'll try to be

22   brief as I feel like our briefing handled a lot of these issues

23   fairly in a fair amount of detail.

24      First of all, I think the threshold issue here and

25   probably a big part of the reason between the contentions

1    between the two parties is just the fundamental

2    misunderstanding that Mr. Anderson has on the purpose of 2004.

3         As we point out in our brief, we cited some cases that

4    say, for example, quote, "Rule 2004 allows a trustee to do the

5    necessary investigatory work without the need for initiating

6    formal litigation which would just trigger the traditional

7    discovery tools.

8         Indeed, one purpose of such an examination is to give the

9    trustee the information needed to determine whether litigation

10   should be filed," and that's the in re J&R Trucking case cited

11   in our brief.

12        We also cited a case that says, "Even if litigation is,

13   quote, 'sure to be filed,' unquote, Rule 2004 discovery is

14   still appropriate because discovery presuit, quote, 'can be

15   critical to ensure that no viable cause of action is lost.'

16        For while it may be certain that suit will be filed

17   against a potential defendant, that does not mean all possible

18   claims, some of which might soon be lost to limitations, have

19   been identified," and that's the in re Mirant case cited on

20   page 6 of our brief.

21        And that's exactly what's going on here, your Honor.  We

22   readily concede we are investigating claims against Mr. Rhodes

23   and the Rhodes entities pursuant to as contemplated by the

24   plan.

25        As Mr. Anderson indicated, we've identified a number of

1   transactions that, you know, if we had to file suit in the near

2   future we could.

3       There are additional transactions that we think are

4   suspicious on their face primarily involving transfers of

5   debtor assets to buy land for the Rhodes entities.

6       And what we don't want to do is file a suit that we have

7   indiciums of -- you know, every first indicia of fraud, and

8   then we end up having to go through pleading amendments and

9   narrow later on when we can file the most narrow suit possible

10  now.

11      And, yes, to the extent we identify additional claims in

12  doing that, we'll certainly pursue those claims to ensure that

13  they're not lost to limitations.

14      But the primary focus of our efforts really are to narrow

15  the number of transactions that we're looking at because, right

16  now, we're looking at potentially hundreds of transactions

17  involving tens if not hundreds of millions of dollars as it

18  relates to these lands transactions.

19      As to the burden of good cause, I think it's pretty

20  obvious to everyone in the courtroom that there will be

21  potential claims against Mr. Rhodes.

22      I think the fact that Mr. Rhodes has fought as vigorously

23  as he has in defending a proof of claim in which in his own

24  words he's repeatedly said the sole purpose of the proof of

25  claim is to obtain a $10,000,000 setoff, it's pretty clear that

1   even Mr. Rhodes recognizes that there will be some claims.

2   There will be liability.

3       As we cited in our brief, you know, it is appropriate for

4   a Court to rely on representations of counsel as to the

5   existence of good cause when there are potential claims, and

6   that's the in re Metiom case cited on page 6 of our brief

7   again.

8       So, in short, as we point out in our brief, we have found

9   a bunch of claims, already, payments made to Jim Rhodes for his

10  personal income taxes, to fund his divorce settlement, to pay

11  legal fees and other professional fees rendered solely for

12  Mr. Rhodes to acquire real property, et cetera.

13      I think it's perfectly appropriate that the Trust would

14  investigate these claims to narrow the scope of any litigation

15  instituted against Mr. Rhodes.

16      As to any concerns the Court may have as the various other

17  entities, the individuals as they're defined in the subpoena,

18  the Rhodes entities as they're defined in the subpoena, the

19  debtors, obviously, they represent all the claims that all the

20  debtors hold, so there just happen to be a lot of debtors in

21  this case with the way the business was structured.

22      The Rhodes entities, again, to the extent that Mr. Rhodes

23  controls them, there's money flowing all around between the

24  different debtors and the Rhodes entities which is why a

25  substantiative consolidation was granted in this case.

1      And a big part of the reason that we're looking at

2   transactions involving the different Rhodes entities and the

3   individuals is there are a lot of instances in which money had

4   been moved upstream from the debtors up to these Rhodes

5   entities and then from the Rhodes entities to Jim Rhodes or the

6   Rhodes entities for some other purpose.

7      And what we can see from the debtor records is money goes

8   from debtor to third party or debtor to a Rhodes entity for

9   what appears to be a purpose of the Rhodes entities or for

10   their benefit.

11      But we don't necessarily know what they did with it, and

12   that's what we're really trying to figure out.  We don't want

13   to get into any indirect -- you know, step into any indirect

14   benefit-rule problems, et cetera.

15      As for the Fabian subpoena, obviously, that's not before

16   the Court today.  That is the one -- we received the motion to

17   quash after we filed our response to the motion to quash filed

18   by Rhodes which is why we represented to the Court that as far

19   as we're concerned everything's been amicably resolved.

