E-File:  February 13, 2011

**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV  89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
            ssherman@klnevada.com

*Attorneys for Reorganized Debtors*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:  pdublin@akingump.com
            aqureshi@akingump.com

*Attorneys for Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>THE RHODES COMPANIES, LLC, aka "Rhodes Homes, et al.,[1]<br><br>               Debtors.<br><hr>Affects:<br><br>☐  All Debtors<br>☒  Affects the following Debtor(s):<br><br>  Bravo, Inc. 09-14825 | Case No.: BK-S-09-14814-LBR<br>(Jointly Administered)<br><br>Chapter 11<br><br>**PRE-TRIAL BRIEF OF THE<br>REORGANIZED DEBTORS**<br><br>Trial Date:  March 5, 2012<br>Trial Time:  9:30 a.m.<br>Courtroom 1 |

---

[1]  The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...............................................................................6

PROCEDURAL BACKGROUND...........................................................................9

    A.    General Background Information ............................................10

    B.    Bravo Hires Union Pacific as a Subcontractor. .....................11

    C.    Kahre is Convicted of Tax Fraud ..........................................13

    D.    The IRS's Untimely Assessment ...........................................14

    E.    The IRS Files its Claim Against Bravo for Union Pacific's Unpaid Taxes......................................................................................14

ARGUMENT ........................................................................................................15

I    THE IRS CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS....................15

II    THE IRS BEARS THE BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT BRAVO COMMITTED FRAUD WITH INTENT TO EVADE TAX, AND NO SUCH EVIDENCE EXISTS. ...............................................................................................16

III    THE IRS CANNOT ESTABLISH THAT BRAVO IS THE EMPLOYER RESPONSIBLE FOR THE TAXES SET FORTH IN THE IRS CLAIM. .......................18

    A.    Bravo Was Not the Employer Because Bravo Did Not Control Payment of the Workers' Wages ..........................................21

    B.    The Balance of the Common Law Factors Weighs in Favor of Finding that Union Pacific is the Employer of the Workers at Issue....................23

IV    BRAVO IS NOT LIABLE FOR ANY PENALTIES...........................................29

V    THE IRS GROSSLY MISCALCULATED THE INTEREST DUE................................30

CONCLUSION......................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Badaracco v. C.I.R.,*
    464 U.S. 386 (1984) ............................................................................................16

*Blue Lake Rancheria v. United States,*
    651 F.3d 1112 (9th Cir. 2011) ..........................................................................24

*Brown v. Comm'r,*
    418 F.2d 574 (9th Cir. 1969) ............................................................................16

*Brown v. Comm'r,*
    T.C.M. 1968-29, Docket Nos. 3387-65, 1971-66, 2209-66, 1968 WL 1152 (U.S.T.C.
    Feb. 19, 1968) ..................................................................................................16

*Clackamas Gastroenterology Assocs., P.C. v. Wells,*
    538 U.S. 440 (2003) ..........................................................................................25

*Hansen v. Comm'r,*
    T.C.M. 1981-98, Docket No. 11617-77, 1981 WL 10875 (U.S.T.C. Feb. 26, 1981)........16, 17

*Helvering v. Taylor,*
    293 U.S. 507 (1935) ..........................................................................................19

*George v. Comm'r,*
    338 F.2d 221 (1st Cir. 1964) ............................................................................17

*Goldberg v. Comm'r,*
    239 F.2d 316 (5th Cir. 1956) ............................................................................17

*In re Galletti,*
    No. LA 99-48587-ER, 2000 WL 1682960 (Bankr. C.D. Cal. Sep. 11, 2000)..................15, 16

*In re Galletti,*
    No. ED CV 00-00753 VAP, 2001 WL 752652 (C.D. Cal. Mar. 23, 2001)............................15

*In re Galletti,*
    314 F.3d 336 (9th Cir. 2002) ............................................................................15

*In re Olshan,*
    356 F.3d 1078 (9th Cir. 2004) ......................................................................16, 19

*In re Sw. Rest. Sys. ("Southwest"),*
    607 F.2d 1237 (9th Cir. 1979) ......................................................................22, 23

*Kittlaus v. United States,*
    41 F.3d 327 (7th Cir. 1994) ..............................................................................23

*Nationawide Mut. Ins. Co. v. Darden*
    503 U.S. 318 (1992).............................................................................25

*Olinger v. Comm'r,*
    234 F.2d 823 (5th Cir. 1956) .........................................................17

*Otte v. United States,*
    419 U.S. 43 (1974)...........................................................................22

*Palmer v. U.S. Internal Revenue Service,*
    116 F.3d 1309 (9th Cir. 1997) .......................................................19

*Raleigh v. Ill. Dept. of Revenue,*
    530 U.S. 15 (2000)...........................................................................16

*Transp. Labor Contract/Leasing, Inc. v. Comm'r,*
    123 T.C. 154 (2004)................................................................. *passim*

*Transp. Labor Contract/Leasing, Inc. v. Comm'r,*
    T.C.M. 2005-173, Nos. 1188-01, 2005 WL 1649136 (U.S.T.C. July 14, 2005) .....................24

*Transp. Labor Contract/Leasing, Inc. v. Comm'r,*
    461 F.3d 1030 (8th Cir. 2006) .......................................................24

*Valetti v. Comm'r,*
    260 F.2d 185 (3d Cir. 1958)...........................................................17

*U.S. v. Galletti,*
    541 U.S. 114 (2004).........................................................................15

*Weimerskirch v. Comm'r,*
    596 F.2d 358 (9th Cir. 1979) .........................................................19

**STATUTES**

11 U.S.C. § 502(b) ................................................................................15

11 U.S.C. § 502(b)(1) ...........................................................................15

26 U.S.C. § 6501(a) ..............................................................................15

26 U.S.C. § 6501(c)(1) .........................................................................16

26 U.S.C. § 6651 ..................................................................................29

26 U.S.C. § 6656 ..................................................................................29

26 U.S.C. § 6663(a) ..............................................................................29

26 U.S.C. § 7454..............................................................................16, 30

4

26 U.S.C. § 7454(a) .................................................................................................16

26 U.S.C. § 3401(d)(1) ........................................................................................22, 24

Tax Ct. R. 142(b) ...................................................................................................16

Treasury Regulations § 31.3121(d) – 1(c)(2) ...........................................................20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2      **TO THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE:**

3              The above-captioned reorganized debtors (collectively, the "Reorganized Debtors")

4      hereby submit this pre-trial brief in support of their objection previously filed to claim No. 7 (as

5      amended from time to time, the "IRS Claim") filed by the Internal Revenue Service (the "IRS")

6      against Debtor Bravo, Inc.**2** ("Bravo", and, together with the IRS, the "Parties") and respectfully

7      represent as follows:

8                                   **PRELIMINARY STATEMENT**

9              In this action, the IRS seeks hundreds of thousands of dollars in back taxes—and millions

10     more in penalties and interest—solely on the basis of Bravo's unfortunate hiring, many years

11     ago, of a subcontractor, Union Pacific Construction ("Union Pacific"), who failed to properly

12     withhold and pay employment taxes for its employees.

