<u>E-File: February 27, 2012</u>

**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV 89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
         ssherman@klnevada.com

*Attorneys for Reorganized Debtors*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail: pdublin@akingump.com
         aqureshi@akingump.com

*Attorneys for Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka
"Rhodes Homes, et al.,[1]
                    Debtors.

_____

Affects:

☐   All Debtors
☒   Affects the following Debtor(s):

Bravo, Inc. 09-14825

Case No.: BK-S-09-14814-LBR
(Jointly Administered)

Chapter 11

**<u>REPLY OF THE REORGANIZED
DEBTORS TO THE UNITED STATES'
PRE-TRIAL BRIEF</u>**

Trial Date:   March 5, 2012
Trial Time:   9:30 a.m.
Courtroom 1

---

[1] The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

1  **TO THE HONORABLE LINDA B. RIEGLE, UNITED STATES BANKRUPTCY JUDGE:**

2  The above-captioned reorganized debtors (collectively, the "Reorganized Debtors")[2]

3  hereby submit this reply brief in further support of their objection previously filed to claim No. 7

4  (as amended from time to time, the "IRS Claim") filed by the Internal Revenue Service (the

5  "IRS") against Debtor Bravo, Inc.[3] ("Bravo" and, together with the IRS, the "Parties"), and in

6  response to the *United States' Pre-Trial Brief* [Docket No. 1658] ("IRS Pre-Trial Brief" or "IRS

7  Pre-Trial Br."). The Reorganized Debtors respectfully represent as follows:

8  ### PRELIMINARY STATEMENT

9  In its pre-trial brief, the IRS clings fast to its theory that because Bravo contracted with a

10  construction company, Union Pacific Construction ("Union Pacific"), run by Robert Kahre

11  ("Kahre"), who was later convicted of tax fraud, Bravo should be punished for Kahre's failure to

12  pay employment taxes. The IRS's theory hinges on its argument that Union Pacific was not a

13  subcontractor providing labor to Bravo, but instead merely a provider of payroll services to

14  Bravo, and that Union Pacific's employees were in fact employees of Bravo. IRS Pre-Trial Br.

15  at 2. The IRS Pre-Trial Brief is most notable, however, for what it does *not* say.

16  First, the IRS Pre-Trial Brief offers no reason why the IRS Claim is not barred by the

17  statute of limitations. Given that the last of the applicable limitations periods expired on March

18  25, 2007,[4] the IRS's failure to do so is fatal.

19  Second, the IRS Pre-Trial Brief nowhere alleges or offers to prove that Bravo had any

20  fraudulent intent or was in any way complicit in Kahre's fraud, a fact which the IRS must prove

21  by clear and convincing evidence. This omission is doubly important because it means both that

22  (a) the IRS cannot benefit from the fraud exception to the statute of limitations and thus the

23  entire claim must be disallowed, and (b) even if the taxes had been assessed within the applicable

24  limitations periods, the portion of the IRS Claim that is comprised of fraud-based penalties and

---

25  [2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Pre-Trial Brief of the Reorganized Debtors* [Docket No. 1659] (the "Pre-Trial Brief" or "Pre-Trial Br.").

26
27  [3] The IRS's proof of claim was in fact filed against Bravo LLC, a non-existent entity. The Reorganized Debtors reserve all rights with respect to this error.

28  [4] *See* Pre-Trial Br. at 15.

1     interest is frivolous and must be disallowed.

2           Third, though the IRS claims it will prove that Bravo's agreement with Union Pacific was

3     for the provision of "payroll services for Bravo employees," IRS Pre-Trial Br. at 2, the IRS has

4     not offered to present a single witness with personal knowledge of the agreement between Bravo

5     and Union Pacific.  Nor has the IRS offered any direct or indirect evidence that the agreement

6     was merely for the provision of payroll services.  Moreover, none of the IRS witnesses—all of

7     whom were low-level employees who lacked personal knowledge of the agreement—had any

8     authority to outsource Bravo's payroll function.

