E-File: February 27, 2012

**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV  89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
            ssherman@klnevada.com

*Attorneys for Reorganized Debtors*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:  pdublin@akingump.com
             aqureshi@akingump.com

*Attorneys for Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka
"Rhodes Homes, et al.,[1]

                              Debtors.

Affects:

☐    All Debtors
☒    Affects the following Debtor(s):

Bravo, Inc. 09-14825

Case No.: BK-S-09-14814-LBR
(Jointly Administered)

Chapter 11

**DECLARATION OF JUSTIN H. BELL
IN SUPPORT OF REPLY OF THE
REORGANIZED DEBTORS TO THE
UNITED STATES' PRE-TRIAL BRIEF**

Trial Date:   March 5, 2012
Trial Time:  9:30 a.m.
Courtroom 1

---

[1]  The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

## <u>DECLARATION OF JUSTIN H. BELL IN SUPPORT OF REPLY OF THE REORGANIZED DEBTORS TO THE UNITED STATES' PRE-TRIAL BRIEF</u>

I, Justin H. Bell, declare as follows:

1.      I am an attorney at law admitted to practice in the State of New York and in the United States District Court for the Southern District of New York. I have filed an application to appear *pro hac vice* in this matter. I am a member of the firm of Akin Gump Strauss Hauer & Feld, LLC ("<u>Akin Gump</u>"), which maintains offices at One Bryant Park, New York, New York 10036.

2.      I make this declaration in support of *Reply of the Reorganized Debtors to the United States' Pre-Trial Brief*, submitted herewith (the "<u>Reply</u>"). Capitalized terms used but not defined herein shall have the meanings and definitions ascribed to them in the Reply.

3.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the Transcript of the Deposition of Dean Griffith, dated Feb. 9, 2012.

4.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the Transcript of the Deposition of James Garner, dated Jan. 18, 2012.

*5.*      Attached hereto as Exhibit C is a true and correct copy of excerpts from the Transcript of the Deposition of Marlene Marcus, dated Jan. 18, 2012.

6.      Attached hereto as Exhibit D is a true and correct copy of excerpts from the Transcript of the Deposition of Pamela Garner, dated Jan. 18, 2012.

7.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of February, 2012 at New York, New York.

