1

1          UNITED STATES BANKRUPTCY COURT

2              DISTRICT OF NEVADA

3              LAS VEGAS, NEVADA

4   In re:  THE RHODES COMPANIES, LLC, )  E-Filed:  03/22/12
                                       )
5                                      )
              Debtors.                 )  Case No.
6                                      )  BK-S-09-14814-LBR
    _____)  Chapter 11
7

8

9

10

11             TRANSCRIPT OF PROCEEDINGS
                          OF
12       TRIAL RE: OBJECTION TO CLAIM, NO. 1377
                      VOLUME 1
13       BEFORE THE HONORABLE LINDA B. RIEGLE
             UNITED STATES BANKRUPTCY JUDGE
14
                 Monday, March 5, 2012
15
                    11:00 a.m.
16

17

18

19

20

21

22

23   Court Recorder:       Deborah Hemstreet

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

2

```
1    APPEARANCES:

2    For the Reorganized          ABID QURESHI, ESQ.
     Debtors:                     JUSTIN H. BELL, ESQ.
3                                 Akin Gump Strauss Hauer & Feld
                                  One Bryant Park
4                                 New York, New York 10036

5    For the United States:       VIRGINIA CONAN LOWE, ESQ.
                                  KAYCEE M. SULLIVAN, ESQ.
6                                 United States Department of Justice
                                     Tax Division
7                                 950 Pennsylvania Avenue, NW
                                  Washington, DC 20530

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2   Witness          Direct    Cross    Red.    Rec.    Voir
                                                         Dire

 3   PAMELA GARNER
     (By Ms. Lowe)      8                        32
 4   (By Mr. Qureshi)            21

 5   JAMES GARNER
     (By Mr. Sullivan)  35
 6   (By Mr. Qureshi)            45

 7   JORGE FERNANDEZ                     86
     (By Ms. Lowe)      54
 8   (By Mr. Qureshi)            69

 9   GEORGE RODRIGUEZ
     (By Ms. Sullivan)  89
10   (By Mr. Qureshi)            96

11   DEAN LEE GRIFFITH
     (By Mr. Qureshi)   103
12   (By Ms. Lowe)               128,141

13   JAMES ARTHUR BEVAN
     (By Mr. Qureshi)   143                      165
14   (By Ms. Sullivan)          153

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                       E X H I B I T S

 2    Number              Description              Page

 3    Plf's 1        Indictment of Mr. Kahre        7

 4    Plf's 2        Judgment for Mr. Kahre         7

 5    Plf's 3                                       5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Court convened at 10:58:31 a.m.)

2          THE COURT:  Be seated.  All right.  In the Rhodes

3    matter.

4       Appearances, please.

5          MR. QURESHI:  Good morning, your Honor.

6    Abid Qureshi, Akin Gump Strauss Hauer & Feld, on behalf of the

7    reorganized debtors and with me is my colleague Justin Bell.

8          THE COURT:  Okay.

9          MS. LOWE:  And Virginia Lowe from the United States

10   Department of Justice Tax Division for the United States and

11   the creditor, Internal Revenue Service, and with me is my

12   colleague, Kaycee Sullivan, who also appears in the

13   District of Nevada cases.

14         THE COURT:  All right.  All right.

15      Do we have stipulations on exhibits first?

16         MS. LOWE:  I believe there's a stipulation with

17   regard to Exhibit 3.

18         THE COURT:  All right.

19      (Plaintiff's Exhibit No. 3 was admitted

20        into evidence per stipulation.)

21         MS. LOWE:  And we can deal with the other two

22   exhibits right now if your Honor would like.

23         MR. QURESHI:  Your Honor, with respect to Exhibit 1

24   and 2, the first is the indictment of Mr. Kahre (phonetic).

25   The second is the judgment.

1          I'm just not certain for what purpose these exhibits are

2    being offered, and so will reserve my right to object until I

3    hear that.

4                    THE COURT:  Okay.

5                    MS. LOWE:  Your Honor, the United States is offering

6    them to show the relevance of the business that Mr. Kahre was

7    conducting during the time period that we're talking about with

8    regard to a payroll service system, and we feel that they're

9    relevant to that issue.

10                   THE COURT:  All right.

11                   MR. QURESHI:  I'm not sure I understand the

12   relevance, your Honor.  What occurred in the criminal

13   proceedings is hearsay.  It's not admissible.

14        The Government has here witnesses who testified in the

15   criminal proceedings, so we can hear firsthand from them

16   whatever they would testify to.

17        If the indictment is being offered for the truth of any of

18   the matters asserted in the indictment, I would object to it.

19   I don't think it's admissible.  I think it's hearsay.

20        If the indictment and the judgment in the criminal case

21   are being offered merely so that the Court can take judicial

22   notice that Mr. Kahre was indicted and that Mr. Kahre was

23   convicted, I have no objection to that.

24                   MS. LOWE:  Your Honor, we believe that they can be

25   allowed in as an exception to the hearsay under Rule 8038, a

1    public records exception.

2             THE COURT:  Yeah.  I'll admit them as evidence of

3    showing that he was convicted of these crimes.  And the

4    indictment shows which offenses -- the indictments match up

5    with the judgment of conviction, and I think it's relevant to

6    show that the business was not a viable business or a legal

7    business.

8        It, of course, doesn't show one way or the other to what

9    extent the Rhodes Company and its subsidiaries knew what

10   Mr. Kahre was doing and whether or not it was legal or illegal.

11   That's obviously what's being proved at trial.  So they --

12            MS. LOWE:  Yes, your Honor.

13            THE COURT:  -- are admitted.

14        (Plaintiff's Exhibits Nos. 1 and 2 were admitted

15         into evidence.)

16            THE COURT:  All right.  So I'll have the Government

17   call its first witness.

18            MS. LOWE:  United States calls Pamela Garner.

19            THE COURT:  All right.

20            THE CLERK:  Please step up here and remain standing.

21   Raise your right hand.

22    Thereupon --

23                          PAMELA GARNER

24    was called as a witness by the United States, and having been

25     first duly sworn, testified as follows:

```
 1              THE WITNESS:  Yes.

 2              THE CLERK:  Please state your name and spell it for

 3  the record.

 4              THE WITNESS:  Pamela Garner,

 5  P-a-m-e-l-a G-a-r-n-e-r.

 6              THE CLERK:  Thank you.  Please be seated.

 7                       DIRECT EXAMINATION

 8   BY MS. LOWE:

 9  Q.   Mrs. Garner, can you tell me are you a resident of

10  Las Vegas?

11  A.   Yes.

12  Q.   And how long have you lived here?

13  A.   Three years, right -- right now.  Overall, probably close

14  to 16.

15  Q.   Okay.  And during the year 2000, were you employed here in

16  Las Vegas?

17  A.   Yes.

18  Q.   And where were you employed?

19  A.   At Rhodes Framing/Bravo, Inc.

20  Q.   Okay.  And when did you start working there, do you

21  remember?

22  A.   Around 1995, 1996.

23  Q.   Okay.  And how long did you continue to work there?

24  A.   'Til the -- until the end of 2002.

25  Q.   Okay.
```

9

1   A.   2003.

2   Q.   And when you first started working there, what did you do?

3   A.   I was the receptionist.

4   Q.   Okay.  And then did you have another responsibility there

5   or did your job increase?

6   A.   My job increased, and then it included payroll.

7   Q.   Okay.  And who was your supervisor when you were performing

8   your payroll function at Bravo?

9   A.   Mona Wilcox (phonetic).

10  Q.   Okay.  And what was her position at Bravo?

11  A.   Controller, CP -- accountant.

12  Q.   Okay.  Can you explain briefly what you did when you said

13  you did the payroll.  What was the payroll process at Bravo?

14  A.   I would collect the time sheets from the foremen.  I would

15  organize them and enter them into our computer system so we

16  could process paychecks.  I would take care of any adjustments.

17  Q.   Okay.

18  A.   Reprints.  Print the checks.  Sort the checks.  Give them

19  out on usually Thursdays or Fridays.

20  Q.   Okay.  So you said that there was foremen who were employed

21  by Bravo; is that correct?

22  A.   Yes.

23  Q.   Okay.  And the foremen, what did they do at Bravo?

24  A.   They managed the workers in the field.

25  Q.   Okay.  So how often would they come in with time sheets?

1   A.   Once a week.

2   Q.   Okay.  And what would be on the time sheet?

3   A.   The days that the workers worked, how many hours they

4   worked, how their work was coded to -- based on what they did

5   in the field, signatures.  Time sheets would need to be signed.

6   Q.   Okay.  So then you would take that information and

7   specifically what would you do with it?

8   A.   I would process it into the computer system.  I would job

9   cost based on the hours and the codes and create paychecks from

10   that.

11   Q.   Okay.  And did anyone review your work while you were doing

12   this function?

13   A.   Mona would review -- Mona would review it.

14   Q.   Okay.

15   A.   Yeah.

16   Q.   Was there anybody else who was involved in the payroll

17   process?

18   A.   The construction manager would review it probably before I

19   would -- I would enter anything just to make sure that it

20   looked -- it looked right.

21   Q.   Okay.  And who was the construction manager?

22   A.   At that time I think it -- it would be -- it would have

23   been Dean Griffith.

24   Q.   Okay.  Now, did Bravo employees ever work for other

25   contractors, do you know?

1  A.   Did we build -- did we frame for other contractors?  Is

2  that what you're asking?

3  Q.   Well, you can answer that question first.  Sure.

4  A.   Okay.  We did -- we did a few outside, you know, outside of

5  Rhodes-type jobs.  Sure.

6  Q.   Okay.  But did the employees who were working, the laborers

7  at Bravo, ever actually work for other contractors?

8  A.   They would.  If we weren't -- if we weren't busy, then they

9  would have to go and find employment at a different company

10  building houses.

11  Q.   Okay.  And so if there was not enough work at Bravo, then

12  they would go to another contractor to fill in their time?

13  A.   Sure.

14  Q.   Okay.  But you still treated those types of workers as

15  employees?  They were entered into your payroll system?

16  A.   Sure.

17  Q.   Okay.  Now, did you receive a paycheck at Bravo?

18  A.   Yes.

19  Q.   Okay.  And were withholding taxes taken out of your

20  paycheck?

21  A.   Yes.

22  Q.   Are you familiar with a company named

23  Union Pacific Construction?

24  A.   Yes.

25  Q.   Okay.  And how did you hear of that company?

1   A.   That company, I was told that they were going to help with

2   some of our -- our payroll processing.

3   Q.   Okay.  And who told you that?

4   A.   That would have been my direct supervisor.  That would have

5   been Mona Wilcox.

6   Q.   Okay.  Can you take a look at Exhibit 3 there in that

7   binder, please.

8           THE COURT:  And there was a stipulation to admit 3;

9   is that correct?

10          MR. QURESHI:  Yes, your Honor.

11          THE COURT:  Okay.  Thank you.

12       (Colloquy not on the record.)

13   BY MS. LOWE:

14   Q.   Now, can you look at, actually, it's the bottom numbers on

15   the right-hand side and go to 00086.

16   A.   Okay.

17   Q.   You're faster than me.  Okay.  Now, have you ever -- do you

18   know have you ever seen this document before?

19   A.   Yes.

20   Q.   Okay.  And do you recognize any of the writing on this

21   document?

22   A.   It's mine.

23   Q.   It's your writing.

24   A.   Yes.

25   Q.   Okay.

13

```
1        THE COURT:  I apologize a second.  Which document

2   number were you referring her to?

3        MS. LOWE:  It's on the very bottom right-hand corner,

4   your Honor.  It's 00086.

5        THE COURT:  86.  All right.

6        MS. LOWE:  Yes.

7        THE COURT:  Thank you.  Sorry.  Go ahead.

8        MS. LOWE:  Okay.

9    BY MS. LOWE:

10  Q.   You've written a name here, Lori (phonetic).  Do you know

11  who that is?

12  A.   That's the person that I dealt with over at Union Pacific.

13  I would -- I would fax the information over to her.

14  Q.   Okay.  And can you read actually what you wrote here on

15  this piece of paper.

16  A.   Okay.  "Lori, have you run and pick up a cashier's check

17  tomorrow morning.  This is so not normal, but I wanted to --

18  wanted you to have it since we did.  No stress this week.

19  Pam."

20  Q.   Do you know what that means?  Can you tell us what you were

21  referring to.

22  A.   I would say that we had some -- we had a cashier's check to

23  pay them.

24  Q.   Okay.  And now if you look at the page here, there's three

25  groups on this page --
```

1    A.    Um-h'm.

2    Q.    -- group 1, group 2, and group 3?

3    A.    Yes.

4    Q.    Do you know actually who created this page here?

5    A.    It -- it could have been me.  It could have been -- it

6    could -- it could have been me.  I -- I can't say 100 percent.

7    It -- more than likely, though.

8    Q.    Okay.

9            THE COURT:  May I interrupt for one second.

10           MS. LOWE:  Sure.

11           THE COURT:  I see we have a number of witnesses here.

12    Timing wise are there times that we can let some of these

13    people be excused and come back at a certain time or have you

14    thought about that already or --

15           MS. LOWE:  Actually, we anticipated, your Honor, that

16    we probably would get through most of our witnesses before we

17    even need a break because --

18           THE COURT:  Okay.

19           MS. LOWE:  -- our first two witnesses are kind of

20    short, and, actually, our fourth witness is kind of short,

21    so --

22           THE COURT:  Okay.

23           MS. LOWE:  Yeah.

24           THE COURT:  No problem.

25           MS. LOWE:  So we're --

```
 1              THE COURT:  I just didn't want people to have to
 2    stick around all day --
 3              MS. LOWE:  Okay.
 4              THE COURT:  -- if we could tell them --
 5              MS. LOWE:  I don't --
 6              THE COURT:  -- to come --
 7              MS. LOWE:  --  know if --
 8              THE COURT:  -- back later.
 9              MS. LOWE:  -- Mr. Qureshi wants to --
10              MR. QURESHI:  No, your Honor.  I anticipate the
11    cross-examinations of the Government's witnesses to be quite
12    brief.
13              THE COURT:  Okay.
14              MR. QURESHI:  So --
15              THE COURT:  And your witnesses aren't -- you told
16    them to come later.
17              MR. QURESHI:  My witnesses are actually here.
18              THE COURT:  Oh, did you want them to come back this
19    afternoon, though?
20              MR. QURESHI:  I will leave that up to them.  If they
21    want to stay, they can stay, but we think this will go
22    relatively quickly.
23              THE COURT:  Okay.  No problem.
24              MR. QURESHI:  Appreciate it.
25              THE COURT:  Do you want to two seconds to ask them
```

```
 1    what they want to do?  I just hate to inconvenience people --

 2              MR. QURESHI:  Sure.

 3              THE COURT:  -- that are working.

 4         (Colloquy not on the record.)

 5              MR. QURESHI:  Yeah.  They'll just stay, your Honor.

 6              THE COURT:  All right.  No problem.

 7              MR. QURESHI:  Thank you.

 8              THE COURT:  I'm so sorry to interrupt.

 9              MS. LOWE:  That's okay.

10     BY MS. LOWE:

11     Q.    Going back to page 86 here --

12     A.    Um-h'm.

13     Q.    -- and do you know who Smiley (phonetic), Andreas

14     (phonetic), and Joaquin (phonetic) are?

15     A.    They were foremen.

16     Q.    Okay.  Were they foremen for Bravo?

17     A.    They did -- they did work for us.

18     Q.    Okay.  Do you ever remember them receiving paychecks at

19     Bravo?

20     A.    Yes.

21     Q.    Okay.  Now, on this page is names of individuals, and then

22     there's dollar figures.  Can you tell us what it means.

23     A.    That would tell me that like Miguel Gutierrez (phonetic)

24     would be receiving $1,920.

25     Q.    Okay.  And do you know where the information came from to
```

1  create this page?

2  A.   The foreman would bring the -- bring whatever they worked

3  out pay wise with the construction manager.  They would say

4  I've done this, this, and this.

5      It would get approved to say, yes it was done or no it

6  wasn't, and then a list was brought to me with -- with names

7  and saying it was okay to payout on those particular portions

8  of the houses that they completed.

9  Q.   Okay.  And then after this list was created, you said that

10  this list was sent -- where was this list sent?

11  A.   To -- this would have been sent to Union Pacific.

12  Q.   Okay.

13          THE COURT:  I'm sorry.  To who?

14          THE WITNESS:  To Union Pacific to Lori.

15          MS. LOWE:  Okay.

16  BY MS. LOWE:

17  Q.   And do you know what type of workers these were that were

18  getting paid this way?

19  A.   They were -- they were pieceworkers.

20  Q.   Okay.  And can you tell me what a pieceworker is?

21  A.   They basically get paid by -- there's a dollar figure

22  associated with like if you completed all the -- all the walls

23  in the house, there would be a dollar figure on that, so

24  whoever worked on that would get a piece of the pot basically.

25  Q.   Okay.

1    A.    For the walls completed on that house or whatever they did.

2    Q.    So these were not hourly employees.  They were paid by the

3    piece.

4    A.    Yes.

5    Q.    Okay.  Now, I notice there's a signature here and

6    underneath it says Dean Griffith.

7    A.    Um-h'm.

8    Q.    And is that the person you were referring to at Bravo?

9    A.    Yes.

10   Q.    Okay.  And his position again at Bravo?

11   A.    Construction manager.

12   Q.    Okay.  And do you recall at all when he would have signed

13   this?

14   A.    Honestly, no.

15   Q.    Okay.  Now, there's a circle up here, and it says

16   Wells Fargo check.  Do you know whose writing that is?

17   A.    That could -- it -- I -- I -- it could be

18   Mona Wilcox's.

19   Q.    Okay.  Do you know if Bravo had a bank account at

20   Wells Fargo at that time?

21   A.    I don't know at that time.  They've had -- they had bank

22   accounts at Wells Fargo.  I couldn't say.  We changed banks a

23   number of times while I was there, so --

24   Q.    Okay.  So at one time they had an account at Wells Fargo.

25   Okay.  Can you look at page 91, please.  Okay.  Do you

1    recognize your handwriting on this page?

2    A.   Yes.

3    Q.   Okay.  And can you read it, please.

4    A.   "Lori, the check will be ready tomorrow.  Pam."

5    Q.   Okay.  And do you remember the circumstances under which

6    you wrote that notation?

7    A.   I can't remember the circumstances, no.

8    Q.   Okay.  Do you know what that means today?

9    A.   It -- I would have been told that a check would have been

10   ready and to communicate that to Union Pacific.

11   Q.   Okay.  And, again, Lori is who?

12   A.   She's the person I dealt with over at Union Pacific.

13   Q.   Okay.  Do you know her last name?

14   A.   No.

15   Q.   Okay.  Is there anyone else you dealt with at

16   Union Pacific?

17   A.   There's someone, and I can't think of her -- it began with

18   an M, but that was, you know, every once in a great while.

19   Q.   Okay.

20   A.   Myrna or some Mierna (phonetic), something like that.

21   Q.   Okay.  So do you know then the individuals that are listed

22   on these sheets, are they getting a paycheck from Bravo?

23   A.   I would say no.

24   Q.   Okay.  So was it your understanding that the payroll for

25   these individuals on the sheet was being handled by

```
 1    Union Pacific?
 2             MR. QURESHI:  Objection, your Honor.  Leading.
 3             THE COURT:  All right.  Sustained.
 4     BY MS. LOWE:
 5    Q.   Do you know who was paying these individuals on the list?
 6    A.   I know that I didn't cut a paycheck for them.
 7    Q.   Okay.
 8    A.   And I sent the information over to Union Pacific.
 9    Q.   Okay.  And a check was also sent to Union Pacific?
10    A.   According to this, yes.
11    Q.   Okay.  Okay.  And were you told the reason why
12    Union Pacific was going to be handling some of the payroll for
13    Bravo?
14    A.   I was just told that they were -- they were going to be
15    helping with taking care of part of it, so I wouldn't have to
16    be cutting as many checks.
17             MS. LOWE:  Okay.  Thank you very much.
18             THE COURT:  All right.  Cross.
19             MR. QURESHI:  Thank you, your Honor.
20        Ms. Garner, good morning.
21             THE WITNESS:  Good morning.
22             MR. QURESHI:  My name is Abid Qureshi from Akin Gump,
23    and I represent the reorganized debtor.  We didn't have a
24    chance to meet at your deposition because I was on the phone.
25             THE WITNESS:  Okay.
```

```
 1                    CROSS-EXAMINATION

 2    BY MR. QURESHI:

 3    Q.   Let's just start with so if I understand your background

 4    correctly, you started as a receptionist in '95, and then

 5    slowly took on more responsibility --

 6    A.   Yes.

 7    Q.   -- including payroll, correct?

 8    A.   Yes.

 9    Q.   Let's talk about the time sheets that Bravo foremen, that

10    is foremen that were employed by Bravo, would bring to you as

11    part of the payroll processing function.  So you would get time

12    sheets from the Bravo foremen.  Was it approximately on a

13    weekly basis?

14    A.   Yes.

15    Q.   Okay.  And your job was to input the information on those

16    time sheets into the computer system, correct?

17    A.   Yes.

18    Q.   And the computer system was some sort of a payroll software

19    system?

20    A.   It was a construction payroll.

21    Q.   Okay.  And, ultimately, the checks -- you testified that

22    all of the Bravo employees were paid by check, correct?

