KATHRYN M. KENEALLY
Assistant Attorney General

VIRGINIA CRONAN LOWE
Trial Attorney, Tax Division
U.S. Department of Justice
P.O. Box 683 Ben Franklin Station
Washington, D.C. 20044-0683
Telephone: (202) 307-6484
email: virginiacronan.lowe@usdoj.gov

Of Counsel:
Daniel Bogden
United States Attorney

Attorneys for the United States of America

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) BK-S-09-14814 LBR |
| | ) (Jointly Administered) |
| THE RHODES COMPANIES, LLC, aka | ) Chapter 11 |
| Rhodes Homes, et al., | ) |
| | ) Trial Date: March 5, 2012 |
| Debtors. | ) Time: 9:30 a.m. |
| | ) |

UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The United States submits the following proposed Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1. On November 20, 2007, a grand jury returned a multiple-count superseding indictment in *United States v. Robert D. Kahre*, CR-S-05-121 DAE (RJJ) (D. Nevada), charging defendants Robert Kahre, Lori Kahre, and Alexander Loglia with one count of conspiracy to defraud the government for the purpose of impeding and impairing the IRS, in violation of 18 U.S.C. § 371. U. S. Exhibit 1.

2. The Kahres and Loglia were also charged with attempting to interfere with the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a). U. S. Exhibit 1.

3. In addition, Robert Kahre was charged with multiple counts of willful failure to collect and pay over employment taxes, in violation of 26 U.S.C. § 7202. In particular, Count One charged that Kahre, in violation of 18 U.S.C. § 371, "devised, marketed, promoted, directed, controlled, implemented,

8306923.1

and used a payroll scheme that concealed and disguised the true amount of income received by the individuals who were paid through the payroll scheme, which included . . . employees of the Other Contractors who used the Payroll Service." U.S. Exhibit 1, p. 6.

4. On August 14, 2009, the jury returned verdicts finding Robert and Lori Kahre guilty of conspiracy to defraud the government and of attempted interference with the internal revenue laws. In addition, Robert Kahre was found guilty of multiple counts of willful failure to collect and pay over employment taxes. On December 3, 2009, a Judgment In A Criminal Case (Dkt. No. 2615) was filed in *United States v. Robert D. Kahre*, CR-S-05-121 DAE (RJJ) (D. Nevada) which found Robert Kahre guilty on Count 1 (which is set forth above), 2-50, 51, 52-55, 56 and 59 of the 3rd Superseding Indictment. U.S. Exhibit 2.

5. On April 13, 2010, the IRS filed amended proof of claim No. 7-2 with regard to Bravo, Inc. (hereinafter "Bravo"), one of the jointly administered debtors herein. Joint Pretrial Statement, Stipulated Facts, No. 1.

6. The IRS amended proof of claim No. 7-2 included federal employment tax liabilities for the quarters ending September 30, 2000, December 31, 2000, all four calendar quarters of the years 2001 and 2001, and the quarters ending March 31, 2003 and June 30, 2003 (hereinafter "the periods at issue"). The proof of claim set forth a unsecured priority claim in the total amount of $1,326,068.11 and an unsecured general claim in the amount of $2,560,388.64. Joint Pretrial Statement, Stipulated Facts, No. 2

7. On March 31, 2011, the Reorganized Debtors filed the Objection to Claim No. 7 Filed by the Internal Revenue Service Against Debtor Bravo, Inc., Etc. Joint Pretrial Statement, Stipulated Facts, No. 3.

8. This contested matter seeks disallowance of the IRS Claim under 11 U.S.C.§ 502(b). It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Joint Pretrial Statement.

9. On March 5, 2012, an evidentiary hearing was held on the issue of whether Bravo is the employer responsible for payment of the employment taxes set forth on the amended proof of claim.

10. Bravo, Inc. was previously in the business of framing houses for the Debtors' various homebuilding operations. Joint Pretrial Statement, Stipulated Facts, No. 1.

8306923.1

11. Dean Griffith was the general manager of Bravo during the time periods applicable in this matter. Transcript of Proceedings (Tr) at 105:5-8.

12. Bravo had three types of employees: salaried, hourly and piece workers. Tr at 106:2-11.

13. The Bravo employees that received a salary were foremen, who were the individuals in charge at the Bravo work sites. Tr at 9: 23-24; 107: 6-9.

14. Bravo would have about 15-20 job sites going at one time and each job site would have a Bravo foreman in charge at that site. Tr at 131: 6-11.

