<u>E-File:  April 12, 2012</u>

**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV  89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
        ssherman@klnevada.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:  pdublin@akingump.com
         aqureshi@akingump.com

*Attorneys for Reorganized Debtors*             *Attorneys for Reorganized Debtors*

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.,[1]
                              Debtors.

Case No.: BK-S-09-14814-LBR
(Jointly Administered)

Chapter 11

Affects:

☐   All Debtors
☒   Affects the following Debtor(s):

   Bravo, Inc. 09-14825

**<u>REORGANIZED DEBTORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

---

[1]  The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

PROPOSED FINDINGS OF FACT .......................................................................4

A.    Stipulated Facts and Procedural History ...................................................4

B.    Other Procedural History .........................................................................5

C.    General Background .................................................................................5

D.    The Agreement Between Bravo and Union Pacific ....................................6

E.    The Employment Factors ..........................................................................8

    i.    Union Pacific controlled the manner and means by which the work
was completed. ................................................................................8

    ii.    Union Pacific paid the workers' wages, which were determined by
Union Pacific's Crew Leaders. .........................................................9

    iii.    Union Pacific had the exclusive right to hire and fire workers on its
crews. .............................................................................................9

    iv.    Union Pacific had the right to, and routinely did, assign workers to
other projects for companies other than Bravo. ................................9

    v.    Union Pacific provided benefits to the workers. ................................9

    vi.    Bravo's tool-purchasing assistance was available only to Bravo
employees. .....................................................................................10

PROPOSED CONCLUSIONS OF LAW ..............................................................10

I.    THE IRS BEARS THE BURDEN OF PROOF. ............................................11

II.    THE IRS FAILED TO PROVE THAT BRAVO IS THE EMPLOYER
RESPONSIBLE FOR THE TAXES SET FORTH IN THE IRS CLAIM. .......13

    A.    Bravo was not the employer under the common law test. ....................13

    B.    Bravo was not the employer because it did not control payment of
the workers' wages. ..........................................................................17

CONCLUSION ...................................................................................................18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Barnhart v. N.Y. Life Ins. Co.*,
    141 F.3d 1310 (9th Cir. 1998) ................................................................12, 13, 16, 17

*In re Prof'l Servs.*,
    162 B.R. 901 (Bankr. M.D. Fla. 1993) ...........................................................17

*In re Sw. Rest. Sys.*,
    607 F.2d 1237 (9th Cir. 1979) ...........................................................17

*Kittlaus v. United States*,
    41 F.3d 327 (7th Cir. 1994) ........................................................... 17-18

*Nationwide Mut. Ins. Co. v. Darden*,
    503 U.S. 318 (1992) ...........................................................13

*Stahl v. United States*,
    626 F.3d 520 (9th Cir. 2010) ...........................................................13

*Transp. Labor Contract/Leasing, Inc. v. Comm'r*,
    123 T.C. 154 (2004)...........................................................15

*Weimerskirch v. Comm'r*,
    596 F.2d 358 (9th Cir. 1979) ...........................................................11, 12


OTHER AUTHORITIES

Treas. Reg.

    § 31.3401(c)-1 ...........................................................13, 15

    § 31.3121(d)-1 ...........................................................13

The above-captioned reorganized debtors (collectively, the "Reorganized Debtors") hereby submit their proposed findings of fact and conclusions of law in support of their objection (the "Objection") previously filed to claim no. 7 (as amended from time to time, the "IRS Claim") filed by the Internal Revenue Service (the "IRS") against Debtor Bravo, Inc.[2] ("Bravo" and, together with the IRS, the "Parties").

## INTRODUCTION

This is a dispute about the nature of the business relationship between Bravo, a debtor-entity and former construction company, and Union Pacific Construction ("Union Pacific"), another construction company. The nature of that relationship determines which company is responsible for paying employment taxes in respect of certain workers whose wages were paid by Union Pacific but, at times, worked on Bravo job sites. If Union Pacific is found by this Court solely to have provided payroll services to Bravo during the relevant time period, then Bravo may be liable for employment taxes with respect to the workers in question. If, however, Union Pacific acted as a subcontractor providing labor to Bravo (as opposed to merely processing the employees' payroll), then Union Pacific alone is liable for the employment taxes, and the IRS Claim against the Reorganized Debtors must be denied.

On March 5, 2012, an evidentiary hearing was held, at which six witnesses testified live and one witness testified by deposition designation. The witnesses and their positions at the relevant times are as follows:

IRS's Witnesses

- Pamela Garner, a Bravo receptionist, administrative assistant, and payroll processor until 2002.

- James Garner, a Bravo foreman.

- Jorge Fernandez (known as "Big Jorge"), the general superintendent of Wright Painting & Drywall until early 2001.

