E-Filed on 5/11/2012

1

2

3
**DIAMOND MCCARTHY LLP**
1201 Elm Street, Suite 3400
Dallas, Texas 75270
(214) 389-5300 (telephone)
(214) 389-5399 (facsimile)

4

5

6
Eric D. Madden, TX Bar No. 24013079
Email: emadden@diamondmccarthy.com
Michael J. Yoder, TX Bar No. 24056572
Email: myoder@diamondmccarthy.com
Jacob J. Roberts, TX Bar No. 24065982
Email: jroberts@diamondmccarthy.com

**LAW OFFICE OF BRIAN D. SHAPIRO, A NEVADA LLC**
228 S. 4th Street, Suite 300
Las Vegas, Nevada 89101
 (702) 386-8600 (telephone)
 (702) 383-0994 (facsimile)

Brian D. Shapiro, NV Bar No. 5772
Email:  bshapiro@brianshapirolaw.com

*Local Counsel for the Litigation Trust of*
*The Rhodes Companies, LLC, et al.*

7
*Counsel for the Litigation Trust of*
*The Rhodes Companies, LLC, et al.*

8

9
**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

10
In re:

11
THE RHODES COMPANIES, LLC,
   aka "Rhodes Homes," *et al.*,

12
Reorganized Debtors.

13

14
THE LITIGATION TRUST OF THE RHODES
COMPANIES, LLC, ET AL.,

15
Plaintiff,

16
v.

17

18

19

20

21

22

23
JAMES M. RHODES, SEDORA HOLDINGS,
LLC, SAGEBRUSH ENTERPRISES, INC.,
GYPSUM RESOURCES, LLC, TRUCKEE
SPRINGS HOLDINGS, INC., JOHN C. RHODES,
JOHN C. RHODES, TRUSTEE OF THE JAMES
M. RHODES DYNASTY TRUST I, JOHN C.
RHODES, TRUSTEE OF THE JAMES M.
RHODES DYNASTY TRUST II, HARMONY
HOMES, INC., NORTH 5, LLC, FARM
HUALAPAI, LLC, HARMONY 2, LLC, HAYDEN
SPRINGS PARTNERS, LLC, TROPICAL SANDS,
LLC, and RHODES RANCH, LLC,

Defendants.

Case No. BK-09-14814-LBR
(Jointly Administered)

Chapter 11

Adversary Proceeding No. _____

**ORIGINAL COMPLAINT**

24

25

26

The Litigation Trust of The Rhodes Companies, LLC, et al. (the "<u>Litigation Trust</u>") hereby complains as follows:

## I.    <u>NATURE OF ACTION</u>

1.    This action arises out of breaches of fiduciary duties owed by James M. Rhodes and certain related entities to the Debtors.[1]  The Debtors operated a home-building business in the Las Vegas, Nevada area doing business as "Rhodes Homes."  In late 2005, James Rhodes and his non-Debtor affiliates crippled this business by causing the Debtors to enter into a $500 million credit facility, solely in order: (a) to obtain $69 million in cash for James Rhodes and his non-Debtor affiliates; (b) to obtain an additional $38.5 million to pay James Rhodes' personal income tax obligations; and (c) to re-finance debt that benefitted non-Debtor affiliated entities owned and/or controlled by James Rhodes, while placing the burden of such debt only on the Debtors. James Rhodes and his affiliated entities acted intentionally and out of disloyal self-interest in causing the Debtors to incur the debt.  There was no legitimate business justification for causing the Debtors to incur such massive debt obligations, obligations which the Debtors would be unable to pay as they came due and which rendered the Debtors over-leveraged, under-capitalized, and/or insolvent at various points in time.

2.    In addition to crippling the Debtors with debt and misappropriating more than $107.5 million of the loan proceeds, James Rhodes further harmed the Debtors by causing them to make an additional $24.5 million in wrongful transfers to or for the benefit of himself and his affiliates.  These funds paid additional personal income tax obligations owed by James Rhodes,

---

[1] The Reorganized Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if applicable, are: Heritage Land Company, LLC (2918); The Rhodes Companies, LLC (3060); Rhodes Ranch General Partnership (1760); Tick, LP (0707); Glynda, LP (5569); Chalkline, LP (0281); Batcave, LP (6837); Jackknife, LP (6189); Wallboard, LP (1467); Overflow, LP (9349); Rhodes Ranch Golf and Country Club (9730); Tuscany Acquisitions, LLC 90206); Tuscany Acquisitions II, LLC (8693); Tuscany Acquisitions III, LLC (9777); Tuscany Acquisitions IV, LLC (0509); Parcel 20 LLC (5534); Rhodes Design and Development Corp. (1963); C&J Holdings, Inc. (1315); Rhodes Realty, Inc. (0716); Jarupa LLC (4090); Elkhorn Investments, Inc. (6673); Rhodes Homes Arizona, LLC (7248); Rhodes Arizona Properties, LLC (8738); Tribes Holdings LLC (4347); Six Feathers Holdings, LLC (8451); Elkhorn Partners, A Nevada Limited Partnership (9654); Bravo Inc. (2642); Gung-Ho Concrete, LLC (6966); Geronimo Plumbing, LLC (6897); Apache Framing, LLC (6352); Tuscany Golf Country Clubb, LLC (7132); Pinnacle Grading, LLC (4838).

repaid personal loans owed solely by James Rhodes, were deposited directly in an account controlled by James Rhodes, or were used to fund working capital requirements of non-Debtor affiliates owned and/or controlled by James Rhodes. None of the Debtors received any valuable consideration or benefit whatsoever in exchange for these payments.

3.     Finally, James Rhodes exacerbated his previous misconduct by delaying any bankruptcy filings by the Debtors solely in order to facilitate his creation of a directly competing home-building entity doing business as "Harmony Homes." By early 2008, the Debtors were insolvent and in default under the credit facility. But rather than file for bankruptcy protection, James Rhodes wrongfully prolonged the Debtors' operations outside of bankruptcy in order to divert Debtor resources for the purpose of launching "Harmony Homes" as a profitable, new home-building company.

4.     As a result of the various breaches of fiduciary duties, fraudulent transfers, and other misconduct described herein, James Rhodes and his non-Debtor affiliates misappropriated many valuable assets, including substantial land holdings such as the former gypsum mine on Blue Diamond Hill overlooking Red Rock National Conservation Area near Las Vegas, Nevada. The Debtors, in contrast, suffered more than $130 million in damages as a result of such misconduct, and faced more than $315 million in estimated unsecured claims.[2]

## II.    JURISDICTION/VENUE

5.     On March 31, 2009 or April 1, 2009, The Rhodes Companies, LLC and certain of its affiliates and subsidiaries (collectively, the "Debtors") commenced the above-referenced bankruptcy cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court.

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334(b) in that the action arises in and/or relates to the bankruptcy cases. This action, moreover,

---

[2] *See* Second Amended Modified Disclosure Statement for the Second Amended Modified Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code for The Rhodes Companies, LLC, et al. (Dkt. No. 798) at 8-10.

involves the implementation and execution of the Chapter 11 plan confirmed by this Court in the bankruptcy cases, including the prosecution of certain pre-petition claims expressly reserved for post-confirmation enforcement by the Litigation Trust.

7.      The Trustee of the Litigation Trust, Eugene I. Davis, resides in and is a citizen of New Jersey.  Each of the Defendants is a citizen of Nevada.  Specifically, James Rhodes resides in Nevada.  Sagebrush Enterprises, Inc. ("Sagebrush") has its headquarters and principal place of business in Las Vegas, Nevada.  Each of the limited liability company Defendants named herein is entirely owned, directly or indirectly, by James Rhodes, Sagebrush, or trusts whose respective trustees are residents of Nevada.

8.      This action is a core proceeding as to which the Court may enter a final judgment under 28 U.S.C. § 157(b)(2)(A), (C) and (H).  This action, for example, includes counterclaims to a claim filed against the bankruptcy estate and claims to avoid and recover fraudulent transfers under 11 U.S.C. §§ 544 and 548.

9.      This Court has personal jurisdiction over the Defendants.  First, some of the Defendants have filed proofs of claim in these bankruptcy cases, thereby subjecting themselves to the equitable jurisdiction of this Court.  Second, the Defendants—all or nearly all of whom reside in Nevada, are organized under Nevada law, and/or are headquartered in Nevada—have the requisite national contacts to support personal jurisdiction in this Court.  Third, the Defendants have purposefully directed their activities toward the Debtors, which were organized under Nevada law and headquartered in Nevada, and those activities are the subject of this action.

10.     Venue is proper in this Court under 28 U.S.C. § 1409(a).

### III.    PARTIES AND OTHER RELEVANT ENTITIES

### A.    THE LITIGATION TRUST AND PERTINENT DEBTORS

11.     The Litigation Trust is a trust organized under New York law.  Eugene I. Davis, a resident of New Jersey, serves as trustee of the Litigation Trust.  The Litigation Trust was created in accordance with a trust agreement and the Third Amended Modified Plan of Reorganization

Pursuant to Chapter 11 of the Bankruptcy Code for The Rhodes Companies, LLC, et al. (the "Plan"), which was confirmed by this Court on March 12, 2010.  The Plan expressly retained certain causes of action belonging to the Debtors, including the causes of action asserted in this complaint,[3] for post-confirmation enforcement by the Litigation Trust under 11 U.S.C. § 1123(b).  The Litigation Trust, therefore, has standing to prosecute the claims set forth in this complaint.

12.     Heritage Land Company, LLC ("Heritage") is a Nevada limited liability company and is one of the Debtors in these bankruptcy cases.

13.     The Rhodes Companies, LLC ("RCO") is a Nevada limited liability company and is one of the Debtors in these bankruptcy cases.

14.     Rhodes Ranch General Partnership ("Rhodes Ranch GP") is a Nevada general partnership and is one of the Debtors in these bankruptcy cases.

15.     Rhodes Design and Development Corp. ("RDD") is a Nevada corporation and is one of the Debtors in these bankruptcy cases.

**B.     THE RHODES ENTITIES AND OTHER DEFENDANTS**

16.     The terms "Rhodes Entities" and "Rhodes Entity" shall have the meaning ascribed to them in the Plan.

17.     James M. Rhodes ("James Rhodes") is an individual whose principal place of residence is Las Vegas, Nevada.  James Rhodes may be served at his residence at 252 Angels Trace Court, Las Vegas, Nevada 89147, and through his counsel of record, Kevin Anderson at Fabian & Clendenin.

18.     John C. Rhodes ("John Rhodes") is an individual whose principal place of residence in Las Vegas, Nevada.  John Rhodes may be served at his residence at 2113 Hillsgate Street, Las Vegas, Nevada 89134.

---

[3] The Plan extended any statute of limitations applicable to the claims belonging to the Debtors against the Rhodes Entities "until sixty days following the Bankruptcy Court's ruling on the allowance of the Rhodes Entities Claims." The Litigation Trust and the Rhodes Entities subsequently entered into a tolling agreement dated April 5, 2012, which further extended any applicable statute of limitations to May 25, 2012.

19.     Sedora Holdings, LLC ("Sedora") is a Delaware limited liability company with its principal place of business in Las Vegas, Nevada.  Sedora may be served by serving any principal at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

20.     Sagebrush Enterprises, Inc. ("Sagebrush") is a Delaware corporation with its principal place of business in Las Vegas, Nevada.  Sagebrush may be served by serving any officer at 8912 Spanish Ridge Avenue, Suite 200, Las Vegas, Nevada 89148.

21.     Gypsum Resources, LLC ("Gypsum Resources") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Gypsum Resources may be served by serving any principal at 8912 Spanish Ridge Avenue, Suite 200, Las Vegas, Nevada 89148.

22.     Truckee Springs Holdings, Inc. ("Truckee Springs Holdings") is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  Truckee Springs Holdings may be served by serving any officer at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

23.     James M. Rhodes Dynasty Trust I, formerly known as the Michael J. Rhodes Investment Trust ("Rhodes Dynasty Trust I") was settled under Nevada law.  John C. Rhodes, a resident of Nevada, serves as trustee of the Rhodes Dynasty Trust I.  The Rhodes Dynasty Trust I may be served by serving the trustee, John C. Rhodes, at 2113 Hillsgate Street, Las Vegas, Nevada 89134.

24.     James M. Rhodes Dynasty Trust II, formerly known as the Ryan Rocky Rhodes Investment Trust ("Rhodes Dynasty Trust II") was settled under Nevada law.  John C. Rhodes, a resident of Nevada, serves as trustee of the Rhodes Dynasty Trust II.  The Rhodes Dynasty Trust II may be served by serving the trustee, John C. Rhodes, at 2113 Hillsgate Street, Las Vegas, Nevada 89134.

25.     Tock, LP ("Tock") is a Nevada limited partnership with its principal place of business in Las Vegas, Nevada.  Tock may be served by serving its general partner, Tulare Springs Holdings, Inc., at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

26.     American Land Management, LLC ("American Land Management") is an Arizona limited liability company with its principal place of business located in Apache Junction, Arizona. American Land Management may be served by serving its registered agent, Brian Studer, at 478 S. Vista Road, Apache Junction, Arizona 85219.

27.     South Dakota Conservancy, LLC ("South Dakota Conservancy") is a South Dakota limited liability company with its principal place of business located in Phoenix, Arizona.  South Dakota Conservancy may be served by serving its registered agent, National Registered Agents, Inc., at 638 N. 5th Avenue, Phoenix, Arizona 85003.

28.     Meridian Land Company, LLC ("Meridian Land") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Meridian Land may be served by serving its manager, Truckee Springs Holdings, Inc., at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

29.     Rhodes Ranch, LLC ("Rhodes Ranch") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Rhodes Ranch may be served by serving it in care of its manager, Sagebrush Enterprises, Inc.

30.     Harmony Homes, Inc. d/b/a Harmony Homes, LLC ("Harmony Homes") is a Nevada corporation with its principal place of business in Las Vegas, Nevada.  Harmony Homes may be served by serving any officer at 8912 Spanish Ridge Avenue, Suite 200, Las Vegas, Nevada 89148.

31.     North 5th LLC ("North 5th") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  North 5th may be served by serving its manager, Harmony Homes, at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

32.    Farm Hualapai, LLC ("Farm Hualapai") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Farm Hualapai may be served by serving its manager, Harmony Homes, at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

33.    Harmony 2, LLC ("Harmony 2") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Harmony 2 may be served by serving its registered agent, John C. Rhodes, at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

34.    Hayden Springs Partners, LLC ("Hayden Springs Partners") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Hayden Springs Partners may be served by serving its manager, Harmony Homes, at 7220 S. Cimarron Road, Suite 100, Las Vegas, Nevada 89113.

35.    Tropical Sands, LLC ("Tropical Sands") is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Tropical Sands may be served by serving its manager, Harmony Homes Nevada, LLC, at 8912 Spanish Ridge Avenue, Suite 200, Las Vegas, Nevada 89148.

