1

1           UNITED STATES BANKRUPTCY COURT

2                 DISTRICT OF NEVADA

3                 LAS VEGAS, NEVADA

4   In re:  THE RHODES COMPANIES,    )  E-Filed:  06/06/12
    LLC,                             )
5           Debtor.                  )  Case No.
                                     )  BK-S-0914814-LBR
6   _____)  Chapter 11

7

8

9

10

11              TRANSCRIPT OF PROCEEDINGS
                          OF
12               CLOSING ARGUMENTS
             RE: DOCUMENT NO. 1377,
13              OBJECTION TO CLAIM
                     VOLUME 1
14       BEFORE THE HONORABLE LINDA B. RIEGLE
             UNITED STATES BANKRUPTCY JUDGE

15               Thursday, April 26, 2012

16                   9:30 a.m.

17

18

19

20

21

22

23   Court Recorder:        Deborah Hemstreet

24

     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

2

```
1    APPEARANCES:

2    For the Reorganized      ABID QURESHI, ESQ.
     Debtor:                  Akin, Gump, Strauss, Hauer & Feld, LLP
3                             One Bryant Park
                              New York, New York 10036
4
     For the United States    VIRGINIA CRONAN LOWE, ESQ.
5    Internal Revenue         United States Department of Justice
     Service:                 Tax Division
6                             Ben Franklin Station
                              P.O. Box 683
7                             Washington, D.C. 20044

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          (Court convened at 09:56:04 a.m.)

2              THE COURT:  Be seated.

3          (Colloquy not on the record.)

4              THE COURT:  All right.  I'm so sorry.  I had some

5    matters I had to take care of.  It took longer than I thought.

6    All right.  So do you want to go ahead?  Let's see.  It's the

7    objection, your objection, so I guess Rhodes should go first.

8              MR. QURESHI:  Whatever your Honor's preference is.

9              THE COURT:  All right.  So go ahead.

10             MR. QURESHI:  Okay.  Thank you.  Good morning,

11   your Honor.  And for the record, your Honor, Abid Qureshi,

12   Akin, Gump, Strauss, Hauer & Feld, on behalf of the reorganized

13   debtors.

14         Your Honor, I have handed up to your Honor and to

15   your Honor's clerk two copies of a book of demonstrative

16   exhibits.  Unfortunately, I was not aware of the technology, so

17   mine is not connected to the screen.

18             THE COURT:  Okay.

19             MR. QURESHI:  It's the bound volume, and --

20             THE COURT:  Which is fine.

21             MR. QURESHI:  Yeah.  And what I'll do is just walk

22   the Court through that presentation which, again, as the IRS

23   and the reorganized debtors have exchanged these books ahead of

24   time.

25             THE COURT:  Okay.

4

