**KOLESAR & LEATHAM**
NILE LEATHAM, ESQ.
Nevada Bar No. 002838
SHLOMO S. SHERMAN, ESQ.
Nevada Bar No. 009688
400 South Rampart Boulevard, Suite 400
Las Vegas, NV  89145
Telephone: 702.362.7800
Facsimile: 702.362.9472
E-Mail: nleatham@klnevada.com
        ssherman@klnevada.com

*Attorneys for Reorganized Debtors*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
New York Bar No. 2959344
ABID QURESHI, ESQ.
New York Bar No. 2684637
JUSTIN H. BELL, ESQ.
New York Bar No. 4497848
One Bryant Park
New York, NY 10036
Telephone: 212.872.1000
Facsimile: 212.872.1002
E-Mail:  pdublin@akingump.com
         aqureshi@akingump.com
         bellj@akingump.com

*Attorneys for Reorganized Debtors*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

THE RHODES COMPANIES, LLC, aka
"Rhodes Homes," et al.,[1]

     Reorganized Debtors.

_____

Affects:

☐  All Debtors
☒  Affects the following Debtor(s):

Bravo, Inc. 09-14825

Case No.: BK-S-09-14814-LBR
(Jointly Administered)

Chapter 11

**REORGANIZED DEBTORS'
AMENDED COUNTER
DESIGNATION OF RECORD ON
APPEAL**

---

[1] The Debtors in these cases, along with their case numbers are:  Heritage Land Company, LLC (Case No. 09-14778); The Rhodes Companies, LLC (Case No. 09-14814); Tribes Holdings, LLC (Case No. 09-14817); Apache Framing, LLC (Case No. 09-14818); Geronimo Plumbing LLC (Case No. 09-14820); Gung-Ho Concrete LLC (Case No. 09-14822); Bravo, Inc. (Case No. 09-14825); Elkhorn Partners, A Nevada Limited Partnership (Case No. 09-14828); Six Feathers Holdings, LLC (Case No. 09-14833); Elkhorn Investments, Inc. (Case No. 09-14837); Jarupa, LLC (Case No. 09-14839); Rhodes Realty, Inc. (Case No. 09-14841); C & J Holdings, Inc. (Case No. 09-14843); Rhodes Ranch General Partnership (Case No. 09-14844); Rhodes Design and Development Corporation (Case No. 09-14846); Parcel 20, LLC (Case No. 09-14848); Tuscany Acquisitions IV, LLC (Case No. 09-14849); Tuscany Acquisitions III, LLC (Case No. 09-14850); Tuscany Acquisitions II, LLC (Case No. 09-14852); Tuscany Acquisitions, LLC (Case No. 09-14853); Rhodes Ranch Golf Country Club, LLC (Case No. 09-14854); Overflow, LP (Case No. 09-14856); Wallboard, LP (Case No. 09-14858); Jackknife, LP (Case No. 09-14860); Batcave, LP (Case No. 09-14861); Chalkline, LP (Case No. 09-14862); Glynda, LP (Case No. 09-14865); Tick, LP (Case No. 09-14866); Rhodes Arizona Properties, LLC (Case No. 09-14868); Rhodes Homes Arizona, L.L.C. (Case No. 09-14882); Tuscany Golf Country Club, LLC (Case No. 09-14884); and Pinnacle Grading, LLC (Case No. 09-14887).

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472

The Reorganized Debtors hereby submit, pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure, this amended counter-designation of the record on appeal.

## DESIGNATION OF RECORD

On May 31, 2012, the United States of America filed its Statement of Issue and Designation of Record on Appeal, which designated certain items for inclusion in the record on appeal. The following additional items are to be included in the record on appeal:

| Dated | Docket No. | Description |
|-------|-----------|-------------|
| 04/26/2012 | 1713 | Transcript of Proceedings, dated April 26, 2012 |
| 04/26/2012 | N/A | Closing argument demonstrative of the Reorganized Debtors, presented to the Court on April 26, 2012 (attached) |
| 04/26/2012 | N/A | Closing argument demonstrative of the United States of America, presented to the Court on April 26, 2012 (attached) |

Dated this 18th day of June, 2012.

