# EXHIBIT A

# EXHIBIT A

**PURCHASE AGREEMENT**

**AND**

**GRANT OF OPTIONS**

**between**

**COMMERCE ASSOCIATES, LLC**

**and**

**RHODES DESIGN AND DEVELOPMENT CORPORATION**

**Dated: November 14, 2003**

## TABLE OF CONTENTS

Description      Page

R E C I T A L S: ......................................................................................................... 1

**AGREEMENT** ......................................................................................................... 3

1.   Purchase and Sale of Property; Grant of Options.......................................... 3
     1.1     Purchase and Sale of Phase I Lots ............................................... 3
         a.     Selection of Parcel 18 Lots ............................................ 3
         b.     Closing Procedure ......................................................... 3
         c.     Extensions of Phase I Lots Closing Date ....................... 4
     1.2     Options......................................................................................... 4
         a.     First Option ................................................................... 4
         b.     Second Option............................................................... 4
         c.     Third Option.................................................................. 5
         d.     Fourth Option................................................................ 5
         e.     Fifth Option................................................................... 5
         f.     Sixth Option.................................................................. 5
         g.     Seventh Option.............................................................. 5
         h.     Eighth Option................................................................ 5
         i.     Multi-Family Development Parcel Option ..................... 6
     1.3     Number and Location of Lots ....................................................... 6
     1.4     Exercise of Option ....................................................................... 7
     1.5     Excluded Property......................................................................... 7
     1.6     Golf Course Right of First Refusal ............................................... 8
2.   Deposits............................................................................................................ 8
     2.1     Deposits ....................................................................................... 8
     2.2     Application of Deposits ................................................................ 9
3.   Purchase Price. ................................................................................................ 9
     3.1     Base Price .................................................................................... 9
     3.2     Profit Participation and Lot Premiums ......................................... 9
         a.     Definitions.................................................................... 10
         b.     Security for Payment..................................................... 11
         c.     Monthly Sales Report.................................................... 11
         d.     Payment........................................................................ 11
         e.     Survival........................................................................ 11
     3.3     SNWA and Related Fees .............................................................. 11
4.   Option Consideration ...................................................................................... 12
     4.1     Option Fee ................................................................................... 12

    4.2    Impositions and Common Element Expenses ........................................................ 12
    4.3    Application of Option Consideration.................................................................... 12
5.    Closing Payments. ......................................................................................................... 12
    5.1    Phase I Lots ......................................................................................................... 13
    5.2    Option Parcels ..................................................................................................... 13
6.    Escrow. ........................................................................................................................... 13
    6.1    Escrow Instructions.............................................................................................. 13
    6.2    Definition of "Close of Escrow" ......................................................................... 13
    6.3    Concerning the Duties of Escrow. ....................................................................... 13
            a.    General .................................................................................................... 13
            b.    The Initial Deposit .................................................................................. 14
            c.    Conflicting Claims .................................................................................. 14
            d.    Escrow Funds .......................................................................................... 14
            e.    Disbursements ......................................................................................... 14
7.    Approval of Investigations of Property. ........................................................................ 14
    7.1    Investigations ....................................................................................................... 14
    7.2    Reliance on Investigations .................................................................................. 15
    7.3    No Inadvertent Seller Representations; Third-Party Materials ........................... 15
8.    Condition of Title. .......................................................................................................... 15
    8.1    Permitted Exceptions ........................................................................................... 15
            a.    Master Declaration.................................................................................. 15
            b.    Record Matters ........................................................................................ 16
            c.    Development Declaration ........................................................................ 16
            d.    Other Matters .......................................................................................... 17
            e.    Subdivision Map(s) Conditions .............................................................. 17
            f.    Preprinted Exceptions ............................................................................. 17
    8.2    Title Insurance Policy .......................................................................................... 17
    8.3    Seller's Financing................................................................................................. 18
9.    Subdivision Maps; Improvement Plans.......................................................................... 18
    9.1    Project Final Maps ............................................................................................... 18
    9.2    Improvement, Other Plans ................................................................................... 19
    9.3    Conditions of Approval ........................................................................................ 19
    9.4    Seller's Work ........................................................................................................ 19
    9.5    Completion; Inspection......................................................................................... 19
    9.6    Outside Date; Termination ................................................................................... 20
    9.7    Remedies for Seller Caused Delays ..................................................................... 20
            a.    Liquidated Damages ................................................................................ 20
            b.    Self Help Remedy ................................................................................... 21

|      |      | c.   | Period of Seller Delay | 21 |
| 9.8  | Purchaser's Obligations | | | 21 |
| 9.9  | Reservation of Rights by Seller | | | 21 |
| 9.10 | Cooperation; Consents | | | 22 |
| 9.11 | Improvement Bonds | | | 22 |
| 9.12 | Plans and Specifications | | | 22 |

10. Construction, Maintenance of Common Areas and Perimeter Walls. ... 23
| 10.1 | Neighborhood and Community Facilities | 23 |
| 10.2 | Purchaser as Declarant | 23 |
| 10.3 | Perimeter Walls and Fence Rails | 24 |
| 10.4 | Completion of Project Common Areas, Walls | 24 |
| 10.5 | Maintenance and Repair of Completed Improvements | 24 |
| 10.6 | Conveyance of Common Areas | 24 |

11. The Projects. ... 25
| 11.1 | Design Guidelines | 25 |
| 11.2 | Project Plan Work | 26 |
| 11.3 | Construction of Projects | 26 |
| 11.4 | Fees | 26 |
| 11.5 | Utility Deposits | 27 |
| 11.6 | Easements and Rights of Way; Rights of Entry | 27 |
| 11.7 | At Risk Development Work | 27 |

12. Conditions Precedent. ... 27
| 12.1 | Purchaser's Conditions | | 28 |
|      | a. | Default | 28 |
|      | b. | Project Final Map | 28 |
|      | c. | Seller's Work | 28 |
|      | d. | Building Permits | 28 |
|      | e. | Title Policy | 28 |
| 12.2 | Seller Condition | | 28 |
|      | a. | Closing Payment | 28 |
|      | b. | Default | 28 |
| 12.3 | Failure of Condition | | 28 |
| 12.4 | Option Conditions | | 29 |
|      | a. | Purchase of Prior Parcel | 29 |
|      | b. | Exercise of Option | 29 |
|      | c. | Default | 29 |

13. Close of Escrow. ... 29
| 13.1 | Closing | 29 |

| | 13.2 | Escrow Cancellation. | 29 |
|---|---|---|---|
| | | a. Default | 29 |
| | | b. Termination | 29 |
| | 13.3 | Return of Seller's Documents | 29 |
| | 13.4 | Return of Purchaser's Documents | 30 |
| | 13.5 | Items to be Delivered into Escrow. | 30 |
| | | a. By Seller | 30 |
| | | b. By Purchaser | 31 |
| | 13.6 | Escrow Holder's Instructions | 32 |
| | 13.7 | Post-Closing Matters | 32 |
| | | a. To Seller | 32 |
| | | b. To Purchaser/SPE: | 33 |
| | 13.8 | Transfer of Possession | 33 |
| 14. | | Costs and Prorations | 33 |
| | 14.1 | Impositions | 33 |
| | 14.2 | Association Assessments | 34 |
| | 14.3 | Other Prorations | 34 |
| | 14.4 | Costs to be Paid by Seller | 34 |
| | 14.5 | Costs to be Paid by Purchaser | 34 |
| 15. | | Purchaser's Covenants, Representations and Warranties | 34 |
| | 15.1 | Organization; Qualification | 34 |
| | 15.2 | Licensed Contractor | 35 |
| | 15.3 | Agreement is Authorized and Binding | 35 |
| | 15.4 | Litigation | 35 |
| | 15.5 | Conflicts | 35 |
| | 15.6 | Condition of Property | 35 |
| | 15.7 | Purchaser Reliance | 35 |
| | 15.8 | Seller's Work | 36 |
| | 15.9 | Alleged Breaches | 36 |
| | 15.10 | Threatened Claims | 36 |
| | 15.11 | Cooperating Brokers | 36 |
| | 15.12 | Single Purpose Entity | 37 |
| | 15.13 | Separateness Matters | 37 |
| | 15.14 | Homebuyer Notice | 39 |
| | 15.15 | Golf Course | 40 |
| | 15.16 | Acknowledgment | 40 |
| 16. | | Seller's Covenants, Representations and Warranties | 40 |
| | 16.1 | General Representations | 40 |

      a.     Authority ................................................................................. 41
      b.     No Other Agreements .......................................................... 41
      c.     Agreement is Authorized and Binding................................. 41
      d.     Condemnation ...................................................................... 41
      e.     Litigation ............................................................................. 41
      f.     Conflicts .............................................................................. 41
      g.     Title .................................................................................... 41
      h.     Labor ................................................................................... 41
      i.     Material Defect .................................................................... 42
  16.2  Environmental Representations. ....................................................... 42
      a.     Hazardous Materials ........................................................... 42
      b.     No Release for Pre-Escrow Conditions ............................. 42
      c.     Benefit of Representation..................................................... 42
      d.     Definition of Hazardous Material ....................................... 42
      e.     Expiration of Representations and Warranties ................... 42
      f.     Environmental Hazards Insurance ...................................... 43
  16.3  No Other Representations or Warranties......................................... 43
  16.4  Covenants ........................................................................................ 43
      a.     Alterations of Property......................................................... 43
      b.     Matters Affecting Title......................................................... 43
      c.     Threatened Claims .............................................................. 44
      d.     Completion of Improvements .............................................. 44
17. Pre-Closing Activities. ................................................................................ 44
  17.1  Entry by Purchaser onto the Property ............................................ 44
  17.2  Purchaser's Activities ...................................................................... 44
  17.3  Indemnity for Development Work.................................................... 45
  17.4  Waiver and Release .......................................................................... 45
  17.5  Survival; Non-Exclusive Provision ................................................ 46
  17.6  Seller's Activities............................................................................. 46
18. Default and Remedies. ................................................................................ 46
  18.1  Purchaser's Events of Default ......................................................... 46
  18.2  Seller Defaults ................................................................................. 47
  18.3  Seller's Remedies. ........................................................................... 48
      a.     Liquidated Damages ........................................................... 48
      b.     Post-Closing Default............................................................ 49
      c.     "Fail-Safe" Option Termination.......................................... 49
  18.4  Right of First Refusal....................................................................... 49
  18.5  Purchaser's Remedies for Seller Closing Default ........................... 50

| 18.6 | Failure to Return the Deposits | 51 |
| 18.7 | Seller Default Following Close of Escrow | 51 |
| 18.8 | Waiver of Jury Trial | 51 |
| 19. | Risk of Loss | 51 |
| 20. | Condemnation. | 52 |
| 21. | Confidentiality | 52 |
| 22. | Brokerage Commissions | 52 |
| 23. | Trademarks | 53 |
| 24. | Miscellaneous. | 53 |
| 24.1 | Notices | 53 |
| 24.2 | Time of the Essence | 54 |
| 24.3 | Interpretation; Governing Law | 54 |
| 24.4 | Attorneys' Fees | 54 |
| 24.5 | Further Assurances; Survival | 55 |
| 24.6 | Entire Agreement; Amendments | 55 |
| 24.7 | Waivers | 55 |
| 24.8 | No Assignment | 55 |
| 24.9 | Binding Effect | 56 |
| 24.10 | Headings; Attachments; Cross References | 56 |
| 24.11 | Performance of Acts on Business Days | 56 |
| 24.12 | Backup Withholding | 56 |
| 24.13 | No Third Party Beneficiaries | 56 |
| 24.14 | No Recording; Quitclaim; Releases | 56 |
| 24.15 | Counterparts | 57 |
| 25. | Certain Definitions | 57 |
| 25.1 | "Agreed Rate" | 57 |
| 25.2 | "Effective Date" | 57 |
| 25.3 | "Force Majeure Delays" | 57 |
| 25.4 | "Record", "Recorded" and "Recordation" | 57 |
| 25.5 | "Substantially Complete" | 58 |
| 25.6 | Miscellaneous Terms | 58 |
| 26. | Mediation and Arbitration. | 58 |
| 26.1 | Mediation | 58 |
| 26.2 | Arbitration | 58 |
| 26.3 | Survival | 59 |
| 27. | Not an Offer | 59 |

## EXHIBITS & SCHEDULES

| Exhibit | Description | Reference |
|---|---|---|
| A | Legal Descriptions of Property | Recital B |
| A-1 - A-7 | Proposed Maps | Recital B |
| B | Master Site Plan | Recital A |
| C | Option Notice | Section 1.3 |
| D | Memorandum of Agreement | Section 2.1 |
| E | Base Prices and Lot Premiums | Section 3.1, 3.2 |
| F | Additional Consideration Memorandum | Section 3.2(b) |
| G | Map Costs Note | Section 3.3 |
| H | Map Costs Mortgage | Section 3.3 |
| I | Due Diligence Materials | Section 7.1 |
| J | Master Declaration | Section 8.1(a) |
| K | Title Reports for Property | Section 8.1(b) |
| L | Declaration of Development Covenants and Restrictions | Section 8.1(c) |
| M | French Drain Exhibit | Section 8.1(d) |
| N | SNDA Form | Section 8.3 |
| O | Grading Plan | Section 9.4 |
| P | Perimeter Walls Exhibit | Section 10.3 |
| Q | Construction License | Section 11.7 |
| R | Form of Lot Deed | Section13.5(a)(i) |
| S | Form of Neighborhood Facilities Deed | Section 13.5(a)(i) |
| T | Form of Non-Foreign Transferor Declaration | 13.5(a)(ii) |
| U | Amendment to Memorandum | 13.5(a)(vi) |
| V | Master Declaration Assignment | Section 10.2 |
| W | Restated Prior Note | Section 2.1 |
| Schedule | | |
| 9.4 | Seller Work | 9.4 |
| 10.1 | Community Facilities to Be Constructed By Purchaser | 10.1 |
| 11.4 | Development and Other Fees to Be Paid by Seller | 11.4 |

## INDEX OF DEFINED TERMS

| Defined Term | Section Reference |
|---|---|
| Actual Costs | 26.2 |
| Actual Damages | 18.5 |
| Additional Consideration Memorandum | 3.2(b) |
| Additional Title Policy Charges | 8.2 |
| Affiliate | 3.2(a)(i) |
| Agreed Rate | 25.1 |
| Agreement | Preamble |
| ALTA Owner's Policy | 8.2 |
| Amendment to Memorandum | 13.5(a)(vi) |
| Apparent Breaches | 15.9 |
| Approved Construction Loan | 3.2(a)(ii) |
| Approved Construction Loan Mortgage | 3.2(a)(ii) |
| Authorizing Resolutions | 1.4 |
| Base Price | 3.1 |
| Cable Contract | 8.1(d) |
| Cancellation Charges | 13.2(a) |
| City | Recital A |
| Close of Escrow | 6.2 |
| Closing Cost | 3.2(a)(iii) |
| Closing Date | 1.1(b) |
| Closing Documents | 15.6 |
| Closing Payment | 13.5(b)(i) |
| common elements | 10.1 |
| Community Facilities | 10.1 |
| Completed Perimeter Walls | 10.6 |
| Completed Project Common Areas | 10.6 |
| Completion Notice | 9.5, 10.6 |
| Conditions of Approval | 8.1(e) |
| Confidential Information | 21 |
| Construction License | 11.7 |
| Deeds | 13.5(a)(i) |
| Default Rate | 4.1 |
| Deposits | 2.1 |
| Design Guidelines | 11.1 |
| Development Declaration | 8.1(c) |
| Development Declaration Amendment | 8.1(c) |
| Development Parcel | Recital B |
| Direct Cost | 3.2(a)(iii) |
| Disapproved Exception | 8.1(b) |
| Dispute | 26.1 |
| Due Diligence Materials | 7.1 |
| Effective Date | 25.2 |

| **Defined Term** | **Section Reference** |
|---|---|

| Defined Term | Section Reference |
|---|---|
| Eighth Option | 1.2(h) |
| Eighth Option Parcel | 1.2(h) |
| Environmental Hazards Policy | 16.2(f) |
| Escrow | 6.1 |
| Escrow Holder | 6.1 |
| Existing Approvals | 9.1 |
| Extension Option | 1.1(c) |
| Extension Payment | 1.1(c) |
| Fence Rail | 10.3 |
| Fence Rail Cost | 10.3 |
| Fifth Option | 1.2(e) |
| Fifth Option Parcel | 1.2(e) |
| Final Premium Due Date | 3.2 |
| Finance Cost | 3.2(a)(iii) |
| First Option | 1.2(a) |
| First Option Parcel | 1.2(a) |
| First Outside Date | 9.6 |
| Force Majeure Delays | 25.3 |
| Fourth Option | 1.2(d) |
| Fourth Option Parcel | 1.2(d) |
| Golf Course | Recital G |
| Golf Course Transfer | 1.6 |
| Golf Course Walls | 10.3 |
| Hazardous Materials | 16.2(d) |
| HDN (Homebuyer's Disclosure Notice) | 15.14 |
| HOA Cable Agreement | 8.1(d) |
| Homebuyers | Recital I |
| Impositions | 4.2 |
| Improvement Plans | 9.2 |
| Indemnified Parties | 17.2, 17.6 |
| Indemnitor | 22 |
| Information Return | 13.6(f) |
| Initial Deposit | 2.1 |
| Insolvency Proceeding | 18.1(a) |
| Investigations | 7.1 |
| JAMS | 26.1 |
| JAMS Rules | 26.2 |
| Kelley | 8.1(d) |
| Lakeside | Recital N |
| Lender's Estoppel | 8.3 |
| limited common elements | 10.1 |
| Liquidated Delay Damages | 9.7(a) |
| Lot | Recital C |
| Lot Closing | 3.2 |
| Lot Cost | 3.2(a)(iii) |

| **Defined Term** | **Section Reference** |
|---|---|
| Lot Deed | 13.5(a)(i) |
| Lot Premium | 3.2 |
| Map Costs | 3.3 |
| Map Costs Mortgage | 3.3 |
| Map Costs Note | 3.3 |
| Map Is Ready Notice | 1.1(b) |
| Marks | 23 |
| Master Association | 8.1(a) |
| Master Declaration | 8.1(a) |
| Master Declaration Assignment | 10.2 |
| Master Site Plan | Recital A |
| Maximum Number | 1.3 |
| Memorandum of Agreement | 2.1 |
| Minimum Number | 1.3 |
| Monetary Liens | 8.1(b) |
| Monthly Sales Report | 3.2(b) |
| Multi-Family Development Parcel | Recital B |
| Multi-Family Option | 1.2(i) |
| Neighborhood Facilities | 10.1 |
| Neighborhood Facilities Deed | 13.5(a)(i) |
| Net Profit | 3.2(a)(iii) |
| New Title Exception | 8.1(b) |
| Non-Foreign Transferor Declaration | 13.5(a)(ii) |
| Notice of Annexation | 8.1(a) |
| Notice of Seller's Failure | 15.9 |
| Notice of Title Defect | 8.1(b) |
| OPA | Recital M |
| Operating Expenses | 4.2 |
| Option | 1.2(i) |
| Option Cash Deposit | 1.3 |
| Option Closing Payment | 5.2 |
| Option Consideration | 4 |
| Option Expiration Date | 1.4 |
| Option Fee | 4.1 |
| Option Notice | 1.4 |
| Option Parcel | 1.2(i) |
| Option Period | 4.1 |
| Organizational Documents | 15.12 |
| Original Phase I Closing Date | 1.1(c) |
| Other Uses | Recital F |
| Owner's Title Policy | 8.2 |
| Parcel | 1.2(i) |
| Parcel Closing | 3.2 |
| Parcel Perimeter Walls | 10.3 |
| Perimeter Walls | 10.3 |

Draft of November 13, 2003

| **Defined Term** | **Section Reference** |
|---|---|

| | |
|---|---|
| Period of Seller Delay | 9.7(c) |
| Permitted Exceptions | 8.1 |
| Person | 3.2(a)(iv) |
| Phase I Closing Payment | 5.1 |
| Phase I Lots | Recital C |
| Post-Closing Seller's Work Default | 9.7(a) |
| Pre-Closing Seller's Work Default | 9.7(a) |
| Prior Note | Recital N |
| Profit Participation | 3.2 |
| Project | Recital E |
| Project Common Areas | 10.1 |
| Project Final Map | 9.1 |
| Project Plan | 11.1 |
| Project Plan Work | 11.2 |
| Property | Recital B |
| Proposed Map | Recital B |
| Purchase Price | 3.1 |
| Purchaser | Preamble |
| Purchaser Default | 18.1 |
| Purchaser's Action | 18.3(a) |
| Purchaser's actual knowledge | 15.9 |
| Purchaser's Closing Costs | 14.5 |
| Purchaser's Escrowee | 3.2(d) |
| Purchaser's Work | 9.7(a) |
| Record, Recordable, Recordation, Recorded and Recorder | 25.4 |
| Reimbursable Costs | Recital M |
| Reimbursable Improvements Costs | 9.4 |
| Required Endorsements | 8.2 |
| Resale | 18.4 |
| Residences | Recital I |
| Residential Development Parcel | Recital B |
| RPTT Declaration | 13.6(b) |
| Sales Cost | 3.2(a)(iii) |
| Sales Price | 3.2(a)(iii) |
| Scheduled Closing Date | 1.1(b) |
| Second Deposit | 2.1 |
| Second Option | 1.2(b) |
| Second Option Parcel | 1.2(b) |
| Second Outside Date | 9.6 |
| Self-Help Remedy | 9.7(b) |
| Seller | Preamble |
| Seller Caused Delay | 9.7 |
| Seller Closing Default | 18.5 |
| Seller Default | 18.2 |
| Seller's Actual Knowledge | 16 |

| **Defined Term** | **Section Reference** |
|---|---|
| Seller's Alleged Breach | 15.9 |
| Seller's Closing Costs | 14.4 |
| Seller's Financing | 8.3 |
| Seller's Lender | 8.3 |
| Seller's Mortgage | 8.3 |
| Seller's Work | 9.4 |
| Seventh Option | 1.2(g) |
| Seventh Option Parcel | 1.2(g) |
| Sixth Option | 1.2(f) |
| Sixth Option Parcel | 1.2(f) |
| SNDA | 8.3 |
| SPE | 1.4 |
| SPE Assumption | 1.4 |
| Specific Improvements | 9.4 |
| Sub-Association | 10.1 |
| Substantially Complete | 25.5 |
| Third Option | 1.2(c) |
| Third Option Parcel | 1.2(c) |
| Title Insurer | 8.2 |
| Total Base Price | 2.2 |
| Tuscany | Recital A |
| unit | 10.1 |
| Unconveyed Property | 4.1 |
| Unpaid Net Purchase Price | 4.1 |

PURCHASE AGREEMENT
AND GRANT OF OPTIONS

THIS PURCHASE AGREEMENT AND GRANT OF OPTIONS ("Agreement"), dated, for identification purposes only, as of the 14th day of November, 2003, is made by and between COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Seller"), and RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("Purchaser"), with reference to the following facts and purposes:

R E C I T A L S:

A.      Seller is the master developer of a planned community in Henderson (the "City"), Nevada commonly known as Tuscany (f/k/a Palm City) ("Tuscany"), as depicted on the map of Tuscany attached hereto as Exhibit B (the "Master Site Plan").

B.      Tuscany includes the 16 single family residential parcels designated on the Master Site Plan as Parcels 5, 6A, 6B, 6C, 10, 11, 12, 14, 16, 17, 18, 19, 22, 23, 24 and 25 (each a "Residential Development Parcel"), and the multi-family parcel designated on the Master Site Plan as Parcel 15 (together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto, the "Multi-Family Development Parcel" and, together with the Residential Development Parcels, each a "Development Parcel"), all of which are legally described on Exhibit A attached hereto and referred to collectively as the "Property". Proposed tentative subdivision maps for each of the Residential Development Parcels are attached hereto as Exhibits A-1 through A-7 (each, a "Proposed Map").

C.      Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, that portion of the Property consisting of all of the Lots in Development Parcel 19 and 160 Lots (to be identified as hereinafter provided) in Development Parcel 18 (together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto, collectively, the "Phase I Lots"). As used herein, the term "Lot" refers to a residential building lot, as generally set forth on the Proposed Maps, whether or not such lot is, as of a particular date, the subject of a Recorded subdivision map.

D.      Upon Purchaser's purchase of the Phase I Lots, Seller is willing to grant certain options to purchase all of the remaining Lots in the Residential Development Parcels and an option to purchase the Multi-Family Development Parcel.

E.      Seller and Purchaser intend that, if purchased in accordance with this Agreement, each Residential Development Parcel will be developed into a single family residential subdivision in accordance with the applicable Proposed Map and that the Multi-Family Residential Parcel will be developed into a multi family residential project (as applicable, each, a "Project"), and that each Project will conform to the provisions of this Agreement and the applicable Development Declaration.

F.      Land within Tuscany has been used in the past for non-residential purposes, including sand and gravel mining, and land within the vicinity of Tuscany has been or is being used for non-residential purposes, including a radio tower, industrial ponds used in connection with the Henderson (BMI) industrial complex and the City's landfill and wastewater treatment facility (all of which uses are collectively referred to herein as the "Other Uses"). The City has required that certain Other Uses be disclosed to purchasers of property within Tuscany.

G.      An 18-hole golf course (the "Golf Course") will be located within the physical boundaries of Tuscany. The Golf Course, however, is presently intended to be operated separate and apart from the Tuscany residential community and the Master Association. Neither Purchaser nor any of its Homebuyers acquires any right, title or interest in the Golf Course pursuant to this Agreement.

H.      Purchaser has been afforded the opportunity to inspect the Property and to evaluate and satisfy all its questions and concerns regarding the Property and Tuscany, including (i) soils, ground water, seismic, flood and other conditions affecting the engineering and building of the Projects; (ii) the absence or presence of Hazardous Materials; (iii) existing and proposed federal, state and local governmental laws and regulations, including zoning and subdivision ordinances and building codes, affecting the Projects and Tuscany; (iv) the availability of water, power and other utilities; (v) the impact of the Other Uses; (vi) matters of record affecting the Property; (vii) market factors and the economic feasibility of the Projects; (viii) the separate ownership and operation of the Golf Course; and (ix) the Master Declaration and the common elements and other matters involving the Master Association, and Purchaser has approved the same.

I.      A material consideration inducing Seller to enter into this Agreement is Purchaser's representation that, except for transfers permitted hereunder, the Phase I Lots and, upon exercise of the Options, the remaining Property, will be developed with residential dwelling units (whether in a single family or, in the case of the Multi-Family Development Parcel, a multi-family project) ("Residences") thereon in accordance with an approved Project Plan for each Project, prior to the transfer of any interest herein or therein, except for the sale of Residences to members of the home-buying public ("Homebuyers").

J.      Purchaser acknowledges that Seller is engaged in master planning the development of Tuscany. Seller, Purchaser, Homebuyers and other builders and developers within Tuscany all will benefit materially from an orderly pattern of development on, and marketing of, the Property. To achieve orderly development, it is necessary to control the sale of parcels to selected builders and developers in order to encourage development by persons desiring to construct residential or other permitted developments and having the knowledge, expertise, good reputation and financial capability to do so in a timely fashion. Seller agrees to sell the Phase I Lots to Purchaser and to grant the Options in part in reliance on Purchaser's representation that the Residences will be built as represented above.

K.      Seller and Purchaser desire to utilize an escrow to receive and transfer certain of the documents and funds to be exchanged pursuant to this Agreement, and to cause the requisite assurance of title to be obtained.

L.     Certain capitalized terms used in this Agreement have the meanings given them elsewhere in this Agreement.

M.     Tuscany is located within a redevelopment area of the City, and Seller is a party to an Owner Participation Agreement (the "OPA") with the City dated April 16, 2002, pursuant to which certain development and construction costs for Tuscany (the "Reimbursable Costs") may be recovered in the future from the City or its redevelopment agency based on increased property tax receipts from Tuscany, and Seller and Purchaser intend that Seller retain all rights to Reimbursable Costs under the OPA.

N.     On or about January 28, 2000, Seller executed and delivered to Lakeside, LLC, a Nevada limited liability company ("Lakeside"), an Affiliate of Purchaser, that certain Promissory Note (the "Prior Note"), pursuant to which, among other things, Seller agreed to pay to the order of Lakeside the principal sum of $2,600,000.00 upon the terms and conditions set forth in the Prior Note.

## AGREEMENT

NOW, THEREFORE, based upon the foregoing Recitals and in consideration of the mutual covenants and agreements set forth herein, Seller and Purchaser hereby agree as follows:

1.     Purchase and Sale of Property; Grant of Options.

1.1     Purchase and Sale of Phase I Lots.  Subject to the terms and conditions of this Agreement, on or before the First Scheduled Closing Date, Seller agrees to sell the Phase I Lots to Purchaser, and Purchaser agrees to purchase the Phase I Lots from Seller.

a.     Selection of Parcel 18 Lots.  Purchaser shall notify Seller no later than December 31, 2003 of the location of the 160 Lots in Development Parcel 18 Purchaser desires to include in the Phase I Lots.  Seller shall have fifteen (15) days, after receipt of such notice, within which to approve the Lots Purchaser has selected.  The criteria for the location of such Lots shall be governed by the same criteria set forth in Section 1.3, regarding the location of Lots included in an Option.  If, within such 15-day period, Seller fails to object to the Lots Purchaser has selected for the Phase I Lots, Seller shall be deemed to have approved Purchaser's selection of Lots.  If Seller timely objects to the Lots Purchaser has selected, the parties shall reasonably negotiate in good faith to reach an agreement on the Lots to be included as the Phase I Lots.  If the parties are unable to agree on the Lots, the matter shall be subject to arbitration in accordance with Section 26 of this Agreement, which shall be concluded no later than 45 days after the date of Purchaser's original notice selecting the Lots.

b.     Closing Procedure.  The Close of Escrow for the Phase I Lots shall occur in accordance with the following procedures.  Seller shall (or shall cause its engineers to) notify Purchaser in writing (with a copy to Escrow Holder) when the Project Final Maps applicable to Development Parcels 18 and 19 are ready to be Recorded (such a notice, whether referring to Development Parcels 18 and 19 or any other Development Parcel is referred to as a "Map Is Ready Notice").  Within fifteen (15) days thereafter, Purchaser shall deposit into Escrow

the Map Costs associated with the Recording of such maps.  Upon receipt by Escrow Holder of the applicable Map Costs, Escrow Holder shall release the Map Costs to Seller and Seller shall cause the Project Final Maps for Development Parcels 18 and 19 to be Recorded, utilizing the Map Costs deposited by Purchaser into Escrow and released to Seller to pay such Map Costs. Subject to the foregoing provisions of this Section, the satisfaction of the conditions to the Close of Escrow described in Article 12 and the provisions of Section 9.6, the Close of Escrow for the Phase I Lots shall occur on the date that is the later of (i) January 15, 2004 or (ii) three (3) business days after the Recordation of the Project Final Maps applicable to the Phase I Lots. (The date on which the Close of Escrow for the Phase I Lots or any other portion of the Property is scheduled to occur is referred to as a "Scheduled Closing Date", and the date such Close of Escrow actually occurs is referred to as a "Closing Date").

c.  Extensions of Phase I Lots Closing Date.  Subject to the satisfaction of the conditions precedent set forth in the following sentence, Purchaser shall have the right, upon no less then ten (10) days written notice to Seller and Escrow Holder, to extend the original Scheduled Closing Date for the Phase I Lots (the "Original Phase I Closing Date") for 30 days (an "Extension Option"), which right Purchaser may exercise a second and third time (but not all at once), upon a similar written notice, resulting in two additional extensions of 30 days each, for a total extension of the Original Phase I Closing Date of up to 90 days.  Purchaser's right to exercise an Extension Option is subject to the satisfaction of the following conditions precedent:  (i) as a condition precedent to Purchaser's exercise of the first Extension Option, Purchaser shall deliver the Second Deposit to Seller; and (ii) as a condition precedent to Purchaser's exercise of any Extension Option, Purchaser shall deliver to Seller an amount (the "Extension Payment") equal to result obtained by (a) multiplying $127,500,000 by the Agreed Rate, (b) dividing the result thereof by 366 and (c) multiplying the result by 30.  The Extension Payment is intended to compensate Seller for the delay in receiving the purchase money consideration hereunder and is not applicable to the purchase price, not refundable and fully earned when due.  If Seller does not receive the Second Deposit or any Extension Deposit when due under this paragraph (and prior to the then current Scheduled Closing Date for the Phase I Lots), this Agreement, other than those provisions which by their express terms survive a termination, shall automatically terminate and Purchaser shall have no further right or interest in the Property.

1.2  Options.

a.  First Option.  Upon and subject to the Close of Escrow on the Phase I Lots, Seller grants to an SPE an exclusive option (the "First Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement.  The Lots included in the First Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "First Option Parcel".  The Scheduled Closing Date for the First Option shall be 180 days after the Closing Date for the Phase I Lots.

b.  Second Option.  Upon and subject to the Close of Escrow on the First Option Parcel, Seller grants to an SPE an exclusive option (the "Second Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Second Option, together with the related appurtenant streets, rights of

way, easements and other interests within or relating thereto are referred to as the "Second Option Parcel". The Scheduled Closing Date for the Second Option shall be 180 days after the First Option Closing Date.

c.    Third Option.    Upon and subject to the Close of Escrow on the Second Option Parcel, Seller grants to an SPE an exclusive option (the "Third Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Third Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Third Option Parcel". The Scheduled Closing Date for the Third Option shall be 180 days after the Second Option Closing Date.

d.    Fourth Option.    Upon and subject to the Close of Escrow on the Third Option Parcel, Seller grants to an SPE an exclusive option (the "Fourth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Fourth Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Fourth Option Parcel". The Scheduled Closing Date for the Fourth Option shall be 180 days after the Third Option Closing Date.

e.    Fifth Option.    Upon and subject to the Close of Escrow on the Fourth Option Parcel, Seller grants to an SPE an exclusive option (the "Firth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Fifth Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Fifth Option Parcel". The Scheduled Closing Date for the Fifth Option shall be 180 days after the Fourth Option Closing Date.

f.    Sixth Option.    Upon and subject to the Close of Escrow on the Fifth Option Parcel, Seller grants to an SPE an exclusive option (the "Sixth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Sixth Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Sixth Option Parcel". The Scheduled Closing Date for the Sixth Option shall be 180 days after the Fifth Option Closing Date.

g.    Seventh Option.    Upon and subject to the Close of Escrow on the Sixth Option Parcel, Seller grants to an SPE an exclusive option (the "Seventh Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Seventh Option, together with the related appurtenant streets, rights of way, easements and other interests within or relating thereto are referred to as the "Seventh Option Parcel". The Scheduled Closing Date for the Seventh Option shall be 180 days after the Sixth Option Closing Date.

h.    Eighth Option.    Upon and subject to the Close of Escrow on the Seventh Option Parcel, Seller grants to an SPE an exclusive option (the "Eighth Option") to purchase the Remaining Lots in accordance with the terms and conditions of this Agreement. The Lots included in the Eighth Option, together with the related appurtenant streets, rights of

way, easements and other interests within or relating thereto are referred to as the "Eighth Option Parcel". The Scheduled Closing Date for the Eighth Option shall be 180 days after the Seventh Option Closing Date.

