changes may have been adopted by the Master Association. Copies of the current Rules and Regulations may be obtained from the Master Association.

### 3.4    Protection of Owners and Others.

Rules and Regulations shall be subject to and consistent with applicable federal and state laws, applicable health codes and other ordinances, the Declaration, Bylaws, and Design Guidelines, and must be adopted without intent to circumvent or evade the requirements and provisions of any of the foregoing. Additionally, no Rule or Regulation, or any other action by the Master Association or Board shall unreasonably hinder or impede the rights of Declarant and/or Builders to develop the Property in accordance with the rights reserved to the Declarant in this Declaration and the Act. The Rules and Regulations shall be binding upon all Owners, occupants, invitees and licensees, if any, until and unless overruled, canceled or modified in a regular or special meeting of the Master Association by the vote of the Requisite Membership Percentage and by the Declarant (during the Declarant Control Period). The Rules shall be uniformly enforced and no rule or action by the Master Association shall unreasonably interfere with use or operation of any Private Amenity.

### 3.5    Use Restrictions.

The Property shall be used only for residential, recreational and related purposes (which may include, without limitation, offices for any property manager retained by the Master Association or business offices for Declarant or the Master Association or any Builder) consistent with this Declaration, any Supplemental Declaration and amendments to either. Any Supplemental Declaration or additional declaration or covenants imposed on property within any Neighborhood may impose stricter standards than those contained in this Article. The Master Association, acting through the Board of Directors, shall have standing and the power to enforce such standards.

(a)    Signs. No sign of any kind shall be erected within the Property without the prior written consent of the Board of Directors, except entry and directional signs installed by Declarant and such signs as the Master Association or this Declaration may not lawfully prohibit. If permission is granted to any Person to erect a sign within the Property or if the placement of specified types of signs within the Property may not lawfully be prohibited by this Declaration or the Master Association, the Board reserves the right to restrict the size, color, lettering and placement of such sign. The Board of Directors and Declarant shall have the right to erect signs as they, in their discretion, deem appropriate. Except as provided above or as expressly permitted by applicable laws, no signs, flags, banners or similar items advertising or providing directional information with respect to activities being conducted within or outside the Property shall be displayed or posted within the Property.

(b)    Parking and Prohibited Vehicles.

(1)    Parking. Vehicles for Owners or the licensee of an Owner shall be parked in the garages or in the driveways, if any, serving the Units or in appropriate spaces or

11

designated areas in which parking may or may not be assigned. Vehicles shall be subject to such reasonable rules and regulations as the Board of Directors or the Neighborhood Association, if any, having concurrent jurisdiction over parking areas within the Neighborhood, may adopt. Declarant and/or the Master Association may designate (i) certain non-parking area and/or (ii) certain on-street parking areas for visitors or guests subject to reasonable rules.

(2)    <u>Prohibited Vehicles</u>. Commercial vehicles, vehicles primarily used or designed for commercial purposes, tractors, mobile homes, recreational vehicles, trailers (either with or without wheels), campers, camper trailers, and boat trailers shall be parked only in enclosed garages or areas, if any, designated by the Board or by the Neighborhood Association, if any, having concurrent jurisdiction over parking areas within a particular Neighborhood. Stored vehicles and vehicles which are either obviously inoperable or do not have current operating licenses shall not be permitted on the Property except within enclosed garages. For purposes of this Section, a vehicle shall be considered "stored" if it is put up on blocks or covered with a tarpaulin and remains on blocks or so covered for fourteen consecutive days without the prior approval of the Board. Notwithstanding the foregoing, service and delivery vehicles may be parked in the Property for such period of time as is reasonably necessary to provide service or to make a delivery to a Unit or the Common Elements. Any vehicle parked in violation of this Section or parking rules promulgated by the Board may be towed, following the giving of any notice required by this Declaration or the Bylaws.

(c)    <u>Occupants Bound</u>. All provisions of the Governing Documents which govern the conduct of Owners and which provide for sanctions against Owners shall also apply to all occupants, guests and invitees of any Unit. Each Owner shall cause all occupants of his or her Unit to comply with the Governing Documents. An Owner shall be responsible for all violations and losses to the Common Elements caused by the occupants of such Owner's Unit, notwithstanding that the occupants of the Unit are fully liable and may themselves be sanctioned for a violation of the Governing Documents.

(d)    <u>Animals and Pets</u>. No animals, livestock or poultry of any kind shall be raised, bred or kept on any portion of the Property other than dogs, cats or other usual and common household pets in a number and of a type not in violation of city ordinances or other laws. However, those pets which are permitted to roam free, or, in the sole discretion of the Board, endanger the health, make objectionable noise or constitute a nuisance or inconvenience to the Owners of other Units or the owner of any portion of the Property shall be removed upon request of the Board. No pets shall be kept, bred or maintained for any commercial purpose. All dogs shall at all times whenever they are outside a Unit be confined on a leash held by a responsible person.

(e)    <u>Quiet Environment</u>. Nothing shall be done or maintained on any part of a Unit which emits foul or obnoxious odors outside the Unit or creates noise or other conditions which tend to disturb the peace, quiet, safety, comfort or serenity of the occupants and invitees of other Units. There shall not be maintained any plants or animals or device or thing of any sort whose activities or existence in any way is noxious, dangerous, unsightly, unpleasant, or of a nature as may diminish or destroy the enjoyment of the Property.

No noxious, illegal or offensive activity shall be carried on upon any portion of the Property, if, in the reasonable determination of the Board, the activity tends to cause embarrassment, discomfort, annoyance or nuisance to Persons using the Common Elements or to the occupants and invitees of other Units. No outside burning shall be permitted within the Property, other than customary household barbecues, fireplaces, fire pits, gas heaters and similar household devices used in compliance with City ordinances and owned and maintained in accordance with all applicable laws. No speaker, horn, whistle, bell or other sound device, except alarm devices used exclusively for security purposes, shall be installed or operated on any Unit. The use and discharge of firecrackers and other fireworks is prohibited within the Property.

(f)    Unsightly or Unkept Conditions.   All portions of a Unit outside of enclosed structures shall be kept in a clean and tidy condition at all times. Nothing shall be done, maintained, stored or kept outside of enclosed structures on a Unit which, in the determination of the Board of Directors, causes an unclean, unhealthy or untidy condition to exist or is obnoxious to the senses. Any structures, equipment or other items which may be permitted to be erected or placed on the exterior portions of Units shall be kept in a neat, clean and attractive condition and shall promptly be removed upon request of the Board if, in the judgment of the Board, they have become rusty, dilapidated or otherwise fallen into disrepair. The pursuit of hobbies or other activities, including specifically, without limiting the generality of the foregoing, the assembly and disassembly of motor vehicles and other mechanical devices, which might tend to cause disorderly, unsightly or unkempt conditions, shall not be pursued or undertaken on any part of the Property. Notwithstanding the above, the disassembly and assembly of motor vehicles to perform repair work shall be permitted provided such activities are not conducted on a regular or frequent basis, and are either conducted entirely within an enclosed garage or, if conducted outside, are begun and completed within twelve hours.

No Owner or occupant shall dump grass clippings, leaves or other debris, petroleum products, fertilizers or other potentially hazardous or toxic substances in any street, open area, drainage ditch, stream, pond or lake, or elsewhere within the Property, except that fertilizers may be applied to landscaping on Units provided care is taken to minimize runoff.

(g)    Antennas.   To the fullest extent allowed by law, no exterior antennas, aerials, satellite dishes, masts or other apparatus for the transmission of television, radio, satellite or other signals of any kind shall be installed or maintained on any Unit or upon any portion of the Property except upon the approval of the Board and in conformity with the rules and regulations adopted by the Master Association applicable to the installation and maintenance of such devices and improvements, in effect from time to time.

(h)    Basketball Equipment, Clotheslines, Garbage Cans, Tanks, Etc.   In addition to the applicable provisions of the Design Guidelines, all basketball hoops and backboards, clotheslines, garbage cans, above-ground storage tanks and structures, mechanical equipment and other similar items on Units shall be located or screened so as to be concealed from view of neighboring Units, streets and property located adjacent to the Unit. All rubbish, trash and

garbage shall be stored in appropriate containers approved pursuant to Article 4 and shall regularly be removed from the Property and shall not be allowed to accumulate.

(i)     Subdivision of Unit and Time Sharing. No Unit shall be subdivided or its boundary lines changed except with the prior written approval of the Board of Directors. Declarant, however, hereby expressly reserves the right to subdivide, change the boundary line of, and replat any Unit(s) or other portion of the Project then owned by Declarant. Any such division, boundary line change or replatting shall not be in violation of the applicable subdivision and zoning regulations.

No Unit shall be made subject to any type of timesharing, fraction-sharing or similar program whereby the right to exclusive use of the Unit rotates among members of the program on a fixed or floating time schedule over a period of years. However, Declarant hereby reserves the right for itself and its assigns to operate such a program with respect to Units which it owns.

(j)     Firearms. The discharge of firearms within the Property is prohibited. The term "firearms" includes "B-B" guns, pellet guns and other firearms of all types, regardless of size. Notwithstanding anything to the contrary contained herein or in the Bylaws, the Master Association shall not be obligated to take action to enforce this Section.

(k)     Irrigation. No sprinkler or irrigation systems of any type which draw upon water from ponds or other ground or surface waters within the Property shall be installed, constructed or operated within the Property. However, Declarant and the Master Association shall have the right to draw water from such sources for the purpose of irrigating any Common Elements or Area of Common Responsibility. All sprinkler and irrigation systems serving Units shall draw upon public water supplies only and shall be subject to approval in accordance with Article 4. Private irrigation wells are prohibited on the Property, unless maintained by the Master Association or Declarant.

(l)     Tents, Mobile Homes and Temporary Structures. Except as may be permitted by Declarant during initial construction within the Property, no tent, shack, mobile home or other structure of a temporary nature shall be placed upon a Unit or any part of the Property. Party tents or similar temporary structures may be erected on a Unit or on Common Elements designated for such purposes for a limited period of time for special events in accordance with the written policies of the Board or with prior written approval of the Board.

(m)     Grading, Drainage and Septic Systems. No Person shall alter the grading of any Unit without prior approval pursuant to Article 4. Catch basins, drainage areas and landscaped areas on a Unit are for the purpose of natural flow of water only. No obstructions or debris shall be placed in these areas. No Person other than Declarant or, after the Declarant Control Period, the Master Association may obstruct or rechannel the drainage flows after location and installation of (i) landscaping or (ii) drainage swales, storm sewers or storm drains or channels. Declarant hereby reserves for itself and the Master Association a perpetual easement across the Property for the purpose of altering drainage and water flow. However, the exercise of such an

easement shall not materially diminish the value of or unreasonably interfere with the use of any Unit without the Owner's consent. Septic tanks and drain fields, other than those installed by or with the consent of Declarant or, after the Declarant Control Period, except in strict compliance with the Design Guidelines and upon prior approval in accordance with Article 4, are prohibited within the Property.

(n)    <u>Removal of Plants and Trees</u>.  No trees or shrubs, except for those which are diseased or dead or create a safety hazard, shall be removed except in strict compliance with the Design Guidelines and upon prior approval in accordance with Article 4.  In the event of an intentional or unintentional violation of this Section, the violator may be required by the Board or other body having jurisdiction to replace the removed tree with one or more comparable trees of such size and number and in such locations as the Board or such body determines, in its sole discretion, is necessary to mitigate the damage.

(o)    <u>Sight Distance at Intersections</u>.  All property located at street intersections shall be landscaped so as to permit safe sight across the street corners.  No fence, wall, hedge or shrub planting shall be placed or permitted to remain where it would create a traffic or sight problem.

(p)    <u>Lighting</u>.  Each Unit shall have two light sconces affixed to the garage portion of the Dwelling constructed on such Unit.  The light sconces shall be illuminated each and every night from dusk until dawn.  Except for the light sconces and except for traditional holiday decorative lights which may be displayed for two months prior to and one month after any commonly recognized holiday for which such lights are traditionally displayed, all exterior lights must be approved in accordance with Article 4.

(q)    <u>Artificial Vegetation, Exterior Sculpture and Similar Items</u>.  No artificial vegetation, sculpture, fountains, birdhouses, birdbaths, other decorative embellishments or similar items shall be permitted except in accordance with the Design Guidelines and any approvals required under Article 4.

(r)    <u>Energy Conservation Equipment</u>.  No solar energy collector panels or attendant hardware or other energy conservation equipment shall be constructed or installed on any Unit unless it is an integral and harmonious part of the architectural design of a structure, as determined in the sole discretion of the appropriate committee pursuant to Article 4, except as otherwise permitted by NRS 111.239.  No windmills, wind generators or other apparatus for generating power from the wind shall be erected or installed on any Unit.

(s)    <u>Playground</u>.  No jungle gyms, swing sets or similar playground equipment shall be erected or installed on any Unit without prior written approval of the DRC in accordance with Article 4.  Any playground or other play areas or equipment furnished by the Master Association or erected within the Property shall be used at the risk of the user.  The Master Association shall not be held liable to any Person for any claim, damage, or injury occurring thereon or related to use thereof.

(t)    Fences.  No hedges, walls, dog runs, animal pens or fences of any kind shall be permitted on any Unit except as approved in accordance with Article 4.

(u)    Business Use.  No business, trade, garage sale, moving sale, rummage sale or similar activity may be conducted in or from any Unit, except that an Owner or occupant residing in a Unit may conduct business activities within the Unit so long as: (a) the existence or operation of the business activity is not apparent or detectable by sight, sound or smell from outside the Unit; (b) the business activity conforms to all zoning requirements for the Property; (c) the business activity does not involve regular visitation of the Unit by clients, customers, suppliers or other business invitees or door-to-door solicitation of residents of the Property; and (d) the business activity is consistent with the residential character of the Property and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Property, as may be determined in the sole discretion of the Board.

The terms "business" and "trade," as used in this provision, shall be construed to have their ordinary, generally accepted meanings and shall include, without limitation, any occupation, work or activity undertaken on an ongoing basis which involves the provision of goods or services to persons other than the provider's family and for which the provider receives a fee, compensation or other form of consideration, regardless of whether: (a) such activity is engaged in full or part-time, (b) such activity is intended to or does generate a profit or (c) a license is required.

Notwithstanding the above, the leasing of a Unit shall not be considered a business or trade within the meaning of this Section. This Section shall not apply to any activity conducted by Declarant or a Builder approved by Declarant with respect to its development and sale of the Property or its use of any Units which it owns within the Property, including the operation of a timeshare or similar program.

(v)    On-Site Fuel Storage.  No on-site storage of gasoline, heating or other fuels shall be permitted on any part of the Property. However, up to five (5) gallons of fuel may be stored on each Unit for emergency purposes and operation of lawn mowers and similar tools or equipment, and the Master Association shall be permitted to store fuel for operation of maintenance vehicles, generators and similar equipment.

(w)    Leasing of Units.  "Leasing," for purposes of this Declaration, is defined as regular, exclusive occupancy of a Unit by any person, other than the Owner for which the Owner receives any consideration or benefit, including, a fee, service, gratuity or emolument.  (The defined term applies as well to all derivations of the word "lease.")  Units may be leased only in their entirety.  No fraction or portion may be leased.  There shall be no subleasing of Units or assignment of leases unless prior written approval is obtained from the Board of Directors.  No transient tenants may be accommodated in a Unit.  All leases shall be in writing and shall be for an initial term of no less than thirty (30) days, except with the prior written consent of the Board of Directors.  Notice of any lease, together with such additional information as may be required by the Board, shall be given to the Board by the Owner within ten (10) days of execution of the

lease.  The Owner must make available to the lessee copies of the Governing Documents.  The Board may adopt reasonable rules regulating leasing and subleasing.

All leases and rental agreements shall be in writing and subject to the requirements of the Governing Documents and the Master Association.  All leases of a Unit shall include a provision that the tenant will recognize and attorn to the Master Association and any applicable Neighborhood Association as landlord, solely for the purpose of having the power to enforce a violation of the provisions of the Governing Documents against the tenant, *provided* the Master Association or, if applicable, the Neighborhood Association gives the landlord notice of its intent to so enforce and a reasonable opportunity to cure the violation directly, prior to the commencement of an enforcement action.

(x)    Laws and Ordinances.  Every Owner and occupant of any Unit, their guests and invitees, shall comply with all laws, statutes, ordinances and rules of federal, state and municipal governments applicable to the Property.  Any violation may be considered a violation of this Declaration.  However, the Board shall have no obligation to take action to enforce such laws, statutes, ordinances and rules.

(y)    Single Family Occupancy.  No Unit or Dwelling shall be occupied by more than a single Family.

(z)    Water and Mineral Operations.  No oil or water drilling, oil or water development operations, oil refining, quarrying or mining operations of any kind shall be permitted on any Unit.  No derrick or other structure designed for use in boring for water, oil, natural gas or other minerals shall be erected and maintained or permitted on any Unit.

(aa)    Doors and Windows.  No "burglar bars," steel or wrought iron bars or similar fixtures, whether designed for decorative, security or other purposes, shall be installed on the exterior of any windows or doors of any dwelling.  No signs, numbers or other writing shall be written on or placed in the doors or windows of an occupied dwelling, either temporarily or permanently.  All windows of an occupied dwelling on a Unit which are visible from the street or other Units shall have draperies, curtains, blinds or other permanent interior window treatments, and all portions which are visible from outside the dwelling shall be white or off-white in color, unless otherwise approved in writing by the Board.  Sheets or similar temporary window treatments may be used for a short time after taking occupancy of a dwelling, provided they are removed and replaced with permanent window treatments within a reasonable time after taking occupancy of the dwelling, as determined in the sole discretion of the Board of Directors.

(bb)    Ground Cover Requirement.  Unless Declarant or Builder has provided a lawn or other ground cover for each Unit, the Owner of that Unit shall have installed thereon a lawn or a ground cover acceptable to the DRC under Article 4, (i) covering the front·yard of the Unit within 4 months following: (A) the Recordation of a deed conveying title to the Unit to the Owner from Declarant or (B) the date of occupancy thereof, whichever occurs first; and (ii) covering the rear yard of a Unit within 6 months following: (A) the Recordation of a deed

conveying title to the Unit to the Owner from Declarant or (B) the date of occupancy thereof, whichever occurs first.

## Article 4.

## Architecture and Landscaping

4.1     General.

Nothing shall be placed, erected, or installed upon any Unit within Tuscany and no improvements or other work (including staking, clearing, excavation, grading and other site work, exterior alterations of existing improvements, or planting or removal of landscaping) shall take place within Tuscany, except in compliance with this Article and the Design Guidelines.

No approval shall be required to repaint the exterior of a structure in accordance with the originally approved color scheme or to rebuild in accordance with originally approved drawings and specifications. Any Owner may remodel, paint or redecorate the interior of his or her Unit without approval. However, modifications to the interior of screened porches, patios, windows, and similar portions of a Unit visible from outside the structure shall be subject to approval.

All dwellings constructed on any portion of Tuscany shall be designed by and built in accordance with the drawings and specifications of a licensed architect or a licensed building designer unless otherwise approved by Declarant or its designee in its sole discretion.

This Article shall not apply to Declarant's activities, the activities of a Builder who has obtained Declarant's approval of drawings and specifications for original construction, nor to activities of the Master Association during the Declarant Control Period.

4.2     Architectural Review.

(a)     By Declarant.  Each Owner, by accepting a deed or other instrument conveying any interest in any portion of Tuscany, acknowledges that, as developer of Tuscany and as an Owner of portions of Tuscany as well as other real estate within the vicinity of Tuscany, Declarant has a substantial interest in ensuring that the improvements within Tuscany enhance Declarant's reputation as a community developer and do not impair Declarant's ability to market, sell, or lease its property.  Therefore, each Owner agrees that no activity within the scope of this Article ("Work") shall be commenced on such Owner's Unit unless and until Declarant or its designee has given its prior written approval for such Work, which approval may be granted or withheld in the Declarant's or its designee's sole discretion.

In reviewing and acting upon any request for approval, Declarant or its designee shall act solely in Declarant's interest and shall owe no duty to any other Person.  Declarant's rights reserved under this Article shall continue so long as Declarant owns any portion of Tuscany or any real property adjacent to Tuscany, unless earlier terminated in a written instrument executed and Recorded by Declarant.

Declarant may, in its sole discretion, designate one or more Persons from time to time to act on its behalf in reviewing applications hereunder.

Declarant may from time to time, but shall not be obligated to, delegate all or a portion of its reserved rights under this Article to (i) a design review committee appointed by the Master Association's Board of Directors (the "DRC"), or (ii) a committee comprised of architects, engineers or other persons who may or may not be Members of the Master Association. Any such delegation shall be in writing, specifying the scope of responsibilities delegated, and shall be subject to (i) Declarant's right to revoke such delegation at any time and resume jurisdiction over the matters previously delegated; and (ii) Declarant's right to veto any decision which Declarant determines, in its sole discretion, to be inappropriate or inadvisable for any reason. So long as Declarant has any rights under this Article, jurisdiction of the foregoing entities shall be limited to such matters as are specifically delegated to it by Declarant.

(b)    Design Review Committee.  Upon delegation by Declarant or upon expiration or termination of Declarant's rights under this Article, the Master Association, acting through the DRC, shall assume jurisdiction over architectural matters hereunder. The DRC, when appointed, shall consist of at least three, but not more than seven, persons who shall serve and may be removed and replaced in the Board's discretion. Members of the DRC need not be Members of the Master Association or representatives of Members, and may, but need not, include architects, engineers or similar professionals, whose compensation, if any, shall be established from time to time by the Board.

Unless and until such time as Declarant delegates all or a portion of its reserved rights to the DRC or Declarant's rights under this Article terminate, the Master Association shall have no jurisdiction over architectural matters.

(c)    Fees; Assistance.  For purposes of this Article, the entity having jurisdiction in a particular case shall be referred to as the "Reviewer." The Reviewer may establish and charge reasonable fees for review of applications hereunder and may require such fees to be paid in full prior to review of any application. Such fees may include the reasonable costs incurred in having any application reviewed by architects, engineers or other professionals. Declarant and the Master Association may employ architects, engineers, or other persons as deemed necessary to perform the review. The Board may include compensation of such persons in the Master Association's annual operating budget as a Common Expense.

4.3    Guidelines and Procedures.

(a)    Design Guidelines.  Declarant may prepare the initial Design Guidelines, which may contain general provisions applicable to all of Tuscany as well as specific provisions which vary from Neighborhood to Neighborhood. The Design Guidelines are intended to provide guidance to Owners and Builders regarding matters of particular concern to the Reviewer in considering applications hereunder. The Design Guidelines are not the exclusive basis for decisions of the Reviewer and compliance with the Design Guidelines does not guarantee approval of any application.

Declarant shall have sole and full authority to amend the Design Guidelines as long as it owns any portion of Tuscany or has a right to expand Tuscany pursuant to Section 9.1, notwithstanding a delegation of reviewing authority to the DRC, unless Declarant also delegates the power to amend to the DRC. Upon termination or delegation of Declarant's right to amend, the DRC shall have the authority to amend the Design Guidelines with the consent of the Board. Any amendments to the Design Guidelines shall be prospective only and shall not apply to require modifications to or removal of structures previously approved once the approved construction or modification has commenced. There shall be no limitation on the scope of amendments to the Design Guidelines, and such amendments may remove requirements previously imposed or otherwise make the Design Guidelines less restrictive.

The Reviewer shall make the Design Guidelines available to Owners and Builders who seek to engage in development or construction within Tuscany. In Declarant's discretion, such Design Guidelines may be Recorded, in which event the Recorded version, as it may unilaterally be amended from time to time, shall control in the event of any dispute as to which version of the Design Guidelines was in effect at any particular time.

(b)     Procedures.    No Work shall commence on any portion of Tuscany until an application for approval has been submitted to and approved by the Reviewer. Such application shall include drawings and specifications ("Plans") showing site layout, structural design, exterior elevations, exterior materials and colors, landscaping, drainage, exterior lighting, irrigation, and other features of proposed construction, as applicable. The Design Guidelines and the Reviewer may require submission of such additional information as may be reasonably necessary to consider any application.

In reviewing each submission, the Reviewer may consider any factors it deems relevant, including, without limitation, harmony of external design with surrounding structures and environment. Decisions may be based on purely aesthetic considerations. Each Owner acknowledges that determinations as to such matters are purely subjective and opinions may vary as to the desirability and/or attractiveness of particular improvements.

The Reviewer shall, within 30 days after receipt of a completed application and all required information, respond in writing to the applicant at the address specified in the application. The response may (i) approve the application, with or without conditions; (ii) approve a portion of the application and disapprove other portions; or (iii) disapprove the application. The Reviewer may, but shall not be obligated to, specify the reasons for any objections and/or offer suggestions for curing any objections.

If the Reviewer fails to respond within 30 days after receipt of a completed application, approval shall be deemed to have been given, subject to Declarant's right to veto approval by the DRC pursuant to this Section. However, no approval, whether expressly granted or deemed granted pursuant to the foregoing, shall be inconsistent with the Design Guidelines unless a variance is granted pursuant to Section 4.5. Notice shall be deemed to have been given at the time the envelope containing the response is deposited with the U. S. Postal Service. Personal

delivery of such written notice shall, however, be sufficient and shall be deemed to have been given at the time of delivery to the applicant.

Until expiration of Declarant's rights under this Article, the DRC shall notify Declarant in writing within five business days after the DRC has approved any application relating to proposed Work within the scope of matters delegated to the DRC by Declarant. The notice shall be accompanied by a copy of the application and any additional information which Declarant may require. Declarant shall have 10 days after receipt of such notice to veto any such action, in its sole discretion, by written notice to the DRC and the applicant.

If construction does not commence on a project for which Plans have been approved within one year after the date of approval, such approval shall be deemed withdrawn, and it shall be necessary for the Owner to reapply for approval before commencing the proposed Work. Once construction is commenced, it shall be diligently pursued to completion. All Work shall be completed within 180 days of commencement unless otherwise specified in the notice of approval or unless the Reviewer grants an extension in writing, which it shall not be obligated to do. If approved Work is not completed within the required time, it shall be considered nonconforming and shall be subject to enforcement action by the Master Association, Declarant or any aggrieved Owner.

The Reviewer may, by resolution, exempt certain activities from the application and approval requirements of this Article, provided such activities are undertaken in strict compliance with the requirements of such resolution.

4.4    No Waiver of Future Approvals.

Each Owner acknowledges that the persons reviewing applications under this Article will change from time to time and that opinions on aesthetic matters, as well as interpretation and application of the Design Guidelines, may vary accordingly. In addition, each Owner acknowledges that it may not always be possible to identify objectionable features of proposed Work until the Work is completed, in which case it may be unreasonable to require changes to the improvements involved, but the Reviewer may refuse to approve similar proposals in the future. Approval of applications or Plans for any Work done or proposed, or in connection with any other matter requiring approval, shall not be deemed to constitute a waiver of the right to withhold approval as to any similar applications, Plans, or other matters subsequently or additionally submitted for approval.

4.5    Variances.

The Reviewer may authorize variances from compliance with any of its guidelines and procedures when circumstances such as topography, natural obstructions, hardship, or aesthetic or environmental considerations require, but only in accordance with duly adopted rules and regulations. No variance shall (a) be effective unless in writing; (b) be contrary to this Declaration; or (c) estop the Reviewer from denying a variance in other circumstances. For purposes of this Section, inability to obtain approval of any governmental agency, issuance of

any permit, or terms of any financing shall not be considered a hardship warranting a variance. Variances need not be Recorded.

4.6     Limitation of Liability.

The standards and procedures established by this Article are intended as a mechanism for maintaining and enhancing the overall aesthetics of Tuscany; they do not create any duty to any Person. Review and approval of any application pursuant to this Article is made on the basis of aesthetic considerations only and the Reviewer shall not bear any responsibility for ensuring the structural integrity or soundness of approved construction or modifications, nor for ensuring compliance with building codes and other governmental requirements, nor for ensuring that all dwellings are of comparable quality, value or size or of similar design.

Declarant, the Master Association, the Board, any committee, or member of any of the foregoing shall not be held liable for soil conditions, drainage or other general site work, any defects in plans revised or approved hereunder, or any injury, damages, or loss arising out of the manner or quality of approved construction on or modifications to any Unit. In all matters, the Board, the DRC, and any members thereof shall be defended and indemnified by the Master Association as provided in Section 7.6.

4.7     Certificate of Compliance.

Any Owner may request that the Reviewer issue a certificate of architectural compliance certifying that there are no known violations of this Article or the Design Guidelines. The Master Association shall either grant or deny such request within 30 days after receipt of a written request and may charge a reasonable administrative fee for issuing such certificates. Issuance of such a certificate shall estop the Master Association from taking enforcement action with respect to any condition as to which the Master Association had notice as of the date of such certificate.

**Article 5.**

**Maintenance and Repair**

5.1     Maintenance of Units and Private Amenities.

Each Owner shall maintain his or her Unit and all landscaping and improvements comprising the Unit in a manner consistent with the Governing Documents, the Community-Wide Standard and all applicable covenants, unless such maintenance responsibility is otherwise assumed by or assigned to the Master Association or a Neighborhood pursuant to this Declaration, any Supplemental Declaration or any other declaration of covenants applicable to such Unit.

5.2     Maintenance of Neighborhood Property.

Any Neighborhood Association shall maintain its common property and any other property for which it has maintenance responsibility in a manner consistent with the Governing Documents, the Community-Wide Standard and all applicable covenants.

Upon resolution of the Board, Owners within each Neighborhood shall be responsible for paying, through Neighborhood Assessments, the costs of operating, maintaining and insuring certain portions of the Area of Common Responsibility within or adjacent to such Neighborhood. This may include, without limitation, the costs of maintaining any signage, entry features, right-of-way and greenspace between the Neighborhood and adjacent public roads, private streets within the Neighborhood, and lakes or ponds within the Neighborhood, regardless of ownership and regardless of the fact that such maintenance may be performed by the Master Association; provided, however, all Neighborhoods which are similarly situated shall be treated the same.

