inspections with respect to the Property, its condition, value and potential. Purchaser agrees that, notwithstanding the fact that it has received certain information from Seller or its agents or consultants, Purchaser has relied solely upon and will continue to rely solely upon its own analysis and will not rely on any information provided by Seller or its agents or consultants, except as otherwise expressly set forth in Section 15.6.

15.8    Seller's Work.  Purchaser understands and acknowledges that, except with respect to the Seller's Work (as to which Seller is responsible): (a) Purchaser is solely responsible for the performance of all work necessary to complete the Projects, (b) Seller will not be responsible for any work required to complete the Projects, and (c) Seller will not be responsible for cost overruns or unforeseen expenditures which may be incurred in order to complete the Projects. Purchaser by closing Escrow, shall be deemed to have accepted the Parcel to be conveyed at such closing in the condition called for by this Agreement, including, without limitation, the completion of all Seller's Work required to have been completed as of the applicable Closing Date, except as otherwise provided on a punchlist prepared in accordance with Section 9.5.

15.9    Alleged Breaches.  If, as of the date which is five (5) days prior to any Scheduled Closing Date, Purchaser has actual knowledge that Seller is in material breach of its obligations with respect to any work or improvement within or affecting a Parcel (collectively, "Seller's Alleged Breach"), Purchaser may (but is not obligated to) proceed to the Close of Escrow without waiving its rights or remedies with respect to Seller's Alleged Breach if and only if Purchaser, no later than one (1) business day prior to the applicable Scheduled Closing Date delivers to Seller a written notice describing with particularity Seller's Alleged Breach as well as any corrective action Purchaser requires to remedy Seller's Alleged Breach (a "Notice of Seller's Failure"). If Purchaser fails to give a Notice of Seller's Failure with respect to any Seller's Alleged Breach of which Purchaser has actual knowledge at the appropriate time (collectively, the "Apparent Breaches"), Purchaser shall be deemed to have waived any right to assert any Apparent Breach as a Seller Default. If Purchaser shall have provided its written Notice of Seller's Failure to Seller in accordance with this provision, Purchaser may (but is not obligated to) elect to proceed to a Close of Escrow without waiving any applicable Seller Default arising from the Seller's Alleged Breach described in the Notice of Seller's Failure. As used in this Agreement, the phrase "Purchaser's actual knowledge" or words of like import shall mean the actual knowledge of Jim Rhodes and/or Dean Walker. There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation.

15.10    Threatened Claims.  Purchaser shall promptly notify Seller of any asserted or threatened claim of which Purchaser has actual knowledge that directly or indirectly materially and adversely affects Seller, this Agreement, Tuscany or the unpurchased portions of the Property.

15.11    Cooperating Brokers.  Purchaser agrees to pay a commercially reasonable commission (as reasonably determined by Purchaser, but not to exceed three percent (3%)) to any cooperating broker who represents a Homebuyer if the Residence is sold during the term of such cooperating broker's agency relationship with the Homebuyer; provided, however, that such cooperating broker negotiated on behalf of the Homebuyer or showed the Residence to the

Homebuyer on the first occasion the Homebuyer viewed the Residence or model. The foregoing provision is not intended and shall not be construed as conferring any benefit on any third party or establishing the amount of any commission, and neither Seller nor Purchaser shall have any obligation whatsoever to any cooperating broker pursuant to this Agreement.

     15.12    <u>Single Purpose Entity</u>. Each Option shall be exercised by a separate SPE who shall be the person acquiring title to the applicable Option Parcel. Notwithstanding any other provision of the SPE's articles of incorporation, bylaws, partnership agreement, articles of organization, operating agreement and/or other documents governing the formation and organization of the SPE (collectively, the "<u>Organizational Documents</u>") or any provision of law that otherwise empowers the SPE and as a condition to the exercise of an Option by an SPE, the SPE's Organizational Documents shall provide that the SPE shall not, without the written consent of Seller, which Seller may grant or withhold in its sole discretion, do any of the following prior to the Close of Escrow for the Parcel it acquires:

     (i)    engage in any business or activity other than the ownership of the particular Option it exercises, the acquisition of the portion of the Property acquired from Seller hereunder and the sale or conveyance of such property to homebuilders;

     (ii)    incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than Approved Construction Loans, except unsecured trade and operational debt incurred with trade creditors in the ordinary course of its business of owning and operating the applicable Option Parcel in such amounts as are normal and reasonable under the circumstances, provided that such debt is not evidenced by a note and is paid when due;

     (iii)    seek the dissolution or winding up, in whole or in part, of the SPE;

     (iv)    cause the SPE to merge into or consolidate with any person or entity or dissolve, terminate or liquidate, in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure; or

     (v)    file a voluntary petition or otherwise initiate proceedings to have the SPE adjudicated bankrupt or insolvent, or consent to the institution of bankruptcy or insolvency proceedings against Purchaser or the SPE, or file a petition seeking or consenting to reorganization or relief of Purchaser or the SPE as debtor under any applicable federal or state law relating to bankruptcy, insolvency, or other relief for debtors with respect to Purchaser or the SPE; or seek or consent to the appointment of any trustee, receiver, conservator, assignee, sequestrator, custodian, liquidator (or other similar official) of Purchaser or the SPE or of all or any substantial part of the properties and assets of Purchaser or the SPE, or make any general assignment for the benefit of creditors of Purchaser or the SPE, or admit in writing the inability of the SPE to pay its debts generally as they become due or declare or effect a moratorium on SPE debt or take any action in furtherance of any such action.

     15.13    <u>Separateness Matters</u>. Each SPE has not and shall not, at any time prior to the Close of Escrow for the Parcel it acquires:

        (a)    acquire or own any material asset other than (i) the Option which it intends to exercise and the portion of the Property acquired from Seller pursuant to such Option, and (ii) such incidental personal property as may be necessary for the ownership, operation and maintenance of such property;

        (b)    fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Seller, amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

        (c)    own any subsidiary or make any investment in or acquire the obligations or securities of any other person or entity without the consent of Seller;

        (d)    commingle its assets with the assets of any shareholder, principal or affiliate of Purchaser, or of any other person or entity or transfer any assets to any such person or entity other than distributions on account of equity interests in Purchaser which do not render the SPE "insolvent" under any definition of such term;

        (e)    allow any person or entity to pay its debts and liabilities (except for a person obligated under any indemnity given or permitted hereunder) or fail to pay its debts and liabilities solely from its own assets;

        (f)    fail to maintain its records, books of account and bank accounts separate and apart from those of the shareholders, members, managers or partners, principals and affiliates of Purchaser (including any other SPE), the affiliates of the shareholders, members, managers or partners of Purchaser and any other person or entity or fail to prepare and maintain its own financial statements in accordance with generally accepted accounting principles and susceptible to audit, or if such financial statements are consolidated fail to cause such financial statements to contain footnotes disclosing that the applicable Option and any portion of the Property acquired hereunder is actually owned by such SPE;

        (g)    enter into any contract or agreement with any shareholder, member, manager, partner, principal or affiliate of Purchaser or any partner, member, shareholder, principal or affiliate thereof (including any other SPE), except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms length basis with third parties other than any shareholder, member, manager, partner, principal or affiliate of Purchaser, as the case may be, any guarantor or any partner, member, shareholder, principal or affiliate thereof;

        (h)    fail to correct any known misunderstandings regarding the separate identity of the SPE;

        (i)    hold itself out to be responsible or pledge its assets or credit worthiness for the debts of another person or entity or allow any person or entity to hold itself out to be responsible or pledge its assets or credit worthiness for the debts of Purchaser or any other SPE (except for a person obligated under any indemnity given or permitted hereunder);

(j)    make any loans or advances to any third party, including any shareholder, member, manager, partner, principal or affiliate of Purchaser (or any other SPE), or any shareholder, partner, member, principal or affiliate thereof;

(k)    fail to file its own tax returns or to use separate contracts, purchase orders, stationary, invoices and checks;

(l)    fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that SPE is responsible for the debts of any third party (including any shareholder, member, manager, partner, principal or affiliate of Purchaser or any other SPE or any shareholder, partner, member, principal or affiliate thereof);

(m)    fail to allocate fairly and reasonably among SPE and any third party (including Purchaser ands any other SPE) any overhead for common employees, shared office space or other overhead and administrative expenses;

(n)    allow any person or entity to pay the salaries of its own employees or fail to maintain a sufficient number of employees for its contemplated business operations;

(o)    fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(p)    share any common logo with or hold itself out as or be considered as a department or division of (i) any shareholder, member, manager, partner, principal, or affiliate of Purchaser (or any other SPE), (ii) any affiliate of a shareholder, member, manager or partner of Purchaser (or any other SPE), or (iii) any other person or entity or allow any person or entity to identify the SPE as a department or division of that person or entity; or

(q)    conceal assets from any creditor, or enter into any transaction with the intent to hinder, delay or defraud creditors of the SPE or the creditors of any other person or entity.

15.14    <u>Homebuyer Notice</u>.  Purchaser acknowledges that Tuscany includes or is in close proximity to the Other Uses, which are more particularly described in the Homebuyer's Disclosure Notice referred to in the Development Declaration (the "<u>HDN</u>"), which Seller reserves the right to modify (and Purchaser agrees to modify) from time to time if required by the City. Purchaser represents, acknowledges and agrees that it is entering into this Agreement with knowledge of the existence of the Other Uses and that its Investigations will include the possible effect of the Other Uses on the Projects.  Purchaser agrees to disclose the existence of the Other Uses to Homebuyers as required by the City and to deliver to each Homebuyer the HDN to be prepared by Seller; agrees for itself and its successors and assigns, including Homebuyers and their respective successors and assigns, and including mortgagees and beneficiaries under deeds of trust affecting the Property or any portion thereof, that the existence of such Other Uses shall never be the basis for the assertion of any claim against Seller by Purchaser; and covenants and agrees never to institute, maintain or support any legal proceeding or action of any kind against

Seller on account of the Other Uses. Purchaser further agrees to protect, defend, indemnify and hold Seller harmless from any liability from claims asserted against Seller by any purchaser from Purchaser based upon or arising out of the failure of Purchaser to disclose the existence of the Other Uses. Purchaser acknowledges the HDN is not intended as a substitute for any statutory notice required to be given by Purchaser to Homebuyers, including any notice under NRS 113.070.

15.15 Golf Course. Purchaser acknowledges: (i) that the Golf Course is not owned by the Master Association and is not a Community Facility; (ii) that property ownership in Tuscany **does not** entitle Purchaser or any Homebuyer or other Lot owner to access to, or the use of, any of the Golf Course facilities nor does such property ownership entitle Purchaser or any Homebuyer or other Lot owner to join any golf or country club operating the Golf Course; and (iii) that nothing in this Agreement, any Closing Document or any other instrument or agreement entered into or delivered in accordance with this Agreement or as of the Close of Escrow is intended to create any right, title or interest in or to the Golf Course or any Golf Course facilities. Purchaser covenants and agrees to disclose the foregoing state of affairs to Homebuyers from Purchaser, and further covenants and agrees: (i) that the status of the Golf Course shall never be the basis for the assertion of any liability for claims against Seller by Purchaser; and (ii) to protect, defend, indemnify and hold Seller harmless from any claims asserted against Seller by any purchaser or other transferee from Purchaser based upon or arising out of the failure of Purchaser to disclose the status of the Golf Course.

15.16 Acknowledgment. By initialing this paragraph Purchaser specifically consents and agrees to the agreements and understandings contained in Sections 15.15 and 15.16.

Purchaser: ______ initials

16. Seller's Covenants, Representations and Warranties. The matters set forth in Sections 16.1 constitute representations and warranties by Seller which are now and (subject to matters contained in any notice given pursuant to the next succeeding sentence) shall, in all material respects, at each Close of Escrow be true and correct. If Seller has actual knowledge that any of the representations and warranties contained in Sections 16.1(d), (e) or (i) or Section 16.2 may cease to be true, Seller shall give prompt notice to Purchaser (which notice shall include copies of the instrument, correspondence, or document, if any, upon which Seller's notice is based). As used in this Agreement, the phrase "Seller's actual knowledge" or words of like import shall mean the actual knowledge of Barry Fieldman or Bob Unger. There shall be no duty imposed or implied to investigate, inspect, or audit any such matters, and there shall be no personal liability on the part of any individual whose knowledge is the basis for such representation. To the extent Purchaser has or acquires actual knowledge prior to the Effective Date that these representations and warranties are inaccurate, untrue or incorrect in any way, such representations and warranties shall be deemed modified to reflect Purchaser's actual knowledge.

16.1 General Representations. As a material inducement to Purchaser to enter into this Agreement, Seller covenants, represents and warrants to Purchaser as follows:

a.      Authority.  Seller is a duly formed, validly existing limited liability company organized under the laws of the State of Nevada and has the full right, power and authority to enter into and carry out the transactions contemplated by this Agreement.  The entering into of this Agreement and the carrying out of the transactions contemplated hereby does not and will not constitute a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under any agreement to which Seller is a party.

b.      No Other Agreements.  Except in connection with the Seller's Work, Seller's Financing, the Permitted Exceptions and the matters disclosed in the Preliminary Title Report, Seller has not entered into any lease or other agreement for possession with any person or entity (except Purchaser) pursuant to which such person or entity has any current or future right or interest to occupy, possess, or use all or any portion of the Property.

c.      Agreement is Authorized and Binding.  This Agreement has been, and all of the documents executed by Seller that are to be delivered to Purchaser at each Close of Escrow shall, as of such Close of Escrow, have been, duly authorized, executed and delivered by Seller and is or will be, as applicable, legal, the valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms (except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of and other principles relating to or limiting the right of contracting parties generally).

d.      Condemnation.  To Seller's actual knowledge, Seller has received no notice of any pending or contemplated condemnation or other similar proceedings affecting the Property or any part thereof.

e.      Litigation.  To Seller's actual knowledge, there are no pending or threatened claims, proceedings or lawsuits of any kind, whether for taxes or otherwise, concerning the Property or that would materially and adversely affect Purchaser's ability to construct any of the Projects or prohibit the sale of any Parcel to Purchaser.

f.      Conflicts.  The execution and delivery of this Agreement and the consummation of the transactions contemplated thereby will not, to Seller's actual knowledge, violate any provision of or require any consent, authorization, or approval under any law, administrative regulation, order, award, judgment, writ, injunction or decree applicable to, or any governmental permit or license issued to, Seller relating to any Parcel.

g.      Title.  Seller has and will convey to Purchaser or the applicable SPE good and marketable fee simple title to each Parcel subject only to the Permitted Exceptions.

h.      Labor.  No labor has been performed or material furnished for any Parcel at the request of Seller or with the consent of Seller or for which a statutory lien may be claimed under NRS 108.221 et seq., for which Seller has not heretofore fully paid or will pay prior to Closing, or for which a mechanic's or materialmen's liens, or any other lien, can be claimed by any person.

i.    Material Defect. To Seller's actual knowledge, the Due Diligence Materials have not been amended in any material respect and, together with the plans, maps and other materials referred to in this Agreement, include all material information in Seller's possession or control relating to the Property and there is no material defect in the Property which would have a material adverse effect upon Purchaser's construction, development, ownership or use of a Parcel, except as may be disclosed elsewhere in this Agreement or in the Due Diligence Materials. To Seller's actual knowledge, except as may be disclosed elsewhere in this Agreement or in the Due Diligence Materials, there is no other material defect in the Property, which would have a material adverse effect upon Purchaser's construction, development, ownership or use of a Parcel.

