First American Title

derrick or other structure designed for use in boring for water, oil, natural gas or other minerals shall be erected and maintained or permitted on any Lot.

(aa)    Doors, Windows and Screens.  No screens, "burglar bars," steel or wrought iron bars or similar fixtures, whether designed for decorative, security or other purposes, shall be installed on the exterior of any windows or doors of any dwelling unless (1) such fixtures are installed by Declarant or a Builder, or (2) such fixtures are expressly permitted by applicable law and comply with the Design Guidelines.  No signs, numbers or other writing shall be written on or placed in the doors or windows of an occupied dwelling, either temporarily or permanently.  All windows of an occupied dwelling on a Residential Lot which are visible from the street or other Residential Lots shall have draperies, curtains, blinds or other permanent interior window treatments, and all portions which are visible from outside the dwelling shall be white or off-white in color, unless otherwise approved in writing by the Board.  Sheets or similar temporary window treatments may be used for a short time after taking occupancy of a dwelling, provided they are removed and replaced with permanent window treatments within a reasonable time after taking occupancy of the dwelling, as determined in the sole discretion of the Board of Directors.

(bb)    Ground Cover Requirement.

(1)    Timing.  Unless Declarant or Builder has provided landscaping or other ground cover for each Lot, the Owner of that Residential Lot shall have installed thereon landscaping or other ground cover acceptable to the DRC under Article 4 and in conformity with the Design Guidelines, (i) covering the front yard of the Lot within 4 months following: (A) the Recordation of a deed conveying title to the Lot to the Owner from Declarant or (B) the date of occupancy thereof, whichever occurs first; and (ii) covering the rear yard of a Lot within 6 months following: (A) the Recordation of a deed conveying title to the Lot to the Owner from Declarant or (B) the date of occupancy thereof, whichever occurs first.

(2)    Restrictions.

(A)    Plants selected for landscaping should be light weight types which require little water and are capable of surviving the prevailing climate.  Only the amount of irrigation necessary to sustain plant life should be provided.  Over watering the landscape areas could adversely affect the Improvements on or near the Lot, and is therefore prohibited.

(B)    Without limiting the provisions of this Declaration requiring prior DRC approval, a buffer area shall exist on each Lot (the "Buffer Area"):

(i)    The Buffer Area on each Lot (now or hereafter added to the Property) that is located within that portion of the real property described on Exhibit "A" or Exhibit "C" except the real property that is shown on the Plat for Parcel 18, Parcel 19 or Parcel 22 ("Lower Lots"), shall be the area located within ten feet (10') of the Dwelling located on such Lot; and

(ii)    The Buffer Area on each Lot (now or hereafter added to the Property) that is located within that portion of the real property described on Exhibit "A" or Exhibit "C" that is shown on the Plat for Parcel 18, Parcel 19 or Parcel 22 (collectively "Upper Lots"), shall be the area located within five feet (5') of the Dwelling located on such Lot.

20

First American Title

NO LANDSCAPING OR PLANTER MAY BE INSTALLED OR PLANTED BY AN OWNER OR OCCUPANT ANY UNIT WITHIN THE BUFFER AREA OF EACH LOT. No irrigation may be provided within the Buffer Area, and desert landscaping using xeriscape technology shall be used outside the Buffer Area on a Lot.

(C)     In addition to the restrictions set forth in this Section 3.5(bb), no sprinkler irrigation system or equipment may be installed on any Lot within three feet (3') of any block wall, wall or fence; only trickle or drip irrigation systems are permitted within such areas.

(D)     Irrigation timers should be adjusted on a monthly basis in accordance with the Southern Nevada Water Authority's posted "Water Schedule" for a low use condition.

(E)     No plants or seeds infected with insects or plant diseases shall be brought upon, grown or maintained upon any part of the Property. No ponds, water features or fountains may be installed on any Lot; and no statues or gazing balls may be installed on any Lot such that a statue or gazing ball may be viewed from the abutting Lots and/or any street.

(F)     The Board may adopt Rules and Regulations proposed by the DRC to regulate landscaping permitted and required within the Property.

(3)     Appearance. From and after the landscaping and/or ground cover is installed on a Lot the Owner thereof shall maintain the landscaping and/or ground cover on those portions of the front and side yards of the Lot which are subject to view from the abutting Lots and/or street(s), in a neat and attractive condition and properly maintain and periodically replace when necessary the ground cover, trees, plants, grass and other vegetation, if any, originally placed on such Lot, all in conformance with the Community Wide Standards. Each Owner shall be responsible, at his or her sole expense, for maintenance, repair, replacement, and watering of any and all landscaping on the Lot, as well as any and all sprinkler or irrigation or other related systems or equipment pertaining to such landscaping.

(4)     Violation. If an Owner fails to install and maintain landscaping in conformance with the Governing Documents, or allows his landscaping to deteriorate to a dangerous, unsafe, unsightly, or unattractive condition, then the DRC shall have the right to either (i) after 30 days' written notice, seek any remedies at law or in equity which it may have; or (ii) after reasonable notice (unless there exists an unsafe or dangerous condition, in which case, the right shall be immediate, and no notice shall be required), to correct such condition and to enter upon such Owner's Lot for the purpose of so doing, and such Owner shall promptly reimburse the Master Association for the cost thereof, as a Specific Assessment enforceable in the manner set forth in the Declaration.

(cc)     Additional Restrictions: Restricted Lots. As more particularly set forth in Section 22.3(h), French Drains are located near or adjacent to certain Lots (the "Restricted Lots"). Specifically, the French Drains run below the surface of the Restricted Lots, sometimes through a portion of the Restricted Lot and other times along the boundary line of the Restricted Lot. Those Restricted Lots are now or may hereafter be part of the Property are described and/or illustrated on Exhibit "D". Additional Lots hereafter added to the Property under Section 9.1 may also be classified as Restricted Lots in the Supplemental Declaration that operates to add the Lots to this Declaration. Without limiting the provisions of this Declaration requiring prior DRC approval or any other use restrictions contained in Section 3.5, each Lot now or hereafter designated to be a Restricted Lot is subject to the following use restrictions:

21

First American Title

(1)    No work, Improvement or any other action may be commenced or performed on any Restricted Lot that damages any portion of the French Drains.

(2)    No vegetation with root systems that have potential to extend to depths of greater than two feet (2') shall be permitted within five feet (5') of the property line of any Restricted Lot.

(3)    Any pool or other Improvement of a hardscape nature constructed or installed on any Restricted Lot must be a distance of not less than five feet (5') from the property line of the Restricted Lot.

(4)    Before constructing or installing any Improvement on a Restricted Lot, the Owner of the Restricted Lot shall undertake a review of the location of the French Drains, including the proximity of the French Drains to the Lot and the proposed Improvement based on a review of the improvement plans and materials for the French Drains on file with the Master Association as well as a physical inspection of the Restricted Lot.

(5)    If during the construction or installation of any Improvement on a Restricted Lot, gravel is encountered below existing grade, or any damage to the French Drains occurs, all work must immediately cease pending the review and recommendation of the Master Association and its geotechnical consultants.

(6)    If Owner or Invitee damages the French Drains, then the Master Association shall be responsible to repair the damages and the Owner of the Restricted Lot shall be obligated to promptly reimburse the Master Association for the cost thereof, as a Specific Assessment enforceable in the manner set forth in this Declaration.

(dd)    <u>Limitation with Respect to Multi-Family Lots</u>. Nothing in this Article shall authorize the Board or the Master Association to adopt, revise, or otherwise modify the Rules and Regulations in any way that would operate to interfere with or limit the right of each Owner of a Multi-Family Lot to lease the Apartments located thereon for residential use.

(ee)    <u>Prohibition on Owner Purchasing More Than One Unit</u>.    In accordance with certain conditions imposed by the City upon the development of the Tuscany Residential Community, to the fullest extent permitted by law, at no time shall title and ownership of more than one condominium unit in any Neighborhood be vested in or held by the same natural person or persons, their agents, assigns, or nominees, or by any corporation, trust organization or other entity, their agents, assigns or nominees. Amendment of the prohibition contained in this Section 3.5(ee) may be made with respect to any Neighborhood containing condominium units only after Declarant has sold all condominium units in that Neighborhood and no longer holds title to any condominium unit in that Neighborhood, and then only with the consent of the Owners of not less than a majority of the condominium units in that Neighborhood.

## Article 4.
## Architecture and Landscaping

4.1    <u>General</u>.

No structure shall be placed, erected, or installed upon any part of the Property and no Improvements or other work (including staking, clearing, excavation, grading and other site work,

22

First American Title

exterior alterations of existing Improvements, painting the exterior of any structure, or planting or removal of landscaping) shall take place within the Property, except in compliance with this Article and the Design Guidelines.

No approval shall be required to repaint the exterior of a structure in accordance with the originally approved color scheme or to rebuild in accordance with originally approved drawings and specifications. Any Owner may remodel, paint or redecorate the interior of his or her Dwelling without the need for any approval under this Article 4. However, exterior modifications to a Dwelling or other Improvements on a Lot, and modifications to the interior of screened porches, patios, windows, and similar portions of a Dwelling that are visible from outside the structure shall be subject to the approval process set forth in this Article 4.

All Dwellings constructed on any portion of the Property shall be designed by and built in accordance with the drawings and specifications of a licensed architect or a licensed building designer unless otherwise approved by Declarant or its designee in its sole discretion.

Article 4 shall not apply to (i) the Master Association after the Declarant Control Period, or (ii) the Declarant at any time, or (iii) a Builder who has obtained Declarant's approval of drawings and specifications for original construction.

4.2     Architectural Review.

(a)     By Declarant.  Each Owner, by accepting a deed or other instrument conveying any interest in any portion of Tuscany, acknowledges that Declarant has a substantial interest in ensuring that the Improvements within the Property enhance Declarant's reputation as a community developer and do not impair Declarant's ability to market, sell, or lease its property.  Therefore, each Owner agrees that no activity within the scope of this Article ("Work") shall be commenced on such Owner's Lot unless and until Declarant or its designee has given its prior written approval for such Work, which approval may be granted or withheld in the sole discretion of Declarant or its designee.

In reviewing and acting upon any request for approval, Declarant or its designee shall act solely in Declarant's interest and shall owe no duty to any Person other than Declarant.  The rights reserved to Declarant under this Article shall continue so long as Declarant (or any of its affiliates) owns or has the right to acquire any part of the real property described in Exhibits "A" or "C", unless earlier terminated in a written instrument executed and Recorded by Declarant.

Declarant may, in its sole discretion, designate one or more Persons from time to time to act on its behalf in reviewing applications hereunder.

Declarant may from time to time, but shall not be obligated to, delegate all or a portion of its reserved rights under this Article to (i) a design review committee appointed by the Master Association's Board of Directors (the "DRC"), or (ii) a committee comprised of architects, engineers or other persons who may or may not be Members of the Master Association.  Any such delegation shall be in writing, specifying the scope of responsibilities delegated, and shall be subject to (i) Declarant's right to revoke such delegation at any time and resume jurisdiction over the matters previously delegated; and (ii) Declarant's right to veto any decision which Declarant determines, in its sole discretion, to be inappropriate or inadvisable for any reason.  So long as Declarant has any rights under this Article, jurisdiction of the foregoing entities shall be limited to such matters as are specifically delegated to it by Declarant.

23

First American Title

(b)    <u>Design Review Committee</u>.  Upon Declarant's delegation to the Master Association's Board of Directors, or upon expiration or termination of Declarant's rights under this Article, the Master Association, acting through the DRC, shall assume jurisdiction over all architectural matters hereunder. The DRC may, in the Board's direction, be divided into one or more committees, each of which shall have the sole responsibility for performance of those DRC responsibilities as may be designated by the Board.  The members of the DRC need not be Members of the Master Association or representatives of Members, and may, but need not, include Architects, engineers, or similar professionals, who may be compensated in such manner and amount as the Board may establish.

Unless and until such time as Declarant delegates all or a portion of its reserved rights to the DRC or Declarant's rights under this Article terminate, the Master Association shall have no jurisdiction over architectural and landscaping matters.

(c)    <u>Fees; Assistance</u>.  During the time that Declarant is performing the architectural review functions hereunder, Declarant may establish and charge reasonable fees for review of applications under this Article and may require such fees to be paid in full prior to review of any application.  Once the DRC is established, the DRC may establish and charge reasonable fees for review of applications and may require such fees to be paid in full prior to review of any application.  Such fees may include the reasonable costs incurred in having any application reviewed by architects, engineers, or other professionals. Declarant and/or the Master Association may employ architects, engineers, or other persons as deemed necessary to perform the review. The Board may include the compensation of such persons (including Declarant) in the Master Association's annual operating budget.  As used in the Article, the term "Reviewer" shall mean Declarant for so long as it is performing architectural review functions hereunder, and thereafter the term shall mean the DRC.

4.3    <u>Guidelines and Procedures</u>.

(a)    <u>Design Guidelines</u>.  Declarant may prepare the initial Design Guidelines, which shall contain general provisions applicable to all of the Tuscany Residential Community as well as specific provisions which vary from Neighborhood to Neighborhood.  The Design Guidelines are intended to provide guidance to Owners and Builders regarding matters of particular concern to the Reviewer in considering applications hereunder.  The Design Guidelines are not the exclusive basis for decisions of the Reviewer and compliance with the Design Guidelines does not guarantee approval of any application.

Declarant shall have sole and full authority to amend the Design Guidelines as long as it (or its affiliates) owns or has the right to acquire any portion of the Property or any real property adjacent to the Property, or has a right to expand the Tuscany Residential Community pursuant to Section 9.1, notwithstanding a delegation of reviewing authority to the DRC, unless Declarant also delegates the power to amend to the DRC.  Upon termination or delegation of Declarant's right to amend, the DRC shall have the authority to amend the Design Guidelines with the consent of the Board.  Any amendments to the Design Guidelines shall be prospective only and shall not apply to require modifications to or removal of structures previously approved once the approved construction or modification has commenced.  There shall be no limitation on the scope of amendments to the Design Guidelines, and such amendments may remove requirements previously imposed or otherwise make the Design Guidelines less restrictive.

The Design Guidelines shall be made available to Owners and Builders who seek to engage in development or construction within the Tuscany Residential Community.

24

(b)    Procedures. No Work shall commence on any portion of the Property until an application for approval has been submitted to and approved by the Reviewer. Such application shall include drawings and specifications ("Plans") showing site layout, structural design, exterior elevations, exterior materials and colors, landscaping, drainage, exterior lighting, irrigation, and other features of proposed construction, as applicable. The Design Guidelines and the Reviewer may require the submission of such additional information as may be reasonably necessary to consider any application.

In reviewing each submission, the Reviewer may consider any factors it deems relevant, including, without limitation, harmony of external design with surrounding structures and environment. Decisions may be based on purely aesthetic considerations. Each Owner acknowledges that determinations as to such matters are purely subjective and opinions may vary as to the desirability and/or attractiveness of particular Improvements.

The Reviewer shall, within 30 days after receipt of a completed application and all required information, respond in writing to the applicant at the address specified in the application. The response may (i) approve the application, with or without conditions; (ii) approve a portion of the application and disapprove other portions; or (iii) disapprove the application. The Reviewer may, but shall not be obligated to, specify the reasons for any objections and/or offer suggestions for curing any objections. If the Reviewer fails to respond within 30 days after receipt of a completed application, approval shall be deemed to have been denied.

Until expiration of Declarant's rights under this Article, the DRC shall notify Declarant in writing within five business days after the DRC has approved any application relating to proposed Work within the scope of matters delegated to the DRC by Declarant. The notice shall be accompanied by a copy of the application and any additional information which Declarant may require. Declarant shall have ten (10) days after receipt of such notice to veto any such action, in its sole discretion, by written notice to the DRC and the applicant. Notice shall be deemed to have been given at the time the envelope containing the response is deposited with the U. S. Postal Service. Personal delivery of such written notice shall, however, be sufficient and shall be deemed to have been given at the time of delivery to the applicant.

If construction does not commence on a project for which Plans have been approved within one year after the date of approval, such approval shall be deemed withdrawn, and it shall be necessary for the Owner to reapply for approval before commencing the proposed Work. Once construction is commenced, it shall be diligently pursued to completion. All Work shall be completed within one hundred eighty (180) days of commencement unless otherwise specified in the notice of approval or unless the Reviewer grants an extension in writing, which it shall not be obligated to do. If approved Work is not completed within the required time, it shall be considered nonconforming and shall be subject to enforcement action by the Master Association, Declarant or any aggrieved Owner.

The Reviewer may, by resolution, exempt certain activities from the application and approval requirements of this Article, provided such activities are undertaken in strict compliance with the requirements of such resolution.

4.4    No Waiver of Future Approvals.

Each Owner acknowledges that the persons reviewing applications under this Article will change from time to time and that opinions on aesthetic matters, as well as interpretation and application of the Design Guidelines, may vary accordingly. In addition, each Owner acknowledges that it may not always

25

First American Title

be possible to identify objectionable features of proposed Work until the Work is completed, in which case it may be unreasonable to require changes to the Improvements involved, but the Reviewer may refuse to approve similar proposals in the future. Approval of applications or Plans for any Work done or proposed, or in connection with any other matter requiring approval, shall not be deemed to constitute a waiver of the right to withhold approval as to any similar applications, Plans, or other matters subsequently or additionally submitted for approval.

4.5    Variances.

The Reviewer may, upon the request of an Owner and the submission of an application for a variance, authorize variances from compliance with any of its guidelines and procedures (but not the provisions of this Declaration) when circumstances such as topography, natural obstructions, hardship, or aesthetic or environmental considerations require, but only in accordance with duly adopted rules and regulations. No variance shall (a) be effective unless in writing; (b) be contrary to this Declaration; or (c) estop the Reviewer from denying a variance in other circumstances. For purposes of this Section, inability to obtain approval of any governmental agency, issuance of any permit, or terms of any financing shall not be considered a hardship warranting a variance. Variances need not be Recorded. If a variance is required in connection with an application, the variances shall be specifically listed and requested on the application. Notwithstanding the above, the DRC may not authorize a variance without the consent of (a) the Board, and (b) Declarant, so long as Declarant (or any of its affiliates) owns or has the right to acquire any portion of the Property or any real property adjacent to the Property, or has the right to expand the Property pursuant to Section 9.1. No such variance shall be effective unless the variance is expressly approved by the Board and Declarant, to the extent required hereunder.

