First American Title

Each of the Governing Documents, including this Declaration, is intended to comply with the requirements of the Act applicable to common interest communities and the Governing Documents shall be interpreted, if at all possible, so as to be consistent with the Act. If there is any conflict between the Governing Documents and the provisions of the foregoing statutes, the provisions of the applicable statutes shall control. In the event of any conflict between this Declaration and any other Governing Document, this Declaration shall control.

21.5    Exhibits.

Exhibits "A," "B," "B-1," "B-2," "C," "D," and "F" attached to this Declaration are incorporated by this reference and amendment of such exhibits shall be governed by this Article. All other exhibits are attached for informational purposes.

**PART EIGHT: ADDITIONAL PROVISIONS**

## Article 22.
### Additional Disclosures, Disclaimers and Releases

22.1    General Disclosures and Disclaimers Regarding Private Amenities

By acceptance of a deed to a Lot, each Owner (for purposes of this Article 22, the term "Owner" shall include an Owner and/or Resident, and their respective Families and Invitees), shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following disclosures and disclaimers. The Lots and Common Elements include absolutely no right, title, or interest in or to (or membership in, use of, or access to) the Private Amenities (including, but not necessarily limited to, the Golf Course and any clubhouse and its components, and related facilities and features, as the same are subject to change in the sole discretion of the management of the Private Amenities. The Private Amenities are NOT A PART OF the Property, and ARE NOT part of the Common Elements. Private Amenity ownership, membership, use, and access, are separate from, and not included in, the Property. Notwithstanding the foregoing, the owners and members of the Private Amenities, and their respective Invitees, shall have an easement of access to, enjoyment of, and ingress and egress over, certain Private Streets and entries and other Common Elements of the Tuscany Residential Community, as described in further detail in Article 15.

22.2    Additional Disclosures and Disclaimers Regarding Private Amenities.

Without limiting Section 22.1 above, by acceptance of a deed to a Lot, each Owner shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following disclosures and disclaimers:

(a)    Portions of the Tuscany Residential Community are located adjacent to or nearby the Golf Course. In connection with the Golf Course: (i) the water facilities, hazards and other installations located on the Golf Course may be an attractive nuisance to children; (ii) operation, maintenance and use of the Golf Course may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the limited right of golfers on the Golf Course ("Golfers") to enter upon the Tuscany Residential Community to retrieve errant golf balls; (2) the right of Golfers, on foot or on golf carts, to enter upon and traverse easements over the Tuscany Residential Community in connection with golf play on the Golf Course; (3) the right of owner(s) and operator(s) of the Golf Course, and their employees, agents, suppliers, and

75

contractors, to (a) enter upon and travel over the Tuscany Residential Community to and from and between any one or more of the Tuscany Residential Community entry areas, and portions of the Golf Course, and (b) enter upon the Tuscany Residential Community to maintain, repair, and replace, water and irrigation lines and pipes used in connection with Golf Course landscaping; (4) operation and use of noisy electric, gasoline, diesel and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (5) operation of sprinkler and other irrigation systems during the day and night; (6) storage, transportation, and application of insecticides, pesticides, herbicides, fertilizers, and other supplies and chemical substances (all, collectively, "chemical substances"); (7) parking and/or storage of vehicles, equipment, chemical substances, and other items; (8) irrigation of the Golf Course, and supply of water facilities thereon, with recycled or effluent water; (9) "overspray" of recycled or effluent water and chemicals onto the Tuscany Residential Community which may result in damage to Improvements constructed on Lots and/or Common Elements within the Tuscany Residential Community; and/or (10) Golfers from time to time may shout and use language, particularly in and around tee and green areas of the Golf Course, which may be distinctly audible to persons in the Tuscany Residential Community; and which language may be profane or otherwise offensive in tone and content; (iii) play on the Golf Course may be allowed by the owner(s) or operator(s) thereof during the daylight and/or evening hours, up to and including seven days a week; (iv) play on the Golf Course may result in damage to the Tuscany Residential Community as a result of golf balls or other items leaving the Golf Course, including, without limitation, damage to windows, doors, stucco, roof tiles, sky lights, and other areas of the Lot and other portions of the Tuscany Residential Community, and damage to real and personal property of Owner or others, whether outdoors or within a Dwelling or other building, and injury to person; and (e) although fencing and other features may (but need not necessarily) be incorporated into the Lot or other portions of the Tuscany Residential Community by Declarant in an effort to decrease the hazards associated with golf balls entering the Tuscany Residential Community from the Golf Course, each Owner acknowledges that such fencing and other features may protect against some, but certainly not all golf balls which enter the Tuscany Residential Community from the Golf Course.

(b)     The Golf Course also may include one or more separate large maintenance and/or warehouse-type building(s), storage area(s) for vehicles, equipment, and chemical substances (as defined above), fuel storage and above-ground fuel island(s), and related facilities (all, collectively, "Maintenance Facility") at a location on or adjacent to the Tuscany Residential Community which may or may not be contiguous to other portions of the Golf Course. The location of the Maintenance Facility will require frequent and recurring travel by Maintenance Facility and other Golf Course personnel, and vehicles (and travel by and transportation of other personnel, equipment, chemicals, fuel, and other items) over Private Streets and other Common Elements of the Tuscany Residential Community to and from the Maintenance Facility and other portions of the Golf Course and Tuscany Residential Community entry areas.  In connection with the Maintenance Facility: (i) the facilities and related items located on the Maintenance Facility may be an attractive nuisance to children; (ii) operation, maintenance, and use, of the Maintenance Facility may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the right of owner(s) and operator(s) of the Maintenance Facility, and their employees, agents, suppliers, and contractors, to enter upon and travel over the Tuscany Residential Community to and from and between any one or more of the Tuscany Residential Community entry areas, the Maintenance Facility, and other portions of the Golf Course; (2) operation, maintenance, and repair of noisy electric, gasoline, and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (3) storage, transportation, and application, of chemical substances; (4) parking and/or storage of vehicles, equipment, chemical substances, fuel, and other items; and (5) fueling and related operations; and (iii) although walls,

76

fencing, and other features may be incorporated into the Maintenance Facility, each Owner acknowledges that such walls, fencing, and other features will certainly not eliminate all sight, noise, or other conditions, on or emanating from the Maintenance Facility.

(c)    All and any one or more of the matters described above may cause inconvenience and disturbance to the Owners, and other Residents of and Invitees to the Lot and/or Common Elements, and possible injury to person and damage to property, and each Owner has carefully considered the foregoing matters, and the location of the Tuscany Residential Community (including the Common Elements and the Lot) and their proximity to those elements of the Golf Course and to the Maintenance Facility likely to affect ownership and enjoyment of a Lot, before making the decision to purchase a Lot in the Property.

22.3    Disclosures and Disclaimers of Certain Other Matters.

Without limiting any other provision in this Declaration, by acceptance of a deed to a Lot, each Owner shall conclusively be deemed to understand, and to have acknowledged and agreed to, all of the following:

(a)    The Commercial Components are designated commercial areas containing approximately 5 acres located within Tuscany but will not be part of the Tuscany Residential Community; that the Commercial Components are ultimately expected to be developed by Declarant, or its affiliates, but may be developed by third parties; that the Commercial Components will not be encumbered by or subject to this Declaration, except to the limited extent set forth in Article 18 hereof; that while the Commercial Components are required to contribute Reasonable Amounts to the Master Association in lieu of Assessments hereunder, no Commercial Component shall be subject to any of the use restrictions (including without limitation DRC review) set forth in this Declaration or any Rules and Regulations; that Declarant and Master Developer each specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to the Commercial Components and/or any matter relating thereto; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(b)    that there is and/or will be electrical power substations located on or adjacent to the Tuscany Residential Community (which term, as used throughout this Article 22, shall include all Lots and Common Elements), and there are presently and may be further major electrical power system components (high voltage transmission or distribution lines, transformers, etc.) from time to time located within or nearby the Tuscany Residential Community, which generate certain electric and magnetic fields ("EMF") around them; that, without limiting any other provision in this Declaration, Declarant and Master Developer each specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to EMF; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising from or relating to said EMF, including, but not necessarily limited to, any claims for nuisance or health hazards; and

(c)    that an ice cream plant is currently located on Olsen Street, in close proximity to the Tuscany Residential Community; that large amounts of anhydrous ammonia is stored at the ice cream plant for refrigerating purposes; that if an industrial accident occurs at the ice cream factory an ammonia leak could result in a hazardous ammonia plume may drift over the Tuscany Residential Community; that exposure to high concentrations of anhydrous ammonia could prove harmful or possibly lethal to Owners, Residents and Invitees; that, without limiting any other provision in this Declaration, Declarant and Master Developer each specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to the operation of the ice cream plant, its proximity to the Tuscany

77

First American Title

Residential Community, and the effects of any ammonia leaks; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising from or relating to the ice cream plant, including, but not necessarily limited to, any claims for nuisance or health hazards; and

(d)  that the Tuscany Residential Community is or may be located within or nearby certain airplane flight patterns, helicopter flight patterns, and/or subject to significant levels of airplane and helicopter traffic noise; that each Owner understands that existing and future noise levels at these locations, associated with existing and future airport operations and flight patterns, may have an effect on the livability, value and suitability of the Property for residential use; and that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to airplane and helicopter flight patterns, and/or airplane and helicopter noise; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising from or relating to airplane and helicopter flight patterns or airplane and helicopter noise; and

(e)  that the Tuscany Residential Community is or may be located adjacent to or nearby major roadways, and subject to levels of traffic thereon and noise, dust, and other nuisance from such roadways and vehicles; that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to roads and/or noise, dust, and other nuisance therefrom; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(f)  that there is and/or will be a water reservoir site located on or adjacent to the Tuscany Residential Community, and certain major water and drainage channels, major washes, and a major water detention basin may be located within and adjacent to the Tuscany Residential Community (all, collectively, "Channel"), the ownership, use, regulation, operation, maintenance, improvement and repair of which are not within the control of Declarant or Master Developer, and over which neither Declarant or Master Developer has any jurisdiction or authority, and, in connection therewith: (1) the Channel may be an attractive nuisance to children; (2) maintenance and use of the Channel may involve various operations and applications, including (but not necessarily limited to) noisy electric, gasoline or other power driven vehicles and/or equipment used by Channel maintenance and repair personnel during various times of the day, including, without limitation, early morning and/or late evening hours; and (3) the possibility of damage to Improvements and property on the Property, particularly in the event of overflow of water or other substances from or related to the Channel, as the result of nonfunction, malfunction, or overtaxing of the Channel or any other reason; (4) any or all of the foregoing may cause inconvenience and disturbance to Owners and other persons in or near the Lot and/or Common Elements, and possible injury to person and/or damage to property; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(g)  that there is or will be a series of monitoring wells installed within the Tuscany Residential Community for the purpose of monitoring soil, groundwater and/or other environmental conditions ("Monitoring Wells"); that the Monitoring Wells will be maintained by Basic Remediation Company, LLC, as set forth in that certain Monitoring Well and Soil Boring Access Agreement recorded April 20, 2004, in Book 20040420 as Instrument No. 03704 of Official Records, in the Office of the County Recorder (as amended); that the existence of the Monitoring Wells may cause inconvenience and disturbance to Owners and other persons in or near the Lot and/or Common Elements, and possible injury to person and/or damage to property; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

78

First American Title

(h)    that there is or will be a series of subdrain systems installed underneath the land within the Tuscany Residential Community consisting of a deeper main system and a secondary near surface subdrain system ("French Drains"); that the French Drains exist throughout Tuscany at depths greater than 10 feet below the pad grade; that those Lots now or hereafter designated as Restricted Lots will be burdened by an easement for the placement and operation of the French Drains; that to prevent damage to the French Drains, the following restrictions apply to each Restricted Lot:

- No vegetation with root systems that have potential to extend to depths of greater than two feet (2') are permitted within five feet (5') of the property line of any Restricted Lot;

- Any pool or other Improvement of a hardscape nature constructed or installed on any Restricted Lot must be a distance of not less than five feet (5') from the property line of the Restricted Lot;

- Before constructing or installing any Improvement on a Restricted Lot, the Owner of the Restricted Lot shall undertake a review of the location of the French Drains, including the proximity of the French Drains to the Lot and the proposed Improvement based on a review of the improvement plans and materials for the French Drains on file with the Master Association as well as a physical inspection of the Restricted Lot;

- If during the construction or installation of any Improvement on a Restricted Lot, gravel is encountered below existing grade, or any damage to the French Drains occurs, all work must immediately cease pending the review and recommendation of the Master Association and its geotechnical consultants;

- If Owner or Invitee damages the French Drains, then the Master Association shall be responsible to repair the damages and the Owner of the Restricted Lot shall be obligated to promptly reimburse the Master Association for the cost thereof, as a Specific Assessment enforceable in the manner set forth in this Declaration;

that the existence of the French Drains and the proximity of the French Drains to the Restricted Lots may cause inconvenience and disturbance to Owners and other persons in or near the Lot and/or Common Elements, and possible injury to person and/or damage to property; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(i)    that the Tuscany Residential Community is located near a site formerly operated as a municipal solid waste landfill from the late 1950s until the mid-1970s; that approximately 3 years ago, the City began the process of closing down the landfill and the City expects to fully close the landfill by the end of 2004; that once the landfill is closed, the City is contemplating the development of the landfill as a municipal golf course, provided that the landfill can sustain such a development; that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to the landfill, its closure or future use; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(j)    that an advanced wastewater treatment plant owned and operated by the City is located to the west of the Tuscany Residential Community; that the plant includes rapid infiltration basins ("RIBs") located approximately 1,600 feet from the southern boundary of Tuscany; that the RIBs are authorized to be used during certain months of the year to store and/or dispose of treated municipal effluent via

79

infiltration into the subsurface; that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to odor, noise, dust, and other nuisance therefrom; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(k)     that the sewage which is created within the Tuscany Residential Community will be handled by the City's wastewater treatment facility; that because the Tuscany Residential Community is lower in elevation than the City's wastewater treatment facility, a lift station must be constructed within the Tuscany Residential Community to pump the sewage to the treatment facility; that the operation of the lift station may produce noise and odor pollution; that the lift station will be operated and maintained by the City; that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to odor, noise, dust, and other nuisance therefrom; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(l)     that three (3) radio towers, located near the Tuscany Residential Community, presently operate at 50,000 watts; that modulation and directional broadcasting can boost the operational power of each tower at certain times of the day; that television sets, receivers, computer modems, and radio communication devices may be adversely impacted by the presence of AM radio signals; that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to the existence of such tower and any nuisance therefrom; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(m)     that construction or installation of Improvements by Declarant, Builders, other Owners, or third parties, including commercial homebuilders, may impair or eliminate the view, if any, of or from any Lot and/or Common Elements; and that Owner hereby releases Declarant and Master Developer from any and all claims arising from or relating to said impairment or elimination including, but not necessarily limited to, any claims for nuisance or health hazards; and

(n)     that residential subdivision and home construction is an industry inherently subject to variations and imperfections, and items which do not materially affect safety or structural integrity shall be deemed "expected minor flaws" (including, but not limited to: reasonable wear, tear or deterioration; shrinkage, swelling, expansion or settlement; squeaking, peeling, chipping, cracking, or fading; touch-up painting; minor flaws or corrective work; and like items) and not constructional defects; and