20      If Mr. Anderson is prepared today to represent to the

21   Court that he has no conflict of interest because Fabian

22   represented solely Rhodes, we'll gladly withdraw that subpoena

23   today.

24      To the extent that there is no representation of the

25   debtors, then I think we could be pretty confident that all the

1    funds from the debtors that went to Fabian did not confer any

2    benefit of the debtors for purposes of our litigation.

3         And I think that just to -- in conclusion, I think that

4    brings us to the final point is we really -- the whole purpose

5    of standing requirements or prohibitions of advisory opinions

6    in the first place in all litigation contexts is so that the

7    Courts aren't wasting their time issuing opinions on

8    hypothetical concerns, and that's essentially what Mr. Rhodes

9    is asking the Court to do here.

10        You know, we have amicably resolved or are in the

11   process of resolving our differences with all the other

12   entities.

13        To the extent, you know, who he -- Mr. Rhodes has no idea

14   more than we do how many different documents some of these

15   entities may or may not have.

16        It's ridiculous to quash a subpoena because an entity may,

17   in fact, have a lot of the records if no one knows.  And at the

18   end of the day, that entity may have 200 pages, not 2,000,000,

19   and I think it's appropriate that we would just resolve those

20   subpoenas with the parties themselves.

21        Does the Court have any questions?

22            THE COURT:  No.

23        Thank you.

24            MR. YODER:  Thank you, your Honor.

25            THE COURT:  Response.

1          MR. ANDERSON:  I would encourage the Court to read

2    the J&R Trucking case because it is a case that says that a

3    Rule 2004 examination is not to be used in lieu of discovery.

4          Mr. Yoder's explanation again continues the vague

5    references to transactions.  Apparently, they have some detail

6    about transactions that they need additional information about.

7          Rather than drafting subpoenas that go after the

8    information that they need, they have drafted, you know,

9    uniform sets of subpoenas that regardless of the role that the

10   people play or that they know or have suspicions about the role

11   that they played, they ask for information going back to 2004

12   or 2005.

13         If the Court is not going to quash the subpoenas, they

14   should be tailored to the specific transactions.  Apparently,

15   they're doing that in these negotiations, although we have no

16   idea what they're doing.

17         We have yet to hear about one specific transaction

18   involving a title company that is subject to some legitimate

19   concern that they want specific documents regarding, the same

20   with bank transfers and the same with work that was performed

21   by law firms.

22         Thank you, your Honor.

23         THE COURT:  Okay.  Well, I'm going to deny the motion

24   to quash.  2004 is an appropriate method to examine the acts

25   and conduct of the debtor, and, obviously, it will lead to

1   litigation from time to time.

2       Is it the smartest way that the Trust should make

3   discovery?  I don't know.  That's not my business, but it is a

4   legitimate way.

5       And it's true while an action is pending that a 2004

6   should not be used it's not yet, and to suggest that a 2004

7   isn't appropriate where you're going to lead to litigation is

8   nonsense because that's the whole point.

9       You do a 2004 to see whether or not there are fraudulent

10  conveyances, to see whether or not there are transfers that

11  should be set aside, to see whether or not third parties have

12  assets of the debtor.

13      We already know that Mr. Rhodes kind of led a slipshod way

14  of doing business.  We have in the proof-of-claim process.  He

15  is claiming he should be reimbursed for paying a third party

16  because he wanted to keep it off the books.

17      All these kinds of transactions deserve investigation in

18  other contexts as well.  We know he didn't care much about his

19  books and records from the way he did his business.

20      And, also, it's not the debtor's place to say this

21  subpoena is burdensome.  The persons who are subpoenaed are

22  perfectly able to do that.

23      Secondly and finally, there was not a good-faith attempt

24  to try and resolve this.  It's just Jim Rhodes saying no and

25  counsel taking no for an attitude, and I'm not going to

22

1    tolerate that kind of conduct.

2        Now, do we have -- has the Mutual of Omaha one been

3    resolved, yet, or do we need to argue that one?

4            MR. GLOVER:  Your Honor, I believe the

5    Mutual of Omaha is all but resolved.  We're trying to hammer

6    out just a few of the deadlines for production, and then at

7    such time we'll withdraw the objection.

8            THE COURT:  All right.  Okay.  Thank you very much.

9    All right.

10        That's all.

11        Thank you.

12            THE CLERK:  That's it?

13        Thank you, your Honor.

14            MR. ANDERSON:  Thank you, your Honor.

15            MR. YODER:  Thank you, your Honor.

16            THE CLERK:  All rise.

17        (Court concluded at 09:57:46 a.m.)

18

19

20

21

22

23

24

25

23

1      I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                           10/21/11

    _____          _____
7    Lisa L. Cline, Transcriptionist              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25