13             The IRS's cupped hand reaches unusually far here, grounded only on its novel and

14     unsupported theory that Union Pacific, a construction company, was not Bravo's subcontractor

15     but rather a mere provider of payroll services to Bravo, and that the employees of *Union Pacific*

16     were actually employees of *Bravo*.  Fatally to its claim, however, the IRS has no direct evidence

17     to support this theory.  Instead, it has offered only the irrelevant testimony of low-level

18     employees whose testimony is not based on their personal knowledge, but instead consists of

19     hearsay, circumstantial evidence, and legal conclusions absent any foundation or expertise.

20             The IRS Claim is not only meritless; it is also time-barred.  Any internal revenue tax,

21     including employment tax, must be assessed within three years of the date the tax return was

22     filed.**3**  In an examination report dated March 23, 2010, many years after the respective

23     limitations periods had expired, the IRS proposed adjustments to Bravo's returns for 2000, 2001,

24     2002, and 2003.  Those adjustments have not been assessed but were incorporated into the IRS

25     proof of claim.  The IRS proof of claim was initially filed on September 25, 2009, which also

26     _____

27     **2** The IRS's proof of claim was in fact filed against Bravo LLC, a non-existent entity.  The Reorganized Debtors
       reserve all rights with respect to this error should the IRS fail to correct it by amendment.

28     **3** For this purpose certain employment and withholding tax returns (including those here at issue) are deemed filed
       April 15 of the succeeding year (if filed by then).  26 U.S.C. § 6501(b)(2).

                                          6

1   was many years after the respective limitations periods had expired.  It is well-settled that a

2   claim that is unenforceable as time-barred under applicable law shall be disallowed in

3   bankruptcy.

4        Having failed to conduct a timely assessment, the IRS will presumably attempt to

5   shoehorn its claim into the fraud exception to the three-year limitations period.  To do so,

6   however, the government must prove *both* (1) the underlying tax liability *as against Bravo*,

7   including the essential element that the workers at issue were employees of Bravo, not Union

8   Pacific; and (2) that Bravo committed fraud with intent to evade payment of the underlying tax.

9   Failure to prove *either* fraud or underlying liability ends the government's case.  Moreover, the

10  government must prove both the fraud and the underlying liability *by clear and convincing*

11  *evidence*.  The government can prove neither.  First, there is simply no evidence of fraud on the

12  part of Bravo—Union Pacific's fraud is not Bravo's fraud.  The IRS has not even *alleged* that

13  Bravo committed fraud in any of its pleadings to date.[4]  Second, with respect to the underlying

14  liability, the IRS cannot even meet the lesser burden of preponderance of the evidence.  Viewed

15  against the higher standard of clear and convincing evidence applicable here, the IRS's meager

16  evidentiary offering falls far short.

17       The Reorganized Debtors plan to rebut the government's evidence with testimony from

18  the CFO of Rhodes Homes and the Construction Manager of Bravo, senior management-level

19  employees with direct personal knowledge of Bravo's relationship with Union Pacific and

20  Bravo's employment practices.  They will testify that (i) Bravo hired Union Pacific as a

21  subcontractor; (ii) at the time the agreement was entered into, Union Pacific was a well-known

22  construction company in the region and was viewed within the industry as a reputable operation;

23  (iii) Bravo's clear understanding was that Union Pacific would have the sole responsibility for its

24  employees, including withholding and paying taxes, providing worker's compensation insurance,

25  hiring and firing, allocating and assigning workers to projects, provided training and tools as

26  needed, and ensuring the work was properly performed; (iv) during the time periods in question,

27

28  [4] At the September 27, 2011 hearing, while discussing penalties, the Reorganized Debtors pointed out that no
    allegations had been made that Bravo possessed the requisite scienter to constitute fraud.  *See* 9/27/11 Tr. at 18:14-
    18:18.  The IRS, though present, had no response to this point.

Bravo correctly paid taxes for its own employees; (v) Bravo maintained and processed its own payroll for hundreds of its own employees, filed the required returns and deposited the corresponding employment and withholding taxes; and (vi) Bravo had no knowledge that Union Pacific was engaged in a fraudulent tax scheme not to pay taxes for its own employees.

Ultimately, the evidence will convincingly show that the workers at issue were in fact employees of Union Pacific, not Bravo. As an initial matter, Bravo had no control over payment of the workers' wages. Thus, under the plain language of the Internal Revenue Code, and controlling legal precedent, Bravo is not the workers' employer for purposes of employment tax withholding. Second, should the Court proceed to weigh the common law employment factors, it will find that they, too, weigh heavily in favor of a finding that Union Pacific, not Bravo, is the employer.

The penalties portion of the IRS Claim fails for the simple reason that where there is no underlying liability, there is no penalty. Moreover, to prevail on its claim for fraud penalties, the IRS bears the burden of proving by clear and convincing evidence that Bravo acted with fraudulent intent to evade taxes. The IRS has not alleged, much less proven, anything approaching fraudulent intent. Although Union Pacific engaged in fraudulent activity, there is no evidence that Bravo—or anyone else at the time—was aware of or knowingly participated in Union Pacific's fraudulent scheme.

Finally, compounding the IRS Claim's lack of timeliness and merit, the IRS grossly miscalculates the interest on the underlying taxes, claiming interest on the general unsecured claims of $849,130.51, more than quadruple the correct amount of $196,509.04. This overreach alone teeters on the edge of frivolousness, and demonstrates that the IRS Claim as a whole is both arbitrary and excessive.

For the reasons set forth herein, the IRS Claim should be disallowed and expunged.

## PROCEDURAL BACKGROUND

On March 31, 2009 (the "Petition Date"), Bravo, one of the above-captioned Debtors,[5] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On September 25, 2009, the IRS filed its proof of claim No. 7-1 as a priority claim in the amount of $1,285,683.50 against Bravo in the bankruptcy case numbered 09-14825.  On April 13, 2010, the IRS filed an amended proof of claim No. 7-2 against Bravo.  The amended proof of claim included a priority claim in the amount of $1,326,068.11 and an unsecured claim in the amount of $2,560,388.64, for a total claim of $3,886,456.75 against Bravo.[6]

On March 31, 2011, the Reorganized Debtors filed the *Reorganized Debtors' Objection to Claim No. 7 Filed by the Internal Revenue Service Against Debtor Bravo, Inc. Pursuant to Sections 105, 502(b) and 505 of the Bankruptcy Code and Bankruptcy Rules 3001, 3003, and 3007* [Docket No. 1377] (the "Objection").  By the Objection, the Reorganized Debtors requested that this Court enter an order disallowing the IRS Claim in its entirety.  The Court scheduled a hearing regarding the IRS Claim on June 24, 2011.

On June 22, 2011, this Court entered an order approving the scheduling stipulation entered into between the Parties continuing the June 24, 2011 hearing.  The Court subsequently re-scheduled the hearing for September 27, 2011 (the "Hearing").  Based upon the Parties' agreement, the IRS's response deadline to the Objection was extended to September 16, 2011. The Reorganized Debtors' reply deadline was extended to September 21, 2011.

On September 15, 2011, the IRS filed its *Opposition to the Debtors' Objection to IRS Claim Filed Against Bravo, Inc.* [Docket No. 1540] (the "Opposition").  On September 21, 2011,

---

[5] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Reorganzied Debtors' Objection to Claim No. 7 Filed by the Internal Revenue Service Against Debtor Bravo, Inc. Pursuant to Sections 105, 502(b) and 505 of the Bankruptcy Code and Bankruptcy Rules 3001, 3003, and 3007* [Docket No. 1377].