9           The Reorganized Debtors, in contrast, will present the testimony of: (1) Dean Griffith,

10    General Manager of Bravo at the relevant times, who will testify that (a) he possessed the

11    authority to subcontract for labor on Bravo's behalf, (b) he reviewed and signed the agreement

12    between Bravo and Union Pacific, and (c) the agreement was a subcontract for the provision of

13    piecework crews by Union Pacific to work on Bravo projects;[5] and (2) James Bevan, the CFO of

14    the Rhodes Companies at the relevant times, who will testify that (a) at all relevant times, he

15    oversaw the payroll function of all of the Rhodes Companies, (b) no employee at Bravo would

16    have had the authority to outsource any portion of Bravo's payroll function absent Mr. Bevan's

17    consent, (c) his consent to outsource Bravo's payroll function was neither requested nor granted,

18    and (d) neither Union Pacific nor Kahre was ever hired by Bravo as merely a payroll processor.

19          Finally, even assuming that the IRS claim is not time-barred and thus subject to dismissal

20    on that ground, the IRS cannot offer a shred of evidence that the workers at issue were Bravo

21    employees.  Indeed, the IRS plans to call as witnesses only former low-level, back-office Bravo

22    employees, none of whom worked on or managed the Union Pacific crews at issue, or had any

23

24    _____
      [5] Piecework crews are work crews that are tasked with discrete projects on an as-needed basis and compensated
25    based on a flat fee per project completed, which is divided among the workers based on hours worked on a particular
      project.  Here, Union Pacific determined how the per-project fee would be allocated among its workers, and
26    invoiced Bravo for the total plus an 18.5% labor burden, which covered payroll taxes, health care, and worker's
      compensation.  Transcript of the Deposition of Dean Griffith, dated Feb. 9. 2012 ("Griffith Transcript" or "Griffith
27    Tr."), at 57:22-57:24; 58:8-59:1; 60:11-60:14.  A true and correct copy of excerpts from the Griffith Transcript is
      attached to the accompanying Declaration of Justin Bell, dated February 27, 2012 ("Bell Declaration" or "Bell
28    Decl."), as **Exhibit A**.

1  direct knowledge of Bravo's agreement with Union Pacific, and two former low-level employees

2  of one of Robert Kahre's other companies—*not* Union Pacific—who themselves are convicted

3  felons. *See Joint Amended Witness List* [Docket No. 1663], at 2-3. None of these witnesses—

4  not one—has direct personal knowledge of the circumstances of the workers' employment at

5  issue. Against this, Mr. Griffith, the senior-most employee at Bravo, will testify that Bravo (1)

6  neither hired nor fired the workers at issue; (2) did not pay such workers' wages; (3) did not

7  dictate the means and methods by which their work was performed; (4) did not provide the

8  workers with workers compensation or health insurance benefits; (5) did not discipline the

9  workers; (6) was not responsible for treatment of their on-the-job injuries; and (7) did not offer

10 the workers at issue the opportunity to receive tools through the wage-deduction tool purchasing

11 program that Bravo offered to its employees. The evidence will show that it was Bravo's clear

12 understanding that Union Pacific would have the sole responsibility for its employees, including

13 withholding and paying taxes, providing worker's compensation insurance, hiring and firing,

14 allocating and assigning workers to projects, provided training and tools as needed, and ensuring

15 the work was properly performed.

16     For these and other reasons set forth below, the IRS Claim is meritless and should be

17 disallowed.