*/s/ Justin H. Bell*
Justin H. Bell

Exhibit A

```
1            IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF NEVADA

3

4    In re:

5    THE RHODES COMPANIES, LLC, aka

     Rhodes Homes, et al.,

6                                    BK-S-09-14814 LBR

7                 Debtors.

8

9

10

11

12            DEPOSITION OF DEAN GRIFFITH

13                 Las Vegas, Nevada

14            Thursday, February 9, 2012

15                 Volume I

16

17

18

19

20   Reported by:

21   ALLYSON W. HARRIS

22   NV CCR No. 740

23

24   Job No. 13473

25   PAGES 1 - 83

                                        Page 1
```

```
 1          Las Vegas, Nevada; Thursday, February 9, 2012
 2                         9:00 a.m.
 3             (Counsel stipulated to waive the reporter
 4             requirements under FRCP Rule 30(b)(5)(A).)
 5
 6                      DEAN GRIFFITH,
 7     having been administered an oath, was examined and
 8     testified as follows:
 9
10                      EXAMINATION
11     BY MR. WATSON:
12        Q    Could you state for the name -- for the
13     record, please, your full name.
14        A    Dean Lee Griffith.
15        Q    And home address or business address?
16        A    Home address is 7540 Red Cinder Street,
17     Las Vegas, Nevada 89131.
18        Q    Okay.  Mr. Griffith, have you had your
19     deposition taken before?
20        A    Yes.
21        Q    About how many times?
22        A    Three.
23        Q    Okay.  I'm sure you're familiar with all the
24     ground rules, so I'll just go over them quickly, if
25     that's okay with you.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

1      Q     And those hourly employees were permanent
2   employees of Bravo?
3      A     Correct.
4      Q     And they worked for Bravo 40 hours a week?
5      A     Correct.
6      Q     Okay.
7      A     Or less.
8      Q     Or less, depending on the work.  And then
9   there was another segment of employees that was
10  responsible for doing the piecework portion of the
11  work?
12     A     Correct.
13     Q     And those employees, were those workers,
14  were they paid hourly as well?
15     A     No.  They were paid piece price.
16     Q     So if they -- and you said that was done by
17  feet, by how much --
18     A     Square footage.
19     Q     -- how much square footage they framed in a
20  particular day?
21     A     Right.
22     Q     So if I framed a hundred square feet and
23  Abid framed 150 --
24     A     Times 28 cents.  At that time it was 28
25  cents a square foot.

1        Q    All right.  So and that was just pure square

2    foot -- that was just a pure piecework calculation.

3        A    Right.

4        Q    And who were they supervised by?

5        A    They were supervised by -- we call them

6    pimps, but they're -- Hispanics pimps, but they were

7    like -- they would control -- like Ismael Curiel did

8    certain things.  Maximino Mato did certain things,

9    Andres Nunez did certain things, you know.  They

10   had -- there was a foreman for almost every phase.

11   Like layout was Maximino Mato.  Framing was Andres,

12   and then the majority of the joist stack and sheeting

13   was Ismael Curiel, and then they had Joaquin that was

14   the sheeter and nailer --

15       Q    So are these --

16       A    -- and they would run -- those were the

17   contacts to get manpower from -- and they all were --

18   at that time they were all on Robert Kahre's payroll.

19       Q    Okay.  Before they went on Mr. Kahre's

20   payroll, were they on Bravo's payroll?

21       A    Correct.

22       Q    And the foremen that you just mentioned

23   let's take, for example, the layout person.

24       A    Maximino Mato.

25       Q    Okay.  Was his sole responsibility to

Page 37

1    three.  The only one I would be concerned with is the

2    third page, this page here (indicating).

3         Q    All right.

4         A    It has the total amount.

5         Q    And who prepared that document, the third

6    page?

7         A    Union Pacific prepared all this.

8         Q    All right.  So Union Pacific would prepare

9    page 3 which starts, "Bravo, Inc.," for example, on

10   the page we're looking at here, page 3, September 22,

11   2000, okay?

12        A    Uh-hmm.

13        Q    And then the words "Group 1" appears and is

14   that "Yokeen"?

15        A    "Wah keen."

16        Q    Joaquin.  And do you know who Joaquin is?

17        A    Yeah, Joaquin was the foreman for

18   Union Pacific that did all the plywood sheeting and

19   nailing.

20        Q    And you said he was a foreman for

21   Union Pacific?

22        A    Correct.

23        Q    Did Joaquin ever work for Bravo?

24        A    Yes.

25        Q    And when did he work for Bravo?

Sarnoff, A VERITEXT COMPANY
877-955-3855