23    A.   Yes.

24    Q.   Okay.  And, ultimately, those checks were generated based

25    on the time records that you would input into the system,
```

1    correct?

2    A.    Yes.

3    Q.    And you then once the checks were printed would actually

4    put them into envelopes and hand them over, correct?

5    A.    Yes.  Um-h'm.

6    Q.    And you would hand them to the crew leaders who would

7    distribute them to their workers; is that right?

8    A.    To the foremen who -- yeah -- who --

9    Q.    Okay.

10    A.    -- would give them to their people.

11    Q.    And the time sheets from the Bravo employees, the Bravo

12    foremen, isn't it true that those time sheets included detailed

13    task codes --

14    A.    Yes.

15    Q.    -- for the work being performed?

16    A.    Um-h'm.

17    Q.    Roughly 20 to 25 different task codes, correct?

18    A.    Sure.

19    Q.    And if you take a look at Exhibit 3 that you have open,

20    these invoices are not the same time sheets that you would get

21    from Bravo foremen, correct?

22    A.    The -- like the one for number -- page 91?

23    Q.    Sure.

24    A.    Yeah.  No.  That's not.

25    Q.    Okay.  And if you flip through them, these are really all

1  similar.  They show crews from, you know, these three groups.

2  And none of these invoices contain the type of task codes that

3  you would input in the time sheets that you received from Bravo

4  foremen, correct?

5  A.    No.

6  Q.    Okay.  And you don't know why these invoices from

7  Union Pacific did not include the Bravo task codes, do you?

8  A.    No.  I was just told to, you know, fax or process and --

9  Q.    Okay.  And in your work in inputting the information from

10  the time sheet into the computer system, that was reviewed by

11  others at Bravo, correct?

12  A.    Yes.

13  Q.    Okay.  And I'm using your words here.  At your deposition

14  you told me that during this time frame you were earning

15  roughly $10 an hour?

16  A.    I started at 10, and I --

17  Q.    Okay.

18  A.    -- I went up -- I mean, I was there for a length of time.

19  I think somewhere around $17 --

20  Q.    Okay.

21  A.    -- was my final pay.

22  Q.    Okay.  And what you said at your deposition is that you

23  would not have been the most dependable person to determine

24  what looked right and what looked wrong, correct?

25  A.    I didn't -- I didn't have a background in accounting or

1    anything --

2    Q.    Okay.

3    A.    -- like that.  It was based on what others taught me.

4    Q.    Okay.  And you don't personally know how Bravo figured out

5    how much tax to withhold from the paychecks of its employees,

6    correct?

7    A.    Yeah.  No.

8    Q.    Okay.  But you do know that Bravo was withholding taxes

9    from the paychecks of its employees?

10    A.    They -- they -- they withheld taxes from my paycheck.

11    Q.    Okay.  And I want to switch gears for a minute and talk

12    about tools of all things.  Are you aware that Bravo had a tool

13    purchase program?

14            MS. LOWE:  Objection.  It's beyond the scope of

15    direct.

16            THE COURT:  Sustained.

17            MR. QURESHI:  Okay.

18     BY MR. QURESHI:

19    Q.    Now, you left Bravo in 2002 on maternity leave, correct?

20    A.    Yes.

21    Q.    And 2003 you did a little work from home --

22    A.    Um-h'm.

23    Q.    -- but ultimately decided that you were going to stay home

24    with your son, right?

25    A.    Right.  Um-h'm.

1    Q.    Okay.  And when you left Bravo in 2002, was it

2    Marlene Marcus (phonetic) who took over your payroll

3    responsibilities?

4    A.    Yes.

5    Q.    Okay.  Now, let's go back to these invoices, and why don't

6    we just look at page 91 given that you have it open.  So I

7    think you testified that your understanding is that the workers

8    listed on this invoice were not being paid by Bravo, correct?

9    A.    Right.

10    Q.    Okay.  And you also testified that your understanding was

11    that Union Pacific was -- I think the phrase you used -- going

12    to be helping Bravo with its payroll; is that right?

13    A.    Yes.

14    Q.    And that understanding is based on not any conversations

15    that you had directly with anybody from Union Pacific, correct?

16    A.    No.

17    Q.    Okay.  And, in fact, at this time during the 2000 time

18    period, you didn't have any understanding of what business

19    Union Pacific was even engaged in, did you?

20    A.    No.

21    Q.    Okay.  And if you look at again just using this page 91,

22    toward the bottom of the invoice you see a subtotal, 33,000 and

23    change.  Do you see that?  In --

24    A.    33.

25    Q.    In --

1    A.    Oh, yes.  Uh-huh.

2    Q.    Okay.  And then below that the next line item it says BRD.

3    A.    Um-h'm.

4    Q.    You don't know what BRD is, do you?

5    A.    No.

6    Q.    Okay.  Now, you also said you're not certain if you created

7    this document, are you?  You think you might have, but you

8    don't know for sure.

9    A.    I can't say for 100 percent.  No.

10   Q.    Okay.  And if you'll turn to the previous page.  It's the

11   page ending in 90.  And you'll see that at the top of the page

12   it says Union Pacific Construction, right?

13   A.    Um-h'm .

14   Q.    And then it says bill to, and it's got the Bravo address.

15   A.    Yes.

16   Q.    Ms. Garner, doesn't this document suggest to you that this

17   is an invoice coming from Union Pacific and as it indicates on

18   the document, billed to Bravo?

19          MS. LOWE:  Objection.  Foundation.  She would have no

20   idea.

21          MR. QURESHI:  Well, your Honor, the witness

22   speculated as to whether she, in fact, created the document.

23          THE COURT:  Well, but how does that give her the

24   right to speculate who may have?  So I'll sustain the

25   objection.

1    BY MR. QURESHI:

2    Q.    Now, let's go back to page 91.  Now, it was not you, was

3    it, Ms. Garner, who determined how much each of the individuals

4    listed on this page would get paid?

5    A.    No.

6    Q.    No.  And do you have an understanding of who did make that

7    determination?

8    A.    It would have been the foremen.

9    Q.    Okay.  So do you understand in group 1, Smiley, do you

10    understand Smiley to be the foreman?

11    A.    Yes.

12    Q.    Okay.  So your understanding is that Smiley would determine

13    how much each of these individuals get paid?

14    A.    Yes.

15    Q.    Okay.  And would the same be true of Andreas and the

16    group 2 employees?

17    A.    Um-h'm.

18    Q.    And Joaquin and the group 3 employees as well?

19    A.    Yes.

20    Q.    Okay.  And you were asked by the Government on your direct

21    whether Smiley, Andreas, and Joaquin were employees of Bravo,

22    and the answer you gave is that they did work for us, correct?

23    A.    I had -- I had cut checks for them --

24    Q.    Right.

25    A.    -- I know and at some point -- at one point or another.

1   Q.   Okay.  So there was a point in time when Smiley, Andreas,

2   and Joaquin as far as you recall, were employees of Bravo,

3   correct?

4   A.   Yes.

5   Q.   And you believe that to be the case because you cut checks

6   for them?  Okay.

7   A.   Sure.

8   Q.   And as you sit here today, can you recall the periods of

9   time during which you cut checks for those individuals?

10  A.   I could not.  That's --

11  Q.   Is it possible, Ms. Garner, that during the period prior to

12  2000, you were cutting checks for Smiley, Andreas, and Joaquin?

13  A.   Sure.  I --

14  Q.   And is it possible, Ms. Garner, that during the period from

15  2000 to 2003, you were not cutting any checks from Bravo to

16  those three individuals, Smiley, Andreas, and Joaquin?

17  A.   I guess I -- I could -- I could say yes.

18  Q.   Okay.  And you have no personal knowledge, do you, of

19  whether workers, laborers, supplied by other companies ever did

20  work for Bravo?

21  A.   I'm sorry.  Could you repeat the question?

22  Q.   Sure.  Isn't it true that you have no personal knowledge of

23  whether laborers from other companies ever did work for Bravo?

24  A.   No.  I wouldn't know.

25  Q.   Right.  And you wouldn't know that because that was not

1   within the scope of your responsibilities at Bravo, right?

2   A.    Right.   Um-h'm.

3   Q.    Now, focusing on the period from 2000 until you left.   It

4   was Dean Griffith that was the manager of Bravo at the time,

5   correct?

6   A.    Yes.

7   Q.    And so did you understand Dean to basically be in charge at

8   Bravo?

9   A.    For everything that went on in the office, yes.

10  Q.    Okay.   And Mr. Griffith would not generally consult you on

11  the business decisions that he was making, would he?

12  A.    No.

13  Q.    Okay.   And so if Mr. Griffith testifies that he signed a

14  contract with Union Pacific for Union Pacific to provide

15  laborers to Bravo, to process the payroll for those laborers

16  that were being provided, and to provide insurance for those

17  laborers, you would have no basis on which to dispute that,

18  would you?

19          MS. LOWE:   I object.   She already said that

20  Mr. Griffith didn't go to her for consultations with regard to

21  business matters.

22          THE COURT:   I'll allow the question.

23  BY MR. QURESHI:

24  Q.    Do you need me to repeat the question?

25  A.    Please.

1  Q.    Sure.  If Mr. Griffith testifies that he signed a contract

2  with Union Pacific pursuant to which Union Pacific would

3  provide laborers to Bravo and would also pay those laborers and

4  would also provide insurance for those laborers, you would have

5  no basis to dispute that testimony, would you?

6  A.    No.

7  Q.    Okay.  Thank you.  Last question.  In all of your years at

8  Bravo, did you ever witness any Bravo employee being paid by

9  Bravo in cash?

10  A.    No.

11  Q.    Did you ever witness in all your years at Bravo, any Bravo

12  employee ever being paid in gold or silver?

13  A.    No.

14  Q.    To your knowledge, did Bravo always pay its employees by

15  check?

16  A.    Yes.

17  Q.    And to your knowledge, did Bravo always withhold taxes from

18  those checks?

19  A.    Yes.

20         MR. QURESHI:  Thank you.  No further questions.

21         THE COURT:  Okay.  Redirect.

22         MS. LOWE:  No, your Honor.

23         THE COURT:  With respect -- let's just look at page

24  91, for example.  Now, you said that you would receive time

25  sheets and code things and write checks.  So, for example,

1    Miguel Gutierrez, was he somebody that you received time sheets

2    for and paid by check?

3              THE WITNESS:  No.  Not -- not on this.  No.

4              THE COURT:  Okay.  Was Miguel -- were the names on

5    this list the same names as those that you received time sheets

6    for?

7              THE WITNESS:  No.

8              THE COURT:  So these are totally different names than

9    the names that you received time sheets for or totally

10   different employees?

11             THE WITNESS:  Well, they -- this would be -- would

12   have been separate.  I would have gotten a time sheet that

13   would have had codes on the right side, the employee's name at

14   the top, the out -- a time sheet broken out by days that hours

15   would have been applied to a code for an entire 40-hour week

16   period or if there was overtime involved.

17             THE COURT:  So are these different employees than the

18   ones on this list?

19             THE WITNESS:  Yes.  Because the -- the people --

20   well, because that's not either.  These -- these crews would --

21   I would have just gotten a list of names.  I would have divvied

22   up the amount of -- the amount of money that would have gone to

23   each of them based on the amount that the foreman would say

24   this person gets this much money.

25             THE COURT:  And then you wrote a check from Bravo to

1    them?

2              THE WITNESS:  To these guys here, no.

3              THE COURT:  No.

4              THE WITNESS:  No.  I -- so I guess you could say they

5    aren't -- they're separate.

6              THE COURT:  Were they two sets of people?  In other

7    words --

8              THE WITNESS:  Yes.  They would have been -- they

9    would have been two sets of people because I would not be

10   cutting paychecks for these people to be paid on Fridays.

11             THE COURT:  Or could they be the same people just

12   paid differently, do you recall?  Were there, for example, a

13   set of Bravo employees --

14             THE WITNESS:  Okay.

15             THE COURT:  -- that you wrote checks to.

16             THE WITNESS:  Yes.

17             THE COURT:  And were any of those people the same

18   people that received these moneys from UP?

19             THE WITNESS:  No.

20             THE COURT:  Okay.  All right.  Questions in response

21   to mine.

22        I'll let you go first, Ms. Lowe.

23             MS. LOWE:  Okay.

24                      REDIRECT EXAMINATION

25    BY MS. LOWE:

33

1    Q.    So is what you're saying is the people on that list then,

2    you said -- are they pieceworkers?

3    A.    Yes.

4    Q.    Okay.  So there's a distinguished type of employee, and

5    they were being paid pursuant to how much piece they were --

6    A.    Yes.

7    Q.    -- doing?

8    A.    Right.

9    Q.    I want to say.

10    A.    So we had hourly workers and pieceworkers.  And maybe

11    that's -- that's what we were trying to distinguish.

12    Q.    Okay.  And before this system happened with UPC, before

13    they were also participating or helping you with the payrolls,

14    were the pieceworkers -- how were they paid by Bravo?

15    A.    By -- by check I guess.

16    Q.    Okay.

17    A.    Those crews -- I would have given Smiley a stack of checks.

18    Q.    Okay.  But the pieceworkers, did they have codes next to

19    their name or they were also just being paid by the piece?

20    A.    They would -- they would have codes because each one of

21    these crews did different tasks which would apply to a code.

22    Q.    Okay.  Okay.  And then but because these people were being

23    paid by UPC, these pieceworkers, there was no codes?

24    A.    Right.

25            MS. LOWE:    Okay.  Just to confirm.  Thank you.

1          THE COURT:  Any questions in response to mine --

2          MR. QURESHI:  I have --

3          THE COURT:  -- or --

4          MR. QURESHI:  -- none, your Honor.

5          THE COURT:  -- (indiscernible).

6     Thank you.

7          THE WITNESS:  Thank you.

8          THE COURT:  You're excused.

9     Can this witness be excused or did you want to call her in

10    your case?

11         MR. QURESHI:  No, your Honor.  I will not be calling

12    her.

13         THE COURT:  Okay.  And the reason I ask was because

14    you'd gone beyond --

15         MR. QURESHI:  Yeah.  It was a minor point.

16         THE COURT:  Okay.

17         MR. QURESHI:  No need to hold up the witness,

18    your Honor.

19         THE COURT:  All right.  Thank you.  All right.

20    Your next witness, Ms. Lowe.

21         MS. SULLIVAN:  The United States calls James Garner.

22         THE COURT:  Okay.

23         THE CLERK:  Please step right up here, please.  Raise

24    your right hand.

25     Thereupon --

JAMES GARNER

was called as a witness by the United States, and having been

first duly sworn, testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please state your name and spell if for

the record.

THE WITNESS:  James -- James Garner.  James,

J-a-m-e-s G-a-r-n-e-r.

THE CLERK:  Okay.  Thank you.  Please be seated.

(Colloquy not on the record.)

MS. SULLIVAN:  Good morning, Mr. Garner.  My name is

Kaycee Sullivan, and I'm an attorney with the U.S. Department

of Justice, and I'm a colleague of Ms. Lowe's who I believe

you've met before.

THE WITNESS:  I can't hear you very well.

MS. SULLIVAN:  Oh, I'm sorry.  Is that better?

DIRECT EXAMINATION

BY MS. LOWE:

Q.    Could you please state your name for the record.

A.    James Garner.

Q.    And where do you live?

A.    In Las Vegas.

Q.    Are you currently employed?

A.    Yes.

Q.    Where do you work?

1   A.   Westcor Construction.

2   Q.   Have you worked for other construction companies?

3   A.   Yes.

4   Q.   Which ones?

5   A.   Rhodes Framing, Bravo, Southwest Framing (phonetic),

6   Breslin.

7   Q.   When did you work for Bravo?

8   A.   Well, I started working for Rhodes Framing when I moved

9   here in 1986 I guess.

10  Q.   Was it called Rhodes Framing at that time?

11  A.   I'm not sure what -- what it was back then.  I think so.

12  It was before he had home building companies or anything.  It

13  was just a framing company.

14  Q.   Okay.  And at some point it became Bravo, Inc.; is that

15  correct?

16  A.   Yes.

17  Q.   Okay.  And what years did you work for Bravo, Inc.?

18  A.   I -- I don't know.  Whenever it changed from

19  Rhodes Framing to Bravo, Inc.

20  Q.   Okay.  No problem.  Did you work there during the 2000 to

21  2003 time frame?

22  A.   Yes.

23  Q.   Okay.  Thank you.  And what did you do at Bravo?

24  A.   I was running -- I was a foreman in the field as well as at

25  one point I was the general foreman, estimating, stuff like

1    that.

2    Q.    Okay.  And how were you paid by Bravo?

3    A.    A paycheck.

4    Q.    And were taxes withheld from your paycheck?

5    A.    Yes.

6    Q.    And how was the amount of money you were paid determined?

7    A.    I was salary -- a salaried employee.

8    Q.    Thank you.  Did you fill out time sheets?

9    A.    I know when I was in the field I did.  I don't remember if

10    I had to fill one out every week when I was in -- mostly

11    working in the office or not.

12    Q.    Okay.  So at some point you switched from being more in the

13    field to working more in the office?

14    A.    Correct.

15    Q.    Okay.  Thank you.  When you were in the field, did you

16    deliver the time sheets to the office?

17    A.    Sometimes, yes.

18    Q.    Who would you give those to?

19    A.    To Pam.

20    Q.    And you mean Pam Garner?

21    A.    Correct.

22    Q.    So when you worked as a general foreman, were you

23    responsible for handing out time sheets -- or excuse me --

24    paychecks to your workers?

25    A.    Not really.  I would help sort them into the different

1    crews that they went in, and -- I wouldn't -- once in a while I

2    would take like if I was going to a job site, I might take the

3    checks that went to that job site there, but not usually for

4    the most part.

5    Q.    Okay.  Who was responsible for giving the workers their

6    paychecks?

7    A.    They would go out to the field, say Sergio (phonetic),

8    John Lehman (phonetic), just people that were going to the

9    different job sites would deliver them.

10   Q.    Did Bravo ever --

11             THE COURT:  Excuse me.  I think it's clear to

12   everybody, but since you started out with a whole time range of

13   when you worked there, let's be specific about what time frame

14   you're asking for, the years.

15        I think you made that clear in a prior question, but it

16   really wasn't clear to me.  If that's your intent, and I think

17   that's your intent, isn't it.

18             MS. SULLIVAN:  Yes, it is, your Honor.  Thank you.

19             THE COURT:  Okay.

20    BY MS. SULLIVAN:

21   Q.    So, Mr. Garner, from the 2000 to 2003 time period is the

22   period that we would really like to focus on right now.

23   A.    Yes.

24   Q.    And during that time period, what was your job title?

25   A.    I'm not sure when -- when exactly I went to being the

1  general foreman from running an actual track, but it was in

2  then.

3  Q.    Okay.  It would have happened during that time period at

4  some point?

5  A.    Yes.

6  Q.    Is that correct?  Okay.  Thank you.  To your knowledge, did

7  Bravo ever subcontract out any of its framing work?

8  A.    Subcontracted.  What -- what do you mean by that?

9  Q.    Did Bravo ever hire other companies to do framing work for

10  them?

11  A.    Not that I know of.  Not --

12  Q.    Okay.

13  A.    -- another company, no --

14  Q.    Okay.

15  A.    -- to do the framing.

16  Q.    Do you know if Bravo ever hired other workers to do framing

17  for them that were not Bravo employees?

18  A.    Bravo never hired them.  No.

19  Q.    Okay.  Thank you.  Do you know if workers provided their

20  own tools?

21  A.    Yes, they did.

22  Q.    And what types of tools would they provide?

23  A.    Nail guns, Skilsaws, levels, hand tools, nail bags.

24  Q.    And in your experience, is that a common practice in the

25  construction industry?

```
 1   A.   Yes.

 2   Q.   So while you working as a general foreman, did all of your

 3   workers receive a paycheck?

 4   A.   Yes.

 5   Q.   Do you know of anyone working at Bravo who did not receive

 6   a paycheck?

 7   A.   No.

 8   Q.   Do you know a man named Robert Kahre?

 9   A.   Yes.

10   Q.   How do you know him?

11   A.   I was the -- I met him in the office at a meeting that we

12   went to.

13   Q.   Okay.  And who all was at that meeting, please.

14   A.   Mona Wilcox, Dean Griffith, Robert Kahre, Big Jorge -- I

15   don't know -- Fernandez, Hernandez (phonetic).  I'm -- I'm not

16   sure what his last name was.

17   Q.   Okay.

18   A.   Ishmael Curio (phonetic), Joaquin Barajas (phonetic),

19   Andreas Nuniez (phonetic), myself, Sergio Juarez (phonetic).

20   That's all -- that's all I can remember.  I don't remember if

21   there was more in there or not.

22   Q.   Okay.  Was Jim Rhodes at that meeting?

23   A.   No.

24   Q.   And do you remember when the meeting took place?

25   A.   No.
```

1   Q.    Would it have been during the time where you were working

2   as the general foreman?

3   A.    I'm not sure.  It could have been.

4   Q.    Okay.  So let's talk about the people that you just listed

5   at the meeting.  Who is Mona Wilcox?

6   A.    She was the controller/officer manager.

7   Q.    Okay.  And who is Dean Griffith?

8   A.    He was the manager of the framing company.

9   Q.    Who is Big Jorge?

10  A.    He worked for Mr. Kahre.

11  Q.    Okay.  Who is Ishmael Curio?

12  A.    He was a crew leader -- a crew leader.  He led guys, the

13  piecework crews.

14  Q.    Okay.  So was he an employee of Bravo at that time?

15  A.    Yes.

16  Q.    And who is Andreas Nuniez?

17  A.    He was also a crew leader.  He -- the wall-framing crew

18  leader.

19  Q.    And was he also an employee of Bravo at that time?

20  A.    Yes.

21  Q.    Who is Joaquin Barajas?

22  A.    The same.  He was a crew leader, pieceworker crews.

23  Q.    And at that time, was he an employee of Bravo?

24  A.    Yes.

25  Q.    And you also mentioned Sergio Juarez.  Was he an employee

1    of Bravo?

2    A.    Yes.

3    Q.    And what did he do?

4    A.    He was -- he did customer service.  He was -- he ran the

5    elevation crews.  Helped out in the office some.  Helped sort

6    paychecks on Fridays, just --

7    Q.    Okay.  And all of these people were at a meeting with you

8    and Mr. Kahre, correct?

9    A.    Correct.

10    Q.    What was that meeting about?

11    A.    Just to let us know that some of the -- some of the guys

12    from the crews, the pieceworker crews, would be like -- like a

13    payroll service through Union Pacific.

14    Q.    Who owns Union Pacific?

15    A.    I'm sorry?

16    Q.    Who owns Union Pacific?

17    A.    Who owned it?  As far as I know, Robert Kahre did.

18    Q.    Okay.  And that company owned by Mr. Kahre was going to

19    provide payroll service?  Is that what you're saying?

20    A.    Correct.

21    Q.    And what do you mean by that?

22    A.    That say for -- if one of the -- if one of Smiley's guys

23    was hurt on the job site, you would call Smiley, and they

24    would take care of it.  They -- they would be covered by

25    Union Pacific.

43

1    Q.    Okay.  So, first, who do you mean by Smile, please.

2    A.    Ishmael Curio.

3    Q.    Okay.  So when we say Smiley, that's who we're talking

4    about?

5    A.    Correct.

6    Q.    Okay.  Thank you.  And then you said that if someone got

7    hurt on Smiley's crew that that's who they would call.  What do

8    you mean by that, that Union Pacific would take care of it?

9    What does that mean?

10   A.    That -- I -- I guess that the -- in the same way that if a

11   Bravo employee was hurt, they would call the office, and -- I

12   mean, if it wasn't life-threatening, the -- the office would

13   tell them where to go or what -- what they -- where -- where to

14   go.  I mean, to what hospital or quick care or whatever.

15   Q.    Okay.  So you mean if someone was injured, they would take

16   them to the hospital?

17   A.    Right.

18   Q.    And to your knowledge would they then also handle paying

19   for any injuries?

20   A.    Would --

21   Q.    Union Pacific.

22   A.    Yes.

23   Q.    At the meeting, did Mr. Kahre mention payments in gold and

24   silver?

25   A.    I -- I don't know if I -- I don't recall if it was ever

1   brought up or how -- if it was -- if anybody -- if -- if we

2   really knew what he meant by that at the time.

3       I -- I don't remember if it was ever brought up that there

4   would be -- it probably was I would say.  I don't really

5   remember for sure.

6   Q.   Okay.  Do you remember giving a deposition in this case?

7   A.   Yes, I do.

8   Q.   Okay.  And do you remember being asked about this at the

9   deposition?

10  A.   Yes.

11  Q.   Okay.  And do you recall saying on page 37 --

12          MR. QURESHI:  Hang on one second, Counselor.

13      (Colloquy not on the record.)

14          THE WITNESS:  Me?

15          MS. SULLIVAN:  I'm sorry.  It's not in there.  No.

16          THE WITNESS:  Oh.

17      (Colloquy not on the record.)

18          MS. SULLIVAN:  Your Honor, may I approach the

19  witness?

20          THE COURT:  Yes.

21   BY MS. SULLIVAN:

22  Q.   So, Mr. Garner, referring you to your deposition on

23  page 37, do you see at the top of the page there's a question

24  by Ms. Lowe.

25      And the question says, "Did Mr. Kahre ever discuss

1    anything with regard to employment taxes at the meeting?"  And

2    the next line starting at line 5 is your response.  Do you see

3    that?

4    A.    Yeah.  Yes, I do.

5    Q.    And you said, "I know that the gold and silver stuff was

6    brought up at the meeting, but I don't -- we didn't really

7    understand all of that or how it worked."

8    A.    Right.

9    Q.    Is that correct?

10   A.    Yes.

11   Q.    Okay.  Does that help to refresh your recollection about

12   whether the gold and silver was discussed at the meeting?

13   A.    Yes.  I -- I believe it was.  I just don't really -- we

14   didn't really understand what it meant at that time.

15   Q.    Okay.  So you personally weren't sure what that was about;

16   is that correct?

17   A.    Right.

18          MS. SULLIVAN:  Okay.  Thank you very much.  Okay.

19   Thank you, Mr. Garner.  No further questions at this time.

20          THE COURT:  All right.  Cross.

21       (Colloquy not on the record.)

22          MR. QURESHI:  Mr. Garner, good afternoon or good

23   morning I should say.  How are you?

24          THE WITNESS:  Fine.  Thank you.

25                            CROSS-EXAMINATION

1     BY MR. QURESHI:

2     Q.    Sir, any relation between you and Pamela Garner?

3     A.    Yes.  That's my wife.

4     Q.    And what year were you married?

5     A.    Trying to get --

6     Q.    I didn't mean to get you in trouble with that one.

7     A.    1999.

8     Q.    Okay.  So during the period from 2000 to 2003 when you were

9     both working at Bravo, you were married?

10    A.    Correct.

11    Q.    Okay.  Now, you started at Rhodes Framing originally as a

12    laborer and eventually worked your way up to be a foreman,

13    right?

14    A.    Yes.

15    Q.    And then after becoming a foreman, you became a general

16    foreman and an assistant manager at the office, right?

17    A.    Yes.

18    Q.    Okay.  Now, let's talk a little bit about this meeting with

19    Robert Kahre.  You testified that you don't remember what year

20    the meeting was, correct?

21    A.    I -- I don't know.

22    Q.    Okay.  And you were asked on your direct examination

23    whether Smiley, Mr. Nuniez, and Mr. Barajas were -- you

24    testified that they were crew leaders, right?

25    A.    Yes.

1  Q.    And you were asked were they employees of Bravo at that

2  time and you said yes, correct?

3  A.    At the meeting, yes.

4  Q.    Okay.  So at the time of the meeting, they were employees

5  of Bravo, right?

6  A.    Yes.

7  Q.    But you don't recall when the meeting was?

8  A.    No.

9  Q.    Okay.  You can't give me the year of the meeting, correct?

10 A.    Right.

11 Q.    Okay.  Mr. Garner, is it possible that subsequent to that

12 meeting whenever it was, that subsequent to the date of that

13 meeting, Smiley, Andreas Nuniez, and Joaquin Barajas were no

14 longer employees of Bravo?

15 A.    I'm not sure if they would be considered employees of Bravo

16 once they went onto Union Pacific's payroll.  Is that --

17 Q.    Okay.

18 A.    -- what you mean?

19 Q.    Well, do you have any personal knowledge.  Do you know if

20 it's possible that subsequent to the meeting with Mr. Kahre

21 that these three individuals, Smiley, Nuniez, and Barajas,

22 ceased to be employees of Bravo?

23 A.    I'm not sure whether they received paychecks after that or

24 not, no --

25 Q.    Okay.

1    A.    -- from Bravo.

2    Q.    Okay.  Now, going back to the attendees at the meeting, you

3    talked about Mona Wilcox and Mr. Griffith, correct?

4    A.    Yes.

5    Q.    And Big Jorge and Smiley all being at the meeting, right?

6    A.    Yes.

7    Q.    But you're not certain whether Mr. Nuniez and Mr. Barajas

8    were there, correct?

9    A.    No.  I said they were there.

10   Q.    Okay.  Well, let's look at what you said at your

11   deposition.  Do you still have a copy of your deposition up

12   there, Mr. Garner?

13   A.    Yes, I do.

14   Q.    Look on page 22, please.

15   A.    22?

16   Q.    Yep.  At the top of the page, question, "Okay.  And who was

17   at the meeting?"  And you gave the following answer:  "There

18   was Mona Wilcox, Dean Griffith, Robert Kahre, a guy that was

19   named Big Jorge.  I don't his name, his whole name.  Ishmael."

20        Question, "And Ishmael, was that the last name?"  Answer,

21   "Curio."  Question, "Okay."  Answer, "Andreas Nuniez and I

22   think Joaquin Barajas was there.  I'm not positive on that,

23   though."  Was that your sworn testimony at your deposition?

24   A.    Yes.

25   Q.    Okay.  So is it, in fact, true that you just can't recall