15. Foremen had hourly workers working for them at the job sites who worked 40 hours per week. Tr at 106: 7-8, 12-17.

16. The majority of Bravo workers were the piece workers because they performed the bulk of the work in the framing of a house. Tr at 106: 10-11; 129:1-4.

17. Prior to the year 2000, all of the Bravo employees, salaried, hourly and piece workers, were paid by a check and employment taxes were deducted from their pay. Tr at 107: 10-15.

18. It is common in the construction industry for piece workers to work for more than one construction company at one time. Tr at 129:7-9.

19. Piece workers working for Bravo often worked for other construction companies; however, they were treated as Bravo employees, were entered into the Bravo payroll system, and received a pay check from Bravo. Tr at 11:6-16; 130: 4-11.

20. Prior to the year 2000, in order to get paid, the crew leaders for the piece workers would denote on a master sheet, that contained all the Bravo work sites by lot number and amounts for each phase of the work at each site, what work that they completed on each lot and turn that in to Dean Griffith for approval to get paid the stated amount. Tr at 106: 18-25; 130: 12-21.

21. After the crew leader's worksheet was approved by Dean Griffith, it was up to the crew leader to determine how much each member of his crew was to be paid. Tr at 107:1-3; 136: 17-23.

22. The crew leaders for the piece worker crews at Bravo were Ismael Curiel a/k/a Smiley, Andres Nunez and Joaquin Barrajas. Tr at 109: 13-19.

23. Prior to the year 2000, the Bravo foremen would contact Smiley Curiel, Andres Nunez, and Joaquin Barrajas directly to get their crews to work on the job site that they ran. Tr at 130: 22-25, 131: 1-4.

24. Prior to the year 2000, Bravo provided all the materials at the work site for the piece workers to perform their jobs such as lumber, trusses, and hardware. Tr at135:21-25.

25. As it is the common practice in the construction industry, the piece workers would provide their own tools to perform their work. Tr at 135:25, 136:1, 39: 19-25, 40: 1.

26. Early in the year 2000, there was a meeting at the Bravo offices attended by Robert Kahre, Jorge Fernandez, and Bravo employees: Dean Griffith, Mona Wilcox, James Garner, Sergio Juarez, Ismael Curiel, Andres Nunez, and Joaquin Barrajas. Tr at 40: 8-23, 41: 4-25, 60:24-25, 110: 17-25.

27. Prior to the meeting with Kahre at the Bravo offices, Dean Griffith had signed a contract with Union Pacific Construction ("UPC"), one of Robert Kahre's businesses. Tr at 111: 19-21.

28. Dean Griffith allowed Mona Wilcox to negotiate the contract with Kahre. Tr at 133: 19-25, 134:1-2.

29. Dean Griffith maintains that the contract with Kahre was for UPC to provide framing crews to Bravo and that the framing crews were the employees of UPC. Tr at 110: 17-20.

30. However, Dean Griffith's testimony about the contract with Kahre is inconsistent with the testimony of two former Bravo employees Pamela Garner and James Garner, and two former Kahre employees Jorge Fernandez and George Rodriguez, who testified that the contract was for Kahre to provide a payroll service through his company UPC. Tr at 12:1-3; 42: 10-20; 60: 3-7; 92: 14-17.

31. The only details that Dean Griffith checked out with Mona Wilcox before signing the contract with Kahre were that Kahre had a contractor's license and that he had a workman's compensation policy. Tr at 134: 11-15.

32. In fact, however, Dean Griffith never saw any evidence of Kahre's actual workman's compensation policy, he left it up to Mona Wilcox to work out the details with Kahre. Tr at 134: 16-26; 135: 1-4.

33. The contract between UPC and Bravo cannot be located. Tr at 111:2-4.

8306923.1

34. James Bevan, the CFO for Rhodes Homes, who is a personal friend of James Rhodes and currently consults with one of Rhodes' companies, testifed that although he may have reviewed the contract with Kahre, he did not actually recall seeing the contract, or any of its terms, and had no personal knowlege about the contract. Tr at 153: 13-22; 157: 18-25, 158: 1-3.

35. James Bevan testified that he relied on Mona Wilcox and Dean Griffith to negotiate all of the contracts entered into by Bravo. Tr at 158: 4-6.

36. James Rhodes, the president of Bravo, rarely visited the Bravo offices and relied on Dean Griffith to run the day to day operations at Bravo, which included entering into contracts on behalf of Bravo. Tr 107: 16-19; 135: 8-12.