---

[2] The IRS Claim was in fact filed against Bravo LLC, a non-existent entity. The Reorganized Debtors reserve all rights with respect to this error.

- George Rodriguez (known as "Little George"), a foreman of Wright Painting & Drywall in 2000, and the general superintendent of Wright Painting & Drywall beginning in 2001.

- Marlene Marcus (by deposition), a Bravo administrative assistant and payroll processor beginning in 2001.

Reorganized Debtors' Witnesses

- Dean Griffith, the general manager of Bravo.

- Jim Bevan, the CFO of Rhodes Homes.

The IRS presented four witnesses live and one by designation, none of whom had direct personal knowledge of the terms of the Agreement (hereinafter defined) between Bravo and Union Pacific. Indeed, none of the IRS's witnesses ever worked on or supervised any of the three work crews that are the subject of this dispute.

The IRS's first witness, Pamela Garner, was a receptionist and payroll processor at Bravo who testified that Union Pacific processed payroll for the workers in question, a fact which is not in dispute.

The IRS's second witness was James Garner, a Bravo foreman, who testified that he was told at a meeting that Union Pacific would be handling payroll and benefits for certain work crews. That, too, is not a fact in dispute. Mr. Garner, however, was neither a member nor supervisor of the work crews at issue and thus had no personal knowledge of the companies' Agreement beyond the discussion at this one meeting. Further, Mr. Garner testified that he did not personally know of any Bravo employees who were compensated other than by a paycheck issued by Bravo. Transcript of Proceedings, dated March 5, 2012 ("3/5/12 Tr.") at 40:2-7.

The IRS's third and fourth witnesses, Big Jorge and Little George, worked for a third company, Wright Painting & Drywall, which shared an owner with Union Pacific (Robert Kahre), but was otherwise unrelated to the dispute. Big Jorge's testimony, while argued by the IRS to be consistent with its theory, was vague as to time frame, and indeed Big Jorge left Mr. Kahre's company in early 2001, so he admittedly had no personal knowledge relevant to this dispute after that time. Moreover, Big Jorge admitted to having a poor memory of the events,

2

and his credibility was brought into question by the circumstances of his departure, which followed accusations of embezzlement. Little George, who was Big Jorge's successor, testified—consistent with the Reorganized Debtors' theory—that Union Pacific was not only a payroll processor but was also a licensed contractor with its own work crews.

The IRS's fifth witness, Marlene Marcus, succeeded Ms. Garner as an administrative assistant and payroll processor at Bravo. Ms. Marcus's testimony (by deposition) was entirely consistent with the Reorganized Debtors' position in this matter. In particular, Ms. Marcus testified, with respect to the business relationship between Bravo and Union Pacific, that when Jim Rhodes, Bravo's owner, needed workers for Bravo's projects, he would call Union Pacific to supply the workers. She further testified that one of the crew leaders of the workers at issue was an employee of Union Pacific and not Bravo.

The Reorganized Debtors presented two witnesses. The first witness, Dean Griffith, was the general manager of Bravo during the relevant time period and was the only witness with personal knowledge of the Agreement between Bravo and Union Pacific, which he negotiated, reviewed, and signed. Mr. Griffith testified that, from 2000 to 2003, Union Pacific subcontracted labor to Bravo on an as needed basis and that Union Pacific controlled the hiring, firing, supervision, payment, and benefits of such workers.

The Reorganized Debtors' second witness was Jim Bevan, the CFO of Rhodes Homes during the relevant time period, who oversaw payroll operations for Rhodes Homes and its subsidiaries, including Bravo. Mr. Bevan testified that Bravo employees were always paid by check, and that it would not have been possible for Bravo to hire Union Pacific merely as a payroll processor without his knowledge. Not only would Mr. Bevan's approval have been required for such a contract, but he also (1) personally signed checks for Bravo's accounts payable, including its checks to Union Pacific and, (2) prior to signing any check to a Bravo counterparty, personally reviewed the contract pursuant to which such check was issued. The Reorganized Debtors' witnesses, in sum, had direct, relevant, and personal knowledge of the events in question that far exceeded the limited knowledge of the IRS witnesses, their testimony was credible, and their testimony is dispositive of the issues before the Court.

3

## **PROPOSED FINDINGS OF FACT**

**A.**    **Stipulated Facts and Procedural History**

1.    On April 13, 2010, the IRS filed amended proof of claim No. 7-2 (the IRS Claim) against Bravo, one of the jointly administered Debtors herein.

2.    Bravo was previously in the business of framing houses for the Debtors' various homebuilding operations.  The general manager of Bravo during the time periods applicable in this matter was Dean Griffith.