## IV.    FACTUAL ALLEGATIONS

### A.    THE "RHODES HOMES" ENTERPRISE BEFORE NOVEMBER 2005

36.    Over the course of the late 1990s and early 2000s, James Rhodes oversaw the operations of an integrated home-building enterprise doing business as "Rhodes Homes" in the area around Las Vegas, Nevada.  This integrated enterprise consisted of various limited and general partnerships, limited liability companies, and joint ventures that operated to acquire, develop, and improve land, to construct residential homes, and to sell real property.  Many of the "Rhodes Homes" entities existed largely, if not entirely, on paper, and never even opened any bank accounts.  Further, with few exceptions, almost all of the Nevada-based entities within the "Rhodes Homes" enterprise utilized the same offices, employees, accounting systems, computer networks, and other office resources.

37.    Within the singular "Rhodes Homes" enterprise, corporate formalities were not observed.    Various assets held by the integrated company were transferred internally and externally without regard to: (a) the pertinent terms of governing organizational documents or written contracts (where such documents even existed in the first place); and/or (b) any legitimate business purpose, (*i.e.*, whether the transferor entity received some benefit from disposing of the assets or had some obligation to transfer the assets).    In essence, the assets and liabilities within the integrated "Rhodes Homes" enterprise were shuffled amongst the various component entities on an ad hoc basis for whatever purpose was most expedient at the time.    Such commingling of assets and liabilities went undocumented except for irregular and improper accounting entries that did not always reflect the economic realities of the purported transactions.

38.    As of the end of 2002, virtually all of the "Rhodes Homes" entities fell under the ownership umbrella of Sagebrush, which was in turn solely owned by James Rhodes.    In the audited financial statements for the fiscal year ending December 31, 2002, Sagebrush—whose financial statements were consolidated with both the Debtors and the Rhodes Entities—reported total assets of $151.37 million (including a total of $44.27 million in land held for development and land held for investment) and total liabilities of $118.99 million (including $103.15 million in notes payable).

39.    Throughout 2003 and into 2004, the "Rhodes Homes" enterprise rapidly increased its land holdings, largely through the incurrence of debt financing (and often in the name of Rhodes Ranch GP).    The consolidated audited financial statements reflected the following:

| (in millions) | 12/31/2002 | 12/31/2003 | 12/31/2004 |
|---|---|---|---|
| Real estate inventories | $ 77.28 | $ 73.85 | $169.26 |
| Land held for development | $ 11.21 | $ 22.56 | $ 43.92 |
| Land held for investment | $ 33.06 | $ 87.55 | $141.05 |
| Total land | $ 44.27 | $110.11 | $184.97 |
| Total assets | $151.37 | $203.10 | $373.85 |
| | | | |
| Notes payable | $103.15 | $ 86.04 | $214.67 |
| Total liabilities | $118.99 | $100.05 | $236.62 |

Accordingly, the "Rhodes Homes" enterprise's total land holdings more than quadrupled over a two-year period, from $44.3 million as of December 31, 2002 to nearly $185 million as of December 31, 2004.

40.    In conjunction with the increasing land holdings, James Rhodes embarked upon a purported "reorganization plan" in 2004.  This "reorganization" supposedly resulted in Sedora and/or Rhodes Dynasty Trust I and Rhodes Dynasty Trust II holding the vast majority of ownership interests of the various entities with mid-term to long-term land holdings.   The "purported reorganization" was motivated by a desire to insulate the rapidly growing land portfolio from legal liabilities incurred as a result of real estate development, home building, and home sales operations conducted by entities that remained under the Sagebrush ownership umbrella, and to otherwise place the bulk of the long-term land holdings beyond the reach of potential creditors.   The "reorganization" was largely a sham, as several of the purported organizational changes were not appropriately documented, related contracts and agreements were not executed and/or were disregarded, and other corporate formalities were not observed.

41.    Following the so-called "reorganization," the singular "Rhodes Homes" enterprise operated much in the way as it did before.  In particular, corporate formalities were routinely disregarded.   The assets and liabilities of the "Rhodes Homes" enterprise continued to be commingled and to be shuffled between and transferred out of the various entities without regard to pertinent provisions in organizational documents and applicable contracts and/or economic substance.   In several instances, the proceeds of debt incurred by entities on the home-building

side of the business, such as Rhodes Ranch GP, were used to obtain land for the land-holding side of the business. Such commingling of assets and liabilities between the home-building side and the land-holding side of the business was improper, irregular, and inconsistent with industry norms and best practices.

42.    Throughout 2005, the "Rhodes Homes" enterprise continued to acquire land. According to the audited financial statements, the land holdings grew to more than $273 million by December 31, 2005, consisting of $66.27 million of "land held for development" and $207.05 million of "land held for investment." This amount represented nearly 50% growth in combined land holdings from the prior year. As before, these land acquisitions were financed with additional debt incurred by entities on the home-building side of the enterprise, revenues diverted from entities on the home-building side of the enterprise, or commingled funds within the enterprise.

43.    By the end of 2005, Gypsum Resources and various Rhodes Entities owned by Sedora held most of the land within the "Rhodes Homes" enterprise. They did not obtain this land—nearly $190 million in reported land holdings—through legitimate means. Instead, they obtained most of this land through debt financing incurred by the Debtors and/or through misappropriation of assets belonging to the Debtors through the continuing failure to observe corporate formalities, improper commingling, and sham accounting that occurred within the integrated "Rhodes Homes" enterprise. In November 2005, James Rhodes, Sagebrush, and Sedora wrongfully capitalized on the improper commingling of assets and liabilities between the home-building side of the business and the land-holding side of the business to the detriment of the Debtors.

**B.      MISCONDUCT IN CAUSING THE DEBTORS TO ENTER INTO THE CSFB CREDIT FACILITY IN NOVEMBER 2005**

44.    On or about November 21, 2005, James Rhodes, Sagebrush, and Sedora caused Rhodes Ranch GP, Heritage, and RCO to enter into: (a) a $430 million first-lien Credit Agreement

with Credit Suisse, Cayman Islands Branch acting as the administrative agent, collateral agent, and syndication agent for various banks, financial institutions, investors, and other lenders; and (b) a $70 million second-lien Credit Agreement (collectively, the "CSFB Credit Facility"). Rhodes Ranch GP, Heritage, and RCO—as well as the other Debtors—pledged the entirety of their assets as collateral for this loan. Yet James Rhodes, Sedora, Sagebrush, and the other Rhodes Entities did not incur any obligation and did not pledge any assets as collateral for this $500 million loan.

45.     The Debtors' entry into the CSFB Credit Facility, therefore, created a distinction between those entities whose assets were pledged as collateral and those entities whose assets were not pledged as collateral for the loan. The former group of entities—which consisted only of the Debtors—were referred to as the "in-the-bucket" entities by personnel within the integrated "Rhodes Homes" enterprise. The latter group of entities—which included Sedora, Sagebrush, and many Rhodes Entities—became known as the "out-of-the-bucket" entities.

46.     By causing Heritage and RCO to enter into the CSFB Credit Facility, James Rhodes, Sedora, and Sagebrush breached their respective fiduciary duties of care and loyalty owed to Heritage and RCO. The incurrence of the $500 million in debt obligations and the grant of liens was intended to and did benefit the "out-of-the-bucket" Rhodes Entities to the detriment of the Debtors. Specifically, as discussed below, the loan was used to: (a) make a $69 million cash payment to Sedora which was used to purchase real property for the Rhodes Entities and/or satisfy other working capital needs of the Rhodes Entities; (b) repay pre-existing obligations incurred to obtain real property held by the Rhodes Entities; and (c) make approximately $38.5 million in tax payments on behalf of James Rhodes (for which none of the Debtors, each of which was a pass-through or disregarded entity for tax purposes, owed any obligation). Much of the remaining loan proceeds were merely set aside to pay interest and fees, thereby buying time for James Rhodes to continue to expand the real estate holdings of the "out-of-the-bucket" Rhodes

Entities and ultimately establish a competing home-builder in the Las Vegas area that did business as Harmony Homes, as discussed below.

47.     At bottom, the CSFB Credit Facility and related transactions enabled James Rhodes and the "out-of-the-bucket" entities to cash out of the "Rhodes Homes" enterprise, taking the land holdings that had been gobbled up from 2003-2005 while leaving the Debtors laden with crippling debt (a substantial portion of which re-financed debt related to the Rhodes Entities' land holdings). This reality was reflected in the audited financials for the fiscal year ending December 31, 2005, which indicated as follows:

|  | TOTAL (millions) | Debtors (millions) | Debtors % |
|---|---|---|---|
| Land held for investment | $207.05 | $17.73 | 8.6% |
| Total Land | 273.32 | 84.00 | 30.7% |
| Total Assets | 773.41 | 506.50 | 65.5% |
| Notes Payable | 539.75 | 490.88 | 90.9% |
| Total Liabilities | 578.48 | 524.45 | 90.7% |
| Book Equity | 190.08 | *-18.43* |  |

The Debtors' holdings accounted for only 65.5% of combined assets, yet the Debtors were left on the hook for over 90% of the combined debt. All of the book equity was in the "out-of-the-bucket" Rhodes Entities. And the Rhodes Entities ended up with land held for investment with a book value of over $189 million while effectively shifting much of the related underlying debt on to the Debtors.

**1.      The $69 Million Cash Payment for the Benefit of the Rhodes Entities**

48.     Approximately $200.9 million of the proceeds of the CSFB Credit Facility were deposited in a Bank of New York account held by Heritage on November 21, 2005. Of the cash loan proceeds received by Heritage, Heritage soon transferred $69 million (the "$69MM Loan Proceeds") to Sedora's account number XX8614 at Bank of New York (the "BONY Custody Account") on December 7, 2005 (the "$69MM Transfer"). Heritage did not receive any benefit, direct or indirect, or any consideration in exchange for making the $69MM Transfer. And Sedora

did not use these proceeds in a manner that conferred any benefit on the Debtors.  Rather, the $69MM Loan Proceeds were used to purchase land for the Rhodes Entities and for other purposes that benefitted the Rhodes Entities (and not the Debtors).

49.    From December 2005 through February 2006, Sedora maintained the balance of the $69MM Loan Proceeds that it had received through the $69MM Transfer from Heritage in the Sedora BONY Custody Account.  During the ensuing three month time period, Sedora transferred $24.2 million of the $69MM Loan Proceeds as follows:

| DATE | AMOUNT | DESTINATION |
|---|---|---|
| 12/15/2005 | $2,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 1/11/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 1/25/2006 | $500,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 1/26/2006 | $400,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 1/26/2006 | $2,600,000.00 | Sagebrush Checking Account (Business Bank of Nevada) |
| 2/7/2006 | $3,100,000.00 | Escrow (Land Title of Nevada, Inc.) |
| 2/8/2006 | $600,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 2/9/2006 | $10,000,000.00 | Rhodes Ranch GP to Sedora (Business Bank of Nevada) |
| 2/13/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 2/17/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 2/22/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 2/27/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| TOTAL | $24,200,000.00 | |

None of these transfers benefitted the Debtors.

50.    Specifically, a portion of these $24.2 million in transfers of $69MM Loan Proceeds were used to purchase real property for the Rhodes Entities, as follows:

| AMOUNT | ACCOUNT | PAYMENT | CLEARED | ENTITY | EX. # |
|---|---|---|---|---|---|
| $326,298.00 | Sedora BB of NV | check 2899 | 1/18/2006 | American Land Management | A |
| $72,195.50 | Sedora BB of NV | check 2901 | 1/12/2006 | South Dakota Conservancy | B |
| $100,202.50 | Sedora BB of NV | check 2902 | 1/12/2006 | South Dakota Conservancy | C |
| $10,000.00 | Sedora BB of NV | check 2903 | 1/12/2006 | South Dakota Conservancy | D |

| AMOUNT | ACCOUNT | PAYMENT | CLEARED | ENTITY | EX. # |
|---|---|---|---|---|---|
| $75,246.50 | Sedora BB of NV | check 2950 | 1/30/2006 | South Dakota Conservancy | E |
| $80,195.50 | Sedora BB of NV | check 2951 | 1/30/2006 | South Dakota Conservancy | F |
| $120,207.50 | Sedora BB of NV | check 2980 | 1/30/2006 | South Dakota Conservancy | G |
| $3,100,000.00 | Sedora BONY Custody | wire transfer | 2/7/2006 | Tock | H |
| $150,420.50 | Sedora BB of NV | check 3003 | 2/8/2006 | South Dakota Conservancy | I |
| $80,262.15 | Sedora BB of NV | check 3004 | 2/8/2006 | South Dakota Conservancy | J |
| $210,222.50 | Sedora BB of NV | check 3005 | 2/8/2006 | South Dakota Conservancy | K |
| $80,195.50 | Sedora BB of NV | check 3009 | 2/9/2006 | South Dakota Conservancy | L |
| $375,750.92 | Sedora BB of NV | check 3021 | 2/14/2006 | South Dakota Conservancy | M |
| $218,237.50 | Sedora BB of NV | check 3024 | 2/16/2006 | South Dakota Conservancy | N |
| $58,525.00 | Sedora BB of NV | check 3029 | 2/17/2006 | South Dakota Conservancy | O |
| $110,207.50 | Sedora BB of NV | check 3031 | 2/17/2006 | South Dakota Conservancy | P |
| $159,396.50 | Sedora BB of NV | check 3032 | 2/17/2006 | South Dakota Conservancy | Q |
| $120,396.50 | Sedora BB of NV | check 3033 | 2/17/2006 | South Dakota Conservancy | R |
| $242,981.50 | Sedora BB of NV | check 3034 | 2/17/2006 | Meridian Land | S |
| $28,382.50 | Sedora BB of NV | check 3086 | 2/27/2006 | South Dakota Conservancy | T |
| $35,349.00 | Sedora BB of NV | check 3087 | 2/27/2006 | South Dakota Conservancy | U |
| $28,382.50 | Sedora BB of NV | check 3088 | 2/27/2006 | South Dakota Conservancy | V |
| $25,182.50 | Sedora BB of NV | check 3089 | 2/27/2006 | South Dakota Conservancy | W |
| $125,207.50 | Sedora BB of NV | check 3090 | 2/27/2006 | South Dakota Conservancy | X |
| $120,207.50 | Sedora BB of NV | check 3091 | 2/27/2006 | South Dakota Conservancy | Y |
| $25,351.50 | Sedora BB of NV | check 3092 | 2/27/2006 | South Dakota Conservancy | Z |

| AMOUNT | ACCOUNT | PAYMENT | CLEARED | ENTITY | EX. # |
|---|---|---|---|---|---|
| $120,207.50 | Sedora BB of NV | check 3093 | 2/27/2006 | South Dakota Conservancy | AA |
| $300,245.50 | Sedora BB of NV | check 3094 | 2/27/2006 | South Dakota Conservancy | AB |
| $120,207.50 | Sedora BB of NV | check 3095 | 2/27/2006 | South Dakota Conservancy | AC |
| **$6,619,665.07** | | | | | |

The Debtors did not receive any benefit from the Rhodes Entities' acquisitions of land.