```
1          MR. QURESHI:  It's really just the summary of what I
2    think is the important evidence.  And just to put this dispute
3    in context for your Honor, this is, of course, a claim by the
4    IRS that emanates out of a fraudulent scheme perpetrated by a
5    Mr. Kahre and his company, Union Pacific.
6          And as your Honor knows, Mr. Kahre and his colleagues who
7    were involved in that scheme are in jail and will be for some
8    time to come.
9          And it's important to remember that there has never been
10   an allegation from the IRS that anybody from Bravo or from any
11   other of the debtor entities had any involvement in the
12   fraudulent scheme, never been alleged.
13         And so, really, what it amounts to here is that the IRS is
14   looking to the creditors of the reorganized debtors to hold the
15   bag if you will for the taxes that were not paid as a result of
16   Kahre and his fraudulent scheme.
17         Moving on to the next slide, again, just by way of
18   background, what's not in dispute, Bravo had three categories
19   of workers, salaried workers, hourly workers, and then
20   so-called pieceworkers, and this dispute is purely about the
21   pieceworkers.
22         And, again, to refresh your Honor's recollection, the way
23   it works in the construction business is the pieceworkers are
24   paid to do a particular job, so whatever it is, putting up
25   walls or framing the house, and they are paid for the job
```

1    itself, and then their crew leader basically divides up what

2    the job pays among the workers on the crew that do the job.

3        Now, there's no dispute also that there was a contract

4    entered into between Bravo and Union Pacific sometime around

5    the year 2000.

6        We also know that we don't have the contract.  Despite

7    best efforts, given the recordkeeping being what it was at the

8    Rhodes Companies, neither side has been able to look at the

9    contract, but both sides agree that there is one.  There's

10    obviously a dispute about what it says.

11        So, again, to frame the dispute, the reorganized debtors

12    say that what the contract was was for Bravo to outsource to

13    another company, in this case, Union Pacific, piecework labor

14    to basically have their piecework labor provided entirely by

15    Union Pacific and to have Union Pacific take care of everything

16    that goes along with providing piecework labor from paying the

17    workers, to hiring them, firing them, supervising them,

18    checking their immigration status, all of that.

19        The IRS has a different view.  They say that the agreement

20    that was reached between the reorganized debtors and

21    Union Pacific was merely for payroll services.

22        So moving on to page 3, the time period, and this is

23    particularly important in light of the evidence that's before

24    your Honor.

25        The IRS alleges that from -- let me make sure I've got

1    this correct.  Just bear with me, your Honor -- that from late

2    September of the year 2000 through to May of 2003 that that is

3    the time period in which the employment taxes that should have

4    been withheld were not, so that's the relevant time period,

5    September 2000 to May of 2003.

6        Now, as your Honor will also recall through the history of

7    this matter, we've bifurcated it, so the issue today -- and

8    this is on page 4 -- and as stated by this Court in one of our

9    prior appearances is simply was Union Pacific a subcontractor

10   that merely provided payroll services or did they do more than

11   that.  Did they provide labor and payroll?

12       And that will be certainly determinative of the threshold

13   issue, and we've left for another day if we need to get there

14   at all the size and penalties and all of that and then any

15   amount owing.

16       And so the simple issue before the Court, the workers that

17   did the work from September of 2000 to May of 2003 that

18   provided this piecework, were they employees of Union Pacific

19   or were they, instead, employees of Bravo.

20       So, next, page 5, burden of proof, again, it's an

21   important issue.  I think at the end of the day we feel so

22   strongly in the evidence that the reorganized debtors have that

23   it doesn't matter where your Honor comes out on burden of

24   proof.  We think we prevail either way.

25       But we do think that the IRS bears the burden here, and so

1    we've quoted from some of the cases that are in our briefs that

2    there is no dispute.  That the initial burden is on the IRS.

3        The question is whether the IRS has done enough through

4    the evidence that it has adduced to shift the burden back to

5    the taxpayer.

6        And, again, if the IRS's determination is arbitrary, if

7    it's excessive, if it's without foundation, the burden stays

8    with the IRS.  It does not move to the taxpayer.

9        And here, certainly, when it comes to the size of their

10   claim, the penalties, the fraud allegations, there is no

11   evidence on any of that, and, certainly, we think that that's

12   excessive.  But even for --

13            THE COURT:  But we don't get to there now, anyway.

14            MR. QURESHI:  Right.

15            THE COURT:  Okay.

16            MR. QURESHI:  That's right.  We don't get there now.

17   So even if we focussed just on the issue before the Court

18   today, we do think that the burden stays with the IRS, and I'll

19   get to this in more detail, your Honor, but it comes down to

20   this.  Okay.

21       The IRS has through all of the witnesses that they

22   brought into this court one witness who contradicts our

23   witnesses.

24       And that one witness by his own admission has testimony

25   that is relevant to the time period from September of 2000

1  until at the absolute latest April of 2001, so that is seven

2  months out of the 32 months that are at issue, and I'm

3  referring to the gentleman known as Big Jorge,

4  Mr. Fernandez.

5      By his own admission, when he left at the latest in April

6  of 2001, he had no knowledge of anything that happened

7  thereafter.

8      The IRS does not have a single witness from that point on

9  that even alleges a set of facts that is contrary to what the

10  debtors, the reorganized debtors, have alleged.

11      To the contrary, the witnesses that they brought in that

12  testified with respect to that time period either had no

13  knowledge at all or testified in a manner consistent with the

14  reorganized debtor's theory of the case.

15      So to bring this back to the burden question, it is our

16  position that the IRS's allegations are without foundation.

17  That they have zero evidence supporting them, and that,

18  therefore, the burden stays with the IRS.

19      Now, the Ninth Circuit in the Olshan case that's

20  footnoted here on the page noted in that case, your Honor,

21  that respect to burden shifting it's not an all-or-nothing

22  proposition, and the burden rests with the particular

23  claim here because we're basically dealing with one

24  claim.

25      And because the vast majority of that claim is without any

1    evidentiary support, we think that with respect to that claim

2    the burden should shift back to the IRS.

3         But, again, even if your Honor should determine that, no,

4    their initial showing satisfies their initial burden, and,

5    therefore, the burden shifts to us to disprove their case,

6    your Honor, we think we easily do it based on the evidence

7    before you.

8         So moving on to the next page, just an overview of who the

9    witnesses were, and, again, it's important because of who they

10   were and what their positions were.

11        So let me take it backwards and start with our witnesses

12   at the bottom of page 6, so we had the two people most directly

13   involved in this situation who were able to testify based on

14   personal knowledge, principally, Dean Griffith who was the

15   manager of Bravo at all relevant times who was the individual

16   who actually entered into and signed the contract.

17        We don't have whoever the counterparty was of that

18   contract as a witness, and then we've also got Mr. Bevan who

19   was Mr. Griffith's superior at Rhodes Home, the parent company

20   if you will of Bravo, so, again, they are the people at the

21   center of this and with firsthand knowledge.

22        On the other hand, the IRS's witnesses, so Pamela Garner,

23   a receptionist and administrative assistant and a payroll

24   processor until 2002.

25        And as we'll get to, not in her job description to be

1    involved in things like this, and, therefore, her testimony not

2    surprisingly is largely secondhand and largely irrelevant.

3        James Garner, again, a foreman not involved in the

4    negotiations leading up to this contract was at some of the

5    meetings, and, again, we'll get to his testimony.  It helps us.

6        Big Jorge, this is the gentleman I mentioned before.  This

7    is the one and only witness that offers testimony on the IRS's

8    behalf that contradicts the reorganized debtor's testimony,

9    but, again, only for at most 7 out of 32 months.

10        Little George who took over from Big Jorge in early

11    2001, his testimony -- and he's probably the next most

12    relevant witness in terms of what his position was, the

13    general superintendent at Wright Painting & Drywall and the

14    time period.  He was there for the majority of the time

15    period -- unequivocally supports our position we think, and

16    we'll get to the details.

17        And, lastly, another administrative assistant,

18    Marlene Marcus, and payroll processor, again, largely

19    irrelevant.  And to the extent she's not irrelevant, once

20    again, her testimony helps us.

21        So let me start with the testimony that we think

22    supports our case.  So if your Honor turns to page 8,

23    Mr. Griffith, he negotiated, he reviewed, and he signed the

24    agreement, and nobody contradicted that.  That that's

25    unrebutted testimony.

1        He also explained why it was that around this time period

2    Bravo needed to get some help with respect to providing labor.

3    It was a time as he testified when the market was incredibly

4    busy when Bravo had more work than it was able to handle.

5        And one of the big problems for Bravo was the time

6    consumed in hiring these workers and particularly in

7    ascertaining their immigration status to make sure that they

8    were legal.  And so as we've quoted here on the page,

9    Union Pacific represented a way to solve that problem.

10        Instead of having to deal with the process of hiring and

11    ascertaining immigration status and interviewing and

12    supervising and disciplining and firing, just give it all to

13    UPC.  Call one number to tell them what you need and where you

14    need it, and they'll do the rest.

15        And so he testified that he entered into that agreement

16    sometime in the year 2000, and that pursuant to the agreement

17    the following things happened:

18        Union Pacific supplied the work crews as needed.

19    Union Pacific paid the workers.  They hired them.  They fired

20    them.  They supervised them on the job sites.  They also paid

21    for the workers' healthcare and workers' compensation.

22        And Union Pacific billed Bravo weekly for the cost of

23    providing that labor plus what was referred to as the burden

24    which is basically Union Pacific's -- excuse me --

25    Union Pacific's fee for providing the labor, and that was a fee