KOLESAR & LEATHAM

NILE LEATHAM, ESQ.
SHLOMO S. SHERMAN, ESQ.
400 South Rampart Boulevard, Suite 400
Las Vegas, NV 89145

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
PHILIP C. DUBLIN, ESQ.
ABID QURESHI, ESQ.
JUSTIN H. BELL, ESQ.
New York Bar No. 4497848
One Bryant Park
New York, NY 10036

*Attorneys for Reorganized Debtors*

KOLESAR & LEATHAM
400 South Rampart Boulevard, Suite 400
Las Vegas, Nevada 89145
Tel: (702) 362-7800 / Fax: (702) 362-9472



# Closing Argument Presentation of the Reorganized Debtors

*In re: THE RHODES COMPANIES, LLC, aka "Rhodes Homes," et al.*,
   Case No.: BK-S-09-14814-LBR (Bankr. D. Nev.)

April 26, 2012

## Nature of the Dispute

- The claim that is presently before the Court (the "IRS Claim") arises out of a fraud perpetrated by Robert Kahre through his company, Union Pacific Construction, Inc. ("Union Pacific").

- Mr. Kahre has been convicted, jailed, and fined.

- It has never been alleged (much less proved) that the Reorganized Debtors participated in the fraud, in any way.

- Nevertheless, by filing this claim, the IRS is seeking to hold the creditors of the Reorganized Debtors liable for taxes avoided by Mr. Kahre's and Union Pacific's fraudulent scheme.

1

# Background

- Bravo was a wholly owned subsidiary of Rhodes Homes and was in the business of framing houses.[1]

- Bravo had three categories of employees: (1) salaried, (2) hourly, and (3) pieceworkers.[2]  This dispute concerns only pieceworkers.
  - Pieceworkers were paid a fixed rate per project (or "piece") completed.[3]
  - Pieceworkers frequently moved among multiple construction companies, going wherever the work was at the time.[4]

- In 2000, Bravo entered into an agreement (the "<u>Agreement</u>") with Union Pacific.[5]  The parties have differing views of the Agreement:
  - The Reorganized Debtors' view is that Bravo outsourced certain of its piecework crews to Union Pacific, which upon execution of the Agreement handled payment, hiring and firing, supervision, benefits, and work assignments of the piecework crews at issue.[6]
  - The IRS's view is that the Agreement was merely an agreement that Union Pacific would process payroll for the piecework crews at issue.

[1] Joint Pre-Trial Statement at ¶ 1; 3/5/12 Tr. at 144:12-15.
[2] 3/5/12 Tr. at 106:2-11.
[3] 3/5/12 Tr. at 106:20-107:3.

[4] 3/5/12 Tr. at 113:20-24; 129:7-9
[5] *See* United States' Proposed Findings of Fact and Conclusions of Law, at ¶ 27.
[6] 3/5/12 Tr. at 109:6-110:22; 111:22-112:17.

2

## Procedural History

■ The IRS Claim[1] included federal employment tax liabilities for the quarters ending September 30, 2000, December 31, 2000, all four calendar quarters of the years 2001 and 2002, and the quarters ending March 31, 2003 and June 30, 2003 (hereinafter "the periods at issue").

■ On September 27, 2011, this Court ordered that litigation of the Reorganized Debtors' objection to the IRS Claim would be bifurcated into separate phases.

■ In "Phase One", the Court would decide whether Bravo is liable for the employment taxes at issue.

■ An evidentiary hearing was held on Phase One on March 5, 2012, at which the IRS presented four live witnesses and one witness by designated deposition testimony, and the Reorganized Debtors presented two live witnesses.

[1] The IRS Claim asserted an unsecured priority claim in the total amount of $1,326,068.11, and an unsecured general claim in the amount of $2,560,388.64.

# The Legal Issue

■ As stated by this Court, the legal issue to be determined at this stage is whether, from July 2000 to June 2003, Union Pacific Construction "was a subcontractor which *merely* provided payroll or a subcontractor who provided labor as well as payroll"[1]

■ Accordingly:

- If the Workers were employed by Union Pacific, which provided labor to Bravo pursuant to a subcontracting agreement, then only Union Pacific is liable.