> i.    Multi-Family Development Parcel Option. Subject to the terms and conditions of this Agreement, upon and subject to the Close of Escrow on the Phase I Lots, Seller grants to an SPE an exclusive option (the "Multi-Family Option") to purchase the Multi-Family Development Parcel in accordance with the terms and conditions of this Agreement. The Scheduled Closing Date for the Multi-Family Option shall be on or prior to the second (2nd) anniversary of the Phase I Lots Closing Date. The First Option, Second Option, Third Option, Fourth Option, Fifth Option, Sixth Option, Seventh Option, Eighth Option and Multi-Family Option are each referred to as an "Option." The First Option Parcel, Second Option Parcel, Third Option Parcel, Fourth Option Parcel, Fifth Option Parcel, Sixth Option Parcel, Seventh Option Parcel, Eighth Option Parcel and Multi-Family Development Parcel are each referred to as an "Option Parcel." The Phase I Lots and each of the Option Parcels are sometimes referred to herein as a "Parcel".

> 1.3    Number and Location of Lots. The number of Lots included in an Option Parcel shall be (i) at least the lesser of (a) 186 Lots or (b) all Remaining Lots(the "Minimum Number"); and (ii) no more than 225 Lots (the "Maximum Number"), unless Purchaser makes the Option Cash Deposit at the time the applicable Option is exercised, in which event the Maximum Number shall be equal to 225 plus the number of Lots whose Base Prices are covered by the Option Cash Deposit. As used herein, "Option Cash Deposit" means an amount of immediately available funds equal to the Base Prices of those Lots within an Option that are in excess of 225, and which shall be held by Seller to be applied against the Base Prices of those Lots in excess of 225 or, if the Close of Escrow does not occur, through no fault of Seller, retained by Seller as additional consideration for the granting of the Options. If the exercise and consummation of an Option results in more than 186 Lots in an Option Parcel being conveyed on an Option Closing Date, such excess, so long as it exists, may be applied as a credit against the Minimum Number of Lots in a future Option. The location of the Lots taken down pursuant to an Option shall be subject to the reasonable approval of Seller and Purchaser, subject, however, to the following provisions of this paragraph. The parties intend and agree that order and location of the Lots included within an Option Parcel (i) shall result in an orderly and logical development of each Development Parcel (e.g., no "leap frogging" or "cherry picking" of purchased Lots) and (ii) shall not result in (A) the unpurchased Lots in a Development Parcel being unmarketable or having an unreasonably or disproportionately lower value or fewer rights, entitlements, waivers or amenities (e.g. view or location) than the purchased Lots or (B) the unpurchased Lots within a Development Parcel ever being landlocked or not having reasonably comparable access to the same utilities, common elements and other facilities, services and amenities as are applicable to the Lots included within an Option Parcel. Options must be exercised in the order set forth above. Seller shall have twenty (20) days within which to approve the Lots Purchaser has included within an Option Parcel. If Seller fails to object to the Lots described in an Option Notice within such 20-day period, Seller shall be deemed to have approved the selection of Lots. If Seller timely objects to the Lots selected, the parties shall negotiate in good faith to reach an agreement on the Lots to be included in the Option, based on the selection criteria described in this Section. If the parties are unable to agree on the Lots, the

matter shall be subject to arbitration in accordance with Section 26 of this Agreement, which shall be concluded no later than 60 days prior to the Scheduled Closing Date for such Option.

       1.4    Exercise of Option.  Each Option must be exercised by Purchaser's giving written notice to Seller (the "Option Notice") in substantially the form set forth in Exhibit C, with a copy to Escrow Holder, that a Person formed solely for the purpose of acquiring title to the applicable Option Parcel, who satisfies the requirements set forth in Sections 15.13 and 15.14 (the "SPE") will acquire title to the Option Parcel and, if applicable, by the SPE delivering the Option Cash Deposit directly to Seller.  An Option Notice for more than 225 Lots without Seller's contemporaneous receipt of the required Option Cash Deposit shall be void in its entirety.  The Option Notice shall include the (i) SPE's Organizational Documents, (ii) resolutions authorizing the exercise of the applicable Option and the acquisition of the applicable portion of the Property to be acquired pursuant to such Option (the "Authorizing Resolutions"); (iii) representations, warranties and covenants by the SPE of the same substance as set forth in Article 15; and (iv) an assumption of Purchaser's obligations hereunder and under Any Development Declaration with respect to the Option Parcel.  Subject to the final sentence of this paragraph, the Option Notice must be given no later than 90 days prior to the applicable Option Scheduled Closing Date, which date shall be the applicable "Option Expiration Date," time being of the essence.  Each Option Notice must be given in accordance with the notice provisions of this Agreement and must, together with all required attachments, be received by Seller and Escrow Holder (and Seller must receive any required Option Cash Deposit) prior to 5:00 p.m., Las Vegas time, on the applicable Option Expiration Date.  If an Option is not exercised strictly in conformity with this Section on or before the applicable Option Expiration Date, that Option and all other remaining, unexercised Options shall, subject to the notice and cure provisions of Section 18.3(c), automatically expire and be of no further force or effect.

Notwithstanding anything to the contrary contained in this Agreement, an Option Notice shall not be effective: (i) unless Seller shall have approved the SPE's Organizational Documents and Authorizing Resolutions, which approval shall be granted or withheld within ten (10) business days following Seller's receipt of the Option Notice and shall not be unreasonably withheld; or (ii) if, as of the date of such notice, any Purchaser Default exists.  As a condition to the conveyance of any Parcel to an SPE, the applicable SPE shall assume, pursuant to a written assumption agreement reasonably satisfactory to Seller (the "SPE Assumption"), all rights, duties and obligations of Purchaser hereunder or under any other agreements between Seller and Purchaser or any Development Declaration applicable to the Parcel being conveyed.  An Option may be exercised and closed earlier than the dates set forth in Section 1.2, with Seller's reasonable consent, but not later.  If Seller permits an Option to be exercised and closed earlier than required by Section 1.2, (i) the completion date for any Seller's Work shall remain unchanged and the failure of the Seller to complete such work as of any earlier date shall not constitute a condition to an SPE's obligation to close Escrow on the Parcel being purchased at such earlier date; and (ii) the Option Expiration Date for future Options shall be calculated from the original Scheduled Closing Date for the Option, rather than the actual Option Closing Date.

       1.5    Excluded Property.  Purchaser acknowledges and agrees that neither Purchaser nor any SPE acquires any right, title or interest in or to the OPA or any Reimbursable Costs, the rights to which shall be retained by Seller.  Purchaser acknowledges that certain Reimbursable Costs may be based upon improvements constructed by Purchaser or other

Purchaser activities. Purchaser shall reasonably cooperate with Seller and the City for the purpose of including as Reimbursable Costs all development and construction costs relating to Tuscany as may be properly subject to reimbursement under the OPA. Payment of Reimbursable Costs by the City shall be made to Seller, and, should Purchaser receive any such payments, Purchaser shall immediately remit the same to Seller.

        1.6    Golf Course Right of First Refusal. Provided no Purchaser Default has occurred and no Option has gone unexercised, Seller agrees that any sale, transfer or conveyance of the Golf Course (other than a sale, transfer or conveyance to an Affiliate of Seller) (a "Golf Course Transfer") shall occur unless Seller has complied with the right of first refusal provisions contained in this Section. Any Golf Course Transfer not complying with the terms and conditions of this Section shall be null and void. Any Golf Course Transfer agreement entered into by Seller shall state specifically that the contract is contingent and subject to the provisions of this Section. If Seller enters into a Golf Course Transfer agreement within five (5) years from the Effective Date, then Seller shall forward a copy of the contract to Purchaser, and Purchaser shall have the right, for a period of 20 days after receipt of the Golf Course Transfer agreement, to notify Seller that Purchaser elects to purchase the Golf Course, for the purchase price provided in, and under the terms of the Golf Course Transfer agreement. If Purchaser does not so notify Seller within such 20-day period that Purchaser elects to purchase the Golf Course, then Seller shall have the right, for a period of 180 days following Purchaser's failure to so elect, to convey the Golf Course subject to the Golf Course Transfer agreement upon the terms and conditions provided therein, without modification. Seller shall notify Purchaser in writing in the event the Golf Course Transfer agreement fails to close within such 180-day period and of any modification of the Golf Course Transfer agreement, and, after the expiration of the 180-day period, then any sale or proposed sale by Seller of the Golf Course (including a sale pursuant to a Golf Course Transfer agreement which has failed to close within such 180-day period or sale upon modified terms) shall again be subject to the terms of this Section 1.6. Purchaser's rights under this Section 1.6 will be subordinate to the rights of any bona fide lender, holding a deed of trust for value on the Golf Course or any portion thereof.

        2.    Deposits.

        2.1    Deposits. No later than three (3) business days following the Effective Date, Purchaser shall deliver to Escrow Holder the sum of $2,500,000 as an earnest money deposit (together with any interest earned thereon in Escrow, collectively, the "Initial Deposit") and shall cause Lakeside to accept from Seller an Amended and Restated Promissory Note, in the form attached hereto as Exhibit W (the "Restated Prior Note"), and, upon receipt of the Restated Prior Note, to deliver the original Prior Note to Seller, marked "cancelled (and replaced)," together with evidence of Lakeside's and Purchaser's respective power and authority to accept the Restated Prior Note and deliver the Prior Note to Seller. The payment on the Prior Note reflected by the Restated Prior Note is given as partial consideration for Seller entering into this Agreement and is not subject to rescission or cancellation under any circumstances. The Initial Deposit shall be held by Seller as security for Purchaser's obligations to purchase the Phase I Lots, and except as otherwise expressly provided in Section 12.1 (Purchaser's Conditions), Section 18.5 (Purchaser's Remedies) or elsewhere in this Agreement, the Initial Deposit shall be immediately non-refundable and Escrow Holder shall release the Initial Deposit to Seller immediately, provided that, as a condition to the release of the Initial Deposit to Seller, Escrow

Holder shall have Recorded a memorandum of this Agreement against the Phase I Lots, in the form attached hereto as Exhibit D (the "Memorandum of Agreement") fully executed and acknowledged by Seller and Purchaser. As part of the Phase I Closing Payment, Purchaser shall deliver to Escrow Holder the additional sum of $2,000,000 (together with any interest earned thereon in Escrow, collectively, the "Second Deposit" and, together with the Initial Deposit, collectively, the "Deposits"). The Second Deposit shall be retained by Seller as additional consideration for the granting of the Options, and except as otherwise expressly provided in Section 12.1 (Purchaser's Conditions), Section 18.5 (Purchaser's Remedies) or elsewhere in this Agreement, the Second Deposit shall be immediately non-refundable and Escrow Holder shall deliver the Second Deposit to Seller at the Close of Escrow.

      2.2    Application of Deposits. At the Close of Escrow for the Phase I Lots, (i) a portion of the Deposits, in an amount equal to $625,056.40 (i.e., the amount of the Deposits multiplied by a fraction, the numerator of which equals the Base Prices for the Phase I Lots and the denominator of which equals the Base Prices for the entire Property (the "Total Base Price") shall be applied to the Phase I Closing Payment; and (ii) Seller shall retain the balance of the Deposits as partial consideration for the granting of the Options. On each Option Closing Date, Seller agrees to apply against the applicable Option Closing Payment a portion of the Deposits, in an amount equal to the amount of the Deposits multiplied by a fraction, the numerator of which equals the Base Prices for the Lots included in the Option Parcel (or if applicable the Base Price for the Multi-Family Parcel) and the denominator of which equals the Total Base Prices; provided, however, that, if all of the Property is acquired pursuant to this Agreement, on the last Option Closing Date, the entire amount of the unapplied Deposits shall be applied to the applicable Closing Payment.

    3.    Purchase Price.

      3.1    Base Price. The purchase price for each Parcel ("Purchase Price") shall be equal to the sum of the Base Prices for the Lots being purchased or, if applicable Multi-Family Parcel. Exhibit E lists the base prices ("Base Price") for each Lot or other portion of the Property. The Purchase Price for the Phase I Lots is $12,771,875.00. Purchaser acknowledges that the Base Prices and Lot Premiums have been agreed upon by the parties based upon, among other things, the payment on the Prior Note reflected by the Restated Prior Note.

      3.2    Profit Participation and Lot Premiums. As additional consideration to Seller over and above the Base Prices, Purchaser shall pay to Seller: (i) two percent (2%) of the Net Profit from the sale of each Residence (collectively, the "Profit Participation") and (ii) a lot premium for the Multi-Family Parcel and each Lot acquired hereunder in the applicable amounts set forth on Exhibit E (each, a "Lot Premium"). Until the Lot Premiums have been paid in full, the applicable Lot Premiums shall be paid to Seller, in cash at the close of escrow of the sale or conveyance by Purchaser or, if applicable, an SPE of each Lot (a "Lot Closing") or other portion of the Property (a "Parcel Closing"), whether such sale is made to a Homebuyer, a third party developer or any other buyer (including any Affiliate of Purchaser or an SPE), provided, however, that notwithstanding the foregoing, all of the unpaid Lot Premiums applicable to a Parcel shall be due and payable in full no later than three (3) years from the Closing Date for such Parcel ("Final Premium Due Date"). The estimated amount of Profit Participation (as reasonably determined by Purchaser or the applicable grantor of the Lot or other portion of the

Property for which the Profit Participation is due) shall also be paid at the applicable Lot Closing or Parcel Closing. The actual amount of Profit Participation shall be determined annually based upon Purchaser's or such grantor's annual financial statements, which shall be prepared in accordance with generally accepted accounting principles, consistently applied by certified public accountants reasonably acceptable to Seller. Based on such annual financial statements: (i) if the estimated amounts of Profit Participation paid to Seller during the prior year exceed the actual Profit Participation due Seller, the excess shall be applied as a credit against the next due payments of estimated Profit Participation or, if none, paid to Purchaser or such grantor 20 days following the determination of such amount; and (ii) if the estimated amounts of Profit Participation paid to Seller during the prior year are less than the actual Profit participation due Seller, the deficiency shall be due and payable to Seller 20 days following the determination of such amount.

       a.     Definitions. As used herein:

       i.     "Affiliate" means, as to any Person: (i) any other Person or entity controlling, controlled by or under common control with, such Person and entity; (ii) any entity, other than a publicly traded company, in which such Person or entity owns any legal, equitable or beneficial interest; and (iii) any employee, officer or director of such Person or entity;

       ii.     "Approved Construction Loan Mortgage" means a deed of trust lien securing a bona fide loan ("Approved Construction Loan") of money to Purchaser (or, if applicable, an SPE or its assignee) from a lender that is not an Affiliate of Purchaser or Jim Rhodes, the proceeds of which have been used to develop the real property encumbered by such deed of trust (and no other real property), and which has been approved by Seller, such approval not to be unreasonably withheld or delayed;

       iii.     "Net Profit" means the Sales Price of a Residence less the sum of the Lot Cost, Direct Cost, Finance Cost, Closing Cost plus Sales Cost, where: (1) "Sales Price" is the total sales price of the Residence including lot premium and options; (2) "Lot Cost" is the cost of the land including carrying cost plus the cost of all land development; (3) "Direct Cost" is the cost of all vertical construction; (4) "Finance Cost" includes interest, points and fees on any Approved Construction Loan and capitalized interest calculated by the outside auditors; (5) "Closing Cost" means actual and reasonable escrow fees, title fees, transfer taxes and all other fees charged to the seller as shown on the closing statement, not to exceed 2% of the Sales Price; and (6) "Sales Cost" is the real estate sales commission, not to exceed 6% of the Sales Price. Notwithstanding the foregoing, for purposes of determining the Net Sales Proceeds on the sale of any Lot to an Affiliate, there shall be no deduction for any commissions or bonuses, except where such Affiliate is an individual who is not an officer, director, or employee of Purchaser or any Affiliate. (Note: The land development cost and Direct Cost is charged an additional 10% of expenses as an allocation of overhead.)

iv.    "Person" means an individual or a corporation, association, joint venture, general partnership, limited partnership, trust, limited liability company, limited liability partnership or other private entity or governmental agency.

b.    Security for Payment. The Premium Participation shall be secured by the lien contained in the Development Declaration. A memorandum reciting the Purchaser's, SPE's or grantee's obligations with respect to the Premium Participation shall be recorded at each Close of Escrow (the "Additional Consideration Memorandum"), in the form attached hereto as Exhibit F.

c.    Monthly Sales Report. Purchaser shall, no later than the twenty-fifth (25th) of each calendar month after the first Lot Closing deliver to Seller a schedule (the "Monthly Sales Report") showing each Lot sold or closed in Tuscany during the preceding calendar month.

d.    Payment. Purchaser or, if applicable the SPE or its nominee shall instruct each escrow agent responsible for any Lot Closing or Parcel Closing ("Purchaser's Escrowee") to pay to Seller, directly from the escrow out of Purchaser's proceeds, the applicable Lot Premiums, upon the sale of each Lot or other portion of the Property immediately following the Lot Closing or Parcel Closing. Notwithstanding such instructions to Purchaser's Escrowee, Purchaser shall be personally responsible for the payment of the Lot Premiums. Unpaid Lot Premiums shall bear interest at the Agreed Rate from the date of the applicable Lot Closing or Parcel Closing or Final Premium Due Date, whichever is applicable, and, if not paid within 30 days thereafter shall bear interest at the Default Rate until paid.

e.    Survival. The provisions set forth in this Section 3.2 shall survive each Close of Escrow and/or the termination of this Agreement.

3.3    SNWA and Related Fees . As additional consideration for the purchase of the Phase I Lots, the granting of the Options and, if applicable, the purchase of the Option Parcels, Purchaser shall pay all fees, costs and other expenses required for the City's approval and the Recording of each Project Final Map, including, without limitation the Southern Nevada Water Authority Regional Water Fee (collectively, the "Map Costs"). Map Costs shall be due and payable as follows: (i) all Map Costs applicable to Development Parcels 18 and 19 shall be payable prior to the Scheduled Closing date for the Phase I Lots as provided in Section 1.1; (ii) all Map Costs applicable to Development Parcels 6B, 6C,10, 11, 22 and 25 shall be due and payable by Purchaser's execution and delivery to Seller on the Closing Date for the Phase I Lots of a promissory note in the form attached hereto as Exhibit G (the "Map Costs Note"), which shall be secured by a deed of trust and assignment of rents in the form attached hereto as Exhibit H (the "Map Costs Mortgage") Recorded against and constituting a lien upon the Phase I Lots; and (iii) all other Map Costs shall be due and payable within (A) 15 days after Purchaser's receipt of a Map Is Ready Notice or (B) 30 days after Purchaser's receipt of written notice from Seller that Seller was required to pay such Map Costs as a result of Purchaser's purchase of the affected property. Any such fees and costs not paid when due shall bear interest at the Agreed Rate from the date such payment was due, and, if not paid within 30 days thereafter shall bear interest at the Default Rate until paid. Purchaser acknowledges that its obligation to pay the Map Costs as well

as Purchaser's obligations under Section 9.10 (Improvement Bonds) may arise with respect to portions of the Property which have not yet been acquired pursuant to the Options. The provisions of this paragraph shall survive each Close of Escrow and/or the termination of the Agreement (with respect to those portions of the Property acquired by Purchaser or an SPE). Seller agrees to subordinate the lien of the Map Costs Mortgage to the lien of an Approved Construction Loan Mortgage.

4.      Option Consideration. As additional consideration for the granting of the Options (the "Option Consideration"), Purchaser shall pay to Seller the Option Fee, Impositions and Operating Expenses as follows:

4.1     Option Fee. As partial consideration for the granting of the Options, an option fee ("Option Fee") shall accrue during the period which begins on the Sewer Completion Date and ends on the earlier of the date this Agreement is terminated or all of the Property has been conveyed pursuant to the Options ("Option Period"), provided, however, that if Seller is unable to convey title to an Option Parcel by a Scheduled Closing Date for such Option, the period of such delay shall be excluded from the Option Period. The Option Fee shall be a per annum amount determined by multiplying (i) the Unpaid Net Purchase Price by (ii) the Agreed Rate. "Unpaid Net Purchase Price" means, as of any date of determination, the sum of the aggregate of the Base Prices for the portion of the Property that has not been conveyed hereunder as of such date (collectively, the "Unconveyed Property") less the portions of the Deposits which have not, as such date, been applied against the Purchase price upon a Close of Escrow. The Option Fee shall be payable in installments, in arrears, commencing on the First Option Closing Date and on each Option Parcel Closing Date thereafter. Any Option Fee not paid when due shall bear interest at a per annum rate of interest equal to the Agreed Rate plus five percent (5%) (the "Default Rate").

4.2     Impositions and Common Element Expenses. As partial consideration for the granting of the Options, commencing on the First Option Closing Date and on each Option Closing Date thereafter, Purchaser shall, at Seller's option, pay directly to Seller or deposit into Escrow as of such Closing Date the amounts of (a) all Impositions which accrue with respect to the Unconveyed Property during the Option period, and (b) all costs and operating expenses of the Master Association (but not capital improvements) and any Completed Project Common Areas (collectively, the "Operating Expenses") which accrue during the Option Period. As used herein, "Impositions" means all taxes and assessments of every type or nature affecting all or any part of the Unconveyed Property.

4.3     Application of Option Consideration. The Option Consideration is intended to compensate Seller for holding the Option Parcels available for purchase under this Agreement and is fully earned and non-refundable when due, except to the extent Purchaser may be entitled to recover such amounts by reason of a Seller Default or the failure of a condition precedent to an SPE's obligation to purchase an Option Parcel. None of the Option Consideration is applicable to the Purchase Price. Without limiting the foregoing, the Option Consideration shall not be returned if an Option, with respect to which the Option Consideration has been paid, is not exercised.

5.      Closing Payments.

5.1     Phase I Lots.  Upon the Close of Escrow for the Phase I Lots, Purchaser shall (a) pay to Seller an amount equal to the Purchase Price for the Phase I Parcel less $625,056.40, which is the applicable portion of the Deposits to be applied thereto as provided in Section 2.2, (b) pay the Purchaser's Closing Costs, (c) pay to Seller the Reimbursable Improvements Costs and any unpaid Map Costs and (d) pay any other amounts required by this Agreement to be paid by Purchaser at the Close of Escrow on the Phase I Lots.  The amounts referred to in clauses (a) through (e) of this Section are collectively referred to as the "Phase I Closing Payment."  The Phase I Closing Payment shall be payable in cash at the Close of Escrow on the First Scheduled Closing Date as provided in Section 13.5(b)(i).

5.2     Option Parcels.  Following the exercise of an Option, upon the Close of Escrow for an Option Parcel, the applicable SPE shall (a) pay to Seller an amount equal to the applicable Purchase Price for the Option Parcel less the applicable portion of the Deposits (and, if applicable, any Option Cash Deposit) to be applied thereto as provided in Section 2.2, (b) pay the Purchaser's Closing Costs, (c) pay to Seller the amounts of Option Consideration then due, (d) pay to Seller any and all Reimbursable Improvements Costs and Fence Rail Costs, unpaid Map Costs and any unpaid Lot Premiums then due and (f) pay any other amounts required by this Agreement to be paid by Purchaser at the Close of Escrow on an Option Parcel.  The applicable amounts referred to in clauses (a) through (f) of this Section are collectively referred to as an "Option Closing Payment."  Each Option Closing Payment shall be payable in cash at the Close of Escrow on the applicable Option Scheduled Closing Date as provided in Section 13.5(b)(i).

6.     Escrow.

6.1     Escrow Instructions.  The purchase and sale of each Parcel shall be consummated through an escrow (the "Escrow") to be established at United Title of Nevada ("Escrow Holder"), 2300 West Sahara Avenue, Suite 140, Las Vegas, Nevada, 89102, Attn: Jay Pugh.  The Escrow shall be opened within three (3) business days following the Effective Date by delivery to Escrow Holder of a fully executed copy of this Agreement, which shall constitute Escrow Holder's instructions.  Seller and Purchaser agree to execute and deliver to Escrow Holder such additional and supplemental instructions as Escrow Holder may reasonably require in order to clarify Escrow Holder's duties under this Agreement.  Absent a clear written expression signed by Seller and Purchaser, that Seller and Purchaser intend to change a provision in this Agreement, if a conflict or inconsistency exists between this Agreement and any additional or supplemental instructions delivered to Escrow Holder, the terms of this Agreement shall govern the duties of Escrow Holder and the rights and obligations of Seller and Purchaser.  The failure of any party to timely execute the escrow instructions shall in no way affect the party's liability or obligations hereunder.

6.2     Definition of "Close of Escrow".  For purposes of this Agreement, the term "Close of Escrow" shall mean the time when Escrow Holder shall have Recorded all of the instruments to be Recorded as set forth in Section 13.5.

6.3     Concerning the Duties of Escrow.

a.     General.  Escrow Holder shall not have any liability or responsibility for any provision in this Agreement not within the control of Escrow Holder or that survives a Close of Escrow.

b.    The Initial Deposit.  Escrow Holder is instructed to release the Initial Deposit to Seller, with no further instruction to Escrow Holder, on the first business day after Escrow Holder's receipt of the Initial Deposit and the Recording of the Memorandum of Agreement.  Payment of the Initial Deposit to Seller prior to the Phase I Lots Closing Date in accordance with this Agreement is made without liability or recourse to Escrow Holder. Purchaser acknowledges and agrees that Escrow Holder will not aid in the recovery of any monies released to Seller if the purchase contemplated by this Agreement is not consummated. Escrow Holder is relieved of all liability and responsibility in connection with the release of the Initial Deposit to Seller if the Escrow is not closed for any reason, provided, that the foregoing is not intended to release Escrow Holder for liability or responsibility in connection with (i) Escrow Holder's failure to comply with its duties as Escrow Holder under this Agreement, (ii) any negligent act or omission of Escrow Holder or (iii) the willful misconduct of Escrow Holder.

Purchaser: _____          Seller: _____
            initials                            initials

c.    Conflicting Claims.  If conflicting claims are made upon Escrow Holder, Escrow Holder is authorized to hold all money and instruments in Escrow pending agreement of the parties or final order of a court of competent jurisdiction.  Seller and Purchaser, however, expressly agree that Escrow Holder shall have the absolute right, at its election, to file a suit in interpleader and obtain an order from a court of competent jurisdiction requiring the claimants to interplead and litigate in such court their several claims and rights amongst themselves.  If suit is brought, Seller and Purchaser jointly and severally agree to pay (without prejudice to Seller's or Purchaser's right of recourse against the other pursuant to any other provision of this Agreement) Escrow Holder's reasonable costs, expenses and attorneys' fees incurred in such interpleader suit, the amount thereof to be fixed and judgment therefore to be rendered by the court in such suit.  Upon filing of such suit and the deposit into court of all documents and money then held in Escrow, Escrow Holder shall thereupon be fully released and discharged from all obligation to further perform any further duties or obligations otherwise imposed by the terms of the Escrow.

d.    Escrow Funds.  Escrow Holder is instructed to invest any sums placed in Escrow by Purchaser in U.S. Treasury bills or notes or such other prudent investments as approved by Seller in writing, so long as such sums are available for release to Seller at the times and in the manner provided for herein.  In the absence of such written instructions, Escrow Holder shall invest such sums in one or more interest bearing trust accounts with local, federally insured banking institutions.

e.    Disbursements.  Unless otherwise instructed in writing by a party to whom a disbursement is due, all disbursements by Escrow Holder are to be made by check of Escrow Holder, drawn on a federally insured bank doing business in Las Vegas, Nevada.

7.    Approval of Investigations of Property.

7.1    Investigations.  Purchaser and its representatives, agents and contractors, at its expense, have conducted such physical or other inspections, reviews, analyses, inquiries, surveys, studies, tests and investigations of the Property and uses on adjacent properties (collectively, "Investigations") as Purchaser in its discretion determined to be appropriate in order

05/08/1994  21:14    7024565210                MAKENA                                    PAGE  02

b.    The Initial Deposit.  Escrow Holder is instructed to release the Initial Deposit to Seller, with no further instruction to Escrow Holder, on the first business day after Escrow Holder's receipt of the Initial Deposit and the Recording of the Memorandum of Agreement.  Payment of the Initial Deposit to Seller prior to the Phase I Lots Closing Date in accordance with this Agreement is made without liability or recourse to Escrow Holder. Purchaser acknowledges and agrees that Escrow Holder will not aid in the recovery of any monies released to Seller if the purchase contemplated by this Agreement is not consummated. Escrow Holder is relieved of all liability and responsibility in connection with the release of the Initial Deposit to Seller if the Escrow is not closed for any reason, provided, that the foregoing is not intended to release Escrow Holder for liability or responsibility in connection with (i) Escrow Holder's failure to comply with its duties as Escrow Holder under this Agreement, (ii) any negligent act or omission of Escrow Holder or (iii) the willful misconduct of Escrow Holder.

Purchaser: _____            Seller _____
                         initials                                              initials



c.    Conflicting Claims.  If conflicting claims are made upon Escrow Holder, Escrow Holder is authorized to hold all money and instruments in Escrow pending agreement of the parties or final order of a court of competent jurisdiction.  Seller and Purchaser, however, expressly agree that Escrow Holder shall have the absolute right, at its election, to file a suit in interpleader and obtain an order from a court of competent jurisdiction requiring the claimants to interplead and litigate in such court their several claims and rights amongst themselves.  If suit is brought, Seller and Purchaser jointly and severally agree to pay (without prejudice to Seller's or Purchaser's right of recourse against the other pursuant to any other provision of this Agreement) Escrow Holder's reasonable costs, expenses and attorneys' fees incurred in such interpleader suit, the amount thereof to be fixed and judgment therefore to be rendered by the court in such suit.  Upon filing of such suit and the deposit into court of all documents and money then held in Escrow, Escrow Holder shall thereupon be fully released and discharged from all obligation to further perform any further duties or obligations otherwise imposed by the terms of the Escrow.

d.    Escrow Funds.  Escrow Holder is instructed to invest any sums placed in Escrow by Purchaser in U.S. Treasury bills or notes or such other prudent investments as approved by Seller in writing, so long as such sums are available for release to Seller at the times and in the manner provided for herein.  In the absence of such written instructions, Escrow Holder shall invest such sums in one or more interest bearing trust accounts with local, federally insured banking institutions.

e.    Disbursements.  Unless otherwise instructed in writing by a party to whom a disbursement is due, all disbursements by Escrow Holder are to be made by check of Escrow Holder, drawn on a federally insured bank doing business in Las Vegas, Nevada.

7.    Approval of Investigations of Property.

7.1    Investigations.  Purchaser and its representatives, agents and contractors, at its expense, have conducted such physical or other inspections, reviews, analyses, inquiries, surveys, studies, tests and investigations of the Property and uses on adjacent properties (collectively, "Investigations") as Purchaser in its discretion determined to be appropriate in order

Draft of November 13, 2003                                                                                    14

to determine whether or not the Property is suitable for Purchaser's intended use, including any effect of the Other Uses on the Projects. By its execution of this Agreement, Purchaser hereby acknowledges that it received a copy of the soils, environmental, drainage, engineering and other studies, reports and materials affecting Tuscany and/or the Property described on <u>Exhibit I</u> attached hereto (collectively, the "<u>Due Diligence Materials</u>") and that it has approved its Investigations of the Property.

7.2    <u>Reliance on Investigations</u>. Purchaser must purchase the Phase I Lots and any other portions of the Property in reliance upon its own Investigations (including Purchaser's evaluation of the Environmental Hazards Policy) and not upon any representations, warranties or agreements of Seller other than as expressly set forth in this Agreement. Purchaser acknowledges that Purchaser is substantially experienced and upon Purchaser's acquisition of the Phase I Lots or any other portion of the Property, Purchaser shall be solely responsible for such property, its condition, development and operation and all matters pertaining thereto, unless otherwise specifically and expressly set forth herein. Except as specifically and expressly provided to the contrary in this Agreement, Seller is fully and completely released from all responsibility and liability regarding the condition, fitness, suitability, valuation and/or utility of the Property. Without limiting the foregoing, Purchaser understands and acknowledges that, except with respect to Seller's Work: (a) Purchaser is solely responsible for the performance of all work necessary to complete each of the Projects; (b) Seller will not be responsible for any work required to complete any of the Projects; and (c) Seller will not be responsible for cost overruns or unforeseen expenditures which may be incurred by Purchaser in order to complete the Projects.

7.3    <u>No Inadvertent Seller Representations; Third-Party Materials</u>. Purchaser expressly acknowledges that it has not relied on any warranties, promises, understandings or representations, express or implied, written or oral, of Seller or any agent or other representative or purported agent or representative of Seller relating to Tuscany, the Property, the Projects or any aspect of any of the forgoing except as expressly set forth in this Agreement. Purchaser acknowledges that any and all third party-prepared soils, environmental, drainage, engineering, feasibility or marketing studies, reports or analyses or other information of any type that Purchaser has received or may receive from Seller or Seller's agents or representatives (including the Due Diligence Materials) was furnished on the express condition that Purchaser would make, and Purchaser acknowledges that it has made, an independent verification of the accuracy of any or all such information, all such information being furnished without any warranty whatsoever (express or implied). Purchaser agrees that it will not attempt to assert any liability against Seller or its agents for furnishing such information.

8.    <u>Condition of Title</u>.

8.1    <u>Permitted Exceptions</u>. Seller shall convey fee simple title to each Parcel subject only to the following title exceptions (the "<u>Permitted Exceptions</u>"):

a.    <u>Master Declaration</u>. The Master Declaration of Covenants, Conditions, Restrictions and Reservation of Easements for Tuscany, substantially in the form of <u>Exhibit J</u> attached hereto, (the "<u>Master Declaration</u>") which will be Recorded on or prior to the Phase I Lots Closing Date, and, if necessary, a supplemental declaration in the form required by

the Master Declaration ("Notice of Annexation"), to be Recorded at each Close of Escrow subjecting each Parcel at such Close of Escrow to the Master Declaration and the jurisdiction of the Tuscany Community Association ("Master Association").

           b.    Record Matters.  The title exceptions shown on the preliminary title reports attached hereto as Exhibit K, with the exception of those matters referred to in Sections 8.1(a), (c), (d), (e) or (f) or otherwise approved by Purchaser as provided herein, but excluding, however, any Monetary Liens, which shall be removed by Seller on or before the Close of Escrow for the applicable Parcel. "Monetary Liens" means liens, judgments, claims or encumbrances which can be satisfied by the payment of a liquidated amount of money and nothing more, other than (i) current Impositions (which shall be paid as part of the Option Consideration and are subject to proration as elsewhere herein provided) or (ii) any lien, claim or encumbrance arising by reason of any act or omission of Purchaser or its agents or employees.