The Master Association may assume maintenance responsibility for property within any Neighborhood, in addition to that designated by any Supplemental Declaration, either by agreement with the Neighborhood or because, in the opinion of the Board, the level and quality of service then being provided is not consistent with the Community-Wide Standard. All costs of maintenance pursuant to this paragraph shall be assessed as a Neighborhood Assessment only against the Units within the Neighborhood to which the services are provided.

5.3     Responsibility for Repair and Replacement.

Unless otherwise specifically provided in the Governing Documents or in other instruments creating and assigning maintenance responsibility, responsibility for maintenance shall include responsibility for repair and replacement, as necessary to maintain the property to a level consistent with the Community-Wide Standard.

By virtue of taking title to a Unit, each Owner covenants and agrees with all other Owners and with the Master Association to carry property insurance for the full replacement cost of all insurable improvements on his or her Unit, less a reasonable deductible, unless either the Neighborhood Association (if any) for the Neighborhood in which the Unit is located or the Master Association carries such insurance (which they may, but are not obligated to do hereunder). If the Master Association assumes responsibility for obtaining any insurance coverage on behalf of Owners, the premiums for such insurance shall be levied as a Specific Assessment against the benefitted Unit and the Owner.

Each Owner further covenants and agrees that in the event of damage to or destruction of structures on or comprising his Unit, the Owner shall proceed promptly to repair or to reconstruct in a manner consistent with the original construction or such other drawings and specifications as are approved in accordance with Article 4. Alternatively, the Owner shall clear the Unit and maintain it in a neat and attractive, landscaped condition consistent with the Community-Wide Standard. The Owner shall pay any costs which are not covered by insurance proceeds.

The requirements of this Section shall apply to any Neighborhood Association responsible for common property within the Neighborhood in the same manner as if the

Neighborhood Association were an Owner and the common property were a Unit. Additional Recorded covenants applicable to any Neighborhood may establish more stringent requirements for insurance and more stringent standards for rebuilding or reconstructing structures on the Units within such Neighborhood and for clearing and maintaining the Units in the event the structures are not rebuilt or reconstructed.

## PART THREE: COMMUNITY GOVERNANCE AND ADMINISTRATION

The success of Tuscany is dependent upon the support and participation of every Owner in its governance and administration. The Declaration establishes the Master Association as the mechanism by which each Owner is able to provide that support and participation. While many powers and responsibilities are vested in the Master Association's Board of Directors, some decisions are reserved for the Master Association's membership -- the Owners of property in the Community.

### Article 6.

### The Master Association and its Members

6.1     Function of Master Association.

The Master Association is the entity responsible for management, maintenance, operation and control of the Area of Common Responsibility. The Master Association also is the primary entity responsible for enforcement of the Governing Documents. The Master Association shall perform its functions in accordance with the Governing Documents and applicable laws.

6.2     Membership.

Every Owner shall be a Member of the Master Association. There shall be only one membership per Unit. If a Unit is owned by more than one Person, all co-Owners shall share the privileges of such membership, subject to reasonable Board regulation and the restrictions on voting set forth in the Governing Documents, and all such co-Owners shall be jointly and severally obligated to perform the responsibilities of Owners. The membership rights of an Owner which is not a natural person may be exercised by any officer, director, partner or trustee, or by the individual designated from time to time by the Owner in a written instrument provided to the Secretary of the Master Association.

6.3     Voting.

The Master Association shall have one class of membership, comprised of all Owners. Each Owner shall have one equal vote for each Unit in which it holds the interest required for membership under Section 6.2, except that there shall be only one vote per Unit and no vote shall be exercised for any property which is exempt from assessment under Section 8.10. Accordingly, the total number of votes for the Master Association shall equal the total number of Units created under and subject to this Declaration.

Special Declarant Rights, including the right to approve, or withhold approval of, actions proposed under the Governing Documents during the Declarant Control Period, are specified in the relevant Sections of the Governing Documents. Declarant may appoint a majority of the Board of Directors during the Declarant Control Period.

Where a Unit is owned jointly by co-owners, only one (1) such co-owner ("Designated Co-Owner"), designated from time to time by all of the co-owners in a written instrument provided to the Secretary of the Master Association, shall be entitled to exercise the one (1) vote to which the Unit is entitled. Where no Designated Co-Owner has been designated, or if such designation has been revoked, the vote for such Unit shall be exercised as the majority of the co-owners of the Unit mutually agree. Fractional votes shall not be allowed. No vote shall be cast for any Unit where the co-owners present in person or by proxy owning the majority interests in such Unit cannot agree to said vote or other action. Absent such advice and in the event that more than one such co-owner casts a vote, the Unit's vote shall be suspended and shall not be included in the final vote tally on the matter being voted upon.

Notwithstanding the foregoing, the voting rights of an Owner shall be automatically suspended during any time period that any Assessment levied against such Owner is delinquent.

6.4    Neighborhoods.

(a)    Neighborhoods. Every Unit shall be located within a Neighborhood. Unless and until additional Neighborhoods are established, the Community shall consist of a single Neighborhood. Units within a particular Neighborhood may be subject to additional covenants. In addition, if required by law or otherwise approved by Declarant, Owners within the Neighborhood may be members of a Neighborhood Association in addition to the Master Association. Owners within a Neighborhood, also may, but shall not be required to, elect a Neighborhood Committee to represent their interests. Neighborhood Committees may be elected as provided for in the Bylaws.

Exhibit "A" to this Declaration, and each Supplemental Declaration submitting additional property to this Declaration, shall initially assign the property submitted thereby to a specific Neighborhood (by name or other identifying designation), which Neighborhood may be then existing or newly created. So long as it has the right to subject additional property to this Declaration pursuant to Section 9.1, Declarant may unilaterally amend this Declaration or any Supplemental Declaration to redesignate Neighborhood boundaries; provided, however, without consent of the Owners of a majority of Units in the affected Neighborhoods, Declarant shall not combine two or more Neighborhoods.

Any Neighborhood may request that the Master Association provide a higher level of service than that which the Master Association generally provides to all Neighborhoods or may request that the Master Association provide special services for the benefit of Units in such Neighborhood. Upon the affirmative vote, written consent, or a combination thereof, of Owners of a majority of the Units within the Neighborhood, the Master Association may, in the Board's

discretion, provide the requested services. The cost of services requested by a Neighborhood and provided by the Master Association, which may include a reasonable administrative charge in such amount as the Board deems appropriate (provided, any such administrative charge shall apply at a uniform rate per Unit to all Neighborhoods receiving the same service), shall be assessed against the Units within such Neighborhood as a Neighborhood Assessment.

## Article 7.

### Master Association Powers and Responsibilities

7.1     <u>Acceptance and Control of Master Association Property.</u>

(a)     To further its functions as set forth above, the Master Association, through action of its Board, may acquire, hold, and dispose of tangible and intangible personal and real property. The Master Association may enter into leases, licenses, or operating agreements for portions of the Area of Common Responsibility, to permit use of such portions of the Area of Common Responsibility by community organizations and by others, whether nonprofit or for profit, or for the provision of goods or services for the general benefit or convenience of Owners and Residents of Tuscany.

(b)     Within 30 days after Owners other than Declarant are entitled to elect a majority of the Directors pursuant to Section 2.17 and in accordance with the procedures set forth in NRS 116.31038, the Declarant shall deliver to the Master Association all personal property of the Owners and the Master Association which Declarant holds or controls including such items as are specifically required to be delivered under the Act.

(c)     Declarant and its designees may convey to the Master Association personal property and fee title, leasehold, or other property interests in any real property, improved or unimproved, described in Exhibit "A". The Master Association shall accept and maintain such property at its expense for the benefit of its Members, subject to any restrictions set forth in the deed or other instrument transferring such property to the Master Association. Upon written request of Declarant, the Master Association shall reconvey to Declarant any unimproved portions of the Property originally conveyed by Declarant to the Master Association for no consideration, to the extent conveyed by Declarant in error or needed by Declarant to make adjustments in property lines.

(d)     The Master Association shall be responsible for management, operation, and control of the Area of Common Responsibility, subject to any covenants and restrictions set forth in the deed or other instrument transferring such property to the Master Association. The Board may adopt such reasonable rules regulating use of the Area of Common Responsibility as it deems appropriate.

26

7.2    <u>Maintenance of Area of Common Responsibility.</u>

(a)    <u>Generally.</u>    The Master Association shall maintain, in accordance with the Community-Wide Standard, the Area of Common Responsibility, which may include, but need not be limited to:

(1)    all portions of and structures situated on the Common Element;

(2)    landscaping within or adjacent to public rights-of-way within or abutting Tuscany;

(3)    such portions of any additional property included within the Area of Common Responsibility as may be dictated by this Declaration, any Supplemental Declaration, any covenant to share costs, or any contract or agreement for maintenance thereof entered into by the Master Association;

(4)    all ponds located within Tuscany which serve as part of the stormwater drainage system for Tuscany, including improvements and equipment installed therein or used in connection therewith;

(5)    any property and facilities owned by Declarant and made available, on a temporary or permanent basis, for the primary use and enjoyment of the Master Association and its Members, such property and facilities to be identified by written notice from Declarant to the Master

Association and to remain a part of the Area of Common Responsibility and be maintained by the Master Association until such time as Declarant revokes such privilege of use and enjoyment by written notice to the Master Association.

(6)    the exterior of all perimeter walls or fences Declarant constructs surrounding the Property (including those walls or fences which separate a Unit from the Golf Course or any other Private Amenity) or which separate a Unit from Area of Common Responsibility (regardless of whether such wall or fence is located on the Area of Common Responsibility or on a Unit). Except for wrought iron fences, an Owner shall be responsible for maintaining the interior surface of perimeter walls or fences located on such Owner's Unit. A perimeter wall or fence shall not be a party wall or party fence as set forth in Article 14.

The Master Association may maintain other property which it does not own, including, without limitation, property dedicated to the public or otherwise open to the public, if the Board of Directors determines that such maintenance is necessary or desirable for the enjoyment of the Members or to maintain the Community-Wide Standard.

The Master Association shall not be liable for any damage or injury occurring on, or arising out of the condition of, property which it does not own except to the extent that it has been negligent in the performance of its maintenance responsibilities.

·(b)    Continuous Operation. The Master Association shall maintain the facilities and equipment within the Area of Common Responsibility in continuous operation, except for any periods necessary, as determined in the sole discretion of the Board, to perform required maintenance or repairs, unless the Requisite Membership Percentage or Declarant (during the Declarant Rights Period) agree in writing to discontinue such operation. The Area of Common Responsibility shall not be reduced during the Declarant Rights Period by amendment of this Declaration or any other means except with Declarant's prior written approval.

(c)    Maintenance as Common Expenses. Costs associated with maintenance, repair and replacement of the Area of Common Responsibility shall be a Common Expense; provided, the Master Association may seek reimbursement from the owner(s) of, or other Persons responsible for, certain portions of the Area of Common Responsibility pursuant to this Declaration, other Recorded covenants, or agreements with the owner(s) thereof. Maintenance, repair and replacement of Neighborhood Common Elements shall be a Neighborhood Expense assessed to the Neighborhood(s) to which the Neighborhood Common Elements are assigned, notwithstanding that the Master Association may be responsible for performing such maintenance hereunder.

7.3    Insurance.

(a)    Required Coverages. The Master Association, acting through its Board or its duly authorized agent, shall obtain and continue in effect the following types of insurance, if reasonably available, or if not reasonably available, the most nearly equivalent coverages as are reasonably available:

(i)    Blanket property insurance covering "risks of direct physical loss" on a "special form" basis (or comparable coverage by whatever name denominated) for all insurable improvements on the Common Element and within the Area of Common Responsibility to the extent that the Master Association has assumed responsibility in the event of a casualty, regardless of ownership. If such coverage is not generally available at reasonable cost, then "broad form" coverage may be substituted. All property insurance policies obtained by the Master Association shall have policy limits sufficient to cover the full replacement cost of the insured improvements under current building ordinances and codes;

(ii)    Commercial general liability insurance on the Area of Common Responsibility, insuring the Master Association and its Members for damage or injury caused by the negligence of the Master Association or any of its Members, employees, agents, or contractors while acting on its behalf. If generally available at reasonable cost, such coverage (including primary and any umbrella coverage) shall have a limit of at least $1,000,000.00 per occurrence with respect to bodily injury, personal injury, and property damage; provided, should additional coverage and higher limits be available at reasonable cost which a reasonably prudent person would obtain, the Master Association shall obtain such additional coverages or limits;

(iii)     Workers compensation insurance and employers liability insurance, if and to the extent required by law;

(iv)     Directors and officers liability coverage;

(v)     Commercial crime insurance, including fidelity insurance covering all Persons responsible for handling Master Association funds in an amount determined in the Board's best business judgment but not less than an amount equal to one-sixth of the annual Base Assessments on all Units plus reserves on hand; provided, there shall be no requirement that the Master Association maintain fidelity insurance during the Declarant Control Period. Fidelity insurance policies shall contain a waiver of all defenses based upon the exclusion of Persons serving without compensation; and

(vi)     Such additional insurance as the Board, in its best business judgment, determines advisable.

In addition, the Master Association shall, if so specified in a Supplemental Declaration applicable to any Neighborhood, obtain and maintain property insurance on the insurable improvements within such Neighborhood which insurance shall comply with the requirements of Section 7.3(a)(i). Any such policies shall provide for a certificate of insurance to be furnished upon request to the Owner of each Unit insured.

Premiums for all insurance on the Area of Common Responsibility shall be Common Expenses, except that (i) premiums for property insurance on Units within a Neighborhood shall be a Neighborhood Expense; and (ii) premiums for insurance on Neighborhood Common Elements may be included in the Neighborhood Expenses of the Neighborhood(s) to which such Neighborhood Common Elements are assigned unless the Board reasonably determines that other treatment of the premiums is more appropriate.

(b)     Policy Requirements.  The Master Association shall arrange for an annual review of the sufficiency of its insurance coverage by one or more qualified Persons, at least one of whom must be familiar with insurable replacement costs in the metropolitan Las Vegas area. All Master Association policies shall provide for a certificate of insurance to be furnished to the Master Association and, upon request, to each Member insured.

The policies may contain a reasonable deductible and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the policy limits satisfy the requirements of Section 7.3(a). In the event of an insured loss, the deductible shall be treated as a Common Expense or a Neighborhood Expense in the same manner as the premiums for the applicable insurance coverage. However, if the Board reasonably determines, after notice and an opportunity to be heard in accordance with the Bylaws, that the loss is the result of the negligence or willful misconduct of one or more Owners, their guests, invitees, or lessees, then the Board may assess the full amount of such deductible against such Owner(s) and their Units as a Specific Assessment.

All insurance coverage obtained by the Board shall:

(i)    be written with a company authorized to do business in Nevada which satisfies the requirements of the Federal National Mortgage Association, or such other secondary mortgage market agencies or federal agencies as the Board deems appropriate;

(ii)    be written in the name of the Master Association as trustee for the benefited parties. Policies on the Common Elements shall be for the benefit of the Master Association and its Members. Policies secured on behalf of a Neighborhood shall be for the benefit of the Owners within the Neighborhood and their Mortgagees, as their interests may appear;

(iii)    not be brought into contribution with insurance purchased by Owners, occupants, or their Mortgagees individually;

(iv)    contain an inflation guard endorsement;

(v)    include an agreed amount endorsement, if the policy contains a co-insurance clause;

(vi)    provide that each Owner is an insured person under the policy with respect to liability arising out of such Owner's interest in the Common Element as a Member in the Master Association (provided, this provision shall not be construed as giving an Owner any interest in the Common Element other than that of a Member);

(vii)    provide a waiver of subrogation under the policy against any Owner or household member of an Owner;

(viii)    include an endorsement precluding cancellation, invalidation, suspension, or non-renewal by the insurer on account of any one or more individual Owners, or on account of any curable defect or violation without prior written demand to the Master Association to cure the defect or violation and allowance of a reasonable time to cure; and

(ix)    include an endorsement precluding cancellation, invalidation, or condition to recovery under the policy on account of any act or omission of any one or more individual Owners, unless such Owner is acting within the scope of its authority on behalf of the Master Association.

In addition, the Board shall use reasonable efforts to secure insurance policies which list the Owners as additional insureds and provide:

(i)    a waiver of subrogation as to any claims against the Master Association's Board, officers, employees, and its manager, the Owners and their tenants, servants, agents, and guests;

(ii)    a waiver of the insurer's rights to repair and reconstruct instead of paying cash;

(iii)    an endorsement excluding Owners' individual policies from consideration under any "other insurance" clause;

(iv)    an endorsement requiring at least 30 days' prior written notice to the Master Association of any cancellation, substantial modification, or non-renewal;

(v)    a cross liability provision; and

(vi)    a provision vesting in the Board exclusive authority to adjust losses; provided, however, no Mortgagee having an interest in such losses may be prohibited from participating in the settlement negotiations, if any, related to the loss.

(c)    <u>Restoring Damaged Improvements</u>.  In the event of damage to or destruction of Common Element or other property which the Master Association is obligated to insure, the Board or its duly authorized agent shall file and adjust all insurance claims and obtain reliable and detailed estimates of the cost of repairing or restoring the property to substantially the condition in which it existed prior to the damage, allowing for changes or improvements necessitated by changes in applicable building codes.

Damaged improvements on the Common Element shall be repaired or reconstructed unless the Owners representing at Requisite Membership Percentage and Declarant (if during the Declarant Control Period), decide within 60 days after the loss not to repair or reconstruct.  If either the insurance proceeds or estimates of the loss, or both, are not available to the Master Association within such 60-day period, then the period shall be extended until such funds or information are available.  However, such extension shall not exceed 60 additional days.  No Mortgagee shall have the right to participate in the determination of whether the damage or destruction to the Common Element shall be repaired or reconstructed.

If a decision is made not to restore the damaged improvements, and no alternative improvements are authorized, the affected property shall be cleared of all debris and ruins and thereafter shall be maintained by the Master Association in a neat and attractive, landscaped condition consistent with the Community-Wide Standard.

Any insurance proceeds remaining after paying the costs of repair or reconstruction, or after such settlement as is necessary and appropriate, shall be retained by the Master Association for the benefit of its Members or the Owners of Units within the insured Neighborhood, as appropriate, and placed in a capital improvements account.  This is a covenant for the benefit of Mortgagees and may be enforced by the Mortgagee of any affected Unit.

If insurance proceeds are insufficient to cover the costs of repair or reconstruction, the Board may, without a vote of the Voting Delegates, levy Special Assessments to cover the

shortfall against those Owners responsible for the premiums for the applicable insurance coverage under Section 7.3(a).

7.4    Compliance and Enforcement.

(a)    Every Owner and occupant of a Unit shall comply with the Governing Documents. The Board may impose sanctions for violation of the Governing Documents after Notice and Hearing in accordance with the procedures set forth in the Bylaws. Such sanctions may include, without limitation:

(1)    imposing reasonable monetary fines (subject to any applicable limitations contained in the Act) which shall constitute a lien upon the violator's Unit;

(2)    suspending an Owner's right to vote;

(3)    suspending any Person's right to use any recreational facilities within the Common Element; provided, however, nothing herein shall authorize the Board to limit ingress or egress to or from a Unit;

(4)    suspending any services provided by the Master Association to an Owner or the Owner's Unit if the Owner is more than 30 days delinquent in paying any assessment or other charge owed to the Master Association;

(5)    exercising self-help or taking action to abate any violation of the Governing Documents in a non-emergency situation;

(6)    requiring an Owner, at its own expense, to remove any structure or improvement on such Owner's Unit in violation of Article 4 and to restore the Unit to its previous condition and, upon failure of the Owner to do so, the Board or its designee shall have the right to enter the property, remove the violation and restore the property to substantially the same condition as previously existed and any such action shall not be deemed a trespass;

(7)    without liability to any Person, precluding any contractor, subcontractor, agent, employee or other invitee of an Owner who fails to comply with the terms and provisions of Article 4 and the Design Guidelines from continuing or performing any further activities in Tuscany; and

(8)    levying Specific Assessments to cover costs incurred by the Master Association to bring a Unit into compliance with the Governing Documents.

(9)    In addition, the Board may take the following enforcement procedures to ensure compliance with the Governing Documents without the necessity of compliance with the procedures set forth in the Bylaws:

(A)    exercising self-help in any emergency situation (specifically including, but not limited to, the towing of vehicles that are in violation of parking rules and regulations); and

(B)    bringing suit at law or in equity to enjoin any violation or to recover monetary damages or both.

(10)    In addition to any other enforcement rights, if an Owner fails properly to perform his or her maintenance responsibility, the Master Association may Record a notice of violation or perform such maintenance responsibilities and assess all costs incurred by the Master Association against the Unit and the Owner as a Specific Assessment. If a Neighborhood Association fails to perform its maintenance responsibilities, the Master Association may perform such maintenance and assess the costs as a Specific Assessment against all Units within such Neighborhood. Except in an emergency situation, the Master Association shall provide the Owner or Neighborhood Association reasonable notice and an opportunity to cure the problem prior to taking such enforcement action.

All remedies set forth in the Governing Documents shall be cumulative of any remedies available at law or in equity. In any action to enforce the Governing Documents, the prevailing party shall be entitled to recover all costs, including, without limitation, attorneys fees and court costs, reasonably incurred in such action.

The Master Association shall not be obligated to take any action if the Board reasonably determines that the Master Association's position is not strong enough to justify taking such action. Such a decision shall not be construed a waiver of the right of the Master Association to enforce such provision at a later time under other circumstances or estop the Master Association from enforcing any other covenant, restriction or rule.

The Master Association, by contract or other agreement, may enforce applicable ordinances and permit Clark County and the City of Henderson to enforce ordinances within Tuscany for the benefit of the Master Association and its Members.

7.5    Implied Rights; Board Authority.

Subject to the Governing Documents and the Act, the Master Association may exercise any right or privilege given to it expressly by the Governing Documents, or reasonably implied from or reasonably necessary to effectuate any such right or privilege. Except as otherwise specifically provided in the Governing Documents, or by law, all rights and powers of the Master Association may be exercised by the Board without a vote of the membership.

7.6    Indemnification of Officers, Directors and Others.

(a)    Indemnification. The Master Association shall indemnify every officer, director, and committee member against all damages and expenses, including counsel fees, reasonably incurred in connection with any action, suit, or other proceeding (including settlement of any suit

or proceeding, if approved by the then Board of Directors) to which he or she may be a party by reason of being or having been an officer, director, or committee member, except that such obligation to indemnify shall be limited to those actions for which liability is limited under the Governing Documents or applicable Nevada law.

(b)    Claims Related to Breach of Duty.    The officers, directors, and committee members shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct, or bad faith.   The officers and directors shall have no personal liability with respect to any contract or other commitment made or action taken in good faith on behalf of the Master Association (except to the extent that such officers or directors may also be Members of the Master Association).

The Master Association shall indemnify and forever hold each such officer, director and committee member harmless from any and all liability to others on account of any such contract, commitment or action. This right to indemnification shall not be exclusive of any other rights to which any present or former officer, director, or committee member may be entitled. The Master Association shall, as a Common Expense, maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such insurance is reasonably available.

7.7    Security.

The Master Association may, but shall not be obligated to, maintain or support certain activities within Tuscany designed to make Tuscany safer than they otherwise might be. Neither the Master Association nor Declarant shall in any way be considered insurers or guarantors of security within Tuscany, nor shall either be held liable for any loss or damage by reason of failure to provide adequate security or ineffectiveness of security measures undertaken. No representation or warranty is made that any systems or measures, including any mechanism or system for limiting access to Tuscany, cannot be compromised or circumvented, nor that any such systems or security measures undertaken will in all cases prevent loss or provide the detection or protection for which the system is designed or intended. Each Owner acknowledges, understands and covenants to inform its tenants and all occupants of its Unit that the Master Association, its Board and committees, and Declarant are not insurers and that each Person using Tuscany assumes all risks of personal injury and loss or damage to property, including Units and the contents of Units, resulting from acts of third parties.

7.8    Powers of the Master Association Relating to Sub-Associations.

The Master Association shall have the power to veto any action taken or contemplated to be taken by any Neighborhood Association which the Board reasonably determines to be adverse to the interests of the Master Association or its Members or inconsistent with the Community-Wide Standard. The Master Association also shall have the power to require specific action to be taken by any Neighborhood Association in connection with its obligations and responsibilities, such as requiring specific maintenance or repairs or aesthetic changes to be effectuated and requiring that a proposed budget include certain items and that expenditures be made therefor.

A Neighborhood Association shall take appropriate action required by the Master Association in a written notice within the reasonable time frame set by the Master Association in the notice. If the Neighborhood Association fails to comply, the Master Association shall have the right to effect such action on behalf of the Neighborhood Association and levy Specific Assessments to cover the costs, as well as an administrative charge and sanctions.

7.9     Provision of Services.

The Master Association may provide or provide for services and facilities for the Members, their guests, lessees, and invitees, and shall be authorized to enter into and terminate contracts or agreements with other entities, including Declarant, to provide such services and facilities. The Board may charge use and consumption fees for such services and facilities. By way of example, some services and facilities which might be offered include landscape maintenance, pest control service, cable television service, internet service, security, caretaker, transportation, fire protection, utilities, and similar services and facilities. Nothing herein shall be construed as a representation by Declarant or the Master Association as to what, if any, services shall be provided. In addition, the Board shall be permitted to modify or cancel existing services provided, in its discretion, unless otherwise required by the Governing Documents. No Owner shall be exempt from the obligation to pay for such services, if provided to all Owners as a Common Expense, based upon non-use or any other reason.

7.10     Relations with Other Property; Entities.

The Master Association may enter into contractual agreements or covenants to share costs with any neighboring property or Private Amenity or entity to contribute funds for, among other things, shared or mutually beneficial property or services and/or a higher level of Common Element maintenance.

7.11     Facilities and Services Open to the Public.

Certain facilities and areas within Tuscany may be open for use and enjoyment of the public. Such facilities and areas may include, by way of example: greenbelts, trails and paths, parks, and other neighborhood spots conducive to gathering and interaction, roads, sidewalks, and medians. Declarant may designate such facilities and areas as open to the public at the time Declarant makes such facilities and areas a part of the Area of Common Responsibility or the Board may so designate at any time thereafter.

## Article 8.

### Master Association Finances

8.1     Budgeting and Allocating Common Expenses.

At least 60 days before the beginning of each fiscal year, the Board shall prepare a budget of the estimated Common Expenses for the coming year in compliance with the Act, which shall include the budget for the daily operation of the Master Association and an adequate reserve for the repair, replacement and restoration of the major components of the Common Elements pursuant to Section 8.4. The budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Units, and the amount to be generated through the levy of Base Assessments and Special Assessments against the Units, as authorized in Section 8.5.

The Master Association is hereby authorized to levy Base Assessments equally against all Units subject to assessment under Section 8.7 to fund the Common Expenses. In determining the Base Assessment rate per Unit, the Board may consider any assessment income expected to be generated from any additional Units reasonably anticipated to become subject to assessment during the fiscal year.

The Board shall send a copy of the final budget or a summary thereof, together with notice of the amount of the Base Assessment to be levied pursuant to such budget, to each Owner not less than 30 days before the beginning of each fiscal year and the Board shall set a date for a meeting of the Owners to consider ratification of the budget. The meeting shall be not less than 14 or more than 30 days after mailing of the budget or summary. Unless at that meeting a majority of the total aggregate voting power of the Membership of the Master Association reject the budget, the budget is ratified, whether or not a quorum is present.

If any proposed budget is rejected, the periodic budget last ratified by the Owners continues until the Owners ratify a subsequent budget proposed by the Board of Directors.

The Board may revise the budget and adjust the Base Assessment from time to time during the year, subject to the notice requirements and the right of the Owners to disapprove the revised budget as set forth above.

8.2     Limitations on Common Assessment Increases.

The Board shall not levy, for any fiscal year, a Base Assessment which exceeds the "Maximum Authorized Common Assessment," unless first approved by Requisite Membership Percentage. The "Maximum Authorized Base Assessment" in any fiscal year following the initial budgeted year shall equal not more than one hundred fifteen percent (115%) of the Base Assessment for the prior year.

8.3    Budgeting and Allocating Neighborhood Expenses.

At least 60 days before the beginning of each fiscal year, the Board shall prepare a separate budget covering the estimated Neighborhood Expenses for each Neighborhood on whose behalf Neighborhood Expenses are expected to be incurred during the coming year. Each such budget shall  be prepared in compliance with the Act, and shall include any costs for additional services or a higher level of services which the Owners in such Neighborhood have ratified pursuant to Section 6.4(a) and an adequate reserve for the repair, replacement and restoration of the major components of the Neighborhood Common Elements attributable to the Neighborhood pursuant to Section 8.4. The budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Units, and the amount required to be generated through the levy of Neighborhood and Special Assessments against the Units in such Neighborhood.

The Master Association is hereby authorized to levy Neighborhood Assessments equally against all Units in the Neighborhood which are subject to assessment under Section 8.7 to fund Neighborhood Expenses; provided, if so specified in the applicable Supplemental Declaration or if so directed by petition signed by a majority of the Owners within the Neighborhood, any portion of the assessment intended for exterior maintenance of structures, insurance on structures, or replacement reserves which pertain to particular structures shall be levied on each of the benefited Units in proportion to the benefit received.

If any proposed budget for any Neighborhood is rejected, the periodic budget last ratified by the applicable Owners continues until the Owners ratify a subsequent budget proposed by the Board of Directors.

The Board may revise the budget for any Neighborhood and the amount of any Neighborhood Assessment from time to time during the year, subject to the notice requirements and the right of the Owners of Units in the affected Neighborhood to disapprove the revised budget as set forth above.