16.2    Environmental Representations.

a.    Hazardous Materials. To Seller's actual knowledge, except as disclosed in any of the Due Diligence Materials, (i) no portion of the Property is being used or has been used for the disposal, storage, treatment, processing or other handling of Hazardous Materials, and (ii) no condition on the Property is in material violation of applicable federal, state, county or other municipal law, ordinance, order, regulation or requirement relating to Hazardous Materials. Notwithstanding anything to the contrary contained herein, Seller makes no representation or warranty with respect to conditions affecting any Parcel arising after the conveyance of such Parcel hereunder or the earlier delivery of possession to Purchaser or an SPE under any Construction License, unless caused by Seller or its contractors in performing the work provided for herein.

b.    No Release for Pre-Escrow Conditions. Seller acknowledges and agrees that no transfer of any Parcel to Purchaser or an SPE shall relieve or release Seller of any legal liability or responsibility that Seller would otherwise have as the owner of such Parcel, whether by way of damages, penalties, remedial actions or otherwise, for any adverse effects or consequences resulting at any time from any contamination existing on, above or under a Parcel at the time of the Close of Escrow on such Parcel; provided, however that the foregoing is not intended to relieve Purchaser from any liability or responsibility caused by or arising in connection with the activities of, or injury by, Purchaser or its employees, agents or other representatives, upon the Property prior to the Close of Escrow.

c.    Benefit of Representation. Seller's representations and warranties hereunder are for the exclusive benefit of Purchaser and shall not inure to nor are they made for the benefit of any other person or entity.

d.    Definition of Hazardous Material. The term "Hazardous Materials" shall mean any substance, water or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety and property, including all of those materials, wastes and substances designated as hazardous or toxic under NRS 40.504 or by the U.S. Environmental Protection Agency, the U.S. Department of Labor, the U.S. Department of Transportation and/or any other governmental agency now or hereafter authorized to regulate materials and substances in the environment.

e.    Expiration of Representations and Warranties. Seller's representation and warranties under Section 16.2(a) shall survive for 3 years after the Phase I

Lots Closing Date. Purchaser shall not be entitled to recover damages or obtain relief for any breach of such representations or warranties and releases Seller from any claim relating to Hazardous Materials unless (i) written notice specifically setting forth the grounds of such breach is promptly given to Seller by Purchaser within such 3 year period, (ii) a suit by Purchaser against Seller is filed in a court of competent jurisdiction within such 3 year period and (iii) service of such complaint is made on Seller within 30 days after the complaint is filed.

           f.      <u>Environmental Hazards Insurance</u>. As of each Close of Escrow Seller shall cause Purchaser or the applicable SPE to be named as an additional insured under that certain "Pollution Legal Liability Select Policy issued by American International Specialty Lines Insurance Company (Policy Number 8089459) (the "<u>Environmental Hazards Policy</u>") with respect to the Parcel being conveyed to Purchaser or such SPE.

           16.3    <u>No Other Representations or Warranties</u>. Except as set forth in the Closing Documents, Seller makes no representation or warranty, express or implied, with respect to the Property. Without limiting the generality of the foregoing, Seller disclaims any obligation to construct any improvements other than the Seller's Work. Furthermore, notwithstanding the fact that the Property is proposed to be located in a master planned community, Seller disclaims any obligation to develop or cause the development of any portion of Tuscany, other than the Seller's Work and the preparation and Recording of the applicable Project Final Maps. Although Purchaser has or may have been advised by employees, agents or representatives of Seller of certain proposed, planned or intended projects of development within the Tuscany, Seller shall be under no obligation whatsoever to construct or develop such projects unless otherwise explicitly set forth herein or in the Closing Documents.

           16.4    <u>Covenants</u>. Seller hereby covenants with Purchaser as follows:

           a.      <u>Alterations of Property</u>. Except for the Seller's Work or as permitted or contemplated by the Permitted Exceptions or any other obligations of Seller hereunder, Seller agrees that it will not, prior to the Close of Escrow with respect to a Parcel, permit any alteration, modification, or addition to such Parcel, except for insubstantial and immaterial changes that do not adversely affect the same or the value thereof.

           b.      <u>Matters Affecting Title</u>. Seller agrees that it will not cause or permit any new encumbrances or liens to be Recorded against title to the Property after the Effective Date other than (i) matters, including Monetary Liens, which Seller shall cause to be removed at or prior to the applicable Close of Escrow; (ii) Permitted Exceptions, including (A) rights of way, easements or other rights necessary for the construction of the Projects or Seller's Work or necessary for Recordation of any Project Final Map or Seller's performance of any other of its obligations hereunder; and (B) water, power and other utility easements and similar easements normally incident to the development of real property in the City which do not materially interfere with a Project (e.g., avigation easements), provided Seller notifies Purchaser of the proposed matter and Seller obtains the consent of Purchaser to the location of any locatable easement, which consent shall not be unreasonably withheld or delayed, and shall be deemed given unless objection is made, specifying the reasons therefor, within ten (10) business days after Purchaser's receipt of a request for approval under this provision.

c.    Threatened Claims.  Seller shall promptly notify Purchaser of any asserted or threatened claim of which Seller has actual knowledge that directly or indirectly materially and adversely affects Seller, this Agreement, Tuscany, or the Property, including, but not limited to, the discovery of Hazardous Materials on the Property.

d.    Completion of Improvements.  Seller shall perform and complete the Seller's Work (i) in a good and workmanlike manner in accordance with all applicable Conditions of Approval and applicable plans and specifications, including any applicable Improvement Plans, (ii) in compliance with all applicable governmental laws and regulations, and (iii) without any material defects.

17.    Pre-Closing Activities.

17.1    Entry by Purchaser onto the Property.  Seller hereby grants to Purchaser a nonexclusive license, during the term of this Agreement, to enter upon the Unconveyed Property, prior to the Close of Escrow with respect thereto for the purpose of allowing Purchaser to conduct, at its sole expense, the Investigations of the Property.  Prior to any such entry by Purchaser on the Property and at all times during which such entry is permitted, Purchaser shall provide Seller with a certificate of Purchaser's liability insurance policy designating Seller as an additional insured, and such certificate shall evidence coverage in the amount of $3,000,000.00 to protect Seller against any loss, damage, or injury which may occur as a result of Purchaser's use of or entry upon the Property, whether prior to or after the Effective Date of this Agreement.

17.2    Purchaser's Activities.    Purchaser, its representatives, agents and contractors shall (i) perform all Purchaser's Investigations and other pre-closing work on the Property in a diligent, expeditious and safe manner, (ii) not allow any dangerous or hazardous condition created by Purchaser or its representatives, agents or contractors to continue beyond the completion of any activity permitted under this Agreement, (iii) comply with all applicable laws and governmental regulations applicable to Purchaser's activities, and (iv) keep the Unconveyed Property free and clear of all mechanics' and materialmen's liens or other liens arising out of the entry and work or activities performed under this Agreement by Purchaser, its representatives, agents and contractors.  After any entry, Purchaser shall immediately restore the affected Property to the same condition as before Purchaser entered such property.  Purchaser shall indemnify, defend (with counsel acceptable to Seller in its reasonable judgment) and hold harmless Seller, its officers, directors, shareholders, members, managers or partners, members, managers, employees, partners, representatives, agents, successors and assigns (as used in this Section, collectively, the "Indemnified Parties") from and against all claims, liabilities, damages, losses, costs or expenses (including, without limitation, attorneys' fees) arising from or relating to the entry on the Property by Purchaser, its representatives, agents or contractors.  Purchaser's obligations to indemnify, defend and hold harmless the Indemnified Parties shall survive the termination of this Agreement and each Close of Escrow and shall not be limited by any insurance required under Section 17.1.

Notwithstanding the foregoing, Purchaser's indemnity and defense obligations, and Purchaser's obligation to repair or restore any damage to the Property caused by Purchaser pursuant to Section 17.1 above shall not apply to (i) any loss, liability, costs or expenses to the extent arising from or relating to the gross negligence or willful misconduct of Seller; (ii) any

diminution in value of the Property arising from or relating to matters discovered (but not caused) by Purchaser or its employees, agents or contractors during Purchaser's Investigations of the Property; (iii) any latent defects in the Property discovered (but not caused) by Purchaser; and (iv) the release or spread of any Hazardous Materials which are discovered by Purchaser (but not deposited by Purchaser or its agents or contractors) on or under the Property.

      17.3   Indemnity for Development Work. Although Seller is performing certain development work with respect to each Parcel, the parties acknowledge that Purchaser shall be solely responsible for construction of the Residences, including all soils preparation. Accordingly, Purchaser shall indemnify, protect, defend (with counsel reasonably approved by Seller), and hold harmless Seller and the Indemnified Parties, its from any and all losses, damages, liabilities, actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses including reasonable attorneys' fees, arising from any fault, act or omission of Purchaser, any contractor or subcontractor employed by it, any sales agent or marketing representative employed directly or indirectly by Purchaser, anyone directly or indirectly employed by any of the foregoing entities, or anyone for whose acts any of the foregoing entities may be liable, in connection with Purchaser's construction of the Residences (including, without limitation, any and all necessary soils preparation) and/or the act or failure to act of the Master Association or committee, officer, agent or representative thereof relating to any of the Residences or other portions of the Property when Purchaser (or any of its Affiliates or their respective employees, agents, or other representative) is in control of the board of directors of such association or constitute a majority of a committee thereof or are an officer, agent or representative thereof. Notwithstanding the foregoing, Purchaser shall not be obligated to indemnify Seller or any of the other Indemnified Parties against any claim or liability to the extent such claim or liability arises from the breach by Seller of its obligations under this Agreement or from the grossly negligent acts or omissions or willful misconduct of Seller or any such Indemnified Party, including claims related to Seller's Work other than soils preparation or other Seller's Work subsequently modified by Purchaser. The parties specifically acknowledge and agree that Seller is not in the homebuilding business, and that once any part of the Property is delivered to Purchaser or any grantee for construction of Residences or any other modification or alteration, Purchaser or such grantee shall be solely responsible for determining the suitability of such land for construction of Residences and further development. Without limiting the foregoing, the parties acknowledge and agree that it is their intention that any and all claims relating to the construction of Residences shall, as between Seller and Purchaser and any SPE (and its Homebuyers and their successors), be the sole and exclusive responsibility of Purchaser and be subject to the Purchaser's obligations to indemnify, protect, defend and hold harmless Seller as provided herein. Purchaser's obligations under this Section 17.3 shall survive the termination of this Agreement and each Close of Escrow, and shall be assumed by each SPE under the Development Declaration applicable to the Parcel it acquires hereunder.

      17.4   Waiver and Release. As a material part of the consideration of this Agreement, Purchaser hereby waives and releases, on behalf of itself and its successors and assigns, all claims and demands against Seller and the other Seller Indemnified Parties for (i) any such loss, damage, injury or claim described in Section 17.3; (ii) any offsite condition relating to the Property other than a condition arising by reason of Seller's performance of any Seller's Work; and (iii) the act or failure to act of the Master Association or committee, officer, agent or

Draft of November 13, 2003

representative thereof relating to any of the Residences or other portions of the Property when any of the Seller Indemnified Parties are in control of the board of directors of such association or constitute a majority of a committee thereof or are an officer, agent or representative thereof).

17.5    Survival; Non-Exclusive Provision.    Purchaser's obligations under Sections 17.2, 17.3 and 17.4 shall survive the termination of this Agreement and each Close of Escrow and shall not be limited by any insurance required under Section 17.1 or the Development Declaration. The provisions of Sections 17.2, 17.3 and 17.4 shall be in addition to, and not in limitation, any release, waiver and/or obligation to indemnify, protect, defend and/or hold harmless under any other agreement entered into between Purchaser and Seller or any other Seller Indemnified Parties, including any easement or license agreement.

17.6    Seller's Activities.    Seller, its representatives, agents and contractors shall (i) perform all Seller's Work on the Property in a diligent, expeditious and safe manner, (ii) not allow any dangerous or hazardous condition created by Seller or its representatives, agents or contractors to continue beyond the completion of any Seller's Work, (iii) comply with all applicable laws and governmental regulations applicable to Seller's Work, and (iv) keep the such portions of the Property as have been conveyed to Purchaser pursuant to this Agreement free and clear of all mechanics' and materialmen's liens or other liens arising out of Seller's entry on such property and the Seller's Work. Subject to Purchaser's obligations under Section 17.3, Seller shall indemnify, defend (with counsel acceptable to Purchaser in its reasonable judgment) and hold harmless Purchaser, its officers, directors, shareholders, members, managers or partners, members, managers, employees, partners, representatives, agents, successors and assigns (as used in this Section, collectively, the "Indemnified Parties") from and against all claims, liabilities, damages, losses, costs or expenses (including, without limitation, attorneys' fees) arising from or relating to the entry on the Parcels conveyed to Purchaser, by Seller, its representatives, agents or contractors, including damages resulting from the release of Hazardous Materials of the Property by Seller or its representatives, agents or contractors. Seller's obligations to indemnify, defend and hold harmless the Indemnified Parties shall survive the termination of this Agreement and each Close of Escrow.

Notwithstanding the foregoing, Seller's indemnity and defense obligations, and Seller's obligation to repair or restore any damage to any of the Parcels conveyed to Purchaser caused by Seller in connection with the Seller's Work shall not apply to any loss, liability, costs or expenses to the extent arising from or relating to the negligence or willful misconduct of Purchaser or its agents or contractors.

18.    Default and Remedies.

18.1    Purchaser's Events of Default.    The occurrence of any of the following prior or subsequent to a Close of Escrow, shall be a "Purchaser Default" hereunder:

a.    The filing of a petition or the institution of proceedings of, by, or against Purchaser or any SPE pursuant to the Bankruptcy Reform Act of 1978, as amended, or any successor statute or pursuant to any state bankruptcy, insolvency, moratoria, reorganization, or similar laws (as applicable, an "Insolvency Proceeding"), and, in the case of any involuntary proceeding, such petition or proceeding is not dismissed within 90 days; or Purchaser's or any SPE's making a general assignment for

the benefit of its creditors or the entering by Purchaser into any compromise or arrangement with its creditors generally; or Purchaser's or any SPE's becoming insolvent in the sense that Purchaser or such SPE is unable to pay its debts as they mature or in the sense that Purchaser's or such SPE's debts exceed the fair market value of Purchaser's or such SPE's assets;

      b.    The failure of Purchaser or any SPE to deliver to Seller or into Escrow, as required by this Agreement, (i) the Initial Deposit, (ii) the Second Deposit, (iii) any Map Costs or (iv) any Extension Fee;

      c.    Any of Purchaser's representations and warranties set forth in Article 15 shall be untrue in any material way; or

      d.    The failure of Purchaser or any SPE (i) to perform any material act to be performed by it, (ii) to refrain from performing any material prohibited act or (iii) to fulfill any material condition to be fulfilled by it under this Agreement or any Closing Document, or under any agreement referred to herein or attached hereto as a schedule or an exhibit, unless such failure results from the failure of one or more of Purchaser's conditions to the Close of Escrow set forth in Section 12.1 to be satisfied or waived, which failure is not cured by Purchaser or such SPE within the relevant cure period set forth below. Purchaser or the SPE shall cure any default consisting of Purchaser's or such SPE's failure to deposit any Closing Payment into Escrow within twenty (20) business days after receipt of written notice of default from Seller. Purchaser or such SPE shall cure any other curable default within thirty (30) days after receipt of written notice of default from Seller; provided, however, that if the default is not the failure to pay money and the default is of a nature that it can be cured but cannot be cured within such 30-day period, then a Purchaser Default shall not exist so long as Purchaser or such SPE, as applicable, shall commence to cure such failure within such 30-day period, and shall diligently prosecute such cure to its completion. The cure periods specified in this Section 18.1(c) shall not apply to those Purchaser Defaults specified in any other paragraph of this Section 18.1.

    18.2   Seller Defaults.  The occurrence of any of the following, prior or subsequent to the Close of Escrow, shall be a "Seller Default" hereunder:

      a.    The failure of Seller (i) to perform any material act to be performed by it under this Agreement, or (ii) to refrain from performing any material prohibited act or (iii) to fulfill any material conditions to be fulfilled by it under this Agreement, unless such failure results from the failure of one or more of Seller's conditions to the Close of Escrow set forth in Sections 12.2 or 12.4 to be satisfied or waived, which failure is not cured by Seller within the relevant cure period. Seller shall cure any default consisting of Seller's failure to make any delivery into the Escrow necessary for the Close of Escrow within twenty (20) days after receipt of written notice of default from Purchaser. Seller shall cure any other curable default within thirty (30) days after receipt of written notice from Purchaser; provided, however, that if the default is not the failure to pay money and the default is of a nature that it can be cured, but cannot be cured within such 30-day period, then a Seller Default shall not exist so long as Seller shall commence to cure such

failure within such 30-day period, and shall diligently prosecute such cure to its completion; or

b.      Any of Seller's representations and warranties set forth in Article 16 shall be untrue in any material way.