**EVERY OWNER AGREES, BY ACQUIRING TITLE AND/OR POSSESSORY RIGHTS TO ANY LOT, THAT DETERMINATIONS AS TO VARIANCES HEREUNDER ARE PURELY SUBJECTIVE AND OPINIONS MAY VARY AS TO THE AESTHETIC EFFECT OF ANY PARTICULAR WAIVER. THE REVIEWER SHALL HAVE THE SOLE DISCRETION TO MAKE FINAL, CONCLUSIVE, AND BINDING DETERMINATIONS ON VARIANCES (SUBJECT TO DECLARANT'S APPROVAL, AS APPLICABLE) AND THEREFORE SUCH DETERMINATIONS SHALL NOT BE SUBJECT TO APPEAL. THERE ARE NO THIRD PARTY BENEFICIARIES TO ANY VARIANCE WHICH MAY BE GRANTED UNDER THIS SECTION 4.5. FURTHERMORE, NEITHER DECLARANT NOR THE DRC SHALL HAVE ANY DUTY TO DISCLOSE THE GRANTING OR EXISTENCE OF ANY VARIANCE. EVERY OWNER AGREES, BY ACQUIRING TITLE AND/OR POSSESSORY RIGHTS TO ANY LOT, THAT HE OR SHE WILL NOT BRING ANY ACTION OR SUIT AGAINST DECLARANT, THE MASTER ASSOCIATION, OR THE DRC OR ANY DESIGNATED REPRESENTATIVE OF ANY OF THE FOREGOING FOR THE RECOVERY OF DAMAGES BY REASON OF ANY REQUEST FOR A VARIANCE MADE BY SUCH OWNER, ANY OTHER OWNER OR ANY OTHER PERSON, WHETHER SUCH REQUEST IS GRANTED OR DENIED.**

4.6    Limitation of Liability.

The standards and procedures established by this Article are intended as a mechanism for maintaining and enhancing the overall aesthetics of the Tuscany Residential Community; they do not create any duty to any Person. Review and approval of any application pursuant to this Article is to be made on the basis of aesthetic considerations only and the Reviewer shall not bear any responsibility for ensuring (a) structural integrity or soundness of approved construction or modifications, (b) compliance with building codes and other governmental requirements, or (c) conformity of quality, value, size, or

26

design with other Dwellings or with the Improvements on a Multi-Family Lot. Neither (1) Declarant nor (2) Master Developer nor (3) the Master Association, the Board, the DRC or any Neighborhood or its board or any committee or member of the foregoing, nor (4) any employee, agent or representative of those listed in (1), (2) or (3) shall be held liable for (x) any claim whatsoever arising out of construction on or modifications to any Lot, (y) soil conditions, drainage or other general site work, any defects in plans revised or approved hereunder, or (z) any injury, damages, or loss arising out of the manner or quality of approved construction on or modifications to any Lot. In all such matters, the Persons protected under this Section 4.6 shall be defended and indemnified by the Master Association as provided in Section 7.6.

4.7     Certificate of Compliance.

Any Owner may request that the Reviewer issue a certificate of architectural compliance certifying that there are no known violations of this Article 4 or the Design Guidelines. The Reviewer shall either grant or deny such request within 30 days after receipt of a written request and may charge a reasonable administrative fee for issuing such certificates. Issuance of such a certificate shall estop the Master Association from taking enforcement action with respect to any condition as to which the Master Association had notice as of the date of such certificate.

4.8     Cure of Nonconforming Work; Enforcement.

Any construction, alteration, or other Work done in violation of this Article 4 or the Design Guidelines shall be deemed to be nonconforming. Upon written request from Declarant, the Master Association, or Reviewer, Owners shall, at their own cost and expense and within such reasonable time frame as set forth in such written notice, cure such nonconformance to the satisfaction of the requester or restore the Lot to substantially the same condition as existed prior to the nonconforming work. Should an Owner fail to remove and restore as required, Declarant, the Master Association, or their designees shall have the right to enter the property, remove the violation, and restore the property to substantially the same condition as previously existed. All costs, together with interest at the rate established by the Board (not to exceed the maximum rate then allowed by applicable law), may be assessed against the benefited Lot and collected as a Specific Assessment unless otherwise prohibited in this Declaration or the Act.

All approvals granted hereunder shall be deemed conditioned upon completion of all elements of the approved Work and all Work previously approved with respect to the same Lot, unless approval to modify any application has been obtained. In the event that any Person fails to commence and diligently pursue to completion all approved Work by the deadline set forth in the approval, Declarant or the Master Association shall be authorized, after notice to the Owner of the Lot and an opportunity to be heard in accordance with the Bylaws, to enter upon the Lot and remove or complete any incomplete Work and to assess all costs incurred against the benefited Lot and the Owner thereof as a Specific Assessment unless otherwise prohibited in this Declaration.

All acts by any contractor, subcontractor, agent, employee, or invitee of an Owner shall be deemed as an act done by or on behalf of such Owner. Any contractor, subcontractor, agent, employee, or other invitee of an Owner who fails to comply with the terms and provisions of this Article 4 and the Design Guidelines may be excluded from the Property, subject to Notice and Hearing. In such event, neither Declarant, the Master Association, nor their officers and directors shall be held liable to any Person for exercising the rights granted by this paragraph. The Master Association and/or Declarant shall have the authority and standing to pursue all legal and equitable remedies available to enforce the provisions of this Article 4 and the decisions of the Reviewer.

27

**Article 5.**
**Maintenance and Repair**

5.1     Maintenance of Lots and Private Amenities.

Each Owner shall maintain his or her Lot and all landscaping and Improvements comprising the Lot in a manner consistent with the Governing Documents, the Community-Wide Standard and all applicable covenants, unless such maintenance responsibility is otherwise assumed by or assigned to the Master Association or a Neighborhood pursuant to this Declaration, any Supplemental Declaration or any other declaration of covenants applicable to such Lot.

5.2     Maintenance of Neighborhood Property.

(a)     Maintenance by Neighborhood Association.    Each Neighborhood Association shall maintain its common property and any other property for which it has maintenance responsibility in a manner consistent with the Governing Documents, the Community-Wide Standard and all applicable covenants.

(b)     Maintenance by the Master Association.  The Owners within each Neighborhood that is not governed by a Neighborhood Association shall be responsible for paying, through Neighborhood Assessments, the costs of operating, maintaining and insuring certain portions of the Area of Common Responsibility within or adjacent to such Neighborhood.  This may include, without limitation, the costs of maintaining any signage, entry features, right-of-way and greenspace between the Neighborhood and adjacent public roads, private streets within the Neighborhood, and lakes or ponds within the Neighborhood, regardless of ownership and regardless of the fact that such maintenance may be performed by the Master Association; provided, however, all Neighborhoods which are similarly situated shall be treated the same.

(c)     Right of Master Association to Maintain Property in Neighborhood.    The Master Association may assume maintenance responsibility for property within any Neighborhood, in addition to that designated by any Supplemental Declaration, either by agreement with the Neighborhood or because, in the opinion of the Board, the level and quality of service then being provided is not consistent with the Community-Wide Standard.  All costs of maintenance pursuant to this paragraph shall be assessed as a Neighborhood Assessment only against the Lots within the Neighborhood to which the services are provided.

5.3     Responsibility for Repair and Replacement.

Unless otherwise specifically provided in the Governing Documents or in other instruments creating and assigning maintenance responsibility, responsibility for maintenance shall include responsibility for repair and replacement, as necessary to maintain the property to a level consistent with the Community-Wide Standard.

By virtue of taking title to a Lot, each Owner covenants and agrees with all other Owners and with the Master Association to carry property insurance for the full replacement cost of all insurable Improvements on his or her Lot, less a reasonable deductible, unless either the Neighborhood Association (if any) for the Neighborhood in which the Lot is located or the Master Association carries such insurance (which they may, but are not obligated to do hereunder).  If the Master Association assumes responsibility

28

for obtaining any insurance coverage on behalf of Owners, the premiums for such insurance shall be levied as a Specific Assessment against the benefited Lot and the Owner.

Each Owner further covenants and agrees that in the event of damage to or destruction of structures on or comprising his or her Lot, the Owner shall proceed promptly to repair or to reconstruct in a manner consistent with the original construction or such other drawings and specifications as are approved in accordance with Article 4. Alternatively, the Owner shall clear the Lot and maintain it in a neat and attractive, landscaped condition consistent with the Community-Wide Standard. The Owner shall pay any costs which are not covered by insurance proceeds.

The requirements of this Section shall apply to any Neighborhood Association responsible for common property within the Neighborhood in the same manner as if the Neighborhood Association were an Owner and the common property were a Lot. Additional Recorded covenants applicable to any Neighborhood may establish more stringent requirements for insurance and more stringent standards for rebuilding or reconstructing structures on the Lots within such Neighborhood and for clearing and maintaining the Lots in the event the structures are not rebuilt or reconstructed.

### PART THREE: COMMUNITY GOVERNANCE AND ADMINISTRATION

*The success of the Tuscany Residential Community is dependent upon the support and participation of every Owner in its governance and administration. The Declaration establishes the Master Association as the mechanism by which each Owner is able to provide that support and participation. While many powers and responsibilities are vested in the Master Association's Board of Directors, some decisions are reserved for the Master Association's membership -- the Owners of property in the Tuscany Residential Community.*

### Article 6.
### The Master Association and its Members

6.1    Function of The Master Association.

The Master Association is the entity responsible for management, maintenance, operation and control of the Area of Common Responsibility. The Master Association also is the primary entity responsible for enforcement of the Governing Documents. The Master Association shall perform its functions in accordance with the Governing Documents and applicable laws.

6.2    Membership.

Every Owner shall be a Member of the Master Association. There shall be only one membership per Lot. If a Lot is owned by more than one Person, all co-Owners shall share the privileges of such membership, subject to reasonable Board regulation and the restrictions on voting set forth in the Governing Documents, and all such co-Owners shall be jointly and severally obligated to perform the responsibilities of Owners. The membership rights of an Owner which is not a natural person may be exercised by any officer, director, partner or trustee, or by the individual designated from time to time by the Owner in a written instrument provided to the Secretary of the Master Association.

6.3    Membership Classes and Voting Rights.

The Master Association shall have two (2) classes of membership: Class A and Class B.

29

First American Title

(a)    <u>Class A</u>.  Class A shall be composed of all of the Owners of Residential Lots.  Each Owner shall have one (1) equal vote for each Residential Lot in which it holds the interest required for membership under Section 6.2, except that there shall be only one (1) vote per Lot.  Accordingly, the total number of Class A votes for the Master Association shall equal the total number of Residential Lots subject to this Declaration, from time to time.

(b)    <u>Class B</u>.  Class B shall be composed of all of the Owners of Multi-Family Lots.  Each Owner shall have one (1) equal vote for every five (5) Apartments located on each Multi-Family Lot in which it holds the interest required for membership under Section 6.2, except that there shall be no fractional votes.  The total number of Class B votes for each Multi-Family Lot shall be equal the total number of Apartments contained on such Multi-Family Lot, divided by five (5) and then rounded to the nearest whole number.  Accordingly, the total number of Class B votes for the Master Association shall be equal to the total number of Apartments subject to this Declaration, from time to time, divided by five (5) and rounded to the nearest whole number.

(c)    <u>Special Declarant Rights</u>.  Special Declarant Rights, including the right to approve, or withhold approval of, actions proposed under the Governing Documents during the Declarant Control Period, are specified in the relevant Sections of the Governing Documents.  Declarant may appoint a majority of the Board of Directors during the Declarant Control Period.

(d)    <u>Co-Owners</u>.  Where a Lot is owned jointly by co-owners, only one (1) such co-owner ("Designated Co-Owner"), designated from time to time by all of the co-owners in a written instrument provided to the Secretary of the Master Association, shall be entitled to exercise the one (1) vote to which the Lot is entitled.  Where no Designated Co-Owner has been designated, or if such designation has been revoked, the vote for such Lot shall be exercised as the majority of the co-owners of the Lot mutually agree.  Fractional votes shall not be allowed.  No vote shall be cast for any Lot where the co-owners present in person or by proxy owning the majority interests in such Lot cannot agree to said vote or other action.  Absent such advice and in the event that more than one such co-owner casts a vote, the Lot's vote shall be suspended and shall not be included in the final vote tally on the matter being voted upon.

6.4    <u>Neighborhoods.</u>

Every Lot shall be located within a Neighborhood.  A Multi-Family Lot may be classified as a single Neighborhood.  Unless and until additional Neighborhoods are established, the Tuscany Residential Community shall consist of a single Neighborhood.  Lots within a particular Neighborhood may be subject to additional covenants.  In addition, if required by law or otherwise approved by Declarant, Owners within the Neighborhood may be members of a Neighborhood Association in addition to the Master Association.  Owners within a Neighborhood also may, but shall not be required to, elect a Neighborhood Committee to represent their interests.  Neighborhood Committees may be elected as provided for in the Bylaws.

Exhibit "A" to this Declaration, and each Supplemental Declaration submitting additional property to this Declaration, shall initially assign the property submitted thereby to a specific Neighborhood (by name or other identifying designation), which Neighborhood may be then existing or newly created.  So long as it has the right to subject additional property to this Declaration pursuant to Section 9.1, Declarant may unilaterally amend this Declaration or any Supplemental Declaration to redesignate Neighborhood boundaries; provided, however, without consent of the Owners of a majority of Lots in the affected Neighborhoods, Declarant shall not combine two or more Neighborhoods.

30

First American Title

Any Neighborhood may request that the Master Association provide a higher level of service than that which the Master Association generally provides to all Neighborhoods or may request that the Master Association provide special services for the benefit of Lots in such Neighborhood. Upon the affirmative vote, written consent, or a combination thereof, of Owners of a majority of the Lots within the Neighborhood, the Master Association may, in the Board's discretion, provide the requested services. The cost of services requested by a Neighborhood and provided by the Master Association, which may include a reasonable administrative charge in such amount as the Board deems appropriate (provided, any such administrative charge shall apply at a uniform rate per Lot to all Neighborhoods receiving the same service), shall be assessed against the Lots within such Neighborhood as a Neighborhood Assessment.

6.5    Declarant Reservation of Right to Notice and Participate.

Declarant hereby reserves for itself, the rights set forth in this Section 6.5, to the fullest extent permitted under the Act, from the date of this Declaration and continuing until January 1, 2025.

(a)    Notice.  Declarant shall be given written notice of all meetings and proposed actions to be approved at meetings (or by written consent in lieu of a meeting) or any correspondence pertaining to any meetings or actions of the Master Association, the Board, or any committee, including but not limited to all correspondence and notices of all meetings of the Members or the Board.  Such notice shall be given to Declarant either personally or by sending a copy of the notice through the mail or by telecopy to the address of Declarant appearing on the books of the Master Association or supplied in writing by Declarant to the Master Association for purpose of notice.  Such notice shall be given in the same manner and be of the same content as required to be given to Members in accordance with the requirements contained in the Governing Documents and as required by the Act.  Any representative of Declarant and/or Master Developer may attend any meeting at which a Member may attend.  This Section may not be amended without the prior written consent of Declarant.

(b)    Participation.  Declarant and/or Master Developer shall be given the opportunity at any meeting of the Master Association, including Board and committee meetings, to join in or to have its representatives, or agents join in discussion from the floor of any prospective action, policy, or program. Declarant and/or Master Developer, its representatives, or agents may make its concerns, thoughts, and suggestions known to the Board and/or members of the subject committee, either during or outside of the meeting.  This Section may not be amended without the prior written consent of Declarant and Master Developer.

**Article 7.**
**Master Association Powers and Responsibilities**

7.1    Acceptance and Control of The Master Association Property.

(a)    To further its functions as set forth above, the Master Association, through action of its Board, may acquire, hold, and dispose of tangible and intangible personal and real property.  The Master Association may enter into leases, licenses, or operating agreements for portions of the Area of Common Responsibility, to permit use of such portions of the Area of Common Responsibility by community organizations and by others, whether nonprofit or for profit, or for the provision of goods or services for the general benefit or convenience of Owners and Residents of the Tuscany Residential Community.

31

First American Title

(b)     Within 30 days after Owners other than Declarant are entitled to elect a majority of the Directors pursuant to Section 2.18 and in accordance with the procedures set forth in NRS 116.31038, the Declarant shall deliver to the Master Association all personal property of the Owners and the Master Association which Declarant holds or controls including such items as are specifically required to be delivered under the Act.

(c)     Declarant and its designees may convey to the Master Association personal property and fee title, leasehold, or other property interests in any real property, improved or unimproved, described in Exhibits "A" or "C", including without limitation a community recreation center.  The Master Association shall accept and maintain such property at its expense for the benefit of its Members, subject to any restrictions set forth in the deed or other instrument transferring such property to the Master Association.  Upon written request of Declarant, the Master Association shall reconvey to Declarant any property originally conveyed by Declarant to the Master Association for no consideration, to the extent conveyed by Declarant in error or needed by Declarant to make adjustments in property lines.

(d)     The Master Association shall be responsible for management, operation, and control of the Area of Common Responsibility, subject to any covenants and restrictions set forth in the deed or other instrument transferring such property to the Master Association.  The Board may adopt such reasonable rules regulating use of the Area of Common Responsibility as it deems appropriate.