(o)     that: (1) the finished construction of the Lot and the Common Elements, while within the standards of the industry in the greater metropolitan Las Vegas area, and while in substantial compliance with the plans and specifications, will be subject to expected minor flaws; and (2) issuance of a Certificate of Occupancy by the relevant governmental authority with jurisdiction shall be deemed conclusive evidence that the relevant Improvement has been built within such industry standards; and

(p)     that indoor air quality of the Lot and/or Common Elements may be affected, in a manner and to a degree found in new construction within industry standards, by particulates or volatiles emanating or evaporating from new carpeting or other building materials, fresh paint or other sealants or finishes, and so on; and

(q)     that installation and maintenance of a gated community, entry gate guard house, or any security device, operation, or method, shall not create any presumption, or duty whatsoever of Declarant

80

or the Master Association (or their respective officers, directors, managers, employees, agents, and/or contractors), with regard to security or protection of person or property within or adjacent to the Tuscany Residential Community and no warranty or assurances are given with respect to the hours of operation of any such security feature; and

     (r)     that in order to preserve the structural integrity of the foundation of the Dwellings and other Improvements on each Lot, the following precautions must be taken by each Owner:

- Neither landscaping nor sprinklers should be installed within ten feet (10') of the Dwelling on each Lot that is now or hereafter designated as a Lower Lot;

- Neither landscaping nor sprinklers should be installed within five feet (5') of the Dwelling on each Lot that is now or hereafter designated as an Upper Lot;

- No sprinkler irrigation may be installed on a Lot within three feet (3') of any block wall, other wall or fence; and

that before any structures, hardscapes, or underground pipes or conduits are installed on a Lot by an Owner, each Owner is encouraged to seek the advice of a qualified soils and/or structural engineer as to how to mitigate the potential adverse effects of the soil; and that Declarant hereby disclaims any responsibility for any damages resulting from the installation of additional Improvements on a Lot or any modification of such Improvements by any Owner; and

     (s)     that each Owner shall be deemed to have acknowledged that DUE TO THE CONDITIONS OF THE SOILS WITHIN THE PROJECT, IT IS IMPERATIVE THAT OWNER NOT INTERFERE OR CHANGE THE ESTABLISHED DRAINAGE PATTERN(S) on a Lot without consulting a licensed landscape architect or civil engineer; that the drainage pattern(s) have been developed to facilitate proper drainage from slopes and yard drainage to the street; that ANY INTERFERENCE within the drainage pattern(s), as initially constructed, can cause water to become entrapped within the yard area and could cause structural failure; and that the construction of retaining walls, pools, spas, patios, gazebos, curbs, decks, walks, or any other landscape amenities can block, alter, or modify drainage patterns, thereby requiring corrective measures to be taken to insure proper water flow; that any disturbance of constructed drainage courses could materially impact soil content and negatively affect the structural integrity of the Dwelling and other Improvements constructed on a Lot; that pooled water, incorrect drainage, leaky irrigation systems, over-watering, or other conditions can also lead to groundwater infiltration and must be avoided by each Owner; that Owner is strongly advised to consult landscape architects and/or qualified civil engineers or contractors for advice prior to the installation of patios, hardscape, yard landscaping or any other alteration to the drainage pattern; and

     (t)     that each Owner shall be deemed to have accepted the soils condition of the Lot; acknowledged that Owner has been advised that the precautions mentioned above in parts (q) and (r) of this Section 22.3 are necessary to preserve the structural integrity of the Dwelling and other Improvements on the Lot; that each Owner acknowledged that the soils condition of a Lot may have a negative effect on property values and future Improvements to the Lot that may be installed by Owner; and that each Owner agreed to observe the above mentioned landscaping restrictions and to maintain the drainage as described above; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

81

(u)      that Owner acknowledges having received from Declarant information regarding the zoning designations and the designations in the master plan regarding land use, adopted pursuant to NRS Chapter 278, for the parcels of land adjoining the Property to the north, south, east, and west, together with a copy of the most recent gaming enterprise district map made available for public inspection by the jurisdiction in which the Lot is located, and related disclosures. Declarant makes no further representation, and no warranty (express or implied), with regard to any matters pertaining to adjoining land or uses thereof or to any gaming uses. Owner is hereby advised that the master plan and zoning ordinances, and gaming enterprise districts, are subject to change from time to time. If additional or more current information concerning such matters is desired, Owner should contact the appropriate governmental planning department. Each Owner acknowledges and agrees that its decision to purchase a Lot is based solely upon Purchaser's own investigation, and not upon any information provided by sales agent or Master Developer; and

(v)      that (i) Declarant presently plans to develop and/or sell for development only those lots which have already been released for construction and sale, and that neither Declarant nor Master Developer has any obligation with respect to future phases, and "custom lots," plans, zoning, or development of other real property contiguous to or nearby the Lot, (ii) proposed or contemplated residential and other developments may have been illustrated in the plot plan or other sales literature in or from Declarant's sales office, and/or Owner may have been advised of the same in discussions with sales personnel; however, notwithstanding such plot plans, sales literature, or discussions or representations by sales personnel or otherwise, neither Declarant nor Master Developer is under any obligation to construct such future or planned developments or units, and the same need not be built in the event that Declarant, Master Developer or any Builder, for any reason whatsoever, decides not to build same, (iii) Owner is not entitled to rely upon, and in fact has not relied upon, the presumption or belief that the same will be built, and (iv) no sales personnel or any other person in any way associated with Declarant or Master Developer has any authority to make any statement contrary to the provisions set forth in the foregoing or any provision of the written purchase agreement; and

(w)      That as set forth in Section 7.9 of this Declaration, the Master Association has or will enter into an agreement for the provision, distribution, maintenance, transmission and servicing of off-air and satellite channels of video programming to each Dwelling by a broadband bulk cable service provider; that the Cable Service Agreement provides that Cable Provider is to have the exclusive right to provide Cable Services in the Tuscany Residential Community, to the extent permitted by law; that the cost of the basic Cable Services is a Common Expense that will be assessed to every Owner as set forth in this Declaration; provided, however, that each Owner or Resident will be required to pay directly to the Cable Provider the following fees and costs: (i) a one-time activation fee to activate basic service for up to four outlets in the Dwelling, and (ii) the prevailing rate of any additional outlets, services, programming and/or repairs requested by the Owner, and (iii) such other charges as may be imposed by the Cable Provider as a condition to the provision of Cable Services, and (iv) such other charges as may be agreed to by the Owner or its Resident or Invitees; that no Owner shall be exempt from the obligation to pay for such services to the extent billed through the Master Association as part of the Common Expenses, if provided to all Owners as a Common Expense, regardless of whether (1) the Cable Services are ever activated by the Owner or Resident, or (2) the Cable Service Provider terminates the provision of Cable Services to that Lot because that Lot Owner or its Resident or Invitees engaged in unauthorized use of the Cable Services, theft of signal, violation of such party's agreement with the Cable Service Provider, violation of a federal, state or local law or regulation governing the Cable Service, or (3) the Cable Service Provider refuses to provide Cable Services to that Lot for any other reason; and that Declarant and Master Developer each hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to the Cable Service Provider, the Cable Service

82

First American Title

Agreement and the Cable Services to be provided thereunder, or any other matter pertaining thereto; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(x)    The Common Elements existing from time to time in the Tuscany Residential Community consist of park and landscape areas (including without limitation, parks, linear parks, and other park facilities) and recreation center. In connection with such Common Elements: (i) the water facilities, hazards, other installations now or hereafter located on the Common Elements may be an attractive nuisance to children; (ii) operation, maintenance, and use, of the Common Elements may result in a certain loss of privacy, and will entail various operations and applications, including (but not necessarily limited to) all or any one or more of the following: (1) the right of the Master Association and its employees, agents, suppliers, and contractors, to (a) enter upon and travel over the Tuscany Residential Community, and (b) enter upon the Tuscany Residential Community to maintain, repair, and replace, water and irrigation lines and pipes used in connection with Common Element landscaping and other Improvements; (2) operation and use of noisy electric, gasoline, diesel and other power driven vehicles and equipment, on various days of the week, including weekends, and during various times of the day, including, without limitation, early morning and late evening hours; (3) operation of sprinkler and other irrigation systems during the day and night; (4) storage, transportation, and application of chemical substances on the Common Elements; (5) irrigation of the Common Elements, and supply of water facilities thereon, with recycled or effluent water; and (6) "overspray" of recycled or effluent water and chemicals onto the Tuscany Residential Community which may result in damage to Improvements constructed on Lots; and (iii) access to and over the Common Elements may be unlimited; that all and any one or more of the matters described above may cause inconvenience and disturbance to the Owners, and other Residents and Invitees of the Lot, and possible injury to person and damage to property, and each Owner has carefully considered the foregoing matters, and the location of the Common Elements and their projected proximity to the Lot, before making the decision to purchase a Lot in the Property; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(y)    that Declarant anticipates that the construction and development of the Tuscany Residential Community and adjacent properties will take place over a significant number of years; that such construction and development is subject to and accompanied by substantial levels of noise, dust, construction-related traffic and traffic restrictions, and other construction-related "nuisances"; that when initially purchased by an Owner, each Lot is within a Neighborhood and the larger master planned development, all of which are currently being developed; that the Owners and Residents will experience and accept substantial levels of construction-related "nuisances" until (i) the Neighborhood (and other neighboring portions of land being developed) has been completed and sold out, and (ii) until the Tuscany Residential Community has been completed and sold out, and (iii) until the Commercial Components have been completed and sold out; and (iv) thereafter in connection with repairs or any new construction; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

(z)    that Declarant reserves the right, for so long as Declarant or any of its affiliated entities owns or has rights to acquire any of the Property, to unilaterally control the entry gate(s), and to keep all such entry gate(s) open during such hours established by Declarant, in its sole discretion, to accommodate Declarant's construction activities and sales and marketing activities; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto; and

83

First American Title

(aa)    that Declarant has reserved certain easements, rights and powers, as set forth in this Declaration; and that each Owner understands, acknowledges, and agrees that Declarant has reserved such easements, rights and powers under this Declaration, which will limit and affect the rights of all Owners and Residents; and that each Owner hereby releases Declarant and Master Developer from any and all claims arising therefrom or relating thereto.

22.4    Releases.

BY ACCEPTANCE OF A DEED TO A LOT, EACH OWNER, FOR ITSELF AND ALL PERSONS CLAIMING UNDER SUCH OWNER, SHALL CONCLUSIVELY BE DEEMED TO HAVE ACKNOWLEDGED AND AGREED, TO WAIVE AND RELEASE DECLARANT, THE DRC, THE MASTER ASSOCIATION, MASTER DEVELOPER (AND: (A) TO THE EXTENT APPLICABLE, ANY BUILDER, AND (B) WITH RESPECT TO THE PRIVATE AMENITIES, THE ARCHITECTS, DESIGNERS, OWNER(S) AND ANY OPERATOR(S) THEREOF; TOGETHER WITH THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND THEIR RESPECTIVE INVITEES), AND EACH OF THEIR RESPECTIVE OFFICERS, MANAGERS, AGENTS, EMPLOYEES, SUPPLIERS AND CONTRACTORS, FROM ANY AND ALL LOSS, DAMAGE OR LIABILITY (INCLUDING, BUT NOT LIMITED TO, ANY CLAIM FOR NUISANCE OR HEALTH HAZARDS) RELATED TO OR ARISING IN CONNECTION WITH ANY DISTURBANCE, INCONVENIENCE, INJURY, OR DAMAGE RESULTING FROM OR PERTAINING TO ALL AND/OR ANY ONE OR MORE OF THE CONDITIONS, ACTIVITIES, OCCURRENCES, SERVICES OR COSTS DESCRIBED IN THE FOREGOING SECTIONS 22.1 THROUGH 22.3, INCLUSIVE.

**Article 23.**
**General Provisions**

23.1    No Public Right or Dedication.

Nothing contained in this Declaration shall be deemed to be a gift or dedication of all or any part of the Property to the public, or for any public use.

23.2    Compliance with the Act.

It is the intent of Declarant that this Declaration shall be in all respects consistent with, and not violative of, applicable provisions of the Act. In the event any provision of this Declaration is found to violate such applicable provision of the Act, such offending provision of the Declaration shall be severed herefrom; provided, however, that if such severance shall impair the integrity of this Declaration, said offending provision shall be automatically deemed modified to the minimum extent necessary to conform to the applicable provision of the Act.

23.3    No Representations or Warranties.

No representations or warranties of any kind, express or implied, have been given or made by Declarant or its agents or employees in connection with the Tuscany Residential Community or any portion of the Tuscany Residential Community, or any Improvement thereon, its physical condition, zoning, compliance with applicable laws, fitness for intended use, or in connection with the subdivision, sale, operation, maintenance, cost of maintenance or taxes, except as specifically and expressly set forth in this Declaration.

84

First American Title

23.4    Invalidity.

The invalidity of any provision of this Declaration or any of the Governing Document shall not impair or affect in any manner the validity, enforceability or effect of the remainder, and if a provision is invalid, all of the other provisions of this Declaration or any Governing Document, as applicable, shall continue in full force and effect.

23.5    Constructive Notice and Acceptance.

Every Person who owns, occupies or acquires any right, title, estate or interest in or to any Lot or other portion of the Property does hereby consent and agree, and shall be conclusively deemed to have consented and agreed, to every limitation, restriction, easements, reservation, conditions and covenant contained herein, whether or not any reference to these restrictions is contained in the instrument by which such person acquired an interest in the Lot, the Property, or any portion thereof.

23.6    Binding Effect.

All of the property described in Exhibit "A" and any additional property made a part of the Tuscany Residential Community from time to time in the future by recording one or more Supplemental Declaration, shall be owned, conveyed, and used subject to all of the provisions of this Declaration, which shall run with the title to such property. This Declaration shall be binding upon all Persons having any rights, title, or interest in any portion of the Property, their heirs, successors, successors-in-title, and assigns.

Unless otherwise provided by applicable Nevada law, this Declaration shall run with the land and have a perpetual duration. This Declaration may be terminated only by a Recorded instrument signed by Members comprising at least 80% of the total voting power of the Master Association, and which complies with the termination procedures set forth in the Act. Nothing in this Section shall be construed to permit termination of any easement created in this Declaration without the consent of the holder of such easements.

[CONTINUED ON NEXT PAGE]

85

First American Title

IN WITNESS WHEREOF, the undersigned Declarant has executed this Declaration the date and year first written above.

RHODES DESIGN AND DEVELOPMENT
CORPORATION, a Nevada corporation

By: _____
Name: _PAUL HUYGENS_
Title: _Secretary/Treasurer_

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _7/27_____, 2005, by _Paul Huygens_ as _Secretary_____ of Rhodes Design and Development Corporation.

_____
Notary Public

My appointment expires: _11-17-07_

CRYSTAL LYNN HAWKINS
Notary Public State of Nevada
No. 03-85327-1
My appt. exp. Nov. 17, 2007

86

First American Title

First American Title

---

CONSENT OF MASTER DEVELOPER

The forgoing Declaration is hereby approved as to form and as to the specific provisions of Section 10.11.

COMMERCE ASSOCIATES, LLC, A Nevada limited liability company

By: _Gee E Reinhardt_
Name: _J GEORGE REINHARDT_
Title: _MANAGER_

California
STATE OF ~~NEVADA~~
                    Marin
COUNTY OF ~~CLARK~~

This instrument was acknowledged before me on _07/27/05_ 2005, by _GEORGE REINHART_ as _MANAGER_ of Commerce Associates, LLC.