[6] A true and correct copy of the IRS Claim is attached to the accompanying Declaration of Justin Bell, dated February 13, 2012 ("Bell Declaration" or "Bell Decl."), as **Exhibit A**.

the Reorganized Debtors field their *Reply in Support of Objection to Claim No. 7 Filed by the Internal Revenue Service Against Debtor Bravo, Inc., etc.* [Docket No. 1553] (the "Reply").

At the Hearing, the Court heard oral argument with respect to the IRS Claim and, for the reasons set forth on the record, set the matter down for trial on March 5, 2012.

On January 26, 2012, the Parties filed their *Joint Pre-Trial Statement* [Docket No. 1640] (the "Pre-Trial Statement").

Although the parties have continued to engage in good faith settlement discussions, as of the time of filing this pre-trial brief, the parties have not yet reached an agreement to resolve the Objection.

## FACTUAL BACKGROUND

### A.  General Background Information

Bravo was a Nevada-based corporation that specialized in framing houses for certain Debtors' homebuilding operations.  In the ordinary course of its business, Bravo (or certain affiliates on Bravo's behalf) maintained books and records, that, among other things, reflected Bravo's tax liability to the IRS and other governmental units in the State of Nevada.  Included in Bravo's books and records was information regarding its withholdings as well as its FICA tax obligations.  At all relevant times, Bravo filed tax returns with the necessary taxation authorities, including the IRS and the State of Nevada, either directly or through its affiliates.  Bravo ceased operations in or around 2007, approximately two years prior to the Petition Date.

On April 13, 2010, the IRS filed the IRS Claim seeking $3,886,456.75 as a result of Bravo's alleged failure to pay various employment-related taxes from approximately 2000 through 2003 (the "Relevant Period").  In addition to its payment claims, the IRS also seeks various penalties against Bravo.  The IRS Claim is premised upon certain amounts due to the IRS as a result of actions by Union Pacific, a company *wholly unaffiliated* with Bravo or any other Debtors.  The IRS's claims are as follows:

| Element of the Claim | Amount |
|---|---|
| IRS's priority claim for Bravo's FICA and withholding taxes for the Relevant Period | $879,452.54 |
| IRS's priority claim for interest associated with the above tax obligations | $446,615.57 |
| **Total Priority Claim** | **$1,326,068.11** |
| Unsecured penalties pursuant to §6651 (Failure to Pay), §6656 (Failure to Deposit), and §6663(a) (Fraud) | $431,179.11 |
| Interest accumulated on the above unsecured penalties | $849,130.51 |
| Penalty on unsecured general claims | $1,280,309.62 |
| **Total Unsecured Claim**[7] | **$2,560,388.64** |
| **Total Amount of Claim:** | **$3,886,456.75** |

The IRS Claim is based on an examination report dated March 23, 2010 (the "Examination Report"), in which the IRS proposed adjustments to Bravo's liability for taxes on its returns for 2000-2003, including fraud penalties.[8]

### B.  Bravo Hires Union Pacific as a Subcontractor.

In the early 2000's, during the housing market boom, Bravo was extremely busy on a number of building projects and determined that it needed to hire additional crews in order to avoid falling behind.  In addition, Bravo faced significant administrative burdens in determining and documenting the immigration status of many of its workers and new job applicants.  *See* Transcript of the Deposition of Dean Griffith, dated Feb. 9. 2012 ("Griffith Transcript" or "Griffith Tr."), at 32:13-32:19.[9]  As a result of these and other reasons, Bravo decided to seek

---

[7] Also included among the general unsecured claims are $10,000 per year—an amount apparently pulled out of thin air—of federal unemployment taxes.  *See* IRS Claim, at 2-3.

[8] A true and correct copy of the Examination Report is attached to the Bell Declaration as **Exhibit B**.  An examination report is typically a preliminary report of audit findings rather than a final determination of a deficiency.  Assessments, by contrast, are final determinations of deficiency usually sent to the taxpayer in letter form.  Assessments of deficiencies may differ from an examination report.

[9] A true and correct copy of excerpts of the Griffith Transcript is attached to the Bell Declaration as **Exhibit C**.

11

1   additional workers from Union Pacific.  *See* Declaration of Dean Griffith, dated September 7,

2   2011 ("<u>Griffith Declaration</u>" or "<u>Griffith Decl.</u>") at ¶ 4 [Docket No. 1532].**10**

3           Following this determination, Bravo's superintendent, Dean Griffith ("<u>Griffith</u>"), met

4   with Robert Kahre ("<u>Kahre</u>"), the owner of Union Pacific, on one occasion to discuss Bravo's

5   evolving needs.  Kahre represented to Griffith that Union Pacific could be hired as a

6   subcontractor and could provide supplemental working crews for Bravo's projects on a

7   temporary, as-needed basis, thereby providing Bravo with the extra workers it needed without

8   burdening Bravo with additional recordkeeping, insurance, and tax obligations because the

9   workers would be employed by Union Pacific rather than Bravo.  *See* Griffith Declaration at ¶ 4.

10  On that basis, Bravo agreed to engage Union Pacific as a subcontractor beginning in the early

11  2000's.  *Id.*  Pursuant to their agreement, Union Pacific would provide laborers to work on

12  Bravo's building projects.

13          To that end, Union Pacific supplied Bravo with the manual labor necessary to meet the

14  demands of an ever-increasing project load.  Union Pacific provided its own employees and

15  hired certain Bravo employees—with Bravo's consent—as its own employees.  Union Pacific

16  had the sole responsibility to pay its own employees—including those employees hired from

17  Bravo—who worked on Bravo's projects.  Union Pacific further represented that it would be

18  responsible for all other matters within the purview of human resources including, but not

19  limited to, payroll, worker's compensation insurance, resolution of labor disputes, and

20  withholding and payment of taxes to the proper taxing authorities.  *Id.* at ¶ 5.  If work was not

21  performed to Bravo's satisfaction, Union Pacific was responsible to correct any problems.

22          After Bravo hired Union Pacific as a subcontractor, Bravo continued to maintain its own

23  employees, hourly as well as salaried, for whom it continued to pay taxes.  *Id.* at ¶ 6.  Bravo

24

25

26

27

28
_____

**10** A true and correct copy of the Griffith Declaration is attached to the Bell Declaration as **Exhibit D**.

1    employees were paid by Bravo, and Union Pacific employees were paid by Union Pacific.[11]

2    Thus, each entity was responsible for withholding taxes from its employees and remitting such

3    payments to the IRS.

4              ### C.  Kahre is Convicted of Tax Fraud

5              On August 14, 2009, Kahre was convicted of underreporting certain information

6    regarding wages, withholding, and employment taxes to the IRS with respect to his construction

7    business and other businesses.  Unbeknownst to Bravo, Kahre had devised a scheme that

8    concealed the true amount of compensation paid to employees of the companies he controlled,

9    including Union Pacific.  Kahre claimed to pay employees in gold and silver coins but allowed

10   the employees to exchange the coins immediately for pre-determined amounts of cash that were

11   worth more than the face value of the coins.  Kahre would then advise the employees that their

12   income was not taxable or that they should falsely report their income to the IRS as the face

13   value of the gold and silver coins.  As a result, no federal tax withholdings were made from the

14   paychecks of persons employed by Kahre and his companies and companies for which he

15   provided payroll services, and their wages were never reported to the IRS.  On November 17,

16   2009, Kahre was sentenced to 15 years and 10 months in prison for his participation in the tax

17   evasion scheme.