18                              **ARGUMENT**

19 **I.    THE IRS BEARS THE BURDEN OF PROOF.**

20     As a threshold matter, because the taxes in the IRS Claim were not assessed within the

21 applicable limitations periods,[6] the IRS bears the burden of proving, by clear and convincing

22 evidence, both (1) fraudulent intent *on the part of Bravo* to evade taxes, and (2) every element

23 necessary to establish underpayment of the taxes at issue. *Badaracco v. Comm'r,* 464 U.S. 386

24 (1984) (holding that the IRS bears the burden of proving that an exception to the statute of

25 limitations applies); *Hansen v. Comm'r,* T.C.M. 1981-98, Docket No. 11617-77, 1981 WL

26 10875 (U.S.T.C. Feb. 26, 1981) (holding that fraud must be proved by clear and convincing

27 _____

28 [6] 26 U.S.C. § 6501(a) (three-year statute of limitations on tax assessments); *see also* Pre-Trial Br. at 15-16.

1119990.doc (7540-1)                    4

1  evidence).  Because the IRS has failed even to allege Bravo's fraudulent intent,[7] the IRS claim

2  must be disallowed in its entirety.

3          Even if the statute of limitations were inapplicable, however, the IRS would still bear the

4  burden of proof as to the issue of whether the workers at issue were Bravo employees.[8]  The IRS

5  concedes, in its pre-trial brief, that the IRS bears the initial burden of proof in an action to collect

6  taxes, and that even where the IRS meets its initial burden, a showing by the taxpayer that the

7  IRS's determination is "arbitrary, excessive or without foundation" shifts the burden of proof to

8  the IRS.  IRS Pre-Trial Br. at 2-3; see also Weimerskirch v. Comm'r, 596 F.2d 358, 361 (9th Cir.

9  1979).

10         Here, the IRS Claim is clearly arbitrary, excessive, and without foundation.  First, there is

11 absolutely no foundation for the portion of the penalties and interest attributable to fraud

12 included within the IRS Claim.  Although the IRS has not broken out the portion of total

13 penalties and interest attributable to fraud, it appears to be well in excess of $900,000.  Indeed,

14 the IRS has not even alleged—much less offered to prove—that Bravo had a fraudulent intent to

15 evade taxes.  Thus, nearly one quarter of the total IRS claim is grounded on nothing—not a

16 single allegation or stitch of evidence.  Second, there is no basis for holding Bravo liable for

17 Kahre's unpaid employment taxes because there is no factual foundation for the IRS's contention

18 that the workers at issue were Bravo's employees.  As set forth in greater detail below and in the

19 Pre-Trial Brief, the IRS has failed to offer any evidence from witnesses with personal knowledge

20 that the workers on Union Pacific's crews were employed by Bravo.  Third, the IRS Claim is

21 arbitrary and excessive for the additional reason that it lists $1,295,746.08 of interest due on

22 $1,310,631.65 of tax.  In particular, the $849,130.51 interest that the IRS calculates on its

23 unsecured general tax claim of $431,179.11 is grossly overstated.  No appropriate calculation of

24

25

_____

26 [7] See generally IRS Pre-Trial Br.  At the September 27, 2011 hearing, while discussing penalties, the Reorganized
   Debtors pointed out that no allegations had been made that Bravo possessed the requisite scienter to constitute fraud.
27 See 9/27/11 Hearing Tr. at 18:14-18:18.  The IRS, though present, had no response to this point.

   [8] Moreover, insofar as a portion of its claim is for fraud penalties and interest thereon, the IRS must nonetheless
28 prove Bravo's specific fraudulent intent to evade taxes by clear and convincing evidence.  26 U.S.C. § 7454.

1  interest at the IRS's own listed rates for the years at issue could have resulted in such an amount

2  of interest, which is over double the amount of tax alleged to be due.  As the Reorganized

3  Debtors will show, the IRS's claimed $849,130.51 in interest is more than quadruple the correct

4  calculation.[9]  Accordingly, the burden of proof reverts to the IRS.  *Weimerskirch*, 596 F.2d at

5  361 (holding that the Tax Court erred in assigning a presumption of correctness to the IRS's

6  deficiency determination, which was not supported by proper foundation because the IRS had

7  not introduced evidence of every required element of the case).