```
 1        A     Prior to Union Pacific.
 2        Q     So is it fair to say that the day before the
 3   Union Pacific/Bravo contract was signed, Joaquin was a
 4   Bravo employee?
 5        A     Correct.
 6        Q     And then the day after it was signed, your
 7   testimony is that he was then a --
 8        A     Union Pacific.
 9        Q     -- Union Pacific employee.
10              And do you know where -- who was responsible
11   for paying Joaquin's wages?
12        A     Union Pacific.
13        Q     Was he wages or salary?
14        A     No, those are the pieceworkers.  They're all
15   pieceworkers.
16        Q     Okay.  But Joaquin himself, was he --
17        A     He was a pieceworker.
18        Q     He was a pieceworker.
19        A     He took a percentage.  All the Group 1,
20   Group 2, Group 3 people took percentages off of their
21   phase of what they did on the home.
22        Q     All right.  So Joaquin was, the day before
23   the Union Pacific contract was filed, was a Bravo
24   employee, correct?
25        A     Correct.
```

Page 48

1    much work they had to do, and this is the amount of
2    piece prices or the amount that's owed to the -- you
3    know, to the overall cost, you know, to the overall
4    what they did for that week.
5        Q    So for Mr. Contreras, then, in the first
6    group on the first line there's a 1068 number, that's
7    $1,068?
8        A    I would say that's correct, yeah.
9        Q    Now, did you see this document on a weekly
10   basis, this document that we're looking at now, page
11   3?
12       A    Yes.
13       Q    Or a similar document.
14       A    Yes.
15       Q    And that's your signature that appears
16   there?
17       A    Yeah.
18       Q    Who was responsible for preparing the
19   document?
20       A    Union Pacific.
21       Q    And who was -- do you know who in
22   Union Pacific prepared the document?
23       A    Ismael Curiel is the one that worked with
24   Union Pacific to come up with all these numbers.
25       Q    And who is Ismael, is that Smiley?

                                        Page 55

1          A     Yes.

2          Q     So Smiley worked with Union Pacific to come

3     up with the numbers.  And what would Smiley do?  Just

4     explain the process to me.  You get to the end of the

5     work week, which I assume is Friday.  How do the

6     pieceworkers get paid?  First, how is their time

7     reported into -- how is it reported and to who is it

8     reported?

9          A     Well, what they would do is they would give

10     me a list of different things they did on each home,

11     and each thing has a price, and I would have to -- he

12     would say, "I'm going to turn this in for X amount of

13     dollars, turn this in for X amount of dollars, turn

14     this in for X amount of dollars."  He's not putting

15     any names to that amount of money until he does this

16     (indicating).

17          Q     All right.  So --

18          A     But all I do is I check to make sure that

19     dollar amount, that dollar amount, that -- all that

20     dollar amount adds up to what he's turning in.

21          Q     So and when you say "he" do you mean Smiley?

22          A     Yes.  Smiley -- Joaquin would turn his time

23     in.

24          Q     Oh, I see.

25          A     Smiley would turn his time in, Andres would

                                             Page 56

1    turn his time in and then I would approve it and then

2    they would create this (indicating).

3        Q    All right.  So they would turn their time in

4    to you, correct?

5        A    They'd turn it -- yeah, they'd turn --

6    they'd bring it into the office and I go through it

7    all and we input -- I input it on a spreadsheet, you

8    know, how much they're turning in so they don't

9    overdraw on each house.  And then when -- you know, if

10   it's calculating out right, and then I'll approve

11   it.

12       Q    So the team -- these group leaders would

13   bring that information to you.

14       A    Correct.

15       Q    Not to the foreman.

16       A    No, they would bring it into the office.

17       Q    And then you would input it on a

18   spreadsheet.

19       A    Correct.

20       Q    On a computer presumably.

21       A    Uh-hmm.

22       Q    And you wouldn't at that time have the

23   individual names.  You would just have a total number.

24       A    Correct.

25       Q    So on this page 3, if I'm following you, in

1    Group 3, Andres, since I can do the math on that one,

2    he would have come in and said, "I've got $1844 I'm

3    going to turn in for framing this week."

4        A    Correct.

5        Q    And then would you put that on the overall

6    spreadsheet.

7        A    Correct.

8        Q    And then who was responsible for creating

9    this document that listed the individual names and

10   individual amounts to each of those?

11       A    Andres.

12       Q    For his group he would create that?

13       A    Correct.

14       Q    And who would he turn that in to to create

15   this master list?

16       A    Well, he would give it to Smiley.

17       Q    So Andres would take his number and his

18   individuals and give that information to Smiley.

19       A    Correct.

20       Q    And so would Joaquin?

21       A    Correct.

22       Q    And then Smiley was the one who generated

23   this document?

24       A    I want to say Union Pacific created it for

25   him.  Smiley gave them the names and the numbers and

1    then they created it.

2         Q    Did Smiley have an office anyplace?

3         A    No.  He worked with Union Pacific, so I'm

4    sure he might have had an office there, you know,

5    to --

6         Q    And he had worked with Union Pacific or he

7    had -- he knew Mr. Kahre before the contract between

8    Bravo and Union Pacific?

9         A    Correct.

10        Q    So your signature appears on this document.

11   At some point in time you would get this document as

12   it exists right now, as we're looking at it right now,

13   correct?

14        A    Correct.

15        Q    And that would come from whom?

16        A    Union Pacific would fax it to Mona.

17        Q    All right.  And then what's the next step in

18   the process?  Mona gets the document, and what does

19   she do with it?

20        A    She brings it to me, and I check to make

21   sure the total amount adds up to what they had told me