```
1    for sure whether Mr. Nuniez and Mr. Barajas were at this
2    meeting?
3    A.   I'm pretty sure they were there.  Yes.
4    Q.   Okay.  So you were mistaken at your deposition, then?
5    A.   I don't think it says that.  No.  It says, "Andreas Nuniez
6    and I think Joaquin Barajas was there."
7    Q.   Okay.  And is it your recollection of the meeting with
8    Mr. Kahre -- you can put the deposition away, sir.  Is it you
9    recollection of the meeting with Mr. Kahre that you were told
10   that these crew leaders, Smiley, Andreas, and Joaquin, would no
11   longer be paid through the Bravo payroll system?
12   A.   I don't know that that was discussed.  No.
13   Q.   Okay.  Look at page 27 of your transcript, please.  In the
14   middle of the page, question, "So you said there was a meeting
15   in the office involving all these individuals.  Do you -- and
16   you were at this meeting and do you recall what was discussed
17   at the meeting?"
18        Answer, "Basically, they just -- we were told that it was
19   going to be like a payroll service to where those crew leaders
20   would just be paid through the payroll service."
21        Mr. Garner, was that truthful testimony at the time you
22   gave it at the deposition?
23   A.   Yes.
24   Q.   And the crew leaders that you're referring to in that
25   answer are Smiley, Andreas, and Joaquin?
```

1    A.    Yes.

2    Q.    Okay.  Thank you.  And is it also your recollection,

3    Mr. Garner, that one of the reasons that Union Pacific would be

4    running the payroll for these crew leaders had a lot to do with

5    insurance?

6    A.    Yes.

7    Q.    Okay.  And you don't know why at the meeting the discussion

8    as you recall it was just about these three crew leaders,

9    Smiley, Barajas, Nuniez, do you?

10    A.    I'm -- I'm sorry?

11    Q.    I said you don't know why the discussion at this meeting

12    with Mr. Kahre involved only the three crew leaders we've been

13    talking about, Smiley, Nuniez, Barajas, right?

14    A.    No.

15    Q.    Okay.  And you also don't know who called the meeting to

16    begin with Mr. Kahre, right?  You were told about the meeting

17    by Dean.

18    A.    Correct.

19    Q.    Okay.  Now, you have a binder in front of you.  I just want

20    to confirm.  If you can open it to tab 3.

21    A.    To what?

22    Q.    Tab 3.

23    A.    Okay.

24    Q.    Now, you were shown invoices like this and actually a

25    subset of these at your deposition, weren't you?

1  A.   I never saw this.  No.  This -- am I on the right page?

2  Q.   Yeah.  Well, if you look at -- well, you can flip through

3  tab 3.  There are a great number of invoices --

4  A.   Okay.

5  Q.   -- at tab 3.

6  A.   Yeah.

7  Q.   And my question is simply that when you were shown a subset

8  of these at your deposition, what you said is that you were

9  seeing them for the first time at your deposition, right?

10 A.   Yes.

11 Q.   Okay.  And the invoices that in tab 3, they look nothing

12 like the time sheets that you submitted on behalf of your crews

13 while you were a foreman at Bravo, correct?

14 A.   Correct.

15 Q.   Okay.  And let's talk for a minute about wage rates at

16 Bravo.  So during the period from 2000 to 2003, is it correct

17 that the only person that had the authority to set the wages of

18 the employees to determine how much Bravo employees would be

19 paid was Mr. Griffith?

20 A.   Correct.

21 Q.   Okay.  And you cannot based on your personal knowledge,

22 testify as to who set the wages of any of the individuals shown

23 on these invoices, can you?

24 A.   No.

25 Q.   Okay.  You can put the invoices away.  We're done with

1    those.  Just a couple more questions, Mr. Garner.  To your

2    knowledge as the manager of Bravo, did Dean Griffith have the

3    authority to enter into contracts for Bravo?

4    A.    Say that again.  I'm sorry.

5    Q.    Sure.  When Dean Griffith was the manager of Bravo, did you

6    understand that he had the authority to enter into contracts

7    for Bravo?

8    A.    To enter into contracts for -- on behalf of Bravo?

9    Q.    On behalf of Bravo, yes.

10    A.    Yes.  I would say so.

11    Q.    Okay.  And Dean was not required to consult with you prior

12    to entering into any contracts, was he?

13    A.    No.

14    Q.    Okay.  And other than what you testified about as a foreman

15    and turning in time sheets, picking up the checks for your

16    crews while you were working as a foreman at Bravo, you had no

17    other responsibility for the payroll function at Bravo, did

18    you?

19    A.    No.

20    Q.    Okay.  And am I also correct, sir, that your knowledge of

21    what Union Pacific was going to do for Bravo was limited to

22    what you recall being told to you at the meeting with Mr. Kahre

23    that you've testified about?

24    A.    Correct.

25    Q.    Okay.  And I think you've testified on this already, so I

1    apologize if I'm repeating.  But during your tenure at Bravo,

2    you were always paid by check, right?

3    A.    Correct.

4    Q.    And you have no knowledge of any Bravo employees ever being

5    paid in cash?

6    A.    No.

7    Q.    Or in gold or silver?

8    A.    No.

9            MR. QURESHI:  Thank you.  No further questions.

10           THE COURT:  All right.

11       Redirect.

12           MS. SULLIVAN:  No, your Honor.

13           THE COURT:  All right.  You're excused.

14           THE WITNESS:  Thank you.

15           THE COURT:  May this witness be excused?

16           MR. QURESHI:  Yes, your Honor.

17           MS. LOWE:  Yes, your Honor.

18           THE COURT:  All right.  Thank you.  All right.

19       Your next witness.

20           MS. LOWE:  United States calls Jorge Fernandez.

21         (Colloquy not on the record.)

22           THE CLERK:  Please remain standing.  Please raise

23    your right hand.

24     Thereupon --

25                              JORGE FERNANDEZ

1    was called as a witness by the United States, and having been

2     first duly sworn, testified as follows:

3                THE WITNESS:  I do.

4                THE CLERK:  Please state your name and spell it for

5    the record.

6                THE WITNESS:  Jorge Alfredo (phonetic) Fernandez.

7    Jorge Alfredo Fernandez is spelled J-o-r-g-e F-e-r-n-a-n-d-e-z.

8                THE CLERK:  Thank you.  Please be seated.

9                          DIRECT EXAMINATION

10    BY MS. LOWE:

11   Q.   Mr. Fernandez, are you a resident of Las Vegas?

12   A.   Yes, ma'am.

13   Q.   And how long have you lived here?

14   A.   40 years.

15   Q.   Okay.  And can you tell me a little bit about your

16   background.  Did you graduate from high school here?

17   A.   Yeah.  I graduated from Rancho High School in 1980.

18   Q.   Okay.  And then did you go onto additional education after

19   high school?

20   A.   Yes.  Eastern New Mexico University.

21   Q.   Okay.  And then did you graduate from there?

22   A.   No.

23   Q.   Okay.  And then after you left college, what did you do?

24   A.   I started working as a teacher's assistant, and then I

25   became employed by Wright Painting & Drywall at the time called

1    KHG (sic).

2    Q.   Okay.  And was that located here in Las Vegas --

3    A.   Yes.

4    Q.   -- the Wright Painting?  Okay.  And who owned

5    Wright Painting & Drywall?

6    A.   Robert Kahre.

7    Q.   Okay.  And were you familiar with him prior to your

8    employment?

9    A.   Robert and I were friends since we were in fourth grade.

10   We went to elementary, junior high, high school, junior

11   college, college.

12   Q.   So he's pretty much a lifelong friend.

13   A.   32 years.

14   Q.   Okay.  Can you tell me do you remember the year that you

15   started working for Mr. Kahre?

16   A.   '95, '96, somewhere in there.

17   Q.   Okay.  You said that the business was called

18   Wright Painting & Drywall?

19   A.   No.  It was called HKG (phonetic).

20   Q.   Okay.  And specifically what did that business do?

21   A.   It did painting, it did drywall, and it also had a company

22   under it called Bobby K's Carpet Service (phonetic) --

23   Q.   Okay.

24   A.   -- Cleaning Service.

25   Q.   Okay.  And what did you do there?

1   A.   I started off as a painter, and then I became a foreman,

2   and then I became the general superintendant of the company.

3   Q.   Okay.  And when did it become Wright Painting & Drywall?

4   A.   About '98.  '97, '98, somewhere in there.

5   Q.   Okay.  And what position then did you have at

6   Wright Painting?

7   A.   At that time I was a foreman.

8   Q.   Okay.  And that would have been around 1998 you said?

9   A.   Somewhere in there.

10  Q.   Okay.  And what were your duties as a foreman?

11  A.   I was in charge of different crews and different jobs, and

12  I was in charge of making sure that the jobs were done on time

13  and correctly.

14  Q.   Okay.  Were there other foreman employed there?

15  A.   At the time, yes.

16  Q.   Okay.  How many others?

17  A.   Three other.

18  Q.   Okay.  And how were you paid when you received your pay at

19  Wright Painting?

20  A.   At first I was given a check, and then I was paid in gold

21  and silver.

22  Q.   Okay.  And what year did you start being paid in gold and

23  silver?

24  A.   When it became Wright Painting.

25  Q.   Okay.  So about 1998?

1    A.    Somewhere in there.

2    Q.    Okay.  Now, can you explain how that occurred.  How did you

3    receive your gold and silver?

4    A.    I was on a salary basis.  So let's say I was making $600 a

5    week when I started, and they would take whatever the value of

6    gold and silver was at the time and divide to 600 and whatever

7    amount that was, that's what you were paid.

8    Q.    Okay.

9    A.    And you were given the option after that to turn it in for

10   Federal Reserve Notes.

11   Q.    Okay.  Now, when you said you were given the option, how

12   did that work?  Did you actually receive the gold and silver?

13   A.    Yes.

14   Q.    Okay.  And where would you receive it?  Where is it --

15   A.    At the --

16   Q.    -- located?

17   A.    -- office.

18   Q.    At the offices of Wright Painting?

19   A.    Yes.

20   Q.    Okay.  And do you know where that was located?

21   A.    On Patrick (phonetic).

22   Q.    Okay.  And so when you were given this option, how did that

23   work?  You had the gold and silver and then --

24   A.    Yes.

25   Q.    -- what would happen?

1    A.    Then I had the option to keep whatever I wanted to keep or

2    trade it all back in and receive Federal Reserve Notes for it.

3    Q.    Okay.  And when you refer to Federal Reserve Notes, what

4    are you referring to?

5    A.    Paper dollars.

6    Q.    Okay.  And who described paper dollars as Federal Reserve

7    Notes?

8    A.    Mr. Kahre.

9    Q.    Okay.  What did you actually do?  Did you turn your gold

10   and silver in or did you keep it?

11   A.    I turned it in.

12   Q.    Okay.  And you would receive the Federal Reserve Notes

13   right there at the same place?

14   A.    Yes.

15   Q.    Okay.  And how did that happen, specifically?  Was there --

16   A.    There was a lady that worked there with us.  She was in

17   charge of payroll at the time.

18        And what she did was you came up to the window, she handed

19   you the gold and silver, and then she asked if we wanted to

20   keep it or not, and then you just turned it back into her.

21   Q.    Okay.

22   A.    You had to accept it first, and then -- this was on

23   Patrick -- you had to return it back to her, and then she'd

24   give you the --

25   Q.    Okay.

1    A.    -- the value in notes.

2    Q.    And you said a lady, who are referring to?

3    A.    I can't remember her name.  It's been a really, really long

4    time.

5    Q.    Okay.  Who else worked in the office there at

6    Wright Painting?

7    A.    Bobby's sister, Lori, his wife, Danielle (phonetic).  They

8    worked in the office.

9    Q.    Okay.  Now, were all the Wright Painting employees paid

10    this way?

11    A.    Yes.

12    Q.    Okay.  And are you aware of any other workers that were

13    paid this way?

14    A.    At the -- at the beginning or throughout?

15    Q.    Well, I guess you can start at the beginning.

16    A.    At the beginning, it was just Wright Painting & Drywall

17    guys that ran their payroll through that method.

18    Q.    Okay.  And then what happened?

19    A.    As it progressed, different companies' payroll was run

20    through our company as Union Pacific became bigger which was a

21    different company owned by Mr. Kahre, a total 35, 36 different

22    companies by the time I left.

23    Q.    Okay.  So there was another company owned by Mr. Kahre

24    called Union Pacific?

25    A.    Yes.

1    Q.    Okay.  And you're saying that there was other contractors?

2    A.    Oh, yes.

3    Q.    Okay.  And they were running their payroll through this

4    Union Pacific company?

5    A.    Yes.

6    Q.    Okay.  And do you know if Bravo was one of those companies?

7    A.    They were.

8    Q.    Okay.  And how do you know Bravo was one of those companies

9    that was doing this?

10   A.    One of my jobs was to -- when we picked up a company, was

11   to go to their office with workers and crew leaders and explain

12   to them how it was going to work as far as how they were going

13   to get paid, what was the method of payment, and if anyone was

14   to get hurt or anything like that, what is the process they had

15   to follow for we were picking up the injury cost.

16   Q.    Okay.  So who would you go with to a meeting such as --

17   A.    Mr. Kahre.

18   Q.    -- you described?  You and Mr. Kahre would go?

19   A.    Yes.

20   Q.    And do you remember ever going to Bravo?

21   A.    I do.

22   Q.    And do you recall the time period that you went to Bravo?

23   A.    Not specifically I don't.  I apologize.

24   Q.    Okay.  But you recall being at a meeting in Bravo offices?

25   A.    I do.

```
 1    Q.   And do you recall then specifically whether Mr. Kahre's

 2    payroll system was described?

 3    A.   Yes.

 4            MR. QURESHI:  Your Honor, I'm sorry.  I've been very

 5    patient, but there's an awful lot of leading questions, so I

 6    object on that basis.

 7            THE COURT:  I'll overrule this particular one.  I

 8    mean, it is foundational.

 9     BY MS. LOWE:

10    Q.   And can you tell me who would do the talking at these

11    meetings?

12    A.   First, Mr. Kahre would explain, and then I would explain to

13    the nonspeaking workers what he had said.

14    Q.   Okay.  The non-English speaking workers?

15    A.   Yes.

16    Q.   Okay.  And what language would you use?

17    A.   Spanish.

18    Q.   Okay.  And were there any other languages used?

19    A.   Just Spanish and English.

20    Q.   Okay.  And, again, do you remember who was at the meeting

21    at Bravo offices?

22    A.   I remember Dean being there.  I remember Ishmael Barajas

23    and Mr. Gardner (sic).

24    Q.   Okay.  And when you say Dean, you're referring to

25    Dean Griffith?
```

1    A.   Dean Griffith.

2    Q.   Okay.  And do you know what Mr. Griffith's position was at

3    Bravo?

4    A.   He was general foreman I think.  He was in charge pretty

5    much of the framing.

6    Q.   Okay.  Did you ever see Mr. Griffith at Wright Painting

7    warehouse?

8    A.   Just a couple of occasions.

9    Q.   You recall on a couple occasions he was there?

10   A.   Yes.

11   Q.   And do you recall was there other meetings at the Bravo

12   work site or at the Bravo offices?  I'm sorry.

13   A.   At the office?  On -- on occasion I would come by the

14   office, but not anything in -- to do with payroll or anything.

15   Q.   Okay.  And specifically then how would the payroll system

16   work with the other contractors?  Do you know how that worked?

17   A.   Yeah.  They would submit a payroll sheet with everyone's

18   name on it to our company.  We would then pay the workers in

19   the same method of gold and silver, and then turn it into

20   Federal Reserve Notes.

21   Q.   Okay.  Can you look Exhibit 3 in that notebook, please.

22   Have you ever seen any of the documents that are tab 3?

23   A.   Yes.

24   Q.   Okay.  And in particular which ones would you have seen?

25   A.   Pretty much every single one of them.  I was in charge of

1  making sure that when they came to pick up their payroll, I was

2  there present, so that they went through and counted to make

3  sure all the money was there before they left the office.

4  Q.   Okay.

5  A.   So --

6  Q.   Who would actually come to pick up the payroll?

7  A.   The crew leaders.  The what we call the labor brokers,

8  Ishmael, Andreas, and Barajas.  Yeah.

9  Q.   Okay.  Do you know then, for example, you can go to

10 page 3 --

11 A.   Okay.

12 Q.   -- of Exhibit 3.  The pages are down in the right-hand

13 bottom.  And have you ever seen this one in particular before,

14 first of all?

15 A.   I can't say this one in particular, but --

16 Q.   Okay.

17 A.   -- I saw most of these exactly the same way when the check

18 was going to be delivered and --

19 Q.   Okay.  At Union Pacific how would they use this?  For

20 example, how would they use a sheet like page 3?

21 A.   Okay.  Like say for Joaquin, he would be paid that full

22 amount.  It would not be broken into envelopes or anything.

23 Q.   Okay.

24 A.   He would be given that full amount, and he would be the one

25 in charge of distributing the money to his workers.  Same thing

1   with Ishmael.  Same thing with Andreas.

2   Q.   Okay.  Now, when you said he was being given the full

3   amount, what was he given it as?

4   A.   As -- as gold and silver, and then by the time that Bravo

5   came along we had a different office which was on Kimberly

6   (phonetic).

7   Q.   Okay.

8   A.   And we had a setup where you would get your gold and silver

9   in one window, and then you would take it from there, walk

10  about five feet, six feet, and there was another window where

11  you'd turn it back in and received it in cash.

12  Q.   Okay.  And who was making up the packages of gold and

13  silver on behalf of Union Pacific?

14  A.   A couple of people.  There was Lori Kahre, Heidi

15  (phonetic), and Debra (phonetic).

16  Q.   Okay.  And do you remember Heidi or Debra's last name?

17  A.   Debra -- I'm sorry.  I don't.

18  Q.   Okay.  And do you remember Heidi's last name?

19  A.   No.

20  Q.   Okay.  Can you go to then the page 1.  And have you ever

21  seen anything like this before?  It's referred to as an

22  invoice.

23  A.   Yes.

24  Q.   Okay.  And what was the purpose of this?

25  A.   This was to make sure how much we were supposed to receive

1    to take care of the workers.

2    Q.    Okay.  And who would you receive -- when you said how much

3    to receive, who were you receiving it from?

4    A.    We had a courier that would go out and pick up checks.

5    Q.    Okay.  From who?

6    A.    From Bravo and several other companies.

7    Q.    Okay.  And other companies using the payroll service?

8    A.    Yes.

9    Q.    Okay.  Now, who was actually doing -- you mentioned

10   Joaquin, Smiley, and Andreas.  Who was supervising them at the

11   job sites, do you know?

12   A.    Bravo.

13   Q.    Okay.  So they were at Bravo work sites being supervised by

14   Bravo foremen?

15   A.    Correct.

16   Q.    Okay.  Did you ever go to a Bravo work site to do any

17   supervision of any of these individuals?

18   A.    No.  That was not part of our agreement.

19   Q.    Okay.  Now, you mentioned a workers' compensation type --

20   it was part of the Bravo pay system.  And can you explain that

21   for me, please.

22   A.    Excuse me.  We would -- we advised Bravo like we did other

23   companies that if someone was to get hurt, they were to call

24   me.

25        I would advise them according to the area they were

1    working in since I had no knowledge where they were at, to what

2    hospital or what doctor in particular we had set up to attend

3    our workers.

4    Q.    Okay.

5    A.    Or the workers from Bravo or whoever else was --

6    Q.    Okay.  So did UPC then -- what type of arrangement was with

7    the hospital?

8    A.    I went out to different hospitals and different doctors and

9    offered them if they would give us a discount if we paid in

10   cash what can we do.

11         And I set up accounts at UMC, Lake Mead Hospital,

12   Summerlin Hospital, St. Rose at the time out on Boulder Highway

13   and Lake Mead, and with a couple of different doctors, a

14   chiropractic doctor and a regular doctor.

15   Q.    Okay.  And so this was a cash system.

16   A.    Yes.

17   Q.    You would pay the hospitals in cash?

18   A.    Yes.  They would --

19   Q.    And where would you get the cash from?

20   A.    Mr. Kahre.

21   Q.    Okay.  And why was it done that way, do you know?

22   A.    It was to maintain the Mock factor of the insurance

23   low.

24   Q.    Okay.

25   A.    If we paid in cash, it never was reported.

1  Q.   Okay.

2  A.   So --

3  Q.   Can you look at page 3 again, and there's something --

4  under the subtotal on page 3, there's something called BRD.  Do

5  you know what that is?

6  A.   It's burden.

7  Q.   Okay.  And what does that mean?

8  A.   It's a tax burden Mr. Kahre would charge Bravo and

9  different companies for running payroll through the company.

10  Q.   Okay.  And do you know if Mr. Kahre ever paid employment

11  taxes to the IRS?

12  A.   Not that I'm aware of.

13  Q.   Okay.  And can you look at page 1, please.  On the bottom

14  left-hand side, there's something called an IMF slash FRN

15  value.  And do you know what that's referring to?

16  A.   That would be the rate of what gold and silver would be or

17  coins that he would use to do the --

18  Q.   Oh, okay.  So that would be -- basically when you say FRN,

19  you're talking about the cash value?

20  A.   Yes.

21  Q.   Okay.  And then dollars paid in gold and silver.

22  A.   Yes.

23  Q.   Do you know what that refers to?

24  A.   That's how they would be paid first, and then they would

25  turn it in for FRN, Federal Reserve Notes.

1   Q.    Okay.  Now, how long did you work for Mr. Kahre?

2   A.    'Til 2001.

3   Q.    Okay.  And why did you leave employment with Mr. Kahre?

4   A.    We had a falling out.

5   Q.    Okay.  What was the falling out?  Can you explain.

6   A.    Mr. Kahre accused me of stealing from the company.  Accused

7   me of using the company for personal gain.

8   Q.    Did Mr. Kahre ever bring formal charges against you?

9   A.    No.

10  Q.    He never called the police?

11  A.    No.

12  Q.    Okay.  And have you ever met James Rhodes?

13  A.    Yes.

14  Q.    Okay.  And where did you meet him?

15  A.    The first time was at Horizon Ridge Estates on

16  Horizon Ridge in Henderson.

17  Q.    Okay.  Was it work related, can you tell me?

18  A.    We were doing the painting and drywall for Rhodes.

19  Q.    Okay.

20  A.    Wright Painting was doing the painting and drywall for

21  Rhodes.

22  Q.    Okay.  And did you ever see Mr. Rhodes at the Bravo offices

23  when you went with Mr. Kahre?

24  A.    No.

25          MS. LOWE:  Okay.  That's it for now.  Thank you.