37. At the meeting in Bravo offices in early 2000, Robert Kahre explained the payroll service administered by his company, UPC. Tr 42: 11-20; 60: 1-15, 24-25; 61: 1-3.

38. As understood by James Garner, who was employed by Bravo as a general foreman, the purpose of the meeting with Kahre was to inform everyone there that the piece work crews, of Ismael Curiel, Andres Nunez, and Joaquin Barrajas, would be paid through Kahre's payroll service. Tr at 42: 10-20.

39. Pamela Garner, who processed the payroll at Bravo in the year 2000, was told by Mona Wilcox, her direct supervisor, that Kahre's company UPC was going to help with some of Bravo's payroll processing. Tr at 12:1-3.

40. Jorge Fernandez, who worked at Wright Painting & Drywall, a company owned by Robert Kahre, first as a painter, then a foreman, and finally the general superintendent of the company, testified that starting in 1998, Kahre began paying him and the other employees of Wright Painting & Drywall in gold and silver coins. Tr at 56: 1-2. 22-25; 57: 1.

41. George Rodriguez, also an employee at Wright Painting & Drywall, was paid in gold and silver. Tr at 95: 5-6.

42. Under Kahre's payroll service, workers would receive their pay in gold and silver coins and after they received the coins they would have the option of cashing the coins in for "Federal Reserve

Notes" which is how Kahre described paper dollars. Tr at 7: 2-7, Exhibit 1, p. 6-9; Tr at 57: 2-13, 22-25; 58: 1-8; 95: 7-19.

43. Approximately 35 other construction companies used Kahre's payroll service. Tr at 7: 2-7, Exhibit 1, p. 5; Tr at 59: 16-22; 92: 9-13.

44. Kahre developed this payroll system to avoid paying taxes and Kahre did not pay any employment taxes to the IRS. Tr at 67: 10-12; 95: 20-24.

45. The same payroll service - payment of workers in gold and silver - was described by Kahre at the meeting held at Bravo offices. Tr at 44: 22-25; 45: 1-14; 60: 24-25; 61: 1-3.

46. Bravo was one of the companies using Kahre's payroll service through Kahre's company UPC. Tr at 60: 3-7; 92: 14-17.

47. UPC did not provide any workers to Bravo; the workers being paid through Kahre's payroll service were the same workers that were receiving paychecks from Bravo the day before the contract with Kahre. Tr at 39: 9-13; 88: 7-8; 113: 12-15; 130: 4-11.

48. After Bravo entered into the contract with Kahre, the process used to pay the piece workers was exactly the same as it was before entering into the contract with Kahre. Tr at 133: 10-12. Each week, the piece work crew leaders would denote on a master sheet all the work that they performed at Bravo work sites for which they should be paid and they would turn this in to Dean Griffith for approval. Tr 132: 23-25; 133: 1-9.

49. After Dean Griffith approved the piece work that was completed and the dollar amount associated with that piece work, the approved work sheet was given to Pamela Garner to prepare a list of the piece work crews and how much each crew was to be paid, such as the list on page 86 of U.S. Exhibit 3. Tr at 16: 21-25; 17: 1-8; 114: 23-25; 115:1-16.

50. Just as before the contract was entered into with Kahre, Dean Griffith left it up to the crew leaders Smiley, Andres and Joaquin as to how much each worker on their crews would be paid. Tr at 136: 13-25.

51. Once the weekly list of how much each of the piece work crews was to be paid was approved by Dean Griffith, it was faxed over to UPC. Tr at 17: 9-14.

8306923.1

52. UPC would then send an invoice to Bravo which included a total amount to be paid which consisted of a subtotal for the amount the workers were to be paid and another amount for the burden to be paid by Bravo. Tr at 67: 3-9; 122: 19-25.

53. The burden is what Kahre charged Bravo and the other construction companies for his payroll service. Tr at 67: 6-9; 122: 17-25.

54. Bravo would then draft a check to UPC for the amount of the invoice and the money from the Bravo check was used to pay the crews performing the piece work at the Bravo work sites. Tr at 137: 7-13.

55. The piece work crew leaders, Smiley Curiel, Andres Nunez, and Joaquin Barrajas would then go to the UPC warehouse to pick up the pay for the workers on their crews. The crew leaders were given the full amount of pay for their crew in gold and silver at one window and then they would take the gold and silver to another window to turn it in for cash to distribute to each worker on their crew. Tr at 63: 19-25; 64: 1-11.