3.    The IRS Claim included federal employment tax liabilities for the quarters ending September 30, 2000, December 31, 2000, all four calendar quarters of the years 2001 and 2002, and the quarters ending March 31, 2003 and June 30, 2003 (hereinafter "the periods at issue"). The IRS Claim asserted an unsecured priority claim in the total amount of $1,326,068.11, and an unsecured general claim in the amount of $2,560,388.64.

4.    On March 31, 2011, the Reorganized Debtors filed the Objection to the IRS Claim.

5.    On September 15, 2011, the United States' filed the Response in Opposition to the Debtors' Objection to the IRS Claim.

6.    On September 21, 2011, the Reorganized Debtors filed the Reply in Support of Objection to the IRS Claim.

7.    On February 13, 2012, the United States filed the United States' Pretrial Brief [Docket No. 1658] ("IRS Pre-Trial Br."), and the Reorganized Debtors filed the Pre-Trial Brief of the Reorganized Debtors [Docket No. 1659].

8.    On February 27, 2012, the Reorganized Debtors filed the Reply of the Reorganized Debtors to the United States' Pre-Trial Brief [Docket No. 1668], and the United

States filed the United States' Response to Pre-Trial Brief of Reorganized Debtors [Docket No. 1670] ("IRS Pre-Trial Response").

**B.    Other Procedural History**

9.    On September 27, 2011, a hearing was held on the Objection at which this Court determined to bifurcate litigation of the Objection into separate phases.  The Court ordered that, during the first phase ("Phase One") of the litigation, the Court would hear evidence only as to the liability of the Reorganized Debtors for the employment taxes at issue.  The specific issue to be decided in Phase One, as stated by the Court, was ". . . . whether [Union Pacific] was a subcontractor which merely provided payroll or a subcontractor who provided labor as well as payroll."  Transcript of Proceedings, dated September 27, 2011 ("9/27/11 Tr.") at 21:20-22.  If the Reorganized Debtors were found liable, the Court further ordered that there would be a second phase ("Phase Two"), during which the amount of the taxes owed, if any, as well as the liability and amount of any interest and penalties owed, including fraud penalties, would be determined.

10.    On March 5, 2012, a trial was held on Phase One, at which the United States presented four witnesses and the Reorganized Debtors presented two witnesses.  The United States also submitted the deposition testimony of one witness with the consent of the Reorganized Debtors.  *See generally* Designated Deposition Transcript of Marlene Marcus ("Marcus Tr.").  At the conclusion of the trial, the Court ordered that oral argument on Phase One would be heard on April 26, 2012, at 9:30 a.m., and that the parties would file proposed findings of fact and conclusions of law on April 12, 2012.

**C.    General Background**

11.    As stated above (*supra* ¶ 1), Bravo was in the business of framing houses for the Debtors' various homebuilding operations.

5

12.    Bravo's employees were compensated for their work in one of three ways: by salary, by hourly wage, or by a fixed piecework rate.  Bravo's management-level employees, including foremen, typically received a salary.  3/5/12 Tr. at 106:4-5.  Bravo's field workers were divided into crews of hourly wage workers and crews of pieceworkers.  *Id*. at 106:7-11. Piecework crews were paid weekly, as a whole crew, for the projects the crew completed during the prior week, based on a fixed rate per project (or "piece").  *Id*. at 106:20-107:3.  The piecework crew leaders would then disburse the total pay among the crew members.  *Id*.

13.    In the time period leading up to 2000, the Las Vegas residential home building market was booming, as was Bravo's framing business.  *Id*. at 108:19-21.  Bravo faced difficulties in developing and maintaining a large enough workforce to handle the additional business.  For example, although Bravo was swamped by employment applications in response to its newspaper ads, Bravo could not process the applications efficiently because of the burdensome complexity of determining and documenting the immigration status of the new applicants, many of whom were not authorized to work legally in the United States.  *Id*. at 108:22-109:5.

**D.    The Agreement Between Bravo and Union Pacific**

14.    In 2000, one of Bravo's piecework crew leaders, Ishmael ("Smiley") Curiel, who was aware of Bravo's administrative and hiring challenges, approached Dean Griffith, the general manager of Bravo at the time, with the suggestion that Bravo engage a construction company called Union Pacific to supply labor to Bravo as needed (*id*. at 108:4-16; 109:6-10), essentially outsourcing Bravo's piecework labor needs.

15.    Union Pacific was a general construction contractor, owned by Robert Kahre, that provided framing, painting, and drywall installation services.  *Id*. at 92:1-4; 93:14-17.

6

16.     In connection with Smiley's suggestion that Bravo engage Union Pacific, Smiley further proposed that he and two other crew leaders then working for Bravo, Andreas Nunez and Joaquin Barajas (collectively, and together with Smiley, the "Crew Leaders"), leave Bravo and go to work for Union Pacific running piecework crews.  *Id*. at 109:6-10.