51.     The remaining portion of the $24.2 million of $69MM Loan Proceeds expended from December 2005 to February 2006 similarly was not used for the benefit of the Debtors, but rather to repay obligations owed by the Rhodes Entities and for other purposes that benefitted the Rhodes Entities (and not the Debtors).  For example, Sagebrush used the $2.6 million of $69MM Loan Proceeds that it received from the Sedora BONY Custody Account on January 26, 2006 to make a $2.25 million loan to Spirit Underground, LLC.  The Debtors did not receive any direct or indirect benefit from this loan, nor from Sagebrush's disposition of the remaining proceeds from the $2.6 million transfer that Sagebrush received from Sedora.

52.     Following this initial flurry of land purchases (totaling in excess of $6.6 million) and other payments made for the benefit of the Rhodes Entities, Sedora transferred the remaining $69MM Loan Proceeds from the Sedora BONY Custody Account to a new Sedora account at Merrill Lynch, account number XXXX7090 (the "Sedora Merrill Lynch Account").  This transfer was accomplished through an approximately $45.68 million wire transfer made on February 27, 2006.

53.     From there, Sedora continued to utilize the remaining $69MM Loan Proceeds for purposes that benefitted the Rhodes Entities, and not the Debtors.  Specifically, $19.35 million of such proceeds were transferred out of the Sedora Merrill Lynch Account from March 2006 through early June 2006, as follows:

| DATE | AMOUNT | DESTINATION |
|---|---|---|
| 3/8/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 3/13/2006 | $7,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |

| DATE | AMOUNT | DESTINATION |
|---|---|---|
| 3/22/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 4/4/2006 | $2,600,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 4/7/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 4/19/2006 | $1,000,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 4/20/2006 | $500,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 4/24/2006 | $3,750,000.00 | Sagebrush Checking Account (Business Bank of Nevada) |
| 4/27/2006 | $500,000.00 | Sedora Checking Account (Business Bank of Nevada) |
| 6/2/2006 | $1,000,000.00 | Sagebrush Checking Account (First National Bank of Nevada) |
| TOTAL | $19,350,000.00 | |

None of these transfers benefitted the Debtors.

54.    Specifically, more than $10.8 million of the $19.35 million in transfers of $69MM Loan Proceeds was used to purchase real property for Rhodes Entities, as follows:

| AMOUNT | ACCOUNT | PAYMENT | CLEARED | ENTITY | EX. # |
|---|---|---|---|---|---|
| $450,282.50 | Sedora BB of NV | check 3126 | 3/9/2006 | Meridian Land | AD |
| $450,282.50 | Sedora BB of NV | check 3127 | 3/9/2006 | Meridian Land | AE |
| $6,042,782.50 | Sedora BB of NV | wire transfer | 3/14/2006 | Meridian Land | AF |
| $325,547.50 | Sedora BB of NV | check 3143 | 3/14/2006 | South Dakota Conservancy | AG |
| $220,117.48 | Sedora BB of NV | wire transfer | 4/6/2006 | Meridian Land | AH |
| $1,400,240.08 | Sedora BB of NV | wire transfer | 4/6/2006 | Meridian Land | AI |
| $18,982.50 | Sedora BB of NV | wire transfer | 4/6/2006 | South Dakota Conservancy | AJ |
| $220,123.82 | Sedora BB of NV | wire transfer | 4/6/2006 | Meridian Land | AK |
| $198,233.23 | Sedora BB of NV | wire transfer | 4/6/2006 | Meridian Land | AL |
| $70,353.86 | Sedora BB of NV | check 3261 | 4/11/2006 | Meridian Land | AM |
| $125,207.50 | Sedora BB of NV | check 3253 | 4/17/2006 | South Dakota Conservancy | AN |
| $120,207.50 | Sedora BB of NV | check 3254 | 4/17/2006 | South Dakota Conservancy | AO |
| $248,103.00 | Sedora BB of NV | check 3269 | 4/17/2006 | South Dakota Conservancy | AP |

| AMOUNT | ACCOUNT | PAYMENT | CLEARED | ENTITY | EX. # |
|---|---|---|---|---|---|
| $160,220.50 | Sedora BB of NV | wire transfer | 4/20/2006 | South Dakota Conservancy | AQ |
| $220,232.50 | Sedora BB of NV | wire transfer | 4/20/2006 | American Land Management | AR |
| $299,291.84 | Sedora BB of NV | wire transfer | 4/20/2006 | Sedora | AS |
| $120,207.50 | Sedora BB of NV | check 3293 | 4/25/2006 | South Dakota Conservancy | AT |
| $120,207.50 | Sedora BB of NV | check 3294 | 4/25/2006 | South Dakota Conservancy | AU |
| $10,810,623.81 | | | | | |

The Debtors did not receive any benefit from the Rhodes Entities' acquisitions of land.

55.     The remaining portion of the $19.35 million of $69MM Loan Proceeds expended from March to June 2006 similarly was not used for the benefit of the Debtors, but rather for other purposes that benefitted the Rhodes Entities (and not the Debtors).

56.     For example, Sagebrush utilized $3,721,277.76 of these proceeds to cover the following checks for membership buyouts: (a) check number 3900 in the amount of $1,662,026.47 payable to Dylan Ltd.; (b) check numbers 3901, 3902, 3905, 3906, and 2907 each in the amount of $176,516,73 payable to James E. Garrett, Dorothy Garrett, Leonard & Betsy Rhodes, Terry Ono (trustee), and United Financial Mgmt Co, respectively; and (c) check numbers 3903 and 3904 in the amount of $588,333.82 payable to James Garrett Trust and Don Kletzien, respectively.  The Debtors did not receive any benefit from these membership buy-outs.  In particular, the Debtors did not obtain any interests held by the entities who received these buy-out checks.

57.     Similarly, the Debtors did not receive any benefit from the use of $1 million of $69MM Loan Proceeds to pay James Rhodes' personal obligations arising out of his divorce of Deborah Rhodes.  Sagebrush used $1 million of the $69MM Loan Proceeds received on June 2, 2006 to issue checks numbered 58 and 59 payable to Deborah Rhodes in the amounts of

$428,571.70 and $571,428.50, respectively, as part of a divorce settlement between Deborah Rhodes and James Rhodes.  Both of these checks cleared on June 2, 2006.

58.    Sedora transferred the remaining proceeds of the $69MM Loan Proceeds out of the Sedora Merrill Lynch Account as follows:

| DATE | AMOUNT | DESTINATION |
|---|---|---|
| 5/31/06 | $650,000.00 | Sedora checking (First National Bank of Nevada) |
| 6/14/06 | $5,125,000.00 | Sedora checking (First National Bank of Nevada) |
| 8/15/06 | $10,000,000.00 | Santoro Driggs |
| 8/29/06 | $2,975,000.00 | Transnation Title |
| 10/10/06 | $1,300,000.00 | Sedora checking (First National Bank of Nevada) |
| 10/13/06 | $700,000.00 | Sedora checking (First National Bank of Nevada) |
| 11/1/06 | $2,000,000.00 | Sedora checking (First National Bank of Nevada) |
| 11/17/06 | $1,004,828.39 | American Commonwealth Mortgage (Loan 50041) |
| 11/22/06 | $3,000,000.00 | Sedora checking (First National Bank of Nevada) |
| **TOTAL** | **$26,754,828.00** | |

None of these proceeds were used in a manner that benefitted the Debtors.  Rather, the funds were used for working capital purposes of the Rhodes Entities and in other ways that benefitted the Rhodes Entities.

59.    In particular, most of these funds were commingled with the funds of other Rhodes Entities through a sweep account that Sedora maintained at First National Bank of Nevada.  From mid-2006 onward, virtually all funds received into the Sedora checking account, Sagebrush checking account, and other Rhodes Entity accounts were automatically swept into this account and commingled with other funds.  As funds were needed by one or more of the Rhodes Entities, transfers were then made from the commingled sweep account to the checking account of the Rhodes Entity in need of the funds.  Funds advanced from the commingled Sedora sweep account were used for working capital purposes of the Rhodes Entities, to purchase land for the Rhodes Entities, and for other purposes that benefitted the Rhodes Entities and not the Debtors.

60.    The funds that were not commingled were similarly used solely for the benefit of the Rhodes Entities. For example, the $2.975 million wire transfer to Transnation Title on August 29, 2006 was for the purchase of vacant land in Mohave County, Arizona (APN 317-36-051 at the time) for American Land Management. The legal description for property acquired from this transfer is described in the attached exhibit "AV."

61.    In sum, Sedora (at James Rhodes' direction) utilized the entirety of the $69MM Loan Proceeds for the benefit of the Rhodes Entities, and not for the benefit of the Debtors. More than $20 million of such funds are directly traceable to land purchases for the Rhodes Entities. Additional $69MM Loan Proceeds were also utilized to purchase land after such funds had been commingled with Rhodes Entity funds in a commingled sweep account held by Sedora. The remaining portion of the $69MM Loan Proceeds were used to pay obligations owed by the Rhodes Entities, were used to meet the Rhodes Entities' working capital requirements, and/or were otherwise spent for the benefit of the Rhodes Entities.

62.    Virtually no portion of the $69MM Loan Proceeds was used in a manner that benefitted the Debtors either directly or indirectly, and the Debtors did not receive any consideration or economic benefit in exchange for the $69MM Transfer. As such, the actions of James Rhodes and Sedora in causing Heritage to make the $69MM Transfer and causing the Debtors to incur the related debt significantly harmed the Debtors.

**2.    Misuse of Other Loan Proceeds to Make Tax Payments for James Rhodes**

63.    In addition to their misuse of the $69MM Loan Proceeds, James Rhodes, Sagebrush, and Sedora utilized a significant portion of the remaining net cash proceeds of the CSFB Credit Facility to make payments solely for the benefit of the Rhodes Entities. Specifically, $38.5 million of the proceeds from the CSFB Credit Facility were used to pay James Rhodes' personal income tax obligations to the IRS—obligations resulting from the status of the Debtors and Rhodes Entities as pass-through or disregarded entities for tax purposes—as described below.

64.     On December 1, 2005, Heritage transferred $7.5 million of the loan proceeds received in connection with the CSFB Credit Facility to Sagebrush.  Sagebrush used these funds to cover check number 3679 to the IRS in the amount of $15,870,431.00 to pay personal income tax obligations owed by James Rhodes.

65.     On April 17, 2006, Heritage transferred $17 million of the loan proceeds received in connection with the CSFB Credit Facility to Sagebrush.  Sagebrush used these funds to cover check number 3892 to the IRS in the amount of $17 million to pay personal income tax obligations owed by James Rhodes.

66.     Finally, on November 30, 2006, Heritage transferred $14 million of the $69MM Loan Proceeds to Sagebrush's checking account at First National Bank of Nevada.  These funds were utilized to cover Sagebrush check number 512 to the IRS in the amount of $14,040,000.00. This check cleared on December 14, 2006.

67.     Heritage and the other Debtors did not receive any benefit from paying James Rhodes' personal income tax obligations in connection with the transfers described in paragraphs 63 to 66 (collectively, the "CSFB Proceeds Tax Transfers"), nor did Heritage and the other Debtors have any obligation to make such payments on behalf of James Rhodes.

68.     At the time James Rhodes, Sagebrush, and Sedora caused the Debtors to enter into the CSFB Credit Facility, James Rhodes, Sagebrush, and Sedora had already contemplated using a portion of the loan proceeds to be received by the Debtors to pay such income tax obligations, even though James Rhodes knew that the Debtors received no benefit from making such payments and had no obligation to make such payments on his behalf.

69.     The misuse of $38.5 million to pay James Rhodes' personal income taxes meant that the majority of the net cash proceeds received by the Debtors in connection with the CSFB Credit Facility did not benefit the Debtors, but instead benefitted James Rhodes (and the Rhodes Entities).  Specifically, the Debtors received approximately $200.9 million in unrestricted cash at closing.  As discussed above, $69 million of the proceeds was transferred to Sedora (and

subsequently used for the benefit of the Rhodes Entities), and $38.5 million was used to make tax payments on behalf of James Rhodes in connection with the CSFB Proceeds Tax Transfers. These $107.5 million in cash payments made for the benefit of the Rhodes Entities did not benefit the Debtors, and the Debtors did not have any obligation to make such payments.  Nor did the Debtors receive any valuable consideration in exchange for making these payments.

**3.      Repayment of Debts Incurred for the Benefit of the Rhodes Entities**

70.      At closing, approximately $235.1 million of the proceeds of the CSFB Credit Facility were transferred to Commerce Title.  These funds were used to pay title fees, recording costs, taxes, and certain existing indebtedness at the time.  In particular, the proceeds were used to repay the principal balances of forty-three (43) outstanding loans totaling nearly $231 million (collectively, the "Existing Indebtedness"), as follows:

| BALANCE | OBLIGEE |
|---|---|
| $6,223,000.00 | Business Bank |
| $5,892,947.97 | Community Bank of Nevada |
| $2,330,000.00 | American Commonwealth Mortgage Company |
| $9,589,741.66 | Dorfinco Corporation |
| $3,100,086.79 | First National Bank of Nevada |
| $4,697,490.95 | First National Bank of Nevada |
| $5,020,000.00 | Community Bank of Nevada |
| $408,685.46 | First National Bank of Nevada |
| $1,688,673.47 | First National Bank of Nevada |
| $1,025,278.90 | First National Bank of Nevada |
| $4,020,347.81 | First National Bank of Nevada |
| $1,157,738.35 | First National Bank of Nevada |
| $8,079,219.60 | First National Bank of Nevada |
| $2,025,200.90 | First National Bank of Nevada |
| $683,698.48 | First National Bank of Nevada |
| $36,923,588.53 | GMAC Residential Construction |
| $24,500,000.00 | GMAC Residential Construction |
| $13,185,942.42 | Nevada State Bank |
| $12,800,000.00 | Commercial Federal Bank |
| $3,781,000.00 | Commercial Federal Bank |

| BALANCE | OBLIGEE |
|---|---|
| $6,647,783.49 | Citibank Texas, N.A. |
| $454,000.00 | Consolidated Mortgage Corporation |
| $533,000.00 | Consolidated Mortgage Corporation |
| $470,000.00 | Consolidated Mortgage Corporation |
| $401,000.00 | Consolidated Mortgage Corporation |
| $457,000.00 | Consolidated Mortgage Corporation |
| $457,000.00 | Consolidated Mortgage Corporation |
| $426,100.00 | Consolidated Mortgage Corporation |
| $429,600.00 | Consolidated Mortgage Corporation |
| $426,100.00 | Consolidated Mortgage Corporation |
| $4,000,000.00 | Consolidated Mortgage Corporation |
| $6,943,625.84 | RBC Builder Finance |
| $5,036,053.53 | RBC Builder Finance |
| $5,378,510.04 | RBC Builder Finance |
| $18,804,837.43 | RBC Builder Finance |
| $1,250,420.00 | Landamerica Account Servicing, Inc. (AZ) |
| $1,270,141.15 | Landamerica Account Servicing, Inc. (AZ) |
| $5,358,918.85 | Landamerica Account Servicing, Inc. (AZ) |
| $7,500,000.00 | Consolidated Mortgage Corporation |
| $16,195,000.00 | Consolidated Mortgage Corporation |
| $76,971.09 | Noteworld Servicing Center as agent for FATCO |
| $479,085.57 | US Loan Servicing |
| $780,343.41 | Winning Wigwam Windfall L.P. |
| $230,908,131.69 | **TOTAL** |

A significant portion of these obligations re-financed through the CSFB Credit Facility had directly or indirectly benefitted the Rhodes Entities, and not the Debtors. In particular, the underlying proceeds related to several of these obligations had been previously commingled with Debtor operational funds to obtain land for the Rhodes Entities and/or to pay-off previous financing incurred to purchase land for the Rhodes Entities.