1    of 18-and-a-half percent.

2         Now, on to page 9 -- and I think this is very important

3    when it comes to the time frame that Big Jorge testified

4    about -- Mr. Griffith testified -- and, again, it's not

5    disputed, your Honor -- that before he signed the contract with

6    Union Pacific sometime in the year 2000 he asked to see proof

7    that Union Pacific was a licensed subcontractor.

8         Obviously, your Honor, he wouldn't have done that if they

9    were just the payroll processor.  He needed to see a

10   subcontractor's license, and he did see a subcontractor's

11   license.

12        And he also testified -- and this becomes consistent with

13   all the evidence your Honor heard from the IRS's witnesses --

14   that the three crew leaders who prior to entering into the

15   agreement were Bravo employees.

16        The gentleman known as Smiley, Mr. Nunez, Mr. Barrajas,

17   those three individuals left Bravo and became employees of

18   Union Pacific.

19        And that's important because these are the guys who before

20   the contract was in place they were supervising the crews.

21   They were employees of Bravo.  They were paid by check.  Nobody

22   disputes that.

23        And when the subcontracting relationship began, they went

24   over with UPC by consent from Bravo as part of the arrangement,

25   and the IRS's witnesses corroborate that.

And so at the end of the day, Mr. Griffith is the most important witness, your Honor.  We think he testified credibly. We don't think his testimony was impeached in any meaningful way on cross-examination.  His knowledge was all firsthand and direct.

The only attempt that the IRS made to impeach his testimony was with respect to this issue of political contributions that he made on behalf of Jim Rhodes and subsequently learned that that was not permitted, and he testified that he didn't know that that was wrong.  His boss asked him to do, and he did it.

Respectfully, your Honor, we don't think that that in any way calls into question his testimony with respect to the events that occurred around the year 2000.

Moving on to Mr. Bevan, Mr. Bevan is once removed if you will the CFO of the parent company, and his testimony is important for a couple of reasons.

He was one of the people responsible for signing the checks and, in particular, for signing the checks to UPC.  When Bravo paid Union Pacific, you can imagine those were significantly-sized checks given that they were for three crews plus this 20-percent burden for one week at a time.

And Mr. Bevan testified that although he couldn't specifically recall reviewing this contract that as a matter of practice when he gets a request to sign a check for 20- or

1    $30,000 he's not going to sign that check unless he reviews the

2    contract first.

3        So he can understand consistent with his responsibilities

4    as CFO what the arrangement is, who's being paid, and why, and

5    that is again entirely consistent with Mr. Griffith's testimony

6    that there was a contract here, and that the contract was what

7    he said it was for, the provision of labor.

8        Now, Mona Wilcox, she didn't testify, but she's a former

9    controller of Bravo, and Mr. Bevan said that

10   Ms. Wilcox came to him and said, gee, how about paying

11   Mr. Kahre in gold and silver.

12       Now, you'll recall Mona Wilcox was convicted of

13   embezzlement.  She came to Mr. Bevan with a scheme, and he

14   rejected it.  He rejected it out of hand.  He said no way.  We

15   don't do that.  We're not going to do anything like that.

16       So, again, I think that Mr. Bevan's testimony -- it's

17   uncontradicted.  We think he testified credibly.  There really

18   was no meaningful impeachment of his testimony.

19       The only attempt again that the IRS made was with respect

20   to this same issue as Mr. Griffith, the political

21   contributions, and, again, your Honor, we don't think that

22   detracts at all from the strength of what he had to say here.

23       If that were all we had, our two witnesses, we should win.

24   We should win whether we have the burden or not.  Fortunately

25   for us, your Honor, we got a lot more really good testimony,

1    and we got it from the IRS's witnesses.

2        Let's start with Little George, so he became the foreman

3    when Big Jorge got fired, and that was sometime in early 2001,

4    and what Little George says is that although Union Pacific

5    certainly did process payroll they also became a full-service

6    general contractor.

7        And, in fact, while he was there, while he was the

8    foreman -- and by the way, your Honor, this Wright Painting &

9    Drywall Company, frankly, it's a little confusing.  The first

10   we had heard of that was when we got to trial or to

11   depositions.

12       That was not a company ever mentioned in any of the IRS's

13   pleadings, and it was news to us.  We really hadn't heard of it

14   either.

15       But that aside, while he was running Wright Painting &

16   Drywall, Little George says Union Pacific was doing framing,

17   painting, and drywall work.

18       And, you know, we have a quote here on the page.

19   "Union Pacific was a general contractor, and they provided

20   labor to people."  He says it.

21       And his testimony covers 25 out of the 32 months that are

22   at issue, so you've got the foreman or the manager I think was

23   his title of Wright Painting & Drywall testifying under oath

24   that they provided general contracting services, including all

25   of the labor that Mr. Griffith says he was getting from UPC, so

1    he directly supports our version of events.

2         Now, importantly, he was in the courtroom, your Honor, for

3    all of the testimony, and I asked him whether he had any basis

4    to dispute the testimony that he had heard from Mr. Griffith

5    that there was a contract signed with Union Pacific to provide

6    framing crews to Bravo.

7         And he unequivocally and clearly said, no, I have no basis

8    to disagree with it, so that's the second most relevant witness

9    to these events, and he agrees with us under oath.

10        Now, let's go on to Marlene Marcus, page 13.  Now, again,

11   generally speaking, your Honor, not a terribly relevant witness

12   given what her position was at the company.

13        But she does say that when Jim Rhodes, the owner of Bravo,

14   needed workers he would call Union Pacific to supply them.

15   Wow, that's pretty consistent with our version of events.

16        And she further testified, again, entirely consistent with

17   the reorganized debtor's testimony that the gentleman known as

18   Smiley, the crew leader, he was employed by Union Pacific just

19   like we say he was.  He went over to their employ at the time

20   this contract was entered into.

21        On to James Garner, one of the Bravo foreman, again, for

22   the most part, not terribly relevant.  And by the way,

23   your Honor, the IRS makes much of the fact that all of these

24   witnesses testified that Union Pacific processed payroll for

25   all of the pieceworkers, and we agree.  That's not in dispute.

1        What's in dispute is whether they did more than that, but

2   the fact that they processed payroll we don't take issue with.

3   Of course, they did.  That was part of the arrangement.

4            THE COURT:  Well, but you're saying they processed

5   payroll, but they didn't process payroll for Bravo employees.

6            MR. QURESHI:  No, no.  Not for Bravo employees.

7   That's right.  They processed payroll for their own employees.

8            THE COURT:  Right.  Okay.

9            MR. QURESHI:  But what I'm saying is that the

10  testimony was that they processed the payroll, Union Pacific

11  did, for these crews --

12           THE COURT:  Okay.

13           MR. QURESHI:  -- for the three crews that are at

14  issue, and we don't dispute that.  It's part of what they were

15  hired to do.

16       But Mr. Garner does say -- and he was employed throughout

17  the relevant time period -- he's not aware of any Bravo

18  employees ever getting paid other than by a check from Bravo,

19  and that's consistent by the way.  There's not a shred of

20  evidence --

21           THE COURT:  Okay.

22           MR. QURESHI:  -- that Bravo ever paid its employees

23  in cash or gold or silver or anything other than a paycheck

24  from which appropriate withholdings were made.

25       On, then, to Pamela Garner on page 15 or down to the same

1    thing, I never witnessed anybody getting paid in cash, and she

2    is one of the people who certainly testified that she

3    understood Union Pacific would be processing the payroll for

4    the pieceworkers, and, again, we don't dispute that.

5         With respect to other aspects of the business, she had no

6    knowledge which again is not surprising given what her position

7    was.

8         And so, again, I asked her what I think is the ultimate

9    question, your Honor, with respect to her testimony here which

10   is do you have any basis to dispute what Mr. Griffith says with

11   respect to signing a contract to provide labor.  Answer,

12   unequivocally, no, the second IRS witness to say that.

13        So let's go on now to what the IRS has in their favor, and

14   it's one witness.  As I said, it's Big Jorge, and Big Jorge

15   says that Union Pacific had no workers of its own and therefore

16   couldn't have provided workers to Bravo.

17        And then he also testified that Bravo effectively

18   participated in the gold-and-silver scheme.  That that's how

19   those workers were paid, but there's much to contradict what

20   Big Jorge says.

21        First of all -- and, again, this is the whole

22   Wright Painting & Drywall -- he didn't work for Union Pacific.

23   He worked for Wright Painting & Drywall.

24        And, most importantly, the time frame, again, he left in

25   early 2001.  There's some question about the

1   circumstances under which he left.  He was accused of

2   embezzling.

3        He, of course, denies it, but, nonetheless, he left

4   as a result of those accusations, and he left in early of

5   2001.

6        Pretty much everything Big Jorge testifies to,

7   your Honor, is contradicted directly by Dean Griffith.  And so

8   with respect to again 7 of 32 months, there is a question that

9   your Honor needs to weigh the conflicting testimony.

10       I would urge your Honor to look at it the following way.

11  That not only do we think Mr. Griffith testified credibly, but

12  Mr. Griffith's version of events is corroborated by every other

13  witness the IRS brought into this courtroom.

14       We do think Big Jorge's testimony is questionable and not,

15  your Honor, because we think he's a bad guy, but because as he

16  said this was a bad chapter for him.  He tried hard to forget

17  everything that happened.  That's what he told your Honor that

18  he tried to do.

19       And so given the circumstances of his departure, given his

20  own involvement in the fraudulent scheme that Mr. Kahre and UPC

21  were pursuing, we think the balance and certainly until it's

22  decisively in favor of the reorganized debtors when you combine

23  that with the fact that all of their other witnesses support

24  us, and, again, your Honor, this is only with respect to 7 out

25  of 32 months.  Beyond that, they have nothing.

1          James Garner, he says he went to this meeting in early

2    2000 that we heard a little bit about, and that at that meeting

3    it was discussed that Union Pacific would handle payroll and

4    benefits for the piecework crews.  We agree.  Again, the IRS