- If the Workers were employed by Bravo, and Union Pacific was solely a payroll processor, then Bravo may be liable.[2]

[1] 9/27/11 Tr. at 21:20-22 (emphasis added).
[2] The Reorganized Debtors reserve their rights with respect to the amount, if any, of taxes, interest, and penalties that may be owing.

4

# Burden of Proof

■ "In an action to collect taxes, the government bears the initial burden of proof."[1]  If the IRS satisfies this burden, a showing by the taxpayer that the IRS's determination is "arbitrary, excessive or without foundation" shifts the burden of proof back to the IRS.[2]

■  The IRS Claim is arbitrary, excessive, and without foundation.

- It lacks foundation because the IRS has presented no direct evidence. None of the IRS's four witnesses ever (1) worked on, supervised, or managed any of the three crews at issue or (2) negotiated or reviewed the Agreement.[3]

- The IRS Claim is arbitrary and excessive because, though not at issue here, it includes fraud penalties but not a single allegation of fraud by the Reorganized Debtors.

- Moreover, the amount of interest claimed by the IRS is grossly overstated.

■ Even if the Reorganized Debtors bear the burden of proof, they have shown that Union Pacific was the Workers' sole employer.

[1] *In re Olshan*, 356 F.3d 1078, 1084 (9th Cir. 2004).
[2] IRS Pre-Trial Br. at 2-3; *see also Weimerskirch v. Comm'r*, 596 F.2d 358, 361 (9th Cir. 1979).
[3] The IRS's only evidence that Union Pacific did *not* provide workers to Bravo is the testimony of a single witness with no personal knowledge, poor credibility and admittedly poor memory.  3/5/12 Tr. at 76:16-21.

5

# The Witnesses

IRS's Witnesses

- **Pamela Garner**, a Bravo receptionist, administrative assistant, and payroll processor until 2002.

- **James Garner**, a Bravo foreman.[1]

- **Jorge Fernandez** (known as "Big Jorge"), the general superintendent of Wright Painting & Drywall until early 2001.

- **George Rodriguez** (known as "Little George"), a foreman of Wright Painting & Drywall in 2000, and the general superintendent of Wright Painting & Drywall beginning in 2001.

- **Marlene Marcus** (by deposition), a Bravo administrative assistant and payroll processor beginning in 2001.

Reorganized Debtors' Witnesses

- **Dean Griffith**, the general manager of Bravo.

- **Jim Bevan**, the CFO of Rhodes Homes.

[1] Positions listed were held during the periods at issue, unless otherwise indicated.

6



**Evidence Supporting the Position of the Reorganized Debtors**

# Testimony of Dean Griffith

- Dean Griffith was the general manager of Bravo.[1]

- Mr. Griffith—and no other witness—negotiated, reviewed, and signed the Agreement between Union Pacific and Bravo.[2]

- Mr. Griffith testified that Bravo's need for workers (with documented legal immigration status) exceeded its ability to hire and manage them.

  - "[T]his was a way of, you know, solving all of our problems by just subcontracting from Union Pacific to be the labor to, you know, to supply labor for us."[3]

- Mr. Griffith testified that pursuant to the Agreement:[4]

  - Union Pacific supplied work crews to Bravo as needed.
  - Union Pacific paid the Workers.
  - Union Pacific hired and fired the Workers.
  - Union Pacific supervised the Workers.
  - Union Pacific paid for the Workers' health care and worker's compensation.
  - Union Pacific billed Bravo weekly for the cost of the labor plus an 18.5% fee.

[1] 3/5/12 Tr. at 105:5-8.
[2] 3/5/12 Tr. at 107:16-19; 110:2-111:1; 146:8-22.
[3] 3/5/12 Tr. at. 110:9-11.
[4] 3/5/12 Tr. at 111:22-112:17.

8

## Testimony of Dean Griffith (continued)

- As a pre-condition to entering the Agreement, Union Pacific provided documentation to Mr. Griffith to prove that it was a licensed contractor.[1]

- Mr. Griffith testified that, in connection with the agreement, the "Crew Leaders" of the three piecework crews at issue, Ishmael ("Smiley") Curiel, Andreas Nunez, and Joaquin Barajas, left Bravo and went to work for Union Pacific, where Smiley became manager.[2]

- Mr. Griffith's testimony was based on direct, first-hand knowledge, he was credible, and there is no evidence in the record to contradict his version of events.