As used herein, the term "Notice of Title Defect" means a writing from Purchaser to Seller describing any new title exception not otherwise permitted by any other subsection of this Section 8.1, which unreasonably affects Purchaser's ability to develop and construct the Residences in accordance with this Agreement and is not acceptable to Purchaser in its reasonable discretion (a "Disapproved Exception"). In the event any new title information received by Purchaser from a supplemental title report, survey, or other source discloses any new title exceptions (collectively, "New Title Exception"), Purchaser shall have ten (10) days after receipt of a title report, survey or other document disclosing a New Title Exception within which to deliver a Notice of Title Defect. Purchaser's failure to deliver a Notice of Title Defect within such ten (10) day period shall constitute Purchaser's approval thereof and/or a waiver of any objection thereto. Seller, within seven (7) days after receiving the Notice of Title Defect, may deliver to Purchaser a notice stating whether or not Seller will use its reasonable efforts to cure the Disapproved Exception(s) on or before the applicable Close of Escrow. Seller's failure to give timely notice in response to Purchaser's Notice of Defect shall constitute Seller's notice that it will not cure the Disapproved Exception(s) on or before the applicable Close of Escrow. If Seller elects or is deemed to have elected not to cure the Disapproved Exception(s) on or before the applicable Close of Escrow, Purchaser shall be deemed to have waived the Disapproved Exceptions unless Purchaser delivers to Seller a written notice terminating this Agreement within five (5) business days after Seller's notice to that effect has been given or deemed given, unless the Disapproved Exception results from a Seller default, in which event Purchaser shall be entitled to pursue its remedies under Section 18.5 below. Notwithstanding the foregoing, Purchaser need not object to any Monetary Liens, all of which shall be deemed to be objectionable by Purchaser.

           c.    Development Declaration.  A Declaration of Development Covenants and Restrictions, substantially in the form attached hereto as Exhibit L, (the "Development Declaration") to be Recorded against the Lots acquired in each Development Parcel at the Close of Escrow affecting such Development Parcel or, in the case of an Option Parcel consisting of Lots located in one or more Development Parcels in which Purchaser has already taken title to Lots, an amendment to the existing Development Declaration for the applicable Development Parcel(s), in the form required by the Development Declaration (the "Development Declaration Amendment"), to be recorded at the Close of Escrow for such Option

Parcel, amending the definition of the "Covered Property" in the affected Development Declaration to include the Lots included in such Option Parcel.

           d.    Other Matters.   Matters created or agreed to by Purchaser or reasonably required pursuant to the provisions of this Agreement, including (i) the OPA; (ii) the easements and other covenants, conditions, restrictions and rights set forth in the Development Declaration or in any of the exhibits or schedules to this Agreement, but excluding, however, any liens arising from Seller's Work; (iii) the Cable Television Infrastructure and Services Agreement dated April 22, 2002 (the "Cable Contract") entered into between Seller and Kelley Communication Company, Inc. ("Kelley") and the Bulk-Basic Cable Agreement to be entered into between Kelley and the Master Association, in accordance with the Cable Contract (the "HOA Cable Agreement"); and (iv) blanket easements for the "French drains", designed to maintain the existing water table within Tuscany, as set forth in Exhibit M attached hereto.

           e.    Subdivision Map(s) Conditions.   Dedications, conditions, restrictions and reservations imposed by the City or other governmental authorities or public utilities on the Property or the development of the Property arising from the approval, in accordance with this Agreement, of any parcel or tentative or final subdivision map(s) by which the Property or any Lot was or is hereafter created as a legal parcel (collectively, the "Conditions of Approval").

           f.    Preprinted Exceptions. The preprinted exceptions contained in the cover jacket to the form of title insurance policy issued by the Title Insurer.

           8.2    Title Insurance Policy.  At each Close of Escrow and as a condition thereto, Escrow Holder shall: (a) issue to the grantee of the applicable Parcel, at Seller's sole cost and expense, a CLTA standard coverage owner's policy of title insurance (the "Owner's Title Policy") of Chicago Title Insurance Company (the "Title Insurer") as to the Parcel being conveyed, with a limit of liability in the amount of the Purchase Price for such Parcel (and including affirmative coverages protecting the grantee against any mechanics' or materialmen's lien arising from any Seller's Work or any other activities of Seller or its agents or employees upon the conveyed Parcel (collectively, the "Required Endorsements") and subject only to the Permitted Exceptions. If Purchaser or the applicable SPE desires an ALTA extended coverage owner's policy of title insurance ("ALTA Owner's Policy") or any endorsements, Purchaser or the SPE shall notify Escrow Holder no less than thirty (30) days prior to the applicable Scheduled Closing Date. The requirement of an ALTA Owner's Policy or such endorsements shall not permit Purchaser or an SPE to delay any Scheduled Closing Date. Purchaser or the SPE, as applicable, shall be responsible for paying the following amounts (collectively, the "Additional Title Policy Charges"): (i) if an ALTA Owner's Policy is requested by Purchaser or such SPE, the additional cost of the ALTA Owner's Policy over and above the cost of the Owner's Title Policy; and (ii) the cost of any endorsements to the Owner's Title Policy or the ALTA Owner's Policy other than the Required Endorsements. In addition, Purchaser or such SPE shall make all necessary arrangements for the preparation of any required ALTA survey so as not to delay any Closing Date, and shall pay all costs related thereto. Delivery of the Deed and the Owner's Title Policy shall be deemed to fulfill all duties of Seller to the sufficiency of title required hereunder, but shall not be deemed a waiver of Seller's statutory warranties in any deed.

8.3    <u>Seller's Financing</u>.  Purchaser acknowledges and agrees that Seller has obtained (and may in the future obtain) financing (or refinancing) for all or any portion of Tuscany ("<u>Seller's Financing</u>"), which results in the encumbrance of some or all of the Property, to secure such financing(s), with mortgages, deeds of trust, assignments of rents or other security agreements, grants, liens, security interests or assignments (collectively "<u>Seller's Mortgage</u>") in favor of the lender(s) under such Seller's Financing ("<u>Seller's Lender</u>").  In such event, any Seller's Mortgage affecting a Parcel shall be deemed a Permitted Exception provided the lien of such Seller's Mortgage is released from the Parcel at or prior to the Close of Escrow for such Parcel.  At Seller's written request, Purchaser or any SPE shall execute, deliver and, if appropriate, acknowledge, in favor of Seller's Lender, a subordination, attornment and non disturbance agreement substantially in the form attached hereto as <u>Exhibit O</u> (the "<u>SNDA</u>") and/or one or more estoppel certificates, confirming the existence of this Agreement and such other matters relating hereto as Seller's Lender requests (a "<u>Lender's Estoppel</u>") and shall reasonably cooperate with requests from Seller or Seller's Lender relating to this Agreement. Without limiting the foregoing: (i) Purchaser and any SPE agrees to execute and deliver to Seller's Lender any SNDA and/or Lender's Estoppel within ten (10) business days after written request from Seller or Seller's Lender.  Purchaser's or an SPE's failure to deliver any Lender's Estoppel within such ten (10) business day period shall be conclusive upon Purchaser and such SPE for the benefit of Seller and Seller's Lender, that this Agreement is in full force and effect and has not been modified; (ii) if Purchaser or an SPE fails to deliver the Lender's Estoppel within the required time period, Purchaser and such SPE irrevocably constitutes and appoints Seller as Purchaser's or such SPE's (as applicable) special attorney-in-fact to execute and deliver the certificate to any third party; and (iii) Purchaser's or such SPE's failure to execute, deliver and acknowledge the SNDA or Lender's Estoppel as required by this Agreement shall, at Seller's option, be a Purchaser Default.

9.    <u>Subdivision Maps; Improvement Plans</u>.

9.1    <u>Project Final Maps</u>.  The Lots in each Parcel to be conveyed to Purchaser or any SPE hereunder shall constitute legally subdivided parcels capable of being conveyed in accordance with NRS Chapter 278, in conformity with the applicable Proposed Map (except for the Multi-Family Development Parcel).  On and after the Effective Date, but subject to Purchaser's obligations under Section 3.3, Seller shall use commercially reasonable efforts to cause the preparation, approval and Recording, in accordance with the City's conditions of approval applicable to Tuscany as of the date of this Agreement ("<u>Existing Approvals</u>"), of the subdivision maps required to convey the Lots within each Parcel (other than the Multi-Family Development Parcel) in accordance with the Proposed Maps attached hereto (each, a "<u>Project Final Map</u>").  Seller and Purchaser shall cooperate with each other in the preparation, approval, processing and Recording of each Project Final Map.  Seller shall notify Purchaser or, if applicable, the SPE of the date each Project Final Map is submitted to the Recorder for Recordation and, within five (5) business days after Recording, provide to Purchaser or such SPE a conformed copy of each Recorded Project Final Map.  Notwithstanding the foregoing, Seller and Purchaser acknowledge and agree that no Project Final Map shall be required for the Multi-Family Development Parcel, and such Parcel may be the subject of a parcel map and consist of one lot.

9.2     Improvement, Other Plans.    Subject to Purchaser's obligations under Section 3.3, Seller shall diligently cause or continue the preparation, and hereafter process and use its reasonable best efforts to procure the approval, in accordance with the Existing Approvals, from all applicable governmental agencies, of all subdivision improvement plans and specifications (collectively, the "Improvement Plans") necessary for the approval of each of the Project Final Maps in accordance with Section 9.1. Seller shall also diligently cause or continue the preparation, and hereafter process and use its reasonable best efforts to procure the approval from all applicable governmental agencies, of all plans and specifications necessary for Seller's Work in accordance with Section 9.4.    Purchaser acknowledges that it has reviewed and approved all Improvements Plans existing as of the date of this Agreement.    Prior to any submission after the Effective Date of any Improvement Plans to the City or any other governmental agency for approval, and prior to any material amendment thereto after the Effective Date, Seller shall submit the applicable plans or amendments to Purchaser, who shall be entitled to approve any such plans or amendments which are inconsistent with the respective obligations of the parties' hereunder or which would alter any of the Projects in any material respect.

9.3     Conditions of Approval.   Purchaser has approved all existing Conditions of Approval applicable to any existing parcel or subdivision map applicable to the Property (including all approved tentative maps) as well as all Conditions of Approval applicable to the Proposed Maps.   After the Effective Date, Seller shall not modify the City-approved and any Purchaser-approved Conditions of Approval in connection with the preparation of any Project Final Map, except for non-material changes and changes which are required by the City in order to comply with the City's ordinances and Development Code and changes approved by the parties.   If Seller proposes any such non-material or other changes required by the City, Seller shall give prompt written notice thereof to Purchaser specifically identifying the proposed changes and Purchaser shall have the right to contest with the City such required changes for a period of up to ten (10) days after its receipt of such notice.

9.4     Seller's Work.    The work and improvements (collectively, "Seller's Work") to be performed by Seller with respect to each Parcel includes the following: (i) Seller shall cause each of the Lots conveyed hereunder to be graded in accordance with the grading plans identified on Exhibit Q; and (ii) Seller shall Substantially Complete the work and improvements described on Schedule 9.4 for each Parcel ("Specific Improvements") on or before the completion dates set forth on Schedule 9.4, subject to the effect of Force Majeure Delays. Seller's Work shall be performed at the sole cost and expense of Seller, except with respect to any work and improvements indicated on Schedule 9.4 which are indicated as an item to be paid for by Purchaser (collectively, the "Reimbursable Improvements Costs").

9.5     Completion; Inspection. Seller shall notify Purchaser in writing (a "Completion Notice") when Seller has completed the Seller's Work or any discrete portion thereof.    Within five (5) business days after Purchaser's receipt of a Completion Notice, Purchaser and Seller shall conduct a joint inspection of the applicable Seller's Work.   If the inspection reveals deficiencies, then (i) the parties shall immediately prepare a written punchlist, and (ii) Seller shall thereafter promptly proceed to complete or correct such punchlist work within thirty (30) days thereafter. Purchaser shall be deemed to have accepted Seller's Work following the receipt of a Completion Notice and the joint inspection of such work by the parties,

subject, however, to completion of all punchlist work. No inspection by Purchaser of Seller's Work is intended to waive any right or remedy based on any latent defect.

9.6    <u>Outside Date; Termination</u>.    Notwithstanding anything to the contrary contained in this Agreement, if the conditions precedent applicable to the Phase I Lots Close of Escrow have not been satisfied or waived, through no fault of Purchaser, by September 30, 2004 ("<u>First Outside Date</u>"), Purchaser may elect to terminate this Agreement by written notice to Seller, with a copy to Escrow Holder; and if the conditions precedent applicable to the Phase I Lots Close of Escrow have not been satisfied or waived by June 30, 2005 ("<u>Second Outside Date</u>"), this Agreement, other than those provisions which expressly survive a termination,, shall automatically terminate. Upon a termination of this Agreement, pursuant to this paragraph, Seller or, if applicable, Escrow Holder shall return the Initial Deposit to Purchaser; Purchaser promptly shall return the Due Diligence Materials to Seller and deliver to Seller copies of all studies, surveys and other similar materials produced by or at the request of Purchaser with respect to the Property, other than Purchaser's confidential proforma, projections, proprietary information, internal accounting and financial information, which may be excluded from such delivery; each party shall be responsible for its respective share of the Cancellation Charges; and thereafter the parties shall have no further rights, duties or obligations under this Agreement, except with respect to those provisions which, by their express terms, survive a termination of this Agreement.

9.7    <u>Remedies for Seller Caused Delays</u>. As used herein, a "<u>Seller Caused Delay</u>" is the failure of any Seller's Work to be Substantially Complete, when required by this Agreement, by reason of a material default by Seller and not the effect of any Force Majeure Delay.

a.    <u>Liquidated Damages</u>. If (i) Purchaser is ready, willing and able to Close Escrow with respect to a Parcel and to commence construction of its project improvements or Residences with respect to the affected Parcel ("<u>Purchaser's Work</u>") but is prevented from doing so solely by reason of a Seller Caused Delay (a "<u>Pre-Closing Seller's Work Default</u>") or (ii) after the Close of Escrow Purchaser is ready, willing and able to commence or continue its Purchaser's Work but is prevented from doing so or prevented from obtaining a building permit and/or a certificate of occupancy for such Residence(s) solely by reason of a Seller Caused Delay (a "<u>Post-Closing Seller's Work Default</u>"), then, unless Seller causes the applicable Seller's Work to be Substantially Completed within thirty (30) days after written notice describing such facts is given by Purchaser to Seller, Seller shall pay Purchaser, as Purchaser's sole monetary remedy, liquidated damages (the "<u>Liquidated Delay Damages</u>") in an amount equal to (A) in the case of a Pre-Closing Seller's Work Default, a daily amount equal to the unapplied portion of the Deposits multiplied by the Agreed Rate divided by 365 for each day during any Period of Seller Delay or (B) in the case of a Post-Closing Seller's Work Default, a daily amount equal to the applicable Purchase Price for the affected Parcel (or portion thereof, in the event not all Lots within a Parcel are affected) multiplied by the Agreed Rate divided by 365 for each day during any Period of Seller Delay. It is expressly understood and agreed between Seller and Purchaser that Purchaser's actual damages for any Seller Caused Delay that prevents Purchaser commencing, continuing or completing any Purchaser's Work or obtaining a certificate of occupancy would be substantial but extremely difficult to ascertain and the Liquidated Delay Damages constitutes a reasonable estimate of such actual damages.

b.      Self Help Remedy. If a Pre-Closing Seller's Work Default is not corrected or cured within the time period permitted by Section 9.7(a), Purchaser may elect, by giving written notice to Seller within ten (10) days following the expiration of the cure period to proceed to the Close of Escrow, and, in such event, Purchaser shall be entitled to complete the Seller's Work affected by the Seller Caused Delay to the extent such Seller's Work is located solely within the affected Parcel and/or in any common areas or streets or rights of way immediately adjoining the affected Parcel, as provided in the Development Declaration (the "Self Help Remedy"). Upon Purchaser's exercise of the Self Help Remedy, the actual reasonable amounts expended by Purchaser in exercising the Self Help Remedy, as evidenced by written receipts reasonably acceptable to Seller, shall be payable by Seller to Purchaser on written demand accompanied by the applicable receipts, and if not paid within thirty (30) days after such demand shall bear interest at the Default Rate from the date expended until paid and may be offset against the next Closing Payment.

c.      Period of Seller Delay. "Period of Seller Delay" means the period Purchaser is delayed, solely by reason of a Seller Caused Delay, in the commencement, continuation or completion of Purchaser's Work or obtaining any building permits and/or certificates of occupancy, excluding the 30-day cure period if Seller cures or corrects the applicable Seller's Work failure within such period, but including the 30-day cure period in the event Seller fails to cure or correct the applicable Seller's Work failure within such period, and continuing until the Seller's Work causing the delay in Purchaser's Work or obtaining building permits and/or certificates of occupancy is Substantially Completed by Seller or, if Purchaser has exercised its Self-Help Remedy, Purchaser, excluding, however, in such latter event, any delays reasonably attributed solely to Purchaser's untimely commencement or performance of the applicable Seller's Work (allowing for reasonable delays in the commencement of such work due to the taking over of such work by Purchaser), it being the intent of this provision that Purchaser's right to Liquidated Delay Damages be limited to periods during which Seller Caused Delays actually adversely impacts Purchaser's development of a Project.

9.8      Purchaser's Obligations. Following the acceptance of any Seller's Work, as described in Section 9.5 above, Purchaser and the SPE grantee of such parcel shall be responsible for maintaining the affected property or improvements in good condition and shall be responsible for any damage caused to any Seller's Work that has been accepted as provided in Section 9.5. Furthermore, and without limiting any other provision of this Agreement, Purchaser and each grantee of any portion of the Property hereunder shall be responsible, from and after the Seller has delivered possession of any Lots within a Development Parcel, to maintain the required moisture content of all Lots within a Development Parcel in which Seller has conveyed any Lots hereunder, whether or not all the Lots in the Development Parcel have been conveyed and whether any SPE has exercised its option to acquire such Lots.

9.9      Reservation of Rights by Seller. Seller makes no representation that Tuscany will be developed or completed as set forth on any map or plan or exhibit illustrating all or any part of Tuscany (including Exhibit B) and Seller reserves the right to make any changes on or to Tuscany, including (i) the reconfiguration of parcels, (ii) the elimination or removal of open space or other recreational areas or common facilities and/or (iii) the elimination or change to any proposed improvements within Tuscany. The preceding sentence is not intended to affect, and shall not be construed as affecting, Seller's express obligations to Purchaser or any SPE

under any other provision of this Agreement, including (i) Seller's obligations to cause the Project Final Maps and Improvement Plans to be prepared, approved and Recorded in accordance with this Agreement, (ii) Seller's obligations to Substantially Complete Seller's Work and (iii) Seller's obligation to convey title to a Parcel in the manner provided for herein. Purchaser acknowledges that Seller makes no representation, warranty or agreement whatsoever concerning the Golf Course and the improvements thereon. Notwithstanding the foregoing, Seller agrees not to (i) materially change the means of access to any Parcel or (ii) cause any residentially zoned parcel adjoining any Parcel that is owned by Seller to be zoned for any commercial use.

9.10    Cooperation; Consents.  The parties shall reasonably cooperate with each other (at no out-of-pocket cost to the party who must cooperate with the performing party, except as expressly provided herein) in obtaining the various governmental approvals applicable to the Projects or Tuscany.  Purchaser agrees not to unreasonably withhold, condition or delay its consent to any matter in this Article 9 requiring Purchaser's consent or approval, and any Purchaser or SPE objection to a matter requiring Purchaser's or an SPE's consent or approval shall specify with particularity the basis for such objection.  Purchaser's or a SPE's failure to respond within ten (10) days to Seller's written request (unless a shorter time is specified herein) for Purchaser's or such SPE's required consent or approval under this Article shall be deemed to be a consent or approval by Purchaser or such SPE to the requested matter.

9.11    Improvement Bonds.  Purchaser and the SPE grantee of a Parcel shall use commercially reasonable efforts to assist Seller in obtaining the release of any bonds placed by Seller with respect to improvements that Seller has completed.  Purchaser and the SPE grantee of a Parcel shall be responsible for placing and maintaining all surety bonds or other security required in connection with the Improvement Plans or otherwise required in connection with each Project.  If, prior to the Close of Escrow on a Parcel, Seller is required by the City, any utility or other governmental or quasi-governmental agency to post any bonds or other security in connection with any work to be performed by Purchaser or an SPE or which is not the obligation of Seller hereunder, Purchaser or such SPE shall, within thirty (30) days after such Close of Escrow, cause any such bonds or other security applicable to the Parcel being conveyed to be replaced with substitute bonds or security provided by Purchaser or such SPE.  If the City, utility or other governmental or quasi-governmental authority does not permit such replacement or substitution, Purchaser and such SPE shall pay the applicable costs incurred by Seller in connection with the continued maintenance of such bonds or other security, including, without limitation, the applicable portion of any bond premiums, letter of credit fees or interest on cash deposits (at the Agreed Rate) and Purchaser and such SPE shall indemnify, protect, defend and hold Seller harmless with respect to any claims or liability (including Seller's reasonable attorneys' fees) arising from any claims against any such bonds or other security which Purchaser or such SPE is obligated to provide under this paragraph.

9.12    Plans and Specifications.    Seller shall assign to the grantee of such Lots or Parcel at the Close of Escrow all warranties applicable to any Seller Work or other improvements constructed by Seller which is included in any portion of the Property conveyed by Seller hereunder.  In addition, Seller shall cause the architects and engineers who have prepared the Improvement Plans or any other improvements constructed by Seller applicable to any conveyed Parcel or any other improvements which Purchaser is obligated to maintain hereunder to deliver to Purchaser or the applicable SPE as of each Close of Escrow, the plans and

specifications necessary to operate and maintain such Seller's Work or other improvements, together with reasonable certifications and proprietary rights appropriate for Purchaser or such SPE to rely upon with respect to those improvements, with respect to which Seller has caused plans and specifications to be prepared, and which, under the terms of this Agreement or any Development Declaration, are Purchaser's or such grantee's obligation to construct.

10.    Construction, Maintenance of Common Areas and Perimeter Walls.

10.1    Neighborhood and Community Facilities.  Project improvements include both (i) improvements, such as private streets, parks, street lamps, common utilities, entrance areas, etc. to be used or held, together with the real property on which such improvements are located (whether in fee or otherwise), for the common benefit of all or some of the homeowners within that Project or Tuscany (referred to as "common elements" in NRS Chapter 116); and (ii) improvements, such as the Residence and other improvements within a Lot, individually owned by a homeowner (referred to as the "unit" in NRS Chapter 116).  Common elements owned or held by the Master Association for the benefit of all members of the Master Association are referred to in this Agreement as "Community Facilities".  Common elements owned or held (A) by the Master Association as "limited common elements" (as defined in NRS Chapter 116) for the benefit of some or all of the owners within a Project and/or (B) by a sub-association whose only members are owners within a Project (a "Sub-Association") are referred to herein as "Neighborhood Facilities".  Community Facilities and Neighborhood Facilities within a Parcel are collectively referred to as "Project Common Areas."  Purchaser and the applicable SPE shall be responsible for constructing, at its sole cost, any Neighborhood Facilities within or benefiting a Parcel and shall be responsible for constructing those Community Facilities listed on Schedule 10.1.

10.2    Purchaser as Declarant.  The Master Declaration shall describe Purchaser as the Declarant thereunder, and Purchaser hereby covenants and agrees to assume all of the Declarant's obligations with respect to Tuscany, and protect, defend, indemnify and hold Seller harmless from any and all losses, damages, liabilities, actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses including reasonable attorneys' fees, arising from any fault, act or omission of the declarant under the Master Declaration.  Without limiting the foregoing, Purchaser shall be responsible for preparation of all necessary public offering statements (NRS 116.4103) applicable to the Master Association and Purchaser covenants and agrees to prepare a public offering statement for each of the Projects in accordance with the provisions of NRS Chapter 116 and shall cause the Master Association to enter into the HOA Cable Agreement.  Seller covenants and agrees to cooperate with Purchaser's preparation of the public offering statement, and acknowledges that, as set forth in NRS 116.4102(3), Seller shall be responsible for any false or misleading statement therein or omission of any material fact with respect to that portion of the public offering statement prepared by Seller.  Notwithstanding the foregoing, Purchaser shall execute and deliver to Seller upon the Close of Escrow for the Phase I Lots, an assignment of the declarant's rights under the Master Declaration, substantially in the form attached hereto as Exhibit V (the "Master Declaration Assignment") pursuant to which Seller shall have the right, but not the obligation, to become the declarant under the Master Declaration (effective as of the date the assignment under the Master Declaration Assignment becomes unconditional and effective) in the event all of the Property is not acquired from Seller as contemplated hereunder or upon the occurrence of a Purchaser Default.

10.3    <u>Perimeter Walls and Fence Rails</u>.  Purchaser shall be responsible for constructing, at its sole cost, all walls, other than Project Perimeter Walls, required to be constructed along the exterior boundaries of a Parcel, including any necessary retaining walls and those indicated on the maps attached to <u>Exhibit P</u> as "Developer Walls", (collectively, the "<u>Parcel Perimeter Walls</u>").  Parcel Perimeter Walls and Project Perimeter Walls (collectively, "<u>Perimeter Walls</u>") will be owned by the lot owners on whose boundaries such walls are constructed. Following the completion thereof, Perimeter Walls other than any Perimeter Walls adjoining the Golf Course ("<u>Golf Course Walls</u>"), shall be maintained by the owner(s) on whose property the applicable wall is constructed, subject to any obligation of the Master Association to maintain the appearance of such walls, following acceptance of such responsibility, which, subject to completion of the Parcel Perimeter Walls in accordance with this Agreement, shall occur no later than the last Lot Closing within a Development Parcel.  Golf Course Walls shall be jointly maintained by the lot owner on whose lot the wall is located and the owner of the Golf Course, subject to the provisions of the Master Declaration.  Additionally, prior to the Closing for each Parcel, Seller shall install fence rail (the "<u>Fence Rail</u>") on those Lots indicated on <u>Exhibit P</u> as having a "Full Viewrail Wall".  At each Closing, Purchaser or the applicable SPE shall reimburse Seller for Seller's cost to provide and install the Fence Rail (the "<u>Fence Rail Cost</u>").

10.4    <u>Completion of Project Common Areas, Walls</u>.  Following each Close of Escrow, Purchaser or the applicable SPE agrees to promptly commence and thereafter diligently complete the Project Common Areas and Parcel Perimeter Walls required to be constructed by Purchaser under Sections 10.1 and 10.2, provided, however, that any entry monumentation which is part of the Project Common Areas within a Development Parcel shall be completed within six (6) months after the first Closing Date on which Lots within that Development Parcel are conveyed hereunder.  Such improvements shall be constructed substantially in accordance with: (i) the previously approved Improvement Plans and Conditions of Approval and all other City requirements, (ii) the Design Guidelines, (iii) the Permitted Exceptions, (iv) the Development Declaration, and (v) the Neighborhood Facilities Deed; and Purchaser or such SPE shall cause such improvements to be approved and/or accepted by the City, Seller, the Master Association and/or any applicable Sub-Association, as required by this Agreement, upon their respective completion.

10.5    <u>Maintenance and Repair of Completed Improvements</u>.  In addition to Purchaser's and the SPE's obligations under Section 9.7, upon each Close of Escrow Purchaser and the applicable SPE shall assume all responsibility for the maintenance, at Purchaser's and such SPE's sole cost and expense, of any and all Completed Project Common Areas, Completed Perimeter Walls and any other improvements (whether or not constructed by Purchaser) located within a conveyed Parcel, pending the dedication, conveyance or acceptance to (or by) the Master Association, Sub-Association, the City or other owner thereof.  In addition, Purchaser and such SPE shall be obligated to repair any damage to such improvements as well as any other Tuscany improvements, whether or not located within the Parcel, caused by the negligence of Purchaser or any SPE or any of its respective employees, agents or contractors.

10.6    <u>Conveyance of Common Areas</u>.  The Completed Project Common Areas shall be conveyed by Seller or, if applicable, Purchaser or an SPE (either in fee or by easement) lien-free to the Master Association, the Sub-Association or any other applicable entity upon Substantial Completion of such improvements and, if applicable, acceptance of such Project

Common Areas by such entity. Seller and/or Purchaser or such SPE shall cause any Project Common Areas constructed by Purchaser, an SPE or Seller that are to be owned by the Master Association to be accepted by the Master Association in accordance with this Section. When Seller, on the one hand, or an SPE or Purchaser, on the other, has Substantially Completed those Project Common Areas and Perimeter Walls to be constructed by it, it shall notify the other party in writing (as used in this section, the "Completion Notice"). Within five (5) business days after the non-constructing party's receipt of a Completion Notice, Purchaser and Seller shall conduct a joint inspection of such Project Common Areas and/or Perimeter Walls and the applicable Project Common Areas or Perimeter Walls shall be deemed to be "Completed Project Common Areas" or "Completed Perimeter Walls" notwithstanding any outstanding punchlist items. If the inspection reveals deficiencies, then (i) the parties shall immediately prepare a written punchlist, and (ii) the party responsible for the construction of such work or improvements shall commence the completion of punchlist items within ten (10) business days and shall proceed to complete or correct such punchlist work within 90 days thereafter. The applicable Completed Project Common Areas shall thereafter be conveyed to the Master Association, Sub-Association or other applicable entity upon completion of the work identified on the punchlist. No inspection by Purchaser, an SPE or Seller of any Project Common Areas or Perimeter Walls constructed by the other is intended to waive any right or remedy based on any latent defect. Following the conveyance of such Completed Project Common Areas, they shall be maintained by such entity. Completion and maintenance of common elements by Purchaser and Seller is further addressed in the Development Declaration, the Neighborhood Facilities Deed and the Master Declaration. Purchaser or Seller, whichever shall be in control of the Master Association, shall cause the Master Association to accept the conveyance of (i) any Community Facilities constructed by Purchaser, an SPE or Seller in accordance with this Agreement and (ii) corner lot setbacks, pedestrian walkways, landscape strips and similar common elements, whether as Community Facilities or Neighborhood Facilities, if designed and constructed in accordance with the reasonable requirements of the Master Association.

11.    The Projects.

11.1    Design Guidelines. Seller's overall concept and design for Tuscany is defined in the design criteria, development standards and improvement standards established by Seller as amended to date and approved by the City (collectively, the "Design Guidelines"), which are included in the Due Diligence Materials. By its execution of this Agreement, Purchaser hereby acknowledges receipt of the Design Guidelines. Purchaser or, if applicable, an SPE shall construct each of the Projects in conformance with the terms and conditions of: (i) this Agreement, the Development Declaration and the other schedules and exhibits referred to herein; (ii) plans and specifications for development of such Project (the "Project Plan") to be prepared by Purchaser or such SPE and approved by Seller in accordance with the Development Declaration; and (iii) the Design Guidelines; provided, Purchaser or an SPE shall not be responsible for conformity with any changes in the Design Guidelines which are made subsequent to the execution of this Agreement, if such changes (A) directly result in an increase in the cost of Purchaser's or such SPE's development of the Property, and such cost in the aggregate exceeds $25,000.00 or (B) materially and adversely affects Purchaser's or such SPE's development of a Parcel in accordance with the Project Plan, unless such changes are required by the City (and are not related to any other change initiated by Seller), in which event Purchaser or

such SPE shall be responsible, at its cost, for conformity with such changes. Seller represents and warrants that it shall not request any changes by the City without the consent of Purchaser. Seller shall reasonably cooperate with Purchaser (at no out-of-pocket cost to Seller) should Purchaser seek to obtain reasonable changes in the Design Guidelines.

11.2    Project Plan Work.  The construction work required by a Project Plan is referred to as the "Project Plan Work". The type and number of Residences that Purchaser will construct on each Parcel shall be limited to the type and number generally described on Exhibits A-1 through A-16 or, with respect to the Multi-Family Development Parcel, as reasonably approved by Seller, and to be described more fully in each Project Plan. Seller's approval of a Project Plan shall not be unreasonably withheld or delayed and, provided Purchaser has complied with the Pre-Submittal Meeting requirements described in the Development Declaration (as defined therein), Seller's approval shall be deemed made if not disapproved in writing specifying the reasons for such disapproval within ten (10) business days of submittal of all information and materials required by the Development Declaration. Notwithstanding that the Project Plan approval process is set forth in the Development Declaration, to be executed and Recorded at a Close of Escrow, Seller agrees that any Plans (as defined in the Development Declaration) submitted to Seller prior to a Close of Escrow shall be subject to the approval process described in the Development Declaration notwithstanding that the Development Declaration has not been executed and Recorded.

11.3    Construction of Projects.   Upon commencement of each discrete item of the Project Plan Work, Purchaser or, if applicable, the SPE shall cause such item of the Project Plan Work to be diligently and continuously prosecuted to its completion, subject however, to the effect of Force Majeure Delays.

11.4    Fees.  Unless otherwise listed on Schedule 11.4 as a fee to be paid by Seller or required to be paid as a part of Seller's Work, Purchaser and, with respect to the Parcel acquired by it, each SPE shall be responsible for and shall pay (or if Seller is required to advance the same as a condition to the performance of any Seller's Work, reimburse Seller for) all fees and costs applicable to development and construction of the Projects, including, (i) fees and costs applicable to the Recordation of each Project Final Map (including, without limitation, the Map Costs and the City's Water Meter Fee) and (ii) all fees and costs normally required upon the "pulling" of a building permit to construct Residences on the Lots, which fees may include, without limitation, sewer development service charges and all other connection fees, water reservation and contract fees, water development service charges and all connection fees, water meter fees, transportation fees, any applicable wash or bridge fees, building permit fees, traffic fees, Nevada Power Company fees, Sprint fees, any in-lieu fees, and VA/FHA and related inspection fees. Any such fees and expenses advanced by Seller which are outstanding as of a Close of Escrow, as evidenced by copies of written receipts delivered to Purchaser and Escrow Holder no later than ten (10) business days prior to a Close of Escrow, shall be paid at such Close of Escrow; any such fees and expenses advanced by Seller not paid at a Close of Escrow shall be paid within 30 days after written demand. Purchaser and the applicable SPE shall be responsible for any and all other fees hereafter required by any governmental agency related to subdivision lot construction and development which are not expressly required by this Agreement to be paid by Seller in connection with Seller's performance of any Seller's Work. Fees payable by Purchaser or an SPE pursuant to this provision shall, if advanced by Seller, and not paid when

due in accordance with this section shall bear interest at the Agreed Rate from date due, and, if not paid within 30 days thereafter shall bear interest at the Default Rate. This paragraph shall survive each Close of Escrow and the termination of this Agreement.

11.5    Utility Deposits. Purchaser and each SPE shall be responsible to timely establish or place all deposits with utility companies in connection with the construction of the Residences and improvements in accordance with this Agreement.

11.6    Easements and Rights of Way; Rights of Entry. Purchaser (for itself and each SPE) and Seller each agrees that if either of them shall require necessary easements or rights-of-way for public or common element improvements, utilities, sewer, drainage, slopes or other necessary purposes over property owned by the other in order to develop any Parcel (in the case of Purchaser or an SPE) or Tuscany (in the case of Seller) in accordance with any final subdivision map or in order to construct any work of improvement required under the terms of this Agreement or by the City, then, from and after the Phase I Lots Closing Date, each agrees to grant such easements or rights-of-way to the other, upon written reasonable request therefor and if available, through established easement areas or dedicated rights-of-way and provided that such easement or right of way can be granted in a manner that does not materially and adversely affect Purchaser's or an SPE's development of any Parcel or Seller's development of any other portion of Tuscany. Purchaser (for itself and each SPE) and Seller (and their respective employees, contractors and other agents) shall also be entitled to such rights of entry on the property of the other for temporary construction or such other purposes as may be reasonably necessary or desirable in connection with the construction of any work of improvement required under the terms of this Agreement. The provisions of this paragraph shall be self operative, but shall, upon the reasonable request of either party from time to time, be confirmed in writing. Purchaser (and, if applicable, each SPE) and Seller shall each be responsible for the costs of any necessary restoration in connection with the exercise of its rights under this Section. In addition, the easements, rights-of-way and rights of entry provided for in this Section shall be located and utilized so as to minimize the impact on Purchaser's (and an SPE's) and Seller's uses and development of its respective property. Each of the parties hereto hereby shall indemnify the other and hold the other and its property free of, clear and harmless from and against any and all claims, liens, losses, liabilities, damages and expenses (including reasonable attorneys' fees and court costs) arising from, in connection with or as a result of such party's (its employees and agents) entry upon the other's property after a Close of Escrow pursuant to this paragraph to perform hereunder, whether such loss involves death, injury to person, damage to property or claims of any other nature. The provisions of this paragraph shall survive each Close of Escrow.