8.4    Budgeting for Reserves.

The Board shall establish and maintain a separate reserve account for the repair, replacement and restoration of the major components of the Common Elements based upon the age, remaining life and the quantity and replacement cost of major components of the Common Elements, in accordance with the provisions of this Declaration and the Bylaws; provided, however, that the reserves of the Master Association must not be used for the daily maintenance expenses of the Community. The Board shall additionally cause to be conducted at least once every 5 years a study of the reserves  required for the repair, replacement and restoration of the major components of the Common Elements.  Such reserve study shall be prepared in compliance with the Act and shall be reviewed at least annually (during the preparation of the Master Association budget) to determine if those reserves are sufficient in order to make any adjustments as may be necessary to maintain adequate reserves.

8.5    Special Assessments.

In addition to other authorized assessments, the Master Association may levy Special Assessments to cover capital improvements, to cover unbudgeted expenses or to cover expenses in excess of those budgeted. Any such Special Assessment may be levied against the entire membership, if such Special Assessment is for Common Expenses, or against the Units within any Neighborhood if such Special Assessment is for Neighborhood Expenses. Except as otherwise specifically provided in this Declaration, any Special Assessment shall require the affirmative vote or written consent the Requisite Membership Percentage (if Common Expense) or the Requisite Neighborhood Percentage (if Neighborhood Expense), and the written Consent of Declarant if during the Declarant Rights Period. Special Assessments shall be payable in such manner and at such times as determined by the Board, and may be payable in installments extending beyond the fiscal year in which the Special Assessment is approved.

8.6    Specific Assessments.

The Master Association shall have the power to levy Specific Assessments against a particular Unit as follows:

(a)    to cover the costs, including overhead and administrative costs, of providing services to Units upon request of an Owner pursuant to any menu of special services which may be offered by the Master Association (which might include the items identified in Section 7.9). Specific Assessments for special services may be levied in advance of the provision of the requested service; and

(b)    to cover costs incurred in bringing the Unit into compliance with the Governing Documents, or costs incurred as a consequence of the conduct of the Owner or occupants of the Unit,

their agents, contractors, employees, licensees, invitees, or guests; provided, the Board shall give the Unit Owner prior written notice and an opportunity for a hearing, in accordance with the Bylaws, before levying any Specific Assessment under this subsection (b).

The Master Association may also levy a Specific Assessment against the Units within any Neighborhood to reimburse the Master Association for costs incurred in bringing the Neighborhood into compliance with the provisions of the Governing Documents, subject to Notice and Hearing with respect to such Owners in the Neighborhood before levying any such assessment.

8.7    Authority To Assess Owners; Time of Payment.

Declarant hereby establishes and the Master Association is hereby authorized to levy assessments as provided for in this Article and elsewhere in the Governing Documents. The obligation to pay assessments shall commence as to each Unit on the first day of the month

38

following: (a) the month in which the Unit is made subject to this Declaration, or (b) the month in which the Board first determines a budget and levies assessments pursuant to this Article, whichever is later. The first annual Base Assessment and Neighborhood Assessment, if any, levied on each Unit shall be adjusted according to the number of months remaining in the fiscal year at the time assessments commence on the Unit.

Assessments shall be paid in such manner and on such dates as the Board may establish. The Board may require advance payment of assessments at closing of the transfer of title to a Unit and impose special requirements for Owners with a history of delinquent payment. If the Board so elects, assessments may be paid in two or more installments. Unless the Board otherwise provides, the Base Assessment and any Neighborhood Assessment shall be due and payable in advance on the first day of each fiscal year. If any Owner is delinquent in paying any assessments or other charges levied on his Unit, the Board may require the outstanding balance on all assessments to be paid in full immediately.

8.8    Personal Obligation for Assessments.

Each Owner, by accepting a deed or entering into a Recorded contract of sale for any portion of Tuscany, is deemed to covenant and agree to pay all assessments authorized in the Governing Documents. All assessments, together with interest (computed from its due date at a rate of 10% per annum or such higher rate as the Board may establish, subject to the limitations of Nevada law), late charges as determined by Board resolution, costs, and reasonable attorneys' fees, shall be the personal obligation of each Owner and a lien upon each Unit until paid in full. Upon a transfer of title to a Unit, the grantee shall be jointly and severally liable for any assessments and other charges due at the time of conveyance.

Failure of the Board to fix assessment amounts or rates or to deliver or mail each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments. In such event, each Owner shall continue to pay Base Assessments and Neighborhood Assessments on the same basis as during the last year for which an assessment was made, if any, until a new assessment is levied, at which time the Master Association may retroactively assess any shortfalls in collections.

No Owner may exempt himself from liability for assessments by non-use of Common Element, abandonment of his Unit, or any other means. The obligation to pay assessments is a separate and independent covenant on the part of each Owner. No diminution or abatement of assessments or set-off shall be claimed or allowed for any alleged failure of the Master Association or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or improvements, or from any other action it takes.

Upon written request, the Master Association shall furnish to any Owner liable for any type of assessment a certificate in writing signed by an Master Association officer setting forth whether such assessment has been paid. Such certificate shall be conclusive evidence of

payment. The Master Association may require the advance payment of a reasonable processing fee for the issuance of such certificate.

8.9     Lien for Assessments.

The Master Association shall have a lien against each Unit to secure payment of delinquent assessments, as well as interest, late charges (subject to the limitations of Nevada law), and costs of collection (including attorneys fees). Such lien shall be superior to all other liens which are Recorded after the Recordation of this Declaration, except (a) the liens of all taxes, bonds, assessments, and other levies which by law would be superior, and (b) the lien or charge of any Recorded first Mortgage (meaning any Recorded Mortgage with first priority over other Mortgages) made in good faith and for value. Such lien, when delinquent, may be enforced by suit, judgment, and judicial or nonjudicial foreclosure. A lien under this Section is also prior to all first Mortgages described in (b) above to the extent that the Common Element assessments are based on the periodic budget adopted by the Master Association in accordance with the provisions of this Declaration and would have become due in the absence of acceleration, during the six months immediately preceding institution of an action to enforce the Master Association's lien. This Subsection does not affect the priority of mechanics' or materialmen's liens or the priority of a lien for other assessments made by the Master Association.

Fees, charges, late charges, fines and interest charged pursuant to the Act and the Governing Documents are enforceable as assessments under this Section; provided, however, that unless otherwise permitted by law, the Master Association may not foreclose upon a lien for unpaid assessments which is comprised solely of fines levied against an Owner for violation of the Governing Documents unless the violation is of a type that threatens the health and welfare of the residents of the Community.

The Master Association's lien must be foreclosed by the same procedure set forth in the Act.

The Master Association may bid for the Unit at the foreclosure sale and acquire, hold, lease, mortgage, and convey the Unit. While a Unit is owned by the Master Association following foreclosure: (a) no right to vote shall be exercised on its behalf; (b) no assessment shall be levied on it; and (c) each other Unit shall be charged, in addition to its usual assessment, its pro rata share of the assessment that would have been charged such Unit had it not been acquired by the Master Association. The Master Association may sue for unpaid assessments and other charges authorized hereunder without foreclosing or waiving the lien securing the same.

Sale or transfer of any Unit shall not affect the assessment lien or relieve such Unit from the lien for any subsequent assessments. However, the sale or transfer of any Unit pursuant to foreclosure of the first Mortgage shall extinguish the lien as to any installments of such assessments due prior to the Mortgagee's foreclosure. The subsequent Owner of the foreclosed Unit shall not be personally liable for assessments on such Unit due prior to such acquisition of

title. Such unpaid assessments shall be deemed to be Common Expenses collectible from Owners of all Units subject to assessment under Section 8.7, including such acquirer, its successors and assigns. The lien rights created in this Declaration shall be for the benefit of the Master Association.

8.10    Exempt Property.

The following property shall be exempt from payment of Base Assessments, Neighborhood Assessments, Special Assessments and Specific Assessments:

(a)    All Common Element and such portions of the property owned by Declarant as are included in the Area of Common Responsibility;

(b)    Any property dedicated to and accepted by any governmental authority or public utility; and

(c)    Property owned by any Neighborhood Association for the common use and enjoyment of its members, or owned by the members of a Neighborhood Association as tenants-in-common.

In addition, Declarant and/or the Master Association shall have the right, but not the obligation, to grant exemptions to certain Persons qualifying for tax exempt status under Section 501(c) of the Internal Revenue Code so long as such Persons own property subject to this Declaration for purposes listed in Section 501(c).

8.11    Capitalization of Master Association.

Upon acquisition of record title to a Unit by the first Owner thereof other than Declarant, a contribution shall be made by or on behalf of the purchaser to the working capital of the Master Association in an amount equal to one-half of the annual Base Assessment per Unit for that year. This amount shall be in addition to, not in lieu of, the annual Base Assessment and shall not be considered an advance payment of such assessment. This amount shall be deposited into the purchase and sales escrow and disbursed therefrom to the Master Association.

## PART FOUR: COMMUNITY DEVELOPMENT

The Declaration reserves various rights to the developer in order to facilitate the smooth and orderly development of Tuscany and to accommodate changes in the Master Plan which inevitably occur as a community the size of Tuscany grows and matures.

**Article 9.**

**Expansion of the Community**

9.1    Expansion by Declarant.

Declarant, from time to time, may make subject to the provisions of this Declaration all or any portion of the property described in Exhibit "B" by Recording a Supplemental Declaration which describes the additional property to be subjected and which otherwise complies with the Act.  Declarant shall have the right hereunder to create up to a total of 2,000 Units in the Community.  A Supplemental Declaration Recorded pursuant to this Section shall not require the consent of any Person except the owner of such property, if other than Declarant.

Declarant's right to expand Tuscany pursuant to this Section shall expire when all property described in Exhibit "B" has been subjected to this Declaration or 10 years after this Declaration is Recorded, whichever is earlier.  Until then, Declarant may transfer or assign this right to any Person who is the developer of at least a portion of the real property described in Exhibits "A" or "B."  Any such transfer shall be memorialized in a written, Recorded instrument executed by Declarant.

Nothing in this Declaration shall be construed to require Declarant or any successor to subject additional property to this Declaration or to develop any of the property described in Exhibit "B" in any manner whatsoever.

9.2    Expansion by the Master Association.

The Master Association may also subject additional property to the provisions of this Declaration by Recording a Supplemental Declaration describing the additional property.  Any such Supplemental Declaration shall require the affirmative vote of the Requisite Membership Percentage at a meeting duly called for such purpose and the consent of the owner of the property.  In addition, so long as Declarant owns property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1, Declarant's consent shall be necessary.  The Supplemental Declaration shall be signed by the President and Secretary of the Master Association, by the owner of the property and by Declarant, if Declarant's consent is necessary.

9.3    Additional Covenants and Easements.

Declarant may subject any portion of Tuscany to additional covenants and easements, including covenants obligating the Master Association to maintain and insure such property and authorizing the Master Association to recover its costs through Neighborhood Assessments.  Such additional covenants and easements may be set forth either in a Supplemental Declaration subjecting such property to this Declaration or in a separate Supplemental Declaration referencing property previously subjected to this Declaration.  If the property is owned by someone other than Declarant, then the consent of the Owner(s) shall be necessary and shall be

evidenced by their execution of the Supplemental Declaration. Any such Supplemental Declaration may supplement, create exceptions to, or otherwise modify the terms of this Declaration as it applies to the subject property in order to reflect the different character and intended use of such property.

9.4    Effect of Filing Supplemental Declaration.

A Supplemental Declaration shall be effective upon Recording unless otherwise specified in such Supplemental Declaration. On the effective date of the Supplemental Declaration, any additional property subjected to this Declaration shall be assigned voting rights in the Master Association and assessment liability in accordance with the provisions of this Declaration.

**Article 10.**

**Additional Rights Reserved to Declarant**

10.1    Withdrawal of Property.

Declarant reserves the right to amend this Declaration, so long as it has a right to annex additional property pursuant to Section 9.1, for the purpose of removing any portion of Tuscany, which has not yet been improved with structures, from the coverage of this Declaration, provided such withdrawal does not reduce the total number of Units then subject to the Declaration by more than 10 percent. Such amendment shall not require the consent of any Person other than the Owner(s) of the property to be withdrawn, if not the Declarant. If the property is Common Element, the Master Association shall consent to such withdrawal.

10.2    Marketing and Sales Activities.

Declarant and Builders authorized by Declarant may construct and maintain upon portions of the Common Element such facilities and activities as, in Declarant's sole opinion, may be reasonably required, convenient, or incidental to the construction or sale of Units, including, but not limited to, business offices, signs, model units, and sales offices. Declarant and authorized Builders shall have easements for access to and use of such facilities.

10.3    Right To Develop.

Declarant and its employees, agents and designees shall have a right of access and use and an easement over and upon all of the Common Element for the purpose of making, constructing and installing such improvements to the Common Element as it deems appropriate in its sole discretion.

Every Person that acquires any interest in Tuscany acknowledges that Tuscany is a master planned community, the development of which is likely to extend over many years, and agrees not to protest, challenge or otherwise object to (a) changes in uses or density of property

43

outside the Neighborhood in which such Person holds an interest, or (b) changes in the Master Plan as it relates to property outside the Neighborhood in which such Person holds an interest.

10.4    Right To Approve Additional Covenants.

No Person shall Record any declaration of covenants, conditions and restrictions, or declaration of condominium or similar instrument affecting any portion of Tuscany without Declarant's review and written consent.  Any attempted Recordation without such consent shall result in such instrument being void and of no force and effect unless subsequently approved by written consent signed and Recorded by Declarant.

10.5    Right To Approve Changes in Tuscany Standards.

No amendment to or modification of any Rules and Regulations or Design Guidelines shall be effective without prior notice to and the written approval of Declarant so long as Declarant owns property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1.

10.6    Right To Transfer or Assign Declarant Rights.

Any or all of Declarant's special rights and obligations set forth in this Declaration or the Bylaws may be transferred in whole or in part to other Persons; provided, the transfer shall not reduce an obligation nor enlarge a right beyond that which Declarant has under this Declaration or the Bylaws.  No such transfer or assignment shall be effective unless it is in a written instrument signed and Recorded by Declarant.  The foregoing sentence shall not preclude Declarant from permitting other Persons to exercise, on a one time or limited basis, any right reserved to Declarant in this Declaration where Declarant does not intend to transfer such right in its entirety, and in such case it shall not be necessary to Record any written assignment unless necessary to evidence Declarant's consent to such exercise.

10.7    Easement to Inspect and Right to Correct.

(a)    Easement.  Declarant reserves, for itself and such other Persons as it may designate, perpetual, non-exclusive easements throughout Tuscany to the extent reasonably necessary for the purposes of access, inspecting, testing, redesigning, correcting, or improving any portion of Tuscany, including Units and the Area of Common Responsibility.  Declarant shall have the right to redesign, correct, or improve any part of Tuscany, including Units and the Area of Common Responsibility.

(b)    Right of Entry.  In addition to the above easement, Declarant reserves a right of entry onto a Unit upon reasonable notice to the Owner; provided, in an emergency, no such notice need be given.  Entry into a Unit shall be only after Declarant notifies the Owner (or Resident) and agrees with the Owner regarding a reasonable time to enter the Unit to perform such activities.  Each Owner agrees to cooperate in a reasonable manner with Declarant in Declarant's exercise of the rights provided to it by this Section.

44

Entry onto the Area of Common Responsibility and into any improvements and structures thereon may be made by Declarant at any time, provided advance notice is given to the Assocation; provided, in an emergency, no notice need be given.

10.8    Exclusive Rights To Use Name of Development.

No Person shall use the name "Tuscany" or any derivative of such name in any printed or promotional material without Declarant's prior written consent. However, Owners may use the name "Tuscany" in printed or promotional matter where such term is used solely to specify that particular property is located within Tuscany and the Master Association shall be entitled to use the words "Tuscany" in its name.

10.9    Reservation of Rights Relating to Provision for Telephone/Cable Services.

Declarant hereby reserves for itself and is successors, assigns and transferees, rights of access, ingress, and egress over, in, upon, under, and across the real property contained within the Project, including all Units and Master Association Property, for the construction, installation, repair and replacement of all facilities necessary to provide cable television, telephone and Internet service to the Units or Private Amenities; provided, however, that no such rights or easements shall be exercised by Declarant in such a manner as to interfere unreasonably with the occupancy, use, enjoyment, or access by each Owner and its Family, guests, and invitees, to that Owner's Unit or the Master Association Property. Declarant additionally reserves to the fullest extent permitted by law but subject to the time limit set forth in Section 10.10 hereof, to grant providers exclusive rights for the marketing and provision of television cable, telephone and Internet services to Units or Private Amenities within the Project.

10.10   Termination of Rights.

The rights contained in this Article shall not terminate until the earlier of (a) 20 years from the date this Declaration is Recorded, or (b) Recording by Declarant of a written statement that all sales activity has ceased.

**PART FIVE:  PROPERTY RIGHTS WITHIN THE COMMUNITY**

The nature of living in a planned community, with its wide array of properties and development types and its ongoing development activity, requires the creation of special property rights and provisions to address the needs and responsibilities of the Owners, Declarant, the Master Association, and others within or adjacent to the community.

## Article 11.

### Easements

11.1    <u>Easements in Common Element.</u>

Declarant grants to each Owner a nonexclusive right and easement of use, access, and enjoyment in and to the Common Element, subject to:

(a)    The Governing Documents and any other applicable covenants;

(b)    Any restrictions or limitations contained in any deed conveying such property to the Master Association;

(c)    The Board's right to:

(i)    adopt rules regulating use and enjoyment of the Common Element, including rules limiting the number of guests who may use the Common Element;

(ii)    suspend the right of an Owner to use recreational facilities within the Common Element (A) for any period during which any charge against such Owner's Unit remains delinquent, and (B) for a period not to exceed 30 days for a single violation or for a longer period in the case of any continuing violation, of the Governing Documents after notice and a hearing pursuant to the Bylaws;

(iii)    dedicate or transfer all or any part of the Common Element, subject to such approval requirements as may be set forth in this Declaration;

(iv)    impose reasonable membership requirements and charge reasonable admission or other use fees for the use of any recreational facility situated upon the Common Element;

(v)    permit use of any recreational facilities situated on the Common Element by persons other than Owners, their families, lessees and guests with or without payment of use fees established by the Board and designate other areas and facilities within the Area of Common Responsibility as open for the use and enjoyment of the public; and

(vi)    mortgage, pledge, or hypothecate any or all of its real or personal property as security for money borrowed or debts incurred, subject to the approval requirements set forth in Sections 17.9 and 19.4;

(d)    The rights of certain Owners to the exclusive use of those portions of the Common Element designated "Neighborhood Common Elements," as described in Article 13; and

46

(e)      The Restrictions and any other applicable covenants.

Any Owner may extend his or her right of use and enjoyment to the members of his or her family, lessees, and social invitees, as applicable, subject to reasonable regulation by the Board. An Owner who leases his or her Unit shall be deemed to have assigned all such rights to the lessee of such Unit for the period of the lease.

11.2    Easements of Encroachment.

Declarant grants reciprocal appurtenant easements of encroachment, and for maintenance and use of any permitted encroachment, between each Unit and any adjacent Common Element and between adjacent Units due to the unintentional placement or settling or shifting of the improvements constructed, reconstructed, or altered thereon (in accordance with the terms of these restrictions) to a distance of not more than three feet, as measured from any point on the common boundary along a line perpendicular to such boundary. However, in no event shall an easement for encroachment exist if such encroachment occurred due to willful and knowing conduct on the part of, or with the knowledge and consent of, the Person claiming the benefit of such easement.

11.3    Easements for Utilities, Etc.

(a)      Installation and Maintenance.  Declarant reserves for itself, so long as Declarant owns any property described in Exhibit "A" or "B" of this Declaration, and grants to the Master Association and all utility providers, perpetual non-exclusive easements throughout Tuscany (but not through a structure) to the extent reasonably necessary for the purpose of:

(i)      installing utilities and infrastructure to serve Tuscany, cable and other systems for sending and receiving data and/or other electronic signals, security and similar systems, walkways, pathways and trails, drainage systems, street lights and signage on property which Declarant owns or within public rights-of-way or easements reserved for such purpose on Recorded plats;

(ii)      inspecting, maintaining, repairing and replacing the utilities, infrastructure and other improvements described in Section 11.3(a)(i); and

(iii)      access to read utility meters.

(b)      Specific Development.  Declarant also reserves for itself the non-exclusive right and power to grant and Record such specific easements as may be necessary, in the sole discretion of Declarant, in connection with the orderly development of any property described in Exhibits "A" and "B." The Owner of any property to be burdened by any easement granted pursuant to this subsection (b) shall be given written notice in advance of the grant. The location of the easement shall be subject to the written approval of the Owner of the burdened property, which approval shall not unreasonably be withheld, delayed or conditioned.

(c)     Minimal Interference.  All work associated with the exercise of the easements described in subsections (a) and (b) of this Section shall be performed in such a manner as to minimize interference with the use and enjoyment of the property burdened by the easement. Regardless of whether such specification is made, upon completion of the work, the Person exercising the easement shall restore the property, to the extent reasonably possible, to its condition prior to the commencement of the work.  The exercise of these easements shall not extend to permitting entry into the structures on any Unit, nor shall it unreasonably interfere with the use of any Unit and, except in an emergency, entry onto any Unit shall be made only after reasonable notice to the Owner or occupant.

### 11.4    Easements To Serve Additional Property.

Declarant hereby reserves for itself and its duly authorized agents, successors, assigns, and mortgagees, an easement over the Common Element for the purposes of enjoyment, use, access, and development of the property described in Exhibit "B," whether or not such property is made subject to this Declaration.  This easement includes, but is not limited to, a right of ingress and egress over the Common Element for construction of roads and for connecting and installing utilities on such property.

Declarant agrees that it and its successors or assigns shall be responsible for any damage caused to the Common Element as a result of their actions in connection with development of such property.  Declarant further agrees that if the easement is exercised for permanent access to such property and such property or any portion thereof benefitting from such easement is not made subject to this Declaration, Declarant, its successors or assigns shall enter into a reasonable agreement with the Master Association to share the cost of any maintenance which the Master Association provides to or along any roadway providing access to such Property.

### 11.5    Easements for Maintenance, Emergency and Enforcement.

Declarant grants to the Master Association easements over Tuscany as necessary to enable the Master Association to fulfill its maintenance responsibilities under Section 7.2.  The Master Association shall also have the right, but not the obligation, to enter upon any Unit for emergency, security, and safety reasons, to perform maintenance and to inspect for the purpose of ensuring compliance with and enforce the Governing Documents.  Such right may be exercised by any member of the Board and its duly authorized agents and assignees, and all emergency personnel in the performance of their duties.  Except in an emergency situation, entry shall only be during reasonable hours and after notice to the Owner.

### 11.6    Easements for Private Amenities.

Every Unit and the Common Element and the common property of any Neighborhood Association are burdened with those easements set forth in Section 15.5 and Section 15.6.

11.7    Easement for Special Events.

Declarant hereby reserves for itself and grants to Declarant, and their respective successors, agents, assigns and designees, a perpetual, nonexclusive easement over the Common Element for the purpose of sponsoring or conducting activities, events or projects of general community interest at such locations and times as Declarant, in its sole discretion, deems appropriate. Each Owner, by accepting a deed or other instrument conveying any interest in a Unit, acknowledges and agrees that the exercise of this easement may result in a temporary increase in traffic, noise, gathering of crowds, and related inconveniences, and each Owner agrees on behalf of itself and the occupants of its Unit to take no action, legal or otherwise, which would interfere with the exercise of such easement. The Master Association shall take no action which would interfere with or otherwise attempt to restrict the exercise of this easement.

11.8    Easements for Lake and Pond Maintenance and Flood Water.

Declarant reserves for itself, the Master Association and their successors, assigns, and designees, the nonexclusive right and easement, but not the obligation, to enter upon bodies of water located within the Area of Common Responsibility to: (a) install, operate, maintain, and replace pumps to supply irrigation water to the Area of Common Responsibility; (b) construct, maintain, and repair structures and equipment used for retaining water; (c) maintain such areas in a manner consistent with the Community Standards; and (d) replace, remove, and/or fill in such bodies of water. Declarant, the Master Association, and their successors, assigns, and designees shall have an access easement over and across any of the Property abutting or containing bodies of water to the extent reasonably necessary to exercise their rights under this Section.

Declarant further reserves for itself, the Master Association, and their successors, assigns, and designees, a perpetual, nonexclusive right and easement of access and encroachment over the Common Elements and Units (but not the dwellings thereon) adjacent to or within 100 feet of bodies of water constituting a part of the Property, in order to (a) temporarily flood and back water upon and maintain water over such portions of the Property; (b) alter in any manner and generally maintain the bodies of water within the Area of Common Responsibility; and (c) maintain and landscape the slopes and banks pertaining to such areas. All persons entitled to exercise these easements shall use reasonable care in and repair any damage resulting from the intentional exercise of such easements. Nothing herein shall be construed to make Declarant or any other Person liable for damage resulting from flooding due to hurricanes, heavy rainfall, or other natural occurrence.

11.9    Easements for Cross-Drainage.

Declarant hereby reserves for itself and grants to the Master Association easements over every Unit and the Common Elements (and other portions of the Area of Common Responsibility, to the extent practicable) for natural drainage of storm water runoff from other portions of the Property; provided, no Person shall alter the natural drainage on any Unit to increase materially the drainage of storm water onto adjacent portions of the Property without the

consent of the Owner(s) of the affected Property, the Board, and the Declarant (during the Declarant Rights Period).

11.10   Rights to Stormwater Runoff, Effluent and Water Reclamation.

Declarant hereby reserves for itself and its designees all rights to ground water, surface water, storm water runoff, and effluent located or produced within the Property, and each Owner agrees, by acceptance of a deed to a Unit, that Declarant shall retain all such rights. Such rights shall include the reservation of an easement over the Property for access, and for installation and maintenance of facilities and equipment to capture and transport such water, runoff, and effluent. This Section 11.10 may not be amended without the consent of Declarant or its successor, and the rights created in this Section 11.10 shall survive termination of this Declaration.

11.11   Easements for Parking; Easements for Vehicular and Pedestrian Traffic.

The Master Association, through the Board, is hereby empowered to establish "parking" and/or "no parking" areas within the Common Elements, and to establish Rules and Regulations governing such matters, as well as to enforce such parking limitations and rules by all means lawful for such enforcement on public streets, including the removal of any violating vehicle, by those so empowered, at the expense of the Owner of the violating vehicle. If any temporary guest or recreational parking is permitted within the Common Elements, such parking shall be permitted only within any spaces and areas clearly marked for such purpose.

In addition to the general easements for use of the Common Elements reserved herein, there hereby are reserved to Declarant, the Master Association, and their respective successors, assigns, Invitees, nonexclusive, appurtenant easements for vehicular and pedestrian traffic over private main entry gate areas and all Private Streets and sidewalks within the Property (including, but not limited to, those which may yet be built from time to time, and those which, when or after being built (by Declarant, Builder, or other authorized third party), comprise or will comprise Neighborhood Common Elements).

11.12   Easements for Public Service Use.

In addition to the foregoing easements over the Common Elements, there shall be and Declarant hereby reserves and covenants for itself and all future Owners within the Property, easements for: (a) placement of any fire hydrants on portions of certain Units and/or Common Elements, and other purposes normally related thereto; and (b) City, County, state and federal public services, including but not limited to, the right of postal, law enforcement, and fire protection services and their respective employees and agents, to enter upon any part of the Common Elements or any Unit, for the purpose of carrying out their official duties.

## Article 12.

## Custom Lots

12.1    General; Supplemental Declaration.

Pursuant to Supplemental Declaration(s), Custom Lots shall comprise Custom Lot Neighborhood(s), and shall be subject to additional covenants, conditions and restrictions set forth by Declarant in its sole discretion (including, but not necessarily limited to, additional requirements such as specific time deadlines for commencement and completion of construction of the custom home on each Custom Lot by the Owner thereof).

12.2    Additional Design Guidelines.

Declarant, in its sole discretion, from time to time may promulgate additional Design Guidelines for Custom Lots (in which event, the Owners of Custom Lots and the DRC shall additionally follow and abide by the Design Guidelines in the implementation of Article 4).

## Article 13.

## Neighborhood Common Elements

13.1    Purpose.

Certain portions of the Common Element may be designated as Neighborhood Common Element and reserved for the exclusive use or primary benefit of Owners and occupants within a particular Neighborhood or Neighborhoods.  By way of illustration and not limitation, Neighborhood Common Elements may include entry features, recreational facilities, landscaped medians and cul-de-sacs, lakes and other portions of the Common Element within a particular Neighborhood or Neighborhoods.  All costs associated with maintenance, repair, replacement, and insurance of an Neighborhood Common Element shall be a Neighborhood Expense allocated among the Owners in the Neighborhood(s) to which the Neighborhood Common Elements are assigned.

13.2    Designation.

Initially, any Neighborhood Common Element shall be designated as such in the deed conveying such area to the Master Association or on the subdivision plat relating to such Common Element; provided, however, any such assignment shall not preclude Declarant from later assigning use of the same Neighborhood Common Element to additional Units and/or Neighborhoods, so long as Declarant has a right to subject additional property to this Declaration pursuant to Section 9.1.

Thereafter, a portion of the Common Element may be assigned as Neighborhood Common Element and a Neighborhood Common Element may be reassigned upon approval of

the Board and the vote or consent of the Owners constituting the Requisite Membership Percentage and the vote or consent of the Requisite Neighborhood Percentage within the Neighborhood(s) affected by the proposed assignment or reassignment. As long as Declarant owns any property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1, any such assignment or reassignment shall also require Declarant's written consent.

13.3    Use by Others.

Upon approval of a majority of Owners of Units within the Neighborhood to which any Neighborhood Common Element is assigned, the Master Association may permit Owners of Units in other Neighborhoods to use all or a portion of such Neighborhood Common Element upon payment of reasonable user· fees, which fees shall be used to offset the Neighborhood Expenses attributable to such Neighborhood Common Element.