18.3    Seller's Remedies.

a.      Liquidated Damages.  IF PURCHASER OR ANY SPE FAILS TO COMPLETE THE PURCHASE OF THE PHASE I LOTS OR, AFTER EXERCISE OF AN OPTION, ANY OPTION PARCEL AS PROVIDED IN THIS AGREEMENT FOR ANY REASON OTHER THAN A SELLER DEFAULT OR THE NONFULFILLMENT OF A CONDITION TO PURCHASER'S PERFORMANCE UNDER THIS AGREEMENT, THEN SELLER SHALL BE RELEASED FROM ALL ITS OBLIGATIONS UNDER THIS AGREEMENT, THE UNEXERCISED OPTIONS SHALL TERMINATE AND SELLER, AS ITS SOLE REMEDY, SHALL BE ENTITLED TO OBTAIN AND KEEP ALL UNAPPLIED PORTIONS OF THE DEPOSITS IN ACCORDANCE WITH THIS AGREEMENT AS LIQUIDATED DAMAGES (INCLUDING, IF APPLICABLE, ANY OPTION CASH DEPOSITS OR OTHER SUMS PAID BY PURCHASER OR AN SPE TO SELLER OR ESCROW HOLDER AS ADDITIONAL EARNEST MONEY INSTALLMENTS OR AS EXTENSION FEES TO BE TREATED AS PART OF THE DEPOSITS PURSUANT TO THE TERMS OF THIS AGREEMENT OR ANY SUBSEQUENT AMENDMENT OF THIS AGREEMENT).  IN LIGHT OF THE DIFFICULTY THE PARTIES WOULD HAVE IN DETERMINING SELLER'S ACTUAL DAMAGES AS A RESULT OF SUCH A FAILURE TO PURCHASE THE PHASE I LOTS OR, AFTER EXERCISE OF AN OPTION, ANY OPTION PARCEL, THE PARTIES AGREE THAT THE AMOUNT OF THE DEPOSITS (OR, IF APPLICABLE, THE UNAPPLIED PORTION THEREOF) IS A REASONABLE ESTIMATE OF THE EXTENT TO WHICH SELLER WOULD BE DAMAGED BY PURCHASER'S OR SUCH SPE'S FAILURE TO CONSUMMATE SUCH PURCHASE. IMMEDIATELY UPON ANY SUCH FAILURE BY PURCHASER TO COMPLETE THE PURCHASE OF SUCH PARCEL, PURCHASER AND EACH SPE HEREBY AUTHORIZES ESCROW HOLDER TO PAY THE DEPOSITS TO SELLER, TO THE EXTENT NOT PREVIOUSLY DELIVERED.  IN CONSIDERATION OF SELLER RECEIVING THE LIQUIDATED DAMAGES, SELLER WILL BE DEEMED TO HAVE WAIVED ALL OF ITS CLAIMS AGAINST PURCHASER AND THE APPLICABLE SPE(S) FOR DAMAGES AND SPECIFIC PERFORMANCE OF PURCHASER'S OR SUCH SPE'S OBLIGATION TO PURCHASE THE PROPERTY (OR PROPERTY WITH RESPECT TO WHICH AN OPTION HAS BEEN EXERCISED).  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS SECTION 18.3(a), IF PURCHASER OR ANY SPE BRINGS AN ACTION AGAINST SELLER FOR AN ALLEGED BREACH OR DEFAULT BY SELLER OF ITS OBLIGATIONS UNDER THIS AGREEMENT, AND, IN CONNECTION WITH THAT ACTION, RECORDS A LIS PENDENS OR OTHERWISE ENJOINS OR RESTRICTS SELLER'S ABILITY TO SELL OR TRANSFER ANY PORTION OF THE PROPERTY NOT PREVIOUSLY CONVEYED TO PURCHASER OR AN SPE IN ACCORDANCE WITH THIS AGREEMENT ("PURCHASER'S ACTION"), SELLER SHALL NOT BE RESTRICTED BY THE PROVISIONS OF THIS SECTION 18.3(a) FROM SEEKING EXPUNGEMENT OR RELIEF FROM THAT LIS PENDENS, INJUNCTION OR OTHER RESTRAINT, AND

RECOVERING DAMAGES, COSTS OR EXPENSES (INCLUDING ATTORNEYS' FEES) WHICH SELLER MAY SUFFER OR INCUR AS A RESULT OF PURCHASER'S ACTION (PROVIDED, HOWEVER, THAT, IN SUCH CIRCUMSTANCES, SELLER SHALL HAVE NO RIGHT TO SEEK SPECIFIC PERFORMANCE OF THE OBLIGATION TO PURCHASE THE APPLICABLE PARCEL FROM PURCHASER OR SUCH SPE), AND THE AMOUNT OF ANY SUCH DAMAGES AWARDED TO SELLER SHALL NOT BE LIMITED TO THE LIQUIDATED DAMAGES SET FORTH HEREIN.   FURTHERMORE, IN NO EVENT SHALL THIS SECTION 18.3(a). HAVE ANY APPLICATION TO OR LIMIT SELLER'S RIGHTS AGAINST PURCHASER OR ANY SPE IN CONNECTION WITH ANY RIGHT OF INDEMNITY UNDER THIS AGREEMENT (INCLUDING THOSE UNDER SECTIONS 9.10, 11.6, 15.14, 15.15, 17.2, 17.3 AND 22), SECTION 24.4 (ATTORNEYS' FEES), ANY MISREPRESENTATIONS BY PURCHASER OR ANY SPE, THE PROVISIONS OF SECTION 18.4 OR ANY CONSTRUCTION LICENSE.



Purchaser: _____    Seller: _____
                   initials                        initials

b.    Post-Closing Default.  If a Purchaser Default, consisting of any of Purchaser's or an SPE's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser or such SPE, occurs after the Close of Escrow for that Parcel, Seller shall have all remedies available to it at law or in equity with respect to that Parcel, including, without limitation, any rights and remedies provided for in the Development Declaration or in Section 18.4 of this Agreement.

c.    "Fail-Safe" Option Termination.    Notwithstanding anything contained in this Agreement to the contrary, before Seller exercise its right to terminate any exercised or unexercised Option(s), Purchaser must have received written notice that Seller intends to terminate such Option(s) and Purchaser must have failed to correct or cure such default within the period of time require by Section 18.1(d); and, in such event, the date as of which the Option can be terminated or must be exercised shall be extended pending the expiration of the applicable notice or cure period under this Section.

The intent of this provision is to require that, prior to the termination of any Option, Purchaser has received notice of the applicable default, expiration or termination, notice that Seller intends to terminate one or more Options and a reasonable period (which is agreed to be the time set forth in Section 18.1(d) above) within which to prevent the termination of such Option.  This provision shall not be construed as requiring that Purchaser receive more than one notice of default or be given more than one cure period.

18.4    Right of First Refusal.  Purchaser covenants that it has not entered into this Agreement in order to sell the Parcels or any Lots therein or assign the Options to another person prior to the construction of a Residence on each Lot by Purchaser or an SPE (except in connection with a permitted assignment under Section 24.8), and Purchaser (for itself and each SPE) waives any right to make any profit from any such resale (a "Resale") except in the manner permitted in this Section.  Purchaser further acknowledges that Seller has a continuing interest in the development of the Property and the successful development of Tuscany, and in order to protect such interest of Seller, Purchaser (for itself and each SPE) covenants and agrees that

neither Purchaser nor any SPE shall resell any Parcel or Lots (except following the construction of a Residence on a Lot for which a certificate of occupancy has been issued) or assign any Option to any person or entity unless Purchaser or such SPE has complied with the right of first refusal provisions contained in this Section. Any sale or assignment not complying with the terms and conditions of this Section shall be null and void. Any Resale contract entered into by Purchaser or any SPE shall state specifically that the contract is contingent and subject to the provisions of this Section. If Purchaser or an SPE enters into a Resale contract within five (5) years from the Effective Date, then Purchaser or such SPE shall forward a copy of the contract to Seller, and Seller shall have the right, for a period of 20 days after receipt of the Resale contract, to notify Purchaser or such SPE that Seller elects to purchase the Parcel, Lots or Option which are the subject of the Resale Contract, for the purchase price provided in, and under the terms of the Resale contract. If Seller does not so notify Purchaser or such SPE within such 20-day period that Seller elects to purchase the Parcel, Lots or Option subject to the Resale contract, then Purchaser or such SPE shall have the right, for a period of 180 days following Seller's failure to so elect, to convey the Parcel, Lots or Option subject to the Resale contract upon the terms and conditions provided therein, without modification. Purchaser or the applicable SPE shall notify Seller in writing in the event the Resale contract fails to close within such 180-day period and of any modification of the Resale contract, and, after the expiration of the 180-day period, then any sale or proposed sale by Purchaser or an SPE of any Parcel, Lots or Option (including a sale pursuant to a Resale contract which has failed to close within such 180-day period or sale upon modified terms) shall again be subject to the terms of this Section 18.4. Seller's rights under this Section 18.4 will be subordinate to the rights of any bona fide lender, unaffiliated with Purchaser or an SPE, holding a deed of trust for value on those portions of the Property previously conveyed to Purchaser or such SPE. Seller reserves the right to Record (concurrently with or at any time after the Recordation of the Deed) a memorandum evidencing Seller's first refusal rights under this Section 18.4. Notwithstanding the foregoing, following the acquisition of title to the Property or any portion thereof by any purchaser at a foreclosure sale other than such lender and following the transfer of title to the Property by such lender to any unaffiliated transferee, the provisions of this Section shall again be applicable to the Property. Notwithstanding anything contained in this Section to the contrary, Seller's right of first refusal shall not apply to any portion of the Property consisting of any Lot following the sale of such Lot to a Homebuyer after the issuance of a certificate of occupancy for that Lot.

18.5  Purchaser's Remedies for Seller Closing Default. Upon the occurrence of a Seller Closing Default, Purchaser or if applicable, the purchasing SPE, at its option, shall be entitled to one of the following remedies as its sole and exclusive remedy (except as otherwise provided in Sections 18.6 and 18.7): (a) Purchaser or such SPE may treat this Agreement as being in full force and effect and pursue only the specific performance of this Agreement, or (b) Purchaser and such SPE shall have the right to terminate this Agreement with respect to the Unconveyed Property, by delivering written notice to Seller which includes a waiver of any right, title or interest of Purchaser and such SPE in the Unconveyed Property, and obtain the return of the unapplied portion of the Deposits together with Purchaser's Actual Damages. Upon a termination of this Agreement pursuant to this Section 18.5, this Agreement (other than those provisions which by their terms survive termination) shall be of no further force and effect with respect to the Unconveyed Property and in the event of such a termination prior to the Close of Escrow on the Phase I Lots, all of the Deposits shall be returned to Purchaser. In such event

Purchaser shall, (and as a condition to the payment of the Deposits to Purchaser upon a termination to the Close of Escrow on the Phase I Lots) deliver to Seller all of Purchaser's engineering plans and reports concerning the Property and the applicable Project (excluding Purchaser's confidential proformas, proprietary information, projects, internal accounting and financial information and proprietary architectural drawings) which shall become the property of Seller. Thereafter, neither party shall have any liability or obligation to or rights against the other with respect to the Unconveyed Property, except as otherwise provided in those provisions of this Agreement which expressly survive a termination hereof. Purchaser and each SPE waives any right to pursue any other remedy at law or in equity for a Seller Closing Default, including any right to seek, claim or obtain any damages, including punitive damages or consequential damages, other than Actual Damages. The term "Seller Closing Default" means that a Seller Default exists and all of the following: (i) Purchaser or the applicable SPE shall be ready, willing and able to complete the Close of Escrow with respect to a Parcel in accordance with this Agreement as of the applicable Scheduled Closing Date, (ii) Purchaser or the applicable SPE shall have delivered reasonable evidence to Seller that Purchaser or such SPE is ready, willing and able to tender the applicable Closing Payment, and (iii) notwithstanding the foregoing, Seller shall have refused or otherwise failed to complete the Close of Escrow with respect to such Parcel in accordance with this Agreement. The term "Actual Damages" shall mean Purchaser's or such SPE's actual, third-party out-of-pocket expenses (based on supporting invoices or other reasonably appropriate evidence of such expenditures), not to exceed $50,000, reasonably incurred by Purchaser or such SPE in connection with its Investigations (but excluding any such costs relating to any proformas, drawings or other materials which Purchaser is entitled to retain following a termination of this Agreement under this paragraph).

      18.6   Failure to Return the Deposits. In addition to the remedy provided in Section 18.5, Purchaser shall be entitled to receive from Seller interest, at the rate of ten percent (10%) per annum, on the Deposits or any portion thereof which is required to be returned to Purchaser in accordance with an express provision of this Agreement, and which Seller does not return within the time period required by this Agreement or, if no specific time period is mentioned, three (3) business days following the event which requires its return.

      18.7   Seller Default Following Close of Escrow. In addition to the remedy provided in Section 18.5, if a Seller Default, consisting of any of Seller's agreements to be performed after the Close of Escrow with respect to a Parcel conveyed to Purchaser, occurs after the Close of Escrow for that Parcel, Purchaser shall have all remedies available to it at law or in equity with respect to that Parcel, including those rights and remedies provided for in the Development Declaration.

      18.8   Waiver of Jury Trial. AS A MATERIAL PART OF THE CONSIDERATION UNDER THIS AGREEMENT, PURCHASER (AND EACH SPE) AND SELLER EACH WAIVES ALL RIGHTS TO TRIAL BY JURY IF LITIGATION ARISES IN CONNECTION WITH THIS AGREEMENT.

      19.   Risk of Loss. All risk of loss concerning a Parcel shall be borne by Seller only until the Closing Date for that Parcel. In the event of damage or destruction of all or a material part of a Parcel prior to the Closing Date for that Parcel, without the fault of the Purchaser, Seller shall immediately give Purchaser written notice of the damage. Within 20 days after delivery of

the notice, Purchaser shall elect, by delivering to Seller a written notice, either: (i) to terminate this Agreement with respect to the Unconveyed Property, in which event Purchaser and Seller shall share equally all Escrow costs and the unapplied portions of the Deposits, less Purchaser's share of any Cancellation Charges, shall be returned to Purchaser, or (ii) to proceed with the purchase and/or continued optioning of the Parcel and consummate this Agreement in accordance with its terms. Purchaser's failure to deliver to Seller notice of its election within the 20-day period shall be deemed Purchaser's election to terminate. If Purchaser elects option (ii), Seller shall, at the applicable Close of Escrow, assign to Purchaser Seller's right, if any, to receive any insurance proceeds payable in connection with such damage or destruction to the affected Parcel.

20.  Condemnation.  If all or part of a Parcel, or any significant interest therein, is taken before the Closing Date for that Parcel as a result of the condemnation (including the filing of any notice of intended condemnation or proceedings in the nature of eminent domain, or negotiations, offers or agreements prior to or in lieu of condemnation or eminent domain proceedings), Seller shall immediately give Purchaser notice of the taking. Within 20 days after Seller delivers the notice, Purchaser shall elect, by delivering to Seller a written notice, either (i) to terminate this Agreement with respect to such Parcel and all Unconveyed Property and terminate all unexercised Options with respect thereto, in which event Purchaser and Seller shall share equally in all Escrow costs and the unapplied portions of the Deposits applicable to the Unconveyed Property which is to be excluded from this Agreement, less Purchaser's Share of any Cancellation Charges, shall be returned to Purchaser, or (ii) to proceed with the purchase and continued optioning of the affected Parcels and consummate this Agreement in accordance with its terms. Purchaser's failure to deliver to Seller notice of its election within the 20-day period shall be deemed Purchaser's election to terminate. If Purchaser elects option (ii), Seller shall, at the Close of Escrow, assign to Purchaser all Seller's right, if any, to receive any portion of any condemnation award with respect to the affected Parcels.

21.  Confidentiality.  The parties hereby covenant to keep confidential all writings, materials  and other information related to this transaction, other than information that: (i) becomes generally available to the public or others as a result of a disclosures by Seller; (ii) was available to Purchaser on a non-confidential basis from a source other than Seller, prior to Purchaser's receipt in connection with this Agreement (provided such information is not subject to another confidentiality agreement with another obligation of secrecy to Seller or another party); (iii) becomes available to Purchaser on a non-confidential basis from sources other than Seller, provided that such source is not prohibited from transmitting the information to Purchaser by a contractual, legal or fiduciary obligation  (collectively, the "Confidential Information"), except that the parties may disclose such Confidential Information to their respective consultants, attorneys, advisors, lenders and employees as may be reasonably necessary in order to evaluate and consummate this transaction.

22.  Brokerage Commissions.  Each party warrants and represents to the other that no broker, finder or other intermediary hired or employed by it is entitled to a commission, finder's fee or other compensation based upon the transaction contemplated hereby and each party (the "Indemnitor") shall protect, defend, indemnify and hold harmless the other party from and against any and all liens, demands, liabilities, causes of action, judgments, costs, claims, damages, suits, losses and expenses, or any combination thereof, including attorneys' fees, of any

nature, kind or description, caused by or arising out of the claim of any broker, finder or other intermediary alleging to have been employed or hired by the Indemnitor, to a commission, finder's fee or other compensation based upon the transactions contemplated hereby..

23.    Trademarks.    Purchaser acknowledges that Seller has the prior right to the Tuscany tradenames, trademarks, servicemarks and logos (collectively, the "Marks"). Purchaser warrants that it shall not use, nor permit others to use, in any manner whatsoever the Marks or the name Tuscany without the prior written consent of Seller.  Purchaser shall be entitled (without payment of a royalty) to and, in such event agrees to refer to, each of the Projects as a part of Tuscany in accordance with the marketing and advertising guidelines developed by Seller. Further, Purchaser acknowledges and agrees that Purchaser shall acquire no rights in Marks except to use the Marks in connection with the Projects and in accordance with this Agreement.