7.2     <u>Maintenance of Area of Common Responsibility.</u>

(a)     <u>Generally.</u>     The Master Association shall maintain, in accordance with the Community-Wide Standard, the Area of Common Responsibility, which may include, but need not be limited to:

(1)     all portions of and structures situated on the Common Elements, including without limitation, any guard house, traffic access gate and entrance monumentation;

(2)     landscaping within or adjacent to public rights-of-way within or abutting the Property;

(3)     such portions of any additional property included within the Area of Common Responsibility as may be dictated by this Declaration, any Supplemental Declaration, any covenant to share costs, or any contract or agreement for maintenance thereof entered into by the Master Association;

(4)     all ponds located within Tuscany which serve as part of the stormwater drainage system for the Tuscany Residential Community, including Improvements and equipment installed therein or used in connection therewith;

(5)     any property and facilities owned by Declarant and made available, on a temporary or permanent basis, for the primary use and enjoyment of the Master Association and its Members, such property and facilities to be identified by written notice from Declarant to the Master Association and to remain a part of the Area of Common Responsibility and be maintained by the Master Association until such time as Declarant revokes such privilege of use and enjoyment by written notice to the Master Association.

32

First American Title

(6)    all perimeter walls or fences Declarant constructs surrounding the Property (including those walls or fences which separate a Lot from the Golf Course or any other Private Amenity) or which separate a Lot from Area of Common Responsibility (regardless of whether such wall or fence is located on the Area of Common Responsibility or on a Lot). Provided, however, that except for that portion of the perimeter walls or fences consisting of wrought iron for which the Master Association shall have complete maintenance responsibility, an Owner shall be responsible for maintaining the interior surface of perimeter walls or fences located on such Owner's Lot.  A perimeter wall or fence shall not be a party wall or party fence as set forth in Article 14.

The Master Association may maintain other property which it does not own, including, without limitation, property dedicated to the public or otherwise open to the public, if the Board of Directors determines that such maintenance is necessary or desirable for the enjoyment of the Members or to maintain the Community-Wide Standard.

The Master Association shall not be liable for any damage or injury occurring on, or arising out of the condition of, property which it does not own except to the extent that it has been negligent in the performance of its maintenance responsibilities.

(b)    Continuous Operation.  The Master Association shall maintain the facilities and equipment within the Area of Common Responsibility in continuous operation, except for any periods necessary, as determined in the sole discretion of the Board, to perform required maintenance or repairs, unless the Requisite Membership Percentage or Declarant (during the Declarant Rights Period) agree in writing to discontinue such operation.  The Area of Common Responsibility shall not be reduced during the Declarant Rights Period by amendment of this Declaration or any other means except with Declarant's prior written approval.

(c)    Maintenance as Common Expenses.  Costs associated with maintenance, repair and replacement of the Area of Common Responsibility shall be a Common Expense; provided, the Master Association may seek reimbursement from the owner(s) of, or other Persons responsible for, certain portions of the Area of Common Responsibility pursuant to this Declaration, other Recorded covenants, or agreements with the owner(s) thereof.  Maintenance, repair and replacement of Neighborhood Common Elements shall be a Neighborhood Expense assessed to the Neighborhood(s) to which the Neighborhood Common Elements are assigned, notwithstanding that the Master Association may be responsible for performing such maintenance hereunder.

7.3    Insurance.

(a)    Required Coverages.  The Master Association, acting through its Board or its duly authorized agent, shall obtain and continue in effect the following types of insurance, if reasonably available, or if not reasonably available, the most nearly equivalent coverages as are reasonably available:

(i)    Blanket property insurance covering "risks of direct physical loss" on a "special form" basis (or comparable coverage by whatever name denominated) for all insurable Improvements on the Common Elements and within the Area of Common Responsibility to the extent that the Master Association has assumed responsibility in the event of a casualty, regardless of ownership.  If such coverage is not generally available at reasonable cost, then "broad form" coverage may be substituted. All property insurance policies obtained by the Master Association shall have policy limits sufficient to cover the full replacement cost of the insured Improvements under current building ordinances and codes;

33

(ii)     Commercial general liability insurance on the Area of Common Responsibility, insuring the Master Association and its Members for damage or injury caused by the negligence of the Master Association or any of its Members, employees, agents, or contractors while acting on its behalf. If generally available at reasonable cost, such coverage (including primary and any umbrella coverage) shall have a limit of at least $1,000,000.00 per occurrence with respect to bodily injury, personal injury, and property damage; provided, should additional coverage and higher limits be available at reasonable cost which a reasonably prudent person would obtain, the Master Association shall obtain such additional coverages or limits;

(iii)    Workers compensation insurance and employers liability insurance, if and to the extent required by law;

(iv)    Directors and officers liability coverage;

(v)    Commercial crime insurance, including fidelity insurance covering all Persons responsible for handling the funds of the Master Association in an amount determined in the Board's business judgment but not less than an amount equal to one-sixth of the annual Base Assessments on all Lots plus reserves on hand; provided, there shall be no requirement that the Master Association maintain fidelity insurance during the Declarant Control Period. Fidelity insurance policies shall contain a waiver of all defenses based upon the exclusion of Persons serving without compensation; and

(vi)    Such additional insurance as the Board, in its business judgment, determines is advisable.

In addition, the Master Association shall, if so specified in a Supplemental Declaration applicable to any Neighborhood, obtain and maintain property insurance on the insurable Improvements within such Neighborhood which insurance shall comply with the requirements of Section 7.3(a)(i). Any such policies shall provide for a certificate of insurance to be furnished upon request to the Owner of each Lot insured.

Premiums for all insurance on the Area of Common Responsibility shall be Common Expenses, except that (i) premiums for property insurance on Lots within a Neighborhood shall be a Neighborhood Expense; and (ii) premiums for insurance on Neighborhood Common Elements may be included in the Neighborhood Expenses of the Neighborhood(s) to which such Neighborhood Common Elements are assigned unless the Board reasonably determines that other treatment of the premiums is more appropriate.

(b)    Policy Requirements. All Master Association policies shall provide for a certificate of insurance to be furnished to the Master Association and, upon request, to each Member insured. The policies may contain a reasonable deductible and the amount thereof shall not be subtracted from the face amount of the policy in determining whether the policy limits satisfy the requirements of Section 7.3(a). In the event of an insured loss, the deductible shall be treated as a Common Expense or a Neighborhood Expense in the same manner as the premiums for the applicable insurance coverage. However, if the Board reasonably determines, after notice and an opportunity to be heard in accordance with the Bylaws, that the loss is the result of the negligence or willful misconduct of one or more Owners, their Residents or Invitees, then the Board may assess the full amount of such deductible against such Owner(s) and their Lots as a Specific Assessment.

All insurance coverage obtained by the Board shall:

34

   (i)  be written with a company authorized to do business in Nevada which satisfies the requirements of the Federal National Mortgage Association, or such other secondary mortgage market agencies or federal agencies as the Board deems appropriate;

   (ii)  be written in the name of the Master Association as trustee for the benefited parties.  Policies on the Common Elements shall be for the benefit of the Master Association and its Members.  Policies secured on behalf of a Neighborhood shall be for the benefit of the Owners within the Neighborhood and their Mortgagees, as their interests may appear;

   (iii)  not be brought into contribution with insurance purchased by Owners, Residents, or their Mortgagees individually;

   (iv)  contain an inflation guard endorsement;

   (v)  include an agreed amount endorsement, if the policy contains a co-insurance clause;

   (vi)  provide that each Owner is an insured person under the policy with respect to liability arising out of such Owner's interest in the Common Elements as a Member in the Master Association (provided, this provision shall not be construed as giving an Owner any interest in the Common Elements other than that of a Member);

   (vii)  provide a waiver of subrogation under the policy against any Owner or household member of an Owner;

   (viii)  include an endorsement precluding cancellation, invalidation, suspension, or non-renewal by the insurer on account of any one or more individual Owners, or on account of any curable defect or violation without prior written demand to the Master Association to cure the defect or violation and allowance of a reasonable time to cure; and

   (ix)  include an endorsement precluding cancellation, invalidation, or condition to recovery under the policy on account of any act or omission of any one or more individual Owners, unless such Owner is acting within the scope of its authority on behalf of the Master Association.

  In addition, the Board shall use reasonable efforts to secure insurance policies which list the Owners as additional insureds and provide:

   (i)  a waiver of subrogation as to any claims against the Master Association's Board, officers, employees, and its manager, the Owners and their tenants, servants, agents, and guests;

   (ii)  a waiver of the insurer's rights to repair and reconstruct instead of paying cash;

   (iii)  an endorsement excluding Owners' individual policies from consideration under any "other insurance" clause;

   (iv)  an endorsement requiring at least 30 days' prior written notice to the Master Association of any cancellation, substantial modification, or non-renewal;

35

First American Title

(v)     a cross liability provision; and

(vi)     a provision vesting in the Board exclusive authority to adjust losses; provided, however, no Mortgagee having an interest in such losses may be prohibited from participating in the settlement negotiations, if any, related to the loss.

(c)     Restoring Damaged Improvements.  In the event of damage to or destruction of Common Elements or other property which the Master Association is obligated to insure, the Board or its duly authorized agent shall file and adjust all insurance claims and obtain reliable and detailed estimates of the cost of repairing or restoring the property to substantially the condition in which it existed prior to the damage, allowing for changes or Improvements necessitated by changes in applicable building codes.

Damaged Improvements on the Common Elements shall be repaired or reconstructed unless the Owners representing at Requisite Membership Percentage and Declarant (if during the Declarant Control Period), decide within 60 days after the loss not to repair or reconstruct.  If either the insurance proceeds or estimates of the loss, or both, are not available to the Master Association within such 60-day period, then the period shall be extended until such funds or information are available.  However, such extension shall not exceed 60 additional days.  No Mortgagee shall have the right to participate in the determination of whether the damage or destruction to the Common Elements shall be repaired or reconstructed.

If a decision is made not to restore the damaged Improvements, and no alternative Improvements are authorized, the affected property shall be cleared of all debris and ruins and thereafter shall be maintained by the Master Association in a neat and attractive, landscaped condition consistent with the Community-Wide Standard.

Any insurance proceeds remaining after paying the costs of repair or reconstruction, or after such settlement as is necessary and appropriate, shall be retained by the Master Association for the benefit of its Members or the Owners of Lots within the insured Neighborhood, as appropriate, and placed in a capital improvements account.  This is a covenant for the benefit of Mortgagees and may be enforced by the Mortgagee of any affected Lot.

If insurance proceeds are insufficient to cover the costs of repair or reconstruction, the Board may, without a vote of the Owners, levy Special Assessments to cover the shortfall against those Owners responsible for the premiums for the applicable insurance coverage under Section 7.3(a).

7.4     Compliance and Enforcement.

(a)     Every Owner and Resident of a Lot shall comply with the Governing Documents.  The Board may impose sanctions for violation of the Governing Documents after Notice and Hearing.  The Board shall establish a range of penalties for such violations, with violations of the Declaration, unsafe conduct, harassment, or intentionally malicious conduct treated more severely than other violations.  Such sanctions may include, without limitation:

(1)     imposing reasonable monetary fines which shall, to the fullest extent permitted under the Act, constitute a lien upon the Lot owned or Occupied by the Person deemed to be in violation of the Governing Documents.  The amount of each such fine must be commensurate with the severity of the violation and shall in no event exceed the maximum permitted by the Act.  If a fine is imposed pursuant to this Section 7.4(a)(1) and the violation is not cured within fourteen days or such longer cure

36

First American Title

period as the Board establishes, then the violation shall be deemed a continuing violation and the Board may thereafter impose an additional fine for the violation for each seven day period or portion thereof that the violation is not cured. Any additional fine may be imposed without Notice and Hearing. In the event that any Resident or Invitee of an Owner or Resident violates the Governing Documents and a fine is imposed, the fine shall first be assessed against the Person found to have been in violation; provided, however, if the fine is not paid by the violator within the time period set by the Board, the Owner shall pay the fine upon the written demand of the Board;

(2)      suspending an Owner's right to vote;

(3)      suspending any Person's right to use any recreational facilities within the Common Elements; provided, however, nothing herein shall authorize the Board to limit ingress or egress to or from a Lot;

(4)      suspending any services provided by the Master Association to an Owner or the Owner's Lot if the Owner is more than 30 days delinquent in paying any assessment or other charge owed to the Master Association;

(5)      entering a Lot and, if necessary, a Dwelling or Apartment, and exercising self-help or taking action to abate any violation of the Governing Documents in a non-emergency situation;

(6)      requiring an Owner, at its own expense, to remove any structure or Improvement on such Owner's Lot in violation of Article 4 and to restore the Lot to its previous condition and, upon failure of the Owner to do so, the Board or its designee shall have the right to enter the property, remove the violation and restore the property to substantially the same condition as previously existed and any such action shall not be deemed a trespass;

(7)      without liability to any Person, precluding any contractor, subcontractor, agent, employee or other Invitee of an Owner or Resident who fails to comply with the terms and provisions of Article 4 and the Design Guidelines from continuing or performing any further activities in the Tuscany Residential Community; and

(8)      levying Specific Assessments to cover costs incurred by the Master Association to bring a Lot into compliance with the Governing Documents.

(9)      In addition, the Board may take the following enforcement procedures to ensure compliance with the Governing Documents without the necessity of compliance with the procedures set forth in the Bylaws:

(A)      exercising self-help in any emergency situation (specifically including, but not limited to, the towing of vehicles that are in violation of parking rules and regulations); and

(B)      bringing suit at law or in equity to enjoin any violation or to recover monetary damages or both.

(10)      In addition to any other enforcement rights, if an Owner fails properly to perform his or her maintenance responsibility, the Master Association may Record a notice of violation or perform such maintenance responsibilities and assess all costs incurred by the Master Association against the Lot

37

.

and the Owner as a Specific Assessment. If a Neighborhood Association fails to perform its maintenance responsibilities, the Master Association may perform such maintenance and assess the costs as a Specific Assessment against all Lots within such Neighborhood. Except in an emergency situation, the Master Association shall provide the Owner or Neighborhood Association reasonable notice and an opportunity to cure the problem prior to taking such enforcement action.

All remedies set forth in the Governing Documents shall be cumulative of any remedies available at law or in equity. In any action to enforce the Governing Documents, the prevailing party shall be entitled to recover all costs, including, without limitation, attorneys' fees and court costs, reasonably incurred in such action.

The Master Association shall not be obligated to take any action if the Board reasonably determines that the Master Association's position is not strong enough to justify taking such action. Such a decision shall not be construed a waiver of the right of the Master Association to enforce such provision at a later time under other circumstances or estop the Master Association from enforcing any other covenant, restriction or rule.

7.5     Implied Rights; Board Authority.

The Master Association, by contract or other agreement, may enforce applicable ordinances of the City and the County within the Tuscany Residential Community for the benefit of the Master Association and its Members. Furthermore, the Master Association may permit the City and the County access for the enforcement of such ordinances within the Tuscany Residential Community.

7.6     Indemnification of Officers, Directors and Others.

(a)     Indemnification. The Master Association shall indemnify every officer, director, and committee member against all damages and expenses, including counsel fees, reasonably incurred in connection with any action, suit, or other proceeding (including settlement of any suit or proceeding, if approved by the then Board of Directors) to which he or she may be a party by reason of being or having been an officer, director, or committee member, except that such obligation to indemnify shall be limited to those actions for which liability may be permitted under the Governing Documents or applicable Nevada law.

(b)     Claims Related to Breach of Duty. The officers, directors, and committee members shall not be liable for any mistake of judgment, negligent or otherwise, except for their own individual willful misfeasance, malfeasance, misconduct, or bad faith. The officers and directors shall have no personal liability with respect to any contract or other commitment made or action taken in good faith on behalf of the Master Association (except to the extent that such officers or directors may also be Members of the Master Association).

The Master Association shall indemnify and forever hold each such officer, director and committee member harmless from any and all liability to others on account of any such contract, commitment or action. This right to indemnification shall not be exclusive of any other rights to which any present or former officer, director, or committee member may be entitled. The Master Association shall, as a Common Expense, maintain adequate general liability and officers' and directors' liability insurance to fund this obligation, if such insurance is reasonably available.

38

7.7    Security.

The Master Association may, but shall not be obligated to, maintain or support certain activities within the Tuscany Residential Community designed to make the Tuscany Residential Community safer than it otherwise might be. Neither the Master Association nor Declarant shall in any way be considered insurers or guarantors of security within the Tuscany Residential Community, nor shall either be held liable for any loss or damage by reason of failure to provide adequate security or ineffectiveness of security measures undertaken. No representation or warranty is made that any systems or measures, including any mechanism or system for limiting access to Tuscany or the Tuscany Residential Community, cannot be compromised or circumvented, nor that any such systems or security measures undertaken will in all cases prevent loss or provide the detection or protection for which the system is designed or intended. Furthermore, although the streets within Tuscany are private and traffic access gates may be constructed within Tuscany, the walkways along the loop road within Tuscany are required to be open to the public which may further compromise any security measures undertaken within the Tuscany Residential Community. Each Owner acknowledges, understands and covenants to inform its Residents of its Lot that the Master Association, its Board and committees, and Declarant are not insurers and that each Person using the Tuscany Residential Community assumes all risks of personal injury and loss or damage to property, including Lots and the contents of Lots, resulting from acts of third parties.

7.8    Powers of the Master Association Relating to Sub-Associations.

The Master Association shall have the power to veto any action taken or contemplated to be taken by any Neighborhood Association which the Board reasonably determines to be adverse to the interests of the Master Association or its Members or inconsistent with the Community-Wide Standard. The Master Association also shall have the power to require specific action to be taken by any Neighborhood Association in connection with its obligations and responsibilities, such as requiring specific maintenance or repairs or aesthetic changes to be effectuated and requiring that a proposed budget include certain items and that expenditures be made therefor.

A Neighborhood Association shall take appropriate action required by the Master Association in a written notice within the reasonable time frame set by the Master Association in the notice. If the Neighborhood Association fails to comply, the Master Association shall have the right to effect such action on behalf of the Neighborhood Association and levy Specific Assessments to cover the costs, as well as an administrative charge and sanctions.