_Chona Sommers_
Notary Public

My appointment expires: _04/11/08_

CHONA SOMMERS
Commission # 1482613
Notary Public - California
Marin County
My Comm. Expires Apr 11, 2008

87

---

First American Title

First American Title

---

## CONSENT OF PARCEL 13 OWNER

The undersigned, as the owner of the real property described as Parcel 13 on Exhibit "A", hereby consents to this Declaration.

BRZ REALTY, LLC

By: _____
Name: _____
Title: _____

STATE OF NEVADA

COUNTY OF CLARK

This instrument was acknowledged before me on _July 28_, 2005, by _Ze'ev Yacobovsky_ as _manager_ of BRZ Realty, LLC.

_____
Notary Public

Augusta J. Yamamoto
My appointment expires: _June 24, 2007_

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
AUGUSTA S. YAMAMOTO
Appt. No. 03-82552-1
My Appt. Expires June 24, 2007

88

---

First American Title

First American Title

EXHIBIT "A"

Land Initially Submitted

A Portion of Parcel 6C:

Neighborhood Designation: La Piazza

Lots One (1) through Eight (8), inclusive, Forty-Three (43) through Eighty-Seven (87), inclusive and Lots Nine (9) through Forty-Two (42), inclusive, as shown on the Final Map of Tuscany Parcel 6C, Formerly Known as (Palm City – Phase 2 Lot 6C), A Common Interest Community, recorded August 30, 2004, on file in Book 119 of plats page 0012 of Official Records, in the Office of the County Recorder, Clark County, Nevada.

A Portion of Parcel 24:

Neighborhood Designation: Avellino

Lots One (1) through Fifty-Two (52), inclusive, and Lots Fifty-Three (53) through Ninety-Six (96), inclusive, as shown on the Final Map of Tuscany Parcel 24 Formerly known as (Palm City – Phase 1 Lot 24), A Common Interest Community, recorded August 13, 2004, on file in Book 118 of plats page 0073 of Official Records, in the Office of the County Recorder, Clark County, Nevada.

A Portion of Parcel 19 ("Parcel 19"):

Neighborhood Designation: Montebello

Lots One (1) through Five (5), inclusive, Six (6) through Forty-Eight (48), inclusive, Forty-Nine (49) through Fifty-Three (53), inclusive, Fifty-Four (54) through Fifty-Seven (57), inclusive, Fifty-Eight (58) through Seventy (70), inclusive, Seventy-One (71) through Eighty-Three (83), inclusive, Eighty-Four (84) through Ninety-Four (94), inclusive, and Lots Ninety-Five (95) through One Hundred Eleven (111), inclusive, as shown on the Final Map of Tuscany Parcel 19 Formerly known as (Palm City – Phase 2 Lot 19), A Common Interest Community, recorded August 20, 2004, on file in Book 118 of plats page 0092 of Official Records, in the Office of the County Recorder, Clark County, Nevada.

All of Parcel 13 ("Parcel 13"):

Neighborhood Designation: Parcel 13-Custom Lots

A PARCEL OF LAND SITUATED IN A PORTION OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 32, TOWNSHIP 21 SOUTH, RANGE 63 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING ALL OF LOT 13 AS SHOWN ON THE PLAT OF PALM CITY – PHASE 1, IN BOOK 94 OF PLATS, PAGE 19 OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

A-1

First American Title

---

**EXHIBIT "B"**

Land Constituting a Portion of the Initial Common Elements

Common Elements 6C-A, 6C-B and "F", as shown on the Final Map of Tuscany Parcel 6C Formerly known as (Palm City – Phase 2 Lot 6C), A Common Interest Community, recorded August 30, 2004, on file in Book 119 of plats page 0012 of Official Records, in the Office of the County Recorder, Clark County, Nevada; and

Common Elements 24-A, 24-B, 24-C and 24-D, as shown on the Final Map of Tuscany Parcel 24 Formerly known as (Palm City – Phase 1 Lot 24), A Common Interest Community, recorded August 13, 2004, on file in Book 118 of plats page 0073 of Official Records, in the Office of the County Recorder, Clark County, Nevada; and

Common Elements "A" and "D", as shown on the Final Map of Tuscany Parcel 19 Formerly known as (Palm City – Phase 2 Lot 19), A Common Interest Community, recorded August 20, 2004, on file in Book 118 of plats page 0092 of Official Records, in the Office of the County Recorder, Clark County, Nevada.

B-1

---

EXHIBIT "B-1"

Easement Areas Constituting a Portion of the Initial Common Elements

 **DIAMOND SURVEYING, INC.**
Land Survey Consulting

April 4, 2005
162-32-610-002

**EXPLANATION:** THIS LEGAL DESCRIBES AN EASEMENT FOR SITE AMENITIES AND MAINTENANCE AT TUSCANY GOLF COURSE.

**LEGAL DESCRIPTION:**

A TRACT OF LAND BEING A PORTION OF LOT GC-2 OF THE FINAL MAP "PALM CITY" AS SHOWN ON FILE IN BOOK 94 OF PLATS, PAGE 19 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF LOT 14 OF SAID FINAL MAP "PALM CITY", SAID POINT BEING ON THE SOUTHERLY RIGHT-OF-WAY LINE OF LAKEFRONT DRIVE (63.50 FEET WIDE), A RADIAL LINE THROUGH SAID POINT BEARS NORTH 10°47'42" EAST; THENCE ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE ALONG THE ARC OF A 618.75 FOOT RADIUS CURVE CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 15°50'05", AN ARC LENGTH OF 171.00 FEET TO THE TRUE POINT OF BEGINNING, A RADIAL LINE THROUGH SAID POINT BEARS NORTH 26°37'47" EAST; THENCE LEAVING SAID SOUTHERLY RIGHT-OF-WAY LINE SOUTH 29°05'25" WEST, 47.81 FEET; THENCE SOUTH 60°54'35" EAST, 53.00 FEET; THENCE NORTH 29°05'25" EAST, 47.82 FEET TO A POINT OF NON-TANGENCY ON SAID SOUTHERLY RIGHT-OF-WAY LINE, A RADIAL LINE THROUGH SAID POINT BEARS NORTH 31°32'21" EAST; THENCE ALONG THE ARC OF A 618.75 FOOT RADIUS CURVE CONCAVE SOUTHWESTERLY, THROUGH A CENTRAL ANGLE OF 4°54'33", AN ARC LENGTH OF 53.02 FEET TO THE TRUE POINT OF BEGINNING, A RADIAL LINE THROUGH SAID POINT BEARS NORTH 26°37'47" EAST.

CONTAINS 2,554 SQUARE FEET OR 0.059 ACRES (MORE OR LESS).

TROY T. TETSUKA, PLS
NEVADA LICENSE NO. 15348
EXPIRES: JUNE 30, 2006

5740 S. Arville Street, Suite 205 • Las Vegas, NV 89118 • Phone: 702.212.3967 • Fax: 702.212.3963

B-1-1

First American Title



**EXHIBIT MAP**

FOR A LANDSCAPE AND MAINTENANCE EASEMENT
BEING A PORTION OF LOT GC-2
FINAL MAP OF "PALM CITY"
LOCATED IN THE NORTHEAST QUARTER OF SECTION 32
T.21S., R.63E., M.D.M.
CITY OF HENDERSON, CLARK COUNTY, NEVADA

APRIL 4, 2005

| CURVE TABLE | | | | |
|---|---|---|---|---|
| CURVE | DELTA | RADIUS | LENGTH | TANGENT |
| C1 | 4°54'33" | 618.75' | 53.02' | 26.52' |
| C2 | 15°50'05" | 618.75' | 171.00' | 88.05' |

SHEET 1 OF 1   JOB NO.: SHG1074

**DIAMOND SURVEYING, INC.**

LAND SURVEY CONSULTING

5740 S. ARVILLE STREET, SUITE 205
LAS VEGAS, NV 69118
702.212.3967  FAX: 702.212.3963

SCALE: 1"=50'

B-1-2

First American Title

First American Title



**DIAMOND SURVEYING, INC.**
Land Survey Consulting

April 4, 2005
162-32-110-002

**EXPLANATION:** THIS LEGAL DESCRIBES AN EASEMENT FOR SITE AMENITIES AND MAINTENANCE AT TUSCANY GOLF COURSE.

**LEGAL DESCRIPTION:**

A TRACT OF LAND BEING A PORTION OF LOT GC-1 OF THE FINAL MAP "PALM CITY" AS SHOWN ON FILE IN BOOK 94 OF PLATS, PAGE 19 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY RIGHT-OF-WAY LINE OF LAKEFRONT DRIVE (62.50 FEET WIDE), SAID POINT BEARS SOUTH 78°43'00" WEST, 145.32 FEET FROM THE EASTERLY TERMINUS OF A LINE DEFINED AS NORTH 78°43'00" EAST, 381.18 FEET ON THE SOUTHERLY LINE OF SAID LOT GC-1; THENCE LEAVING SAID NORTHERLY RIGHT-OF-WAY LINE NORTH 11°17'00" WEST, 45.62 FEET; THENCE SOUTH 78°43'00" WEST, 26.96 FEET; THENCE SOUTH 11°17'00" EAST, 45.62 FEET TO A POINT ON SAID NORTHERLY RIGHT-OF-WAY LINE; THENCE ALONG SAID NORTHERLY RIGHT-OF-WAY LINE NORTH 78°43'00" EAST, 26.96 FEET TO THE POINT OF BEGINNING.

CONTAINS 1,230 SQUARE FEET OR 0.028 ACRES (MORE OR LESS).

TROY T. TETSUKA, PLS
NEVADA LICENSE NO. 15348
EXPIRES: JUNE 30, 2006



5740 S. Arville Street, Suite 205 • Las Vegas, NV 89118 • Phone: 702.212.3967 • Fax: 702.212.3963

B-1-3

First American Title

First American Title



**EXHIBIT MAP**
FOR A LANDSCAPE AND MAINTENANCE EASEMENT
BEING A PORTION OF LOT GC-1
FINAL MAP OF "PALM CITY"
LOCATED IN THE NORTHWEST QUARTER OF SECTION 32
T.21S., R.63E., M.D.M.
CITY OF HENDERSON, CLARK COUNTY, NEVADA

APRIL 4, 2005

B-1-4

First American Title

First American Title



**DIAMOND SURVEYING, INC.**
Land Survey Consulting

April 4, 2005
160-32-210-002

**EXPLANATION:** THIS LEGAL DESCRIBES AN EASEMENT FOR SITE AMENITIES AND MAINTENANCE AT TUSCANY GOLF COURSE.

**LEGAL DESCRIPTION:**

A TRACT OF LAND BEING A PORTION OF LOT GC-4 OF THE FINAL MAP "PALM CITY" AS SHOWN ON FILE IN BOOK 94 OF PLATS, PAGE 19 IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY RIGHT-OF-WAY LINE OF LAKEFRONT DRIVE (62.50 FEET WIDE), SAID POINT BEARS NORTH 03°48'00" WEST, 122.34 FEET FROM THE SOUTHERLY TERMINUS OF A LINE DEFINED AS NORTH 03°46'00" WEST, 409.01 FEET ON THE EASTERLY LINE OF SAID LOT GC-4; THENCE LEAVING SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 90°00'00" WEST, 47.21 FEET; THENCE NORTH 00°00'00" EAST, 23.00 FEET; THENCE NORTH 90°00'00" EAST, 45.68 FEET TO SAID WESTERLY RIGHT-OF-WAY LINE; THENCE ALONG SAID WESTERLY RIGHT-OF-WAY LINE SOUTH 03°48'00" EAST, 23.05 FEET TO THE POINT OF BEGINNING.

CONTAINS 1,068 SQUARE FEET OR 0.025 ACRES (MORE OR LESS).

TROY T. TETSUKA, PLS
NEVADA LICENSE NO. 15348
EXPIRES: JUNE 30, 2006



5740 S. Arville Street, Suite 205 • Las Vegas, NV 89118 • Phone: 702.212.3967 • Fax: 702.212.3963

B-1-5

First American Title

First American Title



**EXHIBIT MAP**
FOR A LANDSCAPE AND MAINTENANCE EASEMENT
BEING A PORTION OF LOT GC-4
FINAL MAP OF "PALM CITY"
LOCATED IN THE SOUTHWEST QUARTER OF SECTION 32
T.21S., R.63E., M.D.M.
CITY OF HENDERSON, CLARK COUNTY, NEVADA

APRIL 4, 2005

BOOK 94 OF PLATS, PAGE 19

APN 160-32-201-002
LOT GC-4

N90'00'00"E
45.68'
S03'48'00"E
N00'00'00"E
23.00'
47.21'
S90'00'00"W

1,068 SF
0.025 ACRES

POINT OF
BEGINNING

LAKEFRONT DRIVE

30.5'     32'

409.01'
122.34'

North

SCALE: 1"=50'

SHEET 1 OF 1    JOB NO.: SHG1074
**DIAMOND SURVEYING, INC.**
LAND SURVEY CONSULTING

5740 S. ARVILLE STREET, SUITE 205
LAS VEGAS, NV 89118
702.212.3967   FAX: 702.212.3963

B-1-6

First American Title

First American Title



**DIAMOND SURVEYING, INC.**
Land Survey Consulting

April 4, 2005
162-32-710-004

EXPLANATION: THIS LEGAL DESCRIBES AN EASEMENT FOR SITE AMENITIES AND
MAINTENANCE AT TUSCANY GOLF COURSE.

LEGAL DESCRIPTION:

A TRACT OF LAND BEING A PORTION OF LOT GC-3 OF THE FINAL MAP "PALM
CITY" AS SHOWN ON FILE IN BOOK 94 OF PLATS, PAGE 19 IN THE OFFICE OF THE
COUNTY RECORDER OF CLARK COUNTY, NEVADA, BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF LOT 17 OF SAID FINAL MAP
"PALM CITY", SAID POINT BEING ON THE SOUTHERLY RIGHT-OF-WAY LINE OF
LAKEFRONT DRIVE (63.50 FEET WIDE), A RADIAL LINE THROUGH SAID POINT
BEARS SOUTH 26°02'26" EAST; THENCE ALONG SAID SOUTHERLY RIGHT-OF-WAY
LINE ALONG THE ARC OF A 601.25 FOOT RADIUS CURVE CONCAVE
NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 12°17'36", AN ARC LENGTH
OF 129.00 FEET TO THE TRUE POINT OF BEGINNING, A RADIAL LINE THROUGH
SAID POINT BEARS SOUTH 38°20'02" EAST; THENCE LEAVING SAID SOUTHERLY
RIGHT-OF WAY LINE SOUTH 38°49'15" EAST, 32.75 FEET; THENCE NORTH 51°10'45"
EAST, 36.83 FEET; THENCE NORTH 41°48'56" WEST, 33.63 FEET TO A POINT OF
NON-TANGENCY ON SAID SOUTHERLY RIGHT-OF-WAY LINE, A RADIAL LINE
THROUGH SAID POINT BEARS SOUTH 41°52'07" EAST; THENCE ALONG THE ARC
OF A 601.25 FOOT RADIUS CURVE CONCAVE NORTHWESTERLY, THROUGH A
CENTRAL ANGLE OF 3°32'05", AN ARC LENGTH OF 37.09 FEET TO THE TRUE
POINT OF BEGINNING, A RADIAL LINE THROUGH SAID POINT BEARS SOUTH
38°20'02" EAST.

CONTAINS 1,252 SQUARE FEET OR 0.029 ACRES (MORE OR LESS).