18              The CFO of Rhodes during the Relevant Period, Jim Bevan, will testify that Kahre once

19   proposed to Mona Wilcox, a former controller at Bravo, that Bravo pay Union Pacific amounts

20   owed under the subcontracting agreement in gold or silver coins.  Ms. Wilcox passed the request

21   on to Mr. Bevan, who immediately and unequivocally rejected the proposal on behalf of Bravo.

22   Afterwards, Mr. Bevan assumed the issue had been put to rest.  Bravo was not aware that Kahre

23   or Union Pacific had failed to pay/withhold taxes or that it had paid its own employees in gold

---

[11] The evidence will show that, to the extent that any individual employee worked part time for Bravo and part the time for Union Pacific, such employee was paid by Bravo for services performed for Bravo, and Bravo withheld and deposited taxes, and reported such employee's wages on Form W-2.

and silver.  When Bravo learned of Union Pacific's silver and gold coin payment scheme in

2003, Bravo immediately terminated its relationship with Union Pacific and Kahre.  *Id.* at ¶ 7.

With respect to its own employees, Bravo always maintained the required payroll records and

satisfied all of its tax withholding, payment, and reporting obligations.

### D.  The IRS's Untimely Assessment.

Throughout the Relevant Period, Bravo filed each of its required Forms 940 (annual

unemployment tax returns) and Forms 941 (quarterly employment tax returns).  As the

Reorganized Debtors will show at trial, the Forms 940 were filed on September 24, 2001,

February 25, 2002, April 1, 2002, March 1, 2003, and March 24, 2004, and the Forms 941 were

filed on June 26, 2000, September 11, 2000, December 25, 2000, September 17, 2001,

September 24, 2001, February 25, 2002, March 25, 2002, April 1, 2002, June 24, 2002,

September 23, 2002, November 25, 2002, March 3, 2003, June 23, 2003, September 8, 2003, and

March 24, 2004.[12]  However, the allegedly underpaid taxes now claimed by the IRS in

connection with these forms have not been assessed, but were included in an examination report

dated March 23, 2010.[13]

### E.  The IRS Files its Claim Against Bravo for Union Pacific's Unpaid Taxes

As stated above, the IRS filed its initial claim on September 25, 2009, and an amended

claim on April 13, 2010.  The IRS seeks payment from Bravo for *Union Pacific's* and *Kahre's*

failure to pay taxes.  The IRS asserts that Bravo did not hire Union Pacific as a subcontractor but

rather as a payroll services provider and that, therefore, the Union Pacific workers were actually

Bravo employees.  Accordingly, the IRS claims that, to the extent that Union Pacific failed to

pay employment taxes, Bravo remains obligated to make those payments as the actual employer

---

[12] Though several of these returns were late when filed, Bravo *paid* the appropriate penalties for late filings at the time.  None of the filings were so late as to have any effect on the Reorganized Debtors' statute of limitations argument.

[13] *See also* IRS Claim, at 2-3 (listing "EXAM" under the column entitled "Date Tax Assessed", with no date of assessment).

14

of the workers.  The Reorganized Debtors disagree.  The Reorganized Debtors will prove that the IRS is improperly looking to Bravo to indemnify it for Kahre's fraudulent conduct.  Bravo paid Union Pacific as a subcontractor to provide additional laborers for its framing business.  Bravo did not employ any of the workers that Union Pacific provided to Bravo pursuant to the subcontracting agreement.  All workers provided by Union Pacific were Union Pacific employees and, thus, the IRS must look to Union Pacific to satisfy its claim.  As such, Union Pacific's failure to remit to the government certain withholding taxes for the laborers should not obligate Bravo or the Reorganized Debtors to make payments on their behalf.

## ARGUMENT

## I.    THE IRS CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS.

Pursuant to 11 U.S.C. § 502(b), where a claim filed under the bankruptcy code is objected to, the court shall disallow such claim "to the extent that … (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  Accordingly, where a claim is barred by the applicable statute of limitations, it must be disallowed in bankruptcy.  *See In re Galletti*, No. LA 99-48587-ER, 2000 WL 1682960, at *5 (Bankr. C.D. Cal. Sept. 11, 2000) (disallowing portion of tax claim not assessed within three years after return was filed), *affirmed by In re Galletti*, No. ED CV 00-00753 VAP, 2001 WL 752652 (C.D. Cal. Mar. 23, 2001), *affirmed by In re Galletti*, 314 F.3d 336 (9th Cir. 2002), *reversed on other grounds by U.S. v. Galletti*, 541 U.S. 114 (2004).

Here, the applicable statute of limitations is set forth in 26 U.S.C. § 6501(a), which provides that "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed" and further that "no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period."  26 U.S.C. § 6501(a).  Because Bravo filed Forms 940 and 941 for the applicable periods in 2000-2004, the respective statutes of limitations expired in April 2004, 2005, 2006, and 2007.  Indeed, the returns for the last disputed year and the last disputed quarter were both filed on March 24, 2004, which means that as of March 25, 2007, the limitations periods had run with respect to *each and every* tax

period during the four years at issue here.  The entire IRS Claim is thus barred by the statute of limitation.  *Id.*; *see also In re Galletti*, 2000 WL 1682960, at *5.  Even had the proposed adjustments contained in the March 23, 2010 examination report been assessed at that time, they would have been time barred.  Lacking a timely assessment of the allegedly owed taxes at issue, and absent the IRS establishing fraud by Bravo, the IRS cannot now pursue its claim in court, nearly five years after the expiration of the last limitations period at issue.  *Id.*

## II. THE IRS BEARS THE BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT BRAVO COMMITTED FRAUD WITH INTENT TO EVADE TAX, AND NO SUCH EVIDENCE EXISTS.

Unless it withdraws the IRS Claim, the IRS must establish that the fraud exception to the statute of limitations applies.[14]  There is indeed no time limitation on when the IRS may assess a fraudulent return filed with the intent to evade taxes.  26 U.S.C. § 6501(c)(1).  However, the burden of proving that an exception to the statute of limitations applies lies squarely on the IRS.  *Badaracco v. C.I.R.*, 464 U.S. 386 (1984).[15]  The burden of proof is on the IRS in any case involving the issue of whether the petitioner has been guilty of fraud with intent to evade tax.  26 U.S.C. §7454.

To carry this burden, the IRS must prove "by clear and convincing evidence" that Bravo engaged in "intentional wrongdoing with the specific purpose of evading a tax believed to be owing."  *Hansen v. Comm'r of Internal Revenue,* T.C. M. 1981-98, Docket No. 11617-77, 1981 WL 10875 (U.S.T.C. Feb. 26, 1981); *Brown v. Commissioner*, T.C. M. 1968-29, Docket Nos. 3387-65, 1971-66, 2209-66, 1968 WL 1152 (U.S.T.C. Feb. 19, 1968) (same), *aff'd per curiam* 418 F.2d 574 (9th Cir. 1969); *see also* 26 U.S.C. 7454(a); Tax Ct. R. 142(b) ("In any case involving the issue of fraud with intent to evade tax, the burden of proof in respect of that issue is on the respondent, and that burden of proof is to be carried by clear and convincing evidence.").