8       Thus, even assuming that the IRS Claim were not barred by the statute of limitations, the

9  IRS would still be required to prove its case by a preponderance of the evidence, which it cannot

10 do.[10]

11 **II.    THE IRS CANNOT ESTABLISH THAT BRAVO IS THE EMPLOYER**
         **RESPONSIBLE FOR THE TAXES SET FORTH IN THE IRS CLAIM.**
12

13      The IRS's proffered evidence falls far short of establishing by a preponderance of the

14 evidence—much less by clear and convincing evidence—that Bravo was the employer of the

15 workers on Union Pacific's crews.  First, of the many factors of the common-law employment

16 test, *see Transp. Labor Contract/Leasing, Inc. v. Comm'r*, 123 T.C. 154, 185 (2004), the IRS

17 chooses to analyze only four—right to control, method of payment, location of the work, and the

18 source of instrumentalities and tools—and the IRS misapplies and ignores critical evidence

19 regarding all four factors.  *See generally* IRS Pre-Trial Br. at 7.  Second, the IRS is completely

20 silent as to the remaining factors, including several key factors that clearly weigh against the

21 IRS's position: that Union Pacific had the exclusive right to hire and fire the workers on its

22 crews, that Union Pacific was solely responsible for the provision of employee benefits, and that

23

24 [9] The unsecured claim taxes relate to the same periods as the priority claim taxes, thus the interest rates should be
     the same.  Yet the IRS inexplicably asserts interest on the unsecured claim that is nearly *double* the interest asserted
25 on the priority claim, despite the fact that the underlying taxes asserted in the unsecured claim are *half* the amount of
     taxes asserted in the priority claim.  This suggests the interest claim is overstated by a factor of approximately *four*
26 *times* the correct amount.  Also included among the general unsecured claims are $10,000 per year—an amount
     apparently pulled out of thin air—of federal unemployment taxes.  *See* IRS Claim at 2-3.

27 [10] Moreover, even if the Reorganized Debtors were incapable of establishing that the IRS Claim is arbitrary,
     excessive, or without foundation, the Reorganized Debtors in order to prevail would need only to show by a
28 preponderance of the evidence that the workers at issue were not Bravo employees.  This showing will easily be
     made at trial.

1    Union Pacific had the discretion to assign the workers where it wished. *Id.*

2        **A.    Union Pacific Controlled its Own Crews.**

3          The IRS correctly identifies the "'right to control the manner and means by which the

4    product is accomplished'" as a critical factor in the common law test for an employer-employee

5    relationship. IRS Pre-Trial Br. at 7 (quoting *Stahl v. United States*, 626 F.3d 520, 523 (9th Cir.

6    2010). But, as the evidence will demonstrate, including even the IRS's own evidence, it was

7    Union Pacific that controlled the "manner and means" by which its crews completed their work

8    on Bravo projects.

9          As the IRS concedes, the entire amount of its claim is based on employment taxes (plus

10    penalties and interest) owed for projects completed by three distinct piecework crews that were

11    "headed", respectively, by three individuals named Ismael Curiel (also known as Smiley),

12    Andres Nunez, and Joaquin Barrajas. IRS Pre-Trial Br. at 5; *see also* Griffith Tr. at 36:8-37:18

13    (explaining that the piecework crews were "supervised" by Mr. Curiel, Mr. Nunez, and Mr.