22   they were going to turn in --

23        Q    And when you say --

24        A    -- for that week.

25        Q    When you say "they," you mean the individual

Page 59

1   group leaders?

2       A    Joaquin, Smiley and Andres, correct.

3       Q    All right.  And if I look at the bottom

4   left-hand corner of the page there's a subtotal, and

5   on this particular document it's $10,217.

6       A    Correct.

7       Q    Correct?  And then there's another amount

8   that -- is it BRD, an abbreviation?

9       A    It's an abbreviation for burden.

10      Q    Burden?  And what's a burden?

11      A    That's for the payroll taxes, the Workman's

12  Comp, the office personnel to, you know, create this,

13  the checks or whatever they're doing to pay the

14  employees.

15      Q    And who calculated the amount of the burden?

16      A    I want to say there was a percentage that --

17  per the dollar amount, for the total dollar amount of

18  the labor there was a percentage that the burden is.

19  Then on some of these, I don't know if I saw them.

20  Let me see.

21           And Mona would check the burden amount to

22  make sure it was correct and then I'd sign off on it.

23           So it's not saying what the burden

24  percentage is.

25      Q    Was that percentage spelled out in the

Page 60

Exhibit B

1              IN THE UNITED STATES BANKRUPTCY COURT

2                   FOR THE DISTRICT OF NEVADA

3

4     In re:

5     THE RHODES COMPANIES, LLC, aka

      Rhodes Homes, et al.,

6                                      BK-S-09-14814 LBR

7                   Debtors.

8

9

10

11    _____

12                 DEPOSITION OF JAMES GARNER

13                     Las Vegas, Nevada

14                Wednesday, January 18, 2012

15                        Volume I

16

17

18

19    Reported by:

      ALLYSON W. HARRIS

20    NV CCR No. 740

21    Job No. 130614B

22

23    PAGES 1 - 42

24

25

                                              Page 1

1          Las Vegas, Nevada, Wednesday, January 18, 2012

2                          10:50 a.m.

3

4                          JAMES GARNER,

5     having been administered an oath, was examined and

6     testified as follows:

7

8                          EXAMINATION

9     BY MS. LOWE:

10         Q    Okay.  This is -- my name is Virginia Lowe

11    and this is the deposition of James Garner in the

12    Rhodes Companies bankruptcy action.

13              And, Mr. Garner, could you spell your name

14    for the record, please?

15         A    J-a-m-e-s, G-a-r-n-e-r.

16         Q    Okay.  And can you tell us your address?

17         A    4670 Hoeker Way, Las Vegas, Nevada 89147.

18         Q    Okay.  And have you ever had your deposition

19    taken before?

20         A    Yes.

21         Q    Okay.  And when was that?

22         A    A couple times years ago for construction

23    defect stuff.

24         Q    Okay.  And so you know that everything you

25    say is -- you're testifying under oath and that you

                                             Page 5

1           A      And the crew leaders basically were in

2      charge of, say, if the job foreman walked the house

3      and there was items that the crew had left incomplete

4      that needed to get taken care of, the job foreman

5      would call the crew leader and they were responsible

6      to get somebody there to finish the job and/or fix

7      something that the crews had done wrong.

8           Q      Okay.

9           A      So it was basically like they were in charge

10     of all those crews and they had to get it taken care

11     of.

12          Q      Okay.  So when you said you were a job

13     foreman, so you had some crew leaders that you dealt

14     with also when you were a job foreman?

15          A      Yes.

16          Q      Okay.  So then if you found a problem,

17     instead of going to the individual workers, you would

18     go to the crew leader and say "This needs to be

19     fixed"?

20          A      Right.

21          Q      Okay.  And then the crew leader, then, would

22     have the individuals working fix -- or rectify

23     whatever was needed to be --

24          A      Whoever had done it or --

25          Q      Okay.

Page  26

1      A      -- they would send somebody else to fix it,

2    yeah.

3      Q      Okay.  And these people were all at the time

4    working for Bravo?

5      A      Yes.

6      Q      Okay, okay.

7             So you said there was a meeting in the

8    office involving all these individuals.  Do you -- and

9    you were at this meeting, and do you recall what was

10   discussed at the meeting?

11     A      Basically they just -- we were told that it

12   was going to be like a payroll service to where those

13   crew leaders would just be paid through the payroll

14   service.

15     Q      Whose payroll service?

16     A      Robert Kahre and George, Big George.

17     Q      Okay.

18     A      And the meeting was basically that as far as

19   if somebody got hurt, because the crew leaders weren't

20   always on the job site, so if somebody got hurt from

21   their crews, you know, you'd have to call the crew

22   leader and let them know and just what to do about

23   that.

24     Q      Okay, okay.

25             And do you know how long the meeting lasted?

Page 27

1       A    I don't remember for sure.  It wasn't very

2    long, though.

3       Q    Okay.  So who was -- you said that the crew

4    leader had to contact somebody else if somebody was

5    hurt at the job site.  And do you know --

6       A    The foreman would.

7       Q    Okay.  Oh, the foreman.  And who was that --

8       A    Would contact the crew leader.

9       Q    Okay.  And who was that that they had to

10   contact?  Was it somebody in Robert Kahre's office

11   or --

12      A    I don't know who the crew leader would talk

13   to after the -- if the foreman called the crew leader.

14      Q    Okay.

15      A    That was the extent of what we knew about

16   it.

17      Q    Okay.  And do you remember if there was

18   anything else discussed at the meeting?

19      A    No, not really.  I think just the insurance

20   and then the payroll would be done through them.

21      Q    When you say "them," who do you mean?

22      A    Through Robert Kahre.

23      Q    Oh, okay, okay.

24           And do you know the name of the company that

25   he ran, Robert Kahre's company?

Page 28