```
1              THE COURT:  All right.  Cross.

2              MR. QURESHI:  Thank you.

3         Mr. Fernandez, good afternoon.  How are you?

4              THE WITNESS:  Good, sir.  And you?

5              MR. QURESHI:  Very well.  Thank you.

6                        CROSS-EXAMINATION

7    BY MR. QURESHI:

8    Q.   I just want to start with reviewing the time frame.  So

9    2000 to 2003 as you know is the time period we're focused on --

10   A.   Correct.

11   Q.   -- for the purposes of these proceedings.  So in 2000, you

12   were general superintendent of Wright Painting & Drywall,

13   correct?

14   A.   Correct.

15   Q.   Okay.  And sometime approximately April 2001 I think you

16   told me is when you left, correct?

17   A.   Correct.

18   Q.   And after Mr. Kahre accused you of embezzling from him, he

19   fired you, correct?

20   A.   No.  He asked me to resign.  He never fired me.

21             THE COURT:  I'm sorry.  What year did you say?

22             MR. QURESHI:  April 2001.

23             THE COURT:  Okay.

24        And your answer was?  I'm sorry I didn't hear your answer.

25             THE WITNESS:  I said, no, he never fired me.  He
```

1   asked me to resign, and I told him he had to fire me if he was

2   accusing me of something like that.

3    BY MR. QURESHI:

4   Q.   And then he fired you, didn't he?

5   A.   He never fired me.  He never told me you're fired me.

6   Q.   Okay.  Okay.  And Mr. Kahre also instituted litigation

7   against you, correct?

8   A.   He wanted to -- yes.

9   Q.   Related to his allegation that you were embezzling?

10  A.   Correct.

11  Q.   Okay.  And ultimately you ended up filing for personal

12  bankruptcy, correct?

13  A.   Correct.

14  Q.   Okay.  Now, let's talk for a minute about

15  Wright Painting & Drywall.  So Wright Painting & Drywall, it's

16  a Robert Kahre company, right?

17  A.   Correct.

18  Q.   Okay.  And at the time that you worked for

19  Wright Painting & Drywall, Wright Painting & Drywall was a

20  subcontractor for among other companies Rhodes Homes, correct?

21  A.   Correct.

22  Q.   And so Wright Painting would use its employees to do

23  painting and drywall work on Rhodes projects, right?

24  A.   Correct.

25  Q.   Okay.  And you personally were involved in that work,

1    right?

2    A.    Yes.

3    Q.    And while --

4    A.    Myself --

5    Q.    -- you --

6    A.    -- and foremans (sic) that I have.

7    Q.    And while you were doing that work, painting and

8    drywall work on Rhodes projects, you were still being paid by

9    Wright Painting & Drywall, correct?

10   A.    Well, it was our company, Wright Painting, that was doing

11   the painting and drywall --

12   Q.    Right.

13   A.    -- in those jobs.

14   Q.    And you were being paid by Wright Painting --

15   A.    Correct.

16   Q.    -- when you were doing work on Rhodes' projects, correct?

17   A.    On -- on -- yes.

18   Q.    Okay.  And when you were -- when Wright Painting was

19   providing drywall and painting services to Rhodes Homes,

20   your role as the general superintendent at the time of

21   Wright Painting was to supervise the foremen and to supervise

22   the workers that were doing that work on Rhodes' job sites,

23   right?

24   A.    That worked for Wright Painting & Drywall, yes.

25   Q.    Right.  Yes.  Okay.  And one of the things you did was to

```
1    make sure that the work that they were doing, the Wright
2    employees, was up to standard, correct?
3    A.   Correct.
4    Q.   You referred a number of times in your direct testimony to
5    a gentleman by the name of Ishmael.
6    A.   Yes.
7    Q.   Ishmael Curio, right?
8    A.   Yes.
9    Q.   Just so everybody is clear also known as Smiley?
10   A.   Yes.
11   Q.   Okay.  And also, again, just so things are clear.  Were you
12   at the time also known as Big Jorge?
13   A.   Yes.
14   Q.   Okay.  And your --
15   A.   Still am.
16   Q.   I'm sorry?
17   A.   Still am.
18   Q.   And your understanding is that Smiley was a labor broker,
19   right?
20   A.   Yes.
21   Q.   Okay.  And you knew Smiley and his crews were doing work on
22   Bravo job sites because you saw them on the same job sites
23   where Wright Painting was providing painting and drywall
24   services, right?
25   A.   On two different job sites, I -- I saw them.  I never saw
```

1    Smiley or anybody, but somebody was doing the framing.  I had

2    no idea of who was doing the framing.

3        I didn't know that the jobs -- what jobs were being run by

4    Bravo, where they were at, or anything.  I just took care of

5    Rhodes.

6    Q.   You didn't know what jobs --

7    A.   I didn't -- I didn't do work for Bravo.  I did work for

8    Rhodes, so I didn't know who the framing company or, you know,

9    who they had where, who was working where, who was involved on

10   the job site.

11       I just dealt directly with Dirk Griffith (phonetic) mostly

12   and Dean Griffith on off-site projects, custom homes, and

13   stuff.

14   Q.   So you never saw Smiley doing framing work on Bravo job

15   sites?

16   A.   Smiley didn't frame.

17   Q.   I'm sorry?

18   A.   He's not a framer.  He just runs the labor.  That's what I

19   said before.  He's a labor broker.  Pretty much got people to

20   come work, and he would just be their broker.

21           MR. QURESHI:  Okay.  Well, your Honor, may I approach

22   with the deposition transcript?

23           THE COURT:  Okay.

24           THE WITNESS:  I got it right here.

25           MR. QURESHI:  Oh, is that yours?

74

1              THE WITNESS:  No.  That's not mine.  I'm sorry.

2         (Colloquy not on the record.)

3              MR. QURESHI:  Your Honor, would you like a copy?

4              THE COURT:  Sure.  Thank you.

5         (Colloquy not on the record.)

6    BY MR. QURESHI:

7    Q.   If you look at page 31, please, of the transcript,

8    Mr. Fernandez, at line 19 -- I'm sorry -- at line 16.  You were

9    asked the following question at your deposition, "So Smiley and

10   his crews you would see doing framing work at Bravo job sites,"

11   question.  Answer, "Yes."  Was that your --

12   A.   When they were -- when we were working through Rhodes, not

13   through Bravo.  We never did any work for Bravo, but yes.  I

14   would see them on the job site --

15   Q.   Right.  That was my question.  It wasn't about who was

16   working for who.

17   A.   Okay.

18   Q.   My question was simply did you see with your own eyes

19   Smiley doing framing work on Bravo job sites?

20   A.   No.  I didn't see him doing framing work.  I saw him on the

21   site.

22   Q.   Okay.  And his crews were doing the work?

23   A.   Supposedly, yes.

24   Q.   And why do you say supposedly?

25   A.   Well, I wasn't in the -- I didn't know who his crews were.

```
 1   Q.   Oh, okay.  And your testimony if I understand it correctly
 2   is that Smiley would come to the Wright Painting office to pick
 3   up payroll for his laborers that he was using on Bravo job
 4   sites?  Do I have that right?
 5   A.   Yes.
 6   Q.   Okay.  And how do you know that?
 7   A.   Because I was supposed to look at the paperwork --
 8   Q.   Okay.
 9   A.   -- to make sure that the right amount of money was being
10   paid.
11   Q.   Okay.  And I think your testimony is that Smiley's crews --
12   when Smiley would come in and get paid for his -- get the money
13   for the crews that worked on Bravo sites, the money was not
14   coming from Union Pacific Construction, was it?
15   A.   Yes.
16   Q.   Well, okay.  So turn to pay 32 of your deposition
17   transcript, please.  And on page 32 at line 11, you were asked
18   the following question:  "And when you say Mr. Kahre was in
19   charge of paying Bravo's employees, do you mean that -- well,
20   let's try to be a little more specific.  Smiley's crews that
21   were working on framing at Bravo job sites, do you mean that
22   Smiley's crews were getting paid through Wright Painting?"
23        Answer, "Not through Wright Painting.  Through
24   Gold Contract & Associates (phonetic) which was an entity of
25   Wright Painting & Drywall.  Wright Painting workers were
```

1    paid by Wright Painting.  Everything else went through

2    Gold Contract & Associates."

3        Was that truthful testimony at the time you gave it, sir?

4    A.   I gave you the name Gold Contract & Associates because

5    that's was one of the companies, and I might have been mistaken

6    through Union Pacific.

7        They were both -- actually, all three companies ran

8    together at one point or another to where the only thing that

9    I know was different that Wright Painting, we directed.

10   The Gold Contract & Associates had nothing to do with

11   Wright Painting.  I made a mistake in my testimony.

12   Q.   So when you say you made a mistake on your testimony, you

13   made a mistake today or you made a mistake at your deposition?

14   A.   No.  I made a mistake saying Gold Contract & Associates

15   instead of Union Pacific.

16   Q.   Okay.  And do you have any idea why you got that wrong at

17   your deposition?

18   A.   You know how long ago this was?

19   Q.   Okay.

20   A.   Do you know how much I've been through with Mr. Kahre?  I

21   want to forget everything that ever happened at that company.

22   Q.   Okay.  And what changed between your deposition and today

23   to cause you to change your testimony?

24   A.   By looking at the paperwork that I recognized.

25   Q.   Okay.  And to the extent Mr. Kahre had other business with

1  Bravo beyond what you've testified to, you wouldn't be aware of

2  that, right?

3  A.    No, I would not.

4  Q.    Okay.  And like Smiley, you also understood Andreas Nuniez

5  to be a labor broker, correct?

6  A.    Correct.

7  Q.    And Joaquin Barajas as well?

8  A.    Correct.

9  Q.    Okay.  And like Smiley your understanding is that Nuniez

10  and Barajas would get paid for their crews -- well, let me back

11  up.  At your deposition you told me that Barajas and Nuniez

12  would also get paid through Gold Contract & Associates.

13  A.    Yes.

14  Q.    And I take it that was also --

15  A.    Yes.

16  Q.    -- not --

17  A.    I used --

18  Q.    -- accurate.

19  A.    -- Gold Contract as what came to my head as one of the

20  companies, but it was Union Pacific.

21  Q.    Okay.  And do you know who Dirk Griffith is?

22  A.    Yes, I do.

23  Q.    Who's Dirk Griffith?  What was his role at the time?

24  A.    I thought he was the second in command behind Jim Rhodes.

25  Q.    Okay.  And did you ever see Dirk Griffith at your warehouse

1   where these gold coins were handed out?

2   A.   I -- I don't recall seeing Dirk.  Maybe -- I think once he

3   might have come by, but I really don't --

4   Q.   Okay.  And I think you testified that you recall seeing

5   Dean there?

6   A.   Yes.

7   Q.   Okay.  And how many times?

8   A.   A few.

9   Q.   And do you know what Dean was doing there?

10  A.   Talking to Mr. Kahre.

11  Q.   And do you know if Dean was getting paid in gold and

12  silver?

13  A.   Never saw him get paid in gold and silver.

14  Q.   Did you ever see Mr. Griffith pick up gold and silver?

15  A.   I wasn't -- like I said, I never saw him do anything with

16  the gold and the silver.

17  Q.   Okay.  Now, let's go back to Smiley for a minute.  There

18  did come a point in time, sir, did there not, when Smiley

19  worked directly for Robert Kahre?

20  A.   I wasn't involved in any framing through Wright Painting.

21  So if it was something set up with him and Mr. Kahre to do

22  stuff, I -- I -- there might have been, but I'm not completely

23  sure.

24  Q.   Well, isn't it your understanding that Smiley at some point

25  had a falling out with Rhodes over money issues?

```
 1    A.   I think -- yeah.  They -- they walked off the job site.  I

 2    met with Dirk out on a job site.  I can't remember if it was

 3    out at Rhodes Ranch or somewhere in that area, and he had told

 4    me that they had walked away, the whole crew had walked away,

 5    Andreas' and Smiley's and Ishmael --

 6    Q.   Okay.  And --

 7    A.   -- Joaquin, so --

 8    Q.   Isn't your understanding that subsequent to that, Smiley

 9    and Mr. Kahre worked something out in terms of the framing

10    business?

11    A.   I think so, yes.

12    Q.   Right.  And that's what you told me at your deposition,

13    too?

14    A.   Right.

15    Q.   Right?  Okay.  Now, let's just go back to the time line.

16    So you recall leaving Wright somewhere around April 2001.  And

17    I gather that subsequent to your departure in April in 2001,

18    you have no personal knowledge of what Union Pacific might have

19    been dong for Bravo.

20    A.   After I left, I do not.

21    Q.   Okay.  And you were never the general superintendent of

22    Union Pacific Construction, were you?  You were the general

23    superintendent of Wright Painting & Drywall?

24    A.   Correct.

25    Q.   Okay.
```

1    A.    I was also in charge of all security matters.

2    Q.    And you had no role in supervising any workers that were

3    doing framing at Bravo --

4    A.    No.

5    Q.    -- job sites?

6    A.    I did not.

7    Q.    Right?  Okay.

8    A.    And neither did my foremen.

9    Q.    Right.  But it was your job to make sure that the work got

10    done?

11    A.    As far as our work, and we checked the work.  Before you

12    hang drywall, you need to check to make sure the framing is

13    correct.

14        If there's a problem, we would relay it to the

15    superintendent in charge of that particular project, and he

16    would relay it to the framers.

17    Q.    Well, wasn't it your job to make sure that the crews that

18    were doing framing work at Bravo projects did what they were

19    supposed to do?

20    A.    It was my job to check any framing work for any company

21    before we hung drywall, otherwise we would be responsible as

22    the drywall company for any corrections on the job.

23    Q.    And so I gather then from that testimony, sir, that

24    Wright Painting & Drywall was the subcontractor doing the

25    painting and drywall at the same homes as these crews that

1    you've testified were doing framing work?

2    A.    I don't know who the framing work was being done, you know,

3    who was there.  We knew that we had to check -- all my foremans

4    had to check, myself, whoever was at the job site to be sure

5    the framing was done correctly.

6        Who was doing the framing was no importance to me or the

7    company, just to make sure that we had gave the superintendent

8    in charge of the job the knowledge that we found some problems

9    with the framing.

10       When I did work for Dean, you know, Wright Painting did

11   the painting on jobs for -- for Dean on off-site homes, I

12   would -- I would inform Dean or my foremen.

13       Whoever was under him would let him know, you know, we

14   found something wrong.  I didn't know who he had framed.

15   Wright Painting had no idea who framed it.  We just knew

16   that --

17   Q.    Okay.

18   A.    -- we had to tell whoever was in charge of the job that we

19   found some problems.

20   Q.    Okay.  Let's talk about workers' compensation for a minute.

21   So as I understand your testimony, these three -- I think you

22   referred to them as labor brokers, right?

23   A.    Correct.

24   Q.    Smiley, Nuniez, Barajas, these three labor brokers.  If any

25   of their workers got injured while working on a Bravo job site,

1    you instructed the three brokers to call you, correct?

2    A.    I pretty much told them at the meeting that I was the one

3    that was --

4    Q.    Okay.

5    A.    -- to be contacted.

6    Q.    And then you would determine which hospital the injured

7    worker should go to, right?

8    A.    I would ask them where were they working.

9    Q.    Right.

10   A.    And point --

11   Q.    Send them --

12   A.    -- them --

13   Q.    -- to the --

14   A.    -- to the area --

15   Q.    -- nearest one.

16   A.    -- of the closest hospital, of course.

17   Q.    Right.  And you would then go to the hospital and pay in

18   cash the medical bills for those workers.

19   A.    I would have a monthly plan thing set up on each hospital,

20   and they would call me and let me know that -- what was owed.

21   I would then instruct Heidi in the office, and then we'd give

22   her the cash to go make the payments to the doctor or the

23   hospital.

24   Q.    Okay.  But it was done on a monthly basis, but it was done

25   in cash.

1    A.    Yes.

2    Q.    Okay.  And to the extent that an injured worker could not

3    continue to work, could not go back out onto the job site,

4    Wright Painting & Drywall would continue to pay that worker a

5    percentage of what he would otherwise make; is that right?

6    A.    Well, I don't think Wright Painting was paying anybody.

7    You know, it didn't -- he didn't work for me, so he wasn't --

8    so I wasn't paying him (indiscernible) Wright Painting, but I

9    did -- I was employed by Wright Painting, but it didn't come

10   from Wright Painting.  The money didn't come from Wright

11   Painting.

12        You just -- they would turn in the list, we'd have the

13   guy's name and how much he made just like this list right here

14   that you've shown me, and the funds would be given to him.

15   Q.    Turn to page 60 of your deposition transcript, please.  Do

16   you have that page in front of you?

17   A.    I do.

18   Q.    So at line 20, you were asked the following question and

19   you gave the following answer:  Question, "Okay.  So if one of

20   these workers couldn't work for a period of time because of the

21   injury that they sustained on a Bravo job site, Wright Painting

22   would pay that person how much?"  Answer, "A percentage of

23   whatever their normal salary was."

24   A.    Correct.

25   Q.    Was that accurate testimony?

1    A.    If -- if the employer was employed by Wright Painting, just

2    like any other company that's all they would get.  The employee

3    could have worked for anybody.  If they were running their

4    payroll through us, through our warehouse --

5    Q.    All right.  I'm confused.  Let me see if we can clear this

6    up.  So workers -- let's take Smiley's crew --

7    A.    Okay.

8    Q.    -- as an example.  If Smiley's crew was working on a Bravo

9    job site and one of Smiley's crews was injured while on the job

10   site and could not work, that employee would be paid some

11   amount of money while injured and unable to work, correct?

12   A.    Whatever Smiley would bring to us and say this is what he

13   makes on an average, on a weekly average.

14   Q.    Okay.  So if Smiley says this employee makes $500 a week on

15   average, then who would determine to pay that person $250 a

16   week while they're injured?

17   A.    Mr. Kahre.

18   Q.    Mr. Kahre would.  Okay.  And who would provide the cash to

19   pay that person?

20   A.    The secretaries in the office would give me the money, and

21   I had a list of all injured workers.

22   Q.    Okay.

23   A.    And I --

24   Q.    But it --

25   A.    -- had to --

1    Q.    It was --

2    A.    -- check their ID.

3    Q.    Ultimately, it was Mr. Kahre's money?

4    A.    It was all Mr. Kahre's money.

5    Q.    Okay.  Got it.  Okay.  So workers from these crews get

6    injured on a Bravo job site and can't work.  Mr. Kahre then

7    would through you pay them a percentage, half of their salary,

8    whatever amount was agreed to with the foreman.

9    A.    Correct.  That's why --

10   Q.    Okay.

11   A.    -- the -- on these papers, that -- that's what covered the

12   injuries.

13   Q.    Okay.  And part --

14   A.    Yes.  Their percentage.

15   Q.    -- of your function as the general superintendent working

16   for Mr. Kahre here was to police these workers to make sure

17   that if they said they were injured and couldn't work, that

18   they weren't, in fact, going out onto another job site working

19   while at the same time getting paid by Mr. Kahre, correct?

20   A.    Correct.  If someone was to inform me, you know, I would go

21   and check it out to make sure they were really, you know -- and

22   I'd have them come in a weekly basis to pick up their money, so

23   that way I could see where their progress was.  I would check

24   with the doctor if he was going to a doctor, what their

25   progress was.

1    Q.    Okay.  Did you consider Smiley to be the leader if you will

2    of these three labor brokers that we've been talking about,

3    Nuniez and Barajas?

4    A.    He was the framing leader, and these guys all worked under

5    him pretty much.  They were just crew leaders.

6    Q.    Okay.  When you say these guys worked under him, you're

7    talking about Nuniez and Barajas?

8    A.    Yes.

9    Q.    Okay.  And prior to you leaving Wright Painting & Drywall

10   in mid 2001, around April 2001, you were aware Mr. Kahre was

11   already discussing with Smiley opening up a framing company,

12   right?

13   A.    Something of that nature.

14         MR. QURESHI:  Okay.  Thank you.  That's all I have.

15         THE COURT:  All right.  Redirect.

16         MS. LOWE:  Yes, your Honor.  I just have a couple of

17   follow-up questions.

18                    REDIRECT EXAMINATION

19   BY MS. LOWE:

20   Q.    You were just testifying with regard to the workmen's comp

21   issue here.  And so you said that say a Bravo worker was

22   injured on the work site and Mr. Curio would say that person on

23   average made $500, so a decision was made to pay that worker

24   $250.

25   A.    A percentage.

1    Q.    Okay.

2    A.    Yes.

3    Q.    Okay.  A percentage of what he made.  Okay.  So you said

4    that Mr. Kahre would actually provide the funds to pay that

5    worker; is that correct?

6    A.    Correct.

7    Q.    Were those funds, did they come out of -- you referred to a

8    burden earlier in your testimony?

9    A.    Yes.

10    Q.    Okay.  So that burden money was actually part of the

11    invoice to Bravo --

12    A.    Correct.

13    Q.    -- for the weekly pay?

14    A.    To every company, yes.

15    Q.    Okay.  Every company paid the burden to Mr. Kahre.

16    A.    Right.

17    Q.    And then Mr. Kahre used some of the burden for the

18    workmen's comp?

19    A.    Correct.

20    Q.    And it was actually a better deal for the construction

21    companies from your testimony from what you said because you

22    actually got a big cash discount at the hospitals?

23    A.    We would get up to 40-percent discount with the hospitals

24    if we paid in cash.

25    Q.    Okay.  Can you tell me during the time frame that you

```
 1    were -- from like 2000 up into 2001, did you UPC actually have

 2    its own business or what was the business of UPC?

 3    A.   I don't know what -- pretty much what he did.  He just

 4    opened up a company to do -- to run payroll and stuff.

 5    Q.   Okay.  So did it have any workers of its own?

 6    A.   No.

 7    Q.   Okay.  So did UPC provide any workers to Bravo?

 8    A.   No.

 9              MS. LOWE:  Thank you.

10              THE COURT:  All right.  Thank you.  You're excused.

11        How many more witnesses do you have --

12              MS. LOWE:  We do have --

13              THE COURT:  -- Ms. Lowe?

14              MS. LOWE:  -- one more, and it's actually kind of a

15    short witness.