56. After Bravo entered into the contract with Kahre, Bravo foremen would still contact the piece work crews leaders, Smiley Curiel, Andres Nunez and Joaquin Barrajas, directly about what work needed to be done at Bravo work sites. Tr 131: 12-25; 132: 1-21.

57. After Bravo entered into the contract with Kahre, the piece work crews were still being supervised at Bravo work sites by Bravo foremen. Tr at 65: 9-15

58. Just as before Bravo entered into the contract with Kahre, Bravo provided all the materials such as lumber, trusses and hardware for the piece work crews to utilize at the Bravo work sites. Tr at 136: 2-7.

59. Instead of having a worker's compensation insurance policy as part of his payroll system, Kahre made agreements with local hospitals to treat workers being paid through his payroll system on a cash basis. Tr at 65: 19-25; 66: 1-20.

60. Kahre designed this cash worker's compensation system because it was cheaper than the usual worker's compensation insurance, because under Kahre's system he received a 40 percent discount

1  at the hospitals by paying in cash, and he did not have to report anything to the state of Nevada.  Tr at 66:
2  21-25; 87: 20-24.

3        61.  The contractors using Kahre's payroll service got the benefit of Kahre's worker's
4  compensation system because it was included in the amount that they paid to Kahre in the burden that he
5  charged the contractors.  Tr at 87: 3-19.

6        62.  Kahre explained this aspect of his payroll service at the meeting held at Bravo offices.  Tr at
7  43: 6-22; 60: 10-21.

8        63.  Bravo paid a burden to Kahre which was included on the weekly invoices to Bravo from
9  UPC and if one of Bravo's workers being paid under Kahre's payroll service was injured, the money that
10 was paid to Kahre for the burden was used to pay the worker's compensation for that worker.  Exhibit 3;
11 Tr at 86: 20-25; 87: 1-19.

12       64.  Designated portions of Marlene Marcus' deposition testimony were submitted to the Court in
13 this matter.  As is evident from her testimony Ms. Marcus did not start working at Bravo until the year
14 2001, after the contract with Kahre had been entered into, and she had no personal knowledge of the
15 contract with Kahre.  Deposition of Marlene Marcus, Tr at 7: 10-13; 26: 25; 27: 1-14

16       65.  On May 5, 2003, Kahre's businesses were shut down by the federal government during the
17 execution of a search warrant.  Tr at 94: 4-10.

18       66.  Dean Griffith terminated Bravo's contract with UPC after Kahre's tax problems became
19 public knowledge through the government's execution of the search warrant.  Tr at 139: 8-11,

20       67.  The last invoice that Bravo received from UPC for the payroll service was dated May 21,
21 2003.  Exhibit 3, p. 515-518.

**CONCLUSIONS OF LAW**

23       68.  This contested matter seeks disallowance of the IRS Claim under 11 U.S.C.§ 502(b). It is a
24 core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

25       69.  In a bankruptcy proceeding, the court applies the burden of proof that has been established by
26 the underlying substantive law that created the debtor's obligation. *In re Olshan*, 356 F.3d 1078, 1084
27 (9th Cir. 2004) (citing *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20-21 (2000)).  "In an action to

- 8 -

8306923.1

collect taxes, the government bears the initial burden of proof." *Id*. (citing *Palmer v. United States*, 116 F.3d 1309,1312 (9th Cir. 1997)). That burden is satisfied by the IRS's "deficiency determinations and assessments for unpaid taxes," which are presumed correct, and in cases which involve a determination based upon unreported income "so long as they are supported by a minimal factual foundation." *See Hardy v. Commissioner*, 181 F.3d 1002, 1005 (9th Cir. 1999). However, "[a] showing by the taxpayer that a determination is arbitrary, excessive or without foundation shifts the burden of proof back to the IRS." *In re Olshan*, 356 F.3d at 1085. In this matter, the IRS has filed a proof of claim setting forth the employment taxes for which Bravo is liable. Therefore, it is incumbent on the Reorganized Debtor to come forward with evidence to show that the IRS' determination that Bravo is responsible for the payment of the employment taxes for the periods at issue is arbitrary, excessive or without foundation.

70. Employers are required to withhold federal social security taxes (Federal Insurance Contributions Act, or "FICA" taxes) and income taxes from the salaries and wages paid to their employees and to pay over the withheld amounts to the United States. 26 U.S.C. §§ 3101; 3102(a), (b); 3402; 3403.