17.     Around the same time, Smiley was in discussions with Robert Kahre to resign from Bravo and to be hired by Union Pacific in the role of manager.  *Id*. at 79:8-11; 98:13-15.

18.     In response to the increasing administrative burdens inherent in growing Bravo's workforce, Dean Griffith ultimately decided, on behalf of Bravo, to enter into an agreement (the "Agreement") to outsource Bravo's piecework to Union Pacific, which would supply labor to Bravo as needed.  *Id*. at 110:17-20.[3]  Mr. Griffith, who had the authority to enter into such an agreement on behalf of Bravo, signed the Agreement for Bravo in the beginning of the year 2000.  *Id*. at 107:16-19; 110:2-111:1; 146:8-22.

19.     The basic terms of the Agreement, as testified to by Mr. Griffith, the only witness with direct knowledge of the Agreement, were as follows:

(1) Union Pacific would provide work crews to Bravo on an as needed basis;

(2) Union Pacific would pay the workers on its work crews;

(3) Union Pacific would handle the process of hiring and, if necessary, firing the workers;

(4) Union Pacific, through its own crew leaders, would supervise the work crews;

(5) Union Pacific would be responsible for providing medical benefits and partial wage replacement to workers injured in the course of employment; and

(6) Union Pacific would bill Bravo weekly for the cost of the labor plus an 18.5% fee.

*See generally id*. at 111:22-112:17.

---

[3] Though the written contract memorializing the Agreement could not be located (3/5/12 Tr. at 111:2-14), testimony from the two witnesses presented by the Reorganized Debtors establishes that a written contract existed (*id*. at 111:15-21; 146:23-147:6), and there is *no* evidence to the contrary.

20.     A meeting was held at Bravo's office in early 2000 to discuss implementation of certain terms of the Agreement.  *Id*. at 110:15-20; 110:25-111:1.  Present at the meeting were Dean Griffith, Robert Kahre, Bravo's controller Mona Wilcox, Big Jorge, the Crew Leaders, James Garner, and Sergio Juarez. *Id*. at 40:13-21.  It was discussed at the meeting that the Crew Leaders would lead crews for Union Pacific and would no longer be on Bravo's payroll.  *Id*. at 49:18-50:1; 113:6-19.  It was also discussed that the cost of treating any injuries sustained by the Union Pacific workers in the course of their work at Bravo job sites would be borne entirely by Union Pacific.  *Id*. at 43:6-22.  In addition, at the meeting, Union Pacific provided proof that its contractor's license was in proper status and up to date.  *Id*. at 120:23-121:3.

**E.    The Employment Factors**

    **i.     Union Pacific controlled the manner and means by which the work was completed.**

21.     After the contract between Bravo and Union Pacific was executed, the Crew Leaders went to work for Union Pacific.  *Id.* at 113:16-19.**[4]**  Smiley, in particular, took a leadership role at Union Pacific, which he effectively ran for Mr. Kahre.  3/15/12 Tr. at 98:13-15.

22.     When Union Pacific provided work crews to work on Bravo job sites, the work crews were led and supervised by the Union Pacific Crew Leaders.  *Id*. at 112:4-8; 113:6-9; 118:16-19.  Bravo's role in the work process was essentially to inform the Union Pacific Crew Leaders of upcoming jobs, including the start dates and the dates when lumber or trusses would be dropped at the site, and the Crew Leaders would take over from that point until completion of the job.  *Id*. at 114:10-18.

23.     Bravo had a job foreman of its own at each site, but the Bravo job foreman's role was only to inspect the end result of a job to verify that it met Bravo's standards.  *Id.* at 118:20-

---

**[4]** *See also* Marcus Tr. at 23:18-22 ("Q. … Now, do you know who this Smiley is on here?  A. He was the head of that group.  Q. Okay.  A. But he was also a Union Pacific. He wasn't our employee.")

119:9. If the Bravo job foreman inspected the work and found problems, the job foreman would not communicate directly with the workers but would instead relay the problem to the Union Pacific Crew Leader, who would address it. *Id*. at 119:10-13.

24.    Bravo had no role in disciplining individual Union Pacific workers, or in determining when and where individual workers on the Union Pacific crews would be assigned. *Id*. at 119:14-16.

### ii.    Union Pacific paid the workers' wages, which were determined by Union Pacific's Crew Leaders.

25.    The workers on crews led by the Crew Leaders were paid by Union Pacific, and those workers' wages were determined by Union Pacific. *Id*. at 27:2-19; 75:11-77:20; 112:9-11; 116:25-117:2 (Griffith: "As far as what they pay their employees, that's – that's not up to me. I just make sure the totals all match up what they turned in.").