71.    For example, the re-financing of the Existing Indebtedness facilitated Gypsum Resource's ability to hold 2,656.02 acres on Blue Diamond Hill, located southwest of Las Vegas, Nevada (the "Blue Diamond Property"), completely unencumbered from any liens as of November 21, 2005.

72.     On March 12, 2003, Rhodes Ranch GP borrowed $65,000,000 from GMAC Residential Funding Corporation.  At closing, $44,373,460.12 of the proceeds of this loan was used to fund the closing of the Blue Diamond Property.  Although Rhodes Ranch GP took out the loan, the Blue Diamond Property was deeded to Gypsum Resources.  Ultimately, Rhodes Ranch GP repaid the $65 million loan used to obtain the Blue Diamond Property through a combination of proceeds from the sale of 168 acres of land held by Rhodes Ranch GP to JB Homes on June 1, 2003, loan refinancing transactions, and revenue from Rhodes Ranch GP's sale of homes.  The various loans used to refinance a portion of the $65 million loan that obtained the Blue Diamond Property for Gypsum were ultimately repaid with proceeds of the CSFB Credit Facility (through the payoff of the $36,923,588.52 GMAC Residential Construction loan set forth in the table above).

73.     Similarly, proceeds of the CSFB Loan Facility were used to repay obligations that had been incurred in order to obtain land for Tock.  Specifically, more than $16.378 million of the proceeds of the $24.5 million GMAC Residential Construction loan identified in the table above were used to obtain various parcels of land near Las Vegas, Nevada that ultimately ended up in the possession of Tock.  Almost the entirety of Tock's land holdings as of the date of the closing of the CSFB Credit Facility were obtained through this loan or otherwise through financing or operating revenues provided by Rhodes Ranch GP and/or other Debtors.

74.     Finally, several of the other loans re-financed through the CSFB Credit Facility (as set forth in the table above) had been utilized to obtain land in Arizona for the Rhodes Entities.  For example, each of the payoffs to Landamerica Account Servicing, Inc. (AZ) in the amounts of $1,250,520.00, $1,270,141.15, and $5,358,918.85 was for a loan or seller carry-back note related to the Rhodes Entities' acquisition of land in Mohave County, Arizona.  Similarly, the $16,195,000 payoff to Consolidated Mortgage Corporation was related—directly or indirectly through refinancing of other loans—to the acquisition of land in Arizona for the Rhodes Entities.

75.     In essence, the refinancing component of the CSFB Credit Facility constituted the final step in a continuous sequence of transactions that enabled the Rhodes Entities to obtain significant holdings of land for investment, while at the same time placing the debt burden related to those substantial land holdings on the Debtors.  These debt re-financings were accompanied by a myriad of contemporaneous, irregular, and improper accounting entries to shuffle assets and liabilities on the Debtors' and Rhodes Entities' books to further ensure that the debt burden was shifted to the Debtors.

76.     As a result of the combined effect of: (a) pre-existing commingling of Debtor and Rhodes Entity funds, the lack of adherence to corporate formalities, and irregular and improper accounting practices leading up to the closing of the CSFB Credit Facility; (b) the Debtors entering into the CSFB Credit Facility and refinancing the Existing Indebtedness; and (c) a number of improper accounting entries on the date of closing, the Debtors ended up bearing a significant portion of debt burden related to the Rhodes Entities' acquisition of nearly $190 million in land holdings.  Rhodes Entities such as Gypsum Resources were thereby enabled to hold valuable parcels such as the Blue Diamond Property free and clear of any encumbrances, while the Debtors were burdened with crippling debt.

77.     In the aggregate, the re-financing component of the CSFB Credit Facility did not provide any net economic benefit to the Debtors, but rather exacerbated the other harm suffered by the Debtors as a result of entering into the CFSB Credit Facility.

**4.     No Business Justification for Causing the Debtors to Enter into the CSFB Credit Facility**

78.     In causing the Debtors to enter into the CSFB Credit Facility, James Rhodes, Sagebrush, and Sedora were acting for the benefit of the Rhodes Entities, and not for the benefit of the Debtors.  From the perspective of solely the Debtors' interests, there was no legitimate purpose served by causing the Debtors to enter into the CSFB Credit Facility.

79.     Upon closing the CSFB Credit Facility, the Debtors received approximately $200.9 million in unrestricted cash, an amount representing less than half of the total indebtedness incurred.  Of this amount, $107.5 million was to be sent to the Rhodes Entities.  The remaining balance of the loan obligation incurred by the Debtors consisted of cash disbursements to third parties to repay pre-existing obligations (many of which had originally been incurred for the benefit of the Rhodes Entities), to pay various fees incurred in connection with the CSFB Credit Facility, to fund interest, and for other miscellaneous administrative purposes, as summarized in the following table:

| SOURCES AND USES | AMOUNT (in millions) |
|---|---|
| Total loan funds, net of original issue discounts | $497.03 |
| Re-financing and transaction costs to Commerce Title | ($235.14) |
| Interest reserve (restricted cash) | ($50.00) |
| CSFB arrangement fees and administration fee | ($10.45) |
| Miscellaneous other transaction costs | ($0.50) |
| Gross amount funded to Debtors | $200.93 |
| Less $69 million distribution | ($69.00) |
| Less $38.5 million tax payments | ($38.50) |
| TOTAL NET PROCEEDS TO DEBTOR | $93.43 |

The net proceeds ultimately utilized by the Debtors represented only 18.7% of the total $500 million of indebtedness incurred in connection with the CSFB Credit Facility.  Further, the $93.43 million in fresh cash utilized by the Debtors accounted for only approximately 35.3% of the total new indebtedness incurred in connection with the CSFB Credit Facility.  There was no legitimate end of the Debtors served by the incurrence of such a massive amount of indebtedness in relation to the amount of proceeds received by the Debtors.  The incurrence of such debt was particularly unjustifiable in light of the ease with which the Debtors were able to acquire credit from other sources at the time.

80.     Further, causing the Debtors to enter into the CSFB Credit Facility significantly increased the Debtors' interest obligations and otherwise imposed significant cash flow constraints.  The incurrence of nearly $365 million in "new" debt significantly increased the

amount of quarterly interest that the Debtors would be required to pay.  Indeed, the Debtors were required to make in excess of $75 million of yearly principal and interest payments over the course of each of the next three years, an amount that exceeded the combined "Rhodes Home" enterprise's operating income in two of the three proceeding years.  As such, the misconduct of James Rhodes, Sagebrush, and Sedora in causing the Debtors to enter into the CSFB Credit Facility and in causing the Debtors to enter into related transactions left the Debtors' over-leveraged and doomed to fail.

**5.    Following Entry into the CSFB Credit Facility and Related Transactions, the Debtors' Business Was Doomed to Fail**

81.    James Rhodes, Sedora, and Sagebrush caused the Debtor to become over-leveraged by placing much of the equity of the combined "Rhodes Homes" enterprise in Sedora and Sagebrush, causing the Debtors to enter into the CSFB Credit Facility, causing the Debtors to transfer significant portions of the proceeds from the CSFB Credit Facility to the Rhodes Entities (through the $69MM Transfer and other transfers), and causing a significant portion of debt that benefitted the Rhodes Entities to be refinanced through the CSFB Credit Facility.  As a result of the transactions consummated in connection with entry into the CSFB Credit Facility, the Debtors were left with unreasonably small assets and would not be able to meet the obligations of the CSFB Credit Facility as such obligations came due.

82.    Based on historical financial results, there was a significant risk at the time that the Debtors entered into the CSFB Credit Facility that the Debtors would not be able to meet the $17-20+ million in quarterly payments of principal and interest that were required under the CSFB Credit Facility.  The historical combined EBITDA of the singular, integrated "Rhodes Homes" enterprise (both Debtors and Rhodes Entities) for the three years leading up to entry into the CSFB Credit Facility was $62.4 million in 2004, $73.6 million for 2003, and $27.5 million for 2002.  In other words, the Debtors' historical earnings indicated that it would be difficult for them to meet or significantly exceed their quarterly obligations with cash flow generated from home-

building operations. This minimal excess cash flow over their quarterly principal and interest obligations meant that the Debtors had no meaningful ability to re-invest the profits that they received in order to obtain compounding returns on their capital.

83. Within a five-year period before the CSFB Credit Facility was to mature in November 2010, the Debtors would need to generate sufficient cash flow to repay $500 million in principal and nearly $150 million in interest payments. It was highly unlikely that the Debtors would be able to obtain a high enough return on their unrestricted cash and $234 million in existing inventory as of the end of 2005 to be able to satisfy such massive debt obligations as they came due, especially given the Debtors' inability to obtain significant compounding of returns under the terms of the CSFB Credit Facility.

84. In short, the transactions consummated in connection with the CSFB Credit Facility imposed an unreasonable financial risk upon the Debtors. James Rhodes, Sagebrush, and Sedora intentionally caused the Debtors to take on too much debt, debt that James Rhodes, Sagebrush, and Sedora knew or reasonably should have known that the Debtors would not be able to repay as it came due. The Debtors' assets were simply too small in relation to the crippling debt burdens that they incurred, and it was only a matter of time until the cash reserves obtained through the CSFB Credit Facility were depleted and filing for bankruptcy was necessary.

C.    **THE RHODES ENTITIES' ONGOING MISCONDUCT FROM THE TIME OF ENTRY INTO THE CSFB FACILITY THROUGH THE END OF 2007**

85. Following the Debtors' entry into the CSFB Credit Facility, James Rhodes, Sedora, and Sagebrush caused the Debtors to make more than $23 million in cash transfers from the Debtors to the Rhodes Entities (in addition to the $107.5 million of CSFB Credit Facility proceeds advanced to the Rhodes Entities), as described below. The wrongful nature of these transfers was concealed in the Debtors' accounting records through several misleading and irregular accounting practices that both disguised the nature of the transfers and the Debtors' undercapitalization at the time the transfers were made.

86.     First, James Rhodes, Sagebrush, and Sedora wrongfully utilized approximately $13.2 million of Debtor funds (in addition to the $38.5 million of CSFB Proceeds Tax Transfers, discussed above) to pay James Rhodes' personal income tax obligations in 2005 and 2006.  On December 2, 2005, James Rhodes, Sagebrush, and Sedora caused Rhodes Ranch GP and RDD to transfer $3.5 million and $5 million, respectively, to Sagebrush.  Sagebrush then used these funds to cover check number 3679 to the IRS in the amount of $15,870,431.00 to pay personal income tax obligations owed by James Rhodes.  Subsequently, James Rhodes and Sagebrush caused RCO to issue check number 4139 directly to the IRS in the amount of $4,654,123.00 to pay additional personal income tax obligations owed by James Rhodes (collectively, along with the $3.5 million and $5 million transfers made by Rhodes Ranch GP and RDD described above, the "Tax Transfers").  This check cleared on October 20, 2006.

87.     None of the Debtors received any valuable consideration in exchange for making the Tax Transfers on behalf of James Rhodes.  The Debtors did not realize any economic benefit in exchange for making the payments, and the Debtors had no obligation to make such payments given that the Debtors were either pass-through or disregarded entities for tax purposes.

88.     Second, James Rhodes, Sagebrush, and Sedora caused the Debtors to make several wire transfers of Debtor funds to a personal account that James Rhodes held at UBS.  On June 16, 2006, James Rhodes and Sagebrush caused RCO to wire transfer $1.875 million to Sagebrush.  These funds were later wire transferred by Sagebrush to James Rhodes' account at UBS on June 21, 2006.  In early 2007, James Rhodes and Sedora caused Heritage to make two wire transfers directly into the UBS account, a (1) $1 million wire transfer on January 31, 2007 and (2) a $500,000 wire transfer on March 1, 2007 (collectively, along with the $1.875 million transfer described above, the "UBS Transfers").

89.     None of the Debtors received any valuable consideration in exchange for transferring funds into a personal bank account held in the name of James Rhodes.  The Debtors

did not realize any economic benefit in exchange for making the UBS Transfers, and the Debtors had no obligation to make such payments.

90.    Third, James Rhodes and Sagebrush caused the Debtors to make repayments of principal and interest on a personal loan from a third party to James Rhodes.  In early 2006, James Rhodes and Sagebrush caused RDD to issue check number 5933 out of RDD's checking account at Business Bank of Nevada in the amount of $737,719.90 to Town & Country Bank as a payment of interest and principal on a $1.33 million personal loan (loan number 1246) that James Rhodes had taken out from Town & Country Bank in March 2005.  This check from RDD cleared on March 6, 2006.  A year later, James Rhodes and Sagebrush caused RCO to issue check number 6747 out of its account at First National Bank of Nevada in the amount of $706,593.95 to Town & Country Bank as a repayment of the remaining balance of principal and interest on the personal loan made to James Rhodes (together along with the $737,719.90 payment described above, the "Town & Country Transfers").  This check cleared on March 8, 2007.

91.    RDD and RCO did not receive any valuable consideration in exchange for re-paying James Rhodes' personal loan obligation to Town & Country Bank.  In particular, RDD and RCO did not realize any benefit in exchange for making the payments, and RDD and RCO did not have any obligation to repay the loan from Town & Country Bank to James Rhodes.

92.    Finally, in addition to causing the Debtors to make approximately $18 million of transfers for James Rhodes' direct personal benefit, James Rhodes, Sagebrush, and Sedora caused the Debtors to make several transfers to Sagebrush and Sedora during 2006 and 2007.  These transfers were as follows (collectively, the "Rhodes Working Capital Transfers"):

| Debtor | Date | Amount | Recipient |
|---|---|---|---|
| RRGP | March 30, 2006 | $3,070,566.93 | Sagebrush |
| RCO | May 19, 2006 | $525,000.00 | Sedora |
| RCO | May 19, 2006 | $100,000.00 | Sagebrush |
| HERITAGE | October 10, 2006 | $600,000.00 | Sagebrush |
| HERITAGE | February 5, 2007 | $300,000.00 | Sagebrush |
| HERITAGE | February 8, 2007 | $225,484.22 | Sagebrush |
| RCO | June 15, 2007 | $500,000.00 | Sedora |
|  |  | $5,321,051.15 |  |

The Debtors did not receive any valuable consideration in exchange for making any of the Rhodes Working Capital Transfers.  In particular, the Debtors did not have any obligation to make these payments, and did not receive any benefit in exchange for making the payments.  Instead, the proceeds of the Rhodes Working Capital Transfers were expended in furtherance of the Rhodes Entities' interests.