5    makes much of it, but not in dispute.

6          But, again, he doesn't know what was going on on the job

7    sites.  That wasn't his role.  He wasn't the one that

8    negotiated the agreement, and he really has very little by way

9    of relevant testimony beyond what isn't in dispute.

10         So let's come back, then, to the legal issue before the

11   Court, your Honor.  Who's the employer?  There's no dispute

12   about what the test is.  It's a multifactor test.

13         Ultimately, control is the decisive factor, and here we

14   think that it's pretty clear, pretty decisive, who exercised

15   control.

16         On page 20, your Honor, we've listed all of the factors,

17   and, again, no one factor is determinative, and not all of the

18   factors are relevant here, your Honor.

19         For example, things about this industry are relevant.

20   It's always the case in the homebuilding industry that the

21   homebuilder provides the work site, right, where the house is

22   being built, that the homebuilder will provide the lumber,

23   deliver the lumber to the job site.

24         And it's also industry practice -- and this is in the

25   testimony of all the witnesses -- that the custom in this

1    industry is that the workers own their own tools.

2        That that is the case regardless of -- that is equally the

3    case with the ones that are employees of Bravo, the hourly

4    workers or the salaried workers.

5        The important distinction, your Honor -- and this is again

6    a point that weighs in favor of the reorganized debtors -- is

7    the reorganized debtors did have a tool-purchase program for

8    its employees.

9        And the way that worked is if one of their employees

10   wanted to purchase, typically, a more expensive tool -- I think

11   the example given in the testimony was a nail gun -- they could

12   buy it through the company for two reasons.

13       One, the company would get a discount on it because they

14   obviously buy a lot of tools, and, secondly, they could pay

15   over time through deductions from their paycheck, and that

16   program was made available to all of their employees, including

17   the piecework crews before this contract was entered into.

18       Once those pieceworkers were provided by Union Pacific,

19   the tool-purchase program was not made available to them.  It

20   was only available to Bravo employees.

21       And so the evidence here is really not contradicted, and

22   I'll sum it up this way, your Honor, and this is all

23   undisputed.

24       Union Pacific interviewed the job applicants.

25   Union Pacific had to determine if they were legally entitled to

1    work in the United States or not, and Union Pacific decided who

2    to hire, not Bravo, right, after the contract was entered into.

3         Bravo when they needed work, workers I should say, they

4    would call Union Pacific, and they would say we need piecework

5    crews at the following job sites on such and such a day to do

6    the following work.

7         It was Union Pacific who would decide which crews to

8    send to which job sites and which workers would be on those

9    crews.

10        Once the workers got to the job sites, your Honor, it was

11   Union Pacific foremen, specifically, Smiley, Nunez, and

12   Barrajas, the three crew leaders, who went over to

13   Union Pacific as part of this arrangement who provided the

14   supervision of the pieceworkers on the job site.

15        Bravo had no ability to fire any of the piecework crews or

16   to discipline them.  That was the job of Union Pacific again

17   consistent with these people being Union Pacific employees.

18        And to the extent that Bravo had any concerns about the

19   quality of the work that it was getting, Bravo would go to the

20   foremen, the Union Pacific foremen, the crew leaders, and say,

21   hey, your crew didn't do X, Y, and Z, fix it, and that is

22   entirely consistent with a subcontracting relationship

23   consistent with what happens in the industry.

24        Bravo also was not the one to deal with on-site job

25   injuries or workers' comp for the piecework crews.  It was for

its employees.  Bravo provided workers' compensation for its employees.

Your Honor heard the scheme, shady, though, it might have been, that Union Pacific had for the workers.  That if somebody was injured they would call Big Jorge or the foreman on the job site.

The Union Pacific foreman would call Big Jorge.  He would send them to a hospital, and he would go and pay the hospital in cash, and he would also pay the workers some portion of their salary to the extent that they could not work for some period of time because of an injury sustained on the job site.

And by the way, he also testified that it was also his job to police those workers.  In other words, if he found out that a worker on one of the Union Pacific piece crews that was getting workers' comp because he was injured was out on some other job site working for somebody else, he would cut them off, warn them, fire them, do whatever he would do, but that was his job, and, again, your Honor, that's entirely consistent with our testimony.

It makes no sense for a company that is allegedly just providing payroll to be dealing with on-site job injuries and paying hospitals and policing whether workers are being honest with respect to being unable to work for some period of time. That's what an employer does, and that's what Union Pacific did here.

1      So in conclusion, the testimony of our witnesses is not

2  only uncontradicted with the exception of Big Jorge for that

3  seven-month period.  It's supported by all of the other

4  witnesses from the IRS.

5      So unless your Honor has any questions, I would like to

6  reserve if I could a little time --

7              THE COURT:  Sure.

8              MR. QURESHI:  -- because there are a couple of things

9  on the slides you're about to see from the IRS that I would

10 like to have the chance to respond to if I could.

11             THE COURT:  All right.

12             MR. QURESHI:  Thank you.

13             THE COURT:  Ms. Lowe.

14             MS. LOWE:  May it please the Court, Government

15 Exhibits 1 and 2 show that Robert Kahre was indicted and

16 convicted of running a fraudulent payroll service in which he

17 paid his own workers and the workers of 35 other construction

18 companies in gold and silver which a worker would then trade in

19 for cash.

20      It is undisputed that in the year 2000 Bravo entered into

21 a contract with Robert Kahre, and this was the only contract

22 they had with Robert Kahre.

23      It is also undisputed that Dean Griffith, the general

24 manager of Bravo, was the one who determined that Bravo should

25 enter into a contract with Kahre.  Griffith had the authority,

1 and he did not consult with Jim Rhodes, the president of Bravo,

2 prior to entering into the contract with Kahre.

3      However, just as he agreed to allow Rhodes to use his name

4 in what turned out to be a violation of the Federal Election

5 laws, he did not attend to the details with regard to the

6 contract with Kahre's company, Union Pacific.

7      Griffith testified that he allowed Mona Wilcox to

8 negotiate the contract with Kahre, and he was not familiar with

9 the specific terms of the contract.

10      He testified that the only details that he checked out

11 with Mona Wilcox before signing the contract with Kahre were

12 that Kahre had a contractor's license, and he had a workmen's

13 compensation policy.

14      However, in fact, upon further questioning, he testified

15 he never saw any evidence of Kahre's actual workers'

16 compensation policy.  He left it up to Mona Wilcox, a Bravo

17 employee, who was later fired for embezzlement to work out the

18 details with Kahre.

19      James Bevan who the reorganized debtors rely on in this

20 matter who also violated the Federal Election laws at the

21 request of Jim Rhodes --

22          THE COURT:  Well, so what?

23          MS. LOWE:  It's just showing that he's loose in his

24 dealings.

25          THE COURT:  Well, how is that competent evidence --

1            MS. LOWE:  It just --

2            THE COURT:  -- or how does prior conduct or past

3    conduct relevant?

4            MS. LOWE:  They want to introduce the prior conduct

5    of my witnesses, so I'm just trying to show that not everybody

6    is a saint in this matter.

7        He testified that other than what he had heard on the day

8    of the trial he had no understanding of the specific contract

9    with Union Pacific.

10       He testified that he did not have any specific

11   recollection of seeing the contract with Union Pacific, and he

12   had no personal knowledge of the contract.

13       Debtors, reorganized debtors, also point to the testimony

14   of Marlene Marcus who testified in her deposition, though, that

15   she had no personal knowledge of the contract with

16   Union Pacific.

17       And her testimony with regard to the fact that saying

18   Jim Rhodes called Union Pacific to request employees is totally

19   inconsistent with every other witness in this matter who said

20   Jim Rhodes hardly ever showed up at the Bravo offices.

21       Government Exhibit 3 which are the pay sheets from Bravo

22   and the invoices from Kahre's company, Union Pacific, show that

23   Bravo's contract with Kahre commenced in September 2000 and

24   continued to the middle of May 2003.

25       The evidence presented at trial shows that the only

1  service provided by Union Pacific in 2000 when Bravo contracted

2  with Union Pacific was a payroll service.  That was the only --

3            THE COURT:  Well, doesn't it say billing for framing?

4            MS. LOWE:  It does, your Honor.  That was part of the

5  whole scheme that Kahre conjured up with these contractors.

6            THE COURT:  But let's assume I had ABC Framing

7  Company.  Isn't this the exact kind of bill I'd get from

8  ABC Framing Company?

9            MS. LOWE:  It is, and it was a way for him to just

10  try and disguise what he was actually doing, what he was

11  doing --

12            THE COURT:  But, I mean, how does this --

13            MS. LOWE:  -- with his whole service.

14            THE COURT:  -- No. 3 prove it was merely a payroll

15  service when this is exactly what a bill for framing would look

16  like?

17            MS. LOWE:  It doesn't.  I'm not really using it to

18  show that it was a payroll service.  It was part of the whole

19  invoice policy with Bravo.

20       That is we're not -- we're just showing that that is

21  how -- with Exhibit 3, you can see that this is how much was

22  paid over the years for the contract, and the contract ran from

23  September of 2000 all the way through the end of May 2003.

24            THE COURT:  Okay.

25            MS. LOWE:  We're looking specifically in this case at

1    the trial testimony of the witnesses, your Honor.  And, in

2    fact, the evidence of the -- the trial testimony of two of

3    Robert Kahre's former employees who are the only witnesses who

4    had personal knowledge of Kahre's businesses, Jorge Fernandez

5    testified that there were 35 companies running their payroll

6    through Union Pacific, and that Bravo was one of these

7    companies.

8        Fernandez also testified that Union Pacific had no workers

9    of its own when he worked for Kahre, and that was from 2000 to

10   2001, and in 2000 is when the contract was entered into with

11   Union Pacific.

12       George Rodriquez testified that in 2000

13   Union Pacific's business was only a payroll

14   service.

15       Kahre may have expanded Union Pacific later to provide