[1] 3/5/12 Tr. at 120:23-121:3.
[2] 3/5/12 Tr. at 98:13-15; 109:6-10; 113:6-19.

9

## Testimony of Jim Bevan

- Jim Bevan was the CFO, secretary, and treasurer of Rhodes Homes and oversaw payroll operations for Rhodes Homes and its subsidiaries, including Bravo.[1]

- Mr. Bevan testified that Bravo employees were paid by check.[2]

- Mr. Bevan testified that it wouldn't have been possible for Bravo to hire Union Pacific solely as payroll processor without his knowledge, because:
  1. Mr. Bevan personally signed checks for Bravo's accounts payable, including its checks to Union Pacific; and
  2. before signing a check to any new Bravo counterparty, Mr. Bevan personally reviewed the contract pursuant to which such check was issued.[3]

- Mona Wilcox, a former controller of Bravo, once relayed to Mr. Bevan a request from Robert Kahre to be paid in gold and silver, but Mr. Bevan denied the request.[4]

- Mr. Bevan, like Mr. Griffith testified credibly, and his version of events is not contradicted by any evidence in the record.

[1] 3/5/12 Tr. at 144:3-8; 144:16-145:1.
[2] 3/5/12 Tr. at 145:5-16.
[3] 3/5/12 Tr. at 146:23-147:11; 148:2-21; 150:18-151:13.
[4] 3/5/12 Tr. at 149:9-150:1.  Ms. Wilcox was later fired for embezzlement.  *Id.* at 159:2-3.

10

## Testimony of Little George

■ Little George worked at Wright Painting & Drywall ("WPD") from 1998 to 2005, starting out as a painter and rising to become a foreman and, in 2001, the superintendent.[1]  Little George also supervised work for Union Pacific.[2]

■ Little George testified that, although Union Pacific was at one time only a payroll service, it became a full-service general contractor.[3]

■ While Little George was running WPD, Union Pacific was doing framing, painting, and drywall work, which suggests that Union Pacific became a full-service contractor sometime prior to Little George's 2001 promotion.

● "Union Pacific was … a general contractor, so they did a lot of work." [4]

[1] 3/5/12 Tr. at 90:8-22; 90:25-91:2.
[2] 3/5/12 Tr. at 91:19-22.
[3] 3/5/12 Tr. at 92:1-4; 93:14-17.
[4] 3/5/12 Tr. at 93:14-17, 92:1-2.

11

## Testimony of Little George (continued)

- Little George testified that he had no reason to disagree with Mr. Griffith's testimony that Union Pacific provided labor to Bravo.

  - "Q. Now, if Mr. Griffith, Dean Griffith, testifies under oath that he signed a contract with Robert Kahre and with Union Pacific Construction for Union Pacific to provide framing crews to Bravo job sites, you have no basis to dispute that testimony, do you?  A. No." [1]

- Little George also testified that Big Jorge left WPD **even before** Union Pacific was created, casting doubt on Big Jorge's knowledge.[2]

[1] 3/5/12 Tr. at 99:5-10.
[2] 3/5/12 Tr. at 98:10-12.

## Testimony of Marlene Marcus

- Marlene Marcus worked for Bravo, starting in 2001, processing payroll and accounts receivable.[1]

- Ms. Marcus testified that when Jim Rhodes, Bravo's owner, needed workers, he would call Union Pacific:

  - "It was my understanding that when Mr. Rhodes needed workers for his projects, he would call [Union Pacific] to supply the workers."[2]

- She further testified that Smiley, a Crew Leader of one of the crews at issue, was an employee of Union Pacific, not Bravo.[3]

[1] Marcus Tr. at 7:10-19.
[2] Marcus Tr. at 20:9-11.
[3] Marcus Tr. at 23:18-22.

13

# Testimony of James Garner

- James Garner was a Bravo foreman.[1]

- Mr. Garner testified that he did not personally know of any Bravo employees who were compensated other than by a paycheck issued by Bravo.[2]

[1] 3/5/12 Tr. at 36:24-37:1.
[2] 3/5/12 Tr. at 40:5-7.