11.7    At Risk Development Work. Seller agrees not to unreasonably withhold or delay its consent to any reasonable request by Purchaser for a license to enter upon a Parcel prior to the Close of Escrow with respect thereto for the purpose of constructing certain improvements thereon in advance of the Closing Date for that Parcel (including the construction of homes or model homes), provided that such construction work may lawfully be undertaken and any work permitted is subject to a separate license agreement substantially in the form attached hereto as Exhibit Q (a "Construction License").

12.    Conditions Precedent.

12.1    <u>Purchaser's Conditions</u>.    Each of the following shall be a condition precedent, for the sole benefit of Purchaser or, if applicable, an SPE, to the obligation of Purchaser or such SPE to purchase each Parcel on the applicable Closing Date.

a.    <u>Default</u>.  No Seller Default shall exist as of the applicable Close of Escrow.

b.    <u>Project Final Map</u>.  The Project Final Map(s) applicable to the Lots in such Parcel shall have been Recorded.

c.    <u>Seller's Work</u>  The Seller's Work applicable to such Parcel shall be Substantially Complete.

d.    <u>Building Permits</u>  Purchaser's ability to pull building permits on any Lot within such Parcel shall not be impaired by any failure of Seller to complete any Seller Work.

e.    <u>Title Policy</u>.  Escrow Holder shall be prepared to issue to the grantee of the portion of the Property to be conveyed hereunder the required Owner's Title Policy or, if applicable, the ALTA Owner's Policy as of such Close of Escrow.

12.2    <u>Seller Condition</u>.  Each of the following shall be a condition precedent, for the sole benefit of Seller, to the obligation of Seller hereunder to sell each Parcel on the applicable Closing Date:

a.    <u>Closing Payment</u>.  Escrow Holder shall be prepared to deliver to Seller the required Closing Payment as of such Close of Escrow, less Seller's share of the applicable closing costs and prorations.

b.    <u>Default</u>.  No Purchaser Default shall exist as of the applicable Close of Escrow.

12.3    <u>Failure of Condition</u>.  Upon a failure of any condition precedent described in Sections 12.1, 12.2 or 12.4, the party entitled to the benefit of such condition may elect, by written notice given within fifteen (15) days of such failure of condition, to terminate its obligation to purchase or to sell, as applicable, the applicable Parcel, and, in such event, (i) this Agreement shall terminate with respect to such Parcel and any Unconveyed Property; (ii) Purchaser promptly shall return the Due Diligence Materials affecting any Unconveyed Property to Seller and deliver to Seller copies of all studies, surveys and other similar materials produced by or at the request of Purchaser with respect to the Unconveyed Property, other than Purchaser's confidential proforma, projections, proprietary information, internal accounting and financial information, which may be excluded from such delivery; (iii) Escrow Holder or Seller, as applicable, shall return any unapplied portion of the Deposits to Purchaser; and (iv) except as otherwise provided herein, neither party shall have any further right, duty or obligation under this Agreement except with respect to those provisions which, by their express terms, survive such a termination. In addition, if the failure of condition also constitutes a Purchaser Default or Seller Default, Seller or Purchaser, as applicable, shall also be entitled to exercise the remedies provided in Section 18.3 (Seller's remedies) or 18.5 (Purchaser's remedies).

12.4 <u>Option Conditions</u>. In addition to the conditions stated in Section 12.2, each of the following shall constitute a condition precedent, for the sole benefit of Seller, to Seller's obligation to sell an Option Parcel to an SPE each of which may be waived only by a written waiver executed by Seller and delivered to Escrow Holder:

a. <u>Purchase of Prior Parcel</u>. Purchaser and, to the extent applicable, each SPE shall have purchased the Phase I Lots and/or the prior Option Parcel, as applicable.

b. <u>Exercise of Option</u>. The applicable SPE shall have timely exercised the Option for the applicable Option Parcel, in accordance with Section 1.4, the representations and warranties of Purchaser and the SPE contained in the applicable Option Notice shall be true and correct in all material respects, and Seller shall have approved such Option Notice as provided in Section 1.4.

c. <u>Default</u>. No Purchaser Default shall exist as of the applicable Close of Escrow.

13. <u>Close of Escrow.</u>

13.1 <u>Closing</u>. Provided that all of the conditions precedent to the Close of Escrow on the applicable Parcel have been satisfied or waived (by the person entitled to the benefit of such condition), the consummation of the applicable purchase transaction shall occur at the office of Escrow Holder or at such other location to which the parties may reasonably agree. Each Close of Escrow shall take place on or before the required Scheduled Closing Date unless Seller and Purchaser and the applicable SPE otherwise agree in writing. If a Close of Escrow for any Parcel does not occur, other than by reason of a Seller Default, or a failure of any of the Purchaser's conditions under Section 12.1, on or before the required Scheduled Closing Date for that Parcel, Purchaser's and any and all SPEs' rights to purchase that Parcel, together with all of Purchaser's and any SPE's other rights under this Agreement, including all unexercised Options and the right to purchase any unpurchased portion of the Property, shall automatically terminate and be of no further force or effect. Escrow Holder, by closing the Escrow, shall be deemed to have irrevocably committed to cause the Title Insurer to issue the applicable Owner's Title Policy or, if applicable, the ALTA Owner's Policy.

13.2 <u>Escrow Cancellation.</u>

a. <u>Default</u>. If Escrow fails to close by reason of the default of Seller or Purchaser (which shall include the default of an SPE), the defaulting party shall pay Escrow Holder's normal and customary escrow cancellation charges (the "<u>Cancellation Charges</u>").

b. <u>Termination</u>. If Escrow fails to close for any reason other than the default of Seller or Purchaser, Seller and Purchaser shall be equally responsible for the payment of the Cancellation Charges.

13.3 <u>Return of Seller's Documents</u>. If Escrow or this Agreement is terminated for any reason other than a Seller Default, Purchaser shall, within five (5) business days following such termination, deliver to Seller all documents and materials relating to the Property previously delivered to Purchaser by Seller and copies of all reports, studies, documents and

materials obtained by Purchaser from third parties in connection with the Property in and Purchaser's Investigations to the extent the same relate to any Unconveyed Property. In such event, Escrow Holder shall deliver all undelivered documents and materials deposited by Seller and then in Escrow Holder's possession to Seller and shall destroy any undelivered documents executed by both Purchaser and Seller. Upon delivery by Escrow Holder to Seller (or such destruction, as applicable) of such documents and materials, Escrow Holder's obligations with regard to such documents and materials under this Agreement shall be deemed fulfilled and Escrow Holder shall have no further liability with regard to such documents and materials to either Seller or Purchaser.

13.4    <u>Return of Purchaser's Documents</u>. If Escrow or this Agreement is terminated for any reason other than a Purchaser Default, Escrow Holder shall deliver all undelivered documents and materials deposited by Purchaser and then in Escrow Holder's possession to Purchaser and shall destroy any undelivered documents executed by both Purchaser and Seller. Upon delivery by Escrow Holder to Purchaser (or such destruction, as applicable) of such documents and materials, Escrow Holder's obligations with regard to such documents and materials under this Agreement shall be deemed fulfilled and Escrow Holder shall have no further liability with regard to such documents and materials to either Seller or Purchaser.

13.5    <u>Items to be Delivered into Escrow</u>.

a.    <u>By Seller</u>. Unless an earlier time is otherwise specified, on or before one (1) business day prior to the date set for each Close of Escrow, and provided Purchaser and the applicable SPE shall have made all deposits into Escrow and complied with all other conditions required by this Agreement, Seller shall deposit in the Escrow the following documents:

i.    A grant, bargain and sale deed substantially in the form of <u>Exhibit R</u> (the "<u>Lot Deed</u>") conveying the Lots in the Parcel to the applicable SPE, and, if appropriate, a grant, bargain and sale deed substantially in the form of <u>Exhibit S</u>, with respect to any related, necessary or appurtenant Neighborhood Facilities (the "<u>Neighborhood Facilities Deed</u>" and, together with the Lot Deed, the "<u>Deeds</u>"), each duly executed and acknowledged by Seller and in Recordable form.

ii.    A non-foreign transferor declaration (the "<u>Non-foreign Transferor Declaration</u>"), substantially in the form of <u>Exhibit T</u> attached hereto, duly executed by Seller.

iii.    Executed counterparts of the Development Declaration or, if applicable, Development Declaration Amendment and a Notice of Annexation for the Parcel, each of which shall be acknowledged by Seller and in Recordable form.

iv.    Any additional funds and/or instruments, signed and properly acknowledged by Seller if appropriate, as may be necessary to comply with this Agreement.

v.       An executed settlement statement reflecting the prorations and adjustments required under Article 14.

vi.      With respect to the Phase I Lots closing only, an executed counterpart, duly acknowledged by Purchaser, of an amendment to the Memorandum of Agreement (the "Amendment to Memorandum"), substantially in the form of Exhibit U attached hereto and made a part hereof.

vii.     Any certifications and evidence of proprietary rights required by Section 9.2.

viii.    Evidence of the insurance coverage under the Environmental Hazards Policy, as required by Section 16.3(f).

b.       By Purchaser.  Unless an earlier time is otherwise specified, on or before one business day prior to the date set for each Close of Escrow, Purchaser shall deposit (or cause the SPE to deposit) in Escrow the following:

i.       Immediately available collected funds in the form of one or more cashier's check(s) drawn on a local Las Vegas bank or wire transfer to the account of Escrow Holder in an amount equal to the Phase I Closing Payment or Option Closing Payment (as applicable, the "Closing Payment").

ii.      With respect to the Phase I Lots Close of Escrow only, the Map Costs Note, the Map Costs Mortgage and the Master Declaration Assignment, each duly executed and, in the case of the Map Costs Mortgage and the Master Declaration Assignment, acknowledged, by the applicable SPE.

iii.     With respect to each Option Parcel, the applicable SPE Assumption.

iv.      Executed counterparts of the Development Declaration or, if applicable, Development Declaration Amendment, and the Notice of Annexation for the Parcel, each of which shall be acknowledged by the applicable SPE and in Recordable form.

v.       Any additional funds and/or instruments, signed and properly acknowledged by Purchaser and/or the applicable SPE, if appropriate, as may be necessary to comply with this Agreement.

vi.      An executed settlement statement reflecting the prorations and adjustments required under Article 14.

vii.     With respect to the Phase I Lots closing only, an executed counterpart, duly acknowledged by Seller and/or the applicable SPE, of the Amendment to Memorandum.

viii.    Any Notice of Seller's Failure, if appropriate under Section 15.9.

13.6    <u>Escrow Holder's Instructions</u>.  At such time as the conditions precedent to the applicable Close of Escrow have been satisfied or waived, Escrow Holder shall perform the acts set forth below in the following order:

a.    Date as of the date of such Close of Escrow, all instruments calling for a date.

b.    Prepare a Declaration of Value in such form as required by NRS 375.060 (the "<u>RPTT Declaration</u>").

c.    <u>Record</u> the following documents in the following order:

i.    The Notice of Annexation.

ii.    The Deeds.

iii.    The Development Declaration or, if applicable, the Development Declaration Amendment.

iv.    In the case of the Close of Escrow on the Phase I Lots only, the Amendment to Memorandum.

d.    Deliver to Seller by intrabank transfer or wire transfer of funds an amount equal to the applicable Closing Payment, less Seller's Closing Costs.

e.    Deliver to the grantee the Owner's Title Policy or, if applicable, the ALTA Owner's Policy and the Non-foreign Transferor Declaration.

f.    Prepare and submit to the Internal Revenue Service the information return and statement concerning the closing of the Escrow (the "<u>Information Return</u>") required by Section 6045(e) of the Internal Revenue Code of 1986, unless the Information Return is not required under the regulations promulgated under Section 6045(e).

g.    Make the prorations described in Article 14 on the basis of a 365 or 366 day year, as applicable, charge Seller with Seller's Closing Costs and charge Purchaser with Purchaser's Closing Costs.

h.    Compute and insert appropriate dates and amounts on documents delivered to Escrow Holder in escrow pursuant to this Agreement.

i.    Deliver to the parties conformed copies of all documents delivered into Escrow in connection with this Agreement and the Close of Escrow.

13.7    <u>Post-Closing Matters</u>.  The instruments that are required to be Recorded under this Agreement shall provide that the Recorder shall return them to Escrow Holder after Recordation, and upon receipt thereof, Escrow Holder shall deliver the following:

a.    <u>To Seller</u>:

i.    Originals of the Notice of Annexation and Development

Declaration or Development Declaration Amendment, as applicable, and, with respect to the Phase I Lots Closing Date, the Amendment to Memorandum.

    ii.    Copies, as Recorded, of the Deeds.

    iii.    Plain copies of the RPTT Declaration.

  b.    <u>To Purchaser/SPE</u>:

    i.    The original of the Deeds.

    ii.    Copies, as Recorded, of the Notice of Annexation and Development Declaration or Development Declaration Amendment, as applicable, and, with respect to the Phase I Lots Closing Date, the Amendment to Memorandum.

    iii.    Plain copies of the RPTT Declaration.

13.8    <u>Transfer of Possession</u>.  Subject to Section 11.7 and Section 17.1, possession of a Parcel shall be transferred to the grantee at the time of the Close of Escrow with respect to such Parcel, subject to the Permitted Exceptions.

14.    <u>Costs and Prorations</u>.

14.1    <u>Impositions</u>. Subject to Purchaser's obligation to pay for Impositions as part of the Option Consideration, as provided in Section 3.2, all Impositions applicable to the Parcel being conveyed, whether payable in installments or not, for the tax year in which the Close of Escrow occurs shall be prorated to the date of the Close of Escrow, based on the latest available tax rate and assessed valuation, to be re-prorated by Seller and Purchaser between themselves or by Escrow Holder at a subsequent Close of Escrow based on actual tax rates and valuations promptly following the time such actual amounts become known. The prorations shall be based on the most recent tax bill issued for the assessor's parcel or parcels of which the Parcel is a part. An allocation of the taxes between the Parcel and the balance of property covered by such tax bill shall be determined on an equitable basis in accordance with Escrow Holder's usual procedures. After a Close of Escrow, and until the Parcel is segregated from any other portions of Tuscany by the County Assessor as a separate assessor's parcel or parcels, if Seller receives property tax bills which include portions of the Parcel conveyed, or Purchaser receives property tax bills which include portions of Tuscany other than the Parcel conveyed, the parties shall timely pay their respective portions of those bills allocated by acreage as set forth above. If, before or after a Close of Escrow, any supplemental taxes are assessed against any Parcel, Escrow Holder or the parties (as appropriate) shall equitably prorate such supplemental taxes.

If real property taxes are apportioned at Close of Escrow based on the tax rate for the preceding period applied to the latest assessed valuation (or based on such other estimate as the parties may agree) and if following the Closing, actual or better estimates of tax rates and assessed valuation become available, the parties agree to reapportion such real property taxes based on such updated information. If, after receipt of such information, neither Seller nor Purchaser has received written request from the other within a reasonable time after such receipt, to reapportion such

real property taxes, then Purchaser and Seller shall each be deemed to have waived any right to seek such reapportionment

14.2    Association Assessments. Each Lot shall be annexed into the Master Declaration at the Close of Escrow. Assessments payable to the Master Association thereunder shall be assessed against each Lot in accordance with the provisions of the Master Declaration and Escrow Holder shall have no obligation to make any prorations with respect to such assessments. Nothing contained in this Section is intended to obligate Seller to fund any capital assessments payable by a purchaser from Seller.

14.3    Other Prorations. In the case of Impositions or any other customary prorations not specifically provided for in Section 14.1, Escrow Holder or, if applicable, the parties, shall prorate or pay their respective shares of the applicable Impositions in accordance with customary practice in Clark County, Nevada.

14.4    Costs to be Paid by Seller. Seller shall pay the following costs ("Seller's Closing Costs"):

a.    The premium for the Owner's Title Policy and the Required Endorsements.

b.    The real property transfer tax imposed on the Deed pursuant to NRS Chapter 375.

c.    Fees for Recording the Notice of Annexation.

d.    One-half (½) of the Escrow fee.

e.    Seller's share of the Impositions and prorations described in Sections 14.1, 14.2 and 14.3 as reasonably calculated by Escrow Holder.

14.5    Costs to be Paid by Purchaser. Purchaser or the applicable SPE shall pay the following costs ("Purchaser's Closing Costs"):

a.    If applicable, the Additional Title Policy Charges.

b.    Fees for Recording the Deeds, Development Declaration or Development Declaration Amendment and Amendment to Memorandum.

c.    One-half (½) of the Escrow fee.

d.    Purchaser's share of the Impositions and prorations described in Sections 14.1, 14.2 and 14.3 as reasonably calculated by Escrow Holder.

15.    Purchaser's Covenants, Representations and Warranties. As a material inducement to Seller to enter into this Agreement, Purchaser covenants, represents and warrants to Seller as of the date hereof and as of each Close of Escrow, as follows:

15.1    Organization; Qualification. Purchaser is a duly organized, validly existing corporation formed under the laws of the State of Nevada, in good standing thereunder,

and has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement. The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Purchaser is a party.

15.2    Licensed Contractor. Purchaser is a Nevada licensed contractor pursuant to NRS Chapter 624. Purchaser's Contractor License Number is 28530.

15.3    Agreement is Authorized and Binding. This Agreement has been, and all of the documents executed by Purchaser that are to be delivered to Seller at each Close of Escrow shall, as of such Close of Escrow, have been, duly authorized, executed and delivered by Purchaser and is or will, as applicable, be the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of and other principles relating to or limiting the right of contracting parties generally).

15.4    Litigation. There are no pending or, to Purchaser's actual knowledge, threatened claims, proceedings or lawsuits of any kind that would materially and adversely affect the ability of Purchaser to purchase the Phase I Lots or, after exercise of an Option, the applicable Option Parcel or to perform its obligations under this Agreement.

15.5    Conflicts.    The execution and delivery of this Agreement and the consummation of the transactions contemplated thereby will not, to Purchaser's actual knowledge, violate any provision of or require any consent, authorization, or approval under any law, administrative regulation, order, award, judgment, writ, injunction, or decree applicable to, or any governmental permit or license issued to, Purchaser.

15.6    Condition of Property. Purchaser agrees that (i) except as expressly set forth in this Agreement or any of the agreements or instruments executed and delivered by Seller and Purchaser at a Close of Escrow (collectively, the "Closing Documents"), each sale of a Parcel is concluded without warranties, representations or guarantees made by Seller; (ii) each Parcel is purchased by Purchaser on an "AS-IS" basis with all faults and conditions thereon (except as otherwise required in connection with Seller's Work); and (iii) Purchaser's decision to purchase each Parcel shall be based only on the Investigations as made by Purchaser and/or Purchaser's agents, employees, representatives and/or independent contractors in accordance with this Agreement and Seller's representations and agreements set forth in the Closing Documents. Except as otherwise specifically provided in the Closing Documents, it is expressly understood by Purchaser and Seller that all statements and representations made by Seller and Seller's agents and independent contractors (a) are intended by Purchaser and Seller to be made only as an accommodation to Purchaser and Purchaser's Investigations and not in lieu of Purchaser's Investigation, and (b) are not to be relied and acted on by Purchaser.

15.7    Purchaser Reliance. Purchaser is an experienced homebuilder and is knowledgeable about the ownership, development and management of real estate and the construction of Residences, and Purchaser has relied and will rely exclusively on its own consultants, advisors, counsel, employees, agents, principals and/or studies, investigations and/or

inspections with respect to the Property, its condition, value and potential. Purchaser agrees that, notwithstanding the fact that it has received certain information from Seller or its agents or consultants, Purchaser has relied solely upon and will continue to rely solely upon its own analysis and will not rely on any information provided by Seller or its agents or consultants, except as otherwise expressly set forth in Section 15.6.

15.8    Seller's Work. Purchaser understands and acknowledges that, except with respect to the Seller's Work (as to which Seller is responsible): (a) Purchaser is solely responsible for the performance of all work necessary to complete the Projects, (b) Seller will not be responsible for any work required to complete the Projects, and (c) Seller will not be responsible for cost overruns or unforeseen expenditures which may be incurred in order to complete the Projects. Purchaser by closing Escrow, shall be deemed to have accepted the Parcel to be conveyed at such closing in the condition called for by this Agreement, including, without limitation, the completion of all Seller's Work required to have been completed as of the applicable Closing Date, except as otherwise provided on a punchlist prepared in accordance with Section 9.5.

15.9    Alleged Breaches. If, as of the date which is five (5) days prior to any Scheduled Closing Date, Purchaser has actual knowledge that Seller is in material breach of its obligations with respect to any work or improvement within or affecting a Parcel (collectively, "Seller's Alleged Breach"), Purchaser may (but is not obligated to) proceed to the Close of Escrow without waiving its rights or remedies with respect to Seller's Alleged Breach if and only if Purchaser, no later than one (1) business day prior to the applicable Scheduled Closing Date delivers to Seller a written notice describing with particularity Seller's Alleged Breach as well as any corrective action Purchaser requires to remedy Seller's Alleged Breach (a "Notice of Seller's Failure"). If Purchaser fails to give a Notice of Seller's Failure with respect to any Seller's Alleged Breach of which Purchaser has actual knowledge at the appropriate time (collectively, the "Apparent Breaches"), Purchaser shall be deemed to have waived any right to assert any Apparent Breach as a Seller Default. If Purchaser shall have provided its written Notice of Seller's Failure to Seller in accordance with this provision, Purchaser may (but is not obligated to) elect to proceed to a Close of Escrow without waiving any applicable Seller Default arising from the Seller's Alleged Breach described in the Notice of Seller's Failure. As used in this Agreement, the phrase "Purchaser's actual knowledge" or words of like import shall mean the actual knowledge of Jim Rhodes and/or Dean Walker. There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation.

15.10    Threatened Claims. Purchaser shall promptly notify Seller of any asserted or threatened claim of which Purchaser has actual knowledge that directly or indirectly materially and adversely affects Seller, this Agreement, Tuscany or the unpurchased portions of the Property.

15.11    Cooperating Brokers. Purchaser agrees to pay a commercially reasonable commission (as reasonably determined by Purchaser, but not to exceed three percent (3%)) to any cooperating broker who represents a Homebuyer if the Residence is sold during the term of such cooperating broker's agency relationship with the Homebuyer; provided, however, that such cooperating broker negotiated on behalf of the Homebuyer or showed the Residence to the

Homebuyer on the first occasion the Homebuyer viewed the Residence or model. The foregoing provision is not intended and shall not be construed as conferring any benefit on any third party or establishing the amount of any commission, and neither Seller nor Purchaser shall have any obligation whatsoever to any cooperating broker pursuant to this Agreement.

15.12  <u>Single Purpose Entity</u>.  Each Option shall be exercised by a separate SPE who shall be the person acquiring title to the applicable Option Parcel. Notwithstanding any other provision of the SPE's articles of incorporation, bylaws, partnership agreement, articles of organization, operating agreement and/or other documents governing the formation and organization of the SPE (collectively, the "<u>Organizational Documents</u>") or any provision of law that otherwise empowers the SPE and as a condition to the exercise of an Option by an SPE, the SPE's Organizational Documents shall provide that the SPE shall not, without the written consent of Seller, which Seller may grant or withhold in its sole discretion, do any of the following prior to the Close of Escrow for the Parcel it acquires:

(i)  engage in any business or activity other than the ownership of the particular Option it exercises, the acquisition of the portion of the Property acquired from Seller hereunder and the sale or conveyance of such property to homebuilders;

(ii)  incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than Approved Construction Loans, except unsecured trade and operational debt incurred with trade creditors in the ordinary course of its business of owning and operating the applicable Option Parcel in such amounts as are normal and reasonable under the circumstances, provided that such debt is not evidenced by a note and is paid when due;

(iii)  seek the dissolution or winding up, in whole or in part, of the SPE;

(iv)  cause the SPE to merge into or consolidate with any person or entity or dissolve, terminate or liquidate, in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; or

(v)  file a voluntary petition or otherwise initiate proceedings to have the SPE adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against Purchaser or the SPE, or file a petition seeking or consenting to reorganization or relief of Purchaser or the SPE as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to Purchaser or the SPE; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of Purchaser or the SPE or of all or any substantial part of the properties and assets of Purchaser or the SPE, or make any general assignment for the benefit of creditors of Purchaser or the SPE, or admit in writing the inability of the SPE to pay its debts generally as they become due or declare or effect a moratorium on SPE debt or take any action in furtherance of any such action.

15.13  <u>Separateness Matters</u>.  Each SPE has not and shall not, at any time prior to the Close of Escrow for the Parcel it acquires:

(a)    acquire or own any material asset other than (i) the Option which it intends to exercise and the portion of the Property acquired from Seller pursuant to such Option, and (ii) such incidental personal property as may be necessary for the ownership, operation and maintenance of such property;

(b)    fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Seller, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(c)    own any subsidiary or make any investment in or acquire the obligations or securities of any other person or entity without the consent of Seller;

(d)    commingle its assets with the assets of any shareholder, principal or affiliate of Purchaser, or of any other person or entity or transfer any assets to any such person or entity other than distributions on account of equity interests in Purchaser which do not render the SPE "insolvent" under any definition of such term;

(e)    allow any person or entity to pay its debts and liabilities (except for a person obligated under any indemnity given or permitted hereunder) or fail to pay its debts and liabilities solely from its own assets;

(f)    fail to maintain its records, books of account and bank accounts separate and apart from those of the shareholders, members, managers or partners, principals and affiliates of Purchaser (including any other SPE), the affiliates of the shareholders, members, managers or partners of Purchaser and any other person or entity or fail to prepare and maintain its own financial statements in accordance with generally accepted accounting principles and susceptible to audit, or if such financial statements are consolidated fail to cause such financial statements to contain footnotes disclosing that the applicable Option and any portion of the Property acquired hereunder is actually owned by such SPE;

(g)    enter into any contract or agreement with any shareholder, member, manager, partner, principal or affiliate of Purchaser or any partner, member, shareholder, principal or affiliate thereof (including any other SPE), except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than any shareholder, member, manager, partner, principal or affiliate of Purchaser, as the case may be, any guarantor or any partner, member, shareholder, principal or affiliate thereof;

(h)    fail to correct any known misunderstandings regarding the separate identity of the SPE;

(i)    hold itself out to be responsible or pledge its assets or credit worthiness for the debts of another person or entity or allow any person or entity to hold itself out to be responsible or pledge its assets or credit worthiness for the debts of Purchaser or any other SPE (except for a person obligated under any indemnity given or permitted hereunder);

(j)    make any loans or advances to any third party, including any shareholder, member, manager, partner, principal or affiliate of Purchaser (or any other SPE), or any shareholder, partner, member, principal or affiliate thereof;

(k)    fail to file its own tax returns or to use separate contracts, purchase orders, stationary, invoices and checks;

(l)    fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that SPE is responsible for the debts of any third party (including any shareholder, member, manager, partner, principal or affiliate of Purchaser or any other SPE or any shareholder, partner, member, principal or affiliate thereof);

(m)    fail to allocate fairly and reasonably among SPE and any third party (including Purchaser ands any other SPE) any overhead for common employees, shared office space or other overhead and administrative expenses;

(n)    allow any person or entity to pay the salaries of its own employees or fail to maintain a sufficient number of employees for its contemplated business operations;

(o)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(p)    share any common logo with or hold itself out as or be considered as a department or division of (i) any shareholder, member, manager, partner, principal, or affiliate of Purchaser (or any other SPE), (ii) any affiliate of a shareholder, member, manager or partner of Purchaser (or any other SPE), or (iii) any other person or entity or allow any person or entity to identify the SPE as a department or division of that person or entity; or

(q)    conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of the SPE or the creditors of any other person or entity.

15.14    <u>Homebuyer Notice</u>.  Purchaser acknowledges that Tuscany includes or is in close proximity to the Other Uses, which are more particularly described in the Homebuyer's Disclosure Notice referred to in the Development Declaration (the "<u>HDN</u>"), which Seller reserves the right to modify (and Purchaser agrees to modify) from time to time if required by the City. Purchaser represents, acknowledges and agrees that it is entering into this Agreement with knowledge of the existence of the Other Uses and that its Investigations will include the possible effect of the Other Uses on the Projects.  Purchaser agrees to disclose the existence of the Other Uses to Homebuyers as required by the City and to deliver to each Homebuyer the HDN to be prepared by Seller; agrees for itself and its successors and assigns, including Homebuyers and their respective successors and assigns, and including mortgagees and beneficiaries under deeds of trust affecting the Property or any portion thereof, that the existence of such Other Uses shall never be the basis for the assertion of any claim against Seller by Purchaser; and covenants and agrees never to institute, maintain or support any legal proceeding or action of any kind against

Seller on account of the Other Uses. Purchaser further agrees to protect, defend, indemnify and hold Seller harmless from any liability from claims asserted against Seller by any purchaser from Purchaser based upon or arising out of the failure of Purchaser to disclose the existence of the Other Uses. Purchaser acknowledges the HDN is not intended as a substitute for any statutory notice required to be given by Purchaser to Homebuyers, including any notice under NRS 113.070.

15.15    Golf Course. Purchaser acknowledges: (i) that the Golf Course is not owned by the Master Association and is not a Community Facility; (ii) that property ownership in Tuscany **does not** entitle Purchaser or any Homebuyer or other Lot owner to access to, or the use of, any of the Golf Course facilities nor does such property ownership entitle Purchaser or any Homebuyer or other Lot owner to join any golf or country club operating the Golf Course; and (iii) that nothing in this Agreement, any Closing Document or any other instrument or agreement entered into or delivered in accordance with this Agreement or as of the Close of Escrow is intended to create any right, title or interest in or to the Golf Course or any Golf Course facilities. Purchaser covenants and agrees to disclose the foregoing state of affairs to Homebuyers from Purchaser, and further covenants and agrees: (i) that the status of the Golf Course shall never be the basis for the assertion of any liability for claims against Seller by Purchaser; and (ii) to protect, defend, indemnify and hold Seller harmless from any claims asserted against Seller by any purchaser or other transferee from Purchaser based upon or arising out of the failure of Purchaser to disclose the status of the Golf Course.

15.16    Acknowledgment.    By initialing this paragraph Purchaser specifically consents and agrees to the agreements and understandings contained in Sections 15.15 and 15.16.

Purchaser: _____
initials

16.    Seller's Covenants, Representations and Warranties. The matters set forth in Sections 16.1 constitute representations and warranties by Seller which are now and (subject to matters contained in any notice given pursuant to the next succeeding sentence) shall, in all material respects, at each Close of Escrow be true and correct. If Seller has actual knowledge that any of the representations and warranties contained in Sections 16.1(d), (e) or (i) or Section 16.2 may cease to be true, Seller shall give prompt notice to Purchaser (which notice shall include copies of the instrument, correspondence, or document, if any, upon which Seller's notice is based). As used in this Agreement, the phrase "Seller's actual knowledge" or words of like import shall mean the actual knowledge of Barry Fieldman or Bob Unger. There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation. To the extent Purchaser has or acquires actual knowledge prior to the Effective Date that these representations and warranties are inaccurate, untrue or incorrect in any way, such representations and warranties shall be deemed modified to reflect Purchaser's actual knowledge.

16.1    General Representations. As a material inducement to Purchaser to enter into this Agreement, Seller covenants, represents and warrants to Purchaser as follows:

05/08/1994  21:14    7024565210                    MAKENA                          PAGE  03

Seller on account of the Other Uses.  Purchaser further agrees to protect, defend, indemnify and hold Seller harmless from any liability from claims asserted against Seller by any purchaser from Purchaser based upon or arising out of the failure of Purchaser to disclose the existence of the Other Uses.  Purchaser acknowledges the HDN is not intended as a substitute for any statutory notice required to be given by Purchaser to Homebuyers, including any notice under NRS 113.070.

      15.15  <u>Golf Course</u>.  Purchaser acknowledges: (i) that the Golf Course is not owned by the Master Association and is not a Community Facility; (ii) that property ownership in Tuscany **does not** entitle Purchaser or any Homebuyer or other Lot owner to access to, or the use of, any of the Golf Course facilities nor does such property ownership entitle Purchaser or any Homebuyer or other Lot owner to join any golf or country club operating the Golf Course; and (iii) that nothing in this Agreement, any Closing Document or any other instrument or agreement entered into or delivered in accordance with this Agreement or as of the Close of Escrow is intended to create any right, title or interest in or to the Golf Course or any Golf Course facilities.  Purchaser covenants and agrees to disclose the foregoing state of affairs to Homebuyers from Purchaser, and further covenants and agrees: (i) that the status of the Golf Course shall never be the basis for the assertion of any liability for claims against Seller by Purchaser; and (ii) to protect, defend, indemnify and hold Seller harmless from any claims asserted against Seller by any purchaser or other transferee from Purchaser based upon or arising out of the failure of Purchaser to disclose the status of the Golf Course.

      15.16  <u>Acknowledgment</u>.  By initialing this paragraph Purchaser specifically consents and agrees to the agreements and understandings contained in Sections 15.15 and 15.16.

Purchaser: _____<br>initials



    16.    <u>Seller's Covenants, Representations and Warranties</u>.  The matters set forth in Sections 16.1 constitute representations and warranties by Seller which are now and (subject to matters contained in any notice given pursuant to the next succeeding sentence) shall, in all material respects, at each Close of Escrow be true and correct.  If Seller has actual knowledge that any of the representations and warranties contained in Sections 16.1(d), (e) or (i) or Section 16.2 may cease to be true, Seller shall give prompt notice to Purchaser (which notice shall include copies of the instrument, correspondence, or document, if any, upon which Seller's notice is based).  As used in this Agreement, the phrase "<u>Seller's actual knowledge</u>" or words of like import shall mean the actual knowledge of Barry Fieldman or Bob Unger.  There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation.  To the extent Purchaser has or acquires actual knowledge prior to the Effective Date that these representations and warranties are inaccurate, untrue or incorrect in any way, such representations and warranties shall be deemed modified to reflect Purchaser's actual knowledge.