## Article 14.

### Party Walls and Other Shared Structures

14.1    General Rules of Law to Apply.

Each wall, fence, driveway or similar structure built as a part of the original construction on the Units which serves and/or separates any two adjoining Units shall constitute a party structure. To the extent not inconsistent with the provisions of this Section, the general rules of law regarding party walls and liability for property damage due to negligence or willful acts or omissions shall apply thereto.

14.2    Maintenance; Damage and Destruction.

The cost of reasonable repair and maintenance of a party structure shall be shared equally by the Owners who make use of the party structure.

If a party structure is destroyed or damaged by fire or other casualty, then to the extent that such damage is not covered by insurance and repaired out of the proceeds of insurance, any Owner who has used the structure may restore it. If other Owners thereafter use the structure, they shall contribute to the restoration cost in equal proportions. However, such contribution will not prejudice the right to call for a larger contribution from the other users under any rule of law regarding liability for negligent or willful acts or omissions.

14.3    Right to Contribution Runs With Land.

The right of any Owner to contribution from any other Owner under this Section shall be appurtenant to the land and shall pass to such Owner's successors-in-title.

14.4    Disputes.

Any dispute arising concerning a party structure shall be handled in accordance with the provisions of Article 16.

## Article 15.

### Private Amenities

15.1    General.

Neither membership in the Master Association nor ownership or occupancy of a Unit shall confer any ownership interest in or right to use any Private Amenity. Rights to use the Private Amenities will be granted only to such persons, and on such terms and conditions, as may be determined from time to time by the respective owners of the Private Amenities. The owners of the Private Amenities shall have the right, from time to time in their sole and absolute discretion and without notice, to amend or waive the terms and conditions of use of their respective Private Amenities, including, without limitation, eligibility for and duration of use rights, categories of use and extent of use privileges, and number of users, and shall also have the right to reserve use rights and to terminate use rights altogether, subject to the terms of any written agreements with their respective members.

15.2    Conveyance of Private Amenities.

All Persons, including all Owners, are hereby advised that no representations or warranties have been or are made or authorized to be made by Declarant, the Master Association, any Builder, or by any Person acting or purporting to be acting on behalf of any of the foregoing, with regard to the continuing ownership or operation of any Private Amenity, and no purported representation or warranty in such regard, either written or oral, shall be effective unless specifically set forth in a written instrument executed by the record owner of the Private Amenity. Further, the ownership or operation of the Private Amenity may change at any time by virtue of, but without limitation, (a) the sale to or assumption of operations of any Private Amenity by a Person (including the City a governmental authority) other than the current owner or operator; (b) the establishment of, or conversion of the membership structure to, an "equity" club or similar arrangement whereby the members of the Private Amenity or an entity owned or controlled by its members become the owner(s) and/or operator(s) of the Private Amenity; or (c) the conveyance of any Private Amenity to one or more of Declarant's affiliates, shareholders, employees, or independent contractors. Consent of the Master Association, any Neighborhood Association, or any Owner shall not be required to effectuate any change in ownership or operation of any Private Amenity, for or without consideration and subject to or free of any mortgage, covenant, lien or other encumbrance.

15.3    View Impairment.

Declarant, the Master Association, or the owner of any Private Amenity, does not guarantee or represent that any view over and across the Private Amenity from Units adjacent to the Private Amenity will be preserved without impairment. Owners of the Private Amenities, if any, shall have no obligation to prune or thin trees or other landscaping, and shall have the right, in their sole and absolute discretion, to add trees and other landscaping to the Private Amenities from time to time. In addition, the owner of any Private Amenity which includes a golf course may, in its sole and absolute discretion, change the location, configuration, size and elevation of the trees, bunkers, fairways and greens from time to time. Any such additions or changes may diminish or obstruct any view from the Units and any express or implied easements for view purposes or for the passage of light and air are hereby expressly disclaimed.

15.4    Cost Sharing.

The Master Association may enter into a contractual arrangement or covenant to share costs with the owner of any Private Amenity obligating the owner of a Private Amenity to contribute funds for, among other things, shared property or services and/or a higher level of Common Element maintenance.

15.5    Rights of Access and Parking.

For purposes of this Article 15, the Property shall comprise the burdened property ("Burdened Property") and the Private Amenities (including, but not necessarily limited to, any office facility, day care facility, sales center facility, and the Golf Course) shall comprise the benefitted property ("Benefitted Property"). The owner(s) of the Benefitted Property, and portions thereof, are collectively referred to herein as the "Benefitted Property Owner." In addition to, and without limiting, any other easement set forth in this Declaration, Declarant has deemed it desirable to establish certain protective covenants, conditions, restrictions and easements on and running with the Burdened Property, for the benefit of the Benefitted Property, in part to protect Declarant and any owner(s) of all or any part of the Benefitted Property, against improper or inappropriate development and use of, and/or restrictions on, the Burdened Property or any part thereof.

Declarant hereby expressly reserves the following easements. The Benefitted Property Owner, its successors and assigns, their respective Invitees, and the Persons permitted to use the Private Amenities (or portion thereof) by the Benefitted Property Owner (regardless of whether such persons are Owners hereunder) and their Families and Invitees, shall at all times have a right and non-exclusive easement of ingress, egress, access and use over all Common Elements (including Private Streets, sidewalks, and entry areas) whether by automobile, golf cart, or other means, located within the Property and reasonably necessary to travel between the entrances to the Property and the Benefitted Property, respectively and, further, over those portions of the Property (whether Common Elements or otherwise) reasonably necessary to the use, operation, maintenance, repair and replacement of the Benefitted Property. Without limiting the generality of the foregoing, persons who are permitted use of the Private Amenities (or portions thereof)

and members of the public as designated or permitted by the Benefitted Property Owner, shall have the right to park their vehicles on the Private Streets and other Common Elements located within the Property at reasonable times before, during, and after, events, tournaments, and other similar functions held by or at the Benefitted Property.

The use restrictions set forth in the Governing Documents shall inure to the benefit of the Benefitted Property and the Benefitted Property Owners, to the extent reasonably appropriate.

The Master Association and the Benefitted Property Owner shall cooperate to the maximum extent reasonably possible in the respective operation of the Property and the Private Amenities. Notwithstanding the foregoing, without the prior written consent of the Benefitted Property Owner in its sole discretion: (a) the Master Association shall have no power to promulgate or enforce rules or regulations affecting activities on or use of the Benefitted Property, and (b) the Benefitted Property shall not be subject to any Master Association assessments, or other Master Association charges, including, but not limited to, such assessments or charges for use, maintenance, or repair of the Common Elements.

The covenants, conditions, restrictions, and reservation of easements, contained herein shall run with, burden and bind the Burdened Property and shall inure to the benefit of the Benefitted Property and the Benefitted Property Owner, and shall be enforceable by the Benefitted Property Owner. Neither this Section, nor any other portion of this Declaration which affects the Benefitted Property or the use and enjoyment thereof, may be terminated, extended, modified, or amended, as to the whole of the Burdened Property or any portion thereof, except by Recorded instrument executed and acknowledged by the then Benefitted Property Owner of Record.

15.6    Additional Golf Course Easements.

Declarant further expressly grants the following additional easements over the Burdened Property, to and for the benefit of the portion of the Benefitted Property which comprises the Golf Course:

(a)    the right, for a five minute period commencing on the departure of any golf ball from the Golf Course onto the Property, of the owner and/or lessee of the Golf Course and of all players and guests at the Golf Course to enter upon the Property to search for and recover errant golf balls provided, if any Unit is fenced or walled, the golfer shall seek the Owners permission before entry. The existence of this easement shall not relieve golfers of liability for damage caused by errant golf balls;

(b)    the right of the players and Invitees at the Golf Course to enter, on golf carts or on foot, upon the Common Elements of the Property in order to reasonably traverse the various playing elements of the Golf Course;

(c)    the right of the owner and/or lessee of the Golf Course and of their employees and contractors to enter upon the Property for the purpose of maintaining and repairing water and

irrigation lines and pipes which are located in or originate from the Golf Course and are used in connection with the irrigation or sprinkling of the Golf Course landscaping or landscaping on the Property;

(d)      a non-exclusive easement is hereby reserved to the Benefitted Property Owner, its successors and assigns, and their respective Invitees, upon, over, in, and across the Private Streets and those portions of the Common Elements reasonably necessary to travel, with storage and maintenance equipment, chemicals, and other items, to and from various portions of the Golf Course, and the right to take all action reasonably necessary for the storage and maintenance of equipment, chemicals and all other items;

(e)      any portion of the Property immediately adjacent to any Golf Course is hereby burdened with a non-exclusive easement in favor of the Golf Course for overspray of water from the irrigation system for such Golf Course. Under no circumstances shall the Master Association or the owner of such Golf Course be held liable for any damage or injury resulting from such overspray or the exercise of this easement; and

(f)      the owner of any Golf Course within or adjacent to any portion of the Property, its successors and assigns, shall have a perpetual, exclusive easement of access over the Property for the purpose of retrieving golf balls from bodies of water upon the Common Elements lying reasonably within range of golf balls hit from the Golf Course.

Under no circumstances shall any of the following Persons be held liable for any damage or injury resulting from errant golf balls or the exercise of this easement: Declarant; the Master Association and/or its Members (in their capacities as such); the owner of any golf course, its successors, or assigns; any Builder or contractor (in their capacities as such); or any officer, director, or partner of any of the foregoing.

15.7     Limitations on Amendments.

In recognition of the fact that the provisions of this Article are for the benefit of the Private Amenity, no amendment to this Article, and no amendment in derogation of any other provisions of this Declaration benefitting any Private Amenity (any other provision of this Declaration which would adversely affect the Benefitted Property Owner, the Benefitted Property, or access to or use and enjoyment of the Private Amenities), may be made without the written approval of the Private Amenity and the Benefitted Property Owner. The foregoing shall not apply, however, to amendments made by Declarant.

15.8     Jurisdiction and Cooperation.

It is Declarant's intention that the Master Association and the Private Amenity shall cooperate to the maximum extent possible in the operation of Tuscany and the Private Amenity. Each shall reasonably assist the other in upholding the Community-Wide Standard as it pertains to maintenance and the Design Guidelines. The Master Association shall have no power to

promulgate Use Restrictions or Rules affecting activities on or use of the Private Amenity without the prior written consent of the owners of the Private Amenity affected thereby.

## PART SIX: RELATIONSHIPS WITHIN AND OUTSIDE THE COMMUNITY

The growth and success of Tuscany as a community in which people enjoy living, working, and playing requires good faith efforts to resolve disputes amicably, attention to and understanding of relationships within the community and with our neighbors, and protection of the rights of others who have an interest in the community.

### Article 16.

### Dispute Resolution and Limitation on Litigation

16.1    Consensus for Master Association Litigation.

Except as provided in this Section, the Master Association shall not commence a judicial or administrative proceeding without first providing written notice of such proposed action to each Member at least 21 days before a meeting to vote on such proposed action and obtaining the approval at such meeting of at least the Requisite Membership Percentage.  This Section shall not apply, however, to (a) actions brought by the Master Association to enforce the Governing Documents (including, without limitation, the foreclosure of liens), the Bylaws, or the rules and regulations of the Master Association; (b) the collection of assessments; (c) counterclaims brought by the Master Association in proceedings instituted against it, or (d) to protect the health, safety and welfare of the Members to the extent permitted under the Act.  This Section shall not be amended unless such amendment is approved by the Requisite Membership Percentage, pursuant to the same procedures necessary to institute proceedings as provided in this Section.

16.2    Alternative Method for Resolving Disputes.

Declarant, any Builder, the Master Association, their officers, directors, and committee members; all Owners and other Persons subject to this Declaration, and any Person not otherwise subject to this Declaration who agrees to submit to this Article (each such entity being referred to as a "Bound Party") agree to encourage the amicable resolution of disputes involving the Community, without the emotional and financial costs of litigation.  Accordingly, each Bound Party covenants and agrees to submit those claims, grievances or disputes described in Section 16.3 of this Article ("Claims") to the procedures set forth in Section 16.4 in lieu of filing suit in any court.

16.3    Claims.

Unless specifically exempted below, all Claims arising out of or relating to the interpretation, application or enforcement of the Governing Documents, or the rights, obligations

and duties of any Bound Party under the Governing Documents or relating to the design or construction of Improvements within Tuscany shall be subject to the provisions of Section 16.4.

Notwithstanding the above, unless all parties thereto otherwise agree, the following shall not be Claims and shall not be subject to the provisions of Section 16.4:

(a)     any suit by the Master Association against any Bound Party to enforce the provisions of Article 8;

(b)     any suit by Declarant or the Master Association to obtain a temporary restraining order (or equivalent emergency equitable relief) and such other ancillary relief as the court may deem necessary in order to maintain the status quo and preserve Declarant's or the Master Association's ability to enforce the provisions of Article 3 and Article 4;

(c)     any suit between Owners, which does not include Declarant or the Master Association, if such suit asserts a Claim which would constitute a cause of action independent of the Governing Documents;

(d)     any suit in which any indispensable party is not a Bound Party; and

(e)     any suit as to which any applicable statute of limitations would expire within 180 days of giving the Notice required by Section 16.4(a), unless the party or parties against whom the Claim is made agree to toll the statute of limitations as to such Claim for such period as may reasonably be necessary to comply with this Article.

With the consent of all parties thereto, any of the above may be submitted to the alternative dispute resolution procedures set forth in Section 16.4.

16.4    Mandatory Procedures.

(a)     Notice. Any Bound Party having a Claim ("Claimant") against any other Bound Party ("Respondent") (collectively, the "Parties") shall notify each Respondent in writing (the "Notice"), stating plainly and concisely:

(i)      the nature of the Claim, including the Persons involved and Respondent's role in the Claim;

(ii)     the legal basis of the Claim (i.e., the specific authority out of which the Claim arises);

(iii)    Claimant's proposed remedy; and

(iv)    that Claimant will meet with Respondent to discuss in good faith ways to resolve the Claim.

(b)     Negotiation and Mediation.

(i)     The Parties shall make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation.  If requested in writing, accompanied by a copy of the Notice, the Board may appoint a representative to assist the Parties in negotiation.

(ii)     If the Parties do not resolve the Claim within 30 days of the date of the Notice (or within such other period as may be agreed upon by the Parties) ("Termination of Negotiations"), Claimant shall have 30 additional days to submit the Claim to mediation under the auspices of an independent agency providing dispute resolution services in the Las Vegas area.

(iii)     If Claimant does not submit the Claim to mediation within such time, or does not appear for the mediation, Claimant shall be deemed to have waived the Claim, and Respondent shall be released and discharged from any and all liability to Claimant on account of such Claim; provided, nothing herein shall release or discharge Respondent from any liability to any Person other than the Claimant.

(iv)     Any settlement of the Claim through mediation shall be documented in writing by the mediator and signed by the Parties.  If the Parties do not settle the Claim within 30 days after submission of the matter to the mediation, or within such time as determined by the mediator, the mediator shall issue a notice of termination of the mediation proceedings ("Termination of Mediation").  The Termination of Mediation notice shall set forth that the Parties are at an impasse and the date that mediation was terminated.

(v)     The Claimant shall thereafter be entitled to sue in any court of competent jurisdiction or to initiate proceedings before any appropriate administrative tribunal on the Claim.

16.5     Allocation of Costs of Resolving Claims.

Subject to Section 16.4(b), each Party shall bear its own costs, including attorneys fees, and each Party shall share equally all charges rendered by the mediator.

16.6     Enforcement of Resolution.

After resolution of any Claim, if any Party fails to abide by the terms of such agreement, then any other Party may file suit or initiate administrative proceedings to enforce such agreement without the need to again comply with the procedures set forth in Section 16.4.  In such event, the Party taking action to enforce the agreement shall be entitled to recover from the non-complying Party (or if more than one non-complying Party, from all such Parties pro rata) all costs incurred in enforcing such agreement, including, without limitation, attorneys' fees and court costs.

16.7    Attorneys' Fees.

In the event an action is instituted to enforce any of the provisions contained in the Governing Documents, then the prevailing party in such action shall be entitled to recover from the other party thereto as part of the judgement, reasonable attorneys' fees and costs, including administrative and lien fees, of such suit. In the event the Master Association is a prevailing party in such action, the amount of such attorneys' fees and costs shall be Specific Assessment with respect to the Unit(s) involved in the action.

## Article 17.

## Mortgagee Provisions

The following provisions are for the benefit of holders, insurers and guarantors of first Mortgages on Units in Tuscany. The provisions of this Article apply to both this Declaration and to the Bylaws, notwithstanding any other provisions contained therein.

17.1    Notices of Action.

An institutional holder, insurer, or guarantor of a first Mortgage which provides a written request to the Master Association (such request to state the name and address of such holder, insurer, or guarantor and the street address of the Unit to which its Mortgage relates, thereby becoming an "Eligible Holder"), will be entitled to timely written notice of:

(a)    Any condemnation loss or any casualty loss which affects a material portion of Tuscany or which affects any Unit on which there is a first Mortgage held, insured, or guaranteed by such Eligible Holder;

(b)    Any delinquency in the payment of assessments or charges owed by a Unit subject to the Mortgage of such Eligible Holder, where such delinquency has continued for a period of 60 days, or any other violation of the Governing Documents relating to such Unit or the Owner or Occupant which is not cured within 60 days;

(c)    Any lapse, cancellation, or material modification of any insurance policy maintained by the Master Association; or

(d)    Any proposed action which would require the consent of a specified percentage of Eligible Holders.

17.2    No Priority.

No provision of this Declaration or the Bylaws gives or shall be construed as giving any Owner or other party priority over any rights of the first Mortgagee of any Unit in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Element.

17.3    Notice to Master Association.

Upon request by the Master Association, each Owner shall be obligated to furnish to the Master Association the name and address of the holder of any Mortgage encumbering such Owner's Unit.

17.4    Failure of Mortgagee To Respond.

Any Mortgagee who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Master Association does not receive a written response from the Mortgagee within 30 days of the date of the Master Association's request, provided such request is delivered to the Mortgagee by certified or registered mail, return receipt requested.

17.5    HUD/VA Approval.

During the Declarant Control Period, the following actions shall require the prior approval of the U.S. Department of Housing and Urban Development or the U.S. Department of Veterans Affairs, if either such agency is insuring or guaranteeing the Mortgage on any Unit: merger, consolidation or dissolution of the Master Association; annexation of additional property other than that described in Exhibit "B"; dedication, conveyance or mortgaging of Common Element; or material amendment of this Declaration. The granting of easements for utilities or other similar purposes consistent with the intended use of the Common Element shall not be deemed a conveyance within the meaning of this Section.

## PART SEVEN: CHANGES IN THE COMMUNITY

Communities such as Tuscany are dynamic and constantly evolving as circumstances, technology, needs and desires, and laws change, as the residents age and change over time, and as the surrounding community changes. Tuscany and its Governing Documents must be able to adapt to these changes while protecting the things that make Tuscany unique.

### Article 18.

### Changes in Ownership of Units

Any Owner desiring to sell or otherwise transfer title to his or her Unit shall give the Board at least seven days' prior written notice of the name and address of the purchaser or transferee, the date of such transfer of title, and such other information as the Board may reasonably require. The transferor shall continue to be jointly and severally responsible with the transferee for all obligations of the Owner of the Unit, including assessment obligations, until the date upon which such notice is received by the Board, notwithstanding the transfer of title.

## Article 19.

### Changes in Common Element

19.1   Condemnation.

If a Unit or portion thereof its taken by eminent domain, compensation and the Owner's interest in the Common Elements shall be allocated as provided under the Act.  If any part of the Common Element shall be taken (or conveyed in lieu of and under threat of condemnation by the Board acting on the written direction of the Requisite Membership Percentage and of Declarant, as long as Declarant owns any property subject to the Declaration or which may be made subject to the Declaration in accordance with Section 9.1) by any authority having the power of condemnation or eminent domain, each Owner shall be entitled to written notice of such taking or conveyance prior to disbursement of any condemnation award or proceeds from such conveyance.  Such award or proceeds shall be payable to the Master Association to be disbursed as follows:

If the taking or conveyance involves a portion of the Common Element on which Improvements have been constructed, the Master Association shall restore or replace such Improvements on the remaining land included in the Common Element to the extent available, unless within 60 days after such taking Declarant, so long as Declarant owns any property subject to the Declaration or which may be made subject to the Declaration in accordance with Section 9.1, and the Owners constituting the Requisite Membership Percentage shall otherwise agree.  Any such construction shall be in accordance with plans approved by the Board.  The provisions of Section 7.3(c) regarding funds for restoring improvements shall apply.

If the taking or conveyance does not involve any Improvements on the Common Element, or if a decision is made not to repair or restore, or if net funds remain after any such restoration or replacement is complete, then such award or net funds shall be disbursed to the Master Association in trust for the Owners and lien holders as their interests appear.

19.2   Partition.

Except as permitted in this Declaration, the Common Element shall remain undivided, and no Person shall bring any action to partition any portion of the Common Element without the written consent of all Owners and Mortgagees.  This Section shall not prohibit the Board from acquiring and disposing of tangible personal property, nor from acquiring and disposing of real property which may or may not be subject to this Declaration.

19.3   Transfer or Dedication of Common Element.

The Master Association may dedicate portions of the Common Element to the City of Henderson, Nevada, or to any other local, state, or federal governmental or quasi-governmental entity, subject to such approval as may be required by Sections 17.9 and 19.4.

19.4    Actions Requiring Owner Approval.

If either the U.S. Department of Housing and Urban Development or the U.S. Department of Veterans Affairs insures or guarantees the Mortgage on any Unit, then the following actions shall require the prior approval of Members representing not less than 67% of the total votes in the Master Association and the consent of Declarant: merger, consolidation or dissolution of the Master Association; annexation of additional property other than that described in Exhibit "B;" and dedication, conveyance or mortgaging of Common Element. Notwithstanding anything to the contrary in Section 19.1 or this Section, the Master Association, acting through the Board, may grant easements over the Common Element for installation and maintenance of utilities and drainage facilities and for other purposes not inconsistent with the intended use of the Common Element, without the approval of the membership.

## Article 20.

## Amendment of Declaration

20.1    By Declarant.

In addition to specific amendment rights granted elsewhere in this Declaration, Declarant may unilaterally amend this Declaration if such amendment is necessary (a) to bring any provision into compliance with any applicable governmental statute, rule, regulation, or judicial determination; (b) to enable any reputable title insurance company to issue title insurance coverage on the Units; (c) to enable any institutional or governmental lender, purchaser, insurer or guarantor of mortgage loans, including, for example, the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, to make, purchase, insure or guarantee mortgage loans on the Units; or (d) to satisfy the requirements of any local, state or federal governmental agency. However, any such amendment shall not adversely affect the title to any Unit unless the affected Owner shall consent in writing.

In addition, so long as Declarant owns property described in Exhibits "A" or "B" for development as part of Tuscany, it may unilaterally amend this Declaration for any other purpose, provided the amendment has no material adverse effect upon any right of any Owner or unless such Owner shall consent in writing.

20.2    By Members.

Except as otherwise specifically provided above and elsewhere in this Declaration, this Declaration may be amended only by the affirmative vote or written consent, or any combination thereof, of Owners representing the Requisite Membership Percentage, and Declarant's consent, so long Declarant owns any property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1. In addition, the approval requirements set forth in Article 17 shall be met, if applicable.

63

Notwithstanding the above, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause.

20.3    Validity, Effective Date, and Conflicts.

No amendment may remove, revoke, or modify any right or privilege of Declarant without Declarant's written consent.

If an Owner consents to any amendment to this Declaration or the Bylaws, it will be conclusively presumed that such Owner has the authority to consent, and no contrary provision in any Mortgage or contract between the Owner and a third party will affect the validity of such amendment.

Any amendment shall become effective upon Recording, unless a later effective date is specified in the amendment. Any procedural challenge to an amendment must be made within six months of its Recordation or such amendment shall be presumed to have been validly adopted. In no event shall a change of conditions or circumstances operate to amend any provision of this Declaration.

Each of the Governing Documents, including this Declaration, is intended to comply with the requirements of the Act applicable to common interest communities and the Governing Documents shall be interpreted, if at all possible, so as to be consistent with the Act. If there is any conflict between the Governing Documents and the provisions of the foregoing statutes, the provisions of the applicable statutes shall control. In the event of any conflict between this Declaration and any other Governing Document, this Declaration shall control.

20.4    Exhibits.

Exhibits "A," "B," and "C" attached to this Declaration are incorporated by this reference and amendment of such exhibits shall be governed by this Article. All other exhibits are attached for informational purposes and may be amended as provided therein or in the provisions of this Declaration which refer to such exhibits.

## PART EIGHT: ADDITIONAL PROVISIONS

### Article 21.

### Additional Disclosures, Disclaimers and Releases

21.1    General Disclosures and Disclaimers Regarding Private Amenities

By acceptance of a deed to a Unit, each Owner (for purposes of this Article 21, the term "Owner" shall include an Owner and/or Resident, and their respective Families and Invitees), shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the

following disclosures and disclaimers. The Units and Common Elements include absolutely no right, title, or interest in or to (or membership in, use of, or access to) the Private Amenities (including, but not necessarily limited to, Golf Course Club (and its components, and related facilities and features), as the same are subject to change in the sole discretion of the management of the Private Amenities. The Private Amenities are NOT A PART OF the Property, and ARE NOT a Common Element. Private Amenity ownership, membership, use, and access, are separate from, and not included in, the Property. Notwithstanding the foregoing, the owners and members of the Private Amenities, and their respective Invitees, shall have an easement of access to, enjoyment of, and ingress and egress over, certain Private Streets and entries and other Common Elements of the Community, as described in further detail in Article 15.

21.2    <u>Additional Disclosures and Disclaimers Regarding Private Amenities.</u>

Without limiting Section 21.1 above, by acceptance of a deed to a Unit, each Owner shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following disclosures and disclaimers:

(a)    Portions of the Community are located adjacent to or nearby the Golf Course. In connection with the Golf Course: (a) the water facilities, hazards, other installations located on the Golf Course may be an attractive nuisance to children; (b) operation, maintenance, and use, of each of the Golf Course may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the limited right of golfers on the Golf Course ("Golfers") to enter upon the Community to retrieve errant golf balls; (2) the right of Golfers, on foot or on golf carts, to enter upon and traverse easements over the Community in connection with golf play on the Golf Course; (3) the right of owner(s) and operator(s) of the Golf Course, and their employees, agents, suppliers, and contractors, to (i) enter upon and travel over the Community to and from and between any one or more of the Community entry areas, and portions of the Golf Course, and (ii) enter upon the Community to maintain, repair, and replace, water and irrigation lines and pipes used in connection with Golf Course landscaping; (4) operation and use of noisy electric, gasoline, diesel and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (5) operation of sprinkler and other irrigation systems during the day and night; (6) storage, transportation, and application of insecticides, pesticides, herbicides, fertilizers, and other supplies and chemical substances (all, collectively, "chemical substances"); (7) parking and/or storage of vehicles, equipment, chemical substances, and other items; (8) irrigation of the Golf Course, and supply of water facilities thereon, with recycled or effluent water; (9) "overspray" of recycled or effluent water and chemicals onto the Community which may result in damage to Improvements constructed on Units and/or Common Elements within the Community ; and/or (10) Golfers from time to time may shout and use language, particularly in and around tee and green areas of the Golf Course, which may be distinctly audible to persons in the Community; and which language may be profane or otherwise offensive in tone and content; (c) play on the Golf Course may be allowed by the owner(s) or operator(s) thereof during the daylight and/or evening hours, up to and including seven days a week; (d) play on the

Golf Course may result in damage to the Community as a result of golf balls or other items leaving the Golf Course, including, without limitation, damage to windows, doors, stucco, roof tiles, sky lights, and other areas of the Unit and other portions of the Community, and damage to real and personal property of Owner or others, whether outdoors or within a residence or other building, and injury to person; and (e) although fencing and other features may (but need not necessarily) be incorporated into the Unit or other portions of the Community in an effort to decrease the hazards associated with golf balls entering the Community from the Golf Course, each Owner acknowledges that such fencing and other features may protect against some, but certainly not all golf balls which enter the Community from the Golf Course.

(b)      The Golf Course also may include one or more separate large maintenance and/or warehouse-type building(s), storage area(s) for vehicles, equipment, and chemical substances (as defined above), fuel storage and above-ground fuel island(s), and related facilities (all, collectively, "Maintenance Facility") at a location on or adjacent to the Community which may or may not be contiguous to other portions of the Golf Course. The location of the Maintenance Facility will require frequent and recurring travel by Maintenance Facility and other Golf Course personnel, and vehicles (and travel by and transportation of other personnel, equipment, chemicals, fuel, and other items) over Private Streets and other Common Elements of the Community to and from the Maintenance Facility and other portions of the Golf Course and Community entry areas. In connection with the Maintenance Facility: (a) the facilities and related items located on the Maintenance Facility may be an attractive nuisance to children; (b) operation, maintenance, and use, of the Maintenance Facility may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the right of owner(s) and operator(s) of the Maintenance Facility, and their employees, agents, suppliers, and contractors, to enter upon and travel over the Community to and from and between any one or more of the Community entry areas, the Maintenance Facility, and other portions of the Golf Course; (2) operation, maintenance, and repair of noisy electric, gasoline, and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (3) storage, transportation, and application, of chemical substances; (4) parking and/or storage of vehicles, equipment, chemical substances, fuel, and other items; and (5) fueling and related operations; and (c) although walls, fencing, and other features may be incorporated into the Maintenance Facility, each Owner acknowledges that such walls, fencing, and other features will certainly not eliminate all sight, noise, or other conditions, on or emanating from the Maintenance Facility.

(c)      All and any one or more of the matters described above may cause inconvenience and disturbance to the Owners, and other occupants of and visitors to the Unit and/or Common Elements, and possible injury to person and damage to property, and each Owner has carefully considered the foregoing matters, and the location of the Community (including the Common Elements and the Unit) and their proximity to those elements of the Golf Course and to the Maintenance Facility likely to affect ownership and enjoyment of a Unit, before making the decision to purchase a Unit in the Property.