24.    Miscellaneous.

24.1    Notices.    All notices, requests and other communications provided for hereunder shall be in writing (including, unless the context expressly otherwise provides, by facsimile transmission, provided that any matter transmitted by facsimile shall be immediately confirmed by a telephone call to the recipient at the number specified herein) and mailed, (by certified mail, return receipt requested) faxed or delivered, to the following addresses or facsimile numbers:

| | |
|---|---|
| If to Seller: | Commerce Associates, LLC<br>2920 North Green Valley Parkway,<br>Suite 114<br>Henderson, Nevada  89014<br>Attention: Bob Unger<br>Telephone:  (702) 456-5210<br>Telecopy:  (702) 456-8744 |
| and: | Jones Vargas<br>3773 Howard Hughes Parkway<br>Third Floor South<br>Las Vegas, Nevada 89109<br>Attention:  Michael E. Buckley, Esq.<br>Telephone: (702) 862-3300<br>Telecopy:  (702) 734-2722 |
| If to Purchaser: | Rhodes Homes<br>4730 S. Fort Apache Road<br>Suite 300<br>Las Vegas, Nevada 89147<br>Attention: James M. Rhodes, President<br>Telephone: (702) 873-5338<br>Telecopy: (702) 873-5129 |

<u>With a copy to:</u>       Rhodes Homes
                              4730 S. Fort Apache Road
                              Suite 300
                              Las Vegas, Nevada 89147
                              Telephone: (702) 873-5338
                              Telecopy: (702) 873-5129

If to Escrow <u>Holder</u>:     United Title of Nevada
                              3980 Howard Hughes Parkway
                              Las Vegas, Nevada 89109
                              Attention: James Bennett
                              Telephone: (702) 836-8000
                              Telecopy:  (702) 836-8180

or to such other address or number as shall be designated by such person in a written notice to the other party given in the manner required hereunder.

All such notices, requests and communications shall, if transmitted by overnight delivery, be effective when delivered for overnight (next day) delivery on the next business day; or, if transmitted in legible form by facsimile machine on or before 5:00 p.m. (at the recipient's location) on a business day, on such day, otherwise the next business day; or if mailed, upon receipt or the first refusal to accept such notice, request or other communication, the third business day after the date deposited into the U.S. mail, certified mail, return receipt requested; or if delivered, upon delivery.

24.2   <u>Time of the Essence</u>.  Time is of the essence of this Agreement and each and every term and provision hereof, including the schedules and exhibits attached hereto.

24.3   <u>Interpretation; Governing Law</u>.  This Agreement shall be construed as if prepared by both parties.  This Agreement shall be construed, interpreted and governed by the laws of the State of Nevada.

24.4   <u>Attorneys' Fees</u>.  If any legal action or any other proceeding, including arbitration or an action for declaratory relief (including an action or proceeding between the parties while either is a debtor in a proceeding under the Bankruptcy Code or any successor statute to the Bankruptcy Code and including appellate proceedings), is brought to enforce this Agreement or because of a dispute, breach, default, or misrepresentation in connection with this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees and other costs incurred in that action or proceeding, in addition to any other relief to which that party may be entitled.  Prevailing party shall include without limitation (a) a party who dismisses an action in exchange for sums allegedly due; (b) the party that receives performance from the other party alleged to have breached a covenant or that receives a desired remedy, where these things are substantially equal to the relief sought in an action; or (c) the party determined to be the prevailing party by a court of law.  In addition, and without limiting the foregoing, Seller shall be entitled to recover its reasonable attorneys' fees and other costs incurred in connection with any action or proceeding involving the Options, including attorneys' fees incurred by Seller to monitor such proceedings.

Draft of November 13, 2003                                                      54

24.5    Further Assurances; Survival. Each party will, whenever and as often as it shall be requested to do so by the other party, execute, acknowledge and deliver, in Recordable form, if appropriate, or cause to be executed, acknowledged and delivered, any and all such further conveyances, assignments, approvals, consents and any and all other documents and do any and all other acts as may be necessary to carry out the intent and purpose of this Agreement. All covenants and obligations contained in this Agreement which imply or require performance after a Close of Escrow and all representations and warranties of the parties contained in this Agreement shall survive such Close of Escrow, subject to any specified period of limitation contained herein, and provided, further, that, subject to Section 16.2(e), the representations and warranties contained in Articles 15 and 16 shall survive with respect to each Parcel for a period of three (3) years from the Close of Escrow on such Parcel.

24.6    Entire Agreement; Amendments. This Agreement, together with the other written agreements referred to herein, is intended by the parties to be the final expression of their agreement with respect to the subject matter hereof, and is intended as the complete and exclusive statement of the terms of the agreement between the parties. As such, this Agreement supersedes any and all prior understandings between the parties, whether oral or written, including any letters of intent. Any amendments to this Agreement shall be in writing and shall be signed by both parties hereto, and, in such event, all references herein to "this Agreement" shall be to this Agreement as modified. References to the term "this Agreement" include all schedules and exhibits attached hereto.

24.7    Waivers. No waiver of any covenant, condition or other provision of this Agreement shall be implied, but shall only be effected by a writing, signed by the person entitled to the benefit of the covenant, condition or other provision, specifically waiving the covenant, condition or other provision. A waiver by either party hereto of a breach of any of the covenants or agreements hereof to be performed by the other party shall not be construed as a waiver of any succeeding breach of the same or other covenants, agreements, restrictions or conditions hereof.

24.8    No Assignment. Except as provided below in this Section 24.8, neither party may assign any of its rights or delegate any of its obligations hereunder without the prior written consent of the other party, which consent may be granted or withheld in such party's reasonable discretion and any purported assignment in violation of this provision shall be void. Notwithstanding the foregoing, the parties acknowledge and agree that:

a.    Seller shall have the right, upon written notice to Purchaser and Escrow Holder, to assign its rights hereunder to (i) a business entity in which Seller, or any of Seller's members, has an ownership interest, or (ii) to an affiliate of Seller or any of Seller's members, provided that such assignee agrees in writing to assume and be bound by the provisions of this Agreement in which event Seller shall have no further liability hereunder and, in such event, all references to "Seller" herein shall refer to such successor entity or affiliate. Notwithstanding the foregoing, such assignment shall not be effective unless and until Seller provides evidence reasonably satisfactory to Purchaser that the financial condition of the assignee is comparable or better than that of the Seller and there exists a continuity of management.

b.       Purchaser shall have the right upon written notice to Purchaser and Escrow Holder, to designate an SPE, as provided in Section 1.4, or to designate as a nominee to take title to a Parcel (i) an entity owned and controlled by Purchaser; (ii) an unrelated entity if such entity's ownership of the interest herein or in the Property is solely to provide financing for Purchaser's acquisition, development and/or construction of the Property and Project or (iii) a joint venture or partnership in which Purchaser is the managing partner or venture member, provided that, in all such instances, (A) the Project continues to be developed as a "Rhodes Homes" project; (B) the assignee assumes the obligations of Purchaser hereunder and under any Ancillary Documents pursuant to a written assumption agreement in form and substance satisfactory to Seller and (C) no such assignment shall release Purchaser from its obligations hereunder.  Purchaser may not assign the Options without first obtaining Seller's prior written consent which Purchaser may grant or withhold in its sole and absolute discretion.

24.9    Binding Effect. Subject to Section 24.8, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns.  Where applicable, references herein to the term "Purchaser" shall include any and all applicable SPEs.

24.10   Headings; Attachments; Cross References.   The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement.  All exhibits and schedules attached to this Agreement and the Recitals at the front of this Agreement are incorporated herein by the references thereto contained herein.  Unless the context otherwise requires a different meaning, the term, "Agreement" includes all Exhibits, schedules and attachments hereto.  Any term used in an exhibit or schedule hereto shall have the same meaning as in this Agreement unless otherwise defined in such exhibit or schedule.  All references in this Agreement to subsections, sections, exhibits or schedules shall be to subsections, sections, exhibits and schedules of or to this Agreement, unless otherwise specified.

24.11   Performance of Acts on Business Days.  Unless specifically stated to the contrary, all references to days herein shall be deemed to refer to calendar days.  If the final date for payment of any amount or performance of any act hereunder falls on a Saturday, Sunday or federal or state of Nevada holiday, such payment may be made or act performed on the next succeeding business day.

24.12   Backup Withholding.  If any regulations proposed or promulgated by the Internal Revenue Service subject the transactions contemplated hereunder to backup withholding (which would require Purchaser to withhold a portion of any Parcel Price from Seller), then Seller will provide Purchaser with the necessary declaration in order to exempt such transactions from backup withholding.

24.13   No Third Party Beneficiaries.  This Agreement is solely for the benefit of Seller and Purchaser and their respective permitted assigns and is not intended and shall not be construed as conferring any benefit on any third party or the general public.

24.14   No Recording; Quitclaim; Releases.   This Agreement shall not be recorded; however the Memorandum of Agreement and Amendment to Memorandum shall be

recorded as provided above. If this Agreement shall expire or terminate and Purchaser shall not have acquired the Phase I Lots pursuant hereto or upon the expiration or termination of any Option, Purchaser shall execute, acknowledge and deliver to Seller a recordable quitclaim deed to the Property or the Unconveyed Property, as applicable, or any other instrument reasonably requested by Seller for the release of the Memorandum of Agreement or Amendment to Memorandum, as applicable, and otherwise indicating the termination of Purchaser's applicable rights hereunder and with respect to the Property or Unconveyed Property. As a condition to Seller or Escrow Holder's obligation to return any portion of the Deposits to Purchaser, Purchaser shall execute and deliver to Seller, in Recordable form, any and all instruments necessary to terminate Purchaser's interest in any Unconveyed Property.

24.15 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. Delivery of this Agreement may be accomplished by facsimile transmission of this Agreement. In such event, the parties hereto shall promptly thereafter deliver to each other executed counterpart originals of this Agreement.

25. <u>Certain Definitions</u>. As used in this Agreement and in any exhibit, schedule or attachment attached hereto, the following terms shall have the meanings set forth below.

25.1 "<u>Agreed Rate</u>" shall mean a per annum interest rate equal to the sum of (i) the "prime rate" as set forth from time to time in the "Money Rates" section of *The Wall Street Journal* (or the highest of such rates if more than one) plus (ii) two percent (2%). Changes in the "prime rate" shall be effective as of the date of such change, and interest shall be calculated on the basis of a 365 day year and actual days.

25.2 "<u>Effective Date</u>" shall mean the date as of which this Agreement is fully executed by Seller and Purchaser (the date as of which the last of the parties has executed this Agreement, as set forth opposite their respective signatures below).

25.3 "<u>Force Majeure Delays</u>" shall mean delays caused by occurrences beyond the reasonable control and without the fault, negligence or financial inability of a party hereto or its contractors, including strikes, labor disputes, material shortages, fire, earthquake, floods and other acts of God, inclement weather, enemy invasion, wars, insurrection, sabotage, terrorism, laws, orders or actions of governmental, civil or military authorities, governmental restrictions, delays in processing by governmental agencies or utilities (including delays caused by Nevada Power Company in reviewing and approving the electrical plans for the Property), riot, civil commotion judicial or administrative proceedings commenced and maintained by persons not parties to this Agreement and unavoidable casualty. If the performance of an obligation hereunder or under any other agreement or declaration, other than the payment of money, is expressly subject to the effect of Force Majeure Delay, then, unless otherwise provided herein or in such other agreement or declaration to the contrary, the effect of a Force Majeure Delay shall be to extend the time for performance of such obligation for the reasonable period of such Force Majeure Delay, but in no event greater than the period of the Force Majeure Delay.

25.4 "<u>Record</u>", "<u>Recorded</u>" and "<u>Recordation</u>" shall mean, with respect to any document, the recordation of such document in the Office of the County Recorder of Clark

County, Nevada ("Recorder"). "Recordable" means the requirement that a document meet the statutory and/or other legal requirements for Recordation.

25.5    "Substantially Complete" (or any variation thereof) shall mean, with respect to any improvement or work to be constructed or installed, that such improvement or work is sufficiently complete so that it may be lawfully used for the purpose for which it is intended and no permit which requires completion of such improvement or work, is being withheld or delayed solely on the basis that such improvement or work is not deemed complete.

25.6    Miscellaneous Terms.    The term "or" is disjunctive; the term "and" is conjunctive.    The term "shall" is mandatory; the term "may" is permissive.    Masculine terms also apply to females; feminine terms also apply to males.    The term "including" is by way of example and not limitation.    Defined terms may used in the singular or plural.

26.    Mediation and Arbitration.

26.1    Mediation.    The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement (a "Dispute").    Either party may initiate negotiations by providing written notice in letter form to the other party, setting forth the subject of the Dispute and the relief requested.    The recipient of such notice will respond in writing within seven (7) business days with a statement of its position on and recommended solution to the Dispute.    If the Dispute is not resolved by this exchange of correspondence, then representatives of each party with full settlement authority will meet at a mutually agreeable time and place within fifteen (15) business days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the Dispute.    If the Dispute is not resolved by these negotiations, the matter will be submitted to J.A.M.S./Endispute ("JAMS"), or its successor, for mediation.    The mediation shall take place at a location chosen by the mediator in the County of Clark, State of Nevada.    Any information provided to the mediator shall be concurrently supplied to the parties involved in the mediation and the parties shall be given an opportunity to comment to the mediator on the information.    Each party shall present the mediator and each other party with a written statement of the party's position and all copies of supporting documentation, at least two (2) business days prior to the mediation.    Each party shall have an opportunity to orally present its position to the mediator and the other party.    The rules of evidence in NRS 47.020 through NRS 56.020 shall not apply, provided that this shall not be deemed to constitute a waiver of the right to assert any privilege defined in NRS Chapter 49.    Each party agrees to designate one or more representatives, having authority to bind that party, who will participate in the mediation process including attending all mediation hearings.    If the mediation results in a mutually acceptable resolution of all or some of the matters in Dispute, then the parties shall memorialize such resolution in a settlement agreement.    Each party shall bear its own costs incurred in connection with the mediation.    The costs of the mediator shall be shared equally between the parties regardless of the outcome.

26.2    Arbitration.    The parties agree that any and all Disputes solely between them that are not resolved through the provisions of Section 26.1 of this Agreement, shall be submitted to JAMS, or its successor, for final and binding arbitration with the arbitration to occur in the County of Clark, State of Nevada.    In instances wherein a complete resolution of the Dispute necessarily requires the participation of a third-party as a party to the arbitration, the

failure of the affected third-party to agree to participate in an arbitration as a party pursuant to the provisions of this Section shall be deemed to excuse any party from being bound by the provisions of this Section and, in such latter instance or instances, notwithstanding the existence of Section 26.2 of this Agreement, such a Dispute shall be finally resolved in a court of competent jurisdiction in Clark County, Nevada.

Either party may initiate JAMS arbitration, in the manner prescribed in the JAMS Comprehensive Arbitration Rules & Procedures in effect as of the date the demand for arbitration is first made (the "JAMS Rules"), at any time following the first JAMS mediation session, or 45 days after filing the written request for Mediation, whichever first occurs. If the parties agree, the mediation initiated under Section 26.1 of this Agreement may continue after the commencement of arbitration, however, the mediator cannot also be appointed arbitrator without the agreement of all of the parties to both proceedings.

With the exceptions specifically outlined below, the arbitration shall be governed under the provisions of the JAMS Rules, provided, however, that notwithstanding anything to the contrary in the JAMS Rules, no punitive or consequential damages may be awarded in the arbitration.

The successful party to the arbitration shall be entitled to an award of reasonable attorneys fees under NRS 38.238 along with the Actual Costs of the proceeding. As used herein, the term "Actual Costs" is not limited to the costs defined in NRS 38.238 but shall also include any and all actual costs of the arbitration, including but not limited to the fees paid for the use of the JAMS Arbitration proceeding, facilities, and arbitrators, provided, however, that the initial costs of the arbitration shall be borne equally by the parties to the arbitration, pending the determination of which party is the successful party.

Subject to the provisions of NRS 38.237, 38.241 and 38.242, the determination of the arbitration, as represented in the award, shall be finding and binding. The successful party may seek confirmation of the award pursuant to NRS 28.239 and a judgment on the award pursuant to NRS 38.243. Any disagreement as to whether a particular Dispute is encompassed within the provisions of Section 22.2 of this Agreement shall be finally determined in accordance with the provisions of NRS 38.206 - 38.248, with all such proceedings to be brought in a competent jurisdiction located within Clark County, Nevada.

26.3   Survival.   The provisions of this Article 26 shall survive each Close of Escrow and the termination of this Agreement.