7.9    Provision of Services.

(a)    Generally. The Master Association may provide or contract to provide for services and facilities for the benefit of all Owners and their Residents and Invitees, and shall be authorized to enter into contracts or agreements with other entities, including Declarant, to provide such services and facilities, which charges and fees shall be Common Expenses. The Board may charge use and consumption fees for such services and facilities. By way of example, some services and facilities which might be offered include landscape maintenance, pest control service, cable television service, internet service, security, caretaker, transportation, fire protection, utilities, and similar services and facilities. Nothing herein shall be construed as a representation by Declarant or the Master Association as to what, if any, services shall be provided. In addition, the Board shall be permitted to modify, cancel or terminate existing services, in its discretion, unless (i) otherwise required by the Governing Documents or (ii) otherwise prohibited by the terms of any applicable contract or applicable law.

39

First American Title

(b)    Cable Services. In furtherance of this Section 7.9, the Master Association has or will enter into a contract ("Cable Services Agreement") for the provision, distribution, maintenance, transmission and servicing of off-air and satellite channels of video programming ("Cable Services") to each Dwelling by a broadband bulk cable service provider ("Cable Provider"). The Cable Provider has installed and/or will cause the installation of all facilities (except inside wiring) necessary to transmit Cable Services to all Dwellings within the Tuscany Residential Community, and in exchange the Master Association has or will contract for the provision of basic Cable Services to every Dwelling. **EVERY OWNER AND RESIDENT AGREES, BY ACQUIRING TITLE AND/OR POSSESSORY RIGHTS TO ANY LOT, as follows:**

(i) The Cable Service Agreement provides that Cable Provider is to have the exclusive right to provide Cable Services in the Tuscany Residential Community, to the extent permitted by law.

(ii) The cost of such basic Cable Services is a Common Expense that will be assessed to every Owner as set forth in this Declaration; provided, however, that each Owner or Resident will be required to pay directly to the Cable Provider the following fees and costs: (1) a one-time activation fee to activate basic service for up to four outlets in the Dwelling; and (2) the prevailing rate of any additional outlets, services, programming and/or repairs requested by the Owner; and (3) such other charges as may be imposed by the Cable Provider as a condition to the provision of Cable Services; and (4) such other charges as may be agreed to by the Owner or its Resident or Invitees.

(iii) No Owner shall be exempt from the obligation to pay for such services to the extent billed through the Master Association as part of the Common Expenses, if provided to all Owners as a Common Expense, regardless of whether (1) the Cable Services are ever activated by the Owner or Resident, or (2) the Cable Service Provider terminates the provision of Cable Services to that Lot because that Lot Owner or its Resident or Invitees engaged in unauthorized use of the Cable Services, theft of signal, violation of such party's agreement with the Cable Service Provider, violation of a federal, state or local law or regulation governing the Cable Service, or (3) the Cable Service Provider refuses to provide Cable Services to that Lot for any other reason.

(c)    No Exemption. No Owner shall be exempt from the obligation to pay for such services, if provided to Owners as a Common Expense, based upon non-use or any other reason.

7.10    Relations with Other Property; Entities.

The Master Association may enter into contractual agreements or covenants to share costs with any neighboring property or Private Amenity or entity to contribute funds for, among other things, shared or mutually beneficial property or services and/or a higher level of maintenance for the Common Elements.

7.11    Facilities and Services Open to the Public.

Certain facilities and areas within the Tuscany Residential Community are required by the City to be open for use and enjoyment of the public. Such facilities and areas shall initially include access to the public parks and other public sites (if any) within the Tuscany Residential Community as well as the walking paths and trails within the Tuscany Residential Community, and may additionally include, by way of example: greenbelts, parks, and other neighborhood spots conducive to gathering and interaction, roads, sidewalks, and medians. Declarant may designate such additional facilities and areas as open to

40

the public at the time Declarant makes such facilities and areas a part of the Area of Common Responsibility or the Board may so designate at any time thereafter.

## Article 8.
## Master Association Finances

8.1    Budgeting and Allocating Common Expenses.

At least 60 days before the beginning of each fiscal year, the Board shall prepare a budget of the estimated Common Expenses for the coming year in compliance with the Act, which shall include the budget for the daily operation of the Master Association and an adequate reserve for the repair, replacement and restoration of the major components of the Common Elements pursuant to Section 8.3. The budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Lots, and the amount to be generated through the levy of Base Assessments and Special Assessments against the Lots, as authorized in Section 8.4.

The Master Association is hereby authorized to levy Base Assessments equally against all Lots subject to assessment under Section 8.6 to fund the Common Expenses in proportion with the allocation of votes under Section 6.3(a) and Section 6.3(b). Specifically, each Residential Lot shall be assessed one Base Assessment and each Multi-Family Lot shall be assessed one equal Base Assessment for every five (5) Apartments located on that Multi-Family Lot. In determining the Base Assessment rate per Lot, the Board may consider any assessment income expected to be generated from any additional Lots reasonably anticipated to become subject to assessment during the fiscal year.

The Board shall send a copy of the final budget or a summary thereof, together with notice of the amount of the Base Assessment to be levied pursuant to such budget, to each Owner not less than 30 days before the beginning of each fiscal year and the Board shall set a date for a meeting of the Owners to consider ratification of the budget. The meeting shall be not less than fourteen (14) or more than thirty (30) days after mailing of the budget or summary. Unless at that meeting a majority of the total aggregate voting power of the Master Association reject the budget, the budget is ratified, whether or not a quorum is present.

If any proposed budget is rejected, the periodic budget last ratified by the Owners continues until the Owners ratify a subsequent budget proposed by the Board.

The Board may revise the budget and adjust the Base Assessment from time to time during the year, subject to the notice requirements and the right of the Owners to disapprove the revised budget as set forth above.

8.2    Budgeting and Allocating Neighborhood Expenses.

At least 60 days before the beginning of each fiscal year, the Board shall prepare a separate budget covering the estimated Neighborhood Expenses for each Neighborhood on whose behalf Neighborhood Expenses are expected to be incurred during the coming year ("Neighborhood Budget"). Each such Neighborhood Budget shall be prepared in compliance with the Act, and shall include any costs for additional services or a higher level of services which the Owners in such Neighborhood have ratified pursuant to Section 6.4(a) and an adequate reserve for the repair, replacement and restoration of the major components of the Neighborhood Common Elements attributable to the Neighborhood pursuant

41

First American Title

to Section 8.3. The Neighborhood Budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Lots, and the amount required to be generated through the levy of Neighborhood and Special Assessments against the Lots in such Neighborhood.

The Master Association is hereby authorized to levy Neighborhood Assessments equally against all Lots in the Neighborhood which are subject to assessment under Section 8.6 to fund Neighborhood Expenses; provided, if so specified in the applicable Supplemental Declaration or if so directed by petition signed by a majority of the Owners within the Neighborhood, any portion of the assessment intended for exterior maintenance of structures, insurance on structures, or replacement reserves which pertain to particular structures shall be levied on each of the benefited Lots in proportion to the benefit received.

When applicable, the Board shall send a copy of the final Neighborhood Budget or a summary thereof, together with notice of the amount of the Neighborhood Assessment to be levied pursuant to such Neighborhood Budget, to each Owner not less than 30 days before the beginning of each fiscal year and the Board shall set a date for a meeting of the Owners in that Neighborhood to consider ratification of the budget. The meeting shall be not less than fourteen (14) or more than thirty (30) days after mailing of the Neighborhood Budget or summary. Unless at that meeting a majority of the total aggregate voting power of that Neighborhood reject the budget.

If any proposed Neighborhood Budget is rejected, the periodic budget last ratified by the applicable Owners in that Neighborhood shall continue in effect until the Owners ratify a subsequent Neighborhood Budget proposed by the Board of Directors.

The Board may revise the Neighborhood Budget for any Neighborhood and the amount of any Neighborhood Assessment from time to time during the year, subject to the notice requirements and the right of the Owners of Lots in the affected Neighborhood to disapprove the revised Neighborhood Budget as set forth above.

8.3    Budgeting for Reserves.

The Board shall establish and maintain a separate reserve account for the repair, replacement and restoration of the major components of the Common Elements based upon the age, remaining life and the quantity and replacement cost of major components of the Common Elements, in accordance with the provisions of this Declaration and the Bylaws. While the reserve account of the Master Association may be combined with the applicable reserve funds of any Neighborhood, in no event may any reserve funds be used for the daily maintenance expenses of the Tuscany Residential Community. The Board shall additionally cause to be conducted at least once every 5 years, or more often as may be required by the Act, a study of the reserves required for the repair, replacement and restoration of the major components of the Common Elements. Such reserve study shall be prepared in compliance with the Act and shall be reviewed at least annually (during the preparation of the Master Association budget) to determine if those reserves are sufficient in order to make any adjustments as may be necessary to maintain adequate reserves.

8.4    Special Assessments.

In addition to other authorized assessments, the Master Association may levy Special Assessments to cover capital improvements, to cover unbudgeted expenses or to cover expenses in excess

42

First American Title

of those budgeted. Any such Special Assessment may be levied against the entire membership, if such Special Assessment is for Common Expenses, or against the Lots within any Neighborhood if such Special Assessment is for Neighborhood Expenses. Except as otherwise specifically provided in this Declaration, any Special Assessment shall require the affirmative vote or written consent the Requisite Membership Percentage (if Common Expense) or the Requisite Neighborhood Percentage (if Neighborhood Expense), and the written Consent of Declarant if during the Declarant Rights Period. Special Assessments shall be payable in such manner and at such times as determined by the Board, and may be payable in installments extending beyond the fiscal year in which the Special Assessment is approved.

8.5    Specific Assessments.

The Master Association shall have the power to levy Specific Assessments against a particular Lot as follows:

(a)    to cover the costs, including overhead and administrative costs, of providing services to Lots upon request of an Owner pursuant to any menu of special services which may be offered by the Master Association (which might include the items identified in Section 7.9). Specific Assessments for special services may be levied in advance of the provision of the requested service; and

(b)    to cover costs incurred in bringing the Lot into compliance with the Governing Documents, or costs incurred as a consequence of the conduct of the Owner or Residents of the Lot, and their Invitees; provided, the Board shall give the Lot Owner prior written notice and an opportunity for a hearing, in accordance with the Bylaws, before levying any Specific Assessment under this subsection (b).

The Master Association may also levy a Specific Assessment against the Lots within any Neighborhood to reimburse the Master Association for costs incurred in bringing the Neighborhood into compliance with the provisions of the Governing Documents, subject to Notice and Hearing with respect to such Owners in the Neighborhood before levying any such assessment.

8.6    Authority To Assess Owners; Time of Payment.

Declarant hereby establishes and the Master Association is hereby authorized to levy assessments as provided for in this Article and elsewhere in the Governing Documents. The obligation to pay assessments shall commence as to each Lot as follows:

(a)    Residential Lots. The obligation to pay assessments shall commence as to each Residential Lot (other than the Custom Lots) on the first day of the month following: (a) the month in which the Lot is made subject to this Declaration, or (b) the month in which the Board first determines a budget and levies assessments pursuant to this Article, whichever is later.

(b)    Custom Lots. The obligation to pay assessments shall commence as to each Custom Lot as follows: (a) for each Custom Lot that is part of the initial Custom Lots (specifically, within Parcel 13 as described on Exhibit "A") made subject to this Declaration, the first day of the month following the earlier to occur of: (1) the day that is two (2) years from the day that construction has been commenced on the last residential "parcel" within Tuscany following the commencement of construction on every other "parcel," regardless of whether Lots within such "parcel" have been added to the Tuscany Residential Community pursuant to Section 9.1, or (2) the date that the Dwelling on the Custom Lot is completed, as

43

evidenced by the issuance of a certificate of occupancy therefore; and (b) for each Custom Lot that is added to the Tuscany Residential Community pursuant to Section 9.1, the first day of the month following the earlier to occur of: (1) the day that is two (2) years from the day that the Supplemental Declaration that adds the Custom Lot to the Tuscany Residential Community is Recorded, or (2) the date that the Dwelling on the Custom Lot is completed, as evidenced by the issuance of a certificate of occupancy therefore. As used in clause (a)(1) of this Section 8.6(b), the term "parcel" shall mean that portion of the real property described on Exhibit "A" and/or Exhibit "B" that is shown on one Plat.

(c)     Multi-Family Lots.  The obligation to pay assessments shall commence as to each Multi-Family Lot added to this Declaration on the first day of the month following the month in which the Lot is made subject to this Declaration and shall be based on the number of Apartments located on such Lot (as set forth in Section 6.3(b) of this Declaration).

The first annual Base Assessment and Neighborhood Assessment, if any, levied on each Lot shall be adjusted according to the number of months remaining in the fiscal year at the time assessments commence on the Lot.  Notwithstanding the foregoing, if a Subsidy Agreement is in effect, Assessments as to all unsold Lots owned by Declarant shall commence upon termination or expiration of the Subsidy Agreement.

Assessments shall be paid in such manner and on such dates as the Board may establish.  The Board may require advance payment of assessments at closing of the transfer of title to a Lot and impose special requirements for Owners with a history of delinquent payment.  If the Board so elects, assessments may be paid in two or more installments.  Unless the Board otherwise provides, the Base Assessment and any Neighborhood Assessment shall be due and payable in monthly installments due on the first day of each month.  If any Owner is delinquent in paying any assessments or other charges levied on his Lot, the Board may require the outstanding balance on all assessments to be paid in full immediately.

8.7     Personal Obligation for Assessments.

Each Owner, by accepting a deed or entering into a Recorded contract of sale for any portion of the Property, is deemed to covenant and agree to pay all assessments authorized in the Governing Documents.  All assessments, together with interest (computed from its due date at a rate of 10% per annum or such higher rate as the Board may establish, subject to the limitations of Nevada law), late charges as determined by Board resolution, costs, and reasonable attorneys' fees, shall be the personal obligation of each Owner and a lien upon each Lot until paid in full.  Upon a transfer of title to a Lot, the grantee shall be jointly and severally liable for any assessments and other charges due at the time of conveyance.

Failure of the Board to fix assessment amounts or rates or to deliver or mail each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments.  In such event, each Owner shall continue to pay Base Assessments and Neighborhood Assessments on the same basis as during the last year for which an assessment was made, if any, until a new assessment is levied, at which time the Master Association may retroactively assess any shortfalls in collections.

No Owner may exempt himself from liability for assessments by non-use of the Common Elements, abandonment of his or her Lot, or any other means.  The obligation to pay assessments is a separate and independent covenant on the part of each Owner.  No diminution or abatement of

44

assessments or set-off shall be claimed or allowed for any alleged failure of the Master Association or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or Improvements, or from any other action it takes.

Upon written request, the Master Association shall furnish to any Owner liable for any type of assessment a certificate in writing signed by a Master Association officer setting forth whether such assessment has been paid. Such certificate shall be conclusive evidence of payment. The Master Association may require the advance payment of a reasonable processing fee for the issuance of such certificate.

8.8     Lien for Assessments.

The Master Association shall have a lien against each Lot to secure payment of delinquent assessments, as well as interest, late charges (subject to the limitations of Nevada law), and costs of collection (including attorneys' fees). Such lien shall be superior to all other liens which are Recorded after the Recordation of this Declaration, except (a) the liens of all taxes, bonds, assessments, and other levies which by law would be superior, and (b) the lien or charge of any Recorded first Mortgage (meaning any Recorded Mortgage with first priority over other Mortgages) made in good faith and for value. Such lien, when delinquent, may be enforced by suit, judgment, and judicial or nonjudicial foreclosure. A lien under this Section is also prior to all first Mortgages described in (b) above to the extent that the Assessments are based on the periodic budget adopted by the Master Association in accordance with the provisions of this Declaration and would have become due in the absence of acceleration, during the six months immediately preceding institution of an action to enforce the Master Association's lien. This Subsection does not affect the priority of mechanics' or materialmen's liens or the priority of a lien for other assessments made by the Master Association.

Fees, charges, late charges, fines and interest charged pursuant to the Act and the Governing Documents are enforceable as assessments under this Section and, unless otherwise prohibited by the Act, the Master Association may foreclose upon a lien for unpaid assessments regardless of whether the assessment is comprised solely of fines levied against an Owner for violation of the Governing Documents.

The Master Association's lien may be foreclosed in the manner set forth in the Act or any other manner permitted by law.

The Master Association may bid for the Lot at the foreclosure sale and acquire, hold, lease, mortgage, and convey the Lot. While a Lot is owned by the Master Association following foreclosure: (a) no right to vote shall be exercised on its behalf; (b) no assessment shall be levied on it; and (c) each other Lot shall be charged, in addition to its usual assessment, its pro rata share of the assessment that would have been charged such Lot had it not been acquired by the Master Association. The Master Association may sue for unpaid assessments and other charges authorized hereunder without foreclosing or waiving the lien securing the same.

Sale or transfer of any Lot shall not affect the assessment lien or relieve such Lot from the lien for any subsequent assessments. However, the sale or transfer of any Lot pursuant to foreclosure of the first Mortgage shall extinguish the lien as to any installments of such assessments due prior to the Mortgagee's foreclosure except to the extent that any such assessments have priority over the lien of the first Mortgage under clause (b) of the first paragraph of this Section 8.8. The subsequent Owner of the foreclosed Lot shall not be personally liable for assessments on such Lot due prior to such acquisition of title. Such

45

unpaid assessments shall be deemed to be Common Expenses collectible from Owners of all Lots subject to assessment under Section 8.6, including such acquirer, its successors and assigns. The lien rights created in this Declaration shall be for the benefit of the Master Association.

8.9     Exempt Property.

The following property shall be exempt from payment of Base Assessments, Neighborhood Assessments, Special Assessments and Specific Assessments:

(a)     All Common Elements and such portions of the property owned by Declarant as are included in the Area of Common Responsibility;

(b)     Any property dedicated to and accepted by any governmental authority or public utility;

(c)     Property owned by any Neighborhood Association for the common use and enjoyment of its members, or owned by the members of a Neighborhood Association as tenants-in-common; and

(d)     The Commercial Components (which shall, however, be subject to payment of periodic amounts as set forth in Article 18, below).