TROY T. TETSUKA, PLS
NEVADA LICENSE NO. 15348
EXPIRES: JUNE 30, 2006

5740 S. Arville Street, Suite 205  •  Las Vegas, NV 89118  •  Phone: 702.212.3967  •  Fax: 702.212.3963

B-1-7

First American Title

First American Title



**EXHIBIT MAP**

FOR A LANDSCAPE AND MAINTENANCE EASEMENT
BEING A PORTION OF LOT GC-3
FINAL MAP OF "PALM CITY"
LOCATED IN THE SOUTHEAST QUARTER OF SECTION 32
T.21S., R.63E., M.D.M.
CITY OF HENDERSON, CLARK COUNTY, NEVADA

APRIL 4, 2005

POINT OF
BEGINNING

POINT OF
COMMENCMENT

LAKEFRONT DRIVE

1,252 SF
0.029 ACRES

LOT GC-3

LOT 17

BOOK 94 OF PLATS, PAGE 19

North

SCALE: 1"=50'

**CURVE TABLE**

| CURVE | DELTA | RADIUS | LENGTH | TANGENT |
|-------|-------|--------|--------|---------|
| C1 | 12°17'36" | 601.25' | 129.00' | 64.75' |
| C2 | 3°32'05" | 601.25' | 37.09' | 18.55' |

SHEET 1 OF 1   JOB NO.:SHG1074
**DIAMOND SURVEYING, INC.**
LAND SURVEY CONSULTING
5740 S. ARVILLE STREET, SUITE 205
LAS VEGAS, NV 89118
702.212.3967   FAX: 702.212.3963

B-1-8

First American Title

First American Title

---

**EXHIBIT "B-2"**

<u>Easement Areas For Access Over Olivia Street</u>

THAT CERTAIN PRIVATE DRIVE AND N.U.E. SHOWN AS "LAKEFRONT DRIVE" (AND NOW KNOWN AS "OLIVIA PARKWAY") ON THE FINAL MAP OF PALM CITY – PHASE 1 ON FILE IN BOOK 94, PAGE 19 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, AS AMENDED; AND

THAT CERTAIN PRIVATE DRIVE AND N.U.E. SHOWN AS "OLIVIA PARKWAY" ON THE FINAL MAP OF PALM CITY – PHASE 2 ON FILE IN BOOK 121, PAGE 59 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA, AS AMENDED.

B-2-1

---

First American Title

EXHIBIT "C"

Land Subject to Annexation

A PORTION OF SECTION 32, TOWNSHIP 21 SOUTH, RANGE 63 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL OF PALM CITY – PHASE 1 AS SHOWN IN BOOK 94 OF PLATS, PAGE 19, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

TOGETHER WITH ALL OF TUSCANY PARCEL 6C AS SHOWN IN BOOK 119 OF PLATS, PAGE 12, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

TOGETHER WITH ALL OF TUSCANY PARCEL 19 AS SHOWN IN BOOK 118 OF PLATS, PAGE 92, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

TOGETHER WITH A PORTION OF LOT 1 AS SHOWN IN FILE 102 OF PARCEL MAPS, PAGE 63, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

TOGETHER WITH A PORTION OF LOT 3-1 AS SHOWN IN FILE 102 OF PARCEL MAPS, PAGE 60, OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

LESS AND EXCEPTING THEREFROM, ALL OF THE REAL PROPERTY DESCRIBED ON EXHIBIT "A" TO THIS MASTER DECLARATION AS FOLLOWS:

A Portion of Parcel 6C:   Lots One (1) through Eight (8), inclusive, Forty-Three (43) through Eighty-Seven (87), inclusive, and Lots Nine (9) through Forty-Two (42), inclusive, as shown on the Final Map of Tuscany Parcel 6C, Formerly Known as (Palm City – Phase 2 Lot 6C), A Common Interest Community, recorded August 30, 2004, on file in Book 119 of plats page 0012 of Official Records, in the Office of the County Recorder, Clark County, Nevada; and

A Portion of Parcel 24:  Lots One (1) through Fifty-Two (52), inclusive, and Lots Fifty-Three (53) through Ninety-Six (96), inclusive, as shown on the Final Map of Tuscany Parcel 24 Formerly known as (Palm City – Phase 1 Lot 24), A Common Interest Community, recorded August 13, 2004, on file in Book 118 of plats page 0073 of Official Records, in the Office of the County Recorder, Clark County, Nevada; and

A Portion of Parcel 19:  Lots One (1) through Five (5), inclusive, Six (6) through Forty-Eight (48), inclusive, Forty-Nine (49) through Fifty-Three (53), inclusive, Fifty-Four (54) through Fifty-Seven (57), inclusive, Fifty-Eight (58) through Seventy (70), inclusive, Seventy-One (71) through Eighty-Three (83), inclusive, Eighty-Four (84) through Ninety-Four (94), inclusive, and Lots Ninety-Five (95) through One Hundred Eleven (111), inclusive, as shown on the Final Map of Tuscany Parcel 19 Formerly known as (Palm City – Phase 2 Lot 19), A Common Interest Community, recorded August 20, 2004, on file in Book 118 of plats page 0092 of Official Records, in the Office of the County Recorder, Clark County, Nevada; and

C-1

First American Title

Parcel 13:   A PARCEL OF LAND SITUATED IN A PORTION OF THE NORTHWEST QUARTER (NW ¼) OF SECTION 32, TOWNSHIP 21 SOUTH, RANGE 63 EAST, M.D.M., CITY OF HENDERSON, CLARK COUNTY, NEVADA MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEING ALL OF LOT 13 AS SHOWN ON THE PLAT OF PALM CITY – PHASE 1, IN BOOK 94 OF PLATS, PAGE 19 OFFICIAL RECORDS, CLARK COUNTY, NEVADA.

C-2

First American Title

### EXHIBIT "D"

#### Initial Land Subject to the French Drains – Restricted Lots

The Restricted Lots are those Lots located near or adjacent to the French Drains as on the attached Groundwater Conduit System Location Maps.



First American Title

First American Title



D-2

First American Title



D-3

First American Title



D-4

First American Title



D-5

First American Title



D-6

**EXHIBIT "E"**

Land Which Intended for Use as Golf Course, NOT A PART OF THE TUSCANY RESIDENTIAL COMMUNITY

LOTS GC-1, GC-2, GC-3, GC-4, AND TWENTY-SEVEN (27) OF PALM CITY – PHASE ONE (1) AS SHOWN BY MAP THEREOF ON FILE IN BOOK 94, PAGE 19 OF PLATS, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

E-1

First American Title

---

**EXHIBIT "F"**

<u>Land Constituting the Commercial Components, NOT A PART OF THE TUSCANY RESIDENTIAL COMMUNITY</u>

LOT 21 AS SHOWN ON THE FINAL MAP OF TUSCANY – PHASE 2 FORMERLY KNOWN AS (PALM CITY – PHASE 2), A COMMON INTEREST COMMUNITY, RECORDED DECEMBER 29, 2004, ON FILE IN BOOK 121 OF PLATS PAGE 59 OF OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

F-1

---

First American Title

# EXHIBIT "C"

A.P.N. # *160-32-210-003*
*160-32-801-006*
*160-32-101-003*

RECORDING REQ~~UESTED~~ BY, AND
WHEN RECORDED, RETURN TO:

Chicago Title Agency of Nevada, Inc.
2300 W. Sahara Ave., #140
Las Vegas, NV 89102
Attn: Clarice Ronzone
(Escrow # 03111313)

R.P.T.T.: $76,143.49

Mail Tax Bills To:
*RHODES DESIGN + DEV. CORP*
*4730 S. FORT APACHE RD #300*
*LAS VEGAS, NV 89147*

20040917-0000674
Fee: $19.00      RPTT: $76,145.55
09/17/2004 09:01:27      T20040100869
Req: CHICAGO TITLE
Frances Deane      N/C: $0.00
Clark County Recorder    Pgs: 6

(Space above line for Recorder's use only)

## GRANT BARGAIN AND SALE DEED

COMMERCE ASSOCIATES, LLC, a Nevada limited liability company, as "Grantor," does hereby Grant, Bargain, Sell and Convey to RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation as "Grantee," the real property in the County of Clark, State of Nevada (hereinafter referred to as the "Land") described on Attachment "A" attached hereto and incorporated herein by this reference.

RESERVING UNTO GRANTOR, its successors and assigns, together with the right to grant and transfer all or a portion of the same, as follows:

A.     Non-exclusive easements in gross on, over, under or across the Land for the purposes of installation, emplacement and maintenance of electric, telephone, cable television, water, gas, sanitary sewer lines, drainage facilities or any other utilities, together with the right to enter upon the Land (without unreasonably interfering with Grantee's reasonable use and enjoyment thereof) in order to service, maintain, repair, reconstruct, relocate or replace any of such lines or facilities, provided, Grantor shall repair any damage caused by its activities upon the Land pursuant to such easement. Grantee's use of the Land subject to the easement reserved by Grantor under this Section A shall be limited to the reasonable vicinity of the applicable lines or facilities and shall terminate as to each residential lot shown upon a recorded final subdivision map, upon the recordation of such final subdivision map without any necessity that any additional document be executed or recorded.

B.      Non-exclusive easements in gross on, over, under or across the Land for the purposes of installation, emplacement and maintenance of those improvements described as "Seller's Work" in that certain Declaration of Development Covenants and Restrictions executed by Grantee and recorded of even date herewith (the "Development Declaration").  Grantee's use of the Land subject to the easement reserved by Grantor under this Section B shall be limited to reasonable vicinity of the applicable Seller's Work of Improvement and shall automatically terminate upon completion by Grantor of all such improvements and dedication thereof to appropriate governmental authorities or public utilities.

SUBJECT TO:

1.      General and special taxes and assessments for the current fiscal tax year and any and all unpaid bonds and/or assessments.

2.      The exceptions set forth on Attachment B attached hereto.

IN WITNESS WHEREOF, Grantor has caused its name to be affixed hereto and this instrument to be executed by its managing member thereunto duly authorized.

[ Remainder of page intentionally left blank. Signatures appear on following page. ]

Dated as of August _31_, 2004

**COMMERCE ASSOCIATES, LLC, a Nevada limited liability company**

By: _____

Name: _Tom Gonzales_

Title: _MEMBER_

STATE OF _FLORIDA_

COUNTY OF _BROWARD_

This instrument was acknowledged before me on this _31ˢᵗ_ day of August, 2004 by Tom Gonzales, as managing member of COMMERCE ASSOCIATES, LLC.

_____
*(Signature of notarial officer)*

(My commission expires: _6/24/08_)

Brandon shawn Norris
Commission #DD332235
Expires: Jun 24, 2008
Bonded Thru
Atlantic Bonding Co., Inc.

Exhibit A

**Parcel One (1):**

All that property lying within the exterior boundaries of Final Map of Tuscany Parcel 24 formerly known as (Palm City – Phase 1 Lot 24) as shown by map thereof on file in Book 118 of Plats, Page 73, in the Office of the County Recorder of Clark County, Nevada.

**Parcel Two (2):**

All that property lying within the exterior boundaries of Final Map of Tuscany Parcel 19 formerly known as (Palm City – Phase 2 Lot 19) as shown by map thereof on file in Book 118 of Plats, Page 92, in the Office of the County Recorder of Clark County, Nevada.

**Parcel Three (3):**

All that property lying within the exterior boundaries of Final Map of Tuscany Parcel 6C formerly known as (Palm City – Phase 2 Lot 6C) as shown by map thereof on file in Book 119 of Plats, Page 12, in the Office of the County Recorder of Clark County, Nevada.

**ATTACHMENT B**
**TO DEED**

**PERMITTED EXCEPTIONS**

**STATE OF NEVADA**
**DECLARATION OF VALUE FORM**

1. Assessor Parcel Number(s)
   a) *160·32-210-003*
   b) *160·32-801-006*
   c) *160·32-101-003*
   d) _____

2. Type of Property:

| | | | |
|---|---|---|---|
| a) [X] Vacant Land | b) [ ] Single Fam. Res. |
| c) [ ] Condo/Twnhse | d) [ ] 2-4 Plex |
| e) [ ] Apt. Bldg | f) [ ] Comm'l/Ind'l |
| g) [ ] Agricultural | h) [ ] Mobile Home |
| [ ] Other _____ | |

FOR RECORDER'S OPTIONAL USE ONLY
Book: _____ Page: _____
Date of Recording: _____
Notes:

3. Total Value/Sales Price of Property          $ 14,930,096.00
   Deed in Lieu of Foreclosure Only (value of property)  ( _____ )
   Transfer Tax Value:                          $ 14,930,096.00
   Real Property Transfer Tax Due               $ 76,143.49

**4. If Exemption Claimed:**
   a. Transfer Tax Exemption per NRS 375.090, Section _____
   b. Explain Reason for Exemption: _____

5. Partial Interest: Percentage being transferred: _____ %
      The undersigned declares and acknowledges, under penalty of perjury, pursuant to
   NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their
   information and belief, and can be supported by documentation if called upon to substantiate the
   information provided herein. Furthermore, the parties agree that disallowance of any claimed
   exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax
   due plus interest at 1% per month. Pursuant to NRS 375.030, the Buyer and Seller shall be
   jointly and severally liable for any additional amount owed.

Signature _____   Capacity *CFO/MANAGER*
Signature _____   Capacity *SECRETARY / TREASURER*

| **SELLER (GRANTOR) INFORMATION** **(REQUIRED)** | **BUYER (GRANTEE) INFORMATION** **(REQUIRED)** |
|---|---|
| Print Name: *Commerce Associates, LLC* | Print Name: *Rhodes Design + Development Corp.* |
| Address: *4511 W. Cheyenne Ave. #801* | Address: *4730 S. Ft Apache #300* |
| City: *Las Vegas* | City: *Las Vegas* |
| State: *Nevada*  Zip: *89032* | State: *NV*  Zip: *89147* |

**COMPANY/PERSON REQUESTING RECORDING (required if not seller or buyer)**
Print Name: *Chicago Title Agency of Nevada*   Escrow #: *031313*
Address: *2300 W. Sahara Ave., #140*
City: *Las Vegas*                              State: *Nevada*  Zip: *89102*

AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED

674

# EXHIBIT "D"



2005121Q-0004171

Fee: $22.00
N/C Fee: $0.00

12/19/2005                    13:30:27
T20050229273

Requestor:
   CHICAGO TITLE

Frances Deane                    DGI
Clark County Recorder      Pgs: 9

APN: _160-32-313-001 thru 012, 019 Thru 086_
_090 thru 126, 136 thru 144, 159 thru 161, 186 thru 192_
RECORDING REQUESTED BY:    _202, 160-32-213 001_
Chicago Title Agency of Nevada, Inc.                    _Thru 038_
2300 W. Sahara Avenue, #140
Las Vegas, NV 89102
Attention: Clarice Ronzone

(Escrow No.05050487)

AND WHEN RECORDED MAIL TO:

3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89109
Attention: Michael E. Buckley, Esq.