---

[14] The fraud exception provides that "[i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time." 26 U.S.C. § 6501(c)(1).

[15] A bankruptcy court adjudicating a tax claim by the IRS must apply the burden-of-proof rubric normally applied under tax law.  *In re Olshan*, 356 F.3d 1078, 1084 (9th Cir. 2004) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20-21 (2000)).

In *Hansen*, the court referenced *George v. Comm'r*, 338 F.2d 221 (1st Cir. 1964), a case in which the First Circuit—considering whether the fraud exception to the statute of limitations applied— held that the IRS could not rely on the presumption of correctness of its determination that taxes were deficient or underpaid. Rather, the court held that the IRS must establish deficiency or underpayment by evidence, and that the IRS must not be allowed "to raise [itself] by [its] own bootstraps." *Id.* (citing *Goldberg v. Comm'r*, 239 F.2d 316 (5th Cir. 1956); *Olinger v. Comm'r*, 234 F.2d 823 (5th Cir. 1956); *cf. Valetti v. Comm'r*, 260 F.2d 185, 188 (3d Cir. 1958)).

Clear and convincing evidence has been described as "impressively more" than a preponderance of the evidence. *Valetti v. Comm'r*, 260 F.2d at 188 (holding that compounding of evidentiary inferences by IRS was insufficient to prove fraud by clear and convincing evidence). Thus, it is "often" the case that even where the IRS might prevail under a preponderance of the evidence standard, it will nonetheless fail on the same evidence to establish fraud. *Id.*

Moreover, the IRS bears this heightened burden with respect to "every subsidiary fact relied upon by the court to support that ultimate conclusion," including the underpayment of the tax at issue. *Hansen*, 1981 WL 10875. Here, accordingly, the IRS must prove by clear and convincing evidence both (1) every element of the underlying tax liability as against Bravo, including that the workers at issue were employees of Bravo, not Union Pacific; and (2) that Bravo committed fraud with intent to evade payment of the underlying tax. Failure by the IRS to prove either fraud or underlying liability is fatal to its case.

The IRS has not come forward with any evidence that Bravo possessed a fraudulent intent to evade taxes because no such evidence exists. Indeed, the IRS has not even made *any* allegations of fraud against Bravo in any of its pleadings to date. To establish intent in the case at bar, the IRS would have to establish that Bravo *knew* that it owed taxes on the workers that it believed to be Union Pacific employees and actively concealed its activities from the IRS. There is simply no evidence that Bravo had any such knowledge. On the contrary, the CFO of Rhodes and the general manager of Bravo will both testify that at all times they considered the workers managed by Union Pacific to be employees of Union Pacific as opposed to Bravo. Indeed, it was

Bravo's understanding that Union Pacific would be handling all incidents of the workers employment, including payment of wages, withholding and payment of taxes, and sponsorship of benefits and worker's compensation. Moreover, the fact that Union Pacific represented to Bravo that Union Pacific would be withholding and paying taxes to the IRS on the workers at issue directly contradicts the notion that Bravo was complicit in concealment of any kind.

Further, the lack of any incentive by Bravo to commit fraud also strongly suggests that Bravo's actions with respect to hiring Union Pacific were not fraudulent. As Mr. Griffith will testify, Bravo paid Union Pacific an 18.5% administrative "burden", which was a percentage added on to its invoices to cover the cost of payroll taxes, worker's compensation, FICA and administrative personnel. Griffith Tr., at 60:7-62:7, 68:13-69:20. When Bravo performed these functions internally, as it did with its own payroll, its administrative burden was similar, fluctuating between 15% and 20%. *Id*. at 69:9-69:13. It defies logic and common sense to suggest that Bravo's specific intent in contracting with Union Pacific was to evade taxes where there was absolutely no cost savings or other financial incentive for Bravo to do so.

Finally, even circumstantial evidence points toward a lack of fraudulent intent. Bravo maintained records, in the form of invoices received from Union Pacific, of every dollar paid to any Union Pacific worker on one of Bravo's jobs, evidencing that Bravo concealed nothing and believed it had nothing to hide. And when Robert Kahre proposed to Bravo that *he* be paid in gold and silver for his services as subcontractor, his proposal was flatly rejected, evidence that Bravo would not accept any arrangement that it knew to be anything less than fully above board.

Because the IRS cannot carry its burden of proving fraud on the part of Bravo by clear and convincing evidence, its claim is time-barred and must be disallowed. Moreover, the IRS Claim must be disallowed for the additional reason, set forth below, that the IRS cannot prove any underpayment of taxes.

## III.    THE IRS CANNOT ESTABLISH THAT BRAVO IS THE EMPLOYER RESPONSIBLE FOR THE TAXES SET FORTH IN THE IRS CLAIM.

Even assuming *arguendo* that the statute of limitations did not bar the IRS's claim, the IRS still bears the initial burden of proof on the issue of whether Bravo is the employer of the

1  workers at issue.  "'In an action to collect taxes, the government bears the initial burden of

2  proof.'"  *In re Olshan*, 356 F.3d at 1084. *(quoting Palmer v. U.S. Internal Revenue Service*, 116

3  F.3d 1309, 1312 (9th Cir. 1997).  In order to satisfy its initial burden, the IRS "must offer some

4  foundational support" for its claim and "provide some predicate evidence connecting the

5  taxpayer to the charged activity."  *Weimerskirch v. Comm'r*, 596 F.2d 358, 361 (9th Cir. 1979).

6  If, and only if, the IRS satisfies this initial burden (and assuming the statute of limitations does

7  not apply), a presumption of correctness will apply to its tax determination.  *Id.*  If the IRS

8  satisfies its initial burden, the debtor may rebut the presumption by a showing "that [the IRS's]

9  determination is arbitrary, excessive or without foundation."  *In re Olshan*, 356 F.3d at 1084

10  (citing *Helvering v. Taylor*, 293 U.S. 507, 515-16 (1935)).  Once the presumption of correctness

11  is rebutted, the burden of proof shifts back to the IRS, *id.*, which must then prove every element

12  of its claim by a preponderance of the evidence.  Here, the Reorganized Debtors have submitted

13  evidence that more than rebuts the IRS's initial presumption with evidence that the IRS's

14  determination that workers at issue were Bravo employees is completely without foundation.[16]

15  Thus, even if the statute of limitations were inapplicable, the IRS would still be required to prove

16  its case by a preponderance of the evidence, which it cannot do, and it would still need to prove

17  its case by clear and convincing evidence to the extent it seeks to impose the penalty for fraud

18  under 26 U.S.C. §6663.

19      Because the statute of limitations has run, however, the government must prove every

20  element of its claim by the heightened standard of clear and convincing evidence, including the

21  element that Bravo is the employer of the workers at issue.  At this task the IRS will certainly fail.