14    Barrajas); Transcript of the Deposition of James Garner, dated Jan. 18, 2012 ("J. Garner

15    Transcript" or "J. Garner Tr."), at 29:15-29:22 (naming Mr. Curiel, Mr. Nunez, and Mr. Barrajas

16    as the three "crew leaders" who ran crews for Union Pacific).[11] The three crew leaders were in

17    charge of their crews and were responsible for ensuring that their projects were completed

18    correctly. The evidence will further establish that these three individuals were, during the

19    periods covered by the IRS claim, working for Union Pacific, paid by Union Pacific, and under

20    the direction of Robert Kahre. *See e.g.* Griffith Tr. at 47:17-47:22 ("Q: . . . . And do you know

21    who Joaquin is? A: Yeah, Joaquin was the foreman for Union Pacific that did all the plywood

22    sheeting and nailing. Q: And you said he was a foreman for Union Pacific? A: Correct."); *id.* at

23    48:10-48:12 ("Q: . . . . And do you know where – who was responsible for paying Joaquin's

24    wages? A: Union Pacific."); Transcript of the Deposition of Marlene Marcus, dated Jan. 18, 2012

25    ("Marcus Transcript" or "Marcus Tr.") at 23:17-23:22 ("Q: . . . . Now, do you know who this

26    Smiley is on here? A: He was the head of that group. Q: Okay. A: But he was also a Union

27

28    ---
[11] A true and correct copy of excerpts from the J. Garner Transcript is attached to the Bell Declaration as **Exhibit B**.

1   Pacific. He wasn't our employee.")[12]. Thus, it was Union Pacific crew leaders who supervised

2   the crews that performed all work related to the IRS claim, and who controlled the means and

3   methods by which the work was completed.

4        The IRS misleadingly argues that "Bravo employees supervised the workers at the work

5   sites." IRS Pre-Trial Br. at 7. Though it offers no elaboration in support of this assertion, the

6   IRS presumably is referring to the job foremen, one of which was typically assigned to oversee

7   each job site. Herein lies the flaw in the IRS's analysis. Job foremen did not direct the *means* or

8   *methods* by which Union Pacific undertook its projects and, in fact, did not even communicate

9   with individual crew members. *See* J. Garner Tr. at 26:2-26:11 ("A: . . . . [I]f the job foreman

10  walked the house and there was items that the crew had left incomplete that needed to get taken

11  care of, the job foreman would call the crew leader and they were responsible to get somebody

12  there to finish the job and/or fix something that the crews had done wrong. Q: Okay. A: So it was

13  basically like [the crew leaders] were in charge of all those crews and they had to get it taken

14  care of."); *id.* at 26:16-27:2 ("Q: Okay. So then if you [as job foreman] found a problem, instead

15  of going to the individual workers, you would go to the crew leader and say 'This needs to be

16  fixed'? A: Right. Q: Okay. And then the crew leader, then, would have the individuals working

17  fix -- or rectify whatever was needed to be – A: Whoever had done it or … they would send

18  somebody else to fix it, yeah."). As this evidence shows, the job foreman's responsibility was to

19  double check and sign off on *the end result*, not to micro-manage the intermediate means and

20  methods. Under binding Treasury Regulations, "if an individual is subject to the control or

21  direction of another *merely as to the result to be accomplished by the work* and not as to the

22  means and methods for accomplishing the result, he is not an employee." Treas. Reg. §

23  31.3401(c)-1 (emphasis added); *see also* § 31.3121(d)-1 (same); *see also Transp. Labor*

24  *Contract/Leasing, Inc*, 123 T.C. at 185 (holding that the fact that trucking company gave routes,

25  assignments, and directions to leased truck drivers was not enough to give it control over each

26  driver). Accordingly, the fact that Bravo job foremen oversaw each job site is irrelevant. Insofar

27

28  [12] A true and correct copy of excerpts from the Marcus Transcript is attached to the Bell Declaration as **Exhibit C.**

as the IRS contends otherwise, the IRS's position would mean that a builder cannot oversee its worksites without having all of its subcontractors' employees treated as the builder's own—an absurd result indeed.