```
1          A     Union Pacific, yeah.
2          Q     Okay.  And so the payroll was going to be
3     run through Union Pacific?
4          A     I believe that's what the name of it was,
5     yes.
6          Q     Okay.  And was there any -- after this --
7     did there -- was there a reason given for the --
8     having Mr. Kahre's company take over a portion of the
9     payroll?
10         A     I would say the reason that I remember it
11    being was a lot to do with the insurance, and as far
12    as -- yeah, I guess just the insurance.
13         Q     Okay.
14         A     And the -- for the crew leader, the crews.
15         Q     Okay.  So I take it these were the crew
16    leaders -- you've named Ismael Curiel, Andres Nunez
17    and Joaquin Barrajas as the crew leaders.
18         A     Right.
19         Q     And so was it just their crews that were
20    going to be serviced by the Kahre payroll service
21    company or the Kahre payroll?
22         A     Yes.
23         Q     Okay.
24         A     I believe so.
25         Q     And there was other crews, though, leaders
```

Page 29

Exhibit C

1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF NEVADA

3

4    In re:

5    THE RHODES COMPANIES, LLC, aka

     Rhodes Homes, et al.,

6                            BK-S-09-14814 LBR

7              Debtors.

8

9

10

11   _____

12         DEPOSITION OF MARLENE MARCUS

13              Las Vegas, Nevada

14         Wednesday, January 18, 2012

15              Volume I

16

17

18

19   Reported by:

     ALLYSON W. HARRIS

20   NV CCR No. 740

21   Job No. 130614

22

23   PAGES 1 - 30

24

25

                                    Page 1