16              THE COURT:  Okay.  Do you need to take a break or are

17    we okay for -- how long do you think?

18              MS. SULLIVAN:  I'm going to say less than 20 minutes,

19    your Honor.

20              THE COURT:  Okay.  Do you want to take a break now --

21              THE CLERK:  I'm fine.

22              THE COURT:  -- or wait?  Okay.  All right.  Thank

23    you.

24        (Colloquy not on the record.)

25              MS. SULLIVAN:  The United States calls
```

```
 1   George Rodriguez.
 2              THE CLERK:  Please step around here, please.  Raise
 3   your right hand.
 4    Thereupon --
 5                          GEORGE RODRIGUEZ
 6    was called as a witness by the United States, and having been
 7     first duly sworn, testified as follows:
 8              THE WITNESS:  I will.
 9              THE CLERK:  Please state your name and spell it for
10   the record.
11              THE WITNESS:  George Rodriguez,
12   G-e-o-r-g-e R-o-d-r-i-g-u-e-z.
13              THE CLERK:  Thank you.  Please be seated.
14        (Colloquy not on the record.)
15              MS. SULLIVAN:  Good afternoon, Mr. Rodriguez.  My
16   name is Kaycee Sullivan.  I'm an attorney for the
17   United States.
18                        DIRECT EXAMINATION
19    BY MS. SULLIVAN:
20   Q.   Could you please state your name for the record.
21   A.   George Rodriguez.
22   Q.   And where do you live?
23   A.   I live right here in Las Vegas.
24   Q.   And are you currently employed?
25   A.   Yes, I am.
```

1    Q.    Where do you work?

2    A.    I work for Findlay Volkswagen.

3    Q.    How long have you worked there?

4    A.    For six years.

5    Q.    So since 2006, 2005, something like that?

6    A.    Yeah.  February 2006, I started there.

7    Q.    Okay.  And what did you do before that?

8    A.    I was -- I worked for Wright Painting & Drywall.

9    Q.    And how many years did you work there?

10   A.    Since '98 through July of 2005.

11   Q.    Okay.  So during the period of time that we're focusing on

12   here today, you worked at Wright Painting & Drywall; is that

13   correct?

14   A.    Absolutely.

15   Q.    Okay.  And those years are 2000 to 2003, okay?

16   A.    Okay.

17   Q.    What did you do at Wright Painting & Drywall during that

18   period of time?

19   A.    In '98, I started as a painter.

20   Q.    Um-h'm.

21   A.    And then eventually became a foreman, and then -- and then

22   after Big Jorge, I became the general superintendent.

23   Q.    Okay.  And who are you referring to as Big Jorge?

24   A.    Jorge Fernandez.

25   Q.    Thank you.  And what year did you become the general

1   superintendent?

2   A.    The end of 2001.

3   Q.    Okay.

4   A.    2002.

5   Q.    Who owns Wright Painting & Drywall?

6   A.    Robert Kahre.

7   Q.    And what were you duties working for him?

8   A.    I'm sorry?

9   Q.    What were you duties working for him?

10  A.    My what?

11  Q.    What was your job duties, responsibilities?

12  A.    Oh, my job duties.  As a superintendent?

13  Q.    Through the years 2000 to 2003.

14  A.    Well, when -- when I was foreman, I was just running a

15  couple jobs, and then eventually I became the general

16  superintendent, and -- and I started to run the whole company.

17  Q.    And which company are you referring to?

18  A.    Wright Painting & Drywall.

19  Q.    Did you ever do any business or provide any services for

20  any other of Robert Kahre's businesses?

21  A.    Yes.  I -- I also supervised work for -- for like

22  Union Pacific.

23  Q.    Okay.  And what kind of work was that?

24  A.    Painting and drywall and -- and framing.

25  Q.    What workers --

1    A.    Like Union Pacific was a general -- a general contractor,

2    so they did a lot of work, and they all worked together.  Like

3    Wright Painting and like Union Pacific was basically all run,

4    you know, under Robert Kahre.

5         He had like I think six or seven different companies, so

6    when he -- he had a Union Pacific job and when I had, you know,

7    like my crews out there, then, of course, I would, you know,

8    supervise them.

9    Q.    Okay.  Did Union Pacific provide payroll services?

10   A.    Yes, they did.

11   Q.    Do you know what companies used Union Pacific's payroll

12   services?

13   A.    There was 35 companies.

14   Q.    Okay.  Do you know if Bravo was one of those companies?

15   A.    Yes, I do.

16   Q.    So yes it was?

17   A.    Yes.

18   Q.    Did Robert Kahre ever provide any workers to the

19   contractors using the payroll system?

20   A.    Did Robert Kahre do what?

21   Q.    Did he ever provide workers to any of these companies using

22   the payroll system?

23   A.    Like will you rephrase that?  Can you resay it?  I don't --

24   Q.    Okay.  So you told me there are 35 companies using --

25   A.    Right.

1   Q.   -- his payroll system.  What do you mean by that?

2   A.   That he provided payroll for these companies, you know.

3   These companies would send him a sheet, you know, for the

4   amount of what we had to pay them.  And then on certain days,

5   we provided the service as far as, you know, paying his --

6   those companies.

7   Q.   Okay.  And then in addition to that, your testimony is that

8   they also provided painting and drywall service?

9   A.   Yes.  Union Pacific when I was, you know, like running

10  Wright Painting & Drywall, you know, actually started to -- to

11  work themselves, you know.  They actually, you know, was doing

12  framing work and were doing, you know, like general contracting

13  work.

14       So, you know, Union Pacific at the time that I was running

15  Wright Painting was just not doing a payroll service like, you

16  know, like they were also doing, you know, framing jobs,

17  painting jobs, drywall jobs.

18  Q.   Okay.  And what time period was that?

19  A.   From 2001, 2002 through 2005 when I quit.

20  Q.   Okay.  And that was a change from when Big Jorge was the

21  superintendent; is that correct?

22  A.   Yes.  In -- in the beginning, like Union Pacific was not

23  doing much work, you know, as far as, you know, framing work.

24  They were just doing the payroll service.

25  Q.   Okay.  Are you aware of any problems that

```
 1   Wright Painting & Drywall had with the government?

 2   A.   Any problems?  Yes.  We -- yes.

 3   Q.   What problems were those?

 4   A.   In May -- May 5th, 2003, we had a search warrant.  Our --

 5   our business got raided, and they came in, and -- and they shut

 6   us down for a couple of days.

 7   Q.   Who raided the company?

 8   A.   The IRS, SWAT, FBI, ATF.  You name it they were there.

 9   Q.   And do you know why?

10   A.   Because of this payroll service.

11   Q.   You mentioned earlier that you stopped working there around

12   2005; is that correct?

13   A.   That's correct.

14   Q.   Why did you stop working there?

15   A.   I quit.  I just -- I just didn't want to fight the fight

16   anymore.  It wasn't my fight.  It was Robert Kahre's fight, and

17   I decided to just -- just quit.

18   Q.   Did you ever face any legal problems because of your work

19   there?

20   A.   Yes.

21   Q.   And what were those?

22   A.   Well, you know, I'm a felon right now because of it, so --

23   so I got charged like with a felony.  I paid back the IRS over

24   $91,000.  I was on house arrest for 90 days, you know,

25   community service, just, you know, turned my life upside down.
```

1    Q.    What felony were you charged with?

2    A.    For tax evasion.

3    Q.    Okay.  And how did you plead?

4    A.    Guilty.

5    Q.    How were paid when you worked at Wright Painting & Drywall?

6    A.    In gold and silver.

7    Q.    And how did that work?

8    A.    You would go -- when I was -- when I started in like '98,

9    we actually had a payroll service that was on Boulder Highway,

10   and then shortly after that it went over to Kimberly.

11        And we basically would go into one, you know, they had --

12   they had like a room set up where you would go in, and they had

13   two windows just -- and, you know, like -- just like at the

14   bank, you know.

15        There's -- there's like tellers at windows, and you

16   basically would go in, you know, one window, and you would pick

17   up your gold and silver coin, go to the next window, drop it in

18   the slot, and then the girl -- would actually give you your

19   Federal Reserve Notes.

20   Q.    And what was the purpose of using this system?

21   A.    What was the purpose?

22   Q.    What did Robert Kahre tell you the purpose was for using

23   this system?

24   A.    It was just a way to avoid taxes.

25   Q.    Okay.  And earlier you testified that 30- to 35 companies

1    were using this payroll service; is that correct?

2    A.   That's correct.

3    Q.   And you mentioned that Bravo was one of those companies?

4    A.   That's correct.

5          MS. SULLIVAN:  Okay.  Thank you.  I think that's all

6    for now, your Honor.

7          THE COURT:  All right.

8       Cross.

9          MR. QURESHI:  Thank you, your Honor.

10       Mr. Rodriguez, good afternoon.

11          THE WITNESS:  Good afternoon.

12          MR. QURESHI:  We met at your deposition.  I'm

13    Abid Qureshi.

14                      CROSS-EXAMINATION

15     BY MR. QURESHI:

16    Q.   So when you were the general superintendent of

17    Wright Painting, when you took over after Big Jorge left,

18    Wright Painting continued to act as a subcontractor for Rhodes

19    to provide and drywall service, right?

20    A.   Yes.

21    Q.   Okay.  And by the way, are you also known as Little George?

22    A.   Yes.

23    Q.   Okay.  Thank you.  Let's talk for a minute about Smiley,

24    Nuniez, and Barajas.  You've heard those names before, right?

25    A.   Yes.

```
 1   Q.   And you're --
 2   A.   I'm more -- I'm more familiar with Smiley and Andreas, you
 3   know.
 4   Q.   Okay.
 5   A.   Joaquin I know the name.  I don't --
 6   Q.   Okay.
 7   A.   -- you know, I couldn't --
 8   Q.   But your understanding is that all three of them -- again
 9   focusing on the 2000 to 2003 time frame that we're talking
10   about here -- were labor brokers?
11   A.   Yes.
12   Q.   Okay.  And it's also your understanding that all three ran
13   crews that framed homes at Bravo?
14   A.   Yes.
15   Q.   Okay.  And it's also your understanding that their crews
16   did work for companies all over Las Vegas, right?
17   A.   Yes.
18   Q.   Companies other than Bravo.
19   A.   Yes.
20   Q.   Okay.  And it's your understanding that Smiley was the -- I
21   think the phrase you used at your deposition was the bigwig of
22   the three of them.
23   A.   Yes.
24   Q.   Okay.  And underneath those three were other foremen who
25   would supervise the work; is that right?
```

1    A.    Yes.

2    Q.    Okay.  Let's talk about Union Pacific Construction for a

3    minute.  Now, it was a framing company owned by Robert Kahre,

4    right?

5    A.    Yes.

6    Q.    Okay.  And among other things Union Pacific was in the

7    business of framing homes and commercial buildings I think,

8    right?

9    A.    Yes.

10    Q.    Okay.  And your recollection is that Mr. Kahre started

11    Union Pacific after Big Jorge was fired or left Wright?

12    A.    Yes.

13    Q.    Okay.  And is it also your understanding that Smiley was

14    the first person to run Union Pacific for Mr. Kahre?

15    A.    Yes.

16    Q.    Okay.  And at the same time that Smiley was running

17    Union Pacific for Mr. Kahre, he was providing framing crews to

18    other job sites including to Bravo, right?

19    A.    Yes.

20    Q.    Okay.  And when Smiley provided his crews to Bravo job

21    sites, he would be the one that would pay those workers, right?

22    A.    I assume yes.

23    Q.    Okay.

24            MS. SULLIVAN:  Objection, your Honor.

25            THE COURT:  Sustained.  Well, I'll strike the answer.

1              MS. SULLIVAN:  Thank you.

2              THE COURT:  The first question was do you know.  You

3     went ahead, he assumed it, so he obviously doesn't know.

4      BY MR. QURESHI:

5     Q.   Now, if Mr. Griffith, Dean Griffith, testifies under

6     oath that he signed a contract with Robert Kahre and with

7     Union Pacific Construction for Union Pacific to provide framing

8     crews to Bravo job sites, you have no basis to dispute that

9     testimony, do you?

10    A.   No.

11    Q.   Okay.  And you also have no personal knowledge of the

12    billing arrangements that existed between Union Pacific and

13    Bravo, do you?

14    A.   No.

15    Q.   And you do know that Union Pacific had a general

16    contractor's license, right?

17    A.   Yes.

18    Q.   And you never ran Union Pacific, did you?

19    A.   No.

20    Q.   But Union Pacific and Wright Painting & Drywall did work

21    closely together when you were the general superintendent,

22    right?  Union Pacific would do the framing work and Wright

23    would come in and do the sheetrock and painting?

24    A.   Yes.

25              MR. QURESHI:  Okay.  That's all I have.

1           Thank you, your Honor.

2                   THE COURT:  All right.

3           Redirect.

4                   MS. SULLIVAN:  None, your Honor.

5                   THE COURT:  All right.  Thank you.  You're excused.

6           Can this witness be excused?

7                   MS. LOWE:  Yes.

8                   THE COURT:  All right.  Thank you.

9           Anymore witnesses?

10                  MS. LOWE:  Not for the Government.

11                  THE COURT:  Okay.  All right.  Let's take a recess.

12   How long do you think?  I told you 45 minutes which is fine,

13   but we can go a little longer if you'd like or what's your

14   preference?

15                  MR. QURESHI:  Your Honor, we're certainly content to

16   take a short break.

17                  THE COURT:  Okay.

18                  MR. QURESHI:  Our two witnesses are here.  We don't

19   plan to leave the courthouse.  So whenever the Court --

20                  THE COURT:  Okay.

21                  MR. QURESHI:  -- at the Court's convenience, we --

22                  THE COURT:  So 45 minutes?  Does that work?

23                  MR. QURESHI:  That's certainly fine.

24                  THE COURT:  Okay.  Fine.  Thank you.

25                  MR. QURESHI:  Okay.  Thank you.

1            THE COURT:  We're in recess.

2            THE CLERK:  Thank you.  You can leave all your --

3            THE COURT:  We're excused.  Thank you.

4            THE CLERK:  And you can leave all your --

5        (Recess at 01:01:09 p.m.)

6        (Court reconvened at 01:51:37 p.m.)

7            THE CLERK:  All rise.  Bankruptcy court is back in

8    session.

9        (Colloquy not on the record.)

10           THE COURT:  Be seated.  All right.

11     Do you want to call your first witness?

12           MR. QURESHI:  Your Honor, before we do just one

13    administrative matter.  There was one other witness -- excuse

14    me -- that was on the Government's witness list where we have

15    agreed in lieu of live testimony to submit designated

16    deposition testimony.

17           THE COURT:  Okay.

18           MR. QURESHI:  So what we have done is gone through

19    the deposition transcript.  We have highlighted in yellow those

20    portions we wish to designate and the Government has done the

21    same in pink.  Is it your Honor's preference that we just hand

22    that up or read into the record or --

23           THE COURT:  No.  Just hand it up.

24           MR. QURESHI:  Okay.  If I could do that at the end of

25    the proceeding, we'll just put a key --

```
 1              THE COURT:  Okay.
 2              MR. QURESHI:  -- on the top and --
 3              THE COURT:  All right.
 4              MR. QURESHI:  -- and --
 5              THE COURT:  Thank you.
 6              MR. QURESHI:  -- and see if we can get a copy made.
 7    Thank you, your Honor.  In that case, the reorganized debtors
 8    call Dean Griffith as their first witness.
 9              THE COURT:  And just so I know for our records, whose
10    the depo that we're designating.
11              MR. QURESHI:  I'm sorry?
12              THE COURT:  Who --
13              MR. QURESHI:  Oh, the witness is Marlene Marcus,
14    M-a-r-c-u-s.
15              THE COURT:  All right.  Thank you.
16              MR. QURESHI:  Thank you.
17              THE CLERK:  Please just step right up here, please,
18    and raise your right hand.
19     Thereupon --
20                        DEAN LEE GRIFFITH
21     was called as a witness by the Debtor, and having been first
22      duly sworn, testified as follows:
23              THE WITNESS:  I do.
24              THE CLERK:  Please state your name and spell it for
25    the record.
```

103

```
 1            THE WITNESS:  Dean Lee Griffith.  Dean, D-e-a-n, Lee,
 2   L-e-e, Griffith, G-r-i-f-f-i-t-h.
 3            THE CLERK:  Thank you.  Please be seated.
 4            MR. QURESHI:  Mr. Griffith, good afternoon.
 5            THE WITNESS:  Good afternoon.
 6                      DIRECT EXAMINATION
 7    BY MR. QURESHI:
 8   Q.   Sir, where do you live?
 9   A.   Las Vegas, Nevada.
10   Q.   Okay.  Can you tell me whether you are presently employed?
11   A.   Yes.
12   Q.   And who do you work for?
13   A.   Two companies, Harmony Homes Las Vegas and
14   Westcor Construction.
15   Q.   Okay.  And what do you do for those companies?
16   A.   At this time I'm framing.
17   Q.   Okay.  And how many years have you been in the construction
18   industry?
19   A.   Since 1977.  Going on 34 years, 35 years.
20   Q.   Okay.  And you previously worked at Rhodes Homes, correct?
21   A.   Correct.
22   Q.   Okay.  And when did you work for Rhodes?
23   A.   I went over to there 2005 through 2010.
24   Q.   Okay.  But --
25   A.   For Rhodes Homes?
```

```
1    Q.    Right.

2    A.    Yes.

3    Q.    2005 or 1995?

4    A.    No.  For Bravo Rhodes Framing?

5    Q.    Right.  Okay.

6    A.    Yeah.  That's --

7    Q.    We're getting --

8    A.    -- your question.

9    Q.    -- a little confused.  Let's --

10   A.    For --

11   Q.    -- back up.

12   A.    Okay.

13   Q.    So did you ever work for the predecessor to Bravo for

14   anything?

15   A.    Rhodes Framing?

16   Q.    Yeah.

17   A.    Yes.

18   Q.    Okay.  And when did you start working for Rhodes Framing?

19   A.    Rhodes Framing I worked early on in 1982, and then I took a

20   break from Rhodes Framing for four years, and then I went back

21   to work for them in 1987 through 2004, 2005.