71. The withheld portion of the taxes–the income taxes and FICA taxes deducted from employees' salaries–are debts of the employees to the federal government on earned income. Although the employer collects the taxes and is, therefore, liable for their payment, the withheld taxes are not the property of the employer. They are a part of the wages held in trust for the benefit of the government. 26 U.S.C. § 7501. It is well settled that such trust funds are for the exclusive use of the United States and may not be used for any other purpose.

72. In addition to withholding taxes from its employees' wages, the employer must also pay its own FICA contributions on behalf of its employees. 26 U.S.C. § 3111.

73. Federal employment tax obligations must be satisfied on a regular basis. The timing and frequency of deposit and payment of employment taxes are prescribed by statute and regulation. Depending on the size of its employment tax liability, an employer must make either semi-weekly or monthly deposits with a government depository. *See* 26 U.S.C. § 6302; 26 C.F.R. § 31.6302-1. When it

files its quarterly return, the employer must make full payment of the balance due for that quarter, after allowing credit for any deposits.  26 U.S.C. § 6151; 26 C.F.R. § 31.6302-1.

74. As set forth by the Ninth Circuit in *Stahl v. United States*, 626 F.3d 520, 523 (9th Cir. 2010), the existence of an employer-employee relationship generally turns on a number of factors:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.  Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Stahl*, 626 F.3d at 523, *citing*, *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992); *see also Vizcaino v. US Dist. Court*, 173 F.3d 713, 723 (9th Cir. 1999).

75. Of these factors, the most significant is the right to control. *See* Treas. Reg. § 31.3121(d)-1(c)(2) (That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done.  In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed.); *Prof'l & Executive Leasing, Inc. v. Commissioner*, 862 F.2d 751, 753 (9th Cir. 1988).

76. A critical question is whether the person for whom the work is performed has the right to control the activities of the individuals whose status is in issue, not only as to results but also as to the means and method to be used for accomplishing the result.  *United States v. Garami*, 184 B.R. 834, 838 (M.D. Fla. 1995).

77. The evidence presented at the trial in this matter reveals that the individuals whose status is in issue in this matter are the piece work crews headed up by Ismael Curiel (also known as Smiley), Andres Nunez, and Joaquin Barrajas.         The testimony at trial by former Bravo construction manager Dean Griffith and former Kahre employees Jorge Fernandez and George Rodriguez established that Bravo had the same control over these crews after Bravo entered into the contract with Kahre as it

- 10 -

8306923.1

had before the contract with Kahre, when Bravo treated these crews as employees and gave a paycheck to each individual on the crews.

78. Before and after the contract with Kahre, Bravo foremen contacted the crew leaders about which Bravo work sites needed work; Bravo provided the materials at the work sites for the workers to perform the business of Bravo, namely the framing of houses; and Bravo foremen supervised the crews at the work sites.

79. In addition, before and after the contract with Kahre, the payment of the crews for their work was done by the same method: the crew leaders would denote on a master sheet all the work that they performed at Bravo work sites for which they should be paid and they would turn this in to Dean Griffith for approval. After Dean Griffith approved the piece work that was completed and the dollar amount associated with that piece work, the approved work sheet was given to Pamela Garner. When the crews were paid by Bravo she would enter the information into the Bravo payroll system and when the crews were paid by Kahre's payroll service she would prepare a list of the piece work crews and how much each crew was to be paid so it could be sent to UPC. The only difference in the payment of the piece work crews was that when the crews were paid by Bravo they would receive a paycheck from Bravo and when the crews were paid by UPC a check would be sent to UPC and these funds were then used to pay the crews.

80. After Bravo entered into the contract with Kahre it even continued to pay the worker's compensation for the piece work crews paid through Kahre's payroll service because the worker's compensation came out of the burden that Bravo was required to pay Kahre for the use of his payroll system.

81. Therefore the evidence shows that the day before the contract was entered into with Kahre the piece work crews were being paid by Bravo as employees and the day after the contract they were being paid through Kahre's payroll service with no difference in how they performed their duties for Bravo.

82. Despite the contract with Kahre, the evidence shows that Bravo continued to control the means and methods by which the piece work crews performed their duties at Bravo work sites. Thus,

- 11 -

8306923.1

consistent with the Ninth Circuit employer-employee relationship factors set forth in *Stahl*, Bravo was the continuous employer of the piece work crews led by Smiley Curiel, Andres Nunez and Joaquin Barrajas.