### iii.    Union Pacific had the exclusive right to hire and fire workers on its crews.

26.    Under Bravo's Agreement with Union Pacific, Union Pacific was responsible for hiring and firing the individual workers. *Id*. at 112:1-3. Bravo had no control over individual hiring and firing decisions. *Id*. at 118:10-13.

### iv.    Union Pacific had the right to, and routinely did, assign workers to other projects for companies other than Bravo.

27.    The Union Pacific crews, including those led by the Crew Leaders, did not work exclusively on Bravo projects. Rather, the Crew Leaders routinely assigned their crews to work on projects for other companies during the same time period that they were working on Bravo projects. *Id*. at 97:15-19; 113:20-24.

### v.    Union Pacific provided benefits to the workers.

28.    It is not disputed that Union Pacific paid for medical treatment for the workers on its crews who suffered on-the-job injuries. *Id*. at 43:6-21; 112:14-17. Union Pacific had accounts at the local hospitals, which it settled monthly in cash. *Id*. at 82:19-83:1. If a worker

on a Union Pacific crew was injured on a Bravo job, the Crew Leaders would call Big Jorge, who would determine which hospital to send the injured worker to.  *Id*. at 81:24-82:16.  Union Pacific would pay the costs of treatment directly to the hospital.  *Id*. at 82:19-23.  In contrast, if a *Bravo* employee was injured on the job, the employee or others at the site would call *Bravo*, which would make the determination of where to send the employee for care.  *Id*. at 43:10-14.

29.    Union Pacific also provided compensation to injured workers who missed work as a result of their injuries.  *Id.* at 120:19-20.  In practice, when a Union Pacific worker was injured on a Bravo job site, Mr. Kahre would determine what percentage of the worker's average pay the worker should receive while out of work, and Big Jorge would ensure that the injured worker was paid in cash by Union Pacific.  *Id*. at 84:8-85:14.  In contrast, workers compensation insurance for *Bravo's* employees was provided by *Bravo*.  *Id.* at 122:25.

**vi.    Bravo's tool-purchasing assistance was available only to Bravo employees.**

30.    As with most construction companies, Bravo required its workers to supply their own tools.  *Id*. at 121:4-8.  However, Bravo employees had access to a tool purchasing program, pursuant to which employees had the option of having tools provided by Bravo and the cost deducted over time from their weekly paychecks.  *Id*. at 121:4-22.  This option was not available to the workers on Union Pacific's crews.  *Id*. at 121:23-122:1.

## PROPOSED CONCLUSIONS OF LAW

The only issue currently before the Court is whether, during the time period from the third quarter of 2000 to the second quarter of 2003, Union Pacific ". . . . was a subcontractor which *merely* provided payroll or a subcontractor who provided labor as well as payroll." 9/27/11 Tr. at 21:20-22 (emphasis added).  At trial, the IRS marched forward a parade of witnesses who testified, uncontroversially, that Union Pacific handled the payroll of the workers at issue.  But the Reorganized Debtors do not dispute, and have never disputed, this fact.  Rather, as the Reorganized Debtors have shown, Union Pacific provided much more than just a payroll

10

service.  In particular, Union Pacific: (1) supplied the workers at issue; (2) supervised the workers; (3) hired and, as necessary, fired the workers; (4) told the workers where and when to work; (5) assigned the workers to other projects; and (6) provided the workers with medical and worker's compensation benefits.

The IRS has not countered any of the Reorganized Debtors' evidence.  On the contrary, the IRS's *own witnesses* testified that Union Pacific was more than just a payroll service; it was a full-service general construction contractor that did framing, painting, and drywall installation (3/5/12 Tr. at 92:1-4; 93:14-17), and provided workers to Bravo (Marcus Tr. at 20:9-11).  The only support for the IRS's position that Union Pacific was *not* a full-service contractor that provided workers to Bravo is the testimony of Big Jorge, a witness who had no personal knowledge because he worked for *neither* Bravo *nor* Union Pacific.  Indeed, the only basis of Big Jorge's purported knowledge was his work as a security guard for Robert Kahre, which ceased in April 2001, when Kahre asked Big Jorge to resign on account of his alleged embezzlement.  Accordingly, there is no evidence whatsoever that Union Pacific was solely a payroll processor.  Moreover, when confronted by inconsistencies in his testimony, Big Jorge admitted to making an effort to "forget everything that ever happened" so "long ago".  *Id*. at 76:16-21.  Fatally to its case, with Big Jorge impeached and lacking personal knowledge, and no other evidence in the record, the IRS failed to prove that Union Pacific was *solely*—or even primarily—a payroll service to Bravo.