**D.    THE RHODES ENTITIES' MISCONDUCT IN THE YEAR LEADING UP TO THE DEBTOR'S BANKRUPTCY FILING**

   **1.    The Second Amendment to the CSFB Credit Facility in April 2008**

   93.    On or about April 24, 2008, James Rhodes, Sedora, and Sagebrush caused Heritage, RCO, and RRGP to enter into an Amendment No. 2 to the credit agreement executed in connection with the CSFB Credit Facility (the "CSFB Second Amendment").  In causing the Debtors to enter into the CSFB Second Amendment, James Rhodes, Sedora, and Sagebrush wrongfully delayed the Debtors' bankruptcy filing in the face of dire financial distress.  Their actions in doing so were motivated by James Rhodes' desire to further the creation of a competing homebuilding entity.  Such actions also enabled additional dissipation of Debtor assets for the benefit of the Rhodes Entities.

   94.    At the time that James Rhodes, Sedora, and Sagebrush caused Heritage, RCO, and RRGP to enter into the CSFB Second Amendment in April 2008, the nation-wide housing bubble burst and related credit crunch had already had a significant negative effect on the Debtors' operations.  For the fiscal year ending December 31, 2007, the Debtors reported an operating loss of approximately $56.7 million and a net loss of $76.3 million.  For the year, the Debtors' reported revenue from the sale of houses was little more than half what it had been the year before, as reported sales of inventory dropped from $311.5 million in 2006 to $159.3 million in 2007.

   95.    The deteriorating market conditions and Debtor losses led to downgrades of the Company's ratings, ratings that were already over-inflated due to completely unrealistic financial

projections.  On May 7, 2007, Moody's lowered the corporate family rating of the Debtors to B2 from B1.  Moody's also lowered its ratings on the first lien and second lien to B2 and Caa1, respectively.  The company's outlook was also revised to "negative," from stable.  On December 3, 2007, Moody's further lowered the corporate family rating of the Debtors to Caa2 and the ratings on the first lien and second lien components of the CSFB Credit Facility to Caa1 and Ca.

96.    By the end of 2007, the Debtors—individually and collectively—were insolvent.  Specifically, the fair market value of the Debtors' liabilities exceeded the fair market value of the Debtors' asset as of December 31, 2007 (if not earlier).  The Debtors' reported equity as of December 31, 2007 was approximately <u>negative</u> $67.5 million.  This amount understated the full extent of the Debtors' insolvency.  First, the Debtors had several contingent obligations that were not recorded on the consolidated balance sheet, including outstanding surety bonds of approximately $71.7 million related to their obligations to various government entities to construct improvements and potential liability in various lawsuits.  Second, much of the Debtors' then existent real property holdings had been purchased at or near the top of the market.  As such, the reported value of the Debtors' reported real property holdings (recorded as cost of acquisition) was more than the fair market value given the declining real estate market.  Indeed, the Debtors recognized a more than $56 million impairment to their recorded inventory during 2007 at the behest of their auditors.

97.    In addition to their insolvency, the Debtors also found themselves out of compliance with the terms of the CSFB Credit Facility.  By early 2008, several events of default had occurred and were continuing under the CSFB Credit Facility.  In particular, the Debtors were in default for their failure to timely provide audited financial statements, and for their failure to comply with various financial covenants, such as the specified interest coverage ratio, loan-to-value ratio, and amount of unrestricted cash and cash equivalents.

98.    In light of the Debtors' deteriorating financial condition and insolvency, the collapsing real estate market (especially in the Las Vegas area), the nation-wide "credit crunch,"

and the significant debt burden imposed under the CSFB Credit Facility, James Rhodes, Sagebrush, and Sedora knew no later than March 2008 that filing for bankruptcy was both inevitable and in the best interest of the Debtors.   But rather than cause the Debtors to timely file for bankruptcy protection, James Rhodes, Sedora, and Sagebrush instead wrongfully delayed the filing in order to: (a) buy time to establish a competing home-building entity and (b) continue to strip value from the Debtors for the benefit of the Rhodes Entities, as discussed below.

99.     In wrongfully causing the Debtors to enter into the CSFB Second Amendment in order to further the interests of Harmony Homes and the Rhodes Entities, James Rhodes, Sagebrush, and Sedora harmed the Debtors.  First, James Rhodes, Sagebrush, and Sedora caused the Debtors to incur additional transaction fees.  On April 24, 2008, Heritage wire transferred $2,114,047.23 out of its account for fees and expenses wrongfully incurred in connection with the CSFB Second Amendment.  Second, James Rhodes, Sagebrush, and Sedora caused the Debtors to incur additional interest obligations, as the CSFB Second Amendment increased the amount of interest from LIBOR plus 3.5% to LIBOR plus 7.5%.

100.     The Debtors did not receive any off-setting benefit from the incurrence of fees and incremental interest obligations in connection with entering into the CSFB Second Amendment. To the contrary, operating outside of bankruptcy further harmed the Debtors.

101.     In causing the Debtors to enter into the CSFB Second Amendment, James Rhodes, Sagebrush, and Sedora were not acting in the best interest of the Debtors, or with the intention of benefitting the Debtors.  Rather, James Rhodes, Sagebrush, and Sedora were acting in their self-interest by furthering the creation of a competing homebuilding entity and enabling further wrongful disposition of Debtor assets.

### 2.     The Wrongful Creation of a Direct Competitor, Harmony Homes

102.     The actions undertaken by James Rhodes, Sagebrush, and Sedora in wrongfully causing the Debtors to enter into the CSFB Second Amendment in April 2008 were motivated by James Rhodes' desire to buy time to establish a competing home-builder.  This enterprise, doing

business as "Harmony Homes," was not even created until early 2008, a time when the Debtors' future was hopeless.  But as of the time of the Debtors' March 31, 2009 bankruptcy filing, Harmony Homes had grown into a full-fledged residential home-builder in the Las Vegas area, with several different projects underway.

103.    Harmony Homes, Inc. filed its articles of organization in Nevada on February 4, 2008 and thereafter conducted business as Harmony Homes, LLC.  Not long after its creation, James Rhodes began designating Harmony Homes, Inc. or its alias Harmony Homes, LLC as a manager of several Nevada limited liability companies established for the purpose of undertaking real estate development activities.  Several of these entities were created throughout the course of 2008, including the following:  (a) North 5th, LLC, created on March 3, 2008; (b) Farm Hualapai, LLC, created on June 2, 2008; (c) Harmony 2, LLC, created on June 16, 2008; (d) Hayden Springs Partners, LLC, created November 20, 2008; and (e) Tropical Sands, LLC, created on November 20, 2008.   These entities and their associated real estate development projects (collectively, the "Harmony Homes Start-up Projects")—along with Harmony Homes, Inc. and Harmony Homes, LLC—formed the beginning of a new "Harmony Homes" home building company overseen by James Rhodes.

104.    In undertaking the Harmony Homes Start-up Projects through his new home building enterprise, James Rhodes was able to capitalize on other developers' and home builders' misfortunes while at the same time giving himself a clean slate.  In particular, many of the Harmony Homes Start-up Projects arose out of other developers' defaults on financing arranged by Nevada-based hard money lender Consolidated Mortgage.

105.    Consolidated Mortgage's hard money lending business consisted of brokering real estate secured loans and then servicing the loans that it brokered.  The brokering and servicing of these "trust deed investments" was a common type of financing for real estate developers and residential homebuilders in Las Vegas in the late 1990's and early 2000's.  When the housing bubble burst, however, many of the borrowers went into default on these hard money loans.

Consolidated Mortgage survived the initial housing bubble burst, but was forced to institute foreclosure proceedings and/or undertake other steps to restructure its loan portfolio during the course of 2008. Throughout this time period, Consolidated Mortgage's President was former Debtor officer, Paul Huygens.

106. From mid-2008 onward, Consolidated Mortgage and James Rhodes formed several joint venture entities to develop undeveloped lots that Consolidated Mortgage or its affiliated entities had obtained through foreclosure or other means. In such instances, Harmony Homes, LLC was able to obtain exclusive builder rights, rights to reimbursement for developer fees (typically 12%), and a 50% membership interest in the newly formed entity. Harmony Homes, LLC purportedly received its membership interest in these entities in exchange for, in part, its "knowledge, skill, expertise and abilities as a residential homebuilder," as discussed in more detail below. But as Harmony Homes was an entirely new company, the knowledge, skill, expertise, and abilities was really that of the Debtors, which Harmony Homes utilized as discussed below.

107. In June 2008, Harmony Homes ramped up its efforts to commence home building operations. For example, Harmony Homes sent a letter seeking workers compensation coverage on June 4, 2008. This letter provided as follows:

> Harmony Homes, LLC is in the process of being established as of June 2008, with Jim Rhodes serving as Qualifying Employee for the Nevada State Contractor's License. This company is set up as a Limited Liability Company owned by Jim Rhodes of Rhodes Home and Development, and will start conducting business within the next several weeks. Harmony Homes, LLC is being established as a separate home builder within the Las Vegas area. We have purchased several parcels of land that will be developed for residential use….

> We feel with our current background and experience in this area, as well as implementing similar policies that are already in place at all other Rhodes Homes companies, we will continue a low claim environment.

108. Around the same time, Harmony Homes and Consolidated Mortgage's parent, Desert Capital Real Estate Investment Trust, Inc. ("DCR"), formed Farm Hualapai, LLC for the purpose of developing forty-four lots held by DCR that were located near the corner of Farm and

Hualapai in Las Vegas. DCR and Harmony Homes, LLC each received 50% membership interests in the joint venture. To obtain its interest, DCR contributed forty-four lots as its initial capital contribution. Harmony Homes, LLC, however, was not required to make an initial contribution for its 50% membership interest. Instead, the operating agreement provided that "Harmony's capital contribution shall be its knowledge, skill, expertise and abilities as a residential homebuilder in the performance of its activities as the 'Builder,' and the costs of construction of the Property."

109.    The creation of Farm Hualapai, LLC for the development of the forty-four lots previously held by DCR led to the creation of Harmony Homes 2, LLC two weeks later on June 16, 2008. Specifically, Harmony Homes 2, LLC was created to first acquire and then develop the remaining twenty-four lots in the sixty-eight lot subdivision. Harmony Homes, LLC was designated as manager of Harmony Homes 2, LLC and was appointed as the "builder" for the project under the terms of the operating agreement, for which it would receive reimbursements and other fees. In addition, Harmony Homes, LLC received a 50% membership interest in the entity without being required to make an initial capital contribution. Instead, the operating agreement for Harmony Homes 2, LLC provides: "Harmony's capital contribution shall be its knowledge, skill, expertise and abilities as a residential homebuilder in the performance of its activities as the 'Builder'."

110.    Two additional joint venture entities between Consolidated Mortgage (or affiliates) and Harmony Homes, LLC were formed on November 20, 2008: (a) Hayden Springs Partners, LLC and (b) Tropical Sands, LLC to develop approximately 200 lots. In each instance, Harmony Homes, LLC was given a 50% membership interest solely in exchange for contributing its purported "knowledge, skill, expertise and abilities as a residential homebuilder in the performance of its activities as the 'Builder.'"

111.    Through the creation of these entities and other means, Harmony Homes was able to obtain equity interests in real estate developments owning approximately 400 lots (and

additional real property holdings) as of the end of January 2009.  Construction of homes on these lots commenced at least as early as August 2008, with initial sales of new homes beginning no later than October 2008.  Harmony Homes, LLC, therefore, was functioning as a home building company in the Las Vegas area as a direct competitor to the Debtors several months before the date of the Debtors' bankruptcy filings.

112.    James Rhodes' misconduct in creating a competing enterprise to the Debtors was worsened by the diversion of Debtor resources to assist in the creation of Harmony Homes and getting the new home-building company off of the ground.  Specifically, James Rhodes caused Debtor employees to:

(a)    Help create letterhead and other documentation and forms necessary for Harmony Homes to carry out operations as a homebuilder;

(b)    Help implement of various accounting, legal, human resources, purchasing and contracting, and other systems and processes that enabled to Harmony Homes to carry out operations; and

(c)    Provide training to new employees of Harmony Homes.

Harmony Homes even misappropriated images and content from the Debtors' website for the new Harmony Homes website.  These and other diversions of Debtor resources did not provide any benefit to the Debtors, but rather harmed the Debtors by shortening the learning curve and otherwise facilitating the start-up operations of a direct competitor, Harmony Homes.   In turn, Harmony Homes was able to obtain profits that it otherwise would not have been able to obtain.

113.    In fostering the start-up of Harmony Homes, James Rhodes turned to the assistance of his brother, John Rhodes.  James Rhodes' misconduct and breaches of fiduciary with respect to Harmony Homes were concealed through the combined efforts of the brothers in arranging for Harmony Homes to be wholly owned by the HH Trust, of which John Rhodes served as trustee. The operating agreements of several of the start-up projects were signed by John Rhodes in this

capacity in order to help avoid drawing attention to James Rhodes' involvement in the establishment of a competing homebuilder.

114.    Throughout this time period, John Rhodes received a hefty salary while providing no meaningful benefit to the Debtors.  Specifically, RDD paid him $597,211.15 in 2008 and $195,180.28 in 2009 as purported salary (collectively, the "John Rhodes Harmony Transfers"), even though John Rhodes' activities were undertaken for the benefit of Harmony Homes and/or other Rhodes Entities.

115.    These substantial payments to John Rhodes were in addition to the $798,000 that RDD paid to John Rhodes in 2006 and $641,269.11 in 2007 as purported salary (the "John Rhodes Pre-Harmony Transfers").  The Debtors did not receive any meaningful economic benefit in exchange for making such exorbitant payments to John Rhodes.  Rather, John Rhodes, a medical doctor who had previously joined the company around the time of the CSFB Credit Facility, was tasked with various "special projects" for the Rhodes Entities.

### 3.    Continued Stripping of Debtor Assets for the Benefit of the Rhodes Entities

116.    The misconduct of James Rhodes, Sagebrush, and Sedora in wrongfully delaying the Debtors' filing for bankruptcy protection also enabled them to divert other assets of the Debtors for the benefit of the Rhodes Entities.  Such wrongful efforts continued until within days of the Debtors' ultimate bankruptcy filings.

117.    On December 8, 2008, Heritage wire transferred $100,000.00 to Fabian & Clendenin.  On December 18, 2008, Heritage wire transferred and additional $56,114.00 to Fabian & Clendenin (collectively, the "Fabian & Clendenin Transfers").  These payments were for legal services provided to the Rhodes Entities, and the Debtors did not receive any benefit whatsoever in exchange for making the payments.  The Debtors did not receive any valuable consideration in exchange for these payments, and did not have any obligation to make such payments.