16   general-contracting work; however, the evidence shows that when

17   Bravo contracted with Kahre in 2000 the only service provided

18   by Union Pacific was a payroll service, and this contract

19   lasted until May of 2003.

20       It is undisputed that prior to the contract with Kahre

21   Bravo had three types of employees all paid by Bravo with a

22   paycheck.

23       There were salary employees such as the foremen, hourly

24   employees, the office workers, and some workers under the

25   foremen, and the pieceworkers who did the bulk of the framing

1    work for Bravo.

2        The evidence is undisputed that the pieceworkers

3    would work with more than one construction company at a

4    time.

5        At issue in this case are the three Bravo piecework crews

6    headed up by Ishmael Curiel, Andres Nunez, and

7    Joaquin Barrajas.

8        The issue to be determined in this case is the

9    responsibility for the payment of the employment taxes for

10   these three piecework crews.

11       In the recent Ninth Circuit case of Stahl v. United States

12   which is cited in the Untied States Conclusions of Law, the

13   Court citing to the Supreme Court case of Nationwide Insurance

14   v. Darden found that, "The existence of an employer/employee

15   relationship generally turns on a number of factors, the source

16   of instrumentalities and tools, the location of the work, the

17   duration of the relationship between the parties, the

18   assignment of the work, the scope of the work, the method of

19   payment, regular hiring, business of the hiring party, and

20   whether the hiring party is in business, and provision of

21   employee benefits."

22       And a number of Courts including the Ninth Circuit have

23   found that the factors that are most significant is the right

24   to control.

25       That is whether the person for whom the work is performed

1    has the right to control the activities of the individuals

2    whose status is in issue not only as to the results, but, also,

3    as to the means and method to be used for accomplishing the

4    result.

5         And I refer your Honor to another case cited in

6    Untied States Conclusions of Law, the case of

7    Professional Executive Leasing v. Commissioner.

8         In that case, the Ninth Circuit found that -- in that

9    case, the issue was whether or not the retirement plan of the

10   plaintiff qualified under Section 401 of the Internal Revenue

11   Code, and then so the Court had to look and see whether the

12   workers were employees.

13        And the Court found that the plaintiff did not exercise

14   sufficient control over management and personnel -- and over

15   the management, the personnel.

16        And they were mostly licensed professionals who were

17   leased by the plaintiff to other businesses, and so they

18   weren't considered to be the employees of the plaintiff.

19        The recipients, the person who leased the employees, were

20   the ones who provided the equipment, tools, office space for

21   the workers, and also the malpractice insurance, and then they

22   had control over the work, the details of the work, and how and

23   when it was to be performed.

24        In another case cited in the Untied States Conclusions of

25   Law, United States v. Garami, the debtor, Garami, was doing

1    business as an entity called Tidy Maids.  It leased its workers

2    from Sunshine Staff & Leasing.

3         In holding that the debtor, Garami, was responsible for

4    the employment taxes on the workers, the Court looked at the

5    common-law factors of the employer/employee relationship and

6    determined that the critical question is whether the person for

7    whom the work is performed has the right to control the

8    activities of the individual whose status is in issue.

9              THE COURT:  Okay.  Well, question, what evidence do I

10   have that -- let's assume we see that Juan Camacho is using the

11   wrong size nails consistently.

12             MS. LOWE:  I'm going to --

13             THE COURT:  What evidence do I have that somebody

14   from Bravo would have the right to say you're off the job?

15             MS. LOWE:  I'm going to go through that, your Honor.

16   The Bravo foremen -- and what I'm going to show is actually

17   that the Bravo foremen actually have the same control of these

18   workers before the contract as they did after the contract.

19        So what the Bravo foremen would do -- and this was in the

20   testimony -- they had the overall control over the work site,

21   and they would go to the crew leaders, and they would do this

22   before the contract, and they would do the same thing --

23             THE COURT:  But what --

24             MS. LOWE:  -- after the contract.

25             THE COURT:  Let's assume again --

1          MS. LOWE:  Right.

2          THE COURT:  -- that Bravo -- in their question, the

3     Bravo foreman's out there, and he says --

4          MS. LOWE:  Yeah.

5          THE COURT:  -- that piece won't work.  That's bad.

6          MS. LOWE:  Right.

7          THE COURT:  It's got to go, and let's assume he saw

8     Juan Camacho put the nails in wrong.  What evidence do I have

9     that he had the right to fire him?

10         MS. LOWE:  In most instances, he wouldn't outright

11    fire him.  He would go to the crew leader, and this is what he

12    did before the contract, too.  He would go to the crew leader.

13       We've had evidence that the crew leaders were the one who

14    were responsible for the workers on their crews, and the Bravo

15    foreman said that -- and James Garner testified -- it was the

16    foreman on the work sites who would deal with the crew leaders.

17       And so those crew leaders were the same before the

18    contract and after the contract, and that was the same process

19    that was used before the contract and after the contract.

20         THE COURT:  But what evidence do I have they had the

21    right to do anything to them?  They talk to them.  They tell

22    them it's not right, but what evidence do I have that they

23    could do something?

24         MS. LOWE:  I don't think we have any evidence --

25         THE COURT:  Okay.

1          MS. LOWE:  -- in the record.  We don't really even

2     have any evidence in the record of Bravo firing crew workers

3     before the contract.

4          THE COURT:  Right.

5          MS. LOWE:  We don't have that evidence in the record

6     either.  We have the evidence is that the foreman would go to

7     the crew leaders, and the crew leaders would have to take care

8     of the problems.

9          THE COURT:  Okay.

10          MS. LOWE:  As I would examine here, the testimony at

11     trial filed by the former Bravo construction manager,

12     Dean Griffith, and former Kahre employees, Jorge Fernandez and

13     George Rodriquez, established that Bravo had the same control

14     over the pieceworkers after Bravo entered into the contract as

15     it had before the contract with Kahre when Bravo treated these

16     crews as employees and gave them paychecks.

17          And I'm going to review now, your Honor, the

18     practices, payroll practices, prior to the contract with

19     Union Pacific.

20          The testimony at trial revealed that the payment of the

21     piecework crews for their work prior to and after the contract

22     with Kahre was according to the same method.

23          Prior to the contract, the crew leaders would denote on a

24     Bravo master worksheet at which sites they performed work and

25     what work they completed.

1        The crew leaders then would turn that master sheet into

2   Dean Griffith for approval.  Dean Griffith would then approve

3   the work completed and how much each crew should be paid for

4   the work performed.

5        Dean Griffith would then give the total figure owed to

6   each crew to the Bravo payroll office, and each crew leader

7   then determined how much each pieceworker on his crew would be

8   paid from the total amount accrued.

9        Bravo payroll office would then enter this information

10  into the Bravo computer-payroll system, and, finally, the Bravo

11  payroll office would issue a check to each pieceworker in the

12  amount designated by the crew leader.

13            THE COURT:  That's not the testimony, is it?

14            MS. LOWE:  H'mm?

15            THE COURT:  Oh, Bravo.

16            MS. LOWE:  Bravo.  This is before the contract.

17            THE COURT:  Before.  Okay.

18            MS. LOWE:  This is all from the pay procedures before

19  the contract.

20            THE COURT:  Before.  Okay.

21            MS. LOWE:  Right.

22            THE COURT:  Sorry.

23            MS. LOWE:  Yeah.  And then now I'm going to review

24  after the contract with Union Pacific.  As testified by

25  Dean Griffith, after the contract with Union Pacific, the

1    process to pay the piecework crews was basically the same as

2    before the contract.

3         The crew leaders would still denote on a Bravo master

4    worksheet which sites they performed work at and what work they

5    completed.

6         The crew leaders would then turn the master sheet into

7    Dean Griffith for approval.  Dean Griffith would then approve

8    their work completed and how much each crew should be paid for

9    the work performed.

10        Dean Griffith would then give the total figure owed to

11   each crew to the Bravo payroll office, and, again, each crew

12   leader was the one who determined how much each pieceworker on

13   his crew would be paid from the total amount accrued.

14        The Bravo payroll office then would send to Union Pacific

15   as in Exhibit 3 a list of the amounts to be paid to each

16   pieceworker as it designated by the crew leader.

17        Then Union Pacific would send an invoice to Bravo for the

18   total amount owed to be paid plus the burden, and I'm going to

19   discuss the burden a little bit later.

20        But this is what Kahre charged for the use of his payroll

21   system.  And as I will discuss, the burden included the payment

22   of the workers' compensation.

23             THE COURT:  Now, what evidence do we have of that?

24             MS. LOWE:  We had the testimony of George Rodriquez.

25             THE COURT:  Right.  But we have no evidence there's a

1    correlation between the burden and the workers' comp, none

2    whatsoever.

3              MS. LOWE:  And --

4              THE COURT:  In other words --

5              MS. LOWE:  -- we --

6              THE COURT:  -- let's assume Joe Blow -- let's assume

7    one of the crew people lost a limb --

8              MS. LOWE:  Um-h'm.

9              THE COURT:  -- and had medical bills of $100,000.

10             MS. LOWE:  Right.

11             THE COURT:  Well, the 18.5-percent burden on that

12   person or for that contract would be far less than that amount

13   of money.

14             MS. LOWE:  But I think it would -- it's the same as

15   insurance, your Honor.  Workers' compensation may pay insurance

16   with the hope that it won't --

17             THE COURT:  Right.  But the point is you --

18             MS. LOWE:  -- result --

19             THE COURT:  There is no correlation, none, no

20   evidence anywhere in the record of a correlation between what

21   they paid for medical injuries and how much was charged.

22             MS. LOWE:  We only have -- we do have the testimony

23   of George Rodriquez, Jorge Fernandez, and we also have the

24   testimony of James Garner who said, though, that Kahre

25   explained his workers' compensation --