14

## Testimony of Pamela Garner

- Pamela Garner was a receptionist and payroll processor at Bravo.[1]

- Ms. Garner testified that she never witnessed any Bravo employee being paid in cash and, to her knowledge, all Bravo employees were paid by paycheck.[2]

- Ms. Garner testified that she was told that Union Pacific would be processing payroll for the Workers, (an undisputed fact).[3]

- As to the other aspects of the Agreement, including whether Bravo subcontracted labor, Ms. Garner had no knowledge.[4]

- Ms. Garner testified that she would have no basis to dispute Mr. Griffith's testimony that Union Pacific provided laborers to Bravo.

  - "Q. . . . If Mr. Griffith testifies that he signed a contract with Union Pacific pursuant to which Union Pacific would provide laborers to Bravo and would also pay those laborers and would also provide insurance for those laborers, you would have no basis to dispute that testimony, would you? A. No." [5]

[1] 3/5/12 Tr. at 9:2-6.
[2] 3/5/12 Tr. at 30:7-10; 30:14-16.
[3] 3/5/12 Tr. at 20:11-16.

[4] 3/5/12 Tr. at 28:22-24; 29:10-12.
[5] 3/5/12 Tr. at 30:1-6.

15



**Evidence Supporting the Position of the IRS**

## Testimony of Big Jorge

- ■ Big Jorge testified that Union Pacific had no workers of its own and did not provide workers to Bravo.[1]

- ■ He testified that Union Pacific paid Bravo's workers in gold and silver, in order to avoid paying taxes to the IRS.[2]

**BUT**:

- ✖ Big Jorge worked for *neither* Bravo *nor* Union Pacific.  The only basis for his knowledge was his employment at WPD, another company owned by Robert Kahre.[3]

- ✖ Big Jorge ceased working for Mr. Kahre in April 2001 (if not sooner), and admitted he has no personal knowledge of later time periods.[4]

- ✖ Big Jorge's departure from WPD followed accusations that he was embezzling from the company.[5]

- ✖ When confronted by numerous inconsistencies in his testimony, Big Jorge admitted to making an effort to "forget everything that ever happened" so "long ago".[6]

[1] 3/5/12 Tr. at 88:5-8.
[2] 3/5/12 Tr. at 62:15-20.
[3] 3/5/12 Tr. at 56:1-7; 59:18-25.

[4] 3/5/12 Tr. at 69:15-17.
[5] 3/5/12 Tr. at 69:18-22.
[6] 3/5/12 Tr. at 76:12-21.

17

## Testimony of James Garner

■ Mr. Garner testified that he was told, at a meeting in 2000, that Union Pacific would be handling payroll and benefits for certain work crews, (an undisputed fact).[1]

■ In attendance at the meeting were Dean Griffith, Robert Kahre (owner of Union Pacific), Bravo's controller Mona Wilcox, Big Jorge, the Crew Leaders, James Garner, and Sergio Juarez.[2]

**<u>BUT:</u>**

✖ Mr. Garner was neither a member nor supervisor of the work crews at issue,[3] and thus he had no knowledge of the other aspects of the Agreement and no knowledge whatsoever of the Agreement beyond what he heard at the meeting.

   ✖ "Q. . . . And am I also correct, sir, that your knowledge of what Union Pacific was going to do for Bravo was limited to what you recall being told to you at the meeting with Mr. Kahre that you've testified about?  A. Correct."[4]

[1] 3/5/12 Tr. at 42:10-43:21.
[2] 3/5/12 Tr. at 40:13-21.
[3] 3/5/12 Tr. at 40:2-4.
[4] 3/5/12 Tr. at 52:20-24.

18

# The Common-Law Employment Test

- The test is: whether the purported employer "**controls the manner and means by which the product is accomplished.**"[1]
  - The IRS and the Reorganized Debtors do not dispute the common law employment test or factors (hereinafter listed).