      16.1   <u>General Representations</u>.  As a material inducement to Purchaser to enter into this Agreement, Seller covenants, represents and warrants to Purchaser as follows:

a.     Authority.  Seller is a duly formed, validly existing limited liability company organized under the laws of the State of Nevada and has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement.  The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Seller is a party.

b.     No Other Agreements.  Except in connection with the Seller's Work, Seller's Financing, the Permitted Exceptions and the matters disclosed in the Preliminary Title Report, Seller has not entered into any lease or other agreement for possession with any person or entity (except Purchaser) pursuant to which such person or entity has any current or future right or interest to occupy, possess, or use all or any portion of the Property.

c.     Agreement is Authorized and Binding.  This Agreement has been, and all of the documents executed by Seller that are to be delivered to Purchaser at each Close of Escrow shall, as of such Close of Escrow, have been, duly authorized, executed and delivered by Seller and is or will be, as applicable, legal, the valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of and other principles relating to or limiting the right of contracting parties generally).

d.     Condemnation.  To Seller's actual knowledge, Seller has received no notice of any pending or contemplated condemnation or other similar proceedings affecting the Property or any part thereof.

e.     Litigation.  To Seller's actual knowledge, there are no pending or threatened claims, proceedings or lawsuits of any kind, whether for taxes or otherwise, concerning the Property or that would materially and adversely affect Purchaser's ability to construct any of the Projects or prohibit the sale of any Parcel to Purchaser.

f.     Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated thereby will not, to Seller's actual knowledge, violate any provision of or require any consent, authorization, or approval under any law, administrative regulation, order, award, judgment, writ, injunction or decree applicable to, or any governmental permit or license issued to, Seller relating to any Parcel.

g.     Title.  Seller has and will convey to Purchaser or the applicable SPE good and marketable fee simple title to each Parcel subject only to the Permitted Exceptions.

h.     Labor.  No labor has been performed or material furnished for any Parcel at the request of Seller or with the consent of Seller or for which a statutory lien may be claimed under NRS 108.221 et seq., for which Seller has not heretofore fully paid or will pay prior to Closing, or for which a mechanic's or materialmen's liens, or any other lien, can be claimed by any person.

i.      Material Defect. To Seller's actual knowledge, the Due Diligence Materials have not been amended in any material respect and, together with the plans, maps and other materials referred to in this Agreement, include all material information in Seller's possession or control relating to the Property and there is no material defect in the Property which would have a material adverse effect upon Purchaser's construction, development, ownership or use of a Parcel, except as may be disclosed elsewhere in this Agreement or in the Due Diligence Materials. To Seller's actual knowledge, except as may be disclosed elsewhere in this Agreement or in the Due Diligence Materials, there is no other material defect in the Property, which would have a material adverse effect upon Purchaser's construction, development, ownership or use of a Parcel.

16.2    Environmental Representations.

a.      Hazardous Materials. To Seller's actual knowledge, except as disclosed in any of the Due Diligence Materials, (i) no portion of the Property is being used or has been used for the disposal, storage, treatment, processing or other handling of Hazardous Materials, and (ii) no condition on the Property is in material violation of applicable federal, state, county or other municipal law, ordinance, order, regulation or requirement relating to Hazardous Materials. Notwithstanding anything to the contrary contained herein, Seller makes no representation or warranty with respect to conditions affecting any Parcel arising after the conveyance of such Parcel hereunder or the earlier delivery of possession to Purchaser or an SPE under any Construction License, unless caused by Seller or its contractors in performing the work provided for herein.

b.      No Release for Pre-Escrow Conditions. Seller acknowledges and agrees that no transfer of any Parcel to Purchaser or an SPE shall relieve or release Seller of any legal liability or responsibility that Seller would otherwise have as the owner of such Parcel, whether by way of damages, penalties, remedial actions or otherwise, for any adverse effects or consequences resulting at any time from any contamination existing on, above or under a Parcel at the time of the Close of Escrow on such Parcel; provided, however that the foregoing is not intended to relieve Purchaser from any liability or responsibility caused by or arising in connection with the activities of, or injury by, Purchaser or its employees, agents or other representatives, upon the Property prior to the Close of Escrow.

c.      Benefit of Representation. Seller's representations and warranties hereunder are for the exclusive benefit of Purchaser and shall not inure to nor are they made for the benefit of any other person or entity.

d.      Definition of Hazardous Material. The term "Hazardous Materials" shall mean any substance, water or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety and property, including all of those materials, wastes and substances designated as hazardous or toxic under NRS 40.504 or by the U.S. Environmental Protection Agency, the U.S. Department of Labor, the U.S. Department of Transportation and/or any other governmental agency now or hereafter authorized to regulate materials and substances in the environment.

e.      Expiration of Representations and Warranties. Seller's representation and warranties under Section 16.2(a) shall survive for 3 years after the Phase I

Lots Closing Date. Purchaser shall not be entitled to recover damages or obtain relief for any breach of such representations or warranties and releases Seller from any claim relating to Hazardous Materials unless (i) written notice specifically setting forth the grounds of such breach is promptly given to Seller by Purchaser within such 3 year period, (ii) a suit by Purchaser against Seller is filed in a court of competent jurisdiction within such 3 year period and (iii) service of such complaint is made on Seller within 30 days after the complaint is filed.

f.    <u>Environmental Hazards Insurance</u>.  As of each Close of Escrow Seller shall cause Purchaser or the applicable SPE to be named as an additional insured under that certain "Pollution Legal Liability Select Policy issued by American International Specialty Lines Insurance Company (Policy Number 8089459) (the "<u>Environmental Hazards Policy</u>") with respect to the Parcel being conveyed to Purchaser or such SPE.

16.3    <u>No Other Representations or Warranties</u>.  Except as set forth in the Closing Documents, Seller makes no representation or warranty, express or implied, with respect to the Property.  Without limiting the generality of the foregoing, Seller disclaims any obligation to construct any improvements other than the Seller's Work.  Furthermore, notwithstanding the fact that the Property is proposed to be located in a master planned community, Seller disclaims any obligation to develop or cause the development of any portion of Tuscany, other than the Seller's Work and the preparation and Recording of the applicable Project Final Maps.  Although Purchaser has or may have been advised by employees, agents or representatives of Seller of certain proposed, planned or intended projects of development within the Tuscany, Seller shall be under no obligation whatsoever to construct or develop such projects unless otherwise explicitly set forth herein or in the Closing Documents.

16.4    <u>Covenants</u>.  Seller hereby covenants with Purchaser as follows:

a.    <u>Alterations of Property</u>.  Except for the Seller's Work or as permitted or contemplated by the Permitted Exceptions or any other obligations of Seller hereunder, Seller agrees that it will not, prior to the Close of Escrow with respect to a Parcel, permit any alteration, modification, or addition to such Parcel, except for insubstantial and immaterial changes that do not adversely affect the same or the value thereof.

b.    <u>Matters Affecting Title</u>.  Seller agrees that it will not cause or permit any new encumbrances or liens to be Recorded against title to the Property after the Effective Date other than (i) matters, including Monetary Liens, which Seller shall cause to be removed at or prior to the applicable Close of Escrow; (ii) Permitted Exceptions, including (A) rights of way, easements or other rights necessary for the construction of the Projects or Seller's Work or necessary for Recordation of any Project Final Map or Seller's performance of any other of its obligations hereunder; and (B) water, power and other utility easements and similar easements normally incident to the development of real property in the City which do not materially interfere with a Project (e.g., avigation easements), provided Seller notifies Purchaser of the proposed matter and Seller obtains the consent of Purchaser to the location of any locatable easement, which consent shall not be unreasonably withheld or delayed, and shall be deemed given unless objection is made, specifying the reasons therefor, within ten (10) business days after Purchaser's receipt of a request for approval under this provision.

c.     <u>Threatened Claims</u>.  Seller shall promptly notify Purchaser of any asserted or threatened claim of which Seller has actual knowledge that directly or indirectly materially and adversely affects Seller, this Agreement, Tuscany, or the Property, including, but not limited to, the discovery of Hazardous Materials on the Property.

d.     <u>Completion of Improvements</u>.  Seller shall perform and complete the Seller's Work (i) in a good and workmanlike manner in accordance with all applicable Conditions of Approval and applicable plans and specifications, including any applicable Improvement Plans, (ii) in compliance with all applicable governmental laws and regulations, and (iii) without any material defects.

17.    <u>Pre-Closing Activities</u>.

17.1    <u>Entry by Purchaser onto the Property</u>.  Seller hereby grants to Purchaser a nonexclusive license, during the term of this Agreement, to enter upon the Unconveyed Property, prior to the Close of Escrow with respect thereto for the purpose of allowing Purchaser to conduct, at its sole expense, the Investigations of the Property.  Prior to any such entry by Purchaser on the Property and at all times during which such entry is permitted, Purchaser shall provide Seller with a certificate of Purchaser's liability insurance policy designating Seller as an additional insured, and such certificate shall evidence coverage in the amount of $3,000,000.00 to protect Seller against any loss, damage, or injury which may occur as a result of Purchaser's use of or entry upon the Property, whether prior to or after the Effective Date of this Agreement.

17.2    <u>Purchaser's Activities</u>.  Purchaser, its representatives, agents and contractors shall (i) perform all Purchaser's Investigations and other pre-closing work on the Property in a diligent, expeditious and safe manner, (ii) not allow any dangerous or hazardous condition created by Purchaser or its representatives, agents or contractors to continue beyond the completion of any activity permitted under this Agreement, (iii) comply with all applicable laws and governmental regulations applicable to Purchaser's activities, and (iv) keep the Unconveyed Property free and clear of all mechanics' and materialmen's liens or other liens arising out of the entry and work or activities performed under this Agreement by Purchaser, its representatives, agents and contractors.  After any entry, Purchaser shall immediately restore the affected Property to the same condition as before Purchaser entered such property.  Purchaser shall indemnify, defend (with counsel acceptable to Seller in its reasonable judgment) and hold harmless Seller, its officers, directors, shareholders, members, managers or partners, members, managers, employees, partners, representatives, agents, successors and assigns (as used in this Section, collectively, the "<u>Indemnified Parties</u>") from and against all claims, liabilities, damages, losses, costs or expenses (including, without limitation, attorneys' fees) arising from or relating to the entry on the Property by Purchaser, its representatives, agents or contractors.  Purchaser's obligations to indemnify, defend and hold harmless the Indemnified Parties shall survive the termination of this Agreement and each Close of Escrow and shall not be limited by any insurance required under Section 17.1.

Notwithstanding the foregoing, Purchaser's indemnity and defense obligations, and Purchaser's obligation to repair or restore any damage to the Property caused by Purchaser pursuant to Section 17.1 above shall not apply to (i) any loss, liability, costs or expenses to the extent arising from or relating to the gross negligence or willful misconduct of Seller; (ii) any

diminution in value of the Property arising from or relating to matters discovered (but not caused) by Purchaser or its employees, agents or contractors during Purchaser's Investigations of the Property; (iii) any latent defects in the Property discovered (but not caused) by Purchaser; and (iv) the release or spread of any Hazardous Materials which are discovered by Purchaser (but not deposited by Purchaser or its agents or contractors) on or under the Property.

   17.3 <u>Indemnity for Development Work</u>.  Although Seller is performing certain development work with respect to each Parcel, the parties acknowledge that Purchaser shall be solely responsible for construction of the Residences, including all soils preparation. Accordingly, Purchaser shall indemnify, protect, defend (with counsel reasonably approved by Seller), and hold harmless Seller and the Indemnified Parties, its from any and all losses, damages, liabilities, actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses including reasonable attorneys' fees, arising from any fault, act or omission of Purchaser, any contractor or subcontractor employed by it, any sales agent or marketing representative employed directly or indirectly by Purchaser, anyone directly or indirectly employed by any of the foregoing entities, or anyone for whose acts any of the foregoing entities may be liable, in connection with Purchaser's construction of the Residences (including, without limitation, any and all necessary soils preparation) and/or the act or failure to act of the Master Association or committee, officer, agent or representative thereof relating to any of the Residences or other portions of the Property when Purchaser (or any of its Affiliates or their respective employees, agents, or other representative) is  in control of the board of directors of such association or constitute a majority of  a committee thereof or are an officer, agent or representative thereof.  Notwithstanding the foregoing, Purchaser shall not be obligated to indemnify Seller or any of the other Indemnified Parties against any claim or liability to the extent such claim or liability arises from the breach by Seller of its obligations under this Agreement or from the grossly negligent acts or omissions or willful misconduct of Seller or any such Indemnified Party, including claims related to Seller's Work other than soils preparation or other Seller's Work subsequently modified by Purchaser.  The parties specifically acknowledge and agree that Seller is not in the homebuilding business, and that once any part of the Property is delivered to Purchaser or any grantee for construction of Residences or any other modification or alteration, Purchaser or such grantee shall be solely responsible for determining the suitability of such land for construction of Residences and further development.  Without limiting the foregoing, the parties acknowledge and agree that it is their intention that any and all claims relating to the construction of Residences shall, as between Seller and Purchaser and any SPE (and its Homebuyers and their successors), be the sole and exclusive responsibility of Purchaser and be subject to the Purchaser's obligations to indemnify, protect, defend and hold harmless Seller as provided herein.  Purchaser's obligations under this Section 17.3 shall survive the termination of this Agreement and each Close of Escrow, and shall be assumed by each SPE under the Development Declaration applicable to the Parcel it acquires hereunder.

   17.4 <u>Waiver and Release</u>.  As a material part of the consideration of this Agreement, Purchaser hereby waives and releases, on behalf of itself and its successors and assigns, all claims and demands against Seller and the other Seller Indemnified Parties for (i) any such loss, damage, injury or claim described in Section 17.3; (ii) any offsite condition relating to the Property other than a condition arising by reason of Seller's performance of any Seller's Work; and (iii)  the act or failure to act of the Master Association or committee, officer, agent or

representative thereof relating to any of the Residences or other portions of the Property when any of the Seller Indemnified Parties are in control of the board of directors of such association or constitute a majority of a committee thereof or are an officer, agent or representative thereof).

17.5    Survival; Non-Exclusive Provision.    Purchaser's obligations under Sections 17.2, 17.3 and 17.4 shall survive the termination of this Agreement and each Close of Escrow and shall not be limited by any insurance required under Section 17.1 or the Development Declaration. The provisions of Sections 17.2, 17.3 and 17.4 shall be in addition to, and not in limitation, any release, waiver and/or obligation to indemnify, protect, defend and/or hold harmless under any other agreement entered into between Purchaser and Seller or any other Seller Indemnified Parties, including any easement or license agreement.

17.6    Seller's Activities.    Seller, its representatives, agents and contractors shall (i) perform all Seller's Work on the Property in a diligent, expeditious and safe manner, (ii) not allow any dangerous or hazardous condition created by Seller or its representatives, agents or contractors to continue beyond the completion of any Seller's Work, (iii) comply with all applicable laws and governmental regulations applicable to Seller's Work, and (iv) keep the such portions of the Property as have been conveyed to Purchaser pursuant to this Agreement free and clear of all mechanics' and materialmen's liens or other liens arising out of Seller's entry on such property and the Seller's Work. Subject to Purchaser's obligations under Section 17.3, Seller shall indemnify, defend (with counsel acceptable to Purchaser in its reasonable judgment) and hold harmless Purchaser, its officers, directors, shareholders, members, managers or partners, members, managers, employees, partners, representatives, agents, successors and assigns (as used in this Section, collectively, the "Indemnified Parties") from and against all claims, liabilities, damages, losses, costs or expenses (including, without limitation, attorneys' fees) arising from or relating to the entry on the Parcels conveyed to Purchaser, by Seller, its representatives, agents or contractors, including damages resulting from the release of Hazardous Materials of the Property by Seller or its representatives, agents or contractors. Seller's obligations to indemnify, defend and hold harmless the Indemnified Parties shall survive the termination of this Agreement and each Close of Escrow.

Notwithstanding the foregoing, Seller's indemnity and defense obligations, and Seller's obligation to repair or restore any damage to any of the Parcels conveyed to Purchaser caused by Seller in connection with the Seller's Work shall not apply to any loss, liability, costs or expenses to the extent arising from or relating to the negligence or willful misconduct of Purchaser or its agents or contractors.

18.    Default and Remedies.

18.1    Purchaser's Events of Default.    The occurrence of any of the following prior or subsequent to a Close of Escrow, shall be a "Purchaser Default" hereunder:

a.    The filing of a petition or the institution of proceedings of, by, or against Purchaser or any SPE pursuant to the Bankruptcy Reform Act of 1978, as amended, or any successor statute or pursuant to any state bankruptcy, insolvency, moratoria, reorganization, or similar laws (as applicable, an "Insolvency Proceeding"), and, in the case of any involuntary proceeding, such petition or proceeding is not dismissed within 90 days; or Purchaser's or any SPE's making a general assignment for

the benefit of its creditors or the entering by Purchaser into any compromise or arrangement with its creditors generally; or Purchaser's or any SPE's becoming insolvent in the sense that Purchaser or such SPE is unable to pay its debts as they mature or in the sense that Purchaser's or such SPE's debts exceed the fair market value of Purchaser's or such SPE's assets;

b.      The failure of Purchaser or any SPE to deliver to Seller or into Escrow, as required by this Agreement, (i) the Initial Deposit, (ii) the Second Deposit, (iii) any Map Costs or (iv) any Extension Fee;

c.      Any of Purchaser's representations and warranties set forth in Article 15 shall be untrue in any material way; or

d.      The failure of Purchaser or any SPE (i) to perform any material act to be performed by it, (ii) to refrain from performing any material prohibited act or (iii) to fulfill any material condition to be fulfilled by it under this Agreement or any Closing Document, or under any agreement referred to herein or attached hereto as a schedule or an exhibit, unless such failure results from the failure of one or more of Purchaser's conditions to the Close of Escrow set forth in Section 12.1 to be satisfied or waived, which failure is not cured by Purchaser or such SPE within the relevant cure period set forth below. Purchaser or the SPE shall cure any default consisting of Purchaser's or such SPE's failure to deposit any Closing Payment into Escrow within twenty (20) business days after receipt of written notice of default from Seller. Purchaser or such SPE shall cure any other curable default within thirty (30) days after receipt of written notice of default from Seller; provided, however, that if the default is not the failure to pay money and the default is of a nature that it can be cured but cannot be cured within such 30-day period, then a Purchaser Default shall not exist so long as Purchaser or such SPE, as applicable, shall commence to cure such failure within such 30-day period, and shall diligently prosecute such cure to its completion. The cure periods specified in this Section 18.1(c) shall not apply to those Purchaser Defaults specified in any other paragraph of this Section 18.1.

18.2    Seller Defaults.    The occurrence of any of the following, prior or subsequent to the Close of Escrow, shall be a "Seller Default" hereunder:

a.      The failure of Seller (i) to perform any material act to be performed by it under this Agreement, or (ii) to refrain from performing any material prohibited act or (iii) to fulfill any material conditions to be fulfilled by it under this Agreement, unless such failure results from the failure of one or more of Seller's conditions to the Close of Escrow set forth in Sections 12.2 or 12.4 to be satisfied or waived, which failure is not cured by Seller within the relevant cure period. Seller shall cure any default consisting of Seller's failure to make any delivery into the Escrow necessary for the Close of Escrow within twenty (20) days after receipt of written notice of default from Purchaser. Seller shall cure any other curable default within thirty (30) days after receipt of written notice from Purchaser; provided, however, that if the default is not the failure to pay money and the default is of a nature that it can be cured, but cannot be cured within such 30-day period, then a Seller Default shall not exist so long as Seller shall commence to cure such

failure within such 30-day period, and shall diligently prosecute such cure to its completion; or

        b.    Any of Seller's representations and warranties set forth in Article 16 shall be untrue in any material way.

    18.3    <u>Seller's Remedies</u>.

        a.    <u>Liquidated Damages</u>. IF PURCHASER OR ANY SPE FAILS TO COMPLETE THE PURCHASE OF THE PHASE I LOTS OR, AFTER EXERCISE OF AN OPTION, ANY OPTION PARCEL AS PROVIDED IN THIS AGREEMENT FOR ANY REASON OTHER THAN A SELLER DEFAULT OR THE NONFULFILLMENT OF A CONDITION TO PURCHASER'S PERFORMANCE UNDER THIS AGREEMENT, THEN SELLER SHALL BE RELEASED FROM ALL ITS OBLIGATIONS UNDER THIS AGREEMENT, THE UNEXERCISED OPTIONS SHALL TERMINATE AND SELLER, AS ITS SOLE REMEDY, SHALL BE ENTITLED TO OBTAIN AND KEEP ALL UNAPPLIED PORTIONS OF THE DEPOSITS IN ACCORDANCE WITH THIS AGREEMENT AS LIQUIDATED DAMAGES (INCLUDING, IF APPLICABLE, ANY OPTION CASH DEPOSITS OR OTHER SUMS PAID BY PURCHASER OR AN SPE TO SELLER OR ESCROW HOLDER AS ADDITIONAL EARNEST MONEY INSTALLMENTS OR AS EXTENSION FEES TO BE TREATED AS PART OF THE DEPOSITS PURSUANT TO THE TERMS OF THIS AGREEMENT OR ANY SUBSEQUENT AMENDMENT OF THIS AGREEMENT). IN LIGHT OF THE DIFFICULTY THE PARTIES WOULD HAVE IN DETERMINING SELLER'S ACTUAL DAMAGES AS A RESULT OF SUCH A FAILURE TO PURCHASE THE PHASE I LOTS OR, AFTER EXERCISE OF AN OPTION, ANY OPTION PARCEL, THE PARTIES AGREE THAT THE AMOUNT OF THE DEPOSITS (OR, IF APPLICABLE, THE UNAPPLIED PORTION THEREOF) IS A REASONABLE ESTIMATE OF THE EXTENT TO WHICH SELLER WOULD BE DAMAGED BY PURCHASER'S OR SUCH SPE'S FAILURE TO CONSUMMATE SUCH PURCHASE. IMMEDIATELY UPON ANY SUCH FAILURE BY PURCHASER TO COMPLETE THE PURCHASE OF SUCH PARCEL, PURCHASER AND EACH SPE HEREBY AUTHORIZES ESCROW HOLDER TO PAY THE DEPOSITS TO SELLER, TO THE EXTENT NOT PREVIOUSLY DELIVERED. IN CONSIDERATION OF SELLER RECEIVING THE LIQUIDATED DAMAGES, SELLER WILL BE DEEMED TO HAVE WAIVED ALL OF ITS CLAIMS AGAINST PURCHASER AND THE APPLICABLE SPE(S) FOR DAMAGES AND SPECIFIC PERFORMANCE OF PURCHASER'S OR SUCH SPE'S OBLIGATION TO PURCHASE THE PROPERTY (OR PROPERTY WITH RESPECT TO WHICH AN OPTION HAS BEEN EXERCISED). NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS SECTION 18.3(a), IF PURCHASER OR ANY SPE BRINGS AN ACTION AGAINST SELLER FOR AN ALLEGED BREACH OR DEFAULT BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, AND, IN CONNECTION WITH THAT ACTION, RECORDS A <u>LIS PENDENS</u> OR OTHERWISE ENJOINS OR RESTRICTS SELLER'S ABILITY TO SELL OR TRANSFER ANY PORTION OF THE PROPERTY NOT PREVIOUSLY CONVEYED TO PURCHASER OR AN SPE IN ACCORDANCE WITH THIS AGREEMENT ("<u>PURCHASER'S ACTION</u>"), SELLER SHALL NOT BE RESTRICTED BY THE PROVISIONS OF THIS SECTION 18.3(a) FROM SEEKING EXPUNGEMENT OR RELIEF FROM THAT <u>LIS PENDENS</u>, INJUNCTION OR OTHER RESTRAINT, AND

RECOVERING DAMAGES, COSTS OR EXPENSES (INCLUDING ATTORNEYS' FEES) WHICH SELLER MAY SUFFER OR INCUR AS A RESULT OF PURCHASER'S ACTION (PROVIDED, HOWEVER, THAT, IN SUCH CIRCUMSTANCES, SELLER SHALL HAVE NO RIGHT TO SEEK SPECIFIC PERFORMANCE OF THE OBLIGATION TO PURCHASE THE APPLICABLE PARCEL FROM PURCHASER OR SUCH SPE), AND THE AMOUNT OF ANY SUCH DAMAGES AWARDED TO SELLER SHALL NOT BE LIMITED TO THE LIQUIDATED DAMAGES SET FORTH HEREIN.   FURTHERMORE, IN NO EVENT SHALL THIS SECTION 18.3(a).  HAVE ANY APPLICATION TO OR LIMIT SELLER'S RIGHTS AGAINST PURCHASER OR ANY SPE IN CONNECTION WITH ANY RIGHT OF INDEMNITY UNDER THIS AGREEMENT (INCLUDING THOSE UNDER SECTIONS 9.10, 11.6, 15.14, 15.15, 17.2, 17.3 AND 22), SECTION 24.4 (ATTORNEYS' FEES), ANY MISREPRESENTATIONS BY PURCHASER OR ANY SPE, THE PROVISIONS OF SECTION 18.4 OR ANY CONSTRUCTION LICENSE.

Purchaser: _____       Seller: _____
                initials                                  initials

b.      Post-Closing Default.  If a Purchaser Default, consisting of any of Purchaser's or an SPE's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser or such SPE, occurs after the Close of Escrow for that Parcel, Seller shall have all remedies available to it at law or in equity with respect to that Parcel, including, without limitation, any rights and remedies provided for in the Development Declaration or in Section 18.4 of this Agreement.

c.      "Fail-Safe" Option Termination.    Notwithstanding anything contained in this Agreement to the contrary, before Seller exercise its right to terminate any exercised or unexercised Option(s), Purchaser must have received written notice that Seller intends to terminate such Option(s) and Purchaser must have failed to correct or cure such default within the period of time require by Section 18.1(d); and, in such event, the date as of which the Option can be terminated or must be exercised shall be extended pending the expiration of the applicable notice or cure period under this Section.

The intent of this provision is to require that, prior to the termination of any Option, Purchaser has received notice of the applicable default, expiration or termination, notice that Seller intends to terminate one or more Options and a reasonable period (which is agreed to be the time set forth in Section 18.1(d) above) within which to prevent the termination of such Option.  This provision shall not be construed as requiring that Purchaser receive more than one notice of default or be given more than one cure period.

18.4    Right of First Refusal.  Purchaser covenants that it has not entered into this Agreement in order to sell the Parcels or any Lots therein or assign the Options to another person prior to the construction of a Residence on each Lot by Purchaser or an SPE (except in connection with a permitted assignment under Section 24.8), and Purchaser (for itself and each SPE) waives any right to make any profit from any such resale (a "Resale") except in the manner permitted in this Section. Purchaser further acknowledges that Seller has a continuing interest in the development of the Property and the successful development of Tuscany, and in order to protect such interest of Seller, Purchaser (for itself and each SPE) covenants and agrees that

05/08/1994  21:20   7024565210                    MAKENA

RECOVERING DAMAGES, COSTS OR EXPENSES (INCLUDING ATTORNEYS' FEES) WHICH SELLER MAY SUFFER OR INCUR AS A RESULT OF PURCHASER'S ACTION (PROVIDED, HOWEVER, THAT, IN SUCH CIRCUMSTANCES, SELLER SHALL HAVE NO RIGHT TO SEEK SPECIFIC PERFORMANCE OF THE OBLIGATION TO PURCHASE THE APPLICABLE PARCEL FROM PURCHASER OR SUCH SPE), AND THE AMOUNT OF ANY SUCH DAMAGES AWARDED TO SELLER SHALL NOT BE LIMITED TO THE LIQUIDATED DAMAGES SET FORTH HEREIN.  FURTHERMORE, IN NO EVENT SHALL THIS SECTION 18.3(a).  HAVE ANY APPLICATION TO OR LIMIT SELLER'S RIGHTS AGAINST PURCHASER OR ANY SPE IN CONNECTION WITH ANY RIGHT OF INDEMNITY UNDER THIS AGREEMENT (INCLUDING THOSE UNDER SECTIONS 9.10, 11.6, 15.14, 15.15, 17.2, 17.3 AND 22), SECTION 24.4 (ATTORNEYS' FEES), ANY MISREPRESENTATIONS BY PURCHASER OR ANY SPE, THE PROVISIONS OF SECTION 18.4 OR ANY CONSTRUCTION LICENSE.

Purchaser: _____        Seller: _____
            initials                      initials

       b.    **Post-Closing Default.**  If a Purchaser Default, consisting of any of Purchaser's or an SPE's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser or such SPE, occurs after the Close of Escrow for that Parcel, Seller shall have all remedies available to it at law or in equity with respect to that Parcel, including, without limitation, any rights and remedies provided for in the Development Declaration or in Section 18.4 of this Agreement.

       c.    **"Fail-Safe" Option Termination.**  Notwithstanding anything contained in this Agreement to the contrary, before Seller exercise its right to terminate any exercised or unexercised Option(s), Purchaser must have received written notice that Seller intends to terminate such Option(s) and Purchaser must have failed to correct or cure such default within the period of time require by Section 18.1(d); and, in such event, the date as of which the Option can be terminated or must be exercised shall be extended pending the expiration of the applicable notice or cure period under this Section.

       The intent of this provision is to require that, prior to the termination of any Option, Purchaser has received notice of the applicable default, expiration or termination, notice that Seller intends to terminate one or more Options and a reasonable period (which is agreed to be the time set forth in Section 18.1(d) above) within which to prevent the termination of such Option.  This provision shall not be construed as requiring that Purchaser receive more than one notice of default or be given more than one cure period.

       18.4   **Right of First Refusal.**  Purchaser covenants that it has not entered into this Agreement in order to sell the Parcels or any Lots therein or assign the Options to another person prior to the construction of a Residence on each Lot by Purchaser or an SPE (except in connection with a permitted assignment under Section 24.8), and Purchaser (for itself and each SPE) waives any right to make any profit from any such resale (a "Resale") except in the manner permitted in this Section.  Purchaser further acknowledges that Seller has a continuing interest in the development of the Property and the successful development of Tuscany, and in order to protect such interest of Seller, Purchaser (for itself and each SPE) covenants and agrees that

                                          

neither Purchaser nor any SPE shall resell any Parcel or Lots (except following the construction of a Residence on a Lot for which a certificate of occupancy has been issued) or assign any Option to any person or entity unless Purchaser or such SPE has complied with the right of first refusal provisions contained in this Section. Any sale or assignment not complying with the terms and conditions of this Section shall be null and void. Any Resale contract entered into by Purchaser or any SPE shall state specifically that the contract is contingent and subject to the provisions of this Section. If Purchaser or an SPE enters into a Resale contract within five (5) years from the Effective Date, then Purchaser or such SPE shall forward a copy of the contract to Seller, and Seller shall have the right, for a period of 20 days after receipt of the Resale contract, to notify Purchaser or such SPE that Seller elects to purchase the Parcel, Lots or Option which are the subject of the Resale Contract, for the purchase price provided in, and under the terms of the Resale contract. If Seller does not so notify Purchaser or such SPE within such 20-day period that Seller elects to purchase the Parcel, Lots or Option subject to the Resale contract, then Purchaser or such SPE shall have the right, for a period of 180 days following Seller's failure to so elect, to convey the Parcel, Lots or Option subject to the Resale contract upon the terms and conditions provided therein, without modification. Purchaser or the applicable SPE shall notify Seller in writing in the event the Resale contract fails to close within such 180-day period and of any modification of the Resale contract, and, after the expiration of the 180-day period, then any sale or proposed sale by Purchaser or an SPE of any Parcel, Lots or Option (including a sale pursuant to a Resale contract which has failed to close within such 180-day period or sale upon modified terms) shall again be subject to the terms of this Section 18.4. Seller's rights under this Section 18.4 will be subordinate to the rights of any bona fide lender, unaffiliated with Purchaser or an SPE, holding a deed of trust for value on those portions of the Property previously conveyed to Purchaser or such SPE. Seller reserves the right to Record (concurrently with or at any time after the Recordation of the Deed) a memorandum evidencing Seller's first refusal rights under this Section 18.4. Notwithstanding the foregoing, following the acquisition of title to the Property or any portion thereof by any purchaser at a foreclosure sale other than such lender and following the transfer of title to the Property by such lender to any unaffiliated transferee, the provisions of this Section shall again be applicable to the Property. Notwithstanding anything contained in this Section to the contrary, Seller's right of first refusal shall not apply to any portion of the Property consisting of any Lot following the sale of such Lot to a Homebuyer after the issuance of a certificate of occupancy for that Lot.

        18.5    Purchaser's Remedies for Seller Closing Default. Upon the occurrence of a Seller Closing Default, Purchaser or if applicable, the purchasing SPE, at its option, shall be entitled to one of the following remedies as its sole and exclusive remedy (except as otherwise provided in Sections 18.6 and 18.7): (a) Purchaser or such SPE may treat this Agreement as being in full force and effect and pursue only the specific performance of this Agreement, or (b) Purchaser and such SPE shall have the right to terminate this Agreement with respect to the Unconveyed Property, by delivering written notice to Seller which includes a waiver of any right, title or interest of Purchaser and such SPE in the Unconveyed Property, and obtain the return of the unapplied portion of the Deposits together with Purchaser's Actual Damages. Upon a termination of this Agreement pursuant to this Section 18.5, this Agreement (other than those provisions which by their terms survive termination) shall be of no further force and effect with respect to the Unconveyed Property and in the event of such a termination prior to the Close of Escrow on the Phase I Lots, all of the Deposits shall be returned to Purchaser. In such event

Purchaser shall, (and as a condition to the payment of the Deposits to Purchaser upon a termination to the Close of Escrow on the Phase I Lots) deliver to Seller all of Purchaser's engineering plans and reports concerning the Property and the applicable Project (excluding Purchaser's confidential proformas, proprietary information, projects, internal accounting and financial information and proprietary architectural drawings) which shall become the property of Seller. Thereafter, neither party shall have any liability or obligation to or rights against the other with respect to the Unconveyed Property, except as otherwise provided in those provisions of this Agreement which expressly survive a termination hereof. Purchaser and each SPE waives any right to pursue any other remedy at law or in equity for a Seller Closing Default, including any right to seek, claim or obtain any damages, including punitive damages or consequential damages, other than Actual Damages. The term "Seller Closing Default" means that a Seller Default exists and all of the following: (i) Purchaser or the applicable SPE shall be ready, willing and able to complete the Close of Escrow with respect to a Parcel in accordance with this Agreement as of the applicable Scheduled Closing Date, (ii) Purchaser or the applicable SPE shall have delivered reasonable evidence to Seller that Purchaser or such SPE is ready, willing and able to tender the applicable Closing Payment, and (iii) notwithstanding the foregoing, Seller shall have refused or otherwise failed to complete the Close of Escrow with respect to such Parcel in accordance with this Agreement. The term "Actual Damages" shall mean Purchaser's or such SPE's actual, third-party out-of-pocket expenses (based on supporting invoices or other reasonably appropriate evidence of such expenditures), not to exceed $50,000, reasonably incurred by Purchaser or such SPE in connection with its Investigations (but excluding any such costs relating to any proformas, drawings or other materials which Purchaser is entitled to retain following a termination of this Agreement under this paragraph).

18.6    Failure to Return the Deposits. In addition to the remedy provided in Section 18.5, Purchaser shall be entitled to receive from Seller interest, at the rate of ten percent (10%) per annum, on the Deposits or any portion thereof which is required to be returned to Purchaser in accordance with an express provision of this Agreement, and which Seller does not return within the time period required by this Agreement or, if no specific time period is mentioned, three (3) business days following the event which requires its return.

18.7    Seller Default Following Close of Escrow. In addition to the remedy provided in Section 18.5, if a Seller Default, consisting of any of Seller's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser, occurs after the Close of Escrow for that Parcel, Purchaser shall have all remedies available to it at law or in equity with respect to that Parcel, including those rights and remedies provided for in the Development Declaration.

18.8    Waiver of Jury Trial. AS A MATERIAL PART OF THE CONSIDERATION UNDER THIS AGREEMENT, PURCHASER (AND EACH SPE) AND SELLER EACH WAIVES ALL RIGHTS TO TRIAL BY JURY IF LITIGATION ARISES IN CONNECTION WITH THIS AGREEMENT.