21.3    Disclosures and Disclaimers of Certain Other Matters.

Without limiting any other provision in this Declaration, by acceptance of a deed to a Unit, each Owner shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following:

(a)    that there is and/or will be electrical power substations located on or adjacent to the Community (which term, as used throughout this Article 21, shall include all Units and Common Elements), and there are presently and may be further major electrical power system components (high voltage transmission or distribution lines, transformers, etc.) from time to time located within or nearby the Community, which generate certain electric and magnetic fields ("EMF") around them; that, without limiting any other provision in this Declaration, Declarant specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to EMF; and that each Owner hereby releases Declarant from any and all claims arising from or relating to said EMF, including, but not necessarily limited to, any claims for nuisance or health hazards; and

(b)    that the Community is or may be located within or nearby certain airplane flight patterns, and/or subject to significant levels of airplane traffic noise; and that Declarant hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to airplane flight patterns, and/or airplane noise; and that each Owner hereby releases Declarant from any and all claims arising from or relating to airplane flight patterns or airplane noise; and

(c)    that the Community is or may be located adjacent to or nearby major roadways, and subject to levels of traffic thereon and noise, dust, and other nuisance from such roadways and vehicles; that Declarant hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to roads and/or noise, dust, and other nuisance therefrom; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(d)    that there is and/or will be a water reservoir site located on or adjacent to the Community, and certain major water and drainage channels, major washes, and a major water detention basin may be located within and adjacent to the Community (all, collectively, "Channel"), the ownership, use, regulation, operation, maintenance, improvement and repair of which are not within Declarant's control, and over which Declarant has no jurisdiction or authority; and, in connection therewith: (1) the Channel may be an attractive nuisance to children; (2) maintenance and use of the Channel may involve various operations and applications, including (but not necessarily limited to) noisy electric, gasoline or other power driven vehicles and/or equipment used by Channel maintenance and repair personnel during various times of the day, including, without limitation, early morning and/or late evening hours; and (3) the possibility of damage to Improvements and property on the Property, particularly in the event of overflow of water or other substances from or related to the Channel, as the result of nonfunction, malfunction, or overtaxing of the Channel or any other reason; (4) any or all of the foregoing may cause inconvenience and disturbance to Owners and other persons in or near the

Unit and/or Common Elements, and possible injury to person and/or damage to property; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(e)     that there is or will be a series of deep and maintenance free sub drains ("French Drains") installed underneath the land within the Community approximately 12 feet below the finished surface; that certain residential lots in Tuscany will be burdened by an easement for the placement and operation of the French Drains; that the existence of the French Drains may cause inconvenience and disturbance to Owners and other persons in or near the Unit and/or Common Elements, and possible injury to person and/or damage to property; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(f)     that the Community is located near a site formerly operated as a municipal solid waste landfill from the late 1950s until the mid-1970s; that approximately 3 years ago, the City began the process of closing down the landfill and the City expects to fully close the landfill by the end of 2004; that once the landfill is closed, the City is contemplating the development of the landfill as a municipal golf course, provided that the landfill can sustain such a development; that Declarant hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to the landfill, its closure or future use; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(g)     that an advanced wastewater treatment plant owned and operated by the City is located to the west of the Community; that the plant includes rapid infiltration basins ("RIBs") located approximately 1,600 feet from the southern boundary of Tuscany; that the RIBs are authorized to be used during certain months of the year to store and/or dispose of treated municipal effluent via infiltration into the subsurface; that Declarant hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to odor, noise, dust, and other nuisance therefrom; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(h)     that the sewage which is created within the Community will be handled by the City's wastewater treatment facility; that because the Community is lower in elevation than the City's wastewater treatment facility, a lift station must be constructed within the Community to pump the sewage to the treatment facility; that the operation of the lift station may produce noise and odor pollution; that the lift station will be operated and maintained by the City; that Declarant hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to odor, noise, dust, and other nuisance therefrom; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(i)     that three (3) radio towers, located near the Community, presently operate at 50,000 watts; that modulation and directional broadcasting can boost the operational power of each tower at certain times of the day; that television sets, receivers, computer modems, and radio communication devices may be adversely impacted by the presence of AM radio signals; that Declarant hereby specifically disclaims any and all representations or warranties, express

and implied, with regard to or pertaining to the existence of such tower and any nuisance therefrom; and that each Owner hereby releases Declarant from any and all claims arising therefrom or relating thereto; and

(j)      that construction or installation of Improvements by Declarant, other Owners, or third parties, including commercial homebuilders, may impair or eliminate the view, if any, of or from any Unit and/or Common Elements; and that Owner hereby releases Declarant from any and all claims arising from or relating to said impairment or elimination including, but not necessarily limited to, any claims for nuisance or health hazards; and

(k)      that residential subdivision and home construction is an industry inherently subject to variations and imperfections, and items which do not materially affect safety or structural integrity shall be deemed "expected minor flaws" (including, but not limited to: reasonable wear, tear or deterioration; shrinkage, swelling, expansion or settlement; squeaking, peeling, chipping, cracking, or fading; touch-up painting; minor flaws or corrective work; and like items) and not constructional defects; and

(l)      that: (1) the finished construction of the Unit and the Common Elements, while within the standards of the industry in metropolitan Las Vegas, Clark County, Nevada, and while in substantial compliance with the plans and specifications, will be subject to expected minor flaws; and (2) issuance of a Certificate of Occupancy by the relevant governmental authority with jurisdiction shall be deemed conclusive evidence that the relevant Improvement has been built within such industry standards; and

(m)      that indoor air quality of the Unit and/or Common Elements may be affected, in a manner and to a degree found in new construction within industry standards, by particulates or volatiles emanating or evaporating from new carpeting or other building materials, fresh paint or other sealants or finishes, and so on; and

(n)      that installation and maintenance of a gated community, entry gate guard house, or any security device, operation, or method, shall not create any presumption, or duty whatsoever of Declarant or the Master Association (or their respective officers, directors, managers, employees, agents, and/or contractors), with regard to security or protection of person or property within or adjacent to the Community and no warranty or assurances are given with respect to the hours of operation of any such security feature; and

(o)      that Owner acknowledges having received from Declarant information regarding the zoning designations and the designations in the master plan regarding land use, adopted pursuant to NRS Chapter 278, for the parcels of land adjoining the Property to the north, south, east, and west, together with a copy of the most recent gaming enterprise district map made available for public inspection by the jurisdiction in which the Unit is located, and related disclosures. Declarant makes no further representation, and no warranty (express or implied), with regard to any matters pertaining to adjoining land or uses thereof or to any gaming uses. Owner is hereby advised that the master plan and zoning ordinances, and gaming enterprise districts, are subject to change from time to time. If additional or more current information

concerning such matters is desired, Owner should contact the appropriate governmental planning department. Each Owner acknowledges and agrees that its decision to purchase a Unit is based solely upon Purchaser's own investigation, and not upon any information provided by sales agent; and

(p)     that Declarant presently plans to develop and/or sell for development only those lots which have already been released for construction and sale, and that Declarant has no obligation with respect to future phases, and "custom lots," plans, zoning, or development of other real property contiguous to or nearby the Unit; (b) proposed or contemplated residential and other developments may have been illustrated in the plot plan or other sales literature in or from Declarant's sales office, and/or Owner may have been advised of the same in discussions with sales personnel; however, notwithstanding such plot plans, sales literature, or discussions or representations by sales personnel or otherwise, Declarant is under no obligation to construct such future or planned developments or units, and the same need not be built in the event that Declarant or any builder, for any reason whatsoever, decides not to build same; (c) Owner is not entitled to rely upon, and in fact has not relied upon, the presumption or belief that the same will be built; and (d) no sales personnel or any other person in any way associated with Declarant has any authority to make any statement contrary to the provisions set forth in the foregoing or any provision of the written purchase agreement.

21.4    Releases.

By acceptance of a deed to a Unit, each Owner, for itself and all Persons claiming under such Owner, shall conclusively be deemed to have acknowledged and agreed, to release Declarant, the DRC, the Master Association (and: (a) to the extent applicable, any Builder, and (b) with respect to the Private Amenities, the architects, designers, owner(s) and any operator(s) thereof; together with their respective successors and assigns, and their respective Invitees), and each of their respective officers, managers, agents, employees, suppliers and contractors, from any and all loss, damage or liability (including, but not limited to, any claim for nuisance or health hazards) related to or arising in connection with any disturbance inconvenience, injury, or damage resulting from or pertaining to all and/or any one or more of the conditions, activities, occurrences described in the foregoing Sections 21.1 through 21.3, inclusive.

## Article 22.

## General Provisions

22.1    No Public Right or Dedication.

Nothing contained in this Declaration shall be deemed to be a gift or dedication of all or any part of the Property to the public, or for any public use.

22.2    Compliance with the Act.

It is the intent of Declarant that this Declaration shall be in all respects consistent with, and not violative of, applicable provisions of the Act. In the event any provision of this Declaration is found to violate such applicable provision of the Act, such offending provision of the Declaration shall be severed herefrom; provided, however, that if such severance shall impair the integrity of this Declaration, said offending provision shall be automatically deemed modified to the minimum extent necessary to conform to the applicable provision of the Act.

22.3    No Representations or Warranties.

No representations or warranties of any kind, express or implied, have been given or made by Declarant or its agents or employees in connection with the Community or any portion of the Community, or any Improvement thereon, its physical condition, zoning, compliance with applicable laws, fitness for intended use, or in connection with the subdivision, sale, operation, maintenance, cost of maintenance or taxes, except s specifically and expressly set forth in this Declaration and except as may be filed by Declarant with any other governmental or public authority.

22.4    Binding Effect.

All of the property described in Exhibit "A" and any additional property made a part of Tuscany from time to time in the future by recording one or more Supplemental Declaration, shall be owned, conveyed, and used subject to all of the provisions of this Declaration , which shall run with the title to such property. This Declaration shall be binding upon all Persons having any rights, title, or interest in any portion of the Property, their heirs, successors, successors-in-title, and assigns.

Unless otherwise provided by applicable Nevada law, this Declaration shall run with the land and have a perpetual duration. This Declaration may be terminated only by a Recorded instrument signed by Members comprising the Requisite Membership Percentage, and which complies with the termination procedures set forth in the Act. Nothing in this Section shall be construed to permit termination of any easement created in this Declaration without the consent of the holder of such easements.

IN WITNESS WHEREOF, the undersigned Declarant has executed this Declaration the date and year first written above.

<div style="margin-left:50%">

COMMERCE ASSOCIATES, LLC, a Nevada limited liability company

By:_____

Name:_____

Title:_____

</div>

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _____, 2003, by
_____ as _____ of Commerce Associates, LLC.


_____
Notary Public

My appointment expires: _____

1

# EXHIBIT "A"

## Land Initially Submitted

Neighborhood Designation:

**EXHIBIT "B"**

<u>Land Subject to Annexation</u>

H:\USERS\RRR\tuscany\master ccr 5.doc

**EXHIBIT "C"**

Land Which Intended for Use as Golf Course, NOT A PART OF TUSCANY

## EXHIBIT K

## TITLE REPORTS

### (Section 8.1(b))

[Attach current title reports for each Development Parcel, marked up, if necessary, to reflect any unacceptable exceptions.]

# UNITED TITLE OF NEVADA

### 3980 Howard Hughes Parkway #100, Las Vegas, NV 89109

## PRELIMINARY REPORT

Order No. 03111313

Escrow Officer: J. Jay Pugh
2300 W. Sahara Ave., #140
Las Vegas, NV 89102
Phone Number: (702) 251-4777

Title Officer: Martin C. Bressler
3980 Howard Hughes Parkway #100
Las Vegas, Nevada 89109
Phone Number: (702) 836-8000

Buyer / Borrower: Rhodes Design & Development Corporation

In response to the above referenced application for a policy of title insurance, United Title of Nevada hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a California Land Title Association Standard Coverage form of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception below, or not excluded from coverage pursuant to the printed schedules, conditions and stipulations of said policy form.

This report (and any supplement or amendments thereto) is issued for the purpose of facilitating the issuance of a policy of title insurance.

Dated: October 10, 2003 at 7:30 AM

_____
Martin C. Bressler - Title Officer

The estate or interest in the land hereinafter described or referred to covered by this report is:

Fee Simple

Title to said estate or interest at the date hereof is vested in:

Commerce Associates, LLC, a Nevada limited liability company

The land referred to in this report is described as follows:

See Exhibit A attached hereto and made a part hereof

PRELIMINARY REPORT
Order No.:03111313

The following are exceptions to Title:

**THE FOLLOWING AFFECTS PARCEL 1:**

1.  State, County and/or City taxes for the fiscal year 2003-2004 a lien in the total amount of $14,895.11
    Parcel No.  : 160-32-310-001
    First installment of $3,723.77 due on or before August 18, 2003      - Partially Delinquent
    Second installment of $ 3,723.78 due on or before October 6, 2003   - Delinquent
    Third installment of $ 3,723.78 due on or before January 5, 2004    - Not yet Due
    Fourth installment of $ 3,723.78 due on or before March 1, 2004     - Not yet Due

2.  Any taxes that may be due, but not assessed, for new construction which can be assessed on the unsecured property rolls, in the Office of the Clark County Assessor, per Nevada Statute 361.260.

3.  Water rights, claims or title to water, whether or not shown by the public record.

4.  An Easement for power transmission lines and incidental purposes, in favor, of Lincoln County Power District No. 1 as described in Order of Condemnation in District Court, Clark County, Nevada, Case No. 6903, a certified copy of which was recorded January 19, 1956 in Book 81 as Document No. 67575 of Official Records.

    The interest of Lincoln County Power District No. 1 under said easement was conveyed to Nevada Power Company by "Grant of Easement and Assignment"
    Recorded        : November 08, 1990 in Book 901108
    Document No.  : 00723, Official Records.

5.  Mineral rights, reservations, easements and exclusions in patent from the United States of America.
    Recorded        : June 07, 1966 in Book 721
    Document No.  : 579784, Official Records.

6.  Mineral rights, reservations, easements and exclusions in patent from the United States of America.
    Recorded        : February 10, 1970 in Book 10
    Document No.  : 7408, Official Records.

7.  The terms, provisions and easements as contained in an instrument, entitled "Land Sale Agreement"
    Recorded        : November 03, 1971 in Book 177
    Document No.  : 141597, Official Records.

    Certain reserved road easements set forth in the above instrument were vacated by Order of Vacation
    Recorded        : January 12, 1999 in Book 990112
    Document No.  : 00771, Official Records.

    And Re-Recorded  : February 04, 1999 in Book 990204
    Document No.      : 00958, Official Records.

    Certain reserved road easements set forth in the above instrument were vacated by Order of Vacation.
    Recorded        : December 26, 2002 in Book 20021226
    Document No.  : 01284, Official Records.

PRELIMINARY REPORT
Order No.:03111313

And Re-recorded : March 20, 2003 in Book 20030320
Document No.  : 01487, Official Records.

8. Any Easements that were not affected by a vacation or abandonment
   Recorded      : January 12, 1999 in Book 990112
   Document No.  : 00771, Official Records.

   And Re-recorded : February 04, 1999 in Book 990204
   Document No.  : 00958, Official Records.

9. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Covenant
   Running with Land"
   Recorded      : April 19, 2000 in Book 20000419
   Document No.  : 00394, Official Records.

10. Dedications and Easements as indicated or delineated on the Plat of said Subdivision on file in Book
    94 of Plats, Page 19, Official Records.

    Said map was amended by Certificate
    Recorded      : October 03, 2001 in Book 20011003
    Document No.  : 00932, Official Records.

11. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Statement of
    Initiation of Redevelopment Proceedings"
    Recorded      : April 02, 2001 in Book 20010402
    Document No.  : 03421, Official Records.

**THE FOLLOWING AFFECTS PARCEL 2:**

12. State, County and/or City taxes for the fiscal year 2003-2004 a lien in the total amount of $12,024.55
    Parcel No.  : 160-32-801-002
    First installment of $3,006.13 due on or before August 18, 2003      - Partially Delinquent
    Second installment of $ 3,006.14 due on or before October 6, 2003    - Delinquent
    Third installment of $ 3,006.14 due on or before January 5, 2004     - Not yet Due
    Fourth installment of $ 3,006.14 due on or before March 1, 2004      - Not yet Due

13. Any taxes that may be due, but not assessed, for new construction which can be assessed on the
    unsecured property rolls, in the Office of the Clark County Assessor, per Nevada Statute 361.260.

14. Water rights, claims or title to water, whether or not shown by the public record.

15. An Easement for power transmission lines and incidental purposes, in favor, of Lincoln County
    Power District No. 1 as described in Order of Condemnation in District Court, Clark County,
    Nevada, Case No. 6903, a certified copy of which was recorded January 19, 1956 in Book 81 as
    Document No. 67575 of Official Records.

PRELIMINARY REPORT
Order No.:03111313

The interest of Lincoln County Power District No. 1 under said easement was conveyed to Nevada Power Company by "Grant of Easement and Assignment"
Recorded         : November 08, 1990 in Book 901108
Document No.  : 00723, Official Records.

16. Mineral rights, reservations, easements and exclusions in patent from the United States of America.
Recorded         : February 10, 1970 in Book 10
Document No.  : 7408, Official Records.

17. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
In Favor of       : U.S. Bureau of Reclamation
For                  : underground water pipeline, electrical control cables, surface structures and appurtenances thereto
Recorded         : November 09, 1984 in Book 2020
Document No.  : 1979552, Official Records.

18. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Covenant"
Recorded         : December 01, 1994 in Book 941201
Document No.  : 00728, Official Records.

19. Dedications and Easements as indicated or delineated on the Plat of said Parcel Map on file in File 90 of Parcel Maps, Page 63, Official Records.

20. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Land Use Covenant"
Recorded         : December 30, 1998 in Book 981230
Document No.  : 04492, Official Records.

21. Any Easements that were not affected by a vacation or abandonment
Recorded         : January 12, 1999 in Book 990112
Document No.  : 00771, Official Records.

And Re-recorded : February 04, 1999 in Book 990204
Document No.  : 00958, Official Records.

22. The terms, covenants, conditions and provisions as contained in an instrument, entitled "State of Initiation of Redevelopment Proceedings"
Recorded         : April 02, 2001 in Book 20010402
Document No.  : 03421, Official Records.

**THE FOLLOWING AFFECTS PARCEL 3:**

23. State, County and/or City taxes for the fiscal year 2003-2004 a lien in the total amount of $13,121.40
Parcel No. : 160-32-401-005
First installment of $3,280.35 due on or before August 18, 2003          - Delinquent
Second installment of $ 3,280.35 due on or before October 6, 2003   - Delinquent
Third installment of $ 3,280.35 due on or before January 5, 2004        - Not yet Due
Fourth installment of $ 3,280.35 due on or before March 1, 2004         - Not yet Due
(Affects Lot 3-2)

PRELIMINARY REPORT
Order No.:03111313

24. State, County and/or City taxes for the fiscal year 2003-2004 a lien in the total amount of $21,700.46
Parcel No.  : 160-32-801-006
First installment of $5,425.10 due on or before August 18, 2003        - Delinquent
Second installment of $ 5,425.12 due on or before October 6, 2003    - Delinquent
Third installment of $ 5,425.12 due on or before January 5, 2004      - Not yet Due
Fourth installment of $ 5,425.12 due on or before March 1, 2004       - Not yet Due
(Affects Lot 3-1)

25. Any taxes that may be due, but not assessed, for new construction which can be assessed on the
unsecured property rolls, in the Office of the Clark County Assessor, per Nevada Statute 361.260.

26. Water rights, claims or title to water, whether or not shown by the public record.

27. An easement for power transmission lines and incidental purposes, in favor of Lincoln County Power
District No. 1 as described in Order of Condemnation in District Court, Clark County, Nevada Case
No. 6903, a certified copy of which was recorded January 19, 1956, in Book 81 as Document No.
67575, of Official Records.

The interest of Lincoln County Power District No. 1 in said easement was assigned to Nevada Power
Company by "Grant of Easement and Assignment" recorded November 8, 1990, in Book 901108 as
Document No. 00723, of Official Records.

28. Mineral rights, reservations, easements and exclusions in patent from the United States of America.
Recorded        : February 10, 1970 in Book 10
Document No.   : 7408, Official Records.

29. An Easement affecting a portion of said land for the purposes stated herein, and incidental purposes
In Favor of       : Nevada Power Company and Continental Telephone Company
For               : power and communication lines
Recorded         : December 4, 1973 in Book 385
Document No.    : 344253, Official Records.

30. The terms, covenants, conditions and provisions as contained in an instrument, entitled
"DECLARATION OF COVENANTS"
Recorded         : December 29, 1982 in Book 1666
Document No.    : 1625257, Official Records.

31. The terms, provisions and easements as contained in an instrument, entitled "NOTICE OF
EXERCISE OF RESERVED RIGHT-OF-WAY BY THE UNITED STATES OVER CERTAIN
LAND OF THE CITY OF HENDERSON"
Recorded         : November 9, 1984 in Book 2020
Document No.    : 1979552, Official Records.

32. Dedications and Easements as indicated or delineated on the Plat of said Parcel Map on file in Book
56 of Parcel Maps, Page 31, Official Records.

PRELIMINARY REPORT
Order No.:03111313

33. An Easement affecting a portion of said land for the purposes stated herein, and incidental purposes
   In Favor of     : Las Vegas Valley Water District
   For             : water lines
   Recorded        : December 28, 1994 in Book 941228
   Document No.    : 01414, Official Records.

34. The terms, covenants, conditions and provisions as contained in an instrument, entitled
   "AGREEMENT FOR GRANT OF A RIGHT-OF-WAY PERMIT AND FOR THE TRANSFER OF
   FLOOD CONTROL IMPROVEMENTS"
   Recorded        : January 18, 1995 in Book 950118
   Document No.    : 01161, Official Records.

35. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Statement of
   Initiation of Redevelopment Proceedings" executed by the City of Henderson
   Recorded        : March 20, 2001 in Book 20010320
   Document No.    : 00845, Official Records.

36. Dedications and Easements as indicated or delineated on the Plat of said Amended Parcel Map on
   file in File 102 of Parcel Maps, Page 60, Official Records.

37. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Land Use
   Covenant"
   Recorded        : March 3, 2003 in Book 20030303
   Document No.    : 02202, Official Records.

38. The terms, provisions and easements as contained in an instrument, entitled "Communication
   Systems Right of Way and Easement Deed"
   By and Between : Commerce Associates, LLC, a Nevada limited liability company and Central
   Telephone Company, a Delaware Corporation
   Recorded        : September 9, 2003 in Book 20030909
   Document No.    : 03877, Official Records.

   **THE FOLLOWING AFFECTS PARCEL 4:**

39. State, County and/or City taxes for the fiscal year 2003-2004 a lien in the total amount of $38,887.12
   Parcel No.  : 160-32-101-003
   First installment of $9,121.78 due on or before August 18, 2003      - Partially Delinquent
   Second installment of $9,121.78 due on or before October 6, 2003     - Delinquent
   Third installment of $ 9,121.78 due on or before January 5, 2004     - Not yet Due
   Fourth installment of $ 9,121.78 due on or before March 1, 2004      - Not yet Due

40. Mineral rights, reservations, easements and exclusions in patent from the United States of America.
   Recorded        : June 07, 1966 in Book 721
   Document No.    : 579784, Official Records.

41. Mineral rights, reservations, easements and exclusions in patent from the United States of America.
   Recorded        : February 10, 1970 in Book 10
   Document No.    : 7408, Official Records.

PRELIMINARY REPORT
Order No.:03111313

42. The terms, provisions and easements as contained in an instrument, entitled "Land Sale Agreement"
    Recorded        : November 03, 1971 in Book 177
    Document No.  : 141597, Official Records.

    Certain reserved road easements set forth in the above instrument were vacated by Order of Vacation
    Recorded        : January 12, 1999 in Book 990112
    Document No.  : 00771, Official Records.

    And Re-Recorded    : February 04, 1999 in Book 990204
    Document No.        : 00958, Official Records.

    Certain reserved road easements set forth in the above instrument were vacated by Order of
    Vacation.
    Recorded        : December 26, 2002 in Book 20021226
    Document No.  : 01284, Official Records.

    And Re-recorded : March 20, 2003 in Book 20030320
    Document No.  : 01487, Official Records.

43. The terms, provisions and easements as contained in an instrument, entitled "Easement Agreement"
    Recorded        : December 28, 1994 in Book 941228
    Document No.  : 02084, Official Records.

44. Any Easements that were not affected by a vacation or abandonment
    Recorded        : January 12, 1999 in Book 990112
    Document No.  : 00771, Official Records.

    And Re-recorded : February 04, 1999 in Book 990204
    Document No.  : 00958, Official Records.

45. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of        : The City of Henderson
    For                    : ingress and egress access and maintenance
    Recorded        : July 13, 1999 in Book 990713
    Document No.  : 00709, Official Records.

46. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of        : The City of Henderson, Southwest Gas Corporation, Nevada Power Company,
                             Sprint of Nevada and Cox Communications Las Vegas, Inc.
    For                    : utility facilities
    Recorded        : July 13, 1999 in Book 990713
    Document No.  : 00710, Official Records.

47. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of        : The City of Henderson
    For                    : ingress and egress access and maintenance
    Recorded        : July 13, 1999 in Book 990713
    Document No.  : 00711, Official Records.

PRELIMINARY REPORT
Order No.:03111313

48. The terms, provisions and easements as contained in an instrument, entitled "Right of Entry"
    In Favor of      :Nevada Power Company
    Recorded         :December 14, 2000 in Book 20001214
    Document No.     :01624, Official Records.

49. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Statement of Initiation of Redevelopment Proceedings"
    Recorded         :April 02, 2001 in Book 20010402
    Document No.     :03421, Official Records.

50. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of      :The City of Henderson
    For              :municipal utilities
    Recorded         :April 12, 2001 in Book 20010412
    Document No.     :00790, Official Records.

51. Dedications and Easements as indicated or delineated on the Plat of said Parcel Map on file in File 102 of Parcel Maps, Page 63, Official Records.

52. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of      :The City of Henderson
    For              :municipal utility maintenance
    Recorded         :September 4, 2002 in Book 20020904
    Document No.     :01067, Official Records.

**THE FOLLOWING AFFECTS ALL PARCELS:**

53. An Easement affecting a portion of said land for the purposes stated herein, and incidental purposes
    In Favor of      :Nevada Power Company
    For              :power lines
    Recorded         :May 9, 2003 in Book 20030509
    Document No.     :01297, Official Records.

54. A Deed of Trust to secure an indebtedness of the amount stated herein below
    Dated            :June 16, 2003
    Amount           :$41,360,700.00
    Trustor          :Commerce Associates, LLC, a Nevada limited liability company
    Trustee          :United Title of Nevada
    Beneficiary      :Nevada State Bank, a Nevada banking corporation
    Recorded         :June 17, 2003 in Book 20030617
    Document No.     :00754, Official Records.
    (Includes Other Property)

55. An Easement affecting a portion of said land for the purposes stated herein, and incidental purposes
    In Favor of      :Nevada Power Company
    For              :power lines
    Recorded         :July 25, 2003 in Book 20030725
    Document No.     :00057, Official Records.

PRELIMINARY REPORT
Order No.:03111313

56. The terms, provisions and conditions as contained in an instrument, entitled "Joint Development
Agreement"
Recorded        : September 25, 2003 in Book 20030925
Document No.   : 04354, Official Records.

57. Note: Information in possession of this company indicates that a division of land is contemplated in
the current transaction involving the land described herein. Such contemplated division of land
would appear to fall within the Purview of N.R.S. 278 and as a prerequisite one of the following must
be accomplished to this company's satisfaction:

(1) That a Subdivision Map has been recorded in compliance with N.R.S. 278 or related local
ordinances; or

(2) That a Parcel Map has been recorded in compliance with N.R.S. 278 or related local ordinances;
or

(3) That a Waiver or other satisfactory evidence indicating compliance or non-violation be
furnished.

58. The requirement that the company be provided a satisfactory Board of Directors resolution
authorizing the proposed transaction and a Good Standing Certificate evidencing that the corporation
known as Rhodes Design & Development Corporation is in good standing in the state of its
incorporation.

59. We will require the following items from Commerce Associates, LLC, a Nevada Limited Liability
Company:

A.  A copy of the Articles of Organization.
B.  A copy of the company's operating agreement.
C.  A current list of the names of the company members, if said company is member managed.

60. We have communicated with the Nevada Secretary of State and determined that the entity known as
Commerce Associates, LLC, is in good standing as of the date of this report.
The list of Officers are: Gordon & Silver, LTD., Resident Agent
                          Tom Gonzales, Manager or Member

61. Rights and claims of parties in possession by reason of unrecorded leases, if any, that would be
disclosed by an inquiry of the parties, or by an inspection of said land.

62. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which
a correct survey would disclose, and which are not shown by the public records.

63. Any facts, rights, interest of claims which are not shown by the public records, but which could be
ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

PRELIMINARY REPORT
Order No.:03111313

64. NOTE: If ALTA Extended Owners coverage is to be required, the following items will need to be satisfied prior to the close of escrow:

A. Prior to the issuance of an ALTA Owners form policy of title insurance, it shall be required that this company be furnished with an ALTA/ACSM Survey. Upon review of said survey, additional exceptions may be added showing any matters that may be disclosed by said survey.

B. An inspection will be required prior to close of escrow. Additional exceptions may be added due to any facts, rights, interests or claims which are not shown by the public records, but which may be ascertained by the inspection of said premises or by making inquiry of persons in possession thereof.

Should the inspection of the real property disclose any work of improvement in progress, Mechanic's Lien Insurance will be deleted from coverage in our policy when issued, unless prior approval to commence work has been obtained from this company.