27.   Not an Offer.   Seller's delivery of unsigned copies of this Agreement is solely for the purpose of review by the party to whom delivered, and neither the delivery nor any prior communications between the parties, whether oral or written, shall in any way be construed as an offer by Seller, nor in any way imply that Seller is under any obligation to enter the transaction which is the subject of this Agreement. The signing of this Agreement by Purchaser constitutes an offer which shall not be deemed accepted by Seller unless and until Seller has signed this Agreement and delivered a duplicate original to Purchaser.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date set forth beneath their respective signatures below.

**COMMERCE ASSOCIATES, LLC, a**
**Nevada limited liability company**

By: _Tom Gonzales_ (signature)

Print Name: _Tom Gonzales_

Title: _____

Dated: _11/17/03_

**RHODES DESIGN AND DEVELOPMENT**
**CORPORATION, a Nevada corporation**

By: _(signature)_

Print Name: _James M. Rhodes_

Title: _Pres._

Dated: _11-14-03_

## RECEIPT AND AGREEMENT

ESCROW HOLDER hereby acknowledges receipt of the foregoing escrow instructions and agrees to act as Escrow Holder in accordance with the terms and conditions thereof.

Escrow Holder further acknowledges receipt from Purchaser of the Initial Deposit in the amount of $2,500,000.

Dated this _____ day of November, 2003.

**United Title of Nevada**

By:_____

Print Name:_____

Title:_____

Escrow Number:_____

## EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

## (Recital B)

[Insert legal descriptions of 17 parcels constituting the Property.]

**EXHIBITS A-1 through A-7**

**PROPOSED MAPS**

**(Recital B)**

[Attach proposed subdivision maps for each Residential Development Parcel. Each subdivision map may also reflect a phasing order, i.e., the order in which Lots will be taken down and developed.]

# EXHIBIT "B"

First American Title

APN:   160-32-101-003 (a portion)
       160-32-210-003 (a portion)
       160-32-801-006 (a portion)
       160-32-210-004

RECORDING REQUESTED BY, AND
WHEN RECORDED RETURN TO:

Rhodes Design and Development Corporation
4730 S. Fort Apache Road, Suite 300
Las Vegas, NV 89147
Attn: Keith Mosley



20050728-0004296

Fee: $129.00
N/C Fee:  $25.00

07/28/2005                14:05:38
T20050136980
Requestor:
    CHICAGO TITLE
Frances Deane                SOL
Clark County Recorder    Pgs: 116

# MASTER DECLARATION OF COVENANTS, CONDITIONS, AND RESTRICTIONS

## AND RESERVATION OF EASEMENTS

### FOR

### TUSCANY RESIDENTIAL COMMUNITY

First American Title

First American Title

## TABLE OF CONTENTS

*PART ONE:  INTRODUCTION TO THE COMMUNITY*
Article 1. Creation of the Community................................................................................1
    1.1    Introduction.................................................................................................1
    1.2    Purpose and Intent. ....................................................................................1
    1.3    Master Association. ....................................................................................2
    1.4    The Act. .....................................................................................................2
    1.5    Governing Documents.................................................................................2
Article 2. Concepts and Definitions ..................................................................................3
    2.1    "Act"..........................................................................................................3
    2.2    "Apartment"...............................................................................................3
    2.3    "Area of Common Responsibility" .............................................................3
    2.4    "Articles" ...................................................................................................3
    2.5    "Assessment" .............................................................................................3
    2.6    "Base Assessment" ....................................................................................3
    2.7    "Board of Directors" or "Board" ................................................................3
    2.8    "Builder" ....................................................................................................3
    2.9    "Bylaws" ....................................................................................................3
    2.10    "City" .........................................................................................................3
    2.11    "Commercial Components" ........................................................................3
    2.12    "Commercial Component Owners" ............................................................4
    2.13    "Common Elements" ..................................................................................4
    2.14    "Common Expenses" ..................................................................................4
    2.15    "Community-Wide Standard" .....................................................................4
    2.16    "County" ....................................................................................................5
    2.17    "Custom Lots" ...........................................................................................5
    2.18    "Declarant" ................................................................................................5
    2.19    "Declarant Advance" .................................................................................5
    2.20    "Declarant Control Period" ........................................................................5
    2.21    "Declarant Rights Period" .........................................................................5
    2.22    "Design Guidelines" ..................................................................................5
    2.23    "Director" ...................................................................................................6
    2.24    "DRC"........................................................................................................6
    2.25    "Dwelling" .................................................................................................6
    2.26    "Family".....................................................................................................6
    2.27    "Golf Course" ............................................................................................6
    2.28    "Governing Documents".............................................................................6
    2.29    "Improvement"...........................................................................................6
    2.30    "Invitees" ...................................................................................................6
    2.31    "Lot" ..........................................................................................................6
    2.32    "Manager"..................................................................................................7
    2.33    "Master Association" ..................................................................................7
    2.34    "Master Developer" ...................................................................................7
    2.35    "Master Plan" ............................................................................................7
    2.36    "Maximum Number of Lots" .....................................................................7
    2.37    "Member"...................................................................................................7
    2.38    "Mortgage".................................................................................................7
    2.39    "Multi-Family Lot" ....................................................................................7

i

First American Title

2.40   "Neighborhood" .................................................................................................7
2.41   "Neighborhood Assessments" ...........................................................................8
2.42   "Neighborhood Association" .............................................................................8
2.43   "Neighborhood Common Elements" ..................................................................8
2.44   "Neighborhood Expenses" ................................................................................8
2.45   "Notice and Hearing" .......................................................................................8
2.46   "Officer" ............................................................................................................8
2.47   "Owner" .............................................................................................................8
2.48   "Person" .............................................................................................................8
2.49   "Plat" .................................................................................................................8
2.50   "Private Amenities" ..........................................................................................8
2.51   "Private Streets" ...............................................................................................9
2.52   "Property" ..........................................................................................................9
2.53   "Purchaser" ........................................................................................................9
2.54   "Record," "Recording," "Recordation," or "Recorded" ....................................9
2.55   "Requisite Membership Percentage" .................................................................9
2.56   "Requisite Neighborhood Percentage" ..............................................................9
2.57   "Resident" ..........................................................................................................9
2.58   "Residential Lot" ...............................................................................................9
2.59   "Rules and Regulations" ....................................................................................10
2.60   "Special Assessment" ........................................................................................10
2.61   "Specific Assessment" .......................................................................................10
2.62   "Subsidy Agreement" ........................................................................................10
2.63   "Supplemental Declaration" ..............................................................................10
2.64   "Tuscany" ...........................................................................................................10
2.65   "Tuscany Residential Community" ....................................................................10
2.66   Additional Defined Terms .................................................................................10
**PART TWO:  CREATION AND MAINTENANCE OF COMMUNITY STANDARDS**
Article 3. Use and Conduct ..........................................................................................12
3.1    Framework for Regulation .................................................................................12
3.2    Rule Making Authority ......................................................................................12
3.3    Owners' Acknowledgment and Notice to Purchasers .......................................13
3.4    Protection of Owners and Others .......................................................................13
3.5    Use Restrictions .................................................................................................14
Article 4. Architecture and Landscaping ......................................................................22
4.1    General ...............................................................................................................22
4.2    Architectural Review ..........................................................................................23
4.3    Guidelines and Procedures .................................................................................24
4.4    No Waiver of Future Approvals .........................................................................25
4.5    Variances ............................................................................................................26
4.6    Limitation of Liability .......................................................................................26
4.7    Certificate of Compliance ..................................................................................27
4.8    Cure of Nonconforming Work; Enforcement ....................................................27
Article 5. Maintenance and Repair ...............................................................................28
5.1    Maintenance of Lots and Private Amenities......................................................28
5.2    Maintenance of Neighborhood Property ............................................................28
5.3    Responsibility for Repair and Replacement. .....................................................28
**PART THREE:  COMMUNITY GOVERNANCE AND ADMINISTRATION**
Article 6. The Master Association and its Members ......................................................29

ii

First American Title

First American Title

| | | | |
|---|---|---|---|
| 6.1 | Function of The Master Association. | | 29 |
| 6.2 | Membership. | | 29 |
| 6.3 | Membership Classes and Voting Rights. | | 29 |
| 6.4 | Neighborhoods. | | 30 |
| 6.5 | Declarant Reservation of Right to Notice and Participate. | | 31 |
| Article 7. Master Association Powers and Responsibilities. | | | 31 |
| 7.1 | Acceptance and Control of The Master Association Property. | | 31 |
| 7.2 | Maintenance of Area of Common Responsibility. | | 32 |
| 7.3 | Insurance. | | 33 |
| 7.4 | Compliance and Enforcement. | | 36 |
| 7.5 | Implied Rights; Board Authority. | | 38 |
| 7.6 | Indemnification of Officers, Directors and Others. | | 38 |
| 7.7 | Security. | | 39 |
| 7.8 | Powers of the Master Association Relating to Sub-Associations. | | 39 |
| 7.9 | Provision of Services. | | 39 |
| 7.10 | Relations with Other Property; Entities. | | 40 |
| 7.11 | Facilities and Services Open to the Public. | | 40 |
| Article 8. Master Association Finances. | | | 41 |
| 8.1 | Budgeting and Allocating Common Expenses. | | 41 |
| 8.2 | Budgeting and Allocating Neighborhood Expenses. | | 41 |
| 8.3 | Budgeting for Reserves. | | 42 |
| 8.4 | Special Assessments. | | 42 |
| 8.5 | Specific Assessments. | | 43 |
| 8.6 | Authority To Assess Owners; Time of Payment. | | 43 |
| 8.7 | Personal Obligation for Assessments. | | 44 |
| 8.8 | Lien for Assessments. | | 45 |
| 8.9 | Exempt Property. | | 46 |
| 8.10 | Capitalization of Master Association. | | 46 |
| 8.11 | Subsidy Agreements and Declarant Advances. | | 46 |
| **PART FOUR:  COMMUNITY DEVELOPMENT** | | | |
| Article 9. Expansion of the Community. | | | 47 |
| 9.1 | Expansion by Declarant. | | 47 |
| 9.2 | Expansion by the Master Association. | | 48 |
| 9.3 | Additional Covenants and Easements. | | 49 |
| 9.4 | Effect of Filing Supplemental Declaration. | | 49 |
| Article 10. Additional Rights Reserved to Declarant. | | | 49 |
| 10.1 | Withdrawal of Property. | | 49 |
| 10.2 | Marketing and Sales Activities. | | 49 |
| 10.3 | Right To Develop. | | 49 |
| 10.4 | Right To Approve Additional Covenants. | | 50 |
| 10.5 | Right To Approve Changes in Standards. | | 50 |
| 10.6 | Right To Merge or Consolidate the Master Association. | | 50 |
| 10.7 | Right To Appoint and Remove Directors During Declarant Control Period. | | 50 |
| 10.8 | Right To Designate Sites for Governmental and Public Interests. | | 50 |
| 10.9 | Right To Transfer or Assign Declarant Rights. | | 50 |
| 10.10 | Easement to Inspect and Right to Correct. | | 51 |
| 10.11 | Exclusive Rights To Use Name of Development. | | 51 |
| 10.12 | Reservation of Rights Relating to Provision for Telephone/Cable Services. | | 51 |
| 10.13 | Equal Treatment. | | 52 |

iii

First American Title

First American Title

10.14   Other Rights..................................................................................52
10.15   Exemption of Declarant..................................................................53
10.16   Termination of Rights....................................................................53
**PART FIVE: PROPERTY RIGHTS WITHIN THE COMMUNITY**
Article 11. Easements .............................................................................53
11.1    Easements in the Common Elements..............................................53
11.2    Easements of Encroachment..........................................................55
11.3    Easements for Utilities, Etc. .........................................................55
11.4    Easements To Serve Additional Property.......................................56
11.5    Easements for Maintenance, Emergency and Enforcement...............56
11.6    Easements for Private Amenities....................................................56
11.7    Easement for Special Events..........................................................56
11.8    Easements for Lake and Pond Maintenance and Flood Water. .........56
11.9    Easements for Cross-Drainage.......................................................57
11.10   Rights to Stormwater Runoff, Effluent and Water Reclamation. ......57
11.11   Easements for Parking; Easements for Vehicular and Pedestrian Traffic. ...57
11.12   Easements for Public Service Use..................................................58
Article 12. Custom Lots .........................................................................58
12.1    General; Supplemental Declaration.................................................58
12.2    Additional Design Guidelines........................................................58
Article 13. Neighborhood Common Elements.............................................58
13.1    Purpose......................................................................................58
13.2    Designation.................................................................................59
13.3    Use by Others..............................................................................59
Article 14. Party Walls and Other Shared Structures...................................59
14.1    General Rules of Law to Apply......................................................59
14.2    Maintenance; Damage and Destruction...........................................59
14.3    Right to Contribution Runs With Land............................................60
14.4    Disputes.....................................................................................60
Article 15. Private Amenities...................................................................60
15.1    General.......................................................................................60
15.2    Conveyance of Private Amenities...................................................60
15.3    View Impairment.........................................................................61
15.4    Cost Sharing...............................................................................61
15.5    Rights of Access and Parking........................................................61
15.6    Additional Golf Course Easements.................................................62
15.7    Limitations on Amendments..........................................................63
15.8    Jurisdiction and Cooperation.........................................................63
**PART SIX:  RELATIONSHIPS WITHIN AND OUTSIDE THE COMMUNITY**
Article 16. Dispute Resolution and Limitation on Litigation.........................63
16.1    Consensus for Master Association Litigation...................................63
16.2    Alternative Method for Resolving Disputes.....................................64
16.3    Claims.......................................................................................64
16.4    Mandatory Procedures..................................................................65
16.5    Declarant's Right to Repair...........................................................66
16.6    Arbitration..................................................................................66
16.7    Allocation of Costs of Resolving Claims.........................................67
16.8    Enforcement of Resolution............................................................67
16.9    Attorneys' Fees............................................................................67

iv

First American Title

Article 17. Mortgagee Provisions ........................................................................................67
  17.1  Notices of Action. ...........................................................................................67
  17.2  No Priority. .....................................................................................................68
  17.3  Notice to Master Association. ..........................................................................68
  17.4  Failure of Mortgagee To Respond. ..................................................................68
Article 18. Commercial Components ....................................................................................68
  18.1  General; Disclaimers. ......................................................................................68
  18.2  Conveyance of Commercial Components. .......................................................69
  18.3  View Impairment. ...........................................................................................69
  18.4  Rights of Access and Parking. .........................................................................69
  18.5  Payments of Reasonable Amounts by Commercial Components. ......................69
  18.6  Architectural Control. .....................................................................................70
  18.7  Further Limitations on Amendments. ..............................................................70
  18.8  Jurisdiction and Cooperation. .........................................................................70
***PART SEVEN:  CHANGES IN THE COMMUNITY***
Article 19. Changes in Ownership of Lots. ...........................................................................71
  19.1  Notice to Master Association. ..........................................................................71
  19.2  Imposition and Collection of Transfer Fees. ....................................................71
Article 20. Changes in the Common Elements .....................................................................73
  20.1  Condemnation. ................................................................................................73
  20.2  Partition. .........................................................................................................73
  20.3  Transfer or Dedication of the Common Elements. ...........................................73
Article 21. Amendment of Declaration .................................................................................73
  21.1  By Declarant. ..................................................................................................73
  21.2  By Members. ...................................................................................................74
  21.3  Additional Consent Requirements. ..................................................................74
  21.4  Validity, Effective Date, and Conflicts. ...........................................................74
  21.5  Exhibits. .........................................................................................................75
***PART EIGHT:  ADDITIONAL PROVISIONS***
Article 22. Additional Disclosures, Disclaimers and Releases ..............................................75
  22.1  General Disclosures and Disclaimers Regarding Private Amenities. .................75
  22.2  Additional Disclosures and Disclaimers Regarding Private Amenities. .............75
  22.3  Disclosures and Disclaimers of Certain Other Matters. ....................................77
  22.4  Releases. .........................................................................................................84
Article 23. General Provisions .............................................................................................84
  23.1  No Public Right or Dedication. ........................................................................84
  23.2  Compliance with the Act. ................................................................................84
  23.3  No Representations or Warranties. ...................................................................84
  23.4  Invalidity. .......................................................................................................85
  23.5  Constructive Notice and Acceptance. ..............................................................85
  23.6  Binding Effect. ................................................................................................85

v

First American Title

First American Title

EXHIBIT "A"    - Land Initially Submitted
EXHIBIT "B"    - Land Constituting a Portion of the Initial Common Elements
EXHIBIT "B-1"  - Easement Areas Constituting a Portion of the Initial Common Elements
EXHIBIT "B-2"  - Easement Areas For Access Over Olivia Street
EXHIBIT "C"    - Land Subject to Annexation
EXHIBIT "D"    - Initial Land Subject to the French Drains - Restricted Lots
EXHIBIT "E"    - Land Intended for Use as Golf Course, NOT A PART OF TUSCANY
                 RESIDENTIAL COMMUNITY
EXHIBIT "F"    - Land constituting the Commercial Components, NOT A PART OF TUSCANY
                 RESIDENTIAL COMMUNITY

First American Title

First American Title

**MASTER DECLARATION OF COVENANTS,
CONDITIONS, RESTRICTIONS AND
RESERVATION OF EASEMENTS
FOR TUSCANY RESIDENTIAL COMMUNITY**

THIS MASTER DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RESERVATION OF EASEMENTS FOR TUSCANY RESIDENTIAL COMMUNITY ("Declaration"), is made this 26TH day of July, 2005, by RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation.  Capitalized terms used herein shall have the meaning set forth in Article 2.