8.10     Capitalization of Master Association.

Upon acquisition of record title to a Residential Lot by the first Purchaser, that first Purchaser shall make a contribution to the working capital of the Master Association in an amount equal to one-sixth (1/6) of the annual Base Assessment per Residential Lot for that year, and upon acquisition of record title to a Multi-Family Lot by an Owner other than Declarant, that first Owner shall make a contribution to the working capital of the Master Association in an amount equal to one-sixth (1/6) of the annual Base Assessment applicable to that Multi-Family Lot for that year. Capital contributions made under this Section 8.10 shall be in addition to, not in lieu of, the annual Base Assessment and shall not be considered an advance payment of such assessment. Each Lot's share of the working capital fund shall be collected and then contributed to the Master Association by Declarant either at the time the sale of the Lot is closed or at the termination of the Declarant Control Period, if earlier. While Declarant is in control of the Board, Declarant cannot use any of the working capital funds to defray the Declarant's own development expenses or construction costs.

8.11     Subsidy Agreements and Declarant Advances.

(a)     Subsidy Agreements. The Master Association is specifically authorized to enter into an agreement (a "Subsidy Agreement") with the Declarant under which such party agrees to subsidize, directly or indirectly, the operating costs of the Master Association in exchange for a temporary suspension of Assessments which would otherwise be payable by Declarant with respect to Lots owned by Declarant and/or those Lots owned by any Declarant affiliate, holding company, finance company or other third party, while the Lot is used by Declarant as a model home and/or sales office.

(b)     Declarant Advances. During the Declarant Control Period, Declarant shall have the right, but not the obligation, to advance funds and/or make loan(s) to the Master Association ("Declarant Advances") from time to time for the sole purpose of paying Common Expenses in excess of Master Association funds then reasonably available to pay Common Expenses. The aggregate amount of any Declarant Advances outstanding from time to time, together with interest at a reasonable rate established

46

by Declarant, shall be repaid by the Master Association to Declarant as soon funds are reasonably available therefore (or, at Declarant's sole and absolute discretion, may be set off and applied by Declarant from time to time against any and all past, current, or future Common Expense Assessments and/or contributions to reserve accounts, to such extent, if any, Declarant is obligated to pay any such amounts under this Declaration, any Subsidy Agreement, or under applicable Nevada law).

**PART FOUR: COMMUNITY DEVELOPMENT**

*The Declaration reserves various rights to the Declarant in order to facilitate the smooth and orderly development of the Tuscany Residential Community and to accommodate changes in the Master Plan which inevitably occur as a community the size of the Tuscany Residential Community grows and matures.*

**Article 9.**
**Expansion of the Community**

9.1     Expansion by Declarant.

Declarant, from time to time, may make subject to the provisions of this Declaration all or any portion of the property described in Exhibit "C," together with any additional property not described in Exhibit "C" to the extent allowed by the Act, by Recording a Supplemental Declaration which describes the additional property to be subjected and which otherwise complies with the Act and the provisions of this Section 9.1.  Declarant shall have the right hereunder to create up to a total of 2,095 Lots in the Tuscany Residential Community.  A Supplemental Declaration Recorded pursuant to this Section shall not require the consent of any Person except the owner of such property, if other than Declarant.  Declarant's right to expand the Tuscany Residential Community includes the right to create Lots, Common Elements, Neighborhoods and Neighborhood Common Elements with respect to such annexed property.

Declarant's right to expand the Tuscany Residential Community pursuant to this Section shall expire 20 years after this Declaration is Recorded.  Until then, Declarant may transfer or assign this right to any Person who is the developer of at least a portion of the real property described in Exhibits "A" or "C."  Any such transfer shall be memorialized in a written, Recorded instrument executed by Declarant.

Nothing in this Declaration shall be construed to require Declarant or Master Developer or any of their respetive successors to subject additional property to this Declaration or to develop any of the property described in Exhibit "C" in any manner whatsoever.

Each Supplemental Declaration which subjects real property to the Declaration shall contain the following information, as applicable:

(a)     A legal description of the real property to be annexed;

(b)     Whether the Lots contained within the real property to be annexed are Residential Lots or Multi-Family Lots;

(c)     The number of Lots.  In addition, if any of the Lots to be annexed are Multi-Family Lots, then the Supplemental Declaration shall identify the maximum number of permissible Apartments as designated by Declarant;

47

First American Title

(d)     A designation of the Neighborhood or Neighborhoods to which the Lots contained within the real property to be annexed are to be included within;

(e)     A legal description of the Common Elements included therein, if any;

(f)     If any part of the Common Elements is designated as Neighborhood Common Elements then the Supplemental Declaration shall identify the Neighborhood Common Elements and the Lots or Neighborhood to which such Neighborhood Common Elements are assigned;

(g)     If the real property being annexed is part of a Neighborhood Association, then the Supplemental Declaration shall identify the Neighborhood Association and specify the common property and any other property for which the Neighborhood Association has maintenance responsibility;

(h)     A description of any additional Areas of Common Responsibility for which the Master Association is to become obligated to maintain;

(i)     If any part of the real property being annexed is located near or adjacent to the French Drains, then the Supplemental Declaration shall specify the location of the French Drains with respect to the annexed real property;

(j)     If a Builder has been designated by Declarant for the real property to be annexed, then the Supplemental Declaration shall include the name and address of the Builder;

(k)     State that the real property to be annexed is subjected to the covenants, conditions, and restrictions contained herein;

(l)     Provide for the readjustment of voting rights and assessment allocations in accordance with the formulas provided herein;

(m)     State that any such expansion shall be effective upon the Recordation of the Supplemental Declaration except as provided therein; and

(n)     Contain such other information as may be necessary to comply with the applicable provisions of the Act.

9.2     Expansion by the Master Association.

The Master Association may also subject additional property to the provisions of this Declaration by Recording a Supplemental Declaration describing the additional property. Any such Supplemental Declaration shall require the affirmative vote of not less than the Requisite Membership Percentage at a meeting duly called for such purpose and the consent of the owner of the property. In addition, so long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1, Declarant's consent shall be necessary. The Supplemental Declaration shall be signed by the President and Secretary of the Master Association, by the owner of the property and by Declarant, if Declarant's consent is necessary.

48

First American Title

9.3     Additional Covenants and Easements.

Declarant may subject any portion of the Property to additional covenants and easements, including covenants obligating the Master Association to maintain and insure such property and authorizing the Master Association to recover its costs through Neighborhood Assessments. Such additional covenants and easements may be set forth either in a Supplemental Declaration subjecting such property to this Declaration or in a separate Supplemental Declaration referencing property previously subjected to this Declaration. If the property is owned by someone other than Declarant, then the consent of the Owner(s) shall be necessary and shall be evidenced by their execution of the Supplemental Declaration. Any such Supplemental Declaration may supplement, create exceptions to, or otherwise modify the terms of this Declaration as it applies to the subject property in order to reflect the different character and intended use of such property.

9.4     Effect of Filing Supplemental Declaration.

A Supplemental Declaration shall be effective upon Recording unless otherwise specified in such Supplemental Declaration. On the effective date of the Supplemental Declaration, any additional property subjected to this Declaration shall be assigned voting rights in the Master Association and assessment liability in accordance with the provisions of this Declaration.

**Article 10.**
**Additional Rights Reserved to Declarant**

10.1     Withdrawal of Property.

Declarant reserves the right to amend this Declaration, so long as it has a right to annex additional property pursuant to Section 9.1, for the purpose of removing any portion of the Property, which has not yet been improved with structures, from the coverage of this Declaration, provided such withdrawal does not reduce the total number of Lots then subject to the Declaration by more than 10%. Such amendment shall not require the consent of any Person other than the Owner(s) of the property to be withdrawn, if not the Declarant. If the property is part of the Common Elements, the Master Association shall consent to such withdrawal.

10.2     Marketing and Sales Activities.

Declarant and Builders authorized by Declarant may construct and maintain upon portions of the Common Elements such facilities and activities as, in Declarant's sole opinion, may be reasonably required, convenient, or incidental to the construction or sale of Lots, including, but not limited to, business offices, sales offices, signs, flags, banners, displays, model units, and sales offices. Declarant and authorized Builders shall have easements for access to and use of such facilities.

10.3     Right To Develop.

Declarant, Master Developer and their respective employees, agents and designees shall have a right of access and use and an easement over and upon all of the Common Elements for the purpose of making, constructing and installing Improvements to (a) the Common Elements , (b) any real property which may be added to the Tuscany Residential Community by Declarant under Article 9, (c) any real property owned by Declarant or which Declarant has the right to acquire, (d) any other real property adjacent to the Property, and (e) any part of the Commercial Components.

49

Every Person that acquires any interest in the Property acknowledges that the Tuscany Residential Community is a master planned community, the development of which is likely to extend over many years, and agrees not to protest, challenge or otherwise object to (a) changes in uses or density of property outside the Neighborhood in which such Person holds an interest, or (b) changes in the Master Plan as it relates to property outside the Neighborhood in which such Person holds an interest.

10.4    Right To Approve Additional Covenants.

No Person shall Record any declaration of covenants, conditions and restrictions, or declaration of condominium or similar instrument affecting any portion of the Property without Declarant's review and written consent. Any attempted Recordation without such consent shall result in such instrument being void and of no force and effect unless subsequently approved by written consent signed and Recorded by Declarant. Once approved by Declarant and Recorded, any declaration (as defined in the Act) or similar instrument affecting any portion of the Property shall be in addition to and not in limitation of, the provisions of this Declaration. In the event of any conflict between this Declaration or any other Governing Document and any declaration (as defined in the Act) or similar instrument affecting any portion of the Property which is Recorded, then the terms of the Governing Documents shall control.

10.5    Right To Approve Changes in Standards.

No amendment to or modification of any Rules and Regulations or Design Guidelines shall be effective without prior notice to and the written approval of Declarant so long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1.

10.6    Right To Merge or Consolidate the Master Association.

Declarant reserves the right to merge or consolidate the Master Association with another common interest community of the same form of ownership.

10.7    Right To Appoint and Remove Directors During Declarant Control Period.

Declarant may appoint and remove the Master Association's officers and directors during the Declarant Control Period as provided in this Declaration and the Governing Documents.

10.8    Right To Designate Sites for Governmental and Public Interests.

For so long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the of the Property, Declarant may designate sites within or adjacent to the Property for government, education, or religious activities and interests, including without limitation, fire, police, and utility facilities, schools and educational facilities, houses of worship, parks, and other public facilities.

10.9    Right To Transfer or Assign Declarant Rights.

Any or all of Declarant's special rights and obligations set forth in this Declaration or the Bylaws may be transferred in whole or in part to other Persons; provided, the transfer shall not reduce an obligation nor enlarge a right beyond that which Declarant has under this Declaration or the Bylaws. No such transfer or assignment shall be effective unless it is in a written instrument signed and Recorded by

50

Declarant. The foregoing sentence shall not preclude Declarant from permitting other Persons to exercise, on a one time or limited basis, any right reserved to Declarant in this Declaration where Declarant does not intend to transfer such right in its entirety, and in such case it shall not be necessary to Record any written assignment unless necessary to evidence Declarant's consent to such exercise.

10.10   Easement to Inspect and Right to Correct.

(a)      Easement. Declarant reserves, for itself and such other Persons as it may designate, including Master Developer, perpetual, non-exclusive easements throughout the Property to the extent reasonably necessary for the purposes of access, inspecting, testing, redesigning, correcting, or improving any portion of the Property, including Lots and the Area of Common Responsibility. Declarant shall have the right to redesign, correct, or improve any part of the Property, including Lots and the Area of Common Responsibility.

(b)      Right of Entry. In addition to the above easement, Declarant reserves a right of entry onto a Lot upon reasonable notice to the Owner; provided, in an emergency, no such notice need be given. Entry into a Lot shall be only after Declarant notifies the Owner (or Resident) and agrees with the Owner regarding a reasonable time to enter the Lot to perform such activities. Each Owner agrees to cooperate in a reasonable manner with Declarant in Declarant's exercise of the rights provided to it by this Section. Entry onto the Area of Common Responsibility and into any Improvements and structures thereon may be made by Declarant at any time, provided advance notice is given to the Master Association.

10.11   Exclusive Rights To Use Name of Development.

No Person shall use the name "Tuscany" or any derivative of such name in any printed or promotional material without the prior written consent of Master Developer. However, Master Developer has consented to the use of the name "Tuscany" in printed or promotional materials by Declarant, Builders and Owners, where such term is used solely to specify that particular property is located within the Tuscany Residential Community and the Master Association shall be entitled to use the words "Tuscany" in its name.

10.12   Reservation of Rights Relating to Provision for Telephone/Cable Services.

Declarant hereby reserves for itself and Master Developer and their respective successors, assigns and transferees, rights of access, ingress, and egress over, in, upon, under, and across the real property contained within the Tuscany Residential Community, including all Lots and Master Association Property, for the construction, installation, repair and replacement of all facilities necessary to provide cable television, telephone and Internet service to the Lots or Private Amenities; provided, however, that no such rights or easements shall be exercised by Declarant in such a manner as to interfere unreasonably with the occupancy, use, enjoyment, or access by each Owner or Resident and their Invitees, to that Owner's Lot or the Master Association Property. Declarant additionally reserves to the fullest extent permitted by law but subject to the time limit set forth in Section 10.14 hereof, to grant providers exclusive rights for the marketing and provision of television cable, telephone and Internet services to Lots or Private Amenities.

51

10.13  Equal Treatment.

For so long as Declarant (or any of its affiliates), Master Developer or any Builder owns any part of the real property described in Exhibits "A" and/or "C," neither the Master Association nor any Neighborhood Association shall, without the prior consent of Declarant, Master Developer and/or any Builder to the extent that each may be affected, adopt any policy, rule, or procedure that:

(i)    limits the access of Declarant, Master Developer, any Builder, and their respective successors, assigns, and affiliates or their employees, agents, representatives, and/or guests, including visitors, to the Common Elements of the Master Association or to any real property owned by any of them;

(ii)    limits or prevents Declarant, Master Developer, any Builder, and their respective successors, assigns, and affiliates or their personnel from advertising, marketing, or using the Master Association or its Common Elements or any real property owned by any of them in promotional materials;

(iii)    limits or prevents Owners from becoming members of the Master Association, subject to the provisions of this Declaration and the Bylaws, or enjoying full use of its Common Elements;

(iv)    impacts the ability of Declarant, Master Developer, any Builder, and their respective successors, assigns, and affiliates, to carry out to completion its development plans and related construction activities for the Tuscany Residential Community, as such plans are expressed in the Master Plan, as such may be amended and updated from time to time. Policies, rules, or procedures affecting the provisions of existing easements established by Declarant and limiting the establishment by Declarant of easements necessary to complete the Tuscany Residential Community shall be expressly included in this provision.  Easements that may be established by Declarant shall include but shall not be limited to easements for development, construction, and landscaping activities and utilities; or

(v)    impacts the ability of Declarant, Master Developer, any Builder, and their respective successors, assigns, and affiliates to develop and conduct customer service programs and activities in a customary and reasonable manner.

Neither the Master Association nor any Neighborhood Association shall exercise its authority over the Common Elements (including, but not limited to, any gated entrances and other means of access to the Property or any other property that may be added to the Tuscany Residential Community under Article 9) to interfere with the rights of Declarant, Master Developer, or any Builder set forth in this Declaration or to impede access over the streets and other Common Elements within the Property to any portion of: (1) the Property, (2) any other property that may be added to the Tuscany Residential Community under Article 9, (3) the Private Amenities, or (4) the Commercial Components.

10.14  Other Rights.

Declarant hereby reserves all other easements, rights, powers, and authority of Declarant set forth in this Declaration.

52

First American Title

10.15    Exemption of Declarant.

Notwithstanding anything to the contrary in this Declaration, the following shall apply:

(a)    Nothing in this Declaration shall limit, and no Owner or Master Association or Neighborhood Association shall do anything to interfere with, the right of Declarant or Master Developer to complete excavation and grading and the construction of Improvements to and on any portion of the real property described on Exhibits "A" and "C", or to alter the foregoing and Declarant's construction plans and designs, or to construct such additional Improvements as Declarant or Master Developer deems advisable in the course of its development of Tuscany.

(b)    This Declaration shall in no way limit the right of Declarant or Master Developer to grant additional licenses, easements, reservations and rights-of-way to itself, to governmental or public authorities (including without limitation public utility companies), or to others, as from time to time may be reasonably necessary to the proper development and disposal of Lots.

(c)    Prospective Purchasers and Declarant shall have the right to use all and any portion of the Common Elements for access to the sales facilities of Declarant.

10.16    Termination of Rights.

The rights contained in this Article 10 shall terminate as specifically provided in NRS Chapter 116, or upon the earlier of (a) thirty (30) years from the conveyance of the first Lot to a Purchaser (provided that if Declarant or any of its affiliates still owns or has rights to acquire any of the property described in Exhibits "A" or "C" on such thirtieth (30th) anniversary date, then such rights and reservations shall continue for one successive period of twenty (20) years thereafter), or (b) Recording by Declarant of a written statement that all new Lot sales activity has ceased in the Tuscany Residential Community. (Thereafter, Declarant, Master Developer and Builders may continue to use the Common Elements for the purposes stated in this Article 10 only pursuant to a rental or lease agreement between Declarant and the Master Association which provides for rental payments based on the fair market rental value of any such portion of the Common Elements). This Article 10 shall not be amended during the Declarant Rights Period without the prior written consent of Declarant.