---

## CONDITIONAL ASSIGNMENT AND GRANT OF RIGHTS

   THIS CONDITIONAL ASSIGNMENT AND GRANT OF RIGHTS ("Assignment") is made as of the  19  day of December, 2005 by RHODES DESIGN AND DEVELOPMENT CORPORATION, a Nevada corporation ("Rhodes") to COMMERCE ASSOCIATES, LLC, a Nevada limited liability company ("Commerce"), with reference to the following facts and purposes:

   A.    Commerce, as seller, and Rhodes, as purchaser, are parties to a Purchase Agreement and Grant of Options, dated as of November 14, 2003 (as now or hereafter in effect, the "Purchase Agreement"), pursuant to which Commerce has conveyed the real property described on Exhibit A attached hereto and incorporated herein by this reference (the "Initial Phases") to Rhodes and certain affiliates of Rhodes.  All capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

   B.    Commerce has also agreed to grant certain Options to purchase the Option Parcels.

   C.    The Initial Phases and the Option Parcels are located within the master planned community known as Tuscany.

   D.    Pursuant to the Purchase Agreement, Rhodes has subjected the Initial Phases to the provisions of that certain Master Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Tuscany Residential Community, recorded July 28, 2005, in Book 20050728, as Instrument No. 04296, Official records, Clark County, Nevada (the "Master Declaration").

   E.    In accordance with the Purchase Agreement, Rhodes is designated as the "Declarant" under the Master Declaration.

1

F.    Commerce requires, in accordance with the Purchase Agreement, that, contemporaneously with the recording of the Master Declaration, Rhodes execute and deliver this Conditional Assignment and Grant of Rights, pursuant to which Commerce is given the right to become the Declarant under the Master Declaration upon the occurrence of a Purchaser Default under the Purchase Agreement or in the event all of the Option Parcels are not acquired under the Purchase Agreement.

NOW THEREFORE, FOR VALUE RECEIVED, Rhodes, subject to Commerce's rights to accept, reject, or limit the transfer of same, hereby grants, transfers, assigns, and sets over to Commerce, and grants Commerce a security interest in, all of Rhodes's right and interest in and to Rhodes's rights as Declarant in and under the Master Declaration, including but not limited to, special declarant's rights (NRS 116.110385), developmental rights (NRS 116.11034), the right to maintain models, offices for sales and signs (NRS 116.2115), and the ability to exercise any of the rights reserved to a declarant under the Master Declaration (collectively, the "Declarant's Rights"). Without limiting the generality of the foregoing, this Assignment is given for the purposes of securing:

(a)    The performance, whether by Rhodes or any other person acquiring title to all or any part of the Option Property pursuant to the Purchase Agreement, of the Purchaser's obligations under (i) the Purchase Agreement, and any amendment or modification thereof and (ii) of every term, provision, condition, duty, obligation, covenant and agreement of the Purchaser contained in any Development Declaration and any amendment, modification, extension, renewal or replacement thereof (collectively, the "Purchase Documents").

(b)    The performance and discharge by Rhodes of every term, provision, condition, duty, obligation, covenant and agreement of Rhodes contained herein and any amendment, modification, extension, renewal or replacement hereof.

This Assignment is intended as a present assignment of the Declarant's Rights and shall be effective immediately, provided, however, that, until the occurrence of a Termination Event (as hereinafter defined), permission is given to Rhodes to exercise the Declarant's Rights solely in accordance with the provisions of this Assignment.

As used herein, the term "Termination Event" means the occurrence of any of the following: (a) the occurrence of a Purchaser Default under the Purchase Agreement, (b) any of the Options is not exercised in accordance with the Purchase Agreement, (c) an Option Closing Date fails to occur by reason of the failure of an Option to be exercised or Commerce's permitted termination of an Option.

Following a Termination Event, Rhodes's exercise of any Declarant's Rights shall be of no force or effect.

**RHODES FURTHER COVENANTS AND AGREES AS FOLLOWS:**

2

1.    Rhodes shall from time to time execute any and all instruments reasonably requested by Commerce in order to evidence or enforce this Assignment.

2.    Rhodes will fully comply at all times with each of the following covenants:

(a)    Rhodes will promptly pay when due all fees, charges and other sums or amounts required to be paid by the Declarant and will further keep and perform all of the covenants, terms and provisions of the Master Declaration that impose any obligation on the Declarant, and will do all other things necessary to preserve and keep unimpaired the Declarant's Rights.

(b)    Rhodes will promptly (not later than five (5) business days following receipt thereof) notify Commerce in writing of any default on the part of Rhodes as the Declarant, and of the occurrence of any event which, with or without any notice or lapse of time or both, would constitute a default on the part of Rhodes as the Declarant.

(c)    Rhodes will promptly send to Commerce a true copy of any notice served on Rhodes as Declarant.

(d)    Rhodes will not surrender, terminate or cancel any Declarant's Rights, in whole or in part, without first obtaining the prior written consent of Commerce. Rhodes will not make or consent to any modification, change, supplement, amendment or alteration of any terms of the Master Declaration in whole or in part, without first obtaining the prior written consent of Commerce, provided that Commerce shall not unreasonably withhold its consent to any such modification, change, supplement, amendment or alteration which does not in any way adversely affect the Declarant's Rights or the value of any real property owned by Commerce within Tuscany or Commerce's ability to develop its real property within Tuscany.

3.    If at any time Rhodes fails to comply fully with any of the Declarant's obligations under the Master Declaration and that failure in any manner threatens to impair Commerce's rights or security under this Assignment, then Commerce may, but is not obligated to, perform any of those obligations on behalf of Rhodes or cure any of Rhodes's defaults. Commerce may take such action without notice to or demand upon Rhodes and without releasing Rhodes from any obligations under this Assignment or any of the Purchase Documents.

4.    Commerce will have the right to appear in and participate in all proceedings, which could affect Commerce's rights or security hereunder or the value of any Declarant's Rights. Rhodes agrees to pay upon demand all reasonable costs and expenses of Commerce (including but not limited to reasonable legal fees and disbursements) incurred in any such proceedings. Any and all such costs and expenses (and any other costs and expenses which Rhodes is obligated to pay hereunder) shall be additional secured obligations hereunder, and shall bear interest at the Agreed Rate from the time of advancement by Commerce until paid, and if not paid within 30 days, at the Default Rate thereafter.

5.    Rhodes hereby agrees to indemnify, protect, defend and hold Commerce harmless of and from any and all liability, loss, damage, or expense which it may or might incur under or by

3

reason of this Assignment or for any action taken by Commerce hereunder or by reason or in defense of any and all claims and demands whatsoever which may be asserted against Commerce arising out of the Master Declaration (excepting only those obligations of Commerce as an Owner or Member [as those terms are defined in the Master Declaration] should any real property owned by Commerce become subject to the Master Declaration). Should Commerce incur any such liability, loss, damage, or expenses, or any expenses in the defense of any claims or demands, the amount thereof (including reasonable attorneys' fees whether or not suit is commenced), shall be payable by Rhodes immediately and without demand, and the payment thereof shall be obligations secured hereby, provided, however, that unless Rhodes at any time shall fail to adequately defend such indemnified person as required hereby, Rhodes shall defend Commerce using legal counsel reasonably satisfactory to such indemnified person, at the sole reasonable cost and expense of Rhodes.

6.    The exercise by Commerce of any of the rights, remedies, powers or privileges provided for herein or the taking of any action by Commerce, whether completed or incomplete with respect thereto, is permissive and not obligatory, and the exercise or non-exercise of the same shall not preclude, delay or prejudice any other rights, remedies, powers or privileges provided for herein or under any of the Purchase Documents, or otherwise provided at law or in equity, and the failure to take action at any time shall not constitute a waiver of such right, remedy, power or privilege.

7.    So long as no Termination Event has occurred, Rhodes may continue to receive and exercise all of the rights, benefits and privileges of the Declarant under the Master Declaration, provided the same are received and exercised in accordance with this Assignment.

8.    Neither this Assignment nor any action or actions on the part of Commerce other than an express agreement in writing executed by Commerce specifically assuming such obligation shall constitute an assumption of all or any of the Declarant's Rights or the obligations of the Declarant under the Master Declaration, and Rhodes shall continue to be liable for all obligations thereunder.

9.    Upon the occurrence of any Termination Event, Commerce shall have the right, but not the obligation, to take in its name or in the name of Rhodes or otherwise, such actions which Commerce may at any time or from time to time after the occurrence of a Termination Event determine is necessary to protect the rights of Rhodes or Commerce hereunder. Commerce shall incur no liability if any action taken by it or in its behalf in good faith, pursuant to the foregoing sentence, shall prove to be in whole or in part inadequate or invalid, and Rhodes agrees to indemnify and hold Commerce harmless from and against any and all loss, cost, liability, or expense (including, but not limited to, reasonable attorneys' fees and expenses) in connection with any such action or actions. Provided, however, without limiting the foregoing, unless Rhodes at any time shall fail to adequately defend such indemnified person as required hereby, Rhodes shall defend Commerce using legal counsel reasonably satisfactory to such indemnified person, at the sole reasonable cost and expense of Rhodes.

10.    Rhodes hereby irrevocably constitutes and appoints Commerce its true and lawful attorney-in-fact, in the name of Rhodes or any successor or assign or in Commerce's name or otherwise, to enforce all rights of Rhodes as the Declarant under the Master Declaration, such power of attorney being coupled with an interest, being irrevocable.

4

11.     There shall be no merger of the interests of the parties to the Master Declaration, or any interest created thereby; without limiting the foregoing, there shall be no merger by reason of any interests thereunder coming into common ownership, unless Commerce consents to such merger of interests in writing.

12.     Any notice, request, demand, statement, authorization, approval or consent made hereunder shall be in writing and shall be sent by United Parcel Service, or other reputable nationally recognized overnight courier service, or by postage pre-paid registered or certified mail, return receipt requested, and shall be deemed given when received or refused (as indicated on the receipt, unless receipt or refusal is not during normal business hours on a business day, in which case, notice shall be deemed given on the next following business day) and addressed as follows:

If to Commerce:     COMMERCE ASSOCIATES, LLC
c/o TG Investments, LLC
4511 W. Cheyenne Ave.
Suite 801
N. Las Vegas, NV  89032
Telephone:  (702) 413-9111
Telecopy:  (702) 413-9107

and:     Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89109
Attention:  Michael E. Buckley, Esq.
Telephone: (702) 862-3300
Telecopy:  (702) 734-2722

If to Rhodes:     Rhodes Homes
4730 S. Fort Apache Road
Suite 300
Las Vegas, Nevada 89147
Attention: James M. Rhodes, President
Telephone: (702) 873-5338
Telecopy: (702) 873-5129

and:     Rhodes Homes
4730 S. Fort Apache Road
Suite 300
Las Vegas, Nevada 89147
Attention: General Counsel
Telephone: (702) 873-5338
Telecopy: (702) 873-5129

5

Each party may designate a change of address by notice given, as herein provided, to the other party, at least fifteen (15) days prior to the date such change of address is to become effective.

13.    Subject to the restrictions set forth in the Purchase Documents, this Assignment is binding on and shall inure to the benefit of the parties hereto, their successors, nominees and assigns.

14.    This Assignment may be executed in two or more counterparts, all of which shall be deemed a duplicate original.

15.    If any one or more of the provisions of this Assignment, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Assignment and all other applications of any such provisions shall not be affected thereby.

16.    This Assignment shall be governed by and construed in accordance with the laws of the State of Nevada without giving effect to any contrary conflict-of-law rules and principles of such State.

17.    The rights and remedies of Commerce under this Assignment are cumulative and are not in lieu of, but are in addition to, any other rights or remedies which Commerce may have under the Purchase Documents, at law, or otherwise.

18.    This Assignment may not be amended, modified or changed, nor shall any waiver of any provision hereof be effective, except by an instrument in writing and signed by the party against whom enforcement of the waiver, amendment, change, modification or discharge is sought.

19.    Upon the satisfaction of all obligations of Rhodes to Commerce under the Purchase Agreement and the acquisition of all of the Property pursuant to the Purchase Agreement, this Assignment shall automatically terminate.  Commerce hereby agrees, upon termination of this Assignment, to execute a release and reconveyance of this Assignment and all further documents, if any, necessary or reasonably requested by Rhodes in order to evidence the termination of this Assignment.

[*The remainder of this page is left blank.  The signature pages follow.*]

6

IN WITNESS WHEREOF, Rhodes has executed this Assignment as of the date first above written.

Rhodes:

**RHODES DESIGN AND DEVELOPMENT CORPORATION**, a Nevada corporation

By: _____

~~James Rhodes, its President~~

*Paul Huygens ,Treasurer*

STATE OF NEVADA
COUNTY OF CLARK

This instrument was acknowledged before me on this *16* day of *December*, 2005 by ~~James Rhodes,~~ ~~as president~~ of Rhodes Design and Development Corporation, a Nevada corporation.

*Paul Huygens, TREASURER*

Notary _____

SARALYN ROSENLUND
Notary Public - Nevada
No. 02-76733-1
My Appt. Exp. July 11, 2006

7

IN WITNESS WHEREOF, Rhodes has executed this Assignment as of the date first above written.

Rhodes:

**RHODES DESIGN AND DEVELOPMENT CORPORATION**, a Nevada corporation

By: _____

~~James Rhodes, its President~~

*Paul Huygens, Treasurer*

STATE OF NEVADA
COUNTY OF CLARK

This instrument was acknowledged before me on this *16* day of *December*, 2005 by ~~James Rhodes, as president~~ of Rhodes Design and Development Corporation, a Nevada corporation.

*Paul Huygens, TREASURER*

Notary _____

SARALYN ROSENLUND
Notary Public - Nevada
No. 02-76733-1
My Appt. Exp. July 11, 2006

7

## EXHIBIT A

Legal Description of the Initial Phases

The real property as described in Exhibit "A"

as attached    to the Master Declaration of Covenants, Conditions and
Restrictions and Reservation of Easements for Tuscany Residential Community]
as defined in this document

1

# EXHIBIT "E"

B6G (Official Form 6G) (12/07)

In re   **The Rhodes Companies, LLC**                                    Case No. ___**09-14814**_____
_____,
                              Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature of debtor's interest in contract, i.e., "Purchaser", "Agent", etc. State whether debtor is the lessor or lessee of a lease. Provide the names and complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| **Lexon Insurance Company**<br>**Bond Safeguard Insurance Company**<br>**1919 S. Highland Dr. Bldg. A**<br>**Suite 300**<br>**Lombard, IL 60148** | **Bond Indemnity Agreement** |
| **Sagebrush Enterprises, Inc.**<br>**4730 S. Fort Apache**<br>**Suite 300**<br>**Las Vegas, NV 89147** | **Operating Agreement of Rhodes Companies, LLC** |

**0**
_____ continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases

Copyright (c) 1996-2009 - Best Case Solutions - Evanston, IL - (800) 492-8037                                                                Best Case Bankruptcy

# EXHIBIT "F"

## PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS

This PURCHASE AGREEMENT AND ESCROW INSTRUCTIONS (this "Agreement") is made and entered into as of this ___ day of October, 2012 (the "Effective Date"), by and between Commerce Associates, LLC, a Nevada limited liability company (the "Seller"), and Greystone Nevada, LLC, a Delaware limited liability company, or its Permitted Transferee (as hereinafter defined) ("Buyer"). Seller and Buyer are hereinafter sometimes individually referred to as a "Party" and together collectively as the "Parties."

## ARTICLE I

## RECITALS

A.      Seller is the owner of certain real property located in the County of Clark (the "County"), State of Nevada (the "State"), which real property is more particularly described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Real Property"), which Real Property consists of approximately 341 partially improved residential lots located in Henderson, Nevada, and generally identified as Clark County Assessor's Parcel Numbers (See Exhibit "B").