22

23  [16] Courts are particularly loath to overlook a meager factual showing by the IRS where, as here, the alternative to
24  placing the initial burden on the IRS would be to require the taxpayer to prove a negative proposition.  *See
Weimerskirch*, 596 F.2d at 361.  In *Weimerskirch*, the government assessed deficiencies based on allegedly
unreported income from the sale of heroin. The government offered no evidence, however, showing that the
25  taxpayer had sold heroin or that he had received any unreported income.  *Id.* at 361-62.  Noting that "as a practical
matter it is never easy to prove a negative," the Court observed that "[e]ven the most innocent of persons would
26  have difficulty in disproving such a serious charge as selling heroin, when the party making the charge was not
required to present [a]ny evidence." *Id.* at 361 (internal quotations omitted).  Here, similarly, were the IRS not
27  required to produce evidence that Bravo is indeed the employer of the workers at issue, the Reorganized Debtors
would face the task of proving the negative proposition that it was *not* the employer of the workers at issue.  For this
28  reason, the law places the burden on the IRS.  *Id.*  Moreover, in this case, the burden on the IRS is to establish each
element of the fraudulent underpayment of tax by clear and convincing evidence.

1    The IRS has offered no evidence in support of its allegation that Bravo is the employer of

2 the workers at issue—a necessary element of the IRS's claim.**17**  Rather than offer any

3 substantive evidence of this element, as it is required to do, the IRS merely assumes it to be true.

4 *See* Opposition ¶ 5 (referring to the workers at issue as "[t]he Bravo employees") and ¶ 8

5 (describing Bravo as "the actual employer" of the workers).

6    In the Pre-Trial Statement, the IRS identified several low-level Bravo employees whose

7 testimony it intends to offer at trial.  Pre-Trial Statement at 2.  Such employees, however, have

8 no knowledge relevant to the question of whether the workers at issue were Bravo employees

9 within the meaning of the Internal Revenue Code.  Moreover, any testimony they might offer on

10 the question would necessarily be based on inadmissible hearsay or legal opinion as to which

11 they are not competent to testify.  For example, the IRS may present the testimony of James

12 Garner, a former Bravo foreman.  Mr. Garner testified that, although he and his crews always

13 received paychecks from Bravo, (Transcript of the Deposition of James Garner, dated Jan. 18,

14 2012 ("J. Garner Tr."), at 13:1-13:11), certain crews ceased being paid by Bravo at a certain

15 point and would from that point on be paid by Union Pacific through what Mr. Garner referred to

16 as a "payroll service" (*id.* at 27:11-27:14; 29:19-29:22)**18**.  Mr. Garner further testified that

17 certain of these individuals were working for Bravo at the time.  *Id*. at 27:3-27:4.  Mr. Garner,

18 however, had no personal knowledge about how anyone at Bravo or Union Pacific was being

19 paid, or who anyone was employed by, other than the men on his own crew, who were all on

20 Bravo's payroll and received Bravo paychecks with taxes withheld.  In general, Mr. Garner also

21 had no personal knowledge of Bravo's withholding and reporting practices.  Moreover, the

22 Reorganized Debtors' evidence will show that Union Pacific was known throughout the

23 construction industry as a sizeable construction company and contractor.

24    Against this evidence, the Reorganized Debtors will offer the testimony of the Rhodes

25

26 **17** The IRS does not appear to dispute that whether Bravo is the employer of the workers is an essential element of
its claim.  *See* Opposition ¶ 2 (describing as the basis of Bravo's purported tax obligations the requirements of

27 "[e]*mployers*" to withhold certain taxes from wages paid to their "*employees*" and arguing that liability for such
taxes falls to "*employers*") (emphasis added).

28 **18** A true and correct copy of excerpts from the Deposition of James Garner is attached to the Bell Declaration as
**Exhibit E**.

CFO and the Bravo general manager, individuals who were actually in positions to have personal knowledge of Bravo's personnel matters.  The construction manager of Bravo during the Relevant Period, Dean Griffith, declared and will testify at trial based on direct, personal knowledge that Union Pacific was hired by Bravo as a subcontractor to provide labor.  Griffith Decl. at ¶ 4.  Mr. Griffith further declared and will testify that, in contrast to its treatment of its own employees, Bravo neither (1) hired nor fired the workers at issue; (2) did not pay such workers' wages; (3) did not provide the workers with workers compensation or health insurance benefits; (4) did not control the workers schedules; (5) did not dictate how and when their work was performed; (6) did not discipline the workers; (7) was not responsible for treatment of their on-the-job injuries; and (8) did not offer the workers at issue the opportunity to receive tools through the wage-deduction tool purchasing program that Bravo offered to its employees.  *See* Griffith Decl. at ¶ 5.

The Reorganized Debtors also plan to introduce testimony from Jim Bevan, the CFO of Rhodes Homes during the Relevant Period, who will testify that every employee that worked for any Rhodes company, including Bravo, received his or her wages by paycheck.  Mr. Bevan will also testify that Mona Wilcox approached him to relay a request from Robert Kahre that Bravo pay Union Pacific for its work as subcontractor in gold coin and that Mr. Bevan unequivocally refused the request.

The evidence that the IRS proposes to offer falls hopelessly short of satisfying the IRS's burden of proving by clear and convincing evidence that Bravo is the employer of the workers at issue.  First, Bravo had no control—both as a legal and a factual matter—over payment of the workers' wages.  Under controlling precedent, this should end the question of Bravo's liability.  Second, should the Court proceed to weigh the common law employment factors, it will find that they too weigh heavily in favor of a finding that Union Pacific, not Bravo, is the employer.  Indeed, though the burden of proof is not borne by Bravo, the evidence will nonetheless show that Bravo was not the employer responsible for the taxes appearing on the Proof of Claim.

### A.    Bravo Was Not the Employer Because Bravo Did Not Control Payment of the Workers' Wages.

1   Bravo is not responsible for the FICA and withholding taxes asserted in the IRS Claim

2   because, as will be established at trial, Bravo had no control over the payment of wages to the

3   workers supplied by Union Pacific.  On the contrary, it was *Union Pacific* that controlled wage

4   payments to the workers, who were paid out of Union Pacific bank accounts to which only

5   Union Pacific had access.  Under controlling Ninth Circuit precedent, this fact alone is

6   determinative and requires the Court to hold, as a matter of law, that Bravo is not the employer

7   of the workers at issue.

8       As a general rule, it is the common law employer that is liable for withholding and

9   paying over FICA and income taxes.  *In re Sw. Rest. Sys. ("Southwest")*, 607 F.2d 1237, 1239

10  (9th Cir. 1979).  An important exception to this general rule applies, however, when "'the person

11  for whom the individual performs or performed the services does not have control of the

12  payment of the wages for such services . . . .'"  *Id.* (quoting 26 U.S.C. § 3401(d)(1)).  In such

13  circumstances, for purposes of the Internal Revenue Code provisions governing income tax

14  withholding and FICA withholding, "the term 'employer' . . . means the person having control of

15  the payment of such wages . . . ."  *Id.*[19]

16      In *Southwest*, the wages of all employees in four separate corporations were paid from a

17  payroll bank account maintained by the debtor.  *Id.* at 1238.  Notwithstanding that the debtor's

18  payroll bank account was occasionally funded by checks from the separate corporations, the

19  Ninth Circuit held that because that the debtor—and the debtor alone—controlled the bank

20  account, the debtor was the only employer for purposes of tax withholding. *Id.* at 1240

21  (observing that "[n]o one other than the person who has control of the payment of the wages is in

22  a position to make the proper accounting and payment to the United States").