      **B.**      **Union Pacific Paid its Crews' Wages.**

      That Union Pacific paid the wages of the workers on its crews is not open to any serious doubt. The IRS does not appear to dispute this, but counters only that Bravo allegedly determined the amount of the wages to be paid to the workers at issue. IRS Pre-Trial Br. at 7. The IRS further contends that Bravo employees prepared a weekly pay sheet dictating how much each worker was to be paid for the week, and sent such pay sheet to Union Pacific along with a check for the total amount due for that week's labor. *Id.*

      These contentions are not supported by the evidence. The Union Pacific crews were piecework crews, meaning that instead of receiving hourly wages, the crew as a whole was paid a fixed price per discrete project that it completed. *See Griffith Tr.* at 56:2-56:20. Though the price per project was set by Bravo, the discretion to determine the allocation of the total among the workers on any particular project belonged entirely to the Union Pacific crew leaders— namely, Mr. Curiel, Mr. Nunez, and Mr. Barrajas. *Id.* at 57:22-57:24; 58:8-59:1. Moreover, the Union Pacific crew leaders dictated and tracked the hours worked by each worker on their crews, and determined their wages accordingly. *Id.* Based on this information, Union Pacific generated weekly invoices setting forth the total amount owed by Bravo for Union Pacific labor in a given week, plus an 18.5% labor burden, which covered payroll taxes, health care, and worker's compensation. *Id.*; *see also Id.* at 55:18-55:20; 60:11-60:14.

      The IRS may attempt to counter this evidence with testimony from Pam Garner, a Bravo administrative office worker, who testified that her understanding was that *Bravo* determined how much each individual worker on the Union Pacific crews would be paid, and further testified that she was involved in dividing the payments for piecework among the workers. Transcript of the Deposition of Pamela Garner, dated Jan. 18, 2012 ("P. Garner Transcript" or

"P. Garner Tr."), at 42:6-42:10; 43:11-17.[13] But the evidence at trial will show that notwithstanding Ms. Garner's involvement in certain administrative tasks, Ms. Garner had no actual involvement in the decision of how much to pay each worker, and thus had no personal knowledge as to how or by whom such decisions were made. Indeed, Ms. Garner acknowledged that her role was purely ministerial. *Id.* at 48:17-48:18 ("It was just, you know, I'm told to do something, so I just do what I'm told."). In addition, to the extent Ms. Garner testifies that she created the Union Pacific invoices under the direction of Bravo employees, her testimony is contradicted by the testimony of (a) Dean Griffith, the only witness with personal knowledge of the agreement between Bravo and Union Pacific, who testified that the invoices in question were created by Union Pacific with input from Union Pacific crew leaders, *see* Griffith Tr. at 57:22-57:24; 58:8-59:1, and (b) the IRS's own witness, Marlene Marcus, who also testified that the invoices were created by Union Pacific, *see* Marcus Tr. at 23:10-23:12. As such, the IRS has not established—and cannot establish—by a preponderance of the evidence, much less by clear and convincing evidence, that Bravo paid, or controlled payment of, the wages of the Union Pacific crews at issue. Accordingly, the workers on Union Pacific's crews were not Bravo employees. Pre-Trial Br. at 22-23 (citing *In re Sw. Rest. Sys.*, 607 F.2d 1237, 1239 (9th Cir. 1979)).

### C. The Sources of Instrumentalities and Location of Work Factors Do Not Support the IRS's Position.

The IRS argues that Bravo provided the work sites and materials necessary for the work at issue. IRS Pre-Trial Br. at 7. The evidence will show, however, that in the construction industry it is customary for employees of subcontractors or independent contractors to work with construction materials and on work sites provided by the builder. It cannot be the law—and in fact is not the law—that an independent contractor or employee of a subcontractor who steps onto a given construction site becomes an employee of such builder. In site-based work environments such as this, where numerous contractors and subcontractors, and their respective employees, all work at a common site, the location of the work factor is necessarily of little significance.