```
 1              Las Vegas, Nevada, Wednesday, January 18, 2012

 2                           1:50 p.m.

 3

 4                        MARLENE MARCUS,

 5      having been administered an oath, was examined and

 6      testified as follows:

 7

 8                         EXAMINATION

 9      BY MS. LOWE:

10         Q    Okay.  This is the deposition of

11      Marlene Marcus, and my name is Virginia Lowe and I

12      represent the United States in this litigation, and

13      Justin Bell is appearing by telephone, representing

14      the reorganized debtors.

15              And, Ms. Marcus, could you spell your full

16      name for the record, please?

17         A    My first name is M-a-r-l-e-n-e.  My last

18      name is M-a-r-c-u-s.

19         Q    Okay.  And can you give us your address,

20      please?

21         A    1109 Sulphur Springs Lane, Unit 101,

22      Las Vegas, Nevada 89128.

23         Q    And can you give us your telephone number,

24      please?

25         A    Area code (702) 804-1490.
```

                                                        Page 5

1        A    I think there were different foremans.

2        Q    Okay.

3        A    I don't think it was one particular

4    foreman.

5        Q    Okay.  So these were Bravo foremen?

6        A    Yes.

7        Q    Okay.  And they would bring in the time

8    sheets.

9        A    (Nods head up and down.)

10       Q    And then who would create this spreadsheet

11   here, this listing of workers?

12       A    Union Pacific.

13       Q    Okay.  And then do you know that for a fact

14   or do you --

15       A    As far as my memory goes.  You know, it's

16   been over six years and it's kind of hazy.

17       Q    Okay, okay.

18            Now, do you know who this Smiley is on here?

19       A    He was the head of that group.

20       Q    Okay.

21       A    But he was also a Union Pacific.  He wasn't

22   our employee.

23       Q    Okay.  And what about --

24       A    There was a time when he did become an

25   employee after we stopped using Union Pacific.

                                        Page 23

Exhibit D

1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF NEVADA

3

4   In re:

5   THE RHODES COMPANIES, LLC, aka

    Rhodes Homes, et al.,

6                               BK-S-09-14814 LBR

7          Debtors.

8

9

10

11  _____

12          DEPOSITION OF PAMELA GARNER

13              Las Vegas, Nevada

14          Wednesday, January 18, 2012

15                  Volume I

16

17

18

19  Reported by:

    ALLYSON W. HARRIS

20  NV CCR No. 740

21  Job No. 130614A

22

23  PAGES 1 - 54

24

25

                                        Page 1

1           Las Vegas, Nevada, Wednesday, January 18, 2012

2                            8:57 a.m.

3

4                        PAMELA GARNER,

5     having been administered an oath, was examined and

6     testified as follows:

7

8                        EXAMINATION

9     BY MS. LOWE:

10        Q    Okay.  We're here for the deposition of

11    Pamela Garner.

12             And can you spell your name for the record,

13    please?

14        A    First and last?

15        Q    Yes, please.

16        A    P-a-m-e-l-a, last name G-a-r-n-e-r.

17        Q    Okay.  And can you tell me your address,

18    please?

19        A    4670 Hoeker Way, Las Vegas, Nevada 89147.

20        Q    Okay.  And what's your telephone number?

21        A    629-2289.  That's my home number.  If you

22    want my . . .

23        Q    No, that's fine.  And that's 702 area code?

24        A    Yes.

25        Q    And have you ever had your deposition taken

                                              Page 5

1    maintenance type, keeping things running?

2        A    Yes, that's a really good description of

3    it.

4        Q    Okay.  And then what about would the

5    workers, would they have any type of special

6    deductions from their payroll for any type of

7    equipment or any type of --

8        A    That's a good question.  If they filled out

9    the paperwork and signed it, like if they wanted the

10   company to buy them a new nail gun or something like

11   that, they would be -- with Dirk and the foreman they

12   would determine, you know, which one they wanted, the

13   cost of it, and how many deductions it would be out of

14   their paycheck.

15       Q    Okay.

16       A    But they would have to sign it and it would

17   be put into their personnel folder.

18       Q    Okay.  And so that -- and so then was that

19   expense deducted from their paycheck?

20       A    Yes.