22   Q.    Okay.  And then in 2005, where did you go to work?

23   A.    For Rhodes Homes.

24   Q.    Okay.  All right.  So you've been in the courtroom for all

25   of the proceedings today, correct?
```

1    A.    Correct.

2    Q.    Okay.  So you know that we're focused for the purposes of

3    these proceedings on the 2000 to 2003 time frame.

4    A.    Correct.

5    Q.    And so what I'd like you to do, please, is just tell the

6    Court what was your job at Bravo during that time frame, 2000

7    to 2003.

8    A.    I was the general manager of the framing company.

9    Q.    And can you please describe generally what your

10    responsibilities were as the general manager of Bravo.

11    A.    Yes.  It was to control the office and -- and all the field

12    framing.

13    Q.    Okay.  And to whom did you report when you were the general

14    manager of Bravo?

15    A.    Jim Rhodes from, you know, weekly.  I would report to him

16    on any --

17    Q.    Okay.

18    A.    -- immediate issues or anything.

19    Q.    Okay.  And prior to the year 2000, can you describe for the

20    Court, please, how Bravo compensated its workforce.  How were

21    the workers paid?

22    A.    Oh, the -- they were paid by payroll checks.

23    Q.    Okay.  And did --

24    A.    In --

25    Q.    -- Bravo --

1    A.    Yeah.   In-house.  We did our own payroll.

2    Q.    Okay.  And prior to 2000, did Bravo have hourly workers or

3    pieceworkers or both?

4    A.    We had all the above.  We had our foremans were typically

5    salary.

6    Q.    Okay.

7    A.    Then we had -- under them they would have their own crews

8    which were hourly.

9    Q.    Okay.

10    A.    And then the majority of the workers were pieceworkers

11    through the different phases of framing the homes.

12    Q.    Okay.  And let's just deal with each of those.  How were

13    the hourly employees paid?

14    A.    They were paid weekly.  They would typically put in -- we

15    wanted them all to work 40 hours, and then at the end of the

16    week, the foremans would turn in their time, and they would be

17    paid by payroll checks.

18    Q.    Okay.  How about the pieceworkers?  Prior to 2000, how were

19    the pieceworkers paid?

20    A.    The pieceworkers would -- each crew leader would turn in

21    their phase of piecework that they were doing.  They would have

22    like a master sheet that would have the -- the lot number and

23    it would have exactly what they did for the week, and then it

24    would have an amount of money that they get paid for each phase

25    of work they did.

1    And then at the bottom, it would have a total amount of

2 moneys to be paid to that crew leader to disperse with -- to

3 his workers.

4 Q.   Okay.  And what about the salaried workers?  How were they

5 paid?

6 A.   The salaried workers were just foremans for Bravo.

7 Typically, they were the -- they oversaw the -- the different

8 sites, job sites, that we were working on, and they would be

9 paid a salary based on a 40-hour work week.

10 Q.   Okay.  And while you were at Bravo to your knowledge were

11 any Bravo employees ever paid other than by check?

12 A.   No.

13 Q.   And to your knowledge, did Bravo always deduct employment

14 taxes from the checks it gave to its employees?

15 A.   Yes.  They always did, yes.

16 Q.   Okay.  So while you were general manager at Bravo -- and

17 again focusing on the 2000 to 2003 time frame -- did you have

18 the authority to enter into contracts on behalf of Bravo?

19 A.   Yes, I did.

20 Q.   And what type of contracts would you enter into on behalf

21 Bravo?

22 A.   Well, typically we dealt with a lot of material companies,

23 truss companies, lumbar companies, hardware companies, and --

24 and our bidding.

25    When we'd bid jobs, we would use more than one price, you

1    know, to -- so we can give the builders the best price.  And

2    then also any other things that came up I could, you know, make

3    decisions on.

4    Q.    Okay.  Let's switch gears and talk about

5    Union Pacific Construction.  When did you first hear of a

6    company called Union Pacific?

7    A.    Right around 2000.

8    Q.    Okay.

9    A.    A little --

10   Q.    And --

11   A.    -- bit before.

12   Q.    -- do you recall how you first heard the name?

13   A.    One of the crew leaders, Ishmael Curio, brought it to my

14   attention to use a company called Union Pacific Construction.

15   Q.    And Ishmael Curio, is he also known as Smiley?

16   A.    Yes.

17   Q.    Okay.  And tell me what you can recall of the circumstances

18   in which Smiley brought Union Pacific to your attention.

19   A.    Well, at that time, you know, Las Vegas was booming in the

20   residential home building, so we were -- we were getting

21   swamped, you know, by new employees.

22        And the majority of them were, you know, Hispanic, and

23   there was a big issue with, you know, illegal, being legal, you

24   know, you know, because at that time we had to call in, you

25   know, their social security numbers, and it was just, you know,

1    and then make sure their -- their, you know, green cards were

2    good.

3        And it was just taking up a lot of -- a lot of the office

4    time, you know, with them coming in because we had ads in the

5    paper, and it was just -- it was -- it was a crazy time.

6        So at that time, Ishmael Curio had made a suggestion to

7    use a company called Union Pacific Construction to subcontract

8    labor from, and that that -- they would take Ishmael, Andreas,

9    and Joaquin Barajas, and then we would -- we would just call

10   them to have the crews come out to our job as needed.

11   Q.    Okay.  And when you say that Union Pacific would take

12   Ishmael, Andreas, and Joaquin, I just want to focus on that a

13   little bit.  So at the time that you had this conversation with

14   Smiley, for whom did Smiley, Andreas, and Joaquin work?

15   A.    They worked for Bravo at the time --

16   Q.    Okay.  So --

17   A.    -- prior to.

18   Q.    And what was their job at Bravo at that time?

19   A.    They were crew foremans for the piecework men.

20   Q.    Okay.  And when you testified just now that Smiley was

21   suggesting that Smiley, Andreas, and Joaquin would go to

22   Union Pacific, what do you mean by that?  Can you explain.

23   A.    Yes.  That Union -- they they'd go on Union Pacific's

24   payroll, and we would be able to then -- they would be able to

25   take care of the burden of all the, you know, the laborers

1   coming into the office and -- and getting them signed up.

2         And -- and a lot of the pieceworkers like I said before

3   they -- they work for multiple people, you know.  If -- if we

4   don't have work for them, they go work for somebody else, and

5   it's just -- it was just so hard to keep track of, you know, if

6   somebody got hurt on our job, did he really get hurt on our

7   job?  You know what I mean?

8         So it just became, you know, all in all just a -- just a

9   major burden, so this was a way of, you know, solving all of

10  our problems by just subcontracting from Union Pacific to be

11  the labor to, you know, to supply labor for us.

12        So their main -- their main job was just to supply labor

13  for us and -- and take care of all the payroll and the

14  workmen's comp.

15  Q.   Okay.  So after Smiley suggested to you that you

16  subcontract with Union Pacific for labor, what happened next?

17  A.   We had -- well, Mona Wilcox and -- and Ishmael had set up a

18  meeting to meet Robert Kahre from Union Pacific to go over a

19  contract that was wrote up to supply labor to Bravo as needed,

20  you know, for all of our job sites.

21  Q.   Okay.  And did you sign that contract?

22  A.   Yes.

23  Q.   Okay.  On behalf of Bravo?

24  A.   Yes.

25  Q.   Okay.  And do you recall approximately when that was?

1    A.    It was around the beginning of 2000, the year 2000.

2    Q.    Okay.  And I gather, sir, you're aware that we have been

3    unable to locate a copy of that contract, right?

4    A.    Yeah.

5    Q.    And --

6    A.    Over the years, you know, Bravo -- Rhodes Framing d/b/a

7    Bravo, was going through a lot of changes.  We -- we moved a

8    couple times.

9          We had a couple of other, you know, construction defect

10   stuff going on and -- and different law firms would come in

11   and -- and gather some of the files, and -- and they weren't

12   being kept track of properly to, you know, to get the copies

13   made and brought back.  And, you know, I just want to say that

14   a lot of things were, you know, were -- just got misplaced.

15   Q.    Okay.  And why are you confident that there was a written

16   contract that you signed with --

17   A.    I recollect --

18   Q.    -- Union Pacific?

19   A.    -- signing one, you know.  I went over it with Mona Wilcox

20   prior to the meeting.  And -- and then when we met with Robert

21   Kahre, I had signed it.

22   Q.    Let's talk a little bit about what that agreement provided

23   for.  So under the contract that you signed, who was to provide

24   the work crews, the framing crews to Bravo?

25   A.    Union Pacific Construction.

1  Q.   And who would handle the process of hiring and if necessary

2  firing the workers who were actually doing the work?

3  A.   Union Pacific Construction would do that.

4  Q.   Okay.  And what about supervising the crews?  So when

5  Union Pacific would provide work crews to come and frame at

6  Bravo job sites, who would supervise those Union Pacific crews?

7  A.   Union Pacific Construction had their crew leaders that we'd

8  just have to contact.

9  Q.   Okay.  And who would pay the workers that were doing the

10  work?

11  A.   Union Pacific --

12  Q.   Okay.

13  A.   -- Construction.

14  Q.   And what about workers' compensation and dealing with

15  medical expenses of the crews that Union Pacific was providing?

16  Who was responsible for that?

17  A.   Union Pacific Construction was.

18  Q.   Okay.  Now, at the time you signed this contract with

19  Union Pacific, do you recall what Jim Garner's title was?

20  A.   Well, Jim Gardner (sic) was like my right-hand person in

21  the office for me.  I had him, you know, deal with the -- the

22  foremans daily, and -- and he did a lot of my

23  estimating --

24  Q.   Okay.

25  A.   -- and -- and, you know, a lot of other things in the

1   office that would help me out.

2   Q.   And before you signed the contract with Union Pacific, did

3   you discuss with Mr. Garner the question of whether Bravo

4   should enter into this arrangement with Union Pacific?

5   A.   No.

6   Q.   Okay.  Let's talk about the crews that Union Pacific

7   actually provided to Bravo pursuant to this contract.  Who led

8   those crews?

9   A.   Ishmael Curio, Smiley --

10  Q.   Okay.

11  A.   -- Andreas Nuniez, and Joaquin Barajas.

12  Q.   Okay.  Now, I think you testified that before the contract

13  was signed, those three individuals, Smiley, Nuniez, and

14  Barajas, were Bravo employees, right?

15  A.   Correct.

16  Q.   And so what happened after with those three individuals

17  after the contract was signed?

18  A.   They went over to Union -- to work for

19  Union Pacific Construction.

20  Q.   Okay.  And do you know if these three individuals, Smiley,

21  Nuniez, and Barajas, once they went over to Union Pacific, do

22  you know if their crews would go and work for companies other

23  than for Bravo?

24  A.   Oh, yes.  Of course they would.  Yeah.

25  Q.   Okay.  And just walk us through again from your position as

1    the general manager of Bravo during the time this contract was

2    in effect with Union Pacific.  If you needed framing crews at a

3    particular job site, just walk us through what the process was.

4    How would you go about ensuring that you got the crews you

5    needed when you needed them?

6    A.   Well, we would, you know, we would inform all the

7    Union Pacific crew leaders, you know, a job is coming up, and

8    then when -- when the start dates, when the lumbar is going to

9    be dropped, when the trusses will be dropped.

10        And then also the job site foreman that worked for Bravo

11   would know all that same information, so -- and they'd just,

12   you know, we'd reassure, you know, the Union Pacific crew

13   leaders, you know, to make sure they were on schedule to start

14   and, you know.

15        Myself and/or the crew leaders would get in touch with

16   them to get them started and -- and pretty much they would, you

17   know, they were good crew leaders, and they'd -- they'd pay

18   attention and get the job done.

19   Q.   Okay.  Let's talk a little bit about the process of

20   how Bravo would pay Union Pacific for the services that

21   Union Pacific was providing.  Why don't we start with you

22   explaining to the Court what your role was in that process.

23   A.   Well, and this -- this is pretty much typical prior to

24   using Union Pacific is -- is all the crew leaders for the

25   pieceworkers would bring in a master sheet.

1       Like say Smiley, he would bring in his master sheet, you

2   know, and it would state the lots, you know, just the same as I

3   was stating prior and with the -- with the totals.

4       And then I would check to make sure that, you know, the

5   work that was done on that -- on those lots weren't already

6   turned in, it was the first time they'd turned in that work,

7   and then I'd call the foremans to make sure the works was

8   done.

9       And then I would turn, you know, those sheets over to Pam

10  approving them, and -- and that would go for, you know, Smiley

11  would turn in his master sheet, Andreas Nuniez would turn in

12  his, and Joaquin Barajas would turn in his.

13      And then I -- I'd give all three to Pam, and -- and Pam

14  would input that information into the system, and then create a

15  total for each crew leader and so that when Union Pacific

16  turned their time in to us -- can I refer to --

17  Q.   Well, let's --

18  A.   Okay.

19  Q.   Yeah.  Why don't you pull the binder out and go to tab 3 if

20  you could.

21  A.   Okay.

22  Q.   And --

23  A.   This doesn't have tabs.  Oh, yeah, it does.

24  Q.   Do you have --

25  A.   Yeah.  So --

1    Q.    Okay.  So I just want to before we go into this document,

2    you talked about a master sheet that you would receive --

3    A.    Correct.

4    Q.    -- from the foreman.

5    A.    Correct.

6    Q.    Are --

7    A.    A master --

8    Q.    Are --

9    A.    -- time sheet.

10    Q.    Okay.  Are any of these invoices that are behind tab 3 the

11    master sheet that you're talking about?

12    A.    No.

13    Q.    Okay.  So --

14    A.    No.  It's a totally different document.

15    Q.    Okay.  So let's start with the invoices.  Explain these

16    invoices.  Your signature appears on them, right?

17    A.    Correct.

18    Q.    Okay.  And what are these invoices?

19    A.    This is the total amount that each crew leader turned in.

20    Q.    And when you say crew leader, can you just be more precise

21    who you're referring to?

22    A.    Yeah.  Joaquin, Smiley, Andreas.

23    Q.    And --

24    A.    That master sheet, the total on the master sheet, matches

25    their total.  As far as what they pay their employees,

1  that's -- that's not up to me.  I just make sure the totals all

2  match up what they turned in.

3  Q.   Okay.  And if the totals matched up, then -- well, let me

4  back up.  Do you have an understanding of who prepared the

5  invoices that are behind tab 3?

6  A.   Union Pacific prepared these documents here.

7  Q.   Okay.  And when you -- well, when Union Pacific would send

8  one of these invoices to Bravo, what would happen next?  Would

9  it come to you?

10  A.   No. It would come to either Mona or Pam Gardner (sic),

11  Mona Wilcox or Pam Gardner (sic).

12  Q.   Okay.

13  A.   And then they would bring it to me in my office, and then I

14  would cross-reference it with their master sheets to make sure

15  their totals match up.

16  Q.   Okay.

17  A.   And then at that time, you know, make sure the -- the

18  burden computes out, and then I'd sign off on it.

19  Q.   And if the totals matched up and if you signed off on it,

20  what would happen next in the process of Union Pacific getting

21  paid?

22  A.   Then I'd give it back to Pam Gardner (sic) and/or

23  Mona Wilcox.

24  Q.   Okay.

25  A.   And they would create the check to pay Union Pacific for

1    the labor.

2    Q.    Okay.  And so would Union Pacific receive one lump-sum

3    check from Bravo for each invoice?

4    A.    Yes.

5    Q.    Okay.  If you turn to page 3 just as an example, you'll see

6    the list of employees and a dollar amount beside each of these

7    employees.  I gather from your testimony Bravo would not write

8    checks to each person.

9    A.    No.

10    Q.    Okay.  So during the period when Union Pacific was

11    providing these crews to Bravo, what role, if any, did Bravo

12    have in hiring or firing the workers?

13    A.    We had no control of that.  That was --

14    Q.    Okay.

15    A.    -- up to UPC.

16    Q.    Okay.  And I think you already testified that Union Pacific

17    had foremen who would supervise their crews on Bravo sites,

18    right?

19    A.    Correct.

20    Q.    And what would Bravo do to verify if you will that he work

21    was being done up to standard?

22    A.    Well, again, we'd have foremans on each job site that

23    worked for Bravo, and they would, you know, coordinate with

24    each crew leader on -- on the jobs that they did.

25    Q.    And when you say crew leader, can you be more specific?

1    Who are you talking about?

2    A.    Smiley, Ishmael Curio, Andreas Nuniez, and Joaquin Barajas.

3    They all did different phases of the framing.

4    Q.    Okay.

5    A.    So depending on what -- what quality they're looking, you

6    know, at and what they were doing at the time, they would call

7    that foreman --

8    Q.    Okay.

9    A.    -- or crew leader.

10    Q.    And if the Bravo foreman that you testified would go and

11    inspect the work, if that Bravo foreman found work that was not

12    up to Bravo's standards, what would happen next?

13    A.    He would call UPC.  Typically, one of their crew leaders.

14    Q.    Okay.  And did Bravo have any role in disciplining the

15    workers that were provided by Union Pacific?

16    A.    No.

17    Q.    Okay.  Did Bravo have any role in determining which workers

18    you would get from Union Pacific?

19    A.    No.

20    Q.    Okay.  Did Bravo have any role in determining where the

21    Union Pacific workers would go in terms of which job site?

22    A.    As far as individually, no.  But as far as the crews

23    needed, my foremen would coordinate with UPC's crew

24    leaders to request, you know, what was needed on their job

25    sites --

1    Q.    Okay.

2    A.    -- what day.

3    Q.    To your knowledge, did Bravo ever pay the workers provided

4    by Union Pacific directly?

5    A.    No.

6    Q.    And did you have an understanding of the process by which

7    Union Pacific -- once Bravo paid Union Pacific the process by

8    which Union Pacific would then pay the laborers that it was

9    providing?

10   A.    No.  Typically, you know, it would be by check.

11   Q.    Okay.  But you didn't know -- after you paid Union Pacific,

12   did you know what would happen next in terms of how

13   Union Pacific would pay its own people?

14   A.    No.  It really wasn't my concern.

15   Q.    Okay.  And did Bravo provide workers' compensation

16   insurance to the crews provided by Union Pacific?

17   A.    They showed us proof of paying workmen's comp, yes.

18   Union Pacific did.

19   Q.    Oh, so Union Pacific paid workers' compensation?

20   A.    Yes.

21   Q.    Okay.  And when you say they showed you proof that they

22   were doing that, what would they show you?

23   A.    Well, originally when we signed the contract, they -- they

24   had to -- they showed us their, you know, we had to check on

25   their license, their, you know, check their contracting license

1    and make sure it was up to date and -- and -- and the status

2    was good and then also to make sure they had workmen's comp in

3    place.

4    Q.    Okay.  Let's switch gears for a minute and talk about

5    tools.  So for Bravo employees, who would provide the tools

6    that they would use on the job sites?

7    A.    Typically, the employees supplied their own nail bags, you

8    know, electrical cords, saws, nail guns, compressors.  But

9    if -- if they needed help, Bravo would -- would help them with,

10   you know, assist in -- in helping them buy tools.

11   Q.    And so how would Bravo help its employees buy tools?

12   A.    Well, an employee would go to -- typically, they'd go to

13   their foreman and say, hey, you know, I need a new nail gun,

14   and then -- and then the foreman would call me.

15        And then I'd approve it, and we'd have our hardware man

16   bring it out to the job with a slip of paper stating the total

17   cost and how that employee wanted, you know, what type of money

18   he wanted taken out weekly to pay the tool off within a certain

19   amount of time.

20   Q.    Okay.  So the employee would pay for the tool, and it would

21   be deducted by the company from his paycheck?

22   A.    Correct.

23   Q.    Okay.  And that payment method if you will for tools,

24   did Bravo ever make that available to laborers provided by

25   Union Pacific?

122

```
1    A.    No.

2    Q.    You testified earlier that Bravo would pay Union Pacific by

3    check once you received these invoices that are in tab 3 and

4    match them up against your master sheet, right?  Who signed the

5    checks for Bravo, do you know?

6    A.    For Bravo?  Myself, Mona Wilcox, and/or Jim Bevans (sic).

7    Q.    And who's Mr. Bevan?

8    A.    He's the gentleman in the back of the room.

9    Q.    Okay.  But what his title at the time?

10   A.    I want to say it was CFO.

11   Q.    Okay.

12   A.    For Rhodes -- Rhodes Design and Development.

13   Q.    Okay.  Let's just again by way of an example in these

14   invoices, turn to page 3 -- you might have that open already --

15   and the invoice.

16         And on page 3 in the bottom left hand, you'll see a

17   subtotal, and then it says BRD, and then a total.  Can you

18   explain what BRD is?

19   A.    Well, BRD is the abbreviation for burden.  If you go back

20   in through the pages, it -- it doesn't abbreviate it.  It will

21   state it as a burden.

22         And it was in the contract as being 18-and-a-half percent

23   which is typically the burden that Bravo was paying out to do

24   payroll -- payroll, you know, run payroll, payroll taxes,

25   workmen's comp, and -- and the office time.
```

1   Q.    Okay.  Let's talk about Robert Kahre.  You heard a lot of

2   testimony about Mr. Kahre this morning.

3   A.    Right.

4   Q.    Did you ever meet him?

5   A.    Yes.  Yes.

6   Q.    And can you recall when you first met him?

7   A.    Pardon?

8   Q.    Can you recall when you first met him?

9   A.    I first met him that -- that -- at the meeting when we were

10  going to sign the contract for Union Pacific to start supplying

11  labor to Bravo.

12  Q.    And when was this approximately?

13  A.    Early 2000.

14  Q.    Okay.  And where did this meeting take place?

15  A.    At the Bravo office on West Hacienda.

16  Q.    Okay.  And as best as you can recall, sir, who attended

17  that meeting?

18  A.    It was me, Mona Wilcox, Robert Kahre, Ishmael Curio, and

19  James Gardner (sic).

20  Q.    Okay.  And what did you understand the purpose of the

21  meeting to be?

22  A.    It was to go over the -- the stipulations in the contract.

23  That he would, you know, keep a current contractor's license,

24  current workmen's comp, and he was to supply labor as needed to

25  Bravo job sites.

1    Q.    Okay.  And do you recall at this meeting whether the

2    subject of paying people in gold and silver was ever raised?

3    A.    No, I do -- no, I do not.  No.

4    Q.    Okay.  And at the time that you entered into the contract

5    with Union Pacific, did you have an understanding of whether

6    Union Pacific would pay the taxes that it was obligated to?

7    A.    Well, I would typically -- typically, that's how people do

8    business, and that -- that was one of the reasons why, you

9    know, we -- we had a contract, you know, to make sure he was on

10   the up and up.

11   Q.    Okay.  And when did Bravo's relationship with Union Pacific

12   come to an end?

13   A.    In 2003 when we found out there was things going on.

14   That -- that he wasn't paying his taxes.

15   Q.    And can you be more specific when in 2003 Union Pacific --

16   or Bravo rather stopped using Union Pacific?

17   A.    I don't know the exact time.

18   Q.    And --

19   A.    No.

20   Q.    -- what had you heard at the time that you did stop using

21   them?  What had you heard about UPC and what they were involved

22   in?

23   A.    Well, we heard they were using -- yeah -- the gold and

24   silver in some way to not have to pay taxes, you know.  I

25   didn't understand the whole, you know, how it all worked until,

1   you know, I've been hearing pieces, parts, you know, over the

2   years about how they were doing that and --

3   Q.   Well, once you heard that this business with gold and

4   silver was going on, why did -- well, first of all, who at

5   Bravo made the decision to terminate the relationship with

6   Union Pacific?

7   A.   Jim Rhodes did.

8   Q.   Okay.  And do you have an understanding of why Bravo

9   decided to terminate the relationship?

10  A.   Well, he heard the same rumor and -- and the same things

11  going on as I did.

12  Q.   And have you since come to become aware that in 2003

13  Union Pacific's offices were searched by the IRS?

14  A.   I heard that.  Yes.

15  Q.   Okay.  And do you recall if that search by the IRS occurred

16  before or after Union Pacific terminated or --

17  A.   That we --

18  Q.   -- strike that -- before Bravo terminated --

19  A.   That was --

20  Q.   -- the relationship?

21  A.   That was after.

22  Q.   Okay.  What was after?

23  A.   When they raided their office.

24  Q.   Okay.

25  A.   We had -- we had terminated it prior to that.

```
 1    Q.    Now --

 2          (Colloquy not on the record.)

 3             MR. QURESHI:  Apologies, your Honor.

 4             THE COURT:  Um-h'm.

 5             MR. QURESHI:  I'm almost wrapped up.

 6      BY MR. QURESHI:

 7    Q.    Mr. Griffith, you were in the courtroom during the

 8    testimony of Mr. Fernandez, correct?

 9    A.    Correct.

10    Q.    Sir, do you ever recall at any point going to a warehouse

11    operated by some company of Mr. Kahre where transactions were

12    taking place in gold and silver?

13    A.    No, I do not.

14    Q.    Okay.  You heard --

15    A.    I never made it to their business.

16    Q.    You heard Mr. Fernandez testify that he recalls you

17    visiting that warehouse, right?

18    A.    Yes.  Correct.

19    Q.    Okay.  And your testimony is that never happened?

20    A.    No, that didn't.

21    Q.    Okay.  Okay.  Just a couple of more questions and then

22    we'll wrap up.  Sir, have you ever in all of your years at

23    Bravo become aware of any Bravo employee ever being paid other

24    than by a check with taxes deducted?

25    A.    No.
```

1    Q.   Okay.  You heard testimony this morning from some of the

2    witnesses suggesting that Union Pacific was only providing

3    payroll services to Bravo and not laborers.  Can you please

4    tell this Court, sir, whether Bravo ever hired Union Pacific

5    solely to provide payroll services.

6              MS. SULLIVAN:  Objection.  Leading.

7              THE COURT:  No.  I'll allow it because they're trying

8    to narrow down the two categories.

9              THE WITNESS:  Can you say that again, please?

10             MR. QURESHI:  Sure.

11    BY MR. QURESHI:

12   Q.   To your knowledge, has Bravo ever used Union Pacific only

13   to provide payroll services?

14   A.   No.  The -- the -- the whole reason why we used

15   Union Pacific was like I said again the burden of all the --

16   the Hispanic people coming into our office and having to check

17   all their IDs and -- and making sure they're legal and that

18   they're not, you know -- legal.

19        And then also, too, they, you know, we -- prior to that we

20   had some incidents where a couple of the workers had gotten

21   hurt but come to find out they didn't get hurt on a Bravo job.

22   They got hurt on another job, and Bravo ended up having to pay

23   for it.

24        So that was one of the big reasons why we wanted a

25   complete package from Union Pacific Construction to supply

1    labor to take care of all their, you know, the payroll costs

2    and the workmen's comp --

3    Q.    Okay.

4    A.    -- because of these issues.

5    Q.    From 2000 to 2003 when you were general superintendent of

6    Bravo, did you ever authorize the outsourcing of Bravo's

7    payroll to any other company?

8    A.    No.

9            MR. QURESHI:    Thank you.    Nothing further for now.

10           THE COURT:    All right.

11       Cross.

12           MS. LOWE:    Good afternoon.

13           THE WITNESS:    Hi.

14                        CROSS-EXAMINATION

15   BY MS. LOWE:

16   Q.    Is it true that the reorganized debtor's attorneys are

17   personally representing you in this matter?

18   A.    Correct.

19   Q.    Okay.    And are you paying them anything for this

20   representation?

21   A.    No, ma'am.

22   Q.    Okay.    And did you meet with the counsel for the

23   reorganized debtors prior to giving your testimony today?

24   A.    Yes.

25   Q.    Okay.    I want to talk a bit about the piecemeal workers

1    that were working, and I want to start I guess in general.  In

2    general, do piecemeal workers do the bulk of framing when it

3    comes to framing a house?

4    A.    Yes, they do.

5    Q.    Okay.

6    A.    Yes.

7    Q.    And is it common in the construction industry for piecemeal

8    workers to work for more than one company at a time?

9    A.    Yes.

10   Q.    Okay.  And so I want to talk a little bit about before

11   entering the contract with Robert Kahre and UPC.  And you

12   mentioned that there was in particular three crew leaders,

13   Ishmael Curio, Andreas Nuniez, and Joaquin Barajas.

14   A.    Barajas.

15   Q.    Okay.  And can you tell me did Ishmael Curio, known as

16   Smiley, did he have a specialty?  Did his crew have some type

17   of specialty in the piecemeal process of framing a house?

18   A.    No.  They did the bulk of the piecework.

19   Q.    Okay.

20   A.    Andreas Nuniez, he just did the wall framing, and then

21   Joaquin just did the sheeting.

22   Q.    Okay.

23   A.    But Ishmael Curio, he did multiple things, you know,

24   that -- that completed the house.

25   Q.    Okay.  So before the contract with Robert Kahre, each of

```
1   these crew leaders also had crews at that time; is that

2   correct?

3   A.   Correct.

4   Q.   Okay.  And each of these crew leaders were actually

5   receiving a paycheck from Bravo; is that correct?

6   A.   Yes.

7   Q.   Okay.  And all of the individuals who were on their crews

8   similarly were receiving paychecks from Bravo?

9   A.   Yeah.  The legal --

10  Q.   Okay.

11  A.   -- the legal people.  Yes.

12  Q.   Okay.  And I guess you explained in your direct testimony

13  how these piecemeal crews were being paid, and it was there was

14  a big spreadsheet for the work sites and each of them would

15  designate what they did in the process of the framing process;

16  is that correct?

17  A.   Correct.

18  Q.   Okay.

19  A.   Correct.

20  Q.   And they would turn that into you for approval?

21  A.   Correct.

22  Q.   Okay.  Now, before the contract entered into with Kahre,

23  how would the crew leaders know which job site to go to?