83. The Reorganized Debtors cannot establish that Bravo was not responsible for paying the employment taxes at issue by merely showing that it delegated the taxing responsibility to Kahre, for the withholding of employees' taxes is considered an important duty that cannot be delegated. *See In re Professional Services*, 162 B.R. 901, 904 (Bankr. M.D. Fla. 1993). The existence of other responsible parties who also control disbursement and have the requisite status, duty and authority does not relieve the party assessed of his own responsibility. *Id.*

84. Under certain circumstances, where an employer's agent has control of the payment of wages to the employees, the agent of the employer may become jointly and severally liable with the employer for the payment of employment taxes. *See* 26 U.S.C. § 3504. Even in that situation, however, "the employer for whom such . . . agent . . . acts shall remain subject to the provisions of law (including penalties) applicable in respect of employers." 26 U.S.C. § 3504.

85. Courts recognize that an employer's duty to pay over employment taxes with respect to its employees is not delegable. *See, e.g.*, *Boyle*, 469 U.S. at 252 (the timely filing of returns and the payment of taxes are solely the duties of the taxpayer and are not delegable); *Morin v. Frontier Business Technologies, Inc.*, 288 B.R. 663, 665 (W.D. N.Y. 2003) (noting that, when payroll services provider misappropriated funds it had received from its clients for payment of their payroll taxes, the clients owed the unpaid taxes to the IRS); *United States v. Garami*, 184 B.R. 834, 838 (M.D. Fla. 1995) (contract with third party to pay employment taxes did not relieve employer of this liability); *See also In re Professional Security Services, Inc.*, 162 B.R. 901, 903 (Bankr. M.D. Fla. 1993); *In re Dakota Indus., Inc.*, 131 B.R. 437, 446 (Bankr. D. S.D. 1991) (IRS was not required to credit taxpayer-employer for amount allegedly misappropriated from a trust-fund account by a third party; rejecting as frivolous taxpayer's argument that IRS should sue bank for the funds). *See also United States v. Galletti*, 541 U.S. 114, 121 (2004) ("[w]hen an employer fails to withhold and submit the requisite amount of employment taxes, § 3403 makes clear that the liable taxpayer is the employer"). *Cf. Boyle*, 469 U.S. at 252 ("[t]he

failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not 'reasonable cause' for a late filing" under penalty provision); *Huffman, Carter & Hunt, Inc. v. United States*, 317 F. Supp. 2d 816 (S.D. Ohio 2004) (embezzlement by outside firm relied on by corporate taxpayer to take care of its payroll-tax obligations did not constitute "reasonable cause" for abatement of penalties for late payment of those taxes and late filing of returns); *Universal Concrete Prods., Corp. v. United States*, 71A A.F.T.R.2d (RIA) 3852 (E.D. Pa. 1990) (deception by taxpayer's controller does not constitute "reasonable cause" for nonpayment of taxes excusing penalties).

86. Former Bravo employees Pamela Garner and James Garner and former Kahre employees Jorge Fernandez and George Rodriguez testified that Bravo contracted with Kahre to participate in Kahre's payroll service administered through Kahre's company UPC. The evidence at trial reveals that consistent with the employer-employee factors determined by the Ninth Circuit, Bravo was the employer of the three piece work crews being paid through Kahre's payroll service. Bravo continued using Kahre's payroll service until the second quarter of the year 2003 when there was a raid on Kahre's businesses by the federal government. Kahre failed to pay the employment taxes for his payroll service. Although Bravo entered into an agreement with Kahre to participate in his fraudulent cash payroll system, that agreement does not relieve Bravo, the actual employer, of the obligation to pay the employment taxes.

Dated this 12th day of April, 2012.

                                                     KATHRYN M. KENEALLY
                                                   Assistant Attorney General

                                                   /s/ Virginia Cronan Lowe
                                                   VIRGINIA CRONAN LOWE
                                                   Trial Attorney, Tax Division
                                                   U.S. Department of Justice

                                                   Of Counsel:
                                                   DANIEL BOGDEN
                                                   United States Attorney

CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW has been made this 12th day of April, 2012, by ECF filing addressed to:

Nile Leatham, Esq. at nleatham@klnevada.com
Abid Qureshi, Esq., at aqureshi@akingump.com

/s/ Virginia Cronan Lowe
VIRGINIA CRONAN LOWE
Trial Attorney, Tax Division
U.S. Department of Justice

- 14 -

8306923.1