## I.   <u>THE IRS BEARS THE BURDEN OF PROOF.</u>

The IRS must prove by a preponderance of the evidence that Union Pacific solely provided payroll services to Bravo.  It has failed to do so.  The IRS concedes, in its pre-trial brief, that the IRS bears the initial burden of proof in an action to collect taxes, and that even where the IRS meets its initial burden, a showing by the taxpayer that the IRS's determination is "arbitrary, excessive or without foundation" shifts the burden of proof back to the IRS.  IRS Pre-Trial Br. at 2-3; *see also Weimerskirch v. Comm'r*, 596 F.2d 358, 361 (9th Cir. 1979).

Here, the IRS Claim is utterly without foundation.  The IRS provided no evidence to

counter the Reorganized Debtors' evidence that Union Pacific hired, supervised, disciplined, paid, insured, and ultimately provided to Bravo, crews of pieceworkers. Not a single one of the IRS's four witnesses ever (1) worked on, supervised, or managed any of the three crews at issue or (2) negotiated or reviewed the Agreement. Indeed, as discussed above, the bulk of the IRS's evidence goes to a fact that the Reorganized Debtors do not even contest: that Union Pacific provided payroll services for the workers it supplied to Bravo job sites. What the IRS's evidence does *not* show is that Union Pacific was *merely* a payroll provider. Even the IRS's own witness, Little George, testified that, at least since 2001, Union Pacific was a general construction contractor that did framing, painting, and drywall installation. 3/5/12 Tr. at 92:1-4; 93:14-17; *see also* Marcus Tr. at 20:9-11 (testifying that when Bravo needed workers, Jim Rhodes would call Union Pacific). Moreover, the testimony of other witnesses establishes that Union Pacific began operations as a legitimate, full-service contractor in concert with its engagement by Bravo. *See id.* at 120:23-121:3 (testifying that Bravo sought and obtained proof of Union Pacific's status as a properly licensed contractor at their first meeting); 109:6-10 (discussing that, in concert with Bravo's engagement of Union Pacific, the Crew Leaders would be hired by, and run piecework crews for, Union Pacific).

The IRS's only evidence that Union Pacific did *not* provide workers to Bravo is the testimony of a single witness, Big Jorge, with no personal knowledge and whose credibility and memory were shown at trial to be in question. *Id.* at 76:16-21. In addition, because Big Jorge left Wright Painting & Drywall in early 2001, his testimony—(contradicted as it was by numerous other witnesses)—is irrelevant with respect to the majority of the time period at issue.

Accordingly, because the IRS has failed to offer any evidentiary foundation in support of its claim that Union Pacific was merely a provider of payroll services, the burden of proof on this issue reverts to the IRS. *See Weimerskirch*, 596 F.2d at 361 (noting that the IRS "cannot rely on the presumption [of correctness] in the absence of a minimal evidentiary foundation").

However, even if the Reorganized Debtors bore the burden of proof, the Reorganized Debtors have shown, by far more than a preponderance of the evidence, that Union Pacific was the employer of the workers at issue and Bravo was not. Thus the Reorganized Debtors cannot

12

be held liable for employment taxes that Union Pacific failed to pay.

**II.     THE IRS FAILED TO PROVE THAT BRAVO IS THE EMPLOYER RESPONSIBLE FOR THE TAXES SET FORTH IN THE IRS CLAIM.**

    **A.     Bravo was not the employer under the common law test.**

The IRS's evidence falls far short of establishing by a preponderance of the evidence that Bravo was the employer of the workers on Union Pacific's crews.  In determining who qualifies as an "employee" for tax purposes, the Ninth Circuit applies the common law test.  *Stahl v. United States*, 626 F.3d 520, 523 (9th Cir. 2010).  Under the common law test for an employer-employee relationship, courts look at whether the purported employer "controls the manner and means by which the product is accomplished."  *Barnhart v. N.Y. Life Ins. Co.*, 141 F.3d 1310, 1312 (9th Cir. 1998) (internal quotations omitted).  The factors include:

> 1) the skill required; 2) source of the instrumentalities and tools; 3) location of the work; 4) duration of the relationship between the parties; 5) whether the hiring party has the right to assign additional projects to the hired party; 6) the extent of the hired party's discretion over when and how long to work; 7) the method of payment; 8) the hired party's role in hiring and paying assistants; 9) whether the work is part of the regular business of the hiring party; 10) whether the hiring party is in business; 11) the provision of employee benefits; and 12) the tax treatment of the hired party.

*Id.* at 1312-13 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-34 (1992)).  Further, under applicable Treasury Regulations, "if an individual is subject to the control or direction of another *merely as to the result to be accomplished by the work* and not as to the means and methods for accomplishing the result, he is not an employee."  Treas. Reg. § 31.3401(c)-1 (emphasis added); *see also* § 31.3121(d)-1 (same).