118.    On March 20, 2009, James Rhodes, Sedora, and Sagebrush caused Heritage to wire transfer $1,050,133.99 to Sagebrush (the "March 2009 Transfer").  These funds were used

exclusively for the benefit of James Rhodes and the Rhodes Entities.  In particular, the proceeds were used:

- to cover Sagebrush check number 1761 to Harmony Homes in the amount of $180,500.00, which cleared on March 27, 2009;

- to cover Sagebrush check number 1759 to Greenberg Traurig, LLP in the amount of $25,000, which cleared on March 31, 2009;

- to cover various checks out of Sagebrush to Deborah Rhodes to pay personal obligations that James Rhodes owed her as a result of a divorce settlement;

- to make a $400,000.00 wire transfer out of Sagebrush on March 27, 2009 to SMS Financial, LLC.  This wire transfer was to repay a personal loan that James Rhodes had taken out from First National Bank of Nevada in the amount of $1 million originally dated December 19, 2005, loan number 1320177-001 with a maturity date of December 17, 2009 (as a result of several amendments);

- to make a $51,534.61 transfer out of Sedora to Desert Communities, Inc., a Rhodes Entity, on March 23, 2009;

- to make a $47,928.54 wire out of Sedora to FATCO-Noteworld on March 25, 2009 on behalf of South Dakota Land Conservancy for payment of principal and interest on a $525,000 seller carry back promissory note given by South Dakota Land made to Stanton Mu, Frank Quon, and the Wallace Quon 1981 Trust for the purchase of a parcel of real property in Mohave County, Arizona on March 18, 2005 (APN 215-01-082);

- to make a $108,100.87 wire out of Sedora to "LCSC Seller Finance" on March 26, 2009 on behalf of South Dakota Land Conservancy for payment of principal and interest on a $400,000 seller carry back promissory note South Dakota Land Conservancy made in favor of MSA, Ltd. for the purchase of five parcels of real property in Mohave County, Arizona on January 26, 2006 (APNs 335-15-013, 335-01-049, 335-01-086, 335-12-026, and 335-12-027);

- to make three wire transfers out of Sedora on March 24, 2009 in the amounts of $7,297.56, $9,159.53, and $34,718.53 to FATCO-Noteworld and First American Title – Trust Dept. on behalf of South Dakota Land; and

- for other working capital proceeds of the Rhodes Entities.

None of the proceeds of March 2009 Transfer conferred any benefit to the Debtors, and Heritage did not receive any benefit or economic value in exchange for making the transfer.  Nor did Heritage or the other Debtors have any obligation to make the transfer.

119.    The wrongful nature of the $1,050,133.99 wire transfer was concealed on the Debtors' books through several misleading and accounting entries, including several "adjustments" made on March 31, 2009.

E.    **THE ADVERSE DOMINATION OF THE DEBTORS BY SAGEBRUSH, SEDORA, AND JAMES RHODES**

120.    Throughout all relevant time periods, Sagebrush, Sedora, and James Rhodes completely dominated and controlled Heritage, RCO, and the other Debtors.  RCO was 100% owned by Sagebrush.  Heritage was 94.306% owned by Sedora, and 5.694% indirectly owned by Sagebrush (as a result of Sagebrush's 100% ownership of Rhodes Ranch, LLC).  James Rhodes served as Chief Executive Officer and President of both Heritage and RCO, and exercised pervasive de facto control and exclusive and final decision-making authority over Heritage, RCO, and the other Debtors.

121.    Throughout all relevant time periods, Sagebrush, Sedora, and James Rhodes acted adversely to the interests of Heritage, RCO, and the other Debtors.  Specifically, they acted out of disloyal self-interest and caused the Debtors to enter into the CSFB Credit Facility solely in order to: (1) obtain $107.5 million in proceeds for the benefit Sagebrush, Sedora, and James Rhodes and their affiliates; (2) shift debt burden related to the Rhodes Entities' land holdings on to the Debtors.  Subsequently, James Rhodes, Sagebrush, and Sedora caused more than $23 million in additional wrongful transfers of Debtor funds and wrongfully delayed the Debtors' respective bankruptcy filings.  Finally, James Rhodes undertook the creation of a directly competing home-building company while still a fiduciary to RCO and Heritage.

122.    The complete control and domination exercised by Sagebrush, Sedora, and in particular James Rhodes prevented the Debtors from bringing suit against Sagebrush, Sedora, and

James Rhodes arising out of their breaches of fiduciary duty and other misconduct until such time that Sagebrush, Sedora, and James Rhodes were removed from power following the Debtors' bankruptcy filings.

## V.      CAUSES OF ACTION

*COUNT 1:*      *BREACH OF FIDUCIARY DUTY (AGAINST SEDORA, SAGEBRUSH, JAMES RHODES)*

123.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

124.    From November 15, 2005 and thereafter at all relevant times herein, James Rhodes served as Chief Executive Officer (CEO) and President of Heritage.  As CEO and President of Heritage, James Rhodes owed fiduciary duties of loyalty and care to Heritage.

125.    At all relevant times herein, Sedora served as managing member of Heritage.  As managing member of Heritage, Sedora owed fiduciary duties of loyalty and care to Heritage.

126.    From November 16, 2005 and thereafter at all relevant times herein, James Rhodes served as Chief Executive Officer (CEO) and President of RCO.  As CEO and President of RCO, James Rhodes owed fiduciary duties of loyalty and care to RCO.

127.    At all relevant times herein, Sagebrush served as the managing member of RCO.  As managing member of RCO, Sagebrush owed fiduciary duties of loyalty and care to RCO.

128.    From the time of the creation of Rhodes Ranch GP through November 15, 2005, Sagebrush served as a General Partner or Managing General Partner of Rhodes Ranch GP.  As General Partner or Managing General Partner of Rhodes Ranch GP, Sagebrush owed fiduciary duties of loyalty and care to Rhodes Ranch GP.

129.    James Rhodes, Sedora, and Sagebrush breached their respective fiduciary duties of loyalty and care owed to Heritage and RCO by causing Heritage and RCO to enter into the CSFB Credit Facility.  Specifically, the actions of James Rhodes, Sedora, and Sagebrush in causing Heritage and RCO to enter into the CSFB Credit Facility were motivated by self-interested desire

to: (a) obtain funds to make the $69MM Transfer to Sedora, which was made solely for the benefit of the Rhodes Entities; (b) obtain an additional $38.5 million in loan proceeds to satisfy James Rhodes' personal income tax obligations; and (c) shift tens of millions of dollars of debt related to acquisitions of land for the Rhodes Entities on to Heritage and RCO (and the other Debtors). The actions of James Rhodes, Sedora, and Sagebrush in causing Heritage and RCO to enter into the CSFB Credit Facility were undertaken in furtherance of their interests, in disregard to the best interests of Heritage and RCO.

130.    The actions of James Rhodes, Sedora, and Sagebrush in causing Heritage and RCO to enter into the CSFB Credit Facility were not in the best interests of Heritage and RCO. There was no legitimate business justification for Heritage and RCO to enter into the CSFB Credit Facility. Further, entering into the CSFB Credit Facility harmed Heritage and RCO by rendering them over-leveraged and doomed to fail. Heritage and RCO could not have been reasonably expected to be able to meet all of the obligations incurred in connection with the CSFB Credit Facility as such obligations came due in the future. James Rhodes, Sagebrush, and Sedora knew or reasonably should have known that causing Heritage and RCO to enter into the CSFB Credit Facility would likely doom those entities to failure, but nevertheless caused Heritage and RCO to enter into the CSFB Credit Facility to further their self-interests. The misconduct of James Rhodes, Sagebrush, and Sedora in causing Heritage and RCO to enter into the CSFB Credit Facility was intentional and wrongful.

131.    James Rhodes, Sagebrush, and Sedora further breached their respective fiduciary duties of care and loyalty by causing Heritage and RCO to make the $69MM Transfer, CSFB Proceeds Tax Transfers, Tax Transfers, UBS Transfers, Town & Country Transfers, Rhodes Working Capital Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer (to the extent each such transfer was made by Heritage or RCO). None of these transfers provided any benefit to Heritage, RCO, or any of the affiliated Debtors. Rather, each of the transfers was motivated by self-interested desire to further the interests of the Rhodes Entities to the detriment

of the Debtors.  Further, causing Heritage and RCO to make such transfers worsened the financial condition of Heritage and RCO and were made at a time when Heritage and RCO would be likely be unable to meet their obligations in connection with the CSFB Credit Facility as such obligations came due, when Heritage and RCO had unreasonably small remaining assets, and/or when Heritage and RCO were insolvent.  The conduct of James Rhodes, Sagebrush, and Sedora in causing Heritage and RCO to make these transfers was intentional and wrongful.

132.    Finally, James Rhodes, Sagebrush, and Sedora breached their respective fiduciary duties of care to Heritage and RCO by causing Heritage and RCO to enter into CSFB Second Amendment.  At the time, Heritage, RCO, and the other Debtors were insolvent, were in default under the CSFB Credit Facility, and faced inevitable business failure, as discussed above.  There was no legitimate business justification for delaying the inevitable.  Yet James Rhodes, Sagebrush, and Sedora intentionally and wrongfully prolonged the bankruptcy filing of Heritage, RCO, and other Debtors.

133.    James Rhodes further breached his fiduciary duties of loyalty to Heritage and RCO through his establishment of Harmony Homes, a competing homebuilder.  James Rhodes wrongfully caused Heritage and RCO to delay inevitable bankruptcy filings by entering into the CSFB Second Amendment in an effort to buy time to get Harmony Homes off the ground.  In the intervening months, James Rhodes then caused Heritage and RCO to divert resources to further Harmony Homes' start-up efforts.  James Rhodes acted intentionally and wrongfully in causing Heritage and RCO to enter into the CSFB Second Amendment, in diverting Heritage and RCO resources to Harmony Homes' efforts, and in establishing a competing homebuilding entity in the same Las Vegas market.

134.    As a result of breaches of fiduciary duty by James Rhodes, Sedora, and Sagebrush, Heritage and RCO suffered significant harm.  Specifically, Heritage and RCO suffered harm as a result of the $69MM Transfer, CSFB Proceeds Tax Transfers, Tax Transfers, UBS Transfers, Town & Country Transfers, Rhodes Working Capital Transfers, Fabian & Clendenin Transfers,

and March 2009 Transfer.  Heritage's and RCO's assets were dissipated through these transfers, none of which would have been made had it not been for the breaches of fiduciary duty alleged herein.

135.    In addition, Heritage and RCO suffered additional harm by entering into the CSFB Second Amendment and delaying their inevitable bankruptcy filings.  Had it not been for breaches of fiduciary duty of James Rhodes, Sagebrush, and Sedora in wrongfully delaying the bankruptcy filings, Heritage and RCO would have been able to avoid additional fees, interest, and other harm stemming from their delayed bankruptcy filings.

*COUNT 2:*    ***AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY (AGAINST JAMES RHODES)***

136.    Plaintiff re-alleges and fully incorporates the allegations pleaded as if fully set forth herein.

137.    As alleged above, Sedora breached fiduciary duties of care and loyalty that it owed Heritage by causing Heritage to enter into the CSFB Credit Facility, causing Heritage to dissipate its assets through various transfers made to or for the benefit of Rhodes Entities, and wrongfully delaying Heritage's bankruptcy filing.

138.    As alleged above, Sagebrush breached fiduciary duties of care and loyalty that it owed RCO by causing RCO to enter into the CSFB Credit Facility, causing RCO to dissipate its assets through various transfers made to or for the benefit of Rhodes Entities, and wrongfully delaying RCO's bankruptcy filing.

139.    James Rhodes knowingly participated in and substantially assisted Sedora's and Sagebrush's breaches of fiduciary duty.  James Rhodes knew of each of the underlying breaches, and facilitated such misconduct through his de facto control of Sagebrush and Sedora as well as his acceptance of wrongful transfers made to him or for his benefit.

140.    As a result of James Rhodes' knowing participation in Sagebrush's and Sedora's breaches of fiduciary duty, Heritage and RCO suffered harm.  Specifically, their respective assets

were dissipated through a variety of transfers made to Rhodes Entities with no concomitant benefit received in exchange. Heritage and RCO were further harmed by the wrongful delay in their respective bankruptcy filings.

**COUNT 3:     *ALTER EGO/PIERCING THE CORPORATE VEIL (AGAINST JAMES RHODES AND SAGEBRUSH)***

141.    Plaintiff re-alleges and fully incorporates the allegations pleaded as if fully set forth herein.

142.    Plaintiff further alleges the following in the alternative in accordance with Federal Rule of Procedure 8(d).

143.    At all times relevant herein, James Rhodes governed and influenced Sagebrush. He was the sole owner of Sagebrush, and exercised legal and de facto control over Sagebrush.

144.    At all times relevant herein, there existed a unity of interest between James Rhodes and Sagebrush. First, James Rhodes was the sole owner of Sagebrush. Second, Sagebrush funds were routinely used to pay personal expenses of James Rhodes. For example, funds from the Sagebrush operating account were used to pay routine divorce settlement payments to James Rhodes' ex-wife (Deborah Rhodes), personal credit card bills, tax payments, vehicle financing payments and registration fees, and a variety of other personal expenditures. Third, James Rhodes essentially treated and viewed Sagebrush's assets as if they were his own. Fourth, Sagebrush failed to observe corporate formalities.

145.    Adherence to the fiction of Sagebrush as a separate entity would sanction fraud or promote injustice. James Rhodes utilized Sagebrush as a vehicle through which he was able to strip assets from the Debtors for his personal benefit. In particular, James Rhodes breached his fiduciary duties of loyalty and care and caused the Debtors to make numerous wrongful transfers of cash to Sagebrush as an intermediary before such funds were ultimately used for his personal benefit.

***COUNT 4:***      ***UNJUST ENRICHMENT (AGAINST SEDORA, SAGEBRUSH, JAMES RHODES, HARMONY HOMES, AND THE HARMONY HOMES START-UP PROJECTS)***

146.      Plaintiff re-alleges and fully incorporates the allegations pleaded above in paragraphs as if fully set forth herein.

147.      Heritage, Rhodes Ranch GP, RDD, and RCO conferred a benefit on Sedora, Sagebrush, and James Rhodes in making the $69MM Transfer, CSFB Proceeds Tax Transfers, Tax Transfers, UBS Transfers, Town & Country Transfers, Rhodes Working Capital Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer to the extent each such transfer was received by Sedora, Sagebrush, and/or James Rhodes, respectfully, or made for the benefit of Sedora, Sagebrush, and/or James Rhodes, respectfully.

148.      Sedora, Sagebrush, and James Rhodes appreciated the benefit of the transfers that they each received. In addition, James Rhodes appreciated the benefit that he received in connection with transfers made by the Debtors for his ultimate, personal benefit. Specifically, Sedora, Sagebrush, and James Rhodes knew that such transfers had been made, and caused Heritage, Rhodes Ranch GP, RDD, and RCO to make such transfers.

149.      Sedora, Sagebrush, and James Rhodes accepted and retained the benefit of the transfers that they received. In addition, James Rhodes accepted and retained the benefit of transfers made to other entities on his behalf.

150.      It would be inequitable and unjust for Sedora, Sagebrush, and James Rhodes to retain the respective benefits that they received in connection with the $69MM Transfer, CSFB Proceeds Tax Transfers, Tax Transfers, UBS Transfers, Town & Country Transfers, Rhodes Working Capital Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer. Specifically, Sedora, Sagebrush, and James Rhodes caused each of these transfers to be made for no consideration at a time when Heritage, Rhodes Ranch GP, RDD, and RCO were insolvent, under-capitalized, and/or would be unable to meet the obligations incurred in connection with the CSFB Credit Facility as such obligations became due. Further, Sedora, Sagebrush, and James

Rhodes breached their fiduciary duties of care and loyalty in causing Heritage and RCO to make the transfers.