```
 1              THE COURT:  Right.  But there's no correlation.
 2    Again, the charge for one person working on a Rhodes job one
 3    day -- I mean, if the guy was on the Rhodes job one day and
 4    lost a leg --
 5              MS. LOWE:  Right.  Well, we also have --
 6              THE COURT:  -- there's no correlation.
 7              MS. LOWE:  -- no evidence of what --
 8              THE COURT:  Right.
 9              MS. LOWE:  -- Bravo --
10              THE COURT:  But don't tell me there's a correlation
11    when there's not.
12              MS. LOWE:  Well, we don't have any evidence of what
13    Bravo paid on a daily --
14              THE COURT:  Right.
15              MS. LOWE:  -- for their own --
16              THE COURT:  So, therefore, you cannot tell me that
17    the burden equalled the workers' comp.  You can't tell me --
18              MS. LOWE:  I --
19              THE COURT:  -- that.
20              MS. LOWE:  It wouldn't equal the workers' comp.
21    That's really not how insurance works --
22              THE COURT:  I know.
23              MS. LOWE:  -- in any event.
24              THE COURT:  But it wouldn't even equal the amount
25    they paid for workers for injuries.  There's no correlation.
```

1          MS. LOWE:  Well, there's actually no evidence in the

2     record that how many workers were even injured --

3          THE COURT:  No.

4          MS. LOWE:  -- in a year.

5          THE COURT:  But you cannot tell me therefore there

6     was a -- you can't tell me there was a correlation.  There

7     wasn't.  We don't know that.  You're trying to tell me that the

8     18.5 percent was an amount equal to what they paid for workers'

9     health insurance.  That's not true.

10          MS. LOWE:  Meaning when we don't have any evidence of

11     the debtors that they actually paid even any less --

12          THE COURT:  But you can't --

13          MS. LOWE:  -- or more.

14          THE COURT:  -- tell me it is.

15          MS. LOWE:  No.  I can't tell you that.

16          THE COURT:  Okay.

17          MS. LOWE:  All is I can tell you is we have the

18     testimony of how Kahre's system worked.

19          THE COURT:  There was an 18.5-percent charge --

20          MS. LOWE:  Correct.  Correct.

21          THE COURT:  -- for everything.

22          MS. LOWE:  Correct.

23          THE COURT:  Okay.

24          MS. LOWE:  And then, finally, Bravo would send --

25     and, finally, after the contract, Bravo would send a check to

1    Union Pacific for the amount of the invoice which was used to

2    pay the crews performing the piecework at Bravo sites.

3         Thus, after the contract with Union Pacific, the only

4    difference was that instead of the information being put into

5    the Bravo computer system the information for paying the

6    pieceworkers was faxed over to Union Pacific and then followed

7    by a check to Union Pacific.

8              THE COURT:  Well, under your theory, is there ever a

9    subcontractor who isn't just a payroll service --

10             MS. LOWE:  Oftentimes --

11             THE COURT:  -- in the industry?

12             MS. LOWE:  Oftentimes, subcontractors even though --

13   oftentimes, subcontractors actually can be the -- in this case,

14   what I'm trying to show is that it was a contract for payroll

15   services, and that these --

16             THE COURT:  But --

17             MS. LOWE:  -- show --

18             THE COURT:  Right.  And you're comparing A and B.

19             MS. LOWE:  Right.

20             THE COURT:  It seems to me that we had -- let's

21   assume again we had ABC Framing owned by no one who had any

22   relationship who was an honest subcontractor.  Wouldn't all

23   these things be exactly the same?

24        Let's assume one day that Bravo decided I'm tired of this.

25   I'm going to subcontract it out.

1          MS. LOWE:  It --

2          THE COURT:  How would --

3          MS. LOWE:  And that's exactly --

4          THE COURT:  How would these factors be any different?

5          MS. LOWE:  And that's exactly what happened,

6   your Honor, in another case which I'm going to discuss in the

7   case of in re Professional Security Services and where they

8   actually -- the debtor provided security guards to commercial

9   and industrial businesses.  Okay?

10      And one day, the debtor decided that he was going to

11  actually have -- he's going to transfer all of his workers over

12  to another entity called Payroll Transfers, Inc., and then he

13  would lease them back --

14         THE COURT:  Well, but that's the same owner.

15         MS. LOWE:  -- at --

16         THE COURT:  That's not the same.

17         MS. LOWE:  No.  No.  He leased them to -- no.  It was

18  a different company.

19         THE COURT:  I know, but it's the same insider.  I'm

20  talking about let's assume we have a third party.  Under your

21  criteria, we would never have a situation where a subcontractor

22  would be in your view determined to be a legitimate

23  subcontractor because all of these factors are still true.

24         MS. LOWE:  No.  I mean, in a subcontract situation,

25  you actually have -- they have control over the work sites, the

1   subcontractors.

2       Here I'm going to show you Bravo still retained the same

3   control over the work sites as it did before the contract.  It

4   just sent its workers over to --

5           THE COURT:  But isn't that true --

6           MS. LOWE:  -- Kahre to be paid.

7           THE COURT:  -- in every housing project?  The point

8   is you got to build the house this way.

9           MS. LOWE:  Correct.  Correct.  And most of the people

10  treat those workers that work at their work site just as Bravo

11  did before this contract.  They treat those workers at their

12  work site as employees.

13          THE COURT:  Okay.  Go ahead.  Sorry.

14          MS. LOWE:  Okay.

15      (Colloquy not on the record.)

16          MS. LOWE:  Before and after the contract with Kahre,

17  Bravo had exactly the same control over the pieceworkers' crews

18  at the Bravo work sites.

19      Prior to the contract with Union Pacific, the Bravo

20  foremen would contact the crew leaders who were Smiley Curiel,

21  Andres Nunez, and Joaquin Barrajas directly to get their crews

22  to work on the job site that they ran.

23      Bravo provided all the materials at the work site for the

24  pieceworkers to perform their jobs such as lumber, trusses, and

25  hardware.  The pieceworkers provided their own tools.

1        Bravo foremen supervised the piecework crews at Bravo work

2   sites, and the work performed by the piecework crews at the

3   sites was a Bravo business, mainly framing houses.

4        After the contract with Union Pacific, the Bravo foremen

5   would still contact the same crew leaders, Smiley Curiel,

6   Andres Nunez, and Joaquin Barrajas, directly to get their crews

7   to work on the job site that they ran.

8        Just as before the contract was entered into with Kahre,

9   Bravo provided all the materials at the work sites for the

10  pieceworkers to perform their jobs.  The pieceworkers provided

11  their own tools.

12       Similarly, the Bravo foremen supervised the piecework

13  crews at the Bravo work sites, and the work performed by the

14  piecework crews was similarly the same, the business of framing

15  houses.

16       So despite the contract with Kahre, the evidence shows

17  that Bravo continued to control the means and methods by which

18  the piecework crews performed their duties at Bravo work sites.

19       With regard to the workers' compensation, I think we

20  talked about this earlier.  Prior to the contract, Bravo

21  provided workers' compensation for their piecework crews.

22       After the contract with Union Pacific, the workers'

23  compensation was paid for Bravo through the burden that was

24  charged by Kahre.

25       As testified by George Rodriquez, instead of having a

1   workers' compensation insurance policy as part of his payroll

2   system, Kahre made agreements with local hospitals to treat the

3   workers being paid through his system on a cash basis, and he

4   got a reduced amount by doing that.  He got a 40-percent

5   discount at the hospitals.

6       The contract as used in Kahre's payroll system got the

7   benefit of Kahre's workers' compensation system because it was

8   included in the burden that they paid in their invoice.

9       Despite the contract with Kahre, the evidence shows that

10  Bravo continued to control the means and methods by which the

11  piecework crews performed their duties at Bravo work sites and

12  how they were compensated for their work at Bravo work sites.

13      Thus, consistent with the Ninth Circuit employer/employee

14  relationship that's set forth in Stahl, Bravo was the

15  continuous employer of the piecework crews led by

16  Smiley Curiel, Andres Nunez, and Joaquin Barrajas.

17      The reorganized debtors cannot establish that Bravo was

18  not responsible for paying the employment taxes by merely

19  showing that it delegated the Taxing Authority responsibility

20  to Kahre for the withholding of employees' taxes and considered

21  an important duty that cannot be delegated.

22      As I was telling the Court earlier, in the case of in re