- "[I]f an individual is subject to the control or direction of another **merely as to the result to be accomplished** by the work and not as to the means and methods for accomplishing the result, he is **not** an employee."[2]

- In addition, if the party for whom services are being performed "'does not have control of the payment of the wages for such services,'" then such party is not the employer.[3]

---

[1] *Barnhart v. N.Y. Life Ins. Co.*, 141 F.3d 1310, 1312 (9th Cir. 1998) (internal quotations omitted).
[2] Treas. Reg. § 31.3401(c)-1; *see also* § 31.3121(d)-1 (same).
[3] *In re Sw. Rest. Sys. ("Southwest")*, 607 F.2d 1237, 1239 (9th Cir. 1979)
   (quoting 26 U.S.C. § 3401(d)(1)).

19

# The Common-Law Employment Test (continued)

In determining whether control exists, courts look at a number of factors including:

1. "whether the hiring party has the right to assign additional projects to the hired party;"

2. "the extent of the hired party's discretion over when and how long to work;"

3. "the method of payment;"

4. "the hired party's role in hiring and paying assistants;"

5. "the provision of employee benefits;"

6. "source of the instrumentalities and tools;"

7. "the skill required;"

8. "location of the work;"

9. "duration of the relationship between the parties;"

10. "whether the work is part of the regular business of the hiring party;"

11. "whether the hiring party is in business;"

12. "the tax treatment of the hired party."

*Barnhart v. N.Y. Life Ins. Co.*, 141 F.3d 1310, 1312-13 (9th Cir. 1998) (emphasis added) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-34 (1992)).

20

# Conclusions

■ **<u>The evidence establishes that Union Pacific provided more than just payroll services</u>**.

1. A contract existed for Union Pacific to provide, pay, supervise, assign, and provide benefits for the Workers.

   ■ It is **uncontradicted** that Dean Griffith reviewed and signed the Agreement.

   ■ It is **uncontradicted** that Jim Bevan would not have issued checks to Union Pacific without having first reviewed the Agreement.

2. Union Pacific did in fact provide more than just payroll services.

   ■ Three witnesses—Dean Griffith, Jim Bevan, and Marlene Marcus—testified that Union Pacific provided labor to Bravo.

   ■ Little George also testified that, since 2001 at the latest, Union Pacific was a full-service general contractor with its own workers performing framing, painting, and drywall services.

   ■ Two additional witnesses—Pamela Garner and Little George—testified that they would have no basis to dispute the other witnesses' testimony that Union Pacific provided labor to Bravo.

21

# Conclusions

■ **<u>The IRS's witnesses lacked direct knowledge</u>.**

1. None of the IRS's witnesses had ever seen the Agreement, (though the IRS conceded a written agreement existed).[1]

2. None of the IRS's witnesses ever worked on or supervised any of the piecework crews at issue.

3. Accordingly, none of the IRS witnesses has direct personal knowledge of the business arrangement between Union Pacific and Bravo.

4. The only witness who testified that Union Pacific did *not* provide labor to Bravo, Big Jorge:

   ● was impeached;

   ● was inconsistent and admitted to a failing memory of the events;

   ● worked for neither Union Pacific nor Bravo, thus had no direct knowledge; and

   ● had **no knowledge whatsoever** after 2001.[2]

---

[1] *See* United States' Proposed Findings of Fact and Conclusions of Law, at ¶ 27.
[2] Indeed, according to Little George, Big Jorge left the company ***even before*** Union Pacific was created. 3/5/12 Tr. at 98:10-12.

## Conclusions

- **<u>Union Pacific controlled the Workers.</u>**

1. It is **uncontradicted** that (upon execution of the Agreement) the Crew Leaders left Bravo and worked for Union Pacific.

   - Two witnesses—Dean Griffith and Little George—testified to this fact with respect to all three Crew Leaders.

   - An additional witness—Marlene Marcus—testified to this fact with respect to Smiley.