19.    Risk of Loss. All risk of loss concerning a Parcel shall be borne by Seller only until the Closing Date for that Parcel. In the event of damage or destruction of all or a material part of a Parcel prior to the Closing Date for that Parcel, without the fault of the Purchaser, Seller shall immediately give Purchaser written notice of the damage. Within 20 days after delivery of

the notice, Purchaser shall elect, by delivering to Seller a written notice, either: (i) to terminate this Agreement with respect to the Unconveyed Property, in which event Purchaser and Seller shall share equally all Escrow costs and the unapplied portions of the Deposits, less Purchaser's share of any Cancellation Charges, shall be returned to Purchaser, or (ii) to proceed with the purchase and/or continued optioning of the Parcel and consummate this Agreement in accordance with its terms. Purchaser's failure to deliver to Seller notice of its election within the 20-day period shall be deemed Purchaser's election to terminate. If Purchaser elects option (ii), Seller shall, at the applicable Close of Escrow, assign to Purchaser Seller's right, if any, to receive any insurance proceeds payable in connection with such damage or destruction to the affected Parcel.

20.    <u>Condemnation</u>.  If all or part of a Parcel, or any significant interest therein, is taken before the Closing Date for that Parcel as a result of the condemnation (including the filing of any notice of intended condemnation or proceedings in the nature of eminent domain, or negotiations, offers or agreements prior to or in lieu of condemnation or eminent domain proceedings), Seller shall immediately give Purchaser notice of the taking.  Within 20 days after Seller delivers the notice, Purchaser shall elect, by delivering to Seller a written notice, either (i) to terminate this Agreement with respect to such Parcel and all Unconveyed Property and terminate all unexercised Options with respect thereto, in which event Purchaser and Seller shall share equally in all Escrow costs and the unapplied portions of the Deposits applicable to the Unconveyed Property which is to be excluded from this Agreement, less Purchaser's Share of any Cancellation Charges, shall be returned to Purchaser, or (ii) to proceed with the purchase and continued optioning of the affected Parcels and consummate this Agreement in accordance with its terms.  Purchaser's failure to deliver to Seller notice of its election within the 20-day period shall be deemed Purchaser's election to terminate.  If Purchaser elects option (ii), Seller shall, at the Close of Escrow, assign to Purchaser all Seller's right, if any, to receive any portion of any condemnation award with respect to the affected Parcels.

21.    <u>Confidentiality</u>.  The parties hereby covenant to keep confidential all writings, materials  and other information related to this transaction, other than information that: (i) becomes generally available to the public or others as a result of a disclosures by Seller; (ii) was available to Purchaser on a non-confidential basis from a source other than Seller, prior to Purchaser's receipt in connection with this Agreement (provided such information is not subject to another confidentiality agreement with another obligation of secrecy to Seller or another party); (iii) becomes available to Purchaser on a non-confidential basis from sources other than Seller, provided that such source is not prohibited from transmitting the information to Purchaser by a contractual, legal or fiduciary obligation  (collectively, the "<u>Confidential Information</u>"), except that the parties may disclose such Confidential Information to their respective consultants, attorneys, advisors, lenders and employees as may be reasonably necessary in order to evaluate and consummate this transaction.

22.    <u>Brokerage Commissions</u>.  Each party warrants and represents to the other that no broker, finder or other intermediary hired or employed by it is entitled to a commission, finder's fee or other compensation based upon the transaction contemplated hereby and each party (the "<u>Indemnitor</u>") shall protect, defend, indemnify and hold harmless the other party from and against any and all liens, demands, liabilities, causes of action, judgments, costs, claims, damages, suits, losses and expenses, or any combination thereof, including attorneys' fees, of any

nature, kind or description, caused by or arising out of the claim of any broker, finder or other intermediary alleging to have been employed or hired by the Indemnitor, to a commission, finder's fee or other compensation based upon the transactions contemplated hereby..

23.    <u>Trademarks</u>.    Purchaser acknowledges that Seller has the prior right to the Tuscany tradenames, trademarks, servicemarks and logos (collectively, the "<u>Marks</u>"). Purchaser warrants that it shall not use, nor permit others to use, in any manner whatsoever the Marks or the name Tuscany without the prior written consent of Seller.  Purchaser shall be entitled (without payment of a royalty) to and, in such event agrees to refer to, each of the Projects as a part of Tuscany in accordance with the marketing and advertising guidelines developed by Seller. Further, Purchaser acknowledges and agrees that Purchaser shall acquire no rights in Marks except to use the Marks in connection with the Projects and in accordance with this Agreement.

24.    <u>Miscellaneous</u>.

24.1    <u>Notices</u>.    All notices, requests and other communications provided for hereunder shall be in writing (including, unless the context expressly otherwise provides, by facsimile transmission, <u>provided</u> that any matter transmitted by facsimile shall be immediately confirmed by a telephone call to the recipient at the number specified herein) and mailed, (by certified mail, return receipt requested) faxed or delivered, to the following addresses or facsimile numbers:

| | |
|---|---|
| <u>If to Seller</u>: | Commerce Associates, LLC<br>2920 North Green Valley Parkway,<br>Suite 114<br>Henderson, Nevada 89014<br>Attention: Bob Unger<br>Telephone: (702) 456-5210<br>Telecopy: (702) 456-8744 |
| <u>and</u>: | Jones Vargas<br>3773 Howard Hughes Parkway<br>Third Floor South<br>Las Vegas, Nevada 89109<br>Attention: Michael E. Buckley, Esq.<br>Telephone: (702) 862-3300<br>Telecopy: (702) 734-2722 |
| <u>If to Purchaser</u>: | Rhodes Homes<br>4730 S. Fort Apache Road<br>Suite 300<br>Las Vegas, Nevada 89147<br>Attention: James M. Rhodes, President<br>Telephone: (702) 873-5338<br>Telecopy: (702) 873-5129 |

<u>With a copy to:</u>              Rhodes Homes
                              4730 S. Fort Apache Road
                              Suite 300
                              Las Vegas, Nevada 89147
                              Telephone: (702) 873-5338
                              Telecopy: (702) 873-5129

If to Escrow <u>Holder:</u>          United Title of Nevada
                              3980 Howard Hughes Parkway
                              Las Vegas, Nevada 89109
                              Attention:  James Bennett
                              Telephone: (702) 836-8000
                              Telecopy:   (702) 836-8180

or to such other address or number as shall be designated by such person in a written notice to the other party given in the manner required hereunder.

All such notices, requests and communications shall, if transmitted by overnight delivery, be effective when delivered for overnight (next day) delivery on the next business day; or, if transmitted in legible form by facsimile machine on or before 5:00 p.m. (at the recipient's location) on a business day, on such day, otherwise the next business day; or if mailed, upon receipt or the first refusal to accept such notice, request or other communication,  the third business day after the date deposited into the U.S. mail, certified mail, return receipt requested; or if delivered, upon delivery.

24.2    <u>Time of the Essence</u>.  Time is of the essence of this Agreement and each and every term and provision hereof, including the schedules and exhibits attached hereto.

24.3    <u>Interpretation; Governing Law</u>.  This Agreement shall be construed as if prepared by both parties.  This Agreement shall be construed, interpreted and governed by the laws of the State of Nevada.

24.4    <u>Attorneys' Fees</u>.  If any legal action or any other proceeding, including arbitration or an action for declaratory relief (including an action or proceeding between the parties while either is a debtor in a proceeding under the Bankruptcy Code or any successor statute to the Bankruptcy Code and including appellate proceedings), is brought to enforce this Agreement or because of a dispute, breach, default, or misrepresentation in connection with this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees and other costs incurred in that action or proceeding, in addition to any other relief to which that party may be entitled.  Prevailing party shall include without limitation (a) a party who dismisses an action in exchange for sums allegedly due; (b) the party that receives performance from the other party alleged to have breached a covenant or that receives a desired remedy, where these things are substantially equal to the relief sought in an action; or (c) the party determined to be the prevailing party by a court of law.  In addition, and without limiting the foregoing, Seller shall be entitled to recover its reasonable attorneys' fees and other costs incurred in connection with any action or proceeding involving the Options, including attorneys' fees incurred by Seller to monitor such proceedings.

24.5    Further Assurances; Survival. Each party will, whenever and as often as it shall be requested to do so by the other party, execute, acknowledge and deliver, in Recordable form, if appropriate, or cause to be executed, acknowledged and delivered, any and all such further conveyances, assignments, approvals, consents and any and all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement. All covenants and obligations contained in this Agreement which imply or require performance after a Close of Escrow and all representations and warranties of the parties contained in this Agreement shall survive such Close of Escrow, subject to any specified period of limitation contained herein, and provided, further, that, subject to Section 16.2(e), the representations and warranties contained in Articles 15 and 16 shall survive with respect to each Parcel for a period of three (3) years from the Close of Escrow on such Parcel.

24.6    Entire Agreement; Amendments. This Agreement, together with the other written agreements referred to herein, is intended by the parties to be the final expression of their agreement with respect to the subject matter hereof, and is intended as the complete and exclusive statement of the terms of the agreement between the parties. As such, this Agreement supersedes any and all prior understandings between the parties, whether oral or written, including any letters of intent. Any amendments to this Agreement shall be in writing and shall be signed by both parties hereto, and, in such event, all references herein to "this Agreement" shall be to this Agreement as modified. References to the term "this Agreement" include all schedules and exhibits attached hereto.

24.7    Waivers. No waiver of any covenant, condition or other provision of this Agreement shall be implied, but shall only be effected by a writing, signed by the person entitled to the benefit of the covenant, condition or other provision, specifically waiving the covenant, condition or other provision. A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

24.8    No Assignment. Except as provided below in this Section 24.8, neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent may be granted or withheld in such party's reasonable discretion and any purported assignment in violation of this provision shall be void. Notwithstanding the foregoing, the parties acknowledge and agree that:

a.    Seller shall have the right, upon written notice to Purchaser and Escrow Holder, to assign its rights hereunder to (i) a business entity in which Seller, or any of Seller's members, has an ownership interest, or (ii) to an affiliate of Seller or any of Seller's members, provided that such assignee agrees in writing to assume and be bound by the provisions of this Agreement in which event Seller shall have no further liability hereunder and, in such event, all references to "Seller" herein shall refer to such successor entity or affiliate. Notwithstanding the foregoing, such assignment shall not be effective unless and until Seller provides evidence reasonably satisfactory to Purchaser that the financial condition of the assignee is comparable or better than that of the Seller and there exists a continuity of management.

b. Purchaser shall have the right upon written notice to Purchaser and Escrow Holder, to designate an SPE, as provided in Section 1.4, or to designate as a nominee to take title to a Parcel (i) an entity owned and controlled by Purchaser; (ii) an unrelated entity if such entity's ownership of the interest herein or in the Property is solely to provide financing for Purchaser's acquisition, development and/or construction of the Property and Project or (iii) a joint venture or partnership in which Purchaser is the managing partner or venture member, provided that, in all such instances, (A) the Project continues to be developed as a "Rhodes Homes" project; (B) the assignee assumes the obligations of Purchaser hereunder and under any Ancillary Documents pursuant to a written assumption agreement in form and substance satisfactory to Seller and (C) no such assignment shall release Purchaser from its obligations hereunder. Purchaser may not assign the Options without first obtaining Seller's prior written consent which Purchaser may grant or withhold in its sole and absolute discretion.

24.9    Binding Effect. Subject to Section 24.8, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns. Where applicable, references herein to the term "Purchaser" shall include any and all applicable SPEs.

24.10    Headings; Attachments; Cross References. The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement. All exhibits and schedules attached to this Agreement and the Recitals at the front of this Agreement are incorporated herein by the references thereto contained herein. Unless the context otherwise requires a different meaning, the term, "Agreement" includes all Exhibits, schedules and attachments hereto. Any term used in an exhibit or schedule hereto shall have the same meaning as in this Agreement unless otherwise defined in such exhibit or schedule. All references in this Agreement to subsections, sections, exhibits or schedules shall be to subsections, sections, exhibits and schedules of or to this Agreement, unless otherwise specified.

24.11    Performance of Acts on Business Days. Unless specifically stated to the contrary, all references to days herein shall be deemed to refer to calendar days. If the final date for payment of any amount or performance of any act hereunder falls on a Saturday, Sunday or federal or state of Nevada holiday, such payment may be made or act performed on the next succeeding business day.

24.12    Backup Withholding. If any regulations proposed or promulgated by the Internal Revenue Service subject the transactions contemplated hereunder to backup withholding (which would require Purchaser to withhold a portion of any Parcel Price from Seller), then Seller will provide Purchaser with the necessary declaration in order to exempt such transactions from backup withholding.

24.13    No Third Party Beneficiaries. This Agreement is solely for the benefit of Seller and Purchaser and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party or the general public.

24.14    No Recording; Quitclaim; Releases. This Agreement shall not be recorded; however the Memorandum of Agreement and Amendment to Memorandum shall be

recorded as provided above. If this Agreement shall expire or terminate and Purchaser shall not have acquired the Phase I Lots pursuant hereto or upon the expiration or termination of any Option, Purchaser shall execute, acknowledge and deliver to Seller a recordable quitclaim deed to the Property or the Unconveyed Property, as applicable, or any other instrument reasonably requested by Seller for the release of the Memorandum of Agreement or Amendment to Memorandum, as applicable, and otherwise indicating the termination of Purchaser's applicable rights hereunder and with respect to the Property or Unconveyed Property. As a condition to Seller or Escrow Holder's obligation to return any portion of the Deposits to Purchaser, Purchaser shall execute and deliver to Seller, in Recordable form, any and all instruments necessary to terminate Purchaser's interest in any Unconveyed Property.

24.15 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. Delivery of this Agreement may be accomplished by facsimile transmission of this Agreement. In such event, the parties hereto shall promptly thereafter deliver to each other executed counterpart originals of this Agreement.

25. <u>Certain Definitions</u>. As used in this Agreement and in any exhibit, schedule or attachment attached hereto, the following terms shall have the meanings set forth below.

25.1 "<u>Agreed Rate</u>" shall mean a per annum interest rate equal to the sum of (i) the "prime rate" as set forth from time to time in the "Money Rates" section of *The Wall Street Journal* (or the highest of such rates if more than one) plus (ii) two percent (2%). Changes in the "prime rate" shall be effective as of the date of such change, and interest shall be calculated on the basis of a 365 day year and actual days.

25.2 "<u>Effective Date</u>" shall mean the date as of which this Agreement is fully executed by Seller and Purchaser (the date as of which the last of the parties has executed this Agreement, as set forth opposite their respective signatures below).

25.3 "<u>Force Majeure Delays</u>" shall mean delays caused by occurrences beyond the reasonable control and without the fault, negligence or financial inability of a party hereto or its contractors, including strikes, labor disputes, material shortages, fire, earthquake, floods and other acts of God, inclement weather, enemy invasion, wars, insurrection, sabotage, terrorism, laws, orders or actions of governmental, civil or military authorities, governmental restrictions, delays in processing by governmental agencies or utilities (including delays caused by Nevada Power Company in reviewing and approving the electrical plans for the Property), riot, civil commotion judicial or administrative proceedings commenced and maintained by persons not parties to this Agreement and unavoidable casualty. If the performance of an obligation hereunder or under any other agreement or declaration, other than the payment of money, is expressly subject to the effect of Force Majeure Delay, then, unless otherwise provided herein or in such other agreement or declaration to the contrary, the effect of a Force Majeure Delay shall be to extend the time for performance of such obligation for the reasonable period of such Force Majeure Delay, but in no event greater than the period of the Force Majeure Delay.

25.4 "<u>Record</u>", "<u>Recorded</u>" and "<u>Recordation</u>" shall mean, with respect to any document, the recordation of such document in the Office of the County Recorder of Clark

County, Nevada ("Recorder"). "Recordable" means the requirement that a document meet the statutory and/or other legal requirements for Recordation.

25.5    "Substantially Complete" (or any variation thereof) shall mean, with respect to any improvement or work to be constructed or installed, that such improvement or work is sufficiently complete so that it may be lawfully used for the purpose for which it is intended and no permit which requires completion of such improvement or work, is being withheld or delayed solely on the basis that such improvement or work is not deemed complete.

25.6    Miscellaneous Terms. The term "or" is disjunctive; the term "and" is conjunctive. The term "shall" is mandatory; the term "may" is permissive. Masculine terms also apply to females; feminine terms also apply to males. The term "including" is by way of example and not limitation. Defined terms may used in the singular or plural.

26.    Mediation and Arbitration.

26.1    Mediation. The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement (a "Dispute"). Either party may initiate negotiations by providing written notice in letter form to the other party, setting forth the subject of the Dispute and the relief requested. The recipient of such notice will respond in writing within seven (7) business days with a statement of its position on and recommended solution to the Dispute. If the Dispute is not resolved by this exchange of correspondence, then representatives of each party with full settlement authority will meet at a mutually agreeable time and place within fifteen (15) business days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the Dispute. If the Dispute is not resolved by these negotiations, the matter will be submitted to J.A.M.S./Endispute ("JAMS"), or its successor, for mediation. The mediation shall take place at a location chosen by the mediator in the County of Clark, State of Nevada. Any information provided to the mediator shall be concurrently supplied to the parties involved in the mediation and the parties shall be given an opportunity to comment to the mediator on the information. Each party shall present the mediator and each other party with a written statement of the party's position and all copies of supporting documentation, at least two (2) business days prior to the mediation. Each party shall have an opportunity to orally present its position to the mediator and the other party. The rules of evidence in NRS 47.020 through NRS 56.020 shall not apply, provided that this shall not be deemed to constitute a waiver of the right to assert any privilege defined in NRS Chapter 49. Each party agrees to designate one or more representatives, having authority to bind that party, who will participate in the mediation process including attending all mediation hearings. If the mediation results in a mutually acceptable resolution of all or some of the matters in Dispute, then the parties shall memorialize such resolution in a settlement agreement. Each party shall bear its own costs incurred in connection with the mediation. The costs of the mediator shall be shared equally between the parties regardless of the outcome.

26.2    Arbitration. The parties agree that any and all Disputes solely between them that are not resolved through the provisions of Section 26.1 of this Agreement, shall be submitted to JAMS, or its successor, for final and binding arbitration with the arbitration to occur in the County of Clark, State of Nevada. In instances wherein a complete resolution of the Dispute necessarily requires the participation of a third-party as a party to the arbitration, the

failure of the affected third-party to agree to participate in an arbitration as a party pursuant to the provisions of this Section shall be deemed to excuse any party from being bound by the provisions of this Section and, in such latter instance or instances, notwithstanding the existence of Section 26.2 of this Agreement, such a Dispute shall be finally resolved in a court of competent jurisdiction in Clark County, Nevada.

Either party may initiate JAMS arbitration, in the manner prescribed in the JAMS Comprehensive Arbitration Rules & Procedures in effect as of the date the demand for arbitration is first made (the "JAMS Rules"), at any time following the first JAMS mediation session, or 45 days after filing the written request for Mediation, whichever first occurs. If the parties agree, the mediation initiated under Section 26.1 of this Agreement may continue after the commencement of arbitration, however, the mediator cannot also be appointed arbitrator without the agreement of all of the parties to both proceedings.

With the exceptions specifically outlined below, the arbitration shall be governed under the provisions of the JAMS Rules, provided, however, that notwithstanding anything to the contrary in the JAMS Rules, no punitive or consequential damages may be awarded in the arbitration.

The successful party to the arbitration shall be entitled to an award of reasonable attorneys fees under NRS 38.238 along with the Actual Costs of the proceeding. As used herein, the term "Actual Costs" is not limited to the costs defined in NRS 38.238 but shall also include any and all actual costs of the arbitration, including but not limited to the fees paid for the use of the JAMS Arbitration proceeding, facilities, and arbitrators, provided, however, that the initial costs of the arbitration shall be borne equally by the parties to the arbitration, pending the determination of which party is the successful party.

Subject to the provisions of NRS 38.237, 38.241 and 38.242, the determination of the arbitration, as represented in the award, shall be finding and binding, The successful party may seek confirmation of the award pursuant to NRS 28.239 and a judgment on the award pursuant to NRS 38.243. Any disagreement as to whether a particular Dispute is encompassed within the provisions of Section 22.2 of this Agreement shall be finally determined in accordance with the provisions of NRS 38.206 - 38.248, with all such proceedings to be brought in a competent jurisdiction located within Clark County, Nevada.

26.3    Survival.  The provisions of this Article 26 shall survive each Close of Escrow and the termination of this Agreement.

27.    Not an Offer.  Seller's delivery of unsigned copies of this Agreement is solely for the purpose of review by the party to whom delivered, and neither the delivery nor any prior communications between the parties, whether oral or written, shall in any way be construed as an offer by Seller, nor in any way imply that Seller is under any obligation to enter the transaction which is the subject of this Agreement. The signing of this Agreement by Purchaser constitutes an offer which shall not be deemed accepted by Seller unless and until Seller has signed this Agreement and delivered a duplicate original to Purchaser.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date set forth beneath their respective signatures below.

**COMMERCE ASSOCIATES, LLC, a Nevada limited liability company**

**RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation**

By:_____

By:_____

Print Name:_____

Print Name:_____

Title:_____

Title:_____

Dated:_____

Dated:_____

Draft of November 13, 2003

05/08/1994  20:48    7024565210                    MAKENA                          PAGE  02

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date set forth beneath their respective signatures below.

**COMMERCE ASSOCIATES, LLC, a**
**Nevada limited liability company**

By: _____

Print Name: _Tori Gonzales___

Title: _____

Dated: _11 / 17 / 03_____

**RHODES DESIGN AND DEVELOPMENT**
**CORPORATION, a Nevada corporation**

By: _____

Print Name: _James M. Rhodes___

Title: _Pres._____

Dated: _11-14-03_____

## RECEIPT AND AGREEMENT

ESCROW HOLDER hereby acknowledges receipt of the foregoing escrow instructions and agrees to act as Escrow Holder in accordance with the terms and conditions thereof.

Escrow Holder further acknowledges receipt from Purchaser of the Initial Deposit in the amount of $2,500,000.

Dated this _____ day of November, 2003.

**United Title of Nevada**

By:_____

Print Name:_____

Title:_____

Escrow Number:_____

## EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

### (Recital B)

[Insert legal descriptions of 17 parcels constituting the Property.]

## EXHIBITS A-1 through A-7

## PROPOSED MAPS

### (Recital B)

[Attach proposed subdivision maps for each Residential Development Parcel.  Each subdivision map may also reflect a phasing order, i.e., the order in which Lots will be taken down and developed.]

**EXHIBIT C**

**NOTICE OF EXERCISE OF OPTION**

**(Section 1.3)**

COMMERCE ASSOCIATES, LLC
2920 North Green Valley Parkway
Suite 114
Henderson, Nevada 89014
Attention: Barry Fieldman, Manager

    *Re:   Purchase Agreement and Grant of Options dated November 10, 2003 ("Purchase Agreement")*

    The undersigned is the Purchaser under the Purchase Agreement and by this notice hereby designates _____, as the SPE to exercise the _____ Option, in accordance with the written notice attached hereto as Attachment A. Capitalized terms used herein without definition have the meanings given such terms in the Purchase Agreement.

    Purchaser hereby reaffirms the representations and warranties set forth in Article 15 and represents and warrants that the same are true and correct in all material respects as of the date hereof. Purchaser further represents and warrants to Seller that no Purchaser Default presently exists.

    The date of this Notice is _____, 200__.

                    Very Truly Yours,

                    RHODES DESIGN AND DEVELOPMENT
                    CORPORATION, a Nevada corporation

                    By:_____
                    Name:_____
                    Title:_____

cc:    Jones Vargas
       United Title

COMMERCE ASSOCIATES, LLC
2920 North Green Valley Parkway
Suite 114
Henderson, Nevada 89014
Attention: Barry Fieldman, Manager

> Re:    *Purchase Agreement and Grant of Options dated November 10, 2003 ("Purchase Agreement")*

The undersigned is the SPE designated by Purchaser under the Purchase Agreement with respect to the ___ Option, and by this notice hereby exercises the ____ Option, which shall include [the _____ Lots set forth in <u>Schedule 1</u> attached hereto/Multi-Family Development Parcel]

Attached hereto are the Organizational Documents and Authorizing Resolutions applicable to the SPE and the exercise of the aforesaid Option.

SPE hereby reaffirms and, to the extent applicable, as of the date hereof hereby makes the same representations and warranties as those of Purchaser as set forth in Articles 7 and 15 of the Purchase Agreement, and, to the extent applicable, represents and warrants that the same are true and correct in all material respects as of the date hereof as if made by the SPE. SPE hereby assumes all of the rights, duties and obligations of Purchaser under the Purchaser Agreement, to the extent the same relate to the Option Parcel which is the subject of this Option. Notwithstanding the foregoing, SPE hereby appoints Purchaser as SPE's agent and attorney in fact for the purposes of dealing with all aspects of the development and construction of the Project, including without limitation, the processing of all Project plans and specifications with Seller, and obtaining the Seller approvals required to be obtained under the Purchase Agreement and/or the Development Declaration.

Capitalized terms used herein without definition have the meanings given such terms in the Purchase Agreement.

The date of this Notice is _____, 200__.

                              Very Truly Yours,

                              [SPE]
                              a Nevada _____


                              By:_____
                              Name:_____
                              Title:_____

cc:    Jones Vargas
       United Title

**EXHIBIT D**

**MEMORANDUM OF AGREEMENT**

**(Section 2.1)**

APN #_____

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

United Title of Nevada
3980 Howard Hughes Parkway
Las Vegas, Nevada 89109
Attention:

Escrow #_____

MEMORANDUM OF AGREEMENT

This Memorandum of Agreement is executed by COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Seller") and RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("Purchaser").

WHEREAS, Seller has entered into a Purchase Agreement and Grant of Options dated November __, 2003 ("Purchase Agreement") with Purchaser, pursuant to which Seller agreed to sell to Purchaser and Purchaser agreed to purchase the real property described on Attachment A attached hereto (the "Land").

NOW THEREFORE, Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the Land, upon and subject to the terms and conditions set forth in the Purchase Agreement. The provisions of the Purchase Agreement are incorporated into this Memorandum of Agreement by reference. Subject to the express provisions of the Purchase Agreement, unless the scheduled closing date for the purchase and sale of the Purchase Property is extended in writing by mutual agreement of the parties, close of escrow for purchase and sale of the Land must occur no later than approximately January 15, 2004.

This Memorandum of Agreement is prepared for the purpose of recordation, and it in no way modifies the provisions of the Purchase Agreement.

This Memorandum of Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute but one and the same instrument.

Draft of November 13, 2003                                                                                 1

IN WITNESS WHEREOF, the Seller and Purchaser have executed this Memorandum of Agreement to be effective as of November ___, 2003.

"Purchaser"                                         "Seller"

RHODES DESIGN AND DEVELOPMENT          COMMERCE ASSOCIATES, LLC, a Nevada
CORPORATION, a Nevada corporation            limited liability company


By:_____          By:_____

   _____             _____
       Printed Name and Title                                   Printed Name and Title


## ACKNOWLEDGMENTS

STATE OF NEVADA

COUNTY OF CLARK

     The foregoing instrument was acknowledged before me this ___ day of _____, 2003, by _____, the _____ of RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation.


                          _____
                                     Notary Public

                          My commission expires: _____

STATE OF NEVADA

COUNTY OF CLARK

     The foregoing instrument was acknowledged before me this ___ day of _____, 2003, by _____, the _____ of COMMERCE ASSOCIATES, LLC.


                          _____
                                     Notary Public

                          My commission expires: _____

## ATTACHMENT A

### LEGAL DESCRIPTION OF LAND

THAT CERTAIN REAL PROPERTY LOCATED IN THE COUNTY OF CLARK, STATE OF NEVADA, DESCRIBED AS FOLLOWS:

# EXHIBIT E

## BASE PRICES AND LOT PREMIUMS

### (Sections 3.1 and 3.2)

# Exhibit E

## Bases Prices and Lot Premiums

### (Sections 3.1 and 3.2)

| Parcel | Acreage | Units | Base Price | Base Price Per Lot | Lot Premium Total | Lot Premium Per Lot |
|--------|---------|-------|------------|--------------------|-------------------|---------------------|
| 5 | 23.3 | 140 | 7,806,547 | 55,761 | 3,317,750 | 23,698 |
| 6a | 53.1 | 208 | 9,977,877 | 47,971 | 5,698,759 | 27,398 |
| 6b | | 74 | 3,713,548 | 50,183 | 507,413 | 6,857 |
| 6c | | 87 | 4,254,739 | 48,905 | 913,227 | 10,497 |
| 10 | 14.9 | 78 | 3,483,058 | 44,655 | 371,440 | 4,762 |
| 11 | 17.1 | 96 | 4,154,291 | 43,274 | 513,439 | 5,348 |
| 12 | 10.2 | 59 | 2,778,433 | 47,092 | 926,548 | 15,704 |
| 14 | 10.7 | 64 | 3,739,346 | 58,427 | 2,285,215 | 35,706 |
| 15 | 14.1 | | 6,853,764 | | 926,629 | (1) |
| 16 | 16.5 | 81 | 4,715,898 | 58,221 | 3,354,401 | 41,412 |
| 17 | 3.4 | 21 | 1,387,495 | 66,071 | 1,374,517 | 65,453 |
| 18 | 28.5 | 217 | 10,675,601 | 49,196 | 2,843,221 | 13,102 |
| 19 | 14.2 | 111 | 4,995,000 | 45,000 | 556,877 | 5,017 |
| 22 | 32.4 | 160 | 7,555,646 | 47,223 | 1,250,661 | 7,817 |
| 23 | 3.2 | 24 | 1,265,807 | 52,742 | 1,879,240 | 78,302 |
| 24 | 15.5 | 96 | 5,680,357 | 59,170 | 4,415,715 | 45,997 |
| 25 | 29.6 | 238 | 9,592,852 | 40,306 | 3,727,826 | 15,683 |
| | 286.7 | 1,754 | 92,630,259 | 52,811 | 34,862,878 | 19,876 |

(1) The Lot Premium for Parcel 15 will be determined by dividing the amount above by the total number of lots approved by the City of Henderson.

**EXHIBIT F**

**ADDITIONAL CONSIDERATION MEMORANDUM**

**Section 3.2(b)**

APN # _____

RECORDED REQUESTED BY
AND WHEN RECORDED RETURN TO:

Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89109
Attention: Michael E. Buckley, Esq.

**MEMORANDUM OF ADDITIONAL CONSIDERATION**

THIS MEMORANDUM OF ADDITIONAL CONSIDERATION ("**Memorandum**") is made as of the _____ day of _____, 2003, by and between _____, A _____ ("**Purchaser**"), and COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("**Seller**").

1.    **Additional Consideration.**  Pursuant to Section 3.2 of that certain Purchase Agreement and Grant of Options, dated as of November __, 2003 between RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("**Rhodes**") and Seller (the "**Purchase Agreement**"), all the terms of which are specifically made a part hereof as though set out in full, Purchaser has agreed to pay to Seller certain additional consideration (collectively, the "**Additional Consideration**") for the purchase of that certain real property generally located in the City of Henderson, County of Clark, State of Nevada, and more particularly described on Attachment A attached hereto (the "**Property**").  Purchaser's obligation to pay such Additional Consideration is secured by a lien on the Property which Purchaser has granted to Seller pursuant to Article ___ of that certain Declaration of Development Covenants and Restrictions which was recorded against the Property on _____, 20__, as Instrument _____, in Book _____, in the official records of Clark County, Nevada.  Such lien shall be automatically subject and subordinate to any lien which secures the financing of improvements which are constructed on the Property.

2.    **Purpose of Memorandum.**  This Memorandum is prepared solely for the purpose of giving notice to third parties and in no way modifies the provisions of the Purchase Agreement or the Development Declaration.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Additional Consideration as of the date stated hereinabove.

PURCHASER:

_____,
a Nevada _____

By:_____
Print Name:_____
Title:_____


SELLER:

COMMERCE ASSOCIATES, LLC, a
Nevada limited liability company

By:_____
Print Name:_____
Title:_____


STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _____, 200__, by _____ as _____ of _____.


_____
Notary Public

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _____, 200__ by _____ as the _____ of Commerce Associates, LLC.


_____
Notary Public

# EXHIBIT G

## MAP COSTS NOTE

### (Section 3.3)

## SECURED PROMISSORY NOTE

$[_____]                                                    _____, 2004

FOR VALUE RECEIVED, the undersigned, _____, a Nevada _____ ("Purchaser") promises to pay to the order of COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Seller"), at 2920 North Green Valley Parkway, Suite 114, Henderson, Nevada 89014, on or before [January ____, 2006 (the "Maturity Date"), the principal sum of [_____] DOLLARS ($_____), together with interest thereon from the date hereof until maturity at the rate or rates of interest hereinafter set forth.

Prior to the occurrence of an Event of Default (hereinafter defined), the unpaid principal balance of this Secured Promissory Note ("Note") shall bear interest at a per annum rate (the "Agreed Rate") equal to the sum of (i) the "prime rate" as set forth from time to time in the "Money Rates" section of *The Wall Street Journal* (or the highest of such rates if more than one) plus (ii) two percent (2%). Changes in the "prime rate" shall be effective as of the date of such change. Upon the occurrence and during the continuance of any Event of Default hereunder, the outstanding principal balance of this Note will, at the option of Seller, bear interest at an annual rate of five percent (3.0%) in excess of the Agreed Rate (the "Default Rate"). From and after maturity of this Note, whether by acceleration or otherwise, all sums then due and payable under this Note, including all principal and all accrued and unpaid interest, shall bear interest until paid in full at the Default Rate. Purchaser acknowledges and agrees that this Note provides for the compounding of interest. Interest shall be computed on the basis of a 365 or 366 day year, as applicable, and actual days elapsed.

All payments of principal and interest of this Note are payable in lawful money of the United States of America to Seller hereof at the office of Seller set forth above, or at such other place as Seller hereof may designate in writing.

This Note is given in connection with that certain Purchase Agreement and Grant of Options, dated November __, 2003 (the "Purchase Agreement"), between Purchaser and Seller, and this Note is secured by a [Short Form Deed of Trust and Assignment of Rents], dated of even date herewith given by Purchaser to Seller (the "Deed of Trust") upon certain real property, as more particularly described in the Deed of Trust.

This Note shall be payable as follows:

(a)    All accrued interest shall be payable semi annually in arrears on the ___ day of each [July] and [January], commencing [July ___, 2004].

(b)    Purchaser shall pay to Seller as principal installments hereunder, (i) the amount of any Southern Nevada Water Authority Regional Water Connection Fees paid by Seller with

1

respect to Development Parcels 6B, 6C, 10, 11, 22 and 25 in Tuscany (as defined in the Deed of Trust); and (ii) the required Release Payments (as defined in the Deed of Trust).

      (c)    If not sooner paid, the unpaid principal balance of this Note, together with all accrued and unpaid interest and other sums due hereunder, shall be fully due and payable on the Maturity Date.

This Note may be prepaid in whole or in part at any time, without premium or penalty, provided that, as a condition to such prepayment, all interest then due hereunder is paid in full. All payments shall be applied, to the extent thereof, to late charges, to accrued but unpaid interest on the amount prepaid, to the remaining principal installments and any other sums due and unpaid Seller hereunder, including any costs and expenses of enforcing this Note (including Seller's reasonable attorneys' fees), in such manner as Seller may elect in its discretion.