Exhibit A

**Parcel One (1):** (APN: 160-32-310-001) (Proposed Parcel 25)

That portion of Section 32, Township 21 South, Range 63 East, M.D.B. & M., in the County of Clark, State of Nevada, described as follows:

Lot Twenty-Five (25) of PALM CITY – PHASE 1, as shown by map thereof on file in Book 94 of Plats, Page 19, in the Office of the County Recorder of Clark County, Nevada.

**Parcel Two (2):** (APN: 160-32-801-002) (A Portion of Proposed Parcel 18)

That portion of the Southeast Quarter (SE ¼) of Section 32, Township 21 South, Range 63 East, M.D.M., described as follows:

Lot 1-1 of Parcel Map in File 90, Page 63, in the Office of the County Recorder of Clark County, Nevada, and recorded December 17, 1997 in Book 971217 as Document 00774, Official Records.

**Parcel Three (3):** (APN's: 160-32-401-005 and 160-32-801-006) (Proposed Parcels 19, 22, a Portion of Parcel 18)

That portion of the South Half (S 1/2) of Section 32, Township 21 South, Range 63 East, M.D.M., described as follows:

Parcels 3-1 and 3-2 of that certain Amended Parcel Map on file in File 102 of Parcel Maps, Page 60, in the Office of the County Recorder of Clark County, Nevada.

**Parcel Four (4):** (APN: 160-32-101-003) (Proposed Parcels 6B, 6C, 10, 11)

That portion of Section 32, Township 21 South, Range 63 East M.D.B. & M. described as follows:

A Portion of Parcel One (1) of that certain Parcel Map on file in File 102 of Parcel Maps, Page 63, in the Office of the County Recorder of Clark County, Nevada.

# United Title of Nevada

2300 W. Sahara Ave., #140, Las Vegas, NV 89102
(702) 251-4777
Fax: (702) 253-0099

## WIRING INSTRUCTIONS

### PLEASE WIRE YOUR FUNDS TO

## UNITED TITLE OF NEVADA

### AT:

### BANK OF AMERICA
### 333 S. Beaudry Avenue
### Los Angeles, CA 90017-1466
### (888) 635-2637

### FEDERAL ROUTING NUMBER (ABA NUMBER): 121000358

### FOR CREDIT TO ACCOUNT NUMBER: 1233813719

### ACCOUNT NAME:  UNITED TITLE OF NEVADA

### MUST REFERENCE ESCROW NUMBER:  03111313-105-JJP

Attention: J. Jay Pugh

## EXHIBIT L

## DECLARATION OF DEVELOPMENT COVENANTS AND RESTRICTIONS

### (Section 8.1(c))

[Attach form]

**EXHIBIT L**
**TO PURCHASE AGREEMENT**

**DECLARATION OF**
**DEVELOPMENT COVENANTS AND RESTRICTIONS**

THIS DECLARATION OF DEVELOPMENT COVENANTS AND RESTRICTIONS ("Development Declaration") dated, for purposes of reference only, as of the ____ day of _____, _____, is entered into between COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Commerce") and _____, a Nevada _____ ("Builder"), with reference to the following facts and objectives:

**R E C I T A L S :**

A.       Commerce owns or has owned and conveyed and is the master developer of certain real property located in the City of Henderson (the "City"), Clark County, Nevada, commonly known as "Tuscany" (f/k/a Palm City) as more particularly described on Attachment B attached hereto ("Tuscany").

B.       Pursuant to that certain Purchase Agreement and Grant of Options dated as of _____, 2003 between Commerce and Builder (together with any amendments thereto, the "Purchase Agreement"), Commerce, of even date herewith, is conveying to Builder the real property described on Attachment A attached hereto (the "Covered Property") located within Tuscany.  Terms used herein which are not defined herein have the meaning given those terms in the Purchase Agreement.

C.       Commerce proposes to sell and/or has sold portions of Tuscany, other than the Covered Property, for development as residential and other uses in a manner consistent with Commerce's overall concept and design for Tuscany as set forth in the Design Guidelines.  Builder acknowledges receipt of a copy of the Design Guidelines, as amended to date.

D.       Under the Purchase Agreement, Builder agreed to construct a residential homesite development (the "Project") on the Covered Property, in conformance with the Design Guidelines and the Project Plan (Section 1.5) to be prepared by Builder and approved in writing by Commerce in accordance with this Development Declaration.

E.       In order to assure that the Covered Property and the Project are developed in a manner consistent with the Project Plan and the Design Guidelines, Commerce has required, as a prior condition to its conveyance to Builder of the Covered Property, that Builder execute and acknowledge this Development Declaration.

F.       Commerce continues to own portions of Tuscany, including, but not limited to, other parcels situated near or adjacent to the Covered Property as to which development is in process or has not yet begun (the "Benefited Property").

G.       Builder desires to subject the Covered Property to this Development Declaration setting forth certain obligations owing to Commerce by Builder concerning the activities of Builder on and in connection with the Covered Property, which are imposed for the benefit of the Builder and the Benefited Property.

1

## DECLARATION:

NOW, THEREFORE, Builder hereby covenants, agrees, and declares that all of its interest, as the same may from time to time appear, in the Covered Property shall be held and conveyed subject to the following covenants and restrictions, which shall run with the Covered Property or any portion thereof until released as provided herein and shall be binding upon all parties having or acquiring any right, title or interest in or to the Covered Property or any portion thereof and which are hereby declared to be for the benefit of the Benefited Property, as follows:

1.      Preparation and Approval of Project Plan.

1.1      No Construction Prior to Project Plan Approval. No construction or alteration of any building, structure or improvement (individually, an "Improvement" and collectively the "Improvements") shall be commenced, erected, or maintained upon the Covered Property until Builder has met with Commerce and prepared and submitted to Commerce and Commerce has approved a Project Plan in accordance with this Development Declaration. The Project Plan shall describe three separate elements of the Project: (i) the Site Improvements, (ii) the Landscape Improvements, and (iii) the Building Improvements.

1.2      Site Improvements. The "Site Improvements" shall be described in (i) the Approved Final Map relating to the Covered Property and the tentative map relating thereto (whether one or more, collectively, the "Final Map") and (ii) the Site Improvements Plan.

1.2.1    Site Improvements Plan. The "Site Improvements Plan" shall clearly illustrate all of the following:

(i)      final grading;

(ii)     grading details (including, without limitation, sections of typical corner lots steeper than 3:1 and drainage-ways);

(iii)    storm drain improvements;

(iv)     potable water improvements;

(v)      sanitary sewer improvements;

(vi)     street lighting improvements;

(vii)    paving;

(viii)   common area improvements;

(ix)     perimeter wall opening location with dimensions; and

(x)      list of construction quantities.

2

1.3     Landscape Improvements. The "Landscape Improvements" shall be described in (i) the Landscape Plan, (ii) the Landscape Materials Sample Board, and (iii) the Landscape Construction Drawings.

1.3.1   Landscape Plan. The "Landscape Plan" shall clearly illustrate all of the following:

(a)     street tree locations;

(b)     plant list;

(c)     typical lot landscape including all corner lots;

(d)     common area landscaping;

(e)     section drawings through landscaped drainage-ways;

(f)     entry wall locations and identification signage; and

(g)     existing vegetation to be preserved.

1.3.2   Landscape Materials Sample Board.  The "Landscape Materials Sample Board" shall include the following:

(a)     color chips;

(b)     manufacturer's cut sheets;

(c)     photographs and/or material samples for all landscape materials including, without limitation, walls, fences, textured paving, gravel, mulch, site furnishings, stucco, paint, stain and other visible exterior finishes.

1.3.3   Landscape Construction Drawings.  The "Landscape Construction Drawings" shall consist of fully complete construction documents for all landscape and irrigation improvements to be constructed as Neighborhood Facilities or Community Facilities. The Landscape Construction Drawings shall be prepared with construction details sufficiently shown, with figured dimensions given and specifications stated, so as to enable prospective bidders to make accurate and reliable estimates of the quantity, quality and character of the labor, materials and equipment required to construct the proposed improvements and to enable workmen of ordinary skill and competence to construct such improvements.

1.4     Building Improvements. The "Building Improvements" shall be described in (i) the Architectural Concept Plan, (ii) the Preliminary Plot Plan, (iii) the Architectural Materials Sample Board, (iv) the Final Plot Plan and (v) the Marketing Signage Plan.

1.4.1   Architectural Concept Plan. The "Architectural Concept Plan" shall consist of the following:

3

(a)    photographs or sketches of front elevations (and side and rear elevations if visible from any street) of each Residence; and

(b)    floor plan for each Residence.

1.4.2    Preliminary Plot Plan. The "Preliminary Plot Plan" shall illustrate typical lots for each type of Residence indicating building footprints, setback requirements, driveway locations and wall locations.

1.4.3    Architectural Materials Sample Board. The "Architectural Materials Sample Board" shall include color chips, manufacturer cut sheets, photographs, and/or material samples for all building materials including roofing, doors, garage doors, windows, stucco, fascia, trim, paint, stain, architectural walls, and other visible exterior features.

1.4.4    Final Plot Plan. The "Final Plot Plan" shall clearly illustrate the plot plan for each individual lot within the Covered Property and describe building footprints, setbacks, use of FAR variances, driveway locations and wall locations.

1.4.5    Marketing Signage Plan. The "Marketing Signage Plan" shall illustrate the layout and design details for all informational, directional, temporary and construction signs.

1.5    Plan Submittals and Review Charges. Each of the plans, maps and sample boards referred to in subsections 1.2.1, 1.3.1, 1.3.2, 1.3.3, 1.4.1, 1.4.2, 1.4.3, 1.4.4 and 1.4.5 is hereinafter referred to as a "Plan." All of such Plans collectively, as approved by Commerce in accordance with this Development Declaration, shall constitute the "Project Plan." Builder shall submit each of the Plans to Commerce in such form as specified above and in the Design Guidelines. Subject to Section 1.6 and in accordance with Section 1.7, Commerce shall, within ten (10) business days after receipt of each of such Plans either (i) approve such Plan as submitted, or (ii) disapprove such Plan and advise Builder in reasonable detail of the reasons for such disapproval. Commerce shall take similar action on each resubmittal of a Plan following any disapproval. Commerce's initial review and the first and second review following resubmittal of any Plan will be conducted at no charge to Builder. If a third review of any of the following Plans is required, Builder shall reimburse Commerce upon demand for any out-of-pocket expenses incurred by Commerce, up to $700 per revision, for such third and any subsequent review: the Landscape Plan, Material Sample Boards, Landscape Construction Drawings, Preliminary Plot Plan, Architectural Materials Sample Board and Final Plot Plan. The third review of the following Plans will be at no charge to Builder; provided, however, Builder shall reimburse Commerce upon demand for any out-of-pocket expenses incurred by Commerce, up to $700 per revision, for the fourth and any subsequent review of the following Plans:  the Site Improvements Plan, Architectural Concept Plan and Marketing Signage Plan.

1.6    Pre-Submittal Meeting. Prior to Builder's preparation of any architectural drawings or designs for the Project, Builder shall, on no less than five (5) business days' notice to Commerce, schedule a meeting with Commerce the ("Pre-Submittal Meeting") for the purpose of having Commerce review with Builder (i) Commerce's Project Plan review and approval process and (ii) the Design Guidelines. Notwithstanding any other provision in this Development Declaration to the contrary, Commerce need not consider any Plan unless and until such time as the Pre-Submittal Meeting has occurred and Builder confirms that it is familiar with both Commerce review and approval process and the Design Guidelines.

4

1.7    <u>Project Plan Approval</u>. Commerce may, in its reasonable discretion, disapprove any or all portions of the Project Plan submitted for its approval, but Commerce's right of disapproval shall be limited to (a) the conformity of the Project Plan with this Development Declaration as to the total number of Residences to be constructed in the Project, (b) the conformity of the Project Plan to the terms of the Purchase Agreement and the general description of the Project attached thereto, (c) exterior design, elevation, materials, and colors and other architectural and design elements and landscaping, (d) roof equipment, (e) size and location of Improvements, (f) the proportionate use of FAR variances throughout the Project, (g) conformity to the Design Guidelines, and (h) other matters that bear on the compatibility of the Project with the Benefited Property, Tuscany, and the real property in the vicinity of the Covered Property. In any event, Commerce may condition its approval of the Project Plan upon such changes therein as are consistent with the scope of its review as set forth above and may require submission of additional Plans or other information prior to approving or disapproving material submitted. Until receipt by Commerce of all required information, Commerce may postpone review of a Plan submitted for approval.

1.8    <u>Plans Exclude Commerce Improvements</u>. Notwithstanding anything to the contrary contained in this Development Declaration, the Project Plan Work (as hereinafter defined) shall not include any Seller's Work (as hereinafter defined).

1.9    <u>Governmental Approvals</u>. Commerce's approvals under this Development Declaration are in addition to and not in lieu of any approvals, permits, consents or reviews required by the City or any other governmental authority (collectively, "<u>Governmental Approvals</u>") or utility in connection with the Project.

2.    <u>Construction of the Project</u>.

2.1    <u>Manner of Construction</u>. Builder, at its sole cost and expense, shall cause to be performed or constructed all of the work and improvements required or contemplated by the Project Plan to be performed by Builder or by this Development Declaration (collectively, the "<u>Project Plan Work</u>"). Builder shall cause the Project Plan Work to be performed or constructed by duly licensed general contractors and duly licensed subcontractors in a good and workmanlike manner in accordance with (a) the Project Plan approved by Commerce, (b) all applicable laws, regulations, codes and ordinances, (c) all requirements of governmental authorities and other duly qualified bodies having jurisdiction with respect to each work of improvement, and (d) generally accepted engineering standards concerning geotechnical and soils conditions. Builder shall supervise and direct the Project Plan Work using its best skill and attention. Builder shall be solely responsible for all means, methods, techniques, sequences and procedures used in the performance or construction of the Project Plan Work and shall diligently pursue the same to completion. Builder shall be responsible for the application for and the obtaining of all Governmental Approvals required for the Project Plan Work. Builder shall meet with Commerce, at Commerce's request, to discuss the status and scheduling of all construction by Builder.

2.2    <u>Commencement and Completion of Project Plan Work</u>. Upon the commencement of each discrete item of the Project Plan Work, Builder shall cause such item of the Project Plan Work to be diligently and continuously prosecuted to its completion. Each discrete item of the Project Plan Work shall be deemed to be completed upon the acceptance of the same by the appropriate governmental authorities and Builder's completion thereof in accordance with the Purchase Agreement and the requirements of this Development Declaration.

2.3     Builder's Work of Improvement.  Builder agrees to construct those Project Common Areas and Project Perimeter Walls which are designated as Builder's responsibility in the Purchase Agreement and the Project entry (herein, "Builder's Work of Improvement"), as set forth on Attachment C hereto, within the time periods set forth in such Attachment.

2.4     Failure to Complete Builder's Work of Improvement.

2.4.1     Commerce's Right to Complete.  If Builder fails to complete any portion of Builder's Work of Improvement within the time periods specified herein or in the Purchase Agreement, Commerce shall have the right, upon 30 days' written notice, to cause any licensed contractor to complete such improvements; provided, however, Commerce shall not exercise its right to prosecute such work pursuant to this Section 2.4 (but Commerce shall retain any other rights including the right to seek damages for breach of Builder's obligation hereunder), if, prior to the expiration of such 30-day period, Builder commences work on such improvements and thereafter diligently prosecutes such improvements to completion.

2.4.2     Builder's Obligation.  If Commerce undertakes construction of any portion of Builder's Work of Improvement pursuant to this Section 2.4 because of Builder's failure to complete timely construction of such improvements, Builder shall pay to Commerce an amount equal to 110% of the actual costs incurred by Commerce in constructing such improvement or causing any licensed contractor to complete such improvement, which amount shall be due and payable by Builder, within 30 days of its receipt of (i) reasonable documentation evidencing such costs, and (ii) unconditional waivers of lien evidencing that no claim of any laborer or material supplier will become a lien on the Covered Property based on work undertaken by Commerce pursuant to its rights under this Section.

2.5     Insurance.  Prior to commencement of any construction on the Covered Property, Builder shall obtain and, at all times prior to completion of both the Project Plan Work and the Builder's Work of Improvement or for such longer period as may be set forth below, maintain in effect the following policies of insurance:

(a)     Comprehensive general public liability insurance with a single per occurrence limit of not less than $3,000,000.00 and an aggregate limit of not less than $5,000,000 with respect to the Covered Property and the operations of any Builder Party (as defined below) in, on or about the Covered Property;

(b)     Workers' compensation insurance covering liability arising from claims of workers in respect of and during the period of the performance of the Project Plan Work with statutory coverage limits;

(c)     Standard course of construction policy with coverage of not less than $3,000,000 per occurrence;

(d)     Automobile liability insurance with Combined Single Limit coverage of not less than  $3,000,000 (including excess policy coverage), covering both personal injury and property damage, which covers non-owned and/or rented vehicles used in

6

connection with the development of the Project;

(e)    Completed operations coverage for each Residence in the Project which coverage must continue for a period of ten (10) years following the close of escrow for such Residence following a sale to a homebuyer; and

(f)    Employer's liability insurance with a limit (including excess policy coverage) of not less than $3,000,000 per occurrence.

Builder shall furnish Commerce with certificates evidencing the insurance coverages required under Section 2.5 before commencing the Project Plan Work or Builder's Work of Improvement. As used in this Agreement, "Builder Parties" shall mean Builder, its affiliates and each of their respective officers, directors, manager, members, partners, principals and employees. "Commerce Parties" shall mean Commerce, its affiliates and each of their respective officers, directors, manager, members, partners, principals and employees. Builder shall also require its contractors and licensees and their respective subcontractors to provide insurance coverages reasonably acceptable to Commerce (taking into account the type and/or magnitude of work involved).

2.6    Forms of Policies.    All policies of insurance required to be maintained pursuant to Section 2.5 above must also comply with the following:

(a)    each policy shall be issued by an insurance company authorized to do business in Nevada and with a financial rating of at least "A-IX" status as rated in the most recent edition of Best's Insurance Reports, unless otherwise consented to in writing by Commerce, which consent may be withheld in Commerce's reasonable discretion;

(b)    each policy shall provide coverage against claims which may arise out of or result from a Builder Party's negligent acts or omissions with respect to its performance of the Project Plan Work or Builder's Work of Improvement or which may arise in connection with the negligent acts or omissions of any Builder Party or anyone employed by any of them;

(c)    each policy shall provide that it may not be canceled or reduced in coverage until the insurer has endeavored to give 30 days written notice to Commerce of such cancellation or reduction in coverage;

(d)    each policy (except worker's compensation) shall name Commerce and such other Commerce Parties as Commerce may designate as additional insureds as to claims by third parties.

2.7    Additional Insurance.    Commerce shall have the right to require Builder to increase the amount of the liability/coverage limits with respect to any insurance required to be maintained by Builder under this Agreement, or to require Builder to secure additional insurance coverage, if in Commerce's reasonable discretion, such increased and/or additional insurance coverage is reasonably necessary or prudent given the circumstances at the time such determination is made.

2.8    Correction of Defects.    If any Builder's Work of Improvements or Seller's Work on the Covered Property or slopes or any other portion of the Covered Property on which no

7

structural improvements have been constructed shall prove to be defective or shall require repair so as to prevent the deterioration of the Covered Property and improvements constructed thereon by erosion or otherwise, Builder or Commerce, as the person responsible for the construction of such work of improvement (as applicable, the "Responsible Party") shall, promptly on written demand by Commerce or Builder, as the person entitled to the benefits of such work of improvement (as applicable, the "Benefited Party") specifying the defect or required repair, and in no event later than thirty (30) days thereafter, commence to correct such defect or effect such repair and diligently and continuously prosecute the same to completion at its sole cost and expense. The Responsible Party shall be obligated under this Section regardless of the reason requiring such action, except to the extent caused by the negligence or willful misconduct of the Benefited Party. If the Responsible Party fails to commence to correct such defect within said thirty (30) day period, or if the Responsible Party timely commences to correct such defect but fails to diligently and continuously prosecute such repair work to completion, the Benefited Party shall have the right but not the obligation to enter upon the Covered Property to take such actions as are necessary to correct such defect. Any costs incurred by the Benefited Party in performing such corrective work (to the extent within the responsibility of the Responsible Party) shall be due and payable by the Responsible Party within thirty (30) days of demand therefor by the Benefited Party, together with such receipts and lien releases as the Responsible Party may reasonably request. It is expressly acknowledged that work undertaken by either Commerce or Builder under this Section shall not be an admission that the party performing such work is responsible for the defect so corrected. The obligation of the Responsible Party pursuant to this Section shall be binding on it until such time as action against the Responsible Party on account of any such defect shall be barred by an applicable statute of limitations. Builder's obligations under this Section are in addition to and not in limitation of Builder's other obligations to Commerce to correct defects in the Builder Work of Improvement. This Section is not intended to apply to Builder's obligations under law to purchasers of Residences under warranty or other theories.

2.9    Grant of Construction Easement. Builder shall have the non-exclusive right to temporarily enter upon those parcels of land owned by Commerce that adjoin the Covered Property as may be reasonably necessary for the purpose of constructing the Project Plan Work, Builder's Work of Improvements and any improvements Builder elects to install pursuant to Section 2.4 above. The use of the land subject to the easement granted to Builder under this Section shall be limited to the reasonable vicinity of the applicable Builder's Work of Improvements or the work or other improvements that Builder elects to install pursuant to Section 2.4, and shall automatically terminate (i) upon completion of all such improvements, whether by Builder, under Section 2.2, or by Builder or Commerce, as applicable, with respect to Seller Work, (ii) the sale of any property subject thereto to a residential homebuyer or (iii) three (3) years from the date this Development Declaration is Recorded.

3.    Builder's Obligations With Respect to Construction of the Project.

3.1    Damage to Roads, Other Property. Should Builder's construction activities in connection with the Project Plan Work cause any damage to any public or private right-of-way or to any improvement within the right-of-way or within the Open Space or Golf Course (as hereinafter defined), whether completed or under construction by Commerce or others, Builder shall, upon demand from Commerce, promptly repair and restore such right-of-way and/or improvement. If Builder fails to commence such repair work within 10 business days after receipt of such notice and diligently prosecute the same to its completion, then Commerce shall have the right to make such repairs, and Builder shall, within thirty (30) days after demand, reimburse Commerce for 110% of

8

Commerce's expenses incurred in repairing and restoring such right-of-way and/or improvement. If such improvement is, at the time of repair, subject to any warranty obligation of the construction contractor which constructed the improvement, Commerce may require that the work of repair be performed by such contractor.

   3.2 <u>Additional Obligations</u>. If the City or any other governmental authority imposes any conditions, fees, or other obligations (in the broadest sense of that word) in connection with the Project, including, without limitation, construction of infrastructure, driveways, curb cuts, sidewalks, perimeter walls, retaining walls, irrigation and drainage systems, landscaping, monuments, and directional signs ("<u>Additional Obligations</u>"), in addition to those described herein or in the Purchase Agreement as being the responsibility of Builder (and which are not expressly designated as Seller's Work), the performance and satisfaction of such Additional Obligations shall be the sole and exclusive responsibility of Builder, and Commerce shall have no responsibility with respect thereto, unless Commerce expressly agrees in writing to perform or satisfy the Additional Obligation(s).

   3.3 <u>Indemnity</u>. Commerce and Builder (as applicable the "<u>Indemnitor</u>") shall each, to the maximum extent permitted by law, indemnify and hold harmless the other party and such party's respective partners, members, managers, divisions, subsidiaries and affiliated companies and its and their respective employees, officers, directors, members, shareholders, agents, professional consultants and representatives, and its and their respective successors and assigns, and each of them (together with such other party hereto, collectively, the "<u>Indemnitees</u>") from and against any and all claims, damages, losses, liabilities, demands and expenses, including, but not limited to, reasonable attorneys' fees, court costs and expenses of litigation (collectively, hereinafter referred to as "<u>Liabilities</u>"), arising out of or resulting from, or claimed to arise out of or result from, in whole or in part, any fault, act or omission of the Indemnitor, any contractor or subcontractor employed by it, any sales agent or marketing representative employed directly or indirectly by the Indemnitor, anyone directly or indirectly employed by any of the foregoing entities, or anyone for whose acts any of the foregoing entities may be liable, in connection with: (a) the Indemnitor's development of the Covered Property and/or the performance or construction of the Indemnitor's obligations with respect to the Project (including, without limitation, in the case of Builder, Builder's Work of Improvements and construction or sale or other conveyance of Residences thereon; and, in the case of Commerce, the Seller's Work other than the Mass Grading), including, without limitation, any such loss, damage, injury or claim arising from or caused by or alleged to have arisen from or have been caused by: (i) any use of the Covered Property or any part thereof, (ii) any defect in the design, construction of, or material in, any structure or other improvement upon the Covered Property, (iii) any defect in soils or in the preparation of soils or in the design and accomplishment of grading, including a spill of any contaminants or hazardous materials in or on the soil, (iv) any accident or casualty on the Covered Property, (v) any material misrepresentations by Indemnitor or any of its agents or employees, including any such misrepresentations contained in any public offering statement or similar materials prepared by the Indemnitor, (vi) a violation or alleged violation by the Indemnitor, its employees or agents of any applicable law, (vii) any slope failure or subsurface geologic or groundwater condition, (viii) any work of design, construction, engineering or other work with respect to the Covered Property provided or performed by or for the Indemnitor either before or after the date hereof, or (ix) any other cause whatsoever in connection with Indemnitor's use of the Covered Property, or Indemnitor's performance under this Development Declaration or the Purchase Agreement; or (b) the negligence or willful misconduct of Indemnitor or its agents, employees, licensees, invitees or contractors in the development, construction, grading or other work performed off the Covered Property by Indemnitor pursuant to this Development Declaration or any defect in any such work.

9

The foregoing indemnity and waiver shall apply to a claim or action brought by a private party or by a governmental agency or entity under any statute or common law now or hereinafter in effect and is intended to apply with respect to loss, damage, injury or claim arising before or after the conveyance of all of the Residences on the Covered Property. With regard to design, construction methods, materials, locations and other matters for which Commerce or Builder has given or will give its approval, recommendation or other direction, the foregoing indemnity and waiver shall apply irrespective of such person's approval, recommendation or other direction, but, in the case of Commerce indemnification obligations, such indemnity is limited by Section 4.4 below.

Notwithstanding the foregoing, the indemnity agreement and waiver created herein shall not indemnify any Indemnitee against, or constitute a waiver with respect to, any Liabilities to the extent such Liabilities: (a) arise from the negligent acts or omissions or willful misconduct of such Indemnitee; provided, however, that (i) any act or omission of Commerce or its agents, servants or independent contractors with respect to the review of the Project Plan and/or the drawings or specifications related to the Project Plan Work, or (ii) any inspection or failure to inspect the construction activities of Indemnitor by Commerce or Builder (as applicable), or (iii) any direction or suggestion given by an Indemnitee with respect to construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Project Plan Work, or the failure to give any such direction or suggestion, shall not be deemed a negligent act or omission or willful misconduct of such Indemnitee relieving Indemnitor of its indemnity obligation hereunder; (b) are covered by insurance; (c) are expressly limited by another provision in the Purchase Agreement; or (d) arise from any failure, inaccuracy or untruth of Builder's or Commerce's (as applicable) representations and warranties reasonably relied on by the Indemnitor.

3.4    Rules and Regulations.  During the period of construction of the Project, Builder and Builder's contractors and subcontractors, and their respective employees and agents, shall observe the following rules and regulations.

3.4.1    All construction vehicles and equipment shall use the construction access routes described on Attachment D attached hereto for access to the Covered Property. No such vehicles or equipment shall be permitted on any public or private streets or rights of way or undeveloped areas within Tuscany not indicated on Attachment D. Without limiting the foregoing, there shall be no construction access through the main entrance to Tuscany.

3.4.2    No equipment maintenance or construction work of any type shall be performed or conducted on or about the Covered Property between the hours of 8:00 p.m. and 6:00 a.m.

3.4.3    No temporary structures, including construction trailers or other temporary office or sales facilities, shall be placed or maintained on the Covered Property until the appearance and location of such facilities have received the approval of Commerce, which approval shall not be unreasonably withheld.

3.4.4    Portions of the Covered Property which are visible from surrounding property shall be kept free of weeds and debris, and all scrap materials generated by the construction activities shall be removed as soon as reasonably possible.

3.4.5    Builder shall maintain a concrete wash-out site on the Covered Property and shall not wash trucks or equipment on any other property within Tuscany without the prior written consent of the Builder thereof.

3.4.6    Builder shall not leave any debris or material on any other property within Tuscany without the prior written consent of the Builder thereof.

3.4.7    Builder shall provide at least one (1) covered trash enclosure for every two Residences under construction. The location, size and design of trash enclosures shall be reasonably acceptable to Commerce and shall, unless Commerce otherwise agrees in writing, be maintained within fenced-in areas. All debris will be placed in one of these enclosures at the end of each day.

3.4.8    Builder shall take such action as may be prudent and use its best efforts to employ all commercially reasonable methods, equipment, techniques and activities to control ambient dust and the accumulation of dust on the Covered Property or dispersion of dust from the Covered Property; and

3.4.9    Builder shall take such action as may be prudent and use its best efforts to employ all commercially reasonable methods, equipment, techniques and activities to abate noise, and to mitigate and abate noise pollution. Builder warrants that it will not use any equipment or undertake any activity in connection with the construction and development of the Project which will generate unreasonable noise.

3.4.10    Builder shall provide street sweeping and cleaning services as required by Commerce so as to maintain neat and attractive streets and sidewalks within all occupied areas, and model and sales areas and along the access routes utilized by Tuscany residents and prospective purchasers within Tuscany.