*PART ONE:  INTRODUCTION TO THE COMMUNITY*

*Rhodes Design and Development Corporation, with the consent of Commerce Associates as the master developer of Tuscany, has established this Declaration to provide a governance structure and a flexible system of standards and procedures for the overall development, administration, maintenance and preservation of the residential areas of Tuscany as a master planned community.*

**Article 1.
Creation of the Community**

1.1    Introduction.

Tuscany is a master planned community located in the City, which is intended to include both residential developments (single family and multi-family) and commercial developments (including office, retail, and gaming).

Declarant has established a master association for the residential developments in Tuscany, which residential developments are collectively referred to herein as the Tuscany Residential Community.  The Tuscany Residential Community will consist of a number of separate subdivisions which may be built by different homebuilders.  Each of these separate subdivisions is referred to in this Declaration as a Neighborhood Association.  A Neighborhood may or may not be governed by a separate Neighborhood Association, and may or may not have Neighborhood Common Elements or be provided special services.  The intent of this Declaration is to provide for communications between the Master Association and the Owners through the Neighborhoods and the Neighborhood Associations, if any.

The commercial developments in Tuscany are referred to herein as the Commercial Components.  Except as otherwise provided in Article 16 below, this Declaration will not govern the commercial developments in Tuscany.

1.2    Purpose and Intent.

The real property described in Exhibit "A" is the first phase within the Tuscany Residential Community.  As the owner of the real property described in Exhibit "A," Declarant intends by Recording this Declaration to create a general plan of development for all portions of the Tuscany Residential Community now or hereafter made subject to this Declaration.  This Declaration provides a flexible and reasonable procedure for the future expansion of the Tuscany Residential Community to include additional real property as Declarant deems appropriate and provides for the overall development,

1

First American Title

First American Title

administration, maintenance, and preservation of the real property now and hereafter comprising the Tuscany Residential Community.  The Tuscany Residential Community is to initially contain 294 residential dwellings and 6 Custom Lots, and Declarant anticipates that the Tuscany Residential Community may include up to approximately 526 acres containing up to 2,095 residential dwellings. The term "Property" is used in this Declaration to refer to all of the real property from time to time subject to this Declaration.

      1.3     Master Association.

An integral part of the development plan is the creation of Tuscany Master Association, a Nevada non-profit corporation, as an association comprised of all owners of real property in the Tuscany Residential Community, to own and/or control, operate, and maintain various Common Elements and community improvements within or benefiting the Tuscany Residential Community, and to administer and enforce this Declaration and the other Governing Documents.

      1.4     The Act.

This document is prepared pursuant to the Nevada Common-Interest Ownership Act, NRS 116.1101, et seq., and establishes a "planned community" as defined therein.

      1.5     Governing Documents.

The Governing Documents create a general plan of development for the Tuscany Residential Community which may be supplemented by additional covenants, restrictions and easements applicable to particular Neighborhoods.  The Governing Documents shall be construed to be consistent with one another to the extent possible.  If there exists any irreconcilable conflicts or inconsistencies among the Governing Documents, then the terms and provisions of this Declaration shall prevail (unless and to the extent only that any provision of the Declaration fails to comply with any applicable provisions of the Act), and thereafter the Articles shall prevail over the Bylaws, the Design Guidelines and the Rules.  In the event of a conflict between or among the Governing Documents and any such additional covenants, conditions, or restrictions, and/or provisions of any other articles of incorporation, bylaws, rules, or policies governing any Neighborhood, the terms of the Governing Documents shall control. Nothing in this Section shall preclude any Supplemental Declaration or other Recorded covenants applicable to any portion of the Property from containing additional restrictions or provisions which are more restrictive than the provisions of this Declaration. Each Neighborhood Association will be responsible for enforcing the covenants, conditions, restrictions, and other instruments applicable to its Neighborhood (including this Declaration), unless the Master Association determines that enforcement of this Declaration by the Neighborhood Association is not in accordance with the Community Wide Standard.  The Master Association may, but shall not be required to, enforce any such covenants, restrictions or other instruments applicable to any Neighborhood.

The Governing Documents shall be enforceable by Declarant, any Builder, the Master Association, any Owner, and their respective legal representatives, heirs, successors, and assigns, by any means available at law or in equity, subject to the provisions of Article 16, if applicable, and subject to the provisions of the Governing Documents that describe or limit how the Governing Documents may be enforced.  In most cases the Board of Directors of the Master Association will be responsible for enforcing the Governing Documents.

2

First American Title

# Article 2.
## Concepts and Definitions

The capitalized terms used in the Governing Documents shall be defined as set forth below. Other terms used in the Governing Documents shall generally be given their natural, commonly accepted definitions unless otherwise defined in the Act.

2.1     "Act":  The Nevada Common-Interest Ownership Act set forth in NRS Chapter 116, as it may be amended from time to time.

2.2     "Apartment":  Each individual single family dwelling unit located within a building or structure or portion of a building or structure situated upon a Multi-Family Lot.

2.3     "Area of Common Responsibility":  The Common Elements, together with such other areas, if any, for which the Master Association has or assumes responsibility pursuant to the terms of this Declaration, any Supplemental Declaration or other applicable covenants, contracts, or agreements.

2.4     "Articles":  The Articles of Incorporation of Tuscany Master Association, as filed with the Nevada Secretary of State.

2.5     "Assessment":  Each and all of the Base Assessments, Neighborhood Assessments, Special Assessments, and Specific Assessments, as applicable.

2.6     "Base Assessment":  Assessments levied on all Lots subject to assessment under Article 8 to fund Common Expenses for the general benefit of the Tuscany Residential Community.  Each and all of the Neighborhood Assessments, Special Assessments, and Specific Assessments, as applicable, are in addition to Base Assessments.

2.7     "Board of Directors" or "Board":  The body responsible for administration of the Master Association, selected as provided in the Bylaws and generally serving the same role as the board of directors under Nevada corporate law and as the executive board under the Act.

2.8     "Builder":  Any Person who purchases one or more Lots for the purpose of constructing Improvements for later sale to consumers, or who purchases one or more parcels of land within the Property for further subdivision, development, and/or resale in the ordinary course of such Person's business.

2.9     "Bylaws":  The Bylaws of Tuscany Master Association, as may be amended from time to time.

2.10    "City":  City of Henderson, Nevada, together with its successors and assigns.

2.11    "Commercial Components":  The real property described in Exhibit "F."  The Commercial Components do not comprise part of the Property encumbered by this Declaration or part of the Tuscany Residential Community, but the Commercial Component Owners shall be required to pay the Master Association certain amounts for the use and enjoyment of the Common Elements, as set forth in Article 18.  The Commercial Components are **NOT A PART** of the Common Elements, **NOT A PART**

3

First American Title

of the Property, **NOT A PART** of the Tuscany Residential Community and (although obligated to make periodic payments as set forth in Article 18) are not subject to Assessments under this Declaration.

2.12   "Commercial Component Owners":   One or more Persons (including Declarant) who hold the record title to any part of the Commercial Components, but excluding in all cases any party holding an interest merely as security for the performance of an obligation. The term shall include sellers under executory contracts of sale but shall exclude Mortgagees.

2.13   "Common Elements":   All (i) real property, other than Lots, owned or leased by the Master Association, (ii) real property over which the Master Association holds an easement for the use and enjoyment of the Owners including, but not limited to easements designated on the Plats as access and ingress/egress easements, as pedestrian/bike trails or access corridor easements, as landscape easements, as public utility easements, as drainage and/or sewer easements, and any other such easements, (iii) any personal property owned by the Master Association for the use and enjoyment of the Owners, and (iv) any other property owned or held by the Master Association for the use and enjoyment of the Owners including, but not limited to, the community recreation center (if constructed), entry monumentation, private entry gates, and guard houses for the Property, Private Streets, French Drains, street lights, street signs, curbs and gutters, landscaping and all perimeter walls or fences Declarant constructs surrounding the Property or which separates a Lot from an Area of Common Responsibility. The Common Elements shall initially consist of (a) the real property described on Exhibit "B" attached hereto and incorporated herein by this reference; (b) easement rights over and across that portion of the Golf Course described and illustrated on Exhibit "B-1" attached hereto and incorporated herein by this reference; (c) easement rights for pedestrian and vehicular access over and across that portion of the Property commonly referred to as Olivia Street, as more particularly described on Exhibit "B-2" attached hereto and incorporated herein by this reference; (d) the Improvements now or hereafter constructed on the real property described on Exhibit "B"; and (e) the Improvements constructed on that portion of the Golf Course described on Exhibit "B-1" consisting of certain landmarks and monumentation.

Notwithstanding the foregoing, all Private Amenities (including without limitation, the Golf Course) and the Commercial Components are separate and constitute private property, and are **NOT A PART** of the Common Elements, are **NOT A PART** of the Property and are **NOT A PART** of the Tuscany Residential Community; except for that portion of the Golf Course over which an easement has been expressly granted to the Master Association by separate Recorded instrument.

2.14   "Common Expenses":   The actual and estimated expenses incurred, or anticipated to be incurred, by the Master Association for the general benefit of the Owners, including (a) a reserve for repairs, replacements or additions to the Common Elements, (b) use and consumption fees for services and facilities contracted for by the Master Association pursuant to Section 7.9 of this Declaration, including without limitation, the provision of the Cable Services to the Master Association and each Dwelling, (c) all expenses, fees and other charges imposed upon the Master Association by any governmental entity because the Tuscany Residential Community is a common interest community pursuant to the Act, and (d) such other expenses as the Board may find necessary and appropriate pursuant to the Governing Documents.

2.15   "Community-Wide Standard":   The standard of conduct, maintenance, or other activity generally prevailing throughout the Property. Such standards may contain both objective and subjective elements and shall be established initially by Declarant in the Design Guidelines and/or the Rules and Regulations. The Community-Wide Standard may evolve as development progresses and as the needs and demands of the Tuscany Residential Community change.

4

2.16    "County": County of Clark, State of Nevada.

2.17    "Custom Lots": Those Residential Lots, as shown on a Plat, within a designated Custom Lot Neighborhood, in which each such lot is intended to be conveyed to an Owner, for construction by the Owner of a custom home subject to design and architectural requirements of Declarant for custom homes where the Owner of such Custom Lot is not Declarant or a Builder. The Custom Lots shall initially include the Lots within Parcel 13 (as defined on Exhibit "A"). Upon the prior written consent of Declarant, if the Owner of a Custom Lot combines the Custom Lot with one or more other Custom Lots before or simultaneously with the construction of the first Dwelling to be built on any of the Custom Lots being combined, then from and after the date such Custom Lots are combined into one legal lot under NRS Chapter 278, the Custom Lots so combined shall be deemed to constitute one Custom Lot for the purposes of allocation voting rights and assessments under Sections 6.3 and 8.1 of this Declaration.

2.18    "Declarant": Rhodes Design and Development Corporation, a Nevada corporation, or any successor or assign who takes title to any portion of the property described in Exhibit "A" or "C" for the purpose of development and/or sale and who is designated as Declarant in a Recorded assignment executed by the immediately preceding Declarant (but excluding any "purchaser" as defined under the Act).

2.19    "Declarant Advance": Funds advances by Declarant to the Master Association of the type described in Section 8.11(b) of this Declaration.

2.20    "Declarant Control Period": The period of time during which the Declarant is entitled to appoint and remove the entire Board of Directors, or a majority thereof. The Declarant Control Period shall terminate upon the first to occur of the following:

(a)    60 days after Declarant has conveyed 75% of the Maximum Number of Lots to Owners other than Builders; or

(b)    five years after Declarant and all Builders have ceased to offer Lots for sale in the ordinary course of business; or

(c)    five years after any right to add all or any portion of the property described on Exhibit "C" under Article 9 was last exercised by Declarant; or

(d)    when, in its discretion, Declarant so determines and declares in a Recorded instrument.

2.21    "Declarant Rights Period": The period of time during which Declarant (or any of its affiliates) owns or has the right to acquire any part of the property subject to this Declaration or which may be added to this Declaration by annexation in accordance with Section 9.1, and during which period of time, Declarant has reserved certain rights as set forth in this Declaration.

2.22    "Design Guidelines": The architectural, design, and construction guidelines and application and review procedures applicable to the Property, as promulgated and administered pursuant to Article 4, as may be amended.

5

2.23    "Director": A duly appointed or elected and current member of the Board of Directors.

2.24    "DRC": The Design Review Committee, if any, created pursuant to Section 4.2 of this Declaration; provided, however, that until the Design Review Committee is created, to the extent the context permits, each reference to the DRC shall mean and refer to the Declarant and or its designees then serving as the Reviewer (as defined in Section 4.2(c) hereof) under Article 4.

2.25    "Dwelling": A single Family detached residential building located on a Residential Lot (or, in a condominium, a condominium unit) designed and intended for use and occupancy as a residence by a single Family, but specifically excluding "manufactured housing" or mobile homes, neither of which shall be permitted as Dwellings.

2.26    "Family": A group of natural persons related to each other by blood or legally related to each other by marriage or adoption, or a group of natural persons not all so related, but who maintain a common household in a Dwelling, all as subject to and in compliance with all applicable federal and Nevada laws and local health codes and other ordinances.

2.27    "Golf Course": That real property described on Exhibit "E" (located adjacent to but **NOT A PART OF** the Property, Common Elements or the Tuscany Residential Community) together with the Improvements constructed thereon, which is part of the Private Amenities and which may be operated as a golf course (including, without limitation, golf course and playing elements, club house, practice facilities, maintenance or storage facilities, driving ranges, parking lots, private streets, lakes, water hazards, trees, bunkers, berms, fairways, greens, and/or other related elements, facilities, features, or components). Refer to Article 15 and to detailed Disclosures and Disclaimers set forth in Article 22, below.

2.28    "Governing Documents": A collective term referring to this Declaration and any applicable Supplemental Declaration, the Articles, the Bylaws, the Design Guidelines, and the Rules and Regulations, as they may be amended.

2.29    "Improvement": Any structure or appurtenance thereto of every type and kind, whether above or below the land surface, placed in the Property, including, but not limited to, Dwellings and other buildings, walkways, sprinkler or drain pipes, swimming pools, spas and other recreational facilities, carports, garages, roads, driveways, parking areas, hardscape, Private Streets, streetlights, curbs, gutters, walls, perimeter walls, fences, screening walls, block walls, retaining walls, stairs, decks, landscaping, antennae, hedges, windbreaks, patio covers, railings, plantings, planted trees and shrubs, poles, signs, exterior air conditioning and water softener fixtures or equipment.

2.30    "Invitees": Each and all of the following: the tenants, guests, agents, contractors, employees, licensees and other invitees of an Owner or Resident.

2.31    "Lot": A Residential Lot or a Multi-Family Lot. As defined herein, the term Lot shall not include any part of the Private Amenities (including without limitation the Golf Course) or any part of the Commercial Components.

6

2.32   "Manager": The Person, if any, whether an employee or independent contractor, appointed by the Master Association, acting through the Board, and delegated the authority to implement certain duties, powers or functions of the Master Association as provided in this Declaration.

2.33   "Master Association": Tuscany Master Association, a Nevada nonprofit corporation, and its successors or assigns.

2.34   "Master Developer": Commerce Associates, LLC, a Nevada limited liability company.

2.35   "Master Plan": The land use plan entitled "Tuscany Hills A Master Planned Community Land Use and Development Guide" and approved by the City of Henderson Planning Commission, as it may be amended, which includes all of the property described in Exhibit "A" and in Exhibit "C." Inclusion of property on the Master Plan shall not, under any circumstances, obligate Declarant to subject such property to this Declaration, nor shall omission of property described in Exhibit "C" from the Master Plan bar its later submission to this Declaration as provided in Article 9.

2.36   "Maximum Number of Lots": The maximum number of Lots approved for development within the Tuscany Residential Community under the Master Plan, as amended from time to time; provided, that nothing in this Declaration shall be construed to require Declarant to develop the maximum number of Lots approved. The Maximum Number of Lots as of the date of this Declaration is 2,095 Lots.