### PART FIVE:  PROPERTY RIGHTS WITHIN THE COMMUNITY

*The nature of living in a planned community, with its wide array of properties and development types and its ongoing development activity, requires the creation of special property rights and provisions to address the needs and responsibilities of the Owners, Declarant, the Master Association, and others within or adjacent to the community.*

### Article 11.
### Easements

11.1    Easements in the Common Elements.

Declarant grants to each Owner a nonexclusive right and easement of use, access, and enjoyment in and to the Common Elements, subject to:

53

(a)    The Governing Documents and any other applicable covenants;

(b)    Any restrictions or limitations contained in any deed conveying such property to the Master Association;

(c)    The Board's right to:

(i)    adopt rules regulating use and enjoyment of the Common Elements, including, without limitation, rules limiting the number of guests who may use the Common Elements;

(ii)    suspend the right of an Owner to use recreational facilities within the Common Elements (A) for any period during which any charge against such Owner's Lot remains delinquent more than 30 days, and (B) for a reasonable period of time, as established by the Board from time to time after Notice and Hearing;

(iii)    dedicate or transfer all or any part of the Common Elements, subject to such approval requirements as may be set forth in this Declaration;

(iv)    impose reasonable membership requirements and charge reasonable admission or other use fees for the use of any recreational facility situated upon the Common Elements;

(v)    permit use of any recreational facilities situated on the Common Elements by persons other than Owners, their families, lessees and guests with or without payment of use fees established by the Board and designate other areas and facilities within the Area of Common Responsibility as open for the use and enjoyment of the public; and

(vi)    mortgage, pledge, or hypothecate any or all of its real or personal property as security for money borrowed or debts incurred, subject to the approval requirements set forth in Section 17.5 and subject to the Act;

(d)    The rights of certain Owners to the exclusive use of those portions of the Common Elements designated "Neighborhood Common Elements," as described in Article 13;

(e)    The use restrictions set forth in Section 3.5 and any other applicable covenants;

(f)    The rights of members of the general public to use the walkways pursuant to the requirements of the City, which walkways may not be restricted to the use of the Owners or Residents, and their respective Invitees, to the exclusion of members of the general public; and

(g)    The right of the Master Association to rent or lease any portion of any clubhouse or other recreational facilities within the Common Elements on a short-term basis to any Person approved by the Master Association for the exclusive use of such Person and such Person's family and guests.

Any Owner may extend his or her right of use and enjoyment to the Resident of that Owner's Lot, and the Family members and Invitees of that Owner or Resident, as applicable, subject to reasonable regulation by the Board. An Owner who leases his or her Lot shall be deemed to have assigned all such rights to the lessee of such Lot for the period of the lease.

54

11.2    Easements of Encroachment.

Declarant grants reciprocal appurtenant easements of encroachment, and for maintenance and use of any permitted encroachment, between each Lot and any adjacent portion of the Common Elements and between adjacent Lots due to the unintentional placement or settling or shifting of the Improvements constructed, reconstructed, or altered thereon (in accordance with the terms of these restrictions) to a distance of not more than three feet, as measured from any point on the common boundary along a line perpendicular to such boundary. However, in no event shall an easement for encroachment exist if such encroachment occurred due to willful and knowing conduct on the part of, or with the knowledge and consent of, the Person claiming the benefit of such easement.

11.3    Easements for Utilities, Etc.

(a)    Installation and Maintenance.  Declarant reserves for itself, Master Developer and each Builder, so long as Declarant (or any of its affiliates) owns or has the right to acquire any part of the property described in Exhibit "A" or "C" of this Declaration, and grants to the Master Association and all utility providers, perpetual non-exclusive easements throughout the Common Elements and the Property (but not through a structure) to the extent reasonably necessary for the purpose of:

(i)    installing utilities and infrastructure to serve the Tuscany Residential Community, cable and other systems for sending and receiving data and/or other electronic signals, security and similar systems, walkways, pathways and trails, drainage systems, street lights and signage on property which Declarant (or any of its affiliates) or Master Developer owns or within public rights-of-way or easements reserved for such purpose on Recorded plats;

(ii)    inspecting, maintaining, repairing and replacing the utilities, infrastructure and other Improvements described in Section 11.3(a)(i); and

(iii)    access to read utility meters.

(b)    Specific Development.  Declarant also reserves for itself (and Master Developer  to the extent such property is owned by Master Developer) the non-exclusive right and power to grant and Record such specific easements as may be necessary, in the sole discretion of Declarant, in connection with the orderly development of any property described in Exhibits "A" and "C."  The Owner of any property to be burdened by any easement granted pursuant to this subsection (b) shall be given written notice in advance of the grant.  The location of the easement shall be subject to the written approval of the Owner of the burdened property, which approval shall not unreasonably be withheld, delayed or conditioned.

(c)    Minimal Interference.  All work associated with the exercise of the easements described in subsections (a) and (b) of this Section shall be performed in such a manner as to minimize interference with the use and enjoyment of the property burdened by the easement.  Regardless of whether such specification is made, upon completion of the work, the Person exercising the easement shall restore the property, to the extent reasonably possible, to its condition prior to the commencement of the work.  The exercise of these easements shall not extend to permitting entry into the structures on any Lot, nor shall it unreasonably interfere with the use of any Lot and, except in an emergency, entry onto any Lot shall be made only after reasonable notice to the Owner or Resident.

55

11.4    Easements To Serve Additional Property.

Declarant hereby reserves for itself, Master Developer and their respective duly authorized agents, successors, assigns, and mortgagees, an easement over the Common Elements for the purposes of enjoyment, use, access, and development of the property described in Exhibit "C," whether or not such property is made subject to this Declaration. This easement includes, but is not limited to, a right of ingress and egress over the Common Elements for construction of roads and for connecting and installing utilities on such property.

Declarant agrees that it and its successors or assigns shall be responsible for any damage caused to the Common Elements as a result of their actions in connection with development of such property. Declarant further agrees that if the easement is exercised for permanent access to such property and such property or any portion thereof benefiting from such easement is not made subject to this Declaration, Declarant, its successors or assigns shall enter into a reasonable agreement with the Master Association to share the cost of any maintenance which the Master Association provides to or along any roadway providing access to such Property.

11.5    Easements for Maintenance, Emergency and Enforcement.

Declarant grants to the Master Association the right, but not the obligation, to enter upon any Lot for emergency, security, and safety reasons, to perform maintenance and to inspect for the purpose of ensuring compliance with and enforce the Governing Documents. Such right may be exercised by any member of the Board and its duly authorized agents and assignees, and all emergency personnel in the performance of their duties. Except in an emergency situation, entry shall only be during reasonable hours and after notice to the Owner.

11.6    Easements for Private Amenities.

Every Lot and the Common Elements and the common property of any Neighborhood Association are burdened with those easements set forth in Section 15.5 and Section 15.6.

11.7    Easement for Special Events.

Declarant hereby reserves for itself and Master Developer and grants to Declarant and Master Developer, and their respective successors, agents, assigns and designees, a perpetual, nonexclusive easement over the Common Elements for the purpose of sponsoring or conducting activities, events or projects of general community interest at such locations and times as Declarant, in its sole discretion, deems appropriate. Each Owner, by accepting a deed or other instrument conveying any interest in a Lot, acknowledges and agrees that the exercise of this easement may result in a temporary increase in traffic, noise, gathering of crowds, and related inconveniences, and each Owner agrees on behalf of itself and the Residents of its Lot to take no action, legal or otherwise, which would interfere with the exercise of such easement. The Master Association shall take no action which would interfere with or otherwise attempt to restrict the exercise of this easement.

11.8    Easements for Lake and Pond Maintenance and Flood Water.

Declarant reserves for itself, Master Developer, the Master Association and their respective successors, assigns, and designees, the nonexclusive right and easement, but not the obligation, to enter upon any body of water located within the Area of Common Responsibility to: (a) install, operate,

56

First American Title

maintain, and replace pumps to supply irrigation water to the Area of Common Responsibility; (b) construct, maintain, and repair structures and equipment used for retaining water; (c) maintain such areas in a manner consistent with the Community Standards; and (d) replace, remove, and/or fill in such bodies of water. Declarant, the Master Association, and their successors, assigns, and designees shall have an access easement over and across any of the Property abutting or containing bodies of water to the extent reasonably necessary to exercise their rights under this Section.

Declarant further reserves for itself, Master Developer, the Master Association and their respective successors, assigns, and designees, a perpetual, nonexclusive right and easement of access and encroachment over the Common Elements and Lots (but not the dwellings thereon) adjacent to or within 100 feet of any body of water constituting a part of the Property, in order to (a) temporarily flood and back water upon and maintain water over such portions of the Property; (b) alter in any manner and generally maintain the bodies of water within the Area of Common Responsibility; and (c) maintain and landscape the slopes and banks pertaining to such areas. All persons entitled to exercise these easements shall use reasonable care in and repair any damage resulting from the intentional exercise of such easements. Nothing herein shall be construed to make Declarant, Master Developer or any other Person liable for damage resulting from flooding due to heavy rainfall, or other natural occurrence.

11.9    Easements for Cross-Drainage.

Declarant hereby reserves for itself and Master Developer and grants to the Master Association easements over every Lot and the Common Elements (and other portions of the Area of Common Responsibility, to the extent practicable) for natural drainage of storm water runoff from other portions of the Property and for drainage through the French Drains; provided, no Person shall alter the natural drainage on any Lot to increase materially the drainage of storm water onto adjacent portions of the Property without the consent of the Owner(s) of the affected Property, the Board, Master Developer and the Declarant (during the Declarant Rights Period).

11.10    Rights to Stormwater Runoff, Effluent and Water Reclamation.

Declarant hereby reserves for itself and Master Developer and their respective designees all rights to ground water, surface water, storm water runoff, and effluent located or produced within the Property, and each Owner agrees, by acceptance of a deed to a Lot, that Declarant, and Master Developer shall retain all such rights. Such rights shall include the reservation of an easement over the Property for access, and for installation and maintenance of facilities and equipment to capture and transport such water, runoff, and effluent. This Section 11.10 may not be amended without the consent of Declarant or its successor, and the rights created in this Section 11.10 shall survive termination of this Declaration.

11.11    Easements for Parking; Easements for Vehicular and Pedestrian Traffic.

The Master Association, through the Board, is hereby empowered to establish "parking" and/or "no parking" areas within the Common Elements, and to establish Rules and Regulations governing such matters, as well as to enforce such parking limitations and rules by all means lawful for such enforcement on public streets, including the removal of any violating vehicle, by those so empowered, at the expense of the Owner of the violating vehicle. If any temporary guest or recreational parking is permitted within the Common Elements, such parking shall be permitted only within any spaces and areas clearly marked for such purpose.

57

First American Title

First American Title

In addition to the general easements for use of the Common Elements reserved herein, there hereby are reserved to Declarant, Master Developer, the Master Association, and their respective successors, assigns and Invitees, nonexclusive, appurtenant easements for vehicular and pedestrian traffic over private main entry gate areas and all Private Streets and sidewalks within the Property (including, but not limited to, those which may yet be built from time to time, and those which, when or after being built (by Declarant, Builder, or other authorized third party), comprise or will comprise Common Elements or Neighborhood Common Elements).

11.12   Easements for Public Service Use.

In addition to the foregoing easements over the Common Elements, there shall be and Declarant hereby reserves for itself, Master Developer, all future Owners within the Property, and all Persons owning or occupying any other portion of the real property within Tuscany, easements for: (a) placement of any fire hydrants on portions of certain Lots and/or Common Elements, and other purposes normally related thereto; and (b) City, County, state and federal public services, including but not limited to, the right of postal, law enforcement, and fire protection services and their respective employees and agents, to enter upon any part of the Common Elements or any Lot, for the purpose of carrying out their official duties.

**Article 12.**
**Custom Lots**

12.1   General; Supplemental Declaration.

Pursuant to Supplemental Declaration(s), Custom Lots shall comprise Custom Lot Neighborhood(s), and shall be subject to additional covenants, conditions and restrictions set forth by Declarant in its sole discretion (including, but not necessarily limited to, additional requirements such as specific time deadlines for commencement and completion of construction of the custom home on each Custom Lot by the Owner thereof).

12.2   Additional Design Guidelines.

Declarant, in its sole discretion, from time to time may promulgate additional Design Guidelines for Custom Lots (in which event, the Owners of Custom Lots and the DRC shall additionally follow and abide by the Design Guidelines in the implementation of Article 4). Notwithstanding the foregoing, only the provisions of the Master Plan shall apply to the construction of the custom homes on the Custom Lots located within Parcel 13 as described on Exhibit "A," it being the express intention of Declarant that neither the Design Guidelines nor any additional Design Guidelines now or hereafter promulgated by Declarant shall apply to the Custom Lots within such Parcel 13.

**Article 13.**
**Neighborhood Common Elements**

13.1   Purpose.

Certain portions of the Common Elements may be designated as Neighborhood Common Elements and reserved for the exclusive use or primary benefit of Owners and Residents within a particular Neighborhood or Neighborhoods. By way of illustration and not limitation, Neighborhood Common Elements may include entry features, recreational facilities, landscaped medians and cul-de-

58

sacs, lakes and other portions of the Common Elements within a particular Neighborhood or Neighborhoods. All costs associated with maintenance, repair, replacement, and insurance of Neighborhood Common Elements shall be a Neighborhood Expense allocated among the Owners in the Neighborhood(s) to which the Neighborhood Common Elements are assigned.

13.2    Designation.

Initially, any Neighborhood Common Elements shall be designated as such in the deed conveying such area to the Master Association or on the subdivision plat relating to such Common Elements; provided, however, any such assignment shall not preclude Declarant from later assigning use of the same Neighborhood Common Elements to additional or different Lots and/or Neighborhoods by a Supplemental Declaration, so long as Declarant has a right to subject additional property to this Declaration pursuant to Section 9.1.

Thereafter, a portion of the Common Elements may be assigned as Neighborhood Common Elements and Neighborhood Common Elements may be reassigned upon approval of the Board and the vote or consent of the Owners constituting the Requisite Membership Percentage and the vote or consent of the Requisite Neighborhood Percentage within the Neighborhood(s) affected by the proposed assignment or reassignment. As long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the property subject to this Declaration or which may become subject to this Declaration in accordance with Section 9.1, any such assignment or reassignment shall also require Declarant's written consent.

13.3    Use by Others.

Upon approval of a majority of Owners of Lots within the Neighborhood to which any Neighborhood Common Elements are assigned, the Master Association may permit Owners of Lots in other Neighborhoods to use all or a portion of such Neighborhood Common Elements upon payment of reasonable user fees, which fees shall be used to offset the Neighborhood Expenses attributable to such Neighborhood Common Elements.

**Article 14.**
**Party Walls and Other Shared Structures**

14.1    General Rules of Law to Apply.

Each wall, fence, driveway or similar structure built as a part of the original construction on the Lots which serves and/or separates any two adjoining Lots shall constitute a party structure. To the extent not inconsistent with the provisions of this Section, the general rules of law regarding party walls and liability for property damage due to negligence or willful acts or omissions shall apply thereto.

14.2    Maintenance; Damage and Destruction.

The cost of reasonable repair and maintenance of a party structure shall be shared equally among the Owners who make use of the party structure or benefit from.

If a party structure is destroyed or damaged by fire or other casualty, then to the extent that such damage is not covered by insurance and repaired out of the proceeds of insurance, any Owner who has used the structure may restore it. If other Owners thereafter use the structure, they shall contribute to the

59

restoration cost in equal proportions. However, such contribution will not prejudice the right to call for a larger contribution from the other users under any rule of law regarding liability for negligent or willful acts or omissions.

14.3    Right to Contribution Runs With Land.

The right of any Owner to contribution from any other Owner under this Section shall be appurtenant to the land and shall pass to such Owner's successors-in-title.

14.4    Disputes.

Any dispute arising concerning a party structure shall be handled in accordance with the provisions of Article 16.

## Article 15.
## Private Amenities

15.1    General.

Neither membership in the Master Association nor ownership or occupancy of a Lot shall confer any ownership interest in or right to use any Private Amenity. Rights to use the Private Amenities will be granted only to such persons, and on such terms and conditions, as may be determined from time to time by the respective owner of the Private Amenities. The respective owner of each Private Amenity shall have the right, from time to time in its sole and absolute discretion and without notice, to establish, amend or waive the terms and conditions of use of its respective Private Amenity, including, without limitation, eligibility for and duration of use rights, categories of use and extent of use privileges, and number of users, and shall also have the right to reserve use rights and to terminate use rights altogether, subject to the terms of any written agreements with their respective members.

15.2    Conveyance of Private Amenities.

All Persons, including all Owners, are hereby advised that no representations or warranties have been or are made or authorized to be made by Declarant, Master Developer, the Master Association, any Builder, or by any Person acting or purporting to be acting on behalf of any of the foregoing, with regard to the continuing ownership or operation of any Private Amenity, and no purported representation or warranty in such regard, either written or oral, shall be effective unless specifically set forth in a written instrument executed by the record owner of the Private Amenity. Further, the ownership or operation of the Private Amenity may change at any time by virtue of, but without limitation, (a) the sale to or assumption of operations of any Private Amenity by a Person (including the City or any other governmental authority) other than the current owner or operator; (b) the establishment of, or conversion of the membership structure to, an "equity" club or similar arrangement whereby the members of the Private Amenity or an entity owned or controlled by its members become the owner(s) and/or operator(s) of the Private Amenity; or (c) the conveyance of any Private Amenity to one or more of Declarant's affiliates, shareholders, employees, or independent contractors. Consent of the Master Association, any Neighborhood Association, or any Owner shall not be required to effectuate any change in ownership or operation of any Private Amenity, for or without consideration and subject to or free of any mortgage, covenant, lien or other encumbrance.

60

### 15.3    View Impairment.

Neither Declarant, Master Developer, the Master Association, nor the owner of any Private Amenity, guarantees or represents that any view over and across the Private Amenity from Lots adjacent to the Private Amenity will be preserved without impairment.  The respective owner of each Private Amenity, shall have no obligation to prune or thin trees or other landscaping, and shall have the right, in its sole and absolute discretion, to add trees and other landscaping to its Private Amenity from time to time.  In addition, the owner of any Private Amenity which includes a golf course may, in its sole and absolute discretion, change the location, configuration, size and elevation of the trees, bunkers, fairways and greens from time to time.  Any such additions or changes may diminish or obstruct any view from the Lots and any express or implied easements for view purposes or for the passage of light and air are hereby expressly disclaimed.