B.      Buyer desires to purchase the Property (as hereinafter defined) from Seller, and Seller desires to sell the Property to Buyer. The purpose of this Agreement is to set forth the terms, provisions and conditions agreed upon between Seller and Buyer with respect to the purchase and sale of the Property. The "Property" is defined as the Real Property together with all rights, encumbrances, agreements, hereditaments, easements, entitlements and rights whatsoever associated with the Real Property, and all fixtures and improvements located upon or affixed to the Real Property.

## ARTICLE II

## AGREEMENT

NOW, THEREFORE, in consideration of the Recitals set forth above, and the mutual promises, covenants, conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE III

## PURCHASE AND SALE

3.01    Purchase and Sale. Subject to the terms, provisions and conditions set forth in this Agreement, Seller agrees to sell the Property to Buyer, and Buyer agrees to purchase the Property from Seller.

1

**ARTICLE IV**

**PURCHASE PRICE**

4.01    Purchase Price. The purchase price for the Property will be ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮(the "Purchase Price").

4.02    Payment of Purchase Price. The Purchase Price shall be payable as follows:

(a)    Deposit. Within four (4) Business Days (as defined below) following the Effective Date, Buyer shall deposit with Escrow Holder, in immediately available funds, the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮(the "Deposit"). The Deposit shall become non-refundable upon Buyer's approval of its Feasibility Review in accordance with Article VI below, except as provided in Article VII, Article IX and Article XI below, and shall be released to Seller and applied toward the Purchase Price at the Close of Escrow (as hereinafter defined).

(b)    Remaining Cash Payment. On or before one (1) Business Day prior to the the Closing Date, Buyer shall deposit with Escrow Holder, in immediately available funds, the full amount of the Purchase Price, less the amount of the Deposit (the "Remaining Cash Payment"), plus Buyer's share of the closing costs and prorations set forth in Section 8.09 below. At the Close of Escrow, the Remaining Cash Payment shall be disbursed to or for the benefit of Seller in accordance with the provisions of this Agreement, less Seller's share of the closing costs and prorations set forth in Section 8.09 below.

**ARTICLE V**

**OPENING OF ESCROW**

Within two (2) Business Days following the Effective Date, Seller and Buyer shall open an escrow (the "Escrow") with First American Title Insurance Company, 2490 Paseo Verde Parkway, Suite 100, Henderson, NV 89074, Attn: Michele Seibold ("Escrow Holder" or sometimes the "Title Company") by delivering an executed copy of this Agreement to Escrow Holder. Buyer and Seller hereby agree that a fully executed copy of this Agreement shall constitute escrow instructions to Escrow Holder, together with any additional instructions consistent with the terms of this Agreement that Escrow Holder may reasonably request. Buyer and Seller hereby agree to promptly execute and deliver any such instructions as may be requested by Escrow Holder. In the event of any conflict or inconsistency between such additional escrow instructions requested by Escrow Holder and the provisions of this Agreement, the provisions of this Agreement shall govern.

**ARTICLE VI**

**FEASIBILITY OF PROPERTY**

6.01    Preliminary Title Report.

944117.doc

2

(a)    Seller, at its sole expense, and within three (3) Business Days after the Effective Date, shall cause Escrow Holder to deliver to Buyer a preliminary title report for the Property, contemplating an ALTA Extended Coverage Owner's Policy of title insurance, with a survey exception, together with a legible copy of listed title exceptions in connection with the preliminary title report (collectively, the "Title Report").   Upon Buyer's approval of its Feasibility Review Buyer shall be deemed to have approved those covenants, conditions, restrictions, rights of way, easements, reservations and other matters of record, as disclosed in the Title Report (the "Permitted Title Exceptions"); provided, however, that the Permitted Title Exceptions shall not include, and Seller shall remove at its sole expense, at or before the Close of Escrow, and shall cause the Property to be delivered and conveyed free and clear of, any and all: deeds of trusts, mortgages, mechanics' liens, notices of lis pendens, and/or other monetary liens (except only for non-delinquent taxes and assessments) whatsoever.   Additionally, the Permitted Title Exceptions shall not include the matters addressed in Schedule B, Section 1 to the Title Report labeled "requirements", and Seller shall be required to satisfy all such requirements on or before the Close of Escrow at its sole expense (to the extent reasonably applicable to Seller and not otherwise inconsistent with this Agreement), except that Seller shall not be required to obtain or provide an ALTA survey for the Property (and neither shall Buyer) or to satisfy any "requirements" that are obligations of Buyer according to the terms of this Agreement.

(b)    Without limiting the foregoing, the Permitted Title Exceptions shall also include the following exceptions to title:

(i)    The standard printed exceptions and exclusions contained in the Title Policy;

(ii)    Non-delinquent general and special real property taxes, bonds, and assessments, which shall be prorated as of the Close of Escrow;

(iii)    Mechanic's liens, judgment liens and other encumbrances arising only from work performed by or at the direction of Buyer, and

(iv)    any title exceptions specifically approved by Buyer in writing.

(c)    The Permitted Title Exceptions shall not include any matters, if any, that Seller has agreed, in writing, to remove at Close of Escrow.

6.02    Buyer's Investigation.  During the Feasibility Period, Buyer shall have the right to conduct such independent investigations as Buyer deems necessary or appropriate, in its sole discretion, concerning the condition, use, sale, development or suitability of the Property for Buyer's intended purposes.  No later than the date that Seller delivers the Title Report, Seller shall deliver or otherwise make available to Buyer for Buyer's review, all studies, reports, documents, and other materials relating to the Property in Seller's possession or control (collectively, together with all other agreements, documents, and other information delivered by Seller to Buyer during the term of this Agreement, the "Property Documents").  Without limiting the generality of the foregoing, the Property Documents shall include, and Seller shall provide to Buyer as soon as commercially reasonable after the Effective Date, a copy of any reserve studies and similar materials regarding Seller's obligation to fund budgets and reserves for any owners'

association, arising under any pertinent governing document and/or under NRS chapter 116. Seller makes no representation or warranty with respect to the accuracy or completeness of any of the Property Documents, except that Seller represents and warrants that the Property Documents include, to the best of Seller's actual knowledge, all such agreements, documents, and other information with respect to the Property in Seller's possession and control, and Seller has no actual knowledge that any of the Property Documents are inaccurate, incorrect, or misleading. As used in this Agreement the phrase "actual knowledge", "to Seller's knowledge," or words of similar meaning shall mean to the knowledge of Tom McManus and Steve Weddell.

6.03    Entry on Property.  Buyer shall have the right to enter upon the Property at all times during the Feasibility Period, subject to the terms of this Section 6.03. Prior to any entry by Buyer on the Property, Buyer shall provide Seller with a certificate of Buyer's liability insurance policy, which insurance shall name Seller as additional insured and evidence coverage in the amount of at least █████████████████████████ per occurrence against any loss, damage, or injury which may arise from or occur as a result of Buyer's entry upon the Property. Moreover, Buyer hereby agrees to indemnify, protect, defend and hold Seller and all portions of the Property free and harmless from and against any and all loss, cost, liability or expense (including reasonable attorneys' fees) caused by or arising from any entry by Buyer, its agents, employees, contractors or consultants, upon the Property, including any such entry made prior to the Effective Date, and from all mechanic's, materialmen's and other liens resulting from any such entry, whether such entry occurred prior to or during the continuance of this Escrow. Buyer shall promptly repair any damage to the Property caused by Buyer, its agents, employees, contractors, or consultants, including, with respect to any invasive testing of the Property, restoring the Property to as near its condition existing prior to such invasive testing as is reasonably possible. The provisions set forth in this Section 6.03 shall survive the Close of Escrow or any earlier termination of this Agreement for all purposes.

6.04    Tentative Map.  If necessary, Buyer and Seller will submit, during the Feasibility Period and at Buyer's cost, all necessary applications and materials with appropriate Government Authorities in order to obtain a tentative map of the Property for Buyer's proposed development of the Property with single family homes and related uses, with such densities and layout as Buyer shall determine (the "Tentative Map"). Seller shall cooperate with Buyer, at Buyer's cost, to take all actions and to make all filings and submissions necessary or appropriate, as determined by Buyer, to apply for, obtain, and support the applications for the Tentative Map, or any amendment, assignment, or update thereto, that may be required by Buyer.

## ARTICLE VII

## CONDITIONS TO CLOSE OF ESCROW

7.01    Conditions for the Benefit of Buyer.  Buyer's obligation to acquire the Property and to perform other obligations associated with the Close of Escrow shall be conditional and contingent upon the satisfaction, or waiver by Buyer, as and when required below, of each of the following conditions (collectively, the "Buyer Conditions"):

(a)    Initial Feasibility Review.

4

(i)    On or before 5:00 P.M. Nevada time on the date that is thirty (30) days after the Effective Date (the period until such date and time, the "Initial Feasibility Period"), Buyer shall have the right to review and approve the feasibility of Buyer's acquisition of the Property based on Buyer's inspection, review and analysis of the Property and Property Documents, including, without limitation, the following: (i) the physical condition of the Property, including, without limitation, any hazardous materials surveys, and any other surveys, inspections, tests, studies and investigations relating to physical, geological, engineering or environmental conditions of the Property that Buyer has elected to conduct, (ii) the feasibility of Buyer's acquisition of the Property based on its investigation, studies and reports (including, without limitation, market studies and appraisals), (iii) any preliminary development plan, general plan amendment or specific plan relating to or affecting the Property, (iv) any existing agreements or title matters relating to the Property, (v) any soils reports, and (vi) any other matters relating to or affecting the Property desired to be reviewed or approved by Buyer (the "Initial Feasibility Review").

(ii)    If Buyer approves of the Initial Feasibility Review, Buyer shall provide written notice of such approval to Seller on or before the expiration of the Feasibility Period. In the event Buyer fails to approve the feasibility of Buyer's acquisition of the Property by written notice to Seller on or before the expiration of the Initial Feasibility Period, Buyer shall be deemed to have disapproved the Initial Feasibility Review, in which event this Agreement shall automatically terminate, the Deposit shall be returned to Buyer, and neither Party shall have any further rights, duties or obligations under this Agreement, except those that by their express terms survive the termination of this Agreement. In the event Buyer delivers written notice of approval to Seller on or before the expiration of the Initial Feasibility Period, this Buyer Condition dealing with the Initial Feasibility Period shall be deemed satisfied.

(b)    Representations and Warranties. As of the pertinent Close of Escrow, the representations and warranties of Seller set forth in this Agreement, including without limitation those set forth in Article IX below, shall be true and correct.

(c)    Seller's Deliveries. Seller shall have deposited into Escrow all documents required to be deposited by Seller pursuant to this Agreement.

(d)    Title Insurance. Escrow Holder shall be committed to issue to Buyer a CLTA Standard Owner's Policy of Title Insurance, with liability limits equal to the Purchase Price, insuring fee title to the Property as being vested in Buyer, subject only to the Permitted Title Exceptions (the "Title Policy"). Notwithstanding the foregoing, Buyer shall have the right to obtain an ALTA Extended Coverage Owner's Policy of Title Insurance in lieu of the CLTA Standard Owner's Policy of Title Insurance, or any required title endorsement, provided Buyer shall pay all excess costs in connection therewith and the costs of obtaining of any necessary survey.

(e)    Bankruptcy. No action shall have been brought by or with respect to Seller under the United States Bankruptcy Code, or other body of law pertaining to creditors' rights.

5

944117.doc

(f)    CIC Approval.  The transactions embodied in this Agreement shall have been approved by Seller's corporate investment committee ("CIC Approval"), which CIC Approval shall be obtained and evidenced to Seller prior to the expiration of the Initial Feasibility Period.  Buyer's approval of its Initial Feasibility Review pursuant to Paragraph 7.01(a)(ii) shall also constitute irrefutable evidence of CIC Approval.

(g)    Material Adverse Change.  There shall be no material adverse change in the condition of the Property from its condition as of the end of the Feasibility Period.

7.02    Failure of Buyer Conditions.  If any of the Buyer Conditions has not been satisfied on or prior to the expiration of the applicable time period for satisfaction thereof, then Buyer shall have the right to (a) waive such Buyer Condition as a condition precedent to the Close of Escrow by written notice given to Seller and Escrow Holder prior to the Closing Date, or (b) terminate this Agreement by written notice of termination delivered to Seller and Escrow Holder.  In the event of the termination of this Agreement by reason of the failure of any of the Buyer Conditions, the Deposit shall be returned to Buyer, Sections 8.07 and 8.08 below shall apply with respect to Escrow cancellation, and neither Party shall have any further rights, duties or obligations under this Agreement, except those that by their express terms survive the termination of this Agreement.

7.03    Conditions for the Benefit of Seller.  Seller's obligation to sell the Property and the Close of Escrow shall be conditional and contingent upon the satisfaction, or waiver by Seller, as and when required below, of each of the following conditions, as applicable (collectively, the "Seller Conditions"):

(a)    Buyer's Deliveries.  Buyer shall have deposited into Escrow all funds and documents required to be deposited by Buyer pursuant to Section 8.05 below.

(b)    Representations and Warranties.  The representations and warranties of Buyer set forth in Article X below shall be true and correct in all material respects.

7.04    Failure of Seller Conditions.  If any Seller Condition has not been satisfied on or prior to the expiration of the applicable time period for satisfaction thereof, then Seller shall have the right to (a) waive such Seller Condition as a condition precedent by written notice given to Buyer and Escrow Holder prior to the Closing Date, or (b) terminate this Agreement by written Notice of termination delivered to Buyer and Escrow Holder.  In the event of the termination of this Agreement by reason of the material failure of a Seller Condition, Seller shall be entitled to retain the Deposit as liquidated damages pursuant to Article XI below, Sections 8.07 and 8.08 below shall apply with respect to Escrow cancellation, and neither Party shall have any further rights, duties or obligations under this Agreement, except those that by their express terms survive the termination of this Agreement.

7.05    Casualty Loss.  In the event that all or any material portion of the Property is destroyed or damaged by fire or other casualty prior to the ▆▆▆▆▆▆▆▆▆▆▆▆▆ restore any loss or damage caused thereby is greater than ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆ then Buyer may, at its option to be exercised within ten (10) days of Seller's notice of the occurrence of the damage or destruction, either terminate this Agreement or consummate

6

the purchase for the full Purchase Price as required by the terms hereof. If Buyer elects to terminate this Agreement or fails to give Seller notice within such ten (10) day period that Buyer will proceed with the purchase, then this Agreement shall terminate at the end of such ten (10) day period and the Deposit shall be returned to Buyer and neither party shall have any further rights or obligations hereunder except as expressly provided herein. If (a) a portion of the Property is destroyed or damaged by fire or other casualty prior to the Closing and the cost to repair or restore any loss or damage caused thereby is equal to or less than ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, or (b) Buyer elects within the aforesaid ten (10) day period to proceed with the purchase, then this Agreement shall not terminate and upon the Closing, there shall be a credit against the Purchase Price due hereunder equal to the amount of any insurance proceeds collected by Seller as a result of any such damage or destruction, plus the amount of any insurance deductible, less any sums expended by Seller toward the restoration or repair of the Property (but in no event shall the amount of such credit exceed the Purchase Price). If the proceeds have not been collected as of the Closing, then such proceeds shall be assigned to Buyer, except to the extent needed to reimburse Seller for sums expended to collect such proceeds or repair or restore the Property, and Buyer shall not receive any credit against the Purchase Price with respect to such proceeds; provided, that if the amount of proceeds subsequently received by Buyer exceeds the Purchase Price, then Buyer shall pay to Seller any such excess within ten (10) days after Buyer's receipt of such proceeds. The provisions of this Section 7.05 shall survive the Closing.