---

[19] Unlike Chapter 24 (governing income tax withholding), the definition of "employer" in Chapter 21 (governing FICA withholding) does not on its face contain the exception for a person who lacks control of the payment of wages.  The Supreme Court, however, has held that Chapter 21 must be interpreted to contain the same exception as contained in Chapter 24.  *Otte v. U.S.*, 419 U.S. 43, 51 (1974).

Similarly, in *Kittlaus v. United States*, 41 F.3d 327 (7th Cir. 1994), the Seventh Circuit found that a motel owner was not the employer of the motel employees for tax purposes because payment of employees was controlled by management company and the motel owner had limited access to payroll funds, and had no signature authority over the accounts used to pay the employees.

Here, just like the motel owner in *Kittlaus*, Bravo had no signature authority—or any other authority—over the accounts used to pay the workers at issue. None of the workers in question received a Bravo paycheck or was paid from a Bravo bank account.[20] Rather, as will be testified to by Bravo's construction manager and Rhodes's CFO during the Relevant Period, Bravo hired Union Pacific as a subcontractor. *See also* Griffith Decl. at ¶ 4. Union Pacific, in turn, bore the responsibility at all times of paying the wages of the workers at issue. Bravo and Union Pacific maintained an arm's length relationship, and accordingly, Bravo never had any type of access to or control over Union Pacific's accounts. Thus, only Union Pacific retained the ability to pay its workers' wages. The IRS has not—and cannot—provide any evidence to the contrary.[21]

**B.     The Balance of the Common Law Factors Weighs in Favor of Finding that Union Pacific is the Employer of the Workers at Issue.**

As set forth above, the clear applicability of the exception in §3401(d)(1) for persons not in control of wage payments should end the inquiry as to whether Bravo is the employer for present purposes. However, even if the Court reaches the common law employment factors—

---

[20] In contrast, actual Bravo employees were all processed though Bravo's payroll system and received Bravo paychecks. J. Garner Tr. at 13:1-11 ("Q: [H]ow did you know that [the Bravo employees] received paychecks? A: Because I would hand them out to them."); Transcript of the Deposition of Pamela Garner, dated Jan. 18, 2012 ("P. Garner Tr."), at 12:20-25 (describing individual employee listings in payroll system). A true and correct copy of excerpts from the Deposition of Pamela Garner is attached to the Bell Declaration as **Exhibit F.**

[21] As the Ninth Circuit's decision in *Southwest* makes clear, the alleged facts that Union Pacific routinely invoiced Bravo, and Bravo remitted checks to Union Pacific, for the work performed by Union Pacific workers—even if proven true—have no bearing on the determination of who was the employer. 607 F.2d at 1240.

23

which it need not reach—application of those factors, on balance, also strongly favors the conclusion that Bravo is not the employer of the workers at issue.

In addition to the payment of wages, courts consider several additional factors when determining the existence of a common law employment relationship. Specifically, when deciding which entity among more than one is the employer for tax purposes, courts have considered, *inter alia*, which entity has the right and/or obligation to: (1) hire and fire the individual employees; (2) control the individual employees; (3) provide the instrumentalities and tools necessary for the employees' work; (4) assign additional projects to the individual employees; and (5) provide employee benefits. *See Transp. Labor Contract/Leasing, Inc. v. Comm'r*, 123 T.C. 154, 185 (2004), *reconsideration den*. T.C.M. 2005-173, Nos. 1188-01, 2005 WL 1649136 (U.S.T.C. July 14, 2005), *rev'd on other grounds*, 461 F.3d 1030 (8th Cir. 2006).[22] As the Reorganized Debtors will establish at trial, each of these factors weighs heavily in favor of determining that Union Pacific, not Bravo, was the true employer of the workers. The IRS has not proven otherwise.

       1.    <u>Union Pacific was in Charge of Hiring and Firing the Workers.</u>

In determining which entity among several is an individual's employer for tax withholding purposes, courts consider which entity had sole and absolute authority to hire and fire employees. *Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 189; *see also Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1120 (9th Cir. 2011). The Reorganized Debtors will show that Bravo had no discretion—absolute or otherwise—to cause Union Pacific to hire (or provide it with) specific laborers. On the contrary, Union Pacific had sole discretion with respect to the ultimate hiring and firing of its employees. Griffith Tr. at 33:7-33:8.

Bravo likewise had its own longstanding hiring process. As part of this process, potential Bravo employees would fill out applications and submit them directly to Bravo. P. Garner Tr. at

---

[22] Factors of the common-law test which are inapplicable or of neutral effect have been omitted.

8:13-9:4.  Those applications were subsequently reviewed by a Bravo foreman or construction manager.  *Id*. at 9:1-4.  The Reorganized Debtors will show that this hiring system was not utilized with respect to the workers at issue.

Additionally, though Bravo could decline to use a particular worker, it was unable to terminate any given worker's employment.  *See Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 196 (noting the difference between the "right to decline using a particular driver-employee whom [the lessor] wanted to lease to it [and the right of] termination by [the lessor] of such driver-employee's employment").  The Reorganized Debtors will demonstrate that ultimate authority to terminate rested solely with Union Pacific, which strongly suggests that Union Pacific was the laborers' employer.

2.  Union Pacific had the Right to Control the Workers' Activities.

When determining which of two entities is the employer, another factor courts consider is "which of the two [entities] has the right to control the activities of the individual."  *Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 185 (internal citations omitted); *see also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) (describing the common law test).  The right to control the individual who performs the services includes the right to control: (1) the result to be accomplished by the worker; and (2) the details and means by which that result is accomplished.  Treasury Regulations §31.3121(d)-1(c)(2).  Industry-pertinent facts and circumstances help determine whether the employer has the right to direct and control the worker.  *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440 (2003).

The Reorganized Debtors will establish at trial that Bravo did not exhibit the requisite control over the workers in question and, thus, was not their true employer.  The Reorganized Debtors will show, for instance, that the foremen in charge of the Union Pacific crews working on Bravo projects were in fact Union Pacific employees on Union Pacific's payroll.  *See* Griffith Tr. at 37:19-21.  Because foremen held sole control of their crews, this is evidence that both the

results of the work done by Union Pacific and the means by which it was accomplished were under the control of Union Pacific.

The Reorganized Debtors will also show that Union Pacific, not Bravo, was ultimately responsible for choosing the workers that were sent to work on specific Bravo projects. Consistent with this fact, upon completion of the work, the workers would return to Union Pacific, *not* to Bravo, for their next assignments. *See* Transcript of the Deposition of Marlene Marcus, dated Jan. 18, 2012 ("Marcus Tr.") at 25:22-26:4[23].