---

[13] A true and correct copy of excerpts from the P. Garner Transcript is attached to the Bell Declaration as **Exhibit D.**

1    Moreover, as set forth in the Reorganized Debtors' opening pre-trial brief, Bravo

2  employees had the option of participating in an employee tool purchasing program pursuant to

3  which Bravo purchased certain tools on a participating employee's behalf, the cost of which

4  would subsequently be deducted from the employee's future paychecks.  P. Garner Tr. at 20:4-

5  21:10.  This program was not, and could not have been, made available to the workers on Union

6  Pacific crews, as they did not receive Bravo paychecks from which such deductions could have

7  been made.  Pre-Trial Br. at 27.  This fact, balanced against the fact that Bravo provided the

8  materials at its work sites, suggests that the source of instrumentalities factor is, overall, of little

9  effect.  If anything, this factor weighs slightly against the workers at issue being Bravo

10  employees.

11    **D.    The IRS Omitted Key Factors Indicating That Bravo is Not the Employer.**

12    In cherry-picking the factors it chose to address, the IRS omitted three factors that

13  strongly support the Reorganized Debtors' position—the right to hire and fire workers, which

14  here belonged to Union Pacific, the discretion to assign workers to other projects, which also

15  belonged to Union Pacific, and the provision of employee benefits, which here was handled by

16  Union Pacific.  *See* Pre-Trial Br. at 24-25, 27-29.

17    As set forth in the Reorganized Debtors' Pre-Trial Brief and will be shown at trial, Union

18  Pacific had the exclusive right to hire and fire the workers on its crews, including its crews that

19  worked on Bravo projects.  Pre-Trial Br. at 24-25.  Indeed, it was the Union Pacific crew leaders,

20  Mr. Curiel, Mr. Nunez, and Mr. Barrajas, who determined the composition of their crews.

21    Hand-in-hand with its ability to hire and fire workers on its crews, Union Pacific also had

22  the ability to re-assign workers from its crews onto other, non-Bravo, projects.  In fact, it was

23  customary in the construction industry for piecework crews, such as Union Pacific's, to come

24  and go from company to company, subcontracting for whichever company had work at the time.

25    Finally, Union Pacific was responsible for the provision of employee benefits, including

26  workers compensation and health insurance.  Pre-Trial Br. at 28-29.  Even the testimony of the

27  IRS's own witnesses supports this factor.  *See* J. Garner Tr. at 27:18-28:8 (explaining that if

28

1119990.doc (7540-1)                                11

1  someone on a Union Pacific crew was injured on the job, their crew leaders were contacted to

2  handle the injury).

3      Overall, no matter who bears the burden of proof, or by what standard, application of the

4  common law employer-employee factors overwhelmingly indicates that Bravo was not the

5  employer of the workers at issue.

6  **III.    THE IRS'S REMAINING ARGUMENTS ARE IRRELEVANT.**

7      The IRS spends a significant portion of its pre-trial brief making the non-controversial

8  point that, under the Internal Revenue Code and cases applying it, an *employer* bears a non-

9  delegable responsibility to withhold and pay over taxes with respect to *its employees*.  IRS Pre-

10  Trial Br. at 4-6.  The Reorganized Debtors do not dispute that if, under applicable law, Bravo

11  were the *employer* of the workers on Union Pacific's crews (and the IRS Claim were not barred

12  by the statute of limitations), Bravo would owe employment taxes with respect to those

13  workers.[14]  As set forth above, however, and as will be established at trial, the evidence

14  overwhelmingly proves that the workers at issue were employed by Union Pacific, not Bravo.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27

28

---

[14] Even if so, Bravo would not owe fraud penalties or interest thereon, or the grossly excess interest that the IRS miscalculated as owing on the general unsecured claim. *See* Pre-Trial Br. at 29-30.

**CONCLUSION**

For the foregoing reasons, the Debtors respectfully request that the Court declare that the IRS Claim is disallowed and expunged as a matter of law.

Dated:  February 27, 2012.

**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV  89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
        ssherman@klnevada.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail: pdublin@akingump.com
        aqureshi@akingump.com

*Attorneys for Reorganized Debtors*

1119990.doc (7540-1)

13