21       Q    Okay.  And it would be over a number of

22   paychecks --

23       A    Uh-hmm.

24       Q    -- is that how you generally did it?

25       A    It depends on the cost of the particular

Sarnoff, A VERITEXT COMPANY
877-955-3855

1    tool.  I mean --

2          Q     Okay.

3          A     -- it could be one paycheck if it was just

4    like a hammer, but if it was something more expensive

5    like a nail gun or -- and I can't even think of tools

6    now, but a nail gun would be like a $300 item.

7          Q     Okay, okay.

8                So in general, then, they at the end would

9    own this type of tool.

10         A     Right.

11         Q     Okay, okay.

12               And then can you tell me a little bit about

13   the work force in general?  Was it pretty steady or

14   was it usually the same people, do you know, or . . .

15         A     A lot of the same people.  It would just

16   depend, because construction fluctuates -- back then

17   it would fluctuate a lot and we could get a lot of

18   houses that we needed to build and they needed to

19   scramble to find people to fill those positions to

20   get -- to keep up with the production.

21         Q     Yes.

22         A     In the wintertime it would slow down so some

23   guys would have to go and find other work for the

24   winter.

25               Did we have a core crew?  I would say that

Page 21

1    out, what we could -- what we needed to bill out, and

2    we'd just go and say, okay to payables, whoever that

3    was at the time bill, you know, pay this and, you

4    know, for me to bill out so much.

5        Q    Okay, okay.

6            So it was your understanding these people

7    were being -- Bravo was determining that these people

8    performed duties and this is how much they should be

9    paid?

10       A    Uh-hmm.

11       Q    And then the money would be sent to UPC for

12   the payment of their wages?

13           MR. QURESHI:  Object to the form.

14           THE WITNESS:  I'm sorry?

15           MS. LOWE:  He's just making an objection as

16   to form.

17           THE WITNESS:  Oh, okay.

18   BY MS. LOWE:

19       Q    Well, let's go over it one by one.

20           These people that are listed on this sheet,

21   this second page here, Bravo, Inc. sheet 0248, again

22   you prepared this document?

23       A    I would figure.

24       Q    Okay.

25       A    I don't --

1        Q    Well, you testified before you got the
2    information from the foremen that these people needed
3    to be paid for their work.
4        A    Right.
5        Q    Okay.
6        A    Uh-hmm -- no, I --
7             MR. QURESHI:  Object to the form.
8             THE WITNESS:  Yeah, I would divvy the money
9    up between the guys, yes.
10   BY MS. LOWE:
11       Q    Okay, okay.  And the foremen would bring you
12   that information?
13       A    Uh-hmm.
14       Q    Okay.  And then you would determine how much
15   would be paid to each individual based on the pot of
16   money that you were informed of?
17       A    Right.
18       Q    Okay, okay.
19            And then these individuals, then, were
20   performing work for Bravo; is that correct?
21       A    As far as I know, yes.
22       Q    Okay.  And then so before it appeared -- so
23   when you -- you wrote this note, okay, "Laurie, the
24   check will be ready tomorrow p.m."  How did this
25   information then get to Laurie?

 1   a few questions.

 2                        EXAMINATION

 3   BY MR. QURESHI:

 4        Q    Again, Miss Garner, it's Abid Qureshi here

 5   on behalf of the reorganized debtor.

 6        A    Okay.

 7        Q    Just a couple of quick questions.  You

 8   testified in response to a question from Ms. Lowe that

 9   you were told that UPC was helping Bravo with its

10   payroll, and my question for you is if you can tell me

11   by whom you were told that?

12        A    It would have either been Mona Wilcox or

13   Dirk Griffith.

14        Q    Now, did you at the time have any

15   understanding of the business in which Union Pacific

16   Construction was engaged?

17        A    No.  It was just, you know, I'm told to do

18   something, so I just do what I'm told.

19        Q    Okay.  You also testified in response to a

20   question from Ms. Lowe concerning the exhibit that you

21   have in front of you --

22        A    Uh-huh.

23        Q    -- that I believe it was Smiley's crew would

24   work for lots of different companies and not just for

25   Bravo, correct?

                                              Page 48