24  A.   Prior to the contract with --

25  Q.   Yes.
```

1    A.    -- Kahre?

2    Q.    Yes.

3    A.    The same -- the same way.  They would directly communicate

4    with the job-site foremans.

5    Q.    Okay.

6    A.    Because we had a job-site foreman that just stayed on each

7    job and ran that job --

8    Q.    Okay.

9    A.    -- versus the piecework crew leaders, they'd move all

10   around because we had multiple jobs.  We would be doing 15, 20

11   jobs at a time, different job sites.

12   Q.    Okay.  And you said then after the contract with Robert

13   Kahre, the same thing would occur?  The Bravo foreman would

14   contract (sic) the crew leader similarly?

15   A.    Contact, yeah.

16   Q.    Okay.

17   A.    Union Pacific -- yeah --

18   Q.    And when --

19   A.    -- employs them.

20   Q.    -- you say Union Pacific, you're talking about Smiley,

21   Andreas, and --

22   A.    And Joaquin --

23   Q.    -- Joaquin.

24   A.    -- Barajas.  Yes.

25   Q.    Yes.  Okay.  And so Bravo foremen would -- after the

1  contract, Bravo foremen would contract (sic) these crew leaders

2  and particularly directly.

3  A.  Correct.

4  Q.  Okay.

5        THE COURT:  You keep saying contract.  Do you really

6  mean contract or are you saying contact?

7        THE WITNESS:  Contact.

8        MS. LOWE:  No.  I'm talking about before the

9  agreement with Robert Kahre and after the agreement --

10        THE COURT:  No.  But you --

11        MS. LOWE:  -- with --

12        THE COURT:  -- just now --

13        MS. LOWE:  -- Robert Kahre.

14        THE COURT:  -- said contract.

15        MS. LOWE:  I'm sorry.  I meant contact.

16        THE COURT:  Okay.

17        MS. LOWE:  Yes.

18        THE WITNESS:  Okay.

19        MS. LOWE:  Sorry.  Contact.

20        THE WITNESS:  I understand.

21        MS. LOWE:  They would contact them.  Yeah.

22   BY MS. LOWE:

23  Q.  And then after the entry into the contract or the agreement

24  with Robert Kahre, so the pay system basically was the same

25  that the piecemeal workers would actually put it on as -- sorry

1    -- on a spreadsheet how much piecemeal work they did at each

2    site, each Bravo site; is that correct?

3    A.    Correct.

4    Q.    Okay.

5    A.    Because I would have to -- I'd have to keep track of it,

6    you know, in my -- in my system so that they wouldn't overturn,

7    you know, so they wouldn't turn in money twice --

8    Q.    Correct.

9    A.    -- you know, prior to them getting paid.

10    Q.    Okay.  So it was the same process before the agreement with

11    Robert Kahre and after the agreement with Robert Kahre?

12    A.    Correct.

13    Q.    Okay.

14    A.    Except for Union Pacific was paying them.

15    Q.    Okay.  Now, the decision to enter into the contract with

16    Robert Kahre, that was made by you and Mona Wilcox; is that

17    correct?

18    A.    Correct.

19    Q.    Okay.  And isn't it correct that you allowed Mona Wilcox to

20    negotiate the terms of this agreement with Mr. Kahre?

21    A.    Yeah.  We pretty much agreed on, you know, the percentage

22    that he was going to make --

23    Q.    Okay.  And you --

24    A.    -- off of --

25    Q.    -- trusted Mona to make these -- to look at the details of

1    this agreement?

2    A.    At the time, yes.

3    Q.    Okay.  But you were the one who actually signed the

4    contract with Kahre?

5    A.    Correct.

6    Q.    Okay.  And --

7    A.    And I -- I can't say -- I can't recollect if Mona signed it

8    too.  I'm not sure.

9    Q.    And today as you said, this agreement we can't find it.

10    A.    No.

11    Q.    Okay.  And isn't true that the only details that you

12    checked out with Mona before signing the contract was that

13    Kahre had a contractor's license and that he had a workmen's

14    compensation policy?

15    A.    Correct.

16    Q.    Okay.  And what proof did you see of the workmen's

17    compensation policy?  Did you ever see any type of -- do you

18    know who he had a policy with?  Did he ever tell you anything

19    about that?

20    A.    No.  That was left up to Mona --

21    Q.    Okay.

22    A.    -- to make sure that was all correct.

23    Q.    Okay.  So you trusted Mona just to ensure that he had a

24    workmen's compensation policy?

25    A.    Certificate, yes.

1   Q.   Okay.

2   A.   Correct.

3   Q.   And you never saw any evidence of one.

4   A.   No.

5   Q.   Now, did you inform Jim Rhodes about entering into the

6   contract with Kahre?

7   A.   No, I did not.

8   Q.   Okay.  And that was within your responsibility that you

9   could go ahead on behalf of Bravo and enter into --

10  A.   Yes.

11  Q.   -- an agreement.

12  A.   Yeah.

13  Q.   Okay.

14  A.   To supply labor.

15  Q.   So it appears that what you're saying today is one of the

16  main reasons you wanted to enter into this contract was that so

17  Bravo would not have to check the immigration status of its

18  workers, the piecemeal workers, anymore; is that correct?

19  A.   That and the flow of new employees coming into the system

20  and -- and it was just -- it was just overwhelming.

21  Q.   Okay.  And before the agreement with Robert Kahre, Bravo

22  would provide all the materials for the pieceworkers to utilize

23  at the work site to perform their jobs; is that correct?

24  A.   Yeah.  Typically a framing company buys all the material,

25  the lumbar, the trusses, the hardware, and then the workers

1    just supply the tools to be able to build the homes.

2    Q.    Okay.  And then it was the same after the agreement with

3    Robert Kahre.  Bravo provided the lumbar, the trusses, and the

4    hardware; is that --

5    A.    Correct.

6    Q.    -- correct?

7    A.    Correct.

8    Q.    Okay.  Okay.  And you stated that when you were approving

9    the amounts in Exhibit 3 there, that you were approving that

10   those workers actually did the work at Bravo work site?

11   A.    Not the workers.  I was approving -- I approved the -- the

12   total turned in by each crew leader from Union Pacific.

13   Q.    Okay.  So you're approving the fact that all that piecemeal

14   work had been done at a Bravo work site.

15   A.    The -- the total amount matched the master -- the master

16   sheet they turned into me, yes.

17   Q.    Okay.  So before the contract -- is it safe to say that

18   before the contract and after the contract with Robert Kahre,

19   you weren't actually concerned with how much each worker made,

20   each piecemeal worker was making, you were just concerned

21   whether or not they had performed their work at the Bravo work

22   site; it that correct?

23   A.    Correct.

24   Q.    Okay.

25   A.    The total, yes.

1    Q.    Now, did you leave it up to Mona Wilcox to check out the

2    burden to make sure that was correct?

3    A.    That the percentage was correct?  Yeah.  And I'd also check

4    it, too.

5    Q.    Okay.

6    A.    I would check it, too.  Yeah.

7    Q.    And Mona Wilcox was the one who was in charge of creating a

8    check that would be sent over to UPC; is that correct?

9    A.    Correct.

10   Q.    Okay.  And that money in that check then would be used to

11   pay the crew performing the piecemeal work at the Bravo work

12   sites; is that correct?

13   A.    That it was proposed to do.  Yes.

14   Q.    Okay.  Now, did you ever personally go -- or did you ever

15   personally check to see how the workers, the piecemeal workers,

16   were being paid by Robert Kahre?

17   A.    No.

18   Q.    Okay.

19   A.    That was --

20   Q.    And did you ever ask Smiley, Andreas, or Joaquin how their

21   crews were being paid under Robert Kahre's payroll system?

22   A.    No.  I -- I -- I assumed it was the same, typically, how we

23   did it at Bravo.

24   Q.    Okay.  I think in your direct testimony you said you heard

25   pieces and parts over the years about gold and silver.  Can you

1    elaborate a little on that.

2    A.    Well, after all this went down, you know, I -- I -- I heard

3    different things about it --

4    Q.    Okay.

5    A.    -- from other --

6    Q.    So was that --

7    A.    -- from people.

8    Q.    -- before -- I mean, was that after you had already

9    terminated the contract or before?

10    A.    After.  After.  Yeah.  I tried to find out what was going

11    on.

12    Q.    Okay.  Can you tell me did Mona Wilcox work at Bravo

13    continuously while you were employed at Bravo?

14    A.    Yes.

15    Q.    And when did she actually leave Bravo, do you know?

16    A.    Well, she was -- I -- I want to say she was terminated like

17    2003, 2004.  Shortly after.

18    Q.    Okay.  And why was she terminated?

19    A.    There was money missing.  I'm not sure the whole -- what

20    all came of that, but there was -- there was some money missing

21    in -- in the accounts --

22    Q.    Okay.

23    A.    -- and/or she was abusing our charge accounts, our supply

24    accounts.

25    Q.    Okay.  And do you know who --

1    A.    (Indiscernible).

2    Q.    -- terminated her employment?

3    A.    Jim Rhodes.

4    Q.    Jim Rhodes did.

5    A.    Yeah.

6    Q.    Okay.  Did he ever speak with you about that?

7    A.    No.

8    Q.    Okay.  So isn't it true that you then terminated the

9    agreement with Robert Kahre because Jim Rhodes told you to shut

10   it down after he had heard about Kahre's tax problems?

11   A.    Correct.

12   Q.    Okay.  How often did Jim Rhodes come to the Bravo work site

13   or I guess your main office at Bravo?

14   A.    The Bravo main office he would probably come once or twice

15   every couple weeks, but he was always out on the job sites.

16   Q.    Okay.  But he pretty much let you manage on a day-to-day

17   basis the Bravo framing business?

18   A.    Correct.

19   Q.    Okay.  How often in a day would you talk to Mr. Rhodes?

20   A.    Probably average of at least once, one time a day.

21   Q.    Okay.  But you --

22   A.    Sometimes more.

23   Q.    -- never did tell him that you -- after you entered into

24   this contract with Robert Kahre, you did not tell him right

25   away about this contract?

1    A.    Well, no.  I mean, I said that we had -- I mean, we spoke

2    to him about that we had contracted labor.  But as far as with

3    who and -- and anything else, he -- he wasn't really concerned.

4    Q.    Okay.  Now, isn't it true that in 2002 at the request of

5    Jim Rhodes, you allowed your name to be used by Rhodes for a

6    contribution to Harry Reid's campaign committee?

7    A.    Yes.

8    Q.    Okay.  But isn't it true that you actually did not make

9    that contribution?  Jim Rhodes made it for you.

10    A.    Correct.

11    Q.    Okay.  And isn't it true that in 2002 at the request of

12    Jim Rhodes you allowed your name to be used by Rhodes for a

13    contribution to Dario Herrera's (phonetic) campaign committee?

14    A.    Yes.

15    Q.    Okay.  But you actually never made a contribution to that

16    campaign committee.

17    A.    I did.

18    Q.    And Jim Rhodes gave you the funds to make that

19    contribution?

20    A.    Yes.

21    Q.    Okay.  And isn't it true that Rhodes was cited with a

22    violation of the Federal Election Campaign Act for those?

23    A.    I don't know anything about that.

24         MS. LOWE:  Okay.  Thank you.

25         THE WITNESS:  All right.  You're welcome.

1            THE COURT:  Okay.

2        Redirect.

3            MR. QURESHI:  No redirect, your Honor.

4            THE COURT:  Did the contract -- let's look, for

5    example, at page 3 of Exhibit 3.  Did you have any way of

6    knowing whether, for example, Miguel Gebberez (phonetic)

7    actually worked?

8            THE WITNESS:  Worked for?

9            THE COURT:  Did work on the job.

10           THE WITNESS:  I wouldn't -- no.  I wouldn't know

11   that.

12           THE COURT:  Okay.  And did the contract provide that

13   the moneys were to be paid to UP in order to pay their

14   employees or reimbursement for paying -- let me rephrase that.

15       Did the contract provide that the money was to be paid to

16   UP in order to pay the people who were listed on the sheets or

17   as reimbursement for payment of those people on the sheets?

18           THE WITNESS:  To pay them.

19           THE COURT:  To pay them.  Okay.  Thanks.

20       Any questions in response to mine?

21           MS. LOWE:  Actually, I have one, your Honor.

22           THE COURT:  All right.

23                   CROSS-EXAMINATION (Cont.)

24   BY MS. LOWE:

25   Q.   I think previously when I asked you some questions, you

1    didn't know the specific terms of the contract, did you?  You

2    said that Mona Wilcox was the one who negotiated the terms of

3    the contract.

4    A.    Yeah.  But the -- the original terms were to be for

5    Union Pacific to supply labor and to be licensed properly and

6    have the proper workmen's comp.

7    Q.    Okay.  So that's the extent of the terms that you knew for

8    the contract?

9    A.    Correct.

10   Q.    Is that correct?

11   A.    Yes.

12   Q.    So you didn't know specifically if the contract had a

13   provision that the Judge told you about?

14   A.    No.

15            MS. LOWE:  Okay.  Thank you.

16            THE COURT:  Okay.

17        Any questions?  No?

18            MR. QURESHI:  Nothing, your Honor.

19            THE COURT:  All right.  You're excused.

20            THE WITNESS:  All right.  Thank you.

21            THE COURT:  Thank you.

22        Any other witnesses?

23            MR. QURESHI:  Your Honor, we have one more, and it

24   will be I think significantly shorter.

25            THE COURT:  Okay.

143

```
 1              MR. QURESHI:  So if I may proceed, we'd call --
 2              THE COURT:  Yes.
 3              MR. QURESHI:  -- Mr. Jim Bevan.
 4              THE CLERK:  Please just step around here.  Remain
 5     standing and raise your right hand, please.
 6     Thereupon --
 7                         JAMES ARTHUR BEVAN
 8     was called as a witness by the Debtor, and having been first
 9     duly sworn, testified as follows:
10              THE WITNESS:  I do.
11              THE CLERK:  Please state your name and spell it for
12     the record.
13              THE WITNESS:  James Arthur Bevan,
14     J-a-m-e-s A-r-t-h-u-r B-e-v-a-n.
15              THE CLERK:  Thank you.  Please be seated.
16              MR. QURESHI:  Mr. Bevan, good afternoon.
17                         DIRECT EXAMINATION
18      BY MR. QURESHI:
19     Q.   Sir, where do you live?
20     A.   I live in Las Vegas.
21     Q.   Okay.  And by whom are you presently employed?
22     A.   I'm an independent contractor right now.
23     Q.   Okay.  And in what line of business do you work?
24     A.   Accounting and finance.
25     Q.   Okay.  And have you been present in the courtroom
```

1   throughout today's proceedings?

2   A.   Yes, I have.

3   Q.   Okay.  So you know that we're focused in these proceedings

4   on the time frame between 2000 and 2003.  So just to speed

5   things along a little bit, can you tell the Court by whom you

6   were employed during that time frame, 2000 to 2003.

7   A.   I was the chief financial officer, secretary, and treasurer

8   for Rhodes Homes.

9   Q.   Okay.

10  A.   Rhodes Design and Development Company was the actual

11  corporate name.

12  Q.   Okay.  And at that time, what relationship did Rhodes Homes

13  have with Bravo?

14  A.   Bravo Rhodes Framing was, in fact, a subcontractor -- I

15  mean, a subsidiary of ours.

16  Q.   Okay.  And in your capacity as chief financial officer of

17  all of the Rhodes companies if you will, can you describe for

18  the Court what responsibilities, if any, you had with respect

19  to Bravo.

20  A.   I was a check signer for their accounts payable.  I was

21  also a check signer on all of their payroll.  In fact, the way

22  the system was set up was that we had one signator from the

23  corporate office which was Rhodes Homes and one signature from

24  the Bravo side, Rhodes Framing.  And I would review the

25  accounts payable before signing, and I would also review their

1    payroll and sign the checks.

2    Q.    Okay.

3    A.    Generally speaking, I would be the one that would sign the

4    checks.

5    Q.    Okay.  And based on your understanding given the

6    responsibilities you've testified to as CFO, can you describe

7    Bravo's payroll process.

8    A.    It would be the same process that we would have -- that

9    they would have to use.  They would have to use the same

10   process that Rhodes Design and Development Corporation set up

11   which was to bring an invoice -- bring the individual employee

12   invoice in in some fashion.

13       In this case, I've heard testimony that it was brought

14   on -- on -- by the foremen, and that it be reviewed and input

15   into the -- into the system by a clerk, payroll clerk, which

16   Pam was, and a check would be then issued on a weekly basis.

17   Q.    And who would figure out what deductions would need to be

18   made from the check?

19   A.    The payroll clerk would be.

20   Q.    Okay.  And was there some kind of software that was used to

21   process all of these checks?

22   A.    Yes.  They had a payroll system.

23   Q.    Okay.  Did you have any oversight authority over

24   Mr. Griffith while he was the general manager at Bravo and you

25   were the CFO of Rhodes?

1    A.    In -- in an indirect way, yes.  Because Jim Rhodes was not

2    always accessible and I was next basically in line, Dean and I

3    would talk if he couldn't get ahold of Jim --

4    Q.    Okay.

5    A.    -- or if I saw something in particular that was concerning

6    or we were talking about different things.  We would talk

7    occasionally.

8    Q.    Okay.  And as chief financial officer of the Rhodes

9    enterprise, did you have an understanding of what authority, if

10   any, Dean had -- Dean Griffith that is -- to enter into

11   contracts on behalf of Bravo?

12   A.    Yes.

13   Q.    And what was --

14   A.    And he was allowed to enter into contracts for purchase --

15   for purchasing different framing wood and things of that nature

16   and also for his employees, hiring his employees.

17   Q.    Okay.  And you've heard Mr. Griffith's testimony that he

18   entered into a contract with Union Pacific to provide labor.

19   From your perspective as CFO, was that something that was

20   within the scope of Mr. Griffith's authority as the manager of

21   Bravo?

22   A.    Yes.

23   Q.    Okay.  Now, let's talk about the contract with

24   Union Pacific.  Did there come a point, sir, where you

25   became aware of Bravo having entered into a contract with

1   Union Pacific for UPC to provide labor?

2   A.   Yes.  We would have done the same thing with every

3   contract.  It was a standard format that the first payment to

4   that -- to any subcontractor, that the contract had to come

5   with the actual -- with the invoice and all of the lien

6   releases and the check for my viewing and signature.

7   Q.   So as CFO of Rhodes, did you have to sign the checks that

8   were going from Bravo to Union Pacific?

9   A.   I did.  I was one of three.  Jim Rhodes, myself, or

10  Nadine Judicessi (phonetic), but it almost always deferred to

11  me.

12  Q.   Okay.  And was there a second signature required from

13  somebody at Bravo?

14  A.   Yes.

15  Q.   And do you know who the people were that had signing

16  authority at Bravo?

17  A.   Dean Griffith and Mona -- and Mona Wilcox.

18  Q.   Okay.  So one of Dean or Mona would need to sign the check?

19  A.   Yes.

20  Q.   And then on Rhodes' side, it would be one of you, Jim

21  Rhodes -- or I'm sorry -- Nadine --

22  A.   Nadine Judicessi.

23  Q.   And what was Ms. Judicessi's --

24  A.   She was --

25  Q.   -- position?

1   A.    -- my controller.

2   Q.    Okay.  Can you explain again as part of that check-signing

3   process how you came to learn that a signed contracted existed

4   between Bravo and Union Pacific.

5   A.    The first time that the check would be issued to any

6   subcontractor working on any job if they were a new

7   subcontractor or -- or it was a job even, either/or, that --

8   that invoice along with -- approved invoice, along with the

9   check and the lien releases and the first -- or that contract

10  would come along to -- for my review.

11  Q.    Okay.

12  A.    That's how I would know they were on the job for the first

13  time.

14  Q.    And why would you have to review that contract?

15  A.    Just for my own benefit.  I'd like to know, you know, who

16  we're working on our jobs with and -- and what the contract

17  looked like, and I'd review it.

18  Q.    Okay.  And would you ever sign a check for the first time

19  to a subcontractor without verifying the existence of a

20  contract?

21  A.    No, I would not.

22  Q.    And why --

23  A.    I would --

24  Q.    -- not?

25  A.    -- ask for the -- I'd ask them to fax me a copy of it or