Here, the overwhelming weight of the evidence proves that the workers at issue were not employees of Bravo under the common law test.

***First***, the *only* witness with personal knowledge of the Agreement between Bravo and Union Pacific, Dean Griffith, (the manager of Bravo during the relevant times), testified that it

was an agreement to subcontract labor.  Mr. Griffith further testified that, under the Agreement, Union Pacific would hire, supply, and supervise its own workers.  3/5/12 Tr. at 111:22-112:8. Courts look to such agreements as evidence of whether an employer-employee relationship existed.  *Barnhart*, 141 F.3d at 1313 (holding that insurance agent was not employee of insurance company based in significant part on parties' contract).

The trial testimony of the IRS's own witnesses, Little George and Marlene Marcus (by deposition) is consistent with Mr. Griffith's testimony.  Little George testified that Union Pacific was doing general construction contracting work in addition to payroll, and that he had no reason to disagree with Mr. Griffith's testimony that Union Pacific provided labor to Bravo.  3/5/12 Tr. at 93:14-17; 99:5-10.  Ms. Marcus testified that when Jim Rhodes, Bravo's owner, needed workers, he would call Union Pacific.  Marcus Tr. at 20:9-11.

None of the IRS's witnesses was in any position to contradict Mr. Griffith's testimony. The IRS presented four live witnesses, none of whom had direct personal knowledge of the companies' Agreement and none of whom worked on or supervised any of the three work crews that are the subject of this dispute.  The IRS's first witness, Pam Garner, was told that Union Pacific would be processing payroll for the work crews at issue—an uncontroversial and undisputed fact—but had no knowledge as to the other aspects of the Agreement, including whether Bravo subcontracted labor.  3/5/12 Tr. at 28:22-24; 29:10-12.  In fact, Ms. Garner testified that she would have no basis to dispute Mr. Griffith's testimony that Union Pacific provided laborers to Bravo.  *Id.* at 30:1-6.  The IRS's second witness, James Garner, similarly was told that Union Pacific would be handling payroll for the workers on its crews, but had no basis for knowledge of the other aspects of the companies' Agreement.  Moreover, though Mr. Garner testified that all Bravo employees were paid by check, he had no knowledge of whether the Crew Leaders in fact received Bravo paychecks after the Agreement was entered into.  The IRS's last two witnesses, Big Jorge and Little George, did not even work at Bravo or Union Pacific.  Finally, Big Jorge lacked credibility—he was accused of embezzlement and admitted to

14

a poor memory of the events (*id.* at 70:6-10; 76:16-21)—and Little George's testimony

supported the position of the Reorganized Debtors.

      ***Second***, Union Pacific plainly controlled the means and methods by which the work was

completed.  It is uncontradicted that, upon execution of the Agreement, the Crew Leaders ceased

to be employees of Bravo and became employees of Union Pacific, reporting to Robert Kahre.

*Id*. at 98:13-15; 113:16-19; Marcus Tr. at 23:18-22.  It is further uncontradicted that all of the

work crews at issue were led and supervised by the Crew Leaders, hence by Union Pacific

employees.  3/5/12 Tr. at 112:4-8; 113:6-9; 118:16-19.  Bravo's role with regard to work done by

Union Pacific was merely to connect the crews with the materials at the beginning of a job, *id.* at

114:10-18, and, at the end of a job, to inspect the end result and report any problems to the Union

Pacific Crew Leaders.  *Id.* at 118:20-119:13.  Of course, as the IRS concedes (*see* IRS Pre-Trial

Response, at 6), if the purported employer's control extends only "to the result to be

accomplished" but not the "means and methods" used, an employer-employee relationship does

not exist.  Treas. Reg. § 31.3401(c)-1.  Accordingly, this factor strongly suggests that Union

Pacific, not Bravo, is the employer of the workers at issue.  *See also Transp. Labor*

*Contract/Leasing, Inc. v. Comm'r*, 123 T.C. 154, 185 (2004) (holding that the fact that trucking

company gave routes, assignments, and directions to leased truck drivers was not enough to give

it control over each driver).