151.    The Debtors conferred a benefit upon Harmony Homes and the Harmony Homes Start-up Projects.  Specifically, the Debtors provided technical know-how; labor; assistance in the creation of letterhead and other documentation and forms necessary for Harmony Homes and the Harmony Homes Start-up Projects to carry out operations as a homebuilder; assistance in the implementation of various accounting, legal, human resources, purchasing and contracting, and other systems and processes that enabled to Harmony Homes and the Harmony Homes Start-up Projects to carry out operations; and training to new employees of Harmony Homes and the Harmony Homes Start-up Projects.  These diversions of Debtor resources directly facilitated and enabled the start-up operations of Harmony Homes and the Harmony Homes Start-up Projects.  In addition, Heritage Homes provided a benefit to Harmony Homes in making the March 2009 Transfer, of which $180,500 was utilized by Harmony Homes.

152.    Harmony Homes and the Harmony Homes Start-up Projects appreciated the benefits provided by the Debtors.  Agents and employees of Harmony Homes and the Harmony Homes Start-up Projects, including but not limited to James Rhodes and John Rhodes, knew that such benefits were being provided by the Debtors.

153.    Harmony Homes and the Harmony Homes Start-up Projects accepted and retained the benefits provided by the Debtors.  Specifically, Harmony Homes and the Harmony Homes Start-up Projects utilized the training, technical know-how, and other assistance provided by the Debtors to jump-start their operations.   Similarly, Harmony Homes accepted the $180,500 provided by Heritage through the March 2009 Transfer.

154.    It would be inequitable and unjust for Harmony Homes and the Harmony Homes Start-up Projects to retain the benefits they received from the Debtors without compensation to the Debtors.  Specifically, Harmony Homes and the Harmony Homes Start-up Projects were created as a direct competitor to the Debtors.  The creation of these entities stemmed from James Rhodes'

breaches of fiduciary duty. The Debtors' respective bankruptcy filings were wrongfully delayed so that Debtor resources could be diverted to assist in the creation of Harmony Homes and the Harmony Homes Start-up Projects. Further, the membership interest obtained by Harmony Homes in connection with each of the Harmony Homes Start-up Projects was obtained as a result of the technical know-how provided by the Debtors. Finally, the diversion of Debtor resources enabled Harmony Homes to become a profitable home-building enterprise while at the same time further harming the Debtors.

***COUNT 5:     AVOIDANCE OF CONSTRUCTIVELY FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 544(b) AND NRS §§ 112.180(1)(b) and 112.190.***

155.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

156.    The Debtors did not receive reasonably equivalent value in exchange for any of the $69MM Transfer, CSFB Proceeds Tax Transfers, Tax Transfers, UBS Transfers, Town & Country Transfers, Rhodes Working Capital Transfers, John Rhodes Harmony Transfers, John Rhodes Pre-Harmony Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer (collectively, the "Transfers"). In particular, the Debtors did not receive any consideration or economic benefit in exchange for making any of the Transfers. Nor did the Debtors have any valid, legally enforceable obligation to make any of the Transfers. Finally, each of the Transfers was made for the benefit of the Rhodes Entities.

157.    Each of the Transfers involved cash originating out of one of the Debtors' bank accounts, and thus involved property of the Debtors. As such, each of the Transfers constituted a transfer of an interest of the Debtors in property.

158.    At the time each of the Transfers was made, the remaining assets of the Debtor were unreasonably small in relation to the Debtors' business. Further, at the time each of the Transfers was made, it was inevitable that the Debtors would not be able to satisfy all of their obligations in connection with the CSFB Credit Facility as such obligations became due.

159.    At all times on or after at least as early as December 31, 2007, the Debtors were insolvent.

160.    There exist creditors of the Debtors holding allowable unsecured claims against the Debtors who could have avoided each of the Transfers as of March 31, 2009 and April 1, 2009. These creditors include those creditors holding Class C-1 general unsecured claims of approximately $15 million, First Lien Lender Deficiency Claims of approximately $231.6 million, or Second Lien Lender Deficiency Claims of approximately $70.3 million.  The identities and addresses of such creditors are set forth in the papers and pleadings filed in the above captioned bankruptcy case, case number 09-14814-lbr.  Such creditors include, but are not limited to, the following: Stanley Consultants, Inc.; Integrity Masonry, Inc.; American Soils Engineering; T. I. Residential, Inc.; Mark Jerue; GC Wallace, Inc.; John Sclafani; and the participant lenders in the CSFB Credit Facility.

**COUNT 6:    AVOIDANCE OF TRANSFERS MADE WITH THE ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD UNDER 11 U.S.C. § 544(b) AND NRS 112.180(1)(a)**

161.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

162.    Each of the Transfers involved cash originating from the Debtors' bank accounts, and thus constituted a transfer of an interest of the Debtors in property.

163.    At all times relevant herein, James Rhodes was President, CEO, and/or agent of the Debtors, and thus James Rhodes' knowledge and intent is imputable to the Debtors.

164.    The Debtors made each of the Transfers with the actual intent to hinder, delay, or defraud present and future creditors of the Debtors.  First, each of the Transfers was made for the benefit of insiders of the Debtors, namely the Rhodes Entities (in particular Sagebrush, Sedora, and James Rhodes).  Second, the Debtors did not receive reasonably equivalent value or any benefit in exchange for making the Transfers.  Third, several of the Transfers, in particular the $69MM Transfer and certain of the CSFB Proceeds Tax Transfers and Tax Transfers, were made

in conjunction with or shortly after the Debtors incurred massive $500 million debt in connection with the CSFB Credit Facility.  Fourth, at the time each of the Transfers was made, the Debtors' remaining assets were unreasonably small in relation to its liabilities, the Debtors knew or should have known that their business was doomed to fail, and/or the Debtors were insolvent.  Finally, in many instances, the nature of the Transfers was concealed through irregular and improper accounting entries.

165.    Each of the Transfers was made in connection with the continuous course of misconduct by James Rhodes, Sedora, and Sagebrush in "cashing out" of the integrated "Rhodes Homes" enterprise.    At the time each of the Transfers was made, the Debtors—through knowledge obtained through various employees and officers, including but not limited to James Rhodes—knew to a substantial certainty that the Debtors would not be able to make all of the required payments owed under the CSFB Credit Facility as such obligations came due.

166.    There exist creditors of the Debtors holding allowable unsecured claims against the Debtors who could have avoided each of the Transfers as of March 31, 2009 and April 1, 2009. These creditors include those creditors holding Class C-1 general unsecured claims of approximately $15 million, First Lien Lender Deficiency Claims of approximately $231.6 million, or Second Lien Lender Deficiency Claims of approximately $70.3 million.  The identities and addresses of such creditors are set forth in the papers and pleadings filed in the above captioned bankruptcy case, case number 09-14814-lbr.  Such creditors include, but are not limited to, the following: Stanley Consultants, Inc.; Integrity Masonry, Inc.; American Soils Engineering; T. I. Residential, Inc.; Mark Jerue; GC Wallace, Inc.; John Sclafani; and the participant lenders in the CSFB Credit Facility.

**COUNT 7:    AVOIDANCE OF "CONSTRUCTIVELY" FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548(a)(1)(B).**

167.    Plaintiff re-alleges and fully incorporates the allegations pleaded above if fully set forth herein.

168.     Each of the John Rhodes Harmony Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer (collectively, the "Section 548 Transfers") involved cash originating from the Debtors' bank accounts, and thus constituted a transfer of an interest in property of the Debtors.

169.     The Debtors did not receive reasonably equivalent value in exchange for the Section 548 Transfers.  Specifically, the Debtors did not receive any consideration or benefit in exchange for making the Section 548 Transfers.  Nor did the Debtors have any obligation to make the Section 548 Transfers.  Rather, the Section 548 Transfers were made for the benefit of the Rhodes Entities.

170.     At the time each of the Section 548 Transfers was made, the Debtors were insolvent.  In addition, each of the Section 548 Transfers was made at a time when the Debtors' remaining assets were unreasonably small in relation to their liabilities, the Debtors' business was doomed to fail, and the Debtors would be unable to meet their debts as they came due.

**COUNT 8:**     **_AVOIDANCE OF TRANSFERS MADE WITH THE ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD UNDER 11 U.S.C. § 548(a)(1)(A)._**

171.     Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

172.     Each of the Section 548 Transfers involved cash originating from the Debtors' bank accounts, and thus constituted a transfer of an interest of the Debtors in property.

173.     At all times relevant herein, James Rhodes was President, CEO, and/or agent of the Debtors, and thus James Rhodes' knowledge and intent is imputable to the Debtors.

174.     The Debtors made each of the Section 548 Transfers with the actual intent to hinder, delay, or defraud present and future creditors of the Debtors.  First, each of the Section 548 Transfers was made for the benefit of insiders of the Debtors, namely the Rhodes Entities (in particular Sagebrush, Sedora, and James Rhodes).  Second, the Debtors did not receive reasonably equivalent value or any benefit in exchange for making the Section 548 Transfers.  Third, at the

time each of the Transfers was made, the Debtors' remaining assets were unreasonably small in relation to its liabilities, the Debtors knew or should have known that their business was doomed to fail, and/or the Debtors were insolvent. Finally, the Section 548 Transfers were concealed through irregular and improper accounting entries.

175.    Further, each of the Section 548 Transfers was made in connection with the continuous course of misconduct by James Rhodes, Sedora, and Sagebrush in "cashing out" of the integrated "Rhodes Homes" enterprise. In particular, each of the Section 548 Transfers was made at a time when James Rhodes was establishing a competing homebuilding entity in Harmony Homes. At the time each of the Section 548 Transfers was made, the Debtors—through knowledge obtained through various employees and officers, including but not limited to James Rhodes—knew to a substantial certainty that the Debtors would not be able to make all of the required payments owed under the CSFB Credit Facility as such obligations came due.

***COUNT 9:    RECOVERY OF AVOIDABLE TRANSFERS UNDER 11 U.S.C. § 550 (AGAINST SAGEBRUSH)***

176.    Plaintiff re-alleges and fully incorporates the allegations pleaded as if fully set forth herein.

177.    Plaintiff further alleges the following in the alternative in accordance with Federal Rule of Procedure 8(d).

178.    Each of the CSFB Proceeds Tax Transfers is avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

179.    The $3.5 million and $5 million Tax Transfers made on December 2, 2005 (collectively, the "Sagebrush Tax Transfers") are avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190, as alleged in paragraphs.

180.    The $1.875 million UBS Transfer made on June 16, 2006 (the "Sagebrush UBS Transfer") is avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190, as alleged in paragraphs.

181.     Each of the Rhodes Working Capital Transfers, including those transfers from the Debtors directly to Sagebrush (collectively, the "Sagebrush Working Capital Transfers"), is avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

182.     The March 2009 Transfer is avoidable under 11 U.S.C. § 548 and/or 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

183.     Sagebrush directly received each of the CSFB Proceeds Tax Transfers, the Sagebrush Tax Transfers, the Sagebrush UBS Transfer, the Sagebrush Working Capital Transfers, and the March 2009 Transfer (collectively, the "Sagebrush Direct Transfers").

184.     The value of each of the Sagebrush Direct Transfers is recoverable from Sagebrush as an initial transferee under 11 U.S.C. § 550(a)(1).

185.     The $69MM Transfer is avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

186.     Sagebrush received certain proceeds of the $69MM Transfer from Sedora.

187.     The value of the portion of the $69MM Transfer received by Sagebrush from Sedora is recoverable from Sagebrush as a subsequent transferee under 11 U.S.C. § 550(a)(2).

**COUNT 10:**     **RECOVERY OF AVOIDABLE TRANSFERS UNDER 11 U.S.C. § 550 (AGAINST SEDORA)**

188.     Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

189.     The $69MM Transfer is avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.   The May 6, 2006 and June 15, 2007 Working Capital Transfers in the amounts of $525,000 and $500,000, respectively (collectively, the "Sedora Working Capital Transfers"), are avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

190.     Sedora directly received the $69MM Transfer and the Sedora Working Capital Transfers.

191.    The value of the $69MM Transfer and the Sedora Working Capital Transfers is recoverable from Sedora as an initial transferee under 11 U.S.C. § 550(a)(1).

***COUNT 11:    RECOVERY OF AVOIDABLE TRANSFERS UNDER 11 U.S.C. § 550 (AGAINST JAMES RHODES)***

192.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

193.    Each of the UBS Transfers is avoidable under 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

194.    James Rhodes received each of the UBS Transfers into his account at UBS, either directly or indirectly through Sagebrush as an intermediary.

195.    The value of each of the UBS Transfers is recoverable from James Rhodes either as an initial transferee under 11 U.S.C. § 550(a)(1) to the extent James Rhodes directly received the funds from the Debtors, or as a subsequent transferee under 11 U.S.C. § 550(a)(2) to the extent James Rhodes received the funds from Sagebrush.

196.    Each of the CSFB Proceeds Tax Transfers, Tax Transfers, Town & Country Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer is avoidable under 11 U.S.C. § 548 and/or 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

197.    The CSFB Proceeds Tax Transfers and Tax Transfers were made for the benefit of James Rhodes.  Specifically, the proceeds of each of these transfers were utilized to pay James Rhodes' personal income tax obligations.  Further, at the time each of the CSFB Proceeds and Tax Transfers and Tax Transfers were made, it was the intent and understanding of the parties involved in those transfers that the proceeds of the transfers were to be used to pay James Rhodes' personal income tax obligations.

198.    Each of the Town & Country Transfers was made for the personal benefit of James Rhodes.  Specifically, the proceeds of each of these transfers were utilized to pay the personal loan obligations owed by James Rhodes to Town & Country Bank.  Further, at the time each of

the Town & Country Transfers was made, it was the intent and understanding of James Rhodes and the Debtors that the proceeds of such transfers were going to be used to repay James Rhodes' obligations to Town & Country Bank.

199.    Each of the Fabian & Clendenin Transfers was made for the benefit of James Rhodes.  Specifically, the proceeds of each of these transfers were used to pay personal legal expenses of James Rhodes, and/or legal expenses of entities under James Rhodes' legal and/or de facto ownership and control.  At the time each of the Fabian & Clendenin Transfers was made, it was the intent and understanding of James Rhodes and the Debtors that the proceeds of such transfers were going to be made to pay legal fees inuring to the personal benefit of James Rhodes.

200.    The March 2009 Transfer was made for the benefit of James Rhodes.  Specifically, $400,000 of the proceeds was utilized to repay a personal loan that James Rhodes had previously received from First National Bank of Nevada.  The remaining proceeds were utilized to pay James Rhodes' obligations to his ex-wife, and to provide working capital and/or repay obligations to entities under James Rhodes' legal and/or de facto ownership and control.  At the time the March 2009 Transfer was made, it was James Rhodes' understanding—and by extension the Debtors' understanding—that the transfer was being made for his benefit.