23  Professional Security Services -- and that is also cited in the

24  Conclusions of Law of the United States -- in that case, the

25  debtor provided security guards to commercial/industrial

1    businesses.

2         The debtor hired the guards and directed the work

3    assignments and schedules.  The guards were not permitted to

4    work anywhere else, and they were inspected by the debtor at

5    the work sites.

6         After a period of time, the debtor entered an agreement

7    with Payroll Transfers, Inc.  Payroll Transfers was to lease

8    the guards to the debtor and receive four percent of the gross

9    payroll services.

10        Prior to contracting with Payroll Transfers, the same

11   guards now leased were the employees of the debtor.  Each week,

12   the debtor would -- after the contract, each week, the guards

13   would provide the debtor with a log of the activities which

14   occurred during the shift, and the debtor would provide

15   Payroll Transfers with a schedule of the number of hours

16   worked.

17        Once the payroll checks were prepared, the debtor would

18   pay Payroll Transfers with a check equivalent to the guards'

19   salaries, the FICA, the FUTA, the medical, and a fee equivalent

20   to four percent of the gross payroll.

21        The Court held that the debtor is responsible for the

22   payment of the employment taxes.  The debtor was the person for

23   whom the guards performed the services.

24        The debtor had control over the payment because it gave

25   the check to Payroll Transfers which then Payroll Transfers

1    used to pay the guards.

2         The Court found the debtor could not delegate the

3    responsibility for the employment taxes merely by showing he

4    delegated taxing responsibility to someone else.

5         The existence of other responsible parties who also

6    controlled disbursement and then the record (indiscernible)

7    status, duty, and authority does not relieve the party asserted

8    of his own responsibility.

9         Former Bravo employees, Pamela Garner, James Garner, and

10   former Kahre employees, Jorge Fernandez and George Rodriquez,

11   testified that Bravo contracted with Kahre to participate in

12   Kahre's payroll service administered through Kahre's company,

13   Union Pacific.

14        The evidence at trial including the testimony of

15   Dean Griffith, the reorganized debtor's own witness, reveals

16   that consistent with the employer/employee factors determined

17   by the Ninth Circuit Bravo was the employer of the three

18   piecework crews being paid through Kahre's payroll service.

19        Bravo continued using Kahre's payroll service until the

20   second quarter of the year 2003 when there was a raid on

21   Kahre's business provided by the Federal Government.  Kahre

22   failed to pay the employment taxes.

23        Although Bravo entered into a contract with Kahre to

24   participate in the payroll scheme, that agreement does not

25   relieve Bravo, the actual employer of these three crews, of the

1    obligation to pay the employment taxes.

2              THE COURT:  Okay.  Thank you.

3              MS. LOWE:  Thank you.

4              THE COURT:  All right.  Reply.

5              MR. QURESHI:  Thank you, your Honor.  And I see

6    there's another matter following us, so I'll try to be quick.

7              THE COURT:  Like 20 matters.

8              MR. QURESHI:  Can I --

9              MS. LOWE:  Sure.  I can take --

10             MR. QURESHI:  Can you --

11             MS. LOWE:  -- this off.

12             MR. QURESHI:  No.  I actually want to use it.

13             MS. LOWE:  Oh.

14             MR. QURESHI:  Your control slide, can you

15   (indiscernible) for that?

16         (Colloquy not on the record.)

17             MR. QURESHI:  Your Honor, I'm going to start with

18   this slide here because this, frankly, is the one that has me

19   most incensed, and I want to start, in particular, with the

20   second bullet from the bottom.

21         Actually, I think there is (indiscernible).  The second

22   bullet from the bottom, it says, "Bravo foremen supervised the

23   crews."  It's not true, your Honor, and I'm going to go in

24   detail through the evidence in the record that establishes it.

25         And, your Honor, I'm going to give your Honor page and

1  line references because I, frankly, am shocked to see that

2  statement there, and, therefore, I didn't put this particular

3  evidence in the slides you have from the reorganized debtors.

4       This is the from the testimony of Mr. Griffith.  Page 112,

5  line 4 to 8, question, "Okay.  And what about supervising

6  crews?  So when Union Pacific would provide work crews to come

7  and frame at Bravo job sites, who would supervise those

8  Union Pacific crews?"  Answer, "Union Pacific Construction had

9  their crew leaders that we'd just have to contact."

10      Page 118, lines 16 to 19, question, "And I think you

11  already testified that Union Pacific had foremen who would

12  supervise their crews on Bravo's sites, right?  Answer,

13  "Correct."

14      Page 119, line 10 to 13, question, "And if the Bravo

15  foreman that you testified would go and inspect the work and if

16  that Bravo foreman found that the work was not up to Bravo's

17  standards, what would happen next?"  Answer, "He would call

18  UPC, typically, one of their crew leaders."

19      And, remember, your Honor, the key point here is the three

20  crew leaders that we're talking about, Smiley, Nunez, Barrajas,

21  uncontradicted evidence they were Bravo employees before this

22  contract was signed.

23      When the contract was signed, they became employees of

24  Union Pacific.  They were the ones that provided the day-to-day

25  supervision of the work crews on the job site.  Yes.  It's true

1    that they did that before the contract was signed, and they did

2    that after the contract was signed.

3         But it's also uncontradicted by their witnesses as well

4    that they became employees of UPC when the contract was signed.

5    They moved over, and that is at page 113, line 12 to 19.

6         Question, "I think you testified that before the contract

7    was signed those three individuals, Smiley, Nunez, Barrajas,

8    were Bravo employees, right?"  Answer, "Correct."

9         Question, "And so what happened after those three

10   individuals -- after the contract was signed?"  Answer, "They

11   went over to work for Union Pacific Construction."

12        Last point on this, your Honor, again, it's the testimony

13   of Dean Griffith.  It's at page 119, line 14 to 16.  Question,

14   "Okay.  And did Bravo have any role in disciplining the workers

15   that were provided by Union Pacific?"  Answer, "No."

16        That's the testimony.  So to suggest that Bravo foremen

17   supervised the crews, that's not what they did.  The testimony

18   is that Bravo foremen would inspect the work that they

19   contracted with Union Pacific to do.

20        And if the work wasn't up to standard, the Bravo foremen

21   would contact the UPC crew leaders and say, hey, guys, you

22   didn't do it right.  You've got to fix it.  That's the

23   testimony, so this, your Honor, respectfully, is highly

24   misleading.

25        Now, going through a couple of the other items on this

1    page, "Bravo foremen contact crew leaders."  Yes, your Honor.

2    That is true before and after.  But, again, before, the crew

3    leaders were employees of Bravo.  After, the crew leaders were

4    employees of Union Pacific, so it's very different.

5          After the contract was signed, they would call

6    Union Pacific crew leaders to say we need people at these job

7    sites, so that's a very big difference.  To suggest that that's

8    no change ignores the fact that the three crew leaders changed

9    employers.

10         Bravo provided all materials at work sites.  Yes, and

11   that's the standard in the industry, and to suggest otherwise

12   would suggest that it's impossible to contract out labor in the

13   construction industry.  Of course, the homebuilder provides the

14   building materials.  That's the way the business is done.

15         Pieceworkers providing their own tools, again, two

16   points.  One, it's industry standard.  The workers provide

17   their own tools.  They all do.  That's how it's done in the

18   industry.

19         What this ignores is the tool-purchase program which I

20   already talked about.  I won't belabor the point.  It was a

21   program made available to Bravo employees.

22         It was made available to the piecework crews when they

23   were employed by Bravo.  When they went over to Union Pacific,

24   the crew leaders, and when they those crews were provided by

25   Union Pacific, that tool-purchase program was no longer made

1   available, so I think the control goes decisively in favor of

2   the reorganized debtors.

3        Now I'm going to just flip back a couple of slides if I

4   could.  Let make sure I didn't go back too far.  Sorry.  Let me

5   find the page.  Okay.

6        So this is two slides that suggest that there was no

7   change before and after the contract with respect to the

8   payroll practices.

9        I'm going to list for your Honor a number of factors that