2. It is also **uncontradicted** that the Workers were supervised by the Crew Leaders.

   - Though Bravo had a job foreman at each job site, the foreman's role was only to inspect the end result of a job to verify that it met Bravo's standards.[1]

   - If the Bravo job foreman inspected the work and found problems, the job foreman would relay the problem to the Union Pacific Crew Leader and not directly to the workers.[2]

3. Union Pacific had complete control over the individual hiring and firing decisions, provision of benefits, work assignments and payment of wages.[3]

[1] 3/5/12 Tr. at 118:20-119:9.
[2] 3/5/12 Tr. at 119:10-13.
[3] 3/5/12 Tr. at 112:1-3; 118:10-13; 43:6-21; 112:14-17; 120:19-20; 97:15-19; 113:20-24; 27:2-19; 75:11-77:20; 112:9-11; 116:25-117:2

# *In re: The Rhodes Companies, LLC*

## BK-S-09-14814 LBR



Closing Argument, United States of America
Trial team: Virginia Cronan Lowe & Kaycee Sullivan

# Bravo Contract with Union Pacific

• Undisputed that a contract was entered into between Bravo and Union Pacific in 2000.

• Government Exhibit 3 shows that Bravo's contract with Union Pacific was from September 2000 until May 2003.

• Evidence presented at trial shows that the only service provided by Union Pacific in 2000 when contract was entered into was payroll service.

# Evidence that Union Pacific was Payroll Service Provider only in 2000

Trial testimony of Union Pacific employees:

- Testimony of Jorge Fernandez:
  - Bravo was one of the companies running its payroll through Union Pacific.  Tr. 60:3-7
  - Union Pacific had no workers of its own. Tr. 88:1-6
- Testimony of George Rodriguez:
  - In 2000 Union Pacific was only doing payroll service. Tr. 93:22-24

# Bravo Had Three Types of Employees

Bravo had three types of employees:

1.  Salary
2.  Hourly
3.  Piece workers

-   It is undisputed that piece workers work for more than one construction company at a time.

At Bravo, the three piece work crews were headed by:

1.  Ismael Curiel (a/k/a "Smiley")
2.  Andres Nunez
3.  Joaquin Barrajas

-   At issue in this case is the responsibility for payment of the employment taxes for Bravo's piece workers.

# Factors Determining Who is an Employee

- Source of instrumentalities & tools
- Location of the work
- Duration of relationship between the parties
- Assignment of work
- Scope of work
- Method of payment
- Regular business of hiring party
- Whether hiring party is in business
- Provision of employee benefits
- *Control*

# Bravo Payroll Practices Prior to Contract with Union Pacific

1. Crew leaders denote on Bravo master worksheet at which sites they performed work and what work they completed.
2. Crew leader turns Bravo master sheet into Dean Griffith for approval.
3. Dean Griffith approves work completed and how much each crew should be paid for work performed.
4. Dean Griffith gives total figure owed to each crew to Bravo payroll office.
5. Each crew leader determined how much each piece worker would be paid from the total amount from Bravo.
6. Bravo payroll office enters the information into their computer payroll system.
7. The Bravo payroll office issued checks to each piece worker in the amount designated by crew leader.

# Bravo Payroll Practices After Contract with Union Pacific

1. Crew leaders denote on Bravo master worksheet at which sites they performed work and what work they completed.

2. Crew leader turns Bravo master sheet into Dean Griffith for approval.

3. Dean Griffith approves work completed and how much each crew should be paid for work performed.

4. Dean Griffith gives total figure owed to each crew to Bravo payroll office.

5. Each crew leader determined how much each piece worker would be paid from the total amount from Bravo.

6. The Bravo payroll office sends to Union Pacific a list of the amounts to be paid to each piece worker as designated by the crew leader.

7. Union Pacific sends an invoice to Bravo for the total amount owed to the crews, plus burden.

8. Bravo sends a check to Union Pacific for the amount of the invoice.

# Control at Work Sites

Prior to Contract with Union Pacific:

- Bravo foreman contact crew leaders
- Bravo provided all materials at work sites
- Piece workers provide own tools
- Bravo foreman supervised crews
- Work performed was framing houses

After Contract with Union Pacific:

- Bravo foreman contact crew leaders
- Bravo provided all materials at work sites
- Piece workers provide own tools
- Bravo foreman supervised crews
- Work performed was framing houses

# Worker's Compensation

Prior to Contract with Union Pacific:

- Bravo provided worker's compensation

After Contract with Union Pacific:

- Bravo paid burden which funded worker's compensation

# Conclusion

- Bravo is responsible for paying the employment taxes of these piece workers.

- Contracting with Union Pacific does not remove that responsibility because paying employment taxes is a non-delegable duty.