If Purchaser fails to make any payment required hereunder within fifteen (15) days after it becomes due and payable, a late charge of five percent (5.0%) of each overdue payment may be charged for the purpose of defraying the expenses incident to handling said delinquent payments and as an inducement to Purchaser to make timely payment. Acceptance of a scheduled payment fifteen (15) days after its due date shall not waive any appropriate late charge, nor shall it constitute a waiver of any event of default hereunder or under the Deed of Trust.

Each of the following events shall constitute an event of default ("Event of Default") under this Note:

      (a)    Failure to make any payment of interest or principal due hereunder (other than the payment due on the Maturity Date) within ten (10) days following the date such payment is due;

      (b)    Failure to pay the entire unpaid principal balance hereunder and all other amounts payable under this Note, including accrued interest, on or before the Maturity Date;

      (c)    The occurrence of a default (and the expiration of any notice and cure period) under the Deed of Trust; or

      (d)    The occurrence of a Purchaser Default (as defined in the Purchase Agreement).

It shall be an "Event of Default" under this Note if Purchaser becomes the subject of any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships ("Insolvency Proceeding"). If that happens, all sums of principal and interest under this Note shall automatically become immediately due and payable without notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind or character.

Time is of the essence of each and every provision hereof. Upon the occurrence of an Event of Default, Seller at its option, shall have the right to declare the entire principal of, and all interest

accrued under, this Note to be, and this Note shall thereupon become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, and Purchaser will immediately pay to Seller, or its order, the entire outstanding principal of, and interest on, this Note. All rights and remedies of Seller hereunder and under the Deed of Trust are cumulative and concurrent and the exercise of one remedy shall not be deemed a waiver or release of any other right or remedy. Failure or delay in exercising the default remedies herein or in the Deed of Trust or acceptance of partial payments shall not constitute a waiver of the right to exercise any remedies available to Seller hereunder or under the Deed of Trust with respect to any subsequent or uncured Event of Default. The subsequent acceptance of any sum in payment of any indebtedness evidenced hereby or any other payment hereunder by Purchaser to Seller shall not be construed to be a waiver or release of any preceding breach by Purchaser of any provision, covenant or condition of this Note other than the failure of Purchaser to pay the particular sum so accepted, regardless of Seller's knowledge of such preceding breach at the time of acceptance of such payment. No payment by Purchaser or receipt by Seller of a lesser amount than the amount herein provided shall be deemed to be other than on account of the earliest sums due and payable hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Seller may accept any such check or payment without prejudice to Seller's right to recover the balance of such sum or pursue any other remedy provided in this Note or the Deed of Trust.

A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

If any lawsuit or arbitration is commenced which arises out of or relates to this Note or the Deed of Trust, the prevailing party shall be entitled to recover from each other party such sums as the court or arbitrator may adjudge to be reasonable attorneys' fees in the action or arbitration, in addition to costs and expenses otherwise allowed by law. In all other situations, including any matter arising out of or relating to any Insolvency Proceeding, Purchaser agrees to pay all of Seller's costs and expenses, including attorneys' fees, which may be incurred in enforcing or protecting Seller's rights or interests. From the time(s) incurred until paid in full to Seller, all such sums shall bear interest at the Default Rate.

This Note shall be construed according to the laws of the State of Nevada.

Failure of Seller to exercise any right or remedy hereunder shall not constitute a waiver of the right to exercise the same in the event of any subsequent default, or in the event of continuance of any existing default.

No waiver or amendment of any of the terms hereof shall be effective unless in writing signed by Seller.

This Note inures to and binds the heirs, legal representatives, successors and assigns of Purchaser and Seller; provided, however, that Purchaser may not assign this Note, or assign or

3

delegate any of its rights or obligations, without the prior written consent of Seller in each instance. Seller in its sole discretion may transfer this Note, and may sell or assign participation's or other interests in all or part of the indebtedness evidenced by this Note, all without notice to or the consent of Purchaser. Seller is hereby authorized to disseminate any information it now has or hereafter obtains pertaining to such indebtedness, including, without limitation, any security for this Note and credit or other information on Purchaser, any of its principals and any guarantor of this Note, to any actual or prospective assignee or participant with respect to such indebtedness evidenced by this Note, to any regulatory body having jurisdiction over Seller, and to any other persons as necessary or appropriate in Seller's reasonable judgment.

IN WITNESS WHEREOF, this Note has been executed as of the date first hereinabove written.

By:_____

4

# EXHIBIT H

## MAP COSTS MORTGAGE

### (Section 3.3)

APN:
**WHEN RECORDED MAIL TO:**
[=ADDRESSEE=]

**MAIL TAX STATEMENT TO:**
[=ADDRESSEE=]

ESCROW NO:

---

# SHORT FORM DEED OF TRUST AND ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

**THIS DEED OF TRUST**, made this ____ day of _____, 2004 between _____, herein called **TRUSTOR**, whose address is:

and _____, herein called **BENEFICIARY**, whose address is _____ and **UNITED TITLE OF NEVADA, A NEVADA CORPORATION** herein called **TRUSTEE**,

**WITNESSETH:** That Trustor **IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE IN TRUST, WITH POWER OF SALE**, that property in Clark County, Nevada described as:

   **See Exhibit A attached hereto and made a part hereof.**

**TOGETHER WITH** the rents, issues and profits thereof, **SUBJECT, HOWEVER,** to the right, power and authority given to and conferred upon Beneficiary by paragraph (10) of the provisions incorporated herein by reference to collect and apply such rents, issues and profits.

**FOR THE PURPOSE OF SECURING:** 1. Performance of each agreement of Trustor incorporated by reference or contained herein. 2. Payment of the indebtedness evidenced by one promissory note of even date herewith, and any extension or renewal thereof, in the principal sum of $[4,324,700.00] executed by Trustor in favor of Beneficiary or order. 3. Payment of such additional sums as may hereafter be borrowed from beneficiary by the then record owner of said property, when evidenced by another promissory note (or notes) reciting it is so secured.

**THE PROVISIONS OF THAT CERTAIN RIDER TO SHORT FORM DEED OF TRUST, AND ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING ATTACHED HERETO ARE HEREBY INCORPORATED BY REFERENCE AND MADE A PART OF THIS DEED OF TRUST.**

**TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:** By the execution and delivery of the Deed of Trust and the Note secured hereby, that provisions (1) to (16) inclusive of the Deed of Trust recorded in the Book and at the Page, or Document No. of Official records in the Office of the County Recorder of the County where said property is located, noted below opposite the name of such county, viz:

| COUNTY | DOC # | BOOK | PAGE | COUNTY | DOC # | BOOK | PAGE | COUNTY | DOC # | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Clark | 413967 | 514 | | Humboldt | 116966 | 3 | 83 | Nye | 47157 | 67 | 163 |
| Churchill | 104132 | 34 mtgs | 591 | Lander | 41172 | 3 | 758 | Ormsby | 72637 | 19 | 102 |
| Douglas | 24496 | 22 | 415 | Lincoln | 41292 | 0 mtgs | 467 | Pershing | 57488 | 28 | 58 |
| Elko | 14831 | 43 | 343 | Washoe | 407205 | 734 | 221 | Storey | 28573 | R mtgs | 112 |
| Esmeralda | 26291 | 3H deeds | 138-141 | Lyon | | 55488 | 31 mtgs | 449 | White Pine | 28124 | 261 | 341-344 |
| Eureka | 39602 | 3 | 263 | Mineral | | 78848 | 10 mtgs | 534-537 | | | | |

(which provisions, identical in all counties, are printed on the reverse hereof) hereby are adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that he will observe and perform said provisions; and that the references to property, obligations, and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in this Deed of Trust.

The undersigned Trustor request that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to him at his address herein before set forth.

STATE OF NEVADA )
)ss
COUNTY OF CLARK )

On_____

personally appeared before me, a Notary Public,

_____

_____

personally known or proven to me to be the person(s) whose name(s) is/are subscribed to the above instrument who acknowledged that he/she/they executed this instrument for the purp therein contained

_____
Notary Public

My commission expires:_____

_____
Trustor

_____
Buyer

**Exhibit A**

**DO NOT RECORD**

The following is a copy of provisions (1) to (16) inclusive, of the Deed of Trust, recorded in each county in Nevada, as stated in the foregoing Deed of Trust and Incorporated by reference in said Deed of Trust as being a part thereof as if set forth at length therein.

To Protect the Security of This Deed of Trust, Trustor Agrees:

1.  To properly care for and keep the property in good condition and repair, not to remove or demolish any building thereon; to complete in a good and workmanlike manner any building which may be constructed thereon, and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws, ordinances and regulations requiring any alterations or improvements to be made thereon; not to commit or permit any waste thereof; not to commit, suffer or permit any act to be done in or upon the property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune and/or do any other act or acts, all in a timely and proper manner, which, from the character or use of the property, may be reasonably necessary, the specific enumerations herein not excluding the general.

2.  To pay and discharge all costs, fees and expenses of these Trusts, including cost of evidence of title and Trustee's fees in connection with sale, whether completed or not, which amounts shall become due upon delivery to Trustee of Declaration of Default and Demand for Sale, as hereinafter provided.

3.  The amount collected under any fire insurance policy shall be credited first, to accrued interest, next to expenditures hereunder, and any remainder upon the principal. Interest shall then cease upon the amount so credited upon principal; provided, however, that at the option of the Beneficiary, the entire amount collected under the policies or any part thereof may be released to the Trustor, without liability upon the Trustee for such release.

4.  That if, during the existence of the Trust there be commenced or pending any suit or action affecting said conveyed premises, or any part thereof, or the title thereto, or if any adverse claim for or against the premises, or any part thereof, be made or asserted, he will appear in and defend any such matter purporting to affect the security and will pay all costs and damages arising because of such action.

5.  Any award of damages in connection with any condemnation for public use of or injury to any property or any part thereof is hereby assigned and shall be paid to Beneficiary, who may apply or release such moneys received by him in the same manner and with the same affect as herein provided for disposition of proceeds of insurance.

6.  Trustee shall be under no obligation to notify any party hereto of any pending sale hereunder or of action or proceeding of any kind in which Trustor, Beneficiary and/or Trustee shall be named as defendant, unless brought by Trustee.

7.  Acceptance by Beneficiary of any sum in payment of any indebtedness secured hereby, after the date when the same is due, shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums so secured or to declare default as herein provided for failure to pay.

8.  Trustee may, at any time, or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust and the Note(s) secured hereby for endorsement, and without affecting the personal liability of

any person for payment of the indebtedness secured hereby or the effect of this Deed of Trust upon the remainder of said property; reconvey any part of said property; consent in writing to the making of any map or plat thereof; join in granting any easement thereon; or join in any extension agreement or subordination agreement in connection herewith.

9.  Upon receipt of written request from Beneficiary reciting that all sums secured hereby have been paid and upon surrender of this Deed of Trust and said Note to Trustee for cancellation and retention and upon payment of its fees, the Trustee shall reconvey without warranty the property then held hereunder.  The recitals in such reconveyance of any matters of fact shall be conclusive proof of the truth thereof.  The Grantee in such reconveyance may be described in general terms as "the person or persons legally entitled thereto."  Trustee is authorized to retain this Deed of Trust and the Note.

(a)  Should default be made by Trustor in payment of any indebtedness secured hereby and/or in performance of any agreement herein, the Beneficiary may declare all sums secured hereby immediately due by delivery to Trustee of a written Declaration of Default and Demand for Sale, and of written notice of default and election to cause said property to be sold (which notice Trustee shall cause to be recorded in the appropriate County Recorder's Office) and shall surrender to Trustee this Deed of Trust, the Note(s) and all documents evidencing any expenditure secured hereby.

10. After three months have elapsed following recordation of any such Notice of Default, Trustee shall sell said property at such time and at such place in the State of Nevada as the Trustee, in it's sole discretion, shall deem best to accomplish the objects of these Trusts, having first given notice of such sale as then required by law.  Place of sale may be either in the County in which the property to be sold, or any part thereof, is situated, or at an office of the Trustee located in the State of Nevada.

(a)  The Trustor, Pledgor and Mortgagor of the personal property herein pledged and/or mortgaged waives any and all other demands or notices as conditions precedent to sale of such personality.

(b)  Trustee may postpone sale of all, or any portion, of said property by public announcement at the time fixed by said Notice of Sale, and may thereafter postpone said sale from time to time by public announcement at the time previously appointed.

(c)  At the time of sale so fixed, Trustee may sell the property  advertised or any part thereof, either as a whole or in separate parcels at its sole discretion, at public auction, to highest bidder for cash in lawful money of the United States, payable at time of sale, and shall deliver to such purchaser a deed conveying the property so sold, but without covenant or warranty, express or implied.  Trustor hereby agrees to surrender, immediately and without demand, possession of said property to such purchaser.

11.  Trustee shall apply the proceeds of any such sale to payment of expenses of sale and all charges and expenses of Trustee and of these Trusts, including cost of evidence of title and Trustee's fee in connection with sale; all sums expended under the terms hereof, not then repaid, with accrued interest at the rate of ten percent (10%) per annum; all other sums then secured hereby, and the remainder, if any, to the person or persons legally entitled thereto.

12.  The Beneficiary or assigns may, at any time, by instrument in writing, appoint a successor or successors to the Trustee named herein or acting hereunder, which instrument, executed and acknowledged by Beneficiary, and recorded in the Office of the

County Recorder of the County or Counties wherein said property is situated, shall be conclusive proof of the proper substitution of such Successor Trustee, who shall have all the estate, powers, duties and trusts in the premises vested in or conferred upon the original Trustee. If there be more than one Trustee, either may act alone and execute the Trust upon the request of the Beneficiary and his acts shall be deemed to be the acts of all Trustees, and the recital in any conveyance executed by such sole Trustee of such requests shall be conclusive evidence thereof, and of the authority of such sole Trustee to act.

13.    This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns.

14.    Trustee accepts these trusts when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

15.    In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular includes the plural, and the term Beneficiary shall include any future holder, including pledges, of the note secured hereby.

16.    When not inconsistent with the above the following covenants, No. 1;2 ($[replacement value]);3;4 (10%) 5;6;7 (a reasonable%) of NRS 107,030 are hereby adopted and made a part of this Deed of Trust.

DO NOT RECORD

**REQUEST FOR FULL RECONVEYANCE**

To be used only when note has been paid in full.

To:   UNITED TITLE OF NEVADA, A NEVADA CORPORATION, TRUSTEE;
Dated _____

The undersigned is the legal owner and holder of all indebtedness secured by the within Deed of Trust. All sums secured by said Deed of Trust have been fully paid and are satisfied. You are hereby requested and directed, on payment to you of any sums owing to you under the terms of said Deed of Trust, to cancel all evidences of indebtedness secured by the Deed of Trust, delivered to you herewith together with the Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of said Deed of Trust, the estate now held by you under the same.


MAIL RECONVEYANCE TO:

_____          _____

_____          _____

_____          BY _____

_____          BY _____

Do not lose or destroy this Deed of Trust OR THE NOTE which it secures.  Both must be delivered to the Trustee for cancellation before reconveyance will be made.

RIDER TO SHORT FORM DEED OF TRUST
AND ASSIGNMENT OF RENTS,
SECURITY AGREEMENT AND FIXTURE FILING ("Rider"),
dated _____ ____, 2004, among
[*Rhodes entity*], a _____, as trustor ("Trustor"),
UNITED TITLE OF NEVADA, a Nevada corporation, as trustee ("Trustee"),
and COMMERCE ASSOCIATES, LLC, a Nevada limited liability company,
as beneficiary ("Beneficiary")


     In addition to the terms and provisions incorporated by the reference on the front page of this Deed of Trust, Trustor and Beneficiary agree as follows (in the event of any inconsistency between the terms of this Rider and the terms of the printed form attached hereto and/or incorporated by reference, the terms of this Rider shall control):

THIS DEED OF TRUST CONSTITUTES A FIXTURE FILING UNDER NRS 104.9334 OF THE UNIFORM COMMERCIAL CODE OF THE STATE OF NEVADA (as now or hereafter in effect, the "UCC"). TO THE EXTENT THE GOODS ARE FIXTURES UNDER THE LAWS OF THE STATE OF NEVADA, THE FIXTURES ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY LOCATED IN THE COUNTY OF CLARK, STATE OF NEVADA, MORE PARTICULARLY DESCRIBED ON EXHIBIT A ATTACHED HERETO. THE NAME OF THE RECORD OWNER OF THE REAL PROPERTY IS _____.

     In addition to the property described on Exhibit A, Trustor hereby grants to Trustee, IN TRUST WITH POWER OF SALE, to the extent the same is real property, and grants a security interest to Beneficiary to the extent the same is personal property, the following property and property rights:

All easements, rights, privileges, tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining (including without limitation all minerals and quarries thereon or therein, all mining claims thereunto appertaining, all oil, gas and mineral rights and all royalties of every kind and nature) to the property described on Exhibit A attached to this Deed of Trust, and all of the estate, right, title, interest, claim, demand, reversion or remainder whatsoever of Trustor therein or thereto, either at law or in equity, in possession or expectancy, now or hereafter acquired, including, without limitation, all and singular the ways, waters, water courses, water rights and powers, liberties, privileges, sewers, pipes, conduits, wires and other facilities furnishing utility or other services to the property (collectively, with the property described on Exhibit A, hereinafter referred to as the "Land");

TOGETHER WITH all of the right, title and interest of Trustor in and to all buildings, structures and improvements now or hereafter erected on the Land including all fixtures of every kind and nature whatsoever now or hereafter located on or forming part of said

buildings. structures and improvements (collectively, the "Improvements"; the Land and Improvements being hereinafter collectively referred to as the "Premises");

TOGETHER WITH all of the right, title and interest of Trustor in and to the land lying in the bed of any street, road, highway or avenue in front of or adjoining the Premises;

TOGETHER WITH any and all award and awards heretofore made or hereafter to be made by any governmental authorities to the present and all subsequent owners of the Premises which may be made with respect to the Premises as a result of the exercise of the right of eminent domain, the alteration of the grade of any street or any other injury to or decrease of value of the Premises, which said award or awards are hereby assigned to Beneficiary, and Beneficiary, at its option, is hereby authorized, directed and empowered to collect and receive the proceeds of any such award or awards from the authorities making the same and to give proper receipts and acquittance therefor, and to apply the same as hereinafter provided; and Trustor hereby covenants and agrees to and with Beneficiary, upon request by Beneficiary, to make, execute and deliver, at Trustor's expense, any and all assignments and other instruments sufficient for the purpose of assigning the aforesaid award or awards to Beneficiary, subject only to such encumbrances (i) not caused by the act or omission of Trustor, its agents or assigns, or (ii) otherwise approved by Beneficiary;

TOGETHER WITH leases of the Premises or any part thereof now or hereafter entered into and all right, title and interest of Trustor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance by the lessees of their obligations thereunder (whether such cash or securities are to be held until the expiration of the terms of such leases or applied to one or more of the installments of rent coming due Immediately prior to the expiration of such terms), all rights to all insurance proceeds and unearned insurance premiums arising from or relating to the Mortgaged Property (hereinafter defined) (whether or not such insurance is required hereunder), all other rights and easements of Trustor now or hereafter existing pertaining to the use and enjoyment of the Premises and all right, title and interest of Trustor in and to all declarations of covenants, conditions and restrictions as may affect or otherwise relate to the Premises;

TOGETHER WITH all permits, plans, licenses, specifications, subdivision rights, security interests, contracts, contract rights, public utility deposits, prepaid sewer and water hook-up charges; Trustor's agreements with the design architect for the construction of the Improvements, soils engineer and mechanical and structural engineer, if any; the construction contract with the general contractor, all subcontracts; and all other rights, licenses, permits and agreements relating to the construction of the Improvements on the Land, or other rights as may affect or otherwise relate to the Premises;

TOGETHER WITH all proceeds, rents, issues, profits, prepaid municipal and utility fees, bonds, revenues, income and other benefits to which Trustor may now or hereafter be entitled from, or which are derived from, the Premises, which premises, titles, interests,

2

awards, easements, rents, revenues, income, benefits, ways, waters, rights, powers, liberties, privileges, utilities, tenements, hereditaments, appurtenances, reversions, remainders, permits, plans, specifications, contracts, contract rights, rents, issues, profits, fees, revenues, bonds, estate, property, rights, accounts, possession, claims and demands, are hereinafter collectively referred to as the "Mortgaged Property").

1.    **Further Acts and Assurances**.    Trustor will, at its sole cost and expense, execute, acknowledge and deliver all such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as the Trustee or Beneficiary shall from time to time require for carrying out the intention or facilitating the performance of the terms of this Deed of Trust, or for filing, registering or recording this Deed of Trust.

2.    **Taxes**.    Trustor, from time to time when the same shall become due, will pay and discharge, or cause to be paid and discharged, all taxes and governmental charges of every kind and nature that may at any time be assessed or levied against or with respect to the Mortgaged Property or any part thereof.

3.    **Liens**.    Trustor will pay from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Mortgaged Property or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the lien and security interest hereof shall be fully preserved, at the cost of Trustor, without expense to Beneficiary.

4.    **Insurance**.

a)    Trustor will obtain and maintain (i) all risk property insurance in an amount at least equal to the unpaid balance of the promissory note secured hereby; (ii) comprehensive public liability insurance, including bodily injury and property damage; (iii) workmen's compensation and employer's liability: (iv) flood insurance if the Project is located in an identified flood plain; and (v) insurance for such other risks as Beneficiary may require (including, without limitation, casualty insurance). All such policies shall be in form and amounts and with coverage satisfactory to Beneficiary, shall be endorsed with a standard non-contributory mortgagee, clause (438 BF) in favor of Beneficiary and shall provide for a 30-day written notice to Beneficiary prior to (i) cancellation for non-payment of premiums or any other reason, (ii) material modification, or (iii) payment of any insurance claims to any person.

b)    Any monies received as payment for any loss under any insurance for or relating to the Premises shall be paid over to Beneficiary to be applied at the option of Beneficiary either to the prepayment of the Note, without premium, in such order as Beneficiary may elect,    or shall be disbursed to Trustor under stage payment terms satisfactory to Beneficiary for application to the cost of repairs, replacements or restorations of the

3

Improvement so damaged or destroyed. If such monies are applied to the prepayment of the Note, including any and all amounts due thereunder, then the surplus remaining after such prepayment, if any, shall be paid over to the person or persons legally entitled thereto.

5.    **Due On Transfer**.  Beneficiary may declare all sums secured hereby immediately due and payable within thirty (30) days after such declaration, except as expressly limited by law, if Trustor, without Beneficiary's prior written consent: (a) sells, conveys, contracts to sell, alienates or further encumbers all or any part of the Mortgaged Property, other than as contemplated in Section 15 below; or (b) leases all or any part of the Mortgaged Property for a term, together with all exercisable options, of more than five (5) years; or (c) permits the title or any interest in the Mortgaged Property to be divested, whether voluntarily or involuntarily, except as expressly permitted by Section 15 below or in the Subordination Agreement of even date herewith by and between Beneficiary and _____ and recorded concurrently herewith; or (d) changes or permits to be changed the character or use of the Mortgaged Property; or (e) transfers the presently existing ownership interests in Trustor (including, without limitation, partnership, membership or stock ownership interest, as the case may be) so as to effectively transfer control of Trustor named herein to any other person, firm, corporation or other entity.  Any such encumbrance, sale, conveyance or transfer made without Beneficiary's prior written consent shall be a default hereunder.

6.    **Compliance With Laws**.  Trustor shall comply with all applicable restrictive covenants, zoning and subdivision ordinances and building codes, all health and environmental laws and regulations and all other applicable laws, rules, regulations, requirements, directions, orders and notices of violations issued by any governmental agency, body or officer (collectively, "Laws") relating to or affecting the Premises or the business or activity being conducted thereon whether by Trustor or by any occupant thereof, including, without limitation any and all Laws relating to hazardous or toxic waste or waste products or hazardous substances.  Further, Trustor shall protect, defend, indemnify and hold Beneficiary and the Trustee harmless from the failure by Trustor to comply with such Laws to the full extent provided for therein.  This indemnity shall survive the satisfaction or reconveyance of this Deed of Trust or the entry of a judgment of foreclosure, sale of the Mortgaged Property by nonjudicial foreclosure sale, or delivery of a deed in lieu of foreclosure.

7.    **Assignment of Rents**.  The assignment of rents, income and other benefits (collectively, "rents") contained in the granting clause of this Deed of Trust shall be fully operative without any further action on the part of Trustor or Beneficiary and specifically Beneficiary shall be entitled, at its option, to all rents from the Mortgaged Property whether or not Beneficiary takes possession of the Mortgaged Property.  Trustor hereby further grants to Beneficiary the right (i) to enter upon and take possession of the Mortgaged Property for the purpose of collecting the rents, (ii) to dispossess by the usual summary proceedings any tenant defaulting in the payment thereof to Beneficiary, (iii) to let the Mortgaged Property or any part thereof, and (iv) to apply the rents, after payment

4

of all necessary charges and expenses, on account of the indebtedness and other sums secured hereby. Such assignment and grant shall continue in effect until the indebtedness and other sums secured hereby are paid, the execution of this Deed of Trust constituting and evidencing the irrevocable consent of Trustor to the entry upon and taking possession of the Mortgaged Property by Beneficiary pursuant to such grant, whether or not sale or foreclosure has been instituted. Neither the exercise of any rights under this paragraph by Beneficiary nor the application of the rents to the indebtedness and other sums secured hereby, shall cure or waive any default or notice of default hereunder or invalidate any act done pursuant hereto, but shall be cumulative of all other rights and remedies.

The foregoing provisions hereof shall constitute an absolute and present assignment of the rents from the Mortgaged Property, subject, however, to the conditional license given to Trustor to collect and use the rents until the occurrence of a default at which time such conditional license shall automatically terminate; and the existence or exercise of such right of Trustor shall not operate to subordinate this assignment, in whole or in part, to any subsequent assignment by Trustor permitted under the provisions of this Deed of Trust, and any such subsequent assignment by Trustor shall be subject to the rights of the Trustee and Beneficiary hereunder.

8.    **Rents After Default**. On and after the occurrence of a default, Trustor shall pay all rents, issues and profits thereafter received by Trustor from the Mortgaged Property to Beneficiary and to the extent not paid shall hold such amounts as trust funds for the benefit of Beneficiary and such rents, issues and profits shall be deemed "cash collateral" of Beneficiary under Title 11 of the United States Code.

9.    **Jury Trial; Appointment of Receiver**. After the happening of a default by Trustor under this Deed of Trust and immediately upon the commencement of any action, suit or other legal proceeding by Beneficiary to obtain judgment for the principal of, or interest on, the Note and other sums required to be paid by Trustor pursuant to any provisions of this Deed of Trust, or of any other nature in aid of the enforcement of the Note, or of this Deed of Trust, TRUSTOR WAIVES TRIAL BY JURY and will enter its voluntary appearance in such action, suit or proceeding. Further, Trustor hereby consents to the appointment of a receiver or receivers of the Mortgaged Property and of all the earnings, revenues, rents, issues, profits and income thereof. After the happening of any such default or upon the commencement of any proceedings to foreclose this Deed of Trust or to enforce the specific performance hereof or in aid thereof or upon the commencement of any other judicial proceeding to enforce any right of the Trustee or Beneficiary hereunder, Beneficiary shall be entitled, as a matter of right, if it shall so elect, without the giving of notice to any other party and without regard to the adequacy or inadequacy of any security for the Deed of Trust indebtedness, forthwith either before or after declaring all sums evidenced by the Note to be due and payable, to the appointment of such a receiver or receivers.

10.    **Security Agreement**. This Deed of Trust constitutes a Security Agreement under the laws of the State of Nevada so that Beneficiary is hereby granted, shall have, and may

endorse, a security interest in any or all of the Mortgaged Property which may or might now or hereafter be or be deemed to be personal property, fixtures or property other than real property (collectively, "Personal Property") and Trustor agrees to execute, as debtor, such financing statement or statements as Beneficiary may now or hereafter reasonably request in order that such security interest or interests may be perfected pursuant to such laws. Notwithstanding the foregoing, Trustor and Beneficiary agree that any Personal Property which may be considered real property shall be conclusively presumed to be real property.

11.    **UCC Remedies**.  Upon the occurrence of a default, Beneficiary shall have all of the rights and remedies of a secured party under the UCC, and specifically the right to direct notice and collections of any obligation owing to Trustor by any lessee.

12.    **Hazardous Substances**.

a)    **Covenants and Agreements**.

i)    Trustor covenants that it shall keep or cause the Premises to be kept  free of Hazardous Substances and not cause or permit the use, storage, treatment, transportation, manufacture, refining, handling, production, generation or disposal (collectively, "Use") of Hazardous Substances, except in compliance with all applicable Federal, State and local laws or regulations, on, in, under or about the Premises.

ii)    Trustor covenants to ensure compliance by all operators and occupants of the Premises with all applicable Federal, State and local laws, ordinances, rules and regulations and will ensure that all such operators and occupants obtain and comply with any and all required approvals, registration or permits.

iii)    Trustor shall immediately advise Beneficiary in writing of (A) any and all claims received by Trustor alleging or asserting liability with respect to Trustor in connection with the Hazardous Substances, or of which Trustor becomes aware, or (B) Trustor's discovery of the presence of any Hazardous Substances on, under or about the Premises (other than in *de minimis* amounts in the ordinary course of construction or in full compliance with all environmental laws); and thereafter, shall conduct and complete all investigations, studies, sampling, testings and remedial action relative to such Hazardous Substances at or affecting the Premises, in accordance with the recommendations of Trustor's environmental engineering consultant (reasonably approved by Beneficiary) to ensure compliance with applicable Federal, State and local laws or regulations.

b)    **Indemnity**.

i)    Trustor shall indemnify, protect, defend (with reputable counsel satisfactory to Beneficiary) and hold Beneficiary harmless from and against any and all liability and expense (including investigation and counsel fees) suffered or incurred by

6

Beneficiary, whether as holder of this Deed of Trust, as mortgagee in possession or as successor in interest to Trustor as owner of the Mortgaged Property by virtue of foreclosure or acceptance of a deed or other transaction in lieu of foreclosure, or after partial or total reconveyance of this Deed of Trust, arising from, in respect of, as a consequence of (whether foreseeable or unforeseeable) or in connection with any spill or with the presence or Use, of any Hazardous Substance at, under or related to the Mortgaged Property, whether or not originating or emanating from the Mortgaged Property.

c)      **Continuing Obligation**.  Satisfaction or reconveyance of this Deed of Trust or the entry of a judgment of foreclosure, sale of the Mortgaged Property by nonjudicial foreclosure sale, or delivery of a deed in lieu of foreclosure shall not operate as a discharge of Trustor's obligations to Beneficiary as to Hazardous Substances and the indemnity provisions above.

d)      **Definitions**.  The term "Hazardous Substances" shall mean any substance defined as "hazardous substances," "hazardous materials" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. section 9601, et seq.; the Materials Transportation Act, 39 U.S.C. section 1801, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. section 901, et seq.; or by local or State law; and in the regulations adopted and publications promulgated pursuant to those laws or any other laws relating to hazardous or toxic waste or hazardous substances.

13.     **Purchase Agreement**.  This Deed of Trust is given in connection with and pursuant to that certain Purchase Agreement and Grant of Options, dated November 7, 2003 (as now or hereafter in effect, the "Purchase Agreement").  The occurrence of a Purchaser Default under the Purchase Agreement shall constitute a default under this Deed of Trust entitling Beneficiary to exercise any and all remedies under this Deed of Trust, including the acceleration of any and all indebtedness secured hereby and Beneficiary's right to require the sale of the Mortgaged Property by nonjudicial foreclosure sale sold pursuant to a trustee's sale.

14.     **Binding Obligations**.  All of the grants, covenants, terms, agreements, provisions and conditions herein contained shall run with the land, shall apply to and bind Trustor and any person or entity having an ownership interest in the Mortgaged Property and shall inure to the benefit of Beneficiary and the Trustee, their successors and assigns.

15.     **Partial Releases**.  Upon the written request of Trustor, Beneficiary agrees to release portions of the Premises from the lien of the Deed of Trust, in connection with sales of Residences (as defined in the Purchase Agreement) to members of the homebuying public, upon the satisfaction of all of the following conditions prior to the release:

a)      At the time of such release no Event of Default (as defined in the Secured Promissory Note which this Deed of Trust secures [the "Note"]) or Purchaser Default (as defined in the Purchase Agreement) shall have occurred and be continuing; provided that so long as all other applicable conditions precedent to releases have been satisfied, Beneficiary will continue to grant releases in accordance with this section notwithstanding the existence of such Event of Default or Purchaser Default, so long as in addition to satisfying all other conditions precedent in this Section 15, (i) Trustor provides Beneficiary with evidence reasonably acceptable to Beneficiary that Trustor is obligated to sell or transfer the Residence pursuant to a bona fide purchase and sale agreement with a member of the homebuying public (a "Purchase Contract") and (ii) in addition to the Release Payment payable to Beneficiary with respect to such release, Trustor pays or causes to be paid to Beneficiary proceeds of whatsoever nature payable to Trustor with respect to such sale.

b)      Such release shall be in connection with the conveyance, pursuant to a Purchase Contract, of a portion of the Land constituting a legally subdivided lot on a recorded subdivision map (a "Lot") on which a Residence has been constructed.

c)      Trustor shall pay, at Beneficiary's option, either (i) all of Beneficiary's reasonable costs and expenses, including, without limitation, reasonable attorneys' fees arising in connection with the applicable release, or (ii) a release fee of $15.00 per Lot.

d)      Each release shall be made by Beneficiary by delivery of the release documents to a title company or other escrow agent satisfactory to Beneficiary upon such conditions as shall assure Beneficiary that all conditions precedent to such release have been satisfied and that the applicable transaction will be completed.

e)      Trustor shall have delivered to Beneficiary a certificate in form reasonably satisfactory to Beneficiary specifying the gross sales proceeds being received upon such sale.

f)      Trustor shall pay to Beneficiary for each Lot released, in immediately available funds, as a principal payment under the Note, an amount (the "Release Payment") equal to the lesser of (i) $5,900 per Lot or (ii) the result obtained by dividing the unpaid principal balance of the Note as of the date of such release by the number of Lots then encumbered by this Deed of Trust.

g)      Unless otherwise agreed by Beneficiary in its sole and absolute discretion, all such sales shall be for cash and no sale shall be subject to financing by the Trustor.

8

# EXHIBIT A

## LEGAL DESCRIPTION

All those plots, pieces or parcels of land lying, being or situate in the County of Clark,
State of Nevada more particularly described as follows:

## EXHIBIT I

## DUE DILIGENCE MATERIALS

### (Section 7.1)

[List/Describe.]

## Due Diligence

1). **Contacts:**

    A). Commerce Associates – Barry Fieldman 702-456-8744/cell 429-6913 or Bob Unger cell 429-6912

    B). Issac Construction- Zev Yakabovsky 702-400-9623 & 215-2660

    C). Michael Buckley Esq (purchase greements KB). – 702-734-2220 Sandra Turner Esq (purc. agreements Amer Prem & Richmond American– 702-862-3389

    D). PBS&J Engineers, Lee Ferris– 702-263-7275

    E). Environmental Consultant – John Kim CEM 602-437-0250

    F). Broadbent & Associates (Environmental) – Bob Broadbent 702-563-0600.

    G). United Title –Jay Pugh 702-251-4777

    H) Loan legal review- Steve Yoken 796-5555 (Gordon&Silver).