3.5    Protection of Open Space and Golf Course. Builder shall not loosen or remove soils or rock with any explosive charge within twenty feet (20') of the boundaries of the Covered Property adjacent to those areas of Tuscany designated by Commerce as linear or other parks, trails, slope areas or open space areas ("Open Space") or the Golf Course. Builder shall construct a temporary construction fence along any Open Space and Golf Course boundary line(s) of the Covered Property prior to any development activity on the Covered Property and will maintain such fence until the completion of development of the Residences or Project Perimeter Wall adjacent to such areas. Builder agrees to use its best efforts to minimize any disturbance to the Open Space or Golf Course area as a result of its construction activities on the Covered Property. Builder further agrees to promptly remove any Project materials or debris from the Open Space or Golf Course and to repair any damage to and restore all landscaping in the Open Space or Golf Course to the same condition as prior to such damage and in a manner that is consistent with the Open Space and Golf Course development plans. If Builder, after fifteen (15) days written notice of a breach of its obligations under this paragraph shall fail to cure or correct such breach, Commerce may elect to cure or correct the breach on its own without further notice to Builder.

4.    Development Restrictions.

4.1    Maximum Number of Residences. The type and number of Residences that Builder will construct within the Covered Property shall be limited to ___ Residences of the type

11

generally described in the Purchase Agreement and to be described more fully in the Project Plan. The maximum number of Residences and the product types constructed within the Project shall not exceed the number and type approved by Commerce hereunder and under the Purchase Agreement. The Covered Property shall be developed, improved and maintained only with Residences as provided herein. Builder acknowledges and agrees that the maximum number of Residences permitted hereunder is for Builder's use on the Covered Property only, and that if the number of Residences on the Covered Property authorized by any subsequent approvals sought by Builder from any governmental authority (which approvals to be sought by Builder are subject to Commerce's prior discretionary consent) is less than the maximum number of Residences permitted hereunder, the right to construct such excess Residences within Tuscany shall belong exclusively to Commerce. Builder has further represented that it has not purchased the Covered Property with the intent to transfer its interest therein except for the sale of Residences to the home-buying public.

      4.2    <u>Compliance With Zoning</u>. Builder agrees that construction of the Project on the Covered Property pursuant to the Project Plan shall be in compliance with all applicable Governmental Approvals, including all zoning, land use and similar governmental restrictions pertaining to the Covered Property. Builder shall not seek to change any zoning or other land use approvals or restrictions applicable to the Covered Property nor seek any variances or waivers thereof (including any FAR waivers), without, in each case, the prior written consent of Commerce, which consent may be granted or withheld in Commerce's sole discretion. All requests or applications together with all supporting documentation for Governmental Approvals which require discretionary action on the part of a governmental authority, whether or not such approvals are specifically herein required to be obtained, shall be submitted by Builder to and approved by Commerce prior to filing with the appropriate governmental authority, and in the event of disapproval, Commerce shall specify the reasons therefor. Failure to so disapprove within ten (10) business days shall be deemed approval thereof. Builder shall send Commerce copies of all written communications between Builder and the governmental authority processing such requests or applications.

      4.3    <u>No Waiver of Future Approvals</u>. The approval by Commerce of any zone change, variance, waiver, proposal, drawing or specification for any work done or proposed or in connection with any other matter requiring the approval and consent of Commerce shall not be deemed to constitute a waiver of any right whatsoever to withhold approval of or consent to any similar proposals, drawings, specifications, or other matters subsequently or additionally submitted for approval or consent.

      4.4    <u>Non-Liability of Commerce</u>. Neither Commerce nor any of its members, managers or affiliates and their respective officers, directors, members, managers, shareholders, partners and employees acting on behalf of Commerce shall be liable to Builder for any Liabilities arising out of or in any way connected with the exercise of Commerce's rights under this Development Declaration, unless due to the willful misconduct or bad faith of Commerce. Commerce shall not be responsible for reviewing, nor shall its approval of any Plan be deemed approval of such Plan from the standpoint of structural safety or conformance with building or safety codes or ordinances or other governmental regulations.

      4.5    <u>Easement for Inspection</u>. Builder hereby expressly grants and conveys to Commerce, its successors and assigns, a temporary non-exclusive right-of-way, easement in gross, and interest in and across the Covered Property as is necessary for Commerce, or persons designated by Commerce, to inspect Improvements thereon or to complete any Seller's Work.

12

4.6    Master Association. Commerce has formed the Tuscany Master Association (the "Master Association"), a non-profit corporation, to which is delegated and assigned the powers of owning, maintaining, and administering certain property within Tuscany, of which the Covered Property is a portion. The covenants, restrictions, easements and other provisions of this Development Declaration are in addition to and are not intended to affect the covenants, conditions, restrictions, easements and other provisions contained in the Master Declaration.

4.7    Sub-Association and Supplemental Declaration. Builder may, with Commerce's approval, which shall not be unreasonably withheld, elect to form a sub-association (the "Sub-Association") in accordance with the requirements of NRS Chapter 116 (the "Act"), composed of owners of Residences within the Covered Property, for the purpose of administering and enforcing covenants, conditions, restrictions, reservations, easements affecting the Project and owning and maintaining the Neighborhood Facilities. In the event Builder causes to be executed and Recorded a supplemental declaration of covenants, conditions and restrictions (the "Supplemental Declaration") applicable to the Project, the Supplemental Declaration shall be subject to Commerce's prior review and approval in its reasonable discretion.

The provisions of the Supplemental Declaration may, with Commerce's reasonable consent, impose such further or more restrictive covenants, conditions, restrictions, land uses and limitations as Builder may deem advisable, taking into account the particular requirements of the Project. The Master Declaration shall control in the event of any conflict between the Supplemental Declaration and the provisions of the Master Declaration, although such documents shall be construed to be consistent with one another to the extent possible. The inclusion in the Supplemental Declaration of covenants, conditions, restrictions, land uses and limitations which are more restrictive or more inclusive than the restrictions contained in the Master Declaration shall not be deemed to constitute a conflict with the provisions of the Master Declaration. Builder may not amend the Supplemental Declaration without the prior written consent of Commerce, which shall not be unreasonably withheld. Builder shall not impose any restrictive covenants, conditions, restrictions or land use limitations on the Covered Property or any portion thereof except with the written consent of Commerce in accordance with this Section 4.7.

Unless Commerce otherwise consents in writing, which consent shall not be unreasonably withheld, prior to or concurrently with the conveyance of the first Residence within a phase of development of the Covered Property, Builder shall convey all Neighborhood Facilities within that phase to the Master Association, if the Master Association has agreed to accept such property as limited common elements (as defined in the Act) or to the Sub-Association, in either case free of all monetary encumbrances (other than taxes and assessments not then delinquent). Conveyance of Neighborhood Facilities consisting of private streets shall include, unless previously existing, access to adjacent public streets. Such conveyance shall be made on a grant, bargain and sale deed form supplied or approved by Commerce. If Neighborhood Facilities are to be owned by a Sub-Association, then, until such time as all owners within the Project are members of the Sub-Association, the Neighborhood Facilities shall be subject to a non-exclusive easement for ingress and egress and public and private utilities over the Neighborhood Facilities for the benefit of Commerce, individually, and all owners of the Covered Property other than Builder. Failure to convey the Neighborhood Facilities as herein provided shall be a Purchaser Default under the Purchase Agreement, if not cured within any applicable cure period.

4.8    Neighborhood Facilities. Unless the same is expressly designated as Seller's Work, Builder shall, at its sole expense, construct any and all Neighborhood Facilities in the same manner required by this Development Declaration for the construction of the Project Plan Work, and the failure of Builder to construct and complete such Neighborhood Facilities or any portion thereof shall, if not cured within any applicable cure period, be deemed a Purchaser Default under the Purchase Agreement, entitling Commerce to exercise the remedies available to Commerce under the Purchase Agreement or this Development Declaration.

Upon completion of each of the Neighborhood Facilities: (a) Builder shall submit to Commerce a copy of the certificate of compliance executed by Builder's state licensed consultant (engineer, architect and/or landscape architect) and, if required by law, the Purchase Agreement or this Development Declaration, the acceptance or approval thereof by the City or other governmental agency or authority; and (b) Builder shall maintain such facilities in good condition and repair, until such time as Commerce and/or the declarant under the Master Declaration have approved (i) the Supplemental Declaration and (ii) the conveyance of the Neighborhood Facilities to the Sub-Association or, if applicable, the Master Association.

4.9    Common Area Lots. Builder acknowledges that certain portions of the Covered Property may consist of open space and slopes, and that the appropriate governmental authorities may require that such open space and slopes be landscaped and conveyed to the Master Association. The Master Association may accept or reject any offer to transfer property to the Master Association in its sole and absolute discretion. Builder further acknowledges, that, in connection with the subdivision of the Covered Property, the appropriate governmental authorities may require that such open space and slopes be designated on the relevant final maps as separately lettered lots (each a "Common Area Lot"). In such event, unless the same is expressly designated as Seller's Work, at all times prior to the conveyance of the Common Area Lots to the Master Association, Builder shall landscape, improve and maintain the Common Area Lots in a manner consistent with the Design Guidelines, including, without limitation maintaining vegetation necessary to avoid erosion, controlling weed growth, and providing for adequate irrigation. Prior to the completion of such landscaping and improvements. Builder shall cause the Common Area Lots to be free of weeds and debris and to be in a neat and attractive condition. Upon the conveyance of a Common Area Lot by Builder to the Master Association, the maintenance obligation of Builder set forth in this Section 4.9 shall terminate if the Master Declaration contains a provision that the Master Association shall maintain the Common Area Lot in the manner required herein.

4.10    Perimeter Walls. Without limiting the provisions of Section 4.9 or any other provision of this Development Declaration, Builder shall, upon request by the Master Association, convey to the Master Association an easement for the purpose of allowing Commerce, the Master Association and/or the owner or operator of the Golf Course to maintain all exterior Project perimeter walls, including all walls adjoining the Open Space, the Golf Course or any adjoining common areas owned or maintained by the Master Association. Such easement shall, in addition, include easements for all necessary support and easements for the purpose of maintaining all landscaping outside such walls, including necessary utility lines and drainage and slope easements.

4.11    Transfer of Voting Rights. Builder hereby irrevocably transfers to Commerce during the term of this Development Declaration, with full power of substitution, as the true and lawful attorney, agent and proxy of Builder, all of the voting rights to which Builder is or will be entitled, coupled with an interest, for and in the name, place and stead of Builder, to vote upon any and all matters which may lawfully come before the Members (as such term is defined in the Master

14

Declaration) of the Master Association, which matters arise under the Master Declaration, provided, however, that so long as no Purchaser Default exists, Commerce agrees not to exercise such voting rights and consents to the conditional exercise of such voting rights by Builder.

5. <u>Project Name and Logo</u>. Builder shall submit to Commerce, for Commerce's review and approval, the name it intends to use in connection with the development and marketing of the Project (the "<u>Project Name</u>") and any logo or mark to be used in connection therewith (the "<u>Project Logo</u>"). Builder shall not use in Advertising (as defined below) or place on any sign, billboard or entry monument any Project Name or Project Logo without first obtaining the written consent thereof of Commerce, which consent shall not unreasonably be withheld.

6. <u>Street Names</u>. Unless otherwise agreed in writing by Commerce in its reasonable discretion, Builder shall not change any street names in the Project from those set forth on the Final Map.

7. <u>Prohibited Plant Species</u>. Builder shall not plant or place any of the following plant species (the "<u>Prohibited Plants</u>") on the Covered Property:

(a) Nerium oleander
(b) Olea europa (Common Olive Tree)
(c) Cynoden Dactylon (Common Bermuda Grass)
(d) Morus alba (Common Mulberry)

Commerce may, from time to time and at any time, in its reasonable discretion, add or delete any plant species to the list of Prohibited Plants. If Commerce adds a plant species to the list of Prohibited Plants, Builder shall refrain from planting or placing such plant species on the Covered Property; <u>provided</u>, however, that Builder shall not be obligated to unearth landscaping existing at such time to remove such plant species from the Covered Property.

8. <u>Construction and Conveyance of Community Facilities</u>.

8.1 <u>Description of Community Facilities</u>. Builder shall, at its sole expense, construct any Project Common Areas consisting of Community Facilities as required by Commerce in the Project Plan submitted to and approved by Commerce pursuant to this Development Declaration. No such Community Facilities shall be installed or constructed until the drawings and specifications therefore have been submitted to and received the approval of Commerce. In the event Builder has not completed the required Community Facilities substantially in accordance with the drawings and specifications previously approved in writing by Commerce, Commerce shall notify Builder of the corrections and improvements required to be completed. Failure by Builder to make the corrections and complete such improvements in accordance with Commerce's requirements and the Project Plan as provided herein shall be deemed a default under the terms and conditions of this Development Declaration.

8.2 <u>Certificate of Compliance</u>. Upon completion of each of the Community Facilities, Builder shall submit to Commerce a copy of the certificate of compliance executed by Builder's state licensed consultant (engineer, architect and/or landscape architect) and, if required by law or by the Purchase Agreement or this Development Declaration, evidence of the acceptance or approval thereof by the City or other governmental agency or authority. The certificate of

compliance shall warrant the installation as substantially conforming to the drawings and specifications approved by Commerce.

8.3    Conveyance to Master Association.  Builder shall convey the Community Facilities to the Master Association free of all monetary encumbrances (other than taxes and assessments not then delinquent) prior to or concurrently with the conveyance of the first Residence on the Covered Property. Such conveyance shall be made on a grant, bargain and sale deed form or other form supplied or approved by Commerce. Failure to convey such Community Facilities as herein provided shall be a Purchaser Default under the Purchase Agreement. Notwithstanding conveyance of the Community Facilities to the Master Association, Builder shall, unless Commerce or the Master Association has otherwise agreed in writing, continue to maintain such facilities until the last Residence on the Covered Property has been conveyed to the general public.

8.4    Continued Maintenance Obligations.  Builder shall continue to maintain any Community Facilities until approval by Commerce of ground cover, shrubbery, and landscaping surrounding the Community Facilities. Commerce may withhold its approval if such improvements have not been accepted by the Master Association, or if the warranty period for such improvements has not expired, provided that the Master Association does not unreasonably withhold its approval.

9.    Cable Television.  Builder, at its sole expense, agrees to pre-wire and install a complete cable television system and cable modem ("CATV"), within each Residence in accordance with specifications furnished to Builder by Commerce or a cable company selected by Commerce, including at least two (2) cable television outlets and at least two (2) cable modem outlets for each Residence, whether contained in such specifications or not. It is expressly understood that all components of such system installed outside each Residence ("Reserved Components") shall become the property of Commerce, or, at the option of Commerce, a cable company selected by Commerce, without the payment of any consideration therefor, and that Builder shall execute and deliver to Commerce, upon demand, a bill of sale for all Reserved Components in the form provided by Commerce. Builder shall expressly reserve ownership of all Reserved Components in the sales contract and/or deed for each Residence sold, and shall provide a non-exclusive easement in gross on, over, under or across the Covered Property for purposes of installation and maintenance of such cable equipment and for the benefit of Commerce or such other cable company as may be selected by Commerce.

10.    Governmental Approvals; Builder's Duty.  Except for any matters which are the express obligation of Commerce hereunder or under the Purchase Agreement, Builder shall obtain, at its sole expense, all Governmental Approvals which may from time to time be required with respect to the construction or sale of any Improvements (including, without limitation, Residences) upon the Covered Property, including, as applicable and without limitation, FHA/VA and other similar governmental or quasi-governmental financing, and appropriate building permits.

11.    Marketing and Advertising.

11.1    Cooperative Advertising Program.

11.1.1 Purpose of Cooperative Advertising Program.  Commerce will develop and implement a marketing and communications program intended to enhance the reputation of and generate short and long term traffic for Tuscany (the "Cooperative

16

<u>Advertising Program</u>"). The program will focus on publicizing the elements which distinguish Tuscany as a unique, multi-faceted residential community.

11.1.2 <u>Builder's Council</u>. The Cooperative Advertising Program will be developed and implemented by Commerce with input from the "Tuscany Builder's Council" through an "Advertising Committee", consisting of advertising and marketing consultants, Commerce representatives and a limited number of homebuilder representatives (but at least one Builder representative). The Tuscany Builder's Council will consist of one representative from each active homebuilder or other residential developer in Tuscany. Builder's representative to the Tuscany Builder's Council will be a full-time employee of Builder. The Tuscany Builder's Council will meet at least quarterly to review the marketing and sales programs in Tuscany in light of changing market conditions. After the beginning of each calendar year, the Cooperative Advertising Program will be reviewed, updated and presented to the Tuscany Builder's Council. In addition, as the Cooperative Advertising Program is implemented and information relating to sales and communications programs becomes available, Commerce will forward this information to members of the Tuscany Builder's Council. This information will be for the confidential use of participating Tuscany homebuilders.

11.1.3 <u>Cooperative Advertising Fee</u>. Pursuant to the Purchase Agreement, Builder has paid to Commerce a Cooperative Advertising Fee for the purpose of conducting the Cooperative Advertising Program, in an amount equal to one and one half percent (1.5%) of the aggregate amount of the projected gross base sales prices (i.e., excluding all lot and other premiums and optional upgrades) of all Residences to be constructed on the Covered Property.

11.1.4 <u>Funds not Segregated; Accounting</u>. Builder acknowledges and agrees that the Cooperative Advertising Fee shall be commingled with other funds received by Commerce from other purchasers of land within Tuscany, and that such funds, as commingled, will be expended for advertising and marketing efforts which relate to other lands and developments within Tuscany and which may or may not refer specifically to Builder or the Covered Property. Commerce shall provide Builder with an annual accounting of the Cooperative Advertising Fee received for Tuscany, including the sources and uses of funds held by Commerce for such purposes

11.2   <u>Builder's Advertising</u>. In addition to the cooperative advertising and marketing campaign administered by Commerce, Builder may conduct an advertising and marketing program for the sale of the Residences to the home-buying public subject to Commerce's prior approval, which shall not be unreasonably withheld or delayed. Prior to public dissemination, Builder shall submit to Commerce proofs or copies of all proposed advertisements, including without limitation, newspaper ads, television or radio ads, signs or billboards, press releases, and copies of all brochures and other handouts which advertise the Project or the Residences (collectively, "<u>Advertising</u>") and the locations where Builder intends to disseminate the Advertising, if such Advertising refers to Tuscany, Commerce or any of its affiliates or any of the amenities within Tuscany. Commerce shall have the right to disapprove all Advertising insofar as the same may refer to Commerce or any of its affiliates, Tuscany or in any manner to the amenities available or planned therein, provided such approval shall not be unreasonably withheld or delayed. Builder shall also submit to Commerce any and all marketing and sales information obtained or available from Builder's sales efforts of Residences. Builder shall use its commercially reasonable efforts to cause

17

each purchaser and prospective purchaser of Residences to submit information requested by Commerce to be used for demographic and marketing studies. In the event Commerce makes available any area or location (on property owned by Commerce or within Master Association property) for the display or obtaining information or marketing materials relating to homebuilders in Tuscany (including the offering of materials by personnel at the Tuscany entrance), Commerce agrees that Builder will be permitted to provide or make available information and marketing materials relating to the Project in the same manner as permitted by Commerce to any other Tuscany homebuilder.

      11.3   Submission of Builder Advertising. Within 10 business days after actual receipt of any proposed Advertising, Commerce shall: (i) disapprove the Advertising by written notice stating the reasons therefor, in which case Builder shall not permit the same to be publicly disseminated; (ii) disapprove certain parts or elements of the Advertising by written notice stating the necessary changes or corrections, in which case Builder shall not permit the Advertising to be publicly disseminated without first making the required changes or corrections; or (iii) take no action, in which case Builder may permit the Advertising to be publicly disseminated.

      11.4   Tradenames. Builder acknowledges that Commerce has the prior right to the trade name "Tuscany" and all variations thereof and logos used in connection therewith ("Marks"). Builder is granted a royalty free license to use the Marks solely in connection with the Covered Property and the terms of this Development Declaration, and warrants that it shall not use, nor permit others to use, in any manner whatsoever, the Marks without the prior written consent of Commerce, which shall not be unreasonably withheld or delayed.

      12.   Broker Participation. Builder agrees to pay a reasonable commission (as determined by Builder, but not to exceed three percent (3%)) to any cooperating broker who represents a Residence purchaser in accordance with the provisions of the Purchase Agreement. The foregoing provision is not intended and shall not be construed as conferring any benefit on any third party or as establishing the amount of any such commission and Builder shall have no obligation whatsoever to any cooperating broker pursuant to this Development Declaration.

      13.   Signs and Advertising Devices.

      13.1   Submission to Commerce. Builder shall not place anywhere in Tuscany, or anywhere within ten (10) miles of the boundaries thereof or anywhere within the City of Henderson, any promotional or directional signs or advertising devices (collectively, "Signs") relating to the construction, sale, or renting of any Residence within the Covered Property without first submitting to Commerce a schedule and specifications showing the placement, design, size, material, color typeface, and other similar information and receiving Commerce's prior written approval thereof. Nothing herein shall be deemed to indicate that Commerce agrees to permit the use of property owned by Commerce for any of Builder's Signs.

      13.2   Self-Help. Commerce shall have the right, in addition to any and all other rights it may have, to remove or terminate or cause to be removed or terminated any Signs or Advertising which have not been approved in accordance with this Section 12, and which are not removed or terminated within fifteen (15) days following written notice to Builder from Commerce demanding such removal or termination.

14. <u>Installation of Street Lights</u>. Builder shall be responsible for the installation of all street lights on the Covered Property, all of which lights shall be of the type and style set forth in the Design Guidelines.

15. <u>Notices to Homebuyers</u>.

15.1 <u>Notice in Transfer Documents</u>. Builder shall include in each and every document or instrument transferring an interest in each Residence, including, without limitation, each deed to a purchaser of a Residence (the "<u>Transfer Document</u>"), a specific provision indicating that the Transfer Document and the interest conveyed therein is subject to the Master Declaration and, if applicable, any Supplemental Declaration.

15.2 <u>Tuscany Homebuyer's Notices</u>. Builder shall distribute the Tuscany Homebuyer's Disclosure Notice ("<u>HDNs</u>"), to be prepared by Commerce, to each prospective buyer of a Residence in the Project. The current form of the HDN is attached hereto as <u>Attachment E</u>. Builder acknowledges that the form and content of the HDNs may be changed from time to time by Commerce in its sole discretion; <u>provided</u>, however, that Commerce's right to change the HDNs shall be limited to changes that reflect the current plans for development of Tuscany existing at the time of such change or are necessary to make the HDNs factually accurate and complete for purposes of full disclosure or to comply with the requirements of the City. Builder acknowledges that the purpose of the HDNs is to provide prospective buyers of Residences with certain information concerning Tuscany and the HDNs do not constitute a representation or warranty by Commerce to Builder or homebuyers, nor are the HDNs intended to be used by Builder in satisfaction of any disclosure requirements imposed on Builder by local, state or federal law.

16. <u>General Restrictions</u>. This Section 16 shall apply to all of the Covered Property (including each Residence).

16.1 <u>Permitted Uses</u>. No Improvement upon the Covered Property shall be used for any purpose other than the uses allowed in the Project Plan or reasonably incident thereto, including, but not limited to, the use of such Improvements for parking, delivery, mail and utility or storage areas.

16.2 <u>Nuisances</u>. No rubbish or debris of any kind shall be placed or permitted to accumulate anywhere upon the Covered Property, and no odor shall be permitted to arise therefrom so as to render the Covered Property or any portion thereof unsanitary, unsightly, offensive, or detrimental to any other property in the vicinity thereof or to its occupants. No noise or other nuisance shall be permitted to exist or operate upon any portion of the Covered Property so as to be offensive or detrimental to any other property in the vicinity thereof or to its occupants.

16.3 <u>Exterior Maintenance and Repair</u>. No Improvement anywhere within the Covered Property shall be permitted to fall into disrepair, and each Improvement shall at all times be kept in good condition and repair.

16.4 <u>Drainage</u>. Builder's draining of water, grading activity and the construction of improvements upon the Covered Property shall not interfere with the established drainage pattern within Tuscany. Builder shall not drain or discharge any water, including, without limitation, rain water, onto any property adjacent to or in the vicinity of the Covered Property, except for drainage into an established drainage facility approved by the City for such purpose.

19

16.5    No Hazardous Activities. No activities shall be conducted on any portion of the Covered Property, and no Improvements shall be constructed on any portion of the Covered Property, which are or might be unsafe or hazardous to any person or property. Without limiting the generality of the foregoing, no firearms shall be discharged on the Covered Property and no open fires shall be lit or permitted on the Covered Property. Commerce acknowledges that the construction of homes and customary activities related thereto shall not be deemed inherently unsafe or hazardous for purposes of this section.

16.6    Excavations. No portion of the Covered Property shall be used for the purpose of mining, quarrying, drilling, boring, or exploring for or removing water, oil, gas or other hydrocarbons, minerals, rocks, stones, gravel or earth. Any excavations on the Covered Property by Builder or construction of Improvements shall not damage or interfere with the "French Drain" system located throughout Tuscany.

16.7    Landscaping. The Covered Property shall at all times be maintained in a neat and attractive condition. No landscaping upon the Covered Property shall be allowed to deteriorate to a dangerous, unsafe, unsightly, or unattractive condition. Builder shall have placed (or caused to be placed) all front yard landscaping on each Residence in conformance with the Project Plan within sixty (60) days after the close of escrow for the sale of such Residence to a member of the home-buying public, and all rear yard landscaping in conformance with the Project Plan shall be installed no later than one hundred eighty (180) from such close of escrow.

16.8    Flags and Banners. No flags, flag poles, balloons, beacons or banners shall be constructed, placed or maintained upon the Covered Property or elsewhere in Tuscany without the written consent of Commerce, which consent shall be within Commerce's sole discretion, provided that if Commerce permits any homebuilder within Tuscany to construct, place or maintain any such items within Tuscany (whether on a builder's own property or within other areas of Tuscany owned by Commerce or the Master Association), Commerce agrees that Builder will be permitted to construct, place or maintain any such items on the same basis as such other homebuilders.

16.9    Marketing, Sales and Construction Trailers. Commerce shall have the right to reasonably approve any trailers or other temporary structures placed or maintained upon the Covered Property for the purpose of marketing, sales or construction activities, which approval shall not be unreasonably withheld or delayed.

17.    Restoration of Damaged or Destroyed Residence. If at any time commencing after Builder's construction of any Residence(s) and prior to the sale of such Residence(s) to a member of the home-buying public, such improvements or Residence(s) are destroyed by fire or other casualty, Builder shall, not later than one hundred twenty (120) days after occurrence of damage or destruction, commence to repair or restore the same in accordance with the Construction Documents for such improvements or Residence(s) and diligently complete the repair or restoration thereof no later than one (1) year from the date of the occurrence of such damage or destruction.

18.    Release and Termination.

18.1    Residences. Each Residence within the Project shall be automatically released from the encumbrance of this Development Declaration without the necessity of executing or recording any instrument of release upon the sale of the Residence by Builder to a member of the

20

home-buying public, but not upon the bulk sale of more than two (2) Residences to any person or entity for resale to the public.

      18.2   Dedication to Public Agency or Public Utility. Any portion of the Covered Property, upon dedication or conveyance to, and acceptance by, a public entity or public utility in accordance with the Project Plan, shall be deemed automatically released from the encumbrance of this Development Declaration, without the necessity of executing or recording any instrument of release.

      18.3   Transfer to Association. Any portion of the Covered Property, upon transfer to and acceptance by the Master Association or a Sub-Association, pursuant to Sections 4.7, 4.9 or 8.3 above, shall be deemed automatically released from the encumbrance of this Development Declaration, without the necessity of executing or recording any instrument of release.

      18.4   Acquisition of Covered Property by Commerce. Upon the acquisition of all or portions of the Covered Property by Commerce by and through any operation of law or instrument of transfer, Commerce shall have the right in its sole discretion to terminate this Development Declaration, and release portions or all of the Covered Property from the covenants and restrictions of this Development Declaration, in which event the covenants and restrictions shall be forever terminated and extinguished.

      18.5   Right of Release. Commerce shall also have the right to release from time to time and at any time, all or any portion of the Covered Property from this Development Declaration for any reason, and the foregoing provisions of this Section 18 shall not be deemed to limit such right in any manner whatsoever.

      18.6   Instrument. Following the release of any portion of the Covered Property from the encumbrance hereof, Commerce shall, if requested by the Builder of such portion of the Covered Property, execute and cause to be Recorded an instrument evidencing such release. Such instrument shall not be necessary, however, to evidence the automatic release of this Development Declaration as to portions of the Covered Property pursuant to Sections 18.1, 18.2 and 18.3 above.

19.    Property Covered.

      19.1   Right of Substitution. Commerce shall have the right, by an amendment to this Development Declaration delivered to Builder, to unilaterally add to, subtract from, or substitute for the Benefited Property any real property owned by Commerce within the City and the term "Benefited Property," as used herein, shall refer to such added, reduced, or substituted real property, effective upon the delivery to Builder of such amendment.

20.    Enforcement; Assignment by Commerce.

      20.1   Waiver. Failure by Commerce to enforce any condition, covenant, or restriction herein contained in any certain instance or on any particular occasion shall not be deemed a waiver of such right on any future breach of the same or any other condition, covenant, or restriction by Builder. Except as expressly provided in the written evidence of approval by

21

Commerce of the Project Plan or any other plans, drawings or specifications for the construction of any Improvement upon the Covered Property, such approval shall not constitute or be deemed a waiver of any requirement contained in this Development Declaration which relates to the conditions upon such construction, or the manner in which such construction shall be performed. All rights, options, and remedies of Commerce under this Development Declaration are cumulative, and no one of them shall be exclusive of any other, and Commerce shall have the right to pursue any one or all of such rights, options, and remedies or any other remedy or relief which may be provided by law or in equity, whether or not stated in this Development Declaration.