2.37   "Member": An Owner subject to membership in the Master Association pursuant to Section 6.2. A "Member in Good Standing" refers to a Member whose voting rights have not been suspended in accordance with Section 7.4(a)(2) of this Declaration, who does not have outstanding any fines or assessments more than 30 days past due, or who is not otherwise subject to an outstanding sanction by the Board for a violation of the Governing Documents under Section 7.4.

2.38   "Mortgage": A mortgage, a deed of trust, a deed to secure debt, or any other form of security instrument affecting title to any Lot. A "Mortgagee" shall refer to a beneficiary or holder of a Mortgage.

2.39   "Multi-Family Lot": A portion of the Property, whether improved or unimproved (other than a Residential Lot, Common Elements, Neighborhood Common Elements, and real property dedicated to the public), which may be independently owned and conveyed, and which is intended to be developed for attached single family residential uses with Apartments, and which is not established as a separate "common-interest community" as defined in the Act. The term "Multi-Family Lot" shall refer to the land, if any, which is part of the Multi-Family Lot as well as any Improvements, including any Apartment, thereon. The boundaries of each Multi-Family Lot shall be delineated on a Plat.

2.40   "Neighborhood": Any residential area within the Property designated by Declarant as a separate Neighborhood, whether or not governed by a Neighborhood Association, as more particularly described in Section 6.4, created for the purpose of sharing Neighborhood Common Elements, or receiving other benefits or services from the Master Association which are not generally provided to or for the benefit of all Residential Lots within the Tuscany Residential Community. A Neighborhood may be comprised of more than one housing type and may include noncontiguous parcels of property. If the Master Association provides benefits or services to less than all Residential Lots within a particular Neighborhood, then the benefited Lots shall be subject to an additional Specific Assessment for such benefits or services.

7

First American Title

Where the context permits or requires, the term Neighborhood shall also refer to the Neighborhood Committee (established in accordance with the Bylaws) or Neighborhood Association, if any, having concurrent jurisdiction over the property within the Neighborhood. Neighborhood boundaries may be established and modified as provided in Section 6.4.

2.41    "Neighborhood Assessments":  Assessments levied by the Master Association (or a Neighborhood Association, if applicable) uniformly against the Residential Lots in a particular Neighborhood to pay for the Neighborhood Expenses within such Neighborhood, as described in Section 8.2.  Neighborhood Assessments are additional to each and all Base Assessments, Special Assessments, and Specific Assessments, as applicable.

2.42    "Neighborhood Association":    An owners association, created by Supplemental Declaration, having subordinate, concurrent jurisdiction with the Master Association over any Neighborhood. Nothing in this Declaration shall require the creation of a Neighborhood Association for any Neighborhood.

2.43    "Neighborhood Common Elements":  A portion of the Common Elements which shall constitute "limited common elements" under the Act, allocated for the primary or exclusive use and benefit of one or more designated Neighborhoods (but less than the entire Tuscany Residential Community), as more particularly described in Article 13; and/or the common elements unique to a Neighborhood which itself is a Neighborhood Association.

2.44    "Neighborhood Expenses":  The actual and estimated expenses which the Master Association incurs or expects to incur for the benefit of Owners of Residential Lots within a particular Neighborhood, which shall include a reserve for repairs, replacements or additions to the Neighborhood Common Elements shared by such Neighborhood and which may include a reasonable administrative charge, as may be authorized pursuant to this Declaration or under a Supplemental Declaration.

2.45    "Notice and Hearing": Written notice and an opportunity for a hearing before the Board, at which the Owner concerned shall have the opportunity to be heard in person, or by counsel at the Owner's expense, in the manner further provided in the Bylaws.

2.46    "Officer": A duly elected or appointed and current officer of the Master Association.

2.47    "Owner":  One or more Persons (including Declarant and any Builder) who hold the record title to any Residential Lot or Multi-Family Lot, but excluding in all cases any party holding an interest merely as security for the performance of an obligation.  The term shall include sellers under executory contracts of sale but shall exclude Mortgagees.

2.48    "Person": A natural person, a corporation, a partnership, a trustee, a governmental entity, or any other legal entity.

2.49    "Plat": The final plat maps of portions of the Property, as Recorded from time to time, as may be amended and supplemented from time to time of Record.

2.50    "Private Amenities":  Certain real property and any Improvements and facilities thereon located adjacent to, in the vicinity of or within the Property, which are or may be publicly owned and

8

operated and/or privately owned and operated by Persons other than the Master Association for recreational or other purposes, on a club membership basis or otherwise, and may include, without limitation, office facility, retail center, sales center, communication tower(s), golf course, and club house, if any, which is so located and all related and supporting facilities and Improvements. Private Amenities are **NOT A PART OF** the Property, **NOT A PART OF** the Common Elements, **NOT A PART** of the Tuscany Residential Community, and **NOT SUBJECT TO** this Declaration. Private Amenity ownership and/or membership is **NOT A PART OF** and is separate from membership in the Master Association. Membership in and use of the Private Amenities (including, but not necessarily limited to the Golf Course), is subject to approval of the governing body of the Private Amenity (which is a body separate from the Master Association or the Board) and payment of separate initiation fees, dues, and other charges as determined by the governing body of the Private Amenity. Notwithstanding the foregoing, the owners and members of Private Amenities, and their respective Invitees, shall have an easement of access to, enjoyment of, and ingress and egress over, the Private Streets and entries and other Common Elements of the Tuscany Residential Community.  Refer to Article 15, and to the Additional Disclosures and Disclaimers set forth in Article 22, below.

     2.51    "Private Streets": All private streets, rights of way, streetscapes, and vehicular ingress and egress easements, in the Property, shown as such on a Plat.

     2.52    "Property":  The real property described in Exhibit "A," together with such additional property as is subjected to this Declaration in accordance with Article 9.  As defined herein, the term Property shall not include any part of the Private Amenities (including without limitation the Golf Course) or any part of the Commercial Components.

     2.53    "Purchaser":  A Person, other than Declarant or a Builder, who by means of a voluntary transfer acquires a legal or equitable interest in a Lot other than a leasehold interest (including options to renew) of less than 20 years, or as security for an obligation.

     2.54    "Record," "Recording," "Recordation," or "Recorded":  To file, filing, or filed of record in the Official Records of the County Recorder.  The date of Recording shall refer to that time at which a document, map, or plat is Recorded.

     2.55    "Requisite Membership Percentage": 67% or more of the total aggregate voting power of the Master Association.

     2.56    "Requisite Neighborhood Percentage": 67% or more of the total aggregate voting power of those certain Members who are Owners of Lots in the relevant Neighborhood.

     2.57    "Resident":  Unless otherwise specified in the Governing Documents, shall mean any person who is physically residing in a Dwelling or Apartment on a regular basis, and shall specifically include tenants and lessees.

     2.58    "Residential Lot":  A portion of the Property, whether improved or unimproved (other than a Multi-Family Lot, Common Elements, any Neighborhood Common Elements, Area of Common Responsibility or any property dedicated to the public), which may be independently owned and is intended for development, use, and occupancy as a Dwelling for a single Family (as show and separately identified on a Plat).  The term shall mean all interests defined as a "unit" under the Act.  The term shall

9

refer to the land, if any, which is part of the Residential Lot as well as any Improvements thereon. In the case of a building within a condominium, each dwelling shall be deemed to be a separate Residential Lot.

2.59    "Rules and Regulations": The restrictions relating to an Owner's use of his or her Residential Lot and conduct of Persons on the Property, as more specifically authorized and provided for in Article 3 and the Act.

2.60    "Special Assessment": Assessments levied in accordance with Section 8.4. Special Assessments are additional to each and all of Base Assessments, Neighborhood Assessments, and Specific Assessments, as applicable.

2.61    "Specific Assessment": Assessments levied against a particular Lot or Lots for expenses incurred or to be incurred by the Master Association in accordance with Section 8.5. Specific Assessments are additional to each and all of Base Assessments, Neighborhood Assessments, and Special Assessments, as applicable.

2.62    "Subsidy Agreement": An agreement of the type described in Section 8.11(a) of this Declaration.

2.63    "Supplemental Declaration": An instrument Recorded pursuant to Article 9 which subjects additional property to this Declaration, designates Neighborhoods, and/or imposes, expressly or by reference, additional restrictions and obligations on the land described in such instrument. The term shall also refer to an instrument Recorded by Declarant pursuant to Section 6.4.

2.64    "Tuscany": That certain master planned community located in the City of Henderson, Clark County, Nevada, which is more particularly described in the Master Plan, as it may be amended from time to time.

2.65    "Tuscany Residential Community": The residential developments in Tuscany which now or hereafter are made subject to this Declaration as a residential common interest community under the Act.

2.66    Additional Defined Terms: The following terms are defined elsewhere in this Declaration:

(a)    "Benefited Property" in Section 15.5;

(b)    "Benefited Property Owner" in Section 15.5;

(c)    "Bound Party" in Section 16.2;

(d)    "Buffer Area" in Section 3.5(bb)(2);

(e)    "Burdened Property" in Section 15.5;

(f)    "business" in Section 3.5(u);

10

First American Title

(g)  "Cable Provider" in Section 7.9(b);

(h)  "Cable Services " in Section 7.9(b);

(i)  "Cable Services Agreement" in Section 7.9(b);

(j)  "Channel" in Section 22.3(f);

(k)  "Chargeable Transfer" in Section 19.2(a)(1);

(l)  "chemical substances" in Section 22.2(a);

(m)  "Claimant" in Section 16.4;

(n)  "Claims" in Section 16.2;

(o)  "Designated Co-Owner" in Section 6.3(d);

(p)  "Eligible Holder" in Section 17.1;

(q)  "EMF" in Section 22.3(b);

(r)  "equity" in Section 15.2;

(s)  "Family Transfer" in Section 19.2(a)(2);

(t)  "firearms" in Section 3.5(j);

(u)  "French Drains" in Section 22.3(h);

(v)  "Golfers" in Section 22.2(a);

(w)  "Leasing" in Section 3.5(w);

(x)  "Maintenance Facility" in Section 22.2(b);

(y)  "Monitoring Wells" in Section 22.3(g);

(z)  "Neighborhood Budget" in Section 8.2;

(aa)  "Notice" in Section 16.4;

(bb)  "Parties" in Section 16.4;

(cc)  "Plans" in Section 4.3(b);

11

First American Title

First American Title

| | | |
|---|---|---|
| (dd) | "Reasonable Amounts" in Section 18.5; |
| (ee) | "Respondent" in Section 16.4; |
| (ff) | "Reviewer" in Section 4.2(c); |
| (gg) | "RIBs" in Section 22.3(j); |
| (hh) | "stored" in Section 3.5(b)(2); |
| (ii) | "Termination of Mediation" in Section 16.4(b)(iv); |
| (jj) | "Termination of Negotiations" in Section 16.4(b)(ii) |
| (kk) | "trade" in Section 3.5(u); |
| (ll) | "Transfer Fee" in Section 19.2(a); |
| (mm) | "Transfer Price" in Section 19.2(a)(3); |
| (nn) | "Water Schedule" in Section 3.5(bb)(2); |
| (oo) | "Work" in Section 4.2(a); |

***PART TWO:  CREATION AND MAINTENANCE OF COMMUNITY STANDARDS***

*The standards for use and conduct, maintenance and architecture within the Tuscany Residential Community are what give the community its identity and make it a place that people want to call "home." This Declaration establishes procedures for rulemaking as a dynamic process which allows the community standards to evolve as the Tuscany Residential Community changes and grows over time.*

**Article 3.**
**Use and Conduct**

3.1     <u>Framework for Regulation</u>.

The Governing Documents establish, as part of the general plan of development for the Property, a framework of affirmative and negative covenants, easements and restrictions which govern the Property.  Within that framework, the Board and the Members must have the ability to respond to unforeseen problems and changes in circumstances, conditions, needs, desires, trends and technologies which inevitably will affect the Tuscany Residential Community, its Owners and Residents.

3.2     <u>Rule Making Authority</u>.

(a)     <u>Authority of Board</u>.  Subject to the Governing Documents, the Act and the Board's duty to exercise business judgment and reasonableness on behalf of the Master Association and its Members, the Board may modify, cancel, limit, create exceptions to, or expand the Rules and Regulations.  The Board shall send notice to all Owners concerning any proposed action on Rules and Regulations at least

12

First American Title

ten (10) business days prior to the Board meeting at which such action is to be considered. Such notice shall be sent in the manner provided for in subsection (c) below. Members shall have a reasonable opportunity to be heard at a Board meeting prior to such action being taken. Such action shall become effective, after compliance with subsection (c), unless disapproved by the Requisite Membership Percentage or Declarant (during Declarant Rights Period). The Board shall have no obligation to call a meeting of the Members to consider disapproval except upon receipt of a petition signed by Members representing at least 10% of the total votes of the Master Association as required for special meetings in the Bylaws. Upon such petition of the Members prior to the effective date of any Board action under this Section, the proposed action shall not become effective until after such meeting is held, and then shall be subject to the outcome of such meeting.

(b)    Notice. The Board shall provide a copy of any proposed new Rule or Regulation or explanation of any modifications to the existing Rules and Regulations to each Owner, with the agenda for each Board meeting at which such action is to be considered, and each Owner shall be provided an opportunity to be heard at such Board meeting prior to such action being taken subject to reasonable Board imposed restrictions in accordance with the Bylaws and the Act.

(c)    Authority to Change Design Guidelines. Prior to expiration or termination of the Declarant Rights Period (or express delegation by Declarant of its rights under Article 4), neither the Board nor the Master Association shall have any authority to modify, repeal, or expand the Design Guidelines. In the event of a conflict between the Design Guidelines and the Rules and Regulations, the Design Guidelines shall control.

3.3    Owners' Acknowledgment and Notice to Purchasers.

All Owners are given notice that use of their Lots and the Common Elements is limited by the Rules and Regulations as they may be amended, expanded and otherwise modified hereunder. Each Owner, by acceptance of a deed, acknowledges and agrees that the use and enjoyment and marketability of his or her Lot can be affected by this provision and that the Rules and Regulations may change from time to time. All Purchasers are on notice that changes may have been adopted by the Master Association. Copies of the current Rules and Regulations may be obtained from the Master Association.

3.4    Protection of Owners and Others.

Rules and Regulations shall be subject to and consistent with applicable federal and state laws, applicable health codes and other ordinances, the Declaration, Bylaws, and Design Guidelines, and must be adopted without intent to circumvent or evade the requirements and provisions of any of the foregoing. Additionally, no Rule or Regulation, or any other action by the Master Association or Board shall unreasonably hinder or impede the rights of Declarant and/or Builders to develop Tuscany in accordance with the rights reserved to the Declarant in this Declaration and the Act and no rule or action by the Master Association shall unreasonably interfere with the use or operation of any Private Amenity or Commercial Components. The Rules and Regulations shall be binding upon all Owners, Residents and Invitees, if any, until and unless overruled, canceled or modified in a regular or special meeting of the Master Association by the vote the Requisite Membership Percentage and by the Declarant (during the Declarant Control Period). The Rules shall be uniformly enforced.

13

3.5    Use Restrictions.

The Property shall be used only for residential, recreational and related purposes (which may include, without limitation, offices for any property manager retained by the Master Association or business offices for Declarant or the Master Association or any Builder) consistent with this Declaration, any Supplemental Declaration and amendments to either. Any Supplemental Declaration or additional declaration or covenants imposed on property within any Neighborhood may impose stricter standards than those contained in this Article. The Master Association, acting through the Board of Directors, shall have standing and the power to enforce such standards.

(a)    Signs. No sign of any kind shall be erected within the Property without the prior written consent of the Board of Directors, except (i) entry and directional signs installed by Declarant, (ii) such signs as the Master Association or this Declaration may not lawfully prohibit, and (iii) such signs as my be expressly permitted in the Design Guidelines and/or the Rules and Regulations, as applicable, provided that such signs comply with all applicable requirements set forth in the Design Guidelines and/or the Rules and Regulations. If permission is granted to any Person to erect a sign within the Property or if the placement of specified types of signs within the Property may not lawfully be prohibited by this Declaration or the Master Association, the Board reserves the right to restrict the size, color, lettering and placement of such sign. Declarant shall have the right to erect signs as Declarant, in its sole discretion, deems appropriate. Except as provided above or as expressly permitted by applicable laws, no signs, flags, banners or similar items advertising or providing directional information with respect to activities being conducted within or outside the Property shall be displayed or posted within the Property by any Person other than Declarant for so long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the property described in Exhibit "A" or "C".

(b)    Parking, Prohibited Vehicles and Motorized Vehicles.