### 15.4    Cost Sharing.

The Master Association may enter into a contractual arrangement or covenant to share costs with the owner of any Private Amenity obligating the owner of a Private Amenity to contribute funds for, among other things, shared property or services and/or a higher level of Common Element maintenance.

### 15.5    Rights of Access and Parking.

For purposes of this Article 15, the Property shall comprise the burdened property ("Burdened Property") and each Private Amenity (including, but not necessarily limited to, any office facility, day care facility, sales center facility, and the Golf Course) shall comprise the benefited property ("Benefited Property"). Each owner of the Benefited Property, and portions thereof, is referred to herein as a "Benefited Property Owner." In addition to, and without limiting, any other easement set forth in this Declaration, Declarant has deemed it desirable to establish certain protective covenants, conditions, restrictions and easements on and running with the Burdened Property, for the benefit of the Benefited Property, in part to protect Declarant and any owner(s) of all or any part of the Benefited Property, against improper or inappropriate development and use of, and/or restrictions on, the Burdened Property or any part thereof.

Declarant hereby expressly reserves the following easements. Each Benefited Property Owner, and its respective successors and assigns, their respective Invitees, and the Persons permitted to use the Private Amenity (or portion thereof) by the Benefited Property Owner (regardless of whether such persons are Owners hereunder) as well as their Families and Invitees, shall at all times have a right and non-exclusive easement of ingress, egress, access and use over all Common Elements (including Private Streets, sidewalks, and entry areas) whether by automobile, golf cart, or other means, located within the Property and reasonably necessary to travel between the entrances to the Property and the Benefited Property, respectively and, further, over those portions of the Property (whether Common Elements or otherwise) reasonably necessary to the use, operation, maintenance, repair and replacement of the Benefited Property. Without limiting the generality of the foregoing, Persons who are permitted use of the Private Amenities (or portions thereof) and members of the public as designated or permitted by a Benefited Property Owner, shall have the right to park their vehicles on the Private Streets and other Common Elements located within the Property at reasonable times before, during, and after, events, tournaments, and other similar functions held by or at the Benefited Property.

The use restrictions set forth in the Governing Documents shall inure to the benefit of the Benefited Property and each Benefited Property Owner, to the extent reasonably appropriate.

61

First American Title

The Master Association and each Benefited Property Owner shall cooperate to the maximum extent reasonably possible in the respective operation of the Property and each respective Private Amenity. Notwithstanding the foregoing, without the prior written consent of each respective Benefited Property Owner in its sole discretion: (a) the Master Association shall have no power to promulgate or enforce rules or regulations affecting activities on or use of the Benefited Property, and (b) the Benefited Property shall not be subject to any Master Association assessments, or other Master Association charges, including, but not limited to, such assessments or charges for use, maintenance, or repair of the Common Elements.

The covenants, conditions, restrictions, and reservation of easements, contained herein shall run with, burden and bind the Burdened Property and shall inure to the benefit of the Benefited Property and each Benefited Property Owner, and shall be enforceable by each Benefited Property Owner. Neither this Section, nor any other portion of this Declaration which affects any part of the Benefited Property or the use and enjoyment thereof, may be terminated, extended, modified, or amended, as to any portion of the Burdened Property, except by Recorded instrument executed and acknowledged by each respective Benefited Property Owner of Record.

15.6    Additional Golf Course Easements.

Declarant further expressly grants the following additional easements over the Burdened Property, to and for the benefit of the portion of the Benefited Property which comprises the Golf Course:

(a)    the right, for a five minute period commencing on the departure of any golf ball from the Golf Course onto the Property, of the owner and/or lessee of the Golf Course and of all players and guests at the Golf Course to enter upon the Property to search for and recover errant golf balls provided, if any Lot is fenced or walled, the golfer shall seek the Owner's permission before entry. The existence of this easement shall not relieve golfers of liability for damage caused by errant golf balls;

(b)    the right of the players and Invitees at the Golf Course to enter, on golf carts or on foot, upon the Common Elements of the Property in order to reasonably traverse the various playing elements of the Golf Course;

(c)    the right of the owner and/or lessee of the Golf Course and of their employees and contractors to enter upon the Property for the purpose of maintaining and repairing water and irrigation lines and pipes which are located in or originate from the Golf Course and are used in connection with the irrigation or sprinkling of the Golf Course landscaping or landscaping on the Property;

(d)    a non-exclusive easement is hereby reserved to the Benefited Property Owner, its successors and assigns, and their respective Invitees, upon, over, in, and across the Private Streets and those portions of the Common Elements reasonably necessary to travel, with storage and maintenance equipment, chemicals, and other items, to and from various portions of the Golf Course, and the right to take all action reasonably necessary for the storage and maintenance of equipment, chemicals and all other items;

(e)    any portion of the Property immediately adjacent to any Golf Course is hereby burdened with a non-exclusive easement in favor of the Golf Course for overspray of water from the irrigation system for such Golf Course. Under no circumstances shall the Master Association or the owner of such

62

First American Title

Golf Course be held liable for any damage or injury resulting from such overspray or the exercise of this easement; and

(f)        the owner of any Golf Course within or adjacent to any portion of the Property, its successors and assigns, shall have a perpetual, exclusive easement of access over the Property for the purpose of retrieving golf balls from bodies of water upon the Common Elements lying reasonably within range of golf balls hit from the Golf Course.

Under no circumstances shall any of the following Persons be held liable for any damage or injury resulting from errant golf balls or the exercise of this easement: Declarant; the Master Association and/or its Members (in their capacities as such); the owner of any golf course, its successors, or assigns; any Builder or contractor (in their capacities as such); or any officer, director, or partner of any of the foregoing.

15.7    Limitations on Amendments.

In recognition of the fact that the provisions of this Article are for the benefit of the Private Amenity, no amendment to this Article, and no amendment in derogation of any other provisions of this Declaration benefiting any Private Amenity (including without limitation any other provision of this Declaration which would adversely affect the Benefited Property Owner, the Benefited Property, or access to or use and enjoyment of the Private Amenities), may be made without the written approval of the Private Amenity and the Benefited Property Owner.  The foregoing shall not apply, however, to amendments made by Declarant.

15.8    Jurisdiction and Cooperation.

It is Declarant's intention that the Master Association and the Private Amenity shall cooperate to the maximum extent possible in the operation of the Tuscany Residential Community and the Private Amenity.  Each shall reasonably assist the other in upholding the Community-Wide Standard as it pertains to maintenance and the Design Guidelines.  The Master Association shall have no power to promulgate use restrictions or Rules affecting activities on or use of the Private Amenity without the prior written consent of the owners of the Private Amenity affected thereby.

**PART SIX:  RELATIONSHIPS WITHIN AND OUTSIDE THE COMMUNITY**

*The growth and success of the Tuscany Residential Community as a community in which people enjoy living, working, and playing requires good faith efforts to resolve disputes amicably, attention to and understanding of relationships within the community and with our neighbors, and protection of the rights of others who have an interest in the community.*

### Article 16.
### Dispute Resolution and Limitation on Litigation

16.1    Consensus for Master Association Litigation.

Except as provided in this Section, the Master Association shall not commence a judicial or administrative proceeding without first providing written notice of such proposed action to each Member at least twenty-one (21) days before a meeting to vote on such proposed action and obtaining the approval at such meeting of at least 80% of the total voting power of the Master Association.  This Section shall

63

not apply, however, to (a) actions brought by the Master Association to enforce the payment of an assessment or an assessment lien or other lien against an Owner as provided for in this Declaration; or (b) actions brought by the Master Association to otherwise enforce compliance with the Governing Documents by, or to obtain other relief from, any Owner or Resident who has violated any provision thereof; or (c) defenses, affirmative defenses, and/or counterclaims brought by the Master Association in proceedings instituted against the Master Association; or (d) actions brought by the Master Association to protect against any matter which imminently and substantially threatens or effects the health, safety and welfare of not less than 80% of the Owners based upon a physical inspection by a third party licensed professional with expertise in the area. This Section shall not be amended unless such amendment is approved by at least 80% of the total voting power of the Master Association, pursuant to the same procedures necessary to institute proceedings as provided in this Section.

16.2   Alternative Method for Resolving Disputes.

Declarant, any Builder, the Master Association, their officers, directors, and committee members; all Owners and other Persons subject to this Declaration, and any Person not otherwise subject to this Declaration who agrees to submit to this Article (each such entity being referred to as a "Bound Party") agree to encourage the amicable resolution of disputes involving the Tuscany Residential Community, without the emotional and financial costs of litigation. Accordingly, each Bound Party covenants and agrees to submit those claims, grievances or disputes described in Section 16.3 of this Article ("Claims") to the procedures set forth in Section 16.4 in lieu of filing suit in any court.

16.3   Claims.

Unless specifically exempted below, all Claims arising out of or relating to the interpretation, application or enforcement of the Governing Documents, or the rights, obligations and duties of any Bound Party under the Governing Documents or relating to the design or construction of Improvements within the Tuscany Residential Community shall be subject to the provisions of Section 16.4. However, matters of aesthetic judgment under Article 4 shall not constitute a Claim.

Notwithstanding the above, unless all parties thereto otherwise agree, the following shall not be Claims and shall not be subject to the provisions of Section 16.4:

(a)   any suit by the Master Association against any Bound Party to enforce the provisions of Article 8;

(b)   any suit by Declarant or the Master Association to obtain a temporary restraining order (or equivalent emergency equitable relief) and such other ancillary relief as the court may deem necessary in order to maintain the status quo and preserve Declarant's or the Master Association's ability to enforce the provisions of Article 3 and Article 4;

(c)   any suit between Owners, which does not include Declarant or the Master Association, if such suit asserts a Claim which would constitute a cause of action independent of the Governing Documents;

(d)   any suit in which any indispensable party is not a Bound Party; and

(e)   any suit as to which any applicable statute of limitations would expire within one hundred eighty (180) days of giving the Notice required by Section 16.4(a), unless the party or parties against

whom the Claim is made agree to toll the statute of limitations as to such Claim for such period as may reasonably be necessary to comply with this Article.

With the consent of all parties thereto, any of the above may be submitted to the alternative dispute resolution procedures set forth in Section 16.4.

16.4    Mandatory Procedures.

(a)    Notice.  Any Bound Party having a Claim ("Claimant") against any other Bound Party ("Respondent") (collectively, the "Parties") shall notify each Respondent in writing (the "Notice"), stating plainly and concisely:

(i)    the nature of the Claim, including the Persons involved and Respondent's role in the Claim;

(ii)    the legal basis of the Claim (i.e., the specific authority out of which the Claim arises);

(iii)    Claimant's proposed remedy; and

(iv)    that Claimant will meet with Respondent to discuss in good faith ways to resolve the Claim.

(b)    Negotiation and Mediation.

(i)    The Parties shall make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation.  If requested in writing, accompanied by a copy of the Notice, the Board may appoint a representative to assist the Parties in negotiation.

(ii)    If the Parties do not resolve the Claim within 30 days of the date of the Notice (or within such other period as may be agreed upon by the Parties) ("Termination of Negotiations"), Claimant shall have 30 additional days to submit the Claim to mediation under the auspices of an independent agency providing dispute resolution services in the Las Vegas area.

(iii)    If Claimant does not submit the Claim to mediation within such time, or does not appear for the mediation, Claimant shall be deemed to have waived the Claim, and Respondent shall be released and discharged from any and all liability to Claimant on account of such Claim; provided, nothing herein shall release or discharge Respondent from any liability to any Person other than the Claimant.

(iv)    Any settlement of the Claim through mediation shall be documented in writing by the mediator and signed by the Parties.  If the Parties do not settle the Claim within 30 days after submission of the matter to the mediation, or within such time as determined by the mediator, the mediator shall issue a notice of termination of the mediation proceedings ("Termination of Mediation"). The Termination of Mediation notice shall set forth that the Parties are at an impasse and the date that mediation was terminated.

65

(v)    The Claimant shall thereafter be entitled to sue in any court of competent jurisdiction or to initiate proceedings before any appropriate administrative tribunal on the Claim.

16.5    Declarant's Right to Repair.

Notwithstanding any other provision in this Declaration, each Owner, by acquiring title to a Lot, and the Master Association, by acquiring title to any Common Element, shall conclusively be deemed to have agreed: (a) to promptly provide Declarant with specific written notice from time to time of any Improvement requiring correction or repair(s) for which Declarant is or may be responsible, and (b) following delivery of such written notice, to reasonably permit Declarant (and/or Declarant's contractors and agents) to inspect the relevant Improvement, and to take reasonable steps, if necessary appropriate, to undertake and to perform corrective or repair work, and (c) to reasonably permit entry by Declarant (and Declarant's contractors and agents) upon the Common Element or other portion of the Property (as applicable) from time to time in connection therewith and/or to undertake and to perform such inspection and such work; and (d) that Declarant shall unequivocally be entitled (i) to specific prior written notice of any such corrective or repair work requested (and shall not be held responsible for any corrective or repair work in the absence of such written notice), (iii) to inspect the relevant Improvement, and (iii) to take reasonable steps, in Declarant's reasonable judgment, to undertake and to perform any and all necessary or appropriate corrective or repair work. The foregoing portion of this Section shall not be deemed to modify or toll any applicable statute of limitation or repose, or any contractual or other limitation pertaining to such work.

16.6    Arbitration.

Subject to the procedural requirements set forth in the foregoing provisions of Article 16, any dispute that may arise between: (a) the Master Association and/or Owner of a Lot, and (b) Declarant or any person or entity who was involved in the construction of any Common Element, Lot or Dwelling, shall be resolved by submitting such dispute to arbitration before a mutually acceptable arbitrator who will render a decision binding on the parties which can be entered as a judgment in court pursuant to NRS 38.000 et. seq. The arbitration shall be conducted according to the provisions of the Construction Industry Arbitration Rules of the American Arbitration Master Association. If the parties to the dispute fail to agree upon an arbitrator within 45 days after an arbitrator is first proposed by the party initiating arbitration, either party may petition the American Arbitration Master Association for the appointment of an arbitrator. Declarant has the right to assert claims against any contractor, subcontractor, person or entity, who may be responsible for any matter raised in arbitration and to name said contractor, subcontractor, person, or entity as an additional party to the arbitration, Upon selection or appointment of the arbitrator, the parties shall confer with the arbitrator who shall establish a discovery schedule which shall not extend beyond 90 days from the date the arbitrator is selected or appointed unless for good cause shown such period is extended by the arbitrator or such period is extended by the consent of the parties. If Declarant asserts a claim against a contractor, subcontractor, person, or entity, the discovery period may be extended, at the discretion of the arbitrator, for a period not to exceed 120 days. The arbitration of a dispute between the Declarant, the Master Association, or any Owner of a Lot shall not be consolidated with any other proceeding unless Declarant chooses to consolidate the same with another similar proceeding brought by the Master Association or any Owner of a Lot. The arbitrator shall convene the arbitration hearing within 120 days from the time the arbitrator is selected or appointed. Upon completion of the arbitration hearing, the arbitrator shall render a decision within 10 days. The date for convening the hearing may be adjusted by the arbitrator to accommodate extensions of discovery and the addition of parties or by consent of the parties. However, unless extraordinary circumstances exist, the hearing shall be convened no later than 180 days from the date the arbitrator is appointed. To the

66

First American Title

extent practicable, any hearing convened pursuant to this provision shall continue, until completed, on a daily basis. The prevailing party shall be entitled to recover its attorney's fees and costs. The costs of the arbitration shall be borne equally by the parties thereto.

### 16.7    Allocation of Costs of Resolving Claims.

Each Party shall bear its own costs, including attorney's fees, and each Party shall share equally all charges rendered by the mediator or arbitrator as applicable.

### 16.8    Enforcement of Resolution.

After resolution of any Claim, if any Party fails to abide by the terms of such agreement, then any other Party may file suit or initiate administrative proceedings to enforce such agreement without the need to again comply with the procedures set forth in Section 16.4. In such event, the Party taking action to enforce the agreement shall be entitled to recover from the non-complying Party (or if more than one non-complying Party, from all such Parties pro rata) all costs incurred in enforcing such agreement, including, without limitation, attorneys' fees and court costs.

### 16.9    Attorneys' Fees.

In the event an action is instituted to enforce any of the provisions contained in the Governing Documents, then the prevailing party in such action shall be entitled to recover from the other party thereto as part of the judgment, reasonable attorneys' fees and costs, including administrative and lien fees, of such suit. In the event the Master Association is a prevailing party in such action, the amount of such attorneys' fees and costs shall be Specific Assessment with respect to the Lot(s) involved in the action.

## Article 17.
## Mortgagee Provisions

The following provisions are for the benefit of holders, insurers and guarantors of first Mortgages on Lots in the Tuscany Residential Community. The provisions of this Article apply to both this Declaration and to the Bylaws, notwithstanding any other provisions contained therein.

### 17.1    Notices of Action.

An institutional holder, insurer, or guarantor of a first Mortgage which provides a written request to the Master Association (such request to state the name and address of such holder, insurer, or guarantor and the street address of the Lot to which its Mortgage relates, thereby becoming an "Eligible Holder"), will be entitled to timely written notice of:

(a)    Any condemnation loss or any casualty loss which affects a material portion of the Property or which affects any Lot on which there is a first Mortgage held, insured, or guaranteed by such Eligible Holder;

(b)    Any delinquency in the payment of assessments or charges owed by a Lot subject to the Mortgage of such Eligible Holder, where such delinquency has continued for a period of 60 days, or any other violation of the Governing Documents relating to such Lot or the Owner or Resident which is not cured within 60 days;

67

(c)    Any lapse, cancellation, or material modification of any insurance policy maintained by the Master Association; or

(d)    Any proposed action which would require the consent of a specified percentage of Eligible Holders.