     7.06   Condemnation Loss. Seller shall give Buyer notice of the commencement of condemnation proceedings affecting any portion of the Property. Buyer shall be bound to purchase the Property without regard to the occurrence of such condemnation proceedings as long as such condemnation does not result in a taking of more than ▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ worth of value of the Property. If such condemnation does result in a taking of more than ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆of value of the Property, then Buyer may, at its option to be exercised within ten (10) days of Seller's notice of commencement of condemnation proceedings, either terminate this Agreement or consummate the purchase for the full Purchase Price as required by the terms hereof. If Buyer elects to terminate this Agreement or fails to give Seller notice within such ten (10) day period that Buyer will proceed with the purchase, then this Agreement shall terminate at the end of such ten (10) day period and the Deposit shall be returned to Buyer and neither party shall have any further rights or obligations hereunder except as specifically provided herein. If (a) such condemnation does not result in a taking of more than ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ in value of the Property, or (b) Buyer elects within the aforesaid ten (10) day period to proceed with the purchase, then this Agreement shall not terminate and upon the Closing, there shall be a credit against the Purchase Price due hereunder equal to the amount of any condemnation awards collected by Seller as a result of any such condemnation, less any sums expended by Seller toward the restoration or repair of the Property (but in no event shall the amount of such credit exceed the Purchase Price). If the condemnation awards have not been collected as of the Closing, then such awards shall be assigned to Buyer, except to the extent needed to reimburse Seller for sums expended to collect such awards or repair or restore the Property, and Buyer shall not receive any credit against the Purchase Price with respect to such awards; provided, that if the amount of awards subsequently received by Buyer exceeds the Purchase Price, then Buyer shall pay to Seller any such excess within ten (10) days after Buyer's receipt of such awards. The provisions of this Section 7.06 shall survive the Closing.

944117.doc

## ARTICLE VIII

### CLOSE OF ESCROW

8.01    Closing Date. Close of Escrow shall occur as and when provided in this Section 8.01. For purposes of this Agreement, the terms "Closing" and "Close of Escrow" shall mean and refer to the recordation in the Official Records of the County of the Grant Deed (as hereinafter defined) conveying title to the Property to Buyer. Subject to the satisfaction or waiver of the Buyer Conditions and Seller Conditions the Close of Escrow for shall take place no later than 5:00 p.m. Nevada time on December 21, 2012 (the "Outside Closing Date").

8.02    Deliveries by Seller to Escrow Holder. Seller hereby covenants and agrees to deliver to Escrow Holder, at least one (1) Business Day prior to the Closing, the following instruments and documents, the delivery of each of which shall be a condition to Close of Escrow for the benefit of Buyer:

(a)    Grant Deed. A "Grant, Bargain and Sale Deed" in the form of Exhibit "C" attached hereto and incorporated herein by this reference (the "Grant Deed"), duly executed and acknowledged by Seller;

(b)    Assignment and Bill of Sale. The "Assignment and Bill of Sale" in the form of Exhibit "D" attached hereto and incorporated herein by this reference, duly executed by Seller;

(c)    Non-Foreign Certificate. An affidavit satisfying the requirements of Section 1445 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder, duly executed by Seller (the "FIRPTA Certificate"); and

(d)    Assignment of Declarant's Rights. One or more assignments of declarant's rights, in the form that the parties may agree upon, in writing, during the Feasibility Period (the "Declarant Right Assignment").

8.03    Closing Costs. Seller shall pay Seller's portion of the escrow fees, prorations, and other charges relating to Closing, except that Seller may instruct Escrow Holder to deduct such closing costs and prorations from the amount due Seller at Close of Escrow.

8.04    Other Documents. All other documents required hereunder or otherwise reasonably required by Escrow Holder to be deposited by Seller to close the Escrow.

8.05    Deliveries by Buyer to Escrow Holder. Buyer hereby covenants and agrees to deliver to Escrow Holder, at least one (1) Business Day prior to Closing Date, the following funds, instruments and documents, the delivery of each of which shall be a condition to the Close of Escrow for the benefit of Seller:

(a)    Remaining Cash Payment. The Remaining Cash Payment, in immediately available funds.

944117.doc

(b)    <u>Closing Costs</u>.  All funds necessary to pay Buyer's share of the closing costs and prorations pursuant to this Agreement.

(c)    <u>Declarant Right Assignment</u>.  A counter-signed copy of the Declarant Right Assignment.

(d)    <u>Other Documents</u>.  All other documents required hereunder or otherwise reasonably required by Escrow Holder to be deposited by Buyer to close the Escrow.

8.06    <u>Disbursements and Other Actions by Escrow Holder</u>.  Upon the Close of Escrow, and when all required funds and documents have been deposited into Escrow by the appropriate parties, Escrow Holder shall promptly undertake all of the following, in the following order:

(a)    Cause the Declarant Right Assignment and Grant Deed, in that order (with documentary transfer tax information to be affixed after recording) to be recorded in the Official Records of the County;

(b)    Disburse all funds deposited with Escrow Holder by Buyer in payment of the Purchase Price and in payment of Buyer's share of any Escrow closing costs and prorations, as follows:

(i)    Deduct from the funds deposited with Escrow Holder by Buyer in payment of Buyer's share of any Escrow closing costs and prorations the amount of all such items chargeable to the account of Buyer hereunder, and return the excess of such funds, if any, to Buyer;

(ii)    Deduct from the Remaining Cash Payment all items chargeable to the account of Seller, including, without limitation, the amount of any deeds of trust, mechanic's liens or other monetary encumbrances to be paid by Seller at Closing, and Seller's share of any Escrow closing costs and prorations; and

(iii)    Disburse the remaining balance of the Remaining Cash Payment to Seller or as directed by Seller promptly upon the Close of Escrow.  Any funds deposited by or on behalf of Seller in excess of Seller's share of any Escrow closing costs and prorations shall be disbursed to Seller;

(c)    Deliver a conformed copy of the recorded Declarant Right Assignment and Grant Deed, the executed original of the Assignment and Bill of Sale, the executed original of the FIRPTA Certificate, and a copy of any other document delivered through Escrow to Buyer;

(d)    Deliver a conformed copy of the recorded Declarant Right Assignment and Grant Deed, a copy of the executed Assignment and Bill of Sale, a copy of the executed FIRPTA Certificate, and a copy of any other document delivered through Escrow to Seller; and

(e)    Cause the Title Policy to be delivered to Buyer or commit to deliver the same with reasonable promptness after the Closing.

9

8.07    Escrow Cancellation.  If Escrow is not in condition to close by the Outside Closing Date, Escrow Holder shall continue to comply with the instructions contained herein until a written demand has been made by any Party not in breach of its obligations under this Agreement for the cancellation of the Escrow.  Escrow Holder shall notify the other Party of any such demand.  In the event of any such demand, and without limiting the other rights and remedies of either Party, this Agreement shall terminate and the Escrow shall thereupon be canceled, and the provisions set forth in Section 8.08 below shall apply.

8.08    Escrow Cancellation Charges.  If the Close of Escrow fails to occur due to Seller's default, Seller shall pay all Escrow cancellation charges.  If the Close of Escrow fails to occur due to Buyer's default, Buyer shall pay all Escrow cancellation charges.  If the Close of Escrow fails to occur for any reason other than the foregoing, Buyer and Seller shall each pay one-half (1/2) of any Escrow cancellation charges.  "Escrow cancellation charges" means all fees, charges and expenses of Escrow Holder hereunder and all fees, charges and expenses related to the services of Escrow Holder as the title company in connection with the issuance of the Title Report and other title matters hereunder.

8.09    Costs and Prorations.  The following shall apply:

(a)    Escrow and Other Costs.  Subject to Section 8.08 above, Buyer and Seller shall each pay one-half (1/2) of (i) Escrow Holder's escrow fees, and (ii) any and all recording fees.  Seller shall pay the cost of Title Policy.  Buyer shall pay (i) the additional cost of any extended coverage (including without limitation any additional survey cost) ALTA, ALTA lender's or other title policy in excess of the cost of Title Policy, including the cost of all other title endorsements desired by Buyer, and (ii) any and all real property transfer taxes.  Buyer and Seller shall each bear their own respective legal and accounting costs, if any, outside of Escrow.  All other costs or expenses not otherwise provided for in this Agreement shall be apportioned or allocated between Buyer and Seller in the manner customary in the County.

(b)    Property Taxes and Assessments.  All non-delinquent general and special real property taxes, bonds and assessments, SID's, LID's (each as applicable) with respect to the Property, including, without limitation, any and all assessments with respect to any applicable association, landscape maintenance districts or assessment districts, shall be paid current at Closing by Seller and prorated through Escrow between Buyer and Seller as of the pertinent Close of Escrow based upon the latest available tax bills using customary escrow procedures.  Further, if the regular tax bill or bills for the Property for the fiscal year in which the Escrow closes are not available as of the Close of Escrow, Buyer and Seller shall re-prorate all such general and special real property taxes, bonds and assessments for the Property between themselves outside of Escrow based upon the then current fiscal year's regular tax bill or bills within thirty (30) days following the date such regular tax bill or bills are actually received by the parties.  This Section shall be interpreted broadly toward the end that any taxes, assessments, bond obligations, or other payment obligations accruing prior to Close of Escrow shall be the responsibility of Seller and any taxes, assessments, bond obligations, or other payment obligations accruing after Close of Escrow shall be the responsibility of Buyer.  The provisions set forth in this Section 8.09 shall survive Close of Escrow for all purposes.

10

8.10    Supplemental Property Taxes.  With respect to any supplemental taxes assessed against the Property, Buyer and Seller hereby agree between themselves that Seller shall be obligated to pay all such supplemental taxes assessed for any period prior to Close of Escrow, and Buyer shall be obligated to pay all such supplemental taxes assessed for any period from and after Close of Escrow.  The provisions set forth in this Section 8.10 shall survive Close of Escrow for all purposes.

8.11    IRS Reporting Responsibilities.  Any returns, statements or reports required to be filed under Section 6045(e) of the Internal Revenue Code of 1986, as amended (or any similar reports required by state or local law) shall be filed by Escrow Holder, including, without limitation, form 1099-S to be filed with the Internal Revenue Service.  In no event shall this Agreement be construed so as to require that such returns, reports or statements be filed by Buyer or Buyer's counsel, or by Seller or Seller's counsel.  Escrow Holder shall provide evidence to Buyer and Seller of its compliance with the provisions of this Section 8.11.

## ARTICLE IX

## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller hereby represents and warrants to Buyer, as of the Effective Date and Closing, as follows:

9.01    Power.  Seller has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to perform its obligations hereunder and to consummate the transaction contemplated hereby.

9.02    Title.  Seller solely holds title to the Property subject only to the matters shown on the Title Report to the best of Seller's actual knowledge.

9.03    Requisite Action.  All requisite action (corporate, partnership, limited liability company or otherwise) has been taken by Seller in connection with the entering into of this Agreement, the execution and delivery of the instruments referenced herein, and the consummation of the transactions contemplated hereby.

9.04    Authority.  The individuals executing this Agreement and the instruments referenced herein on behalf of Seller have the legal power, right and actual authority to bind Seller to the terms and conditions hereof and thereof.

9.05    Enforceability.  This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws or equitable principles affecting or limiting rights of contracting parties generally.

9.06    Litigation.  There are no pending or, to the best of Seller's actual knowledge, threatened lawsuits, arbitrations or other legal proceedings affecting or relating to the Property or that are of a nature to limit or restrict Seller's performance under this Agreement.

944117.doc                                                11

9.07    Condemnation.    There are no condemnation proceedings, eminent domain proceedings or similar actions or proceedings now pending against the Property, and Seller has no actual knowledge that any such proceedings or actions have been threatened against the Property.

9.08    Bankruptcy and Insolvency.    Seller is not insolvent, and has no present intention to file for protection under the United States Bankruptcy code or any other law pertaining to creditors' rights.  There is no set of circumstances that are likely to cause Seller to become insolvent or file for protection under the United States Bankruptcy Code or other law pertaining to creditors' rights, for at least the period ending ninety (90) days after the Closing Date.  To the best of Seller's actual knowledge, no third party has threatened to, and no third party intends to cause the filing of an involuntary bankruptcy or similar proceeding as to Seller.

9.09    Environmental.

(a)    Seller has not been notified by any Government Authority or third person of any pending claim that Seller may be a potentially responsible Person for environmental contamination or any release of Hazardous Material arising under Environmental Laws (an "Environmental Claim");

(b)    Seller in connection with the ownership of the Property has not entered into or agreed to any consent decree or order with respect to or affecting the Property relating to compliance with any Environmental Law or to investigation or cleanup of Hazardous Material under any Environmental Law;

(c)    To the best of Seller's actual knowledge, there are no aboveground or underground storage tanks located on, in or under any Property;

(d)    Seller has not transported or arranged for the treatment, storage, handling, disposal or transportation of any Hazardous Substance to the Property in violation of Environmental Law;

(e)    To the best of Seller's actual knowledge, Seller has provided to Buyer all environmental investigation reports, studies, audits or tests with respect to Property in Seller's possession or control; and

(f)    To the best of Seller's actual knowledge, no part of the Property is listed or, is proposed for listing, on the National Priorities List promulgated pursuant to CERCLA or on any similar state list.

As used herein, "Environmental Law" shall mean any law or order, including, without limitation, CERCLA and CERCIS, relating to the regulation or protection of human health, safety or the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes.

944117.doc                                                        12

As used herein, "Hazardous Material" shall mean (i) any petroleum or petroleum products, flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls (PCBs); (ii) any chemicals or other materials or substances that are now or hereafter become defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants" or words of similar import under any Environmental Law; and (iii) any other chemical or other material or substance, exposure to which is now or hereafter prohibited, limited or regulated by any Government Authority under any Environmental Law.

As used herein, "Government Authority" shall mean any court, tribunal, arbitrator, authority, administrative or other agency, commission, official or other authority or instrumentality of the United States or any state, county, city or other political subdivision.

9.10    Relationship Between the Parties.  The transactions set forth in this Agreement are entered into at arm's length and in good faith.  There is no formal or informal legal relationship as between Seller and Buyer except that of contracting parties.

9.11    NO FURTHER REPRESENTATIONS OR WARRANTIES.  EXCEPT FOR ANY SPECIFIC REPRESENTATION OR WARRANTY CONTAINED IN THIS ARTICLE VII OR THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY WHATSOEVER, AND BUYER IS TAKING TITLE TO THE PROPERTY IN AN "AS IS" CONDITION BASED SOLELY UPON ITS REVIEW OF THE PROPERTY DURING THE FEASIBILITY PERIOD. BUYER ACKNOWLEDGES THAT BUYER IS A SOPHISTICATED AND EXPERIENCED PURCHASER OF REAL ESTATE AND HAS CONSULTED WITH AND WILL CONSULT WITH LEGAL COUNSEL AND OTHER PROFESSIONALS TO ITS SATISFACTION IN CONNECTION WITH ITS ACQUISITION OF THE PROPERTY.

The foregoing representations and warranties of Seller and any other representations and warranties of Seller contained elsewhere in this Agreement shall be true and correct on and as of the Effective Date and shall be true and correct on and as of the date of Close of Escrow.  The foregoing representations and warranties shall survive for a period of twelve (12) months following the Close of Escrow, after which time such representations shall terminate and be of no further force or effect, except with respect to claims for which a notice of claim or notice of potential claim has been given by Buyer to Seller within such twelve (12) month period.