Furthermore, the Reorganized Debtors will show that the Union Pacific crews routinely were internally-directed and were not supervised by Bravo employees. For example, according to the testimony of Sergio Juarez, an ex-foreman at Bravo, Mr. Juarez often arrived at certain Bravo worksites long after the workers had completed their tasks and left for the day. Transcript of the Deposition of Sergio Juarez, dated Jan. 17, 2012 ("Juarez Tr.") at 39:17-23 ("I wouldn't see them all that often because, like I said, everything was what they called stage framing . . . [s]ometimes I wouldn't come until all these guys were gone[.]")[24]. Moreover, even to the extent Mr. Juarez had control over the workers on his own crew, Mr. Juarez led only *Bravo* crews, receiving Bravo paychecks (Juarez Tr. at 33:22-34:15), and was never in charge of a Union Pacific crew. Union Pacific, as subcontractor, thus retained significant control over its workers, including control over how they accomplished their tasks, even though the laborers were working on Bravo projects. *See Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 188.

To the extent that Bravo did provide guidance to Union Pacific laborers, such guidance is insufficient to give Bravo control over each laborer. *Id.* (holding that the fact that trucking company gave routes, assignments, directions, etc. to leased truck drivers was not enough to give

---

[23] A true and correct copy of excerpts from the Deposition of Marlene Marcus is attached to the Bell Declaration as **Exhibit G.**

[24] A true and correct copy of excerpts from the Deposition of Sergio Juarez is attached to the Bell Declaration as **Exhibit H.**

it control over each driver). Given the nature of the labor performed, it would make little sense for Bravo to provide no input. Indeed, the Reorganized Debtors will show that, though Bravo may have provided certain project-specific guidance to the laborers from time to time, such guidance was typical of the industry and does not support a finding that Bravo controlled the workers at issue.

Finally, as further evidence of Union Pacific's control, the Reorganized Debtors will establish that if a Union Pacific crew did not complete a Bravo project properly, it was Union Pacific that was responsible for returning to undertake the necessary repairs or modifications.

3.    Bravo did not Supply the Laborers with Tools to Complete their Tasks.

The supplying of tools necessary for the trade by an entity to an individual is further suggestive of an employer-employee relationship. *See Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 185. The Reorganized Debtors will prove that here, Bravo did not supply any tools to Union Pacific laborers. Indeed, as was common in the industry, Bravo did not supply tools to its own employees. J. Garner Tr. at 33:17-21. Bravo employees, however, had the option of participating in an employee tool purchasing program by which Bravo purchased certain tools on their behalf. The costs of the tools would subsequently be deducted from the employees' paychecks. This program could not have been made available to the workers at issue in this case because they did not receive paychecks from Bravo from which the deductions could be made. In fact, participation in the program by Union Pacific workers would have been an impossibility as the workers were not compensated by Bravo and therefore received no Bravo paychecks from which to deduct the cost of certain tools. This factor also weighs in favor of finding that Union Pacific employed the workers that it provided to Bravo.

4.    Union Pacific was the Only Entity Authorized to Assign Additional Work.

An entity's right to assign additional projects to an individual suggests the existence of an employee relationship. *Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 190. As will be

27

demonstrated by the Reorganized Debtors at trial, Union Pacific determined which workers would be assigned a given Bravo project. Upon completion of their tasks, the workers would return to Union Pacific, not Bravo, for additional assignments. Moreover, the Reorganized Debtors will show that Union Pacific had the right to subcontract laborers to *other* construction companies even while they were still providing services to Bravo and the right to pull its workers off Bravo projects at any time. This factor also demonstrates that Union Pacific, and not Bravo, was the employer.

5.    Union Pacific Provided the Workers' Employee Benefits.

The fact that an entity provides benefits to an employee weighs in favor of an employment relationship. *Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 191. Here, as the Reorganized Debtors will establish, Union Pacific was the only entity that provided any benefits to the workers at issue. Pursuant to the Parties' agreement, Union Pacific was responsible for providing workers' compensation and health insurance benefits. *See* J. Garner Tr. at 29:6-12 (Q: . . . was there a reason given for the—having Mr. Kahre's company take over a portion of the payroll? A: I would say the reason . . . was [sic] a lot to do with the insurance, and as far as— yeah, I guess just the insurance."). Insofar as Bravo's reasoning for hiring Union Pacific as a subcontractor including Bravo's desire to increase its productivity without incurring the significant insurance premiums associated with hiring additional laborers, this factor suggests that Union Pacific is the employer of such laborers. *See Transp. Labor Contract/Leasing, Inc.*, 123 T.C. at 158 ("A principal advantage of leasing driver-employees from [the lessor] related to [its] ability to obtain cost-effective workers' compensation insurance[.]"). Moreover, if a worker on a Union Pacific crew was injured on the job, the Reorganized Debtors will show that it was Union Pacific's responsibility to handle, not Bravo's. *See* J. Garner Tr. at 27:18-27:23. Thus, Union Pacific's provision of benefits to the workers in dispute also weighs in favor of finding that such workers were employees of Union Pacific, not Bravo.

28

Finally, as the evidence will show, some of the workers, who worked part-time for both companies, appeared on both Bravo's payroll and Union Pacific's payroll, which demonstrates that when such workers worked for Bravo, they were paid by Bravo, their taxes were withheld by Bravo, and their benefits were handled by Bravo.

Taken together, these factors tip the balance in favor of finding that Union Pacific was the employer responsible for the taxes claimed in the proof of claim.  Against this evidence, the IRS's efforts to prove by clear and convincing evidence that Bravo was the employer must surely fail.  The IRS cannot even establish the underpayment of taxes by Bravo by a preponderance of the evidence, much less the heightened standard of clear and convincing evidence.

## IV.    BRAVO IS NOT LIABLE FOR ANY PENALTIES.

The IRS claims that Bravo is liable for penalties under 26 U.S.C. § 6651 (failure to pay), § 6656 (failure to deposit), and § 6663(a) (fraud).  Bravo is not liable for any tax penalties, first and foremost, because liability for the penalties alleged is contingent on underpayment of the underlying taxes owed.  *See* 26 U.S.C. §§ 6651, 6656, and 6663(a).  For the reasons set forth above, Bravo owes no penalties because the IRS fails (1) to overcome the Reorganized Debtors' statute of limitations defense and (2) on the merits to establish Bravo's liability for the underlying taxes,.

Moreover, even assuming that the IRS could prevail on the merits of its underlying tax claim, the IRS cannot prevail on its claim for fraud penalties under § 6663(a).  Pursuant to the plain language of the internal revenue code, the IRS bears the burden of proving by clear and convincing evidence that "the [taxpayer] has been guilty of fraud with intent to evade tax."  26 U.S.C. § 7454.  Here, as set forth above, the IRS has not even alleged—much less proved—any fraudulent intent on the part of Bravo to evade taxes.

## V.    THE IRS GROSSLY MISCALCULATED THE INTEREST DUE.

The IRS Claim lists $1,295,746.08 of interest due on $1,310,631.65 of tax.  This amount of interest is grossly miscalculated.  In particular, $849,130.51 interest that the IRS calculates on $431,179.11 unsecured general claim tax is grossly overstated.  No appropriate calculation of

29

interest at the rates for the years at issue could have resulted in this amount of interest. It is over double the amount of tax listed as due. Further, it does not match the calculations the IRS listed in the IRS Claim for the unsecured priority claim portion.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the Court declare that the IRS Claim is disallowed and expunged as a matter of law.

Dated: February 13, 2012.

/s/ Shlomo S. Sherman
_____
**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV 89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
         ssherman@klnevada.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail: pdublin@akingump.com
         aqureshi@akingump.com

*Attorneys for Reorganized Debtors*