```
 1   point out the fact that they missed and -- and go from there.
 2   Q.   Okay.  And do you have any understanding of the specifics
 3   of the contract between Bravo and Union Pacific?
 4   A.   Other than what I've heard today, no.
 5   Q.   Okay.  Did you ever meet Mr. Kahre --
 6   A.   No.
 7   Q.   -- Robert Kahre?  No?  Okay.
 8   A.   Not that I know of.
 9   Q.   Okay.  And how did you first come to hear of Mr. Kahre?
10   A.   It's my recollection that the controller, Mona, who did
11   work for me in an indirect fashion --
12   Q.   Mona Wilcox?
13   A.   Mona Wilcox --
14   Q.   Okay.
15   A.   -- brought to my attention the idea that he -- he -- this
16   Robert Kahre for Union Pacific wanted to be compensated on a
17   weekly, monthly basis as invoices were turned into us under the
18   gold standard, and I said absolutely not.
19   Q.   And what did you understand Mona to mean by that, under the
20   gold standard?
21   A.   That we would actually have to go out and -- and acquire
22   gold or silver to compensate.
23   Q.   To compensate Union Pacific for --
24   A.   Correct.
25   Q.   -- for what?
```

1    A.   For his -- for the work that he had done on our job site.

2    Q.   And did you have an understanding of why Mona was coming to

3    you with this proposal?

4    A.   No.  Other than it was deviation from standard general

5    rules.  We -- we had a standard rule as far as how everything

6    was paid and when they were paid and, you know, 30-day payment

7    upon invoice and that type of thing.

8    Q.   Okay.  And did you become aware of why Bravo terminated its

9    relationship with Union Pacific?

10   A.   Yes.  Ron Gillette (phonetic), our corporate counsel,

11   brought to my attention the -- and I couldn't really remember

12   exactly what, but I began to think about it.

13        He -- he came to Jim and I together and told us about

14   the -- the situation, and we also read it in the paper at that

15   particular point, decided -- and Jim decided that that wasn't

16   what we wanted to be in.  I did the same.  So contacted Mona to

17   let her know that we were going to go ahead and terminate.

18   Q.   Okay.  You've said that you've been in the courtroom

19   throughout today's proceedings, so you've heard the suggestion

20   that Bravo hired UPC only to provide payroll services.

21        Sir, based on your position as the chief financial officer

22   of Rhodes, can you please tell this Court whether you think

23   that would have been possible.

24   A.   No, it would not have.  There was -- we -- I was signing on

25   a weekly basis 400 checks a week, and that's one of the reasons

1    that both Nadine and Jim Rhodes vacated that opportunity to

2    sign checks because it was such a burden to take those checks,

3    and I had to take them home every Wednesday or Thursday night

4    when I got them.

5        And it would literally take me two to three hours to

6    approve every one of those checks before I signed them and then

7    sign them all, and it was a huge undertaking, and so no.  That

8    would not have happened.

9    Q.   Okay.  And why wouldn't it have made sense for Bravo to

10   outsource just payroll?

11   A.   Well, because all 400 checks would have been gone, and I

12   wouldn't have had to sign anymore checks, and I that would have

13   become a very noticeable challenge to all of us.

14   Q.   Okay.

15   A.   We would have had no -- we would have (indiscernible) about

16   that.

17   Q.   Okay.  Lastly, Mr. Bevan, in 2006, did you enter into

18   I think it's called a conciliation agreement with the Federal

19   Elections Commission?

20   A.   Yes.

21   Q.   Can you please tell the Court --

22   A.   What happened --

23   Q.   -- what that's about.

24   A.   In 2002, Senator Reid came in with a councilman or a

25   proposed councilman.  I don't believe that he was a councilman

1    at the time.  I didn't know of him anyway.  And they came in

2    and met with Jim Rhodes.

3        And shortly thereafter while they were still here in the

4    office, Jim Rhodes came into my office with an envelope, just a

5    standard not a brand-new envelope, but a standard just ripped

6    out envelope off his desk more than likely that had eight to

7    ten people on it, listed on it.

8        And he said I want you to go to my personal accounts and

9    get -- I can't remember the exact amount, but it was like

10   $1,000 per individual or $2,000 per couple, and he was -- we

11   were to get all this cash and then go to those individuals and

12   ask them to -- to -- to receive this money as a gift from Jim

13   Rhodes, and that he -- then they were to give or write a check

14   for those two particular people back.

15   Q.   And was your name one of the eight names?

16   A.   Yes, it was.

17   Q.   And did you do that?

18   A.   Yes.

19   Q.   And what happened as a result?

20   A.   We found out that it was illegal, not illegal.  It was

21   against the -- the Commission's regulatory position as far as

22   that goes.  And so they went after Jim Rhodes, and then they --

23   they came after Nadine and I because we were the check signers.

24   Q.   Okay.  And what happened to you as a result?

25   A.   Jim arranged for counsel for me and we conceded, and he

 1   paid a fine for us.

 2              MR. QURESHI:  Okay.  All right.  That's all I have.

 3   Thank you.

 4              THE COURT:  Okay.

 5        Redirect (sic).  I mean, sorry.  Cross.  Excuse me.

 6              MS. SULLIVAN:  Thank you, your Honor.

 7        Good afternoon.

 8              THE WITNESS:  Hi.

 9              MS. SULLIVAN:  I'm Kaycee Sullivan for the

10   United States.

11                        CROSS-EXAMINATION

12    BY MS. SULLIVAN:

13   Q.   Jim Rhodes is a good friend of yours, isn't he?

14   A.   Yes, he is.

15   Q.   In fact, you testified at your deposition that you talk to

16   him every couple weeks, don't you?

17   A.   Depending on when he'd call, yeah.

18   Q.   And your currently consulting for Harmony Choice which

19   is --

20   A.   Yes, I am.

21   Q.   -- a company affiliated with Jim Rhodes?

22   A.   Yes.

23   Q.   And isn't it true that the reorganized debtors are

24   personally representing you in this case?

25   A.   Yes.

154

1  Q.   The attorneys -- excuse me -- for the reorganized debtors.

2  A.   These two attorneys are.  Yes.

3  Q.   Okay.  But you're not paying them, are you?

4  A.   No.

5  Q.   So you worked you testified for -- just to narrow the time

6  frame.  You worked as CFO from Bravo during the 2000 to 2003

7  period, correct?

8  A.   That is correct.

9  Q.   Okay.  And isn't it true that Jim Rhodes was the president

10  of Bravo during that time?

11  A.   I believe that is correct.  Yes.

12  Q.   And wasn't he also the sole director of Bravo, Inc.?

13  A.   I don't believe that's the case.  I think that we had three

14  directors, and I believe I was one of them as well.

15  Q.   Okay.  Who would the third director have been then?

16  A.   Excellent question.  I'm not sure.  I -- I believe

17  Ron Gillette, but I'm not positive of that.

18  Q.   Okay.  But Bravo, Inc., was a subsidiary of Rhodes Homes,

19  correct?

20  A.   Yes, it was.

21  Q.   Okay.  And Dean Griffith was the general manager of Bravo

22  while you were the CFO?

23  A.   Yes.

24  Q.   And was that for the entire time that you were CFO?

25  A.   Yes.

1    Q.    And Mona Wilcox was the controller for some of the time

2    that you were CFO?

3    A.    Correct.

4    Q.    Okay.  And you previously testified that you had signature

5    authority for Bravo.

6    A.    Yes.

7    Q.    Okay.  And the other signers were Jim Rhodes, Mona Wilcox,

8    and Nadine Guiseppe (sic).

9    A.    Judicessi.

10    Q.    Judicessi.  Sorry.

11    A.    And it was a -- it was a -- one side -- one of their side

12    and one from our side being that we were in the corporate side

13    of this.  So either Dean or Mona signed, and then we would

14    sign, one of us, Jim, myself, or -- or Nadine would sign from

15    the other side.

16    Q.    Okay.  But effectively you had to sign all the payroll

17    checks as the --

18    A.    Unfortunately --

19    Q.    -- representation.

20    A.    -- yes.

21    Q.    Okay.  For Rhodes Homes.  And you testified at your

22    deposition that in 2000 you went to Bravo's offices to sign the

23    checks, right?

24    A.    Not every time.  It would depend on what was going under

25    the circumstances.  Unfortunately because of that many

1    employees, they -- there'd be oftentimes that they couldn't get

2    the checks out fast enough, and so I would do it to accommodate

3    them.  For the most part they -- they had to transport the

4    checks over to us --

5    Q.    Okay.  So --

6    A.    -- and then I would sign that way.

7    Q.    So they would send a runner to bring the checks?

8    A.    Correct.

9    Q.    Okay.  But as you testified there were two signatures

10   required for each of those checks?

11   A.    That is correct.

12   Q.    Okay.  You testified that Jim Rhodes and Nadine Judicessi

13   only signed checks on rare occasions; is that correct?

14   A.    That is correct.

15   Q.    In fact, you testified that Jim Rhodes was rarely

16   available, correct?

17   A.    Yes.

18   Q.    So much so that you effectively became Dean Griffith's

19   manager when Jim Rhodes wasn't available to him, correct?

20   A.    That's true.

21   Q.    But Jim Rhodes essentially let Dean Griffith run Bravo,

22   correct?

23   A.    Yes.

24   Q.    And if Dean had a question, he might consult with you if he

25   couldn't get ahold of Jim Rhodes, correct?

1    A.    Correct.

2    Q.    Okay.  And Dean Griffith had the authority to sign

3    contracts for Bravo without talking to Jim Rhodes, correct?

4    A.    Correct.

5    Q.    And you were aware that Bravo entered into a contract with

6    Robert Kahre?

7    A.    Yes.  Well, no.  They entered into a contract with

8    Union Pacific.

9    Q.    Okay.  And you were aware that Robert Kahre was the owner

10    of Union Pacific?

11    A.    I wasn't, but I am now.

12    Q.    I see.  And you were in favor of that contract, correct?

13    A.    No, not necessarily.  No.  I wouldn't have had any actual

14    say on the contract itself.

15    Q.    Okay.  But it would have been the type of contract that you

16    would have reviewed?

17    A.    Yes.  I would have seen it.

18    Q.    But you don't actually recall seeing this specific

19    contract, do you?

20    A.    Not at this moment, no.

21    Q.    Okay.  And you don't actually know what any of the terms of

22    the contract were, do you?

23    A.    No.  But they would have to have get me -- they would have

24    had to have brought me the contract as part of the first

25    payment.  That's the way the rules were.

158

1    Q.    Okay.  But you don't actually recall that happening in this

2    instance?

3    A.    No.

4    Q.    Okay.  You relied on Dean Griffith and Mona Wilcox to

5    handle that contract?

6    A.    All contracts.

7    Q.    Okay.  And Mona Wilcox told you that Robert Kahre wanted to

8    be paid in gold, correct?

9    A.    Yes.  Well, Union Pacific wanted to be paid in gold.

10   Q.    Okay.  And you entered into that contract anyway, correct?

11   A.    Not paying it that way.  No.

12   Q.    Okay.  But that didn't raise a red flag for you?

13   A.    No.  They wanted to be compensated that particular way.  We

14   said absolutely not.

15   Q.    Okay.  And Bravo maintained a relationship with

16   Union Pacific from 2000 into 2003, correct?

17   A.    Yes.

18   Q.    But you weren't really involved in the particulars of that

19   arrangement, correct?

20   A.    Correct.

21   Q.    You don't really have any personal knowledge about that

22   arrangement, do you?

23   A.    No.

24   Q.    You were involved in the decision to fire Mona Wilcox,

25   though, weren't you?

1    A.    Yes.

2    Q.    And you fired her for embezzling, correct?

3    A.    Correct.

4    Q.    And at some point in 2003, Bravo terminated its

5    relationship with Union Pacific and Robert Kahre, correct?

6    A.    That is correct.

7    Q.    And in your deposition you had testified that Dean Griffith

8    made the decision to terminate that relationship, but you

9    couldn't really remember why.

10   A.    I don't believe that's the way it was stated.  No.

11   Q.    Okay.  Can I have you take a look --

12   A.    Please. --

13   Q.    -- at it?  Great.  If you'll take a look at page 40.

14         (Colloquy not on the record.)

15              MS. SULLIVAN:  Your Honor, may I approach the

16   witness?

17              THE COURT:  Yes.

18              MS. SULLIVAN:  Your Honor, here's a copy for you as

19   well.

20              THE COURT:  All right.  Pass it to the clerk there.

21   It's easier.

22              MS. SULLIVAN:  Okay.

23         (Colloquy not on the record.)

24              THE COURT:  Thanks.

25         (Colloquy not on the record.)

160

1          MS. SULLIVAN:  Okay.  If everyone can please take a

2     look at page 40.

3          THE WITNESS:  Okay.

4      BY MS. SULLIVAN:

5     Q.   The question at line 6 is, "Okay.  And then do you know

6     when Bravo's relationship with Robert Kahre or his company was

7     terminated?"

8          Answer, "You know it's fuzzy.  I remember generally either

9     Dean or someone within Bravo coming to me.  He was getting a

10    lot of press, and there was a lot of different issues, and I

11    think at some point with Dean we determined that his

12    relationship should be terminated, but I can't remember the

13    exact conversation or the exact time frame."

14    A.   And I thought about it afterwards and realized that it was

15    Ron Gillette, our corporate counsel, that brought it to my

16    attention and to Jim Rhodes' attention.

17    Q.   Okay.

18    A.   So I did notice that.  You're correct.  I didn't remember

19    saying it quite that way, but yes.  That's how it came about.

20    Q.   Okay.  Thank you.  Prior to today, you didn't remember

21    actually having a specific conversation with Jim Rhodes,

22    correct?

23    A.   That's what I -- I realized that when I read this on

24    Friday that that was -- that -- that that was incorrect

25    (indiscernible) and that it had actually come from

1    Ron Gillette.

2    Q.    Okay.  And when you read your deposition transcript, is

3    that what you're saying?

4    A.    Yes.

5    Q.    Okay.  So your attorneys provided a copy of it to you for

6    you to review?

7    A.    Correct.

8    Q.    Okay.  You signed employment tax forms for Bravo, didn't

9    you?

10    A.    The 941s, are you referring to?

11    Q.    Yes.

12    A.    I -- I believe I did.  I -- I'm not positive of that.  I

13    believe I did see them, though, and sign them.  I know I did

14    for Rhodes Homes, and I'm pretty sure I did for then, too.

15    Q.    Okay.  But you had previously testified that you pretty

16    much just signed the forms that someone at Bravo had prepared,

17    someone like Mona Wilcox, for example?

18    A.    I would look it over briefly, but yes.  I pretty much

19    signed what they gave me.

20    Q.    Okay.  But you didn't specifically prepare the forms?

21    A.    No.

22    Q.    Okay.  And when you say you looked it over, you didn't

23    really have any information to evaluate the content of those

24    forms, did you?

25    A.    You would because the -- the 941 would have as -- as a

1    supplement would have a listing of the employee and the amount

2    that they made.

3         And you could look it over briefly and figure out, well,

4    if somebody made $50,000 in one quarter, something is wrong

5    because these are field people and they don't make that kind of

6    money.  So that's what I'd be looking for would be general

7    oddities.

8    Q.   Okay.  So just kind of a broad overview that everything

9    looked correct to you?

10   A.   Yes.

11   Q.   Okay.  And on direct you testified that you had a little

12   trouble with the Federal Election Commission because of

13   something that Jim Rhodes asked you to do, correct?

14   A.   Correct.

15   Q.   Okay.  Jim Rhodes asked you to make political

16   contributions to these campaign committees and then he or the

17   company would -- using money that he or the company gave to

18   you, correct?

19   A.   What -- what is quite -- just the -- actually the opposite.

20   He was to gift us money, and then we were to give it back to

21   those two, so that's exactly how it happened.

22   Q.   Okay.  And Jim Rhodes got eight of his staff members

23   including you and Dean Griffith to do this, correct?

24   A.   That is correct.

25   Q.   And you did that willingly, correct?

1    A.    Yes.

2    Q.    And Mona Wilcox was also one of those staff members,

3    correct?

4    A.    That I can't tell you.  I don't know.  I don't remember.

5    Q.    Okay.  Well, I have a printout from the press release about

6    it, so I can tell you that that is correct.

7    A.    Okay.

8    Q.    It's not important enough to really make you read it into

9    the record.  But the Federal Election Commission did issue a

10   fine for this, didn't they?

11   A.    Yes.

12   Q.    And that was a $5500 penalty?

13   A.    I don't know how much it was because I never saw that.

14   Q.    Okay.  Well, I'm happy to give you a copy of this.  Just

15   take a look at this, please.

16           THE COURT:  Just mark it and --

17    BY MS. SULLIVAN:

18   Q.    I've just given you a press release from the Federal

19   Election Commission.  Have you ever seen that before?

20   A.    No.

21   Q.    I'll give you a moment to look it over.

22           THE COURT:  Sorry.  Are you moving to admit this?

23   You're not, are you?

24           MS. SULLIVAN:  No, your Honor.

25           THE COURT:  Oh, okay.  Sorry.

1          So you don't need to mark it.

2                THE CLERK:  No?

3                MS. SULLIVAN:  Just let me know when you're done.

4                THE WITNESS:  Okay.

5     BY MS. SULLIVAN:

6     Q.   So does that refresh your recollection that you issued a

7     $5500 --

8     A.   No.

9     Q.   -- penalty?

10    A.   It does not.

11    Q.   It does not.

12    A.   Jim Rhodes pay the -- whatever fine there was as far as

13    that goes, and it came right out of one of his accounts.

14    Q.   According to the press release, it says that the company

15    was responsible for $148,000 of the penalty and that you and

16    Ms. Judicessi were each responsible for $5500.

17    A.   We were not.

18    Q.   Mr. Rhodes paid that penalty for you?

19    A.   Correct.

20    Q.   I see.  And if you look at the second page, it lists a

21    number of people involved with this including Mr. Griffith and

22    Ms. Wilcox, correct?

23    A.   Yes.

24                MS. SULLIVAN:  Thank you.  No further questions.

25                THE COURT:  All right.

1    Redirect.

2            MR. QURESHI:  Very briefly, your Honor.

3                    REDIRECT EXAMINATION

4  BY MR. QURESHI:

5  Q.   Mr. Bevan, do you understand -- do you know whether Jim

6  Rhodes has any stake at all in the outcome of today's

7  proceeding?

8  A.   I -- I have no idea.  No, I don't believe -- I don't know.

9  Q.   Has Mr. Rhodes in any way tried to influence any of the

10  testimony that you've --

11  A.   No.

12  Q.   -- offered here today?

13  A.   No.

14  Q.   Have you had any conversations with Mr. Rhodes about this

15  matter?

16  A.   No.  I don't think he even knows I'm here.

17            MR. QURESHI:  Nothing further.

18            THE COURT:  All right.  You're excused.

19            THE WITNESS:  Thank you.

20            THE COURT:  Okay.  Okay.  One thing that's troubling

21  to me and not necessarily from an impeachment category is the

22  representation by the reorganized debtor of these last two

23  witnesses.  What's that about and how can the reorganized

24  debtor do that?

25            MR. QURESHI:  I'm sorry.  Why did we represent the

1  witnesses?  For the simple reason that they're former employees

2  of the company, and, therefore, to protect the attorney/client

3  privilege.  It's not unusual at all when you represent a

4  company and former employees --

5          THE COURT:  Is that part of the liquidating trust

6  that they're allowed to do that?

7          MR. QURESHI:  Is that part of?

8          THE COURT:  The trust agreement that you're allowed

9  to do that.

10          MR. QURESHI:  I'm not sure that the trust agreement

11  specifically gets into that level of detail, your Honor.  I

12  haven't looked into that.

13          THE COURT:  Well, I'm very concerned about the

14  reorganized debtor's finances being used to represent these

15  witnesses.

16          MR. QURESHI:  Well, your Honor, the reorganized

17  debtors --

18          THE COURT:  I mean, query and also why isn't there a

19  conflict?  I mean, I recognize you're calling them to testify,

20  but you've got a different hat you're wearing.

21          MR. QURESHI:  Well, two points, your Honor.  First of

22  all in terms of expense, there certainly is no additional

23  expense incurred on behalf of the reorganized debtors by the

24  representation.

25      These individuals were deposed.  We clearly would have

1    been there regardless as part of the deposition and been here

2    at the proceeding today, so there is zero incremental expense

3    being incurred by the estate as a result of that.

4          This is for no purpose, your Honor, other than to protect

5    the privilege.  These two individuals are former employees of

6    the debtor, and it is not at all unusual and we have done it

7    many, many time in many, many cases --

8                THE COURT:  You know, don't bother me about what you

9    do --

10               MR. QURESHI:  Okay.

11               THE COURT:  -- in the cases in New York, all right?

12   I'm concerned about the ethical issues, and I --

13               MR. QURESHI:  Your Honor, it was made very clear to

14   both Mr. Bevan and to Mr. Griffith that in the first instance

15   we represent the reorganized debtor, and that to the extent

16   that there were to be a conflict, we would no longer represent

17   them.  It was very clear to us that there did not seem to be

18   here any prospect of a conflict.

19         And so, again, to protect the privilege that existed at

20   the time that they were employees of the debtor which we have

21   now inherited, that is why we represented them.  But, again,

22   your Honor, there was absolutely no incremental expense to the

23   estate at all.

24               THE COURT:  Okay.  All right.  Rather than having you

25   now brief the issue of statute of limitations, what I'd rather

1    we do is focus on the core issue of liability, and I had told

2    you all I wouldn't expect you to argue today.

3                MR. QURESHI:  Right.

4                THE COURT:  So I think it's better that I have you

5    come back at some convenient time for you to do a final

6    argument.

7        It might be helpful to do proposed findings and

8    conclusions, so that I can go -- especially with the issue of

9    the initial proof of claim being valid under the state of the

10   law.  I don't want to cause a lot more expense in this case.

11               MR. QURESHI:  I was going to raise that point,

12   your Honor.  This has been -- there were many more witnesses

13   than we had anticipated.  I think the Government subpoenaed in

14   total six witnesses, four of whom came today.

15       And so I think I completely agree that we don't need to

16   get into the statute of imitations issues.  Certainly, we're

17   confident based on the record today that we can end this with

18   the initial liability.

19       What I would propose again mostly to save expense,

20   your Honor, is that rather than another round of briefing, we

21   simply come in for closing argument where we can summarize to

22   your Honor what we think the evidence shows from today.

23               THE COURT:  I think that will work, but I would like

24   proposed findings and conclusions because this may well be

25   appealed whoever wins or loses, and that way with the proposed

1   findings and conclusions, I could take one from column A, one

2   from column B or all from column A or all from column B.

3          MR. QURESHI:  That makes perfect sense, your Honor.

4   And to be clear, proposed findings and conclusions solely on

5   the issue of is Bravo the employer --

6          THE COURT:  Right.

7          MR. QURESHI:  -- of these individuals.

8          THE COURT:  Right.  We are not getting into statute

9   of limitations now.  We are not getting into --

10          MR. QURESHI:  Right.

11          THE COURT:  -- fraud at this stage.

12          MR. QURESHI:  We're not getting into fraud.  We're

13   not getting into penalties or I might add interest.  The

14   quantum of the claim if you will is not the issue.

15          THE COURT:  Correct.  Correct.

16          MR. QURESHI:  Okay.  That seems perfectly acceptable

17   and reasonable to me.

18          MS. LOWE:  That's fine, your Honor.

19          THE COURT:  Okay.  Okay.  All right.  So you tell me

20   what you'd like for your timing on that or do you want to all

21   confer and then just let my clerk know.  I could give you

22   some --

23          MR. QURESHI:  I --

24          THE COURT:  -- possible dates.

25          MR. QURESHI:  I think that'd be great.  If you could

1    give us some possible dates, and then we could --

2              THE COURT:  Okay.

3              MR. QURESHI:  -- confer.

4              THE COURT:  How about the week of May 14 or anytime

5    in June.  Not really anytime, but --

6              MR. QURESHI:  Your Honor --

7              THE COURT:  -- June is pretty open.

8              MR. QURESHI:  -- is there any possibility of doing it

9    earlier than that?

10             THE COURT:  You want it sooner?

11             MR. QURESHI:  Yeah.

12             THE COURT:  Okay.  Yeah.  We can work you in the week

13   of March 24th, so you could have -- sorry.  April 24th in the

14   afternoon or April 26th anytime --

15             MR. QURESHI:  April 24th afternoon.  April 26th --

16             THE COURT:  -- or --

17             MR. QURESHI:  Okay.

18             THE COURT:  You know I don't have to block all this

19   time out for May 1st and 2nd.  I think just the 2nd.  I think

20   I've got May 1st available.

21             MR. QURESHI:  Okay.  I think that's enough options.

22   Certainly, it is for me.

23             MS. LOWE:  Sure.  It is for me, too.

24             THE COURT:  Okay.

25             MR. QURESHI:  So we --

```
 1              MS. LOWE:  We'll --

 2              MR. QURESHI:  -- will --

 3              MS. LOWE:  -- just confer.

 4              MR. QURESHI:  -- be in touch with your clerk.

 5              THE COURT:  Okay.  And we'll just allow what, an

 6    hour?

 7              MS. LOWE:  Sure.

 8              THE COURT:  I'll allow two.

 9              MS. LOWE:  Two hours?

10              THE COURT:  I don't want to rush.

11              MR. QURESHI:  Yeah.  I think --

12              MS. LOWE:  Okay.  One --

13              MR. QURESHI:  -- two would --

14              THE COURT:  -- for each side.

15              MR. QURESHI:  -- be great.

16              THE COURT:  So great.

17              MR. QURESHI:  And would your Honor be okay with

18    demonstratives?  In other words --

19              THE COURT:  Yes.

20              MR. QURESHI:  -- a chart --

21              THE COURT:  That's fine.

22              MR. QURESHI:  -- that would -- okay.  And then,

23    lastly --

24              THE COURT:  Understanding they're merely a summary of

25    your contentions.
```

1          MR. QURESHI:  Exactly.  And we'll work out exchanging

2     those in advance --

3          THE COURT:  Yes.

4          MR. QURESHI:  -- so we aren't surprised by what we're

5     showing up with.

6          THE COURT:  Okay.

7          MR. QURESHI:  And then what is your Honor's

8     preference in terms of the timing of the proposed findings and

9     conclusions?

10          THE COURT:  Let's do those two weeks before.

11          MR. QURESHI:  Two weeks before?  And just

12     simultaneously exchange --

13          THE COURT:  Yeah.

14          MR. QURESHI:  -- of one set.  That's it.  No --

15          THE COURT:  That's fine.

16          MR. QURESHI:  -- response.

17          THE COURT:  If you could take a stab at stipulating.

18     I don't recall.  Your pretrial didn't have very many

19     stipulated.

20          MR. QURESHI:  No.

21          THE COURT:  So if you could take one more stab at

22     stipulated because I think there's some basic things that

23     everybody agrees on that it's implied in the record, but really

24     isn't in the record, so --

25          MR. QURESHI:  I think we --

1        THE COURT:  -- I'd urge you --

2        THE WITNESS:  -- we can --

3        THE COURT:  -- to do that.

4        THE WITNESS:  -- we can certainly do that.

5        THE COURT:  Okay.

6        MR. QURESHI:  Okay.

7        THE COURT:  All right.  Thank you --

8        MR. QURESHI:  Thank you --

9        THE COURT:  -- very much.

10       MR. QURESHI:  -- your Honor.

11       THE CLERK:  Thank you, your Honor.  All rise.

12    (Court concluded at 03:16:25 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

174

1         I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Jennie Ellis                        03/22/12

7    _____                _____
     Jennie Ellis, Transcriptionist            Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25