      ***Third***, the vast majority of the remaining factors, to the extent applicable, weigh against

holding that the workers are employees of Bravo.  Bravo had no role in determining when and

where individual workers on the Union Pacific crews would be assigned.  3/5/12 Tr. at 119:14-

16.  Moreover, the crews did not work exclusively on Bravo projects.  Rather, as is not disputed,

the Crew Leaders routinely assigned their crews to work on projects for other companies during

the same time period that they were working on Bravo projects.  *Id.* at 97:15-19; 113:20-24.  In

15

addition, Bravo had no control over individual hiring and firing decisions, *id*. at 118:10-13, which were left entirely to Union Pacific, *id*. at 112:1-3. Similarly, payment of the workers was handled entirely by Union Pacific, and the Crew Leaders had discretion to determine the wages. *Id*. at 27:2-19; 75:11-77:20; 112:9-11; 116:25-117:2. Finally, it was uniformly agreed among the witnesses that Union Pacific handled medical benefits and provided compensation for injured workers who missed work as a result of their injuries. *Id*. at 43:6-21; 84:8-85:14, 112:14-17, 120:19-20.

*Fourth*, the remaining factors are neutral or insignificant. The source of tools and instrumentalities, and the location of the work, are largely neutral here. Bravo did not provide tools for any of the workers, including its own employees, but it did provide its employees with the option of receiving tools from Bravo and having the costs deducted over time from their weekly paychecks. *Id*. at 121:4-22. This option was not available to the workers on Union Pacific's crews, who were not receiving Bravo paychecks. *Id*. at 121:23-122:1. Bravo did provide lumber and the work was done on Bravo sites, but of course, in the construction industry, it is customary for employees of subcontractors or independent contractors to work with construction materials and on work sites provided by the builder. With respect to the skills required to complete the work, those would be the same whether the workers were employees of Bravo or Union Pacific, so this factor is neutral. And, finally, because the projects were sporadic and interspersed with projects for other companies, the duration of the parties' relationships is insignificant. *See Barnhart*, 141 F.3d at 1313 (despite sixteen-year relationship, no employment relationship existed where insurance agent was not paid hourly or a salary, but by commission and did work for other insurance companies).

In conclusion, the factors of the common law employer-employee test are consistent with the Agreement between Bravo and Union Pacific: each shows that the workers on Union

16

Pacific's crews were not employees of Bravo. *Barnhart*, 141 F.3d at 1313.  Accordingly, Bravo and the Reorganized Debtors cannot be held liable for employment taxes that Union Pacific failed to pay.

**B.    Bravo was not the employer because it did not control payment of the workers' wages**.

Even if Bravo were the employer of the workers at issue under the common law test, Bravo met the statutory exception to the definition of "employer" in the Internal Revenue Code because Bravo "'does not have control of the payment of the wages for such services . . . .'"  *In re Sw. Rest. Sys. ("Southwest")*, 607 F.2d 1237, 1239 (9th Cir. 1979) (quoting 26 U.S.C. § 3401(d)(1)).  The witnesses at trial were unanimous in their testimony that Union Pacific paid the workers on each of the three crews.  *See, e.g.*, 3/5/12 Tr. at 75:11-77:20; 112:9-11.  Moreover, Union Pacific paid the workers from its own accounts.  *Id.* at 85:3-4 ("Q. Ultimately, it was Mr. Kahre's money? A. It was all Mr. Kahre's money.")  And Union Pacific not only handled the physical payment of the workers, it determined how much each worker should receive.  *Id*. at 27:2-19 (P. Garner: testifying that the Crew Leaders set the wages for the workers on their crews); 116:25-117:2 (Griffith: "As far as what they pay their employees, that's – that's not up to me.  I just make sure the totals all match up what they turned in.").

The authority cited by the IRS in its Pre-Trial Response (IRS Pre-Trial Response, at 6 (citing *In re Prof'l Servs.*, 162 B.R. 901, 904 (Bankr. M.D. Fla. 1993)) is easily distinguishable because there is no evidence here that Union Pacific withheld wages from its workers unless and until it received payment from Bravo (*see, e.g.*, 3/5/12 Tr. at 62:15-20 (describing pay process))—further support for the fact that Union Pacific had control over payment.  Moreover, in *In re Prof'l Servs.*, the debtor (as opposed to the payroll processor) screened applicants, hired and fired the workers, directed work assignments, and determined workers' schedules—all tasks that Union Pacific performs here.  162 B.R. at 904.  Because Bravo did not control payment of the workers on Union Pacific's crews, Bravo is not liable for any employment taxes that Union Pacific failed to pay.  *Southwest*, 607 F.2d at 1239; *see also Kittlaus v. United States*, 41 F.3d

17

327 (7th Cir. 1994) (motel owner not employer because payment of motel employees controlled by management company; motel owner had limited access to payroll funds and no signature authority over accounts used to pay employees).

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Debtors respectfully request that the Court declare that the IRS Claim is disallowed and expunged as a matter of law.

Dated:  April 12, 2012.

/s/Shlomo S. Sherman
**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV  89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
         ssherman@klnevada.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail: pdublin@akingump.com
         aqureshi@akingump.com

*Attorneys for Reorganized Debtors*