201.    The value of each of the CSFB Proceeds Tax Transfers, Tax Transfers, Town & Country Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer is recoverable from James Rhodes as the entity for whose benefit each transfer was made under 11 U.S.C. § 550(a)(1).

**COUNT 12:    *RECOVERY OF AVOIDABLE TRANSFERS UNDER 11 U.S.C. § 550 (AGAINST HARMONY HOMES)***

202.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

203.    The March 2009 Transfer is avoidable under 11 U.S.C. § 548 and/or 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

204.    Harmony Homes received $180,500 of the proceeds of the March 2009 Transfer from Sagebrush on March 27, 2009.

205.    The value of the $180,500 received by Harmony Homes is recoverable from Harmony Homes as a subsequent transfer pursuant to 11 U.S.C. § 550(a)(2).

**COUNT 13:    *RECOVERY OF AVOIDABLE TRANSFERS UNDER 11 U.S.C. § 550 (AGAINST JOHN RHODES)***

206.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

207.    Each of John Rhodes Harmony Transfers and John Rhodes Pre-Harmony Transfers (collectively, the "John Rhodes Transfers") is avoidable under 11 U.S.C. § 548 and/or 11 U.S.C. § 544(b) and NRS §§ 112.180 and 112.190.

208.    John Rhodes received each of the John Rhodes Transfers (net of tax withholdings) into a bank account under his direct or indirect ownership, dominion, or control, and/or otherwise for his benefit.

209.    The value of the portion of the John Rhodes Transfers received by John Rhodes is recoverable from John Rhodes as either an initial transferee or the entity for whose benefit the transfers were made under 11 U.S.C. § 550(a)(1).

**COUNT 14:    *DECLARATORY JUDGMENT REGARDING RHODES RANCH GP'S 99% MEMBERSHIP INTEREST IN GYPSUM RESOURCES PURSUANT TO NRS §§ 30.030 and 30.040.***

210.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

211.    Plaintiff further alleges the following in the alternative in accordance with Federal Rule of Procedure 8(d).

212.    Gypsum Resources was created on March 3, 2003.  The operating agreement for Gypsum Resources was initially dated as of March 3, 2003.  The initial members of Gypsum were Rhodes Ranch GP and the James Michael Rhodes Irrevocable Children's Education Trust, with

respective membership interests of 99% and 1%, respectfully.  Rhodes Ranch GP's 99% membership interest stemmed from a capital contribution in excess of $55 million related to the Blue Diamond Property.

213.    Rhodes Ranch GP's 99% membership interest in Gypsum was purportedly subsequently transferred to Sedora, Sagebrush, Rhodes Dynasty Trust I, Rhodes Dynasty Trust 2, Rhodes Ranch, LLC and/or Truckee Springs Holdings.  All such purported transfers of Rhodes Ranch GP's 99% membership interest in Gypsum Resources, whether initially and directly from Rhodes Ranch GP or subsequently thereafter, are null and void under the terms of Gypsum Resource's operating agreement.

214.    Article VII of Gypsum Resource's operating agreement sets forth several restrictions on transferability.  In particular, Section 7.1 provides: "A Member may not transfer, assign, pledge, encumber or otherwise dispose of all or any part of its Interest, whether voluntary, involuntary or by operation of the law" except in certain circumstances.  Section 7.1(d) provides that transfers to a third party may be made "only after satisfying the provisions of Section 7.3 below."

215.    Section 7.3 provides "Except as provided herein, no Member shall sell, assign, pledge, encumber, or otherwise transfer to a third party or in any dispose of any of his Interest unless all" of certain enumerated, specific conditions are satisfied.  These conditions include the following:

- Service of a written "Notice of Proposed Transfer" on the Company, which sets forth name of intended transferee, proportion of interest to be transferred, purchase price to be paid, and all other terms and conditions of the proposed transfer;

- A formal endorsement by Gypsum Resources "within five (5) days after actual physical receipt of the Notice," which inscribes the date and time of receipt and of which a photocopy is to be mailed to each member; and

- A ninety day option period for the other members to purchase the interest proposed for sale on terms identical to that of the proposed transfer.

Upon information and belief, none of these enumerated, specific conditions were satisfied in connection with any purported transfer of Rhodes Ranch GP's 99% membership interest in Gypsum Resources to Sedora, Sagebrush, and/or Rhodes Ranch, LLC, or with respect to any transfers involving these entities and/or Rhodes Dynasty Trust I, Rhodes Dynasty Trust 2, Rhodes Ranch, LLC and Truckee Springs Holdings.

216.    Section 7.2 of the Gypsum Resources operating agreement provides "Except as otherwise herein specifically provided, any sale, transfer, assignment, pledge, encumbrance, or other disposal or purported sale, transfer, assignment, pledge, encumbrance, or other disposal of any Interest shall be null and void."

217.    Upon information and belief, no amended operating agreement of Gypsum Resources was ever executed.

218.    Accordingly, the Litigation Trust requests that the Court enter a judgment declaring that: (1) no valid sale, transfer, assignment, pledge, encumbrance or other disposal of Rhodes Ranch GP's 99% membership interest in Gypsum Resources was ever made pursuant to Article VII of the operating agreement of Gypsum Resources; and that (2) Rhodes Ranch GP still holds a 99% membership interest in Gypsum Resources pursuant to the terms of its operating agreement.

**COUNT 15:    *TURNOVER OF A 99% MEMBERSHIP INTEREST IN GYPSUM RESOURCES UNDER 11 U.S.C. 542 (AGAINST SEDORA, SAGEBRUSH, RHODES RANCH, LLC, RHODES DYNASTY TRUST I, RHODES DYNASTY TRUST II, TRUCKEE SPRINGS HOLDINGS)***

219.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

220.    Plaintiff further alleges the following in the alternative in accordance with Federal Rule of Procedure 8(d).

221.    Gypsum Resources was created on March 3, 2003.  The operating agreement for Gypsum Resources was initially dated as of March 3, 2003.  The initial members of Gypsum were Rhodes Ranch GP and the James Michael Rhodes Irrevocable Children's Education Trust, with respective membership interests of 99% and 1%, respectfully.   Rhodes Ranch GP's 99% membership interest stemmed from a capital contribution in excess of $55 million related to the Blue Diamond Property.

222.    Rhodes Ranch GP's 99% membership interest in Gypsum was purportedly subsequently transferred to Sedora, Sagebrush, Rhodes Dynasty Trust I, Rhodes Dynasty Trust 2, Rhodes Ranch, LLC and Truckee Springs Holdings.  All such purported transfers of Rhodes Ranch GP's 99% membership interest in Gypsum Resources, whether initially and directly from Rhodes Ranch GP or subsequently thereafter, are null and void under the terms of Gypsum Resource's operating agreement.

223.    Article VII of Gypsum Resource's operating agreement sets forth several restrictions on transferability.  In particular, Section 7.1 provides: "A Member may not transfer, assign, pledge, encumber or otherwise dispose of all or any part of its Interest, whether voluntary, involuntary or by operation of the law" except in certain circumstances.  Section 7.1(d) provides that transfers to a third party may be made "only after satisfying the provisions of Section 7.3 below."

224.    Section 7.3 provides "Except as provided herein, no Member shall sell, assign, pledge, encumber, or otherwise transfer to a third party or in any dispose of any of his Interest unless all" of certain enumerated, specific conditions are satisfied.  These conditions include the following:

- Service of a written "Notice of Proposed Transfer" on the Company, which sets forth name of intended transferee, proportion of interest to be transferred, purchase price to be paid, and all other terms and conditions of the proposed transfer;

- A formal endorsement by Gypsum Resources "within five (5) days after actual physical receipt of the Notice," which inscribes the date and time of receipt and of which a photocopy is to be mailed to each member; and

- A ninety day option period for the other members to purchase the interest proposed for sale on terms identical to that of the proposed transfer.

Upon information and belief, none of these enumerated, specific conditions were satisfied in connection with any purported transfer of Rhodes Ranch GP's 99% membership interest in Gypsum Resources to Sedora, Sagebrush, and/or Rhodes Ranch, LLC, or with respect to any transfers involving these entities and/or Rhodes Dynasty Trust I, Rhodes Dynasty Trust 2, Rhodes Ranch, LLC and Truckee Springs Holdings.

225.    As no transfer of Rhodes Ranch GP's 99% membership interest in Gypsum Resources complied with section 7.1 and section 7.3 of the Gypsum Resources operating agreement, any transfers of Rhodes Ranch GP's 99% membership interest are null and void. Specifically, section 7.2 of the Gypsum Resources operating agreement provides "Except as otherwise herein specifically provided, any sale, transfer, assignment, pledge, encumbrance, or other disposal or purported sale, transfer, assignment, pledge, encumbrance, or other disposal of any Interest shall be null and void."

226.    Upon information and belief, no amended operating agreement of Gypsum Resources was ever executed.

227.    The 99% membership interest in Gypsum Resources attributed to Rhodes Ranch GP at the inception of Gypsum Resources is personal property.

228.    Rhodes Ranch GP's initial 99% membership interest in Gypsum Resources was never validly conveyed, sold, transferred, assigned, pledged, encumbered or otherwise disposed to Sedora, Sagebrush, Rhodes Dynasty Trust I, Rhodes Dynasty Trust 2, Rhodes Ranch, LLC and Truckee Springs Holdings.  As such, the 99% membership interest in Gypsum Resources is still the personal property of Rhodes Ranch GP, and is subject to turnover under 11 U.S.C. § 542.

***COUNT 16:    AVOIDANCE OF ANY TRANSFER OF RHODES RANCH GP'S 99% MEMBERSHIP INTEREST IN GYPSUM RESOURCES AS A TRANSFER MADE WITH ACTUAL INTENT TO HINDER, DELAY, OR DEFRAUD CREDITORS OF RHODES RANCH GP UNDER 11 U.S.C. § 544(b) AND NRS 112.180.***

229.    Plaintiff re-alleges and fully incorporates the allegations pleaded above as if fully set forth herein.

230.    Only to the extent that Rhodes Ranch GP is deemed to have ever validly transferred its 99% membership interest in Gypsum Resources to any other entity (the "Gypsum Transfer"), Plaintiff further alleges the following in the alternative in accordance with Federal Rule of Procedure 8(d).

231.    If ever actually made, the Gypsum Transfer was made with the actual intent to hinder or delay creditors.

232.    Rhodes Ranch GP did not ever receive any valuable consideration or economic benefit in exchange for making the Gypsum Transfer (to the extent it was ever actually made). Nor did Rhodes Ranch ever have any obligation to transfer its 99% membership interest in Gypsum Resources.

233.    Rhodes Ranch, LLC and Sagebrush, partners of Rhodes Ranch GP, were insiders of the Debtor.

234.    To the extent it was ever actually made, the Gypsum Transfer was concealed through improper accounting entries that did not reflect the economic reality of the transaction (if made).

235.    Finally, if ever made, the Gypsum Transfer was made with the express purpose of placing the valuable membership interest beyond the reach of Rhodes Ranch GP's creditors. If deemed made at the time of the purported 2004 "Reorganization Plan," the Transfer was made as part of the express plan of Sagebrush and James Rhodes to place the long-term land holding assets beyond the reach of creditors of Rhodes Ranch GP and the other entities on the home-building side of the integrated "Rhodes Homes" enterprise. Pleading in the alternative, if the Gypsum

Transfer were deemed made following Rhodes Ranch GP's entry into the CSFB Credit Facility, then the transfer was made with the actual intent to hinder, delay, or defraud creditors by placing the valuable 99% membership interest in Gypsum Resources outside of "the bucket," beyond the reach of creditors.

236.    The wrongful nature of the Gypsum Transfer was concealed from creditors of Rhodes Ranch GP and the other Debtors, and such creditors could not have discovered the fraudulent nature of the transfer until within one year of Rhodes Ranch GP's bankruptcy filing.

237.    There exist creditors of the Debtors holding allowable unsecured claims against the Debtors who could have avoided each of the Transfers as of March 31, 2009 and April 1, 2009. These creditors include those creditors holding Class C-1 general unsecured claims of approximately $15 million, First Lien Lender Deficiency Claims of approximately $231.6 million, or Second Lien Lender Deficiency Claims of approximately $70.3 million.  The identities and addresses of such creditors are set forth in the papers and pleadings filed in the above captioned bankruptcy case, case number 09-14814-lbr.  Such creditors include, but are not limited to, the following: Stanley Consultants, Inc.; Integrity Masonry, Inc.; American Soils Engineering; T. I. Residential, Inc.; Mark Jerue; GC Wallace, Inc.; John Sclafani; and the participant lenders in the CSFB Credit Facility.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Litigation Trust respectfully requests that the Court enter judgment as follows:

(a)    Avoiding each of the Transfers and the Gypsum Transfer;

(b)    Directing Sagebrush to pay the full value of the Sagebrush Direct Transfers and of any proceeds it received from the $69MM Transfer;

(c)    Directing Sedora to pay the full value of $69MM Transfer and the Sedora Working Capital Transfers;

(d)     Directing James Rhodes to pay the full value of the CSFB Proceeds Tax Transfers, Tax Transfers, Town & Country Transfers, Fabian & Clendenin Transfers, and March 2009 Transfer;

(e)     Directing John Rhodes to pay the full value of the John Rhodes Transfers (net of tax withholdings);

(f)     Directing Harmony Homes to pay the $180,500 it received through the March 2009 Transfer;

(g)     Directing Sagebrush, Sedora, James Rhodes, Harmony Homes, and John Rhodes to pay the Litigation Trust all pre- and post-judgment interest on the Transfers at the maximum rate allowable by law and/or equity;

(h)     Directing Sagebrush, Sedora, James Rhodes, John Rhodes, and Harmony Homes to pay the Ligation Trust's costs of court;

(i)     Directing Defendants to pay damages to the Litigation Trust in an amount to be determined at trial in connection with the Litigation Trust's common law claims;

(j)     Declaring that: (1) no valid sale, transfer, assignment, pledge, encumbrance or other disposal of Rhodes Ranch GP's 99% membership interest in Gypsum Resources was ever made pursuant to Article VII of the operating agreement of Gypsum Resources; and that (2) Rhodes Ranch GP still holds a 99% membership interest in Gypsum Resources pursuant to the terms of its operating agreement;

(k)     Ordering turnover of the 99% membership interest in Gypsum Resources under 11 U.S.C. § 542; and

(l)     Awarding the Litigation Trust such other relief that the Court deems just and proper.

1    Dated:  May 11, 2012.

2                                            Respectfully submitted,

3                                            **DIAMOND MCCARTHY LLP**

4
                                             By:   _/s/ Michael J. Yoder_
5                                            Eric D. Madden, TX Bar No. 24013079
                                             Michael J. Yoder, TX Bar No. 24056572
6                                            Jacob J. Roberts, TX Bar No. 24065982
                                             1201 Elm Street, 34th Floor
7                                            Dallas, Texas  75270

8
                                             *Counsel for the Litigation Trust*
9                                            *of The Rhodes Companies, LLC, et al.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26