10  aren't on the slide and that did change and that, frankly,

11  your Honor, are the relevant factors.  Okay?

12       Prior to the contract, Bravo interviewed job applicants,

13  ascertained their employment status, decided who to hire, and

14  extended job offers.

15       After the contract, Bravo did none of that.  Union Pacific

16  did.  That was as Mr. Griffith testified a driving force behind

17  why they wanted to contract out the work.  They wanted to

18  relieve themselves of the significant burden of doing all of

19  that work.  That's the testimony.  That's not in the chart.

20       Secondly, Bravo determined before the contract where to

21  send their crews.  They were in control of the crews.  They

22  were their crews.  They would decide what jobs they would work

23  at.

24       After the contract, Union Pacific did that.  Again,

25  that's the clear testimony.  Bravo would simply contact

1     Union Pacific and say we need crews on the following job sites.

2     Union Pacific would decide which crew to send where.

3          Third, Bravo decided before the contract when to

4     discipline its employees and who to fire and who not to fire.

5     They were in control.

6          After the contract was signed, again, we've got the

7     uncontradicted testimony of Mr. Griffith that that

8     responsibility went over to Union Pacific.

9          Day-to-day supervision, before the contract, Smiley,

10    Nunez, and Barrajas were Bravo employees, and they provided the

11    day-to-day supervision.

12         After the contract, they became UPC employees, and,

13    therefore, UPC provided the day-to-day supervision, and, again,

14    that's the point of the various quotes and transcript cites I

15    just gave your Honor.

16         The tool-purchase program is another one -- I won't repeat

17    that -- that changed.  The crews could participate in it when

18    they were Bravo employees, but not when they were UPC

19    employees.

20         Workers' compensation, again, not listed in this chart.

21    When they were Bravo employees, Bravo provided the workers'

22    compensation, not when they went over to UPC.

23         And, finally and very significantly under the case law,

24    paying them.  Before the contract, UPC -- or I'm sorry -- Bravo

25    would pay their workers directly.  They would do it by

1  paycheck.  Each one of their workers would get a check from

2  which the taxes were withheld.

3      After the contract was signed, Bravo would send one check

4  in the gross amount for one-week's work to Union Pacific.

5  Union Pacific, in turn, had the responsibility to divide that

6  up however they decided among the workers that did the work.

7      One last point, your Honor, and then I'll wrap up.  So

8  look at the heading -- I think it's important -- evidence that

9  Union Pacific was payroll-service provider only in 2000.

10      Again, the only evidence they have at all relates to the

11  year 2000 because after that Big Jorge is gone in early 2001,

12  and they have no evidence whatsoever.

13      But the real point I want to make here is the testimony of

14  George Rodriguez that's cited there, your Honor, that's not I

15  don't think quite a fair description of what he said.  He did

16  not say Union Pacific was only doing payroll in 2000.

17      What he said was, "In the beginning like Union Pacific was

18  not doing much work, you know, as far as, you know, framing

19  work.  They were just doing payroll service," so not quite the

20  same.  But, also, later on, Little George says that Mr. Kahre

21  started Union Pacific after Big Jorge was fired which we know

22  was in early 2001, and he says Smiley -- remember, Smiley is

23  the crew leader that was a Bravo employee.  This is at page 98

24  of the transcript.

25      Smiley was the first person to run Union Pacific,

1    perfectly consistent with Dean's testimony, right?  Smiley went

2    over at the beginning of the contract.  Little George says he

3    was the first person to run Union Pacific.

4         And then the last point also at page 98, "And at the time

5    Smiley was running Union Pacific" -- this is Little George

6    talking -- "he was providing framing crews to Bravo."  That's

7    at page 98, lines 16 to 19.

8         So that is, respectfully, taken out of context and does

9    not tell the whole story, so I don't think I need to belabor

10    the other points.  I think the evidence is pretty decisive

11    here, your Honor.  Thank you.

12                   THE COURT:  Okay.

13                   MS. LOWE:  Your Honor, can I mention one thing since

14    he --

15                   THE COURT:  All right.

16                   MS. LOWE:  -- says I'm taking my testimony out of

17    context?  I would like to note that with regard to the other

18    screens that he was pointing to they're all the trial

19    testimony.  They're all taken from my findings of fact and

20    conclusions of law, and they're all supported by the trial

21    testimony, also.

22         And, in particular, with regard to him saying that Bravo

23    would contact the Union Pacific crews, when Mr. Griffith

24    testified on cross-examination, he said that specifically when

25    he meant that the foremen would contact the Union Pacific crews

1    he said they would contact specifically just Smiley, Andres,

2    and Joaquin.  Those are the only crews that we're talking about

3    in this instance.

4        So it's kind of misleading to say that Bravo foremen would

5    contact Union Pacific when they were doing the same thing

6    before it and after the contract.

7        Before the contract, they would go right to Smiley,

8    Joaquin, and Andres.  After they contract, it went to the same

9    individuals, Joaquin, Andres, and Smiley, and that's at

10    page 131 through 132 of the trial testimony.

11        THE COURT:  All right.  Well, I have thoroughly read

12    and reviewed the proposed findings and conclusions of each side

13    and the transcript and pleadings, and I'm going to find for

14    Rhodes as the reorganized debtor and adopt the findings and

15    conclusions of the reorganized debtor.

16        And rather than going through and attempting to suggest

17    which of the U.S.'s proposed findings of fact and conclusions

18    of law are wrong, I think it's just easier and more important

19    because the reorganized debtor's findings were rather complete

20    with the transcripts, et cetera, to adopt those findings.

21        Let me make a couple of comments in that regard, and this

22    is not meant to supplant the proposed findings and conclusions,

23    but merely to explain or elucidate.

24        I do find that Union Pacific was the subcontractor.  It

25    was not merely a payroll service.  I find that Union Pacific

1    had control over the employees.  Bravo did not.

2        I find that the testimony of George Rodriguez is not

3    sufficient to deflate or diffuse the testimony of Bravo's

4    witnesses.  Mr. Rodriguez was there.  It's a long a time ago.

5    He forgot.

6        And, again, the IRS has relied rather than people who knew

7    things people who were in submanagerial positions, and I think

8    we can just sort of know that sometimes hearsay and rumors run

9    rampant within these companies, and people who think they know

10    don't really know.

11        And to make it clear, I find that the Rhodes witnesses,

12    the Bravo witnesses, were not impeached by evidence concerning

13    or their admission concerning the election issues.  That's to

14    me not sufficient to impeach their testimony in this regard

15    even if it would otherwise had been admissible.

16        I find that with respect to the burden of proof that the

17    IRS claim is without foundation in the sense that if it's

18    relying on merely Exhibit 3 to establish it was a contract for

19    payroll services that's insufficient because it says billing

20    for framing in the services.

21        Now, that's not to suggest that they didn't have the right

22    to go further, but my point is that Exhibit 3 doesn't by itself

23    establish that this was a payroll service as opposed to a

24    subcontractor.  On its face, it appears to be a subcontract.

25        But in any event, even if they had met their initial

1    burden of proof, the debtor has overcome that by the testimony

2    of the witnesses and the evidence in the record.

3        So I find for the reorganized debtors and will adopt their

4    proposed findings and conclusions of law, and that obviates

5    obviously the need for additional trials because the issue

6    first was liability.  All right.  Thank you.

7            MR. QURESHI:  We'll prepare an order, your Honor.

8            THE COURT:  All right.

9            MS. LOWE:  Thank you.

10           MR. QURESHI:  Thank you.

11           THE COURT:  Thank you.

12        (Court concluded at 11:15:13 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I certify that the foregoing is a correct transcript

2   from the electronic sound recording of the proceedings in

3   the above-entitled matter.

4

5

6   /s/ Jennie Ellis                          06/06/12

7   Jennie Ellis, Transcriptionist              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25