2). Environmental Insurance Policy and Endorsement

3). 2 CD Rom discs containing:

    1). Tentative Maps (disc 2 sec 3)

    2). Misc. maps & Improvement plans (disc 2 sec 1)

    3). Parcel improvement plans (disc 2 sec 4)

    4). Blank

    5). Vesting deeds (disc 2 sec 7)

    6). Blank

    7). Environmental materials (disc 2 sec 3 #5)

    8). Design Guidelines (disc 2 sec 3 #1)

    9). Residential color & material guidelines (disc 2 sec 3 #6)

    10). C-1 Channel (disc 1 sec 1)

    11). Concept reports (disc 2 sec 4)

    12). Geotechnical Report (disc 2 sec 3 #3)

    13). Master reports (disc 2 sec 3 #5)

    14). Blank

    15). Blank

    16). Loop Road (disc 2 sec 2 #4)

    17). NCTS 1 (disc 1 sec 4)

    18). NCTS 2 (disc 1 sec 5)

    19). R-7 Reservoir (disc 1 sec 6)

    20). Reuse waterline (disc 1 sec 7)

    21). Lift station (disc 1 sec 8)

    22). Maintenance facility (disc 1 sec 3)

4). Parcel handbook showing location of utilities, block walls, fences & fire access.

03/07/1994  23:10    7024565210                    MAKENA

5). Tuscany Design Guidelines— see CD Rom disc 2 sec 3 #1 also hard copy enclosed.

6). Phase I Report

7). HOA Budget – excludes cable hook-up (est. $19.99) added to HOA. Also on disc 2 sec 4)

8). CC&Rs, Articles of Inc., By Laws of HOA and Master Declaration.

9). Preliminary Title Report dated _____, United Title order# _____

10). Site plan

11). Buyer Disclosure/acknowledgement

12). Zoning Approvals.

13). French Drain locations.

14). Cable TV Contract w/HOA @ $19.50 per home.

15). Gold Bond letter from City of Henderson.

16). C1 Channel Exhibit (phase 1 &2).

17). Harding Groundwater Report.


Received by: _____  Date _____

Print Name: _____

## EXHIBIT J

## MASTER DECLARATION

### (Section 8.1(a))

[Attach form]

APN: _____

RECORDING REQUESTED BY, AND
WHEN RECORDED RETURN TO:

_____
_____
_____
_____

# MASTER DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS

## AND RESERVATION OF EASEMENTS

### FOR

### TUSCANY

# TABLE OF CONTENTS

Article 1. Creation of the Community ................................................................................ 1
   1.1   Purpose and Intent............................................................................................... 1
   1.2   Governing Documents. ....................................................................................... 2
Article 2. Concepts and Definitions................................................................................... 2
   2.1   "Act" ................................................................................................................... 2
   2.2   "Area of Common Responsibility" ..................................................................... 2
   2.3   "Articles"............................................................................................................ 2
   2.4   "Assessment" ..................................................................................................... 3
   2.5   "Master Association" .......................................................................................... 3
   2.6   "Base Assessment"............................................................................................. 3
   2.7   "Board of Directors" or "Board" ........................................................................ 3
   2.8   "Builder" ............................................................................................................ 3
   2.9   "Bylaws" ............................................................................................................ 3
   2.10  "City" ................................................................................................................. 3
   2.11  "Common Elements" .......................................................................................... 3
   2.12  "Common Expenses" .......................................................................................... 4
   2.13  "Community" ...................................................................................................... 4
   2.14  "Community-Wide Standard" ............................................................................. 4
   2.15  "Custom Lots"..................................................................................................... 4
   2.16  "Declarant"......................................................................................................... 4
   2.17  "Declarant Control Period" ................................................................................ 4
   2.18  "Declarant Rights Period" .................................................................................. 5
   2.19  "Design Guidelines"........................................................................................... 5
   2.20  "Director" ........................................................................................................... 5
   2.21  "Dwelling" ......................................................................................................... 5
   2.22  "Family"............................................................................................................. 5
   2.23  "Golf Course"..................................................................................................... 5
   2.24  "Governing Documents" .................................................................................... 5
   2.25  "Improvement".................................................................................................... 5
   2.26  "Invitees"............................................................................................................ 6
   2.27  "Manager" .......................................................................................................... 6
   2.28  "Master Plan" ..................................................................................................... 6
   2.29  "Maximum Units" .............................................................................................. 6
   2.30  "Member"............................................................................................................ 6
   2.31  "Mortgage"......................................................................................................... 6
   2.32  "Neighborhood" ................................................................................................. 6
   2.33  "Neighborhood Assessments"............................................................................ 7
   2.34  "Neighborhood Association" .............................................................................. 7
   2.35  "Neighborhood Common Elements" .................................................................. 7
   2.36  "Neighborhood Expenses" ................................................................................. 7
   2.37  "Notice and Hearing" ......................................................................................... 7
   2.38  "Officer"............................................................................................................. 7
   2.39  "Owner" ............................................................................................................. 7

                                                           i

2.40 "Person" ............................................................................................................... 7
2.41 "Plat" .................................................................................................................... 7
2.42 "Private Amenities" ............................................................................................... 8
2.43 "Private Streets" .................................................................................................... 8
2.44 "Property" or "Tuscany" ........................................................................................ 8
2.45 "Record," "Recording," "Recordation," or "Recorded" ............................................ 8
2.46 "Requisite Membership Percentage" ...................................................................... 8
2.47 "Requisite Neighborhood Percentage" ................................................................... 8
2.48 "Resident" ............................................................................................................ 8
2.49 "Rules and Regulations" ....................................................................................... 8
2.50 "Special Assessment" ........................................................................................... 9
2.51 "Specific Assessment" ........................................................................................... 9
2.52 "Supplemental Declaration" .................................................................................. 9
2.53 "Unit" ................................................................................................................... 9
Article 3. Use and Conduct ................................................................................................ 9
3.1  Framework for Regulation .................................................................................... 9
3.2  Rule Making Authority ......................................................................................... 10
3.3  Owners' Acknowledgment and Notice to Purchasers ............................................ 10
3.4  Protection of Owners and Others .......................................................................... 11
3.5  Use Restrictions ................................................................................................... 11
Article 4. Architecture and Landscaping ............................................................................ 18
4.1  General ................................................................................................................ 18
4.2  Architectural Review ............................................................................................ 18
4.3  Guidelines and Procedures ................................................................................... 19
4.4  No Waiver of Future Approvals ............................................................................ 21
4.5  Variances ............................................................................................................. 21
4.6  Limitation of Liability .......................................................................................... 22
4.7  Certificate of Compliance .................................................................................... 22
Article 5. Maintenance and Repair ..................................................................................... 22
5.1  Maintenance of Units and Private Amenities. ....................................................... 22
5.2  Maintenance of Neighborhood Property ................................................................ 22
5.3  Responsibility for Repair and Replacement. .......................................................... 23
Article 6. The Master Association and its Members ............................................................. 24
6.1  Function of Master Association. ............................................................................ 24
6.2  Membership. ........................................................................................................ 24
6.3  Voting. ................................................................................................................. 24
6.4  Neighborhoods. .................................................................................................... 25
Article 7. Master Association Powers and Responsibilities .................................................. 26
7.1  Acceptance and Control of Master Association Property. ....................................... 26
7.2  Maintenance of Area of Common Responsibility. .................................................. 27
7.3  Insurance. ............................................................................................................ 28
7.4  Compliance and Enforcement. .............................................................................. 32
7.5  Implied Rights; Board Authority. ......................................................................... 33
7.6  Indemnification of Officers, Directors and Others. ................................................ 33
7.7  Security. ............................................................................................................... 34

| | | |
|---|---|---|
| 7.8 | Powers of the Master Association Relating to Sub-Associations. | 34 |
| 7.9 | Provision of Services. | 35 |
| 7.10 | Relations with Other Property; Entities. | 35 |
| 7.11 | Facilities and Services Open to the Public. | 35 |
| Article 8. Master Association Finances | | 36 |
| 8.1 | Budgeting and Allocating Common Expenses. | 36 |
| 8.2 | Limitations on Common Assessment Increases. | 36 |
| 8.3 | Budgeting and Allocating Neighborhood Expenses. | 37 |
| 8.4 | Budgeting for Reserves. | 37 |
| 8.5 | Special Assessments. | 38 |
| 8.6 | Specific Assessments. | 38 |
| 8.7 | Authority To Assess Owners; Time of Payment. | 38 |
| 8.8 | Personal Obligation for Assessments. | 39 |
| 8.9 | Lien for Assessments. | 40 |
| 8.10 | Exempt Property. | 41 |
| 8.11 | Capitalization of Master Association. | 41 |
| Article 9. Expansion of the Community | | 42 |
| 9.1 | Expansion by Declarant. | 42 |
| 9.2 | Expansion by the Master Association. | 42 |
| 9.3 | Additional Covenants and Easements. | 42 |
| 9.4 | Effect of Filing Supplemental Declaration. | 43 |
| Article 10. Additional Rights Reserved to Declarant | | 43 |
| 10.1 | Withdrawal of Property. | 43 |
| 10.2 | Marketing and Sales Activities. | 43 |
| 10.3 | Right To Develop. | 43 |
| 10.4 | Right To Approve Additional Covenants. | 44 |
| 10.5 | Right To Approve Changes in Tuscany Standards. | 44 |
| 10.6 | Right To Transfer or Assign Declarant Rights. | 44 |
| 10.7 | Easement to Inspect and Right to Correct. | 44 |
| 10.8 | Exclusive Rights To Use Name of Development. | 45 |
| 10.9 | Reservation of Rights Relating to Provision for Telephone/Cable Services. | 45 |
| 10.10 | Termination of Rights. | 45 |
| Article 11. Easements | | 46 |
| 11.1 | Easements in Common Element. | 46 |
| 11.2 | Easements of Encroachment. | 47 |
| 11.3 | Easements for Utilities, Etc. | 47 |
| 11.4 | Easements To Serve Additional Property. | 48 |
| 11.5 | Easements for Maintenance, Emergency and Enforcement. | 48 |
| 11.6 | Easements for Private Amenities. | 48 |
| 11.7 | Easement for Special Events. | 49 |
| 11.8 | Easements for Lake and Pond Maintenance and Flood Water. | 49 |
| 11.9 | Easements for Cross-Drainage. | 49 |
| 11.10 | Rights to Stormwater Runoff, Effluent and Water Reclamation. | 50 |
| 11.11 | Easements for Parking; Easements for Vehicular and Pedestrian Traffic. | 50 |
| 11.12 | Easements for Public Service Use. | 50 |

Article 12. Custom Lots ................................................................................................. 51
   12.1    General; Supplemental Declaration. ............................................................ 51
   12.2    Additional Design Guidelines. .................................................................... 51
Article 13. Neighborhood Common Elements ................................................................ 51
   13.1    Purpose. ...................................................................................................... 51
   13.2    Designation. ................................................................................................ 51
   13.3    Use by Others. ............................................................................................ 52
Article 14. Party Walls and Other Shared Structures ..................................................... 52
   14.1    General Rules of Law to Apply. .................................................................. 52
   14.2    Maintenance; Damage and Destruction. ..................................................... 52
   14.3    Right to Contribution Runs With Land ....................................................... 52
   14.4    Disputes. ..................................................................................................... 53
Article 15. Private Amenities ......................................................................................... 53
   15.1    General. ....................................................................................................... 53
   15.2    Conveyance of Private Amenities. .............................................................. 53
   15.3    View Impairment. ....................................................................................... 54
   15.4    Cost Sharing. .............................................................................................. 54
   15.5    Rights of Access and Parking. .................................................................... 54
   15.6    Additional Golf Course Easements. ............................................................ 55
   15.7    Limitations on Amendments. ...................................................................... 56
   15.8    Jurisdiction and Cooperation. ..................................................................... 56
Article 16. Dispute Resolution and Limitation on Litigation ......................................... 57
   16.1    Consensus for Master Association Litigation. ............................................ 57
   16.2    Alternative Method for Resolving Disputes. .............................................. 57
   16.3    Claims. ........................................................................................................ 57
   16.4    Mandatory Procedures. ............................................................................... 58
   16.5    Allocation of Costs of Resolving Claims. .................................................. 59
   16.6    Enforcement of Resolution. ........................................................................ 59
   16.7    Attorneys' Fees. .......................................................................................... 60
Article 17. Mortgagee Provisions .................................................................................. 60
   17.1    Notices of Action. ...................................................................................... 60
   17.2    No Priority. ................................................................................................. 60
   17.3    Notice to Master Association. ..................................................................... 61
   17.4    Failure of Mortgagee To Respond. ............................................................ 61
   17.5    HUD/VA Approval. .................................................................................... 61
Article 18. Changes in Ownership of Units .................................................................... 61
Article 19. Changes in Common Element ...................................................................... 62
   19.1    Condemnation. ............................................................................................ 62
   19.2    Partition. ...................................................................................................... 62
   19.3    Transfer or Dedication of Common Element. ............................................. 62
   19.4    Actions Requiring Owner Approval. ........................................................... 63
Article 20. Amendment of Declaration ........................................................................... 63
   20.1    By Declarant. .............................................................................................. 63
   20.2    By Members. ............................................................................................... 63
   20.3    Validity, Effective Date, and Conflicts. ..................................................... 64

20.4    Exhibits. ....................................................................................................... 64
Article 21. Additional Disclosures, Disclaimers and Releases.................................................... 64
21.1    General Disclosures and Disclaimers Regarding Private Amenities............................ 64
21.2    Additional Disclosures and Disclaimers Regarding Private Amenities. ...................... 65
21.3    Disclosures and Disclaimers of Certain Other Matters................................................ 67
21.4    Releases........................................................................................................................ 70
Article 22. General Provisions..................................................................................................... 70
22.1    No Public Right or Dedication..................................................................................... 70
22.2    Compliance with the Act. ............................................................................................ 71
22.3    No Representations or Warranties. .............................................................................. 71
22.4    Binding Effect.............................................................................................................. 71

EXHIBIT "A" - Land Initially Submitted
EXHIBIT "B" - Land Subject to Annexation
EXHIBIT "C" - Land Which Intended for Use as Golf Course, NOT A PART OF TUSCANY

# MASTER DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RESERVATION OF EASEMENTS FOR TUSCANY

THIS MASTER DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RESERVATION OF EASEMENTS FOR TUSCANY, is made this _____ day of _____, 2003, by COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Declarant").

## PART ONE:  INTRODUCTION TO THE COMMUNITY

Commerce Associates, LLC, as the developer of Tuscany has established this Declaration to provide a governance structure and a flexible system of standards and procedures for the overall development, administration, maintenance and preservation of Tuscany as a master planned community.

### Article 1.

### Creation of the Community

1.1    Purpose and Intent.

Declarant, as the owner of approximately 166 acres of real property as described in Exhibit "A," intends by Recording this Declaration to create a general plan of development for the planned community known as Tuscany. This Declaration provides a flexible and reasonable procedure for the future expansion of Tuscany to include additional real property as Declarant deems appropriate and provides for the overall development, administration, maintenance and preservation of the real property now and hereafter comprising Tuscany. The Tuscany planned community shall initially consist of the real property described in Exhibit "A" which is to contain _____ residential dwellings and Declarant anticipates that the Tuscany planned community may include up to 700 acres containing up to 2,000 residential dwellings.

An integral part of the development plan is the creation of Tuscany Master Association, a master association comprised of all owners of real property in Tuscany, to own, operate and/or maintain various Common Elements and community improvements and to administer and enforce this Declaration and the other Governing Documents referred to in this Declaration.

This document is intended to create a common interest community within the meaning of the Nevada Common-Interest Ownership Act (NRS Chapter 116) as it may be amended from time to time ("Act").

1.2     Governing Documents.

The Governing Documents create a general plan of development for Tuscany which may be supplemented by additional covenants, restrictions and easements applicable to particular Neighborhoods within Tuscany. The Governing Documents shall be construed to be consistent with one another to the extent possible. If there exists any irreconcilable conflicts or inconsistencies among the Governing Documents, then terms and provisions of this Declaration shall prevail (unless and to the extent only that any provision of the Declaration fails to comply with any applicable provisions of the Act), and thereafter the Articles shall prevail over the Bylaws, the Design Guidelines and the Rules. In the event of a conflict between or among the Governing Documents and any Community Governing Document, the terms of the Governing Documents shall control. Nothing in this Section shall preclude any Supplemental Declaration or other Recorded covenants applicable to any portion of Tuscany from containing additional restrictions or provisions which are more restrictive than the provisions of this Declaration. The Master Association may, but shall not be required to, enforce any such covenants, restrictions or other instruments applicable to any Neighborhood.

All provisions of the Governing Documents shall apply to all Owners and to all occupants of their Units, as well as their respective tenants, guests and invitees. Any lease on a Unit shall provide that the lessee and all occupants of the leased Unit shall be bound by the terms of the Governing Documents.

If any provision of this Declaration is determined by judgment or court order to be invalid, or invalid as applied in a particular instance, such determination shall not affect the validity of other provisions or applications.

## Article 2.

## Concepts and Definitions

The capitalized terms used in the Governing Documents shall be defined as set forth below. Other terms used in the Governing Documents shall generally be given their natural, commonly accepted definitions unless otherwise defined in the Act.

2.1     "Act":  The Nevada Common-Interest Ownership Act set forth in NRS Chapter 116, as it may be amended from time to time.

2.2     "Area of Common Responsibility":  The Common Elements, together with such other areas, if any, for which the Master Association has or assumes responsibility pursuant to the terms of this Declaration, any Supplemental Declaration or other applicable covenants, contracts, or agreements.

2.3     "Articles":  The Articles of Incorporation of Tuscany Master Association, as filed with the Nevada Secretary of State.

2.4    "Assessment":    Each and all of the Base Assessments, Neighborhood Assessments, Special Assessments, and Specific Assessments, as applicable.

2.5    "Master Association":    Tuscany Master Association, a Nevada nonprofit corporation, and its successors or assigns.

2.6    "Base Assessment":  Assessments levied on all Units subject to assessment under Article 8 to fund Common Expenses for the general benefit of the Community.  Each and all of the Neighborhood Assessments, Neighborhood Special Assessments, and Neighborhood Specific Assessments, as applicable, are in addition to Base Assessments.

2.7    "Board of Directors" or "Board":  The body responsible for administration of the Master Association, selected as provided in the Bylaws and generally serving the same role as the board of directors under Nevada corporate law and as the executive board under the Act.

2.8    "Builder":  Any Person who purchases one or more Units for the purpose of constructing improvements for later sale to consumers, or who purchases one or more parcels of land within Tuscany for further subdivision, development, and/or resale in the ordinary course of such Person's business.

2.9    "Bylaws":  The Bylaws of Tuscany Master Association, as may be amended from time to time.

2.10    "City":  City of Henderson, Nevada, together with its successors and assigns.

2.11    "Common Elements":  All (i) real property, other than Units, owned or leased by the Master Association, (ii) real property over which the Master Association holds an easement for the use and enjoyment of the Owners including, but not limited to easements designated on the Plats as access and ingress/egress easements, as pedestrian/bike trails or access corridor easements, as landscape easements, as public utility easements, as drainage and/or sewer easements, and any other such easements, (iii) any personal property owned by the Master Association for the use and enjoyment of the Owners, and (iv) any other property owned or held by the Master Association for the use and enjoyment of the Owners including, but not limited to, entry monumentation, private entry gates, and guard houses for the Property, Private Streets, street lights, street signs, curbs and gutters, landscaping and the exterior of all perimeter walls or fences Declarant constructs surrounding the Property or which separate a Unit from Area of Common Responsibility.  The Common Elements shall additionally initially consist of the real property described as follows:

**[insert legal description of initial Common Elements]**

Notwithstanding the foregoing, Private Amenities are separate and constitute private property, and are not part of the Common Elements and are not part of the Property.

2.12    "Common Expenses":  The actual and estimated expenses incurred, or anticipated to be incurred, by the Master Association for the general benefit of all Owners, including a reserve for repairs, replacements or additions to the Common Element, all expenses, fees and other charges imposed upon the Master Association by any governmental entity because the Community is a common interest community pursuant to the Act, and such other expenses as the Board may find necessary and appropriate pursuant to the Governing Documents.

2.13    "Community":  Tuscany, a master residential common interest community under the Act.

2.14    "Community-Wide Standard":  The standard of conduct, maintenance, or other activity generally prevailing throughout the Property.  Such standards may contain both objective and subjective elements and shall be established initially by Declarant in the Design Guidelines and/or the Rules and Regulations.  The Community-Wide Standard may evolve as development progresses and as the needs and demands of Tuscany change.

2.15    "Custom Lots":  Lots, as shown on a Plat, within a designated Custom Lots Neighborhood, in which each such lot is intended to be conveyed to an Owner, for construction by the Owner of a custom home subject to design and architectural requirements of Declarant for custom homes where the Owner of such Custom Lot is not Declarant or a Builder.

2.16    "Declarant":  Commerce Associates, LLC, a Nevada limited liability company, or any successor or assign who takes title to any portion of the property described in Exhibit "A" or "B" for the purpose of development and/or sale and who is designated as Declarant in a Recorded assignment executed by the immediately preceding Declarant (but excluding any "purchaser" as defined under the Act).

2.17    "Declarant Control Period":  The period of time during which the Declarant is entitled to appoint and remove the entire Board of Directors, or a majority thereof.  The Declarant Control Period shall terminate upon the first to occur of the following:

(a)    60 days after Declarant has conveyed 75% of the Maximum Units to Owners other than Builders; or

(b)    five years after Declarant and all Builders have ceased to offer Units for sale in the ordinary course of business; or

(c)    five years after any right to add all or any portion of the property described on Exhibit "B" under Article 9 was last exercised by Declarant; or

(d)    when, in its discretion, Declarant so determines and declares in a Recorded instrument.

Nothing in this Section shall preclude Declarant, in its sole discretion, from voluntarily relinquishing control of the Board earlier than required by this Section, and in such event,

Declarant reserves the right to veto actions of the Master Association as provided in the Bylaws until such time as the Declarant Control Period would have otherwise expired under this Section.

2.18    "Declarant Rights Period":  The period of time during which Declarant owns any property subject to this Declaration or which may be come subject to this Declaration by annexation in accordance with Section 9.1, and during which period of time, Declarant has reserved certain rights as set forth in this Declaration.

2.19    "Design Guidelines":  The architectural, design, and construction guidelines and application and review procedures applicable to the Property, as promulgated and administered pursuant to Article 4, as may be amended.

2.20    "Director":  A duly appointed or elected and current member of the Board of Directors.

2.21    "Dwelling": A single Family detached residential building located on a Unit (or, in a condominium, a condominium Unit) designed and intended for use and occupancy as a residence by a single Family, but specifically excluding "manufactured housing" or mobile homes, neither of which shall be permitted as Dwellings.

2.22    "Family": A group of natural persons related to each other by blood or legally related to each other by marriage or adoption, or a group of natural persons not all so related, but who maintain a common household in a Dwelling, all as subject to and in compliance with all applicable federal and Nevada laws and local health codes and other ordinances.

2.23    "Golf Course": That real property described on Exhibit "C" (located adjacent to but **NOT A PART OF** the Property or Common Elements) together with the Improvements constructed thereon, which is part of the Private Amenities and which may be operated as a golf course (including, without limitation, golf course and playing elements, club house, practice facilities, maintenance or storage facilities, driving ranges, parking lots, private streets, lakes, water hazards, trees, bunkers, berms, fairways, greens, and/or other related elements, facilities, features, or components).  Refer to Article 15 and to detailed Disclosures and Disclaimers set forth in Article 21, below.

2.24    "Governing Documents":  A collective term referring to this Declaration and any applicable Supplemental Declaration, the Bylaws, the Articles, the Design Guidelines, and the Rules and Regulations, as they may be amended.

2.25    "Improvement": Any structure or appurtenance thereto of every type and kind, whether above or below the land surface, placed in the properties, including, but not limited to, Dwellings and other buildings, walkways, sprinkler or drain pipes, swimming pools, spas and other recreational facilities, carports, garages, roads, driveways, parking areas, hardscape, Private Streets, streetlights, curbs, gutters, walls, perimeter walls, fences, screening walls, block walls, retaining walls, stairs, decks, landscaping, antennae, hedges, windbreaks, patio covers, railings,

plantings, planted trees and shrubs, poles, signs, exterior air conditioning and water softener fixtures or equipment.

2.26   "Invitees": Each and all of the following: tenants, guests, and other invitees (including, as may be applicable, agents, employees, suppliers, and contractors).

2.27   "Manager": The Person, if any, whether an employee or independent contractor, appointed by the Master Association, acting through the Board, and delegated the authority to implement certain duties, powers or functions of the Master Association as provided in this Declaration.

2.28   "Master Plan":   The land use plan entitled "Tuscany Hills A Master Planned Community Land Use and Development Guide" and approved by the City of Henderson Planning Commission, as it may be amended, which includes all of the property described in Exhibit "A" and in Exhibit "B." Inclusion of property on the Master Plan shall not, under any circumstances, obligate Declarant to subject such property to this Declaration, nor shall omission of property described in Exhibit "B" from the Master Plan bar its later submission to this Declaration as provided in Article 9.

2.29   "Maximum Units": The maximum number of Units approved for development within Tuscany under the Master Plan, as amended from time to time; provided, that nothing in this Declaration shall be construed to require Declarant to develop the maximum number of lots approved. The Maximum Units as of the date of this Declaration is 2,000 Units.

2.30   "Member":  A Person subject to membership in the Master Association pursuant to Section 6.2.

2.31   "Mortgage":  A mortgage, a deed of trust, a deed to secure debt, or any other form of security instrument affecting title to any Unit.  A "Mortgagee" shall refer to a beneficiary or holder of a Mortgage.

2.32   "Neighborhood":   Any residential area within the Property designated by Declarant as a separate Neighborhood, whether or not governed by a Neighborhood Association, as more particularly described in Section 6.4, created for the purpose of sharing Neighborhood Common Elements, or receiving other benefits or services from the Master Association which are not provided to all Units within Tuscany. A Neighborhood may be comprised of more than one housing type and may include noncontiguous parcels of property.  If the Master Association provides benefits or services to less than all Units within a particular Neighborhood, then the benefitted Units shall be subject to an additional Specific Assessment for such benefits or services.

Where the context permits or requires, the term Neighborhood shall also refer to the Neighborhood Committee (established in accordance with the Bylaws) or Neighborhood Association, if any, having concurrent jurisdiction over the property within the Neighborhood. Neighborhood boundaries may be established and modified as provided in Section 6.4.

2.33    "Neighborhood Assessments": Assessments, levied by the Master Association (or a Neighborhood Association, if applicable) uniformly against the Units in a particular Neighborhood to pay for the Neighborhood Expenses within such Neighborhood, as described in Section 8.3. Neighborhood Assessments are additional to each and all Base Assessments, Special Assessments, and Specific Assessments, as applicable.

2.34    "Neighborhood Association": An owners Association, created by Supplemental Declaration, having subordinate, concurrent jurisdiction with the Master Association over any Neighborhood. Nothing in this Declaration shall require the creation of a Neighborhood Association for any Neighborhood.

2.35    "Neighborhood Common Elements": A portion of the Common Elements which shall constitute "limited common elements" under the Act, allocated for the primary or exclusive use and benefit of one or more designated Neighborhoods (but less than the entire Community), as more particularly described in Article 13; and/or the common elements unique to a Neighborhood which itself is a common interest community under the Act and which is created under a Supplemental Declaration.

2.36    "Neighborhood Expenses": The actual and estimated expenses which the Master Association incurs or expects to incur for the benefit of Owners of Units within a particular Neighborhood, which shall include a reserve for repairs, replacements or additions to the Neighborhood Common Elements shared by such Neighborhood and which may include a reasonable administrative charge, as may be authorized pursuant to this Declaration or under a Supplemental Declaration.

2.37    "Notice and Hearing": Written notice and an opportunity for a hearing before the Board, at which the Owner concerned shall have the opportunity to be heard in person, or by counsel at the Owner's expense, in the manner further provided in the Bylaws.

2.38    "Officer": A duly elected or appointed and current officer of the Master Association.

2.39    "Owner": One or more Persons (including Declarant and any Builder) who hold the record title to any Unit, but excluding in all cases any party holding an interest merely as security for the performance of an obligation. The term shall include sellers under executory contracts of sale but shall exclude Mortgagees.

2.40    "Person": A natural person, a corporation, a partnership, a trustee, a governmental entity, or any other legal entity.

2.41    "Plat": The final plat maps of portions of Tuscany, as Recorded from time to time, as may be amended and supplemented from time to time of Record.

2.42    "Private Amenities": Certain real property and any improvements and facilities thereon located adjacent to, in the vicinity of or within the Property, which are or may be publicly owned and operated and/or privately owned and operated by Persons other than the Master Association for recreational or other purposes, on a club membership basis or otherwise, and may include, without limitation, office facility, day care facility, sales center, communication tower(s), golf course, and club house, if any, which is so located and all related and supporting facilities and improvements. Private Amenities are **NOT A PART OF** the Property and **NOT A PART OF** the Common Elements and **NOT SUBJECT TO** this Declaration. Private Amenity ownership and/or membership is **NOT A PART OF** and is separate from membership in the Master Association. Membership in and use of the Private Amenities (including, but not necessarily limited to the Golf Course), is subject to approval of the governing body of the Private Amenity (which is a body separate from the Master Association or the Board) and payment of separate initiation fees, dues, and other charges as determined by the governing body of the Private Amenity. Notwithstanding the foregoing, the owners and members of Private Amenities, and their respective Invitees, shall have an easement of access to, enjoyment of, and ingress and egress over, the Private Streets and entries and other Common Elements of the Community. Refer to Article 15, and to the Additional Disclosures and Disclaimers set forth in Article 21, below.

2.43    "Private Streets": All private streets, rights of way, street scapes, and vehicular ingress and egress easements, in the Property, shown as such on a Plat.

2.44    "Property" or "Tuscany": The real property described in Exhibit "A," together with such additional property as is subjected to this Declaration in accordance with Article 9.

2.45    "Record," "Recording," "Recordation," or "Recorded": To file, filing, or filed of record in the Official Records of the Clark County, Nevada Recorder. The date of Recording shall refer to that time at which a document, map, or plat is Recorded.

2.46    "Requisite Membership Percentage": Eighty percent (80%) or more of the total aggregate voting power of the Membership of the Master Association.

2.47    "Requisite Neighborhood Percentage": Eighty percent (80%) or more of the total aggregate voting power of those certain Association Members who are Owners of Units in the relevant Neighborhood.

2.48    "Resident": Unless otherwise specified in the Governing Documents, shall mean any person who is physically residing in a Unit.

2.49    "Rules and Regulations": The restrictions relating to an Owner's use of his or her Unit and conduct of Persons on the Property, as more specifically authorized and provided for in Article 3 and the Act.

2.50    "Special Assessment": Assessments levied in accordance with Section 8.5. Special Assessments are additional to each and all of Base Assessments, Neighborhood Assessments, and Specific Assessments, as applicable.

2.51    "Specific Assessment": Assessments levied against a particular Unit or Units for expenses incurred or to be incurred by the Master Association in accordance with Section 8.6. Specific Assessments are additional to each and all of Base Assessments, Neighborhood Assessments, and Special Assessments, as applicable.

2.52    "Supplemental Declaration": An instrument Recorded pursuant to Article 9 which subjects additional property to this Declaration, designates Neighborhoods, and/or imposes, expressly or by reference, additional restrictions and obligations on the land described in such instrument. The term shall also refer to an instrument Recorded by Declarant pursuant to Section 6.4.

2.53    "Unit": A portion of the Property, whether improved or unimproved (other than Common Elements, any Neighborhood Common Elements, Area of Common Responsibility or any property dedicated to the public), which may be independently owned and is intended for development, use, and occupancy as a Dwelling for a single Family (as show and separately identified on a Plat). The term shall mean all interests defined as a "unit" under the Act. The term shall refer to the land, if any, which is part of the Unit as well as any improvements thereon. In the case of a building within a condominium or other structure containing multiple dwellings, each dwelling shall be deemed to be a separate Unit.

With respect to any parcel owned by a Builder not yet subdivided into Units, such Builder shall be charged with one assessment unit for each Unit permitted on such parcel up to the maximum number of permissible Units for such parcel as set forth in any Recorded agreement affecting such parcel until such time as the parcel has been so subdivided.

## PART TWO: CREATION AND MAINTENANCE OF COMMUNITY STANDARDS

The standards for use and conduct, maintenance and architecture at Tuscany are what give the community its identity and make it a place that people want to call "home." This Declaration establishes procedures for rulemaking as a dynamic process which allows the community standards to evolve as Tuscany changes and grows over time.

### Article 3.

### Use and Conduct

3.1    Framework for Regulation.

The Governing Documents establish, as part of the Tuscany's general plan of development, a framework of affirmative and negative covenants, easements and restrictions which govern Tuscany. Within that framework, the Board and the Members must have the

ability to respond to unforeseen problems and changes in circumstances, conditions, needs, desires, trends and technologies which inevitably will affect Tuscany, its Owners and residents.

3.2    Rule Making Authority.

(a)    Authority of Board.  Subject to the Governing Documents, the Act and the Board's duty to exercise business judgment and reasonableness on behalf of the Master Association and its Members, the Board may modify, cancel, limit, create exceptions to, or expand the Rules and Regulations.  The Board shall send notice to all Owners concerning any proposed action on Rules and Regulations at least ten (10) business days prior to the Board meeting at which such action is to be considered.  Such notice shall be sent in the manner provided for in subsection (c) below.  Members shall have a reasonable opportunity to be heard at a Board meeting prior to such action being taken.  Such action shall become effective, after compliance with subsection (c), unless disapproved by the Requisite Membership percentage or Declarant (during Declarant Rights Period).  The Board shall have no obligation to call a meeting of the Members to consider disapproval except upon receipt of a petition signed by Members representing at least ten percent (10%) of the total votes of the Master Association as required for special meetings in the Bylaws.  Upon such petition of the Members prior to the effective date of any Board action under this Section, the proposed action shall not become effective until after such meeting is held, and then shall be subject to the outcome of such meeting.

(b)    Members' Authority.  Alternatively, the Members, at a Master Association meeting duly called for such purpose and in accordance with the Bylaws, may adopt provisions which modify, cancel, limit, create exceptions to, or expand, the Rules and Regulations, by a vote of the Requisite Membership Percentage.

(c)    Notice.  The Board shall provide a copy of any proposed new Rule or Regulation or explanation of any modifications to the existing Rules and Regulations to each Owner, with the agenda for each Board meeting at which such action is to be considered, and each Owner shall be provided an opportunity to be heard at such Board meeting prior to such action being taken subject to reasonable Board imposed restrictions.

(d)    Authority to Change Design Guidelines.  Prior to expiration or termination of the Declarant Rights Period (or express delegation by Declarant of its rights under Article 4), neither the  Board nor the Master Association shall have any authority to modify, repeal, or expand the Design Guidelines.  In the event of a conflict between the Design Guidelines and the Rules and Regulations, the Design Guidelines shall control.

3.3    Owners' Acknowledgment and Notice to Purchasers.

All Owners are given notice that use of their Units and the Common Element is limited by the Rules and Regulations as they may be amended, expanded and otherwise modified hereunder.  Each Owner, by acceptance of a deed, acknowledges and agrees that the use and enjoyment and marketability of his or her Unit can be affected by this provision and that the Rules and Regulations may change from time to time.  All purchasers of Units are on notice that