20.2    Assignment of Rights by Commerce. Commerce may assign any of its rights and powers under this Development Declaration, in whole or in part, to a permitted assignee under the Purchase Agreement. Upon the Recordation of such writing accepting such assignment and assuming such duties, such person or entity shall, to the extent of such assignment, have the same rights and powers and be subject to the same obligations and duties as are given to and assumed by Commerce herein. Without limiting the generality of the foregoing, Commerce may make such assignment as to the entire Covered Property or to any portion thereof.

21.    Amendments. Except as provided in this Development Declaration concerning the addition of or substitution for other real property as the Benefited Property, or concerning the assignment by Commerce of its rights under this Development Declaration, this Development Declaration may only be amended by a writing executed by Commerce and the record Builder of the Covered Property, which may be Recorded against the Covered Property. For purposes of this Section 21 only, "Covered Property" shall not include any parcel or portion of the Covered Property that has been released from the encumbrance of this Development Declaration pursuant to Section 18 above.

22.    Miscellaneous.

22.1    Captions. The captions used herein are for convenience only and are not a part of this Development Declaration and do not in any way limit or amplify the terms and provisions hereof.

22.2    Interpretation; Government Law. This Development Declaration shall be construed as if prepared by both parties hereto. Each party acknowledges that it has had full benefit of legal counsel in the preparation and negotiation of this Development Declaration. This Development Declaration shall be governed by and construed under the laws of the State of Nevada.

22.3    Attorneys' Fees. In the event any action, arbitration or other proceeding shall be instituted in connection with this Development Declaration, the party prevailing in such action shall be entitled to recover from the other party all of its costs of action, arbitration or other proceeding, including reasonable attorneys' fees as fixed by the court therein and including, in the case of Commerce, the allocated costs of its in-house counsel.

22.4    Severability. In the event that any phrase, clause, sentence, paragraph, section, article, or other portion of this Development Declaration shall become illegal, null, void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null, void or against public policy, the remaining portions of this Development Declaration shall not be affected thereby and shall remain in force and effect to the full extent permissible by law.

22.5    Gender and Number. In this Development Declaration (unless the context requires otherwise), the masculine, feminine, and neuter genders and the singular and plural include one another.

22.6    Covenants to Run With the Land; Term. The covenants, restrictions, and reservations of this Development Declaration shall run with and bind the Covered Property and shall inure to the benefit of and be enforceable by Commerce and its successors and assigns for a term of sixty (60) years from the date of this Development Declaration, unless terminated earlier in accordance with Section 18 above. As used in the preceding sentence, the term "successors and assigns" shall mean and refer to both (a) Commerce's successors and assigns as contemplated by Section 20.2, and (b) Commerce's successors and assigns as to all or substantially all of Commerce's assets or by merger, consolidation or other reorganization.

22.7    Notices. All notices or other communications between Commerce and Builder required or permitted hereunder shall be given in accordance with the notice provisions of the Purchase Agreement.

22.8    Effect of Development Declaration. This Development Declaration is made for the purposes set forth in the Recitals to this Development Declaration, and Commerce makes no warranties or representations, express or implied, as to the binding effect or enforceability of all or any portion of this Development Declaration or as to the compliance of any of these provisions with public laws, ordinances and regulations applicable thereto.

22.9    Rights of Mortgagees. All restrictions and other provisions herein contained shall be deemed subject and subordinate to all bona fide mortgages and deeds of trust now or hereafter executed upon the Covered Property or any portion thereof, and none of said restrictions shall supersede or in any way reduce the security or affect the validity of any such mortgage or deed of trust; provided, however, that if all or a portion of the Covered Property is sold under a foreclosure of any mortgage or under the provisions of any deed of trust, any purchaser at such sale, including, without limitation, the mortgagee or beneficiary of a deed of trust and the successors and assigns of such purchaser, shall hold any and all property so purchased subject to all of the restrictions and other provisions of this Development Declaration. The foregoing provision shall also apply to a deed in lieu of foreclosure and to the transferee of the lender after such deed in lieu.

22.10    Personal Obligation. Builder shall be personally obligated for the performance of all of the terms of this Development Declaration as to each Residence until Builder shall have been released from such obligations as to such Residence.

23.    Certain Definitions. In addition to using defined terms from the Purchase Agreement, certain terms are used in this Development Declaration with the meaning given them elsewhere herein. The following is a list of defined terms and the provision in this Development Declaration where the term is defined.

| Defined Term | Section |
|---|---|
| Additional Obligations | Section 3.2 |
| Advertising | Section 11.2 |
| Architectural Concept Plan | Section 1.4.1 |
| Architectural Materials Sample Board | Section 1.4.3 |

23

| | |
|---|---|
| Benefited Party | Section 2.8 |
| Benefited Property | Recital F |
| Builder | Preamble |
| Builder Parties | Section 2.5 |
| Builder's Work of Improvement | Section 2.3 |
| Building Improvements | Section 1.4 |
| CATV | Section 9 |
| City | Recital A |
| Commerce | Preamble |
| Commerce Parties | Section 2.5 |
| Common Area Lot | Section 4.9 |
| Cooperative Advertising Program | Section 11.1.1 |
| Covered Property | Recital B |
| Development Declaration | Preamble |
| Final Map | Section 1.2 |
| Final Plot Plan | Section 1.4.4 |
| Governmental Approvals | Section 1.9 |
| HDNs | Section 15.2 |
| Improvement | Section 1.1 |
| Improvements | Section 1.1 |
| Indemnitees | Section 3.3 |
| Indemnitor | Section 3.3 |
| Landscape Construction Drawings | Section 1.3.3 |
| Landscape Improvements | Section 1.3 |
| Landscape Materials Sample Board | Section 1.3.2 |
| Landscape Plan | Section 1.3.1 |
| Liabilities | Section 3.3 |
| Marketing Signage Plan | Section 1.4.5 |
| Marks | Section 11.4 |
| Master Association | Section 4.6 |
| Open Space | Section 3.5 |
| Plan | Section 1.5 |
| Preliminary Plot Plan | Section 1.4.2 |
| Pre-Submittal Meeting | Section 1.6 |
| Prohibited Plants | Section 7 |
| Project | Recital D |
| Project Logo | Section 5 |
| Project Name | Section 5 |
| Project Plan | Section 1.5 |
| Project Plan Work | Section 2.1 |
| Purchase Agreement | Recital B |
| Reserved Components | Section 9 |
| Responsible Party | Section 2.8 |
| Signs | Section 13.1 |
| Site Improvements | Section 1.2 |
| Site Improvement Plans | Section 1.2.1 |
| Sub-Association | Section 4.7 |
| successors and assigns | Section 22.6 |
| Supplemental Declaration | Section 4.7 |

Transfer Document                          Section 15.1
Tuscany                                    Recital A


IN WITNESS WHEREOF, Builder and Commerce have executed this instrument on the day and year first above written.

_____, a Nevada _____

By:_____

Name:_____

Title:_____


**COMMERCE ASSOCIATES, LLC, a Nevada limited liability company**

By:_____

Name:_____

Title:_____

25

STATE OF NEVADA

COUNTY OF CLARK

    This instrument was acknowledged before me on this ____ day of _____, 200__ by
_____ as _____ of _____.

_____
*(Signature of notarial officer)*

(My commission expires:_____)

STATE OF NEVADA

COUNTY OF CLARK

    This instrument was acknowledged before me on this ____ day of _____, 200__ by
_____ as _____ of _____.

_____
*(Signature of notarial officer)*

(My commission expires:_____)

26

## ATTACHMENT A

### COVERED PROPERTY

[Insert legal description of Covered Property]

1

## ATTACHMENT B

### TUSCANY

[Insert legal description of entire Tuscany development.]

## ATTACHMENT C

## BUILDER'S WORK OF IMPROVEMENT

[Describe all Project Common Areas and Perimeter Walls to be completed by Purchase per the Purchase Agreement and Project entry, including time for completion.]

1. Project Common Areas

2. Project Perimeter Walls

3. Project entry

# ATTACHMENT D

## CONSTRUCTION ACCESS

[Attach map indicating construction access routes.]

# ATTACHMENT E

## HOMEBUYER DISCLOSURE NOTICE

[Attach current form of notice.]

# EXHIBIT M

## FRENCH DRAINS EXHIBIT

### (Section 8.1(d))

[Attach maps indicating locations of all French Drains affecting the Property.]



**GROUNDWATER CONDUIT SYSTEM LOCATION MAP PARCEL 5**

**GROUNDWATER CONDUIT DESIGN PREPARED BY GEO-TEK, INC. SEE ATTACHED SHEET FOR DETAIL OF CONDUIT SYSTEM**

**LEGEND**

— — — Existing Ground Water Conduit

——— Proposed Gound Water Conduit

**BENCHMARK**

CITY OF HENDERSON BENCH MARK NO. 220 DATED 11/02/93
DESC: CITY OF HENDERSON BRASS CAP IN THE TOP OF THE CURB
ON THE SOUTHEAST CORNER OF OLSEN STREET AND REDROCK STREET.
ELEVATION IN METERS: 508.195 = 1667.303 FEET
C.O.H. NAVO '88
CONVERSION FACTOR: METERS X 3937/1200 = U.S. FEET
PER C.O.H. BOOK OF BENCHMARKS DATED APRIL 1997.

**PBS&J**

2270 Corporate Circle
Suite 100
Henderson, Nevada  89074
Telephone: 702/263-7275
Fax: 702/263-7200

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

P5-Dwfla.dwg

| JOB NO. | 511197 | DRAWN | RMM | DATE | 04/08/03 |
| SHEET NO. | | CHECKED | | SCALE | 1"=300' |
| | | | LCF | | |

PARCEL 5
DEVELOPER WALLS
AT TUSCANY





GROUNDWATER
CONDUIT SYSTEM
LOCATION MAP PARCEL 6B

GROUNDWATER CONDUIT
DESIGN
PREPARED BY
GEO-TEK INC.
SEE ATTACHED SHEET
FOR DETAIL OF
CONDUIT SYSTEM

**BENCHMARK**

CITY OF HENDERSON BENCH MARK NO. 220 DATED 11/02/93
DESC. CITY OF HENDERSON BRASS CAP IN THE TOP OF THE CURB
ON THE SOUTHEAST CORNER OF OLSEN STREET AND REDROCK STREET.
ELEVATION IN METERS: 508.195
ELEVATION IN METERS: 508.195 = 1667.303 FEET
C.O.H. (NAVD '88
CONVERSION FACTOR: METERS X 3937/1200 = U.S. FEET
PER C.O.H. BOOK OF BENCHMARKS DATED APRIL 1997.

**LEGEND**

— — —  Existing Ground Water Conduit

————  Proposed Gound Water Conduit

**PBS&J**

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

2270 Corporate Circle
Suite 100
Henderson, Nevada 89074
Telephone: 702/263-7275
Fax 702/263-7200

P6B-OFF.DWG

| GROUNDWATER CONDUIT SYSTEM LOCATION MAP | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/16/03 |
| | SHEET NO. | | CHECKED | LCF | SCALE | SCALE |









GROUNDWATER
CONDUIT SYSTEM
LOCATION MAP PARCEL 25

TUSCANY
GOLF COURSE

**BENCHMARK**

CITY OF HENDERSON BENCH MARK NO. 220 DATED 11/02/93
DESC: CITY OF HENDERSON BRASS CAP IN THE TOP OF THE CURB
ON THE SOUTHEAST CORNER OF OLSEN STREET AND REDROCK STREET.
ELEVATION IN METERS: 508.195 = 1667.303 FEET

CONVERSION FACTOR: METERS X 3937/1200 = U.S. FEET
PER C.O.H. BOOK OF BENCHMARKS DATED APRIL 1997.

**GROUNDWATER CONDUIT
DESIGN
PREPARED BY
GEO-TEK, INC.
SEE ATTACHED SHEET
FOR DETAIL OF
CONDUIT SYSTEM**

| | |
|---|---|
| DATE | 04/16/03 | SCALE |
| SCALE | | |
| DRAWN | RMM | LCF |
| CHECKED | | |
| JOB NO. | 511197 | |
| SHEET NO. | | |

GROUNDWATER
CONDUIT SYSTEM
LOCATION MAP

**LEGEND**

—·—·— Existing Ground Water Conduit

———— Proposed Gound Water Conduit

P25-alf.dwg

**PBSJ**

2270 Corporate Circle
Suite 100
Henderson, Nevada  89074
Telephone: 702/263-7275
Fax: 702/263-7200

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

**EXHIBIT N**

**SNDA**

**(Section 8.3)**

[Attach form.]

Assessor's Parcel Nos.

WHEN RECORDED, RETURN TO:

Nevada State Bank
Real Estate Loan Department
750 East Warm Springs Road, 4th Floor
Las Vegas, Nevada 89119
Attention: Derek Braybrooks

## SUBORDINATION, NON-DISTURBANCE AND
## ATTORNMENT AGREEMENT AND ESTOPPEL CERTIFICATE
## (RHODES DESIGN AND DEVLOPMENT CORPORATION)

This Subordination, Non-Disturbance and Attornment Agreement and Estoppel Certificate (the "Agreement") is made and executed as of the _____ day of _____, 2004November, 2003, by and between NEVADA STATE BANK, a Nevada banking corporation ("Lender"), COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Borrower"), and RHODES DESIGN  AND DEVLOPMENT CORPOPRATION, a Nevada corporation ("Subordinating Party").

WHEREAS, Borrower is the owner of real property situated in Clark County, State of Nevada, and more particularly described in Exhibit A attached hereto and incorporated herein by this reference (the "Property"); and

WHEREAS, portions of the Property are subject to that certain Purchase Agreement and Grant of Options dated May 9, 2003 executed between Borrower, as "Seller", and Subordinating Party as "Purchaser", a Memorandum of which was recorded in the office of the County Recorder of Clark County, State of Nevada, on June ___, 2003, as Instrument No._____, in Book _____ (the "Subordinated Agreement"); and

WHEREAS, Borrower has executed that certain Promissory Note dated the Closing Date made payable to Lender, to evidence that certain land development loan being made by Lender to Borrower in the original principal amount of Forty-One Million Dollars ($41,000,000.00) (the

1

"Note") in accordance with the terms and conditions of that certain Land Development Loan Agreement (the "Loan Agreement") dated the Closing Date between Borrower and Lender; and

WHEREAS, to secure the Note, Borrower, as "Trustor", has executed that certain Land Development Trust Deed, Assignment of Rents, Security Agreement and Fixture Filing dated the Closing Date, which is being recorded concurrently herewith in the official records of Clark County, State of Nevada (the "Trust Deed"); and

WHEREAS, Lender requires that the Subordinated Agreement be subordinated to the lien of the Trust Deed and Subordinating Party is willing to subordinate the Subordinated Agreement to the lien of the Trust Deed.

<u>AGREEMENT</u>

In exchange for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Subordinating Party agrees as follows:

1.    <u>Estoppel Certificate</u>. Subordinating Party and Borrower hereby certify to and agree with Lender that, as of the date of this Agreement, Lender is relying on all of the following certifications and agreements of Subordinating Party and Borrower as consideration for Lender executing this Agreement, and in the making of the Loan evidenced by the Note and secured by the Trust Deed, Assignment of Leases, and other collateral identified in the Loan Documents:

a.    The Subordinated Agreement is in full force and effect and is the valid and binding obligation of Subordinating Party, enforceable in accordance with its terms.

b.    Neither Subordinating Party nor Borrower is in default under the Subordinated Agreement and no event has occurred and no condition exists, which with the giving of notice, the passage of time, or both, would constitute a default by Subordinating Party or Borrower under the Subordinated Agreement.

c.    Subordinating Party has not assigned, mortgaged, sublet, encumbered or otherwise transferred any or all of its interest under the Subordinated Agreement.

2.    <u>Subordination</u>. Subordinating Party hereby unconditionally subordinates to the lien and encumbrance of the Trust Deed the priority of the Subordinated Agreement, including, without limitation, any and all options to purchase any portion of the Property contained therein. Subordinating Party acknowledges and agrees that the interests owned by Subordinating Party under the Subordinated Agreement shall be inferior and junior to the lien of the Trust Deed and any extensions, modifications or renewals of the Trust Deed, hereof, or of the Note secured by the Trust Deed, that may hereafter occur.

2

3.     <u>Subordination Absolute</u>. This Agreement is absolute, irrevocable and unconditional, and Subordinating Party does hereby further agree that Lender or Lender's assignee shall not be (a) liable for any act or omission of Borrower; (b) obligated to cure any defaults of Borrower to Subordinating Party; (c) subject to any offsets or defenses which Subordinating Party may be entitled to assert against Borrower; or (d) bound by any amendment or modification of the agreements between Subordinating Party and Borrower made without the prior written consent of Lender.

4.     <u>Priority</u>. In the event of foreclosure or exercise of any power of sale as set forth in the Trust Deed, or in any condemnation or eminent domain proceedings, the priority herein established shall be respected to the same extent and in the same manner as if the Trust Deed had predated, in both time of execution and date of recordation, the Subordinated Agreement to the extent necessary to pay in full any and all sums secured by the Trust Deed.

5.     <u>Non-Disturbance</u>. In the event of foreclosure of the Trust Deed, or upon a sale of the Property pursuant to the trustee's power of sale contained in the Trust Deed, or upon a transfer of the Property by conveyance in lieu of foreclosure (collectively, a "<u>Transfer</u>"), then so long as Subordinated Party complies with this Agreement and is not in default under any of the terms, covenants, or conditions of the Subordinated Agreement, Lender shall not name or join Subordinated Party in any foreclosure proceeding, unless such joinder is necessary, in Lender's discretion, to complete the foreclosure. In the event of a Transfer, Lender will perform and be bound by all of the obligations imposed on Borrower by the Subordinated Agreement for the balance of the term of the Subordinated Agreement, and any extension or renewals of the Subordinated Agreement, as long as no event of default has occurred under the Subordinated Agreement, which has continued to exist for such period of time, after notice and opportunity to cure, if any, required by the Subordinated Agreement, as would entitle Borrower under the Subordinated Agreement to terminate the Subordinated Agreement, or would cause, without any further action of Borrower, the termination of the Subordinated Agreement.

6.     <u>Attornment</u>. In the event of a Transfer, Subordinated Party hereby agrees to attorn to, adhere to and accept any such successor owner as Seller under the Subordinated Agreement, and to be bound by and perform all of the obligations imposed by the Subordinated Agreement, such attornment to be self-operative without the execution of any further instruments.

7.     <u>Notice and Opportunity to Cure</u>. Subordinating Party agrees to deliver to Lender, within five (5) days of delivery to Borrower, a copy of all notices of default or termination delivered to Borrower in connection with the Subordinated Agreement. If any default occurs under the Subordinated Agreement, Lender shall have the right for the same period of time to cure such default as Borrower has under the Subordinated Agreement.

8.     <u>Application of Funds</u>. Subordinating Party acknowledges and agrees that Lender has no obligation to Subordinating Party to advance any funds under the Loan to Borrower or see to or supervise the application of such funds by Borrower, and any application or use of such funds for

3

purposes other than those provided for in the Loan Documents shall not defeat, or in any way affect, the subordination made in this Agreement.

9.      Inconsistent Terms.  It is expressly understood and agreed that this Agreement shall supersede, to the extent inconsistent with this Agreement, any provisions of the Subordinated Agreement.

10.     Waiver.  Subordinating Party waives presentment, demand, protest and notice and agrees that Lender, without notice or consent of Subordinating Party, upon such terms as Lender may deem advisable, without releasing or discharging Subordinating Party from this Agreement or affecting the lien or priority of the Trust Deed, may: (a) extend, in whole or in part, by renewal or otherwise, the time of payment or performance of any obligation secured by the Trust Deed; (b) release, surrender, exchange or modify any obligation secured by the Trust Deed, or any security for such obligation; or (c) settle or compromise any claim with respect to any obligation secured by the Trust Deed or against any person who has given security for any such obligation. Subordinating Party ratifies any such extension, renewal, release, surrender, exchange, modification, settlement, or compromise and waives all defenses, counterclaims or offsets which Subordinating Party might have by reason thereof.

11.     Run of the Land.  This Agreement shall run with the land and be binding upon and inure to the benefit of Lender and Lender's successors and assigns, and shall be binding upon and inure to the benefit of Subordinating Party and Subordinating Party's successors and assigns.

12.     Notices.  All notices shall be in writing and shall be deemed to have been sufficiently given or served when personally delivered, deposited in the United States mail, by registered or certified mail, or deposited with a reputable overnight mail carrier which provides delivery of such mail to be traced, addressed as follows:

Lender:                         Nevada State Bank
                                Real Estate Loan Department
                                750 East Warm Springs Road, 4th Floor
                                Las Vegas, Nevada 89119
                                Attn: Derek Braybrooks

With copies to:                 Callister Nebeker & McCullough
                                Gateway Tower East, Suite 900
                                10 East South Temple
                                Salt Lake City, Utah 84133
                                Attn: John B. Lindsay

4

Borrower:                    Commerce Associates, LLC
                             2920 N. Green Valley Parkway, Suite 114
                             Henderson, Nevada 89014
                             Attn: Tom Gonzales

With copies to:              Jones Vargas
                             3773 Howard Hughes Parkway,
                             Third Floor South
                             Las Vegas, Nevada 89109
                             Attn: Michael E. Buckley, Esq.

Subordinating Party:         Rhodes Design and Development Corporation
                             4730 South Fort Apache Road
                             Suite 300
                             Las Vegas, Nevada 89147
                             Attn: Dean Walker

with copies to:              Rhodes Design and Development Corporation
                             4730 South Fort Apache Road
                             Suite 300
                             Las Vegas, Nevada 89147
                             Attn: Ron Gillette, Esq.

Such addresses may be changed by notice to the other party given in the same manner provided in this Section.

13.    <u>Governing Law</u>. This Agreement shall be governed by, construed and interpreted in accordance with the laws of the State of Nevada.

14.    <u>Successors and Assigns</u>. This Agreement is and shall be binding upon and shall inure to the benefit of Tenant, Lender and their respective successors and assigns.

DATED:          _____, 2004.

<u>SUBORDINATING PARTY</u>

**RHODES    DESIGN    AND    DEVLOPMENT CORPORATION**, a Nevada corporation


By:    _____

5

Its: _____

_____


BORROWER

**COMMERCE ASSOCIATES, LLC,**
a Nevada limited liability company


By: _____

Tom Gonzales, Manager


LENDER

**NEVADA STATE BANK,**
a Nevada banking corporation


By: _____

Derek Braybrooks
Vice President

6

STATE OF NEVADA            )
                           : ss.
COUNTY OF CLARK            )

The foregoing instrument was acknowledged before me this __ day of _____,
2004 by _____, as _____ of Rhodes Design
and Development Corporation, a Nevada corporation.

_____
NOTARY PUBLIC

My Commission Expires:              Residing At:

_____         _____


STATE OF NEVADA            )
                           : ss.
COUNTY OF CLARK            )

The foregoing instrument was acknowledged before me this _____ day of _____,
2004, by Tom Gonzales, as Manager of Commerce Associates, LLC, a Nevada limited liability
company.

_____
NOTARY PUBLIC

My Commission Expires:              Residing At:

_____         _____


STATE OF NEVADA            )
                           : ss.
COUNTY OF CLARK            )

The foregoing instrument was acknowledged before me this ____ day of _____, 2004, by Derek Braybrooks, as Vice President of Nevada State Bank, a Nevada banking corporation.

_____
NOTARY PUBLIC

My Commission Expires:                         Residing At:

_____          _____

8

**EXHIBIT A**

<u>Real Property Description</u>

That certain real property located in Clark County, State of Nevada, and more particularly described as follows:

## EXHIBIT O

## DESCRIPTION OF GRADING PLANS

### (Section 9.4)

Refer to "Tuscany Grading Plans by PBS&J" dated as set forth below for each parcel:

| | |
|---|---|
| Parcel 5 | June 2002 |
| Parcel 6A | October 2001 |
| Parcel 6B | March 2003 |
| Parcel 6C | June 2002 |
| Parcel 10 | October 2001 |
| Parcel 11 | March 2002 |
| Parcel 12 | June 2001 |
| Parcel 14 | June 2002 |
| Parcel 15 | March 2003 |
| Parcel 16 | April 2002 |
| Parcel 17 | April 2002 |
| Parcel 18 | Undated |
| Parcel 19 | Sept 2001 |
| Parcel 22 | March 2003 |
| Parcel 23 | June 2002 |
| Parcel 24 | October 2001 |
| Parcel 25 | June 2002 |

## EXHIBIT P

## PERIMETER WALLS EXHIBIT

### (Section 10.2)

[Attach maps showing location and responsibility of all perimeter walls.]





RETAINING WALL WITH
9 COURSE STD
CMU PERIMETER WALL

9 COURSE STD
CMU PERIMETER WALL

FULL VIEWRAIL WALL

9 COURSE STD
CMU PERIMETER WALL

9 COURSE STANDARD
CMU PERIMETER WALL

N

24' FIRE ACCESS GATE

TUSCANY GOLF COURSE

PARCEL 5A

PARCEL 6A

TUSCANY GOLF COURSE

24' ACCESS GATES

PBS&J

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

2270 Corporate Circle
Suite 100
Henderson, Nevada  89074
Telephone: 702/263-7275
Fax: 702/263-7200

PARCEL 5
COMMERCE WALLS
AT TUSCANY

| PARCEL 5 COMMERCE WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/08/03 |
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=300' |



NOTE: WALLS SHOWN ARE RETAINING WALLS ONLY. DEVELOPER IS RESPONSIBLE FOR CONSTRUCTION OF ALL PROPERTY SCREEN WALLS, PER TM APPROVED 11/21/01, EXCEPT THOSE SHOWN ON COMMERCE WALL EXHIBIT.

LEGEND

——— RETAINING WALL

* GARAGE PAD TO BE 6"
  BELOW FINISH FLOOR

TUSCANY
GOLF COURSE

TUSCANY
GOLF COURSE

**PBS&J**

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

2270 Corporate Circle
Suite 100
Henderson, Nevada  89074
Telephone: 702/263-7275
Fax: 702/263-7200

PARCEL 6A
DEVELOPER WALLS
AT TUSCANY

N

| PARCEL 6A DEVELOPER WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/07/03 |
|---|---|---|---|---|---|---|
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=300' |



FULL VIEWRAIL WALL

12 COURSE STD
CMU PERIMETER WALL

12 COURSE DECORATIVE
CMU PERIMETER WALL

TUSCANY
GOLF COURSE

TUSCANY
GOLF COURSE

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

**PBS&J**

2270 Corporate Circle
Suite 100
Henderson, Nevada 89074
Telephone: 702/263-7275
Fax: 702/263-7200

PARCEL 6A
COMMERCE WALLS
AT TUSCANY

| PARCEL 6A COMMERCE WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RJB | DATE | 04/07/03 |
|---|---|---|---|---|---|---|
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=300' |



RETAINING WALL

NOTE:
WALLS SHOWN ARE RETAINING WALLS ONLY.
DEVELOPER IS RESPONSIBLE FOR CONSTRUCTION
OF ALL PROPERTY SCREEN WALLS, PER TM
APPROVED 11/27/01, EXCEPT THOSE SHOWN
ON COMMERCE WALL EXHIBIT.

PARCEL 6A

PARCEL 14

OLIVIA PARKWAY

PARCEL 6B

C-1 CHANNEL

PARCEL 6C

**PBS&J**
ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES
2270 Corporate Circle
Suite 100
Henderson, Nevada 89074
Telephone: 702/263-7275
Fax: 702/263-7200

PARCEL 6B
DEVELOPER WALLS
AT TUSCANY

PBS-DWALLS.DWG

N

| PARCEL 6B DEVELOPER WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/07/03 |
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=200' |



12 COURSE DECORATIVE
CMU PERIMETER WALL

PARCEL 6A

PARCEL 6B

PARCEL 14

OLIVIA PARKWAY

C-1 CHANNEL

PARCEL 6C

PARCEL 6B
COMMERCE WALLS
AT TUSCANY

**PBS&J**

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

2270 Corporate Circle
Suite 100
Henderson, Nevada 89074
Telephone: 702/263-7275
Fax: 702/263-7200

P-6B-CIVILS.DWG

| PARCEL 6B COMMERCE WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/07/03 |
|---|---|---|---|---|---|---|
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=200' |



C-1 CHANNEL

PARCEL 6B

OLIVA PARKWAY

VIA ALATOIRE

NOTE:
WALLS SHOWN ARE RETAINING WALLS ONLY.
DEVELOPER IS RESPONSIBLE FOR CONSTRUCTION
OF ALL PROPERTY SCREEN WALLS, PER TM
APPROVED 11/21/01, EXCEPT THOSE SHOWN
ON COMMERCE WALL EXHIBIT.

━━━━━  RETAINING WALL

**PBS&J**

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

2270 Corporate Circle
Suite 100
Henderson, Nevada 89074
Telephone: 702/263-7275
Fax: 702/263-7200

P6C-DWALLS.DWG

PARCEL 6C
DEVELOPER WALLS
AT TUSCANY

| PARCEL 6C DEVELOPER WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/07/03 |
|---|---|---|---|---|---|---|
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=200' |

Case 09-14814-gwz    Doc 1738-2    Entered 11/30/12 16:50:45    Page 138 of 138



C-1 CHANNEL

PARCEL 6B

OLIVIA PARKWAY

VIA ALATOIRE

ENGINEERING · PLANNING · SURVEYING · CONSTRUCTION SERVICES

**PBS&J**

2270 Corporate Circle
Suite 100
Henderson, Nevada 89074
Telephone: 702/263-7275
Fax: 702/263-7200

P6C-CWALLS.DWG

9 COURSE STD
CMU PERIMETER WALL

12 COURSE DECORATIVE
CMU PERIMETER WALL

PARCEL 6C
COMMERCE WALLS
AT TUSCANY

N

| PARCEL 6C COMMERCE WALLS AT TUSCANY | JOB NO. | 511197 | DRAWN | RMM | DATE | 04/07/03 |
|---|---|---|---|---|---|---|
| | SHEET NO. | | CHECKED | LCF | SCALE | 1"=200' |