(1)    Parking. Vehicles for Owners and Residents shall be parked in the garages or in the driveways, if any, serving the Lots or in appropriate spaces or designated areas in which parking may or may not be assigned. All on-street parking within the Property shall be limited Invitee parking only (but not tenant parking) and shall be further limited to the non-sidewalk side of the Private Streets. If a Private Street has sidewalks on both sides of the Private Street, then Invitee parking (but not tenant parking) will be allowed on both sides of the Private Street but only to the extent permitted herein. No vehicle may be left overnight on any Private Street within the Property. Vehicles shall additionally be subject to such reasonable rules and regulations as the Board of Directors or the Neighborhood Association having concurrent jurisdiction over parking areas within the Neighborhood (if any), may adopt. Declarant and/or the Master Association may designate (i) certain non-parking areas and/or (ii) certain on-street parking areas for visitors or guests subject to reasonable rules.

(2)    Prohibited Vehicles. Commercial vehicles, vehicles primarily used or designed for commercial purposes, tractors, mobile homes, recreational vehicles, trailers (either with or without wheels), campers, camper trailers, and boat trailers shall be parked only in enclosed garages or areas, if any, designated by the Board or by the Neighborhood Association, if any, having concurrent jurisdiction over parking areas within a particular Neighborhood. Stored vehicles and vehicles which are either obviously inoperable or do not have current operating licenses shall not be permitted on the Property except within enclosed garages. For purposes of this Section, a vehicle shall be considered "stored" if it is put up on blocks or covered with a tarpaulin and remains on blocks or so covered for fourteen consecutive days without the prior approval of the Board. Notwithstanding the foregoing, service and delivery

14

vehicles may be parked in the Property for such period of time as is reasonably necessary to provide service or to make a delivery to a Lot or the Common Elements.

(3)    Violation. Any vehicle parked in violation of this Section 3.5(b) or parking rules promulgated by the Board may be towed, following the giving of any notice required by this Declaration or the Bylaws.

(4)    No Unlicensed Motorized Vehicles. No unlicensed motorized vehicles may be used or operated within the Tuscany Residential Community, regardless of the size of the motor. This prohibition is intended to include, without limitation, motorized scooters (including, Go-Peds), mini-motorcycles (including, Pocket Bikes), all terrain vehicles of any kind, dirt bikes and golf carts (except the use of Golf Course owned golf carts to the extent necessary to allow golf play at the Golf Course).

(c)    Residents Bound. All provisions of the Governing Documents which govern the conduct of Owners and which provide for sanctions against Owners shall also apply to all Residents and Invitees of any Lot. Each Owner shall cause all Residents of his or her Lot to comply with the Governing Documents. An Owner shall be responsible for all violations and losses to the Common Elements caused by the Residents of such Owner's Lot, notwithstanding that the Residents of the Lot are fully liable and may themselves be sanctioned for a violation of the Governing Documents.

(d)    Animals and Pets. No animals, livestock or poultry of any kind shall be raised, bred or kept on any portion of the Property other than dogs, cats or other usual and common household pets in a number and of a type not in violation of city ordinances or other laws. However, those pets which are permitted to roam free, or, in the sole discretion of the Board, endanger the health, make objectionable noise or constitute a nuisance or inconvenience to the Owners of other Lots or the owner of any portion of the Property shall be removed upon request of the Board. No pets shall be kept, bred or maintained for any commercial purpose. All dogs shall at all times whenever they are outside a Lot be confined on a leash held by a responsible person.

(e)    Quiet Environment. Nothing shall be done or maintained on any part of a Residential Lot which emits foul or obnoxious odors outside the Residential Lot or creates noise or other conditions which tend to disturb the peace, quiet, safety, comfort or serenity of the Residents and Invitees of other Lots. There shall not be maintained any plants or animals or device or thing of any sort whose activities or existence in any way is noxious, dangerous, unsightly, unpleasant, or of a nature as may diminish or destroy the enjoyment of the Property.

No noxious, illegal or offensive activity shall be carried on upon any portion of the Property, if, in the reasonable determination of the Board, the activity tends to cause embarrassment, discomfort, annoyance or nuisance to Persons using the Common Elements or to the Residents and Invitees of other Lots. No outside burning shall be permitted within the Property, other than customary household barbecues, fireplaces, fire pits, gas heaters and similar household devices used in compliance with City ordinances and owned and maintained in accordance with all applicable laws. No horn, whistle, bell or other sound device, except alarm devices used exclusively for security purposes, shall be installed or operated on any Lot.

(f)    Unsightly or Unkept Conditions. All portions of a Residential Lot outside of enclosed structures shall be kept in a clean and tidy condition at all times. Nothing shall be done, maintained, stored or kept outside of enclosed structures on a Residential Lot which, in the determination of the Board of Directors, causes an unclean, unhealthy or untidy condition to exist or is obnoxious to the senses. Any

15

First American Title

structures, equipment or other items which may be permitted to be erected or placed on the exterior portions of Residential Lots shall be kept in a neat, clean and attractive condition and shall promptly be removed upon request of the Board if, in the judgment of the Board, they have become rusty, dilapidated or otherwise fallen into disrepair. The pursuit of hobbies or other activities, including specifically, without limiting the generality of the foregoing, the assembly and disassembly of motor vehicles and other mechanical devices, which might tend to cause disorderly, unsightly or unkempt conditions, shall not be pursued or undertaken on any part of the Property. Notwithstanding the above, the disassembly and assembly of motor vehicles to perform repair work shall be permitted provided such activities are not conducted on a regular or frequent basis, and are either conducted entirely within an enclosed garage or, if conducted outside, are begun and completed within twelve hours.

No Owner or Resident shall dump grass clippings, leaves or other debris, petroleum products, fertilizers or other potentially hazardous or toxic substances in any street, open area, drainage ditch, stream, pond or lake, or elsewhere within the Property, except that fertilizers may be applied to landscaping on Residential Lots provided care is taken to minimize runoff.

(g)    Antennas. To the fullest extent allowed by law, no exterior antennas, aerials, satellite dishes, masts or other apparatus for the transmission of television, radio, satellite or other signals of any kind shall be installed or maintained on any Lot or upon any portion of the Property except upon the approval of the Board and in conformity with the rules and regulations adopted by the Master Association applicable to the installation and maintenance of such devices and Improvements, in effect from time to time.

(h)    Basketball Equipment, Clotheslines, Garbage Cans, Tanks, Etc. In addition to the applicable provisions of the Design Guidelines, all basketball hoops and backboards, clotheslines, garbage cans, above-ground storage tanks and structures, mechanical equipment and other similar items on Residential Lots shall be located or screened so as to be concealed from view of neighboring Residential Lots, streets and property located adjacent to the Residential Lot; provided, however, that mobile basketball hoops shall be permitted but when not in use must be stored so as to be concealed from view of neighboring Residential Lots, streets and property located adjacent to the Residential Lot. All rubbish, trash and garbage shall be stored in appropriate containers approved pursuant to Article 4 and shall regularly be removed from the Property and shall not be allowed to accumulate.

(i)    Subdivision of Residential Lot and Time Sharing. No Residential Lot shall be subdivided or its boundary lines changed except with the prior written approval of the Board of Directors. Declarant, however, hereby expressly reserves the right for itself and Master Developer and any Builder to subdivide, change the boundary line of, and replat any Residential Lot(s) or other portion of the Property then owned by Declarant. Any such division, boundary line change or replatting shall not be in violation of the applicable subdivision and zoning regulations.

Declarant hereby expressly reserves (for itself and Master Developer) the right to establish, with respect to Lots which it then owns, any type of timesharing, fraction-sharing or similar program whereby the right to exclusive use of the Lot and/or the Dwellings located thereon rotates among members of the program on a fixed or floating time schedule over a period of years. Except as otherwise may be established by Declarant or Master Developer, no Lot shall be made subject to any type of timesharing, fraction-sharing or similar program whereby the right to exclusive use of the Lot and/or the Dwellings located thereon rotates among members of the program on a fixed or floating time schedule over a period of years.

16

First American Title

(j)    Firearms.  The discharge of firearms within the Property is prohibited.  The term "firearms" includes "B-B" guns, pellet guns and other firearms of all types, regardless of size. Notwithstanding anything to the contrary contained herein or in the Bylaws, the Master Association shall not be obligated to take action to enforce this Section.

(k)    Irrigation.  No sprinkler or irrigation systems of any type which draw upon water from ponds or other ground or surface waters within the Property shall be installed, constructed or operated within the Property.  However, Declarant and the Master Association shall have the right to draw water from such sources for the purpose of irrigating any Common Elements or Area of Common Responsibility.  All sprinkler and irrigation systems serving Lots shall draw upon public water supplies only and shall be subject to approval in accordance with Article 4.  Private irrigation wells are prohibited on the Property, unless maintained by the Master Association or Declarant.

(l)    Tents, Mobile Homes and Temporary Structures.  Except as may be permitted by Declarant during initial construction within the Property, no tent, shack, mobile home or other structure of a temporary nature shall be placed upon a Lot or any part of the Property.  Party tents or similar temporary structures may be erected on a Lot or on Common Elements designated for such purposes for a limited period of time for special events in accordance with the written policies of the Board or with prior written approval of the Board.

(m)    Grading, Drainage and Septic Systems.  No Person shall alter the grading of any Residential Lot without prior approval pursuant to Article 4.  Catch basins, drainage areas and landscaped areas on a Residential Lot are for the purpose of natural flow of water only.  No obstructions or debris shall be placed in these areas.  No Person other than Declarant or, after the Declarant Control Period, the Master Association may obstruct or rechannel the drainage flows after location and installation of (i) landscaping or (ii) drainage swales, storm sewers or storm drains or channels.  Declarant hereby reserves for itself and the Master Association a perpetual easement across the Property for the purpose of altering drainage and water flow.  However, the exercise of such an easement shall not materially diminish the value of or unreasonably interfere with the use of any Lot without the Owner's consent.  Septic tanks and drain fields, other than those installed by or with the consent of Declarant or, after the Declarant Control Period, except in strict compliance with the Design Guidelines and upon prior approval in accordance with Article 4, are prohibited within the Property.

(n)    Removal of Plants and Trees.  No trees or shrubs, except for those which are diseased or dead or create a safety hazard, shall be removed except in strict compliance with the Design Guidelines and upon prior approval in accordance with Article 4.  In the event of an intentional or unintentional violation of this Section, the violator may be required by the Board or other body having jurisdiction to replace the removed tree with one or more comparable trees of such size and number and in such locations as the Board or such body determines, in its sole discretion, is necessary to mitigate the damage.

(o)    Sight Distance at Intersections.  All property located at street intersections shall be landscaped so as to permit safe sight across the street corners.  No fence, wall, hedge or shrub planting shall be placed or permitted to remain where it would create a traffic or sight problem.

(p)    Lighting.  All exterior lights must be approved in accordance with Article 4, except for traditional holiday decorative lights which may be displayed for one month prior to and one month after any commonly recognized holiday for which such lights are traditionally displayed.

17

First American Title

(q)    <u>Artificial Vegetation, Exterior Sculpture and Similar Items</u>.  No artificial vegetation, sculpture, fountains, birdhouses, birdbaths, other decorative embellishments or similar items shall be permitted except in accordance with the Design Guidelines and any approvals required under Article 4.

(r)    <u>Energy Conservation Equipment</u>.  No solar energy collector panels or attendant hardware or other energy conservation equipment shall be constructed or installed on any Lot unless it is an integral and harmonious part of the architectural design of a structure, as determined in the sole discretion of the appropriate committee pursuant to Article 4, except as otherwise expressly permitted by Nevada law.  No windmills, wind generators or other apparatus for generating power from the wind shall be erected or installed on any Lot.

(s)    <u>Playground</u>.  No jungle gyms, swing sets or similar playground equipment shall be erected or installed on any Residential Lot without prior written approval of the DRC in accordance with Article 4; provided, however, that no DRC approval shall be required for playground equipment that is erected or installed in the backyard of a Residential Lot if such equipment does not exceed the height of the wall enclosing the backyard of the Residential Lot.  Any playground or other play areas or equipment furnished by the Master Association or erected within the Property shall be used at the risk of the user. The Master Association shall not be held liable to any Person for any claim, damage, or injury occurring thereon or related to use thereof.

(t)    <u>Fences</u>.  No hedges, walls, dog runs, animal pens or fences of any kind shall be permitted on any Residential Lot except as approved in accordance with Article 4.

(u)    <u>Business Use</u>.  No business, trade, garage sale, moving sale, rummage sale or similar activity may be conducted in or from any Residential Lot, except that an Owner or Resident residing in a Residential Lot may conduct business activities within the Residential Lot so long as: (i) the existence or operation of the business activity is not apparent or detectable by sight, sound or smell from outside the Residential Lot; (ii) the business activity conforms to all zoning requirements for the Property; (iii) the business activity does not involve regular visitation of the Residential Lot by employees, clients, customers, suppliers or other business related visitors or door-to-door solicitation within the Property; and (iv) the business activity is consistent with the residential character of the Property and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other Owners and Residents of the Property, as may be determined in the sole discretion of the Board.

The terms "business" and "trade," as used in this provision, shall be construed to have their ordinary, generally accepted meanings and shall include, without limitation, any occupation, work or activity undertaken on an ongoing basis which involves the provision of goods or services to persons other than the provider's family and for which the provider receives a fee, compensation or other form of consideration, regardless of whether: (1) such activity is engaged in full or part-time, (2) such activity is intended to or does generate a profit or (3) a license is required.

Notwithstanding the above, the leasing of a Residential Lot (or the leasing of multiple Residential Lots, if owned by the same Owner) shall not be considered a business or trade within the meaning of this Section.  This Section shall not apply to any activity conducted by Declarant or a Builder approved by Declarant with respect to its development and sale of the Property or its use of any Residential Lots which it owns within the Property.  Further, this Section shall not apply to the operation of any timesharing, fraction-sharing or similar program whereby the right to exclusive use of the Lot and/or the Dwellings located thereon rotates among members of the program on a fixed or floating time

18

First American Title

First American Title

schedule over a period of years, that may be established by Declarant or Master Developer pursuant to Section 3.5(i) of this Declaration.

(v)    On-Site Fuel Storage.  No on-site storage of gasoline, heating or other fuels shall be permitted on any part of the Property.  However, up to five (5) gallons of fuel may be stored on each Lot for emergency purposes and operation of lawn mowers and similar tools or equipment, and the Master Association shall be permitted to store fuel for operation of maintenance vehicles, generators and similar equipment.

(w)    Leasing of Residential Lots.  "Leasing," for purposes of this Declaration, is defined as regular, exclusive occupancy of a Residential Lot by any person, other than the Owner for which the Owner receives any consideration or benefit, including, a fee, service, gratuity or emolument.  (The defined term applies as well to all derivations of the word "lease.")  Residential Lots may be leased only in their entirety.  No fraction or portion may be leased.  There shall be no subleasing of Residential Lots or assignment of leases unless prior written approval is obtained from the Board of Directors.  No transient tenants may be accommodated in a Residential Lot.  All leases shall be in writing and shall be for an initial term of no less than thirty (30) days, except with the prior written consent of the Board of Directors.  Notice of any lease, together with such additional information as may be required by the Board, shall be given to the Board by the Owner within ten (10) days of execution of the lease.  The Owner must make available to the lessee copies of the Governing Documents.  The Board may adopt reasonable rules regulating leasing and subleasing.

All leases and rental agreements shall be in writing and subject to the requirements of the Governing Documents and the Master Association.  All leases of a Residential Lot shall include a provision that the tenant will recognize and attorn to the Master Association and any applicable Neighborhood Association as landlord, solely for the purpose of having the power to enforce a violation of the provisions of the Governing Documents against the tenant, *provided* the Master Association or, if applicable, the Neighborhood Association gives the landlord notice of its intent to so enforce and a reasonable opportunity to cure the violation directly, prior to the commencement of an enforcement action; provided, however, that no such enforcement by the Master Association or Neighborhood Association, as applicable, shall limit the liability of the Owner of the Residential Lot for any such violation.

This Section shall not apply to the operation of any timesharing, fraction-sharing or similar program whereby the right to exclusive use of the Lot and/or the Dwellings located thereon rotates among members of the program on a fixed or floating time schedule over a period of years, that may be established by Declarant or Master Developer pursuant to Section 3.5(i) of this Declaration.

(x)    Laws and Ordinances.  Every Owner and Resident of any Lot, and their Invitees shall comply with all laws, statutes, ordinances and rules of federal, state and municipal governments applicable to the Property.  Any violation may be considered a violation of this Declaration.  However, the Board shall have no obligation to take action to enforce such laws, statutes, ordinances and rules.

(y)    Single Family Occupancy.  No Residential Lot or Dwelling shall be occupied by more than a single Family.

(z)    Water and Mineral Operations.  No oil or water drilling, oil or water development operations, oil refining, quarrying or mining operations of any kind shall be permitted on any Lot.  No

19

First American Title