17.2    <u>No Priority.</u>

No provision of this Declaration or the Bylaws gives or shall be construed as giving any Owner or other party priority over any rights of the first Mortgagee of any Lot in the case of distribution to such Owner of insurance proceeds or condemnation awards for losses to or a taking of the Common Elements.

17.3    <u>Notice to Master Association.</u>

Upon request by the Master Association, each Owner shall be obligated to furnish to the Master Association the name and address of the holder of any Mortgage encumbering such Owner's Lot.

17.4    <u>Failure of Mortgagee To Respond.</u>

Any Mortgagee who receives a written request from the Board to respond to or consent to any action shall be deemed to have approved such action if the Master Association does not receive a written response from the Mortgagee within 30 days of the date of the Master Association's request, provided such request is delivered to the Mortgagee by certified or registered mail, return receipt requested.

**Article 18.**
**Commercial Components**

18.1    <u>General; Disclaimers.</u>

Each Owner in the Property, by acceptance of the deed to such Owner's Lot, whether or not so stated in such deed, is hereby conclusively deemed to have acknowledged and agreed: (a) that the convenience of having the Commercial Components (including convenient retail, restaurant and other commercial areas) as part of Tuscany, will significantly benefit the Owners, even taking into consideration the detailed disclaimers and releases set forth in this Article 18 and Article 22 below, (b) that this Article 18 is integral to preservation of Tuscany, and benefits the Lots within the Property, and (c) accordingly, to have accepted this Article 18 (and Article 22 below) and the provisions respectively thereof.

Each Owner further acknowledges and agrees that each of the Commercial Components is **NOT A PART** of the Common Elements and **NOT A PART** of the Property and (although obligated to make periodic payments as set forth in Section 18.4 below) is not subject to Assessments under this Declaration. **NEITHER MEMBERSHIP IN THE MASTER ASSOCIATION NOR OWNERSHIP OR OCCUPANCY OF A LOT SHALL CONFER ANY OWNERSHIP INTEREST IN OR RIGHT TO ENTER UPON ANY OF THE COMMERCIAL COMPONENTS.**

68

First American Title

### 18.2    Conveyance of Commercial Components.

All Persons, including all Owners, are hereby advised that no representations or warranties have been or are made by Declarant, Master Developer, the Master Association, any Builder, or by any Person acting on behalf of any of the foregoing, with regard to ownership or operation of any of the Commercial Components. No purported representation or warranty in such regard, either written or oral, shall be effective unless specifically set forth in a written instrument executed by the record owner of the Component. The ownership or operation of the Commercial Components, and portions thereof, may change at any time. Consent of the Master Association, any Neighborhood Association, or any Owner shall not be required to effectuate any change in ownership or operation of any of the Commercial Components, for or without consideration and subject to or free of any mortgage, covenant, lien, or other encumbrance.

### 18.3    View Impairment.

Neither Declarant, Master Developer, the Master Association, nor any of the Commercial Component Owners guarantees or represents that any view over and across the Commercial Components from adjacent Lots will be preserved without impairment. Any additions or changes to the Commercial Components may diminish or obstruct any view from the Lots, and any express or implied easements for view purposes or for the passage of light and air are hereby expressly disclaimed.

### 18.4    Rights of Access and Parking.

Declarant hereby expressly reserves the following easements. The Commercial Component Owners, their successors and assigns, their respective Invitees, and the Persons permitted to use the Commercial Components (or portion thereof) by the Commercial Component Owner (regardless of whether such persons are Owners hereunder) and their Invitees, shall at all times have a right and non-exclusive easement of ingress, egress, access and use over those certain Common Elements (including Private Streets, sidewalks, and entry areas), whether by automobile or other means, located within the Tuscany Residential Community and reasonably and customarily necessary to travel between the entrances to the Tuscany Residential Community and the Commercial Components.

### 18.5    Payments of Reasonable Amounts by Commercial Components.

(a)    Obligation.  Each Owner in the Property, by acceptance of the deed to its Lot, whether or not so stated in such deed, is conclusively deemed to have acknowledged and agreed that the convenience of having the Commercial Components (including convenient retail, restaurant and other commercial areas) as part of Tuscany, will significantly benefit the Owners. Subject to the foregoing, in consideration of the benefits to the Commercial Components, of rights to use, and use of, certain Private Streets and other Common Elements within Tuscany, as set forth in this Declaration, the Commercial Component Owners shall be required to pay to the Master Association, in lieu of Assessments, the following amounts ("Reasonable Amounts") which shall be conclusively deemed to constitute reasonable amounts therefor: for each Commercial Component, Reasonable Amounts shall be amounts equal to Base Assessments computed on a deemed basis of four (4) Lots per each net acre comprising such Commercial Component. No other payment shall ever be required by or for the benefit of the Master Association (or otherwise in connection with the Common Elements) from any of the Commercial Component Owners. Reasonable Amounts shall be due and payable periodically in installments, in like manner and at such times as Base Assessments are due from Lots under this Declaration. Declarant is hereby fully empowered and entitled

69

First American Title

(but not obligated), in its sole discretion, to enter from time to time into separate written agreements with any owner of a Commercial Component, and to Record separate instruments, to memorialize the foregoing.

(b)     Commencement of Obligation.  The obligation of each of the Commercial Component Owners to pay the Reasonable Amounts hereunder shall not commence as to any part of the Commercial Components until the first day of the month following the date that the construction of Improvements on a legally subdivided parcel of land within the Commercial Components is completed, as evidenced by the issuance of a certificate of occupancy therefore.  On the first day of the month following the date that the construction of such Improvements are completed as set forth above, the obligation to pay the Reasonable Amounts shall commence, but only with respect to that portion of the Commercial Components upon which such Improvements have been completed.

18.6    Architectural Control.

The Commercial Components are not subject to the architectural review provisions set forth in this Declaration. Separate architectural review provisions for the Commercial Components may be set forth by Declarant in separate Recorded instruments.

18.7    Further Limitations on Amendments.

In recognition of the fact that the provisions of this Article 18 operate in part to benefit the Commercial Components, no amendment to this Article 18, and no amendment in derogation of any other provisions of this Declaration benefiting any of the Commercial Components, may be made without the written approval of the affected Commercial Component Owners. The foregoing shall not apply, however, to amendments made by Declarant. Notwithstanding the foregoing, or any other provision in this Declaration, without the express prior written approval of Declarant (or Declarant's successor or assignee of Record as to such rights): (a) the Reasonable Amounts set forth in Section 18.5 above shall not be increased; (b) no other payment shall be required by or for the benefit of the Master Association (or related to the Common Elements) from any of the Commercial Components, or form any of the Commercial Component Owners, and/or (c) this Article 18 (expressly including, but not limited to, Section 18.5 above) may not be revoked, deleted, modified, or supplemented (collectively and severally, an "amendment of Article 18"), and any purported amendment of Article 18, or any portion thereof, or the effect respectively thereof, without such express prior written approval, shall be void.

18.8    Jurisdiction and Cooperation.

It is Declarant's intention that the Master Association and the Commercial Component Owners shall cooperate to the maximum extent possible in the operation of the Tuscany Residential Community and the Commercial Components. Each shall reasonably assist the other in upholding the Community Standards as pertain to maintenance and the Design Guidelines. The Master Association shall have no power to promulgate Rules and Regulations other than those promulgated by Declarant affecting activities on or use of the Commercial Components without the prior written consent of the Commercial Component Owners affected thereby.

***PART SEVEN:  CHANGES IN THE COMMUNITY***

*Communities such as the Tuscany Residential Community are dynamic and constantly evolving as circumstances, technology, needs and desires, and laws change, as the Residents age and change over*

70

*time, and as the surrounding community changes. The Tuscany Residential Community and its Governing Documents must be able to adapt to these changes while protecting the things that make the Tuscany Residential Community unique.*

## Article 19.
## Changes in Ownership of Lots

19.1    Notice to Master Association.

Any Owner desiring to sell or otherwise transfer title to his or her Lot shall give the Board at least seven days' prior written notice of the name and address of the purchaser or transferee, the date of such transfer of title, and such other information as the Board may reasonably require. The transferor shall continue to be jointly and severally responsible with the transferee for all obligations of the Owner of the Lot, including assessment obligations, until the date upon which such notice is received by the Board, notwithstanding the transfer of title.

19.2    Imposition and Collection of Transfer Fees.

After the initial conveyance of record title to a Residential Lot to a Purchaser, there shall be imposed on each subsequent Owner of a Residential Lot upon each Chargeable Transfer of such Residential Lot the obligation to pay to the Master Association a transfer fee in an amount of the established from time to time by the Board but not to exceed the lesser amount of $350 or one-fourth of one percent of the Transfer Price (the "Transfer Fee"). Such Transfer Fee shall be paid upon each Chargeable Transfer of the Residential Lot on the occasion of each such Chargeable Transfer. The Transfer Fee is imposed not as a penalty and not as a tax, but as a means of supplementing the Assessments provided for in this Declaration and shall constitute a personal obligation of both the transferor and transferee to the Master Association. Notwithstanding anything to the contrary contained herein, a Transfer Fee shall not be due in connection with the conveyance of (i) a Residential Lot to a Builder from Declarant, (ii) the conveyance of a Residential Lot from a Builder to a Purchaser, or (iii) the conveyance of any Multi-Family Lot.

(a)    Definitions.  As used in this Section 19.2, the capitalized terms shall be defined as follows:

(1)    "Chargeable Transfer".  Each of the following shall constitute a "Chargeable Transfer":

(A)    Any conveyance, assignment, or other disposition other than a Mortgage or Family Transfer of the ownership of all or any interest (other than a leasehold of 20 years of less) of a Residential Lot, whether occurring in one transaction or a series of related transactions, and whether structured as a transfer of all right, title and interest or of beneficial ownership of all or a part or fractional share of a Residential Lot.

(B)    A transfer of an equitable interest under an installment land contract, whether or not recorded and whether or not the purchaser has fulfilled all conditions which would entitle the purchaser to receipt of a deed, if such transaction would otherwise have been a Chargeable Transfer had a fee interest been transferred.

71

(C)    A transfer of more than 50% of the ownership of a corporation, partnership, limited liability company or other entity which, directly or indirectly, owns one or more Residential Lots shall constitute a transfer of such interest in each such Residential Lot so owned.

(D)    A lease for a period of more than 20 years.

(E)    Any conveyance designed primarily for the avoidance of the payment of the Transfer Fee provided for in this Section 19.2.

(F)    Any transaction subject to payment of a state, county, school district or township real estate transfer or documentary stamp or similar tax.

(2)    "Family Transfer".  A "Family Transfer" shall consist of a transfer of ownership or possession of a Residential Lot solely to (i) one or more parents, grandparents, children, grandchildren, siblings, or the spouse of the transferor, or (ii) a trust for the benefit of the Owner or the Owner's parents, grandparents, children, grandchildren, siblings, or spouse.

(3)    "Transfer Price".  In the case of a transfer for which a documentary fee or transfer tax is required to be paid, the "Transfer Price" for purposes of this Section 19.2 shall be deemed to be the purchase price evidenced by the amount of the documentary fee or transfer tax shown on the deed or other instrument of transfer.  If no documentary fee or transfer tax is required to be paid, the "Transfer Price" shall be the fair market value of the interest transferred which, if the transaction is a bona fide "arms length" transaction, shall be rebuttably presumed to be the consideration recited in the instrument evidencing the transfer.

(b)    Payment and Reports.  The Transfer Fee shall be due and payable on the date of the Chargeable Transfer.  Within 10 days after the date of the Chargeable Transfer, a report on forms provided by the Master Association must be filed by the transferee with the Secretary of the Master Association, and the payment of the Transfer Fee shall be delinquent and bear interest and otherwise be treated as a past due Assessment if not paid within 30 days after the Chargeable Transfer.  The report to be filed with the Master Association shall, at a minimum, describe the Chargeable Transfer and state the full amount of the Transfer Price, the names and addresses of the parties to the Chargeable Transfer, and the legal description of the Residential Lot transferred.  For the purposes of this Section 19.2, the date of the Chargeable Transfer shall be the effective date shown on the deed or other instrument evidencing the transfer; or if no date is shown, the date of its recording; or if neither appears, the actual date the Chargeable Transfer became effective as reasonably determined by the Master Association.

No right of first refusal to purchase a Residential Lot in favor of any party or similar restriction on the ability of an Owner to sell the Owner's Residential Lot shall be deemed to exist solely as a result of this Declaration or the inclusion of any Residential Lot in the Tuscany Residential Community.

(c)    Inspection.  The Master Association at its own expense shall have the right for reasonable cause on reasonable notice at any time or times during regular business hours to inspect and copy all records and to audit all accounts of any Owner which is reasonably related to the payment of the Transfer Fee provided for in this Section 19.2.

72

## Article 20.
### Changes in the Common Elements

20.1    Condemnation.

If a Lot or portion thereof is taken by eminent domain, compensation and the Owner's interest in the Common Elements shall be allocated as provided under the Act. If any part of the Common Elements shall be taken (or conveyed in lieu of and under threat of condemnation by the Board acting on the written direction of the Requisite Membership Percentage and of Declarant, as long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the property subject to the Declaration or which may be made subject to the Declaration in accordance with Section 9.1) by any authority having the power of condemnation or eminent domain, each Owner shall be entitled to written notice of such taking or conveyance prior to disbursement of any condemnation award or proceeds from such conveyance. Such award or proceeds shall be payable to the Master Association to be disbursed as follows:

If the taking or conveyance involves a portion of the Common Elements on which Improvements have been constructed, the Master Association shall restore or replace such Improvements on the remaining land included in the Common Elements to the extent available, unless within 60 days after such taking Declarant, so long as Declarant (or any of its affiliates) owns or has rights to acquire any part of the property subject to the Declaration or which may be made subject to the Declaration in accordance with Section 9.1, and the Owners constituting the Requisite Membership Percentage shall otherwise agree. Any such construction shall be in accordance with plans approved by the Board. The provisions of Section 7.3(c) regarding funds for restoring Improvements shall apply.

If the taking or conveyance does not involve any Improvements on the Common Elements, or if a decision is made not to repair or restore, or if net funds remain after any such restoration or replacement is complete, then such award or net funds shall be disbursed to the Master Association in trust for the Owners and lien holders as their interests appear.

20.2    Partition.

Except as permitted in this Declaration, the Common Elements shall remain undivided, and no Person shall bring any action to partition any portion of the Common Elements without the written consent of all Owners and Mortgagees. This Section shall not prohibit the Board from acquiring and disposing of tangible personal property, nor from acquiring and disposing of real property which may or may not be subject to this Declaration.

20.3    Transfer or Dedication of the Common Elements.

The Master Association may dedicate portions of the Common Elements to the City of Henderson, Nevada, or to any other local, state, or federal governmental or quasi-governmental entity.

## Article 21.
### Amendment of Declaration

21.1    By Declarant.

In addition to specific amendment rights granted elsewhere in this Declaration, Declarant may unilaterally amend this Declaration if such amendment is necessary (a) to bring any provision into

73

First American Title

compliance with any applicable governmental statute, rule, regulation, or judicial determination; (b) to enable any reputable title insurance company to issue title insurance coverage on the Lots; (c) to enable any institutional or governmental lender, purchaser, insurer or guarantor of mortgage loans, including, for example, the Federal National Mortgage Association or Federal Home Loan Mortgage Corporation, to make, purchase, insure or guarantee mortgage loans on the Lots; or (d) to satisfy the requirements of any local, state or federal governmental agency.  However, any such amendment shall not adversely affect the title to any Lot unless the affected Owner shall consent in writing.

21.2    By Members.

Except as otherwise specifically provided above and elsewhere in this Declaration, this Declaration may be amended only by the affirmative vote or written consent, or any combination thereof, of Owners representing the Requisite Membership Percentage, and Declarant's consent, so long Declarant is entitled to exercise rights under Article 9.  In addition, the approval requirements set forth in Article 17 and Section 21.3 shall be met, if applicable.   Notwithstanding the foregoing, the percentage of votes necessary to amend a specific clause shall not be less than the prescribed percentage of affirmative votes required for action to be taken under that clause.

21.3    Additional Consent Requirements.

(a)    Consent of Master Developer Required for Certain Amendments:  Any amendment which operates to change or remove any of the Master Developer's rights, easements, benefits and/or protections under this Declaration may occur only if the requisite number of Owners have approved the amendment in accordance with Section 21.2, and the Master Developer has approved the amendment.

(b)    Consent of Declarant Required for Certain Amendments:  Declarant has reserved and retained certain rights, easements, protections and benefits under the terms of this Declaration.  Due to Declarant's significant economic interest in preserving the rights, easements, protections and benefits established under this Declaration, any amendment which operate to change or remove any of Declarant's rights, easements, benefits and/or protections under this Declaration may occur only if the requisite number of Owners have approved the amendment in accordance with Section 21.2, and the Declarant has approved the amendment.   The provisions of this Section 21.3(b) shall specifically apply, without limitation, to the provisions of Article 9, Article 10, Article 11, Article 16, Article 22 and this Article 21.

21.4    Validity, Effective Date, and Conflicts.

No amendment may remove, revoke, or modify any right or privilege of Declarant or any assignee of such right or privilege, including without limitation any Builder, without the consent of Declarant or its assignee, as applicable.

If an Owner consents to any amendment to this Declaration or the Bylaws, it will be conclusively presumed that such Owner has the authority to consent, and no contrary provision in any Mortgage or contract between the Owner and a third party will affect the validity of such amendment.

Any amendment shall become effective upon Recording, unless a later effective date is specified in the amendment.  Any procedural challenge to an amendment must be made within six months of its Recordation or such amendment shall be presumed to have been validly adopted.  In no event shall a change of conditions or circumstances operate to amend any provision of this Declaration.

74

First American Title