## ARTICLE X

## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer hereby represents and warrants to Seller as of the Effective Date and as of Closing, as follows:

944117.doc

10.01  <u>Power</u>.   Buyer has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, to perform its obligations hereunder, and to consummate the transaction contemplated hereby.

10.02  <u>Requisite Action</u>.   Subject to receiving the CIC Approval, all requisite action (corporate, partnership, limited liability company or otherwise) has been taken by Buyer in connection with the entering into of this Agreement, the execution and delivery of the instruments referenced herein, and the consummation of the transaction contemplated hereby.

10.03  <u>Authority</u>.   The individuals executing this Agreement and the instruments referenced herein on behalf of Buyer have the legal power, right and actual authority to bind Buyer to the terms and conditions hereof and thereof.

The foregoing representations and warranties of Buyer and any other representations and warranties of Buyer contained elsewhere in this Agreement shall be true and correct on and as of the date of this Agreement and shall be true and correct on and as of the date of the Close of Escrow.  The foregoing representations and warranties of Buyer shall survive the Close of Escrow for a period of twelve (12) months following such Close of Escrow, after which time such representations and warranties shall terminate and be of no further force or effect, except with respect to claims for which a notice of claim or notice of potential claim has been given by Seller to Buyer within such twelve (12) month period.

## ARTICLE XI

## <u>DEFAULT</u>

11.01  <u>Buyer's Default</u>.  IN THE EVENT ESCROW SHALL FAIL TO CLOSE BY REASON OF THE DEFAULT OF BUYER, BEING THE UNEXCUSED FAILURE OF BUYER TO PERFORM ITS OBLIGATIONS PURSUANT TO <u>SECTION 8.05</u>, SELLER MAY, AT SELLER'S OPTION, TERMINATE THIS AGREEMENT AND THE ESCROW BY GIVING WRITTEN NOTICE TO BUYER AND ESCROW HOLDER.  UPON RECEIPT OF SUCH NOTICE, THIS AGREEMENT SHALL TERMINATE AND THE ESCROW SHALL BE CANCELLED.  BUYER RECOGNIZES AND ACKNOWLEDGES THAT SELLER IS RELYING ON BUYER'S AGREEMENT TO PURCHASE THE PROPERTY, THAT SELLER, IN RELIANCE ON THIS AGREEMENT, INTENDS TO EXPEND SUBSTANTIAL SUMS OF MONEY RELATING TO THE PROPERTY, AND THAT SELLER WOULD OTHERWISE SUFFER SUBSTANTIAL DETRIMENT IN THE EVENT BUYER FAILS TO PERFORM BUYER'S OBLIGATIONS UNDER THIS AGREEMENT.   BUYER SPECIFICALLY AGREES THAT SELLER SHALL BE ENTITLED TO COMPENSATION FOR THE DETRIMENT THAT WOULD BE CAUSED TO SELLER BY REASON OF BUYER'S DEFAULT HEREUNDER.  HOWEVER, BOTH PARTIES AGREE THAT IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICAL TO ASCERTAIN THE EXTENT OF THE DETRIMENT AND DAMAGES CAUSED BY BUYER'S DEFAULT.  TO AVOID SUCH DIFFICULTIES, THE PARTIES AGREE THAT IF BUYER DEFAULTS IN ITS OBLIGATIONS UNDER <u>SECTION 8.05</u> OF THIS AGREEMENT, THROUGH NO FAULT OF SELLER AND NOT AS A RESULT OF AN UNFULFILLED CONDITION IN FAVOR OF BUYER, AND, BY REASON THEREOF, THE CLOSE OF ESCROW DOES NOT OCCUR

14

944117.doc

ON THE CLOSING DATE, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE DEPOSIT.  BOTH PARTIES AGREE THAT SUCH AMOUNT STATED AS LIQUIDATED DAMAGES IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES IN THAT CASE AND SUCH AMOUNT SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY IN LIEU OF ANY OTHER MONETARY OR OTHER RELIEF TO WHICH SELLER MAY OTHERWISE BE ENTITLED BY VIRTUE OF THIS AGREEMENT OR BY OPERATION OF LAW ARISING BY REASON OF BUYER'S DEFAULT.  IF SELLER IS ENTITLED TO LIQUIDATED DAMAGES UNDER THIS SECTION, BUYER AGREES TO PROMPTLY EXECUTE SUCH DOCUMENTS AS MAY BE REQUESTED BY ESCROW HOLDER FOR THE RELEASE OF THE DEPOSIT TO SELLER.  WITHOUT LIMITING ANYTHING CONTAINED IN THIS SECTION, IN THE EVENT SELLER COMPLIES WITH ITS OBLIGATIONS UNDER THIS AGREEMENT TO BE PERFORMED PRIOR TO THE CLOSE OF ESCROW, INCLUDING TIMELY DEPOSITING THOSE DOCUMENTS AND PURCHASE FUNDS INTO ESROW REQUIRED BY SECTION 8.05 ABOVE, AND THE BUYER'S CONDITIONS HAVE BEEN SATISFIED, BUT BUYER FAILS TO COMPLY WITH ITS OBLIGATIONS UNDER THIS AGREEMENT TO BE PERFORMED PRIOR TO THE CLOSE OF ESCROW, INCLUDING DEPOSITING THOSE DOCUMENTS AND FUNDS INTO ESCROW REQUIRED BY SECTION 8.05 ABOVE, ESCROW HOLDER SHALL IMMEDIATELY RELEASE THE DEPOSIT TO SELLER WITHOUT FURTHER INSTRUCTIONS FROM THE PARTIES.

Buyer's Initials _____        Seller's Initials _____

Notwithstanding the foregoing, nothing in this Section 11.01 shall limit the indemnity by Buyer set forth in Section 6.03 above, or any other provision that by its terms survives the termination of this Agreement.

11.02  Seller's Default.  If Seller defaults in the performance of any of its obligations hereunder and fails to consummate the sale of the Property pursuant to this Agreement for any reason other than (a) Buyer's default hereunder, (b) failure of a Seller's Condition, and/or (c) a termination hereof by Buyer or Seller in accordance with either Party's rights under this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy, to either (i) to terminate this Agreement and receive a return of the Deposit or (ii) to seek specific performance of this Agreement, provided that any action seeking specific performance shall be filed, if at all, within thirty (30) days after Seller's default.

## ARTICLE XII

## BROKER'S COMMISSION

Seller and Buyer each represents to the other that there are no brokerage commissions, finder's fees or other compensation of any kind due or owing to any person or entity in connection with the transactions covered by this Agreement.  Buyer and Seller may pay commissions at their sole discretion, however, each Party agrees to and does hereby indemnify and hold the other free and harmless from and against any and all costs, liabilities, losses,

944117.doc

15

damages, claims, causes of action or proceedings (including reasonable attorneys' fees) which may result from any broker, agent or finder, licensed or otherwise, claiming through, under or by reason of the conduct of the indemnifying Party in connection with this transaction.

## ARTICLE XIII

## POSSESSION

Possession of the Property shall be delivered to Buyer at the Close of Escrow, subject only to the Permitted Title Exceptions.

## ARTICLE XIV

## CONFIDENTIALITY

Buyer and Seller agree that, until the Close of Escrow occurs, the terms of this Agreement, and deliveries provided pursuant to this Agreement are confidential, and, accordingly, the Parties agree not to disclose the terms of this Agreement to any third party (other than to the Party's attorneys, consultants, partners, accountants, lenders, investors and advisors), or to use such except in conjunction with this Agreement, including any dispute pertaining to this Agreement, or as may be required by valid court order, without the other Party's consent.

## ARTICLE XV

## POST EXECUTION AND POST CLOSING OBLIGATIONS

Seller agrees, in favor of Buyer, (a) not to cause or allow any matter of title to become of record affecting any of the Property after the Effective Date, except as expressly permitted in this Agreement; (b) not to cause or permit any zoning change, use change, or other change in entitlement affecting the Property or any portion thereof from and after the Effective Date except as expressly permitted in this Agreement; (c) not to enter into any agreement with any party, including without limitation, any homeowners' association or similar entity, from and after the Effective Date, that may be binding upon the Property and/or upon Buyer upon taking title to the Property, (d) not to engage in any further development activities affecting the "Tuscany" development while this Agreement remains in effect, (e) not to cause or allow any action to be taken that would cause any of Seller's representations or warranties to become untrue or incorrect in any material respect, and (f) not to enter into any agreement for the sale, lease, or other disposition of any of the Property, whether as a "back up" basis or otherwise, while this Agreement remains in effect.

944117.doc

16

## ARTICLE XVI

## MISCELLANEOUS

16.01   Assignment.  Buyer shall not voluntarily or by operation of law assign or transfer any right, interest or obligation hereunder without Seller's express prior written consent, which consent may be given or withheld by Seller in its sole discretion.  Subject to the foregoing, and without limiting the restriction on assignment set forth above, each and all of the covenants and conditions of this Agreement shall inure to the benefit of and shall be binding upon the respective heirs, executors, administrators, successors and assigns of Buyer and Seller.  As used in this Section 15.01, the term "successors" shall refer to the successors to all or substantially all of the assets of a Party and to a Party's successors by merger or consolidation.  Notwithstanding the foregoing, Buyer shall have the right to transfer Buyer's rights and obligations under this Agreement without Seller's consent to a limited liability company, corporation, joint venture or partnership which satisfies all of the following requirements (a "Permitted Transferee"):   (i) Buyer, or a corporation or other entity controlling, controlled by or under common control with Buyer (a "Buyer Affiliate"), owns at least a fifty percent (50%) profit interest in the Permitted Transferee, (ii) Buyer or a Buyer Affiliate is responsible for the day-to-day management of the Permitted Transferee, (iii) the Permitted Transferee is required by the assignment documents to develop, construct, market and sell the Property, (iv) the Permitted Transferee assumes all obligations of Buyer under this Agreement, and (v) Buyer promptly notifies Seller in writing of such transfer and assumption of obligations and, upon Seller's request, provides Seller with copies of the operative documents that evidence compliance with the foregoing requirements.

16.02   Attorneys' Fees.  Should either Party institute any action or proceeding to enforce or interpret this Agreement or any portion hereof, for damages by reason of any alleged breach of this Agreement or of any provision hereof, or for a declaration of rights hereunder, the prevailing Party in any such action or proceeding shall be entitled to receive from the other Party all costs and expenses, including reasonable attorneys' and other fees, incurred by the prevailing Party in connection with such action or proceeding.  The term "attorneys' and other fees" shall mean and include attorneys' fees, accountants' fees, and any and all other similar fees incurred in connection with the action or proceeding and preparations therefor.  The term "action or proceeding" shall mean and include actions, proceedings, suits, arbitrations, appeals and other similar proceedings.

16.03   Notices.  All notices, requests, demands, and other communications required or permitted under this Agreement (each, a "Notice") shall be in writing (including telefax communications) and shall be (as elected by the person giving such notice) hand delivered by messenger or sent by overnight courier service, or sent by telefax transmission or sent by electronic mail (email), addressed as follows:

| | |
|---|---|
| If to Buyer: | Greystone Nevada, LLC |
| | 2490 Paseo Verde Parkway Suite 120 |
| | Henderson, Nevada 89074 |
| | Attention:    Jeremy Parness |
| | Email:         Jeremy.parness@lennar.com |
| | Telephone:   (702) 736-9100 |

17

944117.doc

|  | Facsimile: | (702) 736-9200 |
|---|---|---|

| With a copy to: | Cotton, Driggs, Walch,<br>Holley, Woloson & Thompson<br>400 South Fourth Street Suite 300<br>Las Vegas, Nevada 89101 |
|---|---|

Attention:     Dean Bennett
Email:         dbennett@nevadafirm.com
Telephone:     (702) 791-0308
Facsimile:     (702) 791-1912

If to Seller:     Commerce Associates, LLC
134 Lakes Blvd.
Dayton, NV 89403
Attention:     Tom McManus
Email:         tom.mcmanus@tginv.com
Telephone:     (775) 980-5000
Facsimile:     (775) _____

With a copy to:     Rice Silbey Reuther & Sullivan, LLP
3960 Howard Hughes Parkway, Suite 700
Las Vegas, Nevada  89169
Attention:     Stephen M. Rice, Esq.
Email: srice@rsrslaw.com
Telephone:     (702) 732-9099
               (702) 732-7110

If to Escrow Holder:  First American Title Insurance Company
National Commercial Services
2490 Paseo Verde Parkway, Suite 100
Henderson, NV 89074
Attention: Michele Seibold
Email: mseibold@firstam.com
Telephone:     (702) 855-0866
Facsimile:     (702) 289-5654

Each Notice shall be deemed given (i) on the date delivered if by personal delivery or by overnight courier service, (ii) on the date of transmission with confirmed good transmission if by telefax or electronic mail (email) or, if given after normal business hours, on the next business day, or (iii) upon receipt if by regular mail.  By giving to the other parties at least five (5) Business Days prior written notice, the parties to this Agreement and their respective successors and assigns shall have the right from time to time, and at any time during the term of this Agreement, to change their respective addresses and each shall have the right to specify as its address any other address within the State of Nevada.

944117.doc

16.04  Waiver, Consent and Remedies.  Either Party may specifically and expressly waive in writing any breach by the other Party of any provision of this Agreement, but no such waiver shall constitute a further or continuing waiver of any preceding or succeeding breach of the same or any other provision.  A waiving Party may at any time thereafter require further compliance by the other Party with any breach so waived.  The consent by one Party to any act by the other for which such consent was required shall not be deemed to imply consent or waiver of the necessity of obtaining such consent for the same or any similar acts in the future.  No waiver or consent shall be implied from silence or any failure of a Party to act, except as otherwise specified in this Agreement.

16.05  Survivability.  All covenants of Buyer or Seller which are intended hereunder to be performed, or must be performed, in whole or in part after the Closing, and all representations, warranties and indemnities by either Party to the other, shall survive the Closing, subject to any limitation on the period of time of such survival specified herein, and be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, but shall terminate as to any homeowner (but not as to Seller or Buyer with respect to any breach thereof) with respect to any portion of the Property improved with a dwelling unit upon the sale of such dwelling unit to such homeowner.

16.06  Further Documents and Acts.  Each of the Parties hereto agrees to cooperate in good faith with each other, and to execute and deliver such further documents and perform such other acts as may be reasonably necessary or appropriate to consummate and carry into effect the transactions contemplated under this Agreement.

16.07  Gender and Name.  In this Agreement (unless the context requires otherwise), the masculine, feminine and neuter genders and the singular and the plural shall be deemed to include one another, as appropriate.

16.08  Entire Agreement.  This Agreement and its exhibits constitute the final and complete expression of agreement between the Parties hereto pertaining to the subject matter hereof.  All prior agreements, representations, negotiations and understandings of the parties hereto, oral or written, express or implied, are hereby superseded and merged herein.

16.09  Captions.  The captions used herein are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions hereof.

16.10  Time of Essence.  Time is of the essence of every provision of this Agreement in which time is an element.

16.11  Governing Law.  This Agreement and the exhibits attached hereto shall be governed by and construed in accordance with the laws of the State of Nevada.  Exclusive venue and jurisdiction for any action or proceeding arising out of this Agreement shall lay in Clark County, Nevada.

16.12  Invalidity of Provision.  If any provision of this Agreement as applied to either Party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Agreement